# EXHIBIT B1

| | |
|---|---|
| **DISTRICT COURT, PITKIN COUNTY, COLORADO**<br>506 E. Main Street, Suite 300<br>Aspen, Colorado 81611 | DATE FILED: April 26, 2016 4:51 PM<br>FILING ID: 383AA6159164E<br>CASE NUMBER: 2015CV30160 |

**Plaintiffs**:  **RCHFU, LLC**, a Colorado limited liability company, **JEFFREY A. BAYER** and **GAIL L. BAYER, ROBERT BUZZETTI, JULIE C. CANNER, LEE JAMES CHIMERAKIS** and **THERESA ANN CHIMERAKIS** and **KEVIN CLARE** and **NANCY LYNNE SHUTE, TOBY L. CONE TRUST** and **TOBY L. CONE**, its Trustee, **RICHARD DAVIS** and **SHIRLEY J. DAVIS, CARL EICHSTAEDT III, JAMES RICHARD FARQUHAR** and **JENNIFER LUCILLE FARQUHAR, KOPPELMAN FAMILY TRUST** and **LARRY KOPPLEMAN,** its Trustee, **DAVID LANCASHIRE and STEPHEN ANDREWS, DAVID LANCASHIRE, BONNIE LIKOVER, CRAIG LIPTON, JEREMY LOWELL, D.D.S.** and **LORI LOWELL, EDWARD P. MEYERSON** and **ANDREA C. MEYERSON, JERRY M. NOWELL TRUST** and **JERRY M. NOWELL**, its Trustee**,** and **DEE ANN DAVIS NOWELL TRUST** and **AND DEE ANN DAVIS NOWELL**, its Trustee, **THOMAS M. PROSE REVOCABLE LIVING TRUST** and **THOMAS M. PROSE, M.D.,** its Trustee, **CASEY M. ROGERS** and **COURTNEY S. ROGERS, ROBERT A. SKLAR TRUST,  AND ROBERT A SKLAR,** its Trustee, **C. RICHARD STASNEY, M.D.** and **SUSAN P. STASNEY, C. RICHARD STASNEY, M.D. TSE HOLDINGS, LLC,** a Colorado limited liability company**, STEPHEN WEINSTEIN** and **BRENDA WEINSTEIN, JACK ZEMER**, on behalf of themselves and all others similarly situated

v.

**Defendants**:  **MARRIOTT VACATIONS WORLDWIDE CORPORATION,** a Delaware corporation**, MARRIOTT OWNERSHIP RESORTS, INC., d/b/a MARRIOTT VACATION CLUB INTERNATIONAL,** a Delaware corporation**; ASPEN HIGHLANDS CONDOMINIUM ASSOCIATION,** a Colorado non-profit corporation, **RITZ-CARLTON**

**COURT USE ONLY**

_____

**Case Number: 2015 CV 30160**

**Division: 5**

**MANAGEMENT COMPANY, LLC,** a Delaware limited liability company, **COBALT TRAVEL COMPANY, LLC; INC.,** a Delaware limited liability company, and **THE LION & CROWN TRAVEL CO., LLC, a** Delaware limited liability company

*Attorneys for Plaintiffs*
Michael J. Reiser, # 16161
LAW OFFICE OF MICHAEL J. REISER
961 Ygnacio Valley Road
Walnut Creek, CA  94596
Telephone: (925) 256-0400
Facsimile:  (925) 476-0304
E-mail: reiserlaw@gmail.com

Matthew C. Ferguson, A.R. #25687
THE MATTHEW C. FERGUSON LAW FIRM, P.C.
119 South Spring Street, Suite 201
Aspen, Colorado 81611
Telephone: (970) 925-6288
Facsimile:  (970) 925-2273
E-mail: matt@matthewfergusonlaw.com

Michael L. Schrag (*Pro Hac Vice to be filed*)
GIBBS LAW GROUP LLP
1 Kaiser Plaza, Suite 1125
Oakland, CA 94612
Telephone (510) 350-9718
Facsimile: (510) 350-9701
E-mail: mls@classlawgroup.com

Tyler R. Meade (CA SBN 160838)
(*Pro Hac Vice to be filed*)
THE MEADE FIRM P.C.
1816 Fifth Street
Berkeley, CA 94710
Telephone (510) 843-3670
Facsimile: (510) 843-3679
E-mail: tyler@meadefirm.com

**FIRST AMENDED AND SUPPLEMENTAL CLASS ACTION COMPLAINT AND JURY DEMAND**

*RCHFU, LLC et al. v. Marriott Vacations Worldwide Corporation et al.*
Pitkin County District Court Case No. 2015 CV 30160
**FIRST AMENDED AND SUPPLEMENTAL CLASS ACTION COMPLAINT AND JURY DEMAND**
Page **3** of **30**

Plaintiffs, as listed in the caption and in paragraphs 13 through 42, *infra.,* by and through their counsel, for their Complaint and Jury Demand, state and allege as follows:

# I. INTRODUCTION AND BACKGROUND

1.      This lawsuit concerns Defendants' unlawful acts that decimated the value of deeded 1/12 fractional interests that Plaintiffs and Class Members purchased in the Ritz-Carlton Club Aspen Highlands, located in Aspen, Colorado. Over the last few years, Defendants, including Defendant Marriott Vacations Worldwide Corporation ("MVW") and its subsidiaries and affiliates, have damaged Plaintiffs and the Class and unjustly enriched themselves by violating (or aiding and abetting in, or conspiring to violate) various fiduciary duties owed by certain Defendants to Class Members.  These violations undercut the essential features of the fractional interests sold to Class Members.

2.      In the 1980s, Marriott International, Inc. established Defendant Marriott Ownership Resorts Inc. d.b.a. Marriott Vacation Club International ("MVCI") to run Marriott's timeshare operations.  MVCI originally sold timeshare in one-week intervals. In 1984, Marriott's Monarch on Hilton Head Island became the first MVCI resort.  By 2009, MCVI had grown to over 400,000 timeshare owners who had purchased one-week interval timeshares.

3.      In 1999, MVCI introduced "The Ritz-Carlton Club" (also known as "The Ritz-Carlton Destination Club") as a luxury alternative to its "Marriott Vacation Club" timeshare product, which it describes as its "upscale" product line. The Ritz-Carlton Club sold deeded 1/12 fractional ownership interests.   The luxury nature, longer use intervals[1], and exclusivity distinguished the Ritz Carlton Club fractional interests from MVCI's "Marriott Vacation Club" product line.   Based on these distinctions, The Ritz Carlton Club interests were substantially more expensive.

4.      In 2001, the Ritz-Carlton Club, Aspen Highlands was established as the first fractional ownership property for The Ritz-Carlton Club brand. Thereafter, between 2001 and 2012, Defendants developed and sold approximately 3,200 of the deeded 1/12 luxury fractional interests under The Ritz Carlton Club brand at the following nine locations: Aspen Highlands, Colorado; Bachelor Gulch, Colorado; Jupiter, Florida; North Lake Tahoe, California; St. Thomas, U.S.V.I.; San Francisco, California; Vail, Colorado; Abaco, Bahamas; and Maui, Hawaii.

5.      In 2010 MCVI began converting legacy "week owners" of Marriott Vacation Club timeshares to a "points-based product" wherein purchasers bought interests in a land trust

---

[1]   The Ritz-Carlton Club 1/12 fractionals sold at Ritz-Carlton, Aspen Highlands entitled purchasers to 4 weeks of use per year.  The other Ritz-Carlton Clubs sold 1/12 fractionals entitling three weeks of use, with the remaining 16 weeks used by members on a "space available" basis. Use of the "space available" weeks was given to members pursuant to the rules established in the Ritz-Carlton Membership Program.

("MVC Trust") set up by MVCI to own its resorts.  By the end of 2011, many of the Marriott Vacation Club's over 400,000 owners at over 50 Marriott Vacation Club resorts worldwide were utilizing points purchased from MVCI to trade for use of Marriott Vacation Club resorts. Further, by the end of 2011, Marriott Vacation Club points were available for sale on the secondary market for a fraction of the cost at which MVCI sold them "new." In addition, Marriott Vacation Club Points were available to "rent" from other members, enabling them to upgrade to stays at more desirable resorts than their "home resorts."

6.      Between 2001 and 2012, approximately 800 Class Members, including Plaintiffs, paid premium prices, ranging from $200,000 to $400,000, for their deeded 1/12 fractional interest at the Ritz Carlton Club in Aspen Highlands, (known as "Tourist Accommodation Units" or "Fractional Units"). These Fractional Units were sold based on Defendants' claims that the Fractional Units were superior to MVCI's other timeshare offerings in that the Ritz Carlton Club Aspen Highlands would be exclusive and operate for the use, benefit and enjoyment of Ritz Carlton Club Members as well as their family and guests "like a second home," supporting the expensive purchase prices for the Fractional Units as compared to other MVCI timeshare offerings. Defendants further stated that the Fractional Units were transferrable like any other form of deeded real estate.

7.      In November 2011, Marriott International, Inc. "spun-off" Defendant MVW as a separately traded public company (NYSE: VAC), and MVW became the exclusive developer and manager of vacation ownership and related products under the Marriott brand and the exclusive developer of vacation ownership and related products under the Ritz-Carlton brand.

8.      In its first Annual Report filed following the spin-off (dated March 21, 2012), MVW revealed its intent to abandon the upscale Ritz-Carlton product line, stating: "we have significantly scaled back our development of Luxury segment vacation ownership products. We do not have any Luxury segment projects under construction nor do we have any current plans for new luxury development.  While we will continue to sell existing Luxury segment vacation ownership products, we also expect to evaluate opportunities for bulk sales of finished inventory and disposition of undeveloped land."

9.      Beginning in 2013 and continuing through the 2014, Defendants MVW, Ritz-Carlton Management Company, LLC ("RC Management"), The Cobalt Travel Company, LLC ("Cobalt") and the other Defendants used their complete control over Defendant Aspen Highlands Condominium Association, Inc., ("Association") as well as their control over the use and operation of Plaintiffs Fractional Units, to eliminate the very features for which Class Members paid premium prices, thereby destroying the value of the Fractional Units sold to Plaintiffs and Class Members. By these actions, and in breach of their fiduciary duties owed as a result of the control maintained over Plaintiffs Fractional Units and the fact that Defendants were agents or sub-agents of Plaintiffs and Class Members, Defendants profited at Plaintiffs and the Class Members' expense. Even though Defendants actions destroyed the value of the Fractional Units, Plaintiffs and Class Members continue to pay steadily *increasing* annual dues, compounding the harm.  A large percentage of these dues go directly to Defendants in the form

of lucrative "management fees" and other "reimbursements" supposedly incurred by Defendants under the management contracts, including payroll related costs. These management fees and reimbursements are paid solely by Fractional Unit owners at the Ritz Carlton Club Aspen Highlands to the Defendants regardless of usage or occupancy.

10.     Due to Defendants' conduct described herein, the Fractional Units owned by Plaintiffs and Class Members are now worth less than 20% of the original purchase prices, while, on the other hand, Defendants, including MVW; MVCI; RC Management; Cobalt; and The Lion & Crown Travel Co., LLC ("L&C") have been unjustly enriched. Due to defendants' actions, MVC members can now enjoy the benefits and use of the Ritz-Carlton Club Aspen Highlands property for a fraction of the cost that Plaintiffs and Class Members paid. For example, a MVC member can buy (or simply rent) MVC points sufficient to stay at the Ritz Carlton Club Aspen Highlands for approximately twenty percent of what it costs Class Members, who paid $200-400k for substantially similar rights and benefits.

## II.     JURISDICTION AND VENUE

11.     This Court has jurisdiction over the subject matter at issue because this is a civil action for damages and/or equitable relief.  Colo. Const. Art. VI, § 9(1).

12.      Venue is proper in this Court under C.R.C.P. 98(a) and (c) as this action arises from the sale of Fractional Units located in Pitkin County, Colorado, and certain of Defendants' wrongful and illegal conduct was committed in Pitkin County. In addition, jurisdiction and venue are proper in this court pursuant to the terms of the uniform Purchase Contract and other agreements or instruments executed in connection therewith.

## III. PARTIES

### A.     Plaintiffs

13.     Plaintiff **RCHFU, LLC** is organized under the laws of Colorado. Its only members, Jennifer Kaplan and Alexander H. Busansky, are citizens of California. Pursuant to a uniform Purchase Contract Ms. Kaplan and Mr. Busansky signed in 2003, they paid $218,500 to the seller Ritz Carlton Development Company and obtained title to Residence Unit No. 12 consisting of an undivided 1/12 interest in Residence No. 8314 of Aspen Highlands Condominiums, according to the Declaration of Condominium for Aspen Highlands Condominiums, recorded January 11, 2001, Reception No. 450454 (referred to herein as "Aspen Highlands Condominiums" or "Ritz Aspen Highlands").

14.     Pursuant to an Assignment of Claims, Ms. Kaplan and Mr. Busansky transferred all of their claims and all interests in claims arising out of ownership or under the Purchase Contract or otherwise and pertaining to the undivided 1/12 interest in Residence Unit No. 8314 at the Ritz Aspen Highlands to RCHFU, LLC.

15.     Plaintiffs **Jeffrey A. Bayer** and **Gail L. Bayer** (collectively, the "Bayer Plaintiffs") are citizens of the State of Alabama. Pursuant to a uniform Purchase Contract signed in 2001, the Bayer Plaintiffs paid $180,000.00 to the seller Ritz Carlton Development Company, and obtained title to Residence Unit No. 9 consisting of an undivided 1/12 interest in Residence No. 8308 of the Aspen Highlands Condominiums.

16.     Plaintiff **Robert Buzzetti** is a citizen of the State of Florida. Pursuant to a uniform Purchase Contract signed in 2002, Mr. Buzzetti paid $320,000.00 to the seller Ritz Carlton Development Company, and obtained title to Residence Unit No. 4 consisting of an undivided 1/12 interest in Residence No. 8203 of the Aspen Highlands Condominiums.

17.     Plaintiff **Julie C. Canner** is a citizen of the State of Michigan. Pursuant to a uniform Purchase Contract signed in 2001, Ms. Canner paid $170,000.00 to the seller Ritz Carlton Development Company, and obtained title to Residence Unit No. 13 consisting of an undivided 1/12 interest in Residence No. 8402 of the Aspen Highlands Condominiums.

18.     Plaintiffs **Lee James Chimerakis** and **Theresa Ann Chimerakis** (collectively, the "Chimerakis Plaintiffs") are citizens of the State of Florida. Pursuant to a uniform Purchase Contract signed in 2008, the Chimerakis Plaintiffs paid $310,000.00 to the seller Ritz Carlton Development Company, and obtained title to Residence Unit No. 5 consisting of an undivided 1/12 interest in Residence No. 2405 of the Aspen Highlands Condominiums.

19.     Plaintiffs **Kevin Clare** and **Nancy Lynne Shute** (collectively, the "Clare Plaintiffs")are citizens of the State of California. Pursuant to a uniform Purchase Contract signed in 2005, the Clare Plaintiffs paid $266,000.00 to the seller Ritz Carlton Development Company, and obtained title to Residence Unit No. 5 consisting of an undivided 1/12 interest in Residence No. 2206 of the Aspen Highlands Condominiums.

20.     Plaintiffs **Toby L. Cone Trustee** is a citizen of the State of Connecticut and Trustee of the **Toby L. Cone Trust** (collectively, the "Cone Plaintiffs"). Pursuant to a uniform Purchase Contract signed in 2003, the Cone Plaintiffs paid $220,000.00 to the seller Ritz Carlton Development Company, and obtained title to Residence Unit No. 10 consisting of an undivided 1/12 interest in Residence No. 8406 of the Aspen Highlands Condominiums.

21.     Plaintiffs **Richard Davis** and **Shirley J. Davis** (collectively, the "Davis Plaintiffs") are citizens of the State of Texas. Pursuant to a uniform Purchase Contract signed in 2002, the Davis Plaintiffs paid $290,000.00 to the seller Ritz Carlton Development Company, and obtained title to Residence Unit No. 10 consisting of an undivided 1/12 interest in Residence No. 8105 of the Aspen Highlands Condominiums.

22.     Plaintiff **Carl Eichstaedt III** is a citizen of the State of California Pursuant to a uniform Purchase Contract signed in 2004, the Eichstaedt Plaintiff paid $238,000.00 to the seller Ritz Carlton Development Company, and obtained title to Residence Unit No. 7 consisting of an undivided 1/12 interest in Residence No. 2204 of the Aspen Highlands Condominiums.

23.     Plaintiffs **James Richard Farquhar** and **Jennifer Lucille Farquhar** are citizens of Australia. Pursuant to a uniform Purchase Contract signed in 2008, the Farquhar Plaintiffs paid $210,000.00 to the seller Ritz Carlton Development Company, and obtained title to Residence Unit No. 5 consisting of an undivided 1/12 interest in Residence No. 2302 of the Aspen Highlands Condominiums.

24.     Plaintiff **Larry Koppleman** is a citizen of the State of California and Trustee of the **Koppleman Family Trust** (collectively, the "Koppleman Plaintiffs"). Pursuant to a uniform Purchase Contract signed in 2001, the Koppleman Plaintiffs paid $310,000.00 to the seller Ritz Carlton Development Company and obtained title to Residence Unit No. 6 consisting of an undivided 1/12 interest in Residence No. 8205 of the Aspen Highlands Condominiums.

25.     Additionally, pursuant to a uniform Purchase Contract signed in 2001, **the Koppleman Plaintiffs** paid $171,000.00 to the seller Ritz Carlton Development Company and obtained title to Residence Unit No. 1 consisting of an undivided 1/12 interest in Residence No. 8404 of the Aspen Highlands Condominiums.

26.     Additionally, pursuant to a uniform Purchase Contract signed in 2002, **the Koppleman Plaintiffs** paid $295,000.00 to the seller Ritz Carlton Development Company and obtained title to Residence Unit No. 2 consisting of an undivided 1/12 interest in Residence No. 8305 of the Aspen Highlands Condominiums.

27.     Plaintiffs **David Lancashire** and **Stephen Andrews** (collectively, "Lancashire/Andrews") are citizens of the State of Texas. Pursuant to a uniform Purchase Contract signed in 2003, Lancashire/Andrews paid $200,000 to the seller Ritz Carlton Development Company and obtained title to Residence Unit No. 6 consisting of an undivided 1/12 interest in Residence No. 8403 of the Aspen Highlands Condominiums.

28.     Plaintiff **David Lancashire** is a citizen of the State of Texas. Pursuant to a uniform Purchase Contract signed in 2008, Mr. Lancashire paid $230,000 to the seller Ritz Carlton Development Company and obtained title to Residence Unit No. 4 consisting of an undivided 1/12 interest in Residence No. 8105 of the Aspen Highlands Condominiums.

29.     Plaintiff **Bonnie Likover** is a citizen of the State of Texas. Pursuant to a uniform Purchase Contract signed in 2008, Ms Likover paid $173,500.00 to the seller Ritz Carlton Development Company and obtained title to Residence Unit No. 12 consisting of an undivided 1/12 interest in Residence No. 8202 of the Aspen Highlands Condominiums.

30.     Plaintiff **Craig Lipton** is a citizen of the State of California. Pursuant to a uniform Purchase Contract signed in 2007, Mr. Lipton paid $180,000.00 to the seller Ritz Carlton Development Company, and obtained title to Residence Unit No. 7 consisting of an undivided 1/12 interest in Residence No. 8311 of the Aspen Highlands Condominiums.

31.     Plaintiffs **Jeremy Lowell, D.D.S.** and **Lori Lowell** (collectively, the "Lowell Plaintiffs") are citizens of the State of Colorado. Pursuant to a uniform Purchase Contract signed in 2005, the Lowell Plaintiffs paid $250,000.00 to the seller Ritz Carlton Development Company, and obtained title to Residence Unit No. 9 consisting of an undivided 1/12 interest in Residence No. 2204 of the Aspen Highlands Condominiums.

32.     Plaintiffs **Edward P. Meyerson** and **Andrea C. Meyerson** (collectively, the "Meyerson Plaintiffs") are citizens of the State of Alabama. Pursuant to a uniform Purchase Contract signed in 2004, the Meyerson Plaintiffs paid $234,000.00 to the seller Ritz Carlton Development Company and obtained title to Residence Unit No. 12 consisting of an undivided 1/12 interest in Residence No. 8302 of the Aspen Highlands Condominiums.

33.     Plaintiffs **Jerry M. Nowell** and **Dee Ann Davis Nowell** are citizens of the State of Arizona and as Trustees of the **Jerry M. Nowell Trust** and the **Dee Ann Davis Nowell Trust**, respectively (collectively, the "Nowell Plaintiffs"). Pursuant to a uniform Purchase Contract signed in 2004, the Nowell Plaintiffs paid $210,000.00 to the seller Ritz Carlton Development Company, and obtained title to Residence Unit No. 10 consisting of an undivided 1/12 interest in Residence No. 8106 of the Aspen Highlands Condominiums.

34.     Plaintiff **Thomas M. Prose, M.D.** is a citizen of the State of Michigan and Trustee of the **Thomas M. Prose Revocable Living Trust**, (collectively, the "Prose Plaintiffs"). Pursuant to a uniform Purchase Contract signed in 2008, the Prose Plaintiffs paid $369,000.00 to the seller Ritz Carlton Development Company, and obtained title to two undivided 1/12 interests in Residence No. 2401 of the Aspen Highlands Condominiums. The interests are described in weeks.

35.     Additionally, pursuant to a uniform Purchase Contract signed in 2009, the **Prose Plaintiffs** paid $120,650.00 to the seller Ritz Carlton Development Company, and obtained title to an undivided 1/12 interest in Residence No. 2304 of the Aspen Highlands Condominiums. The interest is described in weeks.

36.     Plaintiffs **Case M. Rogers** and **Courtney S. Rogers** are citizens of the State of North Carolina. Pursuant to a uniform Purchase Contract signed in 2003, the Rogers Plaintiffs paid $220,000.00 to the seller Ritz Carlton Development Company, and obtained title to Residence Unit No. 4 consisting of an undivided 1/12 interest in Residence No. 8106 of the Aspen Highlands Condominiums.

37.     Plaintiff **Robert A. Sklar** is a citizen of the State of Michigan and Trustee of the **Robert A. Sklar Trust** (collectively, the "Sklar Plaintiffs"). Pursuant to a uniform Purchase Contract signed in 2012, Mr. Sklar paid $80,000.00 to the seller Ritz Carlton Development Company, and obtained title to Residence Unit No. 10 consisting of an undivided 1/12 interest in Residence No. 8204 of the Aspen Highlands Condominiums.

38.     Plaintiffs **C. Richard Stasney** and **Susan P. Stasney** (collectively, the "Stasney Plaintiffs") are citizens of the State of Texas. Pursuant to a uniform Purchase Contract signed in 2001, the Stasney Plaintiffs paid $300,000.00 to the seller Ritz Carlton Development Company and obtained title to Residence Unit No. 11 consisting of an undivided 1/12 interest in Residence No. 8205 of Aspen Highlands Condominiums.

39.     Additionally, pursuant to a uniform Purchase Contract signed in 2011, **C. Richard Stasney** paid $261,000.00 to the seller Ritz Carlton Development Company and obtained title to an undivided 1/12 interest in Residence No. 2305 of the Aspen Highlands Condominiums. The interest is described in weeks.

40.     Plaintiff **TSE Holding, LLC,** is a Colorado limited liability company, in good standing. Thomas Engelman is a citizen of the State of Colorado and a manager and member. TSE Holding, LLC paid $11,000.00 on the secondary market to purchase and obtain title of an undivided 1/12 interest in Residence No. 2304 of the Aspen Highlands Condominiums. The interest is described in weeks.

41.     Plaintiffs **Stephen Weinstein** and **Brenda Weinstein** (collectively, the "Weinstein Plaintiffs") are citizens of the State of Florida. Pursuant to a uniform Purchase Contract signed in 2005, the Weinstein Plaintiffs paid $227,000.00 to the seller Ritz Carlton Development Company and obtained title to Residence Unit No. 11 consisting of an undivided 1/12 interest in Residence No. 8314 of Aspen Highlands Condominiums.

42.     Plaintiff **Jack Zemer** is a citizen of the State of California. Pursuant to a uniform Purchase Contract signed in 2001, Mr. Zemer paid $230,000.00 to the seller Ritz Carlton Development Company, and obtained title to Residence Unit No. 11 consisting of an undivided 1/12 interest in Residence No. 8405 of Aspen Highlands Condominiums.

## B.     Defendants

43.     Defendant **Marriott Vacations Worldwide Corporation** ("MVW") is a publicly traded Delaware corporation with its principal place of business at 6649 Westwood Boulevard, Orlando, Florida. MVW is the parent and/or an affiliate company of the other Defendants and was involved in and responsible for the wrongful conduct alleged herein. Marriott Vacations Worldwide Corporation is sometimes referred to herein as Marriott.

44.     Defendant **Marriott Ownership Resorts, Inc., d.b.a. Marriott Vacation Club International** ("MVCI") is a Delaware corporation, and a wholly owned subsidiary of Marriott. Its principal place of business is at 6649 Westwood Boulevard, Orlando, Florida, and it is authorized to do business in Colorado. MVCI was involved in and responsible for the wrongful conduct alleged herein.

45.     Defendant **Aspen Highlands Condominium Association, Inc.** ("Association") is a Colorado non-profit corporation that serves as the official "Owners Association" for buyers of Fractional Units, including Class Members.

46.     Defendant **Ritz-Carlton Management Company, LLC** ("RC Management") is another wholly owned MVW subsidiary, and a Delaware limited liability company. Defendant RC Management has a principal place of business at 6649 Westwood Boulevard, Suite 500, Orlando, Florida, and is authorized to do business in Colorado.

47.     Defendant **The Cobalt Travel Company, LLC** ("Cobalt") (formerly known as the Ritz-Carlton Travel Company, LLC) is a Delaware limited liability company, has a principal place of business at 6649 Westwood Boulevard, Suite 500, Orlando, Florida, and is authorized to do business in Colorado.

48.     Defendant **The Lion & Crown Travel Co., LLC** ("L&C") is a Delaware limited liability company formed in 2008 and is authorized to do business in Colorado. L&C is a wholly owned subsidiary of RC Development.

## IV. SOURCE OF FIDUCIARY DUTIES

49.     There are multiple sources of fiduciary duties arising out of the documents governing the management, operation and use of the Ritz-Carlton Club, Aspen Highlands, including the Articles of Incorporation of Aspen Highlands Condominium Association, Inc., ("Articles"), the Declaration of Condominium for Aspen Highlands Condominium ("Declaration"), The Ritz-Carleton Management Company, LLC Management Agreement (Management Agreement), and the Ritz-Carlton Club Membership Program Affiliation Agreement, ("Affiliation Agreement").

### A. Aspen Highlands Condominium Association

50.     The Association was created on December 9, 1999 upon filing with the Colorado Secretary of State the Articles of Incorporation of Aspen Highlands Condominium Association, Inc. Amended and Restated Articles of Incorporation of Aspen Highlands Condominium Association, Inc. were filed with the Colorado Secretary of State on November 2, 2000.

51.     According to the Amended Articles: "The primary purpose for which the Association is organized is to manage, administer, operate and maintain" the Aspen Highlands Condominiums.

52.     Pursuant to Article V. of the Articles, the powers of the Association, include: "To operate, manage, administer, insure, repair, replace, reconstruct and improve the Condominium" (Article 5.1); "To operate, manage and administer the Plan of Fractional Ownership that may be created in the Condominium by the Declarant" (Article 5.2); "To contract for the management of the Condominium and to delegate to such contractor all powers and duties of the Association

except such as are specifically required by the various Association Documents or Colorado law to have approval of the board of directors or the members of the Association" (Article 5.7); and, "To enter into agreements providing for the participation of Owners of Fractional Interests in those units committed to a Plan of Fractional Ownership in an exchange system or network of resorts allowing for reciprocal use of resort properties by owners of fractional ownership interests in the Condominium" (Article 5.11).

53.     Defendant Association owed and owes fiduciary duties to buyers of Fractional Units, including Plaintiffs and Class Members, including but not limited to a duty of loyalty and duty to enforce restrictive covenants set forth in the Declaration of Condominium for Aspen Highlands Condominiums.[2]   The scope of this fiduciary duty extends beyond the norm for condominium associations based on the delegation and assumption of authority over not just the common areas, but also the fractional units themselves.

## B.  Ritz-Carlton Management Company

54.     On January 12, 2001, Defendants Association and RC Management, entered into a written agreement, designated "Management Agreement." Pursuant to paragraph 2, captioned "Appointment and Acceptance of Agency," the Association employed RC Management "to act on behalf of the Association **and its members** as the exclusive managing entity and to manage the daily affairs of the Condominium **and the (Fractional Ownership Interest) Plan**, and (RC Management) hereby agrees to so act." (Emphasis added.) A copy of the Management Agreement is attached hereto as **EXHIBIT A.**

55.     Pursuant to paragraph 4 of the Management Agreement, captioned "Delegation of Authority," Association delegates to RC Management "all of the power and authority of (Association) to the extent necessary to perform (RC Management's) duties and obligations under this agreement." In addition, paragraph 4 provides: **"(RC Management), on behalf of and at the expense of (Association), to the exclusion of all other persons including the (Association) and its members, shall have all the powers and duties of the Executive Board as set forth in the Declaration and the bylaws of the (Association)** (except such thereof as are specifically required to be exercised by its directors or members), and it shall perform, by way of illustration and not limitation, (the services set forth in paragraphs 4(A) through 4(V) . . . ." (Emphasis Added.)

56.     Paragraph 4(A) of the Management Agreement provides RC Management with the exclusive authority to "Hire, pay, supervise and discharge all persons necessary to be employed in order to properly manage, maintain, administer and operate the Condominium and (Fractional Ownership Interest) Plan."

---

[2] **See**, *Woodward v. Board of Directors of Tamarron Association of Condominium Owners, Inc.*, 155 P.3d 621,624 (Colo. App. 2007); *Colorado Homes, Ltd. v. Loerch-Wilson*, 43 P.3d 718, 722 (Colo. App. 2001).

*RCHFU, LLC et al. v. Marriott Vacations Worldwide Corporation et al.*
Pitkin County District Court Case No. 2015 CV 30160
**FIRST AMENDED AND SUPPLEMENTAL CLASS ACTION COMPLAINT AND JURY DEMAND**
Page **12** of **30**

57.     Paragraph 4(F) of the Management Agreement provides RC Management with the exclusive authority to "Maintain the (Association's) financial record book, accounts and other records, and as necessary, issue certificate of account to Owners and their Mortgagees . . . ."

58.     Paragraph 4(H) of the Management Agreement provides RC Management with the exclusive authority to "Prepare the itemized annual budget for the (Association) or revisions to the budget, or a combination thereof, (that RC Management) determines necessary for submission to the Executive Board."

59.     Paragraph 4(I) of the Management Agreement provides RC Management with the "authority and responsibility to maintain and replace the personal property within the Common Elements and the (Fractional Units), and to determine the maintenance fee, proration of taxes, and other common expenses applicable to those Common Elements and (Fractional Units), as defined in and provided for in the Declaration.

60.     Paragraph 4(J) of the Management Agreement provides RC Management with the exclusive authority to "Receive and deposit all funds collected from the Owners, or otherwise accruing to the Association, in a special account or accounts of (RC Management) . . . ."

61.     Paragraph 4(L) of the Management Agreement provides RC Management "shall have sole authority to promulgate and amend rules and regulations for the (Fractional Units) and Limited Common Elements of the (Fractional Units) subject to the (Fractional Unit) Directors to revise, repeal or modify such amended rules and regulations and subject to the provisions of the Declaration."

62.     Paragraph 4(N) of the Management Agreement provides RC Management with the authority to "Retain and employ such professionals and such experts whose services may be reasonably required to effectively perform its duties and exercise its powers hereunder, and to employ same on such basis as it deems appropriate."

63.     Perhaps most importantly, Paragraph 4(S) of the Management Agreement provides RC Management with the authority to "Engage a Program Manager through an affiliation agreement, who shall manage and administer the reservation procedures and exchange program for the Ritz-Carlton Club Membership Program (the 'Membership Program') through which Owners of Residence Interests reserve the use of accommodations at a Club as defined in and pursuant to The Ritz-Carlton Club Membership Program Reservation Procedures ('Reservation Procedures'). The Program Manager shall have the broadest possible delegation of authority regarding administration of the Reservation Procedures . . . . RC Management on behalf of (the Association shall assess the Owners of (Fractional Units) the reasonable cost (as determined by the Program Manager) of operating such Reservation Procedures, which cost shall be included as part of Club dues."

64.     Paragraph 14 of the Management Agreement provides that RC Management "shall receive an annual net fee, free from charges and expenses" of Six Hundred Dollars ($600) per Residence Interest from the Owners of the (Fractional Units) . . ."

65.     Based upon these and other terms of the Management Agreement and also by operation of law, RC Management is the agent of the Association and Fractional Unit Owners, including Plaintiffs and Class Members, and as such, owes the Association, Plaintiffs and Class Members fiduciary duties, including the duties of loyalty, avoiding self-dealing, and to enforce the restrictive covenants set forth in the Declaration of Condominium for Aspen Highlands. These fiduciary duties also flow from the fact RC Management was given control over the Fractional Units.

66.     Based upon the high degree of control over Plaintiffs' and class members' Fractional Units arising from its authority as set forth in the Management Agreement, RC Management owes Plaintiffs and Class Members fiduciary duties, including a duty of loyalty, duty to avoid self-dealing, and duty to enforce the restrictive covenants set forth in the Declaration of Condominium for Aspen Highlands.

## C.  The Cobalt Travel Company

67.     Defendant Cobalt entered into a four party agreement titled "The Ritz-Carlton Club Membership Program Affiliation Agreement" ("Affiliation Agreement") with the Ritz-Carlton Development Company ("RC Development") (the seller of the fractional interests at issue, a wholly owned subsidiary of MVW, and the sole manager and member of Defendants RC Management and Cobalt) and Defendants RC Management and the Association. Pursuant to the Affiliation Agreement, the Ritz-Carlton Club, Aspen Highlands and the purchasers of Fractional Units including Plaintiffs and Class Members, became affiliated with and members of the Ritz-Carlton Membership Program.

68.     Paragraph 1.2 of the Affiliation Agreement provided: "By acceptance of a conveyance of a Residence Interest at the Club . . . each Member is deemed to have consented to the terms and conditions of this Agreement and to have further consented to the appointment of the Members Association as the authorized representative to act on behalf of the Members with respect to the provisions of this Agreement. Whenever the Members Association's acknowledgment, consent, understanding and/or agreement is stated or implied in this Agreement, such acknowledgment, consent, understanding and/or agreement shall be deemed to also have been given by the Board of Directors, if applicable, and each Member.

69.     Pursuant to the terms of the Affiliation Agreement, Defendant Cobalt is the Program Manager of the Ritz-Carlton Club Membership Program and also operates the reservation system through which Class Members obtain use of their allotted number of days at the Ritz Aspen Highlands and obtain access to the sister Ritz-Carlton Destination Clubs in the Ritz-Carlton Club Membership Program. The Affiliation Agreement provides: "The Program Manager may, in its sole discretion, elect to affiliate other locations with the Membership

Program as Member Clubs or Associated Clubs from time to time. *Neither the Developer, Members Association, nor Club Manager shall be entitled to participate in or consent to the Program Manager's decision in this regard."* (Emphasis added.) A copy of the Affiliation Agreement is attached hereto as **EXHIBIT B**.

70.     Based upon the terms of the Management Agreement and the Affiliation Agreement, Cobalt is the agent or subagent of the Association and Fractional Unit owners, including Plaintiffs and Class Members, and as such, owes the Association, Plaintiffs and Class Members fiduciary duties, including a duty of loyalty and duty to avoid self-dealing.

71.     Based upon the high degree of control over Plaintiffs' and Class Members' Fractional Units arising from its authority as set forth in the Affiliation Agreement, Cobalt owes Plaintiffs and Class Members fiduciary duties, including a duty of loyalty and duty to avoid self-dealing.

72.     As described herein, Defendant Cobalt, in violation of its fiduciary duties to Plaintiffs and Class Members, and aided and abetted in said fiduciary duty violations by the other Defendants, entered into an Affiliation Agreement with L&C, which allows some or all of the over 400,000 members of Defendant MVW's Marriott Vacation Club who are able to acquire sufficient points in the Marriott Vacation Club Destinations system, to use the Fractional Units at the Ritz-Aspen Highlands. These breaches of fiduciary duty caused a great diminution in the value of Plaintiffs and Class Members' Fractional Units, and unjustly enriched the other Defendants, including MVW, MVCI, RC Management and Cobalt at the expense of Plaintiffs and Class Members.

73.     MVW directly, and indirectly through wholly owned subsidiaries, exerted control over Ritz-Carlton Club, Aspen Highlands and the other Defendants, because, *inter alia*: 1) MVW's lawyers drafted the Management Agreement that provided its wholly owned subsidiary, RC Management full control of the operation of the Association and the Association Board at the Ritz-Carlton Club, Aspen Highlands; 2) RC Management and Cobalt were shell companies serviced by persons technically employed by MVW and/or MVCI; 3) the costs and revenues generated in connection with Ritz-Carlton Club, Aspen Highlands by MVW, MVCI, RC Management and Cobalt were accounted for in MVW's consolidated financials; 4) employees providing services to MVCI, RC Management, and Cobalt were treated as MVW employees.

74.     Each and all of the Defendants (directly and/or indirectly through individual agents, representatives, employees, principals, officers, directors and members) (a) actively or passively participated in the conduct, acts and omissions alleged herein, (b) materially assisted, aided, abetted and/or conspired with one or more other Defendants in committing the conduct, acts, and omissions alleged herein, (c) purposely, knowingly, recklessly, or negligently planned, directed, implemented, furthered, and/or consented to conduct, acts and omissions alleged herein, and/or (d) is directly, vicariously, jointly, and/or severally liable for the conduct, acts, and omissions alleged herein.

*RCHFU, LLC et al. v. Marriott Vacations Worldwide Corporation et al.*
Pitkin County District Court Case No. 2015 CV 30160
**FIRST AMENDED AND SUPPLEMENTAL CLASS ACTION COMPLAINT AND JURY DEMAND**
Page **15** of **30**

75.     Each of the Defendants are (a) are the agents, representatives, alter egos, and/or instrumentalities of their respective principals or controlling entities, (b) have interlocking or overlapping directors and/or officers with their respective principals or controlling entities, (c) are undercapitalized and/or spurious or disregarded corporate form, (d) and for which "piercing the corporate veil" is or may be necessary and appropriate to prevent injustice and inequity to Plaintiffs and Class Members.

76.     On July 17, 2012, Ms. Eveleen Babich, General Manager of Defendant Cobalt wrote Plaintiffs and Class Members a letter (on Ritz Carlton Destination Club letterhead), stating that "Based on the Ritz-Carlton Destination Club member feedback, additional benefits and experiences will be available through a new affiliation with Marriott Vacation Club Destinations . . . Affiliation will extend to you the opportunity to deposit your Reserved Allocation on an annual basis. Once you deposit, the following will be available for you: . . . Secure any of the 51 worldwide Marriott Vacation Club Resorts . . ." A copy of the July 17, 2012 Letter from Eveleen Babich is attached hereto as **EXHIBIT C**.

77.     Eveleen Babich's July 17, 2012 letter did not specify whether this proposed affiliation would allow the 400,000 Marriott Vacation Club members to access the Ritz Carlton Club locations and in fact assured Class Members that "nothing about the Home Club Membership…has changed" as a result of this affiliation.

78.     This announcement proposing a new affiliation agreement with Defendant MVW's Marriott Vacations Club Destinations program generated extreme concern amongst the various "member controlled" Boards of Directors of the various Ritz-Carlton Destination Clubs. For instance, in a letter dated August 3, 2012, the Association Board of the Ritz Carlton Club-St. Thomas wrote to its members:

> We have been in frequent communications with each other and the Presidents of the other RCDC Clubs since this announcement. Our general but preliminary consensus regarding the 'evolution' of the RCDC brand as described in Eveleen Babich's letter of July 17th is that we are concerned that this may not be an enhancement to our Membership Interests. We all, as members, invested in the Ritz-Carlton brand!

A copy of the August 3, 2012 Letter from the association board of the Ritz Carlton Club-St. Thomas is attached hereto as **EXHIBIT D**.

79.     On August 10, 2012, the Association Board of the Ritz Carlton Club-Jupiter wrote to its members:

> We were disappointed as to how Ritz Carlton, Marriott Vacations Worldwide Corporation and Cobalt Travel Company, LLC ('RCDC Parties') separately and collectively chose to characterize these matters they have defined as the "evolution of the RCDC brand." No input from

your Board of Directors or, to our knowledge, any of the other RCDC Club Boards was ever solicited by these companies while they determined these significant changes to the RCDC system in which we all own a Membership Interest.

A copy of the August 10, 2012 Letter from the association board of the Ritz Carlton Club-St. Thomas is attached hereto as **EXHIBIT E**.[3]

80.      On August 17, 2012, Lee Cunningham, the Executive Vice President and Chief Operating Officer of Defendant MVCW, wrote a letter (on Ritz Carlton Destination Club letterhead) to all Ritz Carlton Destination Club Members, including Class Members, "to provide you further information regarding certain changes announced on July 17th to the Lion and Crown Travel Company and The Ritz-Carlton Destination Club system" and to assure the Ritz-Carlton Vacation Club members that "nothing… has changed or will change as a result of the announcement." The August 17th notice also stated that the original affiliation notice on July 17th had generated questions from the members, which would be addressed in an upcoming Webinar on August 28, 2012. A copy of the August 17, 2012 Letter from Lee Cunningham is attached hereto as **EXHIBIT F**.

81.      In the meantime, Defendant Association wrote a letter to Plaintiffs and Class Members on August 17, 2012, notifying them that the Association board was working with MVW executives to better understand the proposed affiliation. The letter states that "[f]rankly, it has been our position that our members bought into a Ritz-Carlton brand and do not want that brand diluted. The Board has concerns that … the nature of our club will change by opening the club to MVW timeshare/points members who have a much lower cost of entry."

82.      The August 17th letter from the Association states that "[t]he Board is also concerned that there are specific provisions in our Association documents which the Board believes does not permit MVW to conduct a separate program as they currently intend." A copy of the August 17, 2012 Letter from the Association is attached hereto as **EXHIBIT G**.

83.       One of the provisions that the Association was referring to is Section 19.8 of the Declaration of Condominium for Aspen Highlands Condominiums, entitled "Limit on Timesharing," which states as follows:

Each Owner acknowledges that Declarant intends to create Fractional Ownership Interests with respect to Tourist Accommodation Units within Aspen Highlands Condominiums and Aspen Highlands Village.  Other

---

[3]   Ultimately the announced intention to affiliate the Marriot Vacation Club Destinations program, with its over 400,000 members, caused the Condominium Association Boards of Ritz-Bachelor Gulch and Ritz-Jupiter Clubs to put a vote to their members as to whether to terminate their management agreements with RC Management and Cobalt. In 2013 and 2014, respectively, both of these clubs' memberships voted to terminate the management agreements with Defendant RC Management, and both clubs have since left the system.

*RCHFU, LLC et al. v. Marriott Vacations Worldwide Corporation et al.*
Pitkin County District Court Case No. 2015 CV 30160
**FIRST AMENDED AND SUPPLEMENTAL CLASS ACTION COMPLAINT AND JURY DEMAND**
Page **17** of **30**

than the right of Declarant" (sic) or a Successor Declarant and their respective officers, agents, employees, and assigns to create Fractional Ownership Interests in accordance with Article 23 of this Declaration (specifically including, without limitation, the Plan of Fractional Ownership), ***no Unit shall be used for the operation of a timesharing, fraction-sharing, interval ownership, private residence club, membership program, vacation club, exchange network or system or similar program whereby the right to exclusive use of the Unit is alternated or scheduled among participants in the program on a fixed or floating time schedule over a period of years whether by written, recorded agreement or otherwise.*** (Emphasis added.)

A copy of the Declaration of Condominium for Aspen Highlands Condominiums is attached hereto as **EXHIBIT H**.[4]

84.    On August 30, 2012, the Ritz-Carlton Destination Club released a new "Frequently Asked Questions for Members" pamphlet to Plaintiffs and Class Members, which stated that "Marriott Vacations Worldwide intends to sell most of its remaining unsold Ritz-Carlton Club inventory through the Marriott Vacation Club Destinations program."[5] A copy of the August 30, 2012 pamphlet "Frequently Asked Questions for Members" is attached hereto as **EXHIBIT I**.

85.    The August 30, 2012 "Frequently Asked Questions for Members" also states: "Given the current state of the luxury fractional market and the market's unlikely recovery in the near term, selling this inventory through the Marriott Vacation Club Destinations program relieves the significant financial burden of this unsold inventory in a balanced way . . ." and "Marriott Vacations Worldwide is paying club dues on these unsold fractions in excess of eleven million dollars a year, plus continues to subsidize the operating costs at a number of clubs for an additional four million dollars a year."

86.    On October 2, 2012, the Association issued another letter to Plaintiffs and Class Members that purported to update them on the discussions with MVW on this pressing issue. The letter revealed, *inter alia*, that **"MVW has been advised that it is the view of the Board and its counsel, that in order for MVW to move towards the points based system it is planning on, that the underlying Association documents would need to be revised as it is in our view that the documents prohibit what MVW is planning."** A copy of the October 2, 2012 Letter from the Association is attached hereto as **EXHIBIT J**. (Emphasis added.)

---

[4]  The Declaration for Aspen Highlands Village which created the "Master Association", and which also govern the Class Members' Fractional Units, sets forth a similar use restriction, labeled "No Timeshare" at Section 8.25.

[5]  The August 28, 2012 pamphlet stated: "Marriott Vacations Worldwide is paying club dues on these unsold fractions in excess of eleven million dollars a year, plus continues to subsidize the operating costs at a number of clubs for an additional four million dollars a year."

87.     While the Association was conducting its discussions with MVW, on November 5, 2012, the President of the Board of the Ritz-Carlton Club, Bachelor Gulch, Michael Mullenix, wrote a letter to Mr. Steven Weisz, President and CEO of MVW and Lee Cunningham, Executive Vice President and COO of MVW, stating:

> I am writing on behalf of the Board of Directors to continue our dialogue about the proposed affiliation of Ritz Carlton Bachelor Gulch Members with Lion and Crown in 2013 and beyond and to request that such proposed affiliation be canceled. At a minimum, the proposed affiliation should be delayed until January 1, 2014 and the status quo maintained until that time . . . The Board and membership of the Club have serious concerns that the Club's affiliation with Lion and Crown is contrary to the Club's governing documents and, in any event, will have permanent negative impacts on the club, including most importantly to the value of our residence units…

88.     The letter from the Board of the Ritz-Bachelor Club, Gulch to Steven Weisz and Lee Cunningham ended as follows: "Please advise no later than Thursday, November 15, 2012, whether MVW will agree to this requested delay of affiliation. If MVW will not voluntarily agree to this delay and insists on permitting affiliation with Lion and Crown now, the Board may have no alternative but to enforce the Club Declarations prohibition on timesharing through formal legal action. We do not believe that should be necessary given our aligned interests on this issue." A copy of the November 5, 2012 Letter from the Board of the Ritz-Bachelor Gulch to Steven Weisz and Lee Cunningham is attached hereto as **EXHIBIT K**.

89.     Between April 5, 2013 and April 8, 2013, the Association wrote letters to all Plaintiffs and Class Members that:

> Positive discussions were held today between the Board of Directors and representatives of the Ritz/Marriott including Lee Cunningham, COO of the Ritz-Carlton Destination Club. ***Ritz Marriott representatives agree that unless a majority of Aspen Highlands Members (excluding the Marriott interests and Members not in good standing) vote in favor of doing so, Ritz/Marriott will not include Aspen Highlands in the Marriott Vacation Club affiliation/exchange/point program.*** Discussions continue on other important issues affecting Aspen Highlands, including alternatives for divesting the current inventory of Aspen Highlands units owned by Ritz/Marriott. ***Such inventory will not be sold through the Marriott Vacation Club trust without an additional vote of the Members.***

Copies of letters dated April 5, 2013 and April 8, 2013 from the Association to Class Members are attached hereto as **EXHIBIT L**.  (Emphasis added)

90.     No vote of the Members of Ritz-Aspen Highlands, including by Plaintiffs or Class Members, in favor of allowing the Defendants to include Ritz-Aspen Highlands in the Marriott Vacation Club affiliation/exchange/point program ever occurred. Likewise, no vote of the Members of Ritz-Aspen Highlands in favor of allowing the Defendants to sell their unsold inventory of Aspen Highlands units through the Marriott Vacation Club trust ever occurred.

91.     However, in April 2014, Defendant Association, acting in concert with and/or aided and abetted by the other Defendants, including MVW, RC Management, and Cobalt, unilaterally decided to include the Ritz-Carlton Club, Aspen Highlands Fractional Plan in the Marriott Vacation Club affiliation/exchange/points program; and agreed and conspired with Defendants to have the Association breach its fiduciary duties to Plaintiffs and Class Members by, *inter alia*, 1) agreeing to act and acting in a disloyal manner towards Plaintiffs and Class Members by favoring the interests of the Defendants over the interests of the Plaintiffs and Class Members by including the Ritz-Carlton Club, Aspen Highlands Fractional Plan in the Marriott Vacation Club affiliation/exchange/points program; and 2) agreeing not to and/or failing to enforce the Declaration, including the covenant against further timesharing, as set forth in paragraph 19.8 of the Declaration.

92.     In April 2014, the Association wrote a letter to all Plaintiffs and Class Members updating them on "your Board of Directors' efforts on your behalf . . ." On page 2 of the letter, the Board dropped a bombshell under the heading "Marriott Vacation Club Destination Exchange Program: In response to the Members' wishes - both past and present, the Board has crafted a very unique program which would allow Aspen Club Members to exchange a week of their reserved allocated time for points within the Marriott Vacation Club Destinations exchange program." A copy of the April 2014 Letter from the Association to Plaintiffs and Class Members is attached hereto as **EXHIBIT M.**

93.     Plaintiffs allege that sometime in 2014, in contravention of the promises made to Class Members on April 5 and April 8, 2013 (that unless a majority of Aspen Highlands Members vote in favor of doing so, Ritz/Marriott will not include Aspen Highlands in the Marriott Vacation Club affiliation/exchange/point program), Defendants MVW, RC Management and Cobalt, pursuant to an agreement it made with Defendant Association, affiliated the Ritz Carlton Club, Aspen Highlands with Marriott Vacation Club affiliation/exchange/points program.

94.     Plaintiffs allege on information and belief that sometime in 2014, in contravention of the promises made to Class Members on April 5, 2013 (that Defendants' unsold inventory of fractionals "will not be sold through the Marriott Vacation Club trust without an additional vote of the Members"), Defendant MVW, pursuant to an agreement it made with Defendant Association not to enforce Section 19.8 of Declaration of Condominium for Aspen Highlands Condominiums, sold a portion of its remaining unsold Ritz-Carlton Club inventory to the Marriott Vacation Club trust.

95.     The actions of the Defendants described above were knowingly made in violation of their respective duties of loyalty owed to Plaintiffs and Class Members, as well as in violation of Section 19.8 and other provisions of the Declaration of Condominium for Aspen Highlands Condominiums, as well as the promises made to Plaintiffs and Class Members between April 5 and April 8, 2013 that unless a majority of Aspen Highlands Fractional Unit owners and members vote in favor of doing so, Defendants would not include Ritz Carlton Club, Aspen Highlands or the Plaintiffs' and Class Members' Fractional Units in the Marriott Vacation Club affiliation/exchange/point program. The actions described herein violated and/or aided and abetted the violation of Defendants' fiduciary duties owed to Plaintiffs' and Class Members.

96.     Now, approximately 400,000 Marriott Vacation Club members — who paid a small fraction of the purchase prices and who pay approximately a third of the annual fees — have access to luxury resorts that were formerly only available to Plaintiffs and Class Members. Defendants have derived huge profits and/or cost savings through this affiliation, while devaluing Plaintiffs' vested property interests.  Worse yet, Plaintiffs have had to pay, in the form of inflated annual maintenance fees, for the increased use and wear and tear resulting from the opening of the Ritz Carlton Club, Aspen Highlands to Marriott Vacation Club Members.

## V.     CLASS ACTION ALLEGATIONS

97.     Pursuant to Rule 23(b) of the Colorado Rules of Civil Procedure, Plaintiffs bring this action on behalf of themselves and the following proposed class:

> All entities and individuals (including their assignees) who, at any time from January 1, 2001 to the present, purchased a 1/12 fractional interest in the Ritz-Carlton Aspen Highlands development.

98.     Excluded from the proposed class are Marriott Vacations Worldwide Corporation; Marriott Ownership Resorts, Inc., d/b/a Marriott Vacation Club International; Ritz Carlton Development Company, Inc.; Ritz-Carlton Management Company, LLC; Cobalt Travel Company, LLC; Aspen Highlands Condominium Association, Inc.; Aspen Highlands Tourist Accommodation Board; The Lion & Crown Travel Co., LLC; any affiliate, parent, or subsidiary of any Defendant or Ritz Carlton Development Company, Inc.; any entity in which any Defendant or Ritz Carlton Development Company, Inc. has a controlling interest; any officer, director, or employee of any Defendant or Ritz Carlton Development Company, Inc.; any successor or assign of any Defendant or Ritz Carlton Development Company, Inc.; anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse; and members of the judge's staff.

99.     Members of the proposed class are readily ascertainable because the class definition is based upon objective criteria.

100.     **Numerosity.** Defendants sold over 800 1/12 fractional interests in the Ritz-Carlton Aspen Highlands development from 2001 to the present. Members of the proposed class

are thus too numerous to practically join in a single action. Class members may be notified of the pendency of this action by mail, supplemented by published notice (if deemed necessary or appropriate by the Court).

101.   **Commonality and Predominance.** Common questions of law and fact exist as to all proposed class members and predominate over questions affecting only individual class members. These common questions include whether:

a.   Defendants Association, RC Management, and Cobalt owed fiduciary duties to Class Members;

b.   Defendants Association, RC Management, and Cobalt were the agents and/or sub-agents of Plaintiffs and Class Members as a result of certain written agreements and/or by operation of law

c.   Defendants, including MVW, MVCI, Association, RC Management and Cobalt, aided and abetted any breaches of fiduciary duties owed to Class Members;

d.   Defendants, including MVW, MVCI, Association RC Management and Cobalt conspired with other Defendants to breach fiduciary duties owed to Class Members;

e.   Any breaches of fiduciary duty, or aiding and abetting such breaches, caused a diminution in value of the Class Members' Fractional Units and if so, by how much;

f.   Any Defendant was unjustly enriched by the conduct described herein, and if so, by how much;

g.   Plaintiffs and Class Members are entitled to damages, including compensatory or statutory, and the amount of such damages;

h.   Plaintiffs and Class Members are entitled to equitable relief, including restitution or injunctive relief;

i.   Plaintiffs and Class Members are entitled to an award of reasonable attorneys' fees, pre-judgment and post-judgment interest, and/or costs of suit.

102.   **Typicality.** Plaintiffs' claims are typical of the claims of the proposed class. Plaintiffs and the members of the proposed class all purchased 1/12 fractional interests in the Ritz-Carlton Aspen Highlands development, giving rise to substantially the same claims.

103.   **Adequacy.** Plaintiffs are adequate representatives of the proposed class because their interests do not conflict with the interests of the members of the proposed class they seeks

*RCHFU, LLC et al. v. Marriott Vacations Worldwide Corporation et al.*
Pitkin County District Court Case No. 2015 CV 30160
**FIRST AMENDED AND SUPPLEMENTAL CLASS ACTION COMPLAINT AND JURY DEMAND**
Page **22** of **30**

to represent. Plaintiffs have retained counsel competent and experienced in complex class action litigation, and will prosecute this action vigorously on class members' behalf.

104.    **Superiority.** A class action is superior to other available means for the fair and efficient adjudication of this dispute. The injury suffered by each Class Member, while meaningful on an individual basis, is not of such magnitude as to make the prosecution of individual actions against Defendants economically feasible. Even if Class Members themselves could afford such individualized litigation, overseeing hundreds of individual actions would overburden the court system.. In addition to the burden and expense of managing many individual actions arising from Defendants' conduct, individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties and the court system presented by the legal and factual issues of the case. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

105.    In the alternative, the proposed class may be certified because:

a.    the prosecution of separate actions by the individual members of the proposed class would create a risk of inconsistent adjudications, which could establish incompatible standards of conduct for Defendants;

b.    the prosecution of individual actions could result in adjudications, which as a practical matter, would be dispositive of the interests of non-party class members or which would substantially impair their ability to protect their interests; and

## VI.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### (Breach of Fiduciary Duty Against Association, RC Management, and Cobalt)

106.    Plaintiffs and Class Members incorporate by reference the allegations contained in the preceding and subsequent paragraphs, as if fully set forth in this cause of action.

107.    Defendants Association, RC Management, and Cobalt owed fiduciary duties to Plaintiffs and Class Members arising both out of their agency (or sub-agency) relationship with the Plaintiffs and Class Members, as well as by virtue of said Defendants' high degree of control over Plaintiffs' and Class Members' Fractional Units and had a duty to act with the utmost good faith and loyalty in the best interests of Plaintiffs and Class Members.

108.    These Defendants breached this duty by advancing their own interests and the interests of third parties, including the interests of MVW and MVCI, at the expense of Plaintiffs' and Class Members' interests, by agreeing to act and acting in a disloyal manner towards Plaintiffs and Class Members and by favoring the interests of the Defendants over the interests of

the Plaintiffs and Class Members through inclusion of the Ritz-Carlton Club, Aspen Highlands Fractional Plan and the Plaintiffs' and Class Members' Fractional Units in the Marriott Vacation Club affiliation/exchange/points program; and 2) agreeing not to and failing to enforce the Declaration, including the covenant against further timesharing, as set forth in paragraph 19.8 of the Declaration and/or by failing to act as a reasonably prudent fiduciary would have acted under the same or similar circumstances.

109.    Defendants Association and RC Management owed Plaintiffs and Class Members a fiduciary duty that required them to, among other things, enforce the restrictive covenants of the Declaration, including Section 19.8 thereof, as well as section 8.25 of the Declaration for Aspen Highlands Village. These Defendants failed to enforce Section 19.8, Section 8.25 and other provisions, thereby breaching their fiduciary duty, by: (1) failing to enforce these restrictive covenant against timesharing, as set forth in Section 19.8 and Section 8.25; and/or (2) imposing and/or conspiring with the other Defendants to impose the affiliation of the Marriott Vacation Club affiliation/exchange/points program with the Ritz-Carlton Club, Aspen Highlands Fractional Plan and the Plaintiffs' and Class Members/ Fractional Units,

110.    Defendants Association, RC Management and Cobalt also owed Plaintiffs and Class Members a fiduciary duty of loyalty arising both out of their respective agency (or sub-agency) relationship with the Plaintiffs and Class Members, as well as by virtue of their high degree of control over Plaintiffs' and Class Members' Fractional Units and Cobalt's exclusive control of Plaintiffs and Class Members' rights under the appurtenant Ritz-Carlton Club Membership Program.

111.    The fiduciary duties described herein required that Defendants Association, RC Management and Cobalt act in the best interests of Plaintiffs and Class Members, which includes refraining from any actions that would unjustly enrich themselves or their affiliates at the expense of the value of the Fractional Units that Plaintiffs and Class Members purchased. These Defendants breached that duty by, *inter alia*, imposing, allowing and/or conspiring with the other Defendants to impose the affiliation of the Marriott Vacation Club affiliation/exchange/points program with the Ritz-Carlton Club, Aspen Highlands Fractional Plan and the Plaintiffs' and Class Members/ Fractional Units.

112.    Defendants Association, RC Management and Cobalt breached these fiduciary duties by advancing their own interests and the interests of third parties, including the interests of MVW and MVCI, at the expense of Class Members' interests, in allowing the affiliation of the Marriott Vacation Club affiliation/exchange/points program with the Ritz-Carlton Club, Aspen Highlands Fractional Plan and the Plaintiffs' and Class Members/ Fractional Units.

113.    As a result of Defendants' breach of fiduciary duties, Plaintiffs and Class Members suffered damages, including the destruction of the value in their fractional units, in an amount to be proven at trial.

114.   As a result of Defendants breach of fiduciary duties, Defendants profited at Plaintiffs and Class Members' expense. Defendants should be ordered to forfeit to Plaintiffs and Class Members all profits Defendants received as a result of the conduct described herein; and that a constructive trust be imposed upon said profits for the benefit of Plaintiffs and Class Members.

<div align="center">

**SECOND CAUSE OF ACTION**
**(Aiding and Abetting Breach of Fiduciary Duty Against All Defendants)**

</div>

115.   Plaintiffs and Class Members incorporate by reference the allegations contained in the preceding, and subsequent paragraphs, as if fully set forth in this cause of action.

116.   Defendants and each of them, including MVW, MVCI and L & C aided and abetted the breaches of fiduciary duty by Defendants Association, RC Management and Cobalt.

117.   As described above, Association, RC Management, and Cobalt owed fiduciary duties to Plaintiffs and Class Members.

118.   As described above, Association, RC Management and Cobalt breached their fiduciary duties to Plaintiffs and Class members.

119.   Defendants, including MVW, MVCI and L & C knowingly aided and abetted and participated in the breaches of fiduciary duty by, *inter alia*, participating in further timesharing (prohibited by, inter alia, Section 19.8 of the Declaration of Condominium for Aspen Highlands Condominiums and Section 8.25 of the Declaration for Aspen Highlands Village) and by participating in, intermeddling, forcing and otherwise improperly influencing the decision by Cobalt and the other Defendants to affiliate the Marriott Vacation Club and with the Ritz Carlton Club, Aspen Highlands and with Plaintiffs' and Class Members' Fractional Units, despite promises made to Plaintiffs and Class Members that such affiliation would not occur without a vote by the Plaintiffs and Class Members.

120.   Defendants' aiding and abetting the breach of fiduciary duties alleged herein has caused damage to Plaintiffs and Class Members, including the destruction of the value in their fractional units, in an amount to be proven at trial.

121.   As a result of Defendants aiding and abetting of the breach of fiduciary duties described herein, Defendants profited at Plaintiffs and Class Members' expense. Defendants should be ordered to forfeit to Plaintiffs and Class Members all profits Defendants received as a result of the conduct described herein; and that a constructive trust be imposed upon said profits for the benefit of Plaintiffs and Class Members.

### THIRD CAUSE OF ACTION
### (Conspiracy Against All Defendants)

122.    Plaintiffs and Class Members incorporate by reference the allegations contained in the preceding and subsequent paragraphs, as if fully set forth in this cause of action.

123.    Defendants, and each of them, conspired with the remaining Defendants' scheme to commit the wrongful and unlawful conduct alleged herein.

124.    As described in detail above, MVW, MVCI and L & C, in furtherance of their own financial gain, conspired with Defendants Association, RC Management and Cobalt in breaching their fiduciary duties by agreeing to the affiliation of the Ritz-Carlton Club, Aspen Highlands and Plaintiffs' and Class Members' Fractional Units with the Marriott Vacation Club, in violation of promises made by Defendants both in April 2013, in the Affiliation Agreement, and in the Declaration of Condominium at Aspen Highlands.

125.    All Defendants agreed on an object to be accomplished – the affiliation of the Ritz-Carlton Club, Aspen Highlands and Plaintiffs' and Class Members' Fractional Units with the Marriott Vacation Club. There was a meeting of the minds among all Defendants on that object. The Defendants, working together, accomplished the unlawful overt act of aiding and abetting the Association, RC Management, and/or Cobalt in breaching their fiduciary duties to Plaintiffs and Class Members by participating in said affiliation, in violation of promises made by Defendants in April 2013, the Affiliation Agreement, and the Declaration of Condominium at Aspen Highlands.

126.    As a proximate result, Plaintiffs and Class Members suffered damages, including the destruction of the value in their fractional units, in an amount to be proven at trial.

127.    As a result of Defendants conspiracy to breach of fiduciary duties described herein, Defendants profited at Plaintiffs and Class Members' expense. Defendants should be ordered to forfeit to Plaintiffs and Class Members all profits Defendants received as a result of the conduct described herein; and that a constructive trust be imposed upon said profits for the benefit of Plaintiffs and Class Members.

128.    Plaintiffs and Class Members incorporate by reference the allegations contained in the preceding and subsequent paragraphs, as if fully set forth in this cause of action.

129.    Defendants acted in a wrongful manner, unfairly causing detriment to Plaintiffs and  Class Members.

130.    Defendants, and each of them, conspired with and aided and abetted each other in achieving a unilaterally imposed affiliation with the Marriott Vacations Club, in order to rid themselves of a poor financial investment with the Ritz-Carlton Club, to increase the attractiveness, value and price of MVC timeshares sold by the MVW and MVCI through the

affiliation with the Ritz Carton Club Aspen Highlands, as well as to increase exchange fees payable to Cobalt and L & C, despite knowing that such an affiliation would devalue Class Members' Fractional Units, while at the same time making Marriott Vacation Club Destinations more attractive, valuable and expensive, all to the unjust enrichment of Defendants, including but not limited to MVW, MVCI, Cobalt and L & C.

131.   Under these circumstances, it would be unjust for Defendants to retain the benefit and ill-gotten profits they made without commensurate compensation to Class Members. As such, Plaintiffs and Class Members request that the Court impose a constructive trust for the benefit of Plaintiffs and Class Members, on all profits Defendants received as a result of the conduct described herein.

### RESERVATION OF RIGHTS

132.   Plaintiffs and Class Members expressly reserve all rights accorded under Colorado law, including but not limited to the right to amend this pleading as may be necessary in light of new or additional factual information gathered throughout the disclosure and discovery phases of this litigation and the right to plead exemplary damages in accordance with C.R.S. § 13-21.102.

### JURY DEMAND

Plaintiffs demand a trial by jury for all issues so triable.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and Class Members pray for relief as follows:

a.   That the Court determine that this action may be maintained as a class action under Rules 23(a), 23(b)(2), and (b)(3) of the Colorado Rules of Civil Procedure, that Plaintiffs be certified as class representatives and Plaintiffs' counsel be appointed as counsel for the Class;

b.   That Plaintiffs and Class Members recover damages, as provided by law, determined to have been sustained as to each of them;

c.   That Defendants RC Management, Cobalt and L & C forfeit and repay to Plaintiffs and Class Members all compensation paid to them by Plaintiffs and Class Members;

d.   That Defendants forfeit to Plaintiffs and Class Members all profits Defendants received as a result of the conduct described herein; and that a constructive trust be imposed upon said profits for the benefit of Plaintiffs and Class Members;

*RCHFU, LLC et al. v. Marriott Vacations Worldwide Corporation et al.*
Pitkin County District Court Case No. 2015 CV 30160
**FIRST AMENDED AND SUPPLEMENTAL CLASS ACTION COMPLAINT AND JURY DEMAND**
Page **27** of **30**

    e.       That Plaintiffs and Class Members receive pre-judgment and post-judgment interest as allowed by law;

    f.       That Plaintiffs and Class Members recover their costs of the suit, and attorneys' fees as allowed by law; and

    g.       For all other relief allowed by law and equity.

DATED this 26th day of April, 2016.

                                     Respectfully submitted,

LAW OFFICE OF MICHAEL J. REISER         THE MATTHEW C. FERGUSON LAW FIRM, P.C.

*/s/ Michael J. Reiser*_____
Michael J. Reiser, # 16161
961 Ygnacio Valley Road
Walnut Creek, CA  94596
Telephone: (925) 256-0400
Facsimile: (925) 476-0304
E-mail: reiserlaw@gmail.com

                                       _____
                                       Matthew C. Ferguson, #25687
                                       119 South Spring, Suite 201
                                       Aspen, Colorado 81611
                                       Telephone:  (970) 925-6288
                                       Facsimile:   (970) 925-2273
                                       E-mail: matt@matthewfergusonlaw.com

Michael L. Schrag (CA SBN 185832)         Tyler R. Meade (CA SBN 160838)
GIBBS LAW GROUP LLP                    (Motion for *Pro Hac Vice* Admission to be
(Motion for *Pro Hac Vice* Admission to be Filed)   filed)
1 Kaiser Plaza, Suite 1125                  THE MEADE FIRM P.C.
Oakland, CA 94612                       1816 Fifth Street
Telephone (510) 350-9718               Berkeley, CA 94710
Facsimile: (510) 350-9701              Telephone (510) 843-3670
Telephone (510) 350-9718               Facsimile: (510) 843-3679
Facsimile: (510) 350-9701              E-mail: tyler@meadefirm.com
E-mail: mls@classlawgroup.com

                                         *Attorneys for Plaintiffs*

*RCHFU, LLC et al. v. Marriott Vacations Worldwide Corporation et al.*
Pitkin County District Court Case No. 2015 CV 30160
**FIRST AMENDED AND SUPPLEMENTAL CLASS ACTION COMPLAINT AND JURY DEMAND**
Page **28** of **30**


Plaintiffs' Addresses:

**RCHFU, LLC**
2323 Broadway
Oakland, CA 94612

**Jeffrey A. Bayer and Gail L. Bayer**
2222 Arlington Avenue
Birmingham, AL 35205

**Robert Buzzetti**
411 N.E 25th Avenue
Fort Lauderdale, FL 33308

**Julie C. Canner**
2000 Town Center, Suite 1500
Southfield, MI 48075

**Lee James Chimerakis and Theresa Ann Chimerakis**
3801 PGA Blvd. Suite 700
Palm Beach Gardens, FL 33410

**Kevin Clare and Nancy Lynne Shute**
818 Sixth Street
Manhattan Beach, CA 90266

**Toby L. Cone Trust and Toby L. Cone**
17 Morehouse Lane
Norwalk, CT 06850

**Richard David and Shirley J. Davis**
107 Creek Side Lane
Houston, TX 77024

**Carl Eichstaedt, III**
917 Highview Ave
Manhattan Beach, CA 90266

**James Richard Farquhar and Jennifer Lucille Farquhar**
342 Condailly Street
Gunnedan, NSW 2380
Australia

**Koppelman Family Trust and Larry Koppelman, its trustee**

135 Santo Tomas Lane
Santa Barbara Ca. 93108.

**David Lancashire and Stephen Andrews**
5080 Spectrum Drive, Suite 320W
Addison, TX 75001

6415 Desco Dr.
Dallas TX 75225

**David Lancashire**
6415 Desco Dr.
Dallas TX 75225

**Bonnie Likover**
593 Piney Point
Houston, TX 77024

**Craig Lipton**
1138 Taylor Street
San Francisco, CA 94108

**Jeremy Lowell, D.D.S. and Lori Lowell**
2345 Juniper Hill Road
Aspen, CO 81611

**Edward P. Meyerson and Andrea C. Meyerson**
420 20th Street North, Suite 1400
Birmingham, AL 35203

**Jerry M. Nowell Trust and Jerry M. Nowell, its Trustee, and Dee Ann Davis Nowell Trust
and Dee Ann Davis Nowell, its Trustee**
6511 East Monterosa Street
Scottsdale, AZ 85251

**Thomas M. Prose Revocable Living Trust and Thomas M. Prose, M.D
its Trustee**
21333 Haggerty Road, Suite 150
Novi, MI 48375

**Casey M. Rogers and Courtney S. Rogers**
2115 Forest Drive East
Charlotte, NC 28211

*RCHFU, LLC et al. v. Marriott Vacations Worldwide Corporation et al.*
Pitkin County District Court Case No. 2015 CV 30160
**FIRST AMENDED AND SUPPLEMENTAL CLASS ACTION COMPLAINT AND JURY DEMAND**
Page **30** of **30**

**Robert A. Sklar Trust, and  Robert A. Sklar , its Trustee**
26650 Woodlore Road
Franklin, MI 48025

**D.Richard Stasney, M.D. and Susan P. Stasney**
6550 Fannin Street, Suite 2025
Houston, TX 77030

**D. Richard Stasney, M.D.**
6550 Fannin Street, Suite 2025
Houston, TX 77030

**TSE HOLDINGS, LLC**
601 Rio Grande Place #120
Aspen, CO 81611

**Stephen Weinstein and Brenda Weinstein**
17069 Brookwood Drive
Boca Raton FL, 33496

**Jack Zemer**
4330 La Jolla Village Dr., Suite 100
San Diego, CA 92122

4815-4260-8945, v. 1

DATE FILED: April 26, 2016 4:51 PM
FILING ID: 383AA6159164E
CASE NUMBER: 2015CV30160

**EXHIBIT A**

90

# RITZ-CARLTON, SAN FRANCISCO

## CLUB OWNER'S ASSOCIATION

### OPERATING AGREEMENT

THIS OPERATING AGREEMENT (the "Agreement"), made and entered into this 15th day of June, 2006, by and between THE RITZ-CARLTON MANAGEMENT COMPANY, L.L.C., a Delaware limited liability company authorized to do business in the State of California (hereinafter referred to as "Operating Company") and 690 Market Club Owners Association, a non-profit, mutual public benefit corporation (hereinafter referred to as the "Club Interest Association"), which said terms shall be deemed to extend to and include the successors and assigns of the said parties hereto.

WHEREAS, the Club Interest Association is a non-profit, mutual public benefit corporation created pursuant to Section 7110 et seq. of the California Corporations Code for the State of California, as amended and supplemented from time to time;

WHEREAS, pursuant to that certain Declaration of Covenants, Conditions and Restrictions for 690 Market Club, recorded June 15, 2006, as Document No. 2006-I194390-00 of the Official Records of the City and County of San Francisco, California (the "Club Interest Declaration"), the Club Interest Association is responsible for maintenance, control, operation and management of the Club Interest Project located at that that certain historical building located at 690 Market Street, San Francisco, California, commonly known as The Chronicle Building (the "Building"), which Club Interest Project is or shall be subject to the Club Interest Declaration;

WHEREAS, the Club Interest Declaration sets forth the duties, powers, obligations, maintenance responsibilities and functions of the Club Interest Association, as more particularly described in the Club Interest Declaration;

WHEREAS, the Club Interest Declaration provides that the Club Interest Association is authorized to engage an operator to delegate such of its powers to the operator as may be required for the proper functioning of the Club Interest Units and common elements submitted to the condominium form of ownership under the Club Interest Declaration ("Property").

WHEREAS, the parties desire, through this Operating Agreement, to provide for the management and operation of the Club Interest Project.

NOW, THEREFORE, in consideration of the premises and mutual covenants made herein, the Operating Company and Club Interest Association agree as follows:

1

91

1.      Definitions.

Unless the context would clearly dictate otherwise, the terms utilized herein are as defined in the Club Interest Declaration which is hereby incorporated by reference as if fully set forth herein.

2.      Appointment and Acceptance of Operator Agency

The Club Interest Association hereby employs the Operating Company to act on behalf of the Club Interest Association and its members as the exclusive operating entity of the Property (as defined in this paragraph) and to manage the daily affairs of the Club Interest Project, and the Operating Company hereby agrees to so act. In taking any action under this Agreement, the Operating Company shall be acting on behalf of the Club Interest Association, and nothing in this Agreement shall be construed as creating a partnership, joint venture, or any other relationship between the parties to this Agreement, or as requiring Operating Company to bear any portion of losses arising out of or connected with the ownership or operation of the Property. Neither party shall have the power to bind or obligate the other except as expressly set forth in this Agreement, however, in furtherance of the intentions of the parties hereto, the Operating Company is authorized to act with such additional authority and power as may be necessary to carry out the spirit and intent of this Agreement.

3.      Term and Termination.

3.1     Term.

The term of this Agreement shall commence either as of the date hereof, the date of recording of the Club Interest Declaration in the Public Records of the City and County of San Francisco, California, or issuance of a certificate of occupancy by the City of San Francisco, California for any of the Property which is subjected to the Club Interest Declaration, whichever date is the last to occur, and shall continue for a period of five (5) years thereafter. Upon the expiration of said initial five (5) year period, this Agreement shall automatically renew for successive periods of three (3) years each until or unless (i) earlier terminated in accordance with this Agreement or (ii) terminated with ninety (90) days prior written notice to the Operating Company following a majority vote of the non-Declarant Club Interest Association membership approving such termination. Under no circumstances shall the Club Interest Association be authorized to terminate this Agreement without such a vote.

3.2     Termination of Club Interest Association.

If the Club Interest Association is terminated, then the Club Interest Owners shall, as to their separate interests, continue to be a party to this Agreement and bound by the provisions hereof, and the Operating Company shall manage such interests pursuant to the provisions of this Agreement as the nature of such interests and the context of this Agreement shall permit.

92

3.3   Termination by Operating Company.

The Operating Company may terminate this Agreement upon ninety (90) days written notice to the Club Interest Association at any time. In addition to other termination rights set forth in this Agreement, the Operating Company shall have the right to terminate this Agreement, upon thirty (30) days prior written notice thereof to the Club Interest Association, in the event of termination of either (a) that certain Master Association Operating Agreement by and between the Operating Company and 690 Market Master Association (the "Master Association"), dated on or about the date hereof, which provides for the Operating Company's management and administration of the 690 Market Street master community (excluding the commercial units), or (b) that certain Operating Agreement by and between the Operating Company and 690 Market Homeowners Association (the "Residence Association"), dated on or about the date hereof, which provides for the Operating Company's management and administration of the Residence Units.

3.4.   Termination by Club Interest Association

In addition to the Club Interest Association's right to terminate the Agreement under Section 3.1, this Agreement may be terminated by the Club Interest Association for cause, at any time, upon one hundred twenty (120) days prior notice in the event the Operating Company shall fail to keep, observe or perform any material covenant, agreement, term or provision of this Agreement to be kept, observed or performed by the Operating Company; provided, however, if a breach of or a failure to perform by the Operating Company any covenant, agreement, term or provision contained in this Agreement which is capable of being cured constitutes the cause for termination, this Agreement may be terminated only if such breach or failure to perform shall not have been cured by the Operating Company, or commencement and diligent pursuance of all reasonable efforts to effect such cure shall not have been undertaken by the Operating Company, within thirty (30) days following written notice of such default or breach given by the Club Interest Association to the Operating Company.

3.5.   Actions Upon Termination.

Upon termination of this Agreement ("Termination"), the following actions shall be taken:

(A)   The Operating Company shall, within sixty (60) days after such expiration or Termination, prepare and deliver to the Club Interest Association a final accounting statement with respect to any sums due from the Club Interest Association to the Operating Company or due from the Operating Company to the Club Interest Association pursuant to this Agreement, dated as of the date of Termination. Within thirty (30) days of receipt by the Club Interest Association of such final accounting statement, the parties shall make whatever cash adjustments are necessary pursuant to such final statement. In all events, all accounts shall be deemed final one year after the date of Termination.

(B)   All Software (as defined below) used at the Property which is owned by the Operating Company (or any affiliates thereof) or the licensor of any of them is

proprietary to the Operating Company (or such affiliate) or the licensor of any of them, and shall in all events remain the exclusive property of the Operating Company (or such affiliate) or the licensor of any of them, as the case may be, and nothing contained in this Agreement shall confer on the Club Interest Association the right to use any of such Software. The Operating Company shall have the right to remove from the Property without compensation to the Club Interest Association any Software (including upgrades and replacements). Furthermore, upon Termination, the Operating Company shall be entitled to remove from the Property any computer equipment which is: (i) owned by a party other than the Club Interest Association (without reimbursement to the Club Interest Association); or (ii) owned by the Club Interest Association, but utilized as part of a centralized property management system (with reimbursement to the Club Interest Association of all previous expenditures made by the Club Interest Association with respect to such equipment, subject to a reasonable allowance for depreciation).

As used herein, "Software" means all computer software and accompanying documentation (including all future upgrades, enhancements, additions, substitutions and modifications thereof), other than computer software which is commercially available, which are used by the Operating Company in connection with operating the Property, including without limitation, the property management system, the reservation system and the other electronic systems used by the Operating Company in connection with operating the Property.

(C)     If this Agreement is terminated for any reason, other than a Termination by reason of a default of the Operating Company hereunder, a reserve shall be established to reimburse the Operating Company for all costs and expenses incurred by the Operating Company in terminating its employees at the Property, such as severance pay, unemployment compensation, employment relocation, and other employee liability costs arising out of the termination of employment of the Operating Company's employees at the Property.

(D)     The provisions of this Paragraph 3 shall survive Termination.

4.     Delegation of Authority.

Except to the extent prohibited by applicable law, the Club Interest Association hereby delegates to Operating Company all of the power and authority of the Club Interest Association to the extent necessary to perform the Operating Company's duties and obligations under this Agreement. The Operating Company, on behalf of and at the expense of, the Club Interest Association, to the exclusion of all other persons including the Club Interest Association and its members, shall have all the powers and duties of the Board of Directors of the Club Interest Association (the "Board") as set forth in the Articles of Incorporation and the governing documents of the Club Interest Association (except such thereof as are specifically required to be exercised by the Board or its members), and it shall perform, by way of illustration and not of limitation, the following services, the expenses of which will be incurred in substantial conformance with the approved budgets:

94

(A)    Hire, pay, supervise and discharge all persons necessary to be employed in order to properly manage, maintain, administer and operate the Club Interest Project. Such persons shall be employees of the Operating Company and not employees of the Club Interest Association or its members.    The Operating Company shall have full responsibility to supervise, direct and train all personnel (which costs shall be a Basic Expense of the Club Interest Association), to fix their compensation (subject to the budget), and generally to establish and maintain all employment policies and practices, provided that the Operating Company's employment policies and practices shall comply with all applicable laws, regulations and orders of any competent government authority. The Board shall have no right to supervise or direct any personnel of or employed by the Operating Company, and the Board agrees not to attempt to so supervise or direct. The Board and the Operating Company shall fully cooperate with each other to implement and carry out the provisions of this Section 4(A).

(B)    Take such action as may be necessary to comply with all insurance requirements under the provisions of this Agreement.

(C)    Contract for utilities, repairs, engineering, housekeeping, loss prevention and other services necessary for the management, maintenance, administration and operation of the Club Interest Project. Such contracts may be in the name of the Club Interest Association or the Operating Company, as the Operating Company may elect.

(D)    Purchase, lease or rent, on behalf of the Club Interest Association, equipment, tools, vehicles, appliances, goods, supplies, furnishings, furniture, and materials as shall be reasonably necessary to perform its duties, including the maintenance, upkeep, repair, replacement, refurbishing and preservation of the Property. Purchases shall be in the name of the Operating Company or the Club Interest Association, as the Operating Company shall elect.

(E)    Place or keep in force all insurance required in accordance with the provisions of this Agreement, or otherwise, as the Operating Company may deem necessary in its reasonable discretion to be necessary for the protection of a luxury resort; to act on behalf the Club Interest Association and each Club Interest Owner; to adjust all claims arising under said insurance policies; to otherwise exercise all of the rights, powers and privileges of the insured parties; to receive, on behalf of the insured parties, all insurance proceeds, subject to the provisions of this Agreement.

(F)    Maintain or provide for the maintenance of the Club Interest Association's financial record books, accounts and other records, and as necessary, issue certificates of account to Club Interest Owners and their Mortgagees, without liability for errors. Such records shall be maintained in accordance with applicable California Statutes at the expense of the Club Interest Association and at no cost to the Operating Company. Except for the membership roster, these books and records shall be reasonably available for inspection by Club Interest Owners and their authorized representatives at reasonable times and with a minimum of seventy-two (72) hours prior written notice. These records also shall be available for inspection by an expert employed by and at the cost and

5

expense of the Club Interest Association upon seventy-two (72) hours prior written notice and at such reasonable time as the Operating Company may agree. Any of the foregoing inspections shall be conducted without cost to the Operating Company and without unreasonable disruption to the employees and operation of the Operating Company. Any expense associated with copying records shall be a cost of the Club Interest Association, unless a request is made by a Club Interest Owner or group of Club Interest Owners individually, and in such case the cost shall be borne by such Club Interest Owner(s).

(G)     If and so long as required by law or requested by the Club Interest Association, arrange for an annual independent audit of all the books and financial records of the Club Interest Project by a certified public accountant in accordance with generally accepted auditing principles. A copy of the audit shall be forwarded to the officers of the Club Interest Association.

(H)     Prepare and provide for the preparation of the itemized annual budget for the Club Interest Association meeting the requirements of the Club Interest Declaration and/or revisions to the budgets or a combination thereof, which the Operating Company determines necessary for submission to the Club Interest Association. The Operating Company shall submit the annual budget to the Board, setting forth the anticipated income and expenses of the Club Interest Project for the year, and shall specify therein each Club Interest Owner's share thereof for approval by the Board and the members of the Club Interest Association in compliance with the Club Interest Declaration and California statutes. The Operating Company is authorized to collect against the Club Interest Owners, on behalf of the Club Interest Association, all regular and special assessments and charges that may be due under the Club Interest Project documents. In allocating taxes, special assessments, and Basic Expenses, the Operating Company shall clearly label the portion of any amounts due which are attributable to ad valorem taxes and special assessments. The Operating Company shall decide whether ad valorem taxes and special assessments will be billed separately or as a part of the maintenance fees. Should an increase in assessments be required or a special assessment be required during the year, the same shall be recommended to the Board by the Operating Company for approval in accordance with California statutes.

(I)     Have authority and responsibility to maintain and replace the personal property within the Residential Limited Common Area-Club Interest and Club Interest Units, if any, and to determine the maintenance fee, proration of taxes, and other common expenses applicable to those Residential Limited Common Area-Club Interest and Club Interest Units, as defined in and provided for in the Club Interest Declaration. Except to the extent limited by applicable law, the Operating Company shall have sole discretion for making determinations as to replacements of personal property located within such Residential Limited Common Area-Club Interest and Club Interest Units, decor, and all other judgments relating to the Residential Limited Common Area-Club Interest for the Club Interest Units. Notwithstanding the foregoing, all replacements shall be such as to maintain the standard of quality of the furniture and other personal property and decor of a quality substantially comparable to that contained in such Residential Limited Common

96

Area-Club Interest or Club Interest Units at the time it was committed to the Club Interest Project and to other resorts included in The Ritz-Carlton Club brand.

(J)     Receive and deposit all funds collected from the Club Interest Owners, or otherwise accruing to the Club Interest Association, in a special account or accounts of the Operating Company in banks, savings and loan associations, or other appropriate financial institutions qualified to do business in the state of California, with suitable designation indicating the custodial nature thereof.  Club Interest Association funds shall not be commingled (i) with funds managed by the Operating Company on behalf of other condominium associations, master associations, timeshare associations or other associations; or (ii) with its own funds.  Reserves shall be maintained in separate accounts designated for such purposes separate and apart from operating accounts. Alternatively, the Operating Company is authorized to invest collected funds on behalf of the Club Interest Association as approved and directed by the Board; provided, however, that such investments are styled so as to indicate the custodial nature thereof.  The Operating Company is authorized to draw on the Club Interest Association accounts for any payments to be made by the Operating Company to discharge any liabilities or obligations incurred pursuant to this Agreement, for the payment of the management fee or any other disbursements properly incurred on the Club Interest Association's behalf in substantial accordance with the provisions of the Club Interest Association's budget. Receipt of the foregoing funds by Operating Company shall not constitute income to it for income tax purposes, since same is received and held in a custodial capacity only.

(K)     Cause a representative of its organization to attend members meetings of the Board properly called according to the governing documents of the Club Interest Association.

(L)     Suggest amendments to the Club Interest Association's rules and regulations as it deems advisable, in its reasonable discretion, for the use and occupancy of the Property, for approval by the Board. The Operating Company shall have sole authority to promulgate and amend the rules and regulations for the Property Residential Limited Common Area-Club Interest of the Property subject to the rights of the Board to revise, repeal or modify such amended rules and regulations and subject to the provisions of the Club Interest Declaration.

(M)     Cause such alterations and/or additions to be made to the Property, as authorized by the Board and, when required, by the Club Interest Owners.

(N)     Retain and employ such professionals and such other experts whose services may be reasonably required to effectively perform its duties and exercise its powers hereunder, and to employ same on such basis as it deems appropriate.

(O)     Contract, upon such terms and conditions and for such purposes as the Operating Company deems necessary, and grant concessions and licenses to persons to provide facilities and services to or within the Property.  All income derived from the foregoing grant of concessions and licenses shall inure to the benefit of the Club Interest

Association, and all expenses appertaining thereto shall likewise be borne by said Club Interest Association. The agreements, concessions and licensees may be entered into to provide facilities and services as specified herein for very nominal or no consideration whatsoever. The Operating Company shall use its best judgment in entering into such agreements or in granting such concessions or licenses; provided, however, the Operating Company shall not be liable because a greater sum might have been obtained or a shorter period contracted for. The Operating Company shall not be precluded from dealing with entities affiliated with itself for on-site concessions or other services without conflict or self-dealing. The Operating Company is expressly authorized to subcontract with one or more of its affiliates in carrying out its obligations under this Agreement as provided in Section 7 below. The Operating Company shall have the authority to lease or purchase space and equipment (on or off site), or lease portions of the Property, so long as Manager deems that such a lease is beneficial to the Club Interest Association.

(P)     Make and collect special assessments or charges, or a combination thereof, for such purposes and against such parties as provided for in the provisions of the Club Interest Declaration.

(Q)     Exercise such powers and rights as are reasonably necessary to fulfill the terms of this Agreement and as otherwise delegated to it under the terms and provisions of the Articles of Incorporation or the governing documents of the Club Interest Association, or as are specifically authorized by actions of the Board or the Club Interest Owners themselves. In carrying out its duties hereunder, the Operating Company may utilize its corporate and administrative infrastructure in performing services for the Club Interest Association in lieu of contracting with independent providers or consultants. Any expenses incurred by the Operating Company in utilizing its corporate or administrative infrastructure may be allocated as set forth in Section 20 below.

(R)     If repair to the Property or any portion thereof, including any Club Interest Units or the Residential Limited Common Area-Club Interest, is required due to loss by Act of God or other cause, which is other than normal wear and tear, comply with the provisions of the Club Interest Declaration on behalf of the Club Interest Association in repairing the Property and the remainder of this paragraph shall apply except as otherwise provided in the Club Interest Declaration. Should the loss be covered by insurance, the proceeds thereof shall be applied as a credit against the total costs of said repair and restoration in the proportions in which the assessments were levied. It shall be presumed that the first monies disbursed in payment of costs of repair and restoration shall be from insurance proceeds, where such are received, and then from assessments collected, and, should there be a surplus of such funds, the said surplus shall be distributed to or on behalf of the Club Interest Owners, as provided in the aforesaid Club Interest Declaration.

(S)     Engage a Program Manager through an affiliation agreement, who shall manage and administer the reservation procedures and exchange program for The Ritz-Carlton Club Membership Program (the "Membership Program") through which (i) all Owners of Club Interests reserve the use of accommodations at the Club Interest Project

pursuant to the Procedures for Reserving Usage for the Ritz-Carlton Club, San Francisco ("Reservation Procedures"), and (ii) certain Owners of Club Interests who, in accordance with the Reservation Procedures, have membership in the Membership Program, may reserve the use of the accommodations at a Club as defined in and pursuant to the Reservation Procedures. The Program Manager shall have the broadest possible delegation of authority regarding administration of the Reservation Procedures. The Program Manager shall be authorized, in its sole discretion, to promulgate, adopt and amend the Reservation Procedures from time to time, in order to maintain uniformity of reservation procedures within Membership Program and to more effectively fulfill reservation requests. The Operating Company on behalf of the Club Interest Association shall assess the Owners of Club Interests the reasonable cost (as determined by Program Manager) of operating such Reservation Procedures, which cost shall be included as part of the Basic Assessment.

(T)   Provide an integrated telephone line switching system ("PBX") to be utilized by the Club Interests to make local and long distance calls. The Club Interest Association shall provide a space in the Residential Limited Common Area-Club Interest (unless authorized to locate such PBX in a space owned by the Master Association or Club Interest Association) in which to locate the PBX equipment and shall pay all costs and expenses to properly maintain such space. In addition, the Club Interest Association shall charge the Owners of Club Interests all costs and expenses for the maintenance and operation of the PBX system including, but not limited to, electrical power, wiring, and any related equipment necessary for individual use of the system. The Operating Company shall at all times have access to the PBX system without providing notice to the Club Interest Association. The PBX equipment shall be owned by the Club Interest Association and all revenues from local, if applicable, and long distance telephone calls shall inure to the benefit of the Club Interest Association.

(U)   Perform such duties as may be required of an operating entity under the Club Interest Declaration or applicable law, or as may be reasonably necessary or convenient to function as the managing entity of the Club Interest Project and perform the duties required hereunder.

(V)   Enter into the individual Club Interest Units (subject to the provisions of the Club Interest Declaration) to perform all activities that the Operating Company or its affiliates is authorized or required to perform pursuant to the Club Interest Declaration, including provision of cleaning and maid service, maintenance and repair of the Property and abatement of nuisances or other activities of the Club Interest Owners or occupants of the Property that are prohibited by applicable law or the Club Interest Declaration.

(W)   Apply for, obtain and maintain, either in its own name or on behalf of the Club Interest Association's name, as may be required by the applicable authorities, all licenses and permits required for the Club Interest Association in connection with the management and operation of the Club Interest Project. The Club Interest Association, through its Board, agrees to execute and deliver any and all applications and other documents and otherwise to cooperate to the fullest extent with Operating Company in

applying for, obtaining and maintaining such licenses and permits.   The cost of any
licenses or permits shall be an operating expense of the Club Interest Association.

(X)     The Operating Company shall have the authority to grant or deny any
approvals required to be obtained by any Club Interest Owner from the Club Interest
Association or the Board as applicable under the Club Interest Project's governing
documents.

(Y)     If and so long as provided for in the Club Interest Declaration or required
by law or requested by the Club Interest Association, arrange for an annual review of (i)
the Club Interest Association's application for and/or compliance with the California
Government Code §50280 et seq., also known as the Mills Act, and/or the California
Mello-Roos Community Facilities Act of 1982, (ii) compliance review of the Easement,
Access and Use Agreement between 690A HCT LLC and Teachers Insurance & Annuity
Association of America, dated as of December 23, 2004, (iii) compliance review of the
Parking and Access Easement between R. C. Market Holdings, L.P. and R. C. Chronicle,
L.P., dated as of October 19, 2005, and (iv) compliance review of that certain easement
recorded in the Office of the Assessor-Recorder of the City and County of San Francisco,
California, providing for the use rights of certain portions of the second and third floors
of the building located at 660 Market Street, San Francisco, California.  A copy of any
materials related to such reviews shall be forwarded to the officers of the Club Interest
Association.

5.      Insurance.

5.1     Property Insurance.

Effective on the opening date of the Club Interest Project (the "Opening Date"), the
Club Interest Association shall procure and maintain (or Operating Company shall procure and
maintain the following if (i) Club Interest Association requests in writing, at least sixty (60) days
prior to the Opening Date, that Operating Company procure and maintain the following, (ii) the
Club Interest Project satisfies the then-current insurability criteria under Operating Company's
insurance program, and (iii) Operating Company approves such request, in its sole and absolute
discretion) at the Club Interest Association's sole cost and expense the following:

A.      Property insurance (and to the extent applicable builders risk insurance),
including boiler and machinery coverage, on the Club Interest Project (including its component
parts, except the improvement and betterments and personal property of each Club Interest
Owner), all Residential Limited Common Area-Club Interest,  equipment and fixed asset
supplies  and contents against loss or damage by fire, lightning and all other risks as commonly
covered by an "all risk of physical loss," form or equivalent policy of insurance, including, but
not limited, to fire, windstorm, sprinkler leakage, vandalism and malicious mischief, water
damage, explosion of steam boilers, pressure vessels and other similar apparatus, and other
hazards generally included under extended coverage, in an amount not less than the full
replacement cost (less excavation and foundation costs) of the Club Interest Project, contents,
signs awnings, canopies, gazebos, fences and retaining walls.  Such coverage shall include an

100

agreed value provision, waiver of co-insurance, landscape improvements coverage of not less than Five Million Dollars ($5,000,000) and law and ordinance coverage in an amount equal to twenty five (25%) of the replacement value or Ten Million Dollars ($10,000,000) whichever is greater;

B.      Business interruption insurance including extra expense covering at least two (2) years' loss of profits, maintenance fees (if the Club Interest Association elects to insure such maintenance fees), necessary continuing expenses, and if applicable, rent, for interruptions at the Club Interest Project, including an extended period of indemnity of not less than Three Hundred and Sixty Five (365) days, caused by any occurrence covered by the insurance referred to in Section 5.1.A., 5.1.C. and 5.1.D;

C.      If flood insurance is excluded under the property insurance required under this Agreement and the Building is located in whole or in part within an area identified as having a special flood hazard, flood insurance in an amount equal to not less than ten percent (10%) of the replacement cost of the Club Interest Project, to the extent available at commercially reasonable terms, but in no event less than an amount equal to the maximum amount available under the National Flood Insurance Program for such coverage;

D.      If the Building is located in an "earthquake prone zone" as determined by the U.S. Geological Survey, insurance coverage for loss or damage caused by earth movement. Such coverage, including business interruption, shall be for not less than the probable maximum loss as determined by a recognized earthquake-engineering firm, less a reasonable deductible. If the Club Interest Association procures the insurance described in this Section 5.1.D and the Club Interest Association participates in a blanket or shared insurance program, the Club Interest Association shall provide written notice to the Operating Company if actual losses under such program erode the coverage available to the Club Interest Project;

E.      If excluded under the property insurance required under this Agreement, terrorism insurance as available under the Terrorism Risk Insurance Act (as the same may be amended or replaced) or to the extent such coverage is available at commercially reasonable terms; and

F.      Such other property insurance as is customarily maintained by the Operating Company at similar properties.

G.      All insurance procured by the Club Interest Association hereunder shall be obtained from reputable insurance companies of recognized responsibility and financial standing reasonably acceptable to the Operating Company. Any premiums and deductibles under said policies shall be subject to the reasonable approval of the Operating Company. Such premiums and deductibles (net of any credits, rebates and discounts) shall be paid as Basic Expense in accordance with this Agreement.

H.      All such policies of insurance shall be carried in the name of the Club Interest Association, with the Operating Company as an additional insured unless the Operating Company procures such insurance on the Club Interest Association's behalf at which point the

Operating Company shall be the named insured and shall name the Club Interest Association as an additional insured. Any property losses there under shall be payable to the respective parties as their interests may appear. The documentation with respect to each Mortgage shall contain provisions to the effect that proceeds of the insurance policies required to be carried under Section 5 shall be available for repair and restoration of the Residential Limited Common Area-Club Interest, to the extent required pursuant to Section 5.

I.      If the Club Interest Association procures the insurance described in this Section 5.1, the Club Interest Association shall deliver to the Operating Company (i) certificates of insurance for such insurance or, upon Operating Company's request, a certified copy of the policy(ies) so procured and, (ii) in the case of insurance policies about to expire, certificates with respect to the renewal(s) thereof. All such certificates of insurance shall, to the extent obtainable, state that the insurance shall not be canceled, non-renewed or materially changed without at least thirty (30) days' prior written notice to the certificate holder.

J.      Each of the Club Interest Association and the Operating Company hereby waives its rights of recovery and its insurer rights of subrogation from the other party or any of its affiliates (and their respective directors, officers, shareholders, agents and employees) for loss or damage to the Club Interest Project, and any resultant interruption of business regardless of the cause of such property or business interruption loss.

K.      All premiums for the insurance required in this Section shall be allocated on an equitable basis reasonably agreeable to the Club Interest Association and the Operating Company.

L.      If (i) the Club Interest Association is eligible to participate in the Operating Company's property insurance program, (ii) the Club Interest Association nevertheless elects to procure its own property insurance and (iii) the costs of the premiums and/or deductibles for coverage under the Club Interest Association's property insurance program to be paid as Basic Expense under Section 5 exceed the costs of the premiums and deductibles that would have been payable under the Operating Company's property insurance program by more than ten percent (10%), then the Club Interest Association shall be solely responsible (i.e., such costs shall not impact the Operating Fee or be treated as Basic Expense) for the entire amount by which such costs under the Club Interest Association's program exceed such costs under the Operating Company's program.

M.      If the Club Interest Project participates in Operating Company's property insurance program, but thereafter Club Interest Association elects to remove the Club Interest Project from Operating Company's property insurance program and to procure its own property insurance for the Club Interest Project, the Club Interest Association shall provide the Operating Company notice of such decision at least ninety (90) days prior to the next renewal date of coverage under the Operating Company's property insurance program (which is currently April 1st of each calendar year). If the Club Interest Association fails to timely provide such notice, but the Club Interest Association nevertheless procures its own property insurance for the Club Interest Project, the Club Interest Association shall pay (from its own funds, such that it does not impact the Operating Fee) to the Operating Company an amount equal to ten (10%) of the annual

102

premium under the Operating Company's property insurance program to cover all fixed costs and expenses incurred by Operating Company for the placement of such property insurance. If the Club Interest Association elects to exit the Operating Company's property insurance program in the middle of a coverage year (i.e., prior to the end of a coverage year), (i) the premiums under each of the Operating Company's property insurance program and the Club Interest Association's replacement property insurance program will be prorated as of the date on which the Operating Company receives and approves certificates of insurance evidencing the Club Interest Association's replacement property insurance coverage and its compliance with the requirements of this Section 5.1 and (ii) the Club Interest Association shall pay to the Operating Company the amount described in the immediately preceding sentence. If the Club Interest Association elects to exit the Operating Company's property insurance program pursuant to the foregoing provisions, the Club Interest Association may elect to again have the Club Interest Project participate in the Operating Company's property insurance program only upon Operating Company's prior approval, which the Operating Company may withhold in its sole and absolute discretion.

5.2     Operational Insurance

Commencing with the Opening Date and thereafter during the term of this Agreement and any renewals thereof, the Operating Company shall procure and maintain the following:

A.     Commercial general liability insurance against claims for bodily injury, death or property damage occurring in conjunction with the Operating Company's operations of the Club Interest Project, and automobile liability insurance on vehicles operated in conjunction with the operations of the Club Interest Project, with a combined single limit for each occurrence of not less than One Hundred Million Dollars ($100,000,000);

B.     Workers' compensation coverage as may be required under applicable laws covering all of the Operating Company's employees at the Club Interest Project, and employer's liability insurance of not less than One Million Dollars ($1,000,000) per accident/disease;

C.     Fidelity bond coverage in an amount not less than Two Million Dollars ($2,000,000) covering the Operating Company's employees at the Club Interest Project; and

D.     Employment practices liability insurance covering all of the Operating Company's employees at the Club Interest Project, to the extent available at commercially reasonable rates and terms, in an amount not less than Two Million Dollars ($2,000,000);

E.     Such other insurance in amounts as the Operating Company, in its reasonable judgment, deems advisable for protection against claims, liabilities and losses arising out of or connected with the operation of the Club Interest Project.

F.     All insurance described in Sections 5.2 may be obtained through blanket insurance programs, provided that such blanket programs substantially fulfill the requirements

specified herein. The blanket insurance programs may include an "Insurance Retention." Insurance Retention shall mean the deductibles or risk retention levels; however, the Club Interest Project's responsibility for such deductibles or risk retention levels shall be limited to the Club Interest Project's per occurrence limit for any loss or reserve as established for the Club Interest Project, which limit shall be the same as other similar properties participating in the blanket insurance programs.

G. All insurance required under Section 5.2 shall be carried in the name of Operating Company. The insurance required under 5.2.A shall include the Club Interest Association, and any Mortgagees specified by the Club Interest Association, in writing, as additional insureds.

H. Operating Company, upon request, shall deliver to the Club Interest Association certificates of insurance evidencing the insurance coverages required under Section 5.2.A and any renewals thereof. All such certificates of insurance shall, to the extent obtainable, state that the insurance shall not be canceled or materially reduced without at least thirty (30) days' prior written notice to the certificate holder.

I. All insurance premiums, costs and other expenses, including any Insurance Retention, shall be treated as a Basic Expense. All charges under the blanket programs shall be allocated to the Club Interest Project and other similar participating condominiums on a reasonable basis. Any losses and associated costs and expenses that are uninsured shall be treated as a cost of insurance and shall also be treated as part of those operating or other expenditures incurred or paid by or on behalf of the Club Interest Association by the Operating Company in connection with the normal course of owning, conducting and operating the business affairs of the Club Interest Association.

J. Upon termination of this Agreement, a reserve in an amount determined by the Operating Company based on loss projections, shall be established from the Reserve Account to cover the amount of any Insurance Retention and all other costs and expenses that will eventually have to be paid by either the Club Interest Association or the Operating Company with respect to pending or contingent claims, including those that arise after termination of this Agreement for causes arising during the term (or any renewal term) of this Agreement. If the Reserve Account is insufficient to meet the requirements of such reserve, the Club Interest Association shall deliver to the Operating Company, within ten (10) days after receipt of the Operating Company's written request thereof, the sums necessary to establish such reserve; and if the Club Interest Association fails to timely deliver such sums to the Operating Company, the Operating Company shall have the right (without affecting Operating the Company's other remedies under this Agreement) to withdraw the amount of such expenses from the operating accounts, working capital funds or any other funds of the Club Interest Association held by or under the control of the Operating Company.

5.3 Insurance Proceeds.

All proceeds of property damage insurance required to be maintained by the Club Interest Association under Section 5 when collected shall be deposited with the Operating

104

Company, in a trust account in a bank, or trust company approved by the Operating Company and the Club Interest Association, and such insurance proceeds shall be used to the extent necessary for the repairing, rebuilding, and replacement of the Club Interest Project and any other related improvement or improvements, together with replacing any Residential Limited Common Area-Club Interest, required in the operation of the Club Interest Project, all such proceeds being pledged and dedicated by the parties for that purpose. Any Mortgage on the Residential Limited Common Area-Club Interest shall contain provisions to the effect that all such proceeds shall be available for that purpose.

5.4    The Club Interest Association's Insurance.

A.    In connection with the business and affairs of the Club Interest Association and the Club Interest Project, to the extent not delegated to the Operating Company in the Agreement, the Club Interest Association shall, throughout the term (or any renewal term) of this Agreement, provide and maintain, at its sole expense, commercial general liability insurance in amounts not less than a combined single limit of $10,000,000 for each occurrence, providing coverage for claims for personal injury, death and property damage occurring at the Club Interest Project or in connection with the business of the Club Interest Association. In the event that this Agreement is terminated, but the operating agreements for both the Club Interest Association and the Residence Association remains in full force and effect, the Club Interest Association shall provide and maintain, at Club Interest Association's sole cost and expense, commercial general liability insurance in amounts not less than a combined single limit of $10,000,000 for each occurrence, providing coverage for claims for personal injury, death and property damage occurring at the Club Interest Project, or in connection with the business of the Club Interest Association. Such $10,000,000 insurance may be purchased jointly with the Master Association and Residence Association, and provide protection against such claims for both the Club Interest Project, Residential Limited Common Area Full Ownership and the 690 Market Street master community and the Residence Project. The Operating Company shall be named as additional insured on the insurance described in this Section.

B.    The Club Interest Association shall procure and maintain (i) directors and officers liability insurance, (ii) fidelity coverage to protect against dishonest acts on the part of officers, directors, trustees and employees (if any) of the Club Interest Association and (iii) any other coverages required by the Governing Instruments to the extent not procured by Operating Company pursuant to Section 5 of this Agreement.

5.5    Club Interest Owner's Insurance.

Neither Operating Company nor the Club Interest Association has any responsibility for procuring insurance to protect the Owner's improvements and betterments, personal property and personal liability associated with the Owner's activities, and that the Club Owner must provide such insurance if desired or required by the Governing Instruments. Owners shall be required to obtain and maintain property and liability insurance, as appropriate, as required for the Club Interest Association and the Master Association under such association's governing documents.

105

6.   Frequency of Services.

The services, obligations and responsibilities to be performed by the Operating Company shall be performed as often as set forth hereinabove; however, if no time frame is specified, then the Operating Company shall perform its services, obligations and responsibilities under this Agreement as often as it, in its sole discretion, and in accordance with all applicable laws and regulations, deems necessary to ensure compliance with The Ritz-Carlton Club brand standards. The services, obligations and responsibilities shall be performed in substantial accordance to the provisions provided for in the approved budget.

7.   Contracts for Products and Services.

Subject to the provisions of this Section 7, Operating Company shall, on behalf of and as a common expense of the Club Interest Association, engage such third parties as Operating Company deems as necessary or desirable for the operation and maintenance of the Club Interest Project. Operating Company shall administer any contracts for such services on behalf of the Club Interest Association. Subject to the provisions of this Section 7, Operating Company shall not be precluded from executing agreements or granting concessions or licenses to itself or to any affiliate. To the extent not prohibited by California statutes or this Section 7, entering into any contract, agreement, concession or license by Operating Company with an affiliate shall not be considered to be self-dealing; provided that the prices and other terms of such contract, agreement, concession or license are competitive with those obtainable from unrelated vendors or are the subject of competitive bidding. The Operating Company shall not be required to obtain the best price available as to any service, material or purchase, but shall purchase or contract for same on such terms and with such person or party as it deems advisable and in the best interest of the Club Interest Association.

Notwithstanding any contrary provision of this Agreement, Operating Company shall not enter into a contract with a third person whereby such person will furnish goods or services for the management, operation, maintenance or repair of the Club Interest Project or Property for a term longer than three (3) years, without the Club Interest Association's prior written consent (which Operating Company acknowledges will be granted only upon the consent of a majority of Club Interest Owners other than the Declarant), except for:

(a)   a contract with a public utility company if the rates charged for materials or services are regulated by the California Public Utilities Commission; provided, however, that the term of the contract shall not exceed the shortest term for which the supplier will then contract at the regulated rate;

(b)   prepaid casualty and/or liability insurance policies not to exceed three (3) years duration provided that the policy permits short-rate cancellation by the insured;

(c)   the following types of contracts, provided that the lessor or provider is not an entity in which Declarant or Operating Company has a direct or indirect interest of ten percent (10%) or more:

16

106

i.      a lease of furniture, furnishings, appliances and other personal property;

ii.     agreements for cable television services and equipment or satellite television services and equipment;

iii.    agreements for burglar alarm and fire alarm equipment, installation and services;

iv.     a lease for laundry room fixtures and equipment; and

v.      fidelity insurance for the Operating Agreement.

(d)     a contract for a term not to exceed five (5) years that is terminable by the Club Interest Association after no longer than one (1) year without cause, penalty or other obligation upon ninety (90) days written notice of termination to the other party.

8.      Building Compliance.

The Operating Company shall not be responsible for the compliance of the Property or any of its equipment with the requirements of any building codes or with any statutes, ordinances, laws, rules, or regulations (including those relating to the existence and disposal of solid, liquid, and gaseous wastes, and toxic or hazardous substances) of any city, county, state, or federal governments or agencies, or any public authority or official thereof having jurisdiction over it. However, the Operating Company shall notify the Club Interest Association promptly or forward to the Club Interest Association promptly any complaints, warnings, notices, or summonses received by the Operating Company relating to any such matters. The Club Interest Association authorizes the Operating Company to disclose the ownership of the Property to any such officials and agrees to indemnify, defend, and hold the Operating Company, its representatives, servants, and employees, harmless from all loss, cost, expense, and liability whatsoever which may be imposed on them by reason of any present or future violation or alleged violation of such laws, ordinances, rules, or regulations. The cost of compliance with laws, ordinances, rules and regulations incurred by Operating Company shall be a Basic Expense of the Club Interest Association.

9.      Waiver of Reserves.

Notwithstanding the delegating by the Club Interest Association to the Operating Company of its power to determine and collect assessments during the term of this Agreement, the Club Interest Association retains the power to waive required reserves making up a part of those assessments in the manner permitted by law.

17

10. <u>Payment of Basic Expenses.</u>

The Operating Company shall apply assessments collected to those items specified in the Articles of Incorporation and governing documents of the Club Interest Association, including the Operating Company's fee and expenses in substantial accordance with the approved budget. Savings in one category of budgeted expenses may be used to offset overages in other categories.

11. <u>Collection of Assessments.</u>

With the authorization of the Board and subject to applicable law, the Operating Company may take such action in the name of the Club Interest Association by way of filing, recording, satisfying, foreclosing, or vacating a lien against a Club Interest Owner's Club Interest should such Club Interest Owner fail to pay assessments or maintenance fees, and take such other appropriate action, either in its name on behalf of the Club Interest Association or in the name of the Club Interest Association, or if necessary, engage legal counsel to pursue legal process. The Operating Company may compromise liens in such amount as it deems advisable and render statements as to the current status of a Club Interest Owner's account. Any lien or charge against any Club Interest Owner shall be limited to the Club Interest owned by the defaulting Club Interest Owner and shall not be filed so as to encumber the Club Interests owned by any other Club Interest Owners in the any Club Interest Unit related to such Club Interest. The Club Interest Association shall aid and assist the Operating Company in any reasonable manner requested by the Operating Company in the request, demand, making or collecting of assessments, maintenance fees, charges, late fees or interest, or a combination thereof, which may be due the Club Interest Association. The costs of collection shall be a Basic Expense of the Club Interest Association.

12. <u>Denial of Use of Accommodations and Facilities.</u>

The Operating Company is authorized to deny use of the accommodations and facilities of the Club Interest Project to any Club Interest Owner who is delinquent in the payment of any assessment against such Club Interest Owner for common expenses or for ad valorem real estate taxes and may deny such use to any person claiming under such delinquent Club Interest Owner. The Operating Company is also authorized to rent any delinquent Club Interest Owner's Club Interest and any use rights appurtenant thereto and apply the rental income towards the Operating Company's customary rental commissions, if any, cleaning charges, travel agent commissions, or any other commercially reasonable charges and all costs and expenses incurred by the Operating Company in connection with the rental with the balance of such rental income applied to such delinquent Club Interest Owner's account. The Operating Company is not required to obtain the highest nightly rental rate available, nor any particular rental rate. However, the Operating Company must use reasonable efforts to secure a rental that is commensurate with other rentals of similar Club Interests. The Operating Company shall not be required to rent the entire Use Period.

108

13.    No Advances by Operating Company.

The Operating Company shall not be required to pay Basic Expenses from its own funds, and shall only be required to perform its services and to make disbursements to the extent that, and so long as, payments received from assessments or other revenues, if any, of the Club Interest Association are sufficient to pay the costs and expenses of such services and the amounts of such disbursements. If it shall appear to the Operating Company that the assessments and other revenue, if any, of said Club Interest Association and its members are insufficient, the Operating Company shall forthwith determine such additional assessment as is required and advise the Board and its members. Any funds that may be advanced to the Club Interest Association by the Operating Company shall be repaid at the earliest possible date and if such advance was approved by the Board, shall bear interest at the rate of eighteen percent (18%) per annum, or the highest interest rate allowed by law, until paid.

14.    Operating Fee.

As compensation for its services hereunder, the Operating Company shall receive an annual net fee, free from all charges and expenses, which shall be an amount equal to Five Hundred Fifty Four and 23/100 Dollars ($554.23) (in 2007 dollars) per Club Interest from the Owners of the Club Interests in the Club Interest Units (the "Operating Fee"). The Operating Fee shall be increased annually at Operating Company's sole discretion by the same percentage increase of the proposed new year's budget over the immediate prior year's budget excluding all amounts for the Operating Fee.

15.    No Interference.

The Club Interest Association shall not unreasonably interfere, nor allow or cause any of the officers or Club Interest Owners to unreasonably interfere, with the Operating Company in the performance of its duties or the exercise of any of its powers described in this Agreement.

16.    Default.

If either party defaults hereunder, then the other party, sixty (60) days after having given written notice to any officer of the defaulting party, may declare this Agreement in default, unless such default is cured by the defaulting party within sixty (60) days after receipt of such notice. Upon default, either party may, in addition to any other remedy given it by agreement or in law or in equity, bring an action against the other party for damages, injunctive relief or such other rights and remedies as it may have, or a combination thereof, and the prevailing party shall be liable for the other party's reasonable attorneys' fees and costs incurred thereby. All of such rights upon default shall be cumulative, and the exercise of one or more remedies shall not be deemed to exclude or constitute a waiver of any other or additional remedy.

17.     Arbitration.

A dispute under this Agreement shall be governed exclusively by the laws of the State of California and shall be controlled and decided by arbitration. The parties agree that the arbitration shall be held in California and subject to the American Arbitration Association's Commercial Arbitration Rules then in effect. The decision shall be binding and non-appealable by either party. Unless the arbitrator determines otherwise, the party losing the arbitration shall be responsible for and pay all the reasonable costs, expenses, and attorney's fees incurred by the other party.

18.     Indemnity.

The Club Interest Association agrees that it shall defend, indemnify and hold harmless the Operating Company from and against any and all costs, damages, liabilities and expenses (including reasonable attorney's fees) arising from any claim by any person or entity relating to the Club Interest Project or any part thereof, or any death, injury to person or property damage occurring on or about the Club Interest Project or any part thereof or directly or indirectly arising out of any construction defects or claims, or the conduct or operation of the Club Interest Project or the performance of the Operating Company's duties or services hereunder. If any proceeding shall be brought or threatened against the Operating Company with respect to any matter for which the Operating Company is entitled to indemnity pursuant to the preceding sentence, the Operating Company shall promptly notify the Club Interest Association in writing and the Club Interest Association shall assume the defense thereof, including the employment of counsel approved by the Operating Company and the payment of all costs of litigation. Notwithstanding the preceding sentence, the Operating Company shall have the right to employ its own counsel and to determine its own defense of such action in any such case, but the fees and expenses of such counsel shall be at the expense of the Operating Company unless (i) the employment of such counsel shall have been authorized in writing by the Club Interest Association or (ii) the Club Interest Association, after due notice of the action, shall not have employed counsel satisfactory to the Operating Company to have charge of such defense, in either of which events the reasonable fees and expenses of counsel for the Operating Company shall be borne by the Club Interest Association. The Club Interest Association shall not be liable for any settlement of any such action effected without its consent. The provisions of this Section 18 shall survive the termination of this Agreement.

19. .    Successors and Assigns.

This Agreement shall be binding upon and inure to the benefit of the successors and assigns of the Operating Company and the successors and assigns of the Club Interest Association.

20.     Special Charges.

Subject to the requirements for levy of Assessments as provided in the Club Interest Declaration, the Operating Company as operator for the Club Interest Association shall be authorized to impose a special personal charge against a Club Interest Owner for repair or

110

replacement of Residential Limited Common Area-Club Interest or property of the Club Interest Association caused, in the opinion of the Operating Company, by the negligence or misuse of a Club Interest Owner, his family, guests, lessees or invitees; or failure, in the opinion of the Operating Company, of a Club Interest Owner to maintain those portions of his Club Interest and Residential Limited Common Area-Club Interest, if any, assigned to his Club Interest, as he or she is required to repair and maintain; or violation of the provisions of the Club Interest Declaration which require the removal of same by the Operating Company or which increase the costs of maintenance and repair by the Operating Company, or increase insurance rates.

21.    Allocation of Expenses.

The Operating Company and its employees and agents may perform similar services for other master associations, condominium associations, timeshare associations and entities. In this regard, the Operating Company is authorized to provide such services, as appropriate, on a consolidated basis whereby such services are provided to more than one association. To require the Operating Company to strictly cost account with regard to each association or interest in an association managed by the Operating Company would increase the costs of administration hereunder borne by the Club Interest Association. Accordingly, the Operating Company is hereby authorized to allocate to the Club Interest Association its appropriate and fair share of such costs and expenses as are general and, as to those which are not general, to charge the same to the appropriate party(ies) on such basis (weighted or not) as the Operating Company deems fair and equitable.

22.    Operating Company Assumes No Liability.

The Operating Company assumes no liability whatsoever for any acts or omissions of the Board or the Club Interest Association, or current or previous Club Interest Owners of the Property, or any previous management or other agent of either. The Operating Company assumes no liability for any failure of or default by any individual Club Interest Owner in the payment of any assessment or other charges due the Club Interest Association or in the performance of any obligations owned by any individual Club Interest Owner to the Club Interest Association. The Operating Company likewise assumes no liability for any failure of or default by concessionaires in any rental or other payments to the Club Interest Association, nor does the Operating Company assume any liability for previously unknown violations of environmental or other regulations which may become known during the period this Agreement is in effect.

23.    Proprietary Marks.

"Proprietary Marks" include, but are not limited to, all trademarks, trade names, symbols, logos, slogans, designs, insignia, emblems, devices, service marks and distinctive designs of buildings and signs, architectural plans, drawings, specifications, computer files, or combinations thereof, which are used to identify The Ritz-Carlton Development Company, Inc., the Operating Company or any of their affiliates. All works in which copyright rests in Operating Company or any affiliate of Operating Company or any other and all patents registered or applied for in the name of Operating Company or any affiliate of Operating Company shall be considered "Proprietary Marks." The term "Proprietary Marks" shall include

21

all present and future Proprietary Marks, whether they are now or hereafter owned by Operating Company or any affiliate of Operating Company, and whether or not they are registered under the laws of the United States of any other country. The name, "The Ritz-Carlton Club", used in conjunction with other words or names, are examples of Proprietary Marks. Proprietary Marks shall remain the exclusive property of Operating Company or one of its affiliates. Upon termination of this Agreement, the Club Interest Association shall have no right to use the Proprietary Marks and any use of the Proprietary Marks by the Club Interest Association shall immediately cease. In addition, upon termination, neither the Association nor the Club Interest Owners shall any longer be entitled to participate in or have access to any additional benefit or program provided or sponsored by Operating Company or any of its affiliates.

24.    Conflicting Provisions.

      The invalidity in whole or in part of any provision of this Agreement shall not affect the validity of the remaining portions hereof. The provisions of this Agreement shall be paramount to California statutes as to those provisions where permissive variances are permitted; otherwise, the provisions of the aforesaid Acts shall prevail and shall be deemed incorporated herein. The applicable terms and provisions of the Articles of Organization or the governing documents shall be deemed paramount to the terms and provisions of this Operating Agreement and, where applicable, the terms and provisions of this Operating Agreement shall be deemed amended to comply with the foregoing.

25.    No Waiver.

      No waiver of a breach of any of the covenants contained in this Agreement shall be construed to be a waiver of any succeeding breach of this same covenant.

26.    Time of Essence.

      Time is of the essence in every particular, and especially where the obligation is to pay money.

27.    Entire Agreement.

      This Agreement constitutes the entire agreement between the parties hereto, and neither party has been induced by the other by representations, promises or understandings not expressed herein. No modification to any provision hereof shall be valid unless in writing, signed by the parties to this Agreement.

28.    Notices.

      Any notices required or provided for in this Agreement shall be in writing and shall be addressed as indicated below or to such other address as the Operating Company or the Association may specify hereafter in writing.

112

## TO THE OPERATING COMPANY

The Ritz-Carlton Management Company, L.L.C.
6649 Westwood Boulevard, Suite 500
Orlando, Florida 32821-6090
Attention: Vice President of Operations

with a copy to:

The Ritz-Carlton Management Company, L.L.C.
6649 Westwood Boulevard, 3rd Floor
Orlando, FL 32821
Attn: Law Department

## TO THE ASSOCIATION

President of the Association at the address of the President as on file with
- the Operating Company.

Notices or other communications between the parties to this Agreement may be mailed by United States registered or certified mail, return receipt requested, postage prepaid, and may be deposited in a United States Post Office or a depository regularly maintained by the post office. Such notices may also be delivered by hand, by facsimile or by any other receipted method or means permitted by law. For purposes of this Agreement, notices shall be deemed to have been "given" or "delivered" upon personal delivery thereof or forty-eight (48) hours after having been deposited in the United States mails as provided herein.

29.   Affiliated Corporations.

The Operating Company is an affiliated company of a wholly-owned subsidiary of The Ritz-Carlton Development Company, Inc.

30.   Independent Contractor.

The parties hereby agree and acknowledge that the Operating Company is an independent contractor of the Association. The Association hereby releases any right of control over the method, manner or means by which the Operating Company performs its duties and responsibilities under this Agreement.

31.   Excusable Delays.

In the event that the Operating Company shall be delayed, hindered in or prevented from the performance of any act required hereunder by reason of strikes, lock-outs, labor troubles, inability to procure materials, failure of power, restrictive governmental laws or regulations, riots, insurrection, war, Act of God, or any other reason beyond the Operating Company's control, then performance of such act shall be excused for the period of the delay,

and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay.

32. Brand Standards.

For so long as this Agreement remains in effect, the parties agree that the Club Interest Project shall be maintained and operated in accordance with "The Ritz-Carlton Brand Standards", which standards are defined as the standards of operation, service, furnishing, equipping, and maintenance applicable to substantially all of The Ritz-Carlton branded hotels and The Ritz-Carlton Clubs managed and operated by The Ritz-Carlton Hotel Company, L.L.C., an affiliate of Operating Company. Any failure of the Association to maintain the Club Interest Project in accordance with The Ritz-Carlton Brand Standards, which failure is not caused by the acts or omissions of Operating Company, shall constitute a default under this Agreement and the sole remedy of Operating Company, subject to the right of notice and right to cure as provided for in Section 16, shall be to terminate this Agreement.

In the event of either a legal requirement, including an order, judgment or directive by a court or administrative body which is issued in connection with any litigation involving the Association, which restricts or prevents the Operating Company, in a material and adverse manner, from operating the Property in accordance with The Ritz-Carlton Brand Standards (including without limitation, any restrictions on expenditures by the Operating Company from the operating accounts or from the Reserve Account, other than restrictions which are set forth in this Agreement), the Operating Company shall be entitled, at its option, to terminate this Agreement upon sixty (60) days' written notice to the Association. The foregoing shall not reduce or otherwise affect the rights of the parties pertaining to default remedies under this Agreement.

33. Advances and Refurbishments.

Any refurbishments shall be in accordance with the Operating Company's then existing refurbishment standards. For any refurbishments, the Operating Company shall have a right to bid for such services. In addition, if the Association undertakes any major refurbishments or major capital repairs or construction, the Operating Company shall provide project oversight for a reasonable fee in order to ensure compliance with The Ritz-Carlton Brand Standards and the refurbishment standards.

Notwithstanding the foregoing, the Operating company shall not be required to perform any act or duty hereunder involving an expenditure of money unless there shall be sufficient funds therefore in the bank accounts of the Association; if at any time the funds in the bank accounts of the Association are not sufficient to pay the charges incident to this Agreement, the Operating Company, although not obligated to do so, may advance such sums as it deems necessary, and in such event, the Operating Company shall be entitled to reimburse itself from the Association funds for the amount of such advances, together with interest at the rate of eighteen percent (18%) per annum commencing from and after twenty (20) days from the date of the advance by the Operating Company.

114

34.   Survival of Provisions.

All representations and warranties of the parties contained herein shall survive the termination of this Agreement. All provisions of this Agreement that require the Association to have insured or to defend, reimburse, or indemnify the Operating Company shall survive any termination; and if the Operating Company is or becomes involved in any proceeding or litigation by reason of having been the Operating Company for the Association, such provisions shall apply as if this Agreement were still in effect.

35.   Anti-Money Laundering Laws.

The Association hereby represents its compliance with all applicable anti-money laundering laws, including, without limitation, the USA PATRIOT Act, and the laws administered by the United States Treasury Department's Office of Foreign Assets Control, including, without limitation, Executive Order 13224.

*(Rest of Page Intentionally Left Blank)*

*(**Signature Page Follows**)*

115

IN WITNESS WHEREOF, the parties hereto have caused these presents to be signed by their proper officer(s) as of the date first written above.

THE RITZ-CARLTON MANAGEMENT
COMPANY, L.L.C.

By: THE RITZ-CARLTON
DEVELOPMENT COMPANY, INC., its
sole member

By: _____
Name: Daniel B. Zanini
Title: Vice President

690 Market Club Owners Association

By: _____
Name: John Albert
Title: President

V:\ORL535-Legal\Legal  Shared\RCC-San  Francisco  (282)\RCC-(Fractionals)  Condo  Documents\California-situs  state\Management
Agreements\Operating Agreement _Club Association CL.01.24.06.doc

116

EXHIBIT "E"
TO THE AMENDED AND RESTATED DECLARATION OF COVENANTS,
CONDITIONS AND RESTRICTIONS FOR 690 MARKET CLUB

Amended and Restated Limited Subsidy Agreement

## AMENDED AND RESTATED
## LIMITED SUBSIDY AGREEMENT

THIS AMENDED AND RESTATED LIMITED SUBSIDY AGREEMENT ("Agreement") is made as of the 5th day of July 2007, by and between 690 Market Club Owners Association, California nonprofit mutual benefit corporation (the "Association"), and R.C. Chronicle Building, L.P., a Delaware limited partnership ("Developer"), with reference to the following facts and circumstances:

### RECITALS

A.      Developer is the owner of certain real property (the "Property") located in San Francisco County, State of California, as more particularly described on Exhibit A attached hereto and made a part hereof.

B.      The Property is being developed as part of a mixed use condominium project known as 690 Market Street Condominiums in a building located on the Property ("Building") that will include, among other things, commercial units, whole ownership units, and fractional ownership units ("Club Interest Units"), which Club Interest Units are part of a separate regime known as 690 Market Club (the "Club Interest Project"), which are subject to that certain Declaration of Covenants of Covenants, Conditions and Restrictions for 690 Market Club ("Declaration") recorded June 15, 2006, as Document No. 2006-I194390-00 of the Official Records of the City and County of San Francisco, California. The Declaration provides for the operation and maintenance by the Association of the Club Interest Units within the Club Interest Project.

C.      On June 16, 2006, the parties executed that certain Limited Subsidy Agreement ("First Agreement") related to the payment by Developer of any deficiencies between the amounts assessed to all Owners of Club Interest Units, including Club Interests therein, and the Basic Expenses necessary to operate the Club Interest Project during fiscal year 2007 in connection with the Club Interest Units.

D.      In accordance with Section 8(d) of the First Agreement, the parties desire to amend and restate the First Agreement to reflect the change in phasing of the Club Interest Project and correlating deficiencies for fiscal year 2007 related thereto.

E.      The initial phase of the Club Interest Project included, among other things, twelve (12) Club Interest Units on floors 3, 4 and 12 of the Building (collectively, "Phase 1"), which is expected to be completed and ready for occupancy on or about October, 2007.

F.      A second phase of the Club Interest Project may include, among other things, fourteen (14) Club Interest Units on floors 5, 6 and 8 of the Building ("Phase 2").

G.      A third phase of the Club Interest Project may include, among other things, eighteen (18) Club Interest Units on floors 2, 7, 9 and 10 of the Building ("Phase 3").

H.      Association has approved a tentative Budget for fiscal year 2007 ("2007 Budget") based upon forty-four (44) Club Interest Units to be located on floors 2 through 10 and floor 12 of the Building, however, there is no assurance that Developer will add floor 2 and floors 5 through 10 and the respective thirty-two (32) Club Interest Units to the Club Interest Project.

I.      The 2007 Budget includes assessments for the Club Interest Units that may be included in Club Interest Project.

J.      Pursuant to the Declaration, the annual budget of the Association includes a pro-rata share of the expenses of maintaining the Common Area levied by the Master Association, and therefore

118

the Assessments payable by members of the Association include an allocable share of such Basic Expenses.

K.     The twelve (12) Club Interest Units located on floors 3, 4 and 12 of the Building will be completed and available for occupancy prior to the thirty-two (32) Club Interest Units located on floor 2 and floors 5 through 10, if such units are added to the Club Interest Project, which leads to increased staffing ratios and related costs for the former units during the Association's initial period of operation.

L.     In accordance with Sections 11241(a)(2) and 11241(c) of the California Vacation Ownership and Time-share Act of 2004, Developer is willing to pay any deficiencies between the amounts assessed to all Owners of Club Interest Units, including Club Interests therein, and the Basic Expenses necessary to operate the Club Interest Project during fiscal year 2007 in connection with the Club Interest Units. Specifically, Developer and the Association intend to establish by this Agreement a program whereby Developer will provide for the payment of Developer's appropriate share of the costs and expenses of the Association. It is the intention of Developer and the Association that Developer shall, pursuant to the terms and conditions set forth below, pay all of the "Deficiencies" of the Timeshare Association and by its payments hereunder eliminate any need for a Special Assessment during the term hereof (other than special assessments approved by the Board and, if necessary, by Owners, for capital expenditures during the term hereof).

## TERMS AND CONDITIONS

1.     Definitions. Except as otherwise provided herein, the terms used in this Agreement shall have the same meaning as the meanings attributed thereto in the Declaration. As used herein, the term "Assessment" does not refer to nor include personal or default Assessments credited to a specific Owner.

2.     Payment of Deficiencies. In addition to its obligation to pay Assessments as an Owner, Developer hereby agrees to pay the Deficiencies, as defined below, to the Association either on a period basis (pursuant to the Developer's period calendar) or on or before December 31, 2007, as necessary to meet the cash flow needs of the Association related to the Basic Expenses of the Club Interest Units. Based on the 2007 Budget, Developer shall secure or has secured a deficit bond in the amount of $1,479,115, or such lesser amount as deemed acceptable by the California Department of Real Estate, to cover any Deficiencies.

(a)     Deficiencies. "Deficiencies" means, for each Fiscal Year of the Association, the difference between (i) the cumulative total amount of the expenses related to the Club Interest Project that are attributable to the Club Interest Units and the Club Interest Project for fiscal year 2007 including (x) the Reserve Expenses, (y) the Basic Expenses for the Residential Limited Common Area—Club Interest, plus (z) the portion of Basic Expenses for the Common Area assessed by the Master Association and (ii) the annual Assessments received for fiscal year 2007 with respect to the Club Interests sold by the Developer. In addition, the term "Deficiencies" includes any shortfalls for fiscal year 2007 that are budgeted as (x) part of the annual Assessment in a subsequent year, or (y) a special Assessment. No provision of this definition shall, when used hereinafter, entitle Developer to pay less than a full pro-rata share of the Reserve Expenses of the Association for each Club Interest owned by Developer.

(b)     "Reserve Expenses" means those amounts set forth in the budget of the Association for any fiscal year of the Association under consideration for reserves for replacement, repair or refurbishment of:

   1.  the items for which the Association has or anticipates having a duty to maintain and replace, or

119

2.  the items for which the Master Association has or anticipates having a duty to maintain and replace, a pro-rata share of which is included as a reserve component in the regular annual assessment levied against each Club Interest Unit (or Club Interest, as applicable) by the Association.

3.  Notwithstanding the foregoing, Reserve Expenses shall not include any expense set forth in the budget for the Association which is not actually incurred by the Association or the Master Association. For example, if the Club Interest Project at the beginning of a fiscal year of the Association includes thirty two (32) Club Interest Units, but only eight (8) of such Club Interest Units are furnished with Common Furnishings on the Starting Date (defined below), Reserve Expenses would include reserves for replacement of only the Common Furnishings within the eight (8) Club Interest Units which accrue between the Starting Date and the end of such fiscal year, and not within the remaining unfurnished seventeen (17) Club Interest Units, notwithstanding the provision in the budget for reserves for Common Furnishings within all thirty two (32) Units. In the foregoing example, Reserve Expenses would include reserves for the entire fiscal year for all other depreciable assets which are subject to maintenance and replacement by the Association, including interior paint, flooring, water heaters and air-conditioning units within all eight (8) Club Interest Units. Reserves for repair and replacement of the Common Area allocable to all thirty two (32) Club Interest Units would be payable as part of the Basic Expenses assessed to the thirty two (32) Club Interest Units by the Master Association. Developer would accordingly pay, for each Club Interest it owns, a full pro-rata share of the reserves for repair and replacement of the Common Area allocable to the Club Interest Project.

(c)  "Starting Date" means the date on which the first grant deed for each Phase is recorded after the date hereof which conveys a Club Interest owned by Developer excluding any deed which conveys the entire interest in the Club Interest Project then owned by Developer.

(d)  Special Assessments. There shall be no special Assessments during the term of this Agreement assessed against the Club Interest Units or the Club Interests.

(e)  Annual Accounting. Accounting for this Agreement shall be made no later than ninety (90) days after the end of the fiscal year of the Association.

3.   [INTENTIONALLY OMITTED]

4.   Term. The term of this Agreement shall be for the Association's fiscal year 2007.

5.   Club Interest Units. The subsidy set forth in this Agreement only affects the expenses assessed against Club Interest Owners under the Club Interest Association's operating budget by the Club Interest Association.

6.   Surety Bonds. Developer agrees, if required by applicable federal or state law, to furnish to the Association a surety bond ("Bond") in an amount sufficient to provide for Developer's payment of its monetary obligations pursuant to this Agreement. The Bond shall secure the obligation of Developer to pay the Deficiencies during the term of this Agreement.

7.   Effect of Agreement Upon Developer's Assessment Obligations. In the event Developer default in the performance of any of its obligations hereunder and such default shall not have been ed within ten (10) days after notice of default is given to Developer by the Association, (a) Developer's default hereunder shall be deemed a default in the payment of Assessments under the

120

Declaration, which default shall be deemed to have occurred on the date of expiration of the grace period set forth herein and (b) the Association shall have the right to exercise each and all of the rights and remedies set forth herein and in the Declaration with respect to the non-payment of the Assessments by Developer as owner of Club Interest Units, or Club Interests, as applicable, and as provided under the Bond; provided, however, that notwithstanding Developer's failure to cure any default hereunder within the time period specified, Developer shall have the right thereafter to cure such default, and upon so doing, Developer may notify the Association of Developer's intention thereafter to comply with the terms of this Agreement and, if necessary, to reinstate the Bond, in which case all of the rights, duties and obligations of Developer and the Association hereunder shall continue unabated and any Assessments paid by Developer shall be treated as having been paid with respect to Developer's obligations under this Agreement.

    8.    <u>Miscellaneous.</u>

    (a)    <u>Notices.</u> Any notice, request, demand, instruction or other document to be given hereunder to any party shall be in writing and shall either be personally delivered to the person at the appropriate address set forth below (in which event such notice shall be deemed effective only upon such delivery) or delivered by mail, sent by registered or certified mail, return receipt requested, as follows:

<div style="margin-left:2em">

If to the Association:        690 Market Club Owners Association  
                          6649 Westwood Blvd., Suite 500  
                          Orlando, FL 32821

If to Developer:          R.C. Chronicle Building, L.P.  
                          6649 Westwood Blvd., Suite 500  
                          Orlando, FL 32821

With a Copy to:         HCT (690A Market), Inc.  
                          c/o Hunter Group  
                          1411 Harbor Bay Parkway, Suite 100  
                          Alameda, CA 94502

                          and

                          The Ritz-Carlton Development Company, Inc.  
                          6649 Westwood Blvd., Suite 500  
                          Orlando, FL 32821

</div>

Notices so mailed shall be deemed to have been given 48 hours after the deposit of same in any United States mail post office box in the state to which the notice is addressed or 72 hours after deposit in any such post office box other than in the state to which the notice is addressed, postage prepaid, addressed as set forth above. The addresses and addressees for the purpose of this paragraph may be changed by giving notice of such change in the manner herein provided for giving notice. Unless and until such notice is received, the last address and addressee stated by notice, or as provided herein if no notice of change has been sent or received, shall be deemed to continue in effect for all purposes hereunder.

    (b)    <u>Waiver.</u> The waiver or failure to enforce any provision of this Agreement shall not operate as a waiver of any future breach of such provision or of any other provisions hereof.

    (c)    <u>Merger.</u> All understandings and agreements heretofore had between the parties respecting the subsidization contemplated by this Agreement are merged by this Agreement and the exhibits attached hereto, all of which fully and completely express the agreement of the parties. There are

no agreements except as specifically set forth in this Agreement or to be set forth in the instruments or other documents delivered or to be delivered hereunder.

(d)     Amendments.  Except as provided in subparagraph 8(a), above, no change in or addition to, or waiver or termination of this Agreement or any part thereof shall be valid unless in writing and signed by or on behalf of each of the parties hereto.

(e)     Paragraph Headings.  The paragraph headings herein contained are for the purposes of identification only and shall not be considered in construing this Agreement.

(f)     Successors and Assigns.  All of the terms and provisions of this Agreement shall be binding upon, inure to the benefit of and be enforceable by the parties and each of their respective successors and assigns.

(g)     Attorneys' Fees.  In the event any controversy, claim or dispute between the parties hereto, arising out of or relating to this Agreement or the breach thereof, results in arbitration or litigation, the prevailing party in such proceedings shall be entitled to recover from the losing party reasonable expenses, attorneys' fees and costs.

(h)     Severability.  Every provision of this Agreement is intended to be several.  If any term or provision hereof is illegal or invalid for any reason whatsoever, such illegality shall not affect the validity of the remainder of the within Agreement.

(i)     Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be an original and all of which, when taken together, shall constitute a single document.

*(Rest of page intentionally left blank)*

*(Signature page follows)*

122

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

ASSOCIATION:

690 MARKET CLUB OWNERS ASSOCIATION

By: _____

Name: John Albert

Title: President

DEVELOPER:

R.C. Chronicle Building, L.P.,
a Delaware limited partnership

By:       RCC (GP) Holdings LLC,
          a Delaware limited liability company,
          its sole General Partner

          By: _____

          Name: Rich J. Wortila

          Title: Authorized Representative

V:\ORL535\Legal\Legal Shared\RCC-San Francisco (282)\RCC-Fractional Documents\California-situs state\Subsidy Agreement\Amended and Restated Club Subsidy Agreement 7.5.07.doc

Page 6

123

## Exhibit A
### to Limited Subsidy Agreement

Phase 1:  The real property referred to in Recital A of the Limited Subsidy Agreement consists of all of the Club t Units on floors 3, 4 and 12 of the Building as defined and described in that certain Declaration of Covenants, ions and Restrictions for 690 Market Club, recorded or to be recorded in the Office of the Assessor-Recorder for y and County of San Francisco, California and as shown on that certain Condominium Map recorded or to be d in the Office of the Assessor-Recorder for the City and County of San Francisco, California.

Phase 2:  The real property referred to in Recital A of the Limited Subsidy Agreement consists of all of the Club t Units on floors 5, 6 and 8 of the Building as defined and described in that certain Declaration of Covenants. ions and Restrictions for 690 Market Club, to be recorded in the Office of the Assessor-Recorder for the City and r of San Francisco, California and as shown on that certain Condominium Map to be recorded in the Office of the or-Recorder for the City and County of San Francisco, California.

Phase 3:  The real property referred to in Recital A of the Limited Subsidy Agreement consists of all of the Club t Units on floors 2, 7, 9 and 10 of the Building as defined and described in that certain Declaration of Covenants, ions and Restrictions for 690 Market Club, recorded or to be recorded in the Office of the Assessor-Recorder for ty and County of San Francisco, California and as shown on that certain Condominium Map recorded or to be d in the Office of the Assessor-Recorder for the City and County of San Francisco, California.

124

EXHIBIT "F"
TO THE AMENDED AND RESTATED DECLARATION OF COVENANTS,
CONDITIONS AND RESTRICTIONS FOR 690 MARKET CLUB

Schedule of Allocated Percentage Interests for Club Interests

690 MARKET CLUB OWNERS ASSOCIATION

Phases.......................................  1 & 2
Number of Units............................  26
Total Square Footage......................  41,137

| Unit Number | Square Footage | Assessment Interest Per Unit | Assessment Interest Per Club Interest In Such Unit |
|---|---|---|---|
| GROUP A | | | |
| 301 | 1,276 | 3.14% | .262% |
| 302 | 1,303 | 3.14% | .262% |
| 303 | 1,291 | 3.14% | .262% |
| 401 | 1,276 | 3.14% | .262% |
| 402 | 1,303 | 3.14% | .262% |
| 403 | 1,291 | 3.14% | .262% |
| 501 | 1,276 | 3.14% | .262% |
| 502 | 1,304 | 3.14% | .262% |
| 503 | 1,299 | 3.14% | .262% |
| 601 | 1,276 | 3.14% | .262% |
| 602 | 1,304 | 3.14% | .262% |
| 603 | 1,299 | 3.14% | .262% |
| GROUP B | | | |
| 304 | 1,707 | 4.33% | .361% |
| 305 | 1,785 | 4.33% | .361% |
| 404 | 1,707 | 4.33% | .361% |
| 405 | 1,785 | 4.33% | .361% |
| 504 | 1,715 | 4.33% | .361% |
| 505 | 1,801 | 4.33% | .361% |
| 604 | 1,715 | 4.33% | .361% |
| 605 | 1,878 | 4.33% | .361% |
| 801 | 1,775 | 4.33% | .361% |
| 803 | 1,679 | 4.33% | .361% |
| 804 | 1,889 | 4.33% | .361% |
| 1201 | 1,795 | 4.33% | .361% |
| 1202 | 1,932 | 4.33% | .361% |
| GROUP C | | | |
| 802 | 2,476 | 6.02% | .502% |
| TOTALS | 41,137 | 1.0000 | |

125

## SUBORDINATION

The undersigned, as holder of the beneficial interest in and under that certain Construction Deed of Trust, Absolute Assignment of Leases and Rents, Security Agreement and Fixture Filing (the "Deed of Trust") recorded on March 30, 2005, as Instrument No. 2005 H929923 in the Office of the Recorder for the City and County of San Francisco, California, which Deed of Trust is by and between R. C. Chronicle Building, L.P., a Delaware limited partnership, and 942 HCT LLC, a California limited liability company, collectively, as Trustor, for the benefit of Concord Minuteman (Cayman) Ltd., an exempted company organized under the laws of the Cayman Islands, security agent for itself and Mitsui Sumitomo Insurance (London) Ltd., a limited company registered in England, as Beneficiary, hereby expressly subordinates said Deed of Trust (and all amendments thereto) and its beneficial interest thereunder to this Amended and Restated Declaration of Covenants, Conditions and Restrictions for 690 Market Club (the "Declaration") being recorded concurrently with this Subordination, as such Declaration may be amended from time to time.

Date: June 29, 2007

Concord Minuteman (Cayman) Ltd.

By _____

Its _____

[Print Name and Title]

R. Scott Chisholm,
Authorized Signer



126

STATE OF ILLINOIS          )
                           )
COUNTY OF _COOK_           )

On _29 JUNE 2007_, before me, _CHARLES MUELLER_, a Notary Public, personally appeared _R. SCOTT CHISHOLM_, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

"OFFICIAL SEAL"
Charles Mueller
Notary Public, State of Illinois
My Commission Exp. 12/23/2007

Signature _____

DATE FILED: April 26, 2016 4:51 PM
FILING ID: 383AA6159164E
CASE NUMBER: 2015CV30160

**EXHIBIT B**

JAN.11.2001   4:20PM   MVCI LEGAL DEPARTMEN                                    NO.322   P.2/23

# THE RITZ-CARLTON CLUB
# MEMBERSHIP PROGRAM

# AFFILIATION AGREEMENT

450454 01/11/2001 03:02P CONDO DE DAVIS SILVI
116 of 147 R 735.00 D 0.00 N 0.00 PITKIN COUNTY

JAN. 11. 2001   4:20PM   MVCI LEGAL DEPARTMEN                                                    NO. 322   P. 3/23

## TABLE OF CONTENTS

I.      Recitals and Owner Covenants. ...................................................................................2
II.     Definitions. ...................................................................................................................2
        Agreement ....................................................................................................................2
        Allocation ......................................................................................................................2
        Associate Member .......................................................................................................2
        Associated Club ...........................................................................................................2
        Calendar .......................................................................................................................2
        Club ..............................................................................................................................3
        Club Manager ...............................................................................................................3
        Developer ......................................................................................................................3
        Effective Date................................................................................................................3
        Guest of the Program Manager....................................................................................3
        Home Club ....................................................................................................................3
        Member.........................................................................................................................3
        Members Association ....................................................................................................3
        Member Club ................................................................................................................3
        Membership Program or The Ritz-Carlton Club Membership Program .......................3
        Membership Program Documents.................................................................................4
        Membership Program Dues ..........................................................................................4
        Membership Program Marks.........................................................................................4
        Membership Program Materials ...................................................................................4
        Owner ...........................................................................................................................4
        Program Manager .........................................................................................................4
        Reservation System ......................................................................................................4
        Reserved Allocation .....................................................................................................4
        Residence .....................................................................................................................4
        Residence Documents ..................................................................................................4
        Residence Interest ........................................................................................................5
        Season...........................................................................................................................5
        Unreserved Allocation ..................................................................................................5
III.    The Club's Relationship with the Membership Program. ..............................................6
IV.     Covenants of the Developer, Members Association and Club Manager, .......................6
V.      Operation and Management of the Reservation System. ..............................................7
VI.     Assessments, Collections and Transaction Costs. .......................................................8
VII.    Other Member Clubs and Affiliated Clubs ....................................................................9
VIII.   Membership Program Marks and Membership Program Materials................................12
IX.     Term, Early Termination, and Remedies. ......................................................................13
X.      Miscellaneous ..............................................................................................................15



450454 01/11/2001 03:02P CONDO DE DAVIS SILVI
117 of 147 R 735.00 D 0.00 N 0.00 PITKIN COUNTY

ii

JAN.11.2001   4:20PM   MVCI LEGAL DEPARTMEN                                NO.322   P.4/23

**THIS RITZ-CARLTON CLUB MEMBERSHIP PROGRAM AFFILIATION AGREEMENT** ("Agreement") is made and entered this _____ day of _____, 200___, by and among The Ritz-Carlton Travel Company, L.L.C., a Delaware limited liability company, whose address is 6649 Westwood Boulevard – Suite #500, Orlando, Florida 32821-6090, ("Program Manager"), The Ritz-Carlton Development Company, Inc. ("Developer"); Aspen Highlands Condominium Association, Inc. ("Members Association"), and The Ritz-Carlton Management Company, L.L.C., a Delaware limited liability company, whose address is 6649 Westwood Boulevard – Suite #500, Orlando, Florida 32821-6090 ("Club Manager"). The aforedescribed parties are sometimes individually referred to as a "Party" or collectively as "Parties", and said terms shall also include respective successors and assigns of any Party or Parties.

## RECITALS

**WHEREAS**, the Developer has developed a luxury, fractional ownership project known as The Ritz-Carlton Club, Aspen Highlands, located in Aspen, Colorado (the "Club"); and

**WHEREAS**, the Program Manager has established a reservation system (the "Reservation System") and other related benefits and services known as The Ritz-Carlton Club Membership Program (the "Membership Program") for the purpose of providing a means for Members to reserve the use of accommodations and facilities at the Club and other locations affiliated with the Membership Program, in accordance with and as restricted by the terms of the Membership Program as set forth in this Agreement and the procedures governing reservations (the "Reservation Procedures"); and

**WHEREAS**, the Members Association is the not-for-profit owners' association for the Club with responsibility for the management and operation of the Club; and

**WHEREAS**, the Members Association has entered into that certain property management agreement with the Club Manager, which, among other things, provides for the delegation, to the extent permitted by law and not otherwise prohibited, of certain management and operations responsibilities to the Club Manager; and

**WHEREAS**, the Developer and the Members Association desire that the Club become affiliated with the Membership Program and that each Owner (defined below) at the Club become a Member (defined below) of the Membership Program with the ability to make use of the Reservation System (defined below) and the other benefits of the Membership Program, pursuant to the terms of this Agreement and the Reservation Procedures; and

**WHEREAS**, the Club Manager desires to have the Club become affiliated with the Membership Program and further desires to coordinate its activities and perform services associated therewith in accordance with the provisions of this Agreement; and

**WHEREAS**, the Program Manager desires that the Developer, the Members Association, the Club Manager and the Members acknowledge that the Program Manager shall have all of the duties, obligations and responsibilities for the operation of the Reservation System regarding the use of Residences (defined below) at the Club as part of the Membership



450454 01/11/2001 03:02P CONDO DE DAVIS SILVI
118 of 147 R 735.00 D 0.00 N 0.00 PITKIN COUNTY

JAN. 11. 2001  4:28PM  MVCI LEGAL DEPARTMEN   NO. 322  P.5/23

Program in accordance with the terms of this Agreement, the Reservation Procedures and applicable law, so as to fully integrate Residences at the Club and their respective Members into the Membership Program.

NOW, THEREFORE, in consideration of the mutual covenants and obligations contained in this Agreement, the parties hereby agree as follows:

## AGREEMENT

### I. Recitals and Owner Covenants.

1.1 By execution of this Agreement, the Parties agree that the above recitals are true and correct and are hereby incorporated into this Agreement.

1.2 By acceptance of a conveyance of a Residence Interest (defined below) at the Club subject to the Residence Documents (defined below), which have been provided to or made available to each Member, each Member is deemed to have consented to the terms and conditions of this Agreement and to have further consented to the appointment of the Members Association as the authorized representative to act on behalf of the Member with respect to the provisions of this Agreement. Wherever the Members Association acknowledgment, consent, understanding and/or agreement is stated or implied in this Agreement, such acknowledgment, consent, understanding and/or agreement shall be deemed to also have been given by the Board of Directors, if applicable, and each Member.

### II. Definitions.

Unless the context requires a different meaning, the following terms used in this Agreement are defined as follows:

Agreement means this Ritz-Carlton Club Membership Program Affiliation Agreement.

Allocation means the total number of days each year, as established in the Residence Documents, for which a Member is entitled to use a Residence without incurring a per diem charge. An Allocation may be further divided into Reserved Allocations (defined below) and Unreserved Allocations (defined below).

Associate Member means a person having privileges within the Membership Program through a separate category of membership other than that type of membership associated with ownership of a Residence Interest and mandatory affiliation with the Membership Program

Associated Club means a location pursuant to which membership in the Membership Program is made available to persons on a voluntary basis in accordance with such terms and conditions as may be determined by the Program Manager and for which an agreement similar to the subject Agreement has been executed.

Calendar means the annual calendar(s) promulgated by the Program Manager and made available to all Members which identifies Seasons (defined below), the Reserved and



450454 01/11/2001 03:02P CONDO DE DAVIS SILVI
119 of 147 R 735.00 D 0.00 N 0.00 PITKIN COUNTY

JAN.11.2001    4:21PM    MVCI LEGAL DEPARTMEN                        NO.322    P.6/23

Unreserved Allocations, Reservation and Confirmation Periods and other pertinent information for each specific Club in a given year.

Club means a Member Club or Associated Club, or in some cases the subject Club depending upon the context.

Club Manager means the person engaged by the Developer, or as applicable, the Members Association, with responsibility for the management and operation of a particular Member Club.

Developer means the person who has developed and created a plan for the shared usage by Members of Residences and common facilities at a particular Member Club and is selling Residence Interests therein directly or through others.

Effective Date means the date when this Agreement has been fully executed by all Parties.

Guest of the Program Manager means any person who lodges in a Residence at a Club on a space-available basis as an invited guest of the Program Manager, who, except where otherwise specifically provided, shall be treated as a guest.

Home Club means the particular Member Club in which the Member owns a Residence Interest.

Member means a person (natural or otherwise) who, by virtue of ownership of a Residence Interest, has membership privileges in the Membership Program on a mandatory basis. Where more than one person own a Residence Interest, then such persons shall designate at the time of purchase of a Residence Interest which person will be deemed to be the Member (cannot be more than one) for purposes of reserving usage under the Reservation Procedures. Where a Member is not an individual, it shall designate at the time of purchase of a Residence Interest, which individual will be treated as the Individual Member for purposes of reserving usage under the Reservation Procedures, and such designated person will remain in place until changed in accordance with the Residence Documents.

Members Association means all of the Members, including the Developer as the owner of unsold Residence Interests, who own Residence Interests at a particular Member Club (defined below) and who are part of an association of Members, whether such association is incorporated or unincorporated.

Member Club means those locations, including the subject Club, which become affiliated with the Membership Program from time to time pursuant to an agreement similar to this Agreement or otherwise, and for which membership in the Membership Program is a mandatory obligation of ownership of a Residence Interest. For locations where membership in the Membership Program may only be a condition of ownership of Residence Interests in some Residences, the term "Member Club" shall only be deemed to refer to such Residences.

Membership Program or The Ritz-Carlton Club Membership Program means the program of benefits and services created and operated by the Program Manager as they may exist from time to time, which Members participate in by virtue of ownership of a Residence



3

JAN.11.2001   4:21PM   MVCI LEGAL DEPARTMEN                    NO.322   P.7/23

Interest or by other means established by the Program Manager, e.g., the benefits and services made available to Associate Members.

Membership Program Documents means this Agreement, the Reservation Procedures and any other documents governing the use and operation of the Membership Program, as may be amended from time to time.

Membership Program Dues shall consist of the costs and expenses of the Membership Program that are assessable to the Members Association each calendar year and become common charges.

Membership Program Marks means all present and future trademarks or service marks, trade names, symbols, logos, slogans, designs, insignia, emblems, devices and distinctive designs, whether owned by or licensed to the Program Manager or any of its affiliates or subsidiaries, and whether or not registered under the laws of the United States of America or any other country, which are used to identify the Membership Program and/or Program Manager or are otherwise used in the promotion and/or operation of the Membership Program, including, but not limited to, the marks identified on Exhibit A attached hereto, as may be amended from time to time by the Program Manager in its sole discretion.

Membership Program Materials means those reservation services, promotional and/or informational materials developed by the Program Manager for the Membership Program from time to time.

Owner means the owner of record of a Residence Interest at the subject Club and at other Member Clubs who is also a Member and is referred to herein as such.

Program Manager means the person which manages and operates the Membership Program.

Reservation System means the method, means or system by which Members and, as applicable, Associate Members are required to compete among themselves in order to reserve the use of any Residences at any Member Club and, as applicable, an Associated Club.

Reserved Allocation means the portion of the Allocation as established in the Residence Documents, for which a Member is assigned usage of a specific Residence or a specific type of Residence during a specific period or periods of time each year pursuant to the Calendar for a given Home Club

Residence means an apartment, villa, unit or other separate lodging accommodations available for occupancy at a Club as defined in the Residence Documents.

Residence Documents means those documents governing the use of Residences at a particular Home Club pursuant to which the Developer has created Residence Interests owned or to be owned by Members such as, but not limited to, any declaration or other instrument establishing the Residence Interest conveyed to Owners, any Bylaws of the Members Association and any Rules and Regulations of the Members Association.



450454 01/11/2001 03:02P CONDO DE DAVIS SILVI
121 of 147 R 735.00 D 0.00 N 0.00 PITKIN COUNTY

JAN.11.2001   4:21PM   MVCI LEGAL DEPARTMEN                                    NO.322   P.8/23

<u>Residence Interest</u> means the particular real property interest in or use rights a Member has at a Member Club.

<u>Season</u> means that time or times of the year set forth in the Calendar for each particular Club which reflects usage of a Residence consistent with the Residence Interest purchased by a Member as set forth in the Residence Documents.

<u>Unreserved Allocation</u> means the days remaining each year from a Member's Allocation after the number of days designated as Reserved Allocation are deducted as established in the Residence Documents.

### III. The Club's Relationship with the Membership Program.

3.1  By execution of this Agreement, the Parties agree to affiliate the Club with the Membership Program in accordance with the terms and conditions of the Membership Program Documents. During the term of this Agreement and any renewal terms, the Developer, the Members Association and Club Manager shall cooperate fully with the Program Manager in the promotion and operation of the Membership Program at the Club.

3.2  The Developer, the Members Association and the Club Manager hereby acknowledge the following:

a.   In accordance with the Residence Documents, membership in the Membership Program is an appurtenance to and a condition of ownership of a Residence Interest at the Club.

b.   The Program Manager manages the use of all Residences at the Club, and at all other Member Clubs, through a Reservation System operated under the name of The Ritz-Carlton Club Membership Program.

c.   In the event the Program Manager affiliates other resorts with the Membership Program in accordance with Article VII below, the Members at such locations will compete, through participation in the Reservation System, with Members at all Member Clubs, including the subject Club, for reservations for any Residences at such Member Clubs that are available after any priority given to Members at a particular Member Club, if any.

d.   The relationship between the Members Association and the Program Manager and the operation of the Membership Program on behalf of the Members at a particular Member Club constitutes legitimate business of the Members Association.

e.   The Membership Program is not a legal entity nor an association of any kind, but instead is a service name given to the variety of reservation services and other benefits currently offered and the restrictions currently imposed through the Program Manager. Members do not acquire any interest in the Membership Program per se as part of their Residence Interest. The services provided by the Program Manager do not include Club Manager's site management and assessment collection duties for the subject Club, which are provided for and governed by the Club Manager's management agreement with Members Association.



450454 01/11/2001 03:02P CONDO DE DAVIS SILVI
122 of 147 R 735.00 D 0.00 N 0.00 PITKIN COUNTY

5

### IV.  Covenants of the Developer, Members Association, and Club Manager.

4.1  In connection with the Club, the Developer, Members Association and Club Manager agree to do the following:

a.     Promptly submit or cause to be submitted to the Program Manager copies of all fully executed and recorded deeds or other evidence satisfactory to the Program Manager indicating that a Residence Interest at the Club has been transferred to a Member and setting forth that the Residence Interest is subject to membership in the Membership Program as an appurtenance to the Residence Interest such that the Member's use of a Residence at the Club or other Member Club is subject to the terms and conditions of the Membership Program.

b.     Fully and accurately describe the Membership Program to Members and prospective purchasers of Residence Interests at the subject Club.   The Developer, Members Association and Club Manager shall not in any way misrepresent the Membership Program or the Club's relationship with the Program Manager to Members or prospective purchasers of Residence Interests at the Club.   The Developer, Members Association and Club Manager shall not amend, summarize, change or modify any Membership Program Materials without the prior express written consent of the Program Manager, and shall provide such Membership Program Materials, the Membership Program Documents and Residence Documents, as amended, to Members upon their reasonable request and/or as requested by applicable law.

c.     Remain informed of new services and benefits provided by the Program Manager to Members.

d.     Comply with all applicable federal, state and local laws, as well as all applicable administrative rules, regulations and orders in the conduct of their respective businesses as such conduct may affect the Club and the Membership Program.

4.2  The Members Association agrees that at the time the Developer transfers control of the Club to the Members Association as set forth in the Residence Documents, if any, the Club shall continue to be affiliated with the Membership Program as a Member Club pursuant to the provisions of the Membership Program Documents.

4.3  The Developer and Members Association represent and warrant to the Program Manager that (a) the Developer owns or leases, or shall own or lease or have a contract for the purchase or lease prior to marketing or commencement of sales, the real estate and Improvements constituting the Club; and (b) each Member at the  Club shall acquire, possess and enjoy the right to use a Residence at the Club in accordance with the restrictions contained in the applicable deed or other instrument pursuant to which a Member acquired a Residence Interest, the Residence Documents and the Membership Program Documents and in accordance with applicable law.

4.4  The Developer, Members Association and Club Manager agree that during the term of this Agreement , while the Club remains affiliated with the Membership Program as



6

a Member Club, all requests for reservations of Residences at the Club from Members shall be processed through the Program Manager.

4.6  The Developer, Members Association and Club Manager agree to manage, operate and maintain the Club in a manner consistent with the standards of quality and customer service established by the Program Manager for all Member Clubs from time to time. In this regard, the Program Manager shall have the right to consent to the employment of any Club Manager engaged by the Developer or Members Association to manage, operate and maintain the Club.  The Developer, Members Association and Club Manager agree to immediately notify the Program Manager of any change in any fact or circumstance affecting the operation of the Club and/or the Membership Program with respect to the Club, including, but not limited to, the termination of any existing Club Manager, and they further agree that should the Program Manager's consent not be obtained and given to the termination and/or employment of a new Club Manager that the Program Manager shall have the right to immediately terminate this Agreement and the affiliation of the Club with the Membership Program.

### V. Operation and Management of the Reservation System.

5.1  By execution of this Agreement, the Developer, Members Association and Club Manager hereby acknowledge that the Program Manager has all of the rights and duties with regard to the reservation of use rights by Members at the Club and at other Member Clubs or Associated Clubs, for the purpose of implementing the reservation restrictions by virtue of and as outlined in the Membership Program Documents. The Parties agree that the Program Manager's rights, duties and obligations as set forth in this Agreement are exclusive to the Program Manager, and the Program Manager hereby agrees to perform all such duties and obligations.

5.2  The Program Manager shall have the right to adopt and amend those portions of the Membership Program Documents which the Program Manager, in its sole discretion, determines are necessary or desirable to amend from time to time in order to operate and manage the Membership Program and/or Reservation System.  The Membership Program Documents will only be adopted or amended in a manner that in the Program Manager's reasonable business judgment will be for the principal purpose of improving upon the quality and operation of the Membership Program and/or Reservation System and furthering the collective enjoyment of the Membership Program by present and future Members (including Associate Members) as a whole.  The Developer, Members Association and Club Manager agree that each Member's use of a Residence at his or her Home Club and the participation of each Member in the Membership Program shall be governed by the provisions of the Membership Program Documents as adopted and amended from time to time by the Program Manager.

5.3  The Developer, Members Association and Club Manager agree that the Program Manager shall have the right pursuant to the Reservation Procedures to reserve any unreserved use of Residences for its own promotional use, rental for its own account or any other purpose as the Program Manager determines in its sole discretion.  In return, the Program Manager agrees to make available to the Members Association that portion of such unreserved usage verified by the Club Manager as being reasonably necessary to perform additional maintenance of the Residences.



450454 01/11/2001 03:02P CONDO DE DAVIS SILVI
124 of 147 R 735.00 D 0.00 N 0.00 PITKIN COUNTY

5.4  The Developer, Members Association and Club Manager acknowledge and agree that all personal and intellectual property related to the Program Manager's operation of the Reservation System for Residences at the Club, including, but not limited to, any and all computer hardware and software, is and always shall be the personal property of the Program Manager.   In the event that this Agreement is terminated, irrespective of whether the termination is voluntary or involuntary and irrespective of the cause of such termination, the Program Manager shall continue to own and control the Reservation System, subject to, and in accordance with applicable law.

5.5  By execution of this Agreement, the Developer, Members Association and Club Manager hereby acknowledge that the Program Manager is responsible for exercising all of the rights and duties associated with the affiliation of Residences at the Club with any other program which provides use rights to Members at various locations through exchange of use rights or other means, and neither the Developer, Members Association nor Club Manager shall affiliate or attempt to affiliate such Residences with any such program other than as directed and approved by the Program Manager. The Program Manager shall have the right, but not the obligation, to manage all such use rights made through any such program on behalf of Members at the Club in coordination with the provider of such other use program.

## VI.  Assessments, Collections and Transaction Costs.

6.1  The Program Manager shall have the responsibility for providing the Members Association and Club Manager with notice of its total proposed Membership Program Dues assessment for the Club for the upcoming operating year at least ninety (90) days prior to the Members Association's annual meeting.   In accordance with the Residence Documents, costs and expenses incurred by the Program Manager in connection with the operation of the Reservation System and the delivery of other Membership Program services and benefits shall be assessed by the Program Manager as Membership Program Dues to each Member and/or Member Resort based upon a reasonably prorated formula, together with a reasonable fee to the Program Manager which will contain a reasonable profit factor. Any extraordinary or special costs and expenses incurred by the Program Manager with respect to a given Member, group of Members or Member Club, may be assessed by the Program Manager only to the affected Member, group of Members or Member Resort as a portion of their Membership Program Dues. The Developer, Members Association, and Club Manager are not entitled to approve increases in Membership Program Dues assessments; however, the Program Manager agrees that in no event shall the amount of Membership Program Dues assessed to the Club per Member in a given calendar year exceed one hundred twenty percent (120%) of the Dues assessed to the Club per Member in the previous calendar year (i.e., a twenty percent (20%) increase) on a cumulative basis (e.g., if there is no increase in one year, then the increase in the following year may be forty percent (40%).

6.2  As provided in Section 3.2a of Article III above, this Agreement, including the rights and obligations set forth herein, shall constitute an appurtenance to and obligation of ownership of a Residence Interest at the Club.  The Members Association shall be liable to the Program Manager for all Membership Program Dues assessed hereunder; however, the Members Association may, in accordance with the Residence Documents for the Club, assess and collect from each Member that portion of the Membership Program Dues attributable to such Member.  The Members Association agrees that it shall pay to the Program Manager an

amount equal to all the Membership Program Dues assessed against Members for a given year by February 28th (or such other reasonable date established by the Program Manager) of that year, whether or not the Members Association has actually been successful in collecting such amount from the Members by such date.

6.3  The Developer, Members Association and Club Manager agree to use their best efforts to annually assess and collect all amounts due from Members for the maintenance and operation of the Club, as required by the Residence Documents. All Membership Program Dues owed to the Program Manager from Members shall be assessed and collected by the Members Association and the Club Manager with such amounts. Membership Program Dues shall be remitted to the Program Manager by the Members Association on at least a weekly basis (or such other reasonable periodic basis established by the Program Manger) as collected; and in any event, pursuant to Section 6.2 above, shall be paid in full to the Club Manager by the Members Association no later than February 28th (or such other reasonable periodic basis established by the Program Manger) of each year.

6.4  The Developer, Members Association and Club Manager acknowledge and agree that any Member making a reservation pursuant to the Reservation Procedures, other than a reservation by a Member to use a Residence at the Club as part of the Member's Reserved Allocation, shall be personally liable for any transaction charges assessed to the Member by the Program Manager from time to time as set forth in the Reservation Procedures.

6.5   A Member shall only be permitted to use a reservation pursuant to the Reservation Procedures if all common assessments, taxes and other charges attributable to the applicable Residence Interest for the year for which the reservation is requested have been paid in full.  In the event the Members Association has not yet assessed such amounts to become due, then, as a condition to acceptance by the Program Manager of the reservation request, the Member may be required to remit to the Program Manager an amount equal to the estimated amounts to become due, as determined by the Program Manager after consultation with the Club Manager. All such monies shall be held by the Program Manager for the benefit of the Members Association and/or the Member as required by applicable law.  Any interest earned on such funds will be paid to the Members Association, and, in no event, will it be due and payable to the Member.  In the event the amount remitted to the Program Manager for the estimated amounts due is in excess of the actual amounts due, the excess amount shall be returned to the Member or applied to the following year's common assessments taxes, at the Program Manager's sole discretion.  In the event the amount remitted to the Program Manager is less than the actual amounts due, the Member shall remain liable for the deficiency and in no event shall be forgiven for said deficiency. The Members Association agrees, however, not to exercise any "lock-out" remedy it may have pursuant to applicable law and/or the Residence Documents, against any Member with respect to any deficiency which may exist between actual amounts assessed to the Member for a given calendar year, and the estimated amounts for that calendar year actually collected by Program Manager and to the Members Association.

## VII.  Other Member Club and Associated Clubs.

7.1   In the event the Program Manager affiliates one or more additional Member Clubs or Associated Clubs with the Membership Program, the agreement executed to effect such affiliation shall, subject to applicable law, contain substantially the same terms and



conditions as this Agreement in all material respects under the circumstances as pertaining to each such additional Member Club or Associate Club.

   7.2 The Parties agree that the Program Manager shall have the following rights with respect to the addition of locations as Member Clubs or Associated Clubs:

     a. The Program Manager may, in its sole discretion, elect to affiliate other locations with the Membership Program as Member Clubs or Associated Clubs from time to time. Neither the Developer, Members Association, nor Club Manager shall be entitled to participate in or consent to the Program Manager's decision in this regard. The Developer, Members Association and the Club Manager acknowledge and understand that in the event other locations are affiliated with the Membership Program, r the addition of accommodations and facilities will result in the addition of new Members and, who, subject to the Allocation for each respective Member, will compete with existing Members and/or Associate Members in making reservations for the use of available accommodations and facilities within the Membership Program, including Residences at the subject Club.

     b. The Program Manager may, in its sole discretion, create a separate membership program, develop individual resort properties as residential, transient or other use, or enter into management agreements with resort properties without the approval of the Developer, Members Association or Club Manager; and the Club Manager is under no obligation to affiliate with the Membership Program any specific location.

   7.3 The Parties agree that any deletion of Member Clubs and/or Associated Clubs from the Membership Program shall be governed by the following:

     a. In the event of a deletion of any Member Club or Associated Club that results in accommodations or facilities of such Member Club or Associated Club being unavailable for use by Members and/or Associate Members, the Program Manager shall notify all Members and Associate Members with confirmed reservations at the applicable Member Club or Associated Club of such unavailability of use within thirty (30) days after the related event of casualty, eminent domain action or automatic deletion.

     b. The Program Manager may, in its sole discretion, delete an entire existing Member Club or Associated Club from the Membership Program due to casualty where any of the affected accommodations or facilities are not reconstructed or replaced. With respect to casualty, subject to applicable law the Parties further agree that:

      (1) the Members Association and Club Manager shall obtain and maintain casualty insurance as to all accommodations, facilities and furnishings located upon the Club in amounts required by applicable law and/or the Residence Documents The Program Manager shall not be liable for any costs associated with obtaining or maintaining such insurance.

      (2) any insurance proceeds resulting from a casualty at the Club shall be applied to the replacement or acquisition of additional similar accommodations or facilities.

450454  01/11/2001 03:02P CONDO DE DAVIS SILVI
127 of 147 R 735.00 D 0.00 N 0.00 PITKIN COUNTY

JAN.11.2001    4:22PM    MVCI LEGAL DEPARTMEN                              NO.322    P.14/23

(3)    any replacement of accommodations or facilities of the Club due to casualty shall be made so as to provide Owners with an opportunity to enjoy a substantially similar experience as was available with the deleted accommodations or facilities, as determined by the Program Manager in its sole discretion. In determining whether the replacement accommodations and facilities will provide a substantially similar experience, the Program Manager shall consider all relevant factors, including, but not limited to, some or all of the following: size, capacity, furnishings, maintenance costs, location (geographic, topographic and scenic), demand and availability for use. The Program Manager reserves the right, in its sole discretion, to reject replacement accommodations and facilities that do not meet its affiliation criteria including the high standards of quality and customer service established by the Program Manager for all Member Clubs or Associated Clubs from time to time.

c.    The Program Manager may, in its sole discretion, delete existing Member Clubs or Associated Clubs from the Membership Program where an eminent domain action has taken place and where any of the affected accommodations or facilities are not replaced. With respect to any such eminent domain action, subject to applicable law, the Parties further agree as follows:

(1)    in the event of a taking of all or a portion of the accommodations and facilities of a Member Club or Associated Club by eminent domain, the Developer, Members Association and the Club Manager agree that any proceeds resulting from such taking shall be applied, with the prior express written approval of the Program Manager, to the replacement or acquisition of additional similar accommodations or facilities.

(2)    any replacement of accommodations or facilities due to a taking by eminent domain shall be made upon the same basis as replacements made due to casualty as set forth above.

d.    The Program Manager may, in its sole discretion, delete an existing Member Club or Associated Club pursuant to the specific termination rights contained in the applicable agreement pursuant to which the location became affiliated with the Membership Program. A Member Club or Associated Club will also be automatically deleted from the Membership Program upon the expiration or earlier termination of the term of its fractional ownership plan, if any, and/or other similar plan for shared ownership and/or use of Residences as set forth in the applicable Residence Documents.

e.    During any reconstruction or replacement period, Members may temporarily compete for available accommodations on a greater than one-to-one purchaser to accommodation ratio. If available, the Members Association and Club Manager shall acquire business interruption insurance for securing replacement accommodations or facilities during any reconstruction, replacement or acquisition period.

f.    The Program Manager may delete an Associated Club from the Membership Program at any time, in its sole discretion in accordance with the terms of the applicable agreement pursuant to which the Associated Club became affiliated with the Membership Program.

g.    In the event that a Member Club or Associated Club is deleted from the Membership Program, all Members or Associate Members who own Residence



450454 01/11/2001 03:02P CONDO DE DAVIS SILVI
128 of 147 R 735.00 D 0.00 N 0.00 PITKIN COUNTY

11

Interests at the deleted location will also be deleted from the Membership Program and will not be able to make reservations at other Member Clubs or Associated Clubs; however, they will continue to have reservation rights in the location where he or she owns a Residence Interest in accordance with the terms of the Residence Documents.

7.4 While the Program Manager does not currently intend to substitute new locations for existing Member Clubs, the Program Manager reserves the right to exercise substitution rights, from time to time, in accordance with applicable law.

7.5 The Developer, Members Association and Club Manager understand and acknowledge that the accommodations and facilities of Associated Clubs are voluntarily affiliated with the Membership Program and there is no guarantee that accommodations and facilities at an Associated Club will ever be available for reservation or use by Members.

### VIII. Membership Program Marks and Membership Program Materials.

8.1. The Program Manager and its affiliates and subsidiaries are the owners of all rights in the Membership Program Marks.   Neither the Members Association nor the Members have any license to use or other interest in the Membership Program Marks.   The Developer and/or the Club Manager may identify the Club as a Ritz-Carlton Club location and part of the Membership Program until such time as the Program Manager, in its sole discretion, determines otherwise.

8.2 The Developer, Members Association and Club Manager acknowledge that:

a.    the Program Manager has the right to exclude others from using the Membership Program Marks and Membership Program Materials and any variant or combination of said marks or materials determined by the Program Manager to be confusingly similar to the Membership Program Marks or Membership Program Materials;

b.    the Program Manager has the right to control the use of the Membership Program Marks and Membership Program Materials in connection with the Membership Program; and

c.    all uses of the Membership Program Marks and Membership Program Materials inure exclusively to the benefit of the Program Manager.

8.3   The Developer and Club Manager may use the Membership Program Marks and Membership Program Materials only with prior written approval from the Program Manager and in connection with any materials furnished from time to time by the Program Manager and only for the sole purpose of promoting the Membership Program. Said Parties shall comply with all requests of the Program Manager with respect to the appearance and use of the Membership Program Marks and Membership Program Materials. Said Parties agree to promptly submit one copy of all printed material which will use any of the Membership Program Marks or all or a portion of any Membership Program Materials to the Program Manager for inspection and approval in advance of use, which approval may be withheld or conditioned by the Program Manager in its sole and absolute discretion.

JAN.11.2001   4:23PM   MVCI LEGAL DEPARTMEN                                NO.322   P.16/23

8.4    In the event Program Manager, in its sole discretion, provides written notice to the Developer and/or the Club Manager that it shall no longer be permitted to use Membership Program Marks, each Party notified shall immediately take steps to cease all use of the marks(s) identified in Program Manager's notice and shall:

(a)    immediately remove all signs containing the Membership Program Marks from the Club, and from any off-site location;

(b)    immediately destroy all stationery, descriptive literature or printed or written matter bearing the Membership Program Marks;

(c)    immediately cease and desist from using the Membership Program Marks (or any variation thereof) orally or in writing;

(d)    take immediate action to effect changes to any and all documents of the Developer and/or the Club Manager that reflect the Membership Program Mark(s) to eliminate the use of such mark(s) as soon as possible, but in any event, within three (3) months.

The provisions of this Section 8.4 may be enforced by any remedy at law or equity, including mandatory and/or prohibitory injunctions by the Program Manager against the Members Association, the Members, the Developer and/or Management Company.

### IX.  Term, Early Termination and Remedies.

9.1.    This Agreement shall have an initial term commencing on the Effective Date and terminating five (5) years from December 31st of the first year that the Club is operational and Residences are available for occupancy for any portion of the year.  Upon the expiration of said initial five (5) year period, this Agreement shall automatically renew for successive periods of five (5) years each until or unless terminated by a vote of not less than 51% of the votes entitled to be cast by Members in the Members Association.  Under no circumstances shall the Members Association be authorized to terminate this Agreement without such vote.  Program Manager may terminate this Agreement at the end of the initial term or any renewal term by giving written notice to the Members Association no later than ninety (90) days prior to the end of any such initial term or subsequent renewal term.  Notwithstanding the foregoing, this Agreement may otherwise be terminated as provided for below in this Article IX.

9.2  Termination of this Agreement and the Club no longer being affiliated with the Membership Program can occur as follows:

a.    This Agreement will automatically terminate upon:

(1)    the declaration of bankruptcy or insolvency of the Developer, Members Association or Club Manager according to law or if any general assignment shall be made of the Developer's, Members Association's or Club Manager's property for the benefit of creditors; provided, however, the Program Manager shall have the



450454 01/11/2001 03:02P CONDO DE DAVIS SILVI
130 of 147 R 735.00 D 0.00 N 0.00 PITKIN COUNTY

13

JAN.11.2001   4:23PM   MVCI LEGAL DEPARTMEN                    NO.322   P.17/23

right, in its sole discretion, to continue the Agreement as to the Parties that have not been declared bankrupt or insolvent or made the subject of a general assignment for the benefit of creditors or during the pendency of such actions; or

     (2)   the deletion of the Club in accordance with Article VII above.

   b.   The Parties may terminate this Agreement:

     (1)   by the mutual written agreement of all of the Parties, effective upon the date agreed to by all Parties; or

     (2)   in the event of a material breach of any of the terms, conditions, covenants, representations or warranties contained in this Agreement without the breaching Party curing the asserted breach to the reasonable satisfaction of the Party giving such notice within thirty (30) days of the date of written notice to the breaching Party stating the grounds for such termination; or

     (3)   in the event the Members Association votes to terminate this Agreement pursuant to a majority vote of the non-Developer Members to be conducted every five (5) years at a meeting of the Members Association at which (notwithstanding any provision of the Bylaws to the contrary) fifty percent (50%) or more of the voting power of the Members Association residing in Owners other than Developer is present, in person or by proxy. Any such meeting of the Members Association shall be considered a special meeting of the Members Association and shall only be held of requested by the Board or the Owners, as provided for in the Bylaws of the Members Association. Any special meeting of the Members Association called to consider a termination of this Agreement must be held within thirty (30) days of any five (5) year anniversary date of the original recording of the Declaration.

   c.   The Program Manager may terminate or suspend its participation in this Agreement, immediately upon written notice to the Developer, Members Association and Club Manager, in the event that the Program Manager determines, in its sole discretion, that the Developer, Members Association and/or Club Manager have failed to manage, operate and maintain the Club in a manner consistent with the standards of quality and customer service established by the Program Manager from time to time, including, but not limited to, the employment or termination by the Developer and/or Members Association of a management company without the Program Manager's consent, as addressed at Section 4.5 of Article IV hereinabove.

9.3 Any Party's exercise of its right to terminate pursuant to this Agreement shall in no way limit or impair its right to seek other legal or equitable remedies in connection with a breach by any other Party.

9.4 Upon termination or of this Agreement, the following events shall occur:

   a.   The Developer shall immediately discontinue the offering of Residence Interests with appurtenant memberships in the Membership Program to prospective purchasers at the Club.

14

450454 01/11/2001 03:02P CONDO DE DAVIS SILVI
131 of 147 R 735.00 D 0.00 N 0.00 PITKIN COUNTY

b. The Developer, Members Association and Club Manager shall immediately cease using and thereafter abstain from using all the Membership Program Marks and any name or mark similar thereto and all Membership Program Materials including, but not limited to, all of the Program Manager's personal and intellectual property utilized in connection with the operation and management of the Membership Program, except as specifically authorized by this Agreement. No property right in or privilege to use the Membership Program Marks or Membership Program Materials is created by this Agreement that will extend beyond the expiration or termination of this Agreement, except as specifically permitted by this Agreement. Failure to abstain from using the Membership Program Marks or Membership Program Materials following termination of this Agreement shall entitle the Program Manager to receive liquidated damages from the offending Party in the amount of One Thousand Dollars ($1,000) per day in addition to any other injunctive or equitable relief available to the Program Manager.

c. The Program Manager shall honor all reservations and reservation privileges of Members or Associate Members from other Member Clubs or Associated Clubs reserving time at the subject Club that are confirmed or accrued prior to termination or suspension and shall honor all reservations and reservation privileges of Owners at the Club reserving time at other Member Clubs or Associated Clubs that are confirmed or accrued prior to termination of this Agreement. The Developer, Members Association and Club Manager shall honor all reservations and reservation privileges of Members or Associate Members from other Member Clubs or Associated Clubs reserving time at the Club that are confirmed or accrued prior to termination. This requirement shall survive the termination of this Agreement.

9.5 In the event that the Developer, Members Association and/or Club Manager fails to perform its duties under this Agreement to the extent that a Member, Associate Member or other authorized person with a confirmed reservation at the Resort is wrongfully denied access to a Residence at the subject Club, then the Developer, Members Association and/or Club Manager shall immediately correct such denial of access at its own expense.

9.6 Each Party acknowledges that, unless specifically stated otherwise in this Agreement, damages cannot adequately compensate the other Parties for a breach of any of the provisions of this Agreement, and therefore the Parties agree that each Party shall be entitled to a remedy of specific performance or injunctive relief, as appropriate, in the event of a breach or threatened breach of any such provisions by any other Party, in addition to any other appropriate legal or equitable remedies.

9.7 Each Party agrees to indemnify, defend and hold harmless the other Parties from and against any and all claims, demands, obligations, deficiencies, judgments, damages, suits, losses, penalties, expenses, costs (including attorneys' fees at the trial and appellate levels) and liabilities of any kind, type or nature whatsoever directly or indirectly resulting from, arising out of or in connection with this Agreement or the operation of its business as a result of any acts or omissions by it or any of its directors, officers, partners, employees, representatives, agents, brokers, salesmen or associates.

## X. Miscellaneous

450454 01/11/2001 03:02P CONDO DE DAVIS SILVI
132 of 147 R 735.00 D 0.00 N 0.00 PITKIN COUNTY

JAN.11.2001   4:23PM   MVCI LEGAL DEPARTMEN                        NO.322   P.19/23

10.1 This Agreement shall become effective on the date it is executed by all Parties and shall continue in force and effect until its scheduled termination or until such time as it is otherwise terminated pursuant to Article IX above.

10.2 The Program Manager reserves the right, and the Developer, Members Association and Club Manager acknowledge the Program Manager's right, to assign its rights and duties under this Agreement. No other Party may assign its rights and duties under this Agreement without the prior written consent of the Program Manager, which it may give or withhold in its sole discretion.

10.3 Except as may be otherwise provided herein, any notice, demand, request, consent, approval or communication under this Agreement shall be in writing and shall be deemed duly given or made: (a) when deposited, postage prepaid, in the United States mail, certified or registered mail with a return receipt requested, addressed to the Party at the address shown above; (b) when delivered personally to the Party at the address specified above; or (c) when deposited with a reliable overnight courier service, fee prepaid, with receipt of confirmation requested, addressed to the Party as specified above. A Party may designate a different address for receiving notices hereunder by giving notice thereof to the other Parties pursuant to this Section 10.3.

10.4 The headings in this Agreement are intended solely for convenience of reference and shall be given no effect in the construction or interpretation of this Agreement. All references in this Agreement to particular recitals, articles, sections and subsections are references to recitals, articles, sections and subsections of this Agreement.

10.5 In the event that any clause or provision of this Agreement is held to be invalid by any court of competent jurisdiction, the invalidity of such clause or provision shall not affect any other provision of this Agreement. Failure of any Party to insist on strict compliance with the provisions of this Agreement shall not constitute waiver of that Party's right to demand later compliance with the same or other provisions of this Agreement.

10.6 This Agreement constitutes the entire understanding and agreement among the Parties concerning the subject matter of this Agreement. All understandings between the Parties are merged into this Agreement, and there are no representations, warranties, covenants, obligations, understandings or agreements, oral or otherwise, in relation thereto between the Parties other than those incorporated herein.

10.7 This Agreement shall be governed by, and shall be construed in accordance with, the laws of the State of Florida. THE PARTIES HEREBY WAIVE ANY RIGHT THEY MAY HAVE UNDER ANY APPLICABLE LAW TO A TRIAL BY JURY WITH RESPECT TO ANY SUIT OR LEGAL ACTION WHICH MAY BE COMMENCED BY OR AGAINST THE OTHER CONCERNING THE INTERPRETATION, CONSTRUCTION, VALIDITY, ENFORCEMENT OR PERFORMANCE OF THIS AGREEMENT OR ANY OTHER AGREEMENT OR INSTRUMENT EXECUTED IN CONNECTION WITH THIS AGREEMENT. In the event any such suit or legal action is commenced by either Party, the other Party hereby agrees, consents and submits to the personal jurisdiction of the Circuit Court of the Ninth Judicial Circuit of Florida in and for Orange County, Florida, with respect to such suit or legal action, and each Party also hereby consents and submits to and agrees that venue in any such suit or legal action is proper in said court and county, and each Party hereby waives any and all

JAN.11.2001   4:24PM    MVCI LEGAL DEPARTMEN                     NO.322   P.20/23

personal rights under applicable law or in equity to object to the jurisdiction and venue in said court and county. Such jurisdiction and venue shall be exclusive of any other jurisdiction and venue.

10.8 In the event any Party initiates action to enforce its rights hereunder, the prevailing Party shall recover from the non-prevailing Party its reasonable expenses, court costs and reasonable attorneys' fees, whether suit be brought or not. As used herein, expenses, court costs and attorneys' fees include expenses, court costs and attorneys' fees incurred in any appellate proceeding. All such expenses shall bear interest at the highest rate allowable under the laws of the State of Florida from the date the prevailing Party pays such expenses until the date the non-prevailing Party repays such expenses. Expenses incurred in enforcing this Section 10.8 shall be covered by this provision.

10.9 This Agreement and all of its provisions shall be binding upon and inure to the benefit of the Parties and their successors and permitted assigns. In no event shall the terms and conditions of this Agreement be deemed in any way to inure to the benefit of any person or party not expressly made a Party hereto except for successors or permitted assigns to Parties hereto.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the date set forth above.

WITNESSES

Print Name: _Karen L. DiDea_

Print Name: _Lynette Manning_


WITNESSES

Print Name: _Dorothy Longfoote_

Print Name: _Karen L. DiDea_


PROGRAM MANAGER:

The Ritz-Carlton Travel Company, L.L.C
a Delaware limited liability company

By: The Ritz-Carlton Development
Company, Inc., Sole Member

By: _____
Print Name: _Stephen Bradley_
As its: _Vice President_


DEVELOPER

The Ritz-Carlton Development Company,
Inc.

By: _____
Print Name: _William F. Minnock, III_
As its: _Vice President_

458454 01/11/2001 03:02P CONDO DE DAVIS SILVI
134 of 147 R 735.00 D 0.00 N 0.00 PITKIN COUNTY

17

JAN.11.2001   4:24PM   MVCI LEGAL DEPARTMEN                    NO.322   P.21/23

WITNESSES

**MEMBERS ASSOCIATION:**

Aspen Highlands Condominium
Association, Inc.

Print Name: _Pamela D Reyes_

By: _____
Print Name: William J. Love
As its: _____President_____

Print Name: _____

490454 01/11/2001 03:02P CONDO DE DAVIS SILVI
135 of 147 R 735.00 D 0.00 N 0.00 PITKIN COUNTY

18

JAN.11.2001  4:24PM  MVCI LEGAL DEPARTMEN                    NO.322  P.22/23

**WITNESSES**

**CLUB MANAGER:**

The Ritz-Carlton Club Management
Company, L.L.C.
a Delaware limited liability company

By: The Ritz-Carlton Club Development
Company, Inc., Sole Member

Print Name: _Karen L. DiRea_

Print Name: _Joyce S. Cobia_

By: _____
Print Name:   Joseph F. Scalo
As Its:      Vice President

Y:\Legal Shared\Hood\Aspen Highlands\AHV Affiliation Agr eln 3.25.00pj.doc

450454 01/11/2001 03:02P CONDO DE DAVIS SILVI
135 of 147 R 735.00 D 0.00 N 0.00 PITKIN COUNTY

DATE FILED: April 26, 2016 4:51 PM
FILING ID: 383AA6159164E
CASE NUMBER: 2015CV30160

**EXHIBIT C**



THE RITZ-CARLTON DESTINATION CLUB®

Dear Member,

In the past several years we evolved The Ritz-Carlton Destination Club for the greater enjoyment of our Members.  As you are aware, three years ago, we launched a new product offering known as Portfolio, providing a flexible membership option which allows Members to enjoy participating in Ritz-Carlton Destination Club locations within the Portfolio program. As a result of the Portfolio program offering, we also extended Home Club Members the opportunity to enjoy more flexible travel by exchanging their allocated time for points through The Lion & Crown Exchange Company.

In response to Member feedback, we sought ways to provide exceptional usability through a variety of destinations and experiences.  As a result, we have some changes to share with you. Not surprisingly, with the decline of the economic climate, some adjustments had to be made but in other areas we are continuing to advance forward.  Rest assured that as we advance forward, nothing about your Home Club Membership has changed.

After careful consideration, The Ritz-Carlton Destination Club has made the strategic business decision to remove The Ritz-Carlton brand from The Abaco Club at Winding Bay.  The unforeseen deterioration of and uncertainty surrounding global economic conditions have not only rendered this location unsustainable from a business perspective, but have limited the prospects of any enhancements in the near term.

On July 10, 2012, The Ritz-Carlton Management Company, LLC, as manager of the property known as The Ritz-Carlton Club, Kapalua Bay, exercised its right to issue a default notice pursuant to its management agreement with the Kapalua Bay Vacation Owners Association.  As a result, it is the intention of The Ritz-Carlton Management Company, LLC to terminate its management agreement for The Ritz-Carlton Club, Kapalua Bay and to remove The Ritz-Carlton brand from the property at the conclusion of the applicable notice period, with termination to be effective on September 10, 2012 at 11:59 P.M. HST.  Concurrently with the termination of the management agreement for The Ritz-Carlton Club, Kapalua Bay, the Kapalua Bay Condominium will no longer be a Ritz-Carlton Destination Club location.  If you have future reservations or waitlist requests for Kapalua Bay, Member Services is available to assist you with making alternate arrangements.

While we understand that it may be disappointing not having The Abaco Club at Winding Bay or Kapalua Bay Condominium within the collection of Ritz-Carlton Destination Club locations, we have determined new ways to provide a variety of experiences.

Based on The Ritz-Carlton Destination Club Member feedback, additional benefits and experiences will be available through a new affiliation with Marriott Vacation Club Destinations. This affiliation will enable Ritz-Carlton Destination Club Members to expand their options.

Affiliation will extend you the opportunity to deposit your Reserved Allocation on an annual basis. Once you deposit, the following will be available for you:

- Secure available Ritz-Carlton Destination Club locations while enjoying the ability to choose the appropriate size accommodation and length of travel
- Secure any of the 51 worldwide Marriott Vacation Club Resorts, including Europe

- Bank unused points into the following year
- Borrow points from the coming year
- Book any experience in the Explorer Collection which includes over 100 experiences to enjoy. The Explorer Collection will replace the current affiliation with Abercrombie & Kent Residence Club; however, the new offering will include fully escorted tours, upscale cruises, special events and packages.

To clarify, nothing about the Home Club Membership that you purchased has changed. If you wish to continue to use your Membership as you do today, you maintain the opportunity to:

- Reserve your allocated time
- Exchange your Reserved Allocation with fellow Home Club Members via the existing The Cobalt Travel Company, LLC
- Retain the ability to purchase additional Space Available Time at the prevailing per diem fee
- Continue to enjoy The Ritz-Carlton 2012 Hotel Reservation Service

Initially access to the enhancements made available through the new affiliation with Marriott Vacation Club Destinations will be complimentary and easily added to your Membership for you to enjoy. We encourage you to participate, as we feel that you will be delighted with the additional destinations and countless experiential excursions available to you when you choose not to visit your Home Club during your allocated time.

We are enthusiastic about the future of The Ritz-Carlton Destination Club and look forward to assisting you with your travel planning.

Warmest Regards,

Eveleen Babich
General Manager
The Cobalt Travel Company, LLC

628691-7

DATE FILED: April 26, 2016 4:51 PM
FILING ID: 383AA6159164E
CASE NUMBER: 2015CV30160

**EXHIBIT D**

# GREAT BAY CONDOMINIUM OWNERS ASSOCIATION, INC.

## THE NEIGHBORHOOD ASSOCIATION, INC.

### 6900 Great Bay
### St. Thomas, USVI, 00802

TO: Members of the Great Bay Condominium Owners Association, Inc.
   Members of the Neighborhood Association, Inc.

August 3, 2012

> Re:  *Member Service Letter to the Ritz-Carlton Destination Club*
> *Members dated July 17, 2012 regarding the Evolution of the*
> *Ritz-Carlton Destination Club Brand*

Dear Members:

Recently, you should have received a letter from Eveleen Babich, General Manager of the Cobalt Travel Company, LLC, describing the "evolution" and changes to the Ritz-Carlton Destination Club System ("RCDC").

First and foremost, we want our Members to know that the St. Thomas Club Board Presidents received notice of this letter during a conference call with the RCDC and the Ritz-Carlton Management Company ("RCMC"), only **one day before** it was sent to all RCDC Members. We were not given any additional advance indication or notice of the imminent termination of the Kapalua Bay (Maui) Club or the termination of the Abaco Club at Winding Bay (Bahamas) from the RCDC portfolio.

Second, your Board similarly had absolutely no knowledge of the RCDC's plans for "new ways to provide a variety of experiences" to the RCDC Membership until it received the Termination Notice regarding Kapalua Bay and Abaco.

While this development is disconcerting, we believe the situation in these two clubs is substantially different from ours in St. Thomas. We believe that a majority of the whole residences and fractional interests at Kapalua were never sold and instead remained the responsibility of the Developer. We understand that the Abaco property, which was not fully developed, was also undersold and underutilized.

All the Residences in St. Thomas have now been sold and the Development Company retains only approximately 75 interests – a little more than 6 physical residences – in the Suites. For years the St. Thomas Club has enjoyed the highest occupancy of any of the RCDC locations. Also, with Kapalua and Abaco no longer part of the Ritz-Carlton Club system, the St. Thomas club remains the only beach location in the Ritz-Carlton Destination Club.

TO: Members of the Great Bay Condominium Owners Association, Inc.
  Members of The Neighborhood Association, Inc.
Page 2

We were surprised, shocked and extremely disappointed as to how Ritz Carlton, Marriott Vacations Worldwide, Inc. and Cobalt Travel Company, LLC ("RCDC Parties") separately and collectively chose to characterize these matters as the "evolution of the RCDC brand." No input from your Boards of Directors or, to our knowledge, any of the other RCDC Club Boards was ever solicited by these companies while they determined these significant changes to the RCDC system in which we all own a Membership Interest.

Let us take this opportunity to assure you that your Boards of Directors are not taking this "evolution" notice lightly from the RCDC Parties. We are currently evaluating the systemic changes they have communicated in their letter as to how it will affect our Club and, together with all of the other remaining RCDC Club Associations, assessing the impact on the entire RCDC system. However we are not in possession of any other written material describing the "systemic evolution" and its impact on our interests.

We have been in frequent communication with each other and the Presidents of the other RCDC Clubs since this announcement. Our general but preliminary consensus regarding the "evolution" of the RCDC brand as described in Eveleen Babich's letter of July 17th is that we are concerned that this may not be an enhancement to our Memberships' Interests. We all, as members, invested in the Ritz Carlton brand!

We plan to have more extensive, detailed communication with the RCDC Parties about this matter and will try to sort out the many issues involved in this "evolution." In the meantime, your Boards of Directors invite you to submit your comments, questions and/or concerns regarding this matter to: boardstthomas@aol.com as soon as possible, as we would like as much Member input as possible.

Once the Board of Directors have had a chance to further explore and evaluate the "evolution" situation with the RCDC Parties and the other remaining RCDC Club Associations, we will communicate back to our Membership. Please rest assured that your Board will hold the RCDC Parties accountable to preserve, maintain, and continually enhance the Ritz-Carlton Destination Club product they developed and sold to all of us.

We thank you for your support, and welcome your immediate input on this matter. We take this situation seriously and are working diligently to protect the interests of our Club.

TO:  Members of the Great Bay Condominium Owners Association, Inc.
     Members of The Neighborhood Association, Inc.

Page 3

Best regards,

GREAT BAY CONDOMINIUM OWNERS
ASSOCIATION, INC.

John Doyle, Esq.        President

Steve Redan            Vice President

Abbey Chung            Treasurer

Thomas J. Doyle Jr.    Director

THE NEIGHBORHOOD ASSOCIATION, INC.

Sal Cutrona            President

Gino Orsini            Vice President & Treasurer

Henry Troy             Secretary

Marc Betesh, Esq.      Director

Ken Cooke              Director

DATE FILED: April 26, 2016 4:51 PM
FILING ID: 383AA6159164E
CASE NUMBER: 2015CV30160

# EXHIBIT E

August 10, 2012

Re:  Member Service Letter to the Ritz-Carlton Destination Club Members Dated July 17, 2012
     Regarding the Evolution of the Ritz-Carlton Destination Club Brand

Dear Eagle Tree Condominium Association, Inc., Members:

Recently, you should have received a letter from Eveleen Babich, General Manager of the Cobalt Travel Company, LLC, describing the "evolution" and changes to the Ritz-Carlton Destination Club "RCDC" System.

First and foremost, we want our Membership to know our Board received notice of this letter approximately twenty-four (24) hours before it was sent to all RCDC Members. Our Board was not given any additional advance indication or notice of the imminent termination of the Kapalua Bay (Maui) Club or the termination of the Abaco Club at Winding Bay (Bahamas) on July 10th from the RCDC portfolio.

Second, your Board similarly had absolutely no knowledge of the RCDC's plans for "new ways to provide a variety of experiences" to the RCDC Membership until it received the Termination Notice regarding Kapalua Bay and Abaco.

We were disappointed as to how Ritz-Carlton, Marriott Vacations Worldwide Corporation, and the Cobalt Travel Company, LLC ("RCDC Parties") separately and collectively chose to communicate these matters they have defined as "evolution of the RCDC brand." No input from your Board of Directors or, to our knowledge, any of the other RCDC Club Boards was ever solicited by these companies while they determined these significant changes to the RCDC system in which we all own a Membership Interest.

Let us take this opportunity to assure you that your Board of Directors is actively studying this situation. We are currently evaluating the changes they have communicated in their letter and how it will affect our Club. We understand that at Jupiter, Units 202, 204, 206, and 216 plus 17 individual interests are owned by the Trust. The developer has also taken back 6 interests. These interests owned by the Trust are used in the operation of the RCDC "points based" system. They have also told us that when a Member gives up his time for points that time can be used by other point users whether Ritz-Carlton Members or Marriott Vacation Club Members. We are very concerned about the potential blurring of the Ritz-Carlton and Marriott timeshare brands. We all, as Members, invested in the Ritz-Carlton brand! Therefore your Board is paying careful attention to these changes and how they will likely impact our Club.

We have been in frequent communication with the Presidents of the other RCDC Clubs. Our concern regarding the "evolution" of the RCDC brand as described in Eveleen Babich's letter of July 17th is that this may not be in our Membership's Interest.

Once the Board of Directors has had a chance to further explore and evaluate this situation, we will get back to you. Please rest assured your Board wants to preserve, maintain and enhance the Ritz-Carlton Club product we all own.

On behalf of your Board of Directors, we thank you for your support. We are working diligently to protect the interests of our Club.

Best regards,

David A Oestreich
Gerald Rokoff
Pete Ciccone
Louise Berkman
Thomas Boova

DATE FILED: April 26, 2016 4:51 PM
FILING ID: 383AA6159164E
CASE NUMBER: 2015CV30160

# EXHIBIT F



THE RITZ-CARLTON DESTINATION CLUB™

Dear Valued Members,

We are writing to provide you further information regarding certain changes announced on July 17th to the Lion & Crown Travel Company and The Ritz-Carlton Destination Club system.

First of all, we would like to assure you that nothing that you originally purchased has changed or will change as a result of the announcement mentioned above. As a Member of The Ritz-Carlton Destination Club, you will continue to enjoy at your Home Club the service levels that you have come to expect from The Ritz-Carlton brand. Rest assured that our other Ritz-Carlton Club locations will also continue to deliver on these exacting brand standards.

Access to the Home Club product you purchased — a deeded interest in a fixed unit with a rotating calendar — along with the exchange and per diem programs in your Home Club and sister Ritz-Carlton Clubs remain unchanged. Additionally, The Hotel Reservation Service remains in place with no change, subject to annual review and approval of The Ritz-Carlton Hotel Company in accordance with past practice.

We also would like to make it clear that we value you as a Member and look forward to providing the world-class service you have come to expect for your member services needs through our dedicated Ritz-Carlton Club Member Services staff and The Ritz-Carlton Hotel Company during your Club stays for many years to come.

Based on prior Member feedback, The Ritz-Carlton Destination Club team has been exploring ways to broaden the experiences available to all Ritz-Carlton Destination Club Members through external exchange affiliations. As you may know, our first outside affiliation was with Abercrombie & Kent which began over two years ago. While the experiences that affiliation provided were attractive, the imbalance in size between the two groups proved to be too great and ultimately led to the cancellation of that arrangement.

The affiliation option announced in our July 17, 2012 letter regarding the evolution of The Ritz-Carlton Destination Club is the next step in providing significantly more vacation options for our Ritz-Carlton Destination Club Members. This new option is being offered with no additional cost to current Home Club Members and participation is completely optional. Should Members decide to participate in this opportunity, they would be able to exchange one or more weeks for Lion & Crown points. This choice is an annual decision in the same way that utilizing the current sister Club exchange program is an annual decision.

Members choosing to take advantage of the exchange program would receive points in their account that they could then use to access all of the options within the Marriott Vacation Club Destinations program. Prior to the launch of the program for Ritz-Carlton Destination Club Members, the Destinations exchange club is working to expand its luxury experience options. We anticipate that participants will be able to use their points to access oceans and river cruises on luxury lines as well as premier events such as the Masters, Fashion Week in New York City, the Kentucky Derby and more. These new options are in addition to opportunities already provided through the Destinations exchange club which offers access to more than 50 Marriott Vacation Club locations around the world, including locations such as Newport Coast, California, Aruba and Marbella, Spain. The service levels provided at these locations are aligned with standards befitting the Marriott brand and provide numerous new destinations for Members to experience through the use of their Ritz-Carlton Destination Club Membership. This affiliation option will be available for you to choose in 2013 with usage in 2014.

We are also continuing to explore exchange affiliation options that would be available exclusively to Ritz-Carlton Destination Club Members through their Membership in the Lion & Crown exchange program, such as Member access to private luxury vacation homes, affiliation with other club networks, and a variety of other experiences provided through select luxury partners.

We understand our original communication generated questions for a number of our Members and may not have fully anticipated all of your questions regarding the changes to The Ritz-Carlton Destination Club. We have received initial feedback from a few Members and your Board and would appreciate hearing from you with your comments and questions. Your feedback will allow us to communicate with you and the other Members in the upcoming weeks. We would love to hear from you directly at
*Member.inquiry@ritzcarltonclub.com.*

We have scheduled a webinar for Members of The Ritz-Carlton Destination Club with myself and the President and Chief Executive Officer of Marriott Vacations Worldwide on August 28th at 4:00 PM Eastern Standard Time to help address questions we have received from our Members. So that we can address as many questions as possible during the webinar, please provide any feedback or questions by August 24th. To access this event please follow one of the methods below:

Via phone:
Local: 1-480-629-9645
Toll-free: 1-866-225-8754
Conference ID: 4561025

Via live webcast:
Webcast URL:
http://event.on24.com/r.htm?e=506272&s=1&k=C03FF2022A5A681002887D3AB3218910
Webcast Password: mvwc0828

Regards.

*Lee Cunningham*

Lee Cunningham
Executive Vice President & Chief Operating Officer
The Ritz-Carlton Destination Club

DATE FILED: April 26, 2016 4:51 PM
FILING ID: 383AA6159164E
CASE NUMBER: 2015CV30160

**EXHIBIT G**

ASPEN HIGHLANDS TOURIST ACCOMMODATION BOARD

0075 Prospector Road
Aspen, Colorado 81611

August 17, 2012

To the Members of the Aspen Highlands
Condominium Association

Re:     Evolution of the Ritz-Carlton Destination Club Brand

Dear Members:

We wanted to follow up on our letter of July 26, 2012 and provide you with an update. As mentioned in our July 26th letter, we have been paying close attention (together with the other owner controlled boards of other Ritz-Carlton clubs), to the program that is being introduced by Ritz-Carlton Club and Marriott. We are particularly concerned about and focused on what impact there may be to our club as a result of the unsold fractional interests owned by a subsidiary of Marriott Vacations Worldwide ("MVW") and interests owned by a points based trust affiliated with MVW[*] (which together aggregate approximately 13.4% of our Aspen Highlands membership based on information provided to us). Specific questions we have raised with MVW relate to the number of points a MVW timeshare or points owner would have to utilize in order to reserve time in Aspen Highlands; whether MVW members will be able to access time in Aspen Highlands on a nightly or more or less transient basis; whether the Ritz-Carlton Club points and Marriott timeshare points will be marketed jointly; and whether Aspen Highlands members will be competing for space available as well as exchanging time periods with tens of thousands of Marriott timeshare/points members. These issues are very important to us. We have raised these issues with MVW and are awaiting comprehensive responses.

Our allotted times will be unaffected by the new program as well as our ability to exchange weeks (except that it is not yet clear that we will be able to exchange weeks as to the 13.4% of interests controlled by MVW). It is also not yet clear if or how the "float" weeks relating to the 13.4% of interests will affect our members.

In the most recent phone conversation with senior executives of MVW, they are actively considering our suggestions including the imposition of minimum night stays. They will continue to keep us advised as they work through the point valuations between Aspen Highlands and other timeshare facilities in the MVW system and are mindful of the desirability for all concerned to market the Ritz-Carlton and Marriott timeshare properties separately. To date, we are not satisfied that Aspen Highlands is appropriately valued (meaning we believe that the owners of Marriott timeshares/points will find it too easy to exchange into Aspen Highlands). Frankly, it has been our position that our members bought into a Ritz-Carlton brand and do not want that brand diluted. The Board has concerns that since the core business of MVW has and

---

[*] MVW is now a separate company which was spun off from Marriott International, which is the parent company of Ritz-Carlton Hotels (whose personnel manage our facility).

To the Members of the Aspen Highlands Condominium Association
August 17, 2012
Page 2

likely will be the timeshare business (which is appears to be evolving into a points based system), and that the nature of our club will change by opening the club to MVW timeshare/points members who have a much lower cost of entry. The Board is also concerned that there are specific provisions in our Association documents which the Board believes does not permit MVW to conduct a separate program as they currently intend. We are also concerned about our belief that MVW is not currently selling fractional interests (in fact, one of our suggestions is that some of the unsold interests be offered to Aspen Highlands members in weekly increments).

The same concerns have also been expressed by the other member controlled Ritz-Carlton Club boards (St. Thomas, Bachelor's Gulch, Jupiter and Kapalua). In addition, we are monitoring, as best as possible, the events relating to the potential termination by Ritz-Carlton Hotels of its management agreement at Kapalua and the lost affiliation within the system. We understand that discussions are ongoing but in any real estate restructuring, it is hard to predict an outcome. We continue to compare concerns and communicate directly with the presidents of the other owner-controlled fractional clubs.

On a different note, we wanted to provide you with a brief financial overview of the financial strength of our Association. Our Association continues to be operating on budget, the few members who are in arrears for 2012 (or prior years) are either now current or legal action is being actively pursued and since Willow Creek is on all of our minds, it is performing essentially as expected and we expect that by year-end, the operating loss for the amenities acquired (Willow Creek, Caffé Sienna, the spa and the telephone system) will operate at a net loss of less than $200,000 which is approximately what this Board projected in its consideration of the proposed acquisition. We have replaced the major kitchen appliances in each of the units and during the off season, will be installing wood panel covers on the new refrigerators to match the rest of the kitchen.

We at Aspen Highlands are fortunate to be operating as well as we are and we thank our Aspen Highlands staff and our managers for another great year of outstanding performance.

Best regards,

Jay A. Neveloff
(jneveloff@kramerlevin.com)
Philip Schneider
(pjschn2351@aol.com)
Gerald Marsden
(myjerry@aol.com)
Tyler Oliver
(tsoliver@henzlikoliver.com)

DATE FILED: April 26, 2016 4:51 PM
FILING ID: 383AA6159164E
CASE NUMBER: 2015CV30160

**EXHIBIT H**

# DECLARATION OF CONDOMINIUM

## FOR

### ASPEN HIGHLANDS CONDOMINIUMS

### ASPEN HIGHLANDS VILLAGE

### CITY OF ASPEN

### PITKIN COUNTY

### COLORADO

Declarations AHC 01102001 cln



450454 01/11/2001 03:02P CONDO DE DAVIS SILVI
1 of 147 R 735.00 D 0.00 N 0.00 PITKIN COUNTY CO



450454 01/11/2001 03:02P CONDO DE DAVIS SILVI
2 of 147 R 735.00 D 0.00 N 0.00 PITKIN COUNTY CO

## TABLE OF CONTENTS

ARTICLE 1. IMPOSITION OF COVENANTS .......................................................................... 1
    Section 1.1      Purpose. ........................................................................................... 1
    Section 1.2      Residential Units. .......................................................................... 1
    Section 1.3      Commercial Units. ........................................................................ 1
    Section 1.4      Plan of Fractional Ownership. ....................................................... 1
    Section 1.5      Intention of Declarant. ................................................................... 2
    Section 1.6      Development and Use. ................................................................... 2
    Section 1.7      Mixed Use. ..................................................................................... 2
    Section 1.8      Submission of Property. ............................................................... 2
    Section 1.9      Master Declaration. ...................................................................... 2
    Section 1.10    Covenants Running with the Land. ................................................ 3
ARTICLE 2. DEFINITIONS ................................................................................................... 3
    Section 2.1      "Allocated Interest" ...................................................................... 3
    Section 2.2      "Allocated Interest-Commercial". .................................................. 3
    Section 2.3      "Allocated Interest-Deed Restricted Residential" .......................... 3
    Section 2.4      "Allocated Interest-General" ......................................................... 3
    Section 2.5      "Allocated Interest-Tourist Accommodation" ................................ 3
    Section 2.6      "Allocated Interest-Residential" .................................................... 3
    Section 2.7      "Amenities" .................................................................................... 3
    Section 2.8      "Amenities Association" ................................................................ 4
    Section 2.9      "Aspen Highlands Village" ............................................................ 4
    Section 2.10    "Assessments" .............................................................................. 4
    Section 2.11    "Association" ................................................................................. 4
    Section 2.12    "Association Documents" .............................................................. 4
    Section 2.13    "Building(s)" ................................................................................... 4
    Section 2.14    "Category" ..................................................................................... 4
    Section 2.15    "Class" ........................................................................................... 4
    Section 2.16    "Commercial Directors" ................................................................. 4
    Section 2.17    "Commercial Owners" .................................................................. 5
    Section 2.18    "Commercial Unit" ........................................................................ 5
    Section 2.19    "Common Elements" ..................................................................... 5
    Section 2.20    "Common Expense(s)" .................................................................. 5
    Section 2.21    "Condominium Map" or "Map" ...................................................... 6
    Section 2.22    "Declarant" .................................................................................... 6
    Section 2.23    "Declarant Control Period" ........................................................... 6
    Section 2.24    "Declaration" ................................................................................. 6
    Section 2.25    "Deed Restricted Residential Directors" ....................................... 6
    Section 2.26    "Deed Restricted Residential Owners" .......................................... 6
    Section 2.27    "Deed Restricted Residential Unit" ............................................... 6
    Section 2.28    "Director" ....................................................................................... 6
    Section 2.29    "District" ........................................................................................ 6
    Section 2.30    "Eligible Mortgagee" ..................................................................... 7
    Section 2.31    "Executive Board" ......................................................................... 7
    Section 2.32    "Expansion Property" .................................................................... 7
    Section 2.33    "First Mortgage" ............................................................................ 7
    Section 2.34    "First Mortgagee" ......................................................................... 7
    Section 2.35    "Fractional Ownership Interest" or "Residence Interest" ............... 7

450454 01/11/2001 03:02P CONDO DE DAVIS SILVI
3 of 147 R 735.00 D 0.00 N 0.00 PITKIN COUNTY CO

Section 2.36    "Fractional Ownership Plan," "Plan of Fractional Ownership" or "Plan" ............ 7
Section 2.37    "General Common Elements" ................................................................. 7
Section 2.38    "Individual Air Space Unit" .................................................................. 7
    2.38.1      "unfinished perimeter wall" .......................................................... 7
    2.38.2      "unfinished perimeter ceiling" ....................................................... 7
    2.38.3      "unfinished perimeter floor" ......................................................... 7
Section 2.39    "Limited Common Elements" ............................................................... 8
Section 2.40    "Management Agreement" .................................................................. 8
Section 2.41    "Managing Agent" .......................................................................... 8
Section 2.42    "Master Association" ....................................................................... 9
Section 2.43    "Master Association Documents" .......................................................... 9
Section 2.44    "Master Declaration" ...................................................................... 9
Section 2.45    "Maximum Rate" ........................................................................... 9
Section 2.46    "Mortgage" ................................................................................. 9
Section 2.47    "Mortgagee" ............................................................................... 9
Section 2.48    "Owner" .................................................................................... 9
Section 2.49    "Parking Association" ...................................................................... 9
Section 2.50    "Parking Association Documents" ......................................................... 9
Section 2.51    "Parking Declaration" ..................................................................... 9
Section 2.52    "Parking Facility" ......................................................................... 9
Section 2.53    "Plan Assessment" or "Club Dues" ...................................................... 10
Section 2.54    "Plan Member" ........................................................................... 10
Section 2.55    "Plan Unit" or "Residence" .............................................................. 10
Section 2.56    "Plan Unit Furnishings" .................................................................. 10
Section 2.57    "Plan Year" ............................................................................... 10
Section 2.58    "Property" ................................................................................ 10
Section 2.59    "PUD Plan" ............................................................................... 10
Section 2.60    "Reservation Procedures" ................................................................ 10
Section 2.61    "Reserve Account" ....................................................................... 10
Section 2.62    "Residential Directors" ................................................................... 10
Section 2.63    "Residential Owners" ..................................................................... 10
Section 2.64    "Residential Unit" ........................................................................ 10
Section 2.65    "Restricted Common Elements" .......................................................... 10
Section 2.66    "Successor Declarant" .................................................................... 10
Section 2.67    "Supplemental Declaration" ............................................................. 11
Section 2.68    "Supplemental Map" ..................................................................... 11
Section 2.69    "Tourist Accommodation Directors" .................................................... 11
Section 2.70    "Tourist Accommodation Owners" ...................................................... 11
Section 2.71    "Tourist Accommodation Unit" .......................................................... 11
Section 2.72    "Unit" .................................................................................... 11
Section 2.73    "Use Periods" ............................................................................ 11
Section 2.74    "Village Core Plat" ...................................................................... 11
ARTICLE 3. DIVISION OF PROJECT INTO CONDOMINIUM OWNERSHIP ....................... 11
Section 3.1     Division into Units. ...................................................................... 11
Section 3.2     Commercial Units. ....................................................................... 12
Section 3.3     Residential Units. ........................................................................ 13
Section 3.4     Delineation of Unit Boundaries. ......................................................... 13
Section 3.5     Inseparability of Unit. ................................................................... 13
Section 3.6     Nonpartitionability of Common Elements. .............................................. 14
ARTICLE 4. CONDOMINIUM MAP .................................................................... 14
Section 4.1     Condominium Map. ...................................................................... 14

```
450454 01/11/2001 03:02P CONDO DE DAVIS SILVI
4 of 147 R 735.00 D 0.00 N 0.00 PITKIN COUNTY CO
```

| | | |
|---|---|---|
| Section 4.2 | Amendment. | 15 |
| ARTICLE 5. OWNERS' PROPERTY RIGHTS IN COMMON ELEMENTS | | 15 |
| Section 5.1 | General Common Elements. | 15 |
| Section 5.2 | Limited Common Elements. | 15 |
| Section 5.3 | Parking. | 16 |
| 5.3.1 | Association Regulation. | 16 |
| 5.3.2 | Parking Documents. | 16 |
| Section 5.4 | Amenities. | 17 |
| Section 5.5 | Rights of Owners of Fractional Ownership Interests. | 18 |
| ARTICLE 6. MEMBERSHIP AND VOTING RIGHTS IN ASSOCIATION | | 18 |
| Section 6.1 | Association Membership. | 18 |
| Section 6.2 | Categories of Membership. | 18 |
| 6.2.1 | Tourist Accommodation Owners. | 18 |
| 6.2.2 | Deed Restricted Residential Owners. | 19 |
| 6.2.3 | Commercial Owners. | 19 |
| Section 6.3 | Voting Rights. | 19 |
| 6.3.1 | General Common Elements. | 19 |
| 6.3.2 | Limited Common Elements. | 19 |
| Section 6.4 | Voting of Fractional Ownership Interest. | 19 |
| Section 6.5 | Election of Directors. | 20 |
| Section 6.6 | Declarant Control. | 20 |
| Section 6.7 | Executive Board. | 20 |
| Section 6.8 | Fairness Standard. | 21 |
| Section 6.9 | Voting by Association Members. | 22 |
| Section 6.10 | Owner's and Association's Address for Notices. | 22 |
| ARTICLE 7. ASSOCIATION DUTIES | | 23 |
| Section 7.1 | Association Management Duties. | 23 |
| Section 7.2 | Reserve Account. | 24 |
| Section 7.3 | Owner's Negligence. | 24 |
| Section 7.4 | Delegation of Management and Maintenance Duties. | 25 |
| Section 7.5 | Acquiring and Disposing of Personal Property. | 25 |
| Section 7.6 | Cooperation with District, Master Association and Other Associations. | 25 |
| Section 7.7 | Issuance of Rules and Regulations. | 26 |
| Section 7.8 | Enforcement of Association Documents. | 26 |
| Section 7.9 | Identity of Executive Board and Managing Agent. | 27 |
| Section 7.10 | Implied Rights. | 27 |
| Section 7.11 | Books and Records of the Association. | 27 |
| Section 7.12 | Compliance with Liquor Laws. | 27 |
| Section 7.13 | LIMITATION OF LIABILITY OF ASSOCIATION. | 27 |
| Section 7.14 | Financial Statements. | 27 |
| Section 7.15 | Limitation on Power of Managing Agent. | 28 |
| ARTICLE 8. ASSESSMENTS | | 29 |
| Section 8.1 | Covenant of Personal Obligation of Assessments. | 29 |
| Section 8.2 | Purpose of Assessments. | 29 |
| Section 8.3 | Commencement of Assessments. | 30 |
| Section 8.4 | Amount of Total Annual Assessments. | 30 |
| Section 8.5 | Apportionment of Annual Assessments. | 30 |
| Section 8.6 | Annual Budget. | 31 |
| Section 8.7 | Special Assessments. | 33 |
| Section 8.8 | Due Dates for Assessment Payments. | 34 |
| Section 8.9 | Personal Assessments. | 34 |

450454 01/11/2001 03:02P CONDO DE DAVIS SILVI
5 of 147 R 735.00 D 0.00 N 0.00 PITKIN COUNTY CO

Section 8.10    Declarant's Obligation to Pay Assessments..................................................... 34
Section 8.11    Default Assessments.......................................................................................... 35
Section 8.12    Lien for Assessments......................................................................................... 35
Section 8.13    Effect of Nonpayment of Assessments.............................................................. 35
Section 8.14    Successor's Liability for Assessments............................................................... 36
Section 8.15    Waiver of Homestead Exemption; Subordination of Association's Lien for
Assessments.......................................................................................................................... 36
Section 8.16    Statement of Status of Assessments. .................................................................. 37
Section 8.17    Liens................................................................................................................... 38
Section 8.18    Declarant's Obligations to the Project................................................................ 38
ARTICLE 9. MAINTENANCE RESPONSIBILITY ............................................................... 41
Section 9.1     Owner's Rights and Duties with Respect to Interiors. ....................................... 41
Section 9.2     Responsibility of the Owner.............................................................................. 41
Section 9.3     Responsibility of the Association........................................................................ 41
Section 9.4     Owner's Failure to Maintain or Repair. ............................................................ 41
Section 9.5     Owner's Responsibility for Limited Common Elements. .................................. 42
ARTICLE 10. INSURANCE AND FIDELITY BONDS ........................................................... 42
Section 10.1    General Insurance Provisions.............................................................................. 42
Section 10.2    Cancellation....................................................................................................... 43
Section 10.3    Policy Provisions................................................................................................ 43
Section 10.4    Insurance Proceeds............................................................................................. 43
Section 10.5    Association Policies. .......................................................................................... 44
Section 10.6    Insurer Obligation. ............................................................................................ 44
Section 10.7    Repair and Replacement..................................................................................... 44
Section 10.8    Common Expenses.............................................................................................. 44
Section 10.9    Fidelity Insurance. ............................................................................................. 45
Section 10.10   Worker's Compensation Insurance. .................................................................. 45
Section 10.11   Other Insurance. ................................................................................................ 45
Section 10.12   Insurance Obtained by Owners. ........................................................................ 45
ARTICLE 11. CONVEYANCES AND TAXATION OF CONDOMINIUM UNITS.............................. 46
Section 11.1    Contracts to Convey Entered into Prior to Recording of Condominium Map and
Declaration............................................................................................................................ 46
Section 11.2    Contracts to Convey and Conveyances Subsequent to Recording of
Condominium Map and Declaration...................................................................................... 46
Section 11.3    Conveyance Deemed to Describe an Undivided Interest in Common Elements. 46
Section 11.4    Separate Tax Assessments................................................................................. 47
ARTICLE 12. MECHANICS' LIENS. .................................................................................. 47
Section 12.1    Mechanics' Liens. .............................................................................................. 47
Section 12.2    Enforcement by the Association.......................................................................... 47
ARTICLE 13. USE RESTRICTIONS .................................................................................. 48
Section 13.1    Use of Units........................................................................................................ 48
Section 13.2    Commercial Uses. .............................................................................................. 48
Section 13.3    Residential Uses. ............................................................................................... 48
Section 13.4    Conveyance of Units. ......................................................................................... 49
Section 13.5    Use of Common Elements. ................................................................................. 49
Section 13.6    Prohibition of Increases in Insurable Risks and Certain Activities..................... 49
Section 13.7    Use of Commercial Unit as Health Club Facility............................................... 50
ARTICLE 14. EASEMENTS............................................................................................. 51
Section 14.1    Easement of Enjoyment...................................................................................... 51
Section 14.2    Delegation of Use............................................................................................... 51
Section 14.3    Access to Commercial Units. ............................................................................ 51

450454 01/11/2001 03:02P CONDO DE DAVIS SILVI
6 of 147 R 735.00 D 0.00 N 0.00 PITKIN COUNTY CO

| | | |
|---|---|---|
| Section 14.4 | Recorded Easements. | 51 |
| Section 14.5 | Easements for Encroachments. | 51 |
| Section 14.6 | Utility Easements. | 52 |
| Section 14.7 | Reservation of Easements, Exceptions and Exclusions. | 52 |
| Section 14.8 | Emergency Access Easement. | 52 |
| Section 14.9 | Maintenance Easement. | 53 |
| Section 14.10 | Drainage Easement. | 53 |
| Section 14.11 | Easements of Access for Repair, Maintenance, and Emergencies. | 53 |
| Section 14.12 | Declarant's Rights Incident to Construction and Marketing. | 53 |
| Section 14.13 | Right of Declarant and Association to Own Units and to Use Common Elements. | 53 |
| Section 14.14 | Remodeling Easement. | 54 |
| Section 14.15 | Reservation for Expansion. | 54 |
| Section 14.16 | Easement for Master Common Areas. | 54 |
| Section 14.17 | Easement for Access to Amenities. | 54 |
| Section 14.18 | Easements Deemed Created. | 54 |
| ARTICLE 15. ASSOCIATION AS ATTORNEY-IN-FACT | | 55 |
| Section 15.1 | Appointment. | 55 |
| Section 15.2 | General Authority. | 55 |
| ARTICLE 16. DAMAGE OR DESTRUCTION | | 55 |
| Section 16.1 | The Role of the Executive Board. | 55 |
| Section 16.2 | Estimate of Damages or Destruction. | 56 |
| Section 16.3 | Repair and Reconstruction. | 56 |
| Section 16.4 | Funds for Repair and Reconstruction. | 56 |
| Section 16.5 | Insurance Proceeds Sufficient to Repair. | 56 |
| Section 16.6 | Insurance Proceeds Insufficient to Repair; Special Assessment; Remedies for Failure to Pay Special Assessment. | 56 |
| Section 16.7 | Repairs. | 57 |
| Section 16.8 | Notice of Damage or Destruction. | 57 |
| ARTICLE 17. OBSOLESCENCE | | 58 |
| Section 17.1 | Adoption of Plan; Rights of Owners. | 58 |
| Section 17.2 | Sale of Obsolete Units. | 58 |
| ARTICLE 18. CONDEMNATION. | | 58 |
| Section 18.1 | Consequences of Condemnation. | 58 |
| Section 18.2 | Complete Taking. | 58 |
| Section 18.3 | Partial Taking. | 59 |
| Section 18.4 | Reorganization. | 59 |
| Section 18.5 | Repair and Reconstruction. | 60 |
| Section 18.6 | Notice of Condemnation. | 60 |
| Section 18.7 | Limitations on Actions of Association. | 60 |
| ARTICLE 19. OTHER ASSOCIATION MATTERS. | | 60 |
| Section 19.1 | Master Association Matters. | 60 |
| Section 19.2 | Enforcement of Master Association Documents. | 60 |
| Section 19.3 | Aspen Highlands Village Residential Amenities Association. | 61 |
| Section 19.4 | Aspen Highlands Village Parking and Loading Dock Facility Association. | 61 |
| Section 19.5 | Architectural Control. | 61 |
| Section 19.6 | General Reservation. | 62 |
| Section 19.7 | No Use of Trademark. | 62 |
| Section 19.8 | Limit on Timesharing. | 62 |
| Section 19.9 | Acknowledgments. | 62 |
| ARTICLE 20. DECLARANT'S RIGHTS REGARDING TRANSFER | | 64 |

ARTICLE 21. PHASING, EXPANSION AND WITHDRAWAL ............................................................... 65
    Section 21.1    Phasing. ................................................................................................. 65
    Section 21.2    Reservation of Expansion and Withdrawal Rights. ................................ 65
    Section 21.3    Supplemental Declarations and Supplemental Maps. ........................... 65
    Section 21.4    Expansion of Definitions. ....................................................................... 66
    Section 21.5    Declaration Operative on New Units. ..................................................... 66
    Section 21.6    Effect of Expansion. ............................................................................... 66
    Section 21.7    Termination of Expansion and Development Rights. ............................. 67
ARTICLE 22. MISCELLANEOUS ....................................................................................................... 67
    Section 22.1    Restriction on Declarant Powers. .......................................................... 67
    Section 22.2    Term. ....................................................................................................... 67
    Section 22.3    Amendment. ............................................................................................ 67
    Section 22.4    Unilateral Amendment Rights Reserved by Declarant. ......................... 68
    Section 22.5    Recording of Amendments. .................................................................... 68
    Section 22.6    Enforcement. ........................................................................................... 68
    Section 22.7    Severability. ............................................................................................ 68
    Section 22.8    Conflict of Provisions. ........................................................................... 69
    Section 22.9    Nonwaiver. .............................................................................................. 69
    Section 22.10   Number and Gender. .............................................................................. 69
    Section 22.11   Captions. ................................................................................................. 69
    Section 22.12   Exhibits. ................................................................................................. 69
ARTICLE 23. PLAN OF FRACTIONAL OWNERSHIP ....................................................................... 69
    Section 23.1    Right to Submit Tourist Accommodation Units to a Plan of Fractional
                    Ownership. .............................................................................................. 69
    Section 23.2    Definitions. ............................................................................................. 70
        23.2.1   "Affiliation Agreement". ........................................................................ 70
        23.2.2   "Allocation" or "Allocated Use Periods". ............................................. 70
        23.2.3   "Fractional Ownership Interest," "Residence Interest" or "Membership" .......... 70
        23.2.4   "Membership Calendar". ........................................................................ 71
        23.2.5   "Membership Program" or "The Ritz-Carlton Club Membership Program" ...... 71
        23.2.6   "Membership Program Documents" ....................................................... 71
        23.2.7   "Plan Assessment" or "Club Dues". ...................................................... 71
        23.2.8   "Plan Member". ...................................................................................... 71
        23.2.9   "Plan Unit" or "Residence". ................................................................... 71
        23.2.10 "Plan Unit Furnishings". ......................................................................... 71
        23.2.11 "Plan Year" ............................................................................................ 71
        23.2.12 "Program Manager" ............................................................................... 71
        23.2.13 "Reservation Procedures". ...................................................................... 71
        23.2.14 "Use Periods". ........................................................................................ 71
    Section 23.3    Submission of Tourist Accommodation Unit to the Plan of Fractional Ownership.
                    .............................................................................................................. 72
    Section 23.4    Conveyance by Purchaser. ...................................................................... 72
    Section 23.5    Legal Description of a Fractional Ownership Interest. .......................... 72
    Section 23.6    Administration and Management. ........................................................... 73
    Section 23.7    Membership Program. ............................................................................ 73
    Section 23.8    Powers and Duties of the Tourist Accommodation Directors with Respect to
                    Fractional Ownership Interests. .............................................................. 73
    Section 23.9    Plan Assessment. .................................................................................... 74
    Section 23.10   Declarant Subsidy. ................................................................................. 75
    Section 23.11   Acceptance; Enforcement; Indemnification. ........................................... 76
    Section 23.12   Right of First Refusal to Purchase Fractional Ownership Interests. ................ 77

450454 01/11/2001 03:02P CONDO DE DAVIS SILVI
7 of 147 R 735.00 D 0.00 N 0.00 PITKIN COUNTY CO

Section 23.13   Cross Use Easements Pertaining to Fractional Ownership Interests.................. 77
         23.13.1 Cross Use Easement Rights.......................................................................... 77
         23.13.2 Expansion of Use Right Easement. ................................................................ 78
         23.13.3 Reservation Procedures. ............................................................................. 78
         23.13.4 Space Available Use Periods........................................................................ 79
         23.13.5 Rental. ..................................................................................................... 79
Section 23.14   Easement for Cleaning and Maintenance........................................... 79
Section 23.15   Appointment of Directors as Agent for Service of Process. .............................. 80
ARTICLE 24. AGREEMENT TO PARTITION PROPERTY................................................................. 80

**LIST OF EXHIBITS**

| EXHIBIT A | LEGAL DESCRIPTION OF PROPERTY |
|---|---|
| EXHIBIT B | ALLOCATED INTERESTS |
| EXHIBIT C | EXPANSION PROPERTY |
| EXHIBIT D | EASEMENTS, LICENSES AND OTHER TITLE MATTERS |
| EXHIBIT E | CITY DISCLOSURE STATEMENT |
| EXHIBIT F | THE RITZ-CARLTON CLUB MEMBERSHIP PROGRAM AFFILIATION AGREEMENT |
| EXHIBIT G | THE RITZ-CARLTON CLUB, ASPEN HIGHLANDS MEMBERSHIP CALENDAR |
| EXHIBIT H | UNIT OWNERSHIP |

450454 01/11/2001 03:02P CONDO DE DAVIS SILVI
8 of 147 R 735.00 D 0.00 N 0.00 PITKIN COUNTY CO

### DECLARATION OF CONDOMINIUM

### FOR

### ASPEN HIGHLANDS CONDOMINIUMS

THIS DECLARATION OF CONDOMINIUM FOR ASPEN HIGHLANDS CONDOMINIUMS (this "Declaration") dated as of January 10, 2001, shall be effective upon recordation and is made by THE RITZ-CARLTON DEVELOPMENT COMPANY, INC., a Delaware corporation, and HINES HIGHLANDS LIMITED PARTNERSHIP, a Delaware limited partnership (each a "Declarant" and jointly sometimes referred to as "Declarant"). Declarant is the owner of certain real property in Pitkin County, Colorado, more particularly described collectively on Exhibit A attached and made part of this Declaration by this reference (the "Property"). Each Declarant hereby makes the following grants, submissions and declarations for the Property:

### ARTICLE 1.
### IMPOSITION OF COVENANTS

Section 1.1   Purpose.

The purpose of this Declaration is to create a mixed use condominium project (the "Project") pursuant to the Colorado Common Interest Ownership Act as set forth in Article 33.3, Title 38, Colorado Revised Statutes, as amended and supplemented from time to time (the "Act"), within the Buildings (as hereinafter defined) and other improvements located on the Property, which Project shall incorporate residential and commercial uses (that part of the Project to be used for residential purposes being referred to as the "Residential Project" and that part of the Project to be used for commercial purposes being referred to as the "Commercial Project") and, subject to the terms of Article 23 hereof, the creation of a fractional ownership regime (the "Plan of Fractional Ownership") that will allow the sale and ownership of undivided ownership interests ("Fractional Ownership Interests" as defined below in Article 23) in the Tourist Accommodation Units (hereinafter defined).

Section 1.2   Residential Units.

The Residential Project shall consist of Tourist Accommodation Units (collectively, the "Tourist Accommodation Project") and Deed Restricted Residential Units (hereinafter defined) (collectively, the "Deed Restricted Residential Project").

Section 1.3   Commercial Units.

The Commercial Project shall consist of Commercial Units.

Section 1.4   Plan of Fractional Ownership.

Declarant may commit the Tourist Accommodations Units to a Plan of Fractional Ownership. The Plan of Fractional Ownership will provide for the creation of undivided fee ownership interests (to be known as Residence Interests) in the Tourist Accommodation Units.

1



Case 1:16-cv-01301-PAB-GPG  Document 1-2  Filed 05/27/16  USDC Colorado  Page 118 of
144
CASE 0:12-cv-03093-DSD-JJK  Document 49-7  Filed 05/10/13  Page 11 of 74

Section 1.5    Intention of Declarant.

Declarant desires to (a) establish a uniform plan for the development, sale, ownership, use and maintenance of the Property including commercial and residential uses; (b) create a plan of fractional ownership permitting short-term accommodations to owners and guests; (c) protect the value and desirability of the Project as a whole while respecting the separate and distinct interests of the owners of each of the Residential Project and the Commercial Project; (d) further a plan for the improvement, sales and condominium ownership of the Residential Project and the Commercial Project; (e) create a harmonious and attractive mixed use development within the Project; and (f) promote and safeguard the health, comfort, safety, convenience and welfare of the owners of condominium units and Fractional Ownership Interests in the Residential Project and the owners of condominium units in the Commercial Project.

Section 1.6    Development and Use.

As of the recording of this Declaration, the Project consists of seventy-eight (78) Units (without consideration of any resubdivision of Units or the creation of Fractional Ownership Interests), of which forty-seven (47) are Tourist Accommodation Units, twenty-three (23) are Deed Restricted Residential Units, and eight (8) are Commercial Units, all located in those Buildings referred to for convenience as "Buildings 4 and 8." Declarant reserves the right for itself and any Successor Declarant to expand the Property and to expand the Common Elements by the addition of a Building referred to for convenience as "Building 2." In the event of expansion by the addition of Building 2, the number of units subjected to this Declaration shall be subject to the maximum limitations set forth in Section 3.1. All Tourist Accommodation Units may be subject to further subdivision into Fractional Ownership Interests. No additional condominium units may be established on the Property by subdivision of existing units, conversion of non-condominium space, or otherwise, except as provided herein and as provided by applicable land use regulations.

Section 1.7    Mixed Use.

The Residential Project and the Commercial Project together shall comprise the condominium project, the name of which is Aspen Highlands Condominiums. The functions, activities, physical appearance and other features commonly associated with commercial uses and residential uses shall be expressly permitted on the Property and within the Building and other improvements, all as more particularly described and governed herein.

Section 1.8    Submission of Property.

To accomplish the purposes and intentions recited above, Declarant hereby submits the Property, together with all improvements, appurtenances and facilities relating to or located on the Property now and in the future, to the provisions of the Act, and hereby imposes upon all of the Property the covenants, conditions, restrictions, easements, reservations, rights-of-way and other provisions of this Declaration, and Declarant hereby declares that all of the Property shall be held, sold, conveyed, encumbered, leased, rented, occupied and improved, subject to the provisions of this Declaration.

Section 1.9    Master Declaration.

The Property is subject to the Declaration for Aspen Highlands Village dated, October 13, 1998, and recorded October 15, 1998, under Reception No. 423272 in the Office of the Clerk and Recorder of Pitkin County, Colorado (the "Master Declaration") and the Final Plat of Aspen Highlands Village

2



P.U.D., recorded in the Office of the Clerk and Recorder of Pitkin County, Colorado, on October 15, 1998 as Reception No. 423275 (the "Final Plat").

Section 1.10    Covenants Running with the Land.

All provisions of this Declaration shall be deemed to be covenants running with the land or equitable servitudes, as the case may be. The benefits, burdens and other provisions contained in this Declaration shall be binding upon and shall inure to the benefit of Declarant, all Owners and their respective heirs, executors, administrators, personal representatives, successors and assigns.

## ARTICLE 2.
## DEFINITIONS

The following words, when used in this Declaration, shall have the meanings designated below unless the context shall expressly provide otherwise:

Section 2.1    "Allocated Interest" means the interest allocated to each Unit expressed as a percentage as set forth in Exhibit B attached hereto and incorporated herein by reference. Allocated Interests govern voting rights, assessment obligations and ownership interests for all Units.

Section 2.2    "Allocated Interest-Commercial" means, with respect to any Commercial Unit, the Allocated Interest-General allocated to such Commercial Unit as set forth on Exhibit B, attached hereto and incorporated herein by reference divided by the total of Allocated Interests-General allocated to all Commercial Units in the Association from time to time.

Section 2.3    "Allocated Interest-Deed Restricted Residential" means, with respect to any Deed Restricted Residential Unit, the Allocated Interest-General allocated to such Deed Restricted Residential Unit as set forth on Exhibit B, attached hereto and incorporated herein by reference, divided by the total of Allocated Interests-General allocated to all Deed Restricted Residential Units in the Association from time to time.

Section 2.4    "Allocated Interest-General" means, with respect to any Unit, the Allocated Interest allocated to such Unit as set forth on Exhibit B, attached hereto and incorporated herein by reference, divided by the total of Allocated Interests allocated to all Units in the Association from time to time.

Section 2.5    "Allocated Interest-Tourist Accommodation" means, with respect to any Tourist Accommodation Unit, the Allocated Interest-General allocated to such Tourist Accommodation Unit as set forth on Exhibit B, attached hereto and incorporated herein by reference, divided by the total of Allocated Interests-General allocated to all Tourist Accommodation Units in the Association from time to time.

Section 2.6    "Allocated Interest-Residential" means, with respect to any Residential Unit, the Allocated Interest-General allocated to such Residential Unit (whether such Unit is a Deed Restricted Residential Unit or a Tourist Accommodation Unit) as set forth on Exhibit B, attached hereto and incorporated herein by reference, divided by the total of Allocated Interests-General allocated to all Residential Units (whether such Units are Deed Restricted Residential Units or Tourist Accommodation Units) in the Association from time to time.

Section 2.7    "Amenities" shall have the meaning given it in Section 5.4 hereinbelow.

3



450454 01/11/2001 03:02P CONDO DE DAVIS SILVI
11 of 147 R 735.00 D 0.00 N 0.00 PITKIN COUNTY C

Section 2.8     "Amenities Association" means the Aspen Highlands Village Residential Amenities Association, created by that certain Residential Amenities Declaration for Aspen Highlands Village, dated October 15 1998, and recorded October 15, 1998, under Reception No. 423273 in the Office of the Clerk and Recorder of Pitkin County, Colorado, and the articles of incorporation and bylaws of the Amenities Association.

Section 2.9     "Aspen Highlands Village" means all of the real property subject to the Master Declaration.

Section 2.10    "Assessments" means the annual, special, personal and default Assessments levied pursuant to Article 8 below.  Assessments are also referred to as a Common Expense Liability under the Act.

Section 2.11    "Association" means Aspen Highlands Condominium Association, Inc., a Colorado nonprofit corporation, and its successors and assigns.

Section 2.12    "Association Documents" means the basic documents creating and governing the Project, including, but not limited to, this Declaration, the articles of incorporation and bylaws of the Association, the Map and any procedures, rules, regulations or policies relating to the Project adopted under such documents by the Association or the Executive Board.

Section 2.13    "Building(s)" means the building or buildings as the case may be (including all fixtures and improvements contained within it) in which Units and Common Elements are located. Buildings may be referred to as Buildings 2, 4 and 8 with reference to the particular Lot on which the Building or Buildings are located.  The term "Building" or "Buildings" includes Building 2 only if Lot 2 is made subject to this Declaration.

Section 2.14    "Category" shall mean each separate category of members in the Association, namely the Deed Restricted Residential Owners, the Tourist Accommodation Owners (including the Owners of Fractional Ownership Interests therein), and the Commercial Owners (all as described in Section 6.2 of this Declaration), and "Categories" shall mean all such categories collectively. The term shall also refer to the respective Categories of Units as well as the respective Categories of Directors that serve on the Executive Board.

Section 2.15    "Class" shall mean individually the Residential Owners and the Commercial Owners, and "Classes" shall mean both such classes collectively.  The term shall also refer to the respective Classes of Units as well as the respective Classes of Directors that serve on the Executive Board.

Section 2.16    "Commercial Directors" means the members of the Executive Board elected by the Commercial Owners after the expiration of the Declarant Control Period in accordance with the procedures set forth below and in the bylaws of the Association.  Until expiration of the Declarant Control Period, any specific responsibilities of the Commercial Directors shall be undertaken and discharged by the entire Executive Board, and the entire Executive Board shall be authorized to so act.  After the expiration of the Declarant Control Period there shall be three Commercial Directors, one of which shall be elected by the owners of Commercial Units in Building 4 and, if Building 2 has been subjected to this Declaration, Building 2; one of which shall be elected by the owners of Commercial Units in Building 8 and one of which shall be elected by the owners of Commercial Units in all Buildings that are subject to this Declaration at large.

4


450454 01/11/2001 03:02P CONDO DE DAVIS SILVI
12 of 147 R 735.00 D 0.00 N 0.00 PITKIN COUNTY C

Section 2.17 "Commercial Owners" means those Owners of Commercial Units within the Project.

Section 2.18 "Commercial Unit" means a Unit designated with the prefix "C" on the Map and having a commercial use, and not the Residential Units.

Section 2.19 "Common Elements" means all of the Project, except the Individual Air Space Units, and including, without limiting the generality of the foregoing, the following components:

2.19.1 The Property, excluding improvements on the Property unless specifically described in this subsection;

2.19.2 The Buildings (including, but not by way of limitation, the foundations, columns, girders, beams, supports, perimeter and supporting walls, roofs, fireplaces, chimneys, flues, chimney chases, patios, decks, balconies, corridors, lobbies, vestibules, entrances and exits; and the mechanical installations of the Buildings consisting of the equipment and materials making up any central services such as power, light, gas, hot and cold water, sewer and heating which exist for use by one or more of the Owners, including the pipes, vents, ducts, flues, cable conduits, wires, telephone wire and other similar utility installations used in connection therewith and the areas designated on the Map as including those installations; trash rooms and storage rooms; elevators and stairs), except for the Individual Air Space Units;

2.19.3 The plazas, yards, sidewalks, walkways, parking areas, paths, grass, shrubbery, trees, planters, driveways, roadways, landscaping, gardens and related facilities upon the Property;

2.19.4 The pumps, tanks, motors, fans, storm drainage structures, compressors, ducts and, in general, all apparatus, installations and equipment of the Buildings existing for use of one or more of the Owners; and

2.19.5 In general, all other parts of the Project designated by Declarant as Common Elements and existing for the use of one or more of the Owners.

The Owners of the separate Units shall own the Common Elements, each Owner of a Unit having an undivided interest in the Common Elements as provided below.

Section 2.20 "Common Expense(s)" means and includes the following:

2.20.1 Expenses of administration, insurance, operation and management, repair or replacement of the Common Elements except to the extent such repairs and replacements are responsibilities of an Owner as delineated in Section 9.2 below;

2.20.2 Expenses declared Common Expenses by the provisions of this Declaration or the bylaws of the Association;

2.20.3 All sums lawfully assessed against the Units by the Executive Board;

2.20.4 Expenses agreed upon as Common Expenses by the members of the Association;

and



2.20.5  Expenses provided to be paid by the Residential Owners and the Commercial Owners collectively or respectively in accordance with the terms of this Declaration pursuant to the Management Agreement(s) for the maintenance of the General Common Elements, the Limited Common Elements-Residential, the Limited Common Elements-Tourist Accommodation, the Limited Common Elements-Deed Restricted Residential and/or the Limited Common Elements-Commercial.

Section 2.21   "Condominium Map" or "Map" means and includes any engineering survey or surveys of the Property as provided in Article 4, below.

Section 2.22   "Declarant" means Hines Highlands Limited Partnership, a Delaware limited partnership ("HHLP"), and The Ritz-Carlton Development Company, Inc., a Delaware corporation ("RCDC") and their respective successors, transferees and assigns which are Successor Declarants. No party other than HHLP and RCDC shall exercise the rights and privileges reserved herein to Declarant, or be deemed a successor, transferee or assignee of Declarant rights, unless such party shall receive and record in the Office of the Clerk and Recorder of Pitkin County, Colorado, a written instrument from HHLP and RCDC assigning or transferring all or a portion of such rights and privileges.

Section 2.23   "Declarant Control Period" means the period of time commencing on the date of incorporation of the Association and terminating on the earliest of the following events: (i) sixty (60) days after conveyance by Declarant of seventy-five percent (75%) of the Units to Owners, (ii) two (2) years after the last conveyance of a Unit or Fractional Ownership Interest by Declarant in the ordinary course of business, or (iii) the date on which Declarant voluntarily relinquishes such power evidenced by a notice recorded in the Office of the Clerk and Recorder for Pitkin County, Colorado.

Section 2.24   "Declaration" means this Declaration of Condominium for Aspen Highlands Condominiums together with any supplement or amendment to this Declaration, recorded in the Office of the Clerk and Recorder of Pitkin County, Colorado.

Section 2.25   "Deed Restricted Residential Directors" means the members of the Executive Board elected by the Deed Restricted Residential Owners after the expiration of the Declarant Control Period in accordance with the procedures set forth below and in the bylaws of the Association. Until expiration of the Declarant Control Period, any specific responsibilities of the Deed Restricted Residential Directors shall be undertaken and discharged by the entire Executive Board, and the entire Executive Board shall be authorized to so act.

Section 2.26   "Deed Restricted Residential Owners" means those Owners of Deed Restricted Residential Units within the Project.

Section 2.27   "Deed Restricted Residential Unit" means a Unit designated with the prefix "DR" on the Map and restricted as an affordable housing sale unit, rental unit or dormitory unit pursuant to the PUD Plan, and not the Tourist Accommodation Units or the Commercial Units.

Section 2.28   "Director" means a member of the Executive Board.

Section 2.29   "District" means, collectively, the Aspen Highlands Commercial Metropolitan District, a Colorado quasi-municipal corporation, and the Aspen Highlands Residential Metropolitan District, a Colorado quasi-municipal corporation.



Section 2.30 "Eligible Mortgagee" means a holder of a First Mortgage on a Unit or Fractional Ownership Interest who has submitted a written request that the Association notify it on any proposed action requiring the consent of a specified percentage of Eligible Mortgagees.

Section 2.31 "Executive Board" means the governing body of the Association, as provided in this Declaration and in the articles of incorporation and bylaws of the Association.

Section 2.32 "Expansion Property" means the real property more particularly described on the attached Exhibit C attached hereto and incorporated herein which Declarant may subject to this Declaration by one or more duly recorded Supplemental Declarations and Supplemental Maps.

Section 2.33 "First Mortgage" means an unpaid and outstanding mortgage, deed of trust or other security instrument recorded in the Office of the Clerk and Recorder of Pitkin County, Colorado, which secures financing for the construction or development of the Project or which encumbers a Unit or Fractional Ownership Interest and which, in any case, has priority of record over all other recorded liens except those liens made superior by statute (such as general ad valorem tax liens and special assessments) and liens of other associations.

Section 2.34 "First Mortgagee" means the Mortgagee under a First Mortgage.

Section 2.35 "Fractional Ownership Interest" or "Residence Interest" shall have the meaning given to it in Article 23 below.

Section 2.36 "Fractional Ownership Plan," "Plan of Fractional Ownership" or "Plan" means the system of mutual use rights and obligations created and established by Article 23 of this Declaration for Owners of Fractional Ownership Interests.

Section 2.37 "General Common Elements" means the Common Elements, except for Limited Common Elements and the Restricted Common Elements.

Section 2.38 "Individual Air Space Unit" means, with respect to a Residential Unit or a Commercial Unit, that portion of a single Unit designated for separate ownership by an Owner depicted on the Map and consisting of enclosed rooms and bounded by the interior face of the unfinished perimeter walls, ceilings, and floors of the Individual Air Space Unit, and the doors and windows thereof; provided, however, some Commercial Unit(s) may not be bounded on all sides by walls, in which case the boundaries on such sides of an Individual Air Space Unit(s) shall be those boundaries as are designated on the Map. For the purpose of defining an Individual Air Space Unit, the terms set forth below shall be defined as follows:

2.38.1 "unfinished perimeter wall" means the interior surfaces of the studs, supports and other wooden, metal or similar structural materials which constitute the interior face of a wall of an Individual Air Space Unit.

2.38.2 "unfinished perimeter ceiling" means the beams, joists and wooden or other structural materials that constitute the interior face of the ceiling of an Individual Air Space Unit.

2.38.3 "unfinished perimeter floor" means the beams, floor joists and floor deck material that constitute the interior face of the floor of an Individual Air Space Unit.



An Individual Air Space Unit shall include any drywall, wall paneling, wood, tile, paint, paper, carpeting or any other wall, ceiling or floor covering, windows, window glass and window frames, shutters, awnings, doorsteps, stoops and doors, door glass and door frames. An Individual Air Space Unit shall also include any fireplace or stove hearth, facing brick, tile or firebox. An Individual Air Space Unit shall further include fixtures and hardware and all improvements contained within the unfinished perimeter walls, ceilings and floors. An Individual Air Space Unit shall include any heating and refrigerating elements or related equipment, utility lines and outlets, electrical and plumbing fixtures, pipes and all other related equipment required to provide heating, air-conditioning, hot and cold water, electrical or other utility services to the Individual Air Space Unit and located within the unfinished walls, ceilings and floors; provided, however, that an Individual Air Space Unit shall not include any of the structural components of the Building or utility or service lines located within the Individual Air Space Unit but serving more than one Individual Air Space Unit.

Section 2.39 "Limited Common Elements" means those parts of the Common Elements that are limited to and reserved for the use of fewer than all of the Owners. Limited Common Elements that are reserved for the exclusive use of all Residential Owners are defined as "Limited Common Elements-Residential" or "L.C.E.-R" on the Map. Limited Common Elements that are reserved for the exclusive use of Tourist Accommodation Owners are defined as "Limited Common Elements-Tourist Accommodation" or "L.C.E.-TA" on the Map. Limited Common Elements that are reserved for the exclusive use of Deed Restricted Residential Owners are defined as "Limited Common Elements-Deed Restricted Residential" or "L.C.E.-DR" on the Map. Limited Common Elements that are reserved for the exclusive use of Commercial Owners are defined as "Limited Common Elements-Commercial" or "L.C.E.-C" on the Map. Limited Common Elements - Commercial include the storefronts of Commercial Units located on the ground floor extending the width and height of the Commercial Unit to which they are appurtenant, all as may be further defined on the Map. Limited Common Elements may be reserved for the exclusive use of one or more Classes or Categories of Owners. Without limiting the foregoing, the Limited Common Elements shall include any balcony, deck, patio, private entryway or porch adjacent to an Individual Air Space Unit, storage spaces that may be designated as Limited Common Elements serving those particular Individual Air Space Units, parking space units owned by the Association that may be designated as Limited Common Elements for particular Units pursuant to Section 5.3 below, and any individual fireplace chimneys and flues, individual air-conditioning units and fixtures and individual water and sewer service lines, water heaters and any plumbing or other installation or item servicing an Individual Air Space Unit, including, but not limited to, all such items designated as Limited Common Elements on the Map. The deck, balcony or patio, fireplace chimneys or other items which are accessible from, associated with and which adjoin a particular Individual Air Space Unit or Units, without further reference thereto, shall be used in connection with such Individual Air Space Unit or Units to the exclusion of the use thereof by the other Owners, except by invitation. Notwithstanding any other provision of this Section, certain Limited Common Elements-Tourist Accommodation shall be made available for use by persons other than the Tourist Accommodation Owners, as more particularly described in Section 5.4 hereinbelow. No reference to the limited use by individual Owners need be made in any instrument of conveyance, encumbrance or other instrument.

Section 2.40 "Management Agreement" means any contract or arrangement entered into for purposes of discharging the responsibilities of the Executive Board relative to the operation, maintenance and management of the Project.

Section 2.41 "Managing Agent" (or sometimes as the case may be "Management Company") means a person, firm, corporation or other entity employed or engaged as an independent contractor by the Association pursuant to a Management Agreement to perform management services for the Project.

8



Section 2.42   "Master Association" means the Aspen Highlands Village Association, created by the Master Association Documents.

Section 2.43   "Master Association Documents" means the Master Declaration and the articles of incorporation and bylaws of the Master Association, and any procedures, rules and regulations and policies adopted under such documents by the Master Association.

Section 2.44   "Master Declaration" means the Declaration for Aspen Highlands Village, dated October 13, 1998, as recorded October 15, 1998, at Reception No. 423272 in the Office of the Clerk and Recorder of Pitkin County, Colorado, as further amended and supplemented from time to time.

Section 2.45   "Maximum Rate" shall mean three (3) percentage points greater than that rate of interest charged by a bank (designated from time to time by the Executive Board) to the best commercial customers of the designated bank for short-term loans and identified as the "prime rate" by such bank as of the date on which such Maximum Rate is imposed with respect to any amount payable under this Declaration, or if less, the maximum rate allowed by law.

Section 2.46   "Mortgage" means any unpaid and outstanding mortgage, deed of trust or other security instrument recorded in the Office of the Clerk and Recorder of Pitkin County, Colorado, which secures financing for the construction or development of the Project or which encumbers a Unit or Fractional Ownership Interest.

Section 2.47   "Mortgagee" means any person or entity named as a mortgagee or beneficiary under any Mortgage, or any successor to the interest of any such person under such Mortgage.

Section 2.48   "Owner" means any record owner (including Declarant, and including a contract seller, but excluding a contract purchaser), whether a natural person or persons, or an entity, of a fee simple title interest in and to any Unit (including, without limitation, an owner of an Fractional Ownership Interest); excluding, however, any record owner with an interest therein merely as a Mortgagee (unless such Mortgagee has acquired fee simple title interest in the Unit pursuant to foreclosure or any proceedings in lieu of foreclosure).

Section 2.49   "Parking Association" means Aspen Highlands Village Parking and Loading Dock Facility Association, a Colorado nonprofit corporation, established pursuant to the Parking Association Documents and any organization established to succeed it.

Section 2.50   "Parking Association Documents" means the Parking Declaration, together with the articles of incorporation and the bylaws of the Parking Association and all rules, regulations, design guidelines, and other documents established pursuant to the Parking Declaration and other documents described above, all as amended, supplemented and restated from time to time.

Section 2.51   "Parking Declaration" means the Declaration for Aspen Highlands Village Parking and Loading Dock Facility, a Condominium, dated _01_ _10_ _01_, and recorded on _01_ _11_ _01_, under Reception No. 450452 in the Office of the Clerk and Recorder of Pitkin County, Colorado, as amended, supplemented and restated from time to time.

Section 2.52   "Parking Facility" means one or more buildings, together with the real property on which such building(s) are located, which is submitted to condominium or planned community ownership by the Parking Declaration and the associated map.

9


450454 01/11/2001 03:82P CONDO DE DAVIS SILVI
17 of 147 R 735.00 D 0.00 N 0.00 PITKIN COUNTY C

Section 2.53    "Plan Assessment" or "Club Dues" shall have the meaning given it in Article 23 hereinbelow.

Section 2.54    "Plan Member" shall have the meaning given it in Article 23 hereinbelow.

Section 2.55    "Plan Unit" or "Residence" shall have the meaning given it in Article 23 hereinbelow.

Section 2.56    "Plan Unit Furnishings" shall have the meaning given it in Article 23 hereinbelow.

Section 2.57    "Plan Year" shall have the meaning given it in Article 23 hereinbelow.

Section 2.58    "Property" means the real property described in the attached Exhibit A.

Section 2.59    "PUD Plan" means (i) the Aspen Highlands Village Detailed Submission Consolidated Plan recorded as Reception No. 423269 in the Office of the Clerk and Recorder of Pitkin County, Colorado, (ii) the Aspen Highlands Planned Unit Development Guide recorded as Reception No. 423274 in the Office of the Clerk and Recorder of Pitkin County, Colorado, (iii) the Final Plat, (iv) the Village Core Plat, (v) Ordinance No. 35 (Series 2000) of the City Council of the City of Aspen, and (vi) Ordinance No. 36 (Series 2000) of the City Council of the City of Aspen.

Section 2.60    "Reservation Procedures" shall have the meaning given it in Article 23 hereinbelow.

Section 2.61    "Reserve Account" shall have the meaning given it in Section 7.2 hereinbelow.

Section 2.62    "Residential Directors" means the Tourist Accommodation Directors and the Deed Restricted Residential Directors.

Section 2.63    "Residential Owners" means those Owners of Residential Units (including any Owner of Fractional Ownership Interests therein) within the Project. Unless the context otherwise requires, Owners of Fractional Ownership Interests shall be deemed to be Owners for usage and access purposes only during those times when they are entitled pursuant to the Association Documents and the Membership Program Documents to have access to the Project

Section 2.64    "Residential Unit" means a Unit having a residential use (including the Tourist Accommodation Units and the Deed Restricted Residential Units), and not the Commercial Units.

Section 2.65    "Restricted Common Elements" means those portions of the Common Elements designated as "R.C.E." on the Map, designated by the Executive Board, with the approval of the appropriate Directors pursuant to Section 7.1, or designated in these Declarations, which areas are subject to easements, leases, or licenses created for the benefit of certain third parties as described on the Map, this Declaration or otherwise and restricted to the uses described therein.

Section 2.66    "Successor Declarant" means any party or entity to whom Declarant or either of them assigns any or all of its rights, obligations or interest as Declarant, as evidenced by an assignment or deed of record executed by both the assigning Declarant and the transferee or assignee and recorded in the Office of the Clerk and Recorder of Pitkin County, Colorado, designating such party as a Successor

10


450454 01/11/2001 03:02P CONDO DE DAVIS SILVI
16 of 147 R 735.00 D 0.00 N 0.00 PITKIN COUNTY C

Declarant. Upon such recording, Declarant's rights and obligations under this Declaration shall cease and terminate to the extent provided in such document.

Section 2.67 "Supplemental Declaration" means an instrument which subjects any part of the Expansion Property to this Declaration, as more fully provided in Article 21 below.

Section 2.68 "Supplemental Map" means a condominium map of the Project which depicts any part of the Expansion Property becoming subject to this Declaration through a Supplemental Declaration, as more fully provided in Article 21 below.

Section 2.69 "Tourist Accommodation Directors" means the members of the Executive Board elected by the Tourist Accommodation Owners after the expiration of the Declarant Control Period in accordance with the procedures set forth below and in the bylaws of the Association. Until expiration of the Declarant Control Period, any specific responsibilities of the Tourist Accommodation Directors shall be undertaken and discharged by the entire Executive Board, and the entire Executive Board shall be authorized to so act.

Section 2.70 "Tourist Accommodation Owners" means those Owners of Tourist Accommodation Units (including any Owner of Fractional Ownership Interests therein) within the Project. Unless the context otherwise requires, Owners of Fractional Ownership Interests shall be deemed to be Owners for usage and access purposes only during those times when they are entitled pursuant to the Association Documents to have access to the Project.

Section 2.71 "Tourist Accommodation Unit" means a Unit designated with the prefix "TA" on the Map and designated as a tourist accommodation unit in the PUD Plan, and not the Deed Restricted Residential Units or the Commercial Units.

Section 2.72 "Unit" means, with respect to a Tourist Accommodation Unit, a Deed Restricted Residential Unit, or a Commercial Unit, the fee simple interest in and to an Individual Air Space Unit, together with the undivided interests in the Common Elements appurtenant to the Individual Air Space Unit, specifically excluding, however, any Fractional Ownership Interest in a Unit. Each Unit's undivided interest in the Common Elements shall be equivalent to the Allocated Interest of such Unit with respect to the General Common Elements and each category of Limited Common Elements. Unit is also referred to as a Unit under the Act.

Section 2.73 "Use Periods" shall have the meaning given it in Article 23 hereinbelow.

Section 2.74 "Village Core Plat" means the Supplemental Plat, Aspen Highlands Village P.U.D., Block D, recorded on September 28, 1999, under Reception No. 436003 in the Office of the Clerk and Recorder of Pitkin County, Colorado, as amended, supplemented and restated from time to time.

Each capitalized term not otherwise defined in this Declaration or in the Map shall have the same meanings specified or used in the Act.

## ARTICLE 3.
## DIVISION OF PROJECT INTO CONDOMINIUM OWNERSHIP

Section 3.1    Division into Units.

As of the recording of this Declaration, the Property is hereby divided into seventy-eight (78) Units (without consideration of any resubdivision of Units or the creation of Fractional Ownership



11

450454 01/11/2001 03:02P CONDO DE DAVIS SILVI
19 of 147 R 735.00 D 0.00 N 0.00 PITKIN COUNTY C

Interests), of which forty-seven (47) are Tourist Accommodation Units (forty-five (45) in Building 8 and two (2) in Building 4); twenty-three (23) are Deed Restricted Residential Units (seven (7) in Building 8 and sixteen (16) in Building 4); and eight (8) are Commercial Units (four (4) in Building 8 and four (4) in Building 4). Each Unit consists of a fee simple interest in an Individual Air Space Unit and an undivided fee simple interest in the Common Elements in accordance with the respective undivided interests in the Common Elements. Such undivided interests in the Common Elements are hereby declared to be appurtenant to the respective Units. Declarant reserves the right for itself and any Successor Declarant to expand the Property and to expand the Common Elements by the addition of a Building referred to for convenience as "Building 2." In the event of expansion by the addition of Building 2 and/or the resubdivision of Units the maximum number of Units that can be created in the Project subject to any development limitations governing the Property as reflected in the PUD Plan, as the same may be amended, is sixty (60) Commercial Units and one hundred ninety-four (194) Residential Units.

### Section 3.2    Commercial Units.

The Owner or Owners of one or more Commercial Units shall have the right to (a) relocate the boundaries of and between adjoining Commercial Units, (b) physically combine a part of or combination of parts of the space of one Commercial Unit with a part of or combination of parts of the space within one or more adjoining Commercial Units, or (c) subdivide a Commercial Unit or part of a Commercial Unit to create additional Commercial Units; provided, however, that no Commercial Unit shall be less than 250 square feet. In order to accomplish any one of the foregoing, a Commercial Owner may remove or construct additional walls subject to the terms of this Section and any other applicable provisions of this Declaration. Upon the relocation, combination or subdivision of any Commercial Units, the Commercial Unit(s) resulting from such relocation, combination or subdivision shall be re-allocated the Allocated Interest of the predecessor Commercial Unit(s) in and to the General Common Elements and the Limited Common Elements-Commercial. A Commercial Owner must first obtain the consent of the Commercial Directors as described below and must obtain all necessary approvals from any governmental authority having jurisdiction over the Project before exercising its rights herein. The cost and expense incurred for legal, architectural and/or engineering fees and all other costs and expenses incurred by the Association shall be borne by that party requesting such a change.

In order to relocate the boundaries of, combine or subdivide any Commercial Unit(s) as provided above, the Owner(s) of such Commercial Unit(s) shall submit an application to the Commercial Directors, which application shall be executed by such Owner and shall include (a) evidence that the proposed relocation of the boundaries of, combination or subdivision of a Commercial Unit or Units complies with all building codes, fire codes and other applicable ordinances or resolutions adopted and enforced by the Master Association, the City of Aspen and the State of Colorado, and that the proposed action does not violate the terms of any Mortgage encumbering the Commercial Unit(s), (b) the proposed reallocations of Allocated Interests, (c) the proposed form of amendments to this Declaration, including the Map, as may be necessary to show the Commercial Unit(s) which are created by the relocation, combination or subdivision of a Commercial Unit(s) and their dimensions and identifying numbers, (d) a deposit against attorneys' fees and costs which the Commercial Owners and/or the Association may incur in reviewing and effectuating the transaction, in an amount reasonably estimated by the Commercial Directors, (e) evidence of the required approval of the Commercial Owner(s) that own the subject Commercial Unit(s), (f) evidence satisfactory to the Commercial Directors that the Owner(s) has obtained or caused to be obtained all requisite insurance in connection with any construction required to effect the proposed action, (g) indemnification of the Association by the Owner(s) for any and all matters relating to the proposed action, and (h) such other information as may be reasonably requested by the Commercial Directors. To the extent possible, the Commercial Directors shall be permitted to execute and record any amendment effectuating the relocation of boundaries of or combination or subdivision of Commercial Units. If the Commercial Directors require the consent of or the execution of documents by the entire Executive Board



12

450454 01/11/2001 03:02P CONDO DE DAVIS SILVI
20 of 147 R 735.00 D 0.00 N 0.00 PITKIN COUNTY C

in connection with effectuating such relocation of boundaries of or combination or subdivision of Commercial Units, the Executive Board shall approve and take such necessary actions in connection therewith if the requirements in this paragraph have been satisfied.

### Section 3.3 Residential Units.

The Declarant during the Declarant Control Period shall have the right to (a) relocate the boundaries of and between adjoining Residential Units, (b) physically combine a part of or combination of parts of the space of one Residential Unit with a part of or combination of parts of the space within one or more adjoining Residential Units, or (c) subdivide a Residential Unit or part of a Residential Unit to create additional Residential Units; provided, however, that no Residential Unit shall be less than 250 square feet. In order to accomplish any one of the foregoing, the Declarant may remove or construct additional walls subject to the terms of this Section and any other applicable provisions of this Declaration. Upon the relocation, combination or subdivision of any Residential Unit(s), the Residential Unit(s) resulting from such relocation, combination or subdivision shall be re-allocated the Allocated Interest of the predecessor Residential Unit(s) in and to the General Common Elements and the Limited Common Elements-Residential. The Declarant is not required to obtain the consent or the Executive Board or any Owners to relocate, combine or subdivide any Residential Unit(s) during the Declarant Control Period but must obtain all necessary approvals from any governmental authority having jurisdiction over the Project before exercising its rights herein.

In order to relocate the boundaries of, combine or subdivide any Residential Unit(s) as provided above, the Declarant shall be responsible for submitting documentation reflecting (a) the proposed reallocations of Allocated Interests, (b) the proposed form of amendments to this Declaration, including the Map, as may be necessary to show the Residential Unit(s) which are created by the relocation, combination or subdivision of a Residential Unit(s) and their dimensions and identifying numbers, (c) evidence that the Declarant has obtained or caused to be obtained all requisite necessary governmental approvals as well as providing insurance in connection with any construction required to effect the proposed action, and (d) indemnification of the Association by the Declarant for any and all matters relating to the proposed action. The Declarant shall be permitted to execute and record any amendment to the Declaration or the Map, or both, effectuating the relocation of boundaries of or combination or subdivision of Residential Unit(s). If the Declarant requires, whether for title purposes, governmental approvals or otherwise, the ratification of the action by the entire Executive Board or the execution of documents by the executive officers of the Association in connection with effectuating such relocation of boundaries of or combination or subdivision of Residential Unit(s), the Executive Board shall ratify and take such necessary actions in connection therewith if the requirements in this paragraph have been satisfied.

The rights reserved to Declarant under this Section 3.3 shall not apply to a Tourist Accommodation Unit after Declarant first conveys a Fractional Ownership Interest in such Tourist Accommodation Unit to an unaffiliated third-party purchaser thereof.

### Section 3.4 Delineation of Unit Boundaries.

The boundaries of each Individual Air Space Unit are delineated and designated by an identifying number on the Map

### Section 3.5 Inseparability of Unit.

Except as provided in Article 23 of this Declaration and except as provided in Section 3.2 and Section 3.3 hereinabove, no part of a Unit or of the legal rights comprising ownership of a Unit may be



13

450454 01/11/2001 03:02P CONDO DE DAVIS SILVI
21 of 147 R 735.00 D 0.00 N 0.00 PITKIN COUNTY C

partitioned or separated from any other part thereof during the period of condominium ownership prescribed in this Declaration. Subject to Section 3.1 above, each Unit shall always be conveyed, transferred, devised, bequeathed, encumbered and otherwise affected only as a complete Unit. Every conveyance, transfer, gift, devise, bequest, encumbrance or other disposition of a Unit or any part thereof shall be presumed to be a disposition of the entire Unit, together with all appurtenant rights and interests created by law or by this Declaration.

All rights with respect to the use, possession, enjoyment, management or disposition of a Unit (including any Fractional Ownership Interest) which an Owner might otherwise have as a tenant-in-common (including, but not limited to, any common law or statutory right jointly to use, possess or manage commonly owned property) are hereby unconditionally and irrevocably subordinated to this Declaration for so long as this Declaration shall remain in effect; provided, however, that in the event that an election to terminate this Declaration is made pursuant any provision of this Declaration, an Owner shall have the rights specified in this Declaration and the Act.

Section 3.6    Nonpartitionability of Common Elements.

Subject to the provisions of this Article and Article 5 below, the Common Elements shall be owned in common by all of the Owners and shall remain physically undivided; provided, however, the Limited Common Elements shall be for the exclusive use of, enjoyment by and control by the Owners of Units to which such Limited Common Elements are appurtenant, except as provided with respect to the Amenities in Section 5.4 hereinbelow. No Owner shall bring any action for partition or division of the Common Elements. By acceptance of a deed or other instrument of conveyance or assignment to a Unit or Fractional Ownership Interest, each Owner of the Unit or Fractional Ownership Interest shall be deemed to have specifically waived such Owner's right to institute or maintain a partition action or any other cause of action designed to cause a division of the General Common Elements or any Limited Common Elements, and this Section may be pleaded as a bar to the maintenance of such an action. Any Owner who shall institute or maintain any such action shall be liable to the Association and hereby agrees to reimburse the Association for the Association's costs, expenses and reasonable attorneys' fees in defending any such action. Such amounts shall automatically become a default Assessment determined and levied against such Owner's Unit or Fractional Ownership Interest and enforced by the Association in accordance with Section 8.11, Section 8.12 and Section 8.13 below.

Notwithstanding the foregoing, the Association shall have the right to dedicate, sell or otherwise transfer all or any part of the Common Elements to the fullest extent permitted under the Act. The granting of easements by the Executive Board, including the approval of a majority of Residential Directors and a majority of Commercial Directors, for public utilities, for access by pedestrians or for other purposes not inconsistent with the intended use of the Common Elements shall not be deemed a transfer requiring any consent of the Owners.

## ARTICLE 4.
## CONDOMINIUM MAP

Section 4.1    Condominium Map.

The Map shall be filed for record in the Office of the Clerk and Recorder of Pitkin County, Colorado. Any Map filed subsequent to the first Map shall be termed a supplement to such Map, and the numerical sequence of such supplements shall be shown thereon. The Map shall be filed for record following substantial completion of those portions of the Building subject to this Declaration and prior to the conveyance of any Unit depicted on the Map to a purchaser. The Map shall show the location of the Building on the Property; the floor and elevation plans; the location of the Units within the Building, both

14



horizontally and vertically; the thickness of the common walls, if any, between or separating the Units one from the other, or from Common Elements, as applicable; the Unit designations; designation of General Common Elements and Limited Common Elements; and such other information as Declarant may require in its discretion. The Map shall contain a certificate of a registered professional engineer or licensed architect or a licensed land surveyor certifying that the Map substantially depicts the location and the horizontal and vertical measurements of the Building and the Units, the dimensions of the Units, and the elevations of the unfinished floors and ceilings as constructed, and certifying that such Map is prepared subsequent to the substantial completion of the improvements. Each supplement or amendment shall set forth a like certificate when appropriate. The Map shall further contain such other information, certifications and depictions as may be required under Section 38-33.3-209 of the Act.

Section 4.2    Amendment.

Declarant reserves the right to amend or supplement the Map, from time to time, to the fullest extent permitted under the Act or as permitted by this Declaration.

## ARTICLE 5.
## OWNERS' PROPERTY RIGHTS IN COMMON ELEMENTS

Section 5.1    General Common Elements.

Every Owner and the family members, guests, tenants and licensees of each Owner shall have a perpetual right and easement of access over, across and upon the General Common Elements for the purpose of entering and exiting such Owner's Unit and the public ways for both pedestrian and vehicular travel, which right and easement shall be appurtenant to and pass with the transfer of title to such Unit; provided, however, that such right and easement shall be subject to the following:

5.1.1    The covenants, conditions, restrictions, easements, reservations, rights-of-way and other provisions contained in this Declaration, the Master Declaration and the Condominium Map;

5.1.2    The right of the Association to regulate on an equitable basis the use of parking spaces and storage spaces, if any, which are General Common Elements or Limited Common Elements from time to time;

5.1.3    The right of the Association to adopt, from time to time, rules and regulations concerning vehicular traffic and travel upon, in, under and across the Project; and

5.1.4    The right of the Association to adopt, from time to time, any and all rules and regulations concerning the Common Elements as the Association may determine are necessary or prudent, subject to the terms of Section 7.7 and Article 13 hereof.

Notwithstanding the foregoing, the Association shall take no action that unreasonably restricts any Owner's or its family members', guests', tenants' and licensees' right and easement of access over, across and upon the General Common Elements to such Owner's Unit(s).

Section 5.2    Limited Common Elements.

Subject to the provisions of this Declaration (including, without limitation, the rights of others to use the Amenities as described in Section 5.4 hereinbelow), every Owner shall have the exclusive right to use and enjoy the Limited Common Elements appurtenant to his Unit. The Map shall specify to which Unit or Units each Limited Common Element is allocated.

15



450454 01/11/2001 03:02P CONDO DE DAVIS SILVI
23 of 147 R 735.00 D 0.00 N 0.00 PITKIN COUNTY C

Storage spaces, if any, may be designated on the Map as Limited Common Elements appurtenant to the Units or a Class or Category thereof and reserved for the exclusive use of the Owners and the tenants, guests, lessees, licensees, permittees and invitees of the Owners of the Units; provided, however, any such designation shall not be construed as granting any Owner of a Unit the ownership of such storage spaces. The Executive Board shall designate as General Common Elements and subject to regulation all remaining storage spaces.

Any redesignation of the boundaries of the General Common Elements or of the General Common Elements to Limited Common Elements shall be approved by the Executive Board, including the approval of a majority of Residential Directors and a majority of Commercial Directors. Declarant hereby reserves the right and grants to the Association the right to reassign Limited Common Elements to the fullest extent permitted under the Act. Any modification to the Common Elements and/or the Units shall not impair the life safety systems of the Project.

Section 5.3    Parking.

5.3.1    Association Regulation. The Owners acknowledge that the Association will own a portion of the Parking Facility initially consisting of forty-seven (47) parking spaces that shall be allocated for use solely by the Tourist Accommodation Owners as LCE-TA, thirty-three (33) parking spaces that shall be allocated for use solely by the Deed Restricted Residential Owners as LCE-DR (of which twenty-six spaces (26) parking spaces shall be allocated for use solely by the Deed Restricted Residential Owners in Building 4 and seven (7) parking spaces shall be allocated for use solely by the Deed Restricted Residential Owners in Building 8), twenty-seven (27) parking spaces that shall be allocated for use solely by the Commercial Owners as LCE-C (of which eighteen (18) spaces shall be allocated for use solely by the Owners of Commercial Units in Building 4 and nine (9) parking spaces that be allocated for use solely by the Owners of Commercial Units in Building 8). Subject to the foregoing, the Executive Board shall assign parking spaces among Units within specific Classes and Categories in compliance with the PUD Plan. Additional parking spaces may be acquired and owned by the Association in connection with the expansion of the Project to the Expansion Property. In addition to any spaces acquired in connection with the Expansion Property, the Association may acquire additional parking spaces upon the approval of a majority of the Executive Board plus a majority of the Category of Directors representing the Owners who will be able to use such parking spaces. The expenses of the acquisition of any additional parking spaces shall be allocated as a special Assessment to the Class of Category of Owners entitled to use such parking spaces.

The Association will have full right, power, and authority to regulate such parking on an equitable basis as determined by the Executive Board including, without limitation, the right to assign exclusive parking spaces to certain Units, the right to reassign parking spaces between or among certain Classes or Categories of Units based on handicap accessible parking space or other need, and the right to adopt rules and regulations governing the use and maintenance of such parking consistent with the Parking Documents provided that the parking spaces designated as Limited Common Elements for each Category shall be reserved for their exclusive use.

5.3.2    Parking Documents. The Parking Documents govern the ownership, use and maintenance of the Parking Facility. Each Owner acknowledges that the Association will be a member of the Parking Association and the Executive Board will determine all voting with respect to measures arising under the Parking Documents as follows: the Commercial Directors by a majority vote thereof shall vote on all matters of the Parking Association with respect to the parking spaces designated as Limited Common Elements-Commercial; the Deed Restricted Residential Directors by a majority vote thereof shall vote on all matters of the Parking Association with respect to the parking spaces designated as Limited Common Elements-Deed Restricted Residential; and the Tourist Accommodation Directors by

16



a majority vote thereof shall vote on all matters of the Parking Association with respect to the parking spaces designated as Limited Common Elements-Tourist Accommodation. Owners will have no direct ownership interest in the Parking Facility nor will they exercise any vote in matters of the Parking Association.

Section 5.4    Amenities.

A portion of the Project is an outdoor-jetted spa and swimming pool, which are identified on the Map as "Pool L.C.E.-TA-Amenities" (the "Amenities"). The following provisions shall apply to the use and management of the Amenities by the Tourist Accommodation Directors and the Tourist Accommodation Owners:

5.4.1    Notwithstanding that the Amenities are Limited Common Elements-Tourist Accommodation pursuant to this Declaration, Declarant intends that the Amenities shall be available for use by members of the Amenities Association and Tourist Accommodation Units (including Owners of Fractional Ownership Interests therein). Therefore, the Association, by and through the Tourist Accommodation Directors, shall be obligated to enter into an agreement permitting the members of the Amenities Association, which shall consist of no more than sixty-three (63) Free Market Residential Units as that term is defined in the PUD Plan, from time to time to use the Amenities, which agreement shall, at minimum, provide the following:

(a)    The members of the Amenities Association shall have the right to use the Amenities on the same terms and conditions as are provided for the use of the Amenities by the Tourist Accommodation Owners. Use of the Amenities by the members of the Amenities Association shall be governed by the nondiscriminatory provisions of the rules and regulations of the Tourist Accommodation Directors regarding use of the Amenities, and the Tourist Accommodation Directors shall have the same remedies (with the exception of the ability, if any, to assert a lien against a unit owned by a member of the Amenities Association) for violation of such rules and regulations by members of the Amenities Association as are provided for the Tourist Accommodation Owners. In addition, the right of the members of the Amenities Association to use the Amenities may be terminated, after notice and failure to cure, for nonpayment of amounts owed by the Amenities Association;

(b)    In order to compensate for the anticipated greater use of the Amenities by the various Owners of Fractional Ownership Interests in a unit (whether a Unit hereunder or a unit subject to the Amenities Association), all expenses of the operation, maintenance, renovation and replacement of the Amenities shall be allocated such that each unit (whether such units are within the Project or are within the Amenities Association) that has been further subdivided into Fractional Ownership Interests is assessed an amount that is one and one-half (1½) times the amount that is assessed to each unit (whether such units are within the Project or are within the Amenities Association) that has not been subdivided into Fractional Ownership Interests;

(c)    The Amenities Association shall be entitled to comment upon the proposed budget for the Amenities, and the Tourist Accommodation Directors will take such comments into account when determining the budget for the Amenities. In addition, the Amenities Association may object to any budget for any reason in its discretion, and if the Tourist Accommodation Directors do not resolve any such objection to the satisfaction of the Amenities Association (and with no obligation to do so) within ninety (90) days after written notice of objection, then the Amenities Association may terminate the agreement with the Association for the use of the Amenities. Upon such termination, the Amenities Association and its members will have no use rights in the Amenities and will have no obligation to share in the cost thereof; and



(d)     The Amenities Association will indemnify and hold the Tourist Accommodation Directors harmless from and against any claims, losses, liabilities, costs and expenses incurred by the Tourist Accommodation Directors and arising out of the use of the Amenities by the members of the Amenities Association or their guests or invitees, except for normal costs of operation, maintenance, upkeep, repair and replacement of the Amenities the cost of which shall be allocated among the users of the Amenities as provided herein.

5.4.2   In addition to the obligation of the Tourist Accommodation Directors to make the Amenities available to the members of the Amenities Association as provided in sub-section 5.4.1 above, the Tourist Accommodation Directors shall have the right, but not the obligation, to make the Amenities available to other parties, whether or not such parties are residents of Aspen Highlands Village, on such terms and subject to such conditions as the Tourist Accommodation Directors may determine.

5.4.3   Any person who is entitled to use the Amenities pursuant to the terms and conditions of this Section 5.4 and any separate agreement is hereby granted a nonexclusive easement over and across portions of the Common Elements of the Project solely and only to the extent necessary for access to the Amenities, which easement shall be subject to the reasonable rules and regulations of the Executive Board or the applicable Class or Category of Directors.

Section 5.5     Rights of Owners of Fractional Ownership Interests.

An Owner of a Fractional Ownership Interest in a Unit shall be permitted to access the Common Elements, the Amenities, and the Health Club Facility, unless otherwise permitted by separate agreement, only during the period of such Owner's actual occupancy of a Unit pursuant to such Owner's Fractional Ownership Interest.

## ARTICLE 6.
## MEMBERSHIP AND VOTING RIGHTS IN ASSOCIATION

Section 6.1     Association Membership.

Every Owner shall be a member of the Association and shall remain a member for the period of the Owner's ownership of a Unit or Fractional Ownership Interest. No Owner, whether one or more persons, shall have more than one membership per Unit or Fractional Ownership Interest owned, but all of the persons owning a Unit or Fractional Ownership Interest shall be entitled to rights of membership and of use and enjoyment appurtenant to ownership of a Unit or Fractional Ownership Interest. Joint owners of Fractional Ownership Interest shall, however, be required to coordinate usage rights as Owners of Fractional Ownership Interests in accordance with the provisions of Article 23 and as provided below. If title to a Fractional Ownership Interest is held by more than one person, such Owners shall designate one person as their representative and appoint such person as their proxy, as more fully described in this Declaration and the bylaws of the Association or as otherwise required by applicable law. Membership in the Association shall be appurtenant to, and may not be separated from, ownership of a Unit or Fractional Ownership Interest.

Section 6.2     Categories of Membership.

There shall be three (3) Categories of membership in the Association as follows:

6.2.1   Tourist Accommodation Owners. All Owners of Tourist Accommodation Units, including Fractional Ownership Interests therein, and including the Declarant so long as Declarant continues to own an interest in a Tourist Accommodation Unit.



6.2.2    Deed Restricted Residential Owners. All Owners of Deed Restricted Residential Units including the Declarant so long as Declarant continues to own an interest in a Deed Restricted Residential Unit.

6.2.3    Commercial Owners. All Owners of the Commercial Units including the Declarant so long as Declarant continues to own an interest in a Commercial Unit.

Section 6.3    Voting Rights.

6.3.1    General Common Elements.

Each Unit shall be allocated a vote for the purpose of matters relating to the General Common Elements or the Project as a whole equivalent to the Allocated Interest-General of such Unit as provided on Exhibit B attached hereto and incorporated herein by reference.

6.3.2    Limited Common Elements.

(a)    Limited Common Elements-Commercial. Each Commercial Unit shall be allocated a vote for the purpose of matters relating to the Limited Common Elements-Commercial and the election of Commercial Directors, equal to the Allocated Interest-Commercial of such Unit as set forth in Exhibit B attached hereto.

(b)    Limited Common Elements-Residential. Each Residential Unit shall be allocated a vote for the purpose of matters relating to the Limited Common Elements-Residential, equal to the Allocated Interest-Residential of such Unit as set forth in Exhibit B attached hereto.

(c)    Limited Common Elements-Tourist Accommodation. Each Tourist Accommodation Unit shall be allocated a vote for the purpose of matters relating to the Limited Common Elements-Tourist Accommodation and the election of Tourist Accommodation Directors, equal to the Allocation Interest-Tourist Accommodation of such Unit as set forth in Exhibit B attached hereto.

(d)    Limited Common Elements-Deed Restricted Residential. Each Deed Restricted Residential Unit shall be allocated a vote for the purpose of matters relating to the Limited Common Elements-Deed Restricted Residential and the election of Deed Restricted Residential Directors, equal to the Allocated Interest-Deed Restricted Residential of such Unit as set forth in Exhibit B attached hereto.

The Association shall not have a vote with respect to any Unit that may be owned by it. Declarant shall be entitled to vote with respect to Units or Fractional Ownership Interests owned by it. Members of the Association may exercise such voting rights subject to and in accordance with the provisions below and those of the bylaws of the Association.

Section 6.4    Voting of Fractional Ownership Interest.

The votes with respect to each Tourist Accommodation Unit which is further subdivided into Fractional Ownership Interests will be allocated to the Owners of the Fractional Ownership Interests comprising such Unit on the same basis as each Owner's fractional interest in the Unit; meaning, by way of example and not of limitation, that if a Tourist Accommodation Unit is divided into Fractional Ownership Interests constituting a 1/12 share of such Unit, then each Owner of a Fractional Ownership Interest therein shall be entitled to cast 1/12 of the votes with respect to such Unit.



Section 6.5     Election of Directors.

During the Declarant Control Period, the Directors shall be appointed by the Declarant without
regard to the Categories of Directors or the election thereof by certain Categories of members as
described in this Section below. The initial Executive Board shall consist of six (6) Directors. The first
annual meeting of the Owners shall be held within one year after the closing of the escrow for the first
sale of a Plan Unit or within sixty days after conveyance of twenty-five percent (25%) of the Units to
Owners other than Declarant, whichever occurs first. At the first annual meeting of Owners, and at all
times thereafter during the Declarant Control Period, one (1) Director shall be elected by the Tourist
Accommodation Owners, other than Declarant, and one (1) Director shall be elected by the combined
vote of the Deed Restricted Residential Owners and the Commercial Owners, other than Declarant. The
remaining Directors shall be as appointed by the Declarant. The Directors elected at the first annual
meeting and thereafter during the Declarant Control Period, including those appointed by the Declarant,
shall not be classified by Class or Category and any specific responsibilities of any group of Directors
elected by a Class or Category of Owners shall be undertaken and discharged by the entire Executive
Board, and the entire Executive Board shall be authorized to so act. It is hereby determined that, after the
expiration of the Declarant Control Period, in order to protect the valid interests of the various Categories
of Owners, each Category requires representation on the Executive Board and is hereby entitled to elect
certain Directors thereto. After the expiration of the Declarant Control Period, the Executive Board shall
consist of nine (9) Directors, of which the Category of Tourist Accommodation Owners shall be entitled
to nominate and elect four (4), the Category of Deed Restricted Residential Owners shall be entitled to
nominate and elect two (2), and the Class of Commercial Owners shall be entitled to nominate and elect
three (3) Directors as follows: (i) Owners of Commercial Units in Building 4 and, if applicable, Building
2 shall be entitled collectively to nominate and elect one (1) Director; (ii) Owners of Commercial Units in
Building 8 shall be entitled to nominate and elect one (1) Director; and (iii) Owners of Commercial Units
in all Buildings that are subject to this Declaration shall be entitled to nominate and elect one (1) Director
at large.

Section 6.6     Declarant Control.

Notwithstanding anything to the contrary provided for herein or in the bylaws of the Association,
Declarant shall, during the Declarant Control Period, be entitled to appoint and remove the members of
the Association's Executive Board and officers of the Association to the fullest extent currently permitted
under the Act, except as otherwise specifically provided in this Declaration and the bylaws of the
Association. The specific restrictions and procedures governing the exercise of Declarant's right to so
appoint and remove Directors and officers shall be set out in the bylaws of the Association. Declarant
may voluntarily relinquish such power evidenced by a notice executed by Declarant and recorded in the
Office of the Clerk and Recorder for Pitkin County, Colorado but, in such event, Declarant may at its
option require that specified actions of the Association or the Executive Board as described in the
recorded notice, during the period Declarant would otherwise be entitled to appoint and remove Directors
and officers, be approved by Declarant before they become effective. For purposes of this Declaration
and bylaws of the Association, a Unit which is subdivided into Fractional Ownership Interests shall be
deemed conveyed to an Owner other than Declarant for purposes of determining Declarant control only
after conveyance of fifty-one percent (51%) of the Fractional Ownership Interests in such Unit.

Section 6.7     Executive Board.

During the Declarant Control Period, all members of the Executive Board shall be entitled to
participate in all Association affairs without regard to the provisions of this Section and any specific
responsibilities of any group of Directors elected by a Class or Category of Owners shall be undertaken
and discharged by the entire Executive Board, and the entire Executive Board shall be authorized to so

20



450454 01/11/2001 03:02P CONDO DE DAVIS SILVI
28 of 147 R 735.00 D 0.00 N 0.00 PITKIN COUNTY C(

act. After expiration of the Declarant Control Period, all members of the Executive Board shall be
entitled to participate in Association affairs which affect the Project in its entirety, both the Residential
Units and the Commercial Units, both the Residential Owners and the Commercial Owners, or the
Common Expenses affecting both the Residential Units and the Commercial Units. Except as otherwise
provided in this Declaration, the Tourist Accommodation Directors shall have the sole and exclusive
authority to vote with respect to all matters which relate solely to (i) the Tourist Accommodation Units, or
(ii) the Limited Common Elements-Tourist Accommodation. Except as otherwise provided in this
Declaration, the Residential Directors shall have the sole and exclusive authority to vote with respect to
all matters which relate to (i) the Deed Restricted Residential Units or both the Deed Restricted
Residential Units and the Tourist Accommodation Units, or (ii) the Limited Common Elements-
Residential or the Limited Common Elements-Deed Restricted Residential. Except as otherwise provided
in this Declaration, the Commercial Directors shall have the sole and exclusive authority to vote with
respect to all matters that relate solely to the Commercial Units and the Limited Common Elements-
Commercial. Notwithstanding the foregoing, amendments to the rules and regulations of the Association
shall require the majority vote of the Executive Board and the majority vote of each Class of Directors.

The provisions of this Section 6.7 above describe the intent of this Declaration regarding
allocation of decision-making regarding various issues that may arise under this Declaration. In the event
of a bona fide dispute among members of the Executive Board as to whether a matter relates solely to an
individual Class or its Units or Limited Common Elements, or, if applicable, the Category of Tourist
Accommodation Units, the Directors shall use their good faith, reasonable judgment in determining such
matter and the determination as to whether a matter should be for the independent consideration of a
single Class of Directors or, in the case of Tourist Accommodation Directors, a Category, and not for
consideration of the entire Executive Board, shall require the affirmative vote of a majority of each Class
of Directors.

If (a) a vote by the Executive Board to determine whether a matter should be for the consideration
of the entire Executive Board results in an affirmative vote of a majority of one Class of Directors, but
fails to result in the affirmative vote of least a majority of both Classes of Directors, and (b) a majority of
one Class of Directors vote within fifteen (15) days thereafter to submit such issue to arbitration, then the
issue of whether a matter should be considered by the entire Executive Board shall be submitted to
binding arbitration in Pitkin County, Colorado, in accordance with the rules of the American Arbitration
Association then in effect. The decision of the arbitration shall be final and binding on the parties and
judgment may be entered thereon in a court having jurisdiction over the Association. The arbitrator shall
be appointed by the Executive Board, which appointment shall require the affirmative vote of a majority
of each Class of Directors. In the event the Executive Board is unable to do so within ten (10) days of
submitting this matter to arbitration, the arbitrator shall be designated by the chief judge in the District
Court of Pitkin County, Colorado. The cost and expense of the arbitrator shall be deemed an expense of
the Association.

Notwithstanding any other provision in this Declaration to the contrary, in the event of an
emergency requiring immediate action by the Executive Board, the entire Executive Board shall
participate in the decision to take such action as is necessary to advance the interest of the Project as a
whole pending a determination as to whether the matter should be independently considered by a single
Class or if applicable, a Category, of Directors, at which time such Directors as are determined to be
entitled to participate in the decision shall resolve the issue.

Section 6.8     Fairness Standard.

The Executive Board, the officers of the Association and the Association shall have the duty to
represent the interest of the Tourist Accommodation Owners, the Deed Restricted Residential Owners,



450454 01/11/2001 03:02P CONDO DE DAVIS SILVI
29 of 147 R 735.00 D 0.00 N 0.00 PITKIN COUNTY C(

21

and the Commercial Owners in a fair and just manner on all matters that may affect any or all Categories of Owners. In upholding their duties, the Executive Board, the officers and the Association shall be held in their decisions, including, without limitation the determination of whether a matter should be for the independent consideration of the Commercial Directors or the Residential Directors, or both, as described in Section 6.7 above, to the standards of good faith and reasonableness with respect to such matters, taking into account the effect, if any, of the matter on the Project as a whole.

Section 6.9     Voting by Association Members.

To the extent a matter is required by this Declaration, the bylaws of the Association or the Act to be submitted to the vote of the members of the Association, all members shall be entitled to participate in the vote on such matters unless a majority of the voting Directors of the Executive Board, including the affirmative vote of a majority of the Commercial Directors and a majority of the Residential Directors, determine that a particular matter affects exclusively either the membership Class of Residential Owners (including the Owners of Fractional Ownership Interests therein, if any) or Commercial Owners, in which case the Executive Board may give notice of a meeting of either the Residential Owners (including the Owners of Fractional Ownership Interests therein, if any) or the Commercial Owners and conduct a vote on the matter affecting only that Class in order to protect the legitimate, valid interest of such Class.

Section 6.10     Owner's and Association's Address for Notices.

All Owners of each Unit or Fractional Ownership Interest shall have one and the same mailing address to be registered with the Association and used by the Association or other Owners for notices, demands and all other communications regarding Association matters. The Owner or Owners of a Unit or Fractional Ownership Interest shall furnish such address to the Secretary of the Association within five (5) days after transfer of title to the Unit or Fractional Ownership Interest to such Owner or Owners. Such registration shall be in written form and signed by all of the Owners of the Unit or Fractional Ownership Interest or by such persons as are authorized by law to represent the interests of all Owners of the Unit or Fractional Ownership Interest. Notwithstanding the foregoing, the Association shall be entitled to rely upon any such registration or other notice of a change in address of the Owners of the Unit or Fractional Ownership Interest which is signed by less than all of the Owners of such Unit or Fractional Ownership Interest.

If no address is registered or if all of the Owners cannot agree, then the address set forth in the deed to the Unit or Fractional Ownership Interest shall be deemed their registered address until another registered address is furnished as required under this Section.

Any notice delivered to a First Mortgagee in accordance with the terms of this Declaration shall be sent to the address for such party specified in the First Mortgage unless the First Mortgagee notifies the Association in writing of a different address.

All notices and demands intended to be served upon the Executive Board shall be sent to the following address or such other address as the Executive Board may designate from time to time by notice to all of the Owners:

> Executive Board
> Aspen Highlands Condominium Association, Inc.
> c/o The Ritz-Carlton Club
> Attention: Director of Operations
> 6649 Westwood Boulevard, Suite 500
> Orlando, Florida 32821

22



With a copy to:
Hines Highlands Limited Partnership
426 East Main Street
Aspen, Colorado 81611

All notices given in accordance with this Section shall be sent: (a) by personal delivery, which shall be effective upon receipt; (b) by overnight courier service, which shall be effective one (1) business day following timely deposit with the courier service; or (c) regular, registered or certified mail, postage prepaid, which shall be effective three (3) days after deposit in the U.S. mail.

Unless otherwise provided in writing by the Association or the Managing Agent, all bills for common utility services shall be sent to the Executive Board at the address designated in this Section.

## ARTICLE 7.
## ASSOCIATION DUTIES

Section 7.1    Association Management Duties.

7.1.1    Subject to the rights and obligations of Declarant and other Owners as set forth in this Declaration, the Association through the Executive Board shall be responsible for the administration and operation of the Project, for the exclusive management, control, maintenance, repair, replacement and improvement of the General Common Elements (including facilities, furnishings and equipment related thereto), and shall keep the same in good, clean, attractive and sanitary condition, order and repair. The expenses, costs and fees of such management, operation, maintenance and repair by the Association shall be part of the Assessments, and, subject to the budget approval procedures of Section 8.6 below, prior approval of the Owners shall not be required in order for the Association to pay any such expenses, costs and fees. The Executive Board, with the approval of a majority of Commercial Directors and a majority of Residential Directors, and with the approval of the Owners representing a majority of the total votes entitled to be cast on Association matters, including a majority of the total votes allocated to the Residential Owners and a majority of the total votes allocated to the Commercial Owners at a meeting of the Owners called for that purpose, shall have the authority to lease or license any General Common Elements to others for all purposes permitted in this Declaration and by applicable law; provided, however, that any such lease or license shall require the lessee or licensee to pay all costs and expenses, including costs of maintenance, repair and replacement, resulting from its use of such General Common Elements.

7.1.2    The Residential Directors, on behalf of the Residential Owners, shall be responsible for the exclusive management, control, maintenance, repair, replacement and improvement of the Limited Common Elements-Residential and the Limited Common Elements-Deed Restricted Residential. The Tourist Accommodation Directors, on behalf of the Tourist Accommodation Owners, shall be responsible for the exclusive management, control, maintenance, repair, replacement and improvement of the Limited Common Elements-Tourist Accommodation. The expenses, costs and fees of such management, operation, maintenance and repair (i) of the Limited Common Elements-Residential shall be part of the Assessments to be paid by the Residential Owners for such Limited Common Elements-Residential, (ii) of the Limited Common Elements-Tourist Accommodation shall be part of the Assessments to be paid by the Tourist Accommodation Owners for such Limited Common Elements-Tourist Accommodation, and (iii) of the Limited Common Elements-Deed Restricted Residential shall be part of the Assessments to be paid by the Deed Restricted Residential Owners for such Limited Common Elements-Deed Restricted Residential; and, subject to the budget approval procedures of Section 8.6



below, prior approval of the applicable Category of Owners shall not be required in order for the Association to pay any such expenses, costs and fees.

For all purposes permitted in this Declaration and by applicable law, the Residential Directors shall have the authority to lease or license any Limited Common Elements-Residential, the Deed Restricted Residential Directors shall have the authority to lease or license any Limited Common Elements-Deed Restricted Residential, and the Tourist Accommodation Directors shall have the authority to lease or license any Limited Common Elements-Tourist Accommodation. Any lease or license granted in accordance with this sub-section shall require the lessee or licensee to pay all costs and expenses, including costs of maintenance, repair and replacement, resulting from its use of such Limited Common Elements.

7.1.3    The Commercial Directors, on behalf of the Commercial Owners, shall be responsible for the exclusive management, control, maintenance, repair, replacement and improvement of the Limited Common Elements-Commercial. The expenses, costs and fees of such management, operation, maintenance and repair of the Limited Common Elements-Commercial shall be part of the Assessments to be paid by the Commercial Owners for such Limited Common Elements-Commercial and, subject to the budget approval procedures of Section 8.6 below, prior approval of the Commercial Owners shall not be required in order for the Association to pay any such expenses, costs and fees. The Commercial Directors, with the approval of the Commercial Owners representing a majority of the total votes entitled to be cast on Association matters or, if such Limited Common Element is appurtenant to one or more, but fewer than all the Commercial Units, the approval of the Commercial Owners to which such Limited Common Element is appurtenant, shall have the authority to lease or license any Limited Common Elements-Commercial to others for all purposes permitted in this Declaration and by applicable law; provided, however, that any such lease or license shall require the lessee or licensee to pay all costs and expenses, including costs of maintenance, repair and replacement, resulting from its use of such Limited Common Elements.

Section 7.2    Reserve Account.

The Association shall establish and maintain, as part of its budget and out of the installments of the annual Assessments, adequate reserve accounts for maintenance, repair or replacement of those Common Elements that must be replaced on a periodic basis, the reserve funds to be designated for the use of either the General Common Elements, Limited Common Elements-Residential, Limited Common Elements-Tourist Accommodation, Limited Common Elements-Deed Restricted Residential or Limited Common Elements-Commercial and segregated by account in these categories (collectively, the "Reserve Account").

Section 7.3    Owner's Negligence.

Subject to the terms of Section 9.4 hereof, in the event that the need for maintenance, repair or replacement of all or any portion of the Common Elements is due to the grossly negligent, reckless or willful act or omission of an Owner, any member of an Owner's family, or an Owner's guests, invitees or tenants, then the expenses incurred by the Association for such maintenance, repair or replacement shall be a personal obligation of such Owner. To the extent that the area in need of maintenance, repair or replacement is due to the negligent act or omission of an Owner, any member of an Owner's family, or an Owner's guests, invitees or tenants, then such Owner shall be liable to the Association for the amount of any applicable insurance deductible(s) and for any amounts in excess of insurance proceeds; provided, however, if such area is not covered by insurance the expenses incurred by the Association for such maintenance, repair or replacement shall be a personal obligation of such Owner. If the Owner fails to repay any applicable expenses incurred by the Association within seven (7) days after notice to the Owner

24



of the amount owed, then the failure to so repay shall be a default by the Owner under the provisions of this Section, and such expenses shall automatically become a default Assessment determined and levied against such Owner's Unit or Fractional Ownership Interest, enforceable by the Association in accordance with Section 8.11, Section 8.12 and Section 8.13 below.

Section 7.4    Delegation of Management and Maintenance Duties.

The Executive Board, with the approval of a majority of the Commercial Directors and a majority of the Residential Directors, may delegate all or any part of its powers and duties to one or more Managing Agents, including Declarant or affiliates of Declarant or either of them; provided, however, that if a Plan of Fractional Ownership has been created with respect to the Tourist Accommodation Units, the Executive Board shall designate a Managing Agent as provided in this Section, and the Management Agreement for such Managing Agent shall allow for either party to terminate, for cause, upon sixty (60) days' notice, or as required by applicable law. A Management Agreement entered into by the Executive Board may only be terminated by the Executive Board by a majority vote thereof, including the approval of a majority of the Commercial Directors and a majority of the Residential Directors and a vote of Owners representing sixty percent (60%) or more of the total number of votes entitled to be cast on Association matters. Notwithstanding the delegation by the Executive Board to a Managing Agent, the Executive Board shall not be relieved of its responsibilities under this Declaration. Any Management Agreement entered into by the Executive Board shall require the Managing Agent to maintain garage keeper's insurance for the benefit of the Tourist Accommodation Owners as a Limited Common Expense-Tourist Accommodation to the extent such Managing Agent provides parking valet services to the Tourist Accommodation Owners.

Section 7.5    Acquiring and Disposing of Personal Property.

The Association may acquire, own and hold for the use and benefit of all Owners tangible and intangible personal property, including without limitation, membership rights, services and benefits for the use, enjoyment security, comfort and convenience of Owners and any Class or Category thereof and may dispose of the same by sale or otherwise, and the beneficial interest in any such property shall be deemed to be owned by the Owners in the same undivided proportion as their respective undivided interests in the Common Elements. Such interests shall not be transferable except with the transfer of a Unit or Fractional Ownership Interest. A conveyance of a Unit or Fractional Ownership Interest shall transfer ownership of the transferor's beneficial interest in such personal property without any reference thereto. Each Owner may use such personal property in accordance with the purposes for which it is intended, without hindering or encroaching upon the lawful rights of other Owners. The transfer of title to a Unit or Fractional Ownership Interest under foreclosure shall entitle the purchaser to the interest in such personal property associated with the foreclosed Unit or Fractional Ownership Interest.

Section 7.6    Cooperation with District, Master Association and Other Associations.

The Association may contract or cooperate with the District, the Master Association or with other homeowners' associations or entities within Aspen Highlands Village as convenient or necessary to provide services and privileges, such as access to recreational facilities in Aspen Highlands Village, and to fairly allocate costs among the parties utilizing such services and privileges which may be administered by the Association or such other organizations, for the benefit of Owners and their family members, guests, tenants and invitees. The costs associated with such efforts by the Association (to the extent not chargeable to other organizations) shall be a General Common Expense if for the benefit of all Owners or shall be a Limited Common Expense if for the benefit of one or more but less than all Owners.

25


450454 01/11/2001 03:02P CONDO DE DAVIS SILVI
33 of 147 R 735.00 D 0.00 N 0.00 PITKIN COUNTY CC

Section 7.7    Issuance of Rules and Regulations.

The Executive Board may, by a majority of the voting Directors, including the approval of a majority of each Class of Directors consistent with Section 6.7 above, make and amend reasonable rules and regulations governing the use and rental of the Units and the use and operation of the Common Elements. Notwithstanding the foregoing, any such rules and regulations shall not be inconsistent with the terms of this Declaration, including, but not limited to Article 13. In addition, such rules and regulations shall, when applied to each of the Units considering the use of such Unit, be equitable and reasonable as applied to the Unit with respect to the use thereof. After the adoption of the initial rules and regulations, which may be approved by the Executive Board with the consent of the Declarant prior to the conveyance of the first Unit or Fractional Ownership Interest in the Project, the Executive Board shall provide thirty (30) days written notice prior to the adoption or amendment of any rules and regulations and provide for a reasonable opportunity for Owners to comment at a meeting of the Executive Board on the proposed adoption or amendment of any rules and regulations.

Section 7.8    Enforcement of Association Documents.



7.8.1    This Declaration and the bylaws of the Association constitute a general scheme benefiting each Unit and the Property as a whole and may be enforced by Declarant, the Association or an aggrieved Owner. A violation of any of the provisions of this Declaration causes irreparable damage to the Property. Therefore, subject to the terms and conditions of this Section 7.8 and except as otherwise expressly provided elsewhere in this Declaration, Declarant, the Association and any aggrieved Owner may prosecute a proceeding at law or in equity against anyone violating or attempting to violate the provisions of this Declaration, including, without limitation, an action for a temporary restraining order, preliminary injunction and permanent injunction.

7.8.2    The Association may recover from anyone violating or attempting to violate any provision of this Declaration reasonable attorneys' fees and other legal costs incurred by the Association in successfully enforcing the provision, regardless of whether suit is initiated. If such person is an Owner, the amount of the fees and costs constitute a lien against the Owner's Unit or Fractional Ownership Interest which may be foreclosed in accordance with Section 8.13. In addition, if any Owner fails to comply with this Declaration, the bylaws or the rules and regulations of the Association, the Association may (i) temporarily suspend the Owner's right to use or enjoy the Common Elements, and (ii) impose other appropriate measures; provided, however, that before imposing any of those measures (other than late charges, interest and reasonable collection costs relating to delinquent payments), the Executive Board will promulgate rules and regulations relating to those measures including provisions affording a defaulting Owner notice of the claimed default and an opportunity to be heard by the Executive Board prior to the imposition of the disciplinary measure.

7.8.3    Before an aggrieved Owner may prosecute any proceeding at law or in equity enforcing the provisions of this Declaration or the bylaws of the Association or seeking other relief relating to a violation or attempted violation of the provisions of this Declaration or the bylaws of the Association, the Owner will first give written notice to the Executive Board specifying the violation or attempted violation of the provisions of this Declaration or the bylaws, the facts and circumstances surrounding the violation, and the name of the person alleged to have violated or attempted to violate the provisions of this Declaration or the bylaws. The Executive Board may initiate a proceeding in law or in equity to enforce the provisions of this Declaration or the bylaws of the Association, to prevent a violation or to obtain damages for damage to the Common Elements resulting from the violation, or may otherwise enforce the provisions of this Declaration. The aggrieved Owner may exercise any of its rights under Section 7.8.1 if (i) the violation or attempted violation results or would result in direct and immediate physical damage to the Owner's Unit, or (ii) the Association fails to enforce or cause enforcement of the

26



violated provisions of this Declaration or the bylaws of the Association within sixty (60) days after the Executive Board receives the Owner's notice.

### Section 7.9    Identity of Executive Board and Managing Agent.

From time to time, but no less than annually, the Association shall mail to each Owner a notice containing the names and addresses of the members of the Executive Board and the Managing Agent(s), if any.

### Section 7.10    Implied Rights.

The Association may exercise any and all other rights or privileges given to it by this Declaration, or by the other Association Documents, or as may otherwise be given to it by law, and every other right or privilege reasonably to be implied from the existence of any right or privilege given to the Association in the Association Documents or reasonably necessary to effectuate any such right or privilege.

### Section 7.11    Books and Records of the Association.

The Executive Board, directly or through its Managing Agent(s), as the case may be, shall keep detailed, accurate records of the receipts and expenditures affecting the Common Elements and shall maintain such other books and records as may be required under the Act. Owners and Mortgagees may inspect the records of receipts and expenditures of the Managing Agent(s) or the Executive Board at convenient weekday business hours. In addition, the other books, records and papers of the Association, including this Declaration, the articles of incorporation and the bylaws of the Association, as well as any Management Agreement and any rules and regulations of the Association, shall be available for inspection by any Owner or Mortgagee at all times during convenient weekday business hours. Unless a shorter time is required by law, inspection shall require three (3) days advance, written notice.

### Section 7.12    Compliance with Liquor Laws.

To the extent necessary to comply with applicable requirements of the Liquor Code of the State of Colorado, the Executive Board and any Managing Agent may grant exclusive possession and control of any portion of the Common Elements and/or any Unit owned or leased by the Association to a duly authorized licensee for the limited purpose of serving all types of alcoholic beverages.

### Section 7.13    LIMITATION OF LIABILITY OF ASSOCIATION.

NOTWITHSTANDING THE DUTY OF THE ASSOCIATION TO MAINTAIN AND REPAIR THE COMMON ELEMENTS, AND EXCEPT TO THE EXTENT COVERED BY ASSOCIATION INSURANCE AS DESCRIBED IN ARTICLE 10, THE ASSOCIATION SHALL NOT BE LIABLE TO OWNERS FOR INJURY OR DAMAGE, OTHER THAN FOR THE COST OF MAINTENANCE AND REPAIR, CAUSED BY ANY LATENT CONDITION OF THE COMMON ELEMENTS TO BE MAINTAINED AND REPAIRED BY THE ASSOCIATION OR CAUSED BY THE ELEMENTS OR OTHER OWNERS OR PERSONS.

### Section 7.14    Financial Statements.

The Association shall have the power and duty to cause to be regularly prepared financial statements for the Association and copies thereof to be distributed to all Owners as provided in this Section 7.14.



7.14.1  The budgets prepared in accordance with Section 8.6 below shall be distributed to Owners not less than forty-five (45) days nor more than sixty (60) days before the beginning of each fiscal year, except the first fiscal year with respect to which the budget shall be distributed as soon as reasonably possible. The advance budget shall contain at least the following information:

    (a)    Estimated revenue and expenses on an accrual basis;

    (b)    The balance of the Reserve Account;

    (c)    An itemized estimate of the remaining life of major components of the Common Elements and the methods of funding to defray reserve expenses; and

    (d)    A general statement setting forth the procedures used by the Executive Board in the calculation and establishment of the Reserve Account.

7.14.2  An annual report as defined by this Section 7.14.2 shall be distributed within 120 days after the end of each fiscal year. The annual report shall be prepared by a certified public accountant in any fiscal year in which the gross income to the Association exceeds $75,000.00. If the annual report is not prepared by such a certified public accountant, the annual report shall be prepared by the Managing Agent or by an officer of the Association and shall be accompanied by the certificate of the person preparing the annual report that the annual report was prepared without audit from the books and records of the Association. The annual report is a report to the Owners consisting of:

    (a)    A balance sheet relating to the Association as of the last day of the fiscal year;

    (b)    An operating statement for such fiscal year;

    (c)    A statement of changes in financial position for such fiscal year; and

    (d)    A list of the names, mailing addresses and telephone numbers of the members of the Executive Board.

Section 7.15   Limitation on Power of Managing Agent.

The Managing Agent shall not enter into a contract with a third person or entity whereby such person or entity will furnish goods or services for the management and operation of the Project or for the maintenance and repair of the Project, for a term longer than one (1) year without the consent of a majority of the Owners other than Declarant, except for:

7.15.1  A contract with a public utility company; provided, however, that the term of the contract shall not exceed the shortest term for which the supplier will contract at the regulated rate.

7.15.2  Prepaid casualty and/or liability insurance policies not to exceed three (3) years duration provided that the policy permits short-rate cancellation by the insured.

7.15.3  The following types of contracts provided that the lessor or provider is not an entity in which the Declarant or the Managing Agent has a direct or indirect interest of ten percent (10%) or more:

7.15.4  a lease of furniture, furnishings, appliances and other personal property;



450454 01/11/2001 03:02P CONDO DE DAVIS SILVI
36 of 147 R 735.00 D 0.00 N 0.00 PITKIN COUNTY CO