1            IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLORADO
2
     Case Number 16-cv-01301-PAB-GPG
3    _____

4    RCHFU, LLC, et al.,
          Plaintiffs,
5
     vs.
6
     MARRIOTT VACATIONS WORLDWIDE CORPORATION, et al.,
7         Defendants.
     _____

8

9            Proceedings before GORDON P. GALLAGHER,

10   United States Magistrate Judge, United States District

11   Court for the District of Colorado, commencing at

12   4:02 p.m., February 15, 2017, in the United States

13   Courthouse, Denver, Colorado.

14   _____

15       WHEREUPON, THE ELECTRONICALLY RECORDED

16     PROCEEDINGS ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED...
     _____

17                       APPEARANCES
18
             MATTHEW C. FERGUSON and MICHAEL J. REISER
19
     (telephonically), Attorneys at Law, appearing for the
20
     plaintiffs.
21
             DANIEL F. SHEA, JESSICA A. LIVINGSTON
22
     (telephonically) and IAN S. MARX (telephonically),
23
     Attorneys at Law, appearing for the defendants.
24   _____

25                   DISCOVERY CONFERENCE

RCHFU, LLC, et al. vs.
Marriott Vacations Worldwide Corporation, et al.

Discovery Conference
February 15, 2017

Page 2

```
 1                    P R O C E E D I N G S
 2                  (Whereupon, the within electronically
 3   recorded proceedings are herein transcribed, pursuant to
 4   order of counsel.)
 5                  THE CLERK:  Please rise.
 6                  THE COURT:  Thanks.  Please be seated.
 7   Good afternoon, everybody.
 8                  UNKNOWN MALE:  Good afternoon, Your Honor.
 9                  UNKNOWN MALE:  Good afternoon, Your Honor.
10                  THE COURT:  Okay.  This is 16-cv-1301,
11   RCHFU and multiple plaintiffs -- who I will not name
12   individually because it would take me all of our time --
13   versus Marriott, et al.
14                  And we have counsel in a variety of places.
15   So just so we are clear for the record, my understanding
16   is Mr. Reiser is here, correct?
17                  MR. FERGUSON:  Oh, Matt Ferguson,
18   Your Honor.
19                  THE COURT:  Oh, Mr. Ferguson is here.  I'm
20   sorry.
21                  MR. FERGUSON:  Mr. Reiser's on the phone.
22                  THE COURT:  Okay.  Mr. Ferguson's here for
23   the plaintiff.  And Mr. Reiser is also for the
24   plaintiff -- or plaintiffs -- on the phone; is that
25   correct, Mr. Reiser?
```

RCHFU, LLC, et al. vs.
Marriott Vacations Worldwide Corporation, et al.

Discovery Conference
February 15, 2017

Page 3

 1                    MR. REISER:  That's correct, Your Honor.

 2                    THE COURT:  Okay.  Good.  My next question

 3    was could you hear me, but I think that that got

 4    answered.

 5                    And also I can't recall your name, sir.

 6                    MR. SHEA:  Dan Shea.  I'm with Hogan

 7    Lovells, and we represent the Association.

 8                    THE COURT:  Okay.  Mr. Shea is present in

 9    the courtroom for the Association.

10                    MR. SHEA:  And Ms. Livingston is on the

11    phone back in Denver.

12                    THE COURT:  Okay.  And Ms. Livingston is on

13    the phone.  And then I believe also on the phone we have

14    Mr. Marx for Marriott?

15                    MR. MARX:  Correct, Your Honor.

16                    THE COURT:  Okay.  Anybody that I missed?

17                    Nope?  All right.  Well, I appreciate

18    everybody getting together on such short notice.  We have

19    a couple of motions going.  I've also received today the

20    plaintiffs' report for status conference for today, which

21    I didn't ask for, but I appreciate.  That's Filing 104.

22    Has everybody had an opportunity to review that to the

23    extent that they want to?

24                    MR. SHEA:  I have not.

25                    THE COURT:  Okay.

RCHFU, LLC, et al. vs.
Marriott Vacations Worldwide Corporation, et al.

Discovery Conference
February 15, 2017

Page 4

 1                      MR. SHEA:  I've had it summarized by

 2      Ms. Livingston to me, but I haven't read it.

 3                      THE COURT:  Okay.  Do you want us to -- do

 4      you need some time to do that?  If not, we can get you a

 5      copy of it.

 6                      MR. SHEA:  No.

 7                      THE COURT:  Okay.  Anybody else need time

 8      to look at Number 104 before we proceed?  Okay.  I'm not

 9      hearing anything.

10                      So getting together today, let me kind of

11      just summarize at least where it appears to me that we

12      are.  And then if folks disagree, they can let me know.

13                      Right now what I have is the most recent

14      operative complaint is Document 79 filed on November the

15      11th of 2016 entitled Corrected Third Amended and

16      Supplemental Complaint and Jury Demand.

17                      I also have a couple of different motions,

18      and I'll take them up in the order that I'm going to

19      discuss them here.  I'm going to take up first

20      Document 89, which is the motion to stay case, and I'm

21      also then going to take up the motion to modify the

22      scheduling order, which is Document 87.

23                      And starting with 89, it would appear to me

24      that essentially this motion is now, if not quite yet

25      moot, getting pretty darn close to moot.  It looks like

RCHFU, LLC, et al. vs.
Marriott Vacations Worldwide Corporation, et al.

Discovery Conference
February 15, 2017

Page 5

1   a -- there was a notice issue.  I'm not sure if the

2   notice was provided on December the 19th or December

3   the 20th of 2016, but either way, it looks like

4   expiration of that notice would occur over this weekend,

5   essentially making the plaintiffs' motion to stay moot at

6   this point.

7                So I guess, Mr. Ferguson, let me turn to

8   you.  Do you disagree with that?

9                MR. FERGUSON:  Well, five -- about five

10  days (unintelligible), Your Honor.

11               THE COURT:  Right.  This coming weekend.

12               MR. FERGUSON:  Right.

13               THE COURT:  So based on that, any reason

14  that we need to address that motion any further?

15               MR. FERGUSON:  Let me just think that

16  through.  We're supposed to either get a response or no

17  response by the weekend, and the 20th is Monday.  So,

18  yeah, I don't see it as a reason that you have to rule on

19  that.  It really wasn't opposed by the Association and

20  Marriott didn't oppose it either except as an observation

21  about what we could do during our requested stay period.

