## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO

Civil Action No. **1:16-cv-01301-PAB-GPG**

**RCHFU, LLC,** *et al.*

Plaintiffs,

v.

**MARRIOTT VACATIONS WORLDWIDE
CORPORATION,** *et al.*

Defendants.

_____

## PLAINTIFFS' OPPOSITION TO DEFENDANT ASPEN HIGHLANDS CONDOMINIUM ASSOCIATION'S MOTION TO DISMISS PLAINTIFFS' FIFTH AMENDED COMPLAINT

_____

### I.   INTRODUCTION

Plaintiffs are the owners of fractional deeded interests in condominiums at the Ritz-Carlton Club Aspen Highlands ("Ritz-Aspen"). Plaintiffs paid premium prices for these interests based on the Ritz-Carlton brand and promises that Ritz-Carlton Club members would have exclusive access to the Ritz-Aspen and a collection of other similar luxury Ritz-Carlton properties. Over the last several years, Defendants' actions—most notably the affiliation of the Ritz-Aspen with the Marriott Vacation Club (MVC)—have undercut the essential features and severely depressed the value of the fractional interests Plaintiffs purchased, damaging Plaintiffs and unjustly enriching the Marriott Defendants.

Plaintiffs' Fifth Amended Complaint ("FAC") adequately alleges that the Aspen Highlands Condominium Association (the "Association") breached and/or aided and abetted the other Defendants' breach of fiduciary duties owed to Plaintiffs—including the duty of loyalty, the duty to enforce covenants set forth in the Declaration of Condominium for Aspen Highlands Condominiums, and the duties of honesty and full disclosure—by secretly entering into an agreement with the Marriott Defendants to affiliate the Ritz-Aspen with MVC even though the Association's own attorneys advised that it was illegal to do so. Moreover, although Defendants had promised not to affiliate with MVC unless a majority of Ritz-Aspen owners voted to do so, they never held this promised vote. The affiliation served the interests of the Marriott Defendants, but decimated the values of Plaintiffs' fractional interests by giving 400,000 MVC members access to the Ritz-Aspen for a fraction of the cost that Plaintiffs paid for their fractional interests.

The Association does not present any valid grounds to dismiss the FAC. First, the economic loss rule is inapplicable because the FAC alleges a judicially recognized, special independent fiduciary duty that supports a tort action even though the parties have entered into a contractual relationship. Next, the Association is incorrect that the business judgment rule requires dismissal because whether the Association exercised good faith and honest business judgment is a question of fact, inappropriate for resolution on a motion to dismiss. Further, the FAC adequately pleads the elements of aiding and abetting the breach of fiduciary duty, conspiracy, and constructive fraud—so those claims should also be upheld.

## II.    STATEMENT OF THE CASE

The Ritz-Aspen is a luxury fractional ownership property located in Aspen, Colorado. FAC at ¶ 4. It was established in 2001 under the Ritz-Carlton Destination Club ("Ritz-Carlton Club") brand, designed to be an upscale alternative to Defendant MVCI's other timeshare product line – the MVC. *Id.* at ¶¶ 3, 4. MVCI had been running timeshare operations since the 1980s, but introduced the Ritz-Carlton Club brand in 1999 to sell fractional ownership interests that were more exclusive and deluxe – distinct from the MVC. *Id.* at ¶¶ 2-3. As such, Ritz-Carlton Club interests were much more expensive than MVC interests. *Id.* at ¶ 3.

A Ritz-Aspen fractional owner can stay in her unit for four weeks per year. *Id.* at ¶ 3. Owners are also part of the Ritz-Carlton Club Membership Program ("Membership Program"), through which they can reserve stays at the Ritz-Aspen and sister Ritz-Carlton Club resorts. *Id.* at ¶¶ 3-4. Between 2001 and 2013, hundreds of purchasers paid premium prices, averaging over $200,000, with some selling for up to and over $500,000, for their deeded 1/12 fractional interests at the Ritz-Aspen. *Id.* at ¶ 6. These "like-a-second-home" interests were sold based on Defendants' representations that they were superior to run-of-the-mill timeshare offerings, such as the MVC, and that the Ritz-Aspen would operate for the exclusive use and enjoyment of Ritz-Carlton Club members as well as their families and guests. *Id.* at ¶ 6.

