1

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLORADO
 2    Case No. 16-cv-1301--PAB-GPG
      _____
 3

 4    RCHFU, LLC, et al.,

 5         Plaintiffs,

 6    vs.

 7    MARRIOTT VACATIONS WORLDWIDE CORPORATION, et al.,

 8         Defendants.
      _____
 9              Proceedings before GORDON P. GALLAGHER, United

10    States Magistrate Judge, United States District Court for the

11    District of Colorado, commencing at 12:17 p.m., January 12,

12    2018, in the United States Courthouse, Denver, Colorado.

13    _____

14              WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS

15    ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED. . .

16    _____

17                        APPEARANCES

18              MICHAEL SCHRAG, MICHAEL REISER, and MATTHEW

19    FERGUSON, Attorneys at Law, appearing for the Plaintiffs.

20              IAN MARX, Attorney at Law, appearing for the

21    Defendant Marriott.

22              JESSICA LIVINGSTON, Attorney at Law, appearing for

23    the Defendant Aspen Highlands.

24    _____

25                   DISCOVERY DISPUTE HEARING
```

2

```
 1              P R O C E E D I N G S

 2              (Whereupon, the within electronically recorded

 3     proceedings are herein transcribed, pursuant to order of

 4     counsel.)

 5              THE COURT:  For the plaintiffs who is going to be

 6     addressing the issues that we're dealing with today or is it

 7     going to be more than one individual?

 8              MR. SCHRAG:  Your Honor, this is Michael Schrag.  I

 9     will take the lead on starting out.  My colleagues may chime

10     in when necessary, Mike Reiser and Matt Ferguson.

11              THE COURT:  Okay.  And what I'll ask everybody to

12     do, just so we keep a clean record, is identify yourself, and

13     then if it's different counsel, that's fine, just let me know

14     so we're clear for the record for later.

15              And then, Mr. Marx, I suspect that means you will

16     be addressing matters for your client and, Ms. Livingston,

17     same for you.  Is that all correct?

18              MR. MARX:  Correct, Your Honor.

19              THE COURT:  Okay.  Give me just a moment to open

20     the case file here, and I'll make some initial comments and

21     we'll get started from there.  Yes.  Okay.

