# EXHIBIT 4

EXHIBIT 4

Lee Cunningham - November 10, 2017

```
 1   RCHFU, LLC,  et al.,
           Plaintiffs,
 2                              United States District Court
     v.                         District of Colorado
 3                              No.  1:16-cv-09390
     MARRIOTT VACATIONS WORLDWIDE
 4   CORPORATION, et al.,
           Defendants,
 5   _____/
 6   REISER, et al.,
           Plaintiffs,        Eastern District of California
 7   v.                       No. 2:16-cv-00237-MCE-CKD
 8
     MARRIOTT VACATIONS WORLDWIDE
 9   CORPORATION, et al,
           Defendants,
10   _____/
11   PETRICK, et al.,
           Plaintiffs,
12                              San Francisco County
13   vs.                        No. CGC-15-54897
     MARRIOTT VACATION WORLDWIDE
14   CORPORATION, et al.,
15         Defendants.
16   _____/
17
18           VIDEOTAPED DEPOSITION OF LEE CUNNINGHAM
19       VOLUME I, commencing between 9:03 a.m.-5:05 p.m.,
20       on Friday, November 10, 2017 Taken on Behalf of
         the Plaintiffs before Lisa Gerlach, Court Reporter,
21       Notary Public in and for the State of Florida at
22       Large, pursuant to Plaintiffs' Notice of Taking
23       Deposition in the above cause.
24
     Job No. 2733753
25   PAGES 1 - 269
```

                                                    Page  1

Lee Cunningham - November 10, 2017

```
 1        A.  Yesterday was one, and I don't recall the
 2   prior day a couple weeks ago.
 3        Q.  Approximately how many documents have you
 4   reviewed for your deposition today?
 5        A.  Probably in the -- hundred or so.
 6        Q.  Were there any non-Marriott employed people
 7   in any of these meetings?
 8        A.  No.  Well, counsel was not --
 9        Q.  I understand.  Like, did you meet with HOA
10   counsel?
11        A.  No.
12        Q.  All right.  Sir, are you presently employed
13   by Marriott Vacations Worldwide Corporation?
14        A.  That's correct.
15        Q.  Are you an officer in that company?
16        A.  Yes, I am.
17        Q.  Are you an officer under any other entities
18   under the Marriott Vacation Worldwide -- is it okay if
19   I call it MVW?
20        A.  That's fine.
21        Q.  Is that what you all call it at work?
22        A.  Yes.
23        Q.  I notice, for example, you signed some
24   documents on behalf of Lion & Crown Travel --
25        A.  Yes.
```

Page 10

Lee Cunningham - November 10, 2017

```
1        Q.  -- Company?  You're an officer in that
2   company?
3        A.  I am.
4        Q.  What is your position at --
5        A.  Vice president, I think, is how it's
6   characterized.
7        Q.  Approximately how many companies are you an
8   officer in under the MVW umbrella?
9        A.  To be honest, I couldn't estimate.  It's
10  probably in the -- 15 to 20.
11       Q.  Okay.  What Ritz-Carlton entities under the
12  MVW entity are you an officer?
13       A.  Lion & Crown, Cobalt Travel, Ritz-Carlton
14  Development Company.  Those are the primary ones that
15  I...
16       Q.  Have you ever been an officer in any of the
17  HOAs that were formed for any of the clubs?
18       A.  No.
19       Q.  How many times have you been deposed, say, in
20  the last five years?
21       A.  This is my first.
22       Q.  First deposition ever?
23       A.  Yes.
24       Q.  Okay.  I know counsel spent some time with
25  you.  I would have thought that you would've been in a
```

Page 11

Lee Cunningham - November 10, 2017

```
 1    various locations around the United States; correct?
 2              MR. SELLINGER:  Objection to form.
 3         A.   That's -- yes.  I mean, we owned unsold
 4    inventory in a number of clubs that had been
 5    developed.
 6    BY MR. FERGUSON:
 7         Q.   And as part of MVW's business, at least --
 8    let's call it 2012, '13, '14 -- was part of its
 9    business to manage these clubs?
10         A.   Yes.
11         Q.   What entities managed the clubs; do you
12    recall the name of the entities?
13         A.   Ritz-Carlton Management Company.
14         Q.   Are you an officer of that company?
15         A.   Yes.
16         Q.   Are you an officer of the Development
17    Company?
18         A.   Yes.
19         Q.   Does the Ritz-Carlton Development Company
20    today own any inventory in any of the Ritz-Carlton
21    Destination Clubs?
22         A.   Yes.
23         Q.   From foreclosures and whatnot?
24         A.   I'm trying to think.  We definitely own one
25    or two units at a couple of clubs.  We owned a
```

Page 25

Lee Cunningham - November 10, 2017

```
 1    their membership?

 2         A.  Yes, they were able to do it --

 3         Q.  More?

 4         A.  -- on a specific basis -- you know -- an

 5    allocated week for an allocated week basis.  This gave

 6    them more flexibility.

 7         Q.  Now -- thank you.  In Exhibit 1023,

 8    Ms. Babich wrote the members, in the second paragraph,

 9    "In response to member feedback, we sought ways to

10    provide exceptional usability through a variety of

11    destinations and experiences."

12              What member feedback was she talking about?

13         A.  We get feedback from members through our

14    onsite surveys.  We survey all of our guests after

15    their stay.  We survey guests after their member

16    services experience.  We survey our guests -- probably

17    the two primary reasons -- places that we survey our

18    guests.

19              Obviously, member services gets feedback --

20    verbal feedback -- from members as they make

21    reservations.  And we also get feedback from the

22    boards of directors of the various clubs through our

23    interaction with them.

24         Q.  And Ms. Babich -- withdrawn.  In this letter,

25    second -- sorry -- the third and fourth paragraph
```

