# EXHIBIT 14

EXHIBIT 14



# APPRAISAL OF REAL PROPERTY

**BFLT Aspen Holdings**
**75 Prospector Road**
**City and County of Aspen, CO 91611**

**IN A SUMMARY APPRAISAL REPORT**
**As of December 2, 2013**

**Prepared For:**
**Bleu Florida Land Trust Association, Inc.**
**6649 Westwood Blvd.**
**Orlando, FL 32821**



**Prepared By:**
**Cushman & Wakefield Western, Inc.**
**Valuation & Advisory**
**1888 Kalakaua Avenue, Suite C-312**
**Honolulu, HI 96815**
**C&W File ID: 13-38033-900043-003**



CUSHMAN II 000528



**CUSHMAN & WAKEFIELD WESTERN, INC.**
**1888 KALAKAUA AVENUE, SUITE C-312**
**HONOLULU, HI 96815**



**BFLT**
**75 Prospector Road**
**Aspen, Pitkin County, CO 91611**





**1888 KALAKAUA AVENUE, SUITE C-312**
**HONOLULU, HI 96815**

December 16, 2013


Ben Pierce
President of the Association
**Bleu Florida Land Trust Association, Inc.**
6649 Westwood Blvd.
Orlando, FL 32821

Re:     Appraisal of Real Property
        In a Summary Report

        **BFLT**
        75 Prospector Road
        Aspen, Pitkin County, CO 91611


        C&W File ID:     13-38033-900043-003


Dear Mr. Pierce:

In fulfillment of our agreement as outlined in the Letter of Engagement, we are pleased to transmit our appraisal of the above property in a summary report dated December 16, 2013. The effective date of value is December 02, 2013.

This is a summary appraisal, which is intended to comply with the reporting requirements set forth under Standards Rule 2-2(b) of the Uniform Standards of Professional Appraisal Practice.  As such, it presents limited discussions of the data, reasoning, or analyses used in the appraisal process to develop the appraisers' opinion of value.  Additional supporting documentation concerning the data, reasoning, and analyses is retained in our files.  The depth of discussion contained in this report is specific to the needs of the client and for the intended use stated below.

This appraisal report has been prepared in compliance with the *Uniform Standards of Professional Appraisal Practice (*USPAP*)*.

The subject properties are comprised of 65 rotating fractional interests in 12 residential units in the Ritz Carlton Club at Aspen Highlands. The exhibit on the following page summarizes the subject properties.



BEN PIERCE
BLEU FLORIDA LAND TRUST ASSOCIATION, INC.
DECEMBER 16, 2013
PAGE 2

CUSHMAN & WAKEFIELD WESTERN, INC.

| RCC ASPEN UNIT SUMMARY - ASPEN, COLORADO | | | | | |
|---|---|---|---|---|---|
| UNIT # | APN | FRACTIONS | BEDROOMS | SF | CALENDAR |
| 2205 | R019030 | 9 | 2 | 1,471 | Rotating |
| 2307 | R019041 | 9 | 3 | 1,610 | Rotating |
| 8103 | R017792 | 9 | 3 | 1,619 | Rotating |
| 2406 | R019048 | 8 | 2 | 1,319 | Rotating |
| 2203 | R019028 | 6 | 3 | 1,723 | Rotating |
| 4302 | R017780 | 5 | 3 | 1,819 | Rotating |
| 8403 | R018272 | 1 | 2 | 1,308 | Rotating |
| 2310 | R019044 | 9 | 3 | 1,663 | Rotating |
| 8406 | R018308 | 4 | 2 | 1,346 | Rotating |
| 4301 | R017768 | 3 | 3 | 2,015 | Rotating |
| 8405 | R018296 | 1 | 2 | 1,246 | Rotating |
| 8210 | R017852 | 1 | 3 | 1,918 | Rotating |
| TOTAL | 12 | | 65 | | |

RCC Aspen fractional interests are on a completely rotating calendar.

Based on the agreed-to Scope of Work, and as outlined in the report, we developed the following opinions of Market Value for the subject units:

| RITZ CARLTON CLUB ASPEN HIGHLANDS | | | | | | | Aggregate of |
|---|---|---|---|---|---|---|---|
| | Unit No. | SF | Fractions | Bedrooms | S/SF | Retail Value | The Retail Values |
| Fractional Ownership | 2205 | | 1,471 | 9 | 2bdrm | $23.79 | $35,000 | $315,000 |
| Fractional Ownership | 2307 | | 1,610 | 9 | 3bdrm | $24.84 | $40,000 | $360,000 |
| Fractional Ownership | 8103 | | 1,619 | 9 | 3bdrm | $24.71 | $40,000 | $360,000 |
| Fractional Ownership | 2406 | | 1,319 | 8 | 2bdrm | $22.74 | $30,000 | $240,000 |
| Fractional Ownership | 2203 | | 1,723 | 6 | 3bdrm | $26.12 | $45,000 | $270,000 |
| Fractional Ownership | 4302 | Penthouse | 1,819 | 5 | 3bdrm | $30.24 | $55,000 | $275,000 |
| Fractional Ownership | 8403 | | 1,308 | 1 | 2bdrm | $22.94 | $30,000 | $30,000 |
| Fractional Ownership | 2310 | | 1,663 | 9 | 3bdrm | $24.05 | $40,000 | $360,000 |
| Fractional Ownership | 8406 | | 1,346 | 4 | 2bdrm | $22.29 | $30,000 | $120,000 |
| Fractional Ownership | 4301 | Penthouse | 2,015 | 3 | 3bdrm | $29.78 | $60,000 | $180,000 |
| Fractional Ownership | 8405 | | 1,246 | 1 | 2bdrm | $24.08 | $30,000 | $30,000 |
| Fractional Ownership | 8210 | | 1,918 | 1 | 3bdrm | $23.46 | $45,000 | $45,000 |
| Total RCC Aspen | 12 | | 19,057 | 65 | | Average | $39,769 | $2,585,000 |

The value opinions in this report are qualified by certain assumptions, limiting conditions, certifications, and definitions, as well as the following extraordinary assumptions and hypothetical conditions, if any.

We gave sole weight to the Sales Comparison Approach because this mirrors the methodology used by purchasers of this property type.

We note that the retail values presented above are for the individual fractional interests. The Aggregate of the Retail Values is not a market value.

# EXTRAORDINARY ASSUMPTIONS

For a definition of Extraordinary Assumptions please see the Glossary of Terms & Definitions. The use of extraordinary assumptions, if any, might have affected the assignment results.



BEN PIERCE
BLEU FLORIDA LAND TRUST ASSOCIATION, INC.
DECEMBER 16, 2013
PAGE 3

CUSHMAN & WAKEFIELD WESTERN, INC.

This appraisal employs the extraordinary assumption that the subject properties are in very good condition.  At the request of the client, we have not inspected the subject units and have based our valuation on the information provided by the client.

## HYPOTHETICAL CONDITIONS

For a definition of Hypothetical Conditions please see the Glossary of Terms & Definitions. The use of hypothetical conditions, if any, might have affected the assignment results.

This appraisal does not employ any hypothetical conditions.

This letter is invalid as an opinion of value if detached from the report, which contains the text, exhibits, and Addenda.

Respectfully submitted,

**CUSHMAN & WAKEFIELD WESTERN, INC.**

John C. Vaughan
Senior Director
Temporary Practice Permit Certified
General Appraiser
Temporary Practice Permit
john.vaughan@cushwake.com
(808) 791-7872 Office Direct

Christopher T. Donaldson, MAI, CCIM
Managing Director
CO Certified General Appraiser
License No. CGA 1319868
chirs.donaldson@cushwake.com
1 (303) 813-6464    Office Direct
1 (435) 608-6375    Fax



## CLIENT SATISFACTION SURVEY

As part of our quality monitoring campaign, attached is a short survey pertaining to this appraisal report and the service that you received.  Would you please take a few minutes to complete the survey to help us identify the things you liked and did not like?

Each of your responses will be catalogued and reviewed by members of our national Quality Control Committee, and appropriate actions will be taken where necessary.  Your feedback is critical to our effort to continuously improve our service to you, and is sincerely appreciated.

To access the questionnaire, please click on the link here:

http://www.surveymonkey.com/s.aspx?sm=_2bZUxc1p1j1DWj6n_2fswh1KQ_3d_3d&c=13-38033-900043-003

The survey is hosted by Surveymonkey.com, an experienced survey software provider.  Alternatively, simply print out the survey attached in the Addenda of this report and fax it to (716) 852-0890.



# Summary of Salient Facts and Conclusions

| Client: | Bleu Florida Land Trust Association, Inc. |
|---|---|
| Intended Use: | To assist the Trustee of the Association and The Association in understanding the market value of the subject property. This report is not intended for any other use. |
| Intended User: | This appraisal report was prepared for the exclusive use of Bleu Florida Land Trust Association, Inc.. Use of this report by others is not intended by the appraiser. |
| Identification of Real Estate: | BFLT<br>75 Prospector Road<br>City and County of Aspen, Colorado 91611 |
| Current Use: | The subject properties are comprised of 65 rotating fractional interests in 12 residential units in the Ritz Carlton Club at Aspen Highlands. The following exhibit summarizes the subject units. |

| RCC ASPEN UNIT SUMMARY - ASPEN, COLORADO | | | | | |
|---|---|---|---|---|---|
| UNIT # | APN | FRACTIONS | BEDROOMS | SF | CALENDAR |
| 2205 | R019030 | 9 | 2 | 1,471 | Rotating |
| 2307 | R019041 | 9 | 3 | 1,610 | Rotating |
| 8103 | R017792 | 9 | 3 | 1,619 | Rotating |
| 2406 | R019048 | 8 | 2 | 1,319 | Rotating |
| 2203 | R019028 | 6 | 3 | 1,723 | Rotating |
| 4302 | R017780 | 5 | 3 | 1,819 | Rotating |
| 8403 | R018272 | 1 | 2 | 1,308 | Rotating |
| 2310 | R019044 | 9 | 3 | 1,663 | Rotating |
| 8406 | R018308 | 4 | 2 | 1,346 | Rotating |
| 4301 | R017768 | 3 | 3 | 2,015 | Rotating |
| 8405 | R018296 | 1 | 2 | 1,246 | Rotating |
| 8210 | R017852 | 1 | 3 | 1,918 | Rotating |
| TOTAL | 12 | | 65 | | |

RCC Aspen fractional interests are on a completely rotating calendar.



| | |
|---|---|
| Highest & Best Use (As if Vacant): | A residential building to the highest density allowed by current zoning regulations, as demand warrants. |
| Highest & Best Use (As Improved) | A residential development as currently improved. |
| Type of Value | Market Value (defined later in this report). |
| Real Property Interest Valued: | Fee Simple |
| Current Ownership: | HSBC Bank USA NA as Trustee for the Blue Florida Land Trust Association. |
| Sale History: | To the best of our knowledge, the property has not transferred within the past three years. |
| Current Disposition: | To the best of our knowledge, the property is not under contract of sale nor is it being marketed for sale. |
| Personal Property: | Personal property was excluded from our valuation. |
| Date of Inspection: | N/A – at the request of the client, we have not inspected the subject properties |
| Effective Date of Valuation: | |
| As Is: | December 02, 2013 |
| Date of Report: | December 16, 2013 |
| Extraordinary Assumptions: | This appraisal employs the extraordinary assumption that the subject properties are in very good condition.  At the request of the client, we have not inspected the subject units and have based our valuation on the information provided by the client. |
| Hypothetical Conditions: | This appraisal does not employ any hypothetical conditions. |

| RITZ CARLTON CLUB ASPEN HIGHLANDS | | | | | | | Aggregate of |
|---|---|---|---|---|---|---|---|
| | Unit No. | SF | Fractions | Bedrooms | S/SF | Retail Value | The Retail Values |
| Fractional Ownership | 2205 | 1,471 | 9 | 2bdrm | $23.79 | $35,000 | $315,000 |
| Fractional Ownership | 2307 | 1,610 | 9 | 3bdrm | $24.84 | $40,000 | $360,000 |
| Fractional Ownership | 8103 | 1,619 | 9 | 3bdrm | $24.71 | $40,000 | $360,000 |
| Fractional Ownership | 2406 | 1,319 | 8 | 2bdrm | $22.74 | $30,000 | $240,000 |
| Fractional Ownership | 2203 | 1,723 | 6 | 3bdrm | $26.12 | $45,000 | $270,000 |
| Fractional Ownership | 4302 | Penthouse | 1,819 | 5 | 3bdrm | $30.24 | $55,000 | $275,000 |
| Fractional Ownership | 8403 | 1,308 | 1 | 2bdrm | $22.94 | $30,000 | $30,000 |
| Fractional Ownership | 2310 | 1,663 | 9 | 3bdrm | $24.05 | $40,000 | $360,000 |
| Fractional Ownership | 8406 | 1,346 | 4 | 2bdrm | $22.29 | $30,000 | $120,000 |
| Fractional Ownership | 4301 | Penthouse | 2,015 | 3 | 3bdrm | $29.78 | $60,000 | $180,000 |
| Fractional Ownership | 8405 | 1,246 | 1 | 2bdrm | $24.08 | $30,000 | $30,000 |
| Fractional Ownership | 8210 | 1,918 | 1 | 3bdrm | $23.46 | $45,000 | $45,000 |
| Total RCC Aspen | 12 | 19,057 | 65 | | Average | $39,769 | $2,585,000 |

The Aggregate of the Retail Values is not a market value.  It is presented at the request of the client.



# Property Photographs







Entrance and signage



View of property from Aspen Highlands



Subject property pool area



Lobby Ritz Carlton Club Aspen Highlands



BFLT - ASPEN HOLDINGSPROPERTY PHOTOGRAPHS      X


Upper floor bedroom with view


Typical Living Room


Typical Dining Room


Typical Bathroom


Typical Living Room


Typical Kitchen



# TABLE OF CONTENTS

SUMMARY OF SALIENT FACTS AND CONCLUSIONS ———————————————————— V
PROPERTY PHOTOGRAPHS ————————————————————————————————— VII
SCOPE OF WORK———————————————————————————————————————— 1
    OVERVIEW ———————————————————————————————————————————— 1
    VALUATION PROCESS ————————————————————————————————————— 1
REGIONAL ANALYSIS————————————————————————————————————————— 2
PITKIN COUNTY REGIONAL ANALYSIS————————————————————————————— 3
    INTRODUCTION—————————————————————————————————————————— 3
    DEMOGRAPHIC TRENDS————————————————————————————————————— 3
    ECONOMIC TRENDS————————————————————————————————————————— 5
    CONCLUSION———————————————————————————————————————————— 9
    ASPEN HIGHLANDS ——————————————————————————————————————— 10
MARKET ANALYSIS—————————————————————————————————————————— 13
    CONCLUSION———————————————————————————————————————————— 19
PROPERTY ANALYSIS ———————————————————————————————————————— 21
    SITE DESCRIPTION————————————————————————————————————————— 21
    IMPROVEMENT DESCRIPTION————————————————————————————————— 21
    REAL PROPERTY TAXES AND ASSESSMENTS ————————————————————— 21
    ZONING———————————————————————————————————————————————— 22
HIGHEST AND BEST USE——————————————————————————————————————— 23
    VALUATION—————————————————————————————————————————————— 24
    RECONCILIATION AND FINAL VALUE OPINION ————————————————————— 27
    ASSUMPTIONS AND LIMITING CONDITIONS ————————————————————— 28
    CERTIFICATION OF APPRAISAL ——————————————————————————————— 30
ADDENDA CONTENTS ————————————————————————————————————————— 31

# Scope of Work

## OVERVIEW

This appraisal, presented in a summary report, is intended to comply with the reporting requirements outlined under the USPAP for a summary appraisal report.

