# EXHIBIT 15

EXHIBIT 15

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No. 1:16-cv-01301-PAB-GPG

RCHFU, LLC, et al.,

Plaintiffs,

vs.

MARRIOTT VACATIONS WORLDWIDE CORPORATION, et al.,

Defendants.

______________________________________

Videotaped deposition of MICHAEL C. MULLENIX, taken on behalf of the Plaintiffs, at the offices of Summers Compton Wells, 8909 Ladue Road, in the County of St. Louis, State of Missouri, on the 12th day of December, 2017, before Kristine A. Toennies, RMR, CRR, CRC, CCR (MO), CSR (IL & IA), and Notary Public.

Job No. 2763798

Pages 1 - 166

MR. WELSH: Would you flip to 03, please.
A This is in September. Okay, I've read it.
Q (By Mr. Reiser) So do you remember receiving an e-mail in mid-September from Jay Neveloff about forwarding to you the response from Lee Cunningham about his meetings with Jay Neveloff?
A I actually do.
Q Okay. There's evidence in the record that you had a meeting down in Orlando with Steve Weisz and Lee Cunningham on September 19, 2012. Does this e-mail chain refresh your recollection about that meeting?
A Oh, yeah.
Q So were you down in Orlando with Jo-Ann Perfido for some convention of some sort regarding shared or fractionals-type properties?
A Yes.
Q Can you tell me about what that convention was and who put it on?
A It's the annual Ragatz -- Ragatz is a -- I don't know -- an industry maven or consultant for the timeshare industry. I don't remember his first name. Pardon me on that, but you can Google it, I'm sure.
And we had been trying to get ahold of Steve

Weisz and Lee Cunningham. "We" being the Bachelor Gulch board. That's why if you read in previous exhibits, I would participate in these Marilyn Clark and Stephanie Sobeck calls that they would actually tell you nothing, corporate speak, and just said, We want to talk to the powers that actually make decisions, which were Lee Cunningham and Steve Weisz.

I basically tried to contact Lee and Steve and could not get any response, so I noticed, because you get barraged with every seminar that's going around, you know, every conference -- I'm sure you do as attorneys -- you know, for whatever.

And I just happened to see that there was the Ragatz conference in September of 2012 at the -- I don't know -- one of those nasty convention hotels in Orlando, not a Marriott, reiterate, nor a Hilton. It was the Peabody, I think. And Steve Weisz was going to be the featured speaker or the keynote speaker.

So I asked the board permission to fly to Orlando that week, and I wrote an e-mail to them saying I would be in your lobby waiting for you or something that entire week, to Mr. Weisz. I hope you see me.

I then sent a copy of the letter to Bill Shaw, the former president of Marriott. I think I had it sent to his beach house in Hilton Head, so that he finally had to respond back to me because I was getting sick of the corporate speak.

And we were under tremendous pressure from our membership what the heck is going on. We had our annual meeting coming up around October 1st. Typically that's when it is. And members were just -- were just upset. We had no answers. And we had a very high-functioning club, I will say. We had zero delinquencies, very engaged membership, and it's my fiduciary responsibility as president of the board of directors of RCC-BG Condominium Association to have answers for our members to the best of my ability.

So I kind of, you know, forced a meeting with Mr. Weisz and Mr. Cunningham. Jo-Ann lives near Orlando in Sanford or some city near there, and so I just met her down there, and we had a meeting with Weisz and Cunningham.

Q Okay. So there was a lot in there. I'm going to break it down a bit. Had you made efforts between the date of the letter, July 17, 2012, and the date of the meetings roughly two months later,

it in the lobby or where was it?

A It was in a conference room off the lobby where behind the receptionist there was probably a 20-foot painting of our -- the Bachelor Gulch Club.

Q Can you describe what the purpose of the meeting was?

A To get some answers.

Q So can you just describe what happened at the meeting?

A It turned out not to be a pleasant meeting from my recollection. It was obvious from Steve's body language he did not want to be there, and was -- he was openly aggravated to be there. He wanted to give me a lecture that he knew the hotel business better than I did.

We -- he talked about the letter that I had sent and copied Bill Shaw. He was not happy about some things I said in the letter, and I do recall him getting very agitated with Jo-Ann Perfido when I believe she asked him why he was acting so not graciously and not open to talking about what we wanted to talk about, the issues surrounding the combination of the two systems.

And he wouldn't respond, and Jo-Ann used the word fraud or defrauded, we've been defrauded, and

he did not react real well.

Q Can you elaborate on his reaction?

A Pounding tables, clunking furniture, chairs around the table. It was probably I would say in my career, knowing a lot of the Marriott executives, very surprising behavior.

Q Did he make any moves towards either you or Jo-Ann Perfido at that meeting in terms of physical moves like approaching somebody and had to be restrained by anybody else?

