# EXHIBIT Q

## Porterfield & Associates, LLC.

Attorneys at Law

Wendell B. Porterfield, Jr.
wporterfield@opa-law.com

Gerald W. Oliver
joliver@opa-law.com

P.O. Box 3149
Vail, Colorado 81658-3149
Tel: (970) 949-5380
Fax: (970) 845-9135
Website: www.opa-law.com

101 Eagle Road, Bldg. 8
Eagle-Vail, CO  81620

of Counsel:
Frederick S. Otto
f.o3944@yahoo.com

February 16, 2017

Aspen Highlands Condominium Association, Inc.
Litigation Committee
Ritz-Carlton Destination Club – Aspen Highlands
0075 Prospector Road
Aspen, Colorado 81612-3164

  Re:  Notice to Aspen Highlands Condominium Association
     Declaration Section 7.8.3, dated December 20, 2016

Dear Members of the Aspen Highlands Condominium Association, Litigation
Committee:

### Introduction

  I have been requested to act as special litigation counsel to review the
notice served by certain members of the Aspen Highlands Condominium
Association, Inc. (the "Association") to the Executive Board, Tourist
Accommodation Directors, in a letter dated December 20, 2016 (the "Notice").
The Notice was made pursuant to Section 7.8.3 of the Declaration for Aspen
Highlands Condominiums recorded January 11, 2011 at Reception No. 450454 of
the real property records of Pitkin County, Colorado (the "Declaration").

### Conclusion

  It is my conclusion that the actions of the Executive Board described below
were within its power and authority under the business judgment rule and under
the governing documents of the Association.  In any event, the aggrieved owners
who sent the Notice have the same authority to seek to enjoin the continuation of
the program that the Executive Board would have.

Aspen Highlands Condominium Association, Inc.
Page Two
February 16, 2017

## Analysis

The Notice does not demand that the Executive Board of the Association take any particular action. Rather, the Notice states that the owners giving the Notice "intend to seek legal relief to enforce the provisions of the Declaration as well as the bylaws of the Association" (Emphasis added). The Notice also asserts that the "persons who have acted to violate, or who have failed to enforce, the Declaration and the Association's bylaws – [sic] are Randy Mercer, Tyler Oliver, Phillip Schneider [sic] Jerry Madsen and Robert Harris."

As noted below, two of the documents that I have reviewed are (1) the [corrected] Third Amended and Supplemental Complaint and Jury Demand, Civil Action No. 1:16-cv-01301-PAB-GPG, filed November 11, 2016, in the U.S. District Court, District of Colorado and (2) the Class Action Complaint and Jury Demand filed December 31, 2015, Case No. 2015 CV 30160 in the Pitkin County District Court. In neither of these actions were individual directors named as defendants and in neither complaint did plaintiffs seek enforcement of the provision of the declaration which they contend is applicable and which they further contend the Association failed to enforce itself. Rather, plaintiffs seek only monetary damages.

In understanding my analysis and in reaching my conclusion, I have reviewed the documents listed on the attachment to this letter.

Section 7.8.1 of the Declaration provides in pertinent part that:

> . . . the Association and any aggrieved Owner may prosecute a proceeding at law or in equity against anyone violating or attempting to violate the provisions of this Declaration including, without limitation, an action for a temporary restraining order, preliminary injunction and permanent injunction."

Section 7.8.3 of the Declaration provides for "written notice" to the Executive Board of the Association before an "aggrieved Owner may prosecute any proceeding . . . enforcing the provisions of this Declaration . . . or seeking other relief relating to a violation or attempted violation . . . of the Declaration . . ." Section 7.8.3 further provides that the "Executive Board may initiate a

Aspen Highlands Condominium Association, Inc.
Page Three
February 16, 2017

proceeding . . . to enforce . . . this Declaration . . . ., to prevent a violation or to obtain damages for damage to the Common Elements resulting from the violation, or may otherwise enforce the provisions of this Declaration." (Emphasis added).  An aggrieved Owner may exercise its rights under Section 7.8.1 of the Declaration if "the Association fails to enforce or cause enforcement of the violated provision of [the] Declaration or the bylaws" within sixty days of receipt of the Notice.  The rights of the aggrieved Owner would include the right to seek injunctive relief against the continued violation of the Declaration.

Article 14 of the Amended and Restated Bylaws adopted October 2, 2001, states: "Unless otherwise addressed herein, internal disputes arising from the operation of the Project among the Declarant, the Association, the Owners, their respective agents and assigns, or any or all of them, must be submitted first for resolution through binding arbitration in accordance with the Declaration." (Emphasis added).  Despite this Bylaw, I can find no provision in the Declaration requiring arbitration of the issue addressed in the Notice.

A derivative action is a mechanism used in the corporate context by shareholders or members to sue on behalf of a corporation when those in control of the corporation decide not to pursue a claim belonging to the entity. *Hirsch v. Jones Intercable, Inc.*, 984 p.2d 629, 633 (Colo.1999).  Shareholders or members may use the derivative proceeding to file suit in the name of the corporation against the alleged wrongdoer, naming the board of directors as defendants.  This proceeding is available whether the corporation is a non-profit or a business corporation.  *Young v. Bush*, 277 P.3d 916 (Colo.App.2012).  In a derivative action, the corporation may address the question or whether to proceed with the claims that belong to the entity through a special litigation committee formed of individuals independent of those charged with the wrongdoing. *Curtis v. Nevens*, 31 P.3d 146, 151 (Colo.2001).

One focus of the committee inquiry must be the application of the business judgment rule that "bars judicial inquiry into actions of corporate directors taken in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes." *Hirsch,* 948 P.2d at 697.

The right of aggrieved owners provided in the Declaration is not a true derivative action because the Declaration provides owners a direct right to seek to

Aspen Highlands Condominium Association, Inc.
Page Four
February 16, 2017

enforce the Declaration or to seek "other relief relating to a violation or attempted violation" in their own names if "the Association fails to enforce or cause enforcement of the violated provisions" of the Declaration within sixty days after receipt of the Notice. After the passage of 60 days, the right to seek enforcement belongs to the owners and not solely to the entity.

There is no standard set forth in the Declaration as to whether or not the board should exercise its discretion to initiate an action but presumably such is subject to the business judgment rule which acts to protect from liability directors of an entity acting in good faith. *Polk v. Hergert Land & Cattle Co.*, 5 P.3d 402 (Colo.App.2000). A homeowner association has a fiduciary duty to its members to enforce restrictive covenants. *Woodward v. Board of Directors of Tamarron Ass'n of Condo Owners, Inc.*, 155 P.3d 621 (Colo.App.2007); *Colorado Homes Ltd. v. Loerch-Wilson*, 43 P.3d 718 (Colo.App.2001). However, in *Colorado Homes Ltd.*, it was agreed that the covenant was, in fact, being violated. Where as here, it is uncertain or disputed whether a covenant is being violated, whether the Association should seek enforcement would be governed by the business judgment rule. While Section 4.15.1 of the bylaws provides that the Executive Board has a "duty" "[t]o administer and enforce the covenants, conditions, restrictions, easements, uses, limitations, obligations, and all other provisions set forth in the Declaration" the initial question is whether there is a violation of the Declaration and/or bylaws.

The Notice references seven specific sections of the Declaration which it is asserted the Executive Board has failed to enforce. Those are as follows:

1.     Section 1.7 – Mixed Use: This section provides for commercial uses and residential uses. It is not known how or why it is asserted that this section is being violated.

2.     Section 4.5: I am unable to locate a section in the Declaration so numbered.

3.     Section 5.5: This section provides that an Owner of a Fractional Ownership Interest in a Unit shall be permitted to access the Common Elements, the Amenities, and the Health Club Facilities, <u>unless otherwise permitted by separate agreement</u>, only during the period of such Owner's actual occupancy of a Unit

Aspen Highlands Condominium Association, Inc.
Page Five
February 16, 2017

pursuant to such Owner's Fractional Ownership Interest (Emphasis added). It is my understanding that a separate agreement does so provide for access by persons other than the owner that being the membership plan documents and the Affiliation Agreement.

4.     Section 5.3.1: This section deals with parking. I am unable to determine how it is asserted this section is being violated.

5.     Section 23.13.1: This section deals with Cross Use Easement Rights. Again, I am unable to determine how it is asserted that this section is being violated.

6.     Section 23.4: This section deals with "conveyance by purchaser." Again, I am unable to determine how it is alleged that this section is being violated.

General assertions such as those in paragraphs 1 through 6 above do not comply with the specificity requirements of Section 7.8.3. The Notice must specify "the violation or attempted violation of the provisions of this Declaration or the bylaws, the facts and circumstances surrounding the violation, and the name of the person alleged to have violated or attempted to violate the provisions of this Declaration or the bylaws." Thus the Notice fails to comply with this requirement, as to items 1 through 6.

7.     The Notice also alleges a violation of Section 19.8 of the Declaration. The alleged violation of this section appears to be the gravamen of the Owners' Notice and complaint.

