IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:16-cv-01301-PAG-GPG

RCHFU, LLC, et al

      Plaintiffs,

v.

MARRIOTT VACATIONS WORLDWIDE CORPORATION, et al,

      Defendants.

---

### MARRIOTT DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR SANCTIONS AND A DEFAULT JUDGMENT AGAINST CERTAIN MARRIOTT DEFENDANTS

---

Defendants Marriott Vacations Worldwide Corporation, Marriott Ownership Resorts, Inc., The Ritz-Carlton Management Company, LLC, The Cobalt Travel Company, LLC, and The Lion & Crown Travel Co., LLC (collectively, "Marriott Defendants") respectfully submit this Response to Plaintiffs' Motion for Sanctions and a Default Judgment against Certain Marriott Defendants (ECF#223).

## INTRODUCTION

The Marriott Defendants acknowledge that they did not produce the 2013 Affiliation Agreement in response to Plaintiffs' discovery request. Their failure, however, was inadvertent.

1

It bears noting that the existence of the 2013 Affiliation Agreement was made known to Plaintiffs on multiple occasions: it was repeatedly referenced in a document that the Marriott Defendants produced in their initial document production, and it was also referenced in response to a request for documents in the *Petrick* case, during the deposition of a Marriott Defendant executive, and in the Marriott Defendants' privilege log. We do not seek to excuse the non-production but, rather, to show that the document was not concealed or wrongfully withheld, as Plaintiffs contend. When Plaintiffs requested its production in March 2018, the Marriott Defendants immediately complied.

## STATEMENT OF FACTS

This case concerns allegations by owners of fractional interests at The Ritz-Carlton Club, Aspen Highlands, that they have suffered damages due to actions taken by the Marriott Defendants. Similar cases, filed by the same counsel that represent Plaintiffs here, are pending against the Marriott Defendants in the United States Court for the Eastern District of California and the Superior Court of California concerning The Ritz-Carlton Club, Lake Tahoe and The Ritz-Carlton Club, San Francisco, respectively.[1] *See* Declaration of Ian S. Marx ("Marx Decl."), submitted herewith, p. 2, ¶ 3.

---

[1] United States Court for the Eastern District of California, *Reiser v. Marriott Vacations Worldwide Corporation, et. al.*, Docket No.: 2:16-CV-00237-MCE-CKD; and Superior Court of California, San Francisco County, *Petrick v. Marriott Vacations Worldwide Corporation, et. al.*, Case No. CGC 15-545987.

2

### A. How the Marriott Defendants' discovery error occurred

At an early stage in these proceedings, the parties agreed that, given the overlapping nature of the three cases, in the interest of efficiency, there would be a coordinated approach to fact discovery. Thus, it was agreed that the Marriott Defendants would compile, review, and produce documents on a coordinated basis with respect to the three cases and would produce witnesses for depositions only once, rather than on multiple occasions. Marx Decl. p. 2, ¶ 4. The parties engaged in an extensive negotiation regarding the collection, review, and production of electronically stored information (ESI), narrowed through the use of agreed-upon search terms, agreed-upon date ranges, and agreed-upon custodians, and then reviewed for responsiveness and privilege. Marx Decl. p. 2, ¶ 5.

In an effort to ensure that the production of documents would be responsive to Plaintiffs' document requests, and as encouraged by the Federal Rules of Civil Procedure, the document production process included the delivery of approximately 4,000 documents as an initial sample set. These were provided to Plaintiffs' attorneys, without prior review for responsiveness, in order to facilitate negotiation of document custodians, date ranges, and search terms. Marx Decl., p. 3, ¶ 6. Ultimately, several million documents were preserved, several hundred thousand were reviewed, and over 80,000 pages have been produced at significant expense to the Marriott Defendants. *Id*. In fact, after undertaking this agreed-upon process and producing several thousands of pages of documents, Plaintiffs repeatedly demanded additional documents from the Marriott

Defendants, which the Marriott Defendants produced, often in an expedited fashion and at significant additional expense. *Id*.

In addition, the Marriott Defendants produced "hard copy" documents that were not captured through the ESI review process. In November 2016, the Marriott Defendants made an initial production of documents that consisted of hard copy documents in the following categories: advertising and marketing materials; budget information; governing documents relating to the resort and exchange program; purchase contracts and related documents concerning Plaintiffs; internal notes and information relating to communications with Plaintiffs; documents relating to a survey that was conducted concerning the proposed affiliation of The Ritz-Carlton Club, Aspen Highlands with the Marriott Vacation Club Destinations Exchange Program; and usage history summaries relating to Plaintiffs. Marx Decl. p. 3, ¶ 9.

