# EXHIBIT L

```
 1   RCHFU, LLC,  et al.,
 2   Plaintiffs,           United States District Court
                           District of Colorado
 3   v.                    No.  1:16-cv-01301 PAB-GPG
 4   MARRIOTT VACATIONS WORLDWIDE
     CORPORATION, et al.,
 5
          Defendants,
 6   _____/
     REISER, et al.,
 7
          Plaintiffs,      Eastern District of California
 8   v.                    No. 2:16-cv-00237-MCE-CKD
 9   MARRIOTT VACATIONS WORLDWIDE
     CORPORATION, et al,
10
          Defendants,
11   _____/
     PETRICK, et al.,
12
          Plaintiffs,
13                         San Francisco County
     vs.                   No. CGC-15-54897
14
     MARRIOTT VACATION WORLDWIDE
15   CORPORATION, et al.,
16        Defendants.
     _____/
17
18       VIDEOTAPED DEPOSITION OF STEPHANIE SOBECK
19                   May 15, 2018
20           Tuesday, 9:25 a.m.-4:52 p.m.
21
22
23
24   Job No. 2911163
25   Pages 1 - 275
```

Page 1

## Page 2

```
10      Taken on Behalf of the Plaintiffs before
11  Lisa Gerlach, Court Reporter, Notary Public
12  in and for the State of Florida at Large,
13  pursuant to Plaintiffs' Notice of Taking
14  Deposition in the above cause.
```

## Page 4

```
 1   Appearances:
 3   For the Defendant Marriott:
 4      PHILIP SELLINGER, ESQUIRE
 5      Greenberg Traurig, LLP
 6      500 Campus Drive, Suite 400
 7      Florham Park, NJ 07932-0677
 8      sellingerp@gtlaw.com
 9      marxi@gtlaw.co

11      DOUGLAS A. KELLY, ESQUIRE
12      KIM GRAY, ESQUIRE
13      Marriott Vacations Worldwide
14      6649 Westwood Boulevard
15      Orlando, FL 32821

17   For the Defendant Aspen Highlands
18   Condominium Association, by speakerphone:
19      JESSICA BLACK LIVINGSTON, ESQUIRE
20      Hogan Lovells
21      1601 Wewatta Street, Suite 900
22      Denver, CO 80202
23      303-899-7300
24      jessica.livingston@hoganlovells.com
```

## Page 3

```
 1   Appearances:
 2   Counsel for the Plaintiffs:
 3      MATTHEW C. FERGUSON, ESQUIRE
 4      The Matthew C. Ferguson Law Firm, PC
 5      119 South Spring, Suite 201
 6      Aspen, CO 81611
 7      970-925-6288
 8      matt@matthewfergusonlaw.com

10      MICHAEL S. REISER, SR., ESQUIRE
11      MICHAEL S. REISER, JR.
12      MATTHEW REISER, ESQUIRE, by speakerphone
13      Reiser Law, PC
14      1475 Broadway, Suite 300
15      Walnut Creek, CA 94596
16      michael@reiserlaw.com
17      matthew@reiserlaw.com

19      TYLER MEADE, ESQUIRE
20      The Meade Firm
21      1816 Fifth Street
22      Berkeley, CA 94710
23      510-843-3670
24      tyler@meadefirm.com
```

## Page 5

```
            INDEX
WITNESS      EXAMINATION            PAGE
Stephanie Sobeck
    Direct by Mr. Ferguson        8
    Direct by Mr. Reiser        145
    Cross by Mr. Sellinger      270
    Redirect by Mr. Ferguson    271

            EXHIBITS
EXHIBIT       DESCRIPTION           PAGE
Exhibit 2102  Affiliation Agreement,
      RCDC067469 through RCDC067520    23

Exhibit 2103  First Amendment to Affiliation
      Agreement, RCDC070241 through
      RCDC070242                       96

Exhibit 2104  Acknowledgement of and Joinder to
      Affiliation Agreement,
      AHCA00018031 through AHCA00018034  92

Exhibit 2136  Corporate Growth Committee Document,
      RCDC070195 through RCDC070204    29

Exhibit 2137  Corporate Growth Committee Document,
      RCDC070205 through RCDC070209   228

Exhibit 2138  Corporate Growth Committee Document,
      RCDC070210 through RCDC070216   264
```

2 (Pages 2 - 5)

