**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF COLORADO**

Civil Action No. 1:16-cv-01301-PAB-GPG

**RCHFU, LLC**, a Colorado limited liability company, et al.,

Plaintiffs,

v.

**MARRIOTT VACATIONS WORLDWIDE CORPORATION**, a Delaware corporation, et al.,

Defendants.

---

**ASPEN HIGHLANDS CONDOMINIUM ASSOCIATION'S**
**MOTION FOR SUMMARY JUDGMENT**

---

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendant Aspen Highlands Condominium Association (the "AHCA"), by and through its undersigned counsel, Hogan Lovells US LLP, respectfully requests that the Court grant summary judgment in its favor and against Plaintiffs.  In support of this Motion, the AHCA states as follows:

**INTRODUCTION**

Plaintiffs are owners of about 217 of the 876 deeded 1/12 fractional ownership interests at the Ritz-Carlton Club in Aspen Highlands (the "Club").  They sued Defendants on the theory that the value of their interests has declined because other members of the Club, who own their interests in fee simple, have the choice to trade one of their weeks at Aspen Highlands with members of the Marriott Vacation Club ("MVC") through an affiliation between the Club and Marriott Vacations Worldwide Corporation's ("MVW") points-based timeshare program.  Plaintiffs claim that, in connection with the affiliation, the AHCA breached its fiduciary duty to

1

Club members, engaged in constructive fraud, and aided and abetted and conspired with the Marriott Defendants in those defendants' separately alleged breaches of fiduciary duty.  But Plaintiffs have adduced no evidence to support any of their claims against the AHCA.  Nor can they prove that any of the AHCA's allegedly tortious conduct caused their alleged damages.

Plaintiffs claim that the AHCA breached its fiduciary duty to Plaintiffs by not conducting a promised vote before entering into a Memorandum of Understanding ("MOU") in April 2014 with defendant Lion & Crown Travel Co., LLC.  The MOU permitted individual Club members, on a wholly voluntary basis, to trade one week with MVC members (but at the same time precluded Marriott from so trading weeks in its unsold inventory).  But Plaintiffs have adduced no evidence that the AHCA directors acted disloyally or arbitrarily by favoring themselves or another group of Club members over Plaintiffs.  Many members indicated to the AHCA that they wanted more exchange opportunities, including with the MVC, because the exchange opportunities within the Ritz-Carlton Clubs had contracted considerably—four of the eight sister clubs left the system—and the directors had to be fair to these members, who like all members had fee-simple rights to trade a week with anyone.  The business-judgment rule thus insulates the AHCA's decision to conduct a survey, which was not a vote, before permitting the affiliation with the MVCD Exchange Program.[1]

Moreover, all of the Plaintiffs' claims are barred by the economic-loss rule because Section 6.8 of the Condominium Declaration establishes the fiduciary duties that the AHCA owes to Club members, and no torts can lie against the AHCA that encompass the same duties.

---

[1] The Court previously rejected the AHCA's business-judgment-rule and economic-loss-rule defenses at the motion-to-dismiss stage, where the Court was bound to take Plaintiffs' allegations as true.  As demonstrated below, certain of Plaintiffs' allegations are unsupported by the evidence, and the undisputed material facts now demonstrate that both defenses apply here.

The Colorado Supreme Court has said that it is against public policy to allow parties to a contract establishing fiduciary duties to pursue tort claims against one another, even if their fiduciary duties under common law are not much different.  In such cases, the contractual duties govern.

Specifically with respect to the constructive-fraud claim, Plaintiffs have not alleged or adduced any evidence that the AHCA or its directors gained any advantage from allegedly misleading Plaintiffs to believe that a vote would be held.  Plaintiffs thus cannot prove an essential element of their claim.  The statute of limitations also bars their claim because Plaintiffs did not seek to add it to their complaint until December 2016, more than three years after the AHCA repeatedly told Club members that a survey, not a vote, would be held.

Nor can Plaintiffs avoid the protections that the business-judgment rule affords the AHCA by alleging that the AHCA aided and abetted or conspired with one or more of the Marriott Defendants to facilitate those defendants' alleged breaches of their own, independent duties to Plaintiffs because this would eviscerate the business-judgment rule.  And, as the Delaware Supreme Court has held, corporate directors cannot be secondarily liable to an individual whom the director owes a primary fiduciary duty.  Moreover, Plaintiffs cannot prove that the AHCA directors had knowledge that any Marriott entity breached a duty to Plaintiffs to hold a vote or that they provided any substantial assistance to Marriott to deprive Plaintiffs of a vote.  Similarly, in regard to the allegations that the AHCA is secondarily liable for the constructive fraud allegedly perpetrated by some Marriott Defendants, Plaintiffs cannot show that the AHCA knew that any promise by any Marriott entity to hold a vote was enforceable or that the AHCA did anything to assist Marriott in recanting its promise or in gaining an advantage by recanting its promise.  Indeed, the April 2014 MOU prevents Marriott from putting any of its

3

unsold interests into the voluntary trade-a-week program.  Moreover, the AHCA negotiated a $150,000 reduction in the amount of Marriott's annual management fee and obtained for the first time the right to terminate the management agreement during its 10-year term.  Additionally, the secondary liability claims are barred by the economic-loss rule and statute of limitations as to Marriott's alleged constructive fraud.

Finally, Plaintiffs cannot prove that the AHCA's failure to conduct a vote, or its alleged substantial assistance to some Marriott Defendants, was the proximate cause of Plaintiffs' purported damages.  First and foremost, Plaintiffs admitted in their first three complaints that the proximate cause of their damages was the affiliation itself.  Second, it defies reason to believe that an alleged procedural error that Plaintiffs could have sought to correct by making a demand of the Board to stop the affiliation during the six months before the program began in December 2014 (or subsequently by seeking preliminary injunctive relief) caused their real-estate value depreciation.  And Plaintiffs cannot show that, if a vote was somehow required, the result of a vote would have been in opposition to the trade-a-week program.  Indeed, they have not deposed all members of the Club, including the hundreds who have used the MVC program and the many more who used the Abercrombie & Kent, Exclusive Resorts, and Third Home programs.

Ultimately, the MVCD Exchange Program simply formalized what Club members always could do:  exercise their fee-simple rights to trade a week of their time at Aspen Highlands with someone else—including with an MVC member.  The AHCA obtained benefits and protections for Club members when it agreed to the voluntary MVCD Exchange Program, but it in no way breached its fiduciary duties, committed constructive fraud, conspired with the Marriott Defendants, or aided and abetted the Marriott Defendants' allegedly wrongful conduct.

Judgment is proper in the AHCA's favor on all of Plaintiffs' claims.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1.  A Declaration of Condominium was executed in 2001 for the Aspen Highlands Club,

creating the AHCA and setting forth both the duties owed by it to members and the rights of

members to make demands of the AHCA.  Paragraph 6.8 of the Declaration provides that:

> The Executive Board, the officers of the Association and the Association shall
> have the duty to represent the interest of the Tourist Accommodation Owners, the
> Deed Restricted Residential Owners, and the Commercial Owners in a fair and
> just manner in all matters that may affect any or all Categories of Owners. . . .
> [T]he officers and the Association shall be held in their decisions . . . to the
> standards of good faith and reasonableness . . . .

Paragraph 7.8.3 of the Declaration provides that:

> Before an aggrieved Owner may prosecute any proceeding at law or in equity
> enforcing the provisions of this Declaration or the bylaws of the Association or
> seeking other relief relating to a violation or attempted violation of the provisions
> of this Declaration or the bylaws . . . , the Owner will first give written notice to
> the [Association's] Executive Board specifying the violation or attempted
> violation . . . , the facts and circumstances surrounding the violation, and the name
> of the person alleged to have violated or attempted to violate the provisions of this
> Declaration or the bylaws.

Excerpts of the Declaration, filed at Dkt. 109-8 (Mar. 10, 2017), are attached as **Ex. A**.

2.  The Purchase Contract of individual members provide: "The Program Manager has

reserved the right to affiliate additional resorts or delete existing resorts participating in the

Membership program from time to time."  A representative example of the Plaintiffs' Purchase

Contract, ¶ 13, is attached here as **Ex. B**.

