# EXHIBIT Q

Randal Mercer - October 24, 2017

```
 1              UNITED STATES DISTRICT COURT
 2                  DISTRICT OF COLORADO
 3         Civil Action No. 1:16-cv-01301-PAB-GPG
 4
 5    RCHFU, LLC, et al.,
                  Plaintiffs,
 6    vs.
 7    MARRIOTT VACATIONS WORLDWIDE
 8    CORPORATION, et al.,
 9                  Defendants.
10    _____/
11
12              VIDEOTAPED DEPOSITION OF
13                   RANDAL MERCER
14            Tuesday, October 24, 2017
15              9:02 a.m. - 5:32 p.m.
16                 CRE Consultants
17      12140 Carissa Commerce Court, Suite 103
18             Fort Myers, Florida  33966
19
20    Reported By:
21    Yvonne Corrigan, RPR, CRR
22    Notary Public, State of Florida
23    Job No. 2728895
24
25    Pages 1 - 335
```

Page 1

Randal Mercer - October 24, 2017

```
 1  back to the Tourist Accommodation position?
 2       A.   Yes.
 3       Q.   And how did that come to pass?
 4       A.   I ran for the board.
 5       Q.   Did anyone ask you to run for the board?
 6       A.   I don't recall.
 7       Q.   And you ran for the board in the same manner?
 8  You put in a position statement?
 9       A.   Yes.
10       Q.   Do you know if you had the backing of the
11  Marriott and Ritz companies to run for the board?
12       A.   No.
13       Q.   Do you know how they voted their 13.4 percent in
14  those elections?
15       A.   No.
16       Q.   Would you assume that they voted for you?
17       A.   No.
18       Q.   Why not?
19       A.   It was my understanding that Marriott never
20  voted their interest.
21       Q.   Okay.  By the time you ran for the board in
22  2012 -- I think it was 2012, for the fall of 2012, --
23       A.   Mm-hmm.
24       Q.   -- did you know Mr. Cunningham?
25       A.   Yes.
```

Page 51

Randal Mercer - October 24, 2017

```
 1              MR. FERGUSON:  What's your objection?
 2              MR. MARX:  You're asking this witness to ask
 3       what Mr. Neveloff had in his mind regarding the
 4       blurring of lines.  He can't speak for Mr. Neveloff.
 5   BY MR. FERGUSON:
 6       Q.   Your predecessor knew there was blurring of the
 7   lines, did he not?
 8       A.   That was his opinion.
 9       Q.   Was it your opinion when you came on in 2012?
10       A.   I didn't consciously think of it, but I always
11   knew it was -- they're the same company.  So I always knew
12   it was possible to blur lines.  I knew it was always the
13   board's efforts that that did not happen.
14              (Exhibit 1043 previously marked for
15        identification produced to the witness.)
16   BY MR. FERGUSON:
17       Q.   Let me show you this exhibit, which is 1030 --
18   1043, rather (handing).
19              This is the same email chain, but you'll see
20   that Mr. Neveloff sent that on to you on August 8th.  Do
21   you see that?
22       A.   Yes.
23       Q.   It says "FYI."
24              Did you have any concerns when this was sent to
25   you that Marriott Vacation Club was marketing -- sorry --
```

Page 114

Randal Mercer - October 24, 2017

```
 1   that there was marketing material going out that spoke
 2   about premier members and premier plus members, those are
 3   Vacation Worldwide -- those are Vacation Club people,
 4   right?
 5        A.   Repeat the question, please.
 6        Q.   Yeah.  When she talks about -- Sciberras tells
 7   McBride, or McBride's brother, that there are premier
 8   memberships and premier plus memberships, she's talking
 9   about Vacation Club people, right?
10        A.   Yes.
11        Q.   Did it concern you in 2000 -- in August of 2012
12   when Mr. Mercer [sic] sent this on to you and talked about
13   the blurring of the lines, did it concern you that your
14   club and your system, your RCDC system as it then existed,
15   was being used to tell Marriott Vacation Club people what
16   they could -- that they can get into your -- your
17   facility, your club?
18        A.   I didn't understand the point system, so it was
19   hard for me to make an opinion.  I -- I didn't like
20   anything that was mandatory.  That's all I recall about
21   this.
22        Q.   What do you mean by "mandatory"?
23        A.   I didn't want something that was not optional.
24        Q.   Did you think there was a possibility that
25   someone can mandate what you could do with your deeded
```

