# EXHIBIT R

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                     DISTRICT OF COLORADO
 3
 4    RCHFU, LLC, et al.,          )
 5                                 )
 6            Plaintiffs,          )
 7                                 )
 8      vs.                        ) Case No.
                                   ) 1:16-cv-01301-PAB-GPG
 9    MARRIOTT VACATIONS           )
10    WORLDWIDE CORPORATION,       )
11    et al.,                      )
12                                 )
13            Defendants.          )
14    _____
15
16
17              DEPOSITION OF TYLER OLIVER
18          TAKEN ON BEHALF OF THE PLAINTIFFS
19                  JANUARY 12, 2018
20
21
22
23
24    Job No. 2778681
25    Pages 1 - 246
```

Page 1

Veritext Legal Solutions
866 299-5127

```
 1   was just too much.
 2        Q.   And when you say "this nonsense," are you
 3   referring to --
 4        A.   This lawsuit.
 5        Q.   -- the lawsuit and the affiliation?
 6        A.   Yeah.
 7        Q.   And was that one of the reasons that you
 8   resigned?
 9             MR. MARX:  Object to the form of the
10   question.
11        A.   There were lots of reasons.  Yeah.
12        Q.   (By Mr. Schrag)  The lawsuit being one of
13   them?
14        A.   Yes.
15        Q.   The affiliation being one of the reasons?
16        A.   The lawsuit, you know, the refurbishment,
17   the time constraints.  It just wasn't any fun anymore.
18   And, again, it was voluntary.  Right?  I wasn't
19   getting paid for this.  So...
20        Q.   Okay.  Back to Exhibit 1021.  Did you ever
21   have a conversation about whether the developer was
22   going to vote their interest to make sure that you got
23   on the board?
24        A.   No.
25        Q.   Do you know whether the developer even
```

Page 15

```
 1   votes their interest for -- for board members?
 2        A.   I don't know.
 3        Q.   Okay.  Have you ever had your deposition
 4   taken before?
 5        A.   No.
 6        Q.   Have you ever been a defendant in a lawsuit
 7   before?
 8        A.   Yes.
 9        Q.   Tell me about that.  How -- how many
10   lawsuits?
11        A.   One.
12        Q.   And what was the nature of that lawsuit,
13   just generally?
14        A.   Just a contract dispute on a real estate
15   deal.
16        Q.   And did that case go to trial?  Resolve --
17   settle -- resolve by settlement?
18        A.   Uh-huh.
19        Q.   So one of the rules of a
20   deposition -- was -- was that a "yes," by the way?
21        A.   Yes.
22        Q.   So -- and you never had your deposition
23   taken in that case; right?
24        A.   No.
25        Q.   Okay.  So I'm going to give you a few
```

Page 16

```
 1   ground rules of the deposition.  And, for the most
 2   part, you're doing great so far, but one of them is,
 3   you have to answer "yes" or "no" because, as you see,
 4   the court reporter is taking down everything that you
 5   and I say.  So "uh-huh" is -- doesn't always become
 6   clear on the transcript.
 7        A.   Okay.
 8        Q.   So please say "yes" or "no."
 9        A.   Okay.
10        Q.   Is that okay?
11        A.   Yes.
12        Q.   And then the other thing is that, unlike in
13   a natural conversation where people often anticipate
14   what the other person is going to say and start
15   speaking at the same time, we can't overlap, because
16   that makes it very hard for the court reporter.
17             So I'll try to let you finish, and you try
18   to let me finish; is that okay?
19        A.   Yes.
20        Q.   And then any time you need a break, just
21   let me know, and we can take a break --
22        A.   Thanks.
23        Q.   -- unless I'm in the -- unless I'm in the
24   middle of a question or a document.  I might ask you
25   to finish up --
```

Page 17

