# EXHIBIT N

```
 1            IN THE UNITED STATES DISTRICT COURT
 2                    DISTRICT OF COLORADO
 3
 4     RCHFU, LLC, et al.,          )
 5                                  )
 6            Plaintiffs,           )
 7       vs.                        )  Case No.
 8                                  )  1:16-cv-01301-PAB-GPG
 9     MARRIOTT VACATIONS           )
10     WORLDWIDE CORPORATION,       )
11     et al.,                      )
12                                  )
13            Defendants.           )
14     _____
15
16
17              DEPOSITION OF TYLER OLIVER
18            TAKEN ON BEHALF OF THE PLAINTIFFS
19                   JANUARY 12, 2018
20
21
22
23
24     Job No. 2778681
25     Pages 1 - 246
```

Page 1

```
 1          Q.   So you didn't consider whether Marriott
 2   Vacation co-branding the Ritz and Marriott brands
 3   would affect values at the Ritz Aspen?
 4          A.   It didn't matter.
 5          Q.   So --
 6          A.   It doesn't matter if I use -- like, I just
 7   said, my neighbor, my plumber, I give it away at
 8   charity.  Marriott Vacation points, it doesn't matter.
 9   I can do anything that I want with it.  It's -- I own
10   fee simple to it.  It's a deeded interest.  I can use
11   it, not use it, whatever I want to do with it.
12          Q.   Now, you hired a lawyer at some point that
13   had a different view of it, based on the law.
14               Do you -- do you recall that?
15          A.   No.
16          Q.   Do you recall hiring Mr. Gosch?
17          A.   I remember the name, but that was Jay
18   Neveloff, you know, I think, that reached out to him.
19   Jay is a hugely successful attorney.  That was way out
20   of my wheelhouse.  There was nothing I could add to
21   that.
22          Q.   So you didn't pay attention to Mr. Gosch's
23   opinion?
24          A.   No.
25          Q.   And so if Mr. Gosch thought that the
```

Page 51

```
 1   Aspen could decide whether any affiliation would
 2   occur?
 3          A.   Affiliation in what way?
 4          Q.   The affiliation that actually happened.
 5          A.   No.
 6          Q.   Okay.  We'll talk more about the vote
 7   later.
 8               Did you understand at some point that
 9   Mr. Mullenix got Marriott to agree to postpone the
10   decision of whether to affiliate with Lion & Crown to
11   allow Marriott Vacation Club members access to
12   Bachelor Gulch, that that was put off for a year?
13          A.   I don't remember that.
14          Q.   Let's look at Exhibit 1120.
15               Do you see the e-mail chain in Exhibit 1120?
16   The top one is dated November 6, 2012?
17          A.   I do.
18          Q.   And do you see the November 6 e-mail from
19   Mr. Mullenix describing a meeting with Mr. Weisz and
20   Mr. Cunningham?
21          A.   I do.
22          Q.   And do you see that he was able to postpone
23   any affiliation?
24          A.   I do.
25          Q.   And your fellow board member,
```

Page 114

```
 1    Mr. Schneider, thought it was a good idea.
 2             Do you see that?
 3        A.   I do.
 4        Q.   What -- what was your opinion on that?
 5        A.   They just -- again, they were talking about
 6    the whole -- rolling our fractional units into a big
 7    points system.  Mr. Mullenix wasn't in favor of that.
 8        Q.   Isn't it true that they got a year
 9    postponement on any affiliation; correct?
10        A.   Well, that was the only one that was being
11    proposed at the time.
12        Q.   You don't think that the basic proposal
13    that's laid out in Exhibit 1027 was being proposed?
14        A.   No.  And Mr. Mullenix would have no
15    interest in it.  He was long gone.  He was already,
16    you know, dotting his Is and negotiating Timbers
17    contracts and -- and --
18        Q.   He had -- he had no interest in any
19    affiliation contract; correct?
20        A.   He had no interest in Ritz-Carlton,
21    Marriott, or anybody associated with them.
22        Q.   Okay.  Do you see where Mr. Schneider says,
23    "At some point I think it would behoove us to try to
24    join forces with them to try to combat Marriott"?
25        A.   I do.
```

Page 115

```
 1         Q.    Did you agree or disagree with that?
 2         A.    Didn't have an opinion on it.
 3         Q.    Do you see that in -- on the second page of
 4   Exhibit 1120 Mr. Mullenix refers to getting an
 5   industry consultant study about the Lion & Crown
 6   affiliation?
 7         A.    I do.
 8         Q.    At the board at Ritz Aspen, was any such
 9   study done?
10         A.    Not that I remember.
11         Q.    Okay.  Take a look at Exhibit 1122, please.
12               All right.  Do you see that Mr. Marsden,
13   your fellow board member, also thought it was a good
14   idea to get the one year postponement and
15   non-implementation agreement with respect to the
16   affiliation?
17         A.    I do.
18         Q.    Okay.  Take a look at Exhibit 1121, please.
19               Okay.  It looks like the postponement at
20   Bachelor Gulch precipitated further discussions with
21   Mr. Gosch among the -- with the Ritz Aspen board?
22               Do you see that?
23         A.    I do.
24         Q.    And Mr. Gosch says, "I like the approach,
25   although it is" -- "although it is slightly softer
```

