1

```
 1              IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLORADO
 2
      Case No. 16-cv-1301--PAB-GPG
 3    _____

 4    RCHFU, LLC., et al.,

 5         Plaintiffs,

 6    vs.

 7    MARRIOTT VACATIONS WORLDWIDE CORPORATION, et al.,

 8         Defendants.
      _____
 9
      _____

10              Proceedings before GORDON P. GALLAGHER, United

11    States Magistrate Judge, United States District Court for the

12    District of Colorado, commencing at 12:38 p.m., November 20,

13    2018, in the United States Courthouse, Grand Junction,

14    Colorado.

15    _____

16              WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS

17    ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED. . .

18    _____

19                            APPEARANCES

20              MATTHEW FERGUSON, TYLER MEADE, MICHAEL REISER, SR.,

21    MICHAEL SCHRAG, and LINDA LAM, Attorneys at Law, appearing in

22    person for the Plaintiffs.

23    _____

24                          MOTIONS HEARING

25
```

2

```
 1              APPEARANCES (Continued)
 2    ISABELLA MARTINA, MICHAEL REISER, JR., MATTHEW REISER, ANNIE
 3    DECKER and SAM FERGUSON, Attorneys at Law, appearing via
 4    phone for the Plaintiffs.
 5              IAN MARX, DAVID MASTERS, PHILLIP SELLINGER (via
 6    phone), Attorneys at Law, appearing in person for the
 7    Defendants other than Aspen Highlands.
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

3

```
1                    P R O C E E D I N G S

2              (Whereupon, the within electronically recorded

3    proceedings are herein transcribed, pursuant to order of

4    counsel.)

5              THE COURT:  All right.  Let me start by taking

6    appearances here momentarily.  We have a bunch of folks here

7    and then I think on the phone as well.  This is 16-cv-1301,

8    RCHFU vs. Marriott, et al., and let's start with plaintiffs

9    here in Grand Junction.

10             MR. MATT FERGUSON:  Your Honor, the speaker's

11   microphone is nearest me, so to my left is Linda Lam from the

12   Gibbs law firm; Michael Schrag, same law firm; Michael

13   Reiser, Sr., and Tyler Meade; and then myself Matt Ferguson

14   for plaintiffs.

15             THE COURT:  Just so we've got it, Ms. Lam, Mr.

16   Schrag, Mr. Reiser, Mr. Meade and Mr. Ferguson all here at

17   the plaintiff's table.

18             Okay.  For the defense here in Grand Junction,

19   please.

20             MR. MASTERS:  Dave Masters and Ian Marx.

21             THE COURT:  Mr. Masters and Mr. Marx for the

22   defense here in Grand Junction.  And let's start -- anybody

23   for the plaintiffs on the phone?

