# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLORADO

Gordon P. Gallagher, United States Magistrate Judge

Civil Action No. 16-cv-1301-PAB-GPG

RCHFU, LLC *et al.*,

     Plaintiffs,

v.

MARRIOTT VACATIONS WORLDWIDE CORPORATION *et al.*,

     Defendants.

---

## ORDER REGARDING PLAINTIFFS' MOTIONS FOR DEFAULT JUDGMENT (AFFILIATION AGREEMENT MOTION (ECF #223)) & (APCO DOCUMENTS MOTION (ECF#282))

---

This matter comes before the Court on a significant number of pleadings which are appropriate for joint treatment: Plaintiffs' motion for sanctions and a default judgment against certain Marriott Defendants (Affiliation Agreement motion) (ECF #223)[1] (which was referred to this Magistrate Judge (ECF #233)),[2] Plaintiffs' request for judicial notice (ECF #224), Aspen

---

[1] "(ECF #223)" is an example of the convention I use to identify the docket number assigned to a specific paper by the Court's case management and electronic case filing system (CM/ECF). I use this convention throughout this Order.

[2] Any party may object to this non-dispositive Order within fourteen (14) days. Fed.R.Civ.P. 72(a). Because I Order purely non-dispositive sanctions, the order comes under the purview of Rule 72(a) rather than Rule 72(b). *See Gomez v. Martin Marietta Corp.* 50 F.3d 1511, 1519-20 (10th Cir. 1995) (Although Plaintiffs sought dispositive relief, "[t]he penalty to be imposed, rather than the penalty sought by the movant, controls the scope of the magistrate's authority." *Gomez*, 50 F.3d at 1519 (internal citation to Moore's Federal Practice removed).

Highland's response (ECF #262),  the Marriott Defendants' response (ECF #273), Plaintiffs'

reply regarding Aspen Highlands (ECF #274), Plaintiffs' reply regarding the Marriott

Defendants (ECF #278),  the Marriott Defendants' sur-reply (ECF #290), Plaintiffs' motion for

sanctions and default judgment (APCO documents motion) (ECF #282) (which was referred to

this Magistrate Judge (ECF #284)),[3] the Marriott Defendant's response (ECF #295/296),  and

Plaintiffs' reply (ECF #297).  The Court has reviewed each of the aforementioned: documents,

responses, replies and any attachments.  The Court has also considered the entire case file, the

applicable law, and is sufficiently advised in the premises.  Oral argument was held on

November 20, 2018.  For the following reasons, the Court GRANTS the motions in-part and

DENIES the motions in-part as specifically set forth below.

This matter involves a dispute over Marriott Vacation Clubs (MVC) determination to

open Aspen Highlands-a Ritz Carlton Destination Club-to all the members of the MVC.[4]  Rather

than rehash what has already been set forth in detail in prior pleadings in this action, I lift, *in toto*

(footnotes removed), the summary of events as set forth by the Honorable Judge Brimmer in

ECF #210, pp. 1-8:

## I. BACKGROUND[5]

This action arises out of a dispute regarding the management of the Ritz-
Carlton Club, Aspen Highlands ("Aspen Highlands"), located in Aspen, Colorado

---

[3] *See* FN 2.

[4] Two other actions, *Petrick v. Marriott Vacations Worldwide Corporation, et al.* (Superior Court of the State of California, San Francisco County (CGC 15-545987)) and *Reiser v. Marriott Vacations Worldwide Corporation, et al.* (16-CV-237-MCE-CKD (E.D. CA)), are/have proceeded in state and federal courts in California regarding substantially the same matters as herein. Plaintiffs request, *see* ECF #224, that I take judicial notice of four (4) attachments (ECFs #224-1-4 from the *Petrick* and *Reiser* actions.  Pursuant to Federal Rule of Evidence 201, I so take judicial notice.

[5] The following facts are taken from the fifth amended complaint (the "complaint").  For purposes of the Order regarding a motion to dismiss (ECF #210), Judge Brimmer assumed the facts set forth to be true.  I do not ascribe the facts set forth the same assumption of veracity as the present motions are not motions to dismiss.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009) (allegations of fact are accepted as true in the posture of a motion to dismiss).

and its affiliation with Marriott Vacation Club Destinations ("MVC"). MVC is a timeshare program with more than 400,000 members operated by MVCI that sells points, which can be used to stay at various resorts owned by MVCI or affiliated with the program. Docket No. 119 at 11, ¶ 5.

Plaintiffs own deeded 1/12 fractional interests in condominiums at Aspen Highlands (the "fractional units") that entitle them to use of the condominium for four weeks per year. Docket No. 119 at 11, ¶ 3 n.1. Owners could exchange their time for the ability to stay at other Ritz-Carlton Vacation Club properties through its exchange program. *Id.* at 71, ¶ 35. Between 2001 and 2013, plaintiffs paid prices averaging over $200,000.00 for their fractional units. *Id.* at 12, ¶ 6.3.

On October 13, 1998, non-party Hines Highlands Limited Partnership ("Hines"), the developer of the broader development of which Aspen Highlands is a part, made and recorded the Declaration for Aspen Highlands Village (the "Master Declaration"). Docket Nos. 49-1, 49-2, 49-3. The Master Declaration sets forth various aspects of a planned community and includes a section entitled "No Timeshare," which states:

> Each Owner acknowledges that Declarant intends to create Fractional Ownership Interests with respect to certain Units within Aspen Highlands Village. Other than the right of Declarant . . . and specific assigns . . . to create Fractional Ownership Interests . . ., no Unit shall be used for the operation of a timesharing, fraction-sharing, or similar program whereby the right to exclusive use of the Unit rotates among participants in the program on a fixed or floating time schedule over a period of years.

Docket No. 49-3 at 13, § 8.25. On January 10, 2001, Hines and RC Development made and recorded the Declaration of Condominium for Aspen Highlands Condominiums ("Declaration of Condominium"). Docket No. 109-8 at 9. The Declaration of Condominium sets forth various aspects of the plan for Aspen Highlands and includes a section entitled "Limit on Timesharing" stating:

> Other than the right of [Hines and RC Development] or a Successor Declarant and their respective officers, agents, employees, and assigns to create Fractional Ownership Interests . . . no Unit shall be used for the operation of a timesharing, fraction-sharing, interval ownership, private residence club, membership program, vacation club, exchange network or system or similar program whereby the right to exclusive use of the Unit is alternated or scheduled among participants in the program on a fixed or floating time schedule over a period of years whether by written, recorded agreement or otherwise.

Docket No. 109-8 at 70, § 19.8. The Court refers to the "No Timeshare" and "Limit on Timesharing" provisions together as the "restrictive covenants."

The Declaration of Condominium also sets the terms of membership and management of the Association. Docket No. 109-8 at 26, Art. 6. The Association is a Colorado non-profit that serves as the official owners association for owners of fractional units. Docket No. 119 at 66, ¶ 16. It was organized to "manage, administer, operate and maintain" the Aspen Highlands condominiums. *Id*. at 67, ¶ 22.

