# EXHIBIT - C

Lee Cunningham - November 10, 2017

```
 1   RCHFU, LLC,  et al.,
          Plaintiffs,
 2                                 United States District Court
     v.                            District of Colorado
 3                                 No.   1:16-cv-09390
     MARRIOTT VACATIONS WORLDWIDE
 4   CORPORATION, et al.,
          Defendants,
 5   _____/
 6   REISER, et al.,
          Plaintiffs,        Eastern District of California
 7   v.                      No. 2:16-cv-00237-MCE-CKD
 8
     MARRIOTT VACATIONS WORLDWIDE
 9   CORPORATION, et al,
          Defendants,
10   _____/
11   PETRICK, et al.,
          Plaintiffs,
12                                 San Francisco County
13   vs.                           No. CGC-15-54897
     MARRIOTT VACATION WORLDWIDE
14   CORPORATION, et al.,
15        Defendants.
16   _____/
17
18              VIDEOTAPED DEPOSITION OF LEE CUNNINGHAM
19        VOLUME I, commencing between 9:03 a.m.-5:05 p.m.,
20        on Friday, November 10, 2017 Taken on Behalf of
          the Plaintiffs before Lisa Gerlach, Court Reporter,
21        Notary Public in and for the State of Florida at
22        Large, pursuant to Plaintiffs' Notice of Taking
23        Deposition in the above cause.
24
     Job No. 2733753
25   PAGES 1 - 269
```

Page 1

Lee Cunningham - November 10, 2017

| | |
|---|---|
| 1  Appearances: | 1                INDEX |
| 2 | 2 |
| 3  Counsel for the Plaintiffs: | 3  WITNESS      EXAMINATION           PAGE |
| 4      The Matthew C. Ferguson Law Firm, PC | 4  Lee Cunningham |
| 5      BY: MATTHEW C. FERGUSON, ESQUIRE | 5      Direct by Mr. Ferguson        7 |
| 6      119 South Spring, Suite 201 | 6      Direct by Mr. Reiser       115 |
| 7      Aspen, CO 81611 | 7      Direct, continued, by Mr. Ferguson   161 |
| 8      matt@matthewfergusonlaw.com | 8      Direct, continued, by Mr. Reiser   226 |
| 9 | 9 |
| 10     Reiser Law, PC | 10 |
| 11     BY: MICHAEL S. REISER, ESQUIRE | 11 |
| 12        ISABELLA MARTINEZ, ESQUIRE | 12 |
| 13        MATTHEW REISER, ESQUIRE | 13            PLAINTIFFS' EXHIBITS |
| 14     1475 Broadway, Suite 300 | 14            None |
| 15     Walnut Creek, CA 94596 | 15 |
| 16     michael@reiserlaw.com | 16 |
| 17     isabella@reiserlaw.com | 17            DEFENDANTS' EXHIBITS |
| 18     matthew@reiserlaw.com | 18  Exhibit 1279A  Blowup of Exhibit 1279   212 |
| 19 | 19 |
| 20 | 20 |
| 21 | 21 |
| 22 | 22 |
| 23 | 23 |
| 24 | 24 |
| 25 | 25 |
| Page 2 | Page 4 |

| | |
|---|---|
| 1  Appearances: | 1      THE VIDEOGRAPHER:  Good morning.  We're |
| 2 | 2  going on the record at 9:03 a.m. on |
| 3  For the Defendant Marriott: | 3  November 10, 2017.  Please note that the |
| 4      Greenberg Traurig, LLP | 4  microphones are sensitive and may pick up |
| 5      BY: PHILIP SELLINGER, ESQUIRE | 5  whispering, private conversations, and |
| 6        IAN S. MARX, ESQUIRE | 6  cellular interfere.  Please turn off all cell |
| 7      500 Campus Drive, Suite 400 | 7  phones or place them away from the |
| 8      Florham Park, NJ 07932-0677 | 8  microphones, as they may interfere with the |
| 9      sellingerp@gtlaw.com | 9  deposition audio.  Audio and video-recording |
| 10     marxi@gtlaw.co | 10  will continue until all parties agree to go |
| 11 | 11  off the record. |
| | 12      This is media unit one of the videotaped |
| 12       Marriott Vacations Worldwide | 13  deposition of Lee Cunningham, taken by |
| 13       BY: DOUGLAS A. KELLY, ESQUIRE | 14  counsel for plaintiff, in the matter of |
| 14          MARK NAGLE, ESQUIRE | 15  RCHFU, LLC, et al., vs. Marriott Vacations |
| 15       6649 Westwood Boulevard | 16  Worldwide Corporation, et al., filed in the |
| 16       Orlando, FL 32821 | 17  United States District Court, District of |
| 17       douglas.kelly@mvwc.com | 18  Colorado, Case Number 1:16-cv-01301-PAB-GPG. |
| 18       mark.nagle@mvwc.com | 19  This deposition is being held at Greenberg |
| 19  For the Defendant Aspen Highlands | 20  Traurig, located at 450 South Orange Avenue, |
| 20  Condominium Association: | 21  Orlando, Florida. |
| 21       Hogan Lovells | 22      My name is Mike Gerlach.  I'm the |
| 22       BY: JESSICA BLACK LIVINGSTON, ESQUIRE | 23  videographer.  The court reporter is Lisa |
| 23       1601 Wewatta Street, Suite 900 | 24  Gerlach, both representing Veritext |
| 24       Denver, CO 80202 | 25  Reporting. |
| 25       jessica.livingston@hoganlovells.com | |
| Page 3 | Page 5 |

2 (Pages 2 - 5)

Lee Cunningham - November 10, 2017

| | Page 6 |
|---|---|
| 1 | At this time, counsel will state their |
| 2 | appearances and affiliations for the record. |
| 3 | MR. FERGUSON: Matthew Ferguson, |
| 4 | co-counsel, attorney for the plaintiff. |
| 5 | MR. REISER: Michael Reiser, Reiser Law. |
| 6 | I'm here for the plaintiff in Aspen, as well |
| 7 | as the plaintiff in the Tahoe case, and the |
| 8 | plaintiffs in the San Francisco case. All of |
| 9 | those three cases are combined for purposes |
| 10 | of this deposition, Mr. Cunningham, so I |
| 11 | thought I'd put that on the record. |
| 12 | With me is Isabella Martinez, with my |
| 13 | office, and Matthew Reiser, with my office. |
| 14 | MS. LIVINGSTON: Jessica Livingston of |
| 15 | Hogan Lovells for the defendant in the Aspen |
| 16 | Highlands case. |
| 17 | MR. MARX: Ian Marx from Greenberg |
| 18 | Traurig for the Marriott defendants. |
| 19 | MR. SELLINGER: Philip Sellinger from |
| 20 | Greenberg Traurig, also for the Marriott |
| 21 | defendants. |
| 22 | And, Mike, thank you for putting that on |
| 23 | the record, because I think we do need to |
| 24 | correct the statement of the videographer, |
| 25 | that this deposition is being taken in all |

Page 7

1    three cases simultaneously -- RCHFU vs.
2    Marriott, Reiser vs. Marriott, and the
3    Petrick vs. Marriott, regardless of the case
4    in which the deposition notice is issued.
5        And, of course, under those
6    circumstances, any objection with respect to
7    relevance or materiality or any other
8    evidentiary objection, of course, would be
9    preserved, notwithstanding that the
10   depositions are taken simultaneously.
11       MR. REISER: Absolutely. Thank you,
12   Philip.
13       Just one more thing. So, of course, each
14   depo -- this depo can be used across all
15   three cases. That's probably obvious from
16   what you said, but I just want to make that
17   clear.
18       MR. SELLINGER: Yes, subject to any
19   objection based on any ground, including
20   relevance, materiality to a particular case.
21   There may be aspects of the deposition that
22   are germane to one case, but not to the
23   others. So all objections, including those,
24   are preserved.
25       MR. REISER: Fair enough.

Page 8

1        MR. FERGUSON: I just want to be clear
2    that I do not represent the plaintiffs in
3    either Tahoe or the San Francisco case. I
4    only represent the plaintiffs in the Aspen
5    case. I don't want to pretend I was
6    appearing in two cases that I'm not involved
7    with.
8    THEREUPON,
9            LEE CUNNINGHAM,
10   A Witness herein, acknowledged after having
11   been duly sworn and testified upon his oath as
12   follows:
13       THE WITNESS: I do.
14           DIRECT EXAMINATION
15   BY MR. FERGUSON:
16   Q. Good morning, Mr. Cunningham.
17   A. Good morning.
18   Q. We met briefly. My name is Matt Ferguson and
19   I'm from Aspen, Colorado, and I represent about 200 or
20   so plaintiffs that own about 230, 235 fractional
21   interests at the Ritz-Carlton Club in Aspen, Colorado.
22       Do you understand you're appearing in three
23   cases today?
24   A. Yes.
25   Q. How did you prepare for your deposition, sir?

Page 9

1    A. I reviewed documents and met with my counsel.
2    Q. Approximately how many hours have you been
3    preparing for your deposition in these three cases?
4    A. Ten.
5    Q. Over how many days, sir?
6    A. Over 14 days. Something like that.
7    Q. A couple hours a day?
8    A. Yeah.
9    Q. And what counsel have you been meeting with,
10   without divulging anything you said?
11   A. The four gentlemen here.
12   Q. Over the 14 days or was it different people
13   meeting with you at different times?
14       MR. SELLINGER: Objection to form.
15   You're mischaracterizing his having met with
16   counsel over 14 days.
17   BY MR. FERGUSON:
18   Q. Well, did you meet --
19   A. I met with the counsel twice.
20   Q. All four at one time?
21   A. Yes.
22   Q. How many times did you meet with all four
23   counsel?
24   A. Twice.
25   Q. What days were those?

3 (Pages 6 - 9)

Lee Cunningham - November 10, 2017

| | |
|---|---|
| 1   A. Yesterday was one, and I don't recall the | 1 few, but you're a lucky guy. |
| 2 prior day a couple weeks ago. | 2        Just -- you're doing well already.  Let's not |
| 3   Q. Approximately how many documents have you | 3 talk over each other, because the court reporter can't |
| 4 reviewed for your deposition today? | 4 take us both down.  In normal communication, your wife |
| 5   A. Probably in the -- hundred or so. | 5 is usually talking over you, and you can't do that |
| 6   Q. Were there any non-Marriott employed people | 6 here. |
| 7 in any of these meetings? | 7        So I'll ask you just to let me finish before |
| 8   A. No.  Well, counsel was not -- | 8 you begin, because sometimes you'll anticipate what |
| 9   Q. I understand.  Like, did you meet with HOA | 9 I'm going to say. |
| 10 counsel? | 10        There will be objections today.  We'll listen |
| 11   A. No. | 11 to the objections, and, generally, you'll have to |
| 12   Q. All right.  Sir, are you presently employed | 12 answer, but we'll deal with that when it comes. |
| 13 by Marriott Vacations Worldwide Corporation? | 13        If you don't understand anything I say, |
| 14   A. That's correct. | 14 because I'm not in your world and I might say things |
| 15   Q. Are you an officer in that company? | 15 wrong, I might have the wrong company name, please, |
| 16   A. Yes, I am. | 16 let me know.  I'm happy to rephrase it. |
| 17   Q. Are you an officer under any other entities | 17        If you're answering, we're going to assume |
| 18 under the Marriott Vacation Worldwide -- is it okay if | 18 you know what I meant.  So just let me know.  It's |
| 19 I call it MVW? | 19 not a problem. |
| 20   A. That's fine. | 20        With that intro, have you ever testified in a |
| 21   Q. Is that what you all call it at work? | 21 trial? |
| 22   A. Yes. | 22   A. No. |
| 23   Q. I notice, for example, you signed some | 23   Q. Have you ever testified in arbitration? |
| 24 documents on behalf of Lion & Crown Travel -- | 24   A. No. |
| 25   A. Yes. | 25   Q. No experience, then, in the court or |
| Page 10 | Page 12 |

| | |
|---|---|
| 1   Q. -- Company?  You're an officer in that | 1 arbitration systems? |
| 2 company? | 2   A. No. |
| 3   A. I am. | 3   Q. Are you familiar with a case, a lawsuit, |
| 4   Q. What is your position at -- | 4 against Marriott Vacations that's gone to -- I think |
| 5   A. Vice president, I think, is how it's | 5 it's here pending in Orlando.  Let me show you a copy |
| 6 characterized. | 6 of the article. |
| 7   Q. Approximately how many companies are you an | 7   A. Yes. |
| 8 officer in under the MVW umbrella? | 8   Q. I take it there's been no discovery in that |
| 9   A. To be honest, I couldn't estimate.  It's | 9 case?  Do you understand what discovery is -- turning |
| 10 probably in the -- 15 to 20. | 10 over documents, depositions -- or has there been? |
| 11   Q. Okay.  What Ritz-Carlton entities under the | 11   A. I don't recall where we are in the case. |
| 12 MVW entity are you an officer? | 12   Q. All right.  Without divulging any privileged |
| 13   A. Lion & Crown, Cobalt Travel, Ritz-Carlton | 13 communication from your counsel, do you know what that |
| 14 Development Company.  Those are the primary ones that | 14 case is about or have you been following it as an |
| 15 I... | 15 officer in MVW? |
| 16   Q. Have you ever been an officer in any of the | 16        MR. SELLINGER:  Matt, I generally try not |
| 17 HOAs that were formed for any of the clubs? | 17 to have objections based on relevance in the |
| 18   A. No. | 18 deposition, but what does that case have to |
| 19   Q. How many times have you been deposed, say, in | 19 do with this case? |
| 20 the last five years? | 20        MR. FERGUSON:  Well, I mean, I don't |
| 21   A. This is my first. | 21 think relevance is a proper objection in a |
| 22   Q. First deposition ever? | 22 deposition. |
| 23   A. Yes. | 23        MR. SELLINGER:  I agree. |
| 24   Q. Okay.  I know counsel spent some time with | 24        MR. FERGUSON:  And I think we've probably |
| 25 you.  I would have thought that you would've been in a | 25 spent more time on this object than I'm |
| Page 11 | Page 13 |

4 (Pages 10 - 13)

Lee Cunningham - November 10, 2017

| | |
|---|---|
| 1    going to spend on the question, so...<br>2      MR. SELLINGER:  Okay.<br>3 BY MR. FERGUSON:<br>4    Q.  I just want to know -- what's your<br>5 familiarity with this?  Are you involved in it?<br>6    A.  I'm not involved in it.  I'm familiar with<br>7 it.<br>8    Q.  All right.  But you don't know its status?<br>9    A.  No.<br>10    Q.  All right.  Thank you.<br>11    A.  I don't recall the status.<br>12    Q.  I pulled off your bio off the Marriott<br>13 Vacation Worldwide website.  This is generally an<br>14 accurate depiction of your background of the<br>15 Marriott-related entities over the years?<br>16      MR. SELLINGER:  Do you have another copy<br>17 of that?<br>18      MR. FERGUSON:  I don't.  I'm sorry.  I<br>19 printed these off this morning.  I think that<br>20 has --<br>21    A.  Yes, that is accurate.<br>22 BY MR. FERGUSON:<br>23    Q.  I'm sure you've done a lot more things, but<br>24 this is a general overview of your experience here?<br>25    A.  That's a roll-up.<br><div align="right">Page 14</div> | 1    A.  We normally communicate via updates that we<br>2 have with the executive counsel in general.<br>3    Q.  Is that on a computer sometimes?<br>4    A.  No.  That's a period or a monthly meeting.<br>5    Q.  So, generally -- so you have monthly meetings<br>6 with Mr. Weisz to discuss the MVW business?<br>7    A.  There's numerous meetings in our company<br>8 where I participate and Mr. Weisz participates.<br>9    Q.  Do you ever communicate with him by e-mail?<br>10    A.  Sure.<br>11    Q.  Do you ever communicate with him by e-mail<br>12 concerning the issues in any of these three cases?<br>13      MR. SELLINGER:  Objection to form.<br>14    A.  I'm sure I have, at some point, communicated<br>15 to him by e-mail, but not on -- not relative to the<br>16 status of these cases.<br>17 BY MR. FERGUSON:<br>18    Q.  Not about -- issues related to, for example,<br>19 affiliation of various clubs -- let me finish --<br>20 Ritz-Carlton and clubs into the Marriott Vacation<br>21 Worldwide systems.<br>22    A.  I don't recall a specific e-mail.  It's not<br>23 my typical method of communication to him.<br>24    Q.  Normally it's what?<br>25    A.  It's more verbal.<br><div align="right">Page 16</div> |
| 1    Q.  I'm looking at another document that says the<br>2 management would include a Stephen P. Weisz.<br>3    Am I saying that right, or is it Wize<br>4 (phonetic)?<br>5    A.  Weisz.<br>6    Q.  Weisz?<br>7    A.  Weisz.<br>8    Q.  Okay.  What is his position at MVW today?  Is<br>9 it still president and chief executive officer?<br>10    A.  That's correct.<br>11    Q.  And you're executive vice president and chief<br>12 operating officer?<br>13    A.  That's correct.<br>14    Q.  Do you report to Mr. Weisz?<br>15    A.  I do.<br>16    Q.  Is he in the same facility as you in terms of<br>17 offices?<br>18    A.  Yes.<br>19    Q.  How close is he to you and your office suite?<br>20    A.  He's on the fifth floor; I'm on the fourth<br>21 floor.<br>22    Q.  I've been through quite a few documents in<br>23 this case, as have you.  I haven't seen many or, if<br>24 any, documentation between you and Mr. Weisz.<br>25    How do you guys normally communicate?<br><div align="right">Page 15</div> | 1    Q.  Phone or you walk upstairs?<br>2    A.  That's correct.<br>3    Q.  Is there any type of other internal<br>4 communication; for example, a Marriott Vacation<br>5 Worldwide internal e-mail system or texting system?<br>6    A.  There's an e-mail system.<br>7    Q.  Okay.  So it would be by e-mail on your MVW<br>8 e-mail?<br>9      MR. SELLINGER:  Objection.  What would be<br>10 by e-mail?<br>11      MR. FERGUSON:  Communications.<br>12      MR. SELLINGER:  Generally --<br>13      MR. FERGUSON:  With Mr. Weisz.<br>14      MR. SELLINGER:  So let's have a<br>15 specific --<br>16      MR. FERGUSON:  Well, I'm talking about<br>17 Mr. Weisz, Mr. Sellinger --<br>18    A.  Well, I communicate with Mr. Weisz via<br>19 e-mail, telephone, in person, and meetings settings.<br>20 BY MR. FERGUSON:<br>21    Q.  How many meetings were you with -- were you<br>22 at where Mr. Weisz attended with anyone -- any officer<br>23 from a Ritz-Carlton club?<br>24    A.  An officer from a Ritz-Carlton?<br>25    Q.  For example, Randy Mercer.<br><div align="right">Page 17</div> |

<div align="right">5 (Pages 14 - 17)</div>

Lee Cunningham - November 10, 2017

1    A. I don't believe I've been in a meeting with
2  Randy Merer and Steve Weisz.
3    Q. How about any of the HOA officers from the
4  St. Thomas property?
5    A. No.
6    Q. San Francisco?
7    A. No.
8    Q. Tahoe?
9    A. No.
10    Q. How about Bachelor Gulch, Colorado?
11    A. I have had a meeting with Steve --
12  Mr. Weisz -- and Mr. Mullinex.
13    Q. Okay. Was there anybody else there?
14    A. Yes. Jo-Ann Perfido, I believe, is her name.
15  She's also a member of the board in Bachelor Gulch.
16    Q. How many in-person meetings were there with
17  people from Bachelor Gulch that Mr. Weisz attended;
18  was it one or was there another one?
19    A. One.
20    Q. Where was that meeting, sir?
21    A. In our offices in Orlando.
22    Q. Did you arrange that meeting?
23    A. I coordinated it with Mr. Mullenix.
24    Q. Had Mr. Mullenix reached out first to someone
25  from Marriott International in connection with setting

Page 18

1    A. No.
2    Q. All right. Marriott Vacations Worldwide,
3  MVW, its predecessor company was MVWI -- or MVCI,
4  rather -- Marriott Vacation Club International?
5    A. No. Its predecessor company was Marriott
6  International.
7    Q. Marriott International, okay, which is now a
8  separate entity altogether?
9    A. Yes. We were a division of Marriott
10  International that was spun off.
11    Q. What was the division called when it was spun
12  off?
13    A. Marriott Vacation Club International was the
14  DBA.
15    Q. Which is MVW, Marriott Vacation Worldwide
16  Corporation?
17    A. Um --
18    Q. It gets confusing.
19    A. I'm not sure I understand your question. Is
20  MVCI the same thing as MVW?
21    Q. That's my question. What's the relationship
22  between MVCI, when you see that acronym, and MVW?
23    A. MVCI was the division of Marriott that
24  managed or operated the timeshare component of
25  Marriott International.

Page 20

1  up a meeting with you and Mr. Weisz?
2    A. Not to my knowledge.
3    Q. And was that meeting arranged by you and
4  Mr. Mullenix well in advance, or was it something that
5  occurred on the spur of the moment?
6    A. Depends on your definition of well in
7  advance. It was several weeks in advance.
8    Q. Mr. Weisz didn't really want to attend that
9  meeting, did he?
10    A. He was certainly interested in being there,
11  or else he wouldn't have been there.
12    Q. Besides the two of you and the two of them,
13  was there anyone else in attendance -- counsel, any
14  other officers or directors?
15    A. No.
16    Q. What was discussed at that meeting?
17    A. The discussion was around the continued
18  management of the Bachelor Gulch Ritz-Carlton
19  property.
20    Q. Was there any discussion about affiliating
21  with the Marriott Vacation Worldwide system?
22    A. Yes.
23    Q. Was it in 2012?
24    A. I believe that's correct.
25    Q. Do you recall what month?

Page 19

1    Q. And when that was spun off, what Ritz-Carlton
2  businesses spun off with it?
3    A. The Ritz-Carlton Destination Club businesses.
4    Q. And it entered into license agreements with
5  the marks -- trademarks -- with Marriott
6  International?
7    A. That's correct.
8    Q. When it was spun off, had Mr. Weisz been
9  involved in the division under the MI, Marriott
10  International, umbrella?
11    A. Yes.
12    Q. When it was spun off, he was the president at
13  that point?
14    A. He was the president prior to the spinoff,
15  president and CEO --
16    Q. Of that division?
17    A. He was the president of that division.
18    Q. Then, when it was spun off, he became
19  president of the separate entity, the stand-alone
20  entity?
21    A. Yes.
22    Q. Who made the decisions to give the
23  Ritz-Carlton Destination Clubs to the MVW part of that
24  spinoff?
25        MR. SELLINGER: Objection to form.

Page 21

6 (Pages 18 - 21)

Lee Cunningham - November 10, 2017

1    MR. FERGUSON:  What's your objection?
2    MR. SELLINGER:  I don't understand the
3  question.
4    MR. FERGUSON:  Okay.
5  BY MR. FERGUSON:
6    Q.  If you don't understand it, I'll just redo
7  it.
8    A.  Okay.
9    Q.  What aspects of the Ritz-Carlton Destination
10  Club were given to the MVW to handle?  Was it
11  Ritz-Carlton Development -- sorry -- the Ritz-Carlton
12  Destination Clubs, like Aspen, Colorado, Tahoe and
13  San Francisco?  Were there any other businesses?
14    A.  It was any of the existing Ritz-Carlton
15  Destination Club resorts at the time and the future
16  rights for development.
17    Q.  Before spinning off MVW and that ended up
18  with these Ritz-Carlton businesses, had Marriott
19  International tried to sell the Ritz-Carlton
20  businesses?
21    A.  Not to my knowledge.
22    Q.  They didn't try to do that in 2009?
23    A.  Not to my knowledge.
24    Q.  Has there ever been any attempt by Marriott
25  International or MVW to spin off the Ritz-Carlton

Page 22

1    Q.  So you recall no angry words exchanged by
2  Mr. Weisz with people from Bachelor Gulch?
3    A.  Well, there was a heated exchange between
4  Mr. Weisz and Mr. Mullenix, is my memory.
5    Q.  But you don't recall them getting heated with
6  Ms. Perfido?
7    A.  I don't.
8    Q.  And Mr. Michael Mullenix, do you understand
9  that he builds hotels and brands them, other than
10  Marriott International brands?
11    A.  I understand that.
12    Q.  He's been doing that for a number of years?
13    A.  I understand -- I understood that he did that
14  at the time.  I have no idea what Mr. Mullenix does
15  now.
16    Q.  But in terms of what he was doing back then,
17  he wouldn't have been working with Marriott
18  International folks on that side of the business.  He
19  would be building hotels for MVW; right?
20    A.  No, he didn't do anything for us.
21    Q.  And MVW generally doesn't own any hotels; is
22  that right?
23    A.  We don't own hotels.
24    Q.  What it did own was some Ritz-Carlton
25  Development Company inventory that had been built in

Page 24

1  businesses?
2    A.  I'm sorry?
3    Q.  To sell them?
4    A.  Not to my knowledge.  There hasn't been from
5  MVW.
6    Q.  At the time MVW was spun off from MI as a
7  separate company, what percentage of Development
8  Company inventory was owned by the Development
9  Company?
10    A.  I don't recall at that point now.
11    Q.  Was it in the order of 10 percent,
12  20 percent, 25 percent, or would you have to see
13  documents to remember that?
14    A.  I'd have to see documents.
15    Q.  Fair enough.  How long was the meeting with
16  Mr. Weisz and Mr. Mullenix and Ms. Perfido?
17    A.  I don't recall exactly.  Somewhere around an
18  hour.
19    Q.  And at that meeting, Mr. Weisz got angry with
20  Ms. Perfido?
21    A.  Not that I recall.
22    Q.  You don't recall that there was -- he was
23  concerned that they should be -- leave the building
24  because she had used the word "fraud"?
25    A.  I don't recall that.

Page 23

1  various locations around the United States; correct?
2    MR. SELLINGER:  Objection to form.
3    A.  That's -- yes.  I mean, we owned unsold
4  inventory in a number of clubs that had been
5  developed.
6  BY MR. FERGUSON:
7    Q.  And as part of MVW's business, at least --
8  let's call it 2012, '13, '14 -- was part of its
9  business to manage these clubs?
10    A.  Yes.
11    Q.  What entities managed the clubs; do you
12  recall the name of the entities?
13    A.  Ritz-Carlton Management Company.
14    Q.  Are you an officer of that company?
15    A.  Yes.
16    Q.  Are you an officer of the Development
17  Company?
18    A.  Yes.
19    Q.  Does the Ritz-Carlton Development Company
20  today own any inventory in any of the Ritz-Carlton
21  Destination Clubs?
22    A.  Yes.
23    Q.  From foreclosures and whatnot?
24    A.  I'm trying to think.  We definitely own one
25  or two units at a couple of clubs.  We owned a

Page 25

7 (Pages 22 - 25)

Veritext Legal Solutions
866 299-5127

Lee Cunningham - November 10, 2017

1 meaningful inventory at any club.
2    Q. And in terms of -- a lot of the clients and
3 owners at Ritz-Carlton Aspen bought, starting even as
4 early as 2000 -- I believe, 2001 -- they're still
5 being sold -- I think they were still being sold
6 through 2012.
7       Were you involved in the selling of any of
8 this inventory, or that was a different crew
9 altogether?
10      MR. SELLINGER: Objection to form.
11   A. I was not involved.
12 BY MR. FERGUSON:
13   Q. Your division oversees the sales of points
14 primarily, right, today?
15   A. No. I oversee the sale of all of our
16 products, but I'm not directly involved in the
17 activity of sales.
18   Q. So you oversee the -- I understand that. So
19 you have officers and people under you that sell?
20   A. That's correct.
21   Q. But the primary income generation for MVW is
22 the sale of Marriott Vacation points today?
23   A. That's true.
24   Q. And another part of your income is the
25 management of some properties, including the
                                                    Page 26

1 Ritz-Carlton?
2    A. True.
3    Q. And the brands under MVW are the Marriott
4 Vacation Club -- that's one?
5    A. Marriott Vacation Club.
6    Q. And the Ritz-Carlton Destination Club?
7    A. Yes.
8    Q. And the Grand Residences by Marriott?
9    A. That's true, yes.
10   Q. In terms of the Marriott Vacation Club, is
11 that the entity that has the 50 or 55 resorts that MVW
12 points people can visit?
13   A. I'm sorry?
14   Q. Does it have about 55 resorts?
15   A. It has more than that.
16   Q. It does? When your company was talking to --
17 for example, Mr. Mercer is talking about 51 clubs --
18 has that -- I believe it was 51 -- has that number of
19 clubs grown or is it because there's different types
20 of clubs that you're counting?
21      MR. SELLINGER: Objection to form;
22 compound.
23   A. The clubs have grown -- the number of clubs
24 has grown because more of the properties participate,
25 mostly International.
                                                    Page 27

1 BY MR. FERGUSON:
2    Q. And those clubs are owned by whom? Are they
3 independent owners of those resorts or are they owned
4 by Marriott International, or a combination? Who
5 owns -- for example, if I go to a club in -- I don't
6 know -- Hawaii -- who owns that club?
7    A. The owners of that inventory or owners
8 through the Marriott Vacation Club Trust.
9    Q. Are you an officer of any of the trusts?
10   A. No.
11   Q. Let me show you an exhibit a little bit out
12 of order. I generally go in chronological order, but
13 I want to start here. Exhibit 14747.
14      MR. FERGUSON: Jessica, I'm going to need
15 you to -- maybe you guys -- I'll give it to
16 you, Ian. I didn't know you'd have so many
17 lawyers today.
18      MR. MARX: Do you have another one there?
19      MR. SELLINGER: One more?
20      MR. MARX: Thanks.
21      MR. FERGUSON: Didn't make enough copies.
22 BY MR. FERGUSON:
23   Q. This is an e-mail chain from November of
24 2014, and it starts with an e-mail from Patrick Forth
25 to Eveleen Babich.
                                                    Page 28

1       Do you know Ms. Babich?
2    A. I do.
3    Q. And she's no longer with the company, I
4 understand?
5    A. That's correct.
6    Q. And she was the general manager of member
7 services for the Ritz-Carlton Destination Club?
8    A. That's correct.
9    Q. The final e-mail in this chain starts with
10 "Team."
11      MR. SELLINGER: Actually, would you give
12 the witness a moment to review the document?
13      MR. FERGUSON: Yeah.
14 BY MR. FERGUSON:
15   Q. This is an e-mail about San Francisco
16 affiliation, right, sir?
17   A. Yes.
18   Q. Did you over -- were people reporting to you
19 regarding a vote to affiliate the San Francisco
20 property with the MVW systems?
21      MR. SELLINGER: Objection to form.
22   A. We -- I'm not sure I understand. Ask me the
23 question again.
24 BY MR. FERGUSON:
25   Q. Were people reporting to you about the
                                                    Page 29

8 (Pages 26 - 29)

Lee Cunningham - November 10, 2017

| | |
|---|---|
| 1 affiliation of San Francisco with the MVW system? | 1 that owned units in Aspen? |
| 2    A. There was a survey done to get the sentiment | 2    A. No. A majority of the ones that responded to |
| 3 of the San Francisco owners relative to affiliation, | 3 the survey or a -- I was looking at it to understand |
| 4 and I would receive updates on the results of that | 4 their sentiment, their -- as a whole -- based on those |
| 5 survey on a periodic basis. | 5 that responded. |
| 6    Q. So the surveys were to get the sentiment of | 6    Q. Have you reviewed any of the testimony of |
| 7 people that owned Ritz-Carlton Development Company | 7 Randy Mercer before today? |
| 8 fractional units? | 8    A. No. |
| 9    A. That's correct. | 9    Q. She went on to say to her team members there, |
| 10    Q. And what do you mean to get the sentiment? | 10 "It's merely a mechanism to get feedback and the |
| 11    A. To understand their interest or lack of | 11 affiliation is expected to occur regardless." |
| 12 interest in affiliation with Marriott Vacation Club | 12    So does that mean, if you got a sentiment |
| 13 Destination. | 13 that was negative, it was going to happen anyway? |
| 14    Q. And whose sentiment were you paying attention | 14    MR. SELLINGER: Hold on a minute. My |
| 15 to, the people who were for affiliation or the people | 15    problem with the way you're asking questions |
| 16 who were against it? | 16    is -- I have no problem with you asking |
| 17    A. I was paying attention to the total, both | 17    Mr. Cunningham the substance of what was |
| 18 sides. | 18    going on. You can certainly show him the |
| 19    Q. Do you know how many people surveyed at | 19    document. But when you read something and |
| 20 Ritz-Carlton Aspen put down for affiliation? | 20    ask him what that meant, he's not the author |
| 21    A. Are we talking about Aspen or -- | 21    of the document. He's not even copied on |
| 22    Q. I'm just asking about Aspen right now. | 22    this document. |
| 23    A. I don't recall the total number of surveys | 23    MR. FERGUSON: So, objection to form. I |
| 24 that were responded to. Every member, at the time, | 24    got it. |
| 25 was issued an opportunity to participate in the | 25    MR. SELLINGER: Yeah. |
| Page 30 | Page 32 |

| | |
|---|---|
| 1 survey. | 1 BY MR. FERGUSON: |
| 2    Q. But you were not looking for a majority vote? | 2    Q. Is Ms. Babich someone in your company -- |
| 3    A. We were looking for an affirmative vote or | 3 she's someone under the MVW umbrella, right? She |
| 4 affirmative feedback from the owners or members from | 4 works for -- |
| 5 the survey. | 5    A. Yes. |
| 6    Q. And Ms. Babich, here in Exhibit 1447, is | 6    Q. -- the Ritz-Carlton Destination Club? |
| 7 e-mailing a Mitchell Bunn, Daniel Hicks, Fanny Ramirez | 7    A. She did. |
| 8 and Mary Umney. | 8    Q. Okay. Did you inform your people below you |
| 9    Do you know any of those folks, or were they | 9 that the surveys were going to occur regardless of the |
| 10 kind of line personnel? | 10 sentiment at any point? |
| 11    A. I know the name Daniel Hicks; but other than | 11    A. The surveys were going to occur? |
| 12 that, I don't know the other names. | 12    Q. No. That there was going to be an |
| 13    Q. It says in the middle paragraph -- you can | 13 affiliation regardless of the sentiment? |
| 14 look at that -- of the first e-mail, "The survey is | 14    A. No, I did not inform people that. No. |
| 15 similar to Aspen in that we're looking for a | 15    Q. She went on to tell these people, "Please |
| 16 majority -- we are not looking for majority vote." | 16 keep that information confidential." |
| 17    Is that what you mean when you were looking | 17    Have you seen this document prior to today? |
| 18 for -- does that mean they were looking for a | 18    A. Just in preparation for today. |
| 19 sentiment? | 19    Q. Sir, I placed in front of you an e-mail -- |
| 20    A. Yeah. We were looking for a -- it wasn't a | 20 it's an e-mail chain. It's Exhibit 1485. Just so we |
| 21 vote. It was a survey, and we were trying to | 21 get on the same page today, you'll see on page 1 of |
| 22 understand the -- what percentage of the -- those who | 22 Exhibit 1485, it says, "RCDC0055041." |
| 23 replied to the survey were positive toward affiliation | 23    Do you see that? |
| 24 and which ones were against affiliation. | 24    A. I do. |
| 25    Q. Were you looking for a majority of the people | 25    Q. That means it was a document produced by |
| Page 31 | Page 33 |

