# EXHIBIT - G

RCHFU, LLC, et al.,
Plaintiffs, United States District Court District of Colorado No. 1:16-cv-01301 PAB-GPG
v.
MARRIOTT VACATIONS WORLDWIDE CORPORATION, et al.,

Defendants,
_______________________________/
REISER, et al.,

Plaintiffs, Eastern District of California
v. No. 2:16-cv-00237-MCE-CKD
MARRIOTT VACATIONS WORLDWIDE CORPORATION, et al,

Defendants,
_______________________________/
PETRICK, et al.,

Plaintiffs,
San Francisco County
vs. No. CGC-15-54897

MARRIOTT VACATION WORLDWIDE CORPORATION, et al.,
Defendants.
_______________________________/

VIDEOTAPED DEPOSITION OF STEPHANIE SOBECK
May 15, 2018
Tuesday, 9:25 a.m.-4:52 p.m.

Job No. 2911163
Pages 1 - 275

Taken on Behalf of the Plaintiffs before Lisa Gerlach, Court Reporter, Notary Public in and for the State of Florida at Large, pursuant to Plaintiffs' Notice of Taking Deposition in the above cause.

Appearances:

Counsel for the Plaintiffs:

MATTHEW C. FERGUSON, ESQUIRE
The Matthew C. Ferguson Law Firm, PC
119 South Spring, Suite 201
Aspen, CO 81611
970-925-6288
matt@matthewfergusonlaw.com

MICHAEL S. REISER, SR., ESQUIRE
MICHAEL S. REISER, JR.
MATTHEW REISER, ESQUIRE, by speakerphone
Reiser Law, PC
1475 Broadway, Suite 300
Walnut Creek, CA 94596
michael@reiserlaw.com
matthew@reiserlaw.com

TYLER MEADE, ESQUIRE
The Meade Firm
1816 Fifth Street
Berkeley, CA 94710
510-843-3670
tyler@meadefirm.com

Appearances:

For the Defendant Marriott:

PHILIP SELLINGER, ESQUIRE
Greenberg Traurig, LLP
500 Campus Drive, Suite 400
Florham Park, NJ 07932-0677
sellingerp@gtlaw.com
marxi@gtlaw.co

DOUGLAS A. KELLY, ESQUIRE
KIM GRAY, ESQUIRE
Marriott Vacations Worldwide
6649 Westwood Boulevard
Orlando, FL 32821

For the Defendant Aspen Highlands Condominium Association, by speakerphone:

JESSICA BLACK LIVINGSTON, ESQUIRE
Hogan Lovells
1601 Wewatta Street, Suite 900
Denver, CO 80202
303-899-7300
jessica.livingston@hoganlovells.com

INDEX

| WITNESS | EXAMINATION | PAGE |
|---|---|---|
| Stephanie Sobeck | | |
| | Direct by Mr. Ferguson | 8 |
| | Direct by Mr. Reiser | 145 |
| | Cross by Mr. Sellinger | 270 |
| | Redirect by Mr. Ferguson | 271 |

EXHIBITS

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 2102 | Affiliation Agreement, RCDC067469 through RCDC067520 | 23 |
| Exhibit 2103 | First Amendment to Affiliation Agreement, RCDC070241 through RCDC070242 | 96 |
| Exhibit 2104 | Acknowledgement of and Joinder to Affiliation Agreement, AHCA00018031 through AHCA00018034 | 92 |
| Exhibit 2136 | Corporate Growth Committee Document, RCDC070195 through RCDC070204 | 29 |
| Exhibit 2137 | Corporate Growth Committee Document, RCDC070205 through RCDC070209 | 228 |
| Exhibit 2138 | Corporate Growth Committee Document, RCDC070210 through RCDC070216 | 264 |

EXHIBITS

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 2213 | E-Mail, RCDC015683 | 151 |
| Exhibit 2139 | Corporate Growth Committee Document, RCDC070217 through RCDC070222 | 269 |
| Exhibit 2140 | Privilege Log, 143 Pages | 22 |
| Exhibit 2141 | Privilege Log, 8 pages | 73 |
| Exhibit 2142 | Strategic Council Document, RCDC068348 through RCDC068352 | 185 |
| Exhibit 2143 | Strategic Council Document, RCDC068353 through RCDC068358 | 198 |
| Exhibit 2144 | Strategic Council Document, RCDC068359 through RCDC068364 | 202 |
| Exhibit 2145 | Strategic Council Document, RCDC068365 through RCDC068370 | 204 |
| Exhibit 2147 | Strategic Council Document, RCDC067694 through RCDC067699 | 211 |
| Exhibit 2148 | Strategic Council Document, RCDC067521 through RCDC067526 | 217 |

THE VIDEOGRAPHER: Good morning. We're going on the video record. The time is 9:25 a.m., Eastern Daylight Time, on Tuesday, May 15, 2018. This is media unit number one of the video-recorded deposition of Ms. Stephanie Sobeck, taken by counsel for the plaintiff, in the matter of RCHFU, LLC, et al, vs. Marriott Vacations Worldwide Corp., et al.

This case is filed in the US District Court, District of Colorado. The Case Number is 1:16-cv-01301 PAB-GPG. This deposition is being held today in the office of Greenberg Traurig, located at 450 South Orlando Avenue, Suite 650, Orlando, Florida.

My name is Clay McMillan, with Veritext Legal Solutions. The court reporter today is Ms. Lisa Gerlach.

Will counsel in the room, please, identify yourselves and the parties that they represent?

MR. FERGUSON: My name is Matthew Ferguson. I'm counsel for the plaintiffs in the case known as RCHFU vs Marriott, pending in the United States, District of Colorado.

MR. REISER: My name is Mike Reiser. I represent the plaintiffs in the aforementioned case in Aspen. And I also represent the plaintiffs in a case called Petrick vs. Marriott, et al., in the San Francisco Superior Court, as well as the plaintiffs in the case, Reiser v. Marriott, et al., in the Eastern District of California Federal Court.

MR. MEADE: Tyler Meade, for plaintiffs in all three cases.

MR. SELLINGER: Philip Sellinger, from Greenberg Traurig, in all three cases. With me is Kim Gray, corporate counsel at Marriott. And joining us at some point this morning will be Doug Kelly, assistant general counsel and head of litigation at Marriott, and, possibly, Ian Marx, also from Greenberg Traurig.

I would just note that while it was mentioned that this case is being taken in the -- this deposition -- in the Aspen case, our understanding was, this is being taken in all three cases.

MR. FERGUSON: Yeah. He just asked for

appearances, and I think you indicated you're appearing in those two cases also. We agree with that.

THE VIDEOGRAPHER: Is there any counsel on the phone that needs to identify?

MS. LIVNGSTON: Yes. Good morning. This is Jessica Livingston, with Hogan Lovells. I represent the Aspen Highland Condominium Association in the RCHFU vs. Marriott case.

THE VIDEOGRAPHER: Our court reporter will swear in the witness and we can proceed.

THEREUPON,

STEPHANIE SOBECK,

A Witness herein, acknowledged after having been duly sworn and testified upon her oath as follows:

THE WITNESS: I do.

DIRECT EXAMINATION

BY MR. FERGUSON:

Q. Good morning, Ms. Sobeck.
A. Good morning.
Q. Do you recall having your deposition taken in this room on November 16, 2017?
A. I do.
Q. Have you been deposed in any other cases

since I met with you here in November of 2017?
A. I have not.
Q. Have you testified in any trials?
A. No, I have not.
Q. Are you scheduled to testify in any trials?
A. No.
Q. Have you ever reviewed your testimony in connection with today's re-deposition of yourself?
A. I went through it quickly.
Q. When did you go through it, Ms. Sobeck?
A. On Sunday.
Q. Did you go through it by yourself?
A. I read it myself.
Q. Did you read the whole deposition?
A. No.
Q. Did you read the parts about the affiliation agreements that are at issue in this case?
A. Yes, I did.
Q. Did you read anything else in preparation for your deposition today?
A. Yes. I looked at the affiliation agreements.
Q. And that would be the ones starting in 2001 up through today?
A. I didn't look at all of them, but, yes, those would be the ones.

Page 10

Q. When you testified in November of 2017, when you reviewed documents, do you recall whether or not you looked at the affiliation agreement that's dated November 14, 2013, the one that was produced recently?
A. Specifically, no.
Q. Aside from reading your deposition on Sunday and looking at affiliation agreements for some of them, have you reviewed anything else in preparation for your re-deposition today?
A. I looked at some of the business review reports and some of the strategic council decks as well.
Q. Did you look at any corporate growth committee memos?
A. Yes. A couple of those memos as well, yeah.
Q. Are you on the corporate growth committee?
A. I'm not.
Q. Who's on the corporate growth committee?
A. Mostly our executive committee and a couple of the other financial leaders within our corporation.
Q. Mr. Terry?
A. Tony Terry.
Q. Mr. Cunningham?
A. Yes. He's an executive committee member.
Q. How many people are on the executive

Page 11

committee for Marriott Vacation Worldwide?
A. Eight, I want to say. I could be off. Eight plus or minus one.
Q. Is Mr. Essig part of that?
A. Ron Essig, no.
Q. Ms. Kane-Hanan?
A. Lani Kane-Hanan, yes.
Q. Sometimes I see that you actually draft memorandums relating to the corporate growth committee. Correct?
A. I do.
Q. Mr. Reiser will cover those with you.
Is Mr. Weisz on that committee?
A. Yes, he is.
Q. Have you spoken to Mr. Weisz about your deposition here today?
A. No, I have not.
Q. Anything else besides the business review reports, the corporate growth committee reports, the strategic council documents, the affiliation agreements, and your deposition that you reviewed for today?
A. No.
Q. You understand that some of those documents we received since we took your deposition. Do you

Page 12

know that?
A. Yes, I do.
Q. You also understand that we received, after your deposition, a 143-page initial privilege log of documents that were withheld by Marriott Vacation Worldwide?
A. I was not.
Q. Okay. Are you aware that another privilege log was provided -- I guess, maybe eight or nine pages -- on about April 6, 2018?
A. I was not.
Q. So you have not reviewed privilege logs?
A. I'm sorry. I don't know what privilege logs are.
Q. Do you have an understanding generally that documents were withheld, based on the fact that people like Ms. Gray, Ms. Borkholder, or Ms. Egolf were copied on those and they were withheld because they were deemed to be privileged by your lawyers, I guess? Do you have a general understanding that documents were withheld based on attorney-client privilege?
A. Yes, I understand that.
Q. But in terms of selecting which documents you withheld, I take it you left it to your outside counsel and in-house counsel?

Page 13

A. I don't know who did it recently.
Q. Did you meet with counsel in connection with preparation for your re-deposition here today?
A. I did.
Q. Who did you meet with?
A. With Philip, Ian, Doug, and Kim.
Q. When did you first meet with them in connection with preparing for your re-deposition here today?
A. Yesterday.
Q. Any prior phone calls relating to preparation for your deposition?
A. No.
Q. How many hours did you meet or minutes did you meet in connection with your deposition here today?
A. About roughly four.
Q. Without divulging what was stated, were there any other documents that were reviewed by you in connection with your deposition at those meetings -- or that meeting, rather?
A. No.
Q. Were all four lawyers there for most of those four hours?
A. Three of them were. Doug was in and out.

Q. Mr. Kelly?
A. Mr. Kelly, yes.
Q. Do you know David Masters?
A. No, I don't.
Q. Do you know a new lawyer that was retained by Marriott Vacation Worldwide and the other defendants in Colorado to represent you guys in this case?
A. No.
Q. Do you understand that you -- withdrawn.
Have you ever seen the explanation of the production -- the late production -- of the November 14, 2013 affiliation agreement sent by Mr. Marx, Mr. Tyler Meade, and copied to a lot of lawyers in this case? Have you ever seen that?
A. No.
Q. Did you ever see any explanation to plaintiffs' counsel in this room -- Mr. Reiser, Mr. Meade, myself, Ms. Jessica Livingston -- that there was an oversight not to produce that document?
A. No.
Q. Did you maintain a copy of the -- is it okay if I call it the November 13th affiliation agreement? Will you know what I'm talking about?
A. The affiliation agreement between Lion & Crown and Cobalt?

Q. The Lion & Crown and Marriott Resort Travel Company.
A. Yes, I do.
Q. At your deposition, you indicated you did not know what the Marriott -- the MRTC company was.
Do you recall that?
A. Yes.
Q. Was that just because it was a long day or was it something you didn't really know about?
A. I didn't know the name specifically.
Q. The Marriott Resort Travel Company, MRTC, is the program manager for the Marriott Vacation Club -- MVCD system?
MR. SELLINGER: Objection to form.
A. The Marriott Vacation Club Destination system, yes.
BY MR. FERGUSON:
Q. So as to counterpart -- and Ritz-Carlton Destination Club has the Lion & Crown -- has the Lion & Crown as the facilitator of its outside affiliation system?
A. Yes --
MR. SELLINGER: Objection to form. Just pause for a moment generally to give me a chance to object.

THE WITNESS: Okay.
MR. SELLINGER: Thank you.
A. Cobalt Travel is the internal and Lion & Crown is external; correct.
BY MR. FERGUSON:
Q. Lion & Crown was started up, I take it, around the time that you wanted to affiliate with the outside program known as Abercrombie & Kent? Is that about the time Lion & Crown started up?
A. Yes.
Q. I remember from your deposition last time that we had a weird cadence. I would sometimes -- Mr. Reiser and I would speak over you. So we'll try to do a little bit better today than last time. We ran into that a few times.
A. We will all pause.
Q. Okay. We'll just show you what's been previously marked as Exhibit 1003. It's going to be on your screen also. I have paper of everything for you, but it's also on your screen.
MR. SELLINGER: Do you have paper for me too?
MR. FERGUSON: Not on that one. Some I will, some I won't.
THE WITNESS: Would you like to share?

MR. SELLINGER: I'm okay for now.
BY MR. FERGUSON:
Q. Do you recognize this as The Ritz-Carlton Club membership program affiliation agreement that was entered into back in 2001?
A. Yes.
Q. Let me give you my copy here.
A. There's lots of highlights in there.
Q. Yeah. If you go to the last two pages of Exhibit 1003, Bates-labeled -- they're numbered 19, 20, 21. I just want to ask you about some of these signatures here.
This has the Ritz-Carlton Travel Company, LLC. That's the predecessor name to Cobalt; correct?
A. Correct.
Q. Were you working -- you were working at MVCI at this time in 2001; correct?
A. I was.
Q. But you weren't assigned to the RCDC system yet; were you?
A. Correct.
Q. Mr. Bradley -- I take it he's gone from the Marriott Vacation Club? He was with MVCI at the time. Is he still with Marriott Vacation Worldwide?
A. Where do you see Mr. Bradley? What page are

Page 18

you on?
Q. 19. You'll see a little number at the bottom there. Look over -- there.
A. Oh, 19 of that. Sorry. Yes. Steve Bradley.
Q. Is he still there?
A. No. He's retired.
Q. Mr. Minnock signed for the Ritz Carlton Development Company. Is he still there?
A. Yes.
Q. What's his job right now; do you know?
A. I'm trying to think of what his title is. He's in Asia for us. He's kind of the lead point business person in Asia. I don't know his title.
Q. For Marriott Vacation Worldwide?
A. Correct.
Q. He's not working with the RCDC system anymore; is he?
A. No. He hasn't for years.
Q. Mr. Love signed on behalf of the condominium association. Was Mr. Love a member of the Marriott International at the time?
A. He was at the time.
Q. Is he still with any companies related to Marriott International or Marriott Vacation Worldwide?
A. I don't know. I don't think so.

Page 19

Q. Do you recall being shown this at your deposition on November 16, 2017 -- generally, being shown this document?
A. This document?
Q. Yeah.
A. I don't remember if we looked at this or not.
Q. If you look at pages -- I'll get there sometime -- page 10, it's at the bottom of the exhibit number. It's 1002-0112.
A. Oh, 12?
Q. Yeah.
A. 7.2.
Q. Yeah. Do you remember discussing 7.2 with Mr. Reiser?
A. I do remember that.
Q. Do you remember talking about the fact that you believed that Cobalt -- now, I know this is Ritz-Carlton Travel Company back then -- but Cobalt, in your view, was the only entity that could make a decision whether to affiliate The Ritz-Carlton Destination Club with another system?
MR. SELLINGER: Objection to form. If you're going to talk about her testimony from five months ago --
MR. FERGUSON: Sure.

Page 20

MR. SELLINGER: -- I think you ought to show her the testimony.
MR. FERGUSON: Will you go to the deposition, please -- page 21?
MR. REISER: I think it would be easier if we just did it like we were in trial. If she doesn't remember the testimony, then we can refresh her recollection with it. I think it will be speedier.
MR. SELLINGER: I just don't think, in a deposition, it's fair to say, "Do you remember testifying" in a several-hundred page deposition. I don't think, in a trial, that's appropriate.
You can ask, "Do you remember a fact," but to ask, "Do you remember testifying," I don't think that's appropriate at trial without showing them the testimony.
MR. FERGUSON: I just want to get some platform for where we're going to go in this deposition. I don't mind showing it to you.
BY MR. FERGUSON:
Q. I'm looking at the wrong -- on page 21 -- at the top of page 21, the question Mr. Reiser asked you, "Is it your understanding, Ms. Sobeck, that Cobalt

Page 21

Travel Company has the sole discretion to decide whichever clubs are affiliated with the Ritz-Carlton Destination Club under the terms of the affiliation agreement?"

You said that was your understanding; correct?

A. Yes.

Q. Is your understanding different today?

A. No. Cobalt Travel has the sole discretion to decide what clubs that it affiliates with.

Q. But in terms of Exhibit 1003, that was not used to affiliate the Marriott Vacation Club system and the RCDC system. Isn't that right?

A. Well --

MR. SELLINGER: Objection to form.

BY MR. FERGUSON:

Q. It wasn't a final document that you used to effectuate that affiliation; correct?

A. It was not.

Q. And the final document that was used to effectuate that affiliation was on November 13, 2014 -- sorry -- November 14, 2013 affiliation agreement. Correct?

A. Sorry. You can't just throw out dates. If we're talking about -- because there are several, as

Page 22

you know -- several affiliation agreements.

So the one between Lion & Crown and Cobalt was the one that gave the ability to move forward with the program.

Q. But it was between Lion & Crown and MRTC. Is that -- are you referring to a different document when you say "Cobalt"?

MR. SELLINGER: Objection to form.

A. Cobalt connects to Lion & Crown. If that wasn't in place, Lion & Crown couldn't connect to Marriott Vacation Club. So they all have to be in place for Lion & Crown to connect to Marriott Vacation Club.

(Exhibit 2140 was marked for identification.)

BY MR. FERGUSON:

Q. Let me just find that exhibit for you. If you go to Exhibit 2140, I believe it is -- oh, 2102. This was previously marked at a deposition.

MR. FERGUSON: Is that right, Mr. Reiser? It was Mr. Guikema maybe?

MR. REISER: Yeah.

(Exhibit 2102 was marked for identification.)

BY MR. FERGUSON:

Page 23

Q. We've marked it for today's deposition as 2102. This is a document that was produced on or about March 14, 2018.

When you were just referring to the Cobalt agreement, were you referring to this agreement or what?

MR. SELLINGER: Objection to form.

A. Cobalt agreement. So the Cobalt -- do you want me to walk you through the whole --

BY MR. FERGUSON:

Q. That's all right. I just want to know --

A. No. This isn't the Cobalt agreement. But having this without an agreement between Cobalt and Lion & Crown would not allow Marriott Vacation Club to be affiliated with Ritz-Carlton Destination Club.

Q. All right. Let me show you what's been marked previously or marked for today's deposition as 2101. This was produced recently, but we think we've uncovered that it had been produced earlier.

Is this the document you were referring to, the Lion & Crown affiliation agreement between its -- Lion & Crown Travel Company, LLC affiliation agreement providing Cobalt Travel members access to the Lion & Crown exchange program?

A. Yes, yes.

Page 24

Q. So this is the first step in the ability of Lion & Crown to affiliate its RCDC members into the Marriott Vacation Destination Club system?

MR. SELLINGER: Objection to form.

A. Cobalt Travel has the sole right to affiliate with anyone. They affiliated with Lion & Crown. Then Lion & Crown has the right to affiliate with outside exchange companies, which is how they affiliated with Marriott Vacation.

BY MR. FERGUSON:

Q. In this case, I think you -- the next question I want to ask is -- that second agreement, the November 14, 2013 agreement, which is Exhibit 2102, I believe -- that's the document that was actually utilized to effectuate the affiliation with the Marriott Vacation Club Destination program?

MR. SELLINGER: Read that back for me, please.

THE REPORTER: "The next question I want to ask is -- that second agreement, the November 14, 2013 agreement, which is Exhibit 2102, I believe -- that's the document that was actually utilized to effectuate the affiliation with the Marriott Vacation Club Destination program?"

Page 25

MR. SELLINGER: Objection to form. Go ahead.
A. This Lion & Crown agreement with affiliation with Marriott Vacation Club is how the Marriott Vacation Club program became available to...
BY MR. FERGUSON:
Q. Right. Is there a document like that, for example, with respect to the Exclusive Resorts, where Lion & Crown is affiliating with Exclusive Resorts? Is there something like that?
A. I believe there would've been for Exclusive Resorts.
Q. And there would've been one for Third Home?
A. I believe so, yes.
Q. And there would've been one for Abercrombie & Kent?
A. Yes.
Q. Are these the only four systems that Lion & Crown Travel has affiliated its RCDC members with?
A. I believe those are the only ones. We've had other conversations with others, but these are the only ones, yes.
Q. Are there any other programs under consideration?
A. There have been in the past, but none of them

Page 26

ended up being a good fit.
Q. Have there been any discussions as to whether or not Lion & Crown Travel Company might affiliate with some of the new products being brought in through the potential ILG merger?
A. No, not yet.
Q. Are you working on that merger?
A. Yes.
Q. Do you know when the shareholder votes are for the Marriott Vacation Worldwide folks?
MR. SELLINGER: Objection to form.
A. Sorry. I don't understand.
BY MR. FERGUSON:
Q. Are you aware there's going to be a shareholder vote as to whether or not the merger will take place by the shareholders of both entities, ILG and Marriott Vacation Worldwide?
A. Yes.
Q. Do you know when the Marriott Vacation Worldwide shareholders vote might be?
A. I don't.
Q. Do you know what month it's going to be in?
A. I don't.
Q. Exhibit 2102, which is that November '13 version of the document, did you maintain a copy of

Page 27

that in your files?
A. I don't know if it's in my files or not. Certainly not a hard copy.
Q. How would you have had access to that document if you needed it?
A. If I didn't have it, I would -- I would e-mail the law department to get a copy.
Q. Do you have a folder or folders that you keep important documents in for your day-to-day work as an asset manager, overseeing some of the -- over the years, it's changed -- but some of the Ritz-Carlton Destination Clubs?
A. Yes.
Q. Was this document in that folder -- in any of those folders?
A. I don't know if it was or not. Could have been.
Q. Did you work on the preparation of this affiliation agreement?
A. No.
Q. When was the first time you heard about this affiliation agreement, Exhibit 2102, being discussed?
A. I don't understand the question.
Q. When did you first hear about there might be an affiliation agreement between Lion & Crown and the

Page 28

Marriott Vacation Club Destination Exchange Program?
A. When we were working on Third Home.
Q. What does that mean?
A. I'm sorry. Not Third Home. Abercrombie & Kent. Apologies. When we would've been looking -- found the potential suitor that might have been a good exchange opportunity for the Ritz-Carlton members, and the law department would've been working on a mechanism for exchange through the Ritz-Carlton system.
Q. In July of 2012, Ms. Babich -- we talked about her at your deposition -- she sent out the evolution letter. Do you recall that, just for the timeframe here?
A. I do, yes.
Q. Okay. We had produced to us the other day a corporate growth committee memorandum, which is heavily redacted, from May of 2012.
Do you know when -- let me ask you this. Whose idea was it first to potentially affiliate RCDC with Marriott Vacation Destination Club? I'm not talking about inventory. I'm just talking about an affiliation. Who first brought that up?
MR. SELLINGER: Objection to form.
A. Can I correct an answer that I gave before?

Page 29

BY MR. FERGUSON:
Q. Sure.
A. I'm sorry. You were asking me about the 2102 affiliation agreement with MVCD. I was answering the question of the Lion & Crown and Cobalt affiliation agreement. So I apologize. I was answering a different question.
Q. That makes sense to me now, because --
A. I'm sorry. I thought you said, "When did Lion & Crown come into -- in the case?" No.
When Marriott Vacation Club -- the affiliation agreement with Marriott Vacation Club would've been around the time that the whole evolution letter would've been...
Q. Whose idea was it as part of the evolution to affiliate the two systems? Whose idea was it initially? Was it Mr. Cunningham's, yours?
A. I don't know if -- I don't know whose initial idea it would've been.
Q. Did you review an unredacted version of the corporate growth committee documents?
A. I did not.
Q. Did you receive the corporate growth committee documents from Mr. Cunningham in May of 2012, if you know?

Page 30

A. Which documents are we talking about?
(Exhibit 2136 was marked for identification.)
BY MR. FERGUSON:
Q. It's 2136. Are you there?
A. Yes.
Q. Did you see this -- were you a recipient of this -- a copyholder at the time?
A. No. I'm not on the corporate growth committee.
Q. Occasionally, you do write memos to them?
A. Yes.
Q. Did you see this at all in preparation for your deposition here today?
A. I did.
Q. Did you see it in unredacted form or redacted form?
A. Redacted.
Q. Did you have any input into that memorandum, if you know? I'm sorry. I think it's a memorandum.
MR. SELLINGER: Objection to form.
A. No.
BY MR. FERGUSON:
Q. Did you pull any information together for Mr. Cunningham back there in April, May of 2012 for

Page 31

this corporate growth committee memorandum?
A. I don't remember specifically for this memorandum, no.
Q. Aside from seeing it in a redacted format yesterday, had you ever seen this document at any time in connection with your duties as senior vice president today, or vice president in those days, and asset manager?
A. I'm only a vice president, but thank you for -- appreciate that.
I don't know if I've seen it or not. I really don't remember. I certainly saw it yesterday.
Q. If you go to Exhibit 1003 -- we're starting to get a stack of affiliation agreements there built in front of you.
Under 7.2, on page 12, Exhibit 1003, do you recall generally going through whether or not the developer, the association, or the club manager, which is RCMC, had the ability to participate or consent in Cobalt's decision in regard to an affiliation? Do you recall going through that?
MR. SELLINGER: Objection to form. If you're talking about her testimony, I think you should show it to her.
MR. FERGUSON: I'm just going to ask

Page 32

generally if she knows it. If she doesn't, I'll show her the testimony.
A. I remember discussing that, yes.
BY MR. FERGUSON:
Q. Okay. Do you remember discussing generally that you believe that, under this Cobalt -- sorry -- I'm going to call it the Cobalt affiliation agreement from 2001 -- that you believe that the developer did not have a right to participate or consent in the decision?
MR. SELLINGER: Objection to form. I think you really should be showing her testimony if you're asking her what she testified to specifically now and not generally.
MR. FERGUSON: I'm going to have to agree with Mr. Reiser. I can't do it that way. I'm not going to show her testimony and say, "Do you remember this?" If she doesn't remember, I'll show her the testimony.
MR. SELLINGER: Well, I think the right way -- you can ask her the fact and then refresh her recollection or impeach her. Do what you want. I just don't think it's right to ask her, "Did you testify" in a 200-page

Page 33

deposition, six months ago.
BY MR. FERGUSON:
Q. Let me do it this way. You agree that you took a position that the developer had no right to participate or consent. That was your position regardless of what was in your deposition; right?
MR. SELLINGER: Objection to form.
A. Could I see my deposition on that?
BY MR. FERGUSON:
Q. I'm just asking you a question, yeah. Do you recall whether or not -- ignoring your testimony that you believe that the developer had no right to consent or participate in the decision to affiliate with the Marriott Vacation Club.
MR. SELLINGER: I'm sorry.
MR. FERGUSON: You need to stop. It's a pretty simple question. There's a lot of speaking going on here. I want to ask the question. If she doesn't understand it, she can ask me to rephrase it; not you, Mr. Sellinger.
MR. SELLINGER: I'm really not trying to speak, but -- read the question back for me if you would.
THE REPORTER: "You agree that you took a

position that the developer had no right to participate or consent. That was your position regardless of what was in your deposition; right?"
MR. SELLINGER: Objection to form.
A. Are you asking -- that's confusing to me. Are you asking me what I testified or are you asking me --
BY MR. FERGUSON:
Q. What's your position?
A. It says here, "The developer shall not be entitled to participate in or consent to the program manager's decision in this regard."
Q. Would you go to page -- let's go to your deposition, page 43.
Do you recall being asked the questions that start at line 13 about the position that you took at -- when I say "you," -- that Marriott took in the Hoyt litigation?
A. Yes.
Q. So that's the testimony you gave about the position you all took in the Hoyt litigation that Cobalt had the sole discretion; right?
A. Cobalt had the sole discretion; correct.
Q. Can you go to page 46 of your deposition on

November 16, 2017? These are questions by Mr. Reiser. It starts at page -- line 17 of Exhibit 17 [sic].
You were asked, "It's also true under your affiliation agreement" -- that being 1003 -- "meaning, your companies's affiliation agreement -- Marriott Vacation Club International" -- I think we got that wrong -- that's the old name -- "that the association, such as the Aspen homeowners association headed by Randy Mercer, he would not have -- he should not -- he was not entitled to participate and/or consent to any affiliation decisions. True."
And you said what?
A. "He didn't have the right to make an" --
Q. Next page.
A. -- "affiliation decision, yes."
Q. Is that still your belief today, that the association had no right or say in the affiliation?
A. Yes.
Q. Have you told anybody else differently, ever?
A. That they had the right?
Q. Yeah. That they had the final say.
A. No.
Q. But at your deposition, we did not have the 2013 -- November 14, 2013 agreement -- correct? Do you recall that? We did not have it?

