# EXHIBIT - H

1      United States District Court
2          District of Colorado
       RCHFU, LLC, et al.,
3      Plaintiffs,
4      v.
       MARRIOTT VACATIONS WORLDWIDE
5      CORPORATION, et al.,    No.  1:16-cv-01301 PAB-GPG
6          Defendants,
       _____/
7      REISER, et al.,
8          Plaintiffs,      Eastern District of California
9      v.                   No. 2:16-cv-00237-MCE-CKD
       MARRIOTT VACATIONS WORLDWIDE
10     CORPORATION, et al,
11         Defendants,
       _____/
12     PETRICK, et al.,
13         Plaintiffs,
                            San Francisco County
14     vs.                  No. CGC-15-54897
15     MARRIOTT VACATION WORLDWIDE
16     CORPORATION, et al.,
           Defendants.
17     _____/
18
19     VIDEOTAPED DEPOSITION OF LEE CUNNINGHAM
20             Orlando, Florida
               Friday, 10:12 a.m.-2:08 p.m.
21             May 18, 2018
22
23
24
25     Pages 1- 136

                                              Page 1

| | | | |
|---|---|---|---|
| 1 | Taken on Behalf of the Plaintiffs before | 1 | For the Defendant Aspen Highlands |
| 2 | Lisa Gerlach, Court Reporter, Notary Public | 2 | Condominium Association, by speakerphone: |
| 3 | in and for the State of Florida at Large, | 3 | JESSICA BLACK LIVINGSTON, ESQUIRE |
| 4 | pursuant to Plaintiffs' Notice of Taking | 4 | Hogan Lovells |
| 5 | Deposition in the above cause. | 5 | 1601 Wewatta Street, Suite 900 |
| 6 | | 6 | Denver, CO 80202 |
| 7 | | 7 | 303-899-7300 |
| 8 | | 8 | jessica.livingston@hoganlovells.com |
| 9 | | 9 | |
| 10 | | 10 | |
| 11 | | 11 | |
| 12 | | 12 | |
| 13 | | 13 | |
| 14 | | 14 | |
| 15 | | 15 | |
| 16 | | 16 | |
| 17 | | 17 | |
| 18 | | 18 | |
| 19 | | 19 | |
| 20 | | 20 | |
| 21 | | 21 | |
| 22 | | 22 | |
| 23 | | 23 | |
| 24 | | 24 | |
| 25 | | 25 | |

Page 2     Page 4

1    Appearances:
2    Counsel for the Plaintiffs:
3    MATTHEW C. FERGUSON, ESQUIRE
    The Matthew C. Ferguson Law Firm, PC
4    119 South Spring, Suite 201
    Aspen, CO 81611
5    970-925-6288
    matt@matthewfergusonlaw.com
6
    MICHAEL S. REISER, SR., ESQUIRE
7    MICHAEL S. REISER, JR.
    MATTHEW REISER, ESQUIRE, by speakerphone
8    Reiser Law, PC
    1475 Broadway, Suite 300
9    Walnut Creek, CA 94596
    michael@reiserlaw.com
10   isabella@reiserlaw.com
    matthew@reiserlaw.com
11
    TYLER MEADE, ESQUIRE
12   The Meade Firm
    1816 Fifth Street
13   Berkeley, CA 94710
    510-843-3670
14   tyler@meadefirm.com
15
16   For the Defendant Marriott:
    PHILIP SELLINGER, ESQUIRE
17   IAN S. MARX, ESQUIRE
    Greenberg Traurig, LLP
18   500 Campus Drive, Suite 400
    Florham Park, NJ 07932-0677
19   sellingerp@gtlaw.com
    marxi@gtlaw.co
20
    DOUGLAS A. KELLY, ESQUIRE
21   Marriott Vacations Worldwide
    6649 Westwood Boulevard
22   Orlando, FL 32821
23
24
25

Page 3

| | | | |
|---|---|---|---|
| 1 | INDEX | | |
| 2 | WITNESS | EXAMINATION | PAGE |
| 3 | Lee Cunningham | | |
| 4 | Direct by Mr. Reiser | | 8 |
| 5 | Direct by Mr. Ferguson | | 113 |
| 6 | Certificate of Reporter | | 135 |
| 7 | Witness Signature Page | | 136 |
| 8 | | | |
| 9 | | | |
| 10 | EXHIBITS | | |
| 11 | Exhibit 2244  Agenda, RCHC007156 through | | |
| | RCHC007206 | | 108 |
| 12 | | | |
| | Exhibit 2245  E-Mail, 1/3/12 | | 118 |
| 13 | | | |
| | Exhibit 2246  Declaration of Kathy Borkholder | | 124 |
| 14 | | | |
| | Exhibit 2247  Draft Letter, RCHC007151 through | | |
| 15 | RCHC007153 | | 130 |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

Page 5

2 (Pages 2 - 5)

1  THE VIDEOGRAPHER:  Good morning.  We're
2  going on the video record.  The time is 10:12
3  a.m., Eastern Daylight Time, on Friday, May
4  18th, 2018.  This is media unit number one in
5  the video-recorded deposition of Mr. Lee
6  Cunningham, taken by counsel for the
7  plaintiff, in the matter of RCHFU, LLC,
8  et al., vs. Marriott Vacations Worldwide
9  Corp., et al.  This case is filed in the US
10  District Court, District of Colorado, with a
11  case number of 1:16-cv-01301 PAB-GPG.
12  This deposition is being held today at
13  the offices of Greenberg Traurig, located at
14  450 South Orange Avenue, Suite 650, Orlando,
15  Florida.
16  My name is Clay McMillan.  I'm with
17  Veritext.  I'm the videographer.  The court
18  reporter today is Ms. Lisa Gerlach, also with
19  Veritext.
20  Will counsel present, followed by counsel
21  on the phone, please identify yourselves and
22  the parties that you represent?
23  MR. REISER:  Good morning.  Mike Reiser,
24  appearing for the plaintiffs in the Aspen
25  case, the plaintiffs in the Petrick case in

Page 6

1  San Francisco, and the plaintiffs in the
2  Reiser case in Tahoe.
3  MR. FERGUSON:  Good morning.  I'm Matthew
4  Ferguson.  I'm representing the 206 or so
5  plaintiffs in the Aspen litigation.
6  MR. MEADE:  Tyler Meade, representing
7  plaintiffs in all three cases.
8  MR. SELLINGER:  Philip Sellinger and Ian
9  Marx, from Greenberg Traurig, representing
10  defendants in all three cases.  We're
11  accompanied by Doug Kelly, vice president and
12  senior counsel of Marriott.
13  And I note that the deposition is
14  actually being taken in all three cases
15  simultaneously, not just in the Aspen case,
16  as both Mr. Reiser and Mr. Meade indicated as
17  well.
18  THE VIDEOGRAPHER:  Counsel on the phone?
19  MS. LIVINGSTON:  Good morning, everyone.
20  This is Jessica Livingston of Hogan Lovells.
21  I represent the Aspen Highlands Condominium
22  Association in just the Aspen case.
23  THEREUPON,
24  LEE CUNNINGHAM,
25  A Witness herein, acknowledged after having

Page 7

1  been duly sworn and testified upon his oath as
2  follows:
3  THE WITNESS:  I do.
4  DIRECT EXAMINATION
5  BY MR. REISER:
6  Q.  Good morning, Mr. Cunningham.  I'm just going
7  to try to keep -- this is your third deposition, as
8  you know, in this case.  We're going to try to keep it
9  tight and go over some documents that we didn't have
10  at your last deposition.  And I appreciate you
11  appearing again for your deposition.
12  So the first thing I want to ask you about is
13  an affiliation agreement from November 2013 that was
14  produced in March of 2018 in this case.
15  And I don't think I have an extra copy.  I'm
16  not going to really ask too many specific questions
17  about the language in it, but it is on your screen
18  there.  It's been previously marked earlier this week
19  as Exhibit 2102.
20  MR. SELLINGER:  Hold on a minute.  We've
21  got copies ourselves, but I'll actually give
22  mine to the witness.  I think he should have
23  it in front of him.
24  MR. REISER:  Okay.  Thank you.  I thought
25  it had been marked earlier, but I don't see

Page 8

1  it in the package.
2  MR. SELLINGER:  This is the 2013
3  agreement?
4  MR. REISER:  Yes.
5  MR. SELLINGER:  I've got it.
6  THE WITNESS:  Thank you.
7  BY MR. REISER:
8  Q.  Do you recognize this document that's been
9  marked as Exhibit 2102?
10  A.  I recognize this agreement from my
11  preparation for this deposition.
12  Q.  So I just want to understand how -- your
13  involvement in the preparation of this agreement.  As
14  you can see from the date of the agreement, it's dated
15  November 14, 2013.
16  Do you see that?
17  A.  Yes.
18  Q.  Can you tell me the origins of this agreement
19  in terms of how it came to be -- how it came to be?
20  A.  Based on that timeframe, I would say it came
21  to be as a result of our intention to affiliate the
22  Marriott Vacation Club Destinations Program with Lion
23  & Crown Travel.
24  Q.  Okay.  Previously, we've been operating under
25  the assumption that the affiliation agreement that had

Page 9

3 (Pages 6 - 9)

1  been previously marked in this case as Exhibit 1003 --
2  I'll show you that one too. That's the affiliation
3  agreement between -- it's dated in '01, back in the
4  original days of the Aspen Club. I know we went over
5  this agreement in detail at your prior depositions.
6      But what was the reason why the affiliation
7  did not occur pursuant to Exhibit 1003?
8      MR. SELLINGER: Objection to form.
9      A. This agreement is the affiliation between the
10  Ritz-Carlton Travel Company, which is the predecessor
11  to Cobalt, and the Aspen Highlands Association, which
12  created the -- let's see -- but, at that time, there
13  wasn't an affiliation with Lion & Crown or with --
14  subsequently with MVCD.
15  BY MR. REISER:
16      Q. Right. So at the time of the original
17  affiliation in 2001, there was not even a Lion & Crown
18  company. True?
19      A. That's correct.
20      Q. So this was the original agreement that
21  effectuated the affiliations between The Ritz-Carlton
22  Destination Clubs for internal exchange between those
23  clubs?
24      MR. SELLINGER: Objection to form.
25      A. This agreement, like I said, was with

Page 10

1  Ritz-Carlton Travel Company, which was the predecessor
2  to Cobalt, and the Aspen Highlands Association, which
3  established the program manager for the Ritz-Carlton
4  Aspen Highland members, which effectuated the role of
5  that.
6      The program manager was to manage the
7  reservation program for that particular resort for
8  their allocated time and to also, in the future, look
9  at the ability to move to sister clubs.
10  BY MR. REISER:
11      Q. Okay. There's one other -- well -- so
12  Exhibit 2102, which is the November 2013
13  affiliation --
14      A. Is that back to here?
15      Q. The one you have in front of you, yes. I
16  mean, I understand it came into being so that the
17  Marriott Vacation Club could affiliate with Lion &
18  Crown. You mentioned that earlier.
19      But who initiated the preparation of this
20  agreement, if you know?
21      A. It would've been the -- Lion & Crown would
22  have initiated the ability to affiliate with Marriott
23  Vacation Club Destinations.
24      Q. So Lion & Crown -- strike that. You were an
25  officer of Lion & Crown at the time this affiliation

Page 11

1  was prepared. True?
2      A. That's correct.
3      Q. Did you have a role as an officer of Lion &
4  Crown to instruct the legal department or -- your
5  legal department -- strike that.
6      As the officer of Lion & Crown that was
7  contemplating an affiliation with the different Ritz
8  Clubs, was it you that initiated the preparation of
9  this November 2013 affiliation agreement?
10      A. I'm sorry. This was about Lion & Crown with
11  Marriott Vacation Club. You said with the other Ritz
12  Clubs. That was a different affiliation, where Lion &
13  Crown affiliated with Cobalt.
14      Q. Okay. But you're aware -- if you look at
15  Exhibit B to that agreement, the very last four pages
16  of the agreement?
17      A. Okay, yes.
18      Q. Can you just read the title of Exhibit B to
19  the November 2013 affiliation agreement?
20      A. "Acknowledgement of and joinder to
21  affiliation agreement between Lion & Crown Travel
22  Company, LLC, and Marriott Resorts Travel Company,
23  Inc."
24      Q. Was it your understanding, as the officer of
25  Lion & Crown, that -- strike that. Let me get some

Page 12

1  foundation.
2      Is it true that you, as the officer of Lion &
3  Crown, are responsible for -- strike that. Were you
4  the officer of Lion & Crown that was responsible for
5  the November 2013 affiliation agreement being created?
6      A. Yes. I mean, there was an agreement to
7  affiliate, or we had chosen to affiliate. I was the
8  officer, and it was my decision to affiliate MVCD with
9  Lion & Crown.
10      Q. So you were the program manager for Cobalt at
11  the same time. True? Or -- I'm sorry -- the chief
12  decision maker for Cobalt?
13      A. I was an officer in Cobalt, yes.
14      Q. Okay. And as that officer, were you the
15  chief decision maker in that company?
16      A. Yes.
17      Q. So you first, as a Cobalt officer, affiliated
18  The Ritz-Carlton Destination Club with the Lion &
19  Crown club originally, true, in a 2010 agreement?
20      MR. SELLINGER: Objection to form.
21      A. Cobalt has the affiliation with the
22  associations of the various clubs -- with each of the
23  clubs. Then Cobalt had an affiliation in 2010 with
24  Lion & Crown.
25  BY MR. REISER:

Page 13

4 (Pages 10 - 13)

1    Q. That created a potential external exchange
2   program. True?
3    A. I believe the purpose for Lion & Crown was to
4   affiliate with other external clubs.
5    Q. Okay. So Lion & Crown was responsible for --
6   I'm sorry. Cobalt was responsible for initiating the
7   creation of Lion & Crown. True?
8    A. That's correct.
9        MR. SELLINGER: Objection to form.
10    A. I believe that's true.
11   BY MR. REISER:
12    Q. And then, with that affiliation agreement
13   established, Lion & Crown then made the decision to
14   prepare and create the November 2013 affiliation
15   agreement which would allow individual clubs to join
16   into the November 2013 affiliation agreement.
17        Is that a fair description?
18        MR. SELLINGER: Objection to form.
19    A. No. The 2013 agreement affiliated Lion &
20   Crown with MVCD. That affiliation occurred at the
21   execution of that agreement.
22   BY MR. REISER:
23    Q. It was Cobalt that instructed Lion & Crown to
24   affiliate with MVCD?
25    A. No.

Page 14

---

1    Q. So in an effort for Lion & Crown to then
2   affiliate individual Ritz-Carlton Destination Clubs as
3   component sites under the November 2013 agreement,
4   they would need to sign an acknowledgement of and
5   joinder to the November 2013 affiliation agreement.
6   True?
7        MR. SELLINGER: Objection to form.
8    A. No. Like I said, the affiliation between
9   Lion & Crown and MVCD occurred. And when this 2013
10   agreement was executed, the acknowledgement agreement
11   was put in place for -- we made a special accomodation
12   to allow each association to determine whether they
13   wished to allow their members to participate in that
14   affiliation.
15   BY MR. REISER:
16    Q. All right. Who made a special accomodation
17   to allow the associations to participate in that
18   decision?
19    A. Lion & Crown did.
20    Q. So Lion & Crown, in entering into the
21   November 2013 affiliation agreement with Marriott
22   Vacation Club Destinations, provided in that agreement
23   that each association would have the right to join the
24   affiliation agreement. True?
25        MR. SELLINGER: Objection to form.

Page 16

---

1    Q. So Lion & Crown had its own authority to
2   choose new affiliation agreements under the terms of
3   the 2010 agreement?
4        MR. SELLINGER: I'm sorry. I'm trying to
5        review the question to see if I have an
6        objection. Just read it back for me.
7        THE REPORTER: "So Lion & Crown had its
8        own authority to choose new affiliation
9        agreements under the terms of the 2010
10        agreement?"
11    A. Lion & Crown had the right to affiliate with
12   other clubs and programs and it was their right.
13   BY MR. REISER:
14    Q. That right derived from the authority of
15   Cobalt initially. Would you agree?
16        MR. SELLINGER: Objection to form.
17    A. The right for Lion & Crown to affiliate was
18   called out in the agreement between Cobalt and Lion &
19   Crown.
20   BY MR. REISER:
21    Q. Correct. Okay. So Cobalt, in the agreement
22   between Cobalt and Lion & Crown, in terms of that
23   agreement, provided that Lion & Crown could then use
24   its powers under that agreement to affiliate --
25    A. Affiliate, yes. That's correct.

