EXHIBIT - C

Lee Cunningham - November 10, 2017

```
 1   RCHFU, LLC,  et al.,
          Plaintiffs,
 2                              United States District Court
     v.                         District of Colorado
 3                              No.  1:16-cv-09390
     MARRIOTT VACATIONS WORLDWIDE
 4   CORPORATION, et al.,
          Defendants,
 5   _____/
 6   REISER, et al.,
          Plaintiffs,          Eastern District of California
 7   v.                        No. 2:16-cv-00237-MCE-CKD
 8
     MARRIOTT VACATIONS WORLDWIDE
 9   CORPORATION, et al,
          Defendants,
10   _____/
11   PETRICK, et al.,
          Plaintiffs,
12                             San Francisco County
13   vs.                       No. CGC-15-54897
     MARRIOTT VACATION WORLDWIDE
14   CORPORATION, et al.,
15        Defendants.
16   _____/
17
18           VIDEOTAPED DEPOSITION OF LEE CUNNINGHAM
19       VOLUME I, commencing between 9:03 a.m.-5:05 p.m.,
20       on Friday, November 10, 2017 Taken on Behalf of
         the Plaintiffs before Lisa Gerlach, Court Reporter,
21       Notary Public in and for the State of Florida at
22       Large, pursuant to Plaintiffs' Notice of Taking
23       Deposition in the above cause.
24
     Job No. 2733753
25   PAGES 1 - 269
```

                                                    Page 1

Lee Cunningham - November 10, 2017

| | |
|---|---|
| 1 Appearances: | 1 INDEX |
| 2 | 2 |
| 3 Counsel for the Plaintiffs: | 3 WITNESS      EXAMINATION           PAGE |
| 4 The Matthew C. Ferguson Law Firm, PC | 4 Lee Cunningham |
| 5 BY: MATTHEW C. FERGUSON, ESQUIRE | 5 Direct by Mr. Ferguson          7 |
| 6 119 South Spring, Suite 201 | 6 Direct by Mr. Reiser          115 |
| 7 Aspen, CO 81611 | 7 Direct, continued, by Mr. Ferguson   161 |
| 8 matt@matthewfergusonlaw.com | 8 Direct, continued, by Mr. Reiser   226 |
| 9 | 9 |
| 10 Reiser Law, PC | 10 |
| 11 BY: MICHAEL S. REISER, ESQUIRE | 11 |
| 12 ISABELLA MARTINEZ, ESQUIRE | 12 |
| 13 MATTHEW REISER, ESQUIRE | 13 PLAINTIFFS' EXHIBITS |
| 14 1475 Broadway, Suite 300 | 14 None |
| 15 Walnut Creek, CA 94596 | 15 |
| 16 michael@reiserlaw.com | 16 |
| 17 isabella@reiserlaw.com | 17 DEFENDANTS' EXHIBITS |
| 18 matthew@reiserlaw.com | 18 Exhibit 1279A  Blowup of Exhibit 1279    212 |
| 19 | 19 |
| 20 | 20 |
| 21 | 21 |
| 22 | 22 |
| 23 | 23 |
| 24 | 24 |
| 25 | 25 |
| Page 2 | Page 4 |

| | |
|---|---|
| 1 Appearances: | 1 THE VIDEOGRAPHER:  Good morning.  We're |
| 2 | 2 going on the record at 9:03 a.m. on |
| 3 For the Defendant Marriott: | 3 November 10, 2017.  Please note that the |
| 4 Greenberg Traurig, LLP | 4 microphones are sensitive and may pick up |
| 5 BY: PHILIP SELLINGER, ESQUIRE | 5 whispering, private conversations, and |
| 6 IAN S. MARX, ESQUIRE | 6 cellular interfere.  Please turn off all cell |
| 7 500 Campus Drive, Suite 400 | 7 phones or place them away from the |
| 8 Florham Park, NJ 07932-0677 | 8 microphones, as they may interfere with the |
| 9 sellingerp@gtlaw.com | 9 deposition audio.  Audio and video-recording |
| 10 marxi@gtlaw.co | 10 will continue until all parties agree to go |
| 11 | 11 off the record. |
| Marriott Vacations Worldwide | 12     This is media unit one of the videotaped |
| 12 BY: DOUGLAS A. KELLY, ESQUIRE | 13 deposition of Lee Cunningham, taken by |
| 13 MARK NAGLE, ESQUIRE | 14 counsel for plaintiff, in the matter of |
| 14 6649 Westwood Boulevard | 15 RCHFU, LLC, et al., vs. Marriott Vacations |
| 15 Orlando, FL 32821 | 16 Worldwide Corporation, et al., filed in the |
| 16 douglas.kelly@mvwc.com | 17 United States District Court, District of |
| 17 mark.nagle@mvwc.com | 18 Colorado, Case Number 1:16-cv-01301-PAB-GPG. |
| 18 | 19 This deposition is being held at Greenberg |
| 19 For the Defendant Aspen Highlands | 20 Traurig, located at 450 South Orange Avenue, |
| 20 Condominium Association: | 21 Orlando, Florida. |
| 21 Hogan Lovells | 22     My name is Mike Gerlach.  I'm the |
| 22 BY: JESSICA BLACK LIVINGSTON, ESQUIRE | 23 videographer.  The court reporter is Lisa |
| 23 1601 Wewatta Street, Suite 900 | 24 Gerlach, both representing Veritext |
| 24 Denver, CO 80202 | 25 Reporting. |
| 25 jessica.livingston@hoganlovells.com | |
| Page 3 | Page 5 |

2 (Pages 2 - 5)

Lee Cunningham - November 10, 2017

| | |
|---|---|
| 1     At this time, counsel will state their | 1     MR. FERGUSON: I just want to be clear |
| 2 appearances and affiliations for the record. | 2 that I do not represent the plaintiffs in |
| 3     MR. FERGUSON: Matthew Ferguson, | 3 either Tahoe or the San Francisco case. I |
| 4 co-counsel, attorney for the plaintiff. | 4 only represent the plaintiffs in the Aspen |
| 5     MR. REISER: Michael Reiser, Reiser Law. | 5 case. I don't want to pretend I was |
| 6 I'm here for the plaintiff in Aspen, as well | 6 appearing in two cases that I'm not involved |
| 7 as the plaintiff in the Tahoe case, and the | 7 with. |
| 8 plaintiffs in the San Francisco case. All of | 8 THEREUPON, |
| 9 those three cases are combined for purposes | 9     LEE CUNNINGHAM, |
| 10 of this deposition, Mr. Cunningham, so I | 10 A Witness herein, acknowledged after having |
| 11 thought I'd put that on the record. | 11 been duly sworn and testified upon his oath as |
| 12     With me is Isabella Martinez, with my | 12 follows: |
| 13 office, and Matthew Reiser, with my office. | 13     THE WITNESS: I do. |
| 14     MS. LIVINGSTON: Jessica Livingston of | 14     DIRECT EXAMINATION |
| 15 Hogan Lovells for the defendant in the Aspen | 15 BY MR. FERGUSON: |
| 16 Highlands case. | 16 Q. Good morning, Mr. Cunningham. |
| 17     MR. MARX: Ian Marx from Greenberg | 17 A. Good morning. |
| 18 Traurig for the Marriott defendants. | 18 Q. We met briefly. My name is Matt Ferguson and |
| 19     MR. SELLINGER: Philip Sellinger from | 19 I'm from Aspen, Colorado, and I represent about 200 or |
| 20 Greenberg Traurig, also for the Marriott | 20 so plaintiffs that own about 230, 235 fractional |
| 21 defendants. | 21 interests at the Ritz-Carlton Club in Aspen, Colorado. |
| 22     And, Mike, thank you for putting that on | 22     Do you understand you're appearing in three |
| 23 the record, because I think we do need to | 23 cases today? |
| 24 correct the statement of the videographer, | 24 A. Yes. |
| 25 that this deposition is being taken in all | 25 Q. How did you prepare for your deposition, sir? |
| Page 6 | Page 8 |

| | |
|---|---|
| 1 three cases simultaneously -- RCHFU vs. | 1 A. I reviewed documents and met with my counsel. |
| 2 Marriott, Reiser vs. Marriott, and the | 2 Q. Approximately how many hours have you been |
| 3 Petrick vs. Marriott, regardless of the case | 3 preparing for your deposition in these three cases? |
| 4 in which the deposition notice is issued. | 4 A. Ten. |
| 5     And, of course, under those | 5 Q. Over how many days, sir? |
| 6 circumstances, any objection with respect to | 6 A. Over 14 days. Something like that. |
| 7 relevance or materiality or any other | 7 Q. A couple hours a day? |
| 8 evidentiary objection, of course, would be | 8 A. Yeah. |
| 9 preserved, notwithstanding that the | 9 Q. And what counsel have you been meeting with, |
| 10 depositions are taken simultaneously. | 10 without divulging anything you said? |
| 11     MR. REISER: Absolutely. Thank you, | 11 A. The four gentlemen here. |
| 12 Philip. | 12 Q. Over the 14 days or was it different people |
| 13     Just one more thing. So, of course, each | 13 meeting with you at different times? |
| 14 depo -- this depo can be used across all | 14     MR. SELLINGER: Objection to form. |
| 15 three cases. That's probably obvious from | 15 You're mischaracterizing his having met with |
| 16 what you said, but I just want to make that | 16 counsel over 14 days. |
| 17 clear. | 17 BY MR. FERGUSON: |
| 18     MR. SELLINGER: Yes, subject to any | 18 Q. Well, did you meet -- |
| 19 objection based on any ground, including | 19 A. I met with the counsel twice. |
| 20 relevance, materiality to a particular case. | 20 Q. All four at one time? |
| 21 There may be aspects of the deposition that | 21 A. Yes. |
| 22 are germane to one case, but not to the | 22 Q. How many times did you meet with all four |
| 23 others. So all objections, including those, | 23 counsel? |
| 24 are preserved. | 24 A. Twice. |
| 25     MR. REISER: Fair enough. | 25 Q. What days were those? |
| Page 7 | Page 9 |

3 (Pages 6 - 9)

Lee Cunningham - November 10, 2017

1  A. Yesterday was one, and I don't recall the
2  prior day a couple weeks ago.
3      Q. Approximately how many documents have you
4  reviewed for your deposition today?
5      A. Probably in the -- hundred or so.
6      Q. Were there any non-Marriott employed people
7  in any of these meetings?
8      A. No. Well, counsel was not --
9      Q. I understand. Like, did you meet with HOA
10 counsel?
11     A. No.
12     Q. All right. Sir, are you presently employed
13 by Marriott Vacations Worldwide Corporation?
14     A. That's correct.
15     Q. Are you an officer in that company?
16     A. Yes, I am.
17     Q. Are you an officer under any other entities
18 under the Marriott Vacation Worldwide -- is it okay if
19 I call it MVW?
20     A. That's fine.
21     Q. Is that what you all call it at work?
22     A. Yes.
23     Q. I notice, for example, you signed some
24 documents on behalf of Lion & Crown Travel --
25     A. Yes.

Page 10

1  few, but you're a lucky guy.
2      Just -- you're doing well already. Let's not
3  talk over each other, because the court reporter can't
4  take us both down. In normal communication, your wife
5  is usually talking over you, and you can't do that
6  here.
7      So I'll ask you just to let me finish before
8  you begin, because sometimes you'll anticipate what
9  I'm going to say.
10     There will be objections today. We'll listen
11 to the objections, and, generally, you'll have to
12 answer, but we'll deal with that when it comes.
13     If you don't understand anything I say,
14 because I'm not in your world and I might say things
15 wrong, I might have the wrong company name, please,
16 let me know. I'm happy to rephrase it.
17     If you're answering, we're going to assume
18 you know what I meant. So just let me know. It's
19 not a problem.
20     With that intro, have you ever testified in a
21 trial?
22     A. No.
23     Q. Have you ever testified in arbitration?
24     A. No.
25     Q. No experience, then, in the court or

Page 12

1      Q. -- Company? You're an officer in that
2  company?
3      A. I am.
4      Q. What is your position at --
5      A. Vice president, I think, is how it's
6  characterized.
7      Q. Approximately how many companies are you an
8  officer in under the MVW umbrella?
9      A. To be honest, I couldn't estimate. It's
10 probably in the -- 15 to 20.
11     Q. Okay. What Ritz-Carlton entities under the
12 MVW entity are you an officer?
13     A. Lion & Crown, Cobalt Travel, Ritz-Carlton
14 Development Company. Those are the primary ones that
15 I...
16     Q. Have you ever been an officer in any of the
17 HOAs that were formed for any of the clubs?
18     A. No.
19     Q. How many times have you been deposed, say, in
20 the last five years?
21     A. This is my first.
22     Q. First deposition ever?
23     A. Yes.
24     Q. Okay. I know counsel spent some time with
25 you. I would have thought that you would've been in a

Page 11

1  arbitration systems?
2      A. No.
3      Q. Are you familiar with a case, a lawsuit,
4  against Marriott Vacations that's gone to -- I think
5  it's here pending in Orlando. Let me show you a copy
6  of the article.
7      A. Yes.
8      Q. I take it there's been no discovery in that
9  case? Do you understand what discovery is -- turning
10 over documents, depositions -- or has there been?
11     A. I don't recall where we are in the case.
12     Q. All right. Without divulging any privileged
13 communication from your counsel, do you know what that
14 case is about or have you been following it as an
15 officer in MVW?
16     MR. SELLINGER: Matt, I generally try not
17 to have objections based on relevance in the
18 deposition, but what does that case have to
19 do with this case?
20     MR. FERGUSON: Well, I mean, I don't
21 think relevance is a proper objection in a
22 deposition.
23     MR. SELLINGER: I agree.
24     MR. FERGUSON: And I think we've probably
25 spent more time on this objection than I'm

Page 13

4 (Pages 10 - 13)

Veritext Legal Solutions
866 299-5127

Lee Cunningham - November 10, 2017

| | |
|---|---|
| 1    going to spend on the question, so... | 1    A. We normally communicate via updates that we |
| 2         MR. SELLINGER: Okay. | 2  have with the executive counsel in general. |
| 3  BY MR. FERGUSON: | 3    Q. Is that on a computer sometimes? |
| 4    Q. I just want to know -- what's your | 4    A. No. That's a period or a monthly meeting. |
| 5  familiarity with this? Are you involved in it? | 5    Q. So, generally -- so you have monthly meetings |
| 6    A. I'm not involved in it. I'm familiar with | 6  with Mr. Weisz to discuss the MVW business? |
| 7  it. | 7    A. There's numerous meetings in our company |
| 8    Q. All right. But you don't know its status? | 8  where I participate and Mr. Weisz participates. |
| 9    A. No. | 9    Q. Do you ever communicate with him by e-mail? |
| 10    Q. All right. Thank you. | 10    A. Sure. |
| 11    A. I don't recall the status. | 11    Q. Do you ever communicate with him by e-mail |
| 12    Q. I pulled off your bio off the Marriott | 12  concerning the issues in any of these three cases? |
| 13  Vacation Worldwide website. This is generally an | 13         MR. SELLINGER: Objection to form. |
| 14  accurate depiction of your background of the | 14    A. I'm sure I have, at some point, communicated |
| 15  Marriott-related entities over the years? | 15  to him by e-mail, but not on -- not relative to the |
| 16         MR. SELLINGER: Do you have another copy | 16  status of these cases. |
| 17  of that? | 17  BY MR. FERGUSON: |
| 18         MR. FERGUSON: I don't. I'm sorry. I | 18    Q. Not about -- issues related to, for example, |
| 19  printed these off this morning. I think that | 19  affiliation of various clubs -- let me finish -- |
| 20  has -- | 20  Ritz-Carlton and clubs into the Marriott Vacation |
| 21    A. Yes, that is accurate. | 21  Worldwide systems. |
| 22  BY MR. FERGUSON: | 22    A. I don't recall a specific e-mail. It's not |
| 23    Q. I'm sure you've done a lot more things, but | 23  my typical method of communication to him. |
| 24  this is a general overview of your experience here? | 24    Q. Normally it's what? |
| 25    A. That's a roll-up. | 25    A. It's more verbal. |
| Page 14 | Page 16 |

| | |
|---|---|
| 1    Q. I'm looking at another document that says the | 1    Q. Phone or you walk upstairs? |
| 2  management would include a Stephen P. Weisz. | 2    A. That's correct. |
| 3       Am I saying that right, or is it Wize | 3    Q. Is there any type of other internal |
| 4  (phonetic)? | 4  communication; for example, a Marriott Vacation |
| 5    A. Weisz. | 5  Worldwide internal e-mail system or texting system? |
| 6    Q. Weisz? | 6    A. There's an e-mail system. |
| 7    A. Weisz. | 7    Q. Okay. So it would be by e-mail on your MVW |
| 8    Q. Okay. What is his position at MVW today? Is | 8  e-mail? |
| 9  it still president and chief executive officer? | 9         MR. SELLINGER: Objection. What would be |
| 10    A. That's correct. | 10  by e-mail? |
| 11    Q. And you're executive vice president and chief | 11         MR. FERGUSON: Communications. |
| 12  operating officer? | 12         MR. SELLINGER: Generally -- |
| 13    A. That's correct. | 13         MR. SELLINGER: With Mr. Weisz. |
| 14    Q. Do you report to Mr. Weisz? | 14         MR. SELLINGER: So let's have a |
| 15    A. I do. | 15  specific -- |
| 16    Q. Is he in the same facility as you in terms of | 16         MR. FERGUSON: Well, I'm talking about |
| 17  offices? | 17  Mr. Weisz, Mr. Sellinger -- |
| 18    A. Yes. | 18    A. Well, I communicate with Mr. Weisz via |
| 19    Q. How close is he to you and your office suite? | 19  e-mail, telephone, in person, and meetings settings. |
| 20    A. He's on the fifth floor; I'm on the fourth | 20  BY MR. FERGUSON: |
| 21  floor. | 21    Q. How many meetings were you with -- were you |
| 22    Q. I've been through quite a few documents in | 22  at where Mr. Weisz attended with anyone -- any officer |
| 23  this case, as have you. I haven't seen many or, if | 23  from a Ritz-Carlton club? |
| 24  any, documentation between you and Mr. Weisz. | 24    A. An officer from a Ritz-Carlton? |
| 25       How do you guys normally communicate? | 25    Q. For example, Randy Mercer. |
| Page 15 | Page 17 |

5 (Pages 14 - 17)

Lee Cunningham - November 10, 2017

| | |
|---|---|
| 1  A. I don't believe I've been in a meeting with | 1  A. No. |
| 2 Randy Merer and Steve Weisz. | 2  Q. All right. Marriott Vacations Worldwide, |
| 3  Q. How about any of the HOA officers from the | 3 MVW, its predecessor company was MVWI -- or MVCI, |
| 4 St. Thomas property? | 4 rather -- Marriott Vacation Club International? |
| 5  A. No. | 5  A. No. Its predecessor company was Marriott |
| 6  Q. San Francisco? | 6 International. |
| 7  A. No. | 7  Q. Marriott International, okay, which is now a |
| 8  Q. Tahoe? | 8 separate entity altogether? |
| 9  A. No. | 9  A. Yes. We were a division of Marriott |
| 10  Q. How about Bachelor Gulch, Colorado? | 10 International that was spun off. |
| 11  A. I have had a meeting with Steve -- | 11  Q. What was the division called when it was spun |
| 12 Mr. Weisz -- and Mr. Mullinex. | 12 off? |
| 13  Q. Okay. Was there anybody else there? | 13  A. Marriott Vacation Club International was the |
| 14  A. Yes. Jo-Ann Perfido, I believe, is her name. | 14 DBA. |
| 15 She's also a member of the board in Bachelor Gulch. | 15  Q. Which is MVW, Marriott Vacation Worldwide |
| 16  Q. How many in-person meetings were there with | 16 Corporation? |
| 17 people from Bachelor Gulch that Mr. Weisz attended; | 17  A. Um -- |
| 18 was it one or was there another one? | 18  Q. It gets confusing. |
| 19  A. One. | 19  A. I'm not sure I understand your question. Is |
| 20  Q. Where was that meeting, sir? | 20 MVCI the same thing as MVW? |
| 21  A. In our offices in Orlando. | 21  Q. That's my question. What's the relationship |
| 22  Q. Did you arrange that meeting? | 22 between MVCI, when you see that acronym, and MVW? |
| 23  A. I coordinated it with Mr. Mullenix. | 23  A. MVCI was the division of Marriott that |
| 24  Q. Had Mr. Mullenix reached out first to someone | 24 managed or operated the timeshare component of |
| 25 from Marriott International in connection with setting | 25 Marriott International. |
| Page 18 | Page 20 |

| | |
|---|---|
| 1 up a meeting with you and Mr. Weisz? | 1  Q. And when that was spun off, what Ritz-Carlton |
| 2  A. Not to my knowledge. | 2 businesses spun off with it? |
| 3  Q. And was that meeting arranged by you and | 3  A. The Ritz-Carlton Destination Club businesses. |
| 4 Mr. Mullenix well in advance, or was it something that | 4  Q. And it entered into license agreements with |
| 5 occurred on the spur of the moment? | 5 the marks -- trademarks -- with Marriott |
| 6  A. Depends on your definition of well in | 6 International? |
| 7 advance. It was several weeks in advance. | 7  A. That's correct. |
| 8  Q. Mr. Weisz didn't really want to attend that | 8  Q. When it was spun off, had Mr. Weisz been |
| 9 meeting, did he? | 9 involved in the division under the MI, Marriott |
| 10  A. He was certainly interested in being there, | 10 International, umbrella? |
| 11 or else he wouldn't have been there. | 11  A. Yes. |
| 12  Q. Besides the two of you and the two of them, | 12  Q. When it was spun off, he was the president at |
| 13 was there anyone else in attendance -- counsel, any | 13 that point? |
| 14 other officers or directors? | 14  A. He was the president prior to the spinoff, |
| 15  A. No. | 15 president and CEO -- |
| 16  Q. What was discussed at that meeting? | 16  Q. Of that division? |
| 17  A. The discussion was around the continued | 17  A. He was the president of that division. |
| 18 management of the Bachelor Gulch Ritz-Carlton | 18  Q. Then, when it was spun off, he became |
| 19 property. | 19 president of the separate entity, the stand-alone |
| 20  Q. Was there any discussion about affiliating | 20 entity? |
| 21 with the Marriott Vacation Worldwide system? | 21  A. Yes. |
| 22  A. Yes. | 22  Q. Who made the decisions to give the |
| 23  Q. Was it in 2012? | 23 Ritz-Carlton Destination Clubs to the MVW part of that |
| 24  A. I believe that's correct. | 24 spinoff? |
| 25  Q. Do you recall what month? | 25    MR. SELLINGER: Objection to form. |
| Page 19 | Page 21 |

6 (Pages 18 - 21)

Lee Cunningham - November 10, 2017

| | |
|---|---|
| 1     MR. FERGUSON:  What's your objection? | 1     Q.  So you recall no angry words exchanged by |
| 2     MR. SELLINGER:  I don't understand the | 2  Mr. Weisz with people from Bachelor Gulch? |
| 3  question. | 3     A.  Well, there was a heated exchange between |
| 4     MR. FERGUSON:  Okay. | 4  Mr. Weisz and Mr. Mullenix, is my memory. |
| 5  BY MR. FERGUSON: | 5     Q.  But you don't recall them getting heated with |
| 6     Q.  If you don't understand it, I'll just redo | 6  Ms. Perfido? |
| 7  it. | 7     A.  I don't. |
| 8     A.  Okay. | 8     Q.  And Mr. Michael Mullenix, do you understand |
| 9     Q.  What aspects of the Ritz-Carlton Destination | 9  that he builds hotels and brands them, other than |
| 10  Club were given to the MVW to handle?  Was it | 10  Marriott International brands? |
| 11  Ritz-Carlton Development -- sorry -- the Ritz-Carlton | 11     A.  I understand that. |
| 12  Destination Clubs, like Aspen, Colorado, Tahoe and | 12     Q.  He's been doing that for a number of years? |
| 13  San Francisco?  Were there any other businesses? | 13     A.  I understand -- I understood that he did that |
| 14     A.  It was any of the existing Ritz-Carlton | 14  at the time.  I have no idea what Mr. Mullenix does |
| 15  Destination Club resorts at the time and the future | 15  now. |
| 16  rights for development. | 16     Q.  But in terms of what he was doing back then, |
| 17     Q.  Before spinning off MVW and that ended up | 17  he wouldn't have been working with Marriott |
| 18  with these Ritz-Carlton businesses, had Marriott | 18  International folks on that side of the business.  He |
| 19  International tried to sell the Ritz-Carlton | 19  would be building hotels for MVW; right? |
| 20  businesses? | 20     A.  No, he didn't do anything for us. |
| 21     A.  Not to my knowledge. | 21     Q.  And MVW generally doesn't own any hotels; is |
| 22     Q.  They didn't try to do that in 2009? | 22  that right? |
| 23     A.  Not to my knowledge. | 23     A.  We don't own hotels. |
| 24     Q.  Has there ever been any attempt by Marriott | 24     Q.  What it did own was some Ritz-Carlton |
| 25  International or MVW to spin off the Ritz-Carlton | 25  Development Company inventory that had been built in |
| Page 22 | Page 24 |

| | |
|---|---|
| 1  businesses? | 1  various locations around the United States; correct? |
| 2     A.  I'm sorry? | 2     MR. SELLINGER:  Objection to form. |
| 3     Q.  To sell them? | 3     A.  That's -- yes.  I mean, we owned unsold |
| 4     A.  Not to my knowledge.  There hasn't been from | 4  inventory in a number of clubs that had been |
| 5  MVW. | 5  developed. |
| 6     Q.  At the time MVW was spun off from MI as a | 6  BY MR. FERGUSON: |
| 7  separate company, what percentage of Development | 7     Q.  And as part of MVW's business, at least -- |
| 8  Company inventory was owned by the Development | 8  let's call it 2012, '13, '14 -- was part of its |
| 9  Company? | 9  business to manage these clubs? |
| 10     A.  I don't recall at that point now. | 10     A.  Yes. |
| 11     Q.  Was it in the order of 10 percent, | 11     Q.  What entities managed the clubs; do you |
| 12  20 percent, 25 percent, or would you have to see | 12  recall the name of the entities? |
| 13  documents to remember that? | 13     A.  Ritz-Carlton Management Company. |
| 14     A.  I'd have to see documents. | 14     Q.  Are you an officer of that company? |
| 15     Q.  Fair enough.  How long was the meeting with | 15     A.  Yes. |
| 16  Mr. Weisz and Mr. Mullenix and Ms. Perfido? | 16     Q.  Are you an officer of the Development |
| 17     A.  I don't recall exactly.  Somewhere around an | 17  Company? |
| 18  hour. | 18     A.  Yes. |
| 19     Q.  And at that meeting, Mr. Weisz got angry with | 19     Q.  Does the Ritz-Carlton Development Company |
| 20  Ms. Perfido? | 20  today own any inventory in any of the Ritz-Carlton |
| 21     A.  Not that I recall. | 21  Destination Clubs? |
| 22     Q.  You don't recall that there was -- he was | 22     A.  Yes. |
| 23  concerned that they should be -- leave the building | 23     Q.  From foreclosures and whatnot? |
| 24  because she had used the word "fraud"? | 24     A.  I'm trying to think.  We definitely own one |
| 25     A.  I don't recall that. | 25  or two units at a couple of clubs.  We owned a |
| Page 23 | Page 25 |

7 (Pages 22 - 25)

Lee Cunningham - November 10, 2017

1  meaningful inventory at any club.
2    Q.  And in terms of -- a lot of the clients and
3  owners at Ritz-Carlton Aspen bought, starting even as
4  early as 2000 -- I believe, 2001 -- they're still
5  being sold -- I think they were still being sold
6  through 2012.
7      Were you involved in the selling of any of
8  this inventory, or that was a different crew
9  altogether?
10     MR. SELLINGER:  Objection to form.
11   A.  I was not involved.
12 BY MR. FERGUSON:
13   Q.  Your division oversees the sales of points
14 primarily, right, today?
15   A.  No.  I oversee the sale of all of our
16 products, but I'm not directly involved in the
17 activity of sales.
18   Q.  So you oversee the -- I understand that.  So
19 you have officers and people under you that sell?
20   A.  That's correct.
21   Q.  But the primary income generation for MVW is
22 the sale of Marriott Vacation points today?
23   A.  That's true.
24   Q.  And another part of your income is the
25 management of some properties, including the

Page 26

1  Ritz-Carlton?
2    A.  True.
3    Q.  And the brands under MVW are the Marriott
4  Vacation Club -- that's one?
5    A.  Marriott Vacation Club.
6    Q.  And the Ritz-Carlton Destination Club?
7    A.  Yes.
8    Q.  And the Grand Residences by Marriott?
9    A.  That's true, yes.
10   Q.  In terms of the Marriott Vacation Club, is
11 that the entity that has the 50 or 55 resorts that MVW
12 points people can visit?
13   A.  I'm sorry?
14   Q.  Does it have about 55 resorts?
15   A.  It has more than that.
16   Q.  It does?  When your company was talking to --
17 for example, Mr. Mercer is talking about 51 clubs --
18 has that -- I believe it was 51 -- has that number of
19 clubs grown or is it because there's different types
20 of clubs that you're counting?
21     MR. SELLINGER:  Objection to form;
22 compound.
23   A.  The clubs have grown -- the number of clubs
24 has grown because more of the properties participate,
25 mostly International.

Page 27

1  BY MR. FERGUSON:
2    Q.  And those clubs are owned by whom?  Are they
3  independent owners of those resorts or are they owned
4  by Marriott International, or a combination?  Who
5  owns -- for example, if I go to a club in -- I don't
6  know -- Hawaii -- who owns that club?
7    A.  The owners of that inventory or owners
8  through the Marriott Vacation Club Trust.
9    Q.  Are you an officer of any of the trusts?
10   A.  No.
11   Q.  Let me show you an exhibit a little bit out
12 of order.  I generally go in chronological order, but
13 I want to start here.  Exhibit 14747.
14     MR. FERGUSON:  Jessica, I'm going to need
15 you to -- maybe you guys -- I'll give it to
16 you, Ian.  I didn't know you'd have so many
17 lawyers today.
18     MR. MARX:  Do you have another one there?
19     MR. SELLINGER:  One more?
20     MR. MARX:  Thanks.
21     MR. FERGUSON:  Didn't make enough copies.
22 BY MR. FERGUSON:
23   Q.  This is an e-mail chain from November of
24 2014, and it starts with an e-mail from Patrick Forth
25 to Eveleen Babich.

