# EXHIBIT - F

```
 1   RCHFU, LLC,  et al.,    United States District Court
 2        Plaintiffs,        District of Colorado:
 3   v.                      No.  1:16-cv-09390
 4   MARRIOTT VACATIONS WORLDWIDE
 5   CORPORATION, et al.,
         Defendants,
 6   _____/
     REISER, et al.,
 7        Plaintiffs,        Eastern District of California
 8   v.                      No. 2:16-cv-00237-MCE-CKD
 9   MARRIOTT VACATIONS WORLDWIDE
10   CORPORATION, et al,
         Defendants,
11   _____/
12   PETRICK, et al.,
13        Plaintiffs,        San Francisco County
     vs.                     No. CGC-15-54897
14   MARRIOTT VACATION WORLDWIDE
15   CORPORATION, et al.,
16        Defendants.
     _____/
17        CONTINUED VIDEOTAPED DEPOSITION OF LEE CUNNINGHAM
18   VOLUME II, taken at 450 South Orange Avenue, Suite 650,
19   Orlando, Florida, commencing between 2:06 p.m.-7:27 p.m.,
20   Wednesday, November 15, 2017, before Lisa Gerlach, Court
21   Reporter, Notary Public in and for the State of Florida
22   at Large.
23
24   JOB No. 2733762
25   PAGES 270-479
```

Page 270

Lee Cunningham - 11/15/2017

1 Appearances:
2
3 Counsel for the Plaintiffs:
4
5    BY: MATTHEW C. FERGUSON, ESQUIRE
6    The Matthew C. Ferguson Law Firm, PC
7    119 South Spring, Suite 201
8    Aspen, CO 81611
9    matt@matthewfergusonlaw.com
10
11   BY: MICHAEL J. REISER, SR., ESQUIRE
12      ISABELLA MARTINEZ, ESQUIRE
13      MATTHEW REISER, ESQUIRE
14   Reiser Law, PC
15   1475 Broadway, Suite 300
16   Walnut Creek, CA 94596
17   michael@reiserlaw.com
18   isabella@reiserlaw.com
19   matthew@reiserlaw.com
20
21   BY: TYLER MEADE, ESQUIRE
22   The Meade Firm, PC
23   1816 Fifth Street
24   Berkeley, CA 94710
25   tyler@meadefirm.com

Page 271

1 Appearances:
2
3 For the Defendant Aspen Highlands
4 Condominium Association:
5
6    BY: JESSICA BLACK LIVINGSTON, ESQUIRE
7    Hogan Lovells
8    1601 Wewatta Street, Suite 900
9    Denver, CO 80202
10   jessica.livingston@hoganlovells.com
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 273

1 Appearances:
2
3 For the Defendant Marriott:
4
5    BY: PHILIP SELLINGER, ESQUIRE
6    IAN S. MARX, ESQUIRE
7    Greenberg Traurig, LLP
8    500 Campus Drive, Suite 400
9    Florham Park, NJ 07932-0677
10   sellingerp@gtlaw.com
11   marxi@gtlaw.com
12
13   BY: DOUGLAS A. KELLY, ESQUIRE
14   Marriott Vacations Worldwide
15   6649 Westwood Boulevard
16   Orlando, FL 32821
17   douglas.kelly@mvwc.com
18
19
20
21
22
23
24
25

Page 272

1            I N D E X
2
3 WITNESS      EXAMINATION           PAGE
4 LEE CUNNINGHAM
5    Direct, continued by Mr. Ferguson   278
6    Direct, continued by Mr. Reiser   346
7    Direct, continued by Mr. Ferguson   426
8    Cross by Mr. Sellinger       451
9    Redirect by Mr. Reiser     459
10   Redirect by Mr. Ferguson      473
11   Recross by Mr. Sellinger    476
12   Further Redirect by Mr. Ferguson   477
13
14
15
16
17            EXHIBITS
18
19 Exhibit 1607 Memorandum of Understanding     428
20 Exhibit 1608  Plaintiffs' Third Set of Request
              For Production to Marriott
21            Defendants            280
22 Exhibit 1609  Plaintiffs' Second Set of
23            Interrogatories to Marriott
24            Defendants            282
25

Page 274

2 (Pages 271 - 274)

Lee Cunningham - 11/15/2017

1    THE VIDEOGRAPHER: Good afternoon. We
2  are going on the record at 2:06 p.m. on
3  November 15, 2017. Please note that the
4  microphones are sensitive and may pick up
5  whispering and private conversations. Please
6  turn off all cell phones or place them away
7  from the microphones, as they may interfere
8  with the deposition audio. Recording
9  will continue until all parties agree to go
10  off the record.
11    This is the continuation of the
12  video-recorded deposition of Lee Cunningham
13  taken by counsel for plaintiff. This
14  deposition includes three cases. The first
15  is RCHFU, LLC, vs. Marriott Vacation
16  Worldwide Corp., et al., Case Number
17  1:16-cv-101301-PAB-GPG, and is held in the
18  District of Colorado. Next is Reiser vs.
19  Marriott Vacations Worldwide Corp., Case
20  Number 2:16-cv-00237-MCE-CKD, and is held in
21  the State of California. And the third is
22  Petrick vs. Marriott Vacations Worldwide
23  Corp., et al., Case Number CGC-15-54897, and
24  is taking place in San Francisco, California.
25    This deposition is being held at

Page 275

1  Greenberg Traurig, located at 450 South
2  Orange Avenue, Orlando, Florida 32801. My
3  name is Mike Gerlach. I'm the videographer.
4  The court reporter is Lisa Gerlach; both
5  representing Veritext Legal Solutions.
6    Counsel will state their appearances and
7  affiliations for the record, please.
8    MR. FERGUSON: Matthew Ferguson for
9  plaintiffs. With me on our microphone is
10  Michael Reiser. With me is Isabella Martinez
11  and Matthew Reiser.
12    MS. LIVINGSTON: Jessica Livingston for
13  the defendant, Aspen Highlands Condominium
14  Association, in the Aspen case only.
15    MR. MARX: Ian Marx, for Greenberg
16  Traurig, for the Marriott defendants.
17    MR. SELLINGER: Philip Sellinger,
18  Greenberg Traurig as well.
19    THE VIDEOGRAPHER: Will the court
20  reporter, please, swear in the witness?
21  THEREUPON,
22    LEE CUNNINGHAM,
23    A Witness herein, acknowledged after having
24  been duly sworn and testified upon his oath as
25  follows:

Page 276

1    THE WITNESS: I do.
2    MR. SELLINGER: Before we begin, there
3  was one response from the last session that
4  Mr. Cunningham indicated he'd like to
5  supplement, if we can spend a moment doing
6  that.
7    MR. FERGUSON: Do you want to do that on
8  redirect or --
9    MR. SELLINGER: I think he'd rather
10  just --
11    MR. FERGUSON: I'd rather just stay with
12  my deal. What timeframe are you dealing
13  with?
14    MR. SELLINGER: It deals with the -- it
15  deals with one of the exhibits that you
16  marked with the Marriott Vacation Club
17  marketing.
18    MR. FERGUSON: Can you just show it to me
19  at a break and we'll --
20    MR. SELLINGER: I can show it to you
21  right now.
22    MR. FERGUSON: I'd rather have you do
23  that. Okay? I don't recall this. We'll
24  talk at the break about it -- however you
25  want to handle that.

Page 277

1    DIRECT EXAMINATION continued
2  BY MR. FERGUSON:
3    Q. Mr. Cunningham, welcome back for your
4  deposition today. Thanks for being here.
5    Do you know whether there's been a privilege
6  log put together for documents that have been withheld
7  based on privilege, for example, if Ms. Egolf was
8  giving you advice with respect to the decision you
9  said was made that there wouldn't need to be a vote
10  for the affiliation? Do you know if there's a log of
11  communications?
12    A. I do not.
13    Q. And, quickly, because I think we touched upon
14  it, but I just want to see one more time. Do you know
15  if there was any written communications from the legal
16  department at Marriott Vacation Worldwide to you, as
17  the COO and executive vice president of MVW, that you
18  didn't have to do a vote at the Aspen Highlands
19  property; you could do a survey?
20    A. I'm not aware of any written documentation.
21    Q. So did that take place at the water cooler,
22  in the men's room, at a luncheon? Where did that
23  occur?
24    A. That would have occurred in probably either
25  my office or one of my offices or a meeting room.

Page 278

3 (Pages 275 - 278)

Veritext Legal Solutions
866 299-5127

Lee Cunningham - 11/15/2017

| | |
|---|---|
| 1   Q. Did they have a document that they showed you | 1   identification.) |
| 2 that says you don't have to do this? | 2 BY MR. FERGUSON: |
| 3      MR. SELLINGER: Well, hold on one second. | 3   Q. Let me show you what's been marked as |
| 4 I want to make sure we're not impinging upon | 4 Exhibit 1608. Sir, this is plaintiffs' third set of |
| 5 privilege, because I don't think | 5 requests for production to Marriott defendants, and it |
| 6 Mr. Cunningham has testified to any advice | 6 was served in this case -- it looks like we served it |
| 7 that's been received that would be | 7 back in -- the discovery cutoff date for written |
| 8 privileged. He's testified to his | 8 discovery, September 21st, 2017. |
| 9 understanding -- | 9      Have you seen this document, because we |
| 10   I just want to make sure we're doing this | 10 haven't had any responses to this? |
| 11 the right way -- his understanding after | 11   A. I have not. |
| 12 speaking with counsel. | 12   Q. Do you know of anybody that's compiling |
| 13 BY MR. FERGUSON: | 13 documents now at Marriott Vacation Worldwide that's |
| 14   Q. Let me ask it simpler. What document are you | 14 gathering documents for any production request in the |
| 15 relying upon, as COO and executive vice president of | 15 Aspen Highlands case? |
| 16 Marriott Vacation Worldwide, when you said that you | 16   A. I'm not aware of anyone doing that. |
| 17 would change your mind and not give a vote, would | 17      MR. SELLINGER: This is your deposition, |
| 18 maybe do a survey, to get, I think you said, the | 18 but I'll simply note that, to be asking the |
| 19 sentiment of the folks up at Aspen Highlands? | 19 COO about who is gathering documents in |
| 20   A. I'm not relying on a particular document. | 20 response to a request for production does not |
| 21 I'm relying on the advice of counsel and conversation. | 21 seem productive. |
| 22   Q. Okay. Do you know what counsel that was that | 22      MR. FERGUSON: Well, it would be |
| 23 you had that conversation with -- without divulging -- | 23 productive if we had the answers to them |
| 24 just to who that lawyer or lawyers were? | 24 before today's deposition. |
| 25   A. Barbara Egolf. | 25      MR. SELLINGER: You can have whatever |
| Page 279 | Page 281 |

| | |
|---|---|
| 1   Q. Anybody else in the legal department? | 1 position you want, but it's not a productive |
| 2   A. Not that I recall. | 2 use of this witness's time. |
| 3   Q. Do you have anything in your records, your | 3      (Plaintiff's Exhibit 1609 was marked for |
| 4 minutes, your e-mails, your texts -- anything that | 4 identification.) |
| 5 would help us find a date that you were told -- that | 5 BY MR. FERGUSON: |
| 6 you had this conversation with Ms. Egolf? | 6   Q. I'm going to mark this next exhibit as 1609. |
| 7   A. I don't know whether I do or don't. | 7 That is our third set of interrogatories. |
| 8   Q. Did it occur by telephone or in person? | 8      Same questions. Have you been involved at |
| 9   A. What? | 9 all in answering interrogatories? |
| 10   Q. The conversation with your counsel. | 10   A. No. |
| 11   A. In person. | 11   Q. Is that something you would not do as the COO |
| 12   Q. Here in Orlando, sir? | 12 of the company? |
| 13   A. Yes. | 13   A. I've not ever done that in the past. |
| 14   Q. Was there one meeting you have in your mind | 14   Q. And you've never been deposed in the past; |
| 15 or is it more than one on this subject? | 15 right? |
| 16   A. I recall it being one meeting. | 16   A. That's correct. |
| 17   Q. Do you recall the time of the year it was? | 17   Q. So your experience is, you're not involved in |
| 18 Was it 2013? | 18 the production of documents or the answering of |
| 19   A. I believe it would've been roughly summertime | 19 written questions in lawsuits? |
| 20 of 2013. That timeframe. | 20   A. No. |
| 21   Q. So you don't believe there was any written | 21   Q. That would be -- what was the man's name here |
| 22 document that would peg the time for this | 22 that was here last week from the legal department? |
| 23 communication? | 23   A. Mark Nagle. |
| 24   A. I don't recall one, no. | 24   Q. Mark Nagle, is he the head of litigation for |
| 25      (Exhibit 1608 was marked for | 25 your company? |
| Page 280 | Page 282 |

4 (Pages 279 - 282)

Lee Cunningham - 11/15/2017

1    A. Yes.
2    Q. Is he someone you expect to be doing that
3  type of work -- his department at least?
4    A. I presume that would be part of his duties,
5  but I don't know.
6    Q. I just want to briefly show you a document I
7  skipped over last time. Sir, this is Kapalua
8  communications, member response from December 19,
9  2012.
10    Do you recall that there was a survey of some
11  sort that resulted in these comments and questions by
12  members from, primarily, Kapalua? I do see some
13  St. Thomas, San Francisco, and Aspen people in here.
14  Do you recall anything about this?
15    MR. SELLINGER: Object to the form.
16    MR. FERGUSON: I'm sorry -- 1149.
17    A. I don't recall a survey to Kapalua
18    members.
19  BY MR. FERGUSON:
20    Q. So you don't recall this?
21    A. I don't.
22    Q. For example, if you look at the first box
23  from a Mr. Galbut, it says, "Not good at all for the
24  Ritz Club or members who spent a fortune on this
25  project. This hurts the brand too." That's from a

Page 283

1    Q. If you go to page 2 of 1149, look at the
2  second box from this fellow named John Fitzpatrick.
3  720 -- that means he's somewhere in Denver or Boulder,
4  I suspect.
5    It says, "Lee Cunningham, to say I'm
6  disappointed would be an understatement. Actually, I
7  feel like the Ritz deserted me. I would like you to
8  buy back my property, since the only reason I
9  purchased it in the first place is the Ritz promise
10  and assurance that Kapalua Bay was of the Ritz
11  flagship property of all destination clubs and I would
12  have access to other Ritz properties."
13    Having seen Mr. Fitzpatrick's note, and it's
14  to Mr. Cunningham -- to you -- is this the type of
15  communication you received back in response to a
16  survey that went out under your name, if you know?
17    MR. SELLINGER: Well --
18    A. I don't know, because if you flip to page 3,
19  you see, "Dear RCDC Member Services."
20  BY MR. FERGUSON:
21    Q. Yeah. And that's what you put down your name
22  as sometimes?
23    A. No, I don't put my name down as RCDC.
24    Q. So what does happen, Mr. Cunningham, is, when
25  you write a letter, RCDC is tasked with

Page 285

1  lawyer in Arizona -- Mr. Galbut. If you look at
2  the -- he's got a few comments down there.
3    Mr. Fitzpatrick says, "This borders on fraud.
4  You conned us into buying, knowing that the builder
5  was close to insolvency."
6    Does that have to do with the Kapalua
7  property, looking at those comments?
8    A. If they're referring to the builder being
9  close to insolvency, that was the -- that would've
10  been Kapalua, and that would've been Lehman Brothers
11  as the funder of -- the funding entity for the
12  development.
13    Q. In any event, when it says, "Kapalua
14  communications, member responses," that would be
15  people that are owners or members of the -- or were
16  members of the RCDC in Kapalua probably?
17    MR. SELLINGER: Objection to form. If
18    you know.
19    A. I don't know, but I would assume this is a
20  communication to Kapalua fractional owners only.
21  BY MR. FERGUSON:
22    Q. And this would've been a response to
23  communication from you, wouldn't it have been?
24    MR. SELLINGER: Objection to form.
25  BY MR. FERGUSON:

Page 284

1  e-mail-blasting those out to your members; right?
2    A. It comes out from that organization.
3    Q. So if you look at page 5 of Exhibit 1149,
4  you'll see that a fella named Sokolov, in St. Thomas,
5  said, "Dear Mr. Cunningham, executive vice president
6  and chief operating officer." You said, "This is very
7  disappointing news regarding Kapalua."
8    So this is probably something that came under
9  your signature that was sent out by RCDC member
10  services?
11    MR. SELLINGER: Well, I don't know what
12    "this is probably" refers to. Why don't you
13    ask him if he knows what that document is?
14    Or are you asking him to guess?
15  BY MR. FERGUSON:
16    Q. Sir, can you answer the question, or I'll
17  repeat it for you?
18    A. Please.
19    Q. Do you know whether or not this member
20  response on December 19, 2012 was in response to
21  letter or communication under your signature, or over
22  your signature, that went out from RCDC membership
23  services?
24    A. I do not know for a fact that it is.
25    Q. It may have been, but you don't know for

Page 286

Lee Cunningham - 11/15/2017

1  sure?
2      A.  It may have been, but I do not know.
3      Q.  I just want to show you quickly Exhibit 1161.
4  Then I'll get to May of 2013, where we kind of left
5  off last time.  Exhibit 1161 is a communication from
6  February 3, 2013.
7          Do you recall that you were up in Aspen on
8  April 5th when the letter went out from the board --
9  and that was the one you said you were concerned about
10  because it said there'd be a vote and you didn't think
11  there should have been a vote.
12         Just to get you in the timeframe, this is an
13  earlier document to the members.  I just want to show
14  you the second paragraph, the final sentence, where it
15  says, "Finally, please be advised that it is our
16  intention to bring any potential resolution before the
17  members for a vote, should a resolution be tentatively
18  reached between the board, MVW and such Ritz-Carlton
19  affiliation."
20         My question here is simple.  April 5th is
21  when that other letter went out that we saw
22  yesterday -- last Friday, I think it was.
23      A.  Right.
24      Q.  Do you recall this -- do you recall that, as
25  early as February 3rd, 2013, there were communications
                                                    Page 287

1  going out that there would be a vote for resolution of
2  an affiliation?
3      MR. SELLINGER:  Objection to form.
4      A.  I don't recall seeing this letter from the
5  board president to the members in Aspen.
6          We were in discussions in that timeframe
7  about possible solutions and -- but not that there was
8  a discussion about -- whether there was a discussion
9  about a vote at that point in time, I don't recall.
10  BY MR. FERGUSON:
11      Q.  Thank you, sir.  Mr. Cunningham, since our
12  last deposition, have you spent any more time
13  preparing for your deposition with counsel?
14      A.  Yes.
15      Q.  Approximately how many hours?
16      A.  About an hour.
17      Q.  What day?
18      A.  Today.
19      Q.  Since I saw you Friday, last week, have you
20  reviewed any additional documents in addition to the
21  100 you reviewed before the last session?
22      MR. SELLINGER:  Objection to form.
23      A.  I went back and reviewed documents that I had
24  previously reviewed.
25  BY MR. FERGUSON:
                                                    Page 288

1      Q.  Was that approximately 100?
2      A.  That's probably close.
3      Q.  Was that a document file that you maintained
4  or was it something that was given to you to prepare?
5      A.  It was a file that was prepared for me.
6      Q.  Thank you.  Approximately, how many hours did
7  you spend on your own looking at those -- re-looking
8  at those documents?
9      A.  About an hour.
10      Q.  Thank you.  Exhibit 1233.  Sir, this is an
11  e-mail from Randy Mercer, and it's -- from Mercer to
12  you and Stephanie Sobeck, with a copy to the members
13  of his board on June 3, 2013.  And I just want to get
14  kind of where we left off with you, which is probably
15  late April or early May of 2013, at your last
16  deposition.
17          Here we are with an e-mail to you and
18  Ms. Sobeck concerning a second-revised enrollment
19  agreement.  Do you see that?
20      A.  Yes.
21      Q.  It says, "You should know the concept of
22  transparency and collaborative effort is somewhat
23  tarnished due to your rush to disseminate the addendum
24  to those members who have accepted the original
25  enrollment and the revised document in its entirety."
                                                    Page 289

1          Then you ran through a version of a timeline,
2  items one through six.  Then, after the timeline, you
3  said, "The breakdown of protocol and collaboration is
4  a reminder of old practices and certainly not the best
5  practices.  We are of the belief that the old
6  practices were put aside, but in light of the
7  breach" -- which is spelled wrong -- "apparently not."
8          Do you recall having a slight wrinkle or
9  wrinkle in connection with the affiliation discussions
10  with Randy Mercer?
11      A.  Yes, we -- I think we talked about this in
12  the last session.  There was an enrollment packet that
13  went out that had -- some of the members interpreted
14  it to give away their voting rights, which was not our
15  intent.  And as a result, we amended that enrollment
16  packet and re-sent it with an explanatory letter or
17  cover letter explaining that was not our intent.
18      Q.  Was that just a mistake or was it something
19  that needed to be corrected?  Let me do it this way.
20  Did it get sent out, the enrollment form, with the
21  problem that the members had with voting?  Was it sent
22  out and recalled, or was it just sent out because no
23  one was paying attention?
24      A.  It was sent out without -- in hindsight,
25  without enough review to ensure that it was reflective
                                                    Page 290

6 (Pages 287 - 290)

Lee Cunningham - 11/15/2017

1 of all the discussions with the board.
2    Q.  Okay.  I believe we did -- I believe you did
3 talk about this at the last deposition, so I think
4 we're kind of caught up, but I don't think I showed
5 you the documents from that timeframe.  I think we
6 were kind of skipping ahead as to when that happened.
7       Let me show you Exhibit 1236.  It's an e-mail
8 chain that begins at the bottom with Stephanie Sobeck
9 at 10:40 eastern time.
10    MR. SELLINGER:  I'll note that, I think,
11    proceeding in this way is contrary to the
12    agreement that we had reached, where we
13    allowed you to complete a topic, Mr. Reiser
14    to then come in as to the other resorts, with
15    the assumption that you weren't going to come
16    back to the same subject matter, and that
17    seems to be what you're doing now.
18    MR. FERGUSON:  I don't believe we got
19    this far in the examination.  The same
20    subject matter continues for several months,
21    so I believe I kind of -- I'll move on.  I
22    was just trying --
23    MR. SELLINGER:  It's the identical time
24    period of what was covered.
25    MR. FERGUSON:  Okay.  I just don't think

Page 291

1 it's the same document.
2    MR. SELLINGER:  I'm not saying it's the
3    same documents, but it's the identical time
4    period, so it's the identical subject matter
5    that we covered.  And that wasn't the
6    agreement that you were going to then come
7    back --
8    MR. FERGUSON:  But, Philip, the subject
9    matter continues chronologically throughout
10    the summer into December.  So I don't want to
11    replow old ground, but I think I'm -- I think
12    I've moved past the documents we were at.  So
13    let me just proceed with this real quickly
14    then.
15 BY MR. FERGUSON:
16    Q.  This is an e-mail chain -- it starts on the
17 second page -- from Mercer to Sobeck to Marsden and
18 the rest of his board.  It's talking about "the Aspen
19 letter to members, clean."
20    I'm just going to ask you.  Ms. Sobeck says
21 on the top e-mail, in response to the other e-mails
22 below from Mr. Marsden, "Yes, there are two travel
23 companies -- Cobalt and Lion & Crown."
24    Cobalt, you're an officer of; right?
25    A.  Yes.

Page 292

1    Q.  And Lion & Crown, you are; right?
2    A.  That's correct.
3    Q.  And if you keep going there, it says,
4 "The only way the member inventory would be in the
5 Lion & Crown Travel is if a member deposited it.  If
6 it was a vote that the Aspen members wanted no
7 affiliation with the Marriott Vacation system, we
8 simply would not allow Marriott Vacation Club to
9 utilize any Aspen member inventory."
10    I just want to follow through -- still as --
11 going into June -- early June 2013 -- at least
12 Ms. Sobeck thought there would be a vote; right?
13    A.  That's correct.  That's what it says.
14    Q.  After you spoke to Ms. Egolf in an
15 undetermined time, did you communicate to Ms. Sobeck
16 what you were all going to do?
17    A.  Yes.  I believe she was in the conversation.
18    Q.  She was present?
19    A.  Yes.
20    Q.  Was it in your office?
21    A.  As I said earlier, I don't recall where it
22 took place.
23    Q.  Sometimes lawyers keep asking and sometimes
24 their memory comes back.
25       The next exhibit is 1237, sir.  Exhibit 1237

Page 293

1 is your response to the e-mail we saw before from
2 Mr. Mercer and what he was concerned about, the old
3 practices and the breach.  And this is your response,
4 Mr. Cunningham, to Mr. Mercer; right?
5    A.  That's correct.
6    Q.  And I think you said that you were
7 "disappointed to read your e-mail below.  We have
8 keenly focused on transparency with the Aspen board."
9       Is that something you were trying to do at
10 all times is to be transparent with the Aspen board?
11    A.  We try to be transparent at all times with
12 all of our boards.
13    Q.  Were you being transparent -- do you believe
14 you were being transparent with the members of the
15 Aspen Highlands in this process?
16    A.  Yes, through their board.
17    Q.  Through their board only?
18    A.  Not only through their board.
19    Q.  Because you write letters to the members,
20 including the plaintiffs I represent; right?
21    A.  Yes.
22    Q.  Do you recall whether you ever sent an
23 e-mail -- I'm sorry -- did you ever send a
24 communication through RCDC membership or any other
25 way -- you, Mr. Cunningham -- advising them that you

Page 294

7 (Pages 291 - 294)

Lee Cunningham - 11/15/2017

1 would change your mind on giving the plaintiffs and
2 the other members the right to vote on the
3 affiliation?
4     A.  We didn't send a communication saying that
5 the vote was now a survey.  There was communication --
6 clear communication -- that the survey was there and
7 it tied -- the cover to that communication tied it
8 back to, as previously discussed or as we previously
9 communicated, here is the survey or here is the
10 opportunity to provide your feedback.
11     Q.  When you did that, sir -- when you sent those
12 communications out -- you specifically referred to the
13 April 5th letter from Mr. Oliver, Mr. Mercer, and the
14 other two boards members; did you not?
15     A.  I don't recall.  I don't have that letter
16 committed to memory.
17     Q.  And when you sent that communication and you
18 referred to that letter, you recall that that
19 letter -- you do recall that letter did promise a
20 vote?
21     MR. SELLINGER:  Objection to form.
22     A.  I'm sorry?
23 BY MR. FERGUSON:
24     Q.  You do recall the April 5th letter from the
25 board -- after you had the meeting up in Aspen,

Page 295

1 Colorado, you do recall that was the one that said we
2 promise a vote?
3     A.  That was the one that said there would be a
4 vote.
5     Q.  And in Exhibit 1237, you continued in your
6 response to Mr. Mercer, who was -- at that point, had
7 a little strained relationship with you.  You said in
8 the second paragraph, "I want us to have a
9 relationship in which you can trust in the commitments
10 that are made.  When there are questions about one
11 party or the other's intentions, they can be discussed
12 and clearly understood."
13     Do you believe that you clearly communicated
14 or you didn't clearly communicate with the members
15 that you were changing the method of the decision that
16 you said -- let me withdraw that.
17     You did change the commitment to the members
18 that was made on April 5th; did you not?
19     MR. SELLINGER:  Objection to form.
20     A.  There was a letter that said that the -- the
21 letter from the board said there would be a vote.
22 There was not a vote.  There was a survey done, and it
23 tied back to -- the cover letter of that survey tied
24 back to that communication of the 5th to indicate that
25 that was the fulfillment of that prior letter.

