EXHIBIT - G

```
 1    RCHFU, LLC,  et al.,
 2    Plaintiffs,          United States District Court
                            District of Colorado
 3    v.                    No.  1:16-cv-01301 PAB-GPG
 4    MARRIOTT VACATIONS WORLDWIDE
      CORPORATION, et al.,
 5
          Defendants,
 6    _____/

      REISER, et al.,
 7
          Plaintiffs,      Eastern District of California
 8    v.                    No. 2:16-cv-00237-MCE-CKD
 9    MARRIOTT VACATIONS WORLDWIDE
      CORPORATION, et al,
10
          Defendants,
11    _____/

      PETRICK, et al.,
12
          Plaintiffs,
13                          San Francisco County
      vs.                   No. CGC-15-54897
14
      MARRIOTT VACATION WORLDWIDE
15    CORPORATION, et al.,
16        Defendants.
      _____/

17
18        VIDEOTAPED DEPOSITION OF STEPHANIE SOBECK
19              May 15, 2018
20          Tuesday, 9:25 a.m.-4:52 p.m.
21
22
23
24    Job No. 2911163
25    Pages 1 - 275
```

Page 1

**Page 2**

```
1
2
3
4
5
6
7
8
9
10        Taken on Behalf of the Plaintiffs before
11   Lisa Gerlach, Court Reporter, Notary Public
12   in and for the State of Florida at Large,
13   pursuant to Plaintiffs' Notice of Taking
14   Deposition in the above cause.
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
1    Appearances:
2
3    For the Defendant Marriott:
4      PHILIP SELLINGER, ESQUIRE
5      Greenberg Traurig, LLP
6      500 Campus Drive, Suite 400
7      Florham Park, NJ 07932-0677
8      sellingerp@gtlaw.com
9      marxi@gtlaw.co
10
11     DOUGLAS A. KELLY, ESQUIRE
12     KIM GRAY, ESQUIRE
13     Marriott Vacations Worldwide
14     6649 Westwood Boulevard
15     Orlando, FL 32821
16
17   For the Defendant Aspen Highlands
18   Condominium Association, by speakerphone:
19     JESSICA BLACK LIVINGSTON, ESQUIRE
20     Hogan Lovells
21     1601 Wewatta Street, Suite 900
22     Denver, CO 80202
23     303-899-7300
24     jessica.livingston@hoganlovells.com
25
```

**Page 3**

```
1    Appearances:
2    Counsel for the Plaintiffs:
3      MATTHEW C. FERGUSON, ESQUIRE
4      The Matthew C. Ferguson Law Firm, PC
5      119 South Spring, Suite 201
6      Aspen, CO 81611
7      970-925-6288
8      matt@matthewfergusonlaw.com
9
10     MICHAEL S. REISER, SR., ESQUIRE
11     MICHAEL S. REISER, JR.
12     MATTHEW REISER, ESQUIRE, by speakerphone
13     Reiser Law, PC
14     1475 Broadway, Suite 300
15     Walnut Creek, CA 94596
16     michael@reiserlaw.com
17     matthew@reiserlaw.com
18
19     TYLER MEADE, ESQUIRE
20     The Meade Firm
21     1816 Fifth Street
22     Berkeley, CA 94710
23     510-843-3670
24     tyler@meadefirm.com
25
```

**Page 5**

```
1              INDEX
2    WITNESS      EXAMINATION         PAGE
3    Stephanie Sobeck
4      Direct by Mr. Ferguson          8
5      Direct by Mr. Reiser          145
6      Cross by Mr. Sellinger        270
7      Redirect by Mr. Ferguson      271
8
9
10            EXHIBITS
     EXHIBIT     DESCRIPTION          PAGE
11   Exhibit 2102  Affiliation Agreement,
12       RCDC067469 through RCDC067520   23
13
     Exhibit 2103  First Amendment to Affiliation
14       Agreement, RCDC070241 through
         RCDC070242                      96
15
16   Exhibit 2104  Acknowledgement of and Joinder to
17       Affiliation Agreement,
18       AHCA00018031 through AHCA00018034 92
19
     Exhibit 2136  Corporate Growth Committee Document,
20       RCDC070195 through RCDC070204   29
21
     Exhibit 2137  Corporate Growth Committee Document,
22       RCDC070205 through RCDC070209  228
23
24   Exhibit 2138  Corporate Growth Committee Document,
25       RCDC070210 through RCDC070216  264
```

2 (Pages 2 - 5)

| | EXHIBITS | |
|---|---|---|
| 1 | | |
| 2 | EXHIBIT          DESCRIPTION | PAGE |
| 3 | Exhibit 2213  E-Mail, RCDC015683 | 151 |
| 4 | | |
| 5 | Exhibit 2139  Corporate Growth Committee Document, RCDC070217 through RCDC070222 | 269 |
| 6 | | |
| 7 | Exhibit 2140  Privilege Log, 143 Pages | 22 |
| 8 | | |
| 9 | Exhibit 2141  Privilege Log, 8 pages | 73 |
| 10 | Exhibit 2142  Strategic Council Document, RCDC068348 through RCDC068352 | 185 |
| 11 | | |
| 12 | Exhibit 2143  Strategic Council Document, | |
| 13 | RCDC068353 through RCDC068358 | 198 |
| 14 | | |
| 15 | Exhibit 2144  Strategic Council Document, | |
| 16 | RCDC068359 through RCDC068364 | 202 |
| 17 | | |
| 18 | Exhibit 2145  Strategic Council Document, | |
| 19 | RCDC068365 through RCDC068370 | 204 |
| 20 | | |
| 21 | Exhibit 2147  Strategic Council Document, | |
| 22 | RCDC067694 through RCDC067699 | 211 |
| 23 | | |
| 24 | Exhibit 2148  Strategic Council Document, | |
| 25 | RCDC067521 through RCDC067526 | 217 |

Page 6

1   MR. REISER:  My name is Mike Reiser.  I
2   represent the plaintiffs in the
3   aforementioned case in Aspen.  And I also
4   represent the plaintiffs in a case called
5   Petrick vs. Marriott, et al., in the
6   San Francisco Superior Court, as well as the
7   plaintiffs in the case, Reiser v. Marriott,
8   et al., in the Eastern District of California
9   Federal Court.
10   MR. MEADE:  Tyler Meade, for plaintiffs
11   in all three cases.
12   MR. SELLINGER:  Philip Sellinger, from
13   Greenberg Traurig, in all three cases.  With
14   me is Kim Gray, corporate counsel at
15   Marriott.  And joining us at some point this
16   morning will be Doug Kelly, assistant general
17   counsel and head of litigation at Marriott,
18   and, possibly, Ian Marx, also from Greenberg
19   Traurig.
20   I would just note that while it was
21   mentioned that this case is being taken in
22   the -- this deposition -- in the Aspen case,
23   our understanding was, this being taken in
24   all three cases.
25   MR. FERGUSON:  Yeah.  He just asked for

Page 8

1   THE VIDEOGRAPHER:  Good morning.  We're
2   going on the video record.  The time is
3   9:25 a.m., Eastern Daylight Time, on Tuesday,
4   May 15, 2018.  This is media unit number one
5   of the video-recorded deposition of Ms.
6   Stephanie Sobeck, taken by counsel for the
7   plaintiff, in the matter of RCHFU, LLC, et
8   al, vs. Marriott Vacations Worldwide Corp.,
9   et al.
10   This case is filed in the US District
11   Court, District of Colorado.  The Case Number
12   is 1:16-cv-01301 PAB-GPG.  This deposition is
13   being held today in the office of Greenberg
14   Traurig, located at 450 South Orlando Avenue,
15   Suite 650, Orlando, Florida.
16   My name is Clay McMillan, with Veritext
17   Legal Solutions.  The court reporter today is
18   Ms. Lisa Gerlach.
19   Will counsel in the room, please,
20   identify yourselves and the parties that they
21   represent?
22   MR. FERGUSON:  My name is Matthew
23   Ferguson. I'm counsel for the plaintiffs in
24   the case known as RCHFU vs Marriott, pending
25   in the United States, District of Colorado.

Page 7

1   appearances, and I think you indicated you're
2   appearing in those two cases also.  We agree
3   with that.
4   THE VIDEOGRAPHER:  Is there any counsel
5   on the phone that needs to identify?
6   MS. LIVNGSTON:  Yes.  Good morning.  This
7   is Jessica Livingston, with Hogan Lovells.  I
8   represent the Aspen Highland Condominium
9   Association in the RCHFU vs. Marriott case.
10   THE VIDEOGRAPHER:  Our court reporter
11   will swear in the witness and we can proceed.
12   THEREUPON,
13   STEPHANIE SOBECK,
14   A Witness herein, acknowledged after having
15   been duly sworn and testified upon her oath as
16   follows:
17   THE WITNESS:  I do.
18   DIRECT EXAMINATION
19   BY MR. FERGUSON:
20   Q.  Good morning, Ms. Sobeck.
21   A.  Good morning.
22   Q.  Do you recall having your deposition taken in
23   this room on November 16, 2017?
24   A.  I do.
25   Q.  Have you been deposed in any other cases

Page 9

3 (Pages 6 - 9)

1  since I met with you here in November of 2017?
2     A. I have not.
3     Q. Have you testified in any trials?
4     A. No, I have not.
5     Q. Are you scheduled to testify in any trials?
6     A. No.
7     Q. Have you ever reviewed your testimony in
8  connection with today's re-deposition of yourself?
9     A. I went through it quickly.
10    Q. When did you go through it, Ms. Sobeck?
11    A. On Sunday.
12    Q. Did you go through it by yourself?
13    A. I read it myself.
14    Q. Did you read the whole deposition?
15    A. No.
16    Q. Did you read the parts about the affiliation
17 agreements that are at issue in this case?
18    A. Yes, I did.
19    Q. Did you read anything else in preparation for
20 your deposition today?
21    A. Yes. I looked at the affiliation agreements.
22    Q. And that would be the ones starting in 2001
23 up through today?
24    A. I didn't look at all of them, but, yes, those
25 would be the ones.

Page 10

1     Q. When you testified in November of 2017, when
2  you reviewed documents, do you recall whether or not
3  you looked at the affiliation agreement that's dated
4  November 14, 2013, the one that was produced recently?
5     A. Specifically, no.
6     Q. Aside from reading your deposition on Sunday
7  and looking at affiliation agreements for some of
8  them, have you reviewed anything else in preparation
9  for your re-deposition today?
10    A. I looked at some of the business review
11 reports and some of the strategic council decks as
12 well.
13    Q. Did you look at any corporate growth
14 committee memos?
15    A. Yes. A couple of those memos as well, yeah.
16    Q. Are you on the corporate growth committee?
17    A. I'm not.
18    Q. Who's on the corporate growth committee?
19    A. Mostly our executive committee and a couple
20 of the other financial leaders within our corporation.
21    Q. Mr. Terry?
22    A. Tony Terry.
23    Q. Mr. Cunningham?
24    A. Yes. He's an executive committee member.
25    Q. How many people are on the executive

Page 11

1  committee for Marriott Vacation Worldwide?
2     A. Eight, I want to say. I could be off. Eight
3  plus or minus one.
4     Q. Is Mr. Essig part of that?
5     A. Ron Essig, no.
6     Q. Ms. Kane-Hanan?
7     A. Lani Kane-Hanan, yes.
8     Q. Sometimes I see that you actually draft
9  memorandums relating to the corporate growth
10 committee. Correct?
11    A. I do.
12    Q. Mr. Reiser will cover those with you.
13       Is Mr. Weisz on that committee?
14    A. Yes, he is.
15    Q. Have you spoken to Mr. Weisz about your
16 deposition here today?
17    A. No, I have not.
18    Q. Anything else besides the business review
19 reports, the corporate growth committee reports, the
20 strategic council documents, the affiliation
21 agreements, and your deposition that you reviewed for
22 today?
23    A. No.
24    Q. You understand that some of those documents
25 we received since we took your deposition. Do you

Page 12

1  know that?
2     A. Yes, I do.
3     Q. You also understand that we received, after
4  your deposition, a 143-page initial privilege log of
5  documents that were withheld by Marriott Vacation
6  Worldwide?
7     A. I was not.
8     Q. Okay. Are you aware that another privilege
9  log was provided -- I guess, maybe eight or nine
10 pages -- on about April 6, 2018?
11    A. I was not.
12    Q. So you have not reviewed privilege logs?
13    A. I'm sorry. I don't know what privilege logs
14 are.
15    Q. Do you have an understanding generally that
16 documents were withheld, based on the fact that people
17 like Ms. Gray, Ms. Borkholder, or Ms. Egolf were
18 copied on those and they were withheld because they
19 were deemed to be privileged by your lawyers, I guess?
20 Do you have a general understanding that documents
21 were withheld based on attorney-client privilege?
22    A. Yes, I understand that.
23    Q. But in terms of selecting which documents you
24 withheld, I take it you left it to your outside
25 counsel and in-house counsel?

Page 13

4 (Pages 10 - 13)

| | |
|---|---|
| 1      A. I don't know who did it recently. | 1      Q. The Lion & Crown and Marriott Resort Travel |
| 2      Q. Did you meet with counsel in connection with | 2 Company. |
| 3 preparation for your re-deposition here today? | 3      A. Yes, I do. |
| 4      A. I did. | 4      Q. At your deposition, you indicated you did not |
| 5      Q. Who did you meet with? | 5 know what the Marriott -- the MRTC company was. |
| 6      A. With Philip, Ian, Doug, and Kim. | 6         Do you recall that? |
| 7      Q. When did you first meet with them in | 7      A. Yes. |
| 8 connection with preparing for your re-deposition here | 8      Q. Was that just because it was a long day or |
| 9 today? | 9 was it something you didn't really know about? |
| 10      A. Yesterday. | 10      A. I didn't know the name specifically. |
| 11      Q. Any prior phone calls relating to preparation | 11      Q. The Marriott Resort Travel Company, MRTC, is |
| 12 for your deposition? | 12 the program manager for the Marriott Vacation Club -- |
| 13      A. No. | 13 MVCD system? |
| 14      Q. How many hours did you meet or minutes did | 14      MR. SELLINGER: Objection to form. |
| 15 you meet in connection with your deposition here | 15      A. The Marriott Vacation Club Destination |
| 16 today? | 16 system, yes. |
| 17      A. About roughly four. | 17 BY MR. FERGUSON: |
| 18      Q. Without divulging what was stated, were there | 18      Q. So as to counterpart -- and Ritz-Carlton |
| 19 any other documents that were reviewed by you in | 19 Destination Club has the Lion & Crown -- has the Lion |
| 20 connection with your deposition at those meetings -- | 20 & Crown as the facilitator of its outside affiliation |
| 21 or that meeting, rather? | 21 system? |
| 22      A. No. | 22      A. Yes -- |
| 23      Q. Were all four lawyers there for most of those | 23      MR. SELLINGER: Objection to form. Just |
| 24 four hours? | 24      pause for a moment generally to give me a |
| 25      A. Three of them were. Doug was in and out. | 25      chance to object. |
| Page 14 | Page 16 |

| | |
|---|---|
| 1      Q. Mr. Kelly? | 1      THE WITNESS: Okay. |
| 2      A. Mr. Kelly, yes. | 2      MR. SELLINGER: Thank you. |
| 3      Q. Do you know David Masters? | 3      A. Cobalt Travel is the internal and Lion & |
| 4      A. No, I don't. | 4 Crown is external; correct. |
| 5      Q. Do you know a new lawyer that was retained by | 5 BY MR. FERGUSON: |
| 6 Marriott Vacation Worldwide and the other defendants | 6      Q. Lion & Crown was started up, I take it, |
| 7 in Colorado to represent you guys in this case? | 7 around the time that you wanted to affiliate with the |
| 8      A. No. | 8 outside program known as Abercrombie & Kent? Is that |
| 9      Q. Do you understand that you -- withdrawn. | 9 about the time Lion & Crown started up? |
| 10      Have you ever seen the explanation of the | 10      A. Yes. |
| 11 production -- the late production -- of the November | 11      Q. I remember from your deposition last time |
| 12 14, 2013 affiliation agreement sent by Mr. Marx, | 12 that we had a weird cadence. I would sometimes -- |
| 13 Mr. Tyler Meade, and copied to a lot of lawyers in | 13 Mr. Reiser and I would speak over you. So we'll try |
| 14 this case? Have you ever seen that? | 14 to do a little bit better today than last time. We |
| 15      A. No. | 15 ran into that a few times. |
| 16      Q. Did you ever see any explanation to | 16      A. We will all pause. |
| 17 plaintiffs' counsel in this room -- Mr. Reiser, | 17      Q. Okay. We'll just show you what's been |
| 18 Mr. Meade, myself, Ms. Jessica Livingston -- that | 18 previously marked as Exhibit 1003. It's going to be |
| 19 there was an oversight not to produce that document? | 19 on your screen also. I have paper of everything for |
| 20      A. No. | 20 you, but it's also on your screen. |
| 21      Q. Did you maintain a copy of the -- is it okay | 21      MR. SELLINGER: Do you have paper for me |
| 22 if I call it the November 13th affiliation agreement? | 22 too? |
| 23 Will you know what I'm talking about? | 23      MR. FERGUSON: Not on that one. Some I |
| 24      A. The affiliation agreement between Lion & | 24 will, some I won't. |
| 25 Crown and Cobalt? | 25      THE WITNESS: Would you like to share? |
| Page 15 | Page 17 |

5 (Pages 14 - 17)

1        MR. SELLINGER: I'm okay for now.
2  BY MR. FERGUSON:
3        Q. Do you recognize this as The Ritz-Carlton
4  Club membership program affiliation agreement that was
5  entered into back in 2001?
6        A. Yes.
7        Q. Let me give you my copy here.
8        A. There's lots of highlights in there.
9        Q. Yeah. If you go to the last two pages of
10  Exhibit 1003, Bates-labeled -- they're numbered 19,
11  20, 21. I just want to ask you about some of these
12  signatures here.
13        This has the Ritz-Carlton Travel Company,
14  LLC. That's the predecessor name to Cobalt; correct?
15        A. Correct.
16        Q. Were you working -- you were working at MVCI
17  at this time in 2001; correct?
18        A. I was.
19        Q. But you weren't assigned to the RCDC system
20  yet; were you?
21        A. Correct.
22        Q. Mr. Bradley -- I take it he's gone from the
23  Marriott Vacation Club? He was with MVCI at the time.
24  Is he still with Marriott Vacation Worldwide?
25        A. Where do you see Mr. Bradley? What page are
Page 18

1  you on?
2        Q. 19. You'll see a little number at the bottom
3  there. Look over -- there.
4        A. Oh, 19 of that. Sorry. Yes. Steve Bradley.
5        Q. Is he still there?
6        A. No. He's retired.
7        Q. Mr. Minnock signed for the Ritz Carlton
8  Development Company. Is he still there?
9        A. Yes.
10        Q. What's his job right now; do you know?
11        A. I'm trying to think of what his title is.
12  He's in Asia for us. He's kind of the lead point
13  business person in Asia. I don't know his title.
14        Q. For Marriott Vacation Worldwide?
15        A. Correct.
16        Q. He's not working with the RCDC system
17  anymore; is he?
18        A. No. He hasn't for years.
19        Q. Mr. Love signed on behalf of the condominium
20  association. Was Mr. Love a member of the Marriott
21  International at the time?
22        A. He was at the time.
23        Q. Is he still with any companies related to
24  Marriott International or Marriott Vacation Worldwide?
25        A. I don't know. I don't think so.
Page 19

1        Q. Do you recall being shown this at your
2  deposition on November 16, 2017 -- generally, being
3  shown this document?
4        A. This document?
5        Q. Yeah.
6        A. I don't remember if we looked at this or not.
7        Q. If you look at pages -- I'll get there
8  sometime -- page 10, it's at the bottom of the exhibit
9  number. It's 1002-0112.
10        A. Oh, 12?
11        Q. Yeah.
12        A. 7.2.
13        Q. Yeah. Do you remember discussing 7.2 with
14  Mr. Reiser?
15        A. I do remember that.
16        Q. Do you remember talking about the fact that
17  you believed that Cobalt -- now, I know this is
18  Ritz-Carlton Travel Company back then -- but Cobalt,
19  in your view, was the only entity that could make a
20  decision whether to affiliate The Ritz-Carlton
21  Destination Club with another system?
22        MR. SELLINGER: Objection to form. If
23  you're going to talk about her testimony from
24  five months ago --
25        MR. FERGUSON: Sure.
Page 20

1        MR. SELLINGER: -- I think you ought to
2  show her the testimony.
3        MR. FERGUSON: Will you go to the
4  deposition, please -- page 21?
5        MR. REISER: I think it would be easier
6  if we just did it like we were in trial. If
7  she doesn't remember the testimony, then we
8  can refresh her recollection with it. I
9  think it will be speedier.
10        MR. SELLINGER: I just don't think, in a
11  deposition, it's fair to say, "Do you
12  remember testifying" in a several-hundred
13  page deposition. I don't think, in a trial,
14  that's appropriate.
15        You can ask, "Do you remember a fact,"
16  but to ask, "Do you remember testifying," I
17  don't think that's appropriate at trial
18  without showing them the testimony.
19        MR. FERGUSON: I just want to get some
20  platform for where we're going to go in this
21  deposition. I don't mind showing it to you.
22  BY MR. FERGUSON:
23        Q. I'm looking at the wrong -- on page 21 -- at
24  the top of page 21, the question Mr. Reiser asked you,
25  "Is it your understanding, Ms. Sobeck, that Cobalt
Page 21

6 (Pages 18 - 21)

1 Travel Company has the sole discretion to decide
2 whichever clubs are affiliated with the Ritz-Carlton
3 Destination Club under the terms of the affiliation
4 agreement?"
5     You said that was your understanding;
6 correct?
7     A. Yes.
8     Q. Is your understanding different today?
9     A. No. Cobalt Travel has the sole discretion to
10 decide what clubs that it affiliates with.
11    Q. But in terms of Exhibit 1003, that was not
12 used to affiliate the Marriott Vacation Club system
13 and the RCDC system. Isn't that right?
14    A. Well --
15        MR. SELLINGER: Objection to form.
16 BY MR. FERGUSON:
17    Q. It wasn't a final document that you used to
18 effectuate that affiliation; correct?
19    A. It was not produced.
20    Q. And the final document that was used to
21 effectuate that affiliation was on November 13,
22 2014 -- sorry -- November 14, 2013 affiliation
23 agreement. Correct?
24    A. Sorry. You can't just throw out dates. If
25 we're talking about -- because there are several, as

Page 22

1 you know -- several affiliation agreements.
2     So the one between Lion & Crown and Cobalt
3 was the one that gave the ability to move forward with
4 the program.
5     Q. But it was between Lion & Crown and MRTC. Is
6 that -- are you referring to a different document when
7 you say "Cobalt"?
8        MR. SELLINGER: Objection to form.
9     A. Cobalt connects to Lion & Crown. If that
10 wasn't in place, Lion & Crown couldn't connect to
11 Marriott Vacation Club. So they all have to be in
12 place for Lion & Crown to connect to Marriott Vacation
13 Club.
14     (Exhibit 2140 was marked for
15     identification.)
16 BY MR. FERGUSON:
17    Q. Let me just find that exhibit for you. If
18 you go to Exhibit 2140, I believe it is -- oh, 2102.
19 This was previously marked at a deposition.
20        MR. FERGUSON: Is that right, Mr. Reiser?
21     It was Mr. Guikema maybe?
22        MR. REISER: Yeah.
23     (Exhibit 2102 was marked for
24     identification.)
25 BY MR. FERGUSON:

Page 23

1     Q. We've marked it for today's deposition as
2 2102. This is a document that was produced on or
3 about March 14, 2018.
4     When you were just referring to the Cobalt
5 agreement, were you referring to this agreement or
6 what?
7        MR. SELLINGER: Objection to form.
8     A. Cobalt agreement. So the Cobalt -- do you
9 want me to walk you through the whole --
10 BY MR. FERGUSON:
11    Q. That's all right. I just want to know --
12    A. No. This isn't the Cobalt agreement. But
13 having this without an agreement between Cobalt and
14 Lion & Crown would not allow Marriott Vacation Club to
15 be affiliated with Ritz-Carlton Destination Club.
16    Q. All right. Let me show you what's been
17 marked previously or marked for today's deposition as
18 2101. This was produced recently, but we think we've
19 uncovered that it had been produced earlier.
20     Is this the document you were referring to,
21 the Lion & Crown affiliation agreement between its --
22 Lion & Crown Travel Company, LLC affiliation agreement
23 providing Cobalt Travel members access to the Lion &
24 Crown exchange program?
25    A. Yes, yes.

Page 24

1     Q. So this is the first step in the ability of
2 Lion & Crown to affiliate its RCDC members into the
3 Marriott Vacation Destination Club system?
4        MR. SELLINGER: Objection to form.
5     A. Cobalt Travel has the sole right to affiliate
6 with anyone. They affiliated with Lion & Crown. Then
7 Lion & Crown has the right to affiliate with outside
8 exchange companies, which is how they affiliated with
9 Marriott Vacation.
10 BY MR. FERGUSON:
11    Q. In this case, I think you -- the next
12 question I want to ask is -- that second agreement,
13 the November 14, 2013 agreement, which is Exhibit
14 2102, I believe -- that's the document that was
15 actually utilized to effectuate the affiliation with
16 the Marriott Vacation Club Destination program?
17        MR. SELLINGER: Read that back for me,
18     please.
19        THE REPORTER: "The next question I want
20     to ask is -- that second agreement, the
21     November 14, 2013 agreement, which is Exhibit
22     2102, I believe -- that's the document that
23     was actually utilized to effectuate the
24     affiliation with the Marriott Vacation Club
25     Destination program?"

Page 25

7 (Pages 22 - 25)

1    MR. SELLINGER: Objection to form. Go
2    ahead.
3    A. This Lion & Crown agreement with affiliation
4    with Marriott Vacation Club is how the Marriott
5    Vacation Club program became available to...
6    BY MR. FERGUSON:
7    Q. Right. Is there a document like that, for
8    example, with respect to the Exclusive Resorts, where
9    Lion & Crown is affiliating with Exclusive Resorts?
10   Is there something like that?
11   A. I believe there would've been for Exclusive
12   Resorts.
13   Q. And there would've been one for Third Home?
14   A. I believe so, yes.
15   Q. And there would've been one for Abercrombie &
16   Kent?
17   A. Yes.
18   Q. Are these the only four systems that Lion &
19   Crown Travel has affiliated its RCDC members with?
20   A. I believe those are the only ones. We've had
21   other conversations with others, but these are the
22   only ones, yes.
23   Q. Are there any other programs under
24   consideration?
25   A. There have been in the past, but none of them
                                                    Page 26

1    that in your files?
2    A. I don't know if it's in my files or not.
3    Certainly not a hard copy.
4    Q. How would you have had access to that
5    document if you needed it?
6    A. If I didn't have it, I would -- I would
7    e-mail the law department to get a copy.
8    Q. Do you have a folder or folders that you keep
9    important documents in for your day-to-day work as an
10   asset manager, overseeing some of the -- over the
11   years, it's changed -- but some of the Ritz-Carlton
12   Destination Clubs?
13   A. Yes.
14   Q. Was this document in that folder -- in any of
15   those folders?
16   A. I don't know if it was or not. Could have
17   been.
18   Q. Did you work on the preparation of this
19   affiliation agreement?
20   A. No.
21   Q. When was the first time you heard about this
22   affiliation agreement, Exhibit 2102, being discussed?
23   A. I don't understand the question.
24   Q. When did you first hear about there might be
25   an affiliation agreement between Lion & Crown and the
                                                    Page 28

1    ended up being a good fit.
2    Q. Have there been any discussions as to whether
3    or not Lion & Crown Travel Company might affiliate
4    with some of the new products being brought in through
5    the potential ILG merger?
6    A. No, not yet.
7    Q. Are you working on that merger?
8    A. Yes.
9    Q. Do you know when the shareholder votes are
10   for the Marriott Vacation Worldwide folks?
11   MR. SELLINGER: Objection to form.
12   A. Sorry. I don't understand.
13   BY MR. FERGUSON:
14   Q. Are you aware there's going to be a
15   shareholder vote as to whether or not the merger will
16   take place by the shareholders of both entities, ILG
17   and Marriott Vacation Worldwide?
18   A. Yes.
19   Q. Do you know when the Marriott Vacation
20   Worldwide shareholders vote might be?
21   A. I don't.
22   Q. Do you know what month it's going to be in?
23   A. I don't.
24   Q. Exhibit 2102, which is that November '13
25   version of the document, did you maintain a copy of
                                                    Page 27

1    Marriott Vacation Club Destination Exchange Program?
2    A. When we were working on Third Home.
3    Q. What does that mean?
4    A. I'm sorry. Not Third Home. Abercrombie &
5    Kent. Apologies. When we would've been looking --
6    found the potential suitor that might have been a good
7    exchange opportunity for the Ritz-Carlton members, and
8    the law department would've been working on a
9    mechanism for exchange through the Ritz-Carlton
10   system.
11   Q. In July of 2012, Ms. Babich -- we talked
12   about her at your deposition -- she sent out the
13   evolution letter. Do you recall that, just for the
14   timeframe here?
15   A. I do, yes.
16   Q. Okay. We had produced to us the other day a
17   corporate growth committee memorandum, which is
18   heavily redacted, from May of 2012.
19   Do you know who -- let me ask you this.
20   Whose idea was it first to potentially affiliate RCDC
21   with Marriott Vacation Destination Club? I'm not
22   talking about inventory. I'm just talking about an
23   affiliation. Who first brought that up?
24   MR. SELLINGER: Objection to form.
25   A. Can I correct an answer that I gave before?
                                                    Page 29

8 (Pages 26 - 29)

1 BY MR. FERGUSON:
2     Q.  Sure.
3     A.  I'm sorry.  You were asking me about the 2102
4 affiliation agreement with MVCD.  I was answering the
5 question of the Lion & Crown and Cobalt affiliation
6 agreement.  So I apologize.  I was answering a
7 different question.
8     Q.  That makes sense to me now, because --
9     A.  I'm sorry.  I thought you said, "When did
10 Lion & Crown come into -- in the case?"  No.
11         When Marriott Vacation Club -- the
12 affiliation agreement with Marriott Vacation Club
13 would've been around the time that the whole evolution
14 letter would've been...
15     Q.  Whose idea was it as part of the evolution to
16 affiliate the two systems?  Whose idea was it
17 initially?  Was it Mr. Cunningham's, yours?
18     A.  I don't know if -- I don't know whose initial
19 idea it would've been.
20     Q.  Did you review an unredacted version of the
21 corporate growth committee documents?
22     A.  I did not.
23     Q.  Did you receive the corporate growth
24 committee documents from Mr. Cunningham in May of
25 2012, if you know?

