# EXHIBIT - H

United States District Court
District of Colorado

RCHFU, LLC, et al.,
Plaintiffs,
v.
MARRIOTT VACATIONS WORLDWIDE CORPORATION, et al.,
Defendants,

No. 1:16-cv-01301 PAB-GPG

_______________________________________/

REISER, et al.,
Plaintiffs,
v.
MARRIOTT VACATIONS WORLDWIDE CORPORATION, et al,
Defendants,

Eastern District of California
No. 2:16-cv-00237-MCE-CKD

_______________________________________/

PETRICK, et al.,
Plaintiffs,
vs.
MARRIOTT VACATION WORLDWIDE CORPORATION, et al.,
Defendants.

San Francisco County
No. CGC-15-54897

_______________________________________/

VIDEOTAPED DEPOSITION OF LEE CUNNINGHAM

Orlando, Florida
Friday, 10:12 a.m.-2:08 p.m.
May 18, 2018

Pages 1- 136

Taken on Behalf of the Plaintiffs before Lisa Gerlach, Court Reporter, Notary Public in and for the State of Florida at Large, pursuant to Plaintiffs' Notice of Taking Deposition in the above cause.

Appearances:
Counsel for the Plaintiffs:
MATTHEW C. FERGUSON, ESQUIRE
The Matthew C. Ferguson Law Firm, PC
119 South Spring, Suite 201
Aspen, CO 81611
970-925-6288
matt@matthewfergusonlaw.com

MICHAEL S. REISER, SR., ESQUIRE
MICHAEL S. REISER, JR.
MATTHEW REISER, ESQUIRE, by speakerphone
Reiser Law, PC
1475 Broadway, Suite 300
Walnut Creek, CA 94596
michael@reiserlaw.com
isabella@reiserlaw.com
matthew@reiserlaw.com

TYLER MEADE, ESQUIRE
The Meade Firm
1816 Fifth Street
Berkeley, CA 94710
510-843-3670
tyler@meadefirm.com

For the Defendant Marriott:
PHILIP SELLINGER, ESQUIRE
IAN S. MARX, ESQUIRE
Greenberg Traurig, LLP
500 Campus Drive, Suite 400
Florham Park, NJ 07932-0677
sellingerp@gtlaw.com
marxi@gtlaw.co

DOUGLAS A. KELLY, ESQUIRE
Marriott Vacations Worldwide
6649 Westwood Boulevard
Orlando, FL 32821

For the Defendant Aspen Highlands Condominium Association, by speakerphone:
JESSICA BLACK LIVINGSTON, ESQUIRE
Hogan Lovells
1601 Wewatta Street, Suite 900
Denver, CO 80202
303-899-7300
jessica.livingston@hoganlovells.com

INDEX

| WITNESS | EXAMINATION | PAGE |
|---|---|---|
| Lee Cunningham | | |
| | Direct by Mr. Reiser | 8 |
| | Direct by Mr. Ferguson | 113 |
| Certificate of Reporter | | 135 |
| Witness Signature Page | | 136 |

EXHIBITS

Exhibit 2244 Agenda, RCHC007156 through RCHC007206 108

Exhibit 2245 E-Mail, 1/3/12 118

Exhibit 2246 Declaration of Kathy Borkholder 124

Exhibit 2247 Draft Letter, RCHC007151 through RCHC007153 130

THE VIDEOGRAPHER: Good morning. We're going on the video record. The time is 10:12 a.m., Eastern Daylight Time, on Friday, May 18th, 2018. This is media unit number one in the video-recorded deposition of Mr. Lee Cunningham, taken by counsel for the plaintiff, in the matter of RCHFU, LLC, et al., vs. Marriott Vacations Worldwide Corp., et al. This case is filed in the US District Court, District of Colorado, with a case number of 1:16-cv-01301 PAB-GPG.

This deposition is being held today at the offices of Greenberg Traurig, located at 450 South Orange Avenue, Suite 650, Orlando, Florida.

My name is Clay McMillan. I'm with Veritext. I'm the videographer. The court reporter today is Ms. Lisa Gerlach, also with Veritext.

Will counsel present, followed by counsel on the phone, please identify yourselves and the parties that you represent?

MR. REISER: Good morning. Mike Reiser, appearing for the plaintiffs in the Aspen case, the plaintiffs in the Petrick case in

San Francisco, and the plaintiffs in the Reiser case in Tahoe.

MR. FERGUSON: Good morning. I'm Matthew Ferguson. I'm representing the 206 or so plaintiffs in the Aspen litigation.

MR. MEADE: Tyler Meade, representing plaintiffs in all three cases.

MR. SELLINGER: Philip Sellinger and Ian Marx, from Greenberg Traurig, representing defendants in all three cases. We're accompanied by Doug Kelly, vice president and senior counsel of Marriott.

And I note that the deposition is actually being taken in all three cases simultaneously, not just in the Aspen case, as both Mr. Reiser and Mr. Meade indicated as well.

THE VIDEOGRAPHER: Counsel on the phone?

MS. LIVINGSTON: Good morning, everyone. This is Jessica Livingston of Hogan Lovells. I represent the Aspen Highlands Condominium Association in just the Aspen case.

THEREUPON,

LEE CUNNINGHAM,

A Witness herein, acknowledged after having

been duly sworn and testified upon his oath as follows:

THE WITNESS: I do.

DIRECT EXAMINATION

BY MR. REISER:

Q. Good morning, Mr. Cunningham. I'm just going to try to keep -- this is your third deposition, as you know, in this case. We're going to try to keep it tight and go over some documents that we didn't have at your last deposition. And I appreciate you appearing again for your deposition.

So the first thing I want to ask you about is an affiliation agreement from November 2013 that was produced in March of 2018 in this case.

And I don't think I have an extra copy. I'm not going to really ask too many specific questions about the language in it, but it is on your screen there. It's been previously marked earlier this week as Exhibit 2102.

MR. SELLINGER: Hold on a minute. We've got copies ourselves, but I'll actually give mine to the witness. I think he should have it in front of him.

MR. REISER: Okay. Thank you. I thought it had been marked earlier, but I don't see

it in the package.

MR. SELLINGER: This is the 2013 agreement?

MR. REISER: Yes.

MR. SELLINGER: I've got it.

THE WITNESS: Thank you.

BY MR. REISER:

Q. Do you recognize this document that's been marked as Exhibit 2102?

A. I recognize this agreement from my preparation for this deposition.

Q. So I just want to understand how -- your involvement in the preparation of this agreement. As you can see from the date of the agreement, it's dated November 14, 2013.

Do you see that?

A. Yes.

Q. Can you tell me the origins of this agreement in terms of how it came to be -- how it came to be?

A. Based on that timeframe, I would say it came to be as a result of our intention to affiliate the Marriott Vacation Club Destinations Program with Lion & Crown Travel.

Q. Okay. Previously, we've been operating under the assumption that the affiliation agreement that had

been previously marked in this case as Exhibit 1003 -- I'll show you that one too. That's the affiliation agreement between -- it's dated in '01, back in the original days of the Aspen Club. I know we went over this agreement in detail at your prior depositions.

But what was the reason why the affiliation did not occur pursuant to Exhibit 1003?

MR. SELLINGER: Objection to form.

A. This agreement is the affiliation between the Ritz-Carlton Travel Company, which is the predecessor to Cobalt, and the Aspen Highlands Association, which created the -- let's see -- but, at that time, there wasn't an affiliation with Lion & Crown or with -- subsequently with MVCD.

BY MR. REISER:

Q. Right. So at the time of the original affiliation in 2001, there was not even a Lion & Crown company. True?

A. That's correct.

Q. So this was the original agreement that effectuated the affiliations between The Ritz-Carlton Destination Clubs for internal exchange between those clubs?

MR. SELLINGER: Objection to form.

A. This agreement, like I said, was with

Ritz-Carlton Travel Company, which was the predecessor to Cobalt, and the Aspen Highlands Association, which established the program manager for the Ritz-Carlton Aspen Highland members, which effectuated the role of that.

The program manager was to manage the reservation program for that particular resort for their allocated time and to also, in the future, look at the ability to move to sister clubs.

BY MR. REISER:

Q. Okay. There's one other -- well -- so Exhibit 2102, which is the November 2013 affiliation --

A. Is that back to here?

Q. The one you have in front of you, yes. I mean, I understand it came into being so that the Marriott Vacation Club could affiliate with Lion & Crown. You mentioned that earlier.

But who initiated the preparation of this agreement, if you know?

A. It would've been the -- Lion & Crown would have initiated the ability to affiliate with Marriott Vacation Club Destinations.

Q. So Lion & Crown -- strike that. You were an officer of Lion & Crown at the time this affiliation

was prepared. True?

A. That's correct.

Q. Did you have a role as an officer of Lion & Crown to instruct the legal department or -- your legal department -- strike that.

As the officer of Lion & Crown that was contemplating an affiliation with the different Ritz Clubs, was it you that initiated the preparation of this November 2013 affiliation agreement?

A. I'm sorry. This was about Lion & Crown with Marriott Vacation Club. You said with the other Ritz Clubs. That was a different affiliation, where Lion & Crown affiliated with Cobalt.

Q. Okay. But you're aware -- if you look at Exhibit B to that agreement, the very last four pages of the agreement?

A. Okay, yes.

Q. Can you just read the title of Exhibit B to the November 2013 affiliation agreement?

A. "Acknowledgement of and joinder to affiliation agreement between Lion & Crown Travel Company, LLC, and Marriott Resorts Travel Company, Inc."

Q. Was it your understanding, as the officer of Lion & Crown, that -- strike that. Let me get some

foundation.

Is it true that you, as the officer of Lion & Crown, are responsible for -- strike that. Were you the officer of Lion & Crown that was responsible for the November 2013 affiliation agreement being created?

A. Yes. I mean, there was an agreement to affiliate, or we had chosen to affiliate. I was the officer, and it was my decision to affiliate MVCD with Lion & Crown.

Q. So you were the program manager for Cobalt at the same time. True? Or -- I'm sorry -- the chief decision maker for Cobalt?

A. I was an officer in Cobalt, yes.

Q. Okay. And as that officer, were you the chief decision maker in that company?

A. Yes.

Q. So you first, as a Cobalt officer, affiliated The Ritz-Carlton Destination Club with the Lion & Crown club originally, true, in a 2010 agreement?

MR. SELLINGER: Objection to form.

A. Cobalt has the affiliation with the associations of the various clubs -- with each of the clubs. Then Cobalt had an affiliation in 2010 with Lion & Crown.

BY MR. REISER:

Q. That created a potential external exchange program. True?
A. I believe the purpose for Lion & Crown was to affiliate with other external clubs.
Q. Okay. So Lion & Crown was responsible for -- I'm sorry. Cobalt was responsible for initiating the creation of Lion & Crown. True?
A. That's correct.
MR. SELLINGER: Objection to form.
A. I believe that's true.
BY MR. REISER:
Q. And then, with that affiliation agreement established, Lion & Crown then made the decision to prepare and create the November 2013 affiliation agreement which would allow individual clubs to join into the November 2013 affiliation agreement.
Is that a fair description?
MR. SELLINGER: Objection to form.
A. No. The 2013 agreement affiliated Lion & Crown with MVCD. That affiliation occurred at the execution of that agreement.
BY MR. REISER:
Q. It was Cobalt that instructed Lion & Crown to affiliate with MVCD?
A. No.

Q. So Lion & Crown had its own authority to choose new affiliation agreements under the terms of the 2010 agreement?
MR. SELLINGER: I'm sorry. I'm trying to review the question to see if I have an objection. Just read it back for me.
THE REPORTER: "So Lion & Crown had its own authority to choose new affiliation agreements under the terms of the 2010 agreement?"
A. Lion & Crown had the right to affiliate with other clubs and programs and it was their right.
BY MR. REISER:
Q. That right derived from the authority of Cobalt initially. Would you agree?
MR. SELLINGER: Objection to form.
A. The right for Lion & Crown to affiliate was called out in the agreement between Cobalt and Lion & Crown.
BY MR. REISER:
Q. Correct. Okay. So Cobalt, in the agreement between Cobalt and Lion & Crown, in terms of that agreement, provided that Lion & Crown could then use its powers under that agreement to affiliate --
A. Affiliate, yes. That's correct.

Q. So in an effort for Lion & Crown to then affiliate individual Ritz-Carlton Destination Clubs as component sites under the November 2013 agreement, they would need to sign an acknowledgement of and joinder to the November 2013 affiliation agreement. True?
MR. SELLINGER: Objection to form.
A. No. Like I said, the affiliation between Lion & Crown and MVCD occurred. And when this 2013 agreement was executed, the acknowledgement agreement was put in place for -- we made a special accomodation to allow each association to determine whether they wished to allow their members to participate in that affiliation.
BY MR. REISER:
Q. All right. Who made a special accomodation to allow the associations to participate in that decision?
A. Lion & Crown did.
Q. So Lion & Crown, in entering into the November 2013 affiliation agreement with Marriott Vacation Club Destinations, provided in that agreement that each association would have the right to join the affiliation agreement. True?
MR. SELLINGER: Objection to form.

A. No. The 2013 agreement, at the execution of that agreement, the affiliation was accomplished. So --
BY MR. REISER:
Q. I understand that.
MR. SELLINGER: Hold on. Just let him finish.
MR. REISER: Sorry.
MR. SELLINGER: Go ahead.
A. So the accomodation was to allow each association to determine whether they wanted to allow their members to take advantage of the affiliation that had already been created.
BY MR. REISER:
Q. So at the time the affiliation was created, no Ritz-Carlton Clubs had executed a joinder in the affiliation. True?
A. I believe that's true.
Q. Okay. So before -- between the time the affiliation was created on November 14, 2013 -- what was the first association that signed the acknowledgement and joinder?
A. I don't recall which one, what the order was.
Q. So even though the affiliation agreement between Lion & Crown and Marriott Vacation Club

Destinations was created on November 4, 2013, it wasn't until April 24, 2014, when Randy Mercer signed the acknowledgement of and joinder to the affiliation agreement, that Marriott Vacation Club members had the right to participate in or have access to Ritz-Carlton Club Aspen. True?

A. No. They had access to The Ritz-Carlton Club, Aspen, in advance of that through developer-owned inventory that was made available through the Explorer Program component of the MVCD program.

Q. Putting aside that, which ended when the developer-owned inventory sold out, that access to the club through that, as you just said, required the develop to have developer-owned inventory. True?

A. That's correct.

Q. Once that developer-owned inventory was sold out, there would be no access to Marriott Vacation Club members through that program; correct?

MR. SELLINGER: Objection to form.

