# EXHIBIT - I

Randal Mercer - October 24, 2017

```
 1              UNITED STATES DISTRICT COURT
 2                 DISTRICT OF COLORADO
 3            Civil Action No. 1:16-cv-01301-PAB-GPG
 4
 5     RCHFU, LLC, et al.,
                   Plaintiffs,
 6     vs.
 7     MARRIOTT VACATIONS WORLDWIDE
 8     CORPORATION, et al.,
 9                   Defendants.
10     _____/
11
12              VIDEOTAPED DEPOSITION OF
13                   RANDAL MERCER
14              Tuesday, October 24, 2017
15               9:02 a.m. - 5:32 p.m.
16                   CRE Consultants
17         12140 Carissa Commerce Court, Suite 103
18               Fort Myers, Florida  33966
19
20     Reported By:
21     Yvonne Corrigan, RPR, CRR
22     Notary Public, State of Florida
23     Job No. 2728895
24
25     Pages 1 - 335
```

Page 1

Randal Mercer - October 24, 2017

1 APPEARANCES:
2
3 On behalf of Plaintiffs:
   THE MATTHEW C. FERGUSON LAW FIRM, P.C.
4  119 South Spring, Suite 201
   Aspen, Colorado 81611
5  BY: MATTHEW C. FERGUSON, ESQ.
   matt@matthewfergusonlaw.com
6
7 REISER LAW, P.C.
   1475 Broadway, Suite 300
8  Walnut Creek, California 94596
   BY: MICHAEL J. REISER, ESQ.
9  mreiser@reiserlaw.com
10
11 On behalf of Defendant - Aspen Highlands Condominium
12 Association:
   HOGAN LOVELLS US, LLP
13 1601 Wewatta Street, Suite 900
   Denver, Colorado 80202
14 BY: DANIEL F. SHEA, ESQ.
   BY: JESSICA BLACK LIVINGSTON, ESQ.
15 dan.shea@hoganlovells.com
16 jessica.livingston@hoganlovells.com
17
   On behalf of Defendant - Marriott:
18 GREENBERG TRAURIG, P.A.
   500 Campus Drive, Suite 400
19 Florham Park, New York 07932
20 BY: IAN S. MARX, ESQ.
21 marxi@gtlaw.com
22
23 ALSO PRESENT: Michael Reiser, Jr.
24           Timothy Lenz, Videographer
25           Chris Hanlon, Document Technician
                                            Page 2

1           DEPOSITION EXHIBITS
2 NUMBER        DESCRIPTION            PAGE
3 Exhibit 1061  Cunningham letter - August 2012  137
4 Exhibit 1060  Email to Mercer - 8/21/12   143
               Re: A message from Lee
5              Cunningham
6 Exhibit 1064  Email to Mercer - 8/21/12   149
               Re: Aspen Highlands Ritz
7 Exhibit 1066  Email to Mercer - 8/21/12   153
8              Re: Ritz-Carlton member,
9              Nowell #8106
10 Exhibit 1072  Email to Mullenix - 8/21/12  155
               from Neveloff
11 Exhibit 1075  Email to Joel - 8/26/12   156
12             Re: Evolution of RCDC brand
13 Exhibit 1104  Letter to Members of   162
               AHCA - 9/2012 from Neveloff,
14             Schneider, Marsden, Oliver
15 Exhibit 1097  Draft Memorandum - 9/21/12  165
               to AHCA Board of Directors
16 Exhibit 1108  AHCA Minutes of Annual   166
17             Meeting 10/13/12
   Exhibit 1110  Email to Mercer - 10/16/12  168
18             Re: Ritz Club Aspen
19 Exhibit 1103  Question to members document  178
20 Exhibit 1113  Email to Mercer - 10/22/12  188
21             with attached Gosch invoice
22 Exhibit 1114  Email to Oliver - 10/25/12  189
23             Re: Marriott Vacation Club
24 Exhibit 1116  Email to Sobeck - 11/10/12  193
25             Re: Meeting in Orlando
                                            Page 4

1           I N D E X
2 WITNESS                    PAGE
3 RANDAL MERCER
4 Direct Examination by Mr. Ferguson..............10
5        DEPOSITION EXHIBITS
6
7
8 NUMBER        DESCRIPTION            PAGE
   Exhibit 1020  RCDC Re-Engineering Update   55
9 Exhibit 1021  Email to Sobeck - 6/11/12   72
10             Re: Board filing documents
11 Exhibit 1023  Babich letter - July 2012   78
12 Exhibit 1026  Babich letter - July 2012   97
13 Exhibit 1034  Email to Marsden, Schneider,  100
               Oliver - 7/26/12, Re: Letter
14             to Members of Aspen Highlands
15 Exhibit 1035  Letter to AHCA - 7/26/12   110
16             Re: Letter to members
17             regarding the evolution
   Exhibit 1042  Email from Neveloff - 8/7/12  110
18             Re: Fw: Ritz-Carlton Destination
19             Clubs Newest Offering
   Exhibit 1043  Email to Mercer - 8/8/12   114
20             Re: Fw: Ritz-Carlton Destination
21             Clubs Newest Offering
22 Exhibit 1053  Letter to AHCA - 8/17/12   126
23             Re: Evolution of RCDC Brand
24 Exhibit 1058  Email to Clark - 8/20/12   134
25             Re: Feedback
                                            Page 3

1           DEPOSITION EXHIBITS
2 NUMBER        DESCRIPTION            PAGE
3 Exhibit 1117  Email to Oliver - 11/4/12   198
               Re: Meeting in Orlando
4 Exhibit 1118  Email to Oliver - 11/5/12   201
5              Re: Meeting in Orlando
   Exhibit 1120  Email to Neveloff - 11/6/12  204
6              Re: Message from RCC BG
   Exhibit 1122  Email to Mercer - 11/7/12   208
7              Re: Message from RCC BG
8              with attachments
   Exhibit 1124  Email to Weisz - 11/5/12   209
9              Re: Proposed Affiliation
10 Exhibit 1126  Email to Gosch, Mercer -   216
               11/8/12, Re: Message from
11             RCC BG
12 Exhibit 1130  Email to Mercer, Neveloff -  217
               11/28/12, Re: Response to
13             11-5 Correspondence
14 Exhibit 1135  Gosch cease and desist   219
15             letter - 11/21/12
   Exhibit 1137  Email to Mercer - 11/28/12  220
16             Re: Response to 11-5
17             Correspondence
   Exhibit 1145  Memorandum - 12/19/12 to  222
18             membership
19 Exhibit 1146  Email to Oliver, Marsden  227
               and Schneider - 12/12/12
20             Re: Monday meeting
21 Exhibit 1150  Letter to Gosch - 12/21/12  229
22             from Waller, Baker Hostetler
23 Exhibit 1151  Draft Letter to Mercer -   237
24             12/21/12, Re: Follow-up
25             from 11/29/12 meeting
                                            Page 5

Veritext Legal Solutions
866 299-5127

Randal Mercer - October 24, 2017

DEPOSITION EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1152 | Signed letter to Mercer - 12/22/12, Re: Follow-up from 11/29/12 meeting | 242 |
| Exhibit 1155 | Email to Oliver - 12/28/12 Re: Points program and MVCI and Kapalua | 247 |
| Exhibit 1157 | Email to Marsden, Schneider and Oliver - 1/16/13 Re: Member comments | 249 |
| Exhibit 1158 | Member comments | 249 |
| Exhibit 1500 | Vacation Points Chart | 253 |
| Exhibit 1161 | Letter to members - 2/3/13 Update | 259 |
| Exhibit 1168 | Email to Mullenix - 3/22/13 Re: Need your help | 261 |
| Exhibit 1169 | Email to Mercer - 3/28/13 Re: Unintentionally forgot to mention | 263 |
| Exhibit 1172 | Email to Martino - 3/28/13 Re: Privileged and Confidential - BG Notes | 266 |
| Exhibit 1175 | Email to Jenson - 4/5/13 Re: Test | 272 |
| Exhibit 1176 | Memo to DL-RCDC SLC Member Services - 4/5/13, Re: Member Services Update - Aspen Board of Directors Letter | 277 |

Page 6

DEPOSITION EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1223 | Email to Mercer - 5/24/13 Re: Update: Important Enrollment Information | 301 |
| Exhibit 1234 | Email to Mercer, Cunningham - 6/3/13, Re: Lion & Crown Enrollment | 304 |
| Exhibit 1235 | Email to Sobeck - 6/3/13 Re: Aspen Letter to Members CLEAN | 306 |
| Exhibit 1251 | Email to Neveloff - 7/6/13 Re: BG | 309 |
| Exhibit 1255 | Draft letter - 7/13, "Dear Mr. & Mrs. XXX" | 310 |
| Exhibit 1274 | Home Club Members - Frequently Asked Questions | 314 |
| Exhibit 1282 | Draft letter - 9/13, "Dear Mr. & Mrs. XXX" | 315 |
| Exhibit 1313 | Email to Mercer - 12/5/13 Re: Fw: | 318 |
| Exhibit 1314 | Spreadsheet of member comments | 320 |
| Exhibit 1316 | Email to Mercer, Schneider, Harris, Oliver - 12/6/13 from Alper Re: Board short letter to Members (last page of exhibit) | 324 |
| Exhibit 1380 | Email to Mercer - 4/1/14 Re: Fw: Exchange Agreement | 327 |

Page 8

DEPOSITION EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1180 | Confidential letter - 4/5/13 | 279 |
| Exhibit 1178 | Aspen Board Letter Sent - Member Responses - 4/5/13 | 280 |
| Exhibit 1202 | Letter - 5/3/13, "Dear Mr. & Mrs. Aspen Member" | 283 |
| Exhibit 1203 | Email to Marino - 5/4/13 Re: BG Letter | 284 |
| Exhibit 1207 | Email to Oliver - 5/11/13 Re: Aspen board vote | 287 |
| Exhibit 1208 | Email to Marsden - 5/18/13 Re: Update on Lion & Crown Enrollment | 288 |
| Exhibit 1210 | Email to Mercer - 5/15/13 Re: Update on Lion & Crown Enrollment | 291 |
| Exhibit 1212 | Email to Marsden, Schneider and Oliver - 5/18/13 Re: A comment regarding the Exchange Resorts documents | 294 |
| Exhibit 1218 | Email to Schneider - 5/18/13 Re: Urgent: RCC-BG Board seeks approval | 296 |
| Exhibit 1219 | Email to Mullenix - 5/18/13 Re: Urgent: RCC-BG Board seeks approval | 298 |

Page 7

P R O C E E D I N G S

\* \* \* \* \*

THE VIDEOGRAPHER:  Good morning.  We are going on the record at 9:02 a.m., on Tuesday, October 24, 2017, and this is media unit one of the video recorded deposition of Randy Mercer, taken by the plaintiff in the matter of RCHFU, LLC versus, et al. versus Marriott Vacations Worldwide Corporation, et al., filed in the U.S. District Court, District of Colorado, Case Number 1:16-cv-01301-PAB-GPG.

This deposition is being held at CRE Consultants, located at 12140 Carissa Commerce Court, Suite 102, Fort Myers, Florida 33966.

My name is Timothy Lenz from the firm Veritext, and I'm videographer.

The court reporter is Yvonne Corrigan, also from Veritext.

If the court reporter will please swear in the witness.

THE COURT REPORTER:  Off the record for a second, please.

THE VIDEOGRAPHER:  Okay.  We're going off the record.  The time is 9:03.

(There was a discussion off the record.)

THE VIDEOGRAPHER:  We are on the record.  The

Page 9

3 (Pages 6 - 9)

Randal Mercer - October 24, 2017

1 time is 9:03.
2   Will the court reporter please swear in the
3 witness.
4 Whereupon,
5       RANDAL MERCER,
6 was called as a witness and having been first duly sworn
7 and responding, "I do," was examined and testified as
8 follows:
9       THE VIDEOGRAPHER:  We may proceed.
10      -- DIRECT EXAMINATION --
11 BY MR. FERGUSON:
12   Q.  Good morning, Mr. Mercer.
13   A.  Good morning.
14   Q.  My name is Matt Ferguson, and I'm from the law
15 firm of Matthew Ferguson Law Firm in Aspen, Colorado.
16 Thank you for introducing yourself to me a couple of days
17 ago at your annual meeting.
18      As you know, I represent about 206 of your
19 fellow owners that own about 230 units at the Ritz-Carlton
20 in Aspen.  You're generally aware of that?
21   A.  Yes, sir.
22   Q.  Okay.  You have been an owner for -- of a unit
23 at the Ritz-Carlton in Aspen for how long?
24   A.  Fifteen years, approximately.
25   Q.  You purchased the unit in approximately 2004?
                                                    Page 10

1   Q.  Okay.  And the wintertime, same type of
2 situation?
3   A.  Yes.
4   Q.  And 8410 was the unit number.  Do you recall the
5 12th frag?  Was it number six?  Number seven?  Do you
6 recall what it was?
7   A.  No, sir.
8   Q.  Do you recall what you paid for that unit in
9 2004?
10   A.  $160,000.
11   Q.  And prior to that time, had you ever owned any
12 type of an interval product, timeshare, fractional,
13 anything like that?
14   A.  No, sir.
15   Q.  Is this the first time you ever did this?
16   A.  Yes, sir.
17   Q.  Okay.  Were you a member of any hotel chain
18 loyalty program prior to purchasing in 2004, if you
19 recall?
20   A.  Hyatt.
21   Q.  And how did it come to pass that you learned
22 about the Ritz-Carlton in Aspen, Colorado?  How did you
23 get familiar with it, and how did you end up buying?
24   A.  By accident.  My wife and I rented a condominium
25 in Aspen for two weeks in the summertime to take a
                                                    Page 12

1   A.  Yes.
2   Q.  Okay.  Is it -- was it something you purchased
3 on your own?  Through a trust?  With your wife?  Do you
4 recall?
5   A.  I purchased it on my own.
6   Q.  Okay.  And do you know what unit you purchased?
7   A.  8410.
8   Q.  Most of those -- oh, 8410.  Okay.  And the ten
9 was -- what weeks are allocated to unit -- section ten, I
10 forget what it's called, what weeks was that allocated?
11   A.  I don't recall which ones specifically.  We
12 purchased a summer interest, so our predominant weeks
13 would be in the summer.  Two in the summer, one in the
14 winter, and then the float weeks.
15   Q.  And were those allocated weeks set weeks, or
16 were they just any time in the summer?
17   A.  They were set.
18   Q.  Okay.
19   A.  Two were set on a rotating basis.
20   Q.  Okay.  And what were the set ones, what are
21 approximately -- what do you recall the weeks to have been
22 in the summer?
23   A.  They start in early June, and they rotate every
24 year by one week until it gets to the end of the summer,
25 and then they reset until the beginning of the summer.
                                                    Page 11

1 vacation, and we were driving around thinking, wouldn't it
2 be nice to spend summer in Colorado.  And just by
3 happenstance, I had never been to Aspen Highland, drove
4 up, there it was, and went inside, fell in love, and met
5 with a salesperson.
6   Q.  Who was that, do you recall?
7   A.  A young gentleman from Australia.  His name was
8 Ryland Aspy (phonetic).
9   Q.  I'm sorry I interrupted you.  You went in and
10 met with him, and fell in love, and what happened?
11   A.  Took a contract home and signed it.
12   Q.  And your wife's first name is?
13   A.  Debbie, D-E-B-B-I-E.
14   Q.  And has she ever been an owner?
15   A.  No.
16   Q.  What is -- is it Mrs. Mercer?  Is that what she
17 goes by?
18   A.  Yeah, Debbie Ringdahl, R-I-N-G-D-A-H-L, Mercer.
19   Q.  Okay.  Yeah, I've seen her name where you
20 forwarded a few of your emails to her.  Is she a real
21 estate person also?
22   A.  She's a residential real estate agent here in
23 Southwest Florida.
24   Q.  Prior to purchasing a fractional unit at the
25 Ritz-Carlton Aspen Highlands, had you ever done any type
                                                    Page 13

4 (Pages 10 - 13)

Randal Mercer - October 24, 2017

1 of brokerage work or real estate work in the hospitality
2 industry?
3    A.  No, sir.
4    Q.  Is it fair to state that your real estate
5 brokerage specialty is commercial real estate?
6    A.  Yes.
7    Q.  And how long has that been the case?
8    A.  My first real estate license in Florida was
9 obtained through education and testing in 1983.
10    Q.  Okay.  What do you mean by that?  What do you
11 mean "testing"?
12    A.  Had to go through the classes and go through the
13 state test.
14    Q.  Okay.
15    A.  Get your license.
16    Q.  I'll come to your background in a minute there.
17 I just wanted to see -- so it went back to 1983 that you
18 started in the commercial real estate realm?
19    A.  I started in residential for the first two years
20 and transitioned to commercial after that.
21    Q.  Has it been in Fort Myers all along?
22    A.  Yes, sir.
23    Q.  Are you from Fort Myers?
24    A.  No, sir.  I was born in Orlando, Florida.
25    Q.  Okay.  The unit you purchased with the

Page 14

1 25 percent of this building.  I'm the broker who leases
2 the space out.
3    Q.  Your sign's out front.  Is that because you're
4 leasing space in this building?
5    A.  I'm a leasing agent, yes, sir, mm-hmm.
6    Q.  And the group -- the LLC you're part of that
7 owns 25 percent of the building, I take it owns the
8 building with the -- the other 75 percent of the people
9 are people that have invested in this piece of real
10 estate?
11    A.  Yes.
12    Q.  Okay.  And did you utilize a broker at all to
13 sell your unit, 8410, to Mr. Ennen?
14    A.  No.
15    Q.  He was just someone you knew and spoke to and
16 you knew he was interested in it?
17    A.  Mm-hmm.
18    Q.  Is that a yes?
19    A.  Yes.
20    Q.  Okay.  And if he was interested in skiing, he
21 picked up two weeks of summer, and one week of winter; is
22 that right?
23    A.  Yes.
24    Q.  So is it also for summer use, or --
25    A.  Yeah, he owns it with his sister, so I believe

Page 16

1 assistance of Ryland Aspy in 2004, you no longer own that,
2 do you?
3    A.  No, sir.
4    Q.  Okay.  And you sold it to somebody?
5    A.  Yes, sir.
6    Q.  Who did you sell it to; do you recall?
7    A.  I sold it to a gentleman named William Ennen,
8 E-N-N-E-N, and his sister, who does not live here.
9    Q.  Did you know Mr. Ennen prior to selling the unit
10 to him?
11    A.  Yes.
12    Q.  How did you know him?
13    A.  He was the general contractor who built the
14 building in which you're sitting, and he likes to ski.
15    Q.  So he's a general contractor working out of Fort
16 Myers, Florida?
17    A.  Yes.
18    Q.  And how long have you known Mr. Ennen?
19    A.  2000.
20    Q.  Were you a developer of this building, part of a
21 team or --
22    A.  I was part of a team, yes.
23    Q.  Do you have an equity interest in the
24 development of this building?
25    A.  I'm the managing member of an LLC that owns

Page 15

1 she uses it during the summer.
2    Q.  Okay.  Now, had you listed 8410 prior to selling
3 it to Mr. Ennen?
4    A.  No, I don't believe I did.
5    Q.  At around the same time, you purchased another
6 unit?
7    A.  Yes.
8    Q.  So you're still an owner there?
9    A.  Yes.
10    Q.  And that's what allows you to be president of
11 the board of directors?
12    A.  Yes.
13    Q.  And why did you -- why did you sell 8410 to
14 Mr. Ennen and buy a different unit?
15    A.  We were looking for a three-bedroom rather than
16 a two-bedroom.  8410 was a two-bedroom.  We have
17 grandchildren and in hopes that they would come out and
18 join us on vacation occasionally.
19    Q.  And you bought that also -- did you buy the
20 first one from the Ritz-Carlton Development Company?
21    A.  Yes.
22    Q.  And you bought the second one from the
23 Ritz-Carlton Development Company?
24    A.  Yes.
25    Q.  And was there a broker utilized with respect to

Page 17

5 (Pages 14 - 17)

Randal Mercer - October 24, 2017

1 the purchase of the new unit?  And we'll get to the number
2 in a moment?
3    A.  Ivan Skoric of Sotheby's was involved.  And
4 there was a broker that -- utilized by the developer for
5 selling the remaining units, developer-owned units at the
6 club.  They were involved.
7    Q.  And that was out of California.  What's their
8 name?  Legend or --
9    A.  I honestly don't know.
10       (Sotto voce discussion among plaintiffs'
11    counsel.)
12 BY MR. FERGUSON:
13    Q.  Mr. Klein?
14    A.  Yes, I believe it was.
15    Q.  And he's an entity that was retained by the
16 developer to sell off what's become known as the
17 13.4 percent of inventory that the developer still held?
18    A.  That's my understanding, yes.
19    Q.  Had you ever met with Mr. Klein before?
20    A.  No, sir.
21       First name was Jamie, was it not?
22       MR. REISER:  Yes.
23 BY MR. FERGUSON:
24    Q.  I think it might be James.
25    A.  Okay.  Good.  There it is.

Page 18

1    Q.  So Ivan was involved.  Was he your broker, or
2 how did that work?
3    A.  He was not my broker.  I represented myself.
4    Q.  And what did you purchase for this three-bedroom
5 unit?
6    A.  45,000, I believe.
7    Q.  And do you know how long it was listed -- do you
8 know whether it was listed, this three-bedroom unit -- let
9 me back up.
10       What's -- what's the unit -- what's the unit
11 number of 30 -- sorry, of the three-bedroom?
12    A.  8205.
13    Q.  And what is its weeks?  Is it summer?  Winter?
14    A.  Summer.
15    Q.  All summer?
16    A.  Yes.  Summer and one in the winter.
17    Q.  The same deal?
18    A.  Same, same, yes, summer purpose.
19    Q.  Since purchasing it in 2015 -- was it from the
20 developer?
21    A.  Yes.
22    Q.  Have you put in any of your al- -- any of your
23 time, allocated or unallocated time, to -- into the
24 Lion & Crown Travel pool so you can go to a Marriott
25 Vacation Club?

Page 19

1    A.  No.
2    Q.  Had you done that between 2014 and 2015 when you
3 sold 8410?
4    A.  No.
5    Q.  So with respect to the affiliation, you haven't
6 taken advantage of that so-called opportunity, right?
7    A.  I have not signed up for that opportunity.
8    Q.  You voted -- or sorry, you said you were for it
9 in the survey that was done in 2013?
10    A.  Mm-hmm.
11    Q.  Is that a yes?
12    A.  Yes.
13    Q.  Okay.  I was asking you about 8205.  Had -- when
14 did you -- when did you -- withdraw that.
15       Had that been listed, or how did you find out
16 about 8205 being a three-bedroom?  How did you shop for
17 that?  How did you -- how did you come to learn about that
18 particular unit?
19    A.  I believe I asked the listing agent for a list
20 of all of the numbers, units, that were for sale, and
21 whether they were summer or winter weeks, and he provided
22 them for me.
23    Q.  And that was Mr. Skoric?
24    A.  I believe it was either Skoric or Mr. Klein.  I
25 don't recall.

Page 20

1    Q.  Did you communicate directly with Mr. Klein at
2 all by email?
3    A.  Yes.
4    Q.  Did you negotiate the price with him?
5    A.  Yes.
6    Q.  Okay.  What was it listed for?
7    A.  I believe it was listed for what I paid for it,
8 asking price.  I don't recall.
9    Q.  So you did try and negotiate the price with him,
10 and the developer wouldn't do that?
11    A.  I believe that's correct.
12    Q.  Have you had your deposition taken before today?
13    A.  No.
14    Q.  First time?
15    A.  Yes.
16    Q.  Have you ever been a party to a lawsuit where
17 you have been either a plaintiff or a defendant?
18    A.  No.  Other than a few tenants, commercial
19 tenants, who hadn't paid rent, but, no, nothing serious.
20    Q.  How many non-profit organizations have you been
21 a -- a director on or an officer on?
22    A.  Would that include homeowner's associations?
23    Q.  Yes.
24    A.  Oh, gosh, dozens.  All in the line of work.
25    Q.  Okay.  And so those services would have been on

Page 21

6 (Pages 18 - 21)

Randal Mercer - October 24, 2017

1 projects that you had some involvement with here in
2 Florida?
3    A.  If I have clients who own property within a
4 commercial subdivision, oftentimes they ask me to be on
5 the board as their representative, and I would.
6    Q.  Do you have any Marriott-related financial
7 products, like credit cards?
8    A.  I have a Ritz-Carlton card.
9    Q.  What is that?
10    A.  It's a credit card provided by JPMorgan Chase.
11    Q.  What is its title?  Is it gold?  Platinum?  What
12 is it?
13    A.  It's black.
14    Q.  Ritz-Carlton, is it a Visa?
15    A.  I believe so.  Yes.
16    Q.  Is that -- is that a perk that -- how did you
17 come to -- why do you use a Ritz-Carlton card?
18    A.  So I can receive additional points when I stay
19 at Marriott or Ritz-Carlton hotels.
20    Q.  Had you been a Ritz-Carlton Hotel user prior to
21 purchasing the unit in 2004?
22    A.  Very -- very limited.
23    Q.  Okay.
24    A.  There is a Ritz-Carlton in Naples.  We often go
25 down and have Sunday -- Sunday dinner on the beach at the

Page 22

1 beach bar named Gumbo Limbo because it's a beautiful view.
2    Q.  And that was something you started using before
3 or after you became a member of the --
4    A.  Before.
5    Q.  I would have thought as a commercial broker you
6 had been deposed a few times.  My assumption was wrong.
7 So I'm just going -- I'm going to give you a few pointers
8 and suggestions and requests.
9        The first one is that I'm -- I speak fast, but
10 I'm not a fast talker, if you know what I mean.  So please
11 forgive me.
12        MR. MARX:  Objection to the form of the
13 question.
14        THE WITNESS:  Would you explain that, please?
15 BY MR. FERGUSON:
16    Q.  Let me finish my question before you begin your
17 answer, because we tend -- we have a tendency to
18 communicate over each other.  We anticipate what we're
19 going to say, and I see we're already doing that, so it's
20 a little bit of a stilted style of communication.
21        Yvonne is the one that really has to work
22 hardest today, so let me finish and you begin.  If I
23 sometimes, or Yvonne sometimes, reminds you just to let us
24 finish the question, it's not because we're being
25 impolite, it's because if there's two people talking over

Page 23

1 each other, she just can't do that.  Right?
2        So I'd ask you to do that.  So just listen to
3 the question, let me finish it.  There may be objections,
4 you have been told about that.  Generally you'll have to
5 answer unless you're instructed not to.  Keep your voice
6 up.  Answer verbally.  We've already done that a few
7 times.  We also tend to use --
8    A.  So "uh-huh" is not yes.
9    Q.  Yeah.
10    A.  Okay.
11    Q.  I mean, we know it's yes here, but it could be a
12 critical question at trial, well, that was a "nuh-huh."
13 So I'll remind you to do that occasionally.  Okay?
14        Let us know if you need breaks at any time.
15 Okay?
16    A.  Mm-hmm.
17    Q.  And probably, most importantly, lawyers don't
18 always ask great questions.  Most of them aren't going to
19 be that great to you.  So let us -- but what I really want
20 you to do is, if you don't understand, let me know.  What
21 happens is we assume you understood it at some point.  And
22 I have no problem with you telling me, "I don't understand
23 that question," or -- don't say it's a stupid question,
24 even though it is, but just say you don't understand it
25 and I'll rephrase it for you at any time.  Okay.

Page 24

1    A.  Fine.
2    Q.  Okay.
3    A.  And I have a question.
4    Q.  Sure.
5    A.  A request.  I am in officer training for my --
6 for my church to become a deacon, and I have been working
7 on that for ten months now.  And at six o'clock this
8 evening, I have another training session.  If it is
9 humanly possible for me to get out of here at 5:30 today
10 so I can go to my church and have -- resume officer
11 training, I would be grateful.  I understand that that may
12 not be possible, but I would appreciate it.
13    Q.  Yeah, we'll try to accommodate you.  We can talk
14 about that.  You're an important witness, so therefore
15 you'll be relatively long.
16    A.  Understand.
17    Q.  But I don't -- we would never do anything to
18 dis- -- to make it that difficult for you.
19    A.  Understand.  Thank you.
20    Q.  So we would make that accommodation.
21    A.  Just a request.
22    Q.  Yup.  Got it.
23        THE VIDEOGRAPHER:  Before we get back into it,
24 can I have everybody check their phones.  I'm picking
25 up, like, a reminder ring.

Page 25

7 (Pages 22 - 25)

Randal Mercer - October 24, 2017

1    MR. SHEA:  Probably mine.
2    THE WITNESS:  Mine's on mute.
3    MR. SHEA:  I've got mine in my pocket, right
4  next to the mic.  I didn't move it.  Sorry, Tim.
5    THE VIDEOGRAPHER:  Thank you.
6    MR. SHEA:  Turning it off.
7  BY MR. FERGUSON:
8    Q.  Was the Ritz-Carlton card you were talking about
9  something that you had negotiated for on behalf of the
10  membership?  I remember there were some communications
11  about you getting that perk for your members.
12    A.  It was part of the negotiation, yes.
13    Q.  And what was the -- what was that negotiation?
14  Please explain what you negotiated in terms of a perk or a
15  privilege for your members.
16    A.  It was neither a perk nor a privilege.  It was
17  just something that was thrown into the negotiation that
18  could benefit the members, one, if they qualified for the
19  card through JPMorgan Chase, and two, if they used it,
20  they would accrue points.  And I always felt that that
21  would be a -- that would be a benefit.
22    Q.  So they accrue -- if they get the card and they
23  qualify, I suspect most of the people who can afford this
24  place can qualify for a credit card, but assume they got
25  that, --
                                          Page 26

1  negotiating point that you obtained for your membership?
2    A.  Yes.
3    Q.  So they got to give a bank card that earns
4  interest, and they get -- they get banking customers, and
5  you believe that was a perk for your membership?
6    A.  Yes.
7    Q.  Okay.  It was also a perk for them, right?  They
8  were selling credit cards.
9    A.  JPMorgan Chase received the benefit.  It was
10  nothing that the Ritz would benefit from, as far as I
11  know, and it was nothing that they could control.  An
12  application was sent to every member, and whether they
13  filled it out or not was their choice.
14    Q.  Was that a new product, or was it an existing
15  product you had extended?
16    A.  It had been out for a year or so.
17    Q.  And did they get that without an annual fee?  Is
18  that how it worked?
19    A.  I don't recall there were any strings tied to it
20  at all.  I believe there is an annual fee, actually.  I
21  think they all have annual fees.
22    Q.  I was just wondering what you all got from the
23  Marriott companies with respect to this credit card.
24    A.  I thought it would be a benefit for the members,
25  and help enhance their owner experience.
                                          Page 28

1    A.  Mm-hmm.
2    Q.  -- those points you're talking about are what
3  kind of points?
4    A.  They would be like airline -- airline frequency
5  points.  Like frequent flyer points.  Like any reward
6  program.
7    Q.  All right.  So they were -- you could use them
8  with airlines or hotels?
9    A.  I believe you can just use them with Ritz and
10  Marriott properties.  I don't know.
11    Q.  But are they -- are they Marriott points?
12    A.  Yes.  They're transferable back and forth
13  between Marriott and Ritz.  You can use them for either,
14  and you accrue them from either.
15    Q.  Either -- either type of property?
16    A.  Within -- within the Marriott group, yes.
17    Q.  So if a person -- okay.  So -- so those points
18  are Marriott points, and they can utilize them outside the
19  parameters of the basic RD -- RCDC membership?
20    A.  Yes.
21    Q.  And how did you negotiate that?  I mean, is it
22  something you did with Sobeck and Cunningham?  Was it --
23    A.  Yeah.
24    Q.  Okay.  And so you believe that getting a
25  Ritz-Carlton JPMorgan black card was a -- was a positive
                                          Page 27

1    Q.  Why haven't you utilized the Lion & Crown Travel
2  program and affiliation to put in your weeks, either
3  allocated or unallocated, to get to use the Marriott
4  Vacation Destination program?
5    A.  We don't have -- we don't have that much time.
6  My wife and I both work, and we're very happy staying
7  within the confines of the Ritz-Carlton Destination Club
8  program.
9    Q.  What -- sorry.
10    A.  We have used, on several occasions, the Third
11  Home program.
12    Q.  And what did you use Third Home -- what did you
13  use it for?  Where have you gone with that?
14    A.  We were able to obtain for one week, twice, a
15  small condominium on the beach in Naples, which allowed my
16  wife to enjoy the beach for a week in Naples while I came
17  back and forth to work.
18    Q.  What property -- what property was that?
19    A.  I don't recall.  It's down on -- downtown
20  Naples.  But it was right on the beach.  A small
21  condominium.
22    Q.  Any other exchange programs you've utilized with
23  respect to your Ritz membership?
24    A.  No, sir.
25    Q.  Quickly on your background, where did you -- did
                                          Page 29

8 (Pages 26 - 29)

Veritext Legal Solutions
866 299-5127

Randal Mercer - October 24, 2017

1 you attend college?
2    A.  Yes, sir.
3    Q.  Where did you attend?
4    A.  Ohio State.
5    Q.  And what year did you graduate?
6    A.  I did not graduate.
7    Q.  What were you studying before -- what was your
8 course of study?
9    A.  I was a music major when I started, and I went
10 into general business after that.
11    Q.  And when did you leave Ohio State?
12    A.  1974.
13    Q.  And what did you do for work between '74 and
14 '83, just generally?
15    A.  Various jobs.  Worked at beer and wine
16 carryouts.  Owned a beer and wine drive-through, and a
17 beer and wine carryout.
18    Q.  Here in Florida?
19    A.  Columbus, Ohio.  Owned a record store.
20 Entrepreneurial type.
21    Q.  I take it you moved out of records?
22    A.  Yes, I did.  I saw the train.
23    Q.  So various jobs.
24        And when did you move to Florida?
25    A.  I believe it was 1982.
                                      Page 30

1    Q.  Did you do any real estate work while you were
2 in Ohio?
3    A.  No.
4    Q.  And when you came to Florida, you came to Fort
5 Myers, I understand?
6    A.  Yes.
7    Q.  And what brought you here?
8    A.  My family had come to Sanibel Island on vacation
9 since I was a child, and it was the only place I knew to
10 go to.
11    Q.  And what did you do for work when you arrived?
12    A.  I worked on the parasailing crew on Fort
13 Myers -- Fort Myers Beach while I was taking my real
14 estate courses.
15    Q.  And you took the real estate courses.  How does
16 that work in Florida?  Is it just a state exam that you
17 have to study for?
18    A.  Classes that you have to attend and pay for at
19 licensed teaching shops, and then you take the state test.
20    Q.  Did you take the state test?
21    A.  Yes, sir.
22    Q.  What year?
23    A.  1983.
24    Q.  And did you pass the first time?
25    A.  Yes, sir.
                                      Page 31

1    Q.  Okay.  And what was your first employment in
2 real estate here in Florida?
3    A.  A local real estate firm, residential firm, on
4 Sanibel Island, Priscilla Murphy Realty.
5    Q.  And that was residential, and how long did you
6 do that?
7    A.  About two years.
8    Q.  And after her company, Priscilla Real Estate --
9    A.  Priscilla Murphy.
10    A.  Murphy.
11    A.  Mm-hmm.
12    Q.  All right.  How long did you stay there?  What
13 did you do after you left after two years?
14    A.  I left probably 1986, and went to a small
15 startup commercial firm.  I don't even remember the name
16 of it.  No longer exists.  Worked for two years helping
17 them land planning, working on some commercial projects.
18    Q.  So you were a real estate broker, but did you
19 also get involved early on in actual development?  You
20 said "land planning."
21    A.  Yeah, I was on the fringe at that time since my
22 knowledge base was rather limited, but I watched and
23 learned.
24    Q.  Okay.  Were you selling real estate?
25    A.  Yes.
                                      Page 32

1    Q.  And what type of real estate were you selling by
2 then?
3    A.  It was commercial.  I had listed pieces, various
4 pieces of land, and listed some small buildings for sale.
5    Q.  Were you also renting?  Were you a leasing
6 agent?
7    A.  Yes.
8    Q.  And after that small shop you were with for two
9 or three years, I think you said, where did you land after
10 that?
11    A.  I decided that I didn't want to work for anybody
12 else, and in May of 1988, I opened my own commercial real
13 estate firm as a sole proprietor, and the name was Mercer
14 Investment Properties, Inc., licensed with the State of
15 Florida.
16    Q.  Okay.  And what was its business?
17    A.  Renting and selling commercial properties,
18 focusing on office product.
19    Q.  And how long was Mercer Investment Properties,
20 Inc., your employment?
21    A.  Mercer Investment Properties is still
22 functioning in -- in the background.  It operated as a
23 sole proprietorship brokerage firm for ten years, until
24 1998.
25    Q.  Okay.  And what did you do after that?
                                      Page 33

9 (Pages 30 - 33)

Randal Mercer - October 24, 2017

1    A.    Merged three commercial real estate companies
2 together operating in this area, and we formed the CB
3 Richard Ellis affiliate office in Southwest Florida, which
4 was an exclusive contractual agreement.  CB Richard Ellis
5 was the largest commercial real estate company in the
6 world and doing about five billion dollars in revenue at
7 the time, and we were the only affiliate office in the
8 state of Florida.  The remaining offices were company
9 owned.
10    Q.    So you came together with the Mercer Investment
11 Property, Inc., and two other companies to form this
12 affiliate?
13    A.    Yes.
14    Q.    And were the other companies that you merged
15 into the CBRE affiliate also commercial brokerage firms?
16    A.    Yes.
17    Q.    Were they all about equal size, or was one
18 bigger than the other?
19    A.    One was another sole proprietor with several
20 agents.
21    Q.    That's what you had been?
22    A.    Sorry?
23    Q.    That's what you had been?
24    A.    Yeah.
25    Q.    Okay.

Page 34

1    A.    No.
2    Q.    How about the same for the Ritz?
3    A.    No.
4    Q.    And about five years ago, that would have been
5 about 2012-ish, you went on your own again?
6    A.    Yes.
7    Q.    What happened?
8    A.    They, CB Richard Ellis, began winding down the
9 affiliate program wanting to own only company-owned
10 offices, so we had an amicable separation, and we
11 rebranded ourselves as CRE Consultants instead of CBRE,
12 and the tradition continues today.
13    Q.    And what does CRE stand for?
14    A.    Commercial real estate.
15    Q.    All right.  And did the company that had
16 developed between '98 and 2012, did it generally stay
17 intact, the same partners and brokers and whatnot?
18    A.    Yes, several partners had retired during that
19 time or were bought out, yes.
20    Q.    Was this the CBRE office, or did you start a new
21 office, a new location?
22    A.    This was not the CBRE office because it was not
23 built at that time.
24    Q.    All right.
25    A.    But we weren't far from here.

Page 36

1    A.    Mm-hmm.
2    Q.    And what was the other one?
3    A.    The third one was CB Richard Ellis themselves.
4 They had a branch office of the Tampa-owned office
5 operating down here in Fort Myers, so we pulled them all
6 together and rebranded ourselves.
7    Q.    All right.  And that was '98?
8    A.    Yes, sir.
9    Q.    And how long were you -- how long did the CBRE
10 affiliate company you were now involved with in '98, how
11 long did you stay with that?
12    A.    That was -- our franchise agreement expired
13 approximately five years ago.
14    Q.    Okay.  And was there any -- was there any
15 hospitality brokers -- was there a hospitality -- sorry.
16 Withdraw that.
17          Was there anyone doing hospitality real estate,
18 commercial real estate brokerage or advising in the CBRE
19 affiliate group here in Fort Myers?
20    A.    No.
21    Q.    Did they do any work at all for the Marriott
22 Corporation?
23    A.    No.
24    Q.    Have you ever done any work for Marriott in any
25 respect?

Page 35

1    Q.    Okay.  On your website, you note -- you note
2 that you have been a board member of the Ritz-Carlton
3 homeowner's association, particularly the Tourist
4 Accommodation Director Group.  Do you know that that's on
5 your website?
6    A.    Yes, sir.
7    Q.    Okay.  And when did you first become a board of
8 director member at the Ritz-Carlton Highlands?
9    A.    It's a great question.  I know that I am in my
10 12th or 13th year.
11    Q.    I'm looking at your website.  It says on your
12 website that you became a member of the board of directors
13 in 2005 and you served -- it says 2005 to 2016.
14    A.    Okay.
15    Q.    How did it come to pass that you became a
16 participant in the Board of Directors, Tourist
17 Accommodation Board of Directors, at the Ritz-Carlton
18 Aspen Highlands?
19    A.    I was curious as to how the program actually
20 worked, so I thought the best way to find out was to
21 become a board member.  And I ran for office, submitted my
22 resume as everyone else, and did not get elected my first
23 try.  The next year I submitted my resume and did get
24 elected.
25    Q.    All right.  And by the time you got elected, did

Page 37

10 (Pages 34 - 37)

Randal Mercer - October 24, 2017

1  you know Mr. DiMeglio, Nicholas DiMeglio?
2      A.  No, sir.
3      Q.  Who was the manager back at the time you got
4  elected?
5      A.  I don't recall.
6      Q.  Did you know anybody at -- in management at the
7  Ritz-Carlton?
8      A.  No, sir.
9      Q.  How about Marriott?
10     A.  No, sir.
11     Q.  How did you -- withdraw that.
12         When you purchased the 8410 through Mr. Aspy in
13  2004-ish, I take it that they told you there were other
14  Ritz-Carlton Destination clubs?
15     A.  Yes.
16     Q.  And that some had been already built?
17     A.  Yes.
18     Q.  And more were going to come online?
19     A.  Yes.
20     Q.  They told you that it was an exclusive program;
21  it was one of the better hotel brands in the world; is
22  that what they told you?
23         MR. MARX:  Object to the form of the question.
24         THE WITNESS:  I don't recall them saying that.
25     In my mind, the Ritz-Carlton was one of the more

Page 38

1  exclusive brands in the world, yes.
2  BY MR. FERGUSON:
3      Q.  And at the time, did you know anything about a
4  Marriott Vacation Club?
5      A.  No.
6      Q.  Did they ever mention Marriott Vacation Club to
7  you?
8      A.  No.
9      Q.  Did they ever tell you about their relationship,
10  if any, with the Ritz-Carlton Club, that being Marriott?
11     A.  No.
12     Q.  Were these totally Ritz-Carlton people, as far
13  as you recall?
14     A.  Correct.
15     Q.  Did you meet any other salesman besides
16  Mr. Aspy?
17     A.  No.
18     Q.  And what -- the hotel was obviously built at the
19  time you bought it, right?
20     A.  Yes.
21     Q.  Okay.  And you've met people that actually
22  bought before the hotel was built, haven't you?
23     A.  No.
24     Q.  With respect to running for office, were there
25  any particular issues that you ran on?  Was there

Page 39

1  something that concerned you or that you were especially
2  interested in?
3      A.  No.
4      Q.  And did you -- how did you reach out to people
5  to vote for you?  Did you just put your name into the hat,
6  and it went around with the normal communiques?
7      A.  Submitted the resume and application as everyone
8  else.
9      Q.  When you came on the board, was it 2005?
10     A.  I believe so.
11     Q.  And who were -- was Mr. -- oh, my gosh.  Who was
12  the president at the time?
13     A.  John Sternfield.
14     Q.  John Sternfield.  When was the last time you
15  spoke to Mr. Sternfield?
16     A.  Three months ago.
17     Q.  In connection with Ritz?
18     A.  In connection with Third Home.
19     Q.  And what was that about?
20     A.  The annual membership fee.
21     Q.  Was it more than you expected?
22     A.  No.
23     Q.  What was it about the annual fee that you were
24  speaking to Mr. Sternfield about?
25     A.  The fee was increased.

Page 40

1      Q.  Okay.  Did that concern you?
2      A.  No.
3      Q.  So why were you talking to him?
4      A.  He had a question.
5      Q.  Okay.  Did he have a question about the fee
6  being increased?
7      A.  Why the fee increased.
8      Q.  Okay.  When's the last time you spoke to
9  Mr. Neveloff?
10     A.  I spoke to Mr. Neveloff in September, the first
11  week in September, I believe, in Aspen.
12     Q.  Was that before or after his deposition?
13     A.  I don't know when his deposition --
14     Q.  Okay.
15     A.  I think it was recently, but it was before.
16     Q.  So you didn't discuss the deposition with him?
17     A.  No.
18     Q.  Okay.  So the last time you spoke to him was
19  when you saw him in person in Aspen?
20     A.  Yes, sir.
21     Q.  And were you in Aspen in September on an
22  allocated week, unallocated week, or board business?
23     A.  I was on -- not an allocated week.  It was just
24  a reserved week, reserved time.  It was right -- the
25  weekend before Hurricane Charley -- Hurricane Irma, excuse

Page 41

11 (Pages 38 - 41)

Randal Mercer - October 24, 2017

| | |
|---|---|
| 1 me. | 1 during that time frame? Was Mr. Sternfield or anybody |
| 2   Q.   So was that unallocated time you were using? | 2 else a president? |
| 3   A.   Yeah, it was reserved time that we -- we didn't | 3   A.   Mr. Sternfield was the president the entire |
| 4 use our allocated time, but we had reserved it for | 4 time. |
| 5 September.  We like September when the leaves change. | 5   Q.   Okay.  And why did you come off after the seven |
| 6   Q.   So it was time you had -- it was part of your | 6 years? |
| 7 time, but you had moved -- | 7   A.   I was termed off. |
| 8   A.   For this year. | 8   Q.   Per the what? |
| 9   Q.   -- you had bumped it -- let me finish. | 9   A.   Per the documents. |
| 10   A.   Sorry. | 10   Q.   Do you know what documents have the term limits? |
| 11   Q.   You had bumped it to September of this year? | 11   A.   Three-year consecutive terms, two of them. |
| 12   A.   Yes. | 12   Q.   Do you know what documents contain that term |
| 13   Q.   Approximately how much time do you spend at the | 13 limit? |
| 14 Ritz-Carlton on board business, where you're actually | 14   A.   No, sir.  I would assume the bylaws. |
| 15 lodging there, per year? | 15   Q.   And when you came off, would that have been |
| 16   A.   Six nights per year. | 16 about 2011? |
| 17   Q.   About two or three trips? | 17   A.   Sounds about right. |
| 18   A.   Two trips. | 18   Q.   Was Mr. Neveloff on the board at the time? |
| 19   Q.   Two trips.  That would be the meetings of | 19   A.   Yes. |
| 20 September, October, and then the one in April? | 20   Q.   Was Mr. Marsden on the board by that time? |
| 21   A.   Yes. | 21   A.   Yes. |
| 22   Q.   And do you all get stipends for that? | 22   Q.   And when you came off, did you have any advisory |
| 23   A.   No. | 23 role with the board? |
| 24   Q.   Do you get lodging?  I take it they take care of | 24   A.   No. |
| 25 your lodging? | 25   Q.   From time to time, Mr. Neveloff would check in |
| Page 42 | Page 44 |

| | |
|---|---|
| 1   A.   Yes. | 1 with you about board business, though? |
| 2   Q.   How about travel? | 2   A.   We communicated.  We were friends. |
| 3   A.   Yes. | 3   Q.   And did you become friends with him through the |
| 4   Q.   Have you spoken to Mr. Marsden of late?  Have | 4 club, the club membership and being a user, or did you |
| 5 you? | 5 become friends with him because you served together on the |
| 6   A.   I have not spoken with Mr. Marsden, no. | 6 board? |
| 7   Q.   Have you spoken to any of the other board of | 7   A.   Because we served together on the board. |
| 8 directors about your deposition coming up? | 8   Q.   And then so you had no role at all during your |
| 9   A.   No. | 9 hiatus? |
| 10   Q.   So when you came on the board in 2005, you were | 10   A.   No, sir. |
| 11 a board -- you were just a member of the board of | 11   Q.   By the time you had -- withdraw that. |
| 12 directors.  Mr. Sternfield was the president.  How many | 12      Between 2005 and 2011-'12 when you -- your first |
| 13 terms did you serve in your first stint? | 13 tour of duty, were there any issues with the Marriott |
| 14   A.   I served two complete terms of three years, | 14 companies regarding affiliations, talking with |
| 15 total of six. | 15 affiliation? |
| 16   Q.   All right. | 16   A.   There were -- |
| 17   A.   And there was one year at the beginning when | 17      MR. MARX:  Object to the form of the question. |
| 18 I -- when I served a one-year term.  The very first term I | 18 BY MR. FERGUSON: |
| 19 served was one year.  So I served a total of seven | 19   Q.   You can answer. |
| 20 consecutive years. | 20   A.   I can answer? |
| 21   Q.   Okay.  During that seven-year stint, one, plus | 21   Q.   Yeah. |
| 22 two threes, did you serve ever as the president of the | 22   A.   There were always conversations about the |
| 23 association? | 23 Marriott.  As any condominium association that's |
| 24   A.   No, sir. | 24 transitioning out of a developer-controlled situation, |
| 25   Q.   Who was the president -- who were the presidents | 25 there are always conversations about the developer. |
| Page 43 | Page 45 |

12 (Pages 42 - 45)

Randal Mercer - October 24, 2017

1    Q.   Your 8410 and the other unit you purchased in
2 2015, I forget the number, but what building are they in?
3    A.   They are in Elkhorn Lodge.
4    Q.   So the original building?
5    A.   Building -- building eight, yes.
6    Q.   When you bought, was the White River Lodge
7 built?
8    A.   Yes.
9    Q.   Were there any pressing issues that you handled
10 as a board of director member, as a tourist accommodation
11 board of direction member with the association, any
12 pressing matters with respect to Marriott during your
13 first term?
14        MR. SHEA:  First term being the seven years?
15        MR. FERGUSON:  The seven years, yeah.
16    Q.   Sorry.  Your first stint.
17    A.   Define pressing matters.
18    Q.   I mean, was there any disputes with Marriott, or
19 concerns they may be trying to change the nature of the
20 club, taking actions that could change the nature of the
21 club?
22    A.   I would not say those seven years were always
23 harmonious.
24    Q.   What were some of -- or what was the item that
25 would cause disharmony?

Page 46

1    A.   A great example would be unfunded reserves.
2    Q.   From the --
3    A.   From the developer, yes.
4    Q.   The developer-owned inventory that they weren't
5 paying dues on?
6    A.   The developer always paid dues.
7    Q.   Okay.
8    A.   It's just that we felt the reserve budgets were
9 never adequate in order to keep the club up to the
10 original standards.  We had to remodel, and things like
11 that.  Going down the road, you need more money.
12    Q.   So when you were on the board, let's say the
13 first year, and the first -- let me withdraw that and do
14 it this way.
15        During your first three terms of service,
16 bearing in mind one of those was one year, --
17    A.   Mm-hmm.
18    Q.   -- was the -- had the developer, as a declarant,
19 turned over control, or did that happen during your time
20 there?
21    A.   Control was turned over prior to my coming onto
22 the board.
23    Q.   But what was it about the reserves?  Was that
24 part of the budget process, the reserves weren't to your
25 liking?

Page 47

1    A.   Mm-hmm.
2    Q.   Is that a yes?
3    A.   Yes.
4    Q.   Okay.  And the Marriott management team, or the
5 Ritz-Carlton management company, managing company, they
6 were in charge of the budgets?
7    A.   They were until developer controlled.
8    Q.   Okay.
9    A.   After that, we were in charge of the budgets.
10    Q.   So there was a problem with the reserve.  Let me
11 move on beyond that.  Any problems -- any other problems
12 that created disharmony with Marriott during your first
13 seven years?
14    A.   There was always a -- an attitudinal overlay
15 between a big company and a condominium association.  Just
16 a change in leadership.  Those sorts of traditional
17 problems.  Nothing overwhelming.
18    Q.   When do you recall Mr. DiMeglio becoming a
19 manager of the hotel?
20    A.   2007.  And I know that because he just got his
21 ten-year pin, so --
22    Q.   Ten-year pin working for the Ritz-Carlton or
23 working at the Ritz-Carlton Aspen Highlands?
24    A.   Working at Aspen Highlands, yeah.
25    Q.   And then you took the year off, and then you

Page 48

1 came back on the board in 2012?
2    A.   I don't think it was that long.
3    Q.   How long did you come off?
4    A.   I think it was approximately six to seven
5 months.
6    Q.   Then you came off?
7    A.   I was off the board, and the association
8 purchased the amenities, which is Willow Creek Bistro,
9 Cafe Sienna, --
10    Q.   Right.
11    A.   -- and the spa from the developer, and that
12 created one additional commercial board position.
13    Q.   Right.
14    A.   And I was asked to come back on the board as a
15 commercial director.
16    Q.   Who asked you that?
17    A.   I can't recall.
18    Q.   Was it someone at the board level?  Was it
19 someone at Marriott?  At Ritz?  Mr. DiMeglio?
20    A.   It was either Mr. DiMeglio or Mr. Neveloff.
21    Q.   And during your time on the board, I take it you
22 became fairly close, in a business sense, with
23 Mr. DiMeglio?  You had to work with him pretty constantly?
24    A.   I had a good working relationship.
25    Q.   All right.  Now, so you were off for six months,

Page 49

13 (Pages 46 - 49)

Randal Mercer - October 24, 2017

1 became a commercial board of director. Did you have to
2 run for that position?
3    A. No, sir.
4    Q. Was -- by then Mr. Neveloff was the president?
5    A. Yes.
6    Q. And then -- so you're serving a partial term as
7 a commercial director because another seat -- had it
8 created another slot, or did you replace somebody?
9    A. It had created a slot that did not exist.
10    Q. All right. And had you been working on the
11 acquisition or the turnover of those amenities --
12    A. No.
13    Q. -- during your stint, early stint?
14    A. No.
15    Q. That was something that occurred in that six- or
16 seven-month hiatus?
17    A. Yes.
18    Q. And what were your duties as a commercial board
19 of director member when you came on for that partial term
20 created by the new situation with the amenities?
21    A. Review budgets, review income and expense
22 reports.
23    Q. For those amenities?
24    A. For those amenities. Make suggestions.
25    Q. All right. And did you -- did you next segue

Page 50

1 back to the Tourist Accommodation position?
2    A. Yes.
3    Q. And how did that come to pass?
4    A. I ran for the board.
5    Q. Did anyone ask you to run for the board?
6    A. I don't recall.
7    Q. And you ran for the board in the same manner?
8 You put in a position statement?
9    A. Yes.
10    Q. Do you know if you had the backing of the
11 Marriott and Ritz companies to run for the board?
12    A. No.
13    Q. Do you know how they voted their 13.4 percent in
14 those elections?
15    A. No.
16    Q. Would you assume that they voted for you?
17    A. No.
18    Q. Why not?
19    A. It was my understanding that Marriott never
20 voted their interest.
21    Q. Okay. By the time you ran for the board in
22 2012 -- I think it was 2012, for the fall of 2012, --
23    A. Mm-hmm.
24    Q. -- did you know Mr. Cunningham?
25    A. Yes.

Page 51

1    Q. How did you know him?
2    A. I believe he had been at several meetings.
3    Q. In what capacity had he been at several
4 meetings?
5    A. I believe it was to talk about Kapalua and
6 Abaco, and the points program. I'm not sure when he came
7 into our view.
8       Once again, I did not -- I did not operate at
9 that -- at that upper level, you know, direct -- you know,
10 presidents talking to upper level management, so I don't
11 recall.
12    Q. How about Ms. Sobeck, did you know her when you
13 came back on?
14    A. Yes.
15    Q. How did you know her?
16    A. She was the -- she was the touch point for our
17 board for many years. She -- she was in charge of our
18 territory, and she was our relationship manager, I
19 would -- I think you call her. I'm not even sure.
20    Q. With the larger group of companies? Do you know
21 who she's employed by?
22    A. I don't know which one. The Marriott Vacation
23 Club, I believe, but I'm not sure.
24    Q. And Mr. Hearns?
25    A. Yes.

Page 52

1    Q. You know him?
2    A. I do.
3    Q. Okay. And he was more of an HOA management
4 fellow? He helped with the HOA's management? Or what did
5 he do?
6    A. Ritz --
7       MR. MARX: Object to the form of the question.
8       THE WITNESS: Ritz-Carlton Hotel --
9 BY MR. FERGUSON:
10    Q. I meant to --
11    A. -- is his direct report.
12    Q. He's with the hotel company, as far as you know?
13    A. Yes.
14    Q. Show you a few documents here. They mostly
15 cover your -- your current stint on the board of directors
16 as a tourist accommodation director.
17       When you came back online and you got elected
18 in, what, October? September, October of '12?
19    A. Late October 2012.
20    Q. Okay. And you're on -- are you on the last year
21 of your term? Or you've got one more year to go?
22    A. I have one year to go.
23    Q. Okay. And did you become a president when you
24 came back on the board?
25    A. Yes.

Page 53

14 (Pages 50 - 53)

Randal Mercer - October 24, 2017

| | |
|---|---|
| 1   Q.  And did you run for president? | 1      If you look at the first page of this exhibit, |
| 2   A.  No. | 2   okay, what we've done in the bottom corner, there's an |
| 3   Q.  How was it -- how did it come to pass that you | 3   exhibit tab, and that's what we're referring to today. |
| 4   became the president when you rejoined the board as a | 4      A.  Mm-hmm. |
| 5   tourist accommodation director in 2012? | 5      Q.  And you'll see the exhibit tab for this one is |
| 6      A.  The directors of the condominium association, | 6   1020. |
| 7   which includes the residential housing group and the | 7      A.  Mm-hmm. |
| 8   commercial group and the tourist accommodation, somebody | 8      Q.  At the very bottom of that, it says 1020-01, so |
| 9   made a motion.  I don't know who. | 9   that's first page.  So I might say "go to page 7." |
| 10   Q.  Okay.  At a board of directors meeting? | 10      A.  Got it. |
| 11   A.  After the annual meeting, yes. | 11      Q.  And you should be able to find it with those |
| 12      MR. FERGUSON:  All right, Chris, I'm going to | 12   numbers. |
| 13   start using some exhibits. | 13      A.  Okay. |
| 14   Q.  So I'm going to show you exhibits in paper, and | 14      Q.  The other numbers that you might see are -- for |
| 15   we've got copies for counsel, and it's also on the screen. | 15   example, this one is RCD, and it has a 0005686, that tells |
| 16   I suspect most people Michael Jr's. age are going to look | 16   us where the document came from. |
| 17   at screens, but you're going to probably want to look at | 17      Your documents, I think -- Jessica, correct me |
| 18   paper, but you're free to look at either.  Okay? | 18   if I'm wrong -- are AHA? |
| 19   A.  Okay. | 19      MS. LIVINGSTON:  HCA. |
| 20   Q.  And what may happen is that if I'm -- because | 20      MR. FERGUSON:  HCA? |
| 21   I've already got mine all marked up, and it's a lot easier | 21      MR. SHEA:  AHCA. |
| 22   for you to find it.  He could pull it up and highlight it | 22      MS. LIVINGSTON:  AHCA. |
| 23   for you.  So let's just -- do what you think is best for | 23      MR. FERGUSON:  AHCA, okay. |
| 24   your testimony.  So you're welcome to use the screen or | 24      MR. SHEA:  Four letters. |
| 25   the paper.  All right? | 25 |
| Page 54 | Page 56 |
| 1   A.  I'm comfortable using a screen and paper. | 1  BY MR. FERGUSON: |
| 2   Q.  On TV, exhibits are usually guns and knives, but | 2      Q.  Okay.  And that will mean it's a document that |
| 3   in depositions like this, it's a lot of paper. | 3   came from you, or Mr. Oliver, or Schneider, Mr. Marsden, |
| 4   A.  Good.  I like paper. | 4   Mr. Neveloff.  Mostly I'll be showing you those documents, |
| 5      MR. SHEA:  So just one thing. | 5   but a few of them are Ritz documents you may or may not |
| 6      MR. FERGUSON:  Yeah. | 6   have seen, but I'm going to ask you a few questions about |
| 7      MR. SHEA:  Randy, it will probably go more | 7   them.  This happens to be a Ritz document. |
| 8   quickly, if you can read the paper, just to read the | 8      A.  I recognize a good PowerPoint presentation every |
| 9   paper, rather than using the screen. | 9   time I see it. |
| 10      MR. FERGUSON:  Whatever you think. | 10      Q.  All right.  And that's what this is, sir, right? |
| 11      MR. SHEA:  I think he's okay with reading the | 11      A.  Yeah, they usually are. |
| 12   paper. | 12      Q.  All right.  Have you ever seen -- this is, I'll |
| 13      MR. FERGUSON:  Yeah, good. | 13   tell you, it's sometime in early 2012 before you were on |
| 14      THE WITNESS:  Sometimes my arms aren't long | 14   the -- back on the board of directors, and this is a |
| 15   enough, but we'll give it a shot. | 15   Ritz-Carlton Destination Club Re-engineering Update.  Had |
| 16  BY MR. FERGUSON: | 16   you ever seen this re-engineering update by Marriott? |
| 17   Q.  All right.  And I'm going to be going -- you | 17      A.  No. |
| 18   guys are close by, so I'm going to hand counsel and the | 18      Q.  Okay. |
| 19   witness the first exhibit of the day, and there will be | 19      A.  Not that I recall. |
| 20   many.  And that is Exhibit 1020. | 20      Q.  Okay.  It's a Marriott Vacation Worldwide |
| 21      (Exhibit 1020 previously marked for | 21   document, and I just want to ask you a few questions, and |
| 22   identification produced to the witness.) | 22   see if you recall any of these items.  Even though you |
| 23  BY MR. FERGUSON: | 23   haven't seen this, if you -- if you're aware of these |
| 24   Q.  This is a -- I just want to get you oriented on | 24   general topics sometime in 2012-ish. |
| 25   some things with respect to documents, Mr. Mercer. | 25      The first bullet point on page 2 of Exhibit 1020 |
| Page 55 | Page 57 |

15 (Pages 54 - 57)

Veritext Legal Solutions
866 299-5127

Randal Mercer - October 24, 2017

1  says "MVW's strategy," do you see that?
2      A.  Yes.
3      Q.  "To sell the remaining luxury unsold inventory
4  through the North American points program includes the
5  unwind of the RCDC trust by converting the existing 109
6  members in the North American points program, or to an
7  RCDC home club fraction ownership."
8          Did you understand at this time frame that the
9  Ritz-Carlton and Marriott had inventory that they needed
10 to deal with?
11     A.  I knew there was unsold inventory.  Where and
12 how much, I did not know.
13     Q.  Okay.  Was that something you had tracked during
14 your first stint on the board?
15     A.  No.
16     Q.  And were they selling -- from 2005, when you
17 came on the board, through 2011 when you came off, were
18 they selling fractional ownerships, 1/12th ownerships, in
19 this exclusive Ritz-Carlton Destination Club at Aspen
20 Highlands?
21     A.  Yes.
22     Q.  Okay.  And was there someone on premises, like
23 Mr. Aspy had been, doing that?
24     A.  Ivan Skoric was one of the salespeople.  There
25 were others.
                                                  Page 58

1  back on the board.
2      Q.  What do you mean they unwound it?
3      A.  Shut it down.
4      Q.  Okay.  And so when they had inventory after
5  2007, '08, how were they selling inventory?  I know the
6  economy slowed down, but were they selling it, and if so,
7  where and how, where from?
8      A.  I can't recall.
9      Q.  Okay.  Prices had come down by '08, '09, and
10 '10, but they were still selling it, right?
11     A.  I believe they were selling it through Orlando.
12     Q.  All right.
13     A.  Although I'm not sure.
14     Q.  Okay.
15     A.  The prices had come down, yes.
16     Q.  Okay.  Did you ever become aware that the
17 Marriott folks, Marriott Vacations Worldwide, was using
18 sales space in the Ritz-Carlton at Aspen Highlands to
19 sell -- at least to discuss, and I think it was to sell,
20 or market Vacation Club product?
21     A.  Within the condominium association property?
22     Q.  Right.
23     A.  No, I was not aware of that.
24     Q.  Did you know whether or not -- so you don't know
25 whether they were doing that one way or another?
                                                  Page 60

1      Q.  Okay.  And they were set up where?
2      A.  They were set up in a commercial space within
3  the Aspen Highlands village.
4      Q.  Okay.  And they were in that space that's now a
5  law firm?  Is that where they were?
6      A.  There were actually two spaces.  The law firm
7  was the primary, and then they downsized into a space
8  which is now, I believe, either a sporting goods store or
9  an art gallery.
10     Q.  Okay.  So when you bought it, it was in the law
11 firm location, I take it?
12     A.  Yes.
13     Q.  And that's where Mr. Aspy, and his fellow
14 salespeople were?
15     A.  Yes.
16     Q.  And do you know how -- and they were selling
17 developer inventory out of that -- out of those two
18 locations?
19     A.  Yes.
20     Q.  And Mr. Skoric was one of the salesmen?
21     A.  Yes.
22     Q.  And do you know how long they were selling
23 developer inventory out of those spaces?
24     A.  I believe they unwound their on-site sales
25 office within the first two years of my -- after I came
                                                  Page 59

1      A.  I do not know.
2      Q.  Okay.
3      A.  I know Mr. Skoric would obviously take people --
4  would take people through tours of the spaces and the
5  lobby, and the amenities, and talk to them as he was
6  touring them, as any broker would do.
7      Q.  But you don't know what -- withdraw that.
8          Did you ever become aware that the folks that
9  were visiting -- the members that were visiting Aspen for
10 their time, were being marketed, too, with respect to
11 Marriott Vacation Club product?
12     A.  No.
13     Q.  If you look at this second page of Exhibit 1020,
14 you'll see the last main bullet point, then it has sub
15 bullet points, it says, "As a result, we have had various
16 one-on-one discussions with four member-controlled boards
17 which has led to adjustments in our planned roll-out."  I
18 guess this is this club re-engineering roll out.
19         And it talks about Bachelor's Gulch, and it said
20 there is no MVW-owned inventory to place in a trust.  It
21 says, "we will not affiliate with Bachelor's Gulch with
22 Marriott Vacation Club" -- what's the "D" stand for?
23     MR. REISER:  Destinations.
24 BY MR. FERGUSON:
25     Q.  Destinations -- "absent an affirmative vote from
                                                  Page 61

16 (Pages 58 - 61)

Randal Mercer - October 24, 2017

1 the majority of the members." Do you see that?
2    A. Yes.
3    Q. And you were -- when did you first become aware
4 of a fellow named Mike Mullenix, who was an officer of the
5 Bachelor's Gulch HOA?
6    A. During my first terms.
7    Q. You'd compare notes and get together with him at
8 various places?
9    A. We had cross club meetings, as we referred to
10 them, where the boards would get together occasionally or
11 have conference calls. Mostly -- mostly conference calls.
12    Q. Okay. And with respect to Aspen Highlands, it
13 says, "Following the unwind of the RCDC trust, we will own
14 13 percent of the Aspen inventory, however we will not be
15 placing this inventory into the MVCD trust until we obtain
16 the support of the members, precluded by the condo docs."
17    Do you see that?
18    A. Yes.
19    Q. Okay. You understood that at some point you had
20 a lawyer named Philip Gosch send a cease and desist letter
21 to the major folks regarding the use of that inventory for
22 Marriott Vacation Club product?
23    A. Are you referring to the cease and desist
24 letter?
25    Q. Yes, I am.
Page 62

1    A. Yes, I'm familiar with that.
2    Q. And you are aware that Mr. Gosch was the
3 recipient of a letter from a Mr. -- I forget his name,
4 David somebody from a law firm called Baker Hostetler
5 saying, no, we can do what we want with that inventory?
6    A. I don't recall seeing that letter.
7    Q. But at least in 2012, Marriott was internally
8 saying they were precluded from doing -- from putting out
9 inventory into the -- into the trust, right?
10    MR. MARX: Object to the form of the question.
11 BY MR. FERGUSON:
12    Q. Looks that way --
13    A. It says so on page 2, so I --
14    Q. Now, --
15    A. I would believe that.
16    Q. -- one of the interesting bullet points on here,
17 with respect to what you'll be testifying about today,
18 sir, is that it says, "We will not affiliate Aspen
19 Highlands with the Marriott Vacation Club" -- or "MVCD
20 absent an affirmative vote from the majority of the
21 members."
22    Q. Do you see that?
23    A. Yes, sir.
24    Q. And you know that there was about, what, 876
25 fractionals at Aspen Highlands, is that about the number?
Page 63

1    A. Exactly.
2    Q. Okay. I don't know how, it's an odd number, but
3 it does.
4    And so a majority of the members would be how
5 many? 433? 434?
6    A. Sounds right.
7    Q. Was there ever a vote, sir, of 433 people, plus
8 one, 50 percent, to affiliate the Aspen Highlands with the
9 Marriott Vacation Club?
10    A. I don't believe so.
11    Q. No. What there was, was about 70 people that
12 answered a survey in late 2013, right?
13    A. Yes.
14    Q. And based upon that survey, there was an
15 affiliation?
16    A. No.
17    Q. Okay. You signed the MOU acknowledging the
18 affiliation where people today at the Aspen Highlands
19 club, Ritz-Carlton Aspen Highlands, those members can put
20 in some of their time into the Lion & Crown Travel
21 program, they can do that, right?
22    A. If that's what you're referring to --
23    Q. Yes.
24    A. -- as an affiliation, then, --
25    Q. Yeah.
Page 64

1    A. -- yes.
2    Q. Okay. So you don't see that as an affiliation,
3 even though the document you signed says affiliation?
4    A. I look at it as an optional program. I don't
5 consider the legal words. I suppose it's an affiliation,
6 yeah.
7    Q. Okay. So there was never a vote, was there, of
8 the members to affiliate?
9    A. There was never a vote of the members to
10 affiliate.
11    Q. And there was never a survey or a vote of the
12 majority of the members?
13    A. There was a survey that was sent out to all 876
14 members which asked if they were interested in taking part
15 in an optional program.
16    Q. All right. And between February of 2012, when
17 this internal memorandum, internal, when they were saying
18 they were going to get a majority of the members to vote
19 regarding an affiliation, between then and about a year
20 and a half later, or more than that, a year and eight
21 months later, there was a survey in December of '13.
22 That's what lapsed between 2000 -- sorry, between February
23 of 2012 and December of 2013, about a year and eight
24 months, year and ten months?
25    A. Sure.
Page 65

17 (Pages 62 - 65)

Veritext Legal Solutions
866 299-5127

Randal Mercer - October 24, 2017

| | |
|---|---|
| 1   MR. MARX: I object to the form of the question. | 1   little bit wacky because it's one that's in a landscape |
| 2   MR. FERGUSON: What's your objection? | 2   format. Most of them will not be. |
| 3   MR. MARX: Lacks foundation. Mischaracterizes | 3   The bullet point there says, "MVW has executed |
| 4   the document. Among others. Compound. Complex. | 4   strategy to close most of the Ritz-Carlton Destination |
| 5   Vague. Ambiguous. | 5   Club sales distribution locations and convert a few to |
| 6   MR. FERGUSON: How does it mischaracterize the | 6   sell the North America points product." |
| 7   document, sir? | 7   What's North America points product? |
| 8   MR. SHEA: Let's don't waste time. | 8   A. I do not know. |
| 9   MR. FERGUSON: No, I want to clear up my | 9   Q. Is it Marriott Vacation Club product? |
| 10   questions. This is something I need to play at the | 10   A. I do not know. |
| 11   deposition -- at the trial. I need to know what | 11   MR. MARX: Object to the form of the question. |
| 12   you're -- what's mischaracterized, because I don't | 12   MR. FERGUSON: What's your objection? |
| 13   like being told I'm mischaracterizing a document. | 13   MR. MARX: Leading. Suggests the answer. |
| 14   MR. MARX: No, and I appreciate the opportunity | 14   MR. FERGUSON: All right. I can lead, so, thank |
| 15   to explain. | 15   you. |
| 16   MR. FERGUSON: Sure. | 16   Q. My question wasn't leading. It was, do you know |
| 17   MR. MARX: You -- as I understood your question, | 17   what it is, and your answer is you don't know? |
| 18   you purported to make a characterization as to the | 18   A. I don't know. |
| 19   intent behind words on a document that this witness | 19   Q. And then I asked you, do you think it's a |
| 20   is not the author of. | 20   Marriott Vacation Club, and you said you don't know? |
| 21   MR. FERGUSON: All right. So that's your | 21   A. I don't know. |
| 22   foundational question, too -- objection, rather? | 22   Q. Okay. It says -- so did -- it says then in the |
| 23   That he doesn't know what was in the mind of | 23   second bullet point on page 4 of 1020, "The sites that are |
| 24   Marriott? | 24   now selling the North America points product include," and |
| 25   MR. MARX: Nor could he possibly have. | 25   you see Aspen there, right? |
| Page 66 | Page 68 |

| | |
|---|---|
| 1   MR. FERGUSON: Well, -- he -- okay. Let me | 1   A. Yes. |
| 2   clear that up then. | 2   Q. And that's what I was referring to before, were |
| 3   Q. This document is dated February of 2012. Okay? | 3   you aware that MVW was using the -- was using an Aspen |
| 4   And the words say, okay, someone at Marriott Vacation | 4   site to now sell North America points in a program you |
| 5   Clubs and Ritz-Carlton, so Marriott Vacation Worldwide | 5   don't know what it is? |
| 6   people, put the words down, "We will not affiliate Aspen | 6   A. No, sir. |
| 7   Highlands with MVCD absent an affirmative vote from the | 7   MR. FERGUSON: I'll break there. |
| 8   majority of the members." Those words are written in | 8   THE VIDEOGRAPHER: Stand by. We are going off |
| 9   early 2012. About a year and ten months later, you were | 9   the record. The time is 10:14. |
| 10   involved in a survey process where about -- in a survey | 10   (Recess taken -- 10:14 a.m.) |
| 11   process, right, December of '13? | 11   (Return from recess -- 10:27 a.m.) |
| 12   A. Yeah. | 12   THE VIDEOGRAPHER: We are going back on the |
| 13   Q. Okay. So we're going to cover the time frame | 13   record. The time is 10:27. |
| 14   between February of 2012 and up until December '13 when | 14   BY MR. FERGUSON: |
| 15   this survey was taken. Okay? | 15   Q. Sir, just digress for a second; CBRE, I |
| 16   A. Okay. | 16   understand that they shut down or no longer went with |
| 17   Q. Okay. | 17   their affiliate offices -- affiliation, by the way, is a |
| 18   MR. SHEA: Hey, Matt, when you get a chance, a | 18   voluntary situation, right? It's not something you're |
| 19   breaking point, can you take a break? | 19   forced to do with Marriott, it's totally voluntary? |
| 20   MR. FERGUSON: Yeah, let me see if I can finish | 20   A. I don't understand that. |
| 21   this document. | 21   Q. Let me withdraw that. |
| 22   MR. SHEA: Yeah, okay. | 22   You had an affiliation -- sorry. The CBRE |
| 23   BY MR. FERGUSON: | 23   office you had here was an affiliate, not a |
| 24   Q. Yes, if you would look at Exhibit 1020, and | 24   corporate-owned office, right? |
| 25   there's a 004 at the bottom. And this document is a | 25   A. We called it a partner office. They called it |
| Page 67 | Page 69 |

18 (Pages 66 - 69)

Randal Mercer - October 24, 2017

1 an affiliate office.
2    Q.  Okay.  Did CBRE maintain a presence here in Fort
3 Myers?
4    A.  No.
5    Q.  Okay.  Are you aware that CBRE has had some
6 involvement in listing and/or selling certain Ritz assets,
7 including Abaco?
8    A.  No.
9    Q.  Have you spoken to any CBRE people about Ritz
10 properties here in Florida?
11   A.  No.
12   Q.  How about in Abaco?
13   A.  No.
14   Q.  By the time 2012 rolled around and you -- you're
15 about to -- I guess you were about to become an interim
16 member of the commercial -- of the commercial board
17 portion of this association, what clubs had you visited,
18 RCDC clubs had you visited, between 2004 and 2012?
19   A.  St. Thomas, Jupiter.
20   Q.  Any others?
21   A.  No.
22   Q.  Okay.  And did you use those for getaways, or
23 for business in those parts of -- I'm sorry, at least
24 Jupiter, was that for business or was it for pleasure?
25   A.  It was pleasure once we escaped Hurricane

                                                    Page 70

1 Charley by going to Jupiter.  So I'm not sure what that
2 week was.
3    Q.  Okay.  And how many times had you used
4 St. Thomas between '04 and 2012, if you recall?
5    A.  Three or four.
6    Q.  One -- one-week stays?  Two-week stays?
7    A.  One week.
8    Q.  And same for Jupiter, how many times had you
9 used those properties?
10   A.  Several.  Three or four, perhaps.
11   Q.  Never used Kapalua?
12   A.  No.
13   Q.  Abaco?
14   A.  No.
15   Q.  Tahoe or San Francisco?
16   A.  No.
17   Q.  Was there any particular club that they promised
18 to bring into the system that they didn't that you were
19 particularly interested in when you bought in 2014 --
20 2004, rather?
21   A.  Kapalua we were very interested in.  I had never
22 been to Hawaii.  Wanted to go.
23   Q.  But it left to fold before you had an
24 opportunity to do that?
25   A.  Yes.

                                                    Page 71

1    Am I supposed to keep this exhibit?
2    MR. SHEA:  Just keep it in front of you.
3    THE WITNESS:  Okay.  That's fine.
4    MR. FERGUSON:  You can make a pile there.  You
5 can just put them down.
6    (Sotto voce discussion among plaintiffs'
7    counsel.)
8    (Exhibit 1021 previously marked for
9    identification produced to the witness.)
10 BY MR. FERGUSON:
11   Q.  Let me show you Exhibit 1021.  Sir, this is --
12 again, this is a second document today, and it's also a
13 Marriott-produced document.
14      The first part of it is DiMeglio to Hearns, and,
15 as you know, these are print out in -- these strings print
16 out with the earliest on the last page, a little
17 counterintuitive, but you're probably used to that.
18      So DiMeglio to Hearns, it says, "Good afternoon,
19 John.  I am forwarding to you Randy's official volunteer
20 form.  We will be sending all the candidates in to AG on
21 Monday.  Tyler also submitted his name."
22      Who's AG?  Or what is AG?
23   A.  Association governance.
24   Q.  And that would be Hearns's group, or is that
25 somebody else?

                                                    Page 72

1    A.  I have no idea who their direct report is.
2    Q.  All right.  And so Nicholas, did you give your
3 volunteer form to him?
4    A.  I mailed it in as requested.
5    Q.  And are you aware that that was your -- your --
6 the fact of your running as a volunteer for the Tourist
7 Accommodation Board again was being discussed about
8 internally before the election?
9    A.  No.
10   Q.  You'll see that Hearns spoke -- wrote in his
11 email to Sobeck at the top, Stephanie Sobeck, S-O-B-E-C-K.
12 On June 11, 2012, it says that, "Stephanie, if he has
13 already -- if he has not already done so, I understand
14 that Jay Neveloff may request that the developer vote
15 their interest in the upcoming board of directors --
16 director election to ensure that both Randy Mercer and
17 Tyler Oliver was elected to the board."
18      Do you see that?
19   A.  I do.
20   Q.  Okay.  I asked you about that before, whether or
21 not the Marriott people could vote their inventory
22 interest in favor of a candidate, and you didn't believe
23 they could.
24      MR. SHEA:  Objection.  Misleading.
25      MR. FERGUSON:  I thought he said that he didn't

                                                    Page 73

                                        19 (Pages 70 - 73)

Randal Mercer - October 24, 2017

1 think they could.
2    MR. SHEA: Mis -- my objection is misleading.
3 So --
4 BY MR. FERGUSON:
5    Q. All right. Can you answer that question?
6 Otherwise I'll repeat it.
7    A. Not in the way you asked it, so, no.
8    Q. Okay. Did you testify, or not, before that you
9 thought that the developer could not vote its inventory
10 interest in an election?
11    A. I believe I answered they would not.
12    Q. That was a different situation, wasn't it, what
13 they wouldn't vote?
14    A. It was my understanding they never voted their
15 interest. I did not know one way or the other.
16    Q. In an election?
17    A. Yeah.
18    Q. What was worked out at some point when there was
19 going to be a vote was -- for the affiliation in 2012 and
20 into 2013, was that the Marriott would not vote its 13.4
21 percent in that election, right?
22    A. I don't know.
23    Q. You don't recall that?
24    A. You're talking about the survey?
25    Q. No, not the survey. I'm talking about the vote
Page 74

1    Q. Okay. S-C-H-A-V-E-M-A-K-E-R.
2    A. Mm-hmm.
3    Q. What was his role with respect -- if you know,
4 what was his role --
5    A. I do not know.
6    Q. -- with respect to Ritz-Carlton?
7    A. I do not know.
8    Q. It says, "Jay feels that there is a positive and
9 collaborative momentum on the current board of Aspen and
10 is anxious to maintain this synergy and feels that the
11 others on the ballot have the potential to disrupt what
12 has been accomplished in the past year."
13    So you have one president putting his two cents
14 in with the Marriott with whom you have some issues of
15 disharmony, he's putting his two cents in as to who he'd
16 like to see come on the board in the next election?
17    A. By this document, you could be right.
18    Q. In fact, Mr. Neveloff was in touch with you
19 prior to the election about the election and what was
20 going on with Marriott, right?
21    A. Please restate.
22    Q. Sure. Was Mr. -- Mr. Neveloff was in touch with
23 you throughout the summer of 2012, by email at least,
24 because we don't have records of his phones, but by email
25 he was in touch with you about the upcoming election and
Page 76

1 that was promised. Okay. When there was going to be a
2 vote whether to affiliate or not, and it's the upshot of
3 Exhibit 1020 we just saw, there was a deal worked out that
4 when there was a vote of the majority of the members, that
5 it would not include the 13.4 percent owned by Marriott.
6    MR. MARX: Object to the form of the question.
7    THE WITNESS: I don't recall that. If you can
8 show it to me, I'll be --
9 BY MR. FERGUSON:
10    Q. Okay. We'll get to that. So you don't recall
11 that as you sit here today?
12    A. No.
13    Q. Okay. As far as voting in an election for a
14 board of director, you don't -- did you once -- did you
15 think that they couldn't -- they didn't vote in those
16 elections?
17    A. It was my understanding that they never voted in
18 an election.
19    Q. It goes on here, Mr. Hearns at Ritz-Carlton to
20 Stephanie Sobeck -- do you know Dirk Schavemaker?
21    A. I met him once.
22    Q. Who is he?
23    A. I'm not sure if he worked for the Ritz or the
24 Marriott. I believe it's pronounced Schavemaker --
25 Schavemaker.
Page 75

1 what was going on with Marriott and the affiliation?
2    A. I'm sure we kept in contact. I don't recall any
3 specifics.
4    Q. But you were being groomed to come back on the
5 board as the president before the election occurred,
6 right?
7    A. No. I was being groomed to come back on the
8 board. I was -- that's it.
9    Q. But at least Mr. Neveloff, it would appear, was
10 putting whatever influence he had in to have the Marriott
11 folks vote their interest in the upcoming election for you
12 and Mr. Oliver?
13    A. That's what it appears.
14    Q. Had you ever served with Mr. Oliver before on
15 the board?
16    A. Yes.
17    Q. And --
18    A. I believe he was on the board the last year
19 before I termed out.
20    Q. And is he in his last year now? Is he in the
21 same --
22    A. He's not on the board anymore.
23    Q. Not on the board anymore, okay. He rolled off,
24 what, a year ago?
25    A. Yes, sir.
Page 77

20 (Pages 74 - 77)

Randal Mercer - October 24, 2017

1   Q.   And had you known Mr. Oliver outside his serving
2   on the board of directors with you?
3   A.   I did not.
4   Q.   And he's in the real estate industry in some
5   way?
6   A.   He's a real estate developer, yes.
7   Q.   Up in Missouri?
8   A.   He lives in Kansas City, I believe.
9        (Exhibit 1023 previously marked for
10       identification produced to the witness.)
11  BY MR. FERGUSON:
12  Q.   This is Exhibit 1023 (handing).
13       Sir, Exhibit 1023 is a letter that I have, let
14  me just see, it's July of 2012.  But I'm going to come
15  back and forth to this a few times.  But do you recall
16  this letter by Babich to members of the Ritz-Carlton
17  Destination Club Aspen Highlands?
18  A.   Not well, but I remember seeing it.
19  Q.   Okay.  This is breaking news to -- from
20  Ms. Babich.  Ms. Babich is in charge of the Cobalt Travel
21  Company, LLC, right?  Or she's in charge of -- she works
22  with.
23  A.   Mm-hmm.
24  Q.   She's general manager there?
25  A.   Don't know.  Appears that way.

Page 78

1   Q.   All right.  In that role, she oversees the
2   reservationists and the -- advises that -- assists at the
3   Ritz-Carlton Destination Club members like you?
4   A.   It appears that way, yes.
5   Q.   And through her company, or that company, The
6   Cobalt Travel Company, you all put -- that's the vehicle
7   you all use to trade or use other people's weeks within
8   the system itself?  So if you wanted to trade with
9   Mr. Oliver -- not trade, but if you wanted to put it in
10  and Mr. Oliver picked up time, that was the bank that you
11  all used as a group?
12  A.   I've never done that, so I'm not sure.  There
13  are a lot of companies.
14  Q.   All right.  Well, did you know who Ms. Babich --
15  what she did, what her role was?
16  A.   She was always on conference calls with us, and
17  I always assumed she was part of the member services
18  group.
19  Q.   Okay.
20  A.   That may be the same.
21  Q.   Right.  I think it is.
22  A.   Okay.
23  Q.   So this letter went out -- what's the date on
24  the -- so this, we believe, is July 17, 2012.  And this
25  letter gained some notoriety over the next couple of

Page 79

1   years, and still does.
2        It talks about, in paragraph two, a decline in
3   the economic climate.  It's the third line.  Do you see
4   that?  "As a result, some adjustments had to be made but
5   in other areas we're continuing to advance forward.  Rest
6   assured that as we advance forward, nothing about your
7   Home Club Membership has changed."
8        Do you see that?
9   A.   Yes.
10  Q.   And then if you go another paragraph down, it
11  talks about "After careful consideration," do you see that
12  paragraph?
13  A.   Yes.
14  Q.   It says that the Abaco Bay -- sorry, the Abaco
15  Club at Winding Bay would no longer be Ritz-Carlton
16  branded due to a strategic decision someone had made.  Do
17  you see that?
18  A.   Yes.
19  Q.   So by July of 2012, your members are being told
20  that Abaco was being de-branded or was leaving the brand
21  due to a strategic decision by somebody?
22  A.   Yes.
23  Q.   And then also in this letter, it looks like a
24  week beforehand, it says that on July 10th the
25  Ritz-Carlton Management Company, LLC, as manager of the

Page 80

1   company known as the Ritz-Carlton Club, Kapalua Bay,
2   exercised its right to issue a default notice."
3        Do you see that?
4   A.   Yes.
5   Q.   Okay.  Ultimately that club was lost to the RCDC
6   system, right?
7   A.   Yes.
8   Q.   Now, if you look at the next one, Ms. Babich,
9   your customer services person, says, "While we understand
10  that it may be disappointing," were you disappointed when
11  Kapalua Bay was out of the system?
12  A.   Yes.
13  Q.   More than may, right?  You were absolutely
14  disappointed?
15  A.   I was disappointed.
16  Q.   So you have a general manager at Cobalt
17  suggesting that you all may be disappointed, but in fact
18  you were, right?
19  A.   I was.
20  Q.   You were -- withdrawn.
21       Now, she says at the end of that paragraph where
22  she says you may be disappointed, it says, "We have
23  determined new ways to provide a variety of experiences."
24       Do you see that?
25  A.   Yes.

Page 81

21 (Pages 78 - 81)

Randal Mercer - October 24, 2017

1  Q.  And it says, "Based on the Ritz-Carlton
2  Destination Club member feedback, additional benefits and
3  experiences will be available through a new affiliation
4  with the Marriott Vacation Club Destinations."
5     That's what the D stands for.
6     "This affiliation will enable Ritz-Carlton club
7  members to expand their options."
8     Do you see that?
9  A.  Yes.
10  Q.  And that's exactly what happened by 2014.  They
11  were able to, quote-unquote, expand their options because
12  they could use Lion & Crown Travel system to put in their
13  time in order to use the Marriott Vacation Club
14  Destinations, right?  That ultimately happened?
15     MR. SHEA:  Who's the "they" in the question?
16     MR. FERGUSON:  The members.
17     THE WITNESS:  I'm not sure I understand the
18  question.
19  BY MR. FERGUSON:
20  Q.  All right.  So she says that based on
21  feedback -- let me break this down, and I'll come back to
22  that question in a moment.
23     Do you know what she's speaking about regarding
24  feedback for additional benefits and experiences?
25  A.  No.

Page 82

1  Q.  Okay.  And you attended one of those in Naples?
2  A.  Yes, I did.
3  Q.  And did you go there for the particular --
4  specific purpose of understanding what was being presented
5  at these --
6  A.  Yes.
7     MR. MARX:  Wait, could you -- I'm sorry, could
8  you just let --
9     MR. FERGUSON:  Yeah, let me --
10     MR. MARX:  And the reason I'm being insistent
11  here --
12     MR. FERGUSON:  Sure.
13     MR. MARX:  -- is because I think there's an
14  inherent confusing nature to this discussion
15  regarding a points program and whether it's the
16  points program relating to Marriott Vacation Club
17  Destinations or a portfolio points program relating
18  to the Ritz-Carlton product that is quite different.
19     MR. FERGUSON:  Yeah.
20     MR. MARX:  And I think clarity would be more
21  helpful.
22  BY MR. FERGUSON:
23  Q.  I don't think -- I think we've established -- do
24  you know what point system we're talking about at this
25  point?  What were they -- what did you observe them

Page 84

1  talking about, what point system?
2  A.  My under -- my takeaway was that we could trade
3  our week for points.  And at that point my eyes glazed
4  over.  I did not understand completely how it worked
5  because I had never been involved in a timeshare scenario
6  before.
7  Q.  Were they talking about a point system, as she
8  writes here, that would be available through a new
9  affiliation with the Marriott Vacation Club Destinations?
10  That's what I'm focusing on.
11  A.  Mm-hmm.
12  Q.  When you went there, was it regarding MVC?
13  A.  Yeah, they were Marriott properties.
14  Q.  Were they telling you that there would be an
15  affiliation that would allow RCDC members to utilize their
16  allocated or unallocated time to visit Marriott Vacation
17  Club Destinations?
18  A.  I think that was the gist of the presentation.
19  Q.  The last sentence that I was asking you about
20  before and I said I'd come rolling back to it is, "This
21  affiliation will enable Ritz-Carlton Destination Club
22  members to expand their options."  Okay?
23     Focusing on that sentence, at some point
24  following the survey in late '13, early '14, you signed an
25  MOU with an affiliation that allowed your members to put

Page 85

1  Q.  Do you know whether they had gone to your
2  membership to ask for feedback regarding additional
3  benefits and experiences through a new affiliation with
4  the Marriott Vacation Club Destinations?
5  A.  They -- meaning Marriott, Ritz, whomever --
6  conducted a series of road shows, as I refer to them.
7  They conducted one at the Ritz-Carlton Hotel in Naples for
8  those Ritz-Carlton Destination Club members in Southwest
9  Florida, to introduce what they referred to as the point
10  system.
11     I went down.  I was interested.  Didn't
12  understand points and the math and it seemed very -- very
13  complex to me, so I didn't pay much attention to it.  And
14  they did that at various high-density membership areas.  I
15  assume they did Miami.  I assume they did Atlanta.  And
16  they were doing PowerPoint presentations on screens to
17  club members of what a points program would look like to
18  try and introduce us to the concept.  I'm not sure if
19  that's what they're referring to as --
20  Q.  Okay.
21  A.  -- in here.
22  Q.  Yeah, we don't know what she's referring to, but
23  what you witnessed was, there was a road show where they
24  were making presentations about this point system?
25  A.  Yes.

Page 83

22 (Pages 82 - 85)

Randal Mercer - October 24, 2017

1 their time into the Marriott Vacation Club Destinations
2 to -- to have, including as an option, the ability to
3 visit Marriott Vacation Club Destinations?
4     A. I signed an MOU that dealt with an exchange, not
5 an affiliation.
6     Q. Well, you all have some relationship because
7 what you're affiliating with is you're able to utilize the
8 Marriott Vacation Club Destinations?
9     A. If someone signs up for that, they are able to
10 use Marriott -- Marriott sites.
11     Q. So they're now affiliated with it, right?
12     A. That's your term. It's an exchange -- my term
13 is exchange.
14     Q. All right. And in exchange for that, the
15 Marriott Vacation Worldwide people, Marriott Vacation Club
16 people, they can utilize points to vie for and utilize the
17 Ritz-Carlton Aspen?
18     A. For that one week that I or any member would
19 exchange out.
20     Q. Okay.
21     A. Yes.
22     Q. So if 100 people put in their weeks, and
23 Marriott Vacation -- when they put it -- let me withdraw
24 that.
25        Do you know when, if you put in a week of your
                                                    Page 86

1     Q. Okay.
2     A. I think they all probably all came from that.
3     Q. But it's the Lion & Crown -- some company that
4 allows Marriott Vacation Club people to come and utilize
5 Aspen Highlands, right?
6     A. I do not know.
7     Q. Okay. Why don't you know that? Isn't that
8 something you have been in charge with, of, for the
9 last --
10     A. No.
11     Q. -- five and a half years?
12     A. I never signed up for it. I don't know what the
13 name of the program is.
14     Q. Yeah, but you signed a document that allowed
15 some population within the 450,000 Marriott Vacation Club
16 people that have enough points, but some population of
17 those people can now utilize your club at Aspen Highlands,
18 right?
19     A. I signed a document that allows Ritz-Carlton
20 Club members of Aspen Highlands to trade their week into
21 another vehicle.
22     Q. Right.
23     A. That's it.
24     Q. Based upon 74 people answering a survey?
25     A. It gave us a very good indication and gave us a
                                                    Page 88

1 time, if you're a part of the Lion & Crown -- which I
2 think you indicated you're not utilizing, right?
3     A. I am not a member.
4     Q. You're not a member. But if you were a member,
5 if you put it in, is it -- does it automatically get
6 utilized by a Marriott Vacation Club person, or can it be
7 used by other -- other RCDC members, or do you know?
8     A. If I give my week to a program, that week,
9 specific week, is used by the program that I would give it
10 to.
11     Q. Okay.
12     A. Whether it be Third Home Exclusive Resorts or
13 Marriott.
14     Q. Or Lion & Crown?
15     A. One week in, one week out, same week.
16     Q. I'm talking about Lion & Crown right now.
17     A. Okay. Lion & Crown, Marriott. To me, that's
18 Marriott.
19     Q. That's fine. Okay. Yeah, I asked Mr. Marsden,
20 where did they come up with that name, Lion & Crown?
21     A. Because the lion and the crown is the symbol of
22 the Ritz-Carlton.
23     Q. Okay.
24     A. And Cobalt is blue, and that's the color of the
25 Ritz-Carlton.
                                                    Page 87

1 glimpse as to what the people wanted.
2     Q. Really? So it's your testimony --
3        MR. SHEA: Objection. Sarcastic remark that
4     isn't warranted.
5 BY MR. FERGUSON:
6     Q. Is that really what you're saying?
7        MR. SHEA: That's not the way you treat a
8     witness.
9 BY MR. FERGUSON:
10     Q. Is that really what you're saying, that based on
11 74 or so people responding to a survey, that based upon
12 that, you believe you had a green light to go forward with
13 this affiliation?
14     A. I believe that the survey gave us a glimpse into
15 what the members wanted.
16     Q. And what type of studies, analysis, did you look
17 at that, you know, less than 10 percent of the people or
18 the members of the RCDC Aspen Highlands, what did you look
19 at that said those 74 people are actually projecting a
20 glimpse of what everybody else wants?
21     A. There are very few members that respond to
22 anything, annual meetings, proxies, things like -- the
23 number of people who responded were always very, very low.
24     Q. Right. But Mr. Mullenix was able to pull off an
25 election, was he not?
                                                    Page 89

23 (Pages 86 - 89)

Randal Mercer - October 24, 2017

| | |
|---|---|
| 1   A.  Of? | 1   A.  One, two -- there are five. |
| 2   Q.  Of his entire membership with respect to whether | 2   Q.  Five, okay.  You're right. |
| 3  or not to leave the Ritz-Carlton brand and not affiliate | 3     And she says in the second one, "Secure any of |
| 4  with Marriott Vacation Club? | 4  the 51 worldwide Marriott Vacation Club resorts, including |
| 5   MR. MARX:  Object to the form of the question. | 5  Europe."  Do you see that, that bullet point? |
| 6   THE WITNESS:  I don't know the details of his -- | 6   A.  Yes. |
| 7 BY MR. FERGUSON: | 7   Q.  They're not guaranteed getting that today?  If |
| 8   Q.  Well, you do know the details because he sent | 8 you put in some of your allocated or unallocated time, |
| 9 you the details of what happened there.  He told you | 9 you're not guaranteed to get into one of those 51 resorts, |
| 10 exactly who voted, how the vote was going, and that he -- | 10 are you? |
| 11 I think he got -- he told you he had 89 percent of his | 11   A.  I don't know that. |
| 12 membership voted to exit that program. | 12   Q.  You received emails from people saying, hey, you |
| 13   A.  If he did, I'll be happy to read that. | 13 just did this affiliation, and I can't get into the |
| 14   Q.  Okay.  But you suggested you didn't know that. | 14 Marriott Vacation Club in Europe, have you gotten those |
| 15 But do you recall that you actually did know what was | 15 types of emails? |
| 16 going on? | 16   A.  Not that I recall. |
| 17   MR. SHEA:  Objection.  Argumentative. | 17   Q.  In the fifth bullet point, she says, "Book any |
| 18   THE WITNESS:  No, I don't know the exact number. | 18 experience in the Explorer Collection which includes over |
| 19 BY MR. FERGUSON: | 19 100 experiences to enjoy." |
| 20   Q.  Pulling off an election in any non-profit | 20     What are these -- what are these 100 experiences |
| 21 organization with a lot of members is a chore, is it not? | 21 being; do you know?  I don't want you to go through a |
| 22   A.  Changing the condominium documents always | 22 hundred, but what, generally, are they? |
| 23 requires at least a majority. | 23   A.  Although I'm not positive, a safari would be an |
| 24   Q.  All right.  Why are you talking about changing | 24 example of an experience to me. |
| 25 the condominium documents? | 25   Q.  All right.  It says in the last bullet point |
| Page 90 | Page 92 |

| | |
|---|---|
| 1   A.  Because I assume that that's what -- what it | 1 continuing after "100 experiences to enjoy," "The Explorer |
| 2 would take to change -- change the flag, although I don't | 2 Collection will replace the current affiliation with |
| 3 know that. | 3 Abercrombie & Kent Residence Club."  There had been an |
| 4   Q.  So you don't know whether you had to change a | 4 affiliation of some sort or connection with this entity, |
| 5 condominium document to get rid of the flag? | 5 Abercrombie & Kent? |
| 6   A.  No, sir, I don't. | 6   A.  There had been. |
| 7   Q.  Okay.  A majority is 50 percent plus 01, right? | 7   Q.  Okay.  And that was an exclusive travel |
| 8   A.  Yes. | 8 experience provider? |
| 9   Q.  Okay.  Do you have any knowledge of Colorado | 9   A.  Yes. |
| 10 law, generally, as to what is required in order to change | 10   Q.  And that didn't last long, did it? |
| 11 a declaration? | 11   A.  I don't believe it did. |
| 12   A.  I would assume it's at least a majority. | 12   Q.  Did you ever sign up for that or utilize it? |
| 13   Q.  But you don't -- you don't know what it is for | 13   A.  No, sir. |
| 14 this particular association? | 14   Q.  Were you on the board when it came online? |
| 15   A.  No, because we don't do it. | 15   A.  Yes. |
| 16   Q.  You never changed a home -- a declaration for | 16   Q.  Okay.  Were you -- was your board involved in |
| 17 the -- | 17 that, or was it something Marriott just made available to |
| 18   A.  I believe the declaration has been changed once | 18 your membership? |
| 19 after developer turnover, but certainly nothing recently. | 19   A.  I believe it just became available. |
| 20   Q.  So at the bottom of the page where it says, | 20   Q.  And the Explorer Collection is what today?  Do |
| 21 "Affiliation will extend you the opportunity to deposit | 21 you know what the Explorer Collection is? |
| 22 your reserved allocation on an annual basis.  Once you | 22   A.  I have no idea. |
| 23 deposit it, the following will be available to you," and | 23   Q.  If you look at the next set of bullet points, |
| 24 she gives several bullet points.  It looks like she gives | 24 there are four there, it says, "To clarify, nothing about |
| 25 you five.  Do you see those?  I think it's four. | 25 the Home Club Membership that you purchased has changed." |
| Page 91 | Page 93 |

24 (Pages 90 - 93)

Randal Mercer - October 24, 2017

1      It actually had changed, had it not?  Because
2  Home Club Membership entitled an RCDC member to utilize
3  time in Kapalua and Abaco, right?
4      MR. MARX:  Object to the form of the question.
5      THE WITNESS:  Could you please restate that?
6  BY MR. FERGUSON:
7      Q.  Yeah, sure.  She says, "To clarify, nothing
8  about the Home Club Membership that you purchased has
9  changed."
10      And let me do it this way, we do know that what
11  had changed, or whatever she's referring to -- what she's
12  referring to is Home Club Membership here, we do know that
13  at least the rights or the ability of your members to
14  utilize -- your RCDC's people rights to utilize Abaco were
15  no longer existent?
16      A.  I would disagree.  It had not changed because
17  Abaco and Kapalua were not yet opened, so they were never
18  available to us to use.
19      Q.  They never -- they never got opened?
20      A.  I do not believe so, no.
21      Q.  But they had been in the RCDC system?
22      A.  It was in the pipeline, something we could use
23  in the future.
24      Q.  Your members were using Kapalua; did you know
25  that?

Page 94

1      A.  No.
2      Q.  They were reserving there?  Did you know they
3  were reserving there?
4      A.  No.
5      Q.  She says, "Exchange your reserved allocation
6  with fellow Home Club Members via the existing Cobalt
7  Travel Company."  And that's what I was referring to
8  before, the Cobalt Travel Company is how RCDC members
9  exchanged and -- might have swapped -- exchanged allocated
10  time?
11      A.  Okay.
12      Q.  Is that right?
13      A.  I'm not sure.  Possibly.
14      Q.  And it says, "You can continue to enjoy the
15  Ritz-Carlton 2012 hotel reservation service."  Is that
16  something Ms. Babich's group provided to you all as RCDC
17  members?
18      A.  That always was available to us.
19      Q.  That's who you would call if you wanted to book
20  your unallocated time?
21      A.  That's who -- the hotel services who we would
22  call if we wanted to book a hotel that had a Ritz-Carlton
23  flag.
24      Q.  And was there any benefit as a member of RCDC
25  with respect to booking -- I see what you're saying.

Page 95

1      That's a different deal.
2      Okay.  So did you have any perk, benefit,
3  allowance in terms of availability or price to utilize
4  Ritz-Carlton branded hotels?
5      A.  The hotels that participated in -- in that
6  program, offered Ritz-Carlton Destination Club members
7  30 percent of the advertised rack rate, based on
8  availability.
9      (Sotto voce discussion among plaintiffs'
10      counsel.)
11      THE WITNESS:  Would you like me to restate that?
12      MR. FERGUSON:  No, I'll read it here.
13  BY MR. FERGUSON:
14      Q.  Okay.  Now, when you utilized St. Thomas, for
15  example, did you use Cobalt?
16      A.  No, we just called Member Services and they made
17  the arrangements.
18      Q.  Okay.  And do you know whether Member Services
19  was under the Cobalt Travel Company umbrella?
20      A.  No.  They always answered the phone "Member
21  Services."
22      Q.  So you don't know what Member Services -- what
23  company that was that was providing that service?
24      A.  I do not know what umbrella Member Services
25  falls.

Page 96

1      Q.  Do you know what Cobalt Travel Company even is?
2      A.  It is a travel agency owned by Ritz-Carlton and
3  Marriott, and I don't know exactly the ownership
4  structure, no, I don't.
5      Q.  But the cobalt color denotes that it has some
6  type of connection with the Ritz-Carlton brand?
7      A.  Sure.
8      Q.  And as a board member now for, I don't know, on
9  and off for 15 years or so, to date you still don't know
10  what Cobalt is?
11      A.  It never concerned me.  I always called Member
12  Services for reservations.
13      (Exhibit 1026 previously marked for
14      identification produced to the witness.)
15  BY MR. FERGUSON:
16      Q.  Let me show you another exhibit, 12 -- 1026
17  (handing).  You'll see that this is similar to
18  Exhibit 1020 -- 1023 that I just spent some time with.
19  But this one is similar, I think, until the last page.
20  You'll see it's a longer letter.  Do you see that?
21      A.  I'm comparing the two.  It looks identical on
22  the first page, it does.
23      Q.  I believe so.
24      A.  Okay.
25      Q.  So there's an extra paragraph here, is there

Page 97

25 (Pages 94 - 97)

Randal Mercer - October 24, 2017

1  not, Mr. Mercer?
2      A.  Yes.
3      Q.  Okay.  And this paragraph has to do with
4  implementing additional "options under the Lion & Crown
5  Travel Company will require the execution of an addendum
6  to your current enrollment agreement."
7          Do you know what that meant?  Did it have
8  something to do with the fact that some members are
9  already enrolled in something called Lion & Crown?
10     A.  Give me a chance to read this here.
11         Okay.  Would you repeat the question, please?
12     Q.  Yeah.  I mean, do you know what this has to do
13  with?  Some members got a different letter, and it appears
14  that they had maybe enrolled already in Lion & Crown, and
15  they were being told in bold underline -- I think it's
16  underlined -- no, that's my underline -- bold letters that
17  they had to sign an addendum, otherwise they wouldn't
18  accept reservations, do you know anything about that?
19     A.  No, sir.
20     Q.  Because you never enrolled in any Lion & Crown
21  program?
22     A.  No, sir.
23     Q.  So you wouldn't have gotten this letter
24  probably?
25     A.  No, sir.

Page 98

1      Q.  Did you know -- at this time you were -- by June
2  of -- sorry, by July of 2012, you were on the board as a
3  commercial director, right?
4      A.  Yes, sir.
5      Q.  When you were on the board by July of 2012, were
6  you being kept abreast of Mike Mullenix's and
7  Ms. Perfido's concerns regarding the potential affiliation
8  with Lion & Crown and the Marriott Vacation Club?
9      A.  I knew that they were considering dropping the
10  flag.  I was not on the TA board, so I don't believe I was
11  privy to too many details other than that.
12     Q.  Okay.  Do you know whether or not the
13  association, board of directors, was given any -- the
14  right or the ability to put any -- give any input into
15  those two letters we saw, 1023 -- 1023 and 1026, those
16  letters from Ms. Babich to your members?  Do you know
17  whether the board had any input into those letters that
18  went out, to your membership?
19     A.  No, sir.
20     Q.  Do you recall what the response was with respect
21  to the letters that Ms. Babich sent out on July 17, 2012,
22  from the members?
23     A.  No, sir.
24     Q.  It wasn't something you were tracking?
25     A.  I was not on the board, --

Page 99

1      Q.  Did you make --
2      A.  -- the TA board.
3      Q.  Okay.  So you were not being -- you weren't
4  touching those issues as a commercial director?
5      A.  No, sir.
6      Q.  Okay.
7      A.  I was concerned with hamburgers and prices of
8  bottles of wine and things like that.
9          (Exhibit 1034 previously marked for
10  identification produced to the witness.)
11  BY MR. FERGUSON:
12     Q.  Let me show you Exhibit 1034.  Got it?
13     A.  Thank you.
14     Q.  Thank you.  Exhibit 1034 is an email from
15  Mr. Neveloff to Marsden, Schneider, Oliver.  So that was
16  the composition of the board in late July 2012, right?
17     A.  Yes.
18     Q.  And you knew that was the composition --
19  composition of the board because you were -- although you
20  were not a tourist accommodation director, you were on the
21  HOA board as a commercial director?
22     A.  Yes.
23     Q.  Now, did you ever see this draft letter that
24  Mr. Neveloff had sent to his fellow tourist accommodation
25  directors?

Page 100

1      A.  Give me a minute to review.
2      Q.  Sure.
3      A.  Okay.
4      Q.  Okay.  Had you ever seen this letter before,
5  this draft letter by Mr. Neveloff?
6      A.  No, sir.
7      Q.  Okay.  Are you generally aware that Mr. Neveloff
8  was the president at this time?
9      A.  Yes, sir.
10     Q.  And you know that he is a relatively -- or he is
11  a prominent, very prominent, real estate lawyer in New
12  York?
13     A.  Yes, sir.
14     Q.  And in terms of this particular letter, did
15  you -- did you gain understanding that Mr. Neveloff
16  himself wrote -- or drafted communications with your
17  membership?
18         MR. MARX:  Object to the form of the question.
19  BY MR. FERGUSON:
20     Q.  You're aware that Mr. Neveloff wrote letters for
21  the board to send to your members?
22     A.  Certainly.
23     Q.  Okay.  And --
24     A.  That was a yes.
25     Q.  Yeah.  And when you were president, you

Page 101

26 (Pages 98 - 101)

Randal Mercer - October 24, 2017

1 sometimes had the Marriott write those letters for you,
2 right, board to members?
3     A.   They would send letters on my behalf.
4     Q.   Who wrote the ones that you sent, that you sent
5 as the president?
6     A.   Most of them I wrote myself.
7     Q.   Mm-hmm.
8     A.   Some letters they started and I edited.
9     Q.   Okay.  So it was a variety of ways how your
10 board-to-member communications occurred while you were
11 president, and still are occurring?
12     A.   Yes.
13     Q.   You wrote some, and they wrote parts, drafted --
14 maybe did early drafts, and you edited their drafts?
15     A.   They did early drafts.  I always edit.
16     Q.   Now, Mr. Mercer, here -- did you ultimately get
17 a letter from Mr. Mercer as the president?
18     MR. SHEA:  Mr. --
19     THE WITNESS:  Mr. Neveloff?
20 BY MR. FERGUSON:
21     Q.   From Mr. Neveloff?  I'm sorry.
22     A.   I don't recall this, but I'm sure I did.
23     Q.   All right.  And do you recall in July of 2012,
24 the term "evolution" coming up with respect to the RCDC?
25     A.   No, I don't.

Page 102

1 down, "We are disappointed," do you see that?
2     A.   Yes.
3     Q.   "We are disappointed as to how Ritz-Carlton,
4 Marriott Vacation Worldwide, Inc., and Cobalt Travel
5 Company, LLC, the RCDC parties, separately and
6 collectively chose to communicate these matters they have
7 defined as, quote, 'evolution of the RCDC brand,'" end
8 quote.
9         I had asked you about that term "evolution."
10 There it is again.  Did that something -- when you picked
11 up in October as the president and a board member or
12 tourist accommodation board member, did you pick up on
13 this concept that there was a, quote-unquote, evolution of
14 the RCDC brand?
15     A.   The brand is always evolving.
16     Q.   Yeah, my question was, when you became the
17 president in October of 2012, were you aware that the --
18 there were letters being sent out and Mr. Neveloff was
19 saying there was an evolution of the RC brand at that
20 time, and that was in the context of a potential
21 affiliation with Lion & Crown?
22     A.   I don't recall that exact term.  I understand
23 the concept.
24     Q.   What did you understand the concept to be, sir?
25     A.   Any business has to evolve.  I understand that.

Page 104

1     Q.   You saw that first exhibit today where Marriott
2 Vacation -- Marriott Worldwide, rather, was talking about
3 re-engineering the RCDC, did you not?
4     A.   Yes.
5     Q.   It says here that, "First and foremost, we want
6 our membership to know we received notice of this letter
7 approximately 24 hours before it was sent to all members,"
8 and that the board had been given no additional advance
9 indication it was being sent -- I'm sorry, that the
10 termination was being -- occurred at Kapalua Bay.  Do you
11 see that?
12     A.   I do.
13     Q.   Okay.  Did that occur while you were president,
14 when the Marriott folks sent letters to your membership
15 without your ability to give it any meaningful input in 24
16 hours?
17     A.   I don't recall any since I've been president.
18     Q.   Okay.  Is that something you put your foot down
19 on, sir?
20     A.   I'm not sure that I had to.  But it -- this --
21 this -- this is one of the issues that evolved over time
22 after the board turnover and the developer turnover.
23 Oftentimes things were sent early on without recognition
24 or acknowledgment by the board.  It was a challenge.
25     Q.   All right.  It says in the fourth paragraph

Page 103

1 This is no different.  They have to adjust to market
2 conditions.  They have to adjust to staffing.  They have
3 to adjust to real estate needs.  I understand that.
4     Q.   So in general, you understand things change and
5 evolve.  What I'm asking you about is, when Mr. --
6         Can we just take a break?  Because this is going
7 to be played for trial, and there's a lot of background
8 noise.  Should we do that?  Do you mind?
9     A.   No, not at all.
10     MR. FERGUSON:  It's also getting --
11     THE WITNESS:  We have happy employees.
12     MR. FERGUSON:  That's great.  I'm going to grab
13 one of the lollipops at the break.
14     Q.   All right.  What I'm saying is, you know what
15 evolution is, we all know what evolution and change is
16 with respect to the life in the business world here.
17         What I'm talking about is when he quotes
18 Ms. Babich's letters to your members that you all -- that
19 your board didn't get to vet, that when he puts in quotes,
20 "evolution of the RCDC brand," do you know, when you came
21 in October 2012 what that -- what that was referring to?
22     A.   I don't recall a specific issue.  I recall -- I
23 understand the concept.
24     Q.   But --
25     A.   It's always changing.

Page 105

27 (Pages 102 - 105)

Randal Mercer - October 24, 2017

1    Q.   But the concepts were the five bullet points
2  that we just went through.  That you were going to be able
3  to use these opportunities for other experiences.  You
4  were going to be able to use Lion & Crown to put your
5  points in and get to one of the 51 resorts.  You were
6  going to be able to use the Explorers 100 experiences.  Do
7  you recall that?
8    A.   Of course.
9        MR. MARX:  Object to the form of the question.
10 BY MR. FERGUSON:
11   Q.   Isn't that what was going on when you became a
12 board member in 2012?
13   A.   Yes.
14   Q.   So that's what Mr. Neveloff's talking about,
15 evolution of the RCDC brand, right?
16   A.   I would agree with that.
17   Q.   Okay.  Great.  He says, "No input from your
18 board of directors or, to our knowledge, any of the other
19 RCDC boards was ever solicited by these companies while
20 they determined these significant changes to the RCDC
21 system in which we all own membership interest."
22       Do you see that?
23   A.   I do.
24   Q.   Okay.  And I read it pretty accurately, I hope.
25       It talks about it's not being -- the board is
Page 106

1 6 percent of our membership interest represents unsold
2 inventory."
3        Do you see that?
4    A.   Yes.
5    Q.   Would you suspect that 7.4 percent that belonged
6  in a trust, what was that?
7    A.   I understood there was -- there was a real
8  estate trust that they were contemplating depositing their
9  ownership interests into.  I did not know that they, in
10 fact, had done that.  Still don't know that they had done
11 that.  Although this letter indicates that they had.
12   Q.   It says, "It is our understanding that
13 approximately 7.4 percent of our membership interests are
14 owned by a trust."  So 7.4 percent are -- is some amount
15 or number of 1/12th fractional interest, right?
16   A.   I would assume, yeah.
17   Q.   And who owned this 7.4 percent as opposed to the
18 6 percent of unsold inventory?  What's the difference?
19   A.   I don't know what he was implying in this
20 letter, so I don't know.
21   Q.   Well, you became the president and dealt on a
22 fairly consistent and regular basis with the 13.4 percent
23 issue, right?
24   A.   To me, they were all unsold inventory.  I did
25 not -- I did not pay a lot of attention to who owned what.
Page 108

1  not being -- none of the boards being contacted about
2  this -- this brand evolution.  She did indicate, we talked
3  about it, that there had been this member -- member
4  feedback of the additional benefits and experiences.
5        So as far as you can tell, that was something
6  that was being done on these road shows but wasn't being
7  presented to the boards?
8    A.   I would guess that's what she used as the
9  base of her comments.  It's a guess.
10   Q.   Okay.
11   A.   They may have had venues in which to roll out
12 their programs also.  I don't know.
13   Q.   If you look at the second page of
14 Exhibit 1034 -- it's actually the third page, and last,
15 you'll see that the first half paragraph talks about "the
16 systemic changes that have -- that they have communicated
17 in their letter as to how it will affect our club."
18       Do you see that?
19   A.   Yes.
20   Q.   And it says, "It is our" -- it talks about his
21 understanding of "approximately 7.4 percent of our
22 membership interests are owned by a trust."
23       Do you see that?
24   A.   Yes.
25   Q.   Okay.  And then it says, "Another approximately
Page 107

1  It was unsold inventory, therefore, it was owned by the
2  developer in some form.
3    Q.   Okay.  So when he says "7.4 percent of our
4  membership interests are owned by a trust which
5  facilitates the operation of the RCDC points-based
6  system," what is -- do you know what that means?
7    A.   I don't even know if it's true.
8    Q.   What is an RCDC, quote, "points-based system?"
9    A.   That would be the points program where members
10 would trade for points.  It was a mandatory program that
11 was being rolled into our fee simple ownership.
12   Q.   Okay.  Is that some of the inventory that people
13 could use for their float weeks and they get in extra
14 time?
15   A.   I don't know.
16   Q.   Okay.  Now, at the end of that paragraph, first
17 half paragraph on page 3 of Exhibit 1034, I'll pick up
18 with the words, "We are very concerned about the potential
19 blurring of the Ritz-Carlton and Marriott timeshare
20 brands."  Do you see that?
21   A.   Mm-hmm.
22   Q.   Is that yes?
23   A.   Yes.
24   Q.   Thank you.  And is that a concern that you would
25 at some point pick up, or not, which was a blurring of the
Page 109

28 (Pages 106 - 109)

Randal Mercer - October 24, 2017

1 Ritz-Carlton and Marriott brands?
2    A.  Yes.
3    Q.  Okay.  And it says, "Therefore, as we consider
4 the newly-announced systemic RCDC 'evolution,' your board
5 is paying careful attention as these changes will likely
6 impact our club."
7       And that's the -- that's sort of the environment
8 that you would ultimately become -- become a board of
9 director and president of the -- of the board, that's the
10 environment you were dealing with; --
11   A.  Mm-hmm.
12   Q.  -- is that right?
13   A.  Yes.
14   Q.  Thank you.
15      (Exhibit 1035 previously marked for
16 identification produced to the witness.)
17 BY MR. FERGUSON:
18   Q.  Exhibit 1035 (handing).  So this is a July 26,
19 2012 dated letter, and it has, "Best regards, Neveloff,
20 Schneider, Marsden, and Oliver."  It looks -- would you
21 agree with me this is a -- at least a final version or
22 close to final version of the exhibit we just saw prior?
23   A.  It doesn't say final, but perhaps it is.
24   Q.  All right.
25      (Exhibit 1042 previously marked for

Page 110

1    identification produced to the witness.)
2 BY MR. FERGUSON:
3    Q.  Exhibit 1042 (handing).  So this is an email
4 chain that comes from sometime in early August, and you'll
5 see there's a Linda Sciberras.  She's coming from a
6 Ritz-Carlton Club, to a McBride at UNMC Education.  Looks
7 like a professor or a teacher or a student, I don't know.
8 This is -- do you know Ms. Sciberras, rather, at
9 Ritz-Carlton Club?
10   A.  No.
11   Q.  And a John McBride, do you know whether he's a
12 member of your club or someplace else?
13   A.  No.
14   Q.  Okay.  It says that Ms. Sciberras sent to this
15 particular person, that the Ritz-Carlton Destination Club
16 has some newest offering.  And it says, "The Ritz-Carlton
17 Destination Club's newest offering."  And it says, "The
18 Ritz-Carlton Destination Clubs and Marriott Vacations
19 Worldwide are pleased to announce our newest offering with
20 more destinations and more flexibility," and it talks
21 about, in bullet point two, "Access to seven ski
22 destinations."
23      Obviously one of those is Aspen, right?
24   A.  Does it say that?  Yes, it does.
25   Q.  Yeah.

Page 111

1    A.  Mm-hmm.
2    Q.  And there's also Tahoe and Bachelor's Gulch,
3 right?
4    A.  St. Thomas, Jupiter, San Francisco, Tahoe, Aspen
5 and Vail.
6    Q.  All right.  And this is August of 2012.  At any
7 time prior to this time -- and I know you're not on this
8 particular email chain, but I'll ask something about that
9 in a moment -- had you ever seen any type of offerings,
10 marketing, advertising, announcements, that put those two
11 together, that being the Ritz-Carlton Destination Clubs,
12 which you're a member, paid $160,000 for a 1/12th
13 interest, did you ever see these two in the same sentence
14 as making an offer or an announcement?
15   A.  No.  The theme was part of the road show that I
16 referenced earlier, but I've never seen an offering like
17 this.
18   Q.  When you went to the road show, were those
19 Ritz-Carlton Destination Club people?  Was it Ritz-Carlton
20 Hotel Company?  The developer?  Or was it Marriott folks?
21   A.  I don't recall.  I still don't know the
22 difference.
23   Q.  Between the various companies?
24   A.  The lines blur.
25   Q.  All right.  Well, let's talk about that.

Page 112

1       You'll see that Mr. McBride, whoever that may
2 be, sent an email of this Sciberras -- S-C-I-B-E-R-R-A-S,
3 Linda -- that Mr. McBride sent that to Jay with a copy to
4 Mike Mullenix, who you know as the president of Bachelor's
5 Gulch, right?
6    A.  Yes.
7    Q.  And it says, "For your information, not sure if
8 you had seen the email below.  My brother received it this
9 morning.  He has stayed at the Ritz clubs in Bachelor's
10 Gulch, San Francisco, and Kapalua, and Sciberras is
11 probably a salesperson he met in one of those locations."
12 He sent that on to Mr. Neveloff, and then Mr. Neveloff
13 sent it to his board.
14      My question is, in August of -- August 7 of
15 2012, were you receiving communications like this from
16 Mr. Neveloff as a commercial director?
17   A.  No, not that I recall.
18   Q.  He said, "Let the blurring of the lines between
19 Ritz-Carlton and Marriott begin."
20      Do you see that?
21   A.  Yes.
22   Q.  So at least in your predecessor's view, there
23 was some blurring of the brands?
24   A.  Yes.
25      MR. MARX:  Object to the form of the question.

Page 113

29 (Pages 110 - 113)

Randal Mercer - October 24, 2017

1     MR. FERGUSON:  What's your objection?
2     MR. MARX:  You're asking this witness to ask
3   what Mr. Neveloff had in his mind regarding the
4   blurring of lines.  He can't speak for Mr. Neveloff.
5   BY MR. FERGUSON:
6     Q.   Your predecessor knew there was blurring of the
7   lines, did he not?
8     A.   That was his opinion.
9     Q.   Was it your opinion when you came on in 2012?
10    A.   I didn't consciously think of it, but I always
11  knew it was -- they're the same company.  So I always knew
12  it was possible to blur lines.  I knew it was always the
13  board's efforts that did not happen.
14        (Exhibit 1043 previously marked for
15     identification produced to the witness.)
16  BY MR. FERGUSON:
17    Q.   Let me show you this exhibit, which is 1030 --
18  1043, rather (handing).
19        This is the same email chain, but you'll see
20  that Mr. Neveloff sent that on to you on August 8th.  Do
21  you see that?
22    A.   Yes.
23    Q.   It says "FYI."
24        Did you have any concerns when this was sent to
25  you that Marriott Vacation Club was marketing -- sorry --
                                                    Page 114

1   1/12th interest in the piece of property in Aspen,
2   Colorado?
3     A.   In a fee simple ownership, --
4     Q.   Yeah.
5     A.   -- no.
6     Q.   Okay.  Did it concern you -- my question wasn't
7   about mandatory or not mandatory, voluntary.  My question
8   was, sir, did it concern you that your club in Aspen
9   Highlands in which you're a member with your -- with your
10  fellow members and exclusive premier facility, did it
11  concern you that someone with a Ritz-Carlton Club email
12  handle was sending out emails to people they had met at
13  sales meetings talking about what -- how Marriott Vacation
14  Club people can use your club?
15        MR. MARX:  Object to the form of the question.
16        THE WITNESS:  I don't view it that way.  I view
17  it as ways that Ritz-Carlton Destination Club members
18  can trade their week into other opportunities.
19  BY MR. FERGUSON:
20    Q.   Okay.  And in connection with that, what you
21  call an opportunity, okay, what that person -- what that
22  program could do and today is doing, it allows Marriott
23  Vacation Club people to access Aspen Highlands, right?
24    A.   On a one-week-in, one-week-out basis.
25    Q.   I understand that.  But they're able to access
                                                    Page 116

1   that there was marketing material going out that spoke
2   about premier members and premier plus members, those are
3   Vacation Worldwide -- those are Vacation Club people,
4   right?
5     A.   Repeat the question, please.
6     Q.   Yeah.  When she talks about -- Sciberras tells
7   McBride, or McBride's brother, that there are premier
8   memberships and premier plus memberships, she's talking
9   about Vacation Club people, right?
10    A.   Yes.
11    Q.   Did it concern you in 2000 -- in August of 2012
12  when Mr. Mercer [sic] sent this on to you and talked about
13  the blurring of the lines, did it concern you that your
14  club and your system, your RCDC system as it then existed,
15  was being used to tell Marriott Vacation Club people what
16  they could -- that they can get into your -- your
17  facility, your club?
18    A.   I didn't understand the point system, so it was
19  hard for me to make an opinion.  I -- I didn't like
20  anything that was mandatory.  That's all I recall about
21  this.
22    Q.   What do you mean by "mandatory"?
23    A.   I didn't want something that was not optional.
24    Q.   Did you think there was a possibility that
25  someone can mandate what you could do with your deeded
                                                    Page 115

1   it?
2     A.   Yes.
3     Q.   And as a result of accessing it, when they're
4   out on a road show, or they're in a hotel lobby, or
5   they're on the Internet, they can say, hey, if you buy a
6   Marriott Vacation Club membership, or points, whatever it
7   is, guess what, Mr. or Mrs. Marriott Vacation Club
8   potential customer, you get to use Aspen Highlands.  Does
9   that bother you?
10    A.   Not if it's a whole -- if it's a very limited
11  type of a program, no.
12    Q.   So --
13    A.   No more than it would First Home or Exclusive
14  Resorts members, we don't know -- or somebody can rent
15  their unit.  So in my mind, this is different, because
16  somebody can rent their home on Craigslist.
17    Q.   Right.  But it's their home, right?
18    A.   That's right.
19    Q.   Okay.  And it's a big difference between a
20  member putting it -- giving it to his cousin, or donating
21  it, I think Mr. Neveloff says he likes to donate, or
22  putting it on Craigslist or listing it with Friar's,
23  that's different.  They're renting it to individuals.
24  They're not opening it up -- they're not giving it to a
25  pool that allows Marriott Vacation Club people to come in.
                                                    Page 117

30 (Pages 114 - 117)

Randal Mercer - October 24, 2017

1  It's a different scenario.
2      A.  If someone wants to rent their exact week to the
3  Man on the Moon, they should be allowed to do it.
4      Q.  Yeah, and this Man on the Moon happens to be
5  450,000 Marriott Vacation Club members, right?
6      A.  I didn't know they were doing that.
7      Q.  Isn't that the whole purpose of the affiliation?
8      A.  If you're talking the exchange program we have
9  now?
10     Q.  Yes, with Lion & Crown.
11     A.  I don't know who is allowed to come in.  I know
12 that the points are very high for existing Marriott
13 Vacation Club owners to come into Aspen Highlands.  So I
14 would assume that -- that they're heavy users and they
15 have a lot of points.
16         So no, it does not bother me any more than it
17 bothers me that I can rent my unit to whomever I choose or
18 give it away or not use it.
19     Q.  Okay.  So if the Hyatt company came in and said,
20 listen, we're offering you some opportunities if you come
21 over and put your weeks into our Hyatt system, okay, we're
22 going to let our Hyatt people come to the Ritz-Carlton in
23 Aspen Highlands, would that bother you?
24     A.  It's a hypothetical.
25         MR. SHEA:  Objection.  Hypothetical.
                                                    Page 118

1  BY MR. FERGUSON:
2      Q.  I know it's a hypothetical.
3      A.  I wouldn't want -- want a Hyatt to come in just
4  because it's not -- it's not a brand that I particularly
5  care for.
6      Q.  Okay.  But Marriott is?
7      A.  Yeah, I like Marriott, sure.
8      Q.  So you have 700, 800 people bumped down anywhere
9  between 650,000 and 11,000, over the years, but most of
10 the -- the early sales -- the bottom line is that your
11 members and fellow 1/12th deeded fractional owners, they
12 basically funded the purchase -- or the building of this
13 hotel for the developer, right?  The developer collected a
14 lot of money from each member, and they used that money to
15 build this hotel, right?
16         MR. MARX:  Object to the form of the question.
17         THE WITNESS:  I don't know how it worked.  A
18     developer builds and does a deal with a management
19     company, which in this case was Ritz or one of their
20     affiliates to operate, and -- I mean, the Hines
21     Company out of Dallas developed the property.
22 BY MR. FERGUSON:
23     Q.  Yeah, but the developer who built the hotel,
24 built it with the money from the sales they generated to
25 people like you.  You paid 160.  Some of my clients paid
                                                    Page 119

1  600.
2      A.  It was built -- the amenities and the hotel were
3  built in advance of the sales.
4      Q.  Yeah, but ultimately that's what paid for it,
5  right, the sales?
6      A.  Sure.
7      Q.  That's the way it always works?
8      A.  Of course.
9      Q.  You're in this business, right?
10     A.  Yeah.
11     Q.  Okay.
12     A.  Somebody has to pay for it.
13     Q.  So those 700 or 800 owners that owned a hotel,
14 okay, they get -- they get their allocated -- their three
15 allocated weeks and an unallocated week, right?
16     A.  Yes.
17         MR. MARX:  Object to the form of the question.
18         MR. FERGUSON:  What's that objection?
19         MR. MARX:  Assumes facts not in evidence.  Lacks
20     foundation.  Misstates facts.
21         MR. FERGUSON:  What's misstated about it again?
22     People --
23         MR. MARX:  800 owners do not own the hotel.
24         MR. FERGUSON:  That was -- that was a couple of
25     questions ago.  Okay.
                                                    Page 120

1          MR. MARX:  It was in your question, this exact
2      question.  The record will speak for itself.
3          MR. FERGUSON:  Is it the number or the
4      characterization, the -- it's 876.  Is that what's
5      bothering you?
6          MR. MARX:  Among other things.
7          MR. FERGUSON:  What else is bothering you?  I'm
8      serious.  I need to cure these questions, because if
9      Mr. Mercer doesn't come to Denver, then we need to
10     cure these.
11         MR. MARX:  You haven't established a foundation
12     as to Mr. Mercer's knowledge regarding the
13     intricacies of the ownership of the entities, of the
14     structures.
15         MR. FERGUSON:  Well, okay.  Thank you.
16     Q.  As a president of the board now for five and a
17 half years, and having sat on that board for 12 -- 12
18 years, on and off, you had a six-month hiatus, do you have
19 a general understanding that the hotel is owned by --
20 primarily by the Tourist Accommodation owners, like you,
21 and like Mr. Lattore, and Mr. Schneider, and Mr. Oliver?
22 You understand you're owners and that as owners, you're
23 part of an association that runs the hotel -- not runs the
24 hotel, runs the association that owns the hotel?
25     A.  All of the units are sold to independent
                                                    Page 121

31 (Pages 118 - 121)

Randal Mercer - October 24, 2017

1  members.  There are no developer-owned units left, so all
2  of us own a piece of the club.
3     Q.  And the folks that come in through the
4  Lion & Crown Travel Program now can be Marriott Vacation
5  Club people, right?
6     A.  Yes.
7     Q.  And as a result of that, the Marriott
8  Corporations, all right, when they go to their advertisers
9  or they have their marketing teams, and I'm sure they have
10  tons of those, what they can do is say, listen, when we're
11  out on our road show and when we're advertising Marriott
12  Vacation Club, we can honestly tell these people -- we
13  won't tell them too much -- we'll talk about -- ignore
14  points now -- we can tell that potential purchaser, guess
15  what, you get to use Aspen Highlands?
16     A.  I have no idea that they do that, I suppose
17  they could.
18     Q.  Well, we just saw an email that was sent to you
19  by Mr. Neveloff that was doing just that.
20     A.  In 2012.
21     Q.  Right.
22     A.  Okay.
23     Q.  Okay.  Does it still happen; do you know?
24     A.  I have no idea.
25     Q.  How do the people at Marriott Vacation Club know

Page 122

1  that they can use the Ritz-Carlton in Aspen?
2     A.  I have no idea.
3     Q.  As the president of the board, you have no idea
4  how Marriott is marketing or using the inventory that it
5  gains through the Lion & Crown Travel program?
6     A.  No, I don't.
7     MR. SHEA:  Can we take a short break?
8     MR. FERGUSON:  Yeah, I gotta take off my coat.
9     THE VIDEOGRAPHER:  We're going off the record.
10  The time is 11:39.
11     (Recess taken -- 11:39 a.m.)
12     (Return from recess -- 11:50 a.m.)
13     THE VIDEOGRAPHER:  We are going back on the
14  record.  The time is 11:50.
15  BY MR. FERGUSON:
16     Q.  Speaking of that advert- -- advertising that
17  Mr. Neveloff sent on to you with the sentiment that that
18  was blurring the lines somehow, do you know at that time
19  what Marriott was using at your facility to allow Marriott
20  Vacation Club people to -- to be there?
21     A.  I'm not -- I don't understand the question.
22     Q.  Okay.  So we see in August of 2012 that the
23  Marriott people are sending around marketing materials to
24  potential Marriott Vacation Club folks --
25     A.  Mm-hmm.

Page 123

1     Q.  -- that they could use Aspen Highlands.
2     A.  I do not know.
3     Q.  What they were using?
4     A.  I do not know what they were using or if they
5  were using.
6     Q.  Okay.  And when you came on board in October of
7  2012, did you investigate that, whether they were using?
8     A.  No, I did not.
9     Q.  Did you investigate what they were using --
10     A.  No, I did not.
11     Q.  -- and not whether they were using?
12     A.  No, sir.
13     Q.  Is that something -- why didn't you do that?
14  Why didn't you determine, as the president, why -- whether
15  they were using your hotel, or your facility and your
16  club, for Marriott Vacation Club people, why didn't you
17  look into that?
18     A.  I knew that they were using some of their owned
19  units, their developer-owned units, for --
20     Q.  For what?  Sorry.
21     A.  For sales and marketing efforts.  If they were
22  trying to sell a unit to somebody, they'd probably say,
23  "Hey, why don't you come on out and stay."  Who they were
24  saying that to, I don't know.  But everybody -- everybody
25  thought that, jeez, you're trying to sell a unit and

Page 124

1  you've got a deep pool of people who are already in a
2  family, I'm sure over the years lots of different people
3  came in and stayed in hopes -- Marriott, Ritz, developer,
4  whomever -- was hoping they would buy a unit.
5     Q.  As an RCDC member, or as a points person?
6     A.  RCDC, definitely, because that was the longest
7  block of time.  Points, don't know.  If I had units left
8  to sell and I owned them, I would -- I would invite
9  anybody who wanted to come out and who was qualified to
10  buy.
11     Q.  I just want to focus on that advertisement to
12  the Marriott Vacation Club potential customer that may
13  have met this marketing lady, I just want to focus on that
14  as opposed to sales.  Because you know that by 2012, the
15  Ritz-Carlton folks were no longer selling RCDC memberships
16  in Aspen, right, they weren't actively marketing that?
17     A.  I did not know that.
18     Q.  Do you -- I just want to focus on whether or
19  not -- did you find that out at some point?
20     A.  I knew they weren't selling it on site.
21     Q.  Okay.
22     A.  I did not know they were not selling them.
23     Q.  What did you know about whether they were
24  selling off site?
25     A.  I always assumed, and I did not know, that they

Page 125

32 (Pages 122 - 125)

Randal Mercer - October 24, 2017

1 were selling points. I always thought that they were
2 selling fractionals.
3     Q.   Okay. But in terms of when you came on in 2012,
4 you just had no particular knowledge as to what they were
5 doing vis-à-vis Marriott Vacation Club people using it --
6 using it, using time and staying there for holidays?
7     A.   No, sir.
8         (Exhibit 1053 previously marked for
9     identification produced to the witness.)
10 BY MR. FERGUSON:
11     Q.   So here's Exhibit 1053 (handing).
12     A.   Thank you.
13     Q.   You're welcome.
14         So this is a letter that your board sent out,
15 Neveloff, Schneider, Marsden, and Oliver, and it says
16 that -- it's a followup. It's dated August 17, 2012.
17 It's a followup to the letter on July 26, 2012. And
18 you'll recall that we saw a letter that didn't have a
19 signature, and you weren't sure whether it had gone out or
20 not, but that was the letter that they said they had no --
21 no more than 24 hours' notice of the Babich letter, just
22 to cue you in here.
23         Do you generally recall that testimony earlier
24 today and those documents?
25     A.   Yes (indicating).

Page 126

1     attention to the issue of marketing the Ritz-Carlton and
2 Marriott program separately?
3     A.   No.
4     Q.   That's something you trusted Marriott to do?
5     A.   I didn't pay attention to it, nor did I think of
6 it.
7     Q.   Why not?
8     A.   Never came to mind.
9     Q.   It never came to mind after Mr. Neveloff told
10 you, Mr. Mercer, that there was the blurring of the lines
11 between Marriott Ritz-Carlton had begun?
12     A.   No.
13     Q.   So you didn't -- you didn't share his views on
14 that?
15     A.   I disagree with that statement.
16     Q.   Okay. Why do you disagree with it? The
17 statement that "Let the blurring of the lines begin"?
18     A.   Because I always cared about the Ritz brand more
19 than any other brand.
20     Q.   Okay. Were you concerned, as Mr. Neveloff
21 appeared to be expressing, that there was a -- there could
22 be a blurring of the lines between the two brands?
23     A.   I would have preferred that there was never a
24 blurring between the Ritz lines -- the Ritz brand and any
25 other brand, that they would always be kept separate.

Page 128

1     Q.   Okay. Thank you. So they followed up with this
2 letter and talked about how the board was paying close
3 attention. Do you see that in the first sentence?
4     A.   Yes.
5     Q.   And it talks about in the first paragraph, a
6 particular concern about the unsold inventory; do you see
7 that?
8     A.   Yes.
9     Q.   Look at the last paragraph, Exhibit 1053, last
10 paragraph on the first page.
11     A.   Okay.
12     Q.   It says, "In the most recent phone conversation
13 with senior executives of Marriott Vacation Worldwide,
14 MVW, they are actively considering our suggestions
15 including the imposition of minimum night stays. They
16 will continue to keep us advised as they work through the
17 point valuations between Aspen Highlands and our timeshare
18 facilities in the MVW system and are mindful of the
19 desirability for all concerned to market Ritz-Carlton and
20 Marriott timeshare properties separately."
21         Do you see that?
22     A.   Yes.
23     Q.   So I take it, was that something that you began
24 to monitor when you came in as president of the board in
25 October of 2012, were you there to -- were you paying

Page 127

1     Q.   And how do you keep Marriott Vacation Club --
2 Marriott Vacation Club people separate if they're able to
3 access your property today through Lion & Crown Travel
4 programs?
5     A.   Once again, what we're talking about in 2012 is
6 totally different than what's -- what we have today. It's
7 impossible to compare the two.
8     Q.   The bottom line is that Marriott Vacation Club
9 people now have access to your property. It's not through
10 their inventory which they sold off. I think you bought
11 one of those units. What they -- how they access it now
12 is they have your members sign up for opportunities to go
13 to various -- various Marriott Vacation Club destinations,
14 and they put that -- they put their allocated/unallocated
15 time into the Lion & Crown Travel program, and there --
16 from there is where the Marriott Vacation Club people can
17 access the Ritz-Carlton Hotel in Aspen, Colorado?
18     MR. SHEA:   Objection. Misleading.
19     THE WITNESS:   If I put my allocated time into
20     the Marriott program, then someone can come in during
21     my allocated week. That's different than people just
22     coming in whenever they want.
23 BY MR. FERGUSON:
24     Q.   Well --
25     A.   This is different.

Page 129

33 (Pages 126 - 129)

Randal Mercer - October 24, 2017

| | |
|---|---|
| 1  Q.  Well, people always come when they want.  I | 1 rented it? |
| 2 mean, there's nobody at Marriott Vacation Club today that | 2  A.  Mm-hmm. |
| 3 comes in unless they want to come when they come.  They're | 3  Q.  And how did you rent it, sir? |
| 4 not going to book a week they don't want to be there, do | 4  A.  I talked to one of my friends, the gentleman who |
| 5 they? | 5 ultimately bought my unit, and said, "Hey, would you like |
| 6  A.  Nor is anybody going to rent a unit that they | 6 to rent my week for Christmas?  We have family coming.  I |
| 7 don't -- in the time frame that's not allowable. | 7 can't go." |
| 8  Q.  Okay.  So whether it's one person or 800 of your | 8  Q.  So it was not through a broker, it was something |
| 9 fellow members, the bottom line is that Marriott now has a | 9 you mentioned to Mr. Ennen? |
| 10 system in place where they can have their Marriott | 10  A.  Yes, correct. |
| 11 Vacation Club points people utilize Aspen Highlands | 11  Q.  And that was the only time you rented it? |
| 12 Ritz-Carlton, right? | 12  A.  Yes.  And we have Christmas week coming up next |
| 13  A.  Yes. | 13 year, and I will probably rent my unit also. |
| 14  Q.  And it's a one-to-one exchange? | 14  Q.  Okay.  Thank you for that. |
| 15  A.  It is a one-week to one-week exchange.  An exact | 15     It says, "The board has concerns" -- continuing |
| 16 exchange. | 16 at the bottom of page 1 of Exhibit 1053 -- "The board has |
| 17  Q.  He says here on August 17, 2012, in the last | 17 concerns that since the core business of MVW has and |
| 18 sentence of the last full paragraph on page 1 of | 18 likely will be the timeshare business, which appears to be |
| 19 Exhibit 1053, "Frankly, it has been our position that our | 19 evolving into a points-based system, that the nature of |
| 20 members bought into the Ritz-Carlton brand and do not want | 20 our club will change by opening the club to Marriott |
| 21 the brand diluted." | 21 Vacation Worldwide timeshare/points members who have a |
| 22     Do you understand the concept of brand dilution? | 22 much lower cost of entry." |
| 23  A.  I would have a concept of it.  I'm not sure what | 23     Do you see that? |
| 24 it means in this context. | 24  A.  Yes. |
| 25  Q.  As a board member and the president of the | 25  Q.  Okay.  That's what's happened today.  There are |
| Page 130 | Page 132 |

| | |
|---|---|
| 1 association now for five and a half years, or five years, | 1 Marriott Vacation timeshared points members that have |
| 2 do you have -- what is your concept in that capacity of | 2 access to your club, right? |
| 3 brand dilution with respect to the Ritz-Carlton? | 3  A.  If they want my week, yes. |
| 4  A.  A brand dilution, in my mind, would be having | 4  Q.  If you put your week at the Lion & Crown Travel |
| 5 two names on the masthead rather than one.  I always want | 5 program, they can get there? |
| 6 my product, my second home, to be a Ritz-Carlton club. | 6  A.  Yes. |
| 7  Q.  And you do consider this your second home? | 7  Q.  But you don't do that because it's your second |
| 8  A.  Yes, I do. | 8 home? |
| 9  Q.  And, again, as you sit here today, as opposed to | 9  A.  I don't do that because we use our weeks as much |
| 10 2012, do you know how the Marriott entities let their | 10 as we can. |
| 11 Vacation Club members know that they get to use -- even | 11  Q.  Can Mr. Ennen use that program now that you sold |
| 12 though it might be a lot of points -- that they get to use | 12 it to him on the secondary market? |
| 13 your second home? | 13  A.  Sure. |
| 14  A.  No, sir, I don't.  Nor do I know how Exclusive | 14  Q.  Was there a time when there was a suggestion |
| 15 Homes or -- Exclusive Resorts or Third Homes advertise to | 15 that if that program came online, that secondary market |
| 16 their members.  Nor do I know how any other member | 16 owners would not be able to use an exchange program; do |
| 17 advertises their unit. | 17 you recall that? |
| 18  Q.  Have you ever rented your unit? | 18  A.  I don't understand that. |
| 19  A.  Once. | 19  Q.  Was there ever a time when a secondary market |
| 20  Q.  And when was that, sir? | 20 person would not be considered as eligible to utilize an |
| 21  A.  I would say it was Christmas week 2014. | 21 exchange program run by Marriott? |
| 22  Q.  So you had rolled up to a very valuable week? | 22  A.  A fee simple owner can do whatever they want to |
| 23  A.  I rolled up.  It was my turn to have Christmas | 23 do with their -- with their time. |
| 24 week, yes. | 24  Q.  Yeah, I understand that, but my question was -- |
| 25  Q.  Okay.  And what did you do?  You rented it?  You | 25 and maybe it wasn't clear -- was whether or not a |
| Page 131 | Page 133 |

34 (Pages 130 - 133)

Randal Mercer - October 24, 2017

1  secondary market owner could utilize the Marriott Vacation
2  Club or Lion & Crown Travel program to exchange to use the
3  Vacation Club system.
4      A.  I apologize.  Perhaps I don't understand your
5  term "secondary market person."
6      Q.  Someone who didn't buy it from the developer.
7      A.  Okay.
8      Q.  The Ritz-Carlton Hotel Development Company.
9      A.  So you're referring to a Third Home, Exclusive
10 Resorts has the time, something happened, they can't come
11 in, they give it to -- they give it to a friend?
12     Q.  No, let me --
13     A.  Okay.
14     Q.  I might have a document.
15     A.  Help me with that.
16     Q.  It's not that important.  Yeah, it's all right.
17     A.  Okay.
18        (Exhibit 1058 previously marked for
19 identification produced to the witness.)
20 BY MR. FERGUSON:
21     Q.  This is an exchange, sir, after that letter we
22 just quickly reviewed, Mr. Neveloff and the other board
23 members sent out on August 17th, I think -- August 17th
24 (handing).  This is a response from Mr. Hawk, Rick Hawk.
25 Do you know Mr. Rick Hawk?

Page 134

1      A.  No, sir.
2      Q.  Oh, it's 1058.  I'm sorry.  Exhibit 1058 I'm
3  showing you.  Sorry.
4        It talks about, Mr. Hawk told Mr. Neveloff here
5  about -- he thinks it is important -- this is the second
6  page of Exhibit 1058, "I think it is important to note
7  that we are a Ritz program and not the Marriott program
8  and the brands are very different."
9        Do you generally agree that the brands are very
10 different, Marriott and Ritz?
11     A.  Are you referring to the hotels, or are you
12 referring to the fractional and the timeshare?  What are
13 you referring to?
14     Q.  Let's refer to the hotel facilities themselves.
15     A.  Okay.  I believe there is a certain difference,
16 Ritz being more upscale than some of the older Marriotts,
17 yes.  The Marriott Renaissance, for example, yes.
18     Q.  Are there Marriott Hotels in their system that
19 you think are on par with any Ritz-Carlton hotels?
20     A.  I have not been to any of the newer ones.  1
21 have been to Marriott Courtyard.  I have been to Marriott
22 Renaissance.
23     Q.  Have you -- and you've never been to a Marriott
24 Vacation -- one of these 51 Marriott Vacation Club
25 Destinations?

Page 135

1      A.  No, sir.
2      Q.  Do you know whether any of those are on par with
3  Ritz-Carlton brand standards?
4      A.  I have not been to any, so I don't know.
5      Q.  Do they call their service people "The Ladies
6  and Gentlemen," at the Marriott?
7      A.  I don't know.
8      Q.  You know what I'm talking about, "The Ladies and
9  Gentlemen"?
10     A.  Absolutely.
11     Q.  And the Ritz-Carlton staff, from top to bottom,
12 are trained and expected to afford their guests a certain
13 high level of service?
14     A.  Yes.
15     Q.  And you do not have people similarly trained at
16 Marriott-branded hotels, do you?
17     A.  I stayed at a Marriott Renaissance in Columbus,
18 Ohio two weeks ago, and no one referred to me as a lady or
19 a gentleman.
20     Q.  Okay.  So the standard wasn't the same as you
21 would -- if you walked into the Denver Ritz or the Ritz in
22 Naples you like to go to?
23     A.  In the context of staff addressing, me, no.
24     Q.  So it's a different level of service, and a
25 different level of facility?

Page 136

1      A.  The facility was different.  It was a business
2  hotel.  The service was great, and the food was great.
3      Q.  Okay.
4      A.  I was pleasantly surprised, and so were my
5  guests.
6      Q.  Okay.  Now --
7      A.  And Ohio State won, too, by about 60 points, so
8  that helped.
9      Q.  Okay.  I'd like to get you out today.  So I
10 don't need to hear about Ohio State.
11        MR. SHEA:  Well, don't ask questions about other
12   things that have nothing to do with this case then.
13 BY MR. FERGUSON:
14     Q.  The RCDC program and the Marriott program,
15 referred that Mr. Hawk, to your predecessor president,
16 those programs are different, too, are they not?
17     A.  A timeshare is different than a fractional, yes.
18     Q.  Thank you.
19        (Exhibit 1061 previously marked for
20 identification produced to the witness.)
21 BY MR. FERGUSON:
22     Q.  Exhibit 1061 (handing).  That's a letter from a
23 fellow named Lee Cunningham, Executive Vice President and
24 Chief Operating Officer of the Ritz-Carlton Destination
25 Club.  That's the club system that Aspen Highlands is part

Page 137

35 (Pages 134 - 137)

Randal Mercer - October 24, 2017

1  of, right?
2     A.  Yes.
3     Q.  Okay.  But he is employed by a Marriott entity,
4  is he not?
5     A.  It says here he's employed by the Ritz-Carlton
6  Destination Club.
7     Q.  But that's not exactly true, is it?
8     A.  I can't answer that.
9     Q.  Do you know Juan Cappello, Juan Pablo Cappello?
10    A.  No, sir.
11    Q.  Have you ever seen his letter to Mr. Cunningham
12  after this went out?
13    A.  No, sir.
14    Q.  You were never copied on any letters from Juan
15  Pablo Cappello?
16    A.  Not that I remember.
17    Q.  All right.  I believe this letter is also sent
18  out around August 17, 2012, and Mr. Cunningham doesn't
19  seem to date those letters, but you can tell that it at
20  least follows the Babich letter of July 17, 2012.  Do you
21  see that first paragraph?
22    A.  Yes.
23    Q.  Mr. Cunningham writing to his valued members
24  says, "First of all, we would like to assure you that
25  nothing you originally purchased has changed or will
                                              Page 138

1  change as a result of the announcement mentioned above."
2        That would be the Babich announcement, right?
3     A.  Yes.
4     Q.  But what could have changed if -- what would
5  change is that there would be an affiliation with
6  Marriott, right?
7     A.  Through a points system, yes.
8     Q.  Okay.  It talks about, at the bottom of page 1
9  of Exhibit 1061, last paragraph, "The affiliation option
10  announced in our July 17, 2012 letter regarding the
11  evolution of the Ritz-Carlton Destination Club is the next
12  step in providing significantly more vacation options for
13  Ritz-Carlton Destination Club members."
14       Do you see that?
15    A.  Yes.
16    Q.  Okay.  One of the issues, obviously, what was
17  going on, we covered before, is that certain clubs were --
18  were not -- not going to remain online or even come
19  online, Abaco -- Abaco and Kapalua; is that right?
20    A.  Mm-hmm.
21    Q.  Is that a yes?
22    A.  Yes.
23    Q.  It says, "This option is being offered with no
24  additional cost to current club home members and
25  participation is completely optional."
                                              Page 139

1        Is that something Marriott has been saying all
2  along, that it was completely optional or voluntary?
3     A.  I don't recall.
4     Q.  If it talks about, the beginning of page 2, the
5  first sentence -- I know it kind of breaks off -- "Members
6  choosing to take advantage of the exchange program would
7  receive points in their account that they could then use
8  to access all the options within the Marriott Vacation
9  Club Destinations program."
10       Okay.  Mr. Cunningham is basically following up
11  with what Ms. Babich was offering in July, right?
12    A.  Let me refer back to her letter, if I may?
13    Q.  Sure.
14       (Witness peruses documents.)
15    Q.  There's one of them.
16    A.  Yes.
17    Q.  Okay.  What I wanted to ask you about
18  Mr. Cunningham's letter, Exhibit 1061, it says -- the next
19  to last paragraph -- on that page, at least he has a
20  signature page again, but it says, "We understand."
21       Do you see that?
22    A.  Yes.
23    Q.  It says, "We understand our original
24  communication generated questions for a number of our
25  members and may not have fully anticipated all of your
                                              Page 140

1  questions regarding the changes to the Ritz-Carlton
2  Destination Club.  We have received initial feedback from
3  a few members and your board and would appreciate hearing
4  from you with your comments and questions."
5        Do you recall the letter that Mr. Neveloff
6  drafted and then was sent to the members regarding
7  about -- their concern that they hadn't been given any
8  notice of the Babich letter?  Do you recall whether or
9  not -- generally recalling that, do you know what the
10  board was doing to meet with, call, discuss, their
11  concerns regarding this new, quote-unquote, opportunity to
12  utilize the Marriott Vacation Club system?
13    A.  No, I do not.
14    Q.  It says, "We would love to hear from you
15  directly."  Do you recall receiving this letter,
16  Mr. Mercer, from Mr. Cunningham, as a member?
17    A.  No, sir, I don't.
18    Q.  Okay.  And why -- is that something you just
19  don't recall, or these are things you don't look at?
20    A.  I look at them.  I just don't recall it.
21    Q.  It says, "We've scheduled a webinar for members
22  of the Ritz-Carlton Destination Club with myself" -- that
23  would be Cunningham -- "and the president and chief
24  executive officer of Marriott Vacation Club -- Marriott
25  Vacations Worldwide."
                                              Page 141

                                   36 (Pages 138 - 141)

Randal Mercer - October 24, 2017

| | |
|---|---|
| 1   Who was the president and chief executive<br>2 officer at the time; do you recall?<br>3   A. No, sir.<br>4   Q. Do you know the name Stephen Weisz?<br>5   A. I've heard that name.<br>6   Q. Have you ever met with Mr. Weisz?<br>7   A. No, sir.<br>8   Q. Do you have an understanding that Mr. Mullenix<br>9 and Ms. Perfido had met with him someplace in Florida?<br>10   A. I did not know that.<br>11   Q. You understand he is the top management person<br>12 in the Marriott system?<br>13   A. Now or in 2012?<br>14   Q. Now.<br>15   A. No, I don't know that.<br>16   Q. How about then?<br>17   A. I did not know that. I knew he was pretty high<br>18 up the food chain. I had heard the name.<br>19   Q. Okay. But you wouldn't know higher than<br>20 Mr. Cunningham, I take it, and what ensued after this<br>21 letter?<br>22   A. That's correct.<br>23   Q. Did you attend this webinar?<br>24   A. No, sir.<br>25   Q. Thank you. Even though you thought it was<br>Page 142 | 1 Ritz-Carlton Club. Do you see that?<br>2   A. Mm-hmm. Mm-hmm.<br>3   Q. And with respect to this one, do you know<br>4 whether or not those feed -- that feedback that goes back<br>5 to Mr. Cunningham in response to his letter is given to<br>6 the board?<br>7   A. Apparently it had been.<br>8   Q. Yeah, but it wasn't given by Marriott, or<br>9 Mr. Cunningham, or Ms. Babich, or Mr. Weisz. It was given<br>10 to you by Mr. Stillman himself. Do you see that on the<br>11 next -- first page, Mr. Stillman forwards the message he<br>12 sent to Mr. Cunningham's member inquiry email handle?<br>13   A. Help me walk through your question here.<br>14   Q. Okay.<br>15   A. Mr. Stillman sent an email to the member inquiry<br>16 at Ritz-Carlton Club.<br>17   Q. Right. My question --<br>18   A. Which is typically a Member Services email<br>19 address, I would assume.<br>20   Q. Right.<br>21   Q. Okay. Got it.<br>22   Q. If you look at the letter we just saw from<br>23 Mr. Cunningham, you'll see that if you have a comment, you<br>24 can email your comments or questions to that email.<br>25   A. Okay.<br>Page 144 |
| 1 likely that you would become a board of director member?<br>2   A. I'm sure I had a work conflict.<br>3   Q. There was no recording made of it available to<br>4 you, or PowerPoint?<br>5   A. I don't recall. There's always a PowerPoint<br>6 somewhere.<br>7   (Exhibit 1060 previously marked for<br>8   identification produced to the witness.)<br>9 BY MR. FERGUSON:<br>10   Q. I have some questions about some member<br>11 feedback, and this is a document, if you look at the very<br>12 top of it, you'll see that Mr. Neveloff was, on August 21,<br>13 2012, forwarding a message that had bounced back to Lee<br>14 Cunningham from a Mr. Robert Stillman. Do you know a<br>15 Robert Stillman?<br>16   A. No, sir.<br>17   Q. Drs. Robert and Linda Stillman, Stillman Family,<br>18 LLC, Aspen Highlands. He's not a member you've met?<br>19   A. No, sir. Are they current members?<br>20   Q. I don't know if they're current, but in 2012, I<br>21 take it, they were. Would you agree with that?<br>22   A. Apparently.<br>23   Q. And so when an email goes out from the<br>24 Ritz-Carlton Club, it looks like there's a response that<br>25 people can generate that goes to Member Inquiry,<br>Page 143 | 1   Q. So Mr. Stillman obviously -- Dr. Stillman and<br>2 his wife, Dr. Stillman, they responded.<br>3   My question simply was, when Marriott and<br>4 Mr. Cunningham got feedback like this, did they give it to<br>5 the board, or did it have to come from the member himself,<br>6 if you know?<br>7   A. I don't know.<br>8   Q. Number 1060. Mr. -- or Dr. Stillman, at the<br>9 bottom of the page, said he was going to respond to both<br>10 the Babich and -- of Cobalt and the Cunningham of<br>11 Ritz-Carlton Destination Club letters regarding the<br>12 evolution. Do you see that?<br>13   A. Please reference the --<br>14   A. Yeah. I mean, he was -- Mr. -- Dr. Stillman was<br>15 responding to the Babich letter --<br>16   A. Yes.<br>17   Q. -- and to the Cunningham letter?<br>18   A. Yes.<br>19   Q. One's July 17th.<br>20   A. Yes.<br>21   Q. One's August 17th.<br>22   A. Okay.<br>23   Q. And this was forwarded to you by Mr. Neveloff,<br>24 right?<br>25   A. Yes.<br>Page 145 |

37 (Pages 142 - 145)

Randal Mercer - October 24, 2017

1    Q.  And you understood at least this member was not
2  at all happy with the concept of there being an
3  affiliation with Marriott; do you recall that?
4    A.  I do not recall it.  I'd have to read it.
5    Q.  Okay.
6    A.  Would you like me to do that?
7    Q.  No, it's way too long, sir.  We'll miss lunch.
8    A.  Okay.
9    Q.  It looks like they are long-standing members of
10  two fractional units at the Ritz-Carlton Club.  And it
11  says there's been a devolution as opposed to an evolution
12  of the club offerings, its value, and its brand.
13      Do you recall generally, in this time frame,
14  receiving concerns one way or another regarding members'
15  concerns about an affiliation?
16    A.  I was not on the board.  I would not receive
17  them.
18    Q.  Well, you did receive this one?
19    A.  I was forwarded, yes.
20    Q.  Okay.  Because you were going to be voted on the
21  board, and you kind of knew that, didn't you?
22    A.  No, sir, I did not.
23    Q.  You do receive several of these types of
24  communiqués from Mr. Neveloff that were going back to
25  either him or -- going -- coming to him somehow?

Page 146

1    A.  It's possible.
2    Q.  Did you get -- recall any positive responses
3  from the people that were invited by Mr. Cunningham to
4  respond.  Do you recall any positive feedback regarding a
5  potential affiliation with the Marriott Vacation Club?
6    A.  I really can't remember any specifics about that
7  time.  Sorry.
8    Q.  Have you ever seen a compilation of comments on
9  a chart that was generated in response to the Cunningham,
10  August 17, 2012 letter?
11    A.  I recall seeing a chart with some -- with some
12  compilations and assemblage of answers, yes, I do.
13    Q.  Okay.  I'm sorry.
14    A.  I do not recall where they came from.
15    Q.  Well, they came from your members, right?
16    A.  I would assume that the comments did, yes.
17    Q.  And do you recall, in this time frame -- because
18  I think there was another time when this happened, I think
19  in April of 2013 -- yeah, 2013 -- but do you recall in the
20  August of 2012 time frame as you're about to step onto the
21  board, that there was a compilation of member comments to
22  Mr. Cunningham's letter following up on Ms. Babich's
23  letter?
24    A.  I do not recall that.  If you have it, and would
25  like me to review it, I'd be happy to.

Page 147

1    MR. FERGUSON:  Is that an exhibit?
2    Q.  I'll get it to you in a little while.
3    A.  Okay.
4    Q.  Because I think it's on a different system right
5  now.
6    A.  Okay.
7    Q.  In terms of your recollection, do you recall
8  whether it was generally positive or negative with respect
9  to what Babich and Cunningham were offering, vis-à-vis
10  so-called opportunities to exchange voluntarily?
11    A.  It would be a pure guess.
12    Q.  I don't need guesses.  Do you have any --
13    A.  Then I do not.  Other than pure guesses, I don't
14  know specifically.
15    Q.  Was it on the same order of positiveness,
16  positivity, that you said occurred in December of '13 when
17  the survey was done?
18    A.  From what I recall, and it's pure speculation, I
19  don't think members like the points-base system.
20    Q.  Do you know a Barry Schochet, Gayle Weiss, I
21  think they're brother and sister out of New York?
22    A.  No, sir.
23    Q.  Don't know them?  Do you recall being forwarded
24  that -- being forwarded their concerns about the
25  affiliation by Jay Neveloff in August 2012?

Page 148

1    A.  No, sir.
2      (Exhibit 1064 previously marked for
3      identification produced to the witness.)
4  BY MR. FERGUSON:
5    Q.  Show you Exhibit 1064 (handing).
6      Just real quickly, do you recall -- you have no
7  doubt, I take it, that Mr. Neveloff was sending these
8  types of email communiqués to you, when you got them?
9    A.  Well, this is the second one you've shown me, so
10  I know he sent too.
11    Q.  Okay.  It says, "Bringing in" -- Mr. Schochet,
12  Barry Schochet, says to Jay on August 20, 2012, third
13  paragraph down, "Bringing Marriott Vacation Club owners
14  into our system absolutely edging rates our investment.
15  If we had wanted that program, we could have bought in at
16  a much lower price."
17      Was that similar concerns you heard either in
18  emails like this that Mr. Neveloff sent you or in a
19  compilation that you were referring to in your mind's eye?
20    A.  Referring -- if it's in the context of referring
21  to the points-based program which is illustrated in a
22  letter by Eveleen Babich, I would say this is consistent.
23    Q.  Do you consider what's in place today a
24  points-based system with respect to Lion & Crown?
25    A.  Not at all, no.

Page 149

38 (Pages 146 - 149)

Randal Mercer - October 24, 2017

1    Q.  So how is it then that if Annette Kalcheim --
2  you know Annette Kalcheim, right?
3    A.  I'm sorry?
4    Q.  Annette Kalcheim, a member?
5    A.  I don't know.
6    Q.  She's communicated with you a few times.  And at
7  one point after Lion & Crown, after you sent the MOU, very
8  shortly thereafter, she tried to get into a Marriott
9  Vacation Club resort.  I don't know if it's one of the
10  51s.
11    A.  Mm-hmm.
12    Q.  51, and she said, I can't get in there.  And you
13  said to Ms. Sobeck, "Let's give her a light response."
14  Okay?  And the light response was, "Hey, didn't you know
15  that your weeks don't have enough value to trade into a
16  Marriott Vacation Club -- into the Marriott Vacation Club
17  experience that you want?"
18       So do you recall any of that communication in
19  2014?
20    A.  No, sir.
21    Q.  Do you have any idea sitting here as the
22  president, whether or not -- or how it is determined that
23  if a person takes a September shoulder season they may
24  have bought and wants to trade into a Marriott Vacation
25  Club New Year's week, do you know how that's determined?

Page 150

1    A.  Her currency is her allocated week, and her
2  currency is the size of her unit, whether it's a
3  two-bedroom or a three-bedroom.
4    Q.  And how is that converted?  Is it used as
5  points?  Is it used as dollars?  Is it used by some
6  algorithm?  What is it when a three-bedroom person that --
7  during New Year's week wants to put in to Lion & Crown
8  Travel program, that person has a very valuable commodity,
9  and someone who has a September shoulder season week for a
10  two-bedroom, which is a less valued commodity, when they
11  go in the system, what do they come out with?
12    A.  I can only assume that a three-bedroom Christmas
13  week, or a week between Christmas and New Year's, is far
14  more valuable than a two-bedroom in September.
15    Q.  Right.  And how is that value determined?
16    A.  I have no idea how that ratio --
17    Q.  Is it points?
18    A.  -- is applied.
19    Q.  Is it points?
20    A.  Don't know.
21    Q.  I thought you said this wasn't a points system
22  just a while ago.  That's why I asked this series
23  of questions.
24    A.  I don't know.  I would assume that there is some
25  scoring mechanism.  What that is, I don't know.  I've

Page 152

1  What is it that Marriott utilizes, if not points, to
2  determine, no, you don't have enough value here from
3  September to get into here in January?  How does that
4  work?
5    A.  I do not know specifically.  Conceptually I have
6  some thoughts.
7    Q.  What -- but you're the president, so how is this
8  working for your folks?
9    A.  Because if I -- our members choose at this time
10  to trade their specific allocated week, then somebody can
11  come in their specific allocated week.  There are no
12  algorithms.  It is very simple to do.  One week in, one
13  week out.
14    Q.  But the person that comes in, I think you
15  pointed out before, at least once, is that that person
16  needs to have a lot of points?
17    A.  I would assume that, yes.
18    Q.  And now, when that person, and I'll say it's
19  Annette Kalcheim at this point, when Annette Kalcheim
20  wants to put into the Lion & Crown Travel program in order
21  to get to go to one of these 51 Marriott travel
22  experiences, what -- what currency does she use to get
23  into one of the finer Marriott Vacation Club resorts in a
24  nice place on a nice week, what currency does she use to
25  get in there?

Page 151

1  never participated in it.
2    Q.  So when someone asks you how it works, you're
3  not able to tell them?
4    A.  No, I'm not.  I refer them to Member Services.
5    MR. SHEA:  Is now a good breaking point for
6  lunch?
7    (Sotto voce discussion among plaintiffs'
8  counsel.)
9    MR. FERGUSON:  I can't hear two people.
10    MR. SHEA:  Sorry.
11    MR. FERGUSON:  Do you want to take a break, is
12  that what you said?
13    MR. SHEA:  We have to take a break at some time.
14  I thought it might be convenient.
15    MR. FERGUSON:  Let me just do one of these
16  letters.
17    (Exhibit 1066 previously marked for
18  identification produced to the witness.)
19  BY MR. FERGUSON:
20    Q.  10 -- 1066 (handing).
21       So this is another email from a member that was
22  sent to board members and forwarded by Neveloff to Mercer
23  on August 21, and my question simply is, do you know Dee
24  and Jerry Nowell?
25    A.  No, sir.

Page 153

39 (Pages 150 - 153)

Randal Mercer - October 24, 2017

1    Q.   Mr. Nowell advised your board -- Schneider,
2  Oliver, Marsden, and Neveloff -- it says -- he thanks them
3  for the communications.  He said he had been staying in
4  the property when this all happened, and he said he had a
5  few questions "before I email my concerns to the
6  president.  Is the board aware that Ritz-Carlton sales
7  office was closed on the mall?  That it sat vacant after
8  Ivan left, and we no longer have a broker on site to
9  discuss the Ritz-Carlton property for new sales or
10  resales?  That it is now being staffed by a salesman to
11  sell strictly timeshares?"
12        We were talking about that before.  So there
13  seems to be Mr. Nowell and his wife, Dee Nowell, whoever
14  wrote this, both of them, I guess wrote it, this is
15  something you weren't -- you weren't specifically aware
16  of, that they were selling -- or marketing timeshares out
17  of that office?
18    A.   That is correct.
19    Q.   Did -- during the period 2004 to '12, Mr. --
20  notice Mr. Nowell is talking about -- Nowell is talking
21  about resales?
22    A.   Mm-hmm.
23    Q.   Was the Ritz-Carlton sales office handling
24  resales at some point, along with their own inventory?
25    A.   That was not something they were very interested

Page 154

1  in doing.  They were interested in selling new inventory.
2    Q.   Sure.
3    A.   And they would typically refer resales to other
4  brokers in town who handled those sort of things.
5        Did they exclude themselves from doing it
6  completely, I'm not sure.
7    Q.   Okay.  Thank you.  I just was curious about
8  that.
9        MR. FERGUSON:  Do you want to take that break?
10        THE VIDEOGRAPHER:  Stand by, please.
11        We are now going off the record.  This is the
12  end of media unit number three.  The time is 12:34.
13        (Recess taken -- 12:34 p.m.)
14        (Return from recess -- 1:09 p.m.)
15        THE VIDEOGRAPHER:  We are going back on the
16  record.  This is media unit number four.  The time is
17  1:09.
18        (Exhibit 1072 previously marked for
19        identification produced to the witness.)
20  BY MR. FERGUSON:
21    Q.   Okay.  Back on the record.
22        Mr. Mercer, I'm just going to hand you
23  Exhibit 1072.  It's a brief email from a Mr. Neveloff to
24  Mr. Mullenix, August 21, 2012, which is about where I left
25  you off before the lunch break.

Page 155

1        And it says, "Mike, following up on your -- our
2  call earlier, the earlier responses to our board letter --
3  our board's letter which went out on Monday has
4  essentially been unanimous in recognizing and opposing a
5  move towards unifying the Ritz Club and the MVW
6  timeshare/points system."
7        I was asking you before if you had seen, and you
8  indicated you had seen a compilation chart of people's
9  responses to the board's letter and Mr. Cunningham's and
10  Ms. Babich's situation.  This is consistent with the fact
11  that most people were against any type of unification of
12  the two systems; is that right?
13    A.   I recall seeing a compilation grid sheet.  I'm
14  not positive, exactly, when it was generated, but I'll
15  have to see it.
16        (Exhibit 1075 previously marked for
17        identification produced to the witness.)
18  BY MR. FERGUSON:
19    Q.   Okay.  Let me show you Exhibit 1075 (handing).
20  This is an email string that starts at page 2 of
21  Exhibit 1075, in the upper part of the page, August 26,
22  2012.  It's an email from a man named Juan Pablo Cappello,
23  at the time with JP -- JT [sic] Law, which is Greenberg
24  Traurig law firm.  Do you know Greenberg Traurig law firm?
25    A.   Yes.

Page 156

1    Q.   Okay.  It's a copy to Neveloff, the board that
2  you were about to join.  And then if you look above,
3  Mr. Neveloff responded to the letter, and it said -- the
4  cap -- the email we're going to go through a little bit in
5  a minute, that it captured Mr. Neveloff's sentiments quite
6  well.
7        Do you see that on the first page this email
8  from Mr. Cappello to the Ritz-Carlton Club folks in
9  response to Mr. Cunningham's letter was actually forwarded
10  to you on the 26th of August, 2012?
11    A.   You're asking if -- if it was referred to me?
12    Q.   Yes.
13    A.   Yes.
14    Q.   And now if you would just peruse, not
15  necessarily read, the Juan Cappello --
16    A.   Okay.
17    Q.   -- email to Mr. Cunningham, you'll see that he
18  says, "Dear Lee, the recent communications from Marriott
19  Vacation Worldwide Corp. are both insulting and
20  disingenuous.  I encourage your team to communicate with
21  the Ritz-Carlton Destination Club members in an earnest
22  and forthright manner."
23    A.   Mm-hmm.
24    Q.   In the next paragraph he actually says, "Let's
25  start with how you sign your letter."

Page 157

40 (Pages 154 - 157)

Randal Mercer - October 24, 2017

1  Remember we looked at that before?
2  A. Yes.
3  Q. He said, "You are the executive vice president
4  and chief operating officer of the Marriott Vacation
5  Worldwide Corporation." Then he said, "I assume you
6  signed your August 20th letter under the Ritz-Carlton
7  Destination Club" -- in quotes -- "to provide us, RCDC
8  members, comfort that you have our best interest at
9  heart." And then he says, "I encourage you to be upfront
10  that you work with Marriott Vacation Club -- Vacations
11  Worldwide Corp., of which only a small fraction of its
12  members belong/bought into the RCDC brand."
13  So reading this letter, you now know who
14  Mr. Cunningham actually works for, right, or at least
15  worked for?
16  MR. MARX: Object to the form of the question.
17  THE WITNESS: Well, I understand what this
18  gentleman is trying to say. Is it possible that he
19  works for both -- both companies?
20  BY MR. FERGUSON:
21  Q. I guess it could be. Do you know who he works
22  for today?
23  A. No, I do not.
24  Q. Do you know who he worked for in 2012?
25  A. I always assumed he worked for Marriott.

Page 158

1  but nonetheless, he was a first accommodation owner, so in
2  an effort to keep him informed, I imagine that's why I
3  sent this to him.
4  Q. Okay. It says there -- you said to him, "There
5  are bigger issues at play than the appetizer menu." What
6  does that mean?
7  A. Jay was a -- the commercial director that would
8  be in charge of Willow Creek Bistro, and I think Jay, at
9  one time, made a comment about we need to change the
10  appetizer menu.
11  Q. All right.
12  A. Tongue in cheek.
13  Q. So you're basically saying, this is a much
14  bigger thing, pay attention to this?
15  A. I think that's probably right.
16  Q. And Mr. Neveloff said he -- he captured
17  Mr. Neveloff's sentiments quite well. Did you share the
18  sentiments of Mr. Cappello's email. And I know you
19  haven't read it. You can skim it if you want, or -- did
20  you agree that there was a huge incentive by Marriott
21  Vacations Worldwide to dilute the RCDC brand to sell
22  Vacation Club memberships?
23  A. I don't necessarily agree with that statement.
24  I agree that it made sense for the Ritz-Carlton
25  Development Company, the developer, to sell more units

Page 160

1  Q. He says at the bottom of the email, end of the
2  page, he says, "Lastly, your recent communications failed
3  to acknowledge the underlying issue which all RCDC members
4  need to understand." Okay? And he underlines that, "The
5  world -- Marriott Vacations Worldwide Corp. has a huge
6  incentive to dilute the RCDC brand to further its greater
7  interest of selling more Marriott Vacation Club
8  memberships. The growth of the Marriott Vacations Club --
9  Worldwide Corp. as a public company -- as a public company
10  is tied with the growth of sales of more and more Marriott
11  Vacation Club memberships."
12  So this was sent to you by Neveloff, and then
13  you forwarded that on to a Joel Alper?
14  A. Mm-hmm.
15  Q. Is that right, satcomjoel?
16  A. Mm-hmm.
17  Q. And he was a commercial board of director at
18  Aspen?
19  A. Yes.
20  Q. There's two Alpers, I think in this case, that
21  gets me confused, or two Joels.
22  But you said, "For Your Eyes Only, Please." Why
23  did you say that to him, if you recall?
24  A. Because I believe he was taking -- he had taken
25  my place at that point in time as a commercial director,

Page 159

1  because they needed to sell more units. The recession had
2  hit. Prices had gone down. They needed to sell units.
3  Q. So RCDC 1/12th fractional units or points -- or
4  some unit of points?
5  A. Fractional units at Aspen Highlands condominium.
6  Q. But that's not what Mr. Juan Cappello's talking
7  about.
8  A. That's -- that's my opinion.
9  Q. But they're different things, Mr. Mercer. One
10  is about selling 1/12th fractional interests, and
11  Mr. Cappello is saying, listen, you want to allow this
12  affiliation, which would allow Marriott Vacation Club
13  company sell more memberships. That's a different item,
14  is it not?
15  A. Well, I think they would need to sell more
16  memberships at everything they own --
17  Q. Okay.
18  A. -- when there had been a recession. Probably a
19  lot of things hadn't sold.
20  Q. Did you have any knowledge when you took over --
21  Can you guys --
22  MR. HANLON: Sorry.
23  BY MR. FERGUSON:
24  Q. Withdraw that.
25  He closed this letter to Mr. Cunningham's group

Page 161

41 (Pages 158 - 161)

Randal Mercer - October 24, 2017

1 copied to some other folks, including your board, and
2 copied to you, it says, "Unless Marriott Vacations
3 Worldwide changes its attitude and begins to address the
4 clear conflict of interest that will destroy the value of
5 our investment, I continue to encourage the RCDC Aspen
6 Highlands board to explore exiting the Marriott
7 relationship and cancel all management contracts."
8      So that was something at least one of your
9 members was alluding to in August of 2012?
10     A.  Okay.
11     Q.  All right.  And that's also what you were
12 learning that Mr. Mullenix and Bachelor's Gulch were
13 considering, right?
14     A.  It was around that time, yeah.
15     Q.  Okay.
16     MR. REISER, JR.:  Hey, Matt, we have the August
17 spreadsheet.
18     MR. FERGUSON:  Okay.
19     (Exhibit 1104 previously marked for
20 identification produced to the witness.)
21 BY MR. FERGUSON:
22     Q.  (Handing.)
23     A.  Thank you.
24     Q.  For some reason, mine has a blank middle page.
25 I don't know what happened.  Mine was copied wrong.  Okay,

                                              Page 162

1 you don't have that problem.
2     A.  Mine doesn't have a date at the top, so so --
3     Q.  September, blank, 2002 -- '12.  Yeah.
4     A.  This one.
5     Q.  Yeah, that's the date, but it's not filled in,
6 is it?
7     A.  I don't know.  I just --
8     Q.  Okay.
9     A.  Had this been sent?
10     Q.  I don't know.  We'll see if we can come to that.
11     A.  Okay.
12     Q.  I just want to ask you about this -- what
13 appears --
14     A.  Okay.
15     Q.  -- to be a draft letter.
16     A.  Okay.
17     Q.  Were you on the board at this time, or was this
18 prior to you coming on?
19     A.  It was prior.
20     Q.  And do you have any recollection of this -- of
21 the board drafting a letter along the lines of this one,
22 which was to discuss with your members the discussions
23 regarding the plan by MVW to discontinue the sale of its
24 remaining inventory?
25     A.  If it was sent, I'm sure I read it.

                                              Page 163

1     Q.  Okay.  But you hadn't -- you weren't -- you
2 weren't on the board that was actually drafting this at
3 this time?
4     A.  No, sir.
5     Q.  Thank you.  It's Exhibit 1104.  I passed by
6 but --
7     A.  I'm sorry, I'm still reading this.
8     Q.  It's all right.
9     A.  Will this be relevant in the future?
10     Q.  No.  I'll probably come up with the original in
11 a moment, but I wanted to see if you were on the board at
12 this time, but it appears you weren't.
13      Do you recall in this time frame any discussions
14 regarding retaining an outside lawyer on behalf of the --
15 by the board on behalf of the membership of the
16 Ritz-Carlton in Aspen Highlands?
17     A.  If you're referring to Mr. --
18     Q.  Gosch?
19     A.  -- Gosch, I'm not sure when I first heard that.
20     Q.  Is Exhibit 1072, we'd asked -- I had asked you
21 about the Neveloff-Mullenix email that said it's
22 essentially been unanimous in recognizing opposing a move
23 towards the Ritz-Carlton Club.  He then says, "The
24 attorney that was recommended to me with whom I spoke is
25 Phil Gosch, and his firm website is www.bhfs.com."

                                              Page 164

1      Do you recall that when you came on board, that
2 Mr. Gosch had already been introduced into the situation?
3     A.  I believe so.
4     Q.  All right.
5     A.  In some fashion.  I don't know whether he had
6 been engaged or -- I believe he probably had been at that
7 time.
8     Q.  All right.  Let me show you that exhibit
9 (handing).
10     A.  Okay.
11     (Exhibit 1097 previously marked for
12 identification produced to the witness.)
13     Q.  It would be Exhibit 1097.
14      This is a -- this is a draft memorandum, and
15 it's, as I said, Exhibit 1097.  It's a memorandum.  It's
16 several pages long.  I'll count them, seven or eight,
17 nine -- nine pages long by the law firm of Brownstein,
18 Hyatt, Farber & Schreck, and it dealt with an analysis
19 with respect to use of tourist accommodation units by
20 members of the Marriott Vacation Club who are also not
21 members of the Ritz-Carlton membership program.
22      Is this -- I'll refresh your recollection.  Is
23 this put in time -- I can't think of the word.  Does this
24 put into your memory that Mr. Gosch and Brownstein, Hyatt
25 was already well under way in this analysis before you

                                              Page 165

                              42 (Pages 162 - 165)

Randal Mercer - October 24, 2017

1 became a board member, a tourist accommodation board
2 member?
3     A.  This memo would indicate that he would be
4 engaged at least as of seven -- 9/21, yes, sure.
5     Q.  Okay.  So all the work he did in this memorandum
6 predated your coming on the board?
7     A.  Yes, it appears that way.
8     Q.  When you came on the board, did you familiarize
9 yourself with the legal analysis that was conducted by
10 Brownstein, Hyatt on behalf of the condominium association
11 and the board?
12     A.  As best I could in a short period of time, I'm
13 sure I tried to get up to speed.  Sure.  Now, I had also
14 been at the fall annual meeting for 2012, so there's
15 things that I probably just absorbed at that time because
16 I was at the meeting.
17     Q.  All right.  Did Mr. Gosch come to any of those
18 meetings?
19     A.  I don't recall ever meeting him.
20     Q.  Okay.  You did speak to him and communicate with
21 him by email, did you not?
22     A.  After I was on the board, yes, I did.
23     (Exhibit 1108 previously marked for
24     identification produced to the witness.)
25
                                                    Page 166

1 meeting of the members.
2     Q.  Okay.  So the board of directors meeting
3 preceded this meeting?
4     A.  Yes, it would.
5     Q.  So you couldn't have been elected president
6 prior to the annual meeting then?
7     A.  No.
8     Q.  Okay.
9     A.  No, not prior to this meeting.
10     Q.  Do you know that the vote tallies were in
11 connection with your being elevated to -- back to the
12 board?
13     A.  No, sir.
14     (Sotto voce discussion among plaintiffs'
15     counsel.)
16     THE VIDEOGRAPHER:  Mr. Mercer, could I get you
17 to move your water bottle out of the way just a
18 little bit?
19     THE WITNESS:  What would you like, sir?
20     THE VIDEOGRAPHER:  Move your water bottle.
21 There.  Thank you.
22     THE WITNESS:  How about if I drink some water
23 first.
24     (Exhibit 1110 previously marked for
25     identification produced to the witness.)
                                                    Page 168

1 BY MR. FERGUSON:
2     Q.  So this is a document that -- this particular
3 version of a --
4     MR. MARX:  That's face down.  I don't know if
5     you -- that's significant.
6 BY MR. FERGUSON:
7     Q.  This is a -- it's unsigned, but it is a
8 Marriott-produced version of an annual meeting, it looks
9 like, agenda.  Do you see that?
10     A.  Yes.
11     Q.  Actually, it must be --
12     A.  These are the minutes.
13     Q.  Minutes, I'm sorry.  That's right.  Neveloff
14 called the meeting to order on this date at 6:02 p.m.  A
15 quorum was obtained.  Is this the meeting at which you
16 were voted on as a member, if you look at page 2?
17     A.  Yes, this would be the -- probably the third
18 meeting of the day, that's correct.
19     Q.  Okay.  And one was the board, one was the annual
20 meeting of the members?
21     A.  One was the Tourist Accommodation Board, would
22 be the first meeting.  The second meeting of the day is
23 the entire board of the condominium association.  And then
24 the third meeting of the day is the annual meeting of the
25 members.  And that's what this appears to be, the annual
                                                    Page 167

1 BY MR. FERGUSON:
2     Q.  Exhibit 1110, 1110 (handing).
3     So this is an email chain that starts back in
4 September where Mr. Gosch sends Mr. Neveloff that
5 September 21 draft memorandum and cease and desist letter
6 related to Marriott Vacation Club use of tourist
7 accommodation units.
8     A.  Mm-hmm.
9     Q.  And then it talks about above, Neveloff telling
10 Gosch, and I guess one of his other lawyers and he copies
11 you, "Please proceed to call your in-house contact at
12 Marriott but do not send any cease and desist letter.
13 Allow me to introduce Randy Mercer who is the new board
14 president.  Randy is a veteran -- veteran board member at
15 Aspen for six years."
16     So do you know what the in-house contact at
17 Marriott was that Mr. Gosch may have had?
18     A.  No, sir, I don't.  I would assume it would have
19 been another counsel.
20     Q.  You indicated, skipping a year ahead, that you
21 brought in a fellow named Mike Marino who's a lawyer at a
22 firm called Seyfar -- Seyfarth, I think, S-E-Y --
23     A.  Mike Marino was the association's attorney
24 during my first -- my first term of service.  He was also
25 the attorney for the St. Thomas board, and he was also, a
                                                    Page 169

43 (Pages 166 - 169)

Randal Mercer - October 24, 2017

1 the same time, the attorney for the Bachelor Gulch board.
2 So he was heavily involved immediately after the turnovers
3 in the mid, early 2000s.
4     Q.  The turnovers from declarants to the boards?
5     A.  Yes.
6     Q.  Okay.  And is he a member of any RCDC club?
7     A.  He owned units -- at least one unit in
8 St. Thomas, yes.
9     Q.  Okay.  And as a member, was he retained by that
10 board, the St. Thomas board, to represent them?
11    A.  I'm not sure, but he was at the meetings.
12    Q.  Okay.
13    A.  I believe.
14    Q.  Now, when you -- in your first seven years,
15 you're telling me that he was an attorney that represented
16 the HOA?
17    A.  He was an attorney who was at -- present at all
18 of our meetings and gave us legal advice.
19    Q.  So he was an attorney retained by the
20 association --
21    A.  I don't know if he was paid or if it was just --
22 I don't know.  He was an attorney who worked with all
23 three of the Ritz-Carlton Club boards.
24    Q.  Well, I mean, let's talk about your board.
25    A.  Okay.

Page 170

1     Q.  And the first time you said he was a lawyer that
2 was giving legal advice.  Was he being paid for that legal
3 advice?
4     A.  I do not know that.
5     Q.  Did he have a retention agreement with the HOA
6 in Aspen or its board?
7     A.  I do not know that.  I was at the bottom of the
8 board, so I don't know those things.  He was -- he was --
9 he was there when I was first elected to the board.
10    Q.  And he was there at meetings giving legal
11 advice?
12    A.  He was giving advice, yeah, sure.
13    Q.  And who called him in, to your knowledge, in the
14 first -- during your first seven -- let me withdraw that.
15        What was his connection to Aspen Highlands in
16 that first seven years you served on the board?  Did he
17 know one of the board members, Mr. Sternfield?  Did he
18 know Sal Cutrona?  Who did he know?
19    A.  He was -- he was -- had a personal relationship
20 and friendship with Mr. Cutrona because Mr. Cutrona was
21 the president of the St. Thomas board.
22    Q.  Did they have any fractional ownerships?  When I
23 say "they," did Marino have fractional ownership interest
24 at Ritz-Carlton at any time?
25    A.  St. Thomas, yes.

Page 171

1     Q.  No, I asked you about Aspen Highlands.
2     A.  No, sir.
3         MR. SHEA:  No, no.
4         MR. FERGUSON:  I didn't, you're right.  I'm
5 sorry.
6         THE WITNESS:  No, sir.
7         MR. FERGUSON:  In my mind it was a question.
8         MR. SHEA:  That's all right.
9         THE WITNESS:  No, sir.
10 BY MR. FERGUSON:
11    Q.  You're not reading my mind yet, but you will be.
12    A.  Well, I was -- I was starting.  I apologize for
13 that.
14    Q.  So he wasn't a member of the Aspen club?
15    A.  No.
16    Q.  Was Mr. Cutrona?
17    A.  Yes.
18    Q.  And is Mr. Cutrona also a member of St. Thomas?
19    A.  Yes.
20    Q.  And Mr. Cutrona is now on your board as a
21 tourist accommodation director today?
22    A.  Yes.
23    Q.  And he wasn't at the annual meeting, though, was
24 he?
25    A.  On September 21st --

Page 172

1     Q.  A couple of days ago, a week ago?
2     A.  No, he was in Italy.  He couldn't make it.
3     Q.  And he wasn't on the phone?
4     A.  No, he was not.
5     Q.  Okay.  Has he missed any other board meetings
6 when he was a tourist accommodation director?
7     A.  Not that I recall.
8     Q.  So Marino was an attorney that gave legal advice
9 during your first seven years, but the connection may have
10 been through Mr. Cutrona, but you're not sure?
11    A.  I'm pretty sure.
12    Q.  He was, okay.
13    A.  That would be a good guess.
14    Q.  And skipping ahead again, you brought him in
15 twice so far since you were elevated to president as your
16 consigliere, and when you brought him in as the president,
17 did you get a retainer agreement with him?
18    A.  He sent me one.  I don't recall having signed
19 it.  Possibly I did.  I can't imagine I wouldn't have, but
20 I can't find it.  I looked, --
21    Q.  Mm-hmm.
22    A.  -- just to see.
23    Q.  So let me just digress there again.  When you
24 were asked by Mr. Shea and Ms. Livingston Black to -- you
25 were asked by them to get documents, of course, right?

Page 173

44 (Pages 170 - 173)

Randal Mercer - October 24, 2017

1　A.　Of course.

2　Q.　And are you saying that one of the documents may

3 have been the transmittal of a retention letter from the

4 law firm Seyfarth -- Seyfarth what?

5　　MR. REISER:　Shaw.

6　　MS. LIVINGSTON:　Shaw.

7 BY MR. FERGUSON:

8　Q.　Seyfarth Shaw?

9　A.　Yeah, there was a retention letter, sure.

10　Q.　There was a retention letter?

11　A.　Absolutely.

12　Q.　And you understand that's a contract with a

13 lawyer that sets forth the relationship?

14　A.　I do.

15　Q.　Okay.　And you don't know whether it was signed

16 or not?

17　A.　The one I have in my possession was signed by

18 their firm.　I do not have in my possession one that was

19 signed by me.　It doesn't mean there was not one signed.

20　Q.　Where's the one that's in the possession of you

21 that's just signed by them?

22　A.　I believe our counsel has it.

23　Q.　Okay.　And what was he retained to do when he

24 sent you that retainer letter?

25　A.　The primary reason for bringing Mr. Marino into

Page 174

1 the discussions that ensued was his long relationship with

2 the Marriott attorney Barbara Egolf in Orlando.　They had

3 worked through many issues over the years in the

4 multi-club platform, and I felt it was in our members'

5 best interest to have counsel that had a relationship that

6 were -- they were -- they had worked together.

7　Q.　And how did he forge that relationship with

8 Ms. Egolf?

9　A.　I believe over ten years' worth of work back and

10 forth on behalf of multiple associations.

11　Q.　Which associations?　Are you talking about

12 Ritz-Carlton --

13　A.　Bachelor -- Bachelor Gulch and St. Thomas and

14 Aspen Highlands.

15　Q.　All right.　So you brought him in because -- in

16 part, because he knew Ms. Egolf, Barbara Egolf?

17　A.　I had met her several times.

18　Q.　And what -- withdraw that.

19　　You understand that he's not a Colorado lawyer,

20 right?

21　A.　I don't know that.

22　Q.　So you don't know where he's admitted?

23　A.　I believe New York and Florida.

24　Q.　But you don't know about Colorado?

25　A.　No, sir.

Page 175

1　Q.　Mr. Gosch was a Colorado attorney, correct?

2　A.　His office was in Denver.

3　Q.　And do you understand that he specializes in

4 complex real estate legal issues like this?

5　A.　I understand that he was -- he participated in

6 hotel issues and issues that involved things like this.

7　Q.　And Mr. Marino's primary focus in the law, and

8 we all kind of have them -- though I seem to do too many

9 things -- is that he's in the labor and employment arena.

10　A.　Hmmm.

11　Q.　Do you know that?

12　A.　I had heard that.

13　Q.　Okay.　And do you know whether he represents any

14 hospitality industries in connection -- any hospitality

15 companies, hotel companies, in connection with his law

16 practice?

17　A.　No, I do not.

18　Q.　Do you know whether or not he's represented

19 Marriott companies?

20　A.　No, I do not.

21　Q.　So are you saying that his entire relationship

22 with Ms. Egolf had -- if I'm saying that right. Egolf, is

23 that how you say it?

24　A.　I think it's Egolf.

25　　MR. MARX:　It is.

Page 176

1　　MR. FERGUSON:　Egolf.　Yeah, you know her.

2　Q.　His involvement was RCDC issues, Mr. Marino and

3 Ms. Egolf?

4　A.　Association issues.

5　Q.　And when you say, "Association issues," are you

6 meaning association governing documents?　Are you talking

7 about bylaws?　Are you talking about -- or are you talking

8 about association business as it relates to a potential

9 affiliation with the Marriott Vacation Club?

10　A.　In my original tenure, his -- he helped work on

11 rules and regulations.　He helped on, you know, working

12 on -- on those kind of internal issues for the board.　And

13 all of those issues, those ongoing operational issues that

14 the board was involved in, always had to go through

15 Barbara Egolf.

16　Q.　So I was looking at your Exhibit 1110, and that

17 is you being introduced to Mr. Gosch.

18　　Do you -- you do know that Mr. Gosch's firm and

19 your association signed a retention letter?

20　A.　I have not seen that.

21　Q.　And did you, as a board president and board of

22 director member, tourist accommodation board of director,

23 did you utilize Mr. Gosch's services in connection with

24 the issue of affiliation with the Marriott Vacation Club?

25　A.　I used Mr. Gosch on one issue only, and that was

Page 177

45 (Pages 174 - 177)

Randal Mercer - October 24, 2017

1 the issuance of a cease and desist letter after I became
2 president of the association.
3    Q.  And that letter had already been drafted in some
4 respects as we see that?
5    A.  In some form it had, yes.
6       MR. FERGUSON:  Can you guys put up 1103, because
7 I can't find that one.
8    Q.  I might have -- I might have you use the screen
9 here, if you don't mind.
10       (Exhibit 1103 previously marked for
11    identification produced to the witness.)
12 BY MR. FERGUSON:
13    Q.  Exhibit 1103 is a document that went out to your
14 members.  You see at the top, it has, "Given the issues
15 the board has written to members about concerning the new
16 points-based marketing program which Ritz and MVW are
17 considering, certain members have requested the views of
18 the candidates and how they would proceed as to this issue
19 if elected.
20       So basically this is the Babich, Cunningham
21 letters of July 17 and August 17, 2012, and there's a
22 question put to the candidates.
23       Do you recall giving your view on this issue?
24    A.  This was a question put to the candidates?
25    Q.  Right.

Page 178

1    A.  Is that what you're saying?
2    Q.  Yes, sir.
3    A.  And in what format was this presented to us,
4 just to help my recall?
5    Q.  It looks like -- I don't know.  I'm asking you,
6 because you're the one -- it looks like you responded to
7 this question, isn't that correct, if you see "Randy
8 Mercer"?
9    A.  And who wrote this question; do you recall?
10    Q.  "Given the issues the Board has written to
11 members about" -- it's either your board or the people
12 that run -- the people who manage your board, Mr. Hearns'
13 group.
14       MR. REISER:  Or Neveloff.
15 BY MR. FERGUSON:
16    Q.  Or Neveloff.  It might have been Neveloff.
17 Someone is asking you as a potential board --
18    A.  Somebody.  I don't recall who asked it, but
19 someone asked.
20    Q.  Okay.  Yeah, and is this your response, sir?
21    A.  May I see --
22    Q.  Yeah.
23    A.  Would you delete that paragraph and let me take
24 a look at the whole thing?  Okay.
25       MR. HANLON:  I can pull up the whole thing a

Page 179

1 bit.
2       THE WITNESS:  Okay.  That's fine.  I can see it.
3       MR. REISER:  It goes to the next page, too.
4       (Witness examines document.)
5       THE WITNESS:  Okay.
6 BY MR. FERGUSON:
7    Q.  It goes to the next page, in fairness.  I
8 thought it did.  Oh, yeah, oh, boy, it keeps going.
9       MR. HANLON:  I'll give you this much.
10       THE WITNESS:  I can read the page without
11 blowing it up.
12       MR. HANLON:  You can?
13       THE WITNESS:  Yeah, sure.
14       (Witness examines document.)
15       THE WITNESS:  Okay.
16 BY MR. FERGUSON:
17    Q.  Okay.  So this is your answer to a question that
18 was designed, I take it, to educate your members as to
19 what your thinking was about various issues that faced the
20 club vis-à-vis this potential affiliation, correct?
21    A.  Was this distributed to anybody?  Do we know, or
22 was it --
23       MR. REISER:  Yes, it was distributed to the
24    members.
25       THE WITNESS:  Was it?

Page 180

1       MR. REISER:  Yes.
2       THE WITNESS:  Okay.  And it was distributed
3    by --
4       MR. REISER:  By the board.
5       THE WITNESS:  Was it?
6       MR. REISER:  Yeah.
7       THE WITNESS:  Okay.
8       MR. REISER:  Through Marriott Vacation Club.
9       THE WITNESS:  Okay.
10 BY MR. FERGUSON:
11    Q.  I mean, you do this -- you still do this.  I was
12 there the other day when that -- Mr. Jacobson ran and he
13 didn't get elected and was asking questions about it.  But
14 you know that when people run for the board, the board
15 requests position papers or it asks them to say a little
16 bit about their background and what they want to do,
17 right?
18    A.  Right.
19    Q.  And this is a version of that.  This is a
20 specific question, but this -- this is information that is
21 collected by potential candidates for the board that is
22 disseminated to your membership.
23    A.  It was probably a followup after everyone had
24 submitted their resumes.  Those resumes --
25    Q.  Yeah.

Page 181

46 (Pages 178 - 181)

Randal Mercer - October 24, 2017

1  A. -- had gone out to the members and somebody
2  said, "What do these guys think?"
3  Q. And this -- that appears to be the case
4  here.
5  A. Okay.
6  Q. A specialized question.
7  A. Okay.
8  Q. And I take it that this is somewhat unique that
9  it's not every year or every election cycle that a
10  specific question goes out about a potential affiliation?
11  A. I've never -- I've never seen this happen before
12  or since that moment.
13  Q. It says -- or you said --
14  A. I don't even remember it. That's great.
15  Q. Are these your words, sir?
16  A. It looks like my writing.
17  Q. Okay. In the second paragraph, it says, "As a
18  board member from 2005-2011 with firsthand knowledge of
19  similar situations," what are you referring to regarding
20  similar situations there?
21  A. Well, the point system had -- the point
22  system -- we use the point system as a generic term. It's
23  where you trade time for points, and that's really the
24  only way really to phrase it.
25         The point system had come up, I believe, at
                                                    Page 182

1  A. No one was talking about changing the flag.
2  Q. Right. And you said that was your concern.
3  A. Yes.
4  Q. Okay. But that -- if it wasn't being discussed,
5  that's not what you're talking about here. What you're
6  talking about here is not a change of the flag or the
7  brand, you're talking about the affiliation with MVW and a
8  potential dilution of the brand, right?
9  A. No.
10  Q. Okay.
11  A. I am talking about perception versus value,
12  which in the real estate world is a very interesting
13  concept. If somebody perceives its something, then it
14  could become something in their own mind.
15  Q. Okay. That's like thinking a brownstone in
16  Harlem isn't worthwhile because it's in Harlem, it's in
17  a -- perceived to be a bad neighborhood. That's a
18  perception of real estate?
19  A. That would be an ethnic labeling so I
20  wouldn't -- I wouldn't go there, but --
21  Q. I mean, you were talking about perceptions.
22  Right here you're talking about -- your concern was the
23  perception that Marriott Vacation Club affiliation could
24  dilute or dumb down the Ritz-Carlton brand and flag?
25  A. I was always concerned that the Ritz-Carlton
                                                    Page 184

1  multiple times, what do we do, can we do this, and that's
2  what I was referring to.
3  Q. All right. Some of the things -- you can take
4  that down.
5         One of the things you were talking about were
6  your personal concerns as a potential candidate for -- as
7  a candidate for the board, you were concerned with
8  concepts such as brand dilution, were you not? You call
9  it "dumbing down of our membership interest," on the
10  second page. But you were expressing you had concerns
11  about a points-based system with the Marriott Vacation
12  Club.
13  A. I bought a Ritz-Carlton, and I wanted it to
14  remain a Ritz-Carlton.
15  Q. And if you look at the bottom of page 1 of
16  Exhibit 1103, "To the question, I'm very concerned about
17  the dilution of value which may occur as a result of this
18  latest effort of MVW."
19         You said you put -- your concern was about the
20  flag, the Ritz-Carlton brand?
21  A. Mm-hmm.
22  Q. Is that right?
23  A. Yes.
24  Q. No one in this time frame was talking about
25  changing the brand of that hotel, were they?
                                                    Page 183

1  remain, first and foremost, a Ritz-Carlton and nothing
2  else. And I think that's consistent throughout my -- my
3  conversation.
4         But keep in mind, by this time the value had
5  already been diminished because of the global market
6  meltdown.
7  Q. Sir, you just said something, and I want to ask
8  you about it.
9  A. Okay.
10  Q. You said the value had already been diminished,
11  correct?
12  A. I believe so.
13  Q. Real estate values had come down?
14  A. Yes, they had.
15  Q. But the brand had not been diluted yet, had it?
16  A. That's correct.
17  Q. What you're talking about in the platform you're
18  running on and asking this question is, you're telling
19  them, you want the members to believe that you're
20  concerned about the effect of a Marriott Vacation Club
21  affiliation's effect, dumbing down or diluting of the
22  Ritz-Carlton brand, not values, brand; is that right?
23         MR. SHEA: Objection. Argumentative. And said
24  in an argumentative tone. It's unnecessary.
25         MR. FERGUSON: It's not argumentative. It's two
                                                    Page 185

47 (Pages 182 - 185)

Randal Mercer - October 24, 2017

| | |
|---|---|
| 1  gentlemen talking here. | 1    Q.  All right.  Let me show you Exhibit 113 -- 1113, |
| 2    Q.  Go ahead.  Can you respond to that question? | 2  sorry (handing). |
| 3      Can you repeat the question for Mr. Mercer. | 3      (Exhibit 1113 previously marked for |
| 4      (Record read back.) | 4  identification produced to the witness.) |
| 5      THE WITNESS:  I am concerned and was | 5  BY MR. FERGUSON: |
| 6  concerned -- first of all, prefacing, if you'll let | 6    Q.  Just real briefly, this is a -- an email from |
| 7  me, -- | 7  Neveloff to you and a Frank Mouff -- Mouffe. |
| 8  BY MR. FERGUSON: | 8    A.  Chief financial officer at the club in Aspen |
| 9    Q.  Sure. | 9  Highlands, Mouffe. |
| 10    A.  -- Southwest Florida was ground zero for the | 10    Q.  Mouffe.  Okay.  And he's a management company |
| 11  global real estate meltdown.  Between us and Las Vegas, it | 11  employee? |
| 12  was a race to the bottom.  I had already spent five years, | 12    A.  Yes. |
| 13  four years, of my career trying to salvage my client's | 13    Q.  So this is the bill that was sent for the cease |
| 14  properties, our properties, and everything in between. | 14  and desist letter and the memorandum we saw earlier this |
| 15      So the concept of perception versus reality was | 15  afternoon? |
| 16  very real, in my mind, it was very fresh.  It was a raw | 16    A.  This was as of September 30th, so it was before |
| 17  wound that had not yet been healed. | 17  the cease and desist letter. |
| 18      I believe the Ritz-Carlton brand is one of the | 18    Q.  Well, the cease and desist letter was |
| 19  foremost brands in the marketplace today.  I did not want | 19  transmitted on September 21st, just to cue you in on that. |
| 20  anything to diminish that flag, no matter what -- whether | 20    A.  Okay. |
| 21  it be a bad restaurant or a dirty spa, or dirty carpets in | 21    Q.  So it would have been sometime after that. |
| 22  the hallway, or a points-based program that had been | 22    A.  Okay. |
| 23  tried -- that had been -- that they had attempted to | 23    Q.  All right.  So this is a bill, and do you know |
| 24  inject into a fractional ownership program, I did not want | 24  whether Mr. Mer -- I'm sorry, Mr. Gosch's firm was paid |
| 25  anything that would damage that product over and above | 25  this? |
| Page 186 | Page 188 |

| | |
|---|---|
| 1  what the global real estate market had already | 1    A.  I would have heard had they not been, so I |
| 2  experienced. | 2  assume they would -- they were paid. |
| 3    Q.  So there is a delineation in concepts between | 3    Q.  Good. |
| 4  the effects of economy on the value of a property versus | 4      (Exhibit 1114 previously marked for |
| 5  the effects of an affiliation on the value -- on the brand | 5  identification produced to the witness.) |
| 6  itself? | 6  BY MR. FERGUSON: |
| 7    A.  At that point in time in 2012, somebody | 7    Q.  Here is the next exhibit, which is 1114, 1114 |
| 8  hiccuping in the lobby could affect values.  I wanted to | 8  (handing). |
| 9  stabilize, as best I could, take everything off the table | 9      Now, this is an email that came in from a fellow |
| 10  that would -- could have the possible chance, and who | 10  named Tom Prose -- |
| 11  knows what they were, of destabilizing.  That's my | 11    A.  Mm-hmm. |
| 12  object -- because that's what I did there. | 12    Q.  -- on August -- sorry, October 25, 2012, and |
| 13    Q.  Yeah.  And the -- you used the word hiccuping. | 13  it's from Tom Prose, at generalmedicine.com.  Do you know |
| 14  I know what you mean there.  Everything concerned you. | 14  Dr. Prose?  You can see he puts an M.D. after his name |
| 15  But the Marriott Vacation Club affiliation was the biggest | 15  there, so I assume he's a doctor. |
| 16  hiccup that could potentially happen with respect to that | 16    A.  I assume he is a doctor. |
| 17  hotel, right? | 17    Q.  Do you know Tom Prose? |
| 18    A.  The Marriott Vacation Club's point-based program | 18    A.  I have never met Mr. Prose. |
| 19  that members were being introduced to was so radically | 19    Q.  You've talked to him, though, I take it? |
| 20  different from a fractional fee simple owner have -- | 20    A.  I have had communication with him, and I know |
| 21  owner-owns-what-owner-owns program that it didn't seem | 21  he's had a lot of conversation with the on-site management |
| 22  like a logical fit for me. | 22  company that I've heard about over the years. |
| 23    Q.  All right.  Well, that's exactly what's in place | 23    Q.  And so he wrote, "Dear Board, I had the pleasure |
| 24  today? | 24  of staying at a Marriott Vacation Club October 15 to 23. |
| 25    A.  That is incorrect. | 25  I can assure you the brand standards, services, |
| Page 187 | Page 189 |

48 (Pages 186 - 189)

Randal Mercer - October 24, 2017

1 accommodations, etc., do not compare to the Ritz."
2       We were talking about that before.  There are
3 definitely different levels of service and accommodation,
4 right?
5    A.  Mm-hmm.
6    Q.  So you would agree with what he said there?
7    A.  Sure.
8    Q.  Okay.  He says, "I strongly urge the board to
9 oppose any affiliation with MVW.  It will cause serious
10 and irreversible damage to our assets at the Ritz in
11 Aspen."
12       And he keeps going on.  And this letter was sent
13 to the old board, you are the new president.  It looks
14 like Tyler Oliver sent it on to you, correct?
15    A.  Yes.
16    Q.  And you said, "Prose is a head case.  Nothing
17 but problems with him."
18       Do you see that?
19    A.  Yes.
20    Q.  Why did you say that he was a head case?
21    A.  Because I would have heard from the management,
22 the club management.  I deal with a lot of problems, and I
23 know he -- he has been very aggressive in his
24 conversations with our general manager from time to time.  the
25    Q.  And you had that knowledge in the month -- the

Page 190

1 two weeks you had been the president?  Or did you know it
2 from your prior stint?
3    A.  Well, I had been on the board before, so I'm
4 sure it came from prior knowledge.
5    Q.  And the fact that you believe he's a head case,
6 doesn't take away his right to express his opinions?
7    A.  Absolutely.
8    Q.  And is there anything in his letter to the board
9 that was forwarded to you that you find to be
10 inappropriate, unthoughtful, that would make him prone to
11 being called a head case?
12    A.  He has every right in the world to express his
13 opinion.  This is your opinion, I respect it.
14    Q.  Okay.  And his opinion was pretty similar to the
15 group of opinions that had come in after the Cunningham
16 letter had gone out -- I'll show you that compilation in a
17 moment -- but his opinion wasn't keeping with even what
18 you were saying in your statement, right, when you were
19 answer that question.  It's very similar.  He's concerned
20 about an affiliation and a brand dilution, is he not?
21    A.  It appears he is.
22    Q.  So he's agreeing with you, and you're calling
23 him a head case?
24    A.  It wasn't because of that.  I certainly could
25 have used a different choice of words, and I wish I would

Page 191

1 I have.
2       MR. FERGUSON:  Do you have that compilation?
3       Is there anything that dates this?
4       MR. REISER, JR.:  It was produced as a native so
5 not on the actual spreadsheet.
6       MR. REISER:  It's dated in August of 20- --
7       MR. FERGUSON:  '12.
8       MR. REISER:  -- '12.
9 BY MR. FERGUSON:
10    Q.  All right.  This is a -- it says, "Member
11 Question," this is a question that's being posed on the
12 member services or member inquiry email address that
13 Mr. Cunningham had sent out.  And you had mentioned before
14 that you had seen what you thought was a chart or
15 compilation of responses from the members to the Babich
16 and Cunningham letters of July 17th and August 17th,
17 respectively.  Is that what you're referring to?
18    A.  I don't believe I said that.  I believe I said I
19 had -- remember seeing a compilation, a chart, a grid,
20 showing responses -- or showing responses and comments
21 from members.
22    Q.  Is this it?  I didn't mean to -- I just want to
23 know if this is it.  And you can scroll a page or two.
24    A.  No.
25    Q.  No, it's not?

Page 192

1    A.  No, it's not.
2    Q.  So you were talking about something -- something
3 else?
4    A.  I believe I was talking about something about
5 the cease and desist letter.  After that had come out, I
6 received a similar document about that.
7    Q.  Okay.
8    A.  So, yeah.
9    Q.  Okay.
10    A.  So I have not seen this.
11    Q.  All right.  Thank you.
12       THE WITNESS:  Temperature okay for everybody?
13       MR. FERGUSON:  A little warm.
14       THE WITNESS:  Okay.
15       MR. FERGUSON:  Should Jessica go out so you
16 can't -- do you mind?  Do you mind?
17       MS. LIVINGSTON:  I don't mind.
18       (There was a discussion off the record.)
19       (Exhibit 1116 previously marked for
20 identification produced to the witness.)
21 BY MR. FERGUSON:
22    Q.  Mr. Mercer, this is an email -- first one I'm
23 showing you, at least, it goes from you to this woman
24 named Stephanie Sobeck.
25    A.  Mm-hmm.

Page 193

49 (Pages 190 - 193)

Randal Mercer - October 24, 2017

1    Q.   And she, at the beginning of this email chain,
2  is talking about you having -- the last page of the
3  exhibit is the first email, of course.
4    A.   Okay.
5    Q.   And it's Exhibit 1116.  And it says, "Thank you
6  for taking my phone call last week.  If it still works for
7  you, can you please hold November 12, 2012 [sic] for our
8  meeting in Orlando to discuss the RCDC affiliation with
9  Lion & Crown Travel, and any other topics of your
10  choosing?"
11          And then she tells you when you might want to be
12  there, time of day, and if any other board members wanted
13  to attend, they could, so -- and they were welcome.
14          Tell me about this contact with Ms. Sobeck.  Was
15  she reaching out to you to follow up on the potential
16  affiliation of the RCDC with Lion & Crown Travel program?
17    A.   I believe I was the first one to reach out, and
18  she was the regional manager in charge of our club, and I
19  wanted to open up a dialogue as the newly-elected
20  president about that and any other issues that may be on
21  her mind, and wanted to let her know at that point what
22  was on my mind and suggested a preliminary conversation.
23    Q.   All right.  And so this email chain is back and
24  forth about you were in St. Thomas and you thought they
25  did a great job there, and then you talked about, with

Page 194

1  her, just when you were going to come and the type of
2  accommodation you wanted, including whether or not you
3  could have a large suite or two rooms.
4    A.   Mm-hmm.
5    Q.   My question here is, did you meet -- did you
6  ultimately meet with Ms. Sobeck in Orlando?
7    A.   Several times; two, maybe three.
8    Q.   I'm talking about this meeting.  I'm sorry.  I
9  want to be very clear with you.
10    A.   Okay.
11    Q.   I'm talking about a meeting that's being
12  scheduled in Exhibit 1116.
13    A.   Yes.
14    Q.   Okay.  And that -- was there a meeting that was
15  held, ultimately held, on November 29th, a Thursday, in
16  Orlando starting at 2 o'clock with her team?
17    A.   I believe it was that date.  I would have to
18  check my calendar and see.  I'm sure it was.  She said she
19  could.
20    Q.   Okay.  And so you -- you attended that meeting
21  with no other board members?
22    A.   I don't believe so.
23    Q.   Okay.  Who did you attend with?
24    A.   I believe I attended it directly by myself.
25    Q.   Okay.

Page 195

1    A.   It is possible that Tyler Oliver joined me at
2  that meeting, but I think he was at the second meeting.
3  I'm not sure.
4    Q.   Okay.  And there was -- was Mr. Cunningham at
5  that meeting?
6    A.   Briefly, yes.
7    Q.   He was only there briefly?
8    A.   Yeah, I believe most of my -- most of my
9  conversations were with Stephanie.  Lee came in.  We had a
10  nice chat, and he left, and I continued.
11    Q.   What do you mean you had a nice chat?  Weren't
12  you down there to meet with him on a fairly serious issue,
13  which is an affiliation with the Lion & Crown Travel
14  program with the RCDC and Aspen?
15    A.   Typically in a first meeting that I request and
16  go to, it's to try and figure out the lay of the land and
17  try and figure out -- bring up of talking points that are
18  of interest to me, and see -- gauge responses so that I
19  can have follow-up meetings and work on the things that
20  are workable.
21    Q.   So it's your style to drive up to meetings, and
22  you wanted to have a chat so you could familiarize
23  yourself with the individuals in the program?
24    A.   Yes.  Yeah.
25    Q.   Who is Nick Autiello?

Page 196

1    A.   I have no idea.
2    Q.   Did you meet with anybody else besides Sobeck
3  and Cunningham?
4    A.   You know, somebody else may have been invited in
5  the room, but I don't recall who this gentleman was.  He
6  may have joined us.
7    Q.   Okay.  Did you take notes at the meeting?
8    A.   No.
9    Q.   Do you keep notes at meetings you go to on
10  business such as this?
11    A.   Not meets and greets, no.
12    Q.   So you saw this as a meet and greet element?
13    A.   Meet and greet, lay some issues out on the
14  table, listen to the tone of voice, sure.  First
15  conversation.
16    Q.   I take it that the primary set of skills -- or
17  the skill set you bring as a real estate broker, one of
18  the top producers, I guess, in this area, is that you're
19  able to do just this, you're able to broker to try to
20  figure out what people might want on either side, come to
21  agreements, whatnot?  That's your --
22    A.   Create relationships that are long lasting,
23  hopefully, and find common ground with people, and where
24  there are disagreements, to settle those disagreements,
25  absolutely.

Page 197

50 (Pages 194 - 197)

Randal Mercer - October 24, 2017

1    And, by the way, the travel committee Debbie is
2 my wife.
3    (Exhibit 1117 previously marked for
4    identification produced to the witness.)
5 BY MR. FERGUSON:
6    Q.   This is Exhibit 1117 (handing).  And you'll see
7 that it starts at the back with the same email of
8 Ms. Sobeck inviting you to Florida.  And it looks like you
9 forwarded that on to your board, as comprised then, that
10 would be Marsden, Schneider, and Oliver.  You said, "I
11 have had a conversation with Stephanie, see below.  I'm
12 going to drive up to Orlando to meet with her and ML."
13    "ML" is Mary Lynn Clark, right?
14    A.   Yes.
15    Q.   What was she -- was her involvement, if you can
16 tell us, back in this time frame?  Why did you want to see
17 her?
18    A.   I have no idea what she actually did.
19    Q.   But you wanted to meet with her?
20    A.   She was -- she was working in some upper --
21 upper level capacity, or so I thought, in the marketing of
22 the clubs.  She was a sales-oriented type person, and I
23 think I wanted to see what she had to say.  Or maybe
24 someone told me that ML was still involved, and I just did
25 not want to exclude her.  I'm not sure.
Page 198

1    Q.   Well, you said to your three fellow board
2 members, "Although not mentioned here, I have reached out
3 to both of them, and based on my conversations with
4 Jay" -- so you've also spoken to Mary Lynn Clark, I take
5 it?
6    A.   By email; yeah, by email.
7    Q.   And it says, "Stephanie is not as vital to the
8 discussion as Mary Lynn, ML" -- Mary Lynn Clark.  "In
9 fact, if ML is not there, I probably won't go."
10    So with respect to this meet and greet chat, you
11 were going to have -- one of the people you wanted to chat
12 and meet and greet with was Mary Lynn Clark?
13    A.   Mm-hmm.
14    Q.   Is that right?
15    A.   It is.
16    Q.   And was she there, sir?
17    A.   I cannot remember.
18    Q.   Thank you.
19    A.   Another hurricane.
20    Q.   Now, on the first page of Exhibit 1117 -- and
21 this is now no longer an email chain between you and three
22 board members, it's just Mr. Oliver and you -- that
23 happened quite a bit, where the two of you were speaking
24 on your own as opposed to including the two other members,
25 right?
Page 199

1    A.   It happened a lot.  Tyler and I developed a good
2 friendship.
3    Q.   Okay.
4    A.   A good business comradery.
5    Q.   And you felt it was easier to deal with him
6 because he was of like mind and wasn't a troublemaker?
7    A.   He's a very easy guy to get along with, like
8 mind.  And he had such a great way with people.  It was
9 often really good to have him in the room with people.  He
10 would -- he'd hear things that I wouldn't hear.  He would
11 say things that I wouldn't say.
12    Q.   Okay.
13    A.   Good guy.
14    Q.   Great.
15    You told him, "Probably dreaming, but if you
16 think it is a good idea, I will send a call-in number for
17 30 minutes before."
18    You were trying to potentially set up a
19 meeting -- a link for other board members to attend?
20    A.   Mm-hmm.
21    Q.   Okay.  Is that a yes?
22    A.   Yes.
23    Q.   Okay.  And then it says in the middle of the
24 page, Oliver tells you, without copying anybody else,
25 "Would it be helpful to discuss your -- your upcoming
Page 200

1 meeting with Mary Lynn and Stephanie?  Are there any
2 updates from our $34,000 attorney and his discussions with
3 Marriott?"
4    A.   (Laughing.)
5    Q.   You laugh.  Why did you giggle, chuckle?
6    A.   I don't know who he's referring to, but I just
7 saw an invoice that was pretty close to that.  Maybe it
8 was Mr. Gosch.
9    Q.   Was Mr. Oliver griping about the level of
10 billing by Mr. Gosch for his memorandum and his cease and
11 desist letter?
12    A.   It was just a tongue-in-cheek statement.
13    Q.   And it said -- and we had seen this before, are
14 there any updates from Mr. Gosch and his discussions with
15 Marriott?  We had seen before there was a potential --
16 there was a discussion or an item that said Mr. Gosch may
17 have a contact at Marriott legal.  Do you have any
18 recollection of who Mr. Gosch was maybe able to
19 communicate with at Marriott legal?
20    A.   I have no idea who.
21    (Exhibit 1118 previously marked for
22    identification produced to the witness.)
23 BY MR. FERGUSON:
24    Q.   1118 (handing.)  This is more of the
25 communications about meeting with -- meeting in Orlando
Page 201

51 (Pages 198 - 201)

Veritext Legal Solutions
866 299-5127

Randal Mercer - October 24, 2017

1 with Sobeck and Cunningham, and maybe Mary Lynn Clark.
2      At the middle of the first page -- I'm sorry,
3 the bottom of the first page, you're saying, "The update
4 call with Jay and the attorneys scheduled for last Monday
5 was canceled because of hurricane. As of Thursday, Jay
6 still didn't have power and was showering at the gym. I
7 have asked both Jay and attorney to be on the budget
8 call."
9      So the attorney would be Mr. Gosch?
10 A. I would assume so, yes.
11 Q. Did you not know his name at the time, or is it
12 just everybody understood who you were talking about?
13 A. It's just easier to type one word for me.
14 Q. Okay.
15 A. I do two fingers. And that was in the last
16 email also, by the way.
17 Q. It says, "To be on the budget call in case there
18 are some members who brought it up and we had to quiet
19 them down. I still haven't been fully briefed, although I
20 had a call with attorney and nothing has developed."
21      So you were talking to Gosch and nothing had
22 developed with respect to his ability to contact Marriott
23 legal?
24 A. As is typical of me, I like to have introductory
25 meet and greets. In this case it was over the phone,

Page 202

1 introduce myself.
2 Q. What kind of call was occurring here? Was it a
3 call that members could phone in on on November -- in
4 November of 2012?
5 A. No, it was just board president to board
6 attorney to try -- try and get up to speed.
7 Q. So when you say in your email, "There are some
8 members -- in case there are some members who brought it
9 up, we had to quiet them down," are you referring to
10 Marsden and Schneider there?
11 A. Would you repeat the question?
12 Q. Yeah. You're saying to Oliver in this
13 interchange with him about an upcoming phone meeting, I
14 think, and Jay and Gosch are going to be on it, you said
15 that you want the attorney, Gosch and Jay, to be on the
16 call, in case there are some members who brought it up,
17 and we had to quiet them down.
18 A. That would be board members.
19 Q. Okay. Marsden and Schneider?
20 A. Yes.
21 Q. Who did you -- who were you concerned about that
22 might need to be quieted down?
23 A. Anybody that wasn't on the call. Jay had a lot
24 of credibility, so conversation between Jay and attorney
25 and myself, would be totally, totally in order. And

Page 203

1 somebody may have asked, why wasn't I invited. Well, just
2 wanted to have the call.
3      (Exhibit 1120 previously marked for
4      identification produced to the witness.)
5 BY MR. FERGUSON:
6 Q. This is an email chain, looks like a day or so
7 after that call, and it's from Mullenix. Somehow it got
8 into an email chain. I guess he sent it to the president,
9 so it would be Doyle -- who is Doyle the president of?
10 A. St. Thomas.
11 Q. St. Thomas. And David Oestreich is
12 San Francisco?
13 A. Jupiter.
14 Q. Jupiter. Okay. And Salcut is --
15 A. Sal Cutrona.
16 Q. Yeah. Who is he president of, or what was his
17 role at this point?
18 A. He was still on the St. Thomas board of
19 directors, as well as the Aspen Highlands board of
20 directors.
21 Q. Okay. 1120 is what's before the witness.
22      Mr. Schneider weighed in on this email chain
23 that you're CC'd on, to Mr. Neveloff, "I think the board
24 at Bachelor Gulch has made the appropriate decision. If
25 Marriott doesn't agree to defer the affiliation with

Page 204

1 Lion & Crown, then they have no choice but to terminate
2 the relationship with Marriott or litigate the matter. At
3 some point I think it would behoove us to try and join
4 forces with them to combat Marriott. Phil."
5      Is this an example of a board member that you
6 needed to potentially quiet down about the issue of
7 affiliation?
8 A. Again, I can't -- I can't comment on that
9 because I don't have a copy of the communication letter
10 that the entire -- that was sent to the BG membership
11 along with the copy of the letter he sent to Weisz, so I'm
12 not sure.
13 Q. Okay. So you would need to see the letter that
14 was sent by Mr. Mullenix regarding brand and evolution --
15 A. I'd like to keep it in context, if I could.
16 Q. Let me -- I understand. Let me just finish my
17 question.
18 A. I'm sorry.
19 Q. It looks like Mr. Mullenix had written a board
20 to Weisz and Cunningham.
21 A. Mm-hmm.
22 Q. Had you ever seen that letter that was sent to
23 Weisz and Cunningham?
24 A. Not that I recall.
25 Q. Were you ever the recipient of a report from

Page 205

52 (Pages 202 - 205)

Veritext Legal Solutions
866 299-5127

Randal Mercer - October 24, 2017

1 Mullenix or Bachelor's Gulch regarding what happened at
2 any meeting that Bachelor's Gulch directors had with Weisz
3 and Cunningham?
4    A.   Not that I recall, but I could have been.
5    Q.   Do you recall that there was a meeting that had
6 some, I'll call it, fireworks and some pretty tense
7 exchanges?
8    A.   I knew that -- I knew that the Bachelor Gulch
9 relationship was starting to go through a very rough
10 patch.  And while I can only speculate, this letter may --
11 that I don't recall reading -- may have had the line in --
12 the proverbial line in the sand drawn, although I'm not
13 sure.
14    Q.   Do you recall a time where Cunningham and his
15 company were considering slowing down the affiliation, at
16 least -- yeah, slowing down the affiliation with RCDC
17 system wide?
18    A.   Restate.
19    Q.   Yeah.  Do you recall that there was a time when
20 Cunningham's company, Marriott Vacation Club and Marriott
21 Vacation Worldwide, were considering slowing down the
22 affiliation?
23    A.   Slowing it down in what way?
24    Q.   Yeah, not implementing it.
25    A.   I don't recall any formal conversations, but it

Page 206

1 was always, in my mind, that the fewer -- the fewer of the
2 Ritz-Carlton Destination Clubs that were open and
3 operating and functioning as clubs, the less we mattered.
4 And I did not want any clubs to ever go away because that
5 was the strength that we had.  The more clubs, the more we
6 mattered.  The fewer clubs, the less we mattered.
7    Q.   What does that -- put that in context.  Are you
8 saying that you were concerned about Bachelor's Gulch
9 leaving the fold?
10    A.   Of course.  For personal reasons as well as, you
11 know, the global look at what these clubs are really all
12 about.
13    Q.   I was asking, did you -- just simply, did you
14 recall that there was a potential standdown of the
15 implementation of an affiliation as was being set forth in
16 the letters that came from Cunningham and Babich during
17 the summer of 2012?
18    A.   Not to our board, no.  I was not on the board.
19    Q.   You hadn't sent the cease and desist letter yet,
20 had you?
21    A.   In the summer of 2012?
22    Q.   No, by the fall, October, November.
23    A.   After I had been elected president, I saw it.
24 I'm sure -- obviously I saw it.  I'm just not sure when.
25    Q.   Okay.

Page 207

1    A.   But it mattered that the clubs remained the
2 clubs.
3        (Exhibit 1122 previously marked for
4        identification produced to the witness.)
5 BY MR. FERGUSON:
6    Q.   Exhibit 1122 is an email chain with that same
7 beginning email, which is a letter from -- an email from
8 Mullenix to Mullenix and to his -- to his members that has
9 the letter to Weisz and Cunningham.  That's the first
10 email.
11        At the top, you said -- I'm sorry, Jerry Marsden
12 said, "Good morning, Randy.  I think you should get on the
13 opportunity created because and see if we can get us included
14 in the one-year non-implementation agreement while we
15 discuss long-term strategy."
16        And that's what I was just asking about simply,
17 which was, do you recall generally that there was an
18 opportunity or discussion to delay implementation of the
19 Lion & Crown Travel program for a year?
20    A.   I can only view the top page of page 2 where
21 Mr. Weisz suggested the postponement of the Lion & Crown
22 affiliation agreement to the Bachelor Gulch membership.  I
23 can assume that's what was being referred to, but without
24 the letter, I can't verify that.
25    Q.   But the cease and desist letter was something

Page 208

1 that was going to be sent and ultimately sent to tell
2 Marriott not -- to cease and desist from doing just that,
3 the affiliation?
4    A.   The cease and desist letter was something we
5 owned exclusively in our club.  It had nothing to do with
6 anybody else.
7    Q.   But it had to do with the same items, which is
8 the affiliation?
9    A.   Which was the points program or affiliation as
10 you refer to it.
11    Q.   And how do you refer to it?  What are you --
12    A.   I refer to it as the points program.  I believe
13 that's what all of the clubs were referring to.  But
14 just, I'm a small word kind of guy, so --
15    Q.   So you like points program rather than
16 affiliation?
17    A.   Yeah.
18        (Exhibit 1124 previously marked for
19        identification produced to the witness.)
20 BY MR. FERGUSON:
21    Q.   Let me show you Exhibit 1124 (handing).
22        This is a letter from Mullenix to Weisz, the
23 president and CEO, and Cunningham, executive vice
24 president and COO, of the worldwide corporation.
25        Had you ever been provided with this letter?

Page 209

53 (Pages 206 - 209)

Randal Mercer - October 24, 2017

1  This is the letter that you said you wanted to see that
2  you needed to have for context to answer some of my prior
3  questions.  Do you recognize this letter?
4      A.  I don't recall seeing it at the time, but I'm
5  sure I received it.
6      Q.  He said, "Dear Gentlemen" -- to Weisz and
7  Cunningham -- "I'm writing on behalf of the board of
8  directors to continue our dialogue about the proposed
9  affiliation of the Ritz-Carlton Club Bachelor's Gulch
10  members with the Lion & Crown in 2013 and beyond" --
11      A.  Mm-hmm.
12      Q.  -- "to request that such proposed affiliation be
13  canceled."
14      A.  Mm-hmm.
15      Q.  At least your brother president at another RCDC
16  was able -- or was using the word "affiliation."
17      A.  Okay.
18      Q.  Right?
19      A.  He's a hotel guy, so I get that.
20      Q.  "He's a hotel guy," what does that mean?
21      A.  He owns hotels.  He owns Hiltons.  He owns
22  Marriott franchises.  He owns multiple, multiple hotels
23  across the country.
24      Q.  So when you said he's a hotel guy when I asked
25  you if he uses the word "affiliation," are you suggesting

Page 210

1  to the ladies and gentlemen that only a hotel guy can
2  get -- understands the concept of affiliation?
3      A.  I'm suggesting it's just a hotel term and not a
4  generally-accepted -- a generally-used term, at least not
5  by me.
6      Q.  Well, you used it today.
7      A.  Okay.
8      Q.  Right?  When you said CB -- CBRE office is an
9  affiliate of the main company?
10      A.  That's what they called it.
11      MR. SHEA:  Objection.  Argumentative.  No need
12  to raise your voice.
13      THE WITNESS:  We called it a partner office.
14  They call it an affiliate office.  It's the same
15  thing.
16  BY MR. FERGUSON:
17      Q.  So you know what the word "affiliation" means?
18      A.  It's just terminology, sure.
19      Q.  Second paragraph it says, "As we discussed
20  during our face-to-face meeting on September 19, 2012 in
21  Orlando."
22      So prior to your meeting in November, it hasn't
23  occurred yet, they had -- you learned that -- you learned
24  that they had met with Weisz and Cunningham --
25      A.  Mm-hmm.

Page 211

1      Q.  -- about this very issue, right?
2      A.  Mm-hmm.
3      Q.  Is that a yes?
4      A.  Yes.
5      Q.  And were you briefed by Mr. Mullenix before you
6  went down in November 2- -- November 29, 2012 as to what
7  he encountered when he met with Weisz and Cunningham?
8      A.  Other than this letter, no, not that I recall.
9      Q.  If you look at the second page of Exhibit 1124,
10  the second paragraph up from the bottom, it starts with "I
11  understand."
12      Mr. Mullenix says to the CEO and the COO, "I
13  understand we discussed at our meeting the possibility of
14  holding a vote of the club membership on the issues -- on
15  the issue of affiliation with L&C."
16      Did you ever discuss the possibility of a vote
17  regarding affiliation with Lion & Crown when you met with
18  Sobeck and chatted with Mr. Cunningham?
19      A.  We used the word "vote" and "survey"
20  interchangeable, just as "partner" and "affiliate."  It
21  was just a word to describe an outreach.
22      Q.  When you went in November of last year in the
23  general election for the United States of America, did you
24  do a vote or did you do a survey?
25      A.  I did a vote.

Page 212

1      Q.  There is a difference, is there a not?
2      A.  Well, in the case of a general election of the
3  President of the United States, yes, there is a
4  difference.
5      Q.  Well, when you got elected to the board,
6  Mr. Neveloff wanted Marriott to vote its 13.4 percent in
7  your favor, did you get in on a survey, sir, or did you
8  get in on a vote?
9      A.  Rephrase the question.
10      Q.  Did you become an officer and director, tourist
11  accommodation director, representing the interests of some
12  of -- all of my clients, did you get in on a survey, or a
13  vote?
14      A.  It was a vote.
15      Q.  Okay.  And when you met -- my question was, when
16  you met in Florida in Orlando in late November, I think I
17  said, "They discussed their vote regarding affiliation,"
18  that being Bachelor's Gulch and Weisz and Cunningham, I
19  asked you, did you discuss a vote?  And you said you used
20  the word "vote" and "survey" interchangeably at that
21  meeting.
22      A.  Mm-hmm.
23      Q.  Is that yes?
24      A.  Yes.
25      Q.  So from the get-go, you weren't committed to any

Page 213

54 (Pages 210 - 213)

Veritext Legal Solutions
866 299-5127

Randal Mercer - October 24, 2017

1 form of a vote where the members would actually have a
2 real voice by voting their interest, they would have one
3 interest or two or three, you weren't considering them
4 that type of vote, you were considering a survey as early
5 on as November of 2012?
6     A.  I had not even gotten to the point where we were
7 considering an outreach to our members because we were
8 just starting the conversations.
9     Q.  Okay.  So the conversation did start there in
10 November of 2012, because you just said that you discussed
11 interchangeably the words "survey" and "vote," right?
12     A.  Whenever we had the conversation about reaching
13 out to the members, the words were interchangeable.
14 Whether or not it was that November meeting, I can't
15 recall.  Probably not.  But I'm sure I wanted to say we
16 need to find out what our members are interested in.
17     Q.  So --
18     A.  Because we were always interested in doing
19 whatever our members wanted.
20     Q.  So you -- you're saying that you probably didn't
21 discuss a survey or a vote in the November 29th meeting
22 where you attended with Ms. Sobeck and chatted with
23 Mr. Cunningham without any other board members there?
24     A.  I -- it would be way too early to discuss that.
25     Q.  Well, Bachelor's Gulch was discussing it, was it

Page 214

1     Q.  Did you ever hear of Dan Wolf, a lawyer in the
2 Vail area that represented Bachelor's Gulch?
3     A.  No, sir.
4     Q.  Did you ever meet with him?
5     A.  No, sir.
6     Q.  Okay.  And do you know whether or not Bachelor's
7 Gulch had one or two consultants in connection with its
8 study of the affiliation and the potential departure from
9 the Ritz-Carlton brand flag?
10     A.  No, sir.
11     Q.  Did you ever read those reports?
12     A.  No, sir.
13     Q.  Do you know whether Bachelor's Gulch ever filed
14 a lawsuit or threatened to file a lawsuit?
15     A.  No, sir.
16         (Exhibit 1126 previously marked for
17     identification produced to the witness.)
18 BY MR. FERGUSON:
19     Q.  Just maybe if you look at Exhibit 1126, the
20 middle of the first page, it's Gosch to you and Neveloff,
21 "I like the approach, although it's slightly softer than
22 our cease and desist letter.  I think we should join the
23 fight and send some variation of our cease and desist
24 letter in the near future.  When you speak with BG
25 president, please ask him for a copy of the referenced

Page 216

1 not?
2     A.  Okay.  Well, they were further along in any
3 process.  They were pretty upset at the time.  They --
4 they had hired consultants, and they had gone a long way.
5     Q.  And your association had hired a preeminent real
6 estate lawyer in the Denver Bar to write a nine-page,
7 single-spaced, detailed memorandum regarding whether or
8 not Marriott Vacation Club could use your club as a
9 destination for Marriott Vacation Club members; did it
10 not?
11     A.  Yes.
12     Q.  And it charged you $32,000 to do that?
13     A.  That would be considered due diligence.
14     Q.  And you never saw a cease and desist letter from
15 Mr. Mullenix's company, did you?  They didn't hire a
16 lawyer to do that?
17     A.  I was not privy to very much of Mr. Mullenix's
18 information.  That was their board business.
19     Q.  You know that --
20     A.  I believe their consultant was -- was acquired
21 in order to discover additional options should they decide
22 not to remain a Ritz-Carlton flag.  That would be my
23 opinion.  That's what I heard.  I don't know what the
24 consultant was hired for.  He could have been a lawyer.
25 He could have been a hotel guy.  I don't know.

Page 215

1 study."
2         And that would be a study that you were just
3 referring to in your prior set of answers, right?
4     A.  Mm-hmm.
5     Q.  Did you ever get the Bachelor's Gulch study
6 from --
7     A.  No.
8     Q.  -- Mr. Mullenix?
9     A.  No.
10     MR. FERGUSON:  That was Exhibit 1126.
11         (Exhibit 1130 previously marked for
12     identification produced to the witness.)
13 BY MR. FERGUSON:
14     Q.  Exhibit 1130, Mr. Mercer.  The top of the page
15 is an email from Gosch to you and Neveloff regarding a
16 response to an 11/5 correspondence with Mullenix?
17     A.  May I start at the back, please?
18     Q.  Sure.
19     A.  Okay.  Great.  Thanks.
20     MR. MARX:  Matt, do you have an extra one?
21     MR. FERGUSON:  Oh, sorry.
22     THE WITNESS:  Okay.  So that was me to Mike,
23 stuck in his inbox.  There was no response.
24     (Witness examines document.)
25     THE WITNESS:  Thank you.

Page 217

55 (Pages 214 - 217)

Randal Mercer - October 24, 2017

1 BY MR. FERGUSON:
2    Q.  Yeah.  Did you see a letter that Weisz -- I'm
3 sorry, that Cunningham -- did you see Cunningham's
4 November 15th letter in response to Mulienix's
5 November 5th letter which we saw just a moment ago?
6    A.  Mm-hmm.
7    Q.  Did you see Mr. Cunningham's response?
8    A.  I don't recall it.
9    Q.  But it was sent to you?
10    A.  I do not recall it.  If you have it, I'd love to
11 look at it.
12    Q.  I'm just asking if it was sent to you.  Then
13 I'll show it to you if you did get it.
14    A.  Okay.
15    Q.  He said, "Here is their response," and he sent
16 you a document there, right?
17    A.  That's what he said.
18    Q.  Okay.  I just want to know, did you have -- did
19 you have that letter in mind when you went to visit Sobeck
20 and chat with Mr. Cunningham?
21    A.  If I had received it by the 28th, I would have
22 read it.
23    Q.  And prior to your meeting in Orlando, did you
24 send the cease and desist letter?  When I say "you," did
25 Mr. Gosch on behalf of the board, on behalf of the
Page 218

1 association, send the cease and desist letter?
2    A.  Yes, I believe we had by then.
3    Q.  And what was it that precipitated you sending --
4 you all sending the cease and desist letter?
5    A.  In all probability, I would have wanted -- I
6 can't recall specifically, but I would have wanted the
7 Marriott folks to know exactly where our board stood in
8 order to open up a dialogue based on fact.
9       (Exhibit 1135 previously marked for
10    identification produced to the witness.)
11 BY MR. FERGUSON:
12    Q.  And would you look at Exhibit 1135, a letter
13 dated November 21, 2012 to Weisz and Cunningham at the
14 Worldwide Corporation, Cobalt, and to Bhavana Boggs at the
15 Ritz-Carlton Development Company, LLC.  Is this the cease
16 and desist letter that was sent on your behalf by
17 Mr. Gosch?
18    A.  Yes, it is.
19    Q.  Okay.  And it set forth the -- it expressed the
20 opinion of the board in terms of what could and could not
21 be done vis-à-vis the affiliation that was being suggested
22 by Babich and Cunningham in their letters of 17 August, 17
23 July of 2012?
24    A.  Yes, it does.
25    Q.  And you wanted them to immediately cease and
Page 219

1 desist from promoting the use of the Tourist Accommodation
2 Units at the Aspen Highlands condominium to the MVC
3 members and permanently refrain from implementing any such
4 program at the Aspen Highlands condominium, right?
5    A.  Yes.
6       (Exhibit 1137 previously marked for
7    identification produced to the witness.)
8 BY MR. FERGUSON:
9    Q.  Here's another chain.
10    A.  May I have one, please?
11    Q.  Oh, I'm sorry, (handing).
12    A.  Can't quote me if I can't read it.
13    Q.  I would have failed at the blackjack table.
14       This is Exhibit 1137.  It also concerns the
15 letters back and forth between Cunningham and Bachelor's
16 Gulch Mullenix, CCs to Weisz,
17       Gosch is telling you and Neveloff in the bottom
18 of page 1 of Exhibit 1137 on November 28, 2012 that --
19 he's responding to a question.  He says, "I hope not.  My
20 suggestion is to stay strong.  The association" -- that
21 would be Highlands -- "has a stronger position vis-à-vis
22 MVW, and a pullback of the Bachelor's Gulch offer is
23 mostly bad for Bachelor's Gulch, which is unfortunate for
24 them but not wholly relevant to our situation.  We would
25 have had to fight this fight even if we knew about the
Page 220

1 letter since the letter is not global and doesn't
2 expressly address our issues."
3       And then you responded to that, "I have worked
4 on straight commission all my life as a broker.  I know no
5 other position to take."
6       What did you mean by that?
7    A.  I have no idea.  But I use that a lot.  I wake
8 up every day unemployed.  That's how I view my life.  It's
9 a very primitive way to live.
10    Q.  And then he says at the top, "Go get -- go get
11 'em." I take it that means your -- "Go get 'em," meaning
12 good luck with your meeting with Sobeck and your chat with
13 Cunningham?
14    A.  I believe it does.
15       MR. FERGUSON:  Okay.  Take that break?
16       MR. SHEA:  Okay.
17       THE VIDEOGRAPHER:  Stand by, please.  This
18 concludes media unit number four.  We are going off
19 the record.  The time is 2:38.
20       (Recess taken -- 2:38 p.m.)
21       (Return from recess -- 2:50 p.m.)
22       THE VIDEOGRAPHER:  We are going back on the
23 record.  The time is 2:50.  This is media unit number
24 five.
25
Page 221

56 (Pages 218 - 221)

Randal Mercer - October 24, 2017

1     (Exhibit 1145 previously marked for
2     identification produced to the witness.)
3 BY MR. FERGUSON:
4     Q.  Mr. Mercer, I'm handing you what's been marked
5 Exhibit 1145 (handing).  This is a memorandum dated
6 December 19, 2012 to your board -- I'm sorry, to your
7 membership from your board.
8        Is this a document that was drafted with the
9 assistance of Mr. DiMeglio and his team and then you as a
10 board of director?
11    A.  No, sir.
12    Q.  Who drafts these?
13    A.  I drafted this.
14    Q.  Okay.  So you drafted this entire document?
15    A.  Yes, sir, I did.
16    Q.  Okay.  I want to focus on the portion of this
17 memorandum to your membership called "Destination Club."
18 It starts on page -- I think I have it here.  Did I give
19 you the right one?  Yeah, "Destination Club," it's on
20 page --
21    A.  3.
22    Q.  -- 3.  I wanted to see if you actually -- it's
23 also your page 3.
24    A.  Yes.
25    Q.  So you're there?  Good.

Page 222

1     THE VIDEOGRAPHER:  Thank you.
2     MR. FERGUSON:  Thank you.
3     Q.  You said at the top of page 4, "As of the
4 writing -- as of this writing, we remain unsatisfied that
5 Aspen Highlands is appropriately valued, meaning we
6 believe that the owners of Marriott timeshares/points will
7 find it too easy to exchange into our Aspen Highlands."
8        And you said, "It has been our continuing
9 position that our members bought into Ritz-Carlton brand
10 and do not want that brand diluted."
11        Was the concept of brand dilution in any reports
12 that you might have seen that were done for Mr. Mullenix
13 and his group, if you recall?  I think you might not
14 recall whether you saw it or not, but that specific
15 question in mind, do you recall whether you saw a
16 Bachelor's Gulch report with that concept?
17    A.  You know, I do not recall.  It seemed to be a
18 popular word.
19    Q.  On page -- bottom of page 4, you wrote, "As a
20 result of all the items mentioned regarding the
21 Destination Club, the lack of communication and
22 discussions with Marriott -- MVW, and after deep
23 consideration, your board have determined that Aspen
24 Highlands members are essentially having our program and
25 purchased rights reduced."

Page 224

1        You wrote to your board -- to your members, "The
2 Destination Club in its latest version was introduced to
3 the members by Ritz-Carlton Club and Marriott in mid-year
4 2012."
5        Then you talked about updates, and then you
6 talked about also, "After continuing -- continued
7 monitoring conversations with other boards and their
8 presidents, personal trips to Marriott in Orlando for
9 discussions" -- it was only one trip, is that right, by
10 you up to this point?
11    A.  Yes.
12    Q.  Did any other board members go to Marriott
13 separate and apart from you, to your knowledge?
14    A.  No.
15    Q.  -- "the limited benefits remain the same."
16        And you talk about those two benefits, including
17 one, a limited benefit which is you can trade your
18 allotted time for points, and use points for Marriott
19 experiences.
20        And then you quoted from some prior communiqués.
21 Do you see that?  And I want to take you to the next
22 page -- I have a different version of this.
23        THE VIDEOGRAPHER:  Mr. Ferguson?
24        MR. FERGUSON:  Oh, I don't have my mic on.
25 Where is it?

Page 223

1        Do you see that?
2    A.  Yes.
3    Q.  "Comments from a significant number of members
4 are consistent with this position."
5        Do you see that?
6    A.  Yes.
7    Q.  Okay.  And this is December of 2012, right?
8    A.  Yes.
9    Q.  Exactly -- or almost exactly a year later, is it
10 true, in your view, that you had the green light from the
11 survey, enough information to believe that everybody had
12 changed their mind in order to do this affiliation?
13    A.  No.
14    Q.  Did a significant amount of people change their
15 position in regards to this affiliation with
16 Destination --
17    A.  No.
18    Q.  -- Program?
19        You advised them that you had sent a cease and
20 desist letter, correct?
21    A.  Yes.
22    Q.  And it set forth the legal positions of your
23 board, right, --
24    A.  Yes.
25    Q.  -- through its counsel?

Page 225

57 (Pages 222 - 225)

Randal Mercer - October 24, 2017

1      It says at the bottom, "We take no joy in this
2 action, but to sum it up as succinctly as possible, the
3 members of Aspen Highlands want the program to be -- we
4 were sold to remain the same."
5      And then you went on with three other points
6 about what you wanted to achieve from the cease and desist
7 letter, right?
8    A.   Yes.
9    Q.   All right.
10    A.   And I copied them with the cease and desist
11 letter.
12    Q.   You did provide the copy to them?
13    A.   Yes.
14    Q.   And I think you got quite a few comments about
15 that letter back when you sent this out, did you not?
16    A.   Yes, I did.
17    Q.   Okay. And we talked -- we saw you -- Mr. Young
18 Mike Reiser showed you on the screen the copy of that
19 compilation --
20    A.   Mm-hmm.
21    Q.   -- of comments, and I think you said you hadn't
22 seen that before. Was the compilation that's in your
23 mind's eye of comments relative to your December 19, 2012
24 communication with your members with the attached Gosch
25 letter, is that --
                         Page 226

1 it. They could be putting an ad in Craigslist, the result
2 would be the same.
3    Q.   So when you had this meeting about 20 days
4 earlier in Orlando with Sobeck and your chat with
5 Cunningham, at this meeting they told you that it was
6 their position that they could rent their units and that
7 anybody could rent, cash, barter, or trade, that was what
8 they told you in November of 2012, right?
9    A.   I can't remember if those are their words or
10 mine.
11    Q.   And Mr. Mullenix responded to you in Exhibit 146
12 [sic], "They used that line with us, and that is when Jo
13 Perfido, Jo-Ann Perfido" -- or Perfido -- "accused Weisz
14 that taking that approach defrauded us, and that made
15 Weisz slam his hand on the table and say his famous
16 screaming proclamation to Jo-Ann and I -- meaning me --
17 'You use the word fraud in my building and you think I
18 will have a civil conversation with you?' It was
19 something you could have sold tickets to. These guys are
20 rotten to the core."
21    A.   Cash, trade, and barter sounds like their words
22 and not mine.
23    Q.   Right.
24    A.   Yup, you're right.
25    Q.   And is this the first time you had heard about
                         Page 228

1    A.   I believe, and if I can review it, it was a --
2 it was -- they were comments as a result of the cease and
3 desist letter.
4      (Exhibit 1146 previously marked for
5      identification produced to the witness.)
6 BY MR. FERGUSON:
7    Q.   I'll show you what's been marked Exhibit 14- --
8 1146. So on December 19th, the same day you sent that out
9 to your members, that report, and the fairly long section
10 on the Destination Club, you wrote to somebody, it looks
11 like it might have been Mullenix and Doyle, --
12    A.   Mm-hmm.
13    Q.   -- you wrote, "The meeting was brief and
14 typical. MVW position was by allowing access to Aspen
15 Highland units through a points-based system. They're
16 merely renting units which they own by different
17 methodology -- by a different methodology. They are not
18 doing anything different than any other owner who rent
19 their unit. Cash, trade, barter, it's all the same to
20 them."
21      You ultimately have taken their position, have
22 you not?
23    A.   No. I was just saying that by using a points
24 system, as they -- as they knew it to be, as they defined
25 it to be, they're just putting heads in beds, as they call
                         Page 227

1 the tension that had occurred at the September 19th
2 meeting between Perfido and Mullenix and Cunningham and
3 Weisz?
4    A.   Well, specifically, but prior emails indicated
5 it had not gone well. A lot of times they play good cop,
6 bad cop. You never know.
7    Q.   And you do, too, right?
8    A.   No, I'm pretty straight on.
9    Q.   Did you play --
10    A.   I don't have a lot of time. This is a volunteer
11 job, so I just usually get right to it.
12    Q.   Did you and Oliver at one point in negotiating
13 the MOU, the affiliation agreement, and also the
14 management agreement, play good cop, and have Mike Marino
15 play bad cop with Ms. Egolf?
16    A.   He was a lawyer. They were always banging
17 heads. But Mr. Oliver is kind of an "aw shucks" kind of
18 guy, and sometimes -- sometimes "aw shucks" works better
19 than anything else.
20      (Exhibit 1150 previously marked for
21      identification produced to the witness.)
22 BY MR. FERGUSON:
23    Q.   Exhibit 1150 is a letter from Baker Hostetler's
24 David Walker. And that's a letter that Mr. Walker, who
25 represented, I take it, the Marriott Vacations Worldwide
                         Page 229

                         58 (Pages 226 - 229)

Randal Mercer - October 24, 2017

1 Corporation and several of its subsidiaries.  He responded
2 to Mr. Gosch's cease and desist letter, correct?
3    A.  Yes.
4    Q.  Okay.  And in this letter dated the 21st, he
5 related that they had some discussions on the 7th and 17th
6 of December following the November 21, 2012 cease and
7 desist letter.
8       In the second paragraph he discussed the
9 inventory referenced in the November 21st letter.  That
10 would probably be the 13.4 percent of inventory, right?
11    A.  Yes.
12    Q.  And it says, third line down, the sentence
13 beginning, "All owners of residential units at Aspen
14 Highlands are granted the express authority to rent their
15 inventory pursuant to 13.3 of the Declaration."
16       And then he pointed out that their records --
17 Mr. Ian Marx's clients' records, show that "nearly 400
18 weeks of inventory have been rented by Aspen Highlands
19 members over the past three years."
20       So is this consistent with what you were told by
21 Ms. Sobeck and Mr. Cunningham when you met and chatted
22 with them in Orlando, that they could rent, barter, or
23 trade?
24    A.  They were always of the opinion they could do
25 whatever they wanted with their units.

Page 230

1 repeated theme or mantra of the Marriott folks, which is
2 that this is completely voluntary?
3    A.  No, it was not.
4    Q.  It wasn't voluntary, or it wasn't a mantra?
5    A.  It was not consistent all the way through our
6 ongoing relationship.  As the points program indicates,
7 they were trying to institute something that was --
8 something that was different than a fractional ownership.
9 They were trying to, in our opinion, and most everyone
10 else's opinion, phase it into a quasi timeshare
11 organization, and that is -- that is not consistent with
12 the board's position, and it's not consistent with the
13 legal position.
14    Q.  All right.  And so Mr. Walker in the next to
15 last paragraph -- actually, the third if you count the, "I
16 wish you best wishes for the holidays," he said, "If there
17 are particular areas within Aspen Highlands' governing
18 documents which you believe raise additional concerns,
19 please let me know."
20       The bottom line is that Marriott's lawyer
21 basically told Mr. Gosch that his nine -- or his nine-page
22 analysis that was put into a three- or four-page cease and
23 desist letter, they weren't buying any of it, did they?
24    A.  I would interpret it that way, although I'm not
25 a lawyer.

Page 232

1    Q.  Okay.  And that's basically what Mr. Walker said
2 here to you, to your lawyer, and your board, which was, we
3 can do what we want?
4    A.  Fair.
5    Q.  Right?  And you recall that the very first
6 document I showed you in this case said that the condo
7 declaration did not allow them to do that; do you remember
8 that?
9    A.  Yes, I do.
10    Q.  All right.  And on the second page of
11 Exhibit 1150, there's that full -- there's that long
12 partial paragraph, and I'm just going to focus on the end
13 of it.
14       It says that, "Almost half, 47 percent of Aspen
15 Highlands members have enrolled with the Lion & Crown
16 Exchange Program, making over 200 reservations in the
17 short time since those offerings were added to the
18 exchange opportunities."
19       So by this time, people were enrolling in the
20 system that Ms. Babich had rolled out?
21    A.  Apparently.
22    Q.  All right.  It says, "Such participation in the
23 exchange program is completely voluntary and a decision of
24 each individual member."
25       Is that something that was repeated -- a

Page 231

1    Q.  And he suggested to Mr. Gosch, "I hope that our
2 meetings, coupled with this written response, sufficiently
3 clears up any misconceptions that the association may have
4 about what the RCDC is or is not doing with inventory at
5 the Ritz-Carlton Club Aspen Highlands."
6       So this letter was primarily focused on their
7 use of the inventory?
8    A.  Our cease and desist letter was focused on the
9 placing of their unsold units within a points-based
10 program, and that -- that was our thrust, and he's
11 obviously disagreeing with that.
12    Q.  Okay.  But there was two things -- there were
13 two sources of inventory for the -- for the program that
14 they wanted -- the affiliation program they wanted to
15 implement.
16       One was how they could use their inventory.  And
17 I take it they're taking the position we can do whatever
18 the heck we want to do with it, we can barter, trade, sell
19 it, rent it, that's one item.  The other source of
20 inventory would be what your members would put into the
21 Lion & Crown Travel bank, right?
22    A.  But we were not arguing with our members.  We
23 were arguing with them on their position.
24    Q.  Right.  I understand that.
25    A.  Okay.

Page 233

59 (Pages 230 - 233)

Randal Mercer - October 24, 2017

| | |
|---|---|
| 1  Q.  But Marriott would have two sources or banks --<br>2  two sources to fill their bank with inventory to utilize<br>3  for the Marriott Vacation Club people.  One would be,<br>4  plain and simply, the units they own.  They said, we own<br>5  these, we can rent them.<br>6  A.  Mm-hmm.<br>7  Q.  Right?  Is that one source?<br>8  A.  And it's hard to disagree with that.  They have<br>9  fee simple ownership.  They can -- they can rent it.<br>10  Q.  Well, you did disagree with it.  In fact, you<br>11  got them to stop it.  That's why you spent $32,000 to<br>12  Mr. Gosch.<br>13  A.  No, we stopped them from dumping all of their<br>14  unsold inventory into a trust pool that then could have<br>15  turned it into a points-based system for those units.<br>16  That's what we stopped.<br>17  Q.  Okay.  Was one of the other sources of --<br>18  nights, what your membership would put into the<br>19  Lion & Crown Travel program in order to use -- obtain<br>20  these travel experiences in 51 destination resorts?  Was<br>21  that another source of nights that Marriott Vacation Club<br>22  people could use?<br>23  A.  Apparently.<br>24  Q.  All right.  I want to digress for just a second.<br>25      So today when -- I know you don't do it, but a<br>Page 234 | 1  A.  One week in, one week out.<br>2  Q.  Okay.  And I'm talking about now Lion & Crown<br>3  Travel program now has Ms. Kalcheim's seven days.  Okay?<br>4  A.  Mm-hmm.<br>5  Q.  And it says we get to do something with this.<br>6  Assuming they want to give it -- or let a -- not give it,<br>7  but have a Marriott Vacation Club points person --<br>8  A.  Mm-hmm.<br>9  Q.  -- use it, those days that are now in the bank<br>10  for your club,--<br>11  A.  Mm-hmm.<br>12  Q.  -- does it have to be used by one person, or can<br>13  it be used by more than one person?<br>14  A.  My impression, it has to be used by the -- one<br>15  group trading in one week.<br>16  Q.  So it's purely one week for one week?<br>17  A.  One week for one week.<br>18  Q.  That's your understanding?<br>19  A.  Yes, sir.<br>20      (Sotto voce discussion among plaintiffs'<br>21  counsel.)<br>22      THE WITNESS:  May I expand on that answer?<br>23  BY MR. FERGUSON:<br>24  Q.  Yeah, what is it?  What's the question?<br>25  A.  Your question was --<br>Page 236 |
| 1  Ms. Kalcheim, Ms. Kalcheim puts in a week into<br>2  Lion & Crown Travel program.  She's now put in seven days,<br>3  and she gets some type of currency, I think you think it's<br>4  points, but maybe it's not points, I don't know where you<br>5  are on that.  But ignoring that for the moment, when that<br>6  seven days goes into this Lion & Crown Travel program bank<br>7  and is made available to Marriott Vacation Club people,<br>8  can that be used by seven individuals on seven different<br>9  nights?  Can it only be used for seven days?  Can it be<br>10  used, two and three and two, three and four, or do you<br>11  know?<br>12      MR. MARX:  Object to the form of the question.<br>13      THE WITNESS:  My impression is that one week --<br>14  excuse me.<br>15      MR. MARX:  I just had to make an objection.<br>16      THE WITNESS:  Okay.<br>17      MR. MARX:  I objected.<br>18      THE WITNESS:  My impression is that you trade<br>19  one week, you get one week.  Flat out.  That's it.<br>20  BY MR. FERGUSON:<br>21  Q.  Who gets one week?<br>22  A.  Whoever trades in.<br>23  Q.  Okay.  So that if your person puts in a week,<br>24  they get a week to utilize in the exchange program at<br>25  Marriott?<br>Page 235 | 1  Q.  We're talking about --<br>2  A.  Yeah, sure.<br>3  Q.  -- what the recipient of your members' nights<br>4  can or cannot do.<br>5  A.  Right.  I'm not sure what my response was, so<br>6  I'll just pass on that.<br>7  Q.  I thought you said they can only be one<br>8  person --<br>9  A.  Yeah.<br>10  Q.  I guess they can take seven days, they don't<br>11  have to stay there, but if a Marriott Vacation Club person<br>12  comes in, they have the right to use the seven days --<br>13  A.  I know -- I know what it was.  We are trading<br>14  only our allocated week, so it is a specific week.<br>15  Q.  Can that week be split by the people who get<br>16  their hands on it?<br>17  A.  To my knowledge, no.<br>18      (Exhibit 1151 previously marked for<br>19  identification produced to the witness.)<br>20  BY MR. FERGUSON:<br>21  Q.  Let me show you what's been marked Exhibit 1151<br>22  (handing).<br>23      This is a draft of a letter that Marriott<br>24  produced to us.  It looks like someone is red lining it<br>25  internally at Marriott.  I take it you have, in connection<br>Page 237 |

60 (Pages 234 - 237)

Randal Mercer - October 24, 2017

1 with this litigation, any documents you may have reviewed,
2 have you seen this draft of a letter that was ultimately
3 destined for you from Sobeck with a copy to Cunningham and
4 this fellow named Nick Autiello?
5     (Witness examines document.)
6 BY MR. FERGUSON:
7    Q.  Before you read the whole thing, let me just --
8    A.  Okay.
9    Q.  I'm going to move that along.
10     This draft letter -- I think I have the
11 original, but I'm not sure.  But my notes are in this one,
12 so I'll use it.
13     They talk about, on page 2, "To provide comfort
14 to the board regarding transient travel, RCDC proposes to
15 require that any inventory exchange through Lion & Crown
16 be restricted to a minimum of three-night length of stay."
17     Does that help answer the questions that you and
18 I have been struggling with in the last two minutes?
19    A.  No, it really doesn't, because, one, this is a
20 draft letter; and two, this is written in 2012 and may not
21 be applicable in any way, shape, or form to the MOU that
22 was developed a year later.
23    Q.  Understood.  Okay.  We'll come up to that.  Fair
24 enough.
25     Now, I want to look at the bottom of this page.
Page 238

1    Q.  That permanency concerned you, that concept of
2 permanency?
3    A.  Okay.
4    Q.  Is that right?
5    A.  Yeah, possibly, sure.
6    Q.  Okay.
7    Q.  May I ask what was redacted from page 2?
8    Q.  You have to ask him, Mr. Marx.
9    A.  Okay.
10    A.  So he probably won't answer you, or me.
11    A.  Okay.
12    Q.  I don't know why it's redacted.  There's
13 supposed to be a log that tells us that at some point, so
14 I'll fill you in some day.
15     It talks about there on the second page of
16 Exhibit 1151, "Based on the concerns you raised in our
17 meeting, we would like to explore the alternate approach
18 that we discussed -- that we had discussed, the 'fire
19 sale' strategy" -- fire sale in quotes.  "We understand
20 that you" -- Mr. Mercer, I added that -- "believe that
21 there is a strong market within the association membership
22 to purchase the unsold developer inventory at a discounted
23 price, and we'd like to work with the board to understand
24 a potential -- this potential option for developer
25 inventory."
Page 240

1 It says, "As we discussed," and I think she's referring in
2 the first sentence of the letter to your meeting in
3 Orlando on the 29th.
4     It says, "As we discussed, we were trying to
5 determine the best way to convey the remaining unsold
6 developer fractional interests at Highlands -- Aspen
7 Highlands.  We believe that conveying such interest to the
8 Marriott Vacation Trust is a future option that brings
9 benefits to the association and its members, that we hear
10 your concerns."
11     And those concerns would include the ones that
12 were in Mr. Gosch's letter on November 21st, right?
13    A.  Yes.
14    Q.  And I take it you expressed those concerns when
15 you met with Sobeck and chatted with Cunningham?
16    A.  Yes.
17    Q.  Okay.
18    A.  And from what I recall, and I'm not sure the
19 intricacies of this, I had heard over the years, or the
20 time period that this was discussed, that once the units
21 were deposited into the trust, they could never be removed
22 from the trust.  And I don't know what -- what bearing
23 that has, but in my mind, that means that they could never
24 be sold as fractional units again.  That may or may not be
25 true.
Page 239

1     What were you telling them at this point
2 regarding your understanding of demand for the remaining
3 developer inventory being bought by your membership?
4    A.  They brought out the concept, and it wasn't fire
5 sale, it was bulk sale.  Bulk sale to me typically implies
6 a low sales price.  Did not want that.  We relayed that
7 thought.  Although there were members, not many, that had
8 approached the board from time to time, gee, could we buy
9 ten units, could we buy five units?
10     We knew that those would ultimately be put into
11 some sort of a -- of a rental program where people didn't
12 have any -- a whole lot of skin in the game, and we didn't
13 want that.
14     We did not want to have a bulk sale of all of
15 the remaining units that were unsold, let's say, 120, 150,
16 however many at the time, I'm not sure, because then that
17 would give one specific owner a disproportionate share of
18 ownership which could make a lot of difference in ongoing
19 decisions.
20     We did not -- we did not embrace that, nor did
21 we encourage that.  I believe we possibly said, you know,
22 if somebody wants to buy four or five units, that may be
23 okay.  Maybe they have a big family.
24    Q.  But it says that you said -- or they understand
25 you believe, "There's a strong market within the
Page 241

61 (Pages 238 - 241)

Randal Mercer - October 24, 2017

1 association membership to purchase the unsold inventory at
2 discounted price."
3     Okay.  Is that something -- is that what you
4 were just referring to, that some people wanted four or
5 five or ten?
6    A.  Yeah.  And those -- "a strong desire" are their
7 words and not mine.
8    Q.  Okay.  So they were not exactly relaying what
9 you said?
10   A.  They were embellishing, yes.
11   Q.  All right.
12   A.  But at this point, it would be hard to
13 understand why somebody would really want to do that,
14 but --
15   Q.  Do what?
16   A.  Buy -- buy a lot of them.
17   Q.  Well, yeah, there's a bulk sale which would be
18 someone buying --
19   A.  A hundred --
20   Q.  -- a hundred of them?
21   A.  Fifty, yeah.
22     (Exhibit 1152 previously marked for
23 identification produced to the witness.)
24 BY MR. FERGUSON:
25   Q.  I've handed you Exhibit 1152, which is the

Page 242

1 signed version of the letter we see in 1151 which is being
2 worked on.  So after the red lining, internal red lining
3 at Marriott, you did receive a letter on December 22nd
4 from Ms. Sobeck, right?  Or is it Mr. Cunningham?
5    A.  Mm-hmm.
6    Q.  Ms. Sobeck, correct?
7    A.  Yes.
8    Q.  And if you look at the second page of
9 Exhibit 1132 -- 1132 --
10     MR. SHEA:  1332, Matt.
11     MR. HANLON:  1332.
12     MR. FERGUSON:  1332, thank you.
13     THE WITNESS:  This is 1152.  Am I on the wrong
14 page here?
15 BY MR. FERGUSON:
16   Q.  Oh, I see.  I have a different -- it's the same
17 document.  It has been marked twice.  So I'm going to use
18 1152.  Okay?
19   A.  Okay, yeah, I have 52.
20   Q.  Maybe one is your version, and one is their
21 version.
22     Here's 1152 (handing).  Is that what you have
23 now?
24   A.  Yes, sir.
25     MR. FERGUSON:  1152.

Page 243

1     MR. MARX:  Thanks.
2     MR. FERGUSON:  Do you have it now, Dan?
3     MR. SHEA:  Yes.
4 BY MR. FERGUSON:
5    Q.  So 1152, you did receive this letter in final
6 from Ms. Sobeck, and I was showing you page 2 of
7 Exhibit 1152.  It says, "In the interim, we will commit to
8 not move forward with conveying the Aspen Highlands
9 inventory -- developer inventory to the Marriott Vacation
10 Club Trust any earlier than July 1, 2013."
11     Right?  Is that a commitment date made to you in
12 this time frame?
13   A.  Okay.  Forgive me.  We're on the last paragraph.
14 Let me --
15     (Witness examines document.)
16   A.  It appears to me to be a temporary hold until
17 they explore more options.  Is that -- is that the way you
18 interpret that?
19   Q.  Yeah, I mean, I just -- did they commit to you
20 not to do anything with the inventory, particularly
21 putting it into a trust, until July?
22   A.  That's what it appears to be, yes, mm-hmm.  So
23 we got a six-month hold.
24   Q.  Can I have you go back to Exhibit 1151, which is
25 that marked up version?

Page 244

1    A.  Yes.
2    Q.  And if you go to the second page, you'll see a
3 gray block.
4    A.  Mm-hmm.
5    Q.  And it says, "To provide" -- we just talked
6 about this -- to provide comfort regarding transient
7 travel considering a restriction, and you'll see that
8 someone struck the words "Aspen Highlands inventory to be
9 used for a minimum of three nights by those coming to the
10 property through Marriott Vacation Club exchange."  And
11 they struck that out and they talked about proposing a
12 restriction.
13     But someone's written in block letters there,
14 "Is this trust inventory, developer inventory, or exchange
15 inventory being used by MVC owners of which you're
16 writing?  I've assumed the latter," which would be
17 exchange program inventory for revision purposes.
18     Do you -- we were talking about that a little
19 bit before.  There's different -- because I was just using
20 the word "bank" or "source."  But there are different
21 sources of inventory.  One would have been a potential
22 trust inventory, one would have been the developer
23 inventory, I think that's 7 and -- 7 percent and
24 6.4 percent, and then you have the exchange inventory,
25 which is the inventory that would be created through the

Page 245

62 (Pages 242 - 245)

Veritext Legal Solutions
866 299-5127

Randal Mercer - October 24, 2017

1 affiliation.
2    A.   Mm-hmm.
3    Q.   Right?
4    A.   Mm-hmm.
5    Q.   You understand that?
6    A.   I was under the impression that all 13.4 percent
7 would go into the trust and then would be used for the
8 point system affiliation.
9    Q.   Okay.  Now, I want you to focus on this person's
10 words, and I --
11   A.   Do we know who this is?
12   Q.   Well, it would be someone at Marriott, and I do
13 have an email, I hope, that would tell us exactly.  But
14 the person writes -- and I don't know if it's that
15 pertinent to know exactly today who this was, but I'm just
16 trying to see if you understand or agree or grasp the
17 concept that there is another source of an inventory for
18 the Marriott Vacation Club people to use which this person
19 calls "exchange inventory."
20        Do you see that concept?  And do you know what
21 that means?
22   A.   This is in all caps --
23   Q.   Yes, sir.
24   A.   -- on page 2.
25   Q.   2 of Exhibit 1151.
                                              Page 246

1    A.   "Is this trust inventory, developer inventory,
2 or exchange inventory" -- I was under the impression that
3 it was all developer inventory.
4    Q.   Okay.  Do you have a concept, sir, as the
5 president and board member in December 2012, or even
6 today, that there is inventory created by the exchange
7 program?
8        MR. MARX:  Object to the form of the question.
9        THE WITNESS:  There is no inventory created.
10 The inventory is already -- is already -- has already
11 been created.
12 BY MR. FERGUSON:
13   Q.   How has it been created?
14   A.   Because I own it.
15   Q.   Okay.
16   A.   There's no new inventory.
17        (Sotto voce discussion among plaintiffs'
18 counsel.)
19        (Sotto voce discussion among the witness and
20 counsel.)
21        (Exhibit 1155 previously marked for
22 identification produced to the witness.)
23 BY MR. FERGUSON:
24   Q.   The document before you is Exhibit 155 -- sorry,
25 1155, 1155.  It's December 28th from a Sternfield,
                                              Page 247

1 Mr. John Sternfield.  He's a former president, right?
2    A.   Yes.
3    Q.   A copy -- or it's directed to you and a copy to
4 Mr. Cutrona, and it's regarding points program and MVCI in
5 Kapalua.  Do you recall getting this email from
6 Mr. Sternfield?
7    A.   No.
8    Q.   In the middle of the page, it says, "A couple of
9 days ago."
10   A.   Yes, I do recall getting this.
11   Q.   "I volunteered to take an MVCI presentation for
12 the free golf and to get an insight as to how they're
13 selling their points program.  One thing was still the
14 same, the sales guys told a bunch of far-fetched stories
15 about how easy it is to confirm time and to use all the
16 properties, including the Ritz.  This I expected.  What I
17 didn't expect was that they were using the Ritz as the
18 primary carrot to get folks to buy more points.
19 Basically, anyone that buys 6,500 points or more has
20 access to six RCC properties, Abaco, Aspen, Bachelor's
21 Gulch, Jupiter, St. Thomas, Vail."  And he talks about the
22 value of these items.
23        Was it your understanding that your former
24 president was out in the field there and telling you that
25 they were -- Marriott was pretty much marketing to
                                              Page 248

1 Vacation Club people with the carrot of being able to get
2 into your property?
3    A.   It seems to be his opinion.
4    Q.   Was it your opinion at the time?
5    A.   I had not heard that, nor had I been out in the
6 field.
7    Q.   Well, you thought it was very direct insight
8 from John, did you not, in your email to Mr. Oliver?
9    A.   I trust John Sternfield, sure.
10        (Exhibits 1157 and 1158 previously marked for
11 identification produced to the witness.)
12 BY MR. FERGUSON:
13   Q.   Now, here is two documents I'll give to you at
14 the same time, and I'll give them to you like this.  It's
15 1157 and 1158 (handing).  That is you sending on to your
16 board in January, on January 16th to be exact, some of the
17 feedback comments you had received from your members.
18        And if you'd just quickly peruse Exhibit 1158,
19 and tell me if this is the compilation of comments, or
20 concerns, questions that you had in your mind's eye that
21 we have been referring to a couple of times today?
22        (Witness examines document.)
23   A.   No, this is not what I was referring to.
24   Q.   Okay.  Maybe we'll see it today.
25   A.   But you don't get that many "attaboys," so it's
                                              Page 249

                                        63 (Pages 246 - 249)

Randal Mercer - October 24, 2017

1 kind of nice to read.
2    Q.   Yeah.  So there's a couple of "attaboys" in
3 here?
4    A.   There seems to be.
5    Q.   Okay.  And they were -- they were happy that you
6 had reported that you had sent out the cease and desist
7 letter?
8    A.   Yes.
9    Q.   Okay.  In fact, the person on the second tranche
10 of comments, looks like they're delineated by these lines,
11 but this second person had points A, B, C.  And looking at
12 C, it says, "Lastly, a recent phone conversation with
13 Member Services indicated that, quote, 'All Ritz-Carlton
14 clubs, with the exception of Bachelor's Gulch, are on
15 board with MVW program.'  I don't know if 'cease and
16 desist' letter is being ignored, or if the board has
17 reached agreement with MVW, or if Member Services was
18 misinterpreted."
19       You hadn't agreed to stand down on the cease and
20 desist letter, had you, by this time, sometime in
21 January of 2013?
22    A.   No.
23    Q.   So did it -- would it appear to you that the
24 Member Services people weren't exactly on the same page as
25 your board and your membership, vis-à-vis the affiliation?
Page 250

1    Q.   My question was about the last one.
2    A.   Right.
3    Q.   You had a person that said you made a good --
4    A.   Oh, good.
5    Q.   -- choice in Mr. Gosch, right?
6    A.   Right.
7    Q.   But you never used Mr. Gosch again, did you?
8    A.   No, sir.
9    Q.   Why didn't you use Mr. Gosch again?  Was he too
10 expensive?  Were you too good a friend with Mr. Marino?
11 Did you think another expert was needed, a labor lawyer,
12 employment lawyer?  What did you think?
13       MR. SHEA:  Objection.  Argumentative.  He
14 already answered that this morning.
15       THE WITNESS:  I never believed Mr. Gosch was
16 necessary.
17 BY MR. FERGUSON:
18    Q.   Okay.  In fact, I think Mr. Shea's pointing out
19 that you testified before that you selected Mr. Marino
20 because -- as your consigliere, I think you joke around --
21 but as your lawyer because he had dealt with Ms. Egolf
22 before and had dealt with association matters with
23 different clubs?
24    A.   Mm-hmm.
25    Q.   Is that right?
Page 252

1    A.   I would suggest that the hard-working people who
2 answer the phone at Member Services oftentimes are the
3 last to know anything.
4    Q.   But they did -- they did a particular -- they
5 did tell this particular member that all the clubs were on
6 board, with the exception of Bachelor's Gulch.  If they
7 were telling that to someone at Aspen Highlands, that
8 wasn't exactly correct, was it?
9    A.   No.
10    Q.   And if you look at page 3 of Exhibit 1158, the
11 comments there were, "My wife and I fully support your
12 efforts and the opinions you expressed in the above
13 letter.  We are familiar with the Brownstein firm that has
14 been retained to represent us, and we feel that you've
15 made an excellent choice in choosing them.  They are
16 extremely well-versed in the area of law, as well as being
17 fully" -- very -- sorry, "very well politically connected
18 nationally and in Colorado."
19       So at least one of your members was impressed
20 with and agreed, and told you why they agreed with the
21 selection of Mr. Gosch's firm to represent the HOA in
22 connection with the potential affiliation?
23    A.   There's also one member at the top of that page
24 that says, "Why not investigate purchasing the remaining
25 13.4 percent?"
Page 251

1    A.   That's correct.  But he was not our association
2 lawyer.
3    Q.   Who was?
4    A.   David Firmin was our association lawyer for
5 common issues.
6    Q.   So Mr. Gosch was retained in order to look at --
7    A.   Single issue.
8    Q.   Single issue, okay.  And that's the single issue
9 we're still talking about here today, right?  The
10 affiliation that has occurred; is that right?
11    A.   He was involved in the cease and desist and the
12 affiliation letter, yes.
13       MR. FERGUSON:  Okay.  Can you put up another
14 document?  We'll mark this -- what's the next --
15       MR. REISER:  Why don't we call it 1500.
16       MR. FERGUSON:  Is that right?
17       MR. REISER:  We're at 1490 something.
18       (Exhibit 1500 was marked for identification and
19       displayed to the witness.)
20 BY MR. FERGUSON:
21    Q.   This is a points chart that we're going to mark
22 1500.
23       And is it Bates labeled?
24       MR. REISER:  No.
25
Page 253

64 (Pages 250 - 253)

Randal Mercer - October 24, 2017

1 BY MR. FERGUSON:
2    Q.  No.  Okay.  It's a vacation points chart for
3 Ritz-Carlton folks.  And have you ever seen this beautiful
4 cover of some --
5        MR. REISER:  Tahoe.
6 BY MR. FERGUSON:
7    Q.  Tahoe.  Beautiful lake.  Have you seen this
8 cover before?
9    A.  No.  But it is pretty.
10        MR. FERGUSON:  And would you go to the second
11 page, or the pages with the points chart.
12        MR. REISER:  Okay.  Stay there.
13 BY MR. FERGUSON:
14    Q.  So this is a table of contents for the various
15 properties around -- the Marriott properties around the
16 world, correct?  East coast, Florida, west coast, and then
17 you have the luxury brands on -- under -- on the right
18 side of that page, Ritz-Carlton Club Tahoe, San Francisco,
19 Vail, Highlands -- Aspen Highlands, and St. Thomas.  Does
20 this document look familiar having seen the table of
21 contents?
22    A.  I can't recall.
23        MR. FERGUSON:  Could you go to Exhibit --
24 Exhibit 1150, page 66, I believe it was, for Aspen
25 Highlands.

Page 254

1        These are daily points charts, are they not?
2    A.  I have no idea.
3    Q.  Okay.  Do you know what these points denote?  I
4 mean, you look at full week, 6,500 on the first -- on the
5 first block, which is March 24th to April 13th,
6 December 1st to 21st.  Do you know what these -- what
7 these -- what these charts mean?
8    A.  I'm not that familiar because I've never traded
9 for points, but I would assume that if you were a member
10 of Marriott Vacation Club, you could exchange your points
11 that you've accumulated and use them to come into Aspen
12 for whatever points are illustrated on the chart.
13    Q.  Okay.  So it looks like someone can rent it for
14 less than a week.  They can come on a daily rate -- I take
15 it those are daily rates, or are they not?  Yeah, daily
16 rate is 650 for a two-bedroom, 825, they can come to your
17 club as a Marriott Vacation Club person and at least
18 pricing at daily rates?
19    A.  I'm not sure if that's for illustration or if
20 they can -- they have to go a full week or if they can do
21 less.  I don't know.
22    Q.  Do you think that the ad that they're putting on
23 their website is just for illustration or for actual use,
24 if you know?
25    A.  I do not know.

Page 256

1        MR. REISER:  1500.
2        MR. FERGUSON:  Yeah.
3        MR. REISER:  Exhibit 1500, page 66.
4        MR. FERGUSON:  What's that?
5        MR. MARX:  We're wondering what the source of
6 origin of the document is?
7        MR. REISER:  If you type in "Marriott Vacation
8 Club points chart 2017," it will come up.
9        MR. MARX:  Yeah, so it's just a --
10        MR. REISER:  It's a public record.
11        MS. LIVINGSTON:  It's not produced.
12        MR. FERGUSON:  No, no, I think we're pulling it
13 off the Internet.
14        MR. REISER:  Yes.
15        MR. FERGUSON:  So this is Tahoe.  Do you have
16 Highlands?
17        That's 64.  If you can go to 66.
18        MR. REISER:  There it is.
19 BY MR. FERGUSON:
20    Q.  So this is a points chart that's on the Internet
21 today, or 2017, I'm not sure it's exactly right, but it
22 does talk about December 1, December 21st which is coming
23 up -- or past rather, and you've got the whole year here.
24 Beginning in March and ending in December, January, I
25 guess of '18.

Page 255

1    Q.  You talked about before that you thought that
2 the exchange was week for week.  Does this impact your
3 thinking on that, whether or not a week that goes into the
4 exchange inventory can be used on a less-than-a-week
5 increment?
6    A.  No.
7    Q.  That would effectively allow someone to use that
8 week for Sunday to Thursday and another person to come in
9 and turn over and use it for the weekend?
10    A.  It doesn't impact my thinking at all.
11    Q.  So do you know one way or another as the
12 president of the board of the association of Aspen
13 Highlands whether or not if Ms. Kalcheim puts a week in,
14 that Mr. Smith can take the weekend, and Mr. Jones can
15 take the weekdays?
16    A.  It's been purported to me that it's one week in,
17 one week out.  That's what I know.
18    Q.  Who told you that?
19    A.  That's a good question.
20    Q.  Okay.  One of Mr. -- was that the basis of your
21 support, that it would be one week for one week?
22    A.  No.
23    Q.  Well, Mr. Neveloff is concerned that there would
24 be wear and tear on the building, on the facility, because
25 you had greater turnover by guests, and I think even

Page 257

65 (Pages 254 - 257)

Veritext Legal Solutions
866 299-5127

Randal Mercer - October 24, 2017

1 guests that weren't actually owners, but do you believe
2 that a turnover on a less than a weekly basis is --
3 strains the facility and the staff?
4    A.   I believe that if there were somebody new
5 turning over a unit every day, that there would be an
6 increased housekeeping cost.  I don't believe there would
7 be any more wear and tear on a unit because one week is
8 one week.
9    Q.   But there's more moving in and out, there's more
10 bags being transferred in, skis and whatnot, right?
11    A.   Concierge bell stand does that.  They're pretty
12 good.
13    Q.   So the bottom line is that as you sit here
14 today, your belief is that what you signed in April of
15 2014, the MOU and the affiliation of which you do not
16 participate in, but when Ms. Kalcheim puts in a week, that
17 the person from the Marriott Vacation Club that may pick
18 it up is using it for a week and it can't be split?
19    A.   My impression is it's one week in, one week out
20 only.
21    Q.   It's one week out, but can it be used by more
22 than one person?
23    A.   I don't know that.  That's my assumption.
24    Q.   And the assumption is based upon what the
25 Marriott told you?

Page 258

1    It says that -- it says, "At this time" --
2 second paragraph -- "At this time, the board and our
3 outside counsel continue to be in discussions with MVW and
4 Ritz-Carlton affiliates regarding a potential mutually
5 acceptable settlement of our differences."
6    And it goes on in that paragraph, it says,
7 "Finally, please be advised that it is our intention to
8 bring any potential resolution -- any potential
9 resolution" -- do you see that word "any"?
10    A.   Mm-hmm.
11    Q.   -- "before the members for a vote" -- do you see
12 that?
13    A.   I do.
14    Q.   Okay -- "should a resolution be tentatively
15 reached between the board, MVW, and such Ritz-Carlton
16 affiliates."
17    So on February 3, 2013 you were representing to
18 your board that any potential resolution of these issues
19 which would be the, you called it, ongoing dispute with
20 Marriott Vacation Worldwide, would be handled by a vote of
21 the members?
22    A.   Again, vote, survey, discussion.
23 Interchangeable words for myself.  But I read it.
24    Q.   Okay.  So when you sent this to your 876
25 members, you wanted them to understand that a vote could

Page 260

1 A.   One week in, one week out.  That makes sense to
2 me.  The barrier entry to Aspen is so high, it's hard to
3 imagine someone coming for a day.  It's just too
4 expensive.
5    Q.   Well, it's 650 points for somebody --
6    A.   Transportation, them getting -- getting there is
7 hard to do.  We talked about that earlier.  I mean, the
8 odds of that happening, I would think, would be cost
9 prohibitive.
10    Q.   For one day, probably, but not three or four
11 days?
12    A.   Perhaps.
13    Q.   What about people that are in Marriott Vacation
14 Club that want to use -- they offer a couple of days of
15 skiing and then drive the hour and a half or hour and 45
16 minutes over to Aspen, is that something you see
17 occurring, where the week is split that way?
18    A.   I don't know.  I've never seen it.
19    (Exhibit 1161 previously marked for
20    identification produced to the witness.)
21 BY MR. FERGUSON:
22    Q.   There is another email -- I'm sorry, another
23 report from you all on Exhibit 1161 (handing).  And that's
24 an update from you to the membership.  When I say "you,"
25 your board, you as president.

Page 259

1 mean a survey or a -- what was the other word you used?
2    A.   I forget.
3    Q.   Discussion.
4    A.   Discussion.
5    Q.   So they're interchangeable to you, right?
6    A.   Yes.
7    (Exhibit 1168 previously marked for
8    identification produced to the witness.)
9 BY MR. FERGUSON:
10    Q.   Exhibit 1168 is before you, sir (handing).
11 That's an email chain that starts at the back with an
12 email from you here at CRE.  Randy Mercer wrote, "I like
13 to keep in touch with my legacy board members, Sternfield,
14 Cutrona, and Neveloff.  John is who I'm thinking about
15 right now.  Too much brain power in that group to go
16 wasted."
17    Are you communicating here by March of 2013 with
18 Mr. Marino?
19    A.   I don't believe so.
20    Q.   Okay.
21    A.   Pretty early.
22    Q.   If you see -- if you look at the bottom of
23 page 3 of this document, it's four pages, but this is
24 three, is this to Mullenix then?  Mike Mullenix, I suspect
25 then?

Page 261

66 (Pages 258 - 261)

Randal Mercer - October 24, 2017

1    I might have misspoken there. Yeah, I'm sorry,
2 I confused myself, and then you. So this is with Mike
3 Mullenix.
4    A. No. This is the chairman of the board of
5 Timbers Resorts.
6    Q. Okay. So you were telling -- this is to -- this
7 is to somebody, and it looks like it's Mike Mullenix,
8 right? You see above it says, "Randy, absolutely. I have
9 nothing but utmost respect for John, Sal, and Jay and miss
10 dealing with them on this mess. We will have a 90-minute
11 call today with Cunningham and Sobeck -- or had one. It
12 was cordial, but I was matter of fact that we BG --
13    A. Yes, this is from Mike Mullenix.
14    Q. Okay.
15    A. So mine would have been too.
16    Q. My fault.
17    A. Uh-huh.
18    Q. You indicated that you had met with a Timbers
19 guy here. Was that here in -- where we are today?
20    A. Not right here. We met in Naples for lunch. He
21 has a winter home in Naples.
22    Q. Okay.
23    A. He is the president or CEO of Timbers Resorts,
24 which has a facility in Aspen.
25    Q. Right.

Page 262

1 BY MR. FERGUSON:
2    Q. Here's why I got confused. Two Mikes (handing).
3       So this is the next exhibit in line. It's 1169.
4 It's the other Mike. And on March 28, 2013, you said,
5 "Gents, I've asked our former six-year counsel, Mike
6 Marino, after a one-year hiatus, to join us at all the
7 meetings starting on Thursday evening." And that would be
8 the meetings that are coming up mid year, board of
9 directors, the mid-year board of directors meeting?
10    A. That would be the spring board meeting.
11    Q. Right.
12    A. Probably in April, mid April.
13    Q. You said, "He's still counsel for St. Thomas,
14 owns two units at St. Thomas, and has deep relationships
15 with the very top level of Ritz and Marriott."
16       Okay. So when you were telling your three board
17 members, Schneider, Marsden, and Oliver, that Mr. Marino,
18 who you had known, had relationships with the very top
19 level of Ritz and Marriott, who are you referring to?
20    A. I was referring to Stephanie. I was referring
21 to Steve Weisz. I was referring to Barbara Egolf,
22 specifically. And over the years, he had liaisoned with a
23 lot of different people -- different levels that I knew
24 nothing about. But he was embedded as a board member and
25 counsel for three independent boards.

Page 264

1    A. Dancing Bear. Also one in Snowmass.
2    Q. Right.
3    A. And multiple locations around the world.
4    Q. What's his name?
5    A. I can't recall.
6    Q. David somebody? I know him but --
7    A. I can check, if you don't mind me looking at my
8 phone.
9    Q. No, that's okay.
10    A. Okay.
11    Q. We need to move along, Mr. Mercer.
12    A. Only met with him once or twice.
13    Q. And you met with him just to chat with him
14 and give the lay of the land like you do in your initial
15 meetings with folks?
16    A. Yes.
17    Q. Okay.
18    A. I wanted to -- I wanted to discuss options to
19 see if he was interested in Aspen Highlands, and I knew he
20 was in discussions with Bachelor Gulch.
21    Q. You had an inkling that was going on from
22 Mr. Mullenix, they were talking to?
23    A. Oh, yeah, sure.
24       (Exhibit 1169 previously marked for
25    identification produced to the witness.)

Page 263

1    Q. So his deep relationships at the very top level
2 were as a result of, in your understanding, of his
3 dealings with those entities on behalf of associations in
4 the RCDC system?
5    A. Mm-hmm.
6    Q. Yes? Is that a yes?
7    A. Yes, sir.
8    Q. Thank you, sir. And it's this one where you
9 refer to him as your consigliere, he'll watch your back
10 and listen carefully and offer his knowledge as always.
11       You also said he was -- "He has been
12 instrumental in creating the club we have now, including
13 documents, and we are fortunate to have him on board."
14       Are you referring to some of the work you had
15 done during your previous stint on the Tourist
16 Accommodation Board?
17    A. Yes.
18    Q. You said that his fee for coming out for the
19 entire session was $2,500, plus expenses. "This is
20 identical to the special rate in our prior board."
21       So was he someone who was providing a fairly
22 decent rate for his time to come to board meetings here in
23 Aspen?
24    A. Sounds like it.
25    Q. Okay. And was it around this time frame that

Page 265

67 (Pages 262 - 265)

Randal Mercer - October 24, 2017

1 you saw Mr. Marino's firm generate a retention letter?
2    A. Could have been.
3    Q. All right. And he said -- you said, "We'll have
4 some fun. Get your ticket." And he said, "Roger that.
5 We can get the bottle wine update." And I take it
6 that's -- you guys like fine wine and dining at the --
7    A. "Roger that" is something Mike Marino says a
8 lot. He must have been in the Air Force.
9       (Exhibit 1172 previously marked for
10 identification produced to the witness.)
11 BY MR. FERGUSON:
12    Q. It looks like on March 28, 2013, around that
13 same time frame, you had sent to Mr. Marino Bachelor Gulch
14 notes that Mr. Mullenix took of his meetings in Orlando
15 with Sobeck and Hearns. Do you recall getting a hold of
16 these notes and sending them on to Mr. Marino?
17    A. No, I don't, but these are the notes.
18    Q. Okay. So would you go to page 4 of
19 Exhibit 1172. I'm not sure I gave that to you already.
20    1172 is before the witness.
21    Mine's marked so it's a lot easier to see. If
22 you go to seven or eight, nine lines up, it says, "They
23 want to control the conversation," that being MVW,
24 "between their offerings and the members. MVW has a much
25 more cavalier attitude of what is the board's role versus

Page 266

1 their role, and it was insinuated that they could use the
2 'vote of the membership'" -- in quotes -- "to perhaps get
3 their way on important matters."
4       That's a concept that was introduced to you by
5 Mr. Mullenix vis-à-vis this sharing of notes with you and
6 Mr. Marino, ultimately; is that right?
7    A. Looks that way.
8    Q. Okay. And then it says, "She said more than
9 once" -- that would be Ms. Sobeck -- "she said more than
10 once that a vote of the entire membership is how we will
11 address similar issues at the Marriott Vacation Clubs.
12 Well, it was not said back to her, but we are a
13 Ritz-Carlton Club with members who have a much more
14 substantial investment in the proposition than a typical
15 Marriott Vacation Club member."
16       At some point did they promise you a vote?
17    A. No, sir.
18    MR. REISER: What was that answer?
19    THE WITNESS: Nor would they threaten us with
20 one.
21 BY MR. FERGUSON:
22    Q. A vote?
23    A. Yes.
24    Q. On page 1172, 05, page 5 of 1172, there's a
25 section two regarding other tidbits from meeting -- from

Page 267

1 the meeting, and has Aspen, and he's talking about your
2 documents and similar provisions and whatnot.
3       And then you'll see that towards the end of this
4 section on Aspen, he says, eight, nine lines up, "It was
5 further inferred that MVW was flying out to Aspen meeting
6 to persuade the Aspen board to allow MVW -- MVW propose a
7 vote of their members to allow them to get their
8 14 percent inventory and deposited either into the
9 Lion & Crown Exchange Program or transferred to the
10 Marriott Vacation Land Trust as they are under orders to
11 the powers that be to get out from all the remaining hard
12 Ritz-Carlton Destination Club inventory still on their
13 books. Obviously, the prohibition from timesharing in the
14 Aspen and BG documents have prevented MVW from
15 transferring its large inventory position at Aspen."
16       So there was an indication, at least with
17 respect to the trust -- potential trust taking title or
18 taking possession of their 14 percent inventory, that
19 there would be a vote; that's what they were telling
20 Mr. Mullenix; is that right?
21    MR. MARX: Object to the form of the question.
22    THE WITNESS: I'm going to have to read that
23 again.
24 BY MR. FERGUSON:
25    Q. Okay.

Page 268

1       (Witness examines document.)
2    A. That's what they told him.
3    Q. That's what they told him. They told you that
4 also, didn't they? They told you they would have a vote
5 in connection with this affiliation?
6    A. They used that word in a prior -- a prior
7 document, did they not?
8    Q. Affiliation or vote, because those --
9    A. Vote.
10    Q. Well, yeah, --
11    A. I guess I don't understand the question.
12    Q. -- we did talk about that, because in a letter
13 confirming what was spoken about in Orlando, they wrote
14 you on the 29th or -- yeah, the -- sorry, they wrote you
15 on the 19th of December regarding a meeting on the 29th,
16 the one that had the word "fire sale" in there, I believe
17 in there they referred to the word "vote." And you said
18 you didn't recall -- first you recalled that there was a
19 vote discussed, but it was maybe also a survey, and then
20 you didn't recall whether it was discussed there.
21    A. See, that's not how I read this.
22    Q. All right.
23    A. I read this that they would use their vote.
24    Q. Okay. Different concept. All right.
25    A. That's how I read this.

Page 269

68 (Pages 266 - 269)

Randal Mercer - October 24, 2017

1    Q.  But they didn't have enough votes to carry the
2  day on that.  They only had 14 percent, right?
3    A.  It's a big number when very few people vote.
4    Q.  Well, you have to put a lot of effort into a
5  vote?
6    A.  You have to put a lot of effort.  It takes
7  years.
8    Q.  Well, it doesn't take a year because
9  Mr. Mullenix pulled it together in a few months, right?
10   A.  On normal issues.  I know St. Thomas has taken
11  years, sometimes to get -- over a year to get a vote
12  together.  They hold the vote open until they get -- until
13  they get it.
14   Q.  Okay.  So Mr. Mullenix was able to do it in a
15  shorter time frame, three or four months?
16   A.  Pretty big issue.
17   Q.  Yeah.  Well, this is a big issue for Aspen
18  Highlands, is it not?
19   A.  Mm-hmm.
20   Q.  Is that right?
21   A.  Yes.
22   Q.  Yes, it is.  Okay.
23       MR. SHEA:  What's the "this"?
24       MR. FERGUSON:  The what?
25       MR. SHEA:  What's the "this"?  He didn't say --

Page 270

1  BY MR. FERGUSON:
2    Q.  You understand there's two sources of inventory
3  for Marriott Vacation Club people being discussed at this
4  time?
5    A.  No, I do not.
6    Q.  You have no idea about that?
7    A.  The only source -- the only source of income of
8  units that we are discussing are the Marriott-owned
9  income -- the Marriott-owned inventory, and then we're
10  discussing an optional exchange program which is another
11  source of potential inventory.
12       So if that's what you're referring to, --
13   Q.  Yes.
14   A.  -- I would agree with you.
15   Q.  Thank you.  Thank you.  Because that second type
16  of inventory is what came to the -- your members on
17  July 17, 2012 when Babich wrote her letter, and then
18  Mr. Cunningham followed up with it on August 17th, right?
19   A.  Mm-hmm.
20   Q.  They're talking about that type of inventory,
21  exchange inventory, right?  Is that right?
22   A.  I would assume.  I can't predict.
23       (Exhibit 1175 previously marked for
24       identification produced to the witness.)
25

Page 272

1  BY MR. FERGUSON:
2    Q.  An affiliation where people can -- two things,
3  whether or not they could use their inventory and put it
4  into a trust so Marriott Vacation Club people could use
5  it, and the other type of affiliation which is an exchange
6  program.
7    A.  I would agree with the first one, not the second
8  one.
9    Q.  They didn't -- they weren't suggesting that
10  there could be an exchange program to create inventory for
11  Marriott Vacation Club people?
12   A.  What they were suggesting --
13       MR. SHEA:  Excuse me, that wasn't your question
14  the first instance.
15       MR. FERGUSON:  Well, I'm just -- I'm on a
16  different question.
17       Can you repeat what I just said?
18       MR. SHEA:  What you just said, or the first
19  question with the "this"?
20       MR. FERGUSON:  What I just said.  I cleared that
21  up, and then --
22       MR. SHEA:  No, you didn't clear it up.
23       MR. FERGUSON:  Well --
24       (Record read back.)
25

Page 271

1  BY MR. FERGUSON:
2    Q.  I'll just show you Exhibit 1175, and this is a
3  sample of a letter that went from the Aspen Highlands
4  board of directors to a Lori Phillips, and it's a test,
5  Aspen Highlands Condominium Association Tourist
6  Accommodation Board letter to members, and this one's
7  addressed to a fellow named Mr. Richard Hegberg.  Do you
8  know Mr. Richard Hegberg?
9    A.  No, sir.
10   Q.  And it says, "Positive discussions were held
11  today between the board of directors and representatives
12  of Ritz/Marriott, including Lee Cunningham, COO of the
13  Ritz-Carlton Destination Club."
14       Mr. Cunningham and Ms. Sobeck came out to your
15  mid-year board meeting, did they not?
16   A.  Mm-hmm.
17   Q.  Is that right?
18   A.  We only have two on-sites, April and September.
19   Q.  And my question was pretty simple,
20  Mr. Cunningham and Ms. Sobeck were at the mid-year one in
21  April?
22   A.  Mid year is June.  Spring meeting is April.
23   Q.  Spring meeting.  All right, I'll use that.  I'm
24  sorry.
25   A.  Thank you.

Page 273

69 (Pages 270 - 273)

Randal Mercer - October 24, 2017

1    Q.  It says, "Ritz-Carlton representatives agree
2   that unless a majority of Aspen Highlands members,
3   excluding the Marriott interests and members not in good
4   standing" -- so a majority less the Marriott-owned
5   inventory and less people who aren't paying their dues,
6   okay -- "vote in favor of doing so, the Ritz/Marriott will
7   not include Aspen Highlands in the Marriott Vacation Club
8   affiliation/exchange/points program."
9        Okay?  So they told you that at the April spring
10  meeting of your board, and you immediately turned around
11  and wrote a letter to all your members saying, they
12  promised us a vote.
13   A.  Mm-hmm.
14   Q.  Right?
15   A.  Okay.
16   Q.  You didn't use the word "survey," did you?
17   A.  Show me the letter.
18   Q.  I'm showing you the letter right there, sir.
19  This is to Mr. Hegberg.  That's a letter that's going to
20  be signed by the president, vice president, treasurer, and
21  secretary, and you were the president at the time, sir.
22   A.  Okay.
23   Q.  You didn't use the word "survey" or "discussion"
24  in your letter, did you?
25   A.  Once again, I was repeating what they told us.

Page 274

1   that there would be a vote about that, right?  That was my
2   question.
3    A.  If there was a vote about joining the points
4   program required, we would have done that.
5    Q.  My question, Mr. Mercer -- and it's gone on all
6   day, but you don't like to answer my questions.
7        I asked you whether or not the Ritz people,
8   Cunningham and Sobeck, said they would not have a vote of
9   the members unless -- they would not -- they would not put
10  the Marriott Vacation Club inventory into the -- into the
11  trust unless there was a vote.  Do you remember me asking
12  you that?
13   A.  Certainly.
14       MR. SHEA:  This is not professional.  Stop it.
15  BY MR. FERGUSON:
16   Q.  And what you --
17       MR. SHEA:  Stop.  We're going to walk out if --
18       MR. FERGUSON:  Okay.
19       MR. SHEA:  -- you don't lower your voice.
20       MR. FERGUSON:  Let me ask my question.
21       MR. SHEA:  No, lower your voice first or we're
22  walking out.
23       MR. FERGUSON:  Your voice is a lot higher than
24  mine, sir.
25   Q.  Your answer to that question was, and there

Page 276

1    Q.  All right.  And they told you that they were
2   going to have a vote of the majority of the members, and
3   if there wasn't a vote of the majority of members, there
4   would be no affiliation, exchange, or points program with
5   the Marriott Vacation Club?
6    A.  Fine.
7    Q.  That came out of their mouths at your board
8   meeting in April of 2013?
9    A.  Right.  And there is none.
10   Q.  All right.  That's your position, there is none
11  today?
12   A.  There is none.
13   Q.  "Discussions continue on other important issues
14  affecting Aspen Highlands, including alternatives for
15  divesting the current inventory of Aspen Highlands units
16  owned by Ritz/Marriott.  Such inventory will not be sold
17  through the Marriott Vacation Club trust without an
18  additional vote of the members."
19   A.  Mm-hmm.
20   Q.  So they were talking about a separate vote on
21  the issue of what they could do or not do with the
22  inventory.
23   A.  And there was none.
24   Q.  So my question, sir, was whether or not they
25  told you, and you turned around and told your members,

Page 275

1   hasn't been any.  So you didn't answer my question.  All
2   right?  Is there a reason you're not answering my
3   questions today, sir?
4    A.  I'm not even sure what your question is.  Would
5   you repeat it, please?
6    Q.  I'd ask you to answer my questions from now on
7   today, sir.
8        MR. SHEA:  He's just being argumentative and
9   unprofessional.
10       And if you continue it, we're going to call the
11  magistrate and we'll have him listen to the video and
12  the tone of voice.  It's unprofessional.  We don't do
13  that in Colorado.
14       (Exhibit 1176 previously marked for
15  identification produced to the witness.)
16  BY MR. FERGUSON:
17   Q.  Let me show you Exhibit 1176.
18       MR. SHEA:  It's called bullying.  And if you
19  look at the Ethic Code in Colorado, it doesn't permit
20  it.
21  BY MR. FERGUSON:
22   Q.  This is a letter from RCDC SLC, I guess that's
23  Salt Lake Leadership, something like that, and it's
24  regarding Member Services.  And it says, "Ladies and
25  Gentlemen," -- there they go -- "A few hours ago we

Page 277

70 (Pages 274 - 277)

Randal Mercer - October 24, 2017

1  received the attached draft letter which is anticipated to
2  go out to each of our Aspen Club members from the Aspen
3  Club board of directors today."
4       And we just saw that in a prior exhibit. So
5  this is going out from leadership to I, guess, the line
6  people in Member Services. It says that, "Marriott
7  Vacation Worldwide has agreed, together with the board of
8  directors, that we will not affiliate the Aspen Club and
9  club members with our Marriott Vacation Club Destinations
10 program unless a majority of the members vote otherwise."
11      So at least internally the Salt Lake Leadership
12 team headed by Ms. Babich at Cobalt is saying to her
13 people, this is what we're doing. We promised a vote
14 today to Mr. Mercer, Mr. Marsden, Mr. Schneider, and
15 Mr. Oliver. Correct?
16      MR. MARX: Object to the form of the question.
17      THE WITNESS: Apparently they did.
18 BY MR. FERGUSON:
19   Q.  All right. And you heard them say that with
20 their own -- it came out of their own mouths? You
21 actually heard that?
22   A.  I believe I did.
23   Q.  Do you know who drafted that letter we saw in
24 the prior exhibit I was asking about?
25   A.  No, sir.

Page 278

1  communiqué, this is an actual letter that -- the version
2  of the letter that went out, I take it?
3    A.  Appears to be.
4    Q.  All right. And it promises the two votes,
5  right? Is that a yes or a no?
6    A.  Give me a moment, please.
7    Q.  Sure.
8    A.  Promises a vote. If the Aspen Highlands
9  affiliation/exchange/points program were to be instituted.
10   Q.  All right.
11   A.  That is correct, and that has not been done.
12   Q.  Is that because it's voluntary today?
13   A.  No. It's a different subject.
14   Q.  Is it voluntary what -- the exchange program
15 today?
16   A.  It is voluntary.
17   Q.  And it's a one week for one week?
18   A.  Yes, sir.
19   Q.  And you don't --
20      (Sotto voce discussion among plaintiffs'
21 counsel.)
22      (Exhibit 1178 previously marked for
23 identification produced to the witness.)
24 BY MR. FERGUSON:
25   Q.  This is an exhibit that was produced, it looks

Page 280

1    Q.  Okay. If you look back at 1175, it says that
2  it's approved by a Lori Phillips, a manager of association
3  government -- governance out there in Orlando, Florida --
4  not out there, out here.
5       Did you know that your board letter in this
6  regard was being approved by someone at Marriott
7  Governance --
8       MR. MARX: Object to the form of the question.
9  BY MR. FERGUSON:
10   Q.  -- Services, Marriott Governance Services?
11   A.  Yes, they review all letters that go out, I
12 believe.
13   Q.  I take it you haven't seen this exhibit, 1176,
14 this internal document from Salt Lake City Leadership to
15 Member Services?
16   A.  No, sir.
17   Q.  Okay.
18      (Exhibit 1180 previously marked for
19 identification produced to the witness.)
20 BY MR. FERGUSON:
21   Q.  And Exhibit 1180 (handing), produced from the
22 files of the Marriott Corporation's companies. This is a
23 letter to member -- and that would be at least a final,
24 signed -- I put signed in quotation marks -- it's signed
25 electronically, and that's the letter we saw in a prior

Page 279

1  like, by the association, Mr. Shea and Ms. Livingston
2  Black.
3       Do you recall -- we were talking about this
4  document that's in your mind's eye or not in your mind's
5  eye. This would be comments that are coming in to the
6  letter that was approved by Lori Phillips out of Orlando,
7  and I guess sent by you all -- or by you all through
8  Marriott. Is this the chart or compilation that you were
9  thinking about earlier today?
10   A.  This is the compilation that is in my mind's
11 eye.
12      MR. FERGUSON: Okay. I knew we'd come to it.
13 Why don't we just go through this, and is it getting
14 close to a break time? I don't know how long we have
15 been going because I'm doing it, so --
16      MS. LIVINGSTON: We have been going, like, an
17 hour and 20 minutes.
18      MR. FERGUSON: All right. Just give me a few
19 seconds with this one.
20      MR. HANLON: Do you have a number?
21      MR. FERGUSON: This is Exhibit 1178.
22   Q.  So if you look at, for example, Mr. Gradinger's
23 comments on page 2 of Exhibit 1178, he's the third one up
24 from the bottom above Mr. Branoff, he said, "Well done.
25 Will be asked to vote against the inclusion of Aspen

Page 281

71 (Pages 278 - 281)

Randal Mercer - October 24, 2017

1 Highlands in the exchange program -- we will be asked to
2 vote?"
3      Do you know whether anybody responded to him
4 about that?
5   A.  No, I don't.
6   Q.  And, for example, on page 3, there's a Robert
7 Goldberg.  Do you know Robert Goldberg?
8   A.  No, sir.
9   Q.  He said, "Good job.  We should not be included.
10 Congratulations."
11      Was that generally -- people here are saying
12 "Wonderful.  Great job.  Great job.  Thank you.  That's
13 great news.  Hallelujah.  Great job.  Let's hope it works.
14 This is very encouraging.
15      That's because you had told your members that
16 they could decide whether or not there would be an
17 affiliation, right?
18   A.  That's your opinion.
19   Q.  Is that not your opinion?
20   A.  My opinion is that they were saying good job,
21 you stopped something that was very bad.
22   Q.  Well, it hasn't been stopped yet because
23 Marriott is still going to come.  They're going to have a
24 vote about something, at least probably two things.
25   A.  No, they said there will be -- if -- if the
                                                    Page 282

1 question is going to go to the owners, we will have a
2 vote.  The question did not go to the owners.
3   Q.  Well, it did -- I guess it went to the owners on
4 a survey?
5   A.  No, that's not what happened.  We did not say
6 that in the survey question.
7      MR. FERGUSON:  All right.  Let's take a quick
8 break.
9      THE WITNESS:  But we'll get there, I'm sure.
10      MR. FERGUSON:  Possibly before church, I hope.
11      THE WITNESS:  I would hope so.
12      MR. FERGUSON:  We're going to get you out of
13 here.
14      THE VIDEOGRAPHER:  We're going off the record.
15 This is the end of media unit number five.  The time
16 is 4:10.
17      (Recess taken -- 4:10 p.m.)
18      (Return from recess -- 4:19 p.m.)
19      THE VIDEOGRAPHER:  We are going back on the
20 record.  This is media unit number six.  The time is
21 4:19.
22      (Exhibit 1202 previously marked for
23 identification produced to the witness.)
24 BY MR. FERGUSON:
25   Q.  I'm going to hand you Exhibit 1202, which is a
                                                    Page 283

1 Mar-- I'm sorry, is a draft of a letter --
2      THE VIDEOGRAPHER:  Your microphone again,
3 Mr. Ferguson.
4      MR. FERGUSON:  Sorry.
5      THE WITNESS:  Question, please.
6 BY MR. FERGUSON:
7   Q.  I'm putting this on.  That's what happened.
8   A.  Okay.  Question?
9      MR. SHEA:  Just wait.  He's going to start over.
10      THE WITNESS:  I'm sorry.  Forgive me.
11 BY MR. FERGUSON:
12   Q.  Okay.  This is a -- Exhibit 1202 is a draft of a
13 letter to come from the Ritz-Carlton Destination Club's
14 Executive Vice President, Lee Cunningham.  It's "Dear" --
15 it's a blank, obviously -- "Dear Mr. and Mrs. Aspen
16 Member," May 3, 2013.  Had you seen this draft letter
17 before it was finalized and sent to your members?
18   A.  I don't recall this specific letter, but if it
19 had been sent out, then I would have received one.
20      (Exhibit 1203 previously marked for
21 identification produced to the witness.)
22 BY MR. FERGUSON:
23   Q.  Can you look at Exhibit 11 -- sorry, 1203
24 (handing), which is an email from you to Marino.  "They
25 sent us a draft letter that sounded like advertising.  We
                                                    Page 284

1 made some slight adjustments, and we will have a
2 conversation next week.  Trying to slow it down.  They are
3 trying to speed it up."
4      Do you recall that you did, in fact, get a copy
5 of Mr. Cunningham's draft letter to your members?
6   A.  Apparently I did, and that would be my response.
7   Q.  All right.  And if you look at Exhibit 1202, the
8 Cunningham draft letter, it talks about him, quote, he
9 "understands that some members have some concerns about
10 this opportunity.  We believe the proposed affiliation
11 would provide members of the Ritz-Carlton Club with
12 additional vacation options while having the same access
13 to legendary, world-class experiences at the Ritz -- at
14 the RCDC locations."
15      It says, "However, the Ritz-Carlton Club and
16 your board of directors are collectively offering members
17 of the Aspen -- Ritz-Carlton Aspen Club the chance to
18 indicate their preference before any final decisions are
19 made."
20      Okay.  Is that, in your view, when you reviewed
21 this letter and made those slight changes, was this
22 something that was related to the April 5th communiqué
23 that said there would be a vote on affiliation/exchange
24 points program?
25   A.  Preference, vote, survey, all kind of the same
                                                    Page 285

72 (Pages 282 - 285)

Randal Mercer - October 24, 2017

1 to me, so it's hard to say.
2    Q.   And it says, "If a majority of the members
3 surveyed vote -- surveyed vote they want -- they want
4 members of the Ritz-Carlton Club to have the ability to
5 voluntarily access the Marriott Vacation Club system, then
6 it will be an opportunity provided to all members of the
7 Ritz-Carlton Club."
8        So even here he's saying that the members
9 surveyed -- that word is now being used -- vote, and there
10 would be a majority.  Did a majority of members ever get
11 surveyed or vote with respect to the decision to
12 affiliate?
13    A.   The majority of the members had the access --
14 had the ability to vote.  All of the members had the
15 ability to vote.
16    Q.   I understand the ability, but this says "if the
17 majority of the members surveyed vote."  It doesn't say a
18 majority of the people surveyed who take the time to fill
19 out the survey and indicate their vote.  It doesn't say
20 that.  They're promising to your members, my clients, that
21 there would be at least a survey and a vote that would
22 require a majority of the members to agree with this
23 affiliation, right?
24        MR. MARX:  Object to the form of the question.
25        THE WITNESS:  This is their language, not mine.
Page 286

1 issue question to the" -- what does it say?
2        MR. REISER:  "To an end."
3 BY MR. FERGUSON:
4    Q.   -- "to an end by a member vote, not a board
5 vote, and MVW agreed," right?
6    A.   That's what it says.
7    Q.   Those are your words?
8    A.   Those are my words.
9    Q.   You didn't use the word "discussion" or the word
10 "survey" with her, did you?
11    A.   As indicated earlier, they're interchangeable
12 with me, but --
13    Q.   And then you responded, and then you sent that
14 on to whom?  You sent it on to -- I'm sorry.
15        Start at the bottom, you sent this to Mr. Oliver
16 and you told him that she was pissed at first.  I take it
17 you believed you calmed her concerns?
18    A.   I had hoped so.
19    Q.   Okay.  And one of the ways you calmed her
20 concerns was there would be no affiliation unless there
21 was a vote; and you all got MVW to agree to that, right?
22    A.   Yes.
23        (Exhibit 1208 previously marked for
24    identification produced to the witness.)
25
Page 288

1 BY MR. FERGUSON:
2    Q.   Understood, but -- yeah, that keeps going there.
3 He drives home that point, "If you do not hear back
4 affirmatively -- affirmatively, from a majority of the
5 Ritz-Carlton Aspen Club membership, then it will not be
6 available to the members of the Ritz-Carlton Club Aspen."
7        Okay?  So he confirmed that unless there was a
8 majority of the people had voted affirmatively, or did not
9 hear back affirmatively, then there would be no -- that it
10 would not be available to them, right?
11    A.   That's what his letter says.
12        (Exhibit 1207 previously marked for
13    identification produced to the witness.)
14 BY MR. FERGUSON:
15    Q.   Exhibit 1207 is an email exchange you had with a
16 lady named, I think it's Mary O'Brien, Mary Ellen O'Brien.
17        It looks like Ms. O'Brien asked you some
18 questions and you responded to them; is that right?
19    A.   Yes, it looks that way.
20    Q.   Can you go to page 2 of Exhibit 1207.
21    A.   Yes.
22    Q.   And if you look at item nine in your response
23 email to Ms. O'Brien, you said, "Remembering there are 768
24 member votes in Aspen with 150 of those votes being
25 Marriott, your board decided to put this points system
Page 287

1 BY MR. FERGUSON:
2    Q.   Exhibit 1208 (handing).
3        This is a letter to Marsden.  You know
4 Mr. Marsden, of course.  He's a fellow board member at
5 that time, right?
6    A.   Yes.
7    Q.   And this is the letter from Cunningham, and this
8 is a letter dated the 14th of May, 2013.  And in that
9 letter to your fellow board member -- I guess he got it as
10 a member also -- paragraph two, starting with the word,
11 "Second, regarding other potential affiliations, we want
12 to assure you that a Ritz-Carlton Club affiliation with
13 Marriott Vacation Clubs will not take place unless there
14 is an affirmative vote of each club's membership.  We also
15 continue our efforts to expand member experiences through
16 additional affiliated luxury travel opportunities."
17        So on 14, May 2013, Mr. Cunningham is using the
18 word "vote," right?
19    A.   Yes.
20    Q.   And Mr. Neveloff sent this back off to you, and
21 Oliver, and Schneider, and Jerry Marsden, he says, "I did,
22 and didn't bother to read the fine print which I assumed
23 related solely to the program.  Imagine my surprise when I
24 read the BG letters online."
25        Do you know what the BG letters -- what was
Page 289

Randal Mercer - October 24, 2017

1 going on at this time frame?
2    A.  I think -- I think the Bachelor Gulch group had
3 determined that they were going to divest of the Ritz
4 flag, transition to the Timbers, and those articles were
5 in a local newspaper.
6    Q.  Do you recall there was some concern about the
7 fact that the Section 1e had some curtailment of voting
8 rights of your members, and that became a serious concern
9 to Bachelor's Gulch that they pointed out to you, and then
10 Mr. Neveloff said this is not good?
11    A.  Section 1e is what, sir?
12    Q.  Of the affiliation documents that were being
13 sent around at that time, the enrollment form -- there's
14 an enrollment form being sent in May of 2013 to your
15 members, and in that there was a concern that there had
16 been a Section 1e paragraph that had curtailed voting
17 rights of your members.  Do you recall that at all?
18    A.  Have we reviewed those today?
19    Q.  No, you haven't, not yet.
20    A.  Then I won't recall them until I review them.
21 So the answer is no.
22    Q.  Okay.  So it's your testimony that unless you
23 see documents from this time frame -- and I understand
24 this -- unless you see documents, you really can't answer
25 by memory in this time frame?
                                                    Page 290

1 says, "Additionally, in the amended enrollment package, we
2 are providing you a termination provision that allows you
3 the ultimate flexibility with the exchange program."
4        So something was called to Cunningham's
5 attention and he tried to correct that, right?
6    A.  That's the way it sounds.
7    Q.  Okay.  And what you did on the member
8 communication, you'll see that you are on RCDC
9 communications at Ritz-Carlton Club, you responded to him,
10 did you not?  You said, "Nice.  Thanks."
11    A.  Yes, I did.
12    Q.  Okay.  So as a board member, you're
13 communicating with Mr. Cunningham about the correction he
14 had made to the 1e paragraph that had gotten people so --
15 so worked up?
16    A.  Yes.
17    Q.  And -- and then he said to you, "So does this
18 mean he won't send out the Mullenix letter?"
19        The Mullenix letter was what?
20    A.  No idea.
21    Q.  And then he corrected himself and he said,
22 "Sorry, pronoun confusion.  I obviously meant you, not
23 he."
24        Was there a letter that you were holding in
25 reserve that was going to tell your members that what they
                                                    Page 292

1    A.  Pretty much correct.  A long time ago.
2    Q.  Okay.
3        (Exhibit 1210 previously marked for
4    identification produced to the witness.)
5 BY MR. FERGUSON:
6    Q.  Let me show you this exhibit.  This is
7 Exhibit 1210.
8        (Sotto voce discussion among plaintiffs'
9    counsel.)
10 BY MR. FERGUSON:
11    Q.  Okay.  This is the letter that was sent to you,
12 Mr. Mercer.  And on May 14th, Mr. Cunningham wrote to you,
13 as a member, I take it, and an owner, "It has come to our
14 attention that some members have questions regarding
15 language within the Lion & Crown enrollment package.  We
16 appreciate members letting us know about their concerns.
17 We want to clearly address those issues."
18        Isn't it true that people were more than
19 concerned, they were close to livid about what they had
20 put into your enrollment packages?
21    A.  I remember this issue now.  I don't remember the
22 specifics, but there was some pushback on that.
23    Q.  And it says, "First, we are modifying the
24 language that had been questioned, Section 1e, to more
25 clearly define the intention of the provision."  And he
                                                    Page 291

1 had done was totally unfair, that they were taking
2 advantage of you, that Marriott Corporation and its
3 affiliates -- or its subsidiaries were trying to pull a
4 fast one?  Was there a letter like that in the wings?
5    A.  Not that I recall.
6    Q.  And you said, "Our response from an Aspen board
7 member.  'Like it.  Very sincere.  That's two of us.  I'm
8 sure it will be fine, Lee.  Thanks."
9        So somehow in the background, you're working out
10 this problem with Mr. Cunningham?
11    A.  I would guess that -- I'm not sure who it would
12 come from.
13    Q.  Okay.  He said, "Thank you, Randy."  And you
14 said, "There seems to be more anger in our little
15 association worlds than usual.  Very counterproductive."
16 And he said he agreed.
17        So the two of you were having an email chat here
18 regarding some problems with the rollout of the -- with
19 the dissemination of this enrollment form?
20    A.  Yeah.  It was probably very aggressive and
21 one-sided on their part.
22    Q.  And he corrected it, and you told him not to
23 worry, right?
24    A.  Appears that way.
25    Q.  And that letter is -- that email is dated what,
                                                    Page 293

74 (Pages 290 - 293)

Randal Mercer - October 24, 2017

1  sir, the top page?
2     A.  Sorry?
3     Q.  What is your email to him at the top?  That's
4  dated what?
5     A.  "Agreed."
6     Q.  Yeah, "Agreed," when did you say that?
7     A.  Wednesday, May 15, 2013, 11:27 a.m.
8     Q.  So you're telling the second in command at the
9  Marriott Worldwide Corporation that everything's cool?
10    A.  No, I said -- I was agreeing that there seems to
11 be more anger in our little association worlds than usual.
12 He said that, and I -- and he said "Agreed."
13        (Exhibit 1212 previously marked for
14    identification produced to the witness.)
15 BY MR. FERGUSON:
16    Q.  All right.  Exhibit 1212, 1212.
17        This is an email three days later that you sent
18 to your board and Mr. Firmin at Hindman Sanchez, and
19 you're quoting a comment from -- a comment regarding the
20 exchange program.  That comment happens to be from Jay
21 Neveloff, right?
22    A.  I would guess.
23    Q.  All right.  Well, it says, in quotes, "The more
24 I think about this, the more outraged I become.  The
25 intent of MVW is at best awful and borders on fraud,

Page 294

1  that's at best.  For those of you who are simply too busy
2  to read the fine print where there is no expectation of
3  being duped, to see terms that are unrelated to the
4  program rivals the worst conduct I've seen from MVW --
5  from MVW is a situation that demands immediate board
6  notification to the members."
7        Does that help you recall that there was at
8  least Mr. Neveloff suggesting that there should be a
9  letter that goes out to your membership regarding that
10 rollout of the Lion & Crown Travel enrollment form?
11    A.  That refreshes my memory.  Thank you.
12    Q.  You're welcome.  And he said, "That MVW would
13 even consider this nonsense is deplorable.  And I'd be
14 clear to the members that MVW tried to pull a fast one."
15        So Mr. Cunningham acted quickly.  He sent out
16 another letter.  We saw the version he gave to you, and
17 you were able to communicate with him on the back channel
18 saying everything's cool?
19    A.  Mr. Cunningham also said, sorry, he was pronoun
20 confused, whatever that meant.  Okay.
21    Q.  And that letter to you was a similar letter that
22 was sent to the other 768 people or 867?
23    A.  Yeah.
24    Q.  Okay.  It was around this time frame, May into
25 June and July that Mr. Mullenix and his group, his board,

Page 295

1  were putting together a vote of their membership as to
2  what to do regarding a continued management of their hotel
3  by Marriott companies and in the context of an
4  affiliation.  Do you recall that that was going on?
5     A.  Oh, yes.
6     Q.  And he was keeping you somewhat apprised of that
7  as a president to president?
8     A.  I wouldn't say president.  There were some
9  courtesy emails, but I was not privy to all the ongoings
10 and incomings at all.  I just knew it was happening.
11        (Exhibit 1218 previously marked for
12    identification produced to the witness.)
13 BY MR. FERGUSON:
14    Q.  And would you look at Exhibit 1218 (handing).
15 1218 is a letter from -- to fellow members at the
16 Bachelor's Gulch facility.  It is a long letter that has
17 discussion of the research they have done about Timbers
18 Resorts, and also specifically how to vote.
19        It looks like on May 16, 2013, the BG board
20 "took formal action with a unanimous decision to proceed
21 with terminating the wholly-owned subsidiary of Marriott
22 Vacations Worldwide."
23        So you understood, I take it, when Mr. Mullenix
24 sent that to you what was going on at Bachelor's Gulch?
25    A.  Ritz-Carlton was gone.

Page 296

1     Q.  It hadn't gone yet, because Mr. Mullenix
2  promised his membership a vote, right?
3     A.  I'm not sure if the vote happened before this
4  letter or after this letter.
5     Q.  Well, yeah, there was a board vote, and then
6  there was a membership vote.
7     A.  And there was a member after, is that how it
8  went?
9     Q.  Yeah.
10    A.  Okay.
11    Q.  Well, you know that the board promised their --
12 the Bachelor's Gulch membership a vote?
13    A.  To terminate, okay.
14    Q.  Yeah.  And they fulfilled that promise, and they
15 did the hard work to get a vote together?
16    A.  Mm-hmm.
17    Q.  Is that right?
18    A.  Yes.  I said -- my question was, I wasn't sure
19 whether that board vote happened after the member vote --
20    Q.  Okay.
21    A.  -- or not.
22    Q.  So you're not sure --
23    A.  I'm just refreshing my memory, and it appears
24 the board vote happened first.
25    Q.  And you forwarded this on, and it looks like

Page 297

75 (Pages 294 - 297)

Randal Mercer - October 24, 2017

1  Mr. Schneider said, "Why did BG get so upset with Ritz
2  that they want out?" Mr. Schneider asked that. And then
3  Mr. Oliver responded to you all, "I think they should vote
4  Mike out. He's an unhappy guy."
5       I believe that you told him at some point that
6  you thought he was your hero; do you recall that?
7       A.  I possibly said that.
8            (Exhibit 1219 previously marked for
9       identification produced to the witness.)
10  BY MR. FERGUSON:
11       Q.  Exhibit 1219 (handing).  First email.  Randy
12  Mercer, Mike Mullenix, regarding the "Urgent, board seeks
13  membership approval to affirm the change in club
14  management," you said, "You are my hero," right?
15       A.  I did.
16            (Sotto voce discussion among plaintiffs'
17       counsel.)
18  BY MR. FERGUSON:
19       Q.  Why was he your hero?
20       A.  I'm a process guy.
21       Q.  What is -- okay.  You're a processes guy, that's
22  why you thought he was your hero?
23       A.  I thought he did a great job regardless of the
24  outcome.  I did not like the outcome at all.  But I
25  thought he handled a great -- a very tough situation in a
                                                    Page 298

1  very -- in a very good way.
2       Q.  And one thing we know he did, whether he's a
3  hero or an unhappy guy, is that he promised his members a
4  vote and he gave them the vote, right?
5       A.  To change brands, yes, he did.
6            (Sotto voce discussion among plaintiffs'
7       counsel.)
8  BY MR. FERGUSON:
9       Q.  At some point did you look at the process he was
10  following and say, hey, he's giving us a good template as
11  to how to do our vote?
12       A.  No, because our vote was not anywhere close to
13  that, nothing like that.  It was nothing like de-flagging.
14       Q.  Okay.  So it was --
15       A.  Not even close.
16       Q.  It was a different level of decision that was
17  being made by the membership?
18       A.  Changing the brand of a hotel from a
19  Ritz-Carlton to a Timbers is a catastrophic event.
20       Q.  So when he promised a vote because it was
21  catastrophic in your view, that's why he fulfilled his
22  promise to his members?
23       A.  It was the way he did it that I appreciated.
24       Q.  Would you go back to Exhibit 7 -- I'm sorry,
25  1219.  That's the "You are my hero" one.
                                                    Page 299

1       A.  Okay.
2       Q.  He said, "Randy, thanks.  Hopefully you had a
3  chance to click the links embedded in the letter."  He
4  says, "I hate to brag, but I believe this communication is
5  exponentially better than anything Ritz/Marriott has ever
6  sent to the membership.  It took me and the board over 45
7  days to set it up with the assistance of a PR firm in
8  Denver."
9       When you ended up having the survey in December,
10  you used the Morrow company, Ms. Verrecchia?
11       A.  To count -- to count the survey, yes.
12       Q.  To count the survey.
13       A.  Mm-hmm.
14       Q.  Okay.  You didn't go to an outside entity to do
15  that, did you?
16       A.  I wasn't de-flagging.
17       Q.  You were deciding whether or not to allow
18  Marriott Vacation Clubs to affiliate with your -- with
19  your club?
20       A.  No, I was --
21            MR. MARX:  Objection to the form of the
22       question.
23            THE WITNESS:  I was deciding whether or not to
24       provide another vehicle for our members to exchange
25       into, which just happened to be Marriott.  Two
                                                    Page 300

1  different things.
2  BY MR. FERGUSON:
3       Q.  You say in the middle of this page, "Nice job on
4  this, Mike.  Nice job on the process, too.  A model to
5  follow."
6       Okay.  And the model he's talking about, at
7  least in part, is how to set up and run a fair and
8  transparent election with an outside firm?
9       A.  With a PR firm and do everything they needed to
10  do, yes, it was a good body of work.
11       Q.  And when you said it was a process to follow,
12  you weren't talking about what you all had to do?
13       A.  No.
14       Q.  Who did you --
15       A.  It was a great example of a way to do something
16  very complicated and do it very well with a large number
17  of people.
18            (Exhibit 1223 previously marked for
19       identification produced to the witness.)
20  BY MR. FERGUSON:
21       Q.  Let me show you Exhibit 1223 (handing).
22            MR. MARX:  Does it matter that it has your
23       Post-it on it?
24            MR. FERGUSON:  I have another one.
25       Q.  This is Jay Neveloff at the bottom, on May 22nd
                                                    Page 301

                                       76 (Pages 298 - 301)

Veritext Legal Solutions
866 299-5127

Randal Mercer - October 24, 2017

1 saying, "Hope you guys are well on the board.  If this is
2 revised, I would truly hate to see what the first version
3 was."  And then he talked about his concerns about what
4 had gone out.
5          And then you forwarded that on to Mr. Firmin, it
6 looks like, right?  At the top of the page, "An
7 off-the-record of Jay's assessment.  Until I have a board
8 member change in September, will I get this sort of thing
9 stopped before traction ensues."
10         What did that mean?  What were you referring to
11 with Mr. Firmin there?
12    A.  Well, I knew there was going to be a board
13 change because a board member was terming out, and I
14 believe that was Mr. Marsden.
15    Q.  And it says, "Off-the-record-assessment until I
16 have a board member change in September" -- now we know
17 it's Mr. Marsden -- "will I get this sort of thing stopped
18 before traction ensues."
19         What were you referring to when you say "this
20 sort of thing"?
21    A.  I was referring to, I believe, the language that
22 was continually included in communication to the members
23 from Mr. Cunningham, specifically the paragraph 1e that --
24 that he carved out.  Of course, this is just
25 Mr. Neveloff's opinion.

Page 302

1    Q.  Have you ever seen the tally of the votes on the
2 December 13, January 14, survey?
3    A.  I don't believe I have.
4    Q.  Someone reported to you what the outcome was?
5    A.  Yes.
6    Q.  Had you ever seen the comments that came with
7 the vote that were invited by the people conducting the
8 survey, Morrow on behalf of the Marriott companies?
9    A.  Not that I recall, no.
10    Q.  At this time, was there a letter being drafted,
11 co-drafted, by the Marriott people and the board regarding
12 this survey or vote or discussion they had promised
13 everybody?
14         MR. MARX:  Object to the form of the question.
15         THE WITNESS:  What's the time frame?
16         MR. FERGUSON:  Let me rephrase that.
17    Q.  Was there a letter being drafted in May and June
18 of 2013 concerning putting the affiliation -- nothing to
19 do with branding, but I'm talking about Aspen Highlands --
20 putting that affiliation question to the members?  Was
21 there a letter being generated for that purpose?
22    A.  Possibly.  It's around the time frame.
23    Q.  Do you recall a situation where Mr. Mullenix was
24 telling you that the Marriott companies, during the vote
25 process that he initiated, or his board initiated, that

Page 303

1 they were interfering with that process by sending out
2 letters concerning the condition of the hotel and other
3 items that he thought were meant to confuse his members;
4 do you recall anything about that?
5    A.  Vaguely.
6    Q.  Did Mr. Neveloff's fairly regular interaction
7 with you and his expression of concerns put you -- concern
8 you in respect to how you would deal with the Marriott
9 executives?  Were you put kind of on high alert or
10 anything of that nature when you saw a lawyer like
11 Mr. Neveloff was concerned about their conduct?
12    A.  I always appreciated Mr. Neveloff's counsel.  I
13 didn't always agree with his assessment at the time.  But
14 I paid attention to him.  I honored him with
15 consideration.
16         (Exhibit 1234 previously marked for
17         identification produced to the witness.)
18 BY MR. FERGUSON:
19    Q.  I need to show you Exhibit 1234, 1234.  That's
20 an email from you to Sobeck and Cunningham on June 3,
21 2013, and you said, "Attached, please find comments
22 regarding the second/revised agreement."  So this is post
23 the correction in 1e that Mr. Mercer had made and you had
24 communicated with him about.
25         MR. SHEA:  Mr. Cunningham, you mean?

Page 304

1         MR. FERGUSON:  What did I say?
2         MR. SHEA:  Mercer.
3         MR. FERGUSON:  Mr. Cunningham, thank you.
4    Q.  And then you offered him a timeline.  And then
5 you said, "This breakdown of protocol and collaboration is
6 a reminder of old practices and certainly not of best
7 practices.  We were of the belief that the old practices
8 were put aside, but in light of the breach, apparently
9 not."
10         So you were, at this time, after having that
11 chat on email with Mr. Cunningham, you were letting them
12 know in no uncertain terms that you were disappointed of
13 what had occurred in the prior couple of weeks?
14    A.  Yes, I was.
15    Q.  All right.  And it looks to me that you had had
16 discussions with Mr. -- Ms. Sobeck, rather, on 5/13, 5/16,
17 5/22 "discussing the affiliation and the process.  I
18 thought we had discussed the issues and the board's
19 concerns, and we were addressing them to your
20 satisfaction."
21         So it looks to me like you had had discussions
22 with her that at least she believed were productive?
23    A.  Yes.
24    Q.  And then she said at the bottom, "When we talked
25 on May 22, you raised your concerns about sending out the

Page 305

77 (Pages 302 - 305)

Randal Mercer - October 24, 2017

1 addendum changes. I thought we had reviewed the above and
2 were on the same page to your below -- so your below email
3 has caught me by surprise."
4      So there was a little bit of tension or there
5 was a little bit of this -- I guess, tension put into the
6 situation with your email, and she was letting you know
7 that she was surprised, right?
8      A. That is a familiar phrase.
9         (Exhibit 1235 previously marked for
10 identification produced to the witness.)
11 BY MR. FERGUSON:
12      Q. Would you look at Exhibit 1235 (handing).
13      A. Certainly.
14      Q. That is an email from you to Stephanie, and your
15 board copied, it says, "As promised, attached is the
16 revised letter to members. If you make any changes to
17 this, we would appreciate a red line. Track changes is
18 on."
19      So you wanted her to tell you what changes she
20 was making after you had your input in this letter?
21      A. I always did, yes.
22      Q. And this is a -- this is a letter that would
23 come jointly from the Tourist Accommodation board
24 directors and Lee Cunningham; is that right?
25      A. Get my bearings.
Page 306

1 people to respond affirmatively to this concept, right?
2      A. Again, this is a draft. Show me the final.
3      Q. All right. That was my question, this is a
4 draft, right?
5      A. It appears to be.
6      Q. And you and your board and Ritz-Carlton -- what
7 do they call themselves? Executive Leadership Group?
8      A. The executive board is a term that is in the
9 condominium documents.
10      Q. I'm talking about this letter that was being
11 drafted, it says RCDC Executive Leadership. That's
12 Cunningham, right?
13      A. Cunningham.
14      Q. Right.
15      A. And his direct reports whom I do not know who
16 they are.
17      Q. Mr. Weisz, and Ms. Sobeck below him, probably,
18 right?
19      A. There's probably others.
20      Q. The shareholders.
21      A. (Laughing.)
22         (Sotto voce discussion among plaintiffs'
23         counsel.)
24 BY MR. FERGUSON:
25      Q. Yeah, Mr. Reiser pointed out something I meant
Page 308

1      Yes, it would ultimately come with me after it
2 had been modified to meet everybody's approval.
3      Q. Okay. And if you look at page 2 of
4 Exhibit 1235, there is this draft letter in June to
5 Mr. and Mrs. XXX, and it goes -- if you go to the next to
6 the last paragraph there, it says, "RCDC Executive
7 Leadership," do you see that?
8      A. Yes.
9      Q. And "The board of directors in Aspen have agreed
10 that they will allow members the chance to indicate their
11 thoughts before any final decisions regarding their
12 affiliation are made. If the majority, 50 percent plus
13 one, of the Aspen members, not including the
14 Marriott-owned folks -- units, approximately 13 percent,
15 respond affirmatively that they want the members of the
16 Aspen -- Ritz-Carlton Aspen Club to have the ability to
17 voluntarily access the Marriott Vacation Club system and
18 Marriott Club owners to have the ability to vacation at
19 the Ritz-Carlton Aspen Highlands, we will then move
20 forward to provide the opportunity to all the Aspen
21 members on an individual basis."
22      So in this particular draft letter -- and I was
23 asking about letters that were being drafted to go to your
24 membership, in this particular one they were talking about
25 getting thoughts, and -- but they wanted a majority of the
Page 307

1 to ask you.
2      It says above the words "RCDC Executive
3 Leadership and the board. Based on some member and board
4 feedback, it is clear that there are concerns" -- and we
5 saw that in the prior draft of this.
6      It says, "The Ritz-Carlton Club -- opening the
7 Ritz-Carlton Club to Marriott Vacation Club owners, which
8 is why we believe a vote of the members is the best way to
9 determine if the Ritz-Carlton Club, Aspen and its members
10 will be affiliated in any way with the Marriott Vacation
11 Club system," right?
12      A. The word "vote" is in there. Again, it was
13 interchangeable for.
14      Q. And during the next few weeks, you were talking
15 about the frequently asked questions that would go out
16 with this letter, --
17      A. Mm-hmm.
18      Q. -- and you were working with the details of what
19 was going to be communicated to your membership, right?
20      A. Yes.
21         (Exhibit 1251 previously marked for
22         identification produced to the witness.)
23 BY MR. FERGUSON:
24      Q. Exhibit 1251 (handing). So this is an email you
25 sent to Mercer -- I'm sorry, Mercer sent to Neveloff --
Page 309

78 (Pages 306 - 309)

Veritext Legal Solutions
866 299-5127

Randal Mercer - October 24, 2017

1 you sent to Neveloff, and you said, "An excerpt; not
2 good." And this is an excerpt from a report that
3 Mr. Mullenix had given you regarding the outcome of the
4 vote --
5    A.  Mm-hmm.
6    Q.  -- to de-brand and leave the Marriott fold in
7 July of 2013, correct?
8    A.  Yes.
9    Q.  And he reported to you -- or he reported in this
10 particular document that you got a hold of, "That
11 67 percent of the members had voted in favor of the
12 board's recommendation to terminate, while less than
13 9 percent voted against." And it said, "To state these
14 election results in terms of the total number of members
15 who voted in the election, more than 89 percent of the
16 members voted in favor of the board's recommendation to
17 terminate."
18       So at least with respect to Mr. Mullenix's vote,
19 he did pull off a nearly 90 percent voting rate of his
20 members?
21    A.  And that's consistent with his prior
22 communication, I believe.
23       (Exhibit 1255 previously marked for
24       identification produced to the witness.)
25

Page 310

1    A.  It is not.
2    Q.  And there's no concept of numbers, 50 plus 1,
3 right?
4    A.  In that paragraph.
5    Q.  So isn't it true that during the summer of 2013
6 as this letter got drafted regarding the vote that was
7 promised on April 5th, the votes, that it began to morph
8 into something less than a vote, which would be a survey
9 of some sort?
10    A.  Again, the intention was always the same. As we
11 went on, we clarified the documents to match the intent.
12    Q.  The intention was always to have a survey that
13 not a majority of the people had a vote on?
14    A.  The intention was always to get a glimpse of
15 member opinions so that we could serve our members in the
16 way they wanted.
17    Q.  So you're saying that when you promised the
18 folks that were very happy with you in their comments back
19 when you told them there would have to be a vote of 50 --
20 and 50 percent of the membership would have to approve
21 majority, that you really didn't mean what you said? You
22 just wanted to get a glimpse of what people might respond
23 to in the few months?
24    A.  We always wanted to get as many opinions as we
25 possibly could what members always wanted.

Page 312

1 BY MR. FERGUSON:
2    Q.  Exhibit 1255 (handing). Here's another letter,
3 but this one's in July of '13. It's a draft letter, and
4 it's to Mr. and Mrs. XXX again, and it's a version of a
5 letter that was being drafted that would be sent by the
6 Executive RCDC team, Mr. Cunningham, and then your board.
7       And we see some of the same concepts. In this
8 particular one, you'll see that they're talking about
9 approximately 120 fractional interests in the fourth
10 paragraph down. Do you see that?
11    A.  Which paragraph? I apologize.
12    Q.  Fourth paragraph down, it says 120 fractional
13 units?
14    A.  One, two, three, four. Okay, the big one. Yes.
15    Q.  And the next paragraph says, same -- same type
16 of deal, but this one talks about member feedback is clear
17 that there's concern, "which is why we propose -- we
18 believe a survey vote of the Aspen members is the best way
19 to determine if there should be an affiliation in any way
20 with the Marriott Vacation Club Destinations Program. So
21 now we have the word "survey" put in front of "vote,"
22 right?
23    A.  It is.
24    Q.  And the words "majority" -- "majority" is no
25 longer there, right?

Page 311

1    Q.  But you promised that 50 percent of the people
2 would vote, had to vote in order to affiliate?
3    A.  If you're putting words in my mouth, then you're
4 wrong. I always intended on touching all of the members
5 to see what their opinions were.
6    Q.  And you wanted to see what their opinions were,
7 but you didn't even read what their opinions were when
8 they actually voted and answered the questions in their --
9 and, sorry, in December of '13 and January of '14, did
10 you?
11    A.  All I saw was the response to the cease and
12 desist letter.
13    Q.  Okay. So you said that you wanted a glimpse --
14 I mean, you are the president of the board of directors.
15 You don't believe that you promised a vote that required a
16 majority. You believe that you -- now believe that you
17 wanted to get a glimpse of what people were thinking, and
18 when you got that glimpse, you didn't even read the
19 responses that came in from the survey vote that was done
20 by Morrow & Company for Ms. Sobeck?
21    A.  I didn't say that. I read what came to me.
22 There were several people in there that used the word
23 "vote." There were a lot of people that said
24 congratulations. I read them all.
25    Q.  And you're talking about the survey that was

Page 313

79 (Pages 310 - 313)

Randal Mercer - October 24, 2017

1 done in December of '13?
2     A. I'm talking about the grid -- the grid --
3 table response which showed member reaction to the cease
4 and desist letter.
5         (Exhibit 1274 previously marked for
6     identification produced to the witness.)
7 BY MR. FERGUSON:
8     Q. Let me show you Exhibit 1274 (handing). This is
9 a process of generating frequently asked questions that
10 would go out with this joint letter from the Executive
11 Leadership of RCDC and your board, and these are the
12 frequently asked questions. You recall working on those,
13 correct?
14     A. Yes.
15     Q. Okay. And there's a question at the bottom --
16 towards the bottom of page 1 on 1274, Exhibit 1274, it
17 says, "Will the Ritz-Carlton Club Aspen Highlands be
18 available to Marriott Vacation Club Destination program
19 members?"
20         And in this one, the answer was, "If the Aspen
21 Highlands members vote if they would like to affiliate
22 with the Marriott Vacation Club Destinations program, then
23 Marriott Vacation Club Destinations program members will
24 be permitted to reserve residences in the Aspen Highlands
25 property to the extent there is inventory available

Page 314

1     So the wording is changing quite a bit, is it
2 not, how this is being presented to your members now by
3 RCDC Executive Membership?
4     A. Time to read the small print. Give me a second.
5         (Witness examines document.)
6     A. Okay, I read that first sentence.
7     Q. So this is a -- this is being -- I don't want to
8 say spun, but this is being presented as a vote, and
9 someone crossed out "survey," and put in "vote," and
10 they're saying that that's -- whether or not they want to
11 have the opportunity to join this program, so that's the
12 way they're communicating it to your members, as an
13 opportunity, right?
14     A. This is a draft.
15     Q. Right. And then it says -- you'll see this kind
16 of similar language here at the bottom, "It says based on
17 some member feedback" -- now it's some membership feedback
18 -- "it is clear that there is concern" about opening of
19 the club "to the MVCD members through affiliation, which
20 is why we and your board of directors have agreed to allow
21 Aspen members the opportunity to provide input before any
22 final decisions regarding this affiliation are made. If a
23 majority, 50 plus one, of the Aspen members, not including
24 the RCDC inventory owner, surveyed respond affirmatively
25 that they want it," it won't happen, right? So here

Page 316

1 through an exchange."
2         Okay. So at least here in the frequently asked
3 questions, they're talking about a vote, right?
4     A. Again, in the context of accepting an
5 affiliation with a points program and going to a
6 points-based program, that would have required a vote.
7     Q. But you don't believe that happened?
8     A. We did not do that.
9     Q. All right.
10         (Exhibit 1282 previously marked for
11     identification produced to the witness.)
12 BY MR. FERGUSON:
13     Q. Let me show you what's been marked Exhibit 1282
14 (handing). 1282, there is a letter being drafted to
15 Mr. and Mrs. XXX in September. It's no longer July. You
16 see that someone has corrected that. And it's no longer
17 being sent by the board in conjunction with Executive
18 Leadership at RCDC. Do you see that?
19     A. I do.
20     Q. And if you look -- it's now a shorter letter,
21 and in the second -- sorry, the third paragraph, it talks
22 about, "The sole purpose of this survey vote is to decide
23 whether the Aspen members will be able to exchange a week
24 of their reserved allocated time into the MVCD exchange
25 program."

Page 315

1 they're saying a vote and a majority, they're back to
2 that.
3     A. In this draft letter, that's what it says.
4         MR. MARX: Object to the form of the question.
5         MR. SHEA: Matt, just so you know, by our
6     calculation, 25 minutes left for the seven hours.
7         MS. LIVINGSTON: Until 5:25?
8         MR. SHEA: No, 5:35. I told them --
9         MS. LIVINGSTON: Okay.
10         THE WITNESS: And what time will that be?
11         MR. SHEA: 5:35, and then you can go.
12         THE WITNESS: Jessica, can you please ask
13     someone to stay until 6:00 so someone can lock up the
14     office.
15         (There was a discussion off the record.)
16 BY MR. FERGUSON:
17     Q. In October of 2013, Mr. Marsden went off; is
18 that right?
19     A. Yes.
20     Q. Okay. And who replaced him?
21     A. That would be Joel Alper.
22         MR. SHEA: Are you sure it wasn't --
23         THE WITNESS: I think you're right. Bob Harris,
24     forgive me.
25         MR. FERGUSON: Thank you.

Page 317

80 (Pages 314 - 317)

Randal Mercer - October 24, 2017

| | |
|---|---|
| 1      THE WITNESS:  Bob Harris replaced Mr. Marsden. | 1   BY MR. FERGUSON: |
| 2      (Exhibit 1313 previously marked for | 2    Q.  What is that impression from? |
| 3   identification produced to the witness.) | 3    A.  Just conversations over time.  I'm not sure. |
| 4   BY MR. FERGUSON: | 4   You have all the documents, so I'm not sure. |
| 5    Q.  Let me show you Exhibit 1313 (handing). | 5    Q.  Let me show you some documents here that were |
| 6    A.  Thank you. | 6   produced by Morrow & Company, Nicole Verrechia. |
| 7    Q.  So Exhibit 1313 is an email that starts on | 7      On Exhibit 1313, before I move to these Morrow |
| 8   December 5th from Neveloff to you.  He's wishing you and | 8   documents, you'll see that Mr. Neveloff said to you, "I |
| 9   Mrs. -- I know your wife doesn't have your exact last | 9   didn't get that from letter.  That's my point.  The board |
| 10   name, but Debbie, are well.  He said, "We received an | 10   should be describing both sides of the issue, not just the |
| 11   email from MVCI and the ability of Aspen owners to swap. | 11   editing that MVCI wants.  Really!" |
| 12   I intend to respond to the poll, but I think it's | 12      Do you recall that he was actually expressing |
| 13   appropriate for the board to write to the members to raise | 13   concerns about the survey that went out and its -- and how |
| 14   concerns as soon as possible before they take the poll." | 14   it was worded and whether or not it told both sides of the |
| 15      So Mr. Neveloff is telling you he has concerns | 15   story from his perspective? |
| 16   about what ultimately went out, right? | 16    A.  It appears that he had questions. |
| 17    A.  That's his opinion, yes. | 17    Q.  Okay. |
| 18    Q.  And you said, "I thought the connection was | 18      (Exhibit 1314 previously marked for |
| 19   pretty clear regarding the collaborative effort of the | 19   identification produced to the witness.) |
| 20   board on this one.  If it didn't ring loud enough, I will | 20   BY MR. FERGUSON: |
| 21   circle back.  Always available for a call." | 21    Q.  Exhibit 1314 (handing). |
| 22      And then he said to you, "Randy, there was no -- | 22    A.  Thank you. |
| 23   he didn't say Randy, but Mr. Mercer.  I suspect he calls | 23    Q.  This is a Morrow & Company document, I'll |
| 24   you Randy -- "there was no discussion as to the negatives | 24   represent to you. |
| 25   that interests our members swap will be used by hordes of | 25    A.  Can you please define what this means, "Produced |
|                             Page 318 |                             Page 320 |

| | |
|---|---|
| 1   timeshare owners that are likely to come for shorter | 1   in Native"? |
| 2   stays, meaning wear and tear and clogging up the pipeline | 2      MR. REISER, JR.:  It means it's produced as a |
| 3   for members who want shorter stays.  Also that the | 3   spreadsheet. |
| 4   redemption value points may change.  Plus others." | 4      THE WITNESS:  Okay.  Thank you. |
| 5      So he was expressing those concerns to you at | 5   BY MR. FERGUSON: |
| 6   the time this letter went out, final letter went out, to | 6    Q.  It's just a technical term. |
| 7   the membership. | 7    A.  Yes, it is. |
| 8    A.  Okay. | 8    Q.  On 12/5/13 is the first response from a |
| 9    Q.  Right? | 9   Ms. Jennifer Colson, and she says, "I'm voting no." |
| 10    A.  He is expressing his concerns. | 10      Have you ever seen what your members filled |
| 11    Q.  And you put -- you sent that on ultimately to | 11   out -- the very few members that voted -- have you ever |
| 12   Mr. Oliver, who said, "Jay only remembers the past and is | 12   seen what they filled out when they answered this survey? |
| 13   missing the point of this.  It's one week in and one week | 13    A.  No, sir. |
| 14   out.  You want to give up a great week, great, a Marriott | 14    Q.  To this day you haven't seen these responses? |
| 15   guy may take it.  The occupancy doesn't change." | 15    A.  No, sir. |
| 16      But as we sit here today, we're not exactly | 16    Q.  Okay.  So you'll see that after Ms. Colson voted |
| 17   sure, from your testimony, whether or not that week can be | 17   against, there's a fellow -- or a trust named |
| 18   bifurcated, split -- or split into more than weekend | 18   Pitchford/McCabe.  It says, "For those who purchased very |
| 19   increments among Marriott Vacation Club people? | 19   early on, could you provide additional information on how |
| 20    A.  But that's my impression. | 20   our ownership is different?  This clarity would help in |
| 21    Q.  But they do -- that it doesn't happen? | 21   these kinds of discussions.  Thank you." |
| 22    A.  My impression's one week in, one week out. | 22      So this person is asking a question about what's |
| 23      (Sotto voce discussion among plaintiffs' | 23   going on, but they marked him as a "For." |
| 24   counsel.) | 24      Did you ever see the actual ballot and whether |
| 25 | 25   or not this person put down an "F," or "For"? |
|                             Page 319 |                             Page 321 |

81 (Pages 318 - 321)

Randal Mercer - October 24, 2017

1   A.  No, sir.
2   Q.  If you look on page 3, it's actually page 4 of
3   1314, there's a Ms. Hillarie Bass, and she says, "Would
4   the exchange be limited to one week per year out of four?
5   If not, will we be allowed to give up our shoulder week
6   for this exchange?  Thanks."  So she asked a question,
7   then they marked her as a "For."  Did you ever see the
8   actual ballot of whether that person, in fact, marked
9   "For"?
10  A.  No, sir.
11  Q.  On page --
12  A.  And where do you see the "For?"  Forgive me.
13  Q.  Oh, the "F."  I'm sorry.
14  A.  Okay.  Great.  Thank you.
15  Q.  "F" is for, "A" is against, at least that's how
16  it was put down on these sheets.
17  A.  Okay.
18  Q.  If you look on page 6 of Exhibit 1314, you'll
19  see that Mr. Schneider said, "Depends on how many points
20  you get for exchange."  And they put him down as a "For."
21  Do you see that?
22  A.  As an "F."
23  Q.  As an "F."
24  A.  Okay.
25  Q.  Do you know why they put him down as an "F"?

Page 322

1   Ritz-Carlton, which I bought ten years ago.  How do I know
2   how luxurious these properties are on the Marriott
3   umbrella?  I do like" -- and then it cuts off.  And they
4   put her down as an "F."  Do you know why they put her down
5   as an "F"?
6   A.  No.
7       (Exhibit 1316 previously marked for
8       identification produced to the witness.)
9   BY MR. FERGUSON:
10  Q.  Exhibit 1316 (handing).  That's a document
11  that's assembled from -- it looks from -- I'm sorry,
12  that's wrong.  I got that wrong.  That exhibit's done
13  wrong.  Something's wrong somehow.
14      Just look at the last page of Exhibit 1316.
15  We'll fix it later, they don't go together, but I'll have
16  to do it this way.
17      It's from a Joel Alper on the 6th, "Will you
18  look for your draft this morning.  Joel."  And it says --
19  someone says -- Randy Mercer says, "Been getting feedback
20  on the survey and am finding time for return calls to
21  members.  Total of six.  Spoke to Stephanie and there are
22  about 60 responses, and half for and half against."
23      So is it fair to state that you were generally
24  monitoring what was going on at least early December?
25  A.  Is it fair to say what, sir?

Page 324

1   A.  No, sir.  It probably means for, for and
2   against, F and A.
3   Q.  And you wanted to get a glimpse of what people
4   were thinking, and you today on -- what year are we in --
5   2017 is the first time you saw what your members were
6   saying on this survey?
7   A.  I've never seen this.
8   Q.  So you really didn't care what people thought,
9   you wanted to get this affiliation pushed through with
10  Marriott, right?
11  A.  That's totally wrong.
12  Q.  Well, if you wanted to get a glimpse and you
13  spoke about that throughout the day, why didn't you read
14  what people were saying?
15  A.  I wanted to get the numeric results of the
16  survey.
17  Q.  And sitting here today, do you know whether they
18  were fairly tallied by Morrow?
19  A.  I believe they were.
20  Q.  You'll see in the next to last page, page 8,
21  David Perry and Mrs. Mary O'Brien, there she is.  She
22  talks about a couple of places around the world, luxury
23  townhomes, "Italy, Ireland would be wonderful."  And she
24  says, "I'm concerned that the Marriott program is a step
25  down from the luxury I expected from the caliber of

Page 323

1   Q.  You were monitoring the vote or the survey.
2   A.  Oh, I'm sure I was.  I'm sure I was asking
3   Stephanie, "How are the votes?"
4   Q.  And you said you had a communication with Jay
5   Neveloff regarding the survey letter.  "He thinks a few
6   paragraphs stating in simple layman terms how the board
7   was involved in this issue and our position."
8       And you said, "I agree.  I will knock out a few
9   paragraphs and get them to you for comment.  Stephanie
10  said if I get her memo to her by noon, they can get the
11  email blast out tomorrow."
12      So Mr. Neveloff was suggesting that you put in
13  the board's position on this vote, right?
14  A.  He suggested that on the email, Exhibit 1313,
15  that you -- you've given us earlier.
16  Q.  Yeah, yeah, the pros and cons.
17  A.  Yeah.
18  Q.  Yeah.  Do you know whether you sent that out?
19  A.  No, I don't.  I don't even know when the survey
20  was sent out.
21  Q.  Well --
22  A.  Do you?
23  Q.  Yeah, it's December 5th, I believe.
24  A.  Okay.
25  Q.  And you can see the first vote on December 4th

Page 325

82 (Pages 322 - 325)

Randal Mercer - October 24, 2017

| | |
|---|---|
| 1 or 5th. | 1 drafting of the exchange agreement? |
| 2    A.  Okay.  So the vote was sent out the same day Jay | 2    A.  Mm-hmm. |
| 3 sent me the email, and out it went. | 3    Q.  And if you look at 12-- sorry, 1383, it has a |
| 4    Q.  Well, this suggests by the time you were talking | 4 memorandum of understanding between the Lion & -- it had |
| 5 to the recipient of this email, I guess Joel, that there | 5 said Marriott, I guess, the Lion & Crown Travel company, |
| 6 had already been 60 responses and that Neveloff was | 6 and Aspen Highlands Condominium Association. |
| 7 telling you that you should have given it to people, in | 7       So this is a red line of the draft of the |
| 8 layman's terms, how you thought the pros and cons -- | 8 agreement that you ultimately signed sometime later in |
| 9    A.  Also on December 5th, yes. | 9 April, correct? |
| 10    MR. SHEA:  Do you gentlemen know the total run | 10    A.  It is a draft of that agreement, yes. |
| 11 time? | 11    THE VIDEOGRAPHER:  Mr. Ferguson, your mic, |
| 12    MR. FERGUSON:  What time is it, Dan? | 12 please. |
| 13    MR. SHEA:  5:24. | 13    MR. FERGUSON:  Oh, sorry. |
| 14    MR. HANLON:  I have to calculate it. | 14    THE VIDEOGRAPHER:  Down on the floor, I believe. |
| 15    MR. FERGUSON:  Is there a reason you want to | 15 BY MR. FERGUSON: |
| 16 calculate that now, or -- | 16    Q.  I'm going to go quickly through the recitals, |
| 17    MR. SHEA:  Go ahead.  You were just taking a | 17 and then we'll let you get off to greener pastures. |
| 18 break, so -- | 18       It says, "Whereas, the Executive Board on behalf |
| 19    MR. FERGUSON:  Okay. | 19 of the Association" -- that would be you guys, you and |
| 20    MR. SHEA:  -- I didn't want to interrupt you.  I | 20 Marsden, and Harris now, and Oliver, and I guess Schneider |
| 21 was just asking them.  Because I calculate the seven | 21 -- "previously met with representatives of" -- and it |
| 22 hours has probably already run, and I don't want to | 22 doesn't say MVCD anymore, it says, "the Ritz-Carlton |
| 23 cut you short of your seven hours. | 23 Destination Club on several occasions to discuss the |
| 24    MR. FERGUSON:  I kind of go by her, but -- I | 24 potential opportunity for members of the association to |
| 25 mean, I thought we had agreement to go tomorrow, and | 25 participate," and then it took that out, and it says, |
| Page 326 | Page 328 |

| | |
|---|---|
| 1 I thought we had agreement to go to 5:35 here, so -- | 1 "voluntarily participate in the exchange program in the |
| 2    MR. SHEA:  We don't have any agreement to go | 2 Marriott Vacation Club through the Lion & Crown Exchange |
| 3 tomorrow.  We never had an agreement to go beyond | 3 program," |
| 4 seven hours.  So seven hours is specified in the | 4       So the recitals are being massaged, as lawyers |
| 5 scheduling order. | 5 sometimes say, with some wordsmithing by, I take it, Egolf |
| 6    MR. FERGUSON:  Very well. | 6 and Marino going back and forth; is that right? |
| 7    MR. REISER:  For the record, I'm going to say | 7    A.  Yeah. |
| 8 that there was an agreement made to us to go | 8    Q.  Okay.  And it says in the second "Whereas" |
| 9 tomorrow, and we were relying on that agreement all | 9 paragraph, "The parties agreed that a survey of members |
| 10 day today in asking our questions. | 10 should be conducted to determine the interest of," and it |
| 11    MR. FERGUSON:  Let's talk about this later.  We | 11 used to say, "a majority of association members and |
| 12 have a disagreement.  We have a disagreement.  It's | 12 participating," and it now says, "agreed that a survey of |
| 13 okay.  We'll get over it. | 13 the members should be conducted to determine the interest |
| 14    THE VIDEOGRAPHER:  We are approximately five | 14 of members to voluntarily participate." |
| 15 minutes past seven hours of run time. | 15       So it no longer -- someone took -- someone had |
| 16    MR. FERGUSON:  You will hear us out the door at | 16 in here the concept of majority, and that was taken out, |
| 17 5:35.  Does that give you enough time? | 17 right? |
| 18    MR. SHEA:  Yes. | 18    A.  There is a strike-through, yes. |
| 19    THE WITNESS:  Thank you. | 19    Q.  And what was agreed to, because you told your |
| 20    MR. FERGUSON:  All right. | 20 members, and in fact, I think you were somewhat proud of |
| 21       (Exhibit 1380 previously marked for | 21 telling them, you had agreed that there would be a vote of |
| 22 identification produced to the witness.) | 22 a majority of the members, right?  You had told your folks |
| 23 BY MR. FERGUSON: | 23 that? |
| 24    Q.  So this is -- jumping ahead, you had enlisted | 24    A.  If we were to transition to a partially |
| 25 Mike Marino a second time to assist in connection with the | 25 points-based program by the club, the developer putting |
| Page 327 | Page 329 |

83 (Pages 326 - 329)

Randal Mercer - October 24, 2017

1 their units into a trust, not a one week-one out
2 situation.
3       (Sotto voce discussion among plaintiffs'
4    counsel.)
5 BY MR. FERGUSON:
6    Q.   And then it says, "Whereas, a majority of
7 association members voted," that's taken out.  Because
8 they didn't vote, did they?  Some people filled out a
9 survey, right?
10    A.   Mm-hmm.
11    Q.   Is that right?
12    A.   That is correct.
13    Q.   Okay.  "Who responded to" -- "make" take out,
14 "the survey responded affirmatively for the MVCD exchange
15 opportunity for those individuals voluntarily enrolled in
16 the program."
17        As you sit here today, you're telling me that
18 today's the first time you saw what your members said in
19 connection with the survey that was sent out?
20    A.   Yes.
21    Q.   Okay.  Now, would you look at Exhibit 1253 on
22 your screen.
23        MR. REISER:  1353.
24 BY MR. FERGUSON:
25    Q.   1353.  And that's February 2, 2014, a couple of
                                                    Page 330

1 paragraph four, and it says, "The parties," that being
2 Lion & Crown Travel program, which is the Marriott entity,
3 "the parties acknowledge that the survey resulted in the
4 majority of association members electing," and that's
5 taken out to "a majority of members who responded to the
6 survey desiring to have the opportunity to participate."
7        So what happened was, you promised a vote, you
8 didn't give it to them, you didn't give it to the majority
9 of the people, you got about 70 people that filled out
10 these forms, and based upon that, you believe you had a
11 glimpse and you went ahead and approved and ultimately
12 signed as the president a memorandum of understanding
13 between the Lion & Crown Travel company and Aspen
14 Highlands to affiliate and allow the members to place into
15 an exchange program their interest so points people from
16 the Marriott Vacation Club could utilize your hotel,
17 right?
18    A.   Please keep in mind that the word "survey" is in
19 there and "vote" is not in that same paragraph.
20    Q.   Yeah, I know.  They took it out.  They took the
21 word "vote" out a few times.
22    A.   So this isn't a first draft?
23    Q.   There's probably a few drafts.
24    A.   Okay.
25        MR. FERGUSON:  I have nothing further for you,
                                                    Page 332

1 weeks before this red line was generated, and it's from
2 Jay just to you.  And it says, "Honestly, Randy, I don't
3 believe that the communication sent to the members came
4 remotely close to represent" -- sorry, "to presenting the
5 pros and cons.  Therefore, whatever response is received,
6 I have no idea what proportion of the members responded or
7 whether the vote was close or not.  Cannot possibly --
8 possibly form a basis for reliance.  It also appears that
9 not only will member inventory be up for grabs by
10 timeshare owners, but I assume MVCI inventory as well."
11        And he didn't know what that status was.  But he
12 was telling you that he was very concerned about -- again,
13 about what had gone out, right?
14    A.   That was his opinion, yes.
15    Q.   And you disagreed with that opinion, because you
16 had Mr. Marino out there in the field with his deep
17 contact with Marriott, Ms. Egolf, negotiating the document
18 we see in 1383 that ended up the document you signed in
19 later --
20    A.   Keep in mind that a lot of these Marriott
21 documents start out as an in-the-can type of document and
22 have to be adjusted as they go along anyway, a lot of them
23 are very similar.
24    Q.   If you go to page 2 of Exhibit 1383, it's that
25 same draft document red lined, you'll see there's a
                                                    Page 331

1 sir.  We'll take it up with the judge whether or not
2 I can finish it, because you can tell I was
3 scrambling here at the end.  But I do thank you for
4 your time.
5        THE VIDEOGRAPHER:  Are we in adjournment?  Is
6 there a continuance tomorrow?
7        MR. FERGUSON:  Just we had a brief discussion as
8 to whether or not we were able to finish this
9 deposition, and we've agreed to disagree about that,
10 and we'll take it up, if we have to.  Maybe we'll
11 accomplish some other things.
12        THE VIDEOGRAPHER:  We're off the record at
13 5:32 p.m.  This concludes today's testimony given by
14 Randy Mercer.
15        Total number of media units was six and will be
16 retained by Veritext.  Thank you.
17        (The deposition concluded -- 5:32 p.m.)
18
19
20        * * * * *
21
22
23
24
25
                                                    Page 333

84 (Pages 330 - 333)

Randal Mercer - October 24, 2017

1  RE   : RCHFU v. MARRIOTT
2  DEPO OF: RANDAL MERCER
3  TAKEN : October 24, 2017
4
5          EXCEPT FOR ANY CORRECTIONS
6          MADE ON THE ERRATA SHEET BY
7          ME, I CERTIFY THIS IS A TRUE
8          AND ACCURATE TRANSCRIPT.
9          FURTHER DEPONENT SAYETH NOT.
10
11         _____
12         RANDAL MERCER
13
14 STATE OF FLORIDA    )
15              ) ss:
16 COUNTY OF LEE      )
17     Sworn and subscribed to before me this
18 _____ day of _____, 2017.
19 PERSONALLY KNOWN _____ or I.D. _____
20
21         _____
22         Notary Public in and for the
23         State of Florida at Large.
24 My commission expires:
25
                                      Page 334

1          CERTIFICATE OF COURT REPORTER
2
3  STATE OF FLORIDA    )
4  COUNTY OF LEE       )
5
6     I, YVONNE CORRIGAN, Registered Professional Reporter,
7  Certified Realtime Reporter, certify that I was authorized
8  to and did stenographically report the foregoing
9  deposition of RANDAL MERCER, the witness herein on October
10 24, 2017; that a review of the transcript was requested;
11 that the foregoing pages numbered 1 through 333 inclusive
12 is a true and complete record of my stenographic notes.
13    I FURTHER certify that I am not a relative, employee,
14 attorney, or counsel of any of the parties, nor am I a
15 relative or employee of any of the parties' attorney or
16 counsel connected with the action, nor am I financially
17 interested in the action.
18   Dated this 31st day of October, 2017.
19
20
21
22
23    *Yvonne Corrigan*
24   YVONNE CORRIGAN, RPR, CRR
25
                                      Page 335

Veritext Legal Solutions
866 299-5127

Randal Mercer - October 24, 2017

**[& - 1161]**

| & |
|---|
| **&**   7:6,9,12 8:6,13 8:16 19:24 29:1 64:20 82:12 87:1 87:14,16,17,20 88:3 93:3,5 98:4,9 98:14,20 99:8 104:21 106:4 118:10 122:4 123:5 129:3,15 133:4 134:2 149:24 150:7 151:20 152:7 165:18 194:9,16 196:13 205:1 208:19,21 210:10 212:17 231:15 233:21 234:19 235:2,6 236:2 238:15 268:9 291:15 295:10 313:20 320:6,23 328:4,5 329:2 332:2,13 |

| 0 |
|---|
| **0005686**   56:15 |
| **004**   67:25 |
| **01**   91:7 |
| **01301**   1:3 9:10 |
| **04**   71:4 |
| **05**   267:24 |
| **07932**   2:19 |
| **08**   60:5,9 |
| **09**   60:9 |

| 1 |
|---|
| **1**   1:25 130:18 132:16 139:8 183:15 220:18 244:10 255:22 312:2 314:16 |

335:11
**1/12th**   58:18
108:15 112:12
116:1 119:11
161:3,10
**1/16/13**   6:8
**10**   3:4 60:10 89:17
153:20
**10/13/12**   4:17
**10/16/12**   4:17
**10/22/12**   4:20
**10/25/12**   4:22
**100**   3:13 86:22
92:19,20 93:1
106:6
**102**   9:13
**1020**   3:8 55:20,21
56:6 57:25 61:13
67:24 68:23 75:3
97:18
**1020-01**   56:8
**1021**   3:9 72:8,11
**1023**   3:11 78:9,12
78:13 97:18 99:15
99:15
**1026**   3:12 97:13,16
99:15
**103**   1:17
**1030**   114:17
**1034**   3:13 100:9,12
100:14 107:14
109:17
**1035**   3:15 110:15
110:18
**1042**   3:17 110:25
111:3
**1043**   3:19 114:14
114:18
**1053**   3:22 126:8,11
127:9 130:19
132:16

**1058**   3:24 134:18
135:2,2,6
**1060**   4:4 143:7
145:8
**1061**   4:3 137:19,22
139:9 140:18
**1064**   4:6 149:2,5
**1066**   4:7 153:17,20
**1072**   4:10 155:18
155:23 164:20
**1075**   4:11 156:16
156:19,21
**109**   58:5
**1097**   4:15 165:11
165:13,15
**10:14**   69:9,10
**10:27**   69:11,13
**10th**   80:24
**11**   73:12 284:23
**11,000**   119:9
**11-5**   5:13,16
**11/10/12**   4:24
**11/21/12**   5:15
**11/28/12**   5:12,15
**11/29/12**   5:25 6:5
**11/4/12**   5:3
**11/5**   217:16
**11/5/12**   5:4,8
**11/6/12**   5:5
**11/7/12**   5:6
**11/8/12**   5:10
**110**   3:15,17
**1103**   4:19 178:6,10
178:13 183:16
**1104**   4:13 162:19
164:5
**1108**   4:16 166:23
**1110**   4:17 168:24
169:2,2 177:16
**1113**   4:20 188:1,3

**1114**   4:22 189:4,7
189:7
**1116**   4:24 193:19
194:5 195:12
**1117**   5:3 198:3,6
199:20
**1118**   5:4 201:21,24
**1120**   5:5 204:3,21
**1122**   5:6 208:3,6
**1124**   5:8 209:18,21
212:9
**1126**   5:10 216:16
216:19 217:10
**113**   188:1
**1130**   5:12 217:11
217:14
**1132**   243:9,9
**1135**   5:14 219:9,12
**1137**   5:15 220:6,14
220:18
**114**   3:19
**1145**   5:17 222:1,5
**1146**   5:19 227:4,8
**1150**   5:21 229:20
229:23 231:11
254:24
**1151**   5:23 237:18
237:21 240:16
243:1 244:24
246:25
**1152**   6:3 242:22,25
243:13,18,22,25
244:5,7
**1155**   6:6 247:21,25
247:25
**1157**   6:8 249:10,15
**1158**   6:10 249:10
249:15,18 251:10
**1161**   6:12 259:19
259:23

Page 1