# EXHIBIT - J

# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO



COURT REPORTING

LEGAL VIDEOGRAPHY

VIDEOCONFERENCING

TRIAL PRESENTATION

MOCK JURY SERVICES

LEGAL TRANSCRIPTION

COPYING AND SCANNING

LANGUAGE INTERPRETERS



NAEGELI
Expect Excellence

DEPOSITION AND TRIAL

CELEBRATING 35 YEARS IN BUSINESS

(800) 528-3335
NAEGELIUSA.COM

RCHFU, LLC et al.,

     Plaintiff,

vs.                                    Case No.
                                       1:16-cv-01301-RAB-GPG

MARRIOTT VACATIONS WORLDWIDE
CORPORATION, et al.,

     Defendants.

_____


VIDEOTAPED DEPOSITION OF

RANDY MERCER


TAKEN ON
WEDNESDAY, SEPTEMBER 13, 2018
9:04 A.M.


RITZ-CARLTON CLUB, ASPEN HIGHLANDS
0075 PROSPECTOR ROAD
ASPEN, COLORADO 81611

```
 1                        APPEARANCES

 2

 3   APPEARING ON BEHALF OF THE PLAINTIFF:

 4   MATTHEW C. FERGUSON, ESQUIRE

 5   The Matthew C. Ferguson Law Firm, P.C.

 6   119 South Spring, Suite 201

 7   Aspen, CO 81611

 8   (970) 925-6288

 9   (970) 922-2273 (Fax)

10   matt@matthewfergusonlaw.com

11

12   APPEARING TELEPHONICALLY ON BEHALF OF THE PLAINTIFF:

13   MICHAEL J. REISER, ESQUIRE

14   MATTHEW REISER, ESQUIRE

15   LAW OFFICE OF MICHAEL J. REISER

16   961 Ygnacio Valley Road

17   Walnut Creek, CA 94596

18   (925) 256-0400

19   (925) 476-0304 (Fax)

20   michael@reiserlaw.com

21   matthew@reiserlaw.com

22

23

24

25
```

1              APPEARANCES CONTINUED

2

3    APPEARING ON BEHALF OF THE DEFENDANT ASSOCIATION and

4    RANDY MERCER:

5    DANIEL F. SHEA, ESQUIRE

6    JESSICA BLACK LIVINGSTON, ESQUIRE (VIA TELEPHONIC)

7    Hogan Lovells US LLP

8    1200 17th Street, Suite 1500

9    Denver, CO 80202

10   (303) 454-2475

11   (303) 899-7333 (Fax)

12   dan.shea@hoganlovells.com

13   jessica.livingston@hoganlovells.com

14

15   APPEARING TELEPHONICALLY ON BEHALF OF THE DEFENDANT

16   MARRIOTT:

17   IAN S. MARX, ESQUIRE

18   Greenberg Traurig, LLP 500

19   Campus Drive, Suite 400

20   Florham Park, New Jersey 07932

21   973-360-7900

22   MarxI@ngtlaw.com

23

24

25

```
 1                           INDEX

 2                                                     Page

 3

 4  EXAMINATION BY MR. FERGUSON                          7

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

NAEGELI
DEPOSITION AND TRIAL

(800)528-3335
NAEGELIUSA.COM

1                              EXHIBITS

2    Exhibit                                              Page

3

4     3100        ACKNOWLEDGMENT                           7

5

6     3102        PHOTOS                                  28

7

8     3103        EMAILS                                  56

9

10    3104        EMAILS                                  58

11

12    3105        EMAILS                                  59

13

14    3106        EMAILS                                  60

15

16    3107        LETTER                                  62

17

18

19

20

21

22

23

24

25

1          **VIDEOTAPED DEPOSITION OF**

2                **RANDY MERCER**

3                 **TAKEN ON**

4       **WEDNESDAY, SEPTEMBER 13, 2018**

5                **9:04 A.M.**

6

7          **THE VIDEOGRAPHER:**  We are on the record.

8  The time is 9:04.  The date is September 13, 2018.

9  This is the beginning of the deposition of Randy

10  Mercer.  The case caption is RCHFU, LLC versus

11  Marriott Vacations Worldwide Corporation.

12          Will counsel please introduce yourselves

13  and state whom you represent.

14          **MR. FERGUSON:**  Yes.  Matthew Ferguson for

15  the plaintiffs in this case.

16          **MR. REISER:**  Michael Reiser, appearing by

17  phone, for the plaintiffs.

18          **MR. REISER:**  Matthew Reiser, appearing by

19  phone, for the plaintiffs.

20          **MR. SHEA:**  Daniel Shea, with Hogan Lovells

21  in Denver, appearing for Defendant Association and

22  the witness.

23          **MS. LIVINGSTON:**  Jessica Livingston, with

24  Hogan Lovells, for the witness.

25          **MR. MARX:**  Finally you have Ian Marx, I-a-



1  n M-a-r-x, from Greenberg Traurig, appearing by

2  telephone on behalf of the Marriott Defendant.

3          **THE VIDEOGRAPHER:**  All right.  The court

4  reporter will now swear in the witness.

5  **RANDY MERCER,** having been first duly sworn or

6  affirmed, was examined, and testified as follows:

7          **THE VIDEOGRAPHER:**  All right.  You may

8  proceed.

9  **EXAMINATION**

10  BY MR. FERGUSON:

11      Q.    Thank you.  Good morning, Mr. Mercer.  I'm

12  here for your continued deposition.  Thanks for

13  appearing here today.

14      A.    You're welcome.

15          (Whereupon, Deposition Exhibit 3100 was

16  marked for identification.)

17      Q.    I'm going to show you what's been marked

18  as Exhibit 3100.  This is titled Acknowledgment of

19  and Joinder of Affiliation Agreement between Lion

20  and Crown Travel Company LLC and Marriott Resorts

21  Travel Company, Inc.  It's dated April 24th, 2014.

22  Is this your signature on the last page or -- yeah,

23  it's the last page, page four?

24      A.    Yes.

25      Q.    And you signed that on or about -- in or

1   around April 2014?

2        A.    Yes.

3        Q.    At the time -- would you look at the first

4   paragraph.   I know it's kind of hard, but if you

5   look where I'm pointing here, capitalized terms, it

6   says "Capitalized terms used in this acknowledgment

7   and not defined herein shall be ascribed the

8   meanings set forth in that certain affiliation

9   agreement between MRTC, which is defined as Marriott

10  Resort Travel Company, and Lion and Crown dated

11  November 14th, 2013."

12             I'm not going to read the parentheticals.

13  It says "This acknowledgment shall be effective as

14  of the date set forth in the written notice provided

15  by Lion and Crown to the association."

16             When you signed this agreement, had you

17  seen the affiliation agreement as defined in this

18  first paragraph, sir?

19       A.    No, sir.

20       Q.    Had you asked for it?

21       A.    No, sir.

22       Q.    Did you sign an acknowledgment -- did you

23  sign this Acknowledgment and Joinder to the

24  Affiliation Agreement, between these two entities,

25  without having reviewed it at all?

1    A.    That is correct.

2    Q.    Would that be, to your knowledge -- best

3  of your knowledge, the case for Mr. Moreno, do you

4  know if he saw it or not?

5    A.    I do not know.

6          MR. MARX:   Object to the form of the

7  question.

8  BY MR. FERGUSON:

9    Q.    Do you know?

10    A.    I'm sorry?

11    Q.    Do you know whether Mr. Moreno saw it?

12    A.    I do not know if he saw it.

13    Q.    Is there a reason why you didn't ask for

14  this agreement when you signed this acknowledgment

15  and joinder?

16    A.    I had counsel representing me, so I did

17  not feel the need.

18    Q.    And isn't it a fact that it was you, sir,

19  who negotiated the terms of the memorandum of

20  understanding with Ms. Sobeck?

21    A.    I was one of the board members who was

22  involved, but I was a primary point of contact.

23    Q.    Because I asked Mr. Moreno, I said, "In

24  connection with what was put into the memorandum of

25  understanding, the business points and whatnot, were

1   you involved directly in negotiations prior to being

2   asked to draft that MOU?"   And Mr. Moreno answered

3   no, sir.

4          Would that comport with your recollection,

5   of 2014, that you were negotiating the business

6   points?

7      A.    No, sir.   Mr. -- Mr. Moreno was alongside

8   us all the way, that I recall.

9      Q.    All right.   Was he negotiating the terms

10   of the agreement itself, or was he just kind of the

11   scribner, getting what you negotiated down on paper?

12      A.    We, meaning the association, came up with

13   the deal points that we felt were important to the

14   association, and Mr. Moreno transmitted those deal

15   points to Marriott through their counsel.

16      Q.    Ms. Egolf?

17      A.    Yes.

18      Q.    Okay.   Do you know, looking at Exhibit

19   3100, who had the ultimate decision authority with

20   respect to affiliating the folks here, at the Ritz-

21   Carlton Destination Club in Aspen, allowing them to

22   do the voluntary exchange into the Marriott Vacation

23   Club Destination Program?   Do you know who had the

24   ultimate authority?

25          MR. MARX:   Object to the form of the

1  question.

2          THE DEPONENT:  I didn't under -- what did

3  he say?

4  BY MR. FERGUSON:

5      Q.   Object to the form.

6      A.   Okay.  What does that mean?

7          MR. SHEA:  Nothing.  Just go ahead and

8  answer.

9          THE DEPONENT:  Nothing?  Okay.  The

10  association was in 100 percent agreement that the

11  memorandum of understanding was acceptable, upon our

12  approval, from Mr. Moreno.

13  BY MR. FERGUSON:

14      Q.   My question was who had the authority or

15  who had the ultimate decision-making ability with

16  respect to affiliating the Ritz-Carlton Club, here

17  in Aspen, with Marriott exchange program?

18          MR. MARX:  Same objection.

19          THE DEPONENT:  The ultimate authority, I

20  believe, came through the Marriott because they did

21  not need to seek anyone's approval to affiliate.

22  BY MR. FERGUSON:

23      Q.   Let me show you what's been marked

24  previously as Exhibit 2213.  This is an e-mail

25  regarding a vote, a San Francisco Survey Vote

1  Update.

2          But my question on this document is do you

3  know Richard Hayward?

4      A.   Yes.

5      Q.   Mr. Hayward has taken over as the asset

6  manager for the Western Ritz-Carlton Clubs, correct?

7      A.   Yes.

8      Q.   And he kind of stepped into the shoes of

9  what Ms. Sobeck had been doing in 2013 and 2014,

10  correct?

11      A.   Yes.

12      Q.   Okay.  And you'll see, at the top of that

13  page, it says, "Mr. Hayward, is the ultimate

14  decision the board's or the management company?

15  Rich"

16          And Ms. Sobeck answered, "Decision to

17  affiliate? The board's."  Do you see that?

18      A.   I do.

19      Q.   So that would be counter to what you just

20  said, right?

21      A.   It would be.

22      Q.   Is this the first you heard that, those

23  words from her mouth or her pen?

24      A.   I have never seen this before.

25      Q.   Let me show you what's been marked



1  previously as Exhibit 2102 to Mr. Dimeglio's

2  deposition.  And that's an affiliation agreement

3  providing members enrolled in the Lion and Crown

4  Travel Company LLC access to the Marriott Club

5  Destination Exchange Program, and Marriott Resorts

6  Travel Company members access to accommodations here

7  as participating LLC members and Lion and Crown.

8          This is the agreement that's referenced in

9  the first paragraph of the acknowledgment and

10  joinder agreement.  I'll hand this to you now.

11          And you indicated, in 2014, when you

12  signed the acknowledgment and joinder to this

13  agreement, you hadn't seen it.  My question is have

14  you seen it at all before today?

15      A.   Yes, I have reviewed it this year.

16      Q.   And in what connection did you review it,

17  sir?

18      A.   I asked for a copy of it from our counsel,

19  and they provided it to me.

20      Q.   And I understand that Ms. Livingston has

21  put in an affidavit that indicates that a search, of

22  the association files, indicated that it had not

23  been there, correct?

24      A.   It had not been --

25      Q.   In your files?



NAEGELI
DEPOSITION AND TRIAL

(800)528-3335
NAEGELIUSA.COM

Randy Mercer   September 13, 2018   NDT Assgn # 27769-1                    Page 14

1        A.    In my files, no, sir, it had not.

2        Q.    And when I say yours, I would like to

3   include the general association files.

4        A.    I can only speak for mine, but it has not

5   been in mine.

6        Q.    All right.  And what level of detail did

7   you read this document when you reviewed it

8   recently?

9        A.    Please restate the question.

10       Q.    Did you review it in detail, or did you

11   just kind of scan through it?

12       A.    I read it all slowly.

13       Q.    That took you some time, I take it?

14       A.    It was -- it was lengthy.

15       Q.    All right.  And if you look at the fourth

16   whereas clause, I think I double-spaced yours --

17   double-paged yours to save a little bit of trees.

18   That would be on page two of -- page three, I

19   believe.

20       A.    Uh-huh.

21       Q.    Are you there?

22       A.    Yes, sir.

23       Q.    And you'll see that the fourth whereas

24   down says "MVCP and Lion and Crown desire that the

25   LLC program become affiliated with the Marriott



