EXHIBIT - L

1        IN THE UNITED STATES DISTRICT COURT

2              DISTRICT OF COLORADO

3      Civil Action No. 1:16-cv-01301-PAB-GPG

4

5      RCHFU, LLC, et al.,

6                        Plaintiffs,

7

            - against -

8

      MARRIOTT VACATIONS WORLDWIDE CORPORATION,

9      et al.,

10                       Defendants.

11      ----------------------------------------x

12

13

14          VIDEOTAPED DEPOSITION of MICHAEL

15      MARINO, held at the offices of Seyfarth Shaw

16      LLP, located at 620 8th Avenue, New York,

17      New York 10018, commencing at 11:32 a.m. on

18      December 6, 2017, before Anthony Giarro, a

19      Registered Professional Reporter and a Notary

20      Public of the State of New York.

21

22

23

24      Job No. 2732223

25      Pages 1 - 182

                                          Page 1

1    A    Sorry.  On the first page?
2    Q    Yeah.  It's in the third
3  page.
4    A    Oh, third page.
5    Q    Just to put you in a
6  timeline, the first time entry I see on
7  your second tranche of bills in '14 is
8  February 21st, 2014.  I could pull it
9  out.  I'm telling you the truth.  This is
10 about 19 days beforehand.  I just want to
11 get you included on where we were now.
12 It looks like Mr. Neveloff responded to
13 the affiliation agreement on page 2 of
14 Exhibit 1354.
15       Were you ever advised of
16 Mr. Neveloff's view of this affiliation
17 agreement as you wrote here on
18 February 2nd, 2014?
19   A    No, sir.
20   Q    You said, "Honestly, Randy,
21 I don't believe that the communications
22 sent to the members came remotely close
23 to presenting the pros and cons.
24 Therefore, whatever responses were
25 received, I have no idea what proportion

Page 134

1  of the members responded or whether the
2  vote was close or not and cannot possibly
3  form a basis for reliance."
4        Did you have any discussion
5  with Mr. Mercer concerning this sentiment
6  by Mr. Neveloff about the survey vote?
7    A    No, sir.  I had never
8  previously seen this at any time.  And
9  Randy did not discuss it with me.
10   Q    But do you recall that you
11 were eventually retained in the next few
12 days or weeks to look at that affiliation
13 acknowledgment and also an MOU?
14   A    Yes, sir.
15   Q    So when handing that new
16 assignment to you in 2014, Mr. Mercer did
17 not share with you the sentiments
18 expressed on February 2nd by Mr. Neveloff
19 to him regarding the vote?
20       THE WITNESS:  Are any of my
21 counsel objecting?
22       MR. RESNIK:  No.
23       MR. SHEA:  No.
24   A    Again, just to give you the
25 context, the call that I received there

Page 135

1  was a -- the decisions had already been
2  made.  Whatever those decisions were, I
3  had no involvement with them whatsoever.
4  And it was kind of like we had this
5  resolved.  But we want to have you help us
6  put together the agreement because of the,
7  quote, relationship issues.
8        And, really, that was it.
9  The discussion, would you like to come to
10 Aspen?  Absolutely, of course.  But that
11 seriously -- that was the framework.
12 They weren't asking me my opinion on
13 points, on valuation, on affiliation,
14 anything.
15   Q    Just basically describing a
16 document?
17   A    To make sure what the
18 document says reflects what we want.  And,
19 by the way, if we could get any other
20 little goodies out of it, that would be
21 great.  But the decision, if you will,
22 presented to me was that the board
23 representing the members had made a
24 decision to do what they were doing and
25 that they had received a majority member

Page 136

1  support for.
2    Q    They told you they had
3  majority member support?
4    A    Not in those exact words.
5  But the members had either voted that they
6  had the support.  They weren't acting on
7  their own.  They had spent a lot of time
8  which I had known of.  This was, again, on
9  a new kind of swirl issue.  They spent a
10 lot of time on it.  And they had decided.
11 And now they wanted help getting it into
12 the agreement.
13   Q    Did they ever -- when I say
14 "they," did Mr. Mercer or Mr. Oliver or
15 anybody else that Mr. Mercer decided to
16 have involved ever tell you the number of
17 people that they believed voted in favor
18 of the affiliation?
19   A    No, sir.
20   Q    Did they ever describe to
21 you in any kind of quantitative terms of
22 what the vote was, 100 percent in favor
23 or 90 percent in favor or 100 percent
24 against, anything like that?
25   A    No.

Page 137

35 (Pages 134 - 137)

1    Q    Exhibit 1357, it's an e-mail
2 chain. You'll see on page 2 of
3 Exhibit 1357, Mr. Mercer writing to
4 Alper, Schneider, Harris and Oliver at
5 that point. And just so you know, this
6 was eventually sent to you by Mr. Mercer
7 at the top. So it's one of those cases
8 where an e-mail exchange is being
9 forwarded to you.
10   A    Okay.
11   Q    This is February 24th. It
12 says, "This document was passed to me by
13 Stephanie while in the board meeting in
14 Orlando. Did not want to sign it until
15 we had counsel approve it. And it is the
16 remaining document. We can roll out the
17 option member affiliation program. We
18 had kicked it back and forth for a
19 month."
20        Couple of questions there.
21        Were you involved at all in
22 an Orlando meeting that Mr. Mercer had?
23   A    No, sir.
24   Q    So that would have been
25 something that had occurred without any

Page 138

1 involvement by you?
2    A    Correct.
3    Q    And it says, "We have kicked
4 it back and forth for a month. And that
5 would be a draft, a joinder to the
6 affiliation agreement."
7        Same question: You weren't
8 involved in kicking it back and forth at
9 this point?
10   A    No, sir.
11   Q    He said, "I ran the document
12 past our prior president, Jay Neveloff,
13 and also John Sternfield, president for
14 eight years. Neither of them liked it as
15 it was too broad. Legal speak. And it
16 sounds nothing like the optional program
17 we agreed upon."
18        Then you'll see he listed
19 the three attorneys: Furman, who you
20 knew; Gosch, who you didn't know. And he
21 says that, "Mr. Gosch was retained on
22 several matters, in several matters three
23 years ago. Bright guy, more litigation
24 oriented."
25        This is February of '14. So

Page 139

1 he sent his cease and desist letter in
2 November of 2012. So, yeah, about two
3 and a half years ago. And then he had
4 you. And then it looks like he did ask
5 you to come onboard. And you were the
6 one selected to do the affiliation work;
7 right? The affiliation drafting work.
8    A    I think it really is summed
9 up here. "Suggest engaging Mike for the
10 task of polishing up this agreement."
11   Q    And that's a good synopsis
12 of what you were about to do?
13   A    Correct, yes, sir. That's
14 it.
15   Q    Now, had you ever been
16 involved in drafting the affiliation
17 acknowledgment or understanding documents
18 for St. Thomas?
19   A    I had been involved in
20 drafting memorandum of understanding
21 agreements at St. Thomas on a variety of
22 issues. But, again, the whole affiliation
23 discussion I think occurred under the
24 Doyle regime. So I was not involved.
25   Q    And at some point, did you

Page 140

1 learn that Barbara Egolf would be the
2 person on the Marriott side that would be
3 drafting and negotiating the affiliation
4 record, the documents?
5    A    Yes, sir.
6    Q    I'll show you this document,
7 1294. So I just wanted to show you
8 Exhibit 1294 which Mr. Mercer on page 1
9 on February 27th, 2014 sent to you.
10 First, several e-mails illustrating what
11 was done and where we are heading. Board
12 Letter 1, RCC Aspen Highlands, Letter 2,
13 RCC frequently asked questions or FAQ.
14 It said, "All these are final. And the
15 board spent a considerable amount of time
16 editing and dumbing it down in order that
17 members could understand the concept
18 without turning blue. Plain English, in
19 other words, we got as close to that
20 concept as possible especially with the
21 FAQ."
22        And he said, "Issuance of
23 these documents set the stage for member
24 survey which could be the next document I
25 send you. This is the meat of everything

Page 141

36 (Pages 138 - 141)

```
 1              C E R T I F I C A T I O N
 2
 3
 4        I, ANTHONY GIARRO, a Shorthand
 5   Reporter and a Notary Public, do hereby
 6   certify that the foregoing witness, MICHAEL
 7   MARINO, was duly sworn on the date
 8   indicated, and that the foregoing, to the
 9   best of my ability, is a true and accurate
10   transcription of my stenographic notes.
11        I further certify that I am not
12   employed by nor related to any party to
13   this action.
14
15
16
17
18
19
20
21
22
23
24
25        ANTHONY GIARRO
```

Page 182

Veritext Legal Solutions
866 299-5127