EXHIBIT - H

```
 1      United States District Court
 2          District of Colorado
        RCHFU, LLC,  et al.,
 3      Plaintiffs,
 4      v.
        MARRIOTT VACATIONS WORLDWIDE
 5      CORPORATION, et al.,    No.  1:16-cv-01301 PAB-GPG
 6          Defendants,
 7      _____/
        REISER, et al.,
 8          Plaintiffs,      Eastern District of California
 9      v.                   No. 2:16-cv-00237-MCE-CKD
        MARRIOTT VACATIONS WORLDWIDE
10      CORPORATION, et al,
11          Defendants,
        _____/
12      PETRICK, et al.,
13          Plaintiffs,
                            San Francisco County
14      vs.                 No. CGC-15-54897
15      MARRIOTT VACATION WORLDWIDE
16      CORPORATION, et al.,
            Defendants.
17      _____/
18
19      VIDEOTAPED DEPOSITION OF LEE CUNNINGHAM
20              Orlando, Florida
                Friday, 10:12 a.m.-2:08 p.m.
21              May 18, 2018
22
23
24
25      Pages 1- 136

                                        Page 1
```

| | |
|---|---|
| 1 Taken on Behalf of the Plaintiffs before | 1 For the Defendant Aspen Highlands |
| 2 Lisa Gerlach, Court Reporter, Notary Public | 2 Condominium Association, by speakerphone: |
| 3 in and for the State of Florida at Large, | 3 JESSICA BLACK LIVINGSTON, ESQUIRE |
| 4 pursuant to Plaintiffs' Notice of Taking | 4 Hogan Lovells |
| 5 Deposition in the above cause. | 5 1601 Wewatta Street, Suite 900 |
| 6 | 6 Denver, CO 80202 |
| 7 | 7 303-899-7300 |
| 8 | 8 jessica.livingston@hoganlovells.com |
| 9 | 9 |
| 10 | 10 |
| 11 | 11 |
| 12 | 12 |
| 13 | 13 |
| 14 | 14 |
| 15 | 15 |
| 16 | 16 |
| 17 | 17 |
| 18 | 18 |
| 19 | 19 |
| 20 | 20 |
| 21 | 21 |
| 22 | 22 |
| 23 | 23 |
| 24 | 24 |
| 25 | 25 |
| Page 2 | Page 4 |

1  Appearances:
2  Counsel for the Plaintiffs:
3  MATTHEW C. FERGUSON, ESQUIRE
   The Matthew C. Ferguson Law Firm, PC
4  119 South Spring, Suite 201
   Aspen, CO 81611
5  970-925-6288
   matt@matthewfergusonlaw.com
6
   MICHAEL S. REISER, SR., ESQUIRE
7  MICHAEL S. REISER, JR.
   MATTHEW REISER, ESQUIRE, by speakerphone
8  Reiser Law, PC
   1475 Broadway, Suite 300
9  Walnut Creek, CA 94596
   michael@reiserlaw.com
10 isabella@reiserlaw.com
   matthew@reiserlaw.com
11
   TYLER MEADE, ESQUIRE
12 The Meade Firm
   1816 Fifth Street
13 Berkeley, CA 94710
   510-843-3670
14 tyler@meadefirm.com
15
16 For the Defendant Marriott:
   PHILIP SELLINGER, ESQUIRE
17 IAN S. MARX, ESQUIRE
   Greenberg Traurig, LLP
18 500 Campus Drive, Suite 400
   Florham Park, NJ 07932-0677
19 sellingerp@gtlaw.com
   marxi@gtlaw.co
20
   DOUGLAS A. KELLY, ESQUIRE
21 Marriott Vacations Worldwide
   6649 Westwood Boulevard
22 Orlando, FL 32821
23
24
25
                                    Page 3

1                    INDEX
2  WITNESS      EXAMINATION            PAGE
3  Lee Cunningham
4      Direct by Mr. Reiser            8
5      Direct by Mr. Ferguson          113
6  Certificate of Reporter             135
7  Witness Signature Page              136
8
9
10                 EXHIBITS
11 Exhibit 2244  Agenda, RCHC007156 through
                 RCHC007206             108
12
   Exhibit 2245  E-Mail, 1/3/12         118
13
   Exhibit 2246  Declaration of Kathy Borkholder  124
14
   Exhibit 2247  Draft Letter, RCHC007151 through
15               RCHC007153             130
16
17
18
19
20
21
22
23
24
25
                                    Page 5

2 (Pages 2 - 5)

Page 6

1    THE VIDEOGRAPHER: Good morning. We're
2  going on the video record. The time is 10:12
3  a.m., Eastern Daylight Time, on Friday, May
4  18th, 2018. This is media unit number one in
5  the video-recorded deposition of Mr. Lee
6  Cunningham, taken by counsel for the
7  plaintiff, in the matter of RCHFU, LLC,
8  et al., vs. Marriott Vacations Worldwide
9  Corp., et al. This case is filed in the US
10  District Court, District of Colorado, with a
11  case number of 1:16-cv-01301 PAB-GPG.
12    This deposition is being held today at
13  the offices of Greenberg Traurig, located at
14  450 South Orange Avenue, Suite 650, Orlando,
15  Florida.
16    My name is Clay McMillan. I'm with
17  Veritext. I'm the videographer. The court
18  reporter today is Ms. Lisa Gerlach, also with
19  Veritext.
20    Will counsel present, followed by counsel
21  on the phone, please identify yourselves and
22  the parties that you represent?
23    MR. REISER: Good morning. Mike Reiser,
24  appearing for the plaintiffs in the Aspen
25  case, the plaintiffs in the Petrick case in

Page 7

1  San Francisco, and the plaintiffs in the
2  Reiser case in Tahoe.
3    MR. FERGUSON: Good morning. I'm Matthew
4  Ferguson. I'm representing the 206 or so
5  plaintiffs in the Aspen litigation.
6    MR. MEADE: Tyler Meade, representing
7  plaintiffs in all three cases.
8    MR. SELLINGER: Philip Sellinger and Ian
9  Marx, from Greenberg Traurig, representing
10  defendants in all three cases. We're
11  accompanied by Doug Kelly, vice president and
12  senior counsel of Marriott.
13    And I note that the deposition is
14  actually being taken in all three cases
15  simultaneously, not just in the Aspen case,
16  as both Mr. Reiser and Mr. Meade indicated as
17  well.
18    THE VIDEOGRAPHER: Counsel on the phone?
19    MS. LIVINGSTON: Good morning, everyone.
20  This is Jessica Livingston of Hogan Lovells.
21  I represent the Aspen Highlands Condominium
22  Association in just the Aspen case.
23  THEREUPON,
24    LEE CUNNINGHAM,
25    A Witness herein, acknowledged after having

Page 8

1  been duly sworn and testified upon his oath as
2  follows:
3    THE WITNESS: I do.
4    DIRECT EXAMINATION
5  BY MR. REISER:
6    Q. Good morning, Mr. Cunningham. I'm just going
7  to try to keep -- this is your third deposition, as
8  you know, in this case. We're going to try to keep it
9  tight and go over some documents that we didn't have
10  at your last deposition. And I appreciate you
11  appearing again for your deposition.
12    So the first thing I want to ask you about is
13  an affiliation agreement from November 2013 that was
14  produced in March of 2018 in this case.
15    And I don't think I have an extra copy. I'm
16  not going to really ask too many specific questions
17  about the language in it, but it is on your screen
18  there. It's been previously marked earlier this week
19  as Exhibit 2102.
20    MR. SELLINGER: Hold on a minute. We've
21  got copies ourselves, but I'll actually give
22  mine to the witness. I think he should have
23  it in front of him.
24    MR. REISER: Okay. Thank you. I thought
25  it had been marked earlier, but I don't see

Page 9

1  it in the package.
2    MR. SELLINGER: This is the 2013
3  agreement?
4    MR. REISER: Yes.
5    MR. SELLINGER: I've got it.
6    THE WITNESS: Thank you.
7  BY MR. REISER:
8    Q. Do you recognize this document that's been
9  marked as Exhibit 2102?
10    A. I recognize this agreement from my
11  preparation for this deposition.
12    Q. So I just want to understand how -- your
13  involvement in the preparation of this agreement. As
14  you can see from the date of the agreement, it's dated
15  November 14, 2013.
16    Do you see that?
17    A. Yes.
18    Q. Can you tell me the origins of this agreement
19  in terms of how it came to be -- how it came to be?
20    A. Based on that timeframe, I would say it came
21  to be as a result of our intention to affiliate the
22  Marriott Vacation Club Destinations Program with Lion
23  & Crown Travel.
24    Q. Okay. Previously, we've been operating under
25  the assumption that the affiliation agreement that had

3 (Pages 6 - 9)

1   been previously marked in this case as Exhibit 1003 --
2   I'll show you that one too. That's the affiliation
3   agreement between -- it's dated in '01, back in the
4   original days of the Aspen Club. I know we went over
5   this agreement in detail at your prior depositions.
6       But what was the reason why the affiliation
7   did not occur pursuant to Exhibit 1003?
8       MR. SELLINGER: Objection to form.
9       A. This agreement is the affiliation between the
10  Ritz-Carlton Travel Company, which is the predecessor
11  to Cobalt, and the Aspen Highlands Association, which
12  created the -- let's see -- but, at that time, there
13  wasn't an affiliation with Lion & Crown or with --
14  subsequently with MVCD.
15  BY MR. REISER:
16      Q. Right. So at the time of the original
17  affiliation in 2001, there was not even a Lion & Crown
18  company. True?
19      A. That's correct.
20      Q. So this was the original agreement that
21  effectuated the affiliations between The Ritz-Carlton
22  Destination Clubs for internal exchange between those
23  clubs?
24      MR. SELLINGER: Objection to form.
25      A. This agreement, like I said, was with

Page 10

1   Ritz-Carlton Travel Company, which was the predecessor
2   to Cobalt, and the Aspen Highlands Association, which
3   established the program manager for the Ritz-Carlton
4   Aspen Highland members, which effectuated the role of
5   that.
6       The program manager was to manage the
7   reservation program for that particular resort for
8   their allocated time and to also, in the future, look
9   at the ability to move to sister clubs.
10  BY MR. REISER:
11      Q. Okay. There's one other -- well -- so
12  Exhibit 2102, which is the November 2013
13  affiliation --
14      A. Is that back to here?
15      Q. The one you have in front of you, yes. I
16  mean, I understand it came into being so that the
17  Marriott Vacation Club could affiliate with Lion &
18  Crown. You mentioned that earlier.
19      But who initiated the preparation of this
20  agreement, if you know?
21      A. It would've been the -- Lion & Crown would
22  have initiated the ability to affiliate with Marriott
23  Vacation Club Destinations.
24      Q. So Lion & Crown -- strike that. You were an
25  officer of Lion & Crown at the time this affiliation

Page 11

1   was prepared. True?
2       A. That's correct.
3       Q. Did you have a role as an officer of Lion &
4   Crown to instruct the legal department or -- your
5   legal department -- strike that.
6       As the officer of Lion & Crown that was
7   contemplating an affiliation with the different Ritz
8   Clubs, was it you that initiated the preparation of
9   this November 2013 affiliation agreement?
10      A. I'm sorry. This was about Lion & Crown with
11  Marriott Vacation Club. You said with the other Ritz
12  Clubs. That was a different affiliation, where Lion &
13  Crown affiliated with Cobalt.
14      Q. Okay. But you're aware -- if you look at
15  Exhibit B to that agreement, the very last four pages
16  of the agreement?
17      A. Okay, yes.
18      Q. Can you just read the title of Exhibit B to
19  the November 2013 affiliation agreement?
20      A. "Acknowledgement of and joinder to
21  affiliation agreement between Lion & Crown Travel
22  Company, LLC, and Marriott Resorts Travel Company,
23  Inc."
24      Q. Was it your understanding, as the officer of
25  Lion & Crown, that -- strike that. Let me get some

Page 12

1   foundation.
2       Is it true that you, as the officer of Lion &
3   Crown, are responsible for -- strike that. Were you
4   the officer of Lion & Crown that was responsible for
5   the November 2013 affiliation agreement being created?
6       A. Yes. I mean, there was an agreement to
7   affiliate, or we had chosen to affiliate. I was the
8   officer, and it was my decision to affiliate MVCD with
9   Lion & Crown.
10      Q. So you were the program manager for Cobalt at
11  the same time. True? Or -- I'm sorry -- the chief
12  decision maker for Cobalt?
13      A. I was an officer in Cobalt, yes.
14      Q. Okay. And as that officer, were you the
15  chief decision maker in that company?
16      A. Yes.
17      Q. So you first, as a Cobalt officer, affiliated
18  The Ritz-Carlton Destination Club with the Lion &
19  Crown club originally, true, in a 2010 agreement?
20      MR. SELLINGER: Objection to form.
21      A. Cobalt has the affiliation with the
22  associations of the various clubs -- with each of the
23  clubs. Then Cobalt had an affiliation in 2010 with
24  Lion & Crown.
25  BY MR. REISER:

Page 13

4 (Pages 10 - 13)

1    Q. That created a potential external exchange
2  program. True?
3    A. I believe the purpose for Lion & Crown was to
4  affiliate with other external clubs.
5    Q. Okay. So Lion & Crown was responsible for --
6  I'm sorry. Cobalt was responsible for initiating the
7  creation of Lion & Crown. True?
8    A. That's correct.
9        MR. SELLINGER: Objection to form.
10    A. I believe that's true.
11  BY MR. REISER:
12    Q. And then, with that affiliation agreement
13  established, Lion & Crown then made the decision to
14  prepare and create the November 2013 affiliation
15  agreement which would allow individual clubs to join
16  into the November 2013 affiliation agreement.
17    Is that a fair description?
18        MR. SELLINGER: Objection to form.
19    A. No. The 2013 agreement affiliated Lion &
20  Crown with MVCD. That affiliation occurred at the
21  execution of that agreement.
22  BY MR. REISER:
23    Q. It was Cobalt that instructed Lion & Crown to
24  affiliate with MVCD?
25    A. No.

Page 14

1    Q. So in an effort for Lion & Crown to then
2  affiliate individual Ritz-Carlton Destination Clubs as
3  component sites under the November 2013 agreement,
4  they would need to sign an acknowledgement of and
5  joinder to the November 2013 affiliation agreement.
6  True?
7        MR. SELLINGER: Objection to form.
8    A. No. Like I said, the affiliation between
9  Lion & Crown and MVCD occurred. And when this 2013
10  agreement was executed, the acknowledgement agreement
11  was put in place for -- we made a special accomodation
12  to allow each association to determine whether they
13  wished to allow their members to participate in that
14  affiliation.
15  BY MR. REISER:
16    Q. All right. Who made a special accomodation
17  to allow the associations to participate in that
18  decision?
19    A. Lion & Crown did.
20    Q. So Lion & Crown, in entering into the
21  November 2013 affiliation agreement with Marriott
22  Vacation Club Destinations, provided in that agreement
23  that each association would have the right to join the
24  affiliation agreement. True?
25        MR. SELLINGER: Objection to form.

Page 16

1    Q. So Lion & Crown had its own authority to
2  choose new affiliation agreements under the terms of
3  the 2010 agreement?
4        MR. SELLINGER: I'm sorry. I'm trying to
5     review the question to see if I have an
6     objection. Just read it back for me.
7        THE REPORTER: "So Lion & Crown had its
8     own authority to choose new affiliation
9     agreements under the terms of the 2010
10     agreement?"
11    A. Lion & Crown had the right to affiliate with
12  other clubs and programs and it was their right.
13  BY MR. REISER:
14    Q. That right derived from the authority of
15  Cobalt initially. Would you agree?
16        MR. SELLINGER: Objection to form.
17    A. The right for Lion & Crown to affiliate was
18  called out in the agreement between Cobalt and Lion &
19  Crown.
20  BY MR. REISER:
21    Q. Correct. Okay. So Cobalt, in the agreement
22  between Cobalt and Lion & Crown, in terms of that
23  agreement, provided that Lion & Crown could then use
24  its powers under that agreement to affiliate --
25    A. Affiliate, yes. That's correct.

Page 15

1    A. No. The 2013 agreement, at the execution of
2  that agreement, the affiliation was accomplished.
3  So --
4  BY MR. REISER:
5    Q. I understand that.
6        MR. SELLINGER: Hold on. Just let him
7     finish.
8        MR. REISER: Sorry.
9        MR. SELLINGER: Go ahead.
10    A. So the accomodation was to allow each
11  association to determine whether they wanted to allow
12  their members to take advantage of the affiliation
13  that had already been created.
14  BY MR. REISER:
15    Q. So at the time the affiliation was created,
16  no Ritz-Carlton Clubs had executed a joinder in the
17  affiliation. True?
18    A. I believe that's true.
19    Q. Okay. So before -- between the time the
20  affiliation was created on November 14, 2013 -- what
21  was the first association that signed the
22  acknowledgement and joinder?
23    A. I don't recall which one, what the order was.
24    Q. So even though the affiliation agreement
25  between Lion & Crown and Marriott Vacation Club

Page 17

5 (Pages 14 - 17)

Destinations was created on November 4, 2013, it
wasn't until April 24, 2014, when Randy Mercer signed
the acknowledgement of and joinder to the affiliation
agreement, that Marriott Vacation Club members had the
right to participate in or have access to Ritz-Carlton
Club Aspen.  True?

A.  No.  They had access to The Ritz-Carlton
Club, Aspen, in advance of that through
developer-owned inventory that was made available
through the Explorer Program component of the MVCD
program.

Q.  Putting aside that, which ended when the
developer-owned inventory sold out, that access to the
club through that, as you just said, required the
develop to have developer-owned inventory.  True?

A.  That's correct.

Q.  Once that developer-owned inventory was sold
out, there would be no access to Marriott Vacation
Club members through that program; correct?

MR. SELLINGER:  Objection to form.

A.  Once the developer had no inventory, they
would not be able to -- Ritz-Carlton, Aspen -- I'm
sorry -- Marriott Vacation Club Destination club
members wouldn't be able to get access into Aspen
through the Explorer Program because it wouldn't have

Page 18

MR. SELLINGER:  Objection to form.

A.  The signing -- the acknowledgement was a step
in the process, clearly.  The members, before anybody
could -- from MVCD -- could come into Aspen, somebody
had to come out of Aspen.  So until all those steps
occurred, there couldn't be somebody coming in.

BY MR. REISER:

Q.  But without the joinder and acknowledgement
to the affiliation agreement signed by Randy Mercer on
April 24, 2014, it was impossible for a member of the
Marriott Vacation Club to access The Ritz-Carlton Club
through the November 2013 affiliation agreement.
True?

MR. SELLINGER:  Objection to form.

A.  I think the steps were that -- trying to
understand the nuance to your question.  The signing
of the acknowledgement agreement, that was them
indicating to us that they would allow the members to
come in.

The other component of that agreement was to
ensure that, as MVCD members came into Aspen, that
they would accommodate those customers that came in.
Those are the steps.

MR. REISER:  Can you read back the
question?

Page 20

existed.

BY MR. REISER:

Q.  Okay.  So the access of Marriott Vacation
Club members through affiliation is separate from the
access through the Explorer Program; right?

A.  That's correct.

Q.  Now I'm just talking about access through the
affiliation program.  It wasn't until April 24, 2013,
when Randy Mercer signed the acknowledgement of and
joinder to the November 2013 agreement that Marriott
Vacation Club members could obtain access to the
Ritz-Carlton, Aspen through the affiliation program.
True?

A.  Well, at the signing, what that allowed was
for the Ritz-Carlton, Aspen members to -- through Lion
& Crown -- to access the Marriott Vacation Club
Destinations product; which, in turn, made their
inventory available for Marriott Vacation Club
Destinations members to be able to come into Aspen.

Q.  Correct.  So that's -- okay.  Until that was
signed, and until members were able to put -- members
of Ritz were able to put their inventory into the Lion
& Crown, no Marriott Vacation Club members could have
access to the Ritz Club through the affiliation.
True?

Page 19

THE REPORTER:  "But without the joinder
and acknowledgement to the affiliation
agreement signed by Randy Mercer on April 24,
2014, it was impossible for a member of the
Marriott Vacation Club to access The
Ritz-Carlton Club through the November 2013
affiliation agreement.  True?"

THE WITNESS:  I believe that's true.

BY MR. REISER:

Q.  So whether it was a special accomodation that
is provided for in the November 2013 affiliation
agreement or a contractual right that was given to the
associations under the terms of the November 2013
affiliation agreement, association action in the form
of signing an acknowledgement and joinder to the
November 2013 agreement was required before Marriott
Vacation Club members could access the Ritz-Carlton,
Aspen through the affiliation agreement?

MR. SELLINGER:  Objection to form.

MS. LIVINGSTON:  Objection to form.

BY MR. REISER:

Q.  Is that true?

MR. SELLINGER:  Could you read the
question back?

THE REPORTER:  "So whether it was a

Page 21

6 (Pages 18 - 21)

1  special accomodation that is provided for in
2  the November 2013 affiliation agreement or a
3  contractual right that was given to the
4  associations under the terms of the
5  November 2013 affiliation agreement,
6  association action in the form of signing an
7  acknowledgement and joinder to the
8  November 2013 agreement was required before
9  Marriott Vacation Club members could access
10  the Ritz-Carlton, Aspen through the
11  affiliation agreement?
12      THE WITNESS: I still go back to -- my
13  answer is, the steps in the process that we
14  had laid out were -- the affiliation was
15  created; at that point, the clubs were
16  affiliated. As a special accomodation, we
17  allowed the association to sign the
18  acknowledgement indicating their support for
19  the members to be able -- from each of the
20  individual clubs -- in this case, Aspen -- to
21  be able to trade their inventory in.
22      And they're acknowledging they would, in
23  turn, properly service the MVCD customers
24  that came into that inventory.
25  BY MR. REISER:

Page 22

1      Q. Okay. As I understand what you're saying is,
2  prior to -- I think we both agree, after this
3  question-and-answer period, that prior to the
4  association signing the acknowledgement and joinder,
5  no Marriott Vacation Club member could access The
6  Ritz-Carlton Club, Aspen through the November 2013
7  affiliation agreement? It was one of the steps that
8  was required --
9      A. Right; that's correct.
10     Q. Okay. And I understand this affiliation
11  agreement also obligated the Ritz-Carlton Aspen Club,
12  by them acknowledging and joining it, to service those
13  members that were coming in through the affiliation
14  agreement. True?
15     A. That's correct.
16     Q. And you've got the affiliation agreement in
17  front of you -- at least the main body of the
18  affiliation agreement without exhibits -- it's
19  19 pages long and it's signed by you on page 19.
20  True?
21     A. That's correct.
22     Q. And the fact that the Aspen Highlands
23  Association, through Randy Mercer as president, signed
24  the acknowledgement and joinder to the affiliation
25  agreement on April 24, 2014, that signature by the

Page 23

1  association and the acknowledgement of the joinder to
2  this agreement obligated the association to abide by
3  the terms in these 19 pages of the affiliation
4  agreement. True?
5      MR. SELLINGER: Objection to form.
6      MS. LIVINGSTON: Object to form.
7      A. You're asking -- did the acknowledgement
8  agreement bind them to this?
9  BY MR. REISER:
10     Q. Correct.
11     A. The acknowledgement agreement, as I said, was
12  their indication to us that the Aspen members would be
13  able to participate, to utilize the affiliation in
14  exchange through MVCD. And it calls out some specific
15  components within the affiliation agreement that they
16  are agreeing to and being bound by.
17     Q. So by acknowledging and joining the
18  November 2013 affiliation agreement, the Aspen
19  Highlands Association, on April 24, 2014, agreed to be
20  bound by the terms of the November 2014 affiliation
21  agreement. True?
22     MR. SELLINGER: Objection to form.
23     A. The terms that were called out in the
24  acknowledgement agreement.
25  BY MR. REISER:

Page 24

1      Q. Which terms are those? Do you -- strike
2  that.
3      A. Can I have the --
4      Q. Sure. Let me just ask you this. Do you
5  believe that the terms of the -- strike that.
6      Do you believe that the association was only
7  bound by the terms that were spelled out in the
8  acknowledgement and joinder, or do you believe that
9  the association was bound by the entirety of the
10  November 2013 affiliation agreement?
11     A. I don't know. I'd have to go to what was
12  called out and compare that to what was missing. I
13  haven't done that.
14     Q. It seems like you're taking great pains to
15  call this an acknowledgement agreement, when the title
16  actually is "The acknowledgement of and joinder to
17  affiliation agreement."
18     Why do you not choose to name this "The
19  acknowledgement of and joinder to affiliation
20  agreement," and you choose to call it "The
21  acknowledgement agreement"?
22     MR. SELLINGER: Objection to form.
23     A. Well, I was referring -- as you look through
24  the various components in the affiliation agreement,
25  it talks about the acknowledgement agreement, has a

Page 25

7 (Pages 22 - 25)

1  definition for the acknowledgement agreement. I was
2  just using that term.
3  BY MR. REISER:
4       Q. Okay. So the first line of the
5  acknowledgement of and joinder to the affiliation
6  agreement doesn't read, "This acknowledgement of and
7  joinder to affiliation agreement between Lion & Crown
8  Travel Company and Marriott Resorts Travel Company
9  (Acknowledgement)"?
10      So as a shorthand, you can call it
11 acknowledgement. When you say "acknowledgement,"
12 you're just using a shorthand for the actual title of
13 the agreement, which is the acknowledgement of and
14 joinder to affiliation agreement.
15      Isn't that true?
16      A. I am using the -- if you go to page 3 of the
17 agreement, there is a defined term, acknowledgement
18 agreement, which means acknowledgement and joinder to
19 affiliation agreement. That's why I'm using the term
20 "acknowledgement agreement."
21      Q. Okay. Thank you. Appreciate that.
22      So you would agree, though, that this
23 acknowledgement of and joinder to the affiliation
24 agreement includes both an acknowledgement and a
25 joinder to the agreement. True?
                                            Page 26

1       MR. SELLINGER: Objection to form.
2       MS. LIVINGSTON: Objection.
3       A. I'm not sure I know what a "joinder to" is.
4  I believe that's a legal term. I know what an
5  acknowledgement is.
6  BY MR. REISER:
7       Q. Is there a reason why this acknowledgement --
8  is there a reason why this affiliation agreement,
9  dated November 2013, was never provided to any of the
10 boards that signed a joinder to it?
11      A. I'm not aware of whether it was or was not
12 provided to the boards.
13      Q. Pardon? Can you repeat that? I'm sorry.
14      A. I'm not aware of whether it was or was not
15 provided to the boards.
16      Q. Was there a policy to not provide it to the
17 board that was decided by Lion & Crown?
18      MR. SELLINGER: Objection to form.
19      A. If you're -- the simple answer is no. If
20 you're insinuating that we would be trying to hide
21 this, that doesn't make sense. Clearly, the agreement
22 existed. It was referred to in the -- I don't know
23 how many times -- in the acknowledgement agreement,
24 and so there was no hiding of the fact that this
25 agreement existed.
                                            Page 27

1       I guess, if the boards wanted it, they could
2  ask for it or -- like I said, I don't know whether
3  they did or didn't have it.
4  BY MR. REISER:
5       Q. Well, we've taken the depositions of the
6  board members in San Francisco and Tahoe.
7       Are you aware of that?
8       A. I am now.
9       Q. Several of them work for you. One guy's name
10 is Nathan Guikema. Does he report to you?
11      A. No, he does not.
12      Q. Who does he report to?
13      A. He reports to John Albert.
14      Q. Do you know that Nathan Guikema was the
15 president of the San Francisco association who signed
16 the acknowledgement of and joinder?
17      A. I know he was president. I haven't gone back
18 and checked the signatures on the...
19      Q. Have you heard that he testified that he had
20 never seen that agreement?
21      A. I did not know that.
22      Q. Do you know a guy named Charles Baron?
23      A. Yes.
24      Q. Did you know he was on the Tahoe board when
25 this was signed -- the acknowledgement for the Tahoe
                                            Page 28

1  board was signed?
2       A. I didn't. I knew he was on the Tahoe board.
3  I didn't know the timing.
4       Q. Did you know that he testified he had never
5  seen the November 2013 affiliation agreement?
6       A. I did not.
7       Q. Had you ever seen the affiliation agreement
8  between the joinders were signed?
9       A. I signed the agreement. I saw it at some
10 point in time. Had a high-level review.
11      Q. Are you aware of any board member on any of
12 the three boards that is subject to this deposition --
13 the Tahoe board, the San Francisco board, the Aspen
14 board -- are you aware of any board member that had
15 access to this affiliation agreement before signing
16 the joinder?
17      MR. SELLINGER: Objection to form.
18      A. As I said before, I'm not aware of whether
19 they did or did not have access or had a copy of it.
20 BY MR. REISER:
21      Q. You had a meeting with Randy Mercer in
22 November of 2013, the day before the signature on the
23 affiliation agreement in November 2013.
24      Do you remember that? It was in Orlando.
25      A. I remember meeting with Mr. Mercer in
                                            Page 29

8 (Pages 26 - 29)

Page 30

```
 1   Orlando.  I don't know whether those are the dates.
 2       Q.  Do you remember giving or discussing with
 3   Mr. Mercer, during that November 2013 trip, the
 4   affiliation agreement that is marked as Exhibit 2102?
 5       A.  I don't remember what the discussion was at
 6   the meeting.
 7       Q.  Do you believe that Lion & Crown is a
 8   fiduciary to the members of the several clubs?
 9       MR. SELLINGER:  Objection to form.
10   BY MR. REISER:
11       Q.  The Ritz-Carlton Clubs.
12       MR. SELLINGER:  Objection to form.
13       A.  I don't know that -- I don't know exactly
14   what you mean by fiduciary.  They don't have a duty to
15   the members, I don't believe -- Lion & Crown doesn't.
16   BY MR. REISER:
17       Q.  What about Cobalt; do you believe they have a
18   duty to the members?
19       A.  No.
20       MR. SELLINGER:  Objection to form.
21   BY MR. REISER:
22       Q.  Do you believe the Ritz-Carlton Management
23   Company has a duty to the members?
24       MR. SELLINGER:  Objection to form.
25       A.  No, not to the -- not to the members, no.
```

Page 31

```
 1   BY MR. REISER:
 2       Q.  Have you read the opinion dated March 29,
 3   2018 that was issued by Judge Brimmer in the Aspen
 4   case?
 5       A.  No.
 6       Q.  Have you heard about his ruling?
 7       A.  I'm sorry.  When was this?
 8       Q.  March 29, 2018.
 9       Q.  What was the ruling in regards to?
10       Q.  The motion to dismiss.
11       A.  I got a high-level brief on that, that --
12       MR. SELLINGER:  Let me just stop you for
13       a moment.  To the extent that -- in answering
14       the question, I instruct you not to disclose
15       communications with counsel.  To the extent
16       you're able to answer the question without
17       disclosing communications with counsel, you
18       can do that.
19       A.  What I am aware of is that there was -- the
20   motion to dismiss was granted in part and denied in
21   part.  That's really the extent of my understanding.
22   BY MR. REISER:
23       Q.  Did you ever read the order?
24       A.  No.
25       Q.  Did you get that understanding from
```

Page 32

```
 1   attorneys?  Because I don't want to delve into it if
 2   you did, is all I'm saying.
 3       MR. SELLINGER:  Well --
 4       MR. REISER:  Without waiving anything.
 5       I'm trying to lay some foundation for where
 6       he learned this knowledge.
 7       MR. SELLINGER:  I don't think that's the
 8       right way to do it.  I don't object to your
 9       foundation, but that's a question that calls
10       for attorney-client privileged information.
11   BY MR. REISER:
12       Q.  Other than through attorneys at Marriott,
13   that represent Marriott folks and Marriott defendants,
14   have you discussed the order with anybody else?
15       A.  No.
16       Q.  Do you believe that the associations in
17   California had duties to the members during the time
18   that they were controlled by board members appointed
19   by Marriott?
20       MR. SELLINGER:  Objection to form.
21       A.  I'm sorry.  Can you say that again or read it
22   back to me?
23   BY MR. REISER:
24       Q.  Do you believe that the San Francisco
25   association had a duty -- had a fiduciary duty -- to
```

Page 33

```
 1   the members of the San Francisco Ritz-Carlton Club
 2   during the time period that the board was controlled
 3   by appointees of Ritz-Carlton Development Company?
 4       MR. SELLINGER:  Objection to form.
 5       A.  I'm not sure whether the association -- the
 6   board members have a fiduciary duty to the members or
 7   not.  I don't think it would matter whether they
 8   were -- if there is a fiduciary duty, it's -- it is in
 9   place whether they're developer-appointed or members
10   that are elected to the board.  But I don't know
11   whether there is a fiduciary duty there.
12   BY MR. REISER:
13       Q.  Okay.
14       A.  Not my expertise.
15       Q.  You've never held the opinion -- strike that.
16   You're an officer of Ritz-Carlton Management Company
17   as well.  True?
18       A.  That's true.
19       Q.  Is it your -- do you have any understanding
20   of any duties that the -- strike that.
21       Tell me your understanding of any duties that
22   the Ritz-Carlton Management Company owed to the
23   individual members of The Ritz-Carlton Club in, say,
24   San Francisco.
25       MR. SELLINGER:  So two things.  Apart
```

9 (Pages 30 - 33)

1  from having already covered this, this has
2  got nothing to do with the
3  subsequently-disclosed documents.
4      MR. REISER:  It does, actually.
5      MR. SELLINGER:  How?
6      MR. REISER:  There's a duty of full
7  disclosure to disclose things related to
8  decisions such as affiliation.  If the
9  Ritz-Carlton Management Company had -- I want
10  to see if he realizes, you know -- if he
11  understands that a -- if he understands that
12  a fiduciary would be required to turn over
13  all relevant information -- fully disclose.
14  I think it is relevant.
15      MR. SELLINGER:  So read the question back
16  again.
17      THE REPORTER:  "Tell me your
18  understanding of any duties that the
19  Ritz-Carlton Management Company owed to the
20  individual members of The Ritz-Carlton Club
21  in, say, San Francisco."
22      MR. SELLINGER:  What does the
23  Ritz-Carlton Management Company have to do
24  with a 2013 affiliation agreement?
25      MR. REISER:  I'm not going to argue with

Page 34

1      MR. SELLINGER:  Do you have a copy of the
2  agreement?
3      MR. REISER:  We can pull one up.  I mean,
4  it's been extensively discovered --
5  extensively discussed in Judge Brimmer's
6  order, paragraphs 4(a) through (b) or
7  whatever with all the different authorities
8  getting crammed into the Ritz-Carlton
9  Management Company, including the
10  discretionary authority pointed out by Judge
11  Brimmer that he thought posed a fiduciary
12  duty under the management agreement.
13      MR. SELLINGER:  I disagree with your
14  reading of the decision, but that's not
15  relevant here.  You're asking the witness
16  about an agreement without showing him the
17  agreement.  I don't think that's fair.
18      MR. REISER:  I am.  I'm asking his
19  understanding of that agreement without
20  reading the agreement.  If he doesn't
21  understand it, then he doesn't understand it.
22      THE WITNESS:  I don't know all the
23  particular requirements or activities that
24  are outlined in the management agreement.  I
25  know the high-level responsibilities, which I

Page 36

1  you on the record.  If you want to instruct
2  him not to answer, I guess we'll be back for
3  a fourth time here.  I think he should answer
4  the question, Philip.
5      MR. SELLINGER:  I'm not instructing him,
6  but it goes well beyond -- all of those
7  fiduciary questions go well beyond the
8  subsequently-disclosed documents, but let's
9  try and get through it.
10      Objection to form.
11      MR. REISER:  Thanks.
12      THE WITNESS:  The responsibility of the
13  management company is to provide the facility
14  services, the check-in, check-out, cleaning,
15  so forth, manage within the budget provided
16  by the -- that's approved by the
17  association -- and bill to the association to
18  perform all of the hospitality functions, and
19  to do that within the standards set by The
20  Ritz-Carlton Destination Club.
21  BY MR. REISER:
22      Q.  The Ritz-Carlton Management Company is also
23  responsible for providing services to the board of
24  directors, true, under the terms of the management
25  agreement?

Page 35

1  previously discussed.
2      MR. REISER:  Can you put that up on two
3  pages on the screen?
4      MR. SELLINGER:  So if you're going to ask
5  him about the management agreement, which,
6  again, has nothing to do with the
7  subsequently-disclosed documents, you should
8  give him the document and not cherry pick
9  provisions to look at.  I don't think that's
10  fair.
11      MR. REISER:  I don't have the document
12  with me right now, so we're using the screens
13  that we brought here for Trial Director.
14  It's right in front of him.  It's the
15  management agreement.  It's very familiar to
16  this case.  It's been the subject of motions
17  to dismiss.  It's going to be extensively
18  discussed here.
19      He's the Ritz-Carlton Management Company
20  officer.  These are very basic agreements
21  that he's responsible for.  I'm going to ask
22  him about them.  If he doesn't have a copy,
23  you can take a break and get him a copy if
24  you think it's necessary.
25  BY MR. REISER:

Page 37

10 (Pages 34 - 37)

1  Q. I'm going to ask you to -- first question I'm
2  going to ask is -- the paragraph number two of the
3  Ritz-Carlton Management Company, LLC management
4  agreement. It says, "Appointment and acceptance of
5  agency."
6      And it reads, "The association hereby employs
7  the management company to act on behalf of the
8  association and its members" --
9      A. I can read that.
10     MR. SELLINGER: Well, you've now -- I
11 don't understand. You've got something on
12 the screen that you can't read. It's small
13 print.
14     MR. REISER: Hold on a second. Your
15 witness just said he could read it. He asked
16 for that to be taken down, so --
17     MR. SELLINGER: The witness did?
18     THE WITNESS: I can read it.
19     MR. SELLINGER: I'm sorry. I didn't hear
20 that.
21 BY MR. REISER:
22     Q. It says, "The association hereby employs the
23 management company to act on behalf of the association
24 and its members as the exclusive managing entity of
25 the condominium and to manage the daily affairs of the

Page 38

1  record. The time is 10:59 a.m.
2      (Brief recess.)
3      THE VIDEOGRAPHER: We are back on the
4  video record. The time is 11:06 a.m.
5      Counsel, you may proceed.
6  BY MR. REISER:
7      Q. So I was asking about the appointment of --
8  about an acceptance of the agency section --
9      A. I saw that.
10     Q. Okay. We're talking about that -- let me
11 just finish off that one. I was going to move on to
12 paragraph 4.
13     You agree that this management agreement
14 employs the management company to act on behalf of the
15 association and its members to be the exclusive
16 managing entity of the condominium (inaudible) of the
17 condominium plan?
18     A. Yes.
19     Q. Number four, there's a delegation of
20 authority. You're aware that the management agreement
21 provides that, "except to the extent prohibited by
22 applicable law, the association hereby delegates the
23 management company of all of the power and authority
24 of the condominium association to the extent necessary
25 to perform the management company's duties and

Page 40

1  condominium and the plan, and the management company
2  hereby agrees to act."
3      You understand that the management company is
4  acting on behalf of the association and its members
5  pursuant to this agreement?
6      MR. SELLINGER: Objection to form.
7      A. It says -- yeah -- "to act on behalf of the
8  association and its members." I wanted to read the
9  rest of the clause, as opposed to...
10 BY MR. REISER:
11     Q. Okay. Feel free. I'm going to ask you about
12 the fourth paragraph next called "Delegation of
13 authority."
14     A. Okay.
15     Q. Would you agree that the association agreed
16 to -- I'm sorry -- the management company agreed to
17 act on behalf of the association and its members?
18     MR. SELLINGER: Objection to form.
19     A. It's moved. They changed the screen.
20     MR. REISER: Can you put it back, please.
21     THE WITNESS: Could we not move it
22 around?
23     MR. REISER: Let's take a break.
24     MR. SELLINGER: Get the agreement.
25     THE VIDEOGRAPHER: We're going off the

Page 39

1  obligations under this agreement"?
2      A. I see that.
3      Q. And that's your understanding of the
4  delegation of the power and authority from the
5  association to the management company; right?
6      MR. SELLINGER: Objection to form.
7      A. That is the agreement.
8  BY MR. REISER:
9      Q. Okay. And then the agreement lists
10 subparagraphs A through B in terms of individual
11 powers that the association has also delegated to the
12 Ritz-Carlton Management Company. True?
13     A. I think it's itemizing certain components of
14 what has been delegated, yes.
15     Q. And prior to each association meeting --
16 board meeting -- isn't it true that the Ritz-Carlton
17 Management Company is responsible for providing
18 pre-reads to the board that are going to be -- matters
19 that are going to be discussed at the meeting?
20     MR. SELLINGER: Objection to form.
21     A. Our association governance group provides out
22 an agenda, and sometimes there are pre-reads with that
23 agenda. Not always.
24 BY MR. REISER:
25     Q. Okay. The association -- the Ritz-Carlton

Page 41

11 (Pages 38 - 41)

| | |
|---|---|
| 1 Management Company keeps all the books and records of | 1 Q. Well, I mean, you can speak for the |
| 2 the association. True? | 2 Ritz-Carlton Management Company who's got the |
| 3 A. That's correct. | 3 responsibility for maintaining their records. True? |
| 4 Q. Including any affiliation agreements? | 4 A. I can speak for that, yes. |
| 5 A. Any affiliation agreement with the | 5 Q. And, as you mentioned, the Ritz-Carlton |
| 6 association -- with the association -- they would. | 6 Management Company does keep the records of the |
| 7 Q. Any affiliation agreement that would be -- | 7 association. True? |
| 8 that would -- through which the association would be a | 8 A. The Ritz-Carlton Management Company, as part |
| 9 party to through an acknowledgement and joinder would | 9 of their duties, keeps their records of the |
| 10 be kept by the Ritz-Carlton Management Company; | 10 association. I could see them keeping any document |
| 11 correct? | 11 where the association is a party to that document. |
| 12 MR. SELLINGER: Objection to form. | 12 Q. Would you expect the November 14, 2013 |
| 13 A. Any affiliation group -- any affiliation | 13 affiliation agreement, given that it was joined by the |
| 14 agreement between the association and the -- between | 14 association, to be within the association's files -- |
| 15 the association and another group would be kept as | 15 MR. SELLINGER: Objection to form. |
| 16 part of the association records. The acknowledgement | 16 BY MR. REISER: |
| 17 agreement, I would assume, would be kept as well as | 17 Q. -- as maintained by the Ritz-Carlton |
| 18 part of the agreements. | 18 Management Company? |
| 19 BY MR. REISER: | 19 A. I don't know why -- I don't know whether that |
| 20 Q. What about the actual affiliation agreement | 20 would be kept there or not. |
| 21 as it pertains to the acknowledgement agreement? | 21 Q. All right. What was your involvement in |
| 22 A. I don't know the technical -- whether that | 22 drafting the November 14, 2013, affiliation agreement, |
| 23 would've been subject to being kept or not. | 23 if any? |
| 24 Q. Can you think of any reason why the | 24 A. I didn't have any involvement in drafting it. |
| 25 association would not keep in its records the | 25 Q. Okay. Ms. Sobeck's deposition was taken |
| Page 42 | Page 44 |
| 1 affiliation agreement dated November 14, 2013? | 1 earlier this week on Tuesday. Her response to the |
| 2 MR. SELLINGER: Objection to form. | 2 question of "Why didn't the Ritz-Carlton Management |
| 3 A. I have no idea whether they have it or don't | 3 Company give a copy of the affiliation agreement to |
| 4 have it. As I said before, if they had it, I would | 4 the board in Aspen" was that they didn't ask for it. |
| 5 expect them to keep it. | 5 Are you aware of her testimony in that |
| 6 BY MR. REISER: | 6 regard? |
| 7 Q. So we've subpoenaed or asked for all | 7 MR. SELLINGER: Objection to form. |
| 8 documents related to the affiliation agreement from | 8 A. No, I'm not. I haven't spoken to Ms. Sobeck |
| 9 the Aspen Highlands Association, and they provided | 9 about her testimony. |
| 10 their complete file in this case responsive to a | 10 BY MR. REISER: |
| 11 request. | 11 Q. Do you agree with her that the Ritz-Carlton |
| 12 Are you aware of that? | 12 Management Company had no duty to provide the |
| 13 A. I'm aware that they were -- they were | 13 affiliation agreement that was being joined unless the |
| 14 requested to provide -- disclose all their documents. | 14 association asked for it? |
| 15 Q. Are you aware that, in that disclosure, there | 15 MR. SELLINGER: Objection to form. |
| 16 was no November 13, 2014 affiliation agreement | 16 A. I don't think -- I don't know that we had a |
| 17 contained within their records? | 17 duty to provide the agreement. We were -- we |
| 18 A. No. | 18 certainly weren't hiding the agreement. It's |
| 19 Q. Can you see any reason why the association | 19 referenced, I don't know how many times, in the |
| 20 would not have within their records a copy of the | 20 acknowledgement agreement. |
| 21 November 14th, 2013 affiliation agreement? | 21 BY MR. REISER: |
| 22 MR. SELLINGER: Objection to form. | 22 Q. So under the management agreement, the |
| 23 A. I can't speak for them, but I don't know why | 23 management company was provided the authority to -- |
| 24 they wouldn't. | 24 was provided all the power and authority of the |
| 25 BY MR. REISER: | 25 condominium association to the extent necessary to |
| Page 43 | Page 45 |

12 (Pages 42 - 45)

1  perform the management company's duties and
2  obligations under the agreement.
3      Did the management company represent the
4  association in relation to the execution of the
5  joinder and acknowledgement?
6      MR. SELLINGER: Objection to form.
7      A. No.
8  BY MR. REISER:
9      Q. As the management company that is delegated
10  all the power and authority of the association board
11  to the extent allowed by law pursuant to the
12  management agreement, do you think it was responsible
13  for the association at Aspen to sign a joinder to an
14  agreement that they had never seen?
15      MR. SELLINGER: Objection to form.
16      MS. LIVINGSTON: Objection.
17      A. Can you ask that question again or read it
18  back?
19      MR. REISER: Sure. Can you read it back?
20      THE REPORTER: "As the management company
21      that is delegated all the power and authority
22      of the association board to the extent
23      allowed by law pursuant to the management
24      agreement, do you think it was responsible
25      for the association at Aspen to sign a

Page 46

1  joinder to an agreement that they had never
2  seen?"
3      THE WITNESS: They didn't sign -- the
4      management company wasn't party to the
5      agreement -- the acknowledgement agreement.
6  BY MR. REISER:
7      Q. I understand, but they were managing the
8  conduct of the board; were they not?
9      MR. SELLINGER: Objection to form.
10      A. No --
11      MS. LIVINGSTON: Objection.
12      A. -- we had made -- they were delegating
13  certain powers. We had, as part of the affiliation,
14  agreed with -- to provide the accomodation to allow
15  the association board to execute the acknowledgement
16  not to allow their members to participate. We
17  hadn't -- that wasn't delegated to the management
18  company.
19  BY MR. REISER:
20      Q. As an officer of the management company --
21  which you testified earlier today that you were;
22  right?
23      A. Yes.
24      Q. You knew of the November 14, 2013 affiliation
25  agreement before the board signed the joinder. True?

Page 47

1      A. That's true.
2      Q. And did you ever instruct anybody -- strike
3  that. Did you, yourself, or anybody on your behalf,
4  acting on behalf of the management company, feel
5  obligated to provide the affiliation agreement dated
6  November 14, 2013 to the board?
7      MR. SELLINGER: Objection to form.
8      A. I didn't feel obligated to provide a copy of
9  the agreement to the board.
10  BY MR. REISER:
11      Q. You're aware that the Ritz-Carlton Management
12  Company, through Stephanie Sobeck and perhaps
13  yourself, signed an MOU with relation to the
14  affiliation agreement dated in November 2013. True?
15      A. Quite frankly, I'd forgotten about that.
16  As -- through the preparation, I had the opportunity
17  to read through that again, which reminded me that we
18  had entered into that agreement, which was interesting
19  from the standpoint -- it just recapped some of the
20  high points of how the Marriott Vacation Club
21  Destinations Exchange Program would work through Lion
22  & Crown.
23      Q. But listen to my question, Mr. Cunningham.
24  I'm asking you, did Stephanie Sobeck and Lee
25  Cunningham -- I mean, did Stephanie Sobeck and Randy

Page 48

1  Mercer negotiate the terms of the MOU between
2  themselves?
3      A. I have no idea who negotiated that.
4      Q. You never saw any communications from
5  Stephanie Sobeck with relation to the requests that
6  were being made by Randy Mercer in terms of changes to
7  the MOU?
8      A. I don't recall.
9      Q. Are you aware that Stephanie Sobeck made
10  changes to the MOU?
11      A. I'm not.
12      Q. Are you aware that Stephanie Sobeck
13  negotiated the joinder agreement -- the
14  acknowledgement and joinder agreement -- to the
15  November 2013 affiliation agreement with Randy Mercer
16  and Tyler Oliver?
17      A. I'm not aware that that took place.
18      Q. Why was -- well, okay. You have no
19  recollection. You didn't review any e-mails or any
20  drafts of the MOU in preparation for any of your depos
21  in this case?
22      A. Not related to -- that I recall -- related to
23  the drafting of the MOU or the drafting of the
24  acknowledgement agreement.
25      Q. All right. I want to shift gears then for

Page 49

13 (Pages 46 - 49)

1  now and go over some of the strategic council
2  agreements that have been produced recently as well.
3      First of all, I just wanted to ask you -- we
4  received some testimony this week about the strategic
5  council and the members of the strategic council. But
6  I just want to hear you for the record -- if you can
7  tell me which members you recollect were on the
8  strategic council in July of 2012.
9      A. 2012. Steve Weisz, John Geller, Jim Hunter,
10 myself, Brian Miller, Lani Kane-Hanan.
11     Q. Basically, the members of the executive
12 committee for the company?
13     A. Yes. There's two other people. I don't know
14 whether they were voter members on this strategic --
15 oh -- the strategic council?
16     Q. Yes.
17     A. I'm sorry. Dwight Smith and Mike Yonker.
18     Q. The purpose of the strategic council is not
19 to vote on anything. True?
20     A. No. It's not a decision-making body.
21     Q. There's a corporate growth committee that
22 made decisions with regard to the affiliation in this
23 case; is that true?
24     A. There is a corporate growth committee that is
25 a decision-making body relative to, generally, capital

Page 50

1  describes what's going on. Then it has a box for each
2  club.
3      The question is, is that your terminology
4  that this was a luxury segment reengineering? How did
5  that term come to being?
6      A. I don't know whether I coined it or whether
7  somebody else did. It was our way of referring to
8  things that we were considering or contemplating
9  relative to the club overall as opposed to each
10 specific resort location.
11     Q. Okay. I think what I'm going to do first is
12 actually, just because chronologically it's a little
13 cleaner, is talk about the corporate growth committee
14 memo dated May 24, 2012, and then get into the
15 strategic council.
16     So let me show you what we marked this week
17 as what -- exhibit number from May 24 -- 2136.
18     Have you seen Exhibit 2136 before, which is
19 the May 24, 2012 corporate growth committee memo that
20 has the subject "Ritz-Carlton Destination Club
21 proposed strategic plan"?
22     A. Yes.
23     Q. Did you prepare this document?
24     A. It was prepared by a number of people. I
25 guess, you would consider me the sponsor of the

Page 52

1  investment, but...
2  BY MR. REISER:
3      Q. Okay. The members of the corporate growth
4  council basically determine what the strategic
5  council -- in terms of the -- at least all of the
6  members of the executive committee for the company are
7  on both the strategic council and the corporate growth
8  committee. True?
9      A. I'm not a hundred percent positive for Mike
10 Yonker and Dwight Smith; otherwise, I know the other
11 members are.
12     Q. Okay. We've received some testimony this
13 week from both Steve Weisz and Lani Kane-Hanan that
14 the -- what is often times referred to, or repeatedly
15 referred to, in the strategic council updates as the
16 luxury segment reengineering.
17     Both of those witnesses this week have
18 testified that you were pretty much the quarterback
19 for the luxury segment reengineering.
20     Would you agree with that?
21     A. That would be correct.
22     Q. And the term "luxury segment
23 reengineering" -- we can go through this -- but
24 virtually every strategic council report starts with a
25 box called "luxury segment reengineering" and

Page 51

1  activity. It was prepared by a number of people
2  within the organization and then published to the
3  corporate growth committee.
4      Q. Okay. Tony Terry, I understand, is in the
5  finance and accounting department in the company?
6      A. That's correct.
7      Q. He helped you -- he was one of the authors of
8  this report as well?
9      A. He probably was more involved on the
10 financial assessments, but there were other people --
11 many other people -- that were involved in the
12 preparation of the -- as is normal for any document
13 going to our corporate growth committee.
14     Q. Let's go through the requests here. The
15 requests in this memo to the corporate growth
16 committee had five subparts.
17     Do you see that in the beginning of the memo?
18     A. I do.
19     Q. So the first one involved converting the
20 existing 105 RCDC Trust owners to the Marriott
21 Vacation Club Destinations NATO Trust points product
22 or to RCDC home fractional ownership.
23     Did that aspect of this request get
24 ultimately approved and ratified by Steve Weisz?
25     A. I don't recall whether it did at this

Page 53

14 (Pages 50 - 53)

1   particular -- when this was presented.  Ultimately, we
2   did go about -- go about converting those trust
3   members, which are also the Bleu Florida Land Trust
4   members, to the options laid out there.
5       Q. So the first subsection here, Subsection 1,
6   deals with the Bleu Florida Land Trust inventory.
7   True?
8       A. You're talking about number one?  Yes.
9   That's dealing with going to the owners and giving
10  them alternative ownership or options so that they
11  relinquish their ownership in the Bleu Florida Land
12  Trust.
13      Q. Okay.  Whoever prepared this memo -- I know
14  it was a multiparty preparation effort -- but as the
15  sponsor of this effort, you're aware and you knew that
16  you were requesting from the corporate growth
17  committee $1.5 million to use to reacquire all the 105
18  interests that had been bought by folks.  True?
19      A. We were expecting -- we were requesting to
20  spend up to the 1.5 million, not as a purchase, but of
21  inventory of the 105 trust owners.  But the options
22  included transferring their ownership to Marriott
23  Vacation Club Destination points, so there would be
24  the closing costs.
25          So there wasn't -- there wasn't a cash outlay
                                                    Page 54

1   you can actually go down to -- if you can turn to page
2   7 of the memo -- jumping around a little bit, trying
3   to speed this along.
4           It appears from -- page 7 of the memo, it
5   reads, "As mentioned previously, the current strategy
6   reflects the unwind of the RCDC Trust by way of
7   converting the existing 105 RCDC Trust owners."
8   Then it says, "15.5 million cumulative sales."  That's
9   what I wanted to ask you about.
10          Does that mean those 105 RCDC Trust members
11  that paid 15 and a half million dollars for the --
12      A. I think that's correct.
13      Q. Okay.  What I want to get -- when that trust
14  product was reacquired by Ritz-Carlton Development
15  Company, that was then ceded into the NATO Trust.
16  True?
17      A. Into the MVCD Trust, yeah.
18      Q. I just found what the NATO Trust actually
19  stands for -- North American Timeshare Organization.
20  I didn't know that.  Is that the correct acronym?
21      A. Many years ago, like 2007, when we developed
22  an organization structure that had, actually, at the
23  time, four chief operating officers, there was one for
24  North America, one for Europe, one for Asia, and one
25  for The Ritz-Carlton Destination Club.  And so the --
                                                    Page 56

1   for that alternative product to them.  Or if they
2   transferred to ownership of another Ritz-Carlton
3   Destination Club, there wouldn't be a cash outlay
4   there, but there would be expense associated with that
5   transaction.
6       Q. How many of these members actually received a
7   buyout of their interest?
8       A. I don't recall.  I think, by and large, my
9   recollection is that the majority transferred to
10  Marriott Vacation Club Destination points; maybe one
11  or two went to a Ritz-Carlton fractional; and there
12  might have been one or two that received a cash
13  buyout.  I don't recall how it broke down.
14      Q. How many -- I obviously see that there were
15  105 RCDC Trust owners.  How many units did -- were
16  originally -- strike that.
17          How many units were in the RCDC Trust at the
18  time the unwinding process began?
19      A. I don't recall the exact number.  It was, I
20  think, in the single digits.
21      Q. Okay.  Do you know where those units were
22  located, which clubs?
23      A. I remember some of them were San Francisco
24  inventory.  Beyond that, I don't really recall.
25      Q. It appears from this memo that there were --
                                                    Page 55

1   somehow the nickname "North American Timeshare
2   Organization" is what got -- it was an internal -- it
3   wasn't a -- any kind of legal name.  It was just a --
4   how you referred to it.
5       Q. That trust is what holds points that allow --
6   strike that.  That trust holds inventory that allows
7   points to be sold against that inventory, as I learned
8   this week?
9       A. That's correct.
10      Q. Okay.  So at least the five -- strike that.
11  Let's say there were five -- you said single digit
12  units that were purchased or obtained back from the
13  portfolio, RCDC Trust.  Let's just assume it was five
14  hypothetically.
15          Those five units would go into the trust,
16  right, and points associated with those five units
17  would allow -- I'm sorry.  The inventory attached to
18  those five units would then allow a number of points
19  to be sold back by that inventory; right?
20      A. That's correct.
21      Q. And did the financial figures contained in
22  this report show how much points in a dollar amount
23  would be expected from the ultimate sale of points
24  backed by the portfolio inventory that went into the
25  trust?
                                                    Page 57

15 (Pages 54 - 57)

1  MR. SELLINGER: I'm sorry. Read that
2  back for me, please.
3  THE REPORTER: "And did the financial
4  figures contained in this report show how
5  much points in a dollar amount would be
6  expected from the ultimate sale of points
7  backed by the portfolio inventory that went
8  into the trust?"
9  MR. REISER: Let me rephrase before you
10  object.
11  BY MR. REISER:
12  Q. Does Exhibit 2136, which is the May 24, 2012
13  corporate growth committee document -- does this
14  document reveal how much was expected in terms of
15  point sales that would accrue against the new
16  inventory that was going into the trust represented by
17  the portfolio?
18  MR. SELLINGER: Objection to form.
19  A. If you go to, I guess, page 7, economic
20  metric summary?
21  BY MR. REISER:
22  Q. Okay.
23  A. The net -- the development revenue line would
24  be the amount of revenue that was generated as a
25  result of this effort. So if you see zero, you may

Page 58

1  the trust -- that was done as part of this
2  reengineering of The Ritz-Carlton Destination Club --
3  as well as unsold developer inventory in, at least,
4  San Francisco and Tahoe, for our purposes -- unsold
5  developer fractional inventory from those two clubs
6  was also ceded into the trust following the
7  reengineering process. True?
8  MR. SELLINGER: Objection to form.
9  A. In the steps of -- in the various actions
10  that were being contemplated, where we had the rights
11  and the authority to put inventory -- unsold developer
12  inventory -- from The Ritz-Carlton Destination Club
13  into the MVCD Trust. We were planning to do that.
14  BY MR. REISER:
15  Q. Right. Okay. So as I understand it, based
16  on documents I've read -- and you can -- even in the
17  webinar, I think, it was mentioned how much inventory
18  was still owned at the time of the August 2012
19  webinar -- it was laid out, I think, by you -- there
20  was about 25 -- I think the figure was actually
21  27 percent of the total inventory in The Ritz-Carlton
22  Destination Club was unsold at the time of the
23  evolution letter.
24  Is that about right? I'm not going to hold
25  you.

Page 60

1  question why.
2  Well, if I took somebody who was in the Bleu
3  Florida Land Trust, gave them points -- MVCD points --
4  and then, later, I took the inventory that they had
5  relinquished, put that into the MVCD, that just
6  replaced points that I had previously given to the
7  them.
8  Q. Thank you.
9  A. So it's a net zero.
10  Q. Net zero. All right. And the same would not
11  be true for any developer-owned inventory that went
12  into the trust, right, because you're not -- you're
13  not netting out the points in that transaction?
14  MR. SELLINGER: Objection to form.
15  A. So not related to the Bleu Florida Land
16  Trust.
17  BY MR. REISER:
18  Q. Correct.
19  A. If there was a developer-owned Ritz-Carlton
20  Destination Club unit fraction that was put into the
21  MVCD Trust, that would generate points for sale and
22  generate revenues accordingly.
23  Q. All right. So is it true then -- strike
24  that -- strike that. It is true, is it not, that both
25  portfolio inventory that was taken back and put into

Page 59

1  A. I don't know what the exact percentage or --
2  it was a -- there were a number of -- meaningful
3  number of unsold fractionals.
4  Q. Just to try to pin it down -- I appreciate
5  you trying to be precise in your testimony -- here is
6  the webinar -- I think the webinar transcript. It's
7  dated August 28, 2012.
8  If you can take a look at that and let me
9  know if this refreshes your recollection as to how
10  much developer inventory was owned at the time of the
11  evolution or the reengineering of The Ritz-Carlton
12  Destination Club.
13  MR. SELLINGER: I'll just note that this
14  does not have to do with the
15  subsequently-produced documents, but go
16  ahead.
17  MR. REISER: I disagree, but, I mean,
18  you're not in my head, so you don't really --
19  A. Contained in -- I don't know which
20  paragraph -- "Today, luxury demand continues to be
21  very soft and forecasts for luxury real estate market
22  shows little near-term progress for sustained
23  recovery. Approximately 25 percent of the inventory
24  in The Ritz-Carlton Club system remains unsold and the
25  pace of sales is slow."

Page 61

16 (Pages 58 - 61)

BY MR. REISER:

Q. Okay. So there were -- I'm just asking you in rough numbers now. Okay? I don't necessarily need to be precise. But if there were 4,000 total Ritz-Carlton fractionals built -- I think that's the number -- would you agree that's roughly the number that were ultimately built?

A. Let's see. In 2012 -- I'm trying to think -- I don't know what the denominator is, which clubs are included -- for instance in 2012, in August, whether that would have counted. There was still inventory in Abaco. But --

Q. Let me --

A. I don't know. Without going back and looking at an inventory report, I can't tell you whether 4,000 is right or not.

Q. Do you have any estimate, as you sit here today, stripping away the fractionals that -- strike that.

How many unsold inventories did Ritz-Carlton Destination Club just roughly have in the Kapalua club at the time that deal was deflagged?

A. We had sold very little. Once again, I'd have to go back and get an inventory report. I'm not trying to be evasive. I just don't recall the size

Page 62

of -- in that particular project, there were fractional units, there were whole ownership units, there were -- I don't remember the split.

Q. Let me ask you this. What happened to the unsold fractional inventory at Kapalua after the termination?

A. The whole development was sold and that inventory went with it. I do not know what they -- I don't recall what they ultimately did with the unsold fractional; whether they converted it to whole ownership or continued to sell fractional or used it as hotel.

Q. Got you. But at any rate, the unsold fractional interests that were owned by the JV group sold all that to the buyer?

A. That's correct.

Q. You did retain maybe one or two or something, because I know at least Steve Andrews, who was a former board member at San Francisco, traded his San Francisco unit for a Kapalua unit.

A. We didn't really retain them. We ended up with some back through foreclosures on mortgages or that were in our control that weren't part of the joint venture.

Q. So there was -- do you remember the magnitude

Page 63

of --

A. Two or three.

Q. Two or three. That's even after two or three years went by and people had a longer time to default on mortgages and stuff, two or three was the net result out of that club that you got back through foreclosures?

A. Yeah. I think, at the end -- I think we only recently sold the last unit that we had there.

Q. Okay. So Kapalua, I'll stipulate that for now.

Can you tell me the clubs that had the most developer-owned inventory at the time of the RCDC reengineering?

A. Aspen had a meaningful amount.

Q. San Francisco had a meaningful amount?

A. San Francisco.

Q. Tahoe?

A. Tahoe.

Q. Jupiter?

A. Vail. Jupiter, not a lot.

Q. I think Jupiter had around 80, as I saw. Does that sound about right?

A. Let me think. Probably -- let's see. No. I think that would be high. I would think it would be

Page 64

more in the 50-ish range, but -- and in St. Thomas, there was a good amount of inventory that was not owned by the developer, but was owned by the association or in default of some sort.

Q. And, ultimately, there was a deal worked out that -- I'm not going to get into the details of that -- but through an agreement with the club and an amendment to their declaration, the developer was able to gain control of all the defaulted inventory, and then ultimately ceded that inventory into the NATO Trust. Right?

A. There were several agreements, but that resulted in us being -- getting control of that inventory and then having the ability to put it into the MVCD Trust.

Q. Do you know how much of the SFO inventory was ultimately ceded into the trust?

A. Probably in the 10 to 12 unit range. Something like that.

Q. When you say "unit," that would be a fraction?

A. Not fractions. Actual units.

Q. Times that by 12?

A. Yeah.

Q. What about Tahoe?

Page 65

17 (Pages 62 - 65)

| | |
|---|---|
| 1   A. I believe Tahoe would be more in the five or | 1   Q. Do you have any rough idea in terms of -- let |

1     A. I believe Tahoe would be more in the five or
2  six unit range, times the 12.
3     Q. And I'll skip the other clubs for now. But
4  would the units that were ceded to the trust, the
5  points that were able to be sold, backed by those
6  units at those two clubs, limited to the -- like, for
7  instance, in San Francisco, each fractional had three
8  weeks of use.
9        So that would mean a fractional unit that was
10  ceded into the trust from San Francisco allowed
11  36 weeks of inventory to sell points against.  True?
12     A. That's correct.
13     Q. And same thing with Tahoe?
14     A. That's correct.  We -- in many cases, it was
15  an individual fraction that was put into the trust as
16  opposed to a whole unit.  So the inventory -- the
17  points were against the points of that individual
18  fraction -- the seven nights -- or the 21 nights.
19     Q. Okay.  Was there some inventory that had
20  been -- was there some inventory from either the
21  San Francisco or the Tahoe clubs that was put into the
22  NATO Trust as a whole unit which would allow them to
23  sell 52 weeks of points against that unit; do you
24  know?
25     A. I don't recall whether there was.  I know

Page 66

1     Q. Do you have any rough idea in terms of -- let
2  me back up for a second.
3        Do you think that financial analysis, at
4  least the summary of it, appears somewhere under the
5  redacted version of this May 24th memo?
6     A. I don't believe, no.
7     Q. I mean, the corporate growth committee would
8  do a full analysis of the financial impact of the
9  request; would it not?
10     MR. SELLINGER:  Objection to form.
11     A. The impact is -- that's the analysis that was
12  provided as part of this memo -- was -- is included.
13  BY MR. REISER:
14     Q. Where does the expected sales come in on the
15  box on page 7 from the developer-owned inventory that
16  would have backed some point sales?
17     MR. SELLINGER:  Objection to form.
18     A. It's not in this memo.  I don't know where it
19  would have come forward -- or whether it would have
20  come forward -- as individual pieces of inventory were
21  being contemplated to actually be ceded into the
22  trust.
23  BY MR. REISER:
24     Q. So I don't know if you reviewed this memo in
25  its unredacted form in the last couple days and

Page 68

1  that there was that situation in Vail, but not -- I
2  don't know whether it was.
3     Q. So is there an analysis anywhere in -- or do
4  you remember whether there was an analysis of the
5  financial impact of taking these developer-owned
6  inventory fractions and putting them into the NATO
7  Trust in terms of expected point sales that would
8  accrue that were backed by this new inventory into the
9  trust?
10     A. There would've been a financial analysis done
11  of looking at putting that developer inventory in, how
12  many points it generated, how much sales it generated,
13  what the cost of generating those sales were going to
14  be, what the cost of the unsold maintenance fees were
15  going to be while you waited for them to sell.
16        Yeah, there would've been a financial
17  analysis done.
18     MR. REISER:  Okay.  I don't think we
19        received that financial analysis in
20        discovery.  I'll send you an e-mail
21        afterwards.  You can decide whether you think
22        it's privileged or not.  At least, I'll put
23        you on notice that we want that.
24     MR. MARX:  Thank you.
25  BY MR. REISER:

Page 67

1  whether you would be able to tell me whether that
2  analysis might be tucked behind this redaction or not.
3     A. I have not reviewed this form.  I have not
4  reviewed the unredacted form.
5     Q. As you sit here today, do you have any
6  recollection as to what the expected point sales could
7  be generated through the new inventory Ritz-Carlton
8  ceded into the NATO Trust?
9     A. I do not.
10     Q. Was it over $100 million?
11     MR. SELLINGER:  Objection to form.
12     A. I'd be spitballing a number.  I don't -- I
13  don't know.
14     MR. REISER:  Let's take a break.
15     THE VIDEOGRAPHER:  This is the end of
16        video number one.  We're going off the
17        record.  The time is 11:51 a.m.
18        (Brief recess.)
19     THE VIDEOGRAPHER:  Here begins media
20        number two in the deposition of Mr. Lee
21        Cunningham.  We're back on the record.  The
22        time is 12:04 p.m.
23        Counsel, you may proceed.
24  BY MR. REISER:
25     Q. I'm going to try to get through the rest of

Page 69

18 (Pages 66 - 69)

Page 70

```
 1   the bullet points on the first page of Exhibit 2136.
 2   We've gone through the RCDC Trust issue. That's
 3   number one.
 4         Number two is related, I guess. "Unwinding
 5   the RCDC Bleu Florida Land Trust and transferring the
 6   underlying inventory to the NATO Trust."
 7         That's the inventory that basically netted
 8   out each other?
 9      A. That's correct.
10      Q. The third one, "Transferring the remaining
11   Ritz-Carlton Destination Club core inventory to the
12   NATO Trust."
13         That's the developer inventory we were
14   talking about just before the break -- the San
15   Francisco, the Tahoe, and the fractionals that were
16   left in Jupiter and St. Thomas and Vail?
17      A. That's correct.
18      Q. And "Selling the remaining assets where
19   possible, both dispositions," that pertained to, for
20   instance, the 19 units that were ultimately sold to --
21   just recently -- in 2015, '16 -- San Francisco --
22   right -- the 19 units that was a bulk disposition of
23   the other assets in The Ritz-Carlton Destination Club?
24      A. I don't know whether it was referring to
25   those specific units at that time, but it would be
```

Page 72

```
 1   was included in the transfer of the remaining core
 2   inventory. Some of it was and some of it wasn't. For
 3   instance, in the case of Aspen, it wasn't. But, in
 4   part, that was ultimately done. And we continue
 5   through the process of any loose assets that are out
 6   there.
 7      Q. So let me just show you a document we marked
 8   yesterday as Exhibit 2235. It's the minutes. Here it
 9   is.
10         If you look at the second page of this
11   document, does this -- first of all -- does this
12   appear to you to be the meeting minutes from the
13   corporate growth committee that matches up with the
14   exhibit -- the prior exhibit -- the May 24, 2012
15   corporate growth committee memo?
16      A. Yes.
17      Q. And can you read the section on the bottom
18   under "RCDC condominium strategy" to yourself and let
19   me know whether that helps you refresh your
20   recollection as to the outcome of what happened
21   following the corporate growth committee meeting on
22   May 24th?
23      A. Yes. It was delegated to a smaller group --
24   decisions.
25      Q. If you compare -- strike that. Yesterday,
```

Page 71

```
 1   referring to, potentially, the Abaco club, any whole
 2   ownership or land interests that we had elsewhere.
 3      Q. I keep seeing something about Cabrita Point.
 4      A. Cabrita Point is -- we have some lots that
 5   are on a piece of land that is adjacent to The
 6   Ritz-Carlton Club, St. Thomas.
 7      Q. Did that ultimately get sold off; do you
 8   know?
 9      A. I still have some. I'd be glad to sell you
10   one if you'd like one. It's been cleared.
11      Q. I'll go down there and hang out with Randy
12   Mercer. Just kidding. Strike that.
13         MR. REISER: Jess, I'm just joking.
14   BY MR. REISER:
15      Q. Number five, "Ceasing all future RCDC
16   specific sales and marketing activities."
17         That was the fifth item on this request;
18   true?
19      A. That's correct.
20      Q. So in order to shortcut this, hopefully, a
21   bit, even though you can't tell me that these five
22   points -- these five requests were approved on
23   May 24th, would you tell me -- could you say that all
24   these five were ultimately approved or --
25      A. Yeah. Certainly one, two. I don't know what
```

Page 73

```
 1   Steve Weisz testified that he was not a member of the
 2   corporate growth committee; although, he essentially
 3   has the power to either ratify or not ratify any
 4   decision coming out of the growth committee.
 5         Is that your understanding?
 6      A. That's correct.
 7         MR. SELLINGER: Objection to form.
 8      A. The way that structure is, Steve is not a
 9   voting member of the strategic council -- I mean, of
10   the corporate growth committee. But then the
11   recommendations from that group are either ratified or
12   rejected by him.
13   BY MR. REISER:
14      Q. This is a little different because I don't
15   see a "ratified" on it. I compared it to another
16   minutes. I'll show you the minutes from a corporate
17   growth committee dealing with the Ritz-Carlton,
18   San Francisco a year later on 10/21/13.
19         On that minutes, it says, "Steve Weisz was
20   present and ratified both decisions." I don't see
21   that same language in the May 24, 2012 minutes.
22         My question is, is that because he basically
23   delegated to a smaller group, including you, Jim
24   Hunter, and John Geller, as to whether to proceed with
25   this following legal review?
```

19 (Pages 70 - 73)

1    MR. SELLINGER: Objection to form.
2    A. I believe what this would indicate is, it was
3    delegated to the smaller group to make a
4    recommendation to approve that. Ultimately, he would
5    still have to ratify that agreement.
6    BY MR. REISER:
7    Q. So did yourself, Jim Hunter, and John Geller
8    approve the proposal ultimately?
9    A. I don't recall. As we just discussed, many
10   of these things happened. I don't know what
11   adjustments were made to the approval, but we reviewed
12   it and, I guess, approved in part.
13   Q. At least one part that you didn't approve was
14   the developer-owned inventory in Aspen; right? That's
15   one of the ones you mentioned. That turned out not to
16   be allowed into the trust. True?
17   A. If that was called out as a specific
18   component, it would have -- then, yeah, we would have,
19   through the legal review, determined that we didn't
20   have the authority to do that.
21   Q. Would there be another set of minutes that
22   would have approved your -- the smaller committee
23   meeting that you just described between Geller,
24   Hunter, and yourself?
25   MR. SELLINGER: Objection to form.
                                                    Page 74

1    A. I don't -- I don't know whether there is a --
2    I'm trying to think if there was an occasion where the
3    outcome of that smaller group is then brought back to
4    CGC for approval. I don't recall in this particular
5    instance whether there was or wasn't.
6    BY MR. REISER:
7    Q. Okay. Let me put it this -- let me kind of
8    go through these point by point so we don't have to --
9    and I'll try to make this quick. I don't want to
10   belabor it too much.
11       At some point, number one on the first
12   page -- the first request -- converting the existing
13   105 trust owners -- that was ultimately undertaken, so
14   that would indicate to you that the smaller group
15   approved that aspect and it was ultimately ratified by
16   Steve Weisz. Is that true?
17       MR. SELLINGER: Objection to form.
18   A. What I would see in that last bullet of the
19   minutes is that they approved committing that
20   $2 million to -- and the 1.5 in transaction costs --
21   that was the point one.
22   BY MR. REISER:
23   Q. Okay. So that was approved at that original
24   meeting?
25   A. That's what I read here. It had a smaller
                                                    Page 75

1    group to manage the process.
2    Q. Number two was related to that. Would you
3    agree that that's the same answer?
4    A. Yes. We would've -- yeah -- I would think
5    that would have ultimately been approved, because it
6    ultimately happened.
7    Q. Number three, understanding that there might
8    have been some changes to what the core inventory was
9    introduced into the trust, ultimately, at least, the
10   inventory that we discussed before the break -- the
11   San Francisco, the Tahoe, the Vail, the Jupiter, and
12   St. Thomas inventory -- fractional inventory -- was
13   indeed ultimately approved to be ceded into the trust.
14   True?
15       MR. SELLINGER: Objection to form.
16   A. Ultimately, the inventory from those -- the
17   ones that you cited were ceded into the trust, so they
18   were approved to go into the trust.
19   BY MR. REISER:
20   Q. Do you know whether Steve Weisz would have
21   had to ratify that decision or do you think you had
22   the authority to do that under the terms of the
23   minutes that are set forth in 2215?
24   A. I don't think he is required to ratify
25   inventory being ceded into the trust.
                                                    Page 76

1    Q. All right. But that was requested in this
2    May 24, 2012 memo. True?
3    A. Yes.
4    Q. And is it true then that you believe that the
5    outcome of the May 24, 2012 corporate growth committee
6    was that it was approved that a smaller group,
7    including yourself, Jim Hunter, and John Geller, would
8    make the decision as to which of the inventory would
9    go into the trust?
10   A. Yeah, based on further advice from counsel.
11   Q. Okay. Number four, "Selling the remaining
12   assets where possible," that was ultimately approved
13   by Mr. Weisz. Is that true?
14       MR. SELLINGER: Objection to form.
15   A. I believe the concept -- not knowing what
16   exact bulk dispositions or other assets were being
17   called out here -- each of those dispositions would
18   require another trip to the corporate growth
19   committee.
20       MR. REISER: Okay. I'm just going to ask
21   again, Counsel, for Marriott to check and see
22   if there are any other corporate growth
23   committee MOUs that pertain to number four
24   that postdate this memo. I'll put this in an
25   e-mail.
                                                    Page 77

20 (Pages 74 - 77)

|   |   |
|---|---|
| 1    MR. MARX: I think other ones have been | 1    A. Across the Ritz-Carlton Clubs versus at the |
| 2  provided, though. | 2  individual clubs. |
| 3    MR. REISER: Okay. Yeah, yeah. | 3    Q. The second bullet point, under the luxury |
| 4    MR. MARX: There's the two relating to | 4  segment reengineering, states, "The communication |
| 5  San Francisco. | 5  related to the evolution of the RCDC project has not |
| 6    MR. REISER: Got you. In terms of the | 6  been well received by many members. Several boards |
| 7  bulk sale, yeah. Good point. | 7  have made their concern known to us." |
| 8  BY MR. REISER: | 8    So did you write that? |
| 9    Q. Number five, "Ceasing all future RCDC | 9    A. No. |
| 10  specific sales and marketing activities," that was | 10    Q. Who actually wrote this, these strategic |
| 11  approved at the May 24, 2012 meeting; was it not? | 11  council luxury segment updates? |
| 12    A. I don't recall. It's not called out in the | 12    A. They generally come from a document that is |
| 13  memo specifically that that was approved at that | 13  provided to me by the asset manager -- in this case, |
| 14  point. | 14  probably Stephanie Sobeck -- maybe Mary Lynn Clark, |
| 15    Q. So the evidence in the case, without showing | 15  depending on timing -- and then lifted and moved into |
| 16  you all these documents, is it your recollection that | 16  this document. |
| 17  the sales and marketing activities for the RCDC | 17    Q. So the process -- I think I understand -- |
| 18  stopped in 2012? | 18  would be that -- because we've seen these things |
| 19    MR. SELLINGER: Objection to form. | 19  called "Business review reports" that come out every |
| 20    A. I don't recall whether it was 2012. And we | 20  month. |
| 21  continued to sell on a smaller scale at a number of | 21    A. That's correct. |
| 22  locations, sometimes through brokers or whatever, but | 22    Q. So you get reports from the asset managers on |
| 23  not -- it didn't cease in 2012 and never resume. | 23  certain properties through the business review |
| 24  BY MR. REISER: | 24  reports. True? |
| 25    Q. I got you. Let me go through some documents | 25    A. That's correct. |
| Page 78 | Page 80 |

|   |   |
|---|---|
| 1  on the strategic council. | 1    Q. On a monthly basis? |
| 2    So we've gone through the May 24th corporate | 2    A. Periodic. |
| 3  growth committee. We've seen strategic plan, parts of | 3    Q. Periodic. Period nine, how does that work at |
| 4  which were approved that day; other parts of which | 4  Marriott? |
| 5  were either nuanced and approved later on. I want to | 5    A. Up until last year, Marriott was -- or |
| 6  turn now to the strategic council documents. | 6  Marriott Vacations was on a 13-period financial |
| 7    I'll show you first the August 8, 2012, | 7  calendar -- 13 28-day periods. So as you get through |
| 8  strategic council meeting or memo -- luxury segment | 8  the year, period nine has some August and some |
| 9  update -- Exhibit 2143. | 9  September in it. |
| 10    So what I'm going to ask you to do is turn to | 10    Q. So the periods are just 13 periods a year |
| 11  the project updates portion of these memos as I show | 11  instead of 12? |
| 12  them to you. Okay? This one is starting on the fifth | 12    A. That's correct. |
| 13  page. | 13    Q. So 13 times a year, you get reports -- |
| 14    The first box -- this is the first time | 14  business review reports -- from the asset manager for |
| 15  you're seeing this, at least in this deposition -- you | 15  Ritz-Carlton. That would be how you become informed |
| 16  see on the left side, it says, "Luxury segment | 16  about what's happening at every property; right? |
| 17  reengineering" on this project? | 17    MR. SELLINGER: Objection to form. |
| 18    A. Yes. | 18    A. We would get those reports, in general, on a |
| 19    Q. And that was your term? | 19  period basis. I'm sure there were times where we |
| 20    MR. SELLINGER: Objection to form. | 20  didn't. |
| 21    A. Like I said before, I don't know who coined | 21  BY MR. REISER: |
| 22  the phrase, but that came to be the term that we used | 22    Q. Sure. I'm not suggesting it might not have |
| 23  for anything that we were doing across the clubs. | 23  been missed once or twice. But as a general practice, |
| 24  BY MR. REISER: | 24  the purpose of these business review reports was to |
| 25    Q. Across the Ritz-Carlton Clubs; right? | 25  have the asset manager, who was more hands-on with the |
| Page 79 | Page 81 |

21 (Pages 78 - 81)

1   property, report what was going on with that property
2   up to yourself.  True?
3       A. That's correct.
4       Q. And somebody would take -- who would take the
5   content of the business review report and select what
6   to put into the strategic council report?
7       A. It's varied over time.  Generally, someone in
8   our finance and accounting organization, or whatever,
9   would take those -- that information, move it into the
10  different format.  And then I would look at it for --
11  are there things that just don't -- aren't of the
12  level that need to go to the strategic council, and
13  take those out.  But I wouldn't wordsmith anything.
14      Q. You wouldn't wordsmith anything, but would
15  you look at a draft of the luxury segment update and
16  take some stuff out if you didn't think it was
17  appropriate for the strategic council or maybe add
18  something if you thought it was?
19          Is that fair?
20      A. That's a fair assessment.
21      Q. And that was your practice through 2012, '13,
22  and '14?
23      A. Yes.
24      Q. Is there any doubt in your mind that any of
25  these strategic council documents that have been

Page 82

1   produced by your counsel here are authentic?
2       A. What do you mean?
3       Q. That they're true and correct copies of what
4   they purport to be?
5       A. I have no reason to believe they wouldn't be.
6       Q. Okay.  Let's go to the August 30th report.
7   It's Exhibit 2144.
8           Turning to the last page of this document,
9   I'm interested in the entries under the Bachelor Gulch
10  club.  It says, "Board hired HVS, Mark Earle, to study
11  the impact on the value of the members' investment
12  based on the company's recent decisions."
13          You were aware, were you not, that the board
14  at Bachelor Gulch hired Mark Earle to study the impact
15  of the proposed affiliation on the value of the
16  Bachelor Gulch members' investment?
17      A. Yes.
18      Q. Did you ever get a chance to read that
19  report?
20      A. Not that I recall.
21      Q. Did you ever hear from Mike Mullenix or
22  anybody else at Bachelor Gulch that Mark Earle
23  determined that the affiliation would have a negative
24  effect on the members' interests?
25      A. I don't recall.

Page 83

1       Q. Let's go to the September 27th one,
2   Exhibit 2145.  On this one, I want to ask you about
3   the general box "luxury segment reengineering" on the
4   top of page 5.  On each of these reports, it seems
5   like the box "luxury segment reengineering" starts out
6   with the status of the unwinding of the portfolio
7   product and the reacquiring of the land -- the Bleu
8   Florida Land Trust inventory.  True?
9       A. Right.
10      Q. Ultimately, it's true, is it not -- so I
11  don't have to go through every one of these -- it's
12  true that Ritz-Carlton Destination -- or Ritz-Carlton
13  Development Company was able to reacquire all the
14  interests in the Bleu Florida Land Trust?
15      A. That's correct.
16      Q. And it collapsed the trust and terminated it.
17  True?
18      A. That's correct.
19      Q. So right under that one, there's a second
20  bullet point that, again, repeats what is said in
21  earlier ones about the members not being happy about
22  the evolution communication.
23          This one adds, "We have had conference calls,
24  a webinar, one-on-one meetings, and a meeting with
25  Steve and me and the board president and secretary of

Page 84

1   Bachelor Gulch.  Communication with the members will
2   continue in coming months."
3           As of September 27, 2012, would you agree
4   that there had been no affiliation decisions made at
5   any club at that point in time --
6       MR. SELLINGER:  Objection to form.
7   BY MR. REISER:
8       Q. -- in terms of a new affiliation with the
9   Marriott Vacation Club?
10      A. We hadn't made any final determinations.  We
11  had communicated our intent to do that in the
12  evolution letter.
13      Q. The next one is October 25, 2012,
14  Exhibit 2147.  Starting off with the page 5 box,
15  "luxury segment reengineering," there's some
16  information -- new information -- updated in this
17  period's report.
18          After stating again that the evolution
19  communication was not well-received, it adds some new
20  information.  It states, "We have developed a
21  communication plan outline related to future
22  communications of the evolution."
23          That was different than the next sentence.
24  It says, "We have also spoken to a couple of PR firms
25  to provide input into our plan and assist with ongoing

Page 85

22 (Pages 82 - 85)

1    communication."
2         Was that plan -- strike that. Was it
3    ultimately -- strike that. Is it true that,
4    ultimately, Marriott Vacation Worldwide hired APCO to
5    help in the communication to the members on the
6    evolution?
7         MR. SELLINGER: Objection to form.
8       A. I believe that we -- we ultimately engaged
9    APCO, I believe, through -- our law department engaged
10   them to help with communications.
11   BY MR. REISER:
12      Q. The last sentence in the box, it says, "The
13   primary focus on the going-forward communication plan
14   is the individual members, shifting the focus away
15   from the boards."
16        Why was that decision made to shift the
17   communication to members versus the boards?
18      A. My only recollection there was, we felt like,
19   in the case of Bachelor Gulch specifically -- really,
20   the only one that I remember -- that the board -- we
21   didn't feel like the board was properly communicating
22   everything to the members. So we wanted to make sure
23   that we had communications to the members so that they
24   were fully informed.
25      Q. So do you remember, following this October
                                                Page 86

1    25, 2012 strategic council memo, that there were at
2    least three clubs that sent cease-and-desist letters
3    to yourself and Mr. Weisz with regard to the plan for
4    the reengineering of the luxury segment?
5       A. I recall seeing the cease-and-desist from
6    Bachelor Gulch; I believe, Aspen, but I don't recall
7    the third.
8       Q. You don't recall the St. Thomas -- did I say
9    Jupiter or St. Thomas?
10      A. I don't recall.
11      Q. I don't recall either. Long day already.
12   Let me try to find the letter that we marked yesterday
13   and see if I can refresh your recollection.
14        MR. SELLINGER: Once again, I don't think
15     this relates to the subsequently-produced
16     documents.
17   BY MR. REISER:
18      Q. I'll show them to you all at once. An
19   exhibit previously marked as 1806 is a letter from
20   John -- James Deere on behalf of the St. Thomas club.
21   There's another letter, Exhibit 1807, which is a
22   December 18, 2012 letter from the Mountain Law Group
23   on behalf of the Bachelor Gulch association. And
24   there's also Exhibit 1135, which is the November 21,
25   2012 cease-and-desist letter from the Aspen Club.
                                                Page 87

1         Do you remember receiving all these letters
2    now that your recollection has been refreshed?
3         MR. SELLINGER: Objection to form.
4       A. I received the one certainly from Aspen and
5    from St. Thomas. The one from Bachelor Gulch went to
6    Ms. Egolf. I was aware of its existence.
7    BY MR. REISER:
8       Q. So was it the Bachelor Gulch one that went to
9    Ms. Egolf or the St. Thomas one?
10      A. Mountain Law, so...
11      Q. Okay. One other question on the strategic
12   council report dated October 25, 2012.
13      A. Oh, this one.
14      Q. It's under the Aspen Highlands box on page 6.
15   The first bullet point states, "The new board elected
16   10/13/2012." It says, "Pressure from membership
17   during meeting applied to the board to fight the RCDC
18   evolution."
19        Do you remember discussing that sentence with
20   folks on the strategic council in this October
21   meeting?
22      A. I don't recall.
23      Q. You were aware, though, that the sentiment at
24   the -- at least at the board meeting on -- or the
25   annual meeting on 10/13/2012 -- you were aware that
                                                Page 88

1    membership at that meeting applied pressure on the
2    board to fight the RCDC evolution?
3         MR. SELLINGER: Objection to form.
4         MS. LIVINGSTON: Object to form.
5       A. I wasn't at the meeting, so I have no idea.
6    I can read the words on the page and don't know
7    whether they're accurate or what. I wasn't there and
8    didn't write the words.
9    BY MR. REISER:
10      Q. So I understand you weren't at the actual
11   meeting. But the question was actually -- was it
12   discussed at the strategic council meeting on
13   October 2012, this subject that the membership at
14   Aspen was applying pressure to the board to fight the
15   RCDC evolution?
16      A. I don't recall.
17        MR. SELLINGER: Objection to form.
18        MS. LIVINGSTON: Object to form.
19      A. I don't recall.
20   BY MR. REISER:
21      Q. Let's turn to Exhibit 2148. Well, actually,
22   sticking with the last one for one second -- the
23   bullet point right under the one we just went -- there
24   was a call between Stephanie Sobeck and the new board
25   president this week to schedule face-to-face
                                                Page 89

23 (Pages 86 - 89)

| | |
|---|---|
| 1   discussion with the board related to the evolution. | 1   for the RCDC reengineering efforts? |
| 2     Do you remember a meeting the following | 2     A. I didn't receive a complaint, but I remember |
| 3   month, in November 2012, where Randy Mercer met with | 3   the company received a complaint. |
| 4   yourself in Orlando? | 4     Q. Okay. Is that the complaint that is |
| 5     A. I remember meeting with Randy in Orlando. | 5   referenced here -- based on recently-filed claim in |
| 6   Not exactly sure on the timeframe. | 6   Minnesota? I'll just tell you, the Hoyt case was |
| 7     Q. Was the issue that the members were asking | 7   filed in Minnesota. |
| 8   the new board to fight the RCDC engineering -- | 8     A. Yes. |
| 9   reengineering -- discussed at that November 2012 | 9     Q. What was it about that case that caused the |
| 10   meeting with Randy Mercer in Orlando? | 10   re-evaluation of the go-forward strategy? |
| 11     MR. SELLINGER: Objection to form. | 11     A. I really -- I have no idea. |
| 12     A. I don't recall. | 12     Q. Do you have any recollection at all, |
| 13     MS. LIVINGSTON: Object to form. | 13   Mr. Cunningham, as to, like, who wrote the strategic |
| 14     A. I don't recall what was discussed at that | 14   council reports on a given month? I would expect not, |
| 15   meeting. | 15   but I'm just asking you for completeness sake. |
| 16   BY MR. REISER: | 16     A. No. I mean, it would generally be the asset |
| 17     Q. How often is it that a president of a -- | 17   manager responsible for the club, so I don't know in |
| 18   strike that. Can you think of any other time that a | 18   any particular month. |
| 19   president of one of the boards at the Ritz-Carlton | 19     Q. Following the Minnesota filing, it looks like |
| 20   Destination Club traveled solo to Orlando to discuss | 20   the current thinking was -- bullet point number -- |
| 21   with you issues regarding the board's responsibilities | 21   "Move forward with putting the Northstar and San |
| 22   at a given club? | 22   Francisco inventory into the NATO Trust." |
| 23     A. I don't recall any other solo meetings with a | 23     That ultimately happened. True? |
| 24   board president. | 24     A. That's correct. |
| 25     Q. Do you remember whether Randy Mercer brought | 25     Q. And then the second bullet point, "Go club by |
| Page 90 | Page 92 |
| 1   his wife on that trip? | 1   club and attain a majority vote of the members |
| 2     A. No idea. | 2   endorsing the affiliation of their club with Lion & |
| 3     Q. Do you remember anything about where he | 3   Crown." |
| 4   stayed during that trip? There's some evidence that | 4     Did the concept of a majority vote of the |
| 5   there were two rooms -- | 5   members first get raised following the Minnesota |
| 6     A. No idea. | 6   claim? |
| 7     Q. -- at the Ritz-Carlton at Grande Lakes, the | 7     A. I don't know the timing of whether that's |
| 8   one out here in Orlando -- that two rooms were | 8   what prompted it or whether that concept was being |
| 9   procured for Randy Mercer and his wife for the purpose | 9   considered prior to that. |
| 10   of this November 2012 meeting. | 10     Q. The fourth bullet point states, "That |
| 11     Do you remember anything about that? | 11   strategy would be to mount an aggressive |
| 12     MR. SELLINGER: Objection to form. | 12   communication, education, marketing campaign aimed at |
| 13     A. I have no knowledge of any of that. | 13   the member base for each club to give us the best |
| 14     MS. LIVINGSTON: Object to form. | 14   chance of success." |
| 15   BY MR. REISER: | 15     What does that sentence mean to you? |
| 16     Q. So turning to the January 17, 2013 luxury | 16     A. It means that we wanted to make sure that we |
| 17   segment update, it's Exhibit 2148. If you can turn to | 17   were providing the information -- the full |
| 18   page 4 of this one? Under the "luxury segment | 18   information -- necessary for members to make an |
| 19   reengineering" box, it, again, gives an update on the | 19   educated decision on how to -- on whether to support |
| 20   109 RCDC portfolio members. | 20   the affiliation or not. |
| 21     The second primary bullet point under this | 21     Q. Was the aggressive communication, education, |
| 22   box states, "Based on recently-filed claim in | 22   marketing campaign undertaken ultimately by APCO? |
| 23   Minnesota, we are reevaluating go-forward strategy." | 23     A. I don't recall. |
| 24     Do you remember receiving a complaint by two | 24     Q. Was it undertaken by anybody; do you recall? |
| 25   brothers named Hoyt that sued Marriott Vacation Club | 25     A. I don't recall whether what was contemplated |
| Page 91 | Page 93 |

24 (Pages 90 - 93)

1    here was ever executed or not.
2        Q.  Then the fourth bullet point was "Based on
3    the outcome of the vote at each club, either affiliate
4    or not."
5        Do you see that?
6        A.  I do.
7        Q.  As of January 2013, was it the plan, do you
8    know, to have a vote at each club and let the club
9    decide as to whether to affiliate or not?
10       A.  The concept of having each club be able to
11   vote or, later, survey -- respond to their desire to
12   affiliate was obviously in play at this point in time.
13       Q.  Yesterday, I discussed with Mr. Weisz a
14   document that had been marked in an earlier deposition
15   as Exhibit 1020.  It's a document entitled, "Marriott
16   Vacation Worldwide Corporation, Marriott International
17   update."  It's dated on the cover, February 28, 2012.
18   I think, as you can see from the context of reviewing
19   it, that it's misdated and it should be February 28,
20   2013.
21       A.  All right.
22       Q.  Because some of the stuff they talked about
23   happened after February 28, 2012.  I want to ask you a
24   few questions about the update.
25       First of all, would you agree with me that

Page 94

1    this document is misdated?  I don't think it's very
2    controversial.  Steve Weisz was --
3        A.  Let's see.
4        MR. REISER:  Want to stipulate --
5        MR. MARX:  We can discuss it.
6        THE WITNESS:  I'm sorry?
7        MR. MARX:  Nothing.
8        THE WITNESS:  I was trying to put out
9        this note to one of the strategic council
10       documents around the same time, but -- I
11       thought I saw those numbers.
12   BY MR. REISER:
13       Q.  I just want to ask you some general questions
14   about this at this point.  Maybe the date isn't as
15   important as the next question.
16       I'm just wondering why there's periodic
17   updates to the Marriott International company with
18   regard to the reengineering of the luxury segment?
19       A.  I don't recall why that would occur -- would
20   occur post spinoff of our company.  There must have
21   been some agreement that we would update them.
22       Q.  Okay.  Getting to a couple questions about
23   Marriott International and its subsidiary, the
24   Ritz-Carlton Hotel Company -- you're aware, are you
25   not, that the Ritz-Carlton Hotel Company has a

Page 95

1    co-management agreement at the Ritz-Carlton Clubs with
2    the Ritz-Carlton Management Company?
3        A.  That's correct.  Well, they have a
4    sub-management agreement to operate the onsite
5    activities.
6        Q.  Okay.  So I know I'm skipping around a little
7    at this point.  I'm trying to just be efficient.
8        The questions earlier about the November 2013
9    affiliation agreement that we started off this
10   deposition on, was that affiliation agreement provided
11   to John Hearns or any of the individual general
12   managers representing Ritz-Carlton Hotel Company on
13   the site?
14       A.  I have no idea.
15       Q.  Is there any reason you can think of that it
16   wouldn't be given to them?
17       MR. SELLINGER:  Objection to form.
18       A.  I don't know why we -- I can't think of a
19   reason why we would or wouldn't necessarily provide
20   that integration agreement to them.
21   BY MR. REISER:
22       Q.  I don't have a full copy of this, I don't
23   think -- Exhibit 1897.  I think I can bring it up to
24   the board.  I just have one question about this.  It's
25   the amended and restated club onsite management

Page 96

1    agreement between the Ritz-Carlton Hotel Company,
2    manager, and the Ritz-Carlton Management Company,
3    hotel.  It's dated November 21, 2011.
4        MR. SELLINGER:  Why don't you -- if
5        you're going to do it, give him your copy and
6        you can pull up on the screen what you
7        want --
8        MR. REISER:  No problem.  Let me find
9        what -- I thought I made copies of this right
10       before the dep.
11   BY MR. REISER:
12       Q.  I'm going to ask you about paragraph 4.24 on
13   page 18.  I highlighted it for your convenience.
14   Paragraph 4.24 on page 18, can you take a look at
15   that?
16       A.  4.24?
17       Q.  Yes.  It deals with communication.  Again,
18   "The manager and the company" -- that's the
19   Ritz-Carlton Hotel Company and the Ritz-Carlton
20   Management Company -- "shall make good faith,
21   commercially-reasonably efforts to keep the other
22   informed regarding communications with and from the
23   association, the board, or any officers of the
24   association.  Manager and the company will copy the
25   other on any written communications sent to the

Page 97

25 (Pages 94 - 97)

| | |
|---|---|
| 1  association, the entire board or the entire | 1  that's -- whether there's -- there is or isn't a |
| 2  membership.  Manager and the company will also copy | 2  denotion -- I'm sure there is -- between owner and |
| 3  each other on any formal written communication to one | 3  other occupants.  Other than that, I don't know. |
| 4  or more board members of the board as a representative | 4      Q.  All right.  I guess we'll ask Hearns about |
| 5  or representative of the board." | 5  that next week or early June, since we now have some |
| 6      Were you aware that there was this agreement | 6  dates. |
| 7  between the two managers to keep each other informed | 7      Let me just go over the October 21st, 2013 |
| 8  of happenings and communications with the various | 8  corporate growth committee document.  It's previously |
| 9  association boards? | 9  marked as Exhibit 2137.  This is a corporate growth |
| 10      A.  No.  I've never read this document from front | 10  committee memo prepared by Stephanie Sobeck and John |
| 11  to back. | 11  McGowan. |
| 12      Q.  Do you know whether the custom and practice | 12      Do you remember this corporate growth |
| 13  of the Ritz-Carlton Management Company was to inform | 13  committee request?  I'll read the request for the |
| 14  the Ritz-Carlton Hotel Company of issues and | 14  record. |
| 15  communications between the Ritz-Carlton Management | 15      "The purpose of this submission is to provide |
| 16  Company and the various boards? | 16  corporate growth committee an update on the current |
| 17      MR. SELLINGER:  Objection to form. | 17  state of member satisfaction to the Ritz-Carlton, |
| 18      A.  I know there was a practice to communicate | 18  San Francisco club, and a plan approval of the |
| 19  back and forth and keep each other informed.  I don't | 19  financial impact associated with the presentation of |
| 20  know to what degree or at what level that was | 20  board exit options for the members of the Ritz-Carlton |
| 21  executed. | 21  Club, San Francisco." |
| 22  BY MR. REISER: | 22      Do you remember this memo being presented |
| 23      Q.  So given that the affiliation agreement, as | 23  to the corporate growth committee related to the |
| 24  you testified earlier this morning, imposed duties | 24  San Francisco club? |
| 25  upon the association to facilitate members of the | 25      A.  Yes. |
| Page 98 | Page 100 |
| 1  Marriott Vacation Club use of The Ritz-Carlton | 1      Q.  Did you have any role in preparing this memo? |
| 2  Destination Club, and given that the onsite management | 2      A.  I didn't author it.  I may have reviewed it |
| 3  at the various clubs was performed by RCHC, the hotel | 3  at some point.  Obviously, I was a recipient of it as |
| 4  company, wouldn't it have been important to update the | 4  a member of the corporate growth committee. |
| 5  onsite management of this new affiliation | 5      Q.  I'll just leave it at that.  I think I |
| 6  arrangement -- | 6  sufficiently asked Ms. Sobeck about this one. |
| 7      MR. SELLINGER:  Object to form. | 7      And the last two corporate growth committee |
| 8  BY MR. REISER: | 8  documents I want to ask you about are the two that |
| 9      Q.  -- in your opinion? | 9  were related to the bulk sale of the San Francisco |
| 10      A.  I don't think so, only because the RCHC is | 10  units.  Those are -- the first one is dated August 19, |
| 11  going to interact with customers that are -- whose | 11  2014.  It's Exhibit 2138.  The second one is dated |
| 12  reservations are delivered to them via the reservation | 12  November 10, 2015, and is Exhibit 2139. |
| 13  system, through the property management system, and | 13      So I want to ask you just about these in |
| 14  then service all those customers equally. | 14  tandem.  Have you reviewed these corporate growth |
| 15      So they're not involved in the exchange or | 15  committee memos in preparation for the depo? |
| 16  whatever.  They're just -- they get a customer, they | 16      A.  Yes. |
| 17  check them in, take care of them, and deliver the | 17      Q.  The August 19, 2014 and the November 10, 2014 |
| 18  services. | 18  memos both deal with what to do with 19 residential |
| 19      Q.  But they're aware if this customer is coming | 19  units that were originally slated for the fractional |
| 20  in through the Marriott affiliation versus the home | 20  offering, but ultimately were de-annexed from the |
| 21  club membership or a sister club membership; aren't | 21  fractional offering and annexed into the whole |
| 22  they? | 22  residence offering.  True? |
| 23      A.  I don't know how the arrivals manifest -- are | 23      A.  That's correct. |
| 24  denominated or denoted.  Whether they come in as Lion | 24      Q.  As of 2014, the strategy was to just do a |
| 25  & Crown guests, MVCD guests, I don't know how | 25  residential conversion, wherein Ritz-Carlton's own |
| Page 99 | Page 101 |

26 (Pages 98 - 101)

1  sales team would sell the unit and they would be
2  marketed as Ritz-Carlton residences.
3      Is that true?
4      A. That was the August 19th recommendation.
5      Q. What I want to ask you about on the
6  August 19th memo is, the decision to request of the
7  corporate growth committee that these 19 units be
8  handled in the fashion I just described, as a sales
9  effort by Ritz-Carlton under Ritz-Carlton residences,
10  isn't it true that there was a choice at that point
11  that you were making between the sale of these
12  19 units in-house, if you will, versus a bulk
13  disposition to an outside source?
14      MR. SELLINGER: Objection to form.
15      A. I don't believe there was a decision at that
16  point. What the -- August 19th was coming off of a
17  timeframe where we had been selling some other whole
18  ownership inventory in San Francisco, and the request
19  was to finish the development of those units, the
20  remaining 19 units, and then sell them through our
21  sales activities -- continue our existing sales
22  activities and sell those units. That's what was
23  being requested.
24  BY MR. REISER:
25      Q. Okay. In that request, you were explaining
                                                Page 102

1  why that was the route you were requesting versus a
2  bulk disposition. True?
3      MR. SELLINGER: Objection to form.
4      A. That was what the request was. I didn't --
5  once again -- didn't author this. I sponsored it to
6  come forward for consideration. There were several
7  options that were considered and a description of the
8  pros and cons of each.
9  BY MR. REISER:
10      Q. Okay. Got it. The first potential option
11  was just taking these 19 units and putting them into
12  the NATO Trust; right?
13      A. That's correct.
14      Q. And is it true that the thinking was to not
15  do that because the NATO Trust, at that point in time,
16  had enough inventory, and that the inventory that was
17  to be transferred from San Francisco had maintenance
18  fees that were three times higher than the other
19  inventory that was in the trust?
20      MR. SELLINGER: Objection to form.
21      A. The evaluation looked at what the impact of
22  adding that inventory in -- did we need more -- was it
23  beneficial to the members as a whole of the MVCD
24  program to have more Ritz-Carlton, San Francisco
25  inventory, or did they already -- was there already
                                                Page 103

1  enough inventory present, as well as what the cost of
2  that inventory is.
3      The assumption here -- the recommendation was
4  that it wasn't the right thing to add that inventory.
5  BY MR. REISER:
6      Q. Is it true that one of the reasons that
7  decision was made is because of the high maintenance
8  fees attached to the San Francisco inventory as
9  compared to the maintenance fees that were more
10  typical in the trust?
11      MR. SELLINGER: Objection to form.
12      A. When you compared the maintenance fee for
13  points that would be sold or issued from that
14  inventory, and the cost of that maintenance fee to --
15  in comparison to the rest of the Marriott Vacation
16  Club product -- it was a much higher maintenance fee
17  per point.
18  BY MR. REISER:
19      Q. And the maintenance fees in San Francisco
20  were a buck-20 -- strike that. I think that's
21  probably enough there.
22      The second option that was discussed was a
23  bulk disposition of the property. True?
24      A. The second in this list, yes, sir.
25      Q. And the description there of the alternative
                                                Page 104

1  solutions was -- under bulk disposition was -- "Due to
2  entitlement restraints, the strength of the
3  San Francisco real estate market, potential negative
4  consequences to the association, and the long-term
5  impact of the bulk sale at Northstar, it has been
6  deemed that a bulk disposition is not an attractive
7  strategy."
8      I want to ask you about that last one, the
9  long-term impact of the bulk sale at Northstar. Do
10  you know what's meant by that?
11      A. I believe that the main issue there was, the
12  bulk purchaser in Northstar was not as prompt in
13  paying their association dues and it was -- it put
14  strain on the association at Northstar to continually
15  manage that accounts payable or receivable.
16      The other thing is that -- and the other
17  difference is -- in Northstar, that the way that deal
18  worked out was that it was creating whole ownership
19  where there wasn't whole ownership, which is a little
20  different than in San Francisco, because there was
21  already whole ownership in San Francisco. And it was
22  unbranded whole ownership. It wasn't Ritz-Carlton
23  branded.
24      Q. Stephanie Sobeck testified, when I was asking
25  her about this -- and she was one of the authors,
                                                Page 105

27 (Pages 102 - 105)

1  along with yourself, of this memo -- that one of the
2  problems with the bulk sale at Tahoe was, it created
3  some confusion.  When you walked into the lobby area,
4  you had Constellation product on one desk and
5  Ritz-Carlton fractionals at another desk.
6        Would you agree with that?
7      MR. SELLINGER: Objection to form.
8      A.  Well, I don't -- that's back to the -- in the
9  case of Tahoe, there was the unbranded or the
10 Constellation and the Ritz-Carlton, and so it
11 highlighted that there were two different products in
12 the building.
13 BY MR. REISER:
14     Q.  And then, ultimately, it seemed like the
15 San Francisco market got so hot over the next year
16 that -- the next memo -- by November 10, 2015, the
17 decision seemed to have been made to actually go back
18 to the bulk sale, and that's what ultimately
19 happened.
20        Is that a fair summary of what happened to
21 these 19 units?
22     MR. SELLINGER: Objection to form.
23     A.  Ultimately, we evaluated, again, the
24 options -- bulk sale or continue on.  In November,
25 came back with a recommendation to go bulk sale, for a
Page 106

1  number of reasons, depending -- that manifest
2  themselves.
3        Over the timeframe between the memos, we were
4  working on the entitlement so it could be sold as
5  whole ownership.
6  BY MR. REISER:
7      Q.  But was one of the reasons that the decision
8  was made to change from selling out into the
9  Ritz-Carlton brand to just selling in a bulk sale was
10 that the market got hot enough that the developers
11 were coming in and making offers that made the numbers
12 look better than the bulk sale numbers -- I mean, as
13 far as the individual sale numbers?
14     MR. SELLINGER: Objection to form.
15     A.  My memory is that the market had continued to
16 heat up.  Our concern was more that, if we developed
17 it on our own, we would get caught on the downside of
18 that heat-up -- that super-heated market -- and not
19 achieve the economics that we had expected.
20     MR. REISER: I'm almost done.  Are you
21     looking for a break right now?
22     MR. SELLINGER: It's been over an hour.
23     MR. REISER: I probably have ten more
24     minutes.
25     MR. SELLINGER: We'll take a -- I think
Page 107

1  we should take a break anyway.  If you guys
2  collectively are ten minutes, we'll do it
3  quickly.
4      MR. FERGUSON: I've got more.
5      MR. REISER: Let's take ten.
6      MR. SELLINGER: How long do you think?
7      MR. FERGUSON: Half-hour.
8      MR. SELLINGER: Let's go off the record.
9      THE VIDEOGRAPHER: We're going off the
10 video record.  The time is 1:06 p.m.
11     (Brief recess.)
12     THE VIDEOGRAPHER: We're back on the
13 video record.  The time is 1:27 p.m.
14     Counsel, you may proceed.
15     (Exhibit 2244 was marked for
16 identification.)
17 BY MR. REISER:
18     Q.  So I'm going to show you what I marked as
19 2244.  It's a Ritz-Carlton Destination Club general
20 managers conference call agenda dated October 8, 2014.
21        Take a look at that.  I'm going to ask you
22 about a memo that's attached to this, that looks like
23 it was prepared by yourself, regarding some asset
24 management restructuring going on at that time.
25     MR. SELLINGER: Do you have a copy?
Page 108

1      MR. REISER: Oh, sorry.
2  BY MR. REISER:
3      Q.  Can you go ahead and take a look at the
4  second page that starts with "Asset management
5  restructuring and appointments"?
6      A.  Yes.
7      Q.  Do you recognize this document as being
8  written by you?  If you see at the end, it says,
9  "Thank you.  Lee Cunningham."  You can go four pages
10 later.  It appears to be a letter that you wrote to
11 your folks.
12     A.  Yeah.  I haven't reviewed this document in a
13 long time, so...
14     Q.  But you do recognize it, at least, kind of at
15 a high level?  Take your time and look at it.
16     MR. SELLINGER: While he's doing that, I
17     note -- not related to the
18     subsequently-produced documents, I assume.
19     MR. REISER: Well, I mean, they are
20     related.  These are from the hotel company,
21     produced late, so...
22     A.  I'm familiar with it.
23 BY MR. REISER:
24     Q.  I wanted to ask you about a couple points on
25 this.  On the second page of your memo, on the
Page 109

28 (Pages 106 - 109)

1  paragraph starting with "In addition," do you see
2  that?
3      A. Yes.
4      Q. The last sentence to this says, "Given the
5  current size of the portfolio, as well as our current
6  strategy for this brand, I have made the decision to
7  integrate the responsibility for the remaining RCDC
8  resorts into the Marriott Vacation Club asset
9  management regional structure."
10      Did that end up being effectuated, that
11  decision?
12      A. Yes.
13      Q. So the third bullet point under the following
14  section, "Key focus areas for asset management" --
15  first of all, the -- actually, the first point on that
16  section of this letter, it says, "Optimization of
17  company owned and operated assets."
18      You state, "In this capacity, the asset
19  managers act as my in-market representatives with my
20  full delegated authority."
21      What's the purpose of that sentence?
22      MR. SELLINGER: Objection to form.
23      A. The structure in our organization, the field
24  operations don't report directly to me, but I have
25  responsibility for them; and this was giving the --

1      MR. SELLINGER: Objection to form.
2      A. No. That wasn't my intent.
3  BY MR. REISER:
4      Q. Okay. And then, finally, the third -- the
5  last -- the sentence on the top of the following page,
6  I want to ask you a couple questions about that.
7  There's a statement that, "As a result, MVW's resort
8  operations team is not engaged in the management of
9  these locations, and, therefore, does not interact
10  with the COA boards at this location. The asset
11  management team is responsible to represent both the
12  management company and developer interests with these
13  COA boards. Association governance for these
14  locations is handled in concert with the Ritz-Carlton
15  Hotel Company."
16      Is that an accurate statement of the dynamic
17  between the asset management team and the COA boards
18  at the Ritz-Carlton Destination Clubs?
19      MR. SELLINGER: Objection to form.
20      A. What I'm communicating here is really that we
21  had a Marriott Vacation Club, which is not precisely
22  written, we have an operations team, and they're
23  not -- they're the interaction point with our Marriott
24  Vacation Club boards and locations. They're not for
25  The Ritz-Carlton Club, is what I was trying to

1  communicating to the field operations that my asset
2  managers would represent me in their respective
3  markets.
4  BY MR. REISER:
5      Q. Okay. I'm not going to ask you about number
6  two. It looks like that's dealing with the Marriott
7  Vacation Club COA board.
8      Number three is entitled, "Interaction with
9  the Ritz-Carlton Destination Club COA boards as both
10  the management company and the developer
11  representative."
12      Then you state, "As you may recall, similar
13  to our MVC resorts, we (MVW) are the management
14  company for our Ritz-Carlton Destination Club
15  resorts."
16      Would you agree that that's an accurate
17  statement?
18      A. It's the Ritz-Carlton Management Company,
19  which is -- yeah -- would be the more accurate -- it's
20  a subsidiary or an entity within Marriott Vacations
21  Worldwide.
22      Q. It appears to me like you're essentially
23  saying there that the Ritz-Carlton Management Company
24  is the same thing as Marriott Vacation Worldwide, or
25  no?

1  communicate.
2  BY MR. REISER:
3      Q. That's because there's really not a resorts
4  operations team at the Ritz-Carlton Club. RC Hotel
5  Company handles that; is that right?
6      A. That's correct.
7      Q. So because that's the dynamic at the
8  Ritz-Carlton Clubs, the asset management team
9  represents both the management company and the
10  developer at the Ritz-Carlton clubs; right?
11      MR. SELLINGER: Objection to form.
12      A. I believe that's correct.
13      MR. REISER: All right. I'm done with my
14  questioning. My colleague, Matt Ferguson,
15  has some questions for you.
16      I'm going to apologize in advance. I've
17  got to scoot out for a moment. I hope to be
18  back, but my room is up at the Grand Bohemian
19  across the street and I'm going to go check
20  out, and I hope to see you folks.
21      DIRECT EXAMINATION
22  BY MR. FERGUSON:
23      Q. Good afternoon, Mr. Cunningham. Matt
24  Ferguson again. I don't have very much for you.
25  Mr. Reiser covered quite a bit. I'm going to jump

1 around a little bit on some topics.
2     My first one is pretty simple. I've seen
3 some of these corporate growth committee and strategic
4 council documents, and there's talk about disposition
5 of other assets.
6     Real quickly, were there any assets like raw
7 land that was in the RCDC portfolio or -- when I said
8 RCDC, I meant Ritz-Carlton Development Company -- did
9 they own any kind of raw land that had been planned
10 for other Ritz-Carlton Destination Clubs?
11     A. I believe the only land designated for a club
12 would've been in Abaco.
13     Q. We've had some clients at depositions
14 conducted by your lawyers who indicated that they
15 thought the salespeople were telling them there was
16 going to be an RCDC -- Ritz-Carlton Destination
17 Club -- we've got Ritz-Carlton Development Company
18 also -- but I'm talking about a club in South Beach.
19     Do you have a recollection of anybody
20 authorizing -- say there was going to be a club in
21 South Beach?
22     MR. SELLINGER: Objection to form.
23     A. There was a -- nobody was authorized to
24 represent that. We had worked on a project in South
25 Beach that never got off the ground.
Page 114

BY MR. FERGUSON:
2     Q. Did you ever acquire property to do that?
3     A. I don't believe we owned any of the property.
4     Q. Did you dispose of any or get out of any --
5 withdrawn. Were there any contracts for the purchase
6 of land, as opposed to owning the land, for any places
7 that might become RCDC clubs?
8     A. I'm sorry?
9     Q. Did you put any land under contract to
10 purchase property that was slated to be in the RCDC
11 club system?
12     A. Not other than the Abaco, as far as I'm
13 aware.
14     Q. Could you pull out Exhibit 2136, which is
15 that corporate governance committee, May 24, 2012,
16 document? It's the redacted one.
17     A. Got it.
18     Q. Just a few questions about that. First of
19 all, can you go to page 7 of 2136? I don't think
20 they're numbered. It's the seventh page in.
21     MR. MARX: There's a page number.
22 BY MR. FERGUSON:
23     Q. It's the next one. Let me grab mine. It's
24 page 8. I'm sorry. Page 8, you've got these
25 milestones. There's talk about -- withdrawn. The
Page 115

1 sixth one down says, "Communications with RCDC owners
2 of strategy/PR."
3     Was part of this -- do you recall a topic in
4 here -- without discussing any attorney-client
5 privilege -- whether a topic in here was the potential
6 affiliation of Ritz-Carlton Destination Clubs and/or
7 its members to the Marriott Vacation Club system?
8     A. I don't recall whether that was what was
9 being referenced here.
10     Q. We know -- I can pull it up -- it's
11 Exhibit 1024 -- but it's the Eveleen Babich letter
12 that went out on July 17, 2012. It looks like there
13 was a target date of June 14, 2012 for communication
14 to RCDC owners.
15     Is the Eveleen Babich letter that went out on
16 June 17, 2012 the communication referenced here in
17 this corporate growth committee memorandum dated
18 May 24, 2012?
19     MR. SELLINGER: Objection to form.
20     A. I don't know whether it is the -- that's what
21 this is referring to or not.
22     MR. FERGUSON: Just put up Exhibit 1024.
23 BY MR. FERGUSON:
24     Q. That's the evolution letter that came from
25 Ms. Babich. Can you see that on your screen? I'm not
Page 116

1 going to have you go through that. Do you generally
2 recognize that that letter went out around mid July?
3     A. Yes, I do.
4     Q. And you followed up a month later with
5 another letter?
6     A. That's correct.
7     Q. If you go to the second page, the signature
8 block, I just want to show you that that's Ms. Babich
9 who signed that document.
10     She didn't author that document, though; did
11 she?
12     A. There was a number of people who had a hand
13 in authoring that letter.
14     Q. Did lawyers have their hands in doing that
15 letter?
16     A. Yes.
17     Q. Back to Exhibit 2136, that redacted -- you're
18 open to page 8 on it, you can look at it in any manner
19 you want for this question.
20     When you were preparing for your deposition
21 back on November 10th and maybe November 17th -- I
22 think they were the two dates -- do you recall whether
23 or not you reviewed this corporate growth committee
24 strategic plan memorandum -- that you and Mr. Terry
25 sent to the corporate growth committee?
Page 117

30 (Pages 114 - 117)

```
 1     A.  I didn't review that.
 2     Q.  Before seeing it in deposition preparation or
 3  for preparation for this particular leg of your
 4  deposition, had you looked at it in connection with
 5  any of the three litigations?
 6     A.  Before?
 7     Q.  Before -- the last couple days or hours.
 8     A.  No.
 9     Q.  Do you maintain a copy of it, as the author,
10  in your files?
11     A.  I have no idea.
12        (Exhibit 2245 was marked for
13        identification.)
14  BY MR. FERGUSON:
15     Q.  Mr. Cunningham, this is a document that I
16  asked for this morning or last night, and it's an
17  e-mail that starts on the second page with your e-mail
18  to Mike Andrew.
19        Mike Andrew is a lawyer in the legal
20  department?
21     A.  That's correct.
22     Q.  Is he on the -- he's kind of the corporate
23  side, as opposed to the litigation side like
24  Mr. Kelly?
25        MR. SELLINGER:  Objection to form.
                                                Page 118
```

```
 1     A.  I --
 2  BY MR. FERGUSON:
 3     Q.  Just a lawyer?
 4     A.  He's an attorney in our in-house counsel
 5  office.
 6     Q.  Now, you'll see here that you were asking him
 7  for an electronic version of the action item status
 8  summary that he had distributed at the strategic
 9  council meeting.
10        Had there been a recent strategic council
11  meeting?  Can you tell that from this e-mail?
12     A.  He's saying --
13     Q.  You're saying.
14     A.  Yeah.  There must have been, but I don't
15  recall.  January -- what is this?
16     Q.  January 3rd, 2013.
17     A.  Yeah.  So...
18     Q.  A couple weeks or a month after the spinoff,
19  correct -- or several weeks?
20     A.  That's correct.
21     Q.  I just wanted to ask you, also, two things
22  about your e-mail on the back here, in addition to
23  whether or not there was a strategic council meeting.
24        You said that you want to share with the rest
25  of the steering committee on the project.  The project
                                                Page 119
```

```
 1  was -- was that ultimately what became the
 2  reengineering of the luxury brand?
 3        MR. SELLINGER:  Objection to form.
 4  BY MR. FERGUSON:
 5     Q.  Let me ask this.  What was the project?
 6     A.  I don't know.  I assume the project team was
 7  the people that I forwarded it to, but I don't -- had
 8  to do with the inventory at the Ritz-Carlton projects.
 9     Q.  Okay.  Your signature block here is as
10  executive vice president and chief operating officer
11  of North American and Caribbean; correct?
12     A.  That's correct.
13     Q.  Is that the -- it says, "Marriott Vacation
14  Worldwide Corporation."  Is that the signature block
15  that you've regularly used or normally used since you
16  took that position over at spinoff?
17     A.  Yeah.  I don't know whether I changed that --
18  whether that title changed with the added
19  responsibility of Ritz-Carlton because they were all
20  North American and Caribbean.
21     Q.  Of course, we've seen sometimes when you've
22  communicated with our clients and their fellow club
23  owners, you would sign as executive vice president,
24  chief operating officer of Ritz-Carlton Destination
25  Club; correct?
                                                Page 120
```

```
 1     A.  That's correct.
 2     Q.  It looks like, on page 1, you attached what
 3  Mr. Andrew sent to you on the same day, the RCDC legal
 4  analysis.  You forwarded that on to Mary Lynn Clark,
 5  Stephanie Sobeck, Tony Terry, and Nick Rossi.
 6        Were they the steering committee, to the best
 7  of your recollection?
 8     A.  I don't recall.  I don't recall calling it a
 9  steering committee, but they were the people that I
10  was referring to.
11     Q.  Were there any --
12     A.  I was --
13     Q.  Sorry.  It's hard to get used to a new lawyer
14  asking questions.  This steering committee, would it
15  have included an attorney from the legal department,
16  or would it have been mostly or all business people?
17     A.  I don't recall.  I don't know.
18     Q.  Skipping back to something -- I wanted to ask
19  about the November 14, 2013 affiliation agreement.
20  I'm not sure what exhibit it is there.  It's the one
21  that was produced on March 14 or 15 or 16, 2018.
22  That's why we're here.
23     A.  I don't have it.
24     Q.  This is the agreement that was between MRTC
25  and Lion & Crown.  I'm not going to ask you anything
                                                Page 121
```

31 (Pages 118 - 121)

1  about it, per se. I did want to follow up with some
2  questions that Mr. Reiser asked you about the
3  dissemination of it to the various boards. I want to
4  focus -- I want to focus on its dissemination.
5      It was prepared mostly by your legal
6  department; is that right?
7    A. I'm sure it was.
8    Q. It was e-mailed around -- because we have a
9  lot of e-mails that were withheld, based on
10  privileges, with your lawyers internally. Was it
11  e-mailed around the company, including the legal
12  department?
13    A. I have no idea.
14    Q. Was it worked on for many months?
15    A. I don't recall.
16    Q. Do you recall that it was started -- looks
17  like it was started, according to the privilege log,
18  at least, in May, June of 2013?
19    A. I don't recall.
20    Q. And I can pull it out for a second here.
21  Some of the lawyers that I see on the e-mail chains
22  dealing with this particular document -- 2102 -- would
23  include Barbara Egolf.
24      Is she someone that worked on things like
25  this?

Page 122

1    A. I guess you'd have to read that testimony
2  back to me.
3  BY MR. FERGUSON:
4    Q. I wasn't -- I asked you a different way
5  because I might have taken it down wrong. My last
6  question was, do you believe you did have a duty to
7  send it on to Mr. Mercer before he signed a document
8  called "An acknowledgement of and joinder to"?
9      MR. SELLINGER: Objection to form.
10    A. I don't have an opinion one way or the other
11  whether we had a duty to do that, but the existence of
12  the document was clear. I don't know who had a
13  responsibility to provide it or not.
14  BY MR. FERGUSON:
15    Q. I'm just going to show you -- mark another
16  document that's 2246.
17      (Exhibit 2246 was marked for
18      identification.)
19  BY MR. FERGUSON:
20    Q. Exhibit 2246 is a declaration of Kathy
21  Borkholder. It relates to the motion practice --
22  motion just means a court request -- a request of the
23  court by plaintiffs to try to seek some or all of the
24  redactions that were in the May 24, 2012 corporate
25  growth committee, strategic plan that you and

Page 124

1    A. Yes.
2    Q. And Trish Wetmore?
3    A. Yes.
4    Q. She's another lawyer that would have worked
5  on something like this?
6    A. That's correct.
7    Q. And did Mr. Andrew work on documents like the
8  affiliation agreement?
9    A. I don't know.
10    Q. Would you expect the law department of
11  Marriott Vacation Worldwide to have provided
12  Mr. Mercer and Mr. Albert, and the other folks at
13  other clubs, with a copy of the affiliation agreement
14  you wanted them to acknowledge and to join?
15    A. I don't know. They would have done what was
16  proper. I don't know what that -- whether there was
17  an expectation for that.
18    Q. I believe you said that you didn't believe
19  you had a duty to send it.
20      Do you recall that testimony?
21    A. No.
22    Q. I have it in quotes. Do you believe you had
23  a duty to send it on to, for example, Mr. Mercer, who
24  was being asked to acknowledge it and join it?
25      MR. SELLINGER: Objection to form.

Page 123

1  Mr. Terry signed as yours.
2      I just had some questions about it. I
3  thought it was easier to get this out and ask you --
4  have you seen this before today?
5    A. I saw this last night.
6    Q. All right. On page 2 of Exhibit 2246, it
7  says that "Messers. Cunningham and Terry were not the
8  sole authors of the May 24th memo." That's what
9  Ms. Borkholder calls it. It says, "Rather, that
10  document was generated through a collaborative process
11  with a number of individuals and departments drafting
12  and providing revisions and comments to particular
13  sections."
14      Do you generally agree with that, that
15  strategic council -- sorry -- that the corporate
16  growth committee document was done in a collaborative
17  process with a number of individuals?
18    A. Yes.
19    Q. And in connection with reviewing this and
20  looking at this, did you read it or did you see it?
21    A. I read it briefly. I didn't study it.
22    Q. In connection with this, to be clear, you did
23  not see any of the redacted versions in an unredacted
24  form?
25    A. No.

Page 125

32 (Pages 122 - 125)

1    Q. You saw the black that we see?
2    A. I saw the one that you put in front of me.
3    Q. Did you task -- withdrawn. Was Mr. Andrew
4  the person that was your -- that you would task at the
5  law department to spearhead the law department's work
6  on any input they might have given into this strategic
7  plan?
8        MR. SELLINGER: Objection to form.
9    A. I'm not sure I would have tasked him to do
10  it, but he was the person providing legal advice
11  relative to the memo.
12  BY MR. FERGUSON:
13    Q. It looks like he's a senior vice president
14  and deputy general counsel. Right? I'm looking at
15  that e-mail.
16    A. I don't remember their titles.
17    Q. It says --
18    A. I can tell you what Doug's title is.
19    Q. Exhibit 2245 is the one that we just saw.
20  You don't have to pull it out. It says, "Michael W.
21  Andrew, Jr., senior vice president and deputy general
22  counsel."
23        So he's pretty high up in the law department?
24    A. Agree.
25    Q. There's sections that were redacted. And I

Page 126

1  just want to ask you without -- please don't divulge
2  any attorney-client privilege. There's a section
3  called "Risk and opportunities."
4        Was the opportunities portion of this
5  redacted section -- did it have to do with business
6  opportunities or was it legal advice?
7    A. I don't recall exactly, but it was provided
8  by Mr. Andrew, so I believe it was legal advice.
9    Q. The legal department was providing, in your
10  view, legal advice on what the Marriott Vacation
11  Worldwide strategic plan on the RCDC system meant in
12  terms of opportunities?
13        MR. SELLINGER: Objection to form.
14    A. My guess is, it was more related to risk and
15  the -- it's a general heading that we use for that
16  section of these type of memos.
17  BY MR. FERGUSON:
18    Q. Okay. So they generally go together, risk
19  and opportunities, in these memos?
20    A. Yeah.
21    Q. They're the yin and the yang?
22    A. That's correct.
23    Q. Do you have any idea as to why this document,
24  in redacted form, was not produced in this litigation?
25    A. I have no idea.

Page 127

1    Q. And you understand that the -- Exhibit
2  2102 -- the affiliation agreement dated November 14th,
3  2013 -- you understand that wasn't produced in this
4  litigation until March of 2018?
5    A. I understand. Yeah, I understand that that
6  wasn't produced until then.
7    Q. Do you know whether or not the corporate
8  growth committee document that's been redacted --
9  again, without giving legal advice -- do you know
10  whether it addressed Kapalua being deflagged
11  ultimately, or Abaco?
12    A. I have no idea.
13    Q. Looking at the context of the document, the
14  recommendations, the timeline, and the strategies, do
15  you see any indication that that might have to do with
16  Kapalua or Abaco?
17    A. Is that 2136?
18    Q. Yeah, 2136. I don't know why I said 2102.
19  That's the other document.
20        It does have a disposition update on the
21  Abaco, at least on the next two-sided version of it.
22    A. I don't recall the timing of the Kapalua
23  changes vis-à-vis the -- or Abaco. It could include
24  Abaco. I don't know.
25    Q. Had you laid out the reasons for the

Page 128

1  rationale for the -- I guess it was a termination to
2  not renew. Was it a termination -- withdraw that.
3        There was a termination of the Kapalua
4  management contract with Ritz-Carlton Management
5  Company; is that right?
6    A. That's correct.
7    Q. That was something that was also --
8  withdrawn.
9        The inability of the ownership of the Kapalua
10  project, which included, I think, 34 percent ownership
11  by Marriott Vacation Worldwide -- was that about
12  right -- 34 percent?
13    A. I don't recall the breakdown of the joint
14  venture.
15    Q. You knew before, obviously, when it was
16  announced by Ms. Babich to the general membership on
17  July 17, 2012, that the Kapalua relationship,
18  vis-à-vis The Ritz-Carlton Destination Club, was in
19  jeopardy?
20    A. Yes. Otherwise, we wouldn't have announced
21  it.
22    Q. And I think that you announced it. You also
23  explained it in your August 28, 2012 webinar; did you
24  not? Do you recall that generally?
25    A. I don't recall. I would certainly expect

Page 129

33 (Pages 126 - 129)

1  that I might.
2      Q.  I'm going to mark another exhibit here, 2247.
3      (Exhibit 2247 was marked for
4      identification.)
5  BY MR. FERGUSON:
6      Q.  Mr. Cunningham, there was a production of
7  documents in connection with the subpoena we served on
8  the Ritz-Carlton Hotel Company back last November, and
9  we got a production somewhere around Easter weekend or
10  somewhere towards later -- March 2018.  This is one of
11  the documents that was produced.
12      It's another -- it's a version of a document
13  that you were drafting.  It looks like it started on
14  April 2013.  You'll see that someone -- we're in May
15  now.
16      Do you recall -- you might have seen in your
17  deposition -- I can't recall myself -- that, at some
18  point, you were directly communicating with the
19  Bachelor Gulch members -- directly communicating by
20  yourself -- sorry -- from yourself to them.
21      Do you recall that generally?
22      A.  I remember that there was a point in our
23  discussions with the Bachelor Gulch association that
24  we didn't feel like the board of Bachelor Gulch was
25  providing full information to the members, so we took
Page 130

1  it to communicate more directly with them.
2      Q.  This is an iteration of that letter, or a
3  draft of that letter, it would appear?
4      A.  Clearly, it's not the finished product.
5      Q.  I got it.
6      MR. SELLINGER:  Let me note once again --
7      so this subpoena was served after --
8      according to what you said -- after the
9      deposition of Mr. Cunningham and Ms. Sobeck.
10      So how does this relate to
11      subsequently-produced documents?
12      MR. FERGUSON:  Well, it is subsequently
13      produced, so...
14      MR. SELLINGER:  Well, you could serve a
15      subpoena tomorrow --
16      MR. FERGUSON:  Actually, I might.  Ian
17      will know better than I do right now.  It was
18      probably served right around that week.  I
19      remember being in this room, drafting it.
20      I'm almost finished with that one question
21      about it.
22      MR. SELLINGER:  My only point is, the
23      subsequently-produced documents --
24      MR. FERGUSON:  Well, let's look at it a
25      different way.  Okay?  You didn't produce
Page 131

1  this document from Ritz-Carlton Destination
2  or from Marriott Vacation Worldwide.  I had
3  to get it from Ritz-Carlton Hotel Company.
4  So there's another step to that, which is,
5  you all didn't produce it.  The hotel company
6  did.
7      MR. SELLINGER:  I personally have no idea
8  what we produced and what we didn't.  Worry
9  about whether this was subject to the
10  parameters that you and your co-counsel
11  agreed to, which is under the search
12  parameters that were explored.
13      MR. FERGUSON:  Fair enough.  We just
14  spent more time talking about it than my
15  question about it.
16  BY MR. FERGUSON:
17      Q.  I just wanted to go to the end of paragraph 3
18  on page 1 of Exhibit 2247.  It starts with, "Why we
19  believe this affiliation would greatly benefit the
20  members.  We also believe that you and you alone
21  should have the opportunity to make this important
22  choice.  Therefore, if the majority of you choose,
23  that you would not" -- in capitals -- "like an
24  exchange affiliation with the Marriott Vacation Club
25  and the Ritz-Carlton Club, Bachelor Gulch will have no
Page 132

1  exchange affiliation with Marriott Vacation Club in
2  the future."
3      Was this a letter you were drafting or was
4  generally being drafted for you?
5      A.  It was being drafted for me.
6      Q.  Was it being drafted for you by business
7  people, legal people, or both?
8      A.  Probably a combination.
9      Q.  It went on to say, "If, on the other hand,
10  the majority of Bachelor Gulch members vote in favor
11  of this exchange affiliation, then we will allow each
12  individual Bachelor Gulch member to choose to
13  participate on an individual, voluntary basis."
14      At the end of the day, you didn't conduct a
15  survey or a vote for Bachelor Gulch because they had
16  their own and decided to deflag and not renew; right?
17      A.  Ultimately, there was a vote, but it wasn't a
18  vote about affiliation.
19      Q.  It was a vote about whether to renew or not
20  renew the management contract?
21      A.  That's correct.
22      Q.  And the management of these clubs is one of
23  the three main business sectors of Marriott Vacation
24  Worldwide?
25      A.  I'm sorry?
Page 133

34 (Pages 130 - 133)

1     Q. One of the main business sectors of Marriott
2 Vacation Worldwide is the management of clubs. That's
3 a revenue source?
4     MR. SELLINGER: Objection to form.
5     A. It's one of the pieces of our business, yes.
6 BY MR. FERGUSON:
7     Q. So would I state that right that it was a
8 vote to not renew the management contract?
9     A. That's correct.
10     Q. Is that vote required in the declaration or
11 the management contract, if you recall?
12     A. I don't recall.
13     MR. FERGUSON: That's all my questions.
14 Mike, do you have anything else?
15     MR. REISER: No.
16     MR. FERGUSON: That's all I have.
17     MR. SELLINGER: We have nothing.
18     THE VIDEOGRAPHER: This concludes the
19 videotaped deposition of Mr. Lee Cunningham
20 and the end of media number two. We're going
21 off the record. The time is 2:08 p.m.
22     (The reading and signing of the
23 transcript were not waived, and these
24 proceedings concluded at 2:08 p.m.)
25

Page 134

1 Under penalties of perjury, I declare that I have read
2 the foregoing document and that the facts stated in it
  are true.
3

_____

4 DATE          LEE CUNNINGHAM
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 136

---

1          CERTIFICATE OF REPORTER
2
3 STATE OF FLORIDA
4 COUNTY OF ORANGE
5
6          I, Lisa Gerlach, Court Reporter, do hereby
7 certify that I was authorized to and did
8 stenographically report the foregoing deposition; and
9 that the transcript is a true and correct
10 transcription of the testimony given by the witness.
11          I further certify that I am not a relative,
12 employee, attorney or counsel of any of the parties,
13 nor am I a relative or employee of any of the parties'
14 attorney or counsel connected with the action, nor am
15 I financially interested in the action.
16          Dated this 29th day of May, 2018.
17
18
19
20
21          *Lisa Gerlach*
22          Lisa Gerlach, Court Reporter
23
24
25

Page 135

35 (Pages 134 - 136)

[& - 2247]

| & | | | |
|---|---|---|---|

**&**  9:23 10:13,17
  11:17,21,24,25
  12:3,6,10,12,21,25
  13:2,4,9,18,24
  14:3,5,7,13,19,23
  15:1,7,11,17,18,22
  15:23 16:1,9,19,20
  17:25 19:16,23
  26:7 27:17 30:7
  30:15 48:22 93:2
  99:25 121:25

**0**

**00237**  1:9
**01**  10:3
**01301**  1:5 6:11
**07932-0677**  3:18

**1**

**1**  1:25 54:5 121:2
  132:18
**1.5**  54:17,20 75:20
**1/3/12**  5:12
**10**  65:18 101:12,17
  106:16
**10/13/2012**  88:16
  88:25
**10/21/13**  73:18
**100**  69:10
**1003**  10:1,7
**1020**  94:15
**1024**  116:11,22
**105**  53:20 54:17,21
  55:15 56:7,10
  75:13
**108**  5:11
**109**  91:20
**10:59**  40:1
**10th**  117:21
**113**  5:5

**1135**  87:24
**118**  5:12
**119**  3:4
**11:06**  40:4
**11:51**  69:17
**12**  65:18,23 66:2
  81:11
**124**  5:13
**12:04**  69:22
**13**  43:16 81:6,7,10
  81:13 82:21
**130**  5:15
**135**  5:6
**136**  1:25 5:7
**14**  9:15 17:20 43:1
  44:12,22 47:24
  48:6 82:22 116:13
  121:19,21
**1475**  3:8
**14th**  43:21 128:2
**15**  56:11 121:21
**15-54897**  1:14
**15.5**  56:8
**16**  70:21 121:21
**1601**  4:5
**17**  91:16 116:12,16
  129:17
**17th**  117:21
**18**  1:21 87:22
  97:13,14
**1806**  87:19
**1807**  87:21
**1816**  3:12
**1897**  96:23
**18th**  6:4
**19**  23:19,19 24:3
  70:20,22 101:10
  101:17,18 102:7
  102:12,20 103:11
  106:21

**19th**  102:4,6,16
**1:06**  108:10
**1:16**  1:5 6:11
**1:27**  108:13

**2**

**2**  75:20 125:6
**20**  104:20
**2001**  10:17
**2007**  56:21
**201**  3:4
**2010**  13:19,23 15:3
  15:9
**2011**  97:3
**2012**  50:8,9 52:14
  52:19 58:12 60:18
  61:7 62:8,10
  72:14 73:21 77:2
  77:5 78:11,18,20
  78:23 79:7 82:21
  85:3,13 87:1,22,25
  88:12 89:13 90:3
  90:9 91:10 94:17
  94:23 115:15
  116:12,13,16,18
  124:24 129:17,23
**2013**  8:13 9:2,15
  11:12 12:9,19
  13:5 14:14,16,19
  16:3,5,9,21 17:1
  17:20 18:1 19:8
  19:10 20:12 21:6
  21:11,13,16 22:2,5
  22:8 23:6 24:18
  25:10 27:9 29:5
  29:22,23 30:3
  34:24 43:1,21
  44:12,22 47:24
  48:6,14 49:15
  91:16 94:7,20
  96:8 100:7 119:16
  121:19 122:18

**128:3 130:14
2014**  18:2 20:10
  21:4 23:25 24:19
  24:20 43:16
  101:11,17,17,24
  108:20
**2015**  70:21 101:12
  106:16
**2018**  1:21 6:4 8:14
  31:3,8 121:21
  128:4 130:10
  135:16
**206**  7:4
**21**  66:18 87:24
  97:3
**2102**  8:19 9:9
  11:12 30:4 122:22
  128:2,18
**2136**  52:17,18
  58:12 70:1 115:14
  115:19 117:17
  128:17,18
**2137**  100:9
**2138**  101:11
**2139**  101:12
**2143**  79:9
**2144**  83:7
**2145**  84:2
**2147**  85:14
**2148**  89:21 91:17
**21st**  100:7
**2215**  76:23
**2235**  72:8
**2244**  5:11 108:15
  108:19
**2245**  5:12 118:12
  126:19
**2246**  5:13 124:16
  124:17,20 125:6
**2247**  5:14 130:2,3
  132:18

Page 1