# EXHIBIT - I

Randal Mercer - October 24, 2017

| | |
|---|---|
| 1 | UNITED STATES DISTRICT COURT |
| 2 | DISTRICT OF COLORADO |
| 3 | Civil Action No. 1:16-cv-01301-PAB-GPG |
| 4 | |
| 5 | RCHFU, LLC, et al., |
| | Plaintiffs, |
| 6 | vs. |
| 7 | MARRIOTT VACATIONS WORLDWIDE |
| 8 | CORPORATION, et al., |
| 9 | Defendants. |
| 10 | _____/ |
| 11 | |
| 12 | VIDEOTAPED DEPOSITION OF |
| 13 | RANDAL MERCER |
| 14 | Tuesday, October 24, 2017 |
| 15 | 9:02 a.m. - 5:32 p.m. |
| 16 | CRE Consultants |
| 17 | 12140 Carissa Commerce Court, Suite 103 |
| 18 | Fort Myers, Florida  33966 |
| 19 | |
| 20 | Reported By: |
| 21 | Yvonne Corrigan, RPR, CRR |
| 22 | Notary Public, State of Florida |
| 23 | Job No. 2728895 |
| 24 | |
| 25 | Pages 1 - 335 |

Page 1

Randal Mercer - October 24, 2017

1 APPEARANCES:
2
3 On behalf of Plaintiffs:
    THE MATTHEW C. FERGUSON LAW FIRM, P.C.
4   119 South Spring, Suite 201
    Aspen, Colorado 81611
5   BY: MATTHEW C. FERGUSON, ESQ.
    matt@matthewfergusonlaw.com
6
7 REISER LAW, P.C.
    1475 Broadway, Suite 300
8   Walnut Creek, California 94596
    BY: MICHAEL J. REISER, ESQ.
9   mreiser@reiserlaw.com
10
11 On behalf of Defendant - Aspen Highlands Condominium
12 Association:
    HOGAN LOVELLS US, LLP
13   1601 Wewatta Street, Suite 900
    Denver, Colorado 80202
14   BY: DANIEL F. SHEA, ESQ.
    BY: JESSICA BLACK LIVINGSTON, ESQ.
15   dan.shea@hoganlovells.com
16   jessica.livingston@hoganlovells.com
17
    On behalf of Defendant - Marriott:
18   GREENBERG TRAURIG, P.A.
    500 Campus Drive, Suite 400
19   Florham Park, New York 07932
20   BY: IAN S. MARX, ESQ.
21   marxi@gtlaw.com
22
23 ALSO PRESENT: Michael Reiser, Jr.
24   Timothy Lenz, Videographer
25   Chris Hanlon, Document Technician
                                            Page 2

1               I N D E X
2 WITNESS                        PAGE
3 RANDAL MERCER
4   Direct Examination by Mr. Ferguson.................10
5         DEPOSITION EXHIBITS
6
7
8 NUMBER         DESCRIPTION          PAGE
    Exhibit 1020  RCDC Re-Engineering Update      55
9 Exhibit 1021  Email to Sobeck - 6/11/12     72
10    Re: Board filing documents
11 Exhibit 1023  Babich letter - July 2012      78
12 Exhibit 1026  Babich letter - July 2012      97
13 Exhibit 1034  Email to Marsden, Schneider,     100
    Oliver - 7/26/12, Re: Letter
14    to Members of Aspen Highlands
15 Exhibit 1035  Letter to AHCA - 7/26/12      110
16    Re: Letter to members
17    regarding the evolution
    Exhibit 1042  Email from Neveloff - 8/7/12      110
18    Re: Fw: Ritz-Carlton Destination
19    Clubs Newest Offering
    Exhibit 1043  Email to Mercer - 8/8/12      114
20    Re: Fw: Ritz-Carlton Destination
21    Clubs Newest Offering
22 Exhibit 1053  Letter to AHCA - 8/17/12      126
23    Re: Evolution of RCDC Brand
24 Exhibit 1058  Email to Clark - 8/20/12      134
25    Re: Feedback
                                            Page 3

1          DEPOSITION EXHIBITS
2 NUMBER         DESCRIPTION          PAGE
3 Exhibit 1061  Cunningham letter - August 2012   137
4 Exhibit 1060  Email to Mercer - 8/21/12     143
    Re: A message from Lee
5    Cunningham
6 Exhibit 1064  Email to Mercer - 8/21/12     149
    Re: Aspen Highlands Ritz
7 Exhibit 1066  Email to Mercer - 8/21/12     153
8    Re: Ritz-Carlton member,
9    Nowell #8106
10 Exhibit 1072  Email to Mullenix - 8/21/12     155
    from Neveloff
11 Exhibit 1075  Email to Joel - 8/26/12     156
12    Re: Evolution of RCDC brand
13 Exhibit 1104  Letter to Members of       162
    AHCA - 9/2012 from Neveloff,
14    Schneider, Marsden, Oliver
15 Exhibit 1097  Draft Memorandum - 9/21/12     165
    to AHCA Board of Directors
16 Exhibit 1108  AHCA Minutes of Annual       166
17    Meeting 10/13/12
    Exhibit 1110  Email to Mercer - 10/16/12     168
18    Re: Ritz Club Aspen
19 Exhibit 1103  Question to members document    178
20 Exhibit 1113  Email to Mercer - 10/22/12     188
21    with attached Gosch invoice
22 Exhibit 1114  Email to Oliver - 10/25/12     189
23    Re: Marriott Vacation Club
24 Exhibit 1116  Email to Sobeck - 11/10/12     193
25    Re: Meeting in Orlando
                                            Page 4

1          DEPOSITION EXHIBITS
2 NUMBER         DESCRIPTION          PAGE
3 Exhibit 1117  Email to Oliver - 11/4/12     198
    Re: Meeting in Orlando
4 Exhibit 1118  Email to Oliver - 11/5/12     201
5    Re: Meeting in Orlando
    Exhibit 1120  Email to Neveloff - 11/6/12     204
6    Re: Message from RCC BG
    Exhibit 1122  Email to Mercer - 11/7/12     208
7    Re: Message from RCC BG
8    with attachments
    Exhibit 1124  Letter to Weisz - 11/5/12     209
9    Re: Proposed Affiliation
10 Exhibit 1126  Email to Gosch, Mercer -      216
    11/8/12, Re: Message from
11    RCC BG
12 Exhibit 1130  Email to Mercer, Neveloff -     217
    11/28/12, Re: Response to
13    11-5 Correspondence
14 Exhibit 1135  Gosch cease and desist     219
15    letter - 11/21/12
    Exhibit 1137  Email to Mercer - 11/28/12     220
16    Re: Response to 11-5
17    Correspondence
    Exhibit 1145  Memorandum - 12/19/12 to     222
18    membership
19 Exhibit 1146  Email to Oliver, Marsden     227
    and Schneider - 12/12/12
20    Re: Monday meeting
21 Exhibit 1150  Letter to Gosch - 12/21/12     229
22    from Waller, Baker Hostetler
23 Exhibit 1151  Draft Letter to Mercer -      237
24    12/21/12, Re: Follow-up
25    from 11/29/12 meeting
                                            Page 5

2 (Pages 2 - 5)

Randal Mercer - October 24, 2017

| | DEPOSITION EXHIBITS | |
|---|---|---|
| NUMBER | DESCRIPTION | PAGE |
| Exhibit 1152 | Signed letter to Mercer - 12/22/12, Re: Follow-up from 11/29/12 meeting | 242 |
| Exhibit 1155 | Email to Oliver - 12/28/12 Re: Points program and MVCI and Kapalua | 247 |
| Exhibit 1157 | Email to Marsden, Schneider and Oliver - 1/16/13 Re: Member comments | 249 |
| Exhibit 1158 | Member comments | 249 |
| Exhibit 1500 | Vacation Points Chart | 253 |
| Exhibit 1161 | Letter to members - 2/3/13 Update | 259 |
| Exhibit 1168 | Email to Mullenix - 3/22/13 Re: Need your help | 261 |
| Exhibit 1169 | Email to Mercer - 3/28/13 Re: Unintentionally forgot to mention | 263 |
| Exhibit 1172 | Email to Martino - 3/28/13 Re: Privileged and Confidential - BG Notes | 266 |
| Exhibit 1175 | Email to Jenson - 4/5/13 Re: Test | 272 |
| Exhibit 1176 | Memo to DL-RCDC SLC Member Services - 4/5/13, Re: Member Services Update - Aspen Board of Directors Letter | 277 |

Page 6

| | DEPOSITION EXHIBITS | |
|---|---|---|
| NUMBER | DESCRIPTION | PAGE |
| Exhibit 1223 | Email to Mercer - 5/24/13 Re: Update: Important Enrollment Information | 301 |
| Exhibit 1234 | Email to Mercer, Cunningham - 6/3/13, Re: Lion & Crown Enrollment | 304 |
| Exhibit 1235 | Email to Sobeck - 6/3/13 Re: Aspen Letter to Members CLEAN | 306 |
| Exhibit 1251 | Email to Neveloff - 7/6/13 Re: BG | 309 |
| Exhibit 1255 | Draft letter - 7/13, "Dear Mr. & Mrs. XXX" | 310 |
| Exhibit 1274 | Home Club Members - Frequently Asked Questions | 314 |
| Exhibit 1282 | Draft letter - 9/13, "Dear Mr. & Mrs. XXX" | 315 |
| Exhibit 1313 | Email to Mercer - 12/5/13 Re: Fw: | 318 |
| Exhibit 1314 | Spreadsheet of member comments | 320 |
| Exhibit 1316 | Email to Mercer, Schneider, Harris, Oliver - 12/6/13 from Alper Re: Board short letter to Members (last page of exhibit) | 324 |
| Exhibit 1380 | Email to Mercer - 4/1/14 Re: Fw: Exchange Agreement | 327 |

Page 8

| | DEPOSITION EXHIBITS | |
|---|---|---|
| NUMBER | DESCRIPTION | PAGE |
| Exhibit 1180 | Confidential letter - 4/5/13 | 279 |
| Exhibit 1178 | Aspen Board Letter Sent - Member Responses - 4/5/13 | 280 |
| Exhibit 1202 | Letter - 5/3/13, "Dear Mr. & Mrs. Aspen Member" | 283 |
| Exhibit 1203 | Email to Marino - 5/4/13 Re: BG Letter | 284 |
| Exhibit 1207 | Email to Oliver - 5/11/13 Re: Aspen board vote | 287 |
| Exhibit 1208 | Email to Marsden - 5/18/13 Re: Update on Lion & Crown Enrollment | 288 |
| Exhibit 1210 | Email to Mercer - 5/15/13 Re: Update on Lion & Crown Enrollment | 291 |
| Exhibit 1212 | Email to Marsden, Schneider and Oliver - 5/18/13 Re: A comment regarding the Exchange Resorts documents | 294 |
| Exhibit 1218 | Email to Schneider - 5/18/13 Re: Urgent: RCC-BG Board seeks approval | 296 |
| Exhibit 1219 | Email to Mullenix - 5/18/13 Re: Urgent: RCC-BG Board seeks approval | 298 |

Page 7

PROCEEDINGS
* * * * *

THE VIDEOGRAPHER: Good morning. We are going on the record at 9:02 a.m., on Tuesday, October 24, 2017, and this is media unit one of the video recorded deposition of Randy Mercer, taken by the plaintiff in the matter of RCHFU, LLC versus, et al. versus Marriott Vacations Worldwide Corporation, et al., filed in the U.S. District Court, District of Colorado, Case Number 1:16-cv-01301-PAB-GPG.

This deposition is being held at CRE Consultants, located at 12140 Carissa Commerce Court, Suite 102, Fort Myers, Florida 33966.

My name is Timothy Lenz from the firm Veritext, and I'm videographer.

The court reporter is Yvonne Corrigan, also from Veritext.

If the court reporter will please swear in the witness.

THE COURT REPORTER: Off the record for a second, please.

THE VIDEOGRAPHER: Okay. We're going off the record. The time is 9:03.

(There was a discussion off the record.)

THE VIDEOGRAPHER: We are on the record. The

Page 9

3 (Pages 6 - 9)

Randal Mercer - October 24, 2017

1 time is 9:03.
2     Will the court reporter please swear in the
3 witness.
4 Whereupon,
5          RANDAL MERCER,
6 was called as a witness and having been first duly sworn
7 and responding, "I do," was examined and testified as
8 follows:
9          THE VIDEOGRAPHER:  We may proceed.
10          -- DIRECT EXAMINATION --
11 BY MR. FERGUSON:
12    Q.  Good morning, Mr. Mercer.
13    A.  Good morning.
14    Q.  My name is Matt Ferguson, and I'm from the law
15 firm of Matthew Ferguson Law Firm in Aspen, Colorado.
16 Thank you for introducing yourself to me a couple of days
17 ago at your annual meeting.
18          As you know, I represent about 206 of your
19 fellow owners that own about 230 units at the Ritz-Carlton
20 in Aspen.  You're generally aware of that?
21    A.  Yes, sir.
22    Q.  Okay.  You have been an owner for -- of a unit
23 at the Ritz-Carlton in Aspen for how long?
24    A.  Fifteen years, approximately.
25    Q.  You purchased the unit in approximately 2004?
                                                  Page 10

1    Q.  Okay.  And the wintertime, same type of
2 situation?
3    A.  Yes.
4    Q.  And 8410 was the unit number.  Do you recall the
5 12th frag?  Was it number six?  Number seven?  Do you
6 recall what it was?
7    A.  No, sir.
8    Q.  Do you recall what you paid for that unit in
9 2004?
10    A.  $160,000.
11    Q.  And prior to that time, had you ever owned any
12 type of an interval product, timeshare, fractional,
13 anything like that?
14    A.  No, sir.
15    Q.  Is this the first time you ever did this?
16    A.  Yes, sir.
17    Q.  Okay.  Were you a member of any hotel chain
18 loyalty program prior to purchasing in 2004, if you
19 recall?
20    A.  Hyatt.
21    Q.  And how did it come to pass that you learned
22 about the Ritz-Carlton in Aspen, Colorado?  How did you
23 get familiar with it, and how did you end up buying?
24    A.  By accident.  My wife and I rented a condominium
25 in Aspen for two weeks in the summertime to take a
                                                  Page 12

1    A.  Yes.
2    Q.  Okay.  Is it -- was it something you purchased
3 on your own?  Through a trust?  With your wife?  Do you
4 recall?
5    A.  I purchased it on my own.
6    Q.  Okay.  And do you know what unit you purchased?
7    A.  8410.
8    Q.  Most of those -- oh, 8410.  Okay.  And the ten
9 was -- what weeks are allocated to unit -- section ten, I
10 forget what it's called, what weeks was that allocated?
11    A.  I don't recall which ones specifically.  We
12 purchased a summer interest, so our predominant weeks
13 would be in the summer.  Two in the summer, one in the
14 winter, and then the float weeks.
15    Q.  And were those allocated weeks set weeks, or
16 were they just any time in the summer?
17    A.  They were set.
18    Q.  Okay.
19    A.  Two were set on a rotating basis.
20    Q.  Okay.  And what were the set ones, what are
21 approximately -- what do you recall the weeks to have been
22 in the summer?
23    A.  They start in early June, and they rotate every
24 year by one week until it gets to the end of the summer,
25 and then they reset until the beginning of the summer.
                                                  Page 11

1 vacation, and we were driving around thinking, wouldn't it
2 be nice to spend summer in Colorado.  And just by
3 happenstance, I had never been to Aspen Highland, drove
4 up, there it was, and went inside, fell in love, and met
5 with a salesperson.
6    Q.  Who was that, do you recall?
7    A.  A young gentleman from Australia.  His name was
8 Ryland Aspy (phonetic).
9    Q.  I'm sorry I interrupted you.  You went in and
10 met with him, and fell in love, and what happened?
11    A.  Took a contract home and signed it.
12    Q.  And your wife's first name is?
13    A.  Debbie, D-E-B-B-I-E.
14    Q.  And has she ever been an owner?
15    A.  No.
16    Q.  What is -- is it Mrs. Mercer?  Is that what she
17 goes by?
18    A.  Yeah, Debbie Ringdahl, R-I-N-G-D-A-H-L, Mercer.
19    Q.  Okay.  Yeah, I've seen her name where you
20 forwarded a few of your emails to her.  Is she a real
21 estate person also?
22    A.  She's a residential real estate agent here in
23 Southwest Florida.
24    Q.  Prior to purchasing a fractional unit at the
25 Ritz-Carlton Aspen Highlands, had you ever done any type
                                                  Page 13

4 (Pages 10 - 13)

Randal Mercer - October 24, 2017

1  of brokerage work or real estate work in the hospitality
2  industry?
3      A.  No, sir.
4      Q.  Is it fair to state that your real estate
5  brokerage specialty is commercial real estate?
6      A.  Yes.
7      Q.  And how long has that been the case?
8      A.  My first real estate license in Florida was
9  obtained through education and testing in 1983.
10     Q.  Okay.  What do you mean by that?  What do you
11 mean "testing"?
12     A.  Had to go through the classes and go through the
13 state test.
14     Q.  Okay.
15     A.  Get your license.
16     Q.  I'll come to your background in a minute there.
17 I just wanted to see -- so it went back to 1983 that you
18 started in the commercial real estate realm?
19     A.  I started in residential for the first two years
20 and transitioned to commercial after that.
21     Q.  Has it been in Fort Myers all along?
22     A.  Yes, sir.
23     Q.  Are you from Fort Myers?
24     A.  No, sir.  I was born in Orlando, Florida.
25     Q.  Okay.  The unit you purchased with the

Page 14

1  25 percent of this building.  I'm the broker who leases
2  the space out.
3      Q.  Your sign's out front.  Is that because you're
4  leasing space in this building?
5      A.  I'm a leasing agent, yes, sir, mm-hmm.
6      Q.  And the group -- the LLC you're part of that
7  owns 25 percent of the building, I take it owns the
8  building with the -- the other 75 percent of the people
9  are people that have invested in this piece of real
10 estate?
11     A.  Yes.
12     Q.  Okay.  And did you utilize a broker at all to
13 sell your unit, 8410, to Mr. Ennen?
14     A.  No.
15     Q.  He was just someone you knew and spoke to and
16 you knew he was interested in it?
17     A.  Mm-hmm.
18     Q.  Is that a yes?
19     A.  Yes.
20     Q.  Okay.  And if he was interested in skiing, he
21 picked up two weeks of summer, and one week of winter; is
22 that right?
23     A.  Yes.
24     Q.  So is it also for summer use, or --
25     A.  Yeah, he owns it with his sister, so I believe

Page 16

1  assistance of Ryland Aspy in 2004, you no longer own that,
2  do you?
3      A.  No, sir.
4      Q.  Okay.  And you sold it to somebody?
5      A.  Yes, sir.
6      Q.  Who did you sell it to; do you recall?
7      A.  I sold it to a gentleman named William Ennen,
8  E-N-N-E-N, and his sister, who does not live here.
9      Q.  Did you know Mr. Ennen prior to selling the unit
10 to him?
11     A.  Yes.
12     Q.  How did you know him?
13     A.  He was the general contractor who built the
14 building in which you're sitting, and he likes to ski.
15     Q.  So he's a general contractor working out of Fort
16 Myers, Florida?
17     A.  Yes.
18     Q.  And how long have you known Mr. Ennen?
19     A.  2000.
20     Q.  Were you a developer of this building, part of a
21 team or --
22     A.  I was part of a team, yes.
23     Q.  Do you have an equity interest in the
24 development of this building?
25     A.  I'm the managing member of an LLC that owns

Page 15

1  she uses it during the summer.
2      Q.  Okay.  Now, had you listed 8410 prior to selling
3  it to Mr. Ennen?
4      A.  No, I don't believe I did.
5      Q.  At around the same time, you purchased another
6  unit?
7      A.  Yes.
8      Q.  So you're still an owner there?
9      A.  Yes.
10     Q.  And that's what allows you to be president of
11 the board of directors?
12     A.  Yes.
13     Q.  And why did you -- why did you sell 8410 to
14 Mr. Ennen and buy a different unit?
15     A.  We were looking for a three-bedroom rather than
16 a two-bedroom.  8410 was a two-bedroom.  We have
17 grandchildren and in hopes that they would come out and
18 join us on vacation occasionally.
19     Q.  And you bought that also -- did you buy the
20 first one from the Ritz-Carlton Development Company?
21     A.  Yes.
22     Q.  And you bought the second one from the
23 Ritz-Carlton Development Company?
24     A.  Yes.
25     Q.  And was there a broker utilized with respect to

Page 17

5 (Pages 14 - 17)

Randal Mercer - October 24, 2017

1 the purchase of the new unit?  And we'll get to the number
2 in a moment?
3    A.  Ivan Skoric of Sotheby's was involved.  And
4 there was a broker that -- utilized by the developer for
5 selling the remaining units, developer-owned units at the
6 club.  They were involved.
7    Q.  And that was out of California.  What's their
8 name?  Legend or --
9    A.  I honestly don't know.
10       (Sotto voce discussion among plaintiffs'
11    counsel.)
12 BY MR. FERGUSON:
13    Q.  Mr. Klein?
14    A.  Yes, I believe it was.
15    Q.  And he's an entity that was retained by the
16 developer to sell off what's become known as the
17 13.4 percent of inventory that the developer still held?
18    A.  That's my understanding, yes.
19    Q.  Had you ever met with Mr. Klein before?
20    A.  No, sir.
21       First name was Jamie, was it not?
22    MR. REISER:  Yes.
23 BY MR. FERGUSON:
24    Q.  I think it might be James.
25    A.  Okay.  Good.  There it is.
                                            Page 18

1    Q.  So Ivan was involved.  Was he your broker, or
2 how did that work?
3    A.  He was not my broker.  I represented myself.
4    Q.  And what did you purchase for this three-bedroom
5 unit?
6    A.  45,000, I believe.
7    Q.  And do you know how long it was listed -- do you
8 know whether it was listed, this three-bedroom unit -- let
9 me back up.
10       What's -- what's the unit -- what's the unit
11 number of 30 -- sorry, of the three-bedroom?
12    A.  8205.
13    Q.  And what is its weeks?  Is it summer?  Winter?
14    A.  Summer.
15    Q.  All summer?
16    A.  Yes.  Summer and one in the winter.
17    Q.  The same deal?
18    A.  Same, same, yes, summer purpose.
19    Q.  Since purchasing it in 2015 -- was it from the
20 developer?
21    A.  Yes.
22    Q.  Have you put in any of your al- -- any of your
23 time, allocated or unallocated time, to -- into the
24 Lion & Crown Travel pool so you can go to a Marriott
25 Vacation Club?
                                            Page 19

1    A.  No.
2    Q.  Had you done that between 2014 and 2015 when you
3 sold 8410?
4    A.  No.
5    Q.  So with respect to the affiliation, you haven't
6 taken advantage of that so-called opportunity, right?
7    A.  I have not signed up for that opportunity.
8    Q.  You voted -- or sorry, you said you were for it
9 in the survey that was done in 2013?
10    A.  Mm-hmm.
11    Q.  Is that a yes?
12    A.  Yes.
13    Q.  Okay.  I was asking you about 8205.  Had -- when
14 did you -- when did you -- withdraw that.
15       Had that been listed, or how did you find out
16 about 8205 being a three-bedroom?  How did you shop for
17 that?  How did you -- how did you come to learn about that
18 particular unit?
19    A.  I believe I asked the listing agent for a list
20 of all of the numbers, units, that were for sale, and
21 whether they were summer or winter weeks, and he provided
22 them for me.
23    Q.  And that was Mr. Skoric?
24    A.  I believe it was either Skoric or Mr. Klein.  I
25 don't recall.
                                            Page 20

1    Q.  Did you communicate directly with Mr. Klein at
2 all by email?
3    A.  Yes.
4    Q.  Did you negotiate the price with him?
5    A.  Yes.
6    Q.  Okay.  What was it listed for?
7    A.  I believe it was listed for what I paid for it,
8 asking price.  I don't recall.
9    Q.  So you did try and negotiate the price with him,
10 and the developer wouldn't do that?
11    A.  I believe that's correct.
12    Q.  Have you had your deposition taken before today?
13    A.  No.
14    Q.  First time?
15    A.  Yes.
16    Q.  Have you ever been a party to a lawsuit where
17 you have been either a plaintiff or a defendant?
18    A.  No.  Other than a few tenants, commercial
19 tenants, who hadn't paid rent, but, no, nothing serious.
20    Q.  How many non-profit organizations have you been
21 a -- director on or an officer on?
22    A.  Would that include homeowner's associations?
23    Q.  Yes.
24    A.  Oh, gosh, dozens.  All in the line of work.
25    Q.  Okay.  And so those services would have been on
                                            Page 21

6 (Pages 18 - 21)

Randal Mercer - October 24, 2017

| | |
|---|---|
| 1 projects that you had some involvement with here in<br>2 Florida?<br>3    A.  If I have clients who own property within a<br>4 commercial subdivision, oftentimes they ask me to be on<br>5 the board as their representative, and I would.<br>6    Q.  Do you have any Marriott-related financial<br>7 products, like credit cards?<br>8    A.  I have a Ritz-Carlton card.<br>9    Q.  What is that?<br>10    A.  It's a credit card provided by JPMorgan Chase.<br>11    Q.  What is its title?  Is it gold?  Platinum?  What<br>12 is it?<br>13    A.  It's black.<br>14    Q.  Ritz-Carlton, is it a Visa?<br>15    A.  I believe so.  Yes.<br>16    Q.  Is that -- is that a perk that -- how did you<br>17 come to -- why do you use a Ritz-Carlton card?<br>18    A.  So I can receive additional points when I stay<br>19 at Marriott or Ritz-Carlton hotels.<br>20    Q.  Had you been a Ritz-Carlton Hotel user prior to<br>21 purchasing the unit in 2004?<br>22    A.  Very -- very limited.<br>23    Q.  Okay.<br>24    A.  There is a Ritz-Carlton in Naples.  We often go<br>25 down and have Sunday -- Sunday dinner on the beach at the<br>Page 22 | 1 each other, she just can't do that.  Right?<br>2    So I'd ask you to do that.  So just listen to<br>3 the question, let me finish it.  There may be objections,<br>4 you have been told about that.  Generally you'll have to<br>5 answer unless you're instructed not to.  Keep your voice<br>6 up.  Answer verbally.  We've already done that a few<br>7 times.  We also tend to use --<br>8    A.  So "uh-huh" is not yes.<br>9    Q.  Yeah.<br>10    A.  Okay.<br>11    Q.  I mean, we know it's yes here, but it could be a<br>12 critical question at trial, well, that was a "nuh-huh."<br>13 So I'll remind you to do that occasionally.  Okay?<br>14    Let us know if you need breaks at any time.<br>15 Okay?<br>16    A.  Mm-hmm.<br>17    Q.  And probably, most importantly, lawyers don't<br>18 always ask great questions.  Most of them aren't going to<br>19 be that great to you.  So let us -- but what I really want<br>20 you to do is, if you don't understand, let me know.  What<br>21 happens is we assume you understood it at some point.  And<br>22 I have no problem with you telling me, "I don't understand<br>23 that question," or -- don't say it's a stupid question,<br>24 even though it is, but just say you don't understand it<br>25 and I'll rephrase it for you at any time.  Okay.<br>Page 24 |
| 1 beach bar named Gumbo Limbo because it's a beautiful view.<br>2    Q.  And that was something you started using before<br>3 or after you became a member of the --<br>4    A.  Before.<br>5    Q.  I would have thought as a commercial broker you<br>6 had been deposed a few times.  My assumption was wrong.<br>7 So I'm just going -- I'm going to give you a few pointers<br>8 and suggestions and requests.<br>9    The first one is that I'm -- I speak fast, but<br>10 I'm not a fast talker, if you know what I mean.  So please<br>11 forgive me.<br>12    MR. MARX:  Objection to the form of the<br>13 question.<br>14    THE WITNESS:  Would you explain that, please?<br>15 BY MR. FERGUSON:<br>16    Q.  Let me finish my question before you begin your<br>17 answer, because we tend -- we have a tendency to<br>18 communicate over each other.  We anticipate what we're<br>19 going to say, and I see we're already doing that, so it's<br>20 a little bit of a stilted style of communication.<br>21    Yvonne is the one that really has to work<br>22 hardest today, so let me finish and you begin.  If I<br>23 sometimes, or Yvonne sometimes, reminds you just to let us<br>24 finish the question, it's not because we're being<br>25 impolite, it's because if there's two people talking over<br>Page 23 | 1    A.  Fine.<br>2    Q.  Okay.<br>3    A.  And I have a question.<br>4    Q.  Sure.<br>5    A.  A request.  I am in officer training for my --<br>6 for my church to become a deacon, and I have been working<br>7 on that for ten months now.  And at six o'clock this<br>8 evening, I have another training session.  If it is<br>9 humanly possible for me to get out of here at 5:30 today<br>10 so I can go to my church and have -- resume officer<br>11 training, I would be grateful.  I understand that that may<br>12 not be possible, but I would appreciate it.<br>13    Q.  Yeah, we'll try to accommodate you.  We can talk<br>14 about that.  You're an important witness, so therefore<br>15 you'll be relatively long.<br>16    A.  Understand.<br>17    Q.  But I don't -- we would never do anything to<br>18 dis- -- to make it that difficult for you.<br>19    A.  Understand.  Thank you.<br>20    Q.  So we would make that accommodation.<br>21    A.  Just a request.<br>22    Q.  Yup.  Got it.<br>23    THE VIDEOGRAPHER:  Before we get back into it,<br>24 can I have everybody check their phones.  I'm picking<br>25 up, like, a reminder ring.<br>Page 25 |

7 (Pages 22 - 25)

Veritext Legal Solutions
866 299-5127

Randal Mercer - October 24, 2017

| | |
|---|---|
| 1    MR. SHEA: Probably mine. | 1   negotiating point that you obtained for your membership? |
| 2    THE WITNESS: Mine's on mute. | 2    A. Yes. |
| 3    MR. SHEA: I've got mine in my pocket, right | 3    Q. So they got to give a bank card that earns |
| 4   next to the mic. I didn't move it. Sorry, Tim. | 4   interest, and they get -- they get banking customers, and |
| 5    THE VIDEOGRAPHER: Thank you. | 5   you believe that was a perk for your membership? |
| 6    MR. SHEA: Turning it off. | 6    A. Yes. |
| 7   BY MR. FERGUSON: | 7    Q. Okay. It was also a perk for them, right? They |
| 8    Q. Was the Ritz-Carlton card you were talking about | 8   were selling credit cards. |
| 9   something that you had negotiated for on behalf of the | 9    A. JPMorgan Chase received the benefit. It was |
| 10   membership? I remember there were some communications | 10   nothing that the Ritz would benefit from, as far as I |
| 11   about you getting that perk for your members. | 11   know, and it was nothing that they could control. An |
| 12    A. It was part of the negotiation, yes. | 12   application was sent to every member, and whether they |
| 13    Q. And what was the -- what was that negotiation? | 13   filled it out or not was their choice. |
| 14   Please explain what you negotiated in terms of a perk or a | 14    Q. Was that a new product, or was it an existing |
| 15   privilege for your members. | 15   product you had extended? |
| 16    A. It was neither a perk nor a privilege. It was | 16    A. It had been out for a year or so. |
| 17   just something that was thrown into the negotiation that | 17    Q. And did they get that without an annual fee? Is |
| 18   could benefit the members, one, if they qualified for the | 18   that how it worked? |
| 19   card through JPMorgan Chase, and two, if they used it, | 19    A. I don't recall there were any strings tied to it |
| 20   they would accrue points. And I always felt that that | 20   at all. I believe there is an annual fee, actually. I |
| 21   would be a -- that would be a benefit. | 21   think they all have annual fees. |
| 22    Q. So they accrue -- if they get the card and they | 22    Q. I was just wondering what you all got from the |
| 23   qualify, I suspect most of the people who can afford this | 23   Marriott companies with respect to this credit card. |
| 24   place can qualify for a credit card, but assume they got | 24    A. I thought it would be a benefit for the members, |
| 25   that, -- | 25   and help enhance their owner experience. |
| Page 26 | Page 28 |

| | |
|---|---|
| 1    A. Mm-hmm. | 1    Q. Why haven't you utilized the Lion & Crown Travel |
| 2    Q. -- those points you're talking about are what | 2   program and affiliation to put in your weeks, either |
| 3   kind of points? | 3   allocated or unallocated, to get to use the Marriott |
| 4    A. They would be like airline -- airline frequency | 4   Vacation Destination program? |
| 5   points. Like frequent flyer points. Like any reward | 5    A. We don't have -- we don't have that much time. |
| 6   program. | 6   My wife and I both work, and we're very happy staying |
| 7    Q. All right. So they were -- you could use them | 7   within the confines of the Ritz-Carlton Destination Club |
| 8   with airlines or hotels? | 8   program. |
| 9    A. I believe you can just use them with Ritz and | 9    Q. What -- sorry. |
| 10   Marriott properties. I don't know. | 10    A. We have used, on several occasions, the Third |
| 11    Q. But are they -- are they Marriott points? | 11   Home program. |
| 12    A. Yes. They're transferable back and forth | 12    Q. And what did you use Third Home -- what did you |
| 13   between Marriott and Ritz. You can use them for either, | 13   use it for? Where have you gone with that? |
| 14   and you accrue them from either. | 14    A. We were able to obtain for one week, twice, a |
| 15    Q. Either -- either type of property? | 15   small condominium on the beach in Naples, which allowed my |
| 16    A. Within -- within the Marriott group, yes. | 16   wife to enjoy the beach for a week in Naples while I came |
| 17    Q. So if a person -- okay. So -- so those points | 17   back and forth to work. |
| 18   are Marriott points, and they can utilize them outside the | 18    Q. What property -- what property was that? |
| 19   parameters of the basic RD -- RCDC membership? | 19    A. I don't recall. It's down on -- downtown |
| 20    A. Yes. | 20   Naples. But it was right on the beach. A small |
| 21    Q. And how did you negotiate that? I mean, is it | 21   condominium. |
| 22   something you did with Sobeck and Cunningham? Was it -- | 22    Q. Any other exchange programs you've utilized with |
| 23    A. Yeah. | 23   respect to your Ritz membership? |
| 24    Q. Okay. And so you believe that getting a | 24    A. No, sir. |
| 25   Ritz-Carlton JPMorgan black card was a -- was a positive | 25    Q. Quickly on your background, where did you -- did |
| Page 27 | Page 29 |

8 (Pages 26 - 29)

Randal Mercer - October 24, 2017

1  you attend college?
2      A.  Yes, sir.
3      Q.  Where did you attend?
4      A.  Ohio State.
5      Q.  And what year did you graduate?
6      A.  I did not graduate.
7      Q.  What were you studying before -- what was your
8  course of study?
9      A.  I was a music major when I started, and I went
10  into general business after that.
11      Q.  And when did you leave Ohio State?
12      A.  1974.
13      Q.  And what did you do for work between '74 and
14  '83, just generally?
15      A.  Various jobs.  Worked at beer and wine
16  carryouts.  Owned a beer and wine drive-through, and a
17  beer and wine carryout.
18      Q.  Here in Florida?
19      A.  Columbus, Ohio.  Owned a record store.
20  Entrepreneurial type.
21      Q.  I take it you moved out of records?
22      A.  Yes, I did.  I saw the train.
23      Q.  So various jobs.
24          And when did you move to Florida?
25      A.  I believe it was 1982.

Page 30

1      Q.  Did you do any real estate work while you were
2  in Ohio?
3      A.  No.
4      Q.  And when you came to Florida, you came to Fort
5  Myers, I understand?
6      A.  Yes.
7      Q.  And what brought you here?
8      A.  My family had come to Sanibel Island on vacation
9  since I was a child, and it was the only place I knew to
10  go to.
11      Q.  And what did you do for work when you arrived?
12      A.  I worked on the parasailing crew on Fort
13  Myers -- Fort Myers Beach while I was taking my real
14  estate courses.
15      Q.  And you took the real estate courses.  How does
16  that work in Florida?  Is it just a state exam that you
17  have to study for?
18      A.  Classes that you have to attend and pay for at
19  licensed teaching shops, and then you take the state test.
20      Q.  Did you take the state test?
21      A.  Yes, sir.
22      Q.  What year?
23      A.  1983.
24      Q.  And did you pass the first time?
25      A.  Yes, sir.

Page 31

1      Q.  Okay.  And what was your first employment in
2  real estate here in Florida?
3      A.  A local real estate firm, residential firm, on
4  Sanibel Island, Priscilla Murphy Realty.
5      Q.  And that was residential, and how long did you
6  do that?
7      A.  About two years.
8      Q.  And after her company, Priscilla Real Estate --
9      A.  Priscilla Murphy.
10      Q.  Murphy.
11      A.  Mm-hmm.
12      Q.  All right.  How long did you stay there?  What
13  did you do after you left after two years?
14      A.  I left probably 1986, and went to a small
15  startup commercial firm.  I don't even remember the name
16  of it.  No longer exists.  Worked for two years helping
17  them land planning, working on some commercial projects.
18      Q.  So you were a real estate broker, but did you
19  also get involved early on in actual development?  You
20  said "land planning."
21      A.  Yeah, I was on the fringe at that time since my
22  knowledge base was rather limited, but I watched and
23  learned.
24      Q.  Okay.  Were you selling real estate?
25      A.  Yes.

Page 32

1      Q.  And what type of real estate were you selling by
2  then?
3      A.  It was commercial.  I had listed pieces, various
4  pieces of land, and listed some small buildings for sale.
5      Q.  Were you also renting?  Were you a leasing
6  agent?
7      A.  Yes.
8      Q.  And after that small shop you were with for two
9  or three years, I think you said, where did you land after
10  that?
11      A.  I decided that I didn't want to work for anybody
12  else, and in May of 1988, I opened my own commercial real
13  estate firm as a sole proprietor, and the name was Mercer
14  Investment Properties, Inc., licensed with the State of
15  Florida.
16      Q.  Okay.  And what was its business?
17      A.  Renting and selling commercial properties,
18  focusing on office product.
19      Q.  And how long was Mercer Investment Properties,
20  Inc., your employment?
21      A.  Mercer Investment Properties is still
22  functioning in -- in the background.  It operated as a
23  sole proprietorship brokerage firm for ten years, until
24  1998.
25      Q.  Okay.  And what did you do after that?

Page 33

9 (Pages 30 - 33)

Randal Mercer - October 24, 2017

1    A.  Merged three commercial real estate companies
2  together operating in this area, and we formed the CB
3  Richard Ellis affiliate office in Southwest Florida, which
4  was an exclusive contractual agreement.  CB Richard Ellis
5  was the largest commercial real estate company in the
6  world and doing about five billion dollars in revenue at
7  the time, and we were the only affiliate office in the
8  state of Florida.  The remaining offices were company
9  owned.
10   Q.  So you came together with the Mercer Investment
11 Property, Inc., and two other companies to form this
12 affiliate?
13   A.  Yes.
14   Q.  And were the other companies that you merged
15 into the CBRE affiliate also commercial brokerage firms?
16   A.  Yes.
17   Q.  Were they all about equal size, or one was
18 bigger than the other?
19   A.  One was another sole proprietor with several
20 agents.
21   Q.  That's what you had been?
22   A.  Sorry?
23   Q.  That's what you had been?
24   A.  Yeah.
25   Q.  Okay.

Page 34

1    A.  No.
2    Q.  How about the same for the Ritz?
3    A.  No.
4    Q.  And about five years ago, that would have been
5  about 2012-ish, you went on your own again?
6    A.  Yes.
7    Q.  What happened?
8    A.  They, CB Richard Ellis, began winding down the
9  affiliate program wanting to own only company-owned
10 offices, so we had an amicable separation, and we
11 rebranded ourselves as CRE Consultants instead of CBRE,
12 and the tradition continues today.
13   Q.  And what does CRE stand for?
14   A.  Commercial real estate.
15   Q.  All right.  And did the company that had
16 developed between '98 and 2012, did it generally stay
17 intact, the same partners and brokers and whatnot?
18   A.  Yes, several partners had retired during that
19 time or were bought out, yes.
20   Q.  Was this the CBRE office, or did you start a new
21 office, a new location?
22   A.  This was not the CBRE office because it was not
23 built at that time.
24   Q.  All right.
25   A.  But we weren't far from here.

Page 36

1    A.  Mm-hmm.
2    Q.  And what was the other one?
3    A.  The third one was CB Richard Ellis themselves.
4  They had a branch office of the Tampa-owned office
5  operating down here in Fort Myers, so we pulled them all
6  together and rebranded ourselves.
7    Q.  All right.  And that was '98?
8    A.  Yes, sir.
9    Q.  And how long were you -- how long did the CBRE
10 affiliate company you were now involved with in '98, how
11 long did you stay with that?
12   A.  That was -- our franchise agreement expired
13 approximately five years ago.
14   Q.  Okay.  And was there any -- was there any
15 hospitality brokers -- was there a hospitality -- sorry.
16 Withdraw that.
17        Was there anyone doing hospitality real estate,
18 commercial real estate brokerage or advising in the CBRE
19 affiliate group here in Fort Myers?
20   A.  No.
21   Q.  Did they do any work at all for the Marriott
22 Corporation?
23   A.  No.
24   Q.  Have you ever done any work for Marriott in any
25 respect?

Page 35

1    Q.  Okay.  On your website, you note -- you note
2  that you have been a board member of the Ritz-Carlton
3  homeowner's association, particularly the Tourist
4  Accommodation Director Group.  Do you know that that's on
5  your website?
6    A.  Yes, sir.
7    Q.  Okay.  And when did you first become a board of
8  director member at the Ritz-Carlton Highlands?
9    A.  It's a great question.  I know that I am in my
10 12th or 13th year.
11   Q.  I'm looking at your website.  It says on your
12 website that you became a member of the board of directors
13 in 2005 and you served -- it says 2005 to 2016.
14   A.  Okay.
15   Q.  How did it come to pass that you became a
16 participant in the Board of Directors, Tourist
17 Accommodation Board of Directors, at the Ritz-Carlton
18 Aspen Highlands?
19   A.  I was curious as to how the program actually
20 worked, so I thought the best way to find out was to
21 become a board member.  And I ran for office, submitted my
22 resume as everyone else, and did not get elected my first
23 try.  The next year I submitted my resume and did get
24 elected.
25   Q.  All right.  And by the time you got elected, did

Page 37

10 (Pages 34 - 37)

Randal Mercer - October 24, 2017

1 you know Mr. DiMeglio, Nicholas DiMeglio?
2    A.  No, sir.
3    Q.  Who was the manager back at the time you got
4 elected?
5    A.  I don't recall.
6    Q.  Did you know anybody at -- in management at the
7 Ritz-Carlton?
8    A.  No, sir.
9    Q.  How about Marriott?
10    A.  No, sir.
11    Q.  How did you -- withdraw that.
12        When you purchased the 8410 through Mr. Aspy in
13 2004-ish, I take it that they told you there were other
14 Ritz-Carlton Destination clubs?
15    A.  Yes.
16    Q.  And that some had been already built?
17    A.  Yes.
18    Q.  And more were going to come online?
19    A.  Yes.
20    Q.  They told you that it was an exclusive program;
21 it was one of the better hotel brands in the world; is
22 that what they told you?
23    MR. MARX:  Object to the form of the question.
24    THE WITNESS:  I don't recall them saying that.
25    In my mind, the Ritz-Carlton was one of the more
                                                    Page 38

1    exclusive brands in the world, yes.
2 BY MR. FERGUSON:
3    Q.  And at the time, did you know anything about a
4 Marriott Vacation Club?
5    A.  No.
6    Q.  Did they ever mention Marriott Vacation Club to
7 you?
8    A.  No.
9    Q.  Did they ever tell you about their relationship,
10 if any, with the Ritz-Carlton Club, that being Marriott?
11    A.  No.
12    Q.  Were these totally Ritz-Carlton people, as far
13 as you recall?
14    A.  Correct.
15    Q.  Did you meet any other salesman besides
16 Mr. Aspy?
17    A.  No.
18    Q.  And what -- the hotel was obviously built at the
19 time you bought it, right?
20    A.  Yes.
21    Q.  Okay.  And you've met people that actually
22 bought before the hotel was built, haven't you?
23    A.  No.
24    Q.  With respect to running for office, were there
25 any particular issues that you ran on?  Was there
                                                    Page 39

1 something that concerned you or that you were especially
2 interested in?
3    A.  No.
4    Q.  And did you -- how did you reach out to people
5 to vote for you?  Did you just put your name into the hat,
6 and it went around with the normal communiques?
7    A.  Submitted the resume and application as everyone
8 else.
9    Q.  When you came on the board, was it 2005?
10    A.  I believe so.
11    Q.  And who were -- was Mr. -- oh, my gosh.  Who was
12 the president at the time?
13    A.  John Sternfield.
14    Q.  John Sternfield.  When was the last time you
15 spoke to Mr. Sternfield?
16    A.  Three months ago.
17    Q.  In connection with Ritz?
18    A.  In connection with Third Home.
19    Q.  And what was that about?
20    A.  The annual membership fee.
21    Q.  Was it more than you expected?
22    A.  No.
23    Q.  What was it about the annual fee that you were
24 speaking to Mr. Sternfield about?
25    A.  The fee was increased.
                                                    Page 40

1    Q.  Okay.  Did that concern you?
2    A.  No.
3    Q.  So why were you talking to him?
4    A.  He had a question.
5    Q.  Okay.  Did he have a question about the fee
6 being increased?
7    A.  Why the fee increased.
8    Q.  Okay.  When's the last time you spoke to
9 Mr. Neveloff?
10    A.  I spoke to Mr. Neveloff in September, the first
11 week in September, I believe, in Aspen.
12    Q.  Was that before or after his deposition?
13    A.  I don't know when his deposition --
14    Q.  Okay.
15    A.  I think it was recently, but it was before.
16    Q.  So you didn't discuss the deposition with him?
17    A.  No.
18    Q.  Okay.  So the last time you spoke to him was
19 when you saw him in person in Aspen?
20    A.  Yes, sir.
21    Q.  And were you in Aspen in September on an
22 allocated week, unallocated week, or board business?
23    A.  I was on -- not an allocated week.  It was just
24 a reserved week, reserved time.  It was right -- the
25 weekend before Hurricane Charley -- Hurricane Irma, excuse
                                                    Page 41

11 (Pages 38 - 41)

Randal Mercer - October 24, 2017

1  me.
2      Q.  So was that unallocated time you were using?
3      A.  Yeah, it was reserved time that we -- we didn't
4  use our allocated time, but we had reserved it for
5  September.  We like September when the leaves change.
6      Q.  So it was time you had -- it was part of your
7  time, but you had moved --
8      A.  For this year.
9      Q.  -- you had bumped it -- let me finish.
10     A.  Sorry.
11     Q.  You had bumped it to September of this year?
12     A.  Yes.
13     Q.  Approximately how much time do you spend at the
14  Ritz-Carlton on board business, where you're actually
15  lodging there, per year?
16     A.  Six nights per year.
17     Q.  About two or three trips?
18     A.  Two trips.
19     Q.  Two trips.  That would be the meetings of
20  September, October, and then the one in April?
21     A.  Yes.
22     Q.  And do you all get stipends for that?
23     A.  No.
24     Q.  Do you get lodging?  I take it they take care of
25  your lodging?
                                              Page 42

1      A.  Yes.
2      Q.  How about travel?
3      A.  Yes.
4      Q.  Have you spoken to Mr. Marsden of late?  Have
5  you?
6      A.  I have not spoken with Mr. Marsden, no.
7      Q.  Have you spoken to any of the other board of
8  directors about your deposition coming up?
9      A.  No.
10     Q.  So when you came on the board in 2005, you were
11  a board -- you were just a member of the board of
12  directors.  Mr. Sternfield was the president.  How many
13  terms did you serve in your first stint?
14     A.  I served two complete terms of three years,
15  total of six.
16     Q.  All right.
17     A.  And there was one year at the beginning when
18  I -- when I served a one-year term.  The very first term I
19  served was one year.  So I served a total of seven
20  consecutive years.
21     Q.  Okay.  During that seven-year stint, one, plus
22  two threes, did you serve ever as the president of the
23  association?
24     A.  No, sir.
25     Q.  Who was the president -- who were the presidents
                                              Page 43

1  during that time frame?  Was Mr. Sternfield or anybody
2  else a president?
3      A.  Mr. Sternfield was the president the entire
4  time.
5      Q.  Okay.  And why did you come off after the seven
6  years?
7      A.  I was termed off.
8      Q.  Per the what?
9      A.  Per the documents.
10     Q.  Do you know what documents have the term limits?
11     A.  Three-year consecutive terms, two of them.
12     Q.  Do you know what documents contain that term
13  limit?
14     A.  No, sir.  I would assume the bylaws.
15     Q.  And when you came off, would that have been
16  about 2011?
17     A.  Sounds about right.
18     Q.  Was Mr. Neveloff on the board at the time?
19     A.  Yes.
20     Q.  Was Mr. Marsden on the board by that time?
21     A.  Yes.
22     Q.  And when you came off, did you have any advisory
23  role with the board?
24     A.  No.
25     Q.  From time to time, Mr. Neveloff would check in
                                              Page 44

1  with you about board business, though?
2      A.  We communicated.  We were friends.
3      Q.  And did you become friends with him through the
4  club, the club membership and being a user, or did you
5  become friends with him because you served together on the
6  board?
7      A.  Because we served together on the board.
8      Q.  And then so you had no role at all during your
9  hiatus?
10     A.  No, sir.
11     Q.  By the time you had -- withdraw that.
12         Between 2005 and 2011-'12 when you -- your first
13  tour of duty, were there any issues with the Marriott
14  companies regarding affiliations, talking with
15  affiliation?
16     A.  There were --
17         MR. MARX:  Object to the form of the question.
18  BY MR. FERGUSON:
19     Q.  You can answer.
20     A.  I can answer?
21     Q.  Yeah.
22     A.  There were always conversations about the
23  Marriott.  As any condominium association that's
24  transitioning out of a developer-controlled situation,
25  there are always conversations about the developer.
                                              Page 45

12 (Pages 42 - 45)

Randal Mercer - October 24, 2017

| | |
|---|---|
| 1    Q.   Your 8410 and the other unit you purchased in | 1    A.   Mm-hmm. |
| 2   2015, I forget the number, but what building are they in? | 2    Q.   Is that a yes? |
| 3    A.   They are in Elkhorn Lodge. | 3    A.   Yes. |
| 4    Q.   So the original building? | 4    Q.   Okay.  And the Marriott management team, or the |
| 5    A.   Building -- building eight, yes. | 5   Ritz-Carlton management company, managing company, they |
| 6    Q.   When you bought, was the White River Lodge | 6   were in charge of the budgets? |
| 7   built? | 7    A.   They were until developer controlled. |
| 8    A.   Yes. | 8    Q.   Okay. |
| 9    Q.   Were there any pressing issues that you handled | 9    A.   After that, we were in charge of the budgets. |
| 10   as a board of director member, as a tourist accommodation | 10    Q.   So there was a problem with the reserve.  Let me |
| 11   board of direction member with the association, any | 11   move on beyond that.  Any problems -- any other problems |
| 12   pressing matters with respect to Marriott during your | 12   that created disharmony with Marriott during your first |
| 13   first term? | 13   seven years? |
| 14        MR. SHEA:  First term being the seven years? | 14    A.   There was always a -- an attitudinal overlay |
| 15        MR. FERGUSON:  The seven years, yeah. | 15   between a big company and a condominium association.  Just |
| 16    Q.   Sorry.  Your first stint. | 16   a change in leadership.  Those sorts of traditional |
| 17    A.   Define pressing matters. | 17   problems.  Nothing overwhelming. |
| 18    Q.   I mean, was there any disputes with Marriott, or | 18    Q.   When do you recall Mr. DiMeglio becoming a |
| 19   concerns they may be trying to change the nature of the | 19   manager of the hotel? |
| 20   club, taking actions that could change the nature of the | 20    A.   2007.  And I know that because he just got his |
| 21   club? | 21   ten-year pin, so -- |
| 22    A.   I would not say those seven years were always | 22    Q.   Ten-year pin working for the Ritz-Carlton or |
| 23   harmonious. | 23   working at the Ritz-Carlton Aspen Highlands? |
| 24    Q.   What were some of -- or what was the item that | 24    A.   Working at Aspen Highlands, yeah. |
| 25   would cause disharmony? | 25    Q.   And then you took the year off, and then you |
| Page 46 | Page 48 |

| | |
|---|---|
| 1    A.   A great example would be unfunded reserves. | 1   came back on the board in 2012? |
| 2    Q.   From the -- | 2    A.   I don't think it was that long. |
| 3    A.   From the developer, yes. | 3    Q.   How long did you come off? |
| 4    Q.   The developer-owned inventory that they weren't | 4    A.   I think it was approximately six to seven |
| 5   paying dues on? | 5   months. |
| 6    A.   The developer always paid dues. | 6    Q.   Then you came off? |
| 7    Q.   Okay. | 7    A.   I was off the board, and the association |
| 8    A.   It's just that we felt the reserve budgets were | 8   purchased the amenities, which is Willow Creek Bistro, |
| 9   never adequate in order to keep the club up to the | 9   Cafe Sienna, -- |
| 10   original standards.  We had to remodel, and things like | 10    Q.   Right. |
| 11   that.  Going down the road, you need more money. | 11    A.   -- and the spa from the developer, and that |
| 12    Q.   So when you were on the board, let's say the | 12   created one additional commercial board position. |
| 13   first year, and the first -- let me withdraw that and do | 13    Q.   Right. |
| 14   it this way. | 14    A.   And I was asked to come back on the board as a |
| 15        During your first three terms of service, | 15   commercial director. |
| 16   bearing in mind one of those was one year, -- | 16    Q.   Who asked you that? |
| 17    A.   Mm-hmm. | 17    A.   I can't recall. |
| 18    Q.   -- was the -- had the developer, as a declarant, | 18    Q.   Was it someone at the board level?  Was it |
| 19   turned over control, or did that happen during your time | 19   someone at Marriott?  At Ritz?  Mr. DiMeglio? |
| 20   there? | 20    A.   It was either Mr. DiMeglio or Mr. Neveloff. |
| 21    A.   Control was turned over prior to my coming onto | 21    Q.   And during your time on the board, I take it you |
| 22   the board. | 22   became fairly close, in a business sense, with |
| 23    Q.   But what was it about the reserves?  Was that | 23   Mr. DiMeglio?  You had to work with him pretty constantly? |
| 24   part of the budget process, the reserves weren't to your | 24    A.   I had a good working relationship. |
| 25   liking? | 25    Q.   All right.  Now, so you were off for six months, |
| Page 47 | Page 49 |

13 (Pages 46 - 49)

Randal Mercer - October 24, 2017

1  became a commercial board of director.  Did you have to
2  run for that position?
3      A.  No, sir.
4      Q.  Was -- by then Mr. Neveloff was the president?
5      A.  Yes.
6      Q.  And then -- so you're serving a partial term as
7  a commercial director because another seat -- had it
8  created another slot, or did you replace somebody?
9      A.  It had created a slot that did not exist.
10     Q.  All right.  And had you been working on the
11  acquisition or the turnover of those amenities --
12     A.  No.
13     Q.  -- during your stint, early stint?
14     A.  No.
15     Q.  That was something that occurred in that six- or
16  seven-month hiatus?
17     A.  Yes.
18     Q.  And what were your duties as a commercial board
19  of director member when you came on for that partial term
20  created by the new situation with the amenities?
21     A.  Review budgets, review income and expense
22  reports.
23     Q.  For those amenities?
24     A.  For those amenities.  Make suggestions.
25     Q.  All right.  And did you -- did you next segue
                                                    Page 50

1  back to the Tourist Accommodation position?
2      A.  Yes.
3      Q.  And how did that come to pass?
4      A.  I ran for the board.
5      Q.  Did anyone ask you to run for the board?
6      A.  I don't recall.
7      Q.  And you ran for the board in the same manner?
8  You put in a position statement?
9      A.  Yes.
10     Q.  Do you know if you had the backing of the
11  Marriott and Ritz companies to run for the board?
12     A.  No.
13     Q.  Do you know how they voted their 13.4 percent in
14  those elections?
15     A.  No.
16     Q.  Would you assume that they voted for you?
17     A.  No.
18     Q.  Why not?
19     A.  It was my understanding that Marriott never
20  voted their interest.
21     Q.  Okay.  By the time you ran for the board in
22  2012 -- I think it was 2012, for the fall of 2012, --
23     A.  Mm-hmm.
24     Q.  -- did you know Mr. Cunningham?
25     A.  Yes.
                                                    Page 51

1      Q.  How did you know him?
2      A.  I believe he had been at several meetings.
3      Q.  In what capacity had he been at several
4  meetings?
5      A.  I believe it was to talk about Kapalua and
6  Abaco, and the points program.  I'm not sure when he came
7  into our view.
8          Once again, I did not -- I did not operate at
9  that -- at that upper level, you know, direct -- you know,
10  presidents talking to upper level management, so I don't
11  recall.
12     Q.  How about Ms. Sobeck, did you know her when you
13  came back on?
14     A.  Yes.
15     Q.  How did you know her?
16     A.  She was the -- she was the touch point for our
17  board for many years.  She -- she was in charge of our
18  territory, and she was our relationship manager, I
19  would -- I think you call her.  I'm not even sure.
20     Q.  With the larger group of companies?  Do you know
21  who she's employed by?
22     A.  I don't know which one.  The Marriott Vacation
23  Club, I believe, but I'm not sure.
24     Q.  And Mr. Hearns?
25     A.  Yes.
                                                    Page 52

1      Q.  You know him?
2      A.  I do.
3      Q.  Okay.  And he was more of an HOA management
4  fellow?  He helped with the HOA's management?  Or what did
5  he do?
6      A.  Ritz --
7          MR. MARX:  Object to the form of the question.
8          THE WITNESS:  Ritz-Carlton Hotel --
9  BY MR. FERGUSON:
10     Q.  I meant to --
11     A.  -- is his direct report.
12     Q.  He's with the hotel company, as far as you know?
13     A.  Yes.
14     Q.  Show you a few documents here.  They mostly
15  cover your -- your current stint on the board of directors
16  as a tourist accommodation director.
17         When you came back online and you got elected
18  in, what, October?  September, October of '12?
19     A.  Late October 2012.
20     Q.  Okay.  And you're on -- are you on the last year
21  of your term?  Or you've got one more year to go?
22     A.  I have one year to go.
23     Q.  Okay.  And did you become a president when you
24  came back on the board?
25     A.  Yes.
                                                    Page 53

14 (Pages 50 - 53)

Randal Mercer - October 24, 2017

| | |
|---|---|
| 1    Q.  And did you run for president? | 1    If you look at the first page of this exhibit, |
| 2    A.  No. | 2  okay, what we've done in the bottom corner, there's an |
| 3    Q.  How was it -- how did it come to pass that you | 3  exhibit tab, and that's what we're referring to today. |
| 4  became the president when you rejoined the board as a | 4    A.  Mm-hmm. |
| 5  tourist accommodation director in 2012? | 5    Q.  And you'll see the exhibit tab for this one is |
| 6    A.  The directors of the condominium association, | 6  1020. |
| 7  which includes the residential housing group and the | 7    A.  Mm-hmm. |
| 8  commercial group and the tourist accommodation, somebody | 8    Q.  At the very bottom of that, it says 1020-01, so |
| 9  made a motion.  I don't know who. | 9  that's first page.  So I might say "go to page 7." |
| 10    Q.  Okay.  At a board of directors meeting? | 10    A.  Got it. |
| 11    A.  After the annual meeting, yes. | 11    Q.  And you should be able to find it with those |
| 12    MR. FERGUSON:  All right, Chris, I'm going to | 12  numbers. |
| 13  start using some exhibits. | 13    A.  Okay. |
| 14    Q.  So I'm going to show you exhibits in paper, and | 14    Q.  The other numbers that you might see are -- for |
| 15  we've got copies for counsel, and it's also on the screen. | 15  example, this one is RCD, and it has a 0005686, that tells |
| 16  I suspect most people Michael Jr's. age are going to look | 16  us where the document came from. |
| 17  at screens, but you're going to probably want to look at | 17    Your documents, I think -- Jessica, correct me |
| 18  paper, but you're free to look at either.  Okay? | 18  if I'm wrong -- are AHA? |
| 19    A.  Okay. | 19    MS. LIVINGSTON:  HCA. |
| 20    Q.  And what may happen is that if I'm -- because | 20    MR. FERGUSON:  HCA? |
| 21  I've already got mine all marked up, and it's a lot easier | 21    MR. SHEA:  AHCA. |
| 22  for you to find it.  He could pull it up and highlight it | 22    MS. LIVINGSTON:  AHCA. |
| 23  for you.  So let's just -- do what you think is best for | 23    MR. FERGUSON:  AHCA, okay. |
| 24  your testimony.  So you're welcome to use the screen or | 24    MR. SHEA:  Four letters. |
| 25  the paper.  All right? | 25 |
| Page 54 | Page 56 |

| | |
|---|---|
| 1    A.  I'm comfortable using a screen and paper. | 1  BY MR. FERGUSON: |
| 2    Q.  On TV, exhibits are usually guns and knives, but | 2    Q.  Okay.  And that will mean it's a document that |
| 3  in depositions like this, it's a lot of paper. | 3  came from you, or Mr. Oliver, or Schneider, Mr. Marsden, |
| 4    A.  Good.  I like paper. | 4  Mr. Neveloff.  Mostly I'll be showing you those documents, |
| 5    MR. SHEA:  So just one thing. | 5  but a few of them are Ritz documents you may or may not |
| 6    MR. FERGUSON:  Yeah. | 6  have seen, but I'm going to ask you a few questions about |
| 7    MR. SHEA:  Randy, it will probably go more | 7  them.  This happens to be a Ritz document. |
| 8  quickly, if you can read the paper, just to read the | 8    A.  I recognize a good PowerPoint presentation every |
| 9  paper, rather than using the screen. | 9  time I see it. |
| 10    MR. FERGUSON:  Whatever you think. | 10    Q.  All right.  And that's what this is, sir, right? |
| 11    MR. SHEA:  I think he's okay with reading the | 11    A.  Yeah, they usually are. |
| 12  paper. | 12    Q.  All right.  Have you ever seen -- this is, I'll |
| 13    MR. FERGUSON:  Yeah, good. | 13  tell you, it's sometime in early 2012 before you were on |
| 14    THE WITNESS:  Sometimes my arms aren't long | 14  the -- back on the board of directors, and this is a |
| 15  enough, but we'll give it a shot. | 15  Ritz-Carlton Destination Club Re-engineering Update.  Had |
| 16  BY MR. FERGUSON: | 16  you ever seen this re-engineering update by Marriott? |
| 17    Q.  All right.  And I'm going to be going -- you | 17    A.  No. |
| 18  guys are close by, so I'm going to hand counsel and the | 18    Q.  Okay. |
| 19  witness the first exhibit of the day, and there will be | 19    A.  Not that I recall. |
| 20  many.  And that is Exhibit 1020. | 20    Q.  Okay.  It's a Marriott Vacation Worldwide |
| 21    (Exhibit 1020 previously marked for | 21  document, and I just want to ask you a few questions, and |
| 22  identification produced to the witness.) | 22  see if you recall any of these items.  Even though you |
| 23  BY MR. FERGUSON: | 23  haven't seen this, if you -- if you're aware of these |
| 24    Q.  This is a -- I just want to get you oriented on | 24  general topics sometime in 2012-ish. |
| 25  some things with respect to documents, Mr. Mercer. | 25    The first bullet point on page 2 of Exhibit 1020 |
| Page 55 | Page 57 |

15 (Pages 54 - 57)

Randal Mercer - October 24, 2017

1  says "MVW's strategy," do you see that?
2      A.  Yes.
3      Q.  "To sell the remaining luxury unsold inventory
4  through the North American points program includes the
5  unwind of the RCDC trust by converting the existing 109
6  members in the North American points program, or to an
7  RCDC home club fraction ownership."
8          Did you understand at this time frame that the
9  Ritz-Carlton and Marriott had inventory that they needed
10 to deal with?
11     A.  I knew there was unsold inventory.  Where and
12 how much, I did not know.
13     Q.  Okay.  Was that something you had tracked during
14 your first stint on the board?
15     A.  No.
16     Q.  And were they selling -- from 2005, when you
17 came on the board, through 2011 when you came off, were
18 they selling fractional ownerships, 1/12th ownerships, in
19 this exclusive Ritz-Carlton Destination Club at Aspen
20 Highlands?
21     A.  Yes.
22     Q.  Okay.  And was there someone on premises, like
23 Mr. Aspy had been, doing that?
24     A.  Ivan Skoric was one of the salespeople.  There
25 were others.
                                                Page 58

1  back on the board.
2      Q.  What do you mean they unwound it?
3      A.  Shut it down.
4      Q.  Okay.  And so when they had inventory after
5  2007, '08, how were they selling inventory?  I know the
6  economy slowed down, but were they selling it, and if so,
7  where and how, where from?
8      A.  I can't recall.
9      Q.  Okay.  Prices had come down by '08, '09, and
10 '10, but they were still selling it, right?
11     A.  I believe they were selling it through Orlando.
12     Q.  All right.
13     A.  Although I'm not sure.
14     Q.  Okay.
15     A.  The prices had come down, yes.
16     Q.  Okay.  Did you ever become aware that the
17 Marriott folks, Marriott Vacations Worldwide, was using
18 sales space in the Ritz-Carlton at Aspen Highlands to
19 sell -- at least to discuss, and I think it was to sell,
20 or market Vacation Club product?
21     A.  Within the condominium association property?
22     Q.  Right.
23     A.  No, I was not aware of that.
24     Q.  Did you know whether or not -- so you don't know
25 whether they were doing that one way or another?
                                                Page 60

1      Q.  Okay.  And they were set up where?
2      A.  They were set up in a commercial space within
3  the Aspen Highlands village.
4      Q.  Okay.  And they were in that space that's now a
5  law firm?  Is that where they were?
6      A.  There were actually two spaces.  The law firm
7  was the primary, and then they downsized into a space
8  which is now, I believe, either a sporting goods store or
9  an art gallery.
10     Q.  Okay.  So when you bought it, it was in the law
11 firm location, I take it?
12     A.  Yes.
13     Q.  And that's where Mr. Aspy, and his fellow
14 salespeople were?
15     A.  Yes.
16     Q.  And do you know how -- and they were selling
17 developer inventory out of that -- out of those two
18 locations?
19     A.  Yes.
20     Q.  And Mr. Skoric was one of the salesmen?
21     A.  Yes.
22     Q.  And do you know how long they were selling
23 developer inventory out of those spaces?
24     A.  I believe they unwound their on-site sales
25 office within the first two years of my -- after I came
                                                Page 59

1      A.  I do not know.
2      Q.  Okay.
3      A.  I know Mr. Skoric would obviously take people --
4  would take people through tours of the spaces and the
5  lobby, and the amenities, and talk to them as he was
6  touring them, as any broker would do.
7      Q.  But you don't know what -- withdraw that.
8          Did you ever become aware that the folks that
9  were visiting -- the members that were visiting Aspen for
10 their time, were being marketed, too, with respect to
11 Marriott Vacation Club product?
12     A.  No.
13     Q.  If you look at this second page of Exhibit 1020,
14 you'll see the last main bullet point, then it has sub
15 bullet points, it says, "As a result, we have had various
16 one-on-one discussions with four member-controlled boards
17 which has led to adjustments in our planned roll-out." I
18 guess this is this club re-engineering roll out.
19         And it talks about Bachelor's Gulch, and it said
20 there is no MVW-owned inventory to place in a trust.  It
21 says, "we will not affiliate with Bachelor's Gulch with
22 Marriott Vacation Club" -- what's the "D" stand for?
23         MR. REISER:  Destinations.
24 BY MR. FERGUSON:
25     Q.  Destinations -- "absent an affirmative vote from
                                                Page 61

16 (Pages 58 - 61)

Randal Mercer - October 24, 2017

1 the majority of the members." Do you see that?
2    A.  Yes.
3    Q.  And you were -- when did you first become aware
4 of a fellow named Mike Mullenix, who was an officer of the
5 Bachelor's Gulch HOA?
6    A.  During my first terms.
7    Q.  You'd compare notes and get together with him at
8 various places?
9    A.  We had cross club meetings, as we referred to
10 them, where the boards would get together occasionally or
11 have conference calls. Mostly -- mostly conference calls.
12    Q.  Okay. And with respect to Aspen Highlands, it
13 says, "Following the unwind of the RCDC trust, we will own
14 13 percent of the Aspen inventory, however we will not be
15 placing this inventory into the MVCD trust until we obtain
16 the support of the members, precluded by the condo docs."
17    Do you see that?
18    A.  Yes.
19    Q.  Okay. You understood that at some point you had
20 a lawyer named Philip Gosch send a cease and desist letter
21 to the major folks regarding the use of that inventory for
22 Marriott Vacation Club product?
23    A.  Are you referring to the cease and desist
24 letter?
25    Q.  Yes, I am.

Page 62

1    A.  Exactly.
2    Q.  Okay. I don't know how, it's an odd number, but
3 it does.
4       And so a majority of the members would be how
5 many? 433? 434?
6    A.  Sounds right.
7    Q.  Was there ever a vote, sir, of 433 people, plus
8 one, 50 percent, to affiliate the Aspen Highlands with the
9 Marriott Vacation Club?
10    A.  I don't believe so.
11    Q.  No. What there was, was about 70 people that
12 answered a survey in late 2013, right?
13    A.  Yes.
14    Q.  And based upon that survey, there was an
15 affiliation?
16    A.  No.
17    Q.  Okay. You signed the MOU acknowledging the
18 affiliation where people today at the Aspen Highlands
19 club, Ritz-Carlton Aspen Highlands, those members can put
20 in some of their time into the Lion & Crown Travel
21 program, they can do that, right?
22    A.  If that's what you're referring to --
23    Q.  Yes.
24    A.  -- as an affiliation, then, --
25    Q.  Yeah.

Page 64

1    A.  Yes, I'm familiar with that.
2    Q.  And you are aware that Mr. Gosch was the
3 recipient of a letter from a Mr. -- I forget his name,
4 David somebody from a law firm called Baker Hostetler
5 saying, no, we can do what we want with that inventory?
6    A.  I don't recall seeing that letter.
7    Q.  But at least in 2012, Marriott was internally
8 saying they were precluded from doing -- from putting out
9 inventory into the -- into the trust, right?
10    MR. MARX:  Object to the form of the question.
11 BY MR. FERGUSON:
12    Q.  Looks that way --
13    A.  It says so on page 2, so I --
14    Q.  Now, --
15    A.  I would believe that.
16    Q.  -- one of the interesting bullet points on here,
17 with respect to what you'll be testifying about today,
18 sir, is that it says, "We will not affiliate Aspen
19 Highlands with the Marriott Vacation Club" -- or "MVCD
20 absent an affirmative vote from the majority of the
21 members."
22    Q.  Do you see that?
23    A.  Yes, sir.
24    Q.  And you know that there was about, what, 876
25 fractionals at Aspen Highlands, is that about the number?

Page 63

1    A.  -- yes.
2    Q.  Okay. So you don't see that as an affiliation,
3 even though the document you signed says affiliation?
4    A.  I look at it as an optional program. I don't
5 consider the legal words. I suppose it's an affiliation,
6 yeah.
7    Q.  Okay. So there was never a vote, was there, of
8 the members to affiliate?
9    A.  There was never a vote of the members to
10 affiliate.
11    Q.  And there was never a survey or a vote of the
12 majority of the members?
13    A.  There was a survey that was sent out to all 876
14 members which asked if they were interested in taking part
15 in an optional program.
16    Q.  All right. And between February of 2012, when
17 this internal memorandum, internal, when they were saying
18 they were going to get a majority of the members to vote
19 regarding an affiliation, between then and about a year
20 and a half later, or more than that, a year and eight
21 months later, there was a survey in December of '13.
22 That's what lapsed between 2000 -- sorry, between February
23 of 2012 and December of 2013, about a year and eight
24 months, year and ten months?
25    A.  Sure.

Page 65

17 (Pages 62 - 65)

Randal Mercer - October 24, 2017

1    MR. MARX: I object to the form of the question.
2    MR. FERGUSON: What's your objection?
3    MR. MARX: Lacks foundation. Mischaracterizes
4  the document. Among others. Compound. Complex.
5  Vague. Ambiguous.
6    MR. FERGUSON: How does it mischaracterize the
7  document, sir?
8    MR. SHEA: Let's don't waste time.
9    MR. FERGUSON: No, I want to clear up my
10  questions. This is something I need to play at the
11  deposition -- at the trial. I need to know what
12  you're -- what's mischaracterized, because I don't
13  like being told I'm mischaracterizing a document.
14    MR. MARX: No, and I appreciate the opportunity
15  to explain.
16    MR. FERGUSON: Sure.
17    MR. MARX: You -- as I understood your question,
18  you purported to make a characterization as to the
19  intent behind words on a document that this witness
20  is not the author of.
21    MR. FERGUSON: All right. So that's your
22  foundational question, too -- objection, rather?
23  That he doesn't know what was in the mind of
24  Marriott?
25    MR. MARX: Nor could he possibly have.
                                        Page 66

1    MR. FERGUSON: Well, -- he -- okay. Let me
2  clear that up then.
3    Q. This document is dated February of 2012. Okay?
4  And the words say, okay, someone at Marriott Vacation
5  Clubs and Ritz-Carlton, so Marriott Vacation Worldwide
6  people, put the words down, "We will not affiliate Aspen
7  Highlands with MVCD absent an affirmative vote from the
8  majority of the members." Those words are written in
9  early 2012. About a year and ten months later, you were
10  involved in a survey process where about -- in a survey
11  process, right, December of '13?
12    A. Yeah.
13    Q. Okay. So we're going to cover the time frame
14  between February of 2012 and up until December '13 when
15  this survey was taken. Okay?
16    A. Okay.
17    Q. Okay.
18    MR. SHEA: Hey, Matt, when you get a chance, a
19  breaking point, can you take a break?
20    MR. FERGUSON: Yeah, let me see if I can finish
21  this document.
22    MR. SHEA: Yeah, okay.
23  BY MR. FERGUSON:
24    Q. Yes, if you would look at Exhibit 1020, and
25  there's a 004 at the bottom. And this document is a
                                        Page 67

1  little bit wacky because it's one that's in a landscape
2  format. Most of them will not be.
3    The bullet point there says, "MVW has executed
4  strategy to close most of the Ritz-Carlton Destination
5  Club sales distribution locations and convert a few to
6  sell the North America points product."
7    What's North America points product?
8    A. I do not know.
9    Q. Is it Marriott Vacation Club product?
10    A. I do not know.
11    MR. MARX: Object to the form of the question.
12    MR. FERGUSON: What's your objection?
13    MR. MARX: Leading. Suggests the answer.
14    MR. FERGUSON: All right. I can lead, so, thank
15  you.
16    Q. My question wasn't leading. It was, do you know
17  what it is, and your answer is you don't know?
18    A. I don't know.
19    Q. And then I asked you, do you think it's a
20  Marriott Vacation Club, and you said you don't know?
21    A. I don't know.
22    Q. Okay. It says -- so did -- it says then in the
23  second bullet point on page 4 of 1020, "The sites that are
24  now selling the North America points product include," and
25  you see Aspen there, right?
                                        Page 68

1    A. Yes.
2    Q. And that's what I was referring to before, were
3  you aware that MVW was using the -- was using an Aspen
4  site to now sell North America points in a program you
5  don't know what it is?
6    A. No, sir.
7    MR. FERGUSON: I'll break there.
8    THE VIDEOGRAPHER: Stand by. We are going off
9  the record. The time is 10:14.
10    (Recess taken -- 10:14 a.m.)
11    (Return from recess -- 10:27 a.m.)
12    THE VIDEOGRAPHER: We are going back on the
13  record. The time is 10:27.
14  BY MR. FERGUSON:
15    Q. Sir, just digress for a second; CBRE, I
16  understand that they shut down or no longer went with
17  their affiliate offices -- affiliation, by the way, is a
18  voluntary situation, right? It's not something you're
19  forced to do with Marriott, it's totally voluntary?
20    A. I don't understand that.
21    Q. Let me withdraw that.
22    You had an affiliation -- sorry. The CBRE
23  office you had here was an affiliate, not a
24  corporate-owned office, right?
25    A. We called it a partner office. They called it
                                        Page 69

18 (Pages 66 - 69)

Randal Mercer - October 24, 2017

1 an affiliate office.
2    Q.  Okay.  Did CBRE maintain a presence here in Fort
3 Myers?
4    A.  No.
5    Q.  Okay.  Are you aware that CBRE has had some
6 involvement in listing and/or selling certain Ritz assets,
7 including Abaco?
8    A.  No.
9    Q.  Have you spoken to any CBRE people about Ritz
10 properties here in Florida?
11    A.  No.
12    Q.  How about in Abaco?
13    A.  No.
14    Q.  By the time 2012 rolled around and you -- you're
15 about to -- I guess you were about to become an interim
16 member of the commercial -- of the commercial board
17 portion of this association, what clubs had you visited,
18 RCDC clubs had you visited, between 2004 and 2012?
19    A.  St. Thomas, Jupiter.
20    Q.  Any others?
21    A.  No.
22    Q.  Okay.  And did you use those for getaways, or
23 for business in those parts of -- I'm sorry, at least
24 Jupiter, was that for business or was it for pleasure?
25    A.  It was pleasure once we escaped Hurricane
                                                    Page 70

1    Am I supposed to keep this exhibit?
2    MR. SHEA:  Just keep it in front of you.
3    THE WITNESS:  Okay.  That's fine.
4    MR. FERGUSON:  You can make a pile there.  You
5 can just put them down.
6    (Sotto voce discussion among plaintiffs'
7 counsel.)
8    (Exhibit 1021 previously marked for
9 identification produced to the witness.)
10 BY MR. FERGUSON:
11    Q.  Let me show you Exhibit 1021.  Sir, this is --
12 again, this is a second document today, and it's also a
13 Marriott-produced document.
14    The first part of it is DiMeglio to Hearns, and,
15 as you know, these are print out in -- these strings print
16 out with the earliest on the last page, a little
17 counterintuitive, but you're probably used to that.
18    So DiMeglio to Hearns, it says, "Good afternoon,
19 John.  I am forwarding to you Randy's official volunteer
20 form.  We will be sending all the candidates in to AG on
21 Monday.  Tyler also submitted his name."
22    Who's AG?  Or what is AG?
23    A.  Association governance.
24    Q.  And that would be Hearns's group, or is that
25 somebody else?
                                                    Page 72

1 Charley by going to Jupiter.  So I'm not sure what that
2 week was.
3    Q.  Okay.  And how many times had you used
4 St. Thomas between '04 and 2012, if you recall?
5    A.  Three or four.
6    Q.  One -- one-week stays?  Two-week stays?
7    A.  One week.
8    Q.  And same for Jupiter, how many times had you
9 used those properties?
10    A.  Several.  Three or four, perhaps.
11    Q.  Never used Kapalua?
12    A.  No.
13    Q.  Abaco?
14    A.  No.
15    Q.  Tahoe or San Francisco?
16    A.  No.
17    Q.  Was there any particular club that they promised
18 to bring into the system that they didn't that you were
19 particularly interested in when you bought in 2014 --
20 2004, rather?
21    A.  Kapalua we were very interested in.  I had never
22 been to Hawaii.  Wanted to go.
23    Q.  But it left to fold before you had an
24 opportunity to do that?
25    A.  Yes.
                                                    Page 71

1    A.  I have no idea who their direct report is.
2    Q.  All right.  And so Nicholas, did you give your
3 volunteer form to him?
4    A.  I mailed it in as requested.
5    Q.  And are you aware that that was your -- your --
6 the fact of your running as a volunteer for the Tourist
7 Accommodation Board again was being discussed about
8 internally before the election?
9    A.  No.
10    Q.  You'll see that Hearns spoke -- wrote in his
11 email to Sobeck at the top, Stephanie Sobeck, S-O-B-E-C-K.
12 On June 11, 2012, it says that, "Stephanie, if he has
13 already -- if he has not already done so, I understand
14 that Jay Neveloff may request that the developer vote
15 their interest in the upcoming board of directors --
16 director election to ensure that both Randy Mercer and
17 Tyler Oliver was elected to the board."
18    Do you see that?
19    A.  I do.
20    Q.  Okay.  I asked you about that before, whether or
21 not the Marriott people could vote their inventory
22 interest in favor of a candidate, and you didn't believe
23 they could.
24    MR. SHEA:  Objection.  Misleading.
25    MR. FERGUSON:  I thought he said that he didn't
                                                    Page 73

19 (Pages 70 - 73)

Randal Mercer - October 24, 2017

| | |
|---|---|
| 1 think they could. | 1    Q. Okay. S-C-H-A-V-E-M-A-K-E-R. |
| 2    MR. SHEA: Mis -- my objection is misleading. | 2    A. Mm-hmm. |
| 3    So -- | 3    Q. What was his role with respect -- if you know, |
| 4 BY MR. FERGUSON: | 4 what was his role -- |
| 5    Q. All right. Can you answer that question? | 5    A. I do not know. |
| 6 Otherwise I'll repeat it. | 6    Q. -- with respect to Ritz-Carlton? |
| 7    A. Not in the way you asked it, so, no. | 7    A. I do not know. |
| 8    Q. Okay. Did you testify, or not, before that you | 8    Q. It says, "Jay feels that there is a positive and |
| 9 thought that the developer could not vote its inventory | 9 collaborative momentum on the current board of Aspen and |
| 10 interest in an election? | 10 is anxious to maintain this synergy and feels that the |
| 11    A. I believe I answered they would not. | 11 others on the ballot have the potential to disrupt what |
| 12    Q. That was a different situation, wasn't it, what | 12 has been accomplished in the past year." |
| 13 they wouldn't vote? | 13    So you have one president putting his two cents |
| 14    A. It was my understanding they never voted their | 14 in with the Marriott with whom you have some issues of |
| 15 interest. I did not know one way or the other. | 15 disharmony, he's putting his two cents in as to who he'd |
| 16    Q. In an election? | 16 like to see come on the board in the next election? |
| 17    A. Yeah. | 17    A. By this document, you could be right. |
| 18    Q. What was worked out at some point when there was | 18    Q. In fact, Mr. Neveloff was in touch with you |
| 19 going to be a vote was -- for the affiliation in 2012 and | 19 prior to the election about the election and what was |
| 20 into 2013, was that the Marriott would not vote its 13.4 | 20 going on with Marriott, right? |
| 21 percent in that election, right? | 21    A. Please restate. |
| 22    A. I don't know. | 22    Q. Sure. Was Mr. -- Mr. Neveloff was in touch with |
| 23    Q. You don't recall that? | 23 you throughout the summer of 2012, by email at least, |
| 24    A. You're talking about the survey? | 24 because we don't have records of his phones, but by email |
| 25    Q. No, not the survey. I'm talking about the vote | 25 he was in touch with you about the upcoming election and |
| Page 74 | Page 76 |

| | |
|---|---|
| 1 that was promised. Okay. When there was going to be a | 1 what was going on with Marriott and the affiliation? |
| 2 vote whether to affiliate or not, and it's the upshot of | 2    A. I'm sure we kept in contact. I don't recall any |
| 3 Exhibit 1020 we just saw, there was a deal worked out that | 3 specifics. |
| 4 when there was a vote of the majority of the members, that | 4    Q. But you were being groomed to come back on the |
| 5 it would not include the 13.4 percent owned by Marriott. | 5 board as the president before the election occurred, |
| 6    MR. MARX: Object to the form of the question. | 6 right? |
| 7    THE WITNESS: I don't recall that. If you can | 7    A. No. I was being groomed to come back on the |
| 8 show it to me, I'll be -- | 8 board. I was -- that's it. |
| 9 BY MR. FERGUSON: | 9    Q. But at least Mr. Neveloff, it would appear, was |
| 10    Q. Okay. We'll get to that. So you don't recall | 10 putting whatever influence he had in to have the Marriott |
| 11 that as you sit here today? | 11 folks vote their interest in the upcoming election for you |
| 12    A. No. | 12 and Mr. Oliver? |
| 13    Q. Okay. As far as voting in an election for a | 13    A. That's what it appears. |
| 14 board of director, you don't -- did you once -- did you | 14    Q. Had you ever served with Mr. Oliver before on |
| 15 think that they couldn't -- they didn't vote in those | 15 the board? |
| 16 elections? | 16    A. Yes. |
| 17    A. It was my understanding that they never voted in | 17    Q. And -- |
| 18 an election. | 18    A. I believe he was on the board the last year |
| 19    Q. It goes on here, Mr. Hearns at Ritz-Carlton to | 19 before I termed out. |
| 20 Stephanie Sobeck -- do you know Dirk Schavemaker? | 20    Q. And is he in his last year now? Is he in the |
| 21    A. I met him once. | 21 same -- |
| 22    Q. Who is he? | 22    A. He's not on the board anymore. |
| 23    A. I'm not sure if he worked for the Ritz or the | 23    Q. Not on the board anymore, okay. He rolled off, |
| 24 Marriott. I believe it's pronounced Schavemaker -- | 24 what, a year ago? |
| 25 Schavemaker. | 25    A. Yes, sir. |
| Page 75 | Page 77 |

20 (Pages 74 - 77)

Randal Mercer - October 24, 2017

1    Q.   And had you known Mr. Oliver outside his serving
2  on the board of directors with you?
3    A.   I did not.
4    Q.   And he's in the real estate industry in some
5  way?
6    A.   He's a real estate developer, yes.
7    Q.   Up in Missouri?
8    A.   He lives in Kansas City, I believe.
9       (Exhibit 1023 previously marked for
10      identification produced to the witness.)
11 BY MR. FERGUSON:
12   Q.   This is Exhibit 1023 (handing).
13      Sir, Exhibit 1023 is a letter that I have, let
14 me just see, it's July of 2012.  But I'm going to come
15 back and forth to this a few times.  But do you recall
16 this letter by Babich to members of the Ritz-Carlton
17 Destination Club Aspen Highlands?
18   A.   Not well, but I remember seeing it.
19   Q.   Okay.  This is breaking news to -- from
20 Ms. Babich.  Ms. Babich is in charge of the Cobalt Travel
21 Company, LLC, right?  Or she's in charge of -- she works
22 with.
23   A.   Mm-hmm.
24   Q.   She's general manager there?
25   A.   Don't know.  Appears that way.

Page 78

1  years, and still does.
2       It talks about, in paragraph two, a decline in
3  the economic climate.  It's the third line.  Do you see
4  that?  "As a result, some adjustments had to be made but
5  in other areas we're continuing to advance forward.  Rest
6  assured that as we advance forward, nothing about your
7  Home Club Membership has changed."
8       Do you see that?
9    A.   Yes.
10   Q.   And then if you go another paragraph down, it
11 talks about "After careful consideration," do you see that
12 paragraph?
13   A.   Yes.
14   Q.   It says that the Abaco Bay -- sorry, the Abaco
15 Club at Winding Bay would no longer be Ritz-Carlton
16 branded due to a strategic decision someone had made.  Do
17 you see that?
18   A.   Yes.
19   Q.   So by July of 2012, your members are being told
20 that Abaco being de-branded or was leaving the brand
21 due to a strategic decision by somebody?
22   A.   Yes.
23   Q.   And then also in this letter, it looks like a
24 week beforehand, it says that on July 10th the
25 Ritz-Carlton Management Company, LLC, as manager of the

Page 80

1    Q.   All right.  In that role, she oversees the
2  reservationists and the -- advises that -- assists at the
3  Ritz-Carlton Destination Club members like you?
4    A.   It appears that way, yes.
5    Q.   And through her company, or that company, The
6  Cobalt Travel Company, you all put -- that's the vehicle
7  you all use to trade or use other people's weeks within
8  the system itself?  So if you wanted to trade with
9  Mr. Oliver -- not trade, but if you wanted to put it in
10 and Mr. Oliver picked up time, that was the bank that you
11 all used as a group?
12   A.   I've never done that, so I'm not sure.  There
13 are a lot of companies.
14   Q.   All right.  Well, did you know who Ms. Babich --
15 what she did, what her role was?
16   A.   She was always on conference calls with us, and
17 I always assumed she was part of the member services
18 group.
19   Q.   Okay.
20   A.   That may be the same.
21   Q.   Right.  I think it is.
22   A.   Okay.
23   Q.   So this letter went out -- what's the date on
24 the -- so this, we believe, is July 17, 2012.  And this
25 letter gained some notoriety over the next couple of

Page 79

1  company known as the Ritz-Carlton Club, Kapalua Bay,
2  exercised its right to issue a default notice."
3       Do you see that?
4    A.   Yes.
5    Q.   Okay.  Ultimately that club was lost to the RCDC
6  system, right?
7    A.   Yes.
8    Q.   Now, if you look at the next one, Ms. Babich,
9  your customer services person, says, "While we understand
10 that it may be disappointing," were you disappointed when
11 Kapalua Bay was out of the system?
12   A.   Yes.
13   Q.   More than may, right?  You were absolutely
14 disappointed?
15   A.   I was disappointed.
16   Q.   So you have a general manager at Cobalt
17 suggesting that you all may be disappointed, but in fact
18 you were, right?
19   A.   I was.
20   Q.   You were -- withdrawn.
21      Now, she says at the end of that paragraph where
22 she says you may be disappointed, it says, "We have
23 determined new ways to provide a variety of experiences."
24      Do you see that?
25   A.   Yes.

Page 81

21 (Pages 78 - 81)

Randal Mercer - October 24, 2017

1    Q.   And it says, "Based on the Ritz-Carlton
2  Destination Club member feedback, additional benefits and
3  experiences will be available through a new affiliation
4  with the Marriott Vacation Club Destinations."
5        That's what the D stands for.
6        "This affiliation will enable Ritz-Carlton club
7  members to expand their options."
8        Do you see that?
9    A.   Yes.
10   Q.   And that's exactly what happened by 2014.  They
11 were able to, quote-unquote, expand their options because
12 they could use Lion & Crown Travel system to put in their
13 time in order to use the Marriott Vacation Club
14 Destinations, right?  That ultimately happened?
15       MR. SHEA:  Who's the "they" in the question?
16       MR. FERGUSON:  The members.
17       THE WITNESS:  I'm not sure I understand the
18   question.
19 BY MR. FERGUSON:
20   Q.   All right.  So she says that based on
21 feedback -- let me break this down, and I'll come back to
22 that question in a moment.
23       Do you know what she's speaking about regarding
24 feedback for additional benefits and experiences?
25   A.   No.
                                                  Page 82

1    Q.   Okay.  And you attended one of those in Naples?
2    A.   Yes, I did.
3    Q.   And did you go there for the particular --
4  specific purpose of understanding what was being presented
5  at these --
6    A.   Yes.
7        MR. MARX:  Wait, could you -- I'm sorry, could
8  you just let --
9        MR. FERGUSON:  Yeah, let me --
10       MR. MARX:  And the reason I'm being insistent
11   here --
12       MR. FERGUSON:  Sure.
13       MR. MARX:  -- is because I think there's an
14   inherent confusing nature to this discussion
15   regarding a points program and whether it's the
16   points program relating to Marriott Vacation Club
17   Destinations or a portfolio points program relating
18   to the Ritz-Carlton product that is quite different.
19       MR. FERGUSON:  Yeah.
20       MR. MARX:  And I think clarity would be more
21   helpful.
22 BY MR. FERGUSON:
23   Q.   I don't think -- I think we've established -- do
24 you know what point system we're talking about at this
25 point?  What were they -- what did you observe them
                                                  Page 84

1    Q.   Do you know whether they had gone to your
2  membership to ask for feedback regarding additional
3  benefits and experiences through a new affiliation with
4  the Marriott Vacation Club Destinations?
5    A.   They -- meaning Marriott, Ritz, whomever --
6  conducted a series of road shows, as I refer to them.
7  They conducted one at the Ritz-Carlton Hotel in Naples for
8  those Ritz-Carlton Destination Club members in Southwest
9  Florida, to introduce what they referred to as the point
10 system.
11       I went down.  I was interested.  Didn't
12 understand points and the math and it seemed very -- very
13 complex to me, so I didn't pay much attention to it.  And
14 they did that at various high-density membership areas.  I
15 assume they did Miami.  I assume they did Atlanta.  And
16 they were doing PowerPoint presentations on screens to
17 club members of what a points program would look like to
18 try and introduce us to the concept.  I'm not sure if
19 that's what they're referring to as --
20   Q.   Okay.
21   A.   -- in here.
22   Q.   Yeah, we don't know what she's referring to, but
23 what you witnessed was, there was a road show where they
24 were making presentations about this point system?
25   A.   Yes.
                                                  Page 83

1  talking about, what point system?
2    A.   My under -- my takeaway was that we could trade
3  our week for points.  And at that point my eyes glazed
4  over.  I did not understand completely how it worked
5  because I had never been involved in a timeshare scenario
6  before.
7    Q.   Were they talking about a point system, as she
8  writes here, that would be available through a new
9  affiliation with the Marriott Vacation Club Destinations?
10 That's what I'm focusing on.
11   A.   Mm-hmm.
12   Q.   When you went there, was it regarding MVC?
13   A.   Yeah, they were Marriott properties.
14   Q.   Were they telling you that there would be an
15 affiliation that would allow RCDC members to utilize their
16 allocated or unallocated time to visit Marriott Vacation
17 Club Destinations?
18   A.   I think that was the gist of the presentation.
19   Q.   The last sentence that I was asking you about
20 before and I said I'd come rolling back to it, is, "This
21 affiliation will enable Ritz-Carlton Destination Club
22 members to expand their options."  Okay?
23       Focusing on that sentence, at some point
24 following the survey in late '13, early '14, you signed an
25 MOU with an affiliation that allowed your members to put
                                                  Page 85

22 (Pages 82 - 85)

Randal Mercer - October 24, 2017

| | |
|---|---|
| 1 their time into the Marriott Vacation Club Destinations | 1    Q.   Okay. |
| 2 to -- to have, including as an option, the ability to | 2    A.   I think they all probably all came from that. |
| 3 visit Marriott Vacation Club Destinations? | 3    Q.   But it's the Lion & Crown -- some company that |
| 4    A.   I signed an MOU that dealt with an exchange, not | 4 allows Marriott Vacation Club people to come and utilize |
| 5 an affiliation. | 5 Aspen Highlands, right? |
| 6    Q.   Well, you all have some relationship because | 6    A.   I do not know. |
| 7 what you're affiliating with is you're able to utilize the | 7    Q.   Okay.  Why don't you know that?  Isn't that |
| 8 Marriott Vacation Club Destinations? | 8 something you have been in charge with, of, for the |
| 9    A.   If someone signs up for that, they are able to | 9 last -- |
| 10 use Marriott -- Marriott sites. | 10    A.   No. |
| 11    Q.   So they're now affiliated with it, right? | 11    Q.   -- five and a half years? |
| 12    A.   That's your term.  It's an exchange -- my term | 12    A.   I never signed up for it.  I don't know what the |
| 13 is exchange. | 13 name of the program is. |
| 14    Q.   All right.  And in exchange for that, the | 14    Q.   Yeah, but you signed a document that allowed |
| 15 Marriott Vacation Worldwide people, Marriott Vacation Club | 15 some population within the 450,000 Marriott Vacation Club |
| 16 people, they can utilize points to vie for and utilize the | 16 people that have enough points, but some population of |
| 17 Ritz-Carlton Aspen? | 17 those people can now utilize your club at Aspen Highlands, |
| 18    A.   For that one week that I or any member would | 18 right? |
| 19 exchange out. | 19    A.   I signed a document that allows Ritz-Carlton |
| 20    Q.   Okay. | 20 Club members of Aspen Highlands to trade their week into |
| 21    A.   Yes. | 21 another vehicle. |
| 22    Q.   So if 100 people put in their weeks, and | 22    Q.   Right. |
| 23 Marriott Vacation -- when they put it -- let me withdraw | 23    A.   That's it. |
| 24 that. | 24    Q.   Based upon 74 people answering a survey? |
| 25       Do you know when, if you put in a week of your | 25    A.   It gave us a very good indication and gave us a |
| Page 86 | Page 88 |

| | |
|---|---|
| 1 time, if you're a part of the Lion & Crown -- which I | 1 glimpse as to what the people wanted. |
| 2 think you indicated you're not utilizing, right? | 2    Q.   Really?  So it's your testimony -- |
| 3    A.   I am not a member. | 3       MR. SHEA:  Objection.  Sarcastic remark that |
| 4    Q.   You're not a member.  But if you were a member, | 4    isn't warranted. |
| 5 if you put it in, is it -- does it automatically get | 5 BY MR. FERGUSON: |
| 6 utilized by a Marriott Vacation Club person, or can it be | 6    Q.   Is that really what you're saying? |
| 7 used by other -- other RCDC members, or do you know? | 7       MR. SHEA:  That's not the way you treat a |
| 8    A.   If I give my week to a program, that week, | 8    witness. |
| 9 specific week, is used by the program that I would give it | 9 BY MR. FERGUSON: |
| 10 to. | 10    Q.   Is that really what you're saying, that based on |
| 11    Q.   Okay. | 11 74 or so people responding to a survey, that based upon |
| 12    A.   Whether it be Third Home Exclusive Resorts or | 12 that, you believe you had a green light to go forward with |
| 13 Marriott. | 13 this affiliation? |
| 14    Q.   Or Lion & Crown? | 14    A.   I believe that the survey gave us a glimpse into |
| 15    A.   One week in, one week out, same week. | 15 what the members wanted. |
| 16    Q.   I'm talking about Lion & Crown right now. | 16    Q.   And what type of studies, analysis, did you look |
| 17    A.   Okay.  Lion & Crown, Marriott.  To me, that's | 17 at that, you know, less than 10 percent of the people or |
| 18 Marriott. | 18 the members of the RCDC Aspen Highlands, what did you look |
| 19    Q.   That's fine.  Okay.  Yeah, I asked Mr. Marsden, | 19 at that said those 74 people are actually projecting a |
| 20 where did they come up with that name, Lion & Crown? | 20 glimpse of what everybody else wants? |
| 21    A.   Because the lion and the crown is the symbol of | 21    A.   There are very few members that respond to |
| 22 the Ritz-Carlton. | 22 anything, annual meetings, proxies, things like -- the |
| 23    Q.   Okay. | 23 number of people who responded were always very, very low. |
| 24    A.   And Cobalt is blue, and that's the color of the | 24    Q.   Right.  But Mr. Mullenix was able to pull off an |
| 25 Ritz-Carlton. | 25 election, was he not? |
| Page 87 | Page 89 |

23 (Pages 86 - 89)

Randal Mercer - October 24, 2017

| | |
|---|---|
| 1    A.   Of? | 1    A.   One, two -- there are five. |
| 2    Q.   Of his entire membership with respect to whether | 2    Q.   Five, okay. You're right. |
| 3   or not to leave the Ritz-Carlton brand and not affiliate | 3     And she says in the second one, "Secure any of |
| 4   with Marriott Vacation Club? | 4   the 51 worldwide Marriott Vacation Club resorts, including |
| 5    MR. MARX:   Object to the form of the question. | 5   Europe." Do you see that, that bullet point? |
| 6    THE WITNESS:   I don't know the details of his -- | 6    A.   Yes. |
| 7   BY MR. FERGUSON: | 7    Q.   They're not guaranteed getting that today? If |
| 8    Q.   Well, you do know the details because he sent | 8   you put in some of your allocated or unallocated time, |
| 9   you the details of what happened there. He told you | 9   you're not guaranteed to get into one of those 51 resorts, |
| 10   exactly who voted, how the vote was going, and that he -- | 10   are you? |
| 11   I think he got -- he told you he had 89 percent of his | 11    A.   I don't know that. |
| 12   membership voted to exit that program. | 12    Q.   You received emails from people saying, hey, you |
| 13    A.   If he did, I'll be happy to read that. | 13   just did this affiliation, and I can't get into the |
| 14    Q.   Okay. But you suggested you didn't know that. | 14   Marriott Vacation Club in Europe, have you gotten those |
| 15   But do you recall that you actually did know what was | 15   types of emails? |
| 16   going on? | 16    A.   Not that I recall. |
| 17    MR. SHEA:   Objection. Argumentative. | 17    Q.   In the fifth bullet point, she says, "Book any |
| 18    THE WITNESS:   No, I don't know the exact number. | 18   experience in the Explorer Collection which includes over |
| 19   BY MR. FERGUSON: | 19   100 experiences to enjoy." |
| 20    Q.   Pulling off an election in any non-profit | 20    What are these -- what are these 100 experiences |
| 21   organization with a lot of members is a chore, is it not? | 21   being; do you know? I don't want you to go through a |
| 22    A.   Changing the condominium documents always | 22   hundred, but what, generally, are they? |
| 23   requires at least a majority. | 23    A.   Although I'm not positive, a safari would be an |
| 24    Q.   All right. Why are you talking about changing | 24   example of an experience to me. |
| 25   the condominium documents? | 25    Q.   All right. It says in the last bullet point |
| Page 90 | Page 92 |

| | |
|---|---|
| 1    A.   Because I assume that that's what -- what it | 1   continuing after "100 experiences to enjoy," "The Explorer |
| 2   would take to change -- change the flag, although I don't | 2   Collection will replace the current affiliation with |
| 3   know that. | 3   Abercrombie & Kent Residence Club." There had been an |
| 4    Q.   So you don't know whether you had to change a | 4   affiliation of some sort or connection with this entity, |
| 5   condominium document to get rid of the flag? | 5   Abercrombie & Kent? |
| 6    A.   No, sir, I don't. | 6    A.   There had been. |
| 7    Q.   Okay. A majority is 50 percent plus 01, right? | 7    Q.   Okay. And that was an exclusive travel |
| 8    A.   Yes. | 8   experience provider? |
| 9    Q.   Okay. Do you have any knowledge of Colorado | 9    A.   Yes. |
| 10   law, generally, as to what is required in order to change | 10    Q.   And that didn't last long, did it? |
| 11   a declaration? | 11    A.   I don't believe it did. |
| 12    A.   I would assume it's at least a majority. | 12    Q.   Did you ever sign up for that or utilize it? |
| 13    Q.   But you don't -- you don't know what it is for | 13    A.   No, sir. |
| 14   this particular association? | 14    Q.   Were you on the board when it came online? |
| 15    A.   No, because we don't do it. | 15    A.   Yes. |
| 16    Q.   You never changed a home -- a declaration for | 16    Q.   Okay. Were you -- was your board involved in |
| 17   the -- | 17   that, or was it something Marriott just made available to |
| 18    A.   I believe the declaration has been changed once | 18   your membership? |
| 19   after developer turnover, but certainly nothing recently. | 19    A.   I believe it just became available. |
| 20    Q.   So at the bottom of the page where it says, | 20    Q.   And the Explorer Collection is what today? Do |
| 21   "Affiliation will extend you the opportunity to deposit | 21   you know what the Explorer Collection is? |
| 22   your reserved allocation on an annual basis. Once you | 22    A.   I have no idea. |
| 23   deposit it, the following will be available to you," and | 23    Q.   If you look at the next set of bullet points, |
| 24   she gives several bullet points. It looks like she gives | 24   there are four there, it says, "To clarify, nothing about |
| 25   you five. Do you see those? I think it's four. | 25   the Home Club Membership that you purchased has changed." |
| Page 91 | Page 93 |

24 (Pages 90 - 93)

Randal Mercer - October 24, 2017

| | |
|---|---|
| 1    It actually had changed, had it not?  Because | 1    That's a different deal. |
| 2  Home Club Membership entitled an RCDC member to utilize | 2       Okay.  So did you have any perk, benefit, |
| 3  time in Kapalua and Abaco, right? | 3  allowance in terms of availability or price to utilize |
| 4       MR. MARX:  Object to the form of the question. | 4  Ritz-Carlton branded hotels? |
| 5       THE WITNESS:  Could you please restate that? | 5    A.   The hotels that participated in -- in that |
| 6  BY MR. FERGUSON: | 6  program, offered Ritz-Carlton Destination Club members |
| 7    Q.   Yeah, sure.  She says, "To clarify, nothing | 7  30 percent off the advertised rack rate, based on |
| 8  about the Home Club Membership that you purchased has | 8  availability. |
| 9  changed." | 9       (Sotto voce discussion among plaintiffs' |
| 10       And let me do it this way, we do know that what | 10   counsel.) |
| 11  had changed, or whatever she's referring to -- what she's | 11       THE WITNESS:  Would you like me to restate that? |
| 12  referring to is Home Club Membership here, we do know that | 12       MR. FERGUSON:  No, I'll read it here. |
| 13  at least the rights or the ability of your members to | 13  BY MR. FERGUSON: |
| 14  utilize -- your RCDC's people rights to utilize Abaco were | 14    Q.   Okay.  Now, when you utilized St. Thomas, for |
| 15  no longer existent? | 15  example, did you use Cobalt? |
| 16    A.   I would disagree.  It had not changed because | 16    A.   No, we just called Member Services and they made |
| 17  Abaco and Kapalua were not yet opened, so they were never | 17  the arrangements. |
| 18  available to us to use. | 18    Q.   Okay.  And do you know whether Member Services |
| 19    Q.   They never -- they never got opened? | 19  was under the Cobalt Travel Company umbrella? |
| 20    A.   I do not believe so, no. | 20    A.   No.  They always answered the phone "Member |
| 21    Q.   But they had been in the RCDC system? | 21  Services." |
| 22    A.   It was in the pipeline, something we could use | 22    Q.   So you don't know what Member Services -- what |
| 23  in the future. | 23  company that was that was providing that service? |
| 24    Q.   Your members were using Kapalua; did you know | 24    A.   I do not know what umbrella Member Services |
| 25  that? | 25  falls. |
| Page 94 | Page 96 |

| | |
|---|---|
| 1    A.   No. | 1    Q.   Do you know what Cobalt Travel Company even is? |
| 2    Q.   They were reserving there?  Did you know they | 2    A.   It is a travel agency owned by Ritz-Carlton and |
| 3  were reserving there? | 3  Marriott, and I don't know exactly the ownership |
| 4    A.   No. | 4  structure, no, I don't. |
| 5    Q.   She says, "Exchange your reserved allocation | 5    Q.   But the cobalt color denotes that it has some |
| 6  with fellow Home Club Members via the existing Cobalt | 6  type of connection with the Ritz-Carlton brand? |
| 7  Travel Company."  And that's what I was referring to | 7    A.   Sure. |
| 8  before, the Cobalt Travel Company is how RCDC members | 8    Q.   And as a board member now for, I don't know, on |
| 9  exchanged and -- might have swapped -- exchanged allocated | 9  and off for 15 years or so, to date you still don't know |
| 10  time? | 10  what Cobalt is? |
| 11    A.   Okay. | 11    A.   It never concerned me.  I always called Member |
| 12    Q.   Is that right? | 12  Services for reservations. |
| 13    A.   I'm not sure.  Possibly. | 13       (Exhibit 1026 previously marked for |
| 14    Q.   And it says, "You can continue to enjoy the | 14   identification produced to the witness.) |
| 15  Ritz-Carlton 2012 hotel reservation service."  Is that | 15  BY MR. FERGUSON: |
| 16  something Ms. Babich's group provided to you all as RCDC | 16    Q.   Let me show you another exhibit, 12 -- 1026 |
| 17  members? | 17  (handing).  You'll see that this is similar to |
| 18    A.   That always was available to us. | 18  Exhibit 1020 -- 1023 that I just spent some time with. |
| 19    Q.   That's who you would call if you wanted to book | 19  But this one is similar, I think, until the last page. |
| 20  your unallocated time? | 20  You'll see it's a longer letter.  Do you see that? |
| 21    A.   That's who -- the hotel services who we would | 21    A.   I'm comparing the two.  It looks identical on |
| 22  call if we wanted to book a hotel that had a Ritz-Carlton | 22  the first page, is it? |
| 23  flag. | 23    Q.   I believe so. |
| 24    Q.   And was there any benefit as a member of RCDC | 24    A.   Okay. |
| 25  with respect to booking -- I see what you're saying. | 25    Q.   So there's an extra paragraph here, is there |
| Page 95 | Page 97 |

25 (Pages 94 - 97)

Randal Mercer - October 24, 2017

1 not, Mr. Mercer?
2     A.   Yes.
3     Q.   Okay.  And this paragraph has to do with
4 implementing additional "options under the Lion & Crown
5 Travel Company will require the execution of an addendum
6 to your current enrollment agreement."
7          Do you know what that meant?  Did it have
8 something to do with the fact that some members are
9 already enrolled in something called Lion & Crown?
10    A.   Give me a chance to read this here.
11         Okay.  Would you repeat the question, please?
12    Q.   Yeah.  I mean, do you know what this has to do
13 with?  Some members got a different letter, and it appears
14 that they had maybe enrolled already in Lion & Crown, and
15 they were being told in bold underline -- I think it's
16 underlined -- no, that's my underline -- bold letters that
17 they had to sign an addendum, otherwise they wouldn't
18 accept reservations, do you know anything about that?
19    A.   No, sir.
20    Q.   Because you never enrolled in any Lion & Crown
21 program?
22    A.   No, sir.
23    Q.   So you wouldn't have gotten this letter
24 probably?
25    A.   No, sir.

                                            Page 98

1     Q.   Did you make --
2     A.   -- the TA board.
3     Q.   Okay.  So you were not being -- you weren't
4 touching those issues as a commercial director?
5     A.   No, sir.
6     Q.   Okay.
7     A.   I was concerned with hamburgers and prices of
8 bottles of wine and things like that.
9          (Exhibit 1034 previously marked for
10         identification produced to the witness.)
11 BY MR. FERGUSON:
12    Q.   Let me show you Exhibit 1034.  Got it?
13    A.   Thank you.
14    Q.   Thank you.  Exhibit 1034 is an email from
15 Mr. Neveloff to Marsden, Schneider, Oliver.  So that was
16 the composition of the board in late July 2012, right?
17    A.   Yes.
18    Q.   And you knew that was the composition --
19 composition of the board because you were -- although you
20 were not a tourist accommodation director, you were on the
21 HOA board as a commercial director?
22    A.   Yes.
23    Q.   Now, did you ever see this draft letter that
24 Mr. Neveloff had sent to his fellow tourist accommodation
25 directors?

                                            Page 100

1     Q.   Did you know -- at this time you were -- by June
2 of -- sorry, by July of 2012, you were on the board as a
3 commercial director, right?
4     A.   Yes, sir.
5     Q.   When you were on the board by July of 2012, were
6 you being kept abreast of Mike Mullenix's and
7 Ms. Perfido's concerns regarding the potential affiliation
8 with Lion & Crown and the Marriott Vacation Club?
9     A.   I knew that they were considering dropping the
10 flag.  I was not on the TA board, so I don't believe I was
11 privy to too many details other than that.
12    Q.   Okay.  Do you know whether or not the
13 association, board of directors, was given any -- the
14 right or the ability to put any -- give any input into
15 those two letters we saw, 1023 -- 1023 and 1026, those
16 letters from Ms. Babich to your members?  Do you know
17 whether the board had any input into those letters that
18 went out, to your membership?
19    A.   No, sir.
20    Q.   Do you recall what the response was with respect
21 to the letters that Ms. Babich sent out on July 17, 2012,
22 from the members?
23    A.   No, sir.
24    Q.   It wasn't something you were tracking?
25    A.   I was not on the board, --

                                            Page 99

1     A.   Give me a minute to review.
2     Q.   Sure.
3     A.   Okay.
4     Q.   Okay.  Had you ever seen this letter before,
5 this draft letter by Mr. Neveloff?
6     A.   No, sir.
7     Q.   Okay.  Are you generally aware that Mr. Neveloff
8 was the president at this time?
9     A.   Yes, sir.
10    Q.   And you know that he is a relatively -- or he is
11 a prominent, very prominent, real estate lawyer in New
12 York?
13    A.   Yes, sir.
14    Q.   And in terms of this particular letter, did
15 you -- did you gain understanding that Mr. Neveloff
16 himself wrote -- or drafted communications with your
17 membership?
18         MR. MARX:  Object to the form of the question.
19 BY MR. FERGUSON:
20    Q.   You're aware that Mr. Neveloff wrote letters for
21 the board to send to your members?
22    A.   Certainly.
23    Q.   Okay.  And --
24    A.   That was a yes.
25    Q.   Yeah.  And when you were president, you

                                            Page 101

                                26 (Pages 98 - 101)

Randal Mercer - October 24, 2017

1 sometimes had the Marriott write those letters for you,
2 right, board to members?
3    A.   They would send letters on my behalf.
4    Q.   Who wrote the ones that you sent, that you sent
5 as the president?
6    A.   Most of them I wrote myself.
7    Q.   Mm-hmm.
8    A.   Some letters they started and I edited.
9    Q.   Okay.  So it was a variety of ways how your
10 board-to-member communications occurred while you were
11 president, and still are occurring?
12    A.   Yes.
13    Q.   You wrote some, and they wrote parts, drafted --
14 maybe did early drafts, and you edited their drafts?
15    A.   They did early drafts.  I always edit.
16    Q.   Now, Mr. Mercer, here -- did you ultimately get
17 a letter from Mr. Mercer as the president?
18        MR. SHEA:  Mr. --
19        THE WITNESS:  Mr. Neveloff?
20 BY MR. FERGUSON:
21    Q.   From Mr. Neveloff?  I'm sorry.
22    A.   I don't recall this, but I'm sure I did.
23    Q.   All right.  And do you recall in July of 2012,
24 the term "evolution" coming up with respect to the RCDC?
25    A.   No, I don't.

Page 102

1 down, "We are disappointed," do you see that?
2    A.   Yes.
3    Q.   "We are disappointed as to how Ritz-Carlton,
4 Marriott Vacation Worldwide, Inc., and Cobalt Travel
5 Company, LLC, the RCDC parties, separately and
6 collectively chose to communicate these matters they have
7 defined as, quote, 'evolution of the RCDC brand,'" end
8 quote.
9        I had asked you about that term "evolution."
10 There it is again.  Did that something -- when you picked
11 up in October as the president and a board member or
12 tourist accommodation board member, did you pick up on
13 this concept that there was a, quote-unquote, evolution of
14 the RCDC brand?
15    A.   The brand is always evolving.
16    Q.   Yeah, my question was, when you became the
17 president in October of 2012, were you aware that the --
18 there were letters being sent out and Mr. Neveloff was
19 saying there was an evolution of the RC brand at that
20 time, and that was in the context of a potential
21 affiliation with Lion & Crown?
22    A.   I don't recall that exact term.  I understand
23 the concept.
24    Q.   What did you understand the concept to be, sir?
25    A.   Any business has to evolve.  I understand that.

Page 104

1    Q.   You saw that first exhibit today where Marriott
2 Vacation -- Marriott Worldwide, rather, was talking about
3 re-engineering the RCDC, did you not?
4    A.   Yes.
5    Q.   It says here that, "First and foremost, we want
6 our membership to know we received notice of this letter
7 approximately 24 hours before it was sent to all members,"
8 and that the board had been given no additional advance
9 indication it was being sent -- I'm sorry, that the
10 termination was being -- occurred at Kapalua Bay.  Do you
11 see that?
12    A.   I do.
13    Q.   Okay.  Did that occur while you were president,
14 when the Marriott folks sent letters to your membership
15 without your ability to give it any meaningful input in 24
16 hours?
17    A.   I don't recall any since I've been president.
18    Q.   Okay.  Is that something you put your foot down
19 on, sir?
20    A.   I'm not sure that I had to.  But it -- this --
21 this -- this is one of the issues that evolved over time
22 after the board turnover and the developer turnover.
23 Oftentimes things were sent early on without recognition
24 or acknowledgment by the board.  It was a challenge.
25    Q.   All right.  It says in the fourth paragraph

Page 103

1 This is no different.  They have to adjust to market
2 conditions.  They have to adjust to staffing.  They have
3 to adjust to real estate needs.  I understand that.
4    Q.   So in general, you understand things change and
5 evolve.  What I'm asking you about is, when Mr. --
6        Can we just take a break?  Because this is going
7 to be played for trial, and there's a lot of background
8 noise.  Should we do that?  Do you mind?
9    A.   No, not at all.
10        MR. FERGUSON:  It's also getting --
11        THE WITNESS:  We have happy employees.
12        MR. FERGUSON:  That's great.  I'm going to grab
13 one of the lollipops at the break.
14    Q.   All right.  What I'm saying is, you know what
15 evolution is, we all know what evolution and change is
16 with respect to the life in the business world here.
17        What I'm talking about is when he quotes
18 Ms. Babich's letters to your members that you all -- that
19 your board didn't get to vet, that when he puts in quotes,
20 "evolution of the RCDC brand," do you know, when you came
21 in October 2012 what that -- what that was referring to?
22    A.   I don't recall a specific issue.  I recall -- I
23 understand the concept.
24    Q.   But --
25    A.   It's always changing.

Page 105

27 (Pages 102 - 105)

Randal Mercer - October 24, 2017

Page 106

1    Q.   But the concepts were the five bullet points
2    that we just went through.  That you were going to be able
3    to use these opportunities for other experiences.  You
4    were going to be able to use Lion & Crown to put your
5    points in and get to one of the 51 resorts.  You were
6    going to be able to use the Explorers 100 experiences.  Do
7    you recall that?
8        A.   Of course.
9           MR. MARX:  Object to the form of the question.
10   BY MR. FERGUSON:
11       Q.   Isn't that what was going on when you became a
12   board member in 2012?
13       A.   Yes.
14       Q.   So that's what Mr. Neveloff's talking about,
15   evolution of the RCDC brand, right?
16       A.   I would agree with that.
17       Q.   Okay.  Great.  He says, "No input from your
18   board of directors or, to our knowledge, any of the other
19   RCDC boards was ever solicited by these companies while
20   they determined these significant changes to the RCDC
21   system in which we all own membership interest."
22           Do you see that?
23       A.   I do.
24       Q.   Okay.  And I read it pretty accurately, I hope.
25           It talks about it's not being -- the board is

Page 107

1    not being -- none of the boards being contacted about
2    this -- this brand evolution.  She did indicate, we talked
3    about it, that there had been this member -- member
4    feedback of the additional benefits and experiences.
5           So as far as you can tell, that was something
6    that was being done on these road shows but wasn't being
7    presented to the boards?
8        A.   I would guess that's what she used as the
9    base of her comments.  It's a guess.
10       Q.   Okay.
11       A.   They may have had venues in which to roll out
12   their programs also.  I don't know.
13       Q.   If you look at the second page of
14   Exhibit 1034 -- it's actually the third page, and last,
15   you'll see that the first half paragraph talks about "the
16   systemic changes that have -- that they have communicated
17   in their letter as to how it will affect our club."
18           Do you see that?
19       A.   Yes.
20       Q.   And it says, "It is our" -- it talks about his
21   understanding of "approximately 7.4 percent of our
22   membership interests are owned by a trust."
23           Do you see that?
24       A.   Yes.
25       Q.   Okay.  And then it says, "Another approximately

Page 108

1    6 percent of our membership interest represents unsold
2    inventory."
3           Do you see that?
4        A.   Yes.
5        Q.   Would you suspect that 7.4 percent that belonged
6    in a trust, what was that?
7        A.   I understood there was -- there was a real
8    estate trust that they were contemplating depositing their
9    ownership interests into.  I did not know that they, in
10   fact, had done that.  Still don't know that they had done
11   that.  Although this letter indicates that they had.
12       Q.   It says, "It is our understanding that
13   approximately 7.4 percent of our membership interests are
14   owned by a trust."  So 7.4 percent are -- is some amount
15   or number of 1/12th fractional interest, right?
16       A.   I would assume, yeah.
17       Q.   And who owned this 7.4 percent as opposed to the
18   6 percent of unsold inventory?  What's the difference?
19       A.   I don't know what he was implying in this
20   letter, so I don't know.
21       Q.   Well, you became the president and dealt on a
22   fairly consistent and regular basis with the 13.4 percent
23   issue, right?
24       A.   To me, they were all unsold inventory.  I did
25   not -- I did not pay a lot of attention to who owned what.

Page 109

1    It was unsold inventory, therefore, it was owned by the
2    developer in some form.
3        Q.   Okay.  So when he says "7.4 percent of our
4    membership interests are owned by a trust which
5    facilitates the operation of the RCDC points-based
6    system," what is -- do you know what that means?
7        A.   I don't even know if it's true.
8        Q.   What is an RCDC, quote, "points-based system?"
9        A.   That would be the points program where members
10   would trade for points.  It was a mandatory program that
11   was being rolled into our fee simple ownership.
12       Q.   Okay.  Is that some of the inventory that people
13   could use for their float weeks and they get in extra
14   time?
15       A.   I don't know.
16       Q.   Okay.  Now, at the end of that paragraph, first
17   half paragraph on page 3 of Exhibit 1034, I'll pick up
18   with the words, "We are very concerned about the potential
19   blurring of the Ritz-Carlton and Marriott timeshare
20   brands."  Do you see that?
21       A.   Mm-hmm.
22       Q.   Is that yes?
23       A.   Yes.
24       Q.   Thank you.  And is that a concern that you would
25   at some point pick up, or not, which was a blurring of the

28 (Pages 106 - 109)

Randal Mercer - October 24, 2017

1 Ritz-Carlton and Marriott brands?
2    A.   Yes.
3    Q.   Okay. And it says, "Therefore, as we consider
4 the newly-announced systemic RCDC 'evolution,' your board
5 is paying careful attention as these changes will likely
6 impact our club."
7        And that's the -- that's sort of the environment
8 that you would ultimately become -- become a board of
9 director and president of the -- of the board, that's the
10 environment you were dealing with; --
11   A.   Mm-hmm.
12   Q.   -- is that right?
13   A.   Yes.
14   Q.   Thank you.
15       (Exhibit 1035 previously marked for
16   identification produced to the witness.)
17 BY MR. FERGUSON:
18   Q.   Exhibit 1035 (handing). So this is a July 26,
19 2012 dated letter, and it has, "Best regards, Neveloff,
20 Schneider, Marsden, and Oliver." It looks -- would you
21 agree with me this is a -- at least a final version or
22 close to final version of the exhibit we just saw prior?
23   A.   It doesn't say final, but perhaps it is.
24   Q.   All right.
25       (Exhibit 1042 previously marked for
Page 110

1    A.   Mm-hmm.
2    Q.   And there's also Tahoe and Bachelor's Gulch,
3 right?
4    A.   St. Thomas, Jupiter, San Francisco, Tahoe, Aspen
5 and Vail.
6    Q.   All right. And this is August of 2012. At any
7 time prior to this time -- and I know you're not on this
8 particular email chain, but I'll ask something about that
9 in a moment -- had you ever seen any type of offerings,
10 marketing, advertising, announcements, that put those two
11 together, that being the Ritz-Carlton Destination Clubs,
12 which you're a member, paid $160,000 for a 1/12th
13 interest, did you ever see these two in the same sentence
14 as making an offer or an announcement?
15   A.   No. The theme was part of the road show that I
16 referenced earlier, but I've never seen an offering like
17 this.
18   Q.   When you went to the road show, were those
19 Ritz-Carlton Destination Club people? Was it Ritz-Carlton
20 Hotel Company? The developer? Or was it Marriott folks?
21   A.   I don't recall. I still don't know the
22 difference.
23   Q.   Between the various companies?
24   A.   The lines blur.
25   Q.   All right. Well, let's talk about that.
Page 112

1    identification produced to the witness.)
2 BY MR. FERGUSON:
3    Q.   Exhibit 1042 (handing). So this is an email
4 chain that comes from sometime in early August, and you'll
5 see there's a Linda Sciberras. She's coming from a
6 Ritz-Carlton Club, to a McBride at UNMC Education. Looks
7 like a professor or a teacher or a student, I don't know.
8 This is -- do you know Ms. Sciberras, rather, at
9 Ritz-Carlton Club?
10   A.   No.
11   Q.   And a John McBride, do you know whether he's a
12 member of your club or someplace else?
13   A.   No.
14   Q.   Okay. It says that Ms. Sciberras sent to this
15 particular person, that the Ritz-Carlton Destination Club
16 has some newest offering. And it says, "The Ritz-Carlton
17 Destination Club's newest offering." And it says, "The
18 Ritz-Carlton Destination Clubs and Marriott Vacations
19 Worldwide are pleased to announce our newest offering with
20 more destinations and more flexibility," and it talks
21 about, in bullet point two, "Access to seven ski
22 destinations."
23       Obviously one of those is Aspen, right?
24   A.   Does it say that? Yes, it does.
25   Q.   Yeah.
Page 111

1        You'll see that Mr. McBride, whoever that may
2 be, sent an email of this Sciberras -- S-C-I-B-E-R-R-A-S,
3 Linda -- that Mr. McBride sent that to Jay with a copy to
4 Mike Mullenix, who you know as the president of Bachelor's
5 Gulch, right?
6    A.   Yes.
7    Q.   And it says, "For your information, not sure if
8 you had seen the email below. My brother received it this
9 morning. He has stayed at the Ritz clubs in Bachelor's
10 Gulch, San Francisco, and Kapalua, and Sciberras is
11 probably a salesperson he met in one of those locations."
12 He sent that on to Mr. Neveloff, and then Mr. Neveloff
13 sent it to his board.
14       My question is, in August of -- August 7 of
15 2012, were you receiving communications like this from
16 Mr. Neveloff as a commercial director?
17   A.   No, not that I recall.
18   Q.   He said, "Let the blurring of the lines between
19 Ritz-Carlton and Marriott begin."
20       Do you see that?
21   A.   Yes.
22   Q.   So at least in your predecessor's view, there
23 was some blurring of the brands?
24   A.   Yes.
25       MR. MARX: Object to the form of the question.
Page 113

29 (Pages 110 - 113)

Randal Mercer - October 24, 2017

1   MR. FERGUSON: What's your objection?
2   MR. MARX: You're asking this witness to ask
3   what Mr. Neveloff had in his mind regarding the
4   blurring of lines. He can't speak for Mr. Neveloff.
5   BY MR. FERGUSON:
6   Q. Your predecessor knew there was blurring of the
7   lines, did he not?
8   A. That was his opinion.
9   Q. Was it your opinion when you came on in 2012?
10   A. I didn't consciously think of it, but I always
11   knew it was -- they're the same company. So I always knew
12   it was possible to blur lines. I knew it was always the
13   board's efforts that did not happen.
14   (Exhibit 1043 previously marked for
15   identification produced to the witness.)
16   BY MR. FERGUSON:
17   Q. Let me show you this exhibit, which is 1030 --
18   1043, rather (handing).
19   This is the same email chain, but you'll see
20   that Mr. Neveloff sent that on to you on August 8th. Do
21   you see that?
22   A. Yes.
23   Q. It says "FYI."
24   Did you have any concerns when this was sent to
25   you that Marriott Vacation Club was marketing -- sorry --
Page 114

1   1/12th interest in the piece of property in Aspen,
2   Colorado?
3   A. In a fee simple ownership, --
4   Q. Yeah.
5   A. -- no.
6   Q. Okay. Did it concern you -- my question wasn't
7   about mandatory or not mandatory, voluntary. My question
8   was, sir, did it concern you that your club in Aspen
9   Highlands in which you're a member with your -- with your
10   fellow members and exclusive premier facility, did it
11   concern you that someone with a Ritz-Carlton Club email
12   handle was sending out emails to people they had met at
13   sales meetings talking about what -- how Marriott Vacation
14   Club people can use your club?
15   MR. MARX: Object to the form of the question.
16   THE WITNESS: I don't view it that way. I view
17   it as ways that Ritz-Carlton Destination Club members
18   can trade their week into other opportunities.
19   BY MR. FERGUSON:
20   Q. Okay. And in connection with that, what you
21   call an opportunity, okay, what that person -- what that
22   program could do and today is doing, it allows Marriott
23   Vacation Club people to access Aspen Highlands, right?
24   A. On a one-week-in, one-week-out basis.
25   Q. I understand that. But they're able to access
Page 116

1   that there was marketing material going out that spoke
2   about premier members and premier plus members, those are
3   Vacation Worldwide -- those are Vacation Club people,
4   right?
5   A. Repeat the question, please.
6   Q. Yeah. When she talks about -- Sciberras tells
7   McBride, or McBride's brother, that there are premier
8   memberships and premier plus memberships, she's talking
9   about Vacation Club people, right?
10   A. Yes.
11   Q. Did it concern you in 2000 -- in August of 2012
12   when Mr. Mercer [sic] sent this on to you and talked about
13   the blurring of the lines, did it concern you that your
14   club and your system, your RCDC system as it then existed,
15   was being used to tell Marriott Vacation Club people what
16   they could -- that they can get into your -- your
17   facility, your club?
18   A. I didn't understand the point system, so it was
19   hard for me to make an opinion. I -- I didn't like
20   anything that was mandatory. That's all I recall about
21   this.
22   Q. What do you mean by "mandatory"?
23   A. I didn't want something that was not optional.
24   Q. Did you think there was a possibility that
25   someone can mandate what you could do with your deeded
Page 115

1   it?
2   A. Yes.
3   Q. And as a result of accessing it, when they're
4   out on a road show, or they're in a hotel lobby, or
5   they're on the Internet, they can say, hey, if you buy a
6   Marriott Vacation Club membership, or points, whatever it
7   is, guess what, Mr. or Mrs. Marriott Vacation Club
8   potential customer, you get to use Aspen Highlands. Does
9   that bother you?
10   A. Not if it's a whole -- if it's a very limited
11   type of a program, no.
12   Q. So --
13   A. No more than it would First Home or Exclusive
14   Resorts members, we don't know -- or somebody can rent
15   their unit. So in my mind, this is different, because
16   somebody can rent their home on Craigslist.
17   Q. Right. But it's their home, right?
18   A. That's right.
19   Q. Okay. And it's a big difference between a
20   member putting it -- giving it to his cousin, or donating
21   it, I think Mr. Neveloff says he likes to donate, or
22   putting it on Craigslist or listing it with Friar's,
23   that's different. They're renting it to individuals.
24   They're not opening it up -- they're not giving it to a
25   pool that allows Marriott Vacation Club people to come in.
Page 117

30 (Pages 114 - 117)

Randal Mercer - October 24, 2017

1  It's a different scenario.
2     A.  If someone wants to rent their exact week to the
3  Man on the Moon, they should be allowed to do it.
4     Q.  Yeah, and this Man on the Moon happens to be
5  450,000 Marriott Vacation Club members, right?
6     A.  I didn't know they were doing that.
7     Q.  Isn't that the whole purpose of the affiliation?
8     A.  If you're talking the exchange program we have
9  now?
10    Q.  Yes, with Lion & Crown.
11    A.  I don't know who is allowed to come in.  I know
12 that the points are very high for existing Marriott
13 Vacation Club owners to come into Aspen Highlands.  So I
14 would assume that -- that they're heavy users and they
15 have a lot of points.
16       So no, it does not bother me any more than it
17 bothers me that I can rent my unit to whomever I choose or
18 give it away or not use it.
19    Q.  Okay.  So if the Hyatt company came in and said,
20 listen, we're offering you some opportunities if you come
21 over and put your weeks into our Hyatt system, okay, we're
22 going to let our Hyatt people come to the Ritz-Carlton in
23 Aspen Highlands, would that bother you?
24    A.  It's a hypothetical.
25       MR. SHEA:  Objection.  Hypothetical.

Page 118

1 BY MR. FERGUSON:
2    Q.  I know it's a hypothetical.
3    A.  I wouldn't want -- want a Hyatt to come in just
4  because it's not -- it's not a brand that I particularly
5  care for.
6    Q.  Okay.  But Marriott is?
7    A.  Yeah, I like Marriott, sure.
8    Q.  So you have 700, 800 people bumped down anywhere
9  between 650,000 and 11,000, over the years, but most of
10 the -- the early sales -- the bottom line is that your
11 members and fellow 1/12th deeded fractional owners, they
12 basically funded the purchase -- or the building of this
13 hotel for the developer, right?  The developer collected a
14 lot of money from each member, and they used that money to
15 build this hotel, right?
16       MR. MARX:  Object to the form of the question.
17       THE WITNESS:  I don't know how it worked.  A
18    developer builds and does a deal with a management
19    company, which in this case was Ritz or one of their
20    affiliates to operate, and -- I mean, the Hines
21    Company out of Dallas developed the property.
22 BY MR. FERGUSON:
23    Q.  Yeah, but the developer who built the hotel,
24 built it with the money from the sales they generated to
25 people like you.  You paid 160.  Some of my clients paid

Page 119

1  600.
2     A.  It was built -- the amenities and the hotel were
3  built in advance of the sales.
4     Q.  Yeah, but ultimately that's what paid for it,
5  right, the sales?
6     A.  Sure.
7     Q.  That's the way it always works?
8     A.  Of course.
9     Q.  You're in this business, right?
10    A.  Yeah.
11    Q.  Okay.
12    A.  Somebody has to pay for it.
13    Q.  So those 700 or 800 owners that owned a hotel,
14 okay, they get -- they get their allocated -- their three
15 allocated weeks and an unallocated week, right?
16    A.  Yes.
17       MR. MARX:  Object to the form of the question.
18       MR. FERGUSON:  What's that objection?
19       MR. MARX:  Assumes facts not in evidence.  Lacks
20 foundation.  Misstates facts.
21       MR. FERGUSON:  What's misstated about it again?
22 People --
23       MR. MARX:  800 owners do not own the hotel.
24       MR. FERGUSON:  That was -- that was a couple of
25 questions ago.  Okay.

Page 120

1        MR. MARX:  It was in your question, this exact
2  question.  The record will speak for itself.
3        MR. FERGUSON:  Is it the number or the
4  characterization, the -- it's 876.  Is that what's
5  bothering you?
6        MR. MARX:  Among other things.
7        MR. FERGUSON:  What else is bothering you?  I'm
8  serious.  I need to cure these questions, because if
9  Mr. Mercer doesn't come to Denver, then we need to
10 cure these.
11       MR. MARX:  You haven't established a foundation
12 as to Mr. Mercer's knowledge regarding the
13 intricacies of the ownership of the entities, of the
14 structures.
15       MR. FERGUSON:  Well, okay.  Thank you.
16    Q.  As a president of the board now for five and a
17 half years, and having sat on that board for 12 -- 12
18 years, on and off, you had a six-month hiatus, do you have
19 a general understanding that the hotel is owned by --
20 primarily by the Tourist Accommodation owners, like you,
21 and like Mr. Lattore, and Mr. Schneider, and Mr. Oliver?
22 You understand you're owners and that as owners, you're
23 part of an association that runs the hotel -- not runs the
24 hotel, runs the association that owns the hotel?
25    A.  All of the units are sold to independent

Page 121

31 (Pages 118 - 121)

Randal Mercer - October 24, 2017

1 members. There are no developer-owned units left, so all
2 of us own a piece of the club.
3   Q.   And the folks that come in through the
4 Lion & Crown Travel Program now can be Marriott Vacation
5 Club people, right?
6   A.   Yes.
7   Q.   And as a result of that, the Marriott
8 Corporations, all right, when they go to their advertisers
9 or they have their marketing teams, and I'm sure they have
10 tons of those, what they can do is say, listen, when we're
11 out on our road show and when we're advertising Marriott
12 Vacation Club, we can honestly tell these people -- we
13 won't tell them too much -- we'll talk about -- ignore
14 points now -- we can tell that potential purchaser, guess
15 what, you get to use Aspen Highlands?
16   A.   I have no idea that they do that, I suppose
17 they could.
18   Q.   Well, we just saw an email that was sent to you
19 by Mr. Neveloff that was doing just that.
20   A.   In 2012.
21   Q.   Right.
22   A.   Okay.
23   Q.   Okay.  Does it still happen; do you know?
24   A.   I have no idea.
25   Q.   How do the people at Marriott Vacation Club know
                                                    Page 122

1   Q.   -- that they could use Aspen Highlands.
2   A.   I do not know.
3   Q.   What they were using?
4   A.   I do not know what they were using or if they
5 were using.
6   Q.   Okay.  And when you came on board in October of
7 2012, did you investigate that, whether they were using?
8   A.   No, I did not.
9   Q.   Did you investigate what they were using --
10   A.   No, I did not.
11   Q.   -- and not whether they were using?
12   A.   No, sir.
13   Q.   Is that something -- why didn't you do that?
14 Why didn't you determine, as the president, why -- whether
15 they were using your hotel, or your facility and your
16 club, for Marriott Vacation Club people, why didn't you
17 look into that?
18   A.   I knew that they were using some of their owned
19 units, their developer-owned units, for --
20   Q.   For what?  For what?  Sorry.
21   A.   For sales and marketing efforts.  If they were
22 trying to sell a unit to somebody, they'd probably say,
23 "Hey, why don't you come on out and stay."  Who they were
24 saying that to, I don't know.  But everybody -- everybody
25 thought that, jeez, you're trying to sell a unit and
                                                    Page 124

1 that they can use the Ritz-Carlton in Aspen?
2   A.   I have no idea.
3   Q.   As the president of the board, you have no idea
4 how Marriott is marketing or using the inventory that it
5 gains through the Lion & Crown Travel program?
6   A.   No, I don't.
7   MR. SHEA:  Can we take a short break?
8   MR. FERGUSON:  Yeah, I gotta take off my coat.
9   THE VIDEOGRAPHER:  We're going off the record.
10 The time is 11:39.
11   (Recess taken -- 11:39 a.m.)
12   (Return from recess -- 11:50 a.m.)
13   THE VIDEOGRAPHER:  We are going back on the
14 record.  The time is 11:50.
15 BY MR. FERGUSON:
16   Q.   Speaking of that advert- -- advertising that
17 Mr. Neveloff sent on to you with the sentiment that that
18 was blurring the lines somehow, do you know at that time
19 what Marriott was using at your facility to allow Marriott
20 Vacation Club people to -- to be there?
21   A.   I'm not -- I don't understand the question.
22   Q.   Okay.  So we see in August of 2012 that the
23 Marriott people are sending around marketing materials to
24 potential Marriott Vacation Club folks --
25   A.   Mm-hmm.
                                                    Page 123

1 you've got a deep pool of people who are already in a
2 family, I'm sure over the years lots of different people
3 came in and stayed in hopes -- Marriott, Ritz, developer,
4 whomever -- was hoping they would buy a unit.
5   Q.   As an RCDC member, or as a points person?
6   A.   RCDC, definitely, because that was the longest
7 block of time.  Points, don't know.  If I had units left
8 to sell and I owned them, I would -- I would invite
9 anybody who wanted to come out and who was qualified to
10 buy.
11   Q.   I just want to focus on that advertisement to
12 the Marriott Vacation Club potential customer that may
13 have met this marketing lady, I just want to focus on that
14 as opposed to sales.  Because you know that by 2012, the
15 Ritz-Carlton folks were no longer selling RCDC memberships
16 in Aspen, right, they weren't actively marketing that?
17   A.   I did not know that.
18   Q.   Do you -- I just want to focus on whether or
19 not -- did you find that out at some point?
20   A.   I knew they weren't selling it on site.
21   Q.   Okay.
22   A.   I did not know they were not selling them.
23   Q.   What did you know about whether they were
24 selling off site?
25   A.   I always assumed, and I did not know, that they
                                                    Page 125

32 (Pages 122 - 125)

Randal Mercer - October 24, 2017

1 were selling points. I always thought that they were
2 selling fractionals.
3     Q.   Okay. But in terms of when you came on in 2012,
4 you just had no particular knowledge as to what they were
5 doing vis-à-vis Marriott Vacation Club people using it --
6 using it, using time and staying there for holidays?
7     A.   No, sir.
8         (Exhibit 1053 previously marked for
9     identification produced to the witness.)
10 BY MR. FERGUSON:
11    Q.   So here's Exhibit 1053 (handing).
12    A.   Thank you.
13    Q.   You're welcome.
14        So this is a letter that your board sent out,
15 Neveloff, Schneider, Marsden, and Oliver, and it says
16 that -- it's a followup. It's dated August 17, 2012.
17 It's a followup to the letter on July 26, 2012. And
18 you'll recall that we saw a letter that didn't have a
19 signature, and you weren't sure whether it had gone out or
20 not, but that was the letter that they said they had no --
21 no more than 24 hours' notice of the Babich letter, just
22 to cue you in here.
23        Do you generally recall that testimony earlier
24 today and those documents?
25    A.   Yes (indicating).

Page 126

1     Q.   Okay. Thank you. So they followed up with this
2 letter and talked about how the board was paying close
3 attention. Do you see that in the first sentence?
4     A.   Yes.
5     Q.   And it talks about in the first paragraph, a
6 particular concern about the unsold inventory; do you see
7 that?
8     A.   Yes.
9     Q.   Look at the last paragraph, Exhibit 1053, last
10 paragraph on the first page.
11    A.   Okay.
12    Q.   It says, "In the most recent phone conversation
13 with senior executives of Marriott Vacation Worldwide,
14 MVW, they are actively considering our suggestions
15 including the imposition of minimum night stays. They
16 will continue to keep us advised as they work through the
17 point valuations between Aspen Highlands and our timeshare
18 facilities in the MVW system and are mindful of the
19 desirability for all concerned to market Ritz-Carlton and
20 Marriott timeshare properties separately."
21        Do you see that?
22    A.   Yes.
23    Q.   So I take it, was that something that you began
24 to monitor when you came in as president of the board in
25 October of 2012, were you there to -- were you paying

Page 127

1 attention to the issue of marketing the Ritz-Carlton and
2 Marriott program separately?
3     A.   No.
4     Q.   That's something you trusted Marriott to do?
5     A.   I didn't pay attention to it, nor did I think of
6 it.
7     Q.   Why not?
8     A.   Never came to mind.
9     Q.   It never came to mind after Mr. Neveloff told
10 you, Mr. Mercer, that there was the blurring of the lines
11 between Marriott Ritz-Carlton had begun?
12    A.   No.
13    Q.   So you didn't -- you didn't share his views on
14 that?
15    A.   I disagree with that statement.
16    Q.   Okay. Why do you disagree with it? The
17 statement that "Let the blurring of the lines begin"?
18    A.   Because I always cared about the Ritz brand more
19 than any other brand.
20    Q.   Okay. Were you concerned, as Mr. Neveloff
21 appeared to be expressing, that there was a -- there could
22 be a blurring of the lines between the two brands?
23    A.   I would have preferred that there was never a
24 blurring between the Ritz lines -- the Ritz brand and any
25 other brand, that they would always be kept separate.

Page 128

1     Q.   And how do you keep Marriott Vacation Club --
2 Marriott Vacation Club people separate if they're able to
3 access your property today through Lion & Crown Travel
4 programs?
5     A.   Once again, what we're talking about in 2012 is
6 totally different than what's -- what we have today. It's
7 impossible to compare the two.
8     Q.   The bottom line is that Marriott Vacation Club
9 people now have access to your property. It's not through
10 their inventory which they sold off. I think you bought
11 one of those units. What they -- how they access it now
12 is they have your members sign up for opportunities to go
13 to various -- various Marriott Vacation Club destinations,
14 and they put that -- they put their allocated/unallocated
15 time into the Lion & Crown Travel program, and there --
16 from there is where the Marriott Vacation Club people can
17 access the Ritz-Carlton Hotel in Aspen, Colorado?
18        MR. SHEA:  Objection. Misleading.
19        THE WITNESS:  If I put my allocated time into
20    the Marriott program, then someone can come in during
21    my allocated week. That's different than people just
22    coming in whenever they want.
23 BY MR. FERGUSON:
24    Q.   Well --
25    A.   This is different.

Page 129

33 (Pages 126 - 129)

Randal Mercer - October 24, 2017

1    Q.   Well, people always come when they want. I
2 mean, there's nobody at Marriott Vacation Club today that
3 comes in unless they want to come when they come. They're
4 not going to book a week they don't want to be there, do
5 they?
6    A.   Nor is anybody going to rent a unit that they
7 don't -- in the time frame that's not allowable.
8    Q.   Okay. So whether it's one person or 800 of your
9 fellow members, the bottom line is that Marriott now has a
10 system in place where they can have their Marriott
11 Vacation Club points people utilize Aspen Highlands
12 Ritz-Carlton, right?
13    A.   Yes.
14    Q.   And it's a one-to-one exchange?
15    A.   It is a one-week to one-week exchange. An exact
16 exchange.
17    Q.   He says here on August 17, 2012, in the last
18 sentence of the last full paragraph on page 1 of
19 Exhibit 1053, "Frankly, it has been our position that our
20 members bought into the Ritz-Carlton brand and do not want
21 the brand diluted."
22       Do you understand the concept of brand dilution?
23    A.   I would have a concept of it. I'm not sure what
24 it means in this context.
25    Q.   As a board member and the president of the
                                                    Page 130

1 rented it?
2    A.   Mm-hmm.
3    Q.   And how did you rent it, sir?
4    A.   I talked to one of my friends, the gentleman who
5 ultimately bought my unit, and said, "Hey, would you like
6 to rent my week for Christmas? We have family coming. I
7 can't go."
8    Q.   So it was not through a broker, it was something
9 you mentioned to Mr. Ennen?
10    A.   Yes, correct.
11    Q.   And that was the only time you rented it?
12    A.   Yes. And we have Christmas week coming up next
13 year, and I will probably rent my unit also.
14    Q.   Okay. Thank you for that.
15       It says, "The board has concerns" -- continuing
16 at the bottom of page 1 of Exhibit 1053 -- "The board has
17 concerns that since the core business of MVW has and
18 likely will be the timeshare business, which appears to be
19 evolving into a points-based system, that the nature of
20 our club will change by opening the club to Marriott
21 Vacation Worldwide timeshare/points members who have a
22 much lower cost of entry."
23       Do you see that?
24    A.   Yes.
25    Q.   Okay. That's what's happened today. There are
                                                    Page 132

1 association now for five and a half years, or five years,
2 do you have -- what is your concept in that capacity of
3 brand dilution with respect to the Ritz-Carlton?
4    A.   A brand dilution, in my mind, would be having
5 two names on the masthead rather than one. I always want
6 my product, my second home, to be a Ritz-Carlton club.
7    Q.   And you do consider this your second home?
8    A.   Yes, I do.
9    Q.   And, again, as you sit here today, as opposed to
10 2012, do you know how the Marriott entities let their
11 Vacation Club members know that they get to use -- even
12 though it might be a lot of points -- that they get to use
13 your second home?
14    A.   No, sir, I don't. Nor do I know how Exclusive
15 Homes or -- Exclusive Resorts or Third Homes advertise to
16 their members. Nor do I know how any other member
17 advertises their unit.
18    Q.   Have you ever rented your unit?
19    A.   Once.
20    Q.   And when was that, sir?
21    A.   I would say it was Christmas week 2014.
22    Q.   So you had rolled up to a very valuable week?
23    A.   I rolled up. It was my turn to have Christmas
24 week, yes.
25    Q.   Okay. And what did you do? You rented it? You
                                                    Page 131

1 Marriott Vacation timeshared points members that have
2 access to your club, right?
3    A.   If they want my week, yes.
4    Q.   If you put your week at the Lion & Crown Travel
5 program, they can get there?
6    A.   Yes.
7    Q.   But you don't do that because it's your second
8 home?
9    A.   I don't do that because we use our weeks as much
10 as we can.
11    Q.   Can Mr. Ennen use that program now that you sold
12 it to him on the secondary market?
13    A.   Sure.
14    Q.   Was there a time when there was a suggestion
15 that if that program came online, that secondary market
16 owners would not be able to use an exchange program; do
17 you recall that?
18    A.   I don't understand that.
19    Q.   Was there ever a time when a secondary market
20 person would not be considered as eligible to utilize an
21 exchange program run by Marriott?
22    A.   A fee simple owner can do whatever they want to
23 do with their -- with their time.
24    Q.   Yeah, I understand that, but my question was --
25 and maybe it wasn't clear -- was whether or not a
                                                    Page 133

34 (Pages 130 - 133)

Randal Mercer - October 24, 2017

1 secondary market owner could utilize the Marriott Vacation
2 Club or Lion & Crown Travel program to exchange to use the
3 Vacation Club system.
4     A.   I apologize.  Perhaps I don't understand your
5 term "secondary market person."
6     Q.   Someone who didn't buy it from the developer.
7     A.   Okay.
8     Q.   The Ritz-Carlton Hotel Development Company.
9     A.   So you're referring to a Third Home, Exclusive
10 Resorts has the time, something happened, they can't come
11 in, they give it to -- they give it to a friend?
12     Q.   No, let me --
13     A.   Okay.
14     Q.   I might have a document.
15     A.   Help me with that.
16     Q.   It's not that important.  Yeah, it's all right.
17     A.   Okay.
18        (Exhibit 1058 previously marked for
19 identification produced to the witness.)
20 BY MR. FERGUSON:
21     Q.   This is an exchange, sir, after that letter we
22 just quickly reviewed, Mr. Neveloff and the other board
23 members sent out on August 17th, I think -- August 17th
24 (handing).  This is a response from Mr. Hawk, Rick Hawk.
25 Do you know Mr. Rick Hawk?

Page 134

1     A.   No, sir.
2     Q.   Do you know whether any of those are on par with
3 Ritz-Carlton brand standards?
4     A.   I have not been to any, so I don't know.
5     Q.   Do they call their service people "The Ladies
6 and Gentlemen," at the Marriott?
7     A.   I don't know.
8     Q.   You know what I'm talking about, "The Ladies and
9 Gentlemen"?
10    A.   Absolutely.
11    Q.   And the Ritz-Carlton staff, from top to bottom,
12 are trained and expected to afford their guests a certain
13 high level of service?
14    A.   Yes.
15    Q.   And you do not have people similarly trained at
16 Marriott-branded hotels, do you?
17    A.   I stayed at a Marriott Renaissance in Columbus,
18 Ohio two weeks ago, and no one referred to me as a lady or
19 a gentleman.
20    Q.   Okay.  So the standard wasn't the same as you
21 would -- if you walked into the Denver Ritz or the Ritz in
22 Naples you like to go to?
23    A.   In the context of staff addressing, me, no.
24    Q.   So it's a different level of service, and a
25 different level of facility?

Page 136

1     A.   No, sir.
2     Q.   Oh, it's 1058.  I'm sorry.  Exhibit 1058 I'm
3 showing you.  Sorry.
4        It talks about, Mr. Hawk told Mr. Neveloff here
5 about -- he thinks it is important -- this is the second
6 page of Exhibit 1058, "I think it is important to note
7 that we are a Ritz program and not the Marriott program
8 and the brands are very different."
9        Do you generally agree that the brands are very
10 different, Marriott and Ritz?
11    A.   Are you referring to the hotels, or are you
12 referring to the fractional and the timeshare?  What are
13 you referring to?
14    Q.   Let's refer to the hotel facilities themselves.
15    A.   Okay.  I believe there is a certain difference,
16 Ritz being more upscale than some of the older Marriotts,
17 yes.  The Marriott Renaissance, for example, yes.
18    Q.   Are there Marriott Hotels in their system that
19 you think are on par with any Ritz-Carlton hotels?
20    A.   I have not been to any of the newer ones.  I
21 have been to Marriott Courtyard.  I have been to Marriott
22 Renaissance.
23    Q.   Have you -- and you've never been to a Marriott
24 Vacation -- one of these 51 Marriott Vacation Club
25 Destinations?

Page 135

1     A.   The facility was different.  It was a business
2 hotel.  The service was great, and the food was great.
3     Q.   Okay.
4     A.   I was pleasantly surprised, and so were my
5 guests.
6     Q.   Okay.  Now --
7     A.   And Ohio State won, too, by about 60 points, so
8 that helped.
9     Q.   Okay.  I'd like to get you out today.  So I
10 don't need to hear about Ohio State.
11        MR. SHEA:  Well, don't ask questions about other
12    things that have nothing to do with this case then.
13 BY MR. FERGUSON:
14    Q.   The RCDC program and the Marriott program,
15 referred that Mr. Hawk, to your predecessor president,
16 those programs are different, too, are they not?
17    A.   A timeshare is different than a fractional, yes.
18    Q.   Thank you.
19        (Exhibit 1061 previously marked for
20 identification produced to the witness.)
21 BY MR. FERGUSON:
22    Q.   Exhibit 1061 (handing).  That's a letter from a
23 fellow named Lee Cunningham, Executive Vice President and
24 Chief Operating Officer of the Ritz-Carlton Destination
25 Club.  That's the club system that Aspen Highlands is part

Page 137

35 (Pages 134 - 137)

Randal Mercer - October 24, 2017

1  of, right?
2      A.  Yes.
3      Q.  Okay.  But he is employed by a Marriott entity,
4  is he not?
5      A.  It says here he's employed by the Ritz-Carlton
6  Destination Club.
7      Q.  But that's not exactly true, is it?
8      A.  I can't answer that.
9      Q.  Do you know Juan Cappello, Juan Pablo Cappello?
10     A.  No, sir.
11     Q.  Have you ever seen his letter to Mr. Cunningham
12  after this went out?
13     A.  No, sir.
14     Q.  You were never copied on any letters from Juan
15  Pablo Cappello?
16     A.  Not that I remember.
17     Q.  All right.  I believe this letter is also sent
18  out around August 17, 2012, and Mr. Cunningham doesn't
19  seem to date those letters, but you can tell that it at
20  least follows the Babich letter of July 17, 2012.  Do you
21  see that first paragraph?
22     A.  Yes.
23     Q.  Mr. Cunningham writing to his valued members
24  says, "First of all, we would like to assure you that
25  nothing you originally purchased has changed or will
                                              Page 138

1  change as a result of the announcement mentioned above."
2      That would be the Babich announcement, right?
3      A.  Yes.
4      Q.  But what could have changed if -- what would
5  change is that there would be an affiliation with
6  Marriott, right?
7      A.  Through a points system, yes.
8      Q.  Okay.  It talks about, at the bottom of page 1
9  of Exhibit 1061, last paragraph, "The affiliation option
10  announced in our July 17, 2012 letter regarding the
11  evolution of the Ritz-Carlton Destination Club is the next
12  step in providing significantly more vacation options for
13  Ritz-Carlton Destination Club members."
14     Do you see that?
15     A.  Yes.
16     Q.  Okay.  One of the issues, obviously, what was
17  going on, we covered before, is that certain clubs were --
18  were not -- not going to remain online or even come
19  online, Abaco -- Abaco and Kapalua; is that right?
20     A.  Mm-hmm.
21     Q.  Is that a yes?
22     A.  Yes.
23     Q.  It says, "This option is being offered with no
24  additional cost to current club home members and
25  participation is completely optional."
                                              Page 139

1      Is that something Marriott has been saying all
2  along, that it was completely optional or voluntary?
3      A.  I don't recall.
4      Q.  If it talks about, the beginning of page 2, the
5  first sentence -- I know it kind of breaks off -- "Members
6  choosing to take advantage of the exchange program would
7  receive points in their account that they could then use
8  to access all the options within the Marriott Vacation
9  Club Destinations program."
10     Okay.  Mr. Cunningham is basically following up
11  with what Ms. Babich was offering in July, right?
12     A.  Let me refer back to her letter, if I may.
13     Q.  Sure.
14     (Witness peruses documents.)
15     Q.  There's one of them.
16     A.  Yes.
17     Q.  Okay.  What I wanted to ask you about
18  Mr. Cunningham's letter, Exhibit 1061, it says -- the next
19  to last paragraph -- on that page, at least he has a
20  signature page again, but it says, "We understand."
21     Do you see that?
22     A.  Yes.
23     Q.  It says, "We understand our original
24  communication generated questions for a number of our
25  members and may not have fully anticipated all of your
                                              Page 140

1  questions regarding the changes to the Ritz-Carlton
2  Destination Club.  We have received initial feedback from
3  a few members and your board and would appreciate hearing
4  from you with your comments and questions."
5      Do you recall the letter that Mr. Neveloff
6  drafted and then was sent to the members regarding
7  about -- their concern that they hadn't been given any
8  notice of the Babich letter?  Do you recall whether or
9  not -- generally recalling that, do you know what the
10  board was doing to meet with, call, discuss, their
11  concerns regarding this new, quote-unquote, opportunity to
12  utilize the Marriott Vacation Club system?
13     A.  No, I do not.
14     Q.  It says, "We would love to hear from you
15  directly."  Do you recall receiving this letter,
16  Mr. Mercer, from Mr. Cunningham, as a member?
17     A.  No, sir, I don't.
18     Q.  Okay.  And why -- is that something you just
19  don't recall, or these are things you don't look at?
20     A.  I look at them.  I just don't recall it.
21     Q.  It says, "We've scheduled a webinar for members
22  of the Ritz-Carlton Destination Club with myself" -- that
23  would be Cunningham -- "and the president and chief
24  executive officer of Marriott Vacation Club -- Marriott
25  Vacations Worldwide."
                                              Page 141

                                36 (Pages 138 - 141)

Randal Mercer - October 24, 2017

1      Who was the president and chief executive
2  officer at the time; do you recall?
3      A.  No, sir.
4      Q.  Do you know the name Stephen Weisz?
5      A.  I've heard that name.
6      Q.  Have you ever met with Mr. Weisz?
7      A.  No, sir.
8      Q.  Do you have an understanding that Mr. Mullenix
9  and Ms. Perfido had met with him someplace in Florida?
10     A.  I did not know that.
11     Q.  You understand he is the top management person
12 in the Marriott system?
13     A.  Now or in 2012?
14     Q.  Now.
15     A.  No, I don't know that.
16     Q.  How about then?
17     A.  I did not know that.  I knew he was pretty high
18 up the food chain.  I had heard the name.
19     Q.  Okay.  But you wouldn't know higher than
20 Mr. Cunningham, I take it, and what ensued after this
21 letter?
22     A.  That's correct.
23     Q.  Did you attend this webinar?
24     A.  No, sir.
25     Q.  Thank you.  Even though you thought it was
                                                      Page 142

1  likely that you would become a board of director member?
2      A.  I'm sure I had a work conflict.
3      Q.  There was no recording made of it available to
4  you, or PowerPoint?
5      A.  I don't recall.  There's always a PowerPoint
6  somewhere.
7          (Exhibit 1060 previously marked for
8          identification produced to the witness.)
9  BY MR. FERGUSON:
10     Q.  I have some questions about some member
11 feedback, and this is a document, if you look at the very
12 top of it, you'll see that Mr. Neveloff was, on August 21,
13 2012, forwarding a message that had bounced back to Lee
14 Cunningham from a Mr. Robert Stillman.  Do you know a
15 Robert Stillman?
16     A.  No, sir.
17     Q.  Drs. Robert and Linda Stillman, Stillman Family,
18 LLC, Aspen Highlands.  He's not a member you've met?
19     A.  No, sir.  Are they current members?
20     Q.  I don't know if they're current, but in 2012, I
21 take it, they were.  Would you agree with that?
22     A.  Apparently.
23     Q.  And so when an email goes out from the
24 Ritz-Carlton Club, it looks like there's a response that
25 people can generate that goes to Member Inquiry,
                                                      Page 143

1  Ritz-Carlton Club.  Do you see that?
2      A.  Mm-hmm.  Mm-hmm.
3      Q.  And with respect to this one, do you know
4  whether or not those feed -- that feedback that goes back
5  to Mr. Cunningham in response to his letter is given to
6  the board?
7      A.  Apparently it had been.
8      Q.  Yeah, but it wasn't given by Marriott, or
9  Mr. Cunningham, or Ms. Babich, or Mr. Weisz.  It was given
10 to you by Mr. Stillman himself.  Do you see that on the
11 next -- first page, Mr. Stillman forwards the message he
12 sent to Mr. Cunningham's member inquiry email handle?
13     A.  Help me walk through your question here.
14     Q.  Okay.
15     A.  Mr. Stillman sent an email to the member inquiry
16 at Ritz-Carlton Club.
17     Q.  Right.  My question --
18     A.  Which is typically a Member Services email
19 address, I would assume.
20     Q.  Right.
21     A.  Okay.  Got it.
22     Q.  If you look at the letter we just saw from
23 Mr. Cunningham, you'll see that if you have a comment, you
24 can email your comments or questions to that email.
25     A.  Okay.
                                                      Page 144

1      Q.  So Mr. Stillman obviously -- Dr. Stillman and
2  his wife, Dr. Stillman, they responded.
3          My question simply was, when Marriott and
4  Mr. Cunningham got feedback like this, did they give it to
5  the board, or did it have to come from the member himself,
6  if you know?
7      A.  I don't know.
8      Q.  Number 1060.  Mr. -- or Dr. Stillman, at the
9  bottom of the page, said he was going to respond to both
10 the Babich and -- of Cobalt and the Cunningham of
11 Ritz-Carlton Destination Club letters regarding the
12 evolution.  Do you see that?
13     A.  Please reference the --
14     A.  Yeah.  I mean, he was -- Mr. -- Dr. Stillman was
15 responding to the Babich letter --
16     A.  Yes.
17     Q.  -- and to the Cunningham letter?
18     A.  Yes.
19     Q.  One's July 17th.
20     A.  Yes.
21     Q.  One's August 17th.
22     A.  Okay.
23     Q.  And this was forwarded to you by Mr. Neveloff,
24 right?
25     A.  Yes.
                                                      Page 145

37 (Pages 142 - 145)

Randal Mercer - October 24, 2017

1   Q.   And you understood at least this member was not
2   at all happy with the concept of there being an
3   affiliation with Marriott; do you recall that?
4   A.   I do not recall it.  I'd have to read it.
5   Q.   Okay.
6   A.   Would you like me to do that?
7   Q.   No, it's way too long, sir.  We'll miss lunch.
8   A.   Okay.
9   Q.   It looks like they are long-standing members of
10  two fractional units at the Ritz-Carlton Club.  And it
11  says there's been a devolution as opposed to an evolution
12  of the club offerings, its value, and its brand.
13       Do you recall generally, in this time frame,
14  receiving concerns one way or another regarding members'
15  concerns about an affiliation?
16  A.   I was not on the board.  I would not receive
17  them.
18  Q.   Well, you did receive this one?
19  A.   I was forwarded, yes.
20  Q.   Okay.  Because you were going to be voted on the
21  board, and you kind of knew that, didn't you?
22  A.   No, sir, I did not.
23  Q.   You do receive several of these types of
24  communiqués from Mr. Neveloff that were going back to
25  either him or -- going -- coming to him somehow?

Page 146

1   MR. FERGUSON:  Is that an exhibit?
2   Q.   I'll get it to you in a little while.
3   A.   Okay.
4   Q.   Because I think it's on a different system right
5   now.
6   A.   Okay.
7   Q.   In terms of your recollection, do you recall
8   whether it was generally positive or negative with respect
9   to what Babich and Cunningham were offering, vis-à-vis
10  so-called opportunities to exchange voluntarily?
11  A.   It would be a pure guess.
12  Q.   I don't need guesses.  Do you have any --
13  A.   Then I do not.  Other than pure guesses, I don't
14  know specifically.
15  Q.   Was it on the same order of positiveness,
16  positivity, that you said occurred in December of '13 when
17  the survey was done?
18  A.   From what I recall, and it's pure speculation, I
19  don't think members like the points-base system.
20  Q.   Do you know a Barry Schochet, Gayle Weiss, I
21  think they're brother and sister out of New York?
22  A.   No, sir.
23  Q.   Don't know them?  Do you recall being forwarded
24  that -- being forwarded their concerns about the
25  affiliation by Jay Neveloff in August 2012?

Page 148

1   A.   It's possible.
2   Q.   Did you get -- recall any positive responses
3   from the people that were invited by Mr. Cunningham to
4   respond.  Do you recall any positive feedback regarding a
5   potential affiliation with the Marriott Vacation Club?
6   A.   I really can't remember any specifics about that
7   time.  Sorry.
8   Q.   Have you ever seen a compilation of comments on
9   a chart that was generated in response to the Cunningham,
10  August 17, 2012 letter?
11  A.   I recall seeing a chart with some -- with some
12  compilations and assemblage of answers, yes, I do.
13  Q.   Okay.  I'm sorry.
14  A.   I do not recall where they came from.
15  Q.   Well, they came from your members, right?
16  A.   I would assume that the comments did, yes.
17  Q.   And do you recall, in this time frame -- because
18  I think there was another time when this happened, I think
19  in April of 2013 -- yeah, 2013 -- but do you recall in the
20  August of 2012 time frame as you're about to step onto the
21  board, that there was a compilation of member comments to
22  Mr. Cunningham's letter following up on Ms. Babich's
23  letter?
24  A.   I do not recall that.  If you have it, and would
25  like me to review it, I'd be happy to.

Page 147

1   A.   No, sir.
2       (Exhibit 1064 previously marked for
3       identification produced to the witness.)
4   BY MR. FERGUSON:
5   Q.   Show you Exhibit 1064 (handing).
6       Just real quickly, do you recall -- you have no
7   doubt, I take it, that Mr. Neveloff was sending these
8   types of email communiqués to you, when you got them?
9   A.   Well, this is the second one you've shown me, so
10  I know he sent you.
11  Q.   Okay.  It says, "Bringing in" -- Mr. Schochet,
12  Barry Schochet, says to Jay on August 20, 2012, third
13  paragraph down, "Bringing Marriott Vacation Club owners
14  into our system absolutely edging rates our investment.
15  If we had wanted that program, we could have bought in at
16  a much lower price."
17       Was that similar concerns you heard either in
18  emails like this that Mr. Neveloff sent you or in a
19  compilation that you were referring to in your mind's eye?
20  A.   Referring -- if it's in the context of referring
21  to the points-based program which is illustrated in a
22  letter by Eveleen Babich, I would say this is consistent.
23  Q.   Do you consider what's in place today a
24  points-based system with respect to Lion & Crown?
25  A.   Not at all, no.

Page 149

38 (Pages 146 - 149)

Randal Mercer - October 24, 2017

1    Q.   So how is it then that if Annette Kalcheim --
2  you know Annette Kalcheim, right?
3    A.   I'm sorry?
4    Q.   Annette Kalcheim, a member?
5    A.   I don't know.
6    Q.   She's communicated with you a few times.  And at
7  one point after Lion & Crown, after you sent the MOU, very
8  shortly thereafter, she tried to get into a Marriott
9  Vacation Club resort.  I don't know if it's one of the
10 51s.
11   A.   Mm-hmm.
12   Q.   51, and she said, I can't get in there.  And you
13 said to Ms. Sobeck, "Let's give her a light response."
14 Okay?  And the light response was, "Hey, didn't you know
15 that your weeks don't have enough value to trade into a
16 Marriott Vacation Club -- into the Marriott Vacation Club
17 experience that you want?"
18      So do you recall any of that communication in
19 2014?
20   A.   No, sir.
21   Q.   Do you have any idea sitting here as the
22 president, whether or not -- or how it is determined that
23 if a person takes a September shoulder season they may
24 have bought and wants to trade into a Marriott Vacation
25 Club New Year's week, do you know how that's determined?

Page 150

1    A.   Her currency is her allocated week, and her
2  currency is the size of her unit, whether it's a
3  two-bedroom or a three-bedroom.
4    Q.   And how is that converted?  Is it used as
5  points?  Is it used as dollars?  Is it used by some
6  algorithm?  What is it when a three-bedroom person that --
7  during New Year's week wants to put in to Lion & Crown
8  Travel program, that person has a very valuable commodity,
9  and someone who has a September shoulder season week for a
10 two-bedroom, which is a less valued commodity, when they
11 go in the system, what do they come out with?
12   A.   I can only assume that a three-bedroom Christmas
13 week, or a week between Christmas and New Year's, is far
14 more valuable than a two-bedroom in September.
15   Q.   Right.  And how is that value determined?
16   A.   I have no idea how that ratio --
17   Q.   Is it points?
18   A.   -- is applied.
19   Q.   Is it points?
20   A.   Don't know.
21   Q.   I thought you said this wasn't a points system
22 just a little while ago.  That's why I asked this series
23 of questions.
24   A.   I don't know.  I would assume that there is some
25 scoring mechanism.  What that is, I don't know.  I've

Page 152

1  What is it that Marriott utilizes, if not points, to
2  determine, no, you don't have enough value here from
3  September to get into here in January?  How does that
4  work?
5    A.   I do not know specifically.  Conceptually I have
6  some thoughts.
7    Q.   What -- but you're the president, so how is this
8  working for your folks?
9    A.   Because if I -- our members choose at this time
10 to trade their specific allocated week, then somebody can
11 come in their specific allocated week.  There are no
12 algorithms.  It is very simple to do.  One week in, one
13 week out.
14   Q.   But the person that comes in, I think you
15 pointed out before, at least once, is that that person
16 needs to have a lot of points?
17   A.   I would assume that, yes.
18   Q.   And now, when that person, and I'll say it's
19 Annette Kalcheim at this point, when Annette Kalcheim
20 wants to put into the Lion & Crown Travel program in order
21 to get to go to one of these 51 Marriott travel
22 experiences, what -- what currency does she use to get
23 into one of the finer Marriott Vacation Club resorts in a
24 nice place on a nice week, what currency does she use to
25 get in there?

Page 151

1  never participated in it.
2    Q.   So when someone asks you how it works, you're
3  not able to tell them?
4    A.   No, I'm not.  I refer them to Member Services.
5        MR. SHEA:  Is now a good breaking point for
6  lunch?
7        (Sotto voce discussion among plaintiffs'
8  counsel.)
9        MR. FERGUSON:  I can't hear two people.
10       MR. SHEA:  Sorry.
11       MR. FERGUSON:  Do you want to take a break, is
12 that what you said?
13       MR. SHEA:  We have to take a break at some time.
14 I thought it might be convenient.
15       MR. FERGUSON:  Let me just do one of these
16 letters.
17       (Exhibit 1066 previously marked for
18 identification produced to the witness.)
19 BY MR. FERGUSON:
20   Q.   10 -- 1066 (handing).
21       So this is another email from a member that was
22 sent to board members and forwarded by Neveloff to Mercer
23 on August 21, and my question simply is, do you know Dee
24 and Jerry Nowell?
25   A.   No, sir.

Page 153

39 (Pages 150 - 153)

Randal Mercer - October 24, 2017

1    Q.   Mr. Nowell advised your board -- Schneider,
2  Oliver, Marsden, and Neveloff -- it says -- he thanks them
3  for the communications.  He said he had been staying in
4  the property when this all happened, and he said he had a
5  few questions "before I email my concerns to the
6  president.  Is the board aware that Ritz-Carlton sales
7  office was closed on the mall?  That it sat vacant after
8  Ivan left, and we no longer have a broker on site to
9  discuss the Ritz-Carlton property for new sales or
10 resales?  That it is now being staffed by a salesman to
11 sell strictly timeshares?"
12       We were talking about that before.  So there
13 seems to be Mr. Nowell and his wife, Dee Nowell, whoever
14 wrote this, both of them, I guess wrote it, this is
15 something you weren't -- you weren't specifically aware
16 of, that they were selling -- or marketing timeshares out
17 of that office?
18    A.   That is correct.
19    Q.   Did -- during the period 2004 to '12, Mr. --
20 notice Mr. Nowell is talking about -- Nowell is talking
21 about resales?
22    A.   Mm-hmm.
23    Q.   Was the Ritz-Carlton sales office handling
24 resales at some point, along with their own inventory?
25    A.   That was not something they were very interested
Page 154

1  in doing.  They were interested in selling new inventory.
2    Q.   Sure.
3    A.   And they would typically refer resales to other
4  brokers in town who handled those sort of things.
5       Did they exclude themselves from doing it
6  completely, I'm not sure.
7    Q.   Okay.  Thank you.  I just was curious about
8  that.
9       MR. FERGUSON:  Do you want to take that break?
10      THE VIDEOGRAPHER:  Stand by, please.
11      We are now going off the record.  This is the
12 end of media unit number three.  The time is 12:34.
13      (Recess taken -- 12:34 p.m.)
14      (Return from recess -- 1:09 p.m.)
15      THE VIDEOGRAPHER:  We are going back on the
16 record.  This is media unit number four.  The time is
17 1:09.
18      (Exhibit 1072 previously marked for
19 identification produced to the witness.)
20 BY MR. FERGUSON:
21    Q.   Okay.  Back on the record.
22      Mr. Mercer, I'm just going to hand you
23 Exhibit 1072.  It's a brief email from a Mr. Neveloff to
24 Mr. Mullenix, August 21, 2012, which is about where I left
25 you off before the lunch break.
Page 155

1       And it says, "Mike, following up on your -- our
2  call earlier, the earlier responses to our board letter --
3  our board's letter which went out on Monday has
4  essentially been unanimous in recognizing and opposing a
5  move towards unifying the Ritz Club and the MVW
6  timeshare/points system."
7       I was asking you before if you had seen, and you
8  indicated you had seen a compilation chart of people's
9  responses to the board's letter and Mr. Cunningham's and
10 Ms. Babich's situation.  This is consistent with the fact
11 that most people were against any type of unification of
12 the two systems; is that right?
13    A.   I recall seeing a compilation grid sheet.  I'm
14 not positive, exactly, when it was generated, but I'll
15 have to see it.
16      (Exhibit 1075 previously marked for
17 identification produced to the witness.)
18 BY MR. FERGUSON:
19    Q.   Okay.  Let me show you Exhibit 1075 (handing).
20 This is an email string that starts at page 2 of
21 Exhibit 1075, in the upper part of the page, August 26,
22 2012.  It's an email from a man named Juan Pablo Cappello,
23 at the time with JP -- JT [sic] Law, which is Greenberg
24 Traurig law firm.  Do you know Greenberg Traurig law firm?
25    A.   Yes.
Page 156

1    Q.   Okay.  It's a copy to Neveloff, the board that
2  you were about to join.  And then if you look above,
3  Mr. Neveloff responded to the letter, and it said -- the
4  cap -- the email we're going to go through a little bit in
5  a minute, that it captured Mr. Neveloff's sentiments quite
6  well.
7       Do you see that on the first page this email
8  from Mr. Cappello to the Ritz-Carlton Club folks in
9  response to Mr. Cunningham's letter was actually forwarded
10 to you on the 26th of August, 2012?
11    A.   You're asking if -- if it was referred to me?
12    Q.   Yes.
13    A.   Yes.
14    Q.   And now if you would just peruse, not
15 necessarily read, the Juan Cappello --
16    A.   Okay.
17    Q.   -- email to Mr. Cunningham, you'll see that he
18 says, "Dear Lee, the recent communications from Marriott
19 Vacation Worldwide Corp. are both insulting and
20 disingenuous.  I encourage your team to communicate with
21 the Ritz-Carlton Destination Club members in an earnest
22 and forthright manner."
23    A.   Mm-hmm.
24    Q.   In the next paragraph he actually says, "Let's
25 start with how you sign your letter."
Page 157

40 (Pages 154 - 157)

Randal Mercer - October 24, 2017

**Page 158**

1 Remember we looked at that before?
2 A. Yes.
3 Q. He said, "You are the executive vice president
4 and chief operating officer of the Marriott Vacation
5 Worldwide Corporation." Then he said, "I assume you
6 signed your August 20th letter under the Ritz-Carlton
7 Destination Club" -- in quotes -- "to provide us, RCDC
8 members, comfort that you have our best interest at
9 heart." And then he says, "I encourage you to be upfront
10 that you work with Marriott Vacation Club -- Vacations
11 Worldwide Corp., of which only a small fraction of its
12 members belong/bought into the RCDC brand."
13 So reading this letter, you now know who
14 Mr. Cunningham actually works for, right, or at least
15 worked for?
16 MR. MARX: Object to the form of the question.
17 THE WITNESS: Well, I understand what this
18 gentleman is trying to say. Is it possible that he
19 works for both -- both companies?
20 BY MR. FERGUSON:
21 Q. I guess it could be. Do you know who he works
22 for today?
23 A. No, I do not.
24 Q. Do you know who he worked for in 2012?
25 A. I always assumed he worked for Marriott.

**Page 159**

1 Q. He says at the bottom of the email, end of the
2 page, he says, "Lastly, your recent communications failed
3 to acknowledge the underlying issue which all RCDC members
4 need to understand." Okay? And he underlines that, "The
5 world -- Marriott Vacations Worldwide Corp. has a huge
6 incentive to dilute the RCDC brand to further its greater
7 interest of selling more Marriott Vacation Club
8 memberships. The growth of the Marriott Vacations Club --
9 Worldwide Corp. as a public company -- as a public company
10 is tied with the growth of sales of more and more Marriott
11 Vacation Club memberships."
12 So this was sent to you by Neveloff, and then
13 you forwarded that on to a Joel Alper?
14 A. Mm-hmm.
15 Q. Is that right, satcomjoel?
16 A. Mm-hmm.
17 Q. And he was a commercial board of director at
18 Aspen?
19 A. Yes.
20 Q. There's two Alpers, I think in this case, that
21 gets me confused, or two Joels.
22 But you said, "For Your Eyes Only, Please." Why
23 did you say that to him, if you recall?
24 A. Because I believe he was taking -- he had taken
25 my place at that point in time as a commercial director,

**Page 160**

1 but nonetheless, he was a first accommodation owner, so in
2 an effort to keep him informed, I imagine that's why I
3 sent this to him.
4 Q. Okay. It says there -- you said to him, "There
5 are bigger issues at play than the appetizer menu." What
6 does that mean?
7 A. Jay was a -- the commercial director that would
8 be in charge of Willow Creek Bistro, and I think Jay, at
9 one time, made a comment about we need to change the
10 appetizer menu.
11 Q. All right.
12 A. Tongue in cheek.
13 Q. So you're basically saying, this is a much
14 bigger thing, pay attention to this?
15 A. I think that's probably right.
16 Q. And Mr. Neveloff said he -- he captured
17 Mr. Neveloff's sentiments quite well. Did you share the
18 sentiments of Mr. Cappello's email. And I know you
19 haven't read it. You can skim it if you want, or -- did
20 you agree that there was a huge incentive by Marriott
21 Vacations Worldwide to dilute the RCDC brand to sell
22 Vacation Club memberships?
23 A. I don't necessarily agree with that statement.
24 I agree that it made sense for the Ritz-Carlton
25 Development Company, the developer, to sell more units

**Page 161**

1 because they needed to sell more units. The recession had
2 hit. Prices had gone down. They needed to sell units.
3 Q. So RCDC 1/12th fractional units or points -- or
4 some unit of points?
5 A. Fractional units at Aspen Highlands condominium.
6 Q. But that's not what Mr. Juan Cappello's talking
7 about.
8 A. That's -- that's my opinion.
9 Q. But they're different things, Mr. Mercer. One
10 is about selling 1/12th fractional interests, and
11 Mr. Cappello is saying, listen, you want to allow this
12 affiliation, which would allow Marriott Vacation Club
13 company sell more memberships. That's a different item,
14 is it not?
15 A. Well, I think they would need to sell more
16 memberships at everything they own --
17 Q. Okay.
18 A. -- when there had been a recession. Probably a
19 lot of things hadn't sold.
20 Q. Did you have any knowledge when you took over --
21 Can you guys --
22 MR. HANLON: Sorry.
23 BY MR. FERGUSON:
24 Q. Withdraw that.
25 He closed this letter to Mr. Cunningham's group

41 (Pages 158 - 161)

Randal Mercer - October 24, 2017

1 copied to some other folks, including your board, and
2 copied to you, it says, "Unless Marriott Vacations
3 Worldwide changes its attitude and begins to address the
4 clear conflict of interest that will destroy the value of
5 our investment, I continue to encourage the RCDC Aspen
6 Highlands board to explore exiting the Marriott
7 relationship and cancel all management contracts."
8      So that was something at least one of your
9 members was alluding to in August of 2012?
10      A.  Okay.
11      Q.  All right.  And that's also what you were
12 learning that Mr. Mullenix and Bachelor's Gulch were
13 considering, right?
14      A.  It was around that time, yeah.
15      Q.  Okay.
16      MR. REISER, JR.:  Hey, Matt, we have the August
17 spreadsheet.
18      MR. FERGUSON:  Okay.
19      (Exhibit 1104 previously marked for
20 identification produced to the witness.)
21 BY MR. FERGUSON:
22      Q.  (Handing.)
23      A.  Thank you.
24      Q.  For some reason, mine has a blank middle page.
25 I don't know what happened.  Mine was copied wrong.  Okay,
                                                    Page 162

1 you don't have that problem.
2      A.  Mine doesn't have a date at the top, so --
3      Q.  September, blank, 2002 -- '12.  Yeah.
4      A.  This one.
5      Q.  Yeah, that's the date, but it's not filled in,
6 is it?
7      A.  I don't know.  I just --
8      Q.  Okay.
9      A.  Had this been sent?
10      Q.  I don't know.  We'll see if we can come to that.
11      A.  Okay.
12      Q.  I just want to ask you about this -- what
13 appears --
14      A.  Okay.
15      Q.  -- to be a draft letter.
16      A.  Okay.
17      Q.  Were you on the board at this time, or was this
18 prior to you coming on?
19      A.  It was prior.
20      Q.  And do you have any recollection of this -- of
21 the board drafting a letter along the lines of this one,
22 which was to discuss with your members the discussions
23 regarding the plan by MVW to discontinue the sale of its
24 remaining inventory?
25      A.  If it was sent, I'm sure I read it.
                                                    Page 163

1      Q.  Okay.  But you hadn't -- you weren't -- you
2 weren't on the board that was actually drafting this at
3 this time?
4      A.  No, sir.
5      Q.  Thank you.  It's Exhibit 1104.  I passed by
6 but --
7      A.  I'm sorry, I'm still reading this.
8      Q.  It's all right.
9      A.  Will this be relevant in the future?
10      Q.  No.  I'll probably come up with the original in
11 a moment, but I wanted to see if you were on the board at
12 this time, but it appears you weren't.
13      Do you recall in this time frame any discussions
14 regarding retaining an outside lawyer on behalf of the --
15 by the board on behalf of the membership of the
16 Ritz-Carlton in Aspen Highlands?
17      A.  If you're referring to Mr. --
18      Q.  Gosch?
19      A.  -- Gosch, I'm not sure when I first heard that.
20      Q.  Is Exhibit 1072, we'd asked -- I had asked you
21 about the Neveloff-Mullenix email that said it's
22 essentially been unanimous in recognizing opposing a move
23 towards the Ritz-Carlton Club.  He then says, "The
24 attorney that was recommended to me with whom I spoke is
25 Phil Gosch, and his firm website is www.bhfs.com."
                                                    Page 164

1      Do you recall that when you came on board, that
2 Mr. Gosch had already been introduced into the situation?
3      A.  I believe so.
4      Q.  All right.
5      A.  In some fashion.  I don't know whether he had
6 been engaged or -- I believe he probably had been at that
7 time.
8      Q.  All right.  Let me show you that exhibit
9 (handing).
10      A.  Okay.
11      (Exhibit 1097 previously marked for
12 identification produced to the witness.)
13      Q.  It would be Exhibit 1097.
14      This is a -- this is a draft memorandum, and
15 it's, as I said, Exhibit 1097.  It's a memorandum.  It's
16 several pages long.  I'll count them, seven or eight,
17 nine -- nine pages long by the law firm of Brownstein,
18 Hyatt, Farber & Schreck, and it dealt with an analysis
19 with respect to use of tourist accommodation units by
20 members of the Marriott Vacation Club who are also not
21 members of the Ritz-Carlton membership program.
22      Is this -- I'll refresh your recollection.  Is
23 this put in time -- I can't think of the word.  Does this
24 put into your memory that Mr. Gosch and Brownstein, Hyatt
25 was already well under way in this analysis before you
                                                    Page 165

                                        42 (Pages 162 - 165)

Randal Mercer - October 24, 2017

1 became a board member, a tourist accommodation board
2 member?
3      A.   This memo would indicate that he would be
4 engaged at least as of seven -- 9/21, yes, sure.
5      Q.   Okay.  So all the work he did in this memorandum
6 predated your coming on the board?
7      A.   Yes, it appears that way.
8      Q.   When you came on the board, did you familiarize
9 yourself with the legal analysis that was conducted by
10 Brownstein, Hyatt on behalf of the condominium association
11 and the board?
12      A.   As best I could in a short period of time, I'm
13 sure I tried to get up to speed.  Sure.  Now, I had also
14 been at the fall annual meeting for 2012, so there's
15 things that I probably just absorbed at that time because
16 I was at the meeting.
17      Q.   All right.  Did Mr. Gosch come to any of those
18 meetings?
19      A.   I don't recall ever meeting him.
20      Q.   Okay.  You did speak to him and communicate with
21 him by email, did you not?
22      A.   After I was on the board, yes, I did.
23           (Exhibit 1108 previously marked for
24      identification produced to the witness.)
25
                                                    Page 166

1 meeting of the members.
2      Q.   Okay.  So the board of directors meeting
3 preceded this meeting?
4      A.   Yes, it would.
5      Q.   So you couldn't have been elected president
6 prior to the annual meeting then?
7      A.   No.
8      Q.   Okay.
9      A.   No, not prior to this meeting.
10      Q.   Do you know what the vote tallies were in
11 connection with your being elevated to -- back to the
12 board?
13      A.   No, sir.
14           (Sotto voce discussion among plaintiffs'
15      counsel.)
16           THE VIDEOGRAPHER:  Mr. Mercer, could I get you
17      to move your water bottle out of the way just a
18      little bit?
19           THE WITNESS:  What would you like, sir?
20           THE VIDEOGRAPHER:  Move your water bottle.
21      There.  Thank you.
22           THE WITNESS:  How about if I drink some water
23      first.
24           (Exhibit 1110 previously marked for
25      identification produced to the witness.)
                                                    Page 168

1 BY MR. FERGUSON:
2      Q.   So this is a document that -- this particular
3 version of a --
4           MR. MARX:  That's face down.  I don't know if
5      you -- that's significant.
6 BY MR. FERGUSON:
7      Q.   This is a -- it's unsigned, but it is a
8 Marriott-produced version of an annual meeting, it looks
9 like, agenda.  Do you see that?
10      A.   Yes.
11      Q.   Actually, it must be --
12      A.   These are the minutes.
13      Q.   Minutes, I'm sorry.  That's right.  Neveloff
14 called the meeting to order on this date at 6:02 p.m.  A
15 quorum was obtained.  Is this the meeting at which you
16 were voted on as a member, if you look at page 2?
17      A.   Yes, this would be the -- probably the third
18 meeting of the day, that's correct.
19      Q.   Okay.  And one was the board, one was the annual
20 meeting of the members?
21      A.   One was the Tourist Accommodation Board, would
22 be the first meeting.  The second meeting of the day is
23 the entire board of the condominium association.  And then
24 the third meeting of the day is the annual meeting of the
25 members.  And that's what this appears to be, the annual
                                                    Page 167

1 BY MR. FERGUSON:
2      Q.   Exhibit 1110, 1110 (handing).
3           So this is an email chain that starts back in
4 September where Mr. Gosch sends Mr. Neveloff that
5 September 21 draft memorandum and cease and desist letter
6 related to Marriott Vacation Club use of tourist
7 accommodation units.
8      A.   Mm-hmm.
9      Q.   And then it talks about above, Neveloff telling
10 Gosch, and I guess one of his other lawyers and he copies
11 you, "Please proceed to call your in-house contact at
12 Marriott but do not send any cease and desist letter.
13 Allow me to introduce Randy Mercer who is the new board
14 president.  Randy is a veteran -- veteran board member at
15 Aspen for six years."
16           So do you know what the in-house contact at
17 Marriott was that Mr. Gosch may have had?
18      A.   No, sir, I don't.  I would assume it would have
19 been another counsel.
20      Q.   You indicated, skipping a year ahead, that you
21 brought in a fellow named Mike Marino who's a lawyer at a
22 firm called Seyfar -- Seyfarth, I think, S-E-Y --
23      A.   Mike Marino was the association's attorney
24 during my first -- my first term of service.  He was also
25 the attorney for the St. Thomas board, and he was also, at
                                                    Page 169

43 (Pages 166 - 169)

Randal Mercer - October 24, 2017

1 the same time, the attorney for the Bachelor Gulch board.
2 So he was heavily involved immediately after the turnovers
3 in the mid, early 2000s.
4    Q.  The turnovers from declarants to the boards?
5    A.  Yes.
6    Q.  Okay.  And is he a member of any RCDC club?
7    A.  He owned units -- at least one unit in
8 St. Thomas, yes.
9    Q.  Okay.  And as a member, was he retained by that
10 board, the St. Thomas board, to represent them?
11    A.  I'm not sure, but he was at the meetings.
12    Q.  Okay.
13    A.  I believe.
14    Q.  Now, when you -- in your first seven years,
15 you're telling me that he was an attorney that represented
16 the HOA?
17    A.  He was an attorney who was at -- present at all
18 of our meetings and gave us legal advice.
19    Q.  So he was an attorney retained by the
20 association --
21    A.  I don't know if he was paid or if it was just --
22 I don't know.  He was an attorney who worked with all
23 three of the Ritz-Carlton Club boards.
24    Q.  Well, I mean, let's talk about your board.
25    A.  Okay.
                                              Page 170

1    Q.  And the first time you said he was a lawyer that
2 was giving legal advice.  Was he being paid for that legal
3 advice?
4    A.  I do not know that.
5    Q.  Did he have a retention agreement with the HOA
6 in Aspen or its board?
7    A.  I do not know that.  I was at the bottom of the
8 board, so I don't know those things.  He was -- he was --
9 he was there when I was first elected to the board.
10    Q.  And he was there at meetings giving legal
11 advice?
12    A.  He was giving advice, yeah, sure.
13    Q.  And who called him in, to your knowledge, in the
14 first -- during your first seven -- let me withdraw that.
15       What was his connection to Aspen Highlands in
16 that first seven years you served on the board?  Did he
17 know one of the board members, Mr. Sternfield?  Did he
18 know Sal Cutrona?  Who did he know?
19    A.  He was -- he was -- had a personal relationship
20 and friendship with Mr. Cutrona because Mr. Cutrona was
21 the president of the St. Thomas board.
22    Q.  Did they have any fractional ownerships?  When I
23 say "they," did Marino have fractional ownership interest
24 at Ritz-Carlton at any time?
25    A.  St. Thomas, yes.
                                              Page 171

1    Q.  No, I asked you about Aspen Highlands.
2    A.  No, sir.
3       MR. SHEA:  No, no.
4       MR. FERGUSON:  I didn't, you're right.  I'm
5 sorry.
6       THE WITNESS:  No, sir.
7       MR. FERGUSON:  In my mind it was a question.
8       MR. SHEA:  That's all right.
9       THE WITNESS:  No, sir.
10 BY MR. FERGUSON:
11    Q.  You're not reading my mind yet, but you will be.
12    A.  Well, I was -- I was starting.  I apologize for
13 that.
14    Q.  So he wasn't a member of the Aspen club?
15    A.  No.
16    Q.  Was Mr. Cutrona?
17    A.  Yes.
18    Q.  And is Mr. Cutrona also a member of St. Thomas?
19    A.  Yes.
20    Q.  And Mr. Cutrona is now on your board as a
21 tourist accommodation director today?
22    A.  Yes.
23    Q.  And he wasn't at the annual meeting, though, was
24 he?
25    A.  On September 21st --
                                              Page 172

1    Q.  A couple of days ago, a week ago?
2    A.  No, he was in Italy.  He couldn't make it.
3    Q.  And he wasn't on the phone?
4    A.  No, he was not.
5    Q.  Okay.  Has he missed any other board meetings
6 when he was a tourist accommodation director?
7    A.  Not that I recall.
8    Q.  So Marino was an attorney that gave legal advice
9 during your first seven years, but the connection may have
10 been through Mr. Cutrona, but you're not sure?
11    A.  I'm pretty sure.
12    Q.  He was, okay.
13    A.  That would be a good guess.
14    Q.  And skipping ahead again, you brought him in
15 twice so far since you were elevated to president as your
16 consigliere, and when you brought him in as the president,
17 did you get a retainer agreement with him?
18    A.  He sent me one.  I don't recall having signed
19 it.  Possibly I did.  I can't imagine I wouldn't have, but
20 I can't find it.  I looked, --
21    Q.  Mm-hmm.
22    A.  -- just to see.
23    Q.  So let me just digress there again.  When you
24 were asked by Mr. Shea and Ms. Livingston Black to -- you
25 were asked by them to get documents, of course, right?
                                              Page 173

44 (Pages 170 - 173)

Veritext Legal Solutions
866 299-5127

Randal Mercer - October 24, 2017

1    A.  Of course.

2    Q.  And are you saying that one of the documents may

3  have been the transmittal of a retention letter from the

4  law firm Seyfarth -- Seyfarth what?

5        MR. REISER:  Shaw.

6        MS. LIVINGSTON:  Shaw.

7  BY MR. FERGUSON:

8    Q.  Seyfarth Shaw?

9    A.  Yeah, there was a retention letter, sure.

10   Q.  There was a retention letter?

11   A.  Absolutely.

12   Q.  And you understand that's a contract with a

13  lawyer that sets forth the relationship?

14   A.  I do.

15   Q.  Okay.  And you don't know whether it was signed

16  or not?

17   A.  The one I have in my possession was signed by

18  their firm.  I do not have in my possession one that was

19  signed by me.  It doesn't mean there was not one signed.

20   Q.  Where's the one that's in the possession of you

21  that's just signed by them?

22   A.  I believe our counsel has it.

23   Q.  Okay.  And what was he retained to do when he

24  sent you that retainer letter?

25   A.  The primary reason for bringing Mr. Marino into

Page 174

1    Q.  Mr. Gosch was a Colorado attorney, correct?

2    A.  His office was in Denver.

3    Q.  And do you understand that he specializes in

4  complex real estate legal issues like this?

5    A.  I understand that he was -- he participated in

6  hotel issues and issues that involved things like this.

7    Q.  And Mr. Marino's primary focus in the law, and

8  we all kind of have them -- though I seem to do too many

9  things -- is that he's in the labor and employment arena.

10   A.  Hmmm.

11   Q.  Do you know that?

12   A.  I had heard that.

13   Q.  Okay.  And do you know whether he represents any

14  hospitality industries in connection -- any hospitality

15  companies, hotel companies, in connection with his law

16  practice?

17   A.  No, I do not.

18   Q.  Do you know whether or not he's represented

19  Marriott companies?

20   A.  No, I do not.

21   Q.  So are you saying that his entire relationship

22  with Ms. Egolf had -- if I'm saying that right.  Egolf, is

23  that how you say it?

24   A.  I think it's Egolf.

25       MR. MARX:  It is.

Page 176

1  the discussions that ensued was his long relationship with

2  the Marriott attorney Barbara Egolf in Orlando.  They had

3  worked through many issues over the years in the

4  multi-club platform, and I felt it was in our members'

5  best interest to have counsel that had a relationship that

6  were -- they were -- they had worked together.

7    Q.  And how did he forge that relationship with

8  Ms. Egolf?

9    A.  I believe over ten years' worth of work back and

10  forth on behalf of multiple associations.

11   Q.  Which associations?  Are you talking about

12  Ritz-Carlton --

13   A.  Bachelor -- Bachelor Gulch and St. Thomas and

14  Aspen Highlands.

15   Q.  All right.  So you brought him in because -- in

16  part, because he knew Ms. Egolf, Barbara Egolf?

17   A.  I had met her several times.

18   Q.  And what -- withdraw that.

19       You understand that he's not a Colorado lawyer,

20  right?

21   A.  I don't know that.

22   Q.  So you don't know where he's admitted to?

23   A.  I believe New York and Florida.

24   Q.  But you don't know about Colorado?

25   A.  No, sir.

Page 175

1        MR. FERGUSON:  Egolf.  Yeah, you know her.

2    Q.  His involvement was RCDC issues, Mr. Marino and

3  Ms. Egolf?

4    A.  Association issues.

5    Q.  And when you say, "Association issues," are you

6  meaning association governing documents?  Are you talking

7  about bylaws?  Are you talking about -- or are you talking

8  about association business as it relates to a potential

9  affiliation with the Marriott Vacation Club?

10   A.  In my original tenure, his -- he helped work on

11  rules and regulations.  He helped on, you know, working

12  on -- on those kind of internal issues for the board.  And

13  all of those issues, those ongoing operational issues that

14  the board was involved in, always had to go through

15  Barbara Egolf.

16   Q.  So I was looking at your Exhibit 1110, and that

17  is you being introduced to Mr. Gosch.

18       Do you -- you do know that Mr. Gosch's firm and

19  your association signed a retention letter?

20   A.  I have not seen that.

21   Q.  And did you, as a board president and board of

22  director member, tourist accommodation board of director,

23  did you utilize Mr. Gosch's services in connection with

24  the issue of affiliation with the Marriott Vacation Club?

25   A.  I used Mr. Gosch on one issue only, and that was

Page 177

45 (Pages 174 - 177)

Randal Mercer - October 24, 2017

1 the issuance of a cease and desist letter after I became
2 president of the association.
3      Q.  And that letter had already been drafted in some
4 respects as we see that?
5      A.  In some form it had, yes.
6      MR. FERGUSON:  Can you guys put up 1103, because
7 I can't find that one.
8      Q.  I might have -- I might have you use the screen
9 here, if you don't mind.
10     (Exhibit 1103 previously marked for
11 identification produced to the witness.)
12 BY MR. FERGUSON:
13     Q.  Exhibit 1103 is a document that went out to your
14 members.  You see at the top, it has, "Given the issues
15 the board has written to members about concerning the new
16 points-based marketing program which Ritz and MVW are
17 considering, certain members have requested the views of
18 the candidates and how they would proceed as to this issue
19 if elected.
20     So basically this is the Babich, Cunningham
21 letters of July 17 and August 17, 2012, and there's a
22 question put to the candidates.
23     Do you recall giving your view on this issue?
24     A.  This was a question put to the candidates?
25     Q.  Right.

Page 178

1      A.  Is that what you're saying?
2      Q.  Yes, sir.
3      A.  And in what format was this presented to us,
4 just to help my recall?
5      Q.  It looks like -- I don't know.  I'm asking you,
6 because you're the one -- it looks like you responded to
7 this question, isn't that correct, if you see "Randy
8 Mercer"?
9      A.  And who wrote this question; do you recall?
10     Q.  "Given the issues the Board has written to
11 members about" -- it's either your board or the people
12 that run -- the people who manage your board, Mr. Hearns'
13 group.
14     MR. REISER:  Or Neveloff.
15 BY MR. FERGUSON:
16     Q.  Or Neveloff.  It might have been Neveloff.
17 Someone is asking you as a potential board --
18     A.  Somebody.  I don't recall who asked it, but
19 someone asked.
20     Q.  Okay.  Yeah, and is this your response, sir?
21     A.  May I see --
22     Q.  Yeah.
23     A.  Would you delete that paragraph and let me take
24 a look at the whole thing?  Okay.
25     MR. HANLON:  I can pull up the whole thing a

Page 179

1 bit.
2      THE WITNESS:  Okay.  That's fine.  I can see it.
3      MR. REISER:  It goes to the next page, too.
4      (Witness examines document.)
5      THE WITNESS:  Okay.
6 BY MR. FERGUSON:
7      Q.  It goes to the next page, in fairness.  I
8 thought it did.  Oh, yeah, oh, boy, it keeps going.
9      MR. HANLON:  I'll give you this much.
10     THE WITNESS:  I can read the page without
11 blowing it up.
12     MR. HANLON:  You can?
13     THE WITNESS:  Yeah, sure.
14     (Witness examines document.)
15     THE WITNESS:  Okay.
16 BY MR. FERGUSON:
17     Q.  Okay.  So this is your answer to a question that
18 was designed, I take it, to educate your members as to
19 what your thinking was about various issues that faced the
20 club vis-à-vis this potential affiliation, correct?
21     A.  Was this distributed to anybody?  Do we know, or
22 was it --
23     MR. REISER:  Yes, it was distributed to the
24 members.
25     THE WITNESS:  Was it?

Page 180

1      MR. REISER:  Yes.
2      THE WITNESS:  Okay.  And it was distributed
3 by --
4      MR. REISER:  By the board.
5      THE WITNESS:  Was it?
6      MR. REISER:  Yeah.
7      THE WITNESS:  Okay.
8      MR. REISER:  Through Marriott Vacation Club.
9      THE WITNESS:  Okay.
10 BY MR. FERGUSON:
11     Q.  I mean, you do this -- you still do this.  I was
12 there the other day when that -- Mr. Jacobson ran and he
13 didn't get elected and was asking questions about it.  But
14 you know that when people run for the board, the board
15 requests position papers or it asks them to say a little
16 bit about their background and what they want to do,
17 right?
18     A.  Right.
19     Q.  And this is a version of that.  This is a
20 specific question, but this -- this is information that is
21 collected by potential candidates for the board that is
22 disseminated to your membership.
23     A.  It was probably a followup after everyone had
24 submitted their resumes.  Those resumes --
25     Q.  Yeah.

Page 181

46 (Pages 178 - 181)

Randal Mercer - October 24, 2017

1   A. -- had gone out to the members and somebody
2   said, "What do these guys think?"
3   Q. And this -- that appears to be the case
4   here.
5   A. Okay.
6   Q. A specialized question.
7   A. Okay.
8   Q. And I take it that this is somewhat unique that
9   it's not every year or every election cycle that a
10  specific question goes out about a potential affiliation?
11  A. I've never -- I've never seen this happen before
12  or since that moment.
13  Q. It says -- or you said --
14  A. I don't even remember it. That's great.
15  Q. Are these your words, sir?
16  A. It looks like my writing.
17  Q. Okay. In the second paragraph, it says, "As a
18  board member from 2005-2011 with firsthand knowledge of
19  similar situations," what are you referring to regarding
20  similar situations there?
21  A. Well, the point system had -- the point
22  system -- we use the point system as a generic term. It's
23  where you trade time for points, and that's really the
24  only way really to phrase it.
25         The point system had come up, I believe, at

Page 182

1   multiple times, what do we do, can we do this, and that's
2   what I was referring to.
3   Q. All right. Some of the things -- you can take
4   that down.
5         One of the things you were talking about were
6   your personal concerns as a potential candidate for -- as
7   a candidate for the board, you were concerned with
8   concepts such as brand dilution, were you not? You call
9   it "dumbing down of our membership interest," on the
10  second page. But you were expressing you had concerns
11  about a points-based system with the Marriott Vacation
12  Club.
13  A. I bought a Ritz-Carlton, and I wanted it to
14  remain a Ritz-Carlton.
15  Q. And if you look at the bottom of page 1 of
16  Exhibit 1103, "To the question, I'm very concerned about
17  the dilution of value which may occur as a result of this
18  latest effort of MVW."
19         You said you put -- your concern was about the
20  flag, the Ritz-Carlton brand?
21  A. Mm-hmm.
22  Q. Is that right?
23  A. Yes.
24  Q. No one in this time frame was talking about
25  changing the brand of that hotel, were they?

Page 183

1   A. No one was talking about changing the flag.
2   Q. Right. And you said that was your concern.
3   A. Yes.
4   Q. Okay. But that -- if it wasn't being discussed,
5   that's not what you're talking about here. What you're
6   talking about here is not a change of the flag or the
7   brand, you're talking about the affiliation with MVW and a
8   potential dilution of the brand, right?
9   A. No.
10  Q. Okay.
11  A. I am talking about perception versus value,
12  which in the real estate world is a very interesting
13  concept. If somebody perceives its something, then it
14  could become something in their own mind.
15  Q. Okay. That's like thinking a brownstone in
16  Harlem isn't worthwhile because it's in Harlem, it's in
17  a -- perceived to be a bad neighborhood. That's a
18  perception of real estate?
19  A. That would be an ethnic labeling so I
20  wouldn't -- I wouldn't go there, but --
21  Q. I mean, you were talking about perceptions.
22  Right here you're talking about -- your concern was the
23  perception that Marriott Vacation Club affiliation could
24  dilute or dumb down the Ritz-Carlton brand and flag?
25  A. I was always concerned that the Ritz-Carlton

Page 184

1   remain, first and foremost, a Ritz-Carlton and nothing
2   else. And I think that's consistent throughout my -- my
3   conversation.
4         But keep in mind, by this time the value had
5   already been diminished because of the global market
6   meltdown.
7   Q. Sir, you just said something, and I want to ask
8   you about it.
9   A. Okay.
10  Q. You said the value had already been diminished,
11  correct?
12  A. I believe so.
13  Q. Real estate values had come down?
14  A. Yes, they had.
15  Q. But the brand had not been diluted yet, had it?
16  A. That's correct.
17  Q. What you're talking about in the platform you're
18  running on and asking this question is, you're telling
19  them, you want the members to believe that you're
20  concerned about the effect of a Marriott Vacation Club
21  affiliation's effect, dumbing down or diluting of the
22  Ritz-Carlton brand, not values, brand; is that right?
23         MR. SHEA: Objection. Argumentative. And said
24  in an argumentative tone. It's unnecessary.
25         MR. FERGUSON: It's not argumentative. It's two

Page 185

47 (Pages 182 - 185)

Randal Mercer - October 24, 2017

| | |
|---|---|
| 1 gentlemen talking here. | 1   Q.  All right.  Let me show you Exhibit 113 -- 1113, |
| 2   Q.  Go ahead.  Can you respond to that question? | 2 sorry (handing). |
| 3   Can you repeat the question for Mr. Mercer. | 3   (Exhibit 1113 previously marked for |
| 4   (Record read back.) | 4 identification produced to the witness.) |
| 5   THE WITNESS:  I am concerned and was | 5 BY MR. FERGUSON: |
| 6 concerned -- first of all, prefacing, if you'll let | 6   Q.  Just real briefly, this is a -- an email from |
| 7 me, -- | 7 Neveloff to you and a Frank Mouff -- Mouffe. |
| 8 BY MR. FERGUSON: | 8   A.  Chief financial officer at the club in Aspen |
| 9   Q.  Sure. | 9 Highlands, Mouffe. |
| 10   A.  -- Southwest Florida was ground zero for the | 10   Q.  Mouffe.  Okay.  And he's a management company |
| 11 global real estate meltdown.  Between us and Las Vegas, it | 11 employee? |
| 12 was a race to the bottom.  I had already spent five years, | 12   A.  Yes. |
| 13 four years, of my career trying to salvage my client's | 13   Q.  So this is the bill that was sent for the cease |
| 14 properties, our properties, and everything in between. | 14 and desist letter and the memorandum we saw earlier this |
| 15   So the concept of perception versus reality was | 15 afternoon? |
| 16 very real, in my mind, it was very fresh.  It was a raw | 16   A.  This was as of September 30th, so it was before |
| 17 wound that had not yet been healed. | 17 the cease and desist letter. |
| 18   I believe the Ritz-Carlton brand is one of the | 18   Q.  Well, the cease and desist letter was |
| 19 foremost brands in the marketplace today.  I did not want | 19 transmitted on September 21st, just to cue you in on that. |
| 20 anything to diminish that flag, no matter what -- whether | 20   A.  Okay. |
| 21 it be a bad restaurant or a dirty spa, or dirty carpets in | 21   Q.  So it would have been sometime after that. |
| 22 the hallway, or a points-based program that had been | 22   A.  Okay. |
| 23 tried -- that had been -- that they had attempted to | 23   Q.  All right.  So this is a bill, and do you know |
| 24 inject into a fractional ownership program, I did not want | 24 whether Mr. Mer -- I'm sorry, Mr. Gosch's firm was paid |
| 25 anything that would damage that product over and above | 25 this? |
| Page 186 | Page 188 |

| | |
|---|---|
| 1 what the global real estate market had already | 1   A.  I would have heard had they not been, so I |
| 2 experienced. | 2 assume they would -- they were paid. |
| 3   Q.  So there is a delineation in concepts between | 3   Q.  Good. |
| 4 the effects of economy on the value of a property versus | 4   (Exhibit 1114 previously marked for |
| 5 the effects of an affiliation on the value -- on the brand | 5 identification produced to the witness.) |
| 6 itself? | 6 BY MR. FERGUSON: |
| 7   A.  At that point in time in 2012, somebody | 7   Q.  Here is the next exhibit, which is 1114, 1114 |
| 8 hiccuping in the lobby could affect values.  I wanted to | 8 (handing). |
| 9 stabilize, as best I could, take everything off the table | 9   Now, this is an email that came in from a fellow |
| 10 that would -- could have the possible chance, and who | 10 named Tom Prose -- |
| 11 knows what they were, of destabilizing.  That's my | 11   A.  Mm-hmm. |
| 12 object -- because that's what I did here. | 12   Q.  -- on August -- sorry, October 25, 2012, and |
| 13   Q.  Yeah.  And the -- you used the word hiccupping. | 13 it's from Tom Prose, at generalmedicine.com.  Do you know |
| 14 I know what you mean there.  Everything concerned you. | 14 Dr. Prose?  You can see he puts an M.D. after his name |
| 15 But the Marriott Vacation Club affiliation was the biggest | 15 there, so I assume he's a doctor. |
| 16 hiccup that could potentially happen with respect to that | 16   A.  I assume he is a doctor. |
| 17 hotel, right? | 17   Q.  Do you know Tom Prose? |
| 18   A.  The Marriott Vacation Club's point-based program | 18   A.  I have never met Mr. Prose. |
| 19 that members were being introduced to was so radically | 19   Q.  You've talked to him, though, I take it? |
| 20 different from a fractional fee simple owner have -- | 20   A.  I have had communication with him, and I know |
| 21 owner-owns-what-owner-owns program that it didn't seem | 21 he's had a lot of conversation with the on-site management |
| 22 like a logical fit for me. | 22 company that I've heard about over the years. |
| 23   Q.  All right.  Well, that's exactly what's in place | 23   Q.  And so he wrote, "Dear Board, I had the pleasure |
| 24 today? | 24 of staying at a Marriott Vacation Club October 15 to 23. |
| 25   A.  That is incorrect. | 25 I can assure you the brand standards, services, |
| Page 187 | Page 189 |

48 (Pages 186 - 189)

Randal Mercer - October 24, 2017

1  accommodations, etc., do not compare to the Ritz."
2         We were talking about that before.  There are
3  definitely different levels of service and accommodation,
4  right?
5      A.  Mm-hmm.
6      Q.  So you would agree with what he said there?
7      A.  Sure.
8      Q.  Okay.  He says, "I strongly urge the board to
9  oppose any affiliation with MVW.  It will cause serious
10 and irreversible damage to our assets at the Ritz in
11 Aspen."
12         And he keeps going on.  And this letter was sent
13 to the old board, you are the new president.  It looks
14 like Tyler Oliver sent it on to you, correct?
15     A.  Yes.
16     Q.  And you said, "Prose is a head case.  Nothing
17 but problems with him."
18         Do you see that?
19     A.  Yes.
20     Q.  Why did you say that he was a head case?
21     A.  Because I would have heard from the management,
22 the club management.  I deal with a lot of problems, and I
23 know he -- he has been very aggressive in his
24 conversations with our general manager from time to time.
25     Q.  And you had that knowledge in the month -- the

Page 190

1  two weeks you had been the president?  Or did you know it
2  from your prior stint?
3      A.  Well, I had been on the board before, so I'm
4  sure it came from prior knowledge.
5      Q.  And the fact that you believe he's a head case,
6  doesn't take away his right to express his opinions?
7      A.  Absolutely.
8      Q.  And is there anything in his letter to the board
9  that was forwarded to you that you find to be
10 inappropriate, unthoughtful, that would make him prone to
11 being called a head case?
12     A.  He has every right in the world to express his
13 opinion.  This is your opinion, I respect it.
14     Q.  Okay.  And his opinion was pretty similar to the
15 group of opinions that had come in after the Cunningham
16 letter had gone out -- I'll show you that compilation in a
17 moment -- but his opinion wasn't keeping with even what
18 you were saying in your statement, right, when you were
19 answer that question.  It's very similar.  He's concerned
20 about an affiliation and a brand dilution, is he not?
21     A.  It appears he is.
22     Q.  So he's agreeing with you, and you're calling
23 him a head case?
24     A.  It wasn't because of that.  I certainly could
25 have used a different choice of words, and I wish I would

Page 191

1  have.
2      MR. FERGUSON:  Do you have that compilation?
3      Is there anything that dates this?
4      MR. REISER, JR.:  It was produced as a native so
5  not on the actual spreadsheet.
6      MR. REISER:  It's dated in August of 20- --
7      MR. FERGUSON:  '12.
8      MR. REISER:  -- '12.
9  BY MR. FERGUSON:
10     Q.  All right.  This is a -- it says, "Member
11 Question," this is a question that's being posed on the
12 member services or member inquiry email address that
13 Mr. Cunningham had sent out.  And you had mentioned before
14 that you had seen what you thought was a chart or
15 compilation of responses from the members to the Babich
16 and Cunningham letters of July 17th and August 17th,
17 respectively.  Is that what you're referring to?
18     A.  I don't believe I said that.  I believe I said I
19 had -- remember seeing a compilation, a chart, a grid,
20 showing responses -- or showing responses and comments
21 from members.
22     Q.  Is this it?  I didn't mean to -- I just want to
23 know if this is it.  And you can scroll a page or two.
24     A.  No.
25     Q.  No, it's not?

Page 192

1      A.  No, it's not.
2      Q.  So you were talking about something -- something
3  else?
4      A.  I believe I was talking about something about
5  the cease and desist letter.  After that had come out, I
6  received a similar document about that.
7      Q.  Okay.
8      A.  So, yeah.
9      Q.  Okay.
10     A.  So I have not seen this.
11     Q.  All right.  Thank you.
12     THE WITNESS:  Temperature okay for everybody?
13     MR. FERGUSON:  A little warm.
14     THE WITNESS:  Okay.
15     MR. FERGUSON:  Should Jessica go out so you
16 can't -- do you mind?  Do you mind?
17     MS. LIVINGSTON:  I don't mind.
18     (There was a discussion off the record.)
19     (Exhibit 1116 previously marked for
20 identification produced to the witness.)
21 BY MR. FERGUSON:
22     Q.  Mr. Mercer, this is an email -- first one I'm
23 showing you, at least, it goes from you to this woman
24 named Stephanie Sobeck.
25     A.  Mm-hmm.

Page 193

49 (Pages 190 - 193)

Randal Mercer - October 24, 2017

1    Q.    And she, at the beginning of this email chain,
2  is talking about you having -- the last page of the
3  exhibit is the first email, of course.
4    A.    Okay.
5    Q.    And it's Exhibit 1116. And it says, "Thank you
6  for taking my phone call last week. If it still works for
7  you, can you please hold November 12, 2012 [sic] for our
8  meeting in Orlando to discuss the RCDC affiliation with
9  Lion & Crown Travel, and any other topics of your
10  choosing?"
11        And then she tells you when you might want to be
12  there, time of day, and if any other board members wanted
13  to attend, they could, so -- and they were welcome.
14        Tell me about this contact with Ms. Sobeck. Was
15  she reaching out to you to follow up on the potential
16  affiliation of the RCDC with Lion and Crown Travel program?
17    A.    I believe I was the first one to reach out, and
18  she was the regional manager in charge of our club, and I
19  wanted to open up a dialogue as the newly-elected
20  president about that and any other issues that may be on
21  her mind, and wanted to let her know at that point what
22  was on my mind and suggested a preliminary conversation.
23    Q.    All right. And so this email chain is back and
24  forth about you were in St. Thomas and you thought they
25  did a great job there, and then you talked about, with

Page 194

1  her, just when you were going to come and the type of
2  accommodation you wanted, including whether or not you
3  could have a large suite or two rooms.
4    A.    Mm-hmm.
5    Q.    My question here is, did you meet -- did you
6  ultimately meet with Ms. Sobeck in Orlando?
7    A.    Several times; two, maybe three.
8    Q.    I'm talking about this meeting. I'm sorry. I
9  want to be very clear with you.
10    A.    Okay.
11    Q.    I'm talking about a meeting that's being
12  scheduled in Exhibit 1116.
13    A.    Yes.
14    Q.    Okay. And that -- was there a meeting that was
15  held, ultimately held, on November 29th, a Thursday, in
16  Orlando starting at 2 o'clock with her team?
17    A.    I believe it was that date. I would have to
18  check my calendar and see. I'm sure it was. She said she
19  could.
20    Q.    Okay. And so you -- you attended that meeting
21  with no other board members?
22    A.    I don't believe so.
23    Q.    Okay. Who did you attend with?
24    A.    I believe I attended it directly by myself.
25    Q.    Okay.

Page 195

1    A.    It is possible that Tyler Oliver joined me at
2  that meeting, but I think he was at the second meeting.
3  I'm not sure.
4    Q.    Okay. And there was -- was Mr. Cunningham at
5  that meeting?
6    A.    Briefly, yes.
7    Q.    He was only there briefly?
8    A.    Yeah, I believe most of my -- most of my
9  conversations were with Stephanie. Lee came in. We had a
10  nice chat, and he left, and I continued.
11    Q.    What do you mean you had a nice chat? Weren't
12  you down there to meet with him on a fairly serious issue,
13  which is an affiliation with the Lion & Crown Travel
14  program with the RCDC and Aspen?
15    A.    Typically in a first meeting that I request and
16  go to, it's to try and figure out the lay of the land
17  try and figure out -- bring up of talking points that are
18  of interest to me, and see -- gauge responses so that I
19  can have follow-up meetings and work on the things that
20  are workable.
21    Q.    So it's your style to drive up to meetings, and
22  you wanted to have a chat so you could familiarize
23  yourself with the individuals in the program?
24    A.    Yes. Yeah.
25    Q.    Who is Nick Autiello?

Page 196

1    A.    I have no idea.
2    Q.    Did you meet with anybody else besides Sobeck
3  and Cunningham?
4    A.    You know, somebody else may have been invited in
5  the room, but I don't recall who this gentleman was. He
6  may have joined us.
7    Q.    Okay. Did you take notes at the meeting?
8    A.    No.
9    Q.    Do you keep notes at meetings you go to on
10  business such as this?
11    A.    Not meets and greets, no.
12    Q.    So you saw this as a meet and greet element?
13    A.    Meet and greet, lay some issues out on the
14  table, listen to the tone of voice, sure. First
15  conversation.
16    Q.    I take it that the primary set of skills -- or
17  the skill set you bring as a real estate broker, one of
18  the top producers, I guess, in this area, is that you're
19  able to do just this, you're able to broker to try to
20  figure out what people might want on either side, come to
21  agreements, whatnot? That's your --
22    A.    Create relationships that are long lasting,
23  hopefully, and find common ground with people, and where
24  there are disagreements, to settle those disagreements,
25  absolutely.

Page 197

50 (Pages 194 - 197)

Randal Mercer - October 24, 2017

1     And, by the way, the travel committee Debbie is
2 my wife.
3     (Exhibit 1117 previously marked for
4     identification produced to the witness.)
5 BY MR. FERGUSON:
6     Q.   This is Exhibit 1117 (handing).  And you'll see
7 that it starts at the back with the same email of
8 Ms. Sobeck inviting you to Florida.  And it looks like you
9 forwarded that on to your board, as comprised then, that
10 would be Marsden, Schneider, and Oliver.  You said, "I
11 have had a conversation with Stephanie, see below.  I'm
12 going to drive up to Orlando to meet with her and ML."
13     "ML" is Mary Lynn Clark, right?
14     A.   Yes.
15     Q.   What was she -- was her involvement, if you can
16 tell us, back in this time frame?  Why did you want to see
17 her?
18     A.   I have no idea what she actually did.
19     Q.   But you wanted to meet with her?
20     A.   She was -- she was working in some upper --
21 upper level capacity, or so I thought, in the marketing of
22 the clubs.  She was a sales-oriented type person, and I
23 think I wanted to see what she had to say.  Or maybe
24 someone told me that ML was still involved, and I just did
25 not want to exclude her.  I'm not sure.

Page 198

1     Q.   Well, you said to your three fellow board
2 members, "Although not mentioned here, I have reached out
3 to both of them, and based on my conversations with
4 Jay" -- so you've also spoken to Mary Lynn Clark, I take
5 it?
6     A.   By email; yeah, by email.
7     Q.   And it says, "Stephanie is not as vital to the
8 discussion as Mary Lynn, ML" -- Mary Lynn Clark.  "In
9 fact, if ML is not there, I probably won't go."
10     So with respect to this meet and greet chat, you
11 were going to have -- one of the people you wanted to chat
12 and meet and greet with was Mary Lynn Clark?
13     A.   Mm-hmm.
14     Q.   Is that right?
15     A.   It is.
16     Q.   And was she there, sir?
17     A.   I cannot remember.
18     Q.   Thank you.
19     A.   Another hurricane.
20     Q.   Now, on the first page of Exhibit 1117 -- and
21 this is now no longer an email chain between you and three
22 board members, it's just Mr. Oliver and you -- that
23 happened quite a bit, where the two of you were speaking
24 on your own as opposed to including the two other members,
25 right?

Page 199

1     A.   It happened a lot.  Tyler and I developed a good
2 friendship.
3     Q.   Okay.
4     A.   A good business comradery.
5     Q.   And you felt it was easier to deal with him
6 because he was of like mind and wasn't a troublemaker?
7     A.   He's a very easy guy to get along with, like
8 mind.  And he had such a great way with people.  It was
9 often really good to have him in the room with people.  He
10 would -- he'd hear things that I wouldn't hear.  He would
11 say things that I wouldn't say.
12     Q.   Okay.
13     A.   Good guy.
14     Q.   Great.
15     You told him, "Probably dreaming, but if you
16 think it is a good idea, I will send a call-in number for
17 30 minutes before."
18     You were trying to potentially set up a
19 meeting -- a link for other board members to attend?
20     A.   Mm-hmm.
21     Q.   Okay.  Is that a yes?
22     A.   Yes.
23     Q.   Okay.  And then it says in the middle of the
24 page, Oliver tells you, without copying anybody else,
25 "Would it be helpful to discuss your -- your upcoming

Page 200

1 meeting with Mary Lynn and Stephanie?  Are there any
2 updates from our $34,000 attorney and his discussions with
3 Marriott?"
4     A.   (Laughing.)
5     Q.   You laugh.  Why did you giggle, chuckle?
6     A.   I don't know who he's referring to, but I just
7 saw an invoice that was pretty close to that.  Maybe it
8 was Mr. Gosch.
9     Q.   Was Mr. Oliver griping about the level of
10 billing by Mr. Gosch for his memorandum and his cease and
11 desist letter?
12     A.   It was just a tongue-in-cheek statement.
13     Q.   And it said -- and we had seen this before, are
14 there any updates from Mr. Gosch and his discussions with
15 Marriott?  We had seen before there was a potential --
16 there was a discussion or an item that said Mr. Gosch may
17 have a contact at Marriott legal.  Do you have any
18 recollection of who Mr. Gosch was maybe able to
19 communicate with at Marriott legal?
20     A.   I have no idea who.
21     (Exhibit 1118 previously marked for
22     identification produced to the witness.)
23 BY MR. FERGUSON:
24     Q.   1118 (handing.)  This is more of the
25 communications about meeting with -- meeting in Orlando

Page 201

51 (Pages 198 - 201)

Randal Mercer - October 24, 2017

1  with Sobeck and Cunningham, and maybe Mary Lynn Clark.
2      At the middle of the first page -- I'm sorry,
3  the bottom of the first page, you're saying, "The update
4  call with Jay and the attorneys scheduled for last Monday
5  was canceled because of hurricane.  As of Thursday, Jay
6  still didn't have power and was showering at the gym.  I
7  have asked both Jay and attorney to be on the budget
8  call."
9      So the attorney would be Mr. Gosch?
10  A.  I would assume so, yes.
11  Q.  Did you not know his name at the time, or is it
12  just everybody understood who you were talking about?
13  A.  It's just easier to type one word for me.
14  Q.  Okay.
15  A.  I do two fingers.  And that was in the last
16  email also, by the way.
17  Q.  It says, "To be on the budget call in case there
18  are some members who brought it up and we had to quiet
19  them down.  I still haven't been fully briefed, although I
20  had a call with attorney and nothing has developed."
21      So you were talking to Gosch and nothing had
22  developed with respect to his ability to contact Marriott
23  legal?
24  A.  As is typical of me, I like to have introductory
25  meet and greets.  In this case it was over the phone,

Page 202

1  introduce myself.
2  Q.  What kind of call was occurring here?  Was it a
3  call that members could phone in on on November -- in
4  November of 2012?
5  A.  No, it was just board president to board
6  attorney to try -- try and get up to speed.
7  Q.  So when you say in your email, "There are some
8  members -- in case there are some members who brought it
9  up, we had to quiet them down," are you referring to
10  Marsden and Schneider there?
11  A.  Would you repeat the question?
12  Q.  Yeah.  You're saying to Oliver in this
13  interchange with him about an upcoming phone meeting, I
14  think, and Jay and Gosch are going to be on it, you said
15  that you want the attorney, Gosch and Jay, to be on the
16  call, in case there are some members who brought it up,
17  and we had to quiet them down.
18  A.  That would be board members.
19  Q.  Okay.  Marsden and Schneider?
20  A.  Yes.
21  Q.  Who did you -- who were you concerned about that
22  might need to be quieted down?
23  A.  Anybody that wasn't on the call.  Jay had a lot
24  of credibility, so conversation between Jay and attorney
25  and myself, would be totally, totally in order.  And

Page 203

1  somebody may have asked, why wasn't I invited.  Well, just
2  wanted to have the call.
3      (Exhibit 1120 previously marked for
4      identification produced to the witness.)
5  BY MR. FERGUSON:
6  Q.  This is an email chain, looks like a day or so
7  after that call, and it's from Mullenix.  Somehow it got
8  into an email chain.  I guess he sent it to the president,
9  so it would be Doyle -- who is Doyle the president of?
10  A.  St. Thomas.
11  Q.  St. Thomas.  And David Oestreich is
12  San Francisco?
13  A.  Jupiter.
14  Q.  Jupiter.  Okay.  And Salcut is --
15  A.  Sal Cutrona.
16  Q.  Yeah.  Who is he president of, or what was his
17  role at this point?
18  A.  He was still on the St. Thomas board of
19  directors, as well as the Aspen Highlands board of
20  directors.
21  Q.  Okay.  1120 is what's before the witness.
22      Mr. Schneider weighed in on this email chain
23  that you're CC'd on, to Mr. Neveloff, "I think the board
24  at Bachelor Gulch has made the appropriate decision.  If
25  Marriott doesn't agree to defer the affiliation with

Page 204

1  Lion & Crown, then they have no choice but to terminate
2  the relationship with Marriott or litigate the matter.  At
3  some point I think it would behoove us to try and join
4  forces with them to combat Marriott.  Phil."
5      Is this an example of a board member that you
6  needed to potentially quiet down about the issue of
7  affiliation?
8  A.  Again, I can't -- I can't comment on that
9  because I don't have a copy of the communication letter
10  that the entire -- that was sent to the BG membership
11  along with the copy of the letter he sent to Weisz, so I'm
12  not sure.
13  Q.  Okay.  So you would need to see the letter that
14  was sent by Mr. Mullenix regarding brand and evolution --
15  A.  I'd like to keep it in context, if I could.
16  Q.  Let me -- I understand.  Let me just finish my
17  question.
18  A.  I'm sorry.
19  Q.  It looks like Mr. Mullenix had written a board
20  to Weisz and Cunningham.
21  A.  Mm-hmm.
22  Q.  Had you ever seen that letter that was sent to
23  Weisz and Cunningham?
24  A.  Not that I recall.
25  Q.  Were you ever the recipient of a report from

Page 205

52 (Pages 202 - 205)

Randal Mercer - October 24, 2017

1 Mullenix or Bachelor's Gulch regarding what happened at
2 any meeting that Bachelor's Gulch directors had with Weisz
3 and Cunningham?
4    A.  Not that I recall, but I could have been.
5    Q.  Do you recall that there was a meeting that had
6 some, I'll call it, fireworks and some pretty tense
7 exchanges?
8    A.  I knew that -- I knew that the Bachelor Gulch
9 relationship was starting to go through a very rough
10 patch.  And while I can only speculate, this letter may --
11 that I don't recall reading -- may have had the line in --
12 the proverbial line in the sand drawn, although I'm not
13 sure.
14    Q.  Do you recall a time where Cunningham and his
15 company were considering slowing down the affiliation, at
16 least -- yeah, slowing down the affiliation with RCDC
17 system wide?
18    A.  Restate.
19    Q.  Yeah.  Do you recall that there was a time when
20 Cunningham's company, Marriott Vacation Club and Marriott
21 Vacation Worldwide, were considering slowing down the
22 affiliation?
23    A.  Slowing it down in what way?
24    Q.  Yeah, not implementing it.
25    A.  I don't recall any formal conversations, but it

Page 206

1 was always, in my mind, that the fewer -- the fewer of the
2 Ritz-Carlton Destination Clubs that were open and
3 operating and functioning as clubs, the less we mattered.
4 And I did not want any clubs to ever go away because that
5 was the strength that we had.  The more clubs, the more we
6 mattered.  The fewer clubs, the less we mattered.
7    Q.  What does that -- put that in context.  Are you
8 saying that you were concerned about Bachelor's Gulch
9 leaving the fold?
10    A.  Of course.  For personal reasons as well as, you
11 know, the global look at what these clubs are really all
12 about.
13    Q.  I was asking, did you -- just simply, did you
14 recall that there was a potential standdown of the
15 implementation of an affiliation as was being set forth in
16 the letters that came from Cunningham and Babich during
17 the summer of 2012?
18    A.  Not to our board, no.  I was not on the board.
19    Q.  You hadn't sent the cease and desist letter yet,
20 had you?
21    A.  In the summer of 2012?
22    Q.  No, by the fall, October, November.
23    A.  After I had been elected president, I saw it.
24 I'm sure -- obviously I saw it.  I'm just not sure when.
25    Q.  Okay.

Page 207

1    A.  But it mattered that the clubs remained the
2 clubs.
3        (Exhibit 1122 previously marked for
4    identification produced to the witness.)
5 BY MR. FERGUSON:
6    Q.  Exhibit 1122 is an email chain with that same
7 beginning email, which is a letter from -- an email from
8 Mullenix to Mullenix and to his -- to his members that has
9 the letter to Weisz and Cunningham.  That's the first
10 email.
11        At the top, you said -- I'm sorry, Jerry Marsden
12 said, "Good morning, Randy.  I think you should get on the
13 opportunity created here and see if we can get us included
14 in the one-year non-implementation agreement while we
15 discuss long-term strategy."
16        And that's what I was just asking about simply,
17 which was, do you recall generally that there was an
18 opportunity or discussion to delay implementation of the
19 Lion & Crown Travel program for a year?
20    A.  I can only view the top page of page 2 where
21 Mr. Weisz suggested the postponement of the Lion & Crown
22 affiliation agreement to the Bachelor Gulch membership.  I
23 can assume that's what was being referred to, but without
24 the letter, I can't verify that.
25    Q.  But the cease and desist letter was something

Page 208

1 that was going to be sent and ultimately sent to tell
2 Marriott not -- to cease and desist from doing just that,
3 the affiliation?
4    A.  The cease and desist letter was something we
5 owned exclusively in our club.  It had nothing to do with
6 anybody else.
7    Q.  But it had to do with the same items, which is
8 the affiliation?
9    A.  Which was the points program or affiliation as
10 you refer to it.
11    Q.  And how do you refer to it?  What are you --
12    A.  I refer to it as the points program.  I believe
13 that's what all of the clubs were referring to.  But
14 just, I'm a small word kind of guy, so --
15    Q.  So you like points program rather than
16 affiliation?
17    A.  Yeah.
18        (Exhibit 1124 previously marked for
19    identification produced to the witness.)
20 BY MR. FERGUSON:
21    Q.  Let me show you Exhibit 1124 (handing).
22        This is a letter from Mullenix to Weisz, the
23 president and CEO, and Cunningham, executive vice
24 president and COO, of the worldwide corporation.
25        Had you ever been provided with this letter?

Page 209

53 (Pages 206 - 209)

Randal Mercer - October 24, 2017

1  This is the letter that you said you wanted to see that
2  you needed to have for context to answer some of my prior
3  questions.  Do you recognize this letter?
4      A.  I don't recall seeing it at the time, but I'm
5  sure I received it.
6      Q.  He said, "Dear Gentlemen" -- to Weisz and
7  Cunningham -- "I'm writing on behalf of the board of
8  directors to continue our dialogue about the proposed
9  affiliation of the Ritz-Carlton Club Bachelor's Gulch
10 members with the Lion & Crown in 2013 and beyond" --
11     A.  Mm-hmm.
12     Q.  -- "to request that such proposed affiliation be
13 canceled."
14     A.  Mm-hmm.
15     Q.  At least your brother president at another RCDC
16 was able -- or was using the word "affiliation."
17     A.  Okay.
18     Q.  Right?
19     A.  He's a hotel guy, so I get that.
20     Q.  "He's a hotel guy," what does that mean?
21     A.  He owns hotels.  He owns Hiltons.  He owns
22 Marriott franchises.  He owns multiple, multiple hotels
23 across the country.
24     Q.  So when you said he's a hotel guy when I asked
25 you if he uses the word "affiliation," are you suggesting
                                                  Page 210

1      Q.  -- about this very issue, right?
2      A.  Mm-hmm.
3      Q.  Is that a yes?
4      A.  Yes.
5      Q.  And were you briefed by Mr. Mullenix before you
6  went down in November 2-- November 29, 2012 as to what
7  he encountered when he met with Weisz and Cunningham?
8      A.  Other than this letter, no, not that I recall.
9      Q.  If you look at the second page of Exhibit 1124,
10 the second paragraph up from the bottom, it starts with "I
11 understand."
12         Mr. Mullenix says to the CEO and the COO, "I
13 understand we discussed at our meeting the possibility of
14 holding a vote of the club membership on the issues -- on
15 the issue of affiliation with L&C."
16         Did you ever discuss the possibility of a vote
17 regarding affiliation with Lion & Crown when you met with
18 Sobeck and chatted with Mr. Cunningham?
19     A.  We used the word "vote" and "survey"
20 interchangeable, just as "partner" and "affiliate."  It
21 was just a word to describe an outreach.
22     Q.  When you went in November of last year in the
23 general election for the United States of America, did you
24 do a vote or did you do a survey?
25     A.  I did a vote.
                                                  Page 212

1  to the ladies and gentlemen that only a hotel guy can
2  get -- understands the concept of affiliation?
3      A.  I'm suggesting it's just a hotel term and not a
4  generally-accepted -- a generally-used term, at least not
5  by me.
6      Q.  Well, you used it today.
7      A.  Okay.
8      Q.  Right?  When you said CB -- CBRE office is an
9  affiliate of the main company?
10     A.  That's what they called it.
11         MR. SHEA:  Objection.  Argumentative.  No need
12 to raise your voice.
13         THE WITNESS:  We called it a partner office.
14 They call it an affiliate office.  It's the same
15 thing.
16 BY MR. FERGUSON:
17     Q.  So you know what the word "affiliation" means?
18     A.  It's just terminology, sure.
19     Q.  Second paragraph it says, "As we discussed
20 during our face-to-face meeting on September 19, 2012 in
21 Orlando."
22         So prior to your meeting in November, it hasn't
23 occurred yet, they had -- you learned that -- you learned
24 that they had met with Weisz and Cunningham --
25     A.  Mm-hmm.
                                                  Page 211

1      Q.  There is a difference, is there a not?
2      A.  Well, in the case of a general election of the
3  President of the United States, yes, there is a
4  difference.
5      Q.  Well, when you got elected to the board,
6  Mr. Neveloff wanted Marriott to vote its 13.4 percent in
7  your favor, did you get in on a survey, sir, or did you
8  get in on a vote?
9      A.  Rephrase the question.
10     Q.  Did you become an officer and director, tourist
11 accommodation director, representing the interests of some
12 of -- all of my clients, did you get in on a survey, or a
13 vote?
14     A.  It was a vote.
15     Q.  Okay.  And when you met -- my question was, when
16 you met in Florida in Orlando in late November, I think I
17 said, "They discussed their vote regarding affiliation,"
18 that being Bachelor's Gulch and Weisz and Cunningham, I
19 asked you, did you discuss a vote?  And you said you used
20 the word "vote" and "survey" interchangeably at that
21 meeting.
22     A.  Mm-hmm.
23     Q.  Is that yes?
24     A.  Yes.
25     Q.  So from the get-go, you weren't committed to any
                                                  Page 213

54 (Pages 210 - 213)

Randal Mercer - October 24, 2017

1 form of a vote where the members would actually have a
2 real voice by voting their interest, they would have one
3 interest or two or three, you weren't considering them
4 that type of vote, you were considering a survey as early
5 on as November of 2012?
6     A.  I had not even gotten to the point where we were
7 considering an outreach to our members because we were
8 just starting the conversations.
9     Q.  Okay.  So the conversation did start there in
10 November of 2012, because you just said that you discussed
11 interchangeably the words "survey" and "vote," right?
12     A.  Whenever we had the conversation about reaching
13 out to the members, the words were interchangeable.
14 Whether or not it was that November meeting, I can't
15 recall.  Probably not.  But I'm sure I wanted to say we
16 need to find out what our members are interested in.
17     Q.  So --
18     A.  Because we were always interested in doing
19 whatever our members wanted.
20     Q.  So you -- you're saying that you probably didn't
21 discuss a survey or a vote in the November 29th meeting
22 where you attended with Ms. Sobeck and chatted with
23 Mr. Cunningham without any other board members there?
24     A.  I -- it would be way too early to discuss that.
25     Q.  Well, Bachelor's Gulch was discussing it, was it

Page 214

1     Q.  Did you ever hear of Dan Wolf, a lawyer in the
2 Vail area that represented Bachelor's Gulch?
3     A.  No, sir.
4     Q.  Did you ever meet with him?
5     A.  No, sir.
6     Q.  Okay.  And do you know whether or not Bachelor's
7 Gulch had one or two consultants in connection with its
8 study of the affiliation and the potential departure from
9 the Ritz-Carlton brand flag?
10     A.  No, sir.
11     Q.  Did you ever read those reports?
12     A.  No, sir.
13     Q.  Do you know whether Bachelor's Gulch ever filed
14 a lawsuit or threatened to file a lawsuit?
15     A.  No, sir.
16         (Exhibit 1126 previously marked for
17     identification produced to the witness.)
18 BY MR. FERGUSON:
19     Q.  Just maybe if you look at Exhibit 1126, the
20 middle of the first page, it's Gosch to you and Neveloff,
21 "I like the approach, although it's slightly softer than
22 our cease and desist letter.  I think we should join the
23 fight and send some variation of our cease and desist
24 letter in the near future.  When you speak with BG
25 president, please ask him for a copy of the referenced

Page 216

1 not?
2     A.  Okay.  Well, they were further along in any
3 process.  They were pretty upset at the time.  They --
4 they had hired consultants, and they had gone a long way.
5     Q.  And your association had hired a preeminent real
6 estate lawyer in the Denver Bar to write a nine-page,
7 single-spaced, detailed memorandum regarding whether or
8 not Marriott Vacation Club could use your club as a
9 destination for Marriott Vacation Club members; did it
10 not?
11     A.  Yes.
12     Q.  And it charged you $32,000 to do that?
13     A.  That would be considered due diligence.
14     Q.  And you never saw a cease and desist letter from
15 Mr. Mullenix's company, did you?  They didn't hire a
16 lawyer to do that?
17     A.  I was not privy to very much of Mr. Mullenix's
18 information.  That was their board business.
19     Q.  You know that --
20     A.  I believe their consultant was -- was acquired
21 in order to discover additional options should they decide
22 not to remain a Ritz-Carlton flag.  That would be my
23 opinion.  That's what I heard.  I don't know what the
24 consultant was hired for.  He could have been a lawyer.
25 He could have been a hotel guy.  I don't know.

Page 215

1 study."
2         And that would be a study that you were just
3 referring to in your prior set of answers, right?
4     A.  Mm-hmm.
5     Q.  Did you ever get the Bachelor's Gulch study
6 from --
7     A.  No.
8     Q.  -- Mr. Mullenix?
9     A.  No.
10     MR. FERGUSON:  That was Exhibit 1126.
11         (Exhibit 1130 previously marked for
12     identification produced to the witness.)
13 BY MR. FERGUSON:
14     Q.  Exhibit 1130, Mr. Mercer.  The top of the page
15 is an email from Gosch to you and Neveloff regarding a
16 response to an 11/5 correspondence with Mullenix?
17     A.  May I start at the back, please?
18     Q.  Sure.
19     A.  Okay.  Great.  Thanks.
20     MR. MARX:  Matt, do you have an extra one?
21     MR. FERGUSON:  Oh, sorry.
22     THE WITNESS:  Okay.  So that was me to Mike,
23 stuck in his inbox.  There was no response.
24         (Witness examines document.)
25     THE WITNESS:  Thank you.

Page 217

55 (Pages 214 - 217)

Randal Mercer - October 24, 2017

1 BY MR. FERGUSON:
2    Q.  Yeah.  Did you see a letter that Weisz -- I'm
3 sorry, that Cunningham -- did you see Cunningham's
4 November 15th letter in response to Mulienix's
5 November 5th letter which we saw just a moment ago?
6    A.  Mm-hmm.
7    Q.  Did you see Mr. Cunningham's response?
8    A.  I don't recall it.
9    Q.  But it was sent to you?
10    A.  I do not recall it.  If you have it, I'd love to
11 look at it.
12    Q.  I'm just asking if it was sent to you.  Then
13 I'll show it to you if you did get it.
14    A.  Okay.
15    Q.  He said, "Here is their response," and he sent
16 you a document there, right?
17    A.  That's what he said.
18    Q.  Okay.  I just want to know, did you have -- did
19 you have that letter in mind when you went to visit Sobeck
20 and chat with Mr. Cunningham?
21    A.  If I had received it by the 28th, I would have
22 read it.
23    Q.  And prior to your meeting in Orlando, did you
24 send the cease and desist letter?  When I say "you," did
25 Mr. Gosch on behalf of the board, on behalf of the

Page 218

1 association, send the cease and desist letter?
2    A.  Yes, I believe we had by then.
3    Q.  And what was it that precipitated you sending --
4 you all sending the cease and desist letter?
5    A.  In all probability, I would have wanted -- I
6 can't recall specifically, but I would have wanted the
7 Marriott folks to know exactly where our board stood in
8 order to open up a dialogue based on fact.
9        (Exhibit 1135 previously marked for
10    identification produced to the witness.)
11 BY MR. FERGUSON:
12    Q.  And would you look at Exhibit 1135, a letter
13 dated November 21, 2012 to Weisz and Cunningham at the
14 Worldwide Corporation, Cobalt, and to Bhavana Boggs at the
15 Ritz-Carlton Development Company, LLC.  Is this the cease
16 and desist letter that was sent on your behalf by
17 Mr. Gosch?
18    A.  Yes, it is.
19    Q.  Okay.  And it set forth the -- it expressed the
20 opinion of the board in terms of what could and could not
21 be done vis-à-vis the affiliation that was being suggested
22 by Babich and Cunningham in their letters of 17 August, 17
23 July of 2012?
24    A.  Yes, it does.
25    Q.  And you wanted them to immediately cease and

Page 219

1 desist from promoting the use of the Tourist Accommodation
2 Units at the Aspen Highlands condominium to the MVC
3 members and permanently refrain from implementing any such
4 program at the Aspen Highlands condominium, right?
5    A.  Yes.
6        (Exhibit 1137 previously marked for
7    identification produced to the witness.)
8 BY MR. FERGUSON:
9    Q.  Here's another chain.
10    A.  May I have one, please?
11    Q.  Oh, I'm sorry, (handing).
12    A.  Can't quote me if I can't read it.
13    Q.  I would have failed at the blackjack table.
14        This is Exhibit 1137.  It also concerns the
15 letters back and forth between Cunningham and Bachelor's
16 Gulch Mullenix, CCs to Weisz,
17        Gosch is telling you and Neveloff in the bottom
18 of page 1 of Exhibit 1137 on November 28, 2012 that --
19 he's responding to a question.  He says, "I hope not.  My
20 suggestion is to stay strong.  The association" -- that
21 would be Highlands -- "has a stronger position vis-à-vis
22 MVW, and a pullback of the Bachelor's Gulch offer is
23 mostly bad for Bachelor's Gulch, which is unfortunate for
24 them but not wholly relevant to our situation.  We would
25 have had to fight this fight even if we knew about the

Page 220

1 letter since the letter is not global and doesn't
2 expressly address our issues."
3        And then you responded to that, "I have worked
4 on straight commission all my life as a broker.  I know no
5 other position to take."
6        What did you mean by that?
7    A.  I have no idea.  But I use that a lot.  I wake
8 up every day unemployed.  That's how I view my life.  It's
9 a very primitive way to live.
10    Q.  And then he says at the top, "Go get -- go get
11 'em."  I take it that means your -- "Go get 'em," meaning
12 good luck with your meeting with Sobeck and your chat with
13 Cunningham?
14    A.  I believe it does.
15        MR. FERGUSON:  Okay.  Take that break?
16        MR. SHEA:  Okay.
17        THE VIDEOGRAPHER:  Stand by, please.  This
18 concludes media unit number four.  We are going off
19 the record.  The time is 2:38.
20        (Recess taken -- 2:38 p.m.)
21        (Return from recess -- 2:50 p.m.)
22        THE VIDEOGRAPHER:  We are going back on the
23 record.  The time is 2:50.  This is media unit number
24 five.
25

Page 221

56 (Pages 218 - 221)

Randal Mercer - October 24, 2017

| | |
|---|---|
| 1    (Exhibit 1145 previously marked for | 1    THE VIDEOGRAPHER:  Thank you. |
| 2    identification produced to the witness.) | 2    MR. FERGUSON:  Thank you. |
| 3 BY MR. FERGUSON: | 3    Q.  You said at the top of page 4, "As of the |
| 4    Q.  Mr. Mercer, I'm handing you what's been marked | 4    writing -- as of this writing, we remain unsatisfied that |
| 5 Exhibit 1145 (handing).  This is a memorandum dated | 5    Aspen Highlands is appropriately valued, meaning we |
| 6 December 19, 2012 to your board -- I'm sorry, to your | 6    believe that the owners of Marriott timeshares/points will |
| 7 membership from your board. | 7    find it too easy to exchange into our Aspen Highlands." |
| 8       Is this a document that was drafted with the | 8       And you said, "It has been our continuing |
| 9 assistance of Mr. DiMeglio and his team and then you as a | 9    position that our members bought into Ritz-Carlton brand |
| 10 board of director? | 10   and do not want that brand diluted." |
| 11   A.  No, sir. | 11      Was the concept of brand dilution in any reports |
| 12   Q.  Who drafts these? | 12   that you might have seen that were done for Mr. Mullenix |
| 13   A.  I drafted this. | 13   and his group, if you recall?  I think you might not |
| 14   Q.  Okay.  So you drafted this entire document? | 14   recall whether you saw it or not, but that specific |
| 15   A.  Yes, sir, I did. | 15   question in mind, do you recall whether you saw a |
| 16   Q.  Okay.  I want to focus on the portion of this | 16   Bachelor's Gulch report with that concept? |
| 17 memorandum to your membership called "Destination Club." | 17   A.  You know, I do not recall.  It seemed to be a |
| 18 It starts on page -- I think I have it here.  Did I give | 18   popular word. |
| 19 you the right one?  Yeah, "Destination Club," it's on | 19   Q.  On page -- bottom of page 4, you wrote, "As a |
| 20 page -- | 20   result of all the items mentioned regarding the |
| 21   A.  3. | 21   Destination Club, the lack of communication and |
| 22   Q.  -- 3.  I wanted to see if you actually -- it's | 22   discussions with Marriott -- MVW, and after deep |
| 23 also your page 3. | 23   consideration, your board have determined that Aspen |
| 24   A.  Yes. | 24   Highlands members are essentially having our program and |
| 25   Q.  So you're there?  Good. | 25   purchased rights reduced." |
| Page 222 | Page 224 |

| | |
|---|---|
| 1       You wrote to your board -- to your members, "The | 1       Do you see that? |
| 2 Destination Club in its latest version was introduced to | 2    A.  Yes. |
| 3 the members by Ritz-Carlton Club and Marriott in mid-year | 3    Q.  "Comments from a significant number of members |
| 4 2012." | 4    are consistent with this position." |
| 5       Then you talked about updates, and then you | 5       Do you see that? |
| 6 talked about also, "After continuing -- continued | 6    A.  Yes. |
| 7 monitoring conversations with other boards and their | 7    Q.  Okay.  And this is December of 2012, right? |
| 8 presidents, personal trips to Marriott in Orlando for | 8    A.  Yes. |
| 9 discussions" -- it was only one trip, is that right, by | 9    Q.  Exactly -- or almost exactly a year later, is it |
| 10 you up to this point? | 10   true, in your view, that you had the green light from the |
| 11   A.  Yes. | 11   survey, enough information to believe that everybody had |
| 12   Q.  Did any other board members go to Marriott | 12   changed their mind in order to do this affiliation? |
| 13 separate and apart from you, to your knowledge? | 13   A.  No. |
| 14   A.  No. | 14   Q.  Did a significant amount of people change their |
| 15   Q.  -- "the limited benefits remain the same." | 15   position in regards to this affiliation with |
| 16      And you talk about those two benefits, including | 16   Destination -- |
| 17 one, a limited benefit which is you can trade your | 17   A.  No. |
| 18 allotted time for points, and use points for Marriott | 18   Q.  -- Program? |
| 19 experiences. | 19      You advised them that you had sent a cease and |
| 20      And then you quoted from some prior communiqués. | 20   desist letter, correct? |
| 21 Do you see that?  And I want to take you to the next | 21   A.  Yes. |
| 22 page -- I have a different version of this. | 22   Q.  And it set forth the legal positions of your |
| 23      THE VIDEOGRAPHER:  Mr. Ferguson? | 23   board, right, -- |
| 24      MR. FERGUSON:  Oh, I don't have my mic on. | 24   A.  Yes. |
| 25 Where is it? | 25   Q.  -- through its counsel? |
| Page 223 | Page 225 |

57 (Pages 222 - 225)

Veritext Legal Solutions
866 299-5127

Randal Mercer - October 24, 2017

1    It says at the bottom, "We take no joy in this
2  action, but to sum it up as succinctly as possible, the
3  members of Aspen Highlands want the program to be -- we
4  were sold to remain the same."
5      And then you went on with three other points
6  about what you wanted to achieve from the cease and desist
7  letter, right?
8    A.  Yes.
9    Q.  All right.
10    A.  And I copied them with the cease and desist
11  letter.
12    Q.  You did provide the copy to them?
13    A.  Yes.
14    Q.  And I think you got quite a few comments about
15  that letter back when you sent this out, did you not?
16    A.  Yes, I did.
17    Q.  Okay.  And we talked -- we saw you -- Mr. Young
18  Mike Reiser showed you on the screen the copy of that
19  compilation --
20    A.  Mm-hmm.
21    Q.  -- of comments, and I think you said you hadn't
22  seen that before.  Was the compilation that's in your
23  mind's eye of comments relative to your December 19, 2012
24  communication with your members with the attached Gosch
25  letter, is that --

Page 226

1    A.  I believe, and if I can review it, it was a --
2  it was -- they were comments as a result of the cease and
3  desist letter.
4      (Exhibit 1146 previously marked for
5      identification produced to the witness.)
6  BY MR. FERGUSON:
7    Q.  I'll show you what's been marked Exhibit 14- --
8  1146.  So on December 19th, the same day you sent that out
9  to your members, that report, and the fairly long section
10  on the Destination Club, you wrote to somebody, it looks
11  like it might have been Mullenix and Doyle, --
12    A.  Mm-hmm.
13    Q.  -- you wrote, "The meeting was brief and
14  typical.  MVW position was by allowing access to Aspen
15  Highland units through a points-based system.  They're
16  merely renting units which they own by different
17  methodology -- by a different methodology.  They are not
18  doing anything different than any other owner who rent
19  their unit.  Cash, trade, barter, it's all the same to
20  them."
21      You ultimately have taken their position, have
22  you not?
23    A.  No.  I was just saying that by using a points
24  system, as they -- as they knew it to be, as they defined
25  it to be, they're just putting heads in beds, as they call

Page 227

1  it.  They could be putting an ad in Craigslist, the result
2  would be the same.
3    Q.  So when you had this meeting about 20 days
4  earlier in Orlando with Sobeck and your chat with
5  Cunningham, at this meeting they told you that it was
6  their position that they could rent their units and that
7  anybody could rent, cash, barter, or trade, that was what
8  they told you in November of 2012, right?
9    A.  I can't remember if those are their words or
10  mine.
11    Q.  And Mr. Mullenix responded to you in Exhibit 146
12  [sic], "They used that line with us, and that is when Jo
13  Perfido, Jo-Ann Perfido" -- or Perfido -- "accused Weisz
14  that taking that approach defrauded us, and that made
15  Weisz slam his hand on the table and say his famous
16  screaming proclamation to Jo-Ann and I -- meaning me --
17  'You use the word fraud in my building and you think I
18  will have a civil conversation with you?'  It was
19  something you could have sold tickets to.  These guys are
20  rotten to the core."
21    A.  Cash, trade, and barter sounds like their words
22  and not mine.
23    Q.  Right.
24    A.  Yup, you're right.
25    Q.  And is this the first time you had heard about

Page 228

1  the tension that had occurred at the September 19th
2  meeting between Perfido and Mullenix and Cunningham and
3  Weisz?
4    A.  Well, specifically, but prior emails indicated
5  it had not gone well.  A lot of times they play good cop,
6  bad cop.  You never know.
7    Q.  And you do, too, right?
8    A.  No, I'm pretty straight on.
9    Q.  Did you play --
10    A.  I don't have a lot of time.  This is a volunteer
11  job, so I just usually get right to it.
12    Q.  Did you and Oliver at one point in negotiating
13  the MOU, the affiliation agreement, and also the
14  management agreement, play good cop, and have Mike Marino
15  play bad cop with Ms. Egolf?
16    A.  He was a lawyer.  They were always banging
17  heads.  But Mr. Oliver is kind of an "aw shucks" kind of
18  guy, and sometimes -- sometimes "aw shucks" works better
19  than anything else.
20      (Exhibit 1150 previously marked for
21      identification produced to the witness.)
22  BY MR. FERGUSON:
23    Q.  Exhibit 1150 is a letter from Baker Hostetler's
24  David Walker.  And that's a letter that Mr. Walker, who
25  represented, I take it, the Marriott Vacations Worldwide

Page 229

58 (Pages 226 - 229)

Randal Mercer - October 24, 2017

1 Corporation and several of its subsidiaries. He responded
2 to Mr. Gosch's cease and desist letter, correct?
3    A.  Yes.
4    Q.  Okay. And in this letter dated the 21st, he
5 related that they had some discussions on the 7th and 17th
6 of December following the November 21, 2012 cease and
7 desist letter.
8       In the second paragraph he discussed the
9 inventory referenced in the November 21st letter. That
10 would probably be the 13.4 percent of inventory, right?
11    A.  Yes.
12    Q.  And it says, third line down, the sentence
13 beginning, "All owners of residential units at Aspen
14 Highlands are granted the express authority to rent their
15 inventory pursuant to 13.3 of the Declaration."
16       And then he pointed out that their records --
17 Mr. Ian Marx's clients' records, show that "nearly 400
18 weeks of inventory have been rented by Aspen Highlands
19 members over the past three years."
20       So is this consistent with what you were told by
21 Ms. Sobeck and Mr. Cunningham when you met and chatted
22 with them in Orlando, that they could rent, barter, or
23 trade?
24    A.  They were always of the opinion they could do
25 whatever they wanted with their units.

Page 230

1 repeated theme or mantra of the Marriott folks, which is
2 that this is completely voluntary?
3    A.  No, it was not.
4    Q.  It wasn't voluntary, or it wasn't a mantra?
5    A.  It was not consistent all the way through our
6 ongoing relationship. As the points program indicates,
7 they were trying to institute something that was --
8 something that was different than a fractional ownership.
9 They were trying to, in our opinion, and most everyone
10 else's opinion, phase it into a quasi timeshare
11 organization, and that is -- that is not consistent with
12 the board's position, and it's not consistent with the
13 legal position.
14    Q.  All right. And so Mr. Walker in the next to
15 last paragraph -- actually, the third if you count the, "I
16 wish you best wishes for the holidays," he said, "If there
17 are particular areas within Aspen Highlands' governing
18 documents which you believe raise additional concerns,
19 please let me know."
20       The bottom line is that Marriott's lawyer
21 basically told Mr. Gosch that his nine -- or his nine-page
22 analysis that was put into a three- or four-page cease and
23 desist letter, they weren't buying any of it, did they?
24    A.  I would interpret it that way, although I'm not
25 a lawyer.

Page 232

1    Q.  Okay. And that's basically what Mr. Walker said
2 here to you, to your lawyer, and your board, which was, we
3 can do what we want?
4    A.  Fair.
5    Q.  Right? And you recall that the very first
6 document I showed you in this case said that the condo
7 declaration did not allow them to do that; do you remember
8 that?
9    A.  Yes, I do.
10    Q.  All right. And on the second page of
11 Exhibit 1150, there's that full -- there's that long
12 partial paragraph, and I'm just going to focus on the end
13 of it.
14       It says that, "Almost half, 47 percent of Aspen
15 Highlands members have enrolled with the Lion & Crown
16 Exchange Program, making over 200 reservations in the
17 short time since those offerings were added to the
18 exchange opportunities."
19       So by this time, people were enrolling in the
20 system that Ms. Babich had rolled out?
21    A.  Apparently.
22    Q.  All right. It says, "Such participation in the
23 exchange program is completely voluntary and a decision of
24 each individual member."
25       Is that something that was repeated -- a

Page 231

1    Q.  And he suggested to Mr. Gosch, "I hope that our
2 meetings, coupled with this written response, sufficiently
3 clears up any misconceptions that the association may have
4 about what the RCDC is or is not doing with inventory at
5 the Ritz-Carlton Club Aspen Highlands."
6       So this letter was primarily focused on their
7 use of the inventory?
8    A.  Our cease and desist letter was focused on the
9 placing of their unsold units within a points-based
10 program, and that -- that was our thrust, and he's
11 obviously disagreeing with that.
12    Q.  Okay. But there was two things -- there were
13 two sources of inventory for the -- for the program that
14 they wanted -- the affiliation program they wanted to
15 implement.
16       One was how they could use their inventory. And
17 I take it they're taking the position we can do whatever
18 the heck we want to do with it, we can barter, trade, sell
19 it, rent it, that's one item. The other source of
20 inventory would be what your members would put into the
21 Lion & Crown Travel bank, right?
22    A.  But we were not arguing with our members. We
23 were arguing with them on their position.
24    Q.  Right. I understand that.
25    A.  Okay.

Page 233

59 (Pages 230 - 233)

Randal Mercer - October 24, 2017

1  Q.  But Marriott would have two sources or banks --
2  two sources to fill their bank with inventory to utilize
3  for the Marriott Vacation Club people.  One would be,
4  plain and simply, the units they own.  They said, we own
5  these, we can rent them.
6  A.  Mm-hmm.
7  Q.  Right?  Is that one source?
8  A.  And it's hard to disagree with that.  They have
9  fee simple ownership.  They can -- they can rent it.
10  Q.  Well, you did disagree with it.  In fact, you
11  got them to stop it.  That's why you spent $32,000 to
12  Mr. Gosch.
13  A.  No, we stopped them from dumping all of their
14  unsold inventory into a trust pool that then could have
15  turned it into a points-based system for those units.
16  That's what we stopped.
17  Q.  Okay.  Was one of the other sources of --
18  nights, what your membership would put into the
19  Lion & Crown Travel program in order to use -- obtain
20  these travel experiences in 51 destination resorts?  Was
21  that another source of nights that Marriott Vacation Club
22  people could use?
23  A.  Apparently.
24  Q.  All right.  I want to digress for just a second.
25    So today when -- I know you don't do it, but a

Page 234

1  Ms. Kalcheim, Ms. Kalcheim puts in a week into
2  Lion & Crown Travel program.  She's now put in seven days,
3  and she gets some type of currency, I think you think it's
4  points, but maybe it's not points, I don't know where you
5  are on that.  But ignoring that for the moment, when that
6  seven days goes into this Lion & Crown Travel program bank
7  and is made available to Marriott Vacation Club people,
8  can that be used by seven individuals on seven different
9  nights?  Can it only be used for seven days?  Can it be
10  used, two and three and two, three and four, or do you
11  know?
12    MR. MARX:  Object to the form of the question.
13    THE WITNESS:  My impression is that one week --
14  excuse me.
15    MR. MARX:  I just had to make an objection.
16    THE WITNESS:  Okay.
17    MR. MARX:  I objected.
18    THE WITNESS:  My impression is that you trade
19  one week, you get one week.  Flat out.  That's it.
20  BY MR. FERGUSON:
21  Q.  Who gets one week?
22  A.  Whoever trades in.
23  Q.  Okay.  So that if your person puts in a week,
24  they get a week to utilize in the exchange program at
25  Marriott?

Page 235

1  A.  One week in, one week out.
2  Q.  Okay.  And I'm talking about now Lion & Crown
3  Travel program now has Ms. Kalcheim's seven days.  Okay?
4  A.  Mm-hmm.
5  Q.  And it says we get to do something with this.
6  Assuming they want to give it -- or let a -- not give it,
7  but have a Marriott Vacation Club points person --
8  A.  Mm-hmm.
9  Q.  -- use it, those days that are now in the bank
10  for your club,--
11  A.  Mm-hmm.
12  Q.  -- does it have to be used by one person, or can
13  it be used by more than one person?
14  A.  My impression, it has to be used by the -- one
15  group trading in one week.
16  Q.  So it's purely one week for one week?
17  A.  One week for one week.
18  Q.  That's your understanding?
19  A.  Yes, sir.
20    (Sotto voce discussion among plaintiffs'
21  counsel.)
22    THE WITNESS:  May I expand on that answer?
23  BY MR. FERGUSON:
24  Q.  Yeah, what is it?  What's the question?
25  A.  Your question was --

Page 236

1  Q.  We're talking about --
2  A.  Yeah, sure.
3  Q.  -- what the recipient of your members' nights
4  can or cannot do.
5  A.  Right.  I'm not sure what my response was, so
6  I'll just pass on that.
7  Q.  I thought you said they can only be one
8  person --
9  A.  Yeah.
10  Q.  I guess they can take seven days, they don't
11  have to stay there, but if a Marriott Vacation Club person
12  comes in, they have the right to use the seven days --
13  A.  I know -- I know what it was.  We are trading
14  only our allocated week, so it is a specific week.
15  Q.  Can that week be split by the people who get
16  their hands on it?
17  A.  To my knowledge, no.
18    (Exhibit 1151 previously marked for
19  identification produced to the witness.)
20  BY MR. FERGUSON:
21  Q.  Let me show you what's been marked Exhibit 1151
22  (handing).
23    This is a draft of a letter that Marriott
24  produced to us.  It looks like someone at red lining it
25  internally at Marriott.  I take it you have, in connection

Page 237

60 (Pages 234 - 237)

Randal Mercer - October 24, 2017

1 with this litigation, any documents you may have reviewed,
2 have you seen this draft of a letter that was ultimately
3 destined for you from Sobeck with a copy to Cunningham and
4 this fellow named Nick Autiello?
5      (Witness examines document.)
6 BY MR. FERGUSON:
7      Q. Before you read the whole thing, let me just --
8      A. Okay.
9      Q. I'm going to move that along.
10         This draft letter -- I think I have the
11 original, but I'm not sure. But my notes are in this one,
12 so I'll use it.
13         They talk about, on page 2, "To provide comfort
14 to the board regarding transient travel, RCDC proposes to
15 require that any inventory exchange through Lion & Crown
16 be restricted to a minimum of three-night length of stay."
17         Does that help answer the questions that you and
18 I have been struggling with in the last two minutes?
19      A. No, it really doesn't, because, one, this is a
20 draft letter; and two, this is written in 2012 and may not
21 be applicable in any way, shape, or form to the MOU that
22 was developed a year later.
23      Q. Understood. Okay. We'll come up to that. Fair
24 enough.
25         Now, I want to look at the bottom of this page.
                                                    Page 238

1      Q. That permanency concerned you, that concept of
2 permanency?
3      A. Okay.
4      Q. Is that right?
5      A. Yeah, possibly, sure.
6      Q. Okay.
7      Q. May I ask what was redacted from page 2?
8      Q. You have to ask him, Mr. Marx.
9      A. Okay.
10      A. So he probably won't answer you, or me.
11      A. Okay.
12      Q. I don't know why it's redacted. There's
13 supposed to be a log that tells us that at some point, so
14 I'll fill you in some day.
15         It talks about there on the second page of
16 Exhibit 1151, "Based on the concerns you raised in our
17 meeting, we would like to explore the alternate approach
18 that we discussed -- that we had discussed, the 'fire
19 sale' strategy" -- fire sale in quotes. "We understand
20 that you" -- Mr. Mercer, I added that -- "believe that
21 there is a strong market within the association membership
22 to purchase the unsold developer inventory at a discounted
23 price, and we'd like to work with the board to understand
24 a potential -- this potential option for developer
25 inventory."
                                                    Page 240

1 It says, "As we discussed," and I think she's referring in
2 the first sentence of the letter to your meeting in
3 Orlando on the 29th.
4         It says, "As we discussed, we were trying to
5 determine the best way to convey the remaining unsold
6 developer fractional interests at Highlands -- Aspen
7 Highlands. We believe that conveying such interest to the
8 Marriott Vacation Trust is a future option that brings
9 benefits to the association and its members, that we hear
10 your concerns."
11         And those concerns would include the ones that
12 were in Mr. Gosch's letter on November 21st, right?
13      A. Yes.
14      Q. And I take it you expressed those concerns when
15 you met with Sobeck and chatted with Cunningham?
16      A. Yes.
17      Q. Okay.
18      A. And from what I recall, and I'm not sure the
19 intricacies of this, I had heard over the years, or the
20 time period that this was discussed, that once the units
21 were deposited into the trust, they could never be removed
22 from the trust. And I don't know what -- what bearing
23 that has, but in my mind, that means that they could never
24 be sold as fractional units again. That may or may not be
25 true.
                                                    Page 239

1         What were you telling them at this point
2 regarding your understanding of demand for the remaining
3 developer inventory being bought by your membership?
4      A. They brought out the concept, and it wasn't fire
5 sale, it was bulk sale. Bulk sale to me typically implies
6 a low sales price. Did not want that. We relayed that
7 thought. Although there were members, not many, that had
8 approached the board from time to time, gee, could we buy
9 ten units, could we buy five units?
10         We knew that those would ultimately be put into
11 some sort of a -- of a rental program where people didn't
12 have any -- a whole lot of skin in the game, and we didn't
13 want that.
14         We did not want to have a bulk sale of all of
15 the remaining units that were unsold, let's say, 120, 150,
16 however many at the time, I'm not sure, because then that
17 would give one specific owner a disproportionate share of
18 ownership which could make a lot of difference in ongoing
19 decisions.
20         We did not -- we did not embrace that, nor did
21 we encourage that. I believe we possibly said, you know,
22 if somebody wants to buy four or five units, that may be
23 okay. Maybe they have a big family.
24      Q. But it says that you said -- or they understand
25 you believe, "There's a strong market within the
                                                    Page 241

61 (Pages 238 - 241)

Randal Mercer - October 24, 2017

1 association membership to purchase the unsold inventory at
2 discounted price."
3      Okay. Is that something -- is that what you
4 were just referring to, that some people wanted four or
5 five or ten?
6      A. Yeah. And those -- "a strong desire" are their
7 words and not mine.
8      Q. Okay. So they were not exactly relaying what
9 you said?
10     A. They were embellishing, yes.
11     Q. All right.
12     A. But at this point, it would be hard to
13 understand why somebody would really want to do that,
14 but --
15     Q. Do what?
16     A. Buy -- buy a lot of them.
17     Q. Well, yeah, there's a bulk sale which would be
18 someone buying --
19     A. A hundred --
20     Q. -- a hundred of them?
21     A. Fifty, yeah.
22        (Exhibit 1152 previously marked for
23 identification produced to the witness.)
24 BY MR. FERGUSON:
25     Q. I've handed you Exhibit 1152, which is the

Page 242

1      MR. MARX: Thanks.
2      MR. FERGUSON: Do you have it now, Dan?
3      MR. SHEA: Yes.
4 BY MR. FERGUSON:
5      Q. So 1152, you did receive this letter in final
6 from Ms. Sobeck, and I was showing you page 2 of
7 Exhibit 1152. It says, "In the interim, we will commit to
8 not move forward with conveying the Aspen Highlands
9 inventory -- developer inventory to the Marriott Vacation
10 Club Trust any earlier than July 1, 2013."
11     Right? Is that a commitment date made to you in
12 this time frame?
13     A. Okay. Forgive me. We're on the last paragraph.
14 Let me --
15        (Witness examines document.)
16     A. It appears to me to be a temporary hold until
17 they explore more options. Is that -- is that the way you
18 interpret that?
19     Q. Yeah, I mean, I just -- did they commit to you
20 not to do anything with the inventory, particularly
21 putting it into a trust, until July?
22     A. That's what it appears to be, yes, mm-hmm. So
23 we got a six-month hold.
24     Q. Can I have you go back to Exhibit 1151, which is
25 that marked up version?

Page 244

1 signed version of the letter we see in 1151 which is being
2 worked on. So after the red lining, internal red lining
3 at Marriott, you did receive a letter on December 22nd
4 from Ms. Sobeck, right? Or is it Mr. Cunningham?
5      A. Mm-hmm.
6      Q. Ms. Sobeck, correct?
7      A. Yes.
8      Q. And if you look at the second page of
9 Exhibit 1132 -- 1132 --
10     MR. SHEA: 1332, Matt.
11     MR. HANLON: 1332.
12     MR. FERGUSON: 1332, thank you.
13     THE WITNESS: This is 1152. Am I on the wrong
14 page here?
15 BY MR. FERGUSON:
16     Q. Oh, I see. I have a different -- it's the same
17 document. It has been marked twice. So I'm going to use
18 1152. Okay?
19     A. Okay, yeah, I have 52.
20     Q. Maybe one is your version, and one is their
21 version.
22        Here's 1152 (handing). Is that what you have
23 now?
24     A. Yes, sir.
25     MR. FERGUSON: 1152.

Page 243

1      A. Yes.
2      Q. And if you go to the second page, you'll see a
3 gray block.
4      A. Mm-hmm.
5      Q. And it says, "To provide" -- we just talked
6 about this -- to provide comfort regarding transient
7 travel considering a restriction, and you'll see that
8 someone struck the words "Aspen Highlands inventory to be
9 used for a minimum of three nights by those coming to the
10 property through Marriott Vacation Club exchange." And
11 they struck that out and they talked about proposing a
12 restriction.
13     But someone's written in block letters there,
14 "Is this trust inventory, developer inventory, or exchange
15 inventory being used by MVC owners of which you're
16 writing? I've assumed the latter," which would be
17 exchange program inventory for revision purposes.
18     Do you -- we were talking about that a little
19 bit before. There's different -- because I was just using
20 the word "bank" or "source." But there are different
21 sources of inventory. One would have been a potential
22 trust inventory, one would have been the developer
23 inventory, I think that's 7 and -- 7 percent and
24 6.4 percent, and then you have the exchange inventory,
25 which is the inventory that would be created through the

Page 245

62 (Pages 242 - 245)

Randal Mercer - October 24, 2017

1 affiliation.
2    A.   Mm-hmm.
3    Q.   Right?
4    A.   Mm-hmm.
5    Q.   You understand that?
6    A.   I was under the impression that all 13.4 percent
7 would go into the trust and then would be used for the
8 point system affiliation.
9    Q.   Okay.  Now, I want you to focus on this person's
10 words, and I --
11    A.   Do we know who this is?
12    Q.   Well, it would be someone at Marriott, and I do
13 have an email, I hope, that would tell us exactly.  But
14 the person writes -- and I don't know if it's that
15 pertinent to know exactly today who this was, but I'm just
16 trying to see if you understand or agree or grasp the
17 concept that there is another source of an inventory for
18 the Marriott Vacation Club people to use which this person
19 calls "exchange inventory."
20        Do you see that concept?  And do you know what
21 that means?
22    A.   This is in all caps --
23    Q.   Yes, sir.
24    A.   -- on page 2.
25    Q.   2 of Exhibit 1151.

Page 246

1    A.   "Is this trust inventory, developer inventory,
2 or exchange inventory" -- I was under the impression that
3 it was all developer inventory.
4    Q.   Okay.  Do you have a concept, sir, as the
5 president and board member in December 2012, or even
6 today, that there is inventory created by the exchange
7 program?
8        MR. MARX:  Object to the form of the question.
9        THE WITNESS:  There is no inventory created.
10 The inventory is already -- is already -- has already
11 been created.
12 BY MR. FERGUSON:
13    Q.   How has it been created?
14    A.   Because I own it.
15    Q.   Okay.
16    A.   There's no new inventory.
17        (Sotto voce discussion among plaintiffs'
18 counsel.)
19        (Sotto voce discussion among the witness and
20 counsel.)
21        (Exhibit 1155 previously marked for
22 identification produced to the witness.)
23 BY MR. FERGUSON:
24    Q.   The document before you is Exhibit 155 -- sorry,
25 1155, 1155.  It's December 28th from a Sternfield,

Page 247

1 Mr. John Sternfield.  He's a former president, right?
2    A.   Yes.
3    Q.   A copy -- or it's directed to you and a copy to
4 Mr. Cutrona, and it's regarding points program and MVCI in
5 Kapalua.  Do you recall getting this email from
6 Mr. Sternfield?
7    A.   No.
8    Q.   In the middle of the page, it says, "A couple of
9 days ago."
10    A.   Yes, I do recall getting this.
11    Q.   "I volunteered to take an MVCI presentation for
12 the free golf and to get an insight as to how they're
13 selling their points program.  One thing was still the
14 same, the sales guys told a bunch of far-fetched stories
15 about how easy it is to confirm time and to use all the
16 properties, including the Ritz.  This I expected.  What I
17 didn't expect was that they were using the Ritz as the
18 primary carrot to get folks to buy more points.
19 Basically, anyone that buys 6,500 points or more has
20 access to six RCC properties, Abaco, Aspen, Bachelor's
21 Gulch, Jupiter, St. Thomas, Vail."  And he talks about the
22 value of these items.
23        Was it your understanding that your former
24 president was out in the field there and telling you that
25 they were -- Marriott was pretty much marketing to

Page 248

1 Vacation Club people with the carrot of being able to get
2 into your property?
3    A.   It seems to be his opinion.
4    Q.   Was it your opinion at the time?
5    A.   I had not heard that, nor had I been out in the
6 field.
7    Q.   Well, you thought it was very direct insight
8 from John, did you not, in your email to Mr. Oliver?
9    A.   I trust John Sternfield, sure.
10        (Exhibits 1157 and 1158 previously marked for
11 identification produced to the witness.)
12 BY MR. FERGUSON:
13    Q.   Now, here is two documents I'll give to you at
14 the same time, and I'll give them to you like this.  It's
15 1157 and 1158 (handing).  That is you sending on to your
16 board in January, on January 16th to be exact, some of the
17 feedback comments you had received from your members.
18        And if you'd just quickly peruse Exhibit 1158,
19 and tell me if this is the compilation of comments, or
20 concerns, questions that you had in your mind's eye that
21 we have been referring to a couple of times today?
22        (Witness examines document.)
23    A.   No, this is not what I was referring to.
24    Q.   Okay.  Maybe we'll see it today.
25    A.   But you don't get that many "attaboys," so it's

Page 249

63 (Pages 246 - 249)

Randal Mercer - October 24, 2017

**Page 250**

1 kind of nice to read.

2   Q.  Yeah. So there's a couple of "attaboys" in

3 here?

4   A.  There seems to be.

5   Q.  Okay. And they were -- they were happy that you

6 had reported that you had sent out the cease and desist

7 letter?

8   A.  Yes.

9   Q.  Okay. In fact, the person on the second tranche

10 of comments, looks like they're delineated by these lines,

11 but this second person had points A, B, C. And looking at

12 C, it says, "Lastly, a recent phone conversation with

13 Member Services indicated that, quote, 'All Ritz-Carlton

14 clubs, with the exception of Bachelor's Gulch, are on

15 board with MVW program.' I don't know if 'cease and

16 desist' letter is being ignored, or if the board has

17 reached agreement with MVW, or if Member Services was

18 misinterpreted."

19     You hadn't agreed to stand down on the cease and

20 desist letter, had you, by this time, sometime in

21 January of 2013?

22   A.  No.

23   Q.  So did it -- would it appear to you that the

24 Member Services people weren't exactly on the same page as

25 your board and your membership, vis-à-vis the affiliation?

**Page 251**

1   A.  I would suggest that the hard-working people who

2 answer the phone at Member Services oftentimes are the

3 last to know anything.

4   Q.  But they did -- they did a particular -- they

5 did tell this particular member that all the clubs were on

6 board, with the exception of Bachelor's Gulch. If they

7 were telling that to someone at Aspen Highlands, that

8 wasn't exactly correct, was it?

9   A.  No.

10   Q.  And if you look at page 3 of Exhibit 1158, the

11 comments there were, "My wife and I fully support your

12 efforts and the opinions you expressed in the above

13 letter. We are familiar with the Brownstein firm that has

14 been retained to represent us, and we feel that you've

15 made an excellent choice in choosing them. They are

16 extremely well-versed in the area of law, as well as being

17 fully" -- very -- sorry, "very well politically connected

18 nationally and in Colorado."

19     So at least one of your members was impressed

20 with and agreed, and told you why they agreed with the

21 selection of Mr. Gosch's firm to represent the HOA in

22 connection with the potential affiliation?

23   A.  There's also one member at the top of that page

24 that says, "Why not investigate purchasing the remaining

25 13.4 percent?"

**Page 252**

1   Q.  My question was about the last one.

2   A.  Right.

3   Q.  You had a person that said you made a good --

4   A.  Oh, good.

5   Q.  -- choice in Mr. Gosch, right?

6   A.  Right.

7   Q.  But you never used Mr. Gosch again, did you?

8   A.  No, sir.

9   Q.  Why didn't you use Mr. Gosch again? Was he too

10 expensive? Were you too good a friend with Mr. Marino?

11 Did you think another expert was needed, a labor lawyer,

12 employment lawyer? What did you think?

13     MR. SHEA: Objection. Argumentative. He

14 already answered that this morning.

15     THE WITNESS: I never believed Mr. Gosch was

16 necessary.

17 BY MR. FERGUSON:

18   Q.  Okay. In fact, I think Mr. Shea's pointing out

19 that you testified before that you selected Mr. Marino

20 because -- as your consigliere, I think you joke around --

21 but as your lawyer because he had dealt with Ms. Egolf

22 before and had dealt with association matters with

23 different clubs?

24   A.  Mm-hmm.

25   Q.  Is that right?

**Page 253**

1   A.  That's correct. But he was not our association

2 lawyer.

3   Q.  Who was?

4   A.  David Firmin was our association lawyer for

5 common issues.

6   Q.  So Mr. Gosch was retained in order to look at --

7   A.  Single issue.

8   Q.  Single issue, okay. And that's the single issue

9 we're still talking about here today, right? The

10 affiliation that has occurred; is that right?

11   A.  He was involved in the cease and desist and the

12 affiliation letter, yes.

13     MR. FERGUSON: Okay. Can you put up another

14 document? We'll mark this -- what's the next --

15     MR. REISER: Why don't we call it 1500.

16     MR. FERGUSON: Is that right?

17     MR. REISER: We're at 1490 something.

18     (Exhibit 1500 was marked for identification and

19     displayed to the witness.)

20 BY MR. FERGUSON:

21   Q.  This is a points chart that we're going to mark

22 1500.

23     And is it Bates labeled?

24     MR. REISER: No.

25

64 (Pages 250 - 253)

Randal Mercer - October 24, 2017

Page 254

```
 1  BY MR. FERGUSON:
 2     Q.  No.  Okay.  It's a vacation points chart for
 3  Ritz-Carlton folks.  And have you ever seen this beautiful
 4  cover of some --
 5        MR. REISER:  Tahoe.
 6  BY MR. FERGUSON:
 7     Q.  Tahoe.  Beautiful lake.  Have you seen this
 8  cover before?
 9     A.  No.  But it is pretty.
10        MR. FERGUSON:  And would you go to the second
11  page, or the pages with the points chart.
12        MR. REISER:  Okay.  Stay there.
13  BY MR. FERGUSON:
14     Q.  So this is a table of contents for the various
15  properties around -- the Marriott properties around the
16  world, correct?  East coast, Florida, west coast, and then
17  you have the luxury brands on -- under -- on the right
18  side of that page, Ritz-Carlton Club Tahoe, San Francisco,
19  Vail, Highlands -- Aspen Highlands, and St. Thomas.  Does
20  this document look familiar having seen the table of
21  contents?
22     A.  I can't recall.
23        MR. FERGUSON:  Could you go to Exhibit --
24  Exhibit 1150, page 66, I believe it was, for Aspen
25  Highlands.
```

Page 256

```
 1     These are daily points charts, are they not?
 2     A.  I have no idea.
 3     Q.  Okay.  Do you know what these points denote?  I
 4  mean, you look at full week, 6,500 on the first -- on the
 5  first block, which is March 24th to April 13th,
 6  December 1st to 21st.  Do you know what these -- what
 7  these -- what these charts mean?
 8     A.  I'm not that familiar because I've never traded
 9  for points, but I would assume that if you were a member
10  of Marriott Vacation Club, you could exchange your points
11  that you've accumulated and use them to come into Aspen
12  for whatever points are illustrated on the chart.
13     Q.  Okay.  So it looks like someone can rent it for
14  less than a week.  They can come on a daily rate -- I take
15  it those are daily rates, or are they not?  Yeah, daily
16  rate is 650 for a two-bedroom, 825, they can come to your
17  club as a Marriott Vacation Club person and at least
18  pricing at daily rates?
19     A.  I'm not sure if that's for illustration or if
20  they can -- they have to go a full week or if they can do
21  less.  I don't know.
22     Q.  Do you think that the ad that they're putting on
23  their website is just for illustration or for actual use,
24  if you know?
25     A.  I do not know.
```

Page 255

```
 1        MR. REISER:  1500.
 2        MR. FERGUSON:  Yeah.
 3        MR. REISER:  Exhibit 1500, page 66.
 4        MR. FERGUSON:  What's that?
 5        MR. MARX:  We're wondering what the source of
 6  origin of the document is?
 7        MR. REISER:  If you type in "Marriott Vacation
 8  Club points chart 2017," it will come up.
 9        MR. MARX:  Yeah, so it's just a --
10        MR. REISER:  It's a public record.
11        MS. LIVINGSTON:  It's not produced.
12        MR. FERGUSON:  No, no, I think we're pulling it
13  off the Internet.
14        MR. REISER:  Yes.
15        MR. FERGUSON:  So this is Tahoe.  Do you have
16  Highlands?
17        That's 64.  If you can go to 66.
18        MR. REISER:  There it is.
19  BY MR. FERGUSON:
20     Q.  So this is a points chart that's on the Internet
21  today, or 2017, I'm not sure it's exactly right, but it
22  does talk about December 1, December 21st which is coming
23  up -- or past rather, and you've got the whole year here.
24  Beginning in March and ending in December, January, I
25  guess of '18.
```

Page 257

```
 1     Q.  You talked about before that you thought that
 2  the exchange was week for week.  Does this impact your
 3  thinking on that, whether or not a week that goes into the
 4  exchange inventory can be used on a less-than-a-week
 5  increment?
 6     A.  No.
 7     Q.  That would effectively allow someone to use that
 8  week for Sunday to Thursday and another person to come in
 9  and turn over and use it for the weekend?
10     A.  It doesn't impact my thinking at all.
11     Q.  So do you know one way or another as the
12  president of the board of the association of Aspen
13  Highlands whether or not if Ms. Kalcheim puts a week in,
14  that Mr. Smith can take the weekend, and Mr. Jones can
15  take the weekdays?
16     A.  It's been purported to me that it's one week in,
17  one week out.  That's what I know.
18     Q.  Who told you that?
19     A.  That's a good question.
20     Q.  Okay.  One of Mr. -- was that the basis of your
21  support, that it would be one week for one week?
22     A.  No.
23     Q.  Well, Mr. Neveloff is concerned that there would
24  be wear and tear on the building, on the facility, because
25  you had greater turnover by guests, and I think even
```

65 (Pages 254 - 257)

Randal Mercer - October 24, 2017

| | |
|---|---|
| 1 guests that weren't actually owners, but do you believe | 1    It says that -- it says, "At this time" -- |
| 2 that a turnover on a less than a weekly basis is -- | 2 second paragraph -- "At this time, the board and our |
| 3 strains the facility and the staff? | 3 outside counsel continue to be in discussions with MVW and |
| 4    A.  I believe that if there were somebody new | 4 Ritz-Carlton affiliates regarding a potential mutually |
| 5 turning over a unit every day, that there would be an | 5 acceptable settlement of our differences." |
| 6 increased housekeeping cost.  I don't believe there would | 6    And it goes on in that paragraph, it says, |
| 7 be any more wear and tear on a unit because one week is | 7 "Finally, please be advised that it is our intention to |
| 8 one week. | 8 bring any potential resolution -- any potential |
| 9    Q.  But there's more moving in and out, there's more | 9 resolution" -- do you see that word "any"? |
| 10 bags being transferred in, skis and whatnot, right? | 10    A.  Mm-hmm. |
| 11    A.  Concierge bell stand does that.  They're pretty | 11    Q.  -- "before the members for a vote" -- do you see |
| 12 good. | 12 that? |
| 13    Q.  So the bottom line is that as you sit here | 13    A.  I do. |
| 14 today, your belief is that what you signed in April of | 14    Q.  Okay -- "should a resolution be tentatively |
| 15 2014, the MOU and the affiliation of which you do not | 15 reached between the board, MVW, and such Ritz-Carlton |
| 16 participate in, but when Ms. Kalcheim puts in a week, that | 16 affiliates. |
| 17 the person from the Marriott Vacation Club that may pick | 17    So on February 3, 2013 you were representing to |
| 18 it up is using it for a week and it can't be split? | 18 your board that any potential resolution of these issues |
| 19    A.  My impression is it's one week in, one week out | 19 which would be the, you called it, ongoing dispute with |
| 20 only. | 20 Marriott Vacation Worldwide, would be handled by a vote of |
| 21    Q.  It's one week out, but can it be used by more | 21 the members? |
| 22 than one person? | 22    A.  Again, vote, survey, discussion. |
| 23    A.  I don't know that.  That's my assumption. | 23 Interchangeable words for myself.  But I read it. |
| 24    Q.  And the assumption is based upon what the | 24    Q.  Okay.  So when you sent this to your 876 |
| 25 Marriott told you? | 25 members, you wanted them to understand that a vote could |
| Page 258 | Page 260 |

| | |
|---|---|
| 1    A.  One week in, one week out.  That makes sense to | 1 mean a survey or a -- what was the other word you used? |
| 2 me.  The barrier entry to Aspen is so high, it's hard to | 2    A.  I forget. |
| 3 imagine someone coming for a day.  It's just too | 3    Q.  Discussion. |
| 4 expensive. | 4    A.  Discussion. |
| 5    Q.  Well, it's 650 points for somebody -- | 5    Q.  So they're interchangeable to you, right? |
| 6    A.  Transportation, them getting -- getting there is | 6    A.  Yes. |
| 7 hard to do.  We talked about that earlier.  I mean, the | 7    (Exhibit 1168 previously marked for |
| 8 odds of that happening, I would think, would be cost | 8 identification produced to the witness.) |
| 9 prohibitive. | 9 BY MR. FERGUSON: |
| 10    Q.  For one day, probably, but not three or four | 10    Q.  Exhibit 1168 is before you, sir (handing). |
| 11 days? | 11 That's an email chain that starts at the back with an |
| 12    A.  Perhaps. | 12 email from you here at CRE.  Randy Mercer wrote, "I like |
| 13    Q.  What about people that are in Marriott Vacation | 13 to keep in touch with my legacy board members, Sternfield, |
| 14 Club that want to use -- they offer a couple of days of | 14 Cutrona, and Neveloff.  John is who I'm thinking about |
| 15 skiing and then drive the hour and a half or hour and 45 | 15 right now.  Too much brain power in that group to go |
| 16 minutes over to Aspen, is that something you see | 16 wasted." |
| 17 occurring, where the week is split that way? | 17    Are you communicating here by March of 2013 with |
| 18    A.  I don't know.  I've never seen it. | 18 Mr. Marino? |
| 19    (Exhibit 1161 previously marked for | 19    A.  I don't believe so. |
| 20 identification produced to the witness.) | 20    Q.  Okay. |
| 21 BY MR. FERGUSON: | 21    A.  Pretty early. |
| 22    Q.  There is another email -- I'm sorry, another | 22    Q.  If you see -- if you look at the bottom of |
| 23 report from you all on Exhibit 1161 (handing).  And that's | 23 page 3 of this document, it's four pages, but this is |
| 24 an update from you to the membership.  When I say "you," | 24 three, is this to Mullenix then?  Mike Mullenix, I suspect |
| 25 your board, you as president. | 25 then? |
| Page 259 | Page 261 |

66 (Pages 258 - 261)

Randal Mercer - October 24, 2017

| | |
|---|---|
| 1      I might have misspoken there. Yeah, I'm sorry,<br>2 I confused myself, and then you. So this is with Mike<br>3 Mullenix.<br>4      A. No. This is the chairman of the board of<br>5 Timbers Resorts.<br>6      Q. Okay. So you were telling -- this is to -- this<br>7 is to somebody, and it looks like it's Mike Mullenix,<br>8 right? You see above it says, "Randy, absolutely. I have<br>9 nothing but utmost respect for John, Sal, and Jay and miss<br>10 dealing with them on this mess. We will have a 90-minute<br>11 call today with Cunningham and Sobeck -- or had one. It<br>12 was cordial, but I was matter of fact that we BG --<br>13      A. Yes, this is from Mike Mullenix.<br>14      Q. Okay.<br>15      A. So mine would have been too.<br>16      Q. My fault.<br>17      A. Uh-huh.<br>18      Q. You indicated that you had met with a Timbers<br>19 guy here. Was that here in -- where we are today?<br>20      A. Not right here. We met in Naples for lunch. He<br>21 has a winter home in Naples.<br>22      Q. Okay.<br>23      A. He is the president or CEO of Timbers Resorts,<br>24 which has a facility in Aspen.<br>25      Q. Right.<br><div align="right">Page 262</div> | 1 BY MR. FERGUSON:<br>2      Q. Here's why I got confused. Two Mikes (handing).<br>3          So this is the next exhibit in line. It's 1169.<br>4 It's the other Mike. And on March 28, 2013, you said,<br>5 "Gents, I've asked our former six-year counsel, Mike<br>6 Marino, after a one-year hiatus, to join us at all the<br>7 meetings starting on Thursday evening." And that would be<br>8 the meetings that are coming up mid year, board of<br>9 directors, the mid-year board of directors meeting?<br>10      A. That would be the spring board meeting.<br>11      Q. Right.<br>12      A. Probably in April, mid April.<br>13      Q. You said, "He's still counsel for St. Thomas,<br>14 owns two units at St. Thomas, and has deep relationships<br>15 with the very top level of Ritz and Marriott."<br>16          Okay. So when you were telling your three board<br>17 members, Schneider, Marsden, and Oliver, that Mr. Marino,<br>18 who you had known, had relationships with the very top<br>19 level of Ritz and Marriott, who are you referring to?<br>20      A. I was referring to Stephanie. I was referring<br>21 to Steve Weisz. I was referring to Barbara Egolf,<br>22 specifically. And over the years, he had liaisoned with a<br>23 lot of different people -- different levels that I knew<br>24 nothing about. But he was embedded as a board member and<br>25 counsel for three independent boards.<br><div align="right">Page 264</div> |
| 1      A. Dancing Bear. Also one in Snowmass.<br>2      Q. Right.<br>3      A. And multiple locations around the world.<br>4      Q. What's his name?<br>5      A. I can't recall.<br>6      Q. David somebody? I know him but --<br>7      A. I can check, if you don't mind me looking at my<br>8 phone.<br>9      Q. No, that's okay.<br>10      A. Okay.<br>11      Q. We need to move along, Mr. Mercer.<br>12      A. Only met with him once or twice.<br>13      Q. And you met with him just to chat with him<br>14 and give the lay of the land like you do in your initial<br>15 meetings with folks?<br>16      A. Yes.<br>17      Q. Okay.<br>18      A. I wanted to -- I wanted to discuss options to<br>19 see if he was interested in Aspen Highlands, and I knew he<br>20 was in discussions with Bachelor Gulch.<br>21      Q. You had an inkling that was going on from<br>22 Mr. Mullenix, they were talking to?<br>23      A. Oh, yeah, sure.<br>24          (Exhibit 1169 previously marked for<br>25 identification produced to the witness.)<br><div align="right">Page 263</div> | 1      Q. So his deep relationships at the very top level<br>2 were as a result of, in your understanding, of his<br>3 dealings with those entities on behalf of associations in<br>4 the RCDC system?<br>5      A. Mm-hmm.<br>6      Q. Yes? Is that a yes?<br>7      A. Yes, sir.<br>8      Q. Thank you, sir. And it's this one where you<br>9 refer to him as your consigliere, he'll watch your back<br>10 and listen carefully and offer his knowledge as always.<br>11          You also said he was -- "He has been<br>12 instrumental in creating the club we have now, including<br>13 documents, and we are fortunate to have him on board."<br>14          Are you referring to some of the work you had<br>15 done during your previous stint on the Tourist<br>16 Accommodation Board?<br>17      A. Yes.<br>18      Q. You said that his fee for coming out for the<br>19 entire session was $2,500, plus expenses. "This is<br>20 identical to the special rate in our prior board."<br>21          So was he someone who was providing a fairly<br>22 decent rate for his time to come to board meetings here in<br>23 Aspen?<br>24      A. Sounds like it.<br>25      Q. Okay. And was it around this time frame that<br><div align="right">Page 265</div> |

<div align="right">67 (Pages 262 - 265)</div>

Randal Mercer - October 24, 2017

1 you saw Mr. Marino's firm generate a retention letter?
2   A.  Could have been.
3   Q.  All right.  And he said -- you said, "We'll have
4 some fun.  Get your ticket."  And he said, "Roger that.
5 We can get the bottle wine update."  And I take it
6 that's -- you guys like fine wine and dining at the --
7   A.  "Roger that" is something Mike Marino says a
8 lot.  He must have been in the Air Force.
9       (Exhibit 1172 previously marked for
10   identification produced to the witness.)
11 BY MR. FERGUSON:
12   Q.  It looks like on March 28, 2013, around that
13 same time frame, you had sent to Mr. Marino Bachelor Gulch
14 notes that Mr. Mullenix took of his meetings in Orlando
15 with Sobeck and Hearns.  Do you recall getting a hold of
16 these notes and sending them on to Mr. Marino?
17   A.  No, I don't, but these are the notes.
18   Q.  Okay.  So would you go to page 4 of
19 Exhibit 1172.  I'm not sure I gave that to you already.
20   1172 is before the witness.
21   Mine's marked so it's a lot easier to see.  If
22 you go to seven or eight, nine lines up, it says, "They
23 want to control the conversation," that being MVW,
24 "between their offerings and the members.  MVW has a much
25 more cavalier attitude of what is the board's role versus

Page 266

1 their role, and it was insinuated that they could use the
2 'vote of the membership'" -- in quotes -- "to perhaps get
3 their way on important matters."
4       That's a concept that was introduced to you by
5 Mr. Mullenix vis-à-vis this sharing of notes with you and
6 Mr. Marino, ultimately; is that right?
7   A.  Looks that way.
8   Q.  Okay.  And then it says, "She said more than
9 once" -- that would be Ms. Sobeck -- "she said more than
10 once that a vote of the entire membership is how we will
11 address similar issues at the Marriott Vacation Clubs.
12 Well, it was not said back to her, but we are a
13 Ritz-Carlton Club with members who have a much more
14 substantial investment in the proposition than a typical
15 Marriott Vacation Club member."
16       At some point did they promise you a vote?
17   A.  No, sir.
18   MR. REISER:  What was that answer?
19   THE WITNESS:  Nor would they threaten us with
20 one.
21 BY MR. FERGUSON:
22   Q.  A vote?
23   A.  Yes.
24   Q.  On page 1172, 05, page 5 of 1172, there's a
25 section two regarding other tidbits from meeting -- from

Page 267

1 the meeting, and has Aspen, and he's talking about your
2 documents and similar provisions and whatnot.
3       And then you'll see that towards the end of this
4 section on Aspen, he says, eight, nine lines up, "It was
5 further inferred that MVW was flying out to Aspen meeting
6 to persuade the Aspen board to allow MVW -- MVW propose a
7 vote of their members to allow them to get their
8 14 percent inventory and deposited either into the
9 Lion & Crown Exchange Program or transferred to the
10 Marriott Vacation Land Trust as they are under orders from
11 the powers that be to get out from all the remaining hard
12 Ritz-Carlton Destination Club inventory still on their
13 books.  Obviously, the prohibition from timesharing in the
14 Aspen and BG documents have prevented MVW from
15 transferring its large inventory position at Aspen."
16       So there was an indication, at least with
17 respect to the trust -- potential trust taking title or
18 taking possession of their 14 percent inventory, that
19 there would be a vote; that's what they were telling
20 Mr. Mullenix; is that right?
21   MR. MARX:  Object to the form of the question.
22   THE WITNESS:  I'm going to have to read that
23 again.
24 BY MR. FERGUSON:
25   Q.  Okay.

Page 268

1       (Witness examines document.)
2   A.  That's what they told him.
3   Q.  That's what they told him.  They told you that
4 also, didn't they?  They told you they would have a vote
5 in connection with this affiliation?
6   A.  They used that word in a prior -- a prior
7 document, did they not?
8   Q.  Affiliation or vote, because those --
9   A.  Vote.
10   Q.  Well, yeah, --
11   A.  I guess I don't understand the question.
12   Q.  -- we did talk about that, because in a letter
13 confirming what was spoken about in Orlando, they wrote
14 you on the 29th or -- yeah, the -- sorry, they wrote you
15 on the 19th of December regarding a meeting on the 29th,
16 the one that had the word "fire sale" in there, I believe
17 in there they referred to the word "vote."  And you said
18 you didn't recall -- first you recalled that there was a
19 vote discussed, but it was maybe also a survey, and then
20 you didn't recall whether it was discussed there.
21   A.  See, that's not how I read this.
22   Q.  All right.
23   A.  I read this that they would use their vote.
24   Q.  Okay.  Different concept.  All right.
25   A.  That's how I read this.

Page 269

68 (Pages 266 - 269)

Randal Mercer - October 24, 2017

1    Q.   But they didn't have enough votes to carry the
2  day on that.  They only had 14 percent, right?
3    A.   It's a big number when very few people vote.
4    Q.   Well, you have to put a lot of effort into a
5  vote?
6    A.   You have to put a lot of effort.  It takes
7  years.
8    Q.   Well, it doesn't take a year because
9  Mr. Mullenix pulled it together in a few months, right?
10    A.   On normal issues.  I know St. Thomas has taken
11  years, sometimes to get -- over a year to get a vote
12  together.  They hold the vote open until they get -- until
13  they get it.
14    Q.   Okay.  So Mr. Mullenix was able to do it in a
15  shorter time frame, three or four months?
16    A.   Pretty big issue.
17    Q.   Yeah.  Well, this is a big issue for Aspen
18  Highlands, is it not?
19    A.   Mm-hmm.
20    Q.   Is that right?
21    A.   Yes.
22    Q.   Yes, it is.  Okay.
23       MR. SHEA:  What's the "this"?
24       MR. FERGUSON:  The what?
25       MR. SHEA:  What's the "this"?  He didn't say --

Page 270

1  BY MR. FERGUSON:
2    Q.   You understand there's two sources of inventory
3  for Marriott Vacation Club people being discussed at this
4  time?
5    A.   No, I do not.
6    Q.   You have no idea about that?
7    A.   The only source -- the only source of income of
8  units that we are discussing are the Marriott-owned
9  income -- the Marriott-owned inventory, and then we're
10  discussing an optional exchange program which is another
11  source of potential inventory.
12       So if that's what you're referring to, --
13    Q.   Yes.
14    A.   -- I would agree with you.
15    Q.   Thank you.  Thank you.  Because that second type
16  of inventory is what came to the -- your members on
17  July 17, 2012 when Babich wrote her letter, and then
18  Mr. Cunningham followed up with it on August 17th, right?
19    A.   Mm-hmm.
20    Q.   They're talking about that type of inventory,
21  exchange inventory, right?  Is that right?
22    A.   I would assume.  I can't predict.
23       (Exhibit 1175 previously marked for
24       identification produced to the witness.)
25

Page 272

1  BY MR. FERGUSON:
2    Q.   An affiliation where people can -- two things,
3  whether or not they could use their inventory and put it
4  into a trust so Marriott Vacation Club people could use
5  it, and the other type of affiliation which is an exchange
6  program.
7    A.   I would agree with the first one, not the second
8  one.
9    Q.   They didn't -- they weren't suggesting that
10  there could be an exchange program to create inventory for
11  Marriott Vacation Club people?
12    A.   What they were suggesting --
13       MR. SHEA:  Excuse me, that wasn't your question
14  the first instance.
15       MR. FERGUSON:  Well, I'm just -- I'm on a
16  different question.
17       Can you repeat what I just said?
18       MR. SHEA:  What you just said, or the first
19  question with the "this"?
20       MR. FERGUSON:  What I just said.  I cleared that
21  up, and then --
22       MR. SHEA:  No, you didn't clear it up.
23       MR. FERGUSON:  Well --
24       (Record read back.)
25

Page 271

1  BY MR. FERGUSON:
2    Q.   I'll just show you Exhibit 1175, and this is a
3  sample of a letter that went from the Aspen Highlands
4  board of directors to a Lori Phillips, and it's a test,
5  Aspen Highlands Condominium Association Tourist
6  Accommodation Board letter to members, and this one's
7  addressed to a fellow named Mr. Richard Hegberg.  Do you
8  know Mr. Richard Hegberg?
9    A.   No, sir.
10    Q.   And it says, "Positive discussions were held
11  today between the board of directors and representatives
12  of Ritz/Marriott, including Lee Cunningham, COO of the
13  Ritz-Carlton Destination Club."
14       Mr. Cunningham and Ms. Sobeck came out to your
15  mid-year board meeting, did they not?
16    A.   Mm-hmm.
17    Q.   Is that right?
18    A.   We only have two on-sites, April and September.
19    Q.   And my question was pretty simple,
20  Mr. Cunningham and Ms. Sobeck were at the mid-year one in
21  April?
22    A.   Mid year is June.  Spring meeting is April.
23    Q.   Spring meeting.  All right, I'll use that.  I'm
24  sorry.
25    A.   Thank you.

Page 273

69 (Pages 270 - 273)

Randal Mercer - October 24, 2017

1    Q.  It says, "Ritz-Carlton representatives agree
2  that unless a majority of Aspen Highlands members,
3  excluding the Marriott interests and members not in good
4  standing" -- so a majority less the Marriott-owned
5  inventory and less people who aren't paying their dues,
6  okay -- "vote in favor of doing so, the Ritz/Marriott will
7  not include Aspen Highlands in the Marriott Vacation Club
8  affiliation/exchange/points program."
9        Okay?  So they told you that at the April spring
10  meeting of your board, and you immediately turned around
11  and wrote a letter to all your members saying, they
12  promised us a vote.
13    A.  Mm-hmm.
14    Q.  Right?
15    A.  Okay.
16    Q.  You didn't use the word "survey," did you?
17    A.  Show me the letter.
18    Q.  I'm showing you the letter right there, sir.
19  This is to Mr. Hegberg.  That's a letter that's going to
20  be signed by the president, vice president, treasurer, and
21  secretary, and you were the president at the time, sir.
22    A.  Okay.
23    Q.  You didn't use the word "survey" or "discussion"
24  in your letter, did you?
25    A.  Once again, I was repeating what they told us.

Page 274

1  that there would be a vote about that, right?  That was my
2  question.
3    A.  If there was a vote about joining the points
4  program required, we would have done that.
5    Q.  My question, Mr. Mercer -- and it's gone on all
6  day, but you don't like to answer my questions.
7        I asked you whether or not the Ritz people,
8  Cunningham and Sobeck, said they would not have a vote of
9  the members unless -- they would not -- they would not put
10  the Marriott Vacation Club inventory into the -- into the
11  trust unless there was a vote.  Do you remember me asking
12  you that?
13    A.  Certainly.
14        MR. SHEA:  This is not professional.  Stop it.
15  BY MR. FERGUSON:
16    Q.  And what you --
17        MR. SHEA:  Stop.  We're going to walk out if --
18        MR. FERGUSON:  Okay.
19        MR. SHEA:  -- you don't lower your voice.
20        MR. FERGUSON:  Let me ask my question.
21        MR. SHEA:  No, lower your voice first or we're
22  walking out.
23        MR. FERGUSON:  Your voice is a lot higher than
24  mine, sir.
25    Q.  Your answer to that question was, and there

Page 276

1    Q.  All right.  And they told you that they were
2  going to have a vote of the majority of the members, and
3  if there wasn't a vote of the majority of members, there
4  would be no affiliation, exchange, or points program with
5  the Marriott Vacation Club?
6    A.  Fine.
7    Q.  That came out of their mouths at your board
8  meeting in April of 2013?
9    A.  Right.  And there is none.
10    Q.  All right.  That's your position, there is none
11  today?
12    A.  There is none.
13    Q.  "Discussions continue on other important issues
14  affecting Aspen Highlands, including alternatives for
15  divesting the current inventory of Aspen Highlands units
16  owned by Ritz/Marriott.  Such inventory will not be sold
17  through the Marriott Vacation Club trust without an
18  additional vote of the members."
19    A.  Mm-hmm.
20    Q.  So they were talking about a separate vote on
21  the issue of what they could do or not do with the
22  inventory.
23    A.  And there was none.
24    Q.  So my question, sir, was whether or not they
25  told you, and you turned around and told your members,

Page 275

1  hasn't been any.  So you didn't answer my question.  All
2  right?  Is there a reason you're not answering my
3  questions today, sir?
4    A.  I'm not even sure what your question is.  Would
5  you repeat it, please?
6    Q.  I'd ask you to answer my questions from now on
7  today, sir.
8        MR. SHEA:  He's just being argumentative and
9  unprofessional.
10        And if you continue it, we're going to call the
11  magistrate and we'll have him listen to the video and
12  the tone of voice.  It's unprofessional.  We don't do
13  that in Colorado.
14        (Exhibit 1176 previously marked for
15  identification produced to the witness.)
16  BY MR. FERGUSON:
17    Q.  Let me show you Exhibit 1176.
18        MR. SHEA:  It's called bullying.  And if you
19  look at the Ethic Code in Colorado, it doesn't permit
20  it.
21  BY MR. FERGUSON:
22    Q.  This is a letter from RCDC SLC, I guess that's
23  Salt Lake Leadership, something like that, and it's
24  regarding Member Services.  And it says, "Ladies and
25  Gentlemen," -- there they go -- "A few hours ago we

Page 277

70 (Pages 274 - 277)

Randal Mercer - October 24, 2017

1 received the attached draft letter which is anticipated to
2 go out to each of our Aspen Club members from the Aspen
3 Club board of directors today."
4        And we just saw that in a prior exhibit. So
5 this is going out from leadership to, I guess, the line
6 people in Member Services. It says that, "Marriott
7 Vacation Worldwide has agreed, together with the board of
8 directors, that we will not affiliate the Aspen Club and
9 club members with our Marriott Vacation Club Destinations
10 program unless a majority of the members vote otherwise."
11        So at least internally the Salt Lake Leadership
12 team headed by Ms. Babich at Cobalt is saying to her
13 people, this is what we're doing. We promised a vote
14 today to Mr. Mercer, Mr. Marsden, Mr. Schneider, and
15 Mr. Oliver. Correct?
16      MR. MARX: Object to the form of the question.
17      THE WITNESS: Apparently they did.
18 BY MR. FERGUSON:
19    Q. All right. And you heard them say that with
20 their own -- it came out of their own mouths? You
21 actually heard that?
22    A. I believe I did.
23    Q. Do you know who drafted that letter we saw in
24 the prior exhibit I was asking about?
25    A. No, sir.

Page 278

1 communiqué, this is an actual letter that -- the version
2 of the letter that went out, I take it?
3    A. Appears to be.
4    Q. All right. And it promises the two votes,
5 right? Is that a yes or a no?
6    A. Give me a moment, please.
7    Q. Sure.
8    A. Promises a vote. If the Aspen Highlands
9 affiliation/exchange/points program were to be instituted.
10    Q. All right.
11    A. That is correct, and that has not been done.
12    Q. Is that because it's voluntary today?
13    A. No. It's a different subject.
14    Q. Is it voluntary what -- the exchange program
15 today?
16    A. It is voluntary.
17    Q. And it's a one week for one week?
18    A. Yes, sir.
19    Q. And you don't --
20      (Sotto voce discussion among plaintiffs'
21 counsel.)
22      (Exhibit 1178 previously marked for
23 identification produced to the witness.)
24 BY MR. FERGUSON:
25    Q. This is an exhibit that was produced, it looks

Page 280

1    Q. Okay. If you look back at 1175, it says that
2 it's approved by a Lori Phillips, a manager of association
3 government -- governance out there in Orlando, Florida --
4 not out there, out here.
5      Did you know that your board letter in this
6 regard was being approved by someone at Marriott
7 Governance --
8      MR. MARX: Object to the form of the question.
9 BY MR. FERGUSON:
10    Q. -- Services, Marriott Governance Services?
11    A. Yes, they review all letters that go out, I
12 believe.
13    Q. I take it you haven't seen this exhibit, 1176,
14 this internal document from Salt Lake City Leadership to
15 Member Services?
16    A. No, sir.
17    Q. Okay.
18      (Exhibit 1180 previously marked for
19 identification produced to the witness.)
20 BY MR. FERGUSON:
21    Q. And Exhibit 1180 (handing), produced from the
22 files of the Marriott Corporation's companies. This is a
23 letter to member -- and that would be at least a final,
24 signed -- I put signed in quotation marks -- it's signed
25 electronically, and that's the letter we saw in a prior

Page 279

1 like, by the association, Mr. Shea and Ms. Livingston
2 Black.
3      Do you recall -- we were talking about this
4 document that's in your mind's eye or not in your mind's
5 eye. This would be comments that are coming in to the
6 letter that was approved by Lori Phillips out of Orlando,
7 and I guess sent by you all -- or by you all through
8 Marriott. Is this the chart or compilation that you were
9 thinking about earlier today?
10    A. This is the compilation that is in my mind's
11 eye.
12      MR. FERGUSON: Okay. I knew we'd come to it.
13 Why don't we just go through this, and is it getting
14 close to a break time? I don't know how long we have
15 been going because I'm doing it, so --
16      MS. LIVINGSTON: We have been going, like, an
17 hour and 20 minutes.
18      MR. FERGUSON: All right. Just give me a few
19 seconds with this one.
20      MR. HANLON: Do you have a number?
21      MR. FERGUSON: This is Exhibit 1178.
22    Q. So if you look at, for example, Mr. Gradinger's
23 comments on page 2 of Exhibit 1178, he's the third one up
24 from the bottom above Mr. Branoff, he said, "Well done.
25 Will be asked to vote against the inclusion of Aspen

Page 281

71 (Pages 278 - 281)

Randal Mercer - October 24, 2017

1 Highlands in the exchange program -- we will be asked to
2 vote?"
3        Do you know whether anybody responded to him
4 about that?
5    A.  No, I don't.
6    Q.  And, for example, on page 3, there's a Robert
7 Goldberg.  Do you know Robert Goldberg?
8    A.  No, sir.
9    Q.  He said, "Good job.  We should not be included.
10 Congratulations."
11        Was that generally -- people here are saying
12 "Wonderful.  Great job.  Great job.  Thank you.  That's
13 great news.  Hallelujah.  Great job.  Let's hope it works.
14 This is very encouraging.
15        That's because you had told your members that
16 they could decide whether or not there would be an
17 affiliation, right?
18    A.  That's your opinion.
19    Q.  Is that not your opinion?
20    A.  My opinion is that they were saying good job,
21 you stopped something that was very bad.
22    Q.  Well, it hasn't been stopped yet because
23 Marriott is still going to come.  They're going to have a
24 vote about something, at least probably two things.
25    A.  No, they said there will be -- if -- if the
                                                    Page 282

1 question is going to go to the owners, we will have a
2 vote.  The question did not go to the owners.
3    Q.  Well, it did -- I guess it went to the owners on
4 a survey?
5    A.  No, that's not what happened.  We did not say
6 that in the survey question.
7    MR. FERGUSON:  All right.  Let's take a quick
8 break.
9    THE WITNESS:  But we'll get there, I'm sure.
10    MR. FERGUSON:  Possibly before church, I hope.
11    THE WITNESS:  I would hope so.
12    MR. FERGUSON:  We're going to get you out of
13 here.
14    THE VIDEOGRAPHER:  We're going off the record.
15 This is the end of media unit number five.  The time
16 is 4:10.
17        (Recess taken -- 4:10 p.m.)
18        (Return from recess -- 4:19 p.m.)
19    THE VIDEOGRAPHER:  We are going back on the
20 record.  This is media unit number six.  The time is
21 4:19.
22        (Exhibit 1202 previously marked for
23 identification produced to the witness.)
24 BY MR. FERGUSON:
25    Q.  I'm going to hand you Exhibit 1202, which is a
                                                    Page 283

1 Mar- -- I'm sorry, is a draft of a letter --
2    THE VIDEOGRAPHER:  Your microphone again,
3 Mr. Ferguson.
4    MR. FERGUSON:  Sorry.
5    THE WITNESS:  Question, please.
6 BY MR. FERGUSON:
7    Q.  I'm putting this on.  That's what happened.
8    A.  Okay.  Question?
9    MR. SHEA:  Just wait.  He's going to start over.
10    THE WITNESS:  I'm sorry.  Forgive me.
11 BY MR. FERGUSON:
12    Q.  Okay.  This is a -- Exhibit 1202 is a draft of a
13 letter to come from the Ritz-Carlton Destination Club's
14 Executive Vice President, Lee Cunningham.  It's "Dear" --
15 it's a blank, obviously -- "Dear Mr. and Mrs. Aspen
16 Member," May 3, 2013.  Had you seen this draft letter
17 before it was finalized and sent to your members?
18    A.  I don't recall this specific letter, but if it
19 had been sent out, then I would have received one.
20        (Exhibit 1203 previously marked for
21 identification produced to the witness.)
22 BY MR. FERGUSON:
23    Q.  Can you look at Exhibit 11 -- sorry, 1203
24 (handing), which is an email from you to Marino.  "They
25 sent us a draft letter that sounded like advertising.  We
                                                    Page 284

1 made some slight adjustments, and we will have a
2 conversation next week.  Trying to slow it down.  They are
3 trying to speed it up."
4        Do you recall that you did, in fact, get a copy
5 of Mr. Cunningham's draft letter to your members?
6    A.  Apparently I did, and that would be my response.
7    Q.  All right.  And if you look at Exhibit 1202, the
8 Cunningham draft letter, it talks about him, quote, he
9 "understands that some members have some concerns about
10 this opportunity.  We believe the proposed affiliation
11 would provide members of the Ritz-Carlton Club with
12 additional vacation options while having the same access
13 to legendary, world-class experiences at the Ritz -- at
14 the RCDC locations."
15        It says, "However, the Ritz-Carlton Club and
16 your board of directors are collectively offering members
17 of the Aspen -- Ritz-Carlton Aspen Club the chance to
18 indicate their preference before any final decisions are
19 made."
20        Okay.  Is that, in your view, when you reviewed
21 this letter and made those slight changes, was this
22 something that was related to the April 5th communiqué
23 that said there would be a vote on affiliation/exchange
24 points program?
25    A.  Preference, vote, survey, all kind of the same
                                                    Page 285

72 (Pages 282 - 285)

Randal Mercer - October 24, 2017

1 to me, so it's hard to say.
2    Q.  And it says, "If a majority of the members
3 surveyed vote -- surveyed vote they want -- they want
4 members of the Ritz-Carlton Club to have the ability to
5 voluntarily access the Marriott Vacation Club system, then
6 it will be an opportunity provided to all members of the
7 Ritz-Carlton Club."
8        So even here he's saying that the members
9 surveyed -- that word is now being used -- vote, and there
10 would be a majority.  Did a majority of members ever get
11 surveyed or vote with respect to the decision to
12 affiliate?
13    A.  The majority of the members had the access --
14 had the ability to vote.  All of the members had the
15 ability to vote.
16    Q.  I understand the ability, but this says "if the
17 majority of the members surveyed vote."  It doesn't say a
18 majority of the people surveyed who take the time to fill
19 out the survey and indicate their vote.  It doesn't say
20 that.  They're promising to your members, my clients, that
21 there would be at least a survey and a vote that would
22 require a majority of the members to agree with this
23 affiliation, right?
24        MR. MARX:  Object to the form of the question.
25        THE WITNESS:  This is their language, not mine.
                                                    Page 286

1 issue question to the" -- what does it say?
2        MR. REISER:  "To an end."
3 BY MR. FERGUSON:
4    Q.  -- "to an end by a member vote, not a board
5 vote, and MVW agreed," right?
6    A.  That's what it says.
7    Q.  Those are your words?
8    A.  Those are my words.
9    Q.  You didn't use the word "discussion" or the word
10 "survey" with her, did you?
11    A.  As indicated earlier, they're interchangeable
12 with me, but --
13    Q.  And then you responded, and then you sent that
14 on to whom?  You sent it on to -- I'm sorry.
15        Start at the bottom, you sent this to Mr. Oliver
16 and you told him that she was pissed at first.  I take it
17 you believed you calmed her concerns?
18    A.  I had hoped so.
19    Q.  Okay.  And one of the ways you calmed her
20 concerns was there would be no affiliation unless there
21 was a vote; and you all got MVW to agree to that, right?
22    A.  Yes.
23        (Exhibit 1208 previously marked for
24    identification produced to the witness.)
25
                                                    Page 288

1 BY MR. FERGUSON:
2    Q.  Understood, but -- yeah, that keeps going there.
3 He drives home that point, "If you do not hear back
4 affirmatively -- affirmatively, from a majority of the
5 Ritz-Carlton Aspen Club membership, then it will not be
6 available to the members of the Ritz-Carlton Club Aspen."
7        Okay?  So he confirmed that unless there was a
8 majority of the people had voted affirmatively, or did not
9 hear back affirmatively, then there would be no -- that it
10 would not be available to them, right?
11    A.  That's what his letter says.
12        (Exhibit 1207 previously marked for
13    identification produced to the witness.)
14 BY MR. FERGUSON:
15    Q.  Exhibit 1207 is an email exchange you had with a
16 lady named, I think it's Mary O'Brien, Mary Ellen O'Brien.
17        It looks like Ms. O'Brien asked you some
18 questions and you responded to them; is that right?
19    A.  Yes, it looks that way.
20    Q.  Can you go to page 2 of Exhibit 1207.
21    A.  Yes.
22    Q.  And if you look at item nine in your response
23 email to Ms. O'Brien, you said, "Remembering there are 768
24 member votes in Aspen with 150 of those votes being
25 Marriott, your board decided to put this points system
                                                    Page 287

1 BY MR. FERGUSON:
2    Q.  Exhibit 1208 (handing).
3        This is a letter to Marsden.  You know
4 Mr. Marsden, of course.  He's a fellow board member at
5 that time, right?
6    A.  Yes.
7    Q.  And this is the letter from Cunningham, and this
8 is a letter dated the 14th of May, 2013.  And in that
9 letter to your fellow board member -- I guess he got it as
10 a member also -- paragraph two, starting with the word,
11 "Second, regarding other potential affiliations, we want
12 to assure you that a Ritz-Carlton Club affiliation with
13 Marriott Vacation Clubs will not take place unless there
14 is an affirmative vote of each club's membership.  We also
15 continue our efforts to expand member experiences through
16 additional affiliated luxury travel opportunities."
17        So on 14, May 2013, Mr. Cunningham is using the
18 word "vote," right?
19    A.  Yes.
20    Q.  And Mr. Neveloff sent this back off to you, and
21 Oliver, and Schneider, and Jerry Marsden, he says, "I did,
22 and didn't bother to read the fine print which I assumed
23 related solely to the program.  Imagine my surprise when I
24 read the BG letters online."
25        Do you know what the BG letters -- what was
                                                    Page 289

73 (Pages 286 - 289)

Veritext Legal Solutions
866 299-5127

Randal Mercer - October 24, 2017

| | |
|---|---|
| 1 going on at this time frame? | 1 says, "Additionally, in the amended enrollment package, we |
| 2     A.  I think -- I think the Bachelor Gulch group had | 2 are providing you a termination provision that allows you |
| 3 determined that they were going to divest of the Ritz | 3 the ultimate flexibility with the exchange program." |
| 4 flag, transition to the Timbers, and those articles were | 4     So something was called to Cunningham's |
| 5 in a local newspaper. | 5 attention and he tried to correct that, right? |
| 6     Q.  Do you recall there was some concern about the | 6     A.  That's the way it sounds. |
| 7 fact that the Section 1e had some curtailment of voting | 7     Q.  Okay.  And what you did on the member |
| 8 rights of your members, and that became a serious concern | 8 communication, you'll see that you are on RCDC |
| 9 to Bachelor's Gulch that they pointed out to you, and then | 9 communications at Ritz-Carlton Club, you responded to him, |
| 10 Mr. Neveloff said this is not good? | 10 did you not?  You said, "Nice.  Thanks." |
| 11     A.  Section 1e is what, sir? | 11     A.  Yes, I did. |
| 12     Q.  Of the affiliation documents that were being | 12     Q.  Okay.  So as a board member, you're |
| 13 sent around at that time, the enrollment form -- there's | 13 communicating with Mr. Cunningham about the correction he |
| 14 an enrollment form being sent in May of 2013 to your | 14 had made to the 1e paragraph that had gotten people so -- |
| 15 members, and in that there was a concern that there had | 15 so worked up? |
| 16 been a Section 1e paragraph that had curtailed voting | 16     A.  Yes. |
| 17 rights of your members.  Do you recall that at all? | 17     Q.  And -- and then he said to you, "So does this |
| 18     A.  Have we reviewed those today? | 18 mean he won't send out the Mullenix letter?" |
| 19     Q.  No, you haven't, not yet. | 19     The Mullenix letter was what? |
| 20     A.  Then I won't recall them until I review them. | 20     A.  No idea. |
| 21 So the answer is no. | 21     Q.  And then he corrected himself and he said, |
| 22     Q.  Okay.  So it's your testimony that unless you | 22 "Sorry, pronoun confusion.  I obviously meant you, not |
| 23 see documents from this time frame -- and I understand | 23 he." |
| 24 this -- unless you see documents, you really can't answer | 24     Was there a letter that you were holding in |
| 25 by memory in this time frame? | 25 reserve that was going to tell your members that what they |
| Page 290 | Page 292 |

| | |
|---|---|
| 1     A.  Pretty much correct.  A long time ago. | 1 had done was totally unfair, that they were taking |
| 2     Q.  Okay. | 2 advantage of you, that Marriott Corporation and its |
| 3     (Exhibit 1210 previously marked for | 3 affiliates -- or its subsidiaries were trying to pull a |
| 4 identification produced to the witness.) | 4 fast one?  Was there a letter like that in the wings? |
| 5 BY MR. FERGUSON: | 5     A.  Not that I recall. |
| 6     Q.  Let me show you this exhibit.  This is | 6     Q.  And you said, "Our response from an Aspen board |
| 7 Exhibit 1210. | 7 member.  'Like it.  Very sincere.  That's two of us.  I'm |
| 8     (Sotto voce discussion among plaintiffs' | 8 sure it will be fine, Lee.  Thanks." |
| 9 counsel.) | 9     So somehow in the background, you're working out |
| 10 BY MR. FERGUSON: | 10 this problem with Mr. Cunningham? |
| 11     Q.  Okay.  This is the letter that was sent to you, | 11     A.  I would guess that -- I'm not sure who it would |
| 12 Mr. Mercer.  And on May 14th, Mr. Cunningham wrote to you, | 12 come from. |
| 13 as a member, I take it, and an owner, "It has come to our | 13     Q.  Okay.  He said, "Thank you, Randy."  And you |
| 14 attention that some members have questions regarding | 14 said, "There seems to be more anger in our little |
| 15 language within the Lion & Crown enrollment package.  We | 15 association worlds than usual.  Very counterproductive." |
| 16 appreciate members letting us know about their concerns. | 16 And he said he agreed. |
| 17 We want to clearly address those issues." | 17     So the two of you were having an email chat here |
| 18     Isn't it true that people were more than | 18 regarding some problems with the rollout of the -- with |
| 19 concerned, they were close to livid about what they had | 19 the dissemination of this enrollment form? |
| 20 put into your enrollment packages? | 20     A.  Yeah.  It was probably very aggressive and |
| 21     A.  I remember this issue now.  I don't remember the | 21 one-sided on their part. |
| 22 specifics, but there was some pushback on that. | 22     Q.  And he corrected it, and you told him not to |
| 23     Q.  And it says, "First, we are modifying the | 23 worry, right? |
| 24 language that had been questioned, Section 1e, to more | 24     A.  Appears that way. |
| 25 clearly define the intention of the provision."  And he | 25     Q.  And that letter is -- that email is dated what, |
| Page 291 | Page 293 |

74 (Pages 290 - 293)

Randal Mercer - October 24, 2017

1 sir, the top page?
2    A.   Sorry?
3    Q.   What is your email to him at the top?  That's
4 dated what?
5    A.   "Agreed."
6    Q.   Yeah, "Agreed," when did you say that?
7    A.   Wednesday, May 15, 2013, 11:27 a.m.
8    Q.   So you're telling the second in command at the
9 Marriott Worldwide Corporation that everything's cool?
10    A.   No, I said -- I was agreeing that there seems to
11 be more anger in our little association worlds than usual.
12 He said that, and I -- and he said "Agreed."
13        (Exhibit 1212 previously marked for
14        identification produced to the witness.)
15 BY MR. FERGUSON:
16    Q.   All right.  Exhibit 1212, 1212.
17        This is an email three days later that you sent
18 to your board and Mr. Firmin at Hindman Sanchez, and
19 you're quoting a comment from -- a comment regarding the
20 exchange program.  That comment happens to be from Jay
21 Neveloff, right?
22    A.   I would guess.
23    Q.   All right.  Well, it says, in quotes, "The more
24 I think about this, the more outraged I become.  The
25 intent of MVW is at best awful and borders on fraud,
                                                    Page 294

1 that's best.  For those of you who are simply too busy
2 to read the fine print where there is no expectation of
3 being duped, to see terms that are unrelated to the
4 program rivals the worst conduct I've seen from MVW --
5 from MVW is a situation that demands immediate board
6 notification to the members."
7        Does that help you recall that there was at
8 least Mr. Neveloff suggesting that there should be a
9 letter that goes out to your membership regarding that
10 rollout of the Lion & Crown Travel enrollment form?
11    A.   That refreshes my memory.  Thank you.
12    Q.   You're welcome.  And he said, "That MVW would
13 even consider this nonsense is deplorable.  And I'd be
14 clear to the members that MVW tried to pull a fast one."
15        So Mr. Cunningham acted quickly.  He sent out
16 another letter.  We saw the version he gave to you, and
17 you were able to communicate with him on the back channel
18 saying everything's cool?
19    A.   Mr. Cunningham also said, sorry, he was pronoun
20 confused, whatever that meant.  Okay.
21    Q.   And that letter to you was a similar letter that
22 was sent to the other 768 people or 867?
23    A.   Yeah.
24    Q.   Okay.  It was around this time frame, May into
25 June and July that Mr. Mullenix and his group, his board,
                                                    Page 295

1 were putting together a vote of their membership as to
2 what to do regarding a continued management of their hotel
3 by Marriott companies and in the context of an
4 affiliation.  Do you recall that that was going on?
5    A.   Oh, yes.
6    Q.   And he was keeping you somewhat apprised of that
7 as a president to president?
8    A.   I wouldn't say president.  There were some
9 courtesy emails, but I was not privy to all the ongoings
10 and incomings at all.  I just knew it was happening.
11        (Exhibit 1218 previously marked for
12        identification produced to the witness.)
13 BY MR. FERGUSON:
14    Q.   And would you look at Exhibit 1218 (handing).
15 1218 is a letter from -- to fellow members at the
16 Bachelor's Gulch facility.  It is a long letter that has
17 discussion of the research they have done about Timbers
18 Resorts, and also specifically how to vote.
19        It looks like on May 16, 2013, the BG board
20 "took formal action with a unanimous decision to proceed
21 with terminating the wholly-owned subsidiary of Marriott
22 Vacations Worldwide."
23        So you understood, I take it, when Mr. Mullenix
24 sent that to you what was going on at Bachelor's Gulch?
25    A.   Ritz-Carlton was gone.
                                                    Page 296

1    Q.   It hadn't gone yet, because Mr. Mullenix
2 promised his membership a vote, right?
3    A.   I'm not sure if the vote happened before this
4 letter or after this letter.
5    Q.   Well, yeah, there was a board vote, and then
6 there was a membership vote.
7    A.   And there was a member after, is that how it
8 went?
9    Q.   Yeah.
10    A.   Okay.
11    Q.   Well, you know that the board promised their --
12 the Bachelor's Gulch membership a vote?
13    A.   To terminate, okay.
14    Q.   Yeah.  And they fulfilled that promise, and they
15 did the hard work to get a vote together?
16    A.   Mm-hmm.
17    Q.   Is that right?
18    A.   Yes.  I said -- my question was, I wasn't sure
19 whether that board vote happened after the member vote --
20    Q.   Okay.
21    A.   -- or not.
22    Q.   So you're not sure --
23    A.   I'm just refreshing my memory, and it appears
24 the board vote happened first.
25    Q.   And you forwarded this on, and it looks like
                                                    Page 297

75 (Pages 294 - 297)

Randal Mercer - October 24, 2017

1  Mr. Schneider said, "Why did BG get so upset with Ritz
2  that they want out?" Mr. Schneider asked that. And then
3  Mr. Oliver responded to you all, "I think they should vote
4  Mike out. He's an unhappy guy."
5      I believe that you told him at some point that
6  you thought he was your hero; do you recall that?
7      A.  I possibly said that.
8      (Exhibit 1219 previously marked for
9      identification produced to the witness.)
10 BY MR. FERGUSON:
11     Q.  Exhibit 1219 (handing). First email. Randy
12 Mercer, Mike Mullenix, regarding the "Urgent, board seeks
13 membership approval to affirm the change in club
14 management," you said, "You are my hero," right?
15     A.  I did.
16     (Sotto voce discussion among plaintiffs'
17     counsel.)
18 BY MR. FERGUSON:
19     Q.  Why was he your hero?
20     A.  I'm a process guy.
21     Q.  What is -- okay. You're a processes guy, that's
22 why you thought he was your hero?
23     A.  I thought he did a great job regardless of the
24 outcome. I did not like the outcome at all. But I
25 thought he handled a great -- a very tough situation in a

Page 298

1  very -- in a very good way.
2      Q.  And one thing we know he did, whether he's a
3  hero or an unhappy guy, is that he promised his members a
4  vote and he gave them the vote, right?
5      A.  To change brands, yes, he did.
6      (Sotto voce discussion among plaintiffs'
7      counsel.)
8  BY MR. FERGUSON:
9      Q.  At some point did you look at the process he was
10 following and say, hey, he's giving us a good template as
11 to how to do our vote?
12     A.  No, because our vote was not anywhere close to
13 that, nothing like that. It was nothing like de-flagging.
14     Q.  Okay. So it was --
15     A.  Not even close.
16     Q.  It was a different level of decision that was
17 being made by the membership?
18     A.  Changing the brand of a hotel from a
19 Ritz-Carlton to a Timbers is a catastrophic event.
20     Q.  So when he promised a vote because it was
21 catastrophic in your view, that's why he fulfilled his
22 promise to his members?
23     A.  It was the way he did it that I appreciated.
24     Q.  Would you go back to Exhibit 7 -- I'm sorry,
25 1219. That's the "You are my hero" one.

Page 299

1      A.  Okay.
2      Q.  He said, "Randy, thanks. Hopefully you had a
3  chance to click the links embedded in the letter." He
4  says, "I hate to brag, but I believe this communication is
5  exponentially better than anything Ritz/Marriott has ever
6  sent to the membership. It took me and the board over 45
7  days to set it up with the assistance of a PR firm in
8  Denver."
9      When you ended up having the survey in December,
10 you used the Morrow company, Ms. Verrechia?
11     A.  To count -- to count the survey, yes.
12     Q.  To count the survey.
13     A.  Mm-hmm.
14     Q.  Okay. You didn't go to an outside entity to do
15 that, did you?
16     A.  I wasn't de-flagging.
17     Q.  You were deciding whether or not to allow
18 Marriott Vacation Clubs to affiliate with your -- with
19 your club?
20     A.  No, I was --
21     MR. MARX:  Objection to the form of the
22 question.
23     THE WITNESS:  I was deciding whether or not to
24 provide another vehicle for our members to exchange
25 into, which just happened to be Marriott. Two

Page 300

1  different things.
2  BY MR. FERGUSON:
3      Q.  You say in the middle of this page, "Nice job on
4  this, Mike. Nice job on the process, too. A model to
5  follow."
6      Okay. And the model he's talking about, at
7  least in part, is how to set up and run a fair and
8  transparent election with an outside firm?
9      A.  With a PR firm and do everything they needed to
10 do yes, it was a good body of work.
11     Q.  And when you said it was a process to follow,
12 you weren't talking about what you all had to do?
13     A.  No.
14     Q.  Who did you --
15     A.  It was a great example of a way to do something
16 very complicated and do it very well with a large number
17 of people.
18     (Exhibit 1223 previously marked for
19     identification produced to the witness.)
20 BY MR. FERGUSON:
21     Q.  Let me show you Exhibit 1223 (handing).
22     MR. MARX:  Does it matter that it has your
23 Post-it on it?
24     MR. FERGUSON:  I have another one.
25     Q.  This is Jay Neveloff at the bottom, on May 22nd

Page 301

76 (Pages 298 - 301)

Randal Mercer - October 24, 2017

1 saying, "Hope you guys are well on the board. If this is
2 revised, I would truly hate to see what the first version
3 was." And then he talked about his concerns about what
4 had gone out.
5        And then you forwarded that on to Mr. Firmin, it
6 looks like, right? At the top of the page, "An
7 off-the-record of Jay's assessment. Until I have a board
8 member change in September, will I get this sort of thing
9 stopped before traction ensues."
10       What did that mean? What were you referring to
11 with Mr. Firmin there?
12    A.   Well, I knew there was going to be a board
13 change because a board member was terming out, and I
14 believe that was Mr. Marsden.
15    Q.   And it says, "Off-the-record-assessment until I
16 have a board member change in September" -- now we know
17 it's Mr. Marsden -- "will I get this sort of thing stopped
18 before traction ensues."
19       What were you referring to when you say "this
20 sort of thing"?
21    A.   I was referring to, I believe, the language that
22 was continually included in communication to the members
23 from Mr. Cunningham, specifically the paragraph 1e that --
24 that he carved out. Of course, this is just
25 Mr. Neveloff's opinion.

Page 302

1    Q.   Have you ever seen the tally of the votes on the
2 December 13, January 14, survey?
3    A.   I don't believe I have.
4    Q.   Someone reported to you what the outcome was?
5    A.   Yes.
6    Q.   Had you ever seen the comments that came with
7 the vote that were invited by the people conducting the
8 survey, Morrow on behalf of the Marriott companies?
9    A.   Not that I recall, no.
10    Q.   At this time, was there a letter being drafted,
11 co-drafted, by the Marriott people and the board regarding
12 this survey or vote or discussion they had promised
13 everybody?
14       MR. MARX:  Object to the form of the question.
15       THE WITNESS:  What's the time frame?
16       MR. FERGUSON:  Let me rephrase that.
17    Q.   Was there a letter being drafted in May and June
18 of 2013 concerning putting the affiliation -- nothing to
19 do with branding, but I'm talking about Aspen Highlands --
20 putting that affiliation question to the members? Was
21 there a letter being generated for that purpose?
22    A.   Possibly. It's around the time frame.
23    Q.   Do you recall a situation where Mr. Mullenix was
24 telling you that the Marriott companies, during the vote
25 process that he initiated, or his board initiated, that

Page 303

1 they were interfering with that process by sending out
2 letters concerning the condition of the hotel and other
3 items that he thought were meant to confuse his members;
4 do you recall anything about that?
5    A.   Vaguely.
6    Q.   Did Mr. Neveloff's fairly regular interaction
7 with you and his expression of concerns put you -- concern
8 you in respect to how you would deal with the Marriott
9 executives? Were you put kind of on high alert or
10 anything of that nature when you saw a lawyer like
11 Mr. Neveloff was concerned about their conduct?
12    A.   I always appreciated Mr. Neveloff's counsel. I
13 didn't always agree with his assessment at the time. But
14 I paid attention to him. I honored him with
15 consideration.
16       (Exhibit 1234 previously marked for
17       identification produced to the witness.)
18 BY MR. FERGUSON:
19    Q.   I need to show you Exhibit 1234, 1234. That's
20 an email from you to Sobeck and Cunningham on June 3,
21 2013, and you said, "Attached, please find comments
22 regarding the second/revised agreement." So this is post
23 the correction in 1e that Mr. Mercer had made and you had
24 communicated with him about.
25       MR. SHEA:  Mr. Cunningham, you mean?

Page 304

1       MR. FERGUSON:  What did I say?
2       MR. SHEA:  Mercer.
3       MR. FERGUSON:  Mr. Cunningham, thank you.
4    Q.   And then you offered him a timeline. And then
5 you said, "This breakdown of protocol and collaboration is
6 a reminder of old practices and certainly not of best
7 practices. We were of the belief that the old practices
8 were put aside, but in light of the breach, apparently
9 not."
10       So you were, at this time, after having that
11 chat on email with Mr. Cunningham, you were letting them
12 know in no uncertain terms that you were disappointed of
13 what had occurred in the prior couple of weeks?
14    A.   Yes, I was.
15    Q.   All right. And it looks to me that you had had
16 discussions with Mr. -- Ms. Sobeck, rather, on 5/13, 5/16,
17 5/22 "discussing the affiliation and the process. I
18 thought we had discussed the issues and the board's
19 concerns, and we were addressing them to your
20 satisfaction."
21       So it looks to me like you had had discussions
22 with her that at least she believed were productive?
23    A.   Yes.
24    Q.   And then she said at the bottom, "When we talked
25 on May 22, you raised your concerns about sending out the

Page 305

77 (Pages 302 - 305)

Randal Mercer - October 24, 2017

1  addendum changes.  I thought we had reviewed the above and
2  were on the same page to your below -- so your below email
3  has caught me by surprise."
4       So there was a little bit of tension or there
5  was a little bit of this -- I guess, tension put into the
6  situation with your email, and she was letting you know
7  that she was surprised, right?
8       A.  That is a familiar phrase.
9          (Exhibit 1235 previously marked for
10  identification produced to the witness.)
11  BY MR. FERGUSON:
12      Q.  Would you look at Exhibit 1235 (handing).
13      A.  Certainly.
14      Q.  That is an email from you to Stephanie, and your
15  board copied, it says, "As promised, attached is the
16  revised letter to members.  If you make any changes to
17  this, we would appreciate a red line.  Track changes is
18  on."
19       So you wanted her to tell you what changes she
20  was making after you had your input in this letter?
21      A.  I always did, yes.
22      Q.  And this is a -- this is a letter that would
23  come jointly from the Tourist Accommodation board
24  directors and Lee Cunningham; is that right?
25      A.  Get my bearings.
                                              Page 306

1  people to respond affirmatively to this concept, right?
2       A.  Again, this is a draft.  Show me the final.
3       Q.  All right.  That was my question, this is a
4  draft, right?
5       A.  It appears to be.
6       Q.  And you and your board and Ritz-Carlton -- what
7  do they call themselves; Executive Leadership Group?
8       A.  The executive board is a term that is in the
9  condominium documents.
10      Q.  I'm talking about this letter that was being
11  drafted, it says RCDC Executive Leadership.  That's
12  Cunningham, right?
13      A.  Cunningham.
14      Q.  Right.
15      A.  And his direct reports whom I do not know who
16  they are.
17      Q.  Mr. Weisz, and Ms. Sobeck below him, probably,
18  right?
19      A.  There's probably others.
20      Q.  The shareholders.
21      A.  (Laughing.)
22         (Sotto voce discussion among plaintiffs'
23  counsel.)
24  BY MR. FERGUSON:
25      Q.  Yeah, Mr. Reiser pointed out something I meant
                                              Page 308

1       Yes, it would ultimately come with me after it
2  had been modified to meet everybody's approval.
3       Q.  Okay.  And if you look at page 2 of
4  Exhibit 1235, there is this draft letter in June to
5  Mr. and Mrs. XXX, and it goes -- if you go to the next to
6  the last paragraph there, it says, "RCDC Executive
7  Leadership," do you see that?
8       A.  Yes.
9       Q.  And "The board of directors in Aspen have agreed
10  that they will allow members the chance to indicate their
11  thoughts before any final decisions regarding their
12  affiliation are made.  If the majority, 50 percent plus
13  one, of the Aspen members, not including the
14  Marriott-owned folks -- units, approximately 13 percent,
15  respond affirmatively that they want the members of the
16  Aspen -- Ritz-Carlton Aspen Club to have the ability to
17  voluntarily access the Marriott Vacation Club system and
18  Marriott Club owners to have the ability to vacation at
19  the Ritz-Carlton Aspen Highlands, we will then move
20  forward to provide the opportunity to all the Aspen
21  members on an individual basis."
22       So in this particular draft letter -- and I was
23  asking about letters that were being drafted to go to your
24  membership, in this particular one they were talking about
25  getting thoughts, and -- but they wanted a majority of the
                                              Page 307

1  to ask you.
2       It says above the words "RCDC Executive
3  Leadership and the board.  Based on some member and board
4  feedback, it is clear that there are concerns" -- and we
5  saw that in the prior draft of this.
6       It says, "The Ritz-Carlton Club -- opening the
7  Ritz-Carlton Club to Marriott Vacation Club owners, which
8  is why we believe a vote of the members is the best way to
9  determine if the Ritz-Carlton Club, Aspen and its members
10  will be affiliated in any way with the Marriott Vacation
11  Club system," right?
12      A.  The word "vote" is in there.  Again, it was
13  interchangeable for.
14      Q.  And during the next few weeks, you were talking
15  about the frequently asked questions that would go out
16  with this letter, --
17      A.  Mm-hmm.
18      Q.  -- and you were working with the details of what
19  was going to be communicated to your membership, right?
20      A.  Yes.
21         (Exhibit 1251 previously marked for
22  identification produced to the witness.)
23  BY MR. FERGUSON:
24      Q.  Exhibit 1251 (handing).  So this is an email you
25  sent to Mercer -- I'm sorry, Mercer sent to Neveloff --
                                              Page 309

78 (Pages 306 - 309)

Randal Mercer - October 24, 2017

| | |
|---|---|
| 1 you sent to Neveloff, and you said, "An excerpt; not | 1   A.  It is not. |
| 2 good."  And this is an excerpt from a report that | 2   Q.  And there's no concept of numbers, 50 plus 1, |
| 3 Mr. Mullenix had given you regarding the outcome of the | 3 right? |
| 4 vote -- | 4   A.  In that paragraph. |
| 5   A.  Mm-hmm. | 5   Q.  So isn't it true that during the summer of 2013 |
| 6   Q.  -- to de-brand and leave the Marriott fold in | 6 as this letter got drafted regarding the vote that was |
| 7 July of 2013, correct? | 7 promised on April 5th, the votes, that it began to morph |
| 8   A.  Yes. | 8 into something less than a vote, which would be a survey |
| 9   Q.  And he reported to you -- or he reported in this | 9 of some sort? |
| 10 particular document that you got a hold of, "That | 10   A.  Again, the intention was always the same.  As we |
| 11 67 percent of the members had voted in favor of the | 11 went on, we clarified the documents to match the intent. |
| 12 board's recommendation to terminate, while less than | 12   Q.  The intention was always to have a survey that |
| 13 9 percent voted against."  And it said, "To state these | 13 not a majority of the people had a vote on? |
| 14 election results in terms of the total number of members | 14   A.  The intention was always to get a glimpse of |
| 15 who voted in the election, more than 89 percent of the | 15 member opinions so that we could serve our members in the |
| 16 members voted in favor of the board's recommendation to | 16 way they wanted. |
| 17 terminate." | 17   Q.  So you're saying that when you promised the |
| 18       So at least with respect to Mr. Mullenix's vote, | 18 folks that were very happy with you in their comments back |
| 19 he did pull off a nearly 90 percent voting rate of his | 19 when you told them there would have to be a vote of 50 -- |
| 20 members? | 20 and 50 percent of the membership would have to approve |
| 21   A.  And that's consistent with his prior | 21 majority, that you really didn't mean what you said?  You |
| 22 communication, I believe. | 22 just wanted to get a glimpse of what people might respond |
| 23       (Exhibit 1255 previously marked for | 23 to in the few months? |
| 24       identification produced to the witness.) | 24   A.  We always wanted to get as many opinions as we |
| 25 | 25 possibly could what members always wanted. |
| Page 310 | Page 312 |

| | |
|---|---|
| 1 BY MR. FERGUSON: | 1   Q.  But you promised that 50 percent of the people |
| 2   Q.  Exhibit 1255 (handing).  Here's another letter, | 2 would vote, had to vote in order to affiliate? |
| 3 but this one's in July of '13.  It's a draft letter, and | 3   A.  If you're putting words in my mouth, then you're |
| 4 it's to Mr. and Mrs. XXX again, and it's a version of a | 4 wrong.  I always intended on touching all of the members |
| 5 letter that was being drafted that would be sent by the | 5 to see what their opinions were. |
| 6 Executive RCDC team, Mr. Cunningham, and then your board. | 6   Q.  And you wanted to see what their opinions were, |
| 7       And we see some of the same concepts.  In this | 7 but you didn't even read what their opinions were when |
| 8 particular one, you'll see that they're talking about | 8 they actually voted and answered the questions in their -- |
| 9 approximately 120 fractional interests in the fourth | 9 and, sorry, in December of '13 and January of '14, did |
| 10 paragraph down.  Do you see that? | 10 you? |
| 11   A.  Which paragraph?  I apologize. | 11   A.  All I saw was the response to the cease and |
| 12   Q.  Fourth paragraph down, it says 120 fractional | 12 desist letter. |
| 13 units? | 13   Q.  Okay.  So you said that you wanted a glimpse -- |
| 14   A.  One, two, three, four.  Okay, the big one.  Yes. | 14 I mean, you are the president of the board of directors. |
| 15   Q.  And the next paragraph says, same -- same type | 15 You don't believe that you promised a vote that required a |
| 16 of deal, but this one talks about member feedback is clear | 16 majority.  You believe that you -- now believe that you |
| 17 that there's concern, "which is why we propose -- we | 17 wanted to get a glimpse of what people were thinking, and |
| 18 believe a survey vote of the Aspen members is the best way | 18 when you got that glimpse, you didn't even read the |
| 19 to determine if there should be an affiliation in any way | 19 responses that came in from the survey vote that was done |
| 20 with the Marriott Vacation Club Destinations Program.  So | 20 by Morrow & Company for Ms. Sobeck? |
| 21 now we have the word "survey" put in front of "vote," | 21   A.  I didn't say that.  I read what came to me. |
| 22 right? | 22 There were several people in there that used the word |
| 23   A.  It is. | 23 "vote."  There were a lot of people that said |
| 24   Q.  And the words "majority" -- "majority" is no | 24 congratulations.  I read them all. |
| 25 longer there, right? | 25   Q.  And you're talking about the survey that was |
| Page 311 | Page 313 |

79 (Pages 310 - 313)

Randal Mercer - October 24, 2017

1 done in December of '13?
2     A.  I'm talking about the grid -- the grid --
3 table response which showed member reaction to the cease
4 and desist letter.
5         (Exhibit 1274 previously marked for
6     identification produced to the witness.)
7 BY MR. FERGUSON:
8     Q.  Let me show you Exhibit 1274 (handing).  This is
9 a process of generating frequently asked questions that
10 would go out with this joint letter from the Executive
11 Leadership of RCDC and your board, and these are the
12 frequently asked questions.  You recall working on those,
13 correct?
14     A.  Yes.
15     Q.  Okay.  And there's a question at the bottom --
16 towards the bottom of page 1 on 1274, Exhibit 1274, it
17 says, "Will the Ritz-Carlton Club Aspen Highlands be
18 available to Marriott Vacation Club Destination program
19 members?"
20         And in this one, the answer was, "If the Aspen
21 Highlands members vote if they would like to affiliate
22 with the Marriott Vacation Club Destinations program, then
23 Marriott Vacation Club Destinations program members will
24 be permitted to reserve residences in the Aspen Highlands
25 property to the extent there is inventory available

Page 314

1     So the wording is changing quite a bit, is it
2 not, how this is being presented to your members now by
3 RCDC Executive Membership?
4     A.  Time to read the small print.  Give me a second.
5         (Witness examines document.)
6     A.  Okay, I read that first sentence.
7     Q.  So this is a -- this is being -- I don't want to
8 say spun, but this is being presented as a vote, and
9 someone crossed out "survey," and put in "vote," and
10 they're saying that that's -- whether or not they want to
11 have the opportunity to join this program, so that's the
12 way they're communicating it to your members, as an
13 opportunity, right?
14     A.  This is a draft.
15     Q.  Right.  And then it says -- you'll see this kind
16 of similar language here at the bottom, "It says based on
17 some member feedback" -- now it's some membership feedback
18 -- "it is clear that there is concern" about opening of
19 the club "to the MVCD members through affiliation, which
20 is why we and your board of directors have agreed to allow
21 Aspen members the opportunity to provide input before any
22 final decisions regarding this affiliation are made.  If a
23 majority, 50 plus one, of the Aspen members, not including
24 the RCDC inventory owner, surveyed respond affirmatively
25 that they want it," it won't happen, right?  So here

Page 316

1 through an exchange."
2         Okay.  So at least here in the frequently asked
3 questions, they're talking about a vote, right?
4     A.  Again, in the context of accepting an
5 affiliation with a points program and going to a
6 points-based program, that would have required a vote.
7     Q.  But you don't believe that happened?
8     A.  We did not do that.
9     Q.  All right.
10         (Exhibit 1282 previously marked for
11     identification produced to the witness.)
12 BY MR. FERGUSON:
13     Q.  Let me show you what's been marked Exhibit 1282
14 (handing).  1282, there is a letter being drafted to
15 Mr. and Mrs. XXX in September.  It's no longer July.  You
16 see that someone has corrected that.  And it's no longer
17 being sent by the board in conjunction with Executive
18 Leadership at RCDC.  Do you see that?
19     A.  I do.
20     Q.  And if you look -- it's now a shorter letter,
21 and in the second -- sorry, the third paragraph, it talks
22 about, "The sole purpose of this survey vote is to decide
23 whether the Aspen members will be able to exchange a week
24 of their reserved allocated time into the MVCD exchange
25 program."

Page 315

1 they're saying a vote and a majority, they're back to
2 that.
3     A.  In this draft letter, that's what it says.
4         MR. MARX:  Object to the form of the question.
5         MR. SHEA:  Matt, just so you know, by our
6     calculation, 25 minutes left for the seven hours.
7         MS. LIVINGSTON:  Until 5:25?
8         MR. SHEA:  No, 5:35.  I told them --
9         MS. LIVINGSTON:  Okay.
10         THE WITNESS:  And what time will that be?
11         MR. SHEA:  5:35, and then you can go.
12         THE WITNESS:  Jessica, can you please ask
13     someone to stay until 6:00 so someone can lock up the
14     office.
15         (There was a discussion off the record.)
16 BY MR. FERGUSON:
17     Q.  In October of 2013, Mr. Marsden went off; is
18 that right?
19     A.  Yes.
20     Q.  Okay.  And who replaced him?
21     A.  That would be Joel Alper.
22         MR. SHEA:  Are you sure it wasn't --
23         THE WITNESS:  I think you're right.  Bob Harris,
24     forgive me.
25         MR. FERGUSON:  Thank you.

Page 317

80 (Pages 314 - 317)

Randal Mercer - October 24, 2017

1      THE WITNESS:  Bob Harris replaced Mr. Marsden.
2      (Exhibit 1313 previously marked for
3   identification produced to the witness.)
4   BY MR. FERGUSON:
5      Q.   Let me show you Exhibit 1313 (handing).
6      A.   Thank you.
7      Q.   So Exhibit 1313 is an email that starts on
8   December 5th from Neveloff to you.  He's wishing you and
9   Mrs. -- I know your wife doesn't have your exact last
10  name, but Debbie, are well.  He said, "We received an
11  email from MVCI and the ability of Aspen owners to swap.
12  I intend to respond to the poll, but I think it's
13  appropriate for the board to write to the members to raise
14  concerns as soon as possible before they take the poll."
15      So Mr. Neveloff is telling you he has concerns
16  about what ultimately went out, right?
17      A.   That's his opinion, yes.
18      Q.   And you said, "I thought the connection was
19  pretty clear regarding the collaborative effort of the
20  board on this one.  If it didn't ring loud enough, I will
21  circle back.  Always available for a call."
22      And then he said to you, "Randy, there was no --
23  he didn't say Randy, but Mr. Mercer.  I suspect he calls
24  you Randy -- "there was no discussion as to the negatives
25  that interests our members swap will be used by hordes of
                                              Page 318

1   timeshare owners that are likely to come for shorter
2   stays, meaning wear and tear and clogging up the pipeline
3   for members who want shorter stays.  Also that the
4   redemption value points may change.  Plus others."
5      So he was expressing those concerns to you at
6   the time this letter went out, final letter went out, to
7   the membership.
8      A.   Okay.
9      Q.   Right?
10      A.   He is expressing his concerns.
11      Q.   And you put -- you sent that on ultimately to
12  Mr. Oliver, who said, "Jay only remembers the past and is
13  missing the point of this.  It's one week in and one week
14  out.  You want to give up a great week, great, a Marriott
15  guy may take it.  The occupancy doesn't change."
16      But as we sit here today, we're not exactly
17  sure, from your testimony, whether or not that week can be
18  bifurcated, split -- or split into more than weekend
19  increments among Marriott Vacation Club people?
20      A.   But that's my impression.
21      Q.   But they do -- that it doesn't happen?
22      A.   My impression's one week in, one week out.
23      (Sotto voce discussion among plaintiffs'
24  counsel.)
25
                                              Page 319

1   BY MR. FERGUSON:
2      Q.   What is that impression from?
3      A.   Just conversations over time.  I'm not sure.
4   You have all the documents, so I'm not sure.
5      Q.   Let me show you some documents here that were
6   produced by Morrow & Company, Nicole Verrechia.
7      On Exhibit 1313, before I move to these Morrow
8   documents, you'll see that Mr. Neveloff said to you, "I
9   didn't get that from letter.  That's my point.  The board
10  should be describing both sides of the issue, not just the
11  editing that MVCI wants.  Really!"
12      Do you recall that he was actually expressing
13  concerns about the survey that went out and its -- and how
14  it was worded and whether or not it told both sides of the
15  story from his perspective?
16      A.   It appears that he had questions.
17      Q.   Okay.
18      (Exhibit 1314 previously marked for
19  identification produced to the witness.)
20  BY MR. FERGUSON:
21      Q.   Exhibit 1314 (handing).
22      A.   Thank you.
23      Q.   This is a Morrow & Company document, I'll
24  represent to you.
25      A.   Can you please define what this means, "Produced
                                              Page 320

1   in Native"?
2      MR. REISER, JR.:  It means it's produced as a
3   spreadsheet.
4      THE WITNESS:  Okay.  Thank you.
5   BY MR. FERGUSON:
6      Q.   It's just a technical term.
7      A.   Yes, it is.
8      Q.   On 12/5/13 is the first response from a
9   Ms. Jennifer Colson, and she says, "I'm voting no."
10      Have you ever seen what your members filled
11  out -- the very few members that voted -- have you ever
12  seen what they filled out when they answered this survey?
13      A.   No, sir.
14      Q.   To this day you haven't seen these responses?
15      A.   No, sir.
16      Q.   Okay.  So you'll see that after Ms. Colson voted
17  against, there's a fellow -- or a trust named
18  Pitchford/McCabe.  It says, "For those who purchased very
19  early on, could you provide additional information on how
20  our ownership is different?  This clarity would help in
21  these kinds of discussions.  Thank you."
22      So this person is asking a question about what's
23  going on, but they marked him as a "For."
24      Did you ever see the actual ballot and whether
25  or not this person put down an "F," or "For"?
                                              Page 321

                                              81 (Pages 318 - 321)

Randal Mercer - October 24, 2017

1   A.  No, sir.
2   Q.  If you look on page 3, it's actually page 4 of
3   1314, there's a Ms. Hillarie Bass, and she says, "Would
4   the exchange be limited to one week per year out of four?
5   If not, will we be allowed to give up our shoulder week
6   for this exchange?  Thanks."  So she asked a question,
7   then they marked her as a "For."  Did you ever see the
8   actual ballot of whether that person, in fact, marked
9   "For"?
10  A.  No, sir.
11  Q.  On page --
12  A.  And where do you see the "For?"  Forgive me.
13  Q.  Oh, the "F."  I'm sorry.
14  A.  Okay.  Great.  Thank you.
15  Q.  "F" is for, "A" is against, at least that's how
16  it was put down on these sheets.
17  A.  Okay.
18  Q.  If you look on page 6 of Exhibit 1314, you'll
19  see that Mr. Schneider said, "Depends on how many points
20  you get for exchange."  And they put him down as a "For."
21  Do you see that?
22  A.  As an "F."
23  Q.  As an "F."
24  A.  Okay.
25  Q.  Do you know why they put him down as an "F"?
                                                  Page 322

1   Ritz-Carlton, which I bought ten years ago.  How do I know
2   how luxurious these properties are on the Marriott
3   umbrella?  I do like" -- and then it cuts off.  And they
4   put her down as an "F."  Do you know why they put her down
5   as an "F"?
6   A.  No.
7       (Exhibit 1316 previously marked for
8       identification produced to the witness.)
9   BY MR. FERGUSON:
10  Q.  Exhibit 1316 (handing).  That's a document
11  that's assembled from -- it looks from -- I'm sorry,
12  that's wrong.  I got that wrong.  That exhibit's done
13  wrong.  Something's wrong somehow.
14      Just look at the last page of Exhibit 1316.
15  We'll fix it later, they don't go together, but I'll have
16  to do it this way.
17      It's from a Joel Alper on the 6th, "Will you
18  look for your draft this morning.  Joel."  And it says --
19  someone says -- Randy Mercer says, "Been getting feedback
20  on the survey and am finding time for return calls to
21  members.  Total of six.  Spoke to Stephanie and there are
22  about 60 responses, and half for and half against."
23      So is it fair to state that you were generally
24  monitoring what was going on at least early December?
25  A.  Is it fair to say what, sir?
                                                  Page 324

1   A.  No, sir.  It probably means for, for and
2   against, F and A.
3   Q.  And you wanted to get a glimpse of what people
4   were thinking, and you today on -- what year are we in --
5   2017 is the first time you saw what your members were
6   saying on this survey?
7   A.  I've never seen this.
8   Q.  So you really didn't care what people thought,
9   you wanted to get this affiliation pushed through with
10  Marriott, right?
11  A.  That's totally wrong.
12  Q.  Well, if you wanted to get a glimpse and you
13  spoke about that throughout the day, why didn't you read
14  what people were saying?
15  A.  I wanted to get the numeric results of the
16  survey.
17  Q.  And sitting here today, do you know whether they
18  were fairly tallied by Morrow?
19  A.  I believe they were.
20  Q.  You'll see in the next to last page, page 8,
21  David Perry and Mrs. Mary O'Brien, there she is.  She
22  talks about a couple of places around the world, luxury
23  townhomes, "Italy, Ireland would be wonderful."  And she
24  says, "I'm concerned that the Marriott program is a step
25  down from the luxury I expected from the caliber of
                                                  Page 323

1   Q.  You were monitoring the vote or the survey.
2   A.  Oh, I'm sure I was.  I'm sure I was asking
3   Stephanie, "How are the votes?"
4   Q.  And you said you had a communication with Jay
5   Neveloff regarding the survey letter.  "He thinks a few
6   paragraphs stating in simple layman terms how the board
7   was involved in this issue and our position."
8       And you said, "I agree.  I will knock out a few
9   paragraphs and get them to you for comment.  Stephanie
10  said if I get her memo to her by noon, they can get the
11  email blast out tomorrow."
12      So Mr. Neveloff was suggesting that you put in
13  the board's position on this vote, right?
14  A.  He suggested that on the email, Exhibit 1313,
15  that you -- you've given us earlier.
16  Q.  Yeah, yeah, the pros and cons.
17  A.  Yeah.
18  Q.  Yeah.  Do you know whether you sent that out?
19  A.  No, I don't.  I don't even know when the survey
20  was sent out.
21  Q.  Well --
22  A.  Do you?
23  Q.  Yeah, it's December 5th, I believe.
24  A.  Okay.
25  Q.  And you can see the first vote on December 4th
                                                  Page 325

82 (Pages 322 - 325)

Randal Mercer - October 24, 2017

1  or 5th.
2      A.  Okay.  So the vote was sent out the same day Jay
3  sent me the email, and out it went.
4      Q.  Well, this suggests by the time you were talking
5  to the recipient of this email, I guess Joel, that there
6  had already been 60 responses and that Neveloff was
7  telling you that you should have given it to people, in
8  layman's terms, how you thought the pros and cons --
9      A.  Also on December 5th, yes.
10     MR. SHEA:  Do you gentlemen know the total run
11  time?
12     MR. FERGUSON:  What time is it, Dan?
13     MR. SHEA:  5:24.
14     MR. HANLON:  I have to calculate it.
15     MR. FERGUSON:  Is there a reason you want to
16  calculate that now, or --
17     MR. SHEA:  Go ahead.  You were just taking a
18  break, so --
19     MR. FERGUSON:  Okay.
20     MR. SHEA:  -- I didn't want to interrupt you.  I
21  was just asking them.  Because I calculate the seven
22  hours has probably already run, and I don't want to
23  cut you short of your seven hours.
24     MR. FERGUSON:  I kind of go by her, but -- I
25  mean, I thought we had agreement to go tomorrow, and
                                              Page 326

1  I thought we had agreement to go to 5:35 here, so --
2      MR. SHEA:  We don't have any agreement to go
3  tomorrow.  We never had an agreement to go beyond
4  seven hours.  So seven hours is specified in the
5  scheduling order.
6      MR. FERGUSON:  Very well.
7      MR. REISER:  For the record, I'm going to say
8  that there was an agreement made to us to go
9  tomorrow, and we were relying on that agreement all
10  day today in asking our questions.
11     MR. FERGUSON:  Let's talk about this later.  We
12  have a disagreement.  We have a disagreement.  It's
13  okay.  We'll get over it.
14     THE VIDEOGRAPHER:  We are approximately five
15  minutes past seven hours of run time.
16     MR. FERGUSON:  You will hear me out the door at
17  5:35.  Does that give you enough time?
18     MR. SHEA:  Yes.
19     THE WITNESS:  Thank you.
20     MR. FERGUSON:  All right.
21     (Exhibit 1380 previously marked for
22  identification produced to the witness.)
23  BY MR. FERGUSON:
24     Q.  So this is -- jumping ahead, you had enlisted
25  Mike Marino a second time to assist in connection with the
                                              Page 327

1  drafting of the exchange agreement?
2      A.  Mm-hmm.
3      Q.  And if you look at 12- -- sorry, 1383, it has a
4  memorandum of understanding between the Lion & -- it had
5  said Marriott, I guess, the Lion & Crown Travel company,
6  and Aspen Highlands Condominium Association.
7          So this is a red line of the draft of the
8  agreement that you ultimately signed sometime later in
9  April, correct?
10     A.  It is a draft of that agreement, yes.
11     THE VIDEOGRAPHER:  Mr. Ferguson, your mic,
12  please.
13     MR. FERGUSON:  Oh, sorry.
14     THE VIDEOGRAPHER:  Down on the floor, I believe.
15  BY MR. FERGUSON:
16     Q.  I'm going to go quickly through the recitals,
17  and then we'll let you get off to greener pastures.
18         It says, "Whereas, the Executive Board on behalf
19  of the Association" -- that would be you guys, you and
20  Marsden, and Harris now, and Oliver, and I guess Schneider
21  -- "previously met with representatives of" -- and it
22  doesn't say MVCD anymore, it says, "the Ritz-Carlton
23  Destination Club on several occasions to discuss the
24  potential opportunity for members of the association to
25  participate," and then it took that out, and it says,
                                              Page 328

1  "voluntarily participate in the exchange program in the
2  Marriott Vacation Club through the Lion & Crown Exchange
3  program,"
4          So the recitals are being massaged, as lawyers
5  sometimes say, with some wordsmithing by, I take it, Egolf
6  and Marino going back and forth; is that right?
7      A.  Yeah.
8      Q.  Okay.  And it says in the second "Whereas"
9  paragraph, "The parties agreed that a survey of members
10  should be conducted to determine the interest of," and it
11  used to say, "a majority of association members and
12  participating," and it now says, "agreed that a survey of
13  the members should be conducted to determine the interest
14  of members to voluntarily participate."
15         So it no longer -- someone took -- someone had
16  in there the concept of majority, and that was taken out,
17  right?
18     A.  There is a strike-through, yes.
19     Q.  And what was agreed to, because you told your
20  members, and in fact, I think you were somewhat proud of
21  telling them, you had agreed that there would be a vote of
22  a majority of the members, right?  You had told your folks
23  that?
24     A.  If we were to transition to a partially
25  points-based program by the club, the developer putting
                                              Page 329

                                      83 (Pages 326 - 329)

Randal Mercer - October 24, 2017

1 their units into a trust, not a one week-one out
2 situation.
3          (Sotto voce discussion among plaintiffs'
4     counsel.)
5 BY MR. FERGUSON:
6     Q.  And then it says, "Whereas, a majority of
7 association members voted," that's taken out.  Because
8 they didn't vote, did they?  Some people filled out a
9 survey, right?
10    A.  Mm-hmm.
11    Q.  Is that right?
12    A.  That is correct.
13    Q.  Okay.  "Who responded to" -- "make" take out,
14 "the survey responded affirmatively for the MVCD exchange
15 opportunity for those individuals voluntarily enrolled in
16 the program."
17         As you sit here today, you're telling me that
18 today's the first time you saw what your members said in
19 connection with the survey that was sent out?
20    A.  Yes.
21    Q.  Okay.  Now, would you look at Exhibit 1253 on
22 your screen.
23    MR. REISER:  1353.
24 BY MR. FERGUSON:
25    Q.  1353.  And that's February 2, 2014, a couple of
Page 330

1 paragraph four, and it says, "The parties," that being
2 Lion & Crown Travel program, which is the Marriott entity,
3 "the parties acknowledge that the survey resulted in the
4 majority of association members electing," and that's
5 taken out to "a majority of members who responded to the
6 survey desiring to have the opportunity to participate."
7         So what happened was, you promised a vote, you
8 didn't give it to them, you didn't give it to the majority
9 of the people, you got about 70 people that filled out
10 these forms, and based upon that, you believe you had a
11 glimpse and you went ahead and approved and ultimately
12 signed as the president a memorandum of understanding
13 between the Lion & Crown Travel company and Aspen
14 Highlands to affiliate and allow the members to place into
15 an exchange program their interest so points people from
16 the Marriott Vacation Club could utilize your hotel,
17 right?
18    A.  Please keep in mind that the word "survey" is in
19 there and "vote" is not in that same paragraph.
20    Q.  Yeah, I know.  They took it out.  They took the
21 word "vote" out a few times.
22    A.  So this isn't a first draft?
23    Q.  There's probably a few drafts.
24    A.  Okay.
25    MR. FERGUSON:  I have nothing further for you,
Page 332

1 weeks before this red line was generated, and it's from
2 Jay just to you.  And it says, "Honestly, Randy, I don't
3 believe that the communication sent to the members came
4 remotely close to represent" -- sorry, "to presenting the
5 pros and cons.  Therefore, whatever response is received,
6 I have no idea what proportion of the members responded or
7 whether the vote was close or not.  Cannot possibly --
8 possibly form a basis for reliance.  It also appears that
9 not only will member inventory be up for grabs by
10 timeshare owners, but I assume MVCI inventory as well."
11        And he didn't know what that status was.  But he
12 was telling you that he was very concerned about -- again,
13 about what had gone out, right?
14    A.  That was his opinion, yes.
15    Q.  And you disagreed with that opinion, because you
16 had Mr. Marino out there in the field with his deep
17 contact with Marriott, Ms. Egolf, negotiating the document
18 we see in 1383 that ended up the document you signed in
19 later --
20    A.  Keep in mind that a lot of these Marriott
21 documents start out as an in-the-can type of document and
22 have to be adjusted as they go along anyway, a lot of them
23 are very similar.
24    Q.  If you go to page 2 of Exhibit 1383, it's that
25 same draft document red lined, you'll see there's a
Page 331

1 sir.  We'll take it up with the judge whether or not
2 I can finish it, because you can tell I was
3 scrambling here at the end.  But I do thank you for
4 your time.
5     THE VIDEOGRAPHER:  Are we in adjournment?  Is
6 there a continuance tomorrow?
7     MR. FERGUSON:  Just we had a brief discussion as
8 to whether or not we were able to finish this
9 deposition, and we've agreed to disagree about that,
10 and we'll take it up, if we have to.  Maybe we'll
11 accomplish some other things.
12     THE VIDEOGRAPHER:  We're off the record at
13 5:32 p.m.  This concludes today's testimony given by
14 Randy Mercer.
15     Total number of media units was six and will be
16 retained by Veritext.  Thank you.
17     (The deposition concluded -- 5:32 p.m.)
18
19
20          * * * * *
21
22
23
24
25
Page 333

Veritext Legal Solutions
866 299-5127

Randal Mercer - October 24, 2017

```
 1  RE   : RCHFU v. MARRIOTT
 2  DEPO OF: RANDAL MERCER
 3  TAKEN : October 24, 2017
 4
 5          EXCEPT FOR ANY CORRECTIONS
 6          MADE ON THE ERRATA SHEET BY
 7          ME, I CERTIFY THIS IS A TRUE
 8          AND ACCURATE TRANSCRIPT.
 9          FURTHER DEPONENT SAYETH NOT.
10
11          _____
12          RANDAL MERCER
13
14  STATE OF FLORIDA    )
15                      ) ss:
16  COUNTY OF LEE       )
17          Sworn and subscribed to before me this
18  _____ day of _____, 2017.
19  PERSONALLY KNOWN _____ or I.D. _____
20
21          _____
22          Notary Public in and for the
23          State of Florida at Large.
24  My commission expires:
25
                                        Page 334
```

```
 1          CERTIFICATE OF COURT REPORTER
 2
 3  STATE OF FLORIDA    )
 4  COUNTY OF LEE       )
 5
 6      I, YVONNE CORRIGAN, Registered Professional Reporter,
 7  Certified Realtime Reporter, certify that I was authorized
 8  to and did stenographically report the foregoing
 9  deposition of RANDAL MERCER, the witness herein on October
10  24, 2017; that a review of the transcript was requested;
11  that the foregoing pages numbered 1 through 333 inclusive
12  is a true and complete record of my stenographic notes.
13      I FURTHER certify that I am not a relative, employee,
14  attorney, or counsel of any of the parties, nor am I a
15  relative or employee of any of the parties' attorney or
16  counsel connected with the action, nor am I financially
17  interested in the action.
18      Dated this 31st day of October, 2017.
19
20
21
22
23      Yvonne Corrigan
24      YVONNE CORRIGAN, RPR, CRR
25
                                        Page 335
```

85 (Pages 334 - 335)

Randal Mercer - October 24, 2017

**[& - 1161]**

| & |
|---|
| **&**  7:6,9,12 8:6,13 |
| 8:16 19:24 29:1 |
| 64:20 82:12 87:1 |
| 87:14,16,17,20 |
| 88:3 93:3,5 98:4,9 |
| 98:14,20 99:8 |
| 104:21 106:4 |
| 118:10 122:4 |
| 123:5 129:3,15 |
| 133:4 134:2 |
| 149:24 150:7 |
| 151:20 152:7 |
| 165:18 194:9,16 |
| 196:13 205:1 |
| 208:19,21 210:10 |
| 212:17 231:15 |
| 233:21 234:19 |
| 235:2,6 236:2 |
| 238:15 268:9 |
| 291:15 295:10 |
| 313:20 320:6,23 |
| 328:4,5 329:2 |
| 332:2,13 |

| 0 |
|---|
| **0005686**  56:15 |
| **004**  67:25 |
| **01**  91:7 |
| **01301**  1:3 9:10 |
| **04**  71:4 |
| **05**  267:24 |
| **07932**  2:19 |
| **08**  60:5,9 |
| **09**  60:9 |

| 1 |
|---|
| **1**  1:25 130:18 |
| 132:16 139:8 |
| 183:15 220:18 |
| 244:10 255:22 |
| 312:2 314:16 |

335:11
**1/12th**  58:18
108:15 112:12
116:1 119:11
161:3,10
**1/16/13**  6:8
**10**  3:4 60:10 89:17
153:20
**10/13/12**  4:17
**10/16/12**  4:17
**10/22/12**  4:20
**10/25/12**  4:22
**100**  3:13 86:22
92:19,20 93:1
106:6
**102**  9:13
**1020**  3:8 55:20,21
56:6 57:25 61:13
67:24 68:23 75:3
97:18
**1020-01**  56:8
**1021**  3:9 72:8,11
**1023**  3:11 78:9,12
78:13 97:18 99:15
99:15
**1026**  3:12 97:13,16
99:15
**103**  1:17
**1030**  114:17
**1034**  3:13 100:9,12
100:14 107:14
109:17
**1035**  3:15 110:15
110:18
**1042**  3:17 110:25
111:3
**1043**  3:19 114:14
114:18
**1053**  3:22 126:8,11
127:9 130:19
132:16

**1058**  3:24 134:18
135:2,2,6
**1060**  4:4 143:7
145:8
**1061**  4:3 137:19,22
139:9 140:18
**1064**  4:6 149:2,5
**1066**  4:7 153:17,20
**1072**  4:10 155:18
155:23 164:20
**1075**  4:11 156:16
156:19,21
**109**  58:5
**1097**  4:15 165:11
165:13,15
**10:14**  69:9,10
**10:27**  69:11,13
**10th**  80:24
**11**  73:12 284:23
**11,000**  119:9
**11-5**  5:13,16
**11/10/12**  4:24
**11/21/12**  5:15
**11/28/12**  5:12,15
**11/29/12**  5:25 6:5
**11/4/12**  5:3
**11/5**  217:16
**11/5/12**  5:4,8
**11/6/12**  5:5
**11/7/12**  5:6
**11/8/12**  5:10
**110**  3:15,17
**1103**  4:19 178:6,10
178:13 183:16
**1104**  4:13 162:19
164:5
**1108**  4:16 166:23
**1110**  4:17 168:24
169:2,2 177:16
**1113**  4:20 188:1,3

**1114**  4:22 189:4,7
189:7
**1116**  4:24 193:19
194:5 195:12
**1117**  5:3 198:3,6
199:20
**1118**  5:4 201:21,24
**1120**  5:5 204:3,21
**1122**  5:6 208:3,6
**1124**  5:8 209:18,21
212:9
**1126**  5:10 216:16
216:19 217:10
**113**  188:1
**1130**  5:12 217:11
217:14
**1132**  243:9,9
**1135**  5:14 219:9,12
**1137**  5:15 220:6,14
220:18
**114**  3:19
**1145**  5:17 222:1,5
**1146**  5:19 227:4,8
**1150**  5:21 229:20
229:23 231:11
254:24
**1151**  5:23 237:18
237:21 240:16
243:1 244:24
246:25
**1152**  6:3 242:22,25
243:13,18,22,25
244:5,7
**1155**  6:6 247:21,25
247:25
**1157**  6:8 249:10,15
**1158**  6:10 249:10
249:15,18 251:10
**1161**  6:12 259:19
259:23

Page 1