22  But essentially, it is moot, Your Honor, or will surely

23  be.

24               THE COURT:  Okay.  Anybody want to comment

25  or respond on that?

RCHFU, LLC, et al. vs.
Marriott Vacations Worldwide Corporation, et al.

Discovery Conference
February 15, 2017

Page 6

 1               MR. SHEA:  I do not.

 2               THE COURT:  Okay.  Anybody on the phone

 3    want to respond with regard to that?

 4               Okay.  Then what we -- what we have has

 5    been that there was some response and perhaps some

 6    opposition about the terms of the general proposition of

 7    the stay while the notice went out, but in terms of what

 8    could occur with regard to discovery.  But I'm not going

 9    to go into the details of that given the impending

10    nature.  So what we'll do is we will enter an order on

11    the 20th declaring that motion moot.  And that resolves

12    that.

13               So in terms of the motion to modify the

14    scheduling order, the way I read that motion,

15    Mr. Ferguson, is essentially the plaintiffs want to add

16    two claims.  One for promissory estoppel and one for

17    constructive fraud.  And essentially that's the proposed

18    amendment to whether we want to call it a corrected third

19    amended complaint or a fourth amended -- I guess I'll

20    call it what it is titled, a third -- a corrected third

21    amended complaint.  So the plaintiff wants to move to a

22    fourth amended complaint adding those two potential

23    claims.  Is that essentially the gist of it?

24               MR. FERGUSON:  That would be the gist of

25    it.  Also, Your Honor, I'll add that there's 50 or so

RCHFU, LLC, et al. vs.
Marriott Vacations Worldwide Corporation, et al.

Discovery Conference
February 15, 2017

Page 7

1    more owners or 50 more units -- owners of 50 units that

2    will join the case if allowed.  Otherwise, we'd file a

3    separate case and move to consolidate.  But that will be

4    done -- we can do it all at the same time and give you --

5    add all the new people in this new amended complaint or

6    do the amended complaint and add -- and consolidate a

7    separate action.  But I think our final tranche is going

8    to come in -- we'd like to put it in with this final --

9    with this fourth amended complaint.

10              MR. SHEA:  Your Honor, may I ask a

11   clarifying question?

12              THE COURT:  Absolutely.  Please.

13              MR. SHEA:  And so, Matt, are you saying

14   that you're not going to be adding any more defendants to

15   the case?

16              MR. FERGUSON:  No more defendants, I don't

17   believe.  No, we don't -- the only defendants would be

18   the board of directors, and we don't intend to add them

19   at this point.

20              THE COURT:  So essentially the way I hear

21   it, plaintiff wants to add 50 more units -- is that 50

22   more plaintiffs or 50 more units?

23              MR. FERGUSON:  That's -- owners of

24   50 units.

25              THE COURT:  Okay.

Page 8

```
 1                  MR. FERGUSON:  And it could be 35.  It
 2   could be 55 or 60.  I haven't counted them.  But -- I've
 3   been busy on the phone with calls.
 4                  THE COURT:  Okay.  So owners of 50 units.
 5   Obviously I think we all know that you have the option of
 6   filing that as a separate complaint, which probably -- or
 7   a separate case that probably then gets consolidated.  So
 8   that may resolve some of what everybody wants to do
 9   there.  So it seems like the more pertinent issue is
10   probably the promissory estoppel and the constructive
11   fraud matters with regard to the complaint that we
12   currently have.
13                  Let me go back, before I start taking
14   comments from everybody else, while everybody's kind of
15   chewing on that information.  One issue -- and I don't
16   know that it's pertinent to how this will resolve -- but
17   there was an issue in terms of what I meant in the
18   scheduling order that was issued in this matter on
19   October -- August the 18th, 2016, on page 16, with regard
20   to adding plaintiffs within 45 days of today's date.
21                  I think that that was clear that that meant
22   amending pleadings as well, but I can see why perhaps
23   there was some confusion there.  But I think it meant
24   both.  That doesn't, of course, address good cause
25   standards in Rule 16 and Rule 15, just what was meant in
```

RCHFU, LLC, et al. vs.
Marriott Vacations Worldwide Corporation, et al.

Discovery Conference
February 15, 2017

Page 9

 1    there.

 2                    So just so I know, Mr. Ferguson, does

 3    your -- does Mr. Reiser intend to address these issues as

 4    well or are you addressing everything?

 5                    MR. FERGUSON:  It will just be me,

 6    Your Honor, but he's (unintelligible).  If I forget

 7    something, he might remind me.

 8                    THE COURT:  Okay.  Well, then, let me turn

 9    to counsel here in the courtroom for the defense.  And

10    let me start with you, sir.  What's your position at this

11    point having heard what you heard and know where we were

12    at this point?

13                    MR. SHEA:  So in terms of adding additional

14    plaintiffs, Your Honor?

15                    THE COURT:  Plaintiffs and counts.  I mean,

16    I don't --

17                    MR. SHEA:  Yeah, I was going to take the

18    plaintiffs first.  So we would not have any opposition to

19    that, adding new plaintiffs.  Adding new counts, we

20    believe under Rule 16 and the good cause standard, as

21    interpreted by various judges of this Court in the Tenth

22    Circuit, that the plaintiffs have not shown good cause.

23                    And the reason is, you look at their

24    complaint.  So they say they want to bring this

25    constructive fraud claim and promissory estoppel claim

RCHFU, LLC, et al. vs.
Marriott Vacations Worldwide Corporation, et al.

Discovery Conference
February 15, 2017

Page 10

1  based upon the members having been told there was going

2  to be a vote before there was going to be an affiliation

3  with the Marriott Vacation Club.

4            In their complaint filed over a year ago in

5  December in State Court up in Pitkin County, they attach

6  Exhibit J, which is a letter from Mr. Neveloff, who's a

7  lawyer, but he was one of the volunteer members of the

8  board at the time -- he is no longer -- saying, We, our

9  council, believe that the existing documents won't allow

10 for an affiliation, that there would have to be some

11 action to amend the documents.

12           And then in April of 2013, Exhibit L to

13 their complaint, they attached two letters -- April 5 and

14 April 8 of 2013 -- saying there would have to be a vote

15 before there was any affiliation.

16           They also attached as Exhibit M to their

17 complaint an April 2014 letter indicating that, We have

18 decided -- meaning the Association board -- to enter into

19 an agreement with Marriott where each one of you as an

20 individual owner can trade a week with a Marriott

21 Vacation Club.  But Marriott was walled off, so it

22 couldn't use its hundred-plus units that it owned at the

23 time.  It doesn't own them anymore.  Most of them have

24 been sold.

25           But -- so at that time in 2014, every one

Page 11

1    of the 160 plaintiffs or 210 plaintiffs knew that there

2    wasn't going to be a vote because there was no vote and

3    the arrangement was announced.  So there's no good cause.

4              You can't say, Well, my client or my

5    210 clients didn't give me a copy of that letter.

6    They're in the complaint.  All right?  So they got it

7    from somebody.  So somebody among the hundred --

8    210 plaintiffs preserved the copy of those letters

9    indicating that our counsel thinks there needs to be an

10   amendment to the agreement and there needs to be a vote,

11   and that in 2014, the action was taken without a vote.

12             So under any standard, Judge Brimmer, for

13   example, in the Bovino case that was cited, Bovino versus

14   MacMillan, said an eighth-month delay is too long.

15   That's when a plaintiff learned about some facts during

16   discovery in the case.  It was a case involving UBS.

17             Judge Hegarty in the Montez case, Montez

18   versus AllState that we cited, indicated in situations

19   exactly the same as this right here.  The plaintiff knew

20   before the case started that she had made voluntary

21   payments to an insurance company, AllState.

22             And AllState told her she wasn't covered

23   because AllState didn't know whether she was paying for

24   some other person or not.  The fact that she wrote the

25   checks doesn't mean she's the insured.

RCHFU, LLC, et al. vs.
Marriott Vacations Worldwide Corporation, et al.

Discovery Conference
February 15, 2017

Page 12

 1                 So after they deposed during the case a

 2    representative of AllState, who said, Yeah, we got the

 3    payment and we deposited it, the individual wanted to

 4    amend the complaint at that point to edit other claims

 5    against AllState based upon existing facts that the

 6    plaintiff herself knew before the suit was filed.

 7                 So you can't divide (phonetic) and say,

 8    Well, the lawyers didn't know about certain facts when

 9    the plaintiffs themselves did.  And the plaintiffs

10    themselves here, Your Honor, as the plaintiffs themselves

11    have indicated, when they took a gratuitous -- what I

12    think was a cheap shot against my colleague Mr. Marx

13    saying one of his colleagues at Greenberg Traurig is an

14    owner here and complained about the affiliation.

15                 Well, they're all lawyers, doctors,

16    accountants that own those properties up there.  They're

17    not unsophisticated consumers who own those units.  So

18    they all knew it.  And as Judge Cane said in the Sil-Flo

19    case, when he was riding for the Tenth Circuit sitting by

20    designation, the defendant in that case wanted to file a

21    counterclaim.  And the defendant blamed its lawyers for

22    not having timely filed the counterclaim within the time

23    provided in the scheduling order.

24                 And Judge Kane, riding for the unanimous

25    panel of the Tenth Circuit said, That's tough luck, you

RCHFU, LLC, et al. vs.
Marriott Vacations Worldwide Corporation, et al.

Discovery Conference
February 15, 2017

Page 13

 1    know.  And same goes for the lawyers can't blame the

 2    plaintiffs for not giving them information that the

 3    plaintiffs have.

 4                So they have the information.  It's in

 5    their complaint.  I just think it's way too late to start

 6    adding new charges in this under Rule 16.  There's just

 7    no good cause.

 8                THE COURT:  Okay.  All right.  And I will

 9    certainly come back to you, Mr. Ferguson, here in a

10    moment.

11                Mr. Marx, what argument do you have on this

12    matter?

13                MR. MARX:  I don't really have anything to

14    add beyond (unintelligible) argument that

15    (unintelligible) said.

16                THE COURT:  Okay.  All right.  Well,

17    Mr. Ferguson, let me come back to you.  And obviously

18    I've read the briefs and the associated case law.  And,

19    you know, my concern is certainly, A, I understand the

20    issue with a substantial amount of -- I think it's

21    somewhere in the neighborhood of 14,000 pages of

22    discovery.  You've got the clawback issue that occurred.

23                But it really comes down in my line to

24    what -- what do you know now that you didn't know before

25    that justifies adding -- and looking here, I think the

RCHFU, LLC, et al. vs.
Marriott Vacations Worldwide Corporation, et al.

Discovery Conference
February 15, 2017

Page 14

1    date that I've got or -- this was filed December 31 of

2    '15 in Pitkin.  It was removed in May of '16.  So we're

3    now well over a year into this.  And what's new that you

4    didn't know or shouldn't have been able to know before

5    this that adds these at this point in time or reaches

6    that good cause standard?

7                     MR. FERGUSON:  Yes, Your Honor.  The

8    (unintelligible) argument that Mr. Marx has joined from

9    Marriott has two flaws, and I'll address the second flaw

10   in a moment, which is that the passage of the time in

11   this case is really -- it looks like it's filed in

12   December of '15.  It was.  But it wasn't served until

13   '14 -- until April of '15, and then the case was -- the

14   case wasn't getting moving until motions in July, and

15   then the scheduling order on August 18.  I'll cover that

16   in a moment.

17                     The operation appears to be that there's no

18   good cause shown because counsel believes that we knew

19   things that they knew.  Here's what we did not know, and

20   it's significant, Your Honor.

21                     There is a letter sent saying that there

22   would be a vote in April of 2013, and there was a letter

23   in April -- in April of '14.  A year passes.  They said

24   it's been done.  There's been no vote.

25                     What's been turned over, Your Honor, are a

RCHFU, LLC, et al. vs.
Marriott Vacations Worldwide Corporation, et al.

Discovery Conference
February 15, 2017

Page 15

 1    series of -- there's a series of letters -- the April '14

 2    letter goes through 10 to 15 iterations between April of

 3    '13 and April '14, none of which we had.

 4                  The first (unintelligible) saying we're

 5    going to give you -- we're going to give you

 6    (unintelligible), although we could advise a

 7    (unintelligible) affiliation.  And during the year, all

 8    the information we received that my clients wouldn't have

 9    had, could not have had because it was between -- it was

10    communication between Marriott defendants and the

11    Association.

12                  Mr. Neveloff eventually had left the board.

13    He saw the writing on the wall, we believe.  And

14    Mr. Mercer returned.  Mr. Mercer was brought to the

15    corporate offices in Florida.  I believe it's the Orlando

16    Marriott executives.

17                  Marriott executives -- again, this is stuff

18    we didn't know, matters we didn't know -- they come up to

19    Aspen and they meet with the board.  And as that year

20    goes on and that letter literally -- takes literally a

21    year to write, it goes through all these iterations.  And

22    they never get to vote.

23                  At some point -- and we found this out --

24    they did a survey.  And we put it in motion papers, about

25    20 percent of the people responded to it.  One of the

RCHFU, LLC, et al. vs.
Marriott Vacations Worldwide Corporation, et al.

Discovery Conference
February 15, 2017

Page 16

 1   owners is an expert in surveys, and he and Mr. Neveloff,

 2   another (unintelligible) we've seen, asked to see it --

 3   receive it as a joke, that you didn't tell them -- you

 4   didn't tell the owners what had happened or what the

 5   potential downs -- downfall would be or the negative

 6   impacts that would occur with the affiliation.  These are

 7   the kind of documents we found.

 8                THE COURT:  Found when and how?

 9                MR. FERGUSON:  Found on our -- in October

10   of 2016, when (unintelligible) shared the first tranche

11   of documents we've seen in this case, the 14,000

12   documents.  That's the first time we saw these documents.

13                So it's -- it's to suggest that we had this

14   investigation, but we didn't.  (Unintelligible) we have

15   both ends of this communication.  For the life of us, the

16   litigants on this team could never figure out what had

17   happened between the time of saying, We can't do this, I

18   believe, so we can't do this, and a year later when they

19   had them do that.

20                We now have all the documents that should

21   have happened in between, and we've described some of

22   those in our motion papers.  But the suggestion that we

23   had all those documentation because our clients had what

24   the board and the Marriott decided to (unintelligible),

25   that's four or five documents.  We've now got hundred --

RCHFU, LLC, et al. vs.
Marriott Vacations Worldwide Corporation, et al.

Discovery Conference
February 15, 2017

Page 17

1    dozens of documents, I'll say, at least over that period

2    of time.

3              So that's the information that has come to

4    light, and we believe -- we've argued in our papers, what

5    happens is if they tell people there's going to be a vote

6    about whether you're going to do something -- it's either

7    two-thirds of majority under HOA or at least half -- you

8    tell people that's going to happen, they're relying on

9    the board to have that occur.

10             They don't take actions to protect

11   themselves.  They could have -- there could have been a

12   motion for injunction to decide this.  I mean, the cheap

13   shot, that's a great big trial partner who's an owner

14   there, and he pretty much prestiges this case.  That's a

15   document we never had.

16             That was (unintelligible) to the Marriott

17   executive telling him -- telling the Marriott executive

18   that was part of this whole plan to affiliate, tell him,

19   You can't do this in 2012.  And it pretty much said

20   You're going to delete the brand.  You're going to ruin

21   our values all for the enrichment of Marriott

22   Corporation.  For whatever reason, the Association went

23   along with this between 2013 -- April 2013 and April 2014

24   when the affiliation occurred.

25             So there's a lot of new documentations to

RCHFU, LLC, et al. vs.
Marriott Vacations Worldwide Corporation, et al.

Discovery Conference
February 15, 2017

Page 18

1    suggest that we have two or three documents that -- that

2    bookend us, doesn't tell the story.  So our clients were

3    denied the right.  And that's where the constructive

4    fraud comes from.  They thought they were going to get a

5    vote.  They get a survey.  You know, a SurveyMonkey or

6    something like that where they fill out, Do you think

7    this is a good idea?

8              And I think 20 percent of the people

9    responded, I recall it was either 71 to 70 or 70 --

10   70 people said no and 69 people said fine.  But it

11   wasn't -- it was both (unintelligible) the declaration.

12             So we believe our return of

13   (unintelligible) to the concept that this -- this has

14   been delayed somehow, we have been due diligent in the

15   prosecution of the case.  We dropped our certification,

16   class revocation as soon as this case was removed.  We

17   did the research.

18             They moved to the motion to dismiss.  We

19   (unintelligible) the scheduling order.  We propounded

20   discovery within a couple of weeks of the scheduling

21   order.  We got the documents.  Thankfully Mr. Shea, on

22   behalf of the Association, did turn in the documents.

23   And we got those documents, they were -- all these

24   critical documents were, as we said in our papers, were

25   put into our working binders (unintelligible) working on

RCHFU, LLC, et al. vs.
Marriott Vacations Worldwide Corporation, et al.

Discovery Conference
February 15, 2017

Page 19

1    this, and never had the clawback situation.

2             So in terms of the operative part of this

3    case, very little time has elapsed, and, you know, we

4    believe that a motion for leave should be further

5    granted.  Rule 16 says to be -- (unintelligible) with

6    that rule (unintelligible) show of good cause.  We have

7    not been dilatory at all.  We are processing this case as

8    diligently as we possibly can.  Thank you.

9             THE COURT:  All right.  Thank you.  Let me

10   come back to you, Mr. Shea, and then I'll turn to the

11   folks on the phone.  I mean, in terms of the issue that

12   basically the intervening documents that weren't in the

13   possession of the plaintiff really fleshed out the

14   situation for the constructive fraud and the promissory

15   estoppel, versus kind of having an idea there might be

16   something out there but really not being able to put

17   their finger on them, which is I guess what I'm getting

18   from that.

19             MR. SHEA:  Well, it's no different from

20   Judge Hegarty's decision on that insurance case that we

21   cited where someone says, I got more facts that fleshed

22   it out.  Well, you had the information.  And we're not --

23   by the way, I'm not saying or we're not saying that the

24   lawyers here were dilatory.  We're saying that their

25   clients were dilatory in telling them about that claim or

RCHFU, LLC, et al. vs.
Marriott Vacations Worldwide Corporation, et al.

Discovery Conference
February 15, 2017

Page 20

 1   whenever they gave them the documents.

 2                 But the documents they attached to their

 3   complaint that talk about the necessity of the vote are

 4   October of 2012 and May -- or April of 2013, and then the

 5   announcement in April of 2014 that there's a final

 6   arrangement without a vote.

 7                 So they all knew all the facts that they

 8   could have brought a constructive fraud claim or an

 9   estoppel claim that we would never have been able to

10   challenge under Rule 11.

11                 So you can't now say, I've gotten a lot

12   more detailed information.  But as we also said, both in

13   our response to this motion and when we filed our motion

14   to dismiss in front of Judge Brimmer, all this lawyer

15   talk is just a lot of fluff.  They're trying to make some

16   hay of it.  I understand why.  As a litigator for over

17   40 years, you want to make hay.

18                 But the fact remains that contracts -- this

19   is about what that declaration -- condominium declaration

20   required.  Did it require a vote?  Did the arrangement

21   that was entered into in 2014, was that violated?  And

22   you can't offer parole evidence or expert opinions of

23   lawyers.  We're not going to have a trial at the end of

24   the day here with lawyers coming in and saying, I believe

25   that that means X, or being able to offer into evidence

Page 21

1    their internal memoranda that we've now turned over.

2    We've got our client to waive privilege.  They've got all

3    the privileged communications.  They can have them all.

4    They're all worthless.

5              Because we all know, as lawyers, the way

6    you interpret a document, is you interpret it by looking

7    at the language of the agreement.  You don't look at

8    lawyers -- there's clear law that lawyers can't come in

9    and testify as experts as to what the clause in a

10   particular contract means.  They weren't around when the

11   contract was negotiated.

12             I mean, the limited -- the limits -- or the

13   allowances under the parol evidence rule is when you have

14   an ambiguous provision, then maybe one of the people who

15   negotiated the agreement could testify to cure the

16   ambiguity.  Nobody here was around other than -- even

17   Marriott inherited the agreement as its successor.

18             This was a declaration that was filed, you

19   know, two decades ago or 15 years ago, however many years

20   ago.  So there's no one around that can come in and

21   provide confident evidence.  All this stuff -- he can say

22   all this -- you know, it says things, but it's not

23   meaningful information.  And the meaningful information

24   was --

25             THE COURT:  The way I'm understanding it --

RCHFU, LLC, et al. vs.
Marriott Vacations Worldwide Corporation, et al.

Discovery Conference
February 15, 2017

Page 22

 1   and Mr. Ferguson I'm sure will correct me if I'm

 2   misunderstanding his argument -- is that at the end of it

 3   in April of 2014, everybody knew that there wasn't a

 4   vote --

 5                MR. SHEA:  Right.

 6                THE COURT:  -- and a decision had been

 7   made, and Mr. Livingston knew that when he filed suit on

 8   behalf of his clients.  But the constructive fraud comes

 9   from the discussions, whether they were in writing or

10   otherwise, that occurred over a period of time in terms

11   of how they got to the decision not to have the vote, and

12   that's what fleshes out his claim, which really doesn't

13   sound like it has anything to do with a possible contract

14   interpretation.

15                MR. SHEA:  Well, so the fraud is I was told

16   there was going to be a vote and there wasn't a vote.  So

17   they knew that in 2014.  Whatever steps occurred before

18   that, in my view, are not relevant or meaningful.  The

19   vote they knew in 2014 or were told there was going to be

20   a vote, and then in 2014 they knew there wasn't going to

21   be a vote.

22                So they had evidence at that point to bring

23   an estoppel claim if they thought it was justified based

24   upon that evidence or the constructive fraud claim.  And

25   like I said, they had enough evidence.  We wouldn't have

RCHFU, LLC, et al. vs.
Marriott Vacations Worldwide Corporation, et al.

Discovery Conference
February 15, 2017

Page 23

```
 1   been able to say at that point that, you know, that's
 2   Rule 11 material because you don't have evidence of that.
 3   They had evidence of it.
 4              MR. FERGUSON:  Your Honor, may I address
 5   one or two things there?
 6              THE COURT:  You may.  Well, let me -- I'm
 7   going to come back to you for the last word,
 8   Mr. Ferguson, because it is your motion.  So before I do
 9   that, particularly -- I know Mr. Reiser has been
10   essentially quiet on the phone.  I don't know if he wants
11   to add anything, and it may very well be that Mr. Marx
12   wants to add something.  So let me turn, Mr. Reiser, to
13   you.  Anything right now that you wanted to add?
14              MR. REISER:  I think -- I didn't hear --
15   (unintelligible), Your Honor, but I will just add that
16   this (unintelligible) because of the number of
17   (unintelligible).  We haven't even gotten to the
18   documents from Marriott, so (unintelligible).  The time
19   frames there, it really seems like they (unintelligible)
20   on a scheduling order to be (unintelligible) because of
21   the (unintelligible) occurred (unintelligible) not being
22   as quick as (unintelligible).
23              THE COURT:  All right.  Thank you.
24              Mr. Marx.
25              MR. REISER:  And that's all I have, Judge.
```

Page 24

```
 1                    THE COURT:  All right.  Thank you.

 2                    Mr. Marx, sir?

 3                    MR. MARX:  I don't have anything to add to

 4    that motion.

 5                    THE COURT:  Okay.  All right.

 6    Mr. Ferguson, let me come back to you, and then I will

 7    make my ruling on this.

 8                    MR. FERGUSON:  I'll be brief, Your Honor.

 9                    The claims against the Association, which

10    seems to be the most strident opponent of the amendment

11    to the complaint for these claims, it's a breach of

12    fiduciary claims.  This -- these actions that were taken

13    during this year go directly to that.  They're going to

14    say they've moved to dismiss based on a (unintelligible);

15    what we're saying is it's a breach of fiduciary duty.

16    (Unintelligible) doesn't inoculate you from a breach of

17    fiduciary duty.

18                    But among the documents you see is the

19    president of this board who comes off, Mr. Neveloff.

20    Mr. Neveloff is the chairman of the real estate

21    department at Kramer Levin in New York.  He's the Trump

22    organization's lawyer.  He's the (unintelligible)

23    families.  He's one of the more -- foremost experts in

24    real estate law in the country, and he's saying, We can't

25    do this.  Okay?  Well, I didn't have that documentation.
```

RCHFU, LLC, et al. vs.
Marriott Vacations Worldwide Corporation, et al.

Discovery Conference
February 15, 2017

Page 25

1        Aaron Hyatt from Brownstein Hyatt,

2   (unintelligible) there, an accomplished (unintelligible)

3   lawyer who I'm sure my esteemed colleague next to me

4   knows well, he gives me (unintelligible) that's been --

5   says you can't do this, and here are the reasons why.

6   This is what Marriott won't argue.

7        (Unintelligible)?  They say the board

8   (unintelligible) know that.  In fact, there's an email at

9   some point between Mr. Mercer and another board member --

10  Mr. Mercer being another person -- and saying, Oh, I

11  think (unintelligible) a lawyer.  He had written a big

12  detailed opinion, an eight- or nine-lined simple

13  statement, pages that they were complaining about the

14  (unintelligible) bill.  And, again, follows legal advice.

15        So those are the kind of documents we found

16  that go to the breach of fiduciary duty and that support

17  these two new claims.  They're going to paint --

18  (unintelligible) -- it will not be more than 10 or

19  15 paragraphs more, and that we believe that we've shown

20  good cause.  We have been diligent also, Your Honor.

21  Thank you.  We ask that the motion be granted.

22        THE COURT:  And I know Mr. -- well,

23  gentlemen, I said that I was going to give Mr. Ferguson

24  the last word, but I think he added some new information

25  there, Mr. Shea, so I think you should -- I will give you

RCHFU, LLC, et al. vs.
Marriott Vacations Worldwide Corporation, et al.

Discovery Conference
February 15, 2017

Page 26

1  an opportunity to respond to that.

2            MR. SHEA:  So I don't know whether all that

3  stuff about Mr. Neveloff is true or not, but I don't

4  think it matters.  So one thing -- they filed their

5  complaint -- I'm sure Your Honor has read their

6  complaint -- that said that the board allowed this wide

7  ranging affiliation with Marriott.

8            Since we're now in the motion to dismiss

9  phase and he's talking about facts that are well beyond

10  the complaint even, I'm going to talk about some facts

11  that are beyond the complaint.

12            The issue in 2012 was, like I said earlier,

13  Marriott had these units, the 113 or some units.  As you

14  can see from Exhibit 1 to our opposition to the motion to

15  amend the scheduling order, the issue was that

16  Mr. Neveloff was grappling with and Mr. Gosch at

17  Brownstein was grappling with was, Can we stop Marriott

18  from bringing Marriott Vacation Club members another

19  night or two to use those 110 or 12 units, which the

20  members had grown accustomed to getting free use of

21  because they only get essentially one ski week in the

22  winter.  They get four weeks, but it's summer, winter,

23  fall, mud season.

24            The agreement that was eventually

25  negotiated, Marriott agreed, because of the negotiations

RCHFU, LLC, et al. vs.
Marriott Vacations Worldwide Corporation, et al.

Discovery Conference
February 15, 2017

Page 27

1   with the board, not to allow use of its corporate-owned

2   units, the Marriott Vacation Club.  So that's why that

3   May 14 letter, which is Exhibit M to the complaint, says,

4   You, as individual members, are free to trade a week.

5   (Unintelligible) simple ownership rights, so they can

6   rent a week to me, you, a cousin.  They can trade with a

7   cousin who has a Marriott Vacation Club membership.  They

8   could have done that all on their own.

9            But the Association walled off Marriott

10  from using its units.  And it feels in this case like

11  it's no good deed goes unpunished.  In other words, the

12  legal issue that he's talking about that all these

13  opinions went through was a different legal issue than

14  they're now complaining about what the Association did.

15  The Association walled off Marriott and told members, You

16  can trade a week with a Marriott Vacation Club member if

17  you want to, just the same way you can rent your unit or

18  gift it to your child or friend to come use a week.

19            So I just want the Court to know that the

20  legal advice wasn't on the same issue that they're now

21  complaining about in their complaint.

22            THE COURT:  All right.  Well, here's what

23  I'm going to do in this circumstance.  And I appreciate,

24  I think -- I'll go back to Mr. Reiser's comment in terms

25  of the complexity of this case.  This is not by any

RCHFU, LLC, et al. vs.
Marriott Vacations Worldwide Corporation, et al.

Discovery Conference
February 15, 2017

Page 28

 1    stretch of the imagination -- it's not unusual for

 2    Federal Court, but it's certainly more complex.  It needs

 3    more lenience to some extent, although at some point the

 4    defendants have absolutely -- need to have -- to know who

 5    they're going to be facing as plaintiffs and what the

 6    claims against them are going to be, and the scheduling

 7    order sets that up so that we all know where this case is

 8    going.

 9                   That being said, the scheduling order was

10    entered into in to August.  The motion to modify the

11    scheduling order was filed in December.  I know we're

12    sitting here in February, but it -- there was a period of

13    time of briefings, so I think the final briefings on all

14    of these didn't come in until middle or close to the end

15    of January.

16                   So we're sitting here about three to

17    four weeks after the close of briefing on these issues.

18    And in the meantime, there was some significant amount of

19    discovery, something like 14,000 pages distributed.

20    There was a clawback issue that occurred during the

21    course of that that somewhat affected it.

22                   But based on what I've heard, first --

23    well, I guess I should ask -- I don't think I ever asked

24    you this question, Mr. Marx, directly.  In terms of the

25    additional potential 50 units, which could be more than

RCHFU, LLC, et al. vs.
Marriott Vacations Worldwide Corporation, et al.

Discovery Conference
February 15, 2017

Page 29

1   50 plaintiffs more, do you have a position on that?

2                   MR. MARX:  No, we don't.  Given,

3   Your Honor, that observation that (unintelligible) action

4   (unintelligible) violated (unintelligible) practical.  We

5   would not benefit ourselves by objecting here

6   (unintelligible) to occur.  So, no.

7                   THE COURT:  I appreciate that.  I mean,

8   practical -- I think that is the practical ramification,

9   and we all know it's going to get filed as a new case.

10  And under the local rules, it's going to get consolidated

11  anyway, so why mess around with that.

12                  All right.  So with regard to the

13  50 additional units or owners or additional -- it may be

14  more owners if they have shared ownership with the

15  unit -- that will be allowed in what will be titled the

16  Fourth Amended -- Fourth Amended Complaint.

17                  In terms of the trickier issue, which is

18  the added potential claims of promissory estoppel and

19  constructive fraud, from what I have seen and looking at

20  the potential evidence in the light most favorable to the

21  plaintiff, which I think is the appropriate standard

22  given where we're going to be for motions to dismiss, if

23  that's what's coming, I think that the plaintiff has

24  shown good cause with regard to the constructive fraud.

25                  While the parties may have known kind of

Page 30

1  the beginning and the end of this, from what I'm hearing,

2  there's a middle that could show fraudulent conduct.  So

3  I am going to allow amendment of the complaint for the

4  constructive fraud.

5              I'm not hearing that with regard to the

6  promissory estoppel.  I think the promissory estoppel, at

7  least from what I've heard, goes more to the vote and not

8  to the fraud alleged behind it.  So I'm not going to

9  allow an amendment to add a promissory estoppel claim at

10 this point.

11             I'm not going to file -- or I'm not going

12 to require a separate motion under Rule 15.  I'll just

13 address it today that I think it meets -- to the extent

14 that the good cause standards are the same in Rule 15 or

15 16 -- in fact, I think it's probably a little bit greater

16 in Rule 16, looking at the Pump Co. case -- but I am

17 going to find that it's been met for both.

18             So you can file an amended complaint with a

19 constructive fraud claim and with regard to the

20 additional plaintiffs at this point in time, but not with

21 regard to promissory estoppel.

22             All right.  What other issues, gentlemen,

23 does that leave us with at this point in time?

24 Mr. Ferguson?

25             MR. FERGUSON:  Yes, Your Honor.  We -- we

RCHFU, LLC, et al. vs.
Marriott Vacations Worldwide Corporation, et al.

Discovery Conference
February 15, 2017

Page 31

1   notice that you had asked us to discuss discovery with

2   you, and that's why I cobbled together a status report

3   last night and filed it this morning, is to try to give

4   some shape to the following part of the conference.

5              In -- and I'm not sure how -- we have been

6   successful with the Association obtaining probably most

7   of the documents.  We can tell there's holes in them

8   because we have clients that have documents that they

9   don't have and that were communicated to them.  But we'll

10  work through that.  So we're pretty -- pretty well

11  situated at least at this stage with the Association.

12             The documents with the Marriott defendants,

13  we have been handling for many, many, many weeks and

14  months.  I'll preface this -- and I put it in the

15  papers -- that counsel in this case are all

16  extraordinarily talented and helpful and collegial.  And

17  we enjoy that with Mr. Marx and Mr. Selinger at Greenberg

18  Traurig, and we are able to work through things, but it's

19  been very slow.

20             And we -- we even have a problem

21  complaining to Mr. Marx because he's such a gentleman,

22  but we have done that.  (Unintelligible) right before

23  this conference with Mr. Marx, one of the lawyers that's

24  on the phone and myself, because I'd asked him to follow

25  up on an email we'd sent on January 19, and I put that --

RCHFU, LLC, et al. vs.
Marriott Vacations Worldwide Corporation, et al.

Discovery Conference
February 15, 2017

Page 32

1    I attached that to the status report today or the --

2    yeah, status report.

3              We informed that the -- they have hired a

4    vendor.  We do have -- on January 19 or 18 they hired a

5    vendor to search the corporate records.  And I understand

6    14,000 documents were turned over.  That --

7    (unintelligible) 4.4 million documents that will now be

8    put into a separate platform to which our search terms

9    and custodian of records will be tested and applied with

10   the hope that that $5.4 million -- 5.4 million documents

11   is cold.  That's going to be the plan.

12             So we're hopeful that that occurs quickly.

13   Mr. Marx and the Greenberg Traurig team are extremely

14   busy (unintelligible), and have a busy in-house counsel

15   staff at Marriott.  That has set us down, and we would

16   like to get some hard and fast dates.

17             I asked when do they think we'll begin to

18   see the production of documents, and they said 30 days.

19   I'll add 15 days to that because I know how complicated

20   the situation is we're in.

21             So it's working out with them, but I just

22   want to alert you to the fact that, you know, sometimes

23   it's stated that we're not being diligent, and we as

24   plaintiffs don't want to be put in the position that

25   we're being blamed for the lag in time in this case.

Page 33

```
 1                    Luckily we have a long list for a long
 2     period of time in this case.  We don't have
 3     (unintelligible) pretty steadily.  So the conflicts on
 4     the document production was helpful today.  We think
 5     we're going to get there.
 6                    With depositions, it's no secret that the
 7     (unintelligible) defendants have been trying to avoid
 8     that.  And I'm not saying that in any kind of negative
 9     fashion.  It's just it's what they want to do as
10     defendants.  There's a motion to dismiss.
11                    Our position with respect to the
12     Association -- and I wrote it in the status report -- is
13     whether or not they're in the case or not under our
14     clearance (phonetic) and our motion to dismiss, we're
15     going to have to depose them.
16                    And we took a little shot at that in
17     November, December with Mr. Shea's firm, and we got some
18     resistance.  We'd like to start setting those depositions
19     with the Association's directors within the next 30 days,
20     at least start setting them so they're being done in
21     March and April, or at least April.
22                    And the same with the Marriott defendants.
23     We need to get their documents in.  I also suspect that
24     process is going to be at least 60 days to get their
25     documents in for us to review them.  But I'd like to have
```

RCHFU, LLC, et al. vs.
Marriott Vacations Worldwide Corporation, et al.

Discovery Conference
February 15, 2017

Page 34

 1   a window from Your Honor with respect to the depositions.

 2   I think we should have Association depositions 30 days --

 3   30 days out and Marriott depositions 60 days out.

 4           THE COURT:  And I'll come to everybody else

 5   on this, but it sounds to me like what needs to occur --

 6   and I'm not going to order this until I hear from

 7   everybody else -- but it sounds like we need a situation

 8   where counsel all sit down, work out what is a realistic

 9   schedule for when everybody's going to have what they

10   think they're going to need, and schedule depositions and

11   future disclosure dates and everything else based off

12   of -- of what is realistically covered.

13           And I hope that the parties can -- can come

14   to some agreement with regard to that and just present me

15   essentially with a proposal that I can adopt.  And if

16   not, then (unintelligible) the initial scheduling order

17   and present me with a couple of different options or

18   options for each party based on what's coming.

19           But from what I'm hearing, it sounds like

20   there may very well be some dates or timeframes in the

21   scheduling order that are not realistic at this point.  I

22   understand the intention with the motion to dismiss

23   that's pending.  That has not been referred to me and I

24   can't give you any clarity on when you're going to have

25   an order with regard to that.  So that's still hanging

RCHFU, LLC, et al. vs.
Marriott Vacations Worldwide Corporation, et al.

Discovery Conference
February 15, 2017

Page 35

 1   out there with the presiding judge in this matter, and I

 2   don't believe it's going to be referred to me at this

 3   juncture.

 4            So, Mr. Shea, comments on where we are on

 5   all of that?

 6            MR. SHEA:  So we had discussions about

 7   depositions in November, December, but then the

 8   plaintiffs, without getting back to us, then issued their

 9   notice and then asked for a stay.  So there was no point

10   at which a decision had to be made.

11            My reaction right now is they're getting

12   the benefit that they've asked for of being able to amend

13   their complaint to add new people, add a new claim.

14   We're going to have to respond to that complaint.  So I

15   don't think it's fair to say that we're going to take

16   depositions in the next 30 days.  I just don't -- we have

17   other work to do with other clients, and we're having to

18   accommodate them.  I didn't ask for any of this.

19            So -- and then he said take Marriott

20   depositions.  If he -- the plaintiffs agreed that they

21   wouldn't start taking depositions until 60 days after

22   they filed their amended complaint, that's fine.  If they

23   don't, we may come back in front of you and say that

24   that's just not fair.  They want to have their cake and

25   eat it too.

RCHFU, LLC, et al. vs.
Marriott Vacations Worldwide Corporation, et al.

Discovery Conference
February 15, 2017

Page 36

```
 1                  THE COURT:  Well, yeah.  You don't need to
 2   depose these folks on -- some of them won't have anything
 3   to do with the new account or claim certainly.
 4                  MR. SHEA:  Right.
 5                  THE COURT:  But I think it absolutely makes
 6   sense to have a period of time to get all of this
 7   information in before you proceed to that.
 8                  So why don't we go to you, Mr. Marx.
 9   Comments on that?
10                  MR. MARX:  Thanks, Your Honor.
11   (Unintelligible) challenge to hear all of the argument.
12   (Unintelligible) quite clearly, but this is
13   (unintelligible) what I think is a long summary of the
14   issues from Mr. Ferguson.  (Unintelligible.)  The Court's
15   current (unintelligible) discovery on August 21, 2017.
16   From our perspective and based on everything I've heard
17   (unintelligible), it doesn't seem like that
18   (unintelligible) at issue major being something to
19   (unintelligible).
20                  I'll try and -- let (unintelligible)
21   schedule for a deposition, it seems like it's sort of
22   unnecessary at this point.  It would seem that
23   (unintelligible) last we discussed was plaintiffs
24   (unintelligible) part of this proceeding (unintelligible)
25   getting closer to trying to schedule a process now
```

RCHFU, LLC, et al. vs.
Marriott Vacations Worldwide Corporation, et al.

Discovery Conference
February 15, 2017

Page 37

1   (unintelligible) to get it done (unintelligible) at a

2   later date because it's extremely expensive.  It will

3   cost $55,000 (unintelligible) occurred in fees

4   (unintelligible) to get it done.

5               And you know, we (unintelligible) have been

6   able to add a (unintelligible) plan for accomplishing

7   depositions (unintelligible) complete that makes sense

8   and fits us comfortably.  (Unintelligible) discovery

9   cutoff.

10              THE COURT:  Well, let me come back to you,

11  Mr. Ferguson.

12              MR. FERGUSON:  Yeah.

13              THE COURT:  Is there any reason here that

14  depositions need to start before April 1?

15              MR. FERGUSON:  No.  And I -- I didn't say

16  within the next 30 days.  I said after the next 30 days,

17  and then I kind of -- I'm happy to work with counsel.

18              THE COURT:  Okay.

19              MR. FERGUSON:  Mr. Shea makes some

20  decent -- some points there where there has been a stay

21  in effect.  But --

22              THE COURT:  Well, what I would like to see

23  is if -- essentially an amended -- I think what's

24  appropriate at this juncture is an amended scheduling

25  order.  We're kind of in a new playing field here.  We

RCHFU, LLC, et al. vs.
Marriott Vacations Worldwide Corporation, et al.

Discovery Conference
February 15, 2017

Page 38

1  have -- I mean, since the scheduling order was issued in

2  this case, I believe somewhere in the neighborhood of 100

3  to 150 plaintiffs have been added and obviously lots of

4  discovery.  Even with discrete search terms, it's going

5  to take you a long time to cull through five and a half

6  million documents and figure out what's in there.

7              So if the parties could present me with a

8  proposed amended scheduling order within 45 days, I think

9  that's appropriate.  We won't have any -- whatever it is,

10 depositions won't start before April Fool's Day of 2017,

11 and maybe not even then.

12             And, again, if there's disputes within the

13 amended scheduling order, highlight them or italicize

14 them, and I'll resolve those discrete disputes.  We can

15 get back together either on the phone or in person if

16 there are things that require that.  If there's things

17 that you can agree on, obviously we all know that if

18 everybody agrees to it if we can come to an agreement on

19 that.  Right?

20             That should give us a timeframe for where

21 we're heading from here.  And if you think my being

22 involved more directly in this process as we go along,

23 given the nature and size of this case, is appropriate,

24 let us know at any point in time.  We'd far rather spend

25 more time on it at this point in court in some fashion

Page 39

1   because I think it's more efficient in the long run to do

2   it this way.

3            So any questions about that, Mr. Ferguson,

4   or anything else you think I need to address?

5            MR. FERGUSON:  No, Your Honor.

6            THE COURT:  Mr. Shea?

7            MR. SHEA:  No, Your Honor.

8            THE COURT:  Mr. Reiser?

9            MR. REISER:  No, Your Honor.

10            THE COURT:  And Mr. Marx?

11            MR. MARX:  No.  No thank you, Your Honor.

12            THE COURT:  I'm not sure I've talked to you

13   about any of it, Mr. Livingston, but anything from your

14   perspective?

15            MR. FERGUSON:  Ms. Livingston, Your Honor.

16            MS. LIVINGSTON:  Nothing, Your Honor.

17            THE COURT:  I'm sorry.  I'm -- that teaches

18   me to make better notes.

19            MS. LIVINGSTON:  That's fine.

20            THE COURT:  All right.  Well, thank you

21   very much.  Have a good afternoon, everybody, and I have

22   no doubt we'll be back together as this moves forward.

23   Take care.

24            MR. SHEA:  Thank you, Your Honor.

25            THE COURT:  Bye-bye.

Page 40

 1                     MR. FERGUSON:  Thank you.

 2                     MR. MARX:  Thank you.

 3                     (Whereupon, the within hearing was then in

 4     conclusion at 4:53 p.m.)

 5                     I certify that the foregoing is a correct

 6     transcript, to the best of my knowledge and belief

 7     (pursuant to the quality of the recording) from the

 8     record of proceedings in the above-entitled matter.

 9

10

11

12     /s/ Rebecca J. Collings                 March 30, 2017

13     Signature of Transcriber                Date

14

15

16

17

18

19

20

21

22

23

24

25