The governing documents grant the Association almost complete control over Plaintiffs' fractional interests. *Id.* at ¶¶ 22, 23 & Ex. H at ¶ 23.8.[1] In 2001, the Association entered into a "Management Agreement" with RC Management, making RC Management the "managing agent" which would "act on behalf of the Association and its members as the exclusive

---

[1] All exhibit citations are to exhibits to the Fifth Amended Complaint, Dkt. No. 119.

managing entity and … manage the daily affairs of the Condominium and the [Fractional Ownership Interest] Plan." *Id.* at ¶ 26 &, Ex. A at ¶ 2 & Ex. H at ¶ 2.41. RC Management had the power and authority to carry out its duties in maintaining and managing Plaintiffs' fractional interests, including "to the exclusion of all other persons including the (Association) and its members . . . the powers and duties of the Executive Board." *Id.* at ¶ 27, Ex. A at ¶ 4. The agreement gave RC Management the power to hire a "program manager" to manage and administer the reservation procedures and exchange program for the Membership Program. *Id.* at ¶ 35. Exercising this authority, RC Management hired Defendant Cobalt (via an Affiliation Agreement that was also signed by the Association) to operate the reservation system that Ritz-Aspen owners had to use to obtain use of their allotted number of days. *Id.* at ¶ 41.

In 2012, MVW announced that it would scale back its luxury products line – namely, the Ritz-Carlton Club. *Id.* at ¶ 8. In a July 17, 2012 letter, the general manager of Cobalt first informed owners that it might affiliate the Ritz-Carlton Club with the MVC. *Id.* at ¶ 48. Cobalt's letter described the affiliation as a way for Ritz-Aspen owners to use their allocated time to stay at MVC resorts, but failed to mention that the affiliation would also give the 400,000 MVC members access the Ritz-Carlton Club. *Id.* at ¶¶ 48-49.

In the following months, member-controlled boards of various Ritz-Carlton Club properties, including the Association, expressed serious objections to the proposed affiliation, including that it would dilute the Ritz-Carlton brand, for which Plaintiffs and other owners paid premium prices. *Id.* at ¶¶ 50, 51. In August 2012, the Association informed owners that "The Board has concerns that . . . the nature of our club will change by opening the club to MVW timeshare/points members who have a much lower cost of entry." *Id.* at ¶ 53. In September 2012,

the Association retained attorney Philip Gosch to analyze whether the Ritz-Aspen's governing documents allowed the proposed MVC affiliation. *Id.* ¶ 60. *Mr. Gosch advised that they clearly did not. Id.* The Association informed MVW that its counsel had determined that "the underlying Association documents … prohibit what MVW is planning." *Id.* at ¶ 61. In addition, Mr. Gosch warned the Marriott Defendants that:

> [A]any practice of allowing the use of the Tourist Accommodation Units at the Aspen Highlands Condominium by the MVC Members may constitute, among other things, one or more breaches of fiduciary duties of the HOA Manager to the Association under the HOA Management Agreement as a result of self-dealing among the HOA Manager, the Program Manager, the Marriott licensor entity and their respective affiliates to the detriment of the Association and its members. By permitting MVW and/or the Program Manager to utilize the Tourists Accommodation Units in clear violation of the Declaration, the HOA Manager would be enriching its affiliates and the Marriott licensor entity by creating an attractive offering for the MVC members, which would increase sales and license fees under Marriott's arrangement with MVW, all at the expense and burden of the Association and its members."

In April 2013, the Association wrote to Ritz-Aspen owners that unless a majority of the owners voted in favor of doing so, the Ritz-Aspen would not be included in the MVC affiliation. *Id.* at ¶ 68, Ex. O. Again, On May 14, 2013, The Ritz Carlton Destination Club sent a letter to all Ritz-Carlton Club members, stating "regarding other potential affiliations, we want to assure you that a Ritz-Carlton Club affiliation with Marriott Vacation Club Destinations will not take place unless there is an *affirmative vote* of *each Club's Membership*." (Emphasis added). *Id.* at ¶ 70.

No such vote ever took place. *Id.* at ¶ 80. Instead, Defendants eventually distributed a "member survey," which they deceptively stated would be used "to understand whether the Aspen Highlands Members would like the opportunity to voluntarily exchange a week of their allocation time for points within the MVCD exchange program." *Id.* at ¶ 78. Defendants did not mention that this survey was to be a substitute for the vote. *Id.* at ¶ 77.

5

Even though the members did not have a chance to vote on the issue, in April 2014, Cobalt, acting in concert with the other Defendants, decided to include the Ritz-Aspen in the MVC affiliation. *Id.* at ¶ 81. The Association disingenuously claimed that the affiliation occurred "[i]n response to the Members' wishes." *Id.* at ¶ 82, Ex. P.

Due to Defendants' actions, approximately 400,000 MVC members – who paid a small fraction of the purchase prices Plaintiffs paid, and who pay lower annual fees – have access to the once exclusive Ritz-Aspen. *Id.* at ¶ 86. While Defendants have profited from this affiliation, the value of Plaintiffs' fractional interests has been destroyed. *Id.* Adding to their huge losses in value, Plaintiffs have had to pay inflated annual maintenance fees for the increased wear-and-tear resulting from the opening of the Ritz-Aspen to MVC members. *Id.* Plaintiffs seek to recoup these losses.

### III.   STANDARD

In ruling on a Rule 12(b)(6) motion to dismiss, the court's function "is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's amended complaint alone is legally sufficient to state a claim for which relief may be granted." *Brokers' Choice of Am., Inc. v. NBC Universal*, 757 F.3d 1125, 1136-37 (10th Cir. 2014) (quoting *Miller v. Glanz*, 948 F.2d 1562, 1565 (10th Cir. 1991)). While a plaintiff is obligated to plead more than "mere labels and conclusions," a complaint need not contain detailed factual allegations to survive a motion to dismiss. *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 550 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). On a motion to dismiss, the court must

accept the facts alleged in the complaint as true, and it must make all reasonable inferences in favor of the plaintiff. *Bell Atl. Corp*., 550 U.S. at 555-56, 592.

## IV.   ARGUMENT

### A.  The Economic Loss Rule Does Not Apply in this Case

The Colorado Supreme Court adopted the economic loss rule in *Town of Alma v. AZCO Constr., Inc*., 10 P.3d 1256, 1264 (Colo. 2000), holding that "a party suffering only economic loss from the breach of an express or implied contractual duty may not assert a tort claim for such a breach absent an independent duty of care under tort law." There, the Court noted " a more accurate designation of what is commonly termed the 'economic loss rule' would be the 'independent duty rule,'" (*id*. at 1262, n.8), and explained that "[a] breach of a duty *arising independently* of any contract duties between the parties . . . may support a tort action" *Id*. at 1262 (emphasis in original).

Recently, in *S K Peightal Engineers, Ltd v. Mid Valley Real Estate Solutions V, LLC,* 342 P.3d 868, 875 (Colo. 2015), the Colorado Supreme Court "set about clarifying the precise meaning of 'independent duty' in the context of the economic loss rule," explaining that there are two types of independent duties that can render the economic loss rule inapplicable:

"First, any general tort duty is independent of contractual duties if the contract contains no duties or the allegedly breached tort duty is beyond the scope of duties contained within the contract at issue … Thus, if a defendant's specific alleged duties are not governed by the contract, then those duties are independent of the contract and the economic loss rule cannot bar a tort suit for breach of those independent duties." *Id.* at 875.

"Second - as is at issue here - certain 'special relationships' . . . automatically trigger independent duties of care." *Id*. at 1271 (citing attorney-client, physician-patient and insurer-insured relationships as examples). Thus, the existence of a judicially recognized special independent duty will 'support a tort action even though the parties have entered into a contractual relationship' *and will render the economic loss rule inapplicable even if the relevant contracts contain the identical duty*." *Id.* at 875. (emphasis added).

**1. The FAC Alleges a Fiduciary Duty Based on a Judicially Recognized Special Independent Duty, Rendering the Economic Loss Rule Inapplicable**

"Generally, a homeowners' association owes a fiduciary duty to homeowners." *McShane v. Stirling Ranch Prop. Owners Ass'n*, 2015 COA 48, ¶ 30 (overruled on other grounds, 2017 CO 38; WL 1548547, May 1, 2017); *Semler v. Hellerstein*, 2016 COA 143, ¶ 36; *Woodward v. Board. of Directors of Tamarron Ass'n of Condo. Owners, Inc., 155 P.3d 621, 624* (Colo. App. 2007); *Cohen v. Kite Hill Community Ass'n.,* 142 Cal. App. 3d 642, 650-51 (1983). In *Colorado Homes, Ltd. v. Loerch-Wilson*, 43 P. 3d 718 (Colo. App. 2001), the Court specifically found that the fiduciary duty includes a duty to enforce restrictive covenants. *Id*. at 721-722.

Based on this independent fiduciary duty, the *Colorado Homes* court held that the plaintiff's breach of fiduciary duty claim for failure to enforce a restrictive covenant survived the homeowners association's economic loss rule defense:

> Accordingly, given these public policy considerations, we conclude that the trial court erred in granting summary judgment dismissing the breach of fiduciary claim against these defendants. In short, because a duty arises based upon policy considerations that are independent of any contract, the claim may be pursued. Otherwise, the home buyer making the most significant purchase of a lifetime would be protected from latent defects created by a builder under

the *Cosmopolitan*[2] decision, but not from the arbitrary enforcement of covenants that could have an equally or possibly more adverse impact upon the value of a residence.

*Id.* at 722.

The Colorado Supreme Court affirmed this holding in *S K Peightal, supra,* where it clarified that "a judicially recognized special independent duty will 'support a tort action even though the parties have entered into a contractual relationship . . .'" 342 P.3d at 875.[3]

Further, in *S K Peightal,* the Court distinguished its earlier holding in *BRW, Inc. v. Dufficy & Sons, Inc.* 99 P.3d 66 (Colo. 2004) -- a primary authority cited by the Association -- as follows:

> We note that in addressing the plaintiff's tort claim in *BRW,* we stated that '[i]f we conclude that the duty of care owed by [the defendants] was memorialized in the contracts, it follows that the plaintiff has not shown any duty independent of the interrelated contracts and the economic loss rule bars the tort claim and holds the parties to the contracts' terms." *99 P.3d at 74.* Critically, however, we have never recognized the duty at issue in that case . . . as a special independent tort duty. *See id.* at 71, 74. Thus, although in *BRW* we applied the proper test to determine whether a *general* tort duty is independent, **this test does not apply when considering a *specially recognized* independent tort duty** such as that established in *Cosmopolitan Homes.*

*S K Peightal,* 342 P.3d at 875 (italics in original, bolded emphasis added).[4]

---

[2] *Cosmopolitan Homes, Inc. v. Weller*, 663 P.2d 1041, 1043-45 (Colo. 1983) (builders have a duty independent of contract to build a home without latent defects for the benefit of subsequent buyers).

[3] *See Micale v. Bank One NA (Chicago)*, 382 F.Supp.2d 1207, 1222 (D. Colo. 2005) ("The court in *Colorado Homes* determined that the duty in that case was one of those 'special relationships.'").

[4] This Court's decision in *Pernick v. Computershare Trust Co. Inc.*, 136 F.Supp.3d 1247, 1270 (D. Colo. 2015), is also distinguishable because there, the Court noted that "plaintiff fails to identify a non-contractual, common law or statutory tort duty that governs the acts and omissions giving rise to plaintiff's" tort claims.

So under *S K Peightal*, the source of the fiduciary duty that the Association owed to the Plaintiffs is a specially recognized tort duty that renders the economic loss rule inapplicable. This is true even if the Declaration contains the *identical* duties alleged (which, as shown below, it does not). The Association's Motion should be denied on this ground alone.

**2. The Economic Loss Rule Is Also Inapplicable Because the Fiduciary Duty the Association Owes Is Different From the Duty of Good Faith and Fair Dealing Set Forth in the Declaration**

The economic loss rule also does not apply here for the independent reason that "the standards of good faith and reasonableness" found in the Declaration, Section 6.8, do not subsume the fiduciary duties the Association owes Plaintiffs.[5] Section 6.8 of the Declaration merely requires the Association to act "in a fair and just manner" and "in accordance with standards of good faith and reasonableness," essentially parroting the implied covenant of good faith and fair dealing found in every Colorado contract.[6]  This provision does not include the more expansive fiduciary duties that the FAC alleges the Association violated, particularly the duty of loyalty. The court in *Bailey v. Allstate Ins. Co.*, 844 P.2d 1336 (Colo. App. 1992), addressed this distinction between fiduciary duties and those lesser duties stemming from the covenant of good faith:

> The very nature of (fiduciary) relationships encompasses an extensive line of duties that are performed for the total benefit of only one of the parties to the relationship.

[5] Relatedly, Section 7.8.1 of the Declaration does not create a fiduciary duty owed by the HOA, as that section set forth no duties, but rather simply provides that the Association or an aggrieved owner "may prosecute a proceeding at law or equity against anyone violating or attempting to violate the provisions" of the Declaration. Unlike the common law fiduciary duty to enforce covenants recognized in *Colorado Homes, Ltd.,* (*Supra*. at 722), this section gives the Association the right, but not the obligation, to enforce the covenants found in the Declaration.
[6] Under Colorado law, every contract contains an implied covenant of good faith and fair dealing." *Newflower Market, Inc. v. Cook*, 229 P.3d 1058, 1064 (Colo. App. 2010).

> Thus, a fiduciary duty arises when one party has a high degree of control over the property or subject matter of another, or when the benefiting party places a high level of trust and confidence in the fiduciary to look out for the beneficiary's best interest. ....
>
> A fiduciary's obligations to the beneficiary include, among other things, a duty of loyalty, a duty to exercise reasonable care and skill, and a duty to deal impartially with the beneficiary. *Destefano v. Grabrian*, 763 P.2d 275 (Colo. 1988). Thus, the existence of a contract between a fiduciary and beneficiary is secondary to the nature of a true fiduciary relationship.
>
> Conversely, the relationship between an insurer and an insured is initially and fundamentally based on the insurance contract . . . [thus] both parties have a duty to protect their own interests, although each party also owes the other a duty of good faith and fair dealing.

*Id.* at 1339. *See also In re Estate of Gattis*, 318 P.3d 549 (2013) (where home seller owed buyer an independent duty to disclose known defects and the terms in a form real estate sales contract did not subsume this duty, the economic loss rule did not apply).

The covenant of good faith and fair dealing is generally used to effectuate the intentions of the parties or to honor their reasonable expectations. *State Farm Mut. Auto. Ins. Co. v. Nissen,* 851 P.2d 165, 168 (Colo. 1993); *Davis v. M.L.G. Corp.,* 712 P.2d 985, 989 (Colo. 1986). Section 6.8 of the Declaration merely mimics this implied covenant found in all contracts and does not include the far more exacting, common law fiduciary duty the Association owes Plaintiffs. The economic loss rule therefore does not apply because the Association's fiduciary duty to Plaintiffs alleged in the FAC is not based on any contract.

**B. The FAC Adequately Alleges the Association's Breach of Fiduciary Duty**

   **1. The Association breached its duty of loyalty to Plaintiffs by imposing the affiliation**

In addition to the existence of a fiduciary duty, Plaintiffs must also allege a breach of that duty and damages. *F.D.I.C. v. Refco Grp., Ltd*., 989 F.Supp. 1052, 1080 (D. Colo. 1997). The Association does not contest that it owes a fiduciary duty to Plaintiffs. *See generally* Motion. Indeed, it is well established under Colorado law that a homeowners' association owes a fiduciary duty to individual owners. *Woodward v. Board. of Directors. of Tamarron Association of Condo. Owners, Inc., 155 P.3d 621, 624* (Colo. App. 2007).[7] The Association merely contends that Plaintiffs failed to plead a breach of fiduciary duty. Motion at 10-14. Yet the FAC alleges, in detail, how the Association breached its fiduciary duties.

First, the Association, with the other Defendants, breached its duty of loyalty by favoring the interests of Defendants Marriot Vacation Worldwide, RC Management, Cobalt, and Lion & Crown to the detriment of Plaintiffs' interests. The Association's conduct, through the affiliation, allows over 400,000 Marriott Vacation Club members—who paid a small fraction of the purchase prices Plaintiffs paid for their deeded interest and who pay one third of the annual fees Plaintiffs pay—to use their "points" to obtain access to the units and amenities at the Ritz-

---

[7] The Colorado Supreme Court in *Destefano v. Grabian,* 763 P.2d 275, 285 (Colo. 1988) described the various duties owed by a fiduciary as follows: "A fiduciary has a duty to deal 'with utmost good faith and solely for the benefit' of the beneficiary. *See* CJI-Civ. 31:16 (1980). A fiduciary's obligations to the beneficiary include, among other things, a duty of loyalty, *see* Restatement (Second) of Trusts § 170 (1959), a duty to exercise reasonable care and skill, *see* Restatement (Second) of Trusts § 174 (1959), and a duty to deal impartially with beneficiaries, *see* Restatement (Second) of Trusts § 183 (1959)."

Aspen.[8] FAC at ¶¶ 10, 86. The FAC further explains that the Association was in active discussion with MVW in 2012 and 2013 regarding the proposed affiliation. *Id*. at ¶¶ 61, 62, 68. In September 2012, the Association retained Denver attorney Philip Gosch to analyze whether the Ritz-Aspen's governing documents allowed the proposed affiliation with MVC. *Id*. at ¶ 60. Mr. Gosch concluded that they clearly did not, since "[t]here are numerous provisions in the Declaration and the Colorado Disclosure Statement … that support the position that the MVC usage is prohibited." *Id*. at ¶ 60; Ex. K. The Association advised MVW of this legal conclusion, and that in order for the affiliation to occur, the underlying Association documents would need to be revised. *Id*. at ¶ 61.

In November 2012, Mr. Gosch, on behalf of the Association, sent a "cease and desist" letter to the Marriott Defendants, advising that the MVC affiliation would not only violate the express terms of the Declaration and disclosure documents, but would constitute "one or more breaches of fiduciary duty." *Id*. at ¶¶ 64, 65.[9] The owners also received this letter, and sent written comments to the Association vehemently opposing the affiliation. *Id*. at ¶ 67. The

---

[8] The Association's assertion that it somehow convinced Marriott to preclude MVC members from using space available at the Ritz-Aspen is puzzling. *See* Motion at 2, 10, 20. None of the exhibits that the Association cites to supports this notion. *See* Motion at 2, citing to FAC Ex. G, L, K, N, and P. These exhibits either do not speak to whether MVC members would be permitted to use their points to stay at the Ritz-Aspen, or *confirm* that the affiliation would allow MVC members to do so. *See, e.g.*, Ex. P at 2 (explaining the mechanics of the affiliation to members and stating that "a Marriott Vacation Club Member may exchange into your week [at the Ritz-Aspen]").

[9] The cease and desist letter states: "By permitting MVW and/or the Program Manager to utilize the Tourists Accommodation Units in clear violation of the Declaration, the HOA Manager would be enriching its affiliates and the Marriott licensor entity by creating an attractive offering for the MVC members, which would increase sales and license fees under Marriott's arrangement with MVW, all at the expense and burden of the Association and its members." FAC ¶ 65, and Exhibit N.

Association thereafter informed its membership that unless a majority of the owners voted in favor of doing so, the MVC affiliation would not occur. *Id*. at ¶ 68. But when the Association sensed a growing concern among owners about the affiliation, the promised vote was relegated to a mere survey "to understand the Aspen Highlands Member's interest in this voluntary exchange program." *Id*. at ¶¶ 73, 76. Correspondence regarding the survey, however, failed to mention that it was a substitute for the proposed vote – and that the affiliation would allow MVC members to use their points to stay at the Ritz-Aspen. *Id*. at ¶ 78. Despite no vote ever taking place, in April 2014, the Association acted in concert with the Marriott Defendants to impose the affiliation. *Id*. at ¶ 83. These acts adequately allege the Association's breach of the fiduciary duty of loyalty.

Separately, the FAC alleges that the Association breached its fiduciary duty to Plaintiffs by failing to enforce a restrictive covenant against further timesharing, Section 19.8 of the Declaration of Condominium for Aspen Highlands Condominiums. *Id*. at ¶¶ 55, 90; Ex. H. Under *Colorado Homes*, 43 P.3d at 721-22, a homeowners association has a fiduciary duty to enforce restrictive covenants. Here, Section 19.8 states that "no Unit shall be used for the operation of a timesharing, fraction-sharing . . . program whereby the right to exclusive use of the Unit is alternated or scheduled among participants . . ." *Id*. at ¶ 55, Ex. H. The FAC alleges that the Association was concerned that this restrictive covenant would not permit the affiliation (*Id*. at ¶ 54), was informed by its counsel that such an affiliation could not take place absent an amendment to the Declaration (*Id*. at ¶ 60), and that MVW was on notice of that legal opinion. *Id*. at ¶ 60. Yet, against the advice of its own lawyer, the Association, with the other Defendants,

proceeded to carry out the affiliation. *Id.* at ¶ 83. The FAC thus adequately alleges how the Association breached its fiduciary duty to Plaintiffs.

That the Association now asserts a different interpretation of this contractual provision is ethically troubling, but irrelevant to this Motion. Motion at 10-12. The correct interpretation of this very general provision is a question for another day; ambiguities in contractual language must not be resolved on a motion to dismiss. *Chimney Rock Pub. Power Dist. v. Tri-State Generation & Transmission Ass'n, Inc.*, 2012 WL 84572, *7 (D. Colo. Jan. 11, 2012) ("It is not appropriate for the Court to resolve this breach of contract claim at the pleading stage based on an alleged breach of such a general and ambiguous contractual provision"); *Test Servs., Inc. v. Princeton Review, Inc.*, 2005 WL 3211594, *5 (D. Colo. Nov. 29, 2005) ("[I]f a contract is found to be ambiguous, a motion for summary judgment—much less a motion to dismiss—on a breach of contract claim is improper") (quotation marks omitted).

### 2. Whether the business judgment rule applies is a question of fact

The Association concedes that it may only try to take shelter under the business judgment rule if its decisions were made in good faith. Motion at 8-9. Yet the FAC alleges, in detail, how the Association acted in *bad* faith when it: (1) had doubts about the lawfulness of the proposed MVC affiliation (FAC at ¶ 54), (2) hired its own counsel to evaluate the propriety of the affiliation and was advised that the governing documents prohibited it (*Id.* at ¶ 60),  (3) received feedback from its membership in vehement opposition to the affiliation (*Id.* at ¶¶ 67, 69), and yet (4) acted in concert with MVW to impose the affiliation anyway – without even offering the members a chance to vote on it (as was previously promised). *Id.* at ¶¶ 80, 81. That the Association argues these actions were taken in good faith has no import at this stage; "[w]hether

a party acted in good faith is a question of fact which must be determined on a case by case basis." *Polk v. Hergert Land & Cattle Co.*, 5 P.3d 402, 405 (Colo. App. 2000) (citing *Amoco Oil Co. v. Ervin,* 908 P.2d 493 (Colo. 1995)).

*Polk* involved claims that certain members of a closely held family agriculture corporation were engaging in oppressive conduct and acts of self-dealing. *Id.* at 404. Defendants sought summary judgment, in part, on the grounds that their actions were protected by the business judgment rule. *Id*. at 406. While the trial court granted summary judgment, the appellate court reversed, stating, "[n]or does application of the business judgment rule justify summary judgment. That rule applies only to actions taken in good faith … and the Hergerts' good faith is a disputed issue of fact. Whether their actions were protected by the business judgment rule cannot be resolved on summary judgment." *Id.* (citation omitted).

The holding of *Polk* applies with greater force to the Association's Motion to dismiss this action, not on summary judgment, but at the pleadings stage. The Motion must be denied because whether the Association acted in good faith in compliance with the business judgment rule is a question of fact for the jury to resolve. [10]

## C. The FAC Adequately Alleges Aiding and Abetting and Conspiracy Claims Against the Association

The FAC thoroughly alleges an aiding and abetting a breach of fiduciary duty claim against the Association. To prevail on such a claim, a plaintiff must establish three elements: "(1) breach by a fiduciary duty owed to a plaintiff, (2) a defendant's knowing participation in the breach, and (3) damages." *Kirzhner v. Silverstein*, 2010 WL 2985615, *11 n.13 (D. Colo. July

---

[10] Indeed, Plaintiffs are aware of no case holding that a breach of the duty of loyalty can ever be made in good faith.

23, 2010). The FAC adequately pleads all three elements. First, the FAC alleges that the Association, RC Management, and Cobalt each owe a fiduciary duty to Plaintiffs by virtue of their high degree of control over Plaintiffs' property interests, as well as agency (and sub agency) relationships. FAC at ¶¶ 37, 38, 42, 43. The FAC further alleges that Cobalt breached its fiduciary duties to Plaintiffs by working with the other Defendants to effectuate the affiliation. *Id.* at ¶ 43. The FAC then lays out specific facts detailing the Association's active participation in that breach. Paragraphs 61 and 62 explain how the Association advised MVW that governing documents prohibited the affiliation, and that the Association was "conducting [] discussions with MVW." Paragraphs 66 and 68 allege that the Association sent a letter to all owners stating that the affiliation would violate governing documents, and misled Plaintiffs into believing that the affiliation would not occur unless a majority of owners voted in favor of it. *See also id.* at ¶¶ 73, 74. The FAC also plainly alleges damages – that Defendants' wrongful acts caused the value of Plaintiffs' property interests to plummet, and forced Plaintiffs to pay steadily increasing annual dues. *Id.* at ¶¶ 9, 86, 94.

While the Association complains that Plaintiffs "have failed to identify any facts to support" that it aided and abetted other defendants' fiduciary duty breaches, (Motion at 12), the FAC in fact, describes how the Association aided and abetted Cobalt and the other Defendants in deciding on the affiliation and imposing it on the owners, including the Plaintiffs. *Id.* at ¶¶ 53-55, 60-81.

The Association's attack on Plaintiffs' conspiracy claim is as faint as its attack on Plaintiffs' aiding and abetting claim. In fact, the Association makes no substantive argument about the conspiracy claim, instead only concluding that Plaintiffs fail to allege any underlying

breach of fiduciary duty "for the reasons discussed above." Motion at 19. But as explained throughout this opposition, the FAC adequately alleges a breach of fiduciary duty by all Defendants as well as the Association's active participation in that breach.

### D. The FAC Adequately Alleges a Constructive Fraud Claim Against the Association

Plaintiffs adequately pled every element of a constructive fraud claim. Constructive fraud is "a breach of duty, which, irrespective of moral guilt, the law declares fraudulent because of its tendency to deceive, violate confidence, or injure public interests." *Miller v. McCloud*, 2016 WL 524357, *7 (D. Colo. Feb. 10, 2016). The allegations in the FAC are akin to those upheld in *Security Nat. Bank v. Peters, Writer & Christensen, Inc*., 39 Colo.App. 344 (1977). There, the plaintiffs were preferred shareholders of a corporation who filed suit against the corporation's directors because, among other things, they were denied notice of and an opportunity to vote at a shareholders meeting where a plan for liquidation and dissolution of the corporation was approved; plaintiffs claimed these actions deprived them of their right to object to the changes. *Security Nat. Bank*, 39 Colo.App. at 351. The court held that by gambling with the plaintiffs' property without informing the plaintiffs of their plan, the directors' "conduct constitute[d] constructive fraud as a matter of law." *Id*. at 352. The FAC alleges parallel elements: Defendants (including the Association) failed to disclose material facts about and denied Plaintiffs the promised opportunity to vote on a proposed action-- MVC affiliation—that would adversely affect a valuable asset. *Id*. at ¶¶ 97-98. These Defendants knew that Plaintiffs were relying on the promised vote to act against the proposed affiliation. Thus, as in *Security Nat. Bank*, Plaintiffs were denied the opportunity to take other steps to prevent the affiliation – such as demanding the vote or filing a derivative lawsuit to enjoin the Association's Board. *Id*. at ¶ 99. In sum, the

Association's conduct, accepted as true for purposes of this motion, like the conduct in *Security Nat. Bank* case, "constitute[d] constructive fraud as a matter of law." *Id*. at 352.

In seeking to dismiss the constructive fraud claim, the Association tries in vain to assert that Plaintiffs failed to plead certain elements. First, the Association states that there was no breach of fiduciary duty because its actions were subject to the business judgment rule. Motion at 15. But as discussed above, whether the business judgment rule applies cannot be determined at the pleading stage. Then, the Association claims that it did not engage in any deceptive behavior, since it sent to owners a letter from Mr. Gosch that "conveyed essentially the same information" that the FAC alleges it hid, and because nothing in the governing documents required a member vote before the MVC affiliation could take place. *Id*. But the Association is missing the point: the FAC explains how the Association's disclosures to Plaintiffs omitted material information, such as the fact that the affiliation would violate multiple provisions of the governing documents, and that Defendants substituted a misleading survey for the promised majority vote. FAC at ¶ 98. Further, whether or not a vote was contractually required, the Association told owners that the affiliation would not occur absent a vote, and then worked with MVW to impose the affiliation despite never telling the owners that such vote would never take place. The FAC further alleges that Plaintiffs relied on the Association's false promise by refraining from instituting appropriate legal action to halt the affiliation (or at least force a vote). *Id*. at ¶ 99. The FAC goes on to allege that because Plaintiffs were duped into thinking that they would receive a chance to vote against the affiliation (and did not), Plaintiffs suffered the utter destruction of value in their fractional units. Each element of constructive fraud is thus present in the FAC.

## V.   CONCLUSION

For all the above reasons, the Association's motion to dismiss should be denied. In the event that the Court grants the Association's motion to dismiss, plaintiffs respectfully request leave to amend.

Dated: May 5, 2017                           Respectfully submitted,

GIBBS LAW GROUP LLP                          THE MATTHEW C. FERGUSON LAW FIRM, P.C.

/s/ Michael Schrag                           /s/ Matthew C. Ferguson
Michael Schrag (CA State Bar # 185832)       Matthew C. Ferguson, #25687
Linda Lam (CA State Bar# 301461)             119 South Spring, Suite 201
505 14th Street, Suite 1110                  Aspen, Colorado 81611
Oakland, California 94612                     Telephone: (970) 925-6288
Phone: (510) 350-9700                         Facsimile: (970) 925-2273
Facsimile: (510) 350-9701                     E-mail: matt@matthewfergusonlaw.com
E-mail: mls@classlawgroup.com
E-mail: lpl@classlawgroup.com                 Attorney for Plaintiffs

Attorney for Plaintiffs

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on this 5th day of May, 2017, a true and accurate copy of the foregoing **PLAINTIFFS' OPPOSITION TO DEFENDANT ASPEN HIGHLANDS CONDOMINIUM ASSOCIATION'S MOTION TO DISMISS PLAINTIFFS' FIFTH AMENDED COMPLAINT** was filed and served via CM/ECF upon following:

Matthew C. Ferguson, Esq.
The Matthew C. Ferguson Law Firm, P.C.
119 South Spring, Suite 201
Aspen, Colorado 81611

Michael J. Reiser, Esq.
Lilia Bulgucheva, Esq.
Law Office of Michael J. Reiser
961 Ygnacio Valley Road
Walnut Creek, California 94596

Michael L. Schrag, Esq.
Linda Lam, Esq.
Gibbs Law Group LLP
1 Kaiser Plaza, Suite 1125
Oakland, California 94612

Tyler R. Meade, Esq.
Melissa Riess James, Esq.
The Meade Firm P.C.
1816 Fifth Street
Berkeley, California 94710

Daniel F. Shea, Esq.
Jessica Black Livingston, Esq.
Hogan Lovells US LLP
1200 Seventeenth Street, Suite 1500
Denver, Colorado 80202

Naomi G. Beer, Esq.
Greenberg Traurig, LLP
1200 17th Street, Suite 2400
Denver, Colorado 80202

Ian S. Marx, Esq.
Philip R. Sellinger, Esq.
Greenberg Traurig, LLP
500 Campus Drive, Suite 400
Florham Park, New Jersey 07932

　_/s/ Robin White_____
Robin White