22              Ms. Barnes is asking me to ask everybody to make

23     sure that you speak up very well just so we get a good record

24     of everything, and if we have any issues there, we'll let you

25     know and repeat anything that we need.
```

3

```
 1            So we're here for a discovery conference.  I have
 2    received and reviewed the discovery dispute charts.  I
 3    appreciate everybody getting that to me, as well as all of
 4    the exhibits, which are essentially six exhibits related to
 5    the matter, all in the nature of requests for production or
 6    other discovery requests and the responses attached thereto,
 7    the relevant case law.  I have gone back to relevant portions
 8    of the court file.
 9            And one thing that I want to start with because it
10    kinds of flows through many, perhaps not all, but many of the
11    disputes that appear here is a referred to agreement between
12    the parties.  And, essentially, it's referred to initially,
13    and I'll just quote from opposing party's position on page 1
14    of the discovery dispute where it stated that the parties
15    engaged in a laborious negotiation essentially to determine
16    what the search terms are going to be, the scope of the
17    search and things of that nature.  I don't know if that ever
18    was memorialized in some kind of a written agreement; but if
19    it was, I wasn't provided with whatever that agreement was.
20            And while that may not necessarily control the
21    scope of what I order in terms of discovery, it may have some
22    significant impact of who is going to pay for it.  So I guess
23    I would like to get more information before we get any
24    further into it in terms of the nature of that agreement, or
25    at least what each party thinks the nature of that agreement
```

1    was and whether there is such an agreement out there that's

2    in writing or otherwise, or maybe it's multiple agreements.

3            So let me start, Mr. Schrag, with you, in terms of

4    the nature of what that agreement was, how it was

5    memorialized and how you think it might apply to the

6    discussions that we're going to be having about the rest of

7    this.  And then, of course, I'll come to everybody else here

8    in turn.

9            MR. SCHRAG:  Yes, Your Honor.

10           I think there were a series of letters and e-mails

11   that -- that memorialized, you know, the agreement of the

12   search terms, and there was a protracted negotiation.  I

13   think -- I think the overarching issue on that point, on the

14   search terms, is that probably -- probably three things.

15           One is that plaintiff did not agree to limit the

16   search by the defendants' objections, and if there is

17   responsive and relevant documents that came up in the search

18   that they have, but, for some reason, weren't produced

19   because of objection, we feel like we're entitled to those

20   documents.

21           Two, we've learned through discovery that the

22   custodians that they were -- that they were agreed to

23   search -- and keep in mind at that time, you know, the

24   relevant custodians, the people likely to have information,

25   that was only known to the Marriott defendants at that time,

1    and since then through discovery we've learned about other

2    custodians that we've listed who are likely to have relevant

3    information.  And so that's the basis for the request that

4    those custodians now be searched.  We simply know a lot more

5    now than we did at that time.

6            And then the third thing we've learned is that the

7    time period, there were important discussions in 2011, that

8    the document request only went back to -- the agreement to

9    produce documents went only back to 2012, and we learned that

10   in 2011 there were important discussions about the

11   affiliation that is at issue in this case, and those

12   documents should be produced also.

13           And those are kind of the three broad areas, but

14   there were letters and e-mails that documents (inaudible).

15           THE COURT:  Okay, thank you.

16           Mr. Marx.

17           MR. MARX:  Yes, thank you, Your Honor.

18           Yes, as Mr. Schrag indicates, there was an

19   extensively documented agreement regarding the preservation,

20   collection, and production of electronically stored

21   information.  It's reflected in numerous letters.  And by way

22   of the explanation as to why that wasn't included, it wasn't

23   our understanding that the nature of today's call would call

24   for that level of detail, but we agree with Your Honor that

25   an examination of those agreements is going to be highly

1   relevant to the issues to the extent that we actually have to

2   litigate it because, as Your Honor defined, we would, in the

3   event that there is any determination that more

4   electronically stored information has to be collected,

5   reviewed, and produced look to, shift the cost for that,

6   given the parties' agreement.

7          So, yes, there was an agreement.  We think it's

8   essential and we think the Court will definitely have to be

9   apprised of it in order to ultimately make the call if we --

10  if we get there.

11         As far as the three matters where Mr. Schrag sort

12  of gave us a preview of where he's going from, I'm going take

13  them in reverse order of the way he presented them.

14         One concerns proposed expansion of the timeframe.

15  Here, you know, there was an extensive amount of labor that

16  went into the initial document production, the cost of which

17  was, you know, certainly over $500,000 between vendor fees,

18  counsel fees, and that was done by agreement of the parties

19  going back to the beginning of 2012.

20         And, Your Honor, the reason we picked 2012 is

21  because if you look at the allegations of the complaint and

22  the currently operative pleading of the fifth amended

23  complaint, the allegations of the complaint concern events

24  that took place starting with an announcement in June of 2012

25  and going largely through to the present, but also -- but,

1    essentially, it's hot and heavy through 2014.

2             And so if the plaintiffs are correct and we ought

3    to have gone back -- we need now to go back and redo our

4    document production, the addition of that additional year

5    would be a tremendous expense.  And we would argue in

6    opposition to a motion that it wouldn't be warranted based

7    both on Rules 1 and 26 and the case law interpreting it, as

8    well as it wouldn't be justified by the allegations in the

9    complaint.

10            Mr. Schrag also mentioned that the agreed-upon

11   custodian list that was memorialized and the parties they

12   believe now should be expanded.  That, too, would essentially

13   require a redo of the document production.  And the proposed

14   list of custodians which we received -- the parties have been

15   discussing these issues for a long time, because the expanded

16   custodian list is a relatively new introduction that we have

17   not completed our analysis of it.  But I believe that if we

18   were to have to redo the electronic document production for

19   this additional group of custodians, the expense associated

20   with it would probably be at least as much as our initial

21   production.

22            And not only that, I believe that if you look at

23   the custodian list, it would probably determine that many, if

24   not all, of the custodians' electronically stored information

25   would be duplicative of the information gleaned from other

8

1    custodians.

2            Now, I'm saying that not based on the hard and

3    concrete analysis of that, but that's my impression.  And I

4    believe that if we do our analysis over the next couple of

5    weeks, that's what that would show.

6            And the third issue that Mr. Schrag mentioned where

7    there was a narrowing of the documents that we produced based

8    on the objections and responses to the discovery request,

9    again, that was an issue that we believe was -- was

10   identified very explicitly in the parties' written agreement.

11   And we, for that reason -- and we believe that there is clear

12   writing indicating that that was our intended approach; and

13   that if the plaintiff had any issues with the way in which we

14   had responded to the document request, that the time to

15   address those disputes, if any, would be before we did the

16   document review, collection, and production and not after

17   because we only believe that the rules obligated us to do

18   that process once and not multiple times.

19           THE COURT:  Okay.  Thank you, Mr. Marx.

20           Ms. Livingston.

21           MS. LIVINGSTON:  Yes, Your Honor.

22           As I understand it, based on the discovery chart

23   and the dispute that I think is before Your Honor right now,

24   the Association is not involved in the plaintiffs' concerns

25   about discovery, and so I'm on the line for the moment just

1    in case we end up discussing additional discovery matters

2    that expand beyond the immediate nature of the dispute

3    between the Marriott defendants and the plaintiffs.  So I'll

4    pipe up, if needed, but at the moment, I don't have anything

5    further to add.

6              THE COURT:  Okay.  Thank you, I appreciate that.

7              So what I will probably not do, unless you pipe up,

8    is come back to you, not to leave you out, but not to belabor

9    things.

10             So what I want to do then, is I would like to turn

11   to the chart that we've got here and kind of somewhat quickly

12   move through some of these issues and make some

13   determinations about where we're going to go or whether

14   further briefing or other things are going to be needed on

15   these.

16             And I'm going to start with Issue 1, which is

17   essentially profit information, although I don't believe

18   really that that's exactly what is being asked for in each of

19   these, so I'll look at them, not necessarily based on how it

20   has been framed in the discovery chart, but I want to look at

21   the questions themselves.

22             So the first question at issue, or the first two

23   questions at issue, appear to be Requests for Productions 6

24   and 7 from the Marriott defenses -- I'm sorry, from the

25   plaintiffs' first request for production, and I'm going to

1    look at what I've numbered as Exhibit 4, which is the

2    Marriott defendant's responses and objections to that.  And

3    the reason I'm starting with that is because that provides me

4    both the question and the answer in the same page, or the

5    objection.

6           So I'm starting with Request Number 6, which is

7    towards the bottom of page 6 of Exhibit 4 with the response.

8           So the way it appeared to be left there, Mr. Marx,

9    is that it sounded like the defendants might provide some of

10   those, so perhaps this one isn't an issue.  So before we go

11   to any argument on it, do we have an issue or are we good on

12   Request for Production Number 6?

13          MR. MARX:  If by "good," Your Honor means that the

14   defendants agree to produce, then I'm afraid we are -- we are

15   standing on the objection because we believe that -- first

16   off, I mean, we have arguments that the profits relating to

17   this product are not germane to the issues in the case.

18   Also, we object on timing, but most fundamentally because we

19   believe that there is no nexus between the discovery that's

20   sought and the potential remedies in this case.

21          THE COURT:  Okay.  And it appeared that that's what

22   you were saying in your response, but I wanted to make sure.

23          So I believe that with regard to Requests Number 6

24   and Number 7, that I'm going to need some more argument from

25   the plaintiff, then, in terms of why it's believed that it's

1   germane to the issues at hand.  So let me come back then to

2   you, Mr. Schrag.

3            MR. SCHRAG:  Thank you, Your Honor.

4            I may ask Mr. Reiser to chime in if I don't cover

5   everything.  But we think that the financial information is

6   pretty straightforward and definitely relevant.  We -- the

7   main claim is -- in this case is a breach of fiduciary duty

8   claim.  And we cited case law in the chart that shows that

9   you can get disgorgement of wrongfully obtained profits as a

10  breach of fiduciary remedy.  It's also a remedy for aid and

11  abetting breach of fiduciary duty.

12           So whether -- whether the documents on their face

13  provide that exact information, the profits obtained from

14  this particular wrongdoing, that's not the standard.  We

15  think we can use those documents, analyze those financial

16  records, provide them to a consultant or expert if we need

17  to, and that we will be able to discern and have expert

18  opinion, if necessary, on the damages issue, which is a

19  remedy that is available under the main cause of action in

20  the case.

21           So their financial records on revenues, profits,

22  fees, stemming from the affiliation, we will be able to

23  discern what we need to show as damages through the documents

24  requested in 6 and 7 and also through the documents requested

25  in the third document request, which we believe must be

12

1    produced because, you know, as we mentioned, the defendants

2    have waived their objections to that by not filing a timely

3    response.  So there is 6 and 7, but there are also is

4    financial information requested in Document Request Number 3.

5    The financial records are necessary for us to prove up one of

6    our damages theory and called for in the case law.

7            THE COURT:  All right.  And when you say in

8    "Document Request Number 3," are we talking about Requests 14

9    through 21 and 23?

10           MR. SCHRAG:  That's correct, Your Honor.

11           THE COURT:  Okay.  All right.  In terms of the --

12           MR. REISER:  If I could just add -- this is Mike

13   Reiser, Your Honor.  If I could just add one thing on

14   Document 6 and 7, Requests 6 and 7.  Those were specifically

15   kind of parsed out between the plaintiffs and defendants.

16   You know, we told them we do not accept their -- you know,

17   specifically on those two, we do not accept their objection

18   in any way, shape, or form.

19           The Marriott defendants promised a letter stating

20   their position on that after we told them that our theory was

21   disgorgement of profits, and that letter never came until,

22   you know, several weeks ago.

23           But the reason I'm bringing this up is this does

24   not fall, you know, within the parameters of what Mr. Marx

25   argued was agreement.  This is -- this is not one of the

13

1    agreed -- agreed -- this is not within the parameters of any

2    agreements we made.  This was always parsed out for -- for,

3    you know, dispute.

4            MR. MARX:  You know, this is Mr. Marx.  I agree

5    with Mr. Reiser.

6            This issue was definitely, we agree, carved out by

7    both sides to be outside of the ESI issue.  So our objection

8    to the -- to the request is not based on the fact that it

9    would require us to redo the document production.  So I agree

10   with Mr. Reiser on that.

11           MR. SCHRAG:  If I could just add one more thing on

12   the timing.

13           THE COURT:  Who is this?

14           MR. SCHRAG:  Mr. Schrag.

15           THE COURT:  Okay, go ahead.

16           MR. SCHRAG:  This is Michael Schrag --

17           THE COURT:  Okay, thank you.

18           MR. SCHRAG:  -- for the plaintiff.

19           On the timing, you know, there has been no

20   bifurcation of discovery in this case at all.  And, you know,

21   now is the time when we need the financial information with

22   expert discovery looming in the near future.

23           MR. MARX:  If I could, Your Honor -- Mr. Marx.

24           If I could have just one more point on Request 6

25   and 7 because I think --

1        THE COURT:  Actually, you can have more than that,

2   because you haven't responded at all, so go ahead.

3        MR. MARX:  So the -- Your Honor, the case -- the

4   case concerns allegations that the board of directors at the

5   Aspen Highlands -- the Ritz-Carlton/Aspen Highlands board and

6   the Marriott defendants breached their duties owed to the

7   members of the Ritz-Carlton Destination Club and Aspen

8   Highlands.  And it concerns this Ritz-Carlton Destination

9   product which the plaintiffs contend the defendants have

10  devalued through their wrongful conduct.

11       And the document requests that we're talking about

12  now don't concern revenues and profits derived from the sale

13  of the Ritz-Carlton product that are at issue in the case,

14  but rather, they seek revenues and profits relating to the

15  Marriott Vacation Club product.  The Marriott Vacation Club

16  product, that's the main product that the Marriott defendants

17  are engaged in their business (inaudible).

18       And by way of comparison, you know, at its heighth

19  there were about 3,000 Ritz-Carlton Destination Club members.

20  There is over 400,000 Marriott Vacation Club members.  And so

21  our position, and one that we would articulate -- or hope to

22  articulate for comprehensively, if we have to brief the issue

23  in a formal sense, is that there is no way that you could

24  reasonably ascribe any remedy in this case to the revenues

25  and profits for Marriott's overall time share business not

1   related to the allegations of harm or (inaudible).  There is

2   no connection between it, not a strong enough connection.

3          MR. REISER:  Your Honor, I think -- this is Mike

4   Reiser.

5          I think that's absolutely a fundamental

6   misunderstanding of the claim.  We are, indeed, saying that

7   the -- and we have proof -- we have very significant evidence

8   from discovery that the Marriott Vacation Worldwide Corp. was

9   using the Ritz Club as a lure to sell more Marriott Vacation

10  Club points.  And that was the primary objective of what it

11  was trying to accomplish by this merger, to sell more

12  Marriott Vacation Club points.

13         In fact, in 2012 they stopped selling any

14  Ritz-Carlton Destination Club, fractional membership, by

15  their own admission and viewed the Ritz-Carlton Club sales

16  office to sell Marriott points.  So we are trying to disgorge

17  the profits of the aider and abettor of the breaches of

18  fiduciary duty that profited from the breaches.  That's

19  exactly our theory.

20         THE COURT:  Okay, Mr. Marx.

21         MR. MARX:  Well, you know, we disagree with

22  Mr. Reiser's characterization of what he says the proofs have

23  shown.  We understand that those allegations are his claim,

24  but we disagree that that's what the evidence has shown or

25  will show.

1          THE COURT:  Okay.  Well, and to put it simply, Mr.

2     Marx, and maybe this has to be briefed, but it would seem to

3     me that one of the questions might be if Marriott's profits

4     went up because of whatever was occurring with Ritz-Carlton

5     or the Ritz Club, wouldn't there be some factual issue that

6     has to be determined in terms of what percentage of that was

7     related to Ritz, and assuming that there -- arguendo, of

8     course -- that there was going to be disgorgement, what

9     percentage of the Marriott profits might be tied to that?

10    How would that not be some sort of a factual issue to be

11    dealt with?

12         MR. MARX:  Right.  I mean, that is an excellent

13    question and probably, I'm sure, smart people will try to

14    offer their thoughts as to how you could do that.

15         But the fact is that if Marriott Vacation Club is

16    profitable, and I'm sure that someone will argue that the

17    profits were derived because of its one issue and not because

18    of the 99 other driving factors that accomplished their

19    profitability.

20         So I hear what Your Honor is saying.  And my

21    reaction to it would be that we would, having heard what Your

22    Honor said, discuss it with our client and see whether they

23    would want to modify their position on the objection without

24    requiring the plaintiff to file the motion on these

25    particular requests.

1          THE COURT:  And, of course, I'm not saying in any

2     way that it is possible to discern where those profits come

3     from.  I can just see that being an area of argument that

4     might want to be raised by a party at trial, if it gets to

5     that point.

6          All right.  Well, perhaps, it does sound to me like

7     perhaps, then, Mr. Marx, you want to kind of take the

8     entirety of Issue 1 back to your clients and give some

9     thought to that one before we go any farther on that one?

10          MR. MARX:  I agree.

11          THE COURT:  Okay.  So I'm going to just delay Issue

12     1 for now until the defense further discusses it.

13          And do you think you can realistically -- well,

14     what's a realistic timeframe for you to give -- you don't

15     necessarily need to re-involve me in this issue one way or

16     the other.  What's the realistic timeframe on Issue 1 for you

17     to let the plaintiffs know whether they need to bring this

18     issue back to the Court?

19          MR. MARX:  I would say -- I would say -- the delay

20     is caused by the fact that I'm trying to look at the

21     calendar.

22          THE COURT:  Oh, sure, no worries.  I know we've got

23     too many electronic devices sitting in front of us at one

24     time any more.

25          MR. MARX:  We'll say January 26, two weeks from

1    today.

2              THE COURT:  Okay.  All right.

3              Moving on then to Issue Number 2, which is Request

4    for Production Number 22, 24, and 25.  And let me open those

5    up in my documents here.  All right.

6              Let me start with you on this one, Mr. Schrag, if

7    you're going to be the one addressing this matter.

8              MR. SCHRAG:  Yes, Your Honor.

9              These are documents that, you know, they're clearly

10   relevant.  If you look at 22, documents regarding the

11   Marriott defendant's reason for (inaudible - audio cuts out)

12   justification, for the (inaudible) affiliation.  So in a

13   sense, they should have already been produced.

14             To the extent there are documents that have not

15   been produced, they're clearly relevant and they've also

16   waived any objection to it by not filing any -- any timely

17   objection under the (inaudible) case we cite.  And I've said

18   similar things about 24 and 25; they're documents directly

19   related to the affiliation at issue.

20             THE COURT:  Well, let me start there with Number

21   22.  With Number 22 they say they've produced it.  So is

22   there some reason to think that there is a problem with that

23   claim?

24             MR. REISER:  Your Honor, this is Mike Reiser, if I

25   can just jump in.

1            I think the issue here merges in with the issue of

2    the custodian.  Because what this issue here really is, and

3    this needs to be flushed out, I think, in terms of all of the

4    next ones that follow.  Is that the custodians were such that

5    at the time they were proffered to us for approval, we had no

6    idea who the proper custodian -- all the knowledge as to who

7    had access to relevant documents was within the Marriott

8    control.  So the onus is on Marriott to make a good faith

9    effort to identify all custodians at that point and search

10   their records.

11           I'll give you one key example is Steve Weiss (ph),

12   who is the -- I think there is a separate motion pending with

13   regard to him right now.  Here is a guy who is the CEO of the

14   company was very -- you know, the evidence has shown that he

15   was involved with strategic council (ph) meetings and other

16   efforts -- or other discussions and, you know, his conduct on

17   behalf of Marriott in, you know, devising the strategy and

18   implementing it, and he was not even on the custodian list.

19           Similarly, you know, most of those other

20   custodians, you know, are -- all of them have been identified

21   based upon, you know, the documents that it did produce.  You

22   know, it revealed, you know, a bunch of other players that,

23   frankly, there is no reason should not have been on the

24   original custodian list.

25           And so this also, you know, leads into the cost

1    issue.  I think -- I think that needs to be considered that,

2    you know, the problem stems from the initial -- the initial

3    identification of custodians and it being narrowed too much.

4            And so, yeah, in terms of the custodians that they

5    searched, they may have produced all the documents under

6    these production requests, but the issue really is, Is there

7    are other custodians that really need to be searched?

8            THE COURT:  Do you think -- do you think you know

9    who those are now?

10           MR. REISER:  Yes, we do, and we provided that list

11   to the defendants last week --

12           THE COURT:  Okay.

13           MR. REISER:  -- the additional custodians.

14           THE COURT:  And how many custodians -- and how many

15   new and additional custodians are we talking about?

16           MR. REISER:  I think there -- there is in the range

17   of 10 to 15 additional custodians.  It may be the case

18   that -- that there are fewer relevant documents in 2011

19   because, you know, it's true that much of the activity was

20   2012 and 2013.  But we don't think it's going to be very

21   expensive to come up with documents for 2011 just because the

22   volume is going to be -- is going to be a lot less, but there

23   still could be highly relevant documents from that year.

24           THE COURT:  Okay.  And one thought that's just

25   completely kind of off -- off track here, but it kind of got

1   raised by what was just stated about the other jurisdiction

2   litigation.  Has anybody given any thought to addressing this

3   from an MDL posture, either in this district or in another?

4   Is that something that we need to discuss at some point in

5   time?

6          MR. SCHRAG:  Your Honor, one of the -- yeah, so the

7   other two jurisdictions, one, the state court proceeding

8   before judicial referee in California.

9          THE COURT:  That would not be amenable to MDL.

10          MR. SCHRAG:  That was our conclusion.

11          THE COURT:  And what was the other one?  I heard

12   the one in front of the state --

13          MR. SCHRAG:  Smaller case in Eastern District of

14   California.

15          THE COURT:  Okay.  So it sounds like the largest of

16   the cases is the one here in the District of Colorado?

17          MR. SCHRAG:  It involves the most plaintiffs.

18          THE COURT:  Okay, all right.  Well, turning --

19          MR. FERGUSON:  Your Honor --

20          THE COURT:  Yes.

21          MR. FERGUSON:  Your Honor, this is Matt Ferguson.

22   I'm not going to triple team Mr. Marx, but I'm on a trial in

23   the Fifth Judicial District, so I'm going to have to get off

24   the phone.  But I just wanted to say one thing and then I

25   won't triple team.  I just want to put something in context.

22

```
1        Our last set of discovery was, you know, our

2   cleanup, and we held off in doing, you know, real discovery

3   because Mr. Marx (inaudible - audio cuts out) in the

4   corporation like this, but I just want to give you two brief

5   examples.

6        This apparently is not -- it is an inadvertent

7   problem.  It's an appraisal for Aspen that was done that

8   speaks directly to our theory of damages saying if they do

9   this, it's going to devalue of the property.  And that person

10  wasn't searched and we were able to get the written --

11  another written appraisal for San Francisco, a subpoena of

12  Cushman & Wakefield, and found those documents.  So for some

13  reason, their parameters were not picking up key documents,

14  and that happens.

15       And it also happened with a company called Morrow &

16  Company which did the critical survey and we could see gaps

17  in the Marriott production.

18       So, and we understand that there is the complicated

19  case in those documents.  So those (inaudible) -- Mr. Marx

20  explained that those are -- that those were inadvertent, but

21  that appears that is the guy that had ordered those

22  appraisals and that he was just left off, but as discovery

23  goes forward, we find out he's a relevant person and, you

24  know, he should be searched.  That's one of the ways --

25  that's genesis of some of these custodians, but I'm sorry, I
```

1    have to jump off.  So I think Reiser and Schrag have a

2    handle, if you don't mind, Your Honor.

3         THE COURT:  I don't mind.  Have a good week and

4    good luck with your other matter.

5         All right.  Let me turn -- I guess before we go,

6    and I'll turn back and I'll go back to you, Mr. Schrag,

7    briefly and then turn back to Mr. Marx, but before we kind of

8    delve into some of the specifics of the remainder of the

9    items 3 through 6 that are on here, some of these issues are

10   the same, some are different.

11        Do you think, Mr. Schrag, that we should keep going

12   on this today?  Or do you think that this is something we're

13   realistically, a couple weeks of looking at it between the

14   parties might narrow it and save some time before we proceed

15   any further?

16        MR. SCHRAG:  I think -- I think generally it seems

17   like, you know, there is a willingness to go back and

18   consider producing some of the stuff we've asked for.  You

19   know, I think we've covered through Production 4, I think

20   Section 5.5 deals with specific documents.  And we listed,

21   you know, documents that they've agreed to go back and search

22   for there.

23        And the reason we listed them is just because, you

24   know, I think there is a general understanding that time is

25   of the essence, and so we wanted -- we wanted the Court to be

24

1    aware --

2              THE COURT:  Sure.

3              MR. SCHRAG:  -- that we've asked for this stuff

4    now.  We asked them to go back and look at stuff.  Some of it

5    they have agreed to go back and search.

6              But so I'm not sure that going through the specific

7    documents where there is still disagreement is a good use of

8    our time.  But I don't know, maybe Mike Reiser needs -- are

9    there any documents listed in 5 that Marriott has not agreed

10   to produce that you want to waive now Mike?

11             MR. REISER:  I think they will all probably be

12   covered under the custodian.  I mean, I think the custodian

13   issue covers almost, you know, a great majority of things and

14   then the year issue is a little less, you know.  So but,

15   yeah, I do think we probably made the best use of our time by

16   what we've done so far.

17             THE COURT:  Okay.  Mr. --

18             MR. REISER:  And I don't necessarily think it's the

19   best use of our time to go through document by document at

20   this point.

21             THE COURT:  Okay.  Mr. Marx --

22             MR. SCHRAG:  And I guess what I would ask then,

23   Your Honor -- this is Michael Schrag -- that we just have

24   some strict timelines.  I know Mr. Marx had said January 26

25   he can get some information back to us, but let's maybe come

1    back to have a deadline soon after that to come back to Your

2    Honor and report with a new chart or if all the issues are

3    resolved to let you know that.

4              THE COURT:  So, and let me propose it, and then

5    I'll come to Mr. Marx on all of that.

6              So knowing what my trial schedule is like in the

7    beginning of February, if a -- if any lingering issues, if I

8    was to get a Chart by close of business on Friday, February

9    9, I believe I would be able to accommodate further hearing

10   on the matter; if necessary, the following week.

11             Is that a realistic date which gives you, I think,

12   about two weeks to digest whatever agreement and documents

13   you get on the 26th?  Does that work for you all, Mr. Schrag

14   and Mr. Reiser?

15             MR. SCHRAG:  I think that does, Your Honor.  We

16   would get -- we would get further answers from Marriott

17   defendants by the 26th and then meet and confer and then be

18   ready on the 9th to give you a Chart.

19             THE COURT:  Okay.  Mr. Marx, let me turn to you.

20             MR. MARX:  That's fine, Your Honor.

21             THE COURT:  Okay.  Well, that was easy.  Let me

22   turn to one other matter, and this is just a brief scheduling

23   question.

24             I know when I issued an order on the motion to

25   clarify -- and I'm sorry for scaring anybody with jamming up

1   their holiday with the earlier order with regard to the

2   depositions.  The way I had read it was that we had a

3   deposition set potentially over the holidays, or shortly

4   thereafter, and I was leaving the country for a week and a

5   half right after Christmas and needed to get you an answer

6   before that, but I know that got delayed.

7        So my question at this point is -- at this point

8   is, Is that witness currently noticed for a deposition?  And

9   if so -- and the answer might be in the briefs, but just so I

10  don't have to dig for it right now, when is that notification

11  for it, because I want to be able to get you an order well

12  enough in advance of that?

13       UNIDENTIFIED SPEAKER:  You know, this Mike

14  (inaudible).  There is no -- no current date notice for

15  Mr. Weiss's deposition.  You know, one of the issues is we've

16  asked them to search his documents, so we would like to get a

17  document search, but nevertheless, we would love to have that

18  resolved, you know, as soon as the Court can do it.

19       THE COURT:  Okay.  Well, I have a reply coming in

20  then on or before the 18th and I'll endeavor to get you an

21  order out as shortly after that then as I can.

22       Okay.  Well, I think unless anybody has anything

23  else that resolves at least everything for today or delays

24  it.  Anything anybody else wants to add?  Okay.

25       Well, hearing nothing --

27

1           MR. MARX:  Your Honor --

2           THE COURT:  Go ahead.

3           MR. MARX:  Your Honor, this is Ian Marx.

4           If I could briefly just raise an issue that I think

5    we would all benefit from.  And it concerns we have a current

6    fact discovery end date of March 15 that everybody, I know on

7    this call and lots of teams of other people that are working

8    very hard to make sure that we adhere to.

9           One of the concerns is -- relates to the -- what

10   the trial looks like in this case, and more specifically, who

11   the plaintiffs are going to call to testify in their case in

12   chief.

13          And I don't want to indicate that there is any

14   dispute between the parties because I don't believe that

15   there is, but I believe that the trial contours, what that

16   looks like is going to be very relevant to how we complete

17   discovery.  Because from the Marriott defendant's standpoint,

18   we do not want to have a situation where the plaintiffs call

19   a plaintiff to testify at trial who we have not had the

20   opportunity to take a deposition of.

21          And what we're trying to work out is in the earlier

22   discussions in the fall about the plaintiffs providing us

23   with a list of witnesses who they may -- might call at trial

24   and they were good enough to get us a list of about 29

25   plaintiffs who would be amongst the pool of potential trial

1  witnesses, those are folks whose depositions we want to take.

2  And we've -- we've taken three plaintiffs' depositions so

3  far, and obviously have a lot to go.

4        There are other plaintiffs whose depositions we

5  wanted to take in connection with discovery because, quite

6  frankly, we thought that we might discover information that's

7  helpful to our defenses.  And so, you know, we endeavor to

8  take the depositions of about 60 or so out of the 200

9  plaintiffs.  And this week, however, if things had developed

10  that, given that the parties don't have an agreed-upon plan

11  for the trial, that the plaintiffs have indicated that we

12  shouldn't -- they may feel the need to call each and every

13  plaintiff and so we shouldn't feel limited in our deposition

14  approach.

15        And our concern now is that if we are faced with

16  the dilemma of not wanting to (inaudible - audio cuts out )

17  with a trial witness whom we haven't deposed, or taking 200

18  depositions, we don't -- we don't love either -- we can't

19  live with either, really.

20        And so I guess that's a long-winded explanation

21  that we think that, and we're certainly open to a discussion

22  with plaintiffs about a plan for the trial that would obviate

23  the need for 200 plaintiffs having to testify at trial.  But

24  we believe that that plan should be discussed and vetted and

25  agreed to in the very near future because that will, we

29

1    think, be an essential piece of information that will govern

2    how we have to complete these depositions between now and

3    March 15.

4            THE COURT:  Okay.  Either Mr. Schrag or Mr. Reiser,

5    does one of you want to briefly address that?

6            MR. SCHRAG:  Yeah, Your Honor.  This is Michael

7    Schrag.

8            We agree that we should come up with a good trial

9    plan and are glad that, you know, both sides want to have a

10   trial plan that doesn't involve 200 plaintiffs testifying.  I

11   don't think that would make sense, and I think we will be

12   able to come up with a plan soon.  And I think that, you

13   know, we should -- the plaintiffs will be able to come up

14   with something and bring it to the defendants and this

15   meet-and-confer process should probably take place in the

16   same timeframe that we talked about today for this discovery

17   dispute.

18           I don't know if Mike Reiser has anything to add to

19   that.

20           MR. REISER:  Yeah.  I just was wondering whether

21   there should be any Court involvement with the plan because

22   I'm not certain that, you know, we can agree necessarily

23   on -- on that plan without the Court buying on it.  So that

24   was one concern that I think we could probably figure out and

25   address during the next maybe two weeks when we're talking

1   this over and maybe get it before a court, either Judge

2   Gallagher, Judge Brimmer, one of the two.

3            THE COURT:  Yes.  I guess my thoughts on that

4   are -- and I think Mr. Reiser is correct in raising the issue

5   of who is going to address that.

6            What I would like the parties to try and do over

7   the next couple of weeks, just for judicial economy, is

8   narrow the issues that you have on this.  If there is

9   agreed-upon key plaintiffs that everybody knows are going to

10  be called, great, list those out, figure out who they're

11  going to be, and get them deposed.  I completely understand

12  that nobody wants to go into a trial and have a witness who

13  hasn't been deposed.

14           Beyond that -- and I suspect -- obviously, I

15  haven't seen any of the discovery here, but I suspect that

16  there are absolutely key plaintiffs that are likely to be

17  witnesses, for one compelling reason or another.

18           Beyond that, kind of try and narrow where you think

19  the issues are in terms of whom you think you might want to

20  call, but aren't sure.  And if we have to do additional

21  depositions, so be it, but nobody wants to waste money on

22  those either.

23           And then in terms of trial days, I'm not telling

24  you for sure how many trial days you're going to get.  But I

25  can anticipate, from prior experience, that for your trial

1    days beyond Day 5, you're going to at some point be having a

2    discussion with Judge Brimmer about why they are needed.  And

3    I'm certainly not telling you that you're going to be limited

4    in any way to a five-day trial for a case of this magnitude,

5    but there is going to have to be a specific justification for

6    the length of it.

7            And what I would like the parties to do on this is

8    come back to me with areas of disagreement.  And then what

9    I'll do is have a discussion with Judge Brimmer and determine

10   who is going to be addressing those, whether he wants to

11   address it through his Chambers, or whether he wants me to

12   address it, but it will be a lot easier to have that

13   discussion with him when I know what the dispute actually

14   entails.

15           And it sounds like that should be dealt with in the

16   next couple of weeks because you're pushing up against a

17   March 15 deadline and everybody needs time to get the

18   depositions noticed and done.

19           Does that make sense for everybody?

20           UNIDENTIFIED SPEAKER:  Yes, it does, Your Honor.

21           THE COURT:  Okay.  Anything else we need to

22   address?

23           UNIDENTIFIED SPEAKER:  No, Your Honor.

24           THE COURT:  Well, hearing nothing else, thank you

25   all very much.  I appreciate the -- I know there's areas of

32

1    disagreement, but I would -- from what I'm hearing, it sounds

2    like there is a lot more areas of agreement, and particularly

3    in a case of this size I appreciate the effort everybody is

4    making to come to those agreements because it ultimately

5    makes it easier for everybody.

6           So with that we'll sign off and have a good weekend

7    everybody.  Take care.

8           (Whereupon, the within hearing was then in

9    conclusion at 1:09 p.m.)

10

11

12   I certify that the foregoing is a correct transcript to the

13   best of my ability to hear and understand the audio recording

14   and based on the quality of the audio recording from the

15   above-entitled matter.

16

17   /s/ Dyann Labo                    January 25, 2018

18   Signature of Transcriber              Date

19

20

21

22

23

24

25