Page 57

Lee Cunningham - November 10, 2017

```
 1    system that are not in litigation?
 2         A.  Yes.
 3         Q.  Which ones?
 4         A.  Ritz-Carlton Club St. Thomas and Ritz-Carlton
 5    Club Vail.
 6         Q.  You have litigation in St. Thomas, though, do
 7    you not?
 8         A.  Not related to -- yes.  Related to a
 9    completely different issue.
10         Q.  If you look five paragraphs down at the first
11    page of your letter between the 17th and the 24th,
12    July and August, it says, "Based on prior member
13    feedback, The Ritz-Carlton Destination Club team has
14    been exploring ways to broaden."
15              In terms of you writing this letter as
16    opposed to Ms. Babich, is it the same answer, that the
17    member feedback you're referring to is what people,
18    for example, say when they leave the property and do a
19    survey?
20         A.  Yes.
21              MR. SELLINGER:  It's only a partial
22         summary of his earlier answer.
23              MR. FERGUSON:  I understand.
24    BY MR. FERGUSON:
25         Q.  There were other types of surveys?
```

                                        Page 100

Lee Cunningham - November 10, 2017

```
 1        A.   Yes.
 2        Q.   There's OSAT surveys; is that one?  Is that a
 3   term of art?
 4        A.   Owner satisfaction is -- I'm not sure that's
 5   the right terminology.  That wouldn't be the right
 6   terminology for The Ritz-Carlton Destination Club.  We
 7   do a member satisfaction survey and an onsite
 8   satisfaction survey.
 9        Q.   I take it, some other member feedback would
10   be like the letter we saw from Patrick Lattore to
11   Ms. Babich; right?  That would be -- a blast e-mail
12   would send out a letter like hers or this one here --
13        A.   It would be all feedback sources like it was
14   before.
15        Q.   The last paragraph of page 1 of Exhibit 1061
16   says, "The affiliation option announced in our
17   July 17, 2012 letter regarding the evolution of the
18   Ritz-Carlton Destination Club is the next step in
19   providing significantly more vacation options for our
20   Ritz-Carlton Destination Club members."
21             When you say "significantly more vacation
22   options," do you mean they could -- pursuant to what
23   you were planning at this time, would be to access the
24   MVW resorts and excursion experiences; right?
25        A.   The additional options that were being added
```

Page 101

Lee Cunningham - November 10, 2017

1    but he did tell you in the paragraph that starts with

2    "Lastly, your recent communications failed to

3    acknowledge the underlying issue, which all RCDC

4    members -- RCDC members need to understand."  And he

5    underlined "The Marriott Vacation Worldwide

6    Corporation has a huge incentive to dilute the RCDC

7    brand to further its greater interest in selling more

8    Vacation Club memberships."

9         First of all, the primary business of MVW,

10   obviously, is now to sell points; right?

11        A.   Our primary sales is through the sale of

12   Marriott Vacation Club Destination points.

13        Q.   And all you really could've done or were

14   doing in late August in 2012 is trying to placate or

15   take care of the very few -- the small population of

16   RCDC members?

17        MR. SELLINGER:  Objection.  Just give me

18        a moment.  When he asks questions, just pause

19        for a moment so I can object.  Thank you.

20        Objection to form.

21   BY MR. FERGUSON:

22        Q.   You were trying to make them happy, placate

23   them?

24        A.   We were trying to provide them more options.

25        Q.   And he was correct that, in providing more

Page 112

Lee Cunningham - November 10, 2017

```
 1              You don't remember that in the affiliation
 2      agreement?
 3          A.  I'd have to go back and refresh my memory.
 4      If you'd like to provide that document, I'll be glad
 5      to review it.
 6          Q.  I'll show it to you maybe in my next round of
 7      questioning.
 8          A.  Okay.
 9          Q.  As you sit here today -- well, I want to ask
10      you -- you kind of started going through the many hats
11      you wear in the Marriott Vacations Worldwide universe.
12      And you mentioned you were the COO of -- or strike
13      that -- you are an officer of 15 to 20 companies, I
14      thought you said.
15          A.  Entities.
16          Q.  Entities.  One of them is Lion & Crown, you
17      mentioned; right?
18          A.  Uh-huh.
19          Q.  What's your role in Lion & Crown?
20          A.  As far as the officer of the company?
21          Q.  Yeah.
22          A.  As -- of the entity?  My title is vice
23      president, and my role is to oversee the operation of
24      Lion & Crown.
25          Q.  And vice president -- are you chief operating
```

Page 131

Lee Cunningham - November 10, 2017

1   officer of that entity?

2       A.  I think the official title in most of our

3   entities is vice president.

4       Q.  Is Lion & Crown a separate corporation

5   incorporated in a state like Delaware?

6       A.  I don't recall.

7       Q.  You don't recall.  All right.

8           So what is your position at Cobalt?

9       A.  It would be similar to Lion & Crown.

10      Q.  Vice president?

11      A.  Yes.

12      Q.  And what is your position at the Ritz-Carlton

13  Destination Club?

14      A.  Ritz-Carlton Destination Club is a -- is

15  really the -- as I thought about it, is doing business

16  as -- the DBA -- of the Ritz-Carlton Development

17  Corporation.

18      Q.  So there's no Ritz-Carlton Destination Club

19  entity.  You would agree with that now after further

20  reflecting on it?

21      A.  There's not a separate entity.  It's a brand

22  name, a doing business name as, for Ritz-Carlton

23  Development Company.

24      Q.  So you would agree then that the letter you

25  signed as COO and vice president of Ritz-Carlton

                                        Page 132

Lee Cunningham - November 10, 2017

```
 1        Q.   Okay.   At the time you wrote that letter, you
 2   were also the vice president and COO of Marriott
 3   Vacation Club Worldwide; right?
 4        A.   That's correct.
 5        Q.   And you testified a minute ago that Marriott
 6   Vacation Club Worldwide didn't need anybody's
 7   permission to affiliate with whoever they wanted to in
 8   this --
 9             MR. SELLINGER:   Objection;
10        mischaracterizing.
11        A.   I did not say that, I don't believe.   The
12   Ritz-Carlton -- Cobalt -- Cobalt or the Ritz-Carlton
13   Development Company, once we established the correct
14   entity, did not need permission to affiliate
15   additional entities.
16   BY MR. FERGUSON:
17        Q.   When you wrote the letter -- well, strike
18   that.   When Eveleen Babich signed the letter dated
19   July 17, 2012, she was employed by Cobalt as the
20   program manager.   True?
21        A.   She was -- she was the general manager in
22   charge of member services that administered the Cobalt
23   Travel entity, I guess -- the business.
24        Q.   Who was in charge of Cobalt in 2012 at the
25   time she wrote that letter?
```

                                        Page 135

Lee Cunningham - November 10, 2017

1    A.  I would have been.

2    Q.  You were in charge of Cobalt at that time?

3    A.  In 2012, yes.

4    Q.  Did you help Eveleen Babich write that letter

5    of July 2012?

6    A.  There were many people that provided input

7    into that letter.

8    Q.  Who else besides her?

9    A.  I'm sure Stephanie Sobeck, Mary Lynn Clark,

10   myself.  I'm sure we got advice from internal counsel.

11   Q.  Who made the decision to state to the members

12   that there was going to be a new affiliation between

13   Marriott Vacation Club and Ritz-Carlton Destination

14   Club?

15   A.  Who made -- I did.

16   Q.  And you made your decision in what capacity?

17   A.  As an officer of Cobalt Travel.

18   Q.  At that time, you were also an officer and

19   vice president and COO of Ritz-Carlton Development

20   Company.  True?

21   A.  That's correct.

22   Q.  And you were also a COO and chief operating

23   officer of -- sorry -- you were also vice president --

24   executive vice president and chief operating officer

25   of Marriott Vacation Club; right?

Page 136

Lee Cunningham - November 10, 2017

1        A.   Of Marriott Vacations Worldwide.

2        Q.   Worldwide.   What about the Ritz-Carlton

3    Management Company, were you also an officer and

4    director of the Ritz-Carlton Management Company?

5        A.   I would have to go back and research that.   I

6    believe that I'm listed as an officer there, but I may

7    not -- I am not sure.

8        Q.   What about today, are you an officer of the

9    Ritz-Carlton --

10       A.   I'd have to go back and check.

11       Q.   Are there any employees of Ritz-Carlton

12   Destination Club that are not also employees of

13   Marriott Vacation Club or Worldwide?

14       A.   No.   I don't believe so.

15       Q.   So there's no independence whatsoever between

16   Marriott Vacation Club Worldwide and Ritz-Carlton

17   Development Company.   True?

18            MR. SELLINGER:   Objection to the form.

19       A.   Can you restate your question?   There's no

20   independence?

21   BY MR. REISER:

22       Q.   So let me ask you this.   Are there any

23   employees of Cobalt that are not also -- strike that.

24   Are there any independent employees of Cobalt that are

25   also employed by Marriott Vacation Club Worldwide?

                                        Page  137

Lee Cunningham - November 10, 2017

```
 1   are to that, are they -- is their employer of record
 2   Cobalt Travel?  No.
 3            The people in member services -- all the
 4   employees of member services -- work and they're --
 5   all they do is work related to Cobalt Travel for
 6   Ritz-Carlton Destination Club.
 7        Q.  Okay.  But I'm not even talking about Cobalt
 8   right now.  I just want to separate --
 9        A.  I'm just using that as an example.
10        Q.  I got you.  Let's start -- I'm just going to
11   go through the Ritz-Carlton entities that I'm aware
12   of.
13            There's Ritz-Carlton Management Company.
14   Let's start with that.
15            Are you aware of anybody that works for
16   Ritz-Carlton Management Company that's not employed by
17   Marriott Vacation Club Worldwide?
18        A.  No.
19        Q.  Are you aware of anybody that's employed by
20   Ritz-Carlton Development Company that's not employed
21   in actuality by Marriott Vacation Worldwide
22   Corporation?
23        A.  No.
24        Q.  Is there anybody employed at Cobalt Travel
25   that's not also employed by Marriott Vacation Club
```

Page 139

Lee Cunningham - November 10, 2017

1    Worldwide?

2         A.   No.

3         Q.   Is there anybody employed by Lion & Crown

4    Travel Service that is not --

5         A.   No.

6         Q.   -- is not employed by Marriott Vacation Club

7    Worldwide?

8         A.   No.

9         Q.   So as the COO of the Marriott Vacation Club

10   Worldwide, you would be aware if there were any

11   employees that just worked for the Ritz-Carlton

12   entities that I just described.  True?

13        A.   As I said, there are people that are

14   employees that are only focused on those businesses,

15   but their employer of record is Marriott Vacations

16   Worldwide.

17        Q.   All right.  So prior to the spinoff, there

18   was -- the member services was not operated out of

19   Salt Lake City, was it?

20        A.   We moved from -- I don't remember the timing

21   of when we moved it from Orlando to Salt Lake City.

22        Q.   Prior to moving it to Salt Lake City, folks

23   who were members of The Ritz-Carlton Destination Club

24   could call up member services and they would have

25   somebody -- they would reach somebody in Orlando.

Page 140

Lee Cunningham - November 10, 2017

1    True?

2        A.   That's correct.

3        Q.   And after the spinoff, they went to Salt Lake

4    City?

5        A.   The phone lines were moved and they were

6    answered by people in Salt Lake City.

7        Q.   Okay.  Does the Salt Lake City member

8    services group out there also handle members services

9    for the Marriott Vacation Club?

10       A.   No.

11       Q.   That's all Ritz?

12       A.   That's all Ritz.

13       Q.   How many employees does Cobalt Travel have?

14       A.   How many people work exclusively on Cobalt?

15       Q.   Yes.

16       A.   Affairs or --

17       Q.   Start with that.

18       A.   Employees, none.

19       Q.   There's no employees, but how many people

20   work and focus their efforts on Cobalt issues?

21       A.   I would say it's probably around 25 to 30,

22   which is the member services group.

23       Q.   And who is in charge of those 25 to 30

24   people?

25       A.   The general manager of that operation.

Page 141

Lee Cunningham - November 10, 2017

```
 1    manager?
 2         A.   I think that's a fair way to say it.
 3         Q.   Okay.  And who in Cobalt is the boss
 4    currently?
 5         A.   The officers of that entity, which would
 6    include myself.
 7         Q.   Who else?
 8         A.   I don't recall who the other officers are.
 9         Q.   Is there somebody below you that would be in
10    charge of the physical location in Salt Lake City?
11         A.   Yes.  That would be the general manager of
12    the member services operations.
13         Q.   And that was Eveleen Babich in 2012; right?
14         A.   It was.
15         Q.   When did she leave, do you remember?
16         A.   I can't remember.  Probably 2014-ish.  I
17    don't recall.
18         Q.   In 2012, is it true that you were the -- you
19    were the only officer that you can remember of Cobalt,
20    and Eveleen Babich was the person in charge of the
21    employees within Cobalt?
22         A.   The operation of member services.
23         Q.   That's true?
24         A.   That's true.
25         Q.   So is it true that you and Eveleen Babich --
```

Page 143

Lee Cunningham - November 10, 2017

```
 1   strike that.
 2          Who actually made the decision in 2012, July
 3   of 2012, to announce the announcement on July 17, 2012
 4   signed by Eveleen Babich, as the general manager of
 5   Cobalt, announcing the new affiliation with Marriott
 6   Vacation Club, or the proposed affiliation?  Who made
 7   that decision to --
 8       A.   The ultimate -- sorry.
 9       Q.   Go ahead.
10       A.   The ultimate decision was mine.
11       Q.   So you made the decision to evolve the brand,
12   to use the parlance of that July 17, 2012 letter?
13       A.   The decision was to -- yeah -- to use that
14   language, that would be true.  It was my decision to
15   announce the affiliation with Marriott Vacation Club
16   Destinations.
17       Q.   And not just the decision to announce, but
18   who made the decision to actually do it, to propose
19   it -- you?
20       A.   I was the final decision maker.
21       Q.   But wasn't Steve Weisz at all involved in
22   that?
23       A.   I'm certain we consulted with Steve, but it
24   was my decision.
25       Q.   Did you consult with anybody else before
```

Page 144

```
 1    Club had no influence on the decision to affiliate?

 2    That's your testimony?

 3         A.  Affiliation doesn't have a connection to the

 4    sale of the unsold inventory.

 5         Q.  So that's a yes; that's your testimony?

 6         A.  My testimony is that affiliation has no --

 7    has no influence on the sale of the developer

 8    inventory.

 9         Q.  Other than what we testified today -- and I'm

10    going to ask this question again, and I'd like you to

11    see if I can get you to focus on the question.  Okay?

12    Because I'm not trying to argue with you --

13         A.  I'm not trying to argue.

14         Q.  Again, I don't mean to be disrespectful or

15    anything.  I just want to make that clear.  I'm not

16    trying to be argumentative, but I want clear

17    testimony.

18              So you made the decision to affiliate; right?

19         A.  That's correct.

20         Q.  You made the decision based solely on the

21    opportunity for Ritz-Carlton Destination Clubs to be

22    able to trade into the Marriott Vacation Club

23    properties.  True?

24              MR. SELLINGER:  That's a

25         mischaracterization of a lot of testimony on
```

Page 152

Lee Cunningham - November 10, 2017

```
 1          A.  This is when we went to Aspen.
 2          Q.  Did you go there with anyone else from
 3   Marriott Vacation Worldwide?
 4          A.  Stephanie Sobeck.
 5          Q.  And you said to them "The
 6   Ritz-Carlton/Marriott representatives agree that
 7   unless the majority of Aspen Highlands members,
 8   including Marriott interests and members not in good
 9   standing, vote in favor of doing so, the
10   Ritz-Carlton/Marriott will not include Aspen Highlands
11   in the Marriott Vacation Club exchange points
12   program."
13              That's pretty much identical to what you were
14   reporting in that prior document, Exhibit 1020, to
15   Marriott International; right?
16          A.  Yes.
17          Q.  And your testimony here today is that that
18   actually changed.  You decided not to do this?
19          A.  We decided not to do the vote and went with
20   the survey.
21          Q.  Did you guys -- when I say "you guys," that's
22   bad.  Did you -- when I say "you" -- did Marriott
23   Vacation Worldwide folks, you or Ms. Sobeck, assist in
24   writing that letter?
25          A.  No.  Well, I didn't.  I don't believe
```

Page 205

Lee Cunningham - November 10, 2017

```
 1        Q.   Because it never happened, did it?

 2        A.   I don't believe so.

 3        Q.   Was there ever a letter that went out to the

 4   members that said, "Listen, folks, we're so sorry.  We

 5   promised that we wouldn't affiliate unless there was a

 6   vote of the majority members"?  You said, "I'm so

 7   sorry, but we're going to give you a survey instead"?

 8        A.   No.   There was a communication for the

 9   survey.

10        Q.   About nine, ten months later in November or

11   December of 2013?

12        A.   That's correct.

13        Q.   And by that time, the folks that owned those

14   fractional units, including my clients, had no idea

15   what you had been doing with that communication over

16   that seven or eight months.  They wouldn't have known?

17             MR. SELLINGER:  With what communication?

18        A.   I don't know what they knew or didn't know.

19   BY MR. FERGUSON:

20        Q.   Do you recall that you all wanted to do this

21   vote in May of 2013?

22        A.   We started the conversation back -- yes --

23   early.

24        Q.   And it wasn't until November or December -- I

25   think you met with Randy Mercer again in November down
```

Page 217

Lee Cunningham - November 10, 2017

```
 1   here -- and a few weeks later in December -- I think
 2   it was December 13th -- you sent out the survey;
 3   right?
 4        A.  We did send it out.  I believe it was in
 5   December.
 6        Q.  And all the communications that I've hauled
 7   here down here from Aspen -- all these communications
 8   that go back and forth between the association people
 9   and internally at Marriott, the members weren't seeing
10   this stuff, were they?
11        A.  No; other than the members that were members
12   of the board.
13        Q.  When you communicated on December 13, 2013,
14   about ten months after this letter went out that you
15   would not have approved of, ten months later, did you
16   say, "Please, folks, recall the letter Randy Mercer
17   sent to you saying there would be a majority vote"?
18        A.  No.
19        Q.  Did you ever say, "Listen, by the way, what
20   we're giving you a survey on right now is not the vote
21   we had talked about.  We totally changed our mind and
22   we're giving you a survey"?  Did you ever communicate
23   like that?
24        A.  No.
25        Q.  Why not?
```

Page 218

Lee Cunningham - November 10, 2017

1      A.  Didn't occur to us to do it that way.

2      Q.  Do you know how much the one-twelfth

3  fractional owners paid to the Ritz-Carlton Development

4  Company between 2001 and 2009 on fractional sales?

5      A.  I'm sorry?  How much --

6      Q.  Yeah.  I mean, say you had 120 or

7  13.4 percent of the stock left.  In 2009, I know it

8  stopped selling -- it stopped selling -- and you

9  stopped selling in 2012.

10      Do you know how much of it sold -- how many

11  tens of millions of dollars had been sold to my folks?

12      A.  I don't know what the -- I don't know off the

13  top of my head.

14      Q.  My clients, 200 of them, had bought 240

15  interests or whatever it is, adds up to about

16  $60 million in sales.  Some people got it cheap

17  because they got in a little bit later.

18      But do you think it's fair to tell them that

19  they're going to have a vote in April 2013, and not

20  tell them that you changed your mind in December of

21  2013?

22      MR. SELLINGER:  Well, hold on a minute.

23      You completely mischaracterized what was told

24      to them in December of '13.

25      MR. REISER:  Move to strike the

Page 219

Lee Cunningham - November 10, 2017

```
 1        A.  We were clear --
 2   BY MR. FERGUSON:
 3        Q.  How did you communicate that to them?
 4            MR. SELLINGER:  Hold on a minute.  Read
 5        that question back, please.
 6            (The reporter read back the last
 7        question.)
 8            MR. SELLINGER:  Objection to form.
 9        A.  We were -- like I previously said -- we --
10   our communication around the survey was clear as to
11   what the purpose of the survey was, which was
12   synonymous with the previously-communicated vote.
13   BY MR. FERGUSON:
14        Q.  You said it was synonymous?
15        A.  It was the same concept, that we wanted to
16   get their feedback on the affiliation.
17        Q.  Mr. Cunningham, in April, when your Salt Lake
18   team is pushing this e-mail around saying what they
19   announced, they're not using that word, that you want
20   to get their feelings about something.  You're saying
21   we're going to get your vote.
22        A.  I understand that.
23            MR. SELLINGER:  Objection to form.
24   BY MR. FERGUSON:
25        Q.  So you don't say, "How do you feel about
```

Page 221

Lee Cunningham - November 10, 2017

 1  Senator So-and-so being reelected?"  You say, "What's

 2  your vote?"  Right?  Totally different concept.  Would

 3  you agree with that?

 4        A.  That's correct.

 5        Q.  Did you ever see comments that came back from

 6  the owners in response to the letter that Randy Mercer

 7  and his three other board members sent out?

 8        A.  I don't recall seeing any.

 9        Q.  Do you recall that people were actually happy

10  that they were being given the right to vote?

11        A.  I don't recall that.

12        MR. FERGUSON:  I have an SFO here.  So he

13        wanted to pick up because the SFO

14        communications come at this point -- before I

15        move on.

16        MR. SELLINGER:  We're done with this

17        subject?

18        MR. FERGUSON:  We're done with the April

19        promise to -- yeah -- the expectation, I'll

20        use -- we're done with that part of it.  What

21        happens next is in May.

22        MR. REISER:  Well, no, I'm asking

23        questions about the entire vote process here.

24        MR. SELLINGER:  Well, wait --

25        MR. REISER:  I'm asking questions about

Page 222

Lee Cunningham - November 10, 2017

```
 1     everybody or just Aspen.
 2              MR. REISER:  All right.  Can I have
 3          pulled up 1208?
 4              MR. SELLINGER:  Do you have an exhibit
 5          for us?
 6              MR. REISER:  No, I don't.  I think we're
 7          going to have to improvise here and read it
 8          on the board.
 9              MR. SELLINGER:  Is that the entire
10          document?
11              MR. REISER:  It's the entire document.
12              MR. SELLINGER:  Let's read it.
13     BY MR. REISER:
14          Q.  Do you see --
15              MR. SELLINGER:  Hold on.  I'd like all of
16          us to be able to read it.
17              THE WITNESS:  I can't read it from here.
18     BY MR. REISER:
19          Q.  You read the letter, Mr. Cunningham?
20          A.  Yes.
21          Q.  Do you see in the letter there, the third
22     paragraph from the bottom on the second page -- if you
23     can pull that out and highlight it -- it says,
24     "Second, regarding other potential affiliations, we
25     want to assure you that a Ritz-Carlton Club
```

Page 232

Lee Cunningham - November 10, 2017

```
 1    affiliation with the Marriott Vacation Club
 2    Destinations will not take place unless there's an
 3    affirmative vote of each club's membership."
 4              These are your words; correct?
 5        A.   That's correct.
 6        Q.   And you wrote this letter?
 7        A.   I'm sure I had help.
 8        Q.   But that is your signature on the bottom of
 9    the letter.  True?
10        A.   It is my signature on the bottom of the
11    letter.
12        Q.   You meant, when you wrote this, that each
13    club was going to have an affirmative vote of the
14    membership before the affiliation with the Marriott
15    Vacation Club would be allowed; did you not?
16        A.   I meant that there would be an affirmative
17    vote, yes.
18        Q.   Not a survey; a vote?
19        A.   As I said -- and I've said a couple times --
20    we started with the conversation of vote; and, at some
21    point -- I'm not sure exactly what that point is --
22    that was -- we discovered that was an inappropriate
23    methodology.  It wasn't appropriate for a vote for
24    that.  That's when we switched to the survey to get an
25    affirmative --
```

Page 233

Lee Cunningham - November 10, 2017

1    Q.   Okay.  Does this influence at all -- or do

2    you want to change your response at all to the meaning

3    of the April 5th letter that was sent out to the Aspen

4    membership that promised a vote?  Would you agree that

5    that was the correct -- hold on -- that was the

6    correct -- the correct outcome of the meeting in

7    Aspen, that the decision was made to give the members

8    of the Aspen Club a vote as to whether to affiliate

9    with the Marriott Vacation Club?

10          MR. SELLINGER:  Objection to form.

11    A.   I'm not sure whether that was the outcome of

12    that meeting.  The part that I -- the primary part

13    that I would object to would've been the majority of

14    the members component.

15    BY MR. REISER:

16    Q.   Okay.  So you take issue with the April 5th

17    vote that there had to be a majority of the

18    membership?

19    A.   That is correct.

20    Q.   But you would agree that there would have to

21    be an affirmative vote of each club's membership

22    before there would be an affiliation?

23    A.   At that point in time, that is what we felt

24    was the right thing.

25    Q.   And earlier this morning -- or earlier this

Page  234

Lee Cunningham - November 10, 2017

```
 1    afternoon, just a few minutes ago, you did agree with
 2    the concept that a vote is different than a survey.
 3    True?
 4         A.  I understand that a vote is different than a
 5    survey.
 6         Q.  And you agree that, even though this promise
 7    was made of an affirmative vote in each club's
 8    membership, you later changed your mind and decided
 9    that the vote was not required; rather, a survey to
10    take the temperature of the membership was what was
11    required?
12            MR. SELLINGER:  Objection to form.
13         A.  We later, after review with counsel,
14    determined that a vote was the inappropriate forum, or
15    form, to gather the information and went with the
16    survey, and moved to the survey.
17    BY MR. REISER:
18         Q.  It's your testimony, Mr. Cunningham, that you
19    never informed any of the members that had been
20    promised a vote of the change in strategy to switch to
21    a survey?
22            MR. SELLINGER:  Objection to form.
23         A.  We certainly discussed it with the boards and
24    we then communicated the purpose of the survey so that
25    we felt that it was clear that this was the -- what
```

Page 235

Lee Cunningham - November 10, 2017

```
 1   was intended by the vote -- communication earlier.
 2   BY MR. REISER:
 3       Q.   Okay.  So you said something very important
 4   there.  I want to delve into that a little bit.  You
 5   said you discussed this change of -- change from a
 6   vote to the survey with the boards.
 7            That's what you just said; right?
 8       A.   We told -- we certainly had the conversation
 9   with them that it was going to be a survey and this is
10   how we were going to administer it and how the -- how
11   we would view the results of the survey.
12       Q.   And as far as you're aware, the Aspen board
13   never informed its membership that there was no longer
14   going to be a vote coming down from Orlando; it was
15   now going to be a survey?
16       A.   I'm not aware if they did.
17       Q.   And you're not aware of any communication to
18   the Tahoe members that there was no longer going to be
19   a vote, but, coming down from Orlando, there was now
20   going to be a survey.  You never saw to it that the
21   members were apprised of that?
22       A.   We did not have a -- we talked to the board.
23   We did not have a separate communication to the
24   members indicating that the -- a vote was now going to
25   be a survey.
```

Page 236

Lee Cunningham - November 10, 2017

```
 1    BY MR. REISER:
 2        Q.   What was the unique situation at Aspen that
 3    could influence the vote?
 4        A.   The unique situation at Aspen was that -- it
 5    was unique because it was different from Vail and
 6    Northstar and San Francisco, where the inventory could
 7    go into -- the developer inventory could go into the
 8    Marriott Vacation Club Trust in Aspen.  We had come to
 9    the conclusion that that inventory could not without a
10    change to the governing documents.
11             In St. Thomas, it was a similar situation.
12    St. Thomas had chosen to go get approval from their
13    members to change those governing documents.
14        Q.   So the next line down, it says "Aspen."  You
15    talk about the Aspen Club there.  It says you're
16    working with the board on language used to call for
17    the vote.  It will be difficult to gain member
18    support.
19             You knew that by May 29, 2013, that it was
20    going to be difficult to get member support for the
21    affiliation.  True?
22        A.   At that point, that was our assessment.
23        Q.   Right.  I think that would've been pretty
24    obvious from the cease-and-desist letter you got about
25    six months earlier.  Yeah?
```

Page 247

```
 1   RCHFU, LLC,  et al.,    United States District Court
 2        Plaintiffs,       District of Colorado:
 3   v.                     No.  1:16-cv-09390
 4   MARRIOTT VACATIONS WORLDWIDE
 5   CORPORATION, et al.,
          Defendants,
 6   _____/
     REISER, et al.,
 7        Plaintiffs,       Eastern District of California
 8   v.                     No. 2:16-cv-00237-MCE-CKD
 9   MARRIOTT VACATIONS WORLDWIDE
10   CORPORATION, et al,
          Defendants,
11   _____/
12   PETRICK, et al.,
13        Plaintiffs,       San Francisco County
     vs.                    No. CGC-15-54897
14   MARRIOTT VACATION WORLDWIDE
15   CORPORATION, et al.,
16        Defendants.
     _____/
17        CONTINUED VIDEOTAPED DEPOSITION OF LEE CUNNINGHAM
18   VOLUME II, taken at 450 South Orange Avenue, Suite 650,
19   Orlando, Florida, commencing between 2:06 p.m.-7:27 p.m.,
20   Wednesday, November 15, 2017, before Lisa Gerlach, Court
21   Reporter, Notary Public in and for the State of Florida
22   at Large.
23
24   JOB No. 2733762
25   PAGES 270-479
```

Page 270

Lee Cunningham - 11/15/2017

```
 1   BY MR. REISER:
 2        Q.  Fall of 2012.
 3        A.  '12.  A survey -- I'm trying to remember
 4   when -- the survey we spoke about previously.
 5        Q.  Let me remind you of the key dates.  July 17,
 6   2012 is when the initial announcement went out about
 7   a proposed --
 8        A.  I understand.
 9        Q.  April 24th -- around there -- you sent
10   another e-mail out to try to clarify the proposal.
11            You remember that date; right?
12        A.  Yes.
13        Q.  And you remember a webinar taking place on
14   August 30th?
15        A.  Yes.
16        Q.  Where you and Mr. Weisz answered questions by
17   the membership?
18        A.  Yes.
19        Q.  Do you remember, around that time, asking
20   members to respond to their sentiment on whether there
21   affiliation was wanted by the members?
22        A.  I remember, in advance of the webinar, asking
23   for questions and so forth.  I don't recall that exact
24   survey, unless that was the one that we were looking
25   at earlier.  I'm still fuzzy on the date.
```

Page 363

Lee Cunningham - 11/15/2017

```
1          Q.  Well, there's survey results that your

2    counsel has produced in this litigation.  It's got 750

3    rows on an Excel spreadsheet -- more than that.  Every

4    one of those rows is a comment from a club member.

5              I can't produce it today because it's a

6    native spreadsheet.  If I tried to print it out, it

7    would be impossible.

8          A.  Is that -- okay.

9          Q.  I can give you the Bates stamp number.  It's

10   RCDC7337_nav.xls.  It was produced by your counsel.

11   It's dated 8/17/12.  It's communications regarding the

12   OSAT, the owner survey.

13         A.  Okay.

14         Q.  You don't remember looking at any of the

15   comments -- it's 750 -- that were contemporaneous with

16   the announcement of the affiliation as you sit here

17   today.  Is that what you're saying?

18         A.  I'm trying to recall.  I'm not disputing

19   whether it did or didn't go out.  I just can't bring

20   it to my memory at this moment.

21         Q.  Well, I mean, I'm just trying to get your

22   testimony, because it seems to me that you're saying

23   you really just wanted to know the members' position

24   on the affiliation, and you were going to try to

25   follow the members' positions.
```

Page 364

Lee Cunningham - 11/15/2017

```
 1              Isn't that your testimony?
 2        A.  No.
 3              MR. SELLINGER:  Objection to form.
 4        A.  We wanted to know the sentiment of our owners
 5  relative to the affiliation, and then we would use
 6  that as one of the data points, one of the pieces of
 7  information, to make the decision.
 8  BY MR. REISER:
 9        Q.  Okay.  And one of the data points would've
10  been a major survey that was contemporaneous with the
11  announcement of the affiliation; that you would want
12  to view that.  True?
13              MR. SELLINGER:  Objection to form.
14  BY MR. REISER:
15        Q.  In making your data point comparisons?
16        A.  And we may have.
17        Q.  Did you?
18        A.  I don't recall.
19        Q.  All right.  And if you had reviewed it, I
20  think you would have noticed that over 90 percent of
21  the members in that survey were extremely negative in
22  terms of the affiliation.
23              You don't remember reviewing that
24  spreadsheet?
25        A.  I don't --
```

Page 365

Lee Cunningham - 11/15/2017

```
 1              MR. SELLINGER:  Hold on.  Objection to
 2         form.
 3         A.  I don't recall reviewing the survey results.
 4    BY MR. REISER:
 5         Q.  And then this letter that we just saw from
 6    Steve Andrews that you received, where he informs his
 7    members that 81 percent of the San Francisco members
 8    who would rather terminate the Marriott relationship
 9    than proceed with the affiliation -- in that letter --
10              MR. REISER:  If you could pull it up?
11              THE TECHNICIAN:  1531?
12              MR. REISER:  Yes.  Second page.  I'm
13         sorry.  The first page.
14    BY MR. REISER:
15         Q.  You see on the first page, it says, "Please
16    note, the recent communication from Lee Cunningham
17    regarding the survey was not reporting on this survey,
18    but a web-based survey that the RCDC invited owners to
19    respond to in July."
20              Do you remember a survey in July 2013?
21              MR. SELLINGER:  Objection to form.
22         A.  I don't recall it.  I'm sure it went out.
23    BY MR. REISER:
24         Q.  How many surveys did you take with regard to
25    the affiliation?  We, at least, know about the
```

Page 366

Lee Cunningham - 11/15/2017

1    August 2012 one we've been discussing, Bates-stamped

2    7337.  There's this one in July that's mentioned.

3    There's the San Francisco survey that you were aware

4    of in August 2013.

5         A.   That we didn't do.

6         Q.   Yeah, you didn't do that, but you got notice

7    of what the responses were, didn't you?

8         A.   Yes.

9              MR. SELLINGER:  Objection to form.

10   BY MR. REISER:

11        Q.   And then there was -- I believe there was

12   focus groups going on in December of 2013.  Do you

13   remember anything about that?

14        A.   No.

15        Q.   None of those went into your decision making

16   in terms of whether to affiliate?

17             MR. SELLINGER:  Objection to form.

18        A.   I don't recall all the discussions and all

19   the factors that we put into the decision.

20   BY MR. REISER:

21        Q.   Is it your testimony, Mr. Cunningham, that

22   you believe that a majority of the members of The

23   Ritz-Carlton Destination Club were in favor of the

24   affiliation?

25        A.   The majority of the ones that responded to

                                        Page 367

Lee Cunningham - 11/15/2017

```
 1              MR. REISER:  Fine.

 2         A.  I don't know.

 3  BY MR. REISER:

 4         Q.  You're the COO of Lion & Crown; right?

 5         A.  I'm the vice president of Lion & Crown.

 6         Q.  Okay.  You're the vice president of Lion &

 7  Crown.  You're the vice president of Ritz-Carlton

 8  Development Company.  True?

 9         A.  That's correct.

10         Q.  And you're the vice president of MORI?

11         A.  Yes.

12         Q.  Is there any entity that is owned or -- of

13  which MORI is the corporate parent that you're not the

14  vice president of?

15         A.  I'm sure there are.

16         Q.  Is there any that you can think of?

17         A.  I don't know.  There are numerous entities.

18  I don't know --

19         Q.  I want to go over a few of the entities which

20  you're -- I want to get an idea from you as to who, at

21  the time the affiliation agreement was -- strike that.

22              At the time the decision was made to

23  affiliate the Marriott Vacations Destination Club with

24  The Ritz-Carlton Destination Club, I want to establish

25  from you who were the officers of the various parties
```

Page 376