Cushman & Wakefield Western, Inc. has an internal Quality Control Oversight Program. This Program mandates a "second read" of all appraisals. Assignments prepared and signed solely by designated members (MAIs) are read by another MAI who is not participating in the assignment. Assignments prepared, in whole or in part, by non-designated appraisers require MAI participation, Quality Control Oversight, and signature.

For this assignment, Quality Control Oversight was provided by Christopher T. Donaldson, MAI, CCIM. In addition to a qualitative assessment of the appraisal report, Christopher T. Donaldson, MAI, CCIM is a signatory to the appraisal report and concurs in the value estimates set forth herein.

Completing the assignment required collecting primary and secondary data relevant to the subject property. Improved sales were researched in the subject's market, and the input of buyers, sellers, and brokers were considered.

A physical inspection of the property was not made, at the request of the client. The general regional economy as well as the specifics of the subject's local area was investigated. The data have been analyzed and confirmed with sources believed to be reliable, leading to the value conclusions in this report.

## VALUATION PROCESS

There are three generally accepted approaches to developing an opinion of value: Cost, Sales Comparison and Income Capitalization. We considered each in this appraisal to develop an opinion of the market value of the subject property. In appraisal practice, an approach to value is included or eliminated based on its applicability to the property type being valued and the quality of information available. The reliability of each approach depends on the availability and comparability of market data as well as the motivation and thinking of purchasers.

This appraisal employs only the Sales Comparison Approach. Based on our analysis and knowledge of the subject property type and relevant investor profiles, it is our opinion that this approach would be considered necessary and applicable for market participants. Typical purchasers do not generally rely on the Cost or Income Capitalization Approaches when purchasing a property such as the subject of this report. Therefore, we have not employed the Cost Approach or the Income Capitalization Approach to develop an opinion of market value. The absence of these approaches does not diminish the reliability of the analysis. .



# Regional Analysis





# Pitkin County Regional Analysis

## INTRODUCTION

### MARKET DEFINITION

Located in east-central Colorado, Pitkin County encompasses 971 square miles and contained an estimated 17,263 residents in 2012 according to the U.S. Census Bureau. The county seat and principal city of the region with 6,680 residents in 2012 is Aspen, which contains approximately 38.7 percent of the total county population. Aspen is located along Colorado State Highway 82 and is 129 miles east of Grand Junction, the largest city in western Colorado, and 159 miles southwest of Denver, the largest city in the state.

### CURRENT TRENDS

The recovery of Pitkin County generally improved over the first months of 2013. Employment in the county increased 3.1 percent on an annual basis in April 2013, compared to 2.2 percent statewide and 1.2 percent nationally over the same period of time. Unemployment in Pitkin County decreased 120 basis points to 5.3 percent in the twelve months ending in April 2013, despite an increase of 1.8 percent of the local labor force. Tourism is a primary driver of growth in Pitkin County, and the county experienced a relatively severe downturn during the past recession due to the lack of additional growth drivers outside of tourism. Pitkin County will likely maintain more volatile growth than Colorado going forward due to the county's dependence on tourism, but overall growth prospects will benefit from the county's well educated workforce and above average household income levels.

Additional considerations are as follows:

- The skiing industry in Pitkin County emerged with the establishment of the Aspen Skiing Corporation in 1946, which was followed by the development of three additional ski areas, Buttermilk (1958), Aspen Highlands (1958), and Snowmass (1969). The local economy remains heavily weighted towards the Leisure & Hospitality industry, with over one-third of the total workforce employed within the sector in 2013 according to Moody's Economy.com.
- Advanced educational attainment in Pitkin County is supported by a branch of the Colorado Mountain College system in Aspen.

## DEMOGRAPHIC TRENDS

### DEMOGRAPHIC CHARACTERISTICS

The demographic characteristics of Pitkin County are stronger than statewide and national demographic levels. Although the median age of residents in the county is higher than the rest of Colorado and the U.S., local residents are much more likely to have graduated from a four-year college. The well educated workforce corresponds with above average household income levels, and should support stable growth prospects in Pitkin County over the long-term.

Additional considerations are as follows:

- With a median age of 43.4 years, residents in Pitkin County are several years older than the statewide median age of 36.6 years and the national median age of 37.5 years.
- At least 59.6 percent of residents in Pitkin County hold a bachelor's or advanced college degree, compared to 36.3 percent of adults statewide and 28.1 percent of adults nationally.



- At least 42.7 percent of households in Pitkin County earn more than $75,000 annually, compared to 34.4 percent of households statewide and 31.2 percent of households nationally.

Demographic characteristics of Pitkin County are summarized in the following chart:

| Demographic Characteristics Pitkin County vs. Colorado and U.S. 2013 Estimates | | | |
|---|---|---|---|
| Characteristic | Pitkin Co. | Colorado | U.S. |
| Median Age (years) | 43.4 | 36.6 | 37.5 |
| Average Annual Household Income | $112,171 | $73,462 | $69,636 |
| Median Annual Household Income | $62,205 | $53,558 | $49,231 |
| *Households by Annual Income Level:* | | | |
| <$25,000 | 16.5% | 22.5% | 25.4% |
| $25,000 to $49,999 | 24.8% | 24.5% | 25.3% |
| $50,000 to $74,999 | 16.0% | 18.6% | 18.1% |
| $75,000 to $99,999 | 10.8% | 12.6% | 11.7% |
| $100,000 plus | 31.9% | 21.8% | 19.5% |
| *Education Breakdown:* | | | |
| < High School | 3.9% | 10.4% | 14.6% |
| High School Graduate | 11.0% | 22.8% | 28.4% |
| College < Bachelor Degree | 25.4% | 30.5% | 28.9% |
| Bachelor Degree | 42.2% | 23.3% | 17.7% |
| Advanced Degree | 17.4% | 13.0% | 10.4% |

Source: Claritas, Inc., Cushman & Wakefield Analytics

## POPULATION

Pitkin County maintained more volatile population growth trends than Colorado and the U.S. between 2003 and 2012. Growth in the county generally increased between 2003 and 2008, reaching a ten-year high of 4.1 percent in 2008. Population growth in Pitkin County declined over the following three years to a low of negative 0.2 percent in 2011 however, due in part to declining in-migration of retirees. Pitkin County is expected to maintain stable population growth in-line with the rest of Colorado in the near-term, but will likely fall behind national population growth over the long-term due to the county's dependence on tourism and lack of high growth industries.

Additional considerations are as follows:

- Population growth in Pitkin County averaged 1.4 percent between 2003 and 2012, 10 basis points lower than statewide growth of 1.5 percent annually, but 50 basis points above national growth of 0.9 percent over the same period of time.
- Pitkin County and the U.S. are projected to average annual population growth of 1.0 percent between 2013 and 2017, compared to 1.3 percent annually in Colorado.



Population growth trends in Pitkin County are summarized in the following graph:



Source: Data Courtesy of Moody's Economy.com

# ECONOMIC TRENDS

## GROSS METRO PRODUCT

Pitkin County maintained relatively volatile Gross Metro Product (GMP) growth between 2003 and 2012. Growth in the county fluctuated from negative 6.5 percent in 2003 to a ten year high of 11.2 percent in 2005, more than twice as high as growth in Colorado and the U.S. in the same year. Although Pitkin County outpaced statewide and national growth in 2008 as economic conditions began to deteriorate, the county experienced relatively higher negative growth over the following two years. The recovery of Pitkin County continued to struggle to regain momentum in 2011, but recent estimates provided by Moody's Economy.com indicate that regional growth exceeded Colorado and the U.S. once again in 2012. Growth in Pitkin County is expected to remain above average in the near-term, but long-term growth prospects will likely remain prone to volatility due to the county's low industrial diversity and lack of high growth drivers.

Additional considerations are as follows:

- Gross Metro Product (GMP) growth in Pitkin County averaged 1.1 percent annually between 2003 and 2012, 50 basis points lower than annual growth in Colorado of 1.6 percent and 60 basis points below growth of 1.7 percent nationally over the same period of time.

- Growth in Pitkin County is forecast to average 4.6 percent annually between 2013 and 2017, compared to annual growth in Colorado and the U.S. of 3.5 percent and 3.1 percent annually, respectively.



Gross Metro Product growth trends in Pitkin County are summarized in the following graph:



Source: Data Courtesy of Moody's Economy.com

## EMPLOYMENT DISTRIBUTION

Industrial diversity in Pitkin County is relatively low, and employment in the county is heavily weighted towards tourism. Over a third of the workforce in Pitkin County is employed in the Leisure & Hospitality industry, and the local Financial Activities and Professional & Business Services industries exceed their respective statewide proportions as well. The county contains a relatively smaller proportion of employment in goods producing industries and the public sector, and long-term growth in Pitkin County will likely remain prone to volatility due to the county's reliance on tourism.

Additional considerations are as follows:

- The largest employment sector in Pitkin County is Leisure & Hospitality, which comprises 35.7 percent of the regional workforce. In comparison, Leisure & Hospitality accounts for 12.2 percent of statewide employment.
- Employment in Natural Resources & Mining increased at the greatest annual rate over the past decade, at 8.0 percent between 2003 and 2012. The Manufacturing industry declined at the greatest annual rate over the same period time, at negative 6.6 percent annually.



Employment concentration by sector in Pitkin County is summarized in the following graph:



Source: Data Courtesy of Moody's Economy.com

## EMPLOYMENT GROWTH

Employment growth in Pitkin County was characterized by volatility between 2003 and 2012. The county maintained above average employment growth relative to Colorado and the U.S. between 2004 and 2006, and was initially more resistant to deteriorating economic conditions in 2008. Over the following two years however, employment in Pitkin County declined at a relatively higher rate than Colorado or the U.S., due in part to the county's exposure to tourism. The recovery of Pitkin County struggled to keep pace with statewide improvements in 2011, although recent estimates provided by Moody's Economy.com indicate that the county slightly exceeded employment growth in Colorado and the U.S. in 2012. Pitkin County is expected to maintain employment growth in-line with statewide growth in the near-term, but will likely remain prone to volatility over the long-term due to the county's dependence on tourism.

Additional considerations are as follows:

- Employment in Pitkin County in April 2013 decreased 8.8 percent from regional employment over the previous month, but increased 3.1 percent from employment levels in April 2012 according to the Colorado Department of Labor and Employment. In comparison, statewide employment increased 0.8 percent over the past month and 2.2 percent from employment in April 2012.

- Pitkin County averaged annual employment growth of negative 0.4 percent between 2003 and 2012, 100 basis points lower than annual statewide employment growth of 0.6 percent and 70 basis points below employment growth of 0.3 percent nationally over the same period of time.

- Annual employment growth is projected to average 2.8 percent in Pitkin County between 2013 and 2017, compared to expected employment growth of 2.6 percent statewide and 1.9 percent nationally.



Employment growth in Pitkin County is summarized in the following graph:



Source: Data Courtesy of Moody's Economy.com

## UNEMPLOYMENT

Pitkin County generally maintained below average unemployment levels relative to Colorado and the U.S. between 2003 and 2012. Unemployment in the county reached a cyclical low of 2.7 percent in 2007, compared to 3.8 percent statewide and 4.6 percent nationally over the same period of time. Although deteriorating economic conditions contributed to elevated unemployment levels in Pitkin County over the following five years, Pitkin County remained below statewide and national unemployment throughout the past recession. Unemployment in Pitkin County is expected to continue to improve through 2017, and will likely remain below national jobless levels over the long-term.

Additional considerations are as follows:

- Unemployment in Pitkin County increased 50 basis points over the past month to reach 5.3 percent in April 2013, a decline of 120 basis points from unemployment in April 2012 of 6.5 percent according to the Colorado Department of Labor and Employment. Unemployment levels in the county are 150 basis points lower than the statewide unemployment rate of 6.8 percent in April 2013 and 180 basis points below the national unemployment rate of 7.1 percent over the same period of time.
- Annual unemployment in Pitkin County averaged 5.4 percent between 2003 and 2012, 90 basis points lower than average annual unemployment in Colorado of 6.3 percent and 140 basis points below average unemployment of 6.8 percent nationally.
- Pitkin County is projected to average unemployment of 4.9 percent between 2013 and 2017, compared to average unemployment of 5.6 percent statewide and 6.4 percent across the nation.



Unemployment trends in Pitkin County are summarized in the following graph:



**Unemployment Rate By Year**
**Pitkin County vs. Colorado and U.S.**
**2003 - 2017**

Source: Data Courtesy of Moody's Economy.com

## CONCLUSION

Pitkin County will likely maintain below average growth relative to Colorado and the U.S. over the remainder of 2013. Although the county benefits from strong demographic characteristics and a healthy tourism industry, Pitkin County's low industrial diversity and lack of growth drivers outside of tourism will contribute to more volatile growth relative to Colorado and the U.S. going forward. In spite of this, Pitkin County will likely maintain a stable labor force and below average unemployment relative to statewide and national levels over the long-term.



# ASPEN HIGHLANDS

Aspen Highlands is one of four resort areas in the Aspen area and is located three miles west of the town of Aspen.  It was founded in 1958 by Aspen legend Whip Jones. In 1993 Jones donated it to his Alma Mater, Harvard University. Harvard sold the resort to Houston, Texas developer Gerald D. Hines for $18.3 million. Subsequently, Aspen Highlands became part of the Aspen Skiing Company.

The Aspen Highlands ski area is most famous for its Highland Bowl which was completely opened in 2002. Rolling wide beginner and intermediate trails through thick lodgepole pine forest constitute most of the mid-to-lower mountain terrain. The bottom of the mountain is dominated by the Thunderbowl, an expansive steep intermediate run that hosts most of the ski competitions on the mountain. The lower mountain also has challenging expert runs that are served by the Exhibition and Thunderbowl lifts.

The Mid-Mountain area is anchored by the Merry-Go-Round restaurant, with a large, south-facing deck. The Merry-Go-Round also serves as the hub of the major chairlifts on mountain. The Cloud Nine lift serves primarily intermediate and difficult runs on the mid-mountain as well as Scarlett's, a notorious mogul run. The summit of Cloud Nine lift is the location of Cloud Nine Bistro, offering the best on-mountain dining of the Aspen ski areas and views of the Maroon Bells.  The upper mountain is served by the Loge Peak high speed quad accessed at the Merry-Go-Round. The alpine summit affords views of the Maroon Bells, Pyramid Peak, and Hayden Mountain.

Since 2002, the Highland Bowl has been the crown jewel of Aspen Highlands. Most of the terrain is accessed only by hiking from the top of Loge Peak. Prior to the construction of the Deep Temerity lift in 2005, a run down the Highland Bowl required then taking the Grand Traverse, a long, flat catwalk, to get back to the Loge Peak lift. The Highland Bowl also offers access from the summit into the steep and highly avalanche prone backcountry Five Fingers Bowl.

In 2005, a fixed grip triple lift "Deep Temerity" was installed at a cost of $2.7 million, which eliminated the lengthy hike out from the bottom of the Highland Bowl, the Temerity glades, and Steeplechase. 180 acres of new terrain were opened by the Deep Temerity lift, with the potential for 270 acres of new terrain, giving Aspen over 1,000 skiable acres.

The Aspen Highlands ski area trail map is presented on the following page.





After acquiring the Aspen Highlands ski resort from founder Whip Jones at the beginning of the 1993-94 season. Hines arranged a merger with Aspen Skiing Company, and then went on to demolish the original base village and develop a modern mix of timeshares, luxury homes and affordable housing along with commercial uses. Completed in 2001, the Aspen Highlands Village mixed-use development includes 36,000 square feet of retail space, 31 residential lots, 32 townhomes, 73 lodge condominiums, a pedestrian mall, and 12,000 square feet of skier facilities. Aspen Highlands Village was master planned by the architectural firm of Robert A.M. Stern Architects LLP.

The residential component at Aspen Highlands included the Ritz Carlton Club where the subject units are located. This 73 condominium unit development has been modeled on a luxury fractional ownership platform offering 1/12 interests, with three fixed weeks and one floating week.  In addition to the Ritz Carlton Club, the Aspen Highlands



Village includes 32 ski-in/ski-out townhomes and 31 single-family homesites, as well as 112 community-housing units.

In 2007, Hines, along with its partner in Hines Highlands Limited Partnership, Bell Mountain Partners, which also owns Aspen Skiing Company, sold their commercial component of Aspen Highlands Village to Eastwood

Overall, Aspen is a desirable destination ski resort and the subject units benefit from their location in a luxury development at the base of Aspen Highlands ski area.  This area supports a wide array of luxury residential developments and the outlook is for continued improvement in the local economy and rising real estate values.

The subject properties are located in the Ritz Carlton Club at Aspen Highlands, at the base of the Aspen Highlands ski area about three miles west of the town of Aspen.  This is a periphery location that does not have the critical mass of support services and amenities on the level of the Town of Aspen. As will be discussed in the following Market Analysis section, the conversion of the Ritz Carlton Club to a points system affiliated with the Marriott Vacation Club, has resulted in a significant decline in demand for fractional interests at the Ritz Carlton Club Aspen Highlands.



# Market Analysis

## FRACTIONAL MARKET ANALYSIS

Fractional ownership is a product that allows consumers to own flexible vacation time use and benefits without having to purchase a second home. Fractional ownership in the timeshare industry evolved from a single week use right to owning two to four weeks of time allowing owners to transfer use to guests and family as well as give themselves plenty of time for vacationing in any given year.

## PRODUCT PROFILE

Statistically, second home owners use less than five weeks a year after the first few years of ownership, but have 52 weeks a year of responsibility for long distance property management, liability, and expense. For many, whole ownership is becoming less appealing in a society that suffers from "time poverty." The well-educated affluent baby boomer is typically more concerned about time than money and demands services over savings. This market is less price-sensitive than others as long as time is preserved by conveniences and services, and quality is not spared. The quality offered by many of these fractional resorts have positioned them to compete with the overall "experience" provided by a top tier luxury hotel.

Fractional ownership and the Private Residence Club (PRC) model became popular development models during the past cycle.  These concepts were employed by resort developers possessing prime real estate parcels in exclusive communities with high barriers to residential development. A form of fee fractional sharing, the PRC differs from conventional interval ownership by offering a truly private "second home alternative" product. The number of intervals per unit is substantially less, ranging from seven to ten owners, and cost per interval rivals that of a primary, suburban residence. Until recently, exchange privileges were not available, ensuring owner occupancy and a higher standard of use. A number of private residence clubs have been developed in mountain resort communities such as Aspen, Telluride and Vail, Colorado and Deer Valley in Park City, Utah. In addition to ski resorts, other popular fractional product destinations include golf and beach resorts where real estate prices are very high.

Some organizations in the vacation ownership industry still use the terms high-end fractional and PRC interchangeably when, in fact, they are different products for different consumers. A high-end fractional product can be easily integrated into a multi-use development that includes a hotel, timeshare, condominium ownership, etc. In some cases a high-end fractional product will affiliate with one of the exchange companies that traditionally facilitate timeshare exchanges to offer a value added utilization benefit to their owners who want to travel elsewhere using their ownership. A PRC truly is a luxury residence with furniture, fixtures and equipment that would be found in an upscale property. Many prospects for this product typically have their own service personnel at their primary residence, have their own private transportation, including air transport, and have multiple vacation residences or accommodations throughout the country or the world to visit. This market does not want to be a part of a multi-use community. They want to be surrounded by the same people they would see in other luxury destinations. They can easily afford multiple residences full time but see a value in not having to manage the maintenance efforts for a shorter length of stay in each home.

The following characteristics distinguish high-end fractional and/or PRC buyers from traditional timeshare purchasers.

- Fractional buyer is a repeat visitor to the area, more than once a year.

- While mass marketing is the method used for traditional timeshare, fractional sales are more relationship based.



- Fractional purchases include extensive amenities and services, more typical of a luxury hotel, with significant added association costs.

- Fractional buyers who are often capable of affording a wholly owned vacation home, cannot justify the investment due to their lack of use.

- Buyers of PRC's are at the highest end of the market, with incomes often in excess of $250,000.

The fractional ownership product has changed the landscape of interval sales as they were previously known. Interval ownership started in the United States in the 'early 1970s with single intervals being sold with a timesharing concept. "Timeshare" can be defined as "divided interest among many people with rights for each to occupy a unit for a contracted period of time". In this respect, fractional ownership products are no different than timeshare products. Timesharing was born out of an awareness that people wanted to visit certain destinations repeatedly without having to purchase a second home or stay in a hotel room for extended stays with their families. The first timeshare product was a "fixed" unit, "fixed" week usage concept, which meant that the buyer stayed in the same unit that they purchased for the same week each year. The product has evolved over the years to include "floating" units and usage periods, the sale of points either backed by deeded real estate or sold as a "lease" membership which is determined by local regulation, and the sale of multi-week packages, or "fractions" of interval ownership. These fractional packages are generally one-tenth or one-quarter deeded interest.

The fractional ownership product was born of the same awareness that the timeshare offering was built on, for a very different demographic market. Fractional ownership pioneers recognized that a large number of their clientele owned multiple residences with an average stay of four weeks a year in all but their primary residence. These prospects also spend several hundred thousand dollars a year on multiple golf memberships at the best clubs in the country. Golf club memberships that allow members to receive reciprocal privileges between clubs owned by different entities became a product created by this demand. Golf clubs that included even a small lodging component became popular and created a way for members to visit for extended periods of time without purchasing another residence. What seemed to be missing for these members was the sense of community that they felt and created in residential projects situated within a multi-use golf club project during the weeks that they resided there each year with their families. The first developers of fractional ownership projects recognized the need for divided occupancy in a single dwelling that is developed and designed like a luxury second home with the inclusion of the country club benefits that this market requires. This is a major distinction from the timeshare product.

Other variations between timeshare resorts and fractional ownership resorts include the resort service offering and the exchange service benefits. With respect to resort service offerings, the average timeshare resort features limited property amenities such as pools and/or whirlpools, fitness center, and a sundry shop. With the recent entry of the major hotel chains into the timeshare industry we are seeing enhanced service offerings including spas, restaurants, tennis courts, and golf courses, among others; however, this is still rare for the timeshare industry at large. On the other hand, fractional ownership resorts maintain a staff similar to that of a luxury hotel and features extensive property amenities such as full-service restaurant pools and whirlpools; fitness center and spa facilities; direct access to beach and/or ski-in/ski-out; concierge services; valet/shuttle services; and daily maid service, among others.

With respect to exchange service benefits, traditional timeshare resort developments evolved from home resort usage once a year, to depositing your week with an exchange company in trade for a week at another member's home resort elsewhere in the world. This has become big business with two large exchange companies accommodating the majority of the exchange demand today, Resort Condominiums International (RCI) and



Interval International (II). Each of these companies generates over $1 billion dollars a year performing exchanges for the timeshare industry. Conversely, it is not a valuable benefit to high-end fractional ownership and/or PRC developers to be affiliated with these exchange companies as the majority of the properties available for exchange are not equal in design, quality and amenity offering with the properties in the exchange pool and would not be well received by the high-end fractional ownership and/or PRC clientele.

The industry has seen the demand in the high-end fractional ownership and/or PRC market and has implemented a five-star affiliation and exchange segment that allows fractional ownership developers to affiliate with them and offers their members an opportunity to exchange guaranteeing that they will be confirmed and accommodated into five-star resorts solely. RCI created a subsidiary called Global Registry, LLC which has recently formed an alliance with Abercrombie & Kent, Inc. to announce the launch of a new company called Abercrombie & Kent Registry which allows owners of fractional ownership/PRC properties to exchange their time with other members who own similar property. Clubs participating in this system also receive a personal concierge service by Abercrombie & Kent Registry to confirm other travel arrangements.

For those fractional ownership developers who wish to operate independently, there are reciprocal relationships being initiated with similar resort properties offering the same product to accommodate the members that would like to travel outside of their home resort for usage any year. Lastly, there are developers that wish to create a real community with their fractional ownership products and will not offer exchange to sister properties. Their desire is to have the same families back year after year and create lifelong relationships with the property acting as the catalyst for that. Occupancy levels are more consistent and are higher where there is an exchange benefit available; however, most fractional ownership developers don't care if occupancy is low as long as the integrity of the product and the service levels are not compromised for owners who visit.

## FRACTIONAL CATEGORIES

The following categories of product have emerged in the fractional industry. Different price tiers of fractional interest product exist, based on aggregate selling price per square foot of living unit or ownership type.

- Traditional Fractional Interest: Product selling for less than $1,000 per square foot. These are usually resort homes or condominiums of average to good quality, in regional resort areas, with typical resort amenities and services. Often characterized as at the "three to four star" level of quality.

- Private Residence Clubs (PRCs): Product selling for $1,000 or more per square foot. These represent the pinnacle of quality -- not just among fractional interests but in comparison with virtually any resort accommodations available - due to a combination of locations in the top tier of resort destinations on prime sites, extraordinary architecture and design, and the highest levels of services and amenities. "Five star" quality in every way. This product type has emerged into its own industry in the past five to ten years.

- Destination Clubs (DC's): differ from the above three types in that they are based on selling deeded real estate in a particular resort home or development while Destination Clubs involve selling memberships in an equity or non-equity club. Membership allows access to a network of resort homes in a variety of locations. Typically the concept allows for the refund of the membership when members leave the club.

## SALES VOLUME

The fractional industry has suffered significant declines in sales volume over the past several years consistent with other housing related real estate. Sales for all of the product types declined 76.9 percent during the recession. The drop in sales volume for Private Residence Clubs was more pronounced than the other two categories. The large expansion during 2004 was the result of numerous projects in many market areas coming



on line at the beginning of the run up in resort real estate. Sales volume increases continued through 2007 and began to decline in 2008 as the recession took hold. While the housing market began to stabilize in 2012 and recover in 2013, the fractional industry continues to see downward pressure on pricing and weak demand.

## PRODUCT CHARACTERISTICS

The fractional interest product is generally offered in smaller types of projects with less than 50 units. The overall average size is 47 units.  The average unit size in the industry declined toward the end of the past cycle, with the overall average unit size in 2010 at ±1,535 square feet representing a decline from ±1,550 square feet in 2009, ±1,615 square feet in 2008 and ±1,745 square feet in 2007. Unit mix in 2010 indicates 24.6 percent of the units are studio and one bedroom, 39.4 percent are two bedrooms, and 36.0 percent are three and four bedroom units. Private residence club units tend to be slightly larger than fractional interest projects by approximately 20 square feet.

The size of the shares offered for sale generally ranges from ¼ share to 1/12 shares. The largest share segment is the 1/8th share offering which represents 26.9 percent of the total product with 1/12 shares at 21.2 percent followed by ¼ shares at 19.2 percent.

The majority of fractional interest resorts are in ski destinations. Beach locations are second most common. Golf locations, urban locations, and clubs selling either memberships or deeded ownership in single-family homes in various locations make up the remainder.

The most common reservation method for fractional ownership is the rotating calendar system (weeks assigned each owner change on pre-determined basis). The subject's fractional interests are all structured on the rotating calendar system.  Another common reservation method is the rotating priority system (owners select their choice of week based on rotating priority). This is the most common reservation method for private residence clubs. For fractional ownership, the rotating priority system for reservations the second most common reservation system.

Annual maintenance fees vary significantly by unit size, resort features, and other characteristics.  The subject's maintenance fees, at over $20,000 per interest, include real estate taxes, but are very high by industry standards, and have a negative impact on the marketability of the fractional interests at the property.

## PRICING

There is a significant disconnect between developer release prices and resale prices in this segment of the real estate market.  This is attributed to several factors, ranging from changes to the specific property and ownership model, to seller motivations.

## PURCHASING PROCESS

High-end fractional and private residence club owners purchase primarily for the certainty of quality accommodations, location, and quality compared to other options of a similar price.  Traditional fractional interest owners also purchase for the certainty of quality accommodations (86 percent) and location (84 percent), but are much more motivated by the opportunity to exchange with other resorts (74 percent).

## CONSUMER CHARACTERISTICS

The primary distinguishing characteristic of high-end fractional and private residence club owners are their high household incomes, at a median of approximately $250,000. Traditional fractional interest owners are also relatively affluent, with a median income over $100,000. Aside from this, both groups tend to be middle-aged, married-couple homeowners with no children living at home.



## ASPEN FRACTIONAL MARKET

The fractional ownership market in Aspen was thriving in the big market years of 2004 through 2007, and even early 2008. However this market fell off significantly with the downturn in the market and has yet to recover in terms of sales volume and pricing. Following is a brief description of the competitive fractional projects in the Aspen market.

**Residences at Little Nell** is regarded as the top of the market for private residence clubs in Aspen due to its location, quality of product and services, and brand name. The club has 26 three- and four-bedroom condo units (208 shares). The project is managed and affiliated with the adjacent Little Nell Hotel, which is the only five-star hotel in Aspen. Residences are being sold in 1/8th shares, and each member receives a minimum of four weeks of planned vacation weeks and one week during the Summer and Winter season.  Construction on the project was completed in December 2008. The property is located at the base of the Little Nell Chairlift and the Silver Queen gondola.

**St. Regis Residence Club** is another luxury branded private residence club and is at the high end of the market due to its location, quality of product and services, and brand name affiliation. The club is part of a St. Regis Hotel (previously a Ritz-Carlton Hotel), which converted 90 hotel rooms into 25 two- and three-bedroom condo units. Residences are being sold in 1/11th shares, and each member receives three guaranteed weeks usage per year plus space available time. The project was completed in December 2004. Although not located directly on the slopes, it does have a prime location in the heart of downtown with good proximity to skiing on Aspen Mountain. The property sold out in 2008 at membership pricing at St. Regis for the Premier Program averaging $475,000 for all unit and membership types.

The **Hyatt Grand Aspen** is a four-star fractional property one block from the ski lifts, between the St. Regis and the Residences at Little Nell. This project is more reminiscent of timeshare than a private residence club with regards to fraction size and price. The Hyatt Grand Aspen offers 50 units in 1/20th fixed intervals. The club opened in December 2005. The scope of this project and the physical product are significantly different from the subject.

Other shared ownership projects (i.e. timeshare and fractional ownership) also located in the Aspen area but are not regarded as competitive due to inferior quality levels and locations and/or different market orientation.

**The Innsbruck** in downtown Aspen at 233 West Main Street. The project has 17 furnished one and two-bedroom residences offered with a deeded 1/12 interest.  Guaranteed four weeks are provided.   This is a renovation/conversion project which was completed in late 2006. Unit sizes are 540-700 square feet for the one-bedrooms and 1,120 square feet for the two-bedroom units.

**The Roaring Fork Club** located in Basalt, approximately 20 miles north of Aspen, is a golf-oriented project and opened in 1999. It features a championship Jack Nicklaus golf course, and is also well known for its excellent fly-fishing. The project was built on 282 acres, making it a low-density development with generous privacy. The property offers a scenic and secluded setting including streams and woods. The residences are exceptionally well designed and constructed freestanding cabins which represent a substantially different product type than the subject.

**The Timbers** is a well established Private Residence Club in Snowmass which has been sold out for many years. Unit sizes vary but average around 2,000 square feet.



CUSHMAN II 000597

## SUBJECT PROPERTIES

The subject properties are comprised of 65 rotating fractional interests in 12 residential units in the Ritz Carlton Club at Aspen Highlands. The exhibit below summarizes the subject properties.

| UNIT # | APN | FRACTIONS | BEDROOMS | SF | CALENDAR |
|---|---|---|---|---|---|
| 2205 | R019030 | 9 | 2 | 1,471 | Rotating |
| 2307 | R019041 | 9 | 3 | 1,610 | Rotating |
| 8103 | R017792 | 9 | 3 | 1,619 | Rotating |
| 2406 | R019048 | 8 | 2 | 1,319 | Rotating |
| 2203 | R019028 | 6 | 3 | 1,723 | Rotating |
| 4302 | R017780 | 5 | 3 | 1,819 | Rotating |
| 8403 | R018272 | 1 | 2 | 1,308 | Rotating |
| 2310 | R019044 | 9 | 3 | 1,663 | Rotating |
| 8406 | R018308 | 4 | 2 | 1,346 | Rotating |
| 4301 | R017768 | 3 | 3 | 2,015 | Rotating |
| 8405 | R018296 | 1 | 2 | 1,246 | Rotating |
| 8210 | R017852 | 1 | 3 | 1,918 | Rotating |
| TOTAL 12 | | 65 | | | |

RCC Aspen fractional interests are on a completely rotating calendar.

## THE RITZ CARLTON CLUB ASPEN HIGHLANDS

The subject properties are located in the Ritz Carlton Club Aspen Highlands, a 73 unit condominium development that was marketed as a luxury fractional interest development, with 1/12th interests operating on both a fixed calendar or rotating calendar.  The subject units are all rotating interests, with two ski weeks, one summer week and one floating week.  The subject units are part of the Fractional inventory that was not sold by the developer.  They were transferred to the Blue Florida Land Trust Association, which reportedly still holds title to the subject interests.

The Ritz Carlton Club Aspen Highlands was completed in 2001 as part of the Aspen Highlands Village development, a mixed-use development that included retail, restaurants, townhomes, community housing, single-family homes and skier facilities. The Aspen Highlands ski area was acquired by Hines from founder Whip Jones at the beginning of the 1993-94 season. Hines immediately arranged a merger with the Skico, and then went on to demolish the aging base village and redevelop the area with a mix of timeshares, luxury homes and affordable housing along with commercial uses.

Demand for fractional interests at the Ritz Carlton Club – Aspen Highlands was very good when the development was released for sale, resulting in absorption of 9.7 interests per month.  Marketing of the fractional interests was reduced after 93 percent of the 875 interests were sold.  Pricing was reported in the $125,000 to $250,000 range during the primary marketing period.  Subsequent to the sell out of this development, the Ritz Carlton Club was converted to a points system, discussed in the following paragraph.  This conversion has had a severely negative impact on demand for fractional interests at Ritz Carlton Club properties and the subject development in particular.



## THE RITZ CARLTON CLUB

The Ritz Carlton Club was originally structured as a members-only, luxury vacation timeshare club for affluent travelers. It was subsequently modified to provide two equity-based membership options; the Portfolio Membership, offering options to visit different locations each trip, and the Home Club Membership, whereby members go to the same location year after year. This was a major conversion that had a significant impact on existing owners of Ritz Carlton Club fractional interests

The current structure allows owners to enroll through the purchase of a beneficial interest in a trust that holds title to real estate. Because each interest is deeded, it is equity ownership; however, owners have the ability to customize their vacations through a points-based currency system.

**Ritz Carlton Club Vacation Club Points**

- Owners receive an annual allotment of Vacation Club Points to book vacations with personalized assistance.

- The number of Vacation Club Points needed to book a vacation varies based on choices: length of stay, resort, season and accommodation size.

- Vacation Club Points may be used to book vacations at any of the Ritz-Carlton Club locations, plus more than 50 resorts from the Marriott Vacation Club Collection.

- Vacation Club Points may also be used to book vacations for stay at The Ritz-Carlton and Marriott hotels from The Hotel Collection as well as specialty travel options from the Explorer Collection.

- The Destination Club allows you to purchase points to vacation as little or as often as you wish to all of the Ritz-Carlton Club locations along with 70 Ritz-Carton Hotels worldwide, with annual fee's that are lower than a home club membership. The Ritz-Carlton Destination Club offers a menu on how many bedrooms you need and when you want to vacation including holiday and prime weeks visits.

## REPURCUSSIONS OF CONVERSION TO POINTS SYSTEM

While providing greater flexibility to owners, the conversion to a points system has been perceived by existing fractional owners as diluting the exclusivity of the Ritz Carlton Club by opening specific resorts to the Marriott Vacation Club.  Conversely, the Marriott Vacation Club is now perceived in the marketplace as providing an excellent opportunity to access the luxury product offered by the Ritz Carlton Club properties.

Specific repercussions have included litigation by owners of properties at specific Ritz Carlton Clubs and most notably, the changing of the Ritz Carlton Club at Bachelor Gulch in Vail to a Timbers Resort.

Overall, the conversion to a points system and the integration of the Marriott Vacation Club has had a negative impact on the market value of existing fractional interests in the Ritz Carlton Club.  The impact to whole ownership units at the Ritz Carlton Club has also been negative, but not of the same magnitude as that experienced by the fractional interests.

## CONCLUSION

The Shared-Ownership, or fractional interest industry experienced the same trends as other residential real estate during the recession, but the negative dynamics of the credit crisis were exacerbated by the non-essential nature of this product type.  Sale volume decreased dramatically and many properties became distressed. Most



developers did not anticipate the poor sales performance that occurred in 2010, as households continued to repair and rebuild balance sheets and shed non-essential expenses.

There were some analysts that projected a comeback for the fractional industry due to the shift in market perceptions related to large second homes and their cost versus the more economical and trouble free form of ownership offered by fractional product.

In our opinion, the fractional industry is facing a longer time line for recovery than the whole ownership product in resort areas.  This is due to the opportunities for well capitalized buyers in distressed markets to purchase whole ownership properties at significant discounts. The fractional market is not likely to experience upward pressure on pricing until the excess inventory of whole ownership product has been absorbed.

The subject property is located in a market where demand for residential product is very strong, yet demand for the Fractional interests remains constrained.  An example of this is provided by the recent sale of a whole ownership penthouse condominium at the subject development for just under $8,000,000.  Conversely, a recent Fractional interest at the property sold for $24,000.

The subject units include the remaining fractional ownership shares in units in which the prime ski weeks are already sold.  The annual maintenance fees are ±$15,000 per interval.  In addition to the maintenance fees, owners are responsible for real estate taxes.

The subject's fractional ownership, combined with the high maintenance costs and real estate taxes have severely impaired the subject's marketability.  The conversion of the Ritz Carlton Club to a points system exacerbates the negative attributes that impair the marketability of the subject units.



# Property Analysis

## SITE DESCRIPTION

Overall Site Utility:        The subject site is functional for its current use.

Location Rating:             Excellent

The subject units are condominium interests in the ski-in, ski-out residential condominium development at the base of Aspen Highlands ski area.  This is a desirable location for luxury residential development.

## IMPROVEMENT DESCRIPTION

### GENERAL DESCRIPTION

The Ritz-Carlton Club at Aspen Highlands was designed by Robert A.M. Stern, Dean of the Yale School of Architecture. The Club is comprised of 73 residential condominiums that have been sold as 1/12 fractional interests, with a total of 876 shares.  The residences are luxuriously furnished to the highest standards of the Ritz-Carlton, including Frette Linens, natural stone fireplaces, luxurious master bathrooms with double vanities and heated Italian marble floors, top-of-the-line appliances, full size washer and dryer, upscale lighting and fixtures throughout. Units range from two to three bedrooms and range in size from 1,246 to 2,015 square feet.  The subject floorplans are presented in the addenda.

Amenities include the secure, heated underground parking garage, on-site restaurant and gourmet café, private spa and fitness center, Willow Creek Bistro on-site featuring fine dining, wine tasting and live music, two slope-side heated outdoor pools and Jacuzzis, private lounges for relaxing and gathering before and after activities, golf privileges at two nearby championship mountain courses and in-season private, daily Member events and parties.

Services offered at the Ritz Carlton Club Aspen Highlands include a dedicated on-site Concierge service for travel needs, dinner reservations, at-your-service ski valet, ski-lifts just steps from the Club, twice-daily housekeeping, complimentary Aspen in-town shuttle, complimentary valet parking, member privileges to the acclaimed Aspen Recreation Center, Ritz Kids program and kids/teen game room.

## REAL PROPERTY TAXES AND ASSESSMENTS

### CURRENT PROPERTY TAXES

The subject property is located in the taxing jurisdiction of Pitkin County. The assessor's parcel identification numbers are listed below. According to the local tax collector's office, taxes are current. Real estate taxes in Colorado are paid in arrears, by April 30th (in full) the following year, or in two equal installments (February 28 and July 15). Properties are re-assessed every two years, with the next re-assessment due in 2015.  Assessed value for vacant land is 29 percent of the Assessor's estimate of market value. A mill levy is applied to the assessed value to determine the tax liability. The mill levy is released in late December of the tax year.



# ZONING

## GENERAL INFORMATION

The property is zoned L/TR-Lodging/Tourist Residential w/ PUD Overlay by the City of Aspen. A summary of the subject's zoning is provided below:

| ZONING | |
|---|---|
| Municipality Governing Zoning: | City of Aspen |
| Current Zoning: | L/TR-Lodging/Tourist Residential w/ PUD Overlay |
| Current Use: | Mixed Use - Hotel/Residential |
| Is current use permitted: | Yes |
| Permit details: | Approved |
| Proposed Use: | Mixed Use - Hotel/Residential |
| Is proposed use permitted: | Not applicable |
| Change In Zone Likely: | No |
| Zoning Variance Applied For: | Not applicable |
| Permitted Uses: | Intended use of this zone is for tourist oriented detached, duplex, and mult-family residential dwellings. Permitted uses within this district include lodge units, boardinghouse, hotel, mult-family dwellings, detached residential or duplex dwellings, dining rooms, customary accessory uses, and accessory uses. Conditional uses include restaurant, timesharing, and commercial parking. |
| Prohibited Uses: | Prohibited uses within this district include primary commercial or industrial. |

*Compiled by Cushman & Wakefield of Colorado, Inc.*

We analyzed the zoning requirements in relation to the subject property, and considered the compliance of the existing use. We are not experts in the interpretation of complex zoning ordinances but based on our review of public information, the subject property appears to be a complying use. Detailed zoning studies are typically performed by a zoning or land use expert, including attorneys, land use planners, or architects. The depth of our study correlates directly with the scope of this assignment, and it considers all pertinent issues that have been discovered through our due diligence.

This appraisal is not intended to be a detailed determination of compliance, as that determination is beyond the scope of this real estate appraisal assignment.



# Highest And Best Use

## HIGHEST AND BEST USE OF PROPERTY AS THOUGH VACANT

We considered the legal issues related to zoning and legal restrictions. We also analyzed the physical characteristics of the site to determine what legal uses would be possible, and considered the financial feasibility of these uses to determine the use that is maximally productive. Considering the subject site's physical characteristics and location, as well as the state of the local market, it is our opinion that the Highest and Best Use of the subject site as though vacant is a residential building to the highest density allowed by current zoning regulations, as demand warrants.

## HIGHEST AND BEST USE OF PROPERTY AS IMPROVED

In our opinion, the improvements contribute significantly to the value of the site. It is our opinion that the existing improvements add value to the site as though vacant, thus dictating a continuation of its current use and our conclusion for the highest and best use is a residential development as currently improved.



# VALUATION

## METHODOLOGY

We used the Sales Comparison Approach to develop an opinion of value. We examined current offerings and analyzed prices buyers have recently paid for comparable fractional interests. A summary of the comparable listings are presented below.

| | PROPERTY | UNIT | BEDS | BATHS | WEEKS | $ PER WEEKS | LIST PRICE | CALENDAR | UNIT SIZE | $ PER SF | Equivalent $ PER SF Whole Ownership |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | **SUMMARY OF LISTINGS - FRACTIONAL OWNERSHIP - ASPEN HIGHLANDS** | | | | | | | | | | |
| 1 | Ritz Carlton Club | 2302 | 2 | 2 | 4 | $10,750 | **$43,000** | Rotating | 1,328 | $32.38 | $324 |
| 2 | Ritz Carlton Club | 8406 | 2 | 2 | 4 | $16,250 | **$65,000** | Rotating | 1,346 | $48.29 | $483 |
| 3 | Ritz Carlton Club | 2412 | 2 | 2.5 | 4 | $16,250 | **$65,000** | Rotating | 1,467 | $44.31 | $443 |
| 4 | Ritz Carlton Club | 8415 | 2 | 2.5 | 4 | $22,250 | **$89,000** | Fixed | 1,239 | $71.83 | $862 |
| 5 | Ritz Carlton Club | 8014 | 3 | 3 | 4 | $18,750 | **$75,000** | Rotating | 2,015 | $37.22 | $447 |

The comparable listings are all located in the subject Ritz Carlton Club and reflect current pricing for a wide range of units and calendars.  The upper end of the range reflects more desirable calendars, such as President's Week in February or Spring Break.  The listing brokers were interviewed and reported that the sellers were seeking to exit the investment and minimize their losses.   These listings are for various calendars and reflect varying degrees of seller distress.

Comparable Listing One is for the weeks of March 1-8 and August 9-23, 2014, along with the standard floating week.  This offering is at the low end of the range, due to the lack of prime ski season weeks. As all of the subject units are rotating calendars, depending on where they are in the specific rotation, they would be expected to suffer some degree of diminished demand due to a lack of prime ski weeks.

Comparable Listing Five is one of the largest units in the development.  It is an octagonal corner unit on the first floor with windows on 3 sides, which offer views of the Maroon Bells. There are two balconies on this unit, one of which is the largest in the Ritz Carlton Club. This is a three bedroom, three bathroom suite that will accommodate 8 guests comfortably. The offering is for the Winter Interest 5, which is scheduled to have the March 15-22, 2014, Saturday to Saturday in 2014 (Spring Break).  The interest has two consecutive winter weeks guaranteed, one summer week and one floating week each year.   When originally marketed, these units were achieving sale prices of $390,000 per interest.  This current listing illustrates the significant decline in pricing for even the most desirable units at the subject development.

The following exhibit summarizes the most recent sales of fractional interests located in the subject development.



| Brand | Calendar | Unit Number | Season | Floor Plan | View | Sale Date | Sale Price | Sale Price Per Week | Developer's Last Asking Price |
|---|---|---|---|---|---|---|---|---|---|
| RCC | Fixed | AF*2304*04*B | Summer | 2BR+2.5BA | EX | 9/13/2013 | $11,000 | $2,750 | $93,000.00 |
| RCC | Rotating | RA*8104*02*B | Winter | 3BR+3BA | EX | 9/4/2013 | $50,000 | $12,500 | $116,000.00 |
| RCC | Rotating | RA*8206*07*B | Summer | 3BR+3BA | MA | 8/5/2013 | $55,000 | $13,750 | $110,000.00 |
| RCC | Rotating | RA*8208*04*B | Winter | 3BR+3BA | CTYD | 7/10/2013 | $55,000 | $13,750 | $252,000.00 |
| RCC | Rotating | RA*2307*06*B | Winter | 3BR+3BA | MA | 3/19/2013 | $55,000 | $13,750 | $390,000.00 |
| RCC | Rotating | RA*8408*03*B | Winter | 2BR+2BA | MA | 3/4/2013 | $65,000 | $16,250 | $126,000.00 |
| RCC | Rotating | RA*8308*10*B | Summer | 3BR+3BA | MA | 6/27/2013 | $76,500 | $19,125 | $132,000.00 |
| RCC | Rotating | RA*4302*06*B | Winter | 3BR+3BA | SKI | 3/14/2013 | $85,000 | $21,250 | $364,000.00 |
| RCC | Rotating | RA*4302*06*B | Winter | 3BR+3BA | SKI | 4/15/2013 | $85,000 | $21,250 | $364,000.00 |
| RCC | Rotating | RA*8311*04*B | Winter | 3BR+3BA | MA | 1/3/2013 | $85,000 | $21,250 | $217,000.00 |
| RCC | Rotating | RA*8205*03*B | Winter | 3BR+3.5BA | MA | 3/4/2013 | $100,000 | $25,000 | $273,000.00 |
| RCC | Fixed | AF*2312*16*B | Float | 3BR+3BA | MA | 4/29/2013 | $349,000 | $87,250 | $203,000.00 |

Table title: **SUMMARY OF SALES - FRACTIONAL OWNERSHIP - RITZ CARLTON ASPEN HIGHLANDS**

The recent sales at the subject property indicate a wide range in price, which is primarily attributed to the desirability of a specific units calendar. The most recent sale represents the low end of the range, at $11,000 for a fixed summer calendar.  The upper end of the range, at $349,000 was for a fixed calendar with prime winter weeks and sold above the developer's last asking price.  The remaining 10 sales are in a much tighter range, from $50,000 to $100,000 and $12,500 to $25,000 per week.

As illustrated above, the vast majority of sales at the Ritz Carlton Club have been at significant discounts to the developer's last asking prices.

## ANALYSIS OF COMPARABLE DATA

### Property Rights Conveyed

In this instance no adjustments were necessary.

### Financial Terms

Adjustments were not applicable for this category.

### Conditions of Sale

No adjustments were warranted for conditions of sale.

### Market Conditions

The comparable data analyzed occurred between January 2013 and September 2013. These sales are considered all recent enough and reflective of the current market and therefore no adjustments for this factor are required.

### Location

All of the comparables were considered similar in this regard requiring no adjustments.

### Size

We have given most consideration to the specific comparable sales that correspond to the subject units.



## Other – HOA

The subject and comparables are all part of the same association and pay their pro rate share of HOA dues based on living area.  As such, no adjustments were warranted for HOA dues.

## DISCUSSION OF COMPARABLE SALES

All of the comparable sales are located in the subject development and are considered the best indicators of value for the subject properties.  These sales reflect the impact of the changes in the Ritz Carlton Club that have been implemented since the subject development was originally brought to market.

## CONCLUSIONS OF VALUE

The subject properties have limited marketability. Given the current listings and recent sales activity at the property, we have concluded to the following valuations:

| RITZ CARLTON CLUB ASPEN HIGHLANDS | | | | | | | Aggregate of |
|---|---|---|---|---|---|---|---|
| | Unit No. | | SF | Fractions | Bedrooms | S/SF | Retail Value | The Retail Values |
| Fractional Ownership | 2205 | | 1,471 | 9 | 2bdrm | $23.79 | $35,000 | $315,000 |
| Fractional Ownership | 2307 | | 1,610 | 9 | 3bdrm | $24.84 | $40,000 | $360,000 |
| Fractional Ownership | 8103 | | 1,619 | 9 | 3bdrm | $24.71 | $40,000 | $360,000 |
| Fractional Ownership | 2406 | | 1,319 | 8 | 2bdrm | $22.74 | $30,000 | $240,000 |
| Fractional Ownership | 2203 | | 1,723 | 6 | 3bdrm | $26.12 | $45,000 | $270,000 |
| Fractional Ownership | 4302 | Penthouse | 1,819 | 5 | 3bdrm | $30.24 | $55,000 | $275,000 |
| Fractional Ownership | 8403 | | 1,308 | 1 | 2bdrm | $22.94 | $30,000 | $30,000 |
| Fractional Ownership | 2310 | | 1,663 | 9 | 3bdrm | $24.05 | $40,000 | $360,000 |
| Fractional Ownership | 8406 | | 1,346 | 4 | 2bdrm | $22.29 | $30,000 | $120,000 |
| Fractional Ownership | 4301 | Penthouse | 2,015 | 3 | 3bdrm | $29.78 | $60,000 | $180,000 |
| Fractional Ownership | 8405 | | 1,246 | 1 | 2bdrm | $24.08 | $30,000 | $30,000 |
| Fractional Ownership | 8210 | | 1,918 | 1 | 3bdrm | $23.46 | $45,000 | $45,000 |
| **Total RCC Aspen** | **12** | | **19,057** | **65** | | Average | $39,769 | $2,585,000 |

We note that the retail values presented above are for the individual fractional interests. The Aggregate of the Retail Values is not a market value.


CUSHMAN II 000506

# RECONCILIATION AND FINAL VALUE OPINION

## VALUATION METHODOLOGY REVIEW AND RECONCILIATION

This appraisal employs only the Sales Comparison Approach. Based on our analysis and knowledge of the subject property type and relevant investor profiles, it is our opinion that this approach would be considered necessary and applicable for market participants. Typical purchasers do not generally rely on the Cost or Income Capitalization Approaches when purchasing a property such as the subject of this report. Therefore, we have not employed the Cost Approach or the Income Capitalization Approach to develop an opinion of market value. The absence of these approaches does not diminish the reliability of the analysis.

The approach indicated the following values for the subject properties as of December 2, 2013:

| RITZ CARLTON CLUB ASPEN HIGHLANDS | | | | | | | Aggregate of |
|---|---|---|---|---|---|---|---|
| | Unit No. | | SF | Fractions | Bedrooms | S/SF | Retail Value | The Retail Values |
| Fractional Ownership | 2205 | | 1,471 | 9 | 2bdrm | $23.79 | $35,000 | $315,000 |
| Fractional Ownership | 2307 | | 1,610 | 9 | 3bdrm | $24.84 | $40,000 | $360,000 |
| Fractional Ownership | 8103 | | 1,619 | 9 | 3bdrm | $24.71 | $40,000 | $360,000 |
| Fractional Ownership | 2406 | | 1,319 | 8 | 2bdrm | $22.74 | $30,000 | $240,000 |
| Fractional Ownership | 2203 | | 1,723 | 6 | 3bdrm | $26.12 | $45,000 | $270,000 |
| Fractional Ownership | 4302 | Penthouse | 1,819 | 5 | 3bdrm | $30.24 | $55,000 | $275,000 |
| Fractional Ownership | 8403 | | 1,308 | 1 | 2bdrm | $22.94 | $30,000 | $30,000 |
| Fractional Ownership | 2310 | | 1,663 | 9 | 3bdrm | $24.05 | $40,000 | $360,000 |
| Fractional Ownership | 8406 | | 1,346 | 4 | 2bdrm | $22.29 | $30,000 | $120,000 |
| Fractional Ownership | 4301 | Penthouse | 2,015 | 3 | 3bdrm | $29.78 | $60,000 | $180,000 |
| Fractional Ownership | 8405 | | 1,246 | 1 | 2bdrm | $24.08 | $30,000 | $30,000 |
| Fractional Ownership | 8210 | | 1,918 | 1 | 3bdrm | $23.46 | $45,000 | $45,000 |
| **Total RCC Aspen** | **12** | | **19,057** | **65** | | Average | $39,769 | $2,585,000 |

We gave sole weight to the Sales Comparison Approach because this mirrors the methodology used by purchasers of this property type.

We note that the retail values presented above are for the individual fractional interests. The Aggregate of the Retail Values is not a market value.



# ASSUMPTIONS AND LIMITING CONDITIONS

"Report" means the appraisal or consulting report and conclusions stated therein, to which these Assumptions and Limiting Conditions are annexed.

"Property" means the subject of the Report.

"C&W" means Cushman & Wakefield, Inc. or its subsidiary that issued the Report.

"Appraiser(s)" means the employee(s) of C&W who prepared and signed the Report.

The Report has been made subject to the following assumptions and limiting conditions:

- No opinion is intended to be expressed and no responsibility is assumed for the legal description or for any matters that are legal in nature or require legal expertise or specialized knowledge beyond that of a real estate appraiser. Title to the Property is assumed to be good and marketable and the Property is assumed to be free and clear of all liens unless otherwise stated. No survey of the Property was undertaken.

- The information contained in the Report or upon which the Report is based has been gathered from sources the Appraiser assumes to be reliable and accurate. The owner of the Property may have provided some of such information. Neither the Appraiser nor C&W shall be responsible for the accuracy or completeness of such information, including the correctness of estimates, opinions, dimensions, sketches, exhibits and factual matters. Any authorized user of the Report is obligated to bring to the attention of C&W any inaccuracies or errors that it believes are contained in the Report.

- The opinions are only as of the date stated in the Report. Changes since that date in external and market factors or in the Property itself can significantly affect the conclusions in the Report.

- The Report is to be used in whole and not in part. No part of the Report shall be used in conjunction with any other analyses. Publication of the Report or any portion thereof without the prior written consent of C&W is prohibited. Reference to the Appraisal Institute or to the MAI designation is prohibited. Except as may be otherwise stated in the letter of engagement, the Report may not be used by any person(s) other than the party(ies) to whom it is addressed or for purposes other than that for which it was prepared. No part of the Report shall be conveyed to the public through advertising, or used in any sales, promotion, offering or SEC material without C&W's prior written consent. Any authorized user(s) of this Report who provides a copy to, or permits reliance thereon by, any person or entity not authorized by C&W in writing to use or rely thereon, hereby agrees to indemnify and hold C&W, its affiliates and their respective shareholders, directors, officers and employees, harmless from and against all damages, expenses, claims and costs, including attorneys' fees, incurred in investigating and defending any claim arising from or in any way connected to the use of, or reliance upon, the Report by any such unauthorized person(s) or entity(ies).

- Except as may be otherwise stated in the letter of engagement, the Appraiser shall not be required to give testimony in any court or administrative proceeding relating to the Property or the Appraisal.

- The Report assumes (a) responsible ownership and competent management of the Property; (b) there are no hidden or unapparent conditions of the Property, subsoil or structures that render the Property more or less valuable (no responsibility is assumed for such conditions or for arranging for engineering studies that may be required to discover them); (c) full compliance with all applicable federal, state and local zoning and environmental regulations and laws, unless noncompliance is stated, defined and considered in the Report; and (d) all required licenses, certificates of occupancy and other governmental consents have been or can be obtained and renewed for any use on which the value opinion contained in the Report is based.

- The physical condition of the improvements considered by the Report is based on visual inspection by the Appraiser or other person identified in the Report. C&W assumes no responsibility for the soundness of structural components or for the condition of mechanical equipment, plumbing or electrical components.

- The forecasted potential gross income referred to in the Report may be based on lease summaries provided by the owner or third parties. The Report assumes no responsibility for the authenticity or completeness of lease information provided by others. C&W recommends that legal advice be obtained regarding the interpretation of lease provisions and the contractual rights of parties.



- The forecasts of income and expenses are not predictions of the future. Rather, they are the Appraiser's best opinions of current market thinking on future income and expenses. The Appraiser and C&W make no warranty or representation that these forecasts will materialize. The real estate market is constantly fluctuating and changing. It is not the Appraiser's task to predict or in any way warrant the conditions of a future real estate market; the Appraiser can only reflect what the investment community, as of the date of the Report, envisages for the future in terms of rental rates, expenses, and supply and demand.

- Unless otherwise stated in the Report, the existence of potentially hazardous or toxic materials that may have been used in the construction or maintenance of the improvements or may be located at or about the Property was not considered in arriving at the opinion of value. These materials (such as formaldehyde foam insulation, asbestos insulation and other potentially hazardous materials) may adversely affect the value of the Property. The Appraisers are not qualified to detect such substances. C&W recommends that an environmental expert be employed to determine the impact of these matters on the opinion of value.

- Unless otherwise stated in the Report, compliance with the requirements of the Americans with Disabilities Act of 1990 (ADA) has not been considered in arriving at the opinion of value. Failure to comply with the requirements of the ADA may adversely affect the value of the Property. C&W recommends that an expert in this field be employed to determine the compliance of the Property with the requirements of the ADA and the impact of these matters on the opinion of value.

- If the Report is submitted to a lender or investor with the prior approval of C&W, such party should consider this Report as only one factor, together with its independent investment considerations and underwriting criteria, in its overall investment decision. Such lender or investor is specifically cautioned to understand all Extraordinary Assumptions and Hypothetical Conditions and the Assumptions and Limiting Conditions incorporated in this Report.

- In the event of a claim against C&W or its affiliates or their respective officers or employees or the Appraisers in connection with or in any way relating to this Report or this engagement, the maximum damages recoverable shall be the amount of the monies actually collected by C&W or its affiliates for this Report and under no circumstances shall any claim for consequential damages be made.

- If the Report is referred to or included in any offering material or prospectus, the Report shall be deemed referred to or included for informational purposes only and C&W, its employees and the Appraiser have no liability to such recipients. C&W disclaims any and all liability to any party other than the party that retained C&W to prepare the Report.

- Unless otherwise noted, we were not given a soil report to review. However, we assume that the soil's load-bearing capacity is sufficient to support existing and/or proposed structure(s). We did not observe any evidence to the contrary during our physical inspection of the property. Drainage appears to be adequate.

- Unless otherwise noted, we were not given a title report to review. We do not know of any easements, encroachments, or restrictions that would adversely affect the site's use. However, we recommend a title search to determine whether any adverse conditions exist.

- Unless otherwise noted, we were not given a wetlands survey to review. If subsequent engineering data reveal the presence of regulated wetlands, it could materially affect property value. We recommend a wetlands survey by a professional engineer with expertise in this field.

- Unless otherwise noted, we observed no evidence of toxic or hazardous substances during our inspection of the site. However, we are not trained to perform technical environmental inspections and recommend the hiring of a professional engineer with expertise in this field.

- Unless otherwise noted, we did not inspect the roof nor did we make a detailed inspection of the mechanical systems. The appraisers are not qualified to render an opinion regarding the adequacy or condition of these components. The client is urged to retain an expert in this field if detailed information is needed.

- By use of this Report each party that uses this Report agrees to be bound by all of the Assumptions and Limiting Conditions, Hypothetical Conditions and Extraordinary Assumptions stated herein.



# CERTIFICATION OF APPRAISAL

We certify that, to the best of our knowledge and belief:

- The statements of fact contained in this report are true and correct.

- The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are our personal, impartial, and unbiased professional analyses, opinions, and conclusions.

- We have no present or prospective interest in the property that is the subject of this report, and no personal interest with respect to the parties involved.

- We have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

- Our engagement in this assignment was not contingent upon developing or reporting predetermined results.

- Our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

- The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics & Standards of Professional Appraisal Practice of the Appraisal Institute, which include the Uniform Standards of Professional Appraisal Practice.

- The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

- John C. Vaughan, and Christopher T. Donaldson, MAI, CCIM did not make a personal inspection of the property that is the subject of this report.

- We have not performed prior services involving the subject property within the three-year period immediately preceding the acceptance of the assignment.

- No one provided significant real property appraisal assistance to the persons signing this report.

- As of the date of this report Christopher T. Donaldson, MAI, CCIM has completed the continuing education program for Designated Members of the Appraisal Institute.

- As of the date of this report, John C. Vaughan has completed the Standards and Ethics Education Requirements for Candidates/Practicing Affiliates of the Appraisal Institute.

John C. Vaughan
Senior Director
Colorado Temporary Practice Permit
john.vaughan@cushwake.com
(808) 791-7872 Office Direct

Christopher T. Donaldson, MAI, CCIM
Managing Director
CO Certified General Appraiser
License No. CGA 1319868
chirs.donaldson@cushwake.com
1 (303) 813-6464    Office Direct
1 (435) 608-6375    Fax



# ADDENDA CONTENTS

**ADDENDUM A:**    **GLOSSARY OF TERMS & DEFINITIONS**
**ADDENDUM B:**    **CLIENT SATISFACTION SURVEY**
**ADDENDUM C:**    **ENGAGEMENT LETTER**
**ADDENDUM D:**    **FLOOR PLANS**
**ADDENDUM E:**    **UNIT SUMMARIES**
**ADDENDUM F:**    **QUALIFICATIONS OF THE APPRAISERS**



# ADDENDUM A:
# GLOSSARY OF TERMS & DEFINITIONS

The following definitions of pertinent terms are taken from *The Dictionary of Real Estate Appraisal*, Fifth Edition (2010), published by the Appraisal Institute, Chicago, IL, as well as other sources.

## AS IS MARKET VALUE

The estimate of the market value of real property in its current physical condition, use, and zoning as of the appraisal date. (Proposed Interagency Appraisal and Evaluation Guidelines, OCC-4810-33-P 20%)

## BAND OF INVESTMENT

A technique in which the capitalization rates attributable to components of a capital investment are weighted and combined to derive a weighted-average rate attributable to the total investment.

## CASH EQUIVALENCY

An analytical process in which the sale price of a transaction with nonmarket financing or financing with unusual conditions or incentives is converted into a price expressed in terms of cash.

## DEPRECIATION

1. In appraising, a loss in property value from any cause; the difference between the cost of an improvement on the effective date of the appraisal and the market value of the improvement on the same date. 2. In accounting, an allowance made against the loss in value of an asset for a defined purpose and computed using a specified method.

## DISPOSITION VALUE

The most probable price that a specified interest in real property is likely to bring under all of the following conditions:

- Consummation of a sale will occur within a limited future marketing period specified by the client.
- The actual market conditions currently prevailing are those to which the appraised property interest is subject.
- The buyer and seller are each acting prudently and knowledgeably.
- The seller is under compulsion to sell.
- The buyer is typically motivated.
- Both parties are acting in what they consider their best interest.
- An adequate marketing effort will be made in the limited time allowed for the completion of a sale.
- Payment will be made in cash in U.S. dollars or in terms of financial arrangements comparable thereto.
- The price represents the normal consideration for the property sold, unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

Note that this definition differs from the definition of market value.  The most notable difference relates to the motivation of the seller.  In the case of Disposition value, the seller would be acting under compulsion within a limited future marketing period.

## ELLWOOD FORMULA

A yield capitalization method that provides a formulaic solution for developing a capitalization rate for various combinations of equity yields and mortgage terms. The formula is applicable only to properties with stable or stabilized income streams and properties with income streams expected to change according to the J- or K-factor pattern. The formula is

$RO = [YE - M (YE + P\ 1/Sn\lnot - RM) - \Delta O\ 1/S\ n\lnot] / [1 + \Delta I\ J]$

where

$RO$ = Overall Capitalization Rate
$YE$ = Equity Yield Rate
$M$ = Loan-to-Value Ratio
$P$ = Percentage of Loan Paid Off
$1/S\ n\lnot$ = Sinking Fund Factor at the Equity Yield Rate
$RM$ = Mortgage Capitalization Rate
$\Delta O$ = Change in Total Property Value
$\Delta I$ = Total Ratio Change in Income
$J$ = J Factor
Also called mortgage-equity formula.



CUSHMAN II 000572

## EXPOSURE TIME

1. The time a property remains on the market. 2. The estimated length of time the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal; a retrospective estimate based on an analysis of past events assuming a competitive and open market. See also marketing time.

## EXTRAORDINARY ASSUMPTION

An assumption, directly related to a specific assignment, as of the effective date of the assignment results, which, if found to be false, could alter the appraiser's opinions or conclusions.

Comment: Extraordinary assumptions presume as fact otherwise uncertain information about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in an analysis.

## FEE SIMPLE ESTATE

Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat.

## HIGHEST AND BEST USE

The most probable use of a property which is physically possible, appropriately justified, legally permissible, financially feasible, and which results in the highest value of the property being valued.

## HIGHEST AND BEST USE OF PROPERTY AS IMPROVED

The use that should be made of a property as it exists. An existing improvement should be renovated or retained as is so long as it continues to contribute to the total market value of the property, or until the return from a new improvement would more than offset the cost of demolishing the existing building and constructing a new one.

## HYPOTHETICAL CONDITIONS

A condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis.

Comment: Hypothetical conditions are contrary to known facts about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in an analysis.

## INSURABLE VALUE

A type of value for insurance purposes.

## INTENDED USE

The use or uses of an appraiser's reported appraisal, appraisal review, or appraisal consulting assignment opinions and conclusions, as identified by the appraiser based on communication with the client at the time of the assignment.

## INTENDED USER

The client and any other party as identified, by name or type, as users of the appraisal, appraisal review, or appraisal consulting report by the appraiser on the basis of communication with the client at the time of the assignment.

## LEASED FEE INTEREST

A freehold (ownership interest) where the possessory interest has been granted to another party by creation of a contractual landlord-tenant relationship (i.e., a lease).

## LEASEHOLD INTEREST

The tenant's possessory interest created by a lease. See also negative leasehold; positive leasehold.

## LIQUIDATION VALUE

The most probable price that a specified interest in real property is likely to bring under all of the following conditions:

- Consummation of a sale will occur within a severely limited future marketing period specified by the client.

- The actual market conditions currently prevailing are those to which the appraised property interest is subject.

- The buyer is acting prudently and knowledgeably.

- The seller is under extreme compulsion to sell.



- The buyer is typically motivated.

- The buyer is acting in what he or she considers his or her best interest.

- A limited marketing effort and time will be allowed for the completion of a sale.

- Payment will be made in cash in U.S. dollars or in terms of financial arrangements comparable thereto.

- The price represents the normal consideration for the property sold, unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

Note that this definition differs from the definition of market value.  The most notable difference relates to the motivation of the seller.  Under market value, the seller would be acting in his or her own best interests.  The seller would be acting prudently and knowledgeably, assuming the price is not affected by undue stimulus or atypical motivation.  In the case of liquidation value, the seller would be acting under extreme compulsion within a severely limited future marketing period.

# MARKET RENT

The most probable rent that a property should bring in a competitive and open market reflecting all conditions and restrictions of the lease agreement, including permitted uses, use restrictions, expense obligations, term, concessions, renewal and purchase options, and tenant improvements (TIs).

# MARKET VALUE

As defined in the Agencies' appraisal regulations, the most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus.

Implicit in this definition are the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

- Buyer and seller are typically motivated;

- Both parties are well informed or well advised, and acting in what they consider      their own best interests;

- A reasonable time is allowed for exposure in the open market;

- Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and

- The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.[1]

# MARKETING TIME

An opinion of the amount of time it might take to sell a real or personal property interest at the concluded market value level during the period immediately after the effective date of an appraisal. Marketing time differs from exposure time, which is always presumed to precede the effective date of an appraisal. (Advisory Opinion 7 of the Appraisal Standards Board of The Appraisal Foundation and Statement on Appraisal Standards No. 6, "Reasonable Exposure Time in Real Property and Personal Property Market Value Opinions" address the determination of reasonable exposure and marketing time.) See also exposure time.

# MORTGAGE-EQUITY ANALYSIS

Capitalization and investment analysis procedures that recognize how mortgage terms and equity requirements affect the value of income-producing property.

# OPERATING EXPENSES

**Other Taxes, Fees & Permits** - Personal property taxes, sales taxes, utility taxes, fees and permit expenses.

**Property Insurance** – Coverage for loss or damage to the property caused by the perils of fire, lightning, extended coverage perils, vandalism and malicious mischief, and additional perils.

**Management Fees** - The sum paid for management services. Management services may be contracted for or provided by the property owner. Management expenses may include supervision, on-site offices or apartments for resident managers, telephone service, clerical help, legal or accounting services, printing and postage, and advertising. Management fees may occasionally be included among recoverable operating expenses

**Total Administrative Fees** – Depending on the nature of the real estate, these usually include professional fees and other general administrative expenses, such as rent of offices and the services needed to operate the property. Administrative expenses can be provided either in the following expense subcategories or in a bulk total. 1) Professional Fees – Fees paid for any professional services contracted for or incurred in property operation; or 2) Other Administrative – Any other general administrative expenses incurred in property operation.

**Heating Fuel -** The cost of heating fuel purchased from outside producers. The cost of heat is generally a tenant expense in single-tenant, industrial or retail properties, and apartment projects with individual heating units. It is a major expense item shown in operating statements for office buildings and many apartment properties. The fuel consumed may be coal, oil, or public steam. Heating supplies, maintenance, and workers' wages are included in this expense category under certain accounting methods.

**Electricity -** The cost of electricity purchased from outside producers. Although the cost of electricity for leased space is frequently a tenant expense, and therefore not included in the operating expense statement, the owner may be responsible for lighting public areas and for the power needed to run elevators and other building equipment.

---

[1] "Interagency Appraisal and Evaluation Guidelines." Federal Register 75:237 (December 10, 2010) p. 77472.



**Gas** - The cost of gas purchased from outside producers. When used for heating and air conditioning, gas can be a major expense item that is either paid by the tenant or reflected in the rent.

**Water & Sewer** - The cost of water consumed, including water specially treated for the circulating ice water system, or purchased for drinking purposes. The cost of water is a major consideration for industrial plants that use processes depending on water and for multifamily projects, in which the cost of sewer service usually ties to the amount of water used. It is also an important consideration for laundries, restaurants, taverns, hotels, and similar operations.

**Other Utilities** - The cost of other utilities purchased from outside producers.

**Total Utilities** - The cost of utilities net of energy sales to stores and others. Utilities are services rendered by public and private utility companies (e.g., electricity, gas, heating fuel, water/sewer and other utilities providers). Utility expenses can be provided either in expense subcategories or in a bulk total.

**Repairs & Maintenance** - All expenses incurred for the general repairs and maintenance of the building, including common areas and general upkeep. Repairs and maintenance expenses include elevator, HVAC, electrical and plumbing, structural/roof, and other repairs and maintenance expense items. Repairs and Maintenance expenses can be provided either in the following expense subcategories or in a bulk total. 1) Elevator - The expense of the contract and any additional expenses for elevator repairs and maintenance. This expense item may also include escalator repairs and maintenance. 2) HVAC – The expense of the contract and any additional expenses for heating, ventilation and air-conditioning systems. 3) Electrical & Plumbing - The expense of all repairs and maintenance associated with the property's electrical and plumbing systems. 4) Structural/Roof - The expense of all repairs and maintenance associated with the property's building structure and roof. 5) Pest Control – The expense of insect and rodent control. 6). Other Repairs & Maintenance - The cost of any other repairs and maintenance items not specifically included in other expense categories.

**Common Area Maintenance** - The common area is the total area within a property that is not designed for sale or rental, but is available for common use by all owners, tenants, or their invitees, e.g., parking and its appurtenances, malls, sidewalks, landscaped areas, recreation areas, public toilets, truck and service facilities. Common Area Maintenance (CAM) expenses can be entered in bulk or through the sub-categories. 1) Utilities – Cost of utilities that are included in CAM charges and passed through to tenants. 2) Repair & Maintenance – Cost of repair and maintenance items that are included in CAM charges and passed through to tenants. 3) Parking Lot Maintenance – Cost of parking lot maintenance items that are included in CAM charges and passed through to tenants. 4) Snow Removal – Cost of snow removal that are included in CAM charges and passed through to tenants. 5) Grounds Maintenance – Cost of ground maintenance items that are included in CAM charges and passed through to tenants. 6) Other CAM expenses are items that are included in CAM charges and passed through to tenants.

**Painting & Decorating** - This expense category is relevant to residential properties where the landlord is required to prepare a dwelling unit for occupancy in between tenancies.

**Cleaning & Janitorial** - The expenses for building cleaning and janitorial services, for both daytime and night-time cleaning and janitorial service for tenant spaces, public areas, atriums, elevators, restrooms, windows, etc. Cleaning and Janitorial expenses can be provided either in the following subcategories or entered in a bulk total. 1) Contract Services - The expense of cleaning and janitorial services contracted for with outside service providers. 2) Supplies, Materials & Misc. - The cost any cleaning materials and any other janitorial supplies required for property cleaning and janitorial services and not covered elsewhere. 3) Trash Removal - The expense of property trash and rubbish removal and related services. Sometimes this expense item includes the cost of pest control and/or snow removal .4) Other Cleaning/Janitorial - Any other cleaning and janitorial related expenses not included in other specific expense categories.

**Advertising & Promotion** - Expenses related to advertising, promotion, sales, and publicity and all related printing, stationary, artwork, magazine space, broadcasting, and postage related to marketing.

**Professional Fees** - All professional fees associated with property leasing activities including legal, accounting, data processing, and auditing costs to the extent necessary to satisfy tenant lease requirements and permanent lender requirements.

**Total Payroll** - The payroll expenses for all employees involved in the ongoing operation of the property, but whose salaries and wages are not included in other expense categories. Payroll expenses can be provided either in the following subcategories or entered in a bulk total. 1) Administrative Payroll - The payroll expenses for all employees involved in on-going property administration. 2) Repair & Maintenance Payroll - The expense of all employees involved in on-going repairs and maintenance of the property. 3) Cleaning Payroll - The expense of all employees involved in providing on-going cleaning and janitorial services to the property 4) Other Payroll - The expense of any other employees involved in providing services to the property not covered in other specific categories.

**Security** - Expenses related to the security of the Lessees and the Property. This expense item includes payroll, contract services and other security expenses not covered in other expense categories. This item also includes the expense of maintenance of security systems such as alarms and closed circuit television (CCTV), and ordinary supplies necessary to operate a security program, including batteries, control forms, access cards, and security uniforms.

**Roads & Grounds** - The cost of maintaining the grounds and parking areas of the property. This expense can vary widely depending on the type of property and its total area. Landscaping improvements can range from none to extensive beds, gardens and trees. In addition, hard-surfaced public parking areas with drains, lights, and marked car spaces are subject to intensive wear and can be costly to maintain.

**Other Operating Expenses** - Any other expenses incurred in the operation of the property not specifically covered elsewhere.

**Real Estate Taxes** - The tax levied on real estate (i.e., on the land, appurtenances, improvements, structures and buildings); typically by the state, county and/or municipality in which the property is located.

# PROSPECTIVE OPINION OF VALUE

A value opinion effective as of a specified future date. The term does not define a type of value. Instead, it identifies a value opinion as being effective at some specific future date. An opinion of value as of a prospective date is frequently sought in connection with projects that are proposed, under construction, or under conversion to a new use, or those that have not yet achieved sellout or a stabilized level of long-term occupancy.

# PROSPECTIVE VALUE UPON REACHING STABILIZED OCCUPANCY

The value of a property as of a point in time when all improvements have been physically constructed and the property has been leased to its optimum level of long-term occupancy. At such point, all capital outlays for tenant improvements, leasing commissions, marketing costs and other carrying charges are assumed to have been incurred.



**BFLT - ASPEN HOLDINGS**                                                    **ADDENDA CONTENTS**

## SPECIAL, UNUSUAL, OR EXTRAORDINARY ASSUMPTIONS

Before completing the acquisition of a property, a prudent purchaser in the market typically exercises due diligence by making customary enquiries about the property. It is normal for a Valuer to make assumptions as to the most likely outcome of this due diligence process and to rely on actual information regarding such matters as provided by the client. Special, unusual, or extraordinary assumptions may be any additional assumptions relating to matters covered in the due diligence process, or may relate to other issues, such as the identity of the purchaser, the physical state of the property, the presence of environmental pollutants (e.g., ground water contamination), or the ability to redevelop the property.



# ADDENDUM B:
# CLIENT SATISFACTION SURVEY

Survey Link:     http://www.surveymonkey.com/s.aspx?sm=_2bZUxc1p1j1DWj6n_2fswh1KQ_3d_3d&c=13-38033-900043-003

C&W File ID:    13-38033-900043-003

Fax Option:     (716) 852-0890

1. Given the scope and complexity of the assignment, please rate the development of the appraisal relative to the adequacy and relevance of the data, the appropriateness of the techniques used, and the reasonableness of the analyses, opinions, and conclusions:

__ Excellent
__ Good
__ Average
__ Below Average
__ Poor

Comments:_____

_____

_____

2. Please rate the appraisal report on clarity, attention to detail, and the extent to which it was presentable to your internal/external users without revisions:

__ Excellent
__ Good
__ Average
__ Below Average
__ Poor

Comments:_____

_____

_____



CUSHMAN II 0005767

3. The appraiser communicated effectively by listening to your concerns, showed a sense of urgency in responding, and provided convincing support of his/her conclusions:

___ Not Applicable

___ Excellent
___ Good
___ Average
___ Below Average
___ Poor

Comments:_____

_____

_____

4. The report was on time as agreed, or was received within an acceptable time frame if unforeseen factors occurred after the engagement:

___ Yes
___ No

5. Please rate your overall satisfaction relative to cost, timing, and quality:

___ Excellent
___ Good
___ Average
___ Below Average
___ Poor

Comments:_____

_____

_____

6. Any additional comments or suggestions?

_____

_____

_____

_____

_____

_____

_____



7. Would you like a representative of Cushman & Wakefield's National Quality Control Committee to contact you?

___ Yes
___ No

Your Name: _____

Your Telephone Number: _____

Contact Information:     Scott Schafer

Managing Director, National Quality Control

(716) 852-7500, ext. 121

# ADDENDUM C:
# ENGAGEMENT LETTER



John C. Vaughan
Senior Director



**Cushman & Wakefield Western, Inc.**
1888 Kalakaua Ave - Suite C-312
Honolulu, HI 96815
808.791.7872 Tel
john.vaughan@cushwake.com

October 18, 2013

Ben Pierce
President of the Association
BLEU FLORIDA LAND TRUST ASSOCIATION
6649 Westwood Blvd
Orlando, Florida 32821

Re:    **Bleu Florida Land Trust Association, Inc**

Dear Mr. Pierce:

Thank you for requesting our proposal for appraisal services.  This proposal letter will become, upon your acceptance, our letter of engagement to provide the services outlined herein.

## TERMS OF ENGAGEMENT

| | |
|---|---|
| **I. PROBLEM IDENTIFICATION** | Appraisal of the Individual Retail Values "As Is" of  the Subject Interests as defined in Schedule A of this engagement. |
| **The Parties To This Agreement:** | The undersigned Cushman & Wakefield affiliated company and BLEU FLORIDA LAND TRUST ASSOCIATION (herein at times referred to as "Client"). Client agrees to hold harmless and indemnify Cushman & Wakefield Western, Inc (including its officers and agents) against all reasonable claims, damages, and costs (including reasonable attorney's fee and disbursements) arising out of the engagement, except that no indemnity is provided for any and all claims, damages and costs resulting from any wrongful acts or omissions of Cushman & Wakefield Western, Inc. which constitute negligence, fraud, willful or unlawful conduct, or a breach of the terms of this agreement and the Confidentiality Agreement executed by the Parties on October 8, 2013. |
| **Intended Users:** | The appraisal will be prepared for the Bleu Florida Land Trust and Trustee to the Bleu Florida Land Trust Association and is intended only for the use specified below.  The Client agrees that there are no other Intended Users. |
| **Intended Use:** | To assist the Trustee of the Association and The Association in understanding the retail values of the subject properties. |
| **Type of Opinion and Rights Appraised:** | Individual Retail Values of the Fractional Interests and Whole Ownership Interests of the subject properties, as specified in Schedule A.  The Aggregate of the Retail Values will also be presented in the appraisal. |

CUSHMAN II 000581

Ben Pierce
**Bleu Florida Land Trust Association**
October 18, 2013
Page 2

| | |
|---|---|
| **Date Of Value:** | • October 22, 2013. |
| **Subject of the Assignment and Relevant Characteristics:** | The subject of the appraisal is detailed in Schedule A of this document. |
| **Assignment Conditions:** | The assignment will incorporate the extraordinary assumption that the subject properties are in very good condition. The assignment will incorporate any additional extraordinary assumptions or hypothetical conditions as agreed by the parties. |

## II. ANTICIPATED SCOPE OF WORK

| | |
|---|---|
| **USPAP Compliance:** | The undersigned Cushman & Wakefield affiliated company (herein at times "C&W") will develop an appraisal in accordance with USPAP and the Code of Ethics and Certification Standards of the Appraisal Institute. |
| **General Scope of Work:** | • The appraisers will not inspect the subject properties and it will be an extraordinary assumption of the appraisal that the properties are in very good condition. |
| | • Research relevant market data, in terms of quantity, quality, and geographic comparability, to the extent necessary to produce credible appraisal results |
| | • Consider and develop those approaches relevant and applicable to the appraisal problem. Based on our discussions with the Client, we anticipate developing the following valuation approaches as appropriate: |
| | • Sales Comparison Approach |

## III. REPORTING AND DISCLOSURE

| | |
|---|---|
| **Scope of Work Disclosure:** | The actual Scope of Work will be reported within the report. |
| **Reporting Option:** | The appraisal will be communicated in a Summary Report format. |
| **Fee:** | $20,000 based on value conclusions being provided to the client within three weeks of execution of this agreement, with the final report being delivered in four weeks of execution of this agreement. |
| | All invoices are due upon receipt. The Client shall be solely responsible for C&W's fees. Acknowledgement of this obligation is made by the countersignature to this agreement by an authorized representative. |
| **Additional Expenses:** | General Excise Tax (GET) of 4.712 percent shall be applied to the appraisal fee and paid by the client for the State of Hawaii General Excise Tax. |
| **Retainer:** | A retainer is not required for this assignment in order to commence work. |
| **Report Copies:** | The final report will be delivered in electronic format. Up to three hard copies will be provided upon request. |
| **Start Date:** | The appraisal process will initiate upon receipt of signed |



CUSHMAN II 000582

Ben Pierce
**Bleu Florida Land Trust Association**
**October 18,** 2013
Page 3

|  |  |
|---|---|
|  | agreement, applicable retainer, and the receipt of the property specific data. |
| **Acceptance Date:** | This proposal is subject to withdrawal if the engagement letter is not executed by the Client within seven (7) business days. |
| **Draft and Final Report Delivery:** | As requested, the value conclusions will be communicated within three weeks and a draft version of the report will be delivered within four weeks, assuming prompt receipt of necessary property information. The Client will have 10 business days after delivery of the draft report within which to comment, after which a final report will be submitted and the fee will be due and payable. |
| **Changes to Agreement:** | The identity of the Client, intended users, or intended use; the date of value; type of value or interest appraised; or property appraised cannot be changed without a new agreement. |
| **Prior Services Disclosure:** | The engaging appraiser has not performed a previous appraisal of this property within the three years prior to this assignment. |
| **Further Conditions of Engagement:** | The Conditions of Engagement attached hereto are incorporated herein and are part of this letter of engagement. |

Thank you for calling on us to render these services and we look forward to working with you.

Sincerely,
**CUSHMAN & WAKEFIELD WESTERN , INC.**

John C. Vaughan
Senior Director

cc: James W. Myers, MAI

**AGREED:**
**CLIENT: BLEU FLORIDA LAND TRUST ASSOCIATION**

By: _____          Date: 10/21/13

Ben Pierce

Title: _____
President of the Association

E-mail Address/Phone & Fax Nos.: Ben.Pierce @ MVWC.com

407-206-6494          407-206-6262(F)

**CUSHMAN & WAKEFIELD.**

CUSHMAN II 000583

## CONDITIONS OF ENGAGEMENT

1) The Client and any Intended Users identified herein should consider the appraisal as only one factor together with its independent investment considerations and underwriting criteria in its overall investment decision. The appraisal cannot be used by any party or for any purpose other than as specified in this engagement letter.

2) Federal banking regulations require banks and savings and loan associations to employ appraisers where a FIRREA compliant appraisal must be used in connection with mortgage loans or other transactions involving federally regulated lending institutions, including mortgage bankers/brokers. Because of that requirement, this appraisal, if ordered independent of a financial institution or agent, may not be accepted by a federally regulated financial institution. This appraisal will be prepared in accordance with the Uniform Standards of Professional Appraisal Practice of The Appraisal Foundation, the Standards of Professional Practice and the Code of Ethics of the Appraisal Institute.

3) The appraisal report will be subject to our standard Assumptions and Limiting Conditions, which will be incorporated into the appraisal. All users of the appraisal report are specifically cautioned to understand any Extraordinary Assumptions and Hypothetical Conditions which may be employed by the appraiser and incorporated into the appraisal.

4) The appraisal report or our name may not be used in any offering memoranda or other investment material without the prior written consent of C&W, which may be given at the sole discretion of C&W. Any such consent, if given, shall be conditioned upon our receipt of an indemnification agreement from a party satisfactory to us and in a form satisfactory to us. Furthermore, Client agrees to pay the fees of C&W's legal counsel for the review of the material which is the subject of the requested consent. If the appraisal is referred to or included in any offering material or prospectus, the appraisal shall be deemed referred to or included for informational purposes only and C&W, its employees and the appraiser have no liability to such recipients. C&W disclaims any and all liability to any party other than the party which retained C&W to prepare the appraisal.

5) In the event the Client provides a copy of this appraisal to, or permits reliance thereon by, any person or entity not an identified Intended User at the time of the assignment and authorized by C&W in writing to use or rely thereon, Client hereby agrees to indemnify and hold C&W, its affiliates and the respective shareholders, directors, officers and employees, harmless from and against all damages, expenses, claims and costs, including attorney's fees, incurred in investigating and defending any claim arising from or in any way connected to the use of, or reliance upon, the appraisal by any such unauthorized person or entity.

6) The balance of the fee for the appraisal will be due upon delivery of a report. Payment of the fee is not contingent on the appraised value, outcome of the consultation report, a loan closing, or any other prearranged condition. Additional fees will be charged on an hourly basis for any work, which exceeds the scope of this proposal, including performing additional valuation scenarios, additional research and conference calls or meetings with any party, which exceed the time allotted by C&W for an assignment of this nature. If we are requested to stop working on this assignment, for any reason, prior to our completion of the appraisal, C&W will be entitled to bill the Client for the time expended to date at C&W's hourly rates for the personnel involved.

7) If C&W or any of its affiliates or any of their respective employees receives a subpoena or other judicial command to produce documents or to provide testimony involving this assignment in connection with a lawsuit or proceeding, C&W will use reasonable efforts to notify the Client of our receipt of same. However, if C&W or any of its affiliates are not a party to these proceedings, Client agrees to compensate C&W or its affiliate for the professional time and reimburse C&W or its affiliate for the actual expense that it incurs in responding to any such subpoena or judicial command, including attorneys' fees, if any, as they are incurred. C&W or its affiliate will be compensated at the then prevailing hourly rates of the personnel responding to the subpoena or command for testimony.

8) By signing this agreement Client expressly agrees that its sole and exclusive remedy for any and all losses or damages relating to this agreement or the appraisal shall be limited to the amount of the appraisal fee paid by the Client. In the event that the Client, or any other party entitled to do so, makes a claim against C&W or any of its affiliates or any of their respective officers or employees in connection with or in any way relating to this engagement or the appraisal, the maximum damages recoverable from C&W or any of its affiliates or their respective officers or employees shall be the amount of the monies actually collected by C&W or any of its affiliates for this assignment and under no circumstances shall any claim for consequential damages be made.

9) It is acknowledged that any opinions and conclusions expressed by the professionals of C&W or its affiliates during this assignment are representations made as employees and not as individuals. C&W's or its affiliate's responsibility is limited to the Client, and use of our product by third parties shall be solely at the risk of the Client and/or third parties.

10) The fees and expenses shall be due C&W as agreed in this letter. If it becomes necessary to place collection of the fees and expenses due C&W in the hands of a collection agent and/or an attorney (whether or not a legal action is filed) Client agrees to pay all fees and expenses including attorney's fees incurred by C&W in connection with the collection or attempted collection thereof.

# SCHEDULE A

CUSHMAN II 000585

**The Ritz-Carlton Destination Club**
**Inventory Breakdown**

| | Unit # | Fractions | Bedroom Type | |
|---|---|---|---|---|
| **RCC Jupiter - Jupiter, FL** | | | | |
| Whole Ownership | 216 | 8 | 2bdrm | |
| Whole Ownership | 206 | 8 | 4bdrm | |
| Fractional Ownership | 212 | 5 | 4bdrm | |
| Fractional Ownership | 627 | 3 | 2bdrm | |
| Fractional Ownership | 214 | 1 | 4bdrm | |
| Whole Ownership | 202 | 8 | 2bdrm | |
| Whole Ownership | 204 | 8 | 2bdrm | |
| Fractional Ownership | 108 | 2 | 2bdrm | |
| Fractional Ownership | 104 | 2 | 4bdrm | |
| Fractional Ownership | 107 | 2 | 4bdrm | |
| Fractional Ownership | 114 | 2 | 4bdrm | |
| Fractional Ownership | 115 | 1 | 4bdrm | |
| **Total RCC Jupiter** | **12** | **50** | | |
| **RCC Aspen** | | | | |
| Fractional Ownership | 2205 | 9 | 2bdrm | |
| Fractional Ownership | 2307 | 9 | 3bdrm | |
| Fractional Ownership | 8103 | 9 | 3bdrm | |
| Fractional Ownership | 2406 | 8 | 2bdrm | |
| Fractional Ownership | 2203 | 6 | 3bdrm | |
| Fractional Ownership | 4302 | 5 | 3bdrm | |
| Fractional Ownership | 8403 | 1 | 2bdrm | |
| Fractional Ownership | 2310 | 9 | 3bdrm | |
| Fractional Ownership | 8406 | 4 | 2bdrm | |
| Fractional Ownership | 4301 | 3 | 3bdrm | |
| Fractional Ownership | 8405 | 1 | 2bdrm | |
| Fractional Ownership | 8210 | 1 | 3bdrm | |
| **Total RCC Aspen** | **12** | **65** | | |
| **RCC San Francisco** | | | | |
| These units are Whole Ownership but | 501 | 12 | 1bdrm | |
| are deed restricted to Fractional Use; | 502 | 12 | 1bdrm | |
| therefore, they are valued as | 503 | 12 | 1bdrm | |
| Fractional Interests. | 504 | 12 | 2bdrm | {ADA} |
| | 505 | 12 | 2bdrm | |
| **Total RCC San Francisco** | **5** | **60** | | |
| **RCC Northstar - Lake Tahoe, CA** | | | | |
| Whole Ownership | 4406 | 12 | 3bdrm | |
| **Total RCC Northstar** | **1** | **12** | | |

*Total Ritz-Carlton Destination Club*

|  | 30 | 187 |
|---|---|---|

CUSHMAN II 000586

# ADDENDUM D: FLOOR PLANS





ASPEN HIGHLANDS VILLAGE

PITKIN COUNTY, COLORADO

A PROJECT OF

HINES INTERESTS LIMITED PARTNERSHIP

ROBERT A. M. STERN ARCHITECTS
Design Architect

COTTLE GRAYBEAL YAW ARCHITECTS
Associate Architect

KENDALL/HEATON ASSOCIATES, INC.
Architect of Record

CBM ENGINEERS, INC.
Structural Engineer

McFALL — KUNKEL & KIMBALL
CONSULTING ENGINEERS, INC.
MEP Engineer

SCHMUESER GORDON MEYER
Civil Engineer

UNIT TA3-4
ENLARGED PLAN AND RCP

43.10.04

CUSHMAN I 000588



ASPEN
HIGHLANDS
VILLAGE

PITKIN COUNTY, COLORADO

A PROJECT OF
HINES INTERESTS LIMITED PARTNERSHIP

ROBERT A. M. STERN ARCHITECTS
Design Architect

COTTLE GRAYBEAL YAW ARCHITECTS
Associate Architect

KENDALL/HEATON ASSOCIATES, INC.
Architect of Record

CBM ENGINEERS, INC.
Structural Engineer

McFALL — KONKEL & KIMBALL
CONSULTING ENGINEERS, INC.
MEP Engineer

SCHMUESER GORDON MEYER
Civil Engineer

UNIT TA3-6
ENLARGED PLAN AND RCP

A3.10.06

CUSHMAN II 000589



| No. | Date | Issue |
|---|---|---|
| 1 | 2 SEP 97 | DESIGN DEVELOPMENT |
| 2 | 1 DEC 97 | CMP REVIEW |
| 3 | 1 JAN 98 | FOR PERMIT |
| 4 | 2 FEB 98 | PERMIT REVISION NO.1 |
| 5 | 2 MAR 98 | FOR CONSTRUCTION |
| | 27 APR 98 | REVISION NO. 1 |
| | 31 AUG 98 | BLDG. 8 REVISION NO. 1 |
| | 31 JAN 99 | BLDG. 8, REVISION NO. 2 |
| | 5 NOV 99 | BLDG. 8, REVISION NO. 4.3 |
| | 4 JAN 00 | FOR INFORMATION |
| | 2 MAR 00 | BLDG. 8, REVISION NO. 4.8 |
| | 11 JUL 00 | ASI NO. 50 |

# ASPEN HIGHLANDS VILLAGE

PITKIN COUNTY, COLORADO

A PROJECT OF
HINES INTERESTS LIMITED PARTNERSHIP

ROBERT A. M. STERN ARCHITECTS
Design Architect

COTTLE GRAYBEAL YAW ARCHITECTS
Associate Architect

KENDALL/HEATON ASSOCIATES, INC.
Architect of Record

CBM ENGINEERS, INC.
Structural Engineer

McFALL — KONKEL & KIMBALL
CONSULTING ENGINEERS, INC.
MEP Engineer

SCHMUESER GORDON MEYER
Civil Engineer

UNIT TA2-4
ENLARGED PLAN AND RCP

PROJECT NUMBER
9673

A3.10.24

CUSHMAN II 000590



| No. | Date | Issue |
|---|---|---|
| 1 | 2 SEP 97 | DESIGN DEVELOPMENT |
| 2 | 2 DEC 97 | GMP REVIEW |
| 3 | JAN 98 | FOR PERMIT |
| 4 | FEB 98 | PERMIT REVISION NO.1 |
| 2 | 3 MAR 98 | FOR CONSTRUCTION |
| 27 APR 98 | REVISION: NO. 1 |
| 31 AUG 98 | BLDG. 8 REVISION NO. 1 |
| 11 JAN 99 | BLDG. 8, REVISION NO. 2 |
| 5 NOV 99 | BLDG. 8, REVISION NO. 4.5 |
| 4 JAN 00 | FOR INFORMATION |
| 2 MAR 00 | BLDG. 8 REVISION NO. 4.8 |
| 11 JUL 00 | ASI NO. 50 |

# ASPEN HIGHLANDS VILLAGE

PITKIN COUNTY, COLORADO

A PROJECT OF

HINES INTERESTS LIMITED PARTNERSHIP

ROBERT A. M. STERN ARCHITECTS
Design Architect

COTTLE GRAYBEAL YAW ARCHITECTS
Associate Architect

KENDALL/HEATON ASSOCIATES, INC.
Architect of Record

CBM ENGINEERS, INC.
Structural Engineer

McFALL - KONKEL & KIMBALL
CONSULTING ENGINEERS, INC.
MEP Engineer

SCHMUESER GORDON MEYER
Civil Engineer

UNIT TA2-9
ENLARGED PLAN AND RCP

PROJECT NUMBER
9673

43.10.29

CUSHMAN II 000591



| No. | Date | Issue |
|---|---|---|
| 1 | 2 SEP 97 | DESIGN DEVELOPMENT |
| 2 | 1 DEC 97 | DWP REVIEW |
| 3 | 1 JAN 98 | FOR PERMIT |
| 4 | 2 FEB 98 | PERMIT REVISION NO.1 |
| 5 | 2 MAR 98 | FOR CONSTRUCTION |
| 6 | 13 SEPT. 98 | BLDG. 7, REVISION NO. 1 |
| 7 | 21 AUG 98 | BLDG. 8, REVISION NO. 1 |
| 8 | 11 JAN 99 | BLDG. 8, REVISION NO. 2 |
| 9 | 5 NOV 99 | BLDG. 8, REVISION NO. 4.5 |
| 10 | 4 JAN 00 | FOR INFORMATION |
| 11 | 2 MAR 00 | BLDG. 8, REVISION NO. 4.8 |
| 12 | 11 JUL 00 | ASI NO. 50 |

**ASPEN HIGHLANDS VILLAGE**

PITKIN COUNTY, COLORADO

A PROJECT OF

HINES INTERESTS LIMITED PARTNERSHIP

ROBERT A. M. STERN ARCHITECTS
Design Architect

COTTLE GRAYBEAL YAW ARCHITECTS
Associate Architect

KENDALL/HEATON ASSOCIATES, INC.
Architect of Record

CBM ENGINEERS, INC.
Structural Engineer

McFALL - KONKEL & KIMBALL
CONSULTING ENGINEERS, INC.
MEP Engineer

SCHMUESER GORDON MEYER
Civil Engineer

UNIT TA2-1AC
ENLARGED PLAN AND RCP

A3.10.21

CUSHMAN II 006592

# ADDENDUM E:
# UNIT SUMMARIES



| Parcel # | Unit | Htd SF |
|---|---|---|
| R017768 | TA4301 | 2015 |
| R017780 | TA4302 | 1819 |
| R017792 | TA8103 | 1619 |
| R017852 | TA8210 | 1918 |
| R018272 | TA8403 | 1308 |
| R018296 | TA8405 | 1246 |
| R018308 | TA8406 | 1346 |
| R019028 | TA2203 | 1723 |
| R019030 | TA2205 | 1471 |
| R019041 | TA2307 | 1610 |
| R019044 | TA2310 | 1663 |
| R019048 | TA2406 | 1319 |

CUSHMAN II 000594

# ADDENDUM F:
# QUALIFICATIONS OF THE APPRAISERS



## JOHN C. VAUGHAN

SENIOR DIRECTOR | VALUATION & ADVISORY

CUSHMAN & WAKEFIELD WESTERN, INC.

John C. Vaughan serves as a Senior Director of the Valuation & Advisory group of Cushman & Wakefield Western, Inc., in Honolulu, Hawaii, which opened in July 2007. Mr. Vaughan specializes in complex properties located throughout the Hawaiian Islands.

## EXPERIENCE

Mr. Vaughan has been appraising real estate since 1986 and has been with the Valuation & Advisory of Cushman & Wakefield Western, Inc. since 1996. He has performed appraisal and consulting services in the State of Hawaii on all types of properties, including fee simple and leasehold interests of Class A office buildings, proposed high-rise residential developments; luxury shopping centers; and resort developments on the Islands of Kaua'i, Maui, O'ahu and the Big Island of Hawai'i.

Mr. Vaughan has appraised the local assets of major corporate real estate portfolios, the proposed wind farm on the Island of Lanai, and all categories of land, including agricultural, conservation, commercial, industrial, office and residential.

During his 21 years of appraising on the mainland, Mr. Vaughan performed appraisals on a wide variety of real estate throughout California, Nevada, Illinois and Wisconsin, including regional malls, major industrial parks, portfolios of office properties, master planned residential developments and interstate right-of-ways.

The intended use of these assignments has included corporate advisory, disposition, acquisition, rent arbitration, tax appeal, litigation and mortgage lending.

## EDUCATION

- University of California, Davis, Graduated in 1985
  — Bachelor of Science Degree in Managerial Economics

## APPRAISAL EDUCATION

Successfully completed all courses and experience credits to qualify for Hawaii and California General Certified Appraiser licenses.

## MEMBERSHIPS, LICENSES AND PROFESSIONAL AFFILIATIONS

- Candidate for Designation, Appraisal Institute (No. 111154)
- Certified General Real Estate Appraiser in the following states:
  — California (No. AG002680)
  — Hawaii (No. CGA00921)

CUSHMAN II 000596





Business, Transportation & Housing Agency

# OFFICE OF REAL ESTATE APPRAISERS

## REAL ESTATE APPRAISER LICENSE

John C. Vaughan

has successfully met the requirements for a license as a residential and commercial real estate appraiser in the State of California and is, therefore, entitled to use the title:

"Certified General Real Estate Appraiser"

This license has been issued in accordance with the provisions of the Real Estate Appraisers' Licensing and Certification Law.

OREA APPRAISER IDENTIFICATION NUMBER:     AG 002680

Effective Date:     March 2, 2013
Date Expires:       March 1, 2015

Jim Martin, Director, OREA

3005036

THIS DOCUMENT CONTAINS A TRUE WATERMARK - HOLD UP TO LIGHT TO SEE "CHAIN LINK"

CUSHMAN II 000597



## CHRISTOPHER T. DONALDSON, MAI, CCIM

MANAGING DIRECTOR | VALUATION & ADVISORY

CUSHMAN & WAKEFIELD OF COLORADO, INC.

Mr. Donaldson joined Cushman & Wakefield of Colorado, Inc. in 2004 as a Director for the Utah office of Valuation & Advisory. He currently resides in the Denver office. Current responsibilities consist of client relations and the appraisal of real property. Prior to joining Valuation & Advisory, he was a commercial real estate appraiser for John D. Bailey & Company in Dallas, Texas in 1986, until 1990. Employed from 1990-1991 as a Senior Review Appraiser for First Gibraltar Bank in Dallas, Texas. Employed from 1991-2004 as an appraiser and principal with Brown, Chudleigh, Schuler, Donaldson and Associates in Park City, Utah.

### EXPERIENCE

Appraisal experience includes the valuation of income-producing real estate on a national basis. Types of properties appraised include master planned resort developments, conservation easements, hotels/lodging, regional malls, office buildings, shopping centers, apartments, residential and commercial subdivisions, industrial buildings, hotels, resort properties, fractional ownership projects, master planned communities, vacant land, sports and entertainment properties such as water parks, movie theaters, ski areas, and special purpose properties.

### EDUCATION

- Coe College (Cedar Rapids, IA) – Graduated 1978
    - Degree: Bachelor of Arts – English

### APPRAISAL EDUCATION

Mr. Donaldson has completed the requirements of the continuing education program of the Appraisal Institute, including attending numerous lectures. Original coursework included: 1A-Real Estate Appraisal Principles, 1B, (1,2, &3)-Capitalization Theory and Techniques, 2-2-Report Writing and Valuation Analysis, 2-1-Case Studies in Real Estate Valuation, 410&420-Standards of Professional Practice, Parts A & B., and seminars sponsored by the Appraisal Institute. He has attended numerous continuing education courses and seminars.

### MEMBERSHIPS, LICENSES AND PROFESSIONAL AFFILIATIONS

- Designated Member, Appraisal Institute (MAI #9157)
    - As of the current date, Christopher Donaldson, MAI has completed the requirements of the continuing education program of the Appraisal Institute.
- Certified Commercial Investment Member (CCIM Designation): No. 7625
- Certified General Real Estate Appraiser in the following states:
    - California – 30707

CUSHMAN-H-000598

PROFESSIONAL
QUALIFICATIONS

- Colorado – CG01319868
- Idaho – CGA-2243
- Oregon – C000331
- Utah – 5480025-CG00
- Wyoming – 1239

PROFESSIONAL
QUALIFICATIONS

## CALIFORNIA



## COLORADO

PROFESSIONAL QUALIFICATIONS

## IDAHO

## OREGON



## UTAH



PROFESSIONAL
QUALIFICATIONS

## WYOMING



CUSHMAN II 000602