A I recall he stood up, pounded the table and yelled at Jo-Ann, and Lee stood up and I stood up.

Q Sounds pretty intense. So he stood up and he pounded the table. Did anybody have to restrain him in any way?

A Lee, I think, told him to knock it off or -- I can't remember the terminology, but it was like "settle down" or something.

Q So Lee intervened and told the president of Marriott Vacation Worldwide, a public company, to calm down and stop acting like he was acting?

A He tried to disarm the situation, yeah.

Q How long into the meeting was this incident where he pounded the table and stood up and Lee intervened?

A 15, 20 minutes into the meeting. I might be wrong, but it was in the beginning.

Q How long did the meeting last after that?

A Maybe another 45 minutes.

Q So things did calm down after that?

A They calmed down, yeah. There was no more furniture clanking or pounding.

Q Was there any broken furniture or anything like that that happened?

A No.

Q And as far as you sit here today, Mr. Mullenix, what -- as you recall, what was the precipitating factor in this outburst by Mr. Weisz?

MR. MARX: Object to the form of the question.

A All I recall is Steve said, Did you see what he wrote -- being me -- in that letter? Jo-Ann said, Yes, I saw the letter.

And then I remember she said something to the effect like, Are you -- I still don't understand why you don't want to just discuss what is in the letter, the points we raised, with us.

And he I just remember turning red and kind of didn't say much, and then she said, We feel we've been defrauded or something, and that's when he

exploded. He was like, You're in my building. How dare you. You're in my building or something, using words like that.

Q (By Mr. Reiser) Did he use profanities or anything like that?

A I don't recall that.

Q I've never seen the letter that you're referring to. It wasn't produced by Mr. Wolf, and he was kind enough to produce a bunch of stuff, so I don't know. Has that letter been lost to posterity, or do you know the whereabouts of that letter? No?

MR. WELSH: You have to answer out loud.

A No, I don't know.

Q (By Mr. Reiser) So you copied the letter to the former president of Marriott International, Bill Shaw?

A Yeah, I believe he was chairman of Marriott Vacation World at the time of the spinoff. Bill had retired, I think.

Q Okay, so Bill Shaw came over to the Marriott Vacation Worldwide Corp. side?

A I believe he was an executive chairman. I don't -- you would have to look it up.

Q Sure. Did you know Bill Shaw prior to this?

A I've met him. His daughter was an attorney

found out that they had all this inventory, real estate inventory in the Vacation Club division, that was a problem, and it just wasn't for Marriott; it was everybody. Starwood, everybody had these things.

So they were trying to improve their shareholder price, and this was a structure that Marriott came up with to try to, you know, be a win-win, do a tax-free spinoff to the shareholders and put the -- separate the vacation club company from the hotel company, and then they both can trade at different or appropriate multiples and be a win-win for Marriott.

Marriott has done this many times, you know, with the spinoff of Host, Host Marriott Services. I mean, if you own Marriott stock over the years, you own a good portfolio of stuff. It's a great company.

Q So Steve Weisz told you that Marriott Vacation Club Worldwide or VAC was never going to develop another Ritz club?

A Yes.

Q How did that subject come up?

A We were upset. One of our points was they lost Maui; they lost Abaco. We also found out about

Q In favor of recommending the Timbers?

A Yes.

Q And let me -- I'm going to get to the vote in a minute and some of the things that happened on the vote, but I wanted to ask you one question about Exhibit 1166. Take a look at that. I don't know if you --

A I didn't finish answering your earlier question.

Q Okay.

A We did have a vote on it I think -- I believe it was in early July of 2013. I believe we had -- and I'm going from memory -- 76 percent of our membership vote, which was extraordinarily high. We can barely get 20 percent to reach a quorum to approve a budget.

But I had gotten, I think -- the board had gotten 76 percent of the membership to vote. In that 76 percent I believe it was like 89 percent of the people that voted were for terminating the agreement with Marriott Vacation Club or whatever it was called and letting us enter into an agreement with Timbers Resorts.

So really only 11 percent of the voters, which represented 76 percent of the entire club --

well, that included multiple interest owners -- voted against not terminating the new Ritz-Carlton.

Q Great memory because I was going to show you some documents on that later.

A We understand the effort that went into this. It's one of the toughest things I've done in my career.

Q Is getting the vote done?

A Going against this company.

Q Yeah, we'll get to that in a minute because I notice there's some shenanigans during the vote; true?

A We'll get there when we get there.

Q I just want to ask you a real quick question about the Exhibit 1166. Here it is.

A 66, okay.

Q It looks like this is just a five-page document, single space, with meeting notes taken by you and another meeting down in Orlando in March of 2013. Do you remember another meeting down in March?

A Yes.

Q I wanted to ask you about the line in the first paragraph of this that I've always wondered about. It says -- in the first paragraph it states