Section 19.8 reads:

Limit on Timesharing. Each Owner acknowledges that Declarant intends to create Fractional Ownership Interests with respect to Tourist Accommodation Units within Aspen Highlands Condominiums and Aspen Highlands Village. Other than the right of Declarant or a Successor Declarant and their respective officers, agents, employees, and assigns to create Fractional Ownership Interests in accordance with Article 23 of this Declaration (specifically including, without limitation, the Plan of

Aspen Highlands Condominium Association, Inc.
Page Six
February 16, 2017

> Fractional Ownership), no Unit shall be used for the operation of a time sharing, fraction-sharing interval ownership, private residence club, membership program, vacation club, exchange network or system or similar program whereby the right to exclusive use of the Unit is alternated or scheduled among participants in the program on a fixed or floating time schedule over a period of years whether by written, recorded agreement or otherwise (Emphasis added).

By its express terms, this section does not prohibit all timesharing in the project. Rather, "timesharing" is limited to the Plan of Fractional Ownership created by the declarant pursuant to Article 23 of the Declaration. Plan of Fractional Ownership is defined at Section 2.36 of the Declaration to mean "the system of mutual use rights and obligations created and established by Article 23 . . ." Therefore once a unit has been submitted to "a" Plan of Fractional Ownership, then Section 19.8 does not apply to the units so submitted to prohibit fractional ownership or timesharing pursuant to the Plan. After submission of a unit, the Plan of Fractional Ownership is governed by Article 23. To the extent there is an inconsistency or conflict, Article 23 controls.

C.R.S. § 38-33.3-205(1)(l), part of the Colorado Common Interest Ownership Act, provides that the declaration for a common interest community such as Aspen Highlands Condominiums must contain "[a]ny restrictions on the use, occupancy and alienation of the units. . ." A statutory rule of construction found at C.R.S. § 38-34-103 provides that ". . . all restrictions as to the use or occupancy of real property shall be strictly construed . . ." This means that any doubt relative to the meaning and application of a covenant must be resolved in favor of unrestricted use. *Dunne v. Shenandoah Homeowners Ass'n, Inc.*, 12 P.3d 340 (Colo.App.2000).

Nevertheless, the Executive Board of the Association is held to the Fairness Standard found at Section 6.8 of the Declaration. That standard provides:

> The Executive Board, the officers of the Association and the Association shall have the duty to represent the interest of the [Owners] in a fair and just manner on all matters that may affect any and all categories of owners. In upholding their duties, the

Aspen Highlands Condominium Association, Inc.
Page Seven
February 16, 2017

Executive Board, the Officers and the Association shall be held in their decisions . . . to the standards of good faith and reasonableness with respect to such matters, taking into account the effect, if any, of the matter on the Project as a whole.

The Notice included a copy of the September 21, 2012 Memorandum (draft) from Brownstein Hyatt Farber Schreck and asserted that the Association's "violations and failure to enforce" are detailed in that memorandum.

A program had been proposed in 2012 through which unsold interests at Aspen Highlands would be owned by Marriott Vacation Club Trust. This potential led the Association to seek review from Brownstein Hyatt Farber Schreck and resulted in the September 12, 2012 Memorandum, a copy of which is attached. The memorandum discussed in its Introduction the program as it was then proposed and understood. The Memorandum concluded that there was "a prohibition against any timeshare or exchange use of the Tourist Accommodation Units other than the RC Program specified in Article 23 of the Declaration . . ." This conclusion also discussed that the proposed program could arguably be permitted and that the outcome of any litigation regarding the proposed use "would be less than certain." The conclusion was followed by a discussion of provisions prohibiting the proposed program and of provisions permitting the proposed program. The Memorandum included the following:

We can prepare and send a cease and desist letter to the Marriott Parties, an initial draft of which is transmitted with this memorandum. This option will hopefully bring MVW to the table with a more reasonable resolution acceptable to the Association, which we understand is the goal of the Association.

Thereafter a cease and desist letter dated November 21, 2012 was sent by the law firm, a copy of which letter is attached. The November 21, 2012 letter need not be read as stating that the position of the Association was that the proposed program violated the Declaration, but may be read as an attempt to bring Marriott "to the table."

The Membership Program or the Ritz-Carlton Club Membership Program is defined in the Affiliation Agreement attached to the Declaration as Exhibit F to

Aspen Highlands Condominium Association, Inc.
Page Eight
February 16, 2017

mean "the program of benefits and services . . . as they may exist from time to time." (Section 23.2.5). Likewise, Section 23.2.6 defines "Membership Program Documents" to mean "the Affiliation Agreement, the Reservation Procedures established by the Program Manager and any other documents governing the use and operation of the membership program, <u>as they may be amended from time to time</u>" (Emphasis added).

There is nothing in the Affiliation Agreement that requires that the member program must always, or solely, be with Ritz-Carlton. Definitions such as Associate Member and Associate Club indicate that the program is not "set in stone" and may be changed, amended or modified. Section 5.2 of the Affiliation Agreement states that the Program Manager, The Ritz-Carlton Travel Company LLC., has the right "to adopt and amend" program documents in its sole discretion in a manner that in its "reasonable business judgment will be for the principal purpose of improving upon the quality and operation of the . . . [Program] and furthering the collective enjoyment of the Membership Program by present and future Members (including Associate Members) as a whole." The Marriott Vacation Club seems to fit the definition of an "Associated Club" found at Article II of the Affiliation Agreement. Thus, there is no absolute prohibition against amending the program and as amended, such a program would continue to be a program under Article 23 of the Declaration.

The Board sought input from David Firmin of HindmanSanchez regarding "affiliation" with The Lion & Crown Exchange Program. Mr. Firmin stated in July 2012 that "while the association is not in a strong negotiating position in regard to this, it is not without some valid points . . ." In May 2013, Mr. Firmin reviewed The Lion & Crown Enrollment Agreement and stated some of his concerns with the proposed agreement. Mr. Firmin wrote:

> Generally speaking, this agreement is exceedingly one-sided and as drafted permits the vast expansion of the program to not only affiliated programs of similar quality, but also to other products in [sic] affiliated with the Marriott brand, based upon a point allocation system as determined by the Exchange Company. Material revisions to the agreement should be considered prior to member participation in this program.

Aspen Highlands Condominium Association, Inc.
Page Nine
February 16, 2017

/

None of its various counsel opined to the Executive Board that an exchange program unambiguously violated the restriction at Section 19.8 of the Declaration or any other provision.

The Affiliation Agreement has always been a part of and attached to the Declaration. Certain programs have existed in the past under the umbrella of the Affiliation Agreement for the benefit of owners including the Lion & Crown Program, Exclusive Resorts and 3rd Home. There have been, to my knowledge, no claims that these programs have violated the provisions of the Declaration or diminished the value of owner interests. These programs were never presented to the Executive Board of the Association for approval prior to implementation because they were optional benefits to owners.

Nevertheless the Marriott Vacation Club Destinations Exchange Program was discussed with the Executive Board, most likely because of the cease and desist letter that had been sent. It was agreed that a survey of owners would be taken. A survey captioned The Ritz-Carlton Club, Aspen Affiliation Survey was prepared and sent to Aspen members. This survey compared the existing Ritz-Carlton Club system that would continue with "no affiliation" with the Marriott Vacation Club Destinations Exchange Program that would exist "with affiliation." The "vote" among members ended on January 13, 2014. Although owners responding favored affiliation by only a narrow margin, a majority of those responding did approve.

On April 17, 2014, a Memorandum of Understanding between The Lion & Crown Travel Co., LLC, and the Association was executed. Separate counsel, Michael Marino, of Seyfarth Shaw LLP., had been engaged by the Association to negotiate these agreements. That Memorandum of Understanding, a copy of which is attached, contained the following:

> 5. Association acknowledges and agrees that, as a special accommodation, Lion & Crown has allowed Association to determine whether (by a survey of the Association's members or such other method as the Association and Lion & Crown mutually agree upon) to enter into this Acknowledgement, even though Lion & Crown is not required to obtain the association's consent,

Aspen Highlands Condominium Association, Inc.
Page Ten
February 16, 2017

joinder, or acknowledgement in connection with the affiliation with an Affiliate Program.

Thereafter an Acknowledgement of and Joinder to Affiliation Agreement between Lion & Crown Travel Co., LLC. and Marriott Resorts Travel Company, Inc., dated April 24, 2014, was signed. The Association is a signatory to that agreement. A copy is attached.

As specified in the Memorandum, the program is voluntary to members of the Association and must be renewed by members who wish to participate on an annual basis.

A review of the documents demonstrates that the Association did not simply allow the affiliation program to be implemented without careful review and consideration. The decision to allow the program was made by the Executive Board of the Association after careful review, after consultation with its various counsel, and after submitting the matter to a survey vote of members.

Finally, it is noted that if the Association does not take action based upon the Notice, then the owners giving the Notice could seek to enjoin the asserted breach of the Declaration. If those owners are correct that the program does violate Section 19.8 of the Declaration, they could seek to enjoin a continuation of the program. If the owners were correct that the program caused the diminution in value of their interests and if the program were brought to an end, the values would presumably then return to their earlier levels and the owners would suffer no damage.

Very truly yours,

Wendell B. Porterfield, Jr.

WBP:al

## ATTACHMENT

1.    The Notice referred to above, dated December 20, 2016.

2.    Declaration of Condominium for Aspen Highlands Condominiums recorded January 11, 2001;

3.    First Amendment to Declaration dated as of June 4, 2001;

4.    Second Amendment to Declaration dated as of October 2, 2001;

5.    Third Amendment to Declaration dated as of November 3, 2005;

6.    Fourth Amendment to Declaration dated as of November 29, 2005;

7.    Articles of Incorporation for Aspen Highlands Condominium Association Inc. filed December 9, 1999;

8.    Amended and Restated Articles of Incorporation November 1, 2000;

9.    Bylaws effective October 2, 2001;

10.    Amendment to Bylaws approved July 14, 2005;

11.    The Ritz-Carlton Management Company LLC. Management Agreement dated as of January 12, 2001;

12.    Amendment to Management Agreement dated December 31, 2009;

13.    Second Amendment to Management Agreement dated July 2, 2012;

14.    Third Amendment to Management Agreement effective October 11, 2014;

15.    The Ritz-Carlton Club Membership Program Affiliation Agreement attached as Exhibit F to the Declaration;

16.    First Amendment to Affiliation Agreement dated October 2, 2001;

17.    Disclosure Statement (State of Colorado);

18.    Disclosure Statement (State of Colorado) dated February 1, 2005;

19. Disclosure Statement City of Aspen dated January 4, 2001;

20. Second Amended and Restated City of Aspen Disclosure Statement dated June 9, 2005;

21. Non-enrolled Home Club letter dated July 17, 2012;

22. Enrolled Home Club letter dated July 17, 2012;

23. Memo re: Privilege dated December 1, 2016;

24. Memo re: Communication with Counsel dated November 28, 2016 from Hogan Lovells;

25. Email to Jay Neveloff from David Firmin dated July 20, 2012;

26. Letter from Association to Members dated December 19, 2012;

27. Memorandum from of Brownstein Hyatt Farber Schreck dated September 21, 2012;

28. Letter from Phillip A. Gosch of Brownstein Hyatt Farber Schreck dated November 21, 2012;

29. Class Action Complaint filed in Pitkin County District Court, Case No. 2015 CV 30160;

30. Third Amended and Supplemental Complaint filed in U.S. District Court November 11, 2016 with exhibits;

31. Disclosure guide for Cobalt Travel Company LLC., Members with access to Lion and Crown Exchange Program;

32. Enrollment Agreement Terms and Conditions;

33. Ritz-Carlton Club –Lion and Crown Travel Co. LLC., enrollment provisions;

34. Terms and Conditions Supplements for Exclusive Resorts Program Services dated May 1, 2013;

35. Aspen Highlands Tourist Accommodation Board letter to members dated August 17, 2012;

36.     Undated Memo re: Positive Discussion;

37.     "Frequently Asked Questions" with updates and amendments dated October, November and December 2013;

38.     Draft letter from Ritz-Carlton Development Corporation dated December X, 2013 re: Vote;

39.     Form letter to Members from Aspen Highlands Tourist Accommodation Board and Ritz-Carlton Destination Club re: proposed MVC Destinations Exchange Program (October 2013);

40.     September 2013 draft of item 34;

41.     Letter re: July 17 changes;

42.     Letter to Randall Mercer dated December 22, 2012;

43.     Report re: Aspen Owners Usage;

44.     Introduction to your membership guide;

45.     Detailed how to use guide;

46.     Expanded use options Affiliation Brochure;

42.     Survey results as of January 13, 2014;

47.     Email re: Use by Marriott Vacation Club users of weeks registered by Aspen members;

48.     Letter to members of Great Bay Condominium Owners Association, Inc. and The Neighbor Association, Inc. dated August 3, 2007;

49.     Letter to Eagle Tree Condominium Association, Inc. members dated August 10, 2007;

50.     The Notice referred to above.

51.     Acknowledgement and Joinder to Affiliation Agreement between The Lion & Crown Travel Co., LLC. and Marriott Resorts, Travel Corp. dated February (April) 2014;

52.    Memorandum of Understanding between The Lion & Crown Travel Co., LLC. and Association dated April 17, 2014;

53.    Ritz-Carlton Club, Aspen Affiliation Survey;

54.    Amended and Restated Rules and Regulations dated November 2011;

55.    Letter to Members from Association dated December 19, 2012;

56.    Lion & Crown Travel Co., LLC, Exchange Procedures for the Cobalt Travel Company LLC, Members with access to the Lion & Crown Exchange Program (April 30, 2013);

57.    Affiliation Agreement between the Lion & Crown Travel Co., LLC. and Marriott Resorts, Travel Company and Great Bay Condominium Owners Association dated January 31, 2014.

# ATTACHMENT

Brownstein | Hyatt
Farber | Schreck

D R A F T

Memorandum

PRIVILEGED AND CONFIDENTIAL COMMUNICATION
ATTORNEY WORK PRODUCT

DATE:        September 21, 2012

TO:          Aspen Highlands Condominium Association, Inc. (the "Association") Board of Directors

FROM:        Brownstein Hyatt Farber Schreck, LLP

RE:          Analysis with respect to use of Tourist Accommodation Units by members of the Marriott Vacation Club who are not also members of the Ritz Carlton Membership Program

---

<u>INTRODUCTION</u>

The Declaration of Condominium for Aspen Highlands Condominiums (the "Declaration") creates a fractional interest ownership regime that authorizes the sale and ownership of deeded, fractional interests in the Tourist Accommodation Units. The condominium documents and disclosures referenced in this memorandum provide that owners of such fractional interests are members of The Ritz Carlton Membership Program (the "RC Program") and that only such members and other members of the RC Program from other participating RC Program locations may use the Tourist Accommodation Units. Marriott Vacations Worldwide Corporation ("MVW") operates (or controls through one or more affiliates the operations of) the RC Program as well as the Marriott Vacation Club (the "MVC"). MVW or such affiliates utilize the Ritz Carlton and Marriott names by virtue of a license agreement with an affiliate of Marriott International, Inc. MVW has recently begun to offer the use of Tourist Accommodation Units as exchange units (the "MVC Usage") to members of the MVC who are not also members of the RC Program (the "MVC Members"). The Cobalt Travel Company, LLC, an affiliate of Marriott International, Inc., serves as "Program Manager" under the Affiliation Agreement, which Affiliation Agreement provides for the inclusion of the Tourist Accommodation Units in the RC Program. The Ritz Carlton Management Company, L.L.C., also an affiliate of Marriott International, Inc. (the "HOA Manager"), manages the Association and has retained The Cobalt Travel Company, LLC as "Project Manager" pursuant to the HOA Management Agreement. MVW, the HOA Manager and the Project Manager are collectively referred to herein as the "Marriott Parties." The Association has

questioned whether or not the MVC Usage violates the applicable documents and, if so, what legal or other options are available to the Association.

Please be advised that the analysis contained in this memorandum is based on our initial review of the documents provided to us, we have not performed thorough legal research to date and we have not reviewed or been provided copies of the documents for the Amenities Association, if any. Capitalized terms not otherwise defined in this memorandum shall have the meanings afforded them under the applicable documents referenced in this memorandum.

## CONCLUSION

The Declaration is clear in its prohibition against any timeshare or exchange use of the Tourist Accommodation Units other than the RC Program specified in Article 23 of the Declaration, and the Declaration is the governing document that creates the condominium regime under the Colorado Common Ownership Act, C.R.S. Section 38-33.3-101, *et seq.* (the "Act") and governs all condominiums in Colorado. The Disclosure Documents (as hereinafter defined) also make no reference to the MVC Usage or affiliation of the condominium with any hotel brand other than Ritz Carlton. Contrary to the clear prohibition in the Declaration and the absence of disclosure in the Disclosure Documents, the Affiliation Agreement, the Reservation Procedures and the HOA Management Agreement contain provisions and definitions that arguably permit the type of timeshare/exchange use of the Tourist Accommodation Units that the Marriott Parties are implementing. The contrary provisions in the Declaration and the absence of disclosure in the Disclosure Documents, as opposed to the provisions and definitions found in the Affiliation Agreement, the Reservation Procedures and the HOA Management Agreement, create an uncertain playing field where each of the Association and the Marriott Parties can make a reasonable case that the MVC Usage is prohibited or permitted, as applicable. However, the better argument is that the Declaration and the intent evidenced therein should control to the extent of any conflict among the project documents, and there is support in the Act for the proposition that the Declaration is the controlling document. Even if we assume that the MVC Usage is permitted under the Affiliation Agreement, the Reservation Procedures and the HOA Management Agreement, there are qualitative requirements in the Affiliation Agreement that the MVC Usage may not satisfy. Additionally, there exists an argument that the Affiliation Agreement, the Reservation Procedures and the HOA Management Agreement are contracts of adhesion which, in the case of inconsistency with provisions of the Declaration, should be construed against the Marriott Parties' position. Also, there exists arguments that the MVC Usage constitutes a breach of the fiduciary duties of the HOA Manager under the HOA Management Agreement as the Marriott Parties are arguably benefitting from the MVC Usage to the detriment of the Association and its members. Finally, there also exists arguments that the MVC Usage has not been properly disclosed in the state and city disclosure documents filed in connection with the condominium sales offering, which could give rise to claims of fraudulent inducement and/or disclosure noncompliance. Accordingly, the Association has sufficient support to justify the issuance of a cease and desist letter demanding that the Marriott Parties stop the MVC Usage as the same violates the Declaration, is inconsistent with the Disclosure Documents and is not permitted by the Affiliation Agreement, the Reservation Procedures and the HOA Management Agreement, but the outcome of any actual litigation regarding the MVC Usage would be less than certain given the contrary provisions in the Declaration and the Disclosure Documents as opposed to the Affiliation Agreement, the Reservation Procedures and the HOA Management Agreement.

## ANALYSIS

I.    Under the various documents, do MVW, the HOA Manager and/or the Program Manager have the authority to subject the Tourist Accommodation Units to the MVC Usage?

A.    Express and Implicit Provisions Prohibiting the MVC Usage

There are numerous provisions in the Declaration and the Colorado Disclosure Statement, the City of Aspen Disclosure Statement and the New York Condominium Offering Plan (the "Disclosure Documents") that support the position that the MVC Usage is prohibited.   Section 19.8 of the Declaration provides that, other than the rights of Declarant or a Successor Declarant to create Fractional Ownership Interests in accordance with Article 23, "no Unit shall be used for the operation of a timesharing, fraction-sharing, interval ownership, private residence club, membership program, vacation club, exchange network or system or similar program whereby the right to exclusive use of the Unit is alternated or scheduled among participants in the program on a fixed or floating time schedule over a period of years whether by written, recorded agreement or otherwise" (emphasis added). Therefore, Section 19.8 is an unambiguous prohibition against the MVC Usage and a clear expression of Declarant's original intent that timeshare/exchange uses like the MVC Usage are prohibited.

Several other provisions of the Declaration provide that no further or other subdivision of the Fractional Ownership Units is permitted.   Section 1.6 of the Declaration provides that, except as authorized in the Declaration, no further subdivision of the Tourist Accommodation Units into Fractional Ownership Interests is permitted and no additional condominium units may be established on the Property by subdivision of existing units, conversion of non-condominium space or otherwise.   In addition, Section 23.1 of the Declaration provides that "the right to submit a Tourist Accommodation Unit to the Plan of Fractional Ownership shall extend only to the Declarant who owns such Tourist Accommodation Units and any Successor Declarant who are specifically conveyed this right, and shall specifically not be available to individual purchasers of Tourist Accommodation Units, their successors or assigns except with the prior written consent of Declarant." Finally, Section 23.4 of the Declaration provides that "In no event, however, shall a Plan Member convey or encumber less than a Fractional Ownership Interest as defined herein or as defined in a deed conveying a Fractional Ownership Interest, or attempt to subdivide a Fractional Ownership Interest into lesser interests" (emphasis added).  The MVC Usage is an additional ownership/use interest that does not constitute a permitted, additional deeded, Fractional Ownership Interest in the Tourist Accommodation Units, and such additional deeded, Fractional Ownership Interests are the only permitted created interests for use of the Tourist Accommodation Units under the Declaration.

The Declaration further provides that only deeded Owners of Fractional Ownership Interests and other Plan Members were intended to use the Tourist Accommodation Units (see, e.g., §§1.1, 1.4 and 1.6 of the Declaration).   Section 1.7 of the Declaration provides that "other features commonly associated with commercial uses and residential uses shall be expressly permitted on the Property." However, timeshare and exchange use by less compelling brands are not a "commonly associated" use within a luxury, high-end fractional ownership regime as is created by the Declaration, and certainly not at this project given the express prohibitions against timeshare/exchange use in Section 19.8 of the Declaration.  Also, Section 23.13.1 of the Declaration provides cross-use easements for Plan Members of comparable Fractional Ownership Interests in the Project, but not to any other individuals, and such Plan Members only get Fractional Ownership Interests in the Project by way of a deeded and undivided Fractional Ownership Interest.  Accordingly, Plan Members would not include the MVC Members, and such non-Plan Members do not enjoy the benefits of the cross-use easements necessary to fully utilize the property.

The Declaration and the Affiliation Agreement also contain limitations on the use of and access to amenities that do not extend to non-Plan Members.  Section 5.5 of the Declaration provides that "An Owner of a Fractional Ownership Interest in a Unit shall be permitted to access the Common Elements, the Amenities, and the Health Club Facility, unless otherwise permitted by separate agreement, only during the period of such Owner's actual occupancy of a Unit pursuant to such Owner's Fractional Ownership Interest." Accordingly, Section 5.5 of the Declaration is consistent with Section 19.8 of the Declaration in that only Owners occupying Tourist Accommodation Units are permitted access to the amenities, and the Marriott Parties' practice of granting the MVC Members access to the amenities arguably violates Section 5.5 of the Declaration.  To be fair, such Section 5.5 does caveat that

statement by providing "unless otherwise permitted by separate agreement." However, as further described below, the Affiliation Agreement does not grant access and use rights for the amenities to Associate Members, and we are not aware of any separate agreement that does grant such use rights. Lastly, Section 5.3.1 of the Declaration provides parking rights only to Tourist Accommodation Owners, Deed Restricted Residential Owners and the Commercial Owners. Accordingly, the Marriott Parties are arguably violating Section 5.3.1 of the Declaration if the MVC Members are permitted to utilize condominium parking facilities. If the Declarant intended for timeshare/exchange owners at clubs other than those clubs constituting a part of the RC Program to have cross-use rights, rights to use the amenities and parking rights, the Declarant could, should and would have explicitly provided for such rights in the Declaration.

The Declaration and the Disclosure Documents also make repeated references to Ritz Carlton and the RC Program throughout such documents, and there is no mention of any other hotel brand or affiliation with any other non-Ritz Carlton club. It would have been very easy for the Declarant to have caused such documents to disclose the MVC Usage as the Declarant controlled the drafting and preparation of the Disclosure Documents, the Declaration, the other governing documents of the Association, the Affiliation Agreement and the HOA Management Agreement at the very formation of the condominium regime, but no such disclosure exists in such documents.

Moreover, the Association can argue that the Declaration is the controlling document in the event of any conflict among the project documents. Section 103(13) of the Act provides that the Declaration creates the condominium governed by the Act. In addition, Section 203(3) of the Act provides that the Declaration controls over the bylaws in the event of any conflict. Accordingly, the logical implication is that the Declaration controls over any other governing document of an association in the event of a conflict among the governing documents. The Act does not define "governing documents", and accordingly it is unclear whether the Affiliation Agreement and the HOA Management Agreement would even constitute governing documents since such documents do not deal with the formation and/or governance of the Association. In any event, the Affiliation Agreement, the Reservation Procedures and the HOA Management Agreement should constitute contracts of the Declarant under Section 305 of the Act. Under Section 305 of the Act, any contract or lease between an association and a declarant or an affiliate of a declarant or any contract or lease that is not bona fide or was unconscionable to the unit owners at the time entered into under the circumstances then prevailing is terminable by an association upon 90 days notice at any time after the board elected by the unit owners takes office. Accordingly, even though the Reservation Procedures are not necessarily a contract of the Declarant under Section 305 of the Act (since the Reservation Procedures are not an agreement between the Declarant and the Association), and even though the Marriott Parties could argue that the Affiliation Agreement and the HOA Management Agreement are not contracts of the Declarant under Section 305 of the Act (since one of the co-declarants under the Declaration, Hines Highlands Limited Partnership, did not execute the Affiliation Agreement and the HOA Management Agreement), the Association arguably has the right to terminate the Affiliation Agreement and the HOA Management Agreement at any time after the board elected by the unit owners takes office. While termination of the Affiliation Agreement and the HOA Management Agreement is not likely desired by the Association, the clear implication of Section 305 of the Act is that the Act does not give any deference to agreements executed by a declarant or its affiliate and an association at the time that the declarant controls the association, and any such unilaterally implemented agreements are terminable by an association once control of the board passes. Therefore, the Act supports the Association's position that the Declaration should control in the event of any conflict between the Declaration and the Affiliation Agreement, the Reservation Procedures and the HOA Management Agreement. Moreover, as will be detailed later in this memorandum, the Association could also take the position that these ancillary documents are contracts of adhesion that should be construed against the Marriott Parties.

4

B.   Express and Implicit Provisions Permitting the MVC Usage

There are provisions and definitions in the Affiliation Agreement, the Reservation Procedures and the HOA Management Agreement which support the position that the MVC Usage is permitted. The Affiliation Agreement was executed by the Association and is incorporated into the Declaration by Section 23.2.1 of the Declaration, and Section 23.2.6 of the Declaration incorporates the Affiliation Agreement into the definition of Membership Program Documents. In addition, Section 23.8.6 of the Declaration obligates Tourist Accommodation Directors to "comply with the terms, covenants and conditions of the Affiliation Agreement." Also, Section 23.11 of the Declaration states that "by acceptance of a deed to a Fractional Ownership Interest, a Plan Member agrees to be bound by the terms and conditions of the Declaration" (which, as stated above, incorporates the terms and conditions of the Affiliation Agreement). Finally, the HOA Management Agreement is contemplated by Section 7.4 of the Declaration and was executed by the Association.

The strongest argument for the position that the MVC Usage is permitted is found in Section 5.3 of the Affiliation Agreement, which provides that "The Developer, Members Association and Club Manager agree that the Program Manager shall have the right pursuant to the Reservation Procedures to reserve any unreserved use of the Residences for its own promotional use, rental for its own account or any other purpose as Program Manager determines in its sole discretion" (emphasis added). Similarly, Section 4(S) of the HOA Management Agreement authorizes the HOA Manager to engage the Program Manager to manage and administer the reservation procedures and exchange program for the RC Program, and such Section 4(S) further provides as follows: "The Program Manager shall have the broadest possible delegation of authority regarding administration of the Reservation Procedures. The Program Manager shall be authorized, in its sole discretion, to promulgate, adopt and amend the Reservation Procedures from time to time, in order to maintain uniformity of reservation procedures within the Membership Program and to more effectively fulfill reservation requests" (emphasis added). Under such Section 4(S), the HOA Manager is authorized to pass the reasonable cost of operating the Reservation Procedures to unit owners as part of their dues. The Marriott Parties could argue that Section 5.3 of the Affiliation Agreement and Section 4(S) of the HOA Management Agreement provide the Program Manager with the authority to do whatever the Program Manager wants with respect to unused and unreserved Tourist Accommodation Units. The Reservation Procedures provide additional support for this position by granting the Program Manager the authority to reserve space available units to Guests of the Program Manager for no more than seven (7) consecutive nights; however, even though the definition of "Guests" is broad, it implies some sort of personal connection and not an authorization to use the Tourist Accommodation Units in connection with different commercial enterprise, and the Reservation Procedures also defer to the Declaration in the event of any conflict. These provisions could also be interpreted to grant the Program Manager only broad authority and flexibility in operating the RC Program, not authority to establish a new practice of allowing the MVC Members to use, as an element of another club entirely separate from the RC Program, the Tourist Accommodation Units in contradiction of the express terms of the Declaration. To that end, the Association would argue that these provisions provide the Program Manager with the power to temporarily fill unused inventory from time to time in a manner that does not damage or devalue the interests of the members of the Association and that none of these provisions were intended vitiate the express prohibitions found in the Declaration.

Additional support for the position that the MVC Usage is permitted is found in two definitions contained in the Affiliation Agreement. The definition of "Membership Program" is very broad under Article II of the Affiliation Agreement. Membership Program means the program of benefits and services created and operated by the Program Manger as they may exist from time to time, which Members participate in by virtue of ownership of a Residence Interest or by other means established by the Program Manager, e.g., the benefits and services made available to Associate Members (emphasis added). The definition of "Associate Members" is also very broad. Associate Member is defined as a person having privileges within the Membership Program through a separate category of membership other than that type of membership associated with ownership of a Residence Interest and mandatory

5

affiliation with the Membership Program (emphasis added).  Section 3.1 of the Affiliation Agreement provides that "By execution of this Agreement, the Parties agree to affiliate the Club with the Membership Program in accordance with the terms and conditions of the Membership Program Documents."  Also, Section 3.2(a) of the Affiliation Agreement provides that "In accordance with the Residence Documents, membership in the Membership Program is an appurtenance to and a condition of ownership of a Residence Interest at the Club."  The definition of Residence Interest includes "use rights" and not merely a deeded ownership interest (although this provision of the Affiliation Agreement does contradict the Declaration, which provides that only deeds to a Fractional Ownership Interest provide use rights in the Tourist Accommodation Units).  Since the definition of Membership Program includes "benefits and services made available to Associate Members," then arguably the Program Manager can give Associate Members use rights in the Membership Program (which creates the necessary Residence Interest).  Accordingly, the Marriott Parties could take the position that the defined terms "Associate Member" and "Membership Program", when read in conjunction with Sections 3.1 and 3.2(a) of the Affiliation Agreement, permit the MVC Usage as a benefit or service to its Associate Members by taking the position that the MVC Members constitute Associate Members under the Affiliation Agreement.

Section 7.2(a) of the Affiliation Agreement contains another provision that the Marriott Parties could contend supports the position that the MVC Usage is permitted.  Section 7.2(a) of the Affiliation Agreement provides that the Program Manager may, in its sole discretion, elect to affiliate other locations with the Membership Program as Member Clubs or Associated Clubs from time to time without any consent, and further provides that such locations will compete with existing Members and/or Associate Members in reservations for available accommodations.  In this case, the Association would argue that this provision is best construed as permitting the addition of a new location to the RC Program rather than permitting a use of the Tourist Accommodation Units that is expressly prohibited under the Declaration.

Furthermore, Section 23.4 of the Declaration provides that the use rights with respect to the Tourist Accommodation Units are limited to what is set forth in the deed for a Tourist Accommodation Unit.  The deed provided for our review provides that such deed is subject to The Ritz Carlton Club Membership Program Reservation Procedures and, as stated previously, the Reservation Procedures do authorize the Program Manager to use unused and unreserved Tourist Accommodation Units in its sole discretion.  Again, the Association's position would be that such authorization grants the Program Manager the power to temporarily fill unused Tourist Accommodation Units from time to time rather than permitting a use of the Tourist Accommodation Units that is expressly prohibited under the Declaration.

The Marriott Parties could utilize some or all of the foregoing arguments to take the position that the MVC Usage is permitted by the Affiliation Agreement, the Reservation Procedures and the HOA Management Agreement.  However, the Association has reasonable grounds to refute such a position since (i) such claimed authority was not demonstrated anywhere else in the project documents, including in the Declaration and the Disclosure Documents, (ii) the Declaration contains express and implicit prohibitions against the MVC Usage, (iii) in accordance with the Act, the Declaration should control in the event of conflict with any of the other project or governing documents, and (iv) such claimed authority could and should have been set forth in the Declaration and the Disclosure Documents if the original intent was truly to permit something that is expressly prohibited in the Declaration.

Finally, the Affiliation Agreement and the HOA Management Agreement were executed by the Association when the Association was under Declarant's control.  The Affiliation Agreement, the Reservation Procedures and the HOA Management Agreement were also likely prepared by counsel to Declarant, and current and former Owners had no say in the drafting or negotiation of the Affiliation Agreement, the Reservation Procedures and the HOA Management Agreement.  As a result, the Affiliation Agreement, the Reservation Procedures and the HOA Management Agreement arguably

constitute contracts of adhesion, and if necessary, the Association could take the position that such agreements and procedures should be construed more stringently against the drafter than against the Association and/or the Owners (which would work against the Marriott Parties' positions). Also, as previously described, the Association could also argue that the Declaration and Disclosure Documents are the most significant documents in a residential real estate acquisition, and, consistent with the intent of the Act, it is not appropriate to interpret ancillary documents such as the Affiliation Agreement and the HOA Management Agreement in a manner that is contrary to express provisions in the Declaration.

C.    Qualitative Arguments

Even if we assume that the terms of the Affiliation Agreement, the Reservation Procedures and the HOA Management Agreement permit the MVC Usage as a benefit or service to Associate Members, there are qualitative requirements in the Affiliation Agreement that the MVC Usage may not satisfy.

The definition of "Associated Clubs" in the Affiliation Agreement is a location pursuant to which membership in the Membership Program is made available to persons on a voluntary basis in accordance with such terms and conditions as may be determined by the Program Manager and for which an agreement similar to the subject Agreement has been executed (emphasis added). Additionally, Section 7.1 of the Affiliation Agreement provides that in the event the Program Manager affiliates one or more additional Member Clubs or Associated Clubs with the Membership Program, the agreement executed to effect such affiliation shall, subject to applicable law, contain substantially the same terms and conditions as the Affiliation Agreement in all material respects under the circumstances as pertaining to each such additional Member Club or Associate Club (emphasis added). Also, the definition of a Member Club contemplates that such club be governed pursuant to an agreement similar to the Affiliation Agreement or otherwise (emphasis added). It is highly unlikely that the documentation implementing the MVC Usage meets these requirements since the documentation for timeshare owners and other holders of Marriott points will be substantially different from the documentation for an exchange program for owners of deeded, fractional interests.

Also, Section 4.5 of the Affiliation Agreement provides that Developer, the Members Association and the Club Manager agree to manage, operate and maintain the Club in a manner consistent with the standards of quality and customer service established by the Program Manager for all Member Clubs from time to time (emphasis added), and Section 5.2 of the Affiliation Agreement provides that Membership Program Documents will only be adopted or amended in a manner that in the Program Manager's reasonable business judgment will be for the principal purpose of improving upon the quality and operation of the Membership Program and/or the Reservation System and furthering the collective enjoyment of the Membership Program by present and future Members (including Associate Members) as a whole (emphasis added). The Association could take the position that making the Tourist Accommodation Units subject to the MVC Usage does not improve upon the quality and operation of the Membership Program, nor does it further the collective enjoyment by present and future Members as a whole, for a host of reasons, including that the other Marriott brands participating in the MVC are not nearly as highly regarded as is the Ritz Carlton brand, that there are clear differences in the standards of quality and customer service between the other Marriott brands and the Ritz Carlton brand, that the increased traffic and nature of the visitor will negatively impact the experience of Members and that all of which, taken as a whole, will materially damage the value of the condominium units.

D.    Fraudulent Inducement / Self Dealing

The Association could also take the position that the MVC Usage constitutes fraudulent inducement by The Ritz Carlton Development Company, L.L.C., as co-declarant and seller of the condominium units, and/or self-dealing between the HOA Manager and the other Marriott Parties.

Declarant was obligated to provide copies of the applicable Disclosure Documents to prospective purchasers. The Disclosure Documents are intended to apprise prospective purchasers of specific or general risks of buying a unit at the Aspen Highlands Condominium. As noted earlier, Ritz Carlton is the only hotel brand referred to throughout the Disclosure Documents. Section 4 of the Colorado Disclosure Statements discloses only that the resort will be affiliated with the RC Program, and there is no disclosure of any affiliation with the MVC. Moreover, while the Disclosure Documents do disclose the risk that the Program Manager could affiliate other resorts with the Membership Program, none of the Disclosure Documents discloses the risk that the Program Manager or anyone else could create a new class of non-deeded users or that the Tourist Accommodation Units could be used for timeshare/exchange use outside of the RC Program. A form of Purchase Agreement that was attached to the New York Condominium Offering Plan also does not disclose such risks. Accordingly, it could be argued that the unit owners were fraudulently induced into purchasing whole ownership units or Fractional Ownership Interests at the Aspen Highlands Condominium since the MVC Usage was not disclosed to such unit owners. The owners purchased a unit or fractional interest in the condominium expecting the Association and the Fractional Units to be managed in accordance with Ritz Carlton standards and (for the owners of Fractional Units) in a fractional interest regime within the RC Program. If such owners had wanted to purchase a significantly less expensive membership in a club such as the MVC that permitted timeshare/exchange use, such owners certainly could have done so, but they purchased a Unit or Fractional Ownership Interest at the condominium expecting this would not be the case.

Also, Sections 19.9.10 and 23.8.11 of the Declaration place the responsibility to update the City of Aspen Disclosure Statement on the Association, <u>acting through the Tourist Accommodation Directors</u> (emphasis added). The Colorado Disclosure Statement and the City of Aspen Disclosure Statement do not comply with the requirements of Colorado and the City of Aspen regulations for both technical and the above-described substantive reasons. We can provide more detail regarding the technical violations upon request, but there is sufficient non-compliance to consider referencing the potential violations in the cease and desist letter to the Marriott Parties.

Finally, we would need to research the issue, but it is possible that the HOA Manager and the Program Manager are breaching one or more fiduciary duties owed to the Association by virtue of the HOA Management Agreement, including the fiduciary duty prohibiting an agent from self-dealing at the expense of its principal. The potential self-dealing arises as a result of the HOA Manager and the Program Manager permitting/assisting the licensee of their affiliate, MVW, to implement the MVC Usage in violation of the Declaration, and the MVC Usage burdens the Association and its members for the benefit of the Marriott Parties. The HOA Manager and the Program Manager are arguably enriching their affiliates by creating an attractive offering for the MVC Members, which increases sales and license fees under Marriott's arrangement with MVW, all at the expense and burden of the owners of Fractional Ownership Interests and Residences. As previously noted, the HOA Management Agreement provides that the reasonable cost of implementing the Reservation Procedures is passed to the unit owners as part of their dues. An additional breach of fiduciary duty would likely arise to the extent such dues are subsidizing the cost of implementing the MVC Members use of the Tourist Accommodation Units.

II.     What strategies and options are available to the Association to challenge the actions of the Marriott Parties subjecting the Tourist Accommodation Units to the MVC Usage?

A.     <u>Cease and Desist Letter</u>

We can prepare and send a cease and desist letter to the Marriott Parties, an initial daft of which is transmitted with this memorandum. This option will hopefully bring MVW to the table with a more reasonable resolution acceptable to the Association, which we understand is the goal of the Association.

B.      Declaratory Action or Action for Damages

Another option would be to bypass the cease and desist letter and file a declaratory action or an action for damages.   This option would also be available to the Association after receiving an unsatisfactory response from the Marriott Parties to a cease and desist letter.  We understand this is not currently the Association's desired approach, but we did want to detail all of the Association's options in this memorandum.  One of the main considerations in such a strategy would be determining the appropriate plaintiff under the applicable action.  In a declaratory action, the Association would probably be the appropriate plaintiff; and, under an action for damages, an owner or group of owners would probably be the more appropriate plaintiff.  It is worth noting that a declaratory action would be the easier, quicker and cheaper option for the Association as opposed to an action for damages.

C.      Action for Injunctive Relief

We would need to think through application of injunctive relief principles and requirements to the present facts, but this option will be the most unlikely to succeed given that it will be difficult to argue an immediate and irreparable harm that cannot be adequately addressed in an action for damages.

After the Board's review of this memorandum, we stand ready to answer any questions that the Association may have.

016168\0001\1729238.4

ATTACHMENT

Brownstein I Hyatt
Farber I Schreck

Philip A. Gosch
Attorney at Law
303.223.1170 tel
303.223.0970 fax
pgosch@bhfs.com

November 21, 2012

**VIA** FEDERAL EXPRESS

Marriott Vacations Worldwide Corporation
Ritz Carlton Destination Club
Marriott Vacation Club
The Ritz Carlton Management Company, L.L.C.
6649 Westwood Boulevard, Suite 500
Orlando, Florida 32821-6090
Attn: Steven Weisz, President and CEO
      Lee Cunningham, EVP and COO

The Cobalt Travel Company, LLC
2711 Centerville Road, #400
Wilmington, Delaware 19808

The Ritz Carlton Development Company, L.L.C.
10400 Fernwood Road
Bethesda, Maryland 20817
Attn: Bhavana Boggs, Esq.

RE:     The Ritz Carlton Club, Aspen Highlands

This firm represents the Aspen Highlands Condominium Association, Inc. (the "Association"). It has
come to the Association's attention that Marriott Vacations Worldwide Corporation ("MVW"), through its
Marriott Vacations Worldwide program, has begun promoting the use of the Tourist Accommodation
Units at the Aspen Highlands Condominiums to Marriott Vacation Club members who are non-deeded
members of Marriott Vacation Club's timeshare/points/exchange system and are not also members of
the Ritz Carlton Destination Club (the "MVC Members"). It has also come to the Association's attention
that The Ritz Carlton Management Company, L.L.C., an affiliate of MVW and the manager of the
Association (the "HOA Manager"), and The Cobalt Travel Company, LLC, an affiliate of Marriott
International, Inc. and the program manager for the Ritz Carlton Destination Club (the "Program
Manager"), are active and willing participants in and beneficiaries of such promotion and any resulting
use. With this letter, the Association demands that MVW, the HOA Manager, the Program Manager
and their respective affiliates immediately cease and desist from promoting the use of the Tourist
Accommodation Units at the Aspen Highlands Condominiums to the MVC Members and permanently
refrain from implementing any such program at the Aspen Highlands Condominiums. Capitalized terms
not otherwise defined herein shall have the meanings afforded them under the Declaration of
Condominium for Aspen Highlands Condominiums (the "Declaration").

November 21, 2012
Page 2

Any practice of allowing the use of the Tourist Accommodation Units at the Aspen Highlands Condominiums by the MVC Members would violate the express terms of the Declaration and the disclosure documents given to purchasers of units at the Aspen Highlands Condominiums. Further, although MVW, the HOA Manager, the Program Manager and the developer, Ritz Carlton Development Company, L.L.C. or its predecessor, also an affiliate of Marriott International, Inc. (the "Developer"), may attempt to portray these actions as permitted by the Affiliation Agreement, the Reservation Procedures and the HOA Management Agreement, we disagree with that interpretation, and in any event the Declaration is clearly the controlling instrument under Colorado law. Also, ancillary contracts of adhesion which were executed when the developer controlled the Association (such as the HOA Management Agreement and the Affiliation Agreement) are terminable by the Association under Colorado law once control of the Association passes (as it has at the Aspen Highlands Condominiums), and it reasonably and logically follows that any such terminable agreements would in no event supercede the express terms of a recorded declaration. The Association reserves the right to pursue all rights and remedies in the event that MVW, the HOA Manager, the Project Manager, the Marriott licensor entity and their respective affiliates do not immediately cease and desist from promoting the use of the Tourist Accommodation Units at the Aspen Highlands Condominiums to the MVC Members and permanently refrain from implementing any such program at the Aspen Highlands Condominiums.

In addition to violating the Declaration, any practice of allowing the use of the Tourist Accommodation Units at the Aspen Highlands Condominiums by the MVC Members may constitute, among other things, one or more breaches of the fiduciary duties of the HOA Manager to the Association under the HOA Management Agreement as a result of self-dealing among the HOA Manager, the Program Manager, the Marriott licensor entity and their respective affiliates to the detriment of the Association and its members.  By permitting MVW and/or the Program Manager to utilize the Tourist Accommodation Units in clear violation of the Declaration, the HOA Manager would be enriching its affiliates and the Marriott licensor entity by creating an attractive offering for the MVC Members, which would increase sales and license fees under Marriott's arrangement with MVW, all at the expense and burden of the Association and its members.  The Association reserves the right to pursue all rights and remedies in the event that MVW, the HOA Manager, the Project Manager, the Marriott licensor entity and their respective affiliates do not immediately cease and desist from promoting the use of the Tourist Accommodation Units at the Aspen Highlands Condominiums to the MVC Members and permanently refrain from implementing any such program at the Aspen Highlands Condominiums.  The Association also reserves the right to inspect and audit the financial records maintained by the HOA Manager to determine whether Association funds were utilized by the HOA Manager or the Program Manager in connection with the promotion or use of the Tourist Accommodation Units by the MVC Members. Additionally, the Association reserves the right to inspect and audit the financial records maintained by the HOA Manager to determine whether Association funds were improperly allocated to the corporate overhead of MVW, the HOA Manager, the Project Manager, the Marriott licensor entity or any of their respective affiliates.

Any practice of allowing the use the Tourist Accommodation Units at the Aspen Highlands Condominiums by the MVC Members may also justify, among other things, claims by the owners at the Aspen Highlands Condominium against the Developer for improper disclosure and/or fraudulent inducement.  The Colorado Disclosure Statement and the City of Aspen Disclosure Statement contain technical and substantive inaccuracies, inadequacies and omissions, including, significantly, no disclosure that the Condominium could be subjected to use by a timeshare/points/exchange system affiliated with a brand or club program other than Ritz Carlton.  In fact, the Declaration and the Colorado and Aspen Disclosure Statements make repeated references to Ritz Carlton and the Ritz Carlton Program throughout such documents, and there is no mention of any other hotel brand or affiliation with any other non-Ritz Carlton club.  It would have been very easy for the Developer to have caused such

November 21, 2012
Page 3

documents to disclose the availability of the Tourist Accommodation Units to the MVC Members or any other non-Ritz branded association since the Developer controlled the drafting and preparation of such Disclosure Documents, the Declaration and the other governing documents of the Association at the time of formation of the condominium regime, but no such disclosure or authorization exists in such documents. The Association reserves the right to pursue all rights and remedies in the event that MVW, the HOA Manager, the Project Manager, the Marriott licensor entity and their respective affiliates do not immediately cease and desist from promoting the use of the Tourist Accommodation Units at the Aspen Highlands Condominiums to the MVC Members and permanently refrain from implementing any such program at the Aspen Highlands Condominiums. In the event such practice is not immediately discontinued, the Association may have no choice but to report the disclosure inaccuracies and inadequacies to DORA (the regulatory agency that reviews and enforces disclosure statements in Colorado) and/or to any other applicable governmental or regulatory agency.

In addition to the foregoing, MVW, the HOA Manager, the Project Manager, the Developer, the Marriott licensor entity and their respective affiliates should be aware that the Association is in active discussions with several other homeowner associations under The Ritz Carlton Destination Club umbrella who also have been or would be damaged by similar prohibited actions. The Association reserves all rights to initiate joint litigation with such other associations and/or the members of such associations in the event that MVW, the HOA Manager, the Program Manager, the Marriott licensor entity and their respective affiliates do not immediately cease and desist from promoting the use of the Tourist Accommodation Units at the Aspen Highlands Condominiums to the MVC Members and permanently refrain from implementing any such program at the Aspen Highlands Condominiums. Additionally, MVW, the HOA Manager, the Project Manager, the Developer, the Marriott licensor and their respective affiliates should also be aware that several of the Association's members have retained legal counsel in their individual capacities and are in the process of preparing complaints against some or all of MVW, the HOA Manager, the Project Manager, the Developer, the Marriott licensor entity and their respective affiliates.

We look forward to receiving your collective written confirmation by December 10, 2012 that each of MVW, the HOA Manager, the Project Manager, the Marriott licensor entity and their respective affiliates will immediately cease and desist from promoting the use of the Tourist Accommodation Units at the Aspen Highlands Condominium to the MVC Members and permanently refrain from implementing any such program at the Aspen Highlands Condominiums. In the absence of such written confirmation by such date, the Association will have no choice but to pursue claims regarding the circumstances described in this letter.

Sincerely,

*Philip A. Gosch*

Philip A. Gosch

PAG:lai

cc:    Aspen Highlands Condominium Association, Inc.
       Randy Mercer, President

016168\0001\1732112.5

# ATTACHMENT

MEMORANDUM OF UNDERSTANDING
BETWEEN
THE LION & CROWN TRAVEL CO., LLC AND
ASPEN HIGHLANDS CONDOMINIUM ASSOCIATION, INC.

This Memorandum of Understanding ("MOU") is entered into as of April _17_, 2014, between The Lion & Crown Travel Co., LLC, a Delaware limited liability company, whose address for purposes hereof is 6649 Westwood Boulevard, Orlando, Florida 32821 ("Lion & Crown"), and Aspen Highlands Condominium Association, Inc., a Colorado non-profit corporation, whose address is 0075 Prospector Road, Aspen, Colorado 81611 ("Association"). Lion & Crown and Association are sometimes referred to as a "Party" or collectively as "Parties" and said terms shall also include the respective successors and assigns of any Party or Parties. "Executive Board" shall refer to the Executive Board of the Association, which has authority to act on behalf of the Association.

## RECITALS

WHEREAS, the Executive Board, on behalf of the Association, previously met with representatives of The Ritz Carlton Destination Club on several occasions to discuss the potential opportunity for members of the Association ("Members") to voluntarily participate in the exchange opportunity with the Marriott Vacation Club Destinations Exchange Program ("MVCD Exchange Program") through The Lion & Crown Exchange Program;

WHEREAS, the Parties agreed that a survey of Members should be conducted to determine the interest of Members to voluntarily participate in the MVCD Exchange Program opportunity; and

WHEREAS, a majority of Members who responded to the survey responded affirmatively for the MVCD Exchange Program opportunity for those individuals voluntarily enrolled in The Lion & Crown Exchange Program.

NOW, THEREFORE, in consideration of the mutual covenants and obligations contained in this MOU, the Parties agree as follows:

## BACKGROUND AND TERMS

1.    The Parties acknowledge that the above recitals are true and correct.

2.    The Parties acknowledge that the Executive Board, on behalf of the Association, and representatives of The Ritz-Carlton Destination Club previously had a number of discussions regarding The Ritz-Carlton Destination Club continuing to explore additional voluntary exchange opportunities.

3.    As a result of the mutual interest of the Parties and the demonstrated interest of Members in the current opportunity available with Exclusive Resorts through The Lion & Crown Exchange Program, the Association agreed to survey its Members to determine interest in a possible exchange opportunity with the MVCD Exchange Program through The Lion & Crown Exchange Program, as an additional voluntary exchange option.

1



4.      The Parties acknowledge that the survey resulted in a majority of Members who responded to the survey desiring to have the opportunity to participate on a voluntary basis in the MVCD Exchange Program.

5.      Acknowledgement by the Association of participation in an exchange opportunity with the MVCD Exchange Program for individual Members simply results in the opportunity for an eligible Member to elect voluntarily to participate in an exchange opportunity with the MVCD Exchange Program through The Lion & Crown Exchange Program, for so long as such Member is enrolled in The Lion & Crown Exchange Program and the MVCD Exchange Program opportunity exists.

6.      For those eligible Members electing to participate in an exchange opportunity with the MVCD Exchange Program through The Lion & Crown Exchange Program, an individual Member who is enrolled in The Lion & Crown Exchange Program may currently elect, on an annual basis, to deposit his/her/its reserved allocated week in Aspen Highlands Condominium in exchange for a distribution of points in the MVCD Exchange Program ("MVCD Exchange Points"), allowing such Member to use his/her/its MVCD Exchange Points for time to stay at a MVCD resort location, subject to availability and for so long as such Member is enrolled in The Lion & Crown Exchange Program and the MVCD Exchange Program opportunity exists. Members voluntarily determine whether or not to participate in an exchange opportunity with the MVCD Exchange Program.

7.      The Parties agree as follows:

(a)      Participation by individual Members in The Lion & Crown Exchange Program is voluntary.

(b)      As of the date of this MOU, there are no costs associated with enrolling in The Lion & Crown Exchange Program.

(c)      Access by MVCD Members to Aspen Highlands Condominium through The Lion & Crown Exchange Program is limited to reserved allocated time exchanged by Association Members. Space Available time at Aspen Highlands Condominium is currently available through The Cobalt Travel Co., LLC and not The Lion & Crown Exchange Program. Members of the MVCD Exchange Program will not have access to Space Available time at The Ritz-Carlton Club, Aspen Highlands through The Lion & Crown Exchange Program.

(d)      As of the date of this MOU, Members enrolled in The Lion & Crown Exchange Program would elect on an annual basis, whether to participate in an exchange opportunity with the MVCD Exchange Program.

(e)      As of the date of this MOU, Members enrolled in The Lion & Crown Exchange Program currently continue to be permitted to participate in the Exclusive Resorts opportunity, subject to availability of the inventory and the continued affiliation of such opportunity with The Lion & Crown Exchange Program.



(f)     While subject to change and availability, there currently are over 50 Marriott Vacation Club resorts in the United States, Caribbean and Europe, and currently Members enrolled in The Lion & Crown Exchange Program and participating in the MVCD Exchange Program may book experiences in the Explorer Collection through the MVCD Exchange Program.

(g)     As of the date of this MOU, unused MVCD Exchange Points may be banked for use in the next usage year up until June 30 of the use year prior to the use year that the MVCD Exchange Points are being banked into, subject to terms and conditions of the MVCD Exchange Program, as may be changed from time to time.

(h)     As of the date of this MOU, MVCD Exchange Points may be borrowed from a future use year for use in the current use year up to 25 months in advance of the first day of the use year that the MVCD Exchange Points are being banked into, subject to terms and conditions of the MVCD Exchange Program, as may be changed from time to time.

8.     This MOU shall be governed by, and shall be construed in accordance with, the laws of the State of Florida without regard to its conflict of law provisions.  Any controversy or claim arising out of or relating to this MOU, or the breach thereof, shall be settled by arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.  The place of arbitration shall be Orlando, Florida.

9.     This MOU may be executed by the Parties in separate counterparts and via electronic means, and each part will be deemed an original and all of which together will be deemed to be one and the same instrument.

**IN WITNESS WHEREOF**, the Parties have caused this Memorandum of Understanding to be executed as of the date set forth above.

LION & CROWN:                           ASSOCIATION

**THE LION & CROWN TRAVEL CO., LLC,** a Delaware limited liability company

By: _Ralph Lee Cunningham_

Print Name: _Ralph Lee Cunningham_

As its: _Vice President_

**ASPEN HIGHLANDS CONDOMINIUM ASSOCIATION, INC.,** a Colorado non-profit corporation

By: _____

Print Name:   Randal L. Mercer

As its: _____ President



ATTACHMENT

ACKNOWLEDGMENT OF AND JOINDER TO
AFFILIATION AGREEMENT BETWEEN
THE LION & CROWN TRAVEL CO., LLC
AND
MARRIOTT RESORTS, TRAVEL COMPANY, INC.

This Acknowledgment of and Joinder to Affiliation Agreement Between The Lion & Crown Travel Co., LLC, and Marriott Resorts, Travel Company, Inc. ("**Acknowledgment**") is entered into on February 21 2014, but shall be effective as of the Effective Date set forth below, by and among Marriott Resorts, Travel Company, Inc. a Delaware corporation, whose address is 6649 Westwood Boulevard, Orlando, Florida 32821-6090 ("**MRTC**"); The Lion & Crown Travel Co., LLC, a Delaware limited liability company, whose address is 6649 Westwood Boulevard, Orlando, Florida 32821-6090 ("**Lion & Crown**"); and Aspen Highlands Condominium Association, Inc., a Colorado nonprofit corporation, whose address is 0075 Prospector Road, Aspen, Colorado 81611 ("**Association**").  MRTC, Lion & Crown, and Association are sometimes individually referred to as a "**Party**" or collectively as "**Parties**", and said terms shall also include the respective successors and assigns of any Party or Parties.  Capitalized terms used in this Acknowledgment and not defined herein shall be ascribed the meanings set forth in that certain Affiliation Agreement between MRTC and Lion & Crown dated November 14, 2013 (as the same may be amended or otherwise modified from time to time solely by Lion & Crown and MRTC in their sole discretion, the "**Affiliation Agreement**").  This Acknowledgment shall be effective as of the date set forth in a written notice provided by Lion & Crown to Association and MRTC ("**Effective Date**"), which Effective Date shall be no less than thirty (30) days after the date of such written notice.

## RECITALS

**WHEREAS**, MRTC has established an exchange program and other related benefits and services known as Marriott Vacation Club Destinations Exchange Program (the "**MVCD Program**") for the purpose of providing a means for members of the MVCD Program to reserve the use of accommodations that are part of the MVCD Program ("**MVCD Accommodations**"); and

**WHEREAS**, Lion & Crown has established an exchange program and other related benefits and services known as The Lion & Crown Exchange Program ("**L&C Program**") for the purpose of providing a means for members of the L&C Program to reserve the use of accommodations that are part of the L&C Program ("**L&C Accommodations**"); and

**WHEREAS**, MRTC and Lion & Crown entered into the Affiliation Agreement in order to affiliate the MVCD Program and the L&C Program so that (i) each member of the L&C Program who elects to participate in the MVCD Program ("**Participating L&C Member**") shall have the right to participate in the MVCD Program and make use of the MVCD Accommodations in accordance with the terms of the Affiliation Agreement and the Marriott Vacation Club Destinations Exchange Program Exchange Procedures ("**Exchange Procedures**"); and (ii) members in the MVCD Program ("**MVCD Member**") shall have the ability to make use of those



L&C Accommodations that are committed to the MVCD Program by Lion & Crown or a Participating L&C Member; and

**WHEREAS**, Association is the owners' association for that certain club known as The Ritz-Carlton Club, Aspen Highlands ("**Club**"); and

**WHEREAS**, the Affiliation Agreement contemplates that Lion & Crown will obtain an acknowledgment of and joinder to the Affiliation Agreement from any owners' association that desires its club to participate in the MVCD Program; and

**WHEREAS**, the Parties have agreed as a special accommodation to allow Association to determine whether (by a survey of the Association's members or such other method as the Association and Lion & Crown mutually agree upon) to enter into this Acknowledgment, even though Lion & Crown is not required to obtain the Association's consent, joinder, or acknowledgment in connection with the affiliation with an Affiliate Program; and

**WHEREAS**, Association desires to make the MVCD Program available to its members and acknowledges that entering into this Acknowledgment will enable the members of the Association to voluntarily participate in the MVCD Program by becoming Participating L&C Members, and further acknowledges that MVCD Members will have access to L&C Accommodations that are committed to the MVCD Program by Participating L&C Members or Lion & Crown.

**NOW, THEREFORE**, in consideration of the mutual covenants and obligations contained in this Acknowledgment, the parties hereby agree as follows:

## AGREEMENT

1.      By execution of this Acknowledgment, the Parties agree that the above recitals are true and correct and are hereby incorporated into this Acknowledgment.

2.      Association hereby acknowledges the terms of the Affiliation Agreement and joins in such Affiliation Agreement by execution of this Acknowledgment for the purpose of acknowledging and agreeing that the Club constitutes an Affiliate Program. In addition, Association agrees that Association will cooperate with Lion & Crown and MRTC in order to facilitate the L&C Program and the MVCD Program to the extent reasonably necessary to ensure that the Participating L&C Members and the MVCD Members are able to fully enjoy the L&C Program and the MVCD Program as contemplated in the Exchange Company Documents (as defined in the Exchange Procedures). In this regard, Association agrees to cooperate in all respects to assist MRTC and Lion & Crown in connection with facilitating and fulfilling the reservation, check-in, and use of Use Periods in the Accommodations at the Club, and agrees to ensure that Participating L&C Members and MVCD Members are able to reserve, check-in, and use Use Periods in the Accommodations at the Club. Further, Association agrees to honor all confirmed exchanges at the Club, including providing all Participating L&C Members and MVCD Members and their Guests (as defined in the Exchange Procedures) and Family Members (as defined in the Exchange Procedures) with similar rights and privileges and at similar rates afforded to Association members. In return, MRTC will make reasonable efforts to ensure that

654349v7

2



Association members who are Participating L&C Members are able to fully enjoy the MVCD Program as contemplated in the Exchange Company Documents (as defined in the Exchange Procedures), including providing all Association members who are Participating L&C Members, as well as their Guests (as defined in the Exchange Procedures) and Family Members (as defined in the Exchange Procedures), with similar rights and privileges afforded to other exchange participants in the MVCD Program.

3.      Association hereby acknowledges that MRTC has all of the rights and duties with regard to the operation of the MVCD Program and that Lion & Crown has all of the rights and duties with regard to the operation of the L&C Program. Association further acknowledges that the L&C Program and MVCD Program may impact usage patterns at the Club.

4.      If the Affiliation Agreement is terminated or not renewed, Association hereby agrees to abide by and comply with the requirements of Sections 10.5(a), 10.5(c), 10.5(e) of the Affiliation Agreement that are imposed on Lion & Crown, and Association agrees that it will implement such provisions to the same extent such provisions are applicable to Lion & Crown and agrees to be bound by such provisions as if they were set forth herein. In addition, Association agrees that Association will implement the following provisions of the Affiliation Agreement to the same extent such provisions are applicable to Lion & Crown and agrees to be bound by such provisions as if they were set forth herein: Sections 4.3, 6.6, 6.8, 6.11, 7.4, 9.1, 9.3, 10.6, 10.7, and 10.8.

5.      Association acknowledges and agrees that, as a special accommodation, Lion & Crown has allowed Association to determine whether (by a survey of the Association's members or such other method as the Association and Lion & Crown mutually agree upon) to enter into this Acknowledgment, even though Lion & Crown is not required to obtain the Association's consent, joinder, or acknowledgment in connection with the affiliation with an Affiliate Program.

6.      This Acknowledgment shall have a term that is coterminous with the Affiliation Agreement.

7.      This Acknowledgment shall be governed by, and shall be construed in accordance with, the laws of the State of Florida without regard to its conflict of law provisions. All disputes under this Acknowledgment shall be addressed in accordance with the procedures set forth in Sections 11.7 and 11.8 of the Affiliation Agreement.

8.      This Acknowledgment may be executed by the Parties in separate counterparts and via electronic means, and each part will be deemed an original and all of which together will be deemed to be one and the same instrument.

*Signatures on following page.*



**IN WITNESS WHEREOF**, the Parties have caused this Acknowledgment to be executed as of the date set forth above.

**MRTC:**

**MARRIOTT RESORTS, TRAVEL COMPANY, INC.,**
a Delaware corporation

By: _____

Print Name: _____

As its: _____

**LION & CROWN:**

**THE LION & CROWN TRAVEL CO., LLC,**
a Delaware limited liability company

By: _____

Print Name: _RALPH LEE CUNNINGHAM_

As its: _VICE PRESIDENT_

**Association:**

**ASPEN HIGHLANDS CONDOMINIUM ASSOCIATION, INC.,**
a Colorado nonprofit corporation

By: _____

Print Name: _____

As its: _President_