The Marriott Defendants intended that the initial document production would include all hard copy documents that had thus far been compiled, which would have included the 2013 Affiliation Agreement. Marx Decl. p. 4, ¶ 10. Unintentionally, however, the 2013 Affiliation Agreement was not included in the initial document production even though it was in the possession of the Marriott Defendants' attorneys (Greenberg Traurig). Marx Decl., p. 4, ¶ 11.

In March 2018, Plaintiffs requested that the 2013 Affiliation Agreement be produced, and the Marriott Defendants immediately complied. Marx Decl., p. 7, ¶ 21. In

4

addition, the Marriott Defendants readily agreed to make certain executives available for further depositions.  Marx Decl., p. 8, ¶ 22.

> **B.   Repeated references to the 2013 Affiliation Agreement show that the failure to produce that document was unintentional**

The Marriott Defendants' initial document production, made on November 10, 2016, included an agreement entitled Joinder to Affiliation Agreement between The Lion & Crown Travel Company Co., LLC and Marriott Resorts, Travel Company, Inc., dated April 14, 2014 ("Acknowledgement Agreement").  The Acknowledgment Agreement references the 2013 Affiliation Agreement both in the title of the document in large all-capital letters and in the first paragraph.  Marx Decl., p. 5, ¶ 15.

In addition, in the *Petrick* case (which, as noted, involves the same set of lawyers), the Marriott Defendants' response to a request for production of documents specifically identified the 2013 Affiliation Agreement as a document that would be produced.  Marx Decl., p. 4, ¶ 14.

The 2013 Affiliation Agreement was also mentioned during the deposition of Stephanie Sobeck, a Marriott Defendant executive.  In an exchange between Mr. Marx and Mr. Ferguson (one of Plaintiffs' attorneys), Mr. Marx said that the 2013 Affiliation Agreement would be produced regardless of whether it had been previously produced or not.  Regrettably, the Marriott Defendants' counsel did not follow up after the deposition to see that the document was produced.  Marx Decl., pp. 5-7, ¶¶ 16-18.

Finally, the Marriott Defendants produced a privilege log to Plaintiffs that made numerous references to the 2013 Affiliation Agreement with respect to privileged communications regarding that agreement. Marx Decl., p. 7, ¶ 19.

## ARGUMENT

### I. THE INADVERTENT FAILURE TO PRODUCE THE 2013 AFFILIATION AGREEMENT DOES NOT WARRANT THE EXTREME SANCTION OF DEFAULT JUDGMENT.

Plaintiffs seek the sanction of default judgment under the Court's inherent powers. Such an extreme sanction would not be appropriate in this case, nor would it be consistent with the case law on which Plaintiffs rely.

### A. The Cases on Which Plaintiffs Rely Are Inapposite.

The three cases on which Plaintiffs rely to support their argument that the Court should impose the sanction of default judgment are readily distinguishable.

In *Farmer v. Banco Popular of North America*, 791 F.3d 1246 (10th Cir. 2015), the district court awarded fees and costs as a punitive sanction for an extended delay in executing a settlement agreement. The district judge had previously warned Mr. Farmer that he would impose the most severe sanctions and penalties if the parties did not comply with his order enforcing the settlement. *Id*. at 1250. The court noted that Mr. Farmer had "obstinately refused to execute" a settlement agreement and "instead filed frivolous pleadings and stalled the litigation." *Id*. at 1258.

In *Klein v. Harper*, 777 F.3d 1144 (10th Cir. 2015), the district court found that Mr. Harper had repeatedly and willfully refused to follow court orders and had deliberately

6

ignored court orders while simultaneously filing frivolous motions.  The appellate court upheld the entry of default judgment as an appropriate sanction on the basis that Mr. Harper failed to attend the scheduled pretrial conference, repeatedly refused to comply with discovery requests, including a court order, filed dozens of frivolous motions, filed a frivolous interlocutory appeal, and repeatedly and routinely ignored the district court's orders.  *Id*. at 1148.

In *LaFleur v. Teen Help*, 342 F.3d 1145 (10th Cir. 2003), the court considered three cases – including two that were dismissed as a sanction.  In the first case (*LaFleur v. Teen Help*, No. 02–4160), the appellate court affirmed the district court's decision to dismiss the case for failure to obey an order to hire local counsel.  *Id*. at 1149.  Prior to imposing the sanction of dismissal, and after a hearing, the district court directed Ms. LaFleur and her attorney to obtain local counsel within twenty days, or risk dismissal of the case.  They failed to comply with the order and the complaint was dismissed.  In the second case (*Goold v. Teen Help*, No. 02–4161), the court upheld dismissal as a discovery sanction where the plaintiff failed to comply with a discovery order.  *Id*. at 1151.

The facts in *Farmer*, *Klein*, and *LaFleur* stand in sharp contrast to the facts here.  In each of those cases, the conduct was willful, and, in each case, the party had received a prior warning from the court regarding the possible imposition of an extreme sanction.  No willful conduct occurred here, nor has the Court issued any prior warning concerning sanctions.  Indeed, the Marriott Defendants have given the Court no occasion to issue

7

such a warning. Accordingly, Plaintiffs' cases do not support their request for a default judgment against the Marriott Defendants.

### B. A Consideration of the Relevant Factors Shows That the Extreme Sanction Plaintiffs Seek Is Unwarranted.

Dismissal of a complaint and entry of a default judgment are extreme sanctions that are only to be used in cases of willful misconduct. *Ehrenhaus v. Reynolds*, 965 F.2d 916, 920 (10th Cir. 1992). In *Ehrenhaus,* the district court dismissed the complaint with prejudice pursuant to Federal Rule of Civil Procedure 37(b)(2)(C) as a sanction for plaintiff's intentional violation of a discovery order. While no discovery order violation – or any other willful misconduct -- has occurred here, *Ehrenhaus* is instructive because it lists several factors that courts are to consider when confronted with a motion like Plaintiffs'. Those factors are: (1) the degree of actual prejudice to the opposing party; (2) the amount of interference with the judicial process; (3) the culpability of the party; (4) whether the court warned the party in advance that dismissal of the action would be a likely sanction for noncompliance; and (5) the efficacy of lesser sanctions. *Id*. at 921 (citations omitted). As shown below, those factors weigh heavily against imposing the extreme sanction of a default judgment that Plaintiffs seek and support the Marriott Defendants' contention that no sanctions of any type are appropriate here.

### 1. Any prejudice to Plaintiffs that may have been caused by the Marriott Defendants' inadvertent failure to produce the 2013 Affiliation Agreement has been rectified.

8

Plaintiffs' claim of "prejudice" rests on the fact that they did not have a copy of the 2013 Affiliation Agreement when they initially took the depositions of three Marriott Defendant executives – Lee Cunningham, Stephanie Sobeck and Richard Hayward. When Plaintiffs first raised this issue, however, the Marriott Defendants immediately agreed to produce each of those individuals for another deposition. Indeed, Ms. Sobeck and Mr. Cunningham have already appeared for their re-depositions, which took place on May 15 and 18, 2018, respectively. Marx Decl. p. 8, ¶ 22. The Marriott Defendants are working with Plaintiffs' counsel to schedule the re-deposition of Mr. Hayward. Marx Decl., p. 8, ¶ 23.

Plaintiffs also claim to have been prejudiced by not having a copy of the 2013 Affiliation Agreement when they deposed members of the Defendant Aspen Highlands Condominium Association ("AHCA"), and they ask that those witnesses be produced again for deposition. (The AHCA has submitted opposition to this motion, resisting those depositions.) While the Marriott Defendants have no control over whether or not the AHCA Board members are re-deposed, in all events Plaintiffs were not prejudiced with respect to those depositions. It is undisputed that the previously-deposed AHCA board members were unaware of the 2013 Affiliation Agreement at the time of the events in question and that they did not have a copy of that agreement until it was produced by the Marriott Defendants in this case. *See* Declaration of Jessica Black Livingston (ECF#262-1) ¶ 9. Thus, even if Plaintiffs had had a copy of the 2013 Affiliation Agreement at their depositions, the fact that the board member witnesses had never seen that

9

agreement means that the questioning of them would have been no different. Plaintiffs' depositions of the AHCA board directors further demonstrate that Plaintiffs have not suffered the prejudice they claim. Those depositions occurred in Fall 2017 and in January 2018, a full year after Plaintiffs had become aware of the 2013 Affiliation Agreement through the many references to it in the Acknowledgement Agreement. Yet the board director witnesses were asked no questions about the Acknowledgement Agreement, its reference to the 2013 Affiliation Agreement, or the 2013 Affiliation Agreement itself. *See id*. 8.

### 2. The inadvertent failure to disclose the 2013 Affiliation Agreement did not interfere with the judicial process.

Plaintiffs assert that the 2013 Affiliation Agreement contradicts the Marriott Defendants' positions with respect to certain aspects of Plaintiffs' claims. Specifically, Plaintiffs assert that the 2013 Affiliation Agreement "show[s]" that, contrary to the position the Marriott Defendants have taken in motion practice, "the [MVC Affiliation] could not occur unless the Association agreed to it." Plaintiffs' motion (ECF#223) at 1; *see also id*. at 3 (asserting that the "2013 Affiliation Agreement provides that the MVC [A]ffiliation could not go through without the Association's approval"). As evidenced by the following brief summary of other governing documents, the 2013 Affiliation Agreement's plain language and the events leading up to that agreement, Plaintiffs' assertion is incorrect and not supported by the facts or law. The agreement of the Association was not necessary or required under the 2013 Affiliation Agreement.

10

On January 12, 2001, The Ritz-Carlton Management Company, L.L.C. (RC Management) and the Aspen Highlands Condominium Association, Inc. (Association) executed a Management Agreement that, among other things, permitted RC Management to engage, through an affiliation agreement, a Program Manager who would have "the broadest possible" authority to manage and administer The Ritz-Carlton Destination Club Membership Program. Aspen Mgmt. Agmt. (ECF#49-5) § 4(S). The Affiliation Agreement that was subsequently entered for Aspen (to which the Association was a party) identified The Cobalt Travel Company, LLC (Cobalt) as "Program Manager" and gave the Program Manager broad powers, including the unfettered power to, "in its sole discretion," "affiliate other locations" and "create a separate membership program" "<u>without the approval</u> of the Developer, [<u>the</u>] <u>Association</u> or [RC Management]." Aspen Aff. Agmt. (ECF#49-15) § 7.2(a)(b) (emphasis added).[3]

In 2010, Cobalt exercised the unfettered power it had been given under the Aspen Affiliation Agreement by affiliating The Ritz-Carlton Destination Club Membership Program with the exchange program operated by The Lion & Crown Travel Co., LLC (Lion & Crown). *See* August 8, 2010 Lion & Crown/Cobalt Aff. Agmt., attached to the Marx Decl. Exhibit M. The Lion & Crown/Cobalt Affiliation gave the participants in the parties' respective programs the right to access both programs' accommodations and

---

[3] The Affiliation Agreement actually identifies, as Program Manager, Cobalt's predecessor, The Ritz-Carlton Travel Company, L.L.C.

11

facilities. In addition, Lion & Crown was expressly given the "sole and absolute discretion [i.e, unfettered power]… to affiliate other Accommodations with the Program… [which it was understood would] result in the addition of new Participants, who… w[ould] also reserve… the use of Accommodations and facilities within the Program, including Accommodations affiliated with RCC." *Id*. at § 8.1(a). Consistent with its agreement with Cobalt, between 2010 and 2013, without the consent or acknowledgement of any association, Lion & Crown exercised its unfettered affiliation power by affiliating or otherwise contracting with the outside exchange programs offered by Abercrombie & Kent and Exclusive Resorts, LLC. *See* May 15, 2018 Deposition of Stephanie Sobeck (5/15/18 Sobeck Dep.), attached to Marx Decl. as Exhibit L, 26:3-22.[4]

Importantly, throughout this period (i.e., pre-2013), MVC members were already using the accommodations and facilities of RCC resorts through the MVC Explorer program. *See* 5/15/18 Sobeck Dep. 55:11-19 (explaining that MVC members "were actually already accessing… developer inventory [at RCC resorts]… through th[e] Explorer Program"); *id*. at 56:4-6 (in permitting this use, "the developer [was] using their inventory just like any other member can use their inventory."). At the same time, RCC members were beginning to express concern about a lack of vacation choices outside of their home RCC resort. *See* November 16, 2017 Deposition of Stephanie Sobeck (11/16/17

---

[4] Ms. Sobeck is an asset manager for Marriott Ownership Resorts, Inc.

Sobeck Dep.) (attached to Marx Decl. as Exhibit E) 92:12-15 ("[M]embers were concerned… that… [the number of] locations they could go [to] was getting smaller.").

Accordingly, in view of the apparent unfairness of permitting MVC members to have access to RCC resorts without offering RCC members a reciprocal right to access MVC resorts, in 2013, Lion & Crown again exercised its unfettered power to affiliate its program (which, as noted, included access to "Accommodations affiliated with [the Ritz-Carlton Destination Club Membership Program]") by affiliating with the Marriott Vacation Club Destinations (MVCD) Exchange Program. Affiliating with MVCD was seen as a good way to rectify the above-described inequity. See *id*. at 209:20-25 (describing the pre-MVC Affiliation situation as "a one-way street" in which "[MVC] members would be able to come in, but [RCC members] would not be able to go out and use that program."); *id*. at 92:6-11 (explaining that "affiliation was a way to give [RCC] members other options…. It was a voluntary way to allow [RCC] members to go [to] other places."). Thus, although Plaintiffs now try to ascribe a nefarious motive to the MVC Affiliation, in fact, its purpose was simply to give RCC members the opportunity to have the same access to MVC destinations and vacation options that MVC members already had to RCC resorts. The 2013 Affiliation Agreement (ECF#223-8) became effective as of the date of its signing, i.e., on November 14, 2013. *See* 2013 Aff. Agmt. §§ 3.1-2 ("The L&C Program is hereby affiliated with the MVCD Program… [and t]he MVCD Program is hereby affiliated with the L&C Program"). As of that date, Lion &

Crown and MVCD members had the right to use the accommodations and facilities of both entities' programs.

Although the Association's consent to the MVC Affiliation was not required, its acknowledgment of the affiliation was sought as a means of ensuring its cooperation. *See* 2013 Aff. Agmt. § 3.1 ("Lion & Crown will use [its] best efforts to obtain the cooperation of the Associations"). As Ms. Sobeck explains, association boards "change all the time," and a new board might not have the same degree of interest in, or commitment to, seeing that the MVC Affiliation ran smoothly as the previous board had. 5/15/18 Sobeck Dep. 49:15-20; 183:9-24; *cf*. Acknowledgment § 2 (goal is "to ensure that the Participating L&C Members and the MVCD Members are able to fully enjoy the L&C Program and the MVCD Program as contemplated in the Exchange Company Documents"). To ensure the Association's cooperation, its formal acknowledgment of the affiliation bound it:

> [T]o cooperate in all respects to assist [Marriott Resorts, Travel Company] and Lion & Crown in connection with facilitating and fulfilling the reservation, check-in, and use of Use Periods in the Accommodations at the Club, and… to ensure that Participating L&C Members and MVCD Members are able to reserve, check-in, and use Use Periods in the Accommodations at the Club. Further, Association agrees to honor all confirmed exchanges at the Club, including providing all Participating L&C Members and MVCD Members and their Guests and Family Members with similar rights and privileges and at similar rates afforded to Association members.

*Id*.

Thus, while the 2013 Affiliation Agreement gave Lion & Crown members <u>the right</u> to use the opportunities afforded to them by that agreement, whether they actually

14

participated in the exchange program available under the MVC Affiliation was completely up to them. As Ms. Sobeck explains, the desire was "to make [the exchange program] available to everyone. But we were, as a special accommodation, allowing the [association] boards to decide if they wanted to make it available for their members." 5/15/18 Sobeck Dep. 179:5-8; *see also* form Acknowledgment, appended to 2013 Affiliation Agreement, third "WHEREAS" clause and § 5 (stating that Lion & Crown and Marriott had already "entered into the [2013] Affiliation Agreement" and providing that the Association's consent, joinder, or acknowledgment" to the affiliation was "not required"); *id*. at sixth and seventh "WHEREAS" clauses and § 5 (providing that the Association was being allowed, "as a special accommodation… to determine whether (by a survey of the Association's members or such other method as the Association and Lion & Crown mutually agree upon)… to make the MVCD Program available to its members [by] entering into this Acknowledgment...."). As Ms. Sobeck testifies, in the Acknowledgment, "the associations were deciding whether their members were going to be able to participate or not" because Marriott "wanted the homeowners association to decide whether they wanted to allow it for their… members." 5/15/18 Sobeck Dep. 45:21-23, 46:7-9; *see also id*. at 181:12-14 ("[I]f [the Association board] didn't want to make [the exchange opportunity] available to their members, it was going to be the board's decision not to do that.").

In short, while the Association's after-the-fact acknowledgment of the MVC Affiliation was sought, Plaintiffs' claim that the Association essentially had veto power

15

over the affiliation is completely incorrect. *See id*. at 45:13-23 (explaining that the MVC Affiliation did not depend on the Association's acknowledgment because "we were already affiliated with MVCD when [the Acknowledgment] was executed"). Accordingly, notwithstanding Plaintiffs' assertion to the contrary, the 2013 Affiliation Agreement is entirely consistent with the facts and arguments the Marriott Defendants have been making throughout this case.

### 3. The Marriott Defendants' untimely production of the 2013 Affiliation Agreement was inadvertent.

As explained above, the Marriott Defendants' failure to produce the 2013 Affiliation Agreement was the result of a good faith error by a Greenberg Traurig associate or paralegal, who inadvertently failed to include it in the compilation of documents that were provided for review prior to production. *See* SOF, sect. A, *supra.* From the outset of this case, the Marriott Defendants engaged in a significant cooperative process with Plaintiffs to identify, review, and produce thousands of pages of documents. *Id.* The failure to produce the 2013 Affiliation Agreement was not deliberate; rather, it was an innocent mistake. *Id.*

This inadvertence is evident from the fact that the 2013 Affiliation Agreement was repeatedly referenced in a document the Marriott Defendants produced to Plaintiffs, in response to a request for documents in the *Petrick* case, during the deposition of a Marriott defendant executive, and in the Marriott Defendants' privilege log. *See* SOF, sect. B, *supra.*

### 4. No prior warning has been received from the Court.

In virtually every case where dismissal or default judgment was imposed as a sanction, the offending party had been warned that, if its misconduct persisted, an extreme sanction could be imposed. *See* Argument, Point I(A), *supra* (discussing cases). Since the Marriott Defendants' inadvertent discovery error is the first and only such incident to have occurred, no warning from the Court was, or could have been, received.

### 5. No sanction should be imposed on the Marriott Defendants for having inadvertently failed to produce the 2013 Affiliation Agreement.

As noted, the cases in which dispositive sanctions were imposed for discovery violations stand in stark contrast to what happened here: a discovery error caused by a regrettable, but inadvertent, oversight of counsel. *See* Argument, Point I(A), *supra* (discussing cases). As soon as they realized their mistake, the Marriott Defendants produced the 2013 Affiliation Agreement promptly. They have made Marriott executives available for additional depositions to mitigate any possible harm Plaintiffs may have suffered, and those depositions occurred at a time when Plaintiffs' counsel were in Orlando for other depositions; thus, no additional costs were incurred. The 2013 Affiliation Agreement does not change any of the defenses, testimony, or arguments asserted. Under these circumstances, no sanction need be imposed. Certainly, the severe sanction that Plaintiffs seek is unwarranted.

## II. NO COACHING OCCURRED DURING THE CUNNINGHAM DEPOSITION.

Plaintiffs allege that the Marriott Defendants' counsel improperly coached a witness (Mr. Cunningham) during a deposition. Plaintiffs have very selectively quoted

17

from the transcript, however.  A more complete recitation of the relevant exchange shows that counsel was responding directly to a question put to him by Mr. Reiser (one of Plaintiffs' attorneys).  *See* Marx Decl., p. 8, ¶ 24.  Plaintiffs' "coaching" allegation is not supported by the record.

## CONCLUSION

As for the motion before the Court: the Marriott Defendants have taken full responsibility for inadvertently not having produced at an earlier stage the 2013 Affiliation Agreement to Plaintiffs; they have explained at length and in detail how that happened despite the significant document review and production in this case; and they have, without any argument, acceded to Plaintiffs' demands for additional depositions. Plaintiffs, however, are not satisfied and are trying to parlay the Marriott Defendants' innocent discovery error into an unwarranted litigation advantage for themselves.  As shown above, their arguments are not supported by either the facts or the case law. Plaintiffs' motion for sanctions should be denied.

DATED: June 1, 2018.

MASTERS & VINER, P.C.


/s David L. Masters
David L. Masters
Masters & Viner, P.C.
152 Colorado Avenue
Montrose, Colorado 81401
970-249-2622
dlm@mastersviner.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of June, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Michael J. Reiser
Law Office of Michael J. Reiser
1475 N. Broadway, Suite 300
Walnut Creek, CA 94596

Tyler R. Meade
The Meade Firm P.C.
1816 Fifth Street
Berkeley, CA 94710

Matthew C. Ferguson
The Matthew C. Ferguson Law Firm, P.C.
119 South Spring, Suite 201
Aspen, Colorado 81611

Linda Pham Lam
Michael Schrag
Gibbs Law Group LLP
505 14th Street, Suite 1100
Oakland, CA 94612

Daniel F. Shea
Jessica Black Livingston
Hogan Lovells US LLP
1601 Wewatta Street, Suite 900
Denver, Colorado 80202

/s David L. Masters
David L. Masters