Page 26

1  MR. SELLINGER: Objection to form. Go
2 ahead.
3  A. This Lion & Crown agreement with affiliation
4 with Marriott Vacation Club is how the Marriott
5 Vacation Club program became available to...
6 BY MR. FERGUSON:
7  Q. Right. Is there a document like that, for
8 example, with respect to the Exclusive Resorts, where
9 Lion & Crown is affiliating with Exclusive Resorts?
10 Is there something like that?
11  A. I believe there would've been for Exclusive
12 Resorts.
13  Q. And there would've been one for Third Home?
14  A. I believe so, yes.
15  Q. And there would've been one for Abercrombie &
16 Kent?
17  A. Yes.
18  Q. Are these the only four systems that Lion &
19 Crown Travel has affiliated its RCDC members with?
20  A. I believe those are the only ones. We've had
21 other conversations with others, but these are the
22 only ones, yes.
23  Q. Are there any other programs under
24 consideration?
25  A. There have been in the past, but none of them

Page 27

1 ended up being a good fit.
2  Q. Have there been any discussions as to whether
3 or not Lion & Crown Travel Company might affiliate
4 with some of the new products being brought in through
5 the potential ILG merger?
6  A. No, not yet.
7  Q. Are you working on that merger?
8  A. Yes.
9  Q. Do you know when the shareholder votes are
10 for the Marriott Vacation Worldwide folks?
11  MR. SELLINGER: Objection to form.
12  A. Sorry. I don't understand.
13 BY MR. FERGUSON:
14  Q. Are you aware there's going to be a
15 shareholder vote as to whether or not the merger will
16 take place by the shareholders of both entities, ILG
17 and Marriott Vacation Worldwide?
18  A. Yes.
19  Q. Do you know when the Marriott Vacation
20 Worldwide shareholders vote might be?
21  A. I don't.
22  Q. Do you know what month it's going to be in?
23  A. I don't.
24  Q. Exhibit 2102, which is that November '13
25 version of the document, did you maintain a copy of

Page 28

1 that in your files?
2  A. I don't know if it's in my files or not.
3 Certainly not a hard copy.
4  Q. How would you have had access to that
5 document if you needed it?
6  A. If I didn't have it, I would -- I would
7 e-mail the law department to get a copy.
8  Q. Do you have a folder or folders that you keep
9 important documents in for your day-to-day work as an
10 asset manager, overseeing some of the -- over the
11 years, it's changed -- but some of the Ritz-Carlton
12 Destination Clubs?
13  A. Yes.
14  Q. Was this document in that folder -- in any of
15 those folders?
16  A. I don't know if it was or not. Could have
17 been.
18  Q. Did you work on the preparation of this
19 affiliation agreement?
20  A. No.
21  Q. When was the first time you heard about this
22 affiliation agreement, Exhibit 2102, being discussed?
23  A. I don't understand the question.
24  Q. When did you first hear about there might be
25 an affiliation agreement between Lion & Crown and the

Page 29

1 Marriott Vacation Club Destination Exchange Program?
2  A. When we were working on Third Home.
3  Q. What does that mean?
4  A. I'm sorry. Not Third Home. Abercrombie &
5 Kent. Apologies. When we would've been looking --
6 found the potential suitor that might have been a good
7 exchange opportunity for the Ritz-Carlton members, and
8 the law department would've been working on a
9 mechanism for exchange through the Ritz-Carlton
10 system.
11  Q. In July of 2012, Ms. Babich -- we talked
12 about her at your deposition -- she sent out the
13 evolution letter. Do you recall that, just for the
14 timeframe here?
15  A. I do, yes.
16  Q. Okay. We had produced to us the other day a
17 corporate growth committee memorandum, which is
18 heavily redacted, from May of 2012.
19  Do you know when -- let me ask you this.
20 Whose idea was it first to potentially affiliate RCDC
21 with Marriott Vacation Destination Club? I'm not
22 talking about inventory. I'm just talking about an
23 affiliation. Who first brought that up?
24  MR. SELLINGER: Objection to form.
25  A. Can I correct an answer that I gave before?

8 (Pages 26 - 29)

 1  entities like, in this case, Marriott Resort Travel
 2  Company?
 3      A.  Correct.
 4          MR. SELLINGER:  Objection to form.
 5  BY MR. FERGUSON:
 6      Q.  Is that right?
 7      A.  They have signatory authority for certain
 8  entities, correct.
 9      Q.  You said he was the executive vice president
10  of operations?
11      A.  I believe that's his title, yes.
12      Q.  Did he have any direct involvement, do you
13  recall, with respect to the RCDC system in this
14  timeframe?
15      A.  No.
16      Q.  Obviously, Mr. Cunningham signed for Lion &
17  Crown Travel; right?
18      A.  Yes.
19      Q.  Did there come a point in time that, with
20  respect to a potential affiliation between the RCDC
21  members and the Marriott Vacation Worldwide -- I'm
22  sorry -- Marriott Vacation Club Destinations Exchange
23  Program -- did there come a time when you all realized
24  you needed to do this agreement?
25          MR. SELLINGER:  Objection to form.

Page 42

 1      A.  Which agreement?
 2  BY MR. FERGUSON:
 3      Q.  This agreement, Exhibit 2102, which is the
 4  affiliation agreement between Lion and Crown and
 5  Marriott -- with access to the Marriott Vacation Club
 6  Destinations Exchange Program and MRTC.
 7      A.  Would there have been a time that we realized
 8  we needed to do this agreement?
 9      Q.  Yeah.
10      A.  Yes.
11      Q.  Would that have been part of your job
12  function to say, "Hey, we had one of these for Lion &
13  Crown" -- I'm sorry -- "We had one of these for
14  Abercrombie & Kent.  We have one for Exclusive
15  Resorts.  We need one of these to affiliate Marriott
16  Vacation Club with RCDC"?
17      A.  No.
18      Q.  Who would have done that?
19      A.  The law department.
20      Q.  Who in the law department do you know --
21  withdrawn.  Do you know who in the law department
22  would have overseen the drafting of this affiliation
23  agreement from 2013?
24      A.  Probably Barbara Egolf.
25      Q.  If you look at page -- this one doesn't have

Page 43

 1  a page number on it, of course -- if you look at
 2  page 2 -- I'm sorry -- page 1, which is -- starts with
 3  the affiliation agreement.  It's not paginated
 4  because, I guess, it's the first page.
 5          Would you look at the fourth whereas clause,
 6  where it says, "Whereas, MVCD and Lion & Crown desire
 7  that the Lion & Crown program become affiliated with
 8  the MVCD program as an affiliate program"?  Are you
 9  there?
10          MR. SELLINGER:  Just hold on a minute.
11      He's behind you.  And when you're asking a
12      question, I'd really like to be able to look
13      at it.
14          MR. FERGUSON:  Sure.  Why don't you blow
15      up the fourth whereas clause?  Thank you.
16      A.  The fourth whereas clause says, "Lion & Crown
17  has reserved the right to affiliate with L&C program."
18  BY MR. FERGUSON:
19      Q.  Sorry.  Right.  I missed the big first one.
20  It's the fifth one.  I'm sorry.
21      A.  Yes, I see that.
22      Q.  And I wrote through romanette number one, but
23  romanette number two says, "Except as otherwise
24  provided in this agreement, certain members of the
25  Lion & Crown program" -- it says, "who are not members

Page 44

 1  of the Bleu Florida Trust."
 2          Those are people that -- those are people
 3  that bought RCDC points of some sort that was unwound?
 4      A.  Yes.
 5      Q.  Okay.  "Whose owners associations have
 6  executed an acknowledgement agreement, as defined in
 7  Article 2, L&C members shall have the right to elect
 8  to become a participant in the MVCD program."
 9          One of the things that needed to happen
10  pursuant to this affiliation agreement was that the
11  association would have to sign the acknowledgement?
12          MR. SELLINGER:  Objection to form.
13      A.  No.  They were already -- we were already
14  affiliated with MVCD when this was executed.
15  BY MR. FERGUSON:
16      Q.  Who was already affiliated?
17      A.  Lion & Crown was already affiliated with
18  MVCD.  All this was doing was allowing --
19          MR. SELLINGER:  Let her finish.
20          MR. FERGUSON:  Okay.
21      A.  All this was doing was -- the associations
22  were deciding whether their members were going to be
23  able to participate or not.
24  BY MR. FERGUSON:
25      Q.  So they had a decision to make whether to

Page 45

12 (Pages 42 - 45)

```
 1  sign -- to acknowledge and join this agreement?
 2     A.  Yeah.  The company decided, obviously, we
 3  wanted to allow this to be available for everyone.  It
 4  was a good opportunity.  There was additional vacation
 5  options.  It was completely voluntary.
 6         But we wanted -- because of some of the
 7  feedback we got, we wanted the homeowners association
 8  to decide whether they wanted to allow it for their
 9  owners -- their members -- or not.
10     Q.  When you say "the company," what do you mean
11  by the company?  There's a lot of companies here.
12     A.  I know.  It's true.  Ritz-Carlton Destination
13  Club.  We thought that was the best opportunity, was
14  to give more travel options to the Ritz-Carlton
15  member.
16     Q.  Yeah.  I know.  We've covered that.  The
17  opportunity is voluntary, travel options.  That's what
18  you all wanted to try to give to the RCDC members?
19     A.  Correct.
20     Q.  The bottom line is that, with respect to this
21  agreement, though, the associations had the ability
22  and the right to decide?  That's what you wrote in
23  here.
24         MR. SELLINGER:  Objection to form.
25     A.  Not to affiliate MVCD with Lion & Crown.
                                                  Page 46
```

```
 1  They didn't have the right to decide that.  That was
 2  already done.  They had the right to decide if their
 3  members were going to have an option to use the
 4  program or not.
 5  BY MR. FERGUSON:
 6     Q.  How were Lion & Crown and MVCD already
 7  affiliated before this agreement?
 8     A.  Before this agreement?
 9     Q.  Yeah.
10     A.  They weren't, but this agreement is what
11  actually affiliated them, and then the acknowledgement
12  agreement.  But -- I'm sorry -- I thought you were
13  asking about the acknowledgement agreement.
14     Q.  I was, but I thought you indicated that there
15  was a prior agreement that already affiliated Lion &
16  Crown with MVCD.
17     A.  No.  This is the agreement that affiliated
18  them.
19     Q.  Okay.  Would you go to page 3 of
20  Exhibit 2102, which is the 2013 affiliation agreement
21  between Lion & Crown and MRTC --
22     A.  Which is the actual page; right?
23     Q.  Yeah, actual page 3.  Because the other one
24  is confusing.  It says, "Page 3 of blank."  I just
25  want to use that page, yeah.
                                                  Page 47
```

```
 1         The top of the page is an acknowledgement
 2  agreement.  It means an acknowledgement of a joinder
 3  to affiliation agreement among MVCD, Lion & Crown, and
 4  applicable participating L&C association in the form
 5  attached as Exhibit B.  I was right.
 6         So this is a definition of what -- of
 7  acknowledgement agreement in this document.  Is that
 8  right?
 9     A.  Yes.
10     Q.  So in order for an association, such as Aspen
11  or San Francisco or Tahoe, to be a part of this
12  affiliation that you said is occurring, they would
13  have to sign this acknowledgement and joinder?
14         MR. SELLINGER:  Objection to form.
15     A.  They would have to -- Aspen was already --
16  all of the clubs were already affiliated through Lion
17  & Crown.  So Lion & Crown -- I'm sorry.  I don't seem
18  to be explaining myself well.
19         Just like ER, or Abercrombie & Kent before,
20  when the affiliation agreements were done -- when the
21  affiliation agreements between the different
22  organizations was done -- just like when this one was
23  executed -- the affiliation is in place.
24         The new step we were talking about here was
25  an acknowledgement that, in essence, the boards were
                                                  Page 48
```

```
 1  acknowledging that they wanted their members to have
 2  access to the program.
 3  BY MR. FERGUSON:
 4     Q.  So what you're saying is that this document,
 5  Exhibit 2102, is the affiliation agreement between
 6  Lion & Crown and MRTC to do the bilateral exchange --
 7  MVCD people and RCDC -- RCDC people and MVCD -- that's
 8  already been made?
 9     A.  Correct.
10     Q.  But the next part of that is, in order for
11  Aspen to be part of that, they had to sign the
12  acknowledgement and joinder?
13         MR. SELLINGER:  Objection to form.
14     A.  In order for the members to have access to
15  this, the association would have to.  Because, don't
16  forget -- things change all the time.  Boards change.
17  So people change on the boards.  We knew that a board
18  could maybe decide right away that they didn't want
19  to, but, a couple months later, they would want to
20  have their members to have access.
21         So this was the -- the acknowledgement was to
22  allow the members to have the access.
23  BY MR. FERGUSON:
24     Q.  Yeah, but it was also a joinder; right --
25  J-O-I-N-D-E-R -- right -- a joinder?
                                                  Page 49
```

13 (Pages 46 - 49)

**Page 54**

1   You don't have her deposition here today?
2   MR. SELLINGER: No. I didn't know what
3   questions you were going to be asking. I
4   didn't think we were going to be talking
5   about the old deposition.
6   But, anyway, I'm just trying to see the
7   context. I do see Mercer now --
8   MR. FERGUSON: -- we didn't have this
9   document at the deposition, Mr. Sellinger.
10   MR. SELLINGER: I'm not looking to argue
11   with you. I'm just looking -- I see now the
12   reference to Mercer.
13   MR. FERGUSON: Thank you. Can you repeat
14   my question?
15   THE REPORTER: "And you're saying that he
16   didn't have the right to do that, but he did
17   have a right to sign the joinder and --
18   acknowledgement and joinder at some point.
19   Did he not?"
20   THE WITNESS: He had the ability to sign
21   the acknowledgement and joinder.
22   BY MR. FERGUSON:
23   Q. He had the right to do it?
24   MR. SELLINGER: Objection to form.
25   A. He had the right to do it.

**Page 55**

1   BY MR. FERGUSON:
2   Q. Was it a right to do it?
3   A. No. He had the ability to do it. He didn't
4   have to do it if he didn't want to.
5   Q. And if he didn't do it, there would not have
6   been a -- there would not have been an affiliation --
7   withdraw that -- there would not have been an ability
8   by Marriott Vacation Club people to access
9   Ritz-Carlton Destination Club in Aspen, Colorado.
10   Correct?
11   A. No. They were actually already accessing.
12   Q. How were they accessing it, Ms. Sobeck?
13   A. They were accessing it, actually, before.
14   They were accessing it through the Explorer Program.
15   So we had developer inventory, and the inventory was
16   being used through Explorer.
17   And Marriott Vacation members, before kind of
18   any of this had happened, were able to access it
19   through that Explorer Program.
20   Q. So there were some ways for Marriott Vacation
21   Club high-points users, platinum users, and whatnot to
22   access what you all had allowed?
23   A. Correct.
24   Q. Okay. Had there been any voice given to the
25   Marriott Vacation -- sorry -- to the RCDC folks up in

**Page 56**

1   Aspen to allow that access, or was it just hoisted
2   upon them?
3   MR. SELLINGER: Objection to form.
4   A. Well, it was the developer using their
5   inventory, just like any other member can use their
6   inventory.
7   BY MR. FERGUSON:
8   Q. Okay. We've covered all that.
9   You were then asked, "So your interpretation
10   of" --
11   MR. SELLINGER: Tell me where you're
12   reading.
13   MR. FERGUSON: I'm following exactly
14   where we were, Mr. Sellinger.
15   THE WITNESS: He's on 46, though. You're
16   on 47, I think.
17   MR. FERGUSON: Oh, we went back to show
18   you Mr. Mercer. Okay. Let's go to 47.
19   MR. SELLINGER: Okay.
20   BY MR. FERGUSON:
21   Q. You were then asked, "So your interpretation
22   of participate or consent is to make the decision?"
23   And you said, "To make the decision to affiliate,
24   yes."
25   Correct? Did I read that correctly?

**Page 57**

1   A. That's what it says. It wasn't to affiliate.
2   I mean, I think you're asking me many different ways.
3   It's to acknowledge that the members were going to
4   have access.
5   Again, the affiliation was already done. I'm
6   not saying it correctly.
7   Q. It was already done because someone signed it
8   on November 14 --
9   A. Right. The affiliation was already
10   completed.
11   Q. Are you aware that Mr. Mercer and Mr. Oliver
12   visited with you all down here in Orlando on
13   November 14, 2013, the day that Mr. Delorey and
14   Mr. Cunningham signed that document?
15   A. I didn't know that was the same day, but I
16   was -- I do know they were there.
17   Q. You did meet with them, right, when they were
18   here?
19   A. Yes.
20   Q. Did you tell them, "Hey, we signed this
21   affiliation agreement between Lion & Crown and
22   Marriott Resorts Travel Company"?
23   A. I don't think specifically, no.
24   Q. Did you tell him, "Hey, we just signed a
25   document that's going to give you the right to

15 (Pages 54 - 57)

**Page 178**

1 and joinder before any Marriott Vacation Club members
2 could use the Aspen Club through an affiliation; do
3 you not?
4  MR. SELLINGER: Objection to form.
5  A. I'm just going to restate to make sure I
6 understand. The only way the Aspen members would have
7 had access to the program -- the members themselves --
8 would've been, based on this, the acknowledgement
9 being executed by the board and the association.
10  Based on that, the Marriott Vacation Club
11 members, through this affiliation -- they still had
12 access within the other program, Explorer -- but based
13 on affiliation specifically from a Ritz-Carlton member
14 going out and a Marriott Vacation Club coming in, then
15 that would've been the way that would have happened.
16 So, yes.
17 BY MR. REISER:
18  Q. So just to be clear -- and then I'll move
19 on -- I just want to make this crystal clear for the
20 record. The jury is going to probably hear this.
21  In terms of Marriott Vacation Club members
22 having access to Ritz-Carlton Club, Aspen through an
23 affiliation agreement, the association would have to
24 sign the acknowledgement and joinder to the
25 November 2013 affiliation agreement. True?

**Page 179**

1  MR. SELLINGER: Objection to form.
2  A. Your questions are long. The association has
3 to sign the acknowledgement, which would allow the
4 members to participate in the program.
5  We wanted to make it available to everyone.
6 But we were, as a special accomodation, allowing the
7 boards to decide if they wanted to make it available
8 for their members.
9  Q. When you say "a special accomodation," that
10 was actually the terms of the November 2013
11 affiliation agreement. Are you saying that there was
12 an accommodation made by inserting into the
13 requirements of the affiliation agreement that the
14 joinder be signed?
15  MR. SELLINGER: Objection to form.
16  A. We have the right to affiliate -- Lion &
17 Crown and Cobalt Travel have the right to affiliate
18 with whatever program they want. It's not required
19 that we would ask for the board's acknowledgement.
20 But that's the special accomodation that we're talking
21 about, yes.
22 BY MR. REISER:
23  Q. So let me break this down then. So Cobalt
24 has the power to affiliate other programs, right,
25 under the 2001 agreement that we looked at --

**Page 180**

1 Exhibit 1003?
2  A. Yes.
3  Q. Cobalt did create a program with Lion & Crown
4 and affiliated that external exchange program -- Lion
5 & Crown -- right? That was the 2010 agreement?
6  A. It wasn't -- yes, Lion & Crown is internal.
7 It's not external. But, yes, Cobalt affiliated with
8 Lion & Crown.
9  Q. Okay. And then it gave Lion & Crown the
10 right to set the terms by which Ritz-Carlton Clubs
11 would join the affiliation agreement that it entered
12 into with Cobalt. True?
13  MR. SELLINGER: Objection to form.
14  A. It gave Lion & Crown the right to enter into
15 other affiliation programs -- external affiliation
16 programs -- true.
17 BY MR. REISER:
18  Q. And Lion & Crown created the 2013 affiliation
19 agreement, which, by its terms, required that the
20 association sign a joinder and the affiliation
21 agreement if Marriott Vacation members were going to
22 have access through this affiliation program. True?
23  MR. SELLINGER: Objection to form.
24  MS. LIVINGSTON: Object to form.
25  A. The affiliation -- when the affiliation

**Page 181**

1 agreement of 2013 was signed, the affiliation was
2 done. We, again -- the company, Ritz-Carlton
3 Destination Club -- wanted to make options available
4 to members. We didn't think we wanted to withhold
5 anything from members. But because of some of the
6 concern that happened, we made an accomodation with
7 the boards to say, "If you want to make this available
8 to your members, we would like you to acknowledge
9 this."
10  But, I guess, I'm just -- you're saying it a
11 lot of different ways, but it's the acknowledgement of
12 them. So we wanted them -- if they didn't want to
13 make it available to their members, it was going to be
14 the board's decision not to do that.
15  Q. And it would've been the board's decision to
16 not make the Marriott Vacation members have access to
17 the club through the affiliation if they chose not to
18 sign it. True?
19  MR. SELLINGER: Objection to form.
20  MS. LIVINGSTON: Object to form.
21  A. Through affiliation, they would not have had
22 access to an Aspen, if that's what we're talking about
23 specifically, but it was still available through the
24 Explorer Program.
25 BY MR. REISER:

| | |
|---|---|
| 1  Q. I understand. You've said that many times.<br>2 The Explorer Program was going to run out once the<br>3 developer inventory was gone; right?<br>4  A. It could, but --<br>5  Q. It would --<br>6    MR. SELLINGER: Hold on. Hold on.<br>7  A. Right. But the developer inventory could<br>8 have been held for as long as the developer wanted to<br>9 hold it.<br>10 BY MR. REISER:<br>11  Q. Is that what you think, that they had the<br>12 right to hold it as long as they want and never sell<br>13 it?<br>14  A. Yes.<br>15  Q. Okay. I'm actually wanting to drill down,<br>16 because you keep using the word, and the word is used<br>17 as an accomodation. I just want to see if I can get<br>18 you to agree that the accomodation was made at the<br>19 time the November 2013 affiliation agreement was<br>20 entered into, because that agreement gave the<br>21 associations the right to say yes or no to the<br>22 affiliation.<br>23    MR. SELLINGER: Objection to form.<br>24 BY MR. REISER:<br>25  Q. To joining the affiliation.<br>Page 182 | 1  Q. Okay. So I think we're on the same page<br>2 after all that. Thank you for volunteering that other<br>3 stuff. It's helpful. But I just want to get a<br>4 clear -- I think we're saying the same thing.<br>5    The affiliation agreement between Lion &<br>6 Crown and Marriott was in place from November 2013;<br>7 right?<br>8  A. Correct.<br>9  Q. And the decision whether each association<br>10 would join that affiliation agreement and allow their<br>11 members to trade into the Marriott Vacation Club, and<br>12 Marriott Vacation Club members to access through this<br>13 affiliation agreement, The Ritz-Carlton Club, that<br>14 required an approval of each association. True?<br>15    MR. SELLINGER: Objection to form.<br>16  A. It is --<br>17    MS. LIVINGSTON: Object to form.<br>18  A. I'm sorry. It required an execution of the<br>19 acknowledgement agreement, true. Yes.<br>20 BY MR. REISER:<br>21  Q. Do you believe that, if the Aspen -- strike<br>22 that. Do you believe the Aspen association has the<br>23 right to terminate at will, at this point, the<br>24 affiliation -- the joinder and affiliation? Strike<br>25 that. Let me ask a better question.<br>Page 184 |
| 1    MR. SELLINGER: Objection to form.<br>2    MS. LIVINGSTON: Object to form.<br>3  A. Right. The affiliation was in place --<br>4 BY MR. REISER:<br>5  Q. And that affiliation --<br>6    MR. SELLINGER: Hold on. Hold on.<br>7 BY MR. REISER:<br>8  Q. Sorry.<br>9  A. The affiliation is in place, but the<br>10 affiliation is between Lion & Crown and Marriott<br>11 Vacation Club. That affiliation is in place.<br>12    So then you have all these clubs out here<br>13 and, each of the boards are going to say -- the<br>14 affiliation is in place -- the board is going to say,<br>15 "Yes, my members can participate," or, "No, they<br>16 cannot participate."<br>17    If they would like to participate, they sign<br>18 the acknowledgement. Yes, they can participate. If<br>19 the board turns over in three months, the current<br>20 board says, "No, we're not going to participate" --<br>21 three months later, the new board comes on and says,<br>22 "Oh, everybody really seems to like this Marriott<br>23 Vacation Club. Okay, we're going to sign" -- then<br>24 they can participate.<br>25 BY MR. REISER:<br>Page 183 | 1    Is it your belief, because it sounds like<br>2 this is what you testified to just by volunteering<br>3 that earlier -- is it your belief that, if the Aspen<br>4 board changes its mind today, it could notify Lion &<br>5 Crown and say, "We no longer choose to acknowledge and<br>6 consent to this agreement," and they would be out of<br>7 the agreement?<br>8  A. If there --<br>9    MR. SELLINGER: Objection to form.<br>10    MS. LIVINGSTON: Object to form.<br>11  A. If the board came to us and said, "Listen, we<br>12 have concerns. We don't want to -- we don't want to<br>13 be -- this acknowledgement -- this program -- we don't<br>14 want our members to have access to it anymore," we'd<br>15 probably sit down with them and talk to them about<br>16 why -- help understand it.<br>17    But, at the end of day, if they were adamant<br>18 that there were all these issues, there were no<br>19 members who liked it, dissatisfaction was incredible,<br>20 there's no benefit to us for keeping Aspen --<br>21 continuing to have this program available for them.<br>22 This is more vacation options for them. It's not<br>23 doing anything for us.<br>24  Q. So you believe that the decision of the<br>25 board, they can terminate their joinder at will. Is<br>Page 185 |

47 (Pages 182 - 185)