3.  An Affiliation Agreement between The Lion & Crown Travel Co., LLC and the ACHA

provides, "The program manager may, in its sole discretion, elect to affiliate other locations with

the Membership Program as Member Clubs or associated clubs from time to time."  The

Affiliation Agreement, filed at Dkt. 109-2 (Mar. 10, 2017), is attached here as **Ex. C.**

4.   The Management Agreement between the Ritz-Carlton Management Company and the ACHA provides: "the Association may terminate this Agreement at any time for any or no reason upon twelve (12) months advance written notice to the Management Company . . . ."  It also requires the Management Company to rebate $150,000 annually to the Association.  The Management Agreement is attached here as **Ex. D**.

5.   Prior to July 2012, Club members could exchange a week with eight Ritz Carlton clubs at Bachelor Gulch, Colorado; Jupiter, Florida; North Lake Tahoe, California; St. Thomas, U.S.V.I.; San Francisco, California; Vail, Colorado; Abaco, Bahamas; and Maui, Hawaii.  See Dkt. No. 250 (Sixth Am. Compl., May 15, 2018) ¶ 4.

6.   As of July 2012, Marriott announced that it planned to affiliate with the MVC and that it had affiliated with Abercrombie & Kent without any vote of Club members.  See Declaration of Randy Mercer ¶ 6, attached here as **Ex. E**.

7.   In April 2013, Marriott affiliated with Exclusive Resorts without any vote of Club members.  See April 22, 2013 email from Lee Cunningham to RCDC Ass'n Presidents, attached here as **Ex. F** (announcing the affiliation without reference to any vote of the members).

8.   In April 2014, Marriott affiliated with Third Home without any vote of Club members.  See April 22, 2014 Email from R. Lee Cunningham to Randal Mercer, attached here as **Ex. G** (announcing the affiliation with Third Home without referencing a vote by members).

9.   The Abaco and Kapalua Ritz Carlton clubs left the system before April 2013 and the Bachelors Gulch club was threatening to leave the system, prompting some Club members to complain to the AHCA about the loss of exchange opportunities.  See August 17, 2012 Letter to

Aspen Members attached here as **Ex. H**.

10. The AHCA sent a letter to Club members in April 2013 stating, "Ritz/Marriott representatives agree that unless a majority of Aspen Highlands Members . . . vote in favor of doing so, the Ritz/Marriott will not include Aspen Highlands in the Marriott Vacation Club affiliation/exchange/points program."  The April 2013 Letter is attached here as **Ex. I**.

11. Marriott sent a separate letter to Club members in May 2013 stating "we believe a survey of the members is the best way to determine if The Ritz-Carlton Club, Aspen (and the members) will be affiliated in anyway with The Marriott Vacation Club system."  The May 2013 letter is attached here as **Ex. J**.

12. The AHCA sent a letter to Club members in July 2013 stating, "A Member survey will be distributed to all Aspen Members shortly.  The question will be asked in essence, 'Do you want the Aspen Ritz-Carlton Club to have an exchange affiliation with the Marriott Vacation Club Destinations exchange program, and do you want Marriott Vacation Club Destination Members to have access to our Aspen Club?'"  The July 2013 letter is attached here as **Ex. K**.

13. The AHCA sent a letter to Club members in October 2013, stating "A Member survey regarding an additional voluntary exchange program will be distributed to all Aspen Members in November.  The sole purpose of the survey is to understand the Aspen Highlands Member's interest in this voluntary exchange program."  The October 2013 letter is attached here as **Ex. L**.

14. The AHCA and Marriott sent a letter to Club members in November 2013 stating, "As promised earlier this year, Members of The Ritz-Carlton Club, Aspen Highlands will be surveyed on their opinion regarding the potential exchange affiliation with the Marriott Vacation Club Destinations exchange program."  The November 2013 Letter is attached here as **Ex. M**.

15. Marriott sent a letter to Club members in December 2013 attaching a survey asking whether members favored the AHCA facilitating a trade-a-week program with the MVC.  The December 2013 Letter is attached here as **Ex. N**.

16. Of the approximately 141 responses to the survey, 74 indicated that they favored the trade-a-week program.  See Email Exchange between N. Verrechia and S. Sobeck, attached here as **Ex. O**.

17. The AHCA entered into an MOU in April 2014 establishing the structure for a trade-a-week program that would go into effect later in 2014 and that applied only to individual members so that Marriott could not trade a week from any of its owned interests.  A copy of the MOU is attached here as **Ex. P.**

18. The AHCA negotiated a $150,000 reduction in Marriott's management fee, memorialized in October 2014 in the Third Amendment to Management Agreement.  **Ex. D**, § 4.

19. Plaintiffs' first three amended complaints alleged that the agreement to affiliate was the proximate cause of their damages.  Dkt. No. 5 (First Am. Compl., May 27, 2016), ¶¶ 120, 126; Dkt. No. 40 (Second Am. Compl., Jul. 18, 2016) ¶¶ 82, 88; Dkt. No. 79 (Third Am. Compl., Nov. 11, 2016) ¶¶ 82, 88.[2]

## STANDARD OF REVIEW

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  A fact is material if "under the relevant substantive law it is essential to proper disposition of the claim."  *Chateau Village N. Condo. Ass'n v. Am. Family Mut. Ins. Co.*, 170 F. Supp. 3d 1349, 1355 (D. Colo.

---

[2] The remaining facts cited in this motion are undisputed but not material as a matter of law. Undisputed material facts are cited as "UMF."

2016) (Brimmer, J.) (citation omitted).  A dispute over a material fact may create a "genuine issue" if the "evidence is such that it might lead a reasonable jury to return a verdict for the nonmovant.  *Id.* (citation omitted).  Where, as here, the movant "does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying a lack of evidence for the nonmovant on an essential element of the nonmovant's claim."  *Id.* (citation omitted).

## ARGUMENT

I.   **The business judgment rule insulates the AHCA's conduct, and thus judgment is proper on Plaintiffs' breach-of-fiduciary-duty and constructive-fraud claims.**

Courts will not "interfere with or regulate the conduct of the directors [of a board] in the reasonable and honest exercise of their judgment and duties" absent evidence that the "directors acted in bad faith or in fraud of the rights of the members."  *Rywalt v. Writer Corp.*, 526 P.2d 316, 317 (Colo. App. 1974).  This is because the business judgment rule "bars judicial inquiry into actions of corporate directors taken in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes."  *Curtis v. Nevens*, 31 P.3d 146, 151 (Colo. 2001).  That rule applies here, protects the Board's decisions, and demands judgment favoring the AHCA on Plaintiffs' breach-of-fiduciary-duty and constructive-fraud claims.

The Plaintiffs' fiduciary-duty claim is indisputably based on the duty of loyalty.  Sixth Am. Compl. ¶¶ 24, 85.  The Colorado Court of Appeals recently explained the duty that a condominium association owes to its members in *DA Mountain Rentals, LLC v. The Lodge at Lionshead Phase III Condo. Ass'n Inc.*, 409 P.3d 564 (Colo. App. 2016).  Such an association "has a duty to deal with utmost good faith and solely for the benefit" of the members, owing the members "duties of loyalty and to deal with them impartially."  *Id.* at 574.  These duties require

9

that the Board "not favor certain members at the expense of any others" and not "compete with the members or otherwise advance its own interest over those of the members." *Id.* Plaintiffs have presented no evidence that the Board had a conflict of interest, favored certain members over others, competed with them, or otherwise acted in bad faith.[3]

Plaintiffs have uncovered no evidence that the Board's directors had any conflicts of interest at any point relevant to this lawsuit. There is no evidence that any director had business affiliations with Marriott. Indeed, there is no evidence that any of the four directors who voted to proceed with the MOU has even used the MVCD Exchange Program since it was introduced (assuming that subsequent use even could be construed as presenting a conflict). Despite Plaintiffs' suggestions that the developer might have influenced the AHCA's election in 2012 that brought Mr. Mercer and Mr. Oliver onto the Board, no witness has testified that anything of the sort happened. In fact, Mr. Mercer and Mr. Oliver both testified that they have no knowledge of who voted for them or whether the developer voted in the Board elections at all. **Ex. Q**, Dep. of Randy Mercer, 51:10–20 (Oct. 24, 2017) ("Mercer Dep."); **Ex. R**, Dep. of Tyler Oliver, 15–16:20–2 (Jan. 12, 2018) ("Oliver Dep."). Plaintiffs have not pointed to a single fact that demonstrates the Board was conflicted or disloyal, or otherwise acted in bad faith.

---

[3] The Court, in ruling on the AHCA's motion to dismiss, applied a standard requiring that a business judgment "must be made in good faith and must not be arbitrary." Order at 19 (citing *Colorado Homes, Ltd. v. Loerch-Wilson*, 43 P.3d 718 (Colo. App. 2001)). The *Colorado Homes* court adopted the arbitrariness standard from *Rhue v. Cheyenne Homes, Inc.*, which itself did not actually apply the standard: the association there never took action on an architectural plan that was discussed by the court, so the court never made clear what it meant by the term arbitrary. 449 P.2d 361, 363 (Colo. 1969). *DA Mountain Rentals* makes clear what standard applies to an association charged with breaching its duty of loyalty; "arbitrariness" could be a consideration if it means favoring one group of members over another as opposed to the directors acting disloyally by favoring themselves over other members. Some courts have used "arbitrary" to describe conduct that breaches a duty of care, not at issue here, and such cases are simply not applicable here.

Nor did the Board act in a manner that favored only certain individual members over others. The MOU[4] does not do so—it establishes a structure whereby all individual members can, on a voluntary basis, trade a week for MVC points, UMF 17 §§ 5–6, just as they could previously to use an Abercrombie & Kent or Exclusive Resorts facility, *compare* UMF 17 § 4 (explaining that members may "elect voluntarily" to participate); *with* UMF ¶ 6 (attesting to the voluntary affiliation with Abercrombie & Kent and Exclusive Resorts). The MOU ensured that the exchange program would only be available if a member who owned his or her four weeks in fee simple affirmatively elected to deposit his or her weeks in the program, precluding the MVC members from accessing the "space available" days created whenever an individual member chose not to use a particular week and that week then became available to all members. UMF 17 §§ 2, 6, 7(c). This benefited all members:  ensuring that the "space available" days were not eligible for the exchange program guaranteed that MVC members could only visit the Club if a member deposited in advance one of his allocated weeks and prevented MVC members from accessing any additional, unallocated inventory not specifically deposited by a Club member.[5] UMF 6  ¶ 13–14; Oliver Dep., 237–38:19–3.

Finally, although some members did not support the affiliation, other members were asking for more exchange opportunities after four of the eight Ritz-Carlton sister clubs that had been available for exchanges left the Ritz-Carlton family. *See* Comments of Aspen Members,

---

[4] The Board was represented by counsel who negotiated the MOU. *See* **Ex. S**, Dep. of Michael Marino, 71:13–17 (Dec. 6, 2017); Mercer Dep, 169–70: 20–18.

[5] For example, Club members own their interests as 1/12 fractions, meaning they each have a fee-simple right to four weeks per year. This leaves four weeks per unit per year that are not owned by a member (12 fractions x 4 weeks = 48 weeks). Additionally, members who do not wish to use one of their allocated weeks can return that time to the calendar, and those days then become available to all members, including sister-club members. **Ex. U**, Dep. of  Philip Schneider, 79:7–11 (Oct. 18, 2017) ("Schneider Dep.").

11

**Ex. T** at 2, 4–5, 8, 13. The Board had a duty to represent all members, to consider all of their interests, and not to favor only those who oppose the affiliation. That is precisely what the Board did.

Nevertheless, the Court previously assessed other factors at the motion-to-dismiss stage, when it was bound to accept Plaintiffs' allegations as true. Now, however, the undisputed facts demonstrate that those factors also support the AHCA's request for summary judgment on the basis of the business judgment rule—neither the restrictive covenants in the Declaration nor the Board's communications to its members (i) required a vote on the affiliation, or (ii) prohibited the voluntary trade-a-week program that ultimately became the MVCD Exchange Program.

First, nothing in the Declaration requires or even mentions a vote by all members in connection with the decision to affiliate with the MVCD Exchange Program, despite the fact that certain provisions do explicitly permit or require a vote by members on other matters. *See* **Ex. A** ¶¶ 6.5, 7.1.1, 7.4, 8.6.3, 17.1, 17.2, 18.4, 18.7, and 22.3 (requiring a vote on other matters but not requiring a vote for actions such as an affiliation). Plaintiffs have adduced no evidence that any member objected to Marriott's prior affiliation of the Aspen Club with the Abercrombie & Kent or Exclusive Resorts exchange programs, or the subsequent affiliation with Third Home. And Plaintiffs have put forward no evidence that a vote was required or even discussed, let alone conducted, for the affiliations with those programs.

Regarding the Board's communications to members about a vote, the Board initially sent a letter to members in April 2013 stating that "Ritz/Marriott representatives agree" that a vote would be held on the question of the affiliation. UMF 10. But within three months, on July 2, 2013, the Board communicated to its members that a survey would be sent instead. UMF 12 at

2.  The Board's letter to members stated:  "A Member survey will be distributed to all Aspen Members shortly.  The question will be asked in essence, 'Do you want the Aspen Ritz-Carlton Club to have an exchange affiliation with the Marriott Vacation Club Destinations exchange program, and do you want Marriott Vacation Club Destination Members to have access to our Aspen Club?'"  *Id.*  In the same paragraph, the letter explained that a "vote" might follow if the members needed to consider whether to amend the Declaration to permit Marriott to deposit its unsold inventory into a trust—a separate question from the voluntary affiliation program.  *Id.*  The letter pleaded with members:  "Please pay close, diligent attention to the communication, ask questions and be informed.  Your opinion will make a difference!"  *Id.*  Later in October, the AHCA sent a letter to members, iterating that a survey, not a vote, would be taken on the issue of whether a limited affiliation would occur, allowing individual members but not Marriott to trade allocated weeks for MVC points, thereby allowing MVC members to visit the Club during an exchanged week.  UMF 13.  The Board sent another survey communication in November 2013, and disseminated the survey in December 2013.

Only 141 members responded to the survey, and many of them indicated that they wanted the additional exchange opportunities available through the MVC.  UMF 16; *see also* **Ex. T** 2, 4–5, 8, 15.  More than 500 individual members stayed silent during and after the survey.  *See* Sixth Am. Compl. ¶ 99 (noting that a majority vote would require over 400 member votes, out of, by implication, more than 800 members).  Even though the April 2014 MOU did not go into effect until the program began in December 2014, no member sought to enjoin the MOU during the six-month hiatus or demanded that the MOU ultimately not take effect until a vote of all members was taken or.  In fact, as of March 2018, 382 members (446 interests) had enrolled in

13

the MVCD Exchange Program, and Club members had already deposited 160 weeks for use in

the program in 2018 and 75 weeks for use in the program in 2019.  **Ex. V**, Member Usage as of

March 31, 2018, 8–9.[6]

  Second, the restrictive covenants in the Declaration did not, in fact, prohibit the voluntary

trade-a-week program that ultimately became the MVCD Exchange Program.  The unambiguous

terms of the Declaration do not prohibit the affiliation:  Section 19.8 of the Declaration prohibits

any "Unit" from being used to operate a timeshare[7] or similar program whereby the right to use

of the Unit is scheduled "on a fixed or floating time schedule over a period of years."  **Ex. A**

¶ 19.8.  But a "Unit" specifically excluded "any Fractional Ownership Interests," such as the

fractional interest owned by all Plaintiffs.  *Id.* ¶ 2.72.  Further, the MVCD Exchange Program is

not a program that operates "on a fixed or floating time schedule over a period of years" because

the MOU requires that members must elect "on an annual basis, whether to participate in an

exchange opportunity with the MVCD Exchange Program."  **Ex. P** § 7(d).  Not surprisingly, this

Court previously concluded that the restrictive covenants in the Declaration did not prohibit the

affiliation.  *See* Order at 22 ("The Court, however, agrees that the restrictive covenants do not

---

[6] Consistent with the feedback expressed by many members, the additional exchange opportunities available through Abercrombie & Kent (which ended in 2012), Exclusive Resorts, and Third Home were popular among members.  For example, members deposited 742 nights into the Third Home program in 2016, 819 nights in 2017, and 812 nights in 2018 as of March 2018. **Ex. V**, 5. Similarly, members deposited 238 nights into the Exclusive Resorts program in 2016, 274 nights in 2017, and 153 nights in 2018 as of March 2018. *Id.*

[7] The Declaration does not define "timesharing," but Colorado law defines timesharing as "[a]n undivided interest in a present estate in fee simple in a unit" where title "circulates" according to "a fixed schedule" or the "exclusive right to possession and occupancy of the unit during an annually recurring period of time."  Colo. Rev. Stat. § 38-33-110 (defining time sharing for purposes of Colorado Common Interest Ownership Act, *see, e.g.*, §§ 38-33.3-209.7, 38-33.3-308, 38-33.3-310, 38-33.3-316.5).  None of the Members permanently give up their Fractional Interest to create a fee-simple interest or exclusive right to possession for MVC members when they participate in the MVCD Exchange Program.

preclude the MVC affiliation . . . .").  And members could always exercise their fee-simple rights to rent or trade a week of their time with someone else, even if that person is an MVC member.  **Ex. A** ¶ 13.3.  In any event, Colorado law does not permit alteration of members' fee-simple rights by majority vote, so the AHCA would have been exposed to claims from some members that it altered their fee-simple rights by failing to let them into the MVCD Exchange Program.  Colo. Rev. Stat. § 38-33.3-217(4.5); Mercer Dep., 115–16:24–5; Schneider Dep., 217:7–13; and Oliver Dep., 157:4–7.

For their breach-of-fiduciary-duty claim, the Plaintiffs say that the Board handled the affiliation issue arbitrarily.  They point to 2012 communications to Club members regarding a cease-and-desist letter sent by the AHCA's lawyer to certain Marriott entities asserting that the Declaration prevented Marriott from allowing MVC members to use the Club.  **Ex. W**, Letter from Phillip A. Gosch to Mariott Vacations Worldwide Corporation *et al.* (Nov. 21, 2012).  This is nothing more than a sideshow.  The Board president at the time, New York lawyer Jay Neveloff, stated that the cease-and-desist letter related to Marriott's proposal to allow MVC members to use Marriott's unsold inventory at the Club (totaling nearly 200 of the 876 interests).  **Ex. X**, Dep. of Jay Neveloff, 254:4–17 (Jan. 30, 2018).  And the lawyer who sent the cease-and-desist letter testified that he was not asked to and did not opine on the voluntary trade-a-week program that is the subject of the April 2014 MOU between the AHCA and Marriott.  Dep. of Philip Gosch, 73:9–15 (December 1, 2017) ("Gosch Dep.").

Nevertheless, Plaintiffs assert that the cease-and-desist letter shows that the Board breached its duty of loyalty.  But they do so without explaining how the AHCA acted disloyally

or favored one group of members over another.[8]  Thus, the cease-and-desist letter and the

AHCA's communications to members about it are irrelevant, even assuming that the lawyer's

opinions were correct.

Should the Court consider the lawyer's opinion relevant to the disposition of this motion,

the lawyer's memorandum to the AHCA preceding the cease-and-desist letter made clear that

any lawsuit against Marriott would carry considerable litigation risk.  **Ex. Z**, Memorandum from

Brownstein, Hyatt, Farber, Schreck LLP to the AHCA Bd. of Dirs. at 3 (Sept. 21, 2012).  And

the business judgment rule protects legal-strategy decisions by boards that are informed by

litigation risk.  *Young v. Bush*, 277 P.3d 916, 927 (Colo. App. 2012) (a board's special litigation

committee's conclusion on whether to pursue litigation is subject to the business-judgment rule

and "not subject to judicial review").[9]

Ultimately, the undisputed facts demonstrate that the Board did not make its decisions to

hold a survey and to permit the affiliation in bad faith.[10]  Therefore, judgment is proper in the

AHCA's favor on Plaintiffs' claims.

---

[8] In fact, the only member that arguably was disfavored was Marriott, who owned the developer units, and who was prohibited from trading its weeks into the MVCD Exchange Program by the term of the MOU.  UMF 17 §§ 5, 6, 7(a) (discussing participation by "individual Members" and not including or referencing developer-owned interests).

[9] *See also Curtis v. Nevens*, 31 P.3d 146, 151 (Colo. 2001) ("[T]he question of whether to go forward with" litigation is part of the board's "corporate management duties"); *Friedman v. Maffei*, No. CV 11105-VCMR, 2016 WL 1555331, at *8 (Del. Ch. Apr. 13, 2016) ("[T]he decision whether to bring litigation on behalf of a corporation . . . 'is a quintessential exercise of business judgment, involving as it does a complex array of costs (both monetary and otherwise), potential benefits, and the risk of uncertain outcomes.'"); *St. Clair Shores Gen. Employees Ret. Sys. v. Eibeler*, No. 06CIV688SWK, 2006 WL 2849783, at *6 (S.D.N.Y. Oct. 4, 2006) ("The business judgment rule . . . acknowledge[s] that the board is better positioned to weigh the comparative risks and benefits of the initiation and conduct of litigation than is a court.").

[10] And they do not otherwise violate the common-law duty of loyalty if it were to be applied here despite the protections owed to the Board by the business judgment rule.

16

**II.     The economic-loss rule bars Plaintiffs' claims because the AHCA's fiduciary duties are set forth in the Declaration, and no independent duty exists.**

Judgment also should be entered on Plaintiffs' breach-of-fiduciary-duty and constructive-fraud claims, as well as their secondary-liability claims for aiding and abetting and conspiracy, because they are tort-based claims seeking recovery for contract-based breaches and are thus barred by the economic loss rule.  The economic loss rule bars tort claims for a breach of a duty that arises under the provisions of a contract.  *S K Peightal Eng'rs, LTD v. Mid Valley Real Estate Sols. V, LLC*, 342 P.3d 868, 872 (Colo. 2015).  Here, Plaintiffs allege that the Board breached three fiduciary duties:  a duty of loyalty, a duty of honesty, and a duty to enforce restrictive covenants.  Sixth Am. Compl. ¶ 24; *see also id.* ¶ 85 (alleging that the Board's actions were "knowingly made in violation of their duties of loyalty and honesty . . . as well as in violation of Section 19.8" of the Declaration).

The Declaration imposes on the Board a duty to "represent the interests of" the owners "in a fair and just manner on all matters that may affect any or all" owners and holds the Board to "the standards of good faith and reasonableness."  UMF 1 ¶ 6.8.  In a separate section, the Declaration imposes a duty to enforce restrictive covenants—and this Court already ruled that duty is an independent duty such that the economic loss rule does not bar a claim concerning it. *See* Order at 18.  But the Court also dismissed Plaintiffs' breach-of-fiduciary-duty and constructive-fraud claims based on any alleged failure to enforce restrictive covenants.  *Id.* at 23, 25.  So the Board's independent duty to enforce restrictive covenants is no longer at issue and thus no longer precludes the application of the economic loss rule.

The economic-loss rule applies here to bar Plaintiffs' claims based on alleged breaches of the duty of loyalty by failing to hold a vote on the affiliation.  The Board's contractual duties—to

represent owners' interests "in a fair and just manner" under standards of "good faith and reasonableness"—encapsulate the fiduciary duties of loyalty and impartiality—requiring that a fiduciary deal fairly with members by "not favor[ing] certain members at the expense of any others," and act with the "utmost good faith and solely for the benefit" of the members." *See DA Mountain Rentals, LLC*, 409 P.3d at 574. Plaintiffs do not point to any independent duty of loyalty that would apply here to supersede the existing contractual duties set forth in the Declaration. *See S K Peightal Eng'rs, LTD*, 342 P.3d at 875 (an independent tort duty is one that "is beyond the scope of the duties contained within the contract"). They certainly identify no independent fiduciary duty that requires a homeowners association to hold a vote on an affiliation. Nor do they identify any "judicially recognized special independent duty" of loyalty that would require the AHCA to hold a vote on the affiliation. *See id.*

Critically, public policy commands this result. Parties to a contract establishing a duty of fairness cannot be allowed to pursue tort claims against volunteer directors of a non-profit who measure their conduct against their contractual duties. When assessing whether such directors acted unfairly or unreasonably, the proper gauge is the standard in their contract—the one they agreed to be bound by and that they must uphold for their members.

Ultimately, this is a case involving the internal affairs of the AHCA. The four volunteer Tourist Accommodation directors who agreed to a limited affiliation with Marriott in April 2014 believed that their fiduciary duties to Club members were set forth in the Fairness Standard in the Condominium Declaration, which required them to be fair to all Club members. And they were. The affiliation was not unfair to any Plaintiff or any other Club member: no one was required to trade a week for MVC points, and members can always exercise their fee-simple rights by

trading a week of their time, even if the trade is with an MVC member.  The directors did not act unfairly by not first conducting a vote because no provision of the condominium documents required a vote (or survey) of members prior to any affiliation, and no vote (or survey) was conducted before the two prior affiliations with Abercrombie & Kent or Exclusive Resorts.  Nor did the AHCA directors act unfairly by affiliating based on the result of the December 2013 survey, even if they erred in April 2013 by saying that a vote would be held, because no document requires a vote, fee-simple rights of members cannot be subjugated to a majority vote, and the Board said in every subsequent communication between July 2013 and December 2013 that a survey would be conducted.  Plaintiffs have been aware of the Fairness Standard since purchasing their interests, and it would be unjust to the four directors and the silent majority of the 600-plus members-interests who have not joined this action to hold the directors to a different standard now, not to mention sow doubt in the minds of all future directors of the Club as to what standard they should follow in deciding what actions to take on behalf of members.

Accordingly, because the Declaration sets forth the fiduciary duties that underpin Plaintiffs' surviving breach-of-fiduciary-duty and constructive-fraud claims, the economic-loss rule bars Plaintiffs from turning to tort law for what amount to contract-based claims.  Judgment is proper in the AHCA's favor on the breach-of-fiduciary-duty and constructive-fraud claims.

**III.     Judgment is proper on Plaintiffs' constructive fraud claim.**

       **A.     The undisputed material facts prove that the AHCA did not gain an advantage at the Plaintiffs' expense.**

Judgment is proper in the AHCA's favor on Plaintiffs' constructive-fraud claim because the undisputed material facts show that there is no evidence that the AHCA gained any advantage at the expense of the Plaintiffs.  As this Court previously recognized, constructive

fraud may arise where a fiduciary relationship "affords one party the power and means to take undue advantage of the other." *Rosales v. AT & T Info. Sys., Inc.*, 702 F. Supp. 1489, 1498 (D. Colo. 1988); *Scott Sys., Inc. v. Scott*, 996 P.2d 775, 780 (Colo. App. 2000). Gaining an advantage at the expense of the plaintiff is the fifth element of a constructive-fraud claim, and one that Plaintiffs cannot prove. *Barnett v. Elite Props. of Am., Inc.*, 252 P.3d 14, 24 (Colo. App. 2010) (citation omitted)); *Snyder v. ACORD Corp.*, No. 1:14-cv-01736-JLK, 2016 WL 192270, at *11 (D. Colo. Jan. 15, 2016).

The Court permitted Plaintiffs' constructive-fraud claim to proceed only to the extent it is based upon Plaintiffs' allegations that the Defendants "substituted a survey for the promised vote without informing the members of [their] intention to do so." Order at 25. The AHCA did not fail to inform its members that it would be holding a survey and not a vote on the proposed affiliation. *See supra* at 12–13. But even if it did, the undisputed facts prove that the AHCA did not gain any undue advantage by doing so.

Plaintiffs have not identified any advantage that flowed to the AHCA as a result of holding a survey on the proposed affiliation or as a result of the affiliation itself, let alone an advantage that the AHCA obtained at Plaintiffs' expense. Plaintiffs have no evidence that the AHCA profited, financially or otherwise, from the affiliation. The affiliation is a voluntary program available to any Aspen member, UMF 17 §§ 6, 7(a), and the Plaintiffs have not shown that AHCA receives any special access, preferential treatment, or other program benefit not otherwise available to all members. In fact, Plaintiffs have adduced no evidence that the members of the Board that executed the MOU participated in the program. *See* Mercer Dep., 152–53:24–1; Oliver Dep., 149:3–4. As Aspen Club members themselves, the value of the

20

Board directors' fractional interests is affected by the same factors, positive or negative, that affect all other members' fractional interests; the Plaintiffs have not alleged or proven that the Board directors' interests are somehow immune from market forces because of the affiliation or because the AHCA held a survey rather than a vote.

Tellingly, Plaintiffs assert their constructive-fraud claim against the AHCA, RC Management, and Cobalt, and in doing so they allege specifically that "Defendants RC Management and Cobalt have profited at Plaintiffs' expense," but they nowhere allege the same as to the AHCA. Sixth Am. Compl. ¶ 104. Elsewhere, Plaintiffs allege that certain Marriott Defendants gained a financial advantage as a result of the affiliation, namely that they obtained extra commissions, fees, and profits as a result of their alleged wrongful conduct. *See* Sixth Am. Compl. ¶¶ 9, 86, 95, 104, 112, 119, 123. They also allege that the Marriott Defendants benefitted by "rid[ding] themselves of a poor financial investment" and by increasing the "attractiveness, value and price" of their MVCD product at the Plaintiffs' expense. *See* Sixth Am. Compl. ¶ 123. And Plaintiffs assert an unjust-enrichment claim against the Marriott Defendants. *Id.* ¶¶ 121–25. But notably, Plaintiffs do not make any off those same allegations or raise the same unjust-enrichment claim against the AHCA. *See generally* Sixth Am. Compl. In fact, they dropped their unjust-enrichment claim against the AHCA when they filed their Fifth Amended Complaint, wisely recognizing that the AHCA received no benefit or advantage at the expense of the Plaintiffs. *See* Fifth Am. Compl. ¶¶ 117–20.

Accordingly, because the undisputed material facts show that the AHCA did not gain an advantage at the expense of the Plaintiffs in connection with the affiliation or the survey that was held rather than a vote on the proposed affiliation, judgment in the AHCA's favor is proper on

Plaintiffs' constructive-fraud claim.  *Barnett*, 252 P.3d at 24.

     **B.**     **Plaintiffs' constructive-fraud claim is barred by the applicable three-year statute of limitations.**

Judgment on Plaintiffs' constructive-fraud claim also is proper because the claim is barred by the statute of limitations.  In Colorado, claims sounding in fraud must be brought within three years of the date the fraud was discovered or should have been discovered through exercising reasonable diligence.  Colo. Rev. Stat. § 13-80-101(1)(c); 108(3).  Plaintiffs attempted to add their constructive-fraud claim more than three years after being told thrice that a survey, not a vote, would be held regarding the trade-a-week program.

Plaintiffs first asserted a claim for constructive fraud in their Fourth Amended Complaint, which they filed on March 10, 2017, after seeking leave to amend on December 16, 2016.  *See* Dkt. Nos. 87, 109.  Plaintiffs' constructive-fraud claim is based on their allegations that the Board promised to hold a vote prior to affiliating, then changed the vote to a survey, then finalized the affiliation, all without ever holding the formal vote Plaintiffs say was promised to them.  *See* Sixth Am. Compl. ¶¶ 99–100; Order at 25 (dismissing constructive-fraud claim to the extent "premised on a failure to disclose a conflict between the affiliation proposal and the governing documents" and "insofar as it is predicated on the failure to disclose the governing documents requirement of a vote" because none is required).

On April 5, 2013, the AHCA sent members a letter stating:  "Ritz/Marriott representatives agree that unless a majority of Aspen Highlands Members (excluding the Marriott interests and Members not in good standing) vote in favor of doing so, the Ritz/Marriott will not include Aspen Highlands in the Marriott Vacation Club affiliation/exchange/points program."  UMF 10.  This statement, Plaintiffs say, constitutes a promise to hold a formal vote

on the affiliation.  Three months later, on July 2, 2013, the AHCA again wrote to its members, stating:  "A Member survey will be distributed to all Aspen Members shortly.  The question will be asked in essence, 'Do you want the Aspen Ritz-Carlton Club to have an exchange affiliation with the Marriott Vacation Club Destinations exchange program, and do you want Marriott Vacation Club Destination Members to have access to our Aspen Club?'"  UMF 12 at 2.  The letter went on to state:  "[D]epending on the outcome of this survey, there may be another member vote that would involve changes to the Condominium Association documents to allow the Developer to place their Aspen inventory into the MVCD trust."  *Id.*  Similarly, in a letter dated October 23, 2013, the Marriott stated that a survey would be conducted on the limited affiliation with the MVC.  UMF 13 at 2.

Thus, by July 2013, the AHCA clearly announced to its members that a survey would be held on the question of the proposed affiliation, and only after that survey would the AHCA consider whether a formal vote was required to amend the association documents to permit the separate matter of the developer placing its inventory into the MVCD trust.  UMF 12 at 2.  The Plaintiffs therefore should have known the basis for their constructive-fraud claim—that the process had been changed from a vote to a survey—by July 2, 2013.

On November 19, 2013, the AHCA and Ritz-Carlton Destinations Club jointly wrote to members, noting that "As promised earlier this year, Members of The Ritz-Carlton Club, Aspen Highlands will be surveyed on their opinion regarding the potential exchange affiliation with the Marriott Vacation Club Destinations exchange program."  UMF 14.  Two weeks later, on December 4, 2013, a letter with an electronic link to the survey went out to all Aspen members from the Ritz-Carlton Destinations Club.  UMF 15.  Certainly no later than December 4, 2013,

upon receiving the survey, Plaintiffs should have known that a survey was being held rather than a vote on the question of whether to affiliate with the MVCD Exchange Program.

Accordingly, when Plaintiffs sought leave to amend their complaint on December 16, 2016, they did so more than three years after they should have known that no vote would be held on the affiliation—as early as July 2, 2013, and no later than December 4, 2013.  *See* Colo. Rev. Stat. § 13-80-101(1)(c).  Their constructive-fraud claim is barred by the statute of limitations, and judgment is proper in the AHCA's favor on this claim.

## IV.    Judgment is proper on Plaintiffs' aiding-and-abetting and conspiracy claims.

### A.    The AHCA, as a fiduciary of Plaintiffs, cannot be held secondarily liable for the Marriott Defendants' conduct.

Plaintiffs attempt to impose secondary liability on the AHCA for aiding and abetting "breaches of fiduciary duties and constructive fraud" by RC Management and Cobalt and for conspiring with the Marriott Defendants to implement the affiliation through the "unlawful overt acts of breaching fiduciary duties . . . aiding and abetting . . . RC Management and Cobalt in breaching their fiduciary duties and by acting fraudulently by participating in said affiliation in violation of promises made by Defendants in April 2013" to first hold a vote before affiliating.[11] Sixth. Am. Compl. ¶¶ 107, 110, 117.

As an initial matter, however, a defendant cannot be liable for aiding and abetting another's breach of fiduciary duty or conspiring to do so if the defendant itself is a fiduciary of

---

[11] To prevail on their claim for aiding and abetting, Plaintiffs must prove, among other things, that a third party breached a fiduciary duty owed to the Plaintiffs and that the AHCA provided substantial assistance to the third party in connection with the breach of duty.  *See City P'ship Co. v. Lehman Bros., Inc.*, 344 F. Supp. 2d 1241, 1246 (D. Colo. 2004).  To prevail on their conspiracy claim, Plaintiffs must prove, among other things, an agreement between two or more persons on a course of action to accomplish an agreed-upon objective that is unlawful.  *Double Oak Constr., L.L.C. v. Cornerstone Dev. Int'l, L.L.C.*, 97 P.3d 140, 146 (Colo. App. 2003).

the plaintiff alleging the injury.  *In re Kaiser Merger Litigation*, 168 B.R. 991, 997 (D. Colo. 1994) ("The elements of a claim for aiding and abetting a breach of fiduciary duty are: (1) the existence of a fiduciary duty; (2) a breach of the fiduciary's duty; and (3) a knowing or active <u>participation in that breach by the non-fiduciary defendants</u>.") (emphasis added); *Weinberger v. Rio Grande Indus., Inc.*, 519 A.2d 116, 131 (Del. Ch. 1986) ("A claim for civil conspiracy . . . requires . . . a knowing participation in that breach by the defendants <u>who are not fiduciaries</u>." (emphasis added)); *see also Feeley v. NHAOCG, LLC*, 62 A.3d 649, 658 (Del. Ch. 2012) (The third element of a claim for aiding and abetting a breach of fiduciary duty is "a defendant, <u>who is not a fiduciary</u>, knowingly participated in [the] breach.") (emphasis added).

Secondary liability requires a secondary relationship, and there can be no aiding and abetting or conspiracy liability for a defendant who, in its primary relationship with the plaintiff, owes a fiduciary duty to that plaintiff.  The law is clear that "aiding and abetting liability generally cannot attach to defendants who themselves owe fiduciary duties to the relevant entity and plaintiff."  *CMS Inv. Holdings, LLC v. Castle*, No. CV 9468-VCP, 2015 WL 3894021, at *20 (Del. Ch. June 23, 2015).[12]

---

[12] *See also Mann v. GTCR Golder Rauner, L.L.C.*, 483 F. Supp. 2d 884, 916 (D. Ariz. 2007) ("A person who himself owes a fiduciary duty with respect to a transaction or course of conduct cannot be liable for aiding and abetting a breach of that same fiduciary duty by another because the same facts that would otherwise constitute aiding and abetting would constitute a primary breach of fiduciary duty."); *A Commc'n Co., Inc. v. Bonutti*, 55 F. Supp. 3d 1119, 1125 (S.D. Ill. 2014) ("[A]iding and abetting is not a separate tort and will only be applicable if one of the Individual Defendants is not a fiduciary."), *clarified on denial of reconsideration*, No. 13-CV-1193-SMY-SCW, 2015 WL 1577777 (S.D. Ill. Apr. 2, 2015).  In other words, much like the principle behind the double-recovery doctrine, a plaintiff cannot recover under a fiduciary-duty claim and an aiding-and-abetting claim because the conduct giving rise to both claims is the same.  *See Quist v. Specialties Supply Co.*, 12 P.3d 863, 866 (Colo. App. 2000) (Under the double-recovery doctrine, "[a] plaintiff may not receive a double recovery for the same injuries or losses arising from the same conduct.").

This rule exists for good reason:  If a defendant and a third party both owe fiduciary duties to the same plaintiff, then any conduct by the defendant to aid the third party in breaching its fiduciary duties to a plaintiff or to further a conspiracy to do so would likewise constitute a breach of the defendant's own fiduciary duties to the plaintiff—even if the conduct also assisted the third party whose duties might be different.  Subjecting directors to liability for aiding another's breach of duty to the same plaintiffs to whom the directors themselves owe a duty that might be lesser in scope and thereby depriving them of the protections of the business judgment rule would undermine the public-policy concerns that underlie the business-judgment rule.[13]

Plaintiffs' own allegations illustrate this perfectly.  As part of their breach-of-fiduciary-duty claim, Plaintiffs allege that the AHCA's duties require it to "act in the best interests of Plaintiffs and Ritz Carlton Aspen Owners," and that the AHCA breached that duty by "conspiring with the other Defendants to impose the affiliation of the Marriott Vacation Club affiliation/exchange/points program" at Aspen Highlands.  Sixth Am. Compl. ¶ 92.  In other words, Plaintiffs rely on the AHCA's conduct in allegedly conspiring with other defendants to prove how the AHCA purportedly breached its fiduciary duties to Plaintiffs.  The same conduct undergirds the conspiracy claim *and* their primary-liability claim of breach of fiduciary duty.

Imposing secondary liability on the AHCA and denying it the protections of the business judgment rule as well as the economic loss rule, because the AHCA's fairness and reasonableness duties are spelled out in Section 6.8 of the Declaration, would defeat long-standing Colorado public policies and make it impossible for association directors, particularly volunteers as here, to know whose and what duties they might apply to their conduct.

---

[13] This is consistent with the economic loss rule's prohibition on subjecting defendants to liability under different legal standards (tort instead of contract) for the same conduct.

**B.      The AHCA cannot be liable for aiding-and-abetting or conspiring with the Marriott Defendants because the AHCA had no actual knowledge that the Marriott Defendants' conduct was unlawful.**

To hold the AHCA liable for aiding and abetting and conspiring with the Marriott Defendants, Plaintiffs must prove that the AHCA knew that RC Management's and Cobalt's conduct—with which the AHCA allegedly was conspiring or providing substantial assistance—was unlawful.[14]  Plaintiffs have not done so.

Aiding-and-abetting liability requires that "the defendant knowingly participated in the underlying breach or violation."  *Sender v. Mann*, 423 F. Supp. 2d 1155, 1175 (D. Colo. 2006) (citing *Nelson v. Elway*, 971 P.2d 245, 249–250 (Colo. App. 1998)).  A defendant must have "actual knowledge" and must "knowingly and substantially assist[] the principal violation."  *Id.* at 1176 (citing *Holmes v. Young*, 885 P.2d 305, 308 (Colo. App. 1994)).  Critically, "[t]he relevant 'knowledge' for liability to attach for knowingly participating in a fiduciary's breach of duty is knowledge as to the primary violator's status as a fiduciary <u>and knowledge that the primary's conduct contravenes a fiduciary duty</u>."  *Holmes*, 885 P.2d at 309–10 (emphasis added). In other words, the AHCA must have had actual knowledge that RC Management's and Cobalt's conduct "contravenes" their fiduciary duties to the Plaintiffs.[15]

Likewise with the Plaintiffs' conspiracy claim.  Plaintiffs must allege that defendants agreed on an objective and, to further it, performed one or more unlawful acts that proximately

---

[14] Plaintiffs allege that RC Management and Cobalt are responsible for the primary violations of breaching fiduciary duties and constructive fraud.  *See* Sixth Am. Compl. ¶¶ 87–105.  Those two defendants are thus the only Marriott Defendants with whom the AHCA could have conspired or aided in committing their primary violations, as the other Marriott Defendants are not alleged to have committed any primary violations in the first place.

[15] Because Plaintiffs' constructive-fraud claim requires proof that RC Management and Cobalt owed Plaintiffs fiduciary duties and violated those duties by making misleading representations, *see Barnett*, 252 P.3d at 24, this applies equally to Plaintiffs' constructive-fraud claim.

caused Plaintiffs' damages.  *See Double Oak Constr., L.L.C. v. Cornerstone Dev. Int'l, L.L.C.*, 97 P.3d 140, 146 (Colo. App. 2003).  One party's "silent knowledge of an unlawful act is insufficient to establish the requisite agreement" to maintain a civil conspiracy claim.  *More v. Johnson*, 568 P.2d 437, 440 (Colo. 1977).  A plaintiff must show "that each defendant agreed to do something in furtherance of the conspiracy, <u>knowing of its improper purpose</u>."  *Powell Products, Inc. v. Marks*, 948 F. Supp. 1469, 1480 (D. Colo. 1996) (emphasis added).

Here, Plaintiffs allege that the defendants "agreed on an object to be accomplished—the affiliation" and that the defendants "accomplished the unlawful overt acts of breaching fiduciary duties" and "aiding and abetting the Association, RC Management, and/or Cobalt in breaching their fiduciary duties and acting fraudulently by participating in said affiliation in violation of the promises made by Defendants in April 2013."  Sixth Am. Compl. ¶ 117.[16]  In support, Plaintiffs must prove that the AHCA agreed to provide substantial assistance to RC Management and Cobalt knowing that it was for the purpose of breaching fiduciary duties, aiding and abetting breaches of fiduciary duties, and fraud.  *See Powell Products, Inc.*, 948 F. Supp. at 1480.

For both claims, then, Plaintiffs must prove that the AHCA knew that RC Management's and Cobalt's conduct—breaching its fiduciary duties by promising a vote and committing constructive fraud by promising a vote—was unlawful or improper.  This, Plaintiffs cannot prove.  Plaintiffs have not adduced any evidence that the AHCA actually knew that RC Management's and Cobalt's fiduciary duties required them to hold a vote on the question of affiliation, such that their failure to do so would constitute a breach of their fiduciary duties.  No

---

[16] Plaintiffs also list the promises made in the Affiliation Agreement and Declaration, but as discussed above, those "promises"—the restrictive covenants—no longer form the basis for Plaintiffs' claims.  *See* Order at 23, 25.

AHCA Director ever testified that he knew that RC Management and Cobalt were required to hold a vote on the affiliation.  No AHCA Director ever testified that anyone told him about any requirement by RC Management or Cobalt to hold a vote.  And no document that any AHCA Director reviewed said as much.  There is simply no evidence that the AHCA had actual knowledge that the failure to hold a vote on the affiliation would constitute a breach of RC Management's or Cobalt's fiduciary duties.

If anything, the AHCA had reason to believe the opposite—two prior affiliations occurred without a vote and without any complaints by any member.  Plaintiffs have no evidence that any vote was required or discussed, let alone conducted, when the Marriott Defendants previously affiliated the Aspen Club with the Abercrombie & Kent or Exclusive Resorts exchange programs.[17]  *See* UMF 6 ¶¶ 7–8 (attesting that no vote occurred before either program); UMF 7.  The AHCA, then, had no reason to believe that RC Management or Cobalt had any obligation to hold a vote in connection with the MVCD Exchange Program affiliation, let alone that not holding a vote would constitute a breach of their fiduciary duties.

Accordingly, Plaintiffs cannot prove that the AHCA had actual knowledge that RC Management's and Cobalt's failure to hold a vote on the affiliation was a breach of their fiduciary duties.  As a matter of law, then, the AHCA cannot be liable for aiding and abetting RC Management's and Cobalt's breach of their fiduciary duties, *Holmes*, 885 P.2d at 309–10, or for conspiring with RC Management and Cobalt to commit the unlawful act of breach of their fiduciary duties in furtherance of the allegedly agreed-upon objective of affiliating the Aspen Club with the MVC program, *Powell Products, Inc.*, 948 F. Supp. at 1480.

---

[17] Nor do Plaintiffs have any evidence that a vote was required, discussed, or conducted in connection with the Marriott Defendants' subsequent affiliation with Third Home.

C.     **Plaintiffs' aiding-and-abetting claim fails because the AHCA did not provide substantial assistance to the Marriott Defendants in committing constructive fraud.**

Plaintiffs have put forward no evidence that the AHCA substantially assisted any constructive fraud by RC Management or Cobalt.  Plaintiffs have produced no evidence that the AHCA provided RC Management or Cobalt any substantial assistance in gaining an advantage at the expense of the Plaintiffs.  To be sure, Plaintiffs allege that by aiding and abetting other defendants, MVW, MVCI, and L&C profited at Plaintiffs' expense, and that RC Management and Cobalt should be made to account for the commissions, fees, and profits they earned at Plaintiffs' expense.  Sixth Am. Compl. ¶ 112.  But Plaintiffs never allege, let alone establish facts to prove, that the AHCA undertook any action to aid any of the Marriott Defendants in profiting at Plaintiffs' expense.  Plaintiffs have no evidence that the AHCA had any control over the structure of the affiliation such that it could incentivize, meddle with, or otherwise funnel profits to the Marriott Defendants.  And the AHCA did not require any member to participate in the MVCD Exchange Program, UMF 17 § 7(a), so the AHCA could not have taken any action to assure or guarantee that the Marriott Defendants would receive any commissions, fees, or profits from the MVCD Exchange Program.  The AHCA also insisted that the MOU preclude Marriott from trading any of its weeks into the MVCD Exchange Program, *id.* §§ 5, 6, 7(a) (discussing participation by "individual Members" and not including or referencing developer-owned interests), and later in 2014 negotiated a $150,000 reduction in the annual management fee the Club pays Marriott and obtained the right to terminate the management agreement, which it could not do before, UMF 18 § 4, thus underscoring that the AHCA did nothing to aid the Marriott Defendants in profiting at the expense of the Plaintiffs.  Therefore the AHCA cannot be

liable for aiding and abetting any of the Marriott Defendants' alleged constructive fraud.

**D.      Plaintiffs' aiding-and-abetting and conspiracy claims against the AHCA based on the Marriott Defendants' alleged constructive fraud are barred by the statute of limitations.**

Finally, for reasons articulated above, the statute of limitations has run on any secondary liability claims against the AHCA for aiding and abetting or conspiring with RC Management and Cobalt to allegedly commit constructive fraud.  In December 2016, Plaintiffs amended their secondary liability claims to include constructive fraud as the underlying conduct the AHCA supposedly aided and abetted and conspired to further.  *See* Fourth Am. Compl. ¶¶ 99, 101–04, 107–08.  Plaintiffs' should have known the basis for their constructive-fraud claim, and thus their secondary liability claims based on the same conduct, more than three years before they amended their complaint to add those claims.  *See supra* at 21–24.  Their secondary liability claims are thus barred by the statute of limitations.

For all of the above reasons, the Court should enter judgment in the AHCA's favor on Plaintiffs' aiding-and-abetting and conspiracy claims.

**V.      Judgment is proper on Plaintiffs' breach-of-fiduciary-duty and constructive-fraud claims because the AHCA did not proximately cause Plaintiffs' alleged damages.**

Plaintiffs must prove that the AHCA's conduct—whether breach of fiduciary duty or constructive fraud—was the proximate cause of their damages.  *Barnett*, 252 P.3d at 24 (constructive fraud requires proof of proximate causation).[18]  Proximate cause involves questions of causation in fact and legal causation.  *Heinrich v. Master Craft Engineering, Inc.*, 131 F.

---

[18] *See also Mandelbaum v. Fiserv, Inc.*, 787 F. Supp. 2d 1226, 1240 (D. Colo. 2011) (citing *Aller v. Law Office of Carole C. Schriefer, P.C.*, 140 P.3d 23, 26 (Colo. App. 2005)) ("[I]n order to state an actionable claim for breach of fiduciary duty, a plaintiff must allege that a fiduciary duty existed, the defendant breached that duty, and the breach was the proximate cause of damages.").

Supp. 3d 1137, 1147 (D. Colo. 2015); *Vititoe v. Rocky Mountain Pavement Maint., Inc.*, 412 P.3d 767, 777 (Colo. App. 2015).[19]  A plaintiff can establish causation in fact by showing "either that (1) but for the defendant's alleged [misconduct], the claimed injury would not have occurred, or (2) the defendant's alleged [misconduct] was a necessary component of a causal set that would have caused the injury." *Heinrich*, 131 F. Supp. 3d at 1147.[20]

Plaintiffs' remaining claims against the AHCA, both for breach of fiduciary duty and constructive fraud, are premised only on their allegations that the AHCA promised to hold a vote on the proposed affiliation but instead held a survey before approving the affiliation.  *See* Order at 21–22, 25; *see also id.* at 23 (holding that "because the Association's failure to enforce the restrictive covenants cannot have caused plaintiffs' damages," the breach-of-fiduciary-duty claim on that basis must be dismissed); *id.* at 25 (dismissing constructive-fraud claim to the extent "premised on a failure to disclose a conflict between the affiliation proposal and the governing documents" and "insofar as it is predicated on the failure to disclose the governing documents requirement of a vote" because none is required).  Fatally for Plaintiffs, they alleged in their initial complaint and first three amended complaints that the proximate cause of their damages was the affiliation itself, thus admitting that nothing else substantially caused their damages.

---

[19] Legal causation is not at issue here. *Id.* (citations omitted).  *Vittoe* discusses proximate causation in the context of a negligence claim, but the substance of proximate causation is the same for fraud claims.  *See* Note 6, Colo. Civ. Jury Instr. 19:1 (explaining that the negligence causation standard can be given for fraud claims).

[20] The but-for test requires that a plaintiff prove the defendant's conduct "in a natural and continued sequence, unbroken by any efficient, intervening cause, produced the result complained of, and without which the result would not have occurred."  *Vititoe*, 412 P.3d at 777 (internal quotation marks and alterations omitted).  The second test is used if other factors may also have contributed to the plaintiff's injuries, but the defendant's misconduct must be a "substantial contributing cause," meaning "the defendant's conduct was a cause without which the injury would not have occurred."  *Id.* (internal quotation marks and alterations omitted).

Their addition in the Fourth Amended Complaint of the constructive-fraud claim based on the failure to hold a vote cannot change this admission on their part.

In fact, Plaintiffs have alleged since December 31, 2015 when they first filed their initial complaint that the AHCA's failure to enforce certain provisions in the restrictive covenants and acceptance of the affiliation were the cause of their damages, specifically the "destruction of the value in their fractional units."  *See* (Original Compl.) ¶¶ 54–55, 57, attached here as **Ex. BB**; Dkt. No. 5 (First Am. Compl.), ¶¶ 108–09, 111–13; Dkt. No. 40 (Second Am. Compl.) ¶¶ 70–71, 73–75; Dkt. No. 79 (Third Am. Compl.) ¶¶ 70–71, 73–75; Dkt. No. 109 (Fourth Am. Compl.) ¶¶ 83–84, 86–88; Dkt. No. 119 (Fifth Am. Compl.) ¶¶ 89–90, 92–94; Dkt. No. 250 (Sixth Am. Compl.) ¶¶ 89–90, 92–94.  Nowhere did Plaintiffs initially allege that the AHCA's supposed breach of its fiduciary duties by promising to hold a vote and failing to do so proximately caused their damages.  To be sure, Plaintiffs do so allege with regard to their constructive-fraud claims. *See* Sixth Am. Compl. ¶¶ 99–100, 103.  But up until March 10, 2017, when Plaintiffs amended to add their constructive-fraud claim, the only cause of Plaintiffs damages was conduct this Court already has concluded could not have proximately caused their damages.  *See* Order at 23.

Plaintiffs now attempt a bait-and-switch, contending instead that it is the failure to hold a vote on the affiliation that proximately caused their damages.  The failure to hold a vote cannot be the but-for cause of their damages—the cause "without which the result would not have occurred," *Vititoe*, 412 P.3d at 777—when the Plaintiffs simultaneously contend that failing to enforce the restrictive covenants and allowing the affiliation was the but-for cause.

 Even if the Court were to ignore Plaintiffs' admission and conclude that Plaintiffs sufficiently alleged that the failure to hold a vote proximately caused the "destruction of the

value in their fractional units," Sixth Am. Compl. ¶¶ 94, 103, the undisputed material facts prove

otherwise.  The failure to hold a vote cannot have proximately caused Plaintiffs' damages

because the AHCA was not required to hold a vote on the question of affiliation.  As this Court

already recognized, the Declaration does not require a vote on this type of question.  Order at 25;

*see* Declaration ¶¶ 6.5, 7.1.1, 7.4, 8.6.3, 17.1, 17.2, 18.4, 18.7, and 22.3 (requiring votes under

certain circumstances but none related in any way to a proposed affiliation).  Neither does the

2014 Acknowledgement and Joinder.  **Ex. AA**, Acknowledgment of and Joinder, at 2 (Apr. 24,

2014).  Neither does the 2014 Memorandum of Understanding.  *See* UMF 17 § 3.  In fact, no

majority vote could be legally binding because a majority vote is not sufficient to alter fee-

simple interests under the CCIOA.  Colo. Rev. Stat. § 38-33.3-217 (4.5).

Additionally, Plaintiffs cannot show that conducting a survey rather than a vote was the

proximate cause of their alleged damages.  No Plaintiff has put forth any evidence that the failure

to hold a vote, separate and apart from the ultimate affiliation, caused him or her any damages.

No one has proved that he or she suffered any monetary damages as a result of the failure to hold

a vote.  And no one has proved that, but for the lack of a vote, her fractional interest would not

have declined in value.

Notably, Plaintiffs have no evidence that even if a vote had occurred, the result of the

vote would have been different than the survey results; they have no proof that the majority of

members would have voted against the affiliation.  Following the survey, no Plaintiff did

anything to demand a vote, even though the trade-a-week program did not go into effect until

nearly a year later.  Not one utilized the process set forth in the Declaration to demand that the

Board investigate any purported grievance by the members concerning the survey:  no Plaintiff

asked the Board to hold a formal vote, poll all members to determine whether a vote would have been against affiliation, or otherwise challenged the results of the survey.  *See* Decl. § 7.8.3 (setting forth provision for aggrieved members to demand Board initiate investigation or proceeding to prevent violations or enforce the Declaration and bylaws).  Nor was any preliminary injunction sought in this case to halt the MOU until a vote were to be held.

Plaintiffs have not identified any evidence whatsoever supporting the causation element of their breach-of-fiduciary-duty and constructive-fraud claims based on the AHCA's failure to hold a vote on the affiliation.  Therefore, the failure to hold a vote cannot be the proximate cause of the Plaintiffs' alleged damages, and judgment in the AHCA's favor is proper.

## CONCLUSION

For the foregoing reasons, the AHCA respectfully requests that the Court grant summary judgment in its favor.

Respectfully submitted this 12th day of October, 2018.

/s/_____
Daniel F. Shea
Jessica Black Livingston
HOGAN LOVELLS US LLP
1601 Wewatta Street, Suite 900
Denver, Colorado 80202
Telephone: (303) 899-7300
FAX: (303) 899-7333
E-mail: dan.shea@hoganlovells.com
E-mail:jessica.livingston@hoganlovells.com

*Attorneys for Defendant Aspen Highlands Condominium Association*

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that on this 12th day of October, 2018, a true and accurate copy of the foregoing **ASPEN HIGHLANDS CONDOMINIUM ASSOCIATION'S MOTION FOR SUMMARY JUDGMENT** was filed and served via CM/ECF filing system upon following:

Matthew C. Ferguson, Esq.
The Matthew C. Ferguson Law Firm, P.C.
119 South Spring, Suite 201
Aspen, Colorado 81611

Michael J. Reiser, Esq.
Law Office of Michael J. Reiser
1475 N. Broadway, Suite 300
Walnut Creek, California 94596

Michael L. Schrag, Esq.
Linda Lam, Esq.
Gibbs Law Group LLP
505 14th Street, Suite 1110
Oakland, California 94612

Tyler R. Meade, Esq.
The Meade Firm P.C.
1816 Fifth Street
Berkeley, California 94710

Naomi G. Beer, Esq.
Greenberg Traurig, LLP
1200 17th Street, Suite 2400
Denver, Colorado 80202

Ian S. Marx, Esq.
Philip R. Sellinger, Esq.
Todd Schleifstein
Greenberg Traurig, LLP
500 Campus Drive, Suite 400
Florham Park, New Jersey 07932

*/s/ Greg Apt*