Page 115

Randal Mercer - October 24, 2017

```
 1   1/12th interest in the piece of property in Aspen,
 2   Colorado?
 3       A.   In a fee simple ownership, --
 4       Q.   Yeah.
 5       A.   -- no.
 6       Q.   Okay.  Did it concern you -- my question wasn't
 7   about mandatory or not mandatory, voluntary.  My question
 8   was, sir, did it concern you that your club in Aspen
 9   Highlands in which you're a member with your -- with your
10   fellow members and exclusive premier facility, did it
11   concern you that someone with a Ritz-Carlton Club email
12   handle was sending out emails to people they had met at
13   sales meetings talking about what -- how Marriott Vacation
14   Club people can use your club?
15            MR. MARX:  Object to the form of the question.
16            THE WITNESS:  I don't view it that way.  I view
17       it as ways that Ritz-Carlton Destination Club members
18       can trade their week into other opportunities.
19   BY MR. FERGUSON:
20       Q.   Okay.  And in connection with that, what you
21   call an opportunity, okay, what that person -- what that
22   program could do and today is doing, it allows Marriott
23   Vacation Club people to access Aspen Highlands, right?
24       A.   On a one-week-in, one-week-out basis.
25       Q.   I understand that.  But they're able to access
```

Page 116

Randal Mercer - October 24, 2017

```
 1  it?
 2       A.  Yes.
 3       Q.  And as a result of accessing it, when they're
 4  out on a road show, or they're in a hotel lobby, or
 5  they're on the Internet, they can say, hey, if you buy a
 6  Marriott Vacation Club membership, or points, whatever it
 7  is, guess what, Mr. or Mrs. Marriott Vacation Club
 8  potential customer, you get to use Aspen Highlands.  Does
 9  that bother you?
10       A.  Not if it's a whole -- if it's a very limited
11  type of a program, no.
12       Q.  So --
13       A.  No more than it would First Home or Exclusive
14  Resorts members, we don't know -- or somebody can rent
15  their unit.  So in my mind, this is different, because
16  somebody can rent their home on Craigslist.
17       Q.  Right.  But it's their home, right?
18       A.  That's right.
19       Q.  Okay.  And it's a big difference between a
20  member putting it -- giving it to his cousin, or donating
21  it, I think Mr. Neveloff says he likes to donate, or
22  putting it on Craigslist or listing it with Friar's,
23  that's different.  They're renting it to individuals.
24  They're not opening it up -- they're not giving it to a
25  pool that allows Marriott Vacation Club people to come in.
```

Page 117

Randal Mercer - October 24, 2017

1  What is it that Marriott utilizes, if not points, to
2  determine, no, you don't have enough value here from
3  September to get into here in January?  How does that
4  work?
5       A.   I do not know specifically.  Conceptually I have
6  some thoughts.
7       Q.   What -- but you're the president, so how is this
8  working for your folks?
9       A.   Because if I -- our members choose at this time
10 to trade their specific allocated week, then somebody can
11 come in their specific allocated week.  There are no
12 algorithms.  It is very simple to do.  One week in, one
13 week out.
14      Q.   But the person that comes in, I think you
15 pointed out before, at least once, is that that person
16 needs to have a lot of points?
17      A.   I would assume that, yes.
18      Q.   And now, when that person, and I'll say it's
19 Annette Kalcheim at this point, when Annette Kalcheim
20 wants to put into the Lion & Crown Travel program in order
21 to get to go to one of these 51 Marriott travel
22 experiences, what -- what currency does she use to get
23 into one of the finer Marriott Vacation Club resorts in a
24 nice place on a nice week, what currency does she use to
25 get in there?

Page 151

1    A.    Her currency is her allocated week, and her
2  currency is the size of her unit, whether it's a
3  two-bedroom or a three-bedroom.
4    Q.    And how is that converted?  Is it used as
5  points?  Is it used as dollars?  Is it used by some
6  algorithm?  What is it when a three-bedroom person that --
7  during New Year's week wants to put in to Lion & Crown
8  Travel program, that person has a very valuable commodity,
9  and someone who has a September shoulder season week for a
10 two-bedroom, which is a less valued commodity, when they
11 go in the system, what do they come out with?
12   A.    I can only assume that a three-bedroom Christmas
13 week, or a week between Christmas and New Year's, is far
14 more valuable than a two-bedroom in September.
15   Q.    Right.  And how is that value determined?
16   A.    I have no idea how that ratio --
17   Q.    Is it points?
18   A.    -- is applied.
19   Q.    Is it points?
20   A.    Don't know.
21   Q.    I thought you said this wasn't a points system
22 just a little while ago.  That's why I asked this series
23 of questions.
24   A.    I don't know.  I would assume that there is some
25 scoring mechanism.  What that is, I don't know.  I've

Page 152

```
 1   never participated in it.
 2         Q.   So when someone asks you how it works, you're
 3   not able to tell them?
 4         A.   No, I'm not.  I refer them to Member Services.
 5              MR. SHEA:  Is now a good breaking point for
 6         lunch?
 7              (Sotto voce discussion among plaintiffs'
 8         counsel.)
 9              MR. FERGUSON:  I can't hear two people.
10              MR. SHEA:  Sorry.
11              MR. FERGUSON:  Do you want to take a break, is
12         that what you said?
13              MR. SHEA:  We have to take a break at some time.
14         I thought it might be convenient.
15              MR. FERGUSON:  Let me just do one of these
16         letters.
17              (Exhibit 1066 previously marked for
18         identification produced to the witness.)
19   BY MR. FERGUSON:
20         Q.   10 -- 1066 (handing).
21              So this is another email from a member that was
22   sent to board members and forwarded by Neveloff to Mercer
23   on August 21, and my question simply is, do you know Dee
24   and Jerry Nowell?
25         A.   No, sir.
```

Page 153

Randal Mercer - October 24, 2017

```
 1      Q.   Mr. Nowell advised your board -- Schneider,
 2  Oliver, Marsden, and Neveloff -- it says -- he thanks them
 3  for the communications.  He said he had been staying in
 4  the property when this all happened, and he said he had a
 5  few questions "before I email my concerns to the
 6  president.  Is the board aware that Ritz-Carlton sales
 7  office was closed on the mall?  That it sat vacant after
 8  Ivan left, and we no longer have a broker on site to
 9  discuss the Ritz-Carlton property for new sales or
10  resales?  That it is now being staffed by a salesman to
11  sell strictly timeshares?"
12           We were talking about that before.  So there
13  seems to be Mr. Nowell and his wife, Dee Nowell, whoever
14  wrote this, both of them, I guess wrote it, this is
15  something you weren't -- you weren't specifically aware
16  of, that they were selling -- or marketing timeshares out
17  of that office?
18      A.   That is correct.
19      Q.   Did -- during the period 2004 to '12, Mr. --
20  notice Mr. Nowell is talking about -- Nowell is talking
21  about resales?
22      A.   Mm-hmm.
23      Q.   Was the Ritz-Carlton sales office handling
24  resales at some point, along with their own inventory?
25      A.   That was not something they were very interested
```

Page 154

Randal Mercer - October 24, 2017

```
 1    meeting of the members.
 2        Q.   Okay.  So the board of directors meeting
 3    preceded this meeting?
 4        A.   Yes, it would.
 5        Q.   So you couldn't have been elected president
 6    prior to the annual meeting then?
 7        A.   No.
 8        Q.   Okay.
 9        A.   No, not prior to this meeting.
10        Q.   Do you know what the vote tallies were in
11    connection with your being elevated to -- back to the
12    board?
13        A.   No, sir.
14             (Sotto voce discussion among plaintiffs'
15        counsel.)
16             THE VIDEOGRAPHER:  Mr. Mercer, could I get you
17        to move your water bottle out of the way just a
18        little bit?
19             THE WITNESS:  What would you like, sir?
20             THE VIDEOGRAPHER:  Move your water bottle.
21        There.  Thank you.
22             THE WITNESS:  How about if I drink some water
23        first.
24             (Exhibit 1110 previously marked for
25        identification produced to the witness.)
```

Page 168

Randal Mercer - October 24, 2017

```
 1   BY MR. FERGUSON:
 2        Q.   Exhibit 1110, 1110 (handing).
 3             So this is an email chain that starts back in
 4   September where Mr. Gosch sends Mr. Neveloff that
 5   September 21 draft memorandum and cease and desist letter
 6   related to Marriott Vacation Club use of tourist
 7   accommodation units.
 8        A.   Mm-hmm.
 9        Q.   And then it talks about above, Neveloff telling
10   Gosch, and I guess one of his other lawyers and he copies
11   you, "Please proceed to call your in-house contact at
12   Marriott but do not send any cease and desist letter.
13   Allow me to introduce Randy Mercer who is the new board
14   president.  Randy is a veteran -- veteran board member at
15   Aspen for six years."
16             So do you know what the in-house contact at
17   Marriott was that Mr. Gosch may have had?
18        A.   No, sir, I don't.  I would assume it would have
19   been another counsel.
20        Q.   You indicated, skipping a year ahead, that you
21   brought in a fellow named Mike Marino who's a lawyer at a
22   firm called Seyfar -- Seyfarth, I think, S-E-Y --
23        A.   Mike Marino was the association's attorney
24   during my first -- my first term of service.  He was also
25   the attorney for the St. Thomas board, and he was also, at
```

Page 169

```
 1   the same time, the attorney for the Bachelor Gulch board.
 2   So he was heavily involved immediately after the turnovers
 3   in the mid, early 2000s.
 4        Q.   The turnovers from declarants to the boards?
 5        A.   Yes.
 6        Q.   Okay.  And is he a member of any RCDC club?
 7        A.   He owned units -- at least one unit in
 8   St. Thomas, yes.
 9        Q.   Okay.  And as a member, was he retained by that
10   board, the St. Thomas board, to represent them?
11        A.   I'm not sure, but he was at the meetings.
12        Q.   Okay.
13        A.   I believe.
14        Q.   Now, when you -- in your first seven years,
15   you're telling me that he was an attorney that represented
16   the HOA?
17        A.   He was an attorney who was at -- present at all
18   of our meetings and gave us legal advice.
19        Q.   So he was an attorney retained by the
20   association --
21        A.   I don't know if he was paid or if it was just --
22   I don't know.  He was an attorney who worked with all
23   three of the Ritz-Carlton Club boards.
24        Q.   Well, I mean, let's talk about your board.
25        A.   Okay.
```

Page 170

```
 1        Q.   And the first time you said he was a lawyer that
 2   was giving legal advice.  Was he being paid for that legal
 3   advice?
 4        A.   I do not know that.
 5        Q.   Did he have a retention agreement with the HOA
 6   in Aspen or its board?
 7        A.   I do not know that.  I was at the bottom of the
 8   board, so I don't know those things.  He was -- he was --
 9   he was there when I was first elected to the board.
10        Q.   And he was there at meetings giving legal
11   advice?
12        A.   He was giving advice, yeah, sure.
13        Q.   And who called him in, to your knowledge, in the
14   first -- during your first seven -- let me withdraw that.
15             What was his connection to Aspen Highlands in
16   that first seven years you served on the board?  Did he
17   know one of the board members, Mr. Sternfield?  Did he
18   know Sal Cutrona?  Who did he know?
19        A.   He was -- he was -- had a personal relationship
20   and friendship with Mr. Cutrona because Mr. Cutrona was
21   the president of the St. Thomas board.
22        Q.   Did they have any fractional ownerships?  When I
23   say "they," did Marino have fractional ownership interest
24   at Ritz-Carlton at any time?
25        A.   St. Thomas, yes.
```