```
 1        Q.   In the -- in the way that -- that
 2   Ms. Babich used the word "affiliation," which is the
 3   way we've been talking about affiliation all day,
 4   there was, in fact, an affiliation.  There is, in
 5   fact, one; correct?
 6        A.   In -- in Ms. Babich's letter, she --
 7   there's a couple of bullet points in her letter that
 8   are similar to what was eventually signed, but it's
 9   not an affiliation.
10        Q.   In your words, it's not an affiliation?
11        A.   That's why I'm here.
12        Q.   And Ms. Babich called it an "affiliation";
13   right?
14        A.   She wasn't a part of -- she wasn't even an
15   employee when all this was signed.
16        Q.   Do you see the word "exchange" in
17   Exhibit 1180?
18        A.   Which paragraph?
19        Q.   Second paragraph.
20        A.   Yes.
21        Q.   And so the board extracted a promise that
22   there wouldn't be an exchange program with the
23   Marriott Vacation Club unless a majority of -- of Ritz
24   Aspen members voted for it --
25             MR. SHEA:  Objection.
```

Page 148

```
 1          Q.   (By Mr. Schrag) -- correct?
 2               MR. SHEA:  Objection.  Misleading.
 3          A.   It's not an exchange.  It's a voluntary use
 4   of whatever you want to do with your unit.
 5          Q.   (By Mr. Schrag)  Isn't there -- isn't it
 6   done through a Lion & Crown Exchange?
 7          A.   I've never used the program.  I don't know
 8   what the mechanism is.
 9          Q.   So you didn't -- you didn't enroll in the
10   Lion & Crown Exchange Program?
11          A.   Correct.
12          Q.   You do know it's call the "Lion & Crown
13   Exchange Program," though; right?
14          A.   Okay.
15          Q.   And so the promise that's -- that was
16   extracted in the second paragraph, we agree it's
17   unrelated to unsold inventory; right?
18          A.   Yeah.  That's what -- what it's saying.
19          Q.   And that promise would apply to the type of
20   affiliation that Ms. Babich describes in her letter;
21   true?
22               MR. SHEA:  Objection.  Misleading.
23          A.   I don't put any importance on Ms. Babich's
24   letter.
25          Q.   (By Mr. Schrag)  That's not my quest- --
```

Page 149

```
 1   that's not my question, though.  My question is:
 2              The promise that was extracted would apply
 3   to the type of affiliation that Ms. Babich describes
 4   in her letter; correct?
 5              MR. SHEA:  Objection.  Misleading.
 6        A.    Can you ask the question a different way?
 7        Q.    (By Mr. Schrag)  Sure.  The promise that
 8   you extracted -- that the board extracted, do you
 9   agree that that promise would apply to an exchange or
10   the type of affiliation that Ms. Babich described?
11              MR. SHEA:  Objection.  Misleading.
12        A.    No, because it's not an exchange.
13        Q.    (By Mr. Schrag)  Okay.  So you don't -- you
14   don't believe that the exchanging -- depositing weeks
15   into an exchange and allowing Marriott Vacation Club
16   members access to those weeks is an exchange?
17        A.    Is trading my week for a -- you know,
18   Exclusive Resorts, is that an exchange?
19        Q.    You need to -- could you answer the
20   question that I asked, please?
21        A.    Well, I'm trying to get a definition
22   what -- like, "exchange"?  I mean, are those two
23   things the same?
24        Q.    Isn't it true that the promise extracted
25   that's described in paragraph two would apply to an
```

Page 150

```
 1   excited that there was not going to be, you know, this
 2   big points system.  You know, and we pushed out a
 3   letter in excitement, probably a little too fast,
 4   and -- but there was no reason to have a vote.
 5        Q.   So did you intend all along to not have a
 6   vote?
 7        A.   Yeah.  So you -- there was no reason to.
 8        Q.   So from -- from the -- from the very first
 9   instance you sent this letter, you knew that there
10   wouldn't be a vote.  Is that what you're saying?
11        A.   There was no reason to have a vote.
12        Q.   But I'm asking you:
13             Did you know when you sent this letter out
14   that you weren't going to have vote?
15             Did you tell -- in other -- well, answer
16   that question.
17        A.   No.  We didn't -- we did not intentionally
18   write the letter to say that there was a vote with --
19   knowing that we weren't going to have a vote.  No.
20        Q.   So when you wrote the letter, you intended
21   to have a vote?
22        A.   No.  We wrote the letter, and it was poorly
23   worded.
24        Q.   So when you said -- when you said that the
25   affiliation/exchange/points program wouldn't happen
```

Page 156

```
 1   unless a majority of members voted in favor of it, you
 2   didn't mean it?
 3             MR. SHEA:  Objection.  Argumentative.
 4         A.   Michael, it was poorly worded.  You -- you
 5   own fee simple.  You can do whatever you want with it.
 6   And you, as an owner, I can't make you do something
 7   you don't want to, so there's no reason for a vote.
 8         Q.   (By Mr. Schrag)  Yet you promised a vote?
 9         A.   I guess we did.  Sorry.
10         Q.   I'm going to hand you Exhibit 1207.
11             MR. SHEA:  Thanks.
12         Q.   (By Mr. Schrag)  Okay.  Exhibit 1207 is an
13   e-mail string with a top e-mail of May 11, 2013, from
14   Mr. Mercer to you, and he writes, "Start at the
15   bottom.  She was pissed at first."
16             Do you recall receiving this -- this e-mail
17   about Mr. Mercer's discussion with a woman named Mary
18   Ellen O'Brien?
19         A.   I don't recall, but I'm on the e-mail.
20         Q.   And if you look toward the back, there's a
21   discussion of Ms. O'Brien's concerns about an
22   affiliation between Marriott Vacation Club, and Ritz
23   Aspen.  Do you see that -- her e-mails?
24         A.   On page 2 and 3?
25         Q.   Correct.
```

Page 157

```
 1            A.   Okay.
 2            Q.   And do you see on the bottom of page 2,
 3    Mr. Mercer describes that there's going to be a
 4    majority vote?
 5            A.   Oh, the last -- number nine?
 6            Q.   Correct.
 7            A.   Yeah.
 8            Q.   Did you ever have any discussions with
 9    Ms. O'Brien?
10            A.   I don't believe so.
11                 MR. SHEA:   Thanks.
12            Q.   (By Mr. Schrag)  Okay.  I've just handed
13    you Exhibit 1209.  If you look at page 3 of 1209,
14    there's a letter from Mr. Cunningham to Mr. Mercer
15    dated May 14, 2013.
16                 Do you see that?
17            A.   I do.
18            Q.   And it says -- there was some dispute about
19    language in one of the Lion & Crown enrollment
20    packages.
21                 Do you remember that?
22            A.   No.
23            Q.   Okay.  That's what he talks about in --
24            A.   Okay.
25            Q.   -- in the second paragraph.
```

Page 158

1          In the third paragraph where he says,
2  "Second, regarding other potential affiliations, we
3  want to assure you that a Ritz-Carlton Club
4  affiliation with Marriott Vacation Destinations Club
5  will not take place unless there is an affirmative
6  vote of each club's membership.
7          Do you see that?
8      A.  I do.
9      Q.  So, again, Mr. Cunningham is -- is
10 reaffirming the promise that the board extracted on
11 April 5; right?
12     A.  He's -- he's referring to a vote, yes.
13     Q.  And the -- the vote that -- that vote later
14 turned into a survey; correct?
15     A.  And what Mr. Cunningham here is referring
16 to is a big global points exchange or units for
17 points.  More of a time-share kind of a thing.
18     Q.  All it says is that the affiliation with
19 Marriott Vacation Clubs -- and if you look back to
20 1027 -- Ms. Babich describes that the affiliation is
21 almost exactly the type of affiliation --
22     A.  No.
23     Q.  -- that actually happened; right?
24     A.  No, it didn't.  That's not what this means.
25     Q.  And is there any indication from the words

Page 159

```
 1  examples of survey research, clearly biased in a way
 2  to increase the chance of a vote in favor of
 3  affiliation."
 4            Did you ever see that at the time?
 5       A.   I don't remember it.
 6       Q.   Did you ever take any action in response to
 7  the comment that Mr. Skolnick made?
 8       A.   I think Mr. Mercer did in the previous
 9  pages; right?
10       Q.   Did you ever -- did you ever discuss
11  Mr. Skolnick's e-mail with Mr. Mercer?
12       A.   I don't recall.  To my knowledge, if that
13  was -- that might have been the only criticism of the
14  survey.  Maybe there's a couple more, but there
15  certainly wasn't very many.
16       Q.   And do you see he was concerned that values
17  would be diminished if there was the affiliation
18  proposed in the survey?
19       A.   What's the basis of that?
20       Q.   I'm just asking if you took note of it.
21       A.   Okay.
22       Q.   Is that a "yes"?
23       A.   Yes.
24            MR. SCHRAG:  Okay.  I have no more
25  questions.
```

Page 234

```
 1                MR. SHEA:  I have a few, but it will be
 2   five or ten minutes at most.  So first of all I want
 3   to ask --
 4                THE REPORTER:  Wait.
 5                MR. SHEA:  Oh, I'm sorry.  My mic is not
 6   on.
 7                         EXAMINATION
 8   BY MR. SHEA:
 9        Q.   First of all, I want to ask you about
10   whether you -- you just mentioned that there may have
11   been one or two other complaints about the survey, but
12   you didn't know of -- hear of many; is that right?
13        A.   Correct.
14        Q.   So did you ever hear from Randy Mercer or
15   anyone else on the board that there were any
16   complaints about the Memorandum of Understanding after
17   it was announced to the membership in that April of
18   2014 board communication --
19        A.   I don't remember any complaints.
20        Q.   -- over the two -- over the two years you
21   served on the board?
22        A.   Correct.
23        Q.   Did you ever hear from Mr. Mercer or
24   anybody else on the board that there were complaints
25   from members about your not having had a vote on
```

Page 235

```
 1    something before you entered into that agreement?
 2         A.   Not one.
 3         Q.   And, personally, did you ever get
 4    approached by a member who complained about not having
 5    a vote?
 6         A.   Never.
 7         Q.   Or who complained about the exchange
 8    program that you entered into in the MOU?
 9         A.   Not one complaint.
10         Q.   So Mr. Schrag also asked you some questions
11    about the comparison between Ms. Babich's letter back
12    in 2012 and provisions that were in the Memorandum of
13    Understanding.  Do you remember that?
14              So if you can look at the Memorandum of
15    Understanding and Ms. Babich's letter again -- I think
16    she's, what, 1072?
17         A.   10- -- 1027.
18         Q.   1027.  And the MOU is Exhibit 1607?
19         A.   Correct.
20         Q.   Okay.  So do you see the provision in the
21    Memorandum of Understanding, paragraph number five?
22              "Acknowledgement by the association of
23    participation exchange opportunity with the MVCD
24    exchange program for individual members"?
25         A.   Correct.
```

Page 236

```
 1         Q.   So is there any statement about the
 2    limitation to individual members in Ms. Babich's
 3    letter?
 4         A.   No.  And up until this -- this point, you
 5    know, Marriott was continually trying to insert
 6    that -- you know, maybe we'll insert our units.  Maybe
 7    not.  They kept -- you know, kept trying to insert
 8    that, but we thought that that was a huge victory for
 9    us in this Memorandum of Understanding to limit it to
10    individual members.
11         Q.   Okay.  Could you look at paragraph 7C of
12    the Memorandum of Understanding on page 2, again
13    Exhibit 1607.
14              See that the last sentence of that says,
15    "Members of the MVCD exchange program will not have
16    access to space-available time at the Ritz-Carlton
17    Club Aspen Highlands through the Lion & Crown Exchange
18    program"?
19         A.   Right.  That was important because in -- in
20    Aspen, we're one of the -- one of the oddballs.  We
21    have three fixed weeks -- reserved weeks and one
22    floating week, and so we wanted to make sure that this
23    whole Memorandum of Understanding just dealt with
24    reserved allocation, nothing -- there was no points
25    exchanging with the un- -- unallocated -- unreserved
```

Page 237

```
 1   weeks because that would fill up our -- our time more.
 2   We were just talking about reserve weeks, one in, one
 3   out.
 4            Q.   So does Ms. Babich's letter --
 5            A.   No.
 6            Q.   -- deal with that point at all?
 7            A.   It does not.
 8            Q.   Okay.  Could you take a look back also
 9   at -- I'm trying to find them right now -- the Q and A
10   that was prepared and sent by Ms. Sobeck in September
11   of 2000 -- or excuse me -- September of 2013.  So
12   Exhibits 1272, 1273, and 1274.
13            1272, being Ms. Babich's e-mail.  The draft
14   letter is 1273.  And the draft Q and A is 1274.  And I
15   want to focus you on Exhibit 1274, the first page that
16   has the Bates stamp number AHCA 00012435?
17            Do you see that?
18            A.   I do.
19            Q.   Do you see the Q and A that begins with,
20   "Will the Ritz-Carlton Club Aspen Highlands be
21   available to Marriott Vacation Club Destination
22   program members?"
23            A.   I do.
24            Q.   Do you see any references to developer
25   inventory in that paragraph?
```

Page 238

```
 1          A.   Yeah.  So this -- this limited -- up until
 2   that point, again, Marriott was trying to insert that
 3   developer inventory.  And so, with this, they made it
 4   clear we were able to get all that language out of
 5   there, so it was just strictly Aspen Highlands
 6   individual members.
 7          Q.   So but -- but at this point, Ms. Sobeck is
 8   saying that the inventory of the developer is
 9   possibly -- it might be included too?
10          A.   Right.
11          Q.   So when you sent out the letter, the Q and
12   A that Mr. Schrag asked you about, Exhibit 1305 --
13   could you look at the comparable sentence in that
14   particular exhibit?  It's Question 6, I believe.
15               Does it say that the developer inventory
16   may possibly be used in the program?
17          A.   Yes.
18          Q.   Will you compare the two side by side and
19   see if -- if that particular phrase that was in
20   Ms. Sobeck's appears in the letter?
21          A.   Okay.  So it talks about possibly the
22   developer-owned inventory in the --
23          Q.   Yeah, but that -- does the phrase "or
24   possibly developer-owned inventory" appear in the
25   letter that you, as the board, sent out to the
```

Page 239

```
 1   members?  That exact phrase at that --
 2        A.   No.
 3        Q.   -- in -- dependent to that sentence?
 4             Okay.  So who on the board participated in
 5   the -- the discussion about whether the MOU should be
 6   approved on behalf of the members?  What individuals?
 7   Yourself, Mr. Mercer, who else?
 8        A.   Ask that question again now.
 9        Q.   I'm talking about the board members who
10   participated in the final discussion and
11   deliberation --
12        A.   All four of us.
13        Q.   So who would that have been?
14        A.   So at the time, it would have been Randy
15   Mercer, myself, Phil Schneider, and Joel Alper or was
16   that -- or was that --
17        Q.   How about Bob Harris?
18        A.   Bob Harris.  I'm sorry.  Yeah.  And Joel
19   was a commercial member then.
20        Q.   But did he participate in deliberations as
21   well?
22        A.   Yeah.
23        Q.   He's also an owner there --
24        A.   Yes.
25        Q.   -- Joel is?
```

Page 240