Page 116

```
1    than our cease and desist letter."
2            Do you see that?
3        A.  I do.
4        Q.  And at that time, did the board decide to
5    send the cease and desist letter?
6        A.  I'm not sure the chronology of the events.
7        Q.  Do you recall when we looked at the cease
8    and desist letter, it was -- it was sent on
9    November 21?
10       A.  Okay.  Yes, I do.
11       Q.  Did you -- did you have an opinion about
12   whether the cease and desist letter should be sent at
13   that time?
14       A.  I was okay with it.
15       Q.  Do you recall what the members', at Ritz
16   Aspen, reaction was when you sent the cease and desist
17   letter?
18       A.  I do not.
19       Q.  Do you recall that they were basically
20   thrilled and ecstatic that -- that the letter was
21   sent?
22       A.  I don't recall that.
23       Q.  Do you recall that the members were
24   thrilled that the board was taking a position against
25   affiliating with the Marriott Vacation Club?
```

Page 117

1    exchange whereby people deposited their weeks into the
2    Lion & Crown Exchange and Marriott Vacation Club
3    members could access them with their points?
4              MR. SHEA:  Objection.  Argumentative.
5         A.   But as an owner, I can do whatever I want
6    with it; right?  I don't need anybody's approval.
7         Q.   (By Mr. Schrag)  That's -- that -- I get
8    that that's your opinion.  I'm talking about the
9    promise that was described in Exhibit 1180.
10        A.   I don't know how to answer that.
11        Q.   Okay.  So -- so you don't know whether
12   that -- that promise applied to the type of exchange
13   that eventually happened?
14        A.   I don't know.
15        Q.   Don't you think your members thought that
16   that promise of a vote applied to the type of
17   affiliation that eventually happened?
18        A.   No.
19             MR. MARX:  Object to the form of the
20   question.
21        A.   Why -- why would -- why would a member
22   believe that we could obligate them to do something or
23   promise something when they actually own the deed;
24   right?
25        Q.   (By Mr. Schrag)  Didn't -- didn't you --

Page 151

```
 1          A.   It's like your house.
 2          Q.   Didn't you send them a cease and desist
 3   letter that said that any use through an exchange of
 4   units at the Ritz -- Ritz Aspen by Marriott Vacation
 5   Club members was -- was illegal?
 6          A.   We sent them a cease and desist based on a
 7   points system that was being contemplated.
 8          Q.   And don't you agree that the cease and
 9   desist letter used broader language than that?
10          A.   It may have, but the context was -- it was
11   about a points-based system.
12          Q.   Isn't it true that you sent this letter
13   because you knew that your members were going to be
14   thrilled that you had extracted the promise of a vote?
15          A.   Say that again.
16          Q.   Didn't you send this letter out immediately
17   because you knew your members were going to be
18   thrilled that you secured a vote from Marriott?
19          A.   No.
20          Q.   You didn't think they would be happy about
21   it?
22          A.   We thought that they would be happy that we
23   kind of squashed this big points system; right?
24   That's why, when we read all these e-mails, everybody
25   was excited that we were, you know, pushing back on
```

Page 152

```
1    Marriott.
2         Q.   And we're going to see some more e-mails
3    that they were happy they were going to get a vote.
4              Do -- do you recall --
5         A.   I don't --
6         Q.   Do you recall that the members were happy
7    that they got a vote?
8         A.   No.
9         Q.   Okay.  We'll look at those in a sec.
10        A.   Okay.
11        Q.   So if you exclude the Marriott interest and
12   members not in good standing, do you agree that there
13   were approximately 600 members who -- who would be
14   eligible to vote on whether any affiliation, exchange,
15   or points program with Marriott Vacation Club would
16   take place?
17        A.   I agree with the 600 number.
18        Q.   And -- so you would need -- according to
19   the second paragraph of Exhibit 1180, you'd need
20   approximately 300 or a little more votes in favor of
21   the affiliation/exchange with Marriott Vacation Club
22   in order for that to take place if you were going to
23   adhere to this promise in -- in the second paragraph
24   of Exhibit 1180; correct?
25        A.   I'm okay with your math.
```

Page 153

```
1        Q.   All right.  Let's look at Exhibit 1178.
2             Have you seen Exhibit 1178 before?
3        A.   No.
4        Q.   Do you see it says, "Aspen Board Letter
5   Sent.  Member Responses.  April 5, 2013"?
6        A.   I do.
7        Q.   So these are the responses to Exhibit 1180.
8   Agree?
9        A.   Yes.
10       Q.   And if you look at the first page of
11  Exhibit 1178, you see there's overwhelming positive
12  responses.  One comment says "excellent."
13            "Thank you to the board for achieving this
14  favorable outcome."
15            "Good work."
16            Do you see all those comments?
17       A.   Yeah.  They were happy because we were
18  kicking their ass.
19       Q.   And -- and I -- and at that --
20       A.   And pushing back on them.
21       Q.   Yeah.  And at that point, you -- you were
22  kicking their ass by extracting the promise of a
23  majority vote; right?
24       A.   No.  No.
25       Q.   Well, that's what -- you don't think that's
```

Page 154

1   Q.   And that's what Mr. Gosch, for many
2   reasons, had opined was not lawful; correct?
3   A.   No.  That's not what his letter said.
4   His -- his letter was a -- Mr. Gosch's letter was a
5   much broader points-based system, not a one-in-one-out
6   exchange.
7   Q.   And do you recall that Mr. Gosch said that
8   any use of the tourist accommodations by Marriott
9   Vacation Club members through an exchange would be
10  unlawful?
11  A.   That opinion was wrong.
12  Q.   Okay.  So I -- I think you're having an
13  issue separating what you disagreed with in
14  Mr. Gosch's letter from what Mr. Gosch said, and what
15  I'm saying is that:
16       Isn't it correct that the program laid out
17  in the middle of Exhibit -- page 2 of Exhibit 1235 is
18  one of the things that Mr. Gosch opined wasn't lawful?
19  It violated the declaration, and it was an act of
20  self-dealing and breach of fiduciary duty; correct?
21       MR. SHEA:  Can I ask what -- you said in
22  the middle.  You're talking about the fourth paragraph
23  still?
24       MR. SCHRAG:  Correct.
25  A.   I need to look at the other -- Mr. Gosch's

Page 168

```
1    letter, because I don't -- which document is that?
2         Q.   (By Mr. Schrag)  Sure.  I think it's 1135.
3    Top of page 2 of 1135.
4         A.   I got an 1124, 1145.  Oh, it's also on the
5    back of -- let's see.  Cease and desist, is that where
6    it is?
7         Q.   Correct.
8         A.   Okay.  Second page, you said?
9         Q.   Yeah.  At the top.
10        A.   What's the question again?
11        Q.   In the fourth paragraph of 1245, there's an
12   affiliation desc- -- plan described that Mr. Gosch
13   opined was unlawful and in violation of the
14   declaration and an act of self-dealing that breached
15   fiduciary duties.
16             Do you agree?
17        A.   Mr. Gosch is talking about a -- the big
18   time-share thing.  That's not what -- what this is...
19        Q.   If you look at the fifth paragraph, do you
20   see where it says, "We believe a vote of the members
21   is the best way to determine if Ritz-Carlton, Club
22   Aspen, and the members will be affiliated in any way
23   with the Marriott Vacation Club system"?
24             Do you see that?
25        A.   I do.
```

Page 169

```
 1          Q.   And so here you -- this letter -- draft
 2   letter uses the term "vote," which is consistent with
 3   what was promised; right?
 4          A.   Yeah.  I --
 5          Q.   And then in the -- and then in the next
 6   paragraph, it says that, "They've agreed to allow
 7   members of Aspen the chance to indicate their
 8   thoughts."
 9               And that's not what was promised in -- on
10   April 5; right?  They -- they were promised -- your
11   members were promised a vote, not a chance to simply
12   indicate thoughts.
13               Do you agree?
14          A.   No.  I think they're the same.
15          Q.   You think a survey and a vote are the same?
16          A.   There was no reason to have a vote.  There
17   was a lot of reason to -- to get our members' interest
18   on what was going to go on, you know.  Talking about
19   doing due diligence, we're kind of getting to the
20   point here with this -- with this idea.  We wanted to
21   get the -- the members' interest level.  "Hey, is this
22   something you guys," you know, "want?  Do you guys
23   want to do something like this?"
24          Q.   But yet on April 5, you didn't promise to
25   get their interest level.  You promised them a vote?
```

Page 170

```
 1         A.    No.
 2         Q.    You didn't -- you didn't promise them a
 3   vote?
 4         A.    No.  It was a horribly written letter by
 5   four guys that don't do this.  We're volunteers.
 6         Q.    And do you see in the sixth paragraph where
 7   it says that, "If the majority, which is 50 percent
 8   plus one" -- I think we agreed before that's about 300
 9   members; right?
10         A.    Okay.
11         Q.    -- "of" -- "the Aspen members respond
12   affirmatively, then the affiliation would go forward."
13               And do you agree that 300 members
14   never respond- -- never responded affirmatively,
15   whether it was a vote or a survey?
16         A.    I don't know the facts on that.
17         Q.    Okay.  You don't know that only about
18   70 responded to the survey --
19         A.    I don't remember the number.
20         Q.    -- affirmatively?
21         A.    Yeah, if that's -- I trust that those are
22   accurate.  So 70 people took the survey and wanted to
23   do something?
24         Q.    Approximately -- there were approximately
25   70-something votes -- or -- or survey responses
```

Page 171