24             MR. MATT FERGUSON:  Should I just run through them?

25             THE COURT:  Yeah.
```

1          MR. MATT FERGUSON:  So we have Mike Reiser, Jr.,

2    Matthew Reiser and Isabella Martinez from the Reiser law

3    firm.  We have Annie Decker and Sam Ferguson from the Meade

4    law firm.

5          THE COURT:  Okay.  So I heard Michael Reiser Jr.,

6    Matt Reiser, Martinez, and then Decker and Ferguson all on

7    the phone for the plaintiffs.  Are we anticipating a direct

8    involvement from any of them or are they listening in?

9          MR. MATT FERGUSON:  They're all listening in, Your

10   Honor.

11         THE COURT:  And any defense counsel on the phone?

12         MR. MASTERS:  Yes, Your Honor.  Phillip Sellinger.

13         THE COURT:  Okay.  And same question:  Are we

14   anticipating Mr. Sellinger is listening in or is he

15   participating?

16         MR. MASTERS:  Expected he is just listening in,

17   Your Honor.

18         THE COURT:  All right.  We're here today on a

19   number of different items and there will be some things that

20   we can address that are outside of the scope of our motion,

21   so I'll address those first.

22         We have a second addendum to the case schedule that

23   was submitted -- I think it came in to Ms. Barnes by way of

24   e-mail and I think everybody has seen it, so I'll simply ask,

25   does anybody have an objection to that or is that essentially

5

1    what everybody would like to see?

2              MS. LAM:  Plaintiffs have no objection, Your Honor.

3              THE COURT:  Okay.

4              MR. MASTERS:  Nor do the defendants.

5              THE COURT:  Okay, great.  Let me give you this,

6    Angela.  If we could just order this at a later time.  Okay.

7              Then we also still have the issue regarding certain

8    plaintiff depositions.  I don't know that that needs to be

9    addressed today, but it still looks like it may be hanging

10   out there.  And then -- let's see, I think the status report

11   went with what I just gave you, Ms. Barnes, so I'll give you

12   that too.  There is nothing further on that one.  Okay.

13             And then in terms of kind of the main purpose for

14   today, we are here on a motion for sanctions and default

15   judgment, and there is essentially two of those, but I'll run

16   through, other than the remainder of the file, what I've

17   looked through for purposes of our hearing today.

18             We have Motion Number 223 that was referred at

19   Entry 233.  That's the motion for sanctions and default

20   judgment.  Along with that is a request for judicial notice

21   at 224.  At 262, there is a response from Aspen.  At 273,

22   there is a response from Marriott.  At 274, there is a reply

23   regarding Aspen's response.  At 278, there is a reply

24   regarding Marriott's response.  At 282, there is a sanction

25   motion that was filed as restricted.  It has a place holder

1   at 283 for reference purposes.  It was referred at Document

2   284 by Judge Brimmer.  There is a sur-reply to the first

3   section of motions at 290, a response to the sur-reply at

4   291.  Then a response to Motion 282 at 296.  And at 297, a

5   reply that was also filed as restricted.

6          Those are the entries that I think are bearing on

7   our hearing today.  Does anybody think I missed any?  Okay.

8          All right.  Well, I think what makes sense to start

9   with is, what I would like to get maybe from each party is

10  about a five-minute idea of where the parties think they want

11  to head today by way of kind of just a summary and then make

12  a determination if that seems appropriate or not.  In terms

13  of timing, we're sitting here at about 12:43.  I need to be

14  done at about 4:20, no pun intended based on the timing

15  announced, and if we don't have to use all that time, that's

16  fine.  If we need more than that, we'll address that at a

17  later point in time.

18         But let me start with the plaintiffs, since

19  essentially the burden is theirs.  If you could give us about

20  a five-minute summary of where you think we're going today.

21         MR. MATT FERGUSON:  Your Honor, Matt Ferguson.

22         THE COURT:  Sure.

23         MR. MATT FERGUSON:  Just a couple of questions of

24  physicality of the courtroom.  Mr. Meade is going to use the

25  boards.  Can he talk off the witness microphone?

7

1           THE COURT:  We'll try.

2           MR. MATT FERGUSON:  Okay.

3           THE COURT:  And I have no problem with that, from a

4    procedural perspective.  It's more of an issue if we're

5    getting picked up, I'll tell everybody.  We got a new -- all

6    of the Colorado courtroom suites are getting kind of rolling

7    changed.  Ours was changed about a week ago, so we're still

8    kind of getting used to it a little bit.  So Ms. Barnes is

9    checking the audio feed probably more than she normally does

10   just because we're nervous, we want to make sure we're

11   getting it.  So if we're not picking something up, we'll let

12   you know.  But from a perspective, do I care if you're up

13   here talking? I don't care at all.  It's more I just want to

14   make sure everybody is getting picked up on the audio.

15          MR. MATT FERGUSON:  And in terms of myself and

16   other counsel speaking, Mr. Masters and Mr. Marx, do you want

17   us here or going up and down?

18          THE COURT:  You've got all your stuff there.

19          MR. MATT FERGUSON:  Okay.

20          THE COURT:  Let's make life easier and just stay

21   there.  Okay.

22          MR. MATT FERGUSON:  All right.  Your Honor, Matt

23   Ferguson again for plaintiffs.  I'll be three or four

24   minutes, not five.

25          As you can see before you, you have four law firms

8

1   here that represent the owners of 230 units.  That represents
2   230 families, 400-plus spouses and husbands.  We thought it
3   was very important to be here on these pretty momentous
4   motions.  You know, I've circled and read here a moment ago
5   my federal rules, Rule 1, which is, as Your Honor knows, it's
6   a just and speedy, inexpensive resolution of litigation and
7   that's what we're here about.  And it's to apply to every
8   case; not just some cases, every case.  And it has not been
9   followed here.
10          We're 41 days away from this case being three years
11  old.  December 31, 2018 it was filed, and we are still here
12  because of -- in large part, because of what you'll here
13  today from Mr. Meade.
14          There are two motions being heard, as Your Honor
15  has mentioned.  We call one of them the affiliation agreement
16  motion, which is the first one that was filed at 223.  And,
17  Your Honor, this is a document that we're talking about.
18  It's an exhibit to Mr. Reiser's affidavit in the initial
19  motion.  It's a key document in the case.  We're not here
20  about a missing e-mail or anything like that, we're talking
21  about core documents.
22          The other document -- the other motion is we call
23  the APCO motion.  APCO was a company that did survey work at
24  the critical junctures in this case, very, very germane to
25  all the pleadings, motions, evidence, discovery.  And I'll

9

1    have, as you can see, Exhibit 3 and Exhibit 2 to my affidavit

2    on those.  These are -- these are the key documents.  These

3    were withheld and you'll hear about that.  Not only were they

4    withheld, but 48 other documents were withheld and produced

5    in June of this year, June 29, I believe.

6           So you'll hear about the affiliation motion and the

7    APCO motion; they're consolidated here, because they

8    basically overlapped.  As we were getting ready to oppose a

9    sur-reply, we got these -- we got this information about the

10   APCO withholding and concealment of documents.

11          There is another motion that's hung out there, Your

12   Honor, and it has never had to be decided, but it's very

13   telling.  It's the first motion to compel.  And for discovery

14   sanctions, it had to deal with four or five subpoenas that

15   were ignored from November.  It took that motion and numerous

16   status reports, numerous conferrals and -- to get the

17   documents generally produced.  And those documents subpoenaed

18   in November of 2017 were finally all produced, according to

19   defendants, around July 9 of -- or July 10, a day or two

20   before -- the day we met with Your Honor last in this

21   courtroom.

22          Your Honor, the motion papers that are before you,

23   there are the APCO motion.  Attached to those motions, the

24   affiliation motion, is the Reiser affidavit.  Michael Reiser

25   is sitting here across from me.  He goes through in detail

1    the history of the discovery in this case.  He goes through

2    the history of this document and finally it being turned over

3    and its impacts on the litigation and impacts on the

4    pleadings and the Court's ruling, Judge Brimmer's ruling.

5            With respect to the APCO sanctions motion, that is

6    supported by my affidavit.  And I, likewise, go through the

7    history of the discovery relevant to that -- to those

8    documents and why they were not -- why they were not produced

9    and how I discovered they were not produced.  It's also

10   supported by Ms. Lam's reply affidavit, and its opposed

11   affidavit in Mr. Marx and Ms. Meiser (ph), the contract

12   lawyer firm that was doing the document production review in

13   this case.

14           So, Your Honor, we're not going to go through my

15   affidavit, Mr. Reiser's affidavit in any detail.  They're --

16   they're not too long; we hope the Court reads those.  You

17   said you've looked through the documents, but in order to

18   save time, we would ask the Court to focus on those and that

19   would -- we would avoid going through those.

20           Mr. Meade will argue the motion initially, the law

21   and the facts.  He will do a presentation of the history of

22   discovery in the context of both the APCO documents and the

23   affiliation agreement that wasn't produced.  He is going to

24   use these charts.  We decided to go low tech, Your Honor,

25   because we're low tech people, at least the old guys here.

11

1         Mr. -- myself will go through a timeline of the

2    case -- of the key evidence in the case to show why these

3    documents were critical to the substantive part -- the

4    substantive evidence in this case and why it was so important

5    that they should have been produced.  And I'll go through

6    that and I'll go through that timeline.  And then I'll also

7    finally discuss the impacts this liti- -- the impacts these

8    discovery abuses have had on the litigation, on the

9    litigants, on the Court, and on the counsel at this table.

10         So with that, I'll turn it over to Mr. Meade.

11         THE COURT:  Before you do --

12         MR. MATT FERGUSON:  I'm sorry.

13         THE COURT:  -- do you have a -- I'm just flipping

14    through it and I don't see it here.  My recollection was the

15    motion to compel was withdrawn or struck or something of that

16    nature.  Do you happen to have the filing number on that

17    original motion?

18         MR. MATT FERGUSON:  Yeah, I do.  It's behind me,

19    Your Honor.

20         THE COURT:  And we can get that at a later time.

21         Go ahead, Mr. Meade.

22         MR. MATT FERGUSON:  I will say, Your Honor, in

23    connection with that, we resolved it after several months of

24    practice, but there is still -- we've left open the sanction

25    of fees on that -- on that matter, but we thought it would be

1   subsumed, in some degree, in these two motions.

2          THE COURT:  So Mr. Meade, are you intending to go

3   right into your presentation or just give me a summary?

4   Because I want to get a summary from both sides.

5          MR. MEADE:  I was going to say that I'm happy to

6   wait until the other side gives a summary.

7          THE COURT:  Okay.  All right, for the defense.

8          MR. MASTERS:  Thank you, Your Honor.

9          Well, of course, the defense sees this case a

10  little bit differently.  There was not intentional

11  withholding or concealing of the documents.  And during our

12  presentation, I expect to walk through what the documents --

13  what these documents really are, what happened, what their

14  effect is on the case to show that there really is no

15  prejudice to the plaintiffs as a result of this delayed

16  disclosure.

17         This isn't a case of documents that were destroyed

18  or lost and gone forever.  It's not a case where the Court

19  issued an order compelling discovery and then the defendant

20  failed to comply with that.  This is a matter of we

21  discovered that documents that should have been produced were

22  not produced and then we produced them.  And so that will

23  be -- that's what we would walk you through.

24         There may be some times when we get into the

25  technical background about exactly how some of these things

13

1   occurred, but I may call on Mr. Marx to fill in some of the

2   details.

3           THE COURT:  Okay.  All right, thank you.

4           Mr. Meade, then.

5           MR. MEADE:  Thank you, Your Honor.

6           We know that you have lived with this case for some

7   time, but it's also a complex case, and we've talked about

8   various affiliation agreements, and it gets quite confusing

9   because there are a few of them.

10          My first graphic, very high-tech graphic here, I

11  managed to do it in a few different colors.  I thought it

12  would be useful to start here to talk about the different

13  affiliation agreements so we can distinguish them, if that's

14  helpful.

15          THE COURT:  Absolutely.  Let me stop.  Are we

16  picking up enough feed?  Okay, go ahead.

17          MR. MEADE:  Well, at the top we have the

18  Association in the green circle, and the Association, there

19  is an arrow dropping down to a circle that says:  RC

20  Management.

21          When this development was set up, the developer had

22  the Association delegate most of the Association's

23  responsibilities to RC Management.  RC Management, in turn,

24  entered into an affiliation agreement with Cobalt.  These are

25  both Marriott entities.  That is the affiliation agreement

14

1    that was attached to the purchase contract.  So our clients,

2    when they purchased, they saw this affiliation agreement

3    here.

4              That affiliation agreement is significant because

5    it says, arguably, that Cobalt has sole discretion to enter

6    into affiliations with other clubs.  And, in fact, until

7    March of 2018, it was thought by everyone that this is the

8    governing affiliation agreement; this is the agreement that

9    creates the merger with the Marriott Vacation Club.

10             But there are two other affiliation agreements.

11   There is a 2010 affiliation agreement between Cobalt and Lion

12   and Crown.  That -- in that agreement Cobalt says to Lion and

13   Crown, you can affiliate with other external entities.  That

14   was produced in discovery early on; we have it.  We didn't

15   quite know what to make with it.  We thought it had something

16   to do with an earlier affiliation with Abercrombie and Kent,

17   but we got those -- both of those affiliation agreements.

18             What we didn't get is the 2013 affiliation

19   agreement, and that's between Lion and Crown and Marriott

20   Resorts Travel Company.  We didn't get that until March of

21   2018.

22             Now, why is that important?  Well, if you look at

23   the affiliation agreement between RC Management and Cobalt,

24   one might conclude -- in fact, several courts have

25   concluded -- that Cobalt gets to make the decisions about

1   affiliation; the Association has no role.

2        Well, when you look at the affiliation agreement

3   between Lion and Crown and MRTC, you see that the affiliation

4   with Marriott Vacation Club is agreed to among these Marriott

5   entities -- and all these blue circles are Marriott entities.

6   But the way they wrote that last 2013 affiliation agreement

7   is it wouldn't apply to a particular club, unless the

8   association board of that club signed an acknowledgment and

9   joinder in the agreement.  And so that -- that's the

10  foundational information that we need.

11       So in the box at the lower left side of the 2016

12  slide -- I've covered most of these points, I'll just focus

13  on the last one.  The problem here is that until March of

14  2018, everyone believed that the affiliation agreement that

15  governed provided that Cobalt had sole discretion.

16       Now I'll walk through some of the details in

17  explaining why that's so important to this case.  Before I

18  do so, I want to pause one moment and mention one case, which

19  I think is a key case to keep in mind in addressing this

20  motion.  It's the Cocina case.  It's a district court

21  decision out of the Southern District of Florida.  The cite

22  is 2012 Westlaw 3202273.

23       THE COURT:  Sure.  And I read the Cocina case over

24  the weekend.  That was the case having to do with (inaudible)

25  law firm.

1            MR. MEADE:  Correct.  But the part of that decision

2    that I think is most important for our discussion here today

3    appears at page 3.  And the Court there quotes an Eleventh

4    Circuit decision called Byrne, B-Y-R-N-E, and here is the

5    quote.  I'm going to admit a few words.

6            Without a smoking gun, a district court makes a

7    determination of bad faith by drawing inferences from the

8    conduct before it.  And that's why we have these three charts

9    here, because we don't have a smoking gun, per se.  What we

10   have is a lot of very troubling circumstances, and so we've

11   got to look at all those troubling circumstances.

12           What I've done here is I basically have three

13   timelines.  The top timeline in blue are the relevant

14   pleadings.  The timeline below that, and it's circles -- it's

15   squares in orange and red and yellow, that's the discovery

16   timeline.  Down below at the bottom we have the depositions

17   that were taken, and that's, of course, critical for

18   assessing prejudice in this case.

19           So let me begin at the top line.  We're at the 2016

20   slide.  The first amended complaint alleges that Marriott

21   defendants are vicariously liable for the Association's

22   breach of fiduciary duty.  Because of that, in the motion to

23   dismiss that the Marriott defendants filed, they begin, and

24   they said, Look, we have to address the Association's

25   liability because it's alleged we're vicariously liable for

17

1    the Association's breach of fiduciary duty.

2              They then focus on the two thousand -- the

3    affiliation agreement that was attached to the purchase

4    contract, the one that says Cobalt has sole discretion in

5    matters of affiliation.  And they argued -- and this is the

6    second box there on the 2016 slide -- quote:  The Association

7    did not breach any fiduciary duty to plaintiffs because, one,

8    it did not affiliate the RC Club Aspen with MVC, which is the

9    action about which plaintiffs complain, nor could it have

10   done so because such affiliation was not within its power.

11             What they're saying there is that affiliation

12   agreement attached to the purchase contract, the one that we

13   thought governed, it has language saying Cobalt has sole

14   discretion to affiliate.  So they based their motion to

15   dismiss on that.

16             Now, there are a few other complaints filed and so

17   the motion to dismiss that was actually ruled upon was not

18   filed.

19             Now, we switch over to the 27 -- 2017 slide, that

20   first small box.  It was filed on 4/14/17.  It's the same

21   argument.  And in my slides here, I actually cite to the ECF

22   docket number so the Court can follow.  So they reiterate

23   that same argument.

24             The next big box there, still in blue, up on the

25   217 slide, we're shifting over to the Petric case.  And we're

18

1    doing that for a reason, because the fraud that was committed

2    here, Your Honor, was not just committed in this courtroom.

3    The same argument was made in the Petric case, in state court

4    in California.  And the exact same argument was made in the

5    Riser (ph) case involving a Tahoe property in federal court

6    in Sacramento.  I don't even mention the Riser case on this

7    slide because it -- as you can see, it's already too

8    cluttered.

9             But let's talk about the Petric motion to dismiss.

10   In essence, they made the same argument in Petric.  The

11   second bullet point:  The affiliation agreement makes clear

12   that all important discretionary decisions, including

13   affiliating with new membership programs, EGMVC, are made

14   solely by the program manager, i.e., Cobalt.  The governing

15   documents expressly provide that the RCCSF Association has no

16   authority to participate in approval or object to Cobalt's

17   decision.

18            So they make the same argument in all three cases.

19            What happens in 2018?  We're now in the blue box,

20   the first blue box on the 2018 slide.  Something truly

21   remarkable and actually truly terrifying happens here.  The

22   Court -- the state court presiding over the Petric case

23   dismisses all breach of fiduciary duty allegations.  Other

24   important findings remain, but all of the breach of fiduciary

25   duty allegations are dismissed by the Petric court.

1          Quote:  The relevant fiduciary duties here can only

2     extend to decisions for which the association is responsible.

3     Where an association possesses no decision-making authority

4     over the alleged wrongful acts, no fiduciary duty can have

5     been exercised and no breach of fiduciary duty can be

6     successfully alleged.

7          In other words, based on the affiliation agreement

8     attached to the purchase contract, they obtain a dismissal of

9     claims in Petric, and then they come to this Court, February

10    22, 2018, notice of supplemental new authority.  It's ECF

11    Docket Number 191 at page 2.  They ask this Court to adopt

12    the Petric court's ruling.

13         Now, if that is the only affiliation agreement, and

14    if Cobalt actually does have sole discretion, one could

15    understand why they did that, and there might be a legitimate

16    basis for making that argument in three different courts.

17    But as I go through the remainder of the slides, we'll see

18    that what they really did is they buried the most important

19    affiliation agreement, the one that actually governs this

20    affiliation with the Marriott Vacation Club.

21         THE COURT:  Has somebody gone back to Petric and

22    tried to get a reconsideration of that ruling?

23         MR. MEADE:  Petric case is actually in the process

24    of being settled.

25         So I'm now on the orange squares, I'm going to

20

1   follow the discovery timeline.  I'll go back to the 2016

2   slide, and we'll just start at the beginning.  I'm not going

3   to spend too much time on this because none of this is

4   disputed.

5          The Marriott defendants in the Rule 26 disclosure,

6   they indicate they're going to rely on documents relating to

7   the affiliation and agreements relating to the affiliation.

8   No dispute there.

9          Our first request for production of documents,

10  9/8/16, we asked for all documents concerning the affiliation

11  and all documents listed in the Rule 26 disclosures.

12         The next box, the third orange box on the 2016

13  slide, defendants agree to produce all these documents.

14  There is no dispute here.

15         We get to the first failure now.  It's a box in

16  red, and it's November 10, 2016.  Defendants produce just shy

17  of 5,000 pages.  And in that -- in that production -- and we

18  could look to Mr. Marx's declaration to know what they

19  intended.  What they intended was to produce all the

20  governing documents.  And they produced 4,7 -- 871 pages, but

21  they don't produce the 2013 affiliation agreement.

22         Now, this Court's task is going to be:  Is that

23  intentional or is that mistaken?  And in the -- in the Cocina

24  case, of course, there were protestations, Hey, these were

25  innocent mistakes, you should not sanction us.  Of course, it

1   resulted in a -- in a terminating sanction and a very

2   significant liability in the tens of millions of dollars.

3         THE COURT:  Sure.  Did this distinguish Cocina?

4   Because I'm sure there is going to be an issue as we go

5   along.  That was a case, kind of -- this case that's been

6   going on for a long time, but that's the case that got to and

7   through trial in which there had been some warnings and other

8   things of that nature as the case went along that it doesn't

9   appear there have been here but you'll have to address,

10  because I have no doubt defendants are going to address that

11  from that perspective as we're going along.

12        MR. MEADE:  And I think they will, but I guess what

13  I would submit, Your Honor, as we go through these three

14  slides, one would see plenty of other indicators of

15  intentionality or at least recklessness.

16        So continuing on this sort of second line of boxes,

17  shifting over to the 2017 slide.  Around this time defendants

18  asked this Court to stay discovery until the motion to

19  dismiss was decided.  In other words, to avoid any scenario

20  where they might have to produce the 2013 affiliation

21  agreement that contradicts the argument that they make in

22  their motion to dismiss.

23        I want to say one thing there.  We think that the

24  2013 affiliation agreement flatly contradicts the argument.

25  I think that the defendant has an argument that, Well, it

1   doesn't really mean what plaintiffs say it means.  That

2   doesn't matter, that debate, because I think we can all agree

3   that it is extremely relevant evidence that the associations

4   actually did have a say, effect a veto power over the

5   affiliation at their clubs.  We may not be right about that;

6   I think we are.  But at a minimum, it's highly relevant

7   evidence of that.  It's the evidence we need to make that

8   argument in front of this Court and it was deprived from us.

9            In any event, the Court denied the motion to stay

10  discovery until the motion to dismiss was -- was decided.

11           What we have, this box here, defendants failed to

12  produce any documents for more than seven months.  I will

13  tell you, Your Honor, during this time, we are kicking and

14  screaming trying to get the discovery rolling in this case.

15  And the reason is, if you look at Docket Number 60, it set a

16  close of discovery of August 25.  I have a little red line on

17  these timelines to indicate the various closes of fact

18  discovery.

19           In any event, they wait until -- they don't -- they

20  begin what they describe as a rolling production on

21  6/15/2017.  This is the -- the green -- excuse me, the orange

22  slide, the orange box in the middle of the 2017 slide.  This

23  is where things get real dicey.

24           The next box is red, 8/4/17.  Defendants state the

25  Marriott defendants' production of documents in these matters

1   is substantially complete, though there may be some

2   additional documents that the Marriott defendants ultimately

3   produce.  So that is at the end of August.  We're about to

4   hit a close of discovery.  We jointly come into this Court

5   and get it extended to December 15, but we still have to take

6   documents.  We are really up against it here.

7            And we have a statement by the defendants that's

8   equivocal.  They say, Substantially complete, and they say,

9   We may produce more documents.  So what do we do?

10            And this is the next box.  We make four written

11   demands for confirmation that they have produced all relevant

12   documents.  Because from the start of this process we said to

13   defendants, Look, we will work with you to make discovery

14   more efficient.  We'll take one deposition across all three

15   cases, we'll agree to search terms.  But what we won't agree

16   to is a rolling production that remains open.  When we take

17   depositions, we need to know we have all relevant documents.

18   And we made the demand four times in writing for a firm

19   statement, not this equivocal:  Substantially complete, we're

20   going to produce more stuff.  They didn't respond.

21            We get to the next box in red, 11/28/17.  At this

22   point defendants agree that, to the best of their knowledge,

23   they have produced all responsive documents that are not

24   privileged with the exception of some plaintiff-specific

25   documents that will be produced shortly.  And I'll just

24

1    direct Your Honor's attention to the small red box below

2    that.  They do make a production of plaintiff-specific

3    documents on December 10, 2017, but we are up against a close

4    of discovery of December 15.

5            And so once we got -- once they didn't respond to

6    our request for confirmation they produced all documents, we

7    had to get started on depositions.  And so we now have the

8    boxes in green at the bottom of this 2017 slide.  We took 12

9    depositions, hoping we had all responsive documents, taking

10   it -- taking the defendants at their word that they really

11   had produced basically everything.  We didn't get the

12   confirmation of that, but we had no choice, we had to get

13   started.

14           Let me say a few words about these depositions.

15   The witnesses in this case are all around the country, New

16   York, Orlando.  We cannot compel them to come here and

17   testify.  So these are videotaped depositions in which we

18   premarked 1500 exhibits and we had screens in the court -- in

19   the conference room where we could talk about the documents.

20   We spent an incredible amount of money in travel and

21   technical expenses for these depositions, knowing that when

22   this case goes to trial, I can't compel them to bring their

23   witnesses to court.  These depositions are it.  Tens of

24   thousands of dollars were spent on these depositions.  This

25   is the heart of the deposition discovery in October, November

1   and December of 2017.

2          Well, let's switch to the 2018 slide.  What do we

3   learn?  The first red box on the 2018 slide is dated 3/12/18.

4   Mike Reiser discovers the 2013 affiliation agreement.  Let me

5   tell you how he discovers it.

6          I told you in my little handmade slide that the

7   2013 affiliation agreement is between these two Marriott

8   entities, Lion and Crown and Marriott Resorts Travel Company,

9   and it provides that the merger with the Marriott Vacation

10  Club has no effect in a particular club, unless the

11  association board of that club signs an acknowledgment of and

12  joinder in the affiliation.

13         So there is really two separate documents.  There

14  is the 2013 affiliation agreement that says it's not going to

15  apply to a club, unless the board agree to it.  And then

16  there is an addendum.  And one thing that's undisputed here,

17  Your Honor, is that the Marriott defendants showed the boards

18  in the various clubs only the acknowledgment of and joinder

19  in the 2013 affiliation agreement, and it's variably

20  preworded (ph).

21         What they were doing, Your Honor, is they were

22  getting cover.  They knew -- as we'll talk about in a moment,

23  they knew that this merger with the Marriott Vacation Club

24  was deeply troubling.  They had received letters from

25  attorneys hired by three different boards saying, If you do

1    this, you will be breaching fiduciary duties.  And they

2    needed some cover to make -- to achieve their business, if

3    you will, of merging these two clubs.  So they created this

4    document that they kept secret from all the boards, and then

5    they had the boards just sign a separate document, an

6    acknowledgment of and joinder in the affiliation.

7             And I've read that document multiple times and it's

8    incredibly difficult to understand, but the bottom line here

9    is they hoodwinked the boards.  They got them to sign the

10   document without letting them know that they could have

11   actually stopped the affiliation at their club.  And this is

12   true in Aspen, this is true in San Francisco, this is true in

13   Tahoe, and other clubs.

14            In other words, they hid -- this scheme that we're

15   talking about began even before this litigation.  They hid

16   the relevant document from the boards because they didn't

17   want the boards to know they could stop the affiliation.

18   They hid it from three courts.  This one, the state court in

19   San Francisco and the federal court in Sacramento.  And they

20   hid it in discovery in three different cases.

21            Now, to be sure -- and defendants are represented

22   by capable counsel.  He will stand in front of you and say,

23   You know what, this 2013 affiliation was mentioned a few

24   times.  And that's true.  There are a few places that mention

25   the 2013 affiliation.  And if we had perfect vision in a case

1   where they produced 80,000 pages, if we had perfect vision in

2   that case, maybe we would have made the request for it

3   earlier, maybe we would have seen it earlier; but the

4   obligation of these lawyers is to produce the relevant

5   documents.  And as we're trying to deal with various

6   discovery disputes and understand 80,000 pages, to say that

7   just because there was mention, no harm, no foul, they get to

8   withhold it, that's not what the law is.

9           In any event, March 12, 2018, Mike Reiser focuses

10  on this agreement, and he e-mails Ian Marks, Mr. Marx.  He

11  says, What is this?  Where is this?  You never produced it to

12  us.  Ian Marks gives conflicting -- well, he sends it the

13  next day, within a matter of hours, and I applaud him for

14  that.

15          THE COURT:  Sure.  And I suspect they're going to

16  address this.  So isn't that specifically different in Cocina

17  in that they said it -- again, in Cocina they said, We don't

18  know what you're talking about, and didn't give it up.

19          MR. MEADE:  Yeah, I will.  I think that the indicia

20  of intent in Cocina is radically different from this case.

21  And if you were to isolate on that only, that's a very

22  material difference between the two cases.  I think -- as I

23  finish my presentation, which I'll try to wrap up quickly, I

24  think you'll see that there are many other extremely

25  troubling indications of malicious intent or absolute minimum

1   bad faith or recklessness.

2          Okay.  So -- and we get to one of them right here.

3   March 15, 2008, Mr. Marx disavows any claim of error, writing

4   it in e-mail, We produced all the agreements you requested.

5   He's implying there that we never requested the 2013

6   affiliation.  That's his first explanation.

7          He changes his tune -- by early April he changes

8   his tune.  Quote:  On review, it appears we were in

9   possession of the 2013 affiliation agreement before the time

10  we made our initial production on November 10, 2016, but did

11  not realize it was not produced in our production that day or

12  thereafter.

13         Here we have to go to another part of the Cocina

14  decision.  The judge writes:  I will note at the outset that

15  it is difficult to accept that it was a mere coincidence that

16  the late productions on the eve or during trial -- that it

17  was a mere coincidence that these documents contained highly

18  relevant documents.

19         It's an awfully troubling coincidence that a

20  document that directly contradicts motions to dismiss in

21  three different cases is not produced until we make a demand

22  for it.

23         So is that enough for intentionality?  I think so.

24  But even if it's not, there is much more to this story.

25         I'm going to go back to the 2016 slide.  Request

1   Numbers 2 and 3 also request internal analysis and feedback

2   from members.  They agreed to produce those.  In fact, they

3   produced a spreadsheet.

4          I'm now at Box 6/29/17 in yellow, 2017 (inaudible).

5   defendants produced Deposition Exhibit 1266.  It's sort of

6   raw data from the APCO documents of raw responses.  We don't

7   know what to make of it.  APCO isn't mentioned, it's hard to

8   understand.  But it's clearly, we learn later, related to

9   APCO.

10          If there is any doubt about us requesting the APCO

11   documents, it's resolved on 9/21/17.  This is the next yellow

12   box.  That's plaintiff's Request for Production Number 3,

13   Request Number 34 seeks all consultant reports regarding the

14   affiliation.

15          It's interesting, the next box is in red and that's

16   because defendants simply do not respond to our third request

17   for production.  We gave them a one-week extension.  They

18   didn't produce it.

19          The next box, the last box in yellow on the 2017

20   slide, 12/12/17, that's a really important document because

21   it is a very lengthy meet and confer letter in which we

22   complain about many things.  It's a great -- it sort of

23   catalogs all the discovery disputes that we were trying our

24   best to manage.

25          At the end of it we say, We don't think you've

30

1      produced all the documents, including feedback, concerning

2      the decision to affiliate.  I have the cite right there.

3              Well, it's undisputed that the Marriott defendants

4      didn't produce any of the APCO documents.  We subpoenaed APCO

5      on April 26, 2018.  Three days later, Ian Marks writes a

6      curious e-mail.  He says:  Production of APCO documents could

7      be resisted on attorney/client and work product privileges.

8      He is sort of suggesting, giving an explanation in advance as

9      to why they didn't produce the APCO documents.

10              It's a very odd e-mail, and I think when you read

11     it in context of his other conflicting statements, I think it

12     shows that he knew he had a problem at that point.  He knew

13     he should have produced the 2013 affiliation agreement.  He

14     knew he had provided conflicting explanations.  He knew we

15     were moving in this court for sanctions and he had a problem.

16     So he is trying to offer a potential explanation.

17              On May 30, 2018, this is the other yellow box on

18     the 2018 slide, APCO produces dozens of documents.  I think

19     there was like 48 -- well, is it 256 pages of documents?

20              UNIDENTIFIED SPEAKER:  APCO?

21              MR. MEADE:  Yeah.

22              UNIDENTIFIED SPEAKER:  15,000.

23              MR. MEADE:  Okay.  APCO produces 15,000 pages of

24     documents.  We go to the defendants and say, You've got to

25     explain this.  APCO has all these relevant documents.  You

1   didn't produce them.  They ignore two requests for an

2   explanation.

3          In June at some point, Mr. Marx suggests, Oh, there

4   is no prejudice because you received the raw data, 12666.

5   That's a completely disingenuous statement because we had

6   none of the reports in which APCO says -- Mr. Ferguson is

7   going to address this later, so I won't get into it too

8   deeply.

9          But in short, Marriott hires APCO to understand

10  what -- how members were feeling about the -- about the club.

11  And there is an open-ended question and there was a torrent

12  of opposition to this proposed affiliation and there were

13  reports written on that, reports we know that Marriott had,

14  because on June 29, 2018 they actually produced 256 pages, 48

15  discrete documents, including these reports.

16         So 7/2/18 we get the explanation, and it's in the

17  brief on the APCO motion for sanctions.  The lawyers hired to

18  do the rolling -- the review for the rolling production,

19  mistakenly marked a few documents as:  Nonresponsive.  What's

20  interesting about the Miser declaration is that -- well,

21  first of all, it's not a very good explanation because it

22  talks about two reports.  In one of them it says -- showed up

23  three times, two different reviewers marked it on:

24  Nonresponsive.  And then the 2014 report, another reviewer

25  said it's nonresponsive, but they didn't even begin to

32

1   provide an explanation why the other 45 documents were

2   marked:  Nonresponsive.  Mr. Ferguson is going address the

3   import of the APCO documents in greater detail.

4            I just want to mention that when you go back to the

5   depositions, we asked Mr. Cunningham, during his November

6   2017 deposition -- deposition about 1266, we're trying to

7   make sense of.  He provides basic testimony and we're unable

8   to make sense of it.  We're unable to get to the truth

9   because we don't have all the contextual documents.  We don't

10  have the reports from APCO that says, Your members are almost

11  universally opposed to the affiliation because they believe

12  it's going to dilute the brand and it's going to harm them.

13           We have two major categories of -- of discovery

14  failures, the 2013 affiliation agreement and all these APCO

15  documents, for which there is only a partial explanation

16  given.  But that's not the end of this story, and this is

17  what I find so troubling.

18           Now I'll go below the line on the 2018 slide.

19  Below the orange line, there is a series of red boxes.  One,

20  defendants -- they don't produce a privilege log until

21  January 5, 2018.  If you go back and look at our meet and

22  confer letter, which is ECF Docket Number 223-6, you'll see

23  there all of our efforts to get a privilege log earlier

24  because we want to know that we have all the documents.

25           What they do produce on January 5, 2018, it's 140

1   lines.  It's -- it's almost impossible to get through, and

2   they produce it late.  Almost -- makes it almost impossible

3   for us to test.

4           Now, Mr. Ferguson mentioned the subpoenas in

5   November.  They delayed producing the (inaudible) documents

6   until February.  There was another production on February 12,

7   2018 of documents regarding expenses and revenue for MVP

8   points.  Those were requested well before, but we have a very

9   large box here on the 2018 slide, all in red.

10          After we discovered the concealed 2013 affiliation

11   agreement, defendants make a flurry of productions, it says

12   through July.  It's actually through -- through September.

13   On March 13, 2018, they produce strategic counsel documents.

14   They produce a spreadsheet of sales data.  They produce a ton

15   of Ritz-Carlton Hotel company documents that had been

16   subpoenaed in November and we had to get an order to compel

17   them to produce it.  We list them all here.

18          Mr. Ferguson will speak about the corporate growth

19   committee memos.  Those are some of the most significant

20   documents in the case.

21          And so we have three -- three categories of the

22   most significant evidence in the case that wasn't produced

23   when they said their production was "substantially complete"

24   back at the end of 2017 that they didn't produce until we had

25   spent all that money going down to Florida and New York

34

1    taking these depositions.  They withheld this stuff.

2           And then we get to, you know, as late as September

3    25, 2018, without notice, they produce 223 pages of documents

4    that had briefly been marked "Privileged" and on their

5    privilege log.  Why?  We don't know.  All we know is that

6    this is 11 instances where they produce relevant documents,

7    in many cases, extremely relevant documents, after we

8    discovered that they had concealed the 2013 affiliation.

9           I don't know how a lawyer, with the experience and

10   reputation that's required to be a partner at the Greenberg

11   Traurig firm, I don't know how you could innocently,

12   mistakenly fail in so many respects in a way that harmed us

13   so deeply.  This is intentional or reckless, it doesn't

14   matter.  They thwarted our ability to prosecute this case.  I

15   won't go into it too much on this as Mr. Ferguson is going to

16   address the prejudice.

17          And I thank you for your time.

18          Do you have any questions about what I covered

19   here?

20          THE COURT:  The one question I had, you didn't

21   address the California federal court case in terms of status,

22   and maybe Mr. Ferguson is intending to address that, but just

23   briefly, what's the status of that case?

24          MR. MEADE:  There -- and this is in the public

25   record, that there is a settlement has -- getting -- a

1    settlement has been reached.  It's in process, I would say.

2              THE COURT:  So both the federal case and the state

3    case have been processed some sort of settlement?

4              MR. MEADE:  That's correct.

5              THE COURT:  Okay, thank you.

6              MR. MEADE:  Thank you, Your Honor.

7              THE COURT:  All right, Mr. Ferguson.

8              MR. MATT FERGUSON:  Yes, Your Honor.  May I

9    approach, Your Honor?

10             THE COURT:  Absolutely.

11             MR. MATT FERGUSON:  As per Mrs. Barnes' request, I

12   have this on 8 1/2 by 11, Your Honor.

13             THE COURT:  I appreciate that very much, thank you.

14             And has the defense been provided a copy of this as

15   well?

16             MR. MASTERS:  Yes, Your Honor.

17             MR. MATT FERGUSON:  Your Honor, what I wanted to

18   address, you've asked --

19             THE COURT:  Let me stop you for just a moment, just

20   for recordkeeping.

21             Is there anything else marked or should we just

22   start marking Plaintiffs' 1 for kind of the combined colorful

23   chart and Plaintiffs' 2 for the document that we just

24   received?  I don't know if anybody intends to admit it, but

25   it's certainly here.  I think it's marked yet, otherwise.

36

 1          MR. MATT FERGUSON:  No, Your Honor.  In fact, I was
 2   going to ask if you would prefer that we put it all in a
 3   declaration or we could mark them here.
 4          THE COURT:  Let's mark it and do it here.  So I'll
 5   make Plaintiffs' -- or I'll just do a combined exhibit.  We
 6   won't do plaintiffs and defendants because that's a hassle.
 7   So Exhibit 1 is going to be -- unless Mr. -- unless the
 8   defendants have their exhibits already marked.  Do you all
 9   have anything marked yet or can you wait and hold off and
10   we'll --
11          MR. MASTERS:  We can hold off, Your Honor.
12          THE COURT:  So Exhibit 1 is going to be the
13   colorful chart.  Exhibit 2 will be what I just received,
14   which is essentially two-page 8 1/2 by 11 of foam board chart
15   that Mr. Ferguson was about to refer to.
16          All right, go ahead.
17          MR. MATT FERGUSON:  Your Honor, I wanted to address
18   the questions you've asked two or three times now, which
19   is -- which is about the Cocina case and what was going on
20   there.  Was the conduct worse there than it is here.  Mr.
21   Meade has gone through that.
22          But what I really want to focus the Court on is
23   this:  It is far worse, it's worse because of this.  The
24   affiliation agreement that was withheld, the bubble on the
25   MRTC affiliation agreement that was first put up, was

1    withheld, not from only us in 2016, '17 and '18, it was

2    withheld from three boards.

3            The testimony in this case is that Mr. Mercer, the

4    president of our association that represents us, our

5    plaintiffs, 230 of them -- 230 owners or 400 people and the

6    other owners, testified that he had never saw it.  It was

7    never given to him.  When we asked a vice president that was

8    in charge of the situation, Ms. Soback:  Why did you have him

9    sign this document and not give it to him to read?  He's

10   joining something, why aren't you asking him to read?  Why

11   aren't you giving it to him?  And their answer was, and

12   you'll see it in Mr. Reiser's affidavit:  Well, he didn't ask

13   for it.  Did your in-house lawyers -- they have a team of

14   lawyers, Ms. Barbara Egoff (ph), did they give it to

15   Mr. Mercer or his lawyer?  Well, I don't think so.  They

16   didn't ask for it.

17           So they didn't want these people to see this

18   document.  Some of the reasons were that they didn't know it

19   was for ten years that the affiliation would last that long.

20   So they -- what they actually did was, they negotiated this

21   memorandum of understanding -- and I'll show you this chart

22   in a minute.  A memorandum -- this is 2014.  They negotiated

23   this 2014 memorandum of understanding, which is basically --

24   Ms. Sobeck testified to it, it was really kind of

25   meaningless; it was just a -- it was an aside.

1          And so the Association thinks that they're

2    negotiating something very important, they're joining and

3    acknowledging the agreement that was not produced, the

4    2000- -- the 2013 affiliation agreement.

5          When Mr. Reiser took the depositions of folks that

6    control the boards in San Francisco and Tahoe -- those were

7    actually still employees at that time of Marriott.  They

8    still controlled those boards.  When they were shown that

9    affiliation agreement that they acknowledged and joined in

10   2014, just like Mr. Mercer:  I've never seen this, I've never

11   seen this.

12         So those documents -- that's why this is a worse

13   situation.  The documents were withheld from the boards.  Is

14   it a coincidence they were withheld in this -- in three

15   cases?  I doubt it.

16         Not only that -- and I pulled the case of nine

17   frauds or 18 frauds, 18 lies.  You've got the affiliation

18   agreement withheld from three boards, maybe St. Thomas, which

19   would be another one.  We have it, as Mr. Meade has shown

20   you -- we've shown you in three motions to dismiss, they

21   called it the (inaudible) in California.  It's put forth, the

22   Cobalt affiliation agreement is put forward as the device by

23   which they could have the sole authority to do this

24   affiliation.  It was withheld from three courts and it's

25   withheld in three cases.

39

1          Now, we did the right thing here, Your Honor, as

2     plaintiffs.  We decided to do three cases together, do the

3     depositions in a group.  We didn't take -- we didn't have to

4     take the depositions in three cases.  We tried to do the

5     right thing.  And guess what, the plaintiffs answered 230

6     sets of requests for admissions from two parties, two

7     requests for production of documents from the HOA.  We did

8     the work.  Interrogatories, the same thing.  If they wanted a

9     deposition of people, we gave that to them.  We played by the

10    rules.

11         And so three times the affiliation agreement was

12    withheld from the boards.  Three times it was not presented

13    to this Court in motions to dismiss and three times it was

14    withheld in discovery.

15         And the same is exactly true for the APCO

16    documents.  That survey is done -- and I'll show you this

17    timeline in a moment, Your Honor.  That survey -- the

18    critical part of this case is, basically starts, I guess it's

19    as good a time as any to do it.  It starts in two thousand --

20    late 2011 when Marriott International, the big -- when you go

21    check into a Marriott or a Courtyard, that's the company that

22    owned the Ritz-Carlton Hotel brand and it then spun off

23    Marriott Vacation Club.

24         And what did they spin off?  They spun off Marriott

25    Vacation Club point system and the Ritz-Carlton Club system

40

1    that we -- that we now represent, the folks that are members

2    of those, of those clubs.  They spun those off, and

3    immediately they started to start -- the new company started

4    a corporate growth committee.

5          And you'll see in green here, that that committee

6    begins to meet at the new company, new spinoff, as early as

7    December of 2001, and then there is a series of meetings here

8    and then there is a meeting on 5/24/2012.  It's those series

9    of meetings that they decide to do this concept of an

10   affiliation, and that's what's discussed.

11         THE COURT:  So we're clear for the record, you said

12   December 2001, but the chart said December of 2011.

13         MR. MATT FERGUSON:  I'm sorry, 2011.  I'm sorry, I

14   misspoke.

15         THE COURT:  No problem.

16         MR. MATT FERGUSON:  So now there is a spinoff.  And

17   this period of time is when there is planning the affiliation

18   that we're now -- that is now finally effective in 2014.

19         Those green documents that we got to a key point in

20   time were withheld.  Not until Mr. Reiser e-mailed Mr. Marx

21   February -- sorry, March 12 to 13 -- it's (inaudible)

22   affiliation agreement, it comes over the -- within a matter

23   of hours.  I mean, literally, it's 12 hours.  Oh, it's right

24   here.  It's right in his back pocket, right in Marriott's

25   back pocket.  It comes over in the morning.  Mike was up

1    late.

2           A couple days later, or a few days later, we get

3    these corporate growth documents.  I don't know if you

4    remember these documents, Your Honor, but these are the

5    documents that were page after page after page after page

6    blanked out.

7           THE COURT:  I do.  I ordered production of those.

8           MR. MATT FERGUSON:  Exactly right, Your Honor.  And

9    where we were during that period of time, we were down in

10   Orlando for our third trip to take -- take the deposition of

11   Mr. Weiss (ph), the CEO.  They tried to avoid his deposition.

12   Your Honor ruled on that also.

13          We are down now in Orlando to take the -- retake

14   the deposition of Ms. Sobeck and Ms. Cunningham -- and

15   Mr. Cunningham.  He's the senior vice president -- he's the

16   chief operating officer; she's the vice president and the

17   CEO -- and we are -- we are not seeing these documents.  And

18   those depositions go by -- we don't get -- we don't get to

19   use these documents at their depositions.  We get the -- we

20   get the blacked-out ones, and I think finally they were

21   produced in an unredacted form.  But this is one -- gray is

22   one category of documents that were not produced, and that's

23   pretty critical.

24          And it also -- we focused on APCO, we focused on

25   the affiliation agreement, but that's another important

42

1   point.

2           What we also see on this timeline is right about

3   here, on the summer of 2012 is when they announce this

4   affiliation.  They're going to -- they're going to affiliate

5   the clubs.  It's going to be all great, you're going to do

6   all these wonderful things.  Mr. Cunningham follows it up.

7   And our board -- I'm not going to focus on the other

8   boards -- say, you know, they object vociferously.

9           In this column here, in blue, that's the

10  affiliation agreement that we're here talking about.  It

11  starts to get drafted, as far as we can tell, in April 3,

12  2011.  And how do we know that?

13          Because after the affiliation agreement is produced

14  by Mr. Marx on March 13 or 14, whatever it was when he was in

15  his hotel room.  After that, on April 6, we get an eight-page

16  privilege log.  That privilege log has to do -- and there is

17  eight or nine entries per -- you know, e-mail draft, e-mail

18  draft going between four, five, six executives; four, five

19  in-house lawyers working on this affiliation agreement, okay.

20  That's another -- that's not a coincidence.  They withheld

21  the documents and they did not bother -- or they withheld the

22  actual privilege communications about it.

23          And guess what, Your Honor?  We still don't have

24  these communications, and we should.  We don't have the

25  drafts and every communication regarding it has been

43

1    withheld.

2           This is no joke, Your Honor.  There are five or six

3    executives, Sobeck, Cunningham, Rossi, Martin, Babich; there

4    are lawyers, Egoff, Hunter, Berkholder (ph), all working on

5    this affiliation agreement.  And they stop, right about here

6    is when they get -- in late 2000- -- late summer of 2012 is

7    when they get a lot of pushback.  They get pushback from all

8    the boards.  They get pushback from a lawyer at our club, a

9    Juan Cappello, a former head of the business department at

10   Greenberg Traurig in Florida, at the old Andell (ph) office

11   or Mime (ph) office, maybe.  He says, You can't do this,

12   you're just trying to enrich yourself.  We know what you're

13   doing.  You can't even tell us -- you can't even -- you can't

14   even identify yourself by your proper title to

15   Mr. Cunningham.

16          So you get all this pushback here.  Mr. Mercer is

17   put in place.  He has been there about 12 years now.  He

18   comes online.  You'll see that that affiliation agreement is

19   being drafted and it stops.  It stops at May 30, 2013.

20   Again, we can tell this from the recently produced

21   affiliation agreement.  Mr. Mercer meets with the exec on

22   his -- he meets a little later in the year with Ms. Sobeck

23   and Mr. Cunningham.

24          But before that, the board of our club, that

25   represents our members, hired a lawyer named Phil Gosch from

44

1    Brownstein Hyatt, a capable lawyer that works actually in the

2    hotel industry.  He writes the cease and desist letter.  And

3    he says, What you're doing is a breach of your fiduciary

4    duties.  All right.  And he writes that letter.

5          What also happens is they're getting sued -- they

6    get sued in Hawaii on different theories, but it was a

7    Ritz-Carlton Club there that they pulled the flag on, which

8    means they pulled the Ritz-Carlton name from.  Now litigation

9    is still ongoing now.

10         And they get sued in a case called Hoyt in December

11   of 2012.  So you're getting cease and desist letters from

12   Aspen.  You're getting litigation from the Hoyt cases filed

13   in Minnesota, for some reason.  You have a cease and desist

14   letter from the board at Bachelor's Gulch, which is no longer

15   a club because they voted themselves out.  And I believe you

16   get -- you get litigation -- you get cease and desist letters

17   from St. Thomas and eventually litigation down there.  So

18   they're -- they're -- they're a major pushback.

19         And so what they do -- and Your Honor knows this

20   from the tape of reading Judge Brimmer's order -- is that

21   they -- they come to Aspen and they promise a vote and said,

22   Listen, we hear you.  We're not going to do anything unless

23   the majority of the members vote.  Okay.  Not a survey, not

24   anything like, Give us your opinion poll.  This is a vote,

25   okay.  And the jurors will hear this in Denver some day, but

1    there's a big difference between a vote and a survey.

2          Around the exact same time that they promised the

3    vote -- and I put this as an approximation -- but late --

4    late March or early April, right when that vote promise is

5    being made, think hire a company called APCO Worldwide that

6    has a subsidiary group called APCO Incite.  And what they

7    hire them to do litigation messaging on the Hawaii

8    litigation:  Oh, we're being treated unfairly in the press

9    and they've got real powerful plaintiffs' lawyers there, we

10   need to get our message out.  They hire APCO to message on

11   that.

12         And they are hired initially by Jim Hunter, who is

13   a general counsel at Marriott Vacation Worldwide that's been

14   the primary defendant -- or primary defendant in this case.

15   And they go through, you know, messaging on that litigation.

16         But within a few days, APCO is then tapped to do a

17   survey of the club -- the club system and survey all the

18   people in it.  And you will see that in our affidavits

19   that -- that they have an addendum to the initial service

20   contract.

21         Right about here, APCO is hired.  And everything --

22   and there's dozens of documents obviously.  But you'll see

23   the vote APCO hired, then the rest of the year is when the

24   shenanigans occurred in this case.

25         As -- as the -- what happens is after April 5,

46

1    2013, Ms. Sobeck, Ms. Clark, another executive, Ms. --

2    Mr. Cunningham are realizing that we're not going to want to

3    vote.  We're just not going to -- it's going to be really

4    difficult.  Bachelor's Gulch board of directors votes

5    unanimously to put to the members -- its members and its 700

6    people there -- said, What do you want a do?  Do you want --

7    we don't want you affiliate.  We recommend we break away from

8    Ritz-Carlton, its affiliation is so bad for us.

9          And they actually conduct a vote.  Not a survey

10   like Marriott does; they conduct a vote.  In that vote 76

11   percent of the people respond, or 69 percent, and 76 percent

12   of the people vote to get away from this affiliation.

13         So that's also another bad story, all right.

14         The vote -- so APCO is hired.  The day after the

15   vote is announced in Bachelor's Gulch, they send out an APCO

16   survey to all the other clubs, okay.  And that survey is nine

17   or ten questions:  What's your favorite thing about this

18   club?  Where do you like to travel?  Do you like boats?  Do

19   you like train rides?  Do you like wine tours?  This kind of

20   stuff.

21         But they have a thing called an open-ended

22   question.  It says:  Is there anything else you need to tell

23   us?  And in that open-ended question, they get dozens, if not

24   hundreds, of responses that say:  What are you doing to us?

25   This affiliation is a disaster.  It's going to dilute our

47

 1   brand -- it's going to dilute our hotel, it's going to drive

 2   our prices down.  We don't want points-based people here.  We

 3   are a private club.  We joined to be with each other, and

 4   it's going to devastate our values, which is what

 5   Mr. Cappello has said earlier in the -- later the year

 6   before.

 7          So APCO does this survey.  And they literally send

 8   an early version of:  Hey, this is the findings we're

 9   getting.  And the fellow from APCO writes a report and says:

10   This is what's coming in.  And Ms. Sobeck writes an e-mail --

11   and this is not documentation we got.  She writes an e-mail

12   to Ms. Babich, who is the interface with our people.  She is

13   the person they talk to her and her department deals with

14   reservations, whatnot.  She says something along the lines

15   of:  Here's the APCO results.  Look at the answer to the

16   question.  Well, the question is the affiliation.  And she

17   says:  Not for wide distribution.

18          They are getting data here that said -- and I could

19   read it to Your Honor, you should look at the comments -- but

20   APCO lays it out.  Their executive summary says:  People

21   don't want this, they're concerned about Marriottization of

22   our club, it will drive down our values.  And they actually

23   give examples of what people are saying.  And Marriott is

24   getting this information.

25          They eventual get this report, which I put down,

48

1    those blue reports there, which are attached -- this is the

2    focus group.  They get a report issued by August 26.  Again,

3    we had none of these documents during discovery.  All these

4    depositions were taken in October of 2017.  We're getting

5    this information in June of 2018.

6            Mr. Cunningham, he's about our era of a gentleman.

7    He actually tells his secretary to:  Print this out, print

8    this thing out for me is, print it out.  Ms. Sobeck is

9    telling the club, she's the person who interfaces with Randy

10   Mercer on our board, she interfaces with the folks in San

11   Francisco, those boards, in Lake Tahoe, and places like St.

12   Thomas also, she's interfacing with them.  And you can see in

13   our case, there is a survey going on, the APCO survey.  We

14   didn't have the name, but we now look -- we now can look back

15   on some of her memorandums and she says:  I'm going to share

16   this with the clubs.

17           Well, guess what?  This thing was so devastating on

18   affiliation, that she never shared it.  She would show up at

19   a meeting and say, Well, we took a survey and guess what?

20   Your members would love cruises and a wine tour.  That's what

21   they really like.  That's what she reports.  She doesn't

22   report that there are dozens of dozens, if not hundreds, of

23   comments in the open-ended questions saying:  We don't want

24   this.  They ignore it.

25           So there is another set of nine lies.  She says

1    she's going to -- she says she's going to produce it, give

2    the survey results to our board, probably the other two

3    boards.  And she never does because it's really bad

4    information.

5         We also didn't have this information when we pled

6    the complaint, an amended complaint several times.  We should

7    have had this information in the fall of 2016, not June of

8    2018.

9         So what's really amazing from the APCO documents --

10   and I can't blame Mr. Marx's and Mr. Masters' client for

11   this.  But what's really amazing is that the notes that are

12   produced of a meeting with Jim Hunter -- we can't tell the

13   the time exact date?  The notes taken by two people at

14   APCO -- and these are -- these are -- these are impressive

15   people.  I mean, they do research for major corporations

16   around the world, around the country.  Highly trained and

17   experienced people.  They're taking notes with a general

18   counsel and another -- I think maybe the counsel that's in

19   charge of litigation.  And those notes say that the lawyers

20   are telling us there has to be a vote, there has to be a

21   majority vote, to even add up, it has to be 376.

22        So when these lawyers stand up in court and say,

23   Oh, this is semantics, plaintiffs' lawyers are playing

24   semantics with vote and survey, their own general counsel and

25   head of litigation was saying it was a vote.  That was a

1   document that was produced very late.

2          And that's important.  If we had had the APCO

3   documents from them earlier in the case, we would have gotten

4   the APCO documents, the 15,000 pages, earlier in the case and

5   we would have been able to question people about this.

6          One of the biggest concerns I have in this case is

7   with the corporate growth -- the affiliation agreement being

8   drafted and the APCO documents and the corporate growth, we

9   haven't seen -- we haven't peeled back the onion.  We don't

10  see what these lawyers and these are executives are doing.

11  We're only seeing -- we're only seeing a peek into the world

12  of Marriott Vacation Club.

13         So, Your Honor, what happens is then they begin to

14  realize that they can't win a vote.  They literally write a

15  letter to the -- they promise a vote.  They write a letter

16  saying:  Here is the vote.  And they stall that vote and

17  write 12 or 13 versions of a letter to the members between,

18  say, April and -- I think it's -- are we here -- July --

19  sorry, November 19.  A letter comes jointly from Cunningham

20  and Randy Mercer and it says -- this is one of the great --

21  this is one of the great diversions you will ever see.  They

22  say to 800 members:  As promised earlier in April, we're

23  doing a survey.  That's not what they promised.  They

24  promised a vote, and there begins the survey -- another

25  survey.

51

1          And then this survey, it goes out on December 4,

2    2013.  And that's the survey that's sent out by Christmas.

3    And it's one of these surveys, there is evidence that people

4    said it's pretty much useless.  Do you want an opportunity to

5    participate?  Yes or no?

6          That survey goes out, 139 or 140 people answer it.

7    72 say, Yeah, we would like opportunities to -- for other

8    vacations.  68 say no.  And it's that survey that they use

9    with Mr. Mercer to sign the acknowledgment and joinder in the

10   MOU.

11         What they're not telling the Board, and we didn't

12   know about until this June, was that they had this other

13   survey where 755 people responded.  255 people from Aspen.

14   They did not show that to the board or to our members.  And

15   so that's the kind of -- that's the kind of evidence we were

16   denied in this case.

17         Then they pick up -- notice, they pick up drafting

18   the affiliation agreement again in September.  And there it

19   is being drafted and then it is finally signed.  That's the

20   document we didn't get on -- on November 14, 2013.  They have

21   the survey.  They -- finally -- and I'm to wrap up my

22   timeline.

23         As the survey is being done for the opportunity

24   that they're now going to use as cover for this affiliation

25   and joinder, as that's being performed, being put out,

1    Ms. (inaudible) rehires APCO and they hire her to do a focus

2    group.  And guess what?  They actually pick people who they

3    think are going to be responsive and kind of happy about

4    this.

5            And if Your Honor reads this, this report comes

6    out, and this is the kind of document that they missed in

7    their document review:  Ritz-Carlton Destination Club

8    Research Report.  And it talks about members generally do not

9    like the MVC affiliation of proposed memberships here with

10   MDC.  Concern about the Marriottization of a club, members

11   raise a number of concerns about allowing Marriott Vacation

12   Club members access to the Ritz-Carlton Club.

13           These are core issues.  This is what we pled in

14   December of 2015.  This document was withheld, not only from

15   us, but is concurrent with this survey they've sent out to --

16   to our members that's being voted on, they're telling Randy

17   Mercer about, but they never tell them about this, okay.

18           There is another set of probably three lies.  They

19   didn't tell Mr. Mercer, they probably didn't tell their other

20   boards.  It wasn't produced in this litigation and it wasn't

21   able to be used in any of the pleadings or motions so far.

22           There are negotiations about -- there are

23   negotiations about this MOU.  There is internal drafting, and

24   they withhold that agreement January, February, March and

25   most of April when Mr. Mercer signs the acknowledgment and

53

1   joinder.

2          And if you read our affidavits, you will note that

3   Ms. Sobeck does not like to use the word "joinder."  Huh?

4   Joinder is when you join the Army or you join a club or you

5   join an event.  Joinder means you can join or you can- --

6   don't have to join.  And that's the power that they had given

7   to -- or the right they had given to our boards that was

8   withheld from them.  They did not know they had the right or

9   the ability to not join with this affiliation.  They thought

10  it was a fait accompli.

11         So that -- that's the -- that's the timeline.  So

12  you've got corporate growth in green, you've got blue and

13  you've got -- you've got red for APCO.  And those are

14  documents we did not have in this case and they're core

15  documents.

16         Your Honor, then I would like to just quickly go

17  through the impacts it has had in this case.

18         Number one, I started today by saying Federal Rule

19  of Civil Procedure is what -- when you're in doubt, that's

20  what lawyers should look at and that's what a Court should

21  look at.  This case has not been just.  They have concealed,

22  withheld and blamed others.  They blame us, they blame

23  contract lawyers, they blame an associate, they blame a

24  paralegal, okay.  It has not been speedy, okay.

25         We've laid out the timeline, Mr. Meade has done

1    that and it has not inexpensive.  MVW has caused this case to

2    increase in cost exponentially.

3         I told I would tell you about the impacts on

4    clients because -- that's really the people that we care

5    about.  I mean, Marriott Vacation Club has able counsel and

6    they care about their clients and we care about our 400 or so

7    clients ourselves.  Let's put this in perspective.

8         Our 230 clients pay $17,000 a year in assessments.

9    By delaying this case one more year, they get $4 million

10   in -- I shouldn't say "they."  $4 million in assessments are

11   paid.  Marriott Vacation Worldwide makes money three ways.

12   They sell points and they sell a heck of a lot points by

13   using our brand to upsell their points people.  They make

14   money financing the points at 14-15 percent to these

15   vacationers.  And they make it through management fees, which

16   they split with Marriott International and themselves.

17        When a member is late with their payments, they

18   are -- within a day, they are done.  They have a 25- or $2800

19   late fee payment and they are brutal to these people if

20   they're late.  We have clients that are old.  The check was

21   in the mail, they didn't get their vacationing.  That's what

22   goes on during this litigation.

23        So when a case is delayed, those are the stories

24   that we have.  (Inaudible) a pilot and a stewardess.  He got

25   cancer of the eye, rare cancer.  He can't -- he can't work.

1   She got cancer of the back, she's a steward.  These are

2   people we take calls from every day.  And they've been

3   delayed in this case and they haven't -- they haven't been

4   afforded their rights under Federal Rule of Civil Procedure

5   Number 1.

6            There is uncertainty about -- they've all put in

7   money.  There is a front cost in this case.  And we had to go

8   back and get more money from them, Your Honor.  All right.

9            What's most troubling is they -- and perhaps the

10  Court -- is they have a -- they lose faith in the legal

11  system.  Oh, this case will be over in 2017; it's not.  It

12  won't be over until 2019 or '20 in terms of a trial.

13           They take -- big corporations always win.  You guys

14  can't win.  See, we told you, you can't do this.  They fault

15  the courts.  They fault the judge.  Why isn't the judge doing

16  anything?  These are the calls we take when the case is

17  delayed and they fault us.  Impacts on Your Honor, Ms.

18  Barnes, Judge Brimmer.

19           We have a motion to dismiss practice that was less

20  than candid.  You have time of discovery issues, you have the

21  sanctions motion.  And that's why we're here, to invoke the

22  Court's inherent powers.

23           Mr. Meade touched upon this, impacts on the case.

24           Discovery in this case is fairly compromised.  If

25  you're building a house, the plans are important; that's your

56

1    pleadings.  Your foundation is your discovery, okay.  The

2    foundation in this case has been absolutely compromised.  I

3    mean, Ms. Sobeck, we spent  5- or $6,000 to take a court

4    reporter and a videographer and to have TrialDirector people

5    there to do her deposition properly.  We had to go back twice

6    and do two more times.  We couldn't afford -- we didn't want

7    to pay; we could afford.  We didn't want to pay do that with

8    the TrialDirector again.

9            The fact we couldn't amend our pleadings when we

10   wanted to.  Imagine having APCO and the affiliation agreement

11   and the corporate growth story to tell in our pleadings and

12   to ask witnesses about.

13           Mr. Meade pointed out aptly these depositions were

14   for trial preservation.  How are we -- how are we going to

15   edit these?  We have Ms. Sobeck on three depositions.  One

16   of -- her first one, one about withheld that affiliation

17   agreement and one about APCO.  They've made it -- they've

18   made the trial preparation in this case enormously

19   problematic.  The expenses are not tens of thousands of

20   dollars, sorry -- it's in the hundreds of thousands of

21   dollars.  Airplanes, hotels, paralegals, copy cost.  These

22   depositions, we have taken 25, 30 depositions, most of them

23   went out to documents we needed.

24           There was a young lawyer in New York Federal Court

25   there, I'll never forget the judge said, you know, You don't

1    have the -- you don't have the arrows in your quiver.  We had

2    one or two arrows in our quiver until now.  And it's pretty

3    late to try to pick up the mess.  We had a great case, Your

4    Honor, and we're going to win this case probably, but we

5    shouldn't have to try it when the playing field has been so

6    badly compromised.

7          The impacts on plaintiffs' counsel:  Well, we're

8    us.  We are four small firms on a contingency fee.  This case

9    has taken two, three times the effort, time and expense to do

10   it.  It takes us away from our other cases.  It takes us away

11   from our families, and it makes it -- and I'll close with

12   this thought on final impact.

13         Your Honor, a lawyer, has been a lawyer and a

14   judge.  Whenever a lawyer or a judge puts a file down and

15   they're gone for three or four months, you don't pick that

16   file back up and say, I'm going to take the Sobeck deposition

17   again, I'll start on page 22, I left off at 21.  It doesn't

18   work that way.  You've got to read her deposition, you've got

19   to go through the exhibits, you've got to plan.  And so this

20   has happened constantly in this case.

21         In terms of legal fees, it's measured in the

22   millions of dollars.  That's how much time we've dealt with

23   these issues.  So the impacts have been severe.  I hope the

24   timeline helped, Your Honor.

25         I think maybe at some point after Mr. Masters

1    speaks and I heard what he was going to say about the import

2    of this -- of this affiliation agreement, acknowledgment

3    were, he is going to explain that.  But I will tell you what

4    they were really trying to achieve with this affiliation

5    agreement and this acknowledgment was deniability --

6    plausible deniability, plausible deniability.

7           They said we're getting threatened by a former

8    partner at Greenberg Traurig, we're getting threatened by

9    boards, we're getting threatened by lawyers, they had two or

10   three litigations.  We have -- and they're predicting

11   litigation of this, by the way.  We have those memos,

12   including APCO memos that we hadn't had.  They're predicting

13   that and they're saying we're getting sued for fiduciary duty

14   breaches.

15          So why -- why are five or six executives, five or

16   six lawyers in their law department working on a lonely

17   little affiliation agreement?  And why are all the

18   communications and draft withheld?  They were coming up with

19   a plan that said, Listen, if some day we're sued, we can say

20   we gave the clubs a right to vote and we gave them an

21   opportunity to acknowledge and join.  The problem is they

22   never gave them the agreement to acknowledge and join.

23          Thank you.

24          THE COURT:  Thank you, Mr. Ferguson.  Why don't we

25   take -- we've been going close to an hour and a half.  Why

59

1    don't we take about a five-minute break and prepare

2    responses.  We'll be back in about five, ten minutes.

3              (Recess was taken.)

4              THE COURT:  We're back on the record.  Everybody is

5    still present and I think we're ready for presentation from

6    defense, please.

7              MR. MASTERS:  Thank you, Your Honor.  If it's okay

8    with you, I'll stand.

9              THE COURT:  Whatever is most comfortable for you.

10             MR. MASTERS:  That's more comfortable.

11             So, Your Honor, this just is not a case for the

12   extreme sanction of a default judgment.  Those extreme

13   sanctions, terminating sanctions, they're only appropriate in

14   cases of willful misconduct and there is no willful

15   misconduct here.

16             Now, I want to briefly touch on a couple of things

17   that Mr. Ferguson said.  I kind of cautioned myself before

18   coming here today that I wasn't going to get sucked into

19   responding to particular parts, but there are a couple of

20   things that were said that I think need to be addressed

21   upfront.

22             So he talked about how the affiliation agreement

23   was withheld from three boards, including the Aspen board,

24   the board that's relevant in this case.  Well, Your Honor,

25   the board is not a party to that agreement, and whether the

1  board was given the agreement or not has no bearing on the

2  sanctions motion.  And then he commented about how the survey

3  results were not shown to the members.

4          Well, clearly, the members knew a survey took place

5  because they're the ones that filled it out.  Now, the fact

6  that the results weren't given to them isn't particularly

7  unusual.  How many surveys have you filled out at the end of

8  a CLE program or anywhere else that somebody sends you the

9  results and says, Here is the results of the survey.  People

10 are fishing for information from you.  They're not trying to

11 try to give you information.

12         So that's kind of an interesting argument to make,

13 that that the Marriott people were bad people because they

14 hired APCO to conduct a survey and then they didn't give the

15 people who were surveyed, didn't give them the results.  And

16 again, that just has no bearing on these sanctions motions.

17         The plaintiffs added a number of grievances today

18 that aren't contained within the two motions that they filed.

19 And those things that they complained about that aren't

20 within the motions are not things that I am prepared or able

21 and will not address here today.  I just can't do it.  Kind

22 of new to me and it's the way it is going to have to be.

23 You're going to be stuck with the argument that I have.

24         So the Marriott defendants do not dispute in any

25 way that they failed to produce this 2013 affiliation

1    agreement.  That failure was inadvertent and they do not in

2    any way dispute that they failed to produce the APCO

3    documents.  That was the result of human error.

4            The plaintiffs have presented a lot of argument, no

5    evidence; but a lot of argument that this was wrongful

6    withholding or concealment, but no evidence of willful

7    misconduct.

8            Let's look at this in a different perspective.

9    This is a motion for sanctions.  This is not a motion to

10   compel.  The plaintiffs aren't here before the Court saying,

11   Judge, these Marriott defendants are bad people, they're not

12   producing these documents, make them produce the documents.

13   That's not what we're here for.

14           Ultimately the documents that we're talking about

15   have been produced, they have them.  The question may be what

16   harm that delay caused and why there was delay?

17           This is not a case where the documents were lost or

18   destroyed and this is certainly not a case where the Court

19   has ordered a party to produce documents and then that party

20   fails to produce those documents.

21           It is those kinds of cases where there has been a

22   warning and a failure to -- a warning from the Court to the

23   litigant and the litigant's failure to comply with that

24   warning.  Those are the kind of cases where terminating

25   sanctions have been awarded.

1             I can tell you on my research I found not a single

2    case where terminating sanctions were granted with no

3    warning.  This just isn't that case.

4             Well, let's talk more about what happened.  As Mr.

5    Meade said, this is a complex case.  It's very

6    document-intensive, hundreds of thousands of documents.  At

7    the beginning of the case, plaintiffs' counsel, defendants'

8    counsel got together and figured out:  We've got a large

9    universe of documents.  How are we going to handle this?  How

10   are we going to deal with these?

11            There were approximately, and I'm speaking in

12   general terms here, about 5 million documents that were

13   preserved saying, Put a clamp on everything, don't do

14   anything with these documents because they may be relevant.

15   And then, based on search terms -- now, there's were

16   electronic documents.  There is physical documents and

17   electronic documents, but right now I'm talking about the

18   electronic documents.

19            Based on search terms that were negotiated and

20   agreed upon between plaintiffs and defendants, they agreed on

21   what those search terms would be that would turn up relevant

22   documents.  They initially -- defendants produced a sample

23   set, about 4,000 pages that it could run a test on these

24   search terms to make sure that everybody was happy that we

25   had the right set of terms to find relevant documents.

1            THE COURT:  Give me just a moment, Mr. Masters.

2            MR. MASTERS:  Sure.

3            THE COURT:    Angela, let's go ahead and set that

4    emergency criminal at 9:00 tomorrow and let them know we only

5    have until 9:30 because of time limitations.  And it looks

6    like the marshals are available, too, if they need to be.

7            Sorry, go ahead.  We had an emergency matter come

8    up.

9            MR. MASTERS:  So they ran the agreed-upon search

10   terms on a set of test documents to make sure that the -- it

11   was going to work.  And then Marriott went to work.  And

12   based on running those search terms, they got down to about

13   100,000 documents, and it was those documents, then, that

14   needed to be reviewed, and these were the electronic

15   documents.

16           There were also paper documents or documents

17   that -- maybe it's confusing to talk about them in terms of

18   paper documents, but they had -- they at least at one time

19   been represented as paper documents and the Marriott

20   defendants didn't necessarily have paper copies, say -- say

21   the operating agreement or the operating documents for the

22   Aspen property.  Those weren't documents that necessarily

23   they generated, they didn't have them electronically, they

24   had paper.  But the paper probably didn't convert it to pdf

25   because those documents came into Marriott's attorney's

1    office to three associates and a paralegal.  And that initial

2    set of documents were -- the idea was to get everything

3    that -- that Marriott's attorneys thought would be relevant

4    to the defense in this case and, for that matter, to the

5    plaintiffs' claims this case, to get those documents together

6    and get them to the plaintiffs.  So those documents came into

7    three contact points within Greenberg Traurig.

8           And then once they were all assembled, they were

9    handed off to Mr. Marx for his final review before they were

10   produced.  And based on -- based on their criteria, the 2013

11   affiliation agreement should have been in that first batch of

12   documents and it wasn't.  It just -- it was not there.

13          So in -- and those initial set of documents were

14   produced in, I want to say, November 2016?  Okay, November

15   2016.  And then they were taking the deposition of Ms. Sobeck

16   and plaintiffs' counsel asked that Ms. Sobeck was offering

17   some testimony that -- that discussed -- that essentially the

18   affiliation agreement.  It was -- plaintiffs' counsel may

19   have asked a question:  Well, was there an agreement?  Yeah,

20   I think there was an agreement.  And then there was an

21   on-the-record discussion between counsel saying:  Do we have

22   that agreement?  And Mr. Marx's response was:  I don't know

23   if you do or not, but if you don't, we'll produce it.  And

24   that was -- that was during her deposition.

25          Well, unfortunately -- and this happens and we

1    lawyers all have different ways of dealing with this, and I

2    expect if I went around the room and asked all the lawyers

3    here, there would probably be some consensus, but there would

4    be differences on how we do this -- but this happens all the

5    time in depositions where somebody says, Will you send me

6    that document.  Sure, be glad to.

7            And typically, if it's me, I'm going to say:  Would

8    you send me a letter or at least an e-mail when you get back

9    to your office to remind me because I'm not going to remember

10   from here in this deposition?

11           Well, regardless, that didn't happen.  And nobody

12   said another word about the 2013 affiliation agreement until

13   some months later Mr. Marx was in Miami for depositions and

14   plaintiffs' counsel says:  Well, wait a minute, you said you

15   were going to produce that document for us.  Where is it?

16   And Mr. Marx did what he could from Miami and handed them the

17   document the next day.

18           Then the APCO documents -- the 2013 affiliation

19   agreement, that was -- that was a hard-copy document and it

20   just -- it just fell through the cracks.  It is, as we have

21   said in our papers and as plaintiffs' counsel mentioned today

22   during their comments, the Marriott defendants point out in

23   our response to these motions, particularly in response to

24   the first motion, that -- that the 2013 affiliation agreement

25   should have been in that set of documents.  It wasn't.  Can't

66

1    explain why it wasn't.  And when we finally got to it, we

2    produced it.

3            The APCO documents were another matter.  Those were

4    electronic documents, and so we had a large universe of

5    documents.  The Marriott defendants hired this outfit called

6    Special Counsel to review those documents because it was

7    100,000 documents that needed to be reviewed.  And even if a

8    lawyer could review a document in two minutes, say that's 30

9    documents an hour, it's going to take a long time to get

10   through 100,000 documents.  So they hired this outside firm,

11   Special Counsel, to do this.

12           Mr. Marx goes to Jacksonville, Florida where the

13   Special Counsel folks are and provides them with orientation,

14   training, background materials.  Here -- here is what we're

15   looking for.  Here is what this case is about.  As you look

16   at documents you're going to mark them "responsive" or

17   "nonresponsive" and here are those criteria.

18           Mr. Marx stayed around for two days in Jacksonville

19   and as the review got underway and walked around and answered

20   questions about -- they would bring up a document on the

21   screen and the entire team would look at it and say:  All

22   right, is this document responsive or not responsive?  And

23   people would talk about how they would tag that particular

24   document.  This is kind of the nature of the trade.  And Mr.

25   Marx stayed around and answered questions.

1          Then this document review continued, took about two

2     and a half months for this to be completed.  During that time

3     there was the supervisor who stayed in touch with Mr. Marx

4     and others at Greenberg Traurig talking about the progress,

5     but also coming up with, Well, what about this document?

6     Answering questions about how a particular document should be

7     coded.

8          The APCO documents, there was never a question

9     raised about those, unfortunately.

10          THE COURT:  Well, just to be clear, I think it's

11     set forth in the documents.  The way I understand the search

12     process was if a document was nonresponsive, there wasn't a

13     further review.  If it was responsive, then there was a

14     review process on top of that.

15          MR. MASTERS:  Yes, that's correct.  And just to be

16     clear in case this -- this question is bothering you is, when

17     Special Counsel did the review of 100,000 documents, they

18     came out the other end with about 5,000, okay.  So it's

19     not -- it wasn't a process where they reviewed 100,000

20     documents, found 90 to be responsive and 10 to be

21     nonresponsive.  If that was the relationship, it would

22     probably make sense to go back and take a second look at

23     those 10,000, because that's a pretty small job do at that

24     point.  But when you've been through 100,000 documents and 95

25     percent of them are unresponsive, it just didn't make sense

68

1    to go run that whole process two and a half months over again

2    on those -- 95 percent of those documents.

3         The -- it's unfortunate.  The -- it's in -- in our

4    papers, the -- there is an audit trail.  When Greenberg found

5    out that these documents had not been produced when they were

6    contacted by plaintiffs' counsel and said, Hey, we got these

7    documents by a subpoena from APCO, they set about trying to

8    figure out what the heck went wrong.

9         And, fortunately, the review process employed by

10   Special Counsel incorporates a pretty, pretty decent audit

11   trail.  And so they were able to isolate these documents and

12   say, This document was reviewed by this person on this day

13   and it was coded "nonresponsive" and so it ended up in the

14   wrong pile.  And that's how we -- how we got there.

15        The -- of the APCO documents, if you look at that

16   universe of 100,000 documents to start with and we take 49

17   APCO documents that were missed that should have been

18   produced and really there are two that are important, the two

19   surveys, there is no doubt, those documents are germane,

20   they're important, they should have been produced.  The other

21   47 documents are primarily e-mail messages, some of which

22   probably have some substantive value, but probably the

23   majority of them do not.

24        But even if we take that whole 49 documents out of

25   100,000, that represents less than one-half of 1.100th of 1

69

1    percent of the documents.  That's the error rate.  Mistakes

2    happen.  This is the -- it's a failure of the system.

3              Now, let's talk about the substance of these

4    documents, and particularly, let me start with the 2013

5    affiliation agreement.

6              And to talk about that agreement, we need to drop

7    back to the beginning point of 2001.  And in 2001, there was

8    a management agreement that was entered into between the

9    Aspen Highlands Condominium Association and Ritz-Carlton

10   management.  And in that agreement, the condominium

11   association appoints Ritz-Carlton management as the managing

12   entity for the condominium and it allowed Ritz-Carlton

13   management to appoint program manager through an affiliation

14   agreement.

15             So we go all the way back to 2001.  And at that

16   point the Aspen Highlands Condominium Association gave up a

17   whole lot of their authority as an association and turned it

18   over to Ritz-Carlton management.

19             We move forward a few years, 2006, 2008.  There is

20   an affiliation agreement between Ritz-Carlton and Aspen

21   Highlands.  That document that we have happens to be undated,

22   but it appoints Cobalt, one of the defendants in this case,

23   as the program manager.  And that document gives Cobalt the

24   sole and absolute unfettered discretion to affiliate other

25   locations with the membership program.  And we have another

1   agreement in 2010 between Lion and Crown affiliation

2   agreement, and then we come up to the 2013 affiliation

3   agreement.

4        And, Your Honor, I realize that this may be one of

5   the ultimate issues for trial, but it bears on this discovery

6   dispute; and that is:  What does this 2013 affiliation

7   agreement provide?  Plaintiffs have their view and the

8   defendants have their view.  But keep in mind that Cobalt,

9   that the association appointed Ritz-Carlton management and

10  then Ritz-Carlton management appoints Cobalt and then Cobalt

11  has the authority to enter into affiliation agreements.  And

12  so the 2013 affiliation agreement between Lion and Crown and

13  Marriott Resorts is signed in November of that year and it's

14  effective immediately, right then and there.  Those are the

15  parties to the agreement, those are the parties who have the

16  authority to effect the affiliation.

17       The affiliation agreement does not require, doesn't

18  even permit, the association to veto that decision.  What

19  comes next in 2014 is an acknowledgment and joinder

20  agreement.  And that agreement, that's the agreement that

21  says, Okay, there is an affiliation here.  And starting in --

22  I don't know if -- it was probably late 2013 that the

23  affiliation agreement was entered into, so it's probably 2014

24  that Marriott Club members start using the Ritz-Carlton

25  properties because they have the right to do that under this

1   affiliation agreement.

2          The joinder agreement says if Ritz-Carlton

3   properties, if you're members, if you want to participate in

4   the Marriott program, then you have to acknowledge and join

5   this agreement.  If they don't do that, they don't get to

6   participate.  That's -- that's what they get to do, but they

7   don't have the authority to say yay or nay on affiliation.

8   And again, this is probably one of the key issues for trial,

9   but it's important on this discovery dispute because the

10  affiliation occurred in 2013.  It doesn't matter what the

11  association knew or didn't know about the affiliation

12  agreement.

13         The APCO documents -- and again, APCO distributed a

14  survey.  It had some closed questions and some open-ended

15  questions and APCO also conducted some focus groups.  So the

16  answers to the closed-ended questions were contained within a

17  spreadsheet, a large document.  That document was produced,

18  the raw data was produced.

19         What was tagged, goodness knows how, but what was

20  tagged as nonresponsive were these two surveys that

21  summarized the responses to the open-ended questions and

22  summarized the -- whatever you get out of a focus group.  I

23  don't know if you get results or not, but it summarized the

24  proceedings of the focus groups.

25         So those documents don't change the case at all.

72

1    The -- this idea of a change from a vote to a survey -- and

2    again, this is getting pretty far down in the weeds, in the

3    merits of the case.

4           But if you look -- if we went and dug into the

5    evidence, you would see that the -- there was a time when the

6    Marriott folks were using the term "vote" and "survey" kind

7    of somewhat interchangeably and then they stopped using the

8    term "vote" and they talked only in terms of a survey.  And

9    that was -- that was done before APCO was even hired.

10          So it wasn't a result of the APCO survey that they

11   changed from a vote to a survey.  That -- to the extent there

12   was ever any change, that happened even before then.

13          The bottom line here is that the 2013 affiliation

14   agreement does not change the position asserted by the

15   Marriott defendants.  It has been their position from the

16   beginning that that document did not give the association the

17   right to veto affiliation.  The fact that that document was

18   inadvertently not produced and has subsequently been produced

19   did not change Marriott's position.  It remains the same.

20          On that motion, the first motion, the plaintiffs in

21   addition to asking for terminating sanctions, wanted to

22   take -- retake a couple of depositions.  By the time the

23   Marriott defendants filed their response, those depositions

24   had been taken.  Those depositions took place in Orlando

25   during the week when the plaintiffs were scheduled to be

1   there for other depositions, so there was no additional

2   expense.  There was some additional deposition time, but that

3   time would have been spent anyway asking questions about this

4   document.

5          The plaintiffs did not need the 2013 affiliation

6   agreement to depose the Aspen Highlands board members.  The

7   board members all said:  We never saw it.  The Marriott

8   defendants incurred substantial expense to review documents.

9   They produced good results, but not perfect results.  The

10  documents that were missed were not destroyed; they were not

11  lost; they were ultimately produced.

12         The 2013 affiliation agreement and the APCO

13  documents, they're germane, they're relevant, but they're not

14  the keys to this case.  They are not a smoking gun.

15         This should have been a routine discovery dispute

16  that could have been worked out between counsel, not a

17  sanctions motion.  Ultimately, what we have here is

18  plaintiffs trying to take a shortcut to the finish line, deny

19  the defendants their day in court and get a judgment based on

20  some unfortunate circumstances that happened during

21  discovery.

22         Thank you.

23         THE COURT:  Thank you, Counsel.  Was there going to

24  be more presentation?

25         MR. MATT FERGUSON:  Could be.

1        THE COURT:  Sure.

2        MR. MASTERS:  So just a little bit more, Your

3   Honor.  This isn't in our papers, but I've been asked to

4   reiterate that in the Petric case, there was a -- and there

5   is three cases, and it's the same set of lawyers in all three

6   cases, similar claims in all three cases.

7        But in that case, the discovery request -- there

8   was a discovery request.  And in response to it, the Marriott

9   defendants produced the 2013 affiliation agreement.  So the

10  plaintiffs had, not in this case, in another case granted.

11        UNIDENTIFIED SPEAKER:  Not produced; response

12  identified would be produced.

13        MR. MASTERS:  Oh, didn't produce it.  The response

14  identified that it would be produced.

15        THE COURT:  And when was that in time?

16        MR. MATT FERGUSON:  Those discovery responses, Your

17  Honor, the discovery responses in the Petric case were in

18  February of 2017, and those discovery responses -- response

19  to the document requests identified specifically the

20  agreements relating to litigation (inaudible) and they

21  specifically referenced 2013 affiliation.

22        THE COURT:  Thank you.  All right.

23        MR. MASTERS:  And then next the Marriott defendants

24  did produce the acknowledgment and joinder agreement.  And

25  that agreement specifically references multiple times the

1   2013 affiliation agreement.  A lot of eyes looking at this,

2   everybody could have seen that it was there.  I don't really

3   want to blame the plaintiffs for not seeing what was there,

4   but it was clearly -- there was some other document that was

5   being referenced in this one document.  And if it wasn't

6   there, it could have been asked for much earlier and we could

7   have avoided all of this mess.

8            And then finally, the defendants produced a

9   privilege log in January 2018, and it mentions, identifies

10  this 2013 affiliation agreement.

11           THE COURT:  Thank you.  All right.

12           Is the plaintiff prepared to reply?  Are we going

13  to hear, I guess, separately from Aspen Highlands?  I just

14  want to make sure -- okay, I didn't think so, but.

15           MR. MATT FERGUSON:  Yeah, they're not even here.

16           THE COURT:  I wasn't clear in terms of the phone if

17  anybody was (inaudible).

18           UNIDENTIFIED SPEAKER:  They said they didn't want

19  to be here.

20           THE COURT:  All right, go ahead.

21           MR. REISER, SR.:  Your Honor, thank you.  I'm just

22  going to give a short -- short rebuttal to Marriott

23  defendants' presentation.

24           And I just want to start with the big picture here.

25  And the big picture is, is that Marriott has put forth

76

1    essentially two -- from a macro standpoint, they put forth

2    two -- two defenses.  The first defense was:  We have the

3    absolute right to do this.  And they just said it again.

4    That's their defense in the case:  We have the absolute right

5    to do this.  And not only that, but that the association

6    can't aid and abet a beneficiary duty because the association

7    has no right to do this.

8            That's true in the first affiliation agreement.

9    It's absolutely false in the second affiliation agreement

10   because, if nothing else, they had to join the agreement in

11   order for the affiliation to happen at that club.  The 2013

12   affiliation agreement belied their defense.

13           And secondly, their second defense was that we were

14   good guys and we gave it to a vote.  Even though we didn't

15   have to, we gave it to a vote of the members -- or a survey

16   of the members and the survey came back supportive of the

17   affiliation.

18           And what they didn't give was the APCO survey that

19   was several months before the survey they relied on that was

20   diametrically opposed and again would have belied their

21   second primary defense.

22           So these documents, you know, whether they're

23   one-ten of 1 percent of the documents that were produced,

24   they're the documents that were -- that would have, like,

25   essentially undermined their central defenses in this case.

1   So that's why you can't just say that, Oh, we had less than 1

2   percent error rate here.  We have a situation where these

3   documents were so important to their defenses and they didn't

4   produce them.

5          So start with that.  I mean, these aren't just two

6   documents that weren't produced.  These were two documents

7   that would have completely countered their two main defenses

8   in this case.

9          Secondly, since they're saying -- you know, Counsel

10  just said that this affiliation agreement 2013 doesn't say

11  what it says it says.  And, you know, with all due respect,

12  you know, we've been litigating this case for three years a

13  lot of hours, it's funny because we, Cunningham, the COO of

14  this case, the primary architect quarterback of this whole

15  reengineering of the Ritz Club, that's undisputed, they admit

16  it, he said it.  Those are their words:  I'm the quarterback.

17         When we went back to take his deposition after

18  getting the November 2013 affiliation agreement, he

19  admitted -- it's on page 21 and 22, he admitted that the

20  Marriott Vacation Club members could not use the Aspen Club

21  if the board of directors had not joined the affiliation

22  agreement.

23         So this -- it is belied by that.  It's also belied

24  by several other key pieces of evidence, including one that

25  happened to have shown up in the peripheral APCO documents

78

1    that confirmed that it was the board of directors that had

2    the power here.  It's also stated in a very telling response

3    by Ms. Sobeck in this case that the ultimate decision is the

4    board of directors.

5         But to -- to produce the joint -- the joinder --

6    the acknowledgment and joinder to the affiliation agreement

7    and rely on that when that document is itself misleading

8    because, again, remember, as Matt Ferguson pointed out, these

9    affiliation agreements weren't even given to the board.  So

10   the fraud kind of starts there.

11        And if you look at this as a whole, you can't

12   ignore the fact that these same affiliation agreements that

13   weren't given to us in this case, weren't even given to the

14   board; they were, rather, given a joinder to the affiliation

15   agreement, which misstated what was in the affiliation

16   agreement.  How?  Because it said:  We're just doing this as

17   an accommodation to you.  We don't have to give you a vote.

18   We're doing this as accommodation.  Again, that's what --

19   that's what they were telling the board.

20        The board -- we have evidence, even after the

21   lawsuit was filed, e-mails going back and forth between the

22   board members saying:  Don't these guys know that we didn't

23   have any power to choose this anyway?  They were duped.

24   They've been duped since 2013 when they weren't given this

25   thing.  We've been duped in not getting it in discovery.

```
1              But more important, Your Honor, and the reason why
2     this case merits, not a terminated sanction, by the way, it's
3     a default judgment on liability, but we're still going to
4     prove damages against these guys, that there is not
5     necessarily a terminated sanction.  This is a sanction that
6     is just going to establish liability and then they can argue
7     about the damages and there is a lot of argument that.
8              But the reason this deserves a terminated sanction
9     like Cocina, it's because, first of all, Cocina, if counsel
10    wants to know about a couple cases that do actually pull --
11    that you don't need a warning from a court to impose the
12    actual sanction, it's in our papers.  And I'm surprised he
13    missed it because once -- they're both Tenth Circuit cases.
14    Jones vs. Warren Power (ph).  These are both -- Your Honor,
15    I'm not going to repeat the cite here, because you they're in
16    the reply on page -- at page 10.  There's two cases cited in
17    there and it specifically says no prior warning is required.
18             THE COURT:  Just so we're clear for the record,
19    what filing are we talking about?  I know you said "reply,"
20    but I think there is two of them.
21             MR. MEADE:  Sure, it's Document Number 287.
22             THE COURT:  Thank you.
23             MR. MEADE:  And also, Your Honor, even on 223, as
24    well, and that's the right cite.
25             But here what we have, Your Honor, is not only a
```

80

1  fraud on the board initially by not giving them an agreement

2  that they're joining.  Imagine that?  Here, sign this

3  agreement, but we're not going to -- sign this agreement

4  joining an agreement, but we're not going to show you the

5  agreement you're joining.  That doesn't speak to negligence.

6  They purposefully didn't give the documents to the board

7  because they didn't ask for them is what their excuse was.

8  That doesn't speak to negligence.

9        Missing something that says affiliation agreement

10  when they even now admit that they identified this agreement,

11  at least in the Petric case, to produce, it can't be that

12  they identified, on the one hand, to produce and then all of

13  a sudden they just don't produce it -- you know, they just

14  don't produce it.

15        But the most important point here, Your Honor, and

16  why this deserves the ultimate sanction here that we're

17  requesting is they committed a fraud on the courts.  I mean,

18  their entire argument was:  We can't aid and abet a fiduciary

19  duty because the HOA had no role in this.

20        That was more than just not showing them the

21  affiliation agreement.  They made an affirmative

22  misrepresentation to these courts, knowing that they had a

23  document in their files that wasn't produced and it was never

24  shown to the boards even, they made an affirmative

25  misrepresentation to three courts, including two federal

1    courts, that the association had no role.  It was belied by

2    documents they were concealing.

3         So strike one:  Holding it from the boards in

4    violation of a fiduciary duty of full disclosure.

5         Part two:  Withholding it from us in discovery --

6    strike two.

7         Strike three:  Your Honor, is lying to the courts.

8    And it cost us in San Francisco.  Luckily, we had, in this

9    case, some facts that were additional to San Francisco where

10   we had a promise of a vote -- explicit promise of a vote,

11   that, you know, we were able to survive a motion to dismiss

12   on this point because of that.

13        THE COURT:  That raises a question, though -- I'll

14   give the defense an opportunity to respond to this.  What

15   authority do I have -- assuming that that's correct, what

16   authority do I have in this case to make recompense for the

17   supposed fraud or frauds in another case or cases that

18   haven't been joined or related?

19        MR. REISER, SR.:  Well, they were joined and

20   related for purposes of discovery.  So discovery abuses, the

21   strike two in my analogy there is governed there.

22        But you don't need the fraud on the Court in

23   Petric.  We have a fraud on the Court in this case.  That

24   would be my answer.

25        I mean, it's additional bad conduct.  And if we

1   want to add an evidentiary hearing and put that in there,

2   too, but I don't think we need it, because they made the same

3   argument here in this Court.

4          So finally, Your Honor, the affiliation agreement

5   has -- by the way, all -- everything I just mentioned, those

6   three strikes, that's indicia of intent.  But the other thing

7   that I think needs to be mentioned is the sheer

8   implausibility of their argument.  I mean, it's just

9   implausible, to use a Iqbal/Twombly kind of phrase; but it's

10  implausible, Your Honor, that they, not only missed these

11  documents that they identified, it's implausible that they

12  would also miss 48 other documents that they've identified in

13  a privilege log that mentioned this -- these affiliation

14  agreements.

15         So here is the point.  This idea that this was a

16  hard document, the only hard document in the court -- I mean,

17  in the case that exists solely as a hard document and that it

18  was just inadvertently not produced is hogwash because that

19  same document appeared in -- and we learned this from their

20  own privilege log.  The privilege log they gave us shows that

21  this document appears electronically in the custodian files

22  of at least five or six other Marriott custodian files.

23         So they don't explain that.  They don't explain

24  how, you know, yeah, maybe you missed a hard copy of this

25  document that was sitting on Mr. Marx's floor prior to

1   production and it was just overlooked somehow.  But it

2   doesn't  begin to explain the fact that this same document

3   was in the custodians' files electronically for at least a

4   half dozen Marriott custodians that were searched.

5           So this document -- let me say one other thing.  By

6   the time they had to produce this document, they had already

7   lied to the board by not producing it.  So if they produced

8   it to us, the board would have gotten the same production and

9   said:  What the heck is this?  We've never seen this before.

10          So they had already had one foot into the lie by

11  not telling the boards and to produce it now would have been

12  crazy.  But they also had another foot into the lie by

13  telling the Court that they -- not mentioning this to the

14  Court and specifically telling the Court false information

15  that they had no role in it.  That's number two.

16          So by the time they got to discovery, if they

17  produced it at that point in time, we would obviously have

18  gone back right to the Court and said:  Look, they produced

19  this document to us after they made a motion to dismiss

20  telling you they had no -- this HOA had no role in this.

21          So they were stuck by the time they got to

22  discovery.  They had (inaudible) produced it.  And to suggest

23  that it was just an oversight defies everything, including

24  the fact that this same document is included in the custodian

25  files of their own folks.

84

1         So it's just -- it's just surely -- it's sheer

2    implausible that this is not an intentional withholding of

3    this.  They had to withhold it by the time they got to

4    discovery because they already told two lies.  You know, it's

5    hard to catch liars.  Sometimes they continue to lie until

6    they're caught.  And this is what happened, they finally got

7    caught.

8         And, quite frankly, Your Honor, the fourth reason

9    this sanction should be granted is because they're lying to

10   the Court now.  They're lying to the Court by telling you

11   this was inadvertent nondisclosure of a very key document.

12        I'm going to not go tit for tat with every rebuttal

13   argument here but I just want to point out that this was

14   intentional.  It was intentional, and it was intentional

15   because it would have undermined their entire defense across

16   three cases if they would have produced this.

17        Thank you.

18        THE COURT:  All right.  Did the defense want to

19   respond with regard to the issue of potentially other cases

20   being involved?

21        MR. MASTERS:  So, Your Honor, let's be clear, the

22   cases were never joined for the purposes of discovery.  There

23   was not a single judge or magistrate who was put in charge of

24   managing the discovery across these three cases.

25        Now, the cases were worked collectively between the

85

1    plaintiffs and defendants and said, We'll do all our

2    discovery across three cases so that we -- so that we don't

3    have to take depositions three different times and serve

4    discovery requests three different times.

5           That was done.  But these cases were not joined for

6    that purpose and so they were never judicially joined, and

7    the Court can't impose a sanction here for alleged misconduct

8    in another court in another jurisdiction.

9           There are, as mentioned in our papers and as

10   mentioned here today, a number of indicia that show that this

11   was inadvertent.  If it was intentional, the Marriott

12   defendants would not have identified the 2013 affiliation

13   agreement in their response to the discovery requested in the

14   Petric case.  If it was intentional, they would not have

15   produced the 2014 acknowledgment and joinder agreement which

16   references numerous times the 2013 affiliation agreement.

17   They would not have identified in their privilege log.

18          It's a mistake, it's unfortunate, but in cases of

19   this magnitude, mistakes happen.  There was no intent, no

20   willful concealment of these documents.

21          Thank you.

22          THE COURT:  All right.  Thank you all.  I'm going

23   to take this matter under advisement and issue a written

24   order.  I can tell you, it's on the Tuesday afternoon before

25   Thanksgiving, I will not have an order out before this

1   weekend, so don't be waiting for it because you won't get it,

2   but I'll try to get it out in short order after that.  All

3   right.

4           Anything else anybody has got that we need to

5   address this afternoon before we adjourn?

6           UNIDENTIFIED SPEAKER:  I don't think so, Your

7   Honor.  Should we grab the board --

8           THE COURT:  Frankly, I don't think we want to keep

9   them if we don't have to.  I don't think there is anything on

10  boards that isn't on the hard copies, but I have (inaudible)

11  that will be far less unwielding to keep it in that fashion

12  and I'll leave it to you all to haul it back to wherever it

13  came from.

14          Okay, have a good Thanksgiving, everybody.  We'll

15  be in recess.

16          (Whereupon, the within hearing was then in

17  conclusion at 3:07 p.m.)

18

19

20

21

22

23

24

25

87

1              CERTIFICATE OF TRANSCRIBER

2     I certify that the foregoing is a correct transcript to the

3     best of my ability to hear and understand the audio recording

4     and based on the quality of the audio recording from the

5     above-entitled matter.

6

7     /s/ Dyann Labo                    December 7, 2018

8     Signature of Transcriber               Date

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**PATTERSON TRANSCRIPTION COMPANY**
scheduling@pattersontranscription.com