On January 12, 2001, the Association and RC Management entered into The Ritz-Carlton Management Company, L.L.C. Management Agreement ("Management Agreement"). *Id*. at 69, ¶ 26; *see also* Docket Nos. 49-5, 49-6.4 The Management Agreement charges RC Management with responsibility for day-to-day management of Aspen Highlands and delegates various of the Association's powers to RC Management. Docket No. 119 at 69-71, ¶¶ 26-36. One of the powers granted to RC Management is the power to:

> Engage a Program Manager through an affiliation agreement, who shall manage and administer the reservation procedures and exchange program for the Ritz-Carlton Club Membership Program (the 'Membership Program') through which Owners of Residence Interests reserve the use of accommodations at a Club as defined in and pursuant to The Ritz-Carlton Club Membership Program Reservation Procedures ('Reservation Procedures').

Docket No. 119 at 71, ¶ 35 (quoting Docket No. 49-5 at 7, § 4.(S)). In relation to this grant, the Association, RC Management, RC Development, and Cobalt entered into The Ritz-Carlton Club Membership Program Affiliation Agreement ("Affiliation Agreement"). *Id*. at 72, ¶ 39; *see also* Docket No. 109-2. Under the Affiliation Agreement "Cobalt is the Program Manager of the Ritz-Carlton Club Membership Program and also operates the reservation system through which Ritz-Carlton Aspen Owners obtain use of their allotted number of days at the Ritz Aspen Highlands and obtain access to the sister Ritz-Carlton Destination Clubs in the Ritz-Carlton Club Membership Program." Docket No. 119 at 73, ¶ 41. The Affiliation Agreement provides that, in addition to the Ritz-Carlton Club Membership Program, Cobalt "may, in its sole discretion, elect to affiliate other locations with the Membership Program as Member Clubs or Associated Clubs from time to time." Docket No. 109-2 at 12, § 7.2.a. The Association and RC Management are not "entitled to participate in or consent to the Program Manager's decision in this regard." *Id*.

The main events at issue in this case began when Cobalt's general manager sent a letter dated July 17, 2012 to the Aspen Highlands owners stating that, "[b]ased on the Ritz-Carlton Destination Club member feedback, additional benefits and experiences will be available through a new affiliation with Marriott Vacation Club Destinations." Docket No. 119 at 75, ¶ 48. Similar letters were sent to members of other Ritz-Carlton Destination Clubs, some of whom, and their various boards, reacted with concern. *Id*. at 76, ¶¶ 50-51. On August 17, 2012, Lee Cunningham of MVC sent a letter on Ritz Carlton Destination Club letterhead reassuring members that "nothing that you originally purchased has

changed or will change as a result of the announcement" in the prior letter. Docket No. 109-6 at 1; *see also* Docket No. 119 at 77, ¶ 52. By contrast, on the same day, the Association sent a letter to its members expressing "concerns" about the impact of the announcement, including that the "nature of our club will change by opening the club to [MVC] timeshare/points members who have a much lower cost of entry," and stating that "there are specific provisions in our Association documents which the Board believes does [sic] not permit MVW to conduct a separate program as they currently intend." Docket No. 109-7 at 1-2.

In September 2012, the Association retained an attorney to evaluate whether the governing documents allowed the proposed affiliation with MVC, which resulted in the attorney sending a cease and desist letter to the Marriott defendants on behalf of the Association on November 21, 2012. Docket No. 119 at 80, ¶ 60 and at 82, ¶ 65. The letter demanded that the Marriott defendants refrain from pursing an affiliation with MVC and stated, in part, that

> In addition to violating the [restrictive covenant in the] Declaration [of Condominium], any practice of allowing the use of the Tourist Accommodation Units at the Aspen Highlands Condominiums by the MVC Members may constitute, among other things, one or more breaches of the fiduciary duties of the HOA Manager [RC Management] to the Association under the HOA Management Agreement as a result of self-dealing among the HOA Manager, the Program Manager, the Marriott licensor entity and their respective affiliates to the detriment of the Association and its members. By permitting MVW and/or the Program Manager to utilize the Tourist Accommodation Units in clear violation of the Declaration, the HOA Manager would be enriching its affiliates and the Marriott licensor entity by creating an attractive offering for the MVC Members, which would increase sales and license fees under Marriott's arrangement with MVW, all at the expense and burden of the Association and its members.

Docket No. 109-14 at 2.

In April 2013, the Association sent letters to its members stating that, after discussions with the Marriott defendants, "Ritz Marriott representatives agree that unless a majority of Aspen Highlands Members (excluding the Marriott interests and Members not in good standing) vote in favor of doing so, Ritz/Marriott will not include Aspen Highlands in the Marriott Vacation Club affiliation/exchange/point program." Docket No. 119 at 84, ¶ 68.

Similar actions were being taken by other Ritz-Carlton Clubs, some of which decided against affiliation with MVC through member votes. For example, on June 2, 2013, the president of the Bachelor Gulch Club's association emailed the president of Aspen Highlands Association's Board stating that "MVW/Ritz has interfered significantly with the [Bachelor Gulch] Board's efforts to conduct a clean, straightforward vote" and confused its members by offering a "'Survey Vote' on Ritz Letterhead asking whether or not [Butler Gulch] Members wanted

to have affiliation to the Marriott Vacation Clubs or not." Docket No. 119 at 85-86, ¶ 72. On July 6, 2013, the Bachelor Gulch president followed up and stated that 89% of its members who voted in the election voted to terminate the club's relationship with the Marriott defendants. *Id*. at 87, ¶ 75; see also id. at 76, ¶ 51 n.4 (alleging that Ritz-Jupiter Club's members also voted to terminate their relationship with the Marriott defendants to avoid the MVC affiliation).

On November 19, 2013, the Association and the Marriott defendants sent a letter to the members stating that they were conducting a "survey . . . to understand the Aspen Highlands Member's interest in this voluntary exchange program, which would allow Members to exchange a week of their reserved allocated time for points within the Marriott Vacation Club Destinations exchange program." Docket No. 119 at 88, ¶ 77. The letter did not mention that the "survey" was related to, or was a substitute for, the member vote referred to in the previous letters. *Id*.

On April 17, 2014, the Association entered into a Memorandum of Understanding stating that a majority of Aspen Highlands members who responded to the survey desired to "participate on a voluntary basis in the [MVC] Exchange Program" and set out various terms on which Aspen Highlands members would be able to do so. Docket No. 108-2 at 3, ¶ 4; *see also* Docket No. 119 at 91, ¶ 83 (alleging the MVC affiliation). The same month, the Association sent a letter to its members announcing the MVC exchange program. Docket No. 109-16 at 2. Plaintiffs allege that, due to the MVC affiliation opening up access to Aspen Highlands to MVC members who can pay approximately 20% of what they paid, plaintiffs' fractional units are worth less than 20% of the original purchase price, while the Marriott defendants have reaped financial rewards. Docket No. 119 at 13-14, ¶ 10.

On December 31, 2015, plaintiffs filed this lawsuit as a class action in the District Court for Pitkin County, Colorado. Docket No. 1 at 3, ¶ 1. On May 27, 2016, the Marriott defendants removed the case to federal court pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332, 1446, 1453. Docket No. 1 at 2. On March 31, 2017, plaintiffs filed the operative complaint. Docket No. 119. The complaint does not contain any class action allegations. *Id*. Plaintiffs bring five claims: (1) breach of fiduciary duty against the Association, RC Management, and Cobalt; (2) constructive fraud against the same defendants; (3) aiding and abetting a breach of fiduciary duty and constructive fraud against all defendants; (4) conspiracy against all defendants; and (5) unjust enrichment against RC Management, Cobalt, MVW, MVCI, and Lion & Crown. *Id*. at 92-100. Plaintiffs seek monetary damages and disgorgement of all monies they have paid. *Id*. at 101-102.

On April 14, 2017, the Association filed its motion to dismiss and the Marriott defendants filed their motion to dismiss. Docket Nos. 129, 131.

For purposes of the present motions, Plaintiffs contend that Marriott "concealed a later agreement (the "2013 Affiliation Agreement")" (ECF #223, p. 1). Plaintiffs also contend that Marriott also failed to produce "an additional set of documents relating to a survey and focus group performed by APCO Worldwide, Inc. (the "APCO documents") that strongly support Plaintiffs' fiduciary duty and constructive fraud claims" (ECF #282, p. 1).

The Affiliation Agreement[6]

On March 13, 2018, Plaintiffs were provided with the Affiliation Agreement (ECF #223, p. 3) (Affiliation Agreement at ECF #223-8). The end game of the production of the Affiliation Agreement is clear. On March 12, 2018, Michael Reiser (counsel for Plaintiffs), by cross-referencing with other documents produced in discovery, determined that the Affiliation Agreement must exist, yet had not been produced (ECF #223, pp. 8-9). Mr. Reiser emailed Counsel for Marriott, Ian Marx, on March 12, 2018 at 10:12 p.m. (ECF #223-7, p. 4 of 6) demanding production of the document. On March 13, 2018 at 9:24 a.m. (some 12-14 hours later-allowing for the vagaries of time zones) the document was produced (ECF #223-7, p. 4 of 6). The Marriott Defendants acknowledge that the Affiliation Agreement was not produced in response to Plaintiffs' discovery request and argue that the failure to produce was "inadvertent" (ECF #273, p. 1).

The Affiliation Agreement formalizes the relationship, the affiliation, between the Marriott Vacation Club Destinations (MVCD) and the Lion and Crown Program (LC). *See*

---

[6] Various pleadings refer to documents entitled "Affiliation Agreement." *See* e.g., request for judicial notice (ECF #224-4, p. 4 of 29, table of contents II. A 2. "The Affiliation Agreement," and *see* Plaintiffs' motion for sanctions, exhibit I (ECF #223-10, pp. 2-3) (referring to a 2010 "Affiliation Agreement"). For clarity and purposes of the instant motion, the "Affiliation Agreement" at issue is the November 14, 2013 Agreement (ECF #223-8).

Affiliation Agreement (ECF #223-8, p. 4 of 53). Plaintiffs assert the import of the Affiliation Agreement is that it speaks to the breach of fiduciary duty by the Aspen Highland Condominium Association in that the Association had to agree to the affiliation. *See generally* Plaintiff's motion for sanctions (ECF #223, pp. 2-3). Marriott has vigorously litigated the fiduciary duty issue under a variety of theories. *See, e.g.,* Marriott's motion to dismiss (ECF #131, pp. 8-13).[7] One of Marriott's many arguments against the fiduciary duty claim was that "[a]ffiliating with MVC was not within the Association's power" (ECF #131, p. 12). Plaintiffs believe that the Affiliation Agreement is the main piece of evidence belying that argument-essentially that it was the missing link. Plaintiffs assert that they were prejudiced in that: (1) they did not have the Affiliation Agreement when conducting certain "critical depositions"; (2) Plaintiffs were forced to respond to both Marriott's (ECF #131) and the Affiliation's (ECF #129) motions to dismiss the fiduciary duty claims without the benefit of the Affiliation Agreement;[8] and (3) Plaintiffs claim they were prejudiced in both the *Petrick* and *Reiser* actions by the failure to produce the Affiliation Agreement.[9] Additionally, during the hearing held on this matter, Plaintiffs argued that their clients had been financially disadvantaged by the delay caused due to the failure to disclose the Affiliation Agreement because of the increase in discovery costs and because Plaintiffs continue to pay monthly Association assessments over the course of this protracted litigation.[10]

---

[7] Plaintiffs assert that Defendants similarly propounded such arguments against fiduciary duty claims in the *Petrick* and *Reiser* actions in state and federal court in California.

[8] The Court would note that Plaintiffs were successful in litigating the motion to dismiss (at least in the instant case) regarding the various fiduciary duty claims. *See* Judge Brimmer's Order (ECF #210).

[9] While the Court will consider the *Petrick* and *Reiser* actions for their evidentiary and persuasive value, given the outcome of this Order, the Court sees no need to rule on what formal action I could have taken based on a discovery violation in another action, informally joined for discovery.

[10] Presumably, the thought behind this argument is that, if Plaintiffs win, they will no longer be paying assessments at the same rate and thus their damages include more extensive assessments over a longer period of time. Alternatively, for Plaintiffs who

Plaintiffs assert that Marriott "concealed" the Affiliation Agreement (ECF #223, p. 3). Once the existence of the agreement was discovered, Plaintiffs contend that Marriott first denied that the Affiliation Agreement had ever been requested and then stated that the failure to provide was inadvertent error.

Defendants view the import of the Affiliation Agreement differently. According to Marriott, the Affiliation Agreement was entered into for the benefit of Ritz Carlton Club (RCC) members, as "a voluntary way to allow RCC members to go to other places" (Marriott response (ECF #273, p. 13) (original citation removed). The Aspen Highland Defendants similarly "disagree[] with Plaintiffs' interpretation of the significance and relevance of the 2013 Affiliation Agreement" (Aspen Highland's response (ECF #262, p. 3)). A fair assessment of the import of the Affiliation Agreement-at least as expressed by the parties-is that Plaintiffs view it as the missing link, *supra*, while Marriott and Aspen Highlands believe it to be of much more minimal significance.

Plaintiffs essentially present an Occam's razor[11] argument tying in Plaintiffs' view of the importance of the Affiliation Agreement to the case to the failure to produce. Plaintiffs assert that the evidence establishing intentional concealment of the Affiliation Agreement is "overwhelming" (Plaintiffs' reply to Marriott (ECF #278, p. 1)). Plaintiffs believe that the Court should look at the pre-litigation conduct of Marriott regarding the Affiliation Agreement in combination with the failure to produce during discovery. *Id*. Plaintiffs argue that Marriott intentionally withheld the Affiliation Agreement from one or more boards and instead had those

---

may wish to sell, a positive outcome in this litigation may affect their sales price-having the same trickle-down effect in terms of paying a higher assessment over a longer time.

[11] Occam's razor is a principle that gives precedence to simplicity, e.g., of two competing explanations, the simpler is to be preferred. *See* Wikipedia, Posterior Analytics.

boards execute an Acknowledgement of and Joinder (*See* Plaintiffs' reply for the argument to this effect (ECF #278, p. 2); and *see* Marriott's sur-reply (ECF #290-2) for the actual Acknowledgement of and Joinder). Basically, Plaintiffs assert that Marriott did not want the Board(s) to see the Affiliation Agreement so they found a work-around, creating a way for the Affiliation Agreement to be executed without actually being reviewed. As set forth *supra* Marriott has a different opinion as to the significance of the Affiliation Agreement.

Plaintiffs also outline in their motion, *see generally* ECF #223, pp. 5-8, how they believe deposition conduct appears suspiciously like a continued attempt to conceal the agreement based on "changed testimony," "confusing testimony," and a "woodshedding" of deponent Lee Cunningham. *Id*. pp. 6-7.

Plaintiffs also assert that the course of conduct in the *Petrick* and *Reiser* actions, both discovery and dispositive motion practice, are indicative of a continued intent to conceal the Affiliation Agreement. *See* sanctions motion (ECF # 223, p. 9, fn 4). With regard to the dispositive motion practice, both in the California actions and in this one, Plaintiffs conflate Marriott's opposition to the fiduciary duty claims with concealment of the Affiliation Agreement. Essentially Plaintiffs' point can be stated as follows: Defendants knew they were breaching their fiduciary dut[y][ies]; the Affiliation Agreement serves as proof of such breach[es]; thus, the Affiliation Agreement was concealed to hide those breaches until after the conclusion of dispositive motion litigation on the subject. Plaintiffs argue that a supposed failure to show the Board(s) the Affiliation Agreement is further proof that there was essentially a plan or conspiracy to hide the Affiliation Agreement during the course of discovery in the action(s).

Oral argument was held regarding this issue on November 20, 2018. Plaintiffs submitted two demonstrative exhibits (ECF #324). Both exhibits can be summarized as timelines-of a sort. Exhibit 1 is a timeline showing the course of various litigations in all three actions from 2016 to 2018 with a breakdown of relevant pleadings, discovery, perceived "failures," and depositions. Exhibit 2 tracks the course of factual events leading up to and through execution of the Affiliation Agreement and until litigation commenced.

By combining: (1) the pre-litigation conduct; (2) the course of conduct during the litigation which includes depositions, certifications, and disclosures; (3) by reviewing the parallel conduct in *Reiser* and *Petrick*; and (4) by considering what Plaintiffs believe to be inconsistent answers by Attorney Marx for Marriott once the Affiliation Agreement was specifically asked for, Plaintiffs argue that the intent to avoid proper disclosure of the Affiliation Agreement can be discerned. Plaintiffs also argue that Attorney Marx violated Rule 26(g) by certifying the completeness of discovery when the Affiliation Agreement had not been provided (ECF #223, p. 17). There is a dispute over whether there was final certification that document production was complete versus "substantially complete." *See* Plaintiffs' motion (ECF #223, p. 5). Nevertheless, Marriott's Counsel, Attorney Marx, signed agreeing to so produce. *See* Marriott's responses (ECF #223-3, pp. 5 & 10).

Marriott, outlining the course of discovery in this and the other actions, argues that the failure to produce the Affiliation Agreement was "inadvertent" (Marriott's response (ECF #273, p. 1)). While there was no formal legal agreement-at least from a Court perspective-as to joint discovery, the parties engaged in what Marriott has termed "a coordinated approach to fact discovery." *Id*. at p. 3. As stated by Marriott, this involved an agreement between the parties in this action, *Petrick*, and *Reiser* for common ESI production, common "hard copy" production,

and joint depositions. *Id*. at pp. 3-5. With regard to ESI, Marriott outlines how several million documents were culled down to a production of roughly 80,000 pages through joint negotiation of search terms, date ranges, etc. *Id*. at p. 3. With regard to "hard copy" discovery, these items were also produced-with the obvious exception of the Affiliation Agreement. *Id*. at p. 4. Marriott discusses how other documents, particularly the Acknowledgement Agreement, mention the Affiliation Agreement, *Id*. at p. 5., which is how Mr. Reiser finally determined provision had not occurred. *See supra.* Marriott goes on to discuss how the Affiliation Agreement was discussed during the Sobeck Deposition-with an unconsummated agreement to provide the document. *Id*. at p. 5. Finally, Marriott discusses how the Affiliation Agreement is repeatedly referenced in the privilege log. *Id*. at p. 6. Marriott asserts that all of those repeated references, as well as the complexity of the discovery provision in this action, show that the failure to disclose was inadvertent, e.g., if there was some plan to hide the Affiliation Agreement it would not have been repeatedly and openly referenced. As discussed *supra* Marriott and Aspen Highlands also have a different opinion as to the import of the Affiliation Agreement, not ascribing to the document nearly the mythical missing link status preferred by Plaintiffs. Nevertheless, Marriott acknowledges that the document should have and was not timely produced. *Id*. at p. 1.

The APCO Documents

As stated by Judge Brimmer in the factual section set forth above:

> On November 19, 2013, the Association and the Marriott defendants sent a letter to the members stating that they were conducting a "survey . . . to understand the Aspen Highlands Member's interest in this voluntary exchange program, which would allow Members to exchange a week of their reserved allocated time for points within the Marriott Vacation Club Destinations exchange program." Docket No. 119 at 88, ¶ 77. The letter did not mention that the

"survey" was related to, or was a substitute for, the member vote referred to in the previous letters. *Id*.

*See supra*. This survey was conducted by APCO Worldwide, Inc. Plaintiffs state that [i]nstead of producing the reports-with their cogently summarized results and tables-and internal emails, Marriott produced only a 128-page spreadsheet of raw survey-result data that did not mention "APCO" and was an extremely cumbersome document with which to examine witnesses" (Plaintiffs' motion (ECF #282, p. 2)). Plaintiffs state that they requested production of all documents concerning "surveys." *Id*., and *see* Ferguson affidavit (ECF #282-1, p. 7) (providing details as to the request of survey documents). Plaintiffs subpoenaed files directly from APCO, thus learning of the missing APCO files, "then called Marriott to task for not producing its own APCO files . . ." (ECF #282, p. 3). This resulted in provision of the APCO documents from Marriott on June 29, 2018. *Id*. Plaintiffs assert that the APCO documents are of similar significance to the Affiliation Agreement in that they "directly pertain to Marriott's liability for breach of fiduciary duty and constructive fraud." *Id*. at p. 5. As with, and in addition to the arguments made above, Plaintiffs assert that "[t]he two sanctions motions together show Marriott's disturbing and pervasive pattern of concealment, obfuscation, and dishonesty in both document production and deposition testimony." *Id*. at p. 3. Plaintiffs intertwine their discovery violation argument with their argument that the "December 2013 survey by itself was a sham." *Id*. at p. 6. Plaintiff asserts that "the evidence shows that Marriott willfully concealed the APCO files" and that Marriott's claim that the failure to provide was "inadvertence" is not credible." *Id*. at p. 8. Plaintiffs believe that the pattern of discovery shows that the failure to provide the APCO documents shows "Marriott's wrongful intent to conceal them." *Id* at p. 10. In both their first (ECF #223, p. 11) and second (ECF #282, p. 7) default judgment motions, Plaintiffs assert

that the factors set forth in *Erenhaus v. Reynolds*, 965 F.2d 916, 921 (10th Cir 1992) have been met. I will address those factors *infra*.

As set forth regarding the Affiliation Agreement *supra*, Marriott details the steps it took to produce discovery in this, and the related cases, and the failure to provide the APCO documents (Marriott's response (ECF #295, pp. 2-9)). Marriott admits that there was a failure to produce the APCO documents but further states that there was "[n]o intentional concealment." *Id*. at p. 2. Rather, the failure was "because the contract lawyers [Marriott] hired to review documents in this case erroneously marked the APCO documents as "non-responsive."" *Id*. Marriott outlines the discovery procedure leading up to the failure to produce the APCO documents, and reiterated those steps in the hearing before this Court on the issue.

A. There was an agreed upon and coordinated discovery protocol for the three cases (ECF #295, p. 3);

B. APCO Worldwide was engaged to complete a survey and many of the documents related to the APCO survey were released in discovery. *Id*. at pp. 3-5;

C. Marriott's Counsel, Greenberg Traurig (GT), engaged Special Counsel, Inc. for purposes of reviewing some 100,000 electronic documents generated in response to the discovery protocol. *Id*. at pp. 6-9; *see also* A. *supra;* and *see* Marx declaration (ECF #295-1). GT Attorney Ian Marx personally conducted a two-day training session with Special Counsel in order to insure proper discovery compliance and remained in continual contact during the work of Special Counsel. *Id*. at pp. 6-7. The "audit report" shows how the APCO documents were labeled "non-responsive" by Special Counsel and thus not produced. *Id*. at pp. 8-9.

<u>LEGAL ANALYSIS</u>

The Affiliation Agreement motion is premised on the idea that the Court should use its inherent power to fashion sanctions for Marriott's violation of Rule 26(g). However, Plaintiffs additionally encourage the Court to impose sanctions for "bad faith conduct" (ECF #223, p. 12). Further, Plaintiffs apply the *Erenhaus* factors in the context of the Affiliation Agreement motion (ECF #223, p. 14-18). The APCO motion appears to be more generally grounded in the argument that I should exercise my authority on the basis that the Marriott Defendants have "willfully interfered with the judicial process" and thus impose sanctions-default judgment[12]-after application of the *Erenhaus* factors.

Rule 26 (g)(3) states:

> If a certification violates this rule without substantial justification, the court, on motion or on its own, must impose an appropriate sanction on the signer, the party on whose behalf the signer was acting, or both. The sanction may include an order to pay the reasonable expenses, including attorney's fees, caused by the violation.

Fed. R.Civ.P. 26(g)(3).

> [F]ailure to comply with the requirements of Rule 26(g) provides [a] basis for imposing sanctions. *Cf. National Association of Radiation Survivors v. Turnage,* 115 F.R.D. 543, 556 (N.D.Cal.1987) (the consistent failure of defendant and its counsel to conduct reasonable factual inquiries prior to filing discovery responses are sanctionable under Rule 26(g) where the omitted documents and information should have been disclosed). Rule 26(g)(3) provides, in pertinent part, that appropriate sanctions shall be imposed by the court either on its own motion or on the motion of a party, "[i]f without substantial justification a certification is made in violation" of Rule 26(g). *See also St. Paul Reinsurance Co., Ltd. v. Commercial Financial Corp.,* 198 F.R.D. at 516 (sanctions under Rule 26(g)(3) do not require a finding of bad faith). "Where a violation of Rule 26(g) occurs, imposition of sanctions is mandatory." *Gucci America, Inc. v. Costco \*637 Wholesale Corp.,* 2003 WL 21018832, \*2 (S.D.N.Y.2003). However, Rule

---

[12] Were I to recommend default judgment, that would be a dispositive matter thus rendering this a Recommendation rather than an Order. *See* fn. 2 *supra*.

26(g)(3) gives the court discretion to impose an "appropriate" sanction, which may not necessarily include an award of attorneys fees and costs.

*Cache La Poudre Feeds, LLC v. Land O'Lakes, Inc.*, 244 F.R.D. 614, 637-37 (D. Colo. 2007) (collecting cases with examples of sanctionable violations).

Bad Faith

Courts have the inherent power to sanction bad faith conduct occurring during the course of litigation. *See Farmer v. Banco Popular of North America*, 791 F.3d 1246, 1256 (10th Cir. 2015). 'Bad faith' is the antithesis of good faith and has been defined in the cases to be when a thing is done dishonestly and not merely negligently. It is also defined as that which imports a dishonest purpose and implies wrongdoing or some motive of self-interest. *Attorneys Title Guaranty Fund v. Goodman,* 179 F.Supp.2d 1268, 1277 (D.Utah 2001). *Cf. United States v. Heiser,* 2006 WL 1149254, *11 (M.D.Pa.2006) (holding that "'bad faith' with respect to destruction of evidence requires more than mere negligence, it requires ill will towards [the defendant] or a conscious effort to frustrate his defense").

Default judgment is generally considered a harsh sanction that should be used only when a party's noncompliance is due to "willfulness, bad faith, or any fault of the [disobedient party]" and not when a party is unable to comply with a discovery order. *Nat'l Hockey League v. Metro. Hockey Club, Inc.,* 427 U.S. 639, 640, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976) (quoting *Societe Internationale v. Rogers,* 357 U.S. 197, 212, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958)); *see also In re Standard Metals Corp.,* 817 F.2d 625, 628–29 (10th Cir.1987) ("We have defined a willful

failure as 'any intentional failure as distinguished from involuntary noncompliance. No wrongful intent need be shown.'" (quoting *Patterson v. C.I.T. Corp.,* 352 F.2d 333, 336 (10th Cir.1965))).

## *Erenhaus v. Reynolds*

"Before choosing dismissal as a just sanction, a court should ordinarily consider a number of factors, including: (1) the degree of actual prejudice to the defendant; (2) the amount of interference with the judicial process; ... (3) the culpability of the litigant, and (4) whether the court warned the party in advance that dismissal of the action would be a likely sanction for noncompliance." *Ehrenhaus supra,* 965 F.2d at 921 (internal quotations and citations removed). A fifth factor to consider is "the efficacy of lesser sanctions." *Id*.

## The Affiliation Agreement

Marriott admits that it did not timely disclose the Affiliation Agreement-which was finally disclosed on March 13, 2018. Plaintiffs assert that all such agreements were requested as early as August 5, 2016. *See* hearing exhibit no. 1 (ECF #342, p. 1). As discussed *supra*, breadcrumbs were there, e.g.: mention in the privilege log, discussion in the Sobeck deposition, and the ultimate reference in the agreement which led to Counsel for Plaintiffs specifically requesting the document. While there is dispute between the parties about the ultimate significance of the Affiliation Agreement, there is no doubt that the document should have been provided. Plaintiffs' position is that the non-provision of the Affiliation Agreement should be viewed in conglomeration with actions in all three cases (both within the litigation, e.g., any

discovery violation in the companion actions) and (viewing the course of the case, e.g., the proposition that the Affiliation Agreement was hidden from the Board(s) and that this is thus a continuation of a scheme to deceive) and that it should be viewed along with the APCO documents. I will conduct that joint analysis later. First, I find it appropriate to essentially review non-provision of the Affiliation Agreement in a vacuum and determine what kind of violation it was.

The Affiliation Agreement is not electronically stored information (ESI). It was kept in hard form. To put it simply, it was missed. In a case (cases really) with a huge amount of discovery, including multiple agreements, this one was overlooked. Unfortunately for all involved, it was overlooked for a long time. Undoubtedly, there was a violation of Rule 26. Plaintiffs requested all documents and Marriott agreed to provide such documents. *See* Marriott's responses to requests for production signed 10/13/2016 (ECF #223-3, p. 5). Providing the document some 15 months later was a violation of Rule 26.

Looking at the Affiliation Agreement individually, the Court cannot say that there was substantial justification under Rule 26(g)(3) for the non-provision. Yes, there were a significant number of agreements to provide. But the complexity of the action and number of documents to review is not, in and of itself, substantial justification. *See National Association of Radiation Survivors v. Turnage*, 115 F.R.D. 543, 556 (N.D. Cal. 1987) (the consistent failure of defendant and its counsel to conduct reasonable factual inquiries prior to filing discovery responses are sanctionable under Rule 26(g) where the omitted documents and information should have been disclosed). The non-moving party has the burden of showing that they were substantially justified in failing to comply with Rule 26(a)(1). *Nguyen v. IBP, Inc.,* 162 F.R.D. 675, 680 (D.Kan.1995).

> The determination of whether a Rule 26(a) violation is justified or harmless is entrusted to the broad discretion of the district court. A district court need not make explicit findings concerning the existence of a substantial justification or the harmlessness of a failure to disclose. Nevertheless, the following factors should guide its discretion: (1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness.

*Woodworker's Supply, Inc. v. Principal Mutual Life Insurance Co.,* 170 F.3d at 993.

Here, the non-provision is not substantially justified. The Affiliation Agreement, whatever ultimate importance a fact-finder assigns to it, was and remains an important document. Setting aside the failure to provide the document in *Reiser* and *Petrick*, Marriott has not substantially justified its failure to produce the document in this action. *See Nguyen,* 162 F.R.D. at 680. I say that, keeping in mind that "the standard for evaluating discovery is reasonableness, not perfection." *Agerbrink v. Model Service LLC*, 2017 WL 933095 * 5 (S.D.N.Y. 2017) (citations removed-collecting cases). Nevertheless, given the purported importance of the AA and the knowledge that it had not been provided-at least as of November 17, 2017, *see* Marx affidavit (ECF #273-1, pp. 5-6)-the failure to provide goes beyond merely overlooking one agreement in a sea of documents. Here, one of Marriott's lead attorneys was notified to look for an affiliation agreement, personally promised to produce, and did not do so with no apparent reason. *Id*. This chain of events convinces the Court that: (1) the failure was not substantially justified; and (2) the non-moving party has not met their burden of showing substantial justification.

There is and remains prejudice to Plaintiffs. This prejudice includes, in this action, claim amendment issues as discussed in Plaintiffs' reply (ECF #278, p. 9), e.g., Plaintiffs assert that they would have moved to further amend their claims had they been timely provided with the AA. Plaintiffs were forced to re-depose certain witnesses, may have some additional depositions

to notice and take, and expended extra time and effort on this portion of the case as a result of the failure to provide the AA.  Finally, this has somewhat extended the litigation-again costing more.  The prejudice can be cured.  While this litigation has been ongoing for years, no trial date is set.  The Plaintiffs may choose not to attempt to amend their claims-a tactical decision at this juncture-but that avenue is not foreclosed.  Deposition issues can be resolved.  Of course, this all costs money and time.

Moving on to bad faith, I find none-at least not when I look at the Affiliation Agreement individually.  As stated above, "bread crumbs" were left.  By this I mean that Marriott seemed to be taking no pains to hide the existence of the Affiliation Agreement (AA).  The AA was discussed in one or more other documents and it was brought up in a deposition.  Most tellingly, it was provided within less than a day when its non-provision was definitively discovered.  The Court sees plenty of examples of bad faith in the conduct of discovery, and while there is no one pattern for such problematic litigation conduct, this situation does not appear to have occurred due to the bad faith of Marriott or its Counsel.  I find no ill will, conscious effort to deceive, or dishonest purpose.  This was a mistake-perhaps a costly and time-consuming mistake-but a mistake nonetheless.

Plaintiffs have applied the *Erenhaus* factors in their motion (ECF #223, pp. 14-18).  Prior to applying the factors set forth by the Court in *Erenhaus*, there was an initial recognition that "[a]t the outset, we recognize that dismissal represents an extreme sanction appropriate only in cases of willful misconduct."  *Erenhaus*, 965 F.2d at 920 (citations removed).  As I find non-provision of the Affiliation Agreement to be a mistake and not willful misconduct, I do not find it appropriate to apply the *Erenhaus* factors-at this time.

With regard to the Affiliation Agreement, I do not find willful misconduct and default judgment is not appropriate. However, as the failure to disclose was not substantially justified, I do find it appropriate to impose sanctions under Rule 26(g)(3) and those sanctions will be addressed below.

The APCO Documents

Plaintiffs state that during the course of discovery they requested production of all documents concerning "surveys." Plaintiffs' motion (ECF #282, p. 2), and *see* Ferguson affidavit (ECF #282-1, p. 7) (providing details as to the request of survey documents). Marriott admits that there was a failure to produce the APCO documents but further states that there was "[n]o intentional concealment." (Marriott's response (ECF #295, pp. 2-9)). Undoubtedly, there was a violation of Rule 26. Plaintiffs requested all documents and Marriott agreed to provide such documents-and did not do so. As analyzed *supra* with regard to the AA, the Court must determine: (1) substantial justification; and (2) willfulness or bad faith.

First, the importance of the APCO documents in this litigation needs to be established. Plaintiffs were properly provided in discovery with much of the raw data behind the APCO documents. *See* ECF #282-10. Plaintiffs did not get APCO's reports (ECFs #282-3, 282-4, as well as some emails relating to APCO, *see*, e.g., 282-14 (which discusses a survey but not "APCO"). The Court cannot say that the APCO documents are insignificant, and, of course, each party has its position as to overall significance-greater or lesser. Plaintiffs essentially ascribe the APCO documents the status of the smoking gun, asserting they "directly pertain to Marriott's liability for breach of fiduciary duty and constructive fraud" (ECF #282, p. 5).

Marriott, having a different view as to the significance of a survey versus a vote regarding affiliation, necessarily sees the APCO documents in a different light as well-taking the position that the documents do not "reveal any intention on the part of the Marriott Defendants to mislead . . ." (ECF #295, p. 10).

The Court is not going to weigh into the issue of whether the survey versus vote issue is as dispositive as Plaintiffs believe or as *de minimis* as Marriott suggests. The fiduciary duty claim(s) are going forward, and the survey/vote dispute will be at the heart of that controversy. Turning to the APCO documents, if Marriott was trying to hide the fact that a survey was conducted, it did a very poor job of deception. Aside from the fact that many of the Plaintiffs directly participated, the record is replete with references to the survey and the raw data was provided. But the nice neat packaging of the APCO reports-complete with executive summary and colorful charts and graphs-was not.

Plaintiffs essentially argue that the course of deposition questioning would have been altered, *see*, e.g., discussion of the Sobeck deposition (ECF #282, p. 11), had Plaintiffs been provided the APCO documents prior to certain depositions. And this is a fair point. Deposing off the neatly packaged APCO documents would inherently be easier than from the raw data. Common sense dictates that it would have been far easier to pin down a witness using the APCO documents-which summarize and editorialize on the survey results-than the results themselves. For example, the strategic implication portion of the APCO document states "Dissatisfaction with Ritz-Carlton Destination Club could end up hurting the Ritz-Carlton Brand" (ECF #282-3, p. 3). If Plaintiffs were trying to pin down that Marriott was aware of the consequences of its actions, as may be necessary in support of a fiduciary duty claim, deposing off the above statement-a conglomeration of the many surveys-would be better than asking if a particular

survey respondent was opposed to the RCDC affiliation with Marriott. So, there was a Rule 26 violation, a violation which had some negative consequence(s) on Plaintiffs prosecution of their case.

As with the Affiliation Agreement that Marriott failed to provide, also a Rule 26 violation, the Court must look to whether failure was substantially justified-for only without substantial justification can a sanction be imposed. *See* Rule 26(g)(3). The Court has set forth, *supra*, the course of events leading to the APCO documents being labeled "non-responsive" and thus excluded by Special Counsel. Unlike the Affiliation Agreement, the APCO documents were electronically stored information (ESI) and must be viewed through that lens. First, I do not look at this situation any differently, as I do not believe it would be fair to do so, based on the fact that Marriott-or its Counsel-chose to outsource the document review to Special Counsel rather than keep it in-house. The Court knows of no reason to believe that the standard of care should be any different whether discovery is handled directly by Counsel versus being outsourced.

The methodology for ESI review as it applies to the controversy over the APCO documents was set forth *supra*. When I evaluate the steps taken by Marriott's Counsel, in light of whether such steps were reasonable, *see Agerbrink v. Model Service LLC*, 2017 WL 933095 * 5, the Court concludes that a reasonable search and review of the ESI occurred. While it is unfortunate that the APCO documents were labeled "non-responsive," the Court cannot say, without undue Monday morning quarterbacking, that the search methodology was flawed. In retrospect, the failure appears to be, in-part, because there was not a secondary review of "non-responsive" documents as opposed to a built in second level review of responsive documents. *See* Marriott's response (ECF #295, pp. 8-9). But my review is not to determine the best

discovery production method for the ages, it is to decide whether the ESI system utilized for this review was reasonable. While the system obviously was not perfect-it failed at least as to the APCO documents-it was reasonable. For those reasons, the failure to produce the APCO documents was substantially justified.

As the failure to produce the APCO documents was substantially justified, it was not the product of bad faith-*res ipsa loquitur*. The APCO failure was a mistake, and a justified one at that, not the result of willful misconduct. As such, I again do not find it appropriate to apply the *Erenhaus* factors-at this time.

The Totality of the Circumstances

Plaintiffs move to consolidate the two instant motions for default judgment on the basis that "[t]he two sanctions motions together show Marriott's disturbing and pervasive pattern of concealment, obfuscation, and dishonesty in both document production and deposition testimony" (Plaintiffs; APCO motion (ECF #282, p. 3)). The Court will next, as requested by Plaintiffs, review the situation as a whole in order to determine if that 10,000 foot view changes the perspective and establishes bad faith or willful misconduct by Marriott. Regarding the first motion, Plaintiffs' position, as set forth *supra*, is that the Affiliation Agreement was wrongfully withheld: (1) from the various boards; and (2) in all three litigations (in discovery and in depositions). With regard to the APCO documents, Plaintiffs assert that Marriott was hiding the fact that it did not take a vote behind a survey and thus hid the survey during the time before and during the litigation. This theory suggests an intentional intent to deceive a variety of boards, attorneys and courts over multiple states and litigations.

While the Court is not unaware of the fact that such deceptive practices could occur during the course of litigation-having seen such behavior over the course of multiple actions-that does not appear to be what occurred here for a variety of reasons.

The analysis on this score starts with the assertion that the 2013 Affiliation Agreement was hidden from the RCDC Association from the get go.  *See* Plaintiffs' Motion (ECF #223, p. 4).  As set forth *supra*, Plaintiffs argue that, rather than have the RCDC enter directly into the Affiliation Agreement, a work-around was created by having another agreement signed agreeing to the Affiliation Agreement.  Plaintiffs view the Acknowledgement of and Joinder to **Affiliation Agreement** between the Lion & Crown Travel Co., LLC and Marriott Resorts, Travel Company, Inc. (ECF #273-5) Acknowledgement Agreement) (**emphasis** mine) as the document that bypassed the Affiliation Agreement.  As set forth by Attorney Reiser, it was the review of ECF #273-5 that triggered the final knowledge of existence of the Affiliation Agreement.  *See* Reiser declaration (ECF #223-1, p. 5). In the first full paragraph of the Acknowledgement Agreement it states:

> Capitalized terms used in this Acknowledgement and not defined herein shall be ascribed the meaning set forth in that certain Affiliation Agreement between MRTC and Lion & Crown dated November 14, 2013 (as MRTC in their sole discretion, the "**Affiliation Agreement**").

Acknowledgement Agreement (ECF #273-5, p. 2, para. 1).  The Acknowledgement Agreement, containing three (3) pages of text, goes on to mention the Affiliation Agreement another half-dozen times.  *Id*.  Rather than being interposed for purposes of deception, Marriott's view of the Affiliation Agreement is that it served to make reciprocal the usage of Marriott facilities by RCC members.  *See* Marriott's response (ECF #273, p. 13).  Undoubtedly, the parties will vigorously

advocate those competing positions to the finder of fact at the appropriate time during the continuation of this litigation.

For purposes of the present analysis, I have to determine whether there was bad faith or willful misconduct- now looking at the situation as a whole- with the supposed intent to hide the Affiliation Agreement as a part of that whole. To put it bluntly, if Marriott was trying to hide the Affiliation Agreement, they did a relatively ham-handed job of it. Marriott left too many clues, from explicit discussion in the Acknowledgement Agreement to specific deposition testimony by Ms. Sobeck, for the Court to be convinced that there was an intent to bury the Affiliation Agreement. The failure to provide was a mistake, perhaps a costly and time-consuming mistake, but a mistake nonetheless.

Continuing with the analysis of the entire situation, I look next to the APCO documents. As stated *supra*, while there is significant debate over the purpose of the survey versus a vote, the fact that a survey was conducted was never hidden. The raw data, hundreds of pages of it, were provided. It was the final reports that were labeled non-responsive. Again, this does not smack of deception but of error-when looked at individually or collectively. A mistake was made, here by a combination of Special Counsel and the lack of a second level review for non-responsive documents.

Much is made of the fact that the failure to provide the Affiliation Agreement affected not only this action but also the *Petrick* and *Reiser* actions. See Plaintiffs' motion (ECF #223, p. 4). While not excusing the Rule 26 violation, unfortunately, this conglomeration of failures is the logical result of shared discovery across the cases and not necessarily a scheme relating to each case. And this is not to disparage the parties entering into a joint discovery agreement-

either formally or informally. Such agreements might make sense in actions such as these and further the goals of Rule 1 in "secur[ing] the just, speedy, and inexpensive determination of every action and proceeding." However, the countervailing result may be that a discovery mistake populates over multiple cases, thus causing a cascading set of problems rather than problems in just one case. The Court is aware of Plaintiffs' argument that, while arguing that Marriott was litigating against the fiduciary duty claims, the Affiliation Agreement was not provided-thus bolstering the anti-fiduciary duty argument. *See* Plaintiffs' motion (ECF #223, p. 5). But Marriott is entitled to oppose the fiduciary duty argument, and the Rule 26 violation with regard to the Affiliation Agreement is not necessarily a smoking gun on that score. By that I mean that the juxtaposition of the two does not necessarily conflate to some sort of bad faith nor willful misconduct.

To sort this out, I have to look to the: (1) course of discovery conduct as a whole; (2) the remed(y)(ies) afforded by Marriott upon discovery of the non-provision of both the Affiliation Agreement and the APCO documents; and (3) the record made over the course of the case. Briefly, it is instructive to turn to the *Erehnaus* factors, not because I believe the parties have made the initial showing of bad faith to get to application of the factors, but because the 4th factor-notice-is critical to the course of conduct. Here, the record is specifically not replete with prior admonition of any sort. Plaintiffs' first motion (ECF #223) was filed on 4/27/2018 and Plaintiffs' second motion (ECF #282) was filed on 7/3/2018. But, the two appear substantially unrelated and the reasons for the non-provision in each are so distinct that it would be a significant stretch to afford the 1st violation the status of warning for the 2nd. In this case, the Court has taken no prior action for any discovery violation, issued no warnings, nor admonished any party for failings in the discovery process. The parties, in their briefs, dispute whether I can

impose default judgment without the existence of the 4th (notice) factor. While I do not need to determine that issue, as I am not recommending default judgment, I do find the lack of notice to be persuasive to the overall situation.

There have been some disputes and negotiations between the parties during the course of discovery in this matter. It would be surprising if there were not such disputes. As has been explicitly detailed herein, discovery in this matter has been complex and extensive. While it has taken a significant amount of time, and no doubt been an expensive endeavor, the course of discovery has appeared, in large part, to have been less contentious than in many actions. Until the instant motions, there was nothing that necessarily keyed the Court in to indicate discovery was going astray. As discussed by Plaintiffs, particularly with regard to the Affiliation Agreement, Plaintiffs believe that the post-discovery emails of Marriott Attorney Marx show an intent to deceive based on differences therein. *See* Affidavit of Attorney Reiser (ECF #223-1, pp. 6-7) and *see* emails between Attorneys Reiser and Marx on March 15, 2018 (ECF #223-9); but *c.f.*, emails between Attorney tyler@meadefirm.com and Attorney Marx on April 4, 2018 (ECF #223-10). The Court does not read the differences in these emails to be indicative of intent to deceive but rather to impart additional information as garnered after further review and investigation.

In terms of remedies, it appears that Marriott tried to make right their mistake by allowing additional depositions and taking other steps to fix the problem their non-provision caused. However, in the Court's view, additional steps need to be taken to remedy the failure concerning the Affiliation Agreement as set forth *infra*.

For the reasons set forth in detail above, I find as follows;

I find that there was a discovery violation with regard to the Affiliation Agreement. I do not find that the violation was substantially justified. Thus, I Order reasonable expenses, attorney fees, and other relief to remedy the violation.

I find that there was a discovery violation with regard to the APCO documents. I do find the violation to be substantially justified. Therefore, I will Order no sanction as a remedy for this violation.

I find no bad faith nor any willful misconduct. I specifically do not find this situation to merit default judgment.

I find absolutely no misconduct or violation by Aspen Highlands. As to whether I should consider Ordering Marriott to pay for any additional deposition(s), that is encapsulated in my Order below.

The Court is loathe to open this issue to a Pandora's box of further briefing, yet some clarity needs to be sought as to costs, fees, and other potential remedies. Therefore, Plaintiffs shall have fourteen days to do the following:

(1)     Provide a detailed bill of fees and costs, complying with all rules and statutes, including local rules, setting forth specific costs and fees related only to the Rule 26 violation, in this action, for the non-provision of the Affiliation Agreement. The Court is not Ordering the payment of fees and costs that it took to litigate this extensive default judgment controversy over

the past six (6) months. What the Court is referring to is specific costs/expenses/fees Plaintiffs had to expend to otherwise fix the problem(s), e.g., extra deposition(s), travel, etc.; and

(2)    Request any other remedies being sought by Plaintiffs meant to correct the prejudice suffered by non-provision of the Affiliation Agreement, e.g., amendment of claims, additional depositions, etc.  The Court understands Plaintiffs to not want to proceed with amendment due to: the current posture of the case, e.g., summary judgment motions have been filed; the expense involved in attempting to amend; and the fact that amendment may protract the litigation.  Yet, the pleadings did not completely foreclose Plaintiffs wanting to argue this point.  So, if Plaintiffs wish to attempt to amend, now is the time.

Dated at Grand Junction, Colorado, this December 31, 2018.

_____

Gordon P. Gallagher

United States Magistrate Judge