9 (Pages 30 - 33)

Lee Cunningham - November 10, 2017

1 Mr. Marx, I guess, working with folks at your company?
2    A.  Okay.
3    Q.  Were you involved in the collection of
4 documents to be produced in these litigations?
5    A.  No.
6    Q.  Do you know who was coordinating that?
7    A.  Someone through our internal office.  No.
8    Q.  Your in-house counsel?
9    A.  Yes.
10    Q.  This is a -- starts in the last page.  It's
11 an e-mail from Ms. Babich to Ms. Sobeck and
12 Ms. Jackson-Rauso, Mr. Essig, and some other folks.
13       Ms. Sobeck is someone who reports to you, I
14 take it?
15    A.  Yes.
16    Q.  She's still with the company, obviously?
17    A.  She is.
18    Q.  The last page says -- it's from Ms. Babich.
19 It's talking about an update on the number of
20 affiliations through last night.  You see 219 members,
21 240 interests.
22       Are you there?
23    A.  Yeah.
24       MR. SELLINGER:  I'm sorry.  Would you
25    just give him a moment to review the
                                              Page 34

1 totaling -- but I'm focusing right now on Aspen,
2 because that's the people I represent -- as of this
3 date, there was this 104 interest?
4    A.  Those are people who had chosen to affiliate.
5 It doesn't mean they had put any inventory in.
6    Q.  I understand that.  And the people who had
7 chosen to do that -- to be able to do that -- how many
8 weeks of their four were they allowed to put in --
9 one, or could they put in more?
10    A.  In the case of Aspen, they're allowed to put
11 in allocated time.  They could put in -- I believe in
12 the case of Aspen, up to three weeks.  The Aspen
13 product has three reserved allocated time and one
14 unreserved allocated time.
15    Q.  And they can't use unallocated time?
16    A.  They cannot use unallocated time.
17    Q.  Even today?
18    A.  No.
19    Q.  If you look at the first page, you wrote
20 this -- actually, your e-mail at the top, there's a
21 pretty big time gap.  It goes from December 18, '14,
22 Ms. Essig to yourself at the bottom; then at the top,
23 it has you and Mr. Essig going back and forth on
24 January 5, 2016.
25       You said, "Can I get an updated set of
                                              Page 36

1    document?
2       MR. FERGUSON:  Yeah.
3       THE WITNESS:  Okay.
4 BY MR. FERGUSON:
5    Q.  So it says "Aspen 95 members with 104
6 interests," because some people owned more than one
7 interest; correct?
8    A.  Correct.
9    Q.  And that would be people that had actually
10 signed on for the affiliation through Lion & Crown?
11    A.  That's correct.
12    Q.  And as a result of that, they have the option
13 or -- you guys call it the opportunity -- exchange
14 opportunity -- to put in a week of allocated time for
15 them to get the opportunity, as you call it, to use
16 the Marriott Vacation Worldwide property?
17    A.  To use the entire system.
18    Q.  And the weeks they put in, would you call
19 that exchange inventory?  Would Marriott Vacation
20 Worldwide, MVW, now obtain a thing called exchange
21 inventory?
22    A.  That inventory would be in our Marriott
23 Vacation Club Destinations exchange program.
24    Q.  So if she's reporting to you in December of
25 '14 that there wasn't -- what the numbers were
                                              Page 35

1 numbers on the RCDC member affiliation with MVCD."
2       Is this you checking on the exchange
3 inventory you had?
4    A.  This was to understand how many members had
5 chosen to affiliate.
6    Q.  Do you have a general recollection of how
7 many Aspen people or interests had affiliated with the
8 MVCD?
9    A.  I don't.  Obviously, you have through the
10 18th of December.  I don't recall and I don't have an
11 update on that number today.
12    Q.  When is the most recent update you've gotten
13 on the exchange inventory from Aspen?
14    A.  On the affiliation or the exchange?
15    Q.  The exchange inventory.
16    A.  I haven't gotten one in -- probably been over
17 a year.
18    Q.  When you said -- you asked me, exchange or
19 affiliation -- what did you mean by affiliation?
20    A.  Affiliation is not exchange.  Affiliation is
21 to affiliate with a -- or enroll in the exchange
22 program.  It doesn't mean that you ever have to
23 exchange.
24    Q.  Understood.  How about that -- those
25 numbers -- do you know today how many Aspen people
                                              Page 37

10 (Pages 34 - 37)

Lee Cunningham - November 10, 2017

1 have chosen to affiliate as opposed to actually use
2 the program?
3    A. I do not.
4    Q. Is that something that you monitor?
5    A. No.
6    Q. Who monitors those numbers?
7    A. The member services office.
8    Q. Is that the Utah office?
9    A. It's in Salt Lake City, yes.
10    Q. Who's taken over Ms. Babich's position?
11    A. I'm trying to remember whether it's Patrick
12 Forth or -- I think it's Danny Hicks that was on that
13 previous e-mail.
14    Q. Thank you. So this is Exhibit 1552. It's
15 one page produced by your company. It looks like it's
16 a page from a -- if you look at the middle of the page
17 on the right side, it says, "Marriott Vacation Club
18 Resorts, 64." I believe it's page 64.
19       Does this document look familiar to you? Is
20 it something -- a brochure?
21    A. I don't know whether it's from a brochure
22 or --
23    Q. A website?
24    A. Yeah. I don't know.
25    Q. But you're generally familiar that on -- I

Page 38

1 know for sure on Aspen Highlands owners.
2    Q. When you say Ritz-Carlton, do you mean folks,
3 for example, from Tahoe?
4    A. No.
5    Q. What is a Ritz-Carlton owner? What do you
6 mean by that?
7    A. Someone who owns a Ritz-Carlton Destination
8 Club fractional unit.
9    Q. But you would expect that most people at
10 Aspen Highlands wouldn't be using points -- MVW
11 points -- they put into the exchange program to go
12 back and use their own club?
13    A. Not most.
14    Q. So most of the people that you're trying to
15 reach here are MVW folks that are your customers who
16 have bought points?
17       MR. SELLINGER: Objection to form;
18    mischaracterizes the testimony.
19    A. No. It's a communication with anyone who
20 participates in the Marriott Vacation Club
21 Destinations exchange programs.
22 BY MR. FERGUSON:
23    Q. And who participates in that, Mr. Cunningham?
24    A. Those who have enrolled in it through Lion &
25 Crown from Ritz-Carlton owners, and Marriott Vacation

Page 40

1 guess, is it every year that you put out a chart that
2 tells MVW points people how many points -- is this an
3 example of a points chart for MVW points owners to use
4 at Ritz-Carlton Club in Aspen?
5    A. Ritz-Carlton -- it's a points chart for
6 anyone who is using the Marriott Vacation Club
7 Destination exchange program to reserve in Aspen.
8    Q. So this is for MVW points customers and
9 owners?
10    A. And Ritz-Carlton Club. Any members who have
11 enrolled in -- any Ritz-Carlton members who have
12 enrolled in the MVCD company through Lion & Crown,
13 they have the same access as Marriott Vacation Club
14 Destinations exchange members.
15    Q. But a Ritz-Carlton Aspen Highlands owner
16 wouldn't be using points to use their own hotel? I
17 guess they could do that, but --
18    A. Oh, absolutely.
19    Q. So they could trade it -- but they can use
20 the Cobalt system to trade with other owners; correct?
21    A. They can.
22    Q. And do people at Aspen Highlands, to your
23 knowledge, utilize the point system to use their own
24 club?
25    A. I know that Ritz-Carlton owners do. I don't

Page 39

1 Club owners who have either purchased points or have
2 enrolled their weeks -- their weeks ownership in the
3 exchange program.
4    Q. When you say weeks ownership, are those
5 people that bought weeks before you migrated mostly to
6 a points system?
7    A. That's correct, and some after.
8    Q. And how many -- what percentage of people
9 that are reading this brochure for Aspen -- this
10 points system for Ritz-Carlton Aspen Highlands -- what
11 percentage of people that can access this with points
12 are Lion & Crown folks as opposed to MVW?
13    A. I have no idea.
14    Q. Is it 1 percent, 2 percent?
15    A. No idea.
16    Q. How many Lion & Crown folks are there
17 approximately today that are signed up to utilize
18 points to get into Ritz-Carlton Club -- that could get
19 them into Ritz-Carlton Aspen Highlands?
20    A. As I said before, I don't have a recent
21 update on that number.
22    Q. Do you have an update on how many MVW folks
23 would have -- or how many MVW folks are there today?
24    A. How many MVW owners?
25    Q. Yeah.

Page 41

11 (Pages 38 - 41)

Lee Cunningham - November 10, 2017

1   A.  Are you talking about --
2   Q.  Yeah.  Are you going --
3   A.  They're not MVW owners.
4   Q.  They're not owners?
5   A.  MVW is not a product that we sell.
6   Q.  I'm sorry.  What product is -- what product
7   do -- what product is it that gets you, for example,
8   6,500 points to use in 2015 -- to use December 4th and
9   December 17th at Aspen Highlands?
10  A.  You could own an Aspen Highlands fraction or
11  any other Ritz-Carlton fraction.  You could own
12  Marriott Vacation Club Destination Points.  You could
13  own a Marriott Vacation week.  You could own a
14  Marriott Grand Residence fractional unit.  I think
15  that's...
16  Q.  How many Marriott Vacation Destination Club
17  points people are there today?
18  A.  Marriott Vacation Club Destinations owners?
19  Q.  Yes.
20  A.  I don't know exactly.  It's probably 75,000.
21  Something like that.
22  Q.  And how about weeks owners?
23  A.  Marriott Vacation Club weeks owners, probably
24  around 350,000.
25  Q.  Are customers today able to buy weeks still

Page 42

1   or is it all points?
2   A.  Yes, customers can still buy weeks.
3   Q.  At a particular resort?
4   A.  No.  At various resorts.
5   Q.  So you would agree with me then that there
6   are more Marriott Vacation points people and Marriott
7   weeks people together than there are Ritz-Carlton --
8   sorry -- Ritz-Carlton Lion & Crown folks that can
9   access this club?
10  A.  Yes.
11  Q.  And looking at Exhibit 1552, there's a -- the
12  chart on the left side.  I'm sorry.  This has gotten a
13  little bit degraded in the copying process.
14      For example, if you just look down three from
15  the bottom to February 13th to February 19th?  I think
16  I selected this because we've got some of the higher
17  points values, I guess, because the kids are off from
18  school then.
19      It says Friday to Sunday; it says Monday,
20  Tuesday to Thursday, and full week.
21      Are folks able to use points to -- in this
22  system to utilize less than a week?
23  A.  Yes.
24  Q.  Are they able to use it for just one night?
25  A.  Yes.

Page 43

1   Q.  And that would be only Monday nights?
2   A.  Well --
3   Q.  What does that mean?  I'm just trying to
4   figure out what's happening there.
5   A.  The points are priced on a nightly basis, but
6   there is -- we would manage the inventory to ensure
7   that we got the greatest utilization of that
8   inventory.  So while there is the physical capability
9   or potential for a one-night stay, the likelihood of a
10  one-night stay is very low, because then you end up
11  blocking the ability to take a full week stay.
12  Q.  So just looking again for that particular
13  week in Aspen, a points person could say, "I want a
14  two-bedroom for the weekend for 1,725."  Is that
15  points per night or points --
16  A.  That's points per night.
17  Q.  Okay.  And if they say, "We want to fly out
18  on Monday night and ski that day," they can buy the
19  Monday for 825?
20  A.  If it's available.
21  Q.  If it's available.  Can they pick any
22  combination of the days of the week or do they have to
23  stay within these parameters?  I guess, the question
24  is, is this just pricing for those days?
25  A.  This is just to tell you what the pricing --

Page 44

1   the price per night is for each of the groups of
2   nights.
3   Q.  Have you done any studies on the usage
4   patterns of Marriott Vacation points people and
5   Marriott Vacation weeks people at the Aspen Highlands?
6   A.  I have not.
7   Q.  Do people --
8   A.  Well, yeah, I'm sure there's been studies
9   done.  I have not seen them.
10  Q.  I mean, that's one of the more complex parts
11  of your organization is inventory control, I take it?
12  A.  Yes.
13  Q.  If those studies were being done, for
14  example, how many people are picking three-day
15  weekends and the rest of the week is being broken up
16  into threes, fours, twos?  Whose department is that?
17  A.  That's in Lani Kane-Hanan's department.
18  Q.  What's her department called, sir?
19  A.  It would be in the product supply management
20  side of her business -- her role.
21  Q.  And she's here in Orlando, obviously?
22  A.  Yes.
23  Q.  Mr. Hearns, he's with the Marriott
24  International company.  Is he stationed here or in
25  Washington?

Page 45

12 (Pages 42 - 45)

Lee Cunningham - November 10, 2017

1    A.  He's in Washington.
2    Q.  I'm going to put in front of you
3  Exhibit 1522.
4        MR. FERGUSON:  Can you do me a favor?
5        MR. MARX:  It depends.
6        MR. FERGUSON:  I don't have any more
7  clean copies.  I'm going to need those for
8  depositions.  Can I have a copy of yours
9  back?
10        MR. MARX:  Absolutely.  I promise I will
11  accommodate that.
12        MR. FERGUSON:  I know you will.
13        MR. MARX:  I have some questions for you
14  too.
15        MR. FERGUSON:  All right.
16  BY MR. FERGUSON:
17    Q.  Sir, this is a document produced -- it says,
18  "RCDC sample," 51228.
19        MR. FERGUSON:  What is that, Ian; do you
20  know?
21        MR. MARX:  I do know, Matt, at the outset
22  of the document discovery, there was an
23  agreed-upon protocol relative to the ESI
24  collection.  In connection with that, we ran
25  a set of search terms across an agreed-upon
                                         Page 46

1  Marriott Vacations Worldwide logo in the upper
2  right-hand corner.  It looks like there was a slide
3  presentation --
4    A.  This is a PowerPoint presentation.
5    Q.  All right.  Do you recall being at this
6  PowerPoint presentation?
7    A.  That's what I was trying to remember.
8    Q.  I know it was a long time ago.
9    A.  I don't.  I recall some of the components,
10  but I don't recall this particular presentation.
11    Q.  The first page says "Holistic plan for RCDC."
12       What is meant, if you know, by holistic plan?
13        MR. SELLINGER:  Well, let me object to
14  Mr. Cunningham interpreting what is meant by
15  a document that he hasn't confirmed he's
16  seen.  But I certainly have no objection to
17  you asking him whether he's familiar with the
18  concepts that are reflected here so you can
19  get his best information.
20  BY MR. FERGUSON:
21    Q.  Let me ask you -- in 2012, you were still --
22  you were senior vice president and COO back then; were
23  you not?
24    A.  I was executive vice president, COO.
25    Q.  I doubt that you did this PowerPoint, but
                                         Page 48

1  database.  That resulted in the collection of
2  about 5,000 or so documents that were
3  produced.
4        MR. FERGUSON:  And this is one of those
5  Bates in a different way?
6        MR. MARX:  This is one of those
7  documents.
8        MR. FERGUSON:  Very well.  Thank you.
9  BY MR. FERGUSON:
10    Q.  Sir, this is a document -- it looks like it's
11  2012 because it says on the first page "Financials,
12  2012 forecast."
13       Are you there?
14    A.  Okay.
15    Q.  If you want to maybe flip through that?
16    A.  I don't think this is from 2012.
17    Q.  When is this from, sir?
18    A.  I would suspect earlier.
19    Q.  So it's talking forward as opposed to looking
20  back.  It's looking forward to 2012 forecast reports;
21  right?
22    A.  I don't know when this is from.
23    Q.  Okay.  Are you familiar with the format of
24  this document, "Today's discussion, MVW"?  The
25  Marriott logo for -- Marriott Vacation Club --
                                         Page 47

1  that somebody underneath you put it together -- or
2  folks under you did it?
3    A.  Most likely.
4    Q.  And this would've been for a meeting that you
5  would have attended, I take it?
6    A.  I don't recall the meeting, but -- I don't
7  know whether this was prepared for an internal
8  discussion before coming to talk to me about it or
9  whether it was prepared for a meeting with me.
10    Q.  And who would be putting -- who do you
11  recall was putting together a holistic plan for RCDC,
12  financials, risk and opportunities, timeline,
13  et cetera?
14    A.  People involved would have probably -- I
15  mean, at that point in time, it would have likely been
16  Stephanie Sobeck and ML --
17    Q.  Mary Lynn Clark?
18    A.  Yeah.
19    Q.  Was she down here in Orlando at that time?
20    A.  Yes.
21    Q.  But she's no longer with the company?
22    A.  That's correct.
23    Q.  Do you know why she left?
24    A.  Job opportunity in -- with Wyndham.
25    Q.  In New Jersey?
                                         Page 49

13 (Pages 46 - 49)

Lee Cunningham - November 10, 2017

1    A. Uh-huh.

2    Q. I was asking what -- if you have any

3 understanding of what was meant by holistic plan for

4 RCDC.

5        MR. SELLINGER: Same objection.

6    A. I assume it's a comprehensive plan.

7 BY MR. FERGUSON:

8    Q. Then it says "Unwind plan." What did that

9 mean?

10    A. I believe that refers to the unwind of a Bleu

11 Florida Land Trust.

12    Q. That owned a fractional interest in what

13 properties?

14    A. I believe San Francisco. I forget who else.

15 I don't recall who else.

16    Q. Were there any other trusts owned in

17 inventory back in 2012?

18    A. In 2012, we had established a -- for

19 Ritz-Carlton in Abaco -- a trust product --

20 points-based product -- there.

21    Q. Would you go to the same exhibit, and you'll

22 see that another number we have here is, we have the

23 Exhibit 1522, and then it's paginated below the

24 exhibit tab.

25        So, for example, I would take you to

Page 50

1 presentation tour to buy a one-twelfth fractional

2 interest?

3    A. In Aspen in that case.

4    Q. When it says "product being sold, NATO," NATO

5 means what?

6    A. NATO would be North American Timeshare

7 Organization. That product being sold, that would

8 probably be Marriott Vacation Club Destination points.

9    Q. On the same chart, it has -- I don't know

10 what color this was originally. I suspect it had

11 colors. Now it's black and white. It has -- under

12 San Francisco, it has Jupiter, Kapalua, Bachelor

13 Gulch, Tahoe. I'm not naming them all.

14        Why do they say closed? What's been closed

15 there?

16    A. The sales distribution.

17    Q. If we go to 015, there's a rental allowance

18 and restrictions. For Aspen, it says "Open market

19 rentals allowed under Colorado law."

20        What does market rentals mean?

21    A. That you can make units available for the

22 general public to rent.

23    Q. But you weren't -- were you allowed to do

24 that under the governing documents in the contracts

25 you had with The Ritz-Carlton Destination Club in

Page 52

1 Exhibit 1522, page 0009. I'll call it page 9. Do you

2 follow me on how I'm doing that? I'm on the same

3 chart -- the sales distribution strategy.

4    A. Yeah.

5    Q. Is this the sales distribution strategy for

6 the remaining inventory of the Development Company?

7    A. Yes.

8    Q. For Aspen, it says "Local marketing." Is

9 that because the Development Company was marketing

10 fractional units for that property?

11    A. I'm sorry. So under -- the yes under local

12 marketing?

13    Q. Yeah.

14    A. Means that we were doing local marketing.

15    Q. All right. Through local brokers or through

16 your own sales folks on the property, if you recall?

17    A. That would've most likely been our own

18 people.

19    Q. What does preview marketing mean?

20    A. Preview marketing is a -- where you book a

21 package for someone to come in, stay at the resort

22 that you are -- or a representative resort of the

23 product that you're selling. And as part of that

24 package, they take a sales presentation tour.

25    Q. And at this time, that would be a sales

Page 51

1 Aspen?

2    A. There's nothing in the documents that would

3 prevent an owner of inventory from renting their

4 interest, as many Aspen owners do.

5    Q. That's something you all wanted to try to do,

6 correct, with your inventory back in '12, '13, '14?

7    A. No. Our -- I think this refers to, are open

8 market rentals allowed? We were just understanding

9 what the relevant laws and restrictions were.

10 And as you can see, the previews piece --

11 understanding where we had the ability to rent units

12 for preview vacations.

13    Q. When you say preview vacations, do you

14 mean --

15    A. That's a package to get the -- to have

16 somebody come in, experience the product, and take a

17 sales tour.

18    Q. And back in this timeframe, was it for a

19 one-twelfth fractional interest? That would be one?

20    A. Yes.

21    Q. Were you previewing the product for Vacation

22 Club folks?

23    A. I don't recall previewing -- doing preview

24 vacation packages into Ritz-Carlton products for -- to

25 sell Marriott Vacation Destination Club products.

Page 53

14 (Pages 50 - 53)

Lee Cunningham - November 10, 2017

| | |
|---|---|
| 1    Q. Who would've been -- | 1   points based Ritz-Carlton Destination Club product. |
| 2    A. And I don't -- I mean, from this document, I | 2     Q. And what were Aspen folks that owned interest |
| 3  don't know whether this is a recommendation or a -- | 3  allowed to do in the Portfolio back in that timeframe? |
| 4  this is a recap of the actions that are currently | 4     A. I do not know. |
| 5  underway. | 5     Q. It says -- I'll keep going on in the |
| 6    Q. Okay. So this would've been something put | 6  paragraph -- "As a result of the Portfolio program |
| 7  together by Ms. Sobeck, and it would've been folks at | 7  offering, we also extended Home Club members this |
| 8  this PowerPoint presentation to discuss where you guys | 8  opportunity to enjoy more flexible travel by |
| 9  were at and where you were going? | 9  exchanging their allocated time for points through the |
| 10    A. Potentially. It would probably be more | 10  Lion & Crown exchange company." |
| 11  Ms. Clark. | 11     What was being exchanged in those programs, |
| 12    Q. Ms. Clark, okay. Have you ever met a | 12  if you recall that program? |
| 13  gentleman named Juan Pablo Cappello? | 13     A. Having re-read that -- as you re-read that, |
| 14    A. No. | 14  the Portfolio -- what this would indicate is that the |
| 15    Q. Do you recall receiving a letter from him? | 15  Portfolio product was a points-based product, and so |
| 16    A. I was reminded of that in preparation for | 16  the Home Club members or fractional owners could |
| 17  this. | 17  exchange a week of their allocated time and convert |
| 18    Q. He was a former partner in the Miami office | 18  that to Portfolio points or Bleu -- to the Portfolio |
| 19  of Greenberg Traurig. | 19  program and stay at the properties that were included |
| 20    A. I've been informed of that. | 20  in that, which were limited at the time. |
| 21    Q. Sir, this is a letter -- it's Exhibit 1023. | 21     Q. Were they other Ritz-Carlton Destination |
| 22  It's a letter from Eveleen Babich, general manager of | 22  Clubs? |
| 23  The Cobalt Travel Company, LLC. | 23     A. They were only Ritz-Carlton Destination |
| 24     Do you remember this letter from Ms. Babich | 24  Clubs. |
| 25  to Dear Member? | 25     Q. Weren't they able to do that anyway through |
| Page 54 | Page 56 |

| | |
|---|---|
| 1    A. Yes. | 1   their membership? |
| 2    Q. This was also known as the letter advising | 2     A. Yes, they were able to do it -- |
| 3  members of The Ritz-Carlton Destination Club and your | 3     Q. More? |
| 4  fractional owners of the brand evolution? | 4     A. -- on a specific basis -- you know -- an |
| 5    A. Yes, it's been called that. | 5  allocated week for an allocated week basis. This gave |
| 6    Q. This is not dated, but do you recall this is | 6  them more flexibility. |
| 7  about July 17, 2012? | 7     Q. Now -- thank you. In Exhibit 1023, |
| 8    A. Yes. | 8  Ms. Babich wrote the members, in the second paragraph, |
| 9    Q. And what involvement did you have in putting | 9  "In response to member feedback, we sought ways to |
| 10  together this communication to your fractional owners? | 10  provide exceptional usability through a variety of |
| 11    A. I'm sure I reviewed drafts. | 11  destinations and experiences." |
| 12    Q. And did this document arise out of the | 12     What member feedback was she talking about? |
| 13  meeting we saw -- would this document have arose out | 13     A. We get feedback from members through our |
| 14  of the meeting we saw back in the prior exhibit, 1522? | 14  onsite surveys. We survey all of our guests after |
| 15     MR. SELLINGER: Objection to form. | 15  their stay. We survey guests after their member |
| 16    A. I have -- since I don't fully recall having | 16  services experience. We survey our guests -- probably |
| 17  reviewed that, I don't think so. I don't know. | 17  the two primary reasons -- places that we survey our |
| 18  BY MR. FERGUSON: | 18  guests. |
| 19    Q. In the first paragraph, she says, "As you're | 19     Obviously, member services gets feedback -- |
| 20  aware, we launched -- three years ago, we launched a | 20  verbal feedback -- from members as they make |
| 21  product offering, known as Portfolio, providing | 21  reservations. And we also get feedback from the |
| 22  flexible member option." | 22  boards of directors of the various clubs through our |
| 23     What was Portfolio? | 23  interaction with them. |
| 24    A. Portfolio was the -- I think the product name | 24     Q. And Ms. Babich -- withdrawn. In this letter, |
| 25  for the Bleu Florida Land Trust inventory. It's a | 25  second -- sorry -- the third and fourth paragraph |
| Page 55 | Page 57 |

15 (Pages 54 - 57)

Lee Cunningham - November 10, 2017

1 advising members that -- the third paragraph talks
2 about "the consideration that Ritz-Carlton Destination
3 Club has made a strategic business decision to remove
4 the Ritz-Carlton brand from Abaco Club."
5     Do you see that?
6   A. Yes.
7   Q. And when it says The Ritz-Carlton Destination
8 Club, that is actually a Marriott Vacation Worldwide
9 entity; right?
10   A. Yes.
11   Q. So it would've been Marriott Vacation
12 Worldwide people that made that consideration and that
13 decision to remove that brand from that property?
14     MR. SELLINGER: Objection to form.
15   A. It would be people who -- it would be the
16 people authorized to make that decision by -- for The
17 Ritz-Carlton Destination Club.
18 BY MR. FERGUSON:
19   Q. And was that you?
20   A. Would've been myself and the other officers
21 of that company.
22   Q. When you say that company, you mean MVW?
23     MR. SELLINGER: Objection.
24   A. I'm not sure I know exactly who the other
25 officers of The Ritz-Carlton Destination Club are.

Page 58

1   Q. Someone else bought that from Marriott
2 Vacation Worldwide?
3   A. It wasn't Marriott Vacation Worldwide. It
4 was a joint venture between Marriott Vacation -- or
5 between -- I'm not sure of the exact entity within the
6 Marriott Vacation Club family or Vacation Worldwide
7 family. Lehman Brothers and Maui Land and Pineapple.
8   Q. We have only about three minutes left. Would
9 you go to the paragraph that says "Based on The
10 Ritz-Carlton Destination Club member feedback"? And
11 that would be three up from the bottom.
12   A. Uh-huh.
13   Q. It says "Additional benefits and experiences
14 will be available through a new affiliation with
15 Marriott Vacation Club Destinations."
16     And this was an idea that MVW had to
17 provide -- to affiliate the Marriott Vacation Club
18 Destination program with Ritz-Carlton Destination Club
19 members?
20   A. That's correct.
21     MR. SELLINGER: Objection to form.
22 BY MR. FERGUSON:
23   Q. It says "It will enable Ritz-Carlton members
24 to expand their options."
25   A. That's correct.

Page 60

1 BY MR. FERGUSON:
2   Q. Is Mr. Weisz one?
3   A. No.
4     THE VIDEOGRAPHER: Counsel, we have five
5 minutes left on tape.
6 BY MR. FERGUSON:
7   Q. And then also, it says in the fourth
8 paragraph down, on July 10, 2012, "Ritz-Carlton
9 Management Company, as manager of the property known
10 as Kapalua Bay, has exercised the right to issue a
11 default notice."
12   A. Correct.
13   Q. And eventually the Kapalua property obviously
14 dropped out of the Ritz-Carlton Destination Club
15 system?
16   A. Correct.
17   Q. And I understand that MVW, or one of its
18 subentities in The Ritz-Carlton Destination Club, made
19 a bid to buy it back, but lost that bid -- to buy the
20 property, to keep it in the system?
21   A. We made a -- we had a discussion to keep the
22 management of the property. We didn't -- I don't
23 recall bidding to purchase the physical assets.
24   Q. All right. Was there any inventory left?
25   A. There was a lot of inventory left.

Page 59

1   Q. So they were going -- you were going to
2 provide them with an opportunity. And that's a word
3 you used quite a bit, right, because you saw this as
4 an opportunity for them?
5   A. Yes.
6   Q. And you told them that they would extend your
7 opportunity to deposit the reserved allocation on an
8 annual basis. And after a couple years, you actually
9 were able -- you actually did initiate the affiliation
10 so that people at the Aspen Club can put their
11 allocated weeks into the exchange?
12   A. That's correct.
13   Q. Through Lion & Crown Travel?
14   A. That's correct.
15     THE VIDEOGRAPHER: The time is 10:21.
16 That concludes media one in the deposition of
17 Lee Cunningham.
18     (Brief recess.)
19     THE VIDEOGRAPHER: The time is 10:32.
20 This is media two in the deposition of Lee
21 Cunningham.
22 BY MR. FERGUSON:
23   Q. I'll come back to Exhibit 1023 in a moment.
24 I just wanted to ask you -- in your meetings with the
25 four lawyers, which you looked at approximately 100

Page 61

16 (Pages 58 - 61)

Lee Cunningham - November 10, 2017

1 documents over, I take it, about two meetings, I think
2 you said, was there any other Marriott Vacation
3 Worldwide folks there -- for example, Ms. Sobeck?
4      MR. SELLINGER: Objection to form. You
5 mischaracterized his testimony.
6      MR. FERGUSON: I'm sorry. I didn't mean
7 to do that, but my memory might have failed
8 me a little bit.
9 BY MR. FERGUSON:
10     Q. Was Ms. Sobeck at any of the meetings with
11 you and your counsel?
12     A. No.
13     Q. How about Ms. Rauso?
14     A. No.
15     Q. Any other executives at all?
16     A. No.
17     Q. So on 1023, we're looking at the paragraph
18 that starts with "Based on the Ritz-Carlton member
19 feedback, additional benefits and experiences will be
20 available through a new affiliation."
21          When it says "feedback" there, it's not
22 talking about, sir, is it, feedback of people saying,
23 "Hey, we want to be part of the MVW Club Destinations
24 program," is it?
25     A. No.

Page 62

1 to form -- the preview about the -- you sort
2 of make statements, the MOU and
3 acknowledgement. I know it's not really part
4 of your question, but, for the record, I've
5 got to object because of that.
6 BY MR. FERGUSON:
7     Q. Okay. Today --
8      MR. SELLINGER: And I'm not trying to
9 interfere.
10     MR. FERGUSON: I understand. I want to
11 go as fast as I can.
12     MR. SELLINGER: I'm not really trying to
13 get in your way.
14 BY MR. FERGUSON:
15     Q. Today, the people who have signed -- I think
16 you guys called it an opportunity, an option,
17 voluntary program -- people who have gone into the
18 Lion & Crown program to put in their allocated weeks,
19 there was indications that they do that on an annual
20 basis.
21          My question is, for Mr. Smith at the Aspen
22 Club, that's decided to sign up with the Lion & Crown
23 exchange program in order to access MVW properties,
24 does that -- it says annual. Does it annually renew
25 or do they get a document every year they have to

Page 64

1     Q. So the feedback there was that people wanted
2 more opportunities, I take it, because you were losing
3 properties?
4     A. I don't -- I don't know what would have
5 prompted their feedback. They wanted more
6 opportunities.
7     Q. So just to be clear, when it says "member
8 feedback," there was nothing to do with them saying
9 they want any part of that MVW Destination Club?
10     A. I don't recall whether -- there could have
11 been feedback to that effect, but I don't recall.
12     Q. And it says -- we stopped with the video a
13 few moments ago with the sentence "This affiliation
14 will enable Ritz-Carlton Destination Club members to
15 expand their options." Then it talks about
16 "Affiliation will extend the opportunity to deposit
17 your reserved allocation on an annual basis."
18          A couple questions about that. People who
19 now -- cutting ahead two years to when the affiliation
20 occurred, with the MOU, the acknowledgement, and
21 today -- do people have to annually sign up or is it
22 automatically renewed?
23     A. The --
24     Q. The members.
25     MR. SELLINGER: Let me just first object

Page 63

1 sign?
2     A. I think it -- to be honest, I do not recall
3 whether their enrollment to Lion & Crown is a --
4 requires an annual renewal. I think this is referring
5 to the election to deposit a week is an annual
6 session.
7     Q. I understand that. But I was just
8 questioning whether or not they had to renew that
9 ability --
10     A. I do not recall.
11     Q. Is there anywhere in this letter that you
12 recall -- I'm sure you do -- where you tell the
13 members that -- given that allocated weekend, that
14 people from MVW -- either weeks people or points
15 people, I'll call them -- are going to be able to
16 access their private club?
17     A. No.
18     Q. Why not?
19     A. I think it was assumed we had other
20 affiliations. I noted here Abercrombie & Kent. They
21 knew that, as they exchanged their time for -- their
22 allocated time for stays in an Abercrombie & Kent
23 experience, that Abercrombie & Kent members then had
24 the opportunity to access. That's the nature of
25 exchange.

Page 65

17 (Pages 62 - 65)

Lee Cunningham - November 10, 2017

1    Q.  So you're assuming the approximately 700
2 people that had fractional owners -- and I know you
3 guys owned 120, say -- the 700 other folks -- 730
4 other folks -- they knew from this letter from
5 Ms. Babich that the 75,000 points people -- I know it
6 wasn't that many then -- but the points people and
7 weeks people could theoretically access that club?
8       MR. SELLINGER:  Objection to form.
9    A.  I believe, at the time of this letter -- as
10 you can see, it wasn't clear that -- or it wasn't
11 expressly stated that a Marriott Vacation Club person
12 would be able to come into that exchange.
13       It's certainly understood that if you
14 exchange time out to another system, that that
15 system's owners would be able to exchange in.
16 BY MR. FERGUSON:
17    Q.  So Ms. Babich's letter -- this is kind of a
18 watershed moment when you tell the people you're going
19 to affiliate with MVW.  It's the first time you told
20 your members that --
21    A.  That's correct.
22    Q.  And you're just assuming that the folks in my
23 club, the people -- 30, 40 people -- members -- that
24 you assume that they were going to know that MVW
25 people would be able to trade back in on the allocated

Page 66

1 weeks they might put into the program?
2    A.  Yes.
3    Q.  And you say that's because Abercrombie --
4 that they were -- some of them had signed up for
5 Abercrombie & Kent?  Or did you have to sign up for
6 that program at all?
7    A.  I don't recall whether there was a sign-up
8 required.
9    Q.  What was the population of Abercrombie & Kent
10 folks, excluding anybody who signed up from the
11 Ritz-Carlton systems?
12    A.  I don't know.
13    Q.  Was it more than a thousand?
14    A.  I don't know.
15    Q.  Was it less than 75,000 points people?
16    A.  I don't know.
17    Q.  So you don't have any kind of parameters at
18 all?
19    A.  Not for Abercrombie & Kent, no.
20    Q.  And how long has Abercrombie & Kent -- you
21 guys like to call it an opportunity for Ritz-Carlton
22 Destination Club folks.
23    A.  I believe it was around two years.
24    Q.  And people at the Ritz-Carlton, at least
25 Aspen, they were generally favorable when they

Page 67

1 utilized that.  Is that what you heard back in terms
2 of feedback?
3    A.  I don't recall ever seeing any feedback on
4 Abercrombie & Kent.
5    Q.  Were you involved in the process that led to
6 Abercrombie & Kent being an opportunity for
7 Ritz-Carlton Destination Club members?
8    A.  No.
9    Q.  Was that something that occurred -- withdraw
10 that.
11       What kind of feedback did you get from your
12 members when this letter went out to the folks?
13 Members?
14    A.  From Ritz-Carlton members?
15    Q.  Yes.
16    A.  We got feedback from members through our
17 member services, direct letters, conversations from --
18 calls from boards.  Some were positive.  Many were
19 negative.
20    Q.  Including Mr. Cappello?
21    A.  Well, I don't think I had -- I don't -- I
22 didn't correspond with Mr. Cappello regarding this
23 letter.
24    Q.  But he corresponded with you?
25    A.  I didn't -- not regarding this letter.

Page 68

1    Q.  How about the concept of an affiliation with
2 MVW; did he communicate with you about that?
3    A.  Yes.  He sent me an e-mail or -- yeah.
4    Q.  When the spinoff occurred and the
5 Ritz-Carlton Destinations Club went with the new
6 entity -- separate entity, MVW -- was that 2009, or
7 what year was that?  Do you recall?
8    A.  2011.
9    Q.  2011.  All right.  And who made the decisions
10 that the Ritz-Carlton Destination Clubs would go under
11 the vacation -- the new vacation company -- Marriott
12 International?
13    A.  Marriott International did.
14    Q.  Mr. Sorenson?
15    A.  I don't know who within their company made
16 that decision.
17    Q.  And when it was spun off, were there any
18 plans, after 2011, to build any more clubs or bring
19 any more clubs online in any way?
20    A.  We had unfinished development, but -- and we
21 continued to look for opportunities, but they had to
22 make -- they had to meet our economic hurdles, and I
23 don't recall any of them getting to that point.
24    Q.  Because MVW wasn't -- its primary business
25 model is not to develop properties; isn't that

Page 69

18 (Pages 66 - 69)

Lee Cunningham - November 10, 2017

---

**Page 70**

1 right -- in terms of building them through like the
2 Development Company that you inherited?
3     A. A primary part of our business is to develop.
4     Q. All right. In terms of the Development
5 Company, the Ritz-Carlton Development Company that
6 came over that had this remaining inventory -- that
7 particular entity -- do you recall Mr. Weisz
8 discussion that at the meeting with Ms. Perfido and
9 Mr. Mullenix?
10     A. I'm sure there was discussion regarding the
11 fact that we still owned a significant amount of
12 inventory.
13     Q. Do you recall words to the effect of
14 Mr. Weisz telling the folks in the room, including
15 you, that he wasn't happy that Marriott Vacation
16 Worldwide had gotten the Ritz-Carlton --
17     A. No.
18     Q. Do you recall him saying, in words or effect,
19 that he would never build another Ritz-Carlton Club?
20     A. No.
21     Q. I'm going to show you Exhibit 1024. This is
22 a -- Exhibit 1024 is also a letter from Babich, but
23 it's slightly longer than the prior exhibit, 1023.
24         Do you recall there was two versions of this
25 letter that went out?

---

**Page 72**

1 excursions available to you when you choose to not to
2 visit your Home Club during your allocated time."
3         At this point in time, were you -- I don't
4 want to say you -- was MVW allowing its either premium
5 or platinum members to access Ritz-Carlton Clubs?
6     A. I don't recall whether there was the -- I
7 don't recall the timing of when access to Ritz-Carlton
8 inventory was available for members of the MVCD
9 exchange program.
10     Q. But encouraging people to participate in the
11 program, if they did or have -- by encouraging them to
12 do that, they're creating an exchange inventory for
13 Marriott Vacation Worldwide to use for its points or
14 weeks people; correct?
15     A. I think what it says here is "We're
16 encouraging you because we feel you'll be delighted
17 with your additional destinations and countless
18 experiential excursions."
19     Q. Yeah. But what Marriott Vacation Worldwide
20 would get if people signed up --
21     A. Nothing.
22     Q. They wouldn't get exchange inventory?
23     A. Marriott Vacation Worldwide would get -- has
24 no benefit from this.
25     Q. If people affiliate and put it in an

---

**Page 71**

1     A. I do not recall that there were two versions.
2     Q. The letters end with "initially" -- that
3 sentence "initially access to the enhancements made
4 available through the new affiliation with Marriott
5 Vacation Club would be complimentary." You have that
6 paragraph. Then you have a closing one about
7 enthusiasm.
8         This paragraph that has the bold language in
9 there, is that because the people who had already
10 signed up with the Lion & Crown Travel Company would
11 have to reenroll in the MVW system, if you recall? We
12 can always ask Ms. Babich or Ms. Sobeck.
13     A. I don't recall this letter going out.
14     Q. Would you go to the paragraph -- let me go
15 back to this one if you don't recall it. I'll go back
16 to 1023. Look at that paragraph that says "initially
17 access to enhancements." It's on the second page,
18 sir. It's the last full paragraph before the signoff
19 about the enthusiasm.
20         It says, "Initially access to enhancements
21 made available through the new affiliation with
22 Marriott Vacation Destinations will be complimentary
23 and easily added." It says, "We encourage you to
24 participate, as we feel you will be delighted with the
25 additional destinations and countless experiential

---

**Page 73**

1 allocated week, you create some exchange inventory; do
2 you not?
3     A. That's correct.
4     Q. Am I picking the wrong name? At that point,
5 if there's exchange inventory, a Marriott Vacation
6 Worldwide person with, say, 6,500 points can access
7 the Ritz-Carlton Club today?
8     A. An owner of a -- a participant in the
9 Marriott Vacations Exchange Destinations Program would
10 have access to that inventory.
11     Q. And they would have access to the inventory
12 including on less than a weekly basis?
13     A. On an availability basis.
14     Q. But they can book for less than a week?
15     A. On an availability basis.
16     Q. Understood. Exhibit 1022. Sir, Exhibit 1022
17 is an e-mail exchange, Ms. Sobeck, at the bottom, to
18 Mary Lynn Clark. It's July 16th, which is the date
19 before the letter had gone out -- Ms. Babich's
20 letter -- at least the one you recognize -- on the
21 next day, July 17th.
22         It says, "Dear RCDC Association Presidents:
23 Thanks for your time today for the RCDC President's
24 Webinar." It says, "Attached, please find the two
25 letters that are being sent to members tomorrow.

---

19 (Pages 70 - 73)

Lee Cunningham - November 10, 2017

1 Those who have affiliated with Lion & Crown Travel
2 Company will get the first enrolled and those who have
3 not will get the second non-enrolled."
4     Does that kind of help you out in terms of
5 the last two letters --
6     A. Maybe that was the reason for the two
7 letters.
8     Q. Do you know how far in advance you all told
9 the association presidents Ms. Babich's letter was
10 coming to Ritz-Carlton Destination Club members?
11    A. It would look like a day.
12    Q. Do you recall taking the association
13 presidents, such as Mr. Neveloff, by surprise?
14    A. No.
15    Q. Who is John Albert, the vice president of
16 operations planning?
17    A. He's a member of our corporate operations
18 staff.
19    Q. And does he report to you?
20    A. No.
21    Q. Is he underneath your footing at MVW in terms
22 of office?
23    A. No.
24    Q. Who does he report to?
25    A. Cliff Delorey.

Page 74

1     Q. Was it planned to give them one day's notice
2 or was it just you all were too busy to give notice
3 further in advance?
4     A. I don't recall.
5     Q. Was there a decision not to tell the
6 presidents before telling -- to tell them that short
7 in advance of this affiliation announcement?
8       MR. SELLINGER: Objection to form.
9     A. We had no obligation to inform the presidents
10 of anything, and we chose to give them an advance
11 notice.
12 BY MR. FERGUSON:
13    Q. And why do you say you had no obligation to
14 give them an advance notice?
15    A. Because we had no obligation to give them an
16 advance notice of an affiliation, which is entirely
17 our decision.
18    Q. But you all later promised to give a vote
19 that would require a majority of the members to
20 approve affiliation.
21      Do you recall that?
22      MR. SELLINGER: Objection --
23    A. No.
24      MR. SELLINGER: Objection to form.
25 BY MR. FERGUSON:

Page 76

1     Q. And he says, "The long-awaited announcement
2 about RCC."
3       Was why was this long-awaited? Was this
4 something you had been planning for quite some time?
5     A. I don't know why he chose those words.
6     Q. Do you think he would've been in a meeting
7 like the one we saw in that PowerPoint presentation we
8 discussed?
9     A. No.
10    Q. He wouldn't have been there. Who are
11 these -- what type of people are these -- what type of
12 people -- what group are these people -- Mr. Ryan,
13 Asche, Berg, Gum, Welch?
14    A. They are other members of the corporate
15 operations staff.
16    Q. It says there was a webinar. Have you seen
17 that webinar?
18    A. No.
19    Q. Do you know what that webinar was?
20    A. I know what -- the purpose of the webinar was
21 to give the board presidents an advance notice of the
22 letter going out.
23    Q. The one-day advance notice of Ms. Babich's
24 letter?
25    A. That's correct.

Page 75

1     Q. You don't recall that?
2     A. No. We did not give them the decision to
3 make that -- make that decision.
4     Q. Never?
5     A. No.
6     Q. Do you know a Mr. Lattore or Ms. -- Pat
7 Lattore?
8     A. No.
9     Q. Let me just show you Exhibit 1028. This is
10 an e-mail from a Pat Lattore at the bottom. You'll
11 see on the last page -- as you know, these things are
12 printed out kind of in reverse order. The last page
13 is the first communication.
14      It says, "Please find attached letter from
15 Cobalt Travel Company, LLC, regarding the execution --
16 the evolution of a Ritz-Carlton Destination Club."
17      That's the cover e-mail that was sent with
18 Ms. Babich's July 17th letters, was it not?
19    A. I do not know.
20    Q. Well, if you look above, it says "July 17,
21 2012, member communications."
22    A. It probably is.
23    Q. Well, RCDC member communications is the
24 way -- is an e-mail system that you all are able to
25 use through Ms. Babich's group to communicate with

Page 77

20 (Pages 74 - 77)

Lee Cunningham - November 10, 2017

1 your Ritz-Carlton Club members; right?

2     A.  I don't personally remember the exact

3 communication tools that we used to communicate with

4 our members and owners, but...

5     Q.  So if you look at the e-mail, it looks

6 like -- let me ask you this way.  Are they able to

7 respond back to RCDC member communications on letters

8 such as Ms. Babich's on July 17th?

9     A.  I don't know.

10    Q.  If you look at the next page forward, it

11 says, "Hi Eveleen.  Thanks for the update."

12        Are you there?

13    A.  Yes.

14    Q.  It says, "Unfortunately, leadership has taken

15 away two of the nine key exchange locations for us

16 within the system."

17        That would've been Abaco and Kapalua that she

18 announced in her letter; right?

19    A.  There were two announcements in the letter.

20 I don't know which one she's referring to.

21    Q.  Were there any other properties that had left

22 as of July 17, 2012?

23    A.  No.

24    Q.  It says, "You took away A&F, which had great

25 locations, and we were about to exchange a week."

Page 78

---

1     A.  There are times that you can, yes.

2     Q.  And are these secondary markets markets that

3 have the approval of you, or it's just a totally

4 different system?

5     A.  No, it's just -- if you own real estate or a

6 real estate product, you have the right to sell it.

7 You can sell it out through us or through somebody

8 else.

9     Q.  Well, if I pay $65,000 for 6,500 points, or

10 however you do that, why would someone be selling it

11 for less than it's worth?  What's the market for us

12 there?

13    A.  You'd have to ask them.

14    Q.  Are these secondary markets stuff -- sorry --

15 are things that you become aware of just through

16 meetings with your executives?

17    A.  No.  We know they exist.

18    Q.  Is it anything that you have tried to stop or

19 is it something that's just -- market forces and

20 anybody can do it?

21    A.  We don't like it, but we don't -- there's --

22 we exercise our rights and -- to control what we can

23 control.

24    Q.  So although the Rolling Stones don't like

25 scalpers, they're a fact of life.  That's kind of --

Page 80

---

1     Why did the A&F exchange opportunity, as used

2 by you folks -- why was that taken away or why did it

3 end?

4     A.  Because Abercrombie & Fitch -- there was more

5 exchange going to Abercrombie & Fitch than there was

6 demand from Abercrombie & Fitch to go to Ritz-Carlton

7 products.

8     Q.  So there was an imbalance that couldn't be

9 handled by Abercrombie & Kent?

10    A.  That's correct.  It's Abercrombie & Kent.

11 Not Fitch.

12    Q.  I used to go to that store in New York.

13        The next page -- it goes back to the next

14 page.  It's Patrick -- so now we know it's a Patrick.

15 Mr. Lattore says, "The Marriott Club is a B system

16 that we could buy at significantly-discounted prices

17 on the resale market.  It does not come close to Ritz

18 properties nor the Ritz standard."

19        My question there is, are you aware that

20 there is Marriott Vacation Club system points or

21 product that's available in secondary markets?

22    A.  Yes.

23    Q.  And are you able to buy points in the

24 secondary markets for less than the prices that MVW

25 salespeople are required to sell them at?

Page 79

---

1 you don't like it, but it's -- these secondary markets

2 for points are just available and people can buy them

3 still today?

4        MR. SELLINGER:  Objection to form.

5     A.  Yeah.  I mean, there are secondary

6 markets for -- there's markets -- multiple markets for

7 all types of real estate -- points, fractional

8 product, weeks, home ownership.  People are free to

9 price them the way they want to price them.

10 BY MR. FERGUSON:

11    Q.  On the first page of Mr. Lattore's e-mail to

12 Babich, you'll see that he responds -- let me ask you

13 this.  Have you ever seen this letter -- this e-mail?

14    A.  No.

15    Q.  1033 has been placed in front of the witness.

16 Exhibit 1033 is a two-page exhibit, Mr. Cunningham.

17 You'll see that you are the recipient of this

18 confidential document from -- it says confidential --

19        MR. FERGUSON:  Is that stamped

20    confidential for the litigation?

21        MR. MARX:  It is.

22 BY MR. FERGUSON:

23    Q.  Okay.  So that wasn't on there when it was

24 generated.  It's for the litigation.

25        This is a memorandum or -- it looks like it's

Page 81

21 (Pages 78 - 81)

Lee Cunningham - November 10, 2017

1 an e-mail, actually -- from Clark to you,
2 Mr. Cunningham, regarding Mr. Neveloff.
3      Do you know Mr. Neveloff?
4      A. I have spoken to Mr. Neveloff.
5      Q. Have you ever met him in person?
6      A. No, not that I recall.
7      Q. You understand that he's a real estate
8 attorney in New York City?
9      A. I believe I was aware of that.
10      Q. And this looks like it's a call that
11 Ms. Clark had with Mr. Neveloff. She says, "I stuck
12 with my script below."
13      Do you know if anybody -- I'm sorry -- did
14 you work on a script for Ms. Clark's communication,
15 or, I guess, call with Mr. Neveloff?
16      A. No.
17      Q. And then she said, "First we confirmed his
18 concerns; do not want MVW members in their clubs; do
19 not want short stays at the clubs."
20      Do you see that?
21      A. Yes.
22      Q. Is that something you were aware of before
23 you got these notes of a call between Clark and
24 Neveloff?
25      A. I don't recall the time of whether -- I was
Page 82

1 aware that he had those concerns. Whether that
2 awareness occurred before this e-mail or after, I
3 don't know.
4      Q. Although, those were concerns, the fact of
5 the -- those were his concerns -- the fact of the
6 matter is, today, there aren't MVC members in the
7 Ritz-Carlton Aspen club?
8      A. That's correct.
9      Q. As well as other clubs in the system, like
10 Tahoe?
11      A. That's right.
12      Q. And, in fact, also that the MVC people can
13 use short stays in the Aspen Club -- shorter than a
14 week?
15      A. Yes, through the exchange program.
16      Q. Is there any other way that an MVC member can
17 access the Ritz-Carlton Aspen Club from an owner?
18      A. They could rent on the open market from the
19 members who rent their time.
20      Q. She has -- a few bullet points down, there
21 was an intention -- she made it clear that it was
22 Marriott Vacation Worldwide's intent to put unsold
23 inventory into the NATO trust. He wasn't thrilled,
24 but is now accepting it.
25      Do you have an understanding that
Page 83

1 Mr. Neveloff ever accepted that to occur?
2      A. I'm sorry. Where are you?
3      Q. Third bullet point down. It was a terrible
4 question. But it says, "made it clear that our
5 intent was to put unsold inventory into the
6 Ritz-Carlton inventory into the NATO trust. He wasn't
7 thrilled, but is now accepting it."
8      Are you there?
9      A. Yeah.
10      Q. Mr. Neveloff -- withdraw that. In fact, that
11 never happened, right; you did not put Ritz-Carlton
12 inventory that the Development Company owned into the
13 trust?
14      A. No -- we did. Not in Aspen.
15      Q. You understand Mr. Neveloff was the president
16 of the HOA and this is talking about Aspen?
17      A. Okay.
18      Q. Maybe it wasn't. You wouldn't be talking to
19 Mr. Neveloff about what MVW was going to do with his
20 other clubs, would you?
21      MR. SELLINGER: Objection. It's not
22 talking about MVW here, I don't think.
23 BY MR. FERGUSON:
24      Q. Well, MVW owns Ritz-Carlton Development
25 Company; right?
Page 84

1      A. MVW -- Ritz-Carlton Development Company is an
2 entity within Marriott Vacation Worldwide.
3 BY MR. FERGUSON:
4      Q. So in 2012, when Ritz-Carlton Development
5 Company had to pay -- it had to pay members' dues for
6 its 120 units; right? Fractionals?
7      A. That's correct.
8      Q. So that liability would have made its way
9 over to the MVW accounting systems; right?
10      A. The cost would have, yes.
11      Q. Do you recall what the cost was per year on
12 total inventory across the system in 2012?
13      A. I do not.
14      Q. Was it more than a million dollars?
15      A. Most likely.
16      Q. Was it more than $10 million?
17      A. Unlikely.
18      Q. He said -- well, she said he said, five
19 bullet points down, "He said he doesn't want to be
20 sitting at the pool with 'blue collar' customers. He
21 grew up blue collar, but is now out." She wrote
22 "unbelievable" in large letters.
23      Do you recall anything about that comment
24 Mr. Neveloff made or her comment about what he said?
25      A. Just that she made that comment.
Page 85

22 (Pages 82 - 85)

Lee Cunningham - November 10, 2017

| | |
|---|---|
| 1    Q. Was that a theme that you heard over the next | 1    A. No. |
| 2 couple years before the affiliation was allowed to | 2 BY MR. FERGUSON: |
| 3 occur with Lion & Crown -- people that signed with | 3    Q. How many weeks of exchange inventory does |
| 4 Lion & Crown -- do you recall the sentiment that the | 4 Marriott have today for its Marriott Vacation |
| 5 people at Aspen, at least, thought of their ownership | 5 Worldwide people? |
| 6 and their members as being part of a private club | 6    A. I'm not following your question. |
| 7 where they would know each other and spend time | 7    Q. Okay. How much exchange program inventory -- |
| 8 together? Did you hear concerns that it didn't want | 8 I think we covered this before and it might be that |
| 9 people that were strange to the system there? | 9 you don't know. How much exchange program inventory |
| 10      MR. SELLINGER: Objection to form. | 10 is available at the Ritz-Carlton Aspen for MVW |
| 11    A. So, yeah, could you re -- | 11 members? |
| 12 BY MR. FERGUSON: | 12    A. I don't know the current numbers. |
| 13    Q. That was bad. Did you ever hear from other | 13    Q. Okay. |
| 14 folks, besides this comment here -- without using the | 14    A. There are more owners outside than |
| 15 term "blue collar" -- that they were concerned that | 15 Mr. Lattore. |
| 16 allowing MVW people into the Aspen Club would impact | 16    Q. I understand that. You were the person that |
| 17 their desire to have a private club setting where they | 17 was involved in negotiating the sale of the |
| 18 knew everybody? | 18 Ritz-Carlton Development Company inventory at Ritz |
| 19    A. I did hear that there was this concern about | 19 Aspen with the company called the Lore Institute -- |
| 20 exclusivity that had long since been eliminated by the | 20 Mr. Klein? |
| 21 members themselves through their rental of inventory | 21    A. I was aware of that. I didn't negotiate the |
| 22 on the open market and through the Abercrombie & Kent | 22 arrangement. |
| 23 affiliation, which I don't recall hearing the same | 23    Q. Are you the person who reached out to him? |
| 24 feedback from. | 24    A. No. |
| 25    Q. But the difference is that a person that -- | 25    Q. Let me show you what's marked Exhibit 1042. |
| Page 86 | Page 88 |

| | |
|---|---|
| 1 for example, Patrick Lattore, if he owned one-twelfth | 1 This is an e-mail. The bottom of page 1 says "The |
| 2 interest, he would have four weeks to use himself or | 2 Ritz-Carlton Destination Clubs newest offering." It's |
| 3 to trade on the open market; right? | 3 from a Linda Sciberras, and she's with -- regional |
| 4      MR. SELLINGER: Objection to form. What | 4 membership executive at Ritz-Carlton Destination Clubs |
| 5      difference? | 5 here in Orlando. |
| 6    A. What's the question again? | 6      Do you know her? |
| 7 BY MR. FERGUSON: | 7    A. I do not. |
| 8    Q. I'm going to get to that. Mr. Lattore would | 8    Q. If you look at the first page, again, it |
| 9 have four weeks, three allocated and one unreserved; | 9 says, "The Ritz-Carlton Destination Clubs and Marriott |
| 10 right? | 10 Vacations Worldwide are pleased to announce our newest |
| 11    A. That's correct. | 11 offering with more destinations and more flexibility |
| 12    Q. Okay. And your point is that there were | 12 including..." |
| 13 people that weren't part of the private club that | 13      The next page, the second bullet point down |
| 14 could get into there because Mr. Lattore could give it | 14 says "access to seven ski destinations!" |
| 15 his brother-in-law or he could give to Fries | 15      Do you know whether one of those seven ski |
| 16 Properties to rent to anybody that wanted to be in | 16 destinations being -- it looks like it's e-mailed out, |
| 17 Aspen? | 17 in this case, to a Mr. McBride -- included Aspen? |
| 18    A. I'm not familiar with Fries Property, but he | 18    A. I don't know. |
| 19 could list it for rent through a number of means. And | 19    Q. All right. |
| 20 anybody who had the ability to pay, could come. | 20    A. I mean -- |
| 21    Q. All right. So he would be able to do that | 21    Q. Sorry. |
| 22 with four weeks, but Marriott Vacation Worldwide is | 22    A. Yeah. I'm trying -- I don't know in this -- |
| 23 now able to do that with their exchange program | 23 for this particular communication -- whether there |
| 24 inventory for far more than four weeks; right? | 24 was -- how they were counting a destination. |
| 25      MR. SELLINGER: Objection to form. | 25    Q. Does Marriott Vacation Worldwide have ski |
| Page 87 | Page 89 |

23 (Pages 86 - 89)

Lee Cunningham - November 10, 2017

1 destinations other than, say, Aspen and Bachelor
2 Gulch?  It obviously does.
3     A.  Sure.
4     Q.  Let me put it this way.  Does it have
5 non-Ritz-Carlton Destination Club ski resorts?
6     A.  Absolutely.
7     Q.  Okay, great.  If you look at this bullet
8 point here, it says, "6,500 points required to access
9 Ritz-Carlton Destination Clubs."
10        Are you there?
11     A.  Uh-huh.
12     Q.  Is that a yes, sir?
13     A.  Sorry.
14     Q.  You have to say "yes" as opposed -- that's
15 something I should have told you before.
16     A.  I'm sorry.  I'm not sure where you're at.
17     Q.  I'm at 6,500 points --
18     A.  Okay.  Got you.
19     Q.  And I think we can do both of those --
20 Ritz-Carlton Aspen, 6,500 points.  That would be for
21 MVW people, weeks and points, that could, at this
22 point -- or that they were being told they could
23 access these clubs for that amount of points?
24     A.  No.  This refers to the number of points that
25 you would need to own to be a certain level within the

Page 90

1 exchange club; and, therefore, you have to have
2 ownership that equalled 6,500 points.
3        So it's not available to all members of the
4 club.  Just those at the upper end of the club.
5     Q.  So 6,500 points would cost more -- would
6 cost -- that would be one of your higher-level
7 members?
8     A.  Yes.
9     Q.  Okay.  And then a higher-level member would
10 have to use points like in the chart we saw before for
11 the nights in Aspen?
12     A.  Right.
13     Q.  Page 64 of that chart.  What was it that
14 allowed an MVW person to access the Ritz-Carlton Aspen
15 at a 6,500-point level -- that particular type of
16 member -- what was it that would've been used in this
17 timeframe?  Were you going to use the inventory that
18 was owned there?
19     MR. SELLINGER:  Objection to form.
20 BY MR. FERGUSON:
21     Q.  Let me withdraw that.  For the person you're
22 telling there's this opportunity at MVW -- can use
23 Ritz-Carlton Aspen at a 6,500-point level, what would
24 that person say -- "Yeah, I want to do this" -- what
25 would he be accessing, or she be accessing, at least

Page 91

1 in that timeframe?
2     A.  I do not know.  I don't know.
3     Q.  Exhibit 1514 is an e-mail from Clark to you
4 with copy to Ms. Sobeck and back to herself.  The
5 subject is Jay.  This looks like a different e-mail
6 because it doesn't have the -- yeah, this is
7 different.
8        It says, "I spoke to Jay at the end of
9 yesterday" -- that would've been August 10th -- that
10 would be Friday -- "and talked to him about working on
11 communication plan and his thoughts."
12        Do you recall receiving this e-mail about
13 Mr. Neveloff?
14     A.  I'm sure I did.
15     Q.  This is a document reviewed for your
16 deposition, sir, if you recall?
17     A.  Yes.
18     Q.  When you look at the documents, did they have
19 exhibit stickers on them, if you recall?
20     A.  No.
21     Q.  The fourth bullet point says, "Marriott
22 marketing has already started.  He's sending me a
23 marketing e-mail he got from south -- what is an SE?
24 What is an SE?
25     A.  Sales executive.

Page 92

1     Q.  -- "in Orlando that said something about buy
2 and you get Ritz/Marriott stays."
3        Do you know what that's about in terms of
4 buying to get Ritz/Marriott stays blended together?
5     MR. SELLINGER:  Objection to form.
6 BY MR. FERGUSON:
7     Q.  Which Marriott is in the same -- there's a
8 slash between the two of them together.
9     MR. SELLINGER:  So what's the question
10 you're asking?
11 BY MR. FERGUSON:
12     Q.  Do you recall what, in marketing, was going
13 on at that time?  Was it similar to the prior exhibit
14 we just saw in Exhibit 1042?
15     A.  I would suspect it is that prior exhibit.
16     Q.  Exhibit 1049, sir.  That's an e-mail from an
17 address called Marriott Vacation Club Insider.  Is
18 that a --
19     A.  That's a communication that goes out to
20 Marriott Vacation Club owners, speaking to new options
21 and new -- or featuring vacation options for owners.
22     Q.  The second page says, "Explore your newest
23 benefits.  From luxury resort stays to owner-exclusive
24 tours, you can now enjoy even more vacation choices
25 through the Marriott Vacation Club Destinations

Page 93

24 (Pages 90 - 93)

Lee Cunningham - November 10, 2017

1 exchange programs."
2      The first one there is a special premier
3 benefit, Ritz-Carlton stays. It says, "Premier and
4 Premier Plus status. You can use club points to stay
5 at additional Ritz-Carlton Club resorts."
6      So in the fall of 2012 or late summer, this
7 is being sent to your points and weeks people?
8      A. That's correct.
9      Q. At that point, only Premier and Premier Plus
10 people would have the access to those Ritz-Carlton
11 Clubs?
12      A. That's correct.
13      Q. Today, is that still in effect? Is there
14 such a thing as a Premier member and a Premier Plus?
15      A. No. We changed the status -- as we had
16 three -- we went to five and they were renamed.
17      Q. Sounds like our tax brackets. All right. I
18 can cover a lot of this stuff with Stephanie Sobeck.
19      Exhibit 1061. That's a letter from you,
20 Mr. Cunningham, executive vice president and COO to
21 "Dear Valued Members."
22      I take it this was a letter that was
23 written -- co-written with various executives and
24 staff at MVW?
25      MR. SELLINGER: Objection to form.

Page 94

1 letter as the vice president or executive vice
2 president of Lion & Crown Travel?
3      A. That's correct.
4      Q. And sometimes you could do it under Grand
5 Residences?
6      A. That's correct.
7      Q. And sometimes, and most often, you use
8 Marriott Vacation Clubs?
9      A. Probably most of my communication is not
10 Marriott Vacation Clubs. Marriott Vacation Worldwide
11 would be my most frequent use of the -- my title.
12      Q. So in this particular situation, because
13 you're sending it to members of the Ritz-Carlton Club
14 system, you utilize executive vice president and chief
15 operating officer of Ritz-Carlton Destination Club?
16      A. That's correct.
17      MR. SELLINGER: Objection to form.
18 BY MR. FERGUSON:
19      Q. But you are not an executive vice president
20 of The Ritz-Carlton Destination Club, are you?
21      A. I'm an -- I wanted to be clear as to who the
22 communication was coming from -- was me representing
23 The Ritz-Carlton Destination Club.
24      Q. But you're not an executive vice president of
25 those five words, are you? You are not an executive

Page 96

1      MR. FERGUSON: What's your objection?
2      MR. SELLINGER: Well, it's a Ritz-Carlton
3 Destination Club. And, once again, you seem
4 to be conflating MVW and Ritz-Carlton.
5 BY MR. FERGUSON:
6      Q. Your paycheck comes from MVW?
7      A. Yes.
8      Q. Are you employed by The Ritz-Carlton
9 Destination Club?
10      A. No.
11      Q. Ritz-Carlton Destination Club is a trade name
12 that's being used here under the MVW umbrella of
13 companies; right?
14      MR. SELLINGER: Objection to form.
15      A. The Ritz-Carlton Destination Club is an
16 entity that's a part of the Marriott Vacation
17 Worldwide Corporation.
18 BY MR. FERGUSON:
19      Q. Is there a company called The Ritz-Carlton
20 Destination Club? We have the Ritz-Carlton Hotel
21 Company, Ritz-Carlton Hotel Management Company. Is
22 there a company called The Ritz-Carlton Destination
23 Club?
24      A. I don't know the answer to that.
25      Q. Sometimes, I take it, you could sign your

Page 95

1 vice president of The Ritz-Carlton Destination Club?
2      A. I don't know that those five boards make up
3 the --
4      Q. Five words. I should've -- I'm sorry.
5      A. Words? I thought you said boards.
6      Q. No. I'm sorry.
7      A. No.
8      Q. And I'm going to look at your letter. It
9 says, "We are writing to provide further information
10 regarding certain changes announced on July 17th to
11 the Lion & Crown Travel Company and The Ritz-Carlton
12 Destination Club system."
13      So do you understand this letter was you
14 following up to Ms. Babich's letters we saw earlier?
15      A. That's correct.
16      Q. You wanted to ensure them in the first
17 paragraph that, with respect to their rights and their
18 one-twelfth fractional interest, that their Home
19 Clubs -- that that would not change?
20      A. Their fractional deeded interest would not
21 change and their rotating calendar. They're not all
22 one-twelfth interests.
23      Q. There's some people that buy fixed weeks?
24      A. There were. The Ritz-Carlton Club Jupiter
25 was one-eighth interest.

Page 97

25 (Pages 94 - 97)

Lee Cunningham - November 10, 2017

1    Q. Do you know whether this letter was going to
2  people systemwide or some combination?
3    A. Systemwide.
4    Q. Okay. Thank you. After this letter was --
5  at the time this letter was written, Abaco and Kapalua
6  were in the process of or had already left the system;
7  correct?
8    A. They were in the process of, if not out.
9    Q. And after this letter was sent out, Bachelor
10  Gulch left the system?
11    A. I don't know when the -- I don't see a date
12  on this letter.
13    Q. Well, it's July 17th we're referring to. I
14  have it down as August 17th, and I don't know why.
15    A. If --
16    Q. Let me do it this way. If you look at the
17  last paragraph, it says, "We have scheduled a webinar
18  for members of The Ritz-Carlton Destination Club with
19  myself and the chief executive officer on
20  August 28th."
21      So it's sometime between July 17th and
22  August 28th, I take it.
23    A. I don't believe Bachelor Gulch was -- had
24  come out of the system by August 28th.
25    Q. Of '17 -- I'm sorry -- of '12?
                                              Page 98

1  system that are not in litigation?
2    A. Yes.
3    Q. Which ones?
4    A. Ritz-Carlton Club St. Thomas and Ritz-Carlton
5  Club Vail.
6    Q. You have litigation in St. Thomas, though, do
7  you not?
8    A. Not related to -- yes. Related to a
9  completely different issue.
10    Q. If you look five paragraphs down at the first
11  page of your letter between the 17th and the 24th,
12  July and August, it says, "Based on prior member
13  feedback, The Ritz-Carlton Destination Club team has
14  been exploring ways to broaden."
15      In terms of you writing this letter as
16  opposed to Ms. Babich, is it the same answer, that the
17  member feedback you're referring to is what people,
18  for example, say when they leave the property and do a
19  survey?
20    A. Yes.
21    MR. SELLINGER: It's only a partial
22    summary of his earlier answer.
23    MR. FERGUSON: I understand.
24  BY MR. FERGUSON:
25    Q. There were other types of surveys?
                                              Page 100

1    A. '12.
2    Q. But it would eventually leave the system?
3    A. Yes.
4    Q. And then the Jupiter Club would also leave
5  the system?
6    A. Yes.
7    Q. And both of those clubs went with The
8  Timbers?
9    A. That's correct.
10    Q. And in terms of the other clubs that
11  remained, there's Aspen; correct?
12    A. That's correct.
13    Q. And there's a lawsuit pending with 200
14  owners?
15    A. Yeah.
16    Q. And Lake Tahoe is one in the system?
17    A. Yes.
18    Q. And that's also in litigation?
19    A. Yes.
20    Q. About the affiliation in part?
21    A. Yes.
22    Q. And San Francisco, the same, is in
23  litigation?
24    A. That's correct.
25    Q. Are there any clubs that haven't the left the
                                              Page 99

1    A. Yes.
2    Q. There's OSAT surveys; is that one? Is that a
3  term of art?
4    A. Owner satisfaction is -- I'm not sure that's
5  the right terminology. That wouldn't be the right
6  terminology for The Ritz-Carlton Destination Club. We
7  do a member satisfaction survey and an onsite
8  satisfaction survey.
9    Q. I take it, some other member feedback would
10  be like the letter we saw from Patrick Lattore to
11  Ms. Babich; right? That would be -- a blast e-mail
12  would send out a letter like hers or this one here --
13    A. It would be all feedback sources like it was
14  before.
15    Q. The last paragraph of page 1 of Exhibit 1061
16  says, "The affiliation option announced in our
17  July 17, 2012 letter regarding the evolution of the
18  Ritz-Carlton Destination Club is the next step in
19  providing significantly more vacation options for our
20  Ritz-Carlton Destination Club members."
21      When you say "significantly more vacation
22  options," do you mean they could -- pursuant to what
23  you were planning at this time, was to be to access the
24  MVW resorts and excursion experiences; right?
25    A. The additional options that were being added
                                              Page 101

26 (Pages 98 - 101)

Lee Cunningham - November 10, 2017

**Page 102**

```
 1   were the Marriott Vacation Club exchange options which
 2   are -- number in the thousands.
 3        Q.  It says, "Should members decide to
 4   participate in this opportunity, they would be able to
 5   exchange one or more weeks for the Lion & Crown
 6   points."
 7        The fact of the matter is, at this timeframe,
 8   you lost two clubs, there were less options, there
 9   were no clubs being built; and what you mean by
10   evolution, at least in part, was, as a perk, you were
11   going to offer this access to MVW?
12        A.  Which letter are you referring to?
13        Q.  This letter right here.
14        A.  This?
15        Q.  Yeah.
16        A.  When evolution was used here, it was in
17   reference to the prior letter that talked about the
18   evolution of the club.
19        Q.  But one of the reasons you're doing this
20   affiliation, or proposing to do this affiliation, was
21   to present an optional opportunity in this evolution,
22   in part, because the people who had bought into the
23   club system were losing clubs?
24        MR. SELLINGER:  Objection to form.
25        A.  No.  Because this was a follow-on to the
```

**Page 103**

```
 1   announcement before we -- well, I take that back.  We
 2   had, at that point, had the two clubs that had left,
 3   or that were removed from the system.
 4        Yeah, partly in response to the reduced
 5   options for members.
 6   BY MR. FERGUSON:
 7        Q.  And you wanted to communicate pretty
 8   consistently and over and over again that you were
 9   calling this an opportunity and it was optional;
10   right?
11        A.  It is optional.
12        Q.  And that's something you've stressed
13   repeatedly, at least in this letter; right?  You used
14   the words "opportunities, affiliation, option."
15   That's something you really wanted to communicate to
16   your members -- it was optional and you viewed it as
17   an opportunity for them?
18        MR. SELLINGER:  Objection to form.
19        A.  We communicated that it was optional because
20   it was optional, and that it provided additional
21   opportunities for those -- because that's what it did.
22   BY MR. FERGUSON:
23        Q.  At the second page of Exhibit 1061, you said
24   in this paragraph here -- it's one up from the
25   broadcast information -- it says, "We understand our
```

**Page 104**

```
 1   original communication generated questions for a
 2   number of our members and may not have fully
 3   anticipated all your questions regarding changes to
 4   The Ritz-Carlton Destination Club."
 5        Is it fair to state, between July 17th and
 6   the time this letter was written sometime prior to
 7   August 24th, that you were getting a fair number of
 8   communications from members about this -- Ms. Babich's
 9   letter?
10        A.  We had gotten communication from several
11   owners and from several through some of the board
12   members that -- asking questions that we wanted to
13   clarify.
14        Q.  Including, for example, the telephone calls
15   that Ms. Clark had with Mr. Neveloff?
16        A.  Yes.
17        Q.  And you said, "We've received additional
18   feedback from a few members on your board."
19        When it says "your board" here, does that
20   help you understand one way or another whether this
21   was a letter that was targeted to a particular club,
22   or, just, you were able to use that because --
23        A.  Everybody has a board.
24        Q.  Okay.  You said, "We appreciate you hearing
25   from us" and these people could e-mail back.  Could
```

**Page 105**

```
 1   they reply back to this address,
 2   member.inquiry@ritzcarltonclub?
 3        A.  Yes.
 4        Q.  Did there come a time when the Development
 5   Company stopped selling its inventory at Aspen?
 6        A.  At Aspen, yes.
 7        Q.  Why was the decision made to stop selling it?
 8   Let me do it this way.  When was the decision made to
 9   stop selling it?
10        A.  I don't recall the actual date.
11        Q.  Was it before this affiliation concept was
12   being floated to the members, or, I guess --
13        A.  I don't recall the timing.
14        Q.  Why was it stopped?
15        A.  Because the market -- there wasn't a market
16   for it.  As we tried to generate interested customers,
17   the cost of selling it exceeded the cost of the
18   proceeds of the sale.
19        Q.  And the cost of selling it would've been a
20   sales force?
21        A.  Sales force, marketing, accommodations for
22   preview customers -- all sales and normal marketing
23   costs.
24        Q.  At this time, I take it, you and Mr. Weisz --
25   I know one of your specialties is revenue management
```

27 (Pages 102 - 105)

Lee Cunningham - November 10, 2017

1 techniques. One of the things you needed to do then
2 was monetize this inventory; correct?
3    A. Any business would want to sell its
4 inventory.
5    Q. At this point, there was no market for it, so
6 you needed to find a different way to monetize it?
7    A. We needed to find a way to sell the
8 inventory, yes.
9    Q. One way to sell the inventory at this point
10 was to sell it to a trust or to put it in a trust for
11 the points program?
12    A. We could sell it through the trust.
13    Q. What do you mean by selling it through the
14 trust? Who would buy from the trust?
15    A. The purchasers of the product, the under --
16 whatever the underlying trust -- in our case, Marriott
17 Vacation Club Destination points.
18    Q. The Bleu Florida --
19    A. Bleu Florida Land Trust.
20    Q. Is that a land trust that was owned by a
21 Marriott Vacation Worldwide entity or is it a private
22 investor?
23    A. Well, no. It was a trust established by -- I
24 don't know -- timing-wise, may have been when we were
25 part of Marriott International, but, effectively, the

Page 106

1 have very well been in there.
2    Q. You don't recall this gentleman -- this
3 letter by Mr. Stillman -- parsing your letter of
4 August 17th?
5    A. I don't recall receiving it.
6    Q. You'll see at the top, it was sent by
7 Neveloff to Mercer.
8       Do you recall being involved at all in
9 Mr. Mercer running for the board, the Aspen board?
10    A. No.
11    Q. Did you know Mr. Mercer prior to his second
12 stint on the board? He came back on in 2012.
13    A. I didn't know him prior to 2012. I didn't
14 know he was on the prior.
15    Q. Let me show you the next exhibit, 1073.
16 You'll see this is an e-mail, at the bottom, from a
17 lady named Kristi Gilliam, Gilliam Properties, of
18 Aspen.
19       Do you know Ms. Gilliam by any chance?
20    A. No.
21    Q. This is a letter to Neveloff, Schneider,
22 Marsden, and Oliver. And Neveloff, on page 2 of
23 Exhibit 1073, forwarded it to you and Mary Lynn Clark.
24       Do you see that in the upper middle of the
25 page -- upper third?

Page 108

1 Ritz-Carlton group of companies. And it was an
2 attempt to determine how to sell that inventory that
3 didn't pan out.
4    Q. I'll show you Exhibit 1060. I don't know if
5 you've seen this before when it was sent or in your
6 preparation. But if you'll see at the back, it's your
7 e-mail -- the communication from Ritz-Carlton to
8 Mr. Stillman about your letter we just saw in the
9 prior exhibit, Exhibit 1061, and it looks like Mr.
10 Stillman responded to member inquiry.
11       Do you see that?
12    A. Yes.
13    Q. And somehow -- I guess, it was forwarded by
14 Mr. Stillman to Mr. Neveloff. You'll see that this
15 was produced by the association. At the bottom, above
16 the exhibit, it says the association, AHCA.
17       Do you know whether this was produced by your
18 company in this litigation?
19    A. I have no idea.
20    Q. Have you ever seen this communication from
21 Mr. Stillman in the timeframe it was sent?
22    A. No.
23    Q. Did you look to see it in your preparation
24 for today?
25    A. I don't recall this particular one. It may

Page 107

1    A. Yes.
2    Q. It says, "Lee and Mary Lynn -- ML -- I'm
3 forwarding one of the many e-mails I have received so
4 far this week which expresses a number of concerns,
5 which I appreciate you responding to. Thanks."
6       Do you recall reviewing Ms. Gilliam's
7 e-mail?
8    A. I do not. It would have most likely been
9 reviewed by Ms. Clark.
10    Q. You'll see that -- I'm sorry. If you look at
11 Ms. Gilliam's letter, you'll see the different fonts.
12       Do you have an understanding one way or
13 another, as you sit here today, that Ms. Clark did in
14 fact write these -- interlineated this letter in some
15 way to respond to it, or do you have any knowledge of
16 that at all?
17    A. No.
18    Q. Mr. Cunningham, this is the letter, I think,
19 I alluded to earlier from Juan Pablo Cappello. It's
20 Exhibit 1080, August 27, 2012. I'm also going to put
21 in front of you Exhibit 1074 and we'll use those
22 together. Exhibit 1074 is a Cappello e-mail to
23 Neveloff, Schneider, Jerry Marsden, and Tyler Oliver.
24 It looks like it's the same verbiage.
25       I take it you received the letter version of

Page 109

28 (Pages 106 - 109)

Lee Cunningham - November 10, 2017

1  this as opposed to this e-mail version internally to
2  the board?  It does say "to member services" with a
3  copy.
4       Do you recall receiving either one of these,
5  either Exhibit 1054, an e-mail from Mr. Cappello, or a
6  letter dated August 27th from Mr. Cappello?
7    A.  I didn't.  My memory was jogged when we
8  reviewed the information for the deposition.
9    Q.  When it came in, did you read it, or did you
10  give it to someone else to handle?
11   A.  I read it, and then I most likely gave it to
12  someone else to handle, to follow up.
13   Q.  He was not happy with your letter, was he?
14   A.  No.
15   Q.  And one of the things he complained about was
16  the fact that you were -- we just covered that -- that
17  you were in fact the vice president -- executive vice
18  president and chief operating officer of the Marriott
19  Vacation Worldwide Corporation.
20       We covered that, right?  He was correct?
21   A.  That's correct.
22   Q.  And he said, "I assume you signed your
23  August 20th letter under The Ritz-Carlton Destination
24  Club to provide us, the RCDC members, comfort to that
25  you have our best interests at heart."
                                           Page 110

1  but he did tell you in the paragraph that starts with
2  "Lastly, your recent communications failed to
3  acknowledge the underlying issue, which all RCDC
4  members -- RCDC members need to understand."  And he
5  underlined "The Marriott Vacation Worldwide
6  Corporation has a huge incentive to dilute the RCDC
7  brand to further its greater interest in selling more
8  Vacation Club memberships."
9       First of all, the primary business of MVW,
10  obviously, is now to sell points; right?
11   A.  Our primary sales is through the sale of
12  Marriott Vacation Club Destination points.
13   Q.  And all you really could've done or were
14  doing in late August in 2012 is trying to placate or
15  take care of the very few -- the small population of
16  RCDC members?
17       MR. SELLINGER:  Objection.  Just give me
18    a moment.  When he asks questions, just pause
19    for a moment so I can object.  Thank you.
20       Objection to form.
21  BY MR. FERGUSON:
22   Q.  You were trying to make them happy, placate
23  them?
24   A.  We were trying to provide them more options.
25   Q.  And he was correct that, in providing more
                                           Page 112

1       Ignoring his take on it, you were trying to
2  communicate as someone that was -- you used that
3  signature block, The Ritz-Carlton Destination Club,
4  because you felt you were communicating with your
5  Ritz-Carlton Destination Club members?
6    A.  That's correct.
7       THE VIDEOGRAPHER:  Counsel, we have five
8    minutes left.
9  BY MR. FERGUSON:
10   Q.  On the second page of Exhibit 1080, the
11  letter that was sent to you -- by the way, this is a
12  day or two before the member presentation that you and
13  Mr. Weisz put on?
14   A.  Okay.
15   Q.  Is that right?  Do you recall putting a
16  presentation on?
17   A.  Yes.  That's the day before.
18   Q.  Okay.  Do you know whether you had this
19  before -- did you see this letter before you did that
20  presentation?
21   A.  I doubt it --
22   Q.  All right.
23   A.  -- if it was dated the 27th.
24   Q.  He wrote to you -- and I know these are his
25  words and not, obviously, something you agree with --
                                           Page 111

1  options, that you're opening a door or cracking a door
2  for Marriott Vacation Worldwide customers, at this
3  time Premier and Premier Plus people, to access
4  Ritz-Carlton Clubs?
5       MR. SELLINGER:  Objection to form.
6    A.  Can you restate the question?
7  BY MR. FERGUSON:
8    Q.  You were cracking the door at this point to
9  allow MVW people to access Ritz-Carlton Destination
10  Clubs?
11   A.  Not through affiliation.  They were going to
12  have access to Ritz-Carlton Destination Clubs through
13  the inventory that was going to be sold through the
14  Ritz-Carlton -- through the Marriott Vacation Club
15  trust.
16   Q.  But today at Aspen, they can access it
17  because you've given people this opportunity in
18  exchange so they can now do that?
19   A.  That's correct.
20   Q.  And you did that based upon a survey where 71
21  people said they were for it on the survey you all
22  designed to be given out in December of 2013?
23       MR. SELLINGER:  Objection to form.
24   A.  I don't recall the actual count, but we had
25  the authority and the right to make that change, and
                                           Page 113

29 (Pages 110 - 113)

Lee Cunningham - November 10, 2017

1 we surveyed the customers and that was -- got an
2 affirmative -- of the people who were interested
3 enough to respond to the survey, the majority of them
4 were in favor of the affiliation.
5 BY MR. FERGUSON:
6     Q. 70 people out of 876 people?  71?
7     A. I don't know what the final number was.
8     Q. And do you believe that the sentiment of 71
9 people -- 71 or 66 or 73 to 68 -- do you believe that
10 adequately gauged the sentiment of the other 800
11 and -- 800 people -- or 750 people?
12     A. They all had the opportunity to provide their
13 sentiment.
14     Q. You sent something out at Christmastime, a
15 survey for them online to fill out?
16     A. I believe it was a couple weeks before
17 Christmas.
18     Q. And how many surveys do people at Aspen
19 Highlands get?  Do they get it when they leave every
20 time?
21     A. They get a survey when they leave.  This was
22 a very different form that they received -- that
23 survey.
24     Q. Was it done by the same company?
25     A. No.

Page 114

1     you're covering the same subject, and then
2     we're done with the subject in terms of
3     plaintiffs' deps.
4         MR. REISER:  For the most part.  That's
5     the idea.  I'm not guaranteeing there's not
6     going to be a little crossover later that
7     might come up in the context of some issue
8     later on or something.
9         MR. SELLINGER:  But there's not going to
10     be revisiting the same subjects other than if
11     it relates to some new topic.
12         MR. REISER:  Sure.
13         MR. SELLINGER:  Okay.
14 BY MR. REISER:
15     Q. So I just wanted to ask you some background
16 now a little bit and fill in a little bit of your
17 background, and ask you -- when did you first start
18 with Marriott?
19     A. In 1982.
20     Q. But that was with Marriott International?
21     A. That's correct.
22     Q. And what did you start doing for them?
23     A. I joined the company as a front office
24 trainee.
25     Q. Was it right out of the University of Nevada,

Page 116

1         MR. FERGUSON:  Got to switch the tape.
2         THE VIDEOGRAPHER:  The time is 11:52.
3     This concludes media two in the deposition of
4     Lee Cunningham.
5         (Lunch recess.)
6         THE VIDEOGRAPHER:  The time is 12:43.
7     This is media three in the deposition of Lee
8     Cunningham.
9             DIRECT EXAMINATION
10 BY MR. (MIKE) REISER:
11     Q. Good afternoon, Mr. Cunningham.  I'm Mike
12 Reiser.
13         Counsel has been good enough to allow a
14 little bit of an unorthodox procedure here.  I'm going
15 to jump in and try to cover some things on the other
16 two cases that are at issue here, so we can
17 efficiently -- so I'm going to try to just ask you
18 questions that are within the scope of what you just
19 went through.
20     A. Okay.
21         MR. SELLINGER:  Mike, just so the record
22     is clear, our understanding and our
23     willingness to accommodate your untraditional
24     request is the assumption that we're not
25     going to be tag-teaming back and forth; that

Page 115

1 Reno?
2     A. University of Nevada, Las Vegas.
3     Q. There's a hotel management school there;
4 right?
5     A. That's correct.
6     Q. So you've been with the company continuously
7 since '82 to the present?
8     A. That's correct.
9     Q. You were at International first and then the
10 spinoff entity?
11     A. That's correct.
12     Q. So in terms of the spinoff, how involved were
13 you, if at all, on discussions leading up to the
14 spinoff?
15     A. Only on a periphery basis.
16     Q. What was your position with Marriott Vacation
17 Club International, the division of Marriott
18 International, before the spinoff?
19     A. As the spinoff was originally announced, I
20 was the executive -- I was the vice president in
21 charge of -- chief operating officer of the Marriott
22 Vacation Club -- the North American Marriott Vacation
23 Club product.
24     Q. So was it a similar position in that you were
25 kind of a chief operating officer type for that club?

Page 117

30 (Pages 114 - 117)

Lee Cunningham - November 10, 2017

**Page 118**

1    A.  That's correct.
2    Q.  At that point in time, the Marriott Vacation
3  Club International, pre-spinoff, had both Marriott
4  Vacation Club properties and Ritz-Carlton Club
5  properties; is that correct?
6    A.  That's correct.
7    Q.  So you don't recall any effort by Marriott
8  International, prior to the spinoff, to package the
9  assets of The Ritz-Carlton Destination Club and sell
10  those?
11    A.  No.  I wouldn't have been involved -- if
12  there was such a thing, I wouldn't have been involved
13  in it.
14    Q.  Do you recollect anything about Marriott
15  International taking a $1 billion write-down on their
16  balance sheet?
17    A.  Yes, I do recall that.
18    Q.  Was that in relation at all to The
19  Ritz-Carlton Destination Club?
20    A.  It was primarily in relation to the
21  Ritz-Carlton products.
22    Q.  So to be clear, you recall Marriott
23  International taking a write-down of a billion
24  dollars, prior to the spinoff, primarily related to
25  the Ritz-Carlton assets?

**Page 119**

1    A.  It was prior to the -- well prior to the
2  spinoff, yes.
3    Q.  What year was it?
4    A.  I don't know, but it was not -- I don't
5  recall, but it was -- time had passed between that
6  write-off and the spinoff.
7    Q.  As far as you understood it, what was the
8  purpose of the write-off?
9    A.  To -- it was following the -- however you
10  want to term it -- the real estate bubble burst, the
11  beginning of the great depression or recession, the
12  bankruptcy of Lehman.  It was to write down the
13  inventory to its then value.
14    Q.  Was there a decision made prior to the
15  spinoff within the Marriott International, while it
16  was owned by -- the Marriott Vacation Club
17  International was owned by the Marriott
18  International -- was there a discussion of shutting
19  down the club?
20    A.  No, no.
21    Q.  Have you ever heard any figures that the
22  Marriott International lost $600 million and
23  $11 million a year feeding The Ritz-Carlton
24  Destination Club assets?
25    A.  Those particular numbers aren't necessarily

**Page 120**

1  familiar to me.  I know there was a significant loss,
2  and it could be in that order of magnitude for -- like
3  today for Marriott relative to the Ritz-Carlton Club
4  products -- Clubs and Residences.
5    Q.  So my recollection is, the spinoff happened
6  in November of 2011.  Is that --
7    A.  That's correct.
8    Q.  When it was spun off in November of 2011, you
9  went with Marriott Vacation Club, obviously -- the
10  Marriott Vacation Worldwide folks.  You came over in
11  your same position as chief operating officer,
12  essentially?
13    A.  Prior to the spinoff, the operating officer
14  or chief operating officer for The Ritz-Carlton
15  Destination Club had resigned the -- and we had the
16  chief operating officers for our International
17  Marriott Vacation Club product.  They had left and it
18  was all consolidated with me.
19    Q.  Who was the guy who resigned from The
20  Ritz-Carlton Destination Club prior to the spinoff?
21    A.  Pete Watzka.
22    Q.  And what about -- the same question for the
23  European division.
24    A.  European -- I'm trying to remember the timing
25  of when -- I think, at the time of prior to the spin,

**Page 121**

1  Europe and -- I know it was -- Europe and Asia were
2  together, and those were led by Bob Miller.
3    Q.  Did Mr. Miller resign prior to the spinoff as
4  well?
5    A.  He retired as well.
6    Q.  Watzka, he resigned?  He didn't retire?
7    A.  I don't recall whether it was a retirement or
8  a resignation.  I think it was a retirement.
9    Q.  Did he have any -- do you recollect him
10  voicing any opposition to the spinoff or anything?
11    A.  Not to my knowledge.
12    Q.  So prior to the spinoff, what brands were
13  operated by Marriott Vacation Club International?
14    A.  The Marriott Vacation Club, Marriott Vacation
15  Club Destinations, Marriott Grand Residence,
16  Ritz-Carlton -- Ritz-Carlton Destination Club,
17  Ritz-Carlton Residences.  And, I believe, at the time
18  of the spinoff, there was an additional brand,
19  Horizons by Marriott Vacation Club, that was folded
20  into the Marriott Vacations product.
21    Q.  Okay.  I just want to kind of focus for a
22  minute on the -- I thought I heard you say the
23  Ritz-Carlton -- I heard the Ritz-Carlton Destination
24  Club, the Ritz-Carlton Residences, and I thought I
25  heard you say a third one.

31 (Pages 118 - 121)

Lee Cunningham - November 10, 2017

| | |
|---|---|
| 1      What was the other brand? | 1     Q. So reading through some of your SEC filings, |
| 2     A. There wasn't a third Ritz-Carlton. | 2 and it looked like there's a licensing agreement after |
| 3     Q. I thought there were three. So the only two | 3 the spinoff where Marriott Vacations Worldwide Corp. |
| 4 brands that were in the Marriott Vacation Club | 4 licenses the name Ritz and Marriott for purposes of |
| 5 International that were around before the spinoff were | 5 the timeshare business; right? |
| 6 The Ritz-Carlton Destination Club and the Ritz-Carlton | 6     A. That's correct. We have an exclusive license |
| 7 Residences? | 7 for the Marriott name in the timeshare business; and |
| 8     A. That's correct. | 8 for Ritz-Carlton in the timeshare business and then a |
| 9     Q. All right. And you were -- were you the | 9 nonexclusive in the Ritz-Carlton Residences business. |
| 10 chief operating officer prior to spinoff of those two? | 10     Q. That's what I was wondering -- how the guys |
| 11     A. Two months prior to spin. | 11 in Tahoe got the Residences. |
| 12     Q. You got appointed to COO two months prior? | 12     A. That's correct. |
| 13     A. That's correct. Prior to the effective date | 13     Q. What's the annual license fee? I thought I |
| 14 of the spinoff. | 14 read it was 25 million. Has it gone up since the |
| 15     Q. What was your position before that? | 15 original -- |
| 16     A. I was the chief operating officer for the | 16     A. No. It started at 50 million. It has an |
| 17 Marriott Vacation Club North America product or | 17 escalation clause. And then there's a variable |
| 18 business. | 18 component based on sales. |
| 19     Q. So you came up through the Marriott Vacation | 19     Q. So it started at 50 million. Was that |
| 20 Club Destination products. Mr. Watzka resigned right | 20 differentiated at all between the Marriott name and |
| 21 before the spinoff, and then you took over his duties | 21 the Ritz name? |
| 22 as COO of the Ritz properties? | 22     A. No. |
| 23     A. That's correct. | 23     Q. So what is the incremental portion of the |
| 24     Q. So what is the difference between the | 24 license? How does that work? |
| 25 Ritz-Carlton Residences and The Ritz-Carlton | 25     A. It's a percentage of closed sales -- |
| Page 122 | Page 124 |

| | |
|---|---|
| 1 Destination Club? | 1 2 percent of closed developer sales and 1 percent of |
| 2     A. The Residence refers to whole ownership, | 2 sales that are previously-owned inventory, reacquired |
| 3 condominium ownership. | 3 inventory. |
| 4     Q. And certain of the clubs that were in the | 4     Q. So there have been no sales, for the most |
| 5 Ritz-Carlton Destination Clubs were mixed clubs, that | 5 part, of Ritz-Carlton Destination Club fractionals |
| 6 they had Residences -- | 6 since the spinoff. There might have been a few early |
| 7     A. That's correct. | 7 on. |
| 8     Q. -- and the Destination Club, fractionals? | 8      But would you agree with me, for the most |
| 9     A. That's correct. | 9 part since 2012, there haven't been any new fractional |
| 10     Q. Do you remember which clubs had the mixed -- | 10 sales? |
| 11     A. The mixed use was in San Francisco, in Vail, | 11     A. There's been -- |
| 12 there's both Jupiter -- I'm trying to remember. | 12     MR. SELLINGER: Objection to form, |
| 13     Q. Does Bachelor Gulch have any residences? | 13 because you seem to be linking the sales to |
| 14     A. No, not that were part of our business. | 14 the spinoff or the lack thereof -- |
| 15     Q. Okay. So I think -- so SFO, Vail, and | 15     MR. REISER: No. Just -- I'm not trying |
| 16 Jupiter, do you recall them having residences combined | 16 to be rude or anything. If you could just |
| 17 with the fractionals too? | 17 object to the form, that would be great, and |
| 18     A. Yes, within our business. I mean, for | 18 I'll try to fix it. If I can't figure out |
| 19 instance, in Tahoe, there are Ritz-Carlton Residences. | 19 what you're objecting to, I'll ask. Thanks. |
| 20 They just weren't part of our business. | 20 BY MR. REISER: |
| 21     Q. In Tahoe, the Ritz-Carlton Residences were | 21     Q. I'm not trying to relate it, but you would |
| 22 actually part of the hotel portion of the -- | 22 agree that, since 2012 -- somewhere in 2012 -- we've |
| 23     A. They were licensed to the developer of the | 23 got documents, and I can pull them out, you know -- |
| 24 hotel, I believe -- the use of that brand -- and | 24 I'm aware that sales of The Ritz-Carlton Destination |
| 25 they're managed by Marriott International. | 25 Club fractional product stopped around 2012. Is |
| Page 123 | Page 125 |

32 (Pages 122 - 125)

Lee Cunningham - November 10, 2017

1   that --
2       A.  No.  It was before that.
3       Q.  Before that?
4       A.  Yes.
5       Q.  When --
6       A.  Shortly after.  In 2009, sales were
7   significantly low and they continued to be there, and
8   they've never rebounded.
9       Q.  So in 2009, you made an attempt to create --
10  not you -- but Marriott International developed a
11  Portfolio points product for The Ritz-Carlton
12  Destination Club; right?
13      A.  That's correct.
14      Q.  And they were selling those from '09 to '12
15  or so when they unwound?
16      A.  I think that's approximately correct.  I
17  don't recall the exact date.  I wasn't involved in
18  that.
19      Q.  You weren't involved in the Portfolio?
20      A.  Product, no.
21      Q.  So that was Watzka's watch on the
22  Ritz-Carlton --
23      A.  That's correct.
24      Q.  So it's true, is it not, that the Portfolio
25  product has been completely unwound?

Page 126

1   I don't know for sure.
2       Q.  Is it true, then, that there were no
3   fractional Ritz-Carlton sales after 2009?  Is that
4   what I heard you say?
5       A.  No.  There was very low volume of sales after
6   2009.  That's when the fractional sales plummeted.
7       Q.  How many -- well, sales started in San
8   Francisco -- I'm sorry -- sales in Tahoe started in
9   '09.  True?
10      A.  I believe that may be correct, yeah.
11      Q.  So my understanding of the folks in my case,
12  every one of them except for one -- Joe Tan -- who is
13  no longer part of the case anymore -- bought
14  fractional rather than Portfolio.
15          So I'm just wondering if that jogs your
16  recollection at all as to whether fractionals were
17  still being sold during that --
18      A.  Well, they would, obviously -- we were
19  selling -- we sold Lake Tahoe to a point, as the
20  velocity of sales was low.  I don't think it was --
21  when -- Portfolio wasn't offered everywhere to
22  everyone.  It wasn't a replacement product.  It was
23  an optional product.
24      Q.  Correct.  They could buy a fractional or
25  Portfolio?

Page 128

1       A.  That's correct.
2       Q.  And that was done through offering the folks
3   who had bought the Portfolio points -- transfer those
4   points into Marriott Vacation Club points for the most
5   part?
6       A.  We gave them multiple options to choose from.
7       Q.  What were the options they had?
8       A.  One was to transfer into the Marriott
9   Vacation Club.  One was to -- I believe, to receive a
10  fractional interest in some of the locations we they
11  had unsold developer.  I can't remember whether there
12  was a refund opportunity as well, but I believe there
13  was.
14      Q.  Okay.  Do you know how many people who
15  bought -- I understood there were only about 140
16  people who bought Portfolio points during that
17  three-year period they were available.
18          Is that about right?
19      A.  I think it's -- I think that's a high
20  estimate.  I think it was right around 100.
21      Q.  All right.  Do you know how many of those 100
22  actually got a buyback?
23      A.  Got a buyback?
24      Q.  You said that the third option was --
25      A.  I said I think there may have been an option.

Page 127

1       A.  That's correct.
2       Q.  At least 50 fractional products in Tahoe were
3   sold, as I understand it?
4       A.  Sure.
5       Q.  Okay.  And there were a few Portfolio
6   memberships sold in Tahoe as well that you can recall?
7       A.  I don't know whether they were sold from Lake
8   Tahoe or not.
9       Q.  So I want to go back to a comment you made,
10  when Mr. Ferguson was questioning you, about -- that
11  you didn't have to get anybody's permission to
12  affiliate clubs.
13      A.  That's correct.
14      Q.  That's your understanding of the setup of
15  this club?
16      A.  That was my understanding after seeking
17  advice from internal counsel that our -- the
18  affiliation was a -- at our discretion, at our
19  decision.
20      Q.  When you say "our," who do you mean?
21      A.  At the -- at the developers's discretion.
22          MR. REISER:  I don't believe you're
23  intending to waive any privilege on those
24  conversations, or are you?
25          MR. SELLINGER:  Certainly not.

Page 129

33 (Pages 126 - 129)

Lee Cunningham - November 10, 2017

1  BY MR. REISER:
2      Q. You've been involved -- you're familiar with
3  the affiliation agreement between -- that binds the
4  Ritz Club members to the Ritz-Carlton Cobalt trading?
5      A. Yes.
6      Q. And you're aware in the affiliation
7  agreement, are you not, that the decision as to
8  affiliations is to be solely in the discretion of
9  Cobalt and not the developer?
10     A. I may have misstated that it was the
11  developer versus Cobalt, but...
12     Q. So you don't see any difference between the
13  developer and Cobalt?
14     A. There's a difference. I see a difference
15  between them. I just may have misstated where the
16  decision lay.
17     Q. So it's your understanding that the decision
18  to affiliate with Cobalt solely --
19     A. I don't know. I'd have to go back and
20  refresh my memory from advice of counsel.
21     Q. My recollection of reading the affiliation
22  agreement -- I can show it to you if you want -- but
23  it clearly stated in the paragraph that the developer
24  was to have no role whatsoever in deciding affiliation
25  between clubs.

Page 130

1      You don't remember that in the affiliation
2  agreement?
3      A. I'd have to go back and refresh my memory.
4  If you'd like to provide that document, I'll be glad
5  to review it.
6      Q. I'll show it to you maybe in my next round of
7  questioning.
8      A. Okay.
9      Q. As you sit here today -- well, I want to ask
10  you -- you kind of started going through the many hats
11  you wear in the Marriott Vacations Worldwide universe.
12  And you mentioned you were the COO of -- or strike
13  that -- you are an officer of 15 to 20 companies, I
14  thought you said.
15     A. Entities.
16     Q. Entities. One of them is Lion & Crown, you
17  mentioned; right?
18     A. Uh-huh.
19     Q. What's your role in Lion & Crown?
20     A. As far as the officer of the company?
21     Q. Yeah.
22     A. As -- of the entity? My title is vice
23  president, and my role is to oversee the operation of
24  Lion & Crown.
25     Q. And vice president -- are you chief operating

Page 131

1  officer of that entity?
2      A. I think the official title in most of our
3  entities is vice president.
4      Q. Is Lion & Crown a separate corporation
5  incorporated in a state like Delaware?
6      A. I don't recall.
7      Q. You don't recall. All right.
8        So what is your position at Cobalt?
9      A. It would be similar to Lion & Crown.
10     Q. Vice president?
11     A. Yes.
12     Q. And what is your position at the Ritz-Carlton
13  Destination Club?
14     A. Ritz-Carlton Destination Club is a -- is
15  really the -- as I thought about it, is doing business
16  as -- the DBA -- of the Ritz-Carlton Development
17  Corporation.
18     Q. So there's no Ritz-Carlton Destination Club
19  entity. You would agree with that now after further
20  reflecting on it?
21     A. There's not a separate entity. It's a brand
22  name, a doing business name as, for Ritz-Carlton
23  Development Company.
24     Q. So you would agree then that the letter you
25  signed as COO and vice president of Ritz-Carlton

Page 132

1  Destination Club was not accurate?
2      MR. SELLINGER: Objection to form.
3      Q. Can you rephrase the question or ask it
4  again?
5  BY MR. FERGUSON:
6      Q. Well, if The Ritz-Carlton Destination Club is
7  a branding device and there's no company, you can't
8  really have a vice president of a branding device;
9  right?
10     MR. SELLINGER: Objection to form.
11     A. I'm doing business -- we're doing business
12  as -- I mean, it's a registered DBA of Ritz-Carlton
13  Development Company -- corporation or entity.
14  BY MR. REISER:
15     Q. So the proper way to sign that letter
16  would've been the vice president and COO of the
17  Ritz-Carlton Development Company?
18     MR. SELLINGER: Objection to form.
19     A. Trying to represent or to communicate who --
20  what -- to the customers that are members of The
21  Ritz-Carlton Destination Club that this is coming from
22  that part of the business.
23  BY MR. REISER:
24     Q. But as you stated a minute ago --
25     A. It wasn't an intent to mislead anybody.

Page 133

34 (Pages 130 - 133)

Lee Cunningham - November 10, 2017

1   Q. Okay. I mean, I understand your position on
2 that, but I just want to be clear that you were also
3 the COO of Marriott Vacation Club at the time you
4 wrote the letter; right?
5   A. That's correct.
6   Q. You could have easily put down there that you
7 were the vice president and COO of Marriott Vacation
8 Club in signing that letter?
9   MR. SELLINGER: Objection to form. I
10 think you're mixing apples and oranges.
11   MR. REISER: Form is okay, Phil.
12 Otherwise, I consider it kind of coaching.
13 I'm not going to accuse you of that, but
14 that's why I'm asking you to just to state
15 "object to form." Okay?
16   A. I'm sorry. Can you rephrase your question or
17 restate your question?
18 BY MR. REISER:
19   Q. I'm just establishing, at the time you wrote
20 the letter in August of 2012 as the COO of
21 Ritz-Carlton Destination Club, there was no entity
22 called Ritz-Carlton Destination Club. True?
23   A. There wasn't a separate entity. It was the
24 brand name associated with the Ritz-Carlton
25 Development Company.

Page 134

1   A. I would have been.
2   Q. You were in charge of Cobalt at that time?
3   A. In 2012, yes.
4   Q. Did you help Eveleen Babich write that letter
5 of July 2012?
6   A. There were many people that provided input
7 into that letter.
8   Q. Who else besides her?
9   A. I'm sure Stephanie Sobeck, Mary Lynn Clark,
10 myself. I'm sure we got advice from internal counsel.
11   Q. Who made the decision to state to the members
12 that there was going to be a new affiliation between
13 Marriott Vacation Club and Ritz-Carlton Destination
14 Club?
15   A. Who made -- I did.
16   Q. And you made your decision in what capacity?
17   A. As an officer of Cobalt Travel.
18   Q. At that time, you were also an officer and
19 vice president and COO of Ritz-Carlton Development
20 Company. True?
21   A. That's correct.
22   Q. And you were also a COO and chief operating
23 officer of -- sorry -- you were also vice president --
24 executive vice president and chief operating officer
25 of Marriott Vacation Club; right?

Page 136

1   Q. Okay. At the time you wrote that letter, you
2 were also the vice president and COO of Marriott
3 Vacation Club Worldwide; right?
4   A. That's correct.
5   Q. And you testified a minute ago that Marriott
6 Vacation Club Worldwide didn't need anybody's
7 permission to affiliate with whoever they wanted to in
8 this --
9   MR. SELLINGER: Objection;
10 mischaracterizing.
11   A. I did not say that, I don't believe. The
12 Ritz-Carlton -- Cobalt -- Cobalt or the Ritz-Carlton
13 Development Company, once we established the correct
14 entity, did not need permission to affiliate
15 additional entities.
16 BY MR. FERGUSON:
17   Q. When you wrote the letter -- well, strike
18 that. When Eveleen Babich signed the letter dated
19 July 17, 2012, she was employed by Cobalt as the
20 program manager. True?
21   A. She was -- she was the general manager in
22 charge of member services that administered the Cobalt
23 Travel entity, I guess -- the business.
24   Q. Who was in charge of Cobalt in 2012 at the
25 time she wrote that letter?

Page 135

1   A. Of Marriott Vacations Worldwide.
2   Q. Worldwide. What about the Ritz-Carlton
3 Management Company, were you also an officer and
4 director of the Ritz-Carlton Management Company?
5   A. I would have to go back and research that. I
6 believe that I'm listed as an officer there, but I may
7 not -- I am not sure.
8   Q. What about today, are you an officer of the
9 Ritz-Carlton --
10   A. I'd have to go back and check.
11   Q. Are there any employees of Ritz-Carlton
12 Destination Club that are not also employees of
13 Marriott Vacation Club or Worldwide?
14   A. No. I don't believe so.
15   Q. So there's no independence whatsoever between
16 Marriott Vacation Club Worldwide and Ritz-Carlton
17 Development Company. True?
18   MR. SELLINGER: Objection to the form.
19   A. Can you restate your question? There's no
20 independence?
21 BY MR. REISER:
22   Q. So let me ask you this. Are there any
23 employees of Cobalt that are not also -- strike that.
24 Are there any independent employees of Cobalt that are
25 also employed by Marriott Vacation Club Worldwide?

Page 137

35 (Pages 134 - 137)

Lee Cunningham - November 10, 2017

1    MR. SELLINGER:  Same objection.
2    A.  I think every -- you know -- all associates
3  with -- are employed probably by Marriott Ownership
4  Resorts International, which is -- but I don't --
5  there's not a separate list of employees that are
6  only -- that are employed by Cobalt.  There are people
7  who only have -- their jobs are only focused on the
8  business of Cobalt.
9    Q.  Let me ask it another way.  Prior to the 2011
10  spinoff, there were employees of the division --
11  strike that.
12    Before the spinoff -- you mentioned Watzka.
13  His only job was related to Ritz-Carlton Destination
14  Club.  True?
15    A.  He was an executive officer with Marriott
16  Vacation Club International, and he was the chief
17  operating officer for the -- for Ritz-Carlton Club.
18    Q.  So maybe I already asked this, and I
19  apologize, but I'm just going to try to end this here
20  and just kind of sum it up here.
21    Are there any -- is there anybody that works
22  only for any of The Ritz-Carlton Destination Club
23  entities, such as Ritz-Carlton Management Company,
24  Ritz-Carlton Development Company?
25    A.  There's people that that's their only duties
Page 138

1  are to that, are they -- is their employer of record
2  Cobalt Travel?  No.
3    The people in member services -- all the
4  employees of member services -- work and they're --
5  all they do is work related to Cobalt Travel for
6  Ritz-Carlton Destination Club.
7    Q.  Okay.  But I'm not even talking about Cobalt
8  right now.  I just want to separate --
9    A.  I'm just using that as an example.
10    Q.  I got you.  Let's start -- I'm just going to
11  go through the Ritz-Carlton entities that I'm aware
12  of.
13    There's Ritz-Carlton Management Company.
14  Let's start with that.
15    Are you aware of anybody that works for
16  Ritz-Carlton Management Company that's not employed by
17  Marriott Vacation Club Worldwide?
18    A.  No.
19    Q.  Are you aware of anybody that's employed by
20  Ritz-Carlton Development Company that's not employed
21  in actuality by Marriott Vacation Worldwide
22  Corporation?
23    A.  No.
24    Q.  Is there anybody employed at Cobalt Travel
25  that's not also employed by Marriott Vacation Club
Page 139

1  Worldwide?
2    A.  No.
3    Q.  Is there anybody employed by Lion & Crown
4  Travel Service that is not --
5    A.  No.
6    Q.  -- is not employed by Marriott Vacation Club
7  Worldwide?
8    A.  No.
9    Q.  So as the COO of the Marriott Vacation Club
10  Worldwide, you would be aware if there were any
11  employees that just worked for the Ritz-Carlton
12  entities that I just described.  True?
13    A.  As I said, there are people that are
14  employees that are only focused on those businesses,
15  but their employer of record is Marriott Vacations
16  Worldwide.
17    Q.  All right.  So prior to the spinoff, there
18  was -- the member services was not operated out of
19  Salt Lake City, was it?
20    A.  We moved from -- I don't remember the timing
21  of when we moved it from Orlando to Salt Lake City.
22    Q.  Prior to moving it to Salt Lake City, folks
23  who were members of The Ritz-Carlton Destination Club
24  could call up member services and they would have
25  somebody -- they would reach somebody in Orlando.
Page 140

1  True?
2    A.  That's correct.
3    Q.  And after the spinoff, they went to Salt Lake
4  City?
5    A.  The phone lines were moved and they were
6  answered by people in Salt Lake City.
7    Q.  Okay.  Does the Salt Lake City member
8  services group out there also handle members services
9  for the Marriott Vacation Club?
10    A.  No.
11    Q.  That's all Ritz?
12    A.  That's all Ritz.
13    Q.  How many employees does Cobalt Travel have?
14    Q.  How many people work exclusively on Cobalt?
15    Q.  Yes.
16    A.  Affairs or --
17    Q.  Start with that.
18    A.  Employees, none.
19    Q.  There's no employee, but how many people
20  work and focus their efforts on Cobalt issues?
21    A.  I would say it's probably around 25 to 30,
22  which is the member services group.
23    Q.  And who is in charge of those 25 to 30
24  people?
25    A.  The general manager of that operation.
Page 141

36 (Pages 138 - 141)

Lee Cunningham - November 10, 2017

1    Q.  And that's called the program manager in the
2  governing documents at Cobalt -- called the program
3  manager?
4    A.  No.
5    Q.  Who is the program manager then?
6    A.  I don't know that the program manager is a
7  position.
8    Q.  I'll just say that in the affiliation
9  agreement, they identified a program manager.
10   A.  Right.
11   Q.  Who is that person currently and who was it
12 in 2012 --
13   A.  I don't think it's a person.
14       MR. SELLINGER:  Just pause for a moment
15   so I can object.
16       Objection to form.
17       THE REPORTER:  You're also talking over
18   each other.
19   A.  My apologies.  I don't believe that is -- the
20 program manager is an individual, as much as it is the
21 decision of the entity itself or the -- I don't know
22 how to describe it.
23 BY MR. REISER:
24   Q.  The program manager is Cobalt.  Can we say --
25 is that maybe what it is?  Is Cobalt the program

Page 142

1  manager?
2    A.  I think that's a fair way to say it.
3    Q.  Okay.  And who in Cobalt is the boss
4  currently?
5    A.  The officers of that entity, which would
6  include myself.
7    Q.  Who else?
8    A.  I don't recall who the other officers are.
9    Q.  Is there somebody below you that would be in
10 charge of the physical location in Salt Lake City?
11   A.  Yes.  That would be the general manager of
12 the member services operations.
13   Q.  And that was Eveleen Babich in 2012; right?
14   A.  It was.
15   Q.  When did she leave, do you remember?
16   A.  I can't remember.  Probably 2014-ish.  I
17 don't recall.
18   Q.  In 2012, is it true that you were the -- you
19 were the only officer that you can remember of Cobalt,
20 and Eveleen Babich was the person in charge of the
21 employees within Cobalt?
22   A.  The operation of member services.
23   Q.  That's true?
24   A.  That's true.
25   Q.  So is it true that you and Eveleen Babich --

Page 143

1  strike that.
2        Who actually made the decision in 2012, July
3  of 2012, to announce the announcement on July 17, 2012
4  signed by Eveleen Babich, as the general manager of
5  Cobalt, announcing the new affiliation with Marriott
6  Vacation Club, or the proposed affiliation?  Who made
7  that decision to --
8    A.  The ultimate -- sorry.
9    Q.  Go ahead.
10   A.  The ultimate decision was mine.
11   Q.  So you made the decision to evolve the brand,
12 to use the parlance of that July 17, 2012 letter?
13   A.  The decision was to -- yeah -- to use that
14 language, that would be true.  It was my decision to
15 announce the affiliation with Marriott Vacation Club
16 Destinations.
17   Q.  And not just the decision to announce, but
18 who made the decision to actually do it, to propose
19 it -- you?
20   A.  I was the final decision maker.
21   Q.  But wasn't Steve Weisz at all involved in
22 that?
23   A.  I'm certain we consulted with Steve, but it
24 was my decision.
25   Q.  Did you consult with anybody else before

Page 144

1  making that decision?
2    A.  Sure.
3    Q.  Who did you consult with?
4    A.  Mary Lynn Clark, Stephanie Sobeck, with our
5  in-house counsel.  I'm trying to think who else
6  would've been involved.  Probably had a representative
7  from our finance and accounting organization, a cross
8  business team.
9    Q.  What were the business reasons for doing
10 that, for announcing the affiliation of the Marriott
11 Vacation Club with The Ritz-Carlton Destination Club?
12   A.  The business reasons were really focused on
13 providing what we believe was an increase in the
14 options for the owners, to provide them some more
15 flexibility in their usage.
16   Q.  So -- all right.  When did you get any advice
17 that you had the discretion to affiliate?
18   A.  When?
19   Q.  Yeah.
20   A.  In the months leading up to the July letter.
21   Q.  Would it be fair to say it was sometime
22 between the spinoff in November 2011 and the letter?
23   A.  I believe we had begun the discussions about
24 that prior to spinoff.
25   Q.  Prior to spinoff.  Who at Marriott

Page 145

37 (Pages 142 - 145)

Lee Cunningham - November 10, 2017

1 International were you discussing that with?
2     A. I wasn't discussing it with anyone at
3 Marriott International at that point.
4     Q. Who was?
5     A. I don't know that anybody was.
6     Q. You just said that you thought there was some
7 discussion going on beforehand. How do you have
8 knowledge of that?
9     A. No. I said, I believe there was probably
10 discussion going on internally to the MVCI business
11 unit before the spinoff, not with Marriott
12 International.
13     Q. Did you ever tell the Aspen HOA board members
14 that you had complete discretion as to who to
15 affiliate with -- you, Lee Cunningham?
16     A. I'm sure we did. I don't recall the specific
17 conversation.
18     Q. And you never considered the affiliation
19 agreement prohibition against the Ritz-Carlton
20 Development Company, the Ritz-Carlton Management
21 Company, or anybody else, having any input into the
22 decision as to which other clubs to affiliate with?
23     MR. SELLINGER: Objection to form. I
24 have no idea what you just asked.
25     A. Can you ask --

Page 146

1     Q. Well, I've seen documentation -- I think you
2 even testified today that the decision to affiliate
3 was an effort to monetize the unsold inventory of the
4 Ritz-Carlton Development Company.
5     MR. SELLINGER: Completely never --
6     (Multiple speakers.)
7     MR. SELLINGER: But it's worse, because
8 you actually said that he said that, and he
9 certainly never said that.
10 BY MR. REISER:
11     Q. We'll show you some documents in a minute
12 where that's actually stated specifically about
13 sharing the pain of the economic downturn. The
14 Ritz-Carlton Development Company both had lost
15 $600 million and $11 million a year in maintenance
16 fees.
17     A. Okay.
18     Q. Are you saying, Mr. Cunningham, that the
19 maintenance fee obligations for the 25 percent or so
20 developer-owned inventory of Ritz-Carlton Development
21 Company had no influence on the decision to affiliate?
22     A. Did not have an influence on the decision to
23 affiliate. That had influence on the decision to sell
24 that inventory through the Marriott Vacation Club
25 Destinations products.

Page 148

1     MR. REISER: Can you read it back to me
2 and see if it was bad?
3     (The reporter read back the last
4 question.)
5     THE WITNESS: What we did consider was
6 Cobalt Travel's ability to affiliate.
7 BY MR. REISER:
8     Q. How did you separate the interests of the
9 Ritz-Carlton Management Company's interest, given that
10 you were also the COO of Ritz-Carlton Management
11 Company?
12     A. Because it wasn't a Management
13 Company-related decision. Affiliation is related to
14 Cobalt Travel. It's related to that component of the
15 business, which is all about the use of the product
16 and the movement of the product.
17     Q. Same question for Ritz-Carlton Development
18 Company. How did you separate the interests of the
19 Ritz-Carlton Development Company in a potential
20 affiliation, given that you were the COO of
21 Ritz-Carlton Development Company as well?
22     A. Right. Same answer. The -- Cobalt Travel
23 was part of the business that was responsible for
24 affiliation. That was the lens through which we
25 looked at the ability to affiliate.

Page 147

1     Q. Which is part of the evolution that you
2 described in the July 17th letter?
3     A. No. That's not in the July 17th letters,
4 that talks about affiliation.
5     Q. Do you remember preparing some frequently
6 asked questions and answers to the membership in
7 relation to the webinar that was given in August of
8 2012?
9     A. I remember there were frequently asked
10 questions created.
11     Q. Did you have a role in creating the
12 frequently asked questions?
13     A. I'm sure I reviewed them, yes.
14     Q. Have you reviewed them in preparation, the
15 ten hours you prepared for this deposition?
16     A. I did not review those.
17     Q. Who else helped you prepare those frequently
18 asked questions?
19     A. It would've been our internal counsel. I'm
20 sure Mary Lynn Clark and Stephanie Sobeck would've
21 been involved in that.
22     Q. So Mary Lynn Clark had no role in Cobalt.
23 True?
24     A. No, I don't -- I believe so. I believe
25 member services reported to her at one point in time.

Page 149

38 (Pages 146 - 149)

Lee Cunningham - November 10, 2017

| | |
|---|---|
| 1  Q. But she wasn't an officer of Cobalt? | 1  Club had no influence on the decision to affiliate? |
| 2  A. I don't believe so. I don't -- I don't | 2  That's your testimony? |
| 3  recall. | 3  A. Affiliation doesn't have a connection to the |
| 4  Q. And Stephanie Sobeck, did she have any | 4  sale of the unsold inventory. |
| 5  involvement in Cobalt? | 5  Q. So that's a yes; that's your testimony? |
| 6  A. She had less involvement in Cobalt. | 6  A. My testimony is that affiliation has no -- |
| 7  Q. She didn't have any involvement in Cobalt, | 7  has no influence on the sale of the developer |
| 8  did she? | 8  inventory. |
| 9  A. I don't know the answer, whether she had any | 9  Q. Other than what we testified today -- and I'm |
| 10  involvement in Cobalt. It depends on what time you're | 10  going to ask this question again, and I'd like you to |
| 11  talking about. | 11  see if I can get you to focus on the question. Okay? |
| 12  Q. 2012? | 12  Because I'm not trying to argue with you -- |
| 13  A. In 2012, she would have probably had less | 13  A. I'm not trying to argue. |
| 14  involvement in Cobalt. | 14  Q. Again, I don't mean to be disrespectful or |
| 15  Q. She didn't have any; right? | 15  anything. I just want to make that clear. I'm not |
| 16  A. I don't know the -- I don't recall. | 16  trying to be argumentative, but I want clear |
| 17  Q. All right. Fair enough. What was Mary Lynn | 17  testimony. |
| 18  Clark's exact role in Cobalt in 2012, as you can | 18      So you made the decision to affiliate; right? |
| 19  recollect? | 19  A. That's correct. |
| 20  A. My recollection is that member services | 20  Q. You made the decision based solely on the |
| 21  reported -- so Eveleen Babich reported to Mary Lynn | 21  opportunity for Ritz-Carlton Destination Clubs to be |
| 22  Clark. | 22  able to trade into the Marriott Vacation Club |
| 23  Q. And Mary Lynn Clark reported to you? | 23  properties. True? |
| 24  A. No. I don't remember who she reported to. I | 24      MR. SELLINGER: That's a |
| 25  don't recall. | 25  mischaracterization of a lot of testimony on |
| Page 150 | Page 152 |

| | |
|---|---|
| 1  Q. What was the -- okay -- as you sit here | 1  that subject. |
| 2  today, do you recollect any other reason for | 2      MR. REISER: I don't think it is. |
| 3  affiliating The Ritz-Carlton Destination Club with the | 3  BY MR. REISER: |
| 4  Marriott Vacation Club Worldwide program, other than | 4  Q. If you want to tell me if it is -- is that a |
| 5  the stated purpose you mentioned earlier today, to | 5  mischaracterization? |
| 6  give the Ritz-Carlton Development Club members more | 6  A. Our primary reason was to provide additional |
| 7  options? | 7  options for Ritz-Carlton Destination Club fractional |
| 8  A. The only other reason that I am aware of is | 8  owners to be able to have multiple vacation options |
| 9  that, in the case of -- in the case of Vail, for | 9  through the Marriott Vacation Club Destinations |
| 10  instance, where we had put inventory into the Marriott | 10  program. |
| 11  Vacation Club Destinations Trust, it seemed unfair to | 11      The secondary was the one I just mentioned, |
| 12  us to have members of Marriott Vacation Club | 12  that we knew that there was inventory that was going |
| 13  Destinations to be able to come into Vail, but the | 13  into the Destination Club Trust product and points |
| 14  Vail fractional owners not have the ability to access | 14  product and, therefore, members of -- owners of that |
| 15  the Marriott Vacation Club Destinations exchange | 15  product were going to be able to reserve |
| 16  portfolio of products. | 16  accommodations into those Ritz-Carlton Destination |
| 17  Q. So other than that, was there any other | 17  Clubs, and the -- we wanted to make the counter |
| 18  reasons for the affiliation -- | 18  available to the fractional members of the |
| 19  A. No. | 19  Ritz-Carlton Club. |
| 20  Q. And you made the decision, as you just | 20  Q. So early on -- so after the July 17th |
| 21  testified to; right? | 21  announcement, there was no restriction in the |
| 22  A. That's correct. | 22  governing documents of the Vail Club that prevented |
| 23  Q. As you sit here today, Mr. Cunningham, you're | 23  the flat-out sale of The Ritz-Carlton Destination Club |
| 24  testifying under oath that economic reasons involving | 24  unsold inventory to the NATO Trust. True? |
| 25  the unsold inventory of The Ritz-Carlton Destination | 25  A. That's correct. |
| Page 151 | Page 153 |

39 (Pages 150 - 153)

Lee Cunningham - November 10, 2017

| | |
|---|---|
| 1   Q. Is it your same -- | 1 pleased to announce our newest offering with more |
| 2   A. Through the NATO Trust. | 2 destinations and more flexibility, including access to |
| 3   Q. Through the NATO trust. Is that your | 3 various things." |
| 4 position across all the clubs, or did you think that | 4       What -- and you'll see on there, under the |
| 5 some clubs had provisions that prevented that sale? | 5 primetime vacation examples on page 2, it states that, |
| 6   A. Vail, that was allowed. As a matter of fact, | 6 for 4,850 points, Premier Plus and Premier membership |
| 7 that inventory was already in the club. The -- that | 7 folks could get access to the St. Thomas Club. For |
| 8 we had that ability through the governing documents in | 8 4,950, they could get access to Jupiter. For |
| 9 Tahoe, in San Francisco. It was less clear in Aspen | 9 5,675 points, they could get access to San Francisco. |
| 10 and St. Thomas. | 10 For 4,585 points, they have access to Lake Tahoe. For |
| 11   Q. All right. So is it fair to say then -- | 11 6,500 points, they have access to Vail. |
| 12 strike that. | 12       You see all that, right, on the letter? |
| 13       When did the first sale of Ritz-Carlton | 13   A. I see it. |
| 14 unsold inventory in Vail go into the NATO Trust? | 14   Q. What inventory were Marriott Vacation Club |
| 15   A. I'd have to go back and look, but, I believe, | 15 members accessing if they wanted to use 4,585 points |
| 16 it was close to the launch of the Marriott Vacation | 16 to access Lake Tahoe as of August 7, 2012? |
| 17 Club points product, which was mid 2010, but I may be | 17   A. I don't know. To be honest, I don't know |
| 18 wrong on that. | 18 what the -- what inventory they would be accessing. I |
| 19   Q. All right. When was the first time any club | 19 don't know if this is an official -- I think this is a |
| 20 besides Vail had unsold inventory sold to the NATO | 20 person who communicated something beyond maybe what |
| 21 Trust? | 21 they should have. |
| 22   A. I'd have to go back and -- I don't recall the | 22       I don't believe that they had access to that |
| 23 exact dates of when we actually ceded that inventory | 23 inventory. |
| 24 into the trust. | 24   Q. They certainly didn't have access at that |
| 25   Q. Do you recall whether it was before July 17, | 25 time to Ritz-Carlton Aspen Club? |
| Page 154 | Page 156 |
| 1 2012? | 1   A. That's correct. |
| 2   A. I don't believe it was. | 2   Q. You have no explanation for this -- I guess |
| 3   Q. We saw some exhibits earlier today about | 3 it's a rogue salesperson on your force -- |
| 4 the -- let me see if I can pull up an exhibit. | 4   A. I don't know whether that -- I hate to |
| 5 Exhibit 1042. | 5 characterize it that way, but I don't believe this was |
| 6   A. One of these? | 6 an approved communication. |
| 7   Q. Yeah. Do you remember that exhibit shown to | 7   Q. Can you now turn to 1049 then? So this |
| 8 you this morning? | 8 exhibit actually indeed does come from the Marriott |
| 9   A. Right. | 9 Vacation Club folks; right? It's advertising the |
| 10   Q. So this is dated August 7, 2012. True? | 10 Marriott Vacation Club's new benefits. |
| 11   A. Correct. | 11   A. Yeah. |
| 12   Q. At that point in time, the Marriott Vacation | 12   Q. This is August 15, 2012. Yeah? |
| 13 Club sales folks are telling all their members that | 13   A. This is true. |
| 14 there's a new opportunity that they can now trade into | 14   Q. And is this a rogue salesman at the Marriott |
| 15 the Ritz-Carlton Destination Clubs. True? | 15 Vacation Club offering access to the Ritz-Carlton |
| 16       MR. SELLINGER: Objection to form. | 16 properties? |
| 17   A. This e-mail, I believe, was from a | 17   A. This is not -- this is a communication that |
| 18 Ritz-Carlton Club -- Ritz-Carlton Destination Club | 18 doesn't come from a sales executive, so it's -- the |
| 19 membership executive -- sales executive -- not a | 19 answer to your question is no. |
| 20 Marriott Vacation Club sales executive. And it was | 20   Q. Did you approve this mailing? |
| 21 sent out to, as far as I know, this individual. | 21   A. No. |
| 22 BY MR. REISER: | 22   Q. Who would have approved this? |
| 23   Q. It says in there "The Ritz-Carlton | 23   A. I don't know who approved it. Normally, |
| 24 Destination Club's newest offering. The Ritz-Carlton | 24 these require approval through our in-house counsel, |
| 25 Destination Club and Marriott Vacations Worldwide are | 25 but I don't know whether that occurred or didn't occur |
| Page 155 | Page 157 |

40 (Pages 154 - 157)

Lee Cunningham - November 10, 2017

1 or was before that was in place.
2    Q. You have no idea, as you sit here today,
3 Mr. Cunningham, what inventory at the Ritz-Carlton
4 Destination Club was being offered to the 400,000-plus
5 members of the Marriott Vacation Club?
6    A. Well --
7       MR. SELLINGER: Objection to form.
8    A. The inventory that I'm aware that would've
9 been available at Ritz-Carlton Clubs through the
10 Marriott Vacation Club Destinations product would've
11 been Vail at this point in time.
12 BY MR. REISER:
13    Q. Vail only. Okay.
14    A. There may have been others, but I don't
15 recall.
16    Q. You would agree that, prior to the
17 affiliation in Aspen, there was no inventory that
18 would have allowed Marriott Vacation Club members
19 access to Aspen?
20    A. Other than through rental, through outside
21 rental.
22    Q. Outside rental. What about the 13.5 or
23 13.6 percent developer-owned inventory at Aspen?
24    A. It wasn't available for use through the MVCD
25 exchange program.
Page 158

1    A. That's fine.
2       MR. REISER: So, at this point in time,
3 I'm going to thank you for letting me
4 interject here, and I'm going to pass it back
5 to Matt. Thank you.
6       Matt, I did find that one exhibit. Can I
7 ask a couple more questions? Kind of an
8 impromptu thing here.
9       Let's take a two-minute break here or a
10 three-minute break.
11       THE VIDEOGRAPHER: The time is 1:43. We
12 are off record.
13       (Brief recess.)
14       THE VIDEOGRAPHER: The time is 2:00.
15 This is media unit four in the deposition of
16 Lee Cunningham.
17       MR. FERGUSON: Back on the record. That
18 was an 18-minute break, so if we can keep
19 them short. We're going to have a hard time
20 finishing.
21       MR. MARX: You guys asked for the break.
22       MR. REISER: I said two minutes.
23       (Multiple speakers.)
24       MR. SELLINGER: Look, we agree. We think
25 these breaks have been really short and --
Page 160

1    Q. And you're certain of that as you sit here?
2 You haven't reviewed any documents in preparation for
3 this that would show otherwise?
4    A. I don't believe so.
5    Q. Do you remember a cease-and-desist letter
6 that was written by the Aspen Club that was in
7 November 2012 --
8    A. No.
9    Q. -- asking Marriott Vacation Club to cease and
10 desist offering access by the Marriott Vacation Club
11 folks into the Aspen Club?
12    A. No.
13    Q. No recollection of that letter?
14    A. I do not remember getting that letter.
15    Q. Is this the first time you're hearing of that
16 letter today?
17    A. Yes, since I don't remember getting that
18 letter.
19    Q. Do you remember a name, Philip Gosch, an
20 attorney at Brownstein Hyatt in Denver, Colorado?
21    A. I don't recall that name, no.
22    Q. I think you'll probably have your
23 recollection refreshed, but, I guess, I'll have to
24 come back to that after it's covered by my colleague
25 in the depo.
Page 159

1       MR. REISER: That was 15 minutes. That's
2 not a short break.
3       MR. FERGUSON: 18 minutes. It's just
4 hard.
5       DIRECT EXAMINATION, continued
6 BY MR. FERGUSON:
7    Q. Do you know whether people who bought a
8 Ritz-Carlton Destination Club fractional interest in
9 2001 to 2009, when you stopped selling it, were ever
10 advised that Marriott Vacation Worldwide would have,
11 as you say and you believe, a discretion to affiliate
12 with Marriott Vacation Club?
13       MR. SELLINGER: I'm sorry. Can you read
14 that question back?
15       (The reporter read back the last
16 question.)
17       MR. SELLINGER: Well, number one,
18 objection to form. Number two, other than in
19 the documents that were provided?
20       MR. FERGUSON: Other than the documents,
21 yeah.
22    A. I guess, a correction. We didn't stop
23 selling the Destination Club in 2009. We continued to
24 try -- to attempt to sell it, but were unsuccessful.
25 So the question is, did we tell them other than the
Page 161

41 (Pages 158 - 161)

Lee Cunningham - November 10, 2017

1 disclosure documents that the --
2 BY MR. FERGUSON:
3    Q.  Yes.
4    A.  By when?  There was a point in time where --
5    Q.  Up to 2009.
6    A.  No.  I'm not aware of having --
7    Q.  Was the trade name "Marriott" being used at
8 all in connection with selling RCDC memberships,
9 one-twelfth fractionals, from 150 to $650,000?
10    A.  No.
11    Q.  The word "Marriott" wasn't being used at all
12 when these things were sold; right?
13    A.  No.
14    Q.  And if there was anything in the documents
15 that allowed you, which you believe, to have
16 discretion -- you said your lawyers advised you of
17 that -- it wouldn't have used the words "Marriott
18 Vacation Club"?
19    A.  It wouldn't have used the words "Marriott
20 Vacation Club has the discretion"?
21    Q.  No.  That --
22    A.  No, it didn't.
23    Q.  And it wouldn't have had the words there that
24 Ritz-Carlton -- if it said there was discretion to
25 affiliate, it would never have used the trade name
Page 162

1 "Marriott"?
2    A.  No.
3    Q.  And in your letters to the members that we
4 saw on July 17th from Ms. Babich, that you helped
5 write and oversaw, and your letter of August 17th, you
6 weren't telling her that you had discretion to do
7 this; right?
8    A.  No.
9    Q.  And in connection with your understanding
10 that you had discretion to do the affiliation you were
11 writing about in August and July of 2012, was part of
12 the reason you believe you had discretion to do that
13 because it was part of that that you had to make it
14 optional to them or voluntary?
15    A.  No.
16    Q.  You could have made them all affiliate?
17    A.  I believe the Marriott Vacation Club
18 Destination exchange program does -- it's an optional
19 membership for our Marriott Vacation Club members as
20 well, so it was tying those two together.
21    Q.  So --
22    MR. SELLINGER:  Hold on one second.  Let
23    me put an objection on the record, because
24    our accommodation of letting Mike go -- you
25    were going to finish the topic and he was
Page 163

1    going to cover, and then you were going to
2    move on and not tag-team back --
3    MR. FERGUSON:  Let me ask one question
4    and I'll move on.
5 BY MR. FERGUSON:
6    Q.  Do you believe that -- for example, Starwood
7 is now owned by Marriott.  Do you believe it's the
8 discretion of documents, for example, to add in a
9 Westin at this point, if they had a vacation product
10 or timeshare or points system?
11    A.  Does the -- Cobalt have the right to
12 affiliate with Starwood or --
13    Q.  Yeah.  Let's do it that way.
14    MR. SELLINGER:  Let me just -- objection;
15    speculation, but go ahead.
16    A.  I believe it would have the right to do that.
17 I believe there may be other documents that prevent
18 that with Marriott.
19 BY MR. FERGUSON:
20    Q.  I left you off at the webinar.
21       Is the webinar still in existence?  Was it
22 taped?
23    A.  Boy, I don't know the answer to that.
24    Q.  You were on the TV or on a screen with
25 Mr. Weisz?
Page 164

1    A.  I don't believe it was a video webinar.  I
2 believe it was just an audio webinar.
3    Q.  Could people follow along with it on a
4 document?
5    A.  I believe there was a document.  I don't
6 recall.
7    Q.  We do that on CLE, so we listen to someone
8 preaching...
9       Exhibit 1086, this is an e-mail chain.  I
10 must admit, I do not speak Spanish, but this is
11 definitely in Spanish.
12       It's an e-mail from someone that made its way
13 into the hands of the four board of directors at Aspen
14 Highlands at that time -- Neveloff, Schneider,
15 Marsden, and Oliver.  And this is Balbina12.
16       Do you know any owners who are named
17 Alejandro and Balbina?
18    A.  I do not.
19    Q.  It says, "I'm writing with regard to the
20 Ritz-Carlton Aspen Highlands.  What's news with
21 Marriott Club?  We think is a terrible idea to have
22 partnership Marriott is offering to all my friends and
23 the main attraction is the Ritz-Carlton because all
24 other properties are not attractive."
25       If you cut down below -- and I'm actually
Page 165

42 (Pages 162 - 165)

Veritext Legal Solutions
866 299-5127

Lee Cunningham - November 10, 2017

1  reading broken English, so it's not me -- Alejandro
2  and Balbina said, "This is Spanish way they are
3  advertising Marriott Club in Mexico." And you'll see
4  the first line -- it says, "54 properties Marriott and
5  six Ritz-Carlton."
6      Is this a rogue sales executive advertising
7  Marriott -- to Marriott members of the points and
8  weeks systems -- Ritz-Carlton properties, here being
9  six?
10     A.  I have no idea what this is.  I don't know
11  who it's from, other than it's a forwarded message
12  from Balbina12.
13     Q.  If you look at the last page, it has two www
14  addresses.  It's my-vacationclub.com and there's
15  www.marriott.com.
16         Are those e-mails that are used to market
17  Marriott Vacation Club products?
18     A.  I don't see that.
19     MR. SELLINGER:  Tell me where you're
20  reading from, Matt.
21     MR. MARX:  He's reading from a portion of
22  the document in Spanish.
23     THE WITNESS:  I have another page -- I
24  have another last page.
25  BY MR. FERGUSON:

Page 166

1      A.  They had no decision-making responsibilities
2  or rights in this work.
3      Q.  Was this something that was prepared to send
4  over to Marriott International or do you know?
5      A.  I don't recall, but that's what it would
6  appear to be.
7      Q.  Is this a document that would've been
8  given -- was given to you in connection with
9  monitoring -- at this point, it's no longer
10  evolution -- I think you're using the words "product
11  re-engineering" -- was this something that was given
12  to you or prepared by you?
13     A.  It was prepared probably for me.
14     Q.  If you look at the third page of
15  Exhibit 1089, you'll see "Luxury Sales Center
16  Conversions."
17         The luxury sales center would've been where
18  you had -- I say you -- where the Development Company
19  had sold one-twelfth fractional interest to folks?  Is
20  that what a luxury sales center was?
21     A.  Yes.
22     Q.  What's going on here is, you're converting
23  those sites -- you see the second bullet point -- to
24  sell the North American points product.
25         You were going to do that in Aspen and these

Page 168

1      Q.  I'm sorry.  I meant to say second page.
2      A.  I see where you're -- my-vacationclub.com is
3  an owner website for owners of the Marriott Vacation
4  Club product.  And marriott.com is the address for
5  Marriott's rental site.
6      Q.  Marriott Vacation Worldwide?
7      A.  No.  Yeah -- Marriott International.
8      Q.  Marriott International.  Perfect.  Thank you.
9         Sir, I have in front of you Marriott 1089.
10  It's a September 12, 2012 Marriott International
11  update, but it says "Marriott Vacations Worldwide" on
12  the upper right-hand corner.  This document was
13  produced by the Marriott defendants.
14         What does "Marriott International update"
15  mean there?  Is this an update of international
16  properties under the Vacation Worldwide Corporation or
17  does it have anything from the old company you spun
18  off from?
19     A.  I believe it has to do with the company we
20  spun off from.
21     Q.  What involvement did they have in September
22  of 2012 in connection with -- if you look at the next
23  page, for example, "Ritz-Carlton Destination Club,
24  RCDC Unwind/Product Re-engineering," are they involved
25  in that at all?

Page 167

1  other four locations; right?
2      A.  That's correct.
3      Q.  In Aspen, did you own part of the hotel to
4  run sales of fractional interests?  Did you own a
5  piece of that property, or was it rented?
6      A.  I'm sorry?
7      Q.  The fellas and gals that are selling, in the
8  old days, the fractional interest -- and Ivan Skoric
9  or Gary Hughes or some of these guys -- were they --
10  they were in the sales office.
11         Is that something you owned?
12     A.  I don't recall whether that was still owned
13  by the developer or not.  Some cases, they were off
14  site, but I don't recall Aspen specifically.
15     Q.  And you mentioned -- this is 2012 -- you
16  mentioned before that after 2009 -- I made the mistake
17  of saying stop selling -- what you really said was
18  they had stopped selling because it was soft, but
19  there were a few sales.
20         By this time, there had been a decision not
21  to sell out of these luxury centers?
22     A.  That's correct.
23     Q.  Was this something that Ms. Sobeck would've
24  been involved in preparing, to the best of your
25  knowledge?

Page 169

43 (Pages 166 - 169)

Lee Cunningham - November 10, 2017

1      A. Potentially, yes.
2      Q. If you look at the last page of Exhibit 1089,
3   again, this is talking about Ritz-Carlton -- at least
4   the first page. It says, "MVCD Exchange Update."
5   Bullet point one, "Today we have enrolled over
6   122 weeks owners to the MVCD exchange program or
7   35 percent of the 346,000 owners who are eligible to
8   enroll."
9          I'm not understanding the math here. Do you?
10  What does that mean? Who's enrolling these weeks?
11  Oh, it's 122,000 weeks?
12     A. That's correct.
13     Q. Okay. So this is -- are these sales? Is
14  that's what's being reported here? What does MVCD
15  exchange update -- what is being reported in the first
16  sentence of the bullet point one?
17     A. These are -- the first bullet point, it's
18  122,000 weeks owners -- Marriott Vacation Club
19  Destination -- or Marriott Vacation Club weeks owners
20  have enrolled in the Marriott Vacation Club
21  Destination exchange programs. That's roughly
22  35 percent of the 346,000 Marriott Vacation Club weeks
23  owners.
24     Q. So this has nothing really to do with
25  Ritz-Carlton?

Page 170

1   meetings -- what -- twice?
2      A. Just once.
3      Q. That was in April of 2013?
4      A. That sounds -- yes.
5      Q. The first bullet on page 1 of Exhibit 1091
6   talks about the unsold inventory. Are you there?
7      A. Uh-huh.
8      Q. Is that a yes?
9      A. Yes. Sorry.
10     Q. When it's in paper, it looks weird.
11     A. I got you.
12     Q. And that was -- that inventory, I believe you
13  testified was, you were not using that for Marriott
14  Vacations Worldwide points or weeks people at this
15  point?
16     A. That's correct.
17     Q. Is that because of the declaration or the --
18  yeah -- the declaration that you were not using
19  that -- you were not using it?
20     A. That's correct.
21     Q. On the second bullet point -- second
22  sub-bullet point on page 2 of Exhibit 1091, it says,
23  "After researching the Marriott Club average stay --
24  average length of stay -- and the current behavior of
25  the Marriott Premier owners utilizing Aspen as a

Page 172

1      A. It has nothing to do with it.
2      Q. Thank you. 1091. The bottom of 21 [sic] is
3   an e-mail from you to Mr. Neveloff, September 14,
4   2012, with a copy to Mary Lynn Clark. It talks
5   about in the -- this is the first page of
6   Exhibit 1019, the original message at the bottom. It
7   says, "Thank you for your time yesterday. Our
8   conversations have been extremely helpful and we
9   appreciate your insight."
10         Were you talking to Mr. Neveloff on the
11  phone?
12     A. Yes.
13     Q. I think you testified you had never met him
14  in person.
15     A. I don't believe I've ever met him in person.
16     Q. So the officers you've met in, at least,
17  Orlando would've been -- from our HOA at Aspen
18  Highlands -- it would've been definitely Mr. Mercer?
19     A. I met all the members of --
20     Q. In Orlando, though.
21     A. Oh, in Orlando, I met Mr. Mercer. I'm trying
22  to remember. I believe that would be all.
23     Q. There's a Mr. Oliver. I don't know if he
24  came down or not. It was mentioned.
25         The bottom line is, you also went to the HOA

Page 171

1   marketing program."
2          Explain that. What is the marketing program?
3   Were you using the product at -- were you using
4   tourist accommodation units to market Marriott
5   Vacation Club product?
6      A. There was inventory -- the developer-owned
7   inventory in Aspen, I believe, was being used for
8   marketing to bring preview vacations, which we
9   discussed earlier, and providing them a sales
10  presentation, which could be a Marriott -- yes -- it
11  could be a Marriott points offering.
12     Q. Did you believe you had the discretion to do
13  that at this time?
14     A. Yes. We wouldn't have done it if we didn't.
15     Q. You would agree that the inventory of
16  Ritz-Carlton Development Company could be used to
17  preview for potential purchases of one-twelfth
18  fractional interest in this timeframe?
19     A. Yes.
20     Q. But you weren't really selling it?
21     A. We weren't selling the one-twelfth fraction,
22  but we must have believed that we could also bring --
23  use that inventory -- that developer inventory -- to
24  sell other products as well.
25     Q. Including points?

Page 173

44 (Pages 170 - 173)

Lee Cunningham - November 10, 2017

1    A. Including points.
2    Q. The bullet point called "Marketing" at the
3  bottom of page 2 of Exhibit 1091, it's in bold and
4  there's a sub -- I guess you have sections broken up
5  in dark-black ink.
6     Are you there in marketing?
7    A. Yes.
8    Q. It's on the board if that helps you. But as
9  we discussed, we've got the attention of the right
10  people and Mary Lynn -- that's -- ML is Mary Lynn;
11  right?
12    A. That's correct.
13    Q. -- has to approve all marketing that goes out
14  with the Ritz-Carlton name on it.
15     Is this, in part, if you recall, related to
16  the fact that we saw, for example, that Spanish ad --
17  in that ad that Mr. Reiser showed you before that you
18  said was not authorized by your company?
19    A. It could be. I seem to recall that there was
20  that -- I don't know about the Spanish ad, having not
21  seen that one, but the prior one, I believe, was -- it
22  was in response to that.
23    Q. You close this letter "Again, Jay, thank you
24  for your passion for the Aspen members, the brand, and
25  the company."

Page 174

1  BY MR. FERGUSON:
2    Q. I understand that.
3    A. His feedback is partnership on how to work
4  through the remaining issues relative to affiliation,
5  which would be Cobalt, and that was the primary.
6    Q. But he was primarily talking to you about the
7  letters that you had sent him the 17th, and Ms. Babich
8  sent on the 17th of July. That's primarily what you
9  were talking about.
10     This memo or this e-mail -- this e-mail memo
11  from you to Mr. Neveloff is talking about the brand
12  evolution; was it not?
13     MR. SELLINGER: Would you read that
14  question back, please?
15     MR. FERGUSON: Let me rephrase it,
16  Mr. Sellinger.
17  BY MR. FERGUSON:
18    Q. This e-mail on September 14, 2012 in
19  Exhibit 1091 was related to the announcement that had
20  come out on the 17th of July and the 17th of August
21  from you and Ms. Babich; right?
22    A. It was related to his concerns about that.
23    Q. So you wrote that letter under Ritz-Carlton
24  Destination Club, right, not Cobalt -- the letters of
25  17, August that you wrote?

Page 176

1     Did he express that he had passion for his
2  members, or was it just something you were observing?
3    A. I don't know that he said -- used those
4  words. My observation was that he cared about the
5  members of the Aspen product or Aspen Club.
6    Q. When you said, "We appreciate your
7  partnership and look forward to continuing our
8  conversations," are you talking about a partnership
9  between Cobalt and the HOA, the HOA and Marriott
10  Vacation Club, the HOA and The Ritz-Carlton
11  Destination Club, as you said was doing business for
12  the Development Company?
13    A. Probably, the primary relationship or
14  activity at this point in time was between Cobalt and
15  the Aspen owners association; and to some degree,
16  working with them on -- from the developer's
17  standpoint -- on the unsold inventory.
18    Q. So you think the -- when you talk about the
19  partnership with Mr. Neveloff, you think -- your
20  testimony is that it was between the Cobalt entity and
21  the HOA?
22     MR. SELLINGER: Objection to form.
23    A. I believe it was related to the -- it wasn't
24  a -- we certainly weren't forming any legal
25  partnership.

Page 175

1    A. Yes, that's correct.
2    Q. Exhibit 1090. This is probably out of order,
3  because it looks like Ms. Clark assisted you in
4  writing this -- communicating to Mr. Neveloff -- and
5  you would have made some changes, I guess, before it
6  went out.
7    A. Potentially.
8    Q. We're not going to redline that here.
9     Exhibit 1124 is a two-page letter dated
10  November 5, 2012, from Ritz-Carlton Club, Bachelor
11  Gulch Condominium Association, and it's from
12  Mr. Mullinex, the president of that association, to
13  you and Mr. Weisz.
14     Are you with me?
15    A. Yes.
16    Q. It talks about the proposed affiliation
17  between that property, Bachelor Gulch, and Lion &
18  Crown.
19     You said, "I'm writing on behalf of the board
20  of directors to continue our dialogue about the
21  proposed affiliation." And you're talking about the
22  meeting having been, I think on the second paragraph,
23  a face-to-face meeting September 19, 2012 in Orlando.
24     Is that the meeting we were talking about
25  with Ms. Perfido and you and Mr. Weisz?

Page 177

45 (Pages 174 - 177)

Lee Cunningham - November 10, 2017

1  A.  That's correct.
2  Q.  In the third paragraph, you said, "He
3  explained to you during the meeting that at least they
4  believe that affiliating Lion & Crown with his club
5  will depress the already low values of the residence
6  interests."
7       Is that something you discussed in that
8  meeting with Mr. Weisz and Ms. Perfido?  Do you recall
9  that?
10 A.  Yes.
11 Q.  Did you respond to that concern at that
12 meeting, if you recall?
13 A.  I don't recall.
14 Q.  He said at the end of that paragraph
15 "Perhaps, most importantly, the board has heard from a
16 significant portion of the club's membership that they
17 overwhelmingly oppose affiliation with Lion & Crown
18 for a number of reasons."
19      And, eventually, I take it, you recall that
20 he held a -- his board held a board vote first to exit
21 the Ritz-Carlton brand?
22 A.  Yes.
23 Q.  Then he put that to a membership vote of all
24 his members?
25 A.  That's correct.

Page 178

1  A.  I think that's the subsidiary that he works
2  for.
3  Q.  On page 2 of this document, you said on the
4  second -- or the first full paragraph, "Finally, but,
5  most importantly, the board believes that the new
6  club -- that the use of club units that would result
7  from the L&C affiliation, and, therefore, basically
8  becoming part of the points-based Marriott Vacation
9  Club timeshare system, is prohibited by the club's
10 declaration of condominium, section 19.5."
11      Do you recall whether or not you received a
12 cease-and-desist letter from this association?
13 A.  I don't recall.  Could have.
14 Q.  Were you ever sued by Bachelor Gulch or was
15 there a lawsuit filed?
16 A.  I don't believe so.
17 Q.  Had you ever been in any meetings with a Dan
18 Wolf, a lawyer up in Avon or Vail?  Have you ever had
19 any interaction with Dan Wolf?
20 A.  I've heard the name, but I've never been in a
21 call or meeting with him.
22 Q.  Did you agree to put off the affiliation for
23 several months after the discussion in September of
24 2012 and this letter of November 2012?
25 A.  Yes.

Page 180

1  Q.  And he did not use Morrow & Company, did he?
2  A.  I'm sorry?
3  Q.  He didn't use Morrow & Company, did he?
4  A.  I don't recall.
5  Q.  You understand Morrow & Company did your
6  survey for the Aspen property?
7  A.  Yes.
8  Q.  And that's one of your vendors; right?
9  A.  That's a vendor that we use for association
10 governance.
11 Q.  And that would be -- is it Lori Phillips?
12 A.  Lori Phillips, yes, association governance
13 for us.
14 Q.  For Marriott Vacation Worldwide, and
15 Mr. Hearns is on the hotel side?
16 A.  No.
17 Q.  Mr. Hearns is with Marriott International and
18 he's with the Ritz-Carlton Hotel Company?
19 A.  Lori works for us.  I believe she is -- I'm
20 not sure at this time whether she solely works on the
21 Ritz-Carlton Club governance or whether she also has
22 some Marriott Vacation Club accounts as well.
23      Mr. Hearns works for Marriott International.
24 Q.  The company over there is Ritz-Carlton Hotel
25 Company?

Page 179

1  Q.  Why did you agree to put off the affiliation
2  if you believed it was in your discretion?
3  A.  Because we wanted to get the concurrence of
4  the owners, understand their point of view clearly,
5  and go from there.
6  Q.  You didn't want concurrence because you had
7  discretion.  You just wanted to get a feel for their
8  sentiment; is that right?
9  A.  We wanted to understand their -- how they
10 felt about the affiliation.
11 Q.  According to at least Mr. Mullenix, they
12 didn't feel very good about it, did they?
13 A.  No.
14 Q.  Do you think the Aspen Club felt better about
15 it than Bachelor Gulch?  The members, not Mr. Mercer
16 or Mr. Oliver, who you dealt with.
17 A.  We hadn't heard the same level of concern
18 from Aspen members as we had heard from Bachelor
19 Gulch, primarily through Mr. Mullenix.
20 Q.  So Mr. Mullenix was kind of the clearinghouse
21 of Bachelor Gulch members' complaints?
22 A.  Well, he was the spokesman for them.
23 Q.  Right.  So Mr. Neveloff and then Mr. Mercer
24 weren't passing on that, in terms of a synopsis that
25 we see in this November 5th, 2012 -- he said, "Our

Page 181

46 (Pages 178 - 181)

Lee Cunningham - November 10, 2017

1  member feedback is negative. We're telling you it's
2  negative." Right? You were getting that from him?
3      MR. SELLINGER: I'm sorry.
4      MR. FERGUSON: I agree. I agree. I'll
5  rephrase it. I objected to my own question.
6  BY MR. FERGUSON:
7      Q. Mr. Mullenix, as far as you recall, was
8  monitoring the temperature of his members regarding
9  the affiliation that was proposed in July and August
10 of 2012?
11     A. Yes.
12     Q. He's reporting that to you; correct?
13     A. He reported it on a couple of occasions.
14     Q. And you said that you didn't think you were
15 getting as much negative feedback, or, at least,
16 wasn't being communicated to you through a
17 clearinghouse, like Mr. Mullinex from the HOA in
18 Aspen?
19     MR. SELLINGER: Objection to form.
20     A. I don't -- we weren't hearing the same level
21 of objection from Aspen. I don't know why that would
22 be. It wasn't necessarily because there wasn't
23 somebody acting as a clearinghouse.
24 BY MR. FERGUSON:
25     Q. Well, obviously, you had gotten a letter from

Page 182

1      A. I don't recall. I think it became a moot
2  point.
3      Q. Right. Exhibit 1135. This is the letter
4  from Mr. Phil Gosch at Brownstein Hyatt Farber &
5  Schreck in Denver. He was representing the HOA.
6      Do you have a recollection that he did in
7  fact represent the HOA in this timeframe?
8      A. I don't recall.
9      Q. This is a letter --
10     A. I see here that he does, but I don't -- I
11 don't know Mr. Gosch, other than, obviously, this
12 letter. I don't recall having any interaction with
13 him.
14     Q. Other than receiving this letter?
15     A. That's all I recall.
16     Q. And what did you do with this letter? Did
17 you turn it over to legal or did you --
18     A. It went straight to our in-house counsel.
19     Q. And they, in turn, retained the services of a
20 law firm in Denver. Is that your recollection?
21     A. I don't know. I don't recall.
22     Q. You don't recall Mr. Davis at Baker
23 Hostetler?
24     A. I do not recall.
25     Q. Without divulging any attorney-client

Page 184

1  Mr. Cappello, who was clearly in Mr. Mullenix's camp?
2      A. Agree.
3      Q. And in the next-to-last paragraph, it says,
4  "I understand" -- are you there?
5      A. Yes.
6      Q. It says, "I understand we discussed at our
7  meeting the possibility of holding a vote of the club
8  membership on the issue of affiliation with Lion &
9  Crown."
10     Is that something you recall having discussed
11 as at least a possibility at Bachelor Gulch?
12     A. Yes.
13     Q. It says, "Although that is our intention, we
14 do not believe such a vote is necessary in light of
15 our club's governing documents, including without
16 limitation the declaration; nor do we believe such a
17 membership vote is required for this requested delay."
18     So he's talking about a vote, whether or not
19 to affiliate on his side, as opposed to you --
20     A. This is not us.
21     Q. Right. This would be a vote that he would
22 hold?
23     A. That's correct.
24     Q. Okay. And how long had you put off the
25 affiliation decision?

Page 183

1  privileged communications, do you recall ever speaking
2  to anybody at Baker Hostetler in Denver?
3      A. No.
4      Q. I'm not going to use this letter to match
5  because it's too small to read.
6      If you can go to the second page of
7  Exhibit 1135, there's a paragraph that starts with "In
8  addition to violating the declaration."
9      Are you with me?
10     A. Yes.
11     Q. If you go down a few sentences, you'll see
12 that it was their position -- the HOA says, "By
13 permitting MVW and/or the program manager" -- the
14 program manager is Cobalt; right?
15     A. Yes.
16     Q. -- "to utilize the tourist accommodation
17 units is a clear violation of the declaration. The
18 HOA manager" -- that would be the Ritz-Carlton
19 Management Company; right?
20     A. That's correct.
21     Q. -- "would be enriching its affiliates and the
22 Marriott licensor" --
23     So the affiliates of the manager would be the
24 hotel development company and Marriott -- another
25 affiliate is Marriott Vacation Worldwide. Right?

Page 185

47 (Pages 182 - 185)

Lee Cunningham - November 10, 2017

| | |
|---|---|
| 1    MR. SELLINGER: You're asking him to | 1    A. I believe it was in 1990 -- let's see -- |
| 2  interpret what the writer of this letter | 2  either '93 or '94. I think '94. |
| 3  means by affiliates? | 3    Q. Were you around then? |
| 4    MR. FERGUSON: If you want to object to | 4    A. Yeah, I was working for -- |
| 5  form, I'll ask him again. | 5    Q. I know you were alive. |
| 6  BY MR. FERGUSON: | 6    A. I was working for Marriott International. |
| 7    Q. Do you consider Marriott Vacations Worldwide | 7    Q. Do you know a Thomas Boova? |
| 8  to be affiliated with Ritz-Carlton Management Company? | 8    A. Does not ring a bell. |
| 9    A. Ritz-Carlton Management Company is an entity | 9    Q. Mr. Boova was, apparently, a board member at |
| 10  within Marriott Vacations Worldwide. | 10  one HOA. I'm not sure which one. He's the managing |
| 11    Q. The Marriott licensor would be with Marriott | 11  director of Landmore Advisors. Does that ring a bell? |
| 12  International? | 12    A. No. |
| 13    A. Yes. | 13    THE REPORTER: Landmore? |
| 14    Q. -- "by creating an attractive offering for | 14  BY MR. FERGUSON: |
| 15  MVC members, which would increase sales and license | 15    Q. Landmark Advisors. Oh, yeah. Mr. Boova is |
| 16  fees under Marriott's arrangement with MVW at the | 16  from the Jupiter HOA. |
| 17  expense and burden of the association and its | 17    A. Okay. |
| 18  members." | 18    Q. Does that help you at all? |
| 19    We know, at least by this point, November | 19    A. No. |
| 20  2012, that there was some marketing that was going out | 20    Q. This is Exhibit 1106. I have it as late |
| 21  to Marriott Vacation members and/or potential members | 21  2012. It's a Marriott Vacations Worldwide |
| 22  to -- advising them they could utilize Ritz-Carlton | 22  confidential and proprietary information for an Aspen |
| 23  product. | 23  member update. It's produced by the association, but |
| 24    A. Okay. | 24  my question is -- I guess, based upon the nomenclature |
| 25    Q. Is that right? | 25  on it, it's a document that was prepared by Marriott |
| Page 186 | Page 188 |

| | |
|---|---|
| 1    A. Yes. | 1  Vacations Worldwide. It's probably a |
| 2    Q. And then Mary Lynn was told to -- Mary Lynn | 2  PowerPoint that's copied -- |
| 3  Clark -- she won't be mad if we call her by her first | 3    A. Well, it's definitely a PowerPoint. I would |
| 4  name, I'm sure -- but Ms. Clark was told to keep an | 4  expect this is produced by member services or by the |
| 5  eye on that type of marketing? | 5  Ritz-Carlton Management Company for the Aspen HOA. |
| 6    A. Yes; that she needed to review any marketing. | 6    Q. All right. This one, at least -- on the |
| 7    Q. Including whether or not it was authorized at | 7  second page, it says, "Today, Aspen uses options. It |
| 8  all? | 8  has their reserved allocations, their Cobalt Travel, |
| 9    A. That's correct. | 9  and they had access" -- this is in the left-hand |
| 10    Q. Is the Ritz-Carlton Club in Aspen, Colorado | 10  box -- "to their own club and the club system |
| 11  utilized as a selling point for Marriott Vacations | 11  exchange." |
| 12  Worldwide points product today? | 12    Right? That's what they -- I'm looking right |
| 13    A. It's listed as an exchange option through the | 13  here. That's what my clients bought, right, was a |
| 14  Marriott Vacation Club Destinations exchange programs. | 14  deed to reserve allocation, the Cobalt -- |
| 15    Q. When was the brand bought or acquired by a | 15    A. Cobalt Travel is -- the access to or the |
| 16  Marriott entity; do you recall? | 16  subset of Cobalt Travel that are available. |
| 17    A. I'm sorry? | 17    Q. And they also had access, obviously, to their |
| 18    Q. Ritz-Carlton used to be a stand-alone | 18  Home Club? |
| 19  product -- | 19    A. Right. |
| 20    A. Right. | 20    Q. And then they would be able to access -- an |
| 21    Q. -- a company. Do you recall when it was | 21  Aspen person could access St. Thomas or Kapalua, |
| 22  acquired by Marriott -- probably Marriott | 22  things like that; right? Is that what that means? |
| 23  International, I would imagine. There are a lot of | 23    A. The club system exchange on the left is the |
| 24  iterations. There was a Hotel Company in the old | 24  access to St. Thomas and other clubs. On the right is |
| 25  days. | 25  the developer inventory that's made available through |
| Page 187 | Page 189 |

48 (Pages 186 - 189)

Lee Cunningham - November 10, 2017

1  Lion & Crown that the members in Aspen could get
2  access to.
3      Q. I'll show you Exhibit 1148.  This is an
4  e-mail between Mercer and Mullenix.  And you'll see at
5  the top -- I know you haven't been a recipient of
6  this, but I just want to ask you about his
7  recollection of the September 19th meeting here in
8  Florida.  And there's her name, Perfido --
9  P-E-R-F-I-D-O.
10         And he said, "That's the line they used with
11 us" and the line that Marriott used with you is that
12 any owner can rent, cash, trade, or barter their unit.
13         That's something you've told the HOA
14 presidents and officers, have you not?
15     A. I'm sorry.  Where --
16     Q. If you look at Mr. Mercer below, he said he
17 had a meeting that was brief and typical.  Marriott
18 Vacation Worldwide was, by allowing access to Aspen
19 units through a points-based system, that merely
20 renting units which they own by a different
21 methodology.  He said, "They're not doing anything
22 different than any owner."
23         Are you with me?
24     A. Yes.
25     Q. Did you meet with Mr. Mercer when he came
                                              Page 190

1  said something to -- the words to the effect that
2  Mr. Mullenix is using here -- "You used the word
3  'fraud' in my building.  You think I will have a civil
4  conversation with you?"
5          Do you recall generally something like that?
6      A. I don't.
7      Q. You would hear the word "fraud" from the
8  various members of the clubs over and over and over
9  again over the next couple years when we're talking
10 about affiliation, wouldn't you?
11     MR. SELLINGER:  Objection to form.
12     A. No, I don't -- I don't.
13 BY MR. FERGUSON:
14     Q. You don't recall documents like these --
15 they're taking the temperature on things like
16 affiliation, that people were saying -- members were
17 saying things like "we've been defrauded"?
18     A. I don't recall that.
19     Q. When you met with Mr. Mercer here in Orlando,
20 was he alone?
21     A. Yes.
22     Q. Did he say anything about -- you said it was
23 two or three hours -- did he say anything about
24 whether he was there on behalf of the board or was he
25 here kind of on a meeting on his own accord?
                                              Page 192

1  down here in December of 2012?
2      A. I met with Mr. Mercer in Orlando on one
3  occasion, and I don't remember the exact date.
4      Q. How long did you meet with him?
5      A. I think it was a couple hours.  Maybe three.
6      Q. If he called that a short chat in passing,
7  would that have been accurate?
8      A. No.
9      Q. Mr. Mullenix -- I'm sorry.  Did you have
10 something to add?
11     A. No.
12     Q. Mr. Mullenix responded to his e-mail with
13 you -- with him -- about the meeting with you, and he
14 said that -- Mr. Mullenix said, "They used that line
15 with us and that is when Jo-Ann Perfido accused Weisz
16 of taking that approach, defrauding us."
17         Do you recall Ms. Perfido using the word
18 "fraud" at some point?
19     A. Yes.  I mean, I don't recall -- I'm not sure.
20     Q. Do you recall that Mr. Weisz slammed his hand
21 on the table?
22     A. I recall there was a heated exchange between
23 Mr. Weisz and Mr. Mullenix.  I don't recall one with
24 Ms. Perfido.
25     Q. Do you recall that he made a proclamation or
                                              Page 191

1      A. I don't recall.  I believe he was -- his
2  intent was to try to find a way forward that was good
3  for everybody.
4      MR. FERGUSON:  I'm going to mark this
5  document.  We can't mark it, can we?
6      Actually, I can.  Actually, I know how to do
7  that.
8  BY MR. FERGUSON:
9      Q. I'm going to show you what's been marked as
10 Exhibit 1279.  Mr. Marx and Mr. Sellinger were kind
11 enough to blow it up for me.  I still can't read it
12 that well.  We'll mark this at some point.
13         So this is the -- do you recognize this
14 document at all, sir?
15     A. No.
16     Q. Okay.  You'll see that on page 2, it has loss
17 of property comments.  And then across there,
18 satisfaction comments, options, reasoning and MVC and
19 MKR use of property comments.
20     A. I see that.
21     Q. Is there something called MKR?  I hope not.
22 It's too complicated.
23     A. I have no idea what that would be.
24     Q. So this is a document that you weren't
25 utilizing?
                                              Page 193

49 (Pages 190 - 193)

Lee Cunningham - November 10, 2017

1    A. I may have seen it. I don't recall. It's
2  been quite a while.
3    Q. Does it look like a Marriott Vacation
4  Worldwide-generated document, or generated for?
5    A. It looks like a document that was generated
6  probably by owner -- or member services.
7    Q. All right. The last page has other strategic
8  options. This seems to be a little bit out of place,
9  because it has other strategic options, and the first
10 line says, "We need to get an attorney to advise about
11 starting our own class action lawsuit."
12      Does this belong with this document? This
13 looks like somebody that was -- you guys weren't
14 looking into your own class action lawsuit in 2012 or
15 '13, were you?
16    A. Not to my knowledge.
17    Q. And the second one says, "Condé Nast" --
18 "Contact Condé Nast and other travel magazines and
19 expose the outright fraud of Ritz-Carlton and Marriott
20 for what it is."
21      So this is not you guys, obviously?
22    A. No.
23    Q. That would be an example of at least someone
24 writing the concept that they thought they were -- and
25 I'm not asking you to admit -- I'm sure you'll deny
                                              Page 194

1    A. I didn't go through this one.
2    Q. Okay. On the first page, the last bullet
3  point says, "As a result, we had numerous" -- I'm
4  sorry -- "had various one-on-one discussions with the
5  four-member control boards, which has led to
6  adjustments in our planned rollout."
7      That would be the evolved rollout that we
8  were talking about in July and August of 2017?
9    A. Yes.
10    Q. It talks about Bachelor Gulch, and it says,
11 "We will not affiliate BG and MVCD absent an
12 affirmative vote from the majority of the members."
13      Is that something you promised the board?
14    A. No. This is a document to Marriott
15 International.
16    Q. So you're reporting to Marriott International
17 that you would not affiliate Bachelor Gulch property
18 for its Destination Club with Marriott Vacation Club
19 Destinations absent an affirmative vote from the
20 majority of the members.
21      You're reporting what you promised or you
22 told --
23    A. No. I'm reporting what we would -- what our
24 intention was if we were to go out and get -- and take
25 a vote, which never occurred.
                                              Page 196

1  vehemently there was fraud committed in any way. But
2  you were aware that other people besides Ms. Perfido
3  were useing the word "fraud"?
4    A. Yes. Assuming I saw this, I would have known
5  that --
6      MR. SELLINGER: I don't think he should
7    be assuming. I don't think you should be
8    asking whether this is an example if he
9    doesn't know what the document is, and you
10   don't know what it is.
11     MR. FERGUSON: I know what it is.
12 BY MR. FERGUSON:
13    Q. Okay. I have in front of you Exhibit 1020.
14 This is another Marriott Vacations Worldwide
15 Corporation update, February 28, 2012. Then you have
16 the same kind of general format, except it kind of
17 updates itself periodically. It's a Ritz-Carlton
18 Destination re-engineering update.
19      And this is the Marriott Vacation Worldwide
20 document, is it not -- proprietary information?
21    A. It was produced by Marriott Vacations
22 Worldwide for -- it appears for Marriott
23 International.
24    Q. Is this a document you reviewed for your
25 deposition, by the way?
                                              Page 195

1    Q. But I take it it's your testimony here in
2  trial that you didn't have to do any of this because
3  it was fully in your discretion?
4    A. That's correct.
5    Q. And you didn't tell that to Marriott
6  International -- who you paid 20 million or 15 -- $20
7  million dollars a year to for the mark -- did you?
8    A. What?
9    Q. You didn't say, "Hey, we're going to hold
10 this vote, but we don't have to because it's
11 discretionary"?
12    A. My guess is, we would have told them that,
13 but I don't recall.
14    Q. Just not in this periodic update that --
15    A. We didn't in this periodic update.
16    Q. And on the next bullet point, you said the
17 same thing, "We will not affiliate Aspen Highlands
18 with MVCD absent an affirmative vote from the majority
19 of the members." Same basic language; right?
20    A. Agreed.
21    Q. At some point, you did tell people at Aspen
22 Highlands that you would have -- would not affiliate
23 without an affirmative vote from the majority of the
24 members?
25    A. We told them we would not do it without an
                                              Page 197

                                    50 (Pages 194 - 197)

Lee Cunningham - November 10, 2017

1 affirmative vote from the members.
2    Q. But you changed your mind?
3    A. I'm sorry?
4    Q. You changed your mind?
5    A. I said from an affirmative vote of the
6 members, not the majority of the members.
7    Q. An affirmative vote from the majority of the
8 members?
9    A. We told the Aspen HOA that we would not -- I
10 never told the Aspen HOA that we would require or
11 would only affiliate if we got a majority vote of the
12 members of the Aspen owners.
13       Setting a majority member vote is -- in the
14 timeshare world is basically saying you're not going
15 to -- you're not expecting to get that done. It's
16 rare to even get that number of members to even vote
17 one way or the other.
18    Q. There's a problem with what you just said,
19 though. My clients, who would have a one-tenth
20 fractional deeded interest, are not timeshare folks,
21 are they?
22    A. Sure, they are.
23    Q. They're timeshare people?
24    A. The fractional interest is a timeshare.
25    Q. Do points people get deeds?

Page 198

1    A. We sold the inventory. I'm sure we were
2 selling it as fractional interest. And when we review
3 the governing documents and go through our normal
4 quality assurance process, we're assuring that the
5 owners know what they're purchasing.
6 BY MR. FERGUSON:
7    Q. But so far as you know, the word "timeshare,"
8 when those folks came into a sales office in Aspen,
9 Colorado, they weren't told they were being sold
10 timeshares?
11       MR. SELLINGER: Objection to form.
12    There's no foundation of this witness's
13    familiarity with that process.
14 BY MR. FERGUSON:
15    Q. Do you have any familiarity with that
16 process?
17    A. With the sales process?
18    Q. Yeah.
19    A. In general. I do not know how it is
20 performed at a sales location.
21    Q. But you know -- you're involved with
22 marketing, obviously, of points today; right?
23    A. That's correct.
24    Q. People report to you about that. You have
25 sales executives that market it?

Page 200

1    A. Yes.
2    Q. And you're being sued about that in the case
3 that I showed you earlier this morning; whether or not
4 that's actually really real estate interest?
5    A. That's the claim in the -- false claim in the
6 Lennen matter.
7    Q. When the folks put down 500,000, 450,000,
8 350,000 in Aspen, Colorado, were they told that they
9 were buying timeshares?
10    A. Their documents, I believe, would disclose
11 that that -- because the governing documents are
12 fashioned based on the timeshare law of Colorado.
13    Q. But they weren't being -- that wasn't my
14 question. My question was, were they told they were
15 buying timeshares?
16    A. They were told they were buying fractional
17 interests in the Bachelor Gulch product, which is a
18 form of timeshare.
19    Q. A form, but you weren't using that word?
20    A. I don't -- I wasn't there. I don't know
21 whether that word was said or not.
22    Q. In fact, the only time you see that word is
23 when it says you guys, the developer, can't use it as
24 a timeshare?
25       MR. SELLINGER: Objection to the form.

Page 199

1    A. The sales execs don't report to me, but I am
2 generally knowledgeable about the sale of our points
3 product, as I'm generally knowledgeable about the
4 sales of our fractional product.
5    Q. When you were talking to Mr. Mullenix, did
6 you say, "Well, you guys are timeshare folks and we
7 don't have to" -- let me try to clear this up.
8       It says, "We will not affiliate Aspen
9 Highlands with MVCD absent an affirmative vote from
10 the majority of the members." Okay?
11       So majority means more than 51 percent of the
12 members?
13    A. That's what the majority would mean.
14    Q. So if you had 876 members -- and I think you
15 all agreed to subtract out your 120 units, and you
16 weren't going to put that in the vote; right? Is that
17 something you agreed to?
18       MR. SELLINGER: Well, hold on a minute.
19    You're jumping between this document, what he
20    may have said, which isn't this document, and
21    now some third concept and lumping it all
22    together.
23 BY MR. FERGUSON:
24    Q. Are you familiar with the fact that, when you
25 talked about a member -- majority member vote for

Page 201

51 (Pages 198 - 201)

Lee Cunningham - November 10, 2017

1  affiliation with MVW that you agreed not to count the
2  votes or use the votes of the membership interest
3  owned by the Development Company?
4      MR. SELLINGER:  Objection; lack of
5      foundation for his having set the premise of
6      your question.
7  BY MR. FERGUSON:
8      Q.  Do you know it?  I mean, you're a chief
9  operating officer and senior vice president.  You
10 knew that -- and Mr. Sellinger doesn't know this, but
11 you knew back in 2012 and '13 you were not going to
12 include the votes that the Development Company's
13 interests were entitled to?
14     A.  What we committed to is that we would not --
15 the developer-owned interest would not participate in
16 the survey.
17     Q.  I just looked at a document there.  It didn't
18 say "survey," did it?
19     A.  No.
20     Q.  It said "vote."
21     A.  That's correct.
22     Q.  Okay.  Do you ever survey for a candidate or
23 do you vote for a candidate?
24     A.  Vote for a candidate.
25     Q.  And vote means that your say counts towards

Page 202

1  We certainly discussed the survey with the larger
2  board months in advance of completing the survey or
3  doing the survey.
4      Q.  Months in advance?
5      A.  Yes.
6      Q.  Do you know whether you -- you guys -- when I
7  say you guys -- the HOA and Marriott Vacations
8  Worldwide would sometimes make joint announcements to
9  the members; right?
10     A.  There were occasions.
11     Q.  Exhibit 1180.  This is a document that has
12 electronic signatures or scripted signatures of the
13 four, then, tourist accommodation board directors --
14 Oliver, Schneider, Marsden, and Oliver.  It says,
15 "Positive discussions were held today between the
16 board of directors and representatives of the
17 Ritz/Marriott, including Lee Cunningham, chief
18 operating officer of The Ritz-Carlton Destination
19 Club."
20     You're not a chief operating officer
21 obviously of the thing called The Ritz-Carlton
22 Destination Club, right?  We covered that?
23     A.  We covered that.
24     Q.  It says, "The Ritz-Carlton" -- do you recall,
25 is this the time you went to Aspen, Colorado?

Page 204

1  something; right?  It's tallied in order to decide
2  whether a referendum passes or a political candidate
3  gets elected; right?
4      MR. SELLINGER:  Objection to form.
5      A.  A vote is different from a survey.
6  BY MR. FERGUSON:
7      Q.  All right.  Thank you.
8      A.  We began the conversation talking about a
9  vote.  And as we had conversation with our internal
10 counsel, we became aware that a vote was not the
11 appropriate form to go through for this affiliation,
12 and then we moved to a survey.
13     Q.  When did you tell all the clients that I
14 represent and other folks that you didn't think a vote
15 was appropriate anymore?
16     A.  We told the board.
17     Q.  When did you tell them that?
18     A.  After -- obviously, well before we went out
19 with the survey.
20     Q.  Did you tell it the following year?  Did you
21 tell Mr. Mercer when you met with him again here in
22 Orlando that you were going to go with this second
23 plan, which is the survey?
24     A.  We discussed the survey -- I don't know
25 whether that was when he was here in Orlando or not.

Page 203

1      A.  This is when we went to Aspen.
2      Q.  Did you go there with anyone else from
3  Marriott Vacation Worldwide?
4      A.  Stephanie Sobeck.
5      Q.  And you said to them "The
6  Ritz-Carlton/Marriott representatives agree that
7  unless the majority of Aspen Highlands members,
8  including Marriott interests and members not in good
9  standing, vote in favor of doing so, the
10 Ritz-Carlton/Marriott will not include Aspen Highlands
11 in the Marriott Vacation Club exchange points
12 program."
13     That's pretty much identical to what you were
14 reporting in that prior document, Exhibit 1020, to
15 Marriott International; right?
16     A.  Yes.
17     Q.  And your testimony here today is that that
18 actually changed.  You decided not to do this?
19     A.  We decided not to do the vote and went with
20 the survey.
21     Q.  Did you guys -- when I say "you guys," that's
22 bad.  Did you -- when I say "you" -- did Marriott
23 Vacation Worldwide folks, you or Ms. Sobeck, assist in
24 writing that letter?
25     A.  No.  Well, I didn't.  I don't believe

Page 205

52 (Pages 202 - 205)

Lee Cunningham - November 10, 2017

1 Ms. Sobeck did either.
2    Q.  Were all four of those men there?
3    A.  Yes.
4    Q.  It was one of their regular or interim board
5 of directors meetings?
6    A.  That's correct.
7    Q.  Let me show you what's been marked as
8 Exhibit 1185.  Exhibit 1185 is a three-page document.
9 The last e-mail -- sorry.  The first e-mail on the
10 last page is an e-mail from Sobeck to Babich and some
11 others -- Lori Phillips, Mr. DiMeglio, who's, I think,
12 with the Management Company and runs that hotel, or
13 that property.
14       It says, "I'm in Aspen with Lee and the Aspen
15 board right now.  They and Lee would like to send an
16 e-mail communication out to members by the end of the
17 day.  It is a short, one-paragraph e-mail, and we want
18 to get it out today before BG announces anything.  We
19 don't know if they're going to, but could cover the
20 weekend.  Can you please start getting the template
21 ready?  Nicholas will send you the verbiage shortly."
22       In fact, your company did have a hand in
23 writing the e-mail we saw in the prior exhibit, right,
24 Exhibit 10 -- 1180?
25       MR. SELLINGER:  Objection to form.  Why

Page 206

1 would you say that?
2       MR. FERGUSON:  Say what?
3       MR. REISER:  Just object to form, Philip.
4 BY MR. FERGUSON:
5    Q.  Did you get my question?
6    A.  I did get your question.
7    Q.  Do you understand my question?
8    A.  I do.
9    Q.  All right.
10    A.  I don't know whether this is the letter it's
11 referring to.
12    Q.  The folks that she's writing to --
13 Ms. Babich -- I think you called her the general
14 manager of RCDC services -- she and her team of folks
15 blast out e-mails to the various associations -- in
16 this case, Aspen Highlands -- right?
17    A.  They send out e-mails as well as association
18 governance.
19    Q.  So you don't know whether this was the letter
20 we saw in Exhibit 1180?
21    A.  I don't know whether it was or not.
22    Q.  Does the second page of Exhibit 1185 help you
23 out?  Ms. Sobeck says, on April 5, 2013 at 2:18 p.m.,
24 "All, please find attached letter that the Aspen board
25 would like to send out today.  It has been approved by

Page 207

1 Lee and myself."
2    A.  I've read that.
3    Q.  So you approved the language we saw in
4 Exhibit 11 --
5    A.  I don't know if that's the letter that was
6 attached.
7    Q.  So let's talk about that.  You're at a
8 meeting on April 5th.  The letter goes out on
9 April 5th from the board regarding the affiliation and
10 a vote of the majority of the members, and you don't
11 know from this exhibit here -- 1185 -- whether or not
12 Exhibit 1185 relates to Exhibit 1181 -- 1180?
13    A.  I don't know for sure.  You could draw that
14 inference, but I don't know for sure because I don't
15 have the attachment of this.
16    Q.  Did you disagree with anything that was being
17 said in 1181 to the members of the club in Aspen,
18 Colorado?
19       MR. SELLINGER:  1181?
20       MR. FERGUSON:  I'm sorry.  I keep getting
21    that wrong -- 1180.
22       MR. SELLINGER:  Did he?
23       MR. FERGUSON:  Yeah.
24    A.  I would disagree with the statement that it
25 be a majority vote of the members.

Page 208

1 BY MR. FERGUSON:
2    Q.  You disagree with this?
3    A.  I would disagree with that.
4    Q.  So Ms. Sobeck reports to Cindy Hodge, Eveleen
5 Babich, Lori Phillips, who is in charge of governance,
6 Mr. DiMeglio, who is the hotel manager, and Barbara
7 Egolf, who's in the legal department.
8       You would disagree with her telling all those
9 people and those executives that it had been approved
10 by Lee and myself?
11       MR. SELLINGER:  He's already testified he
12    doesn't have --
13       MR. FERGUSON:  An objection, sir?
14       MR. SELLINGER:  -- the attachment.
15    You're just mischaracterizing his testimony.
16       MR. FERGUSON:  I'm asking him questions,
17    Mr. Sellinger.  I'm sorry, but that's what
18    I'm doing.  You can object to form.
19 BY MR. FERGUSON:
20    Q.  You just don't know?
21    A.  I'm sorry?
22    Q.  You don't know?
23    A.  No.  I said I would object to that
24 communication.
25    Q.  From Sobeck to --

Page 209

53 (Pages 206 - 209)

Lee Cunningham - November 10, 2017

1     A. I would object to the communication that says
2   that it would require a vote of the majority of the
3   Aspen members.
4     Q. And you objected to it that day?
5     A. I don't recall that discussion that day.
6         THE VIDEOGRAPHER: We have six minutes
7     left.
8   BY MR. FERGUSON:
9     Q. If you look at the top of this document,
10  there's a fella named John Albert that received this
11  e-mail from Lori Phillips.
12    A. That's correct.
13    Q. Who is John Albert?
14    A. We talked about that earlier. He is a member
15  of the resort operations staff. Association
16  governance reports up through him.
17    Q. He's an MVW person, obviously?
18    A. We've established that all of them are MVW
19  people.
20    Q. I'm sorry. There's a lot of names and
21  they're in your life every day --
22    A. Fair enough.
23    Q. -- and I do forget. And at least with
24  respect to this e-mail chain -- and it has the
25  attachment -- we'll match them up some day. I guess I

Page 210

1   don't have it here.
2         But RA AF -- it says, "4/15/13 special letter
3   to members final." And she told -- Ms. Phillips told
4   Mr. Albert, "Hi John. Barbara's recommended edits
5   were not made to the final letter. Attached is the
6   letter approved by Barbara that was sent."
7         So there was another version of the letter
8   that was sent by Ms. -- that was approved by Barbara
9   Egoll in the MVW legal department? Do you know what's
10  going on there?
11    A. I do not know the answer to that -- whether
12  that was -- I don't know which -- once again, it's
13  missing the attachment of knowing whether that's this
14  letter or a different letter.
15    Q. Ms. Egoll is in the general counsel's office
16  here in Orlando?
17    A. That's correct.
18    Q. Is she someone that's in charge of -- is she
19  someone that's involved in the drafting of legal
20  documents?
21    A. Yes.
22    Q. As opposed to some lawyers that oversee
23  litigation and some lawyers are kind of more corporate
24  type?
25    A. She's more in charge of the management side

Page 211

1   of the business.
2         MR. SELLINGER: Let me make one
3     statement.
4         MR. FERGUSON: Sure.
5         MR. SELLINGER: As I'm looking at this
6     e-mail, I need to study this more carefully
7     as to the issue of attorney-client privilege.
8     But certainly to the extent there's
9     privileged information here -- I'm not
10    contending now there is -- but to the extent
11    there is, we will reserve our right to look
12    and to designate that as an inadvertent
13    production. There's certainly no intention
14    by producing the document or allowing any
15    testimony to waive the privilege.
16        MR. FERGUSON: We're probably up against
17    the wire there; right?
18        THE VIDEOGRAPHER: The time is 3:14.
19    That concludes media number four in the
20    deposition of Lee Cunningham.
21        (Brief recess.)
22        THE VIDEOGRAPHER: The time is 3:31.
23    This is media five in the deposition of Lee
24    Cunningham.
25        (Exhibit 1279A was marked for

Page 212

1     identification.)
2         MR. FERGUSON: One of the things we're
3     going to do is -- there's Exhibit 1279, which
4     is the black-and-white copy -- we're going to
5     call the color copy Exhibit 1279A. That's
6     the big, colored version that's slightly more
7     legible.
8   BY MR. FERGUSON:
9     Q. So, Mr. Cunningham, I'm going to show you
10  Exhibit 1176. This is also dated April 5th at
11  5:35 p.m. from Salt Lake, the same time zone as
12  Colorado. It's from RCDC SLC Leadership.
13        Would that be Ms. Babich, as far as you know,
14  or the team she leads?
15    A. Yes, I would think it would be.
16    Q. She says to the ladies and gentlemen --
17  that's a term of art that's used for the
18  Ritz-Carlton's employees? That's what you call them,
19  ladies and gentlemen?
20    A. That's correct.
21    Q. So the leadership team is sending to Forth,
22  Daley, Teresa Andrus. I take it those are people in
23  customer service in Salt Lake; right?
24    A. That's correct.
25    Q. And it says "Attachment," and it has the same

Page 213

54 (Pages 210 - 213)

Lee Cunningham - November 10, 2017

1 language -- "RA AF 4/5/13 Aspen board letter." So it
2 would appear that whatever that letter may be was sent
3 by leadership at Salt Lake to these three folks?
4 You're not sure what that letter is, but --
5    A. Yes.
6    Q. And she said, "A few hours ago, we received
7 the attached draft letter which is anticipated to go
8 out to each of our Aspen Club members from the club
9 board at Aspen today."
10    It says, "Marriott Vacation Worldwide has
11 agreed, together with the board of directors, that we
12 will not affiliate the Aspen Club and club members
13 with our Marriott Vacation Club Destination program
14 unless a majority of the members vote otherwise."
15    That's the same basic concept.
16    Is it your testimony, Mr. Cunningham, that
17 you're the only one who disagreed with what was going
18 out to the members from the board on this day?
19    MR. SELLINGER: Objection to form.
20    A. I don't know that I was the only one that
21 disagreed with what was going out, but I would have
22 disagreed.
23 BY MR. FERGUSON:
24    Q. So, obviously, Ms. Babich's group was not
25 disagreeing?

Page 214

1    MR. SELLINGER: Objection to form.
2    A. She was just reporting the news, reporting
3 what she had heard.
4 BY MR. FERGUSON:
5    Q. So she --
6    A. Ms. Babich would not have disagreed, I guess.
7    Q. And Ms. Egolf, we believe, had weighed in;
8 hadn't she?
9    A. I did not know whether she had weighed in at
10 this point.
11    Q. As you sit here today looking back on
12 April 5, 2013, when this was reported internally in
13 much the same manner as it was reported to the members
14 at my clients' club, is there anyone else that you
15 know that thought the letter that went out was
16 erroneous?
17    MR. SELLINGER: Objection to form.
18    A. I don't know how I would know that.
19 BY MR. FERGUSON:
20    Q. I mean, did you go, "Oh, my God, Stephanie.
21 This letter went out to the members, and Randy and
22 those guys messed up, Barbara messed up. We can't
23 send this out"?
24    Did you hear that kind of conversation?
25    A. No.

Page 215

1    Q. Did you go, "Oh, my God. This letter went
2 out"?
3    A. I don't recall whether it dawned on me that
4 it went out with the wrong language or not.
5    Q. It dawned on you, what, weeks later?
6    A. I don't know whether it did or not.
7    Q. And when you found this out that this wrong
8 letter had gone out from the board, you would agree
9 with me that's a fairly important promise made to the
10 members by the board after they met with you in Aspen,
11 Colorado?
12    MR. SELLINGER: Objection to form.
13    MR. FERGUSON: The word "important"?
14    MR. SELLINGER: Excuse me?
15    MR. FERGUSON: What are you objecting to?
16    MR. SELLINGER: Promise.
17 BY MR. FERGUSON:
18    Q. You don't believe that's a promise, sir?
19    A. It was a communication to them that they
20 should -- that they would have an expectation of.
21    Q. Do you recall at any time, Mr. Cunningham, as
22 the COO of Marriott Vacations Worldwide, and as
23 executive vice president, saying, "You need to recall
24 Randy Mercer's letter"?
25    A. I don't recall that.

Page 216

1    Q. Because it never happened, did it?
2    A. I don't believe so.
3    Q. Was there ever a letter that went out to the
4 members that said, "Listen, folks, we're so sorry. We
5 promised that we wouldn't affiliate unless there was a
6 vote of the majority members"? You said, "I'm so
7 sorry, but we're going to give you a survey instead"?
8    A. No. There was a communication for the
9 survey.
10    Q. About nine, ten months later in November or
11 December of 2013?
12    A. That's correct.
13    Q. And by that time, the folks that owned those
14 fractional units, including my clients, had no idea
15 what you had been doing with that communication over
16 that seven or eight months. They wouldn't have known?
17    MR. SELLINGER: With what communication?
18    A. I don't know what they knew or didn't know.
19 BY MR. FERGUSON:
20    Q. Do you recall that you all wanted to do this
21 vote in May of 2013?
22    A. We started the conversation back -- yes --
23 early.
24    Q. And it wasn't until November or December -- I
25 think you met with Randy Mercer again in November down

Page 217

55 (Pages 214 - 217)

Veritext Legal Solutions
866 299-5127

Lee Cunningham - November 10, 2017

1  here -- and a few weeks later in December -- I think
2  it was December 13th -- you sent out the survey;
3  right?
4      A.  We did send it out.  I believe it was in
5  December.
6      Q.  And all the communications that I've hauled
7  here down here from Aspen -- all these communications
8  that go back and forth between the association people
9  and internally at Marriott, the members weren't seeing
10  this stuff, were they?
11      A.  No; other than the members that were members
12  of the board.
13      Q.  When you communicated on December 13, 2013,
14  about ten months after this letter went out that you
15  would not have approved of, ten months later, did you
16  say, "Please, folks, recall the letter Randy Mercer
17  sent to you saying there would be a majority vote"?
18      A.  No.
19      Q.  Did you ever say, "Listen, by the way, what
20  we're giving you a survey on right now is not the vote
21  we had talked about.  We totally changed our mind and
22  we're giving you a survey"?  Did you ever communicate
23  like that?
24      A.  No.
25      Q.  Why not?

Page 218

1      A.  Didn't occur to us to do it that way.
2      Q.  Do you know how much the one-twelfth
3  fractional owners paid to the Ritz-Carlton Development
4  Company between 2001 and 2009 on fractional sales?
5      A.  I'm sorry?  How much --
6      Q.  Yeah.  I mean, say you had 120 or
7  13.4 percent of the stock left.  In 2009, I know it
8  stopped selling -- it stopped selling -- and you
9  stopped selling in 2012.
10      Do you know how much of it sold -- how many
11  tens of millions of dollars had been sold to my folks?
12      A.  I don't know what the -- I don't know off the
13  top of my head.
14      Q.  My clients, 200 of them, had bought 240
15  interests or whatever it is, adds up to about
16  $60 million in sales.  Some people got it cheap
17  because they got in a little bit later.
18      But do you think it's fair to tell them that
19  they're going to have a vote in April 2013, and not
20  tell them that you changed your mind in December of
21  2013?
22      MR. SELLINGER:  Well, hold on a minute.
23  You completely mischaracterized what was told
24  to them in December of '13.
25      MR. REISER:  Move to strike the

Page 219

1      objection.  Please, just object to the form
2  and stop coaching the witness, please.
3      MR. SELLINGER:  How about we have
4  comments from at least one lawyer at a
5  time --
6      (Multiple speakers.)
7      MR. REISER:  -- I'm going to ask the
8  judge not to have you coach these witnesses
9  anymore.  Just object to form.  In Colorado,
10  that's a law.
11  BY MR. FERGUSON:
12      Q.  Do you think it was fair to communicate in
13  that manner with the promise in April -- as you said,
14  an expectation in April 2013 -- do you think it was
15  fair not to tell them on December 13, 2013 that you
16  had changed your mind?
17      MR. SELLINGER:  Objection to form.
18      A.  We communicated what we thought was clearly
19  what the purpose of the survey was.
20  BY MR. FERGUSON:
21      Q.  Yeah, but you didn't tell them that there
22  wasn't a vote.  So how does a fellow that punched down
23  $600,000 know that the April 5th expectation that you
24  gave him was now being usurped by the survey?  How
25  does he know that, or she know that?

Page 220

1      A.  We were clear --
2  BY MR. FERGUSON:
3      Q.  How did you communicate that to them?
4      MR. SELLINGER:  Hold on a minute.  Read
5  that question back, please.
6      (The reporter read back the last
7  question.)
8      MR. SELLINGER:  Objection to form.
9      A.  We were -- like I previously said -- we --
10  our communication around the survey was clear as to
11  what the purpose of the survey was, which was
12  synonymous with the previously-communicated vote.
13  BY MR. FERGUSON:
14      Q.  You said it was synonymous?
15      A.  It was the same concept, that we wanted to
16  get their feedback on the affiliation.
17      Q.  Mr. Cunningham, in April, when your Salt Lake
18  team is pushing this e-mail around saying what they
19  announced, they're not using that word, that you want
20  to get their feelings about something.  You're saying
21  we're going to get your vote.
22      A.  I understand that.
23      MR. SELLINGER:  Objection to form.
24  BY MR. FERGUSON:
25      Q.  So you don't say, "How do you feel about

Page 221

56 (Pages 218 - 221)

Lee Cunningham - November 10, 2017

1 Senator So-and-so being reelected?" You say, "What's
2 your vote?" Right? Totally different concept. Would
3 you agree with that?
4    A. That's correct.
5    Q. Did you ever see comments that came back from
6 the owners in response to the letter that Randy Mercer
7 and his three other board members sent out?
8    A. I don't recall seeing any.
9    Q. Do you recall that people were actually happy
10 that they were being given the right to vote?
11    A. I don't recall that.
12    MR. FERGUSON: I have an SFO here. So he
13 wanted to pick up because the SFO
14 communications come at this point -- before I
15 move on.
16    MR. SELLINGER: We're done with this
17 subject?
18    MR. FERGUSON: We're done with the April
19 promise to -- yeah -- the expectation, I'll
20 use -- we're done with that part of it. What
21 happens next is in May.
22    MR. REISER: Well, no, I'm asking
23 questions about the entire vote process here.
24    MR. SELLINGER: Well, wait --
25    MR. REISER: I'm asking questions about

Page 222

1    MR. REISER: I disagree. I think we're
2 accommodating you to have all three of these
3 in one session, and we're trying to make it
4 work through the accommodations. I'm going
5 to ask my questions.
6    MR. SELLINGER: I'm not arguing. Hold on
7 a minute -- but I want to have an
8 understanding. Tell me the scope of what
9 you're covering, and then I'll know where
10 Matt is going, just so I know that we're not
11 going back and forth.
12    MR. REISER: We're not going back and
13 forth, but I'm going -- this is my first
14 time. Just let --
15    MR. SELLINGER: Tell me your scope.
16    MR. REISER: My scope is from where he
17 started last time to the present, you know,
18 on his second round. After I turned it back
19 over to him, whatever he covered to the
20 present and through the vote promise to the
21 other clubs -- the vote subject matter.
22 That's what I'm going to go through right
23 now.
24    I'm not going to recover ground that --
25 like, for instance, next time I get to

Page 224

1 the entire vote process, including Aspen.
2 There's two questioners allowed on the case
3 by the court's order, so I'm not going to
4 limit myself to --
5    MR. SELLINGER: Number one, I'm not sure
6 what court order you're referring to, but --
7    MR. REISER: You should be involved in
8 the case then --
9    MR. SELLINGER: No -- whether or not two
10 lawyers are entitled to ask questions does
11 not go to whether you can jump back and
12 forth.
13    MR. REISER: I'm not jumping back and
14 forth. I haven't asked one question about
15 the vote. I'm going back and I'm asking the
16 questions about the vote and I'm going to go
17 through all three clubs.
18    MR. SELLINGER: Okay. But wait a minute.
19 Wait a minute. I want to make sure that,
20 when we're switching from Matt to you, that
21 we're not going to then come back to the same
22 subject again and we're going back and forth.
23 That's what I'm worried about.
24    Because we're really accommodating you
25 guys, letting you go back and forth.

Page 223

1 question, I'm not going to go back and
2 recover ground that I covered here. This
3 time, I'm not going to go back and cover
4 ground that I covered last time. I'm not
5 going to retread what I've already covered.
6    This is my opportunity to ask about this
7 section of the timeline that involves all
8 three clubs. That's as simple as I can put
9 it.
10    MR. SELLINGER: Well, I'll go on the
11 record simply to say, I think we're making
12 extraordinary accommodations to allow
13 different counsel to keep going back and
14 forth with questions. We're doing that in an
15 effort to accommodate your desire to be
16 efficient going forward.
17    MR. REISER: I appreciate that. I
18 understand your perspective. I believe that
19 this is an attempt by us to be accommodating
20 of you guys and everybody by doing it as
21 quickly as we can across three cases.
22    The alternative would be to just let Matt
23 and me take the Aspen depo. Then come back
24 another day and take the San Francisco depo
25 myself. Then come back a third day and take

Page 225

57 (Pages 222 - 225)

Lee Cunningham - November 10, 2017

| | |
|---|---|
| 1 the Tahoe depo. | 1    A. Yes. |
| 2    So I think the accomodation goes to you. | 2    Q. Mike Marino? |
| 3 To the extent we're doing it a little usual | 3    A. That's correct. |
| 4 is because we're doing three cases at one | 4    Q. Who else? |
| 5 time and it necessitates it. | 5    A. Stephanie Sobeck and myself.  I don't know |
| 6    That's my feeling.  I'll try to do my | 6 that there was anyone else. |
| 7 best to be as efficient as possible. | 7    Q. Okay.  Tell me about the discussions during |
| 8    DIRECT EXAMINATION, Continued | 8 that meeting about a vote of the membership regarding |
| 9 BY MR. REISER: | 9 affiliation. |
| 10    Q. You were reminded of the cease and desist | 10    A. There was a discussion about getting a |
| 11 letter that was sent to you -- to your address and | 11 sentiment of the members.  Could have used the word |
| 12 you, yourself, as the addressee -- on November 21st, | 12 "vote," but to get the understanding of how the |
| 13 2012.  Correct? | 13 members felt about the affiliation. |
| 14    A. Yes. | 14    Q. So prior to this meeting, there had been a |
| 15    Q. And at that point in time, you knew that the | 15 promise made to Bachelor Gulch, not to -- at least to |
| 16 board at Aspen was against the affiliation between | 16 delay the affiliation for a while.  Correct? |
| 17 Marriott and Ritz.  True? | 17    MR. SELLINGER: Objection to form. |
| 18    A. They were against the use of the inventory | 18    A. Prior to which -- |
| 19 for Marriott Vacation Club customers. | 19 BY MR. REISER: |
| 20    Q. So how did it come about that you flew to | 20    Q. Prior to April 5, 2013. |
| 21 Aspen to meet with the board members on April 5, 2013? | 21    A. Yes.  There was -- after the evolution letter |
| 22    A. My recollection is that was an invitation | 22 and a discussion with Mr. Mullenix, we had agreed to |
| 23 extended by the board, probably through Randy Mercer. | 23 postpone an affiliation communication with the members |
| 24    Q. All right.  Did you ever have any contact | 24 at Bachelor Gulch. |
| 25 with anybody else on the board but Randy Mercer in | 25    Q. Okay.  Did you promise the Bachelor Gulch |
| Page 226 | Page 228 |

| | |
|---|---|
| 1 Aspen? | 1 membership either a vote or a survey on an |
| 2    A. At the board meeting, certainly. | 2 affiliation? |
| 3    Q. Before the board meeting? | 3    MR. SELLINGER: Objection to form. |
| 4    A. I'm trying to remember whether or not | 4    A. I don't recall promising the Bachelor Gulch |
| 5 Mr. Oliver, prior to that, but I don't recall. | 5 membership anything relative to a survey.  If I had a |
| 6    Q. Do you know Mike Marino? | 6 conversation, it would've been with -- probably with |
| 7    A. Yes. | 7 Mr. Mullenix. |
| 8    Q. How long have you known him? | 8 BY MR. REISER: |
| 9    A. I knew him -- I've known him since that board | 9    Q. So do you remember making a promise to any |
| 10 meeting.  That's the only time I've ever met or spoken | 10 other clubs that there would be a vote before any |
| 11 to Mr. Marino. | 11 affiliation? |
| 12    Q. I was told he was the counsel -- well, | 12    MR. SELLINGER: Objection to form. |
| 13 there's documents indicating he was counsel for the | 13    A. We may have discussed a vote with the other |
| 14 Aspen board during Randy Mercer's first term, which | 14 clubs.  And as I testified earlier, we subsequently |
| 15 lasted from 2005 to 2011. | 15 determined that a vote was the inappropriate |
| 16    You never met him in that time period? | 16 methodology and moved to the survey. |
| 17    A. No. | 17 BY MR. REISER: |
| 18    Q. So Randy Mercer was at the board meeting on | 18    Q. All right.  So I'm going to get to the |
| 19 April 5th; correct? | 19 subsequent decision to use the survey in a minute.  I |
| 20    A. Correct. | 20 want to see if you remember a period right around |
| 21    Q. Tyler Oliver? | 21 between April and May of 2013 where an enrollment for |
| 22    A. Yes. | 22 Lion & Crown was sent out that caused some controversy |
| 23    Q. Philip Schneider? | 23 among the members. |
| 24    A. Yes. | 24    Do you recall that? |
| 25    Q. Gerald Marsden? | 25    A. Are you talking about -- there was an |
| Page 227 | Page 229 |

58 (Pages 226 - 229)

Lee Cunningham - November 10, 2017

| | |
|---|---|
| 1 enrollment sent out that -- form that was sent out | 1 everybody or just Aspen. |
| 2 that created some concern about -- some of the wording | 2     MR. REISER:  All right.  Can I have |
| 3 created some concern.  And when we got that feedback, | 3 pulled up 1208? |
| 4 we made adjustments to the wording and reissued the | 4     MR. SELLINGER:  Do you have an exhibit |
| 5 form. | 5 for us? |
| 6     Q.  Okay.  What was the issue with the wording? | 6     MR. REISER:  No, I don't.  I think we're |
| 7     A.  I don't recall.  I think -- I know that there | 7 going to have to improvise here and read it |
| 8 was something that was -- I believe it was something | 8 on the board. |
| 9 that Ms. -- it could have been read and was read by | 9     MR. SELLINGER:  Is that the entire |
| 10 some of the members as -- that once they affiliated, | 10 document? |
| 11 they couldn't withdraw, and that wasn't the intention | 11     MR. REISER:  It's the entire document. |
| 12 of the language and that was part of the | 12     MR. SELLINGER:  Let's read it. |
| 13 clarification -- clarifying language.  I believe that | 13 BY MR. REISER: |
| 14 was one of the issues. | 14     Q.  Do you see -- |
| 15     Q.  Right.  And that was in relation to an | 15     MR. SELLINGER:  Hold on.  I'd like all of |
| 16 affiliation with -- not the Marriott Vacation Club, | 16 us to be able to read it. |
| 17 but with -- | 17     THE WITNESS:  I can't read it from here. |
| 18     A.  Lion & Crown, I believe. | 18 BY MR. REISER: |
| 19     Q.  -- the Lion & Crown affiliation.  But the | 19     Q.  You read the letter, Mr. Cunningham? |
| 20 affiliation with another club was what -- Exclusive | 20     A.  Yes. |
| 21 Resorts? | 21     Q.  Do you see in the letter there, the third |
| 22     A.  Exclusive Resorts -- | 22 paragraph from the bottom on the second page -- if you |
| 23     Q.  Or ThirdHome or both? | 23 can pull that out and highlight it -- it says, |
| 24     A.  I think it was Exclusive Resorts at that | 24 "Second, regarding other potential affiliations, we |
| 25 point in time. | 25 want to assure you that a Ritz-Carlton Club |
| Page 230 | Page 232 |

| | |
|---|---|
| 1     Q.  So at the same time that you were suggesting | 1 affiliation with the Marriott Vacation Club |
| 2 the Marriott affiliation, there was also an | 2 Destinations will not take place unless there's an |
| 3 affiliation with Exclusive Resorts; correct? | 3 affirmative vote of each club's membership." |
| 4     A.  That's correct. | 4     These are your words; correct? |
| 5     Q.  And in relation to that, you sent out a new | 5     A.  That's correct. |
| 6 enrollment agreement with Lion & Crown, so the folks | 6     Q.  And you wrote this letter? |
| 7 who wanted to affiliate with Exclusive Resorts could | 7     A.  I'm sure I had help. |
| 8 do so.  True? | 8     Q.  But that is your signature on the bottom of |
| 9     A.  That's true. | 9 the letter.  True? |
| 10     Q.  The controversy among the members was that | 10     A.  It is my signature on the bottom of the |
| 11 the language in the enrollment agreement in Lion & | 11 letter. |
| 12 Crown contained some language that could lead one to | 12     Q.  You meant, when you wrote this, that each |
| 13 believe that, if they enrolled in Lion & Crown, they | 13 club was going to have an affirmative vote of the |
| 14 gave up any right to vote against the wishes of a | 14 membership before the affiliation with the Marriott |
| 15 future affiliation of the program manager? | 15 Vacation Club would be allowed; did you not? |
| 16     A.  Sounds familiar.  That wasn't our intent. | 16     A.  I meant that there would be an affirmative |
| 17     Q.  That was not your intent, so you clarified | 17 vote, yes. |
| 18 it? | 18     Q.  Not a survey; a vote? |
| 19     A.  Corrected that. | 19     A.  As I said -- and I've said a couple times -- |
| 20     Q.  Okay.  And you sent out a letter to the | 20 we started with the conversation of vote; and, at some |
| 21 entire membership across all clubs clarifying that. | 21 point -- I'm not sure exactly what that point is -- |
| 22 True? | 22 that was -- we discovered that was an inappropriate |
| 23     A.  I think we went to the -- I don't know | 23 methodology.  It wasn't appropriate for a vote for |
| 24 whether it was just Aspen or everyone and I don't -- | 24 that.  That's when we switched to the survey to get an |
| 25 because I don't know -- I'm not sure whether it was | 25 affirmative -- |
| Page 231 | Page 233 |

59 (Pages 230 - 233)

Lee Cunningham - November 10, 2017

Page 234

1    Q.  Okay.  Does this influence at all -- or do
2  you want to change your response at all to the meaning
3  of the April 5th letter that was sent out to the Aspen
4  membership that promised a vote?  Would you agree that
5  that was the correct -- hold on -- that was the
6  correct -- the correct outcome of the meeting in
7  Aspen, that the decision was made to give the members
8  of the Aspen Club a vote as to whether to affiliate
9  with the Marriott Vacation Club?
10        MR. SELLINGER:  Objection to form.
11    A.  I'm not sure whether that was the outcome of
12  that meeting.  The part that I -- the primary part
13  that I would object to would've been the majority of
14  the members component.
15  BY MR. REISER:
16    Q.  Okay.  So you take issue with the April 5th
17  vote that there had to be a majority of the
18  membership?
19    A.  That is correct.
20    Q.  But you would agree that there would have to
21  be an affirmative vote of each club's membership
22  before there would be an affiliation?
23    A.  At that point in time, that is what we felt
24  was the right thing.
25    Q.  And earlier this morning -- or earlier this

Page 235

1  afternoon, just a few minutes ago, you did agree with
2  the concept that a vote is different than a survey.
3  True?
4    A.  I understand that a vote is different than a
5  survey.
6    Q.  And you agree that, even though this promise
7  was made of an affirmative vote in each club's
8  membership, you later changed your mind and decided
9  that the vote was not required; rather, a survey to
10  take the temperature of the membership was what was
11  required?
12        MR. SELLINGER:  Objection to form.
13    A.  We later, after review with counsel,
14  determined that a vote was the inappropriate forum, or
15  form, to gather the information and went with the
16  survey, and moved to the survey.
17  BY MR. REISER:
18    Q.  It's your testimony, Mr. Cunningham, that you
19  never informed any of the members that had been
20  promised a vote of the change in strategy to switch to
21  a survey?
22        MR. SELLINGER:  Objection to form.
23    A.  We certainly discussed it with the boards and
24  we then communicated the purpose of the survey so that
25  we felt that it was clear that this was the -- what

Page 236

1  was intended by the vote -- communication earlier.
2  BY MR. REISER:
3    Q.  Okay.  So you said something very important
4  there.  I want to delve into that a little bit.  You
5  said you discussed this change of -- change from a
6  vote to the survey with the boards.
7        That's what you just said; right?
8    A.  We told -- we certainly had the conversation
9  with them that it was going to be a survey and this is
10  how we were going to administer it and how the -- how
11  we would view the results of the survey.
12    Q.  And as far as you're aware, the Aspen board
13  never informed its membership that there was no longer
14  going to be a vote coming down from Orlando; it was
15  now going to be a survey?
16    A.  I'm not aware if they did.
17    Q.  And you're not aware of any communication to
18  the Tahoe members that there was no longer going to be
19  a vote, but, coming down from Orlando, there was now
20  going to be a survey.  You never saw to it that the
21  members were apprised of that?
22    A.  We did not have a -- we talked to the board.
23  We did not have a separate communication to the
24  members indicating that the -- a vote was now going to
25  be a survey.

Page 237

1    Q.  And on what basis did you determine that,
2  even though you promised a vote to the memberships,
3  you could unilaterally change your mind and utilize a
4  survey instead of a vote?
5        MR. SELLINGER:  Hold on.  One, objection
6  to form.  Number two, you can answer the
7  question if you can do so without disclosing
8  privileged conversations.  But, please, don't
9  disclose conversations with counsel.
10    A.  It was upon advice from my internal counsel.
11  BY MR. REISER:
12    Q.  So it was Marriott's counsel that you relied
13  on to switch the promise from a vote to a survey?
14        MR. SELLINGER:  Objection to form.
15    A.  It was Marriott's counsel that we changed
16  from -- the form of the information gathering from a
17  vote to a survey.
18  BY MR. REISER:
19    Q.  How did you communicate this new decision to
20  the board at Aspen?
21    A.  I don't know whether it was done via -- it
22  was most likely done via a conversation, a phone call
23  between Ms. Sobeck and the board or members of the
24  board.
25    Q.  Nothing in writing?

60 (Pages 234 - 237)

Lee Cunningham - November 10, 2017

1    A.  I don't recall.
2    Q.  Is there any written communications from
3  counsel of Marriott that communicates their legal
4  opinion that a vote was no longer -- was not required?
5    A.  Is there written communication -- internal
6  communication?
7    Q.  Is there written communication, yes, between
8  Marriott's counsel internally and yourself?
9    A.  I don't recall whether it was written or in a
10  discussion.
11    Q.  So you think you would have made this
12  decision just based on a discussion and without
13  anything in writing?
14    A.  With appropriate counsel, yes.
15    Q.  How did you communicate -- so as you sit here
16  today, you recollect no writings communicating the
17  decision to change from a promise vote to a promise
18  survey to the Aspen board?
19    MR. SELLINGER:  Objection to form.
20    MR. REISER:  What's the objection,
21    Philip?  Maybe I'll clean it up.
22    MR. SELLINGER:  Okay.  He's already
23    testified that the communications to the
24    members was very clear that it was a survey
25    and it couldn't have been misleading to
                                        Page 238

1  anybody --
2    MR. REISER:  That's your objection to
3    form?  Okay.  All right.  We'll let the judge
4    rule on that, on the depo cut to trial, and
5    we'll see how far that gets.
6  BY MR. REISER:
7    Q.  Can you go ahead --
8    A.  What's the question?
9    MR. REISER:  Can you read it back?
10    (The reporter read back the last
11    question.)
12    THE WITNESS:  I don't recall that there
13    was any written -- I don't recall a written
14    communication from me or -- to the board or
15    from anyone within The Ritz-Carlton
16    Destination Club to the board in Aspen,
17    notifying them or discussing with them the
18    change from a vote to a survey.
19  BY MR. REISER:
20    Q.  Okay.  Do you recollect any writing to any
21  board member at the San Francisco board, telling them
22  that there would no longer be a vote as promised in
23  the May 14th communication?
24    A.  I do not recall any written communication to
25  the San Francisco board.
                                        Page 239

1    Q.  And you don't recall any communications to
2  the Tahoe board, changing the promise of a vote and
3  then saying there was going to be a survey?
4    MR. SELLINGER:  Objection to form.
5    A.  I do not.
6  BY MR. REISER:
7    Q.  So I'm going to go through all three clubs
8  again.  In Aspen, what do you recollect, if anything,
9  about an oral communication where that decision was
10  communicated to the board?
11    A.  I don't recall a communication -- being part
12  of a communication to the Aspen board regarding the
13  change from a vote to a survey.  I'm certain that
14  conversation occurred between either Stephanie and the
15  board or Mary Lynn and the board, due to the fact that
16  they were involved in the cover letter for -- you
17  know -- we reviewed the cover letter for the survey
18  with the board.
19    MR. REISER:  Can you read that back?
20    (The reporter read back the last answer.)
21  BY MR. REISER:
22    Q.  Okay.  So it's your testimony that you
23  reviewed, personally, the cover letter with the board
24  in Aspen or that Stephanie Sobeck and Mary Lynn Clark
25  did?
                                        Page 240

1    A.  I don't recall reviewing the cover letter for
2  the survey with the board personally.
3    Q.  How do you know that Stephanie Sobeck or Mary
4  Lynn Clark were involved in that cover letter?
5    A.  I don't know for a fact.  I know that that
6  would've been part of their responsibilities.
7    Q.  So you don't really know how the
8  communication was made to the board as you sit here,
9  right -- in Aspen -- that there was no longer going to
10  be a vote?
11    A.  I don't know exactly how the conversation
12  occurred or how the -- whether it was in writing or
13  whether it was a verbal conversation or who the
14  participants were.
15    Q.  Are you aware of a series of redline drafts
16  going back and forth between Randy Mercer and the
17  Aspen board and folks at Marriott Vacation Club
18  wordsmithing that letter that you're referring to
19  where they described the survey?
20    A.  I recall seeing something to that effect.
21    Q.  You reviewed all that -- those redline
22  changes in preparation for today's depo, didn't you?
23    MR. SELLINGER:  Objection to form.
24    A.  I didn't review every one of them, no.
25  BY MR. REISER:
                                        Page 241

Lee Cunningham - November 10, 2017

1    Q.   But you reviewed some of them or what --
2    A.   I reviewed some of them, as I recall seeing
3  something related to a change in that letter.
4    Q.   And isn't it true that you changed the --
5  strike that.  Isn't it true that you made a decision
6  to change from a vote to a survey after the Bachelor
7  Gulch members overwhelmingly voted to terminate the
8  relationship with Marriott Vacation Club because they
9  didn't want to affiliate?
10   A.   I think the timing would be such that that
11  decision was changed after Bachelor Gulch made its
12  decision.
13   Q.   And you knew that none of the other boards
14  would -- I'm sorry -- none of the other memberships
15  would vote to affiliate, just like Bachelor Gulch
16  overwhelmingly refused to affiliate?
17   A.   I did not know that at all.
18   Q.   You knew that there was a survey taken by the
19  board in San Francisco, didn't you, that asked them
20  whether they wanted to affiliate, and 98 percent of
21  the folks came back and said no affiliation?
22   A.   I did not know that.
23   Q.   Okay.  I'll show you the document that is
24  addressed to you on that a little later in the depo.
25  Okay?

Page 242

1    Q.   And who prepares these?
2    A.   I don't recall preparing these.  I don't know
3  who --
4    Q.   Who within your organization at Marriott
5  Vacation Club prepares these to update Marriott
6  International?
7    A.   It would've been probably Stephanie or Mary
8  Lynn.
9    Q.   And they work for you; right?
10   A.   That's correct.
11   Q.   And they report to you what's going on at
12  each club, don't they, in terms of this affiliation --
13  the ongoing attempts to affiliate?
14   A.   Yes.
15   Q.   And how often did they report to you on the
16  ongoing efforts to affiliate the different clubs?
17   A.   Probably every couple of weeks.
18   Q.   So they kept you well-informed about the
19  status of the affiliations at each club.  Fair?
20   A.   Yeah.  On an every-couple-week basis, yes.
21      MR. REISER:  If you turn to page 2 of
22  this document?  I'd like you to, if you can,
23  highlight the second bullet point all the way
24  through "the Aspen Club."  Highlight that
25  bullet out.

Page 244

1    A.   Great.
2    Q.   So it's your testimony that you have no
3  communication from the board in San Francisco that
4  they did their own survey and that they wanted nothing
5  to do with the affiliation by about a nine-to-one
6  margin?
7    A.   I don't recall that.
8    Q.   Is it true that you changed the decision to
9  hold a vote after you saw that Bachelor Gulch
10  overwhelmingly voted down the affiliation?
11   A.   The timing is such, but that is -- you're
12  trying to draw a causation between the two, and that's
13  not -- that wasn't the case.
14   Q.   What was the case?
15   A.   As I said, we reviewed with internal counsel
16  and the advice was that a vote was the inappropriate
17  format for collecting this information and that a
18  survey was the appropriate format.
19      MR. REISER:  Can you pull up 1229,
20  please?
21  BY MR. REISER:
22   Q.   So this is another one of those Marriott
23  Vacation Worldwide updates to Marriott International
24  on May 29, 2013.  True?
25   A.   That's what it says.

Page 243

1  BY MR. REISER:
2    Q.   It says, "We are working with each of the
3  association boards to coordinate a vote of the
4  membership to affiliate their club with the Marriott
5  Vacation Club program."  Stop there.
6       That's true; right?  Marriott Vacation Club
7  International -- strike that.  Marriott Vacation
8  Worldwide Corporation was working with each
9  association's board to coordinate a vote of the
10  membership to affiliate their club with the Marriott
11  Vacation Club program.  True statement?
12      MR. SELLINGER:  Objection --
13  BY MR. REISER:
14   Q.   As of May 29, 2013?
15      MR. SELLINGER:  Objection to form.
16   A.   As of May -- as of that date, we were still
17  contemplating a vote.
18  BY MR. REISER:
19   Q.   That's not my question.  My question was,
20  were you working -- was Marriott Vacation Worldwide
21  Corporation working with the association boards to
22  coordinate a vote of their membership to affiliate
23  their club with the Marriott Vacation Club program?
24   A.   Yes.
25   Q.   The next sentence reads, "To date, only one

Page 245

62 (Pages 242 - 245)

Lee Cunningham - November 10, 2017

1   club has taken a vote, Bachelor Gulch, and they have
2   chosen not to affiliate with the Marriott Vacation
3   Club."
4        You knew that as of May 29th, didn't you,
5   that Bachelor Gulch had voted not to affiliate?
6   A.  Yes.
7   Q.  Okay.  Then you say, "Each of the clubs" --
8   or this memo to Marriott International, who you're
9   paying $50 million to in licensing fees a year, plus
10  incremental fees, you state, "Each of the clubs have
11  unique circumstances that will have an influence on
12  the outcome of this vote."
13       As you sit here today, can you tell me any of
14  the unique circumstances of any of the clubs?
15       MR. SELLINGER:  Let me just object to the
16  form.  Go ahead.
17  A.  Yes.  I think I mentioned earlier, several of
18  the clubs, we knew that we were going to be putting
19  developer-owned inventory into the Marriott Vacation
20  Club Destination Trust, which would affiliate
21  them with the -- would allow Marriott Vacation Club
22  Destinations owners to come stay at those clubs;
23  and, therefore, we wanted to make the reciprocal
24  available to the fractional members, so that it wasn't
25  a one-way access to each of those clubs.

Page 246

1   BY MR. REISER:
2   Q.  What was the unique situation at Aspen that
3   could influence the vote?
4   A.  The unique situation at Aspen was that -- it
5   was unique because it was different from Vail and
6   Northstar and San Francisco, where the inventory could
7   go into -- the developer inventory could go into the
8   Marriott Vacation Club Trust in Aspen.  We had come to
9   the conclusion that that inventory could not without a
10  change to the governing documents.
11       In St. Thomas, it was a similar situation.
12  St. Thomas had chosen to go get approval from their
13  members to change those governing documents.
14  Q.  So the next line down, it says "Aspen."  You
15  talk about the Aspen Club there.  It says you're
16  working with the board on language used to call for
17  the vote.  It will be difficult to gain member
18  support.
19       You knew that by May 29, 2013, that it was
20  going to be difficult to get member support for the
21  affiliation.  True?
22  A.  At that point, that was our assessment.
23  Q.  Right.  I think that would've been pretty
24  obvious from the cease-and-desist letter you got about
25  six months earlier.  Yeah?

Page 247

1        MR. SELLINGER:  Objection to form.
2   A.  Is there a question?
3   BY MR. REISER:
4   Q.  Yeah.
5   A.  What's the question?
6   Q.  It would've been pretty obvious from the
7   cease-and-desist letter that you were going to have
8   difficulty getting the affiliation?
9   A.  That wasn't related -- I don't think the
10  cease-and-desist was related to affiliation, as much
11  as it was related to the use of the inventory for
12  preview packages.
13  Q.  Okay.  So how did you become aware that the
14  affiliation was going to be difficult -- the vote on
15  the affiliation was going to be difficult to obtain?
16  A.  From feedback -- our normal feedback sources
17  of member surveys, discussions with the board.
18  Q.  So I want to ask you something about member
19  feedback for a minute.
20       You're aware that, after the April 5, 2013
21  letter went out, there was member feedback from the
22  Aspen members regarding the promise of a vote; are you
23  not?
24       MR. SELLINGER:  Objection to form.
25  A.  Feedback from those members to us or to --

Page 248

1   BY MR. REISER:
2   Q.  To the board that was forwarded to you for
3   your review.
4   A.  Okay.
5   Q.  You're aware of the overwhelming positive
6   response that the members felt they were going to get
7   a vote because that was sent to you?
8   A.  Okay.
9   Q.  True?
10  A.  Yes.
11  Q.  Okay.  And you knew that it was going to be
12  difficult for members to -- strike that.  You knew
13  that it was going to be difficult for Marriott
14  Vacation Worldwide Corporation to get a vote of the
15  Aspen members to affiliate by May 29, 2013 as well.
16  True?
17       MR. SELLINGER:  Objection to form.
18  A.  At that time, that was, as documented here --
19  would've been our sentiment, yes -- our belief.
20  BY MR. REISER:
21  Q.  Okay.  And isn't it true, Mr. Cunningham, the
22  reason you switched from a vote to a survey was
23  because you knew you weren't going to get a vote from
24  the Aspen members and you wanted to affiliate anyway?
25  A.  No.

Page 249

63 (Pages 246 - 249)

Lee Cunningham - November 10, 2017

| | |
|---|---|
| 1 Q. What was the reason for changing to the<br>2 survey?<br>3 A. I think I've covered this ground. Upon<br>4 advice from counsel, they said -- informed us that a<br>5 vote was the appropriate form for this type of<br>6 communication, and that's when we chose to go with the<br>7 survey.<br>8 MR. REISER: So, Philip, are you relying<br>9 on advice of counsel on this point or are you<br>10 going to waive the privilege? He's relying<br>11 on advice of counsel for the decision.<br>12 MR. SELLINGER: We're not relying on the<br>13 advice of counsel. We're not putting the<br>14 advice of counsel at issue.<br>15 You asked the witness a question and he<br>16 answered the question factually, that they<br>17 took the position of advice of counsel.<br>18 What we're relying on are the agreements,<br>19 which give unfettered discretion to Cobalt to<br>20 affiliate without regard to anything else.<br>21 So the witness has testified to the facts<br>22 you're asking, but there is no advice of<br>23 counsel defense.<br>24 BY MR. REISER:<br>25 Q. So is this a communication from Cobalt to<br><div align="right">Page 250</div> | 1 capacity with Cobalt.<br>2 BY MR. REISER:<br>3 Q. So Juan Pablo Cappello put you on notice of<br>4 the conflict that the Marriott Vacation Club --<br>5 Marriott Vacation Worldwide was seeking this<br>6 affiliation because it would allow Marriott Vacation<br>7 Worldwide to sell more memberships.<br>8 Do you remember that letter?<br>9 MR. SELLINGER: Objection to form.<br>10 A. We looked at it earlier, yes.<br>11 BY MR. REISER:<br>12 Q. And did you believe you had a conflict of<br>13 interest -- Marriott Vacations had a conflict of<br>14 interest in this situation?<br>15 A. No.<br>16 Q. Do you believe it was perfectly appropriate,<br>17 Mr. Cunningham, for you, as the COO and executive vice<br>18 president of Marriott Vacation Club on the one hand,<br>19 and the executive vice president of Cobalt on the<br>20 other hand, to make a decision on behalf of Cobalt,<br>21 even though the decision of Cobalt to affiliate the<br>22 Marriott Vacation Club with the Ritz would benefit<br>23 Marriott Vacation Club?<br>24 MR. SELLINGER: Objection to form.<br>25 A. There wasn't a benefit to Marriott Vacation<br><div align="right">Page 252</div> |
| 1 Marriott International or is it a communication from<br>2 Marriott Vacations Worldwide Corporation?<br>3 A. I believe it would be from Marriott<br>4 Worldwide -- Marriott Vacations Worldwide.<br>5 BY MR. REISER:<br>6 Q. And your counsel just testified that he<br>7 thought it was the exclusive discretion of Cobalt, the<br>8 decision on whether to affiliate. True?<br>9 A. That is correct.<br>10 Q. And that's your position?<br>11 A. Yes.<br>12 Q. Do you think it was appropriate for Marriott<br>13 Vacation Worldwide to try to influence that decision<br>14 of Cobalt?<br>15 A. They -- I'm sorry? They're influencing the<br>16 decision of Cobalt how?<br>17 Q. Because they're getting advice from counsel<br>18 about whether there should be a vote.<br>19 MR. SELLINGER: Objection to form.<br>20 What's the question?<br>21 A. I got advice -- I got advice from counsel<br>22 related to whether -- when we were going to seek this<br>23 information -- or going to seek feedback from the<br>24 owners -- whether a vote was appropriate or a survey<br>25 was appropriate. At that point, I was acting in my<br><div align="right">Page 251</div> | 1 Club of the affiliation.<br>2 BY MR. REISER:<br>3 Q. Are you aware that Marriott Vacation Club<br>4 sales folks have consistently sold access to the Ritz<br>5 Club at a cheaper entry point and for minimum dues in<br>6 order to sell Marriott Vacation Club memberships?<br>7 MR. SELLINGER: Objection to form.<br>8 A. I am not.<br>9 MR. REISER: If you could expand the<br>10 exhibit up on the board down to the Northstar<br>11 and San Francisco Clubs?<br>12 BY MR. REISER:<br>13 Q. So in the Northstar Club, it was stated to<br>14 Marriott International that the plan to affiliate with<br>15 the -- strike that. I'm going to ask you -- are you<br>16 writing this -- strike that. Strike the question.<br>17 Let's start over.<br>18 Do you see there that it says that the<br>19 Northstar vote is on hold until the results in Vail<br>20 are seen?<br>21 A. Yes.<br>22 Q. Why were you waiting to get the results in<br>23 Vail in before you had a vote in Northstar?<br>24 A. Just from a timing standpoint to understand<br>25 that -- their feedback.<br><div align="right">Page 253</div> |

<div align="right">64 (Pages 250 - 253)</div>

Lee Cunningham - November 10, 2017

| | |
|---|---|
| 1   Q. So you remember, as you sit here today, that<br>2 that was the reason?<br>3   A. Yes.<br>4   Q. So you were involved in preparing this<br>5 memorandum to the Marriott International.  Is that<br>6 true?<br>7   A. I'm aware that that would've been our plan --<br>8 would be to go through these one at a time and<br>9 understand the results from one or the other.  Whether<br>10 I was involved in -- I'm sure I reviewed this<br>11 document.  Did I develop it?  I don't recall<br>12 developing this document.<br>13   Q. 1236.  I want to ask you about the top part<br>14 of this.<br>15     MR. REISER:  Could you pull out the top<br>16     e-mail?  Actually, strike that.  Pull up the<br>17     middle from myjerry to Stephanie Sobeck.<br>18 BY MR. REISER:<br>19   Q. June of 2013 was the time period during which<br>20 the series of wordsmithing was going on in terms of<br>21 the letter to the members on the vote.  True?<br>22   A. It started then, yes.<br>23   Q. And the e-mail from one of the board members,<br>24 Jerry Marsden to Stephanie Sobeck, states, "I believe<br>25 the frequently asked questions" -- let me stop there.<br><div align="right">Page 254</div> | 1   Q. Okay.  And then he goes on to state, "Also,<br>2 we decided we are having a vote, not a survey."<br>3     Do you see that?<br>4   A. I see that.<br>5   Q. So he's writing to Stephanie Sobeck saying<br>6 that we're having a vote, not a survey, at this point<br>7 in time; right?<br>8   A. That's what he says, yes.<br>9     MR. REISER:  If you could pull up the top<br>10     response of Stephanie Sobeck, the second<br>11     paragraph starting with "I would think."<br>12 BY MR. REISER:<br>13   Q. So Stephanie Sobeck, who works for you -- and<br>14 what's her position again?<br>15   A. She's vice president of asset management.<br>16   Q. All right.  She reports to you?<br>17   A. Yes.<br>18   Q. She says, "I think we would have voting open<br>19 for two, three weeks, with the ability to extend, if<br>20 needed, after discussions with the board.  I.e., if we<br>21 hear from 48 percent of the members that they want to<br>22 affiliate, and we put a little more time into getting<br>23 the vote."<br>24     Is it true that Marriott felt that they had<br>25 the discretion to hold the voting open as long as they<br><div align="right">Page 256</div> |
| 1     Do you remember some frequently asked<br>2 questions being drafted that would explain what was<br>3 going on to the members?<br>4   A. Yes.<br>5   Q. Do you remember whether those were ever sent<br>6 to the members?<br>7   A. I don't recall.<br>8   Q. So Mr. Marsden goes on to state that "I<br>9 believe the frequently asked questions should be<br>10 separated from the letter, but the letter should state<br>11 that they are coming and that they will also be found<br>12 online.  And it also should be made clear that the<br>13 frequently asked questions were prepared by<br>14 Marriott/Ritz as to the open dates on voting" --<br>15     MR. SELLINGER: I'm sorry.  Just tell me<br>16     where you're reading from.<br>17     THE WITNESS:  All caps.<br>18 BY MR. REISER:<br>19   Q. Is it true that the communication to the<br>20 members regarding the vote were prepared by<br>21 Marriott/Ritz?<br>22   A. Prepared by our company through -- by -- I'm<br>23 sure it was a collaboration between Stephanie and the<br>24 association governance, Morrow, the boards, and our<br>25 internal counsel.<br><div align="right">Page 255</div> | 1 needed to in order to get a positive response from the<br>2 board members?<br>3   A. No.  I don't think that's what this says.<br>4   Q. What do you think she means by "I.e., if we<br>5 hear from 48 percent of the members that they want to<br>6 affiliate and we put a little more time into getting<br>7 the vote"?<br>8     MR. SELLINGER:  Objection to form.  If<br>9     you know, you can answer, but don't<br>10     speculate.<br>11   A. I don't know what exactly she's referring to.<br>12 At this time, we're still considering a vote.  There<br>13 are a number of things -- the things that are -- that<br>14 do go out for vote of the membership generally have a<br>15 designated timeline for the vote.  That timeline can<br>16 be extended by the -- by a vote of the board.  So<br>17 that's what this is referring to.<br>18 BY MR. REISER:<br>19   Q. So if you're not getting the result you want,<br>20 just keep it open a couple more weeks until you get<br>21 the result you want.  Is that the concept?<br>22     MR. SELLINGER:  Objection to form.<br>23   A. It generally is because you haven't gotten<br>24 the response level that you're looking for.<br>25 BY MR. REISER:<br><div align="right">Page 257</div> |

<div align="right">65 (Pages 254 - 257)</div>

Lee Cunningham - November 10, 2017

1    Q.  What's the response level that you're
2  typically looking for in these votes?
3    A.  It depends on what the particular issue is.
4    Q.  Did you think you had the authority to hold
5  open the survey for a longer time in order to get the
6  proper number of people that would want to --
7    A.  To respond, yes.
8    Q.  So you felt that this survey could be held
9  open as long as Marriott Vacation Club wanted it?
10   A.  Not indefinitely.  But, as a survey, yes, it
11  could be held open.  It could be communicated that
12  it's going to close here.  If it's held open longer,
13  there will be a subsequent communication that says,
14  "The survey will be extended.  Please respond."
15   Q.  Okay.  Ms. Sobeck ends by saying -- this is
16  by June 4, 2013 -- "If there was a vote that the Aspen
17  members wanted no affiliation with the Marriott
18  Vacation Club system, we would simply not allow
19  Marriott Vacation owners to utilize any Aspen members'
20  inventory that had been deposited into Lion & Crown."
21    As of June 4, 2013, it was still the thinking
22  of Marriott Vacation Club that, unless a majority of
23  the voters wanted to affiliate, and they voted to want
24  to affiliate, that there would be no affiliation.
25  True?
                                            Page 258

1    MR. SELLINGER:  Read that question back.
2    THE REPORTER:  I'm going to play it back.
3    (The last question's audio was played
4  back.)
5    MR. SELLINGER:  Objection to form.
6    A.  At this point, there was a -- it was still
7  obviously contemplated that it would be a vote.  1
8  don't know that it would be a majority-of-the-members
9  vote or the point of communication here.
10  BY MR. REISER:
11    Q.  You saw an e-mail earlier today from Eeveleen
12  Babich in relation to the San Francisco vote, and she
13  was writing one of her colleagues, saying that, as in
14  Aspen, the survey is not something -- I'm
15  paraphrasing -- but, as in Aspen, the survey is not
16  determinative as to whether the affiliation would
17  happen, because the affiliation is going forward
18  regardless of the survey.
19    Do you remember that letter?
20    A.  I remember that.  I don't know how accurate
21  your paraphrase is.
22    Q.  Was that true, that no matter what the survey
23  said, there was going to be an affiliation of Aspen
24  and San Francisco?
25    A.  Well, there were going to be -- I don't know
                                            Page 259

1  that there would be an affiliation in San Francisco.
2  We certainly would have the authority or the right to
3  do that.
4    But the issue in San Francisco, as I
5  mentioned earlier, is that you were going to have
6  Marriott Vacation Club Destinations owners coming into
7  San Francisco because there would be San Francisco
8  inventory in the Marriott Vacation Club Destinations
9  Trust.
10   Q.  Right.  And I'm not asking about that.  I'm
11  asking about the affiliation.
12   A.  Okay.
13   Q.  Is it true that the affiliation would've
14  happened regardless of the survey results in both
15  Aspen and San Francisco, as stated by Eveleen Babich
16  in the exhibit we saw earlier today?
17   A.  I can't comment to whether that was the state
18  of mind at that point in time.  I don't know where she
19  got that impression.
20   Q.  Was that your impression?
21   A.  No.
22   Q.  So you thought that there would have to be
23  some kind of positive survey results to affiliate?
24   A.  If we got affirmative survey results, we were
25  going to move forward.  If we didn't, then we would
                                            Page 260

1  regroup and try to figure out what the next plan would
2  be or what should be done and -- you know -- including
3  and up to not affiliating.
4    Q.  Did you ever see a letter from Jay Neveloff
5  saying that the survey that was given to the Aspen
6  members was so one-sided in discussing the benefits of
7  the affiliation that it could not be used to rely as a
8  reliance document for the decision to affiliate?
9    A.  I don't recall.
10   Q.  Let me show you the next exhibit, 1235.  So
11  you see the cover letter here?  This is from Randy
12  Mercer to Stephanie Sobeck.  And it says, "Stephanie,
13  as promised, attached is the revised letter to
14  members.  If you make any changes to this, we would
15  appreciate a redline before sending."  And it's
16  enclosing a letter -- proposed letter to the Aspen
17  members.
18   A.  Yes.
19   Q.  Do you see on the second paragraph from the
20  bottom of the first page of the letter, it says, "RCDC
21  executive leadership and board of directors in Aspen
22  have agreed that they will allow members of Aspen the
23  chance to indicate their thoughts before any final
24  decisions regarding affiliation are made."
25    "If the majority, 50 percent plus one, of the
                                            Page 261

66 (Pages 258 - 261)

Lee Cunningham - November 10, 2017

1 Aspen members, not including Marriott-owned units,
2 respond affirmatively that they want members of the
3 Ritz-Carlton Club in Aspen to have the ability to
4 voluntarily access the Marriott Vacation Club in
5 Aspen, we will move forward to provide the opportunity
6 to all members on an individual basis."
7        "If we do not hear affirmatively back from a
8 majority of the Aspen membership, then this exchange
9 option will not be made available to the Aspen
10 members."
11        That sounds like a vote to me.  True?
12        MR. SELLINGER:  Objection to form.
13        A.  That sounds like that's what Mr. Mercer was
14 suggesting, that it would be a vote.
15 BY MR. REISER:
16        Q.  Okay.  And that's exactly what you told the
17 members on April 5th, 2013, that there would be a vote
18 of the majority membership.  True?
19        MR. SELLINGER:  Objection to form.
20        A.  Are you referring to the letter from the
21 Aspen board?
22 BY MR. REISER:
23        Q.  Yeah.  That was approved by you and Stephanie
24 Sobeck in Aspen, as evidenced by the exhibits in this
25 case.

Page 262

1        MR. SELLINGER:  Objection to form.
2        A.  Except that we don't -- we're making an
3 assumption that that letter is the attachment that was
4 referred to.
5 BY MR. REISER:
6        Q.  It is.  That will be obvious to the jury.
7        A.  So that was what Mr. Mercer sent forward as a
8 draft back in June of 2013.
9        Q.  All right.  So as of June 2013, at least the
10 Aspen board was insisting that there be a majority
11 vote, as set forth in the letter that it wrote in
12 reliance upon your agreement and Ms. Sobeck's
13 agreement in Aspen in April 5, 2013.  It was his
14 impression that both the executive board of Marriott
15 Vacation Club and the board of directors were going to
16 give a vote of the majority -- strike that.
17        MR. SELLINGER:  Thank you.  Slightly
18 compound.
19        MR. REISER:  I'm going to put a
20 peremptory objection.  That was a good one.
21 I will admit it would've been a good one.
22 BY MR. REISER:
23        Q.  You would agree that the -- well, strike
24 that.  Have you testified to everything you recollect
25 between -- strike that.

Page 263

1        Have you testified about all conversations
2 you can recollect, as you sit here right now, between
3 yourself and the Aspen board members about changing
4 from a vote to a survey?
5        MR. SELLINGER:  Objection to form.
6        A.  I don't recollect a survey -- a discussion
7 between myself and the Bachelor Gulch board regarding
8 the change from a vote to a survey.
9 BY MR. REISER:
10        Q.  I think you misspoke.  You said "Bachelor
11 Gulch."
12        A.  I'm sorry.  Yes, from Aspen.
13        Q.  So you don't remember any conversations with
14 Aspen?
15        A.  I don't remember personally having a
16 conversation with the members of the board of Aspen.
17        Q.  And the same question for the members of the
18 board in Tahoe.
19        A.  No.
20        Q.  No conversations that you can recollect about
21 the change from a vote to a survey; right?
22        MR. SELLINGER:  That he had?
23 BY MR. REISER:
24        Q.  That you had.
25        A.  I did not have that conversation.

Page 264

1        Q.  And you had no conversations with the board
2 members at San Francisco on the subject of changing
3 from a vote to a survey?
4        A.  No.
5        Q.  And your testimony is that the reason it was
6 changed from a vote to the survey is because, based
7 upon conversations you had with legal counsel, the
8 Marriott Vacation Club, in your opinion, or in legal
9 counsel's opinion, did not have to give a vote.  True?
10        MR. SELLINGER:  Just because I don't want
11        to get into a privilege waiver, part of your
12        question asked about the opinion of counsel,
13        which creates a problem.
14        You can ask the same thing, just his
15        opinion based on conversations with counsel,
16        I don't think that implicates privilege and
17        is cleaner.
18        There's no intention to waive privilege.
19        MR. REISER:  There's no intention to
20        waive privilege and you're not waiving it
21        with the question as asked.  I'll just ask
22        her to read back the question because I'm not
23        good at follow-up questions.
24        MR. SELLINGER:  No.  Hold on -- just to
25        clean it up.  Your understanding after

Page 265

67 (Pages 262 - 265)

Lee Cunningham - November 10, 2017

1  counsel -- after you spoke to counsel -- you
2  can answer.
3      MR. REISER:  Can I just have you read it
4  back for the record?
5      (The reporter read back the last
6  question.)
7      THE WITNESS:  Based on conversations with
8  my internal counsel, we came to the
9  conclusion that we did not -- that a vote was
10  an inappropriate vehicle to gather the
11  information that was desired, and that's when
12  we switched to the survey.
13  BY MR. REISER:
14      Q.  You used the word "inappropriate."  That
15  sounds like something -- non-legal advice.  I'm trying
16  to -- did they say -- was it the opinion of Marriott's
17  counsel that --
18      MR. SELLINGER:  Don't answer that.
19      MR. REISER:  Strike that.
20      MR. SELLINGER:  Wait for a question.
21  BY MR. REISER:
22      Q.  Let me follow up with this.  Other than --
23  other than the notion that the vote was not an
24  appropriate means of determining the issue of
25  affiliation, were there any other reasons for not

Page 266

1  Under penalties of perjury, I declare that I have read
2  the foregoing document and that the facts stated in it
3  are true.
4
5  _____
6  DATE            LEE CUNNINGHAM
7
8  Subscribed and sworn before me this _____ day of
9  _____, 2017.
10
11
12
13  State of Florida  )
14  County of          )
15
16
17        NOTARY PUBLIC
18
19
20
21
22
23
24
25

Page 268

1  giving a vote?
2      A.  No.
3      Q.  And why was it inappropriate to hold a vote
4  on the issue of affiliation?
5      A.  There are only certain actions that require
6  or are appropriate for a vote of the members related
7  to a project or an affiliation or a -- not even an
8  affiliation -- the management agreement and so forth.
9  There's limited things that require or are appropriate
10  for a vote of the members.
11      THE VIDEOGRAPHER:  Counsel, we have five
12  minutes left on this video.
13      MR. REISER:  Why don't we just take a
14  break?
15      THE VIDEOGRAPHER:  The time is 4:44.
16  That concludes disc five in the deposition of
17  Lee Cunningham.
18      (Brief recess.)
19      MR. REISER:  Just for the record, today's
20  deposition of Mr. Lee Cunningham is going to
21  be continued and finished, hopefully,
22  starting Wednesday at 2:00.
23      (The reading and signing of the
24  transcript were not waived, and proceedings
25  concluded for the day at 5:05 p.m.)

Page 267

1        CERTIFICATE OF REPORTER
2
3  STATE OF FLORIDA
4  COUNTY OF ORANGE
5
6      I, Lisa Gerlach, Court Reporter, do hereby
7  certify that I was authorized to and did
8  stenographically report the foregoing deposition; and
9  that the transcript is a true and correct
10  transcription of the testimony given by the witness.
11      I further certify that I am not a relative,
12  employee, attorney or counsel of any of the parties,
13  nor am I a relative or employee of any of the parties'
14  attorney or counsel connected with the action, nor am
15  I financially interested in the action.
16      Dated this 18th day of November, 2017.
17
18
19
20
21
22
23
24
25      Lisa Gerlach, Court Reporter

Page 269

68 (Pages 266 - 269)