A. Yes.
Q. In that document, it refers to a joinder and acknowledgement, right -- or acknowledgement and joinder?
A. Yes.
Q. Were you involved at all in the preparation of the acknowledgement and joinder?
A. No.
Q. Do you know why there was an acknowledgement and joinder attached as Exhibit A -- sorry -- Exhibit B -- Exhibit A to the affiliation agreement from November 14, 2013?
A. Yes.
Q. What was your involvement? What was your involvement, if any, with respect to the decision to have the associations sign a joinder and acknowledgement?
A. We discussed having them sign an acknowledgement because of the feedback we were getting on Marriott Vacation Club.
Q. What feedback are you referring to?
A. When the evolution letter was sent out, there were some members who were sharing concerns about an affiliation with Marriott.
Q. That was in 2012?

A. Yes.
Q. Then you got feedback when the April 5, 2013 letter went out to the association. People said it was a great job to have a vote. Do you recall that feedback?
MR. SELLINGER: Objection to form.
A. What letter are you talking about?
BY MR. FERGUSON:
Q. April 15, 2013, the letter that promised the vote -- that letter.
A. I'm sorry. I don't remember the promise of a vote. You mean the letter from Aspen?
Q. Yeah.
A. I'm sorry. I'm struggling here. You have to show me the letter, what we're talking about. The letter that went from the Aspen board --
Q. Right.
A. -- to the members?
Q. Correct.
A. Yeah. I don't remember exactly what it said, but, yes, I remember that letter.
Q. Do you remember that there was feedback from that letter that went to the association? Do you remember that at all?
A. Feedback from the letter of the association?

Q. That the association sent a letter -- after meeting with you and Mr. Cunningham in Aspen on April 5th, a letter went out that you and Mr. Cunningham helped word; right?
A. Well, we didn't help --
MR. SELLINGER: Objection to form.
A. -- but, yes, we -- I remember the meeting, and I remember the letter, and I remember talking to you about the letter, yes.
BY MR. FERGUSON:
Q. My only question was -- because you talked about feedback. I'm just trying to go through the items of feedback.
Do you recall -- and maybe you don't -- do you recall the feedback that the HOA got from the April 5, 2013 letter?
A. I don't remember the feedback the HOA received, no.
Q. Do you remember that your company hired an outfit called APCO -- A-P-C-O -- out of Washington, DC?
A. I do.
Q. And I believe you went through Exhibit 1700 and 1261, which is the long border, row -- or there's a long Excel spreadsheet of many, many -- 750, a

thousand -- comments.
Do you recall that was the product that APCO produced for you?
MR. SELLINGER: Objection to form.
A. I don't remember they produced it, but I remember the spreadsheet you're talking about, yes.
BY MR. FERGUSON:
Q. And that provided feedback on, among other things, the affiliation?
A. It did, among other things.
Q. And was there any other feedback that was coming in before you made a decision to do this acknowledgement and joinder that you just referred to in your prior answer?
A. There was a lot -- there was a lot of time between the acknowledgement and joinder and the evolution letter, so there was a lot of discussions that had occurred with the boards, with members.
Q. A lot of time -- I'm sorry. Are you finished?
A. Yes.
Q. A lot of time elapsed after Ms. Babich's July 17, 2012 letter went out and the time that all you decided to put together an acknowledgement and joinder for the 2013 affiliation agreement?

A. Correct.
Q. Do you have that in front of you, Exhibit 2102? It's very tiny print. We didn't have a great computer down here. That's it, I think.
Just go to page 21. There's a lot of page numbers on this. The exhibit number is 2102, but it's actually page 19 in the actual text of the document. There's a signature block there for MVCD.
A. Are you looking at this actual number right there?
Q. Yeah. I'm looking at both of them. Which one do you want to use?
A. It doesn't matter. 19.
Q. Okay. This is signed by someone named Cliff Delaney or -- do you know who that is?
A. Cliff Delorey.
Q. Who is Mr. Delorey?
A. He's our executive vice president of operations.
Q. For which entity?
A. For Marriott Vacations Worldwide.
Q. I take it, as you explained in your deposition, that various executives, such as yourself and Mr. Delorey, as an executive for Marriott Vacation Worldwide, they would have duties with respect to

entities like, in this case, Marriott Resort Travel Company?

A. Correct.

MR. SELLINGER: Objection to form.

BY MR. FERGUSON:

Q. Is that right?

A. They have signatory authority for certain entities, correct.

Q. You said he was the executive vice president of operations?

A. I believe that's his title, yes.

Q. Did he have any direct involvement, do you recall, with respect to the RCDC system in this timeframe?

A. No.

Q. Obviously, Mr. Cunningham signed for Lion & Crown Travel; right?

A. Yes.

Q. Did there come a point in time that, with respect to a potential affiliation between the RCDC members and the Marriott Vacation Worldwide -- I'm sorry -- Marriott Vacation Club Destinations Exchange Program -- did there come a time when you all realized you needed to do this agreement?

MR. SELLINGER: Objection to form.

A. Which agreement?

BY MR. FERGUSON:

Q. This agreement, Exhibit 2102, which is the affiliation agreement between Lion and Crown and Marriott -- with access to the Marriott Vacation Club Destinations Exchange Program and MRTC.

A. Would there have been a time that we realized we needed to do this agreement?

Q. Yeah.

A. Yes.

Q. Would that have been part of your job function to say, "Hey, we had one of these for Lion & Crown" -- I'm sorry -- "We had one of these for Abercrombie & Kent. We have one for Exclusive Resorts. We need one of these to affiliate Marriott Vacation Club with RCDC"?

A. No.

Q. Who would have done that?

A. The law department.

Q. Who in the law department do you know -- withdrawn. Do you know who in the law department would have overseen the drafting of this affiliation agreement from 2013?

A. Probably Barbara Egolf.

Q. If you look at page -- this one doesn't have

a page number on it, of course -- if you look at page 2 -- I'm sorry -- page 1, which is -- starts with the affiliation agreement. It's not paginated because, I guess, it's the first page.

Would you look at the fourth whereas clause, where it says, "Whereas, MVCD and Lion & Crown desire that the Lion & Crown program become affiliated with the MVCD program as an affiliate program"? Are you there?

MR. SELLINGER: Just hold on a minute. He's behind you. And when you're asking a question, I'd really like to be able to look at it.

MR. FERGUSON: Sure. Why don't you blow up the fourth whereas clause? Thank you.

A. The fourth whereas clause says, "Lion & Crown has reserved the right to affiliate with L&C program."

BY MR. FERGUSON:

Q. Sorry. Right. I missed the big first one. It's the fifth one. I'm sorry.

A. Yes, I see that.

Q. And I wrote through romanette number one, but romanette number two says, "Except as otherwise provided in this agreement, certain members of the Lion & Crown program" -- it says, "who are not members

of the Bleu Florida Trust."

Those are people that -- those are people that bought RCDC points of some sort that was unwound?

A. Yes.

Q. Okay. "Whose owners associations have executed an acknowledgement agreement, as defined in Article 2, L&C members shall have the right to elect to become a participant in the MVCD program."

One of the things that needed to happen pursuant to this affiliation agreement was that the association would have to sign the acknowledgement?

MR. SELLINGER: Objection to form.

A. No. They were already -- we were already affiliated with MVCD when this was executed.

BY MR. FERGUSON:

Q. Who was already affiliated?

A. Lion & Crown was already affiliated with MVCD. All this was doing was allowing --

MR. SELLINGER: Let her finish.

MR. FERGUSON: Okay.

A. All this was doing was -- the associations were deciding whether their members were going to be able to participate or not.

BY MR. FERGUSON:

Q. So they had a decision to make whether to

sign -- to acknowledge and join this agreement?
A. Yeah. The company decided, obviously, we wanted to allow this to be available for everyone. It was a good opportunity. There was additional vacation options. It was completely voluntary.
But we wanted -- because of some of the feedback we got, we wanted the homeowners association to decide whether they wanted to allow it for their owners -- their members -- or not.
Q. When you say "the company," what do you mean by the company? There's a lot of companies here.
A. I know. It's true. Ritz-Carlton Destination Club. We thought that was the best opportunity, was to give more travel options to the Ritz-Carlton member.
Q. Yeah. I know. We've covered that. The opportunity is voluntary, travel options. That's what you all wanted to try to give to the RCDC members?
A. Correct.
Q. The bottom line is that, with respect to this agreement, though, the associations had the ability and the right to decide? That's what you wrote in here.
MR. SELLINGER: Objection to form.
A. Not to affiliate MVCD with Lion & Crown.

They didn't have the right to decide that. That was already done. They had the right to decide if their members were going to have an option to use the program or not.
BY MR. FERGUSON:
Q. How were Lion & Crown and MVCD already affiliated before this agreement?
A. Before this agreement?
Q. Yeah.
A. They weren't, but this agreement is what actually affiliated them, and then the acknowledgement agreement. But -- I'm sorry -- I thought you were asking about the acknowledgement agreement.
Q. I was, but I thought you indicated that there was a prior agreement that already affiliated Lion & Crown with MVCD.
A. No. This is the agreement that affiliated them.
Q. Okay. Would you go to page 3 of Exhibit 2102, which is the 2013 affiliation agreement between Lion & Crown and MRTC --
A. Which is the actual page; right?
Q. Yeah, actual page 3. Because the other one is confusing. It says, "Page 3 of blank." I just want to use that page, yeah.

The top of the page is an acknowledgement agreement. It means an acknowledgement of a joinder to affiliation agreement among MVCD, Lion & Crown, and applicable participating L&C association in the form attached as Exhibit B. I was right.
So this is a definition of what -- of acknowledgement agreement in this document. Is that right?
A. Yes.
Q. So in order for an association, such as Aspen or San Francisco or Tahoe, to be a part of this affiliation that you said is occurring, they would have to sign this acknowledgement and joinder?
MR. SELLINGER: Objection to form.
A. They would have to -- Aspen was already -- all of the clubs were already affiliated through Lion & Crown. So Lion & Crown -- I'm sorry. I don't seem to be explaining myself well.
Just like ER, or Abercrombie & Kent before, when the affiliation agreements were done -- when the affiliation agreements between the different organizations was done -- just like when this one was executed -- the affiliation is in place.
The new step we were talking about here was an acknowledgement that, in essence, the boards were

acknowledging that they wanted their members to have access to the program.
BY MR. FERGUSON:
Q. So what you're saying is that this document, Exhibit 2102, is the affiliation agreement between Lion & Crown and MRTC to do the bilateral exchange -- MVCD people and RCDC -- RCDC people and MVCD -- that's already been made?
A. Correct.
Q. But the next part of that is, in order for Aspen to be part of that, they had to sign the acknowledgement and joinder?
MR. SELLINGER: Objection to form.
A. In order for the members to have access to this, the association would have to. Because, don't forget -- things change all the time. Boards change. So people change on the boards. We knew that a board could maybe decide right away that they didn't want to, but, a couple months later, they would want to have their members to have access.
So this was the -- the acknowledgement was to allow the members to have the access.
BY MR. FERGUSON:
Q. Yeah, but it was also a joinder; right -- J-O-I-N-D-E-R -- right -- a joinder?

A. It says "joinder," I believe. Yes.
Q. They had to join the agreement?
A. No. They were --
MR. SELLINGER: Objection to form.
A. Well, I don't know what it legally means, but they were joining in it with us to allow the members to have access. So we wanted -- we wanted all the members to have access because we thought it was a good opportunity for them.
BY MR. FERGUSON:
Q. But you understood that they were being required to or asked to join this affiliation agreement.
A. No. They were being --
MR. SELLINGER: Hold on. Objection to form.
A. Yeah -- I mean, they were being asked to acknowledge it. Then, if they wanted to allow the members to have access, they would sign the agreement.
BY MR. FERGUSON:
Q. How many lawyers worked on this document, Ms. Sobeck, if you know?
A. I don't know.
Q. Four, five, six?
A. I don't know.

Q. Who's Tracy Borkholder? Do you know her? Or Ms. Borkholder?
A. Yeah.
Q. Is she a lawyer?
A. Kathi.
Q. Kathi. I'm sorry.
A. Yes, she's an attorney.
Q. Did she work on this?
A. I don't know.
Q. Did Ms. Egolf work on this?
A. Yes.
Q. And they put together Exhibit B, and the document is called "Acknowledgement and joinder." Correct?
A. That's what it's called, yes.
Q. So in addition to acknowledging this, do you agree or disagree that they were being asked to join it, to become part of this agreement?
A. I don't believe they were a part of the agreement, because there was nothing for them in the affiliation agreement to become a part of. But, again, I'm not an attorney.
Q. You don't know what the definition of joinder is in the law, I take it?
MR. SELLINGER: Objection to form.

A. The def --
BY MR. FERGUSON:
Q. The definition of joinder, do you know what that means?
A. No.
MR. FERGUSON: Would you go back to page 43 of Ms. Sobeck's deposition? Or is it 47? 47. I'm sorry.
BY MR. FERGUSON:
Q. On page 47 of your deposition, you had just answered that the decision to participate -- the association didn't have the right to make an affiliation decision, and you said, "Yes."
The question was, "And he wasn't" -- he, I guess, is Mr. Mercer -- "wasn't entitled to participate or consent. True?"
You answered, "He wouldn't have been able to make the decision to affiliate" --
A. Sorry. Where are you?
Q. I'm on page 47, lines 2 through 5.
A. Okay.
Q. You said, "He wouldn't have been able to make the decision to affiliate or not."
Do you see that? You said, "Yes."
A. Right.

Q. I guess, what you're going to say here today is that he didn't have the decision whether or not MVCD and RCDC would affiliate through this particular document, this affiliation agreement we looked at, Exhibit 2102, per se. He wasn't going to be able to make that decision?
A. No. The decision --
MR. SELLINGER: Objection to form.
A. The decision was already made when the affiliation agreement was executed.
BY MR. FERGUSON:
Q. Okay. So the decision was made when it was executed?
A. The affiliation agreement, yes.
Q. And you're saying that he didn't have the right to do that, but he did have a right to sign the joinder and -- acknowledgement and joinder at some point. Did he not?
MR. SELLINGER: I'm sorry. I don't want to interrupt you, but given what's shown here, I can't see who the "he" is. Can you just --
MR. FERGUSON: Isn't it Mr. Mercer?
MR. SELLINGER: -- so I can see that?
MR. FERGUSON: It's Mr. Mercer, the HOA.

You don't have her deposition here today?

MR. SELLINGER: No. I didn't know what questions you were going to be asking. I didn't think we were going to be talking about the old deposition.

But, anyway, I'm just trying to see the context. I do see Mercer now --

MR. FERGUSON: -- we didn't have this document at the deposition, Mr. Sellinger.

MR. SELLINGER: I'm not looking to argue with you. I'm just looking -- I see now the reference to Mercer.

MR. FERGUSON: Thank you. Can you repeat my question?

THE REPORTER: "And you're saying that he didn't have the right to do that, but he did have a right to sign the joinder and -- acknowledgement and joinder at some point. Did he not?"

THE WITNESS: He had the ability to sign the acknowledgement and joinder.

BY MR. FERGUSON:

Q. He had the right to do it?

MR. SELLINGER: Objection to form.

A. He had the right to do it.

BY MR. FERGUSON:

Q. Was it a right to do it?

A. No. He had the ability to do it. He didn't have to do it if he didn't want to.

Q. And if he didn't do it, there would not have been a -- there would not have been an affiliation -- withdraw that -- there would not have been an ability by Marriott Vacation Club people to access Ritz-Carlton Destination Club in Aspen, Colorado. Correct?

A. No. They were actually already accessing.

Q. How were they accessing it, Ms. Sobeck?

A. They were accessing it, actually, before. They were accessing it through the Explorer Program. So we had developer inventory, and the inventory was being used through Explorer.

And Marriott Vacation members, before kind of any of this had happened, were able to access it through that Explorer Program.

Q. So there were some ways for Marriott Vacation Club high-points users, platinum users, and whatnot to access what you all had allowed?

A. Correct.

Q. Okay. Had there been any voice given to the Marriott Vacation -- sorry -- to the RCDC folks up in

Aspen to allow that access, or was it just hoisted upon them?

MR. SELLINGER: Objection to form.

A. Well, it was the developer using their inventory, just like any other member can use their inventory.

BY MR. FERGUSON:

Q. Okay. We've covered all that.

You were then asked, "So your interpretation of" --

MR. SELLINGER: Tell me where you're reading.

MR. FERGUSON: I'm following exactly where we were, Mr. Sellinger.

THE WITNESS: He's on 46, though. You're on 47, I think.

MR. FERGUSON: Oh, we went back to show you Mr. Mercer. Okay. Let's go to 47.

MR. SELLINGER: Okay.

BY MR. FERGUSON:

Q. You were then asked, "So your interpretation of participate or consent is to make the decision?" And you said, "To make the decision to affiliate, yes."

Correct? Did I read that correctly?

A. That's what it says. It wasn't to affiliate. I mean, I think you're asking me many different ways. It's to acknowledge that the members were going to have access.

Again, the affiliation was already done. I'm not saying it correctly.

Q. It was already done because someone signed it on November 14 --

A. Right. The affiliation was already completed.

Q. Are you aware that Mr. Mercer and Mr. Oliver visited with you all down here in Orlando on November 14, 2013, the day that Mr. Delorey and Mr. Cunningham signed that document?

A. I didn't know that was the same day, but I was -- I do know they were there.

Q. You did meet with them, right, when they were here?

A. Yes.

Q. Did you tell them, "Hey, we signed this affiliation agreement between Lion & Crown and Marriott Resorts Travel Company"?

A. I don't think specifically, no.

Q. Did you tell him, "Hey, we just signed a document that's going to give you the right to

acknowledge" -- or that's going to -- "we're going to hand you a document that's called 'an acknowledgement and joinder' and you get to decide whether or not you have the Aspen Club sign on with this affiliation"?

MR. SELLINGER: Objection to form.

A. Yeah -- I don't remember if that conversation -- we were talking about a survey and other things during that time.

BY MR. FERGUSON:

Q. You had all worked on this affiliation agreement for months; right?

A. Yes.

Q. And there was a lot of work that went into it through the legal department?

A. I can't answer that. I assume so.

Q. Was there a lot of work done by people like yourself to get a document like that done?

A. No.

Q. Do you know how long the affiliation agreement that we see in Exhibit 2102 -- do you know what its term is?

A. No.

Q. Did you know it's ten years?

A. No, I didn't.

Q. Do you recall discussing the term of a

document called "an MOU" with Mr. Mercer? Do you remember a memorandum of understanding?

A. I went over the memorandum of understanding with him, but I don't remember a term being in there.

Q. Did you ever tell Mr. Mercer what the term of the affiliation agreement between Aspen Highlands and MRTC is?

A. Honestly, I don't remember. I might have, but I don't remember.

MR. SELLINGER: Off the record. Whenever is convenient. It's been about an hour. You can pick the right time.

BY MR. FERGUSON:

Q. Exhibit 2102 --

A. Yep.

Q. -- why didn't you ever give that to Mr. Mercer?

A. Why didn't I ever give it to him?

Q. Yeah.

A. I guess he never asked for it.

Q. But you asked him to sign an acknowledgement and joinder of this document and you never gave it to him?

A. I don't know if I gave it to him or not. If he didn't ask for it, I wouldn't have given it to him.

Q. Why not?

A. Why not? Because he didn't ask for it.

Q. Do you think it would've been fair to give to a board president -- you're the asset manager. Wouldn't it have been fair to give him a document that he was acknowledging and joining?

A. I think, if there were any concerns -- they were represented by counsel and there were conversations happening between our attorneys and their attorney. If there was any need for it, I think they would've discussed it. Barbara might have given it to Mr. Marino. I don't know.

Q. You don't know that?

A. I don't know.

Q. Have you ever seen any evidence that Ms. Egolf ever gave this document to anyone at Aspen Highlands?

A. I don't know if they did or not.

Q. So Marriott Vacation Worldwide, at least as far as you knew from the business side -- not the lawyer side -- did not give the affiliation agreement from November of 2013 to the board president or the board because they didn't ask for it?

MR. SELLINGER: Objection to form.

A. Yeah. We didn't give it to them, I guess, if

they didn't ask for it. We would've been talking about it. We did summaries of the program for them. There was a lot discussion about how the program worked, and it was even included in the letters and FAQs and all that type of thing.

So if they didn't ask for this, I guess we didn't give it to them. I don't know.

BY MR. FERGUSON:

Q. What would have prevented you from saying this agreement was 20 years and not -- did you not think you had to tell him what the term was?

MR. SELLINGER: Objection to form.

BY MR. FERGUSON:

Q. Withdraw that. How would he have known what the term of that agreement was if you hadn't shown it to him?

A. I don't know -- you mean what the term was -- I assume you must be insinuating that I told him, which is fine if I did.

Q. You don't know what the term is as you sit here today?

A. I don't remember.

Q. And you do know that the term is not in any of the documents you just referenced, which were FAQs and letters and informational data. No information in

those FAQs or those letters relates to the term of the affiliation agreement entered into on November 14, 2013?

MR. SELLINGER: Objection to form.

A. I don't remember it being discussed, but I guess I don't understand why that's important.

BY MR. FERGUSON:

Q. The term of the agreement is not important to a board president? He doesn't know if he's signing for five, ten, or 30 years?

A. But the acknowledgement -- I mean, if he wanted to withdraw an acknowledgement, he could certainly do that. We had the ability to sign the affiliation agreement at any time. So if it was ten years and we wanted to do another 30-year term, he didn't have the right to agree to that or not.

Q. Does Mr. Mercer have a right today to say, "Listen, my acknowledgement and joinder -- poof -- I'm not doing it anymore. I'm out"? Does he have a right to do that under these documents?

MR. SELLINGER: Objection to form.

A. I'm not sure why we would care. Again, this is a voluntary program. If he didn't want it to be available for his members, fine.

BY MR. FERGUSON:

Q. Is it your testimony today that he can withdraw from this affiliation agreement? He can say, "My members are no longer acknowledging and no longer joining this agreement"?

A. If the board --

MR. SELLINGER: Hold on. Hold on. Just read that question back.

THE REPORTER: "Is it your testimony today that he can withdraw from this affiliation agreement? He can say, 'My members are no longer acknowledging and no longer joining this agreement'"?

MR. SELLINGER: Objection to form.

A. If the board decided that they did not want -- if a board decided they no longer wanted to allow their members access to the Marriott Vacation Club system, I don't see why we would have any issue with terminating the acknowledgement. It's something that's available for them if they would like.

BY MR. FERGUSON:

Q. That's a different question, though -- what you would do. But do you know that he acknowledged and joined an agreement that has a ten-year term?

MR. SELLINGER: Objection to form.

A. That's not the question you asked me, but --

BY MR. FERGUSON:

Q. That's the question, I guess, I'm asking now. I'm sorry. I forgot what I asked you.

A. We already talked about the term. I don't know -- I didn't -- I probably did know the term. I don't remember what the term is. If you're saying it's ten years, I'm not disputing that.

Q. Hold on. I'll pick up with the actual signed acknowledgement in a little bit, and we'll take a break.

A. Okay.

THE VIDEOGRAPHER: We're going off the video record. The time is 10:30 a.m.

(Brief recess.)

THE VIDEOGRAPHER: We're back on the video record. The time is 10:43 p.m.

Counsel, you may proceed.

MR. FERGUSON: Thank you.

BY MR. FERGUSON:

Q. In Exhibit 2102, which is the 2013 affiliation agreement that was signed by Mr. Delorey and Mr. Cunningham on November 14th of that year, there's attached to it, Marriott Vacation Club exchange procedures.

Do you see that?

A. Yes.

MR. MEADE: Matt, can you just hold on a second? We have to get the technology up and running.

MR. FERGUSON: Sure.

BY MR. FERGUSON:

Q. These Marriott Vacation Club exchange procedures are attached to the November 13, 2013 agreement we've been discussing, Exhibit 2102.

With respect to these exchange procedures, were these exchange procedures then going to be available to RCDC members that, one, whose association presidents or boards agreed to join and affiliate; but, more importantly, number two, if people elected into what you call a voluntary program with these opportunities -- is this the program that an RCDC member, who signs up at Lion & Crown, gets to use in this exchange program -- this exchange document?

MR. SELLINGER: Can you read that back?

THE REPORTER: I don't know if I'll be able to do a good job, but --

MR. FERGUSON: Let me do it another way.

BY MR. FERGUSON:

Q. Are these exchange procedures, in Exhibit 2102, beginning on page 23 -- are these

exchange procedures that an RCDC member would get to use if its club joined and that he or she agreed to sign up for Lion & Crown?

MR. SELLINGER: Objection to form.

A. They would use them if they wanted to use the Marriott Vacation Club system. The Ritz-Carlton reservation system still, obviously, stays in place. Everything they bought stays in place. But if they wanted to use Marriott Vacation Club, this is the exchange procedures they would use.

BY MR. FERGUSON:

Q. Okay. And the MVCD people, Marriott Vacation Club folks that have points, they also use these exchange procedures?

A. Correct.

Q. Okay. And they would use these exchange procedures in order to access inventory that's created by a compliant -- or not a compliant -- a participating RCDC member's depositing of an allocated week?

A. Yes.

Q. You had indicated before that the Explorer people had access to the Ritz-Carlton Destination Clubs?

A. That was before the affiliation was in place.

Q. Right. I understand that. But the Explorer people did have access to the club?

A. It's not Explorer people. It's Marriott Vacation Club people through the Explorer Program.

Q. And Marriott Vacations folks would join the Explorer Program? How did that work?

A. No. It was part of their ownership. I mean, it was a program that they could use as a benefit to their ownership.

Q. And how did that benefit work, if at all, vis-a-vis the Ritz-Carlton Destination Clubs?

A. So the Explorer Program was something that was -- that was -- opportunities that weren't in the trust. So units like Newport Coast or MVCD Orlando, and all those, that's inventory that's actually in the trust.

If inventory wasn't in the trust, there were other opportunities that members had to use -- different vacation options -- like Marriott Hotels, Ritz-Carlton Hotels, wine trips in Napa, trips to Europe; and then Ritz-Carlton Destination Club was one of those.

It was inventory that wasn't owned by the trust, but it was a program that you could use your points, in essence, to go out and use these other

things -- these other opportunities. The Ritz-Carlton Destination Club, before it was in the trust, would have been in that program.

Q. So RCDC developer inventory was put into the trust that the Explorer Program could access?

MR. SELLINGER: Objection to form.

A. It wasn't in the trust. That's why --

BY MR. FERGUSON:

Q. It wasn't?

A. Yes. It wasn't in the trust until it was actually conveyed, and then it wouldn't have gone through Explorer.

Q. But there was developer inventory that was accessible to Marriott Vacation Club folks through this program?

A. Correct.

Q. When did that start, Ms. Sobeck?

A. I don't know when we started. I mean, Vail started -- so the Vail -- actually, conveyance of the inventory, I think, was in 2011, 2012 -- and probably would've been in around '12 or '13, I would guess. We can go back and look for you.

Because we had all this developer inventory to use and we were paying for it, so this was just a way to get some benefit out of that.

Q. So the benefit -- and that was with respect to Aspen only. The benefit that you would derive was to give your Marriott Vacation Club people access to the club in Aspen; right?

MR. SELLINGER: Objection to form.

A. It was giving them -- it was, in essence, using what the developer was paying for, because the developer was paying maintenance fees and nothing was being used.

BY MR. FERGUSON:

Q. And under the theory that the developer is an owner and an owner can rent, that was the rationale for using that inventory for Explorer folks?

A. Not to rent. We didn't -- the developer didn't rent. The developer -- yeah, we were paying it; and, therefore, we had the right to use it like any other owner.

Q. Okay. I know you're not renting it, but I think you said, because any owner could rent and use it how they wanted to, and because the developer had inventory, you could use it as part of the Explorer Program.

MR. SELLINGER: Objection to the form.

A. Yeah, the developer could use it, like -- I threw out rent, but an owner could give it to their

housekeeper as a nice Christmas bonus or something like that. I mean, owners can use that inventory however they want.
BY MR. FERGUSON:
Q. That was my point then, if I can maybe circle up with you. Because people can give it to their housekeeper, they can give it to a charity, or they can give it to a brother-in-law -- because of that, the developer that had inventory in this timeframe -- 2012, 2013 -- the developer, based upon those rights, thought it could use that inventory for people in the Explorer Program?
A. Correct.
MR. SELLINGER: Objection to form.
MR. FERGUSON: What's your objection, Mr. Sellinger?
MR. SELLINGER: I don't think that you accurately summarized the testimony.
MR. FERGUSON: Well, I wasn't summarizing testimony. I was summarizing the program.
It seems that you want to object to every question to throw off my cadence here, but I guess that's what you're going to do.
MR. SELLINGER: You are very capable of not having your cadence affected by an

objection to form, which is certainly not my goal. My goal is to preserve the record, as I'm required to do.
MR. FERGUSON: I think you're just objecting without any rationale, but, whatever.
BY MR. FERGUSON:
Q. If you go to page 13, which is 15 on their system, of Exhibit 2102?
A. Yes.
Q. There is a term, correct -- the term of this agreement is ten years; right?
A. "The agreement shall have a term commencing on effective date" --
MR. SELLINGER: Hold on a minute. Can we put it on the screen?
A. -- "after the effect date." Yes.
MR. FERGUSON: That's not the document. 2102. Hold up for the TV.
THE WITNESS: Your page 15. That's right. Yes. There it is -- 10.1.
BY MR. FERGUSON:
Q. 10.1 is a ten-year term?
A. That's what it says.
Q. And does it automatically renew if notice is

not given?
A. I see termination.
Q. If you go to 10.4 on page 14, their page 16?
A. Yes. "Automatically renew for additional five years unless either party provides notice."
Q. So this agreement would go to about November of 2023?
MR. SELLINGER: Objection to form. I'm sorry. I withdraw that objection.
BY MR. FERGUSON:
Q. It was signed November of '13. It goes to November of 2023; correct?
A. Well, what if it auto-renews?
Q. Yeah. And then it can renew after that, yeah.
A. Yeah.
Q. Okay. Got it. Just digress for a second. Ms. Babich had testified that she provided a signature -- a blank signature -- for you all to affix to her letters.
Do you know anything about that?
MR. SELLINGER: Is there a deposition reference?
MR. FERGUSON: No.
MR. SELLINGER: Objection to form.

BY MR. FERGUSON:
Q. Let me show you Exhibit 1024, if you want to spend just a moment with that. This is the evolution letter. I don't want to go and recreate the whole record -- but this is one of the more important documents in the matter.
My question is, do you recall the situation where she just provided you with a blank signature to use on these letters?
A. I don't -- no, not to me, but it certainly could have happened.
Q. As far as her signing this as general manager of the Cobalt Travel Company, LLC, do you know what that means?
A. She ran member services at this time.
Q. Did she have an official title as general manager of Cobalt Travel?
A. Yes. I should say, I think she was general manager of member services. I don't know specifically if she was general manager of the Cobalt Travel entity.
Q. Well, she wasn't a manager or a member in that sense. She wasn't an official manager of the company, was she?
MR. SELLINGER: Objection to form.

A. I don't believe she is.
BY MR. FERGUSON:
Q. You understand that LLCs have members and managers, just generally, and corporations have shareholders and directors?
A. I do.
Q. She wasn't a manager in the LLC form?
A. I don't know if she was or not, but I think the general manager title was referencing her title at member services.
MR. FERGUSON: Could you bring up the privilege log number two, Mr. Michael Reiser, Jr.?
Is there a first page to that, to the cover letter? No? Okay.
(Exhibit 2141 was marked for identification.)
BY MR. FERGUSON:
Q. Exhibit 2141, this is a supplemental privilege log provided on April 6th, Ms. Sobeck.
Let me ask you this first. Do you recognize this format of this document?
A. No.
Q. If you go to page 3 of Exhibit 2141, at the very bottom of the page, you'll see a document, ID

Page 74

Number 1770.
Are you there with me?
A. On this, yes.
Q. It says, "Nature and description of document, Draft affiliation agreement between Marriott Resort Travel Company, Inc. and Lion & Crown Travel Company, LLC, prepared by and/or with the assistance of counsel." If you pick it up on the next page, it's dated May 30, 2013.
Does that sound about the time, May of 2013, that the affiliation agreement between Lion & Crown and MRTC was being first contemplated?
A. Yes, I guess so. That's what it says.
Q. You'll see that the next document ID Number is 31454 -- 314 --
A. I can't see it. It's gotten too small on the screen.
Q. I'll need you to just work along with the next document on page 4. It's 31454. This is a document -- another ID of another document. It's dated May 31, 2013, at 3:43 and 10 seconds p.m.
It says, "E-Mail communication, questions, and comments provided by legal counsel in draft documents, including draft affiliation agreement between Marriott Resorts Travel Company and the Cobalt

Page 75

Travel Company, which were prepared by and/or with the assistance of counsel."
This one, it says, "Marriott Resorts Travel Company and Cobalt, as opposed to Lion & Crown."
Is that a different agreement? Do you have any recollection that there might have been two agreements prepared in that timeframe?
A. Well, right here, the next -- it says, "Marriott Vacation Club and Lion & Crown."
Q. Okay. Where are you pointing to?
A. The second section.
Q. Okay. That would be the section that starts with "Trisha Wetmore"?
A. Yes.
Q. Who's Trisha Wetmore?
A. She's an attorney.
Q. With Marriott Vacation Worldwide?
A. Yes.
Q. Does she work on documents such as affiliation agreements with respect to your knowledge?
A. Yes. She works with Barbara.
Q. This e-mail chain -- I think these are e-mail chains that actually start on May 30, 2013 -- and it talks about, as you pointed out, the agreement between MRTC and Lion & Crown. It's copied to Essig, Mary

Page 76

Lynn Clark, Stephanie Sobeck, Nick Rossi -- what is Nick Rossi doing these days?
A. Nick Rossi is head of -- we call it IPSM. It's the revenue management team, inventory team.
Q. Darla Everett, who's she?
A. Darla Everett works in feasibility.
Q. Patrick Forth, Eveleen Babich, Stacey Jackson-Rauso, Chris Martin.
Who's Chris Martin?
A. Chris Martin is director of finance for RCDC.
Q. What does he do as director of finance?
A. Looks at all the financials that are produced by the onsite teams.
Q. And then Barbara Egolf and Kathi Borkholder -- I mentioned her before. I misspoke and called her Tracy. I'm sorry. Tracy Borkholder also worked with Ms. Egolf and Ms. Westmore?
A. Kathi. Yes. I won't tell her.
Q. So as early as May of 2013, this affiliation agreement that ended up getting signed in November of 2013 was being circulated between all those folks; right?
A. Yes.
Q. And do you know whether -- I think we already covered with you that you may or may not have this in

Page 77

a work folder on your computer?
MR. SELLINGER: Objection to form.
A. I don't know if it's in a work folder or not.
BY MR. FERGUSON:
Q. If you wanted to see it, for example, to prepare for a deposition -- you wanted to see the affiliation agreement -- how would you access it on your computer? Would you go into a central --
A. No. I would ask the law department to have the most updated affiliation agreement.
Q. So the law department keeps the affiliation agreement -- at least them?
A. At least them?
Q. We know that the law department keeps a copy of the affiliation agreements?
A. Yes.
Q. How about folks like Ms. Clark; would she have had that, do you know, in her files?
A. I don't know if she would have had it.
Q. How about Mr. Rossi; would he have had a document like that in his files?
A. I don't know.
Q. They would have their e-mails -- they have access to their e-mails, obviously?
A. I can only speak -- I have access to my

e-mails. I would assume they do as well.
MR. FERGUSON: Go to page 5 of Exhibit 21 -- same document, 2141. If you just pull 13503, which is the bottom half of that document?
BY MR. FERGUSON:
Q. This is another document, Number 13503. I'm not going to, obviously, go through all of these. This is another e-mail chain. It looks like it starts in June 13th and continues to June 24th at the top. Same basic people are copied there.
Just looking at this -- at this document -- as we scan through the other pages -- 4, 5, 6, 7 -- do you have a general recollection of this document being circulated and drafted in May and June of 2013?
A. I do after seeing this, yes.
Q. In terms of the acknowledgement and joinder document that talks about the association wanting to have some input by a survey -- withdraw that. Withdraw that totally.
In this timeframe, May and June of 2013, you all are still trying to work on how to conduct a survey or -- a survey and/or a vote in that timeframe. Right?
A. Yes. We were trying to work on how to do a

survey to the members.
Q. So in May and June of 2013, when this affiliation agreement between MRTC and Lion & Crown was being done -- was being circulated and worked on by this group of people -- at that point, you didn't -- you still thought you were going to have a vote?
MR. SELLINGER: Objection to form.
A. We thought we were having a survey. I don't remember when the first -- can somebody refresh my memory about when the Aspen survey started?
BY MR. FERGUSON:
Q. December 4th or 5th of 2013.
A. Right. It ended January, like, 15th; right?
Q. January 13th.
A. 13th. Yes.
Q. I guess my question is, do you know whether there was an acknowledgement and joinder being contemplated when the draft was being circulated in May and June of 2013?
A. I don't know if it was or not.
Q. Do you have any idea as to why the documents in Exhibit 2141 -- again, I think I told you at the beginning that it was eight pages -- do you know why these documents were not designated as privileged in

the original privilege log? Any idea about that?
A. No.
Q. But it was being passed around numerous folks at the company; right?
MR. SELLINGER: Objection to form.
A. The draft affiliation agreement was being passed around, yes.
MR. FERGUSON: Would you go to the next exhibit, Michael, which is the first privilege log? What exhibit is that? 2140? Thank you.
Would you go to Exhibit 2140?
Mr. Sellinger and Ms. Livingston, that is a 142-page privilege log.
BY MR. FERGUSON:
Q. I'm not going to be able to show you all 142 pages here, Ms. Sobeck.
A. Thank you.
Q. Same question for you. Have you ever seen the privilege log prior to today?
A. No.
Q. Would you go to page 95 of Exhibit 2140? You'll see that on document number 63228, which is the second document on the privilege log in Exhibit 2140, is an e-mail. Ms. Babich is listed as the custodian

here.
It says it's an e-mail from Barbara Egolf. Addressees, Patrick Forth, Tricia Wetmore, Dee Dinda, Kathi Borgholder, Eveleen Babich, and Teresa Andrus.
Who's Teresa Andrus?
A. She works in member services. She does a lot of the communication. She'll send out -- distribute communication.
Q. This is dated November 12, 2013, two days before Mr. Delorey and Mr. Cunningham signed the 2013 affiliation agreement between MRTC and Lion & Crown.
Do you recall being -- you're not copied on this. Do you recall being involved at all in this timeframe, right before execution, in either the preparation of or comments for the affiliation agreement?
A. I was certainly working with Aspen at the time. Was I working on the Aspen affiliation agreement? I don't remember specifically.
Q. I'm talking about the affiliation agreement between MRTC and Lion & Crown.
A. Isn't that what we just looked at before?
Q. It's not specific to Aspen; is it?
A. The other one was Aspen, San Francisco, and Vail, I think it said, the one you just showed me

before.
Q. When you say, "Aspen, San Francisco, and Vail," are you talking about the nomenclature itself?
A. It said, "Matters," and it was listed, the three clubs.
Q. I think that's -- Delorey is telling us what case it's applicable to, as opposed to what the affiliation agreement relates to.
A. Okay.
Q. My question is simply, were you involved, in this timeframe, in the preparation of this affiliation agreement?
A. This is talking about an e-mail communication that's going out about affiliation. I don't think this is actually about the affiliation agreement itself, but I'm only reading what's on here.
Q. You're right. But in this timeframe, there was communication regarding the affiliation between Lion & Crown with MVCD amongst these several folks; correct?
MR. SELLINGER: Objection to form.
A. It appears there was.
BY MR. FERGUSON:
Q. What was the purpose of the meeting, if you recall, when Mr. Oliver and Mr. Mercer visited here on

November 14, 2013?
A. I believe we were -- that was in my testimony before. I believe we were talking about the management agreement.
Q. That was coming due in a year or so?
A. The auto renewal was coming up, yes.
Q. Let me just show you Exhibit 1008.
A. Okay.
Q. Exhibit 1008 is titled on the front page, "Ritz-Carlton, San Francisco, membership program and affiliation agreement." I just want to get this kind of marked and out there, because we're dealing with the affiliation agreement from November 2013.
But do you recognize this document generally?
A. Yes. This is the affiliation agreement between Cobalt, and this specifically was with San Francisco.
Q. There was one we saw earlier, which was the predecessor name for Aspen. It was called the Ritz-Carlton Travel Company. That's Exhibit 1003; correct?
A. I don't know if it's Exhibit 2003, but, yes.
Q. Okay. So each club got an affiliation agreement with Ritz-Carlton Travel Company, that became Cobalt, and this is San Francisco's version of

that document?
A. Correct. It named the program manager for the property.
Q. The program manager was Cobalt?
A. Correct.
Q. Exhibit 1013, which is coming apart, so I have a paperclip for you. Don't cut yourself.
A. It's the one for Lake Tahoe.
Q. Exhibit 1013, is that a copy of the affiliation agreement with the program manager, Cobalt, for the Lake Tahoe property?
A. Correct.
Q. If you go to the last -- the next to the last page, there's signature blocks. There's three pages. There's going to be a few page 18s just to make things easy for us.
A. Oh, there's multiple pages.
Q. I believe you talked about --
MR. SELLINGER: Can we have them pull that up?
MR. FERGUSON: The first page 18.
THE WITNESS: It's page 20.
MR. FERGUSON: Which is page 20.
THE WITNESS: Yes. Robert Phillips.
BY MR. FERGUSON:

Q. I think you mentioned him at your deposition. What was his position? This is the Marriott International days, when Marriott International had the vacation club business; correct?
A. Yes. Any time before 2011.
Q. Right. Mr. Phillips was with -- was he with the vacation side of Marriott International?
A. Yes. He worked specifically on The Ritz-Carlton Destination Club.
Q. So he signed for the Cobalt Travel Company, whose sole member was the Ritz-Carlton Development Company.
Do you see that?
A. Yes.
Q. Mr. Phillips is gone?
A. He is gone. Not gone. He's no longer with us.
Q. He's retired or left the company?
A. I think he's still working, but, yes, he left the company.
Q. The Ritz-Carlton Development Company, Inc., that was signed on page 21 by a fellow named Peter J. Watzka; is that right?
A. Yes.
Q. Mr. Watzka, was he someone who worked with

Page 86

the RCDC system from the beginning?
A. He was our head of sales and marketing.
MR. SELLINGER: Belatedly, objection to form.
BY MR. FERGUSON:
Q. Head of sales and marketing for MVW?
A. He was -- well, what's your question? When he was here?
Q. Well, you said he was the head of marketing development -- I'm sorry. I forgot what you said. Marketing and development?
A. He ran our sales and marketing department for a long time; and then, later in his career with MVW, he was working specifically on The Ritz-Carlton Destination Club.
I don't know when this falls in that chain of events.
Q. Did he transition with the vacation club side, which included RCDC, when it was spun off from Marriott International? In other words, did he make the transition from MI to MVW?
A. For a short period of time.
Q. Did you have any involvement at all in connection with potential packaging of the RCDC system for a sale to a third party?

Page 87

A. No.
Q. Were you aware of that?
A. Yes.
Q. Mr. Albert signed for the Highlands Resorts Association.
Was he an employee of -- he was an employee of Marriott Vacation Worldwide, was he not -- sorry -- he was an employee of Marriott International?
A. At this time, Marriott International.
Q. And he's made it over to the Marriott Vacation Worldwide company here in Orlando?
A. Yes, he has.
Q. Thank you.
A. Do you want to know about Dan Zanini?
Q. Yeah, let's cover that.
A. He's still with us.
Q. Let me show you what's been previously marked as Exhibit 1307.
A. Randy Mercer. I hope you guys recycle.
Q. Yeah, I do. Just for kind of a placeholder, this is a letter that went out -- this particular one -- to Mr. Mercer. This is the letter that went out after you all met with Mr. Mercer and Mr. Oliver here in Orlando, where, I think, you told the members generally what was coming in terms of critically-asked

Page 88

questions in a survey.
Do you generally recall this document?
A. Yes, I do.
Q. This has been shown to about 40 or 50 of our clients. I figured I'd spend a few moments with you.
It says, "The Ritz-Carlton Destination Club and your board have been exploring" -- and this is page 2 -- I'm sorry -- of Exhibit 1307.
A. I have it.
Q. -- "exchange opportunity with the Marriott Vacation Club Destination Exchange Program."
It says here, "As promised earlier this year, members of The Ritz-Carlton Club, Aspen Highlands, will be surveyed on their opinion regarding potential exchange affiliation with Marriott Vacation Destination Exchange Program."
Did you have any part in writing this letter?
A. I certainly reviewed it, if I didn't write part of it, yes.
Q. Were you the primary author of this document?
A. I wrote some of it. Some of it, I believe, was -- there were multiple people who were involved. You're going to ask me all of them, and I don't know who they all were.
Q. Some of the people we see being -- there's

Page 89

about 20, 30 pages of communications around November -- early November, mid November, late November of 2013.

We saw Egolf and Wetmore and Borkholder on the legal side, and Dee Dinda, Patrick Forth, Eveleen Babich, Teresa Andrus. Were those the types of people helping with this letter?

A. Yes.

Q. And who gave you the input of any -- withdraw that. Who was the person who wrote this sentence that says, "Promised earlier this year, members of RCDC Aspen will be surveyed on their opinion"? Who wrote that part of it?

A. I don't know.

Q. Are you aware of a single document between April 5, 2013 and November 19, 2013, that said they were going to be surveyed -- you told the members they were going to be surveyed?

A. I don't know specifically.

Q. Then, on the bottom of that paragraph on page 2 of Exhibit 1307, it says, "A more complete frequently-asked-questions sheet will be included with a survey."

And the survey went out in the next couple weeks; correct?

A. Yes.

Q. I'm not going to cover the survey again, but --

MR. SELLINGER: I'll just note for the record that I'm not sure what this inquiry or exhibit has to do with the production of the documents that gave rise to the deposition, but I'm not foreclosing --

MR. FERGUSON: I'm happy to tie it together.

BY MR. FERGUSON:

Q. By November 19, 2013, when this went out to 876 Aspen members -- or however many -- I know you guys own some inventory still. When this went out, the ink on the affiliation agreement that was produced in March of 2018 for the first time was just drying; right? It had been signed four or five days earlier; right?

A. Correct.

Q. And was there any mention in the letter that you drafted for Mr. Cunningham and the board to sign that once -- it is 876 people. Was there any mention in there that there had just been an affiliation agreement entered into between those two entities?

A. I don't believe so, but there wouldn't have

had to be.

Q. Well, that's my next question. You didn't have to tell them about that. But did you bother to tell them that there was going to be a right of the board to have an acknowledgement and joinder of that agreement? Did you mention that to them in this letter at all?

MR. SELLINGER: Objection to form.

MS. LIVNGSTON: Object to form.

A. I'm sorry. I don't know if it's in here or not, but I'm assuming, because you're asking, it's not.

BY MR. FERGUSON:

Q. Let me ask you. I read this, but maybe there is a reference to it that's oblique or that the uninitiated might not know is a reference to that agreement -- that joinder, rather.

MR. SELLINGER: Objection to form.

THE VIDEOGRAPHER: Counsel, would this be a good time to go ahead and do the change?

MR. FERGUSON: It's been an hour already?

THE VIDEOGRAPHER: It's within five minutes.

MR. FERGUSON: Go ahead.

THE VIDEOGRAPHER: This is the end of

media unit one. We're going off the record. The time is 11:23 a.m.

(Off record.)

THE VIDEOGRAPHER: This is media unit number two in the deposition of Stephanie Sobeck. We're going back on the video record. The time is 11:23 a.m.

Counsel, you may proceed.

BY MR. FERGUSON:

Q. Ms. Sobeck, you were looking at Exhibit 1307 to see if there's any reference to the acknowledgement and joinder document that was attached as Exhibit B to the affiliation agreement and was signed by Mr. Delorey and Mr. Cunningham a few days earlier.

Is there --

A. Yes. I don't see anything about the acknowledgement.

Q. Thank you. I'm going to show you Exhibit 1354. It starts at the back, like all e-mails like these. There's an e-mail from you on page 135403 that starts with, "Randy, please find the revised affiliation agreement for Aspen Highlands which updated the effective date."

Do you see that?

A. Yes.

Q. Was that all that was done, was updating the effective date, the revision?
A. I don't know if there were additional changes made. It appears here that it was just effective date.
(Exhibit 2104 was marked for identification.)
BY MR. FERGUSON:
Q. I'll show you Exhibit 2104, which I don't have an extra copy of. So 2104 is a document produced by the homeowners association, Bates label 18031. It's kind of free-flowing in the production, but it's dated January of 2014.
Do you see that?
A. Yes.
Q. Was there going to be an earlier effective date or -- what do you recall about effective dates, if anything?
A. Was there going to be earlier than --
MR. SELLINGER: I'm sorry. Can you put up the part of the agreement that --
MR. FERGUSON: Sure.
A. I don't know. It might have been drafted with an earlier date, and then we were updating it based on when it was going to be executed, but I'm

really speculating. I don't know.
BY MR. FERGUSON:
Q. It says, "This acknowledgement shall be effective as of the date set forth in the written notice provided by Lion & Crown to association and MRTC, effective date, which effective date shall be no less than 30 days after the date of such written notice."
That's a document that had to be provided at some future time to give that notice?
MR. SELLINGER: Objection to form.
A. Yeah. I think there was a separate document, yes.
BY MR. FERGUSON:
Q. I hate to jump around with the people on the television there, but going back to 1354, it says -- it's a revised affiliation agreement with an updating of the effective date.
Do you know whether that's referring, if you know, to the January blank, 2014, or is there some change in the effective date language in the bottom of the first paragraph of Exhibit 2104?
A. No. My assumption would be, it would've been the effective overall date, the January 2014 date.
Q. Thank you. Then back to your e-mail, 1354,

it says -- if you can go there -- 1354, page 3. You wrote to him, "This memorializes the Aspen Highlands members having voluntary access to Marriott Vacation Club Destination Club Exchange Program. Let me know if you have any questions. If not, please sign and return at your convenience."
Do you see that?
A. Yes.
Q. We talked about this before, but it would appear for certain here that you did not send him the actual agreement you were asking him to acknowledge and to join; right?
A. Yes. But it certainly could have been sent if he had requested it before.
Q. If he had requested it, it would have been sent?
A. Sure.
Q. If his lawyer had requested it, it would've been sent?
A. Correct. It might have. I don't know.
(Exhibit 2103 was marked for identification.)
BY MR. FERGUSON:
Q. Can you go to Exhibit 2103? This is a first amendment to the affiliation agreement that Delorey

and Cunningham signed a few weeks earlier, the changes to article two. And it says -- and the changes for the purpose of clarification -- "MVCD and Lion & Crown may negotiate changes to the form of the acknowledgement from time to time with participating Lion & Crown associations."
Lion & Crown associations would be, for example, Tahoe, Aspen, St. Thomas -- I'm sorry -- Tahoe and Aspen Highlands?
A. Correct.
Q. Do you have any recollection as to why this clarification was effectuated in this first amendment to affiliation agreement?
A. Not specifically, but if there was a tweak of language that one of the boards was requesting, it would allow them to do that.
Q. So Exhibit B in the initial affiliation agreement that was signed by Delorey and Cunningham on November 14, 2013, had an Exhibit B with fixed language in the acknowledgement and joinder? That was the form that had to be signed pursuant to that agreement?
A. Correct.
MR. SELLINGER: Objection to form.
A. And this was --

BY MR. FERGUSON:

Q. We're talking over each other. Sorry. Go ahead.

A. (Shakes head.)

Q. Does this give you some flexibility if someone asked you for some changes?

A. Yes.

Q. Was someone asking for changes at this point in time, if you know?

A. I don't remember if they were or not.

MR. SELLINGER: Off the record. At some point -- we're over an hour now, so --

MR. FERGUSON: We'll take a break. I'm getting close to handing this to Mike for the other documents.

THE WITNESS: Can we finish --

MR. SELLINGER: How much longer?

MR. FERGUSON: I'd say 15.

THE WITNESS: I'm good.

MR. REISER: The witness is good.

THE WITNESS: He's the one with the hip.

MR. FERGUSON: Take five.

MR. SELLINGER: Let's take five.

THE VIDEOGRAPHER: We're going off the record. The time is 11:31 a.m.

Page 98

(Brief recess.)

THE VIDEOGRAPHER: We're back on the record. The time is 11:47 p.m.

Counsel, you may proceed.

BY MR. FERGUSON:

Q. Ms. Sobeck, Exhibit 1357 is an HOA document. I know you're not a copyholder or a recipient, but I just wanted to ask you about page 2 of 1357. It's between Mercer and his board members on February 24, 2014.

He mentions that this document was passed to him by Stephanie while in the board meeting in Orlando.

Was there a meeting -- we saw, I think, January 30th, you sent him the affiliation agreement as revised. Was there a board meeting before you revised the acknowledgement that you sent to him on that date, or was it after?

MR. SELLINGER: Objection to form.

A. I don't remember the date of the board meeting.

BY MR. FERGUSON:

Q. Well, when he talks about a board meeting in Orlando to his board, what type of meeting did you actually have with Mr. Mercer in early 2014?

Page 99

A. We had a -- they did have a board meeting in Orlando sometime. I'm not sure if it's the 2014 -- many of our boards do board meetings in different places. If this is the one we met with Lee, it wasn't actually a board meeting. We were talking about the management agreement, which is, I believe, what you were talking about earlier.

Q. The management agreement came up later in 2014, right, after the affiliation acknowledgement -- sorry -- the acknowledgement and joinder of the affiliation agreement and the MOU, which I'm going to cover in a moment.

The next thing that followed was the renegotiation of the management agreement; right?

A. Correct, but we started conversations. The management agreement was part of -- always part of the conversation with them.

Q. In terms of you passing on to him the joinder to affiliation agreement, does that help you recall what he might be referring to in terms of a meeting -- a board meeting -- in Orlando, where you would have handed him something like this?

A. This would've been the agreement that -- well, because we had finished the survey at this point -- because the survey was finished mid

Page 100

January -- and -- I'm not sure if this is the board meeting.

They had a board meeting in which we talked about the survey results, and then I would have given him the acknowledgement for his -- for him to look at or sign, whatever he wanted to do.

Q. Okay. At some point -- he talks about the selection of lawyers there -- but at some point, Mr. Marino appeared to work with Mr. Mercer and his board with Ms. Egolf?

A. Yes.

Q. Exhibit 1360. Ms. Sobeck, Exhibit 1360 is an e-mail that was produced by the association. I'm not sure I found your side of this in the production, but we have it nonetheless in this production.

This is you sending an e-mail to Mr. Mercer with a copy to Mr. Oliver.

Do you see that?

A. Yes, I do.

Q. Why were you only copying Mr. Oliver at this time in terms of the Aspen Highlands acknowledgement form?

A. Randy and Tyler were taking a lead on these, so I was spending most of my time talking to the two of them.

Page 101

Q. It looks like you forwarded to him a PDF called "Aspen Highlands acknowledgement." Would that have been the acknowledgement and joinder form that we've been talking about today as Exhibit B to the affiliation agreement?
A. Yes.
Q. You also gave him a detailed "how to use guide; correct?
A. Yes.
Q. That's a PDF. And there's something called a "13-2542-RCC Aspen member MVCD and VCD affiliation brochure file, PDF."
What was that last document? What was that brochure?
A. I don't remember specifically. I guess it would've been a summary of the affiliation program with MVCD.
Q. Had you prepared one of those already then? Obviously, you had, I guess.
A. Well, we did. We had a -- members had to enroll in Lion & Crown and -- I actually don't specifically remember an affiliation brochure, but, obviously, it exists. Is it back here that I can look at it?
Q. Yeah, I think it is. Yeah, it is. There's

some type of brochure with a lot of photos and options and whatnot.
A. This is what we call the "how to use guide."
Q. Is this the "how to use guide"?
A. Well, hold on one second. Let me look.
Q. That's okay.
A. So this has on it the acknowledgement. This is actually the Marriott Vacation Club brochure that talks about all the options within Marriott Vacation Club.
Q. Okay. Is that what was being sent to him, or do you know? It's weird...
A. So this -- so, in essence, this is all of the options that you have to use within Marriott Vacation Club. It doesn't include the how to use guide. It has the other options.
Q. In fact, I just noticed that, Ms. Sobeck. It goes from 8825, which is the last page of the enclosed affiliation agreement, and there's two pages missing, 26 and 27. Don't ask me why, but I apologize. That probably would've been the other attachment, which would've been the how to use guide.
Do you see what I'm saying?
A. Yes.
Q. Does that detailed how to use guide -- does

two pages for that sound about right -- two pages long?
A. I don't know how long it is.
Q. It says, "Based on our last discussion, we have revised affiliation acknowledgement for Aspen Highlands and we have included the brochure."
You can take a look at Exhibit 1360 and the attached acknowledgement. I do see that it now says February -- it's supposed to be January.
Were any other changes made to the affiliation, acknowledgement, and joinder agreement when you sent it to them on February 27, 2014?
A. I don't know.
Q. At this point, you said -- you had mentioned that Mike Marino was to work with this.
Do you see that?
A. Right here -- I guess this Exhibit A and B is information of certain features and offerings in the MVCD program, section 9. That probably would've been the change, because now they're talking about Exhibit A and B, which would've been the...
Q. I got it. Would you go to -- well, if you go to the November -- you can look at that one too -- but if you can also go to the affiliation agreement itself, and try to determine what was added?

A. Well, that's what you asked me; isn't it?
Q. It is, yeah.
A. Okay. So --
Q. It looks like paragraph --
A. Yeah -- and I can't say -- I'm just saying that appears to be -- that paragraph 9 seems to have changed from the last version you gave me in January to the new version you've given me in February, which has -- talks about two exhibits.
Q. Okay. So the affiliation, acknowledgement, and joinder agreement or form was being negotiated to some extent at this timeframe?
A. It appears it was being discussed with the board and they wanted a couple additional things.
Q. You would agree with me that this e-mail, Exhibit 1360, providing potential new exhibits for the acknowledgement and joinder, you did not send to him the underlying affiliation agreement in this agreement either; right?
A. The underlying affiliation agreement is not included in this document, correct.
Q. Let me show you Exhibit 1364. This is an HOA document. I'm trying to -- I'll show you the bottom of page 1. It says "March 3, 2014." It's between Marino and Marino, I think, to Randy Mercer. "We got

all the preliminaries out of the way."

He says, "Barbara, as usual, downplayed everything. I told her one-sided. All about assuring Marriott experience in Aspen. Wanted platinum experience for its members. We speak again tomorrow at 4:00 p.m."

You were in and out of the negotiations, or discussions, I should say, with Mr. Marino, Ms. Egolf -- I know I say that wrong every time -- and Mr. Mercer, were you not, in this timeframe?

A. Yes.

Q. At some point, a document called a "Memorandum of understanding" came into play. Do you recall that?

A. Yes.

Q. Whose idea was it? Did someone request it. Did someone suggest it? What was the genesis of the memorandum of understanding in this timeframe?

A. It was requested by Randy and Mike -- Mr. Marino.

Q. Who took the first draft of it; do you know?

A. I don't remember.

Q. It was requested. It was something you were willing to give them?

A. Yes.

Q. Is it a binding contract between Marriott Vacation Worldwide, or anybody, and the HOA?

MR. SELLINGER: Objection to form.

A. No. I didn't know. It was really -- the purpose of it was, they wanted to kind of memorialize the discussions and what we were offering.

BY MR. FERGUSON:

Q. But the actual document that effectuated the ability of Aspen Highlands folks to voluntarily participate in the Vacation opportunities you were offering, that was going to be the acknowledgement and joinder?

A. Well, the affiliation was the Lion & Crown affiliation, and then the members being able to participate was the acknowledgement by the board. Correct.

Q. So the MOU didn't do anything like that?

A. No.

Q. It was a document they requested and you agreed to and negotiated or discussed over the next few weeks?

A. Yes.

Q. You said, "Nice. Good setup," at the top of page 1 of Exhibit 1364. It says, "Remember, we are the crown jewel in the platform from a cooperation

perspective in a location, member experience position."

Did you have discussions with Mr. Mercer that he and his board were the crown jewel in terms of cooperating with you all about the affiliation?

A. No. I don't remember him saying that.

Q. 1365. I know. Let's see if we can use maybe the smart board here. I only have one question about this anyway.

MR. FERGUSON: Can you go to the last page and blow up that paragraph, see if we can read it? 1365, page 3. Thank you.

BY MR. FERGUSON:

Q. It's a little bit better, Ms. Sobeck, on the screen. It's Marino to Tyler Oliver and Mr. Mercer on March 5th, and it says, "Clarity with Barbara. We want MOU and a letter to members in plain English, explaining."

Do you recall there being -- them wanting a document that was called an MOU? Is this around the timeframe that they wanted the MOU?

A. Yes.

Q. And were they concerned about something being in plain English? Did they discuss that with you?

A. Yes. Mr. Mercer and Tyler Oliver had been

discussing -- they were concerned that information -- that letters that we wrote sometimes weren't as clear to members -- that members didn't understand things.

So that's why we worked together on the member communications that were done, to ensure that, as members, they understood clearly what they said.

Q. Okay. Do you know whether they -- withdrawn. Do you know whether you had ever shown the affiliation agreement that Mr. Delorey and Mr. Cunningham signed on November 14, 2013 -- did you ever show that to them when they were here in Orlando?

A. I don't know.

Q. Did they ever express any concerns about the plain meaning or the clarity or lack of clarity of the affiliation agreement with you at any time?

A. No.

Q. Okay. Go to page -- middle page -- the second page in of Exhibit 1365.

MR. FERGUSON: Can you blow up the -- where it says "original message" there, Mike? A little higher up. Right there. Thank you.

BY MR. FERGUSON:

Q. Mr. Marino told Mr. Mercer and Oliver there on March 5, 2014 -- he said, "She" -- he's referring to Barbara Egolf as you can see before -- "She only

focused on getting the joinder as directed."
Was that something you were directing her to get signed? Was that important to you?
MR. SELLINGER: Objection to form.
A. The joiner?
BY MR. FERGUSON:
Q. The joinder. A joiner -- I guess he called it a joiner.
A. No. I think she was focusing -- he was probably talking about the MOU. She was talking about the acknowledgement.
Q. That's what you needed for your files in order to effectuate the affiliation with respect to the Aspen Highlands?
MR. SELLINGER: Objection to form.
A. We needed the acknowledgement in order to give the members access to the program, yes.
BY MR. FERGUSON:
Q. The acknowledgement and joinder?
A. The joinder form, yes.
Q. Someone didn't put the "D" in the word "joiner," it looks like.
Exhibit 1383. This appears to be a red-line version of the MOU, the memorandum of understanding.
Do you see that?

Page 110

A. Yes.
Q. And it's between -- it says, "Memorandum of understanding between Marriott" -- and that's taken out, and it says, "Lion & Crown Travel Company and Aspen Highlands Condominium Association."
MR. SELLINGER: I'm sorry. Just tell me where you're reading from.
MR. FERGUSON: I'm sorry?
MR. SELLINGER: Where are you reading?
MR. FERGUSON: I'm reading the document's name. Did I give you the wrong document? I might have. For some reason, I have the wrong one in there.
Can you put up 1383?
THE WITNESS: That's the one.
MR. SELLINGER: This is 1388.
MR. FERGUSON: I'm sorry.
BY MR. FERGUSON:
Q. The fact that the word "Marriott" is taken out there and someone put "The Lion & Crown Travel Company" in there as the parties on this memorandum of understanding, does that indicate to you that maybe Mr. Marino had started this document?
A. It appears so.
Q. This would probably be -- at least some of

Page 111

this would be Ms. Egolf -- Ms. Egolf would have been the one red-lining this document with Mr. Marino?
MR. SELLINGER: Objection to form.
A. I don't know.
BY MR. FERGUSON:
Q. You don't know?
A. They were going back and forth, but I don't know whose red line this is.
Q. If you go to page 2 of Exhibit 1383, paragraph 5 says, "Acknowledgement by the association of participation in the exchange opportunity with MVCD Exchange Program for individual members simply results in the opportunity for an eligible member to voluntarily participate in an exchange opportunity with the MVCD Exchange Program."
You see it says, "Acknowledgement by the association of participation." Do you believe that's a reference to the acknowledgement and joinder or is it just using the word "acknowledgement"?
A. I don't know.
Q. Do you know whether the MOU, in any of its iterations -- its early pre-signature -- the pre-execution iterations -- ever referenced the affiliation agreement that was signed by Delorey and Cunningham on 13, November 2013?

Page 112

A. You're asking if any of the versions of the MOU talked about the affiliation?
Q. Yes.
A. I don't know.
Q. Exhibit 1385, this is a board meeting -- tourist accommodation board of directors meeting -- April 5, 2014, a year after the letter went out on April 5, 2013 relating to a vote.
It indicates that, present from the Ritz-Carlton Management Company, were Babich, Sobeck -- were you at the meeting physically or did you appear by telephone?
A. I believe I would've been there physically.
Q. Okay. Did you bring with you the affiliation agreement that was going to be acknowledged and joined by Mr. Mercer and his board?
A. I don't know. I don't -- I thought you said earlier that they did not receive it.
Q. Did you bring it with you and not give it to them? Do you have any recollection?
A. No.
Q. If you look at page 4 of Exhibit 1385, it talks about the member survey results at the very bottom of the page.
A. Yes.

Page 113

Q. Are these minutes or an agenda? It looks like minutes. It says, "The overall result of the members survey regarding potential partnership with Lion & Crown and Exclusive Resorts was discussed."
Exclusive Resorts, was that also being renewed around this timeframe, or was it a new program being offered, I should say?
A. No. I believe Exclusive Resorts existed before.
Q. It says, "The majority of the members who responded to the survey would like to see more destinations offered. The board is working on an executable document that will be sent to members explaining the results.
"Mr. Marino, the board's attorney, commented that the board has been in touch with Barbara Egolf to prepare this document. The membership agreement was discussed."
Having been there -- I know it's a few years ago -- but were they discussing the MOU here, the acknowledgement and joinder, or both?
MR. SELLINGER: Objection to form.
A. (No response.)
BY MR. FERGUSON:
Q. Tell me which one you think or recall, if

any --
A. I think they would've been talking about the -- Mr. Marino, the board's attorney, was working on both the acknowledgements and the MOU, so all I can --
Q. And what was Mr. Marino doing with respect to the acknowledgement and joinder, if you recall?
A. He was reviewing it. He was the association's counsel, so he wanted to look at anything necessary to be able to execute the agreement.
Q. Exhibit 1388, this is an e-mail chain from, I think, April -- of early April of 2013. You'll see it starts -- I shouldn't say "it starts" -- it starts April 4, 2014 with an e-mail from Egolf to Mr. Marino. It was regarding a clarification on paragraph 7C. That's on page 6, by the way.
It looks like the MOU is being negotiated by Marino and Barbara early April there; is that right?
A. Yes.
Q. And going to page 4, it looks like Egolf sent changes about -- suggested to Mr. Marino and you and Ms. Wetmore, in the legal department -- the very bottom of the page, page 5, Exhibit 1388.
She said, "The changes make a lot of sense

technically, but put the words 'currently inform' in front of the word 'limited' and we can live with it."
Do you see that?
A. Yes.
Q. If you go to page 4 of Exhibit 1388, there's an e-mail in the middle on April 5, 2014. You were here in town -- not here -- I'm not in Aspen, am I? I'm in Orlando. You were there in Aspen, Colorado, it looks like, from the minutes.
But you wrote an e-mail at 9:40 p.m., and said, "We have no intention of a unilateral change. If we remove 'currently' and remove 'weeks of,' we're fine."
Then you said, "MVC members have the opportunity to use less than a full week; although, only in the reserve allocation as stated below. Hope this works for you."
You were telling them at this point -- and I think you might have told them a little bit before this -- that Marriott Vacation Club members would be able to access for days less than a full week. Right?
A. Yes. They would be able to use the weeks that had been deposited into Marriott Vacation Worldwide for less than a full seven days.
Q. 1388.

A. Page 4.
Q. Right. That was -- do you recall when you -- withdrawn. Do you recall, on or about December 6, 2013, that Mr. Mercer wrote a letter to the -- it was a day or two after the survey went out -- that he wrote a letter to the members from the board, telling him why they supported the voting or answering "yes" to the survey? Do you recall that e-mail generally?
A. Yes.
MR. SELLINGER: Objection to form.
BY MR. FERGUSON:
Q. You helped write that, did you not? You gave some input into it?
A. Into Randy's e-mail from the board?
Q. Yeah.
A. I don't know. If he asked me to, I certainly would've given comments.
Q. Do you remember at that time telling him something similar to this, that you wanted to alert him to the fact that Marriott Vacation Club people could come in for less than a week's stay -- two days, three days?
A. I would -- specifically about that e-mail or the message communication, I don't remember, but I certainly would have told him that.

Q. At least by this time, you were telling him that there could be people from the Marriott Vacation Club that could be there for less than a week?

A. Sure. Just like Ritz-Carlton Destination Club members. They don't have to come for a full week. They can come for less.

Q. But do you know whether that language made it into -- do you know whether that concept made it into the MOU, that a Marriott Vacation Club person could come in for less than a week?

A. I don't know if it did or not.

Q. Do you understand that it was a concern of some people that Marriott Vacation Club folks, if they can come in for less than a week's stay, would put additional strain on member services -- turnover of rooms -- a private residence club like that? Do you remember that being expressed?

A. There would be no effect on member services.

Q. No effect with room turnover two or three times in a week?

A. Not to member services.

Q. How about housekeeping?

A. Well, there could have been, but members have the ability to do the same thing, so I don't know what the difference would be.

Q. But when this thing was marketed and sold to 206 of our clients, most of them were told that this would be a place they can come for a week or two weeks and treat as their home. It's a private residence club; right? That's what it was started to be?

MR. SELLINGER: Objection to form.

A. It was a --

MS. LIVNGSTON: Object to form.

A. No. It was a vacation destination club for owners who were interested in going to the Ritz-Carlton.

Q. You don't believe it's a private residence club?

A. A private residence club? There was nothing in there that kept members from renting it to their friends or letting other people use it.

Q. So if I pull up -- and I have them -- about 10 or 12 of these Ragatz reports -- you know Ragatz; right?

A. Yes, I do.

Q. And I look in his report of the HVS report that was done for Bachelor Gulch, there's a term -- and I think it's also in the Cushman & Wakefield appraisals that were done for the Bleu Trust inventory that you you all owned -- they use the term "private

residence club" as a term of art within the lodging industry.

Are you familiar with that term of art?

MR. SELLINGER: Objection to form.

A. What's a term of art?

BY MR. FERGUSON:

Q. That it's a term. You have a transient -- a transient person is someone who comes and goes in a hotel. There's a private residence club. There's vacation clubs. It's a term that's used within the lodging and hospitality industry.

A. Okay.

Q. Are you familiar with it?

A. Yes, I'm familiar with that.

Q. Do you consider the product that was built in 1999, 2001, and sold to the people up there in Aspen -- did you consider that to be a private residence club?

A. We considered it a luxury fractional product. We still do.

Q. If you go to page 1 of Exhibit 1388, it looks like Mr. Marino wrote directly to you and Ms. Egolf, and he said, "I'm writing to you, of course, only through Barbara, your legal counsel. The board has approved the MOU with the following language in

Section 7C, which you previously have approved."

So it looks like you were closing in on the final language for the MOU around this timeframe -- early April or mid April 2013 -- 2014?

A. Yes.

Q. Do you recall that Mr. Marino and/or Mr. Mercer were asking for a termination right or provision in the MOU? Do you recall that at all?

A. No, I don't.

Q. Here's the MOU, Exhibit 1607. It looks like this was signed by Cunningham and Mercer. It's dated April 17, 2014.

Does that sound about right?

A. Yes.

Q. Is this a contract?

MR. SELLINGER: Objection to form.

MS. LIVNGSTON: Object to form.

A. I don't know if it's a contract. Legally, are you saying?

BY MR. FERGUSON:

Q. Yeah. Let me do it another way. What does this thing do?

A. Well, that's why we really didn't think we needed it. This was Randy and Michael just clarifying the discussions we had. So we didn't really

understand the need for it, which is why we didn't really offer it up. It's something that they requested.

Q. Mr. Shea, who's Ms. Livingston's partner, the HOA's lawyer, gets up at depositions and waves this around as though it's the key document in the case.

I guess you would disagree with that; right?

MR. SELLINGER: Objection to form.

MS. LIVNGSTON: Object to form.

A. I don't -- well, I don't know what their case is. All I can say is that we certainly -- we understood the board's request for it. We didn't have any objection to it, because all it did was put in writing what we had agreed to. So we didn't have any concerns standing behind that.

BY MR. FERGUSON:

Q. Paragraph 7 has the points that the parties agreed to, and, I guess, it's 7A through 7H, so I guess there's some notion of agreement here.

But is there anything in here that's different than they acknowledged and joined with respect to the main affiliation agreement between MRTC and Lion & Crown?

MR. SELLINGER: Hold on a minute. Could you read that back?

Page 122

BY MR. FERGUSON:

Q. Let me rephrase it. Is there anything in paragraph 7A through 7H that's different than what was acknowledged and joined by the HOA when they signed that form?

MR. SELLINGER: Objection to form.

A. The acknowledgement was allowing members the access to Marriott Vacation Club system. I believe what was included in here is some specifics that the board wanted clarity on of how the Marriott Vacation Club's system would work for the Aspen owners.

BY MR. FERGUSON:

Q. Is it anything different than what we saw in the exchange program for the Marriott Vacation Club program?

MR. SELLINGER: Objection to form.

A. It is --

MS. LIVNGSTON: Object to form.

A. It is different from that because there's some things in here specifically, like the use of space available time, reserved allocated time, that would not have been in that.

BY MR. FERGUSON:

Q. Okay. All right. Is this around this timeframe, April of 2014, that the Jupiter property

Page 123

decided not to -- decided to deflag?

A. I believe they went to a vote of their members.

Q. And the vote was to deflag?

A. Was to -- yes -- not continue with Ritz-Carlton Destination Club.

Q. Was that a vote done by Marriott Vacation Worldwide like you did with respect to our HOA with Ms. Vericchio, or was it something different?

MR. SELLINGER: Objection to form.

BY MR. FERGUSON:

Q. Bad question. What kind of vote was it that was handled in Jupiter right around the timeframe the acknowledgement and joinder was going to be signed in April 2014?

A. With Aspen?

Q. No. In Jupiter.

A. The vote in Jupiter was to -- it was actually -- they were enacting their rights under the declaration and bylaws to terminate the management agreement. So they were actually going -- getting a vote of the members to decide if they wanted to terminate the management agreement and move to someone else or stay with the management company that they had.

Page 124

Q. Is that a vote that was handled by the board itself, the association?

A. The association handled that vote specifically.

Q. So it wasn't one where you hired Morrow & Company to do it for you guys. Something different?

A. It was something different, yes.

Q. Let me show you Exhibit 1302. I'm sorry. 1392. The last page of this document -- this is the acknowledgement and joinder to affiliation agreement between Lion & Crown Travel Company and Marriott Resorts Travel Company, Inc. And this particular one is for the association, which is defined as the Aspen Highlands Condominium Association, a Colorado Non-Profit Corporation, up there on Aspen Highlands Mountain.

So this is a document that was eventually signed by the association, Mr. Mercer and Mr. Cunningham and Mr. Delorey, on the last page?

A. Yes. It was signed by the three of them.

Q. And if you look at the first page of this document, we've seen the version where, in the date of the third line, it was February. Someone scored that and it's now April 24, 2014.

That same paragraph that has the date, it

Page 125

says that the -- towards the bottom -- "Capitalized terms used in this acknowledgement and not defined herein shall be ascribed the meaning set forth in that certain affiliation agreement" --
A. Where are you?
Q. Right here.
A. Capitalized terms. Okay. I see where...
Q. -- "as the same may be amended or otherwise modified from time to time solely by Lion & Crown and MRTC in their sole discretion, the affiliation agreement."
That's the affiliation agreement that was produced in March 14, 2018 that we're here about.
A. 2018?
Q. 2018 is when we got the affiliation agreement.
A. I'm sorry. I thought you said that's the date.
Q. Sorry. And now we're on April 24, 2014. Is there any indication --
MR. SELLINGER: Let me just object to the form of that. I don't think it's parts of the question. So now you're getting to a question and I don't have to object at that part, I don't think.

Page 126

MR. FERGUSON: I don't understand it, but I'll keep going. I had my head down.
BY MR. FERGUSON:
Q. Do you know whether or not Mr. Mercer, who executed this on behalf of the HOA at Aspen Highlands, had ever seen the affiliation agreement as defined in the first paragraph of Exhibit 1392?
A. I do not.
Q. Although, a draft affiliation acknowledgement -- sorry -- a draft acknowledgement of and joinder to affiliation agreement is Exhibit B to the affiliation agreement itself, it appears that the affiliation agreement is not an exhibit to the acknowledgement and joinder; right?
A. I do not see it as an exhibit.
Q. If you go to page 2 of Exhibit 1392, the whereas clause -- second whereas clause on that page, but it was the fifth whereas clause in the agreement -- says, "The affiliation agreement contemplates that Lion & Crown will obtain an acknowledgement and joinder" -- I'm sorry -- "acknowledgement of and joinder to the affiliation agreement for any owners association that desires its club to participate in the MVCD program."
Do you see that?

Page 127

A. Yes.
Q. Again, the affiliation agreement did contemplate that they would -- if they obtained an acknowledgement and joinder to the affiliation agreement, they could get that from HOAs; right?
MR. SELLINGER: Objection to form.
A. The affiliation agreement stated that, if there was an acknowledgement, that we would allow the members of that club to participate in Marriott Vacation Club Destinations program.
BY MR. FERGUSON:
Q. You said "acknowledgement," but it's also a joinder; right?
A. Yes. That's what it says.
Q. It says here, "Whereas, the parties have agreed as a special accommodation to allow association to determine whether, by a survey of the association's members or such other method as the association and Lion & Crown mutually agree upon, to enter into this acknowledgement."
I want to break that down, if you would, with me. The parties have agreed as a special accommodation to allow the association to determine -- what is the special accomodation there mean?
A. Because there's no requirement that the

Page 128

association -- that the board sign any acknowledgement. We have the unfettered right to affiliate with any program that we want. And what we were doing as a special accomodation is allowing the association to -- the board to decide if it wanted to allow their members to participate in the Marriott Vacation Club.
Q. And it was -- that unfettered right that you believe you had, that was the information -- again, without divulging it -- but that's the information that came to you from Ms. Egolf sometime in September of 2013 after you had promised a vote?
MR. SELLINGER: Well, hold on a minute. I want to be very careful about not getting into privileged communication or any waiver of privileged communication. Maybe you can rephrase the question so that it doesn't get into conversations with counsel and elicit what you're looking for.
BY MR. FERGUSON:
Q. Does the statement that you just made, that it was an unfettered right to affiliate the RCDC systems that my clients and their fellow owners bought into, is that something that came to you in a privileged communication?

Page 129

A. It's in the affiliation agreement, so it's in the Cobalt Travel documents, Lion & Crown.
Q. And that's Exhibit 1003 that we saw earlier this morning, one of the first exhibits?
A. Yeah. Both of them.
Q. And we went through 7.2A?
MR. SELLINGER: Objection to form.
A. Do you want me to look back and confirm it?
BY MR. FERGUSON:
Q. Yeah.
A. So where are we? What exhibit?
Q. 1003.
A. Got it. This is Cobalt 7.1 --
MR. SELLINGER: Excuse me. Could you put that on the screen, please?
A. -- 7.2 and 7.3. Correct.
BY MR. FERGUSON:
Q. Can you refer to another agreement? Is there another agreement that you believe that gives you the unfettered right?
A. Well, Cobalt affiliates with Lion & Crown, and then the Lion & Crown affiliation is allowed to affiliate with any outside exchange companies that it wants, so then the Lion & Crown affiliation as well.
Q. So -- but you did give them a special

Page 130

accomodation; right?
A. We allowed the associations to decide if their members were going to be able to participate or not.
Q. And they did that by a survey?
A. They decided by a survey, correct.
Q. And that's a survey that you arranged, Ms. Sobeck, to do with Ms. Vericchio, correct, at Morrow & Company?
A. I did, yes.
Q. When you said you gave them a special accomodation in this case by a survey of the members, or other method, I guess there was no other method you used. It was a survey; right?
A. Well, that's how the boards decided they would sign or execute the acknowledgement. The special accomodation was really the acknowledgement itself.
Q. The special accomodation was the acknowledgement. Okay.
A. Right, because we could -- just like we had with ER or Abercrombie & Kent before, we could do an affiliation with any outside company that we wanted. We didn't need the board's approval or we didn't need them to acknowledge anything or sign anything. We had

Page 131

the right to do it.
Q. So it says here, "The parties have agreed as a special accomodation to allow the association to determine whether" -- you can take out the parenthetical -- "to enter into this acknowledgement."
Correct?
A. Correct.
Q. It says, "Even though Lion & Crown is not required to obtain the association's consent, joinder, or acknowledgement in connection with the affiliation -- with an affiliated program."
So despite the fact that you believe you had these unfettered rights and didn't require a consent to the association, joinder, or acknowledgement, you were to give them that opportunity?
A. We were going to allow --
MR. SELLINGER: Objection to form.
A. -- the board to decide whether the members could participate or not.
BY MR. FERGUSON:
Q. And the board was going to -- withdraw that. Over the several months that preceded this, indeed, before the survey was finished on January 13, 2014, it was you that was working with Mr. Mercer and his folks about how to do this survey; right? That's what you

Page 132

were working on?
It's a bad question.
A. Yeah. I'm sorry. January 13th, it was almost done, I believe.
Q. The bottom line is that it was you, Ms. Sobeck, that was working with the board in connection with getting that survey out and done?
A. Yes; that's correct.
Q. And the vendor that did it, Morrow & Company, was your vender; correct?
A. Yes. We used them for association -- we used them for association business, but it was someone we used often.
Q. And you all paid for that survey at Marriott Vacation Worldwide, not the association?
A. Correct.
Q. Are you aware of any document that, prior to this acknowledgement being signed, told any of the members at Aspen Highlands what the outcome of that survey was, other than a majority of people that were polled had a positive response? Do you recall whether there was any statistics given to the board -- to the Aspen Highlands, rather?
MR. SELLINGER: Objection to form.
A. Statistics were given to the board on a vote,

Page 133

but I don't believe the specifics were given to the members.

BY MR. FERGUSON:

Q. On page 2 of Exhibit 1392, the acknowledgement, it says, "By execution of this acknowledgement, the parties agree that the above recitals are true and correct and are incorporated into this acknowledgement."

So that's what happened here. This particular document says that the recitals are part of the document; right?

MR. SELLINGER: Objection to form.

A. I'm not an attorney.

BY MR. FERGUSON:

Q. Let me withdraw that. The recitals are incorporated into this acknowledgement; right?

A. The parties agree that the recitals above are incorporated into this acknowledgement, yes.

Q. It says, "The association" -- paragraph 2, on page 2 of Exhibit 1392, it says, "Association hereby acknowledges the terms of the affiliation agreement and joins in such affiliation by execution of this acknowledgement for the purpose of acknowledging and agreeing that the club constitutes an affiliate program."

Page 134

Having read that, hopefully, fairly accurately, as you sit here today, you're aware of no evidence that Mr. Mercer has ever seen the affiliation agreement; is that right?

MR. SELLINGER: Objection to form.

A. Mr. Mercer had an attorney, so his attorney, if he wanted to see the affiliation agreement, would have asked for it.

BY MR. FERGUSON:

Q. Is that the way Marriott Vacation Worldwide legal department works; they're not going to turn over a document that someone is acknowledging unless their lawyer asks for it?

MR. SELLINGER: Objection to form.

A. I can't talk about how our legal department...

BY MR. FERGUSON:

Q. You don't know how they operate?

A. Well, I'm not sure I understand the question.

Q. What is so hard about sending Mr. Marino, Mr. Mercer, and Mr. Oliver the agreement that they're actually signing and joining on April 24th, 2014? What's so hard about doing that?

MR. SELLINGER: Objection to form.

MS. LIVNGSTON: Object to form.

Page 135

A. I don't think there's anything hard, and I don't think we would've tried to keep it from them in any way. I don't think that was deliberate. They were certainly welcome to have a copy if they wanted it.

BY MR. FERGUSON:

Q. If you go to page 3 of Exhibit 1392, there's a paragraph 3. It says, "Association hereby acknowledges that Marriott Resort Travel Company has all the rights and duties with regard to the operation of the MVCD program, but Lion & Crown has all the rights and duties with regard to the operation of the Lion & Crown program."

"Association further acknowledges that the Lion & Crown and the MVCD program may impact usage patterns of the club."

What did that mean?

A. Well, there's different -- the Ritz-Carlton owners and the Marriott Vacation owners potentially could have used it differently from each other.

Q. How would that be -- how would that occur?

A. How would it occur?

Q. Yeah.

A. Well, if --

MR. SELLINGER: Objection to form.

Page 136

A. -- Marriott Vacation Club -- the Marriott Vacation Club program is a points program, where they have -- that they can use potentially smaller increments of time. The Ritz-Carlton program, while they could use less time, they bought seven nights -- actually, they bought -- in Aspen, they bought 28 nights.

So seeing an owner -- the same owner -- 28 nights, as you would in Aspen -- that potentially wouldn't be the case with a Marriott Vacation Club owner.

BY MR. FERGUSON:

Q. Okay. Those would be examples of different use patterns?

A. Yes.

Q. Affecting the use patterns of the hotel -- of the club, I should say.

A. Club.

Q. Paragraph 4 says, "If this affiliation agreement is terminated or not renewed, association hereby agrees to abide by and comply with the requirements of Section 10.5A, 10.5C, 10.5E of the affiliation agreement that are imposed on Lion & Crown."

Those are sections of the affiliation

Page 137

agreement; correct?
A. I believe they are.
Q. At the bottom of that paragraph, Sections 4.3, 6.6., 6.8, 6.11, 7.4, 9.1, 9.3, 10.6, 10.7, 10.8, those are sections of the affiliation agreement also?
A. Yes.
Q. To which the association was agreeing to be bound; right?
A. The affiliation agreement existed whether this was executed or not; right? Just so we're clear, this being executed had nothing to do with that.
Q. All right. But the association was agreeing to the terms in that paragraph 4, that they would abide by those terms if there was a termination?
A. Yes.
Q. Thank you. I just have a few more.
A. That was a long 15 minutes.
MR. SELLINGER: I was going to say.
BY MR. FERGUSON:
Q. Later in that year, you were able to get the Lake Tahoe and San Francisco properties to -- you got them to be surveyed, and then you got them to sign these acknowledgements and joinders?
MR. SELLINGER: Objection to form.
A. Lake Tahoe and San Francisco boards later

agreed that they wanted their members surveyed and then later got comfortable with the acknowledgement and executed the acknowledgement.
BY MR. FERGUSON:
Q. I just have a few documents to show you. Exhibit 1447, this is for the San Francisco affiliation, November 4, 2014. This is the e-mail that Ms. Babich sent to her team on November 4, 2004.
There was apparently a call regarding the survey to vote on affiliation -- the San Francisco members -- in the next couple days.
This is the one where she says, "This survey is similar to Aspen. They were not looking for a majority vote. It's merely a mechanism to get feedback and the affiliation is expected to occur regardless. Please keep that information confidential."
Is this around the timeframe that there was going to be a survey of the San Francisco members in early November 2014?
MR. SELLINGER: Objection to form. This is ground that was covered at length in your earlier deposition.
MR. FERGUSON: That was the only question I had.

A. Yeah. It appears in the first paragraph that it was going out on November 6, 2014.
BY MR. FERGUSON:
Q. Were you anxious about getting that survey done and the affiliation executed with San Francisco by the end of the year?
MR. SELLINGER: Objection to form.
A. Anxious to get it done?
BY MR. FERGUSON:
Q. Were you excited about getting it done?
A. I don't remember being excited to get it done. We certainly wanted to move through the process, as the board had requested that we do.
MR. FERGUSON: Can you put up 2212 on the board?
BY MR. FERGUSON:
Q. This is December 15, 2014. It looks like you were excited that day; right?
A. I was excited that we had gotten through the process. It was a long process.
Q. So this is Exhibit 2212. This is an e-mail chain with Ms. Jackson-Rauso, who assists you in terms of asset management for the RCDC system?
A. Correct.
Q. If you go to page 2 of Exhibit 2212,

Jackson-Rauso says to Dee Mooney -- Dee Mooney is who?
A. An associate that works with us on some Ritz-Carlton Destination Club communication.
Q. She said in the bottom of page 2, "In regards to the San Francisco -- San Fran -- affiliation vote, can Morrow tell us if any e-mails or correspondence came back undelivered?"
So was this about -- withdrawn.
Morrow & Company did the affiliation survey for San Francisco; correct?
A. Correct.
Q. If you go to the first page of Exhibit 2212, there's an e-mail from Jackson-Rauso to Dee Mooney, with a copy to you and Mr. Hayward.
Mr. Hayward, by this time, was he involved with RCDC systems and clubs in the western segment of the --
A. Yeah. He was just starting to get involved.
Q. Was he the person like you that was now beginning to oversee the San Francisco property?
A. Correct.
Q. She said, "Yes, the board president is signing the acknowledgement, so they can move forward with the --
MR. SELLINGER: We're not seeing this.

I'm sorry.

MR. FERGUSON: Middle of the page. No worries.

BY MR. FERGUSON:

Q. -- "so they can move forward with the 12/18 launch."

So you needed that acknowledgement done in order to meet a launch date?

A. If we wanted to have San Francisco included, yes.

Q. To that, you would answer, "Wahoo." So you were happy that was done?

A. Yes.

Q. That was the last one dated that year?

A. I believe San Francisco was the last one that was done overall, I believe.

MR. FERGUSON: Then would you go to the next exhibit, Michael, which is RCDC15683? It's the November of '17 document. It's 2213. Would you put up 2213, please?

(Exhibit 2213 was marked for identification.)

BY MR. FERGUSON:

Q. At the bottom of 2213, there's an e-mail from Rivas -- or Edson -- Edson Rivas at Morrow & Company.

He works with Ms. Vericchio. It's to you and Ms. Mooney and copies to Nicole herself. San Francisco survey vote update is the subject.

Mr. Rivas said, "Good afternoon. Today, our total count is ten votes for the survey and seven votes against the survey."

And then, at the top of the page of this e-mail chain, Mr. Hayward wrote, "Is the ultimate decision the board's or the management company? Rich."

You said, "Decision to affiliate, the board's."

Correct?

MR. SELLINGER: This is -- again, this is all old ground which was plowed. Nothing to do with the documents that were more recently produced. We haven't even gotten to what I take are the growth committee and strategic reports. I really don't think it's fair.

MR. FERGUSON: This is probably the most apt document in the entire day, Mr. Sellinger. This is the vice president in charge of this situation, who says in her testimony today, and beforehand, that the board had no right -- okay -- they had

unfettered discretion to do this. And as a special accomodation to these fine folks, they gave this right -- in an e-mail to her counterpart for San Francisco, she says, "The decision to affiliate is the board's. And you're telling us that's irrelevant and unfair?

MR. SELLINGER: I didn't say it wasn't relevant --

MR. FERGUSON: Unbelievable.

MR. SELLINGER: -- I said it's all ground that you plowed before.

BY MR. FERGUSON:

Q. Is that your words, Ms. Sobeck? Are those your words?

A. Just to be clear -- just to be clear, though, Rich didn't understand at this point, because he was new to the program, all of the implications of this.

MR. FERGUSON: I'll turn it over to Mr. Reiser.

MR. SELLINGER: Okay. Off the record.

MR. REISER: We should probably take at least five minutes? Do you want to do lunch now?

MR. MEADE: Let's do lunch.

THE VIDEOGRAPHER: We are off the record. The time is 12:51 p.m.

(Lunch recess.)

THE VIDEOGRAPHER: We are back on the video record. The time is 1:41 p.m.

Counsel, you may proceed.

DIRECT EXAMINATION

BY MR. REISER:

Q. Thank you. Good afternoon, Ms. Sobeck. I don't know if you remember me. I'm Mike Reiser. I represent plaintiffs across the three cases.

A. I do.

Q. Nice to see you again.

A. You too.

Q. All right. So I want to start off with just some general questions about the corporate growth committee versus the strategic council type of mechanisms that go on in the company, so I can get an understanding of how the reporting goes back and forth between folks.

A. Okay.

Q. The corporate growth committee, you mentioned that that's a committee with the executive -- what did you call it -- the executive management team on that?

A. Executive committee.

Q. Could you just tell me -- I know you mentioned a few of them -- but could you list those folks for me?
A. The executive committee?
Q. Yes.
A. So Steve Weisz is the president. There would be John Geller, Brian Miller, Lee Cunningham, Lani Kane-Hanan, Jim Hunter, Dwight Smith, Mike Yonker comes sometimes, Cliff Delorey. I'm trying to work my way around the organization. I think that's all. I feel like I missed somebody.
Q. So Steve Weisz, I know. John Geller, is he the CFO?
A. CFO.
Q. And Brian Miller, what's his --
A. Head of sales and marketing. EVP of sales and marketing.
Q. Did he take over Pete Watzka's job?
A. Yes.
Q. I know who Lee Cunningham is, and Lani Kane-Hanan. Jim Hunter is the general counsel?
A. Yes.
Q. Who is Dwight Smith?
A. VP of information technology.
Q. How about Mike Yonker?

Page 146

A. He's EVP of HR.
Q. And then Cliff Delorey?
A. He is EVP of operations.
Q. Does he report to Lee Cunningham then?
A. No.
Q. So Lee Cunningham, is he still chief operating officer?
A. Yes.
Q. Who is higher on the hierarchy, the chief operating officer or the EVP of operations?
A. All those people, except for Dwight and Mike Yonker, report to Steve, so they would be the same.
Q. Who do Dwight Smith and Mike Yonker report to?
A. John Geller.
Q. So you're not on the corporate growth committee; right?
A. No.
Q. Do any management folks at Marriott Vacation Worldwide have a place on the growth committee on kind of an ad hoc basis ever, or are these the permanent members of the growth committee?
A. So those are the executive committee. There's also some members of the growth committee who are more permanent. Tony Terry, you know him already;

Page 147

Nick Rossi, who's in revenue management; Kathi Pighini, who's the head of sales accounting. Julie Meyer, who -- I don't know what her title is -- audit somehow; Laurie Sullivan, who's our corporate controller.
Q. So in addition to the executive committee people you mentioned, these other five you just mentioned, beginning with Tony Terry, those are permanent members as well?
A. Yes. And also Dave Robison; he helps chair the committee with John.
Q. Who is the chair of the committee?
A. I believe it's John Geller or Steve. I'm really not sure. Dave Robison organizes everything, gets the minutes taken and everything, and then -- I guess it's Steve. Steve is probably the chair.
Q. Do you know how often the corporate growth committee meets?
A. Yes. Every two weeks.
Q. Just to kind of get an idea of how many times you interact with the corporate growth committee, we've got some documents I'm going to show you in a minute that we received recently in the case, wherein you're writing some memos to the corporate growth committee. I'll show you those.

Page 148

I don't know if you're familiar with this one, October 21st, 2013. You may have looked at it to prep for your deposition. I'm going to mark it in a minute.
A. Okay.
Q. So you do, at times, interact with the corporate growth committee; right?
A. Yes.
Q. And under what circumstances would you go to the corporate growth committee for permission to do something?
A. If there was going to be a large investment in something or if there was going to be a disposition or a substantial change in something that had a financial impact to the company.
Q. Is there a dollar amount that's a threshold before it gets to the committee; do you know?
A. There is. I want -- I think it's a million dollars -- it has to go to the corporate growth committee -- but sometimes there's decisions that are potentially smaller than that that go just as an FYI.
Q. And does the corporate growth committee have ultimate authority to make decisions that are presented to it, or do they have to, in turn, have to send their recommendations up to the board of

Page 149

directors of the corporation?
MR. SELLINGER: Objection to form.
A. It depends on the amount.
BY MR. REISER:
Q. Do you know the threshold amount for that?
A. I believe it is $10 million. I think they can make decisions under $10 million and then it goes to the full board.
Q. Do you know if any of the issues -- strike that. Do you know if the reengineering of The Ritz-Carlton Club -- strike that.
Do you know what I mean by the reengineering of the Ritz-Carlton? Have you heard that term before?
A. No, I don't know what you mean. Reengineering, I guess, in what context?
Q. Well, after the spin, wasn't there a change in the club? And I think the internal words for it were the reengineering of the club.
You've never heard that term?
A. I saw it on one of the documents that we went through yesterday, yes.
Q. Well, let me just actually -- can you pull up 2136?
A. I don't have that.
Q. We can pull up it on the screen. There's a

copy for you, 2136.
MR. SELLINGER: I'm going to get a binder then.
THE VIDEOGRAPHER: Going off the record. The time is 1:49 p.m.
(Off record.)
THE VIDEOGRAPHER: We're back on the record. The time is 1:50 p.m.
Counsel, you may proceed.
BY MR. REISER:
Q. So you've had a chance to look at Exhibit 2136. It's the May 24, 2012 memo from Lee Cunningham to Tony Terry to the corporate growth committee; subject, The Ritz-Carlton Destination Club proposed strategic plan.
A. Yes.
Q. I think you testified earlier that you had no role in preparing this memorandum. Is that true?
A. I did not.
Q. Did you appear at any corporate growth committee meetings that discussed this proposed strategic plan year-end May 2012 or earlier?
A. I don't believe I was in this meeting, but certainly talked about different parts of this.
Q. We marked in some earlier depositions an

Exhibit 1522. I'm going to show you another copy of it. I do have a copy for you.
Have you seen Exhibit 1522 before today?
A. What is the -- where is the cover page? It would help if I knew when it was.
Q. There's no cover page. This is actually how it was produced to us. I'm just wondering, do you recognize this document, holistic plan for RCDC?
A. I don't recognize it specifically. I certainly recognize the content of it.
Q. Okay. When was the first time you remember discussions with Lee Cunningham or anybody else about a plan to unwind the portfolio program at the Ritz-Carlton Destination Club?
A. At that point, I was involved with the boards. I may have been in meetings that it was discussed, but that was more of a Mary Lynn and Lee discussion than me.
Q. What was more of a Mary Lynn and Lee --
A. Unwinding the Bleu Florida Land Trust.
Q. If you can turn to page 3 of this exhibit, the caption of this, it says, "What are we doing with the remaining inventory in RCDC?" It says, "Our plan is to unwind the Bleu Florida Land Trust and convert the 105 unit members to the NATO."

Do you remember the first time you heard the plan to unwind the Bleu Florida Land Trust?
A. I don't remember the first time, no.
Q. It wasn't 2012; true?
A. I don't know.
Q. Do you think it was before the evolution letter went out from Eveleen Babich on July 17, 2012?
A. I don't know.
Q. Let me start marking some exhibits then.
Before I do that, let me finish up some of the -- so the corporate growth committee, would you give me your best estimate for how many times a year you have to present something to that corporate growth committee?
A. Every year, it's different. I probably go maybe three or four times a year. But it's -- again, every year is different, depending on what's going on.
Q. So can you remember all of the decisions for which you went to the corporate growth committee as it relates to The Ritz-Carlton Destination Club post-evolution?
A. No. I don't know if I can say all of them. I remember going for San Francisco -- discussions in San Francisco. I don't believe the other -- none of the other things we were working on with the

affiliation or anything would have gone to the corporate growth committee. Probably, at that time, all I was taking would've been San Francisco.

Q. What about the deal in Jupiter, to settle with them in terms of buying back certain of the inventory that they were owed money on?

MR. SELLINGER: Objection to form.

BY MR. REISER:

Q. Let me back up. You remember a deal where the Marriott Vacation Club paid $1.4 million to the St. Thomas homeowners association in exchange for them supporting and obtaining a vote by the members to change the declaration, so that inventory that was repossessed by Marriott Vacation Worldwide could be placed into the NATO Trust? Do you remember that whole issue?

A. I remember going -- yes, I remember the discussion of St. Thomas -- what we called the settlement agreement. I don't know if it was really a settlement, but we were going and talking to them.

It wasn't to buy the vote to get them to put the inventory in the trust. I think we went through this last time. It was, delinquent member -- they had a delinquent member inventory issue, and we were going to relieve them of that inventory, but needed

Page 154

something to do with it. But what we were going to do with it was put it into the NATO Trust, because we weren't going to buy it back unless we had some mechanism to dispose of it.

Q. Did that whole issue --

MR. SELLINGER: Does this have to do with the subsequently-produced documents?

MR. REISER: Yeah. It's in the strategic council almost every time.

BY MR. REISER:

Q. Did that decision -- the settlement agreement, as you put it -- go to the corporate growth committee?

A. I -- well, there's also -- I guess it had to go to the corporate growth committee; although, I don't remember specifically taking it there. We also have another group that handles more legal specific items, that is an executive committee, that it could have gone to as well. But I don't specifically remember.

Q. What is the name of that committee?

A. Can I ask Doug? It's the litigation committee or something along those lines.

Q. So you don't recall, as you sit here, whether the St. Thomas settlement agreement issue went before

Page 155

the corporate growth committee or the litigation committee, we'll call it for now?

A. It would have gone before one of those. I guess, based on the amount of payout, it probably would have gone to the corporate growth committee. I just can't remember specifically.

Q. Because anything over a million bucks goes to corporate growth?

A. Yes. This one is a little different because of how -- it wasn't a million dollar check. It was actually something that we got inventory back. We're paying for inventory, plus maintenance fees and additional expenses.

Q. So was that deal -- the delinquent member inventory -- is that what you just termed it?

A. Delinquent member inventory.

Q. And that's the inventory that was ultimately purchased by Marriott Vacation Worldwide and put into the NATO Trust; right?

A. Yeah. It would've been foreclosed inventory that we got through delinquencies of unpaid members, correct.

Q. That was my question. Was that inventory obtained both through foreclosures from financing that had been provided by the Marriott financing arm at the

Page 156

point of sale, or was that foreclosed inventory that came back because somebody was delinquent in their dues, or was it both?

A. Well, we had the right to get the inventory that we financed back. We would get that in normal course of business.

Specifically what we were talking about was, members who didn't pay their dues to the association and were leaving the association with an additional burden of unpaid maintenance fees.

So how we would have gotten it back -- if somebody was delinquent, they were also delinquent on their mortgage -- we would have done a mortgage foreclosure. But it could potentially have been included in the same, because they would've been delinquent on dues as well.

Q. So if somebody was delinquent on their mortgage, 99 percent of the time, was also delinquent on their dues; right?

A. Ironically, no. Probably not 99 percent. You would think that, but, no.

Q. But a high percentage?

MR. SELLINGER: Objection to form.

A. It's actually a mix. It was my assumption at first, until I got into it. No. There's more people

Page 157

that paid their maintenance fees than you would expect.

BY MR. REISER:

Q. So somebody that is paying their maintenance fees but is delinquent on their mortgage, do you remember whether they had use rights in the club?

A. Yes. If you paid your mortgage but you weren't paying for your maintenance fees?

Q. Other way. You pay your maintenance fee -- that weird set of people that pay their maintenance fees, but are delinquent on their mortgage. You said there were folks like that?

A. Yes.

Q. Those people, could they use the club during the time they were delinquent on their mortgage, but current on their fees?

A. Yes, they could've.

Q. And somebody who's delinquent on their mortgage and delinquent on their fees, do you remember how that person would be -- how that person's fractional would be taken back? Was it through the foreclosure on the mortgage or foreclosure on the maintenance fees?

A. It would depend where in the process both of them were. We would want to take it back as quickly

as possible, obviously, so it would depend.

Q. Is it your understanding that the mortgage foreclosures happened as quickly as possible?

MR. SELLINGER: Objection to form.

BY MR. REISER:

Q. Do you remember a delay between the time -- strike that. Do you remember any circumstances, when you were the asset manager for St. Thomas, where the member was in default on their loan and the decision to foreclose was delayed so that the maintenance fees obligation would not come back to the foreclosing part, Marriott?

A. There was a time that -- I don't know if -- well, see, we have kind of different entities. Because we have a mortgage group who handles mortgages and does that foreclosure. So there was -- I believe there was a time when they weren't aggressively pursuing mortgages, but, you know, kind of the process would always continue to move along.

Q. Because --

MR. SELLINGER: Mike, I'm sorry. Just let me say -- you're asking about St. Thomas. It's already after 2:00. We are going to have time problems. If that's what you want to spend your time on, I guess you can, but

we're going to be at a point where you're going to end up getting cut off and you're going to feel like you're precluded. My position certainly is going to be, "Why are we spending today talking about St. Thomas?" But, your deposition.

BY MR. REISER:

Q. I'm almost done. I'm just trying to figure out whether -- strike that. I think I'm done on St. Thomas. I'll move on.

Let me go to -- okay. So the corporate growth committee, we covered. So the strategic council documents, I have a whole stack of them. It looks like they were written approximately one time per month.

Is that your recollection, the strategic council memo would be prepared --

A. I don't write the strategic council memos.

Q. Who does; do you know?

A. Well, each section, I think, is written by a different strategic council member.

Q. So the first set of strategic council documents, that we got relatively recently in this case through January 2013 -- actually, the title of it is "Strategic council luxury segment update." And

sometime in 2013, it still says, "Strategic council," but it's got "Domestic segment update." So there's just a change in just the cover of the strategic council documents.

In terms of the strategic council reports for the luxury segment update, these ones that were in 2012 that I'm going to show you, is it your testimony that you didn't have any role in preparing these?

A. I didn't prepare them.

Q. Okay. Who was on the strategic council?

A. Actually, I can't really answer that. I think it's the executive committee, but I don't know if there's additional members as well. I don't go in front of the strategic council, so it's something I'm less familiar with.

Q. As far as you understand -- strike that. Do you know if you were solicited on a monthly basis by anybody within Marriott Vacation to update the strategic council luxury segment updates?

A. Was I solicited for it? No.

Q. Solicited to get updates from anybody -- Dee Dinda or anybody like that?

A. No.

Q. Because I noticed -- well, strike that. You do prepare the daily business reports, don't you --

the -- what do you call them -- the business review reports?
A. Yes.
Q. When did you start preparing the daily -- or -- I'm sorry -- the business review reports?
A. When I started working for Lee in asset management.
Q. That was in 2009, as I recall your testimony from last time?
A. I believe so.
Q. All right. So is that a requirement of your job? Lee Cunningham asks you, as part of your job as an asset manager, to prepare monthly business review reports?
A. Yes.
Q. Okay. Let me just give you an example of one we marked previously. It's Exhibit 1264. It happens to be a strategic -- I'm sorry -- a business review report from July 2013.
You prepared that report?
A. Yes.
Q. What was the purpose for preparing this report every month to Mr. Cunningham; just to update him on what's going on in each club?
A. Yes.

Q. So why was it you who was preparing these reports, rather than somebody else in the organization, if you know?
A. Because I was working on The Ritz-Carlton Destination Club with Stacey.
Q. What was Stacey's role in working with you on The Ritz-Carlton Destination Club?
A. She would assist me kind of however I needed her to. She was more involved with the west projects and I stayed more involved with the east projects.
Q. Did she have any, like, discretionary authority in her role, or was she more like a liaison between you and the boards?
MR. SELLINGER: Objection to form.
A. I would say she was more of a liaison; although, she had great relationships with the boards and worked with them as needed.
BY MR. REISER:
Q. Okay. As the asset manager for the Ritz-Carlton Destination Clubs, that's what your role was from '09 until sometime in, say, 2014. Is that fair?
A. Yes.
Q. You were in charge of all nine clubs when you started in 2009?

A. No. When I started, I believe Jeff Hansen was still in charge of Kapalua, and he continued that role. I never really worked with Kapalua.
Q. So you never had any role in Kapalua?
A. Not really, no. And then there was some west -- like, Tahoe -- that was more handled through Bob Phillips and Don Baarman.
Q. That was Tahoe, you said?
A. Tahoe, yes.
Q. So in various of the board minutes that I reviewed in this case for the different clubs -- let's take Aspen board minutes. Often times, it would show you attending on behalf of Ritz-Carlton Management Company.
A. Yes.
Q. Was your role -- and I think we may have gone over this last time -- but was your role representing Ritz-Carlton Management Company to the boards?
A. Yes.
Q. And so -- do you know what a fiduciary duty is?
MR. SELLINGER: I mean, how are we getting to these areas which were covered last time and aren't directly related to these agreements?

MR. REISER: I think they are. You have to give me a little bit of leeway here, you know.
MR. SELLINGER: I am. I'm really trying to. But we are going to cut this off at some point.
MR. REISER: You can cut it off if you really want to, but these are kind of preliminary questions. I don't think I ever asked her before, "Do you know what a fiduciary duty is" or "define fiduciary duty." If you can point to that in the transcript, maybe, but give me a little leeway.
MR. SELLINGER: I don't have the transcript. I'm not instructing. I'm just really trying to avoid the problem.
MR. REISER: I am too. So Let's get through this. I'm not going to try to get in an argument.
BY MR. REISER:
Q. Do you know what a fiduciary duty is?
A. Yes.
Q. What is it?
A. I believe it's to -- a fiduciary duty to an

association -- you have the responsibility to make sure you're making the best financial decision for that association or organization.
Q. Did you believe you had -- you, as the representative of the Ritz-Carlton Management Company -- had a fiduciary duty to the boards?
MR. SELLINGER: Objection to form.
A. Did I have a fiduciary duty to the boards?
BY MR. REISER:
Q. In your role as the representative of Ritz-Carlton Management Company.
A. We were their management company, so we certainly had the responsibility, yes.
Q. So it's your testimony then, just to be clear -- it was a little unclear to me -- you believe that Ritz-Carlton Management Company had a fiduciary duty to the boards that it managed. True?
MR. SELLINGER: Objection to form.
A. Well, I'm not sure legally what that is getting into. I think we had the responsibility, for the boards and the associations, to do the right thing for the boards and the associations as their management company.
There could have potentially been things, I guess, in conflict with the board. Specifically,

Page 166

fiduciarily, like, we charge the management fees; and those management fees are to perform services. So I think there's -- we're responsibility to provide the management services to the association.
BY MR. REISER:
Q. Okay. Do you believe that you, as the representative of Ritz-Carlton Management Company during the time you were acting in that capacity, had a fiduciary duty to the members of the club?
MR. SELLINGER: Objection to form.
BY MR. REISER:
Q. Of the Ritz-Carlton Club --
MR. SELLINGER: Objection to form.
BY MR. REISER:
Q. -- that you were representing the management of -- I mean the association?
A. I had the -- again, I had the management responsibilities for the association, to work with the boards in the best capacity possible as the management company.
Q. Did you believe that you had a fiduciary duty to the members in that capacity?
MR. SELLINGER: Objection to form.
BY MR. REISER:
Q. In other words, when you're wearing your hat

Page 167

as a Ritz-Carlton Management Company representative, representing the boards, did you also believe that you had a fiduciary duty to the members when you were acting in that capacity?
MR. SELLINGER: Objection to form.
A. We have the responsibility to the association, and the association is -- the members are the association.
BY MR. REISER:
Q. So that's a yes?
MR. SELLINGER: Objection to form.
A. The individual members -- the association, I would say. Not the members. The association.
BY MR. REISER:
Q. It's your opinion then -- as you sit here today, you don't believe you had a -- when you were acting in your capacity as the Ritz-Carlton Management Company at the Ritz-Carlton Clubs -- is it your testimony then that you do not believe you had a fiduciary responsibility to individual members?
MR. SELLINGER: Objection to form.
A. I don't believe I had a responsibility to the individual members. I had a responsibility to the association as a whole.
BY MR. REISER:

Page 168

Q. Have you read any of the orders that have come out in this case in the last, like, 90 days?
A. No.
Q. Are you aware of an order that came out in the Aspen case on your company's motions to dismiss? Have you read that order?
A. No.
Q. So would you agree -- I'm just -- have you told me everything that -- strike that.
You mentioned earlier that you believe a fiduciary duty is to act in the best interest -- the best financial interest of the club.
Do you remember that testimony?
A. Yes.
Q. Do you believe that your duties to the association go beyond just the financial aspects of the --
MR. SELLINGER: Objection to form.
BY MR. REISER:
Q. -- financial aspects of the club?
A. I believe they go into the management of the association, which is more than just financial.
Q. Okay. You believe, as the manager of the -- you believe, as the representative of the Ritz-Carlton Management Company, you had a duty to make a full

Page 169

disclosure to the association on any issues pending between the association and the management company. True?

MR. SELLINGER: Objection to form.

A. I don't understand your question.

BY MR. REISER:

Q. Do you believe that your duties to the association included a duty of making a full disclosure to the board on any matter in which the management company was advising or managing for the board?

A. I'm not sure I know what you mean by full disclosure. If the board is already aware of it, I'm not sure what you're asking about.

Q. Let me get specific. You mentioned earlier that you don't believe that you ever gave a copy of the November 2013 affiliation agreement to the Aspen board.

Do you remember that testimony?

A. Yes.

Q. Do you believe that your duty as a manager included making a full disclosure of everything regarding the affiliation agreement, including giving them a copy of the affiliation agreement?

MR. SELLINGER: Objection to form.

Page 170

A. We certainly would have given it to them if they had asked for it. There was nothing that was being hidden. We talked about it -- talked about what was included in the exchange program, talked about what was going to be available, did summaries of what was available, had a brochure that we looked at earlier that had the program outlined in that brochure.

So, I mean, it wasn't information being kept from them.

BY MR. REISER:

Q. So it's your testimony that there was no decision on the part of the Ritz-Carlton Management Company, or anybody else on the Marriott side, to not give the boards copies of the affiliation agreement. You just waited for them ask. If they asked, you would have given it to them. If they didn't, you didn't give it to them.

MR. SELLINGER: Objection to form.

BY MR. REISER:

Q. That's your testimony?

A. It wasn't a conscious decision that, if they asked, we would give it to them. If they wanted it, we would have given it to them, but it was never given to them.

Page 171

THE VIDEOGRAPHER: Two minutes to media change.

BY MR. REISER:

Q. You were also the Ritz-Carlton management representative for the San Francisco and the Tahoe clubs at the time they signed their acknowledgement and joinder to the affiliation agreement. True?

A. True.

Q. And do you recall whether you ever gave a copy of the affiliation agreement to any of the board members at either San Francisco or Tahoe? I'm talking about the November 2013 affiliation agreement.

A. The Lion & Crown affiliation agreement?

Q. Yes.

A. I don't remember giving it to any of them, no.

Q. And as far as you recollect, nobody asked for it on any of the boards?

A. If they would have asked for it, we would have given it to them.

Q. And you didn't give it to them, so they didn't ask for it; is that right?

A. Yes.

MR. REISER: We'll take a break.

THE VIDEOGRAPHER: This concludes media unit two. We're going off the record. The time is 2:18 p.m.

(Brief recess.)

THE VIDEOGRAPHER: We're at the beginning of media number three. The time is 2:28 p.m.

Page 172

BY MR. REISER:

Q. So if you can pull out the joinder agreement that -- the Aspen joinder agreement that Mr. Ferguson asked you about earlier?

A. What exhibit is it?

MR. FERGUSON: 1392.

A. 1392. Okay. Yes.

BY MR. REISER:

Q. All right. So as I understand your testimony, if the association at Aspen did not sign Exhibit 1392, then there would be no ability for any Marriott Vacation Club members to access the club through an affiliation. True?

MR. SELLINGER: Objection to form.

A. There would've been -- Marriott Vacation Club members could've come in through Explorer, because that's how the developer was using their inventory.

But through affiliation, if there were no Ritz-Carlton members going out of Aspen, there would've been no Marriott Vacation Club members coming

Page 173

into Aspen.
BY MR. REISER:
Q. You mentioned the Explorer Program a couple of times. Prior to the affiliation, it's your testimony that the developer was using its developer-owned inventory to allow Marriott Vacation members in through the Explorer Program. True?
A. True.
Q. That had nothing to do with any affiliation whatsoever, right, that access to the club through the Explorer Program?
A. Well, it must've -- affiliation -- like, we're talking about a Ritz-Carlton affiliation with Cobalt and Lion & Crown? Yes, that's true.
Q. So there was a position that was taken by Marriott Vacation or by the developer that -- just like members could do what they wanted with their weeks -- Marriott could do what they wanted with their weeks, including let members of the Marriott Vacation Club use it through the Explorer Program.
That's your testimony?
A. The developer could use the inventory just as a member could, and made it available through Explorer.
Q. Okay. But in terms of the affiliation that

we've been dealing with in this lawsuit for a couple years now -- this is now your second deposition in this lawsuit -- with regard to the affiliation, in order for any members to -- members of Marriott to come into the Ritz-Carlton, Aspen through an affiliation agreement, that wouldn't have happened unless the association signed this acknowledgement and joinder to the affiliation agreement. True?
MR. SELLINGER: Objection to form.
A. Yes, because the members would not have been able to participate in the program.
BY MR. REISER:
Q. So have you read the November 2013 affiliation agreement?
A. Sorry. The date -- that's the Lion & Crown --
Q. That's the Lion & Crown one. Technically, the Lion & Crown one kind of has -- the one between Cobalt and Lion & Crown, which is in August 2010. Then we have the one between Lion & Crown and Marriott Resorts Travel Company. That's the November 2013 one.
A. Yes.
Q. Just so we're clear on that.
A. Sorry.

Q. That's okay. No problem.
So the 2013 affiliation agreement --
MR. REISER: Well, can you just read back my last question before I...
THE REPORTER: "So have you read the" --
MR. REISER: Okay.
BY MR. REISER:
Q. I just want to ask you now -- the November 2013 affiliation agreement, did you ever read that agreement?
A. Yes, I have.
Q. Did you read it in 2013?
A. Yes.
Q. And you read it -- you read it in 2014, you know, I take it too? Or, no, just that one time in 2013?
A. I don't know how many times I've read it.
Q. Okay. Do you know what a component club is under that agreement?
A. No.
Q. You don't know what it is?
A. No. I'm sure we could look it up. What's the number?
MR. SELLINGER: Are we looking at a definition?

MR. REISER: No. Sorry.
MR. SELLINGER: I'm going to -- give me a minute. I'm going to grab my copy.
MR. REISER: Okay. We'll just wait.
(Mr. Sellinger left the room and came back.)
BY MR. REISER:
Q. I'm actually going back to Exhibit 1392, which is the acknowledgement of and joinder to affiliation agreement. I want to go back to this paragraph that Mr. Ferguson asked you questions about. It's the sixth whereas clause in the agreement on page 2.
It starts, "Whereas, the parties have agreed as a special accomodation to allow association to determine whether to enter into this acknowledgement, even though Lion & Crown is not required to obtain the association's consent, joinder, or acknowledgement in connection with the affiliation with an affiliate program."
You remember testifying about that paragraph; right?
A. Yes.
Q. And you would agree that Lion & Crown is required to obtain the association's acknowledgement

and joinder before any Marriott Vacation Club members could use the Aspen Club through an affiliation; do you not?

MR. SELLINGER: Objection to form.

A. I'm just going to restate to make sure I understand. The only way the Aspen members would have had access to the program -- the members themselves -- would've been, based on this, the acknowledgement being executed by the board and the association.

Based on that, the Marriott Vacation Club members, through this affiliation -- they still had access within the other program, Explorer -- but based on affiliation specifically from a Ritz-Carlton member going out and a Marriott Vacation Club coming in, then that would've been the way that would have happened. So, yes.

BY MR. REISER:

Q. So just to be clear -- and then I'll move on -- I just want to make this crystal clear for the record. The jury is going to probably hear this.

In terms of Marriott Vacation Club members having access to Ritz-Carlton Club, Aspen through an affiliation agreement, the association would have to sign the acknowledgement and joinder to the November 2013 affiliation agreement. True?

MR. SELLINGER: Objection to form.

A. Your questions are long. The association has to sign the acknowledgement, which would allow the members to participate in the program.

We wanted to make it available to everyone. But we were, as a special accomodation, allowing the boards to decide if they wanted to make it available for their members.

Q. When you say "a special accomodation," that was actually the terms of the November 2013 affiliation agreement. Are you saying that there was an accommodation made by inserting into the requirements of the affiliation agreement that the joinder be signed?

MR. SELLINGER: Objection to form.

A. We have the right to affiliate -- Lion & Crown and Cobalt Travel have the right to affiliate with whatever program they want. It's not required that we would ask for the board's acknowledgement. But that's the special accomodation that we're talking about, yes.

BY MR. REISER:

Q. So let me break this down then. So Cobalt has the power to affiliate other programs, right, under the 2001 agreement that we looked at --

Exhibit 1003?

A. Yes.

Q. Cobalt did create a program with Lion & Crown and affiliated that external exchange program -- Lion & Crown -- right? That was the 2010 agreement?

A. It wasn't -- yes, Lion & Crown is internal. It's not external. But, yes, Cobalt affiliated with Lion & Crown.

Q. Okay. And then it gave Lion & Crown the right to set the terms by which Ritz-Carlton Clubs would join the affiliation agreement that it entered into with Cobalt. True?

MR. SELLINGER: Objection to form.

A. It gave Lion & Crown the right to enter into other affiliation programs -- external affiliation programs -- true.

BY MR. REISER:

Q. And Lion & Crown created the 2013 affiliation agreement, which, by its terms, required that the association sign a joinder and the affiliation agreement if Marriott Vacation members were going to have access through this affiliation program. True?

MR. SELLINGER: Objection to form.

MS. LIVINGSTON: Object to form.

A. The affiliation -- when the affiliation

agreement of 2013 was signed, the affiliation was done. We, again -- the company, Ritz-Carlton Destination Club -- wanted to make options available to members. We didn't think we wanted to withhold anything from members. But because of some of the concern that happened, we made an accomodation with the boards to say, "If you want to make this available to your members, we would like you to acknowledge this."

But, I guess, I'm just -- you're saying it a lot of different ways, but it's the acknowledgement of them. So we wanted them -- if they didn't want to make it available to their members, it was going to be the board's decision not to do that.

Q. And it would've been the board's decision to not make the Marriott Vacation members have access to the club through the affiliation if they chose not to sign it. True?

MR. SELLINGER: Objection to form.

MS. LIVINGSTON: Object to form.

A. Through affiliation, they would not have had access to an Aspen, if that's what we're talking about specifically, but it was still available through the Explorer Program.

BY MR. REISER:

Q. I understand. You've said that many times. The Explorer Program was going to run out once the developer inventory was gone; right?
A. It could, but --
Q. It would --
MR. SELLINGER: Hold on. Hold on.
A. Right. But the developer inventory could have been held for as long as the developer wanted to hold it.
BY MR. REISER:
Q. Is that what you think, that they had the right to hold it as long as they want and never sell it?
A. Yes.
Q. Okay. I'm actually wanting to drill down, because you keep using the word, and the word is used as an accomodation. I just want to see if I can get you to agree that the accomodation was made at the time the November 2013 affiliation agreement was entered into, because that agreement gave the associations the right to say yes or no to the affiliation.
MR. SELLINGER: Objection to form.
BY MR. REISER:
Q. To joining the affiliation.

MR. SELLINGER: Objection to form.
MS. LIVINGSTON: Object to form.
A. Right. The affiliation was in place --
BY MR. REISER:
Q. And that affiliation --
MR. SELLINGER: Hold on. Hold on.
BY MR. REISER:
Q. Sorry.
A. The affiliation is in place, but the affiliation is between Lion & Crown and Marriott Vacation Club. That affiliation is in place.
So then you have all these clubs out here and, each of the boards are going to say -- the affiliation is in place -- the board is going to say, "Yes, my members can participate," or, "No, they cannot participate."
If they would like to participate, they sign the acknowledgement. Yes, they can participate. If the board turns over in three months, the current board says, "No, we're not going to participate" -- three months later, the new board comes on and says, "Oh, everybody really seems to like this Marriott Vacation Club. Okay, we're going to sign" -- then they can participate.
BY MR. REISER:

Q. Okay. So I think we're on the same page after all that. Thank you for volunteering that other stuff. It's helpful. But I just want to get a clear -- I think we're saying the same thing.
The affiliation agreement between Lion & Crown and Marriott was in place from November 2013; right?
A. Correct.
Q. And the decision whether each association would join that affiliation agreement and allow their members to trade into the Marriott Vacation Club, and Marriott Vacation Club members to access through this affiliation agreement, The Ritz-Carlton Club, that required an approval of each association. True?
MR. SELLINGER: Objection to form.
A. It is --
MS. LIVINGSTON: Object to form.
A. I'm sorry. It required an execution of the acknowledgement agreement, true. Yes.
BY MR. REISER:
Q. Do you believe that, if the Aspen -- strike that. Do you believe the Aspen association has the right to terminate at will, at this point, the affiliation -- the joinder and affiliation? Strike that. Let me ask a better question.

Is it your belief, because it sounds like this is what you testified to just by volunteering that earlier -- is it your belief that, if the Aspen board changes its mind today, it could notify Lion & Crown and say, "We no longer choose to acknowledge and consent to this agreement," and they would be out of the agreement?
A. If there --
MR. SELLINGER: Objection to form.
MS. LIVINGSTON: Object to form.
A. If the board came to us and said, "Listen, we have concerns. We don't want to -- we don't want to be -- this acknowledgement -- this program -- we don't want our members to have access to it anymore," we'd probably sit down with them and talk to them about why -- help understand it.
But, at the end of day, if they were adamant that there were all these issues, there were no members who liked it, dissatisfaction was incredible, there's no benefit to us for keeping Aspen -- continuing to have this program available for them. This is more vacation options for them. It's not doing anything for us.
Q. So you believe that the decision of the board, they can terminate their joinder at will. Is

that what you're saying?

MR. SELLINGER: Objection to form.

A. Am I saying they could send us a note to say, "We want to terminate the acknowledgement"? No. It would be more than that. There's not a termination provision that's in here.

But if they wanted to, and came and talked to us about it, and we understood, and there was member -- negative member feedback, the members weren't happy and so on -- yes, we would certainly work with them. We're not trying to bind them into continuing an agreement or travel options that they're not interested in.

Q. Well, I mean, Mr. Ferguson asked you whether you knew that the term of the affiliation agreement was ten years or not. I think you said you didn't know now, but you read it, I think, in there.

A. Yeah.

Q. You can't point to any clause within the affiliation agreement that gives the association the right to terminate the acknowledgement and joinder if they decided a year after signing it that they wanted to, even if the members were dissatisfied; can you?

A. But the affiliation agreement is not -- the association is not part of the affiliation agreement.

Page 186

Q. Let me rephrase it. I'm going to use very precise language here.

There's nothing in the 2013 affiliation agreement or the document that's entitled "Acknowledgement of and joinder to the affiliation agreement" that the association at Aspen signed, that gives the association the right to terminate the acknowledgement and joinder document that they signed.

Would you agree with that?

A. Not that I'm aware of, correct.

Q. But it's your testimony that, if they came to you, kind of, and said, "Hey, this agreement is really not working," despite what the agreement says, you'd talk to them and maybe let them out, maybe not? Is that what I'm hearing from you?

You don't have the authority, as you sit here today, to say, "Yeah, I would let them out." Right? That's not your decision?

MR. SELLINGER: Objection to form.

A. No, it's not my decision. It would be a company decision. But sitting here, I can't see a reason why the company -- you're insinuating we would want to force them to stay in. I can't truly think of a reason we would want to do that.

BY MR. REISER:

Page 187

Q. You can't think of any reason -- like, the halo effect -- you've never heard of the halo effect? You know what the halo effect is; right? You took Cheki Dev's class.

A. I did take Cheki Dev's class.

Q. You don't think there's a halo effect for the Marriott Vacation Club to have access -- for their members to have access to The Ritz-Carlton Club?

MR. SELLINGER: Objection to form.

A. But they do have access. This doesn't -- this isn't what gives them access. We have inventory in all the clubs except Aspen.

MR. SELLINGER: Hold on. Hold on. Would you read back the question and the answer and let Ms. Sobeck finish her answer?

THE REPORTER: "You don't think there's a halo effect for the Marriott Vacation Club to have access -- for their members to have access to The Ritz-Carlton Club?"

"Objection."

Answer, "But they do have access. This doesn't -- this isn't what gives them access. We have inventory in all the clubs except Aspen."

BY MR. REISER:

Page 188

Q. So right now --

MR. SELLINGER: Hold on. Did you finish your answer?

THE WITNESS: Right. But there's already been developer inventory that's been conveyed and is in the trust. The trust is now paying maintenance fees.

So there's access that exists that -- I don't actually believe there's any way to get that inventory out. That access to the Ritz-Carlton Destination program isn't going to change.

BY MR. REISER:

Q. But there's no developer-owned inventory in Aspen anymore. True?

A. Yes.

Q. Lore & Company, Jamie Klein -- rest his soul -- did you hear he passed away?

A. I did.

Q. Jamie Klein sold out all the developer-owned inventory. True?

A. Yes. At this time, though, we could get foreclosures back.

Q. At this time, the only access for Marriott Vacation folks into the Aspen Club is through the

Page 189

affiliation agreement; right?
A. Correct.
Q. So if that affiliation agreement went away, no more access by Marriott Vacation to Aspen; right?
MR. SELLINGER: Objection to form.
A. Yes. There would be no access, but I'm not --
BY MR. REISER:
Q. And there would be no way --
MR. SELLINGER: Hold on. Hold on.
A. But I'm not sure what that -- I don't -- I think you're insinuating that that hurts Marriott Vacation Club in some way, and it does not.
BY MR. REISER:
Q. Okay. If they don't have access to it, could they put the Aspen Club on the points charts when they're showing members that they could stay at the Ritz-Carlton Clubs for X points? They wouldn't have Aspen on there anymore.
A. No, they wouldn't have Aspen. But they have the other clubs. They have Ritz-Carlton Hotels through Explorer. They have all types of luxury options through Explorer. And we have 50 other resorts. I don't think not having Aspen, which is one property within this whole suite of resorts, would

Page 190

affect Marriott in any way.
Q. So you don't think there's a halo effect with the Aspen Club at all; do you?
A. I don't.
Q. Were you involved at all in the effort by -- strike that. I'm going back pre-spin.
You worked for Marriott Vacation Club International, or MORI, or one of the entities, even when the timeshare division was owned by Marriott International; right?
A. Yes.
Q. So during the time prior to the spin in November of 2011, were you involved at all in an effort by Marriott International to sell The Ritz-Carlton Club as an asset to another entity?
A. No.
Q. Do you remember that The Ritz-Carlton Club was being shopped by Marriott International for sale?
MR. SELLINGER: Objection to form.
A. I remember discussions about it.
BY MR. REISER:
Q. Do you remember a term, "Project Lion"?
A. Yes.
Q. What was Project Lion?
A. That effort.

Page 191

Q. Did you have any role in Project Lion?
A. I did not.
Q. You never appeared at any road show or any presentation by management to any other potential buyer?
A. No.
Q. Have you ever heard Lani Kane-Hanan use the words "halo effect"?
A. No.
Q. Never?
A. No.
Q. So I just want to make sure I understand your testimony. You went to Cornell Hotel School; right?
A. I did.
Q. You got an MBA there or a master's in hotel --
A. Master's.
Q. You took brand classes with professors such as Cheki Dev; right?
A. I did.
Q. You studied the Ritz brand in his class, didn't you?
A. I believe we did.
Q. With all that background, it's your testimony, Ms. Sobeck, that the ability for the

Page 192

Marriott Vacation Club sales folks to tell potential purchasers that they would have access to Aspen Highlands Ritz-Carlton Club has no benefit in terms of trying to sell points to that potential purchaser?
A. It is my testimony that the Marriott Vacation Club sales executives had a lot of different things they could sell. Are there some out there who could sell Aspen? Absolutely; they could sell Aspen. But if Aspen went away, they could sell Vail, they could sell Tahoe, they could sell --
Q. They can't sell Vail anymore. Bachelor Gulch is gone.
MR. SELLINGER: Hold on. Wait a minute. Wait a minute.
A. We have Ritz-Carlton Club, Vail. We have a property in Ritz-Carlton Club, Vail. So we have not only other Ritz-Carlton Clubs ski properties, we have Marriott Vacation Clubs -- many, many Marriott Vacation Clubs ski properties that exist.
So having Aspen not included...
BY MR. REISER:
Q. Did you ever call Ritz Aspen "the crown jewel of the Ritz-Carlton Club" to Jay Neveloff or any of the board members at Aspen?
A. No.

Page 193

Q. What was the management fee that Ritz-Carlton Management Company charged annually to the Aspen club in terms of -- you don't have to give me the dollar amount, but isn't it a cost plus 10 percent?
A. No. I believe it's a fixed -- I believe it's a fixed interest. It's a management fee per interest with a -- I believe how it's calculated is, it's the increase of the budget year over year, and that increases the budget percentage -- is what increases the management fee.
Q. So it's a set management fee. It's not a percentage of the budget?
A. No.
Q. Is Aspen different than the other clubs?
A. No.
Q. So it's your testimony that -- have you seen the terms of the Ritz-Carlton management contract with Aspen?
A. Yes. I believe they're all the same. I believe they are a fixed interest amount with a multiplier.
Q. How does that multiplier work?
A. It's the amount from budget from one year to the next. Whatever increased amount that is, the management fee goes up by the same amount.

Q. As a percentage?
A. As a percentage. So if the management fee -- or if the annual budget goes up 2 and a half percent year over year, then the management fee would go up by 2 and a half percent.
Q. What about Cobalt; how do they get paid?
A. Cobalt gets paid through -- there's a program management -- program manager fees that are included in the operational budget. So Cobalt bills each one of the associations each year for their effort.
MR. SELLINGER: It does strike me that you're continuing to explore areas that are not based on subsequently-produced documents, but just subsequent issues you're curious to ask witnesses about.
MR. REISER: I'm going to mark some strategic council -- I'll mark as Exhibit 2142 the July 9, 2012 strategic council luxury segment update.
(Exhibit 2142 was marked for identification.)
BY MR. REISER:
Q. So can you turn to page -- the last page of this document? It's entitled, "Project updates."
Do you see that?

A. Yes.
Q. Do you see under "Project," it says, "Luxury segment reengineering"?
A. Yes.
Q. Does that refresh your recollection as to whether that was the term used within Marriott Vacation Worldwide to describe the changes that were going on to the luxury division of the Ritz-Carlton?
A. I don't know specifically. This isn't my document.
Q. I understand, but does this refresh your recollection at all, or you just don't remember this term?
A. I don't remember the term being used.
Q. In the Abaco deflag and unwind, how many -- was there a lawsuit that arose out of that unwinding and deflagging?
A. Was there a lawsuit -- out of the fractional or --
Q. Yes.
A. You're kind of putting two things together.
Q. The fractional.
A. The fractional? I don't remember if there was one.
Q. How about the whole owner?

A. I believe there may have been, but I don't know specifics.
Q. Do you remember the unwinding of the Bleu Florida Trust? Did you have anything to do with that?
A. No. That was Mary Lynn.
Q. Do you know how much -- strike that. As you sit here today, do you have any knowledge of the unwinding process of the trust?
A. Of the process?
Q. Yeah.
A. Yes.
Q. What was your role in it, if anything?
A. I didn't have a role.
Q. Are you aware of any appraisals that were undertaken by the Ritz-Carlton Management Company of the fractional interests that the club was reacquiring or that Marriott was reacquiring from the Bleu Florida Land Trust?
A. No.
Q. You've never seen a Cushman & Wakefield appraisal, appraising the worth of the fractional interests in the trust?
A. I have seen that.
Q. You've seen that appraisal?
A. I've seen that recently, actually.

Q. Did you see it back in 2013 when it was out?
A. No.
Q. When was the first time you saw it?
A. Probably six weeks ago.
(Exhibit 2143 was marked for identification.)
BY MR. REISER:
Q. 2143 is the August 8th strategic council. I'm going to always go to the project update section on these as we go through them.
A. I didn't have anything to do with writing any of these, so we can go through them all if you'd like, but I just want you to know.
Q. I hear you. What I noticed was that the business review reports often times, like, word for word, got cut and pasted by whoever drafted these and they take your reports on the individual Ritz Clubs and stick them into this, so I think that --
A. Do you want to talk about those?
Q. No. I think I'd rather talk about these. I didn't print those out. I thought you actually had these. But I'm going to go through them and see --
MR. SELLINGER: What's the date?
MR. REISER: August 8, 2012.
BY MR. REISER:

Page 198

Q. I'm just going to turn to the -- were you the -- right now, I'm actually looking on the last page of the exhibit regarding the Northstar project.
Do you see that?
A. Yes.
Q. Were you the asset manager for Tahoe during 2012?
A. Stacey and I were. Stacey really spent more time on Northstar.
Q. Do you remember a time when the purchaser of the de-annexed -- the 17 de-annexed units -- JMA -- became delinquent in the payment of their maintenance fees?
A. I do.
Q. Do you remember a time where money was actually borrowed from the reserve account to make up for the delinquent maintenance fees that were not paid by JMA?
A. I don't.
Q. You don't remember that happening?
A. I don't specifically remember it happening. It certainly could have. It's happened before.
Q. Is that something that, in your opinion as the Ritz-Carlton Management Company representative to the board, would've been appropriate?

Page 199

MR. SELLINGER: Objection to form.
A. What would've been -- that they borrowed?
BY MR. REISER:
Q. Borrowed from the reserve account to pay operating expenses.
A. We've had other associations do it before. It depends on their governing documents.
Q. Do you think it's appropriate in California -- under California law -- to do that?
A. I can't speak about California law.
Q. That was a club that you were running that was in California. So, in California, I think you'd be familiar with the rules against commingling reserve funds. You're not -- you've never --
A. I'm sorry --
MR. SELLINGER: Objection to form.
A. I'm sorry. I'm not familiar.
BY MR. REISER:
Q. As you sit here today, it's your opinion that it may or may not be okay in a California condo association for the condo board to borrow money from a reserve account and use it to pay operating expenses?
A. I'm not --
MR. SELLINGER: Objection to form.
BY MR. REISER:

Page 200

Q. It may or may not be okay as far as you know; right?
A. Not specifically, no.
Q. So if you saw that going on at the club, would you have reported it to anybody or would you just have let it go?
MR. SELLINGER: Objection to form.
A. We would have asked a question about it to our law department.
BY MR. REISER:
Q. Do you remember ever asking any questions of the law department about whether it was appropriate for the condo board, of which you were the management -- you were managing the condo board at Tahoe; true? You, Stephanie Sobeck.
A. The fractional association, yes.
Q. You didn't manage the condo association?
A. The condo association was -- they actually went out and were eventually unbranded. That was the whole -- JMA was actually selling unbranded inventory.
Q. Eventually, Rock Resorts took over the management of the condo association; right?
A. Uh-huh.
Q. Until that time, you, Stephanie Sobeck, was the asset manager representing Ritz-Carlton management

Page 201

company in relation to the management of the condominium board, right, in Tahoe?
A. Stacey was, but we were working together. She was working for me, so, yes.
Q. Okay. This is August 30, 2012. It's Exhibit 2144.
(Exhibit 2144 was marked for identification.)
BY MR. REISER:
Q. I want to ask you -- you were the asset manager and the representative of the Ritz-Carlton Management Company for the Bachelor Gulch board too during 2012; right?
A. Yes.
Q. Do you remember the board, in the summer of 2012, after the evolution letter went out, hired Mark Earle to study the impact on the value of the members' investment based on the company's recent decisions?
A. Yes.
Q. And what did Mark Earle find in terms of the impact on the value of the members' investment, based on the company's decision to evolve the brand as stated by Eveleen Babich in 2012?
MR. SELLINGER: Objection to form.
A. What did the report say?

Page 202

BY MR. REISER:
Q. Yes. Did you ever see it?
A. I guess I eventually saw it. I don't remember specifically what it said.
Q. Isn't it true that Mark Earle gave the opinion that the Marriott Company's -- or Marriott's decisions in terms of the evolution, that's described by Eveleen Babich, was that it would have a negative impact on the value of the members' interests?
MR. SELLINGER: Objection to form.
A. If that's what the board wanted to find, I'm sure that's what he found.
BY MR. REISER:
Q. Do you remember reading that that was found, though?
A. I don't remember reading the report. I probably did see it, though.
Q. You understood that Mark Earle actually gave -- or -- I'm sorry -- the board at Bachelor Gulch gave the opportunity for Ritz-Carlton Management Company to continue to manage the property after 2012; right? It was a request for proposals, and Ritz-Carlton Management Company submitted a proposal?
A. We did --
MR. SELLINGER: Objection to form.

Page 203

A. We did respond to the RFP.
BY MR. REISER:
Q. That was rejected by the board, true, in the case of The Timbers' proposal?
A. Yes.
Q. And is it your opinion that the decision to go with Timbers was directly related to the finding by -- strike that. Is it your opinion that -- well, strike that. I'm done with this.
Next is 2145. It's a September 27, 2012 strategic council update.
(Exhibit 2145 was marked for identification.)
BY MR. REISER:
Q. Okay. So on page 5 of this document, Exhibit 2145, under the luxury segment reengineering department -- I mean segment -- it says, "The communication related to the evolution of the RCDC product has not been well-received by many of the members. Several boards have made their concerns known to us. We have held conference calls, a webinar, one-on-one meetings, and a meeting with Steve and me and the board president and the secretary of Bachelor Gulch. Communications with the members will continue in the coming months."

Page 204

Do you remember that being true, that the evolution of the RCDC product, as described by Eveleen Babich and as described by Steve Weisz in the webinar, was not well-received by the members?
MR. SELLINGER: Objection to form.
A. I remember there being some comments by members, but it's interesting in this one. I was reading back here. It actually says that member services didn't get a lot of comments, but there was comments back from the board specifically. So, yes.
BY MR. REISER:
Q. It says that, "a one-on-one meeting and a meeting with Steve and me."
Isn't it true that Lee Cunningham writes these strategic council reports?
A. Yes.
Q. So that was in the words of Mr. Cunningham, that the evolution of the RCDC project has not been well-received by many of the members, and that several boards had made their concerns known to us. True?
MR. SELLINGER: Objection to form.
A. I would assume he wrote it because this is his, but I do not know.
BY MR. REISER:
Q. Would you disagree with him that the RCDC

Page 205

product had not been well-received by the members as of September of 2012?
MR. SELLINGER: Objection to form.
A. The RCDC product?
BY MR. REISER:
Q. The evolution of the RCDC product had not been well-received by many of the members.
A. We had gotten feedback from some of the members that there were concerns, yes.
Q. Which boards made their concerns known to you, Stephanie Sobeck, in or around September of 2012 after the evolution was announced?
A. Bachelor Gulch specifically, and then had conversations with Jupiter and Aspen and St. Thomas, I would say.
Q. And it's true that Bachelor Gulch held a vote and terminated Ritz-Carlton Management Company as a result of the evolution proposal. True?
MR. SELLINGER: Objection to form.
A. There were a lot of reasons that -- I think we covered this last time. There were a lot of reasons why Bachelor Gulch left.
BY MR. REISER:
Q. What about Jupiter; what was the reason they left, in your opinion?

Page 206

A. There were many reasons why they left. I wouldn't say there was one specific reason.
Q. What about -- okay.
So Bachelor Gulch sent the Ritz-Carlton Management Company a cease-and-desist letter to cease -- to have Marriott Vacation Worldwide cease and desist from allowing any members of the Marriott Vacation Club to use Bachelor Gulch in or around the fall of 2012; didn't it?
A. Yes.
Q. And Jupiter sent a cease-and-desist letter along the same lines; correct?
A. Yes.
Q. And the Aspen board actually hired a lawyer by the name of Philip Gosch to write a cease-and-desist letter to prevent Marriott Vacation members from using the Aspen Club in the fall of 2012. True?
A. I don't remember getting one from Aspen, but they could have. I don't remember.
MS. LIVINGSTON: Objection to form.
BY MR. REISER:
Q. And St. Thomas also sent a cease-and-desist letter in the fall of 2012 regarding the use by Marriott Vacation Club members of the St. Thomas club.

Page 207

True?
A. Sorry. I don't remember if they -- I only remember Bachelor Gulch and Jupiter specifically. I just don't remember if St. Thomas and Aspen did as well.
Q. Okay. You remember San Francisco holding a survey of their own and being opposed to the affiliation as well. True?
MR. SELLINGER: Objection to form.
A. San Francisco sent a survey out to its members asking about the product overall. It wasn't specifically about affiliation. It was about how the use of the product was going for the members overall.
BY MR. REISER:
Q. Okay. And San Francisco was quite upset about the fact that the club was being represented to third parties through sites like Jetsetter and Wall Street Journal ads. Is that true?
MR. SELLINGER: Objection to form.
A. They were -- that inventory was actually being used for marketing purposes for the club.
BY MR. REISER:
Q. Okay. So you're aware, though, that there were no sales of any Ritz-Carlton fractionals after 2013. True?

Page 208

A. After 2013, yeah, that would probably be about when we stopped.
Q. So what marketing use was being made at the Ritz-Carlton Destination Clubs in 2013 when that survey was taken?
MR. SELLINGER: Objection to form.
A. I don't remember when we stopped doing marketing packages to the club.
Are you trying to say it happened at the same time?
BY MR. REISER:
Q. No. I'm just wondering -- what would you be marketing if there's nothing for sale? How would you have a marketing trip to sell fractionals when there's no fractionals for sale?
A. I don't know when the marketing packages stopped in San Francisco.
Q. Okay. Would you agree that, after sales stopped of fractionals, that it would have been inappropriate to use the inventory at San Francisco to market Marriott Vacation points?
(Speakerphone is making noise.)
MR. REISER: Just for the record, that was a phone conference that just got ended.
If you could just read the question back?

Page 209

THE REPORTER: "Would you agree that, after sales stopped of fractionals, that it would have have inappropriate to use the inventory at San Francisco to market Marriott Vacation points?"
MR. SELLINGER: Objection to form. Once again, I'd also note that we're certainly going, at this point, beyond the scope of issues in the documents that were subsequently produced.
THE REPORTER: And I didn't get an answer.
THE WITNESS: Sorry. This is San Francisco?
(The reporter read the question again.)
THE WITNESS: Well, I think, however the developer wanted to allow use of that inventory -- just like if they had used it through Explorer and brought people who were Marriott Vacation owners in, and they would have had the ability to do that.
BY MR. REISER:
Q. So it's your opinion that there are no use restrictions on the developer inventory; they can do whatever they want with it?

Page 210

MR. SELLINGER: Objection to form.
A. I didn't say that. They could use it like any other member could use it.
BY MR. REISER:
Q. Do you know whether there was any kind of, like, agreement with the Ritz-Carlton hotel in San Francisco, wherein the nightly rentals could not be -- transient rentals could not be made at the Ritz-Carlton Residence Club?
A. Are you saying the territorial?
Q. Yes.
A. I don't know if territorial exists. I don't know.
Q. This is Exhibit 2147, the strategic council, October 25, 2012.
(Exhibit 2147 was marked for identification.)
BY MR. REISER:
Q. I want to look at the luxury segment reengineering box. So a month later, on October 25, 2012, there's still the writing by Mr. Cunningham that, "The communication related to the evolution of the RCDC product has not been well-received by many of the members. Several of the boards have made their concerns known to us."

Page 211

Was that your recollection that, in October 2012, there was still negative reception by the members of the evolution of the RCDC product?
MR. SELLINGER: Objection to form.
A. There were some members who were -- had concerns about the evolution letter, yes.
BY MR. REISER:
Q. Would you agree with Mr. Cunningham that it was many of the members?
A. It was some of the members.
Q. You disagree that it was many? Because some and many are different; don't you think?
MR. SELLINGER: Objection to form.
A. Yes, but we're talking about 3,000 to 4,000 members. I'm not sure of the definition of "some" or "many" in that context.
BY MR. REISER:
Q. Okay. Mr. Cunningham then goes on to write, "We have spoken to a couple PR firms to provide input into our plan and assist with ongoing communications."
Was that the APCO firm that was retained to provide public relations for the evolution?
MR. SELLINGER: Objection to form.
A. APCO was eventually hired, but it was hired through the law department.

Page 212

BY MR. REISER:
Q. Were there any other PR firms that were hired?
A. No, but there were other ones that we looked at.
Q. It says, "So far, we do not have a communication consultant selected; however, we believe we have a viable option to consider."
Do you know what he was talking about there?
A. That was APCO.
Q. "The primary focus on the going-forward communication plan is to individual members, shifting the focus away from the boards."
Did you ever discuss with Mr. Cunningham that the focus going forward, in terms of attempting to implement the evolution, would be on the members, rather than the boards?
A. Yes.
Q. Why was that decision made?
A. When the situation happened at Bachelor Gulch, when the board was communicating out to its members, as it was, we didn't feel like a lot of the information that was being shared by the board was as straight forward and balanced as it should have been.
We wanted to make sure -- because once the

Page 213

communication had been given out to the members about the possibility of the Marriott Vacation Club program, we were getting feedback back from members saying that there were members that were interested and when was it going to happen. But then we had a board, like Bachelor Gulch, that was only sharing negative, and not sharing positive.

So we thought, at this point, it was better to start talking to individual members, versus going through the boards, just so we could educate them on a program. We hadn't decided on the best way on the communication plan that we were going to use.

Q. If the boards didn't want to go through with it, why were you pushing it?

MR. SELLINGER: Objection to form.

A. Quite frankly, the challenge was -- we had already communicated out to all the members that we were going to do this. So there were members who were not on the board -- the board is only five -- you know, it's five directors that represent a thousand people.

So these five directors we saw in Bachelor Gulch, that the way the communication was being rolled out by the Bachelor Gulch board wasn't necessarily factual to how the program was actually going to work.

So we wanted to make sure that -- the members could make their own choice, but we wanted to make sure that the information they were getting was accurate.

BY MR. REISER:

Q. Okay. If you can turn to the Aspen Highlands box on the next page, again, this is dated October 25, 2012 -- these notes.

Under the Aspen Highlands box, it says, "New board elected 10/13/2012. Pressure from membership during meeting applied to board to fight RCDC evolution."

You were at that board meeting, weren't you?

A. I was.

Q. That was when Randy Mercer and Tyler Oliver got elected?

A. Definitely Randy Mercer. I'm not sure about Tyler. He may have been reelected then. But, yes.

Q. Do you remember pressure from the membership, during that meeting, to fight the board on the evolution?

A. There were a few members in attendance at the meeting who had concerns about it, yes.

Q. So Mr. Cunningham writes, "Pressure from membership during meeting." He didn't say, "a few

members."

Do you think he's just using inaccurate terminology there?

MR. SELLINGER: Objection to form.

A. I mean, membership -- we don't usually get a lot of participation from members at an annual meeting. There might be a few members who come, so membership could be a few members. It's not -- you know, we don't get hundreds of people who are coming to these.

BY MR. REISER:

Q. Do you remember how many people were at that meeting?

A. No, but I've never been to a meeting where there's more than -- I think St. Thomas has the most, and maybe there's 30. So it's not a big percentage of the membership.

Q. And I may have asked you this on the last depo. I don't want to get another objection from Phil, so I promise this will be my only question on this.

Do you have any recollection of John Hearns informing you or anybody else at the Ritz-Carlton Management Company that Jay Neveloff was asking that the Marriott folks vote their remaining shares to

Ford, Oliver, and Mercer at that meeting?

A. I believe we looked at an e-mail last time that Jay Neveloff was asking, I think, about Mercer. I don't remember Oliver, but I think it was Randy.

Q. Do you remember anything else about that issue since our last discussion?

A. No.

MR. SELLINGER: Off the record. It's been about an hour. Do you want to --

MR. REISER: Want to keep going for a little bit? I'm making pretty quick progress here.

MR. SELLINGER: If you want to take five, but I don't want to go longer than that.

MR. REISER: Okay.

BY MR. REISER:

Q. Next in order is Exhibit 2148. It's a January 17, 2013 strategic council.

(Exhibit 2148 was marked for identification.)

BY MR. REISER:

Q. On this one, again, let's go to the luxury segment reengineering box. The second bullet point starts -- by the way, I'm skipping over the first bullet point in all these reports dealing with the

portfolio buyback, because you didn't have anything to do with that; right?

A. Correct.

Q. So skipping to the bullet point. It says, "Based on a recently-filed claim in Minnesota, we are reevaluating go-forward strategy. Current thinking not yet finalized -- is yet to be finalized." Then there's six bullet points.

Do you remember there was a strategy change following the class action that was filed by Hoyt and others in the Minnesota District Court?

A. I remember discussions about Hoyt. And, yeah, I remember discussions about kind of moving forward with a -- if you want to call it a survey.

Q. Okay. So the second -- the first bullet point talks about the re-evaluating strategy not yet finalized, albeit, but it says, "Move forward with putting Northstar and San Francisco inventory into the NATO Trust."

MR. SELLINGER: I'm sorry. Let me give you a cautionary instruction, which I think will help keep me from having to object as we go through this. To the extent you can answer any questions about this without getting into conversations with counsel, you

can do so.

But any communications to or from counsel for the purpose of giving or receiving legal advice, I would instruct you not to answer.

THE WITNESS: Okay.

MR. SELLINGER: Go ahead.

BY MR. REISER:

Q. So did you ever seek legal advice as to whether it was appropriate, under the governing documents in both the Tahoe and San Francisco clubs, to put the developer-owned inventory into the NATO Trust?

A. Yes.

Q. When did you do that?

A. It would've been obviously before this. Probably in 2012.

Q. Who did you ask?

A. We would have asked Barbara, Jim Hunter, maybe a couple others, but those probably would've been the primary.

Q. Did you rely on that -- on any legal advice in acting -- to put any of the Northstar or San Francisco inventory into the NATO Trust?

MR. SELLINGER: Let me restate that. To the extent -- I don't want you -- and I'll

instruct you not to disclose legal communications with counsel.

I'm assuming that you're not taking the position that, if she answers a question on whether she relied, that that's constituting any waiver of privilege.

MR. REISER: It's not a waiver, but it might be relevant to an advice-of-counsel defense later on. We can argue about that --

MR. SELLINGER: And I don't believe that there is a reliance on counsel defense, but -- I understand that -- but I want to make sure that you're not going to argue waiver if she --

MR. REISER: Fair enough. I won't.

MR. SELLINGER: -- responds to that question. We have no intention of waiving privilege.

MR. REISER: You've been clear on that.

MR. SELLINGER: Have to be.

BY MR. REISER:

Q. So go ahead.

A. Yes.

Q. Was there a question in your mind as to whether it was allowed under the governing documents?

A. We wanted clarity that it was.

Q. Was there a question in your mind that it was or wasn't, or you always get advice of counsel on doing something?

A. Usually something like this, we would always get advice of counsel.

Q. The second bullet point says -- this, again, is re-evaluating the go-forward strategy in terms of reengineering the club. The second bullet point is, "Go club by club and obtain a majority vote of the members endorsing the affiliation of their club with Lion & Crown."

Do you remember that that was the strategy that ultimately was adopted by Mr. Cunningham in terms of the reengineering strategy?

A. What we went forward with getting, going club by club and going out to the membership, is to seek their feedback, yes.

Q. Okay. You don't know what Mr. Cunningham meant by "majority vote," I take it. Right? Or do you?

A. We talked about this last time. I mean, getting a full majority vote of the members is -- does not happen. It's very difficult to get members out to vote. So I can only guess that he was talking about

the majority of people who voted.

Q. But there was a majority vote at Bachelor Gulch; true?

A. It was a lot of work to get.

Q. Understood, but there was a majority vote? They did get the membership --

A. We didn't manage that vote for them, so I can't really talk about that.

Q. Okay. And there was a majority vote at Jupiter to terminate the management agreement as well; right?

A. Again, we didn't manage that.

Q. So is it your testimony that it's difficult for the Ritz-Carlton Management Company to get a majority vote, but other companies, who attempt to get majority votes, can do it? Is there something unique about Ritz-Carlton Management Company that prevents them or causes a great deal of trouble in getting a majority vote?

MR. SELLINGER: Objection to form.

A. There's nothing that was required to get a majority vote, I guess, is what I'm saying. So if this was something we were changing documents, changing declarations, changing governing documents that existed on the property, and needed it, could we

Page 222

get it? Certainly, with a lot of resources and expense, we could. But this was something that we were getting feedback from the members on, so there would've been no need to do that.

BY MR. REISER:

Q. Well, the membership feedback was negative; right? We saw that. It's even still popping up in this -- strike that. It was in the last strategic council exhibit that Mr. Cunningham repeats that there's a -- the membership is against the evolution.

So you were getting feedback, but it wasn't very good; was it?

MR. SELLINGER: Objection to form.

A. Well, we talked about this last time. When you have a situation where something new rolls out, you're more likely to hear negative from members than positive. So there was a lot of -- there were certainly -- we were hearing from some members that there was concern. But before we actually went out and talked to all members about it, we really didn't know how the membership felt.

BY MR. REISER:

Q. So regardless of whether you believed that you were required, as Ritz-Carlton Management Company, to get a majority of the vote, you would agree that,

Page 223

as of January 17, 2013, Lee Cunningham was stating that "The current thinking is to go club by club and obtain a majority vote of the members endorsing the affiliation at their club with Lion & Crown." True?

MR. SELLINGER: Objection to form.

A. I can read the line that he wrote.

BY MR. REISER:

Q. Did that ever change in terms of strategy? Was that the strategy as of January 2013, to go club by club and obtain a majority vote of the members?

A. We were going club by club to go and get a survey of the members, to understand their interest in participating with the program. That never changed.

Q. The next bullet point says, "Lion & Crown would be described as having an affiliation with the MVCD program, Third Home, and outside private home exchange networks, and Elite Alliances, a luxury tier fraction club exchange network."

Elite Alliance never happened; right?

A. No.

Q. Do you know why not?

A. No.

Q. Did you ever talk to Elite Alliance about a potential exchange program?

A. No.

Page 224

Q. Do you know if Mr. Cunningham did?

A. No.

Q. The fourth bullet point, "Mount an aggressive communication, education, marketing campaign aimed at the member base for each club to give us the best chance of success. Utilize outside communication expertise to develop and execute the campaign."

So do you have any idea what Mr. Cunningham meant by "the best chance of success"?

MR. SELLINGER: Objection to form.

A. I guess the best chance of having a good communication plan, yeah. Going out to the members and communicating to them about the club and...

BY MR. REISER:

Q. It says, "Based on the outcome of the vote at each club, either affiliate or not."

As of January, isn't it true that Mr. Cunningham was -- his strategy on the reengineering was, there was going to be a vote at each club and the club voted, no, there would be no affiliation?

MR. SELLINGER: Objection to form.

A. We never thought it was a vote. It was always a gathering of member information, a survey, and understanding of what members thought. We used

Page 225

"survey" and "vote" interchangeably.
BY MR. REISER:
Q. Did you ever read Lee Cunningham's deposition in this case?
A. No.
Q. Did you talk to him about his deposition?
A. Specifically, no. Talked to him that he had a deposition.
Q. Are you aware that he changed his mind about a vote in the summer or spring of 2013?
MR. SELLINGER: Objection to form.
BY MR. REISER:
Q. And changed his mind from a vote to a survey, so that, indeed, they were not being used interchangeably; a vote was a vote and a survey was a survey, and he changed his mind?
A. No.
Q. You never heard that?
A. I never heard him be deposed to say that, no.
Q. Would that surprise you if he testified to that effect?
A. No.
Q. Why would that not surprise you, given your testimony that you always considered "vote" and "survey" to be the same thing?

Page 226

MR. SELLINGER: Objection to form.
A. Because -- this gets into the counsel part, which I don't know if I can talk about or not.
MR. SELLINGER: Certainly, don't get into any conversations with counsel.
THE WITNESS: But that's where the change came from.
BY MR. REISER:
Q. Is it true then that you are aware that he changed his mind from a vote to a survey?
MR. SELLINGER: Objection to form.
A. I know that we changed the decision to use "vote" versus "survey", yes.
BY MR. REISER:
Q. Did you mean just use the word "vote" versus "survey"?
A. Yes.
Q. You put air quotes on that. Why did you do that?
A. Because this was a -- to me, it was something that was more a change of verbiage based on direction from our attorneys.
MR. SELLINGER: Once again, don't get into communications. I'll instruct you not to get into communications with counsel.

Page 227

BY MR. REISER:
Q. So it's your testimony that counsel was -- the advice of counsel was requested as to whether to use the word "vote" or "survey"?
MR. SELLINGER: Again, I'll instruct you not to answer with respect to communication with counsel for the purpose of getting legal advice.
A. We discussed the approach we were going to take --
MR. SELLINGER: Again, don't -- you can't get into your discussions --
THE WITNESS: I can't answer your question then.
MR. REISER: We never took that break. Want to take it now?
MR. SELLINGER: (Nods head.)
THE VIDEOGRAPHER: We are going off the record. The time is 3:38 p.m.
(Brief recess.)
THE VIDEOGRAPHER: We are back on the video record. The time is 3:49 p.m.
Counsel, you may proceed.
(Exhibit 2137 was marked for identification.)

Page 228

BY MR. REISER:
Q. All right. I'm going to show you Exhibit 2137. It's the October 21st, 2013 corporate growth committee memo authored by yourself and John McGowan regarding Ritz-Carlton, San Francisco, member options/offering.
You have seen this document before, I take it?
A. Yes.
Q. Do you want a chance to read it or --
A. No. It's okay.
Q. First of all, who is John McGowan?
A. He was an attorney. He worked with us.
Q. Did he work as an attorney in the legal department or he happened to be an attorney?
A. No. He worked in the law department.
Q. All right. Did you draft this or did he?
A. I drafted part of it; he drafted part of it.
Q. Do you recollect drafting this as you sit here?
MR. SELLINGER: Objection to form.
A. Yes.
BY MR. REISER:
Q. So the first sentence says, "The purpose of this submission is to provide the corporate growth

Page 229

committee an update on the current state of member satisfaction at the Ritz-Carlton Club, San Francisco, and obtain approval of the financial impacts associated with the presentation of four product exit options to the members of the San Francisco club, San Francisco."

Do you know what was the precipitating factor in preparing this memo?

MR. SELLINGER: Let me just give you one instruction with respect to this document. So we have, Mr. Reiser, redacted a limited part of the memo on the basis of attorney-client privilege.

The decision that was made was that the remainder of the memo, notwithstanding the fact that an attorney was listed as one of the coauthors, were not privileged.

So answer Mr. Reiser's questions, but just, in anticipation, I want to make sure, in doing so, that you don't get into any attorney-client discussions for which we're always, as you know, and Mr. Reiser knows, asserting privilege.

THE WITNESS: Okay.

MR. REISER: But you're not asserting her

Page 230

discussions with McGowan were privileged; right?

MR. SELLINGER: Well, I wouldn't say that. I'd say that a decision was made that we're not asserting privilege with respect to the unredacted parts of the memo.

THE WITNESS: But I would have talked to him about all of this.

MR. SELLINGER: So your conversations with McGowan, yeah, we would generally assert privilege as to -- but I don't think that precludes you from asking questions about -- I would instruct her not to answer any of those discussions with McGowan. But I want to instruct her not to answer questions generally about the unredacted portions.

MR. REISER: It's going to be like Houdini trying to navigate that, but let me see what I can do.

BY MR. REISER:

Q. So you recollect -- I mentioned that survey to you at the San Francisco club that was undertaken by Steve Andrews and Al Bruno. I think we talked a little bit about it last time; right?

A. Yes.

Page 231

Q. Was this effort to give product exit options -- was it prepared as a result of getting a dose of the member dissatisfaction based on the results of that survey?

MR. SELLINGER: Objection to form. Go ahead.

A. Yes. It was in response to concerns we had heard from the San Francisco members about ways to get out of the program.

BY MR. REISER:

Q. I've read this memo pretty closely. You can see my highlights and my scribbling is on the paper. I do want to see if I can ask you more generally and avoid going through line by line. Let me just -- let me just ask you if I can ask you this way.

Would you agree that the maintenance fees at the San Francisco club were one of the highest in the club's system?

A. Yes. The maintenance fees in San Francisco were the highest in the system, yes.

Q. And then the other club that had that dubious distinction was Tahoe, around the same amount of fees per night?

A. I don't think they were quite as high as San Francisco. I mean, San Francisco is an expensive

Page 232

market to operate.

Q. I was just kind of doing the numbers in my head. It seemed like the maintenance fees were roughly equivalent for the same 21-night use.

That's not your recollection?

A. I thought they were a little less. I thought they were a few thousand dollars less.

Q. Okay. Would you say that the San Francisco club and the Tahoe club were the top maintenance fees clubs in terms of the highest maintenance fees?

A. Most expensive?

Q. Yes.

A. Let me think about what Vail -- so Aspen had 28 nights, so they're less. And then Vail and Tahoe, I believe, were about the same, and San Francisco would be the highest.

Q. Is it true that the average maintenance fees at San Francisco were roughly $1,000 per allocated night?

A. Yes.

Q. And it was determined by you, around the time of this memo, that the current nightly price of a suite at the concierge level of the Ritz-Carlton Hotel on Nob Hill is roughly $1,000 per night. That's in the memo and that was your findings at this time?

Page 233

A. Yes.
Q. Is it true that the maintenance fees for the Ritz-Carlton, San Francisco club were roughly three times the maintenance fees for an equivalent-use night at the Marriott Vacation Club?
MR. SELLINGER: Objection to form.
A. Marriott Vacation Club program works differently. So Marriott Vacation Destinations Program is a conglomerate of a lot of different maintenance fees. They get averaged out and put into points. So you can't really say that.
You would have to look at a week, because it depends on the demand, the number of points, and then the maintenance fee is associated with that. It's not really as black and white an answer as that.
BY MR. REISER:
Q. Okay. And the maintenance fees average across all the different clubs in the Marriott Vacation Club were around, like, $10 and some change per point in 2013?
A. Per point, roughly, without getting into specifics -- but, roughly.
Q. So you were seeking approval from the corporate growth committee to give the members in San Francisco four options; were you not?

Page 234

A. Yes.
Q. Could you just list those options for us?
A. We were asking that they be able to potentially convert their fractional interests into points -- Marriott Vacation Club destination points; convert their fractional interests into whole ownership residences, which they would've taken their fractional interest and used it as equity; convert their fractional interests into another fractional program, so one of the other places we had developer inventory they could exchange; or have the Marriott Vacation Club or an affiliate repurchase the fraction on a predetermined price of the unit -- per unit.
Q. You were requesting that the inventory be purchased back if somebody wanted to sell it at 20 cents on the dollar; right?
A. Yes.
Q. Did the corporate growth committee ever approve that option to buy them back?
A. No.
Q. Did they approve the fractional interest to points in Marriott?
A. No, not at that time.
Q. Have they ever approved that one?
A. I don't believe so. I don't know. It might have been an option later we were given. I think, out of this one, they were -- we were able to offer whole ownership or convert them to another fractional interest.

Page 235

Q. Okay. So that's what the corporate growth committee ultimately decided, true, that -- the two middle options you mentioned -- converting -- taking, say, 250 that they paid from the fractional, using that as a down payment for, say, a $2 million condo at the Residence Club; right?
A. Yes.
Q. That was option number one. The second one would be just taking your San Francisco club fractional club share and trading it, say, for Aspen?
A. Correct.
Q. Do you remember how many folks -- members, I should say -- in San Francisco participated in any of those two options?
A. The number, no. But I know we had several people who ended up going to another fractional. I think we had a couple of people who were interested in buying whole ownership. I don't know if that ever happened.
Q. Okay. So let's just -- did you prepare the background section of this memo?

Page 236

A. Yes.
Q. So you were informing the corporate growth committee, including Stephen Weisz and others, that the two directors -- and we know them by Steve Andrews and Al Bruno -- solicited feedback from San Francisco members via survey and they got 78 responses, roughly half the membership. True?
A. Yes.
Q. You state that, "The members' responses expressed growing frustration with their ownership; and, in some cases, threatened litigation absent options being provided by The Ritz-Carlton Destination Club."
Do you remember who would threaten litigation? Do you have any recollection of particular threats of litigation? Or was that generally from the comments that you read on the survey?
A. Generally --
MR. SELLINGER: Objection to form.
A. -- from the comments.
BY MR. REISER:
Q. These bullet points -- I like the way you put a heart as a bullet point. That's probably how I knew you wrote it. Just kidding.

Page 237

A. That's funny. Mine doesn't --
Q. Oh, it doesn't?
A. No. Mine has a squiggly -- you can be assured that I did not use a heart as a bullet point.
Q. Sorry for presuming that.
A. Yeah. That's not really my style.
Q. At any rate, the bullet point that you listed here under background, those were what you gleaned from the survey; right? Those points that -- you were basically outlining the points you gleaned from the survey that Bruno and Steve Andrews took; right?
MR. SELLINGER: Objection to form.
A. Through the survey responses and discussions with the board.
BY MR. REISER:
Q. Under the second bullet point, under background, it says, "Members allege that the annual club dues are too high and that RCDC is undermining the value of their ownership by renting its inventory at rates that are far below the nightly costs associated with their ownership."
The next sentence -- my question is -- is the next sentence something that you are putting in there in terms of what the facts are, or is that something that you gleaned from the inventory [sic] as well? By

that next sentence, I mean, "RCDC has rented its inventory as permitted by the governing documents for the purpose of marketing the sale of its inventory."
Is that your comment or is that something you also gleaned from the survey?
A. This would've been discussions with counsel.
MR. SELLINGER: Okay. I'll instruct you not to get into discussions with counsel.
THE WITNESS: Would you look at that rain?
MR. REISER: I'm glad we're safe and sound at the cozy confines of the Greenberg Traurig conference room.
THE WITNESS: Thank goodness.
MR. SELLINGER: Okay. Off the record -- okay -- five more hours then?
THE WITNESS: No, thank you.
BY MR. REISER:
Q. So the second one says, "These stays do not require a tour and are generally available at a rate between $400 and $600 per night."
Is that factual? You understood that the rentals at San Francisco were renting between $400 and $600 a night back in 2013?
A. Yes, it would've been.

Q. Then you point out that the annual dues at $20,000 for 21 -- you point out that the annual dues are $20,000 for 21 nights of usage.
So I think you're trying to point out that the maintenance fees are about a thousand bucks a night, right, as compared to the $400 to $600 they're being rented for?
MR. SELLINGER: Objection to form.
A. Yeah, I mean, I say that, actually, below.
BY MR. REISER:
Q. Finally, on this point, it says, "RCDC has also utilized this marketing right to rent" -- you put rent in quotes -- "inventory to the MVCD exchange program for access by its Premier and Premier Plus members."
That's a statement by you. That's not something you learned from the survey; right?
A. Yes.
Q. Okay. So is this access by Premier and Premier Plus members different than access from the Explorer Program you were mentioning?
A. No. It's Explorer.
Q. So to be precise, the Explorer Program that was allowing access through that program that you mentioned earlier -- that some folks in Aspen were

using the Explorer Program -- that was only people who had attained Premier or Premier Plus membership in Marriott Vacation Club; right?
A. Yes.
Q. What does it take to get Premier and Premier Plus membership?
A. You have to own a certain number of points.
Q. Do you remember how many that is?
A. No.
Q. Do you know whether Marriott Vacation Club sales folks attempted to sell Marriott Vacation members more points to obtain Premier or Premier Plus membership status so they could obtain the right to access Ritz-Carlton inventory?
MR. SELLINGER: Objection to form.
A. I know that Marriott Vacation Club sales executives would always try to upgrade people into Premier and Premier Plus.
BY MR. REISER:
Q. One of the things they would mention, in terms of trying to upgrade them, would be, "If you obtain this, you could actually get access to the Ritz." Right?
MR. SELLINGER: Objection to form.
A. The sales executives would talk about all the

different benefits in buying that point level.

BY MR. REISER:

Q. It's a benefit to a timeshare company to have luxury products or luxury properties, is it not? In other words, it's a selling point for Marriott Vacation Club to have, like, nice properties to trade into. True?

A. Yes. We have to have nice properties to make the program work overall.

Q. So prior to Ritz and the access that was provided to Marriott Vacation members, starting with Premier and Premier Plus, and later through the affiliation -- prior to that there were no luxury-tier properties in the Marriott Vacation Club. True?

MR. SELLINGER: Objection to form.

A. There were Ritz-Carlton Hotels.

BY MR. REISER:

Q. Ritz-Carlton Hotels were available through the Marriott Vacation Club?

A. Through the Explorer Program, yes.

Q. But that wasn't one of the properties in the club. It was something that was an exchange option. True?

A. That's what this was.

Q. So they had access to Ritz-Carlton Hotels.

Page 242

So how would Premier -- strike that. Would average -- would non-Premier and Premier Plus members of the Marriott Vacation Club have access to the Ritz Hotels?

A. I don't remember if it was something that was specifically for Premier and Premier Plus or if it was available for everyone. But you had to have the right point levels to be able to go, and they were very high point levels.

Q. Anybody had access to a Ritz-Carlton Hotel if they paid the money; right?

A. Not using their points. This is Marriott Vacation Club points we're talking about.

Q. So other than the chance to maybe use an exchange through the Explorer Program to get into a hotel room, prior to Marriott Vacation Club members being able to access the Ritz Residence Clubs, there were no properties within the club at the Marriott Vacation Club that were a luxury property. True?

MR. SELLINGER: Objection to form.

A. We have -- in the program, we have some private resident homes. Now, the upper tiers get Marriott Rewards Platinum status and other things. I'm not sure when these started compared to when we're talking about here, but there are other things that differentiate those tiers.

Page 243

BY MR. REISER:

Q. You saw the recent press release, I'm sure, where Marriott Vacation Worldwide, your company, is buying ILG and all its brands. True?

A. Yes.

Q. So you saw the press release where it said that now Marriott Vacation Worldwide has seven brands, six of them controlled by Marriott International, two luxury brands, and the rest, upper upscale terms.

Did you see that terminology being used in the press release?

A. Yes.

Q. Term of art -- that's what I think Matt Ferguson meant earlier by a term of art. The term "luxury" and "upper upscale," those are terms that have specific meanings within your industry. True?

A. Yes.

MR. SELLINGER: Objection to form.

BY MR. REISER:

Q. So there was no club -- forget about trading in through Explorer or any other program to Ritz-Carlton Hotels -- but prior to the ability for the Marriott Vacation Club members to access Ritz-Carlton Clubs following the evolution, there were no luxury clubs in the Marriott Vacation Club. True?

Page 244

MR. SELLINGER: Objection to form.

A. There were no luxury clubs other than Ritz-Carlton Destination Club in the Explorer Program. I believe that is correct. Because that was our brand. Ritz-Carlton was our brand.

BY MR. REISER:

Q. But I'm not talking about -- I'm just talking about the separate clubs. I'm not talking about the Explorer Program for now. Just take away the Explorer Program and access through an Explorer Program.

A. Okay.

Q. I believe -- well, strike that. Let me ask you this. Maybe I'm wrong.

Is it your testimony that Marriott Vacation Club members who obtain Premier or Premier Plus status, prior to July 2012, could get access to the Ritz-Carlton Clubs through the Explorer Program?

A. Prior to 2012?

Q. Let me ask that a better way. When did the Explorer Program start?

A. The Explorer Program has been in existence since the Marriott Vacation Club program was rolled out.

Q. When did they add Ritz-Carlton Clubs to the Explorer Program?

Page 245

A. I don't remember the date.
Q. Was it after July of 2012?
A. No. I believe it was before.
Q. Do you know how long, by any chance?
A. No, but we can find that out for you.
Q. Do you know whether it was ever communicated to anybody at Ritz -- any member of Ritz-Carlton Club, Aspen -- that any time prior to 2012 or -- strike that.
Do you know, prior to 2012, whether it was ever communicated to any members at the Ritz-Carlton Club that Marriott Vacation Club members could gain access to their clubs through the Explorer Program?
A. Did any of the members know that Marriott Vacation Club could have gotten access through the Explorer Program? That's what you're asking?
Q. Not quite. Almost. Not whether they knew. Were they ever informed by you formally -- "Here's a letter. Ladies and gentlemen, from this date forward, we're giving access to your club -- to the people at the Marriott Vacation Club -- who buy enough points to gain Premier and Premier Plus"?
A. No, I don't think we sent a communication to them, but -- just like a member wouldn't send communication if they were going to give their

Page 246

interest to their friend or...
Q. So they never -- so it's your testimony that you don't believe that The Ritz-Carlton Club members were ever notified that Premier and Premier Plus members were getting access to their club through the Explorer Program?
A. Yeah -- I believe they were told through this process. You were talking about prior to 2012. I do not believe that there was any communication sent to them.
Q. You think during the communications that happened following 2012 that that was presented to them in some --
A. Yeah -- I think it was included at least by the -- at least with the board.
Q. All right. So going to the first bullet point on page 2 of this memo, the last sentence of that first bullet point, it says, "The fractional product also has usage restriction and required booking windows that further complicate comparison to RCDC's rental activities. Members can only book two weekends using their allocated time."
Does that mean that people who rented rooms at the RCDC had a better chance to get more weekend nights than somebody who bought a membership at the

Page 247

Ritz-Carlton, San Francisco?
A. No.
Q. Why do you point this out then, that members can only book two weekends using their allocated time?
A. Because that was one of the frustrations that the members had in using their inventory.
Q. That same restriction was not applicable to a Premier Plus member who wanted to go stay every weekend for a month in San Francisco. True?
A. If the developer had inventory and had -- the developer can only use their inventory like the members could.
So if they had reservations to utilize the inventory, they had their two weekends. If they had multiple reservations to use that inventory that included multiple weekends, a Premier Plus member could have come in and used the weekends more than two weekends.
Q. So in that sense, they had, like, a better opportunity to use weekends in San Francisco than a club member; right?
MR. SELLINGER: Objection to form.
A. If they owned enough points, just like if a member owned multiple interests, they could use multiple weekends. If a Marriott Vacation Club owner

Page 248

owns enough points, because, obviously, the weekend point values are much higher.
BY MR. REISER:
Q. The last bullet point on the top of this page says, "The members allege there is currently no ability to exit the product as we are no longer selling the fractional product and the outside resale market does not see a value proposition that they can sell."
You state, "Our research uncovered two resales within the last 18 months, both at an amount approximately equal to one year's maintenance fees."
You're basically saying there that your own research only uncovered two resales of the Ritz-Carlton Club memberships in the previous 18 months and they were for about $21,000?
A. That's all we could find, but resales don't come back through us. So people exchange their inventory in different ways or sell their inventory. I'm not saying it's all that were there, but that was all we could find.
Q. Okay. And then you start -- there's four more bullet points that you lay out. It looks to me like those bullet points -- you say, "In addition to the frustration that members have expressed through

Page 249

the survey or through their member representatives, below you will find some additional pertinent background information."

Are the next four bullet points background information that you provided that was independent of the survey you reviewed?

MR. SELLINGER: Objection to form.

A. Yes. This would've been information that we just would have had, but probably would not have come in on the survey.

Q. It sounds to me like you were, in a sense, advocating for options for the members, so you were laying out some of their frustrations and even supporting them in a way.

Is that a fair statement?

A. I was sharing the information that we had based on the member feedback that we got.

Q. So you were able to determine, based upon your own research, that a majority of the membership purchased at the height of the market and paid an average price of 260,000 for their fractionals; right?

A. Yes.

Q. And that only five or so of the memberships at the time had outstanding loans. So most of these folks bought for cash; right?

Page 250

A. Correct.

Q. And that -- I think we already covered this -- you reiterated that the property currently carries the highest maintenance fees in the system on a per-allocated night basis, and that the average maintenance fee is approximately $20,000, or roughly $1,000 per allocated night.

Then you give that same comparison about the nightly rental of a suite at the concierge level of the Ritz Hotel and that Nob Hill is a thousand bucks.

You came up with that independently; right?

A. Correct.

Q. Finally, you were also able to -- let me ask you about the last one.

The last one, you say, "The majority of owners purchased their interests in the Ritz-Carlton, San Francisco in order to gain access for use at other Ritz-Carlton Clubs in the system. Only about 30 percent of the members use their time at their home club. Recent changes within the Ritz-Carlton Destination Club system, including the loss of locations such as Kapalua, Abaco, and Bachelor Gulch, along with the lack of growth in the system, creates additional member frustration."

How did you find out that only 30 percent of

Page 251

the members use their time at the home club? You had that type of statistics available to you, true, as the Ritz-Carlton Management Company?

A. I do. Member services tracks usage for the members. My first sentence may have been a little -- I may have been making a little bit of a leap, if I see that 30 percent of the members are using the home club, that that's the reason that they purchase, was to go somewhere else.

There could have been frustrations that we heard with the reservation process or getting access to the club or so on.

But the fact that only 30 percent of the members were actually using their time at their home club was kind of the underlying statistic that I was sharing.

Q. So this next sentence says -- I take it you didn't look at the governing documents and determine on your own that MVW acted in accordance with all governing documents?

A. It would've been by the law department. It would've been reviewed by the law department.

Q. So you're just -- again, you're not waiving any privilege, but this is -- when you state, "It's important to note that MVW has acted in accordance

Page 252

with all governing documents," that's something that you didn't determine on your own; you got it from the law department, right, or somebody -- maybe perhaps even John McGowan?

A. Yes.

MR. SELLINGER: Subject to your comment that that would not be a waiver, I certainly think she can testify as to her understanding as to whether or not the company acted in accordance with governing documents after consulting with counsel.

THE VIDEOGRAPHER: Five minutes for media change.

BY MR. REISER:

Q. Then it says, "Despite our belief that we have acted in accordance with the governing documents, there exists a very real likelihood that our actions will be called into question through litigation."

At this point in time, were the options that you were offering to the members at San Francisco made in an attempt to shrink the pool of potential plaintiffs in the upcoming litigation that you potentially foresaw?

MR. SELLINGER: Objection to form.

A. It was an attempt -- it was an attempt to

Page 253

offer options to members who were frustrated with what they owned.

BY MR. REISER:

Q. So there was definitely that; right? You say, "In an effort to alleviate a significant portion of member frustration," but then you say, "and potentially decrease the risk of litigation by reducing the potential pool of plaintiffs, we recommend offering the following options."

So, again, were these options -- you were seeking to present these offers to the membership to reduce the potential pool of plaintiffs?

MR. SELLINGER: Objection to form.

A. Well, the option would've been to give options to frustrated members. And I don't think it's too far of a stretch to think that the frustrated members are those who potentially could have ended up in litigation.

BY MR. REISER:

Q. Okay. So, naturally, you thought that, if you could get -- make some of these people happy -- they wouldn't sue.

Is that what you're saying?

MR. SELLINGER: Objection to form.

A. Just to give people options. The challenge

Page 254

with these members is, they didn't feel like they had a way, if they wanted to exit the program, to exit. This is a way to give them an exit option.

BY MR. REISER:

Q. The only two options that were ultimately granted by the corporate growth committee weren't really, truly an exit; right? The one was trading into a residence and the other was trading to another club.

The true exit options are trading or getting -- an MVW repurchase was not offered. True?

MR. SELLINGER: Objection to form.

A. Well, going to another fractional club -- there were other fractional clubs where there were interests that were being sold and the dues were less. So it was an exit out of some of their concerns.

BY MR. REISER:

Q. Then you go through the different options. I'm not going to get into those. I think I understand it.

You mention on the first one, "Equity conversion to the NATO Trust." You state, "The business team believes" -- what does that mean? I've seen that term a couple times in these memos, the business team. What's the business team?

Page 255

A. The business team would be those of us who work with -- on the Ritz-Carlton Club property. So, you mean --

Q. Who are you referring to in this memo? Let's just take this one. Who's the business team in this memo?

A. It would've been -- Stacey and I would have talked to, probably, Tony, probably to Lee, about these options that we wanted to present.

Q. I just want to ask you a couple more questions on this and then move on to the next one. I'm going to try to finish up here shortly.

In terms of the equity conversion to NATO, it says, "There should be an equity conversion to Marriott Vacation Club Destination offer based on usage rather than the original purchase price."

What did you mean by that?

A. So it -- you would -- if we were going to convert them over to Marriott Vacation Club, you wanted them to be able to come back and use 21 nights at San Francisco. It shouldn't be tied to what they actually paid. You wanted them to get the same usage as the home club they would have had.

Q. So you would give them enough points to get 21 days at the club they were giving up; right?

Page 256

A. Correct.

Q. And those points could be valued at more or less than the original price they paid. It depends on what they paid; right?

A. Right.

Q. So in the middle of the page, it starts -- I'm jumping past the different options. It says, "Each of the foregoing options, if chosen by a member, would require the member to execute a release, releasing the appropriate Ritz-Carlton entities and affiliates from all liability arising from the member's purchase/ownership of the member's fractional interest."

Did that end up becoming a condition of these options for the folks who did take the options that were granted to them, that they had to sign a release?

A. I believe so. We wouldn't have done it if -- yes.

Q. If Steve Andrews traded his Ritz, San Francisco fraction for a Kapalua fraction, he would have had to sign a release. True?

A. Yes.

Q. And Al Bruno, the same thing if he traded his to Aspen?

A. Correct.

Page 257

THE VIDEOGRAPHER: We need to change media.

MR. REISER: Okay. Let's do it.

THE VIDEOGRAPHER: This is the end of media unit number three. We're going off the record. The time is 4:26 p.m.

(Off record.)

THE VIDEOGRAPHER: Here begins media unit number four in the deposition of Stephanie Sobeck. We're back on the record. The time is 4:27 p.m.

Counsel, you may proceed.

BY MR. REISER:

Q. Jumping down to the bottom of page 3, you're discussing the financial impact of these options. I'm interested in the one that says "Carrying costs."

It states, "The majority of the financial impact is due to the ongoing unsold maintenance fees and subsidy expense that MVW will incur upon receipt of additional Ritz Carlton Club, San Francisco inventory, 6.1 million."

What does the 6.1 million mean?

A. Well, I guess there was -- I don't see it specifically referenced above, but it would've been an estimate of the inventory that we were going to get

back and the amount of time that we would have to carry it before we could do something with it. There's all the unsold maintenance fees and subsidies associated with that inventory.

Q. So then it says, "The operating costs associated with this inventory is approximately $1.20 a point, which is nearly three times the current 43 cents a point."

What is the current 43 cents a point? Is that the maintenance costs for a Marriott Vacation Club point?

A. Yes.

Q. And then you actually threw out some ways to mitigate the cost of these carrying costs at some point. True?

How would you mitigate the carrying costs? I think I see the buy-down impact section is a potential mitigation of the carrying costs. True?

A. (No response.)

Q. Let me put it this way. You do state here, right, that -- you state that, "It is important to note that the subsidy portion of this expense, 3.5 million, could be mitigated in the future through various strategic initiatives as outlined below in the opportunities."

What did you mean by that?

A. Well, it seems like there were opportunities to shrink the potential expense, so there were different ways in which we would look at doing that.

Q. Was one of the ways to actually increase the maintenance fees of the Marriott Vacation Club owners, who would receive the benefit of occupying the inventory, to reflect the additional operating expenses?

A. Yes.

Q. You state that "Each one-penny increase in the Marriott Vacation Club maintenance fees results in approximately $8 million a buy-down mitigation."

I'm trying to figure out what that means. Does that mean, increasing a penny for every single Marriott Vacation Club point, it would equate to $8 million more in annual maintenance fees?

A. Uh-huh.

MR. SELLINGER: Objection to form.

BY MR. REISER:

Q. That's a yes; right?

A. Correct.

Q. Was that ever considered in terms of mitigating the cost of maintenance fees at San Francisco or any other Ritz-Carlton? That is, to

increase the Marriott Vacation Club maintenance fees for those owners who were receiving the benefit of occupying the Ritz-Carlton inventory.

MR. SELLINGER: Objection to form.

A. The inventory has to be in the trust, so the inventory has to be conveyed to the trust for the Marriott Vacation Club member to pay any of it.

BY MR. REISER:

Q. So, in fact, most of -- sorry -- all of the developer-owned inventory in San Francisco that was not de-annexed and sold off to that bulk buyer for $21 million, I guess, in around 2015 -- all of the developer-owned inventory, other than the whole units that were de-annexed -- you know what I'm talking about; right?

A. The fractions, yes.

Q. So all the fractional developer-owned inventory that was not sold has now made it into the NATO Trust. True?

A. Has now been included in the NATO Trust, yes.

Q. Okay. Since now being in the trust, has there been any thought of increasing the maintenance fees on the Marriott Vacation Club members to account for the fact that they're receiving the benefit of occupying these high maintenance Ritz Clubs?

MR. SELLINGER: Objection to form.

A. Okay. I mean, the Marriott Vacation Club member does pay the maintenance fees, so their maintenance fees have gone up because the Ritz-Carlton inventory is in their trust. It's a pool of maintenance fees.

So before, it used to be Orlando and Branson and New Jersey maintenance fees. Now, it's those, plus Ritz-Carlton, San Francisco, Ritz-Carlton, St. Thomas, which are higher. You still take all of those maintenance fees, put them together, and then slice the pie so that every Marriott Vacation Club member pays a portion.

So they were negatively impacted by this inventory going in -- they have access -- but they pay the same amount as all the Ritz-Carlton club members.

BY MR. REISER:

Q. So if I understand your testimony then, when the Ritz-Carlton fractional goes into the trust, the trust pays the normal maintenance fees, right, that every other owner pays?

A. Correct.

Q. And since those are higher, that's put into the total maintenance fee pot across all the trust interests, and that has the effect of increasing, in

Page 262

some manner, the total maintenance fee that the club members pay?

A. Right. Because if you look at the maintenance fees like a pie, you know, all the maintenance fees go into the pie. And the points are the slices of the pie. The points -- the number of points that exist just -- you divide that maintenance fee bucket by the number of points and that becomes your average maintenance fee that each Marriott Vacation Club member pays.

Q. So, basically, I think -- I think what I hear you saying is -- let's just use approximately 400 -- are there 500,000 members yet of the Marriott Vacation Club?

A. No.

Q. 450?

A. Well, that's in all of Marriott Vacation Club. I --

Q. In the NATO Trust, how many are there?

A. 200.

Q. 200,000. So when the Marriott trust buys a fractional unit, those maintenance fees, that are expensive, get divided proportionally between 200,000 members?

A. They get -- yes, based on the number of

Page 263

points they own.

MR. SELLINGER: Tick tock.

MR. REISER: I see you standing over me, making me nervous. It has the desired effect.

BY MR. REISER:

Q. So what I'm going to show you next is the August 19, 2014 corporate growth committee report. This also looks like it was authored by you and Lee Cunningham.

(Exhibit 2138 was marked for identification.)

BY MR. REISER:

Q. This is Exhibit 2138. You authored this memo; right?

A. Yes, with Lee.

Q. With Lee. What was the request you were putting -- give me, in a nutshell, what you were requesting of the corporate growth committee in this memo.

A. We were looking at ways of disposing of the last 19 units at RCDC in St. Thomas -- San Francisco. Sorry.

Q. One of the reasons that you thought that it was not a viable option to -- instead of selling these

Page 264

as bulk sale whole ownership condos, rather, put the inventory into the trust, is that the maintenance fees were too high for the product. True?

MR. SELLINGER: Objection to form.

A. One of the reasons we didn't decide -- because these weren't even built out -- so one of the reasons we didn't decide to build them out and put them into NATO, one of the reasons did have to do with maintenance fees.

BY MR. REISER:

Q. So that was one of the reasons you didn't want to put it in NATO. You didn't want to burden the NATO folks with these additional high maintenance fees. True?

MR. SELLINGER: Objection to form.

A. Yeah. The NATO members already had access, because there was inventory in the trust.

BY MR. REISER:

Q. So you didn't think that the NATO people wanted any more inventory and that was one of the reasons? Was that inventory in the NATO Trust selling out every year or --

A. I don't know if it sells out or not. I think that's pretty well-demanded. 19 units is a lot.

Q. And one of the things I'm interested in --

Page 265

one of the things you thought about in 2014 was a bulk sale. True?

A. Yes.

Q. A bulk sale is different than fixing them up as whole ownership condos and using the Ritz-Carlton sales team to sell them as Ritz-Carlton units. True?

A. It would be different, yes.

Q. Okay. So bulk sale would be selling it to, say, like, Constellation in Tahoe; right? That was a bulk sale of the 17 units in Tahoe to Constellation?

A. Correct.

Q. Versus de-annexing them, making them whole ownership, but making them Ritz residences, and selling them as Ritz residences. That would not be a bulk sale; right?

MR. SELLINGER: Objection to form.

A. If we sold them ourselves and we did the sale of them, yes, it would not be a bulk sale.

Q. So you made a bulk sale in Tahoe, true, to Constellation?

A. Yes.

Q. You were contemplating a bulk sale in 2014 for the 19 wholly-owned interests in San Francisco; right?

A. Yes.

Q. And one of the reasons in 2014 -- and I know it changed a year later -- but, in 2014, one of the -- your thinking was, in passing on a bulk sale for San Francisco, was that you had a bad experience of some sort in Tahoe. I think I remember reading that right in the memo.

Is that a fair description of what you're trying to say here in this memo?

MR. SELLINGER: Objection to form.

A. There was a challenge in Tahoe because the bulk purchaser bought it -- they were not sold as Ritz-Carlton residences. So we ended up with unbranded and branded units in the same building that were being operated separately, but, yet, they were in a common association.

Then that bulk purchaser -- the sales pace was so slow and they weren't -- didn't -- they ended up having financial challenges, which then, in turn, conveyed financial challenges to the association.

Those were kind of the two main -- the branded, unbranded, and the financial challenges are why Tahoe was a challenging situation for us.

BY MR. REISER:

Q. Fair enough. All right. So those were the two things you were trying to avoid in a bulk sale?

A. Right.

Q. Having, like, a diluted brand within the same building, basically -- two different brands in the same building caused confusion to the brand. Right?

MR. SELLINGER: Objection to form.

A. Well, you have two different operating groups and teams and back-of-house spaces. There's a lot of things that come along with that challenge.

BY MR. REISER:

Q. Okay. And then the financial bona fide -- these are purchasers -- you know, always great when you're selling it, but you never really know what's going to happen down the line. And JMA ended up having some difficulties and had to give the property back to its bank. Right?

MR. SELLINGER: Objection to form.

A. JMA -- I was actually talking about JMA not paying its maintenance fees on time to the association specifically.

BY MR. REISER:

Q. Okay. All right. Got you. That's what we talked about earlier, about them potentially having to borrow from the reserves. Does that refresh your recollection at all now that we're talking about the bulk sale, that there was a borrowing of reserves by

Ritz Carlton Management Company when JMA stopped paying their dues?

A. Yes.

Q. You remember that did happen in Tahoe, that there was a borrowing from the reserve accounts?

A. I do.

Q. The final exhibit for the day will be Exhibit 2138, which is the -- I'm sorry -- 2139 -- November 10, 2015 corporate growth committee memo.

(Exhibit 2139 was marked for identification.

BY MR. REISER:

Q. This was also prepared by -- strike that. It was actually prepared by Lee Cunningham, Rich Hayward and Tony Terry.

Did you have any role in preparing this corporate growth committee memo?

A. No.

Q. I'll save that for Cunningham then. It's not my last question. It's my last document. I almost found a loophole.

MR. SELLINGER: Losing credibility here.

BY MR. REISER:

Q. I just want to confirm that, on the first memo, so I don't have to actually think further about

it -- you just simply -- it's your testimony that you had no role in preparing the May 24, 2012 Ritz-Carlton Destination Club proposed strategic plan which was Exhibit 2136?

A. Correct.

MR. REISER: That's all I have.

MR. FERGUSON: I have a few. Just joking.

MR. SELLINGER: Let's take a couple-minute break. I think I have one exhibit that I have a couple of questions on.

THE VIDEOGRAPHER: We're going off the record. The time is 4:42 p.m.

(Brief recess.)

THE VIDEOGRAPHER: We are back on the video record. The time is 4:50 p.m.

Counsel, you may proceed.

CROSS-EXAMINATION

MR. SELLINGER: Could you just highlight the top part -- the top two e-mails down to "Rich"? Yeah.

BY MR. SELLINGER:

Q. Ms. Sobeck, do you remember Mr. Reiser asking you questions about Exhibit 2213, this series of e-mails in November of 2014?

Page 270

A. I do.

Q. On November 17, 2014, when you and Mr. Hayward are communicating, what was the status of the affiliation on that date?

A. It had already been executed.

Q. Are you referring to the 2013 -- November 14, 2013 -- affiliation agreement?

A. Yes. The affiliation agreement between Lion & Crown and Marriott Vacation Club Destination.

Q. Were the boards parties to that agreement?

A. No, they were not.

Q. When you write in your top e-mail, "Decision to affiliate, question the boards," what are you referring to?

A. The acknowledgement.

Q. And why are you not using the specific word "acknowledgement" to Mr. Hayward?

A. Rich was new to the whole Ritz-Carlton Destination Club program and clubs, and I wasn't going to spend the time in this e-mail to explain to him how it all was structured.

MR. SELLINGER: I have nothing further.

REDIRECT EXAMINATION

BY MR. FERGUSON:

Q. I was asking you those questions about that

Page 271

document, not Mr. Reiser. Do you recall that?

A. I do, but I know it was asked. Although, I think he might have asked me at the last deposition.

MR. FERGUSON: That's all I have.

THE VIDEOGRAPHER: This concludes the videotaped deposition of Stephanie Sobeck. We're off the record. This is the end of media unit number four. The time is 4:52 p.m.

(The reading and signing of the transcript were not waived, and these proceedings concluded at 4:52 p.m.)

Page 272

Under penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it are true.

____________________________________

DATE STEPHANIE SOBECK

Subscribed and sworn before me this ____ day of ______________, 2017.

State of Florida )
County of ) ____________________
NOTARY PUBLIC

Page 273

CERTIFICATE OF OATH

STATE OF FLORIDA
COUNTY OF ORANGE

I, Lisa Gerlach, the undersigned Notary Public, in and for the State of Florida, hereby certify that Stephane Sobeck personally appeared before me and was duly sworn.

WITNESS my hand and official seal this 29th day of May, 2018.

Lisa Gerlach, Court Reporter
Commission #GG023652
Expires 9/8/2020

Page 274

CERTIFICATE OF REPORTER

STATE OF FLORIDA
COUNTY OF ORANGE

I, Lisa Gerlach, Court Reporter, do hereby certify that I was authorized to and did stenographically report the foregoing deposition; and that the transcript is a true and correct transcription of the testimony given by the witness.

I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

Dated this 29th day of May, 2018.

Lisa Gerlach, Court Reporter

Page 275