Page 15

---

1    A. No. The 2013 agreement, at the execution of
2   that agreement, the affiliation was accomplished.
3   So --
4   BY MR. REISER:
5    Q. I understand that.
6        MR. SELLINGER: Hold on. Just let him
7        finish.
8        MR. REISER: Sorry.
9        MR. SELLINGER: Go ahead.
10    A. So the accomodation was to allow each
11   association to determine whether they wanted to allow
12   their members to take advantage of the affiliation
13   that had already been created.
14   BY MR. REISER:
15    Q. So at the time the affiliation was created,
16   no Ritz-Carlton Clubs had executed a joinder in the
17   affiliation. True?
18    A. I believe that's true.
19    Q. Okay. So before -- between the time the
20   affiliation was created on November 14, 2013 -- what
21   was the first association that signed the
22   acknowledgement and joinder?
23    A. I don't recall which one, what the order was.
24    Q. So even though the affiliation agreement
25   between Lion & Crown and Marriott Vacation Club

Page 17

5 (Pages 14 - 17)

| | |
|---|---|
| 1 Destinations was created on November 4, 2013, it<br>2 wasn't until April 24, 2014, when Randy Mercer signed<br>3 the acknowledgement of and joinder to the affiliation<br>4 agreement, that Marriott Vacation Club members had the<br>5 right to participate in or have access to Ritz-Carlton<br>6 Club Aspen. True?<br>7     A. No. They had access to The Ritz-Carlton<br>8 Club, Aspen, in advance of that through<br>9 developer-owned inventory that was made available<br>10 through the Explorer Program component of the MVCD<br>11 program.<br>12     Q. Putting aside that, which ended when the<br>13 developer-owned inventory sold out, that access to the<br>14 club through that, as you just said, required the<br>15 develop to have developer-owned inventory. True?<br>16     A. That's correct.<br>17     Q. Once that developer-owned inventory was sold<br>18 out, there would be no access to Marriott Vacation<br>19 Club members through that program; correct?<br>20     MR. SELLINGER: Objection to form.<br>21     A. Once the developer had no inventory, they<br>22 would not be able to -- Ritz-Carlton, Aspen -- I'm<br>23 sorry -- Marriott Vacation Club Destination club<br>24 members wouldn't be able to get access into Aspen<br>25 through the Explorer Program because it wouldn't have<br>               Page 18 | 1     MR. SELLINGER: Objection to form.<br>2     A. The signing -- the acknowledgement was a step<br>3 in the process, clearly. The members, before anybody<br>4 could -- from MVCD -- could come into Aspen, somebody<br>5 had to come out of Aspen. So until all those steps<br>6 occurred, there couldn't be somebody coming in.<br>7 BY MR. REISER:<br>8     Q. But without the joinder and acknowledgement<br>9 to the affiliation agreement signed by Randy Mercer on<br>10 April 24, 2014, it was impossible for a member of the<br>11 Marriott Vacation Club to access The Ritz-Carlton Club<br>12 through the November 2013 affiliation agreement.<br>13 True?<br>14     MR. SELLINGER: Objection to form.<br>15     A. I think the steps were that -- trying to<br>16 understand the nuance to your question. The signing<br>17 of the acknowledgement agreement, that was them<br>18 indicating to us that they would allow the members to<br>19 come in.<br>20     The other component of that agreement was to<br>21 ensure that, as MVCD members came into Aspen, that<br>22 they would accommodate those customers that came in.<br>23 Those are the steps.<br>24     MR. REISER: Can you read back the<br>25 question?<br>               Page 20 |
| 1 existed.<br>2 BY MR. REISER:<br>3     Q. Okay. So the access of Marriott Vacation<br>4 Club members through affiliation is separate from the<br>5 access through the Explorer Program; right?<br>6     A. That's correct.<br>7     Q. Now I'm just talking about access through the<br>8 affiliation program. It wasn't until April 24, 2013,<br>9 when Randy Mercer signed the acknowledgement of and<br>10 joinder to the November 2013 agreement that Marriott<br>11 Vacation Club members could obtain access to the<br>12 Ritz-Carlton, Aspen through the affiliation program.<br>13 True?<br>14     A. Well, at the signing, what that allowed was<br>15 for the Ritz-Carlton, Aspen members to -- through Lion<br>16 & Crown -- to access the Marriott Vacation Club<br>17 Destinations product; which, in turn, made their<br>18 inventory available for Marriott Vacation Club<br>19 Destinations members to be able to come into Aspen.<br>20     Q. Correct. So that's -- okay. Until that was<br>21 signed, and until members were able to put -- members<br>22 of Ritz were able to put their inventory into the Lion<br>23 & Crown, no Marriott Vacation Club members could have<br>24 access to the Ritz Club through the affiliation.<br>25 True?<br>               Page 19 | 1     THE REPORTER: "But without the joinder<br>2 and acknowledgment to the affiliation<br>3 agreement signed by Randy Mercer on April 24,<br>4 2014, it was impossible for a member of the<br>5 Marriott Vacation Club to access The<br>6 Ritz-Carlton Club through the November 2013<br>7 affiliation agreement. True?"<br>8     THE WITNESS: I believe that's true.<br>9 BY MR. REISER:<br>10     Q. So whether it was a special accomodation that<br>11 is provided for in the November 2013 affiliation<br>12 agreement or a contractual right that was given to the<br>13 associations under the terms of the November 2013<br>14 affiliation agreement, association action in the form<br>15 of signing an acknowledgement and joinder to the<br>16 November 2013 agreement was required before Marriott<br>17 Vacation Club members could access the Ritz-Carlton,<br>18 Aspen through the affiliation agreement?<br>19     MR. SELLINGER: Objection to form.<br>20     MS. LIVINGSTON: Objection to form.<br>21 BY MR. REISER:<br>22     Q. Is that true?<br>23     MR. SELLINGER: Could you read the<br>24 question back?<br>25     THE REPORTER: "So whether it was a<br>               Page 21 |

6 (Pages 18 - 21)

1    special accomodation that is provided for in
2    the November 2013 affiliation agreement or a
3    contractual right that was given to the
4    associations under the terms of the
5    November 2013 affiliation agreement,
6    association action in the form of signing an
7    acknowledgement and joinder to the
8    November 2013 agreement was required before
9    Marriott Vacation Club members could access
10   the Ritz-Carlton, Aspen through the
11   affiliation agreement?
12        THE WITNESS: I still go back to -- my
13   answer is, the steps in the process that we
14   had laid out were -- the affiliation was
15   created; at that point, the clubs were
16   affiliated. As a special accomodation, we
17   allowed the association to sign the
18   acknowledgement indicating their support for
19   the members to be able -- from each of the
20   individual clubs -- in this case, Aspen -- to
21   be able to trade their inventory in.
22        And they're acknowledging they would, in
23   turn, properly service the MVCD customers
24   that came into that inventory.
25   BY MR. REISER:

*Page 22*

1    association and the acknowledgement of the joinder to
2    this agreement obligated the association to abide by
3    the terms in these 19 pages of the affiliation
4    agreement. True?
5        MR. SELLINGER: Objection to form.
6        MS. LIVINGSTON: Object to form.
7        A. You're asking -- did the acknowledgement
8    agreement bind them to this?
9    BY MR. REISER:
10       Q. Correct.
11       A. The acknowledgement agreement, as I said, was
12   their indication to us that the Aspen members would be
13   able to participate, to utilize the affiliation in
14   exchange through MVCD. And it calls out some specific
15   components within the affiliation agreement that they
16   are agreeing to and being bound by.
17       Q. So by acknowledging and joining the
18   November 2013 affiliation agreement, the Aspen
19   Highlands Association, on April 24, 2014, agreed to be
20   bound by the terms of the November 2014 affiliation
21   agreement. True?
22       MR. SELLINGER: Objection to form.
23       A. The terms that were called out in the
24   acknowledgement agreement.
25   BY MR. REISER:

*Page 24*

1        Q. Okay. As I understand what you're saying is,
2    prior to -- I think we both agree, after this
3    question-and-answer period, that prior to the
4    association signing the acknowledgement and joinder,
5    no Marriott Vacation Club member could access The
6    Ritz-Carlton Club, Aspen through the November 2013
7    affiliation agreement? It was one of the steps that
8    was required --
9        A. Right; that's correct.
10       Q. Okay. And I understand this affiliation
11   agreement also obligated the Ritz-Carlton Aspen Club,
12   by them acknowledging and joining it, to service those
13   members that were coming in through the affiliation
14   agreement. True?
15       A. That's correct.
16       Q. And you've got the affiliation agreement in
17   front of you -- at least the main body of the
18   affiliation agreement without exhibits -- it's
19   19 pages long and it's signed by you on page 19.
20   True?
21       A. That's correct.
22       Q. And the fact that the Aspen Highlands
23   Association, through Randy Mercer as president, signed
24   the acknowledgement and joinder to the affiliation
25   agreement on April 24, 2014, that signature by the

*Page 23*

1        Q. Which terms are those? Do you -- strike
2    that.
3        A. Can I have the --
4        Q. Sure. Let me just ask you this. Do you
5    believe that the terms of the -- strike that.
6        Do you believe that the association was only
7    bound by the terms that were spelled out in the
8    acknowledgement and joinder, or do you believe that
9    the association was bound by the entirety of the
10   November 2013 affiliation agreement?
11       A. I don't know. I'd have to go to what was
12   called out and compare that to what was missing. I
13   haven't done that.
14       Q. It seems like you're taking great pains to
15   call this an acknowledgement agreement, when the title
16   actually is "The acknowledgement of and joinder to
17   affiliation agreement."
18       Why do you not choose to name this "The
19   acknowledgement of and joinder to affiliation
20   agreement," and you choose to call it "The
21   acknowledgement agreement"?
22       MR. SELLINGER: Objection to form.
23       A. Well, I was referring -- as you look through
24   the various components in the affiliation agreement,
25   it talks about the acknowledgement agreement, has a

*Page 25*

7 (Pages 22 - 25)

Page 26

```
 1   definition for the acknowledgement agreement.  I was
 2   just using that term.
 3   BY MR. REISER:
 4       Q.  Okay.  So the first line of the
 5   acknowledgement of and joinder to the affiliation
 6   agreement doesn't read, "This acknowledgement of and
 7   joinder to affiliation agreement between Lion & Crown
 8   Travel Company and Marriott Resorts Travel Company
 9   (Acknowledgement)"?
10       So as a shorthand, you can call it
11   acknowledgement.  When you say "acknowledgement,"
12   you're just using a shorthand for the actual title of
13   the agreement, which is the acknowledgement of and
14   joinder to affiliation agreement.
15       Isn't that true?
16       A.  I am using the -- if you go to page 3 of the
17   agreement, there is a defined term, acknowledgement
18   agreement, which means acknowledgement and joinder to
19   affiliation agreement.  That's why I'm using the term
20   "acknowledgement agreement."
21       Q.  Okay.  Thank you.  Appreciate that.
22       So you would agree, though, that this
23   acknowledgement of and joinder to the affiliation
24   agreement includes both an acknowledgement and a
25   joinder to the agreement.  True?
```

Page 27

```
 1       MR. SELLINGER:  Objection to form.
 2       MS. LIVINGSTON:  Objection.
 3       A.  I'm not sure I know what a "joinder to" is.
 4   I believe that's a legal term.  I know what an
 5   acknowledgement is.
 6   BY MR. REISER:
 7       Q.  Is there a reason why this acknowledgement --
 8   is there a reason why this affiliation agreement,
 9   dated November 2013, was never provided to any of the
10   boards that signed a joinder to it?
11       A.  I'm not aware of whether it was or was not
12   provided to the boards.
13       Q.  Pardon?  Can you repeat that?  I'm sorry.
14       A.  I'm not aware of whether it was or was not
15   provided to the boards.
16       Q.  Was there a policy to not provide it to the
17   board that was decided by Lion & Crown?
18       MR. SELLINGER:  Objection to form.
19       A.  If you're -- the simple answer is no.  If
20   you're insinuating that we would be trying to hide
21   this, that doesn't make sense.  Clearly, the agreement
22   existed.  It was referred to in the -- I don't know
23   how many times -- in the acknowledgement agreement,
24   and so there was no hiding of the fact that this
25   agreement existed.
```

Page 28

```
 1       I guess, if the boards wanted it, they could
 2   ask for it or -- like I said, I don't know whether
 3   they did or didn't have it.
 4   BY MR. REISER:
 5       Q.  Well, we've taken the depositions of the
 6   board members in San Francisco and Tahoe.
 7       Are you aware of that?
 8       A.  I am now.
 9       Q.  Several of them work for you.  One guy's name
10   is Nathan Guikema.  Does he report to you?
11       A.  No, he does not.
12       Q.  Who does he report to?
13       A.  He reports to John Albert.
14       Q.  Do you know that Nathan Guikema was the
15   president of the San Francisco association who signed
16   the acknowledgement of and joinder?
17       A.  I know he was president.  I haven't gone back
18   and checked the signatures on the...
19       Q.  Have you heard that he testified that he had
20   never seen that agreement?
21       A.  I did not know that.
22       Q.  Do you know a guy named Charles Baron?
23       A.  Yes.
24       Q.  Did you know he was on the Tahoe board when
25   this was signed -- the acknowledgement for the Tahoe
```

Page 29

```
 1   board was signed?
 2       A.  I didn't.  I knew he was on the Tahoe board.
 3   I didn't know the timing.
 4       Q.  Did you know that he testified he had never
 5   seen the November 2013 affiliation agreement?
 6       A.  I did not.
 7       Q.  Had you ever seen the affiliation agreement
 8   between the joinders were signed?
 9       A.  I signed the agreement.  I saw it at some
10   point in time.  Had a high-level review.
11       Q.  Are you aware of any board member on any of
12   the three boards that is subject to this deposition --
13   the Tahoe board, the San Francisco board, the Aspen
14   board -- are you aware of any board member that had
15   access to this affiliation agreement before signing
16   the joinder?
17       MR. SELLINGER:  Objection to form.
18       A.  As I said before, I'm not aware of whether
19   they did or did not have access or had a copy of it.
20   BY MR. REISER:
21       Q.  You had a meeting with Randy Mercer in
22   November of 2013, the day before the signature on the
23   affiliation agreement in November 2013.
24       Do you remember that?  It was in Orlando.
25       A.  I remember meeting with Mr. Mercer in
```

8 (Pages 26 - 29)

Orlando. I don't know whether those are the dates.

Q. Do you remember giving or discussing with Mr. Mercer, during that November 2013 trip, the affiliation agreement that is marked as Exhibit 2102?

A. I don't remember what the discussion was at the meeting.

Q. Do you believe that Lion & Crown is a fiduciary to the members of the several clubs?

MR. SELLINGER: Objection to form.

BY MR. REISER:

Q. The Ritz-Carlton Clubs.

MR. SELLINGER: Objection to form.

A. I don't know that -- I don't know exactly what you mean by fiduciary. They don't have a duty to the members, I don't believe -- Lion & Crown doesn't.

BY MR. REISER:

Q. What about Cobalt; do you believe they have a duty to the members?

A. No.

MR. SELLINGER: Objection to form.

BY MR. REISER:

Q. Do you believe the Ritz-Carlton Management Company has a duty to the members?

MR. SELLINGER: Objection to form.

A. No, not to the -- not to the members, no.

Page 30

---

attorneys? Because I don't want to delve into it if you did, is all I'm saying.

MR. SELLINGER: Well --

MR. REISER: Without waiving anything. I'm trying to lay some foundation for where he learned this knowledge.

MR. SELLINGER: I don't think that's the right way to do it. I don't object to your foundation, but that's a question that calls for attorney-client privileged information.

BY MR. REISER:

Q. Other than through attorneys at Marriott, that represent Marriott folks and Marriott defendants, have you discussed the order with anybody else?

A. No.

Q. Do you believe that the associations in California had duties to the members during the time that they were controlled by board members appointed by Marriott?

MR. SELLINGER: Objection to form.

A. I'm sorry. Can you say that again or read it back to me?

BY MR. REISER:

Q. Do you believe that the San Francisco association had a duty -- had a fiduciary duty to -- to

Page 32

---

BY MR. REISER:

Q. Have you read the opinion dated March 29, 2018 that was issued by Judge Brimmer in the Aspen case?

A. No.

Q. Have you heard about his ruling?

A. I'm sorry. When was this?

Q. March 29, 2018.

Q. What was the ruling in regards to?

Q. The motion to dismiss.

A. I got a high-level brief on that, that --

MR. SELLINGER: Let me just stop you for a moment. To the extent that -- in answering the question, I instruct you not to disclose communications with counsel. To the extent you're able to answer the question without disclosing communications with counsel, you can do that.

A. What I am aware of is that there was -- the motion to dismiss was granted in part and denied in part. That's really the extent of my understanding.

BY MR. REISER:

Q. Did you ever read the order?

A. No.

Q. Did you get that understanding from

Page 31

---

the members of the San Francisco Ritz-Carlton Club during the time period that the board was controlled by appointees of Ritz-Carlton Development Company?

MR. SELLINGER: Objection to form.

A. I'm not sure whether the association -- the board members have a fiduciary duty to the members or not. I don't think it would matter whether they were -- if there is a fiduciary duty, it's -- it is in place whether they're developer-appointed or members that are elected to the board. But I don't know whether there is a fiduciary duty there.

BY MR. REISER:

Q. Okay.

A. Not my expertise.

Q. You've never held the opinion -- strike that. You're an officer of Ritz-Carlton Management Company as well. True?

A. That's true.

Q. Is it your -- do you have any understanding of any duties that the -- strike that.

Tell me your understanding of any duties that the Ritz-Carlton Management Company owed to the individual members of The Ritz-Carlton Club in, say, San Francisco.

MR. SELLINGER: So two things. Apart

Page 33

9 (Pages 30 - 33)

1　from having already covered this, this has
2　got nothing to do with the
3　subsequently-disclosed documents.
4　　　MR. REISER:  It does, actually.
5　　　MR. SELLINGER:  How?
6　　　MR. REISER:  There's a duty of full
7　disclosure to disclose things related to
8　decisions such as affiliation.  If the
9　Ritz-Carlton Management Company had -- I want
10　to see if he realizes, you know -- if he
11　understands that a -- if he understands that
12　a fiduciary would be required to turn over
13　all relevant information -- fully disclose.
14　I think it is relevant.
15　　　MR. SELLINGER:  So read the question back
16　again.
17　　　THE REPORTER:  "Tell me your
18　understanding of any duties that the
19　Ritz-Carlton Management Company owed to the
20　individual members of The Ritz-Carlton Club
21　in, say, San Francisco."
22　　　MR. SELLINGER:  What does the
23　Ritz-Carlton Management Company have to do
24　with a 2013 affiliation agreement?
25　　　MR. REISER:  I'm not going to argue with

Page 34

1　　　MR. SELLINGER:  Do you have a copy of the
2　agreement?
3　　　MR. REISER:  We can pull one up.  I mean,
4　it's been extensively discovered --
5　extensively discussed in Judge Brimmer's
6　order, paragraphs 4(a) through (b) or
7　whatever with all the different authorities
8　getting crammed into the Ritz-Carlton
9　Management Company, including the
10　discretionary authority pointed out by Judge
11　Brimmer that he thought posed a fiduciary
12　duty under the management agreement.
13　　　MR. SELLINGER:  I disagree with your
14　reading of the decision, but that's not
15　relevant here.  You're asking the witness
16　about an agreement without showing him the
17　agreement.  I don't think that's fair.
18　　　MR. REISER:  I am.  I'm asking his
19　understanding of that agreement without
20　reading the agreement.  If he doesn't
21　understand it, then he doesn't understand it.
22　　　THE WITNESS:  I don't know all the
23　particular requirements or activities that
24　are outlined in the management agreement.  I
25　know the high-level responsibilities, which I

Page 36

1　you on the record.  If you want to instruct
2　him not to answer, I guess we'll be back for
3　a fourth time here.  I think he should answer
4　the question, Philip.
5　　　MR. SELLINGER:  I'm not instructing him,
6　but it goes well beyond -- all of those
7　fiduciary questions go well beyond the
8　subsequently-disclosed documents, but let's
9　try and get through it.
10　　　Objection to form.
11　　　MR. REISER:  Thanks.
12　　　THE WITNESS:  The responsibility of the
13　management company is to provide the facility
14　services, the check-in, check-out, cleaning,
15　so forth, manage within the budget provided
16　by the -- that's approved by the
17　association -- and bill to the association to
18　perform all of the hospitality functions, and
19　to do that within the standards set by The
20　Ritz-Carlton Destination Club.
21　BY MR. REISER:
22　　Q.  The Ritz-Carlton Management Company is also
23　responsible for providing services to the board of
24　directors, true, under the terms of the management
25　agreement?

Page 35

1　previously discussed.
2　　　MR. REISER:  Can you put that up on two
3　pages on the screen?
4　　　MR. SELLINGER:  So if you're going to ask
5　him about the management agreement, which,
6　again, has nothing to do with the
7　subsequently-disclosed documents, you should
8　give him the document and not cherry pick
9　provisions to look at.  I don't think that's
10　fair.
11　　　MR. REISER:  I don't have the document
12　with me right now, so we're using the screens
13　that we brought here for Trial Director.
14　It's right in front of him.  It's the
15　management agreement.  It's very familiar to
16　this case.  It's been the subject of motions
17　to dismiss.  It's going to be extensively
18　discussed here.
19　　　He's the Ritz-Carlton Management Company
20　officer.  These are very basic agreements
21　that he's responsible for.  I'm going to ask
22　him about them.  If he doesn't have a copy,
23　you can take a break and get him a copy if
24　you think it's necessary.
25　BY MR. REISER:

Page 37

10 (Pages 34 - 37)

1    Q. I'm going to ask you to -- first question I'm
2    going to ask is -- the paragraph number two of the
3    Ritz-Carlton Management Company, LLC management
4    agreement. It says, "Appointment and acceptance of
5    agency."
6        And it reads, "The association hereby employs
7    the management company to act on behalf of the
8    association and its members" --
9        A. I can read that.
10       MR. SELLINGER: Well, you've now -- I
11   don't understand. You've got something on
12   the screen that you can't read. It's small
13   print.
14       MR. REISER: Hold on a second. Your
15   witness just said he could read it. He asked
16   for that to be taken down, so --
17       MR. SELLINGER: The witness did?
18       THE WITNESS: I can read it.
19       MR. SELLINGER: I'm sorry. I didn't hear
20   that.
21   BY MR. REISER:
22       Q. It says, "The association hereby employs the
23   management company to act on behalf of the association
24   and its members as the exclusive managing entity of
25   the condominium and to manage the daily affairs of the
                                                    Page 38

1    record. The time is 10:59 a.m.
2        (Brief recess.)
3        THE VIDEOGRAPHER: We are back on the
4    video record. The time is 11:06 a.m.
5        Counsel, you may proceed.
6    BY MR. REISER:
7        Q. So I was asking about the appointment of --
8    about an acceptance of the agency section --
9        A. I saw that.
10       Q. Okay. We're talking about that -- let me
11   just finish off that one. I was going to move on to
12   paragraph 4.
13       You agree that this management agreement
14   employs the management company to act on behalf of the
15   association and its members to be the exclusive
16   managing entity of the condominium (inaudible) of the
17   condominium plan?
18       A. Yes.
19       Q. Number four, there's a delegation of
20   authority. You're aware that the management agreement
21   provides that, "except to the extent prohibited by
22   applicable law, the association hereby delegates the
23   management company of all of the power and authority
24   of the condominium association to the extent necessary
25   to perform the management company's duties and
                                                    Page 40

1    condominium and the plan, and the management company
2    hereby agrees to act."
3        You understand that the management company is
4    acting on behalf of the association and its members
5    pursuant to this agreement?
6        MR. SELLINGER: Objection to form.
7        A. It says -- yeah -- "to act on behalf of the
8    association and its members." I wanted to read the
9    rest of the clause, as opposed to...
10   BY MR. REISER:
11       Q. Okay. Feel free. I'm going to ask you about
12   the fourth paragraph next called "Delegation of
13   authority."
14       A. Okay.
15       Q. Would you agree that the association agreed
16   to -- I'm sorry -- the management company agreed to
17   act on behalf of the association and its members?
18       MR. SELLINGER: Objection to form.
19       A. It's moved. They changed the screen.
20       MR. REISER: Can you put it back, please.
21       THE WITNESS: Could we not move it
22   around?
23       MR. REISER: Let's take a break.
24       MR. SELLINGER: Get the agreement.
25       THE VIDEOGRAPHER: We're going off the
                                                    Page 39

1    obligations under this agreement"?
2        A. I see that.
3        Q. And that's your understanding of the
4    delegation of the power and authority from the
5    association to the management company; right?
6        MR. SELLINGER: Objection to form.
7        A. That is the agreement.
8    BY MR. REISER:
9        Q. Okay. And then the agreement lists
10   subparagraphs A through B in terms of individual
11   powers that the association has also delegated to the
12   Ritz-Carlton Management Company. True?
13       A. I think it's itemizing certain components of
14   what has been delegated, yes.
15       Q. And prior to each association meeting --
16   board meeting -- isn't it true that the Ritz-Carlton
17   Management Company is responsible for providing
18   pre-reads to the board that are going to be -- matters
19   that are going to be discussed at the meeting?
20       MR. SELLINGER: Objection to form.
21       A. Our association governance group provides out
22   an agenda, and sometimes there are pre-reads with that
23   agenda. Not always.
24   BY MR. REISER:
25       Q. Okay. The association -- the Ritz-Carlton
                                                    Page 41

11 (Pages 38 - 41)

1 Management Company keeps all the books and records of
2 the association.  True?
3    A.  That's correct.
4    Q.  Including any affiliation agreements?
5    A.  Any affiliation agreement with the
6 association -- with the association -- they would.
7    Q.  Any affiliation agreement that would be --
8 that would -- through which the association would be a
9 party to through an acknowledgement and joinder would
10 be kept by the Ritz-Carlton Management Company;
11 correct?
12       MR. SELLINGER:  Objection to form.
13    A.  Any affiliation group -- any affiliation
14 agreement between the association and the -- between
15 the association and another group would be kept as
16 part of the association records.  The acknowledgement
17 agreement, I would assume, would be kept as well as
18 part of the agreements.
19 BY MR. REISER:
20    Q.  What about the actual affiliation agreement
21 as it pertains to the acknowledgement agreement?
22    A.  I don't know the technical -- whether that
23 would've been subject to being kept or not.
24    Q.  Can you think of any reason why the
25 association would not keep in its records the
                                              Page 42

1 affiliation agreement dated November 14, 2013?
2       MR. SELLINGER:  Objection to form.
3    A.  I have no idea whether they have it or don't
4 have it.  As I said before, if they had it, I would
5 expect them to keep it.
6 BY MR. REISER:
7    Q.  So we've subpoenaed or asked for all
8 documents related to the affiliation agreement from
9 the Aspen Highlands Association, and they provided
10 their complete file in this case responsive to a
11 request.
12       Are you aware of that?
13    A.  I'm aware that they were -- they were
14 requested to provide -- disclose all their documents.
15    Q.  Are you aware that, in that disclosure, there
16 was no November 13, 2014 affiliation agreement
17 contained within their records?
18    A.  No.
19    Q.  Can you see any reason why the association
20 would not have within their records a copy of the
21 November 14th, 2013 affiliation agreement?
22       MR. SELLINGER:  Objection to form.
23    A.  I can't speak for them, but I don't know why
24 they wouldn't.
25 BY MR. REISER:
                                              Page 43

1    Q.  Well, I mean, you can speak for the
2 Ritz-Carlton Management Company who's got the
3 responsibility for maintaining their records.  True?
4    A.  I can speak for that, yes.
5    Q.  And, as you mentioned, the Ritz-Carlton
6 Management Company does keep the records of the
7 association.  True?
8    A.  The Ritz-Carlton Management Company, as part
9 of their duties, keeps their records of the
10 association.  I could see them keeping any document
11 where the association is a party to that document.
12    Q.  Would you expect the November 14, 2013
13 affiliation agreement, given that it was joined by the
14 association, to be within the association's files --
15       MR. SELLINGER:  Objection to form.
16 BY MR. REISER:
17    Q.  -- as maintained by the Ritz-Carlton
18 Management Company?
19    A.  I don't know why -- I don't know whether that
20 would be kept there or not.
21    Q.  All right.  What was your involvement in
22 drafting the November 14, 2013, affiliation agreement,
23 if any?
24    A.  I didn't have any involvement in drafting it.
25    Q.  Okay.  Ms. Sobeck's deposition was taken
                                              Page 44

1 earlier this week on Tuesday.  Her response to the
2 question of "Why didn't the Ritz-Carlton Management
3 Company give a copy of the affiliation agreement to
4 the board in Aspen" was that they didn't ask for it.
5       Are you aware of her testimony in that
6 regard?
7       MR. SELLINGER:  Objection to form.
8    A.  No, I'm not.  I haven't spoken to Ms. Sobeck
9 about her testimony.
10 BY MR. REISER:
11    Q.  Do you agree with her that the Ritz-Carlton
12 Management Company had no duty to provide the
13 affiliation agreement that was being joined unless the
14 association asked for it?
15       MR. SELLINGER:  Objection to form.
16    A.  I don't think -- I don't know that we had a
17 duty to provide the agreement.  We were -- we
18 certainly weren't hiding the agreement.  It's
19 referenced, I don't know how many times, in the
20 acknowledgement agreement.
21 BY MR. REISER:
22    Q.  So under the management agreement, the
23 management company was provided the authority to --
24 was provided all the power and authority of the
25 condominium association to the extent necessary to
                                              Page 45

12 (Pages 42 - 45)

```
 1  perform the management company's duties and
 2  obligations under the agreement.
 3      Did the management company represent the
 4  association in relation to the execution of the
 5  joinder and acknowledgement?
 6      MR. SELLINGER: Objection to form.
 7      A. No.
 8  BY MR. REISER:
 9      Q. As the management company that is delegated
10  all the power and authority of the association board
11  to the extent allowed by law pursuant to the
12  management agreement, do you think it was responsible
13  for the association at Aspen to sign a joinder to an
14  agreement that they had never seen?
15      MR. SELLINGER: Objection to form.
16      MS. LIVINGSTON: Objection.
17      A. Can you ask that question again or read it
18  back?
19      MR. REISER: Sure. Can you read it back?
20      THE REPORTER: "As the management company
21  that is delegated all the power and authority
22  of the association board to the extent
23  allowed by law pursuant to the management
24  agreement, do you think it was responsible
25  for the association at Aspen to sign a
                                    Page 46
```

```
 1  joinder to an agreement that they had never
 2  seen?"
 3      THE WITNESS: They didn't sign -- the
 4  management company wasn't party to the
 5  agreement -- the acknowledgement agreement.
 6  BY MR. REISER:
 7      Q. I understand, but they were managing the
 8  conduct of the board; were they not?
 9      MR. SELLINGER: Objection to form.
10      A. No --
11      MS. LIVINGSTON: Objection.
12      A. -- we had made -- they were delegating
13  certain powers. We had, as part of the affiliation,
14  agreed with -- to provide the accomodation to allow
15  the association board to execute the acknowledgement
16  not to allow their members to participate. We
17  hadn't -- that wasn't delegated to the management
18  company.
19  BY MR. REISER:
20      Q. As an officer of the management company --
21  which you testified earlier today that you were;
22  right?
23      A. Yes.
24      Q. You knew of the November 14, 2013 affiliation
25  agreement before the board signed the joinder. True?
                                    Page 47
```

```
 1      A. That's true.
 2      Q. And did you ever instruct anybody -- strike
 3  that. Did you, yourself, or anybody on your behalf,
 4  acting on behalf of the management company, feel
 5  obligated to provide the affiliation agreement dated
 6  November 14, 2013 to the board?
 7      MR. SELLINGER: Objection to form.
 8      A. I didn't feel obligated to provide a copy of
 9  the agreement to the board.
10  BY MR. REISER:
11      Q. You're aware that the Ritz-Carlton Management
12  Company, through Stephanie Sobeck and perhaps
13  yourself, signed an MOU with relation to the
14  affiliation agreement dated in November 2013. True?
15      A. Quite frankly, I'd forgotten about that.
16  As -- through the preparation, I had the opportunity
17  to read through that again, which reminded me that we
18  had entered into that agreement, which was interesting
19  from the standpoint -- it just recapped some of the
20  high points of how the Marriott Vacation Club
21  Destinations Exchange Program would work through Lion
22  & Crown.
23      Q. But listen to my question, Mr. Cunningham.
24  I'm asking you, did Stephanie Sobeck and Lee
25  Cunningham -- I mean, did Stephanie Sobeck and Randy
                                    Page 48
```

```
 1  Mercer negotiate the terms of the MOU between
 2  themselves?
 3      A. I have no idea who negotiated that.
 4      Q. You never saw any communications from
 5  Stephanie Sobeck with relation to the requests that
 6  were being made by Randy Mercer in terms of changes to
 7  the MOU?
 8      A. I don't recall.
 9      Q. Are you aware that Stephanie Sobeck made
10  changes to the MOU?
11      A. I'm not.
12      Q. Are you aware that Stephanie Sobeck
13  negotiated the joinder agreement -- the
14  acknowledgement and joinder agreement -- to the
15  November 2013 affiliation agreement with Randy Mercer
16  and Tyler Oliver?
17      A. I'm not aware that that took place.
18      Q. Why was -- well, okay. You have no
19  recollection. You didn't review any e-mails or any
20  drafts of the MOU in preparation for any of your depos
21  in this case?
22      A. Not related to -- that I recall -- related to
23  the drafting of the MOU or the drafting of the
24  acknowledgement agreement.
25      Q. All right. I want to shift gears then for
                                    Page 49
```

13 (Pages 46 - 49)

1 now and go over some of the strategic council
2 agreements that have been produced recently as well.
3        First of all, I just wanted to ask you -- we
4 received some testimony this week about the strategic
5 council and the members of the strategic council. But
6 I just want to hear you for the record -- if you can
7 tell me which members you recollect were on the
8 strategic council in July of 2012.
9        A. 2012. Steve Weisz, John Geller, Jim Hunter,
10 myself, Brian Miller, Lani Kane-Hanan.
11        Q. Basically, the members of the executive
12 committee for the company?
13        A. Yes. There's two other people. I don't know
14 whether they were voter members on this strategic --
15 oh -- the strategic council?
16        Q. Yes.
17        A. I'm sorry. Dwight Smith and Mike Yonker.
18        Q. The purpose of the strategic council is not
19 to vote on anything. True?
20        A. No. It's not a decision-making body.
21        Q. There's a corporate growth committee that
22 made decisions with regard to the affiliation in this
23 case; is that true?
24        A. There is a corporate growth committee that is
25 a decision-making body relative to, generally, capital

Page 50

1 investment, but...
2 BY MR. REISER:
3        Q. Okay. The members of the corporate growth
4 committee basically determine what the strategic
5 council -- in terms of the -- at least all of the
6 members of the executive committee for the company are
7 on both the strategic council and the corporate growth
8 committee. True?
9        A. I'm not a hundred percent positive for Mike
10 Yonker and Dwight Smith; otherwise, I know the other
11 members are.
12        Q. Okay. We've received some testimony this
13 week from both Steve Weisz and Lani Kane-Hanan that
14 the -- what is often times referred to, or repeatedly
15 referred to, in the strategic council updates as the
16 luxury segment reengineering.
17        Both of those witnesses this week have
18 testified that you were pretty much the quarterback
19 for the luxury segment reengineering.
20        Would you agree with that?
21        A. That would be correct.
22        Q. And the term "luxury segment
23 reengineering" -- we can go through this -- but
24 virtually every strategic council report starts with a
25 box called "luxury segment reengineering" and

Page 51

1 describes what's going on. Then it has a box for each
2 club.
3        The question is, is that your terminology
4 that this was a luxury segment reengineering? How did
5 that term come to being?
6        A. I don't know whether I coined it or whether
7 somebody else did. It was our way of referring to
8 things that we were considering or contemplating
9 relative to the club overall as opposed to each
10 specific resort location.
11        Q. Okay. I think what I'm going to do first is
12 actually, just because chronologically it's a little
13 cleaner, is talk about the corporate growth committee
14 memo dated May 24, 2012, and then get into the
15 strategic council.
16        So let me show you what we marked this week
17 as what -- exhibit number from May 24 -- 2136.
18        Have you seen Exhibit 2136 before, which is
19 the May 24, 2012 corporate growth committee memo that
20 has the subject "Ritz-Carlton Destination Club
21 proposed strategic plan"?
22        A. Yes.
23        Q. Did you prepare this document?
24        A. It was prepared by a number of people. I
25 guess, you would consider me the sponsor of the

Page 52

1 activity. It was prepared by a number of people
2 within the organization and then published to the
3 corporate growth committee.
4        Q. Okay. Tony Terry, I understand, is in the
5 finance and accounting department in the company?
6        A. That's correct.
7        Q. He helped you -- he was one of the authors of
8 this report as well?
9        A. He probably was more involved on the
10 financial assessments, but there were other people --
11 many other people -- that were involved in the
12 preparation of the -- as is normal for any document
13 going to our corporate growth committee.
14        Q. Let's go through the requests here. The
15 requests in this memo to the corporate growth
16 committee had five subparts.
17        Do you see that in the beginning of the memo?
18        A. I do.
19        Q. So the first one involved converting the
20 existing 105 RCDC Trust owners to the Marriott
21 Vacation Club Destinations NATO Trust points product
22 or to RCDC home fractional ownership.
23        Did that aspect of this request get
24 ultimately approved and ratified by Steve Weisz?
25        A. I don't recall whether it did at this

Page 53

14 (Pages 50 - 53)

1  particular -- when this was presented. Ultimately, we
2  did go about -- go about converting those trust
3  members, which are also the Bleu Florida Land Trust
4  members, to the options laid out there.
5      Q. So the first subsection here, Subsection 1,
6  deals with the Bleu Florida Land Trust inventory.
7  True?
8      A. You're talking about number one? Yes.
9  That's dealing with going to the owners and giving
10  them alternative ownership or options so that they
11  relinquish their ownership in the Bleu Florida Land
12  Trust.
13     Q. Okay. Whoever prepared this memo -- I know
14  it was a multiparty preparation effort -- but as the
15  sponsor of this effort, you're aware and you knew that
16  you were requesting from the corporate growth
17  committee $1.5 million to use to reacquire all the 105
18  interests that had been bought by folks. True?
19     A. We were expecting -- we were requesting to
20  spend up to the 1.5 million, not as a purchase, but of
21  inventory of the 105 trust owners. But the options
22  included transferring their ownership to Marriott
23  Vacation Club Destination points, so there would be
24  the closing costs.
25         So there wasn't -- there wasn't a cash outlay

Page 54

1  you can actually go down to -- if you can turn to page
2  7 of the memo -- jumping around a little bit, trying
3  to speed this along.
4         It appears from -- page 7 of the memo, it
5  reads, "As mentioned previously, the current strategy
6  reflects the unwind of the RCDC Trust by way of
7  converting the existing 105 RCDC Trust owners."
8  Then it says, "15.5 million cumulative sales." That's
9  what I wanted to ask you about.
10        Does that mean those 105 RCDC Trust members
11  that paid 15 and a half million dollars for the --
12     A. I think that's correct.
13     Q. Okay. What I want to get -- when that trust
14  product was reacquired by Ritz-Carlton Development
15  Company, that was then ceded into the NATO Trust.
16  True?
17     A. Into the MVCD Trust, yeah.
18     Q. I just found what the NATO Trust actually
19  stands for -- North American Timeshare Organization.
20  I didn't know that. Is that the correct acronym?
21     A. Many years ago, like 2007, when we developed
22  an organization structure that had, actually, at the
23  time, four chief operating officers, there was one for
24  North America, one for Europe, one for Asia, and one
25  for The Ritz-Carlton Destination Club. And so the --

Page 56

1  for that alternative product to them. Or if they
2  transferred to ownership of another Ritz-Carlton
3  Destination Club, there wouldn't be a cash outlay
4  there, but there would be expense associated with that
5  transaction.
6      Q. How many of these members actually received a
7  buyout of their interest?
8      A. I don't recall. I think, by and large, my
9  recollection is that the majority transferred to
10  Marriott Vacation Club Destination points; maybe one
11  or two went to a Ritz-Carlton fractional; and there
12  might have been one or two that received a cash
13  buyout. I don't recall how it broke down.
14     Q. How many -- I obviously see that there were
15  105 RCDC Trust owners. How many units did -- were
16  originally -- strike that.
17        How many units were in the RCDC Trust at the
18  time the unwinding process began?
19     A. I don't recall the exact number. It was, I
20  think, in the single digits.
21     Q. Okay. Do you know where those units were
22  located, which clubs?
23     A. I remember some of them were San Francisco
24  inventory. Beyond that, I don't really recall.
25     Q. It appears from this memo that there were --

Page 55

1  somehow the nickname "North American Timeshare
2  Organization" is what got -- it was an internal -- it
3  wasn't a -- any kind of legal name. It was just a --
4  how you referred to it.
5      Q. That trust is what holds points that allow --
6  strike that. That trust holds inventory that allows
7  points to be sold against that inventory, as I learned
8  this week?
9      A. That's correct.
10     Q. Okay. So at least the five -- strike that.
11  Let's say there were five -- you said single digit
12  units that were purchased or obtained back from the
13  portfolio, RCDC Trust. Let's just assume it was five
14  hypothetically.
15        Those five units would go into the trust,
16  right, and points associated with those five units
17  would allow -- I'm sorry. The inventory attached to
18  those five units would then allow a number of points
19  to be sold back by that inventory; right?
20     A. That's correct.
21     Q. And did the financial figures contained in
22  this report show how much points in a dollar amount
23  would be expected from the ultimate sale of points
24  backed by the portfolio inventory that went into the
25  trust?

Page 57

15 (Pages 54 - 57)

1    MR. SELLINGER: I'm sorry. Read that
2   back for me, please.
3      THE REPORTER: "And did the financial
4   figures contained in this report show how
5   much points in a dollar amount would be
6   expected from the ultimate sale of points
7   backed by the portfolio inventory that went
8   into the trust?"
9      MR. REISER: Let me rephrase before you
10  object.
11  BY MR. REISER:
12    Q. Does Exhibit 2136, which is the May 24, 2012
13  corporate growth committee document -- does this
14  document reveal how much was expected in terms of
15  point sales that would accrue against the new
16  inventory that was going into the trust represented by
17  the portfolio?
18     MR. SELLINGER: Objection to form.
19    A. If you go to, I guess, page 7, economic
20  metric summary?
21  BY MR. REISER:
22    Q. Okay.
23    A. The net -- the development revenue line would
24  be the amount of revenue that was generated as a
25  result of this effort. So if you see zero, you may

Page 58

1   the trust -- that was done as part of this
2   reengineering of The Ritz-Carlton Destination Club --
3   as well as unsold developer inventory in, at least,
4   San Francisco and Tahoe, for our purposes -- unsold
5   developer fractional inventory from those two clubs
6   was also ceded into the trust following the
7   reengineering process. True?
8      MR. SELLINGER: Objection to form.
9    A. In the steps of -- in the various actions
10  that were being contemplated, where we had the rights
11  and the authority to put inventory -- unsold developer
12  inventory -- from The Ritz-Carlton Destination Club
13  into the MVCD Trust. We were planning to do that.
14  BY MR. REISER:
15    Q. Right. Okay. So as I understand it, based
16  on documents I've read -- and you can -- even in the
17  webinar, I think, it was mentioned how much inventory
18  was still owned at the time of the August 2012
19  webinar -- it was laid out, I think, by you -- there
20  was about 25 -- I think the figure was actually
21  27 percent of the total inventory in The Ritz-Carlton
22  Destination Club was unsold at the time of the
23  evolution letter.
24     Is that about right? I'm not going to hold
25  you.

Page 60

1   question why.
2      Well, if I took somebody who was in the Bleu
3   Florida Land Trust, gave them points -- MVCD points --
4   and then, later, I took the inventory that they had
5   relinquished, put that into the MVCD, that just
6   replaced points that I had previously given to the
7   them.
8    Q. Thank you.
9    A. So it's a net zero.
10    Q. Net zero. All right. And the same would not
11  be true for any developer-owned inventory that went
12  into the trust, right, because you're not -- you're
13  not netting out the points in that transaction?
14     MR. SELLINGER: Objection to form.
15    A. So not related to the Bleu Florida Land
16  Trust.
17  BY MR. REISER:
18    Q. Correct.
19    A. If there was a developer-owned Ritz-Carlton
20  Destination Club unit fraction that was put into the
21  MVCD Trust, that would generate points for sale and
22  generate revenues accordingly.
23    Q. All right. So is it true then -- strike
24  that -- strike that. It is true, is it not, that both
25  portfolio inventory that was taken back and put into

Page 59

1    A. I don't know what the exact percentage or --
2   it was a -- there were a number of -- meaningful
3   number of unsold fractionals.
4    Q. Just to try to pin it down -- I appreciate
5   you trying to be precise in your testimony -- here is
6   the webinar -- I think the webinar transcript. It's
7   dated August 28, 2012.
8      If you can take a look at that and let me
9   know if this refreshes your recollection as to how
10  much developer inventory was owned at the time of the
11  evolution or the reengineering of The Ritz-Carlton
12  Destination Club.
13     MR. SELLINGER: I'll just note that this
14  does not have to do with the
15  subsequently-produced documents, but go
16  ahead.
17     MR. REISER: I disagree, but, I mean,
18  you're not in my head, so you don't really --
19    A. Contained in -- I don't know which
20  paragraph -- "Today, luxury demand continues to be
21  very soft and forecasts for luxury real estate market
22  shows little near-term progress for sustained
23  recovery. Approximately 25 percent of the inventory
24  in The Ritz-Carlton Club system remains unsold and the
25  pace of sales is slow."

Page 61

16 (Pages 58 - 61)

BY MR. REISER:

1  Q. Okay. So there were -- I'm just asking you
in rough numbers now. Okay? I don't necessarily need
to be precise. But if there were 4,000 total
Ritz-Carlton fractionals built -- I think that's the
number -- would you agree that's roughly the number
that were ultimately built?

A. Let's see. In 2012 -- I'm trying to think --
I don't know what the denominator is, which clubs are
included -- for instance in 2012, in August, whether
that would have counted. There was still inventory in
Abaco. But --

Q. Let me --

A. I don't know. Without going back and looking
at an inventory report, I can't tell you whether 4,000
is right or not.

Q. Do you have any estimate, as you sit here
today, stripping away the fractionals that -- strike
that.

How many unsold inventories did Ritz-Carlton
Destination Club just roughly have in the Kapalua club
at the time that deal was deflagged?

A. We had sold very little. Once again, I'd
have to go back and get an inventory report. I'm not
trying to be evasive. I just don't recall the size

Page 62

of -- in that particular project, there were
fractional units, there were whole ownership units,
there were -- I don't remember the split.

Q. Let me ask you this. What happened to the
unsold fractional inventory at Kapalua after the
termination?

A. The whole development was sold and that
inventory went with it. I do not know what they -- I
don't recall what they ultimately did with the unsold
fractional; whether they converted it to whole
ownership or continued to sell fractional or used it
as hotel.

Q. Got you. But at any rate, the unsold
fractional interests that were owned by the JV group
sold all that to the buyer?

A. That's correct.

Q. You did retain maybe one or two or something,
because I know at least Steve Andrews, who was a
former board member at San Francisco, traded his
San Francisco unit for a Kapalua unit.

A. We didn't really retain them. We ended up
with some back through foreclosures on mortgages or
that were in our control that weren't part of the
joint venture.

Q. So there was -- do you remember the magnitude

Page 63

of --

A. Two or three.

Q. Two or three. That's even after two or three
years went by and people had a longer time to default
on mortgages and stuff, two or three was the net
result out of that club that you got back through
foreclosures?

A. Yeah. I think, at the end -- I think we only
recently sold the last unit that we had there.

Q. Okay. So Kapalua, I'll stipulate that for
now.

Can you tell me the clubs that had the most
developer-owned inventory at the time of the RCDC
reengineering?

A. Aspen had a meaningful amount.

Q. San Francisco had a meaningful amount?

A. San Francisco.

Q. Tahoe?

A. Tahoe.

Q. Jupiter?

A. Vail. Jupiter, not a lot.

Q. I think Jupiter had around 80, as I saw.
Does that sound about right?

A. Let me think. Probably -- let's see. No. I
think that would be high. I would think it would be

Page 64

more in the 50-ish range, but -- and in St. Thomas,
there was a good amount of inventory that was not
owned by the developer, but was owned by the
association or in default of some sort.

Q. And, ultimately, there was a deal worked out
that -- I'm not going to get into the details of
that -- but through an agreement with the club and an
amendment to their declaration, the developer was able
to gain control of all the defaulted inventory, and
then ultimately ceded that inventory into the NATO
Trust. Right?

A. There were several agreements, but that
resulted in us being -- getting control of that
inventory and then having the ability to put it into
the MVCD Trust.

Q. Do you know how much of the SFO inventory was
ultimately ceded into the trust?

A. Probably in the 10 to 12 unit range.
Something like that.

Q. When you say "unit," that would be a
fraction?

A. Not fractions. Actual units.

Q. Times that by 12?

A. Yeah.

Q. What about Tahoe?

Page 65

17 (Pages 62 - 65)

1    A. I believe Tahoe would be more in the five or
2  six unit range, times the 12.
3    Q. And I'll skip the other clubs for now. But
4  would the units that were ceded to the trust, the
5  points that were able to be sold, backed by those
6  units at those two clubs, limited to the -- like, for
7  instance, in San Francisco, each fractional had three
8  weeks of use.
9       So that would mean a fractional unit that was
10 ceded into the trust from San Francisco allowed
11 36 weeks of inventory to sell points against. True?
12   A. That's correct.
13   Q. And same thing with Tahoe?
14   A. That's correct. We -- in many cases, it was
15 an individual fraction that was put into the trust as
16 opposed to a whole unit. So the inventory -- the
17 points were against the points of that individual
18 fraction -- the seven nights -- or the 21 nights.
19   Q. Okay. Was there some inventory that had
20 been -- was there some inventory from either the
21 San Francisco or the Tahoe clubs that was put into the
22 NATO Trust as a whole unit which would allow them to
23 sell 52 weeks of points against that unit; do you
24 know?
25   A. I don't recall whether there was. I know

Page 66

1    Q. Do you have any rough idea in terms of -- let
2  me back up for a second.
3       Do you think that financial analysis, at
4  least the summary of it, appears somewhere under the
5  redacted version of this May 24th memo?
6    A. I don't believe, no.
7    Q. I mean, the corporate growth committee would
8  do a full analysis of the financial impact of the
9  request; would it not?
10   MR. SELLINGER: Objection to form.
11   A. The impact is -- that's the analysis that was
12 provided as part of this memo -- was -- is included.
13 BY MR. REISER:
14   Q. Where does the expected sales come in on the
15 box on page 7 from the developer-owned inventory that
16 would have backed some point sales?
17   MR. SELLINGER: Objection to form.
18   A. It's not in this memo. I don't know where it
19 would have come forward -- or whether it would have
20 come forward -- as individual pieces of inventory were
21 being contemplated to actually be ceded into the
22 trust.
23 BY MR. REISER:
24   Q. So I don't know if you reviewed this memo in
25 its unredacted form in the last couple days and

Page 68

1  that there was that situation in Vail, but not -- I
2  don't know whether it was.
3    Q. So is there an analysis anywhere in -- or do
4  you remember whether there was an analysis of the
5  financial impact of taking these developer-owned
6  inventory fractions and putting them into the NATO
7  Trust in terms of expected point sales that would
8  accrue that were backed by this new inventory into the
9  trust?
10   A. There would've been a financial analysis done
11 of looking at putting that developer inventory in, how
12 many points it generated, how much sales it generated,
13 what the cost of generating those sales were going to
14 be, what the cost of the unsold maintenance fees were
15 going to be while you waited for them to sell.
16      Yeah, there would've been a financial
17 analysis done.
18   MR. REISER: Okay. I don't think we
19   received that financial analysis in
20   discovery. I'll send you an e-mail
21   afterwards. You can decide whether you think
22   it's privileged or not. At least, I'll put
23   you on notice that we want that.
24   MR. MARX: Thank you.
25 BY MR. REISER:

Page 67

1  whether you would be able to tell me whether that
2  analysis might be tucked behind this redaction or not.
3    A. I have not reviewed this form. I have not
4  reviewed the unredacted form.
5    Q. As you sit here today, do you have any
6  recollection as to what the expected point sales could
7  be generated through the new inventory Ritz-Carlton
8  ceded into the NATO Trust?
9    A. I do not.
10   Q. Was it over $100 million?
11   MR. SELLINGER: Objection to form.
12   A. I'd be spitballing a number. I don't -- I
13 don't know.
14   MR. REISER: Let's take a break.
15   THE VIDEOGRAPHER: This is the end of
16   video number one. We're going off the
17   record. The time is 11:51 a.m.
18      (Brief recess.)
19   THE VIDEOGRAPHER: Here begins media
20   number two in the deposition of Mr. Lee
21   Cunningham. We're back on the record. The
22   time is 12:04 p.m.
23      Counsel, you may proceed.
24 BY MR. REISER:
25   Q. I'm going to try to get through the rest of

Page 69

18 (Pages 66 - 69)

1  the bullet points on the first page of Exhibit 2136.
2  We've gone through the RCDC Trust issue. That's
3  number one.
4      Number two is related, I guess. "Unwinding
5  the RCDC Bleu Florida Land Trust and transferring the
6  underlying inventory to the NATO Trust."
7      That's the inventory that basically netted
8  out each other?
9    A. That's correct.
10    Q. The third one, "Transferring the remaining
11  Ritz-Carlton Destination Club core inventory to the
12  NATO Trust."
13      That's the developer inventory we were
14  talking about just before the break -- the San
15  Francisco, the Tahoe, and the fractionals that were
16  left in Jupiter and St. Thomas and Vail?
17    A. That's correct.
18    Q. And "Selling the remaining assets where
19  possible, both dispositions," that pertained to, for
20  instance, the 19 units that were ultimately sold to --
21  just recently -- in 2015, '16 -- San Francisco --
22  right -- the 19 units that was a bulk disposition of
23  the other assets in The Ritz-Carlton Destination Club?
24    A. I don't know whether it was referring to
25  those specific units at that time, but it would be

Page 70

1  was included in the transfer of the remaining core
2  inventory. Some of it was and some of it wasn't. For
3  instance, in the case of Aspen, it wasn't. But, in
4  part, that was ultimately done. And we continue
5  through the process of any loose assets that are out
6  there.
7    Q. So let me just show you a document we marked
8  yesterday as Exhibit 2235. It's the minutes. Here it
9  is.
10      If you look at the second page of this
11  document, does this -- first of all -- does this
12  appear to you to be the meeting minutes from the
13  corporate growth committee that matches up with the
14  exhibit -- the prior exhibit -- the May 24, 2012
15  corporate growth committee memo?
16    A. Yes.
17    Q. And can you read the section on the bottom
18  under "RCDC condominium strategy" to yourself and let
19  me know whether that helps you refresh your
20  recollection as to the outcome of what happened
21  following the corporate growth committee meeting on
22  May 24th?
23    A. Yes. It was delegated to a smaller group --
24  decisions.
25    Q. If you compare -- strike that. Yesterday,

Page 72

1  referring to, potentially, the Abaco club, any whole
2  ownership or land interests that we had elsewhere.
3    Q. I keep seeing something about Cabrita Point.
4    A. Cabrita Point is -- we have some lots that
5  are on a piece of land that is adjacent to The
6  Ritz-Carlton Club, St. Thomas.
7    Q. Did that ultimately get sold off; do you
8  know?
9    A. I still have some. I'd be glad to sell you
10  one if you'd like one. It's been cleared.
11    Q. I'll go down there and hang out with Randy
12  Mercer. Just kidding. Strike that.
13    MR. REISER: Jess, I'm just joking.
14  BY MR. REISER:
15    Q. Number five, "Ceasing all future RCDC
16  specific sales and marketing activities."
17      That was the fifth item on this request;
18  true?
19    A. That's correct.
20    Q. So in order to shortcut this, hopefully, a
21  bit, even though you can't tell me that these five
22  points -- these five requests were approved on
23  May 24th, would you tell me -- could you say that all
24  these five were ultimately approved or --
25    A. Yeah. Certainly one, two. I don't know what

Page 71

1  Steve Weisz testified that he was not a member of the
2  corporate growth committee; although, he essentially
3  has the power to either ratify or not ratify any
4  decision coming out of the growth committee.
5      Is that your understanding?
6    A. That's correct.
7    MR. SELLINGER: Objection to form.
8    A. The way that structure is, Steve is not a
9  voting member of the strategic council -- I mean, of
10  the corporate growth committee. But then the
11  recommendations from that group are either ratified or
12  rejected by him.
13  BY MR. REISER:
14    Q. This is a little different because I don't
15  see a "ratified" on it. I compared it to another
16  minutes. I'll show you the minutes from a corporate
17  growth committee dealing with the Ritz-Carlton,
18  San Francisco a year later on 10/21/13.
19      On that minutes, it says, "Steve Weisz was
20  present and ratified both decisions." I don't see
21  that same language in the May 24, 2012 minutes.
22      My question is, is that because he basically
23  delegated to a smaller group, including you, Jim
24  Hunter, and John Geller, as to whether to proceed with
25  this following legal review?

Page 73

19 (Pages 70 - 73)

1    MR. SELLINGER: Objection to form.
2    A. I believe what this would indicate is, it was
3  delegated to the smaller group to make a
4  recommendation to approve that. Ultimately, he would
5  still have to ratify that agreement.
6  BY MR. REISER:
7    Q. So did yourself, Jim Hunter, and John Geller
8  approve the proposal ultimately?
9    A. I don't recall. As we just discussed, many
10  of these things happened. I don't know what
11  adjustments were made to the approval, but we reviewed
12  it and, I guess, approved in part.
13    Q. At least one part that you didn't approve was
14  the developer-owned inventory in Aspen; right? That's
15  one of the ones you mentioned. That turned out not to
16  be allowed into the trust. True?
17    A. If that was called out as a specific
18  component, it would have -- then, yeah, we would have,
19  through the legal review, determined that we didn't
20  have the authority to do that.
21    Q. Would there be another set of minutes that
22  would have approved your -- the smaller committee
23  meeting that you just described between Geller,
24  Hunter, and yourself?
25    MR. SELLINGER: Objection to form.

Page 74

1    A. I don't -- I don't know whether there is a --
2  I'm trying to think if there was an occasion where the
3  outcome of that smaller group is then brought back to
4  CGC for approval. I don't recall in this particular
5  instance whether there was or wasn't.
6  BY MR. REISER:
7    Q. Okay. Let me put it this -- let me kind of
8  go through these point by point so we don't have to --
9  and I'll try to make this quick. I don't want to
10  belabor it too much.
11    At some point, number one on the first
12  page -- the first request -- converting the existing
13  105 trust owners -- that was ultimately undertaken, so
14  that would indicate to you that the smaller group
15  approved that aspect and it was ultimately ratified by
16  Steve Weisz. Is that true?
17    MR. SELLINGER: Objection to form.
18    A. What I would see in that last bullet of the
19  minutes is that they approved committing that
20  $2 million to -- and the 1.5 in transaction costs --
21  that was the point one.
22  BY MR. REISER:
23    Q. Okay. So that was approved at that original
24  meeting?
25    A. That's what I read here. It had a smaller

Page 75

1  group to manage the process.
2    Q. Number two was related to that. Would you
3  agree that that's the same answer?
4    A. Yes. We would've -- yeah -- I would think
5  that would have ultimately been approved, because it
6  ultimately happened.
7    Q. Number three, understanding that there might
8  have been some changes to what the core inventory was
9  introduced into the trust, ultimately, at least, the
10  inventory that we discussed before the break -- the
11  San Francisco, the Tahoe, the Vail, the Jupiter, and
12  St. Thomas inventory -- fractional inventory -- was
13  indeed ultimately approved to be ceded into the trust.
14  True?
15    MR. SELLINGER: Objection to form.
16    A. Ultimately, the inventory from those -- the
17  ones that you cited were ceded into the trust, so they
18  were approved to go into the trust.
19  BY MR. REISER:
20    Q. Do you know whether Steve Weisz would have
21  had to ratify that decision or do you think you had
22  the authority to do that under the terms of the
23  minutes that are set forth in 2215?
24    A. I don't think he is required to ratify
25  inventory being ceded into the trust.

Page 76

1    Q. All right. But that was requested in this
2  May 24, 2012 memo. True?
3    A. Yes.
4    Q. And is it true then that you believe that the
5  outcome of the May 24, 2012 corporate growth committee
6  was that it was approved that a smaller group,
7  including yourself, Jim Hunter, and John Geller, would
8  make the decision as to which of the inventory would
9  go into the trust?
10    A. Yeah, based on further advice from counsel.
11    Q. Okay. Number four, "Selling the remaining
12  assets where possible," that was ultimately approved
13  by Mr. Weisz. Is that true?
14    MR. SELLINGER: Objection to form.
15    A. I believe the concept -- not knowing what
16  exact bulk dispositions or other assets were being
17  called out here -- each of those dispositions would
18  require another trip to the corporate growth
19  committee.
20    MR. REISER: Okay. I'm just going to ask
21  again, Counsel, for Marriott to check and see
22  if there are any other corporate growth
23  committee MOUs that pertain to number four
24  that postdate this memo. I'll put this in an
25  e-mail.

Page 77

20 (Pages 74 - 77)

1    MR. MARX: I think other ones have been
2    provided, though.
3         MR. REISER: Okay. Yeah, yeah.
4         MR. MARX: There's the two relating to
5    San Francisco.
6         MR. REISER: Got you. In terms of the
7    bulk sale, yeah. Good point.
8    BY MR. REISER:
9         Q. Number five, "Ceasing all future RCDC
10   specific sales and marketing activities," that was
11   approved at the May 24, 2012 meeting; was it not?
12        A. I don't recall. It's not called out in the
13   memo specifically that that was approved at that
14   point.
15        Q. So the evidence in the case, without showing
16   you all these documents, is it your recollection that
17   the sales and marketing activities for the RCDC
18   stopped in 2012?
19        MR. SELLINGER: Objection to form.
20        A. I don't recall whether it was 2012. And we
21   continued to sell on a smaller scale at a number of
22   locations, sometimes through brokers or whatever, but
23   not -- it didn't cease in 2012 and never resume.
24   BY MR. REISER:
25        Q. I got you. Let me go through some documents

Page 78

1         A. Across the Ritz-Carlton Clubs versus at the
2    individual clubs.
3         Q. The second bullet point, under the luxury
4    segment reengineering, states, "The communication
5    related to the evolution of the RCDC project has not
6    been well received by many members. Several boards
7    have made their concern known to us."
8         So did you write that?
9         A. No.
10        Q. Who actually wrote this, these strategic
11   council luxury segment updates?
12        A. They generally come from a document that is
13   provided to me by the asset manager -- in this case,
14   probably Stephanie Sobeck -- maybe Mary Lynn Clark,
15   depending on timing -- and then lifted and moved into
16   this document.
17        Q. So the process -- I think I understand --
18   would be that -- because we've seen these things
19   called "Business review reports" that come out every
20   month.
21        A. That's correct.
22        Q. So you get reports from the asset managers on
23   certain properties through the business review
24   reports. True?
25        A. That's correct.

Page 80

1    on the strategic council.
2         So we've gone through the May 24th corporate
3    growth committee. We've seen strategic plan, parts of
4    which were approved that day; other parts of which
5    were either nuanced and approved later on. I want to
6    turn now to the strategic council documents.
7         I'll show you first the August 8, 2012,
8    strategic council meeting or memo -- luxury segment
9    update -- Exhibit 2143.
10        So what I'm going to ask you to do is turn to
11   the project updates portion of these memos as I show
12   them to you. Okay? This one is starting on the fifth
13   page.
14        The first box -- this is the first time
15   you're seeing this, at least in this deposition -- you
16   see on the left side, it says, "Luxury segment
17   reengineering" on this project?
18        A. Yes.
19        Q. And that was your term?
20        MR. SELLINGER: Objection to form.
21        A. Like I said before, I don't know who coined
22   the phrase, but that came to be the term that we used
23   for anything that we were doing across the clubs.
24   BY MR. REISER:
25        Q. Across the Ritz-Carlton Clubs; right?

Page 79

1         Q. On a monthly basis?
2         A. Periodic.
3         Q. Periodic. Period nine, how does that work at
4    Marriott?
5         A. Up until last year, Marriott was -- or
6    Marriott Vacations was on a 13-period financial
7    calendar -- 13 28-day periods. So as you get through
8    the year, period nine has some August and some
9    September in it.
10        Q. So the periods are just 13 periods a year
11   instead of 12?
12        A. That's correct.
13        Q. So 13 times a year, you get reports --
14   business review reports -- from the asset manager for
15   Ritz-Carlton. That would be how you become informed
16   about what's happening at every property; right?
17        MR. SELLINGER: Objection to form.
18        A. We would get those reports, in general, on a
19   period basis. I'm sure there were times where we
20   didn't.
21   BY MR. REISER:
22        Q. Sure. I'm not suggesting it might not have
23   been missed once or twice. But as a general practice,
24   the purpose of these business review reports was to
25   have the asset manager, who was more hands-on with the

Page 81

21 (Pages 78 - 81)

1 property, report what was going on with that property
2 up to yourself. True?
3     A. That's correct.
4     Q. And somebody would take -- who would take the
5 content of the business review report and select what
6 to put into the strategic council report?
7     A. It's varied over time. Generally, someone in
8 our finance and accounting organization, or whatever,
9 would take those -- that information, move it into the
10 different format. And then I would look at it for --
11 are there things that just don't -- aren't of the
12 level that need to go to the strategic council, and
13 take those out. But I wouldn't wordsmith anything.
14     Q. You wouldn't wordsmith anything, but would
15 you look at a draft of the luxury segment update and
16 take some stuff out if you didn't think it was
17 appropriate for the strategic council or maybe add
18 something if you thought it was?
19        Is that fair?
20     A. That's a fair assessment.
21     Q. And that was your practice through 2012, '13,
22 and '14?
23     A. Yes.
24     Q. Is there any doubt in your mind that any of
25 these strategic council documents that have been
                                              Page 82

1 produced by your counsel here are authentic?
2     A. What do you mean?
3     Q. That they're true and correct copies of what
4 they purport to be?
5     A. I have no reason to believe they wouldn't be.
6     Q. Okay. Let's go to the August 30th report.
7 It's Exhibit 2144.
8        Turning to the last page of this document,
9 I'm interested in the entries under the Bachelor Gulch
10 club. It says, "Board hired HVS, Mark Earle, to study
11 the impact on the value of the members' investment
12 based on the company's recent decisions."
13        You were aware, were you not, that the board
14 at Bachelor Gulch hired Mark Earle to study the impact
15 of the proposed affiliation on the value of the
16 Bachelor Gulch members' investment?
17     A. Yes.
18     Q. Did you ever get a chance to read that
19 report?
20     A. Not that I recall.
21     Q. Did you ever hear from Mike Mullenix or
22 anybody else at Bachelor Gulch that Mark Earle
23 determined that the affiliation would have a negative
24 effect on the members' interests?
25     A. I don't recall.
                                              Page 83

1     Q. Let's go to the September 27th one,
2 Exhibit 2145. On this one, I want to ask you about
3 the general box "luxury segment reengineering" on the
4 top of page 5. On each of these reports, it seems
5 like the box "luxury segment reengineering" starts out
6 with the status of the unwinding of the portfolio
7 product and the reacquiring of the land -- the Bleu
8 Florida Land Trust inventory. True?
9     A. Right.
10     Q. Ultimately, it's true, is it not -- so I
11 don't have to go through every one of these -- it's
12 true that Ritz-Carlton Destination -- or Ritz-Carlton
13 Development Company was able to reacquire all the
14 interests in the Bleu Florida Land Trust?
15     A. That's correct.
16     Q. And it collapsed the trust and terminated it.
17 True?
18     A. That's correct.
19     Q. So right under that one, there's a second
20 bullet point that, again, repeats what is said in
21 earlier ones about the members not being happy about
22 the evolution communication.
23        This one adds, "We have had conference calls,
24 a webinar, one-on-one meetings, and a meeting with
25 Steve and me and the board president and secretary of
                                              Page 84

1 Bachelor Gulch. Communication with the members will
2 continue in coming months."
3        As of September 27, 2012, would you agree
4 that there had been no affiliation decisions made at
5 any club at that point in time --
6        MR. SELLINGER: Objection to form.
7 BY MR. REISER:
8     Q. -- in terms of a new affiliation with the
9 Marriott Vacation Club?
10     A. We hadn't made any final determinations. We
11 had communicated our intent to do that in the
12 evolution letter.
13     Q. The next one is October 25, 2012,
14 Exhibit 2147. Starting off with the page 5 box,
15 "luxury segment reengineering," there's some
16 information -- new information -- updated in this
17 period's report.
18        After stating again that the evolution
19 communication was not well-received, it adds some new
20 information. It states, "We have developed a
21 communication plan outline related to future
22 communications of the evolution."
23        That was different than the next sentence.
24 It says, "We have also spoken to a couple of PR firms
25 to provide input into our plan and assist with ongoing
                                              Page 85

22 (Pages 82 - 85)

1  communication."
2      Was that plan -- strike that. Was it
3  ultimately -- strike that. Is it true that,
4  ultimately, Marriott Vacation Worldwide hired APCO to
5  help in the communication to the members on the
6  evolution?
7      MR. SELLINGER: Objection to form.
8  A. I believe that we -- we ultimately engaged
9  APCO, I believe, through -- our law department engaged
10  them to help with communications.
11  BY MR. REISER:
12  Q. The last sentence in the box, it says, "The
13  primary focus on the going-forward communication plan
14  is the individual members, shifting the focus away
15  from the boards."
16      Why was that decision made to shift the
17  communication to members versus the boards?
18  A. My only recollection there was, we felt like,
19  in the case of Bachelor Gulch specifically -- really,
20  the only one that I remember -- that the board -- we
21  didn't feel like the board was properly communicating
22  everything to the members. So we wanted to make sure
23  that we had communications to the members so that they
24  were fully informed.
25  Q. So do you remember, following this October
Page 86

1      Do you remember receiving all these letters
2  now that your recollection has been refreshed?
3      MR. SELLINGER: Objection to form.
4  A. I received the one certainly from Aspen and
5  from St. Thomas. The one from Bachelor Gulch went to
6  Ms. Egolf. I was aware of its existence.
7  BY MR. REISER:
8  Q. So was it the Bachelor Gulch one that went to
9  Ms. Egolf or the St. Thomas one?
10  A. Mountain Law, so...
11  Q. Okay. One other question on the strategic
12  council report dated October 25, 2012.
13  A. Oh, this one.
14  Q. It's under the Aspen Highlands box on page 6.
15  The first bullet point states, "The new board elected
16  10/13/2012." It says, "Pressure from membership
17  during meeting applied to the board to fight the RCDC
18  evolution."
19      Do you remember discussing that sentence with
20  folks on the strategic council in this October
21  meeting?
22  A. I don't recall.
23  Q. You were aware, though, that the sentiment at
24  the -- at least at the board meeting on -- or the
25  annual meeting on 10/13/2012 -- you were aware that
Page 88

1  25, 2012 strategic council memo, that there were at
2  least three clubs that sent cease-and-desist letters
3  to yourself and Mr. Weisz with regard to the plan for
4  the reengineering of the luxury segment?
5  A. I recall seeing the cease-and-desist from
6  Bachelor Gulch; I believe, Aspen, but I don't recall
7  the third.
8  Q. You don't recall the St. Thomas -- did I say
9  Jupiter or St. Thomas?
10  A. I don't recall.
11  Q. I don't recall either. Long day already.
12  Let me try to find the letter that we marked yesterday
13  and see if I can refresh your recollection.
14      MR. SELLINGER: Once again, I don't think
15  this relates to the subsequently-produced
16  documents.
17  BY MR. REISER:
18  Q. I'll show them to you all at once. An
19  exhibit previously marked as 1806 is a letter from
20  John -- James Deere on behalf of the St. Thomas club.
21  There's another letter, Exhibit 1807, which is a
22  December 18, 2012 letter from the Mountain Law Group
23  on behalf of the Bachelor Gulch association. And
24  there's also Exhibit 1135, which is the November 21,
25  2012 cease-and-desist letter from the Aspen Club.
Page 87

1  membership at that meeting applied pressure on the
2  board to fight the RCDC evolution?
3      MR. SELLINGER: Objection to form.
4      MS. LIVINGSTON: Object to form.
5  A. I wasn't at the meeting, so I have no idea.
6  I can read the words on the page and don't know
7  whether they're accurate or what. I wasn't there and
8  didn't write the words.
9  BY MR. REISER:
10  Q. So I understand you weren't at the actual
11  meeting. But the question was actually -- was it
12  discussed at the strategic council meeting on
13  October 2012, this subject that the membership at
14  Aspen was applying pressure to the board to fight the
15  RCDC evolution?
16  A. I don't recall.
17      MR. SELLINGER: Objection to form.
18      MS. LIVINGSTON: Object to form.
19  A. I don't recall.
20  BY MR. REISER:
21  Q. Let's turn to Exhibit 2148. Well, actually,
22  sticking with the last one for one second -- the
23  bullet point right under the one we just went -- there
24  was a call between Stephanie Sobeck and the new board
25  president this week to schedule face-to-face
Page 89

23 (Pages 86 - 89)

1  discussion with the board related to the evolution.
2      Do you remember a meeting the following
3  month, in November 2012, where Randy Mercer met with
4  yourself in Orlando?
5      A. I remember meeting with Randy in Orlando.
6  Not exactly sure on the timeframe.
7      Q. Was the issue that the members were asking
8  the new board to fight the RCDC engineering --
9  reengineering -- discussed at that November 2012
10  meeting with Randy Mercer in Orlando?
11      MR. SELLINGER: Objection to form.
12      A. I don't recall.
13      MS. LIVINGSTON: Object to form.
14      A. I don't recall what was discussed at that
15  meeting.
16  BY MR. REISER:
17      Q. How often is it that a president of a --
18  strike that. Can you think of any other time that a
19  president of one of the boards at the Ritz-Carlton
20  Destination Club traveled solo to Orlando to discuss
21  with you issues regarding the board's responsibilities
22  at a given club?
23      A. I don't recall any other solo meetings with a
24  board president.
25      Q. Do you remember whether Randy Mercer brought

Page 90

1  his wife on that trip?
2      A. No idea.
3      Q. Do you remember anything about where he
4  stayed during that trip? There's some evidence that
5  there were two rooms --
6      A. No idea.
7      Q. -- at the Ritz-Carlton at Grande Lakes, the
8  one out here in Orlando -- that two rooms were
9  procured for Randy Mercer and his wife for the purpose
10  of this November 2012 meeting.
11      Do you remember anything about that?
12      MR. SELLINGER: Objection to form.
13      A. I have no knowledge of any of that.
14      MS. LIVINGSTON: Object to form.
15  BY MR. REISER:
16      Q. So turning to the January 17, 2013 luxury
17  segment update, it's Exhibit 2148. If you can turn to
18  page 4 of this one? Under the "luxury segment
19  reengineering" box, it, again, gives an update on the
20  109 RCDC portfolio members.
21      The second primary bullet point under this
22  box states, "Based on recently-filed claim in
23  Minnesota, we are reevaluating go-forward strategy."
24      Do you remember receiving a complaint by two
25  brothers named Hoyt that sued Marriott Vacation Club

Page 91

1  for the RCDC reengineering efforts?
2      A. I didn't receive a complaint, but I remember
3  the company received a complaint.
4      Q. Okay. Is that the complaint that is
5  referenced here -- based on recently-filed claim in
6  Minnesota? I'll just tell you, the Hoyt case was
7  filed in Minnesota.
8      A. Yes.
9      Q. What was it about that case that caused the
10  re-evaluation of the go-forward strategy?
11      A. I really -- I have no idea.
12      Q. Do you have any recollection at all,
13  Mr. Cunningham, as to, like, who wrote the strategic
14  council reports on a given month? I would expect not,
15  but I'm just asking you for completeness sake.
16      A. No. I mean, it would generally be the asset
17  manager responsible for the club, so I don't know in
18  any particular month.
19      Q. Following the Minnesota filing, it looks like
20  the current thinking was -- bullet point number --
21  "Move forward with putting the Northstar and San
22  Francisco inventory into the NATO Trust."
23      That ultimately happened. True?
24      A. That's correct.
25      Q. And then the second bullet point, "Go club by

Page 92

1  club and attain a majority vote of the members
2  endorsing the affiliation of their club with Lion &
3  Crown."
4      Did the concept of a majority vote of the
5  members first get raised following the Minnesota
6  claim?
7      A. I don't know the timing of whether that's
8  what prompted it or whether that concept was being
9  considered prior to that.
10      Q. The fourth bullet point states, "That
11  strategy would be to mount an aggressive
12  communication, education, marketing campaign aimed at
13  the member base for each club to give us the best
14  chance of success."
15      What does that sentence mean to you?
16      A. It means that we wanted to make sure that we
17  were providing the information -- the full
18  information -- necessary for members to make an
19  educated decision on how to -- on whether to support
20  the affiliation or not.
21      Q. Was the aggressive communication, education,
22  marketing campaign undertaken ultimately by APCO?
23      A. I don't recall.
24      Q. Was it undertaken by anybody; do you recall?
25      A. I don't recall whether what was contemplated

Page 93

24 (Pages 90 - 93)

1  here was ever executed or not.
2      Q.  Then the fourth bullet point was "Based on
3  the outcome of the vote at each club, either affiliate
4  or not."
5          Do you see that?
6      A.  I do.
7      Q.  As of January 2013, was it the plan, do you
8  know, to have a vote at each club and let the club
9  decide as to whether to affiliate or not?
10      A.  The concept of having each club be able to
11  vote or, later, survey -- respond to their desire to
12  affiliate was obviously in play at this point in time.
13      Q.  Yesterday, I discussed with Mr. Weisz a
14  document that had been marked in an earlier deposition
15  as Exhibit 1020.  It's a document entitled, "Marriott
16  Vacation Worldwide Corporation, Marriott International
17  update."  It's dated on the cover, February 28, 2012.
18  I think, as you can see from the context of reviewing
19  it, that it's misdated and it should be February 28,
20  2013.
21      A.  All right.
22      Q.  Because some of the stuff they talked about
23  happened after February 28, 2012.  I want to ask you a
24  few questions about the update.
25          First of all, would you agree with me that

Page 94

1  this document is misdated?  I don't think it's very
2  controversial.  Steve Weisz was --
3      A.  Let's see.
4      MR. REISER:  Want to stipulate --
5      MR. MARX:  We can discuss it.
6      THE WITNESS:  I'm sorry?
7      MR. MARX:  Nothing.
8      THE WITNESS:  I was trying to put out
9  this note to one of the strategic council
10      documents around the same time, but -- I
11      thought I saw those numbers.
12  BY MR. REISER:
13      Q.  I just want to ask you some general questions
14  about this at this point.  Maybe the date isn't as
15  important as the next question.
16          I'm just wondering why there's periodic
17  updates to the Marriott International company with
18  regard to the reengineering of the luxury segment?
19      A.  I don't recall why that would occur -- would
20  occur post spinoff of our company.  There must have
21  been some agreement that we would update them.
22      Q.  Okay.  Getting to a couple questions about
23  Marriott International and its subsidiary, the
24  Ritz-Carlton Hotel Company -- you're aware, are you
25  not, that the Ritz-Carlton Hotel Company has a

Page 95

1  co-management agreement at the Ritz-Carlton Clubs with
2  the Ritz-Carlton Management Company?
3      A.  That's correct.  Well, they have a
4  sub-management agreement to operate the onsite
5  activities.
6      Q.  Okay.  So I know I'm skipping around a little
7  at this point.  I'm trying to just be efficient.
8          The questions earlier about the November 2013
9  affiliation agreement that we started off this
10  deposition on, was that affiliation agreement provided
11  to John Hearns or any of the individual general
12  managers representing Ritz-Carlton Hotel Company on
13  the site?
14      A.  I have no idea.
15      Q.  Is there any reason you can think of that it
16  wouldn't be given to them?
17      MR. SELLINGER:  Objection to form.
18      A.  I don't know why we -- I can't think of a
19  reason why we would or wouldn't necessarily provide
20  that integration agreement to them.
21  BY MR. REISER:
22      Q.  I don't have a full copy of this, I don't
23  think -- Exhibit 1897.  I think I can bring it up to
24  the board.  I just have one question about this.  It's
25  the amended and restated club onsite management

Page 96

1  agreement between the Ritz-Carlton Hotel Company,
2  manager, and the Ritz-Carlton Management Company,
3  hotel.  It's dated November 21, 2011.
4      MR. SELLINGER:  Why don't you -- if
5      you're going to do it, give him your copy and
6      you can pull up on the screen what you
7      want --
8      MR. REISER:  No problem.  Let me find
9      what -- I thought I made copies of this right
10      before the dep.
11  BY MR. REISER:
12      Q.  I'm going to ask you about paragraph 4.24 on
13  page 18.  I highlighted it for your convenience.
14  Paragraph 4.24 on page 18, can you take a look at
15  that?
16      A.  4.24?
17      Q.  Yes.  It deals with communication.  Again,
18  "The manager and the company" -- that's the
19  Ritz-Carlton Hotel Company and the Ritz-Carlton
20  Management Company -- "shall make good faith,
21  commercially-reasonably efforts to keep the other
22  informed regarding communications with and from the
23  association, the board, or any officers of the
24  association.  Manager and the company will copy the
25  other on any written communications sent to the

Page 97

25 (Pages 94 - 97)

1  association, the entire board or the entire
2  membership.  Manager and the company will also copy
3  each other on any formal written communication to one
4  or more board members of the board as a representative
5  or representative of the board."
6       Were you aware that there was this agreement
7  between the two managers to keep each other informed
8  of happenings and communications with the various
9  association boards?
10      A.  No.  I've never read this document from front
11  to back.
12      Q.  Do you know whether the custom and practice
13 of the Ritz-Carlton Management Company was to inform
14 the Ritz-Carlton Hotel Company of issues and
15 communications between the Ritz-Carlton Management
16 Company and the various boards?
17      MR. SELLINGER:  Objection to form.
18      A.  I know there was a practice to communicate
19 back and forth and keep each other informed.  I don't
20 know to what degree or at what level that was
21 executed.
22 BY MR. REISER:
23      Q.  So given that the affiliation agreement, as
24 you testified earlier this morning, imposed duties
25 upon the association to facilitate members of the

Page 98

1  that's -- whether there's -- there is or isn't a
2  denotion -- I'm sure there is -- between owner and
3  other occupants.  Other than that, I don't know.
4       Q.  All right.  I guess we'll ask Hearns about
5  that next week or early June, since we now have some
6  dates.
7       Let me just go over the October 21st, 2013
8  corporate growth committee document.  It's previously
9  marked as Exhibit 2137.  This is a corporate growth
10 committee memo prepared by Stephanie Sobeck and John
11 McGowan.
12      Do you remember this corporate growth
13 committee request?  I'll read the request for the
14 record.
15      "The purpose of this submission is to provide
16 corporate growth committee an update on the current
17 state of member satisfaction to the Ritz-Carlton,
18 San Francisco club, and a plan approval of the
19 financial impact associated with the presentation of
20 board exit options for the members of the Ritz-Carlton
21 Club, San Francisco."
22      Do you remember this memo being presented
23 to the corporate growth committee related to the
24 San Francisco club?
25      A.  Yes.

Page 100

1  Marriott Vacation Club use of The Ritz-Carlton
2  Destination Club, and given that the onsite management
3  at the various clubs was performed by RCHC, the hotel
4  company, wouldn't it have been important to update the
5  onsite management of this new affiliation
6  arrangement --
7       MR. SELLINGER:  Object to form.
8  BY MR. REISER:
9       Q.  -- in your opinion?
10      A.  I don't think so, only because the RCHC is
11 going to interact with customers that are -- whose
12 reservations are delivered to them via the reservation
13 system, through the property management system, and
14 then service all those customers equally.
15      So they're not involved in the exchange or
16 whatever.  They're just -- they get a customer, they
17 check them in, take care of them, and deliver the
18 services.
19      Q.  But they're aware if this customer is coming
20 in through the Marriott affiliation versus the home
21 club membership or a sister club membership; aren't
22 they?
23      A.  I don't know how the arrivals manifest -- are
24 denominated or denoted.  Whether they come in as Lion
25 & Crown guests, MVCD guests, I don't know how

Page 99

1       Q.  Did you have any role in preparing this memo?
2       A.  I didn't author it.  I may have reviewed it
3  at some point.  Obviously, I was a recipient of it as
4  a member of the corporate growth committee.
5       Q.  I'll just leave it at that.  I think I
6  sufficiently asked Ms. Sobeck about this one.
7       And the last two corporate growth committee
8  documents I want to ask you about are the two that
9  were related to the bulk sale of the San Francisco
10 units.  Those are -- the first one is dated August 19,
11 2014.  It's Exhibit 2138.  The second one is dated
12 November 10, 2015, and is Exhibit 2139.
13      So I want to ask you just about these in
14 tandem.  Have you reviewed these corporate growth
15 committee memos in preparation for the depo?
16      A.  Yes.
17      Q.  The August 19, 2014 and the November 10, 2014
18 memos both deal with what to do with 19 residential
19 units that were originally slated for the fractional
20 offering, but ultimately were de-annexed from the
21 fractional offering and annexed into the whole
22 residence offering.  True?
23      A.  That's correct.
24      Q.  As of 2014, the strategy was to just do a
25 residential conversion, wherein Ritz-Carlton's own

Page 101

26 (Pages 98 - 101)

1  sales team would sell the unit and they would be
2  marketed as Ritz-Carlton residences.
3      Is that true?
4      A. That was the August 19th recommendation.
5      Q. What I want to ask you about on the
6  August 19th memo is, the decision to request of the
7  corporate growth committee that these 19 units be
8  handled in the fashion I just described, as a sales
9  effort by Ritz-Carlton under Ritz-Carlton residences,
10  isn't it true that there was a choice at that point
11  that you were making between the sale of these
12  19 units in-house, if you will, versus a bulk
13  disposition to an outside source?
14      MR. SELLINGER: Objection to form.
15      A. I don't believe there was a decision at that
16  point. What the -- August 19th was coming off of a
17  timeframe where we had been selling some other whole
18  ownership inventory in San Francisco, and the request
19  was to finish the development of those units, the
20  remaining 19 units, and then sell them through our
21  sales activities -- continue our existing sales
22  activities and sell those units. That's what was
23  being requested.
24  BY MR. REISER:
25      Q. Okay. In that request, you were explaining

Page 102

1  why that was the route you were requesting versus a
2  bulk disposition. True?
3      MR. SELLINGER: Objection to form.
4      A. That was what the request was. I didn't --
5  once again -- didn't author this. I sponsored it to
6  come forward for consideration. There were several
7  options that were considered and a description of the
8  pros and cons of each.
9  BY MR. REISER:
10      Q. Okay. Got it. The first potential option
11  was just taking these 19 units and putting them into
12  the NATO Trust; right?
13      A. That's correct.
14      Q. And is it true that the thinking was to not
15  do that because the NATO Trust, at that point in time,
16  had enough inventory, and that the inventory that was
17  to be transferred from San Francisco had maintenance
18  fees that were three times higher than the other
19  inventory that was in the trust?
20      MR. SELLINGER: Objection to form.
21      A. The evaluation looked at what the impact of
22  adding that inventory in -- did we need more -- was it
23  beneficial to the members as a whole of the MVCD
24  program to have more Ritz-Carlton, San Francisco
25  inventory, or did they already -- was there already

Page 103

1  enough inventory present, as well as what the cost of
2  that inventory is.
3      The assumption here -- the recommendation was
4  that it wasn't the right thing to add that inventory.
5  BY MR. REISER:
6      Q. Is it true that one of the reasons that
7  decision was made is because of the high maintenance
8  fees attached to the San Francisco inventory as
9  compared to the maintenance fees that were more
10  typical in the trust?
11      MR. SELLINGER: Objection to form.
12      A. When you compared the maintenance fee for
13  points that would be sold or issued from that
14  inventory, and the cost of that maintenance fee to --
15  in comparison to the rest of the Marriott Vacation
16  Club product -- it was a much higher maintenance fee
17  per point.
18  BY MR. REISER:
19      Q. And the maintenance fees in San Francisco
20  were a buck-20 -- strike that. I think that's
21  probably enough there.
22      The second option that was discussed was a
23  bulk disposition of the property. True?
24      A. The second in this list, yes, sir.
25      Q. And the description there of the alternative

Page 104

1  solutions was -- under bulk disposition was -- "Due to
2  entitlement restraints, the strength of the
3  San Francisco real estate market, potential negative
4  consequences to the association, and the long-term
5  impact of the bulk sale at Northstar, it has been
6  deemed that a bulk disposition is not an attractive
7  strategy."
8      I want to ask you about that last one, the
9  long-term impact of the bulk sale at Northstar. Do
10  you know what's meant by that?
11      A. I believe that the main issue there was, the
12  bulk purchaser in Northstar was not as prompt in
13  paying their association dues and it was -- it put
14  strain on the association at Northstar to continually
15  manage that accounts payable or receivable.
16      The other thing is that -- and the other
17  difference is -- in Northstar, that the way that deal
18  worked out was that it was creating whole ownership
19  where there wasn't whole ownership, which is a little
20  different than in San Francisco, because there was
21  already whole ownership in San Francisco. And it was
22  unbranded whole ownership. It wasn't Ritz-Carlton
23  branded.
24      Q. Stephanie Sobeck testified, when I was asking
25  her about this -- and she was one of the authors,

Page 105

27 (Pages 102 - 105)

| | |
|---|---|
| 1　along with yourself, of this memo -- that one of the | 1　we should take a break anyway.  If you guys |
| 2　problems with the bulk sale at Tahoe was, it created | 2　collectively are ten minutes, we'll do it |
| 3　some confusion.  When you walked into the lobby area, | 3　quickly. |
| 4　you had Constellation product on one desk and | 4　　　MR. FERGUSON:  I've got more. |
| 5　Ritz-Carlton fractionals at another desk. | 5　　　MR. REISER:  Let's take ten. |
| 6　　　Would you agree with that? | 6　　　MR. SELLINGER:  How long do you think? |
| 7　　　MR. SELLINGER:  Objection to form. | 7　　　MR. FERGUSON:  Half-hour. |
| 8　　A.  Well, I don't -- that's back to the -- in the | 8　　　MR. SELLINGER:  Let's go off the record. |
| 9　case of Tahoe, there was the unbranded or the | 9　　　THE VIDEOGRAPHER:  We're going off the |
| 10　Constellation and the Ritz-Carlton, and so it | 10　video record.  The time is 1:06 p.m. |
| 11　highlighted that there were two different products in | 11　　　(Brief recess.) |
| 12　the building. | 12　　　THE VIDEOGRAPHER:  We're back on the |
| 13　BY MR. REISER: | 13　video record.  The time is 1:27 p.m. |
| 14　　Q.  And then, ultimately, it seemed like the | 14　　　Counsel, you may proceed. |
| 15　San Francisco market got so hot over the next year | 15　　　(Exhibit 2244 was marked for |
| 16　that -- the next memo -- by November 10, 2015, the | 16　identification.) |
| 17　decision seemed to have been made to actually go back | 17　BY MR. REISER: |
| 18　to the bulk sale, and that's what ultimately | 18　　Q.  So I'm going to show you what I marked as |
| 19　happened. | 19　2244.  It's a Ritz-Carlton Destination Club general |
| 20　　　Is that a fair summary of what happened to | 20　managers conference call agenda dated October 8, 2014. |
| 21　these 19 units? | 21　　　Take a look at that.  I'm going to ask you |
| 22　　　MR. SELLINGER:  Objection to form. | 22　about a memo that's attached to this, that looks like |
| 23　　A.  Ultimately, we evaluated, again, the | 23　it was prepared by yourself, regarding some asset |
| 24　options -- bulk sale or continue on.  In November, | 24　management restructuring going on at that time. |
| 25　came back with a recommendation to go bulk sale, for a | 25　　　MR. SELLINGER:  Do you have a copy? |
| Page 106 | Page 108 |

| | |
|---|---|
| 1　number of reasons, depending -- that manifest | 1　　　MR. REISER:  Oh, sorry. |
| 2　themselves. | 2　BY MR. REISER: |
| 3　　　Over the timeframe between the memos, we were | 3　　Q.  Can you go ahead and take a look at the |
| 4　working on the entitlement so it could be sold as | 4　second page that starts with "Asset management |
| 5　whole ownership. | 5　restructuring and appointments"? |
| 6　BY MR. REISER: | 6　　A.  Yes. |
| 7　　Q.  But was one of the reasons that the decision | 7　　Q.  Do you recognize this document as being |
| 8　was made to change from selling out into the | 8　written by you?  If you see at the end, it says, |
| 9　Ritz-Carlton brand to just selling in a bulk sale was | 9　"Thank you.  Lee Cunningham."  You can go four pages |
| 10　that the market got hot enough that the developers | 10　later.  It appears to be a letter that you wrote to |
| 11　were coming in and making offers that made the numbers | 11　your folks. |
| 12　look better than the bulk sale numbers -- I mean, as | 12　　A.  Yeah.  I haven't reviewed this document in a |
| 13　far as the individual sale numbers? | 13　long time, so... |
| 14　　　MR. SELLINGER:  Objection to form. | 14　　Q.  But you do recognize it, at least, kind of at |
| 15　　A.  My memory is that the market had continued to | 15　a high level?  Take your time and look at it. |
| 16　heat up.  Our concern was more that, if we developed | 16　　　MR. SELLINGER:  While he's doing that, I |
| 17　it on our own, we would get caught on the downside of | 17　note -- not related to the |
| 18　that heat-up -- that super-heated market -- and not | 18　subsequently-produced documents, I assume. |
| 19　achieve the economics that we had expected. | 19　　　MR. REISER:  Well, I mean, they are |
| 20　　　MR. REISER:  I'm almost done.  Are you | 20　related.  These are from the hotel company, |
| 21　looking for a break right now? | 21　produced late, so... |
| 22　　　MR. SELLINGER:  It's been over an hour. | 22　　A.  I'm familiar with it. |
| 23　　　MR. REISER:  I probably have ten more | 23　BY MR. REISER: |
| 24　minutes. | 24　　Q.  I wanted to ask you about a couple points on |
| 25　　　MR. SELLINGER:  We'll take a -- I think | 25　this.  On the second page of your memo, on the |
| Page 107 | Page 109 |

28 (Pages 106 - 109)

1  paragraph starting with "In addition," do you see
2  that?
3      A. Yes.
4      Q. The last sentence to this says, "Given the
5  current size of the portfolio, as well as our current
6  strategy for this brand, I have made the decision to
7  integrate the responsibility for the remaining RCDC
8  resorts into the Marriott Vacation Club asset
9  management regional structure."
10         Did that end up being effectuated, that
11  decision?
12     A. Yes.
13     Q. So the third bullet point under the following
14  section, "Key focus areas for asset management" --
15  first of all, the -- actually, the first point on that
16  section of this letter, it says, "Optimization of
17  company owned and operated assets."
18         You state, "In this capacity, the asset
19  managers act as my in-market representatives within my
20  full delegated authority."
21         What's the purpose of that sentence?
22     MR. SELLINGER: Objection to form.
23     A. The structure in our organization, the field
24  operations don't report directly to me, but I have
25  responsibility for them; and this was giving the --

Page 110

1      MR. SELLINGER: Objection to form.
2      A. No. That wasn't my intent.
3  BY MR. REISER:
4      Q. Okay. And then, finally, the third -- the
5  last -- the sentence on the top of the following page,
6  I want to ask you a couple questions about that.
7  There's a statement that, "As a result, MVW's resort
8  operations team is not engaged in the management of
9  these locations, and, therefore, does not interact
10  with the COA boards at this location. The asset
11  management team is responsible to represent both the
12  management company and developer interests with these
13  COA boards. Association governance for these
14  locations is handled in concert with the Ritz-Carlton
15  Hotel Company."
16         Is that an accurate statement of the dynamic
17  between the asset management team and the COA boards
18  at the Ritz-Carlton Destination Clubs?
19     MR. SELLINGER: Objection to form.
20     A. What I'm communicating here is really that we
21  had a Marriott Vacation Club, which is not precisely
22  written, we have an operations team, and they're
23  not -- they're the interaction point with our Marriott
24  Vacation Club boards and locations. They're not for
25  The Ritz-Carlton Club, is what I was trying to

Page 112

1  communicating to the field operations that my asset
2  managers would represent me in their respective
3  markets.
4  BY MR. REISER:
5      Q. Okay. I'm not going to ask you about number
6  two. It looks like that's dealing with the Marriott
7  Vacation Club COA board.
8         Number three is entitled, "Interaction with
9  the Ritz-Carlton Destination Club COA boards as both
10  the management company and the developer
11  representative."
12         Then you state, "As you may recall, similar
13  to our MVC resorts, we (MVW) are the management
14  company for our Ritz-Carlton Destination Club
15  resorts."
16         Would you agree that that's an accurate
17  statement?
18     A. It's the Ritz-Carlton Management Company,
19  which is -- yeah -- would be the more accurate -- it's
20  a subsidiary or an entity within Marriott Vacations
21  Worldwide.
22     Q. It appears to me like you're essentially
23  saying there that the Ritz-Carlton Management Company
24  is the same thing as Marriott Vacation Worldwide, or
25  no?

Page 111

1  communicate.
2  BY MR. REISER:
3      Q. That's because there's really not a resorts
4  operations team at the Ritz-Carlton Club. RC Hotel
5  Company handles that; is that right?
6      A. That's correct.
7      Q. So because that's the dynamic at the
8  Ritz-Carlton Clubs, the asset management team
9  represents both the management company and the
10  developer at the Ritz-Carlton clubs; right?
11     MR. SELLINGER: Objection to form.
12     A. I believe that's correct.
13     MR. REISER: All right. I'm done with my
14  questioning. My colleague, Matt Ferguson,
15  has some questions for you.
16         I'm going to apologize in advance. I've
17  got to scoot out for a moment. I hope to be
18  back, but my room is up at the Grand Bohemian
19  across the street and I'm going to go check
20  out, and I hope to see you folks.
21         DIRECT EXAMINATION
22  BY MR. FERGUSON:
23     Q. Good afternoon, Mr. Cunningham. Matt
24  Ferguson again. I don't have very much for you.
25  Mr. Reiser covered quite a bit. I'm going to jump

Page 113

29 (Pages 110 - 113)

```
 1   around a little bit on some topics.
 2       My first one is pretty simple.  I've seen
 3   some of these corporate growth committee and strategic
 4   council documents, and there's talk about disposition
 5   of other assets.
 6       Real quickly, were there any assets like raw
 7   land that was in the RCDC portfolio or -- when I said
 8   RCDC, I meant Ritz-Carlton Development Company -- did
 9   they own any kind of raw land that had been planned
10   for other Ritz-Carlton Destination Clubs?
11       A.  I believe the only land designated for a club
12   would've been in Abaco.
13       Q.  We've had some clients at depositions
14   conducted by your lawyers who indicated that they
15   thought the salespeople were telling them there was
16   going to be an RCDC -- Ritz-Carlton Destination
17   Club -- we've got Ritz-Carlton Development Company
18   also -- but I'm talking about a club in South Beach.
19       Do you have a recollection of anybody
20   authorizing -- say there was going to be a club in
21   South Beach?
22       MR. SELLINGER:  Objection to form.
23       A.  There was a -- nobody was authorized to
24   represent that.  We had worked on a project in South
25   Beach that never got off the ground.
                                              Page 114
```

```
 1   BY MR. FERGUSON:
 2       Q.  Did you ever acquire property to do that?
 3       A.  I don't believe we owned any of the property.
 4       Q.  Did you dispose of any or get out of any --
 5   withdrawn.  Were there any contracts for the purchase
 6   of land, as opposed to owning the land, for any places
 7   that might become RCDC clubs?
 8       A.  I'm sorry?
 9       Q.  Did you put any land under contract to
10   purchase property that was slated to be in the RCDC
11   club system?
12       A.  Not other than the Abaco, as far as I'm
13   aware.
14       Q.  Could you pull out Exhibit 2136, which is
15   that corporate governance committee, May 24, 2012,
16   document?  It's the redacted one.
17       A.  Got it.
18       Q.  Just a few questions about that.  First of
19   all, can you go to page 7 of 2136?  I don't think
20   they're numbered.  It's the seventh page in.
21       MR. MARX:  There's a page number.
22   BY MR. FERGUSON:
23       Q.  It's the next one.  Let me grab mine.  It's
24   page 8.  I'm sorry.  Page 8, you've got these
25   milestones.  There's talk about -- withdrawn.  The
                                              Page 115
```

```
 1   sixth one down says, "Communications with RCDC owners
 2   of strategy/PR."
 3       Was part of this -- do you recall a topic in
 4   here -- without discussing any attorney-client
 5   privilege -- whether a topic in here was the potential
 6   affiliation of Ritz-Carlton Destination Clubs and/or
 7   its members to the Marriott Vacation Club system?
 8       A.  I don't recall whether that was what was
 9   being referenced here.
10       Q.  We know -- I can pull it up -- it's
11   Exhibit 1024 -- but it's the Eveleen Babich letter
12   that went out on July 17, 2012.  It looks like there
13   was a target date of June 14, 2012 for communication
14   to RCDC owners.
15       Is the Eveleen Babich letter that went out on
16   June 17, 2012 the communication referenced here in
17   this corporate growth committee memorandum dated
18   May 24, 2012?
19       MR. SELLINGER:  Objection to form.
20       A.  I don't know whether it is the -- that's what
21   this is referring to or not.
22       MR. FERGUSON:  Just put up Exhibit 1024.
23   BY MR. FERGUSON:
24       Q.  That's the evolution letter that came from
25   Ms. Babich.  Can you see that on your screen?  I'm not
                                              Page 116
```

```
 1   going to have you go through that.  Do you generally
 2   recognize that that letter went out around mid July?
 3       A.  Yes, I do.
 4       Q.  And you followed up a month later with
 5   another letter?
 6       A.  That's correct.
 7       Q.  If you go to the second page, the signature
 8   block, I just want to show you that that's Ms. Babich
 9   who signed that document.
10       She didn't author that document, though; did
11   she?
12       A.  There was a number of people who had a hand
13   in authoring that letter.
14       Q.  Did lawyers have their hands in doing that
15   letter?
16       A.  Yes.
17       Q.  Back to Exhibit 2136, that redacted -- you're
18   open to page 8 on it, you can look at it in any manner
19   you want for this question.
20       When you were preparing for your deposition
21   back on November 10th and maybe November 17th -- I
22   think they were the two dates -- do you recall whether
23   or not you reviewed this corporate growth committee
24   strategic plan memorandum -- that you and Mr. Terry
25   sent to the corporate growth committee?
                                              Page 117
```

30 (Pages 114 - 117)

| | |
|---|---|
| 1    A. I didn't review that. | 1    was -- was that ultimately what became the |
| 2    Q. Before seeing it in deposition preparation or | 2    reengineering of the luxury brand? |
| 3    for preparation for this particular leg of your | 3    MR. SELLINGER: Objection to form. |
| 4    deposition, had you looked at it in connection with | 4    BY MR. FERGUSON: |
| 5    any of the three litigations? | 5    Q. Let me ask this. What was the project? |
| 6    A. Before? | 6    A. I don't know. I assume the project team was |
| 7    Q. Before -- the last couple days or hours. | 7    the people that I forwarded it to, but I don't -- had |
| 8    A. No. | 8    to do with the inventory at the Ritz-Carlton projects. |
| 9    Q. Do you maintain a copy of it, as the author, | 9    Q. Okay. Your signature block here is as |
| 10   in your files? | 10   executive vice president and chief operating officer |
| 11    A. I have no idea. | 11   of North American and Caribbean; correct? |
| 12    (Exhibit 2245 was marked for | 12    A. That's correct. |
| 13    identification.) | 13    Q. Is that the -- it says, "Marriott Vacation |
| 14  BY MR. FERGUSON: | 14  Worldwide Corporation." Is that the signature block |
| 15    Q. Mr. Cunningham, this is a document that I | 15  that you've regularly used or normally used since you |
| 16  asked for this morning or last night, and it's an | 16  took that position over at spinoff? |
| 17  e-mail that starts on the second page with your e-mail | 17    A. Yeah. I don't know whether I changed that -- |
| 18  to Mike Andrew. | 18  whether that title changed with the added |
| 19    Mike Andrew is a lawyer in the legal | 19  responsibility of Ritz-Carlton because they were all |
| 20  department? | 20  North American and Caribbean. |
| 21    A. That's correct. | 21    Q. Of course, we've seen sometimes when you've |
| 22    Q. Is he on the -- he's kind of the corporate | 22  communicated with our clients and their fellow club |
| 23  side, as opposed to the litigation side like | 23  owners, you would sign as executive vice president, |
| 24  Mr. Kelly? | 24  chief operating officer of Ritz-Carlton Destination |
| 25    MR. SELLINGER: Objection to form. | 25  Club; correct? |
| Page 118 | Page 120 |
| 1    A. I -- | 1    A. That's correct. |
| 2  BY MR. FERGUSON: | 2    Q. It looks like, on page 1, you attached what |
| 3    Q. Just a lawyer? | 3  Mr. Andrew sent to you on the same day, the RCDC legal |
| 4    A. He's an attorney in our in-house counsel | 4  analysis. You forwarded that on to Mary Lynn Clark, |
| 5  office. | 5  Stephanie Sobeck, Tony Terry, and Nick Rossi. |
| 6    Q. Now, you'll see here that you were asking him | 6    Were they the steering committee, to the best |
| 7  for an electronic version of the action item status | 7  of your recollection? |
| 8  summary that he had distributed at the strategic | 8    A. I don't recall. I don't recall calling it a |
| 9  council meeting. | 9  steering committee, but they were the people that I |
| 10    Had there been a recent strategic council | 10  was referring to. |
| 11  meeting? Can you tell that from this e-mail? | 11    Q. Were there any -- |
| 12    A. He's saying -- | 12    A. I was -- |
| 13    Q. You're saying. | 13    Q. Sorry. It's hard to get used to a new lawyer |
| 14    A. Yeah. There must have been, but I don't | 14  asking questions. This steering committee, would it |
| 15  recall. January -- what is this? | 15  have included an attorney from the legal department, |
| 16    Q. January 3rd, 2013. | 16  or would it have been mostly or all business people? |
| 17    A. Yeah. So... | 17    A. I don't recall. I don't know. |
| 18    Q. A couple weeks or a month after the spinoff, | 18    Q. Skipping back to something -- I wanted to ask |
| 19  correct -- or several weeks? | 19  about the November 14, 2013 affiliation agreement. |
| 20    A. That's correct. | 20  I'm not sure what exhibit it is there. It's the one |
| 21    Q. I just wanted to ask you, also, two things | 21  that was produced on March 14 or 15 or 16, 2018. |
| 22  about your e-mail on the back here, in addition to | 22  That's why we're here. |
| 23  whether or not there was a strategic council meeting. | 23    A. I don't have it. |
| 24    You said that you want to share with the rest | 24    Q. This is the agreement that was between MRTC |
| 25  of the steering committee on the project. The project | 25  and Lion & Crown. I'm not going to ask you anything |
| Page 119 | Page 121 |

31 (Pages 118 - 121)

1  about it, per se. I did want to follow up with some
2  questions that Mr. Reiser asked you about the
3  dissemination of it to the various boards. I want to
4  focus -- I want to focus on its dissemination.
5      It was prepared mostly by your legal
6  department; is that right?
7      A. I'm sure it was.
8      Q. It was e-mailed around -- because we have a
9  lot of e-mails that were withheld, based on
10  privileges, with your lawyers internally. Was it
11  e-mailed around the company, including the legal
12  department?
13     A. I have no idea.
14     Q. Was it worked on for many months?
15     A. I don't recall.
16     Q. Do you recall that it was started -- looks
17  like it was started, according to the privilege log,
18  at least, in May, June of 2013?
19     A. I don't recall.
20     Q. And I can pull it out for a second here.
21  Some of the lawyers that I see on the e-mail chains
22  dealing with this particular document -- 2102 -- would
23  include Barbara Egolf.
24     Is she someone that worked on things like
25  this?

Page 122

1      A. I guess you'd have to read that testimony
2  back to me.
3  BY MR. FERGUSON:
4      Q. I wasn't -- I asked you a different way
5  because I might have taken it down wrong. My last
6  question was, do you believe you did have a duty to
7  send it on to Mr. Mercer before he signed a document
8  called "An acknowledgement of and joinder to"?
9      MR. SELLINGER: Objection to form.
10     A. I don't have an opinion one way or the other
11  whether we had a duty to do that, but the existence of
12  the document was clear. I don't know who had a
13  responsibility to provide it or not.
14  BY MR. FERGUSON:
15     Q. I'm just going to show you -- mark another
16  document that's 2246.
17     (Exhibit 2246 was marked for
18     identification.)
19  BY MR. FERGUSON:
20     Q. Exhibit 2246 is a declaration of Kathy
21  Borkholder. It relates to the motion practice --
22  motion just means a court request -- a request of the
23  court by plaintiffs to try to seek some or all of the
24  redactions that were in the May 24, 2012 corporate
25  growth committee, strategic plan that you and

Page 124

1      A. Yes.
2      Q. And Trish Wetmore?
3      A. Yes.
4      Q. She's another lawyer that would have worked
5  on something like this?
6      A. That's correct.
7      Q. And did Mr. Andrew work on documents like the
8  affiliation agreement?
9      A. I don't know.
10     Q. Would you expect the law department of
11  Marriott Vacation Worldwide to have provided
12  Mr. Mercer and Mr. Albert, and the other folks at
13  other clubs, with a copy of the affiliation agreement
14  you wanted them to acknowledge and to join?
15     A. I don't know. They would have done what was
16  proper. I don't know what that -- whether there was
17  an expectation for that.
18     Q. I believe you said that you didn't believe
19  you had a duty to send it.
20     Do you recall that testimony?
21     A. No.
22     Q. I have it in quotes. Do you believe you had
23  a duty to send it on to, for example, Mr. Mercer, who
24  was being asked to acknowledge it and join it?
25     MR. SELLINGER: Objection to form.

Page 123

1  Mr. Terry signed as yours.
2      I just had some questions about it. I
3  thought it was easier to get this out and ask you --
4  have you seen this before today?
5      A. I saw this last night.
6      Q. All right. On page 2 of Exhibit 2246, it
7  says that "Messers. Cunningham and Terry were not the
8  sole authors of the May 24th memo." That's what
9  Ms. Borkholder calls it. It says, "Rather, that
10  document was generated through a collaborative process
11  with a number of individuals and departments drafting
12  and providing revisions and comments to particular
13  sections."
14     Do you generally agree with that, that
15  strategic council -- sorry -- that the corporate
16  growth committee document was done in a collaborative
17  process with a number of individuals?
18     A. Yes.
19     Q. And in connection with reviewing this and
20  looking at this, did you read it or did you see it?
21     A. I read it briefly. I didn't study it.
22     Q. In connection with this, to be clear, you did
23  not see any of the redacted versions in an unredacted
24  form?
25     A. No.

Page 125

32 (Pages 122 - 125)

1    Q. You saw the black that we see?
2    A. I saw the one that you put in front of me.
3    Q. Did you task -- withdrawn. Was Mr. Andrew
4    the person that was your -- that you would task at the
5    law department to spearhead the law department's work
6    on any input they might have given into this strategic
7    plan?
8        MR. SELLINGER: Objection to form.
9    A. I'm not sure I would have tasked him to do
10   it, but he was the person providing legal advice
11   relative to the memo.
12   BY MR. FERGUSON:
13   Q. It looks like he's a senior vice president
14   and deputy general counsel. Right? I'm looking at
15   that e-mail.
16   A. I don't remember their titles.
17   Q. It says --
18   A. I can tell you what Doug's title is.
19   Q. Exhibit 2245 is the one that we just saw.
20   You don't have to pull it out. It says, "Michael W.
21   Andrew, Jr., senior vice president and deputy general
22   counsel."
23       So he's pretty high up in the law department?
24   A. Agree.
25   Q. There's sections that were redacted. And I

Page 126

1    just want to ask you without -- please don't divulge
2    any attorney-client privilege. There's a section
3    called "Risk and opportunities."
4        Was the opportunities portion of this
5    redacted section -- did it have to do with business
6    opportunities or was it legal advice?
7    A. I don't recall exactly, but it was provided
8    by Mr. Andrew, so I believe it was legal advice.
9    Q. The legal department was providing, in your
10   view, legal advice on what the Marriott Vacation
11   Worldwide strategic plan on the RCDC system meant in
12   terms of opportunities?
13       MR. SELLINGER: Objection to form.
14   A. My guess is, it was more related to risk and
15   the -- it's a general heading that we use for that
16   section of these type of memos.
17   BY MR. FERGUSON:
18   Q. Okay. So they generally go together, risk
19   and opportunities, in these memos?
20   A. Yeah.
21   Q. They're the yin and the yang?
22   A. That's correct.
23   Q. Do you have any idea as to why this document,
24   in redacted form, was not produced in this litigation?
25   A. I have no idea.

Page 127

1    Q. And you understand that the -- Exhibit
2    2102 -- the affiliation agreement dated November 14th,
3    2013 -- you understand that wasn't produced in this
4    litigation until March of 2018?
5    A. I understand. Yeah, I understand that that
6    wasn't produced until then.
7    Q. Do you know whether or not the corporate
8    growth committee document that's been redacted --
9    again, without giving legal advice -- do you know
10   whether it addressed Kapalua being deflagged
11   ultimately, or Abaco?
12   A. I have no idea.
13   Q. Looking at the context of the document, the
14   recommendations, the timeline, and the strategies, do
15   you see any indication that might have to do with
16   Kapalua or Abaco?
17   A. Is that 2136?
18   Q. Yeah, 2136. I don't know why I said 2102.
19   That's the other document.
20       It does have a disposition update on the
21   Abaco, at least on the next two-sided version of it.
22   A. I don't recall the timing of the Kapalua
23   changes vis-à-vis the -- or Abaco. It could include
24   Abaco. I don't know.
25   Q. Had you laid out the reasons for the

Page 128

1    rationale for the -- I guess it was a termination to
2    not renew. Was it a termination -- withdraw that.
3        There was a termination of the Kapalua
4    management contract with Ritz-Carlton Management
5    Company; is that right?
6    A. That's correct.
7    Q. That was something that was also --
8    withdrawn.
9        The inability of the ownership of the Kapalua
10   project, which included, I think, 34 percent ownership
11   by Marriott Vacation Worldwide -- was that about
12   right -- 34 percent?
13   A. I don't recall the breakdown of the joint
14   venture.
15   Q. You knew before, obviously, when it was
16   announced by Ms. Babich to the general membership on
17   July 17, 2012, that the Kapalua relationship,
18   vis-à-vis The Ritz-Carlton Destination Club, was in
19   jeopardy?
20   A. Yes. Otherwise, we wouldn't have announced
21   it.
22   Q. And I think that you announced it. You also
23   explained it in your August 28, 2012 webinar; did you
24   not? Do you recall that generally?
25   A. I don't recall. I would certainly expect

Page 129

33 (Pages 126 - 129)

1  that I might.
2      Q.  I'm going to mark another exhibit here, 2247.
3      (Exhibit 2247 was marked for
4  identification.)
5  BY MR. FERGUSON:
6      Q.  Mr. Cunningham, there was a production of
7  documents in connection with the subpoena we served on
8  the Ritz-Carlton Hotel Company back last November, and
9  we got a production somewhere around Easter weekend or
10  somewhere towards later -- March 2018.  This is one of
11  the documents that was produced.
12      It's another -- it's a version of a document
13  that you were drafting.  It looks like it started on
14  April 2013.  You'll see that someone -- we're in May
15  now.
16      Do you recall -- you might have seen in your
17  deposition -- I can't recall myself -- that, at some
18  point, you were directly communicating with the
19  Bachelor Gulch members -- directly communicating by
20  yourself -- sorry -- from yourself to them.
21      Do you recall that generally?
22      A.  I remember that there was a point in our
23  discussions with the Bachelor Gulch association that
24  we didn't feel like the board of Bachelor Gulch was
25  providing full information to the members, so we took
                                                    Page 130

1  this document from Ritz-Carlton Destination
2  or from Marriott Vacation Worldwide.  I had
3  to get it from Ritz-Carlton Hotel Company.
4  So there's another step to that, which is,
5  you all didn't produce it.  The hotel company
6  did.
7      MR. SELLINGER:  I personally have no idea
8  what we produced and what we didn't.  Worry
9  about whether this was subject to the
10  parameters that you and your co-counsel
11  agreed to, which is under the search
12  parameters that were explored.
13      MR. FERGUSON:  Fair enough.  We just
14  spent more time talking about it than my
15  question about it.
16  BY MR. FERGUSON:
17      Q.  I just wanted to go to the end of paragraph 3
18  on page 1 of Exhibit 2247.  It starts with, "Why we
19  believe this affiliation would greatly benefit the
20  members.  We also believe that you and you alone
21  should have the opportunity to make this important
22  choice.  Therefore, if the majority of you choose,
23  that you would not" -- in capitals -- "like an
24  exchange affiliation with the Marriott Vacation Club
25  and the Ritz-Carlton Club, Bachelor Gulch will have no
                                                    Page 132

1  it to communicate more directly with them.
2      Q.  This is an iteration of that letter, or a
3  draft of that letter, it would appear?
4      A.  Clearly, it's not the finished product.
5      Q.  I got it.
6      MR. SELLINGER:  Let me note once again --
7  so this subpoena was served after --
8  according to what you said -- after the
9  deposition of Mr. Cunningham and Ms. Sobeck.
10  So how does this relate to
11  subsequently-produced documents?
12      MR. FERGUSON:  Well, it is subsequently
13  produced, so...
14      MR. SELLINGER:  Well, you could serve a
15  subpoena tomorrow --
16      MR. FERGUSON:  Actually, I might.  Ian
17  will know better than I do right now.  It was
18  probably served right around that week.  I
19  remember being in this room, drafting it.
20  I'm almost finished with that one question
21  about it.
22      MR. SELLINGER:  My only point is, the
23  subsequently-produced documents --
24      MR. FERGUSON:  Well, let's look at it a
25  different way.  Okay?  You didn't produce
                                                    Page 131

1  exchange affiliation with Marriott Vacation Club in
2  the future."
3      Was this a letter you were drafting or was
4  generally being drafted for you?
5      A.  It was being drafted for me.
6      Q.  Was it being drafted for you by business
7  people, legal people, or both?
8      A.  Probably a combination.
9      Q.  It went on to say, "If, on the other hand,
10  the majority of Bachelor Gulch members vote in favor
11  of this exchange affiliation, then we will allow each
12  individual Bachelor Gulch member to choose to
13  participate on an individual, voluntary basis."
14      At the end of the day, you didn't conduct a
15  survey or a vote for Bachelor Gulch because they had
16  their own and decided to deflag and not renew; right?
17      A.  Ultimately, there was a vote, but it wasn't a
18  vote about affiliation.
19      Q.  It was a vote about whether to renew or not
20  renew the management contract?
21      A.  That's correct.
22      Q.  And the management of these clubs is one of
23  the three main business sectors of Marriott Vacation
24  Worldwide?
25      A.  I'm sorry?
                                                    Page 133

34 (Pages 130 - 133)

1    Q.  One of the main business sectors of Marriott
2  Vacation Worldwide is the management of clubs.  That's
3  a revenue source?
4      MR. SELLINGER:  Objection to form.
5    A.  It's one of the pieces of our business, yes.
6  BY MR. FERGUSON:
7    Q.  So would I state that right that it was a
8  vote to not renew the management contract?
9    A.  That's correct.
10    Q.  Is that vote required in the declaration or
11  the management contract, if you recall?
12    A.  I don't recall.
13      MR. FERGUSON:  That's all my questions.
14  Mike, do you have anything else?
15      MR. REISER:  No.
16      MR. FERGUSON:  That's all I have.
17      MR. SELLINGER:  We have nothing.
18      THE VIDEOGRAPHER:  This concludes the
19  videotaped deposition of Mr. Lee Cunningham
20  and the end of media number two.  We're going
21  off the record.  The time is 2:08 p.m.
22    (The reading and signing of the
23  transcript were not waived, and these
24  proceedings concluded at 2:08 p.m.)
25

Page 134

1  Under penalties of perjury, I declare that I have read
2  the foregoing document and that the facts stated in it
    are true.
3
 
4  DATE         LEE CUNNINGHAM
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 136

1         CERTIFICATE OF REPORTER
2
3  STATE OF FLORIDA
4  COUNTY OF ORANGE
5
6      I, Lisa Gerlach, Court Reporter, do hereby
7  certify that I was authorized to and did
8  stenographically report the foregoing deposition; and
9  that the transcript is a true and correct
10  transcription of the testimony given by the witness.
11      I further certify that I am not a relative,
12  employee, attorney or counsel of any of the parties,
13  nor am I a relative or employee of any of the parties'
14  attorney or counsel connected with the action, nor am
15  I financially interested in the action.
16      Dated this 29th day of May, 2018.
17
18
19
20
21         _Lisa Gerlach_
22         Lisa Gerlach, Court Reporter
23
24
25

Page 135

35 (Pages 134 - 136)

**[& - 2247]**

| & |
|---|
| **&** 9:23 10:13,17 11:17,21,24,25 12:3,6,10,12,21,25 13:2,4,9,18,24 14:3,5,7,13,19,23 15:1,7,11,17,18,22 15:23 16:1,9,19,20 17:25 19:16,23 26:7 27:17 30:7 30:15 48:22 93:2 99:25 121:25 |

| 0 |
|---|
| **00237** 1:9 |
| **01** 10:3 |
| **01301** 1:5 6:11 |
| **07932-0677** 3:18 |

| 1 |
|---|
| **1** 1:25 54:5 121:2 132:18 |
| **1.5** 54:17,20 75:20 |
| **1/3/12** 5:12 |
| **10** 65:18 101:12,17 106:16 |
| **10/13/2012** 88:16 88:25 |
| **10/21/13** 73:18 |
| **100** 69:10 |
| **1003** 10:1,7 |
| **1020** 94:15 |
| **1024** 116:11,22 |
| **105** 53:20 54:17,21 55:15 56:7,10 75:13 |
| **108** 5:11 |
| **109** 91:20 |
| **10:59** 40:1 |
| **10th** 117:21 |
| **113** 5:5 |

**1135** 87:24
**118** 5:12
**119** 3:4
**11:06** 40:4
**11:51** 69:17
**12** 65:18,23 66:2 81:11
**124** 5:13
**12:04** 69:22
**13** 43:16 81:6,7,10 81:13 82:21
**130** 5:15
**135** 5:6
**136** 1:25 5:7
**14** 9:15 17:20 43:1 44:12,22 47:24 48:6 82:22 116:13 121:19,21
**1475** 3:8
**14th** 43:21 128:2
**15** 56:11 121:21
**15-54897** 1:14
**15.5** 56:8
**16** 70:21 121:21
**1601** 4:5
**17** 91:16 116:12,16 129:17
**17th** 117:21
**18** 1:21 87:22 97:13,14
**1806** 87:19
**1807** 87:21
**1816** 3:12
**1897** 96:23
**18th** 6:4
**19** 23:19,19 24:3 70:20,22 101:10 101:17,18 102:7 102:12,20 103:11 106:21

| 19th 102:4,6,16 |
|---|
| **1:06** 108:10 |
| **1:16** 1:5 6:11 |
| **1:27** 108:13 |

| 2 |
|---|
| **2** 75:20 125:6 |
| **20** 104:20 |
| **2001** 10:17 |
| **2007** 56:21 |
| **201** 3:4 |
| **2010** 13:19,23 15:3 15:9 |
| **2011** 97:3 |
| **2012** 50:8,9 52:14 52:19 58:12 60:18 61:7 62:8,10 72:14 73:21 77:2 77:5 78:11,18,20 78:23 79:7 82:21 85:3,13 87:1,22,25 88:12 89:13 90:3 90:9 91:10 94:17 94:23 115:15 116:12,13,16,18 124:24 129:17,23 |
| **2013** 8:13 9:2,15 11:12 12:9,19 13:5 14:14,16,19 16:3,5,9,21 17:1 17:20 18:1 19:8 19:10 20:12 21:6 21:11,13,16 22:2,5 22:8 23:6 24:18 25:10 27:9 29:5 29:22,23 30:3 34:24 43:1,21 44:12,22 47:24 48:6,14 49:15 91:16 94:7,20 96:8 100:7 119:16 121:19 122:18 |

**128:3** 130:14
**2014** 18:2 20:10 21:4 23:25 24:19 24:20 43:16 101:11,17,17,24 108:20
**2015** 70:21 101:12 106:16
**2018** 1:21 6:4 8:14 31:3,8 121:21 128:4 130:10 135:16
**206** 7:4
**21** 66:18 87:24 97:3
**2102** 8:19 9:9 11:12 30:4 122:22 128:2,18
**2136** 52:17,18 58:12 70:1 115:14 115:19 117:17 128:17,18
**2137** 100:9
**2138** 101:11
**2139** 101:12
**2143** 79:9
**2144** 83:7
**2145** 84:2
**2147** 85:14
**2148** 89:21 91:17
**21st** 100:7
**2215** 76:23
**2235** 72:8
**2244** 5:11 108:15 108:19
**2245** 5:12 118:12 126:19
**2246** 5:13 124:16 124:17,20 125:6
**2247** 5:14 130:2,3 132:18

Page 1