Page 28

1      Do you know Ms. Babich?
2    A.  I do.
3    Q.  And she's no longer with the company, I
4  understand?
5    A.  That's correct.
6    Q.  And she was the general manager of member
7  services for the Ritz-Carlton Destination Club?
8    A.  That's correct.
9    Q.  The final e-mail in this chain starts with
10 "Team."
11     MR. SELLINGER:  Actually, would you give
12 the witness a moment to review the document?
13     MR. FERGUSON:  Yeah.
14 BY MR. FERGUSON:
15   Q.  This is an e-mail about San Francisco
16 affiliation, right, sir?
17   A.  Yes.
18   Q.  Did you over -- were people reporting to you
19 regarding a vote to affiliate the San Francisco
20 property with the MVW systems?
21     MR. SELLINGER:  Objection to form.
22   A.  We -- I'm not sure I understand.  Ask me the
23 question again.
24 BY MR. FERGUSON:
25   Q.  Were people reporting to you about the

Page 29

8 (Pages 26 - 29)

Lee Cunningham - November 10, 2017

1 affiliation of San Francisco with the MVW system?
2    A. There was a survey done to get the sentiment
3 of the San Francisco owners relative to affiliation,
4 and I would receive updates on the results of that
5 survey on a periodic basis.
6    Q. So the surveys were to get the sentiment of
7 people that owned Ritz-Carlton Development Company
8 fractional units?
9    A. That's correct.
10    Q. And what do you mean to get the sentiment?
11    A. To understand their interest or lack of
12 interest in affiliation with Marriott Vacation Club
13 Destination.
14    Q. And whose sentiment were you paying attention
15 to, the people who were for affiliation or the people
16 who were against it?
17    A. I was paying attention to the total, both
18 sides.
19    Q. Do you know how many people surveyed at
20 Ritz-Carlton Aspen put down for affiliation?
21    A. Are we talking about Aspen or --
22    Q. I'm just asking about Aspen right now.
23    A. I don't recall the total number of surveys
24 that were responded to. Every member, at the time,
25 was issued an opportunity to participate in the
Page 30

1 survey.
2    Q. But you were not looking for a majority vote?
3    A. We were looking for an affirmative vote or
4 affirmative feedback from the owners or members from
5 the survey.
6    Q. And Ms. Babich, here in Exhibit 1447, is
7 e-mailing a Mitchell Bunn, Daniel Hicks, Fanny Ramirez
8 and Mary Umney.
9       Do you know any of those folks, or were they
10 kind of line personnel?
11    A. I know the name Daniel Hicks; but other than
12 that, I don't know the other names.
13    Q. It says in the middle paragraph -- you can
14 look at that -- of the first e-mail, "The survey is
15 similar to Aspen in that we're looking for a
16 majority -- we are not looking for majority vote."
17       Is that what you mean when you were looking
18 for -- does that mean they were looking for a
19 sentiment?
20    A. Yeah. We were looking for a -- it wasn't a
21 vote. It was a survey, and we were trying to
22 understand the -- what percentage of the -- those who
23 replied to the survey were positive toward affiliation
24 and which ones were against affiliation.
25    Q. Were you looking for a majority of the people
Page 31

1 that owned units in Aspen?
2    A. No. A majority of the ones that responded to
3 the survey or a -- I was looking at it to understand
4 their sentiment, their -- as a whole -- based on those
5 that responded.
6    Q. Have you reviewed any of the testimony of
7 Randy Mercer before today?
8    A. No.
9    Q. She went on to say to her team members there,
10 "It's merely a mechanism to get feedback and the
11 affiliation is expected to occur regardless."
12       So does that mean, if you got a sentiment
13 that was negative, it was going to happen anyway?
14    MR. SELLINGER: Hold on a minute. My
15    problem with the way you're asking questions
16    is -- I have no problem with you asking
17    Mr. Cunningham the substance of what was
18    going on. You can certainly show him the
19    document. But when you read something and
20    ask him what that meant, he's not the author
21    of the document. He's not even copied on
22    this document.
23    MR. FERGUSON: So, objection to form. I
24    got it.
25    MR. SELLINGER: Yeah.
Page 32

1 BY MR. FERGUSON:
2    Q. Is Ms. Babich someone in your company --
3 she's someone under the MVW umbrella, right? She
4 works for --
5    A. Yes.
6    Q. -- the Ritz-Carlton Destination Club?
7    A. She did.
8    Q. Okay. Did you inform your people below you
9 that the surveys were going to occur regardless of the
10 sentiment at any point?
11    A. The surveys were going to occur?
12    Q. No. That there was going to be an
13 affiliation regardless of the sentiment?
14    A. No, I did not inform people that. No.
15    Q. She went on to tell these people, "Please
16 keep that information confidential."
17       Have you seen this document prior to today?
18    A. Just in preparation for today.
19    Q. Sir, I placed in front of you an e-mail --
20 it's an e-mail chain. It's Exhibit 1485. Just so we
21 get on the same page today, you'll see on page 1 of
22 Exhibit 1485, it says, "RCDC0055041."
23       Do you see that?
24    A. I do.
25    Q. That means it was a document produced by
Page 33

9 (Pages 30 - 33)

Lee Cunningham - November 10, 2017

1  Mr. Marx, I guess, working with folks at your company?
2     A.  Okay.
3     Q.  Were you involved in the collection of
4  documents to be produced in these litigations?
5     A.  No.
6     Q.  Do you know who was coordinating that?
7     A.  Someone through our internal office.  No.
8     Q.  Your in-house counsel?
9     A.  Yes.
10    Q.  This is a -- starts in the last page.  It's
11 an e-mail from Ms. Babich to Ms. Sobeck and
12 Ms. Jackson-Rauso, Mr. Essig, and some other folks.
13         Ms. Sobeck is someone who reports to you, I
14 take it?
15    A.  Yes.
16    Q.  She's still with the company, obviously?
17    A.  She is.
18    Q.  The last page says -- it's from Ms. Babich.
19 It's talking about an update on the number of
20 affiliations through last night.  You see 219 members,
21 240 interests.
22         Are you there?
23    A.  Yeah.
24         MR. SELLINGER:  I'm sorry.  Would you
25    just give him a moment to review the

Page 34

1  totaling -- but I'm focusing right now on Aspen,
2  because that's the people I represent -- as of this
3  date, there was this 104 interest?
4     A.  Those are people who had chosen to affiliate.
5  It doesn't mean they had put any inventory in.
6     Q.  I understand that.  And the people who had
7  chosen to do that -- to be able to do that -- how many
8  weeks of their four were they allowed to put in --
9  one, or could they put in more?
10    A.  In the case of Aspen, they're allowed to put
11 in allocated time.  They could put in -- I believe in
12 the case of Aspen, up to three weeks.  The Aspen
13 product has three reserved allocated time and one
14 unreserved allocated time.
15    Q.  And they can't use unallocated time?
16    A.  They cannot use unallocated time.
17    Q.  Even today?
18    A.  No.
19    Q.  If you look at the first page, you wrote
20 this -- actually, your e-mail at the top, there's a
21 pretty big time gap.  It goes from December 18, '14,
22 Ms. Essig to yourself at the bottom; then at the top,
23 it has you and Mr. Essig going back and forth on
24 January 5, 2016.
25         You said, "Can I get an updated set of

Page 36

1     document?
2         MR. FERGUSON:  Yeah.
3         THE WITNESS:  Okay.
4  BY MR. FERGUSON:
5     Q.  So it says "Aspen 95 members with 104
6  interests," because some people owned more than one
7  interest; correct?
8     A.  Correct.
9     Q.  And that would be people that had actually
10 signed on for the affiliation through Lion & Crown?
11    A.  That's correct.
12    Q.  And as a result of that, they have the option
13 or -- you guys call it the opportunity -- exchange
14 opportunity -- to put in a week of allocated time for
15 them to get the opportunity, as you call it, to use
16 the Marriott Vacation Worldwide property?
17    A.  To use the entire system.
18    Q.  And the weeks they put in, would you call
19 that exchange inventory?  Would Marriott Vacation
20 Worldwide, MVW, now obtain a thing called exchange
21 inventory?
22    A.  That inventory would be in our Marriott
23 Vacation Club Destinations exchange program.
24    Q.  So if she's reporting to you in December of
25 '14 that there wasn't -- what the numbers were

Page 35

1  numbers on the RCDC member affiliation with MVCD."
2         Is this you checking on the exchange
3  inventory you had?
4     A.  This was to understand how many members had
5  chosen to affiliate.
6     Q.  Do you have a general recollection of how
7  many Aspen people or interests had affiliated with the
8  MVCD?
9     A.  I don't.  Obviously, you have through the
10 18th of December.  I don't recall and I don't have an
11 update on that number today.
12    Q.  When is the most recent update you've gotten
13 on the exchange inventory from Aspen?
14    A.  On the affiliation or the exchange?
15    Q.  The exchange inventory.
16    A.  I haven't gotten one in -- probably been over
17 a year.
18    Q.  When you said -- you asked me, exchange or
19 affiliation -- what did you mean by affiliation?
20    A.  Affiliation is not exchange.  Affiliation is
21 to affiliate with a -- or enroll in the exchange
22 program.  It doesn't mean that you ever have to
23 exchange.
24    Q.  Understood.  How about that -- those
25 numbers -- do you know today how many Aspen people

Page 37

10 (Pages 34 - 37)

Lee Cunningham - November 10, 2017

1 have chosen to affiliate as opposed to actually use
2 the program?
3    A. I do not.
4    Q. Is that something that you monitor?
5    A. No.
6    Q. Who monitors those numbers?
7    A. The member services office.
8    Q. Is that the Utah office?
9    A. It's in Salt Lake City, yes.
10    Q. Who's taken over Ms. Babich's position?
11    A. I'm trying to remember whether it's Patrick
12 Forth or -- I think it's Danny Hicks that was on that
13 previous e-mail.
14    Q. Thank you. So this is Exhibit 1552. It's
15 one page produced by your company. It looks like it's
16 a page from a -- if you look at the middle of the page
17 on the right side, it says, "Marriott Vacation Club
18 Resorts, 64." I believe it's page 64.
19       Does this document look familiar to you? Is
20 it something -- a brochure?
21    A. I don't know whether it's from a brochure
22 or --
23    Q. A website?
24    A. Yeah. I don't know.
25    Q. But you're generally familiar that on -- I

Page 38

1 know for sure on Aspen Highlands owners.
2    Q. When you say Ritz-Carlton, do you mean folks,
3 for example, from Tahoe?
4    A. No.
5    Q. What is a Ritz-Carlton owner? What do you
6 mean by that?
7    A. Someone who owns a Ritz-Carlton Destination
8 Club fractional unit.
9    Q. But you would expect that most people at
10 Aspen Highlands wouldn't be using points -- MVW
11 points -- they put into the exchange program to go
12 back and use their own club?
13    A. Not most.
14    Q. So most of the people that you're trying to
15 reach here are MVW folks that are your customers who
16 have bought points?
17       MR. SELLINGER: Objection to form;
18    mischaracterizes the testimony.
19    A. No. It's a communication with anyone who
20 participates in the Marriott Vacation Club
21 Destinations exchange programs.
22 BY MR. FERGUSON:
23    Q. And who participates in that, Mr. Cunningham?
24    A. Those who have enrolled in it through Lion &
25 Crown from Ritz-Carlton owners, and Marriott Vacation

Page 40

1 guess, is it every year that you put out a chart that
2 tells MVW points people how many points -- is this an
3 example of a points chart for MVW points owners to use
4 at Ritz-Carlton Club in Aspen?
5    A. Ritz-Carlton -- it's a points chart for
6 anyone who is using the Marriott Vacation Club
7 Destination exchange program to reserve in Aspen.
8    Q. So this is for MVW points customers and
9 owners?
10    A. And Ritz-Carlton Club. Any members who have
11 enrolled in -- any Ritz-Carlton members who have
12 enrolled in the MVCD company through Lion & Crown,
13 they have the same access as Marriott Vacation Club
14 Destinations exchange members.
15    Q. But a Ritz-Carlton Aspen Highlands owner
16 wouldn't be using points to use their own hotel? I
17 guess they could do that, but --
18    A. Oh, absolutely.
19    Q. So they could trade it -- but they can use
20 the Cobalt system to trade with other owners; correct?
21    A. They can.
22    Q. And do people at Aspen Highlands, to your
23 knowledge, utilize the point system to use their own
24 club?
25    A. I know that Ritz-Carlton owners do. I don't

Page 39

1 Club owners who have either purchased points or have
2 enrolled their weeks -- their weeks ownership in the
3 exchange program.
4    Q. When you say weeks ownership, are those
5 people that bought weeks before you migrated mostly to
6 a points system?
7    A. That's correct, and some after.
8    Q. And how many -- what percentage of people
9 that are reading this brochure for Aspen -- this
10 points system for Ritz-Carlton Aspen Highlands -- what
11 percentage of people that can access this with points
12 are Lion & Crown folks as opposed to MVW?
13    A. I have no idea.
14    Q. Is it 1 percent, 2 percent?
15    A. No idea.
16    Q. How many Lion & Crown folks are there
17 approximately today that are signed up to utilize
18 points to get into Ritz-Carlton Club -- that could get
19 them into Ritz-Carlton Aspen Highlands?
20    A. As I said before, I don't have a recent
21 update on that number.
22    Q. Do you have an update on how many MVW folks
23 would have -- or how many MVW folks are there today?
24    A. How many MVW owners?
25    Q. Yeah.

Page 41

11 (Pages 38 - 41)

Lee Cunningham - November 10, 2017

| | |
|---|---|
| 1     A. Are you talking about -- | 1     Q. And that would be only Monday nights? |
| 2     Q. Yeah. Are you going -- | 2     A. Well -- |
| 3     A. They're not MVW owners. | 3     Q. What does that mean? I'm just trying to |
| 4     Q. They're not owners? | 4 figure out what's happening there. |
| 5     A. MVW is not a product that we sell. | 5     A. The points are priced on a nightly basis, but |
| 6     Q. I'm sorry. What product is -- what product | 6 there is -- we would manage the inventory to ensure |
| 7 do -- what product is it that gets you, for example, | 7 that we got the greatest utilization of that |
| 8 6,500 points to use in 2015 -- to use December 4th and | 8 inventory. So while there is the physical capability |
| 9 December 17th at Aspen Highlands? | 9 or potential for a one-night stay, the likelihood of a |
| 10     A. You could own an Aspen Highlands fraction or | 10 one-night stay is very low, because then you end up |
| 11 any other Ritz-Carlton fraction. You could own | 11 blocking the ability to take a full week stay. |
| 12 Marriott Vacation Club Destination Points. You could | 12     Q. So just looking again for that particular |
| 13 own a Marriott Vacation week. You could own a | 13 week in Aspen, a points person could say, "I want a |
| 14 Marriott Grand Residence fractional unit. I think | 14 two-bedroom for the weekend for 1,725." Is that |
| 15 that's... | 15 points per night or points -- |
| 16     Q. How many Marriott Vacation Destination Club | 16     A. That's points per night. |
| 17 points people are there today? | 17     Q. Okay. And if they say, "We want to fly out |
| 18     A. Marriott Vacation Club Destinations owners? | 18 on Monday night and ski that day," they can buy the |
| 19     Q. Yes. | 19 Monday for 825? |
| 20     A. I don't know exactly. It's probably 75,000. | 20     A. If it's available. |
| 21 Something like that. | 21     Q. If it's available. Can they pick any |
| 22     Q. And how about weeks owners? | 22 combination of the days of the week or do they have to |
| 23     A. Marriott Vacation Club weeks owners, probably | 23 stay within these parameters? I guess, the question |
| 24 around 350,000. | 24 is, is this just pricing for those days? |
| 25     Q. Are customers today able to buy weeks still | 25     A. This is just to tell you what the pricing -- |
| Page 42 | Page 44 |
| 1 or is it all points? | 1 the price per night is for each of the groups of |
| 2     A. Yes, customers can still buy weeks. | 2 nights. |
| 3     Q. At a particular resort? | 3     Q. Have you done any studies on the usage |
| 4     A. No. At various resorts. | 4 patterns of Marriott Vacation points and |
| 5     Q. So you would agree with me then that there | 5 Marriott Vacation weeks people at the Aspen Highlands? |
| 6 are more Marriott Vacation points people and Marriott | 6     A. I have not. |
| 7 weeks people together than there are Ritz-Carlton -- | 7     Q. Do people -- |
| 8 sorry -- Ritz-Carlton Lion & Crown folks that can | 8     A. Well, yeah, I'm sure there's been studies |
| 9 access this club? | 9 done. I have not seen them. |
| 10     A. Yes. | 10     Q. I mean, that's one of the more complex parts |
| 11     Q. And looking at Exhibit 1552, there's a -- the | 11 of your organization is inventory control, I take it? |
| 12 chart on the left side. I'm sorry. This has gotten a | 12     A. Yes. |
| 13 little bit degraded in the copying process. | 13     Q. If those studies were being done, for |
| 14       For example, if you just look down three from | 14 example, how many people are picking three-day |
| 15 the bottom to February 13th to February 19th? I think | 15 weekends and the rest of the week is being broken up |
| 16 I selected this because we've got some of the higher | 16 into threes, fours, twos? Whose department is that? |
| 17 points values, I guess, because the kids are off from | 17     A. That's in Lani Kane-Hanan's department. |
| 18 school then. | 18     Q. What's her department called, sir? |
| 19       It says Friday to Sunday; it says Monday, | 19     A. It would be in the product supply management |
| 20 Tuesday to Thursday, and full week. | 20 side of her business -- her role. |
| 21       Are folks able to use points to -- in this | 21     Q. And she's here in Orlando, obviously? |
| 22 system to utilize less than a week? | 22     A. Yes. |
| 23     A. Yes. | 23     Q. Mr. Hearns, he's with the Marriott |
| 24     Q. Are they able to use it for just one night? | 24 International company. Is he stationed here or in |
| 25     A. Yes. | 25 Washington? |
| Page 43 | Page 45 |

12 (Pages 42 - 45)

Lee Cunningham - November 10, 2017

| | |
|---|---|
| 1   A. He's in Washington. | 1  Marriott Vacations Worldwide logo in the upper |
| 2   Q. I'm going to put in front of you | 2  right-hand corner. It looks like there was a slide |
| 3  Exhibit 1522. | 3  presentation -- |
| 4      MR. FERGUSON: Can you do me a favor? | 4      A. This is a PowerPoint presentation. |
| 5      MR. MARX: It depends. | 5      Q. All right. Do you recall being at this |
| 6      MR. FERGUSON: I don't have any more | 6  PowerPoint presentation? |
| 7  clean copies. I'm going to need those for | 7      A. That's what I was trying to remember. |
| 8  depositions. Can I have a copy of yours | 8      Q. I know it was a long time ago. |
| 9  back? | 9      A. I don't. I recall some of the components, |
| 10      MR. MARX: Absolutely. I promise I will | 10  but I don't recall this particular presentation. |
| 11  accommodate that. | 11      Q. The first page says "Holistic plan for RCDC." |
| 12      MR. FERGUSON: I know you will. | 12      What is meant, if you know, by holistic plan? |
| 13      MR. MARX: I have some questions for you | 13      MR. SELLINGER: Well, let me object to |
| 14  too. | 14  Mr. Cunningham interpreting what is meant by |
| 15      MR. FERGUSON: All right. | 15  a document that he hasn't confirmed he's |
| 16  BY MR. FERGUSON: | 16  seen. But I certainly have no objection to |
| 17      Q. Sir, this is a document produced -- it says, | 17  you asking him whether he's familiar with the |
| 18  "RCDC sample," 51228. | 18  concepts that are reflected here so you can |
| 19      MR. FERGUSON: What is that, Ian; do you | 19  get his best impression. |
| 20  know? | 20  BY MR. FERGUSON: |
| 21      MR. MARX: I do know, Matt, at the outset | 21      Q. Let me ask you -- in 2012, you were still -- |
| 22  of the document discovery, there was an | 22  you were senior vice president and COO back then; were |
| 23  agreed-upon protocol relative to the ESI | 23  you not? |
| 24  collection. In connection with that, we ran | 24      A. I was executive vice president, COO. |
| 25  a set of search terms across an agreed-upon | 25      Q. I doubt that you did this PowerPoint, but |
| Page 46 | Page 48 |

| | |
|---|---|
| 1  database. That resulted in the collection of | 1  that somebody underneath you put it together -- or |
| 2  about 5,000 or so documents that were | 2  folks under you did it? |
| 3  produced. | 3      A. Most likely. |
| 4      MR. FERGUSON: And this is one of those | 4      Q. And this would've been for a meeting that you |
| 5  Bates in a different way? | 5  would have attended, I take it? |
| 6      MR. MARX: This is one of those | 6      A. I don't recall the meeting, but -- I don't |
| 7  documents. | 7  know whether this was prepared for an internal |
| 8      MR. FERGUSON: Very well. Thank you. | 8  discussion before coming to talk to me about it or |
| 9  BY MR. FERGUSON: | 9  whether it was prepared for a meeting with me. |
| 10      Q. Sir, this is a document -- it looks like it's | 10      Q. And who would be putting -- who do you |
| 11  2012 because it says on the first page "Financials, | 11  recall was putting together a holistic plan for RCDC, |
| 12  2012 forecast." | 12  financials, risk and opportunities, timeline, |
| 13      Are you there? | 13  et cetera? |
| 14      A. Okay. | 14      A. People involved would have probably -- I |
| 15      Q. If you want to maybe flip through that? | 15  mean, at that point in time, it would have likely been |
| 16      A. I don't think this is from 2012. | 16  Stephanie Sobeck and ML -- |
| 17      Q. When is this from, sir? | 17      Q. Mary Lynn Clark? |
| 18      A. I would suspect earlier. | 18      A. Yeah. |
| 19      Q. So it's talking forward as opposed to looking | 19      Q. Was she down here in Orlando at that time? |
| 20  back. It's looking forward to 2012 forecast reports; | 20      A. Yes. |
| 21  right? | 21      Q. But she's no longer with the company? |
| 22      A. I don't know when this is from. | 22      A. That's correct. |
| 23      Q. Okay. Are you familiar with the format of | 23      Q. Do you know why she left? |
| 24  this document, "Today's discussion, MVW"? The | 24      A. Job opportunity in -- with Wyndham. |
| 25  Marriott logo for -- Marriott Vacation Club -- | 25      Q. In New Jersey? |
| Page 47 | Page 49 |

13 (Pages 46 - 49)

Lee Cunningham - November 10, 2017

1   A. Uh-huh.
2   Q. I was asking what -- if you have any
3 understanding of what was meant by holistic plan for
4 RCDC.
5       MR. SELLINGER: Same objection.
6   A. I assume it's a comprehensive plan.
7 BY MR. FERGUSON:
8   Q. Then it says "Unwind plan." What did that
9 mean?
10   A. I believe that refers to the unwind of a Bleu
11 Florida Land Trust.
12   Q. That owned a fractional interest in what
13 properties?
14   A. I believe San Francisco. I forget who else.
15 I don't recall who else.
16   Q. Were there any other trusts owned in
17 inventory back in 2012?
18   A. In 2012, we had established a -- for
19 Ritz-Carlton in Abaco -- a trust product --
20 points-based product -- there.
21   Q. Would you go to the same exhibit, and you'll
22 see that another number we have here is, we have the
23 Exhibit 1522, and then it's paginated below the
24 exhibit tab.
25       So, for example, I would take you to
Page 50

1 presentation tour to buy a one-twelfth fractional
2 interest?
3   A. In Aspen in that case.
4   Q. When it says "product being sold, NATO," NATO
5 means what?
6   A. NATO would be North American Timeshare
7 Organization. That product being sold, that would
8 probably be Marriott Vacation Club Destination points.
9   Q. On the same chart, it has -- I don't know
10 what color this was originally. I suspect it had
11 colors. Now it's black and white. It has -- under
12 San Francisco, it has Jupiter, Kapalua, Bachelor
13 Gulch, Tahoe. I'm not naming them all.
14       Why do they say closed? What's been closed
15 there?
16   A. The sales distribution.
17   Q. If we go to 015, there's a rental allowance
18 and restrictions. For Aspen, it says "Open market
19 rentals allowed under Colorado law."
20       What does market rentals mean?
21   A. That you can make units available for the
22 general public to rent.
23   Q. But you weren't -- were you allowed to do
24 that under the governing documents in the contracts
25 you had with The Ritz-Carlton Destination Club in
Page 52

1 Exhibit 1522, page 0009. I'll call it page 9. Do you
2 follow me on how I'm doing that? I'm on the same
3 chart -- the sales distribution strategy.
4   A. Yeah.
5   Q. Is this the sales distribution strategy for
6 the remaining inventory of the Development Company?
7   A. Yes.
8   Q. For Aspen, it says "Local marketing." Is
9 that because the Development Company was marketing
10 fractional units for that property?
11   A. I'm sorry. So under -- the yes under local
12 marketing?
13   Q. Yeah.
14   A. Means that we were doing local marketing.
15   Q. All right. Through local brokers or through
16 your own sales folks on the property, if you recall?
17   A. That would've most likely been our own
18 people.
19   Q. What does preview marketing mean?
20   A. Preview marketing is a -- where you book a
21 package for someone to come in, stay at the resort
22 that you are -- or a representative resort of the
23 product that you're selling. And as part of that
24 package, they take a sales presentation tour.
25   Q. And at this time, that would be a sales
Page 51

1 Aspen?
2   A. There's nothing in the documents that would
3 prevent an owner of inventory from renting their
4 interest, as many Aspen owners do.
5   Q. That's something you all wanted to try to do,
6 correct, with your inventory back in '12, '13, '14?
7   A. No. Our -- I think this refers to, are open
8 market rentals allowed? We were just understanding
9 what the relevant laws were and restrictions were.
10 And as you can see, the previews piece --
11 understanding where we had the ability to rent units
12 for preview vacations.
13   Q. When you say preview vacations, do you
14 mean --
15   A. That's a package to get the -- to have
16 somebody come in, experience the product, and take a
17 sales tour.
18   Q. And back in this timeframe, was it for a
19 one-twelfth fractional interest? That would be one?
20   A. Yes.
21   Q. Were you previewing the product for Vacation
22 Club folks?
23   A. I don't recall previewing -- doing preview
24 vacation packages into Ritz-Carlton products for -- to
25 sell Marriott Vacation Destination Club products.
Page 53

14 (Pages 50 - 53)

Lee Cunningham - November 10, 2017

1    Q.  Who would've been --
2    A.  And I don't -- I mean, from this document, I
3  don't know whether this is a recommendation or a --
4  this is a recap of the actions that are currently
5  underway.
6    Q.  Okay.  So this would've been something put
7  together by Ms. Sobeck, and it would've been folks at
8  this PowerPoint presentation to discuss where you guys
9  were at and where you were going?
10    A.  Potentially.  It would probably be more
11  Ms. Clark.
12    Q.  Ms. Clark, okay.  Have you ever met a
13  gentleman named Juan Pablo Cappello?
14    A.  No.
15    Q.  Do you recall receiving a letter from him?
16    A.  I was reminded of that in preparation for
17  this.
18    Q.  He was a former partner in the Miami office
19  of Greenberg Traurig.
20    A.  I've been informed of that.
21    Q.  Sir, this is a letter -- it's Exhibit 1023.
22  It's a letter from Eveleen Babich, general manager of
23  The Cobalt Travel Company, LLC.
24    Do you remember this letter from Ms. Babich
25  to Dear Member?

Page 54

1    A.  Yes.
2    Q.  This was also known as the letter advising
3  members of The Ritz-Carlton Destination Club and your
4  fractional owners of the brand evolution?
5    A.  Yes, it's been called that.
6    Q.  This is not dated, but do you recall this is
7  about July 17, 2012?
8    A.  Yes.
9    Q.  And what involvement did you have in putting
10  together this communication to your fractional owners?
11    A.  I'm sure I reviewed drafts.
12    Q.  And did this document arise out of the
13  meeting we saw -- would this document have arose out
14  of the meeting we saw back in the prior exhibit, 1522?
15    MR. SELLINGER:  Objection to form.
16    A.  I have -- since I don't fully recall having
17  reviewed that, I don't think so.  I don't know.
18  BY MR. FERGUSON:
19    Q.  In the first paragraph, she says, "As you're
20  aware, we launched -- three years ago, we launched a
21  product offering, known as Portfolio, providing
22  flexible member option."
23    What was Portfolio?
24    A.  Portfolio was the -- I think the product name
25  for the Bleu Florida Land Trust inventory.  It's a

Page 55

1  points based Ritz-Carlton Destination Club product.
2    Q.  And what were Aspen folks that owned interest
3  allowed to do in the Portfolio back in that timeframe?
4    A.  I do not know.
5    Q.  It says -- I'll keep going on in the
6  paragraph -- "As a result of the Portfolio program
7  offering, we also extended Home Club members this
8  opportunity to enjoy more flexible travel by
9  exchanging their allocated time for points through the
10  Lion & Crown exchange company."
11    What was being exchanged in those programs,
12  if you recall that program?
13    A.  Having re-read that -- as you re-read that,
14  the Portfolio -- what this would indicate is that the
15  Portfolio product was a points-based product, and so
16  the Home Club members or fractional owners could
17  exchange a week of their allocated time and convert
18  that to Portfolio points or Bleu -- to the Portfolio
19  program and stay at the properties that were included
20  in that, which were limited at the time.
21    Q.  Were they other Ritz-Carlton Destination
22  Clubs?
23    A.  They were only Ritz-Carlton Destination
24  Clubs.
25    Q.  Weren't they able to do that anyway through

Page 56

1  their membership?
2    A.  Yes, they were able to do it --
3    Q.  More?
4    A.  -- on a specific basis -- you know -- an
5  allocated week for an allocated week basis.  This gave
6  them more flexibility.
7    Q.  Now -- thank you.  In Exhibit 1023,
8  Ms. Babich wrote the members, in the second paragraph,
9  "In response to member feedback, we sought ways to
10  provide exceptional usability through a variety of
11  destinations and experiences."
12    What member feedback was she talking about?
13    A.  We get feedback from members through our
14  onsite surveys.  We survey all of our guests after
15  their stay.  We survey guests after their member
16  services experience.  We survey our guests -- probably
17  the two primary reasons -- places that we survey our
18  guests.
19    Obviously, member services gets feedback --
20  verbal feedback -- from members as they make
21  reservations.  And we also get feedback from the
22  boards of directors of the various clubs through our
23  interaction with them.
24    Q.  And Ms. Babich -- withdrawn.  In this letter,
25  second -- sorry -- the third and fourth paragraph

Page 57

15 (Pages 54 - 57)

Lee Cunningham - November 10, 2017

1 advising members that -- the third paragraph talks
2 about "the consideration that Ritz-Carlton Destination
3 Club has made a strategic business decision to remove
4 the Ritz-Carlton brand from Abaco Club."
5     Do you see that?
6   A. Yes.
7   Q. And when it says The Ritz-Carlton Destination
8 Club, that is actually a Marriott Vacation Worldwide
9 entity; right?
10   A. Yes.
11   Q. So it would've been Marriott Vacation
12 Worldwide people that made that consideration and that
13 decision to remove that brand from that property?
14     MR. SELLINGER: Objection to form.
15   A. It would be people who -- it would be the
16 people authorized to make that decision by -- for The
17 Ritz-Carlton Destination Club.
18 BY MR. FERGUSON:
19   Q. And was that you?
20   A. Would've been myself and the other officers
21 of that company.
22   Q. When you say that company, you mean MVW?
23     MR. SELLINGER: Objection.
24   A. I'm not sure I know exactly who the other
25 officers of The Ritz-Carlton Destination Club are.

Page 58

1 BY MR. FERGUSON:
2   Q. Is Mr. Weisz one?
3   A. No.
4     THE VIDEOGRAPHER: Counsel, we have five
5 minutes left on tape.
6 BY MR. FERGUSON:
7   Q. And then also, it says in the fourth
8 paragraph down, on July 10, 2012, "Ritz-Carlton
9 Management Company, as manager of the property known
10 as Kapalua Bay, has exercised the right to issue a
11 default notice."
12   A. Correct.
13   Q. And eventually the Kapalua property obviously
14 dropped out of the Ritz-Carlton Destination Club
15 system?
16   A. Correct.
17   Q. And I understand that MVW, or one of its
18 subentities in The Ritz-Carlton Destination Club, made
19 a bid to buy it back, but lost that bid -- to buy the
20 property, to keep it in the system?
21   A. We made a -- we had a discussion to keep the
22 management of the property. We didn't -- I don't
23 recall bidding to purchase the physical assets.
24   Q. All right. Was there any inventory left?
25   A. There was a lot of inventory left.

Page 59

1   Q. Someone else bought that from Marriott
2 Vacation Worldwide?
3   A. It wasn't Marriott Vacation Worldwide. It
4 was a joint venture between Marriott Vacation -- or
5 between -- I'm not sure of the exact entity within the
6 Marriott Vacation Club family or Vacation Worldwide
7 family. Lehman Brothers and Maui Land and Pineapple.
8   Q. We have only about three minutes left. Would
9 you go to the paragraph that says "Based on The
10 Ritz-Carlton Destination Club member feedback"? And
11 that would be three up from the bottom.
12   A. Uh-huh.
13   Q. It says "Additional benefits and experiences
14 will be available through a new affiliation with
15 Marriott Vacation Club Destinations."
16     And this was an idea that MVW had to
17 provide -- to affiliate the Marriott Vacation Club
18 Destination program with Ritz-Carlton Destination Club
19 members?
20   A. That's correct.
21     MR. SELLINGER: Objection to form.
22 BY MR. FERGUSON:
23   Q. It says "It will enable Ritz-Carlton members
24 to expand their options."
25   A. That's correct.

Page 60

1   Q. So they were going -- you were going to
2 provide them with an opportunity. And that's a word
3 you used quite a bit, right, because you saw this as
4 an opportunity for them?
5   A. Yes.
6   Q. And you told them that they would extend your
7 opportunity to deposit the reserved allocation on an
8 annual basis. And after a couple years, you actually
9 were able -- you actually did initiate the affiliation
10 so that people at the Aspen Club can put their
11 allocated weeks into the exchange?
12   A. That's correct.
13   Q. Through Lion & Crown Travel?
14   A. That's correct.
15     THE VIDEOGRAPHER: The time is 10:21.
16 That concludes media one in the deposition of
17 Lee Cunningham.
18     (Brief recess.)
19     THE VIDEOGRAPHER: The time is 10:32.
20 This is media two in the deposition of Lee
21 Cunningham.
22 BY MR. FERGUSON:
23   Q. I'll come back to Exhibit 1023 in a moment.
24 I just wanted to ask you -- in your meetings with the
25 four lawyers, which you looked at approximately 100

Page 61

16 (Pages 58 - 61)

Lee Cunningham - November 10, 2017

1 documents over, I take it, about two meetings, I think
2 you said, was there any other Marriott Vacation
3 Worldwide folks there -- for example, Ms. Sobeck?
4     MR. SELLINGER: Objection to form. You
5 mischaracterized his testimony.
6     MR. FERGUSON: I'm sorry. I didn't mean
7 to do that, but my memory might have failed
8 me a little bit.
9 BY MR. FERGUSON:
10    Q. Was Ms. Sobeck at any of the meetings with
11 you and your counsel?
12    A. No.
13    Q. How about Ms. Rauso?
14    A. No.
15    Q. Any other executives at all?
16    A. No.
17    Q. So on 1023, we're looking at the paragraph
18 that starts with "Based on the Ritz-Carlton member
19 feedback, additional benefits and experiences will be
20 available through a new affiliation."
21        When it says "feedback" there, it's not
22 talking about, sir, is it, feedback of people saying,
23 "Hey, we want to be part of the MVW Club Destinations
24 program," is it?
25    A. No.

Page 62

1 to form -- the preview about the -- you sort
2 of make statements, the MOU and
3 acknowledgement. I know it's not really part
4 of your question, but, for the record, I've
5 got to object because of that.
6 BY MR. FERGUSON:
7    Q. Okay. Today --
8     MR. SELLINGER: And I'm not trying to
9 interfere.
10    MR. FERGUSON: I understand. I want to
11 go as fast as I can.
12    MR. SELLINGER: I'm not really trying to
13 get in your way.
14 BY MR. FERGUSON:
15    Q. Today, the people who have signed -- I think
16 you guys called it an opportunity, an option,
17 voluntary program -- people who have gone into the
18 Lion & Crown program to put in their allocated weeks,
19 there was indications that they do that on an annual
20 basis.
21        My question is, for Mr. Smith at the Aspen
22 Club, that's decided to sign up with the Lion & Crown
23 exchange program in order to access MVW properties,
24 does that -- it says annual. Does it annually renew
25 or do they get a document every year they have to

Page 64

1    Q. So the feedback there was that people wanted
2 more opportunities, I take it, because you were losing
3 properties?
4    A. I don't -- I don't know what would have
5 prompted their feedback. They wanted more
6 opportunities.
7    Q. So just to be clear, when it says "member
8 feedback," there was nothing to do with them saying
9 they want any part of that MVW Destination Club?
10    A. I don't recall whether -- there could have
11 been feedback to that effect, but I don't recall.
12    Q. And it says -- we stopped with the video a
13 few moments ago with the sentence "This affiliation
14 will enable Ritz-Carlton Destination Club members to
15 expand their options." Then it talks about
16 "Affiliation will extend the opportunity to deposit
17 your reserved allocation on an annual basis."
18        A couple questions about that. People who
19 now -- cutting ahead two years to when the affiliation
20 occurred, with the MOU, the acknowledgement, and
21 today -- do people have to annually sign up or is it
22 automatically renewed?
23    A. The --
24    Q. The members.
25    MR. SELLINGER: Let me just first object

Page 63

1 sign?
2    A. I think it -- to be honest, I do not recall
3 whether their enrollment to Lion & Crown is a --
4 requires an annual renewal. I think this is referring
5 to the election to deposit a week is an annual
6 session.
7    Q. I understand that. But I was just
8 questioning whether or not they had to renew that
9 ability --
10    A. I do not recall.
11    Q. Is there anywhere in this letter that you
12 recall -- I'm sure you do -- where you tell the
13 members that -- given that allocated weekend, that
14 people from MVW -- either weeks people or points
15 people, I'll call them -- are going to be able to
16 access their private club?
17    A. No.
18    Q. Why not?
19    A. I think it was assumed we had other
20 affiliations. I noted here Abercrombie & Kent. They
21 knew that, as they exchanged their time for -- their
22 allocated time for stays in an Abercrombie & Kent
23 experience, that Abercrombie & Kent members then had
24 the opportunity to access. That's the nature of
25 exchange.

Page 65

17 (Pages 62 - 65)

Lee Cunningham - November 10, 2017

1    Q.  So you're assuming the approximately 700
2  people that had fractional owners -- and I know you
3  guys owned 120, say -- the 700 other folks -- 730
4  other folks -- they knew from this letter from
5  Ms. Babich that the 75,000 points people -- I know it
6  wasn't that many then -- but the points people and
7  weeks people could theoretically access that club?
8         MR. SELLINGER:  Objection to form.
9    A.  I believe, at the time of this letter -- as
10  you can see, it wasn't clear that -- or it wasn't
11  expressly stated that a Marriott Vacation Club person
12  would be able to come into that exchange.
13        It's certainly understood that if you
14  exchange time out to another system, that that
15  system's owners would be able to exchange in.
16  BY MR. FERGUSON:
17    Q.  So Ms. Babich's letter -- this is kind of a
18  watershed moment when you tell the people you're going
19  to affiliate with MVW.  It's the first time you told
20  your members that --
21    A.  That's correct.
22    Q.  And you're just assuming that the folks in my
23  club, the people -- 30, 40 people -- members -- that
24  you assume that they were going to know that MVW
25  people would be able to trade back in on the allocated

Page 66

1  weeks they might put into the program?
2    A.  Yes.
3    Q.  And you say that's because Abercrombie --
4  that they were -- some of them had signed up for
5  Abercrombie & Kent?  Or did you have to sign up for
6  that program at all?
7    A.  I don't recall whether there was a sign-up
8  required.
9    Q.  What was the population of Abercrombie & Kent
10  folks, excluding anybody who signed up from the
11  Ritz-Carlton systems?
12    A.  I don't know.
13    Q.  Was it more than a thousand?
14    A.  I don't know.
15    Q.  Was it less than 75,000 points people?
16    A.  I don't know.
17    Q.  So you don't have any kind of parameters at
18  all?
19    A.  Not for Abercrombie & Kent, no.
20    Q.  And how long has Abercrombie & Kent -- you
21  guys like to call it an opportunity for Ritz-Carlton
22  Destination Club folks.
23    A.  I believe it was around two years.
24    Q.  And people at the Ritz-Carlton, at least
25  Aspen, they were generally favorable when they

Page 67

1  utilized that.  Is that what you heard back in terms
2  of feedback?
3    A.  I don't recall ever seeing any feedback on
4  Abercrombie & Kent.
5    Q.  Were you involved in the process that led to
6  Abercrombie & Kent being an opportunity for
7  Ritz-Carlton Destination Club members?
8    A.  No.
9    Q.  Was that something that occurred -- withdraw
10  that.
11        What kind of feedback did you get from your
12  members when this letter went out to the folks?
13  Members?
14    A.  From Ritz-Carlton members?
15    Q.  Yes.
16    A.  We got feedback from members through our
17  member services, direct letters, conversations from --
18  calls from boards.  Some were positive.  Many were
19  negative.
20    Q.  Including Mr. Cappello?
21    A.  Well, I don't think I had -- I don't -- I
22  didn't correspond with Mr. Cappello regarding this
23  letter.
24    Q.  But he corresponded with you?
25    A.  I didn't -- not regarding this letter.

Page 68

1    Q.  How about the concept of an affiliation with
2  MVW; did he communicate with you about that?
3    A.  Yes.  He sent me an e-mail or -- yeah.
4    Q.  When the spinoff occurred and the
5  Ritz-Carlton Destinations Club went with the new
6  entity -- separate entity, MVW -- was that 2009, or
7  what year was that?  Do you recall?
8    A.  2011.
9    Q.  2011.  All right.  And who made the decisions
10  that the Ritz-Carlton Destination Clubs would go under
11  the vacation -- the new vacation company -- Marriott
12  International?
13    A.  Marriott International did.
14    Q.  Mr. Sorenson?
15    A.  I don't know who within their company made
16  that decision.
17    Q.  And when it was spun off, were there any
18  plans, after 2011, to build any more clubs or bring
19  any more clubs online in any way?
20    A.  We had unfinished development, but -- and we
21  continued to look for opportunities, but they had to
22  make -- they had to meet our economic hurdles, and I
23  don't recall any of them getting to that point.
24    Q.  Because MVW wasn't -- its primary business
25  model is not to develop properties; isn't that

Page 69

18 (Pages 66 - 69)

Lee Cunningham - November 10, 2017

**Page 70**

1 right -- in terms of building them through like the
2 Development Company that you inherited?
3     A. A primary part of our business is to develop.
4     Q. All right. In terms of the Development
5 Company, the Ritz-Carlton Development Company that
6 came over that had this remaining inventory -- that
7 particular entity -- do you recall Mr. Weisz
8 discussion that at the meeting with Ms. Perfido and
9 Mr. Mullenix?
10     A. I'm sure there was discussion regarding the
11 fact that we still owned a significant amount of
12 inventory.
13     Q. Do you recall words to the effect of
14 Mr. Weisz telling the folks in the room, including
15 you, that he wasn't happy that Marriott Vacation
16 Worldwide had gotten the Ritz-Carlton --
17     A. No.
18     Q. Do you recall him saying, in words or effect,
19 that he would never build another Ritz-Carlton Club?
20     A. No.
21     Q. I'm going to show you Exhibit 1024. This is
22 a -- Exhibit 1024 is also a letter from Babich, but
23 it's slightly longer than the prior exhibit, 1023.
24         Do you recall there was two versions of this
25 letter that went out?

**Page 71**

1     A. I do not recall that there were two versions.
2     Q. The letters end with "initially" -- that
3 sentence "initially access to the enhancements made
4 available through the new affiliation with Marriott
5 Vacation Club would be complimentary." You have that
6 paragraph. Then you have a closing one about
7 enthusiasm.
8         This paragraph that has the bold language in
9 there, is that because the people who had already
10 signed up with the Lion & Crown Travel Company would
11 have to reenroll in the MVW system, if you recall? We
12 can always ask Ms. Babich or Ms. Sobeck.
13     A. I don't recall this letter going out.
14     Q. Would you go to the paragraph -- let me go
15 back to this one if you don't recall it. I'll go back
16 to 1023. Look at that paragraph that says "initially
17 access to enhancements." It's on the second page,
18 sir. It's the last full paragraph before the signoff
19 about the enthusiasm.
20         It says, "Initially access to enhancements
21 made available through the new affiliation with
22 Marriott Vacation Destinations will be complimentary
23 and easily added." It says, "We encourage you to
24 participate, as we feel you will be delighted with the
25 additional destinations and countless experiential

**Page 72**

1 excursions available to you when you choose to not to
2 visit your Home Club during your allocated time."
3         At this point in time, were you -- I don't
4 want to say you -- was MVW allowing its either premium
5 or platinum members to access Ritz-Carlton Clubs?
6     A. I don't recall whether there was the -- I
7 don't recall the timing of when access to Ritz-Carlton
8 inventory was available for members of the MVCD
9 exchange program.
10     Q. But encouraging people to participate in the
11 program, if they did or have -- by encouraging them to
12 do that, they're creating an exchange inventory for
13 Marriott Vacation Worldwide to use for its points or
14 weeks people; correct?
15     A. I think what it says here is "We're
16 encouraging you because we feel you'll be delighted
17 with your additional destinations and countless
18 experiential excursions."
19     Q. Yeah. But what Marriott Vacation Worldwide
20 would get if people signed up --
21     A. Nothing.
22     Q. They wouldn't get exchange inventory?
23     A. Marriott Vacation Worldwide would get -- has
24 no benefit from this.
25     Q. If people affiliate and put it in an

**Page 73**

1 allocated week, you create some exchange inventory; do
2 you not?
3     A. That's correct.
4     Q. Am I picking the wrong name? At that point,
5 if there's exchange inventory, a Marriott Vacation
6 Worldwide person with, say, 6,500 points can access
7 the Ritz-Carlton Club today?
8     A. An owner of a -- a participant in the
9 Marriott Vacations Exchange Destinations Program would
10 have access to that inventory.
11     Q. And they would have access to the inventory
12 including on less than a weekly basis?
13     A. On an availability basis.
14     Q. But they can book for less than a week?
15     A. On an availability basis.
16     Q. Understood. Exhibit 1022. Sir, Exhibit 1022
17 is an e-mail exchange, Ms. Sobeck, at the bottom, to
18 Mary Lynn Clark. It's July 16th, which is the date
19 before the letter had gone out -- Ms. Babich's
20 letter -- at least the one you recognize -- on the
21 next day, July 17th.
22         It says, "Dear RCDC Association Presidents:
23 Thanks for your time today for the RCDC President's
24 Webinar." It says, "Attached, please find the two
25 letters that are being sent to members tomorrow.

19 (Pages 70 - 73)

Lee Cunningham - November 10, 2017

1 Those who have affiliated with Lion & Crown Travel
2 Company will get the first enrolled and those who have
3 not will get the second non-enrolled."
4     Does that kind of help you out in terms of
5 the last two letters --
6     A.  Maybe that was the reason for the two
7 letters.
8     Q.  Do you know how far in advance you all told
9 the association presidents Ms. Babich's letter was
10 coming to Ritz-Carlton Destination Club members?
11     A.  It would look like a day.
12     Q.  Do you recall taking the association
13 presidents, such as Mr. Neveloff, by surprise?
14     A.  No.
15     Q.  Who is John Albert, the vice president of
16 operations planning?
17     A.  He's a member of our corporate operations
18 staff.
19     Q.  And does he report to you?
20     A.  No.
21     Q.  Is he underneath your footing at MVW in terms
22 of office?
23     A.  No.
24     Q.  Who does he report to?
25     A.  Cliff Delorey.

Page 74

1     Q.  Was it planned to give them one day's notice
2 or was it just you all were too busy to give notice
3 further in advance?
4     A.  I don't recall.
5     Q.  Was there a decision not to tell the
6 presidents before telling -- to tell them that short
7 in advance of this affiliation announcement?
8     MR. SELLINGER:  Objection to form.
9     A.  We had no obligation to inform the presidents
10 of anything, and we chose to give them an advance
11 notice.
12 BY MR. FERGUSON:
13     Q.  And why do you say you had no obligation to
14 give them an advance notice?
15     A.  Because we had no obligation to give them an
16 advance notice of an affiliation, which is entirely
17 our decision.
18     Q.  But you all later promised to give a vote
19 that would require a majority of the members to
20 approve affiliation.
21     Do you recall that?
22     MR. SELLINGER:  Objection --
23     A.  No.
24     MR. SELLINGER:  Objection to form.
25 BY MR. FERGUSON:

Page 76

1     Q.  And he says, "The long-awaited announcement
2 about RCC."
3     Was why was this long-awaited?  Was this
4 something you had been planning for quite some time?
5     A.  I don't know why he chose those words.
6     Q.  Do you think he would've been in a meeting
7 like the one we saw in that PowerPoint presentation we
8 discussed?
9     A.  No.
10     Q.  He wouldn't have been there.  Who are
11 these -- what type of people are these -- what type of
12 people -- what group are these people -- Mr. Ryan,
13 Asche, Berg, Gum, Welch?
14     A.  They are other members of the corporate
15 operations staff.
16     Q.  It says there was a webinar.  Have you seen
17 that webinar?
18     A.  No.
19     Q.  Do you know what that webinar was?
20     A.  I know what -- the purpose of the webinar was
21 to give the board presidents an advance notice of the
22 letter going out.
23     Q.  The one-day advance notice of Ms. Babich's
24 letter?
25     A.  That's correct.

Page 75

1     Q.  You don't recall that?
2     A.  No.  We did not give them the decision to
3 make that -- make that decision.
4     Q.  Never?
5     A.  No.
6     Q.  Do you know a Mr. Lattore or Ms. -- Pat
7 Lattore?
8     A.  No.
9     Q.  Let me just show you Exhibit 1028.  This is
10 an e-mail from a Pat Lattore at the bottom.  You'll
11 see on the last page -- as you know, these things are
12 printed out kind of in reverse order.  The last page
13 is the first communication.
14     It says, "Please find attached letter from
15 Cobalt Travel Company, LLC, regarding the execution --
16 the evolution of a Ritz-Carlton Destination Club."
17     That's the cover e-mail that was sent with
18 Ms. Babich's July 17th letters, was it not?
19     A.  I do not know.
20     Q.  Well, if you look above, it says "July 17,
21 2012, member communications."
22     A.  It probably is.
23     Q.  Well, RCDC member communications is the
24 way -- is an e-mail system that you all are able to
25 use through Ms. Babich's group to communicate with

Page 77

20 (Pages 74 - 77)

Lee Cunningham - November 10, 2017

1 your Ritz-Carlton Club members; right?
2     A.  I don't personally remember the exact
3 communication tools that we used to communicate with
4 our members and owners, but...
5     Q.  So if you look at the e-mail, it looks
6 like -- let me ask you this way.  Are they able to
7 respond back to RCDC member communications on letters
8 such as Ms. Babich's on July 17th?
9     A.  I don't know.
10     Q.  If you look at the next page forward, it
11 says, "Hi Eveleen.  Thanks for the update."
12       Are you there?
13     A.  Yes.
14     Q.  It says, "Unfortunately, leadership has taken
15 away two of the nine key exchange locations for us
16 within the system."
17       That would've been Abaco and Kapalua that she
18 announced in her letter; right?
19     A.  There were two announcements in the letter.
20 I don't know which one she's referring to.
21     Q.  Were there any other properties that had left
22 as of July 17, 2012?
23     A.  No.
24     Q.  It says, "You took away A&F, which had great
25 locations, and we were about to exchange a week."
                                            Page 78

1     A.  There are times that you can, yes.
2     Q.  And are these secondary markets markets that
3 have the approval of you, or it's just a totally
4 different system?
5     A.  No, it's just -- if you own real estate or a
6 real estate product, you have the right to sell it.
7 You can sell it out through us or through somebody
8 else.
9     Q.  Well, if I pay $65,000 for 6,500 points, or
10 however you do that, why would someone be selling it
11 for less than it's worth?  What's the market for us
12 there?
13     A.  You'd have to ask them.
14     Q.  Are these secondary markets stuff -- sorry --
15 are things that you become aware of just through
16 meetings with your executives?
17     A.  No.  We know they exist.
18     Q.  Is it anything that you have tried to stop or
19 is it something that's just -- market forces and
20 anybody can do it?
21     A.  We don't like it, but we don't -- there's --
22 we exercise our rights and -- to control what we can
23 control.
24     Q.  So although the Rolling Stones don't like
25 scalpers, they're a fact of life.  That's kind of --
                                            Page 80

1       Why did the A&F exchange opportunity, as used
2 by you folks -- why was that taken away or why did it
3 end?
4     A.  Because Abercrombie & Fitch -- there was more
5 exchange going to Abercrombie & Fitch than there was
6 demand from Abercrombie & Fitch to go to Ritz-Carlton
7 products.
8     Q.  So there was an imbalance that couldn't be
9 handled by Abercrombie & Kent?
10     A.  That's correct.  It's Abercrombie & Kent.
11 Not Fitch.
12     Q.  I used to go to that store in New York.
13       The next page -- it goes back to the next
14 page.  It's Patrick -- so now we know it's a Patrick.
15 Mr. Lattore says, "The Marriott Club is a B system
16 that we could buy at significantly-discounted prices
17 on the resale market.  It does not come close to Ritz
18 properties nor the Ritz standard."
19       My question there is, are you aware that
20 there is Marriott Vacation Club system points or
21 product that's available in secondary markets?
22     A.  Yes.
23     Q.  And are you able to buy points in the
24 secondary markets for less than the prices that MVW
25 salespeople are required to sell them at?
                                            Page 79

1 you don't like it, but it's -- these secondary markets
2 for points are just available and people can buy them
3 still today?
4       MR. SELLINGER:  Objection to form.
5     A.  Yeah.  I mean, there are secondary
6 markets for -- there's markets -- multiple markets for
7 all types of real estate -- points, fractional
8 product, weeks, home ownership.  People are free to
9 price them the way they want to price them.
10 BY MR. FERGUSON:
11     Q.  On the first page of Mr. Lattore's e-mail to
12 Babich, you'll see that he responds -- let me ask you
13 this.  Have you ever seen this letter -- this e-mail?
14     A.  No.
15     Q.  1033 has been placed in front of the witness.
16 Exhibit 1033 is a two-page exhibit, Mr. Cunningham.
17 You'll see that you are the recipient of this
18 confidential document from -- it says confidential --
19       MR. FERGUSON:  Is that stamped
20     confidential for the litigation?
21       MR. MARX:  It is.
22 BY MR. FERGUSON:
23     Q.  Okay.  So that wasn't on there when it was
24 generated.  It's for the litigation.
25       This is a memorandum or -- it looks like it's
                                            Page 81

21 (Pages 78 - 81)

Lee Cunningham - November 10, 2017

1 an e-mail, actually -- from Clark to you,
2 Mr. Cunningham, regarding Mr. Neveloff.
3     Do you know Mr. Neveloff?
4     A. I have spoken to Mr. Neveloff.
5     Q. Have you ever met him in person?
6     A. No, not that I recall.
7     Q. You understand that he's a real estate
8 attorney in New York City?
9     A. I believe I was aware of that.
10     Q. And this looks like it's a call that
11 Ms. Clark had with Mr. Neveloff. She says, "I stuck
12 with my script below."
13     Do you know if anybody -- I'm sorry -- did
14 you work on a script for Ms. Clark's communication,
15 or, I guess, call with Mr. Neveloff?
16     A. No.
17     Q. And then she said, "First we confirmed his
18 concerns; do not want MVW members in their clubs; do
19 not want short stays at the clubs."
20     Do you see that?
21     A. Yes.
22     Q. Is that something you were aware of before
23 you got these notes of a call between Clark and
24 Neveloff?
25     A. I don't recall the time of whether -- I was
Page 82

1 aware that he had those concerns. Whether that
2 awareness occurred before this e-mail or after, I
3 don't know.
4     Q. Although, those were concerns, the fact of
5 the -- those were his concerns -- the fact of the
6 matter is, today, there aren't MVC members in the
7 Ritz-Carlton Aspen club?
8     A. That's correct.
9     Q. As well as other clubs in the system, like
10 Tahoe?
11     A. That's right.
12     Q. And, in fact, also that the MVC people can
13 use short stays in the Aspen Club -- shorter than a
14 week?
15     A. Yes, through the exchange program.
16     Q. Is there any other way that an MVC member can
17 access the Ritz-Carlton Aspen Club from an owner?
18     A. They could rent on the open market from the
19 members who rent their time.
20     Q. She has -- a few bullet points down, there
21 was an intention -- she made it clear that it was
22 Marriott Vacation Worldwide's intent to put unsold
23 inventory into the NATO trust. He wasn't thrilled,
24 but is now accepting it.
25     Do you have an understanding that
Page 83

1 Mr. Neveloff ever accepted that to occur?
2     A. I'm sorry. Where are you?
3     Q. Third bullet point down. It was a terrible
4 question. But it says, "He made it clear that our
5 intent was to put unsold inventory into the
6 Ritz-Carlton inventory into the NATO trust. He wasn't
7 thrilled, but is now accepting it."
8     Are you there?
9     A. Yeah.
10     Q. Mr. Neveloff -- withdraw that. In fact, that
11 never happened, right; you did not put Ritz-Carlton
12 inventory that the Development Company owned into the
13 trust?
14     A. No -- we did. Not in Aspen.
15     Q. You understand Mr. Neveloff was the president
16 of the HOA and this is talking about Aspen?
17     A. Okay.
18     Q. Maybe it wasn't. You wouldn't be talking to
19 Mr. Neveloff about what MVW was going to do with his
20 other clubs, would you?
21     MR. SELLINGER: Objection. It's not
22 talking about MVW here, I don't think.
23 BY MR. FERGUSON:
24     Q. Well, MVW owns Ritz-Carlton Development
25 Company; right?
Page 84

1     A. MVW -- Ritz-Carlton Development Company is an
2 entity within Marriott Vacation Worldwide.
3 BY MR. FERGUSON:
4     Q. So in 2012, when Ritz-Carlton Development
5 Company had to pay -- it had to pay members' dues for
6 its 120 units; right? Fractionals?
7     A. That's correct.
8     Q. So that liability would have made its way
9 over to the MVW accounting systems; right?
10     A. The cost would have, yes.
11     Q. Do you recall what the cost was per year on
12 total inventory across the system in 2012?
13     A. I do not.
14     Q. Was it more than a million dollars?
15     A. Most likely.
16     Q. Was it more than $10 million?
17     A. Unlikely.
18     Q. He said -- well, she said he said, five
19 bullet points down, "He said he doesn't want to be
20 sitting at the pool with 'blue collar' customers. He
21 grew up blue collar, but is now out." She wrote
22 "unbelievable" in large letters.
23     Do you recall anything about that comment
24 Mr. Neveloff made or her comment about what he said?
25     A. Just that she made that comment.
Page 85

22 (Pages 82 - 85)

Lee Cunningham - November 10, 2017

1    Q. Was that a theme that you heard over the next
2  couple years before the affiliation was allowed to
3  occur with Lion & Crown -- people that signed with
4  Lion & Crown -- do you recall the sentiment that the
5  people at Aspen, at least, thought of their ownership
6  and their members as being part of a private club
7  where they would know each other and spend time
8  together? Did you hear concerns that it didn't want
9  people that were strange to the system there?
10       MR. SELLINGER: Objection to form.
11    A. So, yeah, could you re --
12  BY MR. FERGUSON:
13    Q. That was bad. Did you ever hear from other
14  folks, besides this comment here -- without using the
15  term "blue collar" -- that they were concerned that
16  allowing MVW people into the Aspen Club would impact
17  their desire to have a private club setting where they
18  knew everybody?
19    A. I did hear that there was this concern about
20  exclusivity that had long since been eliminated by the
21  members themselves through their rental of inventory
22  on the open market and through the Abercrombie & Kent
23  affiliation, which I don't recall hearing the same
24  feedback from.
25    Q. But the difference is that a person that --
Page 86

1    A. No.
2  BY MR. FERGUSON:
3    Q. How many weeks of exchange inventory does
4  Marriott have today for its Marriott Vacation
5  Worldwide people?
6    A. I'm not following your question.
7    Q. Okay. How much exchange program inventory --
8  I think we covered this before and it might be that
9  you don't know. How much exchange program inventory
10  is available at the Ritz-Carlton Aspen for MVW
11  members?
12    A. I don't know the current numbers.
13    Q. Okay.
14    A. There are more owners outside than
15  Mr. Lattore.
16    Q. I understand that. You were the person that
17  was involved in negotiating the sale of the
18  Ritz-Carlton Development Company inventory at Ritz
19  Aspen with the company called the Lore Institute --
20  Mr. Klein?
21    A. I was aware of that. I didn't negotiate the
22  arrangement.
23    Q. Are you the person who reached out to him?
24    A. No.
25    Q. Let me show you what's marked Exhibit 1042.
Page 88

1  for example, Patrick Lattore, if he owned one-twelfth
2  interest, he would have four weeks to use himself or
3  to trade on the open market; right?
4       MR. SELLINGER: Objection to form. What
5    difference?
6    A. What's the question again?
7  BY MR. FERGUSON:
8    Q. I'm going to get to that. Mr. Lattore would
9  have four weeks, three allocated and one unreserved;
10  right?
11    A. That's correct.
12    Q. Okay. And your point is that there were
13  people that weren't part of the private club that
14  could get into there because Mr. Lattore could give it
15  his brother-in-law or he could give to Fries
16  Properties to rent to anybody that wanted to be in
17  Aspen?
18    A. I'm not familiar with Fries Property, but he
19  could list it for rent through a number of means. And
20  anybody who had the ability to pay, could come.
21    Q. All right. So he would be able to do that
22  with four weeks, but Marriott Vacation Worldwide is
23  now able to do that with their exchange program
24  inventory for far more than four weeks; right?
25       MR. SELLINGER: Objection to form.
Page 87

1  This is an e-mail. The bottom of page 1 says "The
2  Ritz-Carlton Destination Clubs newest offering." It's
3  from a Linda Sciberras, and she's with -- regional
4  membership executive at Ritz-Carlton Destination Clubs
5  here in Orlando.
6       Do you know her?
7    A. I do not.
8    Q. If you look at the first page, again, it
9  says, "The Ritz-Carlton Destination Clubs and Marriott
10  Vacations Worldwide are pleased to announce our newest
11  offering with more destinations and more flexibility
12  including..."
13       The next page, the second bullet point down
14  says "access to seven ski destinations!"
15       Do you know whether one of those seven ski
16  destinations being -- it looks like it's e-mailed out,
17  in this case, to a Mr. McBride -- included Aspen?
18    A. I don't know.
19    Q. All right.
20    A. I mean --
21    Q. Sorry.
22    A. Yeah. I'm trying -- I don't know in this --
23  for this particular communication -- whether there
24  was -- how they were counting a destination.
25    Q. Does Marriott Vacation Worldwide have ski
Page 89

23 (Pages 86 - 89)

Lee Cunningham - November 10, 2017

1 destinations other than, say, Aspen and Bachelor
2 Gulch? It obviously does.
3    A. Sure.
4    Q. Let me put it this way. Does it have
5 non-Ritz-Carlton Destination Club ski resorts?
6    A. Absolutely.
7    Q. Okay, great. If you look at this bullet
8 point here, it says, "6,500 points required to access
9 Ritz-Carlton Destination Clubs."
10    Are you there?
11    A. Uh-huh.
12    Q. Is that a yes, sir?
13    A. Sorry.
14    Q. You have to say "yes" as opposed -- that's
15 something I should have told you before.
16    A. I'm sorry. I'm not sure where you're at.
17    Q. I'm at 6,500 points --
18    A. Okay. Got you.
19    Q. And I think we can do both of those --
20 Ritz-Carlton Aspen, 6,500 points. That would be for
21 MVW people, weeks and points, that could, at this
22 point -- or that they were being told they could
23 access these clubs for that amount of points?
24    A. No. This refers to the number of points that
25 you would need to own to be a certain level within the
Page 90

1 in that timeframe?
2    A. I do not know. I don't know.
3    Q. Exhibit 1514 is an e-mail from Clark to you
4 with copy to Ms. Sobeck and back to herself. The
5 subject is Jay. This looks like a different e-mail
6 because it doesn't have the -- yeah, this is
7 different.
8    It says, "I spoke to Jay at the end of
9 yesterday" -- that would've been August 10th -- that
10 would be Friday -- "and talked to him about working on
11 communication plan and his thoughts."
12    Do you recall receiving this e-mail about
13 Mr. Neveloff?
14    A. I'm sure I did.
15    Q. This is a document reviewed for your
16 deposition, sir, if you recall?
17    A. Yes.
18    Q. When you look at the documents, did they have
19 exhibit stickers on them, if you recall?
20    A. No.
21    Q. The fourth bullet point says, "Marriott
22 marketing has already started. He's sending me a
23 marketing e-mail he got from south -- what is an SE?
24 What is an SE?
25    A. Sales executive.
Page 92

1 exchange club; and, therefore, you have to have
2 ownership that equalled 6,500 points.
3    So it's not available to all members of the
4 club. Just those at the upper end of the club.
5    Q. So 6,500 points would cost more -- would
6 cost -- that would be one of your higher-level
7 members?
8    A. Yes.
9    Q. Okay. And then a higher-level member would
10 have to use points like in the chart we saw before for
11 the nights in Aspen?
12    A. Right.
13    Q. Page 64 of that chart. What was it that
14 allowed an MVW person to access the Ritz-Carlton Aspen
15 at a 6,500-point level -- that particular type of
16 member -- what was it that would've been used in this
17 timeframe? Were you going to use the inventory that
18 was owned there?
19    MR. SELLINGER: Objection to form.
20 BY MR. FERGUSON:
21    Q. Let me withdraw that. For the person you're
22 telling there's this opportunity at MVW -- can use
23 Ritz-Carlton Aspen at a 6,500-point level, what would
24 that person say -- "Yeah, I want to do this" -- what
25 would he be accessing, or she be accessing, at least
Page 91

1    Q. -- "in Orlando that said something about buy
2 and you get Ritz/Marriott stays."
3    Do you know what that's about in terms of
4 buying to get Ritz/Marriott stays blended together?
5    MR. SELLINGER: Objection to form.
6 BY MR. FERGUSON:
7    Q. Which Marriott is in the same -- there's a
8 slash between the two of them together.
9    MR. SELLINGER: So what's the question
10 you're asking?
11 BY MR. FERGUSON:
12    Q. Do you recall what, in marketing, was going
13 on at that time? Was it similar to the prior exhibit
14 we just saw in Exhibit 1042?
15    A. I would suspect it is that prior exhibit.
16    Q. Exhibit 1049, sir. That's an e-mail from an
17 address called Marriott Vacation Club Insider. Is
18 that a --
19    A. That's a communication that goes out to
20 Marriott Vacation Club owners, speaking to new options
21 and new -- or featuring vacation options for owners.
22    Q. The second page says, "Explore your newest
23 benefits. From luxury resort stays to owner-exclusive
24 tours, you can now enjoy even more vacation choices
25 through the Marriott Vacation Club Destinations
Page 93

24 (Pages 90 - 93)

Lee Cunningham - November 10, 2017

1  exchange programs."
2      The first one there is a special premier
3  benefit, Ritz-Carlton stays. It says, "Premier and
4  Premier Plus status. You can use club points to stay
5  at additional Ritz-Carlton Club resorts."
6      So in the fall of 2012 or late summer, this
7  is being sent to your points and weeks people?
8      A. That's correct.
9      Q. At that point, only Premier and Premier Plus
10  people would have the access to those Ritz-Carlton
11  Clubs?
12      A. That's correct.
13      Q. Today, is that still in effect? Is there
14  such a thing as a Premier member and a Premier Plus?
15      A. No. We changed the status -- as we had
16  three -- we went to five and they were renamed.
17      Q. Sounds like our tax brackets. All right. I
18  can cover a lot of this stuff with Stephanie Sobeck.
19      Q. This is Exhibit 1061. That's a letter from you,
20  Mr. Cunningham, executive vice president and COO to
21  "Dear Valued Members."
22      I take it this was a letter that was
23  written -- co-written with various executives and
24  staff at MVW?
25      MR. SELLINGER: Objection to form.
Page 94

1      MR. FERGUSON: What's your objection?
2      MR. SELLINGER: Well, it's a Ritz-Carlton
3  Destination Club. And, once again, you seem
4  to be conflating MVW and Ritz-Carlton.
5  BY MR. FERGUSON:
6      Q. Your paycheck comes from MVW?
7      A. Yes.
8      Q. Are you employed by The Ritz-Carlton
9  Destination Club?
10      A. No.
11      Q. Ritz-Carlton Destination Club is a trade name
12  that's being used here under the MVW umbrella of
13  companies; right?
14      MR. SELLINGER: Objection to form.
15      A. The Ritz-Carlton Destination Club is an
16  entity that's a part of the Marriott Vacation
17  Worldwide Corporation.
18  BY MR. FERGUSON:
19      Q. Is there a company called The Ritz-Carlton
20  Destination Club? We have the Ritz-Carlton Hotel
21  Company, Ritz-Carlton Hotel Management Company. Is
22  there a company called The Ritz-Carlton Destination
23  Club?
24      A. I don't know the answer to that.
25      Q. Sometimes, I take it, you could sign your
Page 95

1  letter as the vice president or executive vice
2  president of Lion & Crown Travel?
3      A. That's correct.
4      Q. And sometimes you could do it under Grand
5  Residences?
6      A. That's correct.
7      Q. And sometimes, and most often, you use
8  Marriott Vacation Clubs?
9      A. Probably most of my communication is not
10  Marriott Vacation Clubs. Marriott Vacation Worldwide
11  would be my most frequent use of the -- my title.
12      Q. So in this particular situation, because
13  you're sending it to members of the Ritz-Carlton Club
14  system, you utilize executive vice president and chief
15  operating officer of Ritz-Carlton Destination Club?
16      A. That's correct.
17      MR. SELLINGER: Objection to form.
18  BY MR. FERGUSON:
19      Q. But you are not an executive vice president
20  of The Ritz-Carlton Destination Club, are you?
21      A. I'm an -- I wanted to be clear as to who the
22  communication was coming from -- was me representing
23  The Ritz-Carlton Destination Club.
24      Q. But you're not an executive vice president of
25  those five words, are you? You are not an executive
Page 96

1  vice president of The Ritz-Carlton Destination Club?
2      A. I don't know that those five boards make up
3  the --
4      Q. Five words. I should've -- I'm sorry.
5      A. Words? I thought you said boards.
6      Q. No. I'm sorry.
7      A. No.
8      Q. And I'm going to look at your letter. It
9  says, "We are writing to provide further information
10  regarding certain changes announced on July 17th to
11  the Lion & Crown Travel Company and The Ritz-Carlton
12  Destination Club system."
13      So do you understand this letter was you
14  following up to Ms. Babich's letters we saw earlier?
15      A. That's correct.
16      Q. You wanted to ensure them in the first
17  paragraph that, with respect to their rights and their
18  one-twelfth fractional interest, that their Home
19  Clubs -- that that would not change?
20      A. Their fractional deeded interest would not
21  change and their rotating calendar. They're not all
22  one-twelfth interests.
23      Q. There's some people that buy fixed weeks?
24      A. There were. The Ritz-Carlton Club Jupiter
25  was one-eighth interest.
Page 97

25 (Pages 94 - 97)

Lee Cunningham - November 10, 2017

| | Page 98 |
|---|---|
| 1 | Q. Do you know whether this letter was going to |
| 2 | people systemwide or some combination? |
| 3 | A. Systemwide. |
| 4 | Q. Okay. Thank you. After this letter was -- |
| 5 | at the time this letter was written, Abaco and Kapalua |
| 6 | were in the process of or had already left the system; |
| 7 | correct? |
| 8 | A. They were in the process of, if not out. |
| 9 | Q. And after this letter was sent out, Bachelor |
| 10 | Gulch left the system? |
| 11 | A. I don't know when the -- I don't see a date |
| 12 | on this letter. |
| 13 | Q. Well, it's July 17th we're referring to. I |
| 14 | have it down as August 17th, and I don't know why. |
| 15 | A. If -- |
| 16 | Q. Let me do it this way. If you look at the |
| 17 | last paragraph, it says, "We have scheduled a webinar |
| 18 | for members of The Ritz-Carlton Destination Club with |
| 19 | myself and the chief executive officer on |
| 20 | August 28th." |
| 21 | So it's sometime between July 17th and |
| 22 | August 28th, I take it. |
| 23 | A. I don't believe Bachelor Gulch was -- had |
| 24 | come out of the system by August 28th. |
| 25 | Q. Of '17 -- I'm sorry -- of '12? |

Page 98

| | Page 99 |
|---|---|
| 1 | A. '12. |
| 2 | Q. But it would eventually leave the system? |
| 3 | A. Yes. |
| 4 | Q. And then the Jupiter Club would also leave |
| 5 | the system? |
| 6 | A. Yes. |
| 7 | Q. And both of those clubs went with The |
| 8 | Timbers? |
| 9 | A. That's correct. |
| 10 | Q. And in terms of the other clubs that |
| 11 | remained, there's Aspen; correct? |
| 12 | A. That's correct. |
| 13 | Q. And there's a lawsuit pending with 200 |
| 14 | owners? |
| 15 | A. Yeah. |
| 16 | Q. And Lake Tahoe is one in the system? |
| 17 | A. Yes. |
| 18 | Q. And that's also in litigation? |
| 19 | A. Yes. |
| 20 | Q. About the affiliation in part? |
| 21 | A. Yes. |
| 22 | Q. And San Francisco, the same, is in |
| 23 | litigation? |
| 24 | A. That's correct. |
| 25 | Q. Are there any clubs that haven't the left the |

Page 99

| | Page 100 |
|---|---|
| 1 | system that are not in litigation? |
| 2 | A. Yes. |
| 3 | Q. Which ones? |
| 4 | A. Ritz-Carlton Club St. Thomas and Ritz-Carlton |
| 5 | Club Vail. |
| 6 | Q. You have litigation in St. Thomas, though, do |
| 7 | you not? |
| 8 | A. Not related to -- yes. Related to a |
| 9 | completely different issue. |
| 10 | Q. If you look five paragraphs down at the first |
| 11 | page of your letter between the 17th and the 24th, |
| 12 | July and August, it says, "Based on prior member |
| 13 | feedback, The Ritz-Carlton Destination Club team has |
| 14 | been exploring ways to broaden." |
| 15 | In terms of you writing this letter as |
| 16 | opposed to Ms. Babich, is it the same answer, that the |
| 17 | member feedback you're referring to is what people, |
| 18 | for example, say when they leave the property and do a |
| 19 | survey? |
| 20 | A. Yes. |
| 21 | MR. SELLINGER: It's only a partial |
| 22 | summary of his earlier answer. |
| 23 | MR. FERGUSON: I understand. |
| 24 | BY MR. FERGUSON: |
| 25 | Q. There were other types of surveys? |

Page 100

| | Page 101 |
|---|---|
| 1 | A. Yes. |
| 2 | Q. There's OSAT surveys; is that one? Is that a |
| 3 | term of art? |
| 4 | A. Owner satisfaction is -- I'm not sure that's |
| 5 | the right terminology. That wouldn't be the right |
| 6 | terminology for The Ritz-Carlton Destination Club. We |
| 7 | do a member satisfaction survey and an onsite |
| 8 | satisfaction survey. |
| 9 | Q. I take it, some other member feedback would |
| 10 | be like the letter we saw from Patrick Lattore to |
| 11 | Ms. Babich; right? That would be -- a blast e-mail |
| 12 | would send out a letter like hers or this one here -- |
| 13 | A. It would be all feedback sources like it was |
| 14 | before. |
| 15 | Q. The last paragraph of page 1 of Exhibit 1061 |
| 16 | says, "The affiliation option announced in our |
| 17 | July 17, 2012 letter regarding the evolution of the |
| 18 | Ritz-Carlton Destination Club is the next step in |
| 19 | providing significantly more vacation options for our |
| 20 | Ritz-Carlton Destination Club members." |
| 21 | When you say "significantly more vacation |
| 22 | options," do you mean they could -- pursuant to what |
| 23 | you were planning at this time, was to access the |
| 24 | MVW resorts and excursion experiences; right? |
| 25 | A. The additional options that were being added |

Page 101

26 (Pages 98 - 101)

Lee Cunningham - November 10, 2017

1 were the Marriott Vacation Club exchange options which
2 are -- number in the thousands.
3     Q. It says, "Should members decide to
4 participate in this opportunity, they would be able to
5 exchange one or more weeks for the Lion & Crown
6 points."
7         The fact of the matter is, at this timeframe,
8 you lost two clubs, there were less options, there
9 were no clubs being built; and what you mean by
10 evolution, at least in part, was, as a perk, you were
11 going to offer this access to MVW?
12     A. Which letter are you referring to?
13     Q. This letter right here.
14     A. This?
15     Q. Yeah.
16     A. When evolution was used here, it was in
17 reference to the prior letter that talked about the
18 evolution of the club.
19     Q. But one of the reasons you're doing this
20 affiliation, or proposing to do this affiliation, was
21 to present an optional opportunity in this evolution,
22 in part, because the people who had bought into the
23 club system were losing clubs?
24     MR. SELLINGER: Objection to form.
25     A. No. Because this was a follow-on to the

Page 102

1 original communication generated questions for a
2 number of our members and may not have fully
3 anticipated all your questions regarding changes to
4 The Ritz-Carlton Destination Club."
5         Is it fair to state, between July 17th and
6 the time this letter was written sometime prior to
7 August 24th, that you were getting a fair number of
8 communications from members about this -- Ms. Babich's
9 letter?
10     A. We had gotten communication from several
11 owners and from several through some of the board
12 members that -- asking questions that we wanted to
13 clarify.
14     Q. Including, for example, the telephone calls
15 that Ms. Clark had with Mr. Neveloff?
16     A. Yes.
17     Q. And you said, "We've received additional
18 feedback from a few members on your board."
19         When it says "your board" here, does that
20 help you understand one way or another whether this
21 was a letter that was targeted to a particular club,
22 or, just, you were able to use that because --
23     A. Everybody has a board.
24     Q. Okay. You said, "We appreciate you hearing
25 from us" and these people could e-mail back. Could

Page 104

1 announcement before we -- well, I take that back. We
2 had, at that point, had the two clubs that had left,
3 or that were removed from the system.
4         Yeah, partly in response to the reduced
5 options for members.
6 BY MR. FERGUSON:
7     Q. And you wanted to communicate pretty
8 consistently and over and over again that you were
9 calling this an opportunity and it was optional;
10 right?
11     A. It is optional.
12     Q. And that's something you've stressed
13 repeatedly, at least in this letter; right? You used
14 the words "opportunities, affiliation, option." ⸱
15 That's something you really wanted to communicate to
16 your members -- it was optional and you viewed it as
17 an opportunity for them?
18     MR. SELLINGER: Objection to form.
19     A. We communicated that it was optional because
20 it was optional, and that it provided additional
21 opportunities for those -- because that's what it did.
22 BY MR. FERGUSON:
23     Q. At the second page of Exhibit 1061, you said
24 in this paragraph here -- it's one up from the
25 broadcast information -- it says, "We understand our

Page 103

1 they reply back to this address,
2 member.inquiry@ritzcarltonclub?
3     A. Yes.
4     Q. Did there come a time when the Development
5 Company stopped selling its inventory at Aspen?
6     A. At Aspen, yes.
7     Q. Why was the decision made to stop selling it?
8 Let me do it this way. When was the decision made to
9 stop selling it?
10     A. I don't recall the actual date.
11     Q. Was it before this affiliation concept was
12 being floated to the members, or, I guess --
13     A. I don't recall the timing.
14     Q. Why was it stopped?
15     A. Because the market -- there wasn't a market
16 for it. As we tried to generate interested customers,
17 the cost of selling it exceeded the cost of the
18 proceeds of the sale.
19     Q. And the cost of selling it would've been a
20 sales force?
21     A. Sales force, marketing, accommodations for
22 preview customers -- all sales and normal marketing
23 costs.
24     Q. At this time, I take it, you and Mr. Weisz --
25 I know one of your specialties is revenue management

Page 105

27 (Pages 102 - 105)

Lee Cunningham - November 10, 2017

1  techniques.  One of the things you needed to do then
2  was monetize this inventory; correct?
3      A.  Any business would want to sell its
4  inventory.
5      Q.  At this point, there was no market for it, so
6  you needed to find a different way to monetize it?
7      A.  We needed to find a way to sell the
8  inventory, yes.
9      Q.  One way to sell the inventory at this point
10  was to sell it to a trust or to put it in a trust for
11  the points program?
12      A.  We could sell it through the trust.
13      Q.  What do you mean by selling it through the
14  trust?  Who would buy from the trust?
15      A.  The purchasers of the product, the under --
16  whatever the underlying trust -- in our case, Marriott
17  Vacation Club Destination points.
18      Q.  The Bleu Florida --
19      A.  Bleu Florida Land Trust.
20      Q.  Is that a land trust that was owned by a
21  Marriott Vacation Worldwide entity or is it a private
22  investor?
23      A.  Well, no.  It was a trust established by -- I
24  don't know -- timing-wise, may have been when we were
25  part of Marriott International, but, effectively, the
                                                Page 106

1  have very well been in there.
2      Q.  You don't recall this gentleman -- this
3  letter by Mr. Stillman -- parsing your letter of
4  August 17th?
5      A.  I don't recall receiving it.
6      Q.  You'll see at the top, it was sent by
7  Neveloff to Mercer.
8      Do you recall being involved at all in
9  Mr. Mercer running for the board, the Aspen board?
10      A.  No.
11      Q.  Did you know Mr. Mercer prior to his second
12  stint on the board?  He came back on in 2012.
13      A.  I didn't know him prior to 2012.  I didn't
14  know he was on the prior.
15      Q.  Let me show you the next exhibit, 1073.
16  You'll see this is an e-mail, at the bottom, from a
17  lady named Kristi Gilliam, Gilliam Properties, of
18  Aspen.
19      Do you know Ms. Gilliam by any chance?
20      A.  No.
21      Q.  This is a letter to Neveloff, Schneider,
22  Marsden, and Oliver.  And Neveloff, on page 2 of
23  Exhibit 1073, forwarded it to you and Mary Lynn Clark.
24      Do you see that in the upper middle of the
25  page -- upper third?
                                                Page 108

1  Ritz-Carlton group of companies.  And it was an
2  attempt to determine how to sell that inventory that
3  didn't pan out.
4      Q.  I'll show you Exhibit 1060.  I don't know if
5  you've seen this before when it was sent or in your
6  preparation.  But if you'll see at the back, it's your
7  e-mail -- the communication from Ritz-Carlton to
8  Mr. Stillman about your letter we just saw in the
9  prior exhibit, Exhibit 1061, and it looks like Mr.
10  Stillman responded to member inquiry.
11      Do you see that?
12      A.  Yes.
13      Q.  And somehow -- I guess, it was forwarded by
14  Mr. Stillman to Mr. Neveloff.  You'll see that this
15  was produced by the association.  At the bottom, above
16  the exhibit, it says the association, AHCA.
17      Do you know whether this was produced by your
18  company in this litigation?
19      A.  I have no idea.
20      Q.  Have you ever seen this communication from
21  Mr. Stillman in the timeframe it was sent?
22      A.  No.
23      Q.  Did you look to see it in your preparation
24  for today?
25      A.  I don't recall this particular one.  It may
                                                Page 107

1      A.  Yes.
2      Q.  It says, "Lee and Mary Lynn -- ML -- I'm
3  forwarding one of the many e-mails I have received so
4  far this week which expresses a number of concerns,
5  which I appreciate you responding to.  Thanks."
6      Do you recall reviewing Ms. Gilliam's
7  e-mail?
8      A.  I do not.  It would have most likely been
9  reviewed by Ms. Clark.
10      Q.  You'll see that -- I'm sorry.  If you look at
11  Ms. Gilliam's letter, you'll see the different fonts.
12      Do you have an understanding one way or
13  another, as you sit here today, that Ms. Clark did in
14  fact write these -- interlineated this letter in some
15  way to respond to it, or do you have any knowledge of
16  that at all?
17      A.  No.
18      Q.  Mr. Cunningham, this is the letter, I think,
19  I alluded to earlier from Juan Pablo Cappello.  It's
20  Exhibit 1080, August 27, 2012.  I'm also going to put
21  in front of you Exhibit 1074 and we'll use those
22  together.  Exhibit 1074 is a Cappello e-mail to
23  Neveloff, Schneider, Jerry Marsden, and Tyler Oliver.
24  It looks like it's the same verbiage.
25      I take it you received the letter version of
                                                Page 109

28 (Pages 106 - 109)

Lee Cunningham - November 10, 2017

1 this as opposed to this e-mail version internally to
2 the board?  It does say "to member services" with a
3 copy.
4       Do you recall receiving either one of these,
5 either Exhibit 1054, an e-mail from Mr. Cappello, or a
6 letter dated August 27th from Mr. Cappello?
7    A.  I didn't.  My memory was jogged when we
8 reviewed the information for the deposition.
9    Q.  When it came in, did you read it, or did you
10 give it to someone else to handle?
11    A.  I read it, and then I most likely gave it to
12 someone else to handle, to follow up.
13    Q.  He was not happy with your letter, was he?
14    A.  No.
15    Q.  And one of the things he complained about was
16 the fact that you were -- we just covered that -- that
17 you were in fact the vice president -- executive vice
18 president and chief operating officer of the Marriott
19 Vacation Worldwide Corporation.
20       We covered that, right?  He was correct?
21    A.  That's correct.
22    Q.  And he said, "I assume you signed your
23 August 20th letter under The Ritz-Carlton Destination
24 Club to provide us, the RCDC members, comfort to that
25 you have our best interests at heart."
Page 110

1 but he did tell you in the paragraph that starts with
2 "Lastly, your recent communications failed to
3 acknowledge the underlying issue, which all RCDC
4 members -- RCDC members need to understand."  And he
5 underlined "The Marriott Vacation Worldwide
6 Corporation has a huge incentive to dilute the RCDC
7 brand to further its greater interest in selling more
8 Vacation Club memberships."
9       First of all, the primary business of MVW,
10 obviously, is now to sell points; right?
11    A.  Our primary sales is through the sale of
12 Marriott Vacation Club Destination points.
13    Q.  And all you really could've done or were
14 doing in late August in 2012 is trying to placate or
15 take care of the very few -- the small population of
16 RCDC members?
17       MR. SELLINGER:  Objection.  Just give me
18    a moment.  When he asks questions, just pause
19    for a moment so I can object.  Thank you.
20       Objection to form.
21 BY MR. FERGUSON:
22    Q.  You were trying to make them happy, placate
23 them?
24    A.  We were trying to provide them more options.
25    Q.  And he was correct that, in providing more
Page 112

1       Ignoring his take on it, you were trying to
2 communicate as someone that was -- you used that
3 signature block, The Ritz-Carlton Destination Club,
4 because you felt you were communicating with your
5 Ritz-Carlton Destination Club members?
6    A.  That's correct.
7       THE VIDEOGRAPHER:  Counsel, we have five
8    minutes left.
9 BY MR. FERGUSON:
10    Q.  On the second page of Exhibit 1080, the
11 letter that was sent to you -- by the way, this is a
12 day or two before the member presentation that you and
13 Mr. Weisz put on?
14    A.  Okay.
15    Q.  Is that right?  Do you recall putting a
16 presentation on?
17    A.  Yes.  That's the day before.
18    Q.  Okay.  Do you know whether you had this
19 before -- did you see this letter before you did that
20 presentation?
21    A.  I doubt it --
22    Q.  All right.
23    A.  -- if it was dated the 27th.
24    Q.  He wrote to you -- and I know these are his
25 words and not, obviously, something you agree with --
Page 111

1 options, that you're opening a door or cracking a door
2 for Marriott Vacation Worldwide customers, at this
3 time Premier and Premier Plus people, to access
4 Ritz-Carlton Clubs?
5       MR. SELLINGER:  Objection to form.
6    A.  Can you restate the question?
7 BY MR. FERGUSON:
8    Q.  You were cracking the door at this point to
9 allow MVW people to access Ritz-Carlton Destination
10 Clubs?
11    A.  Not through affiliation.  They were going to
12 have access to Ritz-Carlton Destination Clubs through
13 the inventory that was going to be sold through the
14 Ritz-Carlton -- through the Marriott Vacation Club
15 trust.
16    Q.  But today at Aspen, they can access it
17 because you've given people this opportunity in
18 exchange so they can now do that?
19    A.  That's correct.
20    Q.  And you did that based upon a survey where 71
21 people said they were for it on the survey you all
22 designed to be given out in December of 2013?
23       MR. SELLINGER:  Objection to form.
24    A.  I don't recall the actual count, but we had
25 the authority and the right to make that change, and
Page 113

29 (Pages 110 - 113)

Lee Cunningham - November 10, 2017

1 we surveyed the customers and that was -- got an
2 affirmative -- of the people who were interested
3 enough to respond to the survey, the majority of them
4 were in favor of the affiliation.
5 BY MR. FERGUSON:
6     Q. 70 people out of 876 people?  71?
7     A. I don't know what the final number was.
8     Q. And do you believe that the sentiment of 71
9 people -- 71 or 66 or 73 to 68 -- do you believe that
10 adequately gauged the sentiment of the other 800
11 and -- 800 people -- or 750 people?
12     A. They all had the opportunity to provide their
13 sentiment.
14     Q. You sent something out at Christmastime, a
15 survey for them online to fill out?
16     A. I believe it was a couple weeks before
17 Christmas.
18     Q. And how many surveys do people at Aspen
19 Highlands get?  Do they get it when they leave every
20 time?
21     A. They get a survey when they leave.  This was
22 a very different form that they received -- that
23 survey.
24     Q. Was it done by the same company?
25     A. No.

Page 114

1     you're covering the same subject, and then
2     we're done with the subject in terms of
3     plaintiffs' deps.
4         MR. REISER:  For the most part.  That's
5     the idea.  I'm not guaranteeing there's not
6     going to be a little crossover later that
7     might come up in the context of some issue
8     later on or something.
9         MR. SELLINGER:  But there's not going to
10    be revisiting the same subjects other than if
11    it relates to some new topic.
12        MR. REISER:  Sure.
13        MR. SELLINGER:  Okay.
14 BY MR. REISER:
15    Q. So I just wanted to ask you some background
16 now a little bit and fill in a little bit of your
17 background, and ask you -- when did you first start
18 with Marriott?
19    A. In 1982.
20    Q. But that was with Marriott International?
21    A. That's correct.
22    Q. And what did you start doing for them?
23    A. I joined the company as a front office
24 trainee.
25    Q. Was it right out of the University of Nevada,

Page 116

1         MR. FERGUSON:  Got to switch the tape.
2         THE VIDEOGRAPHER:  The time is 11:52.
3     This concludes media two in the deposition of
4     Lee Cunningham.
5         (Lunch recess.)
6         THE VIDEOGRAPHER:  The time is 12:43.
7     This is media three in the deposition of Lee
8     Cunningham.
9             DIRECT EXAMINATION
10 BY MR. (MIKE) REISER:
11    Q. Good afternoon, Mr. Cunningham.  I'm Mike
12 Reiser.
13        Counsel has been good enough to allow a
14 little bit of an unorthodox procedure here.  I'm going
15 to jump in and try to cover some things on the other
16 two cases that are at issue here, so we can
17 efficiently -- so I'm going to try to just ask you
18 questions that are within the scope of what you just
19 went through.
20    A. Okay.
21        MR. SELLINGER:  Mike, just so the record
22    is clear, our understanding and our
23    willingness to accommodate your untraditional
24    request is the assumption that we're not
25    going to be tag-teaming back and forth; that

Page 115

1 Reno?
2     A. University of Nevada, Las Vegas.
3     Q. There's a hotel management school there;
4 right?
5     A. That's correct.
6     Q. So you've been with the company continuously
7 since '82 to the present?
8     A. That's correct.
9     Q. You were at International first and then the
10 spinoff entity?
11    A. That's correct.
12    Q. So in terms of the spinoff, how involved were
13 you, if at all, on discussions leading up to the
14 spinoff?
15    A. Only on a periphery basis.
16    Q. What was your position with Marriott Vacation
17 Club International, the division of Marriott
18 International, before the spinoff?
19    A. As the spinoff was originally announced, I
20 was the executive -- I was the vice president in
21 charge of -- chief operating officer of the Marriott
22 Vacation Club -- the North American Marriott Vacation
23 Club product.
24    Q. So was it a similar position in that you were
25 kind of a chief operating officer type for that club?

Page 117

30 (Pages 114 - 117)

Lee Cunningham - November 10, 2017

1  A.  That's correct.
2     Q.  At that point in time, the Marriott Vacation
3  Club International, pre-spinoff, had both Marriott
4  Vacation Club properties and Ritz-Carlton Club
5  properties; is that correct?
6     A.  That's correct.
7     Q.  So you don't recall any effort by Marriott
8  International, prior to the spinoff, to package the
9  assets of The Ritz-Carlton Destination Club and sell
10 those?
11    A.  No.  I wouldn't have been involved -- if
12 there was such a thing, I wouldn't have been involved
13 in it.
14    Q.  Do you recollect anything about Marriott
15 International taking a $1 billion write-down on their
16 balance sheet?
17    A.  Yes, I do recall that.
18    Q.  Was that in relation at all to The
19 Ritz-Carlton Destination Club?
20    A.  It was primarily in relation to the
21 Ritz-Carlton products.
22    Q.  So to be clear, you recall Marriott
23 International taking a write-down of a billion
24 dollars, prior to the spinoff, primarily related to
25 the Ritz-Carlton assets?

*Page 118*

1  familiar to me.  I know there was a significant loss,
2  and it could be in that order of magnitude for -- like
3  today for Marriott relative to the Ritz-Carlton Club
4  products -- Clubs and Residences.
5     Q.  So my recollection is, the spinoff happened
6  in November of 2011.  Is that --
7     A.  That's correct.
8     Q.  When it was spun off in November of 2011, you
9  went with Marriott Vacation Club, obviously -- the
10 Marriott Vacation Worldwide folks.  You came over in
11 your same position as chief operating officer,
12 essentially?
13    A.  Prior to the spinoff, the operating officer
14 or chief operating officer for The Ritz-Carlton
15 Destination Club had resigned the -- and we had the
16 chief operating officers for our International
17 Marriott Vacation Club product.  They had left and it
18 was all consolidated with me.
19    Q.  Who was the guy who resigned from The
20 Ritz-Carlton Destination Club prior to the spinoff?
21    A.  Pete Watzka.
22    Q.  And what about -- the same question for the
23 European division.
24    A.  European -- I'm trying to remember the timing
25 of when -- I think, at the time of prior to the spin,

*Page 120*

1  A.  It was prior to the -- well prior to the
2  spinoff, yes.
3     Q.  What year was it?
4     A.  I don't know, but it was not -- I don't
5  recall, but it was -- time had passed between that
6  write-off and the spinoff.
7     Q.  As far as you understood it, what was the
8  purpose of the write-off?
9     A.  To -- it was following the -- however you
10 want to term it -- the real estate bubble burst, the
11 beginning of the great depression or recession, the
12 bankruptcy of Lehman.  It was to write down the
13 inventory to its then value.
14    Q.  Was there a decision made prior to the
15 spinoff within the Marriott International, while it
16 was owned by -- the Marriott Vacation Club
17 International was owned by the Marriott
18 International -- was there a discussion of shutting
19 down the club?
20    A.  No, no.
21    Q.  Have you ever heard any figures that the
22 Marriott International lost $600 million and
23 $11 million a year feeding The Ritz-Carlton
24 Destination Club assets?
25    A.  Those particular numbers aren't necessarily

*Page 119*

1  Europe and -- I know it was -- Europe and Asia were
2  together, and those were led by Bob Miller.
3     Q.  Did Mr. Miller resign prior to the spinoff as
4  well?
5     A.  He retired as well.
6     Q.  Watzka, he resigned?  He didn't retire?
7     A.  I don't recall whether it was a retirement or
8  a resignation.  I think it was a retirement.
9     Q.  Did he have any -- do you recollect him
10 voicing any opposition to the spinoff or anything?
11    A.  Not to my knowledge.
12    Q.  So prior to the spinoff, what brands were
13 operated by Marriott Vacation Club International?
14    A.  The Marriott Vacation Club, Marriott Vacation
15 Club Destinations, Marriott Grand Residence,
16 Ritz-Carlton -- Ritz-Carlton Destination Club,
17 Ritz-Carlton Residences.  And, I believe, at the time
18 of the spinoff, there was an additional brand,
19 Horizons by Marriott Vacation Club, that was folded
20 into the Marriott Vacations product.
21    Q.  Okay.  I just want to kind of focus for a
22 minute on the -- I thought I heard you say the
23 Ritz-Carlton -- I heard the Ritz-Carlton Destination
24 Club, the Ritz-Carlton Residences, and I thought I
25 heard you say a third one.

*Page 121*

31 (Pages 118 - 121)

Lee Cunningham - November 10, 2017

| | |
|---|---|
| 1 | What was the other brand? |
| 2 | A. There wasn't a third Ritz-Carlton. |
| 3 | Q. I thought there were three. So the only two |
| 4 | brands that were in the Marriott Vacation Club |
| 5 | International that were around before the spinoff were |
| 6 | The Ritz-Carlton Destination Club and the Ritz-Carlton |
| 7 | Residences? |
| 8 | A. That's correct. |
| 9 | Q. All right. And you were -- were you the |
| 10 | chief operating officer prior to spinoff of those two? |
| 11 | A. Two months prior to spin. |
| 12 | Q. You got appointed to COO two months prior? |
| 13 | A. That's correct. Prior to the effective date |
| 14 | of the spinoff. |
| 15 | Q. What was your position before that? |
| 16 | A. I was the chief operating officer for the |
| 17 | Marriott Vacation Club North America product or |
| 18 | business. |
| 19 | Q. So you came up through the Marriott Vacation |
| 20 | Club Destination products. Mr. Watzka resigned right |
| 21 | before the spinoff, and then you took over his duties |
| 22 | as COO of the Ritz properties? |
| 23 | A. That's correct. |
| 24 | Q. So what is the difference between the |
| 25 | Ritz-Carlton Residences and The Ritz-Carlton |

Page 122

| | |
|---|---|
| 1 | Q. So reading through some of your SEC filings, |
| 2 | and it looked like there's a licensing agreement after |
| 3 | the spinoff where Marriott Vacations Worldwide Corp. |
| 4 | licenses the name Ritz and Marriott for purposes of |
| 5 | the timeshare business; right? |
| 6 | A. That's correct. We have an exclusive license |
| 7 | for the Marriott name in the timeshare business; and |
| 8 | for Ritz-Carlton in the timeshare business and then a |
| 9 | nonexclusive in the Ritz-Carlton Residences business. |
| 10 | Q. That's what I was wondering -- how the guys |
| 11 | in Tahoe got the Residences. |
| 12 | A. That's correct. |
| 13 | Q. What's the annual license fee? I thought I |
| 14 | read it was 25 million. Has it gone up since the |
| 15 | original -- |
| 16 | A. No. It started at 50 million. It has an |
| 17 | escalation clause. And then there's a variable |
| 18 | component based on sales. |
| 19 | Q. So it started at 50 million. Was that |
| 20 | differentiated at all between the Marriott name and |
| 21 | the Ritz name? |
| 22 | A. No. |
| 23 | Q. So what is the incremental portion of the |
| 24 | license? How does that work? |
| 25 | A. It's a percentage of closed sales -- |

Page 124

| | |
|---|---|
| 1 | Destination Club? |
| 2 | A. The Residence refers to whole ownership, |
| 3 | condominium ownership. |
| 4 | Q. And certain of the clubs that were in the |
| 5 | Ritz-Carlton Destination Clubs were mixed clubs, that |
| 6 | they had Residences -- |
| 7 | A. That's correct. |
| 8 | Q. -- and the Destination Club, fractionals? |
| 9 | A. That's correct. |
| 10 | Q. Do you remember which clubs had the mixed -- |
| 11 | A. The mixed use was in San Francisco, in Vail, |
| 12 | there's both Jupiter -- I'm trying to remember. |
| 13 | Q. Does Bachelor Gulch have any residences? |
| 14 | A. No, not that were part of our business. |
| 15 | Q. Okay. So I think -- so SFO, Vail, and |
| 16 | Jupiter, do you recall them having residences combined |
| 17 | with the fractionals too? |
| 18 | A. Yes, within our business. I mean, for |
| 19 | instance, in Tahoe, there are Ritz-Carlton Residences. |
| 20 | They just weren't part of our business. |
| 21 | Q. In Tahoe, the Ritz-Carlton Residences were |
| 22 | actually part of the hotel portion of the -- |
| 23 | A. They were licensed to the developer of the |
| 24 | hotel, I believe -- the use of that brand -- and |
| 25 | they're managed by Marriott International. |

Page 123

| | |
|---|---|
| 1 | 2 percent of closed developer sales and 1 percent of |
| 2 | sales that are previously-owned inventory, reacquired |
| 3 | inventory. |
| 4 | Q. So there have been no sales, for the most |
| 5 | part, of Ritz-Carlton Destination Club fractionals |
| 6 | since the spinoff. There might have been a few early |
| 7 | on. |
| 8 | But would you agree with me, for the most |
| 9 | part since 2012, there haven't been any new fractional |
| 10 | sales? |
| 11 | A. There's been -- |
| 12 | MR. SELLINGER: Objection to form, |
| 13 | because you seem to be linking the sales to |
| 14 | the spinoff or the lack thereof -- |
| 15 | MR. REISER: No. Just -- I'm not trying |
| 16 | to be rude or anything. If you could just |
| 17 | object to the form, that would be great, and |
| 18 | I'll try to fix it. If I can't figure out |
| 19 | what you're objecting to, I'll ask. Thanks. |
| 20 | BY MR. REISER: |
| 21 | Q. I'm not trying to relate it, but you would |
| 22 | agree that, since 2012 -- somewhere in 2012 -- we've |
| 23 | got documents, and I can pull them out, you know -- |
| 24 | I'm aware that sales of The Ritz-Carlton Destination |
| 25 | Club fractional product stopped around 2012. Is |

Page 125

32 (Pages 122 - 125)

Lee Cunningham - November 10, 2017

1  that --
2      A.  No.  It was before that.
3      Q.  Before that?
4      A.  Yes.
5      Q.  When --
6      A.  Shortly after.  In 2009, sales were
7  significantly low and they continued to be there, and
8  they've never rebounded.
9      Q.  So in 2009, you made an attempt to create --
10  not you -- but Marriott International developed a
11  Portfolio points product for The Ritz-Carlton
12  Destination Club; right?
13      A.  That's correct.
14      Q.  And they were selling those from '09 to '12
15  or so when they unwound?
16      A.  I think that's approximately correct.  I
17  don't recall the exact date.  I wasn't involved in
18  that.
19      Q.  You weren't involved in the Portfolio?
20      A.  Product, no.
21      Q.  So that was Watzka's watch on the
22  Ritz-Carlton --
23      A.  That's correct.
24      Q.  So it's true, is it not, that the Portfolio
25  product has been completely unwound?

Page 126

1  I don't know for sure.
2      Q.  Is it true, then, that there were no
3  fractional Ritz-Carlton sales after 2009?  Is that
4  what I heard you say?
5      A.  No.  There was very low volume of sales after
6  2009.  That's when the fractional sales plummeted.
7      Q.  How many -- well, sales started in San
8  Francisco -- I'm sorry -- sales in Tahoe started in
9  '09.  True?
10      A.  I believe that may be correct, yeah.
11      Q.  So my understanding of the folks in my case,
12  every one of them except for one -- Joe Tan -- who is
13  no longer part of the case anymore -- bought
14  fractional rather than Portfolio.
15          So I'm just wondering if that jogs your
16  recollection at all as to whether fractionals were
17  still being sold during that --
18      A.  Well, they would, obviously -- we were
19  selling -- we sold Lake Tahoe to a point, as the
20  velocity of sales was low.  I don't think it was --
21  when -- Portfolio wasn't offered everywhere to
22  everyone.  It wasn't a replacement product.  It was
23  an optional product.
24      Q.  Correct.  They could buy a fractional or
25  Portfolio?

Page 128

1      A.  That's correct.
2      Q.  And that was done through offering the folks
3  who had bought the Portfolio points -- transfer those
4  points into Marriott Vacation Club points for the most
5  part?
6      A.  We gave them multiple options to choose from.
7      Q.  What were the options they had?
8      A.  One was to transfer into the Marriott
9  Vacation Club.  One was to -- I believe, to receive a
10  fractional interest in some of the locations where
11  had unsold developer.  I can't remember whether there
12  was a refund opportunity as well, but I believe there
13  was.
14      Q.  Okay.  Do you know how many people who
15  bought -- I understood there were only about 140
16  people who bought Portfolio points during that
17  three-year period they were available.
18          Is that about right?
19      A.  I think it's -- I think that's a high
20  estimate.  I think it was right around 100.
21      Q.  All right.  Do you know how many of those 100
22  actually got a buyback?
23      A.  Got a buyback?
24      Q.  You said that the third option was --
25      A.  I said I think there may have been an option.

Page 127

1      A.  That's correct.
2      Q.  At least 50 fractional products in Tahoe were
3  sold, as I understand it?
4      A.  Sure.
5      Q.  Okay.  And there were a few Portfolio
6  memberships sold in Tahoe as well that you can recall?
7      A.  I don't know whether they were sold from Lake
8  Tahoe or not.
9      Q.  So I want to go back to a comment you made,
10  when Mr. Ferguson was questioning you, about -- that
11  you didn't have to get anybody's permission to
12  affiliate clubs.
13      A.  That's correct.
14      Q.  That's your understanding of the setup of
15  this club?
16      A.  That was my understanding after seeking
17  advice from internal counsel that our -- the
18  affiliation was a -- at our discretion, at our
19  decision.
20      Q.  When you say "our," who do you mean?
21      A.  At the -- at the developers's discretion.
22      MR. REISER:  I don't believe you're
23  intending to waive any privilege on those
24  conversations, or are you?
25      MR. SELLINGER:  Certainly not.

Page 129

33 (Pages 126 - 129)

Lee Cunningham - November 10, 2017

1  BY MR. REISER:
2      Q.  You've been involved -- you're familiar with
3  the affiliation agreement between -- that binds the
4  Ritz Club members to the Ritz-Carlton Cobalt trading?
5      A.  Yes.
6      Q.  And you're aware in the affiliation
7  agreement, are you not, that the decision as to
8  affiliations is to be solely in the discretion of
9  Cobalt and not the developer?
10     A.  I may have misstated that it was the
11 developer versus Cobalt, but...
12     Q.  So you don't see any difference between the
13 developer and Cobalt?
14     A.  There's a difference.  I see a difference
15 between them.  I just may have misstated where the
16 decision lay.
17     Q.  So it's your understanding that the decision
18 to affiliate with Cobalt solely --
19     A.  I don't know.  I'd have to go back and
20 refresh my memory from advice of counsel.
21     Q.  My recollection of reading the affiliation
22 agreement -- I can show it to you if you want -- but
23 it clearly stated in the paragraph that the developer
24 was to have no role whatsoever in deciding affiliation
25 between clubs.
                                              Page 130

1      You don't remember that in the affiliation
2  agreement?
3      A.  I'd have to go back and refresh my memory.
4  If you'd like to provide that document, I'll be glad
5  to review it.
6      Q.  I'll show it to you maybe in my next round of
7  questioning.
8      A.  Okay.
9      Q.  As you sit here today -- well, I want to ask
10 you -- you kind of started going through the many hats
11 you wear in the Marriott Vacations Worldwide universe.
12 And you mentioned you were the COO of -- or strike
13 that -- you are an officer of 15 to 20 companies, I
14 thought you said.
15     A.  Entities.
16     Q.  Entities.  One of them is Lion & Crown, you
17 mentioned; right?
18     A.  Uh-huh.
19     Q.  What's your role in Lion & Crown?
20     A.  As far as the officer of the company?
21     Q.  Yeah.
22     A.  As -- of the entity?  My title is vice
23 president, and my role is to oversee the operation of
24 Lion & Crown.
25     Q.  And vice president -- are you chief operating
                                              Page 131

1  officer of that entity?
2      A.  I think the official title in most of our
3  entities is vice president.
4      Q.  Is Lion & Crown a separate corporation
5  incorporated in a state like Delaware?
6      A.  I don't recall.
7      Q.  You don't recall.  All right.
8         So what is your position at Cobalt?
9      A.  It would be similar to Lion & Crown.
10     Q.  Vice president?
11     A.  Yes.
12     Q.  And what is your position at the Ritz-Carlton
13 Destination Club?
14     A.  Ritz-Carlton Destination Club is a -- is
15 really the -- as I thought about it, is doing business
16 as -- the DBA -- of the Ritz-Carlton Development
17 Corporation.
18     Q.  So there's no Ritz-Carlton Destination Club
19 entity.  You would agree with that now after further
20 reflecting on it?
21     A.  There's not a separate entity.  It's a brand
22 name, a doing business name as, for Ritz-Carlton
23 Development Company.
24     Q.  So you would agree then that the letter you
25 signed as COO and vice president of Ritz-Carlton
                                              Page 132

1  Destination Club was not accurate?
2      MR. SELLINGER:  Objection to form.
3      Q.  Can you rephrase the question or ask it
4  again?
5  BY MR. FERGUSON:
6      Q.  Well, if The Ritz-Carlton Destination Club is
7  a branding device and there's no company, you can't
8  really have a vice president of a branding device;
9  right?
10     MR. SELLINGER:  Objection to form.
11     A.  I'm doing business -- we're doing business
12 as -- I mean, it's a registered DBA of Ritz-Carlton
13 Development Company -- corporation or entity.
14 BY MR. REISER:
15     Q.  So the proper way to sign that letter
16 would've been the vice president and COO of the
17 Ritz-Carlton Development Company?
18     MR. SELLINGER:  Objection to form.
19     A.  Trying to represent or to communicate who --
20 what -- to the customers that are members of The
21 Ritz-Carlton Destination Club that this is coming from
22 that part of the business.
23 BY MR. REISER:
24     Q.  But as you stated a minute ago --
25     A.  It wasn't an intent to mislead anybody.
                                              Page 133

34 (Pages 130 - 133)

Lee Cunningham - November 10, 2017

Page 134

1    Q.   Okay.  I mean, I understand your position on
2  that, but I just want to be clear that you were also
3  the COO of Marriott Vacation Club at the time you
4  wrote the letter; right?
5    A.   That's correct.
6    Q.   You could have easily put down there that you
7  were the vice president and COO of Marriott Vacation
8  Club in signing that letter?
9         MR. SELLINGER:  Objection to form.  I
10        think you're mixing apples and oranges.
11        MR. REISER:  Form is okay, Phil.
12        Otherwise, I consider it kind of coaching.
13        I'm not going to accuse you of that, but
14        that's why I'm asking you to just to state
15        "object to form."  Okay?
16    A.   I'm sorry.  Can you rephrase your question or
17  restate your question?
18  BY MR. REISER:
19    Q.   I'm just establishing, at the time you wrote
20  the letter in August of 2012 as the COO of
21  Ritz-Carlton Destination Club, there was no entity
22  called Ritz-Carlton Destination Club.  True?
23    A.   There wasn't a separate entity.  It was the
24  brand name associated with the Ritz-Carlton
25  Development Company.

Page 135

1    Q.   Okay.  At the time you wrote that letter, you
2  were also the vice president and COO of Marriott
3  Vacation Club Worldwide; right?
4    A.   That's correct.
5    Q.   And you testified a minute ago that Marriott
6  Vacation Club Worldwide didn't need anybody's
7  permission to affiliate with whoever they wanted to in
8  this --
9         MR. SELLINGER:  Objection;
10        mischaracterizing.
11    A.   I did not say that, I don't believe.  The
12  Ritz-Carlton -- Cobalt -- Cobalt or the Ritz-Carlton
13  Development Company, once we established the correct
14  entity, did not need permission to affiliate
15  additional entities.
16  BY MR. FERGUSON:
17    Q.   When you wrote the letter -- well, strike
18  that.  When Eveleen Babich signed the letter dated
19  July 17, 2012, she was employed by Cobalt as the
20  program manager.  True?
21    A.   She was -- she was the general manager in
22  charge of member services that administered the Cobalt
23  Travel entity, I guess -- the business.
24    Q.   Who was in charge of Cobalt in 2012 at the
25  time she wrote that letter?

Page 136

1    A.   I would have been.
2    Q.   You were in charge of Cobalt at that time?
3    A.   In 2012, yes.
4    Q.   Did you help Eveleen Babich write that letter
5  of July 2012?
6    A.   There were many people that provided input
7  into that letter.
8    Q.   Who else besides her?
9    A.   I'm sure Stephanie Sobeck, Mary Lynn Clark,
10  myself.  I'm sure we got advice from internal counsel.
11    Q.   Who made the decision to state to the members
12  that there was going to be a new affiliation between
13  Marriott Vacation Club and Ritz-Carlton Destination
14  Club?
15    A.   Who made -- I did.
16    Q.   And you made your decision in what capacity?
17    A.   As an officer of Cobalt Travel.
18    Q.   At that time, you were also an officer and
19  vice president and COO of Ritz-Carlton Development
20  Company.  True?
21    A.   That's correct.
22    Q.   And you were also a COO and chief operating
23  officer of -- sorry -- you were also vice president --
24  executive vice president and chief operating officer
25  of Marriott Vacation Club; right?

Page 137

1    A.   Of Marriott Vacations Worldwide.
2    Q.   Worldwide.  What about the Ritz-Carlton
3  Management Company, were you also an officer and
4  director of the Ritz-Carlton Management Company?
5    A.   I would have to go back and research that.  I
6  believe that I'm listed as an officer there, but I may
7  not -- I am not sure.
8    Q.   What about today, are you an officer of the
9  Ritz-Carlton --
10    A.   I'd have to go back and check.
11    Q.   Are there any employees of Ritz-Carlton
12  Destination Club that are not also employees of
13  Marriott Vacation Club or Worldwide?
14    A.   No.  I don't believe so.
15    Q.   So there's no independence whatsoever between
16  Marriott Vacation Club Worldwide and Ritz-Carlton
17  Development Company.  True?
18        MR. SELLINGER:  Objection to the form.
19    A.   Can you restate your question?  There's no
20  independence?
21  BY MR. REISER:
22    Q.   So let me ask you this.  Are there any
23  employees of Cobalt that are not also -- strike that.
24  Are there any independent employees of Cobalt that are
25  also employed by Marriott Vacation Club Worldwide?

35 (Pages 134 - 137)

Lee Cunningham - November 10, 2017

1      MR. SELLINGER:  Same objection.
2      A.  I think every -- you know -- all associates
3  with -- are employed probably by Marriott Ownership
4  Resorts International, which is -- but I don't --
5  there's not a separate list of employees that are
6  only -- that are employed by Cobalt.  There are people
7  who only have -- their jobs are only focused on the
8  business of Cobalt.
9      Q.  Let me ask it another way.  Prior to the 2011
10  spinoff, there were employees of the division --
11  strike that.
12      Before the spinoff -- you mentioned Watzka.
13  His only job was related to Ritz-Carlton Destination
14  Club.  True?
15      A.  He was an executive officer with Marriott
16  Vacation Club International, and he was the chief
17  operating officer for the -- for Ritz-Carlton Club.
18      Q.  So maybe I already asked this, and I
19  apologize, but I'm just going to try to end this here
20  and just kind of sum it up here.
21      Are there any -- is there anybody that works
22  only for any of The Ritz-Carlton Destination Club
23  entities, such as Ritz-Carlton Management Company,
24  Ritz-Carlton Development Company?
25      A.  There's people that that's their only duties
Page 138

1  Worldwide?
2      A.  No.
3      Q.  Is there anybody employed by Lion & Crown
4  Travel Service that is not --
5      A.  No.
6      Q.  -- is not employed by Marriott Vacation Club
7  Worldwide?
8      A.  No.
9      Q.  So as the COO of the Marriott Vacation Club
10  Worldwide, you would be aware if there were any
11  employees that just worked for the Ritz-Carlton
12  entities that I just described.  True?
13      A.  As I said, there are people that are
14  employees that are only focused on those businesses,
15  but their employer of record is Marriott Vacations
16  Worldwide.
17      Q.  All right.  So prior to the spinoff, there
18  was -- the member services was not operated out of
19  Salt Lake City, was it?
20      A.  We moved from -- I don't remember the timing
21  of when we moved it from Orlando to Salt Lake City.
22      Q.  Prior to moving it to Salt Lake City, folks
23  who were members of The Ritz-Carlton Destination Club
24  could call up member services and they would have
25  somebody -- they would reach somebody in Orlando.
Page 140

1  are to that, are they -- is their employer of record
2  Cobalt Travel?  No.
3      The people in member services -- all the
4  employees of member services -- work and they're --
5  all they do is work related to Cobalt Travel for
6  Ritz-Carlton Destination Club.
7      Q.  Okay.  But I'm not even talking about Cobalt
8  right now.  I just want to separate --
9      A.  I'm just using that as an example.
10      Q.  I got you.  Let's start -- I'm just going to
11  go through the Ritz-Carlton entities that I'm aware
12  of.
13      There's Ritz-Carlton Management Company.
14  Let's start with that.
15      Are you aware of anybody that works for
16  Ritz-Carlton Management Company that's not employed by
17  Marriott Vacation Club Worldwide?
18      A.  No.
19      Q.  Are you aware of anybody that's employed by
20  Ritz-Carlton Development Company that's not employed
21  in actuality by Marriott Vacation Worldwide
22  Corporation?
23      A.  No.
24      Q.  Is there anybody employed at Cobalt Travel
25  that's not also employed by Marriott Vacation Club
Page 139

1  True?
2      A.  That's correct.
3      Q.  And after the spinoff, they went to Salt Lake
4  City?
5      A.  The phone lines were moved and they were
6  answered by people in Salt Lake City.
7      Q.  Okay.  Does the Salt Lake City member
8  services group out there also handle members services
9  for the Marriott Vacation Club?
10      A.  No.
11      Q.  That's all Ritz?
12      A.  That's all Ritz.
13      Q.  How many employees does Cobalt Travel have?
14      Q.  How many people work exclusively on Cobalt?
15      Q.  Yes.
16      A.  Affairs or --
17      Q.  Start with that.
18      A.  Employees, none.
19      Q.  There's no employees, but how many people
20  work and focus their efforts on Cobalt issues?
21      A.  I would say it's probably around 25 to 30,
22  which is the member services group.
23      Q.  And who is in charge of those 25 to 30
24  people?
25      A.  The general manager of that operation.
Page 141

36 (Pages 138 - 141)

Lee Cunningham - November 10, 2017

1  Q. And that's called the program manager in the
2  governing documents at Cobalt -- called the program
3  manager?
4  A. No.
5  Q. Who is the program manager then?
6  A. I don't know that the program manager is a
7  position.
8  Q. I'll just say that in the affiliation
9  agreement, they identified a program manager.
10  A. Right.
11  Q. Who is that person currently and who was it
12  in 2012 --
13  A. I don't think it's a person.
14  MR. SELLINGER: Just pause for a moment
15  so I can object.
16  Objection to form.
17  THE REPORTER: You're also talking over
18  each other.
19  A. My apologies. I don't believe that is -- the
20  program manager is an individual, as much as it is the
21  decision of the entity itself or the -- I don't know
22  how to describe it.
23  BY MR. REISER:
24  Q. The program manager is Cobalt. Can we say --
25  is that maybe what it is? Is Cobalt the program

Page 142

1  strike that.
2  Who actually made the decision in 2012, July
3  of 2012, to announce the announcement on July 17, 2012
4  signed by Eveleen Babich, as the general manager of
5  Cobalt, announcing the new affiliation with Marriott
6  Vacation Club, or the proposed affiliation? Who made
7  that decision to --
8  A. The ultimate -- sorry.
9  Q. Go ahead.
10  A. The ultimate decision was mine.
11  Q. So you made the decision to evolve the brand,
12  to use the parlance of that July 17, 2012 letter?
13  A. The decision was to -- yeah -- to use that
14  language, that would be true. It was my decision to
15  announce the affiliation with Marriott Vacation Club
16  Destinations.
17  Q. And not just the decision to announce, but
18  who made the decision to actually do it, to propose
19  it -- you?
20  A. I was the final decision maker.
21  Q. But wasn't Steve Weisz at all involved in
22  that?
23  A. I'm certain we consulted with Steve, but it
24  was my decision.
25  Q. Did you consult with anybody else before

Page 144

1  manager?
2  A. I think that's a fair way to say it.
3  Q. Okay. And who in Cobalt is the boss
4  currently?
5  A. The officers of that entity, which would
6  include myself.
7  Q. Who else?
8  A. I don't recall who the other officers are.
9  Q. Is there somebody below you that would be in
10  charge of the physical location in Salt Lake City?
11  A. Yes. That would be the general manager of
12  the member services operations.
13  Q. And that was Eveleen Babich in 2012; right?
14  A. It was.
15  Q. When did she leave, do you remember?
16  A. I can't remember. Probably 2014-ish. I
17  don't recall.
18  Q. In 2012, is it true that you were the -- you
19  were the only officer that you can remember of Cobalt,
20  and Eveleen Babich was the person in charge of the
21  employees within Cobalt?
22  A. The operation of member services.
23  Q. That's true?
24  A. That's true.
25  Q. So is it true that you and Eveleen Babich --

Page 143

1  making that decision?
2  A. Sure.
3  Q. Who did you consult with?
4  A. Mary Lynn Clark, Stephanie Sobeck, with our
5  in-house counsel. I'm trying to think who else
6  would've been involved. Probably had a representative
7  from our finance and accounting organization, a cross
8  business team.
9  Q. What were the business reasons for doing
10  that, for announcing the affiliation of the Marriott
11  Vacation Club with The Ritz-Carlton Destination Club?
12  A. The business reasons were really focused on
13  providing what we believe was an increase in the
14  options for the owners, to provide them some more
15  flexibility in their usage.
16  Q. So -- all right. When did you get any advice
17  that you had the discretion to affiliate?
18  A. When?
19  Q. Yeah.
20  A. In the months leading up to the July letter.
21  Q. Would it be fair to say it was sometime
22  between the spinoff in November 2011 and the letter?
23  A. I believe we had begun the discussions about
24  that prior to spinoff.
25  Q. Prior to spinoff. Who at Marriott

Page 145

37 (Pages 142 - 145)

Lee Cunningham - November 10, 2017

| | |
|---|---|
| 1 International were you discussing that with? | 1    Q.  Well, I've seen documentation -- I think you |
| 2    A.  I wasn't discussing it with anyone at | 2 even testified today that the decision to affiliate |
| 3 Marriott International at that point. | 3 was an effort to monetize the unsold inventory of the |
| 4    Q.  Who was? | 4 Ritz-Carlton Development Company. |
| 5    A.  I don't know that anybody was. | 5       MR. SELLINGER:  Completely never -- |
| 6    Q.  You just said that you thought there was some | 6       (Multiple speakers.) |
| 7 discussion going on beforehand.  How do you have | 7       MR. SELLINGER:  But it's worse, because |
| 8 knowledge of that? | 8    you actually said that he said that, and he |
| 9    A.  No.  I said, I believe there was probably | 9    certainly never said that. |
| 10 discussion going on internally to the MVCI business | 10 BY MR. REISER: |
| 11 unit before the spinoff, not with Marriott | 11    Q.  We'll show you some documents in a minute |
| 12 International. | 12 where that's actually stated specifically about |
| 13    Q.  Did you ever tell the Aspen HOA board members | 13 sharing the pain of the economic downturn.  The |
| 14 that you had complete discretion as to who to | 14 Ritz-Carlton Development Company both had lost |
| 15 affiliate with -- you, Lee Cunningham? | 15 $600 million and $11 million a year in maintenance |
| 16    A.  I'm sure we did.  I don't recall the specific | 16 fees. |
| 17 conversation. | 17    A.  Okay. |
| 18    Q.  And you never considered the affiliation | 18    Q.  Are you saying, Mr. Cunningham, that the |
| 19 agreement prohibition against the Ritz-Carlton | 19 maintenance fee obligations for the 25 percent or so |
| 20 Development Company, the Ritz-Carlton Management | 20 developer-owned inventory of Ritz-Carlton Development |
| 21 Company, or anybody else, having any input into the | 21 Company had no influence on the decision to affiliate? |
| 22 decision as to which other clubs to affiliate with? | 22    A.  Did not have an influence on the decision to |
| 23       MR. SELLINGER:  Objection to form.  I | 23 affiliate.  That had influence on the decision to sell |
| 24    have no idea what you just asked. | 24 that inventory through the Marriott Vacation Club |
| 25    A.  Can you ask -- | 25 Destinations products. |
| Page 146 | Page 148 |

| | |
|---|---|
| 1       MR. REISER:  Can you read it back to me | 1    Q.  Which is part of the evolution that you |
| 2    and see if it was bad? | 2 described in the July 17th letter? |
| 3       (The reporter read back the last | 3    A.  No.  That's not in the July 17th letters, |
| 4    question.) | 4 that talks about affiliation. |
| 5       THE WITNESS:  What we did consider was | 5    Q.  Do you remember preparing some frequently |
| 6    Cobalt Travel's ability to affiliate. | 6 asked questions and answers to the membership in |
| 7 BY MR. REISER: | 7 relation to the webinar that was given in August of |
| 8    Q.  How did you separate the interests of the | 8 2012? |
| 9 Ritz-Carlton Management Company's interest, given that | 9    A.  I remember there were frequently asked |
| 10 you were also the COO of Ritz-Carlton Management | 10 questions created. |
| 11 Company? | 11    Q.  Did you have a role in creating the |
| 12    A.  Because it wasn't a Management | 12 frequently asked questions? |
| 13 Company-related decision.  Affiliation is related to | 13    A.  I'm sure I reviewed them, yes. |
| 14 Cobalt Travel.  It's related to that component of the | 14    Q.  Have you reviewed them in preparation, the |
| 15 business, which is all about the use of the product | 15 ten hours you prepared for this deposition? |
| 16 and the movement of the product. | 16    A.  I did not review those. |
| 17    Q.  Same question for Ritz-Carlton Development | 17    Q.  Who else helped you prepare those frequently |
| 18 Company.  How did you separate the interests of the | 18 asked questions? |
| 19 Ritz-Carlton Development Company in a potential | 19    A.  It would've been our internal counsel.  I'm |
| 20 affiliation, given that you were the COO of | 20 sure Mary Lynn Clark and Stephanie Sobeck would've |
| 21 Ritz-Carlton Development Company as well? | 21 been involved in that. |
| 22    A.  Right.  Same answer.  The -- Cobalt Travel | 22    Q.  So Mary Lynn Clark had no role in Cobalt. |
| 23 was part of the business that was responsible for | 23 True? |
| 24 affiliation.  That was the lens through which we | 24    A.  No, I don't -- I believe so.  I believe |
| 25 looked at the ability to affiliate. | 25 member services reported to her at one point in time. |
| Page 147 | Page 149 |

38 (Pages 146 - 149)

Lee Cunningham - November 10, 2017

1  Q. But she wasn't an officer of Cobalt?
2  A. I don't believe so. I don't -- I don't
3  recall.
4  Q. And Stephanie Sobeck, did she have any
5  involvement in Cobalt?
6  A. She had less involvement in Cobalt.
7  Q. She didn't have any involvement in Cobalt,
8  did she?
9  A. I don't know the answer, whether she had any
10 involvement in Cobalt. It depends on what time you're
11 talking about.
12 Q. 2012?
13 A. In 2012, she would have probably had less
14 involvement in Cobalt.
15 Q. She didn't have any; right?
16 A. I don't know the -- I don't recall.
17 Q. All right. Fair enough. What was Mary Lynn
18 Clark's exact role in Cobalt in 2012, as you can
19 recollect?
20 A. My recollection is that member services
21 reported -- so Eveleen Babich reported to Mary Lynn
22 Clark.
23 Q. And Mary Lynn Clark reported to you?
24 A. No. I don't remember who she reported to. I
25 don't recall.

Page 150

1  Club had no influence on the decision to affiliate?
2  That's your testimony?
3  A. Affiliation doesn't have a connection to the
4  sale of the unsold inventory.
5  Q. So that's a yes; that's your testimony?
6  A. My testimony is that affiliation has no --
7  has no influence on the sale of the developer
8  inventory.
9  Q. Other than what we testified today -- and I'm
10 going to ask this question again, and I'd like you to
11 see if I can get you to focus on the question. Okay?
12 Because I'm not trying to argue with you --
13 A. I'm not trying to argue.
14 Q. Again, I don't mean to be disrespectful or
15 anything. I just want to make that clear. I'm not
16 trying to be argumentative, but I want clear
17 testimony.
18      So you made the decision to affiliate; right?
19 A. That's correct.
20 Q. You made the decision based solely on the
21 opportunity for Ritz-Carlton Destination Clubs to be
22 able to trade into the Marriott Vacation Club
23 properties. True?
24      MR. SELLINGER: That's a
25 mischaracterization of a lot of testimony on

Page 152

1  Q. What was the -- okay -- as you sit here
2  today, do you recollect any other reason for
3  affiliating The Ritz-Carlton Destination Club with the
4  Marriott Vacation Club Worldwide program, other than
5  the stated purpose you mentioned earlier today, to
6  give the Ritz-Carlton Development Club members more
7  options?
8  A. The only other reason that I am aware of is
9  that, in the case of -- in the case of Vail, for
10 instance, where we had put inventory into the Marriott
11 Vacation Club Destinations Trust, it seemed unfair to
12 us to have members of Marriott Vacation Club
13 Destinations to be able to come into Vail, but the
14 Vail fractional owners not have the ability to access
15 the Marriott Vacation Club Destinations exchange
16 portfolio of products.
17 Q. So other than that, was there any other
18 reasons for the affiliation --
19 A. No.
20 Q. And you made the decision, as you just
21 testified to; right?
22 A. That's correct.
23 Q. As you sit here today, Mr. Cunningham, you're
24 testifying under oath that economic reasons involving
25 the unsold inventory of The Ritz-Carlton Destination

Page 151

1  that subject.
2      MR. REISER: I don't think it is.
3  BY MR. REISER:
4  Q. If you want to tell me if it is -- is that a
5  mischaracterization?
6  A. Our primary reason was to provide additional
7  options for Ritz-Carlton Destination Club fractional
8  owners to be able to have multiple vacation options
9  through the Marriott Vacation Club Destinations
10 program.
11      The secondary was the one I just mentioned,
12 that we knew that there was inventory that was going
13 into the Destination Club Trust product and points
14 product and, therefore, members of -- owners of that
15 product were going to be able to reserve
16 accommodations into those Ritz-Carlton Destination
17 Clubs, and the -- we wanted to make the counter
18 available to the fractional members of the
19 Ritz-Carlton Club.
20 Q. So early on -- so after the July 17th
21 announcement, there was no restriction in the
22 governing documents of the Vail Club that prevented
23 the flat-out sale of The Ritz-Carlton Destination Club
24 unsold inventory to the NATO Trust. True?
25 A. That's correct.

Page 153

39 (Pages 150 - 153)

Lee Cunningham - November 10, 2017

| | |
|---|---|
| 1    Q. Is it your same -- | 1   pleased to announce our newest offering with more |
| 2    A. Through the NATO Trust. | 2   destinations and more flexibility, including access to |
| 3    Q. Through the NATO trust. Is that your | 3   various things." |
| 4   position across all the clubs, or did you think that | 4    What -- and you'll see on there, under the |
| 5   some clubs had provisions that prevented that sale? | 5   primetime vacation examples on page 2, it states that, |
| 6    A. Vail, that was allowed. As a matter of fact, | 6   for 4,850 points, Premier Plus and Premier membership |
| 7   that inventory was already in the club. The -- that | 7   folks could get access to the St. Thomas Club. For |
| 8   we had that ability through the governing documents in | 8   4,950, they could get access to Jupiter. For |
| 9   Tahoe, in San Francisco. It was less clear in Aspen | 9   5,675 points, they could get access to San Francisco. |
| 10   and St. Thomas. | 10   For 4,585 points, they have access to Lake Tahoe. For |
| 11    Q. All right. So is it fair to say then -- | 11   6,500 points, they have access to Vail. |
| 12   strike that. | 12    You see all that, right, on the letter? |
| 13    When did the first sale of Ritz-Carlton | 13    A. I see it. |
| 14   unsold inventory in Vail go into the NATO Trust? | 14    Q. What inventory were Marriott Vacation Club |
| 15    A. I'd have to go back and look, but, I believe, | 15   members accessing if they wanted to use 4,585 points |
| 16   it was close to the launch of the Marriott Vacation | 16   to access Lake Tahoe as of August 7, 2012? |
| 17   Club points product, which was mid 2010, but I may be | 17    A. I don't know. To be honest, I don't know |
| 18   wrong on that. | 18   what the -- what inventory they would be accessing. I |
| 19    Q. All right. When was the first time any club | 19   don't know if this is an official -- I think this is a |
| 20   besides Vail had unsold inventory sold to the NATO | 20   person who communicated something beyond maybe what |
| 21   Trust? | 21   they should have. |
| 22    A. I'd have to go back and -- I don't recall the | 22    I don't believe that they had access to that |
| 23   exact dates of when we actually ceded that inventory | 23   inventory. |
| 24   into the trust. | 24    Q. They certainly didn't have access at that |
| 25    Q. Do you recall whether it was before July 17, | 25   time to Ritz-Carlton Aspen Club? |
|                                  Page 154 |                                  Page 156 |
| 1   2012? | 1    A. That's correct. |
| 2    A. I don't believe it was. | 2    Q. You have no explanation for this -- I guess |
| 3    Q. We saw some exhibits earlier today about | 3   it's a rogue salesperson on your force -- |
| 4   the -- let me see if I can pull up an exhibit. | 4    A. I don't know whether that -- I hate to |
| 5   Exhibit 1042. | 5   characterize it that way, but I don't believe this was |
| 6    A. One of these? | 6   an approved communication. |
| 7    Q. Yeah. Do you remember that exhibit shown to | 7    Q. Can you now turn to 1049 then? So this |
| 8   you this morning? | 8   exhibit actually indeed does come from the Marriott |
| 9    A. Right. | 9   Vacation Club folks; right? It's advertising the |
| 10    Q. So this is dated August 7, 2012. True? | 10   Marriott Vacation Club's new benefits. |
| 11    A. Correct. | 11    A. Yeah. |
| 12    Q. At that point in time, the Marriott Vacation | 12    Q. This is August 15, 2012. Yeah? |
| 13   Club sales folks are telling all their members that | 13    A. This is true. |
| 14   there's a new opportunity that they can now trade into | 14    Q. And is this a rogue salesman at the Marriott |
| 15   the Ritz-Carlton Destination Clubs. True? | 15   Vacation Club offering access to the Ritz-Carlton |
| 16    MR. SELLINGER: Objection to form. | 16   properties? |
| 17    A. This e-mail, I believe, was from a | 17    A. This is not -- this is a communication that |
| 18   Ritz-Carlton Club -- Ritz-Carlton Destination Club | 18   doesn't come from a sales executive, so it's -- the |
| 19   membership executive -- sales executive -- not a | 19   answer to your question is no. |
| 20   Marriott Vacation Club sales executive. And it was | 20    Q. Did you approve this mailing? |
| 21   sent out to, as far as I know, this individual. | 21    A. No. |
| 22   BY MR. REISER: | 22    Q. Who would have approved this? |
| 23    Q. It says in there "The Ritz-Carlton | 23    A. I don't know who approved it. Normally, |
| 24   Destination Club's newest offering. The Ritz-Carlton | 24   these require approval through our in-house counsel, |
| 25   Destination Club and Marriott Vacations Worldwide are | 25   but I don't know whether that occurred or didn't occur |
|                                  Page 155 |                                  Page 157 |

40 (Pages 154 - 157)

Lee Cunningham - November 10, 2017

1 or was before that was in place.
2    Q. You have no idea, as you sit here today,
3 Mr. Cunningham, what inventory at the Ritz-Carlton
4 Destination Club was being offered to the 400,000-plus
5 members of the Marriott Vacation Club?
6    A. Well --
7       MR. SELLINGER: Objection to form.
8    A. The inventory that I'm aware that would've
9 been available at Ritz-Carlton Clubs through the
10 Marriott Vacation Club Destinations product would've
11 been Vail at this point in time.
12 BY MR. REISER:
13    Q. Vail only. Okay.
14    A. There may have been others, but I don't
15 recall.
16    Q. You would agree that, prior to the
17 affiliation in Aspen, there was no inventory that
18 would have allowed Marriott Vacation Club members
19 access to Aspen?
20    A. Other than through rental, through outside
21 rental.
22    Q. Outside rental. What about the 13.5 or
23 13.6 percent developer-owned inventory at Aspen?
24    A. It wasn't available for use through the MVCD
25 exchange program.
                                        Page 158

1    A. That's fine.
2       MR. REISER: So, at this point in time,
3 I'm going to thank you for letting me
4 interject here, and I'm going to pass it back
5 to Matt. Thank you.
6       Matt, I did find that one exhibit. Can I
7 ask a couple more questions? Kind of an
8 impromptu thing here.
9       Let's take a two-minute break here or a
10 three-minute break.
11       THE VIDEOGRAPHER: The time is 1:43. We
12 are off record.
13       (Brief recess.)
14       THE VIDEOGRAPHER: The time is 2:00.
15 This is media unit four in the deposition of
16 Lee Cunningham.
17       MR. FERGUSON: Back on the record. That
18 was an 18-minute break, so if we can keep
19 them short. We're going to have a hard time
20 finishing.
21       MR. MARX: You guys asked for the break.
22       MR. REISER: I said two minutes.
23       (Multiple speakers.)
24       MR. SELLINGER: Look, we agree. We think
25 these breaks have been really short and --
                                        Page 160

1    Q. And you're certain of that as you sit here?
2 You haven't reviewed any documents in preparation for
3 this that would show otherwise?
4    A. I don't believe so.
5    Q. Do you remember a cease-and-desist letter
6 that was written by the Aspen Club that was in
7 November 2012 --
8    A. No.
9    Q. -- asking Marriott Vacation Club to cease and
10 desist offering access by the Marriott Vacation Club
11 folks into the Aspen Club?
12    A. No.
13    Q. No recollection of that letter?
14    A. I do not remember getting that letter.
15    Q. Is this the first time you're hearing of that
16 letter today?
17    A. Yes, since I don't remember getting that
18 letter.
19    Q. Do you remember a name, Philip Gosch, an
20 attorney at Brownstein Hyatt in Denver, Colorado?
21    A. I don't recall that name, no.
22    Q. I think you'll probably have your
23 recollection refreshed, but, I guess, I'll have to
24 come back to that after it's covered by my colleague
25 in the depo.
                                        Page 159

1       MR. REISER: That was 15 minutes. That's
2 not a short break.
3       MR. FERGUSON: 18 minutes. It's just
4 hard.
5       DIRECT EXAMINATION, continued
6 BY MR. FERGUSON:
7    Q. Do you know whether people who bought a
8 Ritz-Carlton Destination Club fractional interest in
9 2001 to 2009, when you stopped selling it, were ever
10 advised that Marriott Vacation Worldwide would have,
11 as you say and you believe, a discretion to affiliate
12 with Marriott Vacation Club?
13       MR. SELLINGER: I'm sorry. Can you read
14 that question back?
15       (The reporter read back the last
16 question.)
17       MR. SELLINGER: Well, number one,
18 objection to form. Number two, other than in
19 the documents that were provided?
20       MR. FERGUSON: Other than the documents,
21 yeah.
22    A. I guess, a correction. We didn't stop
23 selling the Destination Club in 2009. We continued to
24 try -- to attempt to sell it, but were unsuccessful.
25 So the question is, did we tell them other than the
                                        Page 161

41 (Pages 158 - 161)

Lee Cunningham - November 10, 2017

1 disclosure documents that the --
2 BY MR. FERGUSON:
3     Q. Yes.
4     A. By when? There was a point in time where --
5     Q. Up to 2009.
6     A. No. I'm not aware of having --
7     Q. Was the trade name "Marriott" being used at
8 all in connection with selling RCDC memberships,
9 one-twelfth fractionals, from 150 to $650,000?
10     A. No.
11     Q. The word "Marriott" wasn't being used at all
12 when these things were sold; right?
13     A. No.
14     Q. And if there was anything in the documents
15 that allowed you, which you believe, to have
16 discretion -- you said your lawyers advised you of
17 that -- it wouldn't have used the words "Marriott
18 Vacation Club"?
19     A. It wouldn't have used the words "Marriott
20 Vacation Club has the discretion"?
21     Q. No. That --
22     A. No, it didn't.
23     Q. And it wouldn't have had the words there that
24 Ritz-Carlton -- if it said there was discretion to
25 affiliate, it would never have used the trade name

Page 162

1 "Marriott"?
2     A. No.
3     Q. And in your letters to the members that we
4 saw on July 17th from Ms. Babich, that you helped
5 write and oversaw, and your letter of August 17th, you
6 weren't telling her that you had discretion to do
7 this; right?
8     A. No.
9     Q. And in connection with your understanding
10 that you had discretion to do the affiliation you were
11 writing about in August and July of 2012, was part of
12 the reason you believe you had discretion to do that
13 because it was part of that that you had to make it
14 optional to them or voluntary?
15     A. No.
16     Q. You could have made them all affiliate?
17     A. I believe the Marriott Vacation Club
18 Destination exchange program does -- it's an optional
19 membership for our Marriott Vacation Club members as
20 well, so it was tying those two together.
21     Q. So --
22     MR. SELLINGER: Hold on one second. Let
23     me put an objection on the record, because
24     our accommodation of letting Mike go -- you
25     were going to finish the topic and he was

Page 163

1     going to cover, and then you were going to
2     move on and not tag-team back --
3     MR. FERGUSON: Let me ask one question
4     and I'll move on.
5 BY MR. FERGUSON:
6     Q. Do you believe that -- for example, Starwood
7 is now owned by Marriott. Do you believe it's the
8 discretion of documents, for example, to add in a
9 Westin at this point, if they had a vacation product
10 or timeshare or points system?
11     A. Does the -- Cobalt have the right to
12 affiliate with Starwood or --
13     Q. Yeah. Let's do it that way.
14     MR. SELLINGER: Let me just -- objection;
15     speculation, but go ahead.
16     A. I believe it would have the right to do that.
17 I believe there may be other documents that prevent
18 that with Marriott.
19 BY MR. FERGUSON:
20     Q. I left you off at the webinar.
21     Is the webinar still in existence? Was it
22 taped?
23     A. Boy, I don't know the answer to that.
24     Q. You were on the TV or on a screen with
25 Mr. Weisz?

Page 164

1     A. I don't believe it was a video webinar. I
2 believe it was just an audio webinar.
3     Q. Could people follow along with it on a
4 document?
5     A. I believe there was a document. I don't
6 recall.
7     Q. We do that on CLE, so we listen to someone
8 preaching...
9     Exhibit 1086, this is an e-mail chain. I
10 must admit, I do not speak Spanish, but this is
11 definitely in Spanish.
12     It's an e-mail from someone that made its way
13 into the hands of the four board of directors at Aspen
14 Highlands at that time -- Neveloff, Schneider,
15 Marsden, and Oliver. And this is Balbina12.
16     Do you know any owners who are named
17 Alejandro and Balbina?
18     A. I do not.
19     Q. It says, "I'm writing with regard to the
20 Ritz-Carlton Aspen Highlands. What's news with
21 Marriott Club? We think is a terrible idea to have
22 partnership Marriott is offering to all my friends and
23 the main attraction is the Ritz-Carlton because all
24 other properties are not attractive."
25     If you cut down below -- and I'm actually

Page 165

42 (Pages 162 - 165)

Lee Cunningham - November 10, 2017

1 reading broken English, so it's not me -- Alejandro
2 and Balbina said, "This is Spanish way they are
3 advertising Marriott Club in Mexico." And you'll see
4 the first line -- it says, "54 properties Marriott and
5 six Ritz-Carlton."
6       Is this a rogue sales executive advertising
7 Marriott -- to Marriott members of the points and
8 weeks systems -- Ritz-Carlton properties, here being
9 six?
10     A. I have no idea what this is. I don't know
11 who it's from, other than it's a forwarded message
12 from Balbina12.
13     Q. If you look at the last page, it has two www
14 addresses. It's my-vacationclub.com and there's
15 www.marriott.com.
16       Are those e-mails that are used to market
17 Marriott Vacation Club products?
18     A. I don't see that.
19     MR. SELLINGER: Tell me where you're
20     reading from, Matt.
21     MR. MARX: He's reading from a portion of
22     the document in Spanish.
23     THE WITNESS: I have another page -- I
24     have another last page.
25 BY MR. FERGUSON:

Page 166

1     A. They had no decision-making responsibilities
2 or rights in this work.
3     Q. Was this something that was prepared to send
4 over to Marriott International or do you know?
5     A. I don't recall, but that's what it would
6 appear to be.
7     Q. Is this a document that would've been
8 given -- was given to you in connection with
9 monitoring -- at this point, it's no longer
10 evolution -- I think you're using the words "product
11 re-engineering" -- was this something that was given
12 to you or prepared by you?
13     A. It was prepared probably for me.
14     Q. If you look at the third page of
15 Exhibit 1089, you'll see "Luxury Sales Center
16 Conversions."
17       The luxury sales center would've been where
18 you had -- I say you -- where the Development Company
19 had sold one-twelfth fractional interest to folks? Is
20 that what a luxury sales center was?
21     A. Yes.
22     Q. What's going on here is, you're converting
23 those sites -- you see the second bullet point -- to
24 sell the North American points product.
25       You were going to do that in Aspen and these

Page 168

1     Q. I'm sorry. I meant to say second page.
2     A. I see where you're -- my-vacationclub.com is
3 an owner website for owners of the Marriott Vacation
4 Club product. And marriott.com is the address for
5 Marriott's rental site.
6     Q. Marriott Vacation Worldwide?
7     A. No. Yeah -- Marriott International.
8     Q. Marriott International. Perfect. Thank you.
9       Sir, I have in front of you Exhibit 1089.
10 It's a September 12, 2012 Marriott International
11 update, but it says "Marriott Vacations Worldwide" on
12 the upper right-hand corner. This document was
13 produced by the Marriott defendants.
14       What does "Marriott International update"
15 mean there? Is this an update of international
16 properties under the Vacation Worldwide Corporation or
17 does it have anything from the old company you spun
18 off from?
19     A. I believe it has to do with the company we
20 spun off from.
21     Q. What involvement did they have in September
22 of 2012 in connection with -- if you look at the next
23 page, for example, "Ritz-Carlton Destination Club,
24 RCDC Unwind/Product Re-engineering," are they involved
25 in that at all?

Page 167

1 other four locations; right?
2     A. That's correct.
3     Q. In Aspen, did you own part of the hotel to
4 run sales of fractional interests? Did you own a
5 piece of that property, or was it rented?
6     A. I'm sorry?
7     Q. The fellas and gals that are selling, in the
8 old days, the fractional interest -- and Ivan Skoric
9 or Gary Hughes or some of these guys -- were they --
10 they were in the sales office.
11       Is that something you owned?
12     A. I don't recall whether that was still owned
13 by the developer or not. Some cases, they were off
14 site, but I don't recall Aspen specifically.
15     Q. And you mentioned -- this is 2012 -- you
16 mentioned before that after 2009 -- I made the mistake
17 of saying stop selling -- what you really said was
18 they had stopped selling because it was soft, but
19 there were a few sales.
20       By this time, there had been a decision not
21 to sell out of these luxury centers?
22     A. That's correct.
23     Q. Was this something that Ms. Sobeck would've
24 been involved in preparing, to the best of your
25 knowledge?

Page 169

43 (Pages 166 - 169)

Lee Cunningham - November 10, 2017

1    A. Potentially, yes.
2    Q. If you look at the last page of Exhibit 1089,
3 again, this is talking about Ritz-Carlton -- at least
4 the first page. It says, "MVCD Exchange Update."
5 Bullet point one, "Today we have enrolled over
6 122 weeks owners to the MVCD exchange program or
7 35 percent of the 346,000 owners who are eligible to
8 enroll."
9        I'm not understanding the math here. Do you?
10 What does that mean? Who's enrolling these weeks?
11 Oh, it's 122,000 weeks?
12   A. That's correct.
13   Q. Okay. So this is -- are these sales? Is
14 that's what's being reported here? What does MVCD
15 exchange update -- what is being reported in the first
16 sentence of the bullet point one?
17   A. These are -- the first bullet point, it's
18 122,000 weeks owners -- Marriott Vacation Club
19 Destination -- or Marriott Vacation Club weeks owners
20 have enrolled in the Marriott Vacation Club
21 Destination exchange programs. That's roughly
22 35 percent of the 346,000 Marriott Vacation Club weeks
23 owners.
24   Q. So this has nothing really to do with
25 Ritz-Carlton?

Page 170

1 meetings -- what -- twice?
2    A. Just once.
3    Q. That was in April of 2013?
4    A. That sounds -- yes.
5    Q. The first bullet on page 1 of Exhibit 1091
6 talks about the unsold inventory. Are you there?
7    A. Uh-huh.
8    Q. Is that a yes?
9    A. Yes. Sorry.
10   Q. When it's in paper, it looks weird.
11   A. I got you.
12   Q. And that was -- that inventory, I believe you
13 testified was, you were not using that for Marriott
14 Vacations Worldwide points or weeks people at this
15 point?
16   A. That's correct.
17   Q. Is that because of the declaration or the --
18 yeah -- the declaration that you were not using
19 that -- you were not using it?
20   A. That's correct.
21   Q. On the second bullet point -- second
22 sub-bullet point on page 2 of Exhibit 1091, it says,
23 "After researching the Marriott Club average stay --
24 average length of stay -- and the current behavior of
25 the Marriott Premier owners utilizing Aspen as a

Page 172

1    A. It has nothing to do with it.
2    Q. Thank you. 1091. The bottom of 21 [sic] is
3 an e-mail from you to Mr. Neveloff, September 14,
4 2012, with a copy to Mary Lynn Clark. It talks
5 about in the -- this is the first page of
6 Exhibit 1019, the original message at the bottom. It
7 says, "Thank you for your time yesterday. Our
8 conversations have been extremely helpful and we
9 appreciate your insight."
10       Were you talking to Mr. Neveloff on the
11 phone?
12   A. Yes.
13   Q. I think you testified you had never met him
14 in person.
15   A. I don't believe I've ever met him in person.
16   Q. So the officers you've met in, at least,
17 Orlando would've been -- from our HOA at Aspen
18 Highlands -- it would've been definitely Mr. Mercer?
19   A. I met all the members of --
20   Q. In Orlando, though.
21   A. Oh, in Orlando, I met Mr. Mercer. I'm trying
22 to remember. I believe that would be all.
23   Q. There's a Mr. Oliver. I don't know if he
24 came down or not. It was mentioned.
25       The bottom line is, you also went to the HOA

Page 171

1 marketing program."
2        Explain that. What is the marketing program?
3 Were you using the product at -- were you using
4 tourist accommodation units to market Marriott
5 Vacation Club product?
6    A. There was inventory -- the developer-owned
7 inventory in Aspen, I believe, was being used for
8 marketing to bring preview vacations, which we
9 discussed earlier, and providing them a sales
10 presentation, which could be a Marriott -- yes -- it
11 could be a Marriott points offering.
12   Q. Did you believe you had the discretion to do
13 that at this time?
14   A. Yes. We wouldn't have done it if we didn't.
15   Q. You would agree that the inventory of
16 Ritz-Carlton Development Company could be used to
17 preview for potential purchases of one-twelfth
18 fractional interest in this timeframe?
19   A. Yes.
20   Q. But you weren't really selling it?
21   A. We weren't selling the one-twelfth fraction,
22 but we must have believed that we could also bring --
23 use that inventory -- that developer inventory -- to
24 sell other products as well.
25   Q. Including points?

Page 173

44 (Pages 170 - 173)

Lee Cunningham - November 10, 2017

1   A.  Including points.
2      Q.  The bullet point called "Marketing" at the
3   bottom of page 2 of Exhibit 1091, it's in bold and
4   there's a sub -- I guess you have sections broken up
5   in dark-black ink.
6      Are you there in marketing?
7      A.  Yes.
8      Q.  It's on the board if that helps you.  But as
9   we discussed, we've got the attention of the right
10  people and Mary Lynn -- that's -- ML is Mary Lynn;
11  right?
12     A.  That's correct.
13     Q.  -- has to approve all marketing that goes out
14  with the Ritz-Carlton name on it.
15     Is this, in part, if you recall, related to
16  the fact that we saw, for example, that Spanish ad --
17  in that ad that Mr. Reiser showed you before that you
18  said was not authorized by your company?
19     A.  It could be.  I seem to recall that there was
20  that -- I don't know about the Spanish ad, having not
21  seen that one, but the prior one, I believe, was -- it
22  was in response to that.
23     Q.  You close this letter "Again, Jay, thank you
24  for your passion for the Aspen members, the brand, and
25  the company."

                                          Page 174

1   Did he express that he had passion for his
2   members, or was it just something you were observing?
3      A.  I don't know that he said -- used those
4   words.  My observation was that he cared about the
5   members of the Aspen product or Aspen Club.
6      Q.  When you said, "We appreciate your
7   partnership and look forward to continuing our
8   conversations," are you talking about a partnership
9   between Cobalt and the HOA, the HOA and Marriott
10  Vacation Club, the HOA and The Ritz-Carlton
11  Destination Club, as you said was doing business for
12  the Development Company?
13     A.  Probably, the primary relationship or
14  activity at this point in time was between Cobalt and
15  the Aspen owners association; and to some degree,
16  working with them on -- from the developer's
17  standpoint -- on the unsold inventory.
18     Q.  So you think the -- when you talk about the
19  partnership with Mr. Neveloff, you think -- your
20  testimony is that it was between the Cobalt entity and
21  the HOA?
22     MR. SELLINGER:  Objection to form.
23     A.  I believe it was related to the -- it wasn't
24  a -- we certainly weren't forming any legal
25  partnership.

                                          Page 175

1   BY MR. FERGUSON:
2      Q.  I understand that.
3      A.  His feedback is partnership on how to work
4   through the remaining issues relative to affiliation,
5   which would be Cobalt, and that was the primary.
6      Q.  But he was primarily talking to you about the
7   letters that you had sent him the 17th, and Ms. Babich
8   sent on the 17th of July.  That's primarily what you
9   were talking about.
10     This memo or this e-mail -- this e-mail memo
11  from you to Mr. Neveloff is talking about the brand
12  evolution; was it not?
13     MR. SELLINGER:  Would you read that
14  question back, please?
15     MR. FERGUSON:  Let me rephrase it,
16  Mr. Sellinger.
17  BY MR. FERGUSON:
18     Q.  This e-mail on September 14, 2012 in
19  Exhibit 1091 was related to the announcement that had
20  come out on the 17th of July and the 17th of August
21  from you and Ms. Babich; right?
22     A.  It was related to his concerns about that.
23     Q.  So you wrote that letter under Ritz-Carlton
24  Destination Club, right, not Cobalt -- the letters of
25  17, August that you wrote?

                                          Page 176

1      A.  Yes, that's correct.
2      Q.  Exhibit 1090.  This is probably out of order,
3   because it looks like Ms. Clark assisted you in
4   writing this -- communicating to Mr. Neveloff -- and
5   you would have made some changes, I guess, before it
6   went out?
7      A.  Potentially.
8      Q.  We're not going to redline that here.
9      Exhibit 1124 is a two-page letter dated
10  November 5, 2012, from Ritz-Carlton Club, Bachelor
11  Gulch Condominium Association, and it's from
12  Mr. Mullinex, the president of that association, to
13  you and Mr. Weisz.
14     Are you with me?
15     A.  Yes.
16     Q.  It talks about the proposed affiliation
17  between that property, Bachelor Gulch, and Lion &
18  Crown.
19     You said, "I'm writing on behalf of the board
20  of directors to continue our dialogue about the
21  proposed affiliation."  And you're talking about the
22  meeting having been, I think on the second paragraph,
23  a face-to-face meeting September 19, 2012 in Orlando.
24     Is that the meeting we were talking about
25  with Ms. Perfido and you and Mr. Weisz?

                                          Page 177

45 (Pages 174 - 177)

Lee Cunningham - November 10, 2017

1  A. That's correct.
2  Q. In the third paragraph, you said, "He
3  explained to you during the meeting that at least they
4  believe that affiliating Lion & Crown with his club
5  will depress the already low values of the residence
6  interests."
7     Is that something you discussed in that
8  meeting with Mr. Weisz and Ms. Perfido?  Do you recall
9  that?
10  A. Yes.
11  Q. Did you respond to that concern at that
12  meeting, if you recall?
13  A. I don't recall.
14  Q. He said at the end of that paragraph
15  "Perhaps, most importantly, the board has heard from a
16  significant portion of the club's membership that they
17  overwhelmingly oppose affiliation with Lion & Crown
18  for a number of reasons."
19     And, eventually, I take it, you recall that
20  he held a -- his board held a board vote first to exit
21  the Ritz-Carlton brand?
22  A. Yes.
23  Q. Then he put that to a membership vote of all
24  his members?
25  A. That's correct.

Page 178

1  A. I think that's the subsidiary that he works
2  for.
3  Q. On page 2 of this document, you said on the
4  second -- or the first full paragraph, "Finally, but,
5  most importantly, the board believes that the new
6  club -- that the use of club units that would result
7  from the L&C affiliation, and, therefore, basically
8  becoming part of the points-based Marriott Vacation
9  Club timeshare system, is prohibited by the club's
10  declaration of condominium, section 19.5."
11     Do you recall whether or not you received a
12  cease-and-desist letter from this association?
13  A. I don't recall.  Could have.
14  Q. Were you ever sued by Bachelor Gulch or was
15  there a lawsuit filed?
16  A. I don't believe so.
17  Q. Had you ever been in any meetings with a Dan
18  Wolf, a lawyer up in Avon or Vail?  Have you ever had
19  any interaction with Dan Wolf?
20  A. I've heard the name, but I've never been in a
21  call or meeting with him.
22  Q. Did you agree to put off the affiliation for
23  several months after the discussion in September of
24  2012 and this letter of November 2012?
25  A. Yes.

Page 180

1  Q. And he did not use Morrow & Company, did he?
2  A. I'm sorry?
3  Q. He didn't use Morrow & Company, did he?
4  A. I don't recall.
5  Q. You understand Morrow & Company did your
6  survey for the Aspen property?
7  A. Yes.
8  Q. And that's one of your vendors; right?
9  A. That's a vendor that we use for association
10  governance.
11  Q. And that would be -- is it Lori Phillips?
12  A. Lori Phillips, yes, association governance
13  for us.
14  Q. For Marriott Vacation Worldwide, and
15  Mr. Hearns is on the hotel side?
16  A. No.
17  Q. Mr. Hearns is with Marriott International and
18  he's with the Ritz-Carlton Hotel Company?
19  A. Lori works for us.  I believe she is -- I'm
20  not sure at this time whether she solely works on the
21  Ritz-Carlton Club governance or whether she also has
22  some Marriott Vacation Club accounts as well.
23     Mr. Hearns works for Marriott International.
24  Q. The company over there is Ritz-Carlton Hotel
25  Company?

Page 179

1  Q. Why did you agree to put off the affiliation
2  if you believed it was in your discretion?
3  A. Because we wanted to get the concurrence of
4  the owners, understand their point of view clearly,
5  and go from there.
6  Q. You didn't want concurrence because you had
7  discretion.  You just wanted to get a feel for their
8  sentiment; is that right?
9  A. We wanted to understand their -- how they
10  felt about the affiliation.
11  Q. According to at least Mr. Mullenix, they
12  didn't feel very good about it, did they?
13  A. No.
14  Q. Do you think the Aspen Club felt better about
15  it than Bachelor Gulch?  The members, not Mr. Mercer
16  or Mr. Oliver, who you dealt with.
17  A. We hadn't heard the same level of concern
18  from Aspen members as we had heard from Bachelor
19  Gulch, primarily through Mr. Mullenix.
20  Q. So Mr. Mullenix was kind of the clearinghouse
21  of Bachelor Gulch members' complaints?
22  A. Well, he was the spokesman for them.
23  Q. Right.  So Mr. Neveloff and then Mr. Mercer
24  weren't passing on that, in terms of a synopsis that
25  we see in this November 5th, 2012 -- he said, "Our

Page 181

46 (Pages 178 - 181)

Lee Cunningham - November 10, 2017

1 member feedback is negative. We're telling you it's
2 negative." Right? You were getting that from him?
3     MR. SELLINGER: I'm sorry.
4     MR. FERGUSON: I agree. I agree. I'll
5 rephrase it. I objected to my own question.
6 BY MR. FERGUSON:
7     Q. Mr. Mullenix, as far as you recall, was
8 monitoring the temperature of his members regarding
9 the affiliation that was proposed in July and August
10 of 2012?
11     A. Yes.
12     Q. He's reporting that to you; correct?
13     A. He reported it on a couple of occasions.
14     Q. And you said that you didn't think you were
15 getting as much negative feedback, or, at least,
16 wasn't being communicated to you through a
17 clearinghouse, like Mr. Mullinex from the HOA in
18 Aspen?
19     MR. SELLINGER: Objection to form.
20     A. I don't -- we weren't hearing the same level
21 of objection from Aspen. I don't know why that would
22 be. It wasn't necessarily because there wasn't
23 somebody acting as a clearinghouse.
24 BY MR. FERGUSON:
25     Q. Well, obviously, you had gotten a letter from

Page 182

1     A. I don't recall. I think it became a moot
2 point.
3     Q. Right. Exhibit 1135. This is the letter
4 from Mr. Phil Gosch at Brownstein Hyatt Farber &
5 Schreck in Denver. He was representing the HOA.
6     Do you have a recollection that he did in
7 fact represent the HOA in this timeframe?
8     A. I don't recall.
9     Q. This is a letter --
10     A. I see here that he does, but I don't -- I
11 don't know Mr. Gosch, other than, obviously, this
12 letter. I don't recall having any interaction with
13 him.
14     Q. Other than receiving this letter?
15     A. That's all I recall.
16     Q. And what did you do with this letter? Did
17 you turn it over to legal or did you --
18     A. It went straight to our in-house counsel.
19     Q. And they, in turn, retained the services of a
20 law firm in Denver. Is that your recollection?
21     A. I don't know. I don't recall.
22     Q. You don't recall Mr. Davis at Baker
23 Hostetler?
24     A. I do not recall.
25     Q. Without divulging any attorney-client

Page 184

1 Mr. Cappello, who was clearly in Mr. Mullenix's camp?
2     A. Agree.
3     Q. And in the next-to-last paragraph, it says,
4 "I understand" -- are you there?
5     A. Yes.
6     Q. It says, "I understand we discussed at our
7 meeting the possibility of holding a vote of the club
8 membership on the issue of affiliation with Lion &
9 Crown."
10     Is that something you recall having discussed
11 as at least a possibility at Bachelor Gulch?
12     A. Yes.
13     Q. It says, "Although that is our intention, we
14 do not believe such a vote is necessary in light of
15 our club's governing documents, including without
16 limitation the declaration; nor do we believe such a
17 membership vote is required for this requested delay."
18     So he's talking about a vote, whether or not
19 to affiliate on his side, as opposed to you --
20     A. This is not us.
21     Q. Right. This would be a vote that he would
22 hold?
23     A. That's correct.
24     Q. Okay. And how long had you put off the
25 affiliation decision?

Page 183

1 privileged communications, do you recall ever speaking
2 to anybody at Baker Hostetler in Denver?
3     A. No.
4     Q. I'm not going to use this letter to match
5 because it's too small to read.
6     If you can go to the second page of
7 Exhibit 1135, there's a paragraph that starts with "In
8 addition to violating the declaration."
9     Are you with me?
10     A. Yes.
11     Q. If you go down a few sentences, you'll see
12 that it was their position -- the HOA says, "By
13 permitting MVW and/or the program manager" -- the
14 program manager is Cobalt; right?
15     A. Yes.
16     Q. -- "to utilize the tourist accommodation
17 units is a clear violation of the declaration. The
18 HOA manager" -- that would be the Ritz-Carlton
19 Management Company; right?
20     A. That's correct.
21     Q. -- "would be enriching its affiliates and the
22 Marriott licensor" --
23     So the affiliates of the manager would be the
24 hotel development company and Marriott -- another
25 affiliate is Marriott Vacation Worldwide. Right?

Page 185

47 (Pages 182 - 185)

Lee Cunningham - November 10, 2017

| | |
|---|---|
| 1    MR. SELLINGER: You're asking him to | 1    A. I believe it was in 1990 -- let's see -- |
| 2  interpret what the writer of this letter | 2  either '93 or '94. I think '94. |
| 3  means by affiliates? | 3    Q. Were you around then? |
| 4    MR. FERGUSON: If you want to object to | 4    A. Yeah, I was working for -- |
| 5  form, I'll ask him again. | 5    Q. I know you were alive. |
| 6  BY MR. FERGUSON: | 6    A. I was working for Marriott International. |
| 7    Q. Do you consider Marriott Vacations Worldwide | 7    Q. Do you know a Thomas Boova? |
| 8  to be affiliated with Ritz-Carlton Management Company? | 8    A. Does not ring a bell. |
| 9    A. Ritz-Carlton Management Company is an entity | 9    Q. Mr. Boova was, apparently, a board member at |
| 10  within Marriott Vacations Worldwide. | 10  one HOA. I'm not sure which one. He's the managing |
| 11    Q. The Marriott licensor would be with Marriott | 11  director of Landmore Advisors. Does that ring a bell? |
| 12  International? | 12    A. No. |
| 13    A. Yes. | 13    THE REPORTER: Landmore? |
| 14    Q. -- "by creating an attractive offering for | 14  BY MR. FERGUSON: |
| 15  MVC members, which would increase sales and license | 15    Q. Landmark Advisors. Oh, yeah. Mr. Boova is |
| 16  fees under Marriott's arrangement with MVW at the | 16  from the Jupiter HOA. |
| 17  expense and burden of the association and its | 17    A. Okay. |
| 18  members." | 18    Q. Does that help you at all? |
| 19    We know, at least by this point, November | 19    A. No. |
| 20  2012, that there was some marketing that was going out | 20    Q. This is Exhibit 1106. I have it as late |
| 21  to Marriott Vacation members and/or potential members | 21  2012. It's a Marriott Vacations Worldwide |
| 22  to -- advising them they could utilize Ritz-Carlton | 22  confidential and proprietary information for an Aspen |
| 23  product. | 23  member update. It's produced by the association, but |
| 24    A. Okay. | 24  my question is -- I guess, based upon the nomenclature |
| 25    Q. Is that right? | 25  on it, it's a document that was prepared by Marriott |
| Page 186 | Page 188 |

| | |
|---|---|
| 1    A. Yes. | 1  Vacations Worldwide. It's probably a |
| 2    Q. And then Mary Lynn was told to -- Mary Lynn | 2  PowerPoint that's copied -- |
| 3  Clark -- she won't be mad if we call her by her first | 3    A. Well, it's definitely a PowerPoint. I would |
| 4  name, I'm sure -- but Ms. Clark was told to keep an | 4  expect this is produced by member services or by the |
| 5  eye on that type of marketing? | 5  Ritz-Carlton Management Company for the Aspen HOA. |
| 6    A. Yes; that she needed to review any marketing. | 6    Q. All right. This one, at least -- on the |
| 7    Q. Including whether or not it was authorized at | 7  second page, it says, "Today, Aspen uses options. It |
| 8  all? | 8  has their reserved allocations, their Cobalt Travel, |
| 9    A. That's correct. | 9  and they had access" -- this is in the left-hand |
| 10    Q. Is the Ritz-Carlton Club in Aspen, Colorado | 10  box -- "to their own club and the club system |
| 11  utilized as a selling point for Marriott Vacations | 11  exchange." |
| 12  Worldwide points product today? | 12    Right? That's what they -- I'm looking right |
| 13    A. It's listed as an exchange option through the | 13  here. That's what my clients bought, right, was a |
| 14  Marriott Vacation Club Destinations exchange programs. | 14  deed to reserve allocation, the Cobalt -- |
| 15    Q. When was the brand bought or acquired by a | 15    A. Cobalt Travel is -- the access to or the |
| 16  Marriott entity; do you recall? | 16  subset of Cobalt Travel that are available. |
| 17    A. I'm sorry? | 17    Q. And they also had access, obviously, to their |
| 18    Q. Ritz-Carlton used to be a stand-alone | 18  Home Club? |
| 19  product -- | 19    A. Right. |
| 20    A. Right. | 20    Q. And then they would be able to access -- an |
| 21    Q. -- a company. Do you recall when it was | 21  Aspen person could access St. Thomas or Kapalua, |
| 22  acquired by Marriott -- probably Marriott | 22  things like that; right? Is that what that means? |
| 23  International, I would imagine. There are a lot of | 23    A. The club system exchange on the left is the |
| 24  iterations. There was a Hotel Company in the old | 24  access to St. Thomas and other clubs. On the right is |
| 25  days. | 25  the developer inventory that's made available through |
| Page 187 | Page 189 |

48 (Pages 186 - 189)

Lee Cunningham - November 10, 2017

1  Lion & Crown that the members in Aspen could get
2  access to.
3      Q.  I'll show you Exhibit 1148.  This is an
4  e-mail between Mercer and Mullenix.  And you'll see at
5  the top -- I know you haven't been a recipient of
6  this, but I just want to ask you about his
7  recollection of the September 19th meeting here in
8  Florida.  And there's her name, Perfido --
9  P-E-R-F-I-D-O.
10      And he said, "That's the line they used with
11  us" and the line that Marriott used with you is that
12  any owner can rent, cash, trade, or barter their unit.
13      That's something you've told the HOA
14  presidents and officers, have you not?
15      A.  I'm sorry.  Where --
16      Q.  If you look at Mr. Mercer below, he said he
17  had a meeting that was brief and typical.  Marriott
18  Vacation Worldwide was, by allowing access to Aspen
19  units through a points-based system, that merely
20  renting units which they own by a different
21  methodology.  He said, "They're not doing anything
22  different than any owner."
23      Are you with me?
24      A.  Yes.
25      Q.  Did you meet with Mr. Mercer when he came

Page 190

1  said something to -- the words to the effect that
2  Mr. Mullenix is using here -- "You used the word
3  'fraud' in my building.  You think I will have a civil
4  conversation with you?"
5      Do you recall generally something like that?
6      A.  I don't.
7      Q.  You would hear the word "fraud" from the
8  various members of the clubs over and over and over
9  again over the next couple years when we're talking
10  about affiliation, wouldn't you?
11      MR. SELLINGER:  Objection to form.
12      A.  No, I don't -- I don't.
13  BY MR. FERGUSON:
14      Q.  You don't recall documents like these --
15  they're taking the temperature on things like
16  affiliation, that people were saying -- members were
17  saying things like "we've been defrauded"?
18      A.  I don't recall that.
19      Q.  When you met with Mr. Mercer here in Orlando,
20  was he alone?
21      A.  Yes.
22      Q.  Did he say anything about -- you said it was
23  two or three hours -- did he say anything about
24  whether he was there on behalf of the board or was he
25  here kind of on a meeting on his own accord?

Page 192

1  down here in December of 2012?
2      A.  I met with Mr. Mercer in Orlando on one
3  occasion, and I don't remember the exact date.
4      Q.  How long did you meet with him?
5      A.  I think it was a couple hours.  Maybe three.
6      Q.  If he called that a short chat in passing,
7  would that have been accurate?
8      A.  No.
9      Q.  Mr. Mullenix -- I'm sorry.  Did you have
10  something to add?
11      A.  No.
12      Q.  Mr. Mullenix responded to his e-mail with
13  you -- with him -- about the meeting with you, and he
14  said that -- Mr. Mullenix said, "They used that line
15  with us and that is when Jo-Ann Perfido accused Weisz
16  of taking that approach, defrauding us."
17      Do you recall Ms. Perfido using the word
18  "fraud" at some point?
19      A.  Yes.  I mean, I don't recall -- I'm not sure.
20      Q.  Do you recall that Mr. Weisz slammed his hand
21  on the table?
22      A.  I recall there was a heated exchange between
23  Mr. Weisz and Mr. Mullenix.  I don't recall one with
24  Ms. Perfido.
25      Q.  Do you recall that he made a proclamation or

Page 191

1      A.  I don't recall.  I believe he was -- his
2  intent was to try to find a way forward that was good
3  for everybody.
4      MR. FERGUSON:  I'm going to mark this
5  document.  We can't mark it, can we?
6      Actually, I can.  Actually, I know how to do
7  that.
8  BY MR. FERGUSON:
9      Q.  I'm going to show you what's been marked as
10  Exhibit 1279.  Mr. Marx and Mr. Sellinger were kind
11  enough to blow it up for me.  I still can't read it
12  that well.  We'll mark this at some point.
13      So this is the -- do you recognize this
14  document at all, sir?
15      A.  No.
16      Q.  Okay.  You'll see that on page 2, it has loss
17  of property comments.  And then across there,
18  satisfaction comments, options, reasoning and MVC and
19  MKR use of property comments.
20      A.  I see that.
21      Q.  Is there something called MKR?  I hope not.
22  It's too complicated.
23      A.  I have no idea what that would be.
24      Q.  So this is a document that you weren't
25  utilizing?

Page 193

49 (Pages 190 - 193)

Lee Cunningham - November 10, 2017

1    A. I may have seen it. I don't recall. It's
2 been quite a while.
3    Q. Does it look like a Marriott Vacation
4 Worldwide-generated document, or generated for?
5    A. It looks like a document that was generated
6 probably by owner -- or member services.
7    Q. All right. The last page has other strategic
8 options. This seems to be a little bit out of place,
9 because it has other strategic options, and the first
10 line says, "We need to get an attorney to advise about
11 starting our own class action lawsuit."
12       Does this belong with this document? This
13 looks like somebody that was -- you guys weren't
14 looking into your own class action lawsuit in 2012 or
15 '13, were you?
16    A. Not to my knowledge.
17    Q. And the second one says, "Condé Nast" --
18 "Contact Condé Nast and other travel magazines and
19 expose the outright fraud of Ritz-Carlton and Marriott
20 for what it is."
21       So this is not you guys, obviously?
22    A. No.
23    Q. That would be an example of at least someone
24 writing the concept that they thought they were -- and
25 I'm not asking you to admit -- I'm sure you'll deny
Page 194

1    A. I didn't go through this one.
2    Q. Okay. On the first page, the last bullet
3 point says, "As a result, we had numerous" -- I'm
4 sorry -- "had various one-on-one discussions with the
5 four-member control boards, which has led to
6 adjustments in our planned rollout."
7       That would be the evolved rollout that we
8 were talking about in July and August of 2017?
9    A. Yes.
10    Q. It talks about Bachelor Gulch, and it says,
11 "We will not affiliate BG and MVCD absent an
12 affirmative vote from the majority of the members."
13       Is that something you promised the board?
14    A. No. This is a document to Marriott
15 International.
16    Q. So you're reporting to Marriott International
17 that you would not affiliate Bachelor Gulch property
18 for its Destination Club with Marriott Vacation Club
19 Destinations absent an affirmative vote from the
20 majority of the members.
21       You're reporting what you promised or you
22 told --
23    A. No. I'm reporting what we would -- what our
24 intention was if we were to go out and get -- and take
25 a vote, which never occurred.
Page 196

1 vehemently there was fraud committed in any way. But
2 you were aware that other people besides Ms. Perfido
3 were useing the word "fraud"?
4    A. Yes. Assuming I saw this, I would have known
5 that --
6       MR. SELLINGER: I don't think he should
7    be assuming. I don't think you should be
8    asking whether this is an example if he
9    doesn't know what the document is, and you
10    don't know what it is.
11       MR. FERGUSON: I know what it is.
12 BY MR. FERGUSON:
13    Q. Okay. I have in front of you Exhibit 1020.
14 This is another Marriott Vacations Worldwide
15 Corporation update, February 28, 2012. Then you have
16 the same kind of general format, except it kind of
17 updates itself periodically. It's a Ritz-Carlton
18 Destination re-engineering update.
19       And this is the Marriott Vacation Worldwide
20 document, is it not -- proprietary information?
21    A. It was produced by Marriott Vacations
22 Worldwide for -- it appears for Marriott
23 International.
24    Q. Is this a document you reviewed for your
25 deposition, by the way?
Page 195

1    Q. But I take it it's your testimony here in
2 trial that you didn't have to do any of this because
3 it was fully in your discretion?
4    A. That's correct.
5    Q. And you didn't tell that to Marriott
6 International -- who you paid 20 million or 15 -- $20
7 million dollars a year to for the mark -- did you?
8    A. What?
9    Q. You didn't say, "Hey, we're going to hold
10 this vote, but we don't have to because it's
11 discretionary"?
12    A. My guess is, we would have told them that,
13 but I don't recall.
14    Q. Just not in this periodic update that --
15    A. We didn't in this periodic update.
16    Q. And on the next bullet point, you said the
17 same thing, "We will not affiliate Aspen Highlands
18 with MVCD absent an affirmative vote from the majority
19 of the members." Same basic language; right?
20    A. Agreed.
21    Q. At some point, you did tell people at Aspen
22 Highlands that you would have -- would not affiliate
23 without an affirmative vote from the majority of the
24 members?
25    A. We told them we would not do it without an
Page 197

50 (Pages 194 - 197)

Lee Cunningham - November 10, 2017

1 affirmative vote from the members.
2    Q.  But you changed your mind?
3    A.  I'm sorry?
4    Q.  You changed your mind?
5    A.  I said from an affirmative vote of the
6 members, not the majority of the members.
7    Q.  An affirmative vote from the majority of the
8 members?
9    A.  We told the Aspen HOA that we would not -- I
10 never told the Aspen HOA that we would require or
11 would only affiliate if we got a majority vote of the
12 members of the Aspen owners.
13       Setting a majority member vote is -- in the
14 timeshare world is basically saying you're not going
15 to -- you're not expecting to get that done.  It's
16 rare to even get that number of members to even vote
17 one way or the other.
18    Q.  There's a problem with what you just said,
19 though.  My clients, who would have a one-tenth
20 fractional deeded interest, are not timeshare folks,
21 are they?
22    A.  Sure, they are.
23    Q.  They're timeshare people?
24    A.  The fractional interest is a timeshare.
25    Q.  Do points people get deeds?

Page 198

1    A.  We sold the inventory.  I'm sure we were
2 selling it as fractional interest.  And when we review
3 the governing documents and go through our normal
4 quality assurance process, we're assuring that the
5 owners know what they're purchasing.
6 BY MR. FERGUSON:
7    Q.  But so far as you know, the word "timeshare,"
8 when those folks came into a sales office in Aspen,
9 Colorado, they weren't told they were being sold
10 timeshares?
11       MR. SELLINGER:  Objection to form.
12    There's no foundation of this witness's
13    familiarity with that process.
14 BY MR. FERGUSON:
15    Q.  Do you have any familiarity with that
16 process?
17    A.  With the sales process?
18    Q.  Yeah.
19    A.  In general.  I do not know how it is
20 performed at a sales location.
21    Q.  But you know -- you're involved with
22 marketing, obviously, of points today; right?
23    A.  That's correct.
24    Q.  People report to you about that.  You have
25 sales executives that market it?

Page 200

1    A.  Yes.
2    Q.  And you're being sued about that in the case
3 that I showed you earlier this morning; whether or not
4 that's actually really real estate interest?
5    A.  That's the claim in the -- false claim in the
6 Lennen matter.
7    Q.  When the folks put down 500,000, 450,000,
8 350,000 in Aspen, Colorado, were they told that they
9 were buying timeshares?
10    A.  Their documents, I believe, would disclose
11 that that -- because the governing documents are
12 fashioned based on the timeshare law of Colorado.
13    Q.  But they weren't being -- that wasn't my
14 question.  My question was, were they told they were
15 buying timeshares?
16    A.  They were told they were buying fractional
17 interests in the Bachelor Gulch product, which is a
18 form of timeshare.
19    Q.  A form, but you weren't using that word?
20    A.  I don't -- I wasn't there.  I don't know
21 whether that word was said or not.
22    Q.  In fact, the only time you see that word is
23 when it says you guys, the developer, can't use it as
24 a timeshare?
25       MR. SELLINGER:  Objection to the form.

Page 199

1    A.  The sales execs don't report to me, but I am
2 generally knowledgeable about the sale of our points
3 product, as I'm generally knowledgeable about the
4 sales of our fractional product.
5    Q.  When you were talking to Mr. Mullenix, did
6 you say, "Well, you guys are timeshare folks and we
7 don't have to" -- let me try to clear this up.
8       It says, "We will not affiliate Aspen
9 Highlands with MVCD absent an affirmative vote from
10 the majority of the members."  Okay?
11       So majority means more than 51 percent of the
12 members?
13    A.  That's what the majority would mean.
14    Q.  So if you had 876 members -- and I think you
15 all agreed to subtract out your 120 units, and you
16 weren't going to put that in the vote; right?  Is that
17 something you agreed to?
18       MR. SELLINGER:  Well, hold on a minute.
19    You're jumping between this document, what he
20    may have said, which isn't this document, and
21    now some third concept and lumping it all
22    together.
23 BY MR. FERGUSON:
24    Q.  Are you familiar with the fact that, when you
25 talked about a member -- majority member vote for

Page 201

51 (Pages 198 - 201)

Veritext Legal Solutions
866 299-5127

Lee Cunningham - November 10, 2017

1 affiliation with MVW that you agreed not to count the
2 votes or use the votes of the membership interest
3 owned by the Development Company?
4     MR. SELLINGER:  Objection; lack of
5   foundation for his having set the premise of
6   your question.
7 BY MR. FERGUSON:
8   Q.  Do you know it?  I mean, you're a chief
9 operating officer and senior vice president.  You
10 knew that -- and Mr. Sellinger doesn't know this, but
11 you knew back in 2012 and '13 you were not going to
12 include the votes that the Development Company's
13 interests were entitled to?
14   A.  What we committed to is that we would not --
15 the developer-owned interest would not participate in
16 the survey.
17   Q.  I just looked at a document there.  It didn't
18 say "survey," did it?
19   A.  No.
20   Q.  It said "vote."
21   A.  That's correct.
22   Q.  Okay.  Do you ever survey for a candidate or
23 do you vote for a candidate?
24   A.  Vote for a candidate.
25   Q.  And vote means that your say counts towards

Page 202

1 something; right?  It's tallied in order to decide
2 whether a referendum passes or a political candidate
3 gets elected; right?
4     MR. SELLINGER:  Objection to form.
5   A.  A vote is different from a survey.
6 BY MR. FERGUSON:
7   Q.  All right.  Thank you.
8   A.  We began the conversation talking about a
9 vote.  And as we had conversation with our internal
10 counsel, we became aware that a vote was not the
11 appropriate form to go through for this affiliation,
12 and then we moved to a survey.
13   Q.  When did you tell all the clients that I
14 represent and other folks that you didn't think a vote
15 was appropriate anymore?
16   A.  We told the board.
17   Q.  When did you tell them that?
18   A.  After -- obviously, well before we went out
19 with the survey.
20   Q.  Did you tell it the following year?  Did you
21 tell Mr. Mercer when you met with him again here in
22 Orlando that you were going to go with this second
23 plan, which is the survey?
24   A.  We discussed the survey -- I don't know
25 whether that was when he was here in Orlando or not.

Page 203

1 We certainly discussed the survey with the larger
2 board months in advance of completing the survey or
3 doing the survey.
4   Q.  Months in advance?
5   A.  Yes.
6   Q.  Do you know whether you -- you guys -- when I
7 say you guys -- the HOA and Marriott Vacations
8 Worldwide would sometimes make joint announcements to
9 the members; right?
10   A.  There were occasions.
11   Q.  Exhibit 1180.  This is a document that has
12 electronic signatures or scripted signatures of the
13 four, then, tourist accommodation board directors --
14 Oliver, Schneider, Marsden, and Oliver.  It says,
15 "Positive discussions were held today between the
16 board of directors and representatives of the
17 Ritz/Marriott, including Lee Cunningham, chief
18 operating officer of The Ritz-Carlton Destination
19 Club."
20     You're not a chief operating officer
21 obviously of the thing called The Ritz-Carlton
22 Destination Club, right?  We covered that?
23   A.  We covered that.
24   Q.  It says, "The Ritz-Carlton" -- do you recall,
25 is this the time you went to Aspen, Colorado?

Page 204

1   A.  This is when we went to Aspen.
2   Q.  Did you go there with anyone else from
3 Marriott Vacation Worldwide?
4   A.  Stephanie Sobeck.
5   Q.  And you said to them "The
6 Ritz-Carlton/Marriott representatives agree that
7 unless the majority of Aspen Highlands members,
8 including Marriott interests and members not in good
9 standing, vote in favor of doing so, the
10 Ritz-Carlton/Marriott will not include Aspen Highlands
11 in the Marriott Vacation Club exchange points
12 program."
13     That's pretty much identical to what you were
14 reporting in that prior document, Exhibit 1020, to
15 Marriott International; right?
16   A.  Yes.
17   Q.  And your testimony here today is that that
18 actually changed.  You decided not to do this?
19   A.  We decided not to do the vote and went with
20 the survey.
21   Q.  Did you guys -- when I say "you guys," that's
22 bad.  Did you -- when I say "you" -- did Marriott
23 Vacation Worldwide folks, you or Ms. Sobeck, assist in
24 writing that letter?
25   A.  No.  Well, I didn't.  I don't believe

Page 205

52 (Pages 202 - 205)

Lee Cunningham - November 10, 2017

1 Ms. Sobeck did either.
2    Q. Were all four of those men there?
3    A. Yes.
4    Q. It was one of their regular or interim board
5 of directors meetings?
6    A. That's correct.
7    Q. Let me show you what's been marked as
8 Exhibit 1185. Exhibit 1185 is a three-page document.
9 The last e-mail -- sorry. The first e-mail on the
10 last page is an e-mail from Sobeck to Babich and some
11 others -- Lori Phillips, Mr. DiMeglio, who's, I think,
12 with the Management Company and runs that hotel, or
13 that property.
14        It says, "I'm in Aspen with Lee and the Aspen
15 board right now. They and Lee would like to send an
16 e-mail communication out to members by the end of the
17 day. It is a short, one-paragraph e-mail, and we want
18 to get it out today before BG announces anything. We
19 don't know if they're going to, but could cover the
20 weekend. Can you please start getting the template
21 ready? Nicholas will send you the verbiage shortly."
22        In fact, your company did have a hand in
23 writing the e-mail we saw in the prior exhibit, right,
24 Exhibit 10 -- 1180?
25        MR. SELLINGER: Objection to form. Why
Page 206

1 Lee and myself."
2    A. I've read that.
3    Q. So you approved the language we saw in
4 Exhibit 11 --
5    A. I don't know if that's the letter that was
6 attached.
7    Q. So let's talk about that. You're at a
8 meeting on April 5th. The letter goes out on
9 April 5th from the board regarding the affiliation and
10 a vote of the majority of the members, and you don't
11 know from this exhibit here -- 1185 -- whether or not
12 Exhibit 1185 relates to Exhibit 1181 -- 1180?
13    A. I don't know for sure. You could draw that
14 inference, but I don't know for sure because I don't
15 have the attachment of this.
16    Q. Did you disagree with anything that was being
17 said in 1181 to the members of the club in Aspen,
18 Colorado?
19        MR. SELLINGER: 1181?
20        MR. FERGUSON: I'm sorry. I keep getting
21    that wrong -- 1180.
22        MR. SELLINGER: Did he?
23        MR. FERGUSON: Yeah.
24    A. I would disagree with the statement that it
25 be a majority vote of the members.
Page 208

1 would you say that?
2        MR. FERGUSON: Say what?
3        MR. REISER: Just object to form, Philip.
4 BY MR. FERGUSON:
5    Q. Did you get my question?
6    A. I did get your question.
7    Q. Do you understand my question?
8    A. I do.
9    Q. All right.
10    A. I don't know whether this is the letter it's
11 referring to.
12    Q. The folks that she's writing to --
13 Ms. Babich -- I think you called her the general
14 manager of RCDC services -- she and her team of folks
15 blast out e-mails to the various associations -- in
16 this case, Aspen Highlands -- right?
17    A. They send out e-mails as well as association
18 governance.
19    Q. So you don't know whether this was the letter
20 we saw in Exhibit 1180?
21    A. I don't know whether it was or not.
22    Q. Does the second page of Exhibit 1185 help you
23 out? Ms. Sobeck says, on April 5, 2013 at 2:18 p.m.,
24 "All, please find attached letter that the Aspen board
25 would like to send out today. It has been approved by
Page 207

1 BY MR. FERGUSON:
2    Q. You disagree with this?
3    A. I would disagree with that.
4    Q. So Ms. Sobeck reports to Cindy Hodge, Eveleen
5 Babich, Lori Phillips, who is in charge of governance,
6 Mr. DiMeglio, who is the hotel manager, and Barbara
7 Egoff, who's in the legal department.
8        You would disagree with her telling all those
9 people and those executives that it had been approved
10 by Lee and myself?
11        MR. SELLINGER: He's already testified he
12    doesn't have --
13        MR. FERGUSON: An objection, sir?
14        MR. SELLINGER: -- the attachment.
15    You're just mischaracterizing his testimony.
16        MR. FERGUSON: I'm asking him questions,
17    Mr. Sellinger. I'm sorry, but that's what
18    I'm doing. You can object to form.
19 BY MR. FERGUSON:
20    Q. You just don't know?
21    A. I'm sorry?
22    Q. You don't know?
23    A. No. I said I would object to that
24 communication.
25    Q. From Sobeck to --
Page 209

53 (Pages 206 - 209)

Lee Cunningham - November 10, 2017

1   A. I would object to the communication that says
2   that it would require a vote of the majority of the
3   Aspen members.
4   Q. And you objected to it that day?
5   A. I don't recall that discussion that day.
6      THE VIDEOGRAPHER: We have six minutes
7   left.
8 BY MR. FERGUSON:
9   Q. If you look at the top of this document,
10 there's a fella named John Albert that received this
11 e-mail from Lori Phillips.
12   A. That's correct.
13   Q. Who is John Albert?
14   A. We talked about that earlier.  He is a member
15 of the resort operations staff.  Association
16 governance reports up through him.
17   Q. He's an MVW person, obviously?
18   A. We've established that all of them are MVW
19 people.
20   Q. I'm sorry.  There's a lot of names and
21 they're in your life every day --
22   A. Fair enough.
23   Q. -- and I do forget.  And at least with
24 respect to this e-mail chain -- and it has the
25 attachment -- we'll match them up some day.  I guess I

Page 210

1 of the business.
2      MR. SELLINGER:  Let me make one
3   statement.
4      MR. FERGUSON:  Sure.
5      MR. SELLINGER:  As I'm looking at this
6   e-mail, I need to study this more carefully
7   as to the issue of attorney-client privilege.
8   But certainly to the extent there's
9   privileged information here -- I'm not
10   contending now there is -- but to the extent
11   there is, we will reserve our right to look
12   and to designate that as an inadvertent
13   production.  There's certainly no intention
14   by producing the document or allowing any
15   testimony to waive the privilege.
16      MR. FERGUSON:  We're probably up against
17   the wire there; right?
18      THE VIDEOGRAPHER:  The time is 3:14.
19   That concludes media number four in the
20   deposition of Lee Cunningham.
21      (Brief recess.)
22      THE VIDEOGRAPHER:  The time is 3:31.
23   This is media five in the deposition of Lee
24   Cunningham.
25      (Exhibit 1279A was marked for

Page 212

1 don't have it here.
2      But RA AF -- it says, "4/15/13 special letter
3 to members final."  And she told -- Ms. Phillips told
4 Mr. Albert, "Hi John.  Barbara's recommended edits
5 were not made to the final letter.  Attached is the
6 letter approved by Barbara that was sent."
7      So there was another version of the letter
8 that was sent by Ms. -- that was approved by Barbara
9 Egoll in the MVW legal department?  Do you know what's
10 going on there?
11   A. I do not know the answer to that -- whether
12 that was -- I don't know which -- once again, it's
13 missing the attachment of knowing whether that's this
14 letter or a different letter.
15   Q. Ms. Egoll is in the general counsel's office
16 here in Orlando?
17   A. That's correct.
18   Q. Is she someone that's in charge of -- is she
19 someone that's involved in the drafting of legal
20 documents?
21   A. Yes.
22   Q. As opposed to some lawyers that oversee
23 litigation and some lawyers are kind of more corporate
24 type?
25   A. She's more in charge of the management side

Page 211

1   identification.)
2      MR. FERGUSON:  One of the things we're
3   going to do is -- there's Exhibit 1279, which
4   is the black-and-white copy -- we're going to
5   call the color copy Exhibit 1279A.  That's
6   the big, colored version that's slightly more
7   legible.
8 BY MR. FERGUSON:
9   Q. So, Mr. Cunningham, I'm going to show you
10 Exhibit 1176.  This is also dated April 5th at
11 5:35 p.m. from Salt Lake, the same time zone as
12 Colorado.  It's from RCDC SLC Leadership.
13      Would that be Ms. Babich, as far as you know,
14 or the team she leads?
15   A. Yes, I would think it would be.
16   Q. She says to the ladies and gentlemen --
17 that's a term of art that's used for the
18 Ritz-Carlton's employees?  That's what you call them,
19 ladies and gentlemen?
20   A. That's correct.
21   Q. So the leadership team is sending to Forth,
22 Daley, Teresa Andrus.  I take it those are people in
23 customer service in Salt Lake; right?
24   A. That's correct.
25   Q. And it says "Attachment," and it has the same

Page 213

Lee Cunningham - November 10, 2017

1 language -- "RA AF 4/5/13 Aspen board letter." So it
2 would appear that whatever that letter may be was sent
3 by leadership at Salt Lake to these three folks?
4 You're not sure what that letter is, but --
5    A. Yes.
6    Q. And she said, "A few hours ago, we received
7 the attached draft letter which is anticipated to go
8 out to each of our Aspen Club members from the club
9 board at Aspen today."
10       It says, "Marriott Vacation Worldwide has
11 agreed, together with the board of directors, that we
12 will not affiliate the Aspen Club and club members
13 with our Marriott Vacation Club Destination program
14 unless a majority of the members vote otherwise."
15       That's the same basic concept.
16       Is it your testimony, Mr. Cunningham, that
17 you're the only one who disagreed with what was going
18 out to the members from the board on this day?
19       MR. SELLINGER: Objection to form.
20    A. I don't know that I was the only one that
21 disagreed with what was going out, but I would have
22 disagreed.
23 BY MR. FERGUSON:
24    Q. So, obviously, Ms. Babich's group was not
25 disagreeing?

Page 214

1       MR. SELLINGER: Objection to form.
2    A. She was just reporting the news, reporting
3 what she had heard.
4 BY MR. FERGUSON:
5    Q. So she --
6    A. Ms. Babich would not have disagreed, I guess.
7    Q. And Ms. Egolf, we believe, had weighed in;
8 hadn't she?
9    A. I did not know whether she had weighed in at
10 this point.
11    Q. As you sit here today looking back on
12 April 5, 2013, when this was reported internally in
13 much the same manner as it was reported to the members
14 at my clients' club, is there anyone else that you
15 know that thought the letter that went out was
16 erroneous?
17       MR. SELLINGER: Objection to form.
18    A. I don't know how I would know that.
19 BY MR. FERGUSON:
20    Q. I mean, did you go, "Oh, my God, Stephanie.
21 This letter went out to the members, and Randy and
22 those guys messed up, Barbara messed up. We can't
23 send this out"?
24       Did you hear that kind of conversation?
25    A. No.

Page 215

1    Q. Did you go, "Oh, my God. This letter went
2 out"?
3    A. I don't recall whether it dawned on me that
4 it went out with the wrong language or not.
5    Q. It dawned on you, what, weeks later?
6    A. I don't know whether it did or not.
7    Q. And when you found this out that this wrong
8 letter had gone out from the board, you would agree
9 with me that's a fairly important promise made to the
10 members by the board after they met with you in Aspen,
11 Colorado?
12       MR. SELLINGER: Objection to form.
13       MR. FERGUSON: The word "important"?
14       MR. SELLINGER: Excuse me?
15       MR. FERGUSON: What are you objecting to?
16       MR. SELLINGER: Promise.
17 BY MR. FERGUSON:
18    Q. You don't believe that's a promise, sir?
19    A. It was a communication to them that they
20 should -- that they would have an expectation of.
21    Q. Do you recall at any time, Mr. Cunningham, as
22 the COO of Marriott Vacations Worldwide, and as
23 executive vice president, saying, "You need to recall
24 Randy Mercer's letter"?
25    A. I don't recall that.

Page 216

1    Q. Because it never happened, did it?
2    A. I don't believe so.
3    Q. Was there ever a letter that went out to the
4 members that said, "Listen, folks, we're so sorry. We
5 promised that we wouldn't affiliate unless there was a
6 vote of the majority members"? You said, "I'm so
7 sorry, but we're going to give you a survey instead"?
8    A. No. There was a communication for the
9 survey.
10    Q. About nine, ten months later in November or
11 December of 2013?
12    A. That's correct.
13    Q. And by that time, the folks that owned those
14 fractional units, including my clients, had no idea
15 what you had been doing with that communication over
16 that seven or eight months. They wouldn't have known?
17       MR. SELLINGER: With what communication?
18    A. I don't know what they knew or didn't know.
19 BY MR. FERGUSON:
20    Q. Do you recall that you all wanted to do this
21 vote in May of 2013?
22    A. We started the conversation back -- yes --
23 early.
24    Q. And it wasn't until November or December -- I
25 think you met with Randy Mercer again in November down

Page 217

55 (Pages 214 - 217)

Lee Cunningham - November 10, 2017

1  here -- and a few weeks later in December -- I think
2  it was December 13th -- you sent out the survey;
3  right?
4      A.  We did send it out.  I believe it was in
5  December.
6      Q.  And all the communications that I've hauled
7  here down here from Aspen -- all these communications
8  that go back and forth between the association people
9  and internally at Marriott, the members weren't seeing
10  this stuff, were they?
11     A.  No; other than the members that were members
12  of the board.
13     Q.  When you communicated on December 13, 2013,
14  about ten months after this letter went out that you
15  would not have approved of, ten months later, did you
16  say, "Please, folks, recall the letter Randy Mercer
17  sent to you saying there would be a majority vote"?
18     A.  No.
19     Q.  Did you ever say, "Listen, by the way, what
20  we're giving you a survey on right now is not the vote
21  we had talked about.  We totally changed our mind and
22  we're giving you a survey"?  Did you ever communicate
23  like that?
24     A.  No.
25     Q.  Why not?

Page 218

1      A.  Didn't occur to us to do it that way.
2      Q.  Do you know how much the one-twelfth
3  fractional owners paid to the Ritz-Carlton Development
4  Company between 2001 and 2009 on fractional sales?
5      A.  I'm sorry?  How much --
6      Q.  Yeah.  I mean, say you had 120 or
7  13.4 percent of the stock left.  In 2009, I know it
8  stopped selling -- it stopped selling -- and you
9  stopped selling in 2012.
10         Do you know how much of it sold -- how many
11  tens of millions of dollars had been sold to my folks?
12     A.  I don't know what the -- I don't know off the
13  top of my head.
14     Q.  My clients, 200 of them, had bought 240
15  interests or whatever it is, adds up to about
16  $60 million in sales.  Some people got it cheap
17  because they got in a little bit later.
18         But do you think it's fair to tell them that
19  they're going to have a vote in April 2013, and not
20  tell them that you changed your mind in December of
21  2013?
22     MR. SELLINGER:  Well, hold on a minute.
23  You completely mischaracterized what was told
24  to them in December of '13.
25     MR. REISER:  Move to strike the

Page 219

1      objection.  Please, just object to the form
2  and stop coaching the witness, please.
3      MR. SELLINGER:  How about we have
4  comments from at least one lawyer at a
5  time --
6      (Multiple speakers.)
7      MR. REISER:  -- I'm going to ask the
8  judge not to have you coach these witnesses
9  anymore.  Just object to form.  In Colorado,
10  that's a law.
11  BY MR. FERGUSON:
12     Q.  Do you think it was fair to communicate in
13  that manner with the promise in April -- as you said,
14  an expectation in April 2013 -- do you think it was
15  fair not to tell them on December 13, 2013 that you
16  had changed your mind?
17     MR. SELLINGER:  Objection to form.
18     A.  We communicated what we thought was clearly
19  what the purpose of the survey was.
20  BY MR. FERGUSON:
21     Q.  Yeah, but you didn't tell them that there
22  wasn't a vote.  So how does a fellow that punched down
23  $600,000 know that the April 5th expectation that you
24  gave him was now being usurped by the survey?  How
25  does he know that, or she know that?

Page 220

1      A.  We were clear --
2  BY MR. FERGUSON:
3      Q.  How did you communicate that to them?
4      MR. SELLINGER:  Hold on a minute.  Read
5  that question back, please.
6      (The reporter read back the last
7  question.)
8      MR. SELLINGER:  Objection to form.
9      A.  We were -- like I previously said -- we --
10  our communication around the survey was clear as to
11  what the purpose of the survey was, which was
12  synonymous with the previously-communicated vote.
13  BY MR. FERGUSON:
14     Q.  You said it was synonymous?
15     A.  It was the same concept, that we wanted to
16  get their feedback on the affiliation.
17     Q.  Mr. Cunningham, in April, when your Salt Lake
18  team is pushing this e-mail around saying what they
19  announced, they're not using that word, that you want
20  to get their feelings about something.  You're saying
21  we're going to get your vote.
22     A.  I understand that.
23     MR. SELLINGER:  Objection to form.
24  BY MR. FERGUSON:
25     Q.  So you don't say, "How do you feel about

Page 221

56 (Pages 218 - 221)

Lee Cunningham - November 10, 2017

1 Senator So-and-so being reelected?" You say, "What's
2 your vote?" Right? Totally different concept. Would
3 you agree with that?
4    A. That's correct.
5    Q. Did you ever see comments that came back from
6 the owners in response to the letter that Randy Mercer
7 and his three other board members sent out?
8    A. I don't recall seeing any.
9    Q. Do you recall that people were actually happy
10 that they were being given the right to vote?
11    A. I don't recall that.
12    MR. FERGUSON: I have an SFO here. So he
13 wanted to pick up because the SFO
14 communications come at this point -- before I
15 move on.
16    MR. SELLINGER: We're done with this
17 subject?
18    MR. FERGUSON: We're done with the April
19 promise to -- yeah -- the expectation, I'll
20 use -- we're done with that part of it. What
21 happens next is in May.
22    MR. REISER: Well, no, I'm asking
23 questions about the entire vote process here.
24    MR. SELLINGER: Well, wait --
25    MR. REISER: I'm asking questions about

Page 222

1    MR. REISER: I disagree. I think we're
2 accommodating you to have all three of these
3 in one session, and we're trying to make it
4 work through the accommodations. I'm going
5 to ask my questions.
6    MR. SELLINGER: I'm not arguing. Hold on
7 a minute -- but I want to have an
8 understanding. Tell me the scope of what
9 you're covering, and then I'll know where
10 Matt is going, just so I know that we're not
11 going back and forth.
12    MR. REISER: We're not going back and
13 forth, but I'm going -- this is my first
14 time. Just let --
15    MR. SELLINGER: Tell me your scope.
16    MR. REISER: My scope is from where he
17 started last time to the present, you know,
18 on his second round. After I turned it back
19 over to him, whatever he covered to the
20 present and through the vote promise to the
21 other clubs -- the vote subject matter.
22 That's what I'm going to go through right
23 now.
24    I'm not going to recover ground that --
25 like, for instance, next time I get to

Page 224

1 the entire vote process, including Aspen.
2 There's two questioners allowed on the case
3 by the court's order, so I'm not going to
4 limit myself to --
5    MR. SELLINGER: Number one, I'm not sure
6 what court order you're referring to, but --
7    MR. REISER: You should be involved in
8 the case then --
9    MR. SELLINGER: No -- whether or not two
10 lawyers are entitled to ask questions does
11 not go to whether you can jump back and
12 forth.
13    MR. REISER: I'm not jumping back and
14 forth. I haven't asked one question about
15 the vote. I'm going back and I'm asking the
16 questions about the vote and I'm going to go
17 through all three clubs.
18    MR. SELLINGER: Okay. But wait a minute.
19 Wait a minute. I want to make sure that,
20 when we're switching from Matt to you, that
21 we're not going to then come back to the same
22 subject again and we're going back and forth.
23 That's what I'm worried about.
24    Because we're really accommodating you
25 guys, letting you go back and forth.

Page 223

1 question, I'm not going to go back and
2 recover ground that I covered here. This
3 time, I'm not going to go back and cover
4 ground that I covered last time. I'm not
5 going to retread what I've already covered.
6    This is my opportunity to ask about this
7 section of the timeline that involves all
8 three clubs. That's as simple as I can put
9 it.
10    MR. SELLINGER: Well, I'll go on the
11 record simply to say, I think we're making
12 extraordinary accommodations to allow
13 different counsel to keep going back and
14 forth with questions. We're doing that in an
15 effort to accommodate your desire to be
16 efficient going forward.
17    MR. REISER: I appreciate that. I
18 understand your perspective. I believe that
19 this is an attempt by us to be accommodating
20 of you guys and everybody by doing it as
21 quickly as we can across three cases.
22    The alternative would be to just let Matt
23 and me take the Aspen depo. Then come back
24 another day and take the San Francisco depo
25 myself. Then come back a third day and take

Page 225

57 (Pages 222 - 225)

Lee Cunningham - November 10, 2017

| | |
|---|---|
| 1 the Tahoe depo. | 1   A. Yes. |
| 2     So I think the accomodation goes to you. | 2   Q. Mike Marino? |
| 3   To the extent we're doing it a little usual | 3   A. That's correct. |
| 4   is because we're doing three cases at one | 4   Q. Who else? |
| 5   time and it necessitates it. | 5   A. Stephanie Sobeck and myself.  I don't know |
| 6     That's my feeling.  I'll try to do my | 6  that there was anyone else. |
| 7   best to be as efficient as possible. | 7   Q. Okay.  Tell me about the discussions during |
| 8       DIRECT EXAMINATION, Continued | 8  that meeting about a vote of the membership regarding |
| 9  BY MR. REISER: | 9  affiliation. |
| 10   Q. You were reminded of the cease and desist | 10   A. There was a discussion about getting a |
| 11  letter that was sent to you -- to your address and | 11  sentiment of the members.  Could have used the word |
| 12  you, yourself, as the addressee -- on November 21st, | 12  "vote," but to get the understanding of how the |
| 13  2012.  Correct? | 13  members felt about the affiliation. |
| 14   A. Yes. | 14   Q. So prior to this meeting, there had been a |
| 15   Q. And at that point in time, you knew that the | 15  promise made to Bachelor Gulch, not to -- at least to |
| 16  board at Aspen was against the affiliation between | 16  delay the affiliation for a while.  Correct? |
| 17  Marriott and Ritz.  True? | 17     MR. SELLINGER: Objection to form. |
| 18   A. They were against the use of the inventory | 18   A. Prior to which -- |
| 19  for Marriott Vacation Club customers. | 19  BY MR. REISER: |
| 20   Q. So how did it come about that you flew to | 20   Q. Prior to April 5, 2013. |
| 21  Aspen to meet with the board members on April 5, 2013? | 21   A. Yes.  There was -- after the evolution letter |
| 22   A. My recollection is that was an invitation | 22  and a discussion with Mr. Mullenix, we had agreed to |
| 23  extended by the board, probably through Randy Mercer. | 23  postpone an affiliation communication with the members |
| 24   Q. All right.  Did you ever have any contact | 24  at Bachelor Gulch. |
| 25  with anybody else on the board but Randy Mercer in | 25   Q. Okay.  Did you promise the Bachelor Gulch |
| Page 226 | Page 228 |

| | |
|---|---|
| 1  Aspen? | 1  membership either a vote or a survey on an |
| 2   A. At the board meeting, certainly. | 2  affiliation? |
| 3   Q. Before the board meeting? | 3     MR. SELLINGER: Objection to form. |
| 4   A. I'm trying to remember whether or not | 4   A. I don't recall promising the Bachelor Gulch |
| 5  Mr. Oliver, prior to that, but I don't recall. | 5  membership anything relative to a survey.  If I had a |
| 6   Q. Do you know Mike Marino? | 6  conversation, it would've been with -- probably with |
| 7   A. Yes. | 7  Mr. Mullenix. |
| 8   Q. How long have you known him? | 8  BY MR. REISER: |
| 9   A. I knew him -- I've known him since that board | 9   Q. So do you remember making a promise to any |
| 10  meeting.  That's the only time I've ever met or spoken | 10  other clubs that there would be a vote before any |
| 11  to Mr. Marino. | 11  affiliation? |
| 12   Q. I was told he was the counsel -- well, | 12     MR. SELLINGER: Objection to form. |
| 13  there's documents indicating he was counsel for the | 13   A. We may have discussed a vote with the other |
| 14  Aspen board during Randy Mercer's first term, which | 14  clubs.  And as I testified earlier, we subsequently |
| 15  lasted from 2005 to 2011. | 15  determined that a vote was the inappropriate |
| 16     You never met him in that time period? | 16  methodology and moved to the survey. |
| 17   A. No. | 17  BY MR. REISER: |
| 18   Q. So Randy Mercer was at the board meeting on | 18   Q. All right.  So I'm going to get to the |
| 19  April 5th; correct? | 19  subsequent decision to use the survey in a minute.  I |
| 20   A. Correct. | 20  want to see if you remember a period right around |
| 21   Q. Tyler Oliver? | 21  between April and May of 2013 where an enrollment for |
| 22   A. Yes. | 22  Lion & Crown was sent out that caused some controversy |
| 23   Q. Philip Schneider? | 23  among the members. |
| 24   A. Yes. | 24     Do you recall that? |
| 25   Q. Gerald Marsden? | 25   A. Are you talking about -- there was an |
| Page 227 | Page 229 |

58 (Pages 226 - 229)

Lee Cunningham - November 10, 2017

| | |
|---|---|
| 1 enrollment sent out that -- form that was sent out | 1 everybody or just Aspen. |
| 2 that created some concern about -- some of the wording | 2     MR. REISER:  All right.  Can I have |
| 3 created some concern.  And when we got that feedback, | 3 pulled up 1208? |
| 4 we made adjustments to the wording and reissued the | 4     MR. SELLINGER:  Do you have an exhibit |
| 5 form. | 5 for us? |
| 6     Q.  Okay.  What was the issue with the wording? | 6     MR. REISER:  No, I don't.  I think we're |
| 7     A.  I don't recall.  I think -- I know that there | 7 going to have to improvise here and read it |
| 8 was something that was -- I believe it was something | 8 on the board. |
| 9 that Ms. -- it could have been read and was read by | 9     MR. SELLINGER:  Is that the entire |
| 10 some of the members as -- that once they affiliated, | 10 document? |
| 11 they couldn't withdraw, and that wasn't the intention | 11     MR. REISER:  It's the entire document. |
| 12 of the language and that was part of the | 12     MR. SELLINGER:  Let's read it. |
| 13 clarification -- clarifying language.  I believe that | 13 BY MR. REISER: |
| 14 was one of the issues. | 14     Q.  Do you see -- |
| 15     Q.  Right.  And that was in relation to an | 15     MR. SELLINGER:  Hold on.  I'd like all of |
| 16 affiliation with -- not the Marriott Vacation Club, | 16 us to be able to read it. |
| 17 but with -- | 17     THE WITNESS:  I can't read it from here. |
| 18     A.  Lion & Crown, I believe. | 18 BY MR. REISER: |
| 19     Q.  -- the Lion & Crown affiliation.  But the | 19     Q.  You read the letter, Mr. Cunningham? |
| 20 affiliation with another club was what -- Exclusive | 20     A.  Yes. |
| 21 Resorts? | 21     Q.  Do you see in the letter there, the third |
| 22     A.  Exclusive Resorts -- | 22 paragraph from the bottom on the second page -- if you |
| 23     Q.  Or ThirdHome or both? | 23 can pull that out and highlight it -- it says, |
| 24     A.  I think it was Exclusive Resorts at that | 24 "Second, regarding other potential affiliations, we |
| 25 point in time. | 25 want to assure you that a Ritz-Carlton Club |
| Page 230 | Page 232 |

| | |
|---|---|
| 1     Q.  So at the same time that you were suggesting | 1 affiliation with the Marriott Vacation Club |
| 2 the Marriott affiliation, there was also an | 2 Destinations will not take place unless there's an |
| 3 affiliation with Exclusive Resorts; correct? | 3 affirmative vote of each club's membership." |
| 4     A.  That's correct. | 4     These are your words; correct? |
| 5     Q.  And in relation to that, you sent out a new | 5     A.  That's correct. |
| 6 enrollment agreement with Lion & Crown, so the folks | 6     Q.  And you wrote this letter? |
| 7 who wanted to affiliate with Exclusive Resorts could | 7     A.  I'm sure I had help. |
| 8 do so.  True? | 8     Q.  But that is your signature on the bottom of |
| 9     A.  That's true. | 9 the letter.  True? |
| 10     Q.  The controversy among the members was that | 10     A.  It is my signature on the bottom of the |
| 11 the language in the enrollment agreement in Lion & | 11 letter. |
| 12 Crown contained some language that could lead one to | 12     Q.  You meant, when you wrote this, that each |
| 13 believe that, if they enrolled in Lion & Crown, they | 13 club was going to have an affirmative vote of the |
| 14 gave up any right to vote against the wishes of a | 14 membership before the affiliation with the Marriott |
| 15 future affiliation of the program manager? | 15 Vacation Club would be allowed; did you not? |
| 16     A.  Sounds familiar.  That wasn't our intent. | 16     A.  I meant that there would be an affirmative |
| 17     Q.  That was not your intent, so you clarified | 17 vote, yes. |
| 18 it? | 18     Q.  Not a survey; a vote? |
| 19     A.  Corrected that. | 19     A.  As I said -- and I've said a couple times -- |
| 20     Q.  Okay.  And you sent out a letter to the | 20 we started with the conversation of vote; and, at some |
| 21 entire membership across all clubs clarifying that. | 21 point -- I'm not sure exactly what that point is -- |
| 22 True? | 22 that was -- we discovered that was an inappropriate |
| 23     A.  I think we went to the -- I don't know | 23 methodology.  It wasn't appropriate for a vote for |
| 24 whether it was just Aspen or everyone and I don't -- | 24 that.  That's when we switched to the survey to get an |
| 25 because I don't know -- I'm not sure whether it was | 25 affirmative -- |
| Page 231 | Page 233 |

59 (Pages 230 - 233)

Lee Cunningham - November 10, 2017

1    Q. Okay. Does this influence at all -- or do
2 you want to change your response at all to the meaning
3 of the April 5th letter that was sent out to the Aspen
4 membership that promised a vote? Would you agree that
5 that was the correct -- hold on -- that was the
6 correct -- the correct outcome of the meeting in
7 Aspen, that the decision was made to give the members
8 of the Aspen Club a vote as to whether to affiliate
9 with the Marriott Vacation Club?
10      MR. SELLINGER: Objection to form.
11    A. I'm not sure whether that was the outcome of
12 that meeting. The part that I -- the primary part
13 that I would object to would've been the majority of
14 the members component.
15 BY MR. REISER:
16    Q. Okay. So you take issue with the April 5th
17 vote that there had to be a majority of the
18 membership?
19    A. That is correct.
20    Q. But you would agree that there would have to
21 be an affirmative vote of each club's membership
22 before there would be an affiliation?
23    A. At that point in time, that is what we felt
24 was the right thing.
25    Q. And earlier this morning -- or earlier this

Page 234

1 was intended by the vote -- communication earlier.
2 BY MR. REISER:
3    Q. Okay. So you said something very important
4 there. I want to delve into that a little bit. You
5 said you discussed this change of -- change from a
6 vote to the survey with the boards.
7      That's what you just said; right?
8    A. We told -- we certainly had the conversation
9 with them that it was going to be a survey and this is
10 how we were going to administer it and how the -- how
11 we would view the results of the survey.
12    Q. And as far as you're aware, the Aspen board
13 never informed its membership that there was no longer
14 going to be a vote coming down from Orlando; it was
15 now going to be a survey?
16    A. I'm not aware if they did.
17    Q. And you're not aware of any communication to
18 the Tahoe members that there was no longer going to be
19 a vote, but, coming down from Orlando, there was now
20 going to be a survey. You never saw to it that the
21 members were apprised of that?
22    A. We did not have a -- we talked to the board.
23 We did not have a separate communication to the
24 members indicating that the -- a vote was now going to
25 be a survey.

Page 236

1 afternoon, just a few minutes ago, you did agree with
2 the concept that a vote is different than a survey.
3 True?
4    A. I understand that a vote is different than a
5 survey.
6    Q. And you agree that, even though this promise
7 was made of an affirmative vote in each club's
8 membership, you later changed your mind and decided
9 that the vote was not required; rather, a survey to
10 take the temperature of the membership was what was
11 required?
12      MR. SELLINGER: Objection to form.
13    A. We later, after review with counsel,
14 determined that a vote was the inappropriate forum, or
15 form, to gather the information and went with the
16 survey, and moved to the survey.
17 BY MR. REISER:
18    Q. It's your testimony, Mr. Cunningham, that you
19 never informed any of the members that had been
20 promised a vote of the change in strategy to switch to
21 a survey?
22      MR. SELLINGER: Objection to form.
23    A. We certainly discussed it with the boards and
24 we then communicated the purpose of the survey so that
25 we felt that it was clear that this was the -- what

Page 235

1    Q. And on what basis did you determine that,
2 even though you promised a vote to the memberships,
3 you could unilaterally change your mind and utilize a
4 survey instead of a vote?
5      MR. SELLINGER: Hold on. One, objection
6 to form. Number two, you can answer the
7 question if you can do so without disclosing
8 privileged conversations. But, please, don't
9 disclose conversations with counsel.
10    A. It was upon advice from my internal counsel.
11 BY MR. REISER:
12    Q. So it was Marriott's counsel that you relied
13 on to switch the promise from a vote to a survey?
14      MR. SELLINGER: Objection to form.
15    A. It was Marriott's counsel that we changed
16 from -- the form of the information gathering from a
17 vote to a survey.
18 BY MR. REISER:
19    Q. How did you communicate this new decision to
20 the board at Aspen?
21    A. I don't know whether it was done via -- it
22 was most likely done via a conversation, a phone call
23 between Ms. Sobeck and the board or members of the
24 board.
25    Q. Nothing in writing?

Page 237

60 (Pages 234 - 237)

Lee Cunningham - November 10, 2017

1    A. I don't recall.
2    Q. Is there any written communications from
3 counsel of Marriott that communicates their legal
4 opinion that a vote was no longer -- was not required?
5    A. Is there written communication -- internal
6 communication?
7    Q. Is there written communication, yes, between
8 Marriott's counsel internally and yourself?
9    A. I don't recall whether it was written or in a
10 discussion.
11   Q. So you think you would have made this
12 decision just based on a discussion and without
13 anything in writing?
14   A. With appropriate counsel, yes.
15   Q. How did you communicate -- so as you sit here
16 today, you recollect no writings communicating the
17 decision to change from a promise vote to a promise
18 survey to the Aspen board?
19       MR. SELLINGER: Objection to form.
20       MR. REISER: What's the objection,
21    Philip? Maybe I'll clean it up.
22       MR. SELLINGER: Okay. He's already
23    testified that the communications to the
24    members was very clear that it was a survey
25    and it couldn't have been misleading to
                                          Page 238

1 anybody --
2       MR. REISER: That's your objection to
3    form? Okay. All right. We'll let the judge
4    rule on that, on the depo cut to trial, and
5    we'll see how far that gets.
6 BY MR. REISER:
7    Q. Can you go ahead --
8    A. What's the question?
9       MR. REISER: Can you read it back?
10       (The reporter read back the last
11    question.)
12       THE WITNESS: I don't recall that there
13    was any written -- I don't recall a written
14    communication from me or -- to the board or
15    from anyone within The Ritz-Carlton
16    Destination Club to the board in Aspen,
17    notifying them or discussing with them the
18    change from a vote to a survey.
19 BY MR. REISER:
20   Q. Okay. Do you recollect any writing to any
21 board member at the San Francisco board, telling them
22 that there would no longer be a vote as promised in
23 the May 14th communication?
24   A. I do not recall any written communication to
25 the San Francisco board.
                                          Page 239

1    Q. And you don't recall any communications to
2 the Tahoe board, changing the promise of a vote and
3 then saying there was going to be a survey?
4       MR. SELLINGER: Objection to form.
5    A. I do not.
6 BY MR. REISER:
7    Q. So I'm going to go through all three clubs
8 again. In Aspen, what do you recollect, if anything,
9 about an oral communication where that decision was
10 communicated to the board?
11   A. I don't recall a communication -- being part
12 of a communication to the Aspen board regarding the
13 change from a vote to a survey. I'm certain that
14 conversation occurred between either Stephanie and the
15 board or Mary Lynn and the board, due to the fact that
16 they were involved in the cover letter for -- you
17 know -- we reviewed the cover letter for the survey
18 with the board.
19       MR. REISER: Can you read that back?
20       (The reporter read back the last answer.)
21 BY MR. REISER:
22   Q. Okay. So it's your testimony that you
23 reviewed, personally, the cover letter with the board
24 in Aspen or that Stephanie Sobeck and Mary Lynn Clark
25 did?
                                          Page 240

1    A. I don't recall reviewing the cover letter for
2 the survey with the board personally.
3    Q. How do you know that Stephanie Sobeck or Mary
4 Lynn Clark were involved in that cover letter?
5    A. I don't know for a fact. I know that that
6 would've been part of their responsibilities.
7    Q. So you don't really know how the
8 communication was made to the board as you sit here,
9 right -- in Aspen -- that there was no longer going to
10 be a vote?
11   A. I don't know exactly how the conversation
12 occurred or how the -- whether it was in writing or
13 whether it was a verbal conversation or who the
14 participants were.
15   Q. Are you aware of a series of redline drafts
16 going back and forth between Randy Mercer and the
17 Aspen board and folks at Marriott Vacation Club
18 wordsmithing that letter that you're referring to
19 where they described the survey?
20   A. I recall seeing something to that effect.
21   Q. You reviewed all that -- those redline
22 changes in preparation for today's depo, didn't you?
23       MR. SELLINGER: Objection to form.
24   A. I didn't review every one of them, no.
25 BY MR. REISER:
                                          Page 241

61 (Pages 238 - 241)

Lee Cunningham - November 10, 2017

| | |
|---|---|
| 1  Q. But you reviewed some of them or what -- | 1  Q. And who prepares these? |
| 2  A. I reviewed some of them, as I recall seeing | 2  A. I don't recall preparing these. I don't know |
| 3 something related to a change in that letter. | 3 who -- |
| 4  Q. And isn't it true that you changed the -- | 4  Q. Who within your organization at Marriott |
| 5 strike that. Isn't it true that you made a decision | 5 Vacation Club prepares these to update Marriott |
| 6 to change from a vote to a survey after the Bachelor | 6 International? |
| 7 Gulch members overwhelmingly voted to terminate the | 7  A. It would've been probably Stephanie or Mary |
| 8 relationship with Marriott Vacation Club because they | 8 Lynn. |
| 9 didn't want to affiliate? | 9  Q. And they work for you; right? |
| 10  A. I think the timing would be such that that | 10  A. That's correct. |
| 11 decision was changed after Bachelor Gulch made its | 11  Q. And they report to you what's going on at |
| 12 decision. | 12 each club, don't they, in terms of this affiliation -- |
| 13  Q. And you knew that none of the other boards | 13 the ongoing attempts to affiliate? |
| 14 would -- I'm sorry -- none of the other memberships | 14  A. Yes. |
| 15 would vote to affiliate, just like Bachelor Gulch | 15  Q. And how often did they report to you on the |
| 16 overwhelmingly refused to affiliate? | 16 ongoing efforts to affiliate the different clubs? |
| 17  A. I did not know that at all. | 17  A. Probably every couple of weeks. |
| 18  Q. You knew that there was a survey taken by the | 18  Q. So they kept you well-informed about the |
| 19 board in San Francisco, didn't you, that asked them | 19 status of the affiliations at each club. Fair? |
| 20 whether they wanted to affiliate, and 98 percent of | 20  A. Yeah. On an every-couple-week basis, yes. |
| 21 the folks came back and said no affiliation? | 21  MR. REISER: If you turn to page 2 of |
| 22  A. I did not know that. | 22 this document? I'd like you to, if you can, |
| 23  Q. Okay. I'll show you the document that is | 23 highlight the second bullet point all the way |
| 24 addressed to you on that a little later in the depo. | 24 through "the Aspen Club." Highlight that |
| 25 Okay? | 25 bullet out. |
| Page 242 | Page 244 |

| | |
|---|---|
| 1  A. Great. | 1 BY MR. REISER: |
| 2  Q. So it's your testimony that you have no | 2  Q. It says, "We are working with each of the |
| 3 communication from the board in San Francisco that | 3 association boards to coordinate a vote of the |
| 4 they did their own survey and that they wanted nothing | 4 membership to affiliate their club with the Marriott |
| 5 to do with the affiliation by about a nine-to-one | 5 Vacation Club program." Stop there. |
| 6 margin? | 6  That's true; right? Marriott Vacation Club |
| 7  A. I don't recall that. | 7 International -- strike that. Marriott Vacation |
| 8  Q. Is it true that you changed the decision to | 8 Worldwide Corporation was working with each |
| 9 hold a vote after you saw that Bachelor Gulch | 9 association's board to coordinate a vote of the |
| 10 overwhelmingly voted down the affiliation? | 10 membership to affiliate their club with the Marriott |
| 11  A. The timing is such, but that is -- you're | 11 Vacation Club program. True statement? |
| 12 trying to draw a causation between the two, and that's | 12  MR. SELLINGER: Objection -- |
| 13 not -- that wasn't the case. | 13 BY MR. REISER: |
| 14  Q. What was the case? | 14  Q. As of May 29, 2013? |
| 15  A. As I said, we reviewed with internal counsel | 15  MR. SELLINGER: Objection to form. |
| 16 and the advice was that a vote was the inappropriate | 16  A. As of May -- as of that date, we were still |
| 17 format for collecting this information and that a | 17 contemplating a vote. |
| 18 survey was the appropriate format. | 18 BY MR. REISER: |
| 19  MR. REISER: Can you pull up 1229, | 19  Q. That's not my question. My question was, |
| 20 please? | 20 were you working -- was Marriott Vacation Worldwide |
| 21 BY MR. REISER: | 21 Corporation working with the association boards to |
| 22  Q. So this is another one of those Marriott | 22 coordinate a vote of their membership to affiliate |
| 23 Vacation Worldwide updates to Marriott International | 23 their club with the Marriott Vacation Club program? |
| 24 on May 29, 2013. True? | 24  A. Yes. |
| 25  A. That's what it says. | 25  Q. The next sentence reads, "To date, only one |
| Page 243 | Page 245 |

62 (Pages 242 - 245)

Lee Cunningham - November 10, 2017

1 club has taken a vote, Bachelor Gulch, and they have
2 chosen not to affiliate with the Marriott Vacation
3 Club."
4        You knew that as of May 29th, didn't you,
5 that Bachelor Gulch had voted not to affiliate?
6    A.  Yes.
7    Q.  Okay.  Then you say, "Each of the clubs" --
8 or this memo to Marriott International, who you're
9 paying $50 million to in licensing fees a year, plus
10 incremental fees, you state, "Each of the clubs have
11 unique circumstances that will have an influence on
12 the outcome of this vote."
13        As you sit here today, can you tell me any of
14 the unique circumstances of any of the clubs?
15        MR. SELLINGER:  Let me just object to the
16 form.  Go ahead.
17    A.  Yes.  I think I mentioned earlier, several of
18 the clubs, we knew that we were going to be putting
19 developer-owned inventory into the Marriott Vacation
20 Club Destination Trust, which would affiliate
21 them with the -- would allow Marriott Vacation Club
22 Destinations owners to come stay at those clubs;
23 and, therefore, we wanted to make the reciprocal
24 available to the fractional members, so that it wasn't
25 a one-way access to each of those clubs.

Page 246

1 BY MR. REISER:
2    Q.  What was the unique situation at Aspen that
3 could influence the vote?
4    A.  The unique situation at Aspen was that -- it
5 was unique because it was different from Vail and
6 Northstar and San Francisco, where the inventory could
7 go into -- the developer inventory could go into the
8 Marriott Vacation Club Trust in Aspen.  We had come to
9 the conclusion that that inventory could not without a
10 change to the governing documents.
11        In St. Thomas, it was a similar situation.
12 St. Thomas had chosen to go get approval from their
13 members to change those governing documents.
14    Q.  So the next line down, it says "Aspen."  You
15 talk about the Aspen Club there.  It says you're
16 working with the board on language used to call for
17 the vote.  It will be difficult to gain member
18 support.
19        You knew that by May 29, 2013, that it was
20 going to be difficult to get member support for the
21 affiliation.  True?
22    A.  At that point, that was our assessment.
23    Q.  Right.  I think that would've been pretty
24 obvious from the cease-and-desist letter you got about
25 six months earlier.  Yeah?

Page 247

1        MR. SELLINGER:  Objection to form.
2    A.  Is there a question?
3 BY MR. REISER:
4    Q.  Yeah.
5    A.  What's the question?
6    Q.  It would've been pretty obvious from the
7 cease-and-desist letter that you were going to have
8 difficulty getting the affiliation?
9    A.  That wasn't related -- I don't think the
10 cease-and-desist was related to affiliation, as much
11 as it was related to the use of the inventory for
12 preview packages.
13    Q.  Okay.  So how did you become aware that the
14 affiliation was going to be difficult -- the vote on
15 the affiliation was going to be difficult to obtain?
16    A.  From feedback -- our normal feedback sources
17 of member surveys, discussions with the board.
18    Q.  So I want to ask you something about member
19 feedback for a minute.
20        You're aware that, after the April 5, 2013
21 letter went out, there was member feedback from the
22 Aspen members regarding the promise of a vote; are you
23 not?
24        MR. SELLINGER:  Objection to form.
25    A.  Feedback from those members to us or to --

Page 248

1 BY MR. REISER:
2    Q.  To the board that was forwarded to you for
3 your review.
4    A.  Okay.
5    Q.  You're aware of the overwhelming positive
6 response that the members felt they were going to get
7 a vote because that was sent to you?
8    A.  Okay.
9    Q.  True?
10    A.  Yes.
11    Q.  Okay.  And you knew that it was going to be
12 difficult for members to -- strike that.  You knew
13 that it was going to be difficult for Marriott
14 Vacation Worldwide Corporation to get a vote of the
15 Aspen members to affiliate by May 29, 2013 as well.
16 True?
17        MR. SELLINGER:  Objection to form.
18    A.  At that time, that was, as documented here --
19 would've been our sentiment, yes -- our belief.
20 BY MR. REISER:
21    Q.  Okay.  And isn't it true, Mr. Cunningham, the
22 reason you switched from a vote to a survey was
23 because you knew you weren't going to get a vote from
24 the Aspen members and you wanted to affiliate anyway?
25    A.  No.

Page 249

63 (Pages 246 - 249)

Lee Cunningham - November 10, 2017

1  Q.  What was the reason for changing to the
2 survey?
3  A.  I think I've covered this ground.  Upon
4 advice from counsel, they said -- informed us that a
5 vote was the appropriate form for this type of
6 communication, and that's when we chose to go with the
7 survey.
8  MR. REISER:  So, Philip, are you relying
9 on advice of counsel on this point or are you
10 going to waive the privilege?  He's relying
11 on advice of counsel for the decision.
12  MR. SELLINGER:  We're not relying on the
13 advice of counsel.  We're not putting the
14 advice of counsel at issue.
15  You asked the witness a question and he
16 answered the question factually, that they
17 took the position of advice of counsel.
18  What we're relying on are the agreements,
19 which give unfettered discretion to Cobalt to
20 affiliate without regard to anything else.
21 So the witness has testified to the facts
22 you're asking, but there is no advice of
23 counsel defense.
24 BY MR. REISER:
25  Q.  So is this a communication from Cobalt to
Page 250

1 capacity with Cobalt.
2 BY MR. REISER:
3  Q.  So Juan Pablo Cappello put you on notice of
4 the conflict that the Marriott Vacation Club --
5 Marriott Vacation Worldwide was seeking this
6 affiliation because it would allow Marriott Vacation
7 Worldwide to sell more memberships.
8  Do you remember that letter?
9  MR. SELLINGER:  Objection to form.
10  A.  We looked at it earlier, yes.
11 BY MR. REISER:
12  Q.  And did you believe you had a conflict of
13 interest -- Marriott Vacations had a conflict of
14 interest in this situation?
15  A.  No.
16  Q.  Do you believe it was perfectly appropriate,
17 Mr. Cunningham, for you, as the COO and executive vice
18 president of Marriott Vacation Club on the one hand,
19 and the executive vice president of Cobalt on the
20 other hand, to make a decision on behalf of Cobalt,
21 even though the decision of Cobalt to affiliate the
22 Marriott Vacation Club with the Ritz would benefit
23 Marriott Vacation Club?
24  MR. SELLINGER:  Objection to form.
25  A.  There wasn't a benefit to Marriott Vacation
Page 252

1 Marriott International or is it a communication from
2 Marriott Vacations Worldwide Corporation?
3  A.  I believe it would be from Marriott
4 Worldwide -- Marriott Vacations Worldwide.
5 BY MR. REISER:
6  Q.  And your counsel just testified that he
7 thought it was the exclusive discretion of Cobalt, the
8 decision on whether to affiliate.  True?
9  A.  That is correct.
10  Q.  And that's your position?
11  A.  Yes.
12  Q.  Do you think it was appropriate for Marriott
13 Vacation Worldwide to try to influence that decision
14 of Cobalt?
15  A.  They -- I'm sorry?  They're influencing the
16 decision of Cobalt how?
17  Q.  Because they're getting advice from counsel
18 about whether there should be a vote.
19  MR. SELLINGER:  Objection to form.
20  What's the question?
21  A.  I got advice -- I got advice from counsel
22 related to whether -- when we were going to seek this
23 information -- or going to seek feedback from the
24 owners -- whether a vote was appropriate or a survey
25 was appropriate.  At that point, I was acting in my
Page 251

1 Club of the affiliation.
2 BY MR. REISER:
3  Q.  Are you aware that Marriott Vacation Club
4 sales folks have consistently sold access to the Ritz
5 Club at a cheaper entry point and for minimum dues in
6 order to sell Marriott Vacation Club memberships?
7  MR. SELLINGER:  Objection to form.
8  A.  I am not.
9  MR. REISER:  If you could expand the
10 exhibit up on the board down to the Northstar
11 and San Francisco Clubs?
12 BY MR. REISER:
13  Q.  So in the Northstar Club, it was stated to
14 Marriott International that the plan to affiliate with
15 the -- strike that.  I'm going to ask you -- are you
16 writing this -- strike that.  Strike the question.
17 Let's start over.
18  Do you see there that it says that the
19 Northstar vote is on hold until the results in Vail
20 are seen?
21  A.  Yes.
22  Q.  Why were you waiting to get the results in
23 Vail in before you had a vote in Northstar?
24  A.  Just from a timing standpoint to understand
25 that -- their feedback.
Page 253

64 (Pages 250 - 253)

Lee Cunningham - November 10, 2017

1    Q. So you remember, as you sit here today, that
2 that was the reason?
3    A. Yes.
4    Q. So you were involved in preparing this
5 memorandum to the Marriott International. Is that
6 true?
7    A. I'm aware that that would've been our plan --
8 would be to go through these one at a time and
9 understand the results from one or the other. Whether
10 I was involved in -- I'm sure I reviewed this
11 document. Did I develop it? I don't recall
12 developing this document.
13    Q. 1236. I want to ask you about the top part
14 of this.
15    MR. REISER: Could you pull out the top
16    e-mail? Actually, strike that. Pull up the
17    middle from myjerry to Stephanie Sobeck.
18 BY MR. REISER:
19    Q. June of 2013 was the time period during which
20 the series of wordsmithing was going on in terms of
21 the letter to the members on the vote. True?
22    A. It started then, yes.
23    Q. And the e-mail from one of the board members,
24 Jerry Marsden to Stephanie Sobeck, states, "I believe
25 the frequently asked questions" -- let me stop there.

Page 254

1    Q. Okay. And then he goes on to state, "Also,
2 we decided we are having a vote, not a survey."
3    Do you see that?
4    A. I see that.
5    Q. So he's writing to Stephanie Sobeck saying
6 that we're having a vote, not a survey, at this point
7 in time; right?
8    A. That's what he says, yes.
9    MR. REISER: If you could pull up the top
10    response of Stephanie Sobeck, the second
11    paragraph starting with "I would think."
12 BY MR. REISER:
13    Q. So Stephanie Sobeck, who works for you -- and
14 what's her position again?
15    A. She's vice president of asset management.
16    Q. All right. She reports to you?
17    A. Yes.
18    Q. She says, "I think we would have voting open
19 for two, three weeks, with the ability to extend, if
20 needed, after discussions with the board. I.e., if we
21 hear from 48 percent of the members that they want to
22 affiliate, and we put a little more time into getting
23 the vote."
24    Is it true that Marriott felt that they had
25 the discretion to hold the voting open as long as they

Page 256

1 needed to in order to get a positive response from the
2 board members?
3    A. No. I don't think that's what this says.
4    Q. What do you think she means by "I.e., if we
5 hear from 48 percent of the members that they want to
6 affiliate and we put a little more time into getting
7 the vote"?
8    MR. SELLINGER: Objection to form. If
9    you know, you can answer, but don't
10    speculate.
11    A. I don't know what exactly she's referring to.
12 At this time, we're still considering a vote. There
13 are a number of things -- the things that are -- that
14 do go out for vote of the membership generally have a
15 designated timeline for the vote. That timeline can
16 be extended by the -- by a vote of the board. So
17 that's what this is referring to.
18 BY MR. REISER:
19    Q. So if you're not getting the result you want,
20 just keep it open a couple more weeks until you get
21 the result you want. Is that the concept?
22    MR. SELLINGER: Objection to form.
23    A. It generally is because you haven't gotten
24 the response level that you're looking for.
25 BY MR. REISER:

Page 257

1    Do you remember some frequently asked
2 questions being drafted that would explain what was
3 going on to the members?
4    A. Yes.
5    Q. Do you remember whether those were ever sent
6 to the members?
7    A. I don't recall.
8    Q. So Mr. Marsden goes on to state that "I
9 believe the frequently asked questions should be
10 separated from the letter, but the letter should state
11 that they are coming and that they will also be found
12 online. And it also should be made clear that the
13 frequently asked questions were prepared by
14 Marriott/Ritz as to the open dates on voting" --
15    MR. SELLINGER: I'm sorry. Just tell me
16    where you're reading from.
17    THE WITNESS: All caps.
18 BY MR. REISER:
19    Q. Is it true that the communication to the
20 members regarding the vote were prepared by
21 Marriott/Ritz?
22    A. Prepared by our company through -- by -- I'm
23 sure it was a collaboration between Stephanie and the
24 association governance, Morrow, the boards, and our
25 internal counsel.

Page 255

65 (Pages 254 - 257)

Lee Cunningham - November 10, 2017

| | |
|---|---|
| 1  Q. What's the response level that you're | 1 that there would be an affiliation in San Francisco. |
| 2 typically looking for in these votes? | 2 We certainly would have the authority or the right to |
| 3  A. It depends on what the particular issue is. | 3 do that. |
| 4  Q. Did you think you had the authority to hold | 4  But the issue in San Francisco, as I |
| 5 open the survey for a longer time in order to get the | 5 mentioned earlier, is that you were going to have |
| 6 proper number of people that would want to -- | 6 Marriott Vacation Club Destinations owners coming into |
| 7  A. To respond, yes. | 7 San Francisco because there would be San Francisco |
| 8  Q. So you felt that this survey could be held | 8 inventory in the Marriott Vacation Club Destinations |
| 9 open as long as Marriott Vacation Club wanted it? | 9 Trust. |
| 10  A. Not indefinitely. But, as a survey, yes, it | 10  Q. Right. And I'm not asking about that. I'm |
| 11 could be held open. It could be communicated that | 11 asking about the affiliation. |
| 12 it's going to close here. If it's held open longer, | 12  A. Okay. |
| 13 there will be a subsequent communication that says, | 13  Q. Is it true that the affiliation would've |
| 14 "The survey will be extended. Please respond." | 14 happened regardless of the survey results in both |
| 15  Q. Okay. Ms. Sobeck ends by saying -- this is | 15 Aspen and San Francisco, as stated by Eveleen Babich |
| 16 by June 4, 2013 -- "If there was a vote that the Aspen | 16 in the exhibit we saw earlier today? |
| 17 members wanted no affiliation with the Marriott | 17  A. I can't comment to whether that was the state |
| 18 Vacation Club system, we would simply not allow | 18 of mind at that point in time. I don't know where she |
| 19 Marriott Vacation owners to utilize any Aspen members' | 19 got that impression. |
| 20 inventory that had been deposited into Lion & Crown." | 20  Q. Was that your impression? |
| 21  As of June 4, 2013, it was still the thinking | 21  A. No. |
| 22 of Marriott Vacation Club that, unless a majority of | 22  Q. So you thought that there would have to be |
| 23 the voters wanted to affiliate, and they voted to want | 23 some kind of positive survey results to affiliate? |
| 24 to affiliate, that there would be no affiliation. | 24  A. If we got affirmative survey results, we were |
| 25 True? | 25 going to move forward. If we didn't, then we would |
| Page 258 | Page 260 |

| | |
|---|---|
| 1  MR. SELLINGER: Read that question back. | 1 regroup and try to figure out what the next plan would |
| 2  THE REPORTER: I'm going to play it back. | 2 be or what should be done and -- you know -- including |
| 3  (The last question's audio was played | 3 and up to not affiliating. |
| 4 back.) | 4  Q. Did you ever see a letter from Jay Neveloff |
| 5  MR. SELLINGER: Objection to form. | 5 saying that the survey that was given to the Aspen |
| 6  A. At this point, there was a -- it was still | 6 members was so one-sided in discussing the benefits of |
| 7 obviously contemplated that it would be a vote. 1 | 7 the affiliation that it could not be used to rely as a |
| 8 don't know that it would be a majority-of-the-members | 8 reliance document for the decision to affiliate? |
| 9 vote or the point of communication here. | 9  A. I don't recall. |
| 10 BY MR. REISER: | 10  Q. Let me show you the next exhibit, 1235. So |
| 11  Q. You saw an e-mail earlier today from Eveleen | 11 you see the cover letter here? This is from Randy |
| 12 Babich in relation to the San Francisco vote, and she | 12 Mercer to Stephanie Sobeck. And it says, "Stephanie, |
| 13 was writing one of her colleagues, saying that, as in | 13 as promised, attached is the revised letter to |
| 14 Aspen, the survey is not something -- I'm | 14 members. If you make any changes to this, we would |
| 15 paraphrasing -- but, as in Aspen, the survey is not | 15 appreciate a redline before sending." And it's |
| 16 determinative as to whether the affiliation would | 16 enclosing a letter -- proposed letter to the Aspen |
| 17 happen, because the affiliation is going forward | 17 members. |
| 18 regardless of the survey. | 18  A. Yes. |
| 19  Do you remember that letter? | 19  Q. Do you see on the second paragraph from the |
| 20  A. I remember that. I don't know how accurate | 20 bottom of the first page of the letter, it says, "RCDC |
| 21 your paraphrase is. | 21 executive leadership and board of directors in Aspen |
| 22  Q. Was that true, that no matter what the survey | 22 have agreed that they will allow members of Aspen the |
| 23 said, there was going to be an affiliation of Aspen | 23 chance to indicate their thoughts before any final |
| 24 and San Francisco? | 24 decisions regarding affiliation are made." |
| 25  A. Well, there were going to be -- I don't know | 25  "If the majority, 50 percent plus one, of the |
| Page 259 | Page 261 |

66 (Pages 258 - 261)

Lee Cunningham - November 10, 2017

1 Aspen members, not including Marriott-owned units,
2 respond affirmatively that they want members of the
3 Ritz-Carlton Club in Aspen to have the ability to
4 voluntarily access the Marriott Vacation Club in
5 Aspen, we will move forward to provide the opportunity
6 to all members on an individual basis."
7        "If we do not hear affirmatively back from a
8 majority of the Aspen membership, then this exchange
9 option will not be made available to the Aspen
10 members."
11       That sounds like a vote to me. True?
12       MR. SELLINGER: Objection to form.
13       A. That sounds like that's what Mr. Mercer was
14 suggesting, that it would be a vote.
15 BY MR. REISER:
16       Q. Okay. And that's exactly what you told the
17 members on April 5th, 2013, that there would be a vote
18 of the majority membership. True?
19       MR. SELLINGER: Objection to form.
20       A. Are you referring to the letter from the
21 Aspen board?
22 BY MR. REISER:
23       Q. Yeah. That was approved by you and Stephanie
24 Sobeck in Aspen, as evidenced by the exhibits in this
25 case.

Page 262

1        Have you testified about all conversations
2 you can recollect, as you sit here right now, between
3 yourself and the Aspen board members about changing
4 from a vote to a survey?
5        MR. SELLINGER: Objection to form.
6        A. I don't recollect a survey -- a discussion
7 between myself and the Bachelor Gulch board regarding
8 the change from a vote to a survey.
9 BY MR. REISER:
10       Q. I think you misspoke. You said "Bachelor
11 Gulch."
12       A. I'm sorry. Yes, from Aspen.
13       Q. So you don't remember any conversations with
14 Aspen?
15       A. I don't remember personally having a
16 conversation with the members of the board of Aspen.
17       Q. And the same question for the members of the
18 board in Tahoe.
19       A. No.
20       Q. No conversations that you can recollect about
21 the change from a vote to a survey; right?
22       MR. SELLINGER: That he had?
23 BY MR. REISER:
24       Q. That you had.
25       A. I did not have that conversation.

Page 264

1        MR. SELLINGER: Objection to form.
2        A. Except that we don't -- we're making an
3 assumption that that letter is the attachment that was
4 referred to.
5 BY MR. REISER:
6        Q. It is. That will be obvious to the jury.
7        A. So that was what Mr. Mercer sent forward as a
8 draft back in June of 2013.
9        Q. All right. So as of June 2013, at least the
10 Aspen board was insisting that there be a majority
11 vote, as set forth in the letter that it wrote in
12 reliance upon your agreement and Ms. Sobeck's
13 agreement in Aspen in April 5, 2013. It was his
14 impression that both the executive board of Marriott
15 Vacation Club and the board of directors were going to
16 give a vote of the majority -- strike that.
17       MR. SELLINGER: Thank you. Slightly
18 compound.
19       MR. REISER: I'm going to put a
20 peremptory objection. That was a good one.
21 I will admit it would've been a good one.
22 BY MR. REISER:
23       Q. You would agree that the -- well, strike
24 that. Have you testified to everything you recollect
25 between -- strike that.

Page 263

1        Q. And you had no conversations with the board
2 members at San Francisco on the subject of changing
3 from a vote to a survey?
4        A. No.
5        Q. And your testimony is that the reason it was
6 changed from a vote to the survey is because, based
7 upon conversations you had with legal counsel, the
8 Marriott Vacation Club, in your opinion, or in legal
9 counsel's opinion, did not have to give a vote. True?
10       MR. SELLINGER: Just because I don't want
11       to get into a privilege waiver, part of your
12       question asked about the opinion of counsel,
13       which creates a problem.
14       You can ask the same thing, just his
15       opinion based on conversations with counsel,
16       I don't think that implicates privilege and
17       is cleaner.
18       There's no intention to waive privilege.
19       MR. REISER: There's no intention to
20       waive privilege and you're not waiving it
21       with the question as asked. I'll just ask
22       her to read back the question because I'm not
23       good at follow-up questions.
24       MR. SELLINGER: No. Hold on -- just to
25       clean it up. Your understanding after

Page 265

67 (Pages 262 - 265)

Lee Cunningham - November 10, 2017

1 counsel -- after you spoke to counsel -- you
2 can answer.
3     MR. REISER:  Can I just have you read it
4 back for the record?
5     (The reporter read back the last
6 question.)
7     THE WITNESS:  Based on conversations with
8 my internal counsel, we came to the
9 conclusion that we did not -- that a vote was
10 an inappropriate vehicle to gather the
11 information that was desired, and that's when
12 we switched to the survey.
13 BY MR. REISER:
14     Q.  You used the word "inappropriate."  That
15 sounds like something -- non-legal advice.  I'm trying
16 to -- did they say -- was it the opinion of Marriott's
17 counsel that --
18     MR. SELLINGER:  Don't answer that.
19     MR. REISER:  Strike that.
20     MR. SELLINGER:  Wait for a question.
21 BY MR. REISER:
22     Q.  Let me follow up with this.  Other than --
23 other than the notion that the vote was not an
24 appropriate means of determining the issue of
25 affiliation, were there any other reasons for not

Page 266

1 giving a vote?
2     A.  No.
3     Q.  And why was it inappropriate to hold a vote
4 on the issue of affiliation?
5     A.  There are only certain actions that require
6 or are appropriate for a vote of the members related
7 to a project or an affiliation or a -- not even an
8 affiliation -- the management agreement and so forth.
9 There's limited things that require or are appropriate
10 for a vote of the members.
11     THE VIDEOGRAPHER:  Counsel, we have five
12 minutes left on this video.
13     MR. REISER:  Why don't we just take a
14 break?
15     THE VIDEOGRAPHER:  The time is 4:44.
16 That concludes disc five in the deposition of
17 Lee Cunningham.
18     (Brief recess.)
19     MR. REISER:  Just for the record, today's
20 deposition of Mr. Lee Cunningham is going to
21 be continued and finished, hopefully,
22 starting Wednesday at 2:00.
23     (The reading and signing of the
24 transcript were not waived, and proceedings
25 concluded for the day at 5:05 p.m.)

Page 267

1 Under penalties of perjury, I declare that I have read
2 the foregoing document and that the facts stated in it
3 are true.
4
5 _____
6 DATE          LEE CUNNINGHAM
7
8 Subscribed and sworn before me this _____ day of
9 _____, 2017.
10
11
12
13 State of Florida   )
14 County of          )
15
16
17        NOTARY PUBLIC
18
19
20
21
22
23
24
25

Page 268

1        CERTIFICATE OF REPORTER
2
3 STATE OF FLORIDA
4 COUNTY OF ORANGE
5
6     I, Lisa Gerlach, Court Reporter, do hereby
7 certify that I was authorized to and did
8 stenographically report the foregoing deposition; and
9 that the transcript is a true and correct
10 transcription of the testimony given by the witness.
11     I further certify that I am not a relative,
12 employee, attorney or counsel of any of the parties,
13 nor am I a relative or employee of any of the parties'
14 attorney or counsel connected with the action, nor am
15 I financially interested in the action.
16     Dated this 18th day of November, 2017.
17
18
19
20
21
22
23
24 _____
25     Lisa Gerlach, Court Reporter

Page 269

68 (Pages 266 - 269)