Page 296

1 BY MR. FERGUSON:
2     Q.  But you didn't really tell the people that
3 you were changing your commitment to them?  You didn't
4 say, "Hey, listen" --
5     A.  We made it -- I'm sorry.
6     Q.  You didn't tell the people that I represent,
7 and the other members, that you would change your
8 commitment made on April 5th, 2013?
9     A.  We made it clear, when the survey went out
10 with the cover letter, that this was a survey in
11 fulfillment of the letter from the 5th.
12     Q.  Excuse me one second.  Let me show you what's
13 been previously marked as Exhibit 1305, sir.  This is
14 the letter that went out, I believe -- it went out
15 from both RCDC -- you signed it under RCDC, and
16 Mr. Mercer and his board signed in on behalf of the
17 TAC, the tourist accomodation portion of the board.
18     MR. SELLINGER:  Give Mr. Cunningham a
19 moment to review it.
20     MR. FERGUSON:  Absolutely.  I'm only
21 going to be focusing on the first page.
22 BY MR. FERGUSON:
23     Q.  Sir, thank you for glancing at that.  I'm a
24 little bit familiar with it.  I know it's a long
25 document that you and Mr. Mercer and the board sent on

Page 297

1 November 19, 2013.
2     I just want to show you the section that
3 says, "Marriott Vacation Destinations exchange
4 program" at the bottom of page 1 of Exhibit 1305.  It
5 says, "As mentioned above, the sole purpose of the
6 survey is to understand Aspen Highlands members'
7 interest in the voluntary exchange program, which
8 allows members to exchange a week of their reserved
9 time for points within the Marriott Vacation Club
10 Destinations exchange program."
11     Is it your testimony, sir, that you had
12 adequately informed the members that you had changed
13 from a vote of the majority of the members to a
14 survey?
15     A.  Yes.  We had communicated through this letter
16 that there was -- up in the second paragraph -- that
17 we'll be surveying their opinions regarding the
18 potential exchange affiliation with Marriott Vacation
19 Destinations exchange program.
20     Q.  Where are you reading from, sir?
21     A.  The middle of the first -- second paragraph.
22     Q.  Let's talk about that.  It says, "The
23 Ritz-Carlton Destination Club and your board have been
24 exploring an additional voluntary exchange."
25     Do you see that?

Page 298

8 (Pages 295 - 298)

Lee Cunningham - 11/15/2017

1    A.  Yes.
2    Q.  And that would be with the MVCD program;
3  right?
4    A.  That's correct.
5    Q.  When I say we, the HOA that Aspen Highlands
6  has committed to; right?  They committed to the MVCD
7  program.
8        MR. SELLINGER:  Objection to form.
9    A.  In November of 2013, the board had not
10  committed to the -- I'm not sure what you mean by
11  committed to.
12  BY MR. FERGUSON:
13    Q.  Well, they affiliated.  They signed the MOU
14  in April of 2014 --
15    A.  Yes.
16        MR. SELLINGER:  Hold on.  Wait a minute.
17        MR. FERGUSON:  Objection, form, sir?
18        MR. SELLINGER:  Objection to form.
19    Please wait so I can object.
20        MR. FERGUSON:  Thank you.  Yeah, I agree
21    with Mr. Sellinger.
22        MR. SELLINGER:  So what --
23  BY MR. FERGUSON:
24    Q.  The question was simply that the MVCD program
25  referred to in November 19, 2013, was in fact
                                            Page 299

1  brand for the Ritz-Carlton Club, and informing the
2  members that there would be a survey to understand
3  their interest in affiliating with the Marriott
4  Vacation Club Destinations exchange program.
5  BY MR. FERGUSON:
6    Q.  In early June, we just saw an e-mail where
7  you told Mr. Mercer your company wanted to be
8  transparent and honor its commitments.
9        Do you recall that exhibit?
10    A.  Yes.
11    Q.  Do you believe telling them, as promised on
12  April 5th, 2013, which said a vote -- and you sent
13  this letter out on the 19th of November -- do you
14  believe that's being transparent?
15    A.  I believe we were clear about our intent in
16  November as to what we --
17    Q.  You were purposely not --
18        MR. SELLINGER:  Hold on a minute.  Hold
19    on a minute.  Please, let the witness
20    answer his -- finish answering.
21    A.  So in this letter, we were clear that it was
22  a survey and it was to get the opinion of the members,
23  and we referred back to the prior letter which had
24  indicated a vote.
25  BY MR. FERGUSON:
                                            Page 301

1  acknowledged, and there was an MOU entered into in
2  April of 2013 -- 2014 -- between the HOA and Marriott
3  Vacation Worldwide; correct?
4    A.  That's correct.
5    Q.  And Cobalt?
6    A.  No.  There wouldn't have been an affiliation
7  between -- of MVCD with Cobalt.
8    Q.  Keeping on Exhibit 1305, it said, "As
9  promised earlier this year, members of The Ritz
10  Carlton Club, Aspen Highlands, will be surveyed on
11  their opinion."
12        They weren't promised a survey, sir.  They
13  were promised a vote; were they not?
14        MR. SELLINGER:  Objection to form.
15    A.  The letter went out saying that there would
16  be a vote of the members.
17  BY MR. FERGUSON:
18    Q.  Yeah.  And between this letter that you and
19  Mr. Mercer and his board sent out -- and you signed it
20  as RCDC, but we know you're really Marriott Vacation
21  Worldwide -- you didn't tell them, "Hey, we changed
22  the program, folks."  Did you?
23        MR. SELLINGER:  Objection to form.
24    A.  I sent this letter out representing The
25  Ritz-Carlton Destination Club, which is the working
                                            Page 300

1    Q.  But you weren't clear, because the way to be
2  clear would be to say, "Hey, we promised you in
3  April of 2013 to give you a vote, but I've talked to
4  Ms. Egolf and Ms. Sobeck, and we decided internally
5  not to give you a vote.  We're going to give you a
6  survey."
7        That would've been transparent, wouldn't it
8  have been?
9        MR. SELLINGER:  Objection to form.
10    A.  That would've been your version of a way to
11  be transparent about that.
12  BY MR. FERGUSON:
13    Q.  Okay.  In the week before Thanksgiving, like
14  we are now, four years ago, it's your testimony to the
15  ladies and gentlemen of the jury -- not the ladies and
16  gentlemen of the Ritz-Carlton Club -- that you were
17  being transparent with this letter?
18    A.  Yes.
19    Q.  And you were honoring your commitments to the
20  members?
21    A.  Yes.
22    Q.  All 700-something of them?
23    A.  Yes.
24    Q.  So the record has the exhibit that's referred
25  to here, Exhibit 1180, that's a version of the
                                            Page 302

9 (Pages 299 - 302)

Veritext Legal Solutions
866 299-5127

Lee Cunningham - 11/15/2017

1 communication that went out, and we saw it the other
2 day; correct?
3    A. Yes.
4    Q. And the one you didn't think was correct to
5 go out?
6    A. That's correct.
7    Q. Thank you. Let me show you Exhibit 1245.
8 This is an RCDC future options meeting with, I guess,
9 the Lion & Crown symbol in the upper right-hand corner
10 of The Ritz-Carlton Destination Club.
11        This is not a report like we saw a few of the
12 other day, which were reports to Marriott
13 International; is it? This is a different type of
14 report?
15    A. It is not the same report.
16    Q. Who prepares this type of report? Is this
17 Sobeck or Clark or you or some combination of both?
18    A. I believe this would've been Ms. Sobeck and
19 Mrs. Clark.
20    Q. If you look at page 4 of Exhibit 1245 -- and
21 this is June 26, 2013 -- internally, you were talking
22 about affiliation vote in process with board input.
23        Do you see that?
24    A. Yes.
25    Q. The next steps were to get final approval to

Page 303

1 proceed with the vote and then it said to conduct a
2 vote; right?
3    A. I'm sorry. Where are you?
4    Q. Page 4.
5    A. Right.
6    Q. The next steps, did I read those correctly?
7    A. Yes. And that vote, I believe, refers to the
8 vote to amend the declaration that was subsection 2 of
9 A in the options.
10    Q. Well, that's not exactly true, is it,
11 because --
12    A. That's what I believe it is.
13    Q. Okay.
14    A. It says, before that, that the affiliation
15 vote is already in process.
16    Q. So there's two things going on here, which
17 was -- and there always was two things going on --
18 there was a vote promised to do an affiliation with
19 Marriott Vacation Worldwide -- the vote that we saw on
20 April 5th as being a vote -- and then a survey on
21 November 19, 2013. That's one type of vote; right?
22        MR. SELLINGER: Objection to form.
23    A. There was a discussion between us and the
24 board, and we used the word "vote" early on, and
25 ultimately changed that. That was related to the

Page 304

1 affiliation.
2        There was also a discussion about a vote that
3 would've been an appropriate use of a vote of the
4 members to amend the declaration, to allow the unsold
5 developer inventory to go into the MVCD Trust, which,
6 subsequently, we never got to that point.
7 BY MR. FERGUSON:
8    Q. And you know, sir, that with respect to the
9 second vote, which would be to allow the inventory to
10 go in under an amendment to the declaration, you first
11 told the members that they would have a vote on
12 affiliation; and if that didn't go forward, the NATO
13 inventory would not go forward.
14        Do you recall that? Was it a two-step
15 promise?
16        MR. SELLINGER: Objection to form.
17    A. Well, clearly, we wouldn't -- won't -- if we
18 didn't get an affirmative response from the members
19 relative to affiliation, then there would be no
20 expectation that we would get an affirmative response
21 from them in a vote for changing the bylaws -- the
22 declaration.
23 BY MR. FERGUSON:
24    Q. And it was a two-step process. It was an
25 affiliation vote which became a survey?

Page 305

1    A. It wasn't --
2        MR. SELLINGER: Hold on a minute. I
3 don't know if he had finished so I was
4 waiting. But if you have, objection to form.
5        THE WITNESS: Was that the end of your
6 question?
7 BY MR. FERGUSON:
8    Q. It was.
9    A. Sorry. It wasn't a two-step process. It was
10 two separate processes that ran in series, as opposed
11 to in parallel.
12    Q. But at all times up to this point, you were
13 promising a vote on affiliation, and then a vote on
14 whether to put inventory into the trust?
15    A. We were discussing a vote with the board.
16 And as I've said numerous times now, we later, on
17 advice of counsel, changed to a survey as a more
18 appropriate form of gathering the information we were
19 interested in gathering or needed to gather.
20    Q. So when it says, on page 4 of Exhibit 1245,
21 "conduct the vote," that is talking about the
22 affiliation, not the inventory and declaration change.
23 Is it?
24    A. No, I don't believe so. I believe that this
25 refers to getting --- getting an approval from the

Page 306

10 (Pages 303 - 306)

Veritext Legal Solutions
866 299-5127

Lee Cunningham - 11/15/2017

1 board or support from the board to move forward with a
2 vote on the amendment of the declaration. Once we got
3 that, then moving to conducting the vote with the
4 members.
5     Q. Now, Mr. Cunningham --
6     A. I'm not -- that would be my -- how I would
7 read this document today. I'm not sure I can know how
8 I would have read it back then.
9     Q. And it says, "options," which deals with the
10 inventory in NATO. Then it talks about affiliation
11 vote in process with board input, and next steps,
12 which follows -- which immediately before, it says,
13 "affiliation vote." Okay? It says, "Get final
14 approval to proceed with the vote, conduct the vote."
15        That's talking about the conduct of a vote
16 with respect to affiliation; nothing to do with the
17 inventory. Would you disagree with that?
18     A. That's not how I would read this.
19     Q. Thank you.
20        Do you recall any outside vendor being called
21 in to assist in the communication of this potential
22 affiliation in the summer of 2013?
23     A. With regard to conducting the survey was --
24 we brought in Morrow. They were a vendor that we used
25 for doing that type of tabulation. We wanted to bring

Page 307

1 summer -- early July or early June -- of 2013?
2     A. Yes.
3     Q. The top document talks about -- sorry. The
4 first page, which is a letter of some sort from RCC-BG
5 Condominium Association, Inc. -- 1252 -- the
6 paragraph -- the third paragraph down said, "The board
7 sought more than 50 percent of the total voting
8 interest to support its recommendations to terminate
9 Marriott" --
10        Are you with me?
11     A. Yes.
12     Q. -- "and affiliate all of our 640 members into
13 The Timbers reciprocity program." And this person, I
14 would suggest to you, is Mr. Mullenix -- "I'm happy to
15 report that over 67 percent of our members have voted
16 in favor of the board's recommendation to terminate,
17 while less than 9 percent voted against the board's
18 recommendation."
19        You, obviously, became aware of those
20 statistics sometime after the vote occurred, right,
21 because you were told?
22     A. That's correct.
23     Q. And I take it that you knew, at this point in
24 time, that the sentiment at Aspen Highlands was
25 essentially the same. They were not for the

Page 309

1 in a third party so that there wasn't a concern or an
2 issue that we were tallying the votes and -- or the
3 results of the survey and ending up where we wanted
4 to.
5     Q. I know it was Morrow & Company. Forgive me.
6 I might've been unclear. Do you recall any other
7 vendors, besides Morrow, assisting Sobeck, Cunningham,
8 and others in this effort -- mostly the two of you --
9 with respect to how to communicate it clearly to the
10 members?
11     A. Yeah. There was a company called ABCO.
12     Q. ABCO?
13     A. Yes.
14     Q. Thank you. Is that something you were
15 overseeing or was that somebody below you?
16     A. That was somebody else within the
17 organization that was on point with that relationship.
18     Q. Let me know if you need a break or anything.
19     A. No. I'm good.
20     Q. Let me show you Exhibit 1252. This is a
21 communication from -- well, there's two communications
22 on here. You see it's produced by the HOA defendants
23 that are represented by Ms. Livingston.
24        But do you recall there was a Bachelor Gulch
25 election results announcement sometime in the

Page 308

1 affiliation?
2        MR. SELLINGER: Objection to form.
3     A. I did not know that. I didn't -- there's
4 nothing to suggest that I would know that.
5 BY MR. FERGUSON:
6     Q. Do you recall, sir, when, on April 5th, 2013,
7 the letter went out from the board, it invited -- RCDC
8 membership invited comments back from various members
9 and you got a printout of their comments?
10     A. I'm sorry. Which communication?
11     Q. April 5th, 2013.
12     A. Yes.
13     Q. Do you recall -- I showed it to you the other
14 day, and I can go through it now -- do you recall the
15 members that didn't respond were saying things like,
16 "hip hip hooray" -- literally saying, "hip hip hooray.
17 Thank you, thank you, thank you for not allowing the
18 affiliation." About nine out of ten were saying --
19 had that sentiment?
20        MR. SELLINGER: Objection to form.
21     A. I know that there were comments of that --
22 from that point of view -- in the recap of the
23 communication. I don't recall the percentage or the
24 overwhelming nature of that.
25 BY MR. FERGUSON:

Page 310

11 (Pages 307 - 310)

Lee Cunningham - 11/15/2017

1    Q.  And you had maybe one or two people who had
2  bought late for a cheap price and had thought there
3  was going to be an affiliation, and they were the only
4  people -- one or two of them -- that said, "Where's
5  our affiliation?"
6    A.  I don't -- I don't know that.
7    Q.  By early July of 2013, Marriott Vacation
8  Worldwide knew that, if they put this to an honest
9  vote and put the effort into a vote, that there would
10  be no vote for affiliation at Aspen Highlands; did it
11  not?
12    MR. SELLINGER:  Objection to form.
13    A.  We did not.
14  BY MR. FERGUSON:
15    Q.  And after you saw this result, you went and
16  talked to Ms. Egolf and Ms. Sobeck, and that's when
17  you made your decision?
18    A.  No.
19    Q.  Let me show you Exhibit 1254.  Exhibit 1254
20  is a two-page document that has been produced in all
21  three cases.  It's a letter from you, as executive
22  vice president and chief operating officer of RCDC.
23    We spent a lot of time, of course, last week
24  discussing the fact that you're not an officer of that
25  corporation.  Do you recall that?

Page 311

1    MR. SELLINGER:  Objection to form.
2    A.  That is not a corporation.
3  BY MR. FERGUSON:
4    Q.  Right.  And that's what Mr. Cappello had been
5  critical of you doing in your letters back in 2012;
6  right?
7    A.  That's correct.
8    Q.  And this letter went out from you.  It says,
9  "We are disappointed to hear that the club at Bachelor
10  Gulch will no longer be managed by Ritz-Carlton."  And
11  you talked about a smooth transition.  This is July 8,
12  2013.
13    And you got a response from this man named
14  Richard Beusman, B-E-U-S-M-A-N, did you not?
15    A.  Yes.
16    Q.  And he said, "Dear Mr. Cunningham:  Perfect.
17  You can't even get the label merge to work on the
18  final communications from The Ritz-Carlton Club to
19  your valued members."
20    You called them valued members, did you not?
21  Or you do call them valued members?
22    A.  There are times, yes.
23    Q.  Uh-huh.  And he was not happy that
24  Mr. Beusman was called "Dear Label," was he?
25    A.  I'm sorry?

Page 312

1    Q.  He didn't appear to be too happy with you to
2  be called "Dear Label."
3    A.  No.  There was a technical malfunction in the
4  sending of this.
5    Q.  He said, "I'm deeply disturbed in The Ritz
6  and the downward spiral that has occurred here.  Your
7  brand and reputation are ruining my eyes."  Then he
8  goes on to say, "Label this.  Good riddance."
9    Do you recall this communication?
10    A.  I didn't recall it until I saw it here.
11    Q.  Do you know if this is from a person that
12  owned at Bachelor Gulch, Aspen Highlands, San
13  Francisco, or Lake Tahoe?
14    A.  I would assume from Bachelor Gulch, because
15  it was in response to a communication that went out to
16  Bachelor Gulch members.
17    Q.  Well, we do know from the prior exhibit,
18  Mr. Mullenix's letter, that a fairly-sizable majority
19  had voted to leave the Marriott brand -- Ritz-Carlton
20  flag.  And you'll see that this letter says, "We are
21  disappointed to hear that Bachelor Gulch would no
22  longer be managed by the Ritz-Carlton."  And this
23  fella seemed to be unhappy with that loss of Bachelor
24  Gulch.
25    Would that suggest to you, sir, that this was

Page 313

1  indeed another RCDC property owner?
2    MR. SELLINGER:  Objection to form.
3    A.  I don't see where it says that.
4  BY MR. FERGUSON:
5    Q.  It's okay.  I'll withdraw the question, sir.
6    Let me show you what's been marked
7  Exhibit 1264.  It's a memorandum from Sobeck and
8  Jackson-Rauso to you, Mr. Cunningham, and Tony Terry.
9  It's a business review report, Ritz-Carlton
10  Destination Club, period 7, 2013.
11    I just want to focus you on this exhibit in
12  the section called "Aspen under review."  This says,
13  under Aspen board, "During board meeting on July 26,
14  2013, board stated serious concerns about the collapse
15  of the brand."
16    Do you recall being a party to any of those
17  conversations with the board or were those people
18  under you?
19    A.  No; that wasn't me.
20    Q.  If you look on this date, July 27, 2013, the
21  third bullet point says, "Follow-up meeting to be
22  scheduled with board to discuss moving forward with
23  the affiliation vote, future of RCDC, and survey
24  results."
25    So you were still promising a vote at that

Page 314

12 (Pages 311 - 314)

Lee Cunningham - 11/15/2017

1 point?
2     A.  We were still discussing a vote at that time.
3     Q.  And you also had requested beforehand --
4 before this memo went out, you requested -- or you
5 sent out a survey to take the temperature of the
6 people about affiliation before this day?
7         MR. SELLINGER:  Objection to form.
8     A.  Can you repeat the question?
9 BY MR. FERGUSON:
10     Q.  Yeah.  It talks about a survey here, sir.  It
11 says, "survey results."
12         Do you recall that, prior to July 27, 2013,
13 you had sent out a survey; did you not?
14     A.  Prior to July -- I'm still...
15     Q.  Prior to July 27th.
16     A.  I don't recall having sent out a survey to
17 the Aspen members.  The survey -- are you talking
18 about the affiliation survey?
19     A.  Yes.
20     A.  That went out in -- it did not go out until
21 December of 2013.
22     Q.  I'm actually not talking about that.  I'm
23 talking about a survey that was done in July of 2013.
24     A.  I don't recall that survey.  We could have
25 done a general survey out to the membership at that

Page 315

1 time.
2     Q.  Let me show you what's been marked as
3 Exhibit 1266.  This is a -- it says, "RCDC open-ended
4 responses, 8/4".  I believe this is '13.
5         Does this look like a survey that had gone
6 out in July of 2013?
7         MR. SELLINGER:  Objection to form.
8     A.  I don't know when it went out.  This looks
9 like the compilation of verbatim open-ended responses
10 from a survey or from a group of surveys.
11 BY MR. FERGUSON:
12     Q.  Have you looked through this document in
13 preparation for your deposition here today?
14     A.  I did not.
15     Q.  Did you look at it when it came in?
16     A.  I don't recall.
17     Q.  If you look at the first page of
18 Exhibit 1266, it has gender, age, resort --
19     A.  That's not my first page.
20     Q.  You know what?  I flipped over --
21     A.  It's backwards.  Okay.
22     Q.  I actually copied it on two sides because it
23 was so thick.
24         Just real quickly about this.  This says,
25 "RCDC satisfaction."  Those are all zeros.  Do you

Page 316

1 know what that's about?  Does that mean anything to
2 you?
3     A.  I do not know why that column is all zeros.
4     Q.  Do you know what the sentiment was in August
5 of 2013 for affiliation among the members surveyed in
6 that particularly long document?
7     A.  I do not.
8     Q.  I'll show you Exhibit 1265.  This is a --
9 real quickly -- a document -- or an e-mail sent by
10 Rasol Parvaresh, from the San Francisco Club, to you,
11 Mr. Cunningham.  He says, "This is not the first
12 survey conducted.  After speaking to several members,
13 it's clear to us that the surveys conducted are not to
14 better serve the members, but to enhance or to protect
15 Ritz Club membership" -- I'm sorry -- "but to enhance
16 or to protect Ritz Club membership business
17 opportunity."  He wrote you how discouraged he was.
18         Does this refresh your recollection that
19 there was a good deal of negativity from your members
20 regarding what was going on in the summer of 2013?
21         MR. SELLINGER:  Objection to form.  I
22     have no idea what you're referring to in your
23     question.
24 BY MR. FERGUSON:
25     Q.  Did you understand it, sir?

Page 317

1     A.  Does this -- this doesn't refresh -- this
2 refreshed my memory that Mr. Parvaresh was negative
3 about the club.  Let me finish reading here, though.
4     Q.  I'm going to withdraw that exhibit.  Don't
5 worry about it.
6         You do know that there was a survey, though?
7 Have you seen that document?
8     A.  Yes.
9     Q.  Moving into late August here real quickly.
10 This is Exhibit 1271.  Here you are, sir.  This is
11 another report from Sobeck and Rauso to you,
12 August 22, 2013, for the 8th period of 2013.
13         Are you with me?
14     A.  Yes.
15     Q.  If you look at the bullet points, it talks
16 about bullet point two.  Let me ask you this.  There
17 was a position on the board up for election.
18         Did you have anything to do with -- do you
19 know Sal Cutrona?
20     A.  Yes, I do know Mr. Cutrona.
21     Q.  In what capacity do you know him?
22     A.  I know him as the board president of the
23 neighborhood association in St. Thomas.
24     Q.  Did you know he also became a board member in
25 Aspen?

Page 318

13 (Pages 315 - 318)

Lee Cunningham - 11/15/2017

1    A.  I knew that he -- I know that he was a board
2 member in Aspen prior to me knowing him, and I know
3 that he is a board member today.
4    Q.  So he's been a board member at least twice
5 in Aspen, and he's also been on a board down in
6 St. Thomas?
7    A.  That's correct.  He's an owner of both
8 products.
9    Q.  And you know him pretty well, I take it?
10    A.  I wouldn't say well.  I met Mr. Cutrona two
11 or three times.
12    Q.  Bullet point three in Exhibit 1271, it says,
13 "Follow-up meeting to be scheduled with the board to
14 discuss moving forward with the affiliation vote,
15 future of RCDC, and survey results.  On hold until
16 progress made with St. Thomas."
17       Were you also promising a vote to the members
18 of St. Thomas Club on affiliation?
19    MR. SELLINGER:  Objection to form.
20    A.  We were in discussions with St. Thomas about
21 an affiliation and also about a change in their
22 declaration to allow for the inventory owned by the
23 developer and inventory that would subsequently be
24 purchased by the developer to go into the MVCD Trust.
25 BY MR. FERGUSON:

Page 319

1 affiliation -- that you were still contemplating a
2 vote in June -- late June?
3    A.  One second.  Let me read.  Yes, in June, we
4 were still discussing a vote.
5    Q.  And then this was forwarded by Stephanie
6 Sobeck to Mercer as "Aspen letter to members clean."
7       So she was still operating with these letters
8 as late as September 6, 2013?
9    A.  That's correct.
10    Q.  Let me just show you one of several of these
11 types of records and see if you know anything about
12 them.
13       Exhibit 1282.  This is now a version of a
14 letter from Cunningham, a draft letter, September X,
15 2013.  It talks about -- it's hard for me to read.
16 The members are being asked to vote their choice
17 regarding exchange affiliation with MVCD.
18       Are you there, first paragraph?
19    A.  Yes.
20    Q.  It says, "We have worked collaboratively with
21 the board of directors and the potential opportunity,
22 and you should have received a series of letters on
23 April 5th, 2013 and July X, 2013 regarding this
24 member" -- and then someone had written "survey" and
25 then they put "vote" back in.

Page 321

1    Q.  So they had a two-vote process underway also?
2    A.  They had two separate --
3    MR. SELLINGER:  Objection to form.
4    A.  They had two separate votes.  They had a --
5 we were talking to them -- at that time, we were using
6 the word "vote" about the affiliation, but we had a
7 discussion as well about a vote to change their
8 declaration.
9 BY MR. FERGUSON:
10    Q.  Exhibit 1272.  This is an e-mail on top --
11 it's actually Exhibit 1272 and Exhibit 1273 and
12 Exhibit 1274, because they're the attachments here in
13 September 2013.
14       It talks about -- from Stephanie Sobeck to
15 the board there -- Aspen Tourist Accommodation board
16 of directors -- this talks about my apologies and
17 responding.  This goes back into -- actually, till
18 June.
19       It says, "Letter one will be sent to members
20 next with a copy of the original board communication
21 from April 5th and the FAQs."
22       So I take it that you would state that,
23 because Ms. Sobeck is referring to the April 5th
24 letter in connection with this then-draft of the --
25 the July draft of the letter to the members regarding

Page 320

1       Do you see that?
2    A.  Yep.
3    Q.  Okay.  "We are writing today to provide you
4 with the information needed to cast your vote."
5 Right?
6    A.  This is a draft of -- it went back and forth
7 a number of times.
8    Q.  Right.  At least --
9    MR. SELLINGER:  Well, would you show the
10 witness whose document this is so he knows?
11    MR. FERGUSON:  I was going to ask him
12 that question next.
13 BY MR. FERGUSON:
14    Q.  Do you know who was doing this redlining?
15    A.  I don't know for a fact for certain.  I would
16 assume it would have been Stephanie Sobeck and -- I
17 don't know who was representing on the board --
18 whether it was Mr. Mercer or someone else.
19    Q.  It was Mr. Mercer, wasn't it?
20    A.  I don't know.
21    Q.  He's the only person you talked to directly,
22 at least up to September of 2013?
23    A.  No.  I spoke to --
24    Q.  Let me withdraw that.
25    A.  -- talked to the board --

Page 322

14 (Pages 319 - 322)

Lee Cunningham - 11/15/2017

1    Q.  You talked to the board when you came in
2  April?
3    A.  Right.
4    Q.  And I think you might have come another time?
5    A.  No.  I only --
6    Q.  Mr. Mercer, of course, came to see you in
7  December of 2012?
8    A.  That's correct.
9    Q.  Now, after September of 2013, when we see
10  this -- this is a September '13 -- 2013 -- draft of
11  the letter that's being red-lined by someone other
12  than you -- do you recall that Mr. Mercer came to
13  Orlando again?
14    A.  I don't recall that, but I -- I seem to
15  have -- recall having read something in the documents
16  that spoke to a meeting of him and potentially
17  Mr. Oliver coming, but I don't have memory of that.
18    Q.  And I've seen that document too.  Do you have
19  any recollection of Mercer and Oliver coming here
20  shortly before -- I think it said November 14th --
21  shortly before your November 19, 2013 survey letter
22  went out?
23    A.  I don't recall that.  I'm not saying it
24  didn't happen.  I just don't recall.
25    Q.  Could it have been that they came and saw

Page 323

1  Ms. Sobeck and not you?  Any recollection?
2    A.  It could have been.  That's possible.
3    Q.  Let me show you Exhibit 1281.  Exhibit 1281
4  is yet another draft of a letter with redlining on it.
5      Are you with me?
6    A.  Yes.
7    Q.  You'll see, at the last page of this document
8  now, instead of just having your signature block over
9  RCDC, it now includes the TAC board of directors?
10    A.  Yes.
11    Q.  Do you believe they have the right to be
12  involved in this decision like this?
13    MR. SELLINGER:  Objection to form.
14    A.  I mean, this was a survey going out to get a
15  feel for the sentiment of the members.  I'm sure there
16  was a discussion somewhere along the way of, should it
17  come out under just RCDC or under a joint right --
18  they would have a right -- not necessarily.  They
19  could have sent it out just under their own signature.
20  BY MR. FERGUSON:
21    Q.  And Exhibit 1281, this particular redline
22  version, starts with the words, "As a follow-up to the
23  letter of April 5th, 2013, a copy of which is enclosed
24  from the board of directors" -- that's the letter
25  we've been talking about for two days.

Page 324

1    At least in this draft, you were actually
2  going to send and refer to the letter of April 5th,
3  2013 to your members?
4    A.  That's what it appears.  I will say, one of
5  the options that was being discussed in...
6    Q.  So would you state that Ms. Egolf came to you
7  and Ms. Sobeck sometime after this draft letter?
8    MR. SELLINGER:  Hold on a minute.  Hold
9  on a minute.  You haven't -- for both of
10  these exhibits, unlike the earlier ones --
11  you haven't given him the cover letter, so he
12  doesn't know whose edits these are, what the
13  date is.
14    You have those documents.  So why
15  don't you at least give him a package so he
16  knows what's he's looking at?  I don't think
17  it's fair.
18    MR. FERGUSON:  The problem is, I have
19  these documents from the association, but not
20  all you guys.
21    MR. SELLINGER:  So regardless of who you
22  have them from, you, for example, in Exhibit
23  1272, attach the cover letter, so he knows
24  who it's coming from, and the exhibits as one
25  package, so Mr. Cunningham knows who wrote

Page 325

1    the letter, whose edits they are,     et
2    cetera.
3      Here, you're taking drafts.  We don't
4    know what day it is -- he doesn't know.  You
5    know, I know, but he doesn't know.  I just
6    don't think that that's fair.
7    MR. FERGUSON:  I'm not sure I do know.
8  BY MR. FERGUSON:
9    Q.  Do you know who was -- on this particular
10  version, Exhibit 1281 -- who was doing the redlining
11  on this particular version that said -- in this
12  particular version -- that the April 5th letter was
13  attached or would be attached?
14    A.  I don't know for certain.  I would assume --
15    MR. SELLINGER:  Don't assume.
16  BY MR. FERGUSON:
17    Q.  You just don't know?
18    A.  I don't know.
19    Q.  But it probably would've been Sobeck and
20  Mercer?
21    A.  I don't know.
22    MR. SELLINGER:  Well, if it's a redline,
23    they are two different people from two
24    different entities.
25  BY MR. FERGUSON:

Page 326

15 (Pages 323 - 326)

Lee Cunningham - 11/15/2017

1    Q. I'll show you, real quickly, Exhibit 1286.
2 This is a document produced by the association. You
3 can tell by the nomenclature at the bottom. This is
4 also dated September 2013.
5    You'll see I have a big question mark. Who
6 is redlining? So I'll ask you if you can answer that.
7    A. I cannot.
8    Q. Okay. Do you believe that there would be
9 e-mails at the Marriott Vacation Worldwide Corporation
10 or any of its affiliated companies that would be
11 transmitting these within your company?
12    A. There should have been -- I would assume this
13 is an attachment to an e-mail that either went out or
14 was received at our company.
15    THE VIDEOGRAPHER: Five minutes left,
16 Counsel.
17    MR. FERGUSON: Let's see if I can sneak
18 another question in. I'll mark this and
19 we'll pick it up in a moment.
20 BY MR. FERGUSON:
21    Q. This is Exhibit 1297. Let me get that in
22 front of you, Mr. Cunningham.
23    A. Yes.
24    Q. This is another one of these -- this is the
25 period 10 report on the clubs -- The Ritz-Carlton

Page 327

1 Destination Club.
2    It says on the bullet point under "board" --
3 there's one, two, three, four bullet points -- "Board
4 meeting has been called for October 17th to discuss
5 the final affiliation letters to the members and
6 discussing the survey process." Right?
7    A. Yes.
8    Q. Okay. Now, this is the first time we've seen
9 in one of these reports the concept of a survey
10 process as opposed to a vote. Right?
11    A. That's the first I've seen it here, yes.
12    Q. Okay. And then it talked about -- I bet
13 you're referring to this, as I was in my mind's eye --
14 that Oliver and Mercer had requested a meeting here in
15 or on November 14, 2013 to discuss the developer
16 inventory and our disposition plan.
17    A. That's correct.
18    Q. And that's the meeting you don't really have
19 a recollection --
20    A. I don't recall if it took place. If it did,
21 whether I was there or not.
22    MR. FERGUSON: Okay. Thank you.
23    THE VIDEOGRAPHER: The time is 3:21.
24    That concludes disc one in the deposition of
25    Lee Cunningham.

Page 328

1    (Brief recess.)
2    THE VIDEOGRAPHER: The time is 3:32.
3 This is media two in the deposition of Lee
4 Cunningham.
5 BY MR. FERGUSON:
6    Q. Mr. Cunningham, after you wrote the
7 November 19th letter with the TAC board, Tourist
8 Accommodation board, were you involved in the -- at
9 all -- drafting of, for example, the frequently asked
10 questions?
11    A. I'm sure I reviewed them at some point in the
12 process.
13    Q. Were you involved in the -- so you were
14 slightly involved with the FAQs?
15    A. Just from reading them at some point. I
16 didn't have much input, I don't believe.
17    MR. SELLINGER: Let me belatedly object
18 to two questions earlier about the April
19 letter. Objection to form.
20 BY MR. FERGUSON:
21    Q. I'll show you Exhibit 1312. Do you recognize
22 this Ritz-Carlton Aspen affiliation survey?
23    A. Yes.
24    Q. So whose work product was this?
25    A. It would've been, I imagine, a collaboration

Page 329

1 between Ms. Sobeck and the Aspen board or their
2 representatives -- a representative from the board.
3    Q. So you believe the board was involved in this
4 document?
5    A. I would think they may have -- they would
6 have wanted to review it.
7    Q. So this was couched in terms of "I do want --
8 I want the opportunity" or "I do not want the
9 opportunity." That's the choice given here; right?
10    A. That's correct.
11    Q. Where on here does this tell the folks what
12 the potential downside is? Withdraw that.
13    Where does it tell you on here, if at all,
14 that the access to more than 50 Marriott Vacation
15 Resorts would, in turn, allow Marriott Vacation
16 Worldwide points people and weeks people to access
17 Aspen Highlands?
18    MR. SELLINGER: Just read that question
19 back.
20    (The reporter read back the last
21 question.)
22    MR. SELLINGER: Objection to form.
23 Misleading description.
24    A. I don't see anywhere on here where it tells
25 us, I believe, the -- I know that this survey came

Page 330

16 (Pages 327 - 330)

Lee Cunningham - 11/15/2017

1 with other materials that describe those -- that this
2 was indeed an exchange.
3 BY MR. FERGUSON:
4     Q. Did you approve, Mr. Cunningham, this survey
5 going out -- this affiliation survey? Was that your
6 decision?
7     A. Yes.
8     Q. Obviously, that had happened after you met
9 with Ms. Egolf and Ms. Sobeck?
10     A. Yes.
11     Q. And thereafter, you monitored the vote?
12     A. Yes.
13     Q. Exhibit 1350 is an example of Ms. Sobeck
14 keeping you appraised of the votes that are coming in?
15     A. That's correct.
16     Q. And in that survey, you all requested for
17 there to be member feedback; right?
18         MR. SELLINGER: I'm sorry. I didn't hear
19 the question.
20 BY MR. FERGUSON:
21     Q. In the survey -- affiliation survey -- you
22 said that they could contact RCDC communications with
23 their comments?
24     A. Yes.
25     Q. And those comments started to come in; do you

Page 331

1     Q. Never -- you have no recollection of that?
2     A. That's correct.
3     Q. Do you recall that, after the survey went
4 out, that the board of directors -- Mr. Mercer
5 particularly -- sent out a letter in the middle of the
6 survey?
7     A. I don't recall that.
8     Q. Exhibit 1536. Exhibit 1536 is an e-mail, at
9 the top, from Ms. Sobeck to you on December 6, 2013.
10 It says, "Here's the letter that Randy wants to send
11 today. Hopefully, he will be okay with my edits."
12         Does that refresh your recollection that,
13 after the vote started, that the association was
14 communicating with Ms. Sobeck, and she with you, about
15 sending a letter out?
16     A. Yes.
17     Q. Do you recall this letter at all?
18     A. I didn't until looking at it now.
19     Q. Let me show you what's been marked as
20 Exhibit 1319. This is some comments that came in from
21 folks. This was produced by Morrow & Company.
22         Do you recall seeing this type of document
23 coming in from Morrow at the time the survey was being
24 conducted? This particular document has comments from
25 the 6th of December 2013, through the 8th of

Page 333

1 recall that?
2     A. I don't.
3     Q. You don't recall that. Okay.
4         Exhibit 1309, so this is dated 12/4/13, but
5 you'll see that the comments, I believe, are dated
6 between 12/4, and then, on the last page of
7 Exhibit 1309, it has 12/17.
8         Do you recall these comments coming in? If
9 so, were you reviewing them?
10     A. I recall that we were getting comments in. I
11 was not reviewing each of these comments. Those were
12 being done for me.
13     Q. Did you read this very first comment from Mr.
14 Kevin Grant? Do you know Kevin Grant?
15     A. I do not.
16     Q. Do you know what he does?
17     A. I do not.
18     Q. It says, "Folks, I went to the survey and
19 really do not think there's enough information to cast
20 a vote."
21         Did you hear similar sentiments that the
22 survey you would send out really wasn't providing
23 enough information to the folks to make an educated
24 guess?
25     A. I don't recall hearing that.

Page 332

1 December 2013.
2     A. I recall I reviewed this in advance of today.
3     Q. Do you know a man named Mr. Mark Bloom?
4     A. I do not.
5     Q. Do you know who he works for?
6     A. I do not.
7     Q. He said, at the bottom of his comment on
8 page 2 of Exhibit 1319, "Addition of MVCD privileges
9 to our benefit is, in my view, no more than partial
10 compensation for the loss of our privileges at Maui,
11 Abaco, Bachelor Gulch, as well as the abandonment of
12 further Ritz-Carlton Club development."
13         It's a pretty negative comment, is it not?
14 He's saying it's only partial compensation?
15     A. He's saying it's partial compensation.
16     Q. The first sentence says, "I see the
17 opportunity in the exchange program as potentially
18 useful, but not" -- in capital letters -- "if it
19 affords MVCD members a reciprocal right to compete
20 with our Ritz-Carlton members for unallocated released
21 time."
22         I take it, it's your position that the MVCD
23 people cannot use that type of time?
24     A. Cannot use?
25     Q. Cannot use unallocated or released time.

Page 334

17 (Pages 331 - 334)

Lee Cunningham - 11/15/2017

1    A. Yeah. The MVCD members -- or in the case of
2 Aspen Highlands, MVCD members can only use time that
3 has been deposited by the members and they can only
4 deposit allocated time.
5    Q. But in any event, he made this comment and
6 question. Then he made a remark that it was only
7 partial compensation, but to count on him as a "yes"
8 vote, a "for" vote. Do you see that?
9    A. I see.
10    Q. Isn't it true that the survey you sent out
11 kind of forced people to vote yes; it was designed
12 that way?
13    A. No.
14    Q. Ever hear anybody say that?
15    A. No.
16    Q. You do know Mr. Neveloff; correct?
17    A. Yes.
18    Q. Did you ever hear him say that? There wasn't
19 enough information to make an informed "for" or "not
20 for" vote. Do you recall that?
21    A. I recall him sending a note saying that he
22 thought there needed to be more information about what
23 happened with the inventory that was deposited.
24 Something along those lines.
25    Q. Let me show you Exhibit 1323, 11 December.
Page 335

1    A. No, I don't believe that is what the
2 communication is saying. I think the emphasis is on
3 the majority of the members to positively vote. It's
4 looking for -- I mean, at the time, our sentiment was
5 that we were trying to get an understanding.
6        As we've said before, we still had the
7 authority to and the right to affiliate, but we wanted
8 to understand the interest of the members, and our
9 intent was to align our interest with theirs or theirs
10 with ours.
11 BY MR. FERGUSON:
12    Q. What you got was, you got 74 people -- you
13 got 74 people to vote on that survey. And based upon
14 those 74 people who voted "for," you went ahead and
15 did this affiliation?
16        MR. SELLINGER: Objection to form.
17    A. I don't recall the final tally of the numbers
18 that responded to the survey. The majority of those
19 who responded, responded positively. And in
20 discussion with the board, we agreed to move forward
21 with the affiliation.
22 BY MR. FERGUSON:
23    Q. So the majority was how many -- what
24 percentage of the people, that voted on this survey,
25 voted for it?
Page 337

1 The top e-mail here is an e-mail from Sobeck to John
2 Doyle. He's someone at -- is it Jupiter or is it --
3 who's John Doyle?
4    A. No. He's the board president of the GBCOA,
5 which is the association in St. Thomas.
6    Q. Thank you. If you look at the second page,
7 it says, "John" -- are you with me -- "the final date
8 of the survey" --
9    A. I'm sorry. Second page?
10    Q. Yes, sir.
11    A. Yes.
12    Q. "The final date of the survey is scheduled
13 for January 13, 2013. Aspen is ready to conduct their
14 survey now, but the board is not looking for a
15 majority of the members to positively vote for
16 affiliation to move forward. They simply want to
17 understand their members' interest level, and plan to
18 offer it to all members since it is completely
19 voluntary."
20        Isn't it true, in the middle of this vote,
21 Ms. Sobeck is telling one of your board presidents
22 that not even the survey was going to really count.
23 The vote at Aspen is going to affiliate no matter
24 what?
25        MR. SELLINGER: Objection to form.
Page 336

1    A. That's correct.
2    Q. What percentage?
3    A. Oh.
4    Q. Like 60, 70?
5    A. I think it was around 55 percent.
6    Q. Does 52 sound about right?
7    A. I don't recall.
8    Q. Let me show you Exhibit 1328. This is a
9 comment from a Philippe G. and Lori Berenger. This
10 came in on 12/17/2013 -- December 17th.
11        This particular owner said -- at Aspen, said,
12 "I find the above presentation and description
13 deceptive. The way the information is depicted is
14 such to bundle other opportunities with the Marriott
15 affiliation that aren't described in the 'no
16 affiliation.'"
17        So this is one person that was at least
18 expressing their concerns on the member feedback
19 portion of the survey about what the survey looked
20 like; right?
21    A. Yes.
22    Q. And that survey went out with an FAQ?
23    A. Yes.
24    Q. Exhibit 1314. Exhibit 1314 is another set of
25 these comments coming in from your members in relation
Page 338

18 (Pages 335 - 338)

Lee Cunningham - 11/15/2017

1 to the survey that was sent out on December 5th, I
2 believe it was.
3        Could you go to page 4 of Exhibit 1314, top
4 of the page?  There's a comment there from Dr. and
5 Mrs. Patrick and Dee Lattore.
6        Do you know the Lattores?
7    A. I do not.
8    Q. It says, "I voted no because I could have
9 bought into the Marriott system and did not.  The
10 survey is doing everything possible to get a 'yes'
11 response."
12       It was doing that, wasn't it?  It was
13 designed to get "yes" responses?
14       MR. SELLINGER:  Objection to form.
15    A. That's this gentleman's opinion.
16 BY MR. FERGUSON:
17    Q. Well, it's the second opinion we saw so far,
18 is it not -- second or third?
19       MR. SELLINGER:  Well, what else said,
20    "designed to get a "yes" response?"
21       MR. FERGUSON:  Is there an objection to
22    form?
23       MR. SELLINGER:  I have no idea what
24    you're referring to.
25 BY MR. FERGUSON:

Page 339

1    A. I didn't -- I don't recall reading that.  The
2 survey went out and people responded back.
3    Q. Three or four people so far, in early
4 December, were telling you that they thought it was
5 not a very valid survey, and you did not listen to
6 their comments?
7       MR. SELLINGER:  Objection to form.
8    A. I don't recall having seen or having
9 responded to their comments -- the comments in here
10 any more than the ones that were excited about the
11 opportunity.
12 BY MR. FERGUSON:
13    Q. And you all value your members and their
14 feedback; right?
15    A. That's correct.
16    Q. But not Mr. Skolnick or Dr. Lattore, I take
17 it?
18       MR. SELLINGER:  Objection to form.
19    A. I'm just answering for what I did.  Other
20 people in my organization -- or in the organization
21 would have reviewed these.
22 BY MR. FERGUSON:
23    Q. Let me show you Exhibit 1345.  Sir, this was
24 produced by Morrow & Company.  Do you know whether you
25 all kept copies of these documents at your company?

Page 341

1    Q. Do you know, sir, is it about the second or
2 third you've seen of these?
3       MR. SELLINGER:  Seen -- that did what?
4 BY MR. FERGUSON:
5    Q. That criticized the affiliation survey that
6 went out on December 5th as being designed to not
7 provide the requisite information for people to make
8 an informed decision on what you now call their
9 sentiment.
10       MR. SELLINGER:  Objection to form.
11    A. There was a couple of comments that felt like
12 they didn't have enough information to make a
13 decision.
14 BY MR. FERGUSON:
15    Q. Do you know a Mr. Robert Skolnick?
16    A. No.
17    Q. If you look at page 8 of this document,
18 there's a large box, and Mr. Skolnick provided back --
19 he voted against on December 4, 2013, the first day of
20 voting, and this is what he wrote to you, sir.  "This
21 is a terrible survey and not indicative of anything.
22 Extremely biased in how it is presented.  I am in the
23 survey business and would not offer such a survey to
24 any of my clients."
25       Did you take this comment to heart?

Page 340

1       Sorry.  I'll ask it again because my mic was
2 off.  This is a Morrow & Company-produced document.
3 Do you know whether you kept these records?
4    A. I have no idea.
5    Q. And this is the results as were reported as
6 of 1/14/2014.
7       You understand that the voting was closed or
8 the survey was closed on or about January 13th; right?
9    A. Yes.
10    Q. Is that about right?
11    A. It sounds right.
12    Q. Did you know that Mr. Marsden did not vote
13 for this at all?
14    A. Mr.?
15    Q. Marsden.
16    A. No.
17    Q. And Mr. Neveloff didn't vote at all?
18    A. No.
19    Q. Mr. Harris, another board member, didn't vote
20 at all?
21    A. No.
22    Q. And Mr. Cutrona didn't vote?
23    A. Okay.
24    Q. The only person that I could find on here
25 that voted on the board was Randal Mercer.

Page 342

19 (Pages 339 - 342)

Lee Cunningham - 11/15/2017

1    A. Okay.
2    Q. Did you expect that people that were
3 writing --
4    A. I didn't review the votes and who voted for
5 and against.
6    Q. You didn't review that at all?
7    A. No.
8    Q. It didn't matter to you, did it?
9       MR. SELLINGER: Objection to form.
10   A. We sent it out as a confidential survey. I
11 didn't feel it was appropriate for me to know who
12 voted for and who voted against.
13 BY MR. FERGUSON:
14   Q. Well, your company gave you the -- the
15 company that did the survey for you gave -- at least,
16 generated this document. Are you saying -- let me
17 finish, sir. Are you saying that you didn't get these
18 documents from Morrow & Company?
19   A. I did not.
20   Q. Okay. I'll end with this one for now. I'm
21 almost done. This is the final tally. This is
22 Exhibit 1346.
23      On this date, you received an e-mail from
24 Ms. Sobeck telling you the final vote information for
25 Aspen. Do you see that at the top?
                                          Page 343

1    A. I do.
2    Q. And you got a grand total of 74 people who
3 Marriott Vacation Worldwide managed to get to say
4 "for." And based upon that, you told everybody that
5 you had enough people to go forward with the MOU;
6 right?
7       MR. SELLINGER: Objection to form.
8 BY MR. FERGUSON:
9    Q. Let me redo that. Based upon 74 people who
10 voted on that survey that was criticized by the people
11 we just talked about -- based upon that survey, you
12 went ahead in the next few months and entered into a
13 memorandum of understanding to affiliate the club with
14 MVCD?
15      MR. SELLINGER: Objection to form.
16   A. There were, as you can see, 74 that voted
17 for, 67 against. Based on that majority voting for --
18 the people who responded voted for -- we moved forward
19 with the affiliation with the board.
20 BY MR. FERGUSON:
21   Q. That's a lot different than the 51 percent of
22 the total membership you had promised throughout most
23 of the year; right?
24      MR. SELLINGER: Objection to form.
25   A. We hadn't promised that throughout the
                                          Page 344

1 majority of the year.
2       MR. FERGUSON: I'm finished with the
3    vote, and probably just have a short amount
4    of stuff, but Mike wants to catch up on the
5    two other clubs' votes.
6       MR. SELLINGER: When you say you have a
7    short --
8       MR. FERGUSON: I don't have that much.
9       MR. SELLINGER -- unrelated, on another
10   subject?
11      MR. FERGUSON: Yeah. I'm moving on to
12   the MOU, yeah.
13      MR. REISER: Why don't we go off the
14   record for a minute?
15      THE VIDEOGRAPHER: The time is 3:57. We
16   are off record.
17      (Off record.)
18      THE VIDEOGRAPHER: The time is 4:00. We
19   are back on record.
20      MR. REISER: Can you put 1208 on the
21   screen?
22      MR. SELLINGER: Have we looked at that
23   yet?
24      MR. REISER: I'm not going to continue to
25   pass out new copies of the same documents
                                          Page 345

1 we've been marking over the last few days.
2 We made that clear to Ian over the...
3       MR. SELLINGER: You don't need to mark
4    new copies, but we'd like to certainly have
5    it in front of us.
6       THE REPORTER: Let me see if I can find
7    it.
8       DIRECT EXAMINATION, continued
9 BY MR. REISER:
10   Q. You saw 1208 when we talked to you on Friday,
11 Mr. Cunningham?
12   A. Yes.
13   Q. This is where, on May 14th, you sent a letter
14 out to all clubs promising them -- strike that. This
15 is the May 14th letter that you sent out to all clubs
16 in relation to a problem that was perceived to have
17 been -- perceived by the Bachelor Gulch folks to be
18 present with your enrollment agreement at Lion &
19 Crown.
20      Do you remember that whole --
21   A. I do.
22   Q. Yeah. So the response to some pushback on
23 what the terms of the Lion & Crown agreement said, you
24 wrote this letter; correct?
25   A. That's correct.
                                          Page 346

20 (Pages 343 - 346)

Lee Cunningham - 11/15/2017

1    Q.  The very first paragraph on the second page,
2  this is the section of the letter that you wrote to
3  all members of The Ritz-Carlton Destination Club,
4  explaining the provision in the Lion & Crown agreement
5  that you felt was ambiguous, and you were explaining
6  that you were going to take care of that
7  misinformation.  True?
8    A.  That's correct.
9    Q.  If you go to the second paragraph on the
10  second page, please?  This is the section that says,
11  "Second, regarding other potential affiliations, we
12  want to assure you that a Ritz-Carlton Club
13  affiliation with the Marriott Vacation Club
14  Destinations will not take place unless there is an
15  affirmative vote of each club's membership."
16        You recall this promise that we talked about
17  last Friday; correct?
18    A.  I recall this, yes.
19  BY MR. REISER:
20    Q.  I just want to clarify -- because I've got
21  two others documents I can show you -- Exhibit 1603
22  and 1604. -- where this exact same letter went out to
23  other clubs -- the San Francisco Club and the Tahoe
24  Club.
25        Can I just get you to agree that you sent
Page 347

1  an affiliation.  True?
2        MR. SELLINGER:  Objection to form.
3    A.  We've established that I sent out this
4  memo -- or this letter -- and that the -- in the
5  letter, we are calling -- we are suggesting that there
6  will be a vote.
7    Q.  Okay.  So are you aware of a survey that was
8  taken by the San Francisco Club members on their own
9  without any input from the Marriott Vacation Club
10  folks?
11    A.  I don't recall that.
12        MR. REISER:  We need to pull up
13  Exhibit 1278.
14        Can you pull up 1531?  I don't have an
15  extra copy.  We're going to have to read it
16  on the screen.
17        1531, this is a --
18        MR. SELLINGER:  Hold on.  Is this the
19  whole document?
20        THE TECHNICIAN:  It's one of three pages.
21        MR. SELLINGER:  I've got to be able to
22  look at the document -- and the witness --
23  the entire document before he's being
24  questioned.
25        MR. REISER:  Why don't we go off the
Page 349

1  this letter to every club in the Ritz system at the
2  time?
3    A.  I believe that's true.  I'm not positive that
4  we sent it to every one of them, but...
5    Q.  Let me pull up 1603.
6    A.  I mean, I'm not...
7    Q.  You're not denying that?
8    A.  I'm not denying that we did to San Francisco
9  and Lake Tahoe.  I just don't recall whether we sent
10  it to St. Thomas or...
11    Q.  Well, the Lion & Crown enrollment that had
12  the snafu in it went out to all the members.  True?
13    A.  I don't recall.
14    Q.  You don't remember.  You would agree then, as
15  you sit here today, that this promise of an
16  affirmative vote went out to the Aspen Club members,
17  the San Francisco Club members, and the Tahoe Club
18  members.  True?
19        MR. SELLINGER:  Objection to form.
20    A.  I would agree that this letter went out to
21  all of them that talks about a...
22  BY MR. REISER:
23    Q.  So we've established now, as of August 13,
24  2013, it was your position there was going to be a
25  vote of each club's membership before there would be
Page 348

1  record for a second?
2        THE VIDEOGRAPHER:  The time is 4:06.  We
3  are off record.
4        (Brief recess.)
5        THE VIDEOGRAPHER:  The time is 4:17.  We
6  are back on record.
7  BY MR. REISER:
8    Q.  Sorry for the delay.  We're back on the
9  record.  Counsel was kind enough to make copies of
10  Exhibit 1531, so I'm going to hand you a copy.
11    A.  Thank you.
12    Q.  This is an e-mail chain, Mr. Cunningham,
13  from -- starting with Steve Andrews to Al Bruno.  On
14  the second page is a long e-mail that starts it off.
15  And then there's an e-mail -- there's a couple e-mails
16  on the first page I want to get into.
17        I want to ask you, first of all -- you'll see
18  from the first page of this exhibit that the letter
19  that starts off this e-mail chain was forwarded to you
20  on August 28, 2013.
21        Do you see that on the first page of the
22  document?
23    A.  Yes.
24    Q.  So does this refresh your recollection as to
25  whether you were aware of a survey that was performed
Page 350

21 (Pages 347 - 350)

Lee Cunningham - 11/15/2017

1 by the board of directors at San Francisco independent
2 of Marriott?
3     A. Yes.
4     Q. And if you go to the first page -- the second
5 page of the letter, the first -- strike that.
6         The second page of the e-mail is the Steve
7 Andrews e-mail to Al Bruno. If you could read the
8 first section of this e-mail starting with "Dear
9 Members" and ending with "July"?
10     A. I'm sorry. Do you want me to read it to you?
11     Q. If you can just read it? Then I'm going to
12 ask you some questions about it.
13     A. "Dear Members: Thanks to those of you who
14 took the time to respond to the survey in our last
15 communication. We have summarized the results of the
16 78 members that responded to the attached PDF
17 document."
18         "The key takeaways are: Over 81 percent of
19 the respondents would prefer to liquidate their RCDC
20 SFO purchase than convert to Marriott Vacation Club or
21 remain in the club as is."
22         "A majority of the owners purchased between
23 2006 and '8, which means that this same number of
24 owners are most underwater in terms of the fractional
25 ownership market."

Page 351

1         "A vast majority of the owners purchased the
2 RCDC membership for use with other clubs and are
3 specifically disturbed by the loss of Kapalua and
4 Bachelor Gulch, and the inability of the corporation
5 to sign up similar replacement destinations."
6         "Please note, the recent communication from
7 Lee Cunningham regarding the survey was not reporting
8 on this survey, but a web-based survey that RCDC
9 invited owners to respond to in July."
10     Q. Okay. So you knew, once you got this letter
11 in August 2013, that the overwhelming majority of
12 members at the SF Club wanted no affiliation with
13 Marriott Vacation Club; did you not?
14     MR. SELLINGER: Objection to form.
15     A. I think this says that the 81 percent would
16 prefer to liquidate rather than purchase or convert to
17 Marriott Vacation Club ownership. It doesn't say
18 ownership, but that's what I would assume.
19 BY MR. REISER:
20     Q. Okay. Did you take this to mean that the
21 members were in favor of the affiliation?
22     A. No.
23     Q. And you say there that 78 members responded
24 to this survey; right?
25     A. That's correct.

Page 352

1     Q. Do you know what the survey results were and
2 how many members responded to the San Francisco
3 survey?
4     A. It was 25, 30. Something like that.
5     Q. I think it was 13 to 11; so, yeah, you're
6 close. 24.
7         So let me just ask you -- isn't it true -- I
8 think you said this Friday, but isn't it true that the
9 survey was not meant to be determinative of whether
10 you were going to affiliate the Marriott Vacation Club
11 with The Ritz-Carlton Destination Club? True?
12     A. That's correct.
13     Q. You were going to affiliate regardless of
14 what the survey results said?
15     A. No. We were going to take that feedback into
16 the decision process.
17     Q. As you sit here today, can you think of any
18 feedback that supported the affiliation?
19     A. Yes. The survey results.
20     Q. Okay. So the survey results that you never
21 reviewed the comments to?
22     A. I didn't review the comments to all of them,
23 no.
24     Q. Okay. So you just went on the actual number
25 of survey results. True?

Page 353

1     A. That's correct.
2     Q. Are you saying now that it was the survey
3 results that were determinative of whether you were
4 going to affiliate or not?
5     A. No.
6     Q. So you were going to affiliate whether the
7 survey results were tied, were you not?
8     A. No. I'm not saying that. If there was a --
9 whatever the vote was, we were going to take that into
10 consideration. And if the majority -- since the
11 majority in each case of the respondents voted in
12 favor of the affiliation, we never got to the point of
13 having to think about what we would do if it turned
14 out differently.
15         I don't recall what we would have done had
16 that -- I mean, it's a while ago.
17     Q. All right. You saw an e-mail on Friday from
18 Eveleen Babich, where she was extremely forthright in
19 her communications internally within Marriott, where
20 she said that the surveys were not going to matter in
21 terms of the affiliation. The affiliation was going
22 forward regardless.
23         Do you remember seeing that?
24     MR. SELLINGER: Objection to form.
25     A. I remember seeing an e-mail where she made

Page 354

22 (Pages 351 - 354)

Lee Cunningham - 11/15/2017

1 that comment, and I believe she thought that was true,
2 but I don't know where she gathered that information
3 from. It wasn't communicated from myself.
4 BY MR. REISER:
5     Q. What did you tell her?
6     A. I didn't have a conversation with her at all
7 about that.
8     Q. All right. Friday, you testified that you
9 didn't think the members were entitled to a vote.
10 True?
11     A. It wasn't a requirement for the members to
12 vote for affiliation. The affiliation is in the
13 discretion of the program manager of Lion & Crown.
14     Q. You testified Friday, did you not, that you
15 did not consider the survey a vote?
16     MR. SELLINGER: Objection to form. Is
17 there a particular --
18 BY MR. REISER:
19     Q. Wasn't that your testimony?
20     A. On Friday, did I consider the survey a vote?
21     Q. Yeah. Didn't you testify on Friday that you
22 did not consider the survey to be a vote?
23     MR. SELLINGER: Objection to form.
24     A. What was -- I'm trying to remember exactly in
25 what context you're getting to that statement.
                                                    Page 355

1     Q. So your testimony today is, even though a
2 vote wasn't required in your mind, that you wanted to
3 get the feedback of the members. True?
4     A. That's correct.
5     Q. And the only feedback you considered was the
6 numerical yes-or-no votes on the survey. True?
7     MR. SELLINGER: Objection to form.
8 BY MR. REISER:
9     Q. Is that true?
10     A. That was the primary determining factor, yes.
11     Q. And you didn't consider the May 2013
12 independent survey from the San Francisco Club members
13 at all?
14     A. No.
15     Q. And you didn't consider the comments that
16 were made in a spreadsheet that your company provided
17 in this litigation where there were over 750 responses
18 to the original idea of the affiliation? You didn't
19 consider that survey?
20     MR. SELLINGER: Objection to form.
21     A. We had that information. It was reviewed. I
22 didn't -- I don't recall whether we put all that in
23 the hopper, in the decision. But we primarily looked
24 at the -- our rights and the feedback that we got from
25 the vote; primarily, the numerical number.
                                                    Page 357

1 BY MR. REISER:
2     Q. I mean, it's on the video, so we're going to
3 see it regardless, so I'm just asking --
4     A. I understand that.
5     Q. -- if you remember whether you testified that
6 this survey was not a vote --
7     A. I don't --
8     (Multiple speakers at the same time.)
9 BY MR. REISER:
10     Q. Can you just let me finish my question? Did
11 you testify on Friday that the survey was not a vote
12 and that you did not think a vote was required?
13     MR. SELLINGER: Let's break it down.
14     It's compound.
15 BY MR. REISER:
16     Q. Did you testify on Friday that the survey was
17 not a vote?
18     A. The survey is not a vote, and I would have
19 testified to that on Friday.
20     Q. Okay. And you do not consider the survey to
21 be a vote?
22     A. I do not. Not a binding --
23     Q. A vote was not required in order to make your
24 decision to affiliate. True?
25     A. That's correct.
                                                    Page 356

1 BY MR. REISER:
2     Q. And you got feedback from Jay Neveloff in no
3 uncertain terms, did you not, that the membership at
4 Aspen was unanimously -- near unanimously opposed to
5 the affiliation?
6     A. We had a number of discussions with
7 Mr. Neveloff where his concern was about the amount of
8 points that would be assigned to the Aspen inventory,
9 so that would indicate that there was an interest in
10 affiliation. Otherwise, why would you have a
11 conversation about the number of points?
12     Q. Okay. Did you keep the number of points
13 confidential from the members before they voted?
14     A. I don't know what -- at what point the number
15 of point values were shared with the members. I don't
16 recall.
17     Q. You, actually, literally, kept the point
18 value -- exchange value -- confidential from the
19 members before the vote; did you not?
20     MR. SELLINGER: Objection to form.
21     A. I don't recall when the point values were
22 disclosed to the members.
23 BY MR. REISER:
24     Q. Have you ever seen -- you're not aware of a
25 policy within Marriott Vacation Club that the point
                                                    Page 358

Veritext Legal Solutions
866 299-5127

Lee Cunningham - 11/15/2017

| | |
|---|---|
| 1 transfer values are not shared with the members ever? | 1    A.  I don't know that it would be inappropriate, |
| 2    A.  No.  That doesn't make sense. | 2 but I would've given them the point values. |
| 3    Q.  Do you remember any members asking for the | 3 BY MR. REISER: |
| 4 point equivalencies between the Marriott Vacation | 4    Q.  And you think it would've been inappropriate |
| 5 Clubs and the Ritz Clubs prior to the vote? | 5 not to give them if they were asked; no? |
| 6    A.  I don't recall, other than Mr. Neveloff. | 6    A.  There may be something I'm not understanding, |
| 7    Q.  Would it have been your policy -- would it | 7 but I would've given them the point values. |
| 8 have been the policy of Marriott Vacation Club to | 8    Q.  All right.  And if there was a decision made |
| 9 reveal the trading values before the vote if somebody | 9 on behalf of your executives at the Marriott Vacation |
| 10 asked for that? | 10 Club who were involved in the survey to not give the |
| 11       MR. SELLINGER: Objection to form.  Did | 11 point members to the members prior to the voting -- |
| 12    they have a policy? | 12 I'm sorry -- the point values to the members prior to |
| 13 BY MR. REISER: | 13 voting, that would've been inappropriate in your view. |
| 14    Q.  As COO of Marriott Vacation Club, who was | 14 True? |
| 15 overseeing these surveys and who was involved in these | 15       MR. SELLINGER: Objection to form.  He's |
| 16 surveys, don't you think it would've been appropriate | 16    answered that question three times. |
| 17 for your company to share the points equivalency | 17       MR. REISER: It's a different question. |
| 18 values -- the trading values -- between the Marriott | 18       MR. SELLINGER: It's the same question. |
| 19 Vacation Club and the Ritz Club before the members | 19       THE WITNESS: Can you read it back to me? |
| 20 voted?  That would've been a proper thing to do; | 20       (The reporter read back the last |
| 21 correct? | 21    question.) |
| 22       MR. SELLINGER: Objection to form. | 22 BY MR. REISER: |
| 23    A.  I believe that -- like I said, I don't know | 23    Q.  Can you answer the question? |
| 24 whether we did or didn't.  I don't believe there would | 24    A.  I would've expected them to provide the point |
| 25 be a -- there's not a policy that would say we | 25 values. |
| Page 359 | Page 361 |
| 1 wouldn't share that with the members.  They ultimately | 1    Q.  Okay.  And if there was an actual decision |
| 2 need to know those point values. | 2 made by your executives to not give them the point |
| 3       I'm not sure the point values would -- in and | 3 values, you would feel that would be not correct or |
| 4 of themselves -- would be meaningful to a Ritz-Carlton | 4 not -- that would be violative of -- hold on.  Let me |
| 5 member -- to tell them 5,500 points for this -- when | 5 just finish my question.  I'll start over. |
| 6 they don't have a context of what that compares to | 6       If you were shown evidence that executives |
| 7 elsewhere. | 7 that report to you made a conscious decision to not |
| 8 BY MR. REISER: | 8 give the point values to the members prior to voting, |
| 9    Q.  You think it would've been appropriate for | 9 that would've been inappropriate on their part.  You |
| 10 Marriott Vacation Club to reveal to a member who asked | 10 would agree, would you not? |
| 11 what the points trading value would've been in the | 11       MR. SELLINGER: Objection, asked and |
| 12 Marriott Vacation Club before they voted.  True? | 12    answered, and objection to form. |
| 13       MR. SELLINGER: Objection to form. | 13    A.  I would have -- they would have had a |
| 14    A.  I'm sorry? | 14 different point of view than mine.  I would have |
| 15 BY MR. REISER: | 15 shared it.  They may have very good reason why not to. |
| 16    Q.  If a member, in response to the survey, | 16 BY MR. REISER: |
| 17 requested the points values, you think it would've | 17    Q.  Can you think of any reason? |
| 18 been appropriate for them to be given the points | 18    A.  No.  That's why I would've given them the |
| 19 values from Marriott.  True? | 19 points. |
| 20    A.  I think we could've -- should've given them | 20    Q.  So you're not aware of a major survey that |
| 21 the point value. | 21 was taken by a Marriott Vacation Club in August -- or |
| 22    Q.  Okay.  It would've been inappropriate for | 22 the fall of 2012 -- gauging the members' reactions to |
| 23 Marriott Vacation Club not to give the point value if | 23 the proposed affiliation? |
| 24 asked? | 24       MR. SELLINGER: Objection to form. |
| 25       MR. SELLINGER: Objection to form. | 25    A.  When? |
| Page 360 | Page 362 |

24 (Pages 359 - 362)

Lee Cunningham - 11/15/2017

1 BY MR. REISER:
2    Q. Fall of 2012.
3    A. '12. A survey -- I'm trying to remember
4 when -- the survey we spoke about previously.
5    Q. Let me remind you of the key dates. July 17,
6 2012 is when the initial announcement went out about
7 a proposed --
8    A. I understand.
9    Q. April 24th -- around there -- you sent
10 another e-mail out to try to clarify the proposal.
11       You remember that date; right?
12    A. Yes.
13    Q. And you remember a webinar taking place on
14 August 30th?
15    A. Yes.
16    Q. Where you and Mr. Weisz answered questions by
17 the membership?
18    A. Yes.
19    Q. Do you remember, around that time, asking
20 members to respond to their sentiment on whether there
21 affiliation was wanted by the members?
22    A. I remember, in advance of the webinar, asking
23 for questions and so forth. I don't recall that exact
24 survey, unless that was the one that we were looking
25 at earlier. I'm still fuzzy on the date.

Page 363

1    Q. Well, there's survey results that your
2 counsel has produced in this litigation. It's got 750
3 rows on an Excel spreadsheet -- more than that. Every
4 one of those rows is a comment from a club member.
5       I can't produce it today because it's a
6 native spreadsheet. If I tried to print it out, it
7 would be impossible.
8    A. Is that -- okay.
9    Q. I can give you the Bates stamp number. It's
10 RCDC7337_nav.xls. It was produced by your counsel.
11 It's dated 8/17/12. It's communications regarding the
12 OSAT, the owner survey.
13    A. Okay.
14    Q. You don't remember looking at any of the
15 comments -- it's 750 -- that were contemporaneous with
16 the announcement of the affiliation as you sit here
17 today. Is that what you're saying?
18    A. I'm trying to recall. I'm not disputing
19 whether it did or didn't go out. I just can't bring
20 it to my memory at this moment.
21    Q. Well, I mean, I'm just trying to get your
22 testimony, because it seems to me that you're saying
23 you really just wanted to know the members' position
24 on the affiliation, and you were going to try to
25 follow the members' positions.

Page 364

1       Isn't that your testimony?
2    A. No.
3       MR. SELLINGER: Objection to form.
4    A. We wanted to know the sentiment of our owners
5 relative to the affiliation, and then we would use
6 that as one of the data points, one of the pieces of
7 information, to make the decision.
8 BY MR. REISER:
9    Q. Okay. And one of the data points would've
10 been a major survey that was contemporaneous with the
11 announcement of the affiliation; that you would want
12 to view that. True?
13       MR. SELLINGER: Objection to form.
14 BY MR. REISER:
15    Q. In making your data point comparisons?
16    A. And we may have.
17    Q. Did you?
18    A. I don't recall.
19    Q. All right. And if you had reviewed it, I
20 think you would have noticed that over 90 percent of
21 the members in that survey were extremely negative in
22 terms of the affiliation.
23       You don't remember reviewing that
24 spreadsheet?
25    A. I don't --

Page 365

1       MR. SELLINGER: Hold on. Objection to
2       form.
3    A. I don't recall reviewing the survey results.
4 BY MR. REISER:
5    Q. And then this letter that we just saw from
6 Steve Andrews that you received, where he informs his
7 members that 81 percent of the San Francisco members
8 who would rather terminate the Marriott relationship
9 than proceed with the affiliation -- in that letter --
10       MR. REISER: If you could pull it up?
11       THE TECHNICIAN: 1531?
12       MR. REISER: Yes. Second page. I'm
13       sorry. The first page.
14 BY MR. REISER:
15    Q. You see on the first page, it says, "Please
16 note, the recent communication from Lee Cunningham
17 regarding the survey was not reporting on this survey,
18 but a web-based survey that the RCDC invited owners to
19 respond to in July."
20       Do you remember a survey in July 2013?
21       MR. SELLINGER: Objection to form.
22    A. I don't recall it. I'm sure it went out.
23 BY MR. REISER:
24    Q. How many surveys did you take with regard to
25 the affiliation? We, at least, know about the

Page 366

25 (Pages 363 - 366)

Lee Cunningham - 11/15/2017

1  August 2012 one we've been discussing, Bates-stamped
2  7337. There's this one in July that's mentioned.
3  There's the San Francisco survey that you were aware
4  of in August 2013.
5      A. That we didn't do.
6      Q. Yeah, you didn't do that, but you got notice
7  of what the responses were, didn't you?
8      A. Yes.
9      MR. SELLINGER: Objection to form.
10 BY MR. REISER:
11     Q. And then there was -- I believe there was
12 focus groups going on in December of 2013. Do you
13 remember anything about that?
14     A. No.
15     Q. None of those went into your decision making
16 in terms of whether to affiliate?
17     MR. SELLINGER: Objection to form.
18     A. I don't recall all the discussions and all
19 the factors that we put into the decision.
20 BY MR. REISER:
21     Q. Is it your testimony, Mr. Cunningham, that
22 you believe that a majority of the members of The
23 Ritz-Carlton Destination Club were in favor of the
24 affiliation?
25     A. The majority of the ones that responded to

Page 367

1  the surveys at each of the clubs.
2      Q. Okay. Isn't it true that you selectively
3  used that one survey and ignored every other survey we
4  just mentioned in order to justify your decision to
5  affiliate?
6      MR. SELLINGER: Objection to form.
7      A. That's a mischaracterization of what I've
8  said.
9  BY MR. REISER:
10     Q. How is that mischaracterizing it?
11     A. We looked at a number of things -- I can't
12 recall each and everything that we looked at -- and
13 that was one of them.
14     Q. That's the only one you remember as you sit
15 here today; isn't it true?
16     A. That's correct.
17     Q. You don't remember anything about the
18 August 2012 survey as you sit here; right?
19     A. That's correct.
20     Q. So did you just selectively review that
21 survey so that you could testify here that you relied
22 on just that survey?
23     MR. SELLINGER: Objection to form.
24     A. No. I just --
25 BY MR. REISER:

Page 368

1      Q. Why didn't you review --
2      MR. SELLINGER: Hold on. Let him finish.
3  BY MR. REISER:
4      Q. I'm sorry. I thought you were finished.
5      A. I reviewed the information that was available
6  to me prior to this, and I don't recall the results of
7  those surveys or that being part of that.
8      Q. Now, let me ask you this. Why was Marriott
9  Vacation Club involved in any way in surveying the
10 members about what they wanted to do?
11     A. Marriott Vacation Club wasn't.
12     Q. You didn't have any participation in these
13 surveys that we've been discussing?
14     A. It was a survey from the -- from each of the
15 associations or each of the -- from The Ritz-Carlton
16 Destination Club to get some information about the
17 owners' sentiment.
18     Q. And the Marriott Vacation Club Worldwide, who
19 was the person that was going to have The Ritz Club --
20 the corporate person that was going to have the Ritz
21 Clubs affiliated with, they were involved in creating
22 those surveys; were they not?
23     MR. SELLINGER: Object to the form of the
24     question.
25     A. I'm not following that question.

Page 369

1  BY MR. REISER:
2      Q. Isn't it true that it was Marriott Vacation
3  Club Worldwide that helped Morrow & Company create
4  that survey?
5      A. No.
6      Q. Who created it?
7      A. It was created with -- collaboratively,
8  with -- I believe with Morrow, Stephanie Sobeck, and
9  the individual boards.
10     Q. And Stephanie Sobeck worked for Marriott
11 Vacation Club; right?
12     A. Stephanie Sobeck is employed by Marriott
13 Ownership Resorts, Inc.; and, at the time, was --
14 100 percent of her efforts were against The
15 Ritz-Carlton Destination Club.
16     Q. Okay. And Marriott Ownership Resorts
17 International, that's the sole owner of Ritz-Carlton
18 Development Company. True?
19     A. That's correct.
20     Q. So MORI is actually the parent of the
21 Ritz-Carlton Development Company?
22     A. I believe that's correct.
23     Q. And she works for MORI?
24     A. That's correct.
25     Q. So why was the developer, through MORI,

Page 370

26 (Pages 367 - 370)

Lee Cunningham - 11/15/2017

**Page 371**

1 having anything to do with surveying the members'
2 wishes in this regard?
3    A. She also --
4    MR. SELLINGER: Objection to form.
5 BY MR. REISER:
6    Q. Why was a Ritz-Carlton Destination -- sorry.
7 Strike that. Why was a Ritz-Carlton Development
8 Company executive involved in surveying the members as
9 to the affiliation between Marriott Vacation Club and
10 Ritz-Carlton Destination Club?
11    A. She also -- it's the parent for Cobalt
12 Travel. It's also the parent for Lion & Crown, which
13 is the areas that Stephanie was focused on.
14    Q. Why were any of those entities involved in
15 surveying the members as to their thoughts on the
16 affiliation?
17    A. To gather their sentiment on the affiliation.
18    Q. Why?
19    A. Because we wanted to know that.
20    Q. Why would you want to know that?
21    A. So that we could determine how to move
22 forward with affiliation or not.
23    Q. Okay. Because it was Marriott Vacation Club
24 that was deciding the affiliation?
25    A. No.

**Page 372**

1    Q. What effect would the surveys have on the
2 decision --
3    A. It was Lion & Crown's decision to affiliate
4 or not.
5    Q. Is that your testimony? It was Lion &
6 Crown's decision as to whether to affiliate?
7    A. Yes.
8    Q. How did Lion --
9    MR. SELLINGER: Hold on. Wait a minute.
10 You've got to wait, because for me to -- for
11 my objection to be preserved, it's got to get
12 made for the court down the road. So you
13 need to wait for a moment.
14    So, objection to form.
15    MR. REISER: Okay. That's fine. Object
16 to form.
17    Can you read it back?
18    I'd appreciate it if you'd just say,
19 "object to form."
20    MR. SELLINGER: That's all I said.
21    MR. REISER: No, you didn't. You talked
22 to your witness on the record for a long time
23 and telling him to wait and everything. I
24 think he knows that.
25    MR. SELLINGER: Well, no. I was

**Page 373**

1 responding to the fact that you and he were
2 talking over each other. And I need to, have
3 the right to, and intend to be in a position
4 to object to every question or make a
5 decision yea or nay.
6    So all I'm asking for is that both you
7 and he pause so I have the opportunity to do
8 my job.
9    MR. REISER: Read my question back,
10 please.
11    (The reporter read back the last
12 question.)
13 BY MR. REISER:
14    Q. How did Lion & Crown get the authority to
15 decide who to affiliate with?
16    A. Lion & Crown is where all -- any external
17 affiliations for Ritz-Carlton Destination Club go
18 through Lion & Crown.
19    Q. How did Lion & Crown get authority to
20 affiliate any clubs? What document are you relying
21 on? What legal authority do you sit here and testify
22 that Lion & Crown, a company that didn't even exist
23 when any of my clients bought their fractionals, could
24 make a decision to affiliate their club with another
25 club?

**Page 374**

1    MR. SELLINGER: Objection to form.
2 BY MR. REISER:
3    Q. Especially one that was owned by Marriott
4 Vacation Club, in which the COO of Marriott Vacation
5 Club is also the COO of the Lion & Crown.
6    MR. SELLINGER: Objection to form.
7    A. The entity was established. I don't know
8 what the -- the documents --
9 BY MR. REISER:
10    Q. Well, it was established in 2 --
11    MR. SELLINGER: Hold on. Hold on. Hold
12 on. Please, give Mr. Cunningham the
13 opportunity to finish his answer.
14    MR. REISER: Okay.
15    A. I'm not aware of the timing or -- relative to
16 the implementation of Lion & Crown, so...
17 BY MR. REISER:
18    Q. So I think I know -- I can tell you that it
19 was established in 2010, because I checked out the
20 Delaware Secretary of State filing. So it looks like
21 I might know a little bit more about Lion & Crown than
22 you do as the COO.
23    Is that true in terms of when it was
24 incorporated?
25    MR. SELLINGER: Objection to form.

27 (Pages 371 - 374)

Lee Cunningham - 11/15/2017

1   A. You know the date of when it was formed.
2   BY MR. REISER:
3       Q. Okay. And it was formed in relation to
4   trying to get other affiliations, such as Abercrombie
5   & Kent. True?
6       A. Yes.
7       Q. So it wasn't even around when any of these
8   folks bought their units from the developer, because
9   you stopped selling in 2009 -- fractionals. True?
10      MR. SELLINGER: Objection to form.
11      A. That's not true. We did not stop selling
12  fractions in 2009.
13  BY MR. REISER:
14      Q. The vast majority of fractionals were sold
15  prior to 2010, when Lion & Crown was formed; is that
16  fair?
17      MR. SELLINGER: Objection to form.
18      A. The majority of the fractional interests were
19  sold prior to 2010.
20  BY MR. REISER:
21      Q. And how did Lion & Crown, which was formed in
22  2010, get authority to affiliate these members'
23  interests with another club?
24      MR. SELLINGER: Objection to form yet
25  again.

Page 375

1   to the affiliation agreement.
2       A. Okay.
3       MR. REISER: So if you can pull up 1434?
4       MR. SELLINGER: Could we have a copy,
5   please?
6   BY MR. REISER:
7       Q. This is dated October 11, 2014. It's the
8   second amendment to the Ritz-Carlton membership
9   program affiliation agreement.
10      Do you recognize this document?
11      A. Yes.
12      Q. If you could turn to the third page? Well,
13  let me ask you to do the recitals first. The recital
14  on page 1 talks about, "Whereas, the parties entered
15  into that certain Ritz-Carlton Club membership program
16  affiliation agreement dated January 11, 2001, the
17  original agreement, as amended by the first amendment
18  to the Ritz-Carlton Club membership program agreement
19  dated October 2, 2001, and together with the original
20  agreement, the agreement."
21      So this is an amendment to the original
22  affiliation agreement, which we marked earlier in this
23  deposition as 1003.
24      You've seen the original affiliation
25  agreement, I take it?

Page 377

1       MR. REISER: Fine.
2       A. I don't know.
3   BY MR. REISER:
4       Q. You're the COO of Lion & Crown; right?
5       A. I'm the vice president of Lion & Crown.
6       Q. Okay. You're the vice president of Lion &
7   Crown. You're the vice president of Ritz-Carlton
8   Development Company. True?
9       A. That's correct.
10      Q. And you're the vice president of MORI?
11      A. Yes.
12      Q. Is there any entity that is owned or -- of
13  which MORI is the corporate parent that you're not the
14  vice president of?
15      A. I'm sure there are.
16      Q. Is there any that you can think of?
17      A. I don't know. There are numerous entities.
18  I don't know --
19      Q. I want to go over a few of the entities which
20  you're -- I want to get an idea from you as to who, at
21  the time the affiliation agreement was -- strike that.
22      At the time the decision was made to
23  affiliate the Marriott Vacations Destination Club with
24  The Ritz-Carlton Destination Club, I want to establish
25  from you who were the officers of the various parties

Page 376

1       A. Yes.
2       Q. You're familiar with the affiliation
3   agreement?
4       A. I know what...
5       Q. When the original affiliation agreement was
6   signed, which, again, is referenced in this -- do you
7   see the date that this affiliation agreement was filed
8   in the records of --
9       A. Yes.
10      Q. It was January 11, 2001. True?
11      A. Yes.
12      Q. So this is the affiliation agreement that
13  Exhibit 1434 is amending. True?
14      A. Yes.
15      Q. All right. The affiliation agreement that
16  was in 2014 -- can you turn to the third page? I want
17  to ask you if you recognize your signatures.
18      You signed this amendment to the affiliation
19  agreement on October 11, 2014 as the vice president of
20  Cobalt Travel company. True?
21      A. That's correct.
22      Q. And you signed as the vice president of the
23  developer, the Ritz-Carlton Development Company.
24  True?
25      A. That's correct.

Page 378

28 (Pages 375 - 378)

Lee Cunningham - 11/15/2017

1    Q.  And on this amendment, Randy Mercer signed as
2  the president of the Aspen Highlands Condominium
3  Association.  True?
4    A.  Correct.
5    Q.  And, finally, the club manager signed this
6  affiliation agreement.  And do you recognize Stephanie
7  Sobeck's signature there?
8    A.  Yes.
9    Q.  She signed as the vice president, asset
10  management, of the Ritz Carlton Management Company.
11  True?
12    A.  Yes.  That's what she wrote.
13    Q.  Was she actually the vice president of asset
14  management to the Ritz-Carlton Management Company?
15    A.  I don't know what her title is under -- as an
16  officer of Ritz-Carlton Management Company, I would
17  imagine it's vice president.
18    Q.  I'm going to show you 1601, which we marked
19  yesterday with your colleague, Richard Hayward.  I'll
20  just show it to you, 1601.  And you signed the --
21    MR. SELLINGER:  Hold on a minute.  Hold
22  on.  I'd like to see a copy, please.
23  BY MR. REISER:
24    Q.  -- the acknowledgement of and joinder to
25  affiliation agreement between Lion & Crown Travel
Page 379

1  Company and Marriott Resorts Travel Company.
2    MR. SELLINGER:  Do you have another copy?
3    THE REPORTER:  I might have it.
4    MR. REISER:  There it is, 1601.
5    MR. SELLINGER:  Can I have one?
6    MR. REISER:  You can look at his.
7  BY MR. REISER:
8    Q.  I'm just going to ask you about your
9  signature on this.  Can you turn to the third page?
10    A.  Uh-huh.
11    Q.  This was something that you signed with
12  regard to -- actually, this is the affiliation
13  agreement -- the acknowledgement of the affiliation
14  agreement with regard to the San Francisco Club.
15  Nonetheless, it also shows you signing as The Lion &
16  Crown Travel Company vice president.  True?
17    A.  True.
18    Q.  And you're vice president of MORI.  True?
19    A.  True.
20    Q.  You're vice president of the developer.
21  True?
22    A.  True.
23    Q.  You're vice president of the management
24  company.  True?
25    A.  True.
Page 380

1    Q.  You're vice president of The Lion & Crown
2  Travel Company.  True?
3    A.  Correct.
4    Q.  You're vice president of Cobalt Travel
5  Company.  True?
6    A.  That's correct.
7    Q.  All right.  So on the original affiliation
8  agreement, I'd like to draw your attention to
9  paragraph 7.2a.  It's Exhibit 1003, page 10.
10    You're reading that, Mr. Cunningham?
11    A.  I am.
12    Q.  I'd like to draw your attention to the first
13  sentence -- the first two sentences in paragraph 7.2a
14  of the affiliation agreement.
15    It says, "The program manager may, in its
16  sole discretion, elect to affiliate other locations
17  with the membership program as member clubs or
18  associated clubs from time to time."
19    So you would agree that that statement gives
20  Cobalt, the program manager, the right to affiliate
21  other locations with the membership program from time
22  to time in its sole discretion.  True?
23    A.  Other member clubs, yes, and associated
24  clubs.
25    Q.  Okay.  And you understand that your counsel
Page 381

1  took the position in a case in Minnesota called Hoyt
2  vs. Marriott that this provision allowed the program
3  manager to affiliate with the Marriott Vacation Club
4  or not?
5    A.  I'm not aware of that.
6    Q.  The second sentence in this paragraph says,
7  "Neither the developer, members association, nor club
8  manager shall be entitled to participate in or consent
9  to the program manager's decision in this regard."
10    Do you see that?
11    A.  Yes.
12    Q.  You were aware of this paragraph because this
13  is your affiliation agreement.  True?
14    A.  Yes.
15    Q.  Why is it then that you, as the developer,
16  participated and consented to the program manager's
17  decision to affiliate?
18    MR. SELLINGER:  Objection to form.
19    A.  You're talking about this?
20  BY MR. REISER:
21    Q.  No.  I'm talking about the decision to
22  affiliate.  This prevents, does it not, the developer
23  from participating in or consenting to Cobalt's
24  decision to affiliate?
25    MR. SELLINGER:  Objection to form.
Page 382

29 (Pages 379 - 382)

Lee Cunningham - 11/15/2017

1    A. It says, "The developer can -- shall be" --
2  wait a minute.
3    Q. It says, "Neither the developer" --
4    A. I got it.
5    Q. -- "nor the club manager, shall be entitled
6  to participate in or consent to the program manager's
7  decision to affiliate."
8    A. Yes.
9    Q. Why was the developer participating in the
10 decision to affiliate?
11    MR. SELLINGER: Objection to form.
12    A. To affiliate the -- are you talking about the
13 MVCD affiliation with Lion & Crown?
14 BY MR. REISER:
15    Q. Yes.
16    A. The developer wasn't.
17    Q. You were the developer?
18    MR. SELLINGER: Objection to form.
19    A. I was the developer as well as -- in that
20 case, I was acting on behalf of my role as the -- as
21 an officer of Lion & Crown.
22 BY MR. REISER:
23    Q. Were you operating in your role as an officer
24 of Cobalt?
25    A. No.

Page 383

1    Q. Cobalt is the program manager that has the
2  decision as to who to affiliate with in this
3  agreement?
4    A. I'm sorry. But the -- I believe the addition
5  of Lion & Crown in 2010 -- I don't know the exact
6  reasoning, but my understanding was that Lion & Crown
7  is the entity that affiliates with non-RCDC projects
8  or clubs.
9      So that's why it was done with Lion & Crown.
10 That's why we did the acknowledgement with Lion &
11 Crown and the association.
12    Q. So you're not saying that Cobalt made the
13 decision to affiliate. You're saying that it was Lion
14 & Crown that made the decision to affiliate?
15    MR. SELLINGER: Objection to form.
16 BY MR. REISER:
17    Q. That's true?
18    A. I'm saying it was Lion & Crown that made that
19 decision.
20    Q. How do you explain the first sentence then?
21 "The program manager, who's defined in this agreement
22 as Cobalt, may, in its sole discretion, elect to
23 affiliate other locations with the membership program
24 at member clubs or associated clubs from time to
25 time."

Page 384

1      It gives the sole discretion to Cobalt to
2  make the affiliation decision; does it not?
3    A. I need to see the --
4    Q. You can see it. This is your affiliation
5  agreement.
6    MR. SELLINGER: Hold on.
7    A. Can I finish?
8 BY MR. REISER:
9    Q. Sorry.
10    A. I need to see the documents for Lion & Crown
11 to understand why we chose the affiliation through
12 Lion & Crown.
13    Q. This is your affiliation agreement. True?
14    A. This is the affiliation agreement with Cobalt
15 and the clubs.
16    Q. Right. The program manager signs the
17 affiliation agreement -- the Ritz-Carlton Travel
18 Company, which was the predecessor to the Cobalt
19 Travel Company. True?
20    A. (No response.)
21    Q. You don't know?
22    A. I don't know.
23    Q. So you're the vice president of Cobalt and
24 you don't know that that's the predecessor company to
25 Cobalt, Mr. Cunningham?

Page 385

1    MR. SELLINGER: Objection to form.
2    MR. REISER: It's really tough to take a
3  deposition when the officer that is
4  testifying on behalf of these entities
5  doesn't really know anything about the
6  company.
7    MR. SELLINGER: Mr. Cunningham is being
8  deposed as a fact witness today. That's how
9  he's been noticed. He's not speaking on
10 behalf of the entities. He's giving you his
11 best understanding without having the full
12 set of documents in front of him that he's
13 asked to review.
14 BY MR. REISER:
15    Q. This is your -- Cobalt -- you're the vice
16 president of Cobalt. True?
17    A. True.
18    Q. And you're the vice president of the
19 Ritz-Carlton Development Company. True?
20    A. True.
21    Q. And I don't need to go through all that
22 again, but you're the vice president and officer of
23 every one of these companies that signed the
24 affiliation agreement. True?
25    MR. SELLINGER: Objection to form.

Page 386

30 (Pages 383 - 386)

Lee Cunningham - 11/15/2017

1    A.  I'm sorry?
2  BY MR. REISER:
3    Q.  Do you want to go through the signatories for
4  the affiliation agreement?  The first one is the
5  program manager.
6       And I'll represent to you, since you don't
7  seem to remember, that the Ritz-Carlton Travel Company
8  was the name of the program manager before they
9  changed their name to Cobalt.
10      Does that refresh your recollection at all
11 that Cobalt -- the name change from the Ritz-Carlton.
12 Travel Company?
13   A.  Sure.  Yeah.
14   Q.  So you would agree.  Because you did sign it
15 then in October of 2014 under the program manager of
16 the Cobalt Travel Company?
17   A.  Right.
18   Q.  So it's the same agreement.  This is an
19 amendment to the affiliation agreement.  True?
20   A.  I understand.
21   Q.  So you signed -- you signed the affiliation
22 agreement -- strike that.
23      Cobalt is the program manager under the
24 affiliation agreement.  True?
25   A.  Under the affiliation, yes.

Page 387

1    A.  Cobalt is -- the program manager under Cobalt
2  is -- has the affiliation -- or has the sole
3  discretion for affiliation between Cobalt and each of
4  the clubs or other entities.  I believe --
5    Q.  So what is your explanation for why you
6  believe The Lion & Crown Travel Company has the
7  authority to affiliate other clubs with The
8  Ritz-Carlton Destination Club?
9    A.  That was the advice from counsel that that
10 was the appropriate entity to affiliate with, so I'd
11 have to go back and refresh myself on those documents.
12   Q.  Do you see this also says that the members
13 association --
14      MR. SELLINGER:  Where are you reading?
15 BY MR. REISER:
16   Q.  -- shall not be entitled to participate in or
17 consent to the program manager's decision to
18 affiliate.  True?
19      MR. SELLINGER:  Where are you reading
20   from?
21      THE WITNESS:  Right here.
22 BY MR. REISER:
23   Q.  You would agree that your affiliation
24 agreement disallowed the member association from
25 participating in or consenting to the affiliation

Page 389

1    Q.  And under paragraph 7.2a, Cobalt, as the
2  program manager, in its sole discretion, may elect to
3  affiliate locations with membership programs --
4      MR. SELLINGER:  Hold on.
5      MR. REISER:  Let me finish my question,
6   Mr. Sellinger.  Don't interrupt my question
7   again.  Okay?
8      MR. SELLINGER:  Stop raising your voice.
9   Hold on a minute.  You're raising your voice
10  at the witness.  Your raising your voice at
11  me.
12     We've gone well beyond seven hours.
13  We're trying to accommodate you.  It's
14  5:00 p.m.  It's the second day of a
15  deposition, so --
16     MR. REISER:  I'm not going to allow you
17  to interrupt my questions.
18     MR. SELLINGER:  No, I'm not interrupting.
19  You interrupted my objection.
20     MR. REISER:  Just don't interrupt me.
21  Okay?
22 BY MR. REISER:
23   Q.  Cobalt, as the program manager, you would
24 agree, under your affiliation agreement, had the sole
25 discretion to affiliate clubs with The Ritz.  True?

Page 388

1  decision of Cobalt.  True?
2      MR. SELLINGER:  Hold on a minute.
3   Objection to form.  That's not what it says.
4   Ask him what it says.
5      MR. REISER:  Don't -- speaking
6   objections, Mr. Sellinger.  Just don't.
7      MR. SELLINGER:  Don't misrepresent what
8   the language says to him at 5:00 in the
9   afternoon.
10     MR. REISER:  There's no
11  misrepresentations going on.  You're out of
12  line.  You're out of line.  It says the
13  member association.  So stop your
14  objections -- your speaking objections.
15     MR. SELLINGER:  Hold on a minute.  If you
16  want to read back the question, your question
17  misrepresents what the language of that
18  clause said.
19     MR. REISER:  Please read back the
20  question.
21     MR. MEADE:  Before you do so, I'd like to
22  state for the record that, for a second time,
23  Mr. Sellinger has begun his objection before
24  the question is completed.  You need to wait
25  until he completes his objection.  Otherwise,

Page 390

31 (Pages 387 - 390)

Lee Cunningham - 11/15/2017

1    you're thwarting the videotape on the
2    deposition. Let's all slow down. Okay?
3        MR. SELLINGER: And, by the way, I really
4    have no intention of objecting before the
5    question --
6        MR. MEADE: But you have twice.
7        MR. SELLINGER: Well, part of my problem
8    is, when I wait, sometimes there's an answer
9    and then I don't have the ability to object.
10       MR. MEADE: That's between you and your
11   witness. Then counsel your witness to pause.
12       MR. SELLINGER: Well, listen, I have no
13   intention of objecting before a question.
14       MR. MEADE: I'm not saying it's
15   intentional. I'm just noting it for the
16   record that you've done it twice.
17       Thank you. You can read back the
18   question.
19       THE REPORTER: "You would agree that your
20   affiliation agreement disallowed the member
21   association from participating in or
22   consenting to the affiliation decision of
23   Cobalt. True?"
24   BY MR. REISER:
25   Q. Can you answer that question?

Page 391

1    A. Yes.
2    Q. So we've seen documents for the last two
3    days, wherein yourself, your executives, such as
4    Stephanie Sobeck and others, were in joint
5    communication with Randy Mercer and his board in terms
6    of trying to formulate the survey. True?
7    A. Yes.
8    Q. Why did you allow that to happen, when your
9    affiliation agreement provides that the member
10   association shall not be entitled to participate in or
11   consent to the program manager's decision in regards
12   to affiliation?
13       MR. SELLINGER: Objection to form.
14   A. Because the affiliation that we were
15   discussing was with Lion & Crown, not with Cobalt.
16       MR. REISER: Okay.
17       THE VIDEOGRAPHER: The time is 5:05.
18   That concludes media two in the deposition of
19   Lee Cunningham.
20       (Brief recess.)
21       THE VIDEOGRAPHER: The time is 5:23.
22   This is media three in the deposition of Lee
23   Cunningham.
24       MR. REISER: What's the time?
25       THE VIDEOGRAPHER: 5:23.

Page 392

1        MR. REISER: I'm just going to note for
2    the record that we went out of here at 5:05,
3    and that it was an 18-minute break. I
4    requested that it be not even a break. I
5    don't know what happened over the last
6    18 minutes, but it's unacceptable to take
7    these long breaks when I didn't agree to it.
8        MR. SELLINGER: I'd like to go on the
9    record that it's now been eight hours and
10   37 minutes of deposition time. We have moved
11   very quickly over two days of these
12   depositions, but we're getting to the point
13   where the same questions and the same subject
14   matter are being covered about eight times.
15       So from our perspective, so both counsel
16   are on notice, we view this as the last
17   taping session, which will be well over nine
18   and a half hours at the conclusion of it. So
19   that's going to be our position, that this is
20   it.
21       The amount of break is not relevant.
22   What's relevant is the amount of deposition
23   time and the opportunities that you've both
24   had with our accommodation to go back and
25   forth. So that's where we are.

Page 393

1        MR. REISER: We'll preserve that for the
2    court. I understand your position. Our
3    position is, we get at least 21 hours on the
4    three cases.
5        MR. SELLINGER: At least?
6        MR. REISER: We might need more,
7    actually. So we'll see. There's no ironclad
8    rule of seven hours on any witness,
9    especially one across three clubs.
10       So if you really want to take that
11   position in this complex case --
12       MR. SELLINGER: We've already gone
13   beyond seven hours.
14       MR. REISER: And there's three cases.
15       MR. SELLINGER: Yes, and they all deal
16   with the same issues. Everything that we
17   covered is the same affiliation issue in the
18   same cases.
19       MR. REISER: Okay.
20   BY MR. REISER:
21   Q. So do you want to change your testimony at
22   all as to whether Cobalt is the sole -- has the sole
23   authority to affiliate other clubs with The
24   Ritz-Carlton Destination Club?
25       MR. SELLINGER: Objection to form.

Page 394

32 (Pages 391 - 394)

Lee Cunningham - 11/15/2017

1    A. Cobalt -- Cobalt can affiliate with other
2  clubs. They have -- refreshed my memory -- they have
3  affiliated with Lion & Crown, and have, in this case,
4  through Lion & Crown, sought the affiliation of the
5  other clubs.
6  BY MR. REISER:
7    Q. So it's your testimony then that Cobalt,
8  having sole authority to affiliate, somehow delegated
9  that authority to affiliate to Lion & Crown, of which
10  you were the vice president?
11    A. They directed --
12      MR. SELLINGER: Objection to form.
13  BY MR. REISER:
14    Q. Is that your testimony?
15    A. They directed Lion & Crown to affiliate with
16  the other clubs.
17    Q. Who made the decision to affiliate?
18    A. The -- Cobalt did.
19    Q. So you're changing your testimony from right
20  before this break. True?
21      MR. SELLINGER: Objection to form.
22    A. Cobalt directed Lion & Crown to the
23  affiliation. The decision was made by Cobalt.
24  BY MR. REISER:
25    Q. Okay. So why was the members association

Page 395

1    A. That's correct.
2    Q. There's no other employees of Cobalt that you
3  can remember as you sit here. True?
4      MR. SELLINGER: Objection to form.
5  BY MR. REISER:
6    Q. Is that true?
7    A. I don't know of any other -- I don't know who
8  the other officers of Cobalt are.
9    Q. In fact, there's no other employees of
10  Cobalt, as you testified to Friday. True?
11    A. There are no employees that are employed by
12  Cobalt or any of the other subentities of Marriott
13  Ownership.
14    Q. As I understand your testimony -- and let me
15  see if I understand this right -- you're saying that
16  Cobalt had the discretion to ask Marriott Vacation
17  Club and the members association both for input as to
18  the affiliation?
19      MR. SELLINGER: I'm sorry. Read that
20  back, please.
21      (The reporter read back the last
22  question.)
23    A. They could ask anybody -- they had the right
24  to ask anybody's input to the affiliation question.
25  BY MR. REISER:

Page 397

1  involved in the decision of Cobalt to -- why did you,
2  as the Marriott Vacation Club, violate the provision
3  in the affiliation agreement that states that neither
4  the developer, the members association, nor the club
5  manager shall be entitled to participate in or consent
6  to the program manager's decision to affiliate?
7      MR. SELLINGER: Objection to form;
8      mischaracterizes the document.
9    A. It says that they won't be entitled to. It
10  doesn't say that they can't participate, that we can't
11  get their feedback.
12  BY MR. REISER:
13    Q. So you're saying that, even though it says,
14  "they shall not be entitled to participate," that they
15  are entitled to participate?
16    A. I'm not saying they're entitled to. They can
17  at the invitation of the program manager.
18    Q. And they did in this regard. True?
19    A. No. They -- we worked with the association
20  to gather the sentiment of the owners so that we could
21  put that into our calculus.
22    Q. Who's we? Who are you referring to?
23    A. Cobalt or -- yeah, Cobalt.
24    Q. So you control Cobalt, though; right? You're
25  the vice president?

Page 396

1    Q. Okay. And were you entitled to -- as the
2  developer, were you entitled to participate if they
3  asked?
4    A. I wasn't entitled to. If they chose me -- if
5  they -- if Cobalt asked for my -- for the developer's
6  input, they would be okay to give that input.
7    Q. Okay. So you felt that the developer -- and
8  you were the developer, because you just testified
9  that you're the vice president of the development
10  company. True?
11      MR. SELLINGER: Objection to form.
12    A. I am the vice president of the development
13  company.
14  BY MR. REISER:
15    Q. Okay.
16    A. But I was -- in this, I was acting as the
17  vice president of Cobalt Travel.
18    Q. Who was acting as the developer in this
19  regard?
20    A. No one.
21    Q. So you were acting as the -- you were
22  acting -- you personally, Lee Cunningham, were acting
23  as the vice president of Cobalt in making the decision
24  to affiliate. Is that your testimony?
25    A. That's correct.

Page 398

33 (Pages 395 - 398)

Lee Cunningham - 11/15/2017

1 Q. And you, Lee Cunningham, as the developer,
2 had no input in that decision?
3 A. That's correct.
4 Q. And you, Lee Cunningham, as Ritz-Carlton
5 Management Company, had no input in that decision?
6 A. That's correct.
7 Q. And --
8 A. Well --
9     MR. SELLINGER: Hold on. Have you
10 finished your answer?
11 A. Yeah -- no. I finished my answer. No.
12 BY MR. REISER:
13 Q. So is it your testimony that the members
14 association did not participate in the decision to
15 affiliate?
16     MR. SELLINGER: Objection to form.
17 A. The members association did not have a say in
18 the affiliation. They participated in the form of
19 working with Cobalt to -- and Lion & Crown -- to
20 gather feedback from the members.
21 BY MR. REISER:
22 Q. All right. I want to switch gears for a
23 minute and turn to Lake Tahoe.
24     Were you involved in the decision,
25 Mr. Cunningham, to de-annex the 17 units at Tahoe and
Page 399

1 de-annexed.
2 A. I think the de-annex and sale of the club
3 closed -- I don't know -- I want to say late October
4 of 2011, or early November.
5 Q. That was after you're the developer -- the
6 president of -- vice president of the developer.
7 Right?
8 A. I don't know that I was an officer of that.
9 I had been asked to take responsibility for the
10 Ritz-Carlton business in late September -- September
11 of 2011.
12 Q. So you became the head of the development
13 company -- strike that.
14     Did you report to anybody as vice president
15 of the development company or did you make all the
16 decisions for the developer once you were appointed
17 vice president?
18 A. Once I was appointed vice president, then the
19 decision would've been mine on --
20 Q. What about Steve Weisz; he didn't have any
21 involvement?
22 A. At that time, the way our development
23 decisions worked -- at that point in time, we had a --
24 we have a committee that meets, reviews a
25 recommendation relative to a disposition in this case.
Page 401

1 sell them to JMA?
2 A. No.
3     MR. SELLINGER: Objection to form.
4 BY MR. REISER:
5 Q. Who was?
6 A. The people that were responsible for
7 Ritz-Carlton and the developer at that point in time.
8 Q. And who was that? It was in November 2011,
9 just to refresh your recollection.
10 A. That's correct.
11 Q. And you're saying you were not the vice
12 president at that point?
13 A. I was the vice president. I don't know
14 whether I was officially named an officer of
15 Ritz-Carlton Development Company at that point in
16 time. It was -- all work and all the decisions
17 relative to the 17 units in Lake Tahoe were before my
18 involvement with Ritz-Carlton Destination Club.
19 Q. Okay. So after you became -- when was it
20 that you became vice president of the developer --
21 A. September.
22 Q. September 2011?
23 A. Yes.
24 Q. I think it's November 2011 when the
25 announcement was made to the members that it was
Page 400

1 And then that recommendation would go to Marriott
2 International's corporate growth committee and -- for
3 approval -- because, at that point in time, we were
4 still part of Marriott International.
5 Q. All right.
6 A. So that decision -- the ultimate decision
7 occurred at -- in Bethesda at Marriott International's
8 development committee.
9 Q. Good. We'll add them as a defendant -- as a
10 Doe defendant in San Francisco. Thank you for
11 clarifying that. I appreciate that.
12     After September 2011, when you were appointed
13 the vice president, who was the president -- Steve
14 Weisz?
15 A. Of? I'm sorry --
16 Q. Ritz-Carlton Development Company.
17 A. I said, I don't know that I was added as a
18 vice president of Ritz-Carlton Development Company. I
19 don't know exactly when that occurred. I'd have to go
20 back and look when I was added as an officer of that
21 entity.
22     And at the time that I took responsibility
23 for Ritz-Carlton, I reported to Steve Weisz.
24 Q. And Steve Weisz was the president of the
25 Ritz-Carlton Development Company?
Page 402

34 (Pages 399 - 402)

Lee Cunningham - 11/15/2017

1    A. No.
2    Q. What is his position in the Ritz-Carlton
3 Development Company such that you would report to him?
4    MR. SELLINGER: Objection to form.
5    A. I report to him for numerous things, not just
6 the Ritz-Carlton Development Company. And I don't
7 know that -- I don't believe Mr. Weisz is an officer
8 of Ritz-Carlton Development Company, but I don't know
9 whether he is or isn't.
10 BY MR. REISER:
11    Q. Are there any other officers that you're
12 aware of at Ritz-Carlton Development Company?
13    A. I'm not aware of who the other officers are.
14    Q. Are you aware of any of the other officers,
15 besides yourself, at the Ritz-Carlton Management
16 Company?
17    A. I believe Stephanie Sobeck is an officer of
18 the Ritz-Carlton Management Company, but I'm...
19    Q. Is Steve Weisz the president of the
20 Ritz-Carlton Management Company?
21    A. There's not a president position of the
22 entities.
23    Q. Who's the CEO of the Ritz-Carlton Development
24 Company?
25    A. There isn't a CEO of Ritz-Carlton Development
Page 403

1 when the sale closed, but I believe the sale closed in
2 late October or early November.
3    Q. By the way, this refreshes your recollection
4 that Stephen P. Weisz was also a director of the
5 Ritz-Carlton Development Company. True?
6    A. Yes.
7    Q. Is he a director of any of the other
8 organizations that we've been discussing today?
9    A. Am I?
10    Q. Is he?
11    A. I don't know.
12    Q. Who would know all this?
13    A. Our legal department that is responsible for
14 entity management or entity --
15    Q. So are there any regular meetings of the
16 officers of the Ritz-Carlton Development Company?
17    A. No.
18    Q. Are there any regular meetings of the
19 officers of Ritz-Carlton Management Company?
20    A. No.
21    Q. Are there any regular meetings of the Cobalt
22 Travel Company?
23    A. No.
24    Q. Are there any regular meetings of The Lion &
25 Crown Travel Company?
Page 405

1 Company.
2    Q. I'm going to show you Exhibit 1511. It
3 actually lists out the officers of the Ritz-Carlton
4 Development Company.
5    See if this refreshes your recollection as to
6 any other officers of the Ritz-Carlton Development
7 Company.
8    A. Okay.
9    Q. Does that refresh your recollection that
10 Steve Weisz is the president of the Ritz-Carlton
11 Development Company?
12    A. Yes.
13    Q. Does this refresh your recollection as to
14 whether Stephen Weisz is also the president of the
15 Ritz-Carlton Management Company?
16    A. It doesn't.
17    Q. So in -- going back to Tahoe -- in 2011, when
18 you took over, the sale had not yet happened at JMA.
19 True?
20    A. That's correct.
21    Q. And after you became vice president of the
22 Ritz-Carlton Development Company, the sale closed to
23 JMA -- the 17 units?
24    A. As of -- this says, as of December 31st, I
25 would've have been an officer. I don't recall exactly
Page 404

1    A. No.
2    Q. As far as you sit here today, you don't know
3 if you're a board member of any of those companies I
4 just mentioned. True?
5    A. I'm sorry. Repeat the question.
6    Q. Are you a board member of any of the
7 companies I just mentioned?
8    A. I don't believe so.
9    Q. Are you aware of any litigation between JMA
10 and the Ritz-Carlton Development Company arising out
11 of the sale of those 17 units?
12    A. I am not.
13    Q. Are you aware of JMA ever making any claim
14 that there was not full disclosure as to the -- strike
15 that.
16    Are you familiar with the -- any of the terms
17 of the sale between Ritz-Carlton Development Company
18 and JMA?
19    A. I am not.
20    Q. Who was your predecessor in the Ritz-Carlton
21 Development Company who would have knowledge of the
22 sale to JMA?
23    A. I believe, as I testified last Friday, Pete
24 Watzka was part -- was responsible for The
25 Ritz-Carlton Destination Club through his resignation
Page 406

35 (Pages 403 - 406)

Veritext Legal Solutions
866 299-5127

Lee Cunningham - 11/15/2017

1  or retirement in April of 2011.  Then there was a
2  period of time that -- I believe there was shared
3  leadership between Brian Miller and Lani Kane-Hanan.
4  And then in September of '11 is when I was asked to
5  step into that position.
6      Q.  You're aware, are you not, that the Bachelor
7  Gulch terminated the Ritz-Carlton Management
8  Company from managing its club because they didn't
9  want it to be affiliated with the Marriott Vacation
10  Club?
11         MR. SELLINGER:  Objection to form.
12      A.  I'm aware that they have terminated the
13  agreement -- the management agreement -- and hired
14  Timbers in our place.
15  BY MR. REISER:
16      Q.  You know that from your meeting with Mike
17  Mullinex and Jo-Ann Perfido that they vehemently
18  opposed the affiliation.  True?
19      A.  I know they did, yes.
20      Q.  You know that their members voted
21  overwhelmingly to terminate the relationship with Ritz
22  based on the proposal to affiliate with the Marriott
23  Vacation Club?
24         MR. SELLINGER:  Objection to form.
25      A.  I know that they voted and met the

Page 407

1         MR. SELLINGER:  Objection to form.
2      A.  They communicated that they weren't
3  interested -- there was a renewal due with Jupiter and
4  they took a vote of their members and chose not to
5  renew with Ritz-Carlton, and subsequently hired
6  Timber.
7  BY MR. REISER:
8      Q.  Right.  And you knew that the membership of
9  Jupiter was overwhelmingly opposed to the affiliation
10  when they made that vote.  True?
11         MR. SELLINGER:  Objection to form.
12      A.  I know that there was concern.  I don't know
13  that they -- I don't recall a knowledge that they were
14  overwhelmingly opposed.
15  BY MR. REISER:
16      Q.  Did you put in a proposal to continue to
17  manage the club at the Jupiter Club?
18      A.  Yes.
19      Q.  And that got rejected.  True?
20      A.  That's correct.
21      Q.  By the membership?
22      A.  That's correct.
23      Q.  And you put in a proposal to continue to
24  manage the Bachelor Gulch Club and that got rejected
25  by the membership.  True?

Page 409

1  requirement of termination of the management or the
2  non-renewal of the management agreement and moved to
3  hire Timbers.
4  BY MR. REISER:
5      Q.  Did the sentiment of the members at the
6  Timbers Club have any influence on your decision to
7  affiliate the other clubs?
8      A.  The sentiment of the members at the Timbers
9  Club?
10      Q.  I meant the Bachelor Gulch Club.  Because you
11  knew that the members were overwhelmingly opposed to
12  the affiliation.  True?
13         MR. SELLINGER:  Objection to form.
14      A.  Do you want me to answer the first question?
15  BY MR. REISER:
16      Q.  I'd like you to answer whether you know that
17  the members of Bachelor Gulch were overwhelmingly
18  opposed to the affiliation with the Marriott Vacation
19  Club.
20      A.  Yes.
21      Q.  And are you aware that the Jupiter Club
22  members also overwhelmingly opposed the affiliation
23  with the Marriott Vacation Club and they also
24  terminated their relationship with Ritz because of the
25  proposed affiliation?

Page 408

1      A.  That's true.
2      Q.  And this all was at the same time that you,
3  as the vice president of Cobalt, were making the
4  decision to affiliate the Ritz-Carlton Clubs with the
5  Marriott Vacation Club.  True?
6         MR. SELLINGER:  Objection to form.
7      A.  The timing was similar within -- in the same
8  calendar year or 12-month period.
9  BY MR. REISER:
10      Q.  All right.  So you would agree that the other
11  remaining members of the Ritz-Carlton Club, such as
12  Tahoe, San Francisco, and Aspen, lost two clubs,
13  namely Jupiter and Bachelor Gulch, because of the
14  decision that Cobalt had made to attempt to affiliate
15  those clubs with the Marriott Vacation Club?
16         MR. SELLINGER:  Objection to form.
17      A.  No, I wouldn't -- I wouldn't characterize it
18  that way.
19  BY MR. REISER:
20      Q.  What other reason are you aware of that the
21  terminations at those two clubs occurred?
22      A.  Well, I believe it was based on the
23  information provided by members of the Bachelor Gulch
24  board; and, in some cases, that information wasn't
25  accurately portrayed and they made that decision.

Page 410

36 (Pages 407 - 410)

Lee Cunningham - 11/15/2017

1    Q. So -- okay.
2    A. They ran their campaign.
3    Q. What about the St. Thomas Club; did they have
4  a vote on the affiliation?
5    A. I'm trying to remember whether their vote on
6  the affiliation -- I don't recall whether their vote
7  on the affiliation was a separate vote or a -- was
8  combined with their vote to change the declaration.
9    Q. And --
10   A. But they were --
11   Q. Are you saying that the members voted to
12  change the declaration in St. Thomas?
13   A. Yes, they did.
14   Q. Do you remember a payment of 1.4 million to
15  the board of directors at St. Thomas in order to
16  attempt to get approval of the board of the
17  affiliation?
18       MR. SELLINGER: Objection to form.
19   A. That's not -- the payment was not for a vote.
20 BY MR. REISER:
21   Q. Okay. What was the payment for?
22   A. The payment was for -- I believe related to
23  delinquent dues accounts and the beginning of a
24  process for us to take responsibility or take back the
25  delinquent inventory as it was foreclosed upon by the
                                              Page 411

1    Q. How close was it to the affiliation vote?
2    A. It wasn't -- like I said, I'm not sure there
3  was a separate affiliation vote --
4    Q. How close was it to amend the declaration?
5    A. It was in proximity of that. It was --
6    Q. Several months before?
7    A. There was a -- no.
8    Q. How proximate to it was it?
9    A. It was as part of the overall negotiation of
10  going forward, and it was -- what they had -- were
11  looking for from us and moving the club forward and
12  supporting the vote of the members.
13   Q. So they did ask you for $1.4 million in order
14  to support the decision to change the declaration.
15  True?
16       MR. SELLINGER: Objection to form.
17   A. There was a negotiation of a number of
18  different changes and accommodations that were
19  included as part of the vote that went out to the
20  association -- to the members of the association.
21 BY MR. REISER:
22   Q. Were there any other monetary accommodations,
23  other than the 1.4 million, to influence that vote?
24   A. I don't recall. I just don't recall all the
25  details of that discussion.
                                              Page 413

1  association.
2    Q. Nonetheless, Marriott Vacation Club Worldwide
3  paid the board -- I'm sorry -- the association at
4  St. Thomas -- $1.4 million. True?
5    A. Yes.
6    Q. What obligations did they have to pay that
7  $1.4 million?
8    A. I don't believe we had any.
9    Q. You had no obligation to pay the
10  $1.4 million, but you did it out of the kindness of
11  your hearts?
12       MR. SELLINGER: Objection to form.
13   A. We paid it because -- as part of an overall
14  restructuring of the relationship, so that we could
15  deal with some of the issues facing that association,
16  primarily around delinquent club dues.
17 BY MR. REISER:
18   Q. Are you aware of any of the board presidents
19  or -- strike that. Are you aware of any of the board
20  of directors at St. Thomas taking the position that
21  the $1.4 million was paid in order to have the board
22  vote to affiliate?
23   A. I'm not aware of that.
24   Q. When was the payment made?
25   A. I don't recall the timing.
                                              Page 412

1    Q. Were you involved in the negotiations with
2  the board at St. Thomas over the payment of
3  1.4 million?
4    A. I was involved peripherally in that
5  discussion.
6    Q. Who was involved primarily?
7    A. There was discussion between -- with
8  Stephanie Sobeck, as well as with -- ultimately
9  with -- between our legal team and their counsel.
10   Q. Who at the legal team was involved in that
11  transaction?
12   A. I believe it was -- on our -- from our
13  business, it was Barbara Egolf and Mark Nagle.
14   Q. So Barbara Egolf and Mark Nagle were involved
15  with negotiating a payment of $1.4 million to the
16  board at St. Thomas as part of an agreement by the
17  board at St. Thomas to support the amendment to the
18  declaration to allow the sale of unsold inventory to
19  the NATO Trust.
20       Is that true?
21       MR. SELLINGER: Objection to form.
22   A. They were part of the final documentation and
23  discussions relative to changing the declaration,
24  which, in effect, was clarifying the ability for
25  Marriott to -- or for us to put the unsold developer
                                              Page 414

37 (Pages 411 - 414)

Lee Cunningham - 11/15/2017

1 inventory into the Marriott Vacation Club Destinations
2 Trust.
3    BY MR. REISER:
4       Q.  When did that happen?
5       A.  I would think that would've been 2014 --
6 early 2014 or --
7       Q.  And when did the affiliation at St. Thomas
8 happen?
9       A.  After the completion of their vote on the --
10 it was -- it was -- like I said, I don't know if it
11 was a separate vote.  It was part and parcel to
12 changing of the declaration.
13      Q.  So in St. Thomas, they voted on the
14 affiliation or were surveyed on the affiliation, but,
15 separately, they voted on an amendment to the
16 declaration.  True?
17      A.  That's what I just said.  I don't recall
18 whether we did a separate survey on the affiliation.
19 They were tied together -- the affiliation and the
20 change of the declaration.
21      Q.  How were they tied?
22      A.  Well, by understanding what the
23 association -- that a vote to put the inventory into
24 the MVCD Trust -- to change the declaration to allow
25 for that would, in fact, have Marriott Vacation Club

Page 415

1 Destinations exchange members able to exchange into
2 St. Thomas and come into their resort; and, in turn,
3 making that -- the ability for the fractional owners
4 to exchange their time and go out.
5       Q.  So you testified just a minute ago that there
6 was no obligation for Marriott Vacation Club to pay
7 the 1.4 million.  True?
8       A.  That's correct.
9       Q.  And you testified that they paid the
10 1.4 million as part of an effort to amend the
11 declaration to allow the sale of unsold inventory that
12 you had as Marriott Vacation Club to the NATO Trust.
13 True?
14      MR. SELLINGER:  Objection to form.
15      A.  The $1.4 million payment was part and parcel
16 to the -- to the agreement to move forward with the
17 vote and seek the support of the owners.
18 BY MR. REISER:
19      Q.  So the vote wouldn't have happened without
20 the payment of the 1.4 million?
21      A.  Without the commitment of the payment of the
22 1.4, had the -- if the vote would have -- if the vote
23 would have come out negative, there would not have
24 been a -- then we wouldn't have paid the 1.4, and
25 there wouldn't have been a change, because the members

Page 416

1 wouldn't have changed the documents to allow for that
2 inventory to go into the trust.
3       Q.  Did Marriott Vacation Club or anybody
4 involved with your organization have any input in the
5 vote to change the amendment and to amend the
6 declaration?
7       A.  Did -- I think we administered the vote
8 through Morrow.
9       Q.  Did you prepare any materials that went to
10 the members describing the benefits of the vote?
11      A.  We worked with the board to communicate to
12 the members what the vote meant, what would occur, and
13 what the benefits to the association would be from the
14 vote.
15      Q.  Did you offer any payment to the Aspen board
16 to support the amendment of their declaration to allow
17 the sale of the unsold inventory to the trust?
18      MR. SELLINGER:  Objection to form.
19      A.  Did we offer to the board?  You mean --
20 BY MR. REISER:
21      Q.  Did you make the similar offer to the Aspen
22 board to try to get them to amend their declaration,
23 so that you could sell the 13.4 percent unsold
24 inventory at Aspen into the trust?
25      MR. SELLINGER:  Objection to form.

Page 417

1       A.  I don't believe so.  We talked to the Aspen
2 board about a number of different scenarios or options
3 to consider relative to selling the remaining
4 inventory in the -- at Aspen.  And, ultimately, we
5 agreed and chose to move forward with a broker
6 arrangement to sell the remaining inventory.
7 BY MR. REISER:
8       Q.  Did the St. Thomas Club have a similar
9 provision in their declaration -- what we call "the no
10 further timeshare division" that's in paragraph 19.8
11 of the Aspen declaration and paragraph 19.5 of the
12 Bachelor Gulch declaration?
13      MR. SELLINGER:  Objection to form.
14      A.  I believe that -- I don't know whether it was
15 that exact provision or if you're quoting the right
16 provisions, but, clearly, there were -- Aspen,
17 St. Thomas, and Bachelor Gulch were all -- their
18 declarations were all similar.  They were developed at
19 a similar time -- in a similar timeframe -- and they
20 all did -- had language that prevented us from
21 putting -- prevented the developer from selling the
22 inventory through the MVCD Trust.
23 BY MR. REISER:
24      Q.  So you would agree that the declarations at
25 those three clubs you just mentioned did prevent the

Page 418

38 (Pages 415 - 418)

Lee Cunningham - 11/15/2017

1 sale of developer-owned inventory to the MVCD Trust?
2      MR. SELLINGER: Objection to form.
3 BY MR. REISER:
4      Q. True?
5      A. Those three clubs, yes, that's true.
6      Q. All right. You did indeed make an offer to
7 pay the Aspen board any delinquent maintenance fees if
8 they would agree to support and attempt to get the
9 member vote to change the declaration. True?
10      A. We very well could have. I don't believe --
11 I don't recall them being similarly situated as
12 St. Thomas. St. Thomas had a larger issue with
13 delinquent inventory -- delinquent membership.
14      Q. The issue with the delinquent inventory -- or
15 the delinquent maintenance fees in St. Thomas -- I
16 just want to understand that.
17      Is it true that there was a delinquency
18 problem because Marriott Vacation Clubs' finance
19 division had foreclosed on a number of memberships
20 there and had stopped paying the membership fees
21 during which time the foreclosures were undergoing?
22      MR. SELLINGER: Objection to form.
23      A. I believe the foreclosure -- any foreclosure
24 on the loan, if there were -- if part of the
25 delinquency beyond the loan included maintenance fees,

Page 419

1      Q. All right. And do you have any knowledge --
2 well, strike that. The securities division of the
3 Marriott Vacation Club is responsible for generating a
4 substantial amount of their income. True?
5      MR. SELLINGER: Objection to form.
6      A. I'm not sure what you mean by the
7 securities --
8 BY MR. REISER:
9      Q. Let me -- when I say securities -- let me
10 back up. I meant the lending arm of it.
11      Isn't it true that Marriott Vacation Club
12 also lends purchase money for people who want to buy
13 Marriott Vacation Club memberships, or, in the past,
14 Ritz-Carlton memberships?
15      A. Yes.
16      Q. So part of the business model is that you
17 provide the financing to the folks that are buying
18 your inventory; right?
19      A. That's correct.
20      Q. In St. Thomas, there was a large amount of
21 folks who utilized the financing by Marriott Vacation
22 Club. True?
23      A. That's true.
24      Q. How many -- what percentage of the loans that
25 Marriott Vacation Club made at St. Thomas were

Page 421

1 there was no obligation of the lender to pay those
2 back maintenance fees. Then once that was foreclosed
3 upon, if it was -- excuse me. If it was inventory
4 owned by the Ritz-Carlton Development Company or one
5 of our entities, it would've been -- the maintenance
6 fee was paid.
7 BY MR. REISER:
8      Q. In arrears or just going forward?
9      A. No. Just going forward.
10      Q. So the time period before the foreclosure and
11 before your financing arm took the property back,
12 those maintenance fees were never paid by -- once the
13 foreclosure happened?
14      A. They were never paid by the owner.
15      Q. They were never paid by the owner. And they
16 were never paid by Marriott Vacation Club until you
17 foreclosed. And then going forward, once you had
18 ownership of the property, you would pay the
19 maintenance fees going forward?
20      A. That's correct.
21      Q. But the delinquency that involved the HOA in
22 St. Thomas was as a result of the period of time
23 before Marriott foreclosed and the maintenance fees
24 became in arrears; correct?
25      A. That's correct.

Page 420

1 ultimately foreclosed on?
2      A. I don't know.
3      Q. More than 20 percent?
4      A. I don't know.
5      Q. You have no idea?
6      A. I do not.
7      Q. How much is the financing division of
8 Marriott Vacation Club responsible for in terms of
9 percentage of gross revenue for the company on a
10 quarterly basis, just in terms of big picture? 20,
11 25 percent?
12      A. Just give me a minute. Gross revenues,
13 they're probably, maybe, 10 percent.
14      Q. Okay. Are you in charge of that part of the
15 company's operations at all?
16      A. No.
17      Q. Do you have any knowledge of how the laws at
18 St. Thomas differ from the laws of, say, Aspen,
19 Colorado or California in terms of whether a loan in
20 foreclosure -- well, strike that. Strike that
21 question.
22      Do you have any idea what the average time
23 between a default in the loan -- the loans that were
24 made in St. Thomas -- and the actual foreclosure by
25 Marriott?

Page 422

39 (Pages 419 - 422)

Lee Cunningham - 11/15/2017

1    MR. SELLINGER:  Objection to form.
2    A.  I don't -- I don't know the actual amount of
3  time.  I would expect it to be somewhere in the
4  two-year range.
5  BY MR. REISER:
6    Q.  So during that two-year period, maintenance
7  fees are accruing from the defaulting owner; correct?
8    A.  That's correct.
9    Q.  Marriott Vacation Club has no real incentive
10 to foreclose at any time because, once they foreclose,
11 they have to start paying maintenance fees.  True?
12    MR. SELLINGER:  Objection to form.
13    A.  We do -- at this point, we absolutely do;
14 because the sooner we can get that inventory
15 foreclosed and put it in the Marriott Vacation Club
16 Destination Trust and sell it, then we have no
17 obligation on the maintenance fees while it sits
18 unsold.
19 BY MR. REISER:
20    Q.  Okay.  So that's true after the vote happened
21 allowing you to sell the inventory to Marriott,
22 though; right?
23    A.  That's correct.
24    Q.  Prior to that time, there was no incentive to
25 foreclose because you would have to start paying the

Page 423

1  maintenance fees.  Am I correct on that?
2    MR. SELLINGER:  Objection to form.
3    A.  On the mortgage foreclosures, we wanted to
4  get the inventory closed and/or foreclosed and back,
5  you know.  There's no incentive for us not to do that.
6  BY MR. REISER:
7    Q.  Why the two-year average delay between the
8  time of the default and the foreclosure?
9    A.  It's very slow to get through the foreclosure
10 process in St. Thomas.  It's just terribly slow.
11    Q.  During the time period during which the
12 member's in default and the time the Marriott Vacation
13 Club forecloses, it's true, is it not, that Marriott
14 Vacation Club actually took control of those units and
15 rented them out?
16    A.  No.
17    Q.  It's not true?
18    A.  No.
19    Q.  So those remained unrented during the entire
20 time that the member was in foreclosure?
21    A.  That's correct.
22    MR. REISER:  Okay.  I'm going to pass --
23    MR. MARX:  Mike, I didn't interrupt you
24  in the interest of efficiency to state the
25  following regarding St. Thomas questions and

Page 424

1    answers.
2    As I understand it, there's a settlement
3  agreement between the company and the
4  St. Thomas homeowners association, which has
5  an obligation of confidentiality that
6  requires us to designate the questions and
7  answers relating to some of the subjects as
8  confidential under the order that we have in
9  our case, which allows us to designate things
10 as confidential.
11    So I don't want to be overbroad here.  So
12 for the time being, let's designate the
13 questions and answers relating to St. Thomas
14 in general to be confidential.  We will go
15 back and designate specific questions and
16 answers that fall within that, if that's okay
17 with you.
18    MR. REISER:  Let me think about it, Ian,
19 because I don't know that that
20 confidentiality agreement would apply in the
21 case where there's a subpoena or other
22 litigation where we're asking him about it
23 because of issues that are relevant outside
24 the amount of the settlement or anything
25 else.

Page 425

1    I mean, I think that the facts of the
2  settlement bear on some of the issues and the
3  incentives and what happened in our case.  I
4  don't think that it necessarily would apply.
5  Let me think about it.
6    MR. MARX:  We're exercising our
7  obligation to designate the questions and
8  answers as confidential.
9    MR. REISER:  Okay.
10    MR. MARX:  Thanks.
11    DIRECT EXAMINATION, continued
12 BY MR. FERGUSON:
13    Q.  Mr. Cunningham, I just have two questions on
14 1003.  If you look at page 4 of Exhibit 1003, there's
15 a definition for associated club.  It says, "It means
16 a location pursuant to which membership in -- and the
17 membership program is available."
18    And then it goes on and says that, "In
19 accordance with such terms and conditions that may be
20 determined by the program manager and for which an
21 agreement similar to the subject agreement" -- which
22 is this -- "has been executed."
23    Are you aware of any other agreements similar
24 to the original affiliation agreement that have
25 been -- that are in existence?

Page 426

40 (Pages 423 - 426)

Lee Cunningham - 11/15/2017

**Page 427**

1 MR. SELLINGER: Objection to form.
2 A. I believe this affiliation agreement is one
3 that is in place between -- or in place with each of
4 the club locations. I'm not aware of it being in
5 place outside of that, other than potentially with
6 Lion & Crown, but I don't know how that --
7 BY MR. FERGUSON:
8 Q. So the other ones you're referring to that
9 would be similarly executed would've been clubs like
10 San Francisco, Bachelor Gulch, et cetera?
11 A. Yes.
12 Q. And then just real quickly, when we took the
13 break before, it was on 17.2a. There was a question
14 and there was an objection in the middle of -- 7.2a --
15 there was a question. You recall there was a problem
16 with objecting in the middle of a question, and I'm
17 not going to make any judgment on that, but just to
18 recall that period of time.
19 It was talking about -- you were talking
20 about neither the developer, the members association,
21 nor club manager shall be entitled to participate or
22 consent.
23 I think you came back from an 18-minute break
24 and you said that you believe that to mean that it was
25 discretionary with the program manager to allow --

**Page 428**

1 even though it says, "shall not be entitled to
2 participate," the program manager can allow those
3 entities to participate or consent?
4 MR. SELLINGER: Objection to form.
5 A. So what I said was that they are not entitled
6 to participate, but that there's nothing that says
7 that we can't get the feedback or consult with the
8 other components.
9 BY MR. FERGUSON:
10 Q. Yeah, but you got more than feedback from the
11 association. You entered into an agreement with them
12 to affiliate; right -- a memorandum of understanding?
13 MR. SELLINGER: Objection to form. You
14 want to show him the agreement you're
15 referring to?
16 MR. FERGUSON: Absolutely.
17 (Exhibit 1607 was marked for
18 identification.)
19 BY MR. FERGUSON:
20 Q. This is 1607. This is a memorandum of
21 understanding between Lion & Crown Travel Company, LLC
22 and Aspen Highlands Condominium Association. This
23 relates to the participation in the MVCD exchange
24 program; right?
25 A. That's correct.

**Page 429**

1 Q. And the MVCD program -- exchange program --
2 was entered into after the survey -- is what we refer
3 to as the affiliation?
4 MR. SELLINGER: Objection to form.
5 A. This isn't the affiliation agreement.
6 BY MR. FERGUSON:
7 Q. I know. This refers to the affiliation.
8 A. Correct.
9 Q. This document was the association and Lion &
10 Crown Travel Company, LLC agreeing that the members --
11 any members that sign up for the Lion & Crown exchange
12 program voluntarily can put their -- one or two of
13 their allocated weeks -- or one or more of their
14 allocated weeks into the MVCD exchange program. Is
15 that right?
16 MR. SELLINGER: Objection to form.
17 A. This is -- this is not the -- like I said,
18 it's not the affiliation. It's the understanding --
19 memorandum of understanding from the -- with the
20 board -- or with the association -- that there is
21 going to be an affiliation.
22 BY MR. FERGUSON:
23 Q. Would you consider it a consent under 7.2a
24 of Exhibit 1003 or not?
25 MR. SELLINGER: Objection. You're

**Page 430**

1 calling for a legal conclusion.
2 BY MR. FERGUSON:
3 Q. You can answer that.
4 A. I wouldn't consider it a consent. I would
5 consider it a memorandum of understanding.
6 Q. And at least that members association was
7 also participating in the process of affiliation?
8 MR. SELLINGER: Objection to form.
9 A. No. The association is -- they participated
10 in the process of collecting member feedback, but the
11 association is not participating in the affiliation.
12 I believe that's how that worked.
13 BY MR. FERGUSON:
14 Q. And when we took the break, did you have this
15 document in the back in your break room?
16 A. This one?
17 Q. Yes -- no -- 7.2a, the affiliation agreement,
18 Exhibit 1003?
19 A. Yes.
20 Q. Did you go through it while you were on the
21 break?
22 A. I went back through 7.2a.
23 Q. Pretty carefully?
24 A. Yes.
25 Q. That's when you came up with the idea that

41 (Pages 427 - 430)

Lee Cunningham - 11/15/2017

1  shall -- neither the developer, members association,
2  or club managers shall be entitled to participate in
3  or consent -- that's when you came up with the concept
4  that that was discretionary?
5      MR. SELLINGER: Objection to form.
6      A. That's where I realized, after reading the
7  language more carefully, that it was -- they are not
8  entitled, but it doesn't mean that they can't.
9  BY MR. FERGUSON:
10     Q. That's the way you interpret it?
11     A. That's how I interpret it.
12     Q. During the break?
13     MR. SELLINGER: Objection to form.
14     A. That's how -- after I read the language
15  carefully, that's my interpretation.
16  BY MR. FERGUSON:
17     Q. In that break, without divulging it, did you
18  discuss 7.2a with your counsel?
19     MR. SELLINGER: I'm going to instruct him
20  not to answer about our discussions.
21     MR. FERGUSON: I'm not asking for the
22  content. I'm asking the basic content, which
23  you have to put in the privilege log anyway,
24  which is, did you discuss this with your
25  counsel?

Page 431

1      testimony.
2          That's an egregious example of coaching,
3  Mr. Sellinger, and we're going to take it up
4  with the judge.
5      MR. SELLINGER: Hold on a minute. So the
6  record is clear, you took the break. The
7  questioning was finished. There was no
8  indication that the questioning was going to
9  continue with respect to that document. It
10  was your decision as to when to break. There
11  was nothing open. There was no subject
12  matter that was open. So that's your
13  decision.
14     MR. REISER: The record is going to
15  reflect that the break was taken only to
16  change the tape. I asked that the tape be
17  changed and we continue with the questioning.
18  Against my explicit request, you took an
19  18-minute break when I said I did not want to
20  break at this time, because I was asking him
21  about that document. He came back and
22  changed his testimony on the document.
23         And I'm going to take it up with the
24  judge. We'll just leave it at that.
25     MR. SELLINGER: No. Here's where we'll

Page 433

1      MR. SELLINGER: I'm instructing him not
2  to answer.
3      MR. REISER: I'm just going to state for
4  the record that I objected to the break at
5  that moment, and there was an 18-minute
6  break. I was taking the deposition and
7  asking the questions at that point. Counsel
8  took the opportunity to step outside for
9  18 minutes, without my authority for that
10  break, right in the middle of questioning
11  about this document, and then he comes back
12  and changed his answer.
13         So I'm going to take this up with each of
14  our judges. This is egregious coaching.
15     MR. SELLINGER: To the contrary. The
16  break was not taken without your authority.
17  You asked for the break and we took the
18  break.
19     MR. REISER: I said --
20     (Multiple speakers at once.)
21     MR. REISER: -- enough time to change the
22  tape. You took 18 minutes in that break, and
23  your witness met with you, with this
24  document, right during the questioning on the
25  document, and came back and changed his

Page 432

1  leave it. We have taken breaks at the
2  conclusion of tapes throughout this
3  deposition. Never once -- never once have I
4  broken the deposition of Mr. Cunningham prior
5  to the conclusion of tapes.
6      We are entitled to take a break after an
7  hour and 15 minutes or an hour and 20 minutes
8  during a deposition, and that's what we did
9  here. There was no indication that the
10  questioning was continued.
11     MR. REISER: The record is going to
12  reflect what it is.
13     MR. FERGUSON: That's what judges are
14  for, guys. Let's keep going.
15     I'm not sure if I showed him
16  Exhibit 1447. I think I had it out.
17  Mr. Sellinger and Mr. Cunningham, if you
18  would indulge me once, it would take too long
19  to dig through here. Do you have that?
20     THE REPORTER: I've got it.
21     MR. FERGUSON: You've got 1447?
22     THE WITNESS: Yes.
23     MR. FERGUSON: If you can blow up the
24  first paragraph of this e-mail from Babich to
25  her team?

Page 434

42 (Pages 431 - 434)

Lee Cunningham - 11/15/2017

1    MR. SELLINGER: I'll note again that this
2 is a document that was covered last Friday
3 during the deposition of Mr. Cunningham. We
4 have since gone back and forth three times at
5 least between you and Mr. Reiser with an
6 agreement that we were only allowing the
7 switch-off with the understanding that you
8 are not going to come back to subject matters
9 previously covered.
10    MR. FERGUSON: This is November 4, 2014.
11 It says, "The survey is similar to Aspen in
12 that we are not looking for a majority vote.
13 It's merely a mechanism to get feedback."
14    And did we cover this the other day,
15 Mr. Sellinger? Is that what you're saying;
16 we had this exhibit out?
17    MR. SELLINGER: Yes.
18 BY MR. FERGUSON:
19    Q. So you recall this exhibit and you recall
20 testifying about it?
21    A. Yes.
22    Q. And that testimony stands?
23    A. Uh-huh.
24    MR. FERGUSON: Thank you for indulging on
25 that.

Page 435

1    Q. 2013.
2    A. I don't recall. I'm sure there was a --
3 there could have been. I don't recall.
4    Q. But she's got numbers, I think, that target
5 below and above. Is that kind of the way they set it
6 up on her evaluation forms?
7    A. The way our evaluation forms -- there's a
8 number of business goals, there's a number of
9 characteristics or -- I forget the word that we
10 use -- leadership ability, execution management, and
11 so forth. And the net result of those scores is
12 calculated and the feedback is provided to the
13 associate at the end of the year.
14    Q. And that would go into things such as
15 advancement and compensation?
16    A. Sure.
17    Q. But as you sit here today, you don't recall
18 whether or not she had the affiliation of four clubs
19 as a goal for 2014?
20    A. I don't recall.
21    Q. Would it surprise you that she had the
22 affiliation of four clubs as a goal for 2013?
23    MR. SELLINGER: Objection to form.
24    A. No, I don't believe it would.
25 BY MR. FERGUSON:

Page 437

1 BY MR. FERGUSON:
2    Q. Can you take a look at Exhibit 1356? This is
3 a document called "Marriott Vacation Worldwide --
4 Vacations Worldwide -- Strategic Council, February 20,
5 2014."
6    What is the strategic council?
7    A. It is a meeting of the executive leaders of
8 our company that occurs roughly once a month. At this
9 time, once every four weeks.
10    Q. Who is on the strategic council or is it a
11 big group?
12    A. It's executive officers of our company, so
13 it's Steve Weisz, John Geller, Jim Hunter, myself,
14 Brian Miller, Lani Kane-Hanan, Cliff Delorey, Dwight
15 Smith, Mike Yonker.
16    Q. Would Sobeck be in that group?
17    A. No.
18    Q. Do you have anything to do with evaluating --
19 like, a review of employees? For example, Ms. Sobeck,
20 do you review her performance at the end of the year
21 as part of a process?
22    A. Yes.
23    Q. Do you recall whether or not she had as a
24 goal for 2013 to affiliate all four clubs?
25    A. I'm sorry. What year?

Page 436

1    Q. It's probably something she would have done,
2 because that's --
3    A. She would've been foreclosed on that effort.
4    Q. In 2013, you achieved -- I shouldn't say
5 that. Withdraw that.
6    Were you at all involved in the negotiation
7 of the memorandum of understanding we just saw in
8 Exhibit 1607 -- the one with the blue sticker? Were
9 you involved directly in the negotiation of the
10 wording for that document?
11    A. No.
12    Q. Do you know who was?
13    A. It would've been Stephanie, probably Barbara
14 Egolf, and the -- I don't know what input the
15 association board would have had in there. I don't
16 know whether they would have received advance copies
17 or not.
18    Q. And forgive me. I might've asked this the
19 other day, but I'll ask Mr. Sellinger to give me a
20 break. Do you know Mr. Marino, Mike Marino?
21    A. I met him one time at the board meeting that
22 I attended in Aspen.
23    Q. Did you ever negotiate any legal documents
24 with him?
25    A. No.

Page 438

43 (Pages 435 - 438)

Lee Cunningham - 11/15/2017

| | |
|---|---|
| 1 Q. I show you Exhibit 1372, Mr. Cunningham. | 1 some additional training with him. And then there was |
| 2 This is a draft letter to go out over your signature. | 2 a separate broker that was hired to sell the developer |
| 3 This particular draft is March XX, 2014. | 3 inventory, working with Ivan. |
| 4 Were you preparing -- I take it you were | 4 Q. Okay. And that's Mr. Klein with The Lore |
| 5 preparing this document -- this letter to your | 5 Institute? |
| 6 members -- in conjunction with other associates and | 6 A. That's correct. |
| 7 officers of your company helping? | 7 Q. Just with respect to the sales that have |
| 8 A. Yeah. It would've been primarily authored by | 8 been -- let's talk about sales first -- the sales |
| 9 others and I would review it at the end. | 9 would've been occurring since April of 2014, after the |
| 10 Q. Do you know that the word "opportunity" is | 10 MOU was signed and the affiliation acknowledgement. |
| 11 used five times in the first page? | 11 Do you get reports on resale prices at Aspen |
| 12 A. I haven't counted. | 12 Highlands or is that something that you care -- |
| 13 Q. And the word "voluntary" five times? | 13 A. I don't get those reports. |
| 14 A. Okay. | 14 Q. So you're not following what the values are, |
| 15 Q. Is that something that you pounded into the | 15 at least in terms of actual sales? |
| 16 members that it was voluntary and an opportunity? | 16 A. No. |
| 17 A. We wanted to make sure they understood that | 17 Q. Are you following the listing prices at all? |
| 18 it was voluntary. | 18 A. No. |
| 19 Q. Since your last deposition, have you | 19 Q. Are you getting any complaints, as the COO |
| 20 looked in -- I think I asked you very early in the | 20 and executive vice president of Marriott Vacation |
| 21 deposition last week -- as to whether or not you | 21 Worldwide, from owners about values since the |
| 22 looked into the population or the number of allocated | 22 affiliation? |
| 23 weeks that have been put into the program by folks at | 23 A. We receive some -- there were some complaints |
| 24 Aspen Highlands -- that have put their allocated weeks | 24 that suggest that the affiliation impacted their |
| 25 into the exchange program? | 25 values. Our indication, after the real estate bubble |
| Page 439 | Page 441 |
| 1 A. I did not go back and ask for that. | 1 burst in 2008, was when the values dropped out, and |
| 2 Q. So it's not information you have today? | 2 that was well before the affiliation. |
| 3 A. (Shakes head.) | 3 Q. Has there been any kind of recovery that |
| 4 Q. Thank you. Does the development company own | 4 you've seen, or you're not really following it? |
| 5 any inventory at all, either unsold original inventory | 5 A. I would get snippets here and there, but, no, |
| 6 or foreclosed-on inventory, at Aspen? | 6 I am not following it on a continual basis, as we |
| 7 A. At this point in time, no. | 7 don't have developer inventory to sell. |
| 8 Q. Do you know when that last -- when, | 8 Q. Would you agree that, for example, a |
| 9 approximately, the last fractional interest was sold | 9 three-bedroom unit at Aspen Highlands -- three |
| 10 or disposed of by the development company? | 10 bedrooms with a view of the mountain -- that it's |
| 11 A. In the last two months. | 11 worth a lot more -- it would be worth a lot more as a |
| 12 Q. Do you know what it sold for? | 12 single-owned unit as opposed to a fractional in your |
| 13 A. I do not. | 13 system? |
| 14 Q. Have you been following at all the values | 14 MR. SELLINGER: Objection to form. |
| 15 being achieved in sales since the affiliation in April | 15 A. I don't -- I don't know because I don't |
| 16 of 2014? | 16 really know the prices of whole ownership real estate |
| 17 A. I receive reports on the sales volumes | 17 in Aspen. |
| 18 from -- through the outside broker arrangement over | 18 BY MR. FERGUSON: |
| 19 the -- really, probably, mostly occurring in 2015. | 19 Q. It's not something you follow? |
| 20 Q. And the outside broker that was trained and | 20 A. No. |
| 21 approved was Ivan Skoric? | 21 Q. Has anybody been reporting to you about any |
| 22 A. Ivan was trained and was selected by the | 22 divergence in a three-bedroom in Aspen Highlands, or |
| 23 board as the resale broker for the Aspen members who | 23 in the environs, and whole ownership, as opposed to |
| 24 were interested in selling. | 24 fractionals, saying, "Hey, this is a differential in |
| 25 Ivan had worked with us in the past. We did | 25 pricing"? |
| Page 440 | Page 442 |

44 (Pages 439 - 442)

Lee Cunningham - 11/15/2017

| | |
|---|---|
| 1    A. No. | 1  conducted to determine the interest of the members to |
| 2    Q. Has anybody studied the impacts of being able | 2  voluntarily participate." |
| 3  to advertise The Ritz-Carlton Destination Club's | 3      The parties are, in this particular document |
| 4  impact on sales of Marriott Vacation Club points? | 4  at least, Lion & Crown Travel Company and the |
| 5      MR. SELLINGER: Objection to form. | 5  association; right? |
| 6    A. No. I don't know of any studies or any | 6    A. Yes. |
| 7  attempt to try and measure that. | 7    Q. It says, "The parties agree that the survey |
| 8  BY MR. FERGUSON: | 8  of the members should be conducted." We've been |
| 9    Q. I take it you do -- you would agree that you | 9  talking about that for a while, so I'm not going to |
| 10  do target the upper echelon, at least Premier and | 10  spend too much time on it. |
| 11  Platinum -- you do try to sell points to people based | 11      But was there ever a -- was that agreed upon |
| 12  upon the fact that they get into an RCDC property? | 12  when -- withdraw that. Was that agreed upon with |
| 13      MR. SELLINGER: Objection to form. | 13  Randy Mercer or the board? What do you recall about |
| 14    A. We tell -- we try to sell everybody as many | 14  this agreement? |
| 15  points as we can, as much ownership as they are | 15      MR. SELLINGER: Objection to form. |
| 16  interested in having. And we highlight all the | 16    A. Are you asking who -- the agreement to do the |
| 17  inventory and the advantages of owning more points, | 17  survey? |
| 18  including access or the ability -- or having enough | 18  BY MR. FERGUSON: |
| 19  points to go stay at a Ritz-Carlton Club property. | 19    Q. Yeah. When did you all agree that there was |
| 20  BY MR. FERGUSON: | 20  going to be a survey as opposed to a vote? Because, |
| 21    Q. Did you ever hear the -- do you recall the | 21  obviously, you talked to Ms. Sobeck and Ms. Egolf. |
| 22  situation where some of your sales force was literally | 22  When did you let on to Mercer and Oliver, at least, |
| 23  laughing at people about owning the fractional | 23  who were taking the lead here? |
| 24  interest at Ritz Aspen? | 24      MR. SELLINGER: Objection to form. |
| 25    A. No, I'm not aware of that. | 25    A. Where I think the language changed from a |
| Page 443 | Page 445 |

| | |
|---|---|
| 1    Q. Do you recall saying to Randy Mercer | 1  vote to a survey occurred somewhere in the September |
| 2  something to the effect of, "I sincerely apologize for | 2  timeframe. That's just based on -- I saw another -- a |
| 3  what our salesmen are doing and see they're | 3  draft of the cover letter for the survey. I forget |
| 4  punished -- see that they're punished"? | 4  what it was, but it was a draft that was dated -- that |
| 5      Do you recall that at all? | 5  didn't have a complete date, but had September at the |
| 6    A. I don't. | 6  top. |
| 7    Q. Let me show you Exhibit 1383. Sir, this is a | 7  BY MR. FERGUSON: |
| 8  draft of the memorandum of understanding between -- | 8    Q. But this document is obviously after the |
| 9  between the Lion & Crown Travel Company and Aspen | 9  affiliation, sometime before April 17, 2004, when 1607 |
| 10  Highlands condominium association. Have you seen this | 10  was signed. This is an earlier draft of it. |
| 11  redline before? | 11      If you look at page 1 of Exhibit 1383, the |
| 12    A. No. I don't recall seeing it. | 12  last whereas clause -- there's three of them -- you'll |
| 13    Q. If you look -- let me see if this helps. If | 13  see it says, "Whereas, a majority of associations" -- |
| 14  you look at the second whereas clause, you said, "The | 14  crossed out -- "members voted" -- and that's crossed |
| 15  parties agree that a survey should be conducted to | 15  out. |
| 16  determine the interest of a majority of association | 16      So in this particular draft redline, someone |
| 17  members in participating in the Lion & Crown." | 17  had used the word "voted." Somebody did, right? |
| 18      Someone's taken out the word "majority," | 18      MR. SELLINGER: Can you show the witness |
| 19  right? | 19  the cover letter so he knows who's editing |
| 20    A. They took out that whole section. I don't | 20  whose document? |
| 21  know who marked that. | 21      MR. FERGUSON: This is another one where |
| 22    Q. Well, they did leave it -- "the parties agree | 22  I have the association's documents, but not |
| 23  that" -- let me take that out. What was left was -- | 23  yours, so I don't know. |
| 24  what we see in this whereas clause in 1607, was, "The | 24      MR. SELLINGER: Every document I've seen |
| 25  parties agree that a survey of members should be | 25  here, whether it's been produced by the |
| Page 444 | Page 446 |

45 (Pages 443 - 446)

Lee Cunningham - 11/15/2017

1 association or Marriott, has a cover letter
2 that shows whose document is being addressed.
3     MR. FERGUSON: Let me see if I can help
4 you. I don't know if I can.
5     MR. MARX: For example, it could be an
6 e-mail from Mike Marino.
7     MR. FERGUSON: Could be.
8     Could you look at 1383 and see if there's
9 any documents in the Bates range for 14879?
10    THE TECHNICIAN: It goes to 84?
11    MR. FERGUSON: I'll come to that in a
12 minute.
13 BY MR. FERGUSON:
14    Q. The bottom line is, you don't know who --
15 without seeing some cover letters from Marino or Egolf
16 or Sobeck, you don't know who put the word "voted" in
17 and who took it out?
18    A. No.
19    Q. So someone was using it at some point in the
20 negotiation of this instrument?
21    MR. SELLINGER: Objection to form.
22    A. It appears.
23 BY MR. FERGUSON:
24    Q. Go back to Exhibit 1607. Paragraph 2, it
25 says, "The parties acknowledge that the executive
                                                Page 447

1 board, on behalf of the association, of the RCDC" --
2 I'm sorry -- I got the wrong -- oh, paragraph 2 -- "as
3 a result of the mutual interests and the demonstrated
4 interest of members."
5     MR. SELLINGER: I'm sorry. Tell me where
6 you're reading.
7     MR. FERGUSON: Sorry. I don't have that
8 in front of me right now. It's
9 paragraph 3 -- I'm sorry -- of Exhibit 1607.
10 BY MR. FERGUSON:
11    Q. As a result of the mutual interest, there's a
12 demonstrated interest?
13    A. Yes.
14    Q. And I take it you're referring to the 74
15 people?
16    A. The survey results, yes.
17    Q. The 74 people?
18    A. Yes.
19    THE VIDEOGRAPHER: Counsel, we have five
20 minutes left on this media.
21    MR. FERGUSON: Really?
22 BY MR. FERGUSON:
23    Q. Real quickly on that one, Exhibit 1392 --
24 just -- I wanted to get that in the deposition record.
25 I think Mr. Reiser had shown you the acknowledgement
                                                Page 448

1 and joinder to affiliation agreement between Lion &
2 Crown and Marriott Resorts Travel Company for San
3 Francisco.
4     Is this the -- is this for -- is this the
5 same document, acknowledgement for Aspen Highlands?
6 If you look at the first paragraph -- no -- they
7 wouldn't have signed it. It would've been --
8     A. Yeah. This is the acknowledgement of the
9 affiliation.
10    Q. If you look at page 2 of Exhibit 1392,
11 there's a whereas clause. It's the third one in that
12 page. It says, "whereas, the parties have agreed as a
13 special accommodation to allow the association to
14 determine whether" -- it says, "by a survey of the
15 association members or such other method as the
16 association and Lion & Crown mutually agree to enter
17 into this acknowledgement."
18    What is meant by special accommodation?
19    A. I think that we didn't have the obligation to
20 allow the association to enter this acknowledgement.
21    Q. Did you ever tell or did you ever -- did you,
22 sir, as a COO and executive vice president of Marriott
23 Vacation Worldwide, ever tell Mr. Mercer that you
24 thought you were giving him and his members a special
25 accomodation with that survey?
                                                Page 449

1     MR. SELLINGER: Objection to form.
2     A. I don't recall using those words.
3     MR. FERGUSON: Well, I've run out of
4 stuff to do. You have two minutes?
5     THE VIDEOGRAPHER: Three.
6     MR. FERGUSON: You want to go ahead?
7     MR. REISER: Why don't we take a break?
8     THE VIDEOGRAPHER: The time is 6:40. We
9 are off record.
10    (Brief recess.)
11    THE VIDEOGRAPHER: The time is 6:54.
12 This is media four in the deposition of Lee
13 Cunningham.
14    (Brief recess.)
15    MR. FERGUSON: We are concluding our
16 deposition of Mr. Cunningham. As I told
17 Mr. Marx in the hallway -- part of the
18 hallway -- that we'd keep it open if there
19 was any -- because we haven't got all the
20 production yet. If there's any documents we
21 need Mr. Cunningham to come back for, we
22 reserve our right. Hopefully that's not the
23 case, but that's our caveat today.
24    MR. SELLINGER: Given he's the COO of the
25 company, we will try and accommodate you for
                                                Page 450

46 (Pages 447 - 450)

Lee Cunningham - 11/15/2017

| | |
|---|---|
| 1   information you need, but it will certainly | 1   on to say, "Thank you." |
| 2   be our effort that, whatever information | 2       Do you see that? |
| 3   might be needed, that it would easily be | 3   A. I do. |
| 4   obtained from some witness other than the | 4       MR. FERGUSON: What is that exhibit? |
| 5   chief operating officer of the company. | 5       MR. SELLINGER: This is 1314. |
| 6       MR. FERGUSON: It could be. We'll see if | 6   BY MR. SELLINGER: |
| 7   that happens. | 7   Q. And then if you turn to page 4 of the |
| 8       MR. REISER: Well, one of the things that | 8   document, you see a comment by Mr. and Mrs. Edward and |
| 9   can shorten the efforts is the stipulation as | 9   Nancy White? |
| 10   to authenticity of any documents you | 10   A. Yes. |
| 11   produced, if that's something you guys would | 11   Q. It reads, "We need other destinations since |
| 12   be willing to do as well. | 12   loss of Maui, et cetera." |
| 13       MR. SELLINGER: Today, obviously, I'm not | 13       Do you see that? |
| 14   in a position to do that, but we're certainly | 14   A. Yes. |
| 15   prepared to deal with reasonable stipulations | 15   Q. Did I read that correctly? |
| 16   for both sides that makes sense. | 16   A. Yes. |
| 17       MR. REISER: That prevents us from having | 17   Q. If you turn to page 5, do you see the comment |
| 18   to -- you know. | 18   from Mr. and Mrs. Keith and Sarah Faller, second one |
| 19       MR. SELLINGER: Understood. We're not | 19   down? |
| 20   looking to waste anybody's time at trial or | 20   A. Yes. |
| 21   in discovery. | 21   Q. It states, "We are very interested in having |
| 22       MR. REISER: Fair enough. | 22   more vacation options than the current lineup of |
| 23       MR. SELLINGER: Rational stipulations | 23   Ritz-Carlton Destination Clubs. We have enjoyed |
| 24   make sense. | 24   visits to St. Thomas and Jupiter, Florida. The |
| 25           CROSS-EXAMINATION | 25   Marriott Vacation Club has several properties that we |
| Page 451 | Page 453 |

| | |
|---|---|
| 1   BY MR. SELLINGER: | 1   would be interested in visiting and are particularly |
| 2   Q. Mr. Cunningham, I show you what's been marked | 2   interested in European sites." |
| 3   as Exhibit 1314. This is one of several compilations | 3       Did I read that correctly? |
| 4   of data, commenting from members, that Mr. Ferguson | 4   A. Yes. |
| 5   showed you earlier today. | 5   Q. On page 6, you see a comment, second from the |
| 6       Do you recall being questioned about this by | 6   bottom -- there's no name, but it says 76387776. |
| 7   Mr. Ferguson? | 7   A. Yes. |
| 8   A. I do. | 8   Q. It actually looks likes it's Dr. and Mrs. |
| 9   Q. And you recall being shown on this document | 9   Daniel and Jane Miller, correct? |
| 10   and a couple of similar documents negative comments | 10   A. That's correct. |
| 11   from certain members of Aspen and/or other clubs? | 11   Q. It states, "At this point, I just want the |
| 12   A. Yes, I do. | 12   opportunity to exchange, not even knowing how many |
| 13   Q. He didn't read you all of the comments that | 13   points I have. May never do it, but definitely want |
| 14   were given, did he? | 14   the possibility open." |
| 15   A. No. | 15       Do you see that? |
| 16   Q. And if you turn to page 2 of this document, | 16   A. I do. |
| 17   do you see that there are comments from Mr. and Mrs. | 17   Q. On page 7, do you see the comment from Mr. |
| 18   Bill and Linda Schaeffer? | 18   and Mrs. Charles and Diana Romito? |
| 19   A. Yes. | 19   A. Yes. |
| 20   Q. And it states, "We greatly appreciate | 20   Q. It says, "I'm still at a loss as to why owner |
| 21   Marriott working with RCDC-Aspen Highlands' board in | 21   approval is required for this voluntary program. This |
| 22   developing this affiliate exchange program. I believe | 22   was to have been accomplished two years ago." |
| 23   it addresses the concerns of our members, maintains | 23       Did I read that right? |
| 24   the value of our ownership, and provides the expanded | 24   A. Yes. |
| 25   travel opportunities most of us want." Then it goes | 25   Q. And turning to page 10, do you see the |
| Page 452 | Page 454 |

47 (Pages 451 - 454)

Lee Cunningham - 11/15/2017

1  comment or Mr. and Mrs. Robert and Jeanine Harris?
2  A. 10?
3  Q. Yes.
4  A. Yes.
5  Q. It states, "This seems like a win-win."
6  Did I read that right?
7  A. Yes.
8  Q. Now, while you may not have seen this
9  particular survey compilation of comments or others,
10  were you generally aware that there were members, such
11  as those that I've read, who were very much in favor
12  of the affiliation?
13  A. Yes.
14  Q. Now, you testified that you personally were
15  not reviewing these surveys at the time?
16  A. That's correct.
17  Q. Was somebody on your staff doing that?
18  A. Yes. There's a number of people that would
19  track and keep track of the comments coming back and
20  the votes, including -- I don't know -- in the various
21  surveys, it would have included Stephanie Sobeck
22  and/or others on my staff that are responsible for
23  providing that feedback.
24  Q. And Stephanie Sobeck, who would have received
25  the feedback of the member comments in detail from
                                                    Page 455

1  because it will cause no additional burden on member
2  availability in ongoing operations of our property.
3  One, a current member gives up their allocated week in
4  April, as an example, and a Marriott member comes to
5  Aspen Highlands on that specific week only, there will
6  be no impact on your availability."
7  "Two, it is a specific week exchange. It's
8  no different from you as a member renting or giving
9  your allocated week to a friend, colleague, or family
10  member."
11  Do you see that?
12  A. Yes.
13  Q. And those statements are accurate?
14  A. They are.
15  Q. Are they making it clear that, when a Ritz
16  Club owner selects to enroll his or her week and
17  exchange it, that a Marriott member would come in for
18  that week?
19  A. That's correct.
20  Q. And, lastly, I show you Exhibit 1049. This
21  document was shown to you in your deposition last
22  Friday.
23  Do you recall that exhibit?
24  A. I do.
25  Q. So this is on August 15, 2012, and it appears
                                                    Page 457

1  these surveys, she was part of the team you consulted
2  with in making the decision on behalf of Cobalt to
3  approve the affiliation?
4  A. That's correct.
5  Q. Now, do you recall also that there was some
6  questions by either Mr. Ferguson or Mr. Reiser about
7  some of the letters that were sent to members that did
8  not specifically talk about Marriott folks having
9  access to properties when somebody from Ritz offered
10  their property -- enrolled and elected to change their
11  property -- correct?
12  A. Yes.
13  Q. I show you Exhibit 1536. This is one of the
14  exhibits that was shown to you. This is a draft
15  letter from -- yeah -- this is a draft letter from,
16  apparently, Mr. Mercer, on the Aspen board, to the
17  Aspen Highlands members.
18  Do you see that?
19  A. Yes.
20  Q. In one of the paragraphs that you were not
21  asked about when you were shown the exhibit is the
22  fifth bullet point.
23  Do you see that?
24  A. Yes.
25  Q. It states, "We are in favor of this offering
                                                    Page 456

1  to be an e-mail from Marriott Vacation Club, and
2  advising of certain inventory, excluding -- excuse
3  me -- including a Ritz-Carlton Club stay; do you see
4  that -- for Premier and Premier Plus owners?
5  A. Yes.
6  Q. Do you know how it is that, in 2012, Marriott
7  was able to offer access to a Ritz-Carlton Club stay
8  to Premier and Premier Plus members?
9  A. Yes. That was one of the questions last
10  Friday that -- I believe I answered "I don't know,"
11  because I was struggling to remember how that -- as I
12  reviewed some of the documents, I was reminded that
13  the access to inventory at the Ritz-Carlton Clubs that
14  was being offered in August of 2012 was
15  developer-owned inventory that it was renting to
16  the -- just like any other member is allowed to
17  rent -- to the Marriott Vacation Club Destinations
18  exchange program; and they, in turn, were making it
19  available on a points basis to the members of that
20  exchange company.
21  We do that for Ritz-Carlton Hotels. Part of
22  the MVCD exchange program has a component that allows
23  owners to use their points and go to Ritz-Carlton
24  Hotels, Marriott Hotels, go on cruises, and all of
25  those are -- those accommodations or those cruises are
                                                    Page 458

48 (Pages 455 - 458)

Lee Cunningham - 11/15/2017

1 paid for by the exchange company, and then the points
2 are utilized to get access to those.
3      MR. SELLINGER: I have nothing further.
4      MR. REISER: I have a couple of questions
5 for cross.
6      MR. FERGUSON: I do too. Go ahead.
7            REDIRECT EXAMINATION
8 BY MR. REISER:
9      Q. On 1536 -- you just went over that with
10 Mr. Sellinger -- I'd like to focus on that same bullet
11 point.
12      MR. REISER: I'm wondering if we can get
13      that on screen.
14      THE TECHNICIAN: I'm having trouble
15      closing this.
16      MR. REISER: Okay.
17 BY MR. REISER:
18      Q. Is it true, though -- strike that. When
19 Mr. Sellinger read you this -- a portion of this
20 exhibit -- he focused on the fourth bullet point
21 stating that --
22      THE TECHNICIAN: 1536 is up.
23 BY MR. REISER:
24      Q. Let me start over. Do you know whether the
25 letter you just read from was the final letter that

Page 459

1 testimony earlier about -- within the last month.
2      A. Okay.
3      Q. October 24th. He testified, in no uncertain
4 terms, that he understood the program that he was
5 recommending to the members allowed a member to trade
6 in a week to the Marriott Vacation Club through Lion &
7 Crown, and a Marriott Vacation member could use that
8 one week.
9      A. Okay.
10      Q. Was that your understanding of what you guys
11 discussed would be the program?
12      MR. SELLINGER: Objection to form.
13      MS. LIVINGSTON: I object to form as
14      well.
15      A. The way the program works is, if you -- if an
16 Aspen -- if a Ritz-Carlton Club member is enrolled in
17 the exchange program, elects to deposit a week in the
18 exchange program, then that week becomes available for
19 use by the other members of the exchange program -- of
20 the Marriott Vacation Club Destinations exchange
21 program -- including other Ritz-Carlton members.
22      So that week could be occupied by a Marriott
23 Vacation Club Destinations owner or by a St. Thomas
24 owner who is enrolled in the program as well, or any
25 number of -- anyone that is a member of a -- if they

Page 461

1 went out?
2      A. I don't know whether this was the final
3 letter. I believe this information was included -- or
4 this clause was included in the final letter that went
5 out to the members.
6      Q. Okay. From the first page of this exhibit,
7 it's clear that Stephanie Sobeck sent you this letter
8 before it went out to the members. True?
9      A. That's correct.
10      Q. And you approved this letter?
11      A. I don't believe so. She was sending it to me
12 as an FYI, that, "Hey, this is the letter that Randy
13 wants to send out and I made a couple edits."
14      Q. And you don't know, as you sit here today,
15 what edits she made?
16      A. I can't tell on this copy.
17      Q. Why would she make any edits to Randy
18 Mercer's communications to the members?
19      A. If he had asked her for input to make sure
20 that -- if nothing else, to make sure that it was
21 accurate; and some of the specifics of the exchange
22 program, the members of the board would not fully
23 grasp or understand. He just wanted to make sure we
24 were clear.
25      Q. Okay. So Randy Mercer gave his deposition

Page 460

1 had enough points to be able to make that reservation,
2 they would be eligible to do so.
3 BY MR. REISER:
4      Q. Including any Marriott Vacation Club member
5 too; right?
6      A. Absolutely.
7      Q. I understood that. I don't think we disagree
8 on that.
9      Randy Mercer testified that he understood
10 that it would have to be the exact same member that
11 would use it for one week. In other words, it would
12 be a week for a week. And he said that there would be
13 no opportunity for more than one member of any of
14 those clubs you mentioned to use that week because the
15 week was not splittable.
16      Was that your understanding of what this
17 Exhibit 1536 was intended to convey?
18      MR. SELLINGER: Objection to form.
19      MS. LIVINGSTON: Object to the form of
20      the question.
21      A. No. It was meant that no Marriott Vacation
22 Club member could come in to -- other time. They
23 would only be able to come into that week. I don't
24 believe there was a restriction -- a, per se,
25 restriction -- on the number of nights that an

Page 462

49 (Pages 459 - 462)

Lee Cunningham - 11/15/2017

1 exchange would be required to meet. I know there
2 wasn't.
3 BY MR. REISER:
4    Q. Okay. So you would be surprised if Randy
5 Mercer testified that he believed that the program
6 only allowed a week-for-week exchange to the same
7 person?
8    MS. LIVINGSTON: Object to form.
9    MR. SELLINGER: Objection to form.
10    A. It wasn't my understanding of the
11 communication that we had with Randy.
12 BY MR. REISER:
13    Q. That week-for-week swap is not unusual. In
14 fact, that's how it worked with a Cobalt swap with
15 other Ritz Clubs; right -- it had to be a week for
16 week?
17    A. There are many other forms of --
18    Q. No. I'm just asking you under The
19 Ritz-Carlton Destination Club, prior to the Portfolio,
20 every member who wanted to trade for another week for
21 St. Thomas or for Bachelor Gulch had to deposit a
22 week. One member could take that week and exchange it
23 into an Aspen member's week. Isn't that true?
24    A. I don't believe a sister club exchange is
25 limited to just a week for week -- a one-week

Page 463

1 entirety. For instance, I don't believe you have to
2 use all seven of your nights when you do a sister club
3 exchange into San Francisco.
4    Q. That's the only exception?
5    A. No. I don't know whether there are other --
6 I don't know whether you can take a week in part in a
7 sister club exchange. I'd have to go back and
8 double-check the rules.
9    Q. You're the COO of this club and you don't
10 know that?
11    A. I don't know it off the top of my head. I
12 don't administer it on a day-to-day basis.
13    Q. But you remember, at some point in the club's
14 history, at least -- do you remember that much, that a
15 week -- an exchange between Ritz Club members would
16 have to be a week for a week, or do you think they can
17 divide it up?
18    A. I don't know whether there was the
19 opportunity early on in the clubs for a -- to do a
20 split week -- would be what we would be talking about.
21    Q. All right. Fair enough. Let's see what
22 Randy Mercer says, because, luckily, he's on tape too.
23    A. That's fine.
24    Q. Marriott Vacation Club, the 1049 exhibit.
25    A. Uh-huh.

Page 464

1    Q. So after testifying last Friday that you
2 thought this was a rogue member of the sales team at
3 Ritz-Carlton Destination Club, you've now reconsidered
4 and you've come to the conclusion that this is a
5 perfectly appropriate e-mail to send out, because
6 Marriott Vacation Club International, as the owner of
7 unsold inventory, is perfectly -- it's perfectly
8 acceptable, because it's like renting your unit for
9 them to put inventory into the Marriott Vacation Club
10 and have it available to Marriott Vacation Club
11 members.
12    That's your testimony?
13    MR. SELLINGER: Objection to form and
14 mischaracterizing his testimony from last
15 week.
16    A. This is not the e-mail that I said was
17 potentially from a rogue sales executive. That was a
18 different one that had a different format. This was
19 the one that had this company communication; right?
20 And you asked me, how did we have the right to utilize
21 this inventory. And my answer was, "I don't know."
22    That bothered me, because I was trying to
23 understand why we would send out an official company
24 communication that was purporting rights to access of
25 something that we didn't have rights to.

Page 465

1    That's why I went back and re-read through
2 some of the documents in the discovery packet and
3 found the information that this was being done based
4 on the rental of the developer inventory to the
5 Destination Club, which we had the right to do as any
6 other owner.
7    Q. So, mechanically, how did that work?
8    A. Mechanically?
9    Q. Mechanically, how did it work to get your
10 unsold inventory into the Marriott Vacation Club?
11 Would you rent that to them?
12    A. We would rent that -- we would take the
13 allocated time, make that available through points --
14    Q. Would they pay you for it?
15    A. Pay the developer?
16    Q. Would they pay you for it, the developer that
17 owned it?
18    A. Yes. They would pay that through inter -- I
19 don't know whether there was a transfer of funds. It
20 would all take place -- the financials of that all
21 take place within the rental component of our
22 business.
23    Q. So you weren't really renting it. It was
24 going straight to the coffers of Marriott Vacation
25 Club?

Page 466

50 (Pages 463 - 466)

Lee Cunningham - 11/15/2017

**Page 467**

```
 1    A.  The points were being used --
 2       MR. SELLINGER:  Hold on.  Objection to
 3  form.
 4    A.  The inventory was available.  Points were
 5  being used.  The inventory -- inventory somewhere
 6  associated with those points was being rented to pay
 7  for the cost of accessing that inventory in Aspen.
 8  BY MR. REISER:
 9    Q.  Okay.  That's a little different than
10  somebody taking his one week, renting it to somebody,
11  and then getting the benefit of that one week as a
12  member of the club.  That's a little different, don't
13  you think, or is that just the same to you?
14    A.  It's a difference -- different steps, but
15  it's the same outcome.  It's the same process of
16  making that inventory available for rent.
17    Q.  Okay.  And you understood that this letter
18  was one of the letters that the attorneys for the
19  association sent a cease-and-desist letter?
20    A.  That's correct.
21    Q.  So the lawyers at Brownstein Hyatt, hired by
22  the association, took a different view by your ability
23  to, quote, unquote, rent this inventory through
24  putting it into Marriott Vacation Club's pool of
25  available units?
```

**Page 468**

```
 1       MS. LIVINGSTON:  Object to form.
 2    A.  They took a different opinion, and our
 3  response from our attorneys pointed out the fallacy in
 4  their opinion and pointed to the rights that we had to
 5  rent that inventory.
 6  BY MR. REISER:
 7    Q.  So you believe your lawyers at Baker
 8  Hostetler were better than the lawyers the board hired
 9  at Brownstein Hyatt, I guess?
10    A.  They were our attorneys giving us advice, and
11  that was the advice we went with.
12    Q.  So you were relying on advice of counsel?
13    A.  Yeah, and confirmed our read of the rights
14  as an owner of that inventory.
15       MR. REISER:  I was going to put on -- I
16  did find the spreadsheet and the ability
17  to -- since you read some straight comments
18  from some members of the survey, I think I'd
19  like to ask the COO about the 750 comments
20  that are displayed on the screen here.  About
21  98 percent of them are extremely negative.
22       MR. SELLINGER:  Are we talking about the
23  exhibit that I asked him about, because --
24       MR. REISER:  I'm talking about the
25  exhibit you produced in native format.
```

**Page 469**

```
 1  That's the one I'm talking about.
 2       MR. SELLINGER:  This is Exhibit 1314?
 3       MR. FERGUSON:  It's the one they couldn't
 4  find before, Philip.
 5       MR. REISER:  We could find it, but it's
 6  in native format.  It's RCDC004876_nav.xlsx.
 7       MR. SELLINGER:  Well, this certainly is
 8  not --
 9       MR. REISER:  It's your production.
10       MR. SELLINGER:  I didn't say it wasn't
11  our production.  I was about to say that
12  that's certainly a cross relating to the
13  examination that I did of a particular
14  document.
15       MR. REISER:  Well, I'm just going to ask
16  him about comments.  You asked him about
17  comments that he didn't review, so I'm going
18  to ask him about other comments he may not
19  have reviewed.  So it's a fair use of time
20  here.
21  BY MR. REISER:
22    Q.  Why don't we go to the top?  The first one,
23  the RCDC satisfaction -- by the way, this was in
24  August of 2012 after your webinar.  We can go through
25  it, but I'll just go through the first couple.
```

**Page 470**

```
 1  "The Marriott has abandoned the concept and
 2  totally cheapened the product, destroying the value of
 3  these memberships."
 4    The second one is, "You foolishly and
 5  stubbornly lost BG by diluting our membership with
 6  Marriott.  What next?"
 7    The third one is, "I was flat out lied to by
 8  sales representatives in the purchase of the Kapalua
 9  property purchased in particular -- Michael Cornelius.
10  Now I see half of your properties crumbling under poor
11  financial planning and foresight.  I really hope you
12  can turn the relationship with your club members
13  around by treating us the way you originally promised
14  us using the resources we know you have available."
15    Did you read any of those comments,
16  Mr. Cunningham?
17    A.  I don't recall whether I read it.
18    Q.  Do you think Stephanie Sobeck read it in her
19  duties to review comments by the members?
20    A.  I would imagine.
21    Q.  You would imagine she did?
22    A.  Yes.
23    Q.  Fourth one, "Ritz brand diluted by Jet
24  Setter, the Marriott Vacation users, way overpriced
25  for value, Ritz Clubs going away -- Hawaii, Bachelor
```

51 (Pages 467 - 470)

Lee Cunningham - 11/15/2017

1  Gulch, and Bahamas, sold off most of Tahoe."
2      Next one, "Extreme cost-cutting measures were
3  taken which severely detract from any enjoyment.  No
4  juice or croissants available in the lounge anymore.
5  No bath soap available."  We can go on from that one.
6      The one after that says, "The selloff of
7  Jupiter to Trump without due consideration to
8  homeowners' interest has damaged our unit's value.
9  Cannot sell it."  I'll skip it.
10     "It's difficult to book SF when the company
11  has now expanded its reach with the Marriott.  They're
12  also renting out unsold nights, making it difficult
13  for members to trade or sell their nights for other
14  properties of their own.  Also, many clubs have
15  closed, reducing attractiveness and the flexibility of
16  the program.  Lastly, the fees are extremely high."
17     The next one, "What we purchased is not what
18  we have.  There was no point system.  Now there is.
19  There is no resort.  There is no exclusivity.
20  Eliminate the points system."
21     It goes on and on.  This goes on for 750
22  lines and I think I read ten of them.
23     Did you read any of these comments at the
24  time they were given?
25     A.  I may have.  I don't recall.

Page 471

1      Q.  If you had read these, would you have
2  considered them in making the decision to affiliate
3  the Marriott Vacation Club with The Ritz-Carlton
4  Destination Club?
5      A.  Sure.
6      Q.  Would you have considered them as a pro or a
7  con?
8      A.  They would've been a con.
9      Q.  So did you get any reports from anybody as to
10  the nature of the comments that were made in response
11  to your affiliation?
12     A.  I don't recall.
13     Q.  Did you have any system in place at Marriott
14  Vacation Clubs so that you would find out, as the
15  person who was making the decision, and gauging the
16  sentiment of the members in terms of their affiliation?
17  Was there any kind of system set up so that somebody
18  would report to you the comments that you weren't
19  reading?
20     A.  No.
21     Q.  Why not?
22     A.  Didn't -- it wasn't set up.  I don't recall
23  why it wasn't set up.
24     Q.  Didn't you want to know the comments of the
25  members, or, at least, a high-level report of them?

Page 472

1      A.  Yes.
2      Q.  Did you ever get any reports of this
3  spreadsheet?
4      A.  I don't recall.
5      Q.  I find it hard to believe you wouldn't recall
6  something this negative in such a volume.
7          MR. SELLINGER:  Objection to form.
8  BY MR. REISER:
9      Q.  You truly don't recall --
10     A.  I don't recall having seen or reviewed that
11  spreadsheet.
12         MR. REISER:  Okay.  That's all I have.
13         MR. FERGUSON:  I just have three on 1314.
14             REDIRECT EXAMINATION
15  BY MR. FERGUSON:
16     Q.  Mr. Cunningham, I'm almost done.  Just a few
17  moments on 1314.
18     A.  Got it.
19     Q.  Mr. Sellinger took you through some of the
20  comments by people who were interested in the
21  exchange -- exchanges that might be made available
22  under affiliation.  Do you recall that?
23     A.  Yes.
24     Q.  And I think you said -- you were reading one
25  person that said they would like exchange

Page 473

1  opportunities, and you read St. Thomas and Jupiter.
2      Do you recall that?
3      A.  That I read it?
4      Q.  That you read, yeah, or maybe Mr. Sellinger
5  read it.
6      A.  I didn't read any of them.
7      Q.  Let me do it this way.  If they did mention
8  Jupiter amongst the other properties, within a few
9  months after this survey was done, you lost the
10  Jupiter Club?
11     A.  That's correct.
12     Q.  And you talked about Mr. and Mrs. Schaeffer.
13  Do you recall them?
14     A.  Let me find them here.
15     Q.  When did the Schaeffers make a comment to
16  you?  What's the date of that?
17     A.  It's the earlier -- just a moment.  The
18  Schaeffers were on 12/20/2013.
19     Q.  Did you know that, a year later, they sold
20  their unit for about $41,000?
21     A.  No.
22     Q.  Did you know they paid $295,000 for it in
23  2007?
24     A.  No.
25     Q.  So within a year of you pointing out that

Page 474

52 (Pages 471 - 474)

Lee Cunningham - 11/15/2017

1  they made a positive comment, they sold their property
2  at a loss of about 200,000 bucks -- 250,000 thousand
3  bucks.
4      A.  Okay.
5      Q.  You didn't know that?
6      A.  I did not.
7      Q.  Mr. Romito, did you know that he was able to
8  get in for about $87,000 in 2011?
9      A.  No.
10     Q.  That was around the timeframe the sales had
11  pretty much stalled.  I think you said you weren't
12  trying to sell things, but things were selling?
13     A.  Yes.
14     Q.  Okay.  Did you know that he sold that for
15  $29,000 this last August?
16     A.  Yes.
17     Q.  And lost about 60,000 bucks?
18     A.  No.
19     Q.  And do you know anybody at any time that ever
20  sold a Ritz-Carlton Destination Club membership before
21  2014 that said, "Hey, when you buy this fractional
22  interest, you get to take a bike ride or a bike tour"?
23     A.  I'm sorry?
24     Q.  Do you know of any Ritz-Carlton Destination
25  Club fractional owner that was the recipient of
                                              Page 475

1  options?  Is that what was happening in the industry
2  as a whole?
3      A.  Absolutely.
4      Q.  And if people bought their interest in 2006,
5  2007, 2008, et cetera, that was before the real estate
6  market crashed?
7      A.  That's correct.
8      Q.  Did the crash of the real estate market
9  affect the value of their interests?
10     A.  Yes.
11     MR. SELLINGER:  I have nothing further.
12         FURTHER REDIRECT EXAMINATION
13  BY MR. FERGUSON:
14     Q.  And they're not coming up, are they?
15     A.  Pardon me?
16     Q.  They're not coming up?
17     A.  They have not rebounded.
18     MR. FERGUSON:  Thank you.
19     THE VIDEOGRAPHER:  The time is 7:27.
20  That concludes the deposition of Lee
21  Cunningham.
22     (The reading and signing of the
23  transcript were not waived, and these
24  proceedings concluded at 7:27 p.m.)
25
                                              Page 477

1  marketing that said, "If you buy an RCDC fractional
2  interest at Aspen Highlands, you get to go on a bike
3  tour in Europe"?
4      A.  No.
5      Q.  How about a cruise -- ever mentioned cruises?
6      A.  No.
7      Q.  The bottom line is, when you were -- what was
8  happening here was, you had lost clubs, and these
9  folks were getting a booby prize, which was the 50
10  clubs and opportunities, I think you call them, for
11  bike rides, cruises, all the vacations like that?
12     MR. SELLINGER:  Objection to form.
13     A.  They were getting opportunities to take
14  advantage of the exchanges within the MVCD program.
15  BY MR. FERGUSON:
16     Q.  Opportunities that they had never ever
17  envisioned when they bought these things?
18     A.  No -- or I don't know whether they had or
19  not.  We haven't talked to them about it.
20     MR. FERGUSON:  With that, I'm done.
21         RECROSS-EXAMINATION
22  BY MR. SELLINGER:
23     Q.  In the fractional interest timeshare business
24  during the time of the affiliation and the industry
25  generally, were members saying that they wanted more
                                              Page 476

1  Under penalties of perjury, I declare that I have read
2  the foregoing document and that the facts stated in it
3  are true.
4
5  _____
6  DATE           LEE CUNNINGHAM
7
8  Subscribed and sworn before me this _____ day of
9  _____, 2017.
10
11  State of Florida   )
12  County of          ) _____
13          NOTARY PUBLIC
14
15
16
17
18
19
20
21
22
23
24
25
                                              Page 478

53 (Pages 475 - 478)

Lee Cunningham - 11/15/2017

```
 1         CERTIFICATE OF REPORTER
 2
 3  STATE OF FLORIDA
 4  COUNTY OF ORANGE
 5
 6         I, Lisa Gerlach, Court Reporter, do hereby
 7  certify that I was authorized to and did
 8  stenographically report the foregoing deposition; and
 9  that the transcript is a true and correct
10  transcription of the testimony given by the witness.
11         I further certify that I am not a relative,
12  employee, attorney or counsel of any of the parties,
13  nor am I a relative or employee of any of the parties'
14  attorney or counsel connected with the action, nor am
15  I financially interested in the action.
16         Dated this 4th day of December, 2017.
17
18
19  Lisa Gerlach
20  Lisa Gerlach, Court Reporter
21
22
23
24
25
                                      Page 479
```