Page 30

1     A.  Which documents are we talking about?
2         (Exhibit 2136 was marked for
3     identification.)
4 BY MR. FERGUSON:
5     Q.  It's 2136.  Are you there?
6     A.  Yes.
7     Q.  Did you see this -- were you a recipient of
8 this -- a copyholder at the time?
9     A.  No.  I'm not on the corporate growth
10 committee.
11     Q.  Occasionally, you do write memos to them?
12     A.  Yes.
13     Q.  Did you see this at all in preparation for
14 your deposition here today?
15     A.  I did.
16     Q.  Did you see it in unredacted form or redacted
17 form?
18     A.  Redacted.
19     Q.  Did you have any input into that memorandum,
20 if you know?  I'm sorry.  I think it's a memorandum.
21         MR. SELLINGER:  Objection to form.
22     A.  No.
23 BY MR. FERGUSON:
24     Q.  Did you pull any information together for
25 Mr. Cunningham back there in April, May of 2012 for

Page 31

1 this corporate growth committee memorandum?
2     A.  I don't remember specifically for this
3 memorandum, no.
4     Q.  Aside from seeing it in a redacted format
5 yesterday, had you ever seen this document at any time
6 in connection with your duties as senior vice
7 president today, or vice president in those days, and
8 asset manager?
9     A.  I'm only a vice president, but thank you
10 for -- appreciate that.
11         I don't know if I've seen it or not.  I
12 really don't remember.  I certainly saw it yesterday.
13     Q.  If you go to Exhibit 1003 -- we're starting
14 to get a stack of affiliation agreements there built
15 in front of you.
16         Under 7.2, on page 12, Exhibit 1003, do you
17 recall generally going through whether or not the
18 developer, the association, or the club manager, which
19 is RCMC, had the ability to participate or consent in
20 Cobalt's decision in regard to an affiliation?  Do you
21 recall going through that?
22         MR. SELLINGER:  Objection to form.  If
23     you're talking about her testimony, I think
24     you should show it to her.
25         MR. FERGUSON:  I'm just going to ask

Page 32

1     generally if she knows it.  If she doesn't,
2     I'll show her the testimony.
3     A.  I remember discussing that, yes.
4 BY MR. FERGUSON:
5     Q.  Okay.  Do you remember discussing generally
6 that you believe that, under this Cobalt -- sorry --
7 I'm going to call it the Cobalt affiliation agreement
8 from 2001 -- that you believe that the developer did
9 not have a right to participate or consent in the
10 decision?
11         MR. SELLINGER:  Objection to form.  I
12     think you really should be showing her
13     testimony if you're asking her what she
14     testified to specifically now and not
15     generally.
16         MR. FERGUSON:  I'm going to have to agree
17     with Mr. Reiser.  I can't do it that way.
18     I'm not going to show her testimony and say,
19     "Do you remember this?"  If she doesn't
20     remember, I'll show her the testimony.
21         MR. SELLINGER:  Well, I think the right
22     way -- you can ask her the fact and then
23     refresh her recollection or impeach her.  Do
24     what you want.  I just don't think it's right
25     to ask her, "Did you testify" in a 200-page

Page 33

9 (Pages 30 - 33)

1  deposition, six months ago.
2  BY MR. FERGUSON:
3      Q. Let me do it this way. You agree that you
4  took a position that the developer had no right to
5  participate or consent. That was your position
6  regardless of what was in your deposition; right?
7      MR. SELLINGER: Objection to form.
8      A. Could I see my deposition on that?
9  BY MR. FERGUSON:
10     Q. I'm just asking you a question, yeah. Do you
11  recall whether or not -- ignoring your testimony that
12  you believe that the developer had no right to consent
13  or participate in the decision to affiliate with the
14  Marriott Vacation Club.
15     MR. SELLINGER: I'm sorry.
16     MR. FERGUSON: You need to stop. It's a
17  pretty simple question. There's a lot of
18  speaking going on here. I want to ask the
19  question. If she doesn't understand it,
20  she can ask me to rephrase it; not you,
21  Mr. Sellinger.
22     MR. SELLINGER: I'm really not trying to
23  speak, but -- read the question back for me
24  if you would.
25     THE REPORTER: "You agree that you took a
                                            Page 34

1  November 16, 2017? These are questions by Mr. Reiser.
2  It starts at page -- line 17 of Exhibit 17 [sic].
3      You were asked, "It's also true under your
4  affiliation agreement" -- that being 1003 -- "meaning,
5  your companies's affiliation agreement -- Marriott
6  Vacation Club International" -- I think we got that
7  wrong -- that's the old name -- "that the association,
8  such as the Aspen homeowners association headed by
9  Randy Mercer, he would not have -- he should not -- he
10  was not entitled to participate and/or consent to any
11  affiliation decisions. True."
12     And you said what?
13     A. "He didn't have the right to make an" --
14     Q. Next page.
15     A. -- "affiliation decision, yes."
16     Q. Is that still your belief today, that the
17  association had no right or say in the affiliation?
18     A. Yes.
19     Q. Have you told anybody else differently, ever?
20     A. That they had the right?
21     Q. Yeah. That they had the final say.
22     A. No.
23     Q. But at your deposition, we did not have the
24  2013 -- November 14, 2013 agreement -- correct? Do
25  you recall that? We did not have it?
                                            Page 36

1  position that the developer had no right to
2  participate or consent. That was your
3  position regardless of what was in your
4  deposition; right?"
5      MR. SELLINGER: Objection to form.
6      A. Are you asking -- that's confusing to me.
7  Are you asking me what I testified or are you
8  asking me --
9  BY MR. FERGUSON:
10     Q. What's your position?
11     A. It says here, "The developer shall not be
12  entitled to participate in or consent to the program
13  manager's decision in this regard."
14     Q. Would you go to page -- let's go to your
15  deposition, page 43.
16  Do you recall being asked the questions that start at
17  line 13 about the position that you took at -- when I
18  say "you," -- that Marriott took in the Hoyt
19  litigation?
20     A. Yes.
21     Q. So that's the testimony you gave about the
22  position you all took in the Hoyt litigation that
23  Cobalt had the sole discretion; right?
24     A. Cobalt had the sole discretion; correct.
25     Q. Can you go to page 46 of your deposition on
                                            Page 35

1      A. Yes.
2      Q. In that document, it refers to a joinder and
3  acknowledgement, right -- or acknowledgement and
4  joinder?
5      A. Yes.
6      Q. Were you involved at all in the preparation
7  of the acknowledgement and joinder?
8      A. No.
9      Q. Do you know why there was an acknowledgement
10  and joinder attached as Exhibit A -- sorry -- Exhibit
11  B -- Exhibit A to the affiliation agreement from
12  November 14, 2013?
13     A. Yes.
14     Q. What was your involvement? What was your
15  involvement, if any, with respect to the decision to
16  have the associations sign a joinder and
17  acknowledgement?
18     A. We discussed having them sign an
19  acknowledgement because of the feedback we were
20  getting on Marriott Vacation Club.
21     Q. What feedback are you referring to?
22     A. When the evolution letter was sent out, there
23  were some members who were sharing concerns about an
24  affiliation with Marriott.
25     Q. That was in 2012?
                                            Page 37

10 (Pages 34 - 37)

| | |
|---|---|
| 1    A. Yes. | 1   thousand -- comments. |
| 2    Q. Then you got feedback when the April 5, 2013 | 2       Do you recall that was the product that APCO |
| 3   letter went out to the association. People said it | 3   produced for you? |
| 4   was a great job to have a vote. Do you recall that | 4       MR. SELLINGER: Objection to form. |
| 5   feedback? | 5    A. I don't remember they produced it, but I |
| 6       MR. SELLINGER: Objection to form. | 6   remember the spreadsheet you're talking about, yes. |
| 7    A. What letter are you talking about? | 7   BY MR. FERGUSON: |
| 8   BY MR. FERGUSON: | 8    Q. And that provided feedback on, among other |
| 9    Q. April 15, 2013, the letter that promised the | 9   things, the affiliation? |
| 10   vote -- that letter. | 10    A. It did, among other things. |
| 11    A. I'm sorry. I don't remember the promise of a | 11    Q. And was there any other feedback that was |
| 12   vote. You mean the letter from Aspen? | 12   coming in before you made a decision to do this |
| 13    Q. Yeah. | 13   acknowledgement and joinder that you just referred to |
| 14    A. I'm sorry. I'm struggling here. You have to | 14   in your prior answer? |
| 15   show me the letter, what we're talking about. The | 15    A. There was a lot -- there was a lot of time |
| 16   letter that went from the Aspen board -- | 16   between the acknowledgement and joinder and the |
| 17    Q. Right. | 17   evolution letter, so there was a lot of discussions |
| 18    A. -- to the members? | 18   that had occurred with the boards, with members. |
| 19    Q. Correct. | 19    Q. A lot of time -- I'm sorry. Are you |
| 20    A. Yeah. I don't remember exactly what it said, | 20   finished? |
| 21   but, yes, I remember that letter. | 21    A. Yes. |
| 22    Q. Do you remember that there was feedback from | 22    Q. A lot of time elapsed after Ms. Babich's |
| 23   that letter that went to the association? Do you | 23   July 17, 2012 letter went out and the time that all |
| 24   remember that at all? | 24   you decided to put together an acknowledgement and |
| 25    A. Feedback from the letter of the association? | 25   joinder for the 2013 affiliation agreement? |
| Page 38 | Page 40 |

| | |
|---|---|
| 1    Q. That the association sent a letter -- after | 1    A. Correct. |
| 2   meeting with you and Mr. Cunningham in Aspen on | 2    Q. Do you have that in front of you, |
| 3   April 5th, a letter went out that you and | 3   Exhibit 2102? It's very tiny print. We didn't have a |
| 4   Mr. Cunningham helped word; right? | 4   great computer down here. That's it, I think. |
| 5    A. Well, we didn't help -- | 5       Just go to page 21. There's a lot of page |
| 6       MR. SELLINGER: Objection to form. | 6   numbers on this. The exhibit number is 2102, but it's |
| 7    A. -- but, yes, we -- I remember the meeting, | 7   actually page 19 in the actual text of the document. |
| 8   and I remember the letter, and I remember talking to | 8   There's a signature block there for MVCD. |
| 9   you about the letter, yes. | 9    A. Are you looking at this actual number right |
| 10   BY MR. FERGUSON: | 10   there? |
| 11    Q. My only question was -- because you talked | 11    Q. Yeah. I'm looking at both of them. Which |
| 12   about feedback. I'm just trying to go through the | 12   one do you want to use? |
| 13   items of feedback. | 13    A. It doesn't matter. 19. |
| 14       Do you recall -- and maybe you don't -- do | 14    Q. Okay. This is signed by someone named Cliff |
| 15   you recall the feedback that the HOA got from the | 15   Delaney or -- do you know who that is? |
| 16   April 5, 2013 letter? | 16    A. Cliff Delorey. |
| 17    A. I don't remember the feedback the HOA | 17    Q. Who is Mr. Delorey? |
| 18   received, no. | 18    A. He's our executive vice president of |
| 19    Q. Do you remember that your company hired an | 19   operations. |
| 20   outfit called APCO -- A-P-C-O -- out of Washington, | 20    Q. For which entity? |
| 21   DC? | 21    A. For Marriott Vacations Worldwide. |
| 22    A. I do. | 22    Q. I take it, as you explained in your |
| 23    Q. And I believe you went through Exhibit 1700 | 23   deposition, that various executives, such as yourself |
| 24   and 1261, which is the long border, row -- or there's | 24   and Mr. Delorey, as an executive for Marriott Vacation |
| 25   a long Excel spreadsheet of many, many -- 750, a | 25   Worldwide, they would have duties with respect to |
| Page 39 | Page 41 |

11 (Pages 38 - 41)

1  entities like, in this case, Marriott Resort Travel
2  Company?
3      A.  Correct.
4      MR. SELLINGER:  Objection to form.
5  BY MR. FERGUSON:
6      Q.  Is that right?
7      A.  They have signatory authority for certain
8  entities, correct.
9      Q.  You said he was the executive vice president
10  of operations?
11      A.  I believe that's his title, yes.
12      Q.  Did he have any direct involvement, do you
13  recall, with respect to the RCDC system in this
14  timeframe?
15      A.  No.
16      Q.  Obviously, Mr. Cunningham signed for Lion &
17  Crown Travel; right?
18      A.  Yes.
19      Q.  Did there come a point in time that, with
20  respect to a potential affiliation between the RCDC
21  members and the Marriott Vacation Worldwide -- I'm
22  sorry -- Marriott Vacation Club Destinations Exchange
23  Program -- did there come a time when you all realized
24  you needed to do this agreement?
25      MR. SELLINGER:  Objection to form.

Page 42

1  a page number on it, of course -- if you look at
2  page 2 -- I'm sorry -- page 1, which is -- starts with
3  the affiliation agreement.  It's not paginated
4  because, I guess, it's the first page.
5      Would you look at the fourth whereas clause,
6  where it says, "Whereas, MVCD and Lion & Crown desire
7  that the Lion & Crown program become affiliated with
8  the MVCD program as an affiliate program"?  Are you
9  there?
10      MR. SELLINGER:  Just hold on a minute.
11  He's behind you.  And when you're asking a
12  question, I'd really like to be able to look
13  at it.
14      MR. FERGUSON:  Sure.  Why don't you blow
15  up the fourth whereas clause?  Thank you.
16      A.  The fourth whereas clause says, "Lion & Crown
17  has reserved the right to affiliate with L&C program."
18  BY MR. FERGUSON:
19      Q.  Sorry.  Right.  I missed the big first one.
20  It's the fifth one.  I'm sorry.
21      A.  Yes, I see that.
22      Q.  And I wrote through romanette number one, but
23  romanette number two says, "Except as otherwise
24  provided in this agreement, certain members of the
25  Lion & Crown program" -- it says, "who are not members

Page 44

1      A.  Which agreement?
2  BY MR. FERGUSON:
3      Q.  This agreement, Exhibit 2102, which is the
4  affiliation agreement between Lion and Crown and
5  Marriott -- with access to the Marriott Vacation Club
6  Destinations Exchange Program and MRTC.
7      A.  Would there have been a time that we realized
8  we needed to do this agreement?
9      Q.  Yeah.
10      A.  Yes.
11      Q.  Would that have been part of your job
12  function to say, "Hey, we had one of these for Lion &
13  Crown" -- I'm sorry -- "We had one of these for
14  Abercrombie & Kent.  We have one for Exclusive
15  Resorts.  We need one of these to affiliate Marriott
16  Vacation Club with RCDC"?
17      A.  No.
18      Q.  Who would have done that?
19      A.  The law department.
20      Q.  Who in the law department do you know --
21  withdrawn.  Do you know who in the law department
22  would have overseen the drafting of this affiliation
23  agreement from 2013?
24      A.  Probably Barbara Egolf.
25      Q.  If you look at page -- this one doesn't have

Page 43

1  of the Bleu Florida Trust."
2      Those are people that -- those are people
3  that bought RCDC points of some sort that was unwound?
4      A.  Yes.
5      Q.  Okay.  "Whose owners associations have
6  executed an acknowledgement agreement, as defined in
7  Article 2, L&C members shall have the right to elect
8  to become a participant in the MVCD program."
9      One of the things that needed to happen
10  pursuant to this affiliation agreement was that the
11  association would have to sign the acknowledgement?
12      MR. SELLINGER:  Objection to form.
13      A.  No.  They were already -- we were already
14  affiliated with MVCD when this was executed.
15  BY MR. FERGUSON:
16      Q.  Who was already affiliated?
17      A.  Lion & Crown was already affiliated with
18  MVCD.  All this was doing was allowing --
19      MR. SELLINGER:  Let her finish.
20      MR. FERGUSON:  Okay.
21      A.  All this was doing was -- the associations
22  were deciding whether their members were going to be
23  able to participate or not.
24  BY MR. FERGUSON:
25      Q.  So they had a decision to make whether to

Page 45

12 (Pages 42 - 45)

**Page 46**

1  sign -- to acknowledge and join this agreement?
2      A.  Yeah.  The company decided, obviously, we
3  wanted to allow this to be available for everyone.  It
4  was a good opportunity.  There was additional vacation
5  options.  It was completely voluntary.
6          But we wanted -- because of some of the
7  feedback we got, we wanted the homeowners association
8  to decide whether they wanted to allow it for their
9  owners -- their members -- or not.
10     Q.  When you say "the company," what do you mean
11  by the company?  There's a lot of companies here.
12     A.  I know.  It's true.  Ritz-Carlton Destination
13  Club.  We thought that was the best opportunity, was
14  to give more travel options to the Ritz-Carlton
15  member.
16     Q.  Yeah.  I know.  We've covered that.  The
17  opportunity is voluntary, travel options.  That's what
18  you all wanted to try to give to the RCDC members?
19     A.  Correct.
20     Q.  The bottom line is that, with respect to this
21  agreement, though, the associations had the ability
22  and the right to decide?  That's what you wrote in
23  here.
24         MR. SELLINGER:  Objection to form.
25     A.  Not to affiliate MVCD with Lion & Crown.

**Page 47**

1  They didn't have the right to decide that.  That was
2  already done.  They had the right to decide if their
3  members were going to have an option to use the
4  program or not.
5  BY MR. FERGUSON:
6      Q.  How were Lion & Crown and MVCD already
7  affiliated before this agreement?
8      A.  Before this agreement?
9      Q.  Yeah.
10     A.  They weren't, but this agreement is what
11  actually affiliated them, and then the acknowledgment
12  agreement.  But -- I'm sorry -- I thought you were
13  asking about the acknowledgement agreement.
14     Q.  I was, but I thought you indicated that there
15  was a prior agreement that already affiliated Lion &
16  Crown with MVCD.
17     A.  No.  This is the agreement that affiliated
18  them.
19     Q.  Okay.  Would you go to page 3 of
20  Exhibit 2102, which is the 2013 affiliation agreement
21  between Lion & Crown and MRTC --
22     A.  Which is the actual page; right?
23     Q.  Yeah, actual page 3.  Because the other one
24  is confusing.  It says, "Page 3 of blank."  I just
25  want to use that page, yeah.

**Page 48**

1          The top of the page is an acknowledgement
2  agreement.  It means an acknowledgement of a joinder
3  to affiliation agreement among MVCD, Lion & Crown, and
4  applicable participating L&C association in the form
5  attached as Exhibit B.  I was right.
6          So this is a definition of what -- of
7  acknowledgement agreement in this document.  Is that
8  right?
9      A.  Yes.
10     Q.  So in order for an association, such as Aspen
11  or San Francisco or Tahoe, to be a part of this
12  affiliation that you said is occurring, they would
13  have to sign this acknowledgement and joinder?
14         MR. SELLINGER:  Objection to form.
15     A.  They would have to -- Aspen was already --
16  all of the clubs were already affiliated through Lion
17  & Crown.  So Lion & Crown -- I'm sorry.  I don't seem
18  to be explaining myself well.
19         Just like ER, or Abercrombie & Kent before,
20  when the affiliation agreements were done -- when the
21  affiliation agreements between the different
22  organizations was done -- just like when this one was
23  executed -- the affiliation is in place.
24         The new step we were talking about here was
25  an acknowledgement that, in essence, the boards were

**Page 49**

1  acknowledging that they wanted their members to have
2  access to the program.
3  BY MR. FERGUSON:
4      Q.  So what you're saying is that this document,
5  Exhibit 2102, is the affiliation agreement between
6  Lion & Crown and MRTC to do the bilateral exchange --
7  MVCD people and RCDC -- RCDC people and MVCD -- that's
8  already been made?
9      A.  Correct.
10     Q.  But the next part of that is, in order for
11  Aspen to be part of that, they had to sign the
12  acknowledgement and joinder?
13         MR. SELLINGER:  Objection to form.
14     A.  In order for the members to have access to
15  this, the association would have to.  Because, don't
16  forget -- things change all the time.  Boards change.
17  So people change on the boards.  We knew that a board
18  could maybe decide right away that they didn't want
19  to, but, a couple months later, they would want to
20  have their members to have access.
21         So this was the -- the acknowledgement was to
22  allow the members to have the access.
23  BY MR. FERGUSON:
24     Q.  Yeah, but it was also a joinder; right --
25  J-O-I-N-D-E-R -- right -- a joinder?

13 (Pages 46 - 49)

1   A. It says "joinder," I believe. Yes.
2   Q. They had to join the agreement?
3   A. No. They were --
4      MR. SELLINGER: Objection to form.
5   A. Well, I don't know what it legally means, but
6 they were joining in it with us to allow the members
7 to have access. So we wanted -- we wanted all the
8 members to have access because we thought it was a
9 good opportunity for them.
10 BY MR. FERGUSON:
11   Q. But you understood that they were being
12 required to or asked to join this affiliation
13 agreement.
14   A. No. They were being --
15      MR. SELLINGER: Hold on. Objection to
16 form.
17   A. Yeah -- I mean, they were being asked to
18 acknowledge it. Then, if they wanted to allow the
19 members to have access, they would sign the agreement.
20 BY MR. FERGUSON:
21   Q. How many lawyers worked on this document,
22 Ms. Sobeck, if you know?
23   A. I don't know.
24   Q. Four, five, six?
25   A. I don't know.
                                              Page 50

1   A. The def --
2 BY MR. FERGUSON:
3   Q. The definition of joinder, do you know what
4 that means?
5   A. No.
6      MR. FERGUSON: Would you go back to
7 page 43 of Ms. Sobeck's deposition? Or is it
8 47? 47. I'm sorry.
9 BY MR. FERGUSON:
10   Q. On page 47 of your deposition, you had just
11 answered that the decision to participate -- the
12 association didn't have the right to make an
13 affiliation decision, and you said, "Yes."
14      The question was, "And he wasn't" -- he, I
15 guess, is Mr. Mercer -- "wasn't entitled to
16 participate or consent. True?"
17      You answered, "He wouldn't have been able to
18 make the decision to affiliate" --
19   A. Sorry. Where are you?
20   Q. I'm on page 47, lines 2 through 5.
21   A. Okay.
22   Q. You said, "He wouldn't have been able to make
23 the decision to affiliate or not."
24      Do you see that? You said, "Yes."
25   A. Right.
                                              Page 52

1   Q. Who's Tracy Borkholder? Do you know her? Or
2 Ms. Borkholder?
3   A. Yeah.
4   Q. Is she a lawyer?
5   A. Kathi.
6   Q. Kathi. I'm sorry.
7   A. Yes, she's an attorney.
8   Q. Did she work on this?
9   A. I don't know.
10   Q. Did Ms. Egolf work on this?
11   A. Yes.
12   Q. And they put together Exhibit B, and the
13 document is called "Acknowledgement and joinder."
14 Correct?
15   A. That's what it's called, yes.
16   Q. So in addition to acknowledging this, do you
17 agree or disagree that they were being asked to join
18 it, to become part of this agreement?
19   A. I don't believe they were a part of the
20 agreement, because there was nothing for them in the
21 affiliation agreement to become a part of. But,
22 again, I'm not an attorney.
23   Q. You don't know what the definition of joinder
24 is in the law, I take it?
25      MR. SELLINGER: Objection to form.
                                              Page 51

1   Q. I guess, what you're going to say here today
2 is that he didn't have the decision whether or not
3 MVCD and RCDC would affiliate through this particular
4 document, this affiliation agreement we looked at,
5 Exhibit 2102, per se. He wasn't going to be able to
6 make that decision?
7   A. No. The decision --
8      MR. SELLINGER: Objection to form.
9   A. The decision was already made when the
10 affiliation agreement was executed.
11 BY MR. FERGUSON:
12   Q. Okay. So the decision was made when it was
13 executed?
14   A. The affiliation agreement, yes.
15   Q. And you're saying that he didn't have the
16 right to do that, but he did have a right to sign the
17 joinder and -- acknowledgement and joinder at some
18 point. Did he not?
19      MR. SELLINGER: I'm sorry. I don't want
20 to interrupt you, but given what's shown
21 here, I can't see who the "he" is. Can you
22 just --
23      MR. FERGUSON: Isn't it Mr. Mercer?
24      MR. SELLINGER: -- so I can see that?
25      MR. FERGUSON: It's Mr. Mercer, the HOA.
                                              Page 53

14 (Pages 50 - 53)

1      You don't have her deposition here today?
2      MR. SELLINGER: No. I didn't know what
3 questions you were going to be asking. I
4 didn't think we were going to be talking
5 about the old deposition.
6      But, anyway, I'm just trying to see the
7 context. I do see Mercer now --
8      MR. FERGUSON: -- we didn't have this
9 document at the deposition, Mr. Sellinger.
10      MR. SELLINGER: I'm not looking to argue
11 with you. I'm just looking -- I see now the
12 reference to Mercer.
13      MR. FERGUSON: Thank you. Can you repeat
14 my question?
15      THE REPORTER: "And you're saying that he
16 didn't have the right to do that, but he did
17 have a right to sign the joinder and --
18 acknowledgement and joinder at some point.
19 Did he not?"
20      THE WITNESS: He had the ability to sign
21 the acknowledgement and joinder.
22 BY MR. FERGUSON:
23     Q. He had the right to do it?
24      MR. SELLINGER: Objection to form.
25     A. He had the right to do it.
Page 54

1 BY MR. FERGUSON:
2     Q. Was it a right to do it?
3     A. No. He had the ability to do it. He didn't
4 have to do it if he didn't want to.
5     Q. And if he didn't do it, there would not have
6 been a -- there would not have been an affiliation --
7 withdraw that -- there would not have been an ability
8 by Marriott Vacation Club people to access
9 Ritz-Carlton Destination Club in Aspen, Colorado.
10 Correct?
11     A. No. They were actually already accessing.
12     Q. How were they accessing it, Ms. Sobeck?
13     A. They were accessing it, actually, before.
14 They were accessing it through the Explorer Program.
15 So we had developer inventory, and the inventory was
16 being used through Explorer.
17     And Marriott Vacation members, before kind of
18 any of this had happened, were able to access it
19 through that Explorer Program.
20     Q. So there were some ways for Marriott Vacation
21 Club high-points users, platinum users, and whatnot to
22 access what you all had allowed?
23     A. Correct.
24     Q. Okay. Had there been any voice given to the
25 Marriott Vacation -- sorry -- to the RCDC folks up in
Page 55

1 Aspen to allow that access, or was it just hoisted
2 upon them?
3      MR. SELLINGER: Objection to form.
4     A. Well, it was the developer using their
5 inventory, just like any other member can use their
6 inventory.
7 BY MR. FERGUSON:
8     Q. Okay. We've covered all that.
9     You were then asked, "So your interpretation
10 of" --
11      MR. SELLINGER: Tell me where you're
12 reading.
13      MR. FERGUSON: I'm following exactly
14 where we were, Mr. Sellinger.
15      THE WITNESS: He's on 46, though. You're
16 on 47, I think.
17      MR. FERGUSON: Oh, we went back to show
18 you Mr. Mercer. Okay. Let's go to 47.
19      MR. SELLINGER: Okay.
20 BY MR. FERGUSON:
21     Q. You were then asked, "So your interpretation
22 of participate or consent is to make the decision?"
23 And you said, "To make the decision to affiliate,
24 yes."
25     Correct? Did I read that correctly?
Page 56

1     A. That's what it says. It wasn't to affiliate.
2 I mean, I think you're asking me many different ways.
3 It's to acknowledge that the members were going to
4 have access.
5     Again, the affiliation was already done. I'm
6 not saying it correctly.
7     Q. It was already done because someone signed it
8 on November 14 --
9     A. Right. The affiliation was already
10 completed.
11     Q. Are you aware that Mr. Mercer and Mr. Oliver
12 visited with you all down here in Orlando on
13 November 14, 2013, the day that Mr. Delorey and
14 Mr. Cunningham signed that document?
15     A. I didn't know that was the same day, but I
16 was -- I do know they were there.
17     Q. You did meet with them, right, when they were
18 here?
19     A. Yes.
20     Q. Did you tell them, "Hey, we signed this
21 affiliation agreement between Lion & Crown and
22 Marriott Resorts Travel Company"?
23     A. I don't think specifically, no.
24     Q. Did you tell him, "Hey, we just signed a
25 document that's going to give you the right to
Page 57

15 (Pages 54 - 57)

1 acknowledge" -- or that's going to -- "we're going to
2 hand you a document that's called 'an acknowledgement
3 and joinder' and you get to decide whether or not you
4 have the Aspen Club sign on with this affiliation"?
5     MR. SELLINGER: Objection to form.
6     A. Yeah -- I don't remember if that
7 conversation -- we were talking about a survey and
8 other things during that time.
9 BY MR. FERGUSON:
10     Q. You had all worked on this affiliation
11 agreement for months; right?
12     A. Yes.
13     Q. And there was a lot of work that went into it
14 through the legal department?
15     A. I can't answer that. I assume so.
16     Q. Was there a lot of work done by people like
17 yourself to get a document like that done?
18     A. No.
19     Q. Do you know how long the affiliation
20 agreement that we see in Exhibit 2102 -- do you know
21 what its term is?
22     A. No.
23     Q. Did you know it's ten years?
24     A. No, I didn't.
25     Q. Do you recall discussing the term of a

Page 58

1     Q. Why not?
2     A. Why not? Because he didn't ask for it.
3     Q. Do you think it would've been fair to give to
4 a board president -- you're the asset manager.
5 Wouldn't it have been fair to give him a document that
6 he was acknowledging and joining?
7     A. I think, if there were any concerns -- they
8 were represented by counsel and there were
9 conversations happening between our attorneys and
10 their attorney. If there was any need for it, I think
11 they would've discussed it. Barbara might have given
12 it to Mr. Marino. I don't know.
13     Q. You don't know that?
14     A. I don't know.
15     Q. Have you ever seen any evidence that
16 Ms. Egolf ever gave this document to anyone at Aspen
17 Highlands?
18     A. I don't know if they did or not.
19     Q. So Marriott Vacation Worldwide, at least as
20 far as you knew from the business side -- not the
21 lawyer side -- did not give the affiliation agreement
22 from November of 2013 to the board president or the
23 board because they didn't ask for it?
24     MR. SELLINGER: Objection to form.
25     A. Yeah. We didn't give it to them, I guess, if

Page 60

1 document called "an MOU" with Mr. Mercer? Do you
2 remember a memorandum of understanding?
3     A. I went over the memorandum of understanding
4 with him, but I don't remember a term being in there.
5     Q. Did you ever tell Mr. Mercer what the term of
6 the affiliation agreement between Aspen Highlands and
7 MRTC is?
8     A. Honestly, I don't remember. I might have,
9 but I don't remember.
10     MR. SELLINGER: Off the record. Whenever
11     is convenient. It's been about an hour. You
12     can pick the right time.
13 BY MR. FERGUSON:
14     Q. Exhibit 2102 --
15     A. Yep.
16     Q. -- why didn't you ever give that to
17 Mr. Mercer?
18     A. Why didn't I ever give it to him?
19     Q. Yeah.
20     A. I guess he never asked for it.
21     Q. But you asked him to sign an acknowledgement
22 and joinder of this document and you never gave it to
23 him?
24     A. I don't know if I gave it to him or not. If
25 he didn't ask for it, I wouldn't have given it to him.

Page 59

1 they didn't ask for it. We would've been talking
2 about it. We did summaries of the program for them.
3 There was a lot discussion about how the program
4 worked, and it was even included in the letters and
5 FAQs and all that type of thing.
6     So if they didn't ask for this, I guess we
7 didn't give it to them. I don't know.
8 BY MR. FERGUSON:
9     Q. What would have prevented you from saying
10 this agreement was 20 years and not -- did you not
11 think you had to tell him what the term was?
12     MR. SELLINGER: Objection to form.
13 BY MR. FERGUSON:
14     Q. Withdraw that. How would he have known what
15 the term of that agreement was if you hadn't shown it
16 to him?
17     A. I don't know -- you mean what the term was --
18 I assume you must be insinuating that I told him,
19 which is fine if I did.
20     Q. You don't know what the term is as you sit
21 here today?
22     A. I don't remember.
23     Q. And you do know that the term is not in any
24 of the documents you just referenced, which were FAQs
25 and letters and informational data. No information in

Page 61

16 (Pages 58 - 61)

1 those FAQs or those letters relates to the term of the
2 affiliation agreement entered into on November 14,
3 2013?
4     MR. SELLINGER: Objection to form.
5     A. I don't remember it being discussed, but I
6 guess I don't understand why that's important.
7 BY MR. FERGUSON:
8     Q. The term of the agreement is not important to
9 a board president? He doesn't know if he's signing
10 for five, ten, or 30 years?
11     A. But the acknowledgement -- I mean, if he
12 wanted to withdraw an acknowledgement, he could
13 certainly do that. We had the ability to sign the
14 affiliation agreement at any time. So if it was ten
15 years and we wanted to do another 30-year term, he
16 didn't have the right to agree to that or not.
17     Q. Does Mr. Mercer have a right today to say,
18 "Listen, my acknowledgement and joinder -- poof -- I'm
19 not doing it anymore. I'm out"? Does he have a right
20 to do that under these documents?
21     MR. SELLINGER: Objection to form.
22     A. I'm not sure why we would care. Again, this
23 is a voluntary program. If he didn't want it to be
24 available for his members, fine.
25 BY MR. FERGUSON:

Page 62

1     Q. Is it your testimony today that he can
2 withdraw from this affiliation agreement? He can say,
3 "My members are no longer acknowledging and no longer
4 joining this agreement"?
5     A. If the board --
6     MR. SELLINGER: Hold on. Hold on. Just
7 read that question back.
8     THE REPORTER: "Is it your testimony
9 today that he can withdraw from this
10 affiliation agreement? He can say, 'My
11 members are no longer acknowledging and no
12 longer joining this agreement'"?
13     MR. SELLINGER: Objection to form.
14     A. If the board decided that they did not
15 want -- if a board decided they no longer wanted to
16 allow their members access to the Marriott Vacation
17 Club system, I don't see why we would have any issue
18 with terminating the acknowledgement. It's something
19 that's available for them if they would like.
20 BY MR. FERGUSON:
21     Q. That's a different question, though -- what
22 you would do. But do you know that he acknowledged
23 and joined an agreement that has a ten-year term?
24     MR. SELLINGER: Objection to form.
25     A. That's not the question you asked me, but --

Page 63

1 BY MR. FERGUSON:
2     Q. That's the question, I guess, I'm asking now.
3 I'm sorry. I forgot what I asked you.
4     A. We already talked about the term. I don't
5 know -- I didn't -- I probably did know the term. I
6 don't remember what the term is. If you're saying
7 it's ten years, I'm not disputing that.
8     Q. Hold on. I'll pick up with the actual signed
9 acknowledgement in a little bit, and we'll take a
10 break.
11     A. Okay.
12     THE VIDEOGRAPHER: We're going off the
13 video record. The time is 10:30 a.m.
14     (Brief recess.)
15     THE VIDEOGRAPHER: We're back on the
16 video record. The time is 10:43 p.m.
17     Counsel, you may proceed.
18     MR. FERGUSON: Thank you.
19 BY MR. FERGUSON:
20     Q. In Exhibit 2102, which is the 2013
21 affiliation agreement that was signed by Mr. Delorey
22 and Mr. Cunningham on November 14th of that year,
23 there's attached to it, Marriott Vacation Club
24 exchange procedures.
25     Do you see that?

Page 64

1     A. Yes.
2     MR. MEADE: Matt, can you just hold on a
3 second? We have to get the technology up and
4 running.
5     MR. FERGUSON: Sure.
6 BY MR. FERGUSON:
7     Q. These Marriott Vacation Club exchange
8 procedures are attached to the November 13, 2013
9 agreement we've been discussing, Exhibit 2102.
10     With respect to these exchange procedures,
11 were these exchange procedures then going to be
12 available to RCDC members that, one, whose association
13 presidents or boards agreed to join and affiliate;
14 but, more importantly, number two, if people elected
15 into what you call a voluntary program with these
16 opportunities -- is this the program that an RCDC
17 member, who signs up at Lion & Crown, gets to use in
18 this exchange program -- this exchange document?
19     MR. SELLINGER: Can you read that back?
20     THE REPORTER: I don't know if I'll be
21 able to do a good job, but --
22     MR. FERGUSON: Let me do it another way.
23 BY MR. FERGUSON:
24     Q. Are these exchange procedures, in
25 Exhibit 2102, beginning on page 23 -- are these

Page 65

17 (Pages 62 - 65)

1 exchange procedures that an RCDC member would get to
2 use if its club joined and that he or she agreed to
3 sign up for Lion & Crown?
4      MR. SELLINGER: Objection to form.
5      A. They would use them if they wanted to use the
6 Marriott Vacation Club system. The Ritz-Carlton
7 reservation system still, obviously, stays in place.
8 Everything they bought stays in place. But if they
9 wanted to use Marriott Vacation Club, this is the
10 exchange procedures they would use.
11 BY MR. FERGUSON:
12      Q. Okay. And the MVCD people, Marriott Vacation
13 Club folks that have points, they also use these
14 exchange procedures?
15      A. Correct.
16      Q. Okay. And they would use these exchange
17 procedures in order to access inventory that's created
18 by a compliant -- or not a compliant -- a
19 participating RCDC member's depositing of an allocated
20 week?
21      A. Yes.
22      Q. You had indicated before that the Explorer
23 people had access to the Ritz-Carlton Destination
24 Clubs?
25      A. That was before the affiliation was in place.
                                                    Page 66

1 things -- these other opportunities. The Ritz-Carlton
2 Destination Club, before it was in the trust, would
3 have been in that program.
4      Q. So RCDC developer inventory was put into the
5 trust that the Explorer Program could access?
6      MR. SELLINGER: Objection to form.
7      A. It wasn't in the trust. That's why --
8 BY MR. FERGUSON:
9      Q. It wasn't?
10      A. Yes. It wasn't in the trust until it was
11 actually conveyed, and then it wouldn't have gone
12 through Explorer.
13      Q. But there was developer inventory that was
14 accessible to Marriott Vacation Club folks through
15 this program?
16      A. Correct.
17      Q. When did that start, Ms. Sobeck?
18      A. I don't know when we started. I mean, Vail
19 started -- so the Vail -- actually, conveyance of the
20 inventory, I think, was in 2011, 2012 -- and probably
21 would've been in around '12 or '13, I would guess. We
22 can go back and look for you.
23      Because we had all this developer inventory
24 to use and we were paying for it, so this was just a
25 way to get some benefit out of that.
                                                    Page 68

1      Q. Right. I understand that. But the Explorer
2 people did have access to the club?
3      A. It's not Explorer people. It's Marriott
4 Vacation Club people through the Explorer Program.
5      Q. And Marriott Vacations folks would join the
6 Explorer Program? How did that work?
7      A. No. It was part of their ownership. I mean,
8 it was a program that they could use as a benefit to
9 their ownership.
10      Q. And how did that benefit work, if at all,
11 vis-a-vis the Ritz-Carlton Destination Clubs?
12      A. So the Explorer Program was something that
13 was -- that was -- opportunities that weren't in the
14 trust. So units like Newport Coast or MVCD Orlando,
15 and all those, that's inventory that's actually in the
16 trust.
17      If inventory wasn't in the trust, there were
18 other opportunities that members had to use --
19 different vacation options -- like Marriott Hotels,
20 Ritz-Carlton Hotels, wine trips in Napa, trips to
21 Europe; and then Ritz-Carlton Destination Club was one
22 of those.
23      It was inventory that wasn't owned by the
24 trust, but it was a program that you could use your
25 points, in essence, to go out and use these other
                                                    Page 67

1      Q. So the benefit -- and that was with respect
2 to Aspen only. The benefit that you would derive was
3 to give your Marriott Vacation Club people access to
4 the club in Aspen; right?
5      MR. SELLINGER: Objection to form.
6      A. It was giving them -- it was, in essence,
7 using what the developer was paying for, because the
8 developer was paying maintenance fees and nothing was
9 being used.
10 BY MR. FERGUSON:
11      Q. And under the theory that the developer is an
12 owner and an owner can rent, that was the rationale
13 for using that inventory for Explorer folks?
14      A. Not to rent. We didn't -- the developer
15 didn't rent. The developer -- yeah, we were paying
16 it; and, therefore, we had the right to use it like
17 any other owner.
18      Q. Okay. I know you're not renting it, but I
19 think you said, because any owner could rent and use
20 it how they wanted to, and because the developer had
21 inventory, you could use it as part of the Explorer
22 Program.
23      MR. SELLINGER: Objection to the form.
24      A. Yeah, the developer could use it, like -- I
25 threw out rent, but an owner could give it to their
                                                    Page 69

Veritext Legal Solutions
866 299-5127

1 housekeeper as a nice Christmas bonus or something
2 like that. I mean, owners can use that inventory
3 however they want.
4 BY MR. FERGUSON:
5    Q. That was my point then, if I can maybe circle
6 up with you. Because people can give it to their
7 housekeeper, they can give it to a charity, or they
8 can give it to a brother-in-law -- because of that,
9 the developer that had inventory in this timeframe --
10 2012, 2013 -- the developer, based upon those rights,
11 thought it could use that inventory for people in the
12 Explorer Program?
13    A. Correct.
14       MR. SELLINGER: Objection to form.
15       MR. FERGUSON: What's your objection,
16 Mr. Sellinger?
17       MR. SELLINGER: I don't think that you
18 accurately summarized the testimony.
19       MR. FERGUSON: Well, I wasn't summarizing
20 testimony. I was summarizing the program.
21       It seems that you want to object to every
22 question to throw off my cadence here, but I
23 guess that's what you're going to do.
24       MR. SELLINGER: You are very capable of
25 not having your cadence affected by an
Page 70

1 not given?
2    A. I see termination.
3    Q. If you go to 10.4 on page 14, their page 16?
4    A. Yes. "Automatically renew for additional
5 five years unless either party provides notice."
6    Q. So this agreement would go to about November
7 of 2023?
8       MR. SELLINGER: Objection to form. I'm
9 sorry. I withdraw that objection.
10 BY MR. FERGUSON:
11    Q. It was signed November of '13. It goes to
12 November of 2023; correct?
13    A. Well, what if it auto-renews?
14    Q. Yeah. And then it can renew after that,
15 yeah.
16    A. Yeah.
17    Q. Okay. Got it. Just digress for a second.
18 Ms. Babich had testified that she provided a
19 signature -- a blank signature -- for you all to affix
20 to her letters.
21       Do you know anything about that?
22       MR. SELLINGER: Is there a deposition
23 reference?
24       MR. FERGUSON: No.
25       MR. SELLINGER: Objection to form.
Page 72

1 objection to form, which is certainly not my
2 goal. My goal is to preserve the record, as
3 I'm required to do.
4       MR. FERGUSON: I think you're just
5 objecting without any rationale, but,
6 whatever.
7 BY MR. FERGUSON:
8    Q. If you go to page 13, which is 15 on their
9 system, of Exhibit 2102?
10    A. Yes.
11    Q. There is a term, correct -- the term of this
12 agreement is ten years; right?
13    A. "The agreement shall have a term commencing
14 on effective date" --
15       MR. SELLINGER: Hold on a minute. Can we
16 put it on the screen?
17    A. -- "after the effect date." Yes.
18       MR. FERGUSON: That's not the document.
19 2102. Hold up for the TV.
20       THE WITNESS: Your page 15. That's
21 right. Yes. There it is -- 10.1.
22 BY MR. FERGUSON:
23    Q. 10.1 is a ten-year term?
24    A. That's what it says.
25    Q. And does it automatically renew if notice is
Page 71

1 BY MR. FERGUSON:
2    Q. Let me show you Exhibit 1024, if you want to
3 spend just a moment with that. This is the evolution
4 letter. I don't want to go and recreate the whole
5 record -- but this is one of the more important
6 documents in the matter.
7       My question is, do you recall the situation
8 where she just provided you with a blank signature to
9 use on these letters?
10    A. I don't -- no, not to me, but it certainly
11 could have happened.
12    Q. As far as her signing this as general manager
13 of the Cobalt Travel Company, LLC, do you know what
14 that means?
15    A. She ran member services at this time.
16    Q. Did she have an official title as general
17 manager of Cobalt Travel?
18    A. Yes. I should say, I think she was general
19 manager of member services. I don't know specifically
20 if she was general manager of the Cobalt Travel
21 entity.
22    Q. Well, she wasn't a manager or a member in
23 that sense. She wasn't an official manager of the
24 company, was she?
25       MR. SELLINGER: Objection to form.
Page 73

19 (Pages 70 - 73)

Veritext Legal Solutions
866 299-5127

1    A. I don't believe she is.
2  BY MR. FERGUSON:
3    Q. You understand that LLCs have members and
4  managers, just generally, and corporations have
5  shareholders and directors?
6    A. I do.
7    Q. She wasn't a manager in the LLC form?
8    A. I don't know if she was or not, but I think
9  the general manager title was referencing her title at
10  member services.
11    MR. FERGUSON: Could you bring up the
12    privilege log number two, Mr. Michael Reiser,
13    Jr.?
14    Is there a first page to that, to the
15    cover letter? No? Okay.
16    (Exhibit 2141 was marked for
17    identification.)
18  BY MR. FERGUSON:
19    Q. Exhibit 2141, this is a supplemental
20  privilege log provided on April 6th, Ms. Sobeck.
21    Let me ask you this first. Do you recognize
22  this format of this document?
23    A. No.
24    Q. If you go to page 3 of Exhibit 2141, at the
25  very bottom of the page, you'll see a document, ID
Page 74

1  Travel Company, which were prepared by and/or with the
2  assistance of counsel."
3    This one, it says, "Marriott Resorts Travel
4  Company and Cobalt, as opposed to Lion & Crown."
5    Is that a different agreement? Do you have
6  any recollection that there might have been two
7  agreements prepared in that timeframe?
8    A. Well, right here, the next -- it says,
9  "Marriott Vacation Club and Lion & Crown."
10    Q. Okay. Where are you pointing to?
11    A. The second section.
12    Q. Okay. That would be the section that starts
13  with "Trisha Wetmore"?
14    A. Yes.
15    Q. Who's Trisha Wetmore?
16    A. She's an attorney.
17    Q. With Marriott Vacation Worldwide?
18    A. Yes.
19    Q. Does she work on documents such as
20  affiliation agreements with respect to your knowledge?
21    A. Yes. She works with Barbara.
22    Q. This e-mail chain -- I think these are e-mail
23  chains that actually start on May 30, 2013 -- and it
24  talks about, as you pointed out, the agreement between
25  MRTC and Lion & Crown. It's copied to Essig, Mary
Page 76

1  Number 1770.
2    Are you there with me?
3    A. On this, yes.
4    Q. It says, "Nature and description of document,
5  Draft affiliation agreement between Marriott Resort
6  Travel Company, Inc. and Lion & Crown Travel Company,
7  LLC, prepared by and/or with the assistance of
8  counsel." If you pick it up on the next page, it's
9  dated May 30, 2013.
10    Does that sound about the time, May of 2013,
11  that the affiliation agreement between Lion & Crown
12  and MRTC was being first contemplated?
13    A. Yes, I guess so. That's what it says.
14    Q. You'll see that the next document ID Number
15  is 31454 -- 314 --
16    A. I can't see it. It's gotten too small on the
17  screen.
18    Q. I'll need you to just work along with the
19  next document on page 4. It's 31454. This is a
20  document -- another ID of another document. It's
21  dated May 31, 2013, at 3:43 and 10 seconds p.m.
22    It says, "E-Mail communication, questions,
23  and comments provided by legal counsel in draft
24  documents, including draft affiliation agreement
25  between Marriott Resorts Travel Company and the Cobalt
Page 75

1  Lynn Clark, Stephanie Sobeck, Nick Rossi -- what is
2  Nick Rossi doing these days?
3    A. Nick Rossi is head of -- we call it IPSM.
4  It's the revenue management team, inventory team.
5    Q. Darla Everett, who's she?
6    A. Darla Everett works in feasibility.
7    Q. Patrick Forth, Eveleen Babich, Stacey
8  Jackson-Rauso, Chris Martin.
9    Who's Chris Martin?
10    A. Chris Martin is director of finance for RCDC.
11    Q. What does he do as director of finance?
12    A. Looks at all the financials that are produced
13  by the onsite teams.
14    Q. And then Barbara Egolf and Kathi
15  Borkholder -- I mentioned her before. I misspoke and
16  called her Tracy. I'm sorry. Tracy Borkholder also
17  worked with Ms. Egolf and Ms. Westmore?
18    A. Kathi. Yes. I won't tell her.
19    Q. So as early as May of 2013, this affiliation
20  agreement that ended up getting signed in November of
21  2013 was being circulated between all those folks;
22  right?
23    A. Yes.
24    Q. And do you know whether -- I think we already
25  covered with you that you may or may not have this in
Page 77

20 (Pages 74 - 77)

1 a work folder on your computer?
2        MR. SELLINGER:  Objection to form.
3        A.  I don't know if it's in a work folder or not.
4 BY MR. FERGUSON:
5        Q.  If you wanted to see it, for example, to
6 prepare for a deposition -- you wanted to see the
7 affiliation agreement -- how would you access it on
8 your computer?  Would you go into a central --
9        A.  No.  I would ask the law department to have
10 the most updated affiliation agreement.
11        Q.  So the law department keeps the affiliation
12 agreement -- at least them?
13        A.  At least them?
14        Q.  We know that the law department keeps a copy
15 of the affiliation agreements?
16        A.  Yes.
17        Q.  How about folks like Ms. Clark; would she
18 have had that, do you know, in her files?
19        A.  I don't know if she would have had it.
20        Q.  How about Mr. Rossi; would he have had a
21 document like that in his files?
22        A.  I don't know.
23        Q.  They would have their e-mails -- they have
24 access to their e-mails, obviously?
25        A.  I can only speak -- I have access to my
                                                    Page 78

1 survey to the members.
2        Q.  So in May and June of 2013, when this
3 affiliation agreement between MRTC and Lion & Crown
4 was being done -- was being circulated and worked
5 on by this group of people -- at that point, you
6 didn't -- you still thought you were going to have a
7 vote?
8        MR. SELLINGER:  Objection to form.
9        A.  We thought we were having a survey.  I don't
10 remember when the first -- can somebody refresh my
11 memory about when the Aspen survey started?
12 BY MR. FERGUSON:
13        Q.  December 4th or 5th of 2013.
14        A.  Right.  It ended January, like, 15th; right?
15        Q.  January 13th.
16        A.  13th.  Yes.
17        Q.  I guess my question is, do you know whether
18 there was an acknowledgement and joinder being
19 contemplated when the draft was being circulated in
20 May and June of 2013?
21        A.  I don't know if it was or not.
22        Q.  Do you have any idea as to why the documents
23 in Exhibit 2141 -- again, I think I told you at the
24 beginning that it was eight pages -- do you know why
25 these documents were not designated as privileged in
                                                    Page 80

1 e-mails.  I would assume they do as well.
2        MR. FERGUSON:  Go to page 5 of
3     Exhibit 21 -- same document, 2141.  If you
4     just pull 13503, which is the bottom half of
5     that document?
6 BY MR. FERGUSON:
7        Q.  This is another document, Number 13503.  I'm
8 not going to, obviously, go through all of these.
9 This is another e-mail chain.  It looks like it starts
10 in June 13th and continues to June 24th at the top.
11 Same basic people are copied there.
12        Just looking at this -- at this document --
13 as we scan through the other pages -- 4, 5, 6, 7 -- do
14 you have a general recollection of this document being
15 circulated and drafted in May and June of 2013?
16        A.  I do after seeing this, yes.
17        Q.  In terms of the acknowledgement and joinder
18 document that talks about the association wanting to
19 have some input by a survey -- withdraw that.
20 Withdraw that totally.
21        In this timeframe, May and June of 2013, you
22 all are still trying to work on how to conduct a
23 survey or -- a survey and/or a vote in that timeframe.
24 Right?
25        A.  Yes.  We were trying to work on how to do a
                                                    Page 79

1 the original privilege log?  Any idea about that?
2        A.  No.
3        Q.  But it was being passed around numerous folks
4 at the company; right?
5        MR. SELLINGER:  Objection to form.
6        A.  The draft affiliation agreement was being
7 passed around, yes.
8        MR. FERGUSON:  Would you go to the next
9     exhibit, Michael, which is the first
10     privilege log?  What exhibit is that?  2140?
11     Thank you.
12        Would you go to Exhibit 2140?
13     Mr. Sellinger and Ms. Livingston, that is a
14     142-page privilege log.
15 BY MR. FERGUSON:
16        Q.  I'm not going to be able to show you all
17 142 pages here, Ms. Sobeck.
18        A.  Thank you.
19        Q.  Same question for you.  Have you ever seen
20 the privilege log prior to today?
21        A.  No.
22        Q.  Would you go to page 95 of Exhibit 2140?
23 You'll see that on document number 63228, which is the
24 second document on the privilege log in Exhibit 2140,
25 is an e-mail.  Ms. Babich is listed as the custodian
                                                    Page 81

21 (Pages 78 - 81)

1  here.

2      It says it's an e-mail from Barbara Egolf.

3  Addressees, Patrick Forth, Tricia Wetmore, Dee Dinda,

4  Kathi Borgholder, Eveleen Babich, and Teresa Andrus.

5      Who's Teresa Andrus?

6      A. She works in member services. She does a lot

7  of the communication. She'll send out -- distribute

8  communication.

9      Q. This is dated November 12, 2013, two days

10 before Mr. Delorey and Mr. Cunningham signed the 2013

11 affiliation agreement between MRTC and Lion & Crown.

12      Do you recall being -- you're not copied on

13 this. Do you recall being involved at all in this

14 timeframe, right before execution, in either the

15 preparation of or comments for the affiliation

16 agreement?

17      A. I was certainly working with Aspen at the

18 time. Was I working on the Aspen affiliation

19 agreement? I don't remember specifically.

20      Q. I'm talking about the affiliation agreement

21 between MRTC and Lion & Crown.

22      A. Isn't that what we just looked at before?

23      Q. It's not specific to Aspen; is it?

24      A. The other one was Aspen, San Francisco, and

25 Vail, I think it said, the one you just showed me

Page 82

1  November 14, 2013?

2      A. I believe we were -- that was in my testimony

3  before. I believe we were talking about the

4  management agreement.

5      Q. That was coming due in a year or so?

6      A. The auto renewal was coming up, yes.

7      Q. Let me just show you Exhibit 1008.

8      A. Okay.

9      Q. Exhibit 1008 is titled on the front page,

10 "Ritz-Carlton, San Francisco, membership program and

11 affiliation agreement." I just want to get this kind

12 of marked and out there, because we're dealing with

13 the affiliation agreement from November 2013.

14      But do you recognize this document generally?

15      A. Yes. This is the affiliation agreement

16 between Cobalt, and this specifically was with San

17 Francisco.

18      Q. There was one we saw earlier, which was the

19 predecessor name for Aspen. It was called the

20 Ritz-Carlton Travel Company. That's Exhibit 1003;

21 correct?

22      A. I don't know if it's Exhibit 2003, but, yes.

23      Q. Okay. So each club got an affiliation

24 agreement with Ritz-Carlton Travel Company, that

25 became Cobalt, and this is San Francisco's version of

Page 84

1  before.

2      Q. When you say, "Aspen, San Francisco, and

3  Vail," are you talking about the nomenclature itself?

4      A. It said, "Matters," and it was listed, the

5  three clubs.

6      Q. I think that's -- Delorey is telling us what

7  case it's applicable to, as opposed to what the

8  affiliation agreement relates to.

9      A. Okay.

10      Q. My question is simply, were you involved in

11 this timeframe, in the preparation of this affiliation

12 agreement?

13      A. This is talking about an e-mail communication

14 that's going out about affiliation. I don't think

15 this is actually about the affiliation agreement

16 itself, but I'm only reading what's on here.

17      Q. You're right. But in this timeframe, there

18 was communication regarding the affiliation between

19 Lion & Crown with MVCD amongst these several folks;

20 correct?

21      MR. SELLINGER: Objection to form.

22      A. It appears there was.

23 BY MR. FERGUSON:

24      Q. What was the purpose of the meeting, if you

25 recall, when Mr. Oliver and Mr. Mercer visited here on

Page 83

1  that document?

2      A. Correct. It named the program manager for

3  the property.

4      Q. The program manager was Cobalt?

5      A. Correct.

6      Q. Exhibit 1013, which is coming apart, so I

7  have a paperclip for you. Don't cut yourself.

8      A. It's the one for Lake Tahoe.

9      Q. Exhibit 1013, is that a copy of the

10 affiliation agreement with the program manager,

11 Cobalt, for the Lake Tahoe property?

12      A. Correct.

13      Q. If you go to the last -- the next to the last

14 page, there's signature blocks. There's three pages.

15 There's going to be a few page 18s just to make things

16 easy for us.

17      A. Oh, there's multiple pages.

18      Q. I believe you talked about --

19      MR. SELLINGER: Can we have them pull

20 that up?

21      MR. FERGUSON: The first page 18.

22      THE WITNESS: It's page 20.

23      MR. FERGUSON: Which is page 20.

24      THE WITNESS: Yes. Robert Phillips.

25 BY MR. FERGUSON:

Page 85

22 (Pages 82 - 85)

1   Q. I think you mentioned him at your deposition.
2   What was his position?  This is the Marriott
3   International days, when Marriott International had
4   the vacation club business; correct?
5       A. Yes.  Any time before 2011.
6       Q. Right.  Mr. Phillips was with -- was he with
7   the vacation side of Marriott International?
8       A. Yes.  He worked specifically on The
9   Ritz-Carlton Destination Club.
10      Q. So he signed for the Cobalt Travel Company,
11  whose sole member was the Ritz-Carlton Development
12  Company.
13          Do you see that?
14      A. Yes.
15      Q. Mr. Phillips is gone?
16      A. He is gone.  Not gone.  He's no longer with
17  us.
18      Q. He's retired or left the company?
19      A. I think he's still working, but, yes, he left
20  the company.
21      Q. The Ritz-Carlton Development Company, Inc.,
22  that was signed on page 21 by a fellow named Peter J.
23  Watzka; is that right?
24      A. Yes.
25      Q. Mr. Watzka, was he someone who worked with

Page 86

1   the RCDC system from the beginning?
2       A. He was our head of sales and marketing.
3           MR. SELLINGER:  Belatedly, objection to
4   form.
5   BY MR. FERGUSON:
6       Q. Head of sales and marketing for MVW?
7       A. He was -- well, what's your question?  When
8   he was here?
9       Q. Well, you said he was the head of marketing
10  development -- I'm sorry.  I forgot what you said.
11  Marketing and development?
12      A. He ran our sales and marketing department for
13  a long time; and then, later in his career with MVW,
14  he was working specifically on The Ritz-Carlton
15  Destination Club.
16          I don't know when this falls in that chain of
17  events.
18      Q. Did he transition with the vacation club
19  side, which included RCDC, when it was spun off from
20  Marriott International?  In other words, did he make
21  the transition from MI to MVW?
22      A. For a short period of time.
23      Q. Did you have any involvement at all in
24  connection with potential packaging of the RCDC system
25  for a sale to a third party?

Page 87

1       A. No.
2       Q. Were you aware of that?
3       A. Yes.
4       Q. Mr. Albert signed for the Highlands Resorts
5   Association.
6           Was he an employee of -- he was an employee
7   of Marriott Vacation Worldwide, was he not -- sorry --
8   he was an employee of Marriott International?
9       A. At this time, Marriott International.
10      Q. And he's made it over to the Marriott
11  Vacation Worldwide company here in Orlando?
12      A. Yes, he has.
13      Q. Thank you.
14      A. Do you want to know about Dan Zanini?
15      Q. Yeah, let's cover that.
16      A. He's still with us.
17      Q. Let me show you what's been previously marked
18  as Exhibit 1307.
19      A. Randy Mercer.  I hope you guys recycle.
20      Q. Yeah, I do.  Just for kind of a placeholder,
21  this is a letter that went out -- this particular
22  one -- to Mr. Mercer.  This is the letter that went
23  out after you all met with Mr. Mercer and Mr. Oliver
24  here in Orlando, where, I think, you told the members
25  generally what was coming in terms of critically-asked

Page 88

1   questions in a survey.
2           Do you generally recall this document?
3       A. Yes, I do.
4       Q. This has been shown to about 40 or 50 of our
5   clients.  I figured I'd spend a few moments with you.
6           It says, "The Ritz-Carlton Destination Club
7   and your board have been exploring" -- and this is
8   page 2 -- I'm sorry -- of Exhibit 1307.
9       A. I have it.
10      Q. -- "exchange opportunity with the Marriott
11  Vacation Club Destination Exchange Program."
12          It says here, "As promised earlier this year,
13  members of The Ritz-Carlton Club, Aspen Highlands,
14  will be surveyed on their opinion regarding potential
15  exchange affiliation with Marriott Vacation
16  Destination Exchange Program."
17          Did you have any part in writing this letter?
18      A. I certainly reviewed it, if I didn't write
19  part of it, yes.
20      Q. Were you the primary author of this document?
21      A. I wrote some of it.  Some of it, I believe,
22  was -- there were multiple people who were involved.
23  You're going to ask me all of them, and I don't know
24  who they all were.
25      Q. Some of the people we see being -- there's

Page 89

23 (Pages 86 - 89)

1  about 20, 30 pages of communications around
2  November -- early November, mid November, late
3  November of 2013.
4      We saw Egolf and Wetmore and Borkholder on
5  the legal side, and Dee Dinda, Patrick Forth, Eveleen
6  Babich, Teresa Andrus.  Were those the types of people
7  helping with this letter?
8      A.  Yes.
9      Q.  And who gave you the input of any -- withdraw
10 that.  Who was the person who wrote this sentence that
11 says, "Promised earlier this year, members of RCDC
12 Aspen will be surveyed on their opinion"?  Who wrote
13 that part of it?
14     A.  I don't know.
15     Q.  Are you aware of a single document between
16 April 5, 2013 and November 19, 2013, that said they
17 were going to be surveyed -- you told the members they
18 were going to be surveyed?
19     A.  I don't know specifically.
20     Q.  Then, on the bottom of that paragraph on
21 page 2 of Exhibit 1307, it says, "A more complete
22 frequently-asked-questions sheet will be included with
23 a survey."
24     And the survey went out in the next couple
25 weeks; correct?

Page 90

1      A.  Yes.
2      Q.  I'm not going to cover the survey again,
3  but --
4      MR. SELLINGER:  I'll just note for the
5      record that I'm not sure what this inquiry or
6      exhibit has to do with the production of the
7      documents that gave rise to the deposition,
8      but I'm not foreclosing --
9      MR. FERGUSON:  I'm happy to tie it
10     together.
11 BY MR. FERGUSON:
12     Q.  By November 19, 2013, when this went out to
13 876 Aspen members -- or however many -- I know you
14 guys own some inventory still.  When this went out,
15 the ink on the affiliation agreement that was produced
16 in March of 2018 for the first time was just drying;
17 right?  It had been signed four or five days earlier;
18 right?
19     A.  Correct.
20     Q.  And was there any mention in the letter that
21 you drafted for Mr. Cunningham and the board to sign
22 that once -- it is 876 people.  Was there any mention
23 in there that there had just been an affiliation
24 agreement entered into between those two entities?
25     A.  I don't believe so, but there wouldn't have

Page 91

1  had to be.
2      Q.  Well, that's my next question.  You didn't
3  have to tell them about that.  But did you bother to
4  tell them that there was going to be a right of the
5  board to have an acknowledgement and joinder of that
6  agreement?  Did you mention that to them in this
7  letter at all?
8      MR. SELLINGER:  Objection to form.
9      MS. LIVNGSTON:  Object to form.
10     A.  I'm sorry.  I don't know if it's in here or
11 not, but I'm assuming, because you're asking, it's
12 not.
13 BY MR. FERGUSON:
14     Q.  Let me ask you.  I read this, but maybe there
15 is a reference to it that's oblique or that the
16 uninitiated might not know is a reference to that
17 agreement -- that joinder, rather.
18     MR. SELLINGER:  Objection to form.
19     THE VIDEOGRAPHER:  Counsel, would this be
20     a good time to go ahead and do the change?
21     MR. FERGUSON:  It's been an hour already?
22     THE VIDEOGRAPHER:  It's within five
23     minutes.
24     MR. FERGUSON:  Go ahead.
25     THE VIDEOGRAPHER:  This is the end of

Page 92

1  media unit one.  We're going off the record.
2  The time is 11:23 a.m.
3      (Off record.)
4      THE VIDEOGRAPHER:  This is media unit
5  number two in the deposition of Stephanie
6  Sobeck.  We're going back on the video
7  record.  The time is 11:23 a.m.
8      Counsel, you may proceed.
9 BY MR. FERGUSON:
10     Q.  Ms. Sobeck, you were looking at Exhibit 1307
11 to see if there's any reference to the acknowledgement
12 and joinder document that was attached as Exhibit B to
13 the affiliation agreement and was signed by
14 Mr. Delorey and Mr. Cunningham a few days earlier.
15     Is there --
16     A.  Yes.  I don't see anything about the
17 acknowledgement.
18     Q.  Thank you.  I'm going to show you
19 Exhibit 1354.  It starts at the back, like all e-mails
20 like these.  There's an e-mail from you on page 135403
21 that starts with, "Randy, please find the revised
22 affiliation agreement for Aspen Highlands which
23 updated the effective date."
24     Do you see that?
25     A.  Yes.

Page 93

24 (Pages 90 - 93)

1    Q.   Was that all that was done, was updating the
2 effective date, the revision?
3    A.   I don't know if there were additional changes
4 made.  It appears here that it was just effective
5 date.
6         (Exhibit 2104 was marked for
7    identification.)
8 BY MR. FERGUSON:
9    Q.   I'll show you Exhibit 2104, which I don't
10 have an extra copy of.  So 2104 is a document produced
11 by the homeowners association, Bates label 18031.
12 It's kind of free-flowing in the production, but it's
13 dated January of 2014.
14      Do you see that?
15    A.   Yes.
16    Q.   Was there going to be an earlier effective
17 date or -- what do you recall about effective dates,
18 if anything?
19      Was there going to be earlier than --
20      MR. SELLINGER:  I'm sorry.  Can you put
21    up the part of the agreement that --
22      MR. FERGUSON:  Sure.
23    A.   I don't know.  It might have been drafted
24 with an earlier date, and then we were updating it
25 based on when it was going to be executed, but I'm
Page 94

1 it says -- if you can go there -- 1354, page 3.  You
2 wrote to him, "This memorializes the Aspen Highlands
3 members having voluntary access to Marriott Vacation
4 Club Destination Club Exchange Program.  Let me know
5 if you have any questions.  If not, please sign and
6 return at your convenience."
7      Do you see that?
8    A.   Yes.
9    Q.   We talked about this before, but it would
10 appear for certain here that you did not send him the
11 actual agreement you were asking him to acknowledge
12 and to join; right?
13    A.   Yes.  But it certainly could have been sent
14 if he had requested it before.
15    Q.   If he had requested it, it would have been
16 sent?
17    A.   Sure.
18    Q.   If his lawyer had requested it, it would've
19 been sent?
20    A.   Correct.  It might have.  I don't know.
21      (Exhibit 2103 was marked for
22    identification.)
23 BY MR. FERGUSON:
24    Q.   Can you go to Exhibit 2103?  This is a first
25 amendment to the affiliation agreement that Delorey
Page 96

1 really speculating.  I don't know.
2 BY MR. FERGUSON:
3    Q.   It says, "This acknowledgement shall be
4 effective as of the date set forth in the written
5 notice provided by Lion & Crown to association and
6 MRTC, effective date, which effective date shall be no
7 less than 30 days after the date of such written
8 notice."
9      That's a document that had to be provided at
10 some future time to give that notice?
11      MR. SELLINGER:  Objection to form.
12    A.   Yeah.  I think there was a separate document,
13 yes.
14 BY MR. FERGUSON:
15    Q.   I hate to jump around with the people on the
16 television there, but going back to 1354, it says --
17 it's a revised affiliation agreement with an updating
18 of the effective date.
19      Do you know whether that's referring, if you
20 know, to the January blank, 2014, or is there some
21 change in the effective date language in the bottom of
22 the first paragraph of Exhibit 2104?
23    A.   No.  My assumption would be, it would've been
24 the effective overall date, the January 2014 date.
25    Q.   Thank you.  Then back to your e-mail, 1354,
Page 95

1 and Cunningham signed a few weeks earlier, the changes
2 to article two.  And it says -- and the changes for
3 the purpose of clarification -- "MVCD and Lion & Crown
4 may negotiate changes to the form of the
5 acknowledgement from time to time with participating
6 Lion & Crown associations."
7      Lion & Crown associations would be, for
8 example, Tahoe, Aspen, St. Thomas -- I'm sorry --
9 Tahoe and Aspen Highlands?
10    A.   Correct.
11    Q.   Do you have any recollection as to why this
12 clarification was effectuated in this first amendment
13 to affiliation agreement?
14    A.   Not specifically, but if there was a tweak of
15 language that one of the boards was requesting, it
16 would allow them to do that.
17    Q.   So Exhibit B in the initial affiliation
18 agreement that was signed by Delorey and Cunningham on
19 November 14, 2013, had an Exhibit B with fixed
20 language in the acknowledgement and joinder?  That was
21 the form that had to be signed pursuant to that
22 agreement?
23    A.   Correct.
24      MR. SELLINGER:  Objection to form.
25    A.   And this was --
Page 97

25 (Pages 94 - 97)

BY MR. FERGUSON:
1  Q. We're talking over each other. Sorry. Go
ahead.
4  A. (Shakes head.)
5  Q. Does this give you some flexibility if
someone asked you for some changes?
7  A. Yes.
8  Q. Was someone asking for changes at this point
in time, if you know?
10  A. I don't remember if they were or not.
11  MR. SELLINGER: Off the record. At some
point -- we're over an hour now, so --
13  MR. FERGUSON: We'll take a break. I'm
getting close to handing this to Mike for the
other documents.
16  THE WITNESS: Can we finish --
17  MR. SELLINGER: How much longer?
18  MR. FERGUSON: I'd say 15.
19  THE WITNESS: I'm good.
20  MR. REISER: The witness is good.
21  THE WITNESS: He's the one with the hip.
22  MR. FERGUSON: Take five.
23  MR. SELLINGER: Let's take five.
24  THE VIDEOGRAPHER: We're going off the
record. The time is 11:31 a.m.

Page 98

1  (Brief recess.)
2  THE VIDEOGRAPHER: We're back on the
record. The time is 11:47 p.m.
4  Counsel, you may proceed.
5 BY MR. FERGUSON:
6  Q. Ms. Sobeck, Exhibit 1357 is an HOA document.
I know you're not a copyholder or a recipient, but I
just wanted to ask you about page 2 of 1357. It's
between Mercer and his board members on February 24,
2014.
11  He mentions that this document was passed to
him by Stephanie while in the board meeting in
Orlando.
14  Was there a meeting -- we saw, I think,
January 30th, you sent him the affiliation agreement
as revised. Was there a board meeting before you
revised the acknowledgement that you sent to him on
that date, or was it after?
19  MR. SELLINGER: Objection to form.
20  A. I don't remember the date of the board
meeting.
22 BY MR. FERGUSON:
23  Q. Well, when he talks about a board meeting in
Orlando to his board, what type of meeting did you
actually have with Mr. Mercer in early 2014?

Page 99

1  A. We had a -- they did have a board meeting in
Orlando sometime. I'm not sure if it's the 2014 --
many of our boards do board meetings in different
places. If this is the one we met with Lee, it wasn't
actually a board meeting. We were talking about the
management agreement, which is, I believe, what you
were talking about earlier.
8  Q. The management agreement came up later in
2014, right, after the affiliation acknowledgement --
sorry -- the acknowledgement and joinder of the
affiliation agreement and the MOU, which I'm going to
cover in a moment.
13  The next thing that followed was the
renegotiation of the management agreement; right?
15  A. Correct, but we started conversations. The
management agreement was part of -- always part of the
conversation with them.
18  Q. In terms of you passing on to him the joinder
to affiliation agreement, does that help you recall
what he might be referring to in terms of a meeting --
a board meeting -- in Orlando, where you would have
handed him something like this?
23  A. This would've been the agreement that --
well, because we had finished the survey at this
point -- because the survey was finished mid

Page 100

1 January -- and -- I'm not sure if this is the board
meeting.
3  They had a board meeting in which we talked
about the survey results, and then I would have given
him the acknowledgement for his -- for him to look at
or sign, whatever he wanted to do.
7  Q. Okay. At some point -- he talks about the
selection of lawyers there -- but at some point,
Mr. Marino appeared to work with Mr. Mercer and his
board with Ms. Egolf?
11  A. Yes.
12  Q. Exhibit 1360. Ms. Sobeck, Exhibit 1360 is an
e-mail that was produced by the association. I'm not
sure I found your side of this in the production, but
we have it nonetheless in this production.
16  This is you sending an e-mail to Mr. Mercer
with a copy to Mr. Oliver.
18  Do you see that?
19  A. Yes, I do.
20  Q. Why were you only copying Mr. Oliver at this
time in terms of the Aspen Highlands acknowledgement
form?
23  A. Randy and Tyler were taking a lead on these,
so I was spending most of my time talking to the two
of them.

Page 101

26 (Pages 98 - 101)

1    Q. It looks like you forwarded to him a PDF
2 called "Aspen Highlands acknowledgement." Would that
3 have been the acknowledgement and joinder form that
4 we've been talking about today as Exhibit B to the
5 affiliation agreement?
6    A. Yes.
7    Q. You also gave him a detailed "how to use
8 guide; correct?
9    A. Yes.
10    Q. That's a PDF. And there's something called a
11 "13-2542-RCC Aspen member MVCD and VCD affiliation
12 brochure file, PDF."
13        What was that last document? What was that
14 brochure?
15    A. I don't remember specifically. I guess it
16 would've been a summary of the affiliation program
17 with MVCD.
18    Q. Had you prepared one of those already then?
19 Obviously, you had, I guess.
20    A. Well, we did. We had a -- members had to
21 enroll in Lion & Crown and -- I actually don't
22 specifically remember an affiliation brochure, but,
23 obviously, it exists. Is it back here that I can look
24 at it?
25    Q. Yeah, I think it is. Yeah, it is. There's

1 two pages for that sound about right -- two pages
2 long?
3    A. I don't know how long it is.
4    Q. It says, "Based on our last discussion, we
5 have revised affiliation acknowledgement for Aspen
6 Highlands and we have included the brochure."
7        You can take a look at Exhibit 1360 and the
8 attached acknowledgement. I do see that it now says
9 February -- it's supposed to be January.
10        Were any other changes made to the
11 affiliation, acknowledgement, and joinder agreement
12 when you sent it to them on February 27, 2014?
13    A. I don't know.
14    Q. At this point, you said -- you had mentioned
15 that Mike Marino was to work with this.
16        Do you see that?
17    A. Right here -- I guess this Exhibit A and B is
18 information of certain features and offerings in the
19 MVCD program, section 9. That probably would've been
20 the change, because now they're talking about Exhibit
21 A and B, which would've been the...
22    Q. I got it. Would you go to -- well, if you go
23 to the November -- you can look at that one too -- but
24 if you can also go to the affiliation agreement
25 itself, and try to determine what was added?

1 some type of brochure with a lot of photos and options
2 and whatnot.
3    A. This is what we call the "how to use guide."
4    Q. Is this the "how to use guide"?
5    A. Well, hold on one second. Let me look.
6    Q. That's okay.
7    A. So this has on it the acknowledgement. This
8 is actually the Marriott Vacation Club brochure that
9 talks about all the options within Marriott Vacation
10 Club.
11    Q. Okay. Is that what was being sent to him, or
12 do you know? It's weird...
13    A. So this -- so, in essence, this is all of the
14 options that you have to use within Marriott Vacation
15 Club. It doesn't include the how to use guide. It
16 has the other options.
17    Q. In fact, I just noticed that, Ms. Sobeck. It
18 goes from 8825, which is the last page of the enclosed
19 affiliation agreement, and there's two pages missing,
20 26 and 27. Don't ask me why, but I apologize. That
21 probably would've been the other attachment, which
22 would've been the how to use guide.
23        Do you see what I'm saying?
24    A. Yes.
25    Q. Does that detailed how to use guide -- does

1    A. Well, that's what you asked me; isn't it?
2    Q. It is, yeah.
3    A. Okay. So --
4    Q. It looks like paragraph --
5    A. Yeah -- and I can't say -- I'm just saying
6 that appears to be -- that paragraph 9 seems to have
7 changed from the last version you gave me in January
8 to the new version you've given me in February, which
9 has -- talks about two exhibits.
10    Q. Okay. So the affiliation, acknowledgement,
11 and joinder agreement or form was being negotiated to
12 some extent at this timeframe?
13    A. It appears it was being discussed with the
14 board and they wanted a couple additional things.
15    Q. You would agree with me that this e-mail,
16 Exhibit 1360, providing potential new exhibits for the
17 acknowledgement and joinder, you did not send to him
18 the underlying affiliation agreement in this agreement
19 either; right?
20    A. The underlying affiliation agreement is not
21 included in this document, correct.
22    Q. Let me show you Exhibit 1364. This is an HOA
23 document. I'm trying to -- I'll show you the bottom
24 of page 1. It says "March 3, 2014." It's between
25 Marino and Marino, I think, to Randy Mercer. "We got

Veritext Legal Solutions
866 299-5127

1 all the preliminaries out of the way."
2     He says, "Barbara, as usual, downplayed
3 everything. I told her one-sided. All about assuring
4 Marriott experience in Aspen. Wanted platinum
5 experience for its members. We speak again tomorrow
6 at 4:00 p.m."
7     You were in and out of the negotiations,
8 or discussions, I should say, with Mr. Marino,
9 Ms. Egolf -- I know I say that wrong every time -- and
10 Mr. Mercer, were you not, in this timeframe?
11   A. Yes.
12   Q. At some point, a document called a
13 "Memorandum of understanding" came into play. Do you
14 recall that?
15   A. Yes.
16   Q. Whose idea was it? Did someone request it.
17 Did someone suggest it? What was the genesis of the
18 memorandum of understanding in this timeframe?
19   A. It was requested by Randy and Mike --
20 Mr. Marino.
21   Q. Who took the first draft of it; do you know?
22   A. I don't remember.
23   Q. It was requested. It was something you were
24 willing to give them?
25   A. Yes.

Page 106

1   Q. Is it a binding contract between Marriott
2 Vacation Worldwide, or anybody, and the HOA?
3     MR. SELLINGER: Objection to form.
4   A. No. I didn't know. It was really -- the
5 purpose of it was, they wanted to kind of memorialize
6 the discussions and what we were offering.
7 BY MR. FERGUSON:
8   Q. But the actual document that effectuated the
9 ability of Aspen Highlands folks to voluntarily
10 participate in the Vacation opportunities you were
11 offering, that was going to be the acknowledgement and
12 joinder?
13   A. Well, the affiliation was the Lion & Crown
14 affiliation, and then the members being able to
15 participate was the acknowledgement by the board.
16 Correct.
17   Q. So the MOU didn't do anything like that?
18   A. No.
19   Q. It was a document they requested and you
20 agreed to and negotiated or discussed over the next
21 few weeks?
22   A. Yes.
23   Q. You said, "Nice. Good setup," at the top of
24 page 1 of Exhibit 1364. It says, "Remember, we are
25 the crown jewel in the platform from a cooperation

Page 107

1 perspective in a location, member experience
2 position."
3     Did you have discussions with Mr. Mercer that
4 he and his board were the crown jewel in terms of
5 cooperating with you all about the affiliation?
6   A. No. I don't remember him saying that.
7   Q. 1365. I know. Let's see if we can use maybe
8 the smart board here. I only have one question about
9 this anyway.
10     MR. FERGUSON: Can you go to the last
11 page and blow up that paragraph, see if we
12 can read it? 1365, page 3. Thank you.
13 BY MR. FERGUSON:
14   Q. It's a little bit better, Ms. Sobeck, on the
15 screen. It's Marino to Tyler Oliver and Mr. Mercer on
16 March 5th, and it says, "Clarity with Barbara. We
17 want MOU and a letter to members in plain English,
18 explaining."
19     Do you recall there being -- them wanting a
20 document that was called an MOU? Is this around the
21 timeframe that they wanted the MOU?
22   A. Yes.
23   Q. And were they concerned about something being
24 in plain English? Did they discuss that with you?
25   A. Yes. Mr. Mercer and Tyler Oliver had been

Page 108

1 discussing -- they were concerned that information --
2 that letters that we wrote sometimes weren't as clear
3 to members -- that members didn't understand things.
4     So that's why we worked together on the
5 member communications that were done, to ensure that,
6 as members, they understood clearly what they said.
7   Q. Okay. Do you know whether they -- withdrawn.
8 Do you know whether you had ever shown the affiliation
9 agreement that Mr. Delorey and Mr. Cunningham signed
10 on November 14, 2013 -- did you ever show that to them
11 when they were here in Orlando?
12   A. I don't know.
13   Q. Did they ever express any concerns about the
14 plain meaning or the clarity or lack of clarity of the
15 affiliation agreement with you at any time?
16   A. No.
17   Q. Okay. Go to page -- middle page -- the
18 second page in of Exhibit 1365.
19     MR. FERGUSON: Can you blow up the --
20 where it says "original message" there, Mike?
21     A little higher up. Right there. Thank you.
22 BY MR. FERGUSON:
23   Q. Mr. Marino told Mr. Mercer and Oliver there
24 on March 5, 2014 -- he said, "She" -- he's referring
25 to Barbara Egolf as you can see before -- "She only

Page 109

28 (Pages 106 - 109)

1 focused on getting the joinder as directed."
2        Was that something you were directing her to
3 get signed?  Was that important to you?
4        MR. SELLINGER:  Objection to form.
5        A.  The joiner?
6 BY MR. FERGUSON:
7        Q.  The joinder.  A joiner -- I guess he called
8 it a joiner.
9        A.  No.  I think she was focusing -- he was
10 probably talking about the MOU.  She was talking about
11 the acknowledgement.
12        Q.  That's what you needed for your files in
13 order to effectuate the affiliation with respect to
14 the Aspen Highlands?
15        MR. SELLINGER:  Objection to form.
16        A.  We needed the acknowledgement in order to
17 give the members access to the program, yes.
18 BY MR. FERGUSON:
19        Q.  The acknowledgement and joinder?
20        A.  The joinder form, yes.
21        Q.  Someone didn't put the "D" in the word
22 "joiner," it looks like.
23        Exhibit 1383.  This appears to be a red-line
24 version of the MOU, the memorandum of understanding.
25        Do you see that?

Page 110

1        A.  Yes.
2        Q.  And it's between -- it says, "Memorandum of
3 understanding between Marriott" -- and that's taken
4 out, and it says, "Lion & Crown Travel Company and
5 Aspen Highlands Condominium Association."
6        MR. SELLINGER:  I'm sorry.  Just tell me
7 where you're reading from.
8        MR. FERGUSON:  I'm sorry?
9        MR. SELLINGER:  Where are you reading?
10        MR. FERGUSON:  I'm reading the document's
11 name.  Did I give you the wrong document?  I
12 might have.  For some reason, I have the
13 wrong one in there.
14        Can you put up 1383?
15        THE WITNESS:  That's the one.
16        MR. SELLINGER:  This is 1388.
17        MR. FERGUSON:  I'm sorry.
18 BY MR. FERGUSON:
19        Q.  The fact that the word "Marriott" is taken
20 out there and someone put "The Lion & Crown Travel
21 Company" in there as the parties on this memorandum of
22 understanding, does that indicate to you that maybe
23 Mr. Marino had started this document?
24        A.  It appears so.
25        Q.  This would probably be -- at least some of

Page 111

1 this would be Ms. Egolf -- Ms. Egolf would have been
2 the one red-lining this document with Mr. Marino?
3        MR. SELLINGER:  Objection to form.
4        A.  I don't know.
5 BY MR. FERGUSON:
6        Q.  You don't know?
7        A.  They were going back and forth, but I don't
8 know whose red line this is.
9        Q.  If you go to page 2 of Exhibit 1383,
10 paragraph 5 says, "Acknowledgement by the association
11 of participation in the exchange opportunity with MVCD
12 Exchange Program for individual members simply results
13 in the opportunity for an eligible member to
14 voluntarily participate in an exchange opportunity
15 with the MVCD Exchange Program."
16        You see it says, "Acknowledgement by the
17 association of participation."  Do you believe that's
18 a reference to the acknowledgement and joinder or is
19 it just using the word "acknowledgement"?
20        A.  I don't know.
21        Q.  Do you know whether the MOU, in any of its
22 iterations -- its early pre-signature -- the
23 pre-execution iterations -- ever referenced the
24 affiliation agreement that was signed by Delorey and
25 Cunningham on 13, November 2013?

Page 112

1        A.  You're asking if any of the versions of the
2 MOU talked about the affiliation?
3        Q.  Yes.
4        A.  I don't know.
5        Q.  Exhibit 1385, this is a board meeting --
6 tourist accommodation board of directors meeting --
7 April 5, 2014, a year after the letter went out on
8 April 5, 2013 relating to a vote.
9        It indicates that, present from the
10 Ritz-Carlton Management Company, were Babich,
11 Sobeck -- were you at the meeting physically or did
12 you appear by telephone?
13        A.  I believe I would've been there physically.
14        Q.  Okay.  Did you bring with you the affiliation
15 agreement that was going to be acknowledged and joined
16 by Mr. Mercer and his board?
17        A.  I don't know.  I don't -- I thought you said
18 earlier that they did not receive it.
19        Q.  Did you bring it with you and not give it to
20 them?  Do you have any recollection?
21        A.  No.
22        Q.  If you look at page 4 of Exhibit 1385, it
23 talks about the member survey results at the very
24 bottom of the page.
25        A.  Yes.

Page 113

29 (Pages 110 - 113)

1 Q. Are these minutes or an agenda? It looks
2 like minutes. It says, "The overall result of the
3 members survey regarding potential partnership with
4 Lion & Crown and Exclusive Resorts was discussed."
5      Exclusive Resorts, was that also being
6 renewed around this timeframe, or was it a new program
7 being offered, I should say?
8 A. No. I believe Exclusive Resorts existed
9 before.
10 Q. It says, "The majority of the members who
11 responded to the survey would like to see more
12 destinations offered. The board is working on an
13 executable document that will be sent to members
14 explaining the results.
15      "Mr. Marino, the board's attorney, commented
16 that the board has been in touch with Barbara Egolf to
17 prepare this document. The membership agreement was
18 discussed."
19      Having been there -- I know it's a few years
20 ago -- but were they discussing the MOU here, the
21 acknowledgement and joinder, or both?
22 MR. SELLINGER: Objection to form.
23 A. (No response.)
24 BY MR. FERGUSON:
25 Q. Tell me which one you think or recall, if

Page 114

1 any --
2 A. I think they would've been talking about
3 the -- Mr. Marino, the board's attorney, was working
4 on both the acknowledgements and the MOU, so all I
5 can --
6 Q. And what was Mr. Marino doing with respect to
7 the acknowledgement and joinder, if you recall?
8 A. He was reviewing it. He was the
9 association's counsel, so he wanted to look at
10 anything necessary to be able to execute the
11 agreement.
12 Q. Exhibit 1388, this is an e-mail chain from, I
13 think, April -- of early April of 2013. You'll see it
14 starts -- I shouldn't say "it starts" -- it starts
15 April 4, 2014 with an e-mail from Egolf to Mr. Marino.
16 It was regarding a clarification on paragraph 7C.
17 That's on page 6, by the way.
18      It looks like the MOU is being negotiated by
19 Marino and Barbara early April there; is that right?
20 A. Yes.
21 Q. And going to page 4, it looks like Egolf sent
22 changes about -- suggested to Mr. Marino and you and
23 Ms. Wetmore, in the legal department -- the very
24 bottom of the page, page 5, Exhibit 1388.
25      She said, "The changes make a lot of sense

Page 115

1 technically, but put the words 'currently inform' in
2 front of the word 'limited' and we can live with it."
3      Do you see that?
4 A. Yes.
5 Q. If you go to page 4 of Exhibit 1388, there's
6 an e-mail in the middle on April 5, 2014. You were
7 here in town -- not here -- I'm not in Aspen, am I?
8 I'm in Orlando. You were there in Aspen, Colorado, it
9 looks like, from the minutes.
10      But you wrote an e-mail at 9:40 p.m., and
11 said, "We have no intention of a unilateral change.
12 If we remove 'currently' and remove 'weeks of,' we're
13 fine."
14      Then you said, "MVC members have the
15 opportunity to use less than a full week; although,
16 only in the reserve allocation as stated below. Hope
17 this works for you."
18      You were telling them at this point -- and I
19 think you might have told them a little bit before
20 this -- that Marriott Vacation Club members would be
21 able to access for days less than a full week. Right?
22 A. Yes. They would be able to use the weeks
23 that had been deposited into Marriott Vacation
24 Worldwide for less than a full seven days.
25 Q. 1388.

Page 116

1 A. Page 4.
2 Q. Right. That was -- do you recall when you --
3 withdrawn. Do you recall, on or about December 6,
4 2013, that Mr. Mercer wrote a letter to the -- it was
5 a day or two after the survey went out -- that he
6 wrote a letter to the members from the board, telling
7 him why they supported the voting or answering "yes"
8 to the survey? Do you recall that e-mail generally?
9 A. Yes.
10 MR. SELLINGER: Objection to form.
11 BY MR. FERGUSON:
12 Q. You helped write that, did you not? You gave
13 some input into it?
14 A. Into Randy's e-mail from the board?
15 Q. Yeah.
16 A. I don't know. If he asked me to, I certainly
17 would've given comments.
18 Q. Do you remember at that time telling him
19 something similar to this, that you wanted to alert
20 him to the fact that Marriott Vacation Club people
21 could come in for less than a week's stay -- two days,
22 three days?
23 A. I would -- specifically about that e-mail or
24 the message communication, I don't remember, but I
25 certainly would have told him that.

Page 117

30 (Pages 114 - 117)

1    Q.  At least by this time, you were telling him
2  that there could be people from the Marriott Vacation
3  Club that could be there for less than a week?
4    A.  Sure.  Just like Ritz-Carlton Destination
5  Club members.  They don't have to come for a full
6  week.  They can come for less.
7    Q.  But do you know whether that language made it
8  into -- do you know whether that concept made it
9  into the MOU, that a Marriott Vacation Club person
10  could come in for less than a week?
11    A.  I don't know if it did or not.
12    Q.  Do you understand that it was a concern of
13  some people that Marriott Vacation Club folks, if they
14  can come in for less than a week's stay, would put
15  additional strain on member services -- turnover of
16  rooms -- a private residence club like that?  Do you
17  remember that being expressed?
18    A.  There would be no effect on member services.
19    Q.  No effect with room turnover two or three
20  times in a week?
21    A.  Not to member services.
22    Q.  How about housekeeping?
23    A.  Well, there could have been, but members have
24  the ability to do the same thing, so I don't know what
25  the difference would be.

Page 118

1  residence club" as a term of art within the lodging
2  industry.
3    Q.  Are you familiar with that term of art?
4    MR. SELLINGER:  Objection to form.
5    A.  What's a term of art?
6  BY MR. FERGUSON:
7    Q.  That it's a term.  You have a transient -- a
8  transient person is someone who comes and goes in a
9  hotel.  There's a private residence club.  There's
10  vacation clubs.  It's a term that's used within the
11  lodging and hospitality industry.
12    A.  Okay.
13    Q.  Are you familiar with it?
14    A.  Yes, I'm familiar with that.
15    Q.  Do you consider the product that was built in
16  1999, 2001, and sold to the people up there in
17  Aspen -- did you consider that to be a private
18  residence club?
19    A.  We considered it a luxury fractional product.
20  We still do.
21    Q.  If you go to page 1 of Exhibit 1388, it looks
22  like Mr. Marino wrote directly to you and Ms. Egolf,
23  and he said, "I'm writing to you, of course, only
24  through Barbara, your legal counsel.  The board has
25  approved the MOU with the following language in

Page 120

1    Q.  But when this thing was marketed and sold to
2  206 of our clients, most of them were told that this
3  would be a place they can come for a week or two weeks
4  and treat as their home.  It's a private residence
5  club; right?  That's what it was started to be?
6    MR. SELLINGER:  Objection to form.
7    A.  It was a --
8    MS. LIVNGSTON:  Object to form.
9    A.  No.  It was a vacation destination club for
10  owners who were interested in going to the
11  Ritz-Carlton.
12    Q.  You don't believe it's a private residence
13  club?
14    A.  A private residence club?  There was nothing
15  in there that kept members from renting it to their
16  friends or letting other people use it.
17    Q.  So if I pull up -- and I have them -- about
18  10 or 12 of these Ragatz reports -- you know Ragatz;
19  right?
20    A.  Yes, I do.
21    Q.  And I look in his report of the HVS report
22  that was done for Bachelor Gulch, there's a term --
23  and I think it's also in the Cushman & Wakefield
24  appraisals that were done for the Bleu Trust inventory
25  that you you all owned -- they use the term "private

Page 119

1  Section 7C, which you previously have approved."
2    So it looks like you were closing in on the
3  final language for the MOU around this timeframe --
4  early April or mid April 2013 -- 2014?
5    A.  Yes.
6    Q.  Do you recall that Mr. Marino and/or
7  Mr. Mercer were asking for a termination right or
8  provision in the MOU?  Do you recall that at all?
9    A.  No, I don't.
10    Q.  Here's the MOU, Exhibit 1607.  It looks like
11  this was signed by Cunningham and Mercer.  It's dated
12  April 17, 2014.
13    Does that sound about right?
14    A.  Yes.
15    Q.  Is this a contract?
16    MR. SELLINGER:  Objection to form.
17    MS. LIVNGSTON:  Object to form.
18    A.  I don't know if it's a contract.  Legally,
19  are you saying?
20  BY MR. FERGUSON:
21    Q.  Yeah.  Let me do it another way.  What does
22  this thing do?
23    A.  Well, that's why we really didn't think we
24  needed it.  This was Randy and Michael just clarifying
25  the discussions we had.  So we didn't really

Page 121

31 (Pages 118 - 121)

1  understand the need for it, which is why we didn't
2  really offer it up.  It's something that they
3  requested.
4      Q.  Mr. Shea, who's Ms. Livingston's partner, the
5  HOA's lawyer, gets up at depositions and waves this
6  around as though it's the key document in the case.
7      I guess you would disagree with that; right?
8      MR. SELLINGER:  Objection to form.
9      MS. LIVNGSTON:  Object to form.
10     A.  I don't -- well, I don't know what their case
11  is.  All I can say is that we certainly -- we
12  understood the board's request for it.  We didn't have
13  any objection to it, because all it did was put in
14  writing what we had agreed to.  So we didn't have any
15  concerns standing behind that.
16  BY MR. FERGUSON:
17     Q.  Paragraph 7 has the points that the parties
18  agreed to, and, I guess, it's 7A through 7H, so I
19  guess there's some notion of agreement here.
20     But is there anything in here that's
21  different than they acknowledged and joined with
22  respect to the main affiliation agreement between MRTC
23  and Lion & Crown?
24     MR. SELLINGER:  Hold on a minute.  Could
25     you read that back?

Page 122

1  BY MR. FERGUSON:
2      Q.  Let me rephrase it.  Is there anything in
3  paragraph 7A through 7H that's different than what was
4  acknowledged and joined by the HOA when they signed
5  that form?
6      MR. SELLINGER:  Objection to form.
7      A.  The acknowledgement was allowing members the
8  access to Marriott Vacation Club system.  I believe
9  what was included in here is some specifics that the
10  board wanted clarity on of how the Marriott Vacation
11  Club's system would work for the Aspen owners.
12  BY MR. FERGUSON:
13     Q.  Is it anything different than what we saw in
14  the exchange program for the Marriott Vacation Club
15  program?
16     MR. SELLINGER:  Objection to form.
17     A.  It is --
18     MS. LIVNGSTON:  Object to form.
19     A.  It is different from that because there's
20  some things in here specifically, like the use of
21  space available time, reserved allocated time, that
22  would not have been in that.
23  BY MR. FERGUSON:
24     Q.  Okay.  All right.  Is this around this
25  timeframe, April of 2014, that the Jupiter property

Page 123

1  decided not to -- decided to deflag?
2      A.  I believe they went to a vote of their
3  members.
4      Q.  And the vote was to deflag?
5      A.  Was to -- yes -- not continue with
6  Ritz-Carlton Destination Club.
7      Q.  Was that a vote done by Marriott Vacation
8  Worldwide like you did with respect to our HOA with
9  Ms. Vericchio, or was it something different?
10     MR. SELLINGER:  Objection to form.
11  BY MR. FERGUSON:
12     Q.  Bad question.  What kind of vote was it that
13  was handled in Jupiter right around the timeframe the
14  acknowledgement and joinder was going to be signed in
15  April 2014?
16     A.  With Aspen?
17     Q.  No.  In Jupiter.
18     A.  The vote in Jupiter was to -- it was
19  actually -- they were enacting their rights under the
20  declaration and bylaws to terminate the management
21  agreement.  So they were actually going -- getting a
22  vote of the members to decide if they wanted to
23  terminate the management agreement and move to someone
24  else or stay with the management company that they
25  had.

Page 124

1      Q.  Is that a vote that was handled by the board
2  itself, the association?
3      A.  The association handled that vote
4  specifically.
5      Q.  So it wasn't one where you hired Morrow &
6  Company to do it for you guys.  Something different?
7      A.  It was something different, yes.
8      Q.  Let me show you Exhibit 1302.  I'm sorry.
9  1392.  The last page of this document -- this is the
10  acknowledgement and joinder to affiliation agreement
11  between Lion & Crown Travel Company and Marriott
12  Resorts Travel Company, Inc.  And this particular one
13  is for the association, which is defined as the Aspen
14  Highlands Condominium Association, a Colorado
15  Non-Profit Corporation, up there on Aspen Highlands
16  Mountain.
17     So this is a document that was eventually
18  signed by the association, Mr. Mercer and
19  Mr. Cunningham and Mr. Delorey, on the last page?
20     A.  Yes.  It was signed by the three of them.
21     Q.  And if you look at the first page of this
22  document, we've seen the version where, in the date of
23  the third line, it was February.  Someone scored that
24  and it's now April 24, 2014.
25     That same paragraph that has the date, it

Page 125

32 (Pages 122 - 125)

1  says that the -- towards the bottom -- "Capitalized
2  terms used in this acknowledgement and not defined
3  herein shall be ascribed the meaning set forth in that
4  certain affiliation agreement" --
5      A.  Where are you?
6      Q.  Right here.
7      A.  Capitalized terms.  Okay.  I see where...
8      Q.  -- "as the same may be amended or otherwise
9  modified from time to time solely by Lion & Crown and
10  MRTC in their sole discretion, the affiliation
11  agreement."
12          That's the affiliation agreement that was
13  produced in March 14, 2018 that we're here about.
14      A.  2018?
15      Q.  2018 is when we got the affiliation
16  agreement.
17      A.  I'm sorry.  I thought you said that's the
18  date.
19      Q.  Sorry.  And now we're on April 24, 2014.  Is
20  there any indication --
21          MR. SELLINGER:  Let me just object to the
22      form of that.  I don't think it's parts of
23      the question.  So now you're getting to a
24      question and I don't have to object at that
25      part, I don't think.

Page 126

1      A.  Yes.
2      Q.  Again, the affiliation agreement did
3  contemplate that they would -- if they obtained an
4  acknowledgement and joinder to the affiliation
5  agreement, they could get that from HOAs; right?
6          MR. SELLINGER:  Objection to form.
7      A.  The affiliation agreement stated that, if
8  there was an acknowledgement, that we would allow the
9  members of that club to participate in Marriott
10  Vacation Club Destinations program.
11  BY MR. FERGUSON:
12      Q.  You said "acknowledgement," but it's also a
13  joinder; right?
14      A.  Yes.  That's what it says.
15      Q.  It says here, "Whereas, the parties have
16  agreed as a special accommodation to allow association
17  to determine whether, by a survey of the association's
18  members or such other method as the association and
19  Lion & Crown mutually agree upon, to enter into this
20  acknowledgement."
21          I want to break that down, if you would, with
22  me.  The parties have agreed as a special
23  accommodation to allow the association to determine --
24  what is the special accomodation there mean?
25      A.  Because there's no requirement that the

Page 128

1          MR. FERGUSON:  I don't understand it, but
2      I'll keep going.  I had my head down.
3  BY MR. FERGUSON:
4      Q.  Do you know whether or not Mr. Mercer, who
5  executed this on behalf of the HOA at Aspen Highlands,
6  had ever seen the affiliation agreement as defined in
7  the first paragraph of Exhibit 1392?
8      A.  I do not.
9      Q.  Although, a draft acknowledgement
10  acknowledgement -- sorry -- a draft acknowledgement of
11  and joinder to affiliation agreement is Exhibit B to
12  the affiliation agreement itself, it appears that the
13  affiliation agreement is not an exhibit to the
14  acknowledgement and joinder; right?
15      A.  I do not see it as an exhibit.
16      Q.  If you go to page 2 of Exhibit 1392, the
17  whereas clause -- second whereas clause on that page,
18  but it was the fifth whereas clause in the
19  agreement -- says, "The affiliation agreement
20  contemplates that Lion & Crown will obtain an
21  acknowledgement and joinder" -- I'm sorry --
22  "acknowledgement of and joinder to the affiliation
23  agreement for any owners association that desires its
24  club to participate in the MVCD program."
25          Do you see that?

Page 127

1  association -- that the board sign any
2  acknowledgement.  We have the unfettered right to
3  affiliate with any program that we want.  And what we
4  were doing as a special accomodation is allowing the
5  association to -- the board to decide if it wanted to
6  allow their members to participate in the Marriott
7  Vacation Club.
8      Q.  And it was -- that unfettered right that you
9  believe you had, that was the information -- again,
10  without divulging it -- but that's the information
11  that came to you from Ms. Egolf sometime in September
12  of 2013 after you had promised a vote?
13          MR. SELLINGER:  Well, hold on a minute.
14      I want to be very careful about not getting
15      into privileged communication or any waiver
16      of privileged communication.  Maybe you can
17      rephrase the question so that it doesn't get
18      into conversations with counsel and elicit
19      what you're looking for.
20  BY MR. FERGUSON:
21      Q.  Does the statement that you just made, that
22  it was an unfettered right to affiliate the RCDC
23  systems that my clients and their fellow owners bought
24  into, is that something that came to you in a
25  privileged communication?

Page 129

33 (Pages 126 - 129)

1    A. It's in the affiliation agreement, so it's in
2  the Cobalt Travel documents, Lion & Crown.
3    Q. And that's Exhibit 1003 that we saw earlier
4  this morning, one of the first exhibits?
5    A. Yeah. Both of them.
6    Q. And we went through 7.2A?
7    MR. SELLINGER: Objection to form.
8    A. Do you want me to look back and confirm it?
9  BY MR. FERGUSON:
10    Q. Yeah.
11    A. So where are we? What exhibit?
12    Q. 1003.
13    A. Got it. This is Cobalt 7.1 --
14    MR. SELLINGER: Excuse me. Could you put
15    that on the screen, please?
16    A. -- 7.2 and 7.3. Correct.
17  BY MR. FERGUSON:
18    Q. Can you refer to another agreement? Is there
19  another agreement that you believe that gives you the
20  unfettered right?
21    A. Well, Cobalt affiliates with Lion & Crown,
22  and then the Lion & Crown affiliation is allowed to
23  affiliate with any outside exchange companies that it
24  wants, so then the Lion & Crown affiliation as well.
25    Q. So -- but you did give them a special

Page 130

1  accomodation; right?
2    A. We allowed the associations to decide if
3  their members were going to be able to participate or
4  not.
5    Q. And they did that by a survey?
6    A. They decided by a survey, correct.
7    Q. And that's a survey that you arranged,
8  Ms. Sobeck, to do with Ms. Vericchio, correct, at
9  Morrow & Company?
10    A. I did, yes.
11    Q. When you said you gave them a special
12  accomodation in this case by a survey of the members,
13  or other method, I guess there was no other method you
14  used. It was a survey; right?
15    A. Well, that's how the boards decided they
16  would sign or execute the acknowledgement. The
17  special accomodation was really the acknowledgement
18  itself.
19    Q. The special accomodation was the
20  acknowledgement. Okay.
21    A. Right, because we could -- just like we had
22  with ER or Abercrombie & Kent before, we could do an
23  affiliation with any outside company that we wanted.
24  We didn't need the board's approval or we didn't need
25  them to acknowledge anything or sign anything. We had

Page 131

1  the right to do it.
2    Q. So it says here, "The parties have agreed as
3  a special accomodation to allow the association to
4  determine whether" -- you can take out the
5  parenthetical -- "to enter into this acknowledgement."
6    Correct?
7    A. Correct.
8    Q. It says, "Even though Lion & Crown is not
9  required to obtain the association's consent, joinder,
10  or acknowledgement in connection with the
11  affiliation -- with an affiliated program."
12    So despite the fact that you believe you had
13  these unfettered rights and didn't require a consent
14  to the association, joinder, or acknowledgement, you
15  were to give them that opportunity?
16    A. We were going to allow --
17    MR. SELLINGER: Objection to form.
18    A. -- the board to decide whether the members
19  could participate or not.
20  BY MR. FERGUSON:
21    Q. And the board was going to -- withdraw that.
22  Over the several months that preceded this, indeed,
23  before the survey was finished on January 13, 2014, it
24  was you that was working with Mr. Mercer and his folks
25  about how to do this survey; right? That's what you

Page 132

1  were working on?
2    It's a bad question.
3    A. Yeah. I'm sorry. January 13th, it was
4  almost done, I believe.
5    Q. The bottom line is that it was you,
6  Ms. Sobeck, that was working with the board in
7  connection with getting that survey out and done?
8    A. Yes; that's correct.
9    Q. And the vendor that did it, Morrow & Company,
10  was your vender; correct?
11    A. Yes. We used them for association -- we used
12  them for association business, but it was someone we
13  used often.
14    Q. And you all paid for that survey at Marriott
15  Vacation Worldwide, not the association?
16    A. Correct.
17    Q. Are you aware of any document that, prior to
18  this acknowledgement being signed, told any of the
19  members at Aspen Highlands what the outcome of that
20  survey was, other than a majority of people that were
21  polled had a positive response? Do you recall whether
22  there was any statistics given to the board -- to the
23  Aspen Highlands, rather?
24    MR. SELLINGER: Objection to form.
25    A. Statistics were given to the board on a vote,

Page 133

34 (Pages 130 - 133)

1 but I don't believe the specifics were given to the
2 members.
3 BY MR. FERGUSON:
4      Q.  On page 2 of Exhibit 1392, the
5 acknowledgement, it says, "By execution of this
6 acknowledgement, the parties agree that the above
7 recitals are true and correct and are incorporated
8 into this acknowledgement."
9          So that's what happened here.  This
10 particular document says that the recitals are part of
11 the document; right?
12          MR. SELLINGER:  Objection to form.
13      A.  I'm not an attorney.
14 BY MR. FERGUSON:
15      Q.  Let me withdraw that.  The recitals are
16 incorporated into this acknowledgement; right?
17      A.  The parties agree that the recitals above are
18 incorporated into this acknowledgement, yes.
19      Q.  It says, "The association -- paragraph 2, on
20 page 2 of Exhibit 1392, it says, "Association hereby
21 acknowledges the terms of the affiliation agreement
22 and joins in such affiliation by execution of this
23 acknowledgement for the purpose of acknowledging and
24 agreeing that the club constitutes an affiliate
25 program."

Page 134

1      A.  I don't think there's anything hard, and I
2 don't think we would've tried to keep it from them in
3 any way.  I don't think that was deliberate.  They
4 were certainly welcome to have a copy if they wanted
5 it.
6 BY MR. FERGUSON:
7      Q.  If you go to page 3 of Exhibit 1392, there's
8 a paragraph 3.  It says, "Association hereby
9 acknowledges that Marriott Resort Travel Company has
10 all the rights and duties with regard to the operation
11 of the MVCD program, but Lion & Crown has all the
12 rights and duties with regard to the operation of the
13 Lion & Crown program."
14          "Association further acknowledges that the
15 Lion & Crown and the MVCD program may impact usage
16 patterns of the club."
17          What did that mean?
18      A.  Well, there's different -- the Ritz-Carlton
19 owners and the Marriott Vacation owners potentially
20 could have used it differently from each other.
21      Q.  How would that be -- how would that occur?
22      A.  How would it occur?
23      Q.  Yeah.
24      A.  Well, if --
25          MR. SELLINGER:  Objection to form.

Page 136

1          Having read that, hopefully, fairly
2 accurately, as you sit here today, you're aware of no
3 evidence that Mr. Mercer has ever seen the affiliation
4 agreement; is that right?
5          MR. SELLINGER:  Objection to form.
6      A.  Mr. Mercer had an attorney, so his attorney,
7 if he wanted to see the affiliation agreement, would
8 have asked for it.
9 BY MR. FERGUSON:
10      Q.  Is that the way Marriott Vacation Worldwide
11 legal department works; they're not going to turn over
12 a document that someone is acknowledging unless their
13 lawyer asks for it?
14          MR. SELLINGER:  Objection to form.
15      A.  I can't talk about how our legal
16 department...
17 BY MR. FERGUSON:
18      Q.  You don't know how they operate?
19      A.  Well, I'm not sure I understand the question.
20      Q.  What is so hard about sending Mr. Marino,
21 Mr. Mercer, and Mr. Oliver the agreement that they're
22 actually signing and joining on April 24th, 2014?
23 What's so hard about doing that?
24          MR. SELLINGER:  Objection to form.
25          MS. LIVNGSTON:  Object to form.

Page 135

1      A.  -- Marriott Vacation Club -- the Marriott
2 Vacation Club program is a points program, where they
3 have -- that they can use potentially smaller
4 increments of time.  The Ritz-Carlton program, while
5 they could use less time, they bought seven nights --
6 actually, they bought -- in Aspen, they bought 28
7 nights.
8          So seeing an owner -- the same owner -- 28
9 nights, as you would in Aspen -- that potentially
10 wouldn't be the case with a Marriott Vacation Club
11 owner.
12 BY MR. FERGUSON:
13      Q.  Okay.  Those would be examples of different
14 use patterns?
15      A.  Yes.
16      Q.  Affecting the use patterns of the hotel -- of
17 the club, I should say.
18      A.  Club.
19      Q.  Paragraph 4 says, "If this affiliation
20 agreement is terminated or not renewed, association
21 hereby agrees to abide by and comply with the
22 requirements of Section 10.5A, 10.5C, 10.5E of the
23 affiliation agreement that are imposed on Lion &
24 Crown."
25          Those are sections of the affiliation

Page 137

35 (Pages 134 - 137)

1 agreement; correct?

2    A. I believe they are.

3    Q. At the bottom of that paragraph, Sections

4 4.3, 6.6., 6.8, 6.11, 7.4, 9.1, 9.3, 10.6, 10.7, 10.8,

5 those are sections of the affiliation agreement also?

6    A. Yes.

7    Q. To which the association was agreeing to be

8 bound; right?

9    A. The affiliation agreement existed whether

10 this was executed or not; right? Just so we're clear,

11 this being executed had nothing to do with that.

12    Q. All right. But the association was agreeing

13 to the terms in that paragraph 4, that they would

14 abide by those terms if there was a termination?

15    A. Yes.

16    Q. Thank you. I just have a few more.

17    A. That was a long 15 minutes.

18       MR. SELLINGER: I was going to say.

19 BY MR. FERGUSON:

20    Q. Later in that year, you were able to get the

21 Lake Tahoe and San Francisco properties to -- you got

22 them to be surveyed, and then you got them to sign

23 these acknowledgements and joinders?

24       MR. SELLINGER: Objection to form.

25    A. Lake Tahoe and San Francisco boards later

Page 138

1 agreed that they wanted their members surveyed and

2 then later got comfortable with the acknowledgement

3 and executed the acknowledgement.

4 BY MR. FERGUSON:

5    Q. I just have a few documents to show you.

6 Exhibit 1447, this is for the San Francisco

7 affiliation, November 4, 2014. This is the e-mail

8 that Ms. Babich sent to her team on November 4, 2004.

9       There was apparently a call regarding the

10 survey to vote on affiliation -- the San Francisco

11 members -- in the next couple days.

12       This is the one where she says, "This survey

13 is similar to Aspen. They were not looking for a

14 majority vote. It's merely a mechanism to get

15 feedback and the affiliation is expected to occur

16 regardless. Please keep that information

17 confidential."

18       Is this around the timeframe that there was

19 going to be a survey of the San Francisco members in

20 early November 2014?

21       MR. SELLINGER: Objection to form. This

22    is ground that was covered at length in your

23    earlier deposition.

24       MR. FERGUSON: That was the only question

25    I had.

Page 139

1    A. Yeah. It appears in the first paragraph that

2 it was going out on November 6, 2014.

3 BY MR. FERGUSON:

4    Q. Were you anxious about getting that survey

5 done and the affiliation executed with San Francisco

6 by the end of the year?

7       MR. SELLINGER: Objection to form.

8    A. Anxious to get it done?

9 BY MR. FERGUSON:

10    Q. Were you excited about getting it done?

11    A. I don't remember being excited to get it

12 done. We certainly wanted to move through the

13 process, as the board had requested that we do.

14       MR. FERGUSON: Can you put up 2212 on the

15 board?

16 BY MR. FERGUSON:

17    Q. This is December 15, 2014. It looks like you

18 were excited that day; right?

19    A. I was excited that we had gotten through the

20 process. It was a long process.

21    Q. So this is Exhibit 2212. This is an e-mail

22 chain with Ms. Jackson-Rauso, who assists you in terms

23 of asset management for the RCDC system?

24    A. Correct.

25    Q. If you go to page 2 of Exhibit 2212,

Page 140

1 Jackson-Rauso says to Dee Mooney -- Dee Mooney is who?

2    A. An associate that works with us on some

3 Ritz-Carlton Destination Club communication.

4    Q. She said in the bottom of page 2, "In regards

5 to the San Francisco -- San Fran -- affiliation vote,

6 can Morrow tell us if any e-mails or correspondence

7 came back undelivered?"

8       So was this about -- withdrawn.

9       Morrow & Company did the affiliation survey

10 for San Francisco; correct?

11    A. Correct.

12    Q. If you go to the first page of Exhibit 2212,

13 there's an e-mail from Jackson-Rauso to Dee Mooney,

14 with a copy to you and Mr. Hayward.

15       Mr. Hayward, by this time, was he involved

16 with RCDC systems and clubs in the western segment of

17 the --

18    A. Yeah. He was just starting to get involved.

19    Q. Was he the person like you that was now

20 beginning to oversee the San Francisco property?

21    A. Correct.

22    Q. She said, "Yes, the board president is

23 signing the acknowledgement, so they can move forward

24 with the --

25       MR. SELLINGER: We're not seeing this.

Page 141

36 (Pages 138 - 141)

1  I'm sorry.
2      MR. FERGUSON:  Middle of the page.  No
3  worries.
4  BY MR. FERGUSON:
5      Q.  -- "so they can move forward with the 12/18
6  launch."
7      So you needed that acknowledgement done in
8  order to meet a launch date?
9      A.  If we wanted to have San Francisco included,
10 yes.
11     Q.  To that, you would answer, "Wahoo."  So you
12 were happy that was done?
13     A.  Yes.
14     Q.  That was the last one dated that year?
15     A.  I believe San Francisco was the last one that
16 was done overall, I believe.
17     MR. FERGUSON:  Then would you go to the
18     next exhibit, Michael, which is RCDC15683?
19     It's the November of '17 document.  It's
20     2213.  Would you put up 2213, please?
21     (Exhibit 2213 was marked for
22     identification.)
23 BY MR. FERGUSON:
24     Q.  At the bottom of 2213, there's an e-mail from
25 Rivas -- or Edson -- Edson Rivas at Morrow & Company.

Page 142

1  unfettered discretion to do this.  And as a
2  special accomodation to these fine folks,
3  they gave this right -- in an e-mail to her
4  counterpart for San Francisco, she says, "The
5  decision to affiliate is the board's.  And
6  you're telling us that's irrelevant and
7  unfair?"
8      MR. SELLINGER:  I didn't say it wasn't
9  relevant --
10     MR. FERGUSON:  Unbelievable.
11     MR. SELLINGER:  -- I said it's all ground
12     that you plowed before.
13 BY MR. FERGUSON:
14     Q.  Is that your words, Ms. Sobeck?  Are those
15 your words?
16     A.  Just to be clear -- just to be clear, though,
17 Rich didn't understand at this point, because he was
18 new to the program, all of the implications of this.
19     MR. FERGUSON:  I'll turn it over to
20     Mr. Reiser.
21     MR. SELLINGER:  Okay.  Off the record.
22     MR. REISER:  We should probably take at
23     least five minutes?  Do you want to do lunch
24     now?
25     MR. MEADE:  Let's do lunch.

Page 144

1  He works with Ms. Vericchio.  It's to you and
2  Ms. Mooney and copies to Nicole herself.  San
3  Francisco survey vote update is the subject.
4      Mr. Rivas said, "Good afternoon.  Today, our
5  total count is ten votes for the survey and seven
6  votes against the survey."
7      And then, at the top of the page of this
8  e-mail chain, Mr. Hayward wrote, "Is the ultimate
9  decision the board's or the management company?
10 Rich."
11     You said, "Decision to affiliate, the
12 board's."
13     Correct?
14     MR. SELLINGER:  This is -- again, this is
15     all old ground which was plowed.  Nothing to
16     do with the documents that were more recently
17     produced.  We haven't even gotten to what I
18     take are the growth committee and strategic
19     reports.  I really don't think it's fair.
20     MR. FERGUSON:  This is probably the
21     most apt document in the entire day,
22     Mr. Sellinger.  This is the vice president in
23     charge of this situation, who says in her
24     testimony today, and beforehand, that the
25     board had no right -- okay -- they had

Page 143

1      THE VIDEOGRAPHER:  We are off the record.
2      The time is 12:51 p.m.
3      (Lunch recess.)
4      THE VIDEOGRAPHER:  We are back on the
5      video record.  The time is 1:41 p.m.
6      Counsel, you may proceed.
7          DIRECT EXAMINATION
8  BY MR. REISER:
9      Q.  Thank you.  Good afternoon, Ms. Sobeck.  I
10 don't know if you remember me.  I'm Mike Reiser.  I
11 represent plaintiffs across the three cases.
12     A.  I do.
13     Q.  Nice to see you again.
14     A.  You too.
15     Q.  All right.  So I want to start off with just
16 some general questions about the corporate growth
17 committee versus the strategic council type of
18 mechanisms that go on in the company, so I can get an
19 understanding of how the reporting goes back and forth
20 between folks.
21     A.  Okay.
22     Q.  The corporate growth committee, you mentioned
23 that that's a committee with the executive -- what did
24 you call it -- the executive management team on that?
25     A.  Executive committee.

Page 145

1    Q. Could you just tell me -- I know you
2 mentioned a few of them -- but could you list those
3 folks for me?
4    A. The executive committee?
5    Q. Yes.
6    A. So Steve Weisz is the president. There would
7 be John Geller, Brian Miller, Lee Cunningham, Lani
8 Kane-Hanan, Jim Hunter, Dwight Smith, Mike Yonker
9 comes sometimes, Cliff Delorey. I'm trying to work my
10 way around the organization. I think that's all. I
11 feel like I missed somebody.
12    Q. So Steve Weisz, I know. John Geller, is he
13 the CFO?
14    A. CFO.
15    Q. And Brian Miller, what's his --
16    A. Head of sales and marketing. EVP of sales
17 and marketing.
18    Q. Did he take over Pete Watzka's job?
19    A. Yes.
20    Q. I know you Lee Cunningham is, and Lani
21 Kane-Hanan. Jim Hunter is the general counsel?
22    A. Yes.
23    Q. Who is Dwight Smith?
24    A. VP of information technology.
25    Q. How about Mike Yonker?

Page 146

1 Nick Rossi, who's in revenue management; Kathi
2 Pighini, who's the head of sales accounting. Julie
3 Meyer, who -- I don't know what her title is -- audit
4 somehow; Laurie Sullivan, who's our corporate
5 controller.
6    Q. So in addition to the executive committee
7 people you mentioned, these other five you just
8 mentioned, beginning with Tony Terry, those are
9 permanent members as well?
10    A. Yes. And also Dave Robison; he helps chair
11 the committee with John.
12    Q. Who is the chair of the committee?
13    A. I believe it's John Geller or Steve. I'm
14 really not sure. Dave Robison organizes everything,
15 gets the minutes taken and everything, and then -- I
16 guess it's Steve. Steve is probably the chair.
17    Q. Do you know how often the corporate growth
18 committee meets?
19    A. Yes. Every two weeks.
20    Q. Just to kind of get an idea of how many times
21 you interact with the corporate growth committee,
22 we've got some documents I'm going to show you in a
23 minute that we received recently in the case, wherein
24 you're writing some memos to the corporate growth
25 committee. I'll show you those.

Page 148

1    A. He's EVP of HR.
2    Q. And then Cliff Delorey?
3    A. He is EVP of operations.
4    Q. Does he report to Lee Cunningham then?
5    A. No.
6    Q. So Lee Cunningham, is he still chief
7 operating officer?
8    A. Yes.
9    Q. Who is higher on the hierarchy, the chief
10 operating officer or the EVP of operations?
11    A. All those people, except for Dwight and Mike
12 Yonker, report to Steve, so they would be the same.
13    Q. Who do Dwight Smith and Mike Yonker report
14 to?
15    A. John Geller.
16    Q. So you're not on the corporate growth
17 committee; right?
18    A. No.
19    Q. Do any management folks at Marriott Vacation
20 Worldwide have a place on the growth committee on kind
21 of an ad hoc basis ever, or are these the permanent
22 members of the growth committee?
23    A. So those are the executive committee.
24 There's also some members of the growth committee who
25 are more permanent. Tony Terry, you know him already;

Page 147

1    I don't know if you're familiar with this
2 one, October 21st, 2013. You may have looked at it to
3 prep for your deposition. I'm going to mark it in a
4 minute.
5    A. Okay.
6    Q. So you do, at times, interact with the
7 corporate growth committee; right?
8    A. Yes.
9    Q. And under what circumstances would you go to
10 the corporate growth committee for permission to do
11 something?
12    A. If there was going to be a large investment
13 in something or if there was going to be a disposition
14 or a substantial change in something that had a
15 financial impact to the company.
16    Q. Is there a dollar amount that's a threshold
17 before it gets to the committee; do you know?
18    A. There is. I want -- I think it's a million
19 dollars -- it has to go to the corporate growth
20 committee -- but sometimes there's decisions that are
21 potentially smaller than that that go just as an FYI.
22    Q. And does the corporate growth committee have
23 ultimate authority to make decisions that are
24 presented to it, or do they have to, in turn, have to
25 send their recommendations up to the board of

Page 149

38 (Pages 146 - 149)

1 directors of the corporation?
2         MR. SELLINGER: Objection to form.
3     A. It depends on the amount.
4 BY MR. REISER:
5     Q. Do you know the threshold amount for that?
6     A. I believe it is $10 million. I think they
7 can make decisions under $10 million and then it goes
8 to the full board.
9     Q. Do you know if any of the issues -- strike
10 that. Do you know if the reengineering of The
11 Ritz-Carlton Club -- strike that.
12        Do you know what I mean by the reengineering
13 of the Ritz-Carlton? Have you heard that term before?
14    A. No, I don't know what you mean.
15 Reengineering, I guess, in what context?
16    Q. Well, after the spin, wasn't there a change
17 in the club? And I think the internal words for it
18 were the reengineering of the club.
19        You've never heard that term?
20    A. I saw it on one of the documents that we went
21 through yesterday, yes.
22    Q. Well, let me just actually -- can you pull up
23 2136?
24    A. I don't have that.
25    Q. We can pull up it on the screen. There's a
Page 150

1 copy for you, 2136.
2         MR. SELLINGER: I'm going to get a binder
3 then.
4         THE VIDEOGRAPHER: Going off the record.
5 The time is 1:49 p.m.
6         (Off record.)
7         THE VIDEOGRAPHER: We're back on the
8 record. The time is 1:50 p.m.
9         Counsel, you may proceed.
10 BY MR. REISER:
11    Q. So you've had a chance to look at
12 Exhibit 2136. It's the May 24, 2012 memo from Lee
13 Cunningham to Tony Terry to the corporate growth
14 committee; subject, The Ritz-Carlton Destination Club
15 proposed strategic plan.
16    A. Yes.
17    Q. I think you testified earlier that you had no
18 role in preparing this memorandum. Is that true?
19    A. I did not.
20    Q. Did you appear at any corporate growth
21 committee meetings that discussed this proposed
22 strategic plan year-end May 2012 or earlier?
23    A. I don't believe I was in this meeting, but
24 certainly talked about different parts of this.
25    Q. We marked in some earlier depositions an
Page 151

1 Exhibit 1522. I'm going to show you another copy of
2 it. I do have a copy for you.
3         Have you seen Exhibit 1522 before today?
4     A. What is the -- where is the cover page? It
5 would help if I knew where it was.
6     Q. There's no cover page. This is actually how
7 it was produced to us. I'm just wondering, do you
8 recognize this document, holistic plan for RCDC?
9     A. I don't recognize it specifically. I
10 certainly recognize the content of it.
11    Q. Okay. When was the first time you remember
12 discussions with Lee Cunningham or anybody else about
13 a plan to unwind the portfolio program at the
14 Ritz-Carlton Destination Club?
15    A. At that point, I was involved with the
16 boards. I may have been in meetings that it was
17 discussed, but that was more of a Mary Lynn and Lee
18 discussion than me.
19    Q. What was more of a Mary Lynn and Lee --
20    A. Unwinding the Bleu Florida Land Trust.
21    Q. If you can turn to page 3 of this exhibit,
22 the caption of this, it says, "What are we doing with
23 the remaining inventory in RCDC?" It says, "Our plan
24 is to unwind the Bleu Florida Land Trust and convert
25 the 105 unit members to the NATO."
Page 152

1         Do you remember the first time you heard the
2 plan to unwind the Bleu Florida Land Trust?
3     A. I don't remember the first time, no.
4     Q. It wasn't 2012; true?
5     A. I don't know.
6     Q. Do you think it was before the evolution
7 letter went out from Eveleen Babich on July 17, 2012?
8     A. I don't know.
9     Q. Let me start marking some exhibits then.
10        Before I do that, let me finish up some of
11 the -- so the corporate growth committee, would you
12 give me your best estimate for how many times a year
13 you have to present something to that corporate growth
14 committee?
15    A. Every year, it's different. I probably go
16 maybe three or four times a year. But it's -- again,
17 every year is different, depending on what's going on.
18    Q. So can you remember all of the decisions for
19 which you went to the corporate growth committee as it
20 relates to The Ritz-Carlton Destination Club
21 post-evolution?
22    A. No. I don't know if I can say all of them.
23 I remember going for San Francisco -- discussions in
24 San Francisco. I don't believe the other -- none of
25 the other things we were working on with the
Page 153

39 (Pages 150 - 153)

1 affiliation or anything would have gone to the
2 corporate growth committee. Probably, at that time,
3 all I was taking would've been San Francisco.
4     Q.  What about the deal in Jupiter, to settle
5 with them in terms of buying back certain of the
6 inventory that they were owed money on?
7         MR. SELLINGER:  Objection to form.
8 BY MR. REISER:
9     Q.  Let me back up.  You remember a deal where
10 the Marriott Vacation Club paid $1.4 million to the
11 St. Thomas homeowners association in exchange for them
12 supporting and obtaining a vote by the members to
13 change the declaration, so that inventory that was
14 repossessed by Marriott Vacation Worldwide could be
15 placed into the NATO Trust?  Do you remember that
16 whole issue?
17     A.  I remember going -- yes, I remember the
18 discussion of St. Thomas -- what we called the
19 settlement agreement.  I don't know if it was really a
20 settlement, but we were going and talking to them.
21         It wasn't to buy the vote to get them to put
22 the inventory in the trust.  I think we went through
23 this last time.  It was, delinquent member -- they had
24 a delinquent member inventory issue, and we were going
25 to relieve them of that inventory, but needed

Page 154

1 something to do with it.  But what we were going to do
2 with it was put it into the NATO Trust, because we
3 weren't going to buy it back unless we had some
4 mechanism to dispose of it.
5     Q.  Did that whole issue --
6         MR. SELLINGER:  Does this have to do with
7     the subsequently-produced documents?
8         MR. REISER:  Yeah.  It's in the strategic
9     council almost every time.
10 BY MR. REISER:
11     Q.  Did that decision -- the settlement
12 agreement, as you put it -- go to the corporate growth
13 committee?
14     A.  I -- well, there's also -- I guess it had to
15 go to the corporate growth committee; although, I
16 don't remember specifically taking it there.  We also
17 have another group that handles more legal specific
18 items, that is an executive committee, that it could
19 have gone to as well.  But I don't specifically
20 remember.
21     Q.  What is the name of that committee?
22     A.  Can I ask Doug?  It's the litigation
23 committee or something along those lines.
24     Q.  So you don't recall, as you sit here, whether
25 the St. Thomas settlement agreement issue went before

Page 155

1 the corporate growth committee or the litigation
2 committee, we'll call it for now?
3     A.  It would have gone before one of those.  I
4 guess, based on the amount of payout, it probably
5 would have gone to the corporate growth committee.  I
6 just can't remember specifically.
7     Q.  Because anything over a million bucks goes to
8 corporate growth?
9     A.  Yes.  This one is a little different because
10 of how -- it wasn't a million dollar check.  It is
11 actually something that we got inventory back.  We're
12 paying for inventory, plus maintenance fees and
13 additional expenses.
14     Q.  So was that deal -- the delinquent member
15 inventory -- is that what you just termed it?
16     A.  Delinquent member inventory.
17     Q.  And that's the inventory that was ultimately
18 purchased by Marriott Vacation Worldwide and put into
19 the NATO Trust; right?
20     A.  Yeah.  It would've been foreclosed inventory
21 that we got through delinquencies of unpaid members,
22 correct.
23     Q.  That was my question.  Was that inventory
24 obtained both through foreclosures from financing that
25 had been provided by the Marriott financing arm at the

Page 156

1 point of sale, or was that foreclosed inventory that
2 came back because somebody was delinquent in their
3 dues, or was it both?
4     A.  Well, we had the right to get the inventory
5 that we financed back.  We would get that in normal
6 course of business.
7         Specifically what we were talking about was,
8 members who didn't pay their dues to the association
9 and were leaving the association with an additional
10 burden of unpaid maintenance fees.
11         So how we would have gotten it back -- if
12 somebody was delinquent, they were also delinquent on
13 their mortgage -- we would have done a mortgage
14 foreclosure.  But it could potentially have been
15 included in the same, because they would've been
16 delinquent on dues as well.
17     Q.  So if somebody was delinquent on their
18 mortgage, 99 percent of the time, was also delinquent
19 on their dues; right?
20     A.  Ironically, no.  Probably not 99 percent.
21 You would think that, but, no.
22     Q.  But a high percentage?
23         MR. SELLINGER:  Objection to form.
24     A.  It's actually a mix.  It was my assumption at
25 first, until I got into it.  No.  There's more people

Page 157

40 (Pages 154 - 157)

1 that paid their maintenance fees than you would
2 expect.
3 BY MR. REISER:
4    Q. So somebody that is paying their maintenance
5 fees but is delinquent on their mortgage, do you
6 remember whether they had use rights in the club?
7    A. Yes. If you paid your mortgage but you
8 weren't paying for your maintenance fees?
9    Q. Other way. You pay your maintenance fee --
10 that weird set of people that pay their maintenance
11 fees, but are delinquent on their mortgage. You said
12 there were folks like that?
13    A. Yes.
14    Q. Those people, could they use the club during
15 the time they were delinquent on their mortgage, but
16 current on their fees?
17    A. Yes, they could've.
18    Q. And somebody who's delinquent on their
19 mortgage and delinquent on their fees, do you remember
20 how that person would be -- how that person's
21 fractional would be taken back? Was it through the
22 foreclosure on the mortgage or foreclosure on the
23 maintenance fees?
24    A. It would depend where in the process both of
25 them were. We would want to take it back as quickly
                                              Page 158

1    we're going to be at a point where you're
2    going to end up getting cut off and you're
3    going to feel like you're precluded. My
4    position certainly is going to be, "Why are
5    we spending today talking about St. Thomas?"
6       But, your deposition.
7 BY MR. REISER:
8    Q. I'm almost done. I'm just trying to figure
9 out whether -- strike that. I think I'm done on
10 St. Thomas. I'll move on.
11       Let me go to -- okay. So the corporate
12 growth committee, we covered. So the strategic
13 council documents, I have a whole stack of them. It
14 looks like they were written approximately one time
15 per month.
16       Is that your recollection, the strategic
17 council memo would be prepared --
18    A. I don't write the strategic council memos.
19    Q. Who does; do you know?
20    A. Well, each section, I think, is written by a
21 different strategic council member.
22    Q. So the first set of strategic council
23 documents, that we got relatively recently in this
24 case through January 2013 -- actually, the title of it
25 is "Strategic council luxury segment update." And
                                              Page 160

1 as possible, obviously, so it would depend.
2    Q. Is it your understanding that the mortgage
3 foreclosures happened as quickly as possible?
4       MR. SELLINGER: Objection to form.
5 BY MR. REISER:
6    Q. Do you remember a delay between the time --
7 strike that. Do you remember any circumstances, when
8 you were the asset manager for St. Thomas, where the
9 member was in default on their loan and the decision
10 to foreclose was delayed so that the maintenance fees
11 obligation would not come back to the foreclosing
12 part, Marriott?
13    A. There was a time that -- I don't know if --
14 well, see, we have kind of different entities.
15 Because we have a mortgage group who handles mortgages
16 and does that foreclosure. So there was -- I believe
17 there was a time when they weren't aggressively
18 pursuing mortgages, but, you know, kind of the process
19 would always continue to move along.
20    Q. Because --
21       MR. SELLINGER: Mike, I'm sorry. Just
22    let me say -- you're asking about St. Thomas.
23    It's already after 2:00. We are going to
24    have time problems. If that's what you want
25    to spend your time on, I guess you can, but
                                              Page 159

1 sometime in 2013, it still says, "Strategic council,"
2 but it's got "Domestic segment update." So there's
3 just a change in just the cover of the strategic
4 council documents.
5       In terms of the strategic council reports for
6 the luxury segment update, these ones that were in
7 2012 that I'm going to show you, is it your testimony
8 that you didn't have any role in preparing these?
9    A. I didn't prepare them.
10    Q. Okay. Who was on the strategic council?
11    A. Actually, I can't really answer that. I
12 think it's the executive committee, but I don't know
13 if there's additional members as well. I don't go in
14 front of the strategic council, so it's something I'm
15 less familiar with.
16    Q. As far as you understand -- strike that. Do
17 you know if you were solicited on a monthly basis by
18 anybody within Marriott Vacation to update the
19 strategic council luxury segment updates?
20    A. Was I solicited for it? No.
21    Q. Solicited to get updates from anybody -- Dee
22 Dinda or anybody like that?
23    A. No.
24    Q. Because I noticed -- well, strike that. You
25 do prepare the daily business reports, don't you --
                                              Page 161

41 (Pages 158 - 161)

1 the -- what do you call them -- the business review
2 reports?
3    A. Yes.
4    Q. When did you start preparing the daily --
5 or -- I'm sorry -- the business review reports?
6    A. When I started working for Lee in asset
7 management.
8    Q. That was in 2009, as I recall your testimony
9 from last time?
10    A. I believe so.
11    Q. All right. So is that a requirement of your
12 job? Lee Cunningham asks you, as part of your job as
13 an asset manager, to prepare monthly business review
14 reports?
15    A. Yes.
16    Q. Okay. Let me just give you an example of one
17 we marked previously. It's Exhibit 1264. It happens
18 to be a strategic -- I'm sorry -- a business review
19 report from July 2013.
20       You prepared that report?
21    A. Yes.
22    Q. What was the purpose for preparing this
23 report every month to Mr. Cunningham; just to update
24 him on what's going on in each club?
25    A. Yes.

Page 162

1    A. No. When I started, I believe Jeff Hansen
2 was still in charge of Kapalua, and he continued that
3 role. I never really worked with Kapalua.
4    Q. So you never had any role in Kapalua?
5    A. Not really, no. And then there was some
6 west -- like, Tahoe -- that was more handled through
7 Bob Phillips and Don Baarman.
8    Q. That was Tahoe, you said?
9    A. Tahoe, yes.
10    Q. So in various of the board minutes that I
11 reviewed in this case for the different clubs -- let's
12 take Aspen board minutes. Often times, it would show
13 you attending on behalf of Ritz-Carlton Management
14 Company.
15    A. Yes.
16    Q. Was your role -- and I think we may have gone
17 over this last time -- but was your role representing
18 Ritz-Carlton Management Company to the boards?
19    A. Yes.
20    Q. And so -- do you know what a fiduciary duty
21 is?
22       MR. SELLINGER: I mean, how are we
23 getting to these areas which were covered
24 last time and aren't directly related to
25 these agreements?

Page 164

1    Q. So why was it you who was preparing these
2 reports, rather than somebody else in the
3 organization, if you know?
4    A. Because I was working on The Ritz-Carlton
5 Destination Club with Stacey.
6    Q. What was Stacey's role in working with you on
7 The Ritz-Carlton Destination Club?
8    A. She would assist me kind of however I needed
9 her to. She was more involved with the west projects
10 and I stayed more involved with the east projects.
11    Q. Did she have any, like, discretionary
12 authority in her role, or was she more like a liaison
13 between you and the boards?
14       MR. SELLINGER: Objection to form.
15    A. I would say she was more of a liaison;
16 although, she had great relationships with the boards
17 and worked with them as needed.
18 BY MR. REISER:
19    Q. Okay. As the asset manager for the
20 Ritz-Carlton Destination Clubs, that's what your role
21 was from '09 until sometime in, say, 2014. Is that
22 fair?
23    A. Yes.
24    Q. You were in charge of all nine clubs when you
25 started in 2009?

Page 163

1       MR. REISER: I think they are. You have
2 to give me a little bit of leeway here, you
3 know.
4       MR. SELLINGER: I am. I'm really trying
5 to. But we are going to cut this off at some
6 point.
7       MR. REISER: You can cut it off if you
8 really want to, but these are kind of
9 preliminary questions. I don't think I ever
10 asked her before, "Do you know what a
11 fiduciary duty is" or "define fiduciary
12 duty." If you can point to that in the
13 transcript, maybe, but give me a little
14 leeway.
15       MR. SELLINGER: I don't have the
16 transcript. I'm not instructing. I'm just
17 really trying to avoid the problem.
18       MR. REISER: I am too. So Let's get
19 through this. I'm not going to try to get in
20 an argument.
21 BY MR. REISER:
22    Q. Do you know what a fiduciary duty is?
23    A. Yes.
24    Q. What is it?
25    A. I believe it's to -- a fiduciary duty to an

Page 165

42 (Pages 162 - 165)

1  association -- you have the responsibility to make
2  sure you're making the best financial decision for
3  that association or organization.
4      Q.  Did you believe you had -- you, as the
5  representative of the Ritz-Carlton Management
6  Company -- had a fiduciary duty to the boards?
7          MR. SELLINGER:  Objection to form.
8      A.  Did I have a fiduciary duty to the boards?
9  BY MR. REISER:
10     Q.  In your role as the representative of
11 Ritz-Carlton Management Company.
12     A.  We were their management company, so we
13 certainly had the responsibility, yes.
14     Q.  So it's your testimony then, just to be
15 clear -- it was a little unclear to me -- you believe
16 that Ritz-Carlton Management Company had a fiduciary
17 duty to the boards that it managed.  True?
18         MR. SELLINGER:  Objection to form.
19     A.  Well, I'm not sure legally what that is
20 getting into.  I think we had the responsibility, for
21 the boards and the associations, to do the right thing
22 for the boards and the associations as their
23 management company.
24         There could have potentially been things, I
25 guess, in conflict with the board.  Specifically,

Page 166

1  as a Ritz-Carlton Management Company representative,
2  representing the boards, did you also believe that you
3  had a fiduciary duty to the members when you were
4  acting in that capacity?
5          MR. SELLINGER:  Objection to form.
6      A.  We have the responsibility to the
7  association, and the association is -- the members are
8  the association.
9  BY MR. REISER:
10     Q.  So that's a yes?
11         MR. SELLINGER:  Objection to form.
12     A.  The individual members -- the association, I
13 would say.  Not the members.  The association.
14 BY MR. REISER:
15     Q.  It's your opinion then -- as you sit here
16 today, you don't believe you had a -- when you were
17 acting in your capacity as the Ritz-Carlton Management
18 Company at the Ritz-Carlton Clubs -- is it your
19 testimony then that you do not believe you had a
20 fiduciary responsibility to individual members?
21         MR. SELLINGER:  Objection to form.
22     A.  I don't believe I had a responsibility to the
23 individual members.  I had a responsibility to the
24 association as a whole.
25 BY MR. REISER:

Page 168

1  fiduciarily, like, we charge the management fees; and
2  those management fees are to perform services.  So I
3  think there's -- we're responsibility to provide the
4  management services to the association.
5  BY MR. REISER:
6      Q.  Okay.  Do you believe that you, as the
7  representative of Ritz-Carlton Management Company
8  during the time you were acting in that capacity, had
9  a fiduciary duty to the members of the club?
10         MR. SELLINGER:  Objection to form.
11 BY MR. REISER:
12     Q.  Of the Ritz-Carlton Club --
13         MR. SELLINGER:  Objection to form.
14 BY MR. REISER:
15     Q.  -- that you were representing the management
16 of -- I mean the association?
17     A.  I had the -- again, I had the management
18 responsibilities for the association, to work with the
19 boards in the best capacity possible as the management
20 company.
21     Q.  Did you believe that you had a fiduciary duty
22 to the members in that capacity?
23         MR. SELLINGER:  Objection to form.
24 BY MR. REISER:
25     Q.  In other words, when you're wearing your hat

Page 167

1      Q.  Have you read any of the orders that have
2  come out in this case in the last, like, 90 days?
3      A.  No.
4      Q.  Are you aware of an order that came out in
5  the Aspen case on your company's motions to dismiss?
6  Have you read that order?
7      A.  No.
8      Q.  So would you agree -- I'm just -- have you
9  told me everything that -- strike that.
10         You mentioned earlier that you believe a
11 fiduciary duty is to act in the best interest -- the
12 best financial interest of the club.
13         Do you remember that testimony?
14     A.  Yes.
15     Q.  Do you believe that your duties to the
16 association go beyond just the financial aspects of
17 the --
18         MR. SELLINGER:  Objection to form.
19 BY MR. REISER:
20     Q.  -- financial aspects of the club?
21     A.  I believe they go into the management of the
22 association, which is more than just financial.
23     Q.  Okay.  You believe, as the manager of the --
24 you believe, as the representative of the Ritz-Carlton
25 Management Company, you had a duty to make a full

Page 169

43 (Pages 166 - 169)

1 disclosure to the association on any issues pending
2 between the association and the management company.
3 True?
4          MR. SELLINGER: Objection to form.
5     A. I don't understand your question.
6 BY MR. REISER:
7     Q. Do you believe that your duties to the
8 association included a duty of making a full
9 disclosure to the board on any matter in which the
10 management company was advising or managing for the
11 board?
12    A. I'm not sure I know what you mean by full
13 disclosure. If the board is already aware of it, I'm
14 not sure what you're asking about.
15    Q. Let me get specific. You mentioned earlier
16 that you don't believe that you ever gave a copy of
17 the November 2013 affiliation agreement to the Aspen
18 board.
19        Do you remember that testimony?
20    A. Yes.
21    Q. Do you believe that your duty as a manager
22 included making a full disclosure of everything
23 regarding the affiliation agreement, including giving
24 them a copy of the affiliation agreement?
25        MR. SELLINGER: Objection to form.

Page 170

1     A. We certainly would have given it to them if
2 they had asked for it. There was nothing that was
3 being hidden. We talked about it -- talked about what
4 was included in the exchange program, talked about
5 what was going to be available, did summaries of what
6 was available, had a brochure that we looked at
7 earlier that had the program outlined in that
8 brochure.
9        So, I mean, it wasn't information being kept
10 from them.
11 BY MR. REISER:
12    Q. So it's your testimony that there was no
13 decision on the part of the Ritz-Carlton Management
14 Company, or anybody else on the Marriott side, to not
15 give the boards copies of the affiliation agreement.
16 You just waited for them ask. If they asked, you
17 would have given it to them. If they didn't, you
18 didn't give it to them.
19        MR. SELLINGER: Objection to form.
20 BY MR. REISER:
21    Q. That's your testimony?
22    A. It wasn't a conscious decision that, if they
23 asked, we would give it to them. If they wanted it,
24 we would have given it to them, but it was never given
25 to them.

Page 171

1          THE VIDEOGRAPHER: Two minutes to media
2     change.
3 BY MR. REISER:
4     Q. You were also the Ritz-Carlton management
5 representative for the San Francisco and the Tahoe
6 clubs at the time they signed their acknowledgement
7 and joinder to the affiliation agreement. True?
8     A. True.
9     Q. And do you recall whether you ever gave a
10 copy of the affiliation agreement to any of the board
11 members at either San Francisco or Tahoe? I'm talking
12 about the November 2013 affiliation agreement.
13    A. The Lion & Crown affiliation agreement?
14    Q. Yes.
15    A. I don't remember giving it to any of them,
16 no.
17    Q. And as far as you recollect, nobody asked for
18 it on any of the boards?
19    A. If they would have asked for it, we would
20 have given it to them.
21    Q. And you didn't give it to them, so they
22 didn't ask for it; is that right?
23    A. Yes.
24        MR. REISER: We'll take a break.
25        THE VIDEOGRAPHER: This concludes media

Page 172

1 unit two. We're going off the record. The
2 time is 2:18 p.m.
3     (Brief recess.)
4        THE VIDEOGRAPHER: We're at the beginning
5 of media number three. The time is 2:28 p.m.
6 BY MR. REISER:
7     Q. So if you can pull out the joinder agreement
8 that -- the Aspen joinder agreement that Mr. Ferguson
9 asked you about earlier?
10    A. What exhibit is it?
11        MR. FERGUSON: 1392.
12    A. 1392. Okay. Yes.
13 BY MR. REISER:
14    Q. All right. So as I understand your
15 testimony, if the association at Aspen did not sign
16 Exhibit 1392, then there would be no ability for any
17 Marriott Vacation Club members to access the club
18 through an affiliation. True?
19        MR. SELLINGER: Objection to form.
20    A. There would've been -- Marriott Vacation Club
21 members could've come in through Explorer, because
22 that's how the developer was using their inventory.
23        But through affiliation, if there were no
24 Ritz-Carlton members going out of Aspen, there
25 would've been no Marriott Vacation Club members coming

Page 173

44 (Pages 170 - 173)

1 into Aspen.
2 BY MR. REISER:
3    Q. You mentioned the Explorer Program a couple
4 of times. Prior to the affiliation, it's your
5 testimony that the developer was using its
6 developer-owned inventory to allow Marriott Vacation
7 members in through the Explorer Program. True?
8    A. True.
9    Q. That had nothing to do with any affiliation
10 whatsoever, right, that access to the club through the
11 Explorer Program?
12    A. Well, it must've -- affiliation -- like,
13 we're talking about a Ritz-Carlton affiliation with
14 Cobalt and Lion & Crown? Yes, that's true.
15    Q. So there was a position that was taken by
16 Marriott Vacation or by the developer that -- just
17 like members could do what they wanted with their
18 weeks -- Marriott could do what they wanted with their
19 weeks, including let members of the Marriott Vacation
20 Club use it through the Explorer Program.
21      That's your testimony?
22    A. The developer could use the inventory just as
23 a member could, and made it available through
24 Explorer.
25    Q. Okay. But in terms of the affiliation that
                                                   Page 174

1    Q. That's okay. No problem.
2      So the 2013 affiliation agreement --
3      MR. REISER: Well, can you just read back
4 my last question before I...
5      THE REPORTER: "So have you read the" --
6      MR. REISER: Okay.
7 BY MR. REISER:
8    Q. I just want to ask you now -- the
9 November 2013 affiliation agreement, did you ever read
10 that agreement?
11    A. Yes, I have.
12    Q. Did you read it in 2013?
13    A. Yes.
14    Q. And you read it -- you read it in 2014, you
15 know, I take it too? Or, no, just that one time in
16 2013?
17    A. I don't know how many times I've read it.
18    Q. Okay. Do you know what a component club is
19 under that agreement?
20    A. No.
21    Q. You don't know what it is?
22    A. No. I'm sure we could look it up. What's
23 the number?
24      MR. SELLINGER: Are we looking at a
25 definition?
                                                   Page 176

1 we've been dealing with in this lawsuit for a couple
2 years now -- this is now your second deposition in
3 this lawsuit -- with regard to the affiliation, in
4 order for any members to -- members of Marriott to
5 come into the Ritz-Carlton, Aspen through an
6 affiliation agreement, that wouldn't have happened
7 unless the association signed this acknowledgement and
8 joinder to the affiliation agreement. True?
9      MR. SELLINGER: Objection to form.
10    A. Yes, because the members would not have been
11 able to participate in the program.
12 BY MR. REISER:
13    Q. So have you read the November 2013
14 affiliation agreement?
15    A. Sorry. The date -- that's the Lion &
16 Crown --
17    Q. That's the Lion & Crown one. Technically,
18 the Lion & Crown one kind of has -- the one between
19 Cobalt and Lion & Crown, which is in August 2010.
20 Then we have the one between Lion & Crown and Marriott
21 Resorts Travel Company. That's the November 2013
22 one.
23    A. Yes.
24    Q. Just so we're clear on that.
25    A. Sorry.
                                                   Page 175

1      MR. REISER: No. Sorry.
2      MR. SELLINGER: I'm going to -- give me a
3 minute. I'm going to grab my copy.
4      MR. REISER: Okay. We'll just wait.
5      (Mr. Sellinger left the room and came
6      back.)
7 BY MR. REISER:
8    Q. I'm actually going back to Exhibit 1392,
9 which is the acknowledgement of and joinder to
10 affiliation agreement. I want to go back to this
11 paragraph that Mr. Ferguson asked you questions about.
12 It's the sixth whereas clause in the agreement on
13 page 2.
14      It starts, "Whereas, the parties have agreed
15 as a special accomodation to allow association to
16 determine whether to enter into this acknowledgement,
17 even though Lion & Crown is not required to obtain the
18 association's consent, joinder, or acknowledgement in
19 connection with the affiliation with an affiliate
20 program."
21      You remember testifying about that paragraph;
22 right?
23    A. Yes.
24    Q. And you would agree that Lion & Crown is
25 required to obtain the association's acknowledgement
                                                   Page 177

45 (Pages 174 - 177)

1 and joinder before any Marriott Vacation Club members
2 could use the Aspen Club through an affiliation; do
3 you not?
4      MR. SELLINGER: Objection to form.
5      A. I'm just going to restate to make sure I
6 understand. The only way the Aspen members would have
7 had access to the program -- the members themselves --
8 would've been, based on this, the acknowledgement
9 being executed by the board and the association.
10      Based on that, the Marriott Vacation Club
11 members, through this affiliation -- they still had
12 access within the other program, Explorer -- but based
13 on affiliation specifically from a Ritz-Carlton member
14 going out and a Marriott Vacation Club coming in, then
15 that would've been the way that would have happened.
16 So, yes.
17 BY MR. REISER:
18      Q. So just to be clear -- and then I'll move
19 on -- I just want to make this crystal clear for the
20 record. The jury is going to probably hear this.
21      In terms of Marriott Vacation Club members
22 having access to Ritz-Carlton Club, Aspen through an
23 affiliation agreement, the association would have to
24 sign the acknowledgement and joinder to the
25 November 2013 affiliation agreement. True?

Page 178

1      MR. SELLINGER: Objection to form.
2      A. Your questions are long. The association has
3 to sign the acknowledgement, which would allow the
4 members to participate in the program.
5      We wanted to make it available to everyone.
6 But we were, as a special accomodation, allowing the
7 boards to decide if they wanted to make it available
8 for their members.
9      Q. When you say "a special accomodation," that
10 was actually the terms of the November 2013
11 affiliation agreement. Are you saying that there was
12 an accommodation made by inserting into the
13 requirements of the affiliation agreement that the
14 joinder be signed?
15      MR. SELLINGER: Objection to form.
16      A. We have the right to affiliate -- Lion &
17 Crown and Cobalt Travel have the right to affiliate
18 with whatever program they want. It's not required
19 that we would ask for the board's acknowledgement.
20 But that's the special accomodation that we're talking
21 about, yes.
22 BY MR. REISER:
23      Q. So let me break this down then. So Cobalt
24 has the power to affiliate other programs, right,
25 under the 2001 agreement that we looked at --

Page 179

1 Exhibit 1003?
2      A. Yes.
3      Q. Cobalt did create a program with Lion & Crown
4 and affiliated that external exchange program -- Lion
5 & Crown -- right? That was the 2010 agreement?
6      A. It wasn't -- yes, Lion & Crown is internal.
7 It's not external. But, yes, Cobalt affiliated with
8 Lion & Crown.
9      Q. Okay. And then it gave Lion & Crown the
10 right to set the terms by which Ritz-Carlton Clubs
11 would join the affiliation agreement that it entered
12 into with Cobalt. True?
13      MR. SELLINGER: Objection to form.
14      A. It gave Lion & Crown the right to enter into
15 other affiliation programs -- external affiliation
16 programs -- true.
17 BY MR. REISER:
18      Q. And Lion & Crown created the 2013 affiliation
19 agreement, which, by its terms, required that the
20 association sign a joinder and the affiliation
21 agreement if Marriott Vacation members were going to
22 have access through this affiliation program. True?
23      MR. SELLINGER: Objection to form.
24      MS. LIVINGSTON: Object to form.
25      A. The affiliation -- when the affiliation

Page 180

1 agreement of 2013 was signed, the affiliation was
2 done. We, again -- the company, Ritz-Carlton
3 Destination Club -- wanted to make options available
4 to members. We didn't think we wanted to withhold
5 anything from members. But because of some of the
6 concern that happened, we made an accomodation with
7 the boards to say, "If you want to make this available
8 to your members, we would like you to acknowledge
9 this."
10      But, I guess, I'm just -- you're saying it a
11 lot of different ways, but it's the acknowledgement of
12 them. So we wanted them -- if they didn't want to
13 make it available to their members, it was going to be
14 the board's decision not to do that.
15      Q. And it would've been the board's decision to
16 not make the Marriott Vacation members have access to
17 the club through the affiliation if they chose not to
18 sign it. True?
19      MR. SELLINGER: Objection to form.
20      MS. LIVINGSTON: Object to form.
21      A. Through affiliation, they would not have had
22 access to an Aspen, if that's what we're talking about
23 specifically, but it was still available through the
24 Explorer Program.
25 BY MR. REISER:

Page 181

46 (Pages 178 - 181)

1    Q. I understand. You've said that many times.
2 The Explorer Program was going to run out once the
3 developer inventory was gone; right? --
4    A. It could, but --
5    Q. It would --
6       MR. SELLINGER: Hold on. Hold on.
7    A. Right. But the developer inventory could
8 have been held for as long as the developer wanted to
9 hold it.
10 BY MR. REISER:
11    Q. Is that what you think, that they had the
12 right to hold it as long as they want and never sell
13 it?
14    A. Yes.
15    Q. Okay. I'm actually wanting to drill down,
16 because you keep using the word, and the word is used
17 as an accomodation. I just want to see if I can get
18 you to agree that the accomodation was made at the
19 time the November 2013 affiliation agreement was
20 entered into, because that agreement gave the
21 associations the right to say yes or no to the
22 affiliation.
23       MR. SELLINGER: Objection to form.
24 BY MR. REISER:
25    Q. To joining the affiliation.

Page 182

1       MR. SELLINGER: Objection to form.
2       MS. LIVINGSTON: Object to form.
3    A. Right. The affiliation was in place --
4 BY MR. REISER:
5    Q. And that affiliation --
6       MR. SELLINGER: Hold on. Hold on.
7 BY MR. REISER:
8    Q. Sorry.
9    A. The affiliation is in place, but the
10 affiliation is between Lion & Crown and Marriott
11 Vacation Club. That affiliation is in place.
12       So then you have all these clubs out here
13 and, each of the boards are going to say -- the
14 affiliation is in place -- the board is going to say,
15 "Yes, my members can participate," or, "No, they
16 cannot participate."
17       If they would like to participate, they sign
18 the acknowledgement. Yes, they can participate. If
19 the board turns over in three months, the current
20 board says, "No, we're not going to participate" --
21 three months later, the new board comes on and says,
22 "Oh, everybody really seems to like this Marriott
23 Vacation Club. Okay, we're going to sign" -- then
24 they can participate.
25 BY MR. REISER:

Page 183

1    Q. Okay. So I think we're on the same page
2 after all that. Thank you for volunteering that other
3 stuff. It's helpful. But I just want to get a
4 clear -- I think we're saying the same thing.
5       The affiliation agreement between Lion &
6 Crown and Marriott was in place from November 2013;
7 right?
8    A. Correct.
9    Q. And the decision whether each association
10 would join that affiliation agreement and allow their
11 members to trade into the Marriott Vacation Club, and
12 Marriott Vacation Club members to access through this
13 affiliation agreement, The Ritz-Carlton Club, that
14 required an approval of each association. True?
15       MR. SELLINGER: Objection to form.
16    A. It is --
17       MS. LIVINGSTON: Object to form.
18    A. I'm sorry. It required an execution of the
19 acknowledgement agreement, true. Yes.
20 BY MR. REISER:
21    Q. Do you believe that, if the Aspen -- strike
22 that. Do you believe the Aspen association has the
23 right to terminate at will, at this point, the
24 affiliation -- the joinder and affiliation? Strike
25 that. Let me ask a better question.

Page 184

1       Is it your belief, because it sounds like
2 this is what you testified to just by volunteering
3 that earlier -- is it your belief that, if the Aspen
4 board changes its mind today, it could notify Lion &
5 Crown and say, "We no longer choose to acknowledge and
6 consent to this agreement," and they would be out of
7 the agreement?
8    A. If there --
9       MR. SELLINGER: Objection to form.
10       MS. LIVINGSTON: Object to form.
11    A. If the board came to us and said, "Listen, we
12 have concerns. We don't want to -- we don't want to
13 be -- this acknowledgement -- this program -- we don't
14 want our members to have access to it anymore," we'd
15 probably sit down with them and talk to them about
16 why -- help understand it.
17       But, at the end of day, if they were adamant
18 that there were all these issues, there were no
19 members who liked it, dissatisfaction was incredible,
20 there's no benefit to us for keeping Aspen --
21 continuing to have this program available for them.
22 This is more vacation options for them. It's not
23 doing anything for us.
24    Q. So you believe that the decision of the
25 board, they can terminate their joinder at will. Is

Page 185

47 (Pages 182 - 185)

1 that what you're saying?
2      MR. SELLINGER: Objection to form.
3      A. Am I saying they could send us a note to say,
4 "We want to terminate the acknowledgement"?  No.  It
5 would be more than that.  There's not a termination
6 provision that's in here.
7      But if they wanted to, and came and talked to
8 us about it, and we understood, and there was
9 member -- negative member feedback, the members
10 weren't happy and so on -- yes, we would certainly
11 work with them.  We're not trying to bind them into
12 continuing an agreement or travel options that they're
13 not interested in.
14      Q. Well, I mean, Mr. Ferguson asked you whether
15 you knew that the term of the affiliation agreement
16 was ten years or not.  I think you said you didn't
17 know now, but you read it, I think, in there.
18      A. Yeah.
19      Q. You can't point to any clause within the
20 affiliation agreement that gives the association the
21 right to terminate the acknowledgement and joinder if
22 they decided a year after signing it that they wanted
23 to, even if the members were dissatisfied; can you?
24      A. But the affiliation agreement is not -- the
25 association is not part of the affiliation agreement.

Page 186

1      Q. Let me rephrase it.  I'm going to use very
2 precise language here.
3      There's nothing in the 2013 affiliation
4 agreement or the document that's entitled
5 "Acknowledgement of and joinder to the affiliation
6 agreement" that the association at Aspen signed, that
7 gives the association the right to terminate the
8 acknowledgement and joinder document that they signed.
9      Would you agree with that?
10      A. Not that I'm aware of, correct.
11      Q. But it's your testimony that, if they came to
12 you, kind of, and said, "Hey, this agreement is really
13 not working," despite what the agreement says, you'd
14 talk to them and maybe let them out, maybe not?  Is
15 that what I'm hearing from you?
16      You don't have the authority, as you sit here
17 today, to say, "Yeah, I would let them out."  Right?
18 That's not your decision?
19      MR. SELLINGER: Objection to form.
20      A. No, it's not my decision.  It would be a
21 company decision.  But sitting here, I can't see a
22 reason why the company -- you're insinuating we would
23 want to force them to stay in.  I can't truly think of
24 a reason we would want to do that.
25 BY MR. REISER:

Page 187

1      Q. You can't think of any reason -- like, the
2 halo effect -- you've never heard of the halo effect?
3 You know what the halo effect is; right?  You took
4 Cheki Dev's class.
5      A. I did take Cheki Dev's class.
6      Q. You don't think there's a halo effect for the
7 Marriott Vacation Club to have access -- for their
8 members to have access to The Ritz-Carlton Club?
9      MR. SELLINGER: Objection to form.
10      A. But they do have access.  This doesn't --
11 this isn't what gives them access.  We have inventory
12 in all the clubs except Aspen.
13      MR. SELLINGER: Hold on.  Hold on.  Would
14 you read back the question and the answer and
15 let Ms. Sobeck finish her answer?
16      THE REPORTER:  "You don't think there's a
17 halo effect for the Marriott Vacation Club to
18 have access -- for their members to have
19 access to The Ritz-Carlton Club?"
20      "Objection."
21      Answer, "But they do have access.  This
22 doesn't -- this isn't what gives them access.
23 We have inventory in all the clubs except
24 Aspen."
25 BY MR. REISER:

Page 188

1      Q. So right now --
2      MR. SELLINGER: Hold on.  Did you finish
3 your answer?
4      THE WITNESS: Right.  But there's already
5 been developer inventory that's been conveyed
6 and is in the trust.  The trust is now paying
7 maintenance fees.
8      So there's access that exists that -- I
9 don't actually believe there's any way to get
10 that inventory out.  That access to the
11 Ritz-Carlton Destination program isn't going
12 to change.
13 BY MR. REISER:
14      Q. But there's no developer-owned inventory in
15 Aspen anymore.  True?
16      A. Yes.
17      Q. Lore & Company, Jamie Klein -- rest his
18 soul -- did you hear he passed away?
19      A. I did.
20      Q. Jamie Klein sold out all the developer-owned
21 inventory.  True?
22      A. Yes.  At this time, though, we could get
23 foreclosures back.
24      Q. At this time, the only access for Marriott
25 Vacation folks into the Aspen Club is through the

Page 189

48 (Pages 186 - 189)

1 affiliation agreement; right?
2    A. Correct.
3    Q. So if that affiliation agreement went away,
4 no more access by Marriott Vacation to Aspen; right?
5        MR. SELLINGER: Objection to form.
6    A. Yes. There would be no access, but I'm
7 not --
8 BY MR. REISER:
9    Q. And there would be no way --
10       MR. SELLINGER: Hold on. Hold on.
11   A. But I'm not sure what that -- I don't -- I
12 think you're insinuating that that hurts Marriott
13 Vacation Club in some way, and it does not.
14 BY MR. REISER:
15   Q. Okay. If they don't have access to it, could
16 they put the Aspen Club on the points charts when
17 they're showing members that they could stay at the
18 Ritz-Carlton Clubs for X points? They wouldn't have
19 Aspen on there anymore.
20   A. No, they wouldn't have Aspen. But they have
21 the other clubs. They have Ritz-Carlton Hotels
22 through Explorer. They have all types of luxury
23 options through Explorer. And we have 50 other
24 resorts. I don't think not having Aspen, which is one
25 property within this whole suite of resorts, would

Page 190

---

1    Q. Did you have any role in Project Lion?
2    A. I did not.
3    Q. You never appeared at any road show or any
4 presentation by management to any other potential
5 buyer?
6    A. No.
7    Q. Have you ever heard Lani Kane-Hanan use the
8 words "halo effect"?
9    A. No.
10   Q. Never?
11   A. No.
12   Q. So I just want to make sure I understand your
13 testimony. You went to Cornell Hotel School; right?
14   A. I did.
15   Q. You got an MBA there or a master's in
16 hotel --
17   A. Master's.
18   Q. You took brand classes with professors such
19 as Cheki Dev; right?
20   A. I did.
21   Q. You studied the Ritz brand in his class,
22 didn't you?
23   A. I believe we did.
24   Q. With all that background, it's your
25 testimony, Ms. Sobeck, that the ability for the

Page 192

---

1 affect Marriott in any way.
2    Q. So you don't think there's a halo effect with
3 the Aspen Club at all; do you?
4    A. I don't.
5    Q. Were you involved at all in the effort by --
6 strike that. I'm going back pre-spin.
7        You worked for Marriott Vacation Club
8 International, or MORI, or one of the entities, even
9 when the timeshare division was owned by Marriott
10 International; right?
11   A. Yes.
12   Q. So during the time prior to the spin in
13 November of 2011, were you involved at all in an
14 effort by Marriott International to sell The
15 Ritz-Carlton Club as an asset to another entity?
16   A. No.
17   Q. Do you remember that The Ritz-Carlton Club
18 was being shopped by Marriott International for sale?
19       MR. SELLINGER: Objection to form.
20   A. I remember discussions about it.
21 BY MR. REISER:
22   Q. Do you remember a term, "Project Lion"?
23   A. Yes.
24   Q. What was Project Lion?
25   A. That effort.

Page 191

---

1 Marriott Vacation Club sales folks to tell potential
2 purchasers that they would have access to Aspen
3 Highlands Ritz-Carlton Club has no benefit in terms of
4 trying to sell points to that potential purchaser?
5    A. It is my testimony that the Marriott Vacation
6 Club sales executives have a lot of different things
7 they could sell. Are there some out there who could
8 sell Aspen? Absolutely; they could sell Aspen. But
9 if Aspen went away, they could sell Vail, they could
10 sell Tahoe, they could sell --
11   Q. They can't sell Vail anymore. Bachelor Gulch
12 is gone.
13       MR. SELLINGER: Hold on. Wait a minute.
14       Wait a minute.
15   A. We have Ritz-Carlton Club, Vail. We have a
16 property in Ritz-Carlton Club, Vail. So we have not
17 only other Ritz-Carlton Clubs ski properties, we have
18 Marriott Vacation Clubs -- many, many Marriott
19 Vacation Clubs ski properties that exist.
20       So having Aspen not included...
21 BY MR. REISER:
22   Q. Did you ever call Ritz Aspen "the crown jewel
23 of the Ritz-Carlton Club" to Jay Neveloff or any of
24 the board members at Aspen?
25   A. No.

Page 193

49 (Pages 190 - 193)

1    Q.  What was the management fee that Ritz-Carlton
2  Management Company charged annually to the Aspen club
3  in terms of -- you don't have to give me the dollar
4  amount, but isn't it a cost plus 10 percent?
5    A.  No.  I believe it's a fixed -- I believe it's
6  a fixed interest.  It's a management fee per interest
7  with a -- I believe how it's calculated is, it's the
8  increase of the budget year over year, and that
9  increases the budget percentage -- is what increases
10 the management fee.
11   Q.  So it's a set management fee.  It's not a
12 percentage of the budget?
13   A.  No.
14   Q.  Is Aspen different than the other clubs?
15   A.  No.
16   Q.  So it's your testimony that -- have you seen
17 the terms of the Ritz-Carlton management contract with
18 Aspen?
19   A.  Yes.  I believe they're all the same.  I
20 believe they are a fixed interest amount with a
21 multiplier.
22   Q.  How does that multiplier work?
23   A.  It's the amount from budget from one year to
24 the next.  Whatever increased amount that is, the
25 management fee goes up by the same amount.

Page 194

1    Q.  As a percentage?
2    A.  As a percentage.  So if the management fee --
3  or if the annual budget goes up 2 and a half percent
4  year over year, then the management fee would go up by
5  2 and a half percent.
6    Q.  What about Cobalt; how do they get paid?
7    A.  Cobalt gets paid through -- there's a program
8  management -- program manager fees that are included
9  in the operational budget.  So Cobalt bills each one
10 of the associations each year for their effort.
11       MR. SELLINGER:  It does strike me that
12    you're continuing to explore areas that are
13    not based on subsequently-produced documents,
14    but just subsequent issues you're curious to
15    ask witnesses about.
16       MR. REISER:  I'm going to mark some
17    strategic council -- I'll mark as
18    Exhibit 2142 the July 9, 2012 strategic
19    council luxury segment update.
20       (Exhibit 2142 was marked for
21    identification.)
22 BY MR. REISER:
23   Q.  So can you turn to page -- the last page of
24 this document?  It's entitled, "Project updates."
25       Do you see that?

Page 195

1    A.  Yes.
2    Q.  Do you see under "Project," it says, "Luxury
3  segment reengineering"?
4    A.  Yes.
5    Q.  Does that refresh your recollection as to
6  whether that was the term used within Marriott
7  Vacation Worldwide to describe the changes that were
8  going on to the luxury division of the Ritz-Carlton?
9    A.  I don't know specifically.  This isn't my
10 document.
11   Q.  I understand, but does this refresh your
12 recollection at all, or you just don't remember this
13 term?
14   A.  I don't remember the term being used.
15   Q.  In the Abaco deflag and unwind, how many --
16 was there a lawsuit that arose out of that unwinding
17 and deflagging?
18   A.  Was there a lawsuit -- out of the fractional
19 or --
20   Q.  Yes.
21   A.  You're kind of putting two things together.
22   Q.  The fractional.
23   A.  The fractional?  I don't remember if there
24 was one.
25   Q.  How about the whole owner?

Page 196

1    A.  I believe there may have been, but I don't
2  know specifics.
3    Q.  Do you remember the unwinding of the Bleu
4  Florida Trust?  Did you have anything to do with that?
5    A.  No.  That was Mary Lynn.
6    Q.  Do you know how much -- strike that.  As you
7  sit here today, do you have any knowledge of the
8  unwinding process of the trust?
9    A.  Of the process?
10   Q.  Yeah.
11   A.  Yes.
12   Q.  What was your role in it, if anything?
13   A.  I didn't have a role.
14   Q.  Are you aware of any appraisals that were
15 undertaken by the Ritz-Carlton Management Company of
16 the fractional interests that the club was reacquiring
17 or that Marriott was reacquiring from the Bleu Florida
18 Land Trust?
19   A.  No.
20   Q.  You've never seen a Cushman & Wakefield
21 appraisal, appraising the worth of the fractional
22 interests in the trust?
23   A.  I have seen that.
24   Q.  You've seen that appraisal?
25   A.  I've seen that recently, actually.

Page 197

50 (Pages 194 - 197)

| | |
|---|---|
| 1   Q. Did you see it back in 2013 when it was out? | 1   MR. SELLINGER: Objection to form. |
| 2   A. No. | 2   A. What would've been -- that they borrowed? |
| 3   Q. When was the first time you saw it? | 3 BY MR. REISER: |
| 4   A. Probably six weeks ago. | 4   A. Borrowed from the reserve account to pay |
| 5   (Exhibit 2143 was marked for | 5 operating expenses. |
| 6   identification.) | 6   A. We've had other associations do it before. |
| 7 BY MR. REISER: | 7 It depends on their governing documents. |
| 8   Q. 2143 is the August 8th strategic council. | 8   Q. Do you think it's appropriate in |
| 9 I'm going to always go to the project update section | 9 California -- under California law -- to do that? |
| 10 on these as we go through them. | 10   A. I can't speak about California law. |
| 11   A. I didn't have anything to do with writing any | 11   Q. That was a club that you were running that |
| 12 of these, so we can go through them all if you'd like, | 12 was in California. So, in California, I think you'd |
| 13 but I just want you to know. | 13 be familiar with the rules against commingling reserve |
| 14   Q. I hear you. What I noticed was that the | 14 funds. You're not -- you've never -- |
| 15 business review reports often times, like, word for | 15   A. I'm sorry -- |
| 16 word, got cut and pasted by whoever drafted these and | 16   MR. SELLINGER: Objection to form. |
| 17 they take your reports on the individual Ritz Clubs | 17   A. I'm sorry. I'm not familiar. |
| 18 and stick them into this, so I think that -- | 18 BY MR. REISER: |
| 19   A. Do you want to talk about those? | 19   Q. As you sit here today, it's your opinion that |
| 20   Q. No. I think I'd rather talk about these. I | 20 it may or may not be okay in a California condo |
| 21 didn't print those out. I thought you actually had | 21 association for the condo board to borrow money from a |
| 22 these. But I'm going to go through them and see -- | 22 reserve account and use it to pay operating expenses? |
| 23   MR. SELLINGER: What's the date? | 23   A. I'm not -- |
| 24   MR. REISER: August 8, 2012. | 24   MR. SELLINGER: Objection to form. |
| 25 BY MR. REISER: | 25 BY MR. REISER: |
| Page 198 | Page 200 |
| 1   Q. I'm just going to turn to the -- were you | 1   Q. It may or may not be okay as far as you know; |
| 2 the -- right now, I'm actually looking on the last | 2 right? |
| 3 page of the exhibit regarding the Northstar project. | 3   A. Not specifically, no. |
| 4   Do you see that? | 4   Q. So if you saw that going on at the club, |
| 5   A. Yes. | 5 would you have reported it to anybody or would you |
| 6   Q. Were you the asset manager for Tahoe during | 6 just have let it go? |
| 7 2012? | 7   MR. SELLINGER: Objection to form. |
| 8   A. Stacey and I were. Stacey really spent more | 8   A. We would have asked a question about it to |
| 9 time on Northstar. | 9 our law department. |
| 10   Q. Do you remember a time when the purchaser of | 10 BY MR. REISER: |
| 11 the de-annexed -- the 17 de-annexed units -- JMA -- | 11   Q. Do you remember ever asking any questions of |
| 12 became delinquent in the payment of their maintenance | 12 the law department about whether it was appropriate |
| 13 fees? | 13 for the condo board, of which you were the |
| 14   A. I do. | 14 management -- you were managing the condo board at |
| 15   Q. Do you remember a time where money was | 15 Tahoe; true? You, Stephanie Sobeck. |
| 16 actually borrowed from the reserve account to make up | 16   A. The fractional association, yes. |
| 17 for the delinquent maintenance fees that were not paid | 17   Q. You didn't manage the condo association? |
| 18 by JMA? | 18   A. The condo association was -- they actually |
| 19   A. I don't. | 19 went out and were eventually unbranded. That was the |
| 20   Q. You don't remember that happening? | 20 whole -- JMA was actually selling unbranded inventory. |
| 21   A. I don't specifically remember it happening. | 21   Q. Eventually, Rock Resorts took over the |
| 22 It certainly could have. It's happened before. | 22 management of the condo association; right? |
| 23   Q. Is that something that, in your opinion as | 23   A. Uh-huh. |
| 24 the Ritz-Carlton Management Company representative to | 24   Q. Until that time, you, Stephanie Sobeck, was |
| 25 the board, would've been appropriate? | 25 the asset manager representing Ritz-Carlton management |
| Page 199 | Page 201 |

51 (Pages 198 - 201)

1 company in relation to the management of the
2 condominium board, right, in Tahoe?
3    A. Stacey was, but we were working together.
4 She was working for me, so, yes.
5    Q. Okay. This is August 30, 2012. It's
6 Exhibit 2144.
7       (Exhibit 2144 was marked for
8    identification.)
9 BY MR. REISER:
10    Q. I want to ask you -- you were the asset
11 manager and the representative of the Ritz-Carlton
12 Management Company for the Bachelor Gulch board too
13 during 2012; right?
14    A. Yes.
15    Q. Do you remember the board, in the summer of
16 2012, after the evolution letter went out, hired Mark
17 Earle to study the impact on the value of the members'
18 investment based on the company's recent decisions?
19    A. Yes.
20    Q. And what did Mark Earle find in terms of the
21 impact on the value of the members' investment, based
22 on the company's decision to evolve the brand as
23 stated by Eveleen Babich in 2012?
24       MR. SELLINGER: Objection to form.
25    A. What did the report say?

Page 202

1 BY MR. REISER:
2    Q. Yes. Did you ever see it?
3    A. I guess I eventually saw it. I don't
4 remember specifically what it said.
5    Q. Isn't it true that Mark Earle gave the
6 opinion that the Marriott Company's -- or Marriott's
7 decisions in terms of the evolution, that's described
8 by Eveleen Babich, was that it would have a negative
9 impact on the value of the members' interests?
10       MR. SELLINGER: Objection to form.
11    A. If that's what the board wanted to find, I'm
12 sure that's what he found.
13 BY MR. REISER:
14    Q. Do you remember reading that was found,
15 though?
16    A. I don't remember reading the report. I
17 probably did see it, though.
18    Q. You understood that Mark Earle actually
19 gave -- or -- I'm sorry -- the board at Bachelor Gulch
20 gave the opportunity for Ritz-Carlton Management
21 Company to continue to manage the property after 2012;
22 right? It was a request for proposals, and
23 Ritz-Carlton Management Company submitted a proposal?
24    A. We did --
25       MR. SELLINGER: Objection to form.

Page 203

1    A. We did respond to the RFP.
2 BY MR. REISER:
3    Q. That was rejected by the board, true, in the
4 case of The Timbers' proposal?
5    A. Yes.
6    Q. And is it your opinion that the decision to
7 go with Timbers was directly related to the finding
8 by -- strike that. Is it your opinion that -- well,
9 strike that. I'm done with this.
10    Next is 2145. It's a September 27, 2012
11 strategic council update.
12       (Exhibit 2145 was marked for
13    identification.)
14 BY MR. REISER:
15    Q. Okay. So on page 5 of this document,
16 Exhibit 2145, under the luxury segment reengineering
17 department -- I mean segment -- it says, "The
18 communication related to the evolution of the RCDC
19 product has not been well-received by many of the
20 members. Several boards have made their concerns
21 known to us. We have held conference calls, a
22 webinar, one-on-one meetings, and a meeting with Steve
23 and me and the board president and the secretary of
24 Bachelor Gulch. Communications with the members will
25 continue in the coming months."

Page 204

1    Do you remember that being true, that the
2 evolution of the RCDC product, as described by Eveleen
3 Babich and as described by Steve Weisz in the webinar,
4 was not well-received by the members?
5       MR. SELLINGER: Objection to form.
6    A. I remember there being some comments by
7 members, but it's interesting in this one. I was
8 reading back here. It actually says that member
9 services didn't get a lot of comments, but there was
10 comments back from the board specifically. So, yes.
11 BY MR. REISER:
12    Q. It says that, "a one-on-one meeting and a
13 meeting with Steve and me."
14    Isn't it true that Lee Cunningham writes
15 these strategic council reports?
16    A. Yes.
17    Q. So that was in the words of Mr. Cunningham,
18 that the evolution of the RCDC project has not been
19 well-received by many of the members, and that several
20 boards had made their concerns known to us. True?
21       MR. SELLINGER: Objection to form.
22    A. I would assume he wrote it because this is
23 his, but I do not know.
24 BY MR. REISER:
25    Q. Would you disagree with him that the RCDC

Page 205

52 (Pages 202 - 205)

1 product had not been well-received by the members as
2 of September of 2012?
3        MR. SELLINGER:  Objection to form.
4        A.  The RCDC product?
5 BY MR. REISER:
6        Q.  The evolution of the RCDC product had not
7 been well-received by many of the members.
8        A.  We had gotten feedback from some of the
9 members that there were concerns, yes.
10       Q.  Which boards made their concerns known to
11 you, Stephanie Sobeck, in or around September of 2012
12 after the evolution was announced?
13       A.  Bachelor Gulch specifically, and then had
14 conversations with Jupiter and Aspen and St. Thomas, I
15 would say.
16       Q.  And it's true that Bachelor Gulch held a vote
17 and terminated Ritz-Carlton Management Company as a
18 result of the evolution proposal.  True?
19       MR. SELLINGER:  Objection to form.
20       A.  There were a lot of reasons that -- I think
21 we covered this last time.  There were a lot of
22 reasons why Bachelor Gulch left.
23 BY MR. REISER:
24       Q.  What about Jupiter; what was the reason they
25 left, in your opinion?

Page 206

1        A.  There were many reasons why they left.  I
2 wouldn't say there was one specific reason.
3        Q.  What about -- okay.
4        So Bachelor Gulch sent the Ritz-Carlton
5 Management Company a cease-and-desist letter to
6 cease -- to have Marriott Vacation Worldwide cease and
7 desist from allowing any members of the Marriott
8 Vacation Club to use Bachelor Gulch in or around the
9 fall of 2012; didn't it?
10       A.  Yes.
11       Q.  And Jupiter sent a cease-and-desist letter
12 along the same lines; correct?
13       A.  Yes.
14       Q.  And the Aspen board actually hired a lawyer
15 by the name of Philip Gosch to write a
16 cease-and-desist letter to prevent Marriott Vacation
17 members from using the Aspen Club in the fall of 2012.
18 True?
19       A.  I don't remember getting one from Aspen, but
20 they could have.  I don't remember.
21       MS. LIVINGSTON:  Objection to form.
22 BY MR. REISER:
23       Q.  And St. Thomas also sent a cease-and-desist
24 letter in the fall of 2012 regarding the use by
25 Marriott Vacation Club members of the St. Thomas club.

Page 207

1 True?
2        A.  Sorry.  I don't remember if they -- I only
3 remember Bachelor Gulch and Jupiter specifically.  I
4 just don't remember if St. Thomas and Aspen did as
5 well.
6        Q.  You remember San Francisco holding a
7 survey of their own and being opposed to the
8 affiliation as well.  True?
9        MR. SELLINGER:  Objection to form.
10       A.  San Francisco sent a survey out to its
11 members asking about the product overall.  It wasn't
12 specifically about affiliation.  It was about how the
13 use of the product was going for the members overall.
14 BY MR. REISER:
15       Q.  Okay.  And San Francisco was quite upset
16 about the fact that the club was being represented to
17 third parties through sites like Jetsetter and Wall
18 Street Journal ads.  Is that true?
19       MR. SELLINGER:  Objection to form.
20       A.  They were -- that inventory was actually
21 being used for marketing purposes for the club.
22 BY MR. REISER:
23       Q.  Okay.  So you're aware, though, that there
24 were no sales of any Ritz-Carlton fractionals after
25 2013.  True?

Page 208

1        A.  After 2013, yeah, that would probably be
2 about when we stopped.
3        Q.  So what marketing use was being made at the
4 Ritz-Carlton Destination Clubs in 2013 when that
5 survey was taken?
6        MR. SELLINGER:  Objection to form.
7        A.  I don't remember when we stopped doing
8 marketing packages to the club.
9        Are you trying to say it happened at the same
10 time?
11 BY MR. REISER:
12       Q.  No.  I'm just wondering -- what would you be
13 marketing if there's nothing for sale?  How would you
14 have a marketing trip to sell fractionals when there's
15 no fractionals for sale?
16       A.  I don't know when the marketing packages
17 stopped in San Francisco.
18       Q.  Okay.  Would you agree that, after sales
19 stopped of fractionals, that it would have been
20 inappropriate to use the inventory at San Francisco to
21 market Marriott Vacation points?
22       (Speakerphone is making noise.)
23       MR. REISER:  Just for the record, that
24 was a phone conference that just got ended.
25       If you could just read the question back?

Page 209

53 (Pages 206 - 209)

1    THE REPORTER: "Would you agree that,
2 after sales stopped of fractionals, that it
3 would have have inappropriate to use the
4 inventory at San Francisco to market Marriott
5 Vacation points?"
6    MR. SELLINGER: Objection to form. Once
7 again, I'd also note that we're certainly
8 going, at this point, beyond the scope of
9 issues in the documents that were
10 subsequently produced.
11    THE REPORTER: And I didn't get an
12 answer.
13    THE WITNESS: Sorry. This is San
14 Francisco?
15    (The reporter read the question again.)
16    THE WITNESS: Well, I think, however the
17 developer wanted to allow use of that
18 inventory -- just like if they had used it
19 through Explorer and brought people who were
20 Marriott Vacation owners in, and they would
21 have had the ability to do that.
22 BY MR. REISER:
23    Q. So it's your opinion that there are no use
24 restrictions on the developer inventory; they can do
25 whatever they want with it?

Page 210

1    MR. SELLINGER: Objection to form.
2    A. I didn't say that. They could use it like
3 any other member could use it.
4 BY MR. REISER:
5    Q. Do you know whether there was any kind of,
6 like, agreement with the Ritz-Carlton hotel in San
7 Francisco, wherein the nightly rentals could not be --
8 transient rentals could not be made at the
9 Ritz-Carlton Residence Club?
10    Q. Are you saying the territorial?
11    Q. Yes.
12    A. I don't know if territorial exists. I don't
13 know.
14    Q. This is Exhibit 2147, the strategic council,
15 October 25, 2012.
16    (Exhibit 2147 was marked for
17 identification.)
18 BY MR. REISER:
19    Q. I want to look at the luxury segment
20 reengineering box. So a month later, on October 25,
21 2012, there's still the writing by Mr. Cunningham
22 that, "The communication related to the evolution of
23 the RCDC product has not been well-received by many of
24 the members. Several of the boards have made their
25 concerns known to us."

Page 211

1    Was that your recollection that, in
2 October 2012, there was still negative reception by
3 the members of the evolution of the RCDC product?
4    MR. SELLINGER: Objection to form.
5    A. There were some members who were -- had
6 concerns about the evolution letter, yes.
7 BY MR. REISER:
8    Q. Would you agree with Mr. Cunningham that it
9 was many of the members?
10    A. It was some of the members.
11    Q. You disagree that it was many? Because some
12 and many are different; don't you think?
13    MR. SELLINGER: Objection to form.
14    A. Yes, but we're talking about 3,000 to 4,000
15 members. I'm not sure of the definition of "some" or
16 "many" in that context.
17 BY MR. REISER:
18    Q. Okay. Mr. Cunningham then goes on to write,
19 "We have spoken to a couple PR firms to provide input
20 into our plan and assist with ongoing communications."
21    Was that the APCO firm that was retained to
22 provide public relations for the evolution?
23    MR. SELLINGER: Objection to form.
24    A. APCO was eventually hired, but it was hired
25 through the law department.

Page 212

1 BY MR. REISER:
2    Q. Were there any other PR firms that were
3 hired?
4    A. No, but there were other ones that we looked
5 at.
6    Q. It says, "So far, we do not have a
7 communication consultant selected; however, we believe
8 we have a viable option to consider."
9    Do you know what he was talking about there?
10    A. That was APCO.
11    Q. "The primary focus on the going-forward
12 communication plan is to individual members, shifting
13 the focus away from the boards."
14    Did you ever discuss with Mr. Cunningham that
15 the focus going forward, in terms of attempting to
16 implement the evolution, would be on the members,
17 rather than the boards?
18    A. Yes.
19    Q. Why was that decision made?
20    A. When the situation happened at Bachelor
21 Gulch, when the board was communicating out to its
22 members, as it was, we didn't feel like a lot of the
23 information that was being shared by the board was as
24 straight forward and balanced as it should have been.
25    We wanted to make sure -- because once the

Page 213

54 (Pages 210 - 213)

1  communication had been given out to the members about
2  the possibility of the Marriott Vacation Club program,
3  we were getting feedback from members saying that
4  there were members that were interested and when was
5  it going to happen.  But then we had a board, like
6  Bachelor Gulch, that was only sharing negative, and
7  not sharing positive.
8       So we thought, at this point, it was better
9  to start talking to individual members, versus going
10 through the boards, just so we could educate them on a
11 program.  We hadn't decided on the best way on the
12 communication plan that we were going to use.
13      Q.  If the boards didn't want to go through with
14 it, why were you pushing it?
15          MR. SELLINGER:  Objection to form.
16      A.  Quite frankly, the challenge was -- we had
17 already communicated out to all the members that we
18 were going to do this.  So there were members who were
19 not on the board -- the board is only five -- you
20 know, it's five directors that represent a thousand
21 people.
22      So these five directors we saw in Bachelor
23 Gulch, that the way the communication was being rolled
24 out by the Bachelor Gulch board wasn't necessarily
25 factual to how the program was actually going to work.

Page 214

1       So we wanted to make sure that -- the members
2  could make their own choice, but we wanted to make
3  sure that the information they were getting was
4  accurate.
5  BY MR. REISER:
6       Q.  Okay.  If you can turn to the Aspen Highlands
7  box on the next page, again, this is dated October 25,
8  2012 -- these notes.
9       Under the Aspen Highlands box, it says, "New
10 board elected 10/13/2012.  Pressure from membership
11 during meeting applied to board to fight RCDC
12 evolution."
13      You were at that board meeting, weren't you?
14      A.  I was.
15      Q.  That was when Randy Mercer and Tyler Oliver
16 got elected?
17      A.  Definitely Randy Mercer.  I'm not sure about
18 Tyler.  He may have been reelected then.  But, yes.
19      Q.  Do you remember pressure from the membership,
20 during that meeting, to fight the board on the
21 evolution?
22      A.  There were a few members in attendance at the
23 meeting who had concerns about it, yes.
24      Q.  So Mr. Cunningham writes, "Pressure from
25 membership during meeting."  He didn't say, "a few

Page 215

1  members."
2       Do you think he's just using inaccurate
3  terminology there?
4          MR. SELLINGER:  Objection to form.
5       A.  I mean, membership -- we don't usually get a
6  lot of participation from members at an annual
7  meeting.  There might be a few members who come, so
8  membership could be a few members.  It's not -- you
9  know, we don't get hundreds of people who are coming
10 to these.
11 BY MR. REISER:
12      Q.  Do you remember how many people were at that
13 meeting?
14      A.  No, but I've never been to a meeting where
15 there's more than -- I think St. Thomas has the most,
16 and maybe there's 30.  So it's not a big percentage of
17 the membership.
18      Q.  And I may have asked you this on the last
19 depo.  I don't want to get another objection from
20 Phil, so I promise this will be my only question on
21 this.
22      Do you have any recollection of John Hearns
23 informing you or anybody else at the Ritz-Carlton
24 Management Company that Jay Neveloff was asking that
25 the Marriott folks vote their remaining shares to

Page 216

1  Ford, Oliver, and Mercer at that meeting?
2       A.  I believe we looked at an e-mail last time
3  that Jay Neveloff was asking, I think, about Mercer.
4  I don't remember Oliver, but I think it was Randy.
5       Q.  Do you remember anything else about that
6  issue since our last discussion?
7       A.  No.
8          MR. SELLINGER:  Off the record.  It's
9       been about an hour.  Do you want to --
10         MR. REISER:  Want to keep going for a
11      little bit?  I'm making pretty quick progress
12      here.
13         MR. SELLINGER:  If you want to take five,
14      but I don't want to go longer than that.
15         MR. REISER:  Okay.
16 BY MR. REISER:
17      Q.  Next in order is Exhibit 2148.  It's a
18 January 17, 2013 strategic council.
19         (Exhibit 2148 was marked for
20      identification.)
21 BY MR. REISER:
22      Q.  On this one, again, let's go to the luxury
23 segment reengineering box.  The second bullet point
24 starts -- by the way, I'm skipping over the first
25 bullet point in all these reports dealing with the

Page 217

55 (Pages 214 - 217)

1 portfolio buyback, because you didn't have anything to
2 do with that; right?
3     A. Correct.
4     Q. So skipping to the bullet point. It says,
5 "Based on a recently-filed claim in Minnesota, we are
6 reevaluating go-forward strategy. Current thinking
7 not yet finalized -- is yet to be finalized." Then
8 there's six bullet points.
9        Do you remember there was a strategy change
10 following the class action that was filed by Hoyt and
11 others in the Minnesota District Court?
12     A. I remember discussions about Hoyt. And,
13 yeah, I remember discussions about kind of moving
14 forward with a -- if you want to call it a survey.
15     Q. Okay. So the second -- the first bullet
16 point talks about the re-evaluating strategy not yet
17 finalized, albeit, but it says, "Move forward with
18 putting Northstar and San Francisco inventory into the
19 NATO Trust."
20        MR. SELLINGER: I'm sorry. Let me give
21     you a cautionary instruction, which I think
22     will help keep me from having to object as we
23     go through this. To the extent you can
24     answer any questions about this without
25     getting into conversations with counsel, you

Page 218

1     instruct you not to disclose legal
2     communications with counsel.
3        I'm assuming that you're not taking the
4     position that, if she answers a question on
5     whether she relied, that that's constituting
6     any waiver of privilege.
7        MR. REISER: It's not a waiver, but it
8     might be relevant to an advice-of-counsel
9     defense later on. We can argue about that --
10        MR. SELLINGER: And I don't believe that
11     there is a reliance on counsel defense,
12     but -- I understand that -- but I want to
13     make sure that you're not going to argue
14     waiver if she --
15        MR. REISER: Fair enough. I won't.
16        MR. SELLINGER: -- responds to that
17     question. We have no intention of waiving
18     privilege.
19        MR. REISER: You've been clear on that.
20        MR. SELLINGER: Have to be.
21 BY MR. REISER:
22     Q. So go ahead.
23     A. Yes.
24     Q. Was there a question in your mind as to
25 whether it was allowed under the governing documents?

Page 220

1 can do so.
2        But any communications to or from counsel
3     for the purpose of giving or receiving legal
4     advice, I would instruct you not to answer.
5        THE WITNESS: Okay.
6        MR. SELLINGER: Go ahead.
7 BY MR. REISER:
8     Q. So did you ever seek legal advice as to
9 whether it was appropriate, under the governing
10 documents in both the Tahoe and San Francisco clubs,
11 to put the developer-owned inventory into the NATO
12 Trust?
13     A. Yes.
14     Q. When did you do that?
15     A. It would've been obviously before this.
16 Probably in 2012.
17     Q. Who did you ask?
18     A. We would have asked Barbara, Jim Hunter,
19 maybe a couple others, but those probably would've
20 been the primary.
21     Q. Did you rely on that -- on any legal advice
22 in acting -- to put any of the Northstar or San
23 Francisco inventory into the NATO Trust?
24        MR. SELLINGER: Let me restate that. To
25     the extent -- I don't want you -- and I'll

Page 219

1     A. We wanted clarity that it was.
2     Q. Was there a question in your mind that it was
3 or wasn't, or you always get advice of counsel on
4 doing something?
5     A. Usually something like this, we would always
6 get advice of counsel.
7     Q. The second bullet point says -- this, again,
8 is re-evaluating the go-forward strategy in terms of
9 reengineering the club. The second bullet point is,
10 "Go club by club and obtain a majority vote of the
11 members endorsing the affiliation of their club with
12 Lion & Crown."
13        Do you remember that that was the strategy
14 that ultimately was adopted by Mr. Cunningham in terms
15 of the reengineering strategy?
16     A. What we went forward with getting, going club
17 by club and going out to the membership, is to seek
18 their feedback, yes.
19     Q. Okay. You don't know what Mr. Cunningham
20 meant by "majority vote," I take it. Right? Or do
21 you?
22     A. We talked about this last time. I mean,
23 getting a full majority vote of the members is -- does
24 not happen. It's very difficult to get members out to
25 vote. So I can only guess that he was talking about

Page 221

56 (Pages 218 - 221)

1 the majority of people who voted.

2     Q. But there was a majority vote at Bachelor

3 Gulch; true?

4     A. It was a lot of work to get.

5     Q. Understood, but there was a majority vote?

6 They did get the membership --

7     A. We didn't manage that vote for them, so I

8 can't really talk about that.

9     Q. Okay. And there was a majority vote at

10 Jupiter to terminate the management agreement as well;

11 right?

12     A. Again, we didn't manage that.

13     Q. So is it your testimony that it's difficult

14 for the Ritz-Carlton Management Company to get a

15 majority vote, but other companies, who attempt to get

16 majority votes, can do it? Is there something unique

17 about Ritz-Carlton Management Company that prevents

18 them or causes a great deal of trouble in getting a

19 majority vote?

20     MR. SELLINGER: Objection to form.

21     A. There's nothing that was required to get a

22 majority vote, I guess, is what I'm saying. So if

23 this was something we were changing documents,

24 changing declarations, changing governing documents

25 that existed on the property, and needed it, could we

Page 222

1 get it? Certainly, with a lot of resources and

2 expense, we could. But this was something that we

3 were getting feedback from the members on, so there

4 would've been no need to do that.

5 BY MR. REISER:

6     Q. Well, the membership feedback was negative;

7 right? We saw that. It's even still popping up in

8 this -- strike that. It was in the last strategic

9 council exhibit that Mr. Cunningham repeats that

10 there's a -- the membership is against the evolution.

11     So you were getting feedback, but it wasn't

12 very good; was it?

13     MR. SELLINGER: Objection to form.

14     A. Well, we talked about this last time. When

15 you have a situation where something new rolls out,

16 you're more likely to hear negative from members than

17 positive. So there was a lot of -- there were

18 certainly -- we were hearing from some members that

19 there was concern. But before we actually went out

20 and talked to all members about it, we really didn't

21 know how the membership felt.

22 BY MR. REISER:

23     Q. So regardless of whether you believed that

24 you were required, as Ritz-Carlton Management Company,

25 to get a majority of the vote, you would agree that,

Page 223

1 as of January 17, 2013, Lee Cunningham was stating

2 that "The current thinking is to go club by club and

3 obtain a majority vote of the members endorsing the

4 affiliation at their club with Lion & Crown." True?

5     MR. SELLINGER: Objection to form.

6     A. I can read the line that he wrote.

7 BY MR. REISER:

8     Q. Did that ever change in terms of strategy?

9 Was that the strategy as of January 2013, to go club

10 by club and obtain a majority vote of the members?

11     A. We were going club by club to go and get a

12 survey of the members, to understand their interest in

13 participating with the program. That never changed.

14     Q. The next bullet point says, "Lion & Crown

15 would be described as having an affiliation with the

16 MVCD program, Third Home, and outside private home

17 exchange networks, and Elite Alliances, a luxury tier

18 fraction club exchange network."

19     Elite Alliance never happened; right?

20     A. No.

21     Q. Do you know why not?

22     A. No.

23     Q. Did you ever talk to Elite Alliance about a

24 potential exchange program?

25     A. No.

Page 224

1     Q. Do you know if Mr. Cunningham did?

2     A. No.

3     Q. The fourth bullet point, "Mount an aggressive

4 communication, education, marketing campaign aimed at

5 the member base for each club to give us the best

6 chance of success. Utilize outside communication

7 expertise to develop and execute the campaign."

8     So do you have any idea what Mr. Cunningham

9 meant by "the best chance of success"?

10     MR. SELLINGER: Objection to form.

11     A. I guess the best chance of having a good

12 communication plan, yeah. Going out to the members

13 and communicating to them about the club and...

14 BY MR. REISER:

15     Q. It says, "Based on the outcome of the vote at

16 each club, either affiliate or not."

17     As of January, isn't it true that

18 Mr. Cunningham was -- his strategy on the

19 reengineering was, there was going to be a vote at

20 each club and the club voted, no, there would be no

21 affiliation?

22     MR. SELLINGER: Objection to form.

23     A. We never thought it was a vote. It was

24 always a gathering of member information, a survey,

25 and understanding of what members thought. We used

Page 225

57 (Pages 222 - 225)

1 "survey" and "vote" interchangeably.
2 BY MR. REISER:
3     Q. Did you ever read Lee Cunningham's deposition
4 in this case?
5     A. No.
6     Q. Did you talk to him about his deposition?
7     A. Specifically, no. Talked to him that he had
8 a deposition.
9     Q. Are you aware that he changed his mind about
10 a vote in the summer or spring of 2013?
11         MR. SELLINGER: Objection to form.
12 BY MR. REISER:
13     Q. And changed his mind from a vote to a survey,
14 so that, indeed, they were not being used
15 interchangeably; a vote was a vote and a survey was a
16 survey, and he changed his mind?
17     A. No.
18     Q. You never heard that?
19     A. I never heard him be deposed to say that, no.
20     Q. Would that surprise you if he testified to
21 that effect?
22     A. No.
23     Q. Why would that not surprise you, given your
24 testimony that you always considered "vote" and
25 "survey" to be the same thing?

Page 226

1 "survey" and "vote" interchangeably.
2 BY MR. REISER:
3     Q. So it's your testimony that counsel was --
4 the advice of counsel was requested as to whether to
4 use the word "vote" or "survey"?
5         MR. SELLINGER: Again, I'll instruct you
6     not to answer with respect to communication
7     with counsel for the purpose of getting legal
8     advice.
9     A. We discussed the approach we were going to
10 take --
11         MR. SELLINGER: Again, don't -- you can't
12     get into your discussions --
13         THE WITNESS: I can't answer your
14     question then.
15         MR. REISER: We never took that break.
16 Want to take it now?
17         MR. SELLINGER: (Nods head.)
18         THE VIDEOGRAPHER: We are going off the
19 record. The time is 3:38 p.m.
20     (Brief recess.)
21         THE VIDEOGRAPHER: We are back on the
22 video record. The time is 3:49 p.m.
23     Counsel, you may proceed.
24     (Exhibit 2137 was marked for
25     identification.)

Page 228

1         MR. SELLINGER: Objection to form.
2     A. Because -- this gets into the counsel part,
3 which I don't know if I can talk about or not.
4         MR. SELLINGER: Certainly, don't get into
5     any conversations with counsel.
6         THE WITNESS: But that's where the change
7     came from.
8 BY MR. REISER:
9     Q. Is it true then that you are aware that he
10 changed his mind from a vote to a survey?
11         MR. SELLINGER: Objection to form.
12     A. I know that we changed the decision to use
13 "vote" versus "survey", yes.
14 BY MR. REISER:
15     Q. Did you mean just use the word "vote" versus
16 "survey"?
17     A. Yes.
18     Q. You put air quotes on that. Why did you do
19 that?
20     A. Because this was a -- to me, it was something
21 that was more a change of verbiage based on direction
22 from our attorneys.
23         MR. SELLINGER: Once again, don't get
24     into communications. I'll instruct you not
25     to get into communications with counsel.

Page 227

1 BY MR. REISER:
2     Q. All right. I'm going to show you
3 Exhibit 2137. It's the October 21st, 2013 corporate
4 growth committee memo authored by yourself and John
5 McGowan regarding Ritz-Carlton, San Francisco, member
6 options/offering.
7     You have seen this document before, I take
8 it?
9     A. Yes.
10     Q. Do you want a chance to read it or --
11     A. No. It's okay.
12     Q. First of all, who is John McGowan?
13     A. He was an attorney. He worked with us.
14     Q. Did he work as an attorney in the legal
15 department or he happened to be an attorney?
16     A. No. He worked in the law department.
17     Q. All right. Did you draft this or did he?
18     A. I drafted part of it; he drafted part of it.
19     Q. Do you recollect drafting this as you sit
20 here?
21         MR. SELLINGER: Objection to form.
22     A. Yes.
23 BY MR. REISER:
24     Q. So the first sentence says, "The purpose of
25 this submission is to provide the corporate growth

Page 229

58 (Pages 226 - 229)

1 committee an update on the current state of member
2 satisfaction at the Ritz-Carlton Club, San Francisco,
3 and obtain approval of the financial impacts
4 associated with the presentation of four product exit
5 options to the members of the San Francisco club,
6 San Francisco."
7      Do you know what was the precipitating factor
8 in preparing this memo?
9      MR. SELLINGER:  Let me just give you one
10 instruction with respect to this document.
11 So we have, Mr. Reiser, redacted a limited
12 part of the memo on the basis of
13 attorney-client privilege.
14      The decision that was made was that the
15 remainder of the memo, notwithstanding the
16 fact that an attorney was listed as one of
17 the coauthors, were not privileged.
18      So answer Mr. Reiser's questions, but
19 just, in anticipation, I want to make sure,
20 in doing so, that you don't get into any
21 attorney-client discussions for which we're
22 always, as you know, and Mr. Reiser knows,
23 asserting privilege.
24      THE WITNESS:  Okay.
25      MR. REISER:  But you're not asserting her
                                                    Page 230

1      Q.  Was this effort to give product exit
2 options -- was it prepared as a result of getting a
3 dose of the member dissatisfaction based on the
4 results of that survey?
5      MR. SELLINGER:  Objection to form.  Go
6      ahead.
7      A.  Yes.  It was in response to concerns we had
8 heard from the San Francisco members about ways to get
9 out of the program.
10 BY MR. REISER:
11      Q.  I've read this memo pretty closely.  You can
12 see my highlights and my scribbling is on the paper.
13 I do want to see if I can ask you more generally and
14 avoid going through line by line.  Let me just -- let
15 me just ask you if I can ask you this way.
16      Would you agree that the maintenance fees at
17 the San Francisco club were one of the highest in the
18 club's system?
19      A.  Yes.  The maintenance fees in San Francisco
20 were the highest in the system, yes.
21      Q.  And then the other club that had that dubious
22 distinction was Tahoe, around the same amount of fees
23 per night?
24      A.  I don't think they were quite as high as
25 San Francisco.  I mean, San Francisco is an expensive
                                                    Page 232

1 discussions with McGowan were privileged;
2 right?
3      MR. SELLINGER:  Well, I wouldn't say
4 that.  I'd say that a decision was made that
5 we're not asserting privilege with respect to
6 the unredacted parts of the memo.
7      THE WITNESS:  But I would have talked to
8 him about all of this.
9      MR. SELLINGER:  So your conversations
10 with McGowan, yeah, we would generally assert
11 privilege as to -- but I don't think that
12 precludes you from asking questions about --
13 I would instruct her not to answer any of
14 those discussions with McGowan.  But I want
15 to instruct her not to answer questions
16 generally about the unredacted portions.
17      MR. REISER:  It's going to be like
18 Houdini trying to navigate that, but let me
19 see what I can do.
20 BY MR. REISER:
21      Q.  So you recollect -- I mentioned that survey
22 to you at the San Francisco club that was undertaken
23 by Steve Andrews and Al Bruno.  I think we talked a
24 little bit about it last time; right?
25      A.  Yes.
                                                    Page 231

1 market to operate.
2      Q.  I was just kind of doing the numbers in my
3 head.  It seemed like the maintenance fees were
4 roughly equivalent for the same 21-night use.
5      That's not your recollection?
6      A.  I thought they were a little less.  I thought
7 they were a few thousand dollars less.
8      Q.  Okay.  Would you say that the San Francisco
9 club and the Tahoe club were the top maintenance fees
10 clubs in terms of the highest maintenance fees?
11      A.  Most expensive?
12      Q.  Yes.
13      A.  Let me think about what Vail -- so Aspen had
14 28 nights, so they're less.  And then Vail and Tahoe,
15 I believe, were about the same, and San Francisco
16 would be the highest.
17      Q.  Is it true that the average maintenance fees
18 at San Francisco were roughly $1,000 per allocated
19 night?
20      A.  Yes.
21      Q.  And it was determined by you, around the time
22 of this memo, that the current nightly price of a
23 suite at the concierge level of the Ritz-Carlton Hotel
24 on Nob Hill is roughly $1,000 per night.  That's in
25 the memo and that was your findings at this time?
                                                    Page 233

59 (Pages 230 - 233)

1    A.  Yes.
2        Q.  Is it true that the maintenance fees for the
3    Ritz-Carlton, San Francisco club were roughly three
4    times the maintenance fees for an equivalent-use night
5    at the Marriott Vacation Club?
6            MR. SELLINGER:  Objection to form.
7        A.  Marriott Vacation Club program works
8    differently.  So Marriott Vacation Destinations
9    Program is a conglomerate of a lot of different
10   maintenance fees.  They get averaged out and put into
11   points.  So you can't really say that.
12           You would have to look at a week, because it
13   depends on the demand, the number of points, and then
14   the maintenance fee is associated with that.  It's not
15   really as black and white an answer as that.
16   BY MR. REISER:
17       Q.  Okay.  And the maintenance fees average
18   across all the different clubs in the Marriott
19   Vacation Club were around, like, $10 and some change
20   per point in 2013?
21       A.  Per point, roughly, without getting into
22   specifics -- but, roughly.
23       Q.  So you were seeking approval from the
24   corporate growth committee to give the members in
25   San Francisco four options; were you not?

Page 234

1    have been an option later we were given.  I think, out
2    of this one, they were -- we were able to offer whole
3    ownership or convert them to another fractional
4    interest.
5        Q.  Okay.  So that's what the corporate growth
6    committee ultimately decided, true, that -- the two
7    middle options you mentioned -- converting -- taking,
8    say, 250 that they paid from the fractional, using
9    that as a down payment for, say, a $2 million condo at
10   the Residence Club; right?
11       A.  Yes.
12       Q.  That was option number one.  The second one
13   would be just taking your San Francisco club
14   fractional club share and trading it, say, for Aspen?
15       A.  Correct.
16       Q.  Do you remember how many folks -- members, I
17   should say -- in San Francisco participated in any of
18   those two options?
19       A.  The number, no.  But I know we had several
20   people who ended up going to another fractional.  I
21   think we had a couple of people who were interested in
22   buying whole ownership.  I don't know if that ever
23   happened.
24       Q.  Okay.  So let's just -- did you prepare the
25   background section of this memo?

Page 236

1    A.  Yes.
2        Q.  Could you just list those options for us?
3        A.  We were asking that they be able to
4    potentially convert their fractional interests into
5    points -- Marriott Vacation Club destination points;
6    convert their fractional interests into whole
7    ownership residences, which they would've taken their
8    fractional interest and used it as equity; convert
9    their fractional interests into another fractional
10   program, so one of the other places we had developer
11   inventory they could exchange; or have the Marriott
12   Vacation Club or an affiliate repurchase the fraction
13   on a predetermined price of the unit -- per unit.
14       Q.  You were requesting that the inventory be
15   purchased back if somebody wanted to sell it at
16   20 cents on the dollar; right?
17       A.  Yes.
18       Q.  Did the corporate growth committee ever
19   approve that option to buy them back?
20       A.  No.
21       Q.  Did they approve the fractional interest to
22   points in Marriott?
23       A.  No, not at that time.
24       Q.  Have they ever approved that one?
25       A.  I don't believe so.  I don't know.  It might

Page 235

1    A.  Yes.
2        Q.  So you were informing the corporate growth
3    committee, including Stephen Weisz and others, that
4    the two directors -- and we know them by Steve Andrews
5    and Al Bruno -- solicited feedback from San Francisco
6    members via survey and they got 78 responses, roughly
7    half the membership.  True?
8        A.  Yes.
9        Q.  You state that, "The members' responses
10   expressed growing frustration with their ownership;
11   and, in some cases, threatened litigation absent
12   options being provided by The Ritz-Carlton Destination
13   Club."
14           Do you remember who would threaten
15   litigation?  Do you have any recollection of
16   particular threats of litigation?  Or was that
17   generally from the comments that you read on the
18   survey?
19       A.  Generally --
20           MR. SELLINGER:  Objection to form.
21       A.  -- from the comments.
22   BY MR. REISER:
23       Q.  These bullet points -- I like the way you put
24   a heart as a bullet point.  That's probably how I knew
25   you wrote it.  Just kidding.

Page 237

60 (Pages 234 - 237)

1    A. That's funny. Mine doesn't --
2    Q. Oh, it doesn't?
3    A. No. Mine has a squiggly -- you can be
4 assured that I did not use a heart as a bullet point.
5    Q. Sorry for presuming that.
6    A. Yeah. That's not really my style.
7    Q. At any rate, the bullet point that you listed
8 here under background, those were what you gleaned
9 from the survey; right? Those points that -- you were
10 basically outlining the points you gleaned from the
11 survey that Bruno and Steve Andrews took; right?
12       MR. SELLINGER: Objection to form.
13    A. Through the survey responses and discussions
14 with the board.
15 BY MR. REISER:
16    Q. Under the second bullet point, under
17 background, it says, "Members allege that the annual
18 club dues are too high and that RCDC is undermining
19 the value of their ownership by renting its inventory
20 at rates that are far below the nightly costs
21 associated with their ownership."
22       The next sentence -- my question is -- is the
23 next sentence something that you are putting in there
24 in terms of what the facts are, or is that something
25 that you gleaned from the inventory [sic] as well? By

Page 238

1    Q. Then you point out that the annual dues at
2 $20,000 for 21 -- you point out that the annual dues
3 are $20,000 for 21 nights of usage.
4       So I think you're trying to point out that
5 the maintenance fees are about a thousand bucks a
6 night, right, as compared to the $400 to $600 they're
7 being rented for?
8       MR. SELLINGER: Objection to form.
9    A. Yeah, I mean, I say that, actually, below.
10 BY MR. REISER:
11    Q. Finally, on this point, it says, "RCDC has
12 also utilized this marketing right to rent" -- you put
13 rent in quotes -- "inventory to the MVCD exchange
14 program for access by its Premier and Premier Plus
15 members."
16       That's a statement by you. That's not
17 something you learned from the survey; right?
18    A. Yes.
19    Q. Okay. So is this access by Premier and
20 Premier Plus members different than access from the
21 Explorer Program you were mentioning?
22    A. No. It's Explorer.
23    Q. So to be precise, the Explorer Program that
24 was allowing access through that program that you
25 mentioned earlier -- that some folks in Aspen were

Page 240

1 that next sentence, I mean, "RCDC has rented its
2 inventory as permitted by the governing documents for
3 the purpose of marketing the sale of its inventory."
4       Is that your comment or is that something you
5 also gleaned from the survey?
6    A. This would've been discussions with counsel.
7       MR. SELLINGER: Okay. I'll instruct you
8    not to get into discussions with counsel.
9       THE WITNESS: Would you look at that
10    rain?
11       MR. REISER: I'm glad we're safe and
12    sound at the cozy confines of the Greenberg
13    Traurig conference room.
14       THE WITNESS: Thank goodness.
15       MR. SELLINGER: Okay. Off the record --
16    okay -- five more hours then?
17       THE WITNESS: No, thank you.
18 BY MR. REISER:
19    Q. So the second one says, "These stays do not
20 require a tour and are generally available at a rate
21 between $400 and $600 per night."
22       Is that factual? You understood that the
23 rentals at San Francisco were renting between $400 and
24 $600 a night back in 2013?
25    A. Yes, it would've been.

Page 239

1 using the Explorer Program -- that was only people who
2 had attained Premier or Premier Plus membership in
3 Marriott Vacation Club; right?
4    A. Yes.
5    Q. What does it take to get Premier and Premier
6 Plus membership?
7    A. You have to own a certain number of points.
8    Q. Do you remember how many that is?
9    A. No.
10    Q. Do you know whether Marriott Vacation Club
11 sales folks attempted to sell Marriott Vacation
12 members more points to obtain Premier or Premier Plus
13 membership status so they could obtain the right to
14 access Ritz-Carlton inventory?
15       MR. SELLINGER: Objection to form.
16    A. I know that Marriott Vacation Club sales
17 executives would always try to upgrade people into
18 Premier and Premier Plus.
19 BY MR. REISER:
20    Q. One of the things they would mention, in
21 terms of trying to upgrade them, would be, "If you
22 obtain this, you could actually get access to the
23 Ritz." Right?
24       MR. SELLINGER: Objection to form.
25    A. The sales executives would talk about all the

Page 241

61 (Pages 238 - 241)

1 different benefits in buying that point level.
2 BY MR. REISER:
3    Q.  It's a benefit to a timeshare company to have
4 luxury products or luxury properties, is it not?  In
5 other words, it's a selling point for Marriott
6 Vacation Club to have, like, nice properties to trade
7 into.  True?
8    A.  Yes.  We have to have nice properties to make
9 the program work overall.
10    Q.  So prior to Ritz and the access that was
11 provided to Marriott Vacation members, starting with
12 Premier and Premier Plus, and later through the
13 affiliation -- prior to that there were no luxury-tier
14 properties in the Marriott Vacation Club.  True?
15       MR. SELLINGER:  Objection to form.
16    A.  There were Ritz-Carlton Hotels.
17 BY MR. REISER:
18    Q.  Ritz-Carlton Hotels were available through
19 the Marriott Vacation Club?
20    A.  Through the Explorer Program, yes.
21    Q.  But that wasn't one of the properties in the
22 club.  It was something that was an exchange option.
23 True?
24    A.  That's what this was.
25    Q.  So they had access to Ritz-Carlton Hotels.
Page 242

1 BY MR. REISER:
2    Q.  You saw the recent press release, I'm sure,
3 where Marriott Vacation Worldwide, your company, is
4 buying ILG and all its brands.  True?
5    A.  Yes.
6    Q.  So you saw the press release where it said
7 that now Marriott Vacation Worldwide has seven brands,
8 six of them controlled by Marriott International, two
9 luxury brands, and the rest, upper upscale terms.
10       Did you see that terminology being used in
11 the press release?
12    A.  Yes.
13    Q.  Term of art -- that's what I think Matt
14 Ferguson meant earlier by a term of art.  The term
15 "luxury" and "upper upscale," those are terms that
16 have specific meanings within your industry.  True?
17    A.  Yes.
18       MR. SELLINGER:  Objection to form.
19 BY MR. REISER:
20    Q.  So there was no club -- forget about trading
21 in through Explorer or any other program to
22 Ritz-Carlton Hotels -- but prior to the ability for
23 the Marriott Vacation Club members to access
24 Ritz-Carlton Clubs following the evolution, there were
25 no luxury clubs in the Marriott Vacation Club.  True?
Page 244

1 So how would Premier -- strike that.  Would average --
2 would non-Premier and Premier Plus members of the
3 Marriott Vacation Club have access to the Ritz Hotels?
4    A.  I don't remember if it was something that was
5 specifically for Premier and Premier Plus or if it was
6 available for everyone.  But you had to have the right
7 point levels to be able to go, and they were very high
8 point levels.
9    Q.  Anybody had access to a Ritz-Carlton Hotel if
10 they paid the money; right?
11    A.  Not using their points.  This is Marriott
12 Vacation Club points we're talking about.
13    Q.  So other than the chance to maybe use an
14 exchange through the Explorer Program to get into a
15 hotel room, prior to Marriott Vacation Club members
16 being able to access the Ritz Residence Clubs, there
17 were no properties within the club at the Marriott
18 Vacation Club that were a luxury property.  True?
19       MR. SELLINGER:  Objection to form.
20    A.  We have -- in the program, we have some
21 private resident homes.  Now, the upper tiers get
22 Marriott Rewards Platinum status and other things.
23 I'm not sure when these started compared to when we're
24 talking about here, but there are other things that
25 differentiate those tiers.
Page 243

1       MR. SELLINGER:  Objection to form.
2    A.  There were no luxury clubs other than
3 Ritz-Carlton Destination Club in the Explorer Program.
4 I believe that is correct.  Because that was our
5 brand.  Ritz-Carlton was our brand.
6 BY MR. REISER:
7    Q.  But I'm not talking about -- I'm just talking
8 about the separate clubs.  I'm not talking about the
9 Explorer Program for now.  Just take away the Explorer
10 Program and access through an Explorer Program.
11    A.  Okay.
12    Q.  I believe -- well, strike that.  Let me ask
13 you this.  Maybe I'm wrong.
14       Is it your testimony that Marriott Vacation
15 Club members who obtain Premier or Premier Plus
16 status, prior to July 2012, could get access to the
17 Ritz-Carlton Clubs through the Explorer Program?
18    A.  Prior to 2012?
19    Q.  Let me ask that a better way.  When did the
20 Explorer Program start?
21    A.  The Explorer Program has been in existence
22 since the Marriott Vacation Club program was rolled
23 out.
24    Q.  When did they add Ritz-Carlton Clubs to the
25 Explorer Program?
Page 245

62 (Pages 242 - 245)

1    A. I don't remember the date.
2    Q. Was it after July of 2012?
3    A. No. I believe it was before.
4    Q. Do you know how long, by any chance?
5    A. No, but we can find that out for you.
6    Q. Do you know whether it was ever communicated
7 to anybody at Ritz -- any member of Ritz-Carlton Club,
8 Aspen -- that any time prior to 2012 or -- strike
9 that.
10      Do you know, prior to 2012, whether it was
11 ever communicated to any members at the Ritz-Carlton
12 Club that Marriott Vacation Club members could gain
13 access to their clubs through the Explorer Program?
14      A. Did any of the members know that Marriott
15 Vacation Club could have gotten access through the
16 Explorer Program?  That's what you're asking?
17      Q. Not quite.  Almost.  Not whether they knew.
18 Were they ever informed by you formally -- "Here's a
19 letter.  Ladies and gentlemen, from this date forward,
20 we're giving access to your club -- to the people at
21 the Marriott Vacation Club -- who buy enough points to
22 gain Premier and Premier Plus"?
23      A. No, I don't think we sent a communication to
24 them, but -- just like a member wouldn't send
25 communication if they were going to give their
                                              Page 246

1 interest to their friend or...
2    Q. So they never -- so it's your testimony that
3 you don't believe that The Ritz-Carlton Club members
4 were ever notified that Premier and Premier Plus
5 members were getting access to their club through the
6 Explorer Program?
7    A. Yeah -- I believe they were told through this
8 process.  You were talking about prior to 2012.  I do
9 not believe that there was any communication sent to
10 them.
11      Q. You think during the communications that
12 happened following 2012 that that was presented to
13 them in some --
14      A. Yeah -- I think it was included at least by
15 the -- at least with the board.
16      Q. All right.  So going to the first bullet
17 point on page 2 of this memo, the last sentence of
18 that first bullet point, it says, "The fractional
19 product also has usage restriction and required
20 booking windows that further complicate comparison to
21 RCDC's rental activities.  Members can only book two
22 weekends using their allocated time."
23      Does that mean that people who rented rooms
24 at the RCDC had a better chance to get more weekend
25 nights than somebody who bought a membership at the
                                              Page 247

1 Ritz-Carlton, San Francisco?
2    A. No.
3    Q. Why do you point this out then, that members
4 can only book two weekends using their allocated time?
5    A. Because that was one of the frustrations that
6 the members had in using their inventory.
7    Q. That same restriction was not applicable to a
8 Premier Plus member who wanted to go stay every
9 weekend for a month in San Francisco.  True?
10      A. If the developer had inventory and had -- the
11 developer can only use their inventory like the
12 members could.
13      So if they had reservations to utilize the
14 inventory, they had their two weekends.  If they had
15 multiple reservations to use that inventory that
16 included multiple weekends, a Premier Plus member
17 could have come in and used the weekends more than two
18 weekends.
19      Q. So in that sense, they had, like, a better
20 opportunity to use weekends in San Francisco than a
21 club member; right?
22      MR. SELLINGER:  Objection to form.
23      A. If they owned enough points, just like if a
24 member owned multiple interests, they could use
25 multiple weekends.  If a Marriott Vacation Club owner
                                              Page 248

1 owns enough points, because, obviously, the weekend
2 point values are much higher.
3 BY MR. REISER:
4    Q. The last bullet point on the top of this page
5 says, "The members allege there is currently no
6 ability to exit the product as we are no longer
7 selling the fractional product and the outside resale
8 market does not see a value proposition that they can
9 sell."
10      You state, "Our research uncovered two
11 resales within the last 18 months, both at an amount
12 approximately equal to one year's maintenance fees."
13      You're basically saying there that your own
14 research only uncovered two resales of the
15 Ritz-Carlton Club memberships in the previous
16 18 months and they were for about $21,000?
17      A. That's all we could find, but resales don't
18 come back through us.  So people exchange their
19 inventory in different ways or sell their inventory.
20 I'm not saying it's all that were there, but that was
21 all we could find.
22      Q. Okay.  And then you start -- there's four
23 more bullet points that you lay out.  It looks to me
24 like those bullet points -- you say, "In addition to
25 the frustration that members have expressed through
                                              Page 249

1 the survey or through their member representatives,
2 below you will find some additional pertinent
3 background information."
4     Are the next four bullet points background
5 information that you provided that was independent of
6 the survey you reviewed?
7     MR. SELLINGER:  Objection to form.
8     A.  Yes.  This would've been information that we
9 just would have had, but probably would not have come
10 in on the survey.
11     Q.  It sounds to me like you were, in a sense,
12 advocating for options for the members, so you were
13 laying out some of their frustrations and even
14 supporting them in a way.
15     Is that a fair statement?
16     A.  I was sharing the information that we had
17 based on the member feedback that we got.
18     Q.  So you were able to determine, based upon
19 your own research, that a majority of the membership
20 purchased at the height of the market and paid an
21 average price of 260,000 for their fractionals; right?
22     A.  Yes.
23     Q.  And that only five or so of the memberships
24 at the time had outstanding loans.  So most of these
25 folks bought for cash; right?

Page 250

1     A.  Correct.
2     Q.  And that -- I think we already covered
3 this -- you reiterated that the property currently
4 carries the highest maintenance fees in the system on
5 a per-allocated night basis, and that the average
6 maintenance fee is approximately $20,000, or roughly
7 $1,000 per allocated night.
8     Then you give that same comparison about the
9 nightly rental of a suite at the concierge level of
10 the Ritz Hotel and that Nob Hill is a thousand bucks.
11     You came up with that independently; right?
12     A.  Correct.
13     Q.  Finally, you were also able to -- let me ask
14 you about the last one.
15     The last one, you say, "The majority of
16 owners purchased their interests in the Ritz-Carlton,
17 San Francisco in order to gain access for use at other
18 Ritz-Carlton Clubs in the system.  Only about
19 30 percent of the members use their time at their home
20 club.  Recent changes within the Ritz-Carlton
21 Destination Club system, including the loss of
22 locations such as Kapalua, Abaco, and Bachelor Gulch,
23 along with the lack of growth in the system, creates
24 additional member frustration."
25     How did you find out that only 30 percent of

Page 251

1 the members use their time at the home club?  You had
2 that type of statistics available to you, true, as the
3 Ritz-Carlton Management Company?
4     A.  I do.  Member services tracks usage for the
5 members.  My first sentence may have been a little --
6 I may have been making a little bit of a leap, if I
7 see that 30 percent of the members are using the home
8 club, that that's the reason that they purchase, was
9 to go somewhere else.
10     There could have been frustrations that we
11 heard with the reservation process or getting access
12 to the club or so on.
13     But the fact that only 30 percent of the
14 members were actually using their time at their home
15 club was kind of the underlying statistic that I was
16 sharing.
17     Q.  So this next sentence says -- I take it you
18 didn't look at the governing documents and determine
19 on your own that MVW acted in accordance with all
20 governing documents?
21     A.  It would've been by the law department.  It
22 would've been reviewed by the law department.
23     Q.  So you're just -- again, you're not waiving
24 any privilege, but this is -- when you state, "It's
25 important to note that MVW has acted in accordance

Page 252

1 with all governing documents," that's something that
2 you didn't determine on your own; you got it from the
3 law department, right, or somebody -- maybe perhaps
4 even John McGowan?
5     A.  Yes.
6     MR. SELLINGER:  Subject to your comment
7 that that would not be a waiver, I certainly
8 think she can testify as to her understanding
9 as to whether or not the company acted in
10 accordance with governing documents after
11 consulting with counsel.
12     THE VIDEOGRAPHER:  Five minutes for media
13 change.
14 BY MR. REISER:
15     Q.  Then it says, "Despite our belief that we
16 have acted in accordance with the governing documents,
17 there exists a very real likelihood that our actions
18 will be called into question through litigation."
19     At this point in time, were the options that
20 you were offering to the members at San Francisco made
21 in an attempt to shrink the pool of potential
22 plaintiffs in the upcoming litigation that you
23 potentially foresaw?
24     MR. SELLINGER:  Objection to form.
25     A.  It was an attempt -- it was an attempt to

Page 253

64 (Pages 250 - 253)

1 offer options to members who were frustrated with what
2 they owned.
3 BY MR. REISER:
4     Q. So there was definitely that; right?  You
5 say, "In an effort to alleviate a significant portion
6 of member frustration," but then you say, "and
7 potentially decrease the risk of litigation by
8 reducing the potential pool of plaintiffs, we
9 recommend offering the following options."
10     So, again, were these options -- you were
11 seeking to present these offers to the membership to
12 reduce the potential pool of plaintiffs?
13     MR. SELLINGER: Objection to form.
14     A. Well, the option would've been to give
15 options to frustrated members.  And I don't think it's
16 too far of a stretch to think that the frustrated
17 members are those who potentially could have ended up
18 in litigation.
19 BY MR. REISER:
20     Q. Okay.  So, naturally, you thought that, if
21 you could get -- make some of these people happy --
22 they wouldn't sue.
23     Is that what you're saying?
24     MR. SELLINGER: Objection to form.
25     A. Just to give people options.  The challenge

Page 254

1     A. The business team would be those of us who
2 work with -- on the Ritz-Carlton Club property.  So,
3 you mean --
4     Q. Who are you referring to in this memo?  Let's
5 just take this one.  Who's the business team in this
6 memo?
7     A. It would've been -- Stacey and I would have
8 talked to, probably, Tony, probably to Lee, about
9 these options that we wanted to present.
10     Q. I just want to ask you a couple more
11 questions on this and then move on to the next one.
12 I'm going to try to finish up here shortly.
13     In terms of the equity conversion to NATO, it
14 says, "There should be an equity conversion to
15 Marriott Vacation Club Destination offer based on
16 usage rather than the original purchase price."
17     What did you mean by that?
18     A. So it -- you would -- if we were going to
19 convert them over to Marriott Vacation Club, you
20 wanted them to be able to come back and use 21 nights
21 at San Francisco.  It shouldn't be tied to what they
22 actually paid.  You wanted them to get the same usage
23 as the home club they would have had.
24     Q. So you would give them enough points to get
25 21 days at the club they were giving up; right?

Page 256

1 with these members is, they didn't feel like they had
2 a way, if they wanted to exit the program, to exit.
3 This is a way to give them an exit option.
4 BY MR. REISER:
5     Q. The only two options that were ultimately
6 granted by the corporate growth committee weren't
7 really, truly an exit; right?  The one was trading
8 into a residence and the other was trading to another
9 club.
10     The true exit options are trading or
11 getting -- an MVW repurchase was not offered.  True?
12     MR. SELLINGER: Objection to form.
13     A. Well, going to another fractional club --
14 there were other fractional clubs where there were
15 interests that were being sold and the dues were less.
16 So it was an exit out of some of their concerns.
17 BY MR. REISER:
18     Q. Then you go through the different options.
19 I'm not going to get into those.  I think I understand
20 it.
21     You mention on the first one, "Equity
22 conversion to the NATO Trust."  You state, "The
23 business team believes" -- what does that mean?  I've
24 seen that term a couple times in these memos, the
25 business team.  What's the business team?

Page 255

1     A. Correct.
2     Q. And those points could be valued at more or
3 less than the original price they paid.  It depends on
4 what they paid; right?
5     A. Right.
6     Q. So in the middle of the page, it starts --
7 I'm jumping past the different options.  It says,
8 "Each of the foregoing options, if chosen by a member,
9 would require the member to execute a release,
10 releasing the appropriate Ritz-Carlton entities and
11 affiliates from all liability arising from the
12 member's purchase/ownership of the member's fractional
13 interest."
14     Did that end up becoming a condition of these
15 options for the folks who did take the options that
16 were granted to them, that they had to sign a release?
17     A. I believe so.  We wouldn't have done it if --
18 yes.
19     Q. If Steve Andrews traded his Ritz, San
20 Francisco fraction for a Kapalua fraction, he would
21 have had to sign a release.  True?
22     A. Yes.
23     Q. And Al Bruno, the same thing if he traded his
24 to Aspen?
25     A. Correct.

Page 257

65 (Pages 254 - 257)

1      THE VIDEOGRAPHER: We need to change
2 media.
3      MR. REISER: Okay. Let's do it.
4      THE VIDEOGRAPHER: This is the end of
5 media unit number three. We're going off the
6 record. The time is 4:26 p.m.
7      (Off record.)
8      THE VIDEOGRAPHER: Here begins media unit
9 number four in the deposition of Stephanie
10 Sobeck. We're back on the record. The time
11 is 4:27 p.m.
12      Counsel, you may proceed.
13 BY MR. REISER:
14    Q. Jumping down to the bottom of page 3, you're
15 discussing the financial impact of these options. I'm
16 interested in the one that says "Carrying costs."
17     It states, "The majority of the financial
18 impact is due to the ongoing unsold maintenance fees
19 and subsidy expense that MVW will incur upon receipt
20 of additional Ritz Carlton Club, San Francisco
21 inventory, 6.1 million."
22     What does the 6.1 million mean?
23    A. Well, I guess there was -- I don't see it
24 specifically referenced above, but it would've been an
25 estimate of the inventory that we were going to get

Page 258

1     What did you mean by that?
2    A. Well, it seems like there were opportunities
3 to shrink the potential expense, so there were
4 different ways in which we would look at doing that.
5    Q. Was one of the ways to actually increase the
6 maintenance fees of the Marriott Vacation Club owners,
7 who would receive the benefit of occupying the
8 inventory, to reflect the additional operating
9 expenses?
10    A. Yes.
11    Q. You state that "Each one-penny increase in
12 the Marriott Vacation Club maintenance fees results in
13 approximately $8 million a buy-down mitigation."
14     I'm trying to figure out what that means.
15 Does that mean, increasing a penny for every single
16 Marriott Vacation Club point, it would equate to
17 $8 million more in annual maintenance fees?
18    A. Uh-huh.
19     MR. SELLINGER: Objection to form.
20 BY MR. REISER:
21    Q. That's a yes; right?
22    A. Correct.
23    Q. Was that ever considered in terms of
24 mitigating the cost of maintenance fees at San
25 Francisco or any other Ritz-Carlton? That is, to

Page 260

1 back and the amount of time that we would have to
2 carry it before we could do something with it.
3 There's all the unsold maintenance fees and subsidies
4 associated with that inventory.
5    Q. So then it says, "The operating costs
6 associated with this inventory is approximately $1.20
7 a point, which is nearly three times the current 43
8 cents a point."
9     What is the current 43 cents a point? Is
10 that the maintenance costs for a Marriott Vacation
11 Club point?
12    A. Yes.
13    Q. And then you actually threw out some ways to
14 mitigate the cost of these carrying costs at some
15 point. True?
16     How would you mitigate the carrying costs? I
17 think I see the buy-down impact section is a potential
18 mitigation of the carrying costs. True?
19    A. (No response.)
20    Q. Let me put it this way. You do state
21 here, right, that -- you state that, "It is important
22 to note that the subsidy portion of this expense,
23 3.5 million, could be mitigated in the future through
24 various strategic initiatives as outlined below in the
25 opportunities."

Page 259

1 increase the Marriott Vacation Club maintenance fees
2 for those owners who were receiving the benefit of
3 occupying the Ritz-Carlton inventory.
4     MR. SELLINGER: Objection to form.
5    A. The inventory has to be in the trust, so the
6 inventory has to be conveyed to the trust for the
7 Marriott Vacation Club member to pay any of it.
8 BY MR. REISER:
9    Q. So, in fact, most of -- sorry -- all of the
10 developer-owned inventory in San Francisco that was
11 not de-annexed and sold off to that bulk buyer for
12 $21 million, I guess, in around 2015 -- all of the
13 developer-owned inventory, other than the whole units
14 that were de-annexed -- you know what I'm talking
15 about; right?
16    A. The fractions, yes.
17    Q. So all the fractional developer-owned
18 inventory that was not sold has now made it into the
19 NATO Trust. True?
20    A. Has now been included in the NATO Trust, yes.
21    Q. Okay. Since now being in the trust, has
22 there been any thought of increasing the maintenance
23 fees on the Marriott Vacation Club members to account
24 for the fact that they're receiving the benefit of
25 occupying these high maintenance Ritz Clubs?

Page 261

66 (Pages 258 - 261)

1    MR. SELLINGER:  Objection to form.
2    A.  Okay.  I mean, the Marriott Vacation Club
3  member does pay the maintenance fees, so their
4  maintenance fees have gone up because the Ritz-Carlton
5  inventory is in their trust.  It's a pool of
6  maintenance fees.
7    So before, it used to be Orlando and Branson
8  and New Jersey maintenance fees.  Now, it's those,
9  plus Ritz-Carlton, San Francisco, Ritz-Carlton, St.
10  Thomas, which are higher.  You still take all of those
11  maintenance fees, put them together, and then slice
12  the pie so that every Marriott Vacation Club member
13  pays a portion.
14    So they were negatively impacted by this
15  inventory going in -- they have access -- but they pay
16  the same amount as all the Ritz-Carlton club members.
17  BY MR. REISER:
18    Q.  So if I understand your testimony then, when
19  the Ritz-Carlton fractional goes into the trust, the
20  trust pays the normal maintenance fees, right, that
21  every other owner pays?
22    A.  Correct.
23    Q.  And since those are higher, that's put into
24  the total maintenance fee pot across all the trust
25  interests, and that has the effect of increasing, in
Page 262

1  points they own.
2    MR. SELLINGER:  Tick tock.
3    MR. REISER:  I see you standing over me,
4  making me nervous.  It has the desired
5  effect.
6  BY MR. REISER:
7    Q.  So what I'm going to show you next is the
8  August 19, 2014 corporate growth committee report.
9  This also looks like it was authored by you and Lee
10  Cunningham.
11    (Exhibit 2138 was marked for
12  identification.)
13  BY MR. REISER:
14    Q.  This is Exhibit 2138.  You authored this
15  memo; right?
16    A.  Yes, with Lee.
17    Q.  With Lee.  What was the request you were
18  putting -- give me, in a nutshell, what you were
19  requesting of the corporate growth committee in this
20  memo.
21    A.  We were looking at ways of disposing of the
22  last 19 units at RCDC in St. Thomas -- San Francisco.
23  Sorry.
24    Q.  One of the reasons that you thought that it
25  was not a viable option to -- instead of selling these
Page 264

1  some manner, the total maintenance fee that the club
2  members pay?
3    A.  Right.  Because if you look at the
4  maintenance fees like a pie, you know, all the
5  maintenance fees go into the pie.  And the points are
6  the slices of the pie.  The points -- the number of
7  points that exist just -- you divide that maintenance
8  fee bucket by the number of points and that becomes
9  your average maintenance fee that each Marriott
10  Vacation Club member pays.
11    Q.  So, basically, I think -- I think what I hear
12  you saying is -- let's just use approximately 400 --
13  are there 500,000 members yet of the Marriott Vacation
14  Club?
15    A.  No.
16    Q.  450?
17    A.  Well, that's in all of Marriott Vacation
18  Club.  I --
19    Q.  In the NATO Trust, how many are there?
20    A.  200.
21    Q.  200,000.  So when the Marriott trust buys a
22  fractional unit, those maintenance fees, that are
23  expensive, get divided proportionally between 200,000
24  members?
25    A.  They get -- yes, based on the number of
Page 263

1  as bulk sale whole ownership condos, rather, put the
2  inventory into the trust, is that the maintenance fees
3  were too high for the product.  True?
4    MR. SELLINGER:  Objection to form.
5    A.  One of the reasons we didn't decide --
6  because these weren't even built out -- so one of the
7  reasons we didn't decide to build them out and put
8  them into NATO, one of the reasons did have to do with
9  maintenance fees.
10  BY MR. REISER:
11    Q.  So that was one of the reasons you didn't
12  want to put it in NATO.  You didn't want to burden the
13  NATO folks with these additional high maintenance
14  fees.  True?
15    MR. SELLINGER:  Objection to form.
16    A.  Yeah.  The NATO members already had access,
17  because there was inventory in the trust.
18  BY MR. REISER:
19    Q.  So you didn't think that the NATO people
20  wanted any more inventory and that was one of the
21  reasons?  Was that inventory in the NATO Trust selling
22  out every year or --
23    A.  I don't know if it sells out or not.  I think
24  that's pretty well-demanded.  19 units is a lot.
25    Q.  And one of the things I'm interested in --
Page 265

67 (Pages 262 - 265)

1 one of the things you thought about in 2014 was a bulk
2 sale. True?
3    A. Yes.
4    Q. A bulk sale is different than fixing them up
5 as whole ownership condos and using the Ritz-Carlton
6 sales team to sell them as Ritz-Carlton units. True?
7    A. It would be different, yes.
8    Q. Okay. So bulk sale would be selling it to,
9 say, like, Constellation in Tahoe; right? That was a
10 bulk sale of the 17 units in Tahoe to Constellation?
11    A. Correct.
12    Q. Versus de-annexing them, making them whole
13 ownership, but making them Ritz residences, and
14 selling them as Ritz residences. That would not be a
15 bulk sale; right?
16    MR. SELLINGER: Objection to form.
17    A. If we sold them ourselves and we did the sale
18 of them, yes, it would not be a bulk sale.
19    Q. So you made a bulk sale in Tahoe, true, to
20 Constellation?
21    A. Yes.
22    Q. You were contemplating a bulk sale in 2014
23 for the 19 wholly-owned interests in San Francisco;
24 right?
25    A. Yes.

Page 266

1    Q. And one of the reasons in 2014 -- and I know
2 it changed a year later -- but, in 2014, one of the --
3 your thinking was, in passing on a bulk sale for San
4 Francisco, was that you had a bad experience of some
5 sort in Tahoe. I think I remember reading that right
6 in the memo.
7    Is that a fair description of what you're
8 trying to say here in this memo?
9    MR. SELLINGER: Objection to form.
10    A. There was a challenge in Tahoe because the
11 bulk purchaser bought it -- they were not sold as
12 Ritz-Carlton residences. So we ended up with
13 unbranded and branded units in the same building that
14 were being operated separately, but, yet, they were in
15 a common association.
16    Then that bulk purchaser -- the sales pace
17 was so slow and they weren't -- didn't -- they ended
18 up having financial challenges, which then, in turn,
19 conveyed financial challenges to the association.
20    Those were kind of the two main -- the
21 branded, unbranded, and the financial challenges are
22 why Tahoe was a challenging situation for us.
23 BY MR. REISER:
24    Q. Fair enough. All right. So those were the
25 two things you were trying to avoid in a bulk sale?

Page 267

1    A. Right.
2    Q. Having, like, a diluted brand within the same
3 building, basically -- two different brands in the
4 same building caused confusion to the brand. Right?
5    MR. SELLINGER: Objection to form.
6    A. Well, you have two different operating groups
7 and teams and back-of-house spaces. There's a lot of
8 things that come along with that challenge.
9 BY MR. REISER:
10    Q. Okay. And then the financial bona fide --
11 these are purchasers -- you know, always great when
12 you're selling it, but you never really know what's
13 going to happen down the line. And JMA ended up
14 having some difficulties and had to give the property
15 back to its bank. Right?
16    MR. SELLINGER: Objection to form.
17    A. JMA -- I was actually talking about JMA not
18 paying its maintenance fees on time to the association
19 specifically.
20 BY MR. REISER:
21    Q. Okay. All right. Got you. That's what we
22 talked about earlier, about them potentially having to
23 borrow from the reserves. Does that refresh your
24 recollection at all now that we're talking about the
25 bulk sale, that there was a borrowing of reserves by

Page 268

1 Ritz Carlton Management Company when JMA stopped
2 paying their dues?
3    A. Yes.
4    Q. You remember that did happen in Tahoe, that
5 there was a borrowing from the reserve accounts?
6    A. I do.
7    Q. The final exhibit for the day will be
8 Exhibit 2138, which is the -- I'm sorry -- 2139 --
9 November 10, 2015 corporate growth committee memo.
10    (Exhibit 2139 was marked for
11 identification.
12 BY MR. REISER:
13    Q. This was also prepared by -- strike that. It
14 was actually prepared by Lee Cunningham, Rich Hayward
15 and Tony Terry.
16    Did you have any role in preparing this
17 corporate growth committee memo?
18    A. No.
19    Q. I'll save that for Cunningham then. It's not
20 my last question. It's my last document. I almost
21 found a loophole.
22    MR. SELLINGER: Losing credibility here.
23 BY MR. REISER:
24    Q. I just want to confirm that, on the first
25 memo, so I don't have to actually think further about

Page 269

68 (Pages 266 - 269)

1 it -- you just simply -- it's your testimony that you
2 had no role in preparing the May 24, 2012 Ritz-Carlton
3 Destination Club proposed strategic plan which was
4 Exhibit 2136?
5     A. Correct.
6         MR. REISER: That's all I have.
7         MR. FERGUSON: I have a few. Just
8 joking.
9         MR. SELLINGER: Let's take a
10 couple-minute break. I think I have one
11 exhibit that I have a couple of questions on.
12        THE VIDEOGRAPHER: We're going off the
13 record. The time is 4:42 p.m.
14        (Brief recess.)
15        THE VIDEOGRAPHER: We are back on the
16 video record. The time is 4:50 p.m.
17        Counsel, you may proceed.
18             CROSS-EXAMINATION
19        MR. SELLINGER: Could you just highlight
20 the top part -- the top two e-mails down to
21 "Rich"? Yeah.
22 BY MR. SELLINGER:
23    Q. Ms. Sobeck, do you remember Mr. Reiser asking
24 you questions about Exhibit 2213, this series of
25 e-mails in November of 2014?

Page 270

1 document, not Mr. Reiser. Do you recall that?
2     A. I do, but I know it was asked. Although, I
3 think he might have asked me at the last deposition.
4         MR. FERGUSON: That's all I have.
5         THE VIDEOGRAPHER: This concludes the
6 videotaped deposition of Stephanie Sobeck.
7 We're off the record. This is the end of
8 media unit number four. The time is
9 4:52 p.m.
10
11        (The reading and signing of the
12 transcript were not waived, and these
13 proceedings concluded at 4:52 p.m.)

Page 272

1     A. I do.
2     Q. On November 17, 2014, when you and
3 Mr. Hayward are communicating, what was the status of
4 the affiliation on that date?
5     A. It had already been executed.
6     Q. Are you referring to the 2013 -- November 14,
7 2013 -- affiliation agreement?
8     A. Yes. The affiliation agreement between Lion
9 & Crown and Marriott Vacation Club Destination.
10    Q. Were the boards parties to that agreement?
11    A. No, they were not.
12    Q. When you write in your top e-mail, "Decision
13 to affiliate, question the boards," what are you
14 referring to?
15    A. The acknowledgement.
16    Q. And why are you not using the specific word
17 "acknowledgement" to Mr. Hayward?
18    A. Rich was new to the whole Ritz-Carlton
19 Destination Club program and clubs, and I wasn't going
20 to spend the time in this e-mail to explain to him how
21 it all was structured.
22        MR. SELLINGER: I have nothing further.
23            REDIRECT EXAMINATION
24 BY MR. FERGUSON:
25    Q. I was asking you those questions about that

Page 271

1 Under penalties of perjury, I declare that I have read
2 the foregoing document and that the facts stated in it
3 are true.
4
5 _____
6 _____
7 DATE            STEPHANIE SOBECK
8
9
10 Subscribed and sworn before me this _____ day of
11 _____, 2017.
12
13 State of Florida   )
14 County of          )
15            NOTARY PUBLIC
16
17
18
19
20
21
22
23
24
25

Page 273

69 (Pages 270 - 273)

```
 1        CERTIFICATE OF OATH
 2
 3  STATE OF FLORIDA
 4  COUNTY OF ORANGE
 5
 6
 7        I, Lisa Gerlach, the undersigned Notary
 8  Public, in and for the State of Florida, hereby
 9  certify that Stephane Sobeck personally appeared
10  before me and was duly sworn.
11
12        WITNESS my hand and official seal this
13  29th day of May, 2018.
14
15
16
17        [signature]
18        Lisa Gerlach, Court Reporter
19        Commission #GG023652
20        Expires 9/8/2020
21
22
23
24
25
                                    Page 274
```

```
 1        CERTIFICATE OF REPORTER
 2
 3  STATE OF FLORIDA
 4  COUNTY OF ORANGE
 5
 6        I, Lisa Gerlach, Court Reporter, do hereby
 7  certify that I was authorized to and did
 8  stenographically report the foregoing deposition; and
 9  that the transcript is a true and correct
10  transcription of the testimony given by the witness.
11        I further certify that I am not a relative,
12  employee, attorney or counsel of any of the parties,
13  nor am I a relative or employee of any of the parties'
14  attorney or counsel connected with the action, nor am
15  I financially interested in the action.
16        Dated this 29th day of May, 2018.
17
18
19
20
21
22
23        [signature]
24        Lisa Gerlach, Court Reporter
25
                                    Page 275
```



70 (Pages 274 - 275)