A. Once the developer had no inventory, they would not be able to -- Ritz-Carlton, Aspen -- I'm sorry -- Marriott Vacation Club Destination club members wouldn't be able to get access into Aspen through the Explorer Program because it wouldn't have

existed.

BY MR. REISER:

Q. Okay. So the access of Marriott Vacation Club members through affiliation is separate from the access through the Explorer Program; right?

A. That's correct.

Q. Now I'm just talking about access through the affiliation program. It wasn't until April 24, 2013, when Randy Mercer signed the acknowledgement of and joinder to the November 2013 agreement that Marriott Vacation Club members could obtain access to the Ritz-Carlton, Aspen through the affiliation program. True?

A. Well, at the signing, what that allowed was for the Ritz-Carlton, Aspen members to -- through Lion & Crown -- to access the Marriott Vacation Club Destinations product; which, in turn, made their inventory available for Marriott Vacation Club Destinations members to be able to come into Aspen.

Q. Correct. So that's -- okay. Until that was signed, and until members were able to put -- members of Ritz were able to put their inventory into the Lion & Crown, no Marriott Vacation Club members could have access to the Ritz Club through the affiliation. True?

MR. SELLINGER: Objection to form.

A. The signing -- the acknowledgement was a step in the process, clearly. The members, before anybody could -- from MVCD -- could come into Aspen, somebody had to come out of Aspen. So until all those steps occurred, there couldn't be somebody coming in.

BY MR. REISER:

Q. But without the joinder and acknowledgement to the affiliation agreement signed by Randy Mercer on April 24, 2014, it was impossible for a member of the Marriott Vacation Club to access The Ritz-Carlton Club through the November 2013 affiliation agreement. True?

MR. SELLINGER: Objection to form.

A. I think the steps were that -- trying to understand the nuance to your question. The signing of the acknowledgement agreement, that was them indicating to us that they would allow the members to come in.

The other component of that agreement was to ensure that, as MVCD members came into Aspen, that they would accommodate those customers that came in. Those are the steps.

MR. REISER: Can you read back the question?

THE REPORTER: "But without the joinder and acknowledgement to the affiliation agreement signed by Randy Mercer on April 24, 2014, it was impossible for a member of the Marriott Vacation Club to access The Ritz-Carlton Club through the November 2013 affiliation agreement. True?"

THE WITNESS: I believe that's true.

BY MR. REISER:

Q. So whether it was a special accomodation that is provided for in the November 2013 affiliation agreement or a contractual right that was given to the associations under the terms of the November 2013 affiliation agreement, association action in the form of signing an acknowledgement and joinder to the November 2013 agreement was required before Marriott Vacation Club members could access the Ritz-Carlton, Aspen through the affiliation agreement?

MR. SELLINGER: Objection to form.

MS. LIVINGSTON: Objection to form.

BY MR. REISER:

Q. Is that true?

MR. SELLINGER: Could you read the question back?

THE REPORTER: "So whether it was a

special accomodation that is provided for in the November 2013 affiliation agreement or a contractual right that was given to the associations under the terms of the November 2013 affiliation agreement, association action in the form of signing an acknowledgement and joinder to the November 2013 agreement was required before Marriott Vacation Club members could access the Ritz-Carlton, Aspen through the affiliation agreement?

THE WITNESS: I still go back to -- my answer is, the steps in the process that we had laid out were -- the affiliation was created; at that point, the clubs were affiliated. As a special accomodation, we allowed the association to sign the acknowledgement indicating their support for the members to be able -- from each of the individual clubs -- in this case, Aspen -- to be able to trade their inventory in.

And they're acknowledging they would, in turn, properly service the MVCD customers that came into that inventory.

BY MR. REISER:

Q. Okay. As I understand what you're saying is, prior to -- I think we both agree, after this question-and-answer period, that prior to the association signing the acknowledgement and joinder, no Marriott Vacation Club member could access The Ritz-Carlton Club, Aspen through the November 2013 affiliation agreement? It was one of the steps that was required --

A. Right; that's correct.

Q. Okay. And I understand this affiliation agreement also obligated the Ritz-Carlton Aspen Club, by them acknowledging and joining it, to service those members that were coming in through the affiliation agreement. True?

A. That's correct.

Q. And you've got the affiliation agreement in front of you -- at least the main body of the affiliation agreement without exhibits -- it's 19 pages long and it's signed by you on page 19. True?

A. That's correct.

Q. And the fact that the Aspen Highlands Association, through Randy Mercer as president, signed the acknowledgement and joinder to the affiliation agreement on April 24, 2014, that signature by the

association and the acknowledgement of the joinder to this agreement obligated the association to abide by the terms in these 19 pages of the affiliation agreement. True?

MR. SELLINGER: Objection to form.

MS. LIVINGSTON: Object to form.

A. You're asking -- did the acknowledgement agreement bind them to this?

BY MR. REISER:

Q. Correct.

A. The acknowledgement agreement, as I said, was their indication to us that the Aspen members would be able to participate, to utilize the affiliation in exchange through MVCD. And it calls out some specific components within the affiliation agreement that they are agreeing to and being bound by.

Q. So by acknowledging and joining the November 2013 affiliation agreement, the Aspen Highlands Association, on April 24, 2014, agreed to be bound by the terms of the November 2014 affiliation agreement. True?

MR. SELLINGER: Objection to form.

A. The terms that were called out in the acknowledgement agreement.

BY MR. REISER:

Q. Which terms are those? Do you -- strike that.

A. Can I have the --

Q. Sure. Let me just ask you this. Do you believe that the terms of the -- strike that.

Do you believe that the association was only bound by the terms that were spelled out in the acknowledgement and joinder, or do you believe that the association was bound by the entirety of the November 2013 affiliation agreement?

A. I don't know. I'd have to go to what was called out and compare that to what was missing. I haven't done that.

Q. It seems like you're taking great pains to call this an acknowledgement agreement, when the title actually is "The acknowledgement of and joinder to affiliation agreement."

Why do you not choose to name this "The acknowledgement of and joinder to affiliation agreement," and you choose to call it "The acknowledgement agreement"?

MR. SELLINGER: Objection to form.

A. Well, I was referring -- as you look through the various components in the affiliation agreement, it talks about the acknowledgement agreement, has a

definition for the acknowledgement agreement. I was just using that term.
BY MR. REISER:
Q. Okay. So the first line of the acknowledgement of and joinder to the affiliation agreement doesn't read, "This acknowledgement of and joinder to affiliation agreement between Lion & Crown Travel Company and Marriott Resorts Travel Company (Acknowledgement)"?
So as a shorthand, you can call it acknowledgement. When you say "acknowledgement," you're just using a shorthand for the actual title of the agreement, which is the acknowledgement of and joinder to affiliation agreement.
Isn't that true?
A. I am using the -- if you go to page 3 of the agreement, there is a defined term, acknowledgement agreement, which means acknowledgement and joinder to affiliation agreement. That's why I'm using the term "acknowledgement agreement."
Q. Okay. Thank you. Appreciate that.
So you would agree, though, that this acknowledgement of and joinder to the affiliation agreement includes both an acknowledgement and a joinder to the agreement. True?

MR. SELLINGER: Objection to form.
MS. LIVINGSTON: Objection.
A. I'm not sure I know what a "joinder to" is. I believe that's a legal term. I know what an acknowledgement is.
BY MR. REISER:
Q. Is there a reason why this acknowledgement -- is there a reason why this affiliation agreement, dated November 2013, was never provided to any of the boards that signed a joinder to it?
A. I'm not aware of whether it was or was not provided to the boards.
Q. Pardon? Can you repeat that? I'm sorry.
A. I'm not aware of whether it was or was not provided to the boards.
Q. Was there a policy to not provide it to the board that was decided by Lion & Crown?
MR. SELLINGER: Objection to form.
A. If you're -- the simple answer is no. If you're insinuating that we would be trying to hide this, that doesn't make sense. Clearly, the agreement existed. It was referred to in the -- I don't know how many times -- in the acknowledgement agreement, and so there was no hiding of the fact that this agreement existed.

I guess, if the boards wanted it, they could ask for it or -- like I said, I don't know whether they did or didn't have it.
BY MR. REISER:
Q. Well, we've taken the depositions of the board members in San Francisco and Tahoe.
Are you aware of that?
A. I am now.
Q. Several of them work for you. One guy's name is Nathan Guikema. Does he report to you?
A. No, he does not.
Q. Who does he report to?
A. He reports to John Albert.
Q. Do you know that Nathan Guikema was the president of the San Francisco association who signed the acknowledgement of and joinder?
A. I know he was president. I haven't gone back and checked the signatures on the...
Q. Have you heard that he testified that he had never seen that agreement?
A. I did not know that.
Q. Do you know a guy named Charles Baron?
A. Yes.
Q. Did you know he was on the Tahoe board when this was signed -- the acknowledgement for the Tahoe

board was signed?
A. I didn't. I knew he was on the Tahoe board. I didn't know the timing.
Q. Did you know that he testified he had never seen the November 2013 affiliation agreement?
A. I did not.
Q. Had you ever seen the affiliation agreement between the joinders were signed?
A. I signed the agreement. I saw it at some point in time. Had a high-level review.
Q. Are you aware of any board member on any of the three boards that is subject to this deposition -- the Tahoe board, the San Francisco board, the Aspen board -- are you aware of any board member that had access to this affiliation agreement before signing the joinder?
MR. SELLINGER: Objection to form.
A. As I said before, I'm not aware of whether they did or did not have access or had a copy of it.
BY MR. REISER:
Q. You had a meeting with Randy Mercer in November of 2013, the day before the signature on the affiliation agreement in November 2013.
Do you remember that? It was in Orlando.
A. I remember meeting with Mr. Mercer in

Orlando. I don't know whether those are the dates.
Q. Do you remember giving or discussing with Mr. Mercer, during that November 2013 trip, the affiliation agreement that is marked as Exhibit 2102?
A. I don't remember what the discussion was at the meeting.
Q. Do you believe that Lion & Crown is a fiduciary to the members of the several clubs?
MR. SELLINGER: Objection to form.
BY MR. REISER:
Q. The Ritz-Carlton Clubs.
MR. SELLINGER: Objection to form.
A. I don't know that -- I don't know exactly what you mean by fiduciary. They don't have a duty to the members, I don't believe -- Lion & Crown doesn't.
BY MR. REISER:
Q. What about Cobalt; do you believe they have a duty to the members?
A. No.
MR. SELLINGER: Objection to form.
BY MR. REISER:
Q. Do you believe the Ritz-Carlton Management Company has a duty to the members?
MR. SELLINGER: Objection to form.
A. No, not to the -- not to the members, no.

Page 30

BY MR. REISER:
Q. Have you read the opinion dated March 29, 2018 that was issued by Judge Brimmer in the Aspen case?
A. No.
Q. Have you heard about his ruling?
A. I'm sorry. When was this?
Q. March 29, 2018.
A. What was the ruling in regards to?
Q. The motion to dismiss.
A. I got a high-level brief on that, that --
MR. SELLINGER: Let me just stop you for a moment. To the extent that -- in answering the question, I instruct you not to disclose communications with counsel. To the extent you're able to answer the question without disclosing communications with counsel, you can do that.
A. What I am aware of is that there was -- the motion to dismiss was granted in part and denied in part. That's really the extent of my understanding.
BY MR. REISER:
Q. Did you ever read the order?
A. No.
Q. Did you get that understanding from

Page 31

attorneys? Because I don't want to delve into it if you did, is all I'm saying.
MR. SELLINGER: Well --
MR. REISER: Without waiving anything. I'm trying to lay some foundation for where he learned this knowledge.
MR. SELLINGER: I don't think that's the right way to do it. I don't object to your foundation, but that's a question that calls for attorney-client privileged information.
BY MR. REISER:
Q. Other than through attorneys at Marriott, that represent Marriott folks and Marriott defendants, have you discussed the order with anybody else?
A. No.
Q. Do you believe that the associations in California had duties to the members during the time that they were controlled by board members appointed by Marriott?
MR. SELLINGER: Objection to form.
A. I'm sorry. Can you say that again or read it back to me?
BY MR. REISER:
Q. Do you believe that the San Francisco association had a duty -- had a fiduciary duty -- to

Page 32

the members of the San Francisco Ritz-Carlton Club during the time period that the board was controlled by appointees of Ritz-Carlton Development Company?
MR. SELLINGER: Objection to form.
A. I'm not sure whether the association -- the board members have a fiduciary duty to the members or not. I don't think it would matter whether they were -- if there is a fiduciary duty, it's -- it is in place whether they're developer-appointed or members that are elected to the board. But I don't know whether there is a fiduciary duty there.
BY MR. REISER:
Q. Okay.
A. Not my expertise.
Q. You've never held the opinion -- strike that. You're an officer of Ritz-Carlton Management Company as well. True?
A. That's true.
Q. Is it your -- do you have any understanding of any duties that the -- strike that.
Tell me your understanding of any duties that the Ritz-Carlton Management Company owed to the individual members of The Ritz-Carlton Club in, say, San Francisco.
MR. SELLINGER: So two things. Apart

Page 33

from having already covered this, this has got nothing to do with the subsequently-disclosed documents.

MR. REISER: It does, actually.

MR. SELLINGER: How?

MR. REISER: There's a duty of full disclosure to disclose things related to decisions such as affiliation. If the Ritz-Carlton Management Company had -- I want to see if he realizes, you know -- if he understands that a -- if he understands that a fiduciary would be required to turn over all relevant information -- fully disclose. I think it is relevant.

MR. SELLINGER: So read the question back again.

THE REPORTER: "Tell me your understanding of any duties that the Ritz-Carlton Management Company owed to the individual members of The Ritz-Carlton Club in, say, San Francisco."

MR. SELLINGER: What does the Ritz-Carlton Management Company have to do with a 2013 affiliation agreement?

MR. REISER: I'm not going to argue with

you on the record. If you want to instruct him not to answer, I guess we'll be back for a fourth time here. I think he should answer the question, Philip.

MR. SELLINGER: I'm not instructing him, but it goes well beyond -- all of those fiduciary questions go well beyond the subsequently-disclosed documents, but let's try and get through it.

Objection to form.

MR. REISER: Thanks.

THE WITNESS: The responsibility of the management company is to provide the facility services, the check-in, check-out, cleaning, so forth, manage within the budget provided by the -- that's approved by the association -- and bill to the association to perform all of the hospitality functions, and to do that within the standards set by The Ritz-Carlton Destination Club.

BY MR. REISER:

Q. The Ritz-Carlton Management Company is also responsible for providing services to the board of directors, true, under the terms of the management agreement?

MR. SELLINGER: Do you have a copy of the agreement?

MR. REISER: We can pull one up. I mean, it's been extensively discovered -- extensively discussed in Judge Brimmer's order, paragraphs 4(a) through (b) or whatever with all the different authorities getting crammed into the Ritz-Carlton Management Company, including the discretionary authority pointed out by Judge Brimmer that he thought posed a fiduciary duty under the management agreement.

MR. SELLINGER: I disagree with your reading of the decision, but that's not relevant here. You're asking the witness about an agreement without showing him the agreement. I don't think that's fair.

MR. REISER: I am. I'm asking his understanding of that agreement without reading the agreement. If he doesn't understand it, then he doesn't understand it.

THE WITNESS: I don't know all the particular requirements or activities that are outlined in the management agreement. I know the high-level responsibilities, which I

previously discussed.

MR. REISER: Can you put that up on two pages on the screen?

MR. SELLINGER: So if you're going to ask him about the management agreement, which, again, has nothing to do with the subsequently-disclosed documents, you should give him the document and not cherry pick provisions to look at. I don't think that's fair.

MR. REISER: I don't have the document with me right now, so we're using the screens that we brought here for Trial Director. It's right in front of him. It's the management agreement. It's very familiar to this case. It's been the subject of motions to dismiss. It's going to be extensively discussed here.

He's the Ritz-Carlton Management Company officer. These are very basic agreements that he's responsible for. I'm going to ask him about them. If he doesn't have a copy, you can take a break and get him a copy if you think it's necessary.

BY MR. REISER:

Q. I'm going to ask you to -- first question I'm going to ask is -- the paragraph number two of the Ritz-Carlton Management Company, LLC management agreement. It says, "Appointment and acceptance of agency."

And it reads, "The association hereby employs the management company to act on behalf of the association and its members" --

A. I can read that.

MR. SELLINGER: Well, you've now -- I don't understand. You've got something on the screen that you can't read. It's small print.

MR. REISER: Hold on a second. Your witness just said he could read it. He asked for that to be taken down, so --

MR. SELLINGER: The witness did?

THE WITNESS: I can read it.

MR. SELLINGER: I'm sorry. I didn't hear that.

BY MR. REISER:

Q. It says, "The association hereby employs the management company to act on behalf of the association and its members as the exclusive managing entity of the condominium and to manage the daily affairs of the

condominium and the plan, and the management company hereby agrees to act."

You understand that the management company is acting on behalf of the association and its members pursuant to this agreement?

MR. SELLINGER: Objection to form.

A. It says -- yeah -- "to act on behalf of the association and its members." I wanted to read the rest of the clause, as opposed to...

BY MR. REISER:

Q. Okay. Feel free. I'm going to ask you about the fourth paragraph next called "Delegation of authority."

A. Okay.

Q. Would you agree that the association agreed to -- I'm sorry -- the management company agreed to act on behalf of the association and its members?

MR. SELLINGER: Objection to form.

A. It's moved. They changed the screen.

MR. REISER: Can you put it back, please.

THE WITNESS: Could we not move it around?

MR. REISER: Let's take a break.

MR. SELLINGER: Get the agreement.

THE VIDEOGRAPHER: We're going off the

record. The time is 10:59 a.m.

(Brief recess.)

THE VIDEOGRAPHER: We are back on the video record. The time is 11:06 a.m.

Counsel, you may proceed.

BY MR. REISER:

Q. So I was asking about the appointment of -- about an acceptance of the agency section --

A. I saw that.

Q. Okay. We're talking about that -- let me just finish off that one. I was going to move on to paragraph 4.

You agree that this management agreement employs the management company to act on behalf of the association and its members to be the exclusive managing entity of the condominium (inaudible) of the condominium plan?

A. Yes.

Q. Number four, there's a delegation of authority. You're aware that the management agreement provides that, "except to the extent prohibited by applicable law, the association hereby delegates the management company of all of the power and authority of the condominium association to the extent necessary to perform the management company's duties and

obligations under this agreement"?

A. I see that.

Q. And that's your understanding of the delegation of the power and authority from the association to the management company; right?

MR. SELLINGER: Objection to form.

A. That is the agreement.

BY MR. REISER:

Q. Okay. And then the agreement lists subparagraphs A through B in terms of individual powers that the association has also delegated to the Ritz-Carlton Management Company. True?

A. I think it's itemizing certain components of what has been delegated, yes.

Q. And prior to each association meeting -- board meeting -- isn't it true that the Ritz-Carlton Management Company is responsible for providing pre-reads to the board that are going to be -- matters that are going to be discussed at the meeting?

MR. SELLINGER: Objection to form.

A. Our association governance group provides out an agenda, and sometimes there are pre-reads with that agenda. Not always.

BY MR. REISER:

Q. Okay. The association -- the Ritz-Carlton

Management Company keeps all the books and records of the association. True?
A. That's correct.
Q. Including any affiliation agreements?
A. Any affiliation agreement with the association -- with the association -- they would.
Q. Any affiliation agreement that would be -- that would -- through which the association would be a party to through an acknowledgement and joinder would be kept by the Ritz-Carlton Management Company; correct?
MR. SELLINGER: Objection to form.
A. Any affiliation group -- any affiliation agreement between the association and the -- between the association and another group would be kept as part of the association records. The acknowledgement agreement, I would assume, would be kept as well as part of the agreements.
BY MR. REISER:
Q. What about the actual affiliation agreement as it pertains to the acknowledgement agreement?
A. I don't know the technical -- whether that would've been subject to being kept or not.
Q. Can you think of any reason why the association would not keep in its records the

affiliation agreement dated November 14, 2013?
MR. SELLINGER: Objection to form.
A. I have no idea whether they have it or don't have it. As I said before, if they had it, I would expect them to keep it.
BY MR. REISER:
Q. So we've subpoenaed or asked for all documents related to the affiliation agreement from the Aspen Highlands Association, and they provided their complete file in this case responsive to a request.
Are you aware of that?
A. I'm aware that they were -- they were requested to provide -- disclose all their documents.
Q. Are you aware that, in that disclosure, there was no November 13, 2014 affiliation agreement contained within their records?
A. No.
Q. Can you see any reason why the association would not have within their records a copy of the November 14th, 2013 affiliation agreement?
MR. SELLINGER: Objection to form.
A. I can't speak for them, but I don't know why they wouldn't.
BY MR. REISER:

Q. Well, I mean, you can speak for the Ritz-Carlton Management Company who's got the responsibility for maintaining their records. True?
A. I can speak for that, yes.
Q. And, as you mentioned, the Ritz-Carlton Management Company does keep the records of the association. True?
A. The Ritz-Carlton Management Company, as part of their duties, keeps their records of the association. I could see them keeping any document where the association is a party to that document.
Q. Would you expect the November 14, 2013 affiliation agreement, given that it was joined by the association, to be within the association's files --
MR. SELLINGER: Objection to form.
BY MR. REISER:
Q. -- as maintained by the Ritz-Carlton Management Company?
A. I don't know why -- I don't know whether that would be kept there or not.
Q. All right. What was your involvement in drafting the November 14, 2013, affiliation agreement, if any?
A. I didn't have any involvement in drafting it.
Q. Okay. Ms. Sobeck's deposition was taken

earlier this week on Tuesday. Her response to the question of "Why didn't the Ritz-Carlton Management Company give a copy of the affiliation agreement to the board in Aspen" was that they didn't ask for it.
Are you aware of her testimony in that regard?
MR. SELLINGER: Objection to form.
A. No, I'm not. I haven't spoken to Ms. Sobeck about her testimony.
BY MR. REISER:
Q. Do you agree with her that the Ritz-Carlton Management Company had no duty to provide the affiliation agreement that was being joined unless the association asked for it?
MR. SELLINGER: Objection to form.
A. I don't think -- I don't know that we had a duty to provide the agreement. We were -- we certainly weren't hiding the agreement. It's referenced, I don't know how many times, in the acknowledgement agreement.
BY MR. REISER:
Q. So under the management agreement, the management company was provided the authority to -- was provided all the power and authority of the condominium association to the extent necessary to

perform the management company's duties and obligations under the agreement.

Did the management company represent the association in relation to the execution of the joinder and acknowledgement?

MR. SELLINGER: Objection to form.

A. No.

BY MR. REISER:

Q. As the management company that is delegated all the power and authority of the association board to the extent allowed by law pursuant to the management agreement, do you think it was responsible for the association at Aspen to sign a joinder to an agreement that they had never seen?

MR. SELLINGER: Objection to form.

MS. LIVINGSTON: Objection.

A. Can you ask that question again or read it back?

MR. REISER: Sure. Can you read it back?

THE REPORTER: "As the management company that is delegated all the power and authority of the association board to the extent allowed by law pursuant to the management agreement, do you think it was responsible for the association at Aspen to sign a

joinder to an agreement that they had never seen?"

THE WITNESS: They didn't sign -- the management company wasn't party to the agreement -- the acknowledgement agreement.

BY MR. REISER:

Q. I understand, but they were managing the conduct of the board; were they not?

MR. SELLINGER: Objection to form.

A. No --

MS. LIVINGSTON: Objection.

A. -- we had made -- they were delegating certain powers. We had, as part of the affiliation, agreed with -- to provide the accomodation to allow the association board to execute the acknowledgement not to allow their members to participate. We hadn't -- that wasn't delegated to the management company.

BY MR. REISER:

Q. As an officer of the management company -- which you testified earlier today that you were; right?

A. Yes.

Q. You knew of the November 14, 2013 affiliation agreement before the board signed the joinder. True?

A. That's true.

Q. And did you ever instruct anybody -- strike that. Did you, yourself, or anybody on your behalf, acting on behalf of the management company, feel obligated to provide the affiliation agreement dated November 14, 2013 to the board?

MR. SELLINGER: Objection to form.

A. I didn't feel obligated to provide a copy of the agreement to the board.

BY MR. REISER:

Q. You're aware that the Ritz-Carlton Management Company, through Stephanie Sobeck and perhaps yourself, signed an MOU with relation to the affiliation agreement dated in November 2013. True?

A. Quite frankly, I'd forgotten about that. As -- through the preparation, I had the opportunity to read through that again, which reminded me that we had entered into that agreement, which was interesting from the standpoint -- it just recapped some of the high points of how the Marriott Vacation Club Destinations Exchange Program would work through Lion & Crown.

Q. But listen to my question, Mr. Cunningham. I'm asking you, did Stephanie Sobeck and Lee Cunningham -- I mean, did Stephanie Sobeck and Randy

Mercer negotiate the terms of the MOU between themselves?

A. I have no idea who negotiated that.

Q. You never saw any communications from Stephanie Sobeck with relation to the requests that were being made by Randy Mercer in terms of changes to the MOU?

A. I don't recall.

Q. Are you aware that Stephanie Sobeck made changes to the MOU?

A. I'm not.

Q. Are you aware that Stephanie Sobeck negotiated the joinder agreement -- the acknowledgement and joinder agreement -- to the November 2013 affiliation agreement with Randy Mercer and Tyler Oliver?

A. I'm not aware that that took place.

Q. Why was -- well, okay. You have no recollection. You didn't review any e-mails or any drafts of the MOU in preparation for any of your depos in this case?

A. Not related to -- that I recall -- related to the drafting of the MOU or the drafting of the acknowledgement agreement.

Q. All right. I want to shift gears then for

now and go over some of the strategic council agreements that have been produced recently as well.

First of all, I just wanted to ask you -- we received some testimony this week about the strategic council and the members of the strategic council. But I just want to hear you for the record -- if you can tell me which members you recollect were on the strategic council in July of 2012.

A. 2012. Steve Weisz, John Geller, Jim Hunter, myself, Brian Miller, Lani Kane-Hanan.

Q. Basically, the members of the executive committee for the company?

A. Yes. There's two other people. I don't know whether they were voter members on this strategic -- oh -- the strategic council?

Q. Yes.

A. I'm sorry. Dwight Smith and Mike Yonker.

Q. The purpose of the strategic council is not to vote on anything. True?

A. No. It's not a decision-making body.

Q. There's a corporate growth committee that made decisions with regard to the affiliation in this case; is that true?

A. There is a corporate growth committee that is a decision-making body relative to, generally, capital

investment, but...

BY MR. REISER:

Q. Okay. The members of the corporate growth committee basically determine what the strategic council -- in terms of the -- at least all of the members of the executive committee for the company are on both the strategic council and the corporate growth committee. True?

A. I'm not a hundred percent positive for Mike Yonker and Dwight Smith; otherwise, I know the other members are.

Q. Okay. We've received some testimony this week from both Steve Weisz and Lani Kane-Hanan that the -- what is often times referred to, or repeatedly referred to, in the strategic council updates as the luxury segment reengineering.

Both of those witnesses this week have testified that you were pretty much the quarterback for the luxury segment reengineering.

Would you agree with that?

A. That would be correct.

Q. And the term "luxury segment reengineering" -- we can go through this -- but virtually every strategic council report starts with a box called "luxury segment reengineering" and

describes what's going on. Then it has a box for each club.

The question is, is that your terminology that this was a luxury segment reengineering? How did that term come to being?

A. I don't know whether I coined it or whether somebody else did. It was our way of referring to things that we were considering or contemplating relative to the club overall as opposed to each specific resort location.

Q. Okay. I think what I'm going to do first is actually, just because chronologically it's a little cleaner, is talk about the corporate growth committee memo dated May 24, 2012, and then get into the strategic council.

So let me show you what we marked this week as what -- exhibit number from May 24 -- 2136.

Have you seen Exhibit 2136 before, which is the May 24, 2012 corporate growth committee memo that has the subject "Ritz-Carlton Destination Club proposed strategic plan"?

A. Yes.

Q. Did you prepare this document?

A. It was prepared by a number of people. I guess, you would consider me the sponsor of the

activity. It was prepared by a number of people within the organization and then published to the corporate growth committee.

Q. Okay. Tony Terry, I understand, is in the finance and accounting department in the company?

A. That's correct.

Q. He helped you -- he was one of the authors of this report as well?

A. He probably was more involved on the financial assessments, but there were other people -- many other people -- that were involved in the preparation of the -- as is normal for any document going to our corporate growth committee.

Q. Let's go through the requests here. The requests in this memo to the corporate growth committee had five subparts.

Do you see that in the beginning of the memo?

A. I do.

Q. So the first one involved converting the existing 105 RCDC Trust owners to the Marriott Vacation Club Destinations NATO Trust points product or to RCDC home fractional ownership.

Did that aspect of this request get ultimately approved and ratified by Steve Weisz?

A. I don't recall whether it did at this

particular -- when this was presented. Ultimately, we did go about -- go about converting those trust members, which are also the Bleu Florida Land Trust members, to the options laid out there.

Q. So the first subsection here, Subsection 1, deals with the Bleu Florida Land Trust inventory. True?

A. You're talking about number one? Yes. That's dealing with going to the owners and giving them alternative ownership or options so that they relinquish their ownership in the Bleu Florida Land Trust.

Q. Okay. Whoever prepared this memo -- I know it was a multiparty preparation effort -- but as the sponsor of this effort, you're aware and you knew that you were requesting from the corporate growth committee $1.5 million to use to reacquire all the 105 interests that had been bought by folks. True?

A. We were expecting -- we were requesting to spend up to the 1.5 million, not as a purchase, but of inventory of the 105 trust owners. But the options included transferring their ownership to Marriott Vacation Club Destination points, so there would be the closing costs.

So there wasn't -- there wasn't a cash outlay

Page 54

for that alternative product to them. Or if they transferred to ownership of another Ritz-Carlton Destination Club, there wouldn't be a cash outlay there, but there would be expense associated with that transaction.

Q. How many of these members actually received a buyout of their interest?

A. I don't recall. I think, by and large, my recollection is that the majority transferred to Marriott Vacation Club Destination points; maybe one or two went to a Ritz-Carlton fractional; and there might have been one or two that received a cash buyout. I don't recall how it broke down.

Q. How many -- I obviously see that there were 105 RCDC Trust owners. How many units did -- were originally -- strike that.

How many units were in the RCDC Trust at the time the unwinding process began?

A. I don't recall the exact number. It was, I think, in the single digits.

Q. Okay. Do you know where those units were located, which clubs?

A. I remember some of them were San Francisco inventory. Beyond that, I don't really recall.

Q. It appears from this memo that there were --

Page 55

you can actually go down to -- if you can turn to page 7 of the memo -- jumping around a little bit, trying to speed this along.

It appears from -- page 7 of the memo, it reads, "As mentioned previously, the current strategy reflects the unwind of the RCDC Trust by way of converting the existing 105 RCDC Trust owners." Then it says, "15.5 million cumulative sales." That's what I wanted to ask you about.

Does that mean those 105 RCDC Trust members that paid 15 and a half million dollars for the --

A. I think that's correct.

Q. Okay. What I want to get -- when that trust product was reacquired by Ritz-Carlton Development Company, that was then ceded into the NATO Trust. True?

A. Into the MVCD Trust, yeah.

Q. I just found what the NATO Trust actually stands for -- North American Timeshare Organization. I didn't know that. Is that the correct acronym?

A. Many years ago, like 2007, when we developed an organization structure that had, actually, at the time, four chief operating officers, there was one for North America, one for Europe, one for Asia, and one for The Ritz-Carlton Destination Club. And so the --

Page 56

somehow the nickname "North American Timeshare Organization" is what got -- it was an internal -- it wasn't a -- any kind of legal name. It was just a -- how you referred to it.

Q. That trust is what holds points that allow -- strike that. That trust holds inventory that allows points to be sold against that inventory, as I learned this week?

A. That's correct.

Q. Okay. So at least the five -- strike that. Let's say there were five -- you said single digit units that were purchased or obtained back from the portfolio, RCDC Trust. Let's just assume it was five hypothetically.

Those five units would go into the trust, right, and points associated with those five units would allow -- I'm sorry. The inventory attached to those five units would then allow a number of points to be sold back by that inventory; right?

A. That's correct.

Q. And did the financial figures contained in this report show how much points in a dollar amount would be expected from the ultimate sale of points backed by the portfolio inventory that went into the trust?

Page 57

MR. SELLINGER: I'm sorry. Read that back for me, please.

THE REPORTER: "And did the financial figures contained in this report show how much points in a dollar amount would be expected from the ultimate sale of points backed by the portfolio inventory that went into the trust?"

MR. REISER: Let me rephrase before you object.

BY MR. REISER:

Q. Does Exhibit 2136, which is the May 24, 2012 corporate growth committee document -- does this document reveal how much was expected in terms of point sales that would accrue against the new inventory that was going into the trust represented by the portfolio?

MR. SELLINGER: Objection to form.

A. If you go to, I guess, page 7, economic metric summary?

BY MR. REISER:

Q. Okay.

A. The net -- the development revenue line would be the amount of revenue that was generated as a result of this effort. So if you see zero, you may

question why.

Well, if I took somebody who was in the Bleu Florida Land Trust, gave them points -- MVCD points -- and then, later, I took the inventory that they had relinquished, put that into the MVCD, that just replaced points that I had previously given to the them.

Q. Thank you.

A. So it's a net zero.

Q. Net zero. All right. And the same would not be true for any developer-owned inventory that went into the trust, right, because you're not -- you're not netting out the points in that transaction?

MR. SELLINGER: Objection to form.

A. So not related to the Bleu Florida Land Trust.

BY MR. REISER:

Q. Correct.

A. If there was a developer-owned Ritz-Carlton Destination Club unit fraction that was put into the MVCD Trust, that would generate points for sale and generate revenues accordingly.

Q. All right. So is it true then -- strike that -- strike that. It is true, is it not, that both portfolio inventory that was taken back and put into

the trust -- that was done as part of this reengineering of The Ritz-Carlton Destination Club -- as well as unsold developer inventory in, at least, San Francisco and Tahoe, for our purposes -- unsold developer fractional inventory from those two clubs was also ceded into the trust following the reengineering process. True?

MR. SELLINGER: Objection to form.

A. In the steps of -- in the various actions that were being contemplated, where we had the rights and the authority to put inventory -- unsold developer inventory -- from The Ritz-Carlton Destination Club into the MVCD Trust. We were planning to do that.

BY MR. REISER:

Q. Right. Okay. So as I understand it, based on documents I've read -- and you can -- even in the webinar, I think, it was mentioned how much inventory was still owned at the time of the August 2012 webinar -- it was laid out, I think, by you -- there was about 25 -- I think the figure was actually 27 percent of the total inventory in The Ritz-Carlton Destination Club was unsold at the time of the evolution letter.

Is that about right? I'm not going to hold you.

A. I don't know what the exact percentage or -- it was a -- there were a number of -- meaningful number of unsold fractionals.

Q. Just to try to pin it down -- I appreciate you trying to be precise in your testimony -- here is the webinar -- I think the webinar transcript. It's dated August 28, 2012.

If you can take a look at that and let me know if this refreshes your recollection as to how much developer inventory was owned at the time of the evolution or the reengineering of The Ritz-Carlton Destination Club.

MR. SELLINGER: I'll just note that this does not have to do with the subsequently-produced documents, but go ahead.

MR. REISER: I disagree, but, I mean, you're not in my head, so you don't really --

A. Contained in -- I don't know which paragraph -- "Today, luxury demand continues to be very soft and forecasts for luxury real estate market shows little near-term progress for sustained recovery. Approximately 25 percent of the inventory in The Ritz-Carlton Club system remains unsold and the pace of sales is slow."

BY MR. REISER:
Q. Okay. So there were -- I'm just asking you in rough numbers now. Okay? I don't necessarily need to be precise. But if there were 4,000 total Ritz-Carlton fractionals built -- I think that's the number -- would you agree that's roughly the number that were ultimately built?
A. Let's see. In 2012 -- I'm trying to think -- I don't know what the denominator is, which clubs are included -- for instance in 2012, in August, whether that would have counted. There was still inventory in Abaco. But --
Q. Let me --
A. I don't know. Without going back and looking at an inventory report, I can't tell you whether 4,000 is right or not.
Q. Do you have any estimate, as you sit here today, stripping away the fractionals that -- strike that.
How many unsold inventories did Ritz-Carlton Destination Club just roughly have in the Kapalua club at the time that deal was deflagged?
A. We had sold very little. Once again, I'd have to go back and get an inventory report. I'm not trying to be evasive. I just don't recall the size

of -- in that particular project, there were fractional units, there were whole ownership units, there were -- I don't remember the split.
Q. Let me ask you this. What happened to the unsold fractional inventory at Kapalua after the termination?
A. The whole development was sold and that inventory went with it. I do not know what they -- I don't recall what they ultimately did with the unsold fractional; whether they converted it to whole ownership or continued to sell fractional or used it as hotel.
Q. Got you. But at any rate, the unsold fractional interests that were owned by the JV group sold all that to the buyer?
A. That's correct.
Q. You did retain maybe one or two or something, because I know at least Steve Andrews, who was a former board member at San Francisco, traded his San Francisco unit for a Kapalua unit.
A. We didn't really retain them. We ended up with some back through foreclosures on mortgages or that were in our control that weren't part of the joint venture.
Q. So there was -- do you remember the magnitude

of --
A. Two or three.
Q. Two or three. That's even after two or three years went by and people had a longer time to default on mortgages and stuff, two or three was the net result out of that club that you got back through foreclosures?
A. Yeah. I think, at the end -- I think we only recently sold the last unit that we had there.
Q. Okay. So Kapalua, I'll stipulate that for now.
Can you tell me the clubs that had the most developer-owned inventory at the time of the RCDC reengineering?
A. Aspen had a meaningful amount.
Q. San Francisco had a meaningful amount?
A. San Francisco.
Q. Tahoe?
A. Tahoe.
Q. Jupiter?
A. Vail. Jupiter, not a lot.
Q. I think Jupiter had around 80, as I saw. Does that sound about right?
A. Let me think. Probably -- let's see. No. I think that would be high. I would think it would be

more in the 50-ish range, but -- and in St. Thomas, there was a good amount of inventory that was not owned by the developer, but was owned by the association or in default of some sort.
Q. And, ultimately, there was a deal worked out that -- I'm not going to get into the details of that -- but through an agreement with the club and an amendment to their declaration, the developer was able to gain control of all the defaulted inventory, and then ultimately ceded that inventory into the NATO Trust. Right?
A. There were several agreements, but that resulted in us being -- getting control of that inventory and then having the ability to put it into the MVCD Trust.
Q. Do you know how much of the SFO inventory was ultimately ceded into the trust?
A. Probably in the 10 to 12 unit range. Something like that.
Q. When you say "unit," that would be a fraction?
A. Not fractions. Actual units.
Q. Times that by 12?
A. Yeah.
Q. What about Tahoe?

A. I believe Tahoe would be more in the five or six unit range, times the 12.

Q. And I'll skip the other clubs for now. But would the units that were ceded to the trust, the points that were able to be sold, backed by those units at those two clubs, limited to the -- like, for instance, in San Francisco, each fractional had three weeks of use.

So that would mean a fractional unit that was ceded into the trust from San Francisco allowed 36 weeks of inventory to sell points against. True?

A. That's correct.

Q. And same thing with Tahoe?

A. That's correct. We -- in many cases, it was an individual fraction that was put into the trust as opposed to a whole unit. So the inventory -- the points were against the points of that individual fraction -- the seven nights -- or the 21 nights.

Q. Okay. Was there some inventory that had been -- was there some inventory from either the San Francisco or the Tahoe clubs that was put into the NATO Trust as a whole unit which would allow them to sell 52 weeks of points against that unit; do you know?

A. I don't recall whether there was. I know

that there was that situation in Vail, but not -- I don't know whether it was.

Q. So is there an analysis anywhere in -- or do you remember whether there was an analysis of the financial impact of taking these developer-owned inventory fractions and putting them into the NATO Trust in terms of expected point sales that would accrue that were backed by this new inventory into the trust?

A. There would've been a financial analysis done of looking at putting that developer inventory in, how many points it generated, how much sales it generated, what the cost of generating those sales were going to be, what the cost of the unsold maintenance fees were going to be while you waited for them to sell.

Yeah, there would've been a financial analysis done.

MR. REISER: Okay. I don't think we received that financial analysis in discovery. I'll send you an e-mail afterwards. You can decide whether you think it's privileged or not. At least, I'll put you on notice that we want that.

MR. MARX: Thank you.

BY MR. REISER:

Q. Do you have any rough idea in terms of -- let me back up for a second.

Do you think that financial analysis, at least the summary of it, appears somewhere under the redacted version of this May 24th memo?

A. I don't believe, no.

Q. I mean, the corporate growth committee would do a full analysis of the financial impact of the request; would it not?

MR. SELLINGER: Objection to form.

A. The impact is -- that's the analysis that was provided as part of this memo -- was -- is included.

BY MR. REISER:

Q. Where does the expected sales come in on the box on page 7 from the developer-owned inventory that would have backed some point sales?

MR. SELLINGER: Objection to form.

A. It's not in this memo. I don't know where it would have come forward -- or whether it would have come forward -- as individual pieces of inventory were being contemplated to actually be ceded into the trust.

BY MR. REISER:

Q. So I don't know if you reviewed this memo in its unredacted form in the last couple days and

whether you would be able to tell me whether that analysis might be tucked behind this redaction or not.

A. I have not reviewed this form. I have not reviewed the unredacted form.

Q. As you sit here today, do you have any recollection as to what the expected point sales could be generated through the new inventory Ritz-Carlton ceded into the NATO Trust?

A. I do not.

Q. Was it over $100 million?

MR. SELLINGER: Objection to form.

A. I'd be spitballing a number. I don't -- I don't know.

MR. REISER: Let's take a break.

THE VIDEOGRAPHER: This is the end of video number one. We're going off the record. The time is 11:51 a.m.

(Brief recess.)

THE VIDEOGRAPHER: Here begins media number two in the deposition of Mr. Lee Cunningham. We're back on the record. The time is 12:04 p.m.

Counsel, you may proceed.

BY MR. REISER:

Q. I'm going to try to get through the rest of

the bullet points on the first page of Exhibit 2136. We've gone through the RCDC Trust issue. That's number one.

Number two is related, I guess. "Unwinding the RCDC Bleu Florida Land Trust and transferring the underlying inventory to the NATO Trust."

That's the inventory that basically netted out each other?

A. That's correct.

Q. The third one, "Transferring the remaining Ritz-Carlton Destination Club core inventory to the NATO Trust."

That's the developer inventory we were talking about just before the break -- the San Francisco, the Tahoe, and the fractionals that were left in Jupiter and St. Thomas and Vail?

A. That's correct.

Q. And "Selling the remaining assets where possible, both dispositions," that pertained to, for instance, the 19 units that were ultimately sold to -- just recently -- in 2015, '16 -- San Francisco -- right -- the 19 units that was a bulk disposition of the other assets in The Ritz-Carlton Destination Club?

A. I don't know whether it was referring to those specific units at that time, but it would be

referring to, potentially, the Abaco club, any whole ownership or land interests that we had elsewhere.

Q. I keep seeing something about Cabrita Point.

A. Cabrita Point is -- we have some lots that are on a piece of land that is adjacent to The Ritz-Carlton Club, St. Thomas.

Q. Did that ultimately get sold off; do you know?

A. I still have some. I'd be glad to sell you one if you'd like one. It's been cleared.

Q. I'll go down there and hang out with Randy Mercer. Just kidding. Strike that.

MR. REISER: Jess, I'm just joking.

BY MR. REISER:

Q. Number five, "Ceasing all future RCDC specific sales and marketing activities."

That was the fifth item on this request; true?

A. That's correct.

Q. So in order to shortcut this, hopefully, a bit, even though you can't tell me that these five points -- these five requests were approved on May 24th, would you tell me -- could you say that all these five were ultimately approved or --

A. Yeah. Certainly one, two. I don't know what

was included in the transfer of the remaining core inventory. Some of it was and some of it wasn't. For instance, in the case of Aspen, it wasn't. But, in part, that was ultimately done. And we continue through the process of any loose assets that are out there.

Q. So let me just show you a document we marked yesterday as Exhibit 2235. It's the minutes. Here it is.

If you look at the second page of this document, does this -- first of all -- does this appear to you to be the meeting minutes from the corporate growth committee that matches up with the exhibit -- the prior exhibit -- the May 24, 2012 corporate growth committee memo?

A. Yes.

Q. And can you read the section on the bottom under "RCDC condominium strategy" to yourself and let me know whether that helps you refresh your recollection as to the outcome of what happened following the corporate growth committee meeting on May 24th?

A. Yes. It was delegated to a smaller group -- decisions.

Q. If you compare -- strike that. Yesterday,

Steve Weisz testified that he was not a member of the corporate growth committee; although, he essentially has the power to either ratify or not ratify any decision coming out of the growth committee.

Is that your understanding?

A. That's correct.

MR. SELLINGER: Objection to form.

A. The way that structure is, Steve is not a voting member of the strategic council -- I mean, of the corporate growth committee. But then the recommendations from that group are either ratified or rejected by him.

BY MR. REISER:

Q. This is a little different because I don't see a "ratified" on it. I compared it to another minutes. I'll show you the minutes from a corporate growth committee dealing with the Ritz-Carlton, San Francisco a year later on 10/21/13.

On that minutes, it says, "Steve Weisz was present and ratified both decisions." I don't see that same language in the May 24, 2012 minutes.

My question is, is that because he basically delegated to a smaller group, including you, Jim Hunter, and John Geller, as to whether to proceed with this following legal review?

MR. SELLINGER: Objection to form.
A. I believe what this would indicate is, it was delegated to the smaller group to make a recommendation to approve that. Ultimately, he would still have to ratify that agreement.
BY MR. REISER:
Q. So did yourself, Jim Hunter, and John Geller approve the proposal ultimately?
A. I don't recall. As we just discussed, many of these things happened. I don't know what adjustments were made to the approval, but we reviewed it and, I guess, approved in part.
Q. At least one part that you didn't approve was the developer-owned inventory in Aspen; right? That's one of the ones you mentioned. That turned out not to be allowed into the trust. True?
A. If that was called out as a specific component, it would have -- then, yeah, we would have, through the legal review, determined that we didn't have the authority to do that.
Q. Would there be another set of minutes that would have approved your -- the smaller committee meeting that you just described between Geller, Hunter, and yourself?
MR. SELLINGER: Objection to form.

Page 74

A. I don't -- I don't know whether there is a -- I'm trying to think if there was an occasion where the outcome of that smaller group is then brought back to CGC for approval. I don't recall in this particular instance whether there was or wasn't.
BY MR. REISER:
Q. Okay. Let me put it this -- let me kind of go through these point by point so we don't have to -- and I'll try to make this quick. I don't want to belabor it too much.
At some point, number one on the first page -- the first request -- converting the existing 105 trust owners -- that was ultimately undertaken, so that would indicate to you that the smaller group approved that aspect and it was ultimately ratified by Steve Weisz. Is that true?
MR. SELLINGER: Objection to form.
A. What I would see in that last bullet of the minutes is that they approved committing that $2 million to -- and the 1.5 in transaction costs -- that was the point one.
BY MR. REISER:
Q. Okay. So that was approved at that original meeting?
A. That's what I read here. It had a smaller

Page 75

group to manage the process.
Q. Number two was related to that. Would you agree that that's the same answer?
A. Yes. We would've -- yeah -- I would think that would have ultimately been approved, because it ultimately happened.
Q. Number three, understanding that there might have been some changes to what the core inventory was introduced into the trust, ultimately, at least, the inventory that we discussed before the break -- the San Francisco, the Tahoe, the Vail, the Jupiter, and St. Thomas inventory -- fractional inventory -- was indeed ultimately approved to be ceded into the trust. True?
MR. SELLINGER: Objection to form.
A. Ultimately, the inventory from those -- the ones that you cited were ceded into the trust, so they were approved to go into the trust.
BY MR. REISER:
Q. Do you know whether Steve Weisz would have had to ratify that decision or do you think you had the authority to do that under the terms of the minutes that are set forth in 2215?
A. I don't think he is required to ratify inventory being ceded into the trust.

Page 76

Q. All right. But that was requested in this May 24, 2012 memo. True?
A. Yes.
Q. And is it true then that you believe that the outcome of the May 24, 2012 corporate growth committee was that it was approved that a smaller group, including yourself, Jim Hunter, and John Geller, would make the decision as to which of the inventory would go into the trust?
A. Yeah, based on further advice from counsel.
Q. Okay. Number four, "Selling the remaining assets where possible," that was ultimately approved by Mr. Weisz. Is that true?
MR. SELLINGER: Objection to form.
A. I believe the concept -- not knowing what exact bulk dispositions or other assets were being called out here -- each of those dispositions would require another trip to the corporate growth committee.
MR. REISER: Okay. I'm just going to ask again, Counsel, for Marriott to check and see if there are any other corporate growth committee MOUs that pertain to number four that postdate this memo. I'll put this in an e-mail.

Page 77

MR. MARX: I think other ones have been provided, though.
MR. REISER: Okay. Yeah, yeah.
MR. MARX: There's the two relating to San Francisco.
MR. REISER: Got you. In terms of the bulk sale, yeah. Good point.
BY MR. REISER:
Q. Number five, "Ceasing all future RCDC specific sales and marketing activities," that was approved at the May 24, 2012 meeting; was it not?
A. I don't recall. It's not called out in the memo specifically that that was approved at that point.
Q. So the evidence in the case, without showing you all these documents, is it your recollection that the sales and marketing activities for the RCDC stopped in 2012?
MR. SELLINGER: Objection to form.
A. I don't recall whether it was 2012. And we continued to sell on a smaller scale at a number of locations, sometimes through brokers or whatever, but not -- it didn't cease in 2012 and never resume.
BY MR. REISER:
Q. I got you. Let me go through some documents

on the strategic council.
So we've gone through the May 24th corporate growth committee. We've seen strategic plan, parts of which were approved that day; other parts of which were either nuanced and approved later on. I want to turn now to the strategic council documents.
I'll show you first the August 8, 2012, strategic council meeting or memo -- luxury segment update -- Exhibit 2143.
So what I'm going to ask you to do is turn to the project updates portion of these memos as I show them to you. Okay? This one is starting on the fifth page.
The first box -- this is the first time you're seeing this, at least in this deposition -- you see on the left side, it says, "Luxury segment reengineering" on this project?
A. Yes.
Q. And that was your term?
MR. SELLINGER: Objection to form.
A. Like I said before, I don't know who coined the phrase, but that came to be the term that we used for anything that we were doing across the clubs.
BY MR. REISER:
Q. Across the Ritz-Carlton Clubs; right?

A. Across the Ritz-Carlton Clubs versus at the individual clubs.
Q. The second bullet point, under the luxury segment reengineering, states, "The communication related to the evolution of the RCDC project has not been well received by many members. Several boards have made their concern known to us."
So did you write that?
A. No.
Q. Who actually wrote this, these strategic council luxury segment updates?
A. They generally come from a document that is provided to me by the asset manager -- in this case, probably Stephanie Sobeck -- maybe Mary Lynn Clark, depending on timing -- and then lifted and moved into this document.
Q. So the process -- I think I understand -- would be that -- because we've seen these things called "Business review reports" that come out every month.
A. That's correct.
Q. So you get reports from the asset managers on certain properties through the business review reports. True?
A. That's correct.

Q. On a monthly basis?
A. Periodic.
Q. Periodic. Period nine, how does that work at Marriott?
A. Up until last year, Marriott was -- or Marriott Vacations was on a 13-period financial calendar -- 13 28-day periods. So as you get through the year, period nine has some August and some September in it.
Q. So the periods are just 13 periods a year instead of 12?
A. That's correct.
Q. So 13 times a year, you get reports -- business review reports -- from the asset manager for Ritz-Carlton. That would be how you become informed about what's happening at every property; right?
MR. SELLINGER: Objection to form.
A. We would get those reports, in general, on a period basis. I'm sure there were times where we didn't.
BY MR. REISER:
Q. Sure. I'm not suggesting it might not have been missed once or twice. But as a general practice, the purpose of these business review reports was to have the asset manager, who was more hands-on with the

Veritext Legal Solutions
866 299-5127

property, report what was going on with that property up to yourself. True?

A. That's correct.

Q. And somebody would take -- who would take the content of the business review report and select what to put into the strategic council report?

A. It's varied over time. Generally, someone in our finance and accounting organization, or whatever, would take those -- that information, move it into the different format. And then I would look at it for -- are there things that just don't -- aren't of the level that need to go to the strategic council, and take those out. But I wouldn't wordsmith anything.

Q. You wouldn't wordsmith anything, but would you look at a draft of the luxury segment update and take some stuff out if you didn't think it was appropriate for the strategic council or maybe add something if you thought it was?

Is that fair?

A. That's a fair assessment.

Q. And that was your practice through 2012, '13, and '14?

A. Yes.

Q. Is there any doubt in your mind that any of these strategic council documents that have been

produced by your counsel here are authentic?

A. What do you mean?

Q. That they're true and correct copies of what they purport to be?

A. I have no reason to believe they wouldn't be.

Q. Okay. Let's go to the August 30th report. It's Exhibit 2144.

Turning to the last page of this document, I'm interested in the entries under the Bachelor Gulch club. It says, "Board hired HVS, Mark Earle, to study the impact on the value of the members' investment based on the company's recent decisions."

You were aware, were you not, that the board at Bachelor Gulch hired Mark Earle to study the impact of the proposed affiliation on the value of the Bachelor Gulch members' investment?

A. Yes.

Q. Did you ever get a chance to read that report?

A. Not that I recall.

Q. Did you ever hear from Mike Mullenix or anybody else at Bachelor Gulch that Mark Earle determined that the affiliation would have a negative effect on the members' interests?

A. I don't recall.

Q. Let's go to the September 27th one, Exhibit 2145. On this one, I want to ask you about the general box "luxury segment reengineering" on the top of page 5. On each of these reports, it seems like the box "luxury segment reengineering" starts out with the status of the unwinding of the portfolio product and the reacquiring of the land -- the Bleu Florida Land Trust inventory. True?

A. Right.

Q. Ultimately, it's true, is it not -- so I don't have to go through every one of these -- it's true that Ritz-Carlton Destination -- or Ritz-Carlton Development Company was able to reacquire all the interests in the Bleu Florida Land Trust?

A. That's correct.

Q. And it collapsed the trust and terminated it. True?

A. That's correct.

Q. So right under that one, there's a second bullet point that, again, repeats what is said in earlier ones about the members not being happy about the evolution communication.

This one adds, "We have had conference calls, a webinar, one-on-one meetings, and a meeting with Steve and me and the board president and secretary of

Bachelor Gulch. Communication with the members will continue in coming months."

As of September 27, 2012, would you agree that there had been no affiliation decisions made at any club at that point in time --

MR. SELLINGER: Objection to form.

BY MR. REISER:

Q. -- in terms of a new affiliation with the Marriott Vacation Club?

A. We hadn't made any final determinations. We had communicated our intent to do that in the evolution letter.

Q. The next one is October 25, 2012, Exhibit 2147. Starting off with the page 5 box, "luxury segment reengineering," there's some information -- new information -- updated in this period's report.

After stating again that the evolution communication was not well-received, it adds some new information. It states, "We have developed a communication plan outline related to future communications of the evolution."

That was different than the next sentence. It says, "We have also spoken to a couple of PR firms to provide input into our plan and assist with ongoing

communication."

Was that plan -- strike that. Was it ultimately -- strike that. Is it true that, ultimately, Marriott Vacation Worldwide hired APCO to help in the communication to the members on the evolution?

MR. SELLINGER: Objection to form.

A. I believe that we -- we ultimately engaged APCO, I believe, through -- our law department engaged them to help with communications.

BY MR. REISER:

Q. The last sentence in the box, it says, "The primary focus on the going-forward communication plan is the individual members, shifting the focus away from the boards."

Why was that decision made to shift the communication to members versus the boards?

A. My only recollection there was, we felt like, in the case of Bachelor Gulch specifically -- really, the only one that I remember -- that the board -- we didn't feel like the board was properly communicating everything to the members. So we wanted to make sure that we had communications to the members so that they were fully informed.

Q. So do you remember, following this October

25, 2012 strategic council memo, that there were at least three clubs that sent cease-and-desist letters to yourself and Mr. Weisz with regard to the plan for the reengineering of the luxury segment?

A. I recall seeing the cease-and-desist from Bachelor Gulch; I believe, Aspen, but I don't recall the third.

Q. You don't recall the St. Thomas -- did I say Jupiter or St. Thomas?

A. I don't recall.

Q. I don't recall either. Long day already. Let me try to find the letter that we marked yesterday and see if I can refresh your recollection.

MR. SELLINGER: Once again, I don't think this relates to the subsequently-produced documents.

BY MR. REISER:

Q. I'll show them to you all at once. An exhibit previously marked as 1806 is a letter from John -- James Deere on behalf of the St. Thomas club. There's another letter, Exhibit 1807, which is a December 18, 2012 letter from the Mountain Law Group on behalf of the Bachelor Gulch association. And there's also Exhibit 1135, which is the November 21, 2012 cease-and-desist letter from the Aspen Club.

Do you remember receiving all these letters now that your recollection has been refreshed?

MR. SELLINGER: Objection to form.

A. I received the one certainly from Aspen and from St. Thomas. The one from Bachelor Gulch went to Ms. Egolf. I was aware of its existence.

BY MR. REISER:

Q. So was it the Bachelor Gulch one that went to Ms. Egolf or the St. Thomas one?

A. Mountain Law, so...

Q. Okay. One other question on the strategic council report dated October 25, 2012.

A. Oh, this one.

Q. It's under the Aspen Highlands box on page 6. The first bullet point states, "The new board elected 10/13/2012." It says, "Pressure from membership during meeting applied to the board to fight the RCDC evolution."

Do you remember discussing that sentence with folks on the strategic council in this October meeting?

A. I don't recall.

Q. You were aware, though, that the sentiment at the -- at least at the board meeting on -- or the annual meeting on 10/13/2012 -- you were aware that

membership at that meeting applied pressure on the board to fight the RCDC evolution?

MR. SELLINGER: Objection to form.

MS. LIVINGSTON: Object to form.

A. I wasn't at the meeting, so I have no idea. I can read the words on the page and don't know whether they're accurate or what. I wasn't there and didn't write the words.

BY MR. REISER:

Q. So I understand you weren't at the actual meeting. But the question was actually -- was it discussed at the strategic council meeting on October 2012, this subject that the membership at Aspen was applying pressure to the board to fight the RCDC evolution?

A. I don't recall.

MR. SELLINGER: Objection to form.

MS. LIVINGSTON: Object to form.

A. I don't recall.

BY MR. REISER:

Q. Let's turn to Exhibit 2148. Well, actually, sticking with the last one for one second -- the bullet point right under the one we just went -- there was a call between Stephanie Sobeck and the new board president this week to schedule face-to-face

discussion with the board related to the evolution.
Do you remember a meeting the following month, in November 2012, where Randy Mercer met with yourself in Orlando?
A. I remember meeting with Randy in Orlando. Not exactly sure on the timeframe.
Q. Was the issue that the members were asking the new board to fight the RCDC engineering -- reengineering -- discussed at that November 2012 meeting with Randy Mercer in Orlando?
MR. SELLINGER: Objection to form.
A. I don't recall.
MS. LIVINGSTON: Object to form.
A. I don't recall what was discussed at that meeting.
BY MR. REISER:
Q. How often is it that a president of a -- strike that. Can you think of any other time that a president of one of the boards at the Ritz-Carlton Destination Club traveled solo to Orlando to discuss with you issues regarding the board's responsibilities at a given club?
A. I don't recall any other solo meetings with a board president.
Q. Do you remember whether Randy Mercer brought

his wife on that trip?
A. No idea.
Q. Do you remember anything about where he stayed during that trip? There's some evidence that there were two rooms --
A. No idea.
Q. -- at the Ritz-Carlton at Grande Lakes, the one out here in Orlando -- that two rooms were procured for Randy Mercer and his wife for the purpose of this November 2012 meeting.
Do you remember anything about that?
MR. SELLINGER: Objection to form.
A. I have no knowledge of any of that.
MS. LIVINGSTON: Object to form.
BY MR. REISER:
Q. So turning to the January 17, 2013 luxury segment update, it's Exhibit 2148. If you can turn to page 4 of this one? Under the "luxury segment reengineering" box, it, again, gives an update on the 109 RCDC portfolio members.
The second primary bullet point under this box states, "Based on recently-filed claim in Minnesota, we are reevaluating go-forward strategy."
Do you remember receiving a complaint by two brothers named Hoyt that sued Marriott Vacation Club

for the RCDC reengineering efforts?
A. I didn't receive a complaint, but I remember the company received a complaint.
Q. Okay. Is that the complaint that is referenced here -- based on recently-filed claim in Minnesota? I'll just tell you, the Hoyt case was filed in Minnesota.
A. Yes.
Q. What was it about that case that caused the re-evaluation of the go-forward strategy?
A. I really -- I have no idea.
Q. Do you have any recollection at all, Mr. Cunningham, as to, like, who wrote the strategic council reports on a given month? I would expect not, but I'm just asking you for completeness sake.
A. No. I mean, it would generally be the asset manager responsible for the club, so I don't know in any particular month.
Q. Following the Minnesota filing, it looks like the current thinking was -- bullet point number one -- "Move forward with putting the Northstar and San Francisco inventory into the NATO Trust."
That ultimately happened. True?
A. That's correct.
Q. And then the second bullet point, "Go club by

club and attain a majority vote of the members endorsing the affiliation of their club with Lion & Crown."
Did the concept of a majority vote of the members first get raised following the Minnesota claim?
A. I don't know the timing of whether that's what prompted it or whether that concept was being considered prior to that.
Q. The fourth bullet point states, "That strategy would be to mount an aggressive communication, education, marketing campaign aimed at the member base for each club to give us the best chance of success."
What does that sentence mean to you?
A. It means that we wanted to make sure that we were providing the information -- the full information -- necessary for members to make an educated decision on how to -- on whether to support the affiliation or not.
Q. Was the aggressive communication, education, marketing campaign undertaken ultimately by APCO?
A. I don't recall.
Q. Was it undertaken by anybody; do you recall?
A. I don't recall whether what was contemplated

here was ever executed or not.
Q. Then the fourth bullet point was "Based on the outcome of the vote at each club, either affiliate or not."
Do you see that?
A. I do.
Q. As of January 2013, was it the plan, do you know, to have a vote at each club and let the club decide as to whether to affiliate or not?
A. The concept of having each club be able to vote or, later, survey -- respond to their desire to affiliate was obviously in play at this point in time.
Q. Yesterday, I discussed with Mr. Weisz a document that had been marked in an earlier deposition as Exhibit 1020. It's a document entitled, "Marriott Vacation Worldwide Corporation, Marriott International update." It's dated on the cover, February 28, 2012. I think, as you can see from the context of reviewing it, that it's misdated and it should be February 28, 2013.
A. All right.
Q. Because some of the stuff they talked about happened after February 28, 2012. I want to ask you a few questions about the update.
First of all, would you agree with me that

this document is misdated? I don't think it's very controversial. Steve Weisz was --
A. Let's see.
MR. REISER: Want to stipulate --
MR. MARX: We can discuss it.
THE WITNESS: I'm sorry?
MR. MARX: Nothing.
THE WITNESS: I was trying to put out this note to one of the strategic council documents around the same time, but -- I thought I saw those numbers.
BY MR. REISER:
Q. I just want to ask you some general questions about this at this point. Maybe the date isn't as important as the next question.
I'm just wondering why there's periodic updates to the Marriott International company with regard to the reengineering of the luxury segment?
A. I don't recall why that would occur -- would occur post spinoff of our company. There must have been some agreement that we would update them.
Q. Okay. Getting to a couple questions about Marriott International and its subsidiary, the Ritz-Carlton Hotel Company -- you're aware, are you not, that the Ritz-Carlton Hotel Company has a

co-management agreement at the Ritz-Carlton Clubs with the Ritz-Carlton Management Company?
A. That's correct. Well, they have a sub-management agreement to operate the onsite activities.
Q. Okay. So I know I'm skipping around a little at this point. I'm trying to just be efficient.
The questions earlier about the November 2013 affiliation agreement that we started off this deposition on, was that affiliation agreement provided to John Hearns or any of the individual general managers representing Ritz-Carlton Hotel Company on the site?
A. I have no idea.
Q. Is there any reason you can think of that it wouldn't be given to them?
MR. SELLINGER: Objection to form.
A. I don't know why we -- I can't think of a reason why we would or wouldn't necessarily provide that integration agreement to them.
BY MR. REISER:
Q. I don't have a full copy of this, I don't think -- Exhibit 1897. I think I can bring it up to the board. I just have one question about this. It's the amended and restated club onsite management

agreement between the Ritz-Carlton Hotel Company, manager, and the Ritz-Carlton Management Company, hotel. It's dated November 21, 2011.
MR. SELLINGER: Why don't you -- if you're going to do it, give him your copy and you can pull up on the screen what you want --
MR. REISER: No problem. Let me find what -- I thought I made copies of this right before the dep.
BY MR. REISER:
Q. I'm going to ask you about paragraph 4.24 on page 18. I highlighted it for your convenience. Paragraph 4.24 on page 18, can you take a look at that?
A. 4.24?
Q. Yes. It deals with communication. Again, "The manager and the company" -- that's the Ritz-Carlton Hotel Company and the Ritz-Carlton Management Company -- "shall make good faith, commercially-reasonably efforts to keep the other informed regarding communications with and from the association, the board, or any officers of the association. Manager and the company will copy the other on any written communications sent to the

association, the entire board or the entire membership. Manager and the company will also copy each other on any formal written communication to one or more board members of the board as a representative or representative of the board."

Were you aware that there was this agreement between the two managers to keep each other informed of happenings and communications with the various association boards?

A. No. I've never read this document from front to back.

Q. Do you know whether the custom and practice of the Ritz-Carlton Management Company was to inform the Ritz-Carlton Hotel Company of issues and communications between the Ritz-Carlton Management Company and the various boards?

MR. SELLINGER: Objection to form.

A. I know there was a practice to communicate back and forth and keep each other informed. I don't know to what degree or at what level that was executed.

BY MR. REISER:

Q. So given that the affiliation agreement, as you testified earlier this morning, imposed duties upon the association to facilitate members of the

Marriott Vacation Club use of The Ritz-Carlton Destination Club, and given that the onsite management at the various clubs was performed by RCHC, the hotel company, wouldn't it have been important to update the onsite management of this new affiliation arrangement --

MR. SELLINGER: Object to form.

BY MR. REISER:

Q. -- in your opinion?

A. I don't think so, only because the RCHC is going to interact with customers that are -- whose reservations are delivered to them via the reservation system, through the property management system, and then service all those customers equally.

So they're not involved in the exchange or whatever. They're just -- they get a customer, they check them in, take care of them, and deliver the services.

Q. But they're aware if this customer is coming in through the Marriott affiliation versus the home club membership or a sister club membership; aren't they?

A. I don't know how the arrivals manifest -- are denominated or denoted. Whether they come in as Lion & Crown guests, MVCD guests, I don't know how

that's -- whether there's -- there is or isn't a denotion -- I'm sure there is -- between owner and other occupants. Other than that, I don't know.

Q. All right. I guess we'll ask Hearns about that next week or early June, since we now have some dates.

Let me just go over the October 21st, 2013 corporate growth committee document. It's previously marked as Exhibit 2137. This is a corporate growth committee memo prepared by Stephanie Sobeck and John McGowan.

Do you remember this corporate growth committee request? I'll read the request for the record.

"The purpose of this submission is to provide corporate growth committee an update on the current state of member satisfaction to the Ritz-Carlton, San Francisco club, and a plan approval of the financial impact associated with the presentation of board exit options for the members of the Ritz-Carlton Club, San Francisco."

Do you remember this memo being presented to the corporate growth committee related to the San Francisco club?

A. Yes.

Q. Did you have any role in preparing this memo?

A. I didn't author it. I may have reviewed it at some point. Obviously, I was a recipient of it as a member of the corporate growth committee.

Q. I'll just leave it at that. I think I sufficiently asked Ms. Sobeck about this one.

And the last two corporate growth committee documents I want to ask you about are the two that were related to the bulk sale of the San Francisco units. Those are -- the first one is dated August 19, 2014. It's Exhibit 2138. The second one is dated November 10, 2015, and is Exhibit 2139.

So I want to ask you just about these in tandem. Have you reviewed these corporate growth committee memos in preparation for the depo?

A. Yes.

Q. The August 19, 2014 and the November 10, 2014 memos both deal with what to do with 19 residential units that were originally slated for the fractional offering, but ultimately were de-annexed from the fractional offering and annexed into the whole residence offering. True?

A. That's correct.

Q. As of 2014, the strategy was to just do a residential conversion, wherein Ritz-Carlton's own

sales team would sell the unit and they would be marketed as Ritz-Carlton residences.
Is that true?
A. That was the August 19th recommendation.
Q. What I want to ask you about on the August 19th memo is, the decision to request of the corporate growth committee that these 19 units be handled in the fashion I just described, as a sales effort by Ritz-Carlton under Ritz-Carlton residences, isn't it true that there was a choice at that point that you were making between the sale of these 19 units in-house, if you will, versus a bulk disposition to an outside source?
MR. SELLINGER: Objection to form.
A. I don't believe there was a decision at that point. What the -- August 19th was coming off of a timeframe where we had been selling some other whole ownership inventory in San Francisco, and the request was to finish the development of those units, the remaining 19 units, and then sell them through our sales activities -- continue our existing sales activities and sell those units. That's what was being requested.
BY MR. REISER:
Q. Okay. In that request, you were explaining

why that was the route you were requesting versus a bulk disposition. True?
MR. SELLINGER: Objection to form.
A. That was what the request was. I didn't -- once again -- didn't author this. I sponsored it to come forward for consideration. There were several options that were considered and a description of the pros and cons of each.
BY MR. REISER:
Q. Okay. Got it. The first potential option was just taking these 19 units and putting them into the NATO Trust; right?
A. That's correct.
Q. And is it true that the thinking was to not do that because the NATO Trust, at that point in time, had enough inventory, and that the inventory that was to be transferred from San Francisco had maintenance fees that were three times higher than the other inventory that was in the trust?
MR. SELLINGER: Objection to form.
A. The evaluation looked at what the impact of adding that inventory in -- did we need more -- was it beneficial to the members as a whole of the MVCD program to have more Ritz-Carlton, San Francisco inventory, or did they already -- was there already

enough inventory present, as well as what the cost of that inventory is.
The assumption here -- the recommendation was that it wasn't the right thing to add that inventory.
BY MR. REISER:
Q. Is it true that one of the reasons that decision was made is because of the high maintenance fees attached to the San Francisco inventory as compared to the maintenance fees that were more typical in the trust?
MR. SELLINGER: Objection to form.
A. When you compared the maintenance fee for points that would be sold or issued from that inventory, and the cost of that maintenance fee to -- in comparison to the rest of the Marriott Vacation Club product -- it was a much higher maintenance fee per point.
BY MR. REISER:
Q. And the maintenance fees in San Francisco were a buck-20 -- strike that. I think that's probably enough there.
The second option that was discussed was a bulk disposition of the property. True?
A. The second in this list, yes, sir.
Q. And the description there of the alternative

solutions was -- under bulk disposition was -- "Due to entitlement restraints, the strength of the San Francisco real estate market, potential negative consequences to the association, and the long-term impact of the bulk sale at Northstar, it has been deemed that a bulk disposition is not an attractive strategy."
I want to ask you about that last one, the long-term impact of the bulk sale at Northstar. Do you know what's meant by that?
A. I believe that the main issue there was, the bulk purchaser in Northstar was not as prompt in paying their association dues and it was -- it put strain on the association at Northstar to continually manage that accounts payable or receivable.
The other thing is that -- and the other difference is -- in Northstar, that the way that deal worked out was that it was creating whole ownership where there wasn't whole ownership, which is a little different than in San Francisco, because there was already whole ownership in San Francisco. And it was unbranded whole ownership. It wasn't Ritz-Carlton branded.
Q. Stephanie Sobeck testified, when I was asking her about this -- and she was one of the authors,

along with yourself, of this memo -- that one of the problems with the bulk sale at Tahoe was, it created some confusion. When you walked into the lobby area, you had Constellation product on one desk and Ritz-Carlton fractionals at another desk.
Would you agree with that?
MR. SELLINGER: Objection to form.
A. Well, I don't -- that's back to the -- in the case of Tahoe, there was the unbranded or the Constellation and the Ritz-Carlton, and so it highlighted that there were two different products in the building.
BY MR. REISER:
Q. And then, ultimately, it seemed like the San Francisco market got so hot over the next year that -- the next memo -- by November 10, 2015, the decision seemed to have been made to actually go back to the bulk sale, and that's what ultimately happened.
Is that a fair summary of what happened to these 19 units?
MR. SELLINGER: Objection to form.
A. Ultimately, we evaluated, again, the options -- bulk sale or continue on. In November, came back with a recommendation to go bulk sale, for a

Page 106

number of reasons, depending -- that manifest themselves.
Over the timeframe between the memos, we were working on the entitlement so it could be sold as whole ownership.
BY MR. REISER:
Q. But was one of the reasons that the decision was made to change from selling out into the Ritz-Carlton brand to just selling in a bulk sale was that the market got hot enough that the developers were coming in and making offers that made the numbers look better than the bulk sale numbers -- I mean, as far as the individual sale numbers?
MR. SELLINGER: Objection to form.
A. My memory is that the market had continued to heat up. Our concern was more that, if we developed it on our own, we would get caught on the downside of that heat-up -- that super-heated market -- and not achieve the economics that we had expected.
MR. REISER: I'm almost done. Are you looking for a break right now?
MR. SELLINGER: It's been over an hour.
MR. REISER: I probably have ten more minutes.
MR. SELLINGER: We'll take a -- I think

Page 107

we should take a break anyway. If you guys collectively are ten minutes, we'll do it quickly.
MR. FERGUSON: I've got more.
MR. REISER: Let's take ten.
MR. SELLINGER: How long do you think?
MR. FERGUSON: Half-hour.
MR. SELLINGER: Let's go off the record.
THE VIDEOGRAPHER: We're going off the video record. The time is 1:06 p.m.
(Brief recess.)
THE VIDEOGRAPHER: We're back on the video record. The time is 1:27 p.m.
Counsel, you may proceed.
(Exhibit 2244 was marked for identification.)
BY MR. REISER:
Q. So I'm going to show you what I marked as 2244. It's a Ritz-Carlton Destination Club general managers conference call agenda dated October 8, 2014.
Take a look at that. I'm going to ask you about a memo that's attached to this, that looks like it was prepared by yourself, regarding some asset management restructuring going on at that time.
MR. SELLINGER: Do you have a copy?

Page 108

MR. REISER: Oh, sorry.
BY MR. REISER:
Q. Can you go ahead and take a look at the second page that starts with "Asset management restructuring and appointments"?
A. Yes.
Q. Do you recognize this document as being written by you? If you see at the end, it says, "Thank you. Lee Cunningham." You can go four pages later. It appears to be a letter that you wrote to your folks.
A. Yeah. I haven't reviewed this document in a long time, so...
Q. But you do recognize it, at least, kind of at a high level? Take your time and look at it.
MR. SELLINGER: While he's doing that, I note -- not related to the subsequently-produced documents, I assume.
MR. REISER: Well, I mean, they are related. These are from the hotel company, produced late, so...
A. I'm familiar with it.
BY MR. REISER:
Q. I wanted to ask you about a couple points on this. On the second page of your memo, on the

Page 109

paragraph starting with "In addition," do you see that?

A. Yes.

Q. The last sentence to this says, "Given the current size of the portfolio, as well as our current strategy for this brand, I have made the decision to integrate the responsibility for the remaining RCDC resorts into the Marriott Vacation Club asset management regional structure."

Did that end up being effectuated, that decision?

A. Yes.

Q. So the third bullet point under the following section, "Key focus areas for asset management" -- first of all, the -- actually, the first point on that section of this letter, it says, "Optimization of company owned and operated assets."

You state, "In this capacity, the asset managers act as my in-market representatives with my full delegated authority."

What's the purpose of that sentence?

MR. SELLINGER: Objection to form.

A. The structure in our organization, the field operations don't report directly to me, but I have responsibility for them; and this was giving the --

communicating to the field operations that my asset managers would represent me in their respective markets.

BY MR. REISER:

Q. Okay. I'm not going to ask you about number two. It looks like that's dealing with the Marriott Vacation Club COA board.

Number three is entitled, "Interaction with the Ritz-Carlton Destination Club COA boards as both the management company and the developer representative."

Then you state, "As you may recall, similar to our MVC resorts, we (MVW) are the management company for our Ritz-Carlton Destination Club resorts."

Would you agree that that's an accurate statement?

A. It's the Ritz-Carlton Management Company, which is -- yeah -- would be the more accurate -- it's a subsidiary or an entity within Marriott Vacations Worldwide.

Q. It appears to me like you're essentially saying there that the Ritz-Carlton Management Company is the same thing as Marriott Vacation Worldwide, or no?

MR. SELLINGER: Objection to form.

A. No. That wasn't my intent.

BY MR. REISER:

Q. Okay. And then, finally, the third -- the last -- the sentence on the top of the following page, I want to ask you a couple questions about that. There's a statement that, "As a result, MVW's resort operations team is not engaged in the management of these locations, and, therefore, does not interact with the COA boards at this location. The asset management team is responsible to represent both the management company and developer interests with these COA boards. Association governance for these locations is handled in concert with the Ritz-Carlton Hotel Company."

Is that an accurate statement of the dynamic between the asset management team and the COA boards at the Ritz-Carlton Destination Clubs?

MR. SELLINGER: Objection to form.

A. What I'm communicating here is really that we had a Marriott Vacation Club, which is not precisely written, we have an operations team, and they're not -- they're the interaction point with our Marriott Vacation Club boards and locations. They're not for The Ritz-Carlton Club, is what I was trying to

communicate.

BY MR. REISER:

Q. That's because there's really not a resorts operations team at the Ritz-Carlton Club. RC Hotel Company handles that; is that right?

A. That's correct.

Q. So because that's the dynamic at the Ritz-Carlton Clubs, the asset management team represents both the management company and the developer at the Ritz-Carlton clubs; right?

MR. SELLINGER: Objection to form.

A. I believe that's correct.

MR. REISER: All right. I'm done with my questioning. My colleague, Matt Ferguson, has some questions for you.

I'm going to apologize in advance. I've got to scoot out for a moment. I hope to be back, but my room is up at the Grand Bohemian across the street and I'm going to go check out, and I hope to see you folks.

DIRECT EXAMINATION

BY MR. FERGUSON:

Q. Good afternoon, Mr. Cunningham. Matt Ferguson again. I don't have very much for you. Mr. Reiser covered quite a bit. I'm going to jump

around a little bit on some topics.

My first one is pretty simple. I've seen some of these corporate growth committee and strategic council documents, and there's talk about disposition of other assets.

Real quickly, were there any assets like raw land that was in the RCDC portfolio or -- when I said RCDC, I meant Ritz-Carlton Development Company -- did they own any kind of raw land that had been planned for other Ritz-Carlton Destination Clubs?

A. I believe the only land designated for a club would've been in Abaco.

Q. We've had some clients at depositions conducted by your lawyers who indicated that they thought the salespeople were telling them there was going to be an RCDC -- Ritz-Carlton Destination Club -- we've got Ritz-Carlton Development Company also -- but I'm talking about a club in South Beach.

Do you have a recollection of anybody authorizing -- say there was going to be a club in South Beach?

MR. SELLINGER: Objection to form.

A. There was a -- nobody was authorized to represent that. We had worked on a project in South Beach that never got off the ground.

Page 114

BY MR. FERGUSON:

Q. Did you ever acquire property to do that?

A. I don't believe we owned any of the property.

Q. Did you dispose of any or get out of any -- withdrawn. Were there any contracts for the purchase of land, as opposed to owning the land, for any places that might become RCDC clubs?

A. I'm sorry?

Q. Did you put any land under contract to purchase property that was slated to be in the RCDC club system?

A. Not other than the Abaco, as far as I'm aware.

Q. Could you pull out Exhibit 2136, which is that corporate governance committee, May 24, 2012, document? It's the redacted one.

A. Got it.

Q. Just a few questions about that. First of all, can you go to page 7 of 2136? I don't think they're numbered. It's the seventh page in.

MR. MARX: There's a page number.

BY MR. FERGUSON:

Q. It's the next one. Let me grab mine. It's page 8. I'm sorry. Page 8, you've got these milestones. There's talk about -- withdrawn. The

Page 115

sixth one down says, "Communications with RCDC owners of strategy/PR."

Was part of this -- do you recall a topic in here -- without discussing any attorney-client privilege -- whether a topic in here was the potential affiliation of Ritz-Carlton Destination Clubs and/or its members to the Marriott Vacation Club system?

A. I don't recall whether that was what was being referenced here.

Q. We know -- I can pull it up -- it's Exhibit 1024 -- but it's the Eveleen Babich letter that went out on July 17, 2012. It looks like there was a target date of June 14, 2012 for communication to RCDC owners.

Is the Eveleen Babich letter that went out on June 17, 2012 the communication referenced here in this corporate growth committee memorandum dated May 24, 2012?

MR. SELLINGER: Objection to form.

A. I don't know whether it is the -- that's what this is referring to or not.

MR. FERGUSON: Just put up Exhibit 1024.

BY MR. FERGUSON:

Q. That's the evolution letter that came from Ms. Babich. Can you see that on your screen? I'm not

Page 116

going to have you go through that. Do you generally recognize that that letter went out around mid July?

A. Yes, I do.

Q. And you followed up a month later with another letter?

A. That's correct.

Q. If you go to the second page, the signature block, I just want to show you that that's Ms. Babich who signed that document.

She didn't author that document, though; did she?

A. There was a number of people who had a hand in authoring that letter.

Q. Did lawyers have their hands in doing that letter?

A. Yes.

Q. Back to Exhibit 2136, that redacted -- you're open to page 8 on it, you can look at it in any manner you want for this question.

When you were preparing for your deposition back on November 10th and maybe November 17th -- I think they were the two dates -- do you recall whether or not you reviewed this corporate growth committee -- strategic plan memorandum -- that you and Mr. Terry sent to the corporate growth committee?

Page 117

A. I didn't review that.
Q. Before seeing it in deposition preparation or for preparation for this particular leg of your deposition, had you looked at it in connection with any of the three litigations?
A. Before?
Q. Before -- the last couple days or hours.
A. No.
Q. Do you maintain a copy of it, as the author, in your files?
A. I have no idea.
(Exhibit 2245 was marked for identification.)
BY MR. FERGUSON:
Q. Mr. Cunningham, this is a document that I asked for this morning or last night, and it's an e-mail that starts on the second page with your e-mail to Mike Andrew.
Mike Andrew is a lawyer in the legal department?
A. That's correct.
Q. Is he on the -- he's kind of the corporate side, as opposed to the litigation side like Mr. Kelly?
MR. SELLINGER: Objection to form.

A. I --
BY MR. FERGUSON:
Q. Just a lawyer?
A. He's an attorney in our in-house counsel office.
Q. Now, you'll see here that you were asking him for an electronic version of the action item status summary that he had distributed at the strategic council meeting.
Had there been a recent strategic council meeting? Can you tell that from this e-mail?
A. He's saying --
Q. You're saying.
A. Yeah. There must have been, but I don't recall. January -- what is this?
Q. January 3rd, 2013.
A. Yeah. So...
Q. A couple weeks or a month after the spinoff, correct -- or several weeks?
A. That's correct.
Q. I just wanted to ask you, also, two things about your e-mail on the back here, in addition to whether or not there was a strategic council meeting.
You said that you want to share with the rest of the steering committee on the project. The project

was -- was that ultimately what became the reengineering of the luxury brand?
MR. SELLINGER: Objection to form.
BY MR. FERGUSON:
Q. Let me ask this. What was the project?
A. I don't know. I assume the project team was the people that I forwarded it to, but I don't -- had to do with the inventory at the Ritz-Carlton projects.
Q. Okay. Your signature block here is as executive vice president and chief operating officer of North American and Caribbean; correct?
A. That's correct.
Q. Is that the -- it says, "Marriott Vacation Worldwide Corporation." Is that the signature block that you've regularly used or normally used since you took that position over at spinoff?
A. Yeah. I don't know whether I changed that -- whether that title changed with the added responsibility of Ritz-Carlton because they were all North American and Caribbean.
Q. Of course, we've seen sometimes when you've communicated with our clients and their fellow club owners, you would sign as executive vice president, chief operating officer of Ritz-Carlton Destination Club; correct?

A. That's correct.
Q. It looks like, on page 1, you attached what Mr. Andrew sent to you on the same day, the RCDC legal analysis. You forwarded that on to Mary Lynn Clark, Stephanie Sobeck, Tony Terry, and Nick Rossi.
Were they the steering committee, to the best of your recollection?
A. I don't recall. I don't recall calling it a steering committee, but they were the people that I was referring to.
Q. Were there any --
A. I was --
Q. Sorry. It's hard to get used to a new lawyer asking questions. This steering committee, would it have included an attorney from the legal department, or would it have been mostly or all business people?
A. I don't recall. I don't know.
Q. Skipping back to something -- I wanted to ask about the November 14, 2013 affiliation agreement. I'm not sure what exhibit it is there. It's the one that was produced on March 14 or 15 or 16, 2018. That's why we're here.
A. I don't have it.
Q. This is the agreement that was between MRTC and Lion & Crown. I'm not going to ask you anything

about it, per se. I did want to follow up with some questions that Mr. Reiser asked you about the dissemination of it to the various boards. I want to focus -- I want to focus on its dissemination.

It was prepared mostly by your legal department; is that right?

A. I'm sure it was.

Q. It was e-mailed around -- because we have a lot of e-mails that were withheld, based on privileges, with your lawyers internally. Was it e-mailed around the company, including the legal department?

A. I have no idea.

Q. Was it worked on for many months?

A. I don't recall.

Q. Do you recall that it was started -- looks like it was started, according to the privilege log, at least, in May, June of 2013?

A. I don't recall.

Q. And I can pull it out for a second here. Some of the lawyers that I see on the e-mail chains dealing with this particular document -- 2102 -- would include Barbara Egolf.

Is she someone that worked on things like this?

A. Yes.

Q. And Trish Wetmore?

A. Yes.

Q. She's another lawyer that would have worked on something like this?

A. That's correct.

Q. And did Mr. Andrew work on documents like the affiliation agreement?

A. I don't know.

Q. Would you expect the law department of Marriott Vacation Worldwide to have provided Mr. Mercer and Mr. Albert, and the other folks at other clubs, with a copy of the affiliation agreement you wanted them to acknowledge and to join?

A. I don't know. They would have done what was proper. I don't know what that -- whether there was an expectation for that.

Q. I believe you said that you didn't believe you had a duty to send it.

Do you recall that testimony?

A. No.

Q. I have it in quotes. Do you believe you had a duty to send it on to, for example, Mr. Mercer, who was being asked to acknowledge it and join it?

MR. SELLINGER: Objection to form.

A. I guess you'd have to read that testimony back to me.

BY MR. FERGUSON:

Q. I wasn't -- I asked you a different way because I might have taken it down wrong. My last question was, do you believe you did have a duty to send it on to Mr. Mercer before he signed a document called "An acknowledgement of and joinder to"?

MR. SELLINGER: Objection to form.

A. I don't have an opinion one way or the other whether we had a duty to do that, but the existence of the document was clear. I don't know who had a responsibility to provide it or not.

BY MR. FERGUSON:

Q. I'm just going to show you -- mark another document that's 2246.

(Exhibit 2246 was marked for identification.)

BY MR. FERGUSON:

Q. Exhibit 2246 is a declaration of Kathy Borkholder. It relates to the motion practice -- motion just means a court request -- a request of the court by plaintiffs to try to seek some or all of the redactions that were in the May 24, 2012 corporate growth committee, strategic plan that you and

Mr. Terry signed as yours.

I just had some questions about it. I thought it was easier to get this out and ask you -- have you seen this before today?

A. I saw this last night.

Q. All right. On page 2 of Exhibit 2246, it says that "Messers. Cunningham and Terry were not the sole authors of the May 24th memo." That's what Ms. Borkholder calls it. It says, "Rather, that document was generated through a collaborative process with a number of individuals and departments drafting and providing revisions and comments to particular sections."

Do you generally agree with that, that strategic council -- sorry -- that the corporate growth committee document was done in a collaborative process with a number of individuals?

A. Yes.

Q. And in connection with reviewing this and looking at this, did you read it or did you see it?

A. I read it briefly. I didn't study it.

Q. In connection with this, to be clear, you did not see any of the redacted versions in an unredacted form?

A. No.

Q. You saw the black that we see?
A. I saw the one that you put in front of me.
Q. Did you task -- withdrawn. Was Mr. Andrew the person that was your -- that you would task at the law department to spearhead the law department's work on any input they might have given into this strategic plan?
MR. SELLINGER: Objection to form.
A. I'm not sure I would have tasked him to do it, but he was the person providing legal advice relative to the memo.
BY MR. FERGUSON:
Q. It looks like he's a senior vice president and deputy general counsel. Right? I'm looking at that e-mail.
A. I don't remember their titles.
Q. It says --
A. I can tell you what Doug's title is.
Q. Exhibit 2245 is the one that we just saw. You don't have to pull it out. It says, "Michael W. Andrew, Jr., senior vice president and deputy general counsel."
So he's pretty high up in the law department?
A. Agree.
Q. There's sections that were redacted. And I

just want to ask you without -- please don't divulge any attorney-client privilege. There's a section called "Risk and opportunities."
Was the opportunities portion of this redacted section -- did it have to do with business opportunities or was it legal advice?
A. I don't recall exactly, but it was provided by Mr. Andrew, so I believe it was legal advice.
Q. The legal department was providing, in your view, legal advice on what the Marriott Vacation Worldwide strategic plan on the RCDC system meant in terms of opportunities?
MR. SELLINGER: Objection to form.
A. My guess is, it was more related to risk and the -- it's a general heading that we use for that section of these type of memos.
BY MR. FERGUSON:
Q. Okay. So they generally go together, risk and opportunities, in these memos?
A. Yeah.
Q. They're the yin and the yang?
A. That's correct.
Q. Do you have any idea as to why this document, in redacted form, was not produced in this litigation?
A. I have no idea.

Q. And you understand that the -- Exhibit 2102 -- the affiliation agreement dated November 14th, 2013 -- you understand that wasn't produced in this litigation until March of 2018?
A. I understand. Yeah, I understand that that wasn't produced until then.
Q. Do you know whether or not the corporate growth committee document that's been redacted -- again, without giving legal advice -- do you know whether it addressed Kapalua being deflagged ultimately, or Abaco?
A. I have no idea.
Q. Looking at the context of the document, the recommendations, the timeline, and the strategies, do you see any indication that that might have to do with Kapalua or Abaco?
A. Is that 2136?
Q. Yeah, 2136. I don't know why I said 2102. That's the other document.
It does have a disposition update on the Abaco, at least on the next two-sided version of it.
A. I don't recall the timing of the Kapalua changes vis-à-vis the -- or Abaco. It could include Abaco. I don't know.
Q. Had you laid out the reasons for the

rationale for the -- I guess it was a termination to not renew. Was it a termination -- withdraw that.
There was a termination of the Kapalua management contract with Ritz-Carlton Management Company; is that right?
A. That's correct.
Q. That was something that was also -- withdrawn.
The inability of the ownership of the Kapalua project, which included, I think, 34 percent ownership by Marriott Vacation Worldwide -- was that about right -- 34 percent?
A. I don't recall the breakdown of the joint venture.
Q. You knew before, obviously, when it was announced by Ms. Babich to the general membership on July 17, 2012, that the Kapalua relationship, vis-à-vis The Ritz-Carlton Destination Club, was in jeopardy?
A. Yes. Otherwise, we wouldn't have announced it.
Q. And I think that you announced it. You also explained it in your August 28, 2012 webinar; did you not? Do you recall that generally?
A. I don't recall. I would certainly expect

that I might.
Q. I'm going to mark another exhibit here, 2247.
(Exhibit 2247 was marked for identification.)
BY MR. FERGUSON:
Q. Mr. Cunningham, there was a production of documents in connection with the subpoena we served on the Ritz-Carlton Hotel Company back last November, and we got a production somewhere around Easter weekend or somewhere towards later -- March 2018. This is one of the documents that was produced.
It's another -- it's a version of a document that you were drafting. It looks like it started on April 2013. You'll see that someone -- we're in May now.
Do you recall -- you might have seen in your deposition -- I can't recall myself -- that, at some point, you were directly communicating with the Bachelor Gulch members -- directly communicating by yourself -- sorry -- from yourself to them.
Do you recall that generally?
A. I remember that there was a point in our discussions with the Bachelor Gulch association that we didn't feel like the board of Bachelor Gulch was providing full information to the members, so we took

it to communicate more directly with them.
Q. This is an iteration of that letter, or a draft of that letter, it would appear?
A. Clearly, it's not the finished product.
Q. I got it.
MR. SELLINGER: Let me note once again -- so this subpoena was served after -- according to what you said -- after the deposition of Mr. Cunningham and Ms. Sobeck.
So how does this relate to subsequently-produced documents?
MR. FERGUSON: Well, it is subsequently produced, so...
MR. SELLINGER: Well, you could serve a subpoena tomorrow --
MR. FERGUSON: Actually, I might. Ian will know better than I do right now. It was probably served right around that week. I remember being in this room, drafting it. I'm almost finished with that one question about it.
MR. SELLINGER: My only point is, the subsequently-produced documents --
MR. FERGUSON: Well, let's look at it a different way. Okay? You didn't produce

this document from Ritz-Carlton Destination or from Marriott Vacation Worldwide. I had to get it from Ritz-Carlton Hotel Company. So there's another step to that, which is, you all didn't produce it. The hotel company did.
MR. SELLINGER: I personally have no idea what we produced and what we didn't. Worry about whether this was subject to the parameters that you and your co-counsel agreed to, which is under the search parameters that were explored.
MR. FERGUSON: Fair enough. We just spent more time talking about it than my question about it.
BY MR. FERGUSON:
Q. I just wanted to go to the end of paragraph 3 on page 1 of Exhibit 2247. It starts with, "Why we believe this affiliation would greatly benefit the members. We also believe that you and you alone should have the opportunity to make this important choice. Therefore, if the majority of you choose, that you would not" -- in capitals -- "like an exchange affiliation with the Marriott Vacation Club and the Ritz-Carlton Club, Bachelor Gulch will have no

exchange affiliation with Marriott Vacation Club in the future."
Was this a letter you were drafting or was generally being drafted for you?
A. It was being drafted for me.
Q. Was it being drafted for you by business people, legal people, or both?
A. Probably a combination.
Q. It went on to say, "If, on the other hand, the majority of Bachelor Gulch members vote in favor of this exchange affiliation, then we will allow each individual Bachelor Gulch member to choose to participate on an individual, voluntary basis."
At the end of the day, you didn't conduct a survey or a vote for Bachelor Gulch because they had their own and decided to deflag and not renew; right?
A. Ultimately, there was a vote, but it wasn't a vote about affiliation.
Q. It was a vote about whether to renew or not renew the management contract?
A. That's correct.
Q. And the management of these clubs is one of the three main business sectors of Marriott Vacation Worldwide?
A. I'm sorry?

Q. One of the main business sectors of Marriott Vacation Worldwide is the management of clubs. That's a revenue source?

MR. SELLINGER: Objection to form.

A. It's one of the pieces of our business, yes.

BY MR. FERGUSON:

Q. So would I state that right that it was a vote to not renew the management contract?

A. That's correct.

Q. Is that vote required in the declaration or the management contract, if you recall?

A. I don't recall.

MR. FERGUSON: That's all my questions. Mike, do you have anything else?

MR. REISER: No.

MR. FERGUSON: That's all I have.

MR. SELLINGER: We have nothing.

THE VIDEOGRAPHER: This concludes the videotaped deposition of Mr. Lee Cunningham and the end of media number two. We're going off the record. The time is 2:08 p.m.

(The reading and signing of the transcript were not waived, and these proceedings concluded at 2:08 p.m.)

Page 134

CERTIFICATE OF REPORTER

STATE OF FLORIDA
COUNTY OF ORANGE

I, Lisa Gerlach, Court Reporter, do hereby certify that I was authorized to and did stenographically report the foregoing deposition; and that the transcript is a true and correct transcription of the testimony given by the witness.

I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

Dated this 29th day of May, 2018.

Lisa Gerlach
Lisa Gerlach, Court Reporter

Page 135

Under penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it are true.

________________________________________

DATE LEE CUNNINGHAM

Page 136

**&**

**&** 9:23 10:13,17 11:17,21,24,25 12:3,6,10,12,21,25 13:2,4,9,18,24 14:3,5,7,13,19,23 15:1,7,11,17,18,22 15:23 16:1,9,19,20 17:25 19:16,23 26:7 27:17 30:7 30:15 48:22 93:2 99:25 121:25

**0**

**00237** 1:9
**01** 10:3
**01301** 1:5 6:11
**07932-0677** 3:18

**1**

**1** 1:25 54:5 121:2 132:18
**1.5** 54:17,20 75:20
**1/3/12** 5:12
**10** 65:18 101:12,17 106:16
**10/13/2012** 88:16 88:25
**10/21/13** 73:18
**100** 69:10
**1003** 10:1,7
**1020** 94:15
**1024** 116:11,22
**105** 53:20 54:17,21 55:15 56:7,10 75:13
**108** 5:11
**109** 91:20
**10:59** 40:1
**10th** 117:21
**113** 5:5
**1135** 87:24
**118** 5:12
**119** 3:4
**11:06** 40:4
**11:51** 69:17
**12** 65:18,23 66:2 81:11
**124** 5:13
**12:04** 69:22
**13** 43:16 81:6,7,10 81:13 82:21
**130** 5:15
**135** 5:6
**136** 1:25 5:7
**14** 9:15 17:20 43:1 44:12,22 47:24 48:6 82:22 116:13 121:19,21
**1475** 3:8
**14th** 43:21 128:2
**15** 56:11 121:21
**15-54897** 1:14
**15.5** 56:8
**16** 70:21 121:21
**1601** 4:5
**17** 91:16 116:12,16 129:17
**17th** 117:21
**18** 1:21 87:22 97:13,14
**1806** 87:19
**1807** 87:21
**1816** 3:12
**1897** 96:23
**18th** 6:4
**19** 23:19,19 24:3 70:20,22 101:10 101:17,18 102:7 102:12,20 103:11 106:21
**19th** 102:4,6,16
**1:06** 108:10
**1:16** 1:5 6:11
**1:27** 108:13

**2**

**2** 75:20 125:6
**20** 104:20
**2001** 10:17
**2007** 56:21
**201** 3:4
**2010** 13:19,23 15:3 15:9
**2011** 97:3
**2012** 50:8,9 52:14 52:19 58:12 60:18 61:7 62:8,10 72:14 73:21 77:2 77:5 78:11,18,20 78:23 79:7 82:21 85:3,13 87:1,22,25 88:12 89:13 90:3 90:9 91:10 94:17 94:23 115:15 116:12,13,16,18 124:24 129:17,23
**2013** 8:13 9:2,15 11:12 12:9,19 13:5 14:14,16,19 16:3,5,9,21 17:1 17:20 18:1 19:8 19:10 20:12 21:6 21:11,13,16 22:2,5 22:8 23:6 24:18 25:10 27:9 29:5 29:22,23 30:3 34:24 43:1,21 44:12,22 47:24 48:6,14 49:15 91:16 94:7,20 96:8 100:7 119:16 121:19 122:18 128:3 130:14
**2014** 18:2 20:10 21:4 23:25 24:19 24:20 43:16 101:11,17,17,24 108:20
**2015** 70:21 101:12 106:16
**2018** 1:21 6:4 8:14 31:3,8 121:21 128:4 130:10 135:16
**206** 7:4
**21** 66:18 87:24 97:3
**2102** 8:19 9:9 11:12 30:4 122:22 128:2,18
**2136** 52:17,18 58:12 70:1 115:14 115:19 117:17 128:17,18
**2137** 100:9
**2138** 101:11
**2139** 101:12
**2143** 79:9
**2144** 83:7
**2145** 84:2
**2147** 85:14
**2148** 89:21 91:17
**21st** 100:7
**2215** 76:23
**2235** 72:8
**2244** 5:11 108:15 108:19
**2245** 5:12 118:12 126:19
**2246** 5:13 124:16 124:17,20 125:6
**2247** 5:14 130:2,3 132:18