```
 1   Vacation Club Program as an affiliate program."
 2           You understand that the Lion and Crown
 3   program is the program that the Ritz-Carlton
 4   Destination Club members can sign into, correct?
 5       A.   Yes.
 6       Q.   All right.  And it goes on to say "Except
 7   as otherwise provided in this agreement, certain
 8   members of the LLC program, who are not members of
 9   the Blue Florida Land Trust," and it says, "Whose
10   owners association has executed an acknowledgment
11   agreement, as defined in article two, shall have the
12   right to elect to become a participant in the MVCP
13   program."  I won't read the rest of that.
14           Did you have an understanding that you
15   were -- you had a right to elect to become a
16   participant, as an association, in this affiliation
17   agreement --
18           MR. MARX:  Object to the form of the
19   question.
20   BY MR. FERGUSON:
21       Q.   -- when you signed the acknowledgment in
22   2014?
23           MR. SHEA:  So just for clarity, so he
24   understands, you're asking before he saw this --
25           MR. FERGUSON:  Yes.
```

1          MR. SHEA: -- November 3rd, 2013, what did

2    he understand?

3    BY MR. FERGUSON:

4          Q.   That's right.

5          A.   Before I saw this, I had no knowledge of

6    this paragraph, so I could not have understood it.

7          Q.   Okay.  And without seeing the paragraph --

8    and I know you didn't see it back in that time frame

9    -- but when you negotiated back and forth with Ms.

10   Sobeck and Mr. Moreno with Ms. Egolf, did you

11   understand at that time, without having had the

12   benefit of this document, that the association had a

13   right to elect to become a participant in this

14   program?

15         A.   As my counsel did not disallow that from

16   happening, I assumed that it was fine.

17         Q.   I asked Ms. Sobeck, at her deposition, "Is

18   it true, because counsel so attests, that the

19   association never had the 2013 affiliation

20   agreement, is it also true that Ms. Sobeck --" I'm

21   sorry.  I'm not reading that right.

22          I asked Mr. Mercer -- Ms. Sobeck, "Why

23   didn't you give that to Mr. Mercer," speaking of the

24   affiliation agreement, 2202.  "Why didn't I ever give

25   it to him?

1        "Yeah." "I guess he never asked for it."

2        Does that comport with your prior

3   testimony, that you never asked for this document?

4        A.   I personally never asked for it.

5        Q.   Okay.  Then I asked her "But you asked him

6   to sign an acknowledgment and joinder of this

7   document, and you never gave it to him?"

8        And she answered, "I don't know if I gave

9   it to him or not.  If he didn't ask for it, I

10  wouldn't have given it to him."  Do you recall

11  anything like that?

12       A.   No, sir.

13       Q.   And I asked her "Why not?"  And she said,

14  "Because he didn't ask for it."  I asked, "Do you

15  think it would have been fair to give the board

16  president -- you're the asset manager -- wouldn't it

17  have been fair to give him a document that he was

18  acknowledging and joining?"

19       And she answered, "I think, if there were

20  any concerns, they were represented by counsel, and

21  there were conversations happening between our

22  attorney and their attorney.  If there was any need

23  for it, I think they would have discussed it.

24  Barbara Egolf might have given it to Mr. Moreno.  I

25  don't know."

1     As you sit here today, I believe your

2  testimony is you don't know whether Mr. Moreno had

3  this document one way or another?

4     A.   I do not know.

5     Q.   Okay.  Have you ever spoken to him about

6  this since it came up in this case?

7     A.   No, sir.

8     Q.   And I asked her, "You don't know that?"

9  And she said, "I don't know."  I said, "Have you

10  ever seen any evidence that Ms. Egolf ever gave this

11  document to anyone at Aspen Highlands?"  And she

12  answered, "I don't know if they did or not."

13     So at least Ms. Sobeck would appear not to

14  -- not to have even known if Ms. Egolf had given it

15  to Mr. Moreno.  Would you agree with that?

16     A.   I would agree with that.

17     Q.   She answered to this question, "So

18  Marriott Vacation Worldwide, at least as far as you

19  knew -- from the business side, not the lawyer side

20  -- did not give the affiliation agreement, from

21  November of 2013, to the board president or the

22  board because they didn't ask for it?"

23     And she answered, "Yeah, we didn't give it

24  to them, I guess, if they didn't ask for it.  We

25  would have been talking about it.  We did summaries

1  of the program for them.  "There was a lot of

2  discussion about how the program worked, and it was

3  even included in the letters and in the FAQs and all

4  that type of thing.  So if they didn't ask for this,

5  I guess we didn't give it to them.  I don't know."

6          Have you been made aware of that testimony

7  at all since she gave it last May?

8      A.   No, sir.

9      Q.   Does it concern you that she took that

10 attitude with you, that if you didn't ask for a

11 document she was asking you to acknowledge and join,

12 that she said if you didn't ask for it, I wasn't

13 going to give it to you?

14     A.   That would be up to the lawyers to ask.

15 So I'm not sure.

16     Q.   Do you know how long the affiliation

17 agreement that you acknowledged and joined lasts?

18     A.   Now?

19     Q.   Yeah.

20     A.   Ten years.

21     Q.   And did you know it back then when you

22 signed it?

23     A.   No, sir.

24     Q.   That's because you didn't have it?

25     A.   That's correct.

1     Q.    Did you negotiate the term?  Do you recall

2   negotiating the term at all with her?

3     A.    No, sir.

4     Q.    I'll show you what was previously marked

5   as 1364.  This is an e-mail between Mr. Moreno and

6   yourself with a copy to Mr. Oliver.

7          And is this around the time frame, March

8   of 2014, that you had Mr. Moreno on board to assist

9   in the, I guess, creation of documents relative to

10  the affiliation that you had approved to go forward?

11    A.    Yes, sir.

12    Q.    And looks like, at the bottom, Mr. Moreno

13  said, "We got all preliminaries out of the way.  I

14  explained position.  Debriefing from St. Thomas

15  board, including watching painfully the webinar with

16  Lee and John explaining the program."

17          And then you responded, up on top, about

18  the telephone call to Barbara Egolf, "Nice.  Good

19  setup. Remember we are the crown jewel in the

20  platform from a cooperation perspective and location

21  member experience position."

22          By crown jewel in the platform of

23  cooperation perspective, you meant that you were --

24  you had -- you thought you enjoyed a good

25  relationship with Marriott worldwide, including

1  specifically Ms. Sobeck?

2      A.   I believe that I was referring to the

3  property itself.  We always perceived ourself as the

4  best of the best.

5      Q.   And when you said from a cooperation

6  perspective, that doesn't mean the facility or

7  service. That means the board's cooperation with the

8  Marriott Vacation Worldwide executives, correct?

9      A.   We were never adversarial.

10      Q.   But you would agree that, at least looking

11  back now, that she was less than candid with you

12  having not provided you with the affiliation

13  agreement?

14      A.   Having what you read to me, I would agree

15  with that.

16      Q.   Have you spoken to Ms. Sobeck or Mr.

17  Hayward about this issue since you found out about

18  it?

19      A.   No, sir.

20      Q.   Let me show you what's been previously

21  marked as Exhibit 226.  This is a communication,

22  April 2000 -- I'm sorry, Dan -- a communication

23  dated April 2014.  It's from the board at the time,

24  Mercer, Schneider, Harris, Oliver.

25          And I wanted to focus you on the bottom of



1  page two.  This is a document that's been shown to

2  all our clients by Mr. Marx and his co-counsel.

3          At the bottom, it says, "Optional exchange

4  programs.  It says a member survey regarding

5  additional exchange desires was distributed to all

6  members earlier this year."

7          I take it there you're referring to the

8  December 4th -- 6th survey that went out with the

9  questions do you want affiliation opportunities,

10  check yes, or do you not want them, check no.

11     A.   I don't recall if it was that specific.

12  If it was the only one, then that would be referring

13  to it.

14     Q.   Okay.  And that's -- if you -- if you look

15  at then -- see if I can find it.  If you look at

16  Exhibit A1, that was Mr. Marr's deposition, Mr. Shea

17  marked that document.

18          That's the memorandum of understanding

19  that you negotiated, with Ms. Sobeck, around the

20  same time you signed the affiliation agreement?

21     A.   Yes.

22     Q.   And if you look at the third paragraph,

23  the third whereas paragraph on page one of Exhibit

24  A1, you'll see "Whereas a majority of members, who

25  responded to the survey, responded affirmatively for

1  the MVCT exchange program opportunity for those

2  individuals voluntarily enrolled in Lion and Crown

3  exchange programs," that's -- that recital refers to

4  the survey that you found out was about 72 people or

5  68 or somewhere in that range, 71 to 66, is that

6  right?

7       A.   I believe so.

8       Q.   Okay.  And that's a survey, at your last

9  deposition -- as of the last deposition, you hadn't

10  seen the results of, correct?

11       A.   I had not.  Did you say I had not?

12       Q.   You did not know the results of that

13  survey when I questioned you back in Fort Myers

14  about a year ago?

15       A.   Okay.

16       Q.   Is that right?

17       A.   If that's what I said, I'll stand by it.

18       Q.   Okay.  And with respect to this document,

19  the MOU, I asked Ms. Sobeck, "But the actual

20  document that affected the ability of Aspen

21  Highlands' folks to voluntarily participate in the

22  vacation opportunities you were offering, that was

23  going to be the acknowledgment and joinder," which

24  is 3101 -- sorry -- 3100.

25            And she answered, "Well, the affiliation

1  was the Lion and Crown affiliation, and then the

2  members being able to participate was acknowledgment

3  by the board," correct?  That's what she said,

4  correct?

5          And so I said, "So the MOU didn't do

6  anything like that?"  And she answered, "No."

7          Do you know why the MOU was even drafted?

8      A.    It was an outline of where we were going.

9      Q.    Okay.  I asked her, "It was a document

10 that they requested and --"  I asked, "It was a

11 document they requested, and you agreed to and

12 negotiated or discussed over the next few weeks?"

13         And she answered "Yes."

14         So that would comport with your testimony,

15 at least with respect to Ms. Sobeck's, there was

16 that you -- you guys -- when I say you guys, your

17 board, led by you as the president, were asking for

18 the points in the MOU?

19     A.    It was a road map.

20     Q.    Is it true that it was a document you

21 requested?

22         MR. SHEA:  He asked you --

23         THE DEPONENT:  I'm sorry.  I'm sorry.  I'm

24 having a hard time hearing.

25 BY MR. FERGUSON:



1    Q.    That's okay.

2    A.    That's okay.  I'll turn up my hearing aid.

3    Q.    I'll -- I'll withdraw that question.  Now

4  I'll show you exhibit -- can you mark that as the

5  next exhibit?

6         (Whereupon, Deposition Exhibit 1301 was

7  marked for identification.)

8    Q.    1301 is an e-mail from Mr. Sal Cutrona to

9  yourself.  Mr. Cutrona had been a board member in

10  St. Thomas, had he not?

11    A.    Yes.

12    Q.    And did he become a board member here, did

13  he not too?

14    A.    He was a board member here prior, yes.

15    Q.    And this is an e-mail to you, on July

16  16th, 2014, a short time after -- I've got to go

17  back to that document in a moment -- a short time

18  after you sent that April 2014 message to your

19  members about the survey. You'll see that -- I'm

20  pointing here -- about a third of the way down the

21  page, he wrote you "Also I'm not sure the board

22  provided the members with the survey results.  Did I

23  miss it?  I thought you did."

24         In fact, you hadn't provided the survey

25  results to the members, had you?

1    A.    I -- I do not recall.  Excuse me.

2    Q.    And then he -- you'll see that he found

3  the following in the newsletter, which we just saw

4  in the prior exhibit.  And he's quoting it, "A

5  member survey regarding additional exchanges was

6  distributed to all Aspen members earlier this year.

7  As suspected, the majority of those members

8  responded, requested additional opportunities."

9          Why was it you suspected that the majority

10 of those members responding would request the

11 exchange program in the affiliation?

12   A.    Had I said that, I would assume that I

13 would have seen a tally of some sorts, provided by

14 Ms. Sobeck, of the ayes and nays.

15   Q.    So as you sit here today, when you say as

16 suspected, you believe that that would be based upon

17 something that had happened in terms of reporting of

18 results after it happened?

19   A.    Yeah.  I wouldn't have said that

20 otherwise.

21   Q.    So you weren't saying that I predicted

22 that this would happen?

23   A.    No, sir.

24   Q.    You'll see also that, on this topic, Mr.

25 Cutrona said to you, "I ran into Tyler."  That's Mr.

1  Oliver, correct?

2          And he said, "He told me the board decided

3  not to allow the developer to put its own inventory

4  in the Marriott Vacation Club, and that the

5  developers will soon be marketing the units for

6  sale."

7          And he wrote, "I caution you to not -- "

8  in capitals -- "N-O-T let the developer to do a fire

9  sale as they did in St. Thomas some years ago.  We

10 have never recovered."

11         In fact, LORE Institute, Jamie Klein, were

12 retained around this time frame, June 2014, to

13 conduct a sale of the -- of the Marriott's

14 inventory, correct?

15     A.   Yes.

16     Q.   And did you know that they marketed it --

17 they marketed a Ritz-Carlton final closeout of

18 inventory at 75 percent discounts?

19     A.   I saw that.

20     Q.   And did you know that they were marketing

21 it as -- and I'll show you this brochure in a minute

22 -- Marriott, the owners of Ritz-Carlton introduce

23 the Marriott Vacation Club Exchange to Ritz-Carlton

24 residence owners.

25         Did you understand that, when they were

1  marketing it, they were marketing, in part, a new

2  owner's ability to join this exchange program?

3      A.   No, I did not.

4      Q.   Let me have this marked as Exhibit 3102,

5  and I don't have an additional copy, but --

6          MR. MARX:  Do you have Bates numbers?

7  That would be helpful.

8          MR. FERGUSON:  You know, I don't have it

9  for this, but it's -- oh, wait a second.  It is.

10  It's AHCA 21657.

11          (Whereupon, Deposition Exhibit 3102 was

12  marked for identification.)

13  BY MR. FERGUSON:

14      Q.   I just wanted to ask you if you've seen

15  that before?

16      A.   I don't recall seeing that, no, but it

17  looks like any normal marketing piece to me.

18      Q.   And if you keep going, you'll see the page

19  I just referred to.  I think it's under -- and I put

20  my highlight on there.

21      A.   Okay.

22      Q.   I'll get a clean copy.

23      A.   Great.

24      Q.   You'll see they're marketing the 44

25  resorts in the U.S., and 12 states.  And the next



 1    page, 11 Marriott Vacation Clubs in Europe, on the

 2    next page.  Take a look there.

 3        A.    Okay.

 4        Q.    All right.  So to your knowledge, when

 5    LORE Institute was conducting this sale of units, at

 6    75 percent off, I guess, the list price, could you -

 7    - were you generally aware that they were marketing

 8    the vacation club -- the Marriott vacation club as

 9    part of the deal?

10        A.    No, sir, I was not.

11        Q.    And you had -- you had interfaced a little

12    bit, at least, with Mr. Klein, right?

13        A.    And he was with -- he was with LORE?

14        Q.    Right.

15        A.    Yes.  I had e-mailed him, yeah.

16        Q.    Okay.  And then Mr. Skort was tapped as

17    the -- -- the local broker for that endeavor?

18        A.    Yes.

19        Q.    When the survey was conducted in December,

20    I think there's a letter and I'll show it to you in

21    minute if I have time, because the letter went out

22    December 4th, 2014, from Mr. Cunningham, that said

23    here's the vote, and you could log into the yes or

24    no question.

25              At that time, did anyone at Marriott tell

1  you that they were conducting focus groups with

2  Ritz-Carlton Destination Club members?

3       A.   No, sir.

4       Q.   Did they ever mention that there was a

5  company called APCO Worldwide or APCO Insight?  They

6  were conducting a focus group in December --

7  designing a focus group in December of '13, that

8  they conducted in 2014?

9       A.   Not that I specifically recall.

10          MR. REISER:  Hey, Matt, can you clarify.

11  I think you referred to the date of that document as

12  December of 2014.

13          MR. FERGUSON:  I did.  I did.

14          MR. SHEA:  We're about halfway through.

15  Do you want to take a break and organize yourself so

16  that we don't --

17          MR. FERGUSON:  I'll keep going.

18          MR. SHEA:  Okay.

19  BY MR. FERGUSON:

20       Q.   I'm going to show you what's been marked

21  as A10. This is a newsletter that went out July 2nd,

22  2013.  And before I do that, when I did ask you the

23  question before, about the letter that went out from

24  Mr. Cunningham, I said December 4th, 2014.  I meant

25  December 4th, 2013, okay?



1      A.    Thank you.

2      Q.    All right.  If you look at the second page

3  of this document, you said, "A member survey will be

4  distributed to all Aspen members shortly.  The

5  question will be asked, in essence, do you want the

6  Ritz-Carlton Club to have an exchange affiliation

7  with the Marriott Vacation Club Destination Exchange

8  Program."  You all wrote that with your board,

9  correct, the members?

10     A.    Yes.

11     Q.    And do you know what survey you were

12 referring to?

13     A.    It may have been the one you just asked me

14 a question about.

15     Q.    All right.  Let me show you what's been

16 marked as 1259.  1259 is a document -- you'll see

17 the first page is a document where Mr. Glazer

18 received, from Mr. Dahlback and Cunningham, and it

19 looks like he forwarded it to RCDC member

20 communications, but I'm not referring -- I don't

21 care about that.

22          The second page says member feedback, to

23 the Glazers.  And down there it says there's a

24 survey being conducted, and tells you to go online.

25          And if you look above, it says "We are

```
 1   using APCO Insight, an independent global research

 2   firm, to conduct a survey of members."

 3              Were you aware, before this went out to

 4   your membership, that APCO Insight was doing this

 5   survey?

 6        A.   I don't recall the name APCO.

 7        Q.   Okay.  And you didn't have any input into

 8   the survey that went out by Mr. Cunningham's letter?

 9        A.   I don't believe I did, no.

10        Q.   Thank you.  I'm just going to show you

11   this quickly, Exhibit 3036.  It's an e-mail from a

12   Bart Palm to the Ritz-Carlton Club Aspen Board.  It

13   looks like you guys all had a board-related e-mail,

14   so you didn't get inundated, Mr. Mercer.

15              It says from Mr. Palm to the board, which

16   would be you and the other men listed in these

17   exhibits.  It says, "Is this our survey or

18   management company's?  Do I answer this or not?  I

19   definitely do not want all the Marriott people using

20   our club.  Please advise."  Do you recall this e-

21   mail at all?

22        A.   No, sir.

23        Q.   At the bottom of Mr. Cunningham's letter,

24   he said "As always, we appreciate your membership in

25   the Ritz-Carlton Destination Club.  You can expect
```

1   to hear from us again after all responses have been

2   collected and analyzed."

3           Do you know whether or not Marriott

4   Vacation Worldwide, headed by Mr. Cunningham, ever

5   provided the collected and analyzed responses to the

6   membership?

7       A.   No, sir, I do not.

8       Q.   Have you ever -- do you recall ever seeing

9   anything like that?

10      A.   No, sir, I have not.

11      Q.   Let me show you what's been marked as

12  Exhibit 1263.  And this is the minutes of a meeting,

13  on July 26th, 2013, of the TAC board of directors.

14          And if you go to the page marked 005 at

15  the bottom, and the top action items assigned, the

16  fourth bullet point says "Ms. Sobeck to send

17  feedback regarding the member survey to the board

18  for review."

19          Do you recall ever receiving any feedback,

20  from Ms. Sobeck or Marriott Vacation Worldwide, from

21  the APCO Insight survey?

22      A.   I do not recall.

23      Q.   Let me show you Exhibit 1308.  I don't

24  have a stamp on it, as I didn't print that version

25  out, but it's been previously marked.

1        This is the responses, to open-ended

2   questions in the survey, that were collected by APCO

3   Worldwide or APCO Insight.

4        Have you ever seen -- and I put two to a

5   page, and I gave you yours double-spaced.  There's

6   seven or eight hundred here.  Have you ever seen

7   this document before and all these responses?

8      A.    No.

9      Q.    And if I look -- if I open to page 34, the

10  third page in, the bottom says "From a fellow from

11  Jupiter, I have absolutely no interest in being

12  affiliated with MVC," and comments like that.

13        Did they ever report to you that being --

14  Marriott Vacation Worldwide, any -- any synthesis or

15  analysis of this data that they collected through

16  APCO Insight?

17      A.    Not that I recall.

18        MR. FERGUSON:  All right.  Let's take that

19  quick break.

20        THE VIDEOGRAPHER:  All right.  The time is

21  9:38. We are off the record.

22        (Whereupon, a recess was taken.)

23        THE VIDEOGRAPHER:  The time is 9:45.  We

24  are on the record.

25  BY MR. FERGUSON:

```
 1        Q.    Okay.  Mr. Mercer, I've put in front of

 2   you a document that is marked 2260.  It's a document

 3   we received recently in the litigation from APCO,

 4   and then finally from Marriott, I think, June 30,

 5   2018.

 6              If you would just take a quick look at

 7   that, I'll just ask you initially, have you ever

 8   seen this Ritz-Carlton Destination Club member study

 9   detailed report of August 2013, from APCO Insight?

10        A.    No, sir.

11        Q.    You didn't see it in preparation for your

12   deposition today?

13        A.    No, sir.

14        Q.    And do you recall having seen it in 2013

15   or '14?

16        A.    No, sir.

17        Q.    Have you heard about it?

18        A.    From you.

19        Q.    All right.  If you would go to the second

20   page, on page two, it's numbered on the bottom

21   right, it says "Methodology, online survey."

22              It says, "Among 795 members, it was from

23   July 8th to August 16th, 2013, with a response rate

24   of 34 with 255 people responding in Aspen."

25              Were you aware -- or ever made -- let me
```

1   ask you this, were you ever made aware, by Ms.

2   Sobeck, Ms. Clark, Mr. Cunningham, Mr. Hayward, that

3   they had conducted a survey where 255 Aspen members

4   had responded?

5        A.   No, sir, not that I recall.

6        Q.   If you would turn to the executive summary

7   on page four, at the bottom, there's a section

8   called key findings.  And you'll see the key

9   findings are --

10       A.   I'm sorry?

11       Q.   Yeah, you're there.

12       A.   Am I there?  Okay.

13       Q.   Yeah.  Key finding one was "While members

14   say they are generally satisfied, once on sight,

15   overall members are frustrated with Ritz-Carlton

16   Destination Club."

17            And then you'll see that they had a --

18   "Furthermore, members expressed dissatisfaction with

19   six of seven -- six of eleven assessed membership

20   elements."

21            Do you have any recollection of any

22   assessment being done, by APCO or Marriott Vacation

23   Worldwide, of eleven elements?

24       A.   No, sir.

25       Q.   Bullet point number two says, "There is a

1    real sense among the members that they are not

2    getting Ritz-Carlton value -- in quotes -- anymore.

3    Many members believe the Marriott partnership

4    dilutes the brand."

5          Did you ever receive anything like that

6    from Marriott Worldwide?

7        A.    No, sir.

8        Q.    Then it says, "The open-ended responses

9    reveal that members have seen their fractural

10   ownership investment erode in both real and

11   perceived value, and they are unhappy with the

12   introduction of Marriott Vacation Properties and

13   members into, quote, unquote, their Ritz-Carlton

14   system."  Were you ever told anything like that by

15   Ms. Sobeck or her team?

16       A.    No, sir.

17       Q.    Wouldn't you have liked to have known this

18   going into this period of time, August 2013, when

19   you were deciding, as a board, whether or not to

20   sign on with this affiliation?

21       A.    I'm not sure it would have mattered, but I

22   like to know everything in advance.

23       Q.    And then one said, "For members, Marriott

24   properties are not as attractive and do not offer

25   the same value or benefits as a Ritz-Carlton

1    property."

2             Was that a general -- not consensus -- a

3    general feeling that was going around with people

4    you spoke to, as the president, they didn't think

5    the Marriott Vacation Club offered the same benefits

6    or value as the Ritz-Carlton property?

7             MR. MARX:  Object to the form of the

8    question.

9             THE DEPONENT:  I've never discussed it

10   with any members in person.

11   BY MR. FERGUSON:

12        Q.   All right.  You did by e-mail, those kind

13   of sentiments?

14        A.   No, sir.

15        Q.   All right.  "Some members resent Marriott

16   owners having access to RCDC properties, feeling it

17   devalues the Ritz-Carlton membership."

18             Were you ever advised, by Ms. Sobeck or

19   her team, of this finding?

20        A.   No, sir.

21        Q.   This key finding?

22        A.   No, sir.

23        Q.   If you go to the next page, page five, it

24   has a section called strategic implications, and the

25   third bullet point down says "Affiliation with



1   Marriott Vacation Destinations will deepen member

2   mistrust and dissatisfaction with Ritz-Carlton

3   Destination Club."

4            Were you ever advised, by Ms. Sobeck or

5   Marriott Vacation Worldwide, that they had been

6   advised by APCO Insight of this strategic

7   implication?

8       A.    No, sir.

9       Q.    If you go on, just kind of page through

10  these detailed findings and these graphs.  I guess

11  these are the eleven elements, some of that.  Have

12  you ever seen any of this data in any form before

13  today?

14      A.    No, sir.

15      Q.    If you go all the way to the back, page 13

16  -- not all the way to the back -- page 13 and 14,

17  you'll see a section called "Open-ended responses

18  further demonstrate members' frustrations and

19  dissatisfaction."

20            That bullet point first says "In part, at

21  worst, they accuse RCDC of fraud and remark whether

22  there are legal remedies available."

23            In this time frame, of August 2013, were

24  you aware that there was a lawsuit, a class action

25  lawsuit, I think it was in Minnesota?

1    A.    No, sir.

2    Q.    If you go to the next page, 14, there's,

3  in the lower right-hand corner, there's a -- what do

4  you call these things -- a balloon quote, from a

5  male in Aspen.  And you'll see, halfway through that

6  bullet point, after talking about the loss of these

7  properties in Abico, Jupiter, Capilu, and Bachelor's

8  Gulch, this person said "The attempt to introduce a

9  points system of ownership, in the Marriott Vacation

10 Club, is a dilution of value of our investment and

11 the experience which we bought into.  We bought into

12 it and are, so to speak, investors in it."

13        Then it says "Some clear, open, and honest

14 information would be appreciated, rather than the

15 sales pitch telling us how good something is for us

16 when we repeatedly say we don't want it."

17        Were you ever provided with this male

18 Aspen member's comments along those lines?

19    A.    No, sir.

20    Q.    Put that aside.  Exhibit 1271, this is an

21 internal document from Cunningham -- Sobeck to

22 Cunningham, and I don't suspect you saw that, but I

23 just want to show you, in the time frame August

24 22nd, 2013, there's a section called Aspen under

25 review, work underway, board.

1          And the last bullet point says, "Follow-up

2    meeting to be scheduled with board to discuss moving

3    forward with affiliation vote, future of RCDC and

4    survey results."

5          Okay.  With respect to the APCO document

6    we just saw, in Exhibit 2202, I believe it was, did

7    she, Ms. Sobeck, ever report to you at any board

8    meeting, on the phone, e-mail, the results of the

9    APCO survey in any form?

10       A.   Not that I recall, sir.

11       Q.   Let me show you this Exhibit 1272.  That's

12   an e-mail to your board, at the bottom, from Ms.

13   Sobeck.  And she says my apologies.  This is Exhibit

14   1272.  "My apologies about the delay in responding.

15   We have an outside communication company that we use

16   to make all series of communications flow and are

17   clear to membership."

18          Do you know who she's referring to there?

19       A.   No, sir.

20       MR. MARX:  Object to the form of the

21   question.

22   BY MR. FERGUSON:

23       Q.   Were you aware at all that -- made aware

24   at all that APCO Insight was assisting her in

25   writing communications to the board?

1        A.    No, sir.

2        Q.    Or to the members?

3        A.    No, sir.

4        Q.    I want to show you this real quickly,

5   Exhibit 1282.  And this is one of the draft letters

6   that didn't go out, but it's one of the 13 or 14

7   drafts of a letter that will ultimately go out, on

8   November 19th, 2017, over your signature and Mr.

9   Cunningham's.

10            But it says "Based on some member

11   feedback, it is clear that there is concern about

12   opening the Ritz-Carlton Club Aspen Highlands to

13   MVCD members through affiliation."

14            This was a document being written

15   primarily by Marriott, is that right?

16        A.    Would you please state the question again?

17        Q.    Is this a document that was primarily

18   written by Marriott?

19        A.    I would assume so.

20        Q.    And you gave some insight, I believe?

21        A.    I'm not sure of that.

22        Q.    Okay.  Do you know whether or not any

23   communication ever went, to the membership, along

24   the lines that there was concern, based on

25   membership feedback, about affiliation with MVCD?



NAEGELI
DEPOSITION AND TRIAL

(800)528-3335
NAEGELIUSA.COM

1       A.    I'm not aware of any.

2       Q.    This is a document that's Bates labeled --

3  it doesn't show up Bates labeled because it's an

4  Excel, but it's Bates labeled AHCA 1085.

5            And you'll see that on this September 13th

6  tourist accommodation action items, number 17 says

7  "Send feedback regarding the member survey to board

8  for review."

9            Did you ever get the feedback from the

10 member survey in September or October?

11      A.    It was an action item, so I don't recall

12 if I got it.  So when they refer to -- may I ask a

13 question?

14      Q.    Sure.

15      A.    So when they refer to member survey, are

16 they referring to the APCO survey?

17      Q.    Well, it's on your board.  Do you know?

18 Let me ask you this way, are you aware of any survey

19 before -- were you made aware of any survey, before

20 September 2013, aside from maybe getting an e-mail

21 to respond to it?

22      A.    I don't even recall getting an e-mail to

23 respond to it.  So -- so that's why I'm asking if

24 member survey is the same as the APCO document which

25 you just showed me, because I'm just -- it's just a

1  question.  I don't know.

2     Q.   All right.  Let me show you what's been

3  marked as Exhibit 2261.  This is a package of the

4  minutes and the agenda.

5        And there's various documents from that

6  September 21st get-together, but if you look at page

7  -- at the bottom of page 1408, which is part of the

8  tourist accommodation board of directors meeting

9  held on September 21st, 2013, you'll see that Ms.

10 Sobeck was there and Ms. Babich's absent.

11       And the second bullet, from the bottom,

12 says "The overall member survey results were

13 discussed.  The survey was used to understand the

14 needs of members, and what's most important to them.

15 Aspen Members value luxury residences and cruises.

16 Members currently want to see more club development

17 in Europe."

18       Is that what you recall Ms. -- is that

19 what was reported by Ms. Sobeck?

20       MR. MARX:   Object to the form of the

21 question.

22       THE DEPONENT:   Would you please point me

23 to the bullet point?

24 BY MR. FERGUSON:

25     Q.   Yes.  It's the second one up.

1      A.    Second one?   Okay.    Good.   She must have

2  said that.

3      Q.    **And she didn't say anything like the**

4  **things we were reading from the APCO report, about**

5  **the concerns about the affiliation, did she?**

6      A.    No, sir.

7      Q.    **She didn't report the bad news from the**

8  **survey report?  It appears she reported some**

9  **corporate fluff about what people wanted, Europe and**

10 **cruises and whatnot, right?**

11          MR. MARX:   Object to the form of the

12 question.

13          THE DEPONENT:   It does not seem to be --

14 it does not seem to be all of the items included in

15 the APCO survey.

16 BY MR. FERGUSON:

17     Q.    **So she wasn't fulsome in her discussions**

18 **with you at a board meeting, a tourist accommodation**

19 **board meeting, it would appear from these notes at**

20 **least, correct?**

21          MR. MARX:   Object to the form of the

22 question.

23          THE DEPONENT:   What did he say?

24          MR. SHEA:   He objected to the form of the

25 question.



```
 1                THE DEPONENT:  Okay.

 2                MR. SHEA:  You can answer it.

 3                THE DEPONENT:  It certainly looks

 4   incomplete.

 5   BY MR. FERGUSON:

 6        Q.    Did you ever discuss the APCO results or

 7   survey with a John Herns?

 8        A.    He would have been at the meeting.

 9        Q.    Okay.  I want to show you real quickly --

10   I might have touched upon this at your prior, but

11   just to give me a time frame.

12                MR. SHEA:  What are you showing again?

13                THE DEPONENT:  Mr. Herns was not at the

14   meeting.

15   BY MR. FERGUSON:

16        Q.    Okay.  Yeah, I think you're right.  I

17   wasn't referring to that.  I just want to know did

18   you ever discuss a member survey -- we saw the APCO

19   survey -- with Mr. Herns or Mr. Dimeglio?

20        A.    No, sir.

21        Q.    Okay.  Exhibit 1313, just to put you in

22   the time frame, is December 5th, from Mr. Nevloff,

23   to you.  And this is just to key you in on the time

24   frame, December 5th, 2013.

25                He would have received the letter, from
```



1   Mr. Cunningham, with the vote, the survey vote or

2   whatever they call it.

3        It says "There was no discussions as to

4   negatives that interest our members, swap will be

5   used by hoards of time share owners -- share owners

6   that are likely to come for shorter stays, meaning

7   wear and tear and clogging up the pipeline for

8   members who want shorter stays."

9        Two questions, do you recall whether or

10  not you put out a communication, to the membership,

11  in connection with Mr. Nevloff's concerns as

12  expressed on December 5th, 2013?

13       A.   I do not recall, sir.

14       Q.   Okay.  And the other question was -- never

15  mind. Let me show you Exhibit 226 -- 26 -- 2264.

16  And that's a December 4th, 2013 letter to the

17  members.  Do you see that, at the bottom, from Mr.

18  Cunningham?

19       A.   I'm sorry, sir.  Please.  Okay.  Yes.

20  Starts at the back page.  Got it.

21       Q.   And I asked you before if you were aware,

22  one way or another, that Ms. Clark and Ms. Sobeck

23  had hired APCO Insight to do a focus group in this

24  time frame.

25       A.   Did you say Clark, Ms. Clark?

1    Q.    Ms. Clark.  Do you know Ms. Clark?

2    A.    No.

3    Q.    Okay.  Ms. Sobeck?

4    A.    I know Ms. Sobeck.

5    Q.    Okay.  She didn't tell you they were doing

6  a focus group, did she?

7    A.    No, sir.

8    Q.    And after Mr. Nevloff sent you the letter

9  expressing his concerns, you sent ultimately Exhibit

10  1337.  You'll see, at the bottom, December 6th,

11  2013, there's a red line of a member letter.  "Dear

12  Aspen Highland Member," and it has five or six

13  bullet points as to why the board was in favor of

14  the program.

15        Do you recall that Ms. Sobeck was involved

16  in redlining changes of your letter to the board in

17  the -- on or around December 6th, 2013?

18    A.    No, sir, I do not recall.

19        MR. FERGUSON:  Just give me a minute here.

20  I can't find what I'm looking for.

21        MR. SHEA:  Do you just want to take a

22  break then?

23        MR. FERGUSON:  Yeah, let's take a break,

24  and then I'll be done in ten minutes.

25        MR. SHEA:  Yeah, that's fine.



1                THE VIDEOGRAPHER:   The time is 10:02.   We

2    are off the record.

3                (Whereupon, a recess was taken.)

4                THE VIDEOGRAPHER:   The time is 10:13.   We

5    are on the record.

6    BY MR. FERGUSON:

7        Q.   Mr. Mercer, I've put, in front of you,

8    Exhibit 2265 to Mr. Dimeglio's deposition, and APCO

9    3056.  This is member focus group interviews, Ritz-

10   Carlton Destination Club Research Report from

11   January 2014.

12              And the reason I showed you some of the

13   documents before, in December, when Mr. Cunningham

14   asked for people to respond to a survey vote, vote

15   survey, survey or vote, this is the following month.

16              Do you generally recall that -- that the

17   survey that Mr. Cunningham was doing closed sometime

18   in mid-January 2014?

19       A.   No, sir.

20       Q.   Have you ever seen this documenter before

21   today?

22       A.   No, sir.

23       Q.   All right.  Let me just run you through

24   and ask you if you've ever heard Ms. Sobeck or any

25   of the executives, such as Mr. Cunningham, if they

1   shared any of the information in here, in any form,

2   with you or your board?

3            On page one, there's an objective.  It

4   says "The Ritz-Carlton Destination --" I'm sorry.

5        A.    That's all right.

6        Q.    "The Ritz-Carlton Destination Club engaged

7   APCO Worldwide in order to follow up on recent

8   member survey to obtain further feedback and input

9   from RCDC members regarding their membership."

10  That's referring to the recent member survey.  Do

11  you see that?

12       A.    Yes, sir.

13       Q.    Okay.  And do you know what that recent

14  member survey was?

15       A.    I would assume it's the one you were

16  referring to earlier this morning.

17       Q.    All right.

18       A.    Okay.

19       Q.    Because it's the same company.

20       A.    But I don't know that.

21       Q.    Same company, APCO Worldwide?

22       A.    Yes, sir.

23       Q.    Okay.  And if you look at the key

24  findings, there's those key findings again, but

25  they're a little bit different here.



1      The first key finding is RCDC is a travel

2  club, but if you look at the very bottom, the key

3  finding in this focus group interview research

4  report, it says "There's a real potential for brand

5  damage to the Ritz-Carlton Hotel.  We noted this

6  finding in the survey, and these interviews have

7  reinforced this concern."

8      This is about brand damage, and they said

9  that APCO said that they noted this in their

10 findings in the survey, but you weren't told about

11 that by Ms. Sobeck, were you?

12     A.    No, sir.

13     Q.    It says "Moreover, the loss in favorable

14 sentiment towards Ritz-Carlton may translate into

15 lost revenue as members deselect Ritz-Carlton and

16 begin to stay at the Four Seasons."

17      But I wanted to focus you then on page

18 two.  There's some more key findings there, a little

19 bit different than the ones we saw in Exhibit 2202.

20      It says "The members want to know what the

21 club's vision is."  And it says "The survey also

22 noted the low ratings for communication and

23 transparency in the communications I receive from

24 the club.

25      Members spoke about how most of the

1  communications they received are full of legalese

2  and that they don't understand them."

3        It goes on to say, "They also spoke about

4  how bad news is delivered in a happy tone."

5        That was a concern that you sometimes had

6  when you got a hold of Sobeck's letters, some of

7  Cunningham's letters, you wanted to make it a little

8  clearer?

9    A.   I prefer clarity, yes, sir.

10   Q.   And did you find that their communications

11 had some legalese in there?

12   A.   Sometimes they had -- they had a happy

13 tone, yes.

14   Q.   All right.  And then you'll see the bullet

15 point that I really wanted to focus you on.  Have

16 you ever -- you'll see it says "concern about the

17 Marriottization of the club," and that's in quotes.

18 I guess -- I guess it's a noun.

19        Did you ever hear of the term

20 Marriottization before today?

21   A.   No, sir.

22   Q.   Okay.  Never told by Ms. Sobeck that APCO

23 Worldwide had reported to them a concern about the

24 Marriottization?

25   A.   No, sir.



1    Q.    And it goes on to say club members raise a

2  number of concerns about allowing Marriott Vacation

3  Club members to Ritz-Carlton Club, and it goes on to

4  say "a related concern is whether or not allowing

5  members, MVC members to allow -- allowing MVC

6  members access to clubs would result in devaluing

7  their asset."  This is right around the time that

8  the 2013-'14 Cunningham survey went out.

9          This is a yes or no question.  Were you

10 ever made aware by anyone at the time -- at this

11 time -- they were pretty much overlapping -- that

12 they were getting reports that members were

13 concerned about devaluing of their asset from

14 Marriottization?

15    A.    No, sir.

16         MR. MARX:    Object to the form of the

17 question.

18 BY MR. FERGUSON:

19    Q.    Is that something -- isn't that something

20 you thought -- you would think they would tell you

21 when they were doing a focus group on issues that

22 brought up Marriottization?

23         Does it concern you at least that they

24 weren't telling you what you were studying when they

25 were sending a member survey out about affiliation

1  with Marriott?

2      A.   I prefer total transparency.

3           MR. MARX:   Object to the form of the

4  question.

5  BY MR. FERGUSON:

6      Q.   The next key finding is "members do not

7  generally like the MVC affiliation, the proposed

8  membership tier with MVC."  I guess they were

9  proposing a membership tier in addition --

10  additionally there.

11          And it goes on and says "Ritz-Carlton

12  members don't see how they benefit from gaining

13  access," et cetera.  Were you ever made aware of

14  this key finding?

15      A.   No, sir.

16      Q.   Okay.  Thank you.  I wasn't looking at

17  you.

18      A.   I'm sorry.

19      Q.   Page seven, there's a couple comments

20  there.  I guess they got -- these were people that

21  were interviewed.  Do you have any knowledge at all

22  that they were interviewing people here at the Aspen

23  Club?

24      A.   No, sir.

25      Q.   Today's the first you heard of it?



1      A.    Yes, sir.

2      Q.    On page seven, there's a comment from

3  somebody, in quotes, "I pay a premium to be a Ritz-

4  Carlton member, and don't want Marriott Vacation

5  Club members at my property.  The Marriott presence

6  dilutes the value of the club."  Were you ever told

7  about that person's comment?

8      A.    No, sir.

9      Q.    That's all I have on that.  Exhibit 2272.

10     A.    Thank you.

11     Q.    Just real quickly, this is an exhibit, a

12  November 18th, 2014 letter from Evelyn Babich.  She

13  signs this one as the general manager of the Lion

14  and Crown Travel Company LLC.  She also signs it as

15  the Cobalt general manager.

16          She says, "Dear Randy, pursuant to the

17  certain acknowledgment of and joinder agreement,

18  between Lion and Crown and MRTC, dated April 21,

19  2014, that's a document that you had signed that

20  says that there's a notification with an effective

21  date of the affiliation of December 5th, 2014."  Do

22  you recall receiving this letter?

23     A.    No, sir.

24     Q.    Does that generally comport with when the

25  affiliation exchange opportunities went into effect?

1      A.   Yes, sir, I believe.

2      Q.   Let me show you an exhibit -- will you

3  mark this as the next exhibit?  It's Bates labeled

4  AHCA 25538.

5           (Whereupon, Deposition Exhibit 3103 was

6  marked for identification.)

7      Q.   This is an e-mail from Harris, to Oliver,

8  with a copy to you.  And it's now in January of

9  2016, a couple days after the case was actually

10 filed.  It's talking about the case.

11          It says it sounds ill-founded.  I want to

12 focus on that.  It says "If they had gotten our

13 agreement, they would see it's one-to-one.  Not sure

14 how they could prevail."

15          As you sit here today -- and I know you

16 testified at the deposition back in October 2017 --

17 as you sit here today, have you since learned

18 Marriott Vacation Club people can come in for less

19 than one week?

20     A.   No, sir.

21     Q.   As you sit here today, you're not aware

22 that if you put a -- or if one of your compatriots -

23 - I know you didn't join up for it -- if someone

24 here is signed up in the affiliation program, and

25 they put a week in, do you know, as you sit here

1  today, that Marriott Vacation Club people can come

2  in for that week, say two days, three days, and two

3  days, different people?

4       A.   As can I in my allocated time.

5       Q.   I'm talking --

6       A.   So help me out.

7       Q.   Okay.  I'm sorry.  When Mr. Smith puts his

8  week in of allocated time, that a Marriott Club

9  person can come -- it's now in their inventory --

10 are you aware, as you sit here today, that that one

11 week can be used by three or four different people?

12      A.   No, sir.

13           MR. MARX:  Object to the form of the

14 question.

15           MR. SHEA:  So you said that one week can

16 be used by three or four different people.  You mean

17 that one week could be fractionally split up?

18           MR. FERGUSON:  Yes.

19           MR. SHEA:  And not reused?

20           MR. FERGUSON:  That's right.

21 BY MR. FERGUSON:

22      Q.   So week -- there's a week of inventory

23 that Mr. Smith, one of your fellow owners has.

24 Marriott Vacation Club now has that one week of

25 inventory.

1          Are you aware that Marriott Vacation Club

2  -- Jones can use it for two days over the weekend,

3  Mr. Black can come in on Monday and use it for three

4  days and move out, and another person can move in

5  for the next weekend?

6      A.    No, sir, and that was never the intent.

7      Q.    I'll show you exhibit -- can you mark that

8  as the next exhibit?

9          (Whereupon, Deposition Exhibit 3104 was

10  marked for identification.)

11      Q.    This is an e-mail chain into 2017.  It's

12  something from Greg Jacobson, who we all know and

13  love, to the AHCA board.

14          And you said -- or the board -- yeah, you

15  said, on page one, April 5th, 2017, "Here is the

16  exact language from the document which we negotiated

17  with MVW.  This was an unbending negotiating point

18  for me as I did not want Marriott members coming

19  into the club unless a member voluntarily gave up a

20  week."

21          And then it talks about, at the top -- Mr.

22  Harris weighed in and said "I think that both

23  Marriott and Dan and Jessica did a great job showing

24  that the Fifth Amended Complaint was poorly done,

25  and how they individually had no fiduciary rights

1    and it wasn't our decision to make anyhow."  Do you

2    see that?

3         A.   Yes, sir.

4         Q.   Okay.  And when he says to his -- I guess

5    to you, Mr. Mercer, about a year -- about a year and

6    a half ago, that it wasn't your decision to make

7    anyhow, that would be in -- that would contradict

8    what Ms. Sobeck told Mr. Hayward in that e-mail we

9    saw earlier this morning, correct?

10        A.   Yes.

11        Q.   So at least Mr. Harris didn't know that he

12   might have had -- the board might have had the right

13   to elect whether or not to become a participant,

14   right?

15             MR. MARX:   Object to the form of the

16   question.

17   BY MR. FERGUSON:

18        Q.   Can you answer that?

19        A.   Yes.

20        Q.   I'll look down.  Okay.  I'm almost here at

21   the end, guys.  Exhibit --

22             THE REPORTER:  This is 3105.

23             (Whereupon, Deposition Exhibit 3105 was

24   marked for identification.)

25   BY MR. FERGUSON:



1     Q.    Actually that's a Mr. Harris e-mail.  I'm

2  going to skip to that one.  I'm sorry.  All I have

3  for you on this is an e-mail exchange, between

4  Hayward and Richard Harris, and you got copied on

5  that.  Do you see that you were copied on that?

6     A.    Okay.  Hang on.  From Sal to Richard

7  Haywood -- Hayward.  Got it.

8           MR. FERGUSON:  Can you mark that?

9           (Whereupon, Deposition Exhibit 3106 was

10  marked for identification.)

11  BY MR. FERGUSON:

12     Q.    3106, I hope it's what I have here.  Yeah.

13  Just a real quick question about this document.

14  It's from Sal to Richard Hayward, with a copy to

15  you.

16           It says, to Mr. Hayward, "Just trying to

17  understand beyond the words of the MOU and the

18  affiliation agreement amendment."

19           Do you know whether or not -- do you know

20  what he's referring to as an affiliation agreement

21  amendment here?

22     A.    No.  Can you help me here real quick?  How

23  am I tying in 05 to 06?

24     Q.    Oh, they're not tied in.

25     A.    They're not tied in?

1    Q.    I'm sorry.  Yeah.  It was my fault.

2    A.    Okay.  So disregard that for right now?

3    Q.    Yes, sir.

4    A.    Okay.  Thank you.  Would you repeat the

5  question please?

6    Q.    Yeah.  My question is you'll see that Mr.

7  Harris, who is on the board, says --

8         MR. SHEA:  Mr. Cutrona.

9  BY MR. FERGUSON:

10    Q.    Mr. Cutrona.  I'm sorry.  Mr. Cutrona

11  said, to Mr. Hayward, your asset manager by this

12  time, he says, "Just trying to understand beyond the

13  words of the MOU and the affiliation agreement

14  amendment."

15         My question is real simple.  Do you know

16  what the affiliation agreement amendment means here?

17         MR. MARX:  Object to the form of the

18  question.

19         THE DEPONENT:  I would assume that it was

20  the document signed in 2014.

21  BY MR. FERGUSON:

22    Q.    The acknowledgment and joinder that you

23  signed?

24    A.    Possibly, but it doesn't have the specific

25  name so --



1      Q.    I'm just trying -- I'm just trying to

2   determine if someone, by 2017 at least, had the

3   affiliation agreement, from November 2013, that you

4   hadn't seen at the time you signed the

5   acknowledgment and joinder?

6          MR. MARX:   Object to the form of the

7   question.

8          THE DEPONENT:   We received the 2013

9   agreement sometime in 2018.  So I would say no, this

10  does not -- I would think this would refer to the

11  joinder agreement.

12  BY MR. FERGUSON:

13     Q.    And then finally I have one more document

14  to mark and then one more question in addition to

15  this.  How am I doing, Dan?  Am I making you happy?

16         MR. SHEA:   That's not your job.

17         (Whereupon, Deposition Exhibit 3107 was

18  marked for identification.)

19  BY MR. FERGUSON:

20     Q.    So Exhibit 3107 is an e-mail -- is a

21  document called Special Message From Aspen Highlands

22  Association Board Concerning Members' Litigation,

23  and it's signed by the board, Harris, Mercer, Alper,

24  and Cutrona.

25         And this is just a report on the

 1    litigation.  I don't want to get into any real great

 2    detail on it, but do you generally recall that Mr.

 3    Porterfield was retained to give an opinion as to

 4    the work you had done in regards to the affiliation?

 5        A.    I do.

 6        Q.    And do you know whether or not he had the

 7    affiliation agreement that you hadn't seen when you

 8    signed the acknowledgment and joinder?

 9        A.    I do not know.

10        Q.    My question, on this document, is has

11    there been any reports to the membership, after the

12    court denied, at least in part, the association's

13    motion to dismiss?

14        A.    No, sir.

15        Q.    Have there been any other kind of longer

16    reports -- have there been any reports, to the

17    membership, since April of 2017, on the litigation?

18        A.    I don't believe so, no, sir.

19        Q.    Have you retained counsel to look at the

20    insurance issue, whether or not the insurer should

21    pay the policy limits?

22        A.    Yes, sir.

23        Q.    And who's that counsel, if you're allowed

24    to tell me?

25        A.    I forget the name.  I'm sorry.  I don't

1  know.

2      Q.   I'll get it from Dan.

3      A.   It starts with a B.

4      Q.   Brown?

5      A.   Yeah, there you go.

6      Q.   My last -- my last question is, when I

7  reviewed your testimony the last couple days, you

8  had indicated -- and I can pull the pages up, but I

9  want to get you out of here -- you had indicated

10 that, when the vote survey was done, that Mr.

11 Cunningham sent out on December 4th, that it was

12 difficult to get a lot of people to respond.  It was

13 -- people didn't pay attention, and whatnot.  Do you

14 generally recall that?

15     A.   It's historically been the association.

16     Q.   All right.  But you weren't told, at any

17 time, that APCO was achieving fairly significant

18 feedback results of 34, 35 percent?

19     A.   No, sir.

20     Q.   All right.  I think my hour is up.

21         MR. SHEA:  Is that it?

22         MR. FERGUSON:  Let me just see.  Mike, is

23 there anything glaring I need to talk to you about?

24         MR. SHEA:  Okay.

25         MR. REISER:  Sorry.  I was on mute.  There



 1  was one document.  I know we're up to the hour, but

 2  there's just one other document.

 3          MR. FERGUSON:  What is it?

 4          MR. SHEA:  Go ahead.  It's one of the

 5  documents. Go ahead.

 6          MR. FERGUSON:  What's the date?

 7          MR. REISER:  Matt, can you step out of the

 8  room for a minute because I just want to talk to you

 9  real quick, for one second.

10          MR. FERGUSON:  Thank you, guys.

11          THE VIDEOGRAPHER:  Are we taking a break

12  or --

13          MR. SHEA:  Yes, we're taking a break.

14          THE VIDEOGRAPHER:  The time is 10:31.

15          (Whereupon, a recess was taken.)

16          THE VIDEOGRAPHER:  The time is 10:35.  We

17  are back on the record.

18  BY MR. FERGUSON:

19      Q.    Yeah.  On Exhibit 3104, there's some

20  language -- and of course I can't find it -- it

21  talks about fiduciary duty.  Do you see that first

22  paragraph?  Do you find those words?

23      A.    No, sir, not yet.  I'm sorry.

24      Q.    It says -- it talks about the Complaint

25  was poorly done and how they individually had no

1   fiduciary rights.

2          Do you know what Mr. Cutrona was referring

3   to about who wasn't -- did you ever discuss who he

4   meant by they had no fiduciary rights individually?

5          MR. MARX:  Object to the form of the

6   question.

7          THE DEPONENT:  No, sir.  I have not spoken

8   with anyone about this.

9   BY MR. FERGUSON:

10     Q.   But you understand that generally the

11  board has -- without maybe legalese -- has fiduciary

12  duties to the membership?

13     A.   Oh, absolutely.

14         MR. FERGUSON:  Okay.  That's all I have.

15         MR. SHEA:  No questions on our end.

16         THE VIDEOGRAPHER:  All right.  This is the

17  end of the deposition of Randy Mercer.  The court

18  reporter will now take orders for the transcript.

19         MR. FERGUSON:  You can turn it off.

20         MR. MARX:  I have no questions.  Thanks,

21  Mike.  I have no questions, and I would like to

22  order a copy of the transcript in accordance with

23  whatever standing order we have.

24         MR. FERGUSON:  I'll have --

25         MR. SHEA:  Is this a new company?

1          MR. FERGUSON:   This is a new company we

2   had to get.   Thank you very much, Diane, for coming

3   all the way here.   So, Ian, just send me -- have

4   your paralegal send me the normal order, and I'll

5   get it to Diane.

6          MR. MARX:   Okay.   That's fine.

7          MR. FERGUSON:   Very good.

8          THE VIDEOGRAPHER:   Does anyone want to

9   order a copy of the video, other than the scheduling

10  attorney?

11          MR. SHEA:   I don't.   Maybe Marriott's

12  attorney does.   I don't know.

13          MR. FERGUSON:   He probably doesn't, no.

14  Give me your card, and I'll contact him.   We'll see

15  what kind of format we want it in.

16          THE VIDEOGRAPHER:   The time is 10:37. We

17  are off the record.

18          (Whereupon, the deposition was concluded

19  at 10:37 a.m.)

20

21

22

23

24

25

```
1                        CERTIFICATE
2
3          I, the undersigned, Erik Lassi, am a videographer on
4     behalf of on behalf of NAEGELI DEPOSITION AND TRIAL.  I do
5     hereby certify that I have accurately made the video
6     recording of the deposition of Randy Mercer, in the above
7     captioned matter on the 13th day of September, 2018, taken
8     on the location of 0075 Prospector Road, Aspen CO, 81611,
9     consisting of 1 DVD(s).
10         No alterations, additions or deletions were made
11    thereto.
12         I further certify that I am not related to any of the
13    parties in the matter and have no financial interest in
14    the outcome of this matter.
15
16
17
18    _____
19    Erik Lassi, Videographer
20
21
22
23
24
25
```

```
 1              C E R T I F I C A T E

 2

 3         BE IT KNOWN that I, DIANE LAUR, took the

 4    foregoing deposition, that I was then and there a Notary

 5    Public in the County of Denver, State of Colorado; that by

 6    virtue thereof, I was authorized to administer an oath;

 7    that the witness, before testifying, was duly sworn or

 8    affirmed to testify to the whole truth and nothing but the

 9    truth, and the testimony of the witness was reduced to

10    writing under my direction.

11         I DO FURTHER CERTIFY that I am not a relative

12    or attorney of either party or otherwise interested in the

13    event of this action.

14

15         WITNESS my hand this 24th day of September,

16    2018.

17                        DIANE LAUR
                          NOTARY PUBLIC
18                       STATE OF COLORADO
                        NOTARY ID 20154018654
19                  MY COMMISSION EXPIRES MAY 12, 2019

20

21

22    _____

23              Diane Laur

24    My Commission Expires May 12, 2019

25
```

```
 1  Date:       October 5, 2018        Assignment #: 27769-1

 2  Attorney: Daniel F. Shea, Esquire

 3  Deponent: Randy Mercer

 4  Case:    RCFU, LLC vs. Marriott Vacations

 5

 6  ATTORNEY - TRANSCRIPT ENCLOSED:  Signature of your client

 7  is required.  Please have your client make any corrections

 8  necessary.  Sign the Correction Sheet where indicated.

 9  Forward a COPY of the executed Correction Sheet directly

10  to the attorney(s) listed below.  (The Address(es) can be

11  found on the Appearance page of the deposition.)  Also,

12  send a COPY of the executed Correction Sheet to our

13  corporation.

14

15

16

17

18

19  CC:  Naegeli Deposition & Trial

20       Matthew C. Ferguson, Esquire

21       Ian S. Marx, Esquire

22       Jessica B. Livingston, Esquire

23

24

25
```



NAEGELI
DEPOSITION AND TRIAL

(800)528-3335
NAEGELIUSA.COM