# EXHIBIT - M

```
 1    RCHFU, LLC,  et al.,
 2         Plaintiffs,        United States District Court
                              District of Colorado
 3    v.                      No.  1:16-cv-09390
 4
      MARRIOTT VACATIONS WORLDWIDE
 5    CORPORATION, et al.,
           Defendants,
 6    _____/
      REISER, et al.,
 7         Plaintiffs,
                              Eastern District of California
 8    v.                      No. 2:16-cv-00237-MCE-CKD
 9
      MARRIOTT VACATIONS WORLDWIDE
10    CORPORATION, et al,
           Defendants,
11    _____/
      PETRICK, et al.,
12         Plaintiffs,
13                            San Francisco County
      vs.                     No. CGC-15-54897
14
      MARRIOTT VACATION WORLDWIDE
15    CORPORATION, et al.,
16         Defendants.
      _____/
17
18         VIDEOTAPED DEPOSITION OF STEPHANIE SOBECK
19    taken at 450 South Orange Avenue, Suite 650,
      Orlando, Florida, commencing between 9:11 a.m.
20    - 6:20 p.m. on Thursday November 16, 2017
21    before Lisa Gerlach, Court Reporter, Notary
22    Public in and for the State of Florida at Large.
23
24    Job No. 2733702
25    Pages 1 - 374
```

Page 1

**Page 2**

```
 1   Appearances:
 2
 3   Counsel for the Plaintiffs:
 4      BY: MATTHEW C. FERGUSON, ESQUIRE
 5      The Matthew C. Ferguson Law Firm, PC
 6      119 South Spring, Suite 201
 7      Aspen, CO 81611
 8      matt@matthewfergusonlaw.com
 9
10      BY: MICHAEL J. REISER, SR., ESQUIRE
11         ISABELLA MARTINEZ, ESQUIRE
12         MATTHEW REISER, ESQUIRE
13      Reiser Law, PC
14      1475 Broadway, Suite 300
15      Walnut Creek, CA 94596
16      michael@reiserlaw.com
17      isabella@reiserlaw.com
18      matthew@reiserlaw.com
19
20      BY: TYLER MEADE, ESQUIRE
21      The Meade Firm, PC
22      1816 Fifth Street
23      Berkeley, CA 94710
24      tyler@meadefirm.com
25
```

**Page 4**

```
 1   Appearances:
 2
 3   For the Defendant Aspen Highlands
 4   Condominium Association:
 5
 6      BY: JESSICA BLACK LIVINGSTON, ESQUIRE
 7      Hogan Lovells
 8      1601 Wewatta Street, Suite 900
 9      Denver, CO 80202
10      jessica.livingston@hoganlovells.com
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1   Appearances:
 2
 3   For the Defendant Marriott:
 4
 5      BY: PHILIP SELLINGER, ESQUIRE
 6         IAN S. MARX, ESQUIRE
 7      Greenberg Traurig, LLP
 8      500 Campus Drive, Suite 400
 9      Florham Park, NJ 07932-0677
10      sellingerp@gtlaw.com
11      marxi@gtlaw.com
12
13      BY: DOUGLAS A. KELLY, ESQUIRE
14      Marriott Vacations Worldwide
15      6649 Westwood Boulevard
16      Orlando, FL 32821
17      douglas.kelly@mvwc.com
18
19
20
21
22
23
24
25
```

**Page 5**

```
 1               INDEX
 2   WITNESS        EXAMINATION              PAGE
 3   Stephanie Sobeck
 4      Direct by Mr. Reiser          6
 5      Direct by Mr. Ferguson        161
 6
 7
 8
 9
10            EXHIBITS
11   EXHIBIT      DESCRIPTION              PAGE
12   Exhibit 1701   E-Mail Chain, RCDC Sample
13         00841 through 00849           95
14
15
16
17
18
19
20
21
22
23
24
25
```

2 (Pages 2 - 5)

**Page 6**

1    THE VIDEOGRAPHER:  Good morning.  We are
2  going on the record at 9:11 a.m. on November
3  16, 2017.  Please note that the microphones
4  are sensitive and may pick up whispering,
5  private conversations, and cellular
6  interference.  Please turn off all cell
7  phones or place them away from the
8  microphones, as they may interfere with the
9  deposition audio.  Recording will continue
10  until all parties agree to go off the record.
11    This is media unit one of the
12  video-recorded deposition of Stephanie Sobeck
13  taken by counsel for plaintiff.  This
14  deposition includes three cases.  The first
15  is RCHFU, LLC, vs. Marriott Vacations
16  Worldwide Corp., et al., Case Number
17  1:16-cv-01301-PAB-GPG, and is held in the
18  District of Colorado.  Next is Reiser vs.
19  Marriott Vacations Worldwide Corp., et al,
20  Case Number 2:16-cv-00237-MCE-CKD, and is
21  held in the State of California.  And the
22  third is Petrick vs. Marriott Vacations
23  Worldwide Corp., et al., San Francisco
24  County, Case Number CGC-15-54897, and is held
25  in San Francisco, California.

**Page 7**

1    This deposition is being held at
2  Greenberg Traurig, located at 450 South
3  Orange Avenue, Orlando, Florida 32801.  My
4  name is Mike Gerlach.  I'm the videographer.
5  The court reporter is Lisa Gerlach; both of
6  Veritext Legal Solutions.
7    Counsel, at this time, will state their
8  appearance and affiliations for the record.
9    MR. REISER:  My name is Mike Reiser.  I
10  represent the plaintiffs in all three cases.
11    MR. MEADE:  Tyler Meade, for plaintiffs
12  in all three cases.
13    MR. REISER:  With me is Isabella
14  Martinez, from my office, and Matthew Reiser,
15  also from my office, is joining us shortly.
16  Matthew Ferguson is here on the Aspen case
17  for plaintiffs.
18    MS. LIVINGSTON:  Jessica Livingston, of
19  Hogan Lovells, on behalf of the condominium
20  association in the Aspen case.
21    MR. MARX:  Ian Marx, from Greenberg
22  Traurig, representing the Marriott
23  defendants.
24    MR. SELLINGER:  Philip Sellinger,
25  Greenberg Traurig, for the Marriott

**Page 8**

1  defendants as well.
2    THE VIDEOGRAPHER:  Will the court
3  reporter please swear in the witness?
4  THEREUPON,
5    STEPHANIE SOBECK,
6    A Witness herein, acknowledged after having
7  been duly sworn and testified upon her oath as
8  follows:
9    THE WITNESS:  I do.
10    DIRECT EXAMINATION
11  BY MR. REISER:
12    Q.  Good morning, Ms. Sobeck.  I introduced
13  myself prior to the deposition.  I'm Mike Reiser and I
14  represent, as you just heard, the plaintiffs in three
15  lawsuits involving the clubs at Aspen, San Francisco,
16  and Tahoe.
17    Do you realize you're here to give a
18  deposition today across all three cases?
19    A.  Yes, sir.
20    Q.  Just really quickly, how long did you spend
21  preparing for this deposition today?
22    A.  Probably nine or ten hours.
23    Q.  I assume you met with counsel during that
24  time?
25    A.  I did.

**Page 9**

1    Q.  How many days did you meet for across those
2  nine to ten hours?
3    A.  Three.
4    Q.  Three days?
5    A.  Three.
6    Q.  When was the last time you met?
7    A.  Just a few minutes ago.
8    Q.  How many documents, approximately, did you
9  review in preparation for today's deposition?
10    A.  I don't know.  A hundred.
11    Q.  Have you had a deposition before -- given
12  one?
13    A.  Yes.
14    Q.  How many times?
15    A.  One.  Oh, two.  I'm sorry.  Two.
16    Q.  Two prior depositions?
17    A.  Yes, sir.
18    Q.  Were those both in relation to your job at
19  Marriott?
20    A.  Yes.
21    Q.  When was the last one?
22    A.  Two years ago.
23    Q.  Do you remember the case name?
24    A.  It was the Hoyt case.
25    Q.  What about the other deposition?

3 (Pages 6 - 9)

1    A.  The other one was years ago.  Probably 10 or
2  12 years ago.  It was in New Jersey.
3        MR. SELLINGER:  Mike, excuse me for
4    interrupting you for a second.  I assume
5    we've got, for all depositions, the same
6    agreements about all objections being
7    preserved as to relevance, materiality,
8    et cetera, among the three cases.
9        MR. REISER:  Yeah.  Just the form
10    objections need to be stated; other than
11    that, preserved.
12  BY MR. REISER:
13    Q.  So when did you start with Marriott
14  Vacations?
15    A.  I'm going on 19 years, so '99 -- 1999.
16    Q.  What was your first position at Marriott?
17    A.  Management associate was actually the title
18  of it.
19    Q.  Was that for Marriott International?
20  Obviously, yes?
21    A.  It was for Marriott International.  I worked
22  for the Marriott Vacation Club brand or group down in
23  Orlando.
24    Q.  So you've always been based in Orlando in the
25  last 19 years?

Page 10

1    A.  I came right from that to MVC, so, '99, I
2  graduated.
3    Q.  Did Professor Dev teach you a class on
4  branding in the hospitality world?
5    A.  He did.
6    Q.  Was The Ritz discussed in that class?
7    A.  Probably.  The Ritz brand was out there.  I
8  don't remember specifically.
9    Q.  Have you ever seen a YouTube video of him
10  talking about The Ritz brand in the last several
11  years?
12    A.  No.
13    Q.  Have you ever come across Professor Dev as an
14  expert in any opposite cases?
15    A.  No.
16    Q.  So what is process reengineering?  What was
17  that?  You mentioned you had that job responsibility.
18    A.  Yeah.  There was -- the company decided they
19  wanted to kind of restructure how some of the work
20  happened, so we went into one of the departments,
21  which was, at the time -- we called it -- it ended up
22  being new products market, but it was construction,
23  and it looked at how the process would work in
24  development products.
25    Q.  And then you said you got into the

Page 12

1    A.  I've worked for Marriott Vacation Club, but I
2  worked at a couple different projects, so I moved
3  around.  But, yes, I've always been with Marriott
4  Vacation Club specifically.
5    Q.  Okay.  So how long were you in that position?
6    A.  About a year.
7    Q.  And what was your next position?
8    A.  My next position was, I did some process
9  reengineering.  I did that for about a year.  Then I
10  was -- then I worked in the development team.
11    Q.  So what's your college degree in?
12    A.  I have an undergrad in finance and I have an
13  MBA.
14    Q.  Where was the finance degree?
15    A.  Where was it?
16    Q.  Yes.
17    A.  Albright College in Reading, Pennsylvania.
18    Q.  What about the MBA?
19    A.  It's a master's in hospitality.  MBA from
20  Cornell.
21    Q.  Do you know a Professor Chekitan Dev?
22    A.  I do.
23    Q.  He was your professor?
24    A.  Uh-huh.
25    Q.  When did you graduate from the MBA program?

Page 11

1  development side?
2    A.  And then I went and worked in -- project
3  delivery was the new department after that.
4    Q.  What year did you start working in project
5  delivery on the developer side or the development
6  side?
7    A.  Probably 2001.
8    Q.  That seems to be right around the time the
9  Ritz-branded fractions were starting up.  Yes?
10    A.  Yes, I think so.  Yeah, probably 2001, 2002.
11  I didn't work on them, though.
12    Q.  You didn't work on any of those clubs?
13    A.  No.
14    Q.  What was your role in 2001?
15    A.  I was working on Europe, so I was the project
16  delivery leader for Europe, so we had a few projects
17  in Europe that were in different phases of
18  construction, so I just worked with the teams to get
19  them delivered.
20    Q.  When did you start working on the Ritz
21  product?
22    A.  I didn't start on the Ritz product until I
23  actually was transferred down to a project in Jupiter
24  as the project -- I was the project director there.
25  That was -- had to be probably 12 years ago.

Page 13

4 (Pages 10 - 13)

1    Q. Was that during the time that Jupiter was
2  getting built?
3    A. No. It was -- there were some -- the final
4  residences were being built, but the fractional --
5  most of the fractional was built. There was a last
6  stage that was -- actually, I take it back. There was
7  a last phase. There was a last few buildings that
8  were going up at the time.
9    Q. So 12 years ago would be right around 2005?
10    A. Yeah, 2005, 2006.
11    Q. Before 2005, 2006, were your entire job
12  responsibilities at Marriott Vacation Club
13  International involved in the Marriott Vacation Club
14  side of things?
15    A. Yes.
16    Q. So the first involvement with any Ritz
17  product was in 2005, 2006?
18    A. Yes.
19    Q. So what was your responsibility as the
20  project director at Jupiter?
21    A. I was responsible for the sales operation.
22    Q. For the fractionals or the residences?
23    A. Both.
24    Q. Did you sell that property out during your
25  tenure there?

Page 14

1    No speaking objections. Okay?
2    MR. SELLINGER: My objection was even
3  after she had answered. I didn't get it in
4  quickly enough. So I don't think you can
5  really object on that basis.
6    MR. REISER: I'm objecting to the
7  coaching, not the objection, by the way.
8    MR. SELLINGER: My point is, one can't
9  coach if the objection is put on the record
10  after the answer.
11    MR. REISER: I'm not going to argue with
12  you, but it can influence the answers going
13  forward. It's the rule, Philip. So, please,
14  abide by the rule. In Colorado, there's no
15  speaking objections.
16    MR. SELLINGER: I'm abiding by the rules.
17  Let's go forward.
18  BY MR. REISER:
19    Q. At the time of the sales in Jupiter, there
20  was no indication whatsoever that the Ritz Club would
21  ever be affiliated with the Marriott Vacation Club at
22  that timeframe. True?
23    A. It wasn't discussed.
24    Q. So after Jupiter, what did you do next?
25    A. I came back to Orlando, and my next job was

Page 16

1    A. Close. We still have a couple fractions even
2  today.
3    Q. Did you sell at any other Ritz Club?
4    A. No.
5    Q. Did you oversee sales personnel at Jupiter?
6    A. Yes.
7    Q. You didn't do the direct selling yourself?
8    A. No.
9    Q. Do you recollect ever having any mention of
10  the Marriott Vacation Club's potential affiliation
11  with any of the Jupiter buyers during the sales
12  process?
13    A. No.
14    MR. SELLINGER: Objection to form. She
15  testified she wasn't talking to buyers.
16    MR. REISER: Philip, let's not get into
17  an argument again about the objections. If
18  you can just object to the form?
19    MR. SELLINGER: I know. I just think you
20  should be more careful.
21    MR. REISER: Well, I mean, I know you do.
22  Just object to the form because that's the
23  proper way to do it. If the judge sustains
24  your objection at trial, then I lose and you
25  win. Okay? That's the way it works.

Page 15

1  regional sales and marketing for the Ritz-Carlton.
2    Q. What year did you come back to Orlando?
3    A. 2008 -- I want to say '7 or '8.
4    Q. So your regional sales responsibility for The
5  Ritz-Carlton Destination Club, did you oversee all the
6  different clubs -- the sales at all those different
7  clubs?
8    A. I worked with the teams, but I wasn't
9  directly responsible for them.
10    Q. What was your responsibility as regional
11  sales and marketing director for The Ritz-Carlton
12  Destination Clubs?
13    A. I supported the vice president of regional
14  marketing and sales.
15    Q. Who was that?
16    A. Robert Calhoun.
17    Q. Robert who?
18    A. Robert Calhoun.
19    Q. When you say you supported him, how did you
20  support him?
21    A. Did projects for him, you know -- worked on
22  different projects throughout the -- throughout the
23  different sales operations that we had.
24    Q. Can you give me an idea of one of the
25  projects you worked on?

Page 17

5 (Pages 14 - 17)

| | |
|---|---|
| 1    A. Yeah. One of the projects was, I worked on | 1    Q. What about the management agreement -- the |
| 2  Abaco. Abaco fractional products was rolling out, so | 2  Ritz-Carlton management agreement -- did you |
| 3  I assisted with that. | 3  familiarize yourself with that? |
| 4    Q. Any other projects you can fill us in on? | 4    A. Yes. |
| 5    A. (No response.) | 5    Q. And you were able to answer any questions |
| 6    Q. Let me ask you -- did you work on the | 6  that any potential purchaser of Jupiter would have on |
| 7  Portfolio product? | 7  the governing documents? |
| 8    A. Very peripherally. No. | 8      MR. SELLINGER: Objection to form. |
| 9    Q. Were you regional sales and marketing | 9    A. No. I wouldn't have been the one that it |
| 10  director during the time the Portfolio product was | 10  would come to. |
| 11  announced? | 11  BY MR. REISER: |
| 12    A. I believe I was in asset management when it | 12    Q. If a customer had -- a potential customer had |
| 13  was actually announced. | 13  any questions on the governing documents, who would |
| 14    Q. When did you go to asset management? | 14  they speak to while you were the sales director? |
| 15    A. Shortly after -- the regional sales and | 15    A. We would've -- it depends on what the |
| 16  marketing was probably less than a year, and I | 16  question was. |
| 17  transitioned over into asset management. | 17    Q. How about whether the -- how the affiliation |
| 18    Q. So you were there probably in the '07-'08 | 18  agreement worked -- who would you refer that person |
| 19  era? | 19  to? |
| 20    A. Yeah. | 20    A. I would want to understand what they were |
| 21    Q. Is it true that the Portfolio product was | 21  asking. |
| 22  rolled out in 2009; do you recall? | 22    Q. What if they were asking whether Cobalt had |
| 23    A. I don't remember the specific date. | 23  the power to affiliate Marriott Vacation Clubs to the |
| 24    Q. When you say you were peripherally involved | 24  club? |
| 25  in it, what was your involvement? | 25    A. I never had that question come up. |
| Page 18 | Page 20 |

| | |
|---|---|
| 1    A. I knew it was happening. I knew it was | 1    Q. Is it your understanding, Ms. Sobeck, that |
| 2  occurring, but there was another group that was | 2  the Cobalt Travel Company has the sole discretion to |
| 3  specifically working on the -- on it. | 3  decide whichever clubs are affiliated with The |
| 4    Q. All right. In your roles in sales at either | 4  Ritz-Carlton Destination Club under the terms of the |
| 5  Jupiter or as regional sales and management director, | 5  affiliation agreement? |
| 6  did you undertake to familiarize yourself with the | 6    A. It is. |
| 7  governing documents at the various clubs? | 7    Q. Is it your understanding that the |
| 8    A. In the roles -- sorry. Can you repeat the | 8  Ritz-Carlton Development Company was to have no |
| 9  question? | 9  participation or consent to the decision of Cobalt in |
| 10    Q. Yeah. In your role as -- let's start with | 10  that regard? |
| 11  Jupiter. You were in charge of the sales operations; | 11      MR. SELLINGER: Objection to form. |
| 12  right? | 12    A. I guess I don't understand your question. |
| 13    A. Uh-huh. | 13  There's two different companies. |
| 14    Q. Did you familiarize yourself with the | 14  BY MR. REISER: |
| 15  governing documents at Jupiter in relation to your new | 15    Q. Right. Ritz-Carlton Development Company is a |
| 16  position as sales manager? | 16  company; yes? Do you have any title within the |
| 17    A. I would've been familiar with the governing | 17  Ritz-Carlton Development Company, or have you ever? |
| 18  documents. | 18    A. Do I have any title? |
| 19    Q. And that would include the declaration of the | 19    Q. Are you an officer? |
| 20  club? | 20    A. No, I'm not. |
| 21    A. Yes. | 21    Q. Have you ever worked for the Ritz-Carlton |
| 22    Q. Did you also familiarize yourself with the | 22  Development Company? |
| 23  affiliation agreement that pertained to the clubs? | 23    A. I've done duties that are within the |
| 24    A. Not specifically, but it is one of the | 24  Ritz-Carlton Development Company's responsibilities. |
| 25  governing documents. | 25    Q. Who signs your paycheck? |
| Page 19 | Page 21 |

6 (Pages 18 - 21)

| | Page 22 | | Page 24 |
|---|---|---|---|

**Page 22**

1    A.  MORI.
2    Q.  Has that been the case since you started with
3  Marriott?
4    A.  Yes.  I think in New Jersey -- I think it may
5  have gone to another entity, but it's always been --
6  since I've been in Orlando, it's always been MORI.
7    Q.  And MORI is the parent company for the
8  Ritz-Carlton Development Company.  True?
9    A.  Yes.
10    Q.  And is MORI also the parent company for the
11  Ritz-Carlton Management Company?
12    A.  Yes.
13    Q.  That's true?
14    A.  Yes.
15    Q.  Is MORI the parent company for Cobalt?
16    A.  Yes.
17    Q.  Is MORI the parent company for Lion & Crown?
18    A.  You're saying parent company.  I'm saying, my
19  understanding of the structure is, yes, that MORI --
20  all of those entities are part of MORI.
21    Q.  Including Cobalt?
22    A.  Yes.
23    Q.  What about Lion & Crown?
24    A.  Lion & Crown is affiliated specifically with
25  Cobalt.

**Page 24**

1  timeframe -- which would've been -- I'm guessing, but
2  maybe 2009-2010 timeframe.
3    Q.  So Lion & Crown -- strike that.  What was
4  your position in the company at the time you first
5  heard of Lion & Crown?
6    A.  I would've been in asset management.
7    Q.  What was your understanding of why Lion &
8  Crown was formed?
9    A.  It was to do affiliations with other
10  entities; bring in opportunities for the members,
11  vacation opportunities.
12    Q.  And the first one they did was Abercrombie &
13  Kent.  True?
14    A.  I believe that was -- yeah -- that's the
15  first one.  I remember ER was right around the same
16  time too, I believe.
17    Q.  Is that Executive Resorts or --
18    A.  Exclusive Resorts.
19    Q.  Are either of those two affiliations still
20  around?
21    A.  Exclusive Resorts is.  Abercrombie & Kent is
22  not.
23    Q.  Why did that one drop out of the affiliation?
24    A.  It ended up not being a beneficial
25  relationship for one side or the other.

**Page 23**

1    Q.  What is that affiliation between Lion & Crown
2  and Cobalt?
3    A.  I don't understand your question.
4    Q.  Well, it's your words.  You just said that
5  Lion & Crown and Cobalt are affiliated.  What is your
6  understanding of that affiliation?
7    A.  I think there is an agreement between the
8  two.  And if there is -- I mean, in essence, Cobalt
9  is -- the Cobalt Travel Company is affiliated
10  specifically with each of the associations; and then
11  Lion & Crown is actually affiliated or related
12  specifically with Cobalt, not directly with the
13  associations.
14    Q.  Who owns Lion & Crown?
15    A.  MORI.
16    Q.  When was Lion & Crown formed?
17    A.  I don't know the exact date.
18    Q.  I'm not looking for the exact date.  Can you
19  give me the year?
20    A.  No.  I'm sorry.  I really can't.  It's more
21  of a legal question.
22    Q.  When was the first time you heard of Lion &
23  Crown?
24    A.  When we were initially working -- I guess it
25  was probably, like, Abercrombie & Kent -- that

**Page 25**

1    Q.  It wasn't very beneficial for Abercrombie.
2  True?
3    A.  Excuse me?
4    Q.  It wasn't very beneficial for Abercrombie?
5    A.  Yeah.  I believe it was a supply-and-demand
6  issue that existed.  We had too much demand and they
7  did not have enough supply.
8    Q.  Because that was a very small club with few
9  members.  True?
10    A.  Abercrombie & Kent?
11    Q.  Yes.
12    A.  Yeah -- I don't know how many members they
13  had, but it was smaller than we were.
14    Q.  Do you remember how many properties they had?
15    A.  No.
16    Q.  Can you give me an order of magnitude on the
17  properties?
18    A.  I really can't.
19    Q.  Was it 50, was it 10?  You don't know?
20    A.  I don't know.
21    Q.  You didn't have anything to do with that
22  affiliation?
23    A.  I knew it was out there, but, no, I didn't
24  have anything to do with it.
25    Q.  And you say you went into asset management in

7 (Pages 22 - 25)

1  what year?
2      A. It was around -- around 2009.
3      Q. Who do you report to in asset management?
4      A. I report to Lee Cunningham.
5      Q. What are your responsibilities as an asset
6  manager?
7      A. I'm responsible for the overall projects,
8  working with all the different disciplines within the
9  company to make sure we get the best outcome for each
10 of the different projects and the associations.
11     Q. So are you looking out for the best interests
12 of the developer, via MORI, or are you looking out for
13 the best interests of the association? Or what is
14 your -- who is your stakeholder in terms of your
15 responsibilities in overall project management?
16     MR. SELLINGER: Objection to form.
17     A. The -- it's different. Marriott Vacation
18 Club and Ritz-Carlton are different.
19     So in Marriott Vacation Club, it's -- we
20 focus more, I would say, on developer issues; but
21 there's plenty of times where we work on -- through
22 association challenges or issues with the sites that
23 there aren't specific developer issues. We really
24 look at the best interests, the best business
25 decisions for the overall property.

Page 26

1  BY MR. REISER:
2      Q. From the perspective of MORI?
3      MR. SELLINGER: Objection to form --
4  withdrawn.
5      A. Yes, with respect to MORI.
6  BY MR. REISER:
7      Q. What about the Ritz-Carlton Club; what's your
8  perspective there? Are you looking for the best
9  interest of MORI or --
10     A. Ritz-Carlton Club -- the asset managers were
11 responsible for the duties of the Ritz-Carlton
12 Management Company, and then we also do other things
13 as well.
14     Q. So you just said, as an asset manager, you're
15 responsible for the duties of the Ritz-Carlton
16 Management Company; right?
17     A. We represent the Ritz-Carlton Management
18 Company to the associations.
19     Q. Are there any employees dedicated to the
20 Ritz-Carlton Management Company?
21     A. Well, there's several of us who work with the
22 Ritz-Carlton Management -- through the Ritz-Carlton
23 Management Company. We dedicate time to it.
24     Q. I'm not sure what that means, work through
25 the Ritz-Carlton Management Company. Are you a

Page 27

1  consultant or --
2      A. We dedicate time -- no -- it's a part of
3  MORI, so it's -- I work for MORI, and that's one of
4  the things -- one of the entities that I work on --
5  dedicate time to.
6      Q. When you say you represent the Ritz-Carlton
7  Management Company to the associations, what does that
8  mean?
9      A. So the Ritz-Carlton Management Company is
10 actually the management company that holds the
11 agreement with the associations. So we are the ones
12 at board meetings and so on who represent the
13 Management Company to those associations. It's a
14 different structure than in the Marriott.
15     Q. But you don't have any, like -- any
16 responsibilities to the associations in your role, do
17 you?
18     A. Sure.
19     Q. What are they?
20     A. Ritz-Carlton Management Company is
21 responsible for billing and collecting.
22     Q. I'm not talking about Ritz-Carlton Management
23 Company. I'm talking about you as the asset manager,
24 if you wouldn't mind. I'm just asking, like, what
25 your role as the asset manager would be --

Page 28

1      A. I represent the Ritz-Carlton Management
2  Company for the association. I'm sorry. I don't...
3      Q. So when you say you represent the
4  Ritz-Carlton Management Company, what do you
5  personally do, if anything, involving the Ritz-Carlton
6  Management Company and their interactions with the
7  homeowners associations?
8      A. So, as an example, at the board meetings,
9  we -- I, because I'm the representative there -- get
10 the billing and collections timelines approved, work
11 through the bills with the onsite team, get them
12 approved. We work through member services with the
13 program manager. If there's things going on that the
14 association's interested in understanding more about,
15 we get the information from the program manager.
16 Those type of things.
17     Q. So you personally, as an executive, you
18 handle the billing and collection matters?
19     A. No, but I'm the one sitting there with the
20 board --
21     Q. I understand you're listening to the board at
22 the board meetings. I'm trying to say, who at the
23 Ritz-Carlton Management Company physically does the
24 billing and collections?
25     A. We have an outside company called Concord who

Page 29

8 (Pages 26 - 29)

1 does the billing and collections.
2    Q.  Okay.  Who at the Ritz-Carlton Management
3 Company actually discusses -- handles the billing with
4 the -- is it just the same company, Concord?
5    A.  Concord does billing, yes, for the members.
6    Q.  So who at the Ritz-Carlton Management Company
7 handles any issues with member services?
8    A.  Our member services team handles -- they
9 manage the member services organization.
10    Q.  So it sounds to me like you show up at the
11 board meetings and report back to somebody about
12 issues that occur at the board meeting, but you
13 personally don't have any hands-on responsibilities
14 for the Ritz-Carlton Management Company?
15        MR. SELLINGER:  Objection to form.
16 BY MR. REISER:
17    Q.  Is that true?
18    A.  I manage -- it's the management company.  So
19 do I actually go out and send bills?  No.  I make sure
20 that the bills get sent.  I work with our team to make
21 sure they get sent.  I make sure that the association
22 and the board is comfortable with how they're being
23 sent, when they're being sent.  So --
24 BY MR. REISER:
25    Q.  When you say the bills --

Page 30

1        MR. SELLINGER:  Hold on a minute.  Are
2    you done with your answer?
3    A.  Yeah.  That's just an example.
4 BY MR. REISER:
5    Q.  When you say the bills -- you make sure the
6 bills get sent -- are those the maintenance fee bills?
7    A.  Maintenance fee bills.
8    Q.  Any other bills you're talking about?
9    A.  Well, if there's special assessments, we do
10 those too.
11    Q.  So you're basically responsible for making
12 sure that Concord bills annually for the maintenance
13 fees?
14    A.  Yes.  That's one of the things we do.
15    Q.  And any special assessments, you make sure
16 that Concord bills for the special assessments?
17    A.  We do.
18    Q.  Okay.  And what else do you do?  I'm really
19 trying to get an idea of any hands-on activities that
20 you do, rather than make sure that the subcontractor
21 at Concord gets bills out or member services
22 independently handles member services.
23    A.  My job as the vice president of asset
24 management, I direct people to do things.  So I give
25 direction, help understand what the members'

Page 31

1 challenges are, what the board's challenges, the
2 association's challenges, and I work to find
3 solutions.
4        And, you know, through things like billing
5 and collections, association governance, those type of
6 items, those are things that the Ritz-Carlton
7 Management Company is responsible for.
8    Q.  As far as you know, does the Ritz-Carlton
9 Management Company have any employees?
10    A.  I don't believe so.
11    Q.  As far as you know, does Cobalt Travel
12 Company have any employees?
13    A.  I don't believe so.
14    Q.  As far as you know, does the Ritz-Carlton
15 Development Company have any employees?
16    A.  I don't know that.  I don't believe so.
17    Q.  So to the extent that any of those entities
18 are performing any functions related to the club,
19 they're all staffed by employees of MORI.  Is that
20 true?
21        MR. SELLINGER:  Objection to form.
22    A.  We're all -- the associates from MORI, like
23 myself, would work in -- dedicate time in each of
24 those capacities, yes.
25 BY MR. REISER:

Page 32

1    Q.  And MORI is owned a hundred percent by
2 Marriott Vacation Club Worldwide.  True?
3    A.  Yes.
4    Q.  So Marriott Vacation Worldwide employees are
5 the only ones doing work for Ritz-Carlton Management
6 Company?
7    A.  Marriott Vacation Worldwide employees are
8 doing the --
9    Q.  The --
10    THE REPORTER:  I didn't get the rest of
11    that.  Marriott Vacation Worldwide employees
12    are doing --
13    THE WITNESS:  Are the only ones who are
14    working for the Ritz-Carlton Management
15    Company.
16 BY MR. REISER:
17    Q.  Okay.  And Marriott Vacation Worldwide
18 Corporation's employees are the only ones working for
19 Ritz-Carlton Development Company.  True?
20    A.  That is correct.
21    Q.  And Marriott Vacation Worldwide Corporation
22 employees are the only ones doing any working or
23 working for Cobalt.  True?
24    A.  That is correct.  I guess I'll just clarify
25 because we're talking about an extended period of

Page 33

9 (Pages 30 - 33)

1 time. There was a time where our company was spun
2 off. We used to be part of Marriott International,
3 and then your questions would've been all MI
4 associates. Now it's all MVW associates after 2011.
5    Q. Got you. Thank you for that clarification.
6 I know the spinoff happened in November of '11; right?
7    A. Uh-huh.
8    Q. Before that, MORI was a division of Marriott
9 International; true?
10   A. Uh-huh.
11   Q. I'm sorry. You have to say "yes" for the
12 record.
13   A. Yes. Sorry. I apologize.
14   Q. And since the spinoff, MORI is now a division
15 of Marriott Vacation Worldwide. True?
16   A. MORI is a division -- correct, yes.
17   Q. Just to clarify, Ritz-Carlton Development
18 Company has no employees either, other than --
19   A. I don't believe so.
20   Q. Are you an officer of any of the entities
21 that I just mentioned?
22   A. I don't know, actually. I don't believe I
23 am.
24   Q. Okay. There was an amendment to the
25 affiliation agreement in Aspen that was signed in
Page 34

1    A. I don't remember.
2    Q. I know you and Lee Cunningham had a board
3 meeting in April of 2013. True?
4    A. Yes.
5    Q. When you signed the second amendment to the
6 affiliation, was that a different time that you were
7 in Aspen with Lee Cunningham and --
8    A. I don't believe --
9       MR. SELLINGER: Hold on. Objection to
10 form.
11   A. I don't believe he was at that meeting.
12 You're talking about two different meetings.
13 BY MR. REISER:
14   Q. Yeah. Let me actually show you the -- this
15 has been previously marked as Exhibit 1434. Let me
16 show the witness.
17   A. I'm not sure. I'm sorry. I'm really not
18 sure if this is the one. I was thinking we were at
19 the meeting -- because there was one where we were
20 actually at the meeting. He wanted it signed -- that
21 Randy wanted it signed there. I apologize. I don't
22 remember if it was this one or not.
23      This was actually the -- oh, yeah -- because
24 this was in conjunction with the amendment to the
25 management agreement, so this was different.
Page 36

1 October of 2014, and Lee Cunningham signed on behalf
2 of Cobalt, and Lee Cunningham signed on behalf of the
3 Ritz-Carlton Development Company, and then Randy
4 Mercer signed on behalf of the homeowners association,
5 and you actually signed on behalf of the Ritz-Carlton
6 Management Company.
7      Why were you signing the amendment to the
8 affiliation agreement on behalf of Ritz-Carlton
9 Management Company?
10   A. I was actually signing because I was there at
11 the meeting, and Randy wanted it signed at the
12 meeting. I think we actually did, like, a power of
13 attorney. I think I actually had the right to do
14 that, because, again, we were actually -- I was in
15 Aspen sitting at the meeting, and he wanted to have it
16 signed right there.
17   Q. So that amendment occurred while you guys
18 were in Aspen?
19   A. The amendment?
20   Q. Yeah. The second amendment to the
21 affiliation agreement.
22   A. Yeah, I believe it happened at a board
23 meeting. I believe it was executed at a board
24 meeting, I should say.
25   Q. But that was in October of 2014. Is that --
Page 35

1    Q. So this was in conjunction with -- the title
2 of this is "Second Amendment to Ritz-Carlton Club
3 Membership Program Affiliation Agreement."
4    A. Right.
5    Q. Are you saying that the management agreement
6 was also signed at some meeting in or around October
7 of 2014?
8    A. The management agreement wasn't. There was
9 actually an amendment to it that was done around the
10 same time.
11   Q. But that's separate from this document.
12 True?
13   A. It is. The discussions were, yes.
14   Q. Were you around when the signatures for the
15 amendment to the management agreement and the
16 amendment to the affiliation agreement were signed?
17      MR. SELLINGER: Objection to form.
18 BY MR. REISER:
19   Q. Let me rephrase. Were you at the meeting
20 with the signatories to the Ritz-Carlton management
21 agreement that was signed in 2014?
22   A. Sorry. I just stated, I don't remember if
23 this is the one that we were actually sitting in the
24 same room together or not. I apologize. I don't
25 remember.
Page 37

10 (Pages 34 - 37)

1    Q. Okay. Regardless of this document, though --
2    A. Isn't this what you're talking about, though?
3    Q. Yeah, but I'm changing gears right now.
4    A. Oh, sorry.
5    Q. Regardless of this document, I'm just trying
6  to figure out -- I know you were at a meeting in April
7  of 2013 --
8    A. Yes.
9    Q. -- with Lee Cunningham and the board. True?
10   A. Correct.
11   Q. Do you remember another meeting at all in
12 October 2014, roughly 18 months later, in Aspen with
13 Randy Mercer and folks when there was an amendment to
14 the management agreement signed?
15   A. Yes -- yes. And that's the one -- I don't
16 believe Lee was at that meeting. I thought you were
17 trying to insinuate he was there. I think it was just
18 me at that meeting.
19   Q. Okay. Fair enough. So back to 1434, which
20 you have in front of you. This, as you see, was dated
21 October 11, 2014.
22       Your signature is on page 3 of this amendment
23 to the affiliation agreement. True?
24   A. Yes.
25   Q. And you see your signature on page 3; you

1    A. Janet Cope. That's Lee's administrative
2  assistant.
3    Q. She witnessed your signature. True?
4    A. Yeah.
5    Q. She witnessed both of Lee Cunningham's
6  signatures?
7    A. Yes.
8    Q. And the second gentleman, who's that?
9    A. That's a woman. That's Dawn Stevenson.
10   Q. She's the second witness to all -- to your
11 signature. True?
12   A. Yes, she was.
13   Q. And she was also the witness to both Lee
14 Cunningham's signatures on the document. True?
15   A. Yes.
16   Q. So does this help refresh your recollection
17 as to whether you were in the same room with Lee
18 Cunningham when this document was signed?
19   A. I'm sorry. It actually doesn't, because this
20 is -- I would've been with Randy -- if it was signed
21 at a later time. I don't believe Lee was at this
22 meeting, but he may have been. I just don't recall
23 it.
24   Q. So it's your testimony, Ms. Sobeck, that it
25 was Randy Mercer who actually signed while you were

1  signed on behalf of the Ritz-Carlton Management
2  Company, LLC?
3    A. I do.
4    Q. That is your signature there. True?
5    A. It is.
6    Q. And can you explain why you were signing on
7  behalf of the Ritz-Carlton Management Company at this
8  meeting?
9    A. Yes. It would've been what I had said, that
10 we were at the meeting together, and Randy would have
11 wanted it signed at the meeting.
12   Q. So this document also has the signatures of
13 Lee Cunningham, as the vice president of the Cobalt
14 Travel Company, and Lee Cunningham, as the vice
15 president of the developer -- the Ritz-Carlton
16 Development Company.
17       Does this indicate to you or help you
18 remember whether he was at this meeting as well?
19   A. The only thing that helps me, that he wasn't
20 at the meeting, is the witnesses are different. So I
21 would have -- you know -- I signed for Randy, which
22 would make me think that I was in the meeting. Randy
23 and Mike Marino were in the meeting.
24   Q. It looks like the witnesses were exactly the
25 same for you and Mr. Cunningham to me. Janet Cox?

1  out there in Aspen in October of 2014?
2    A. That's my recollection, yes.
3    Q. Why would you take directions from Randy
4  Mercer in that regard?
5       MR. SELLINGER: Objection to form.
6    A. I wasn't taking direction from him. If he
7  had asked me to work -- to have the document signed
8  there, I certainly would've been happy to do that for
9  him.
10 BY MR. REISER:
11   Q. Why couldn't Lee Cunningham sign this at the
12 same time he signed these other ones; do you know?
13   A. Because he --
14       MR. SELLINGER: Objection to form.
15   A. I don't believe he was at the meeting.
16 BY MR. REISER:
17   Q. Even though all the witnesses were the same
18 for both your signatures and his, you don't believe
19 you were in the same room?
20   A. I know that Janet Cope and Dawn Stevenson did
21 not come to the meeting in Aspen.
22   Q. So does this indicate to you that you
23 actually signed in Orlando then?
24   A. I may have.
25   Q. It's unlikely, if they weren't in Aspen, that

1  you signed this in Aspen when they were witnessing it.
2  True?
3      A.  I really don't remember.  I may have actually
4  signed it and it didn't get witnessed until later.
5      Q.  That defeats the purpose of the witness,
6  doesn't it?
7          MR. SELLINGER:  Objection to form.
8      A.  Randy was -- I was witnessing with Randy.
9  Randy was sitting in the meeting with the other board
10  members.  Yeah -- I'm sorry.  I don't remember when it
11  was witnessed.  I don't.
12  BY MR. REISER:
13      Q.  Okay.  At any rate, it's true, is it not,
14  that it was actually Lee Cunningham that was the vice
15  president of the Ritz-Carlton Management Company at
16  the time he signed this?  True?
17      A.  I don't know what his title was in the
18  Ritz-Carlton Management Company.
19      Q.  I'm going to show you the affiliation
20  agreement that this document amended.  It's been
21  previously marked as Exhibit 1003.
22          Can you turn to paragraph 7.2a?
23      A.  Yes.
24      Q.  Let me ask you a preliminary question about
25  this document.  Is it true that you testified in

Page 42

1  relation to this document in the Hoyt case?
2      A.  Yeah, I would have talked about the
3  affiliation agreement as well.  Not with Aspen.
4      Q.  Why not?  That club was actually involved in
5  Hoyt, wasn't it?
6      A.  Oh, was it?  I thought it was Bachelor Gulch.
7      Q.  It was both.
8      A.  All right.
9      Q.  So this was the subject of your testimony in
10  that deposition as well, the affiliation agreement; do
11  you recall?
12      A.  The affiliation was discussed, yes.
13      Q.  And that litigation, isn't it true that
14  Marriott Vacation Club took the position that the
15  program manager, Cobalt, had the sole discretion to
16  affiliate other locations with Ritz-Carlton
17  Development Company?  I'm sorry.  Let me repeat that.
18          Isn't it true that, in the Hoyt case,
19  Marriott Vacation Club Worldwide took the position
20  that paragraph 7.2a gave the program manager, Cobalt,
21  the sole discretion to affiliate other membership
22  programs with The Ritz-Carlton Destination Club?
23      A.  I believe that's the case.
24      Q.  And you still believe that's the case, that
25  Cobalt is the sole decision maker in terms of other

Page 43

1  affiliations with the Ritz-Carlton Development Club?
2      A.  Cobalt has the sole discretion to, yes.
3      Q.  Now that we've established that, I want to
4  turn to the second sentence of this paragraph.  It
5  says, "Neither the developer, the member association,
6  nor the club manager shall be entitled to participate
7  in or consent to the program manager's decision in
8  regards to the affiliation."
9          You understood that that was the terms of
10  this affiliation agreement, did you not?
11      A.  Yes.
12      Q.  And did that mean to you that the developer,
13  Ritz-Carlton Development Company, could not
14  participate in or consent to the affiliation with
15  Marriott Vacation Club?
16      A.  The developer?
17      Q.  Yes.
18          MR. SELLINGER:  Objection to -- just one
19  minute.  Objection to form.
20      A.  The developer wouldn't have had the decision
21  to affiliate anything with...
22  BY MR. REISER:
23      Q.  But do you agree that the developer was not
24  entitled to participate or consent to the Cobalt
25  decision as to whether to affiliate Marriott Vacation

Page 44

1  Club with Ritz-Carlton Destination Club?
2      A.  Yes.  The developer wouldn't have had the
3  ability to consent to them being affiliated.
4      Q.  What about participate?  Do you agree that
5  this sentence precluded the developer from
6  participating in the program manager's decision to
7  affiliate?
8      A.  That's --
9          MR. SELLINGER:  Objection to form.
10      A.  That's -- I mean, it says participate.
11  BY MR. REISER:
12      Q.  So you would agree that they're not allowed
13  to participate in the decision of Cobalt.  True?
14          MR. SELLINGER:  Objection to form.
15      A.  I'm sorry.  I'm having a hard time with --
16  what do you mean?  I feel like you're asking me to
17  read the words and I do see the words, but, I guess...
18  BY MR. REISER:
19      Q.  This is your document drafted by Marriott
20  Vacation Club International, so they're your words,
21  actually --
22      A.  They're not my words, actually.
23      Q.  Your company's words.  True?
24      A.  The company's words, yes.
25      Q.  What do you think "participate" means here as

Page 45

12 (Pages 42 - 45)

1 the representative of Marriott Vacation Worldwide --
2 the asset manager for these clubs?
3     A.  Right.  I mean, I think participate would
4 mean it would be -- it would have the ability to
5 affiliate, and I do not believe the developer has any
6 rights to say what clubs or what other programs are
7 able to affiliate with --
8     Q.  And they wouldn't be able to consent either;
9 right?
10        MR. SELLINGER:  Objection to form.
11 BY MR. REISER:
12     Q.  They're precluded from consenting to any
13 affiliation --
14     A.  Yes.  If they didn't have the right to
15 affiliate them, they wouldn't be able to consent
16 either.
17     Q.  It's also true, under your affiliation
18 agreement -- meaning your company's affiliation
19 agreement, Marriott Vacation Club affiliation --
20 that the association, such as the Aspen homeowners
21 association headed by Randy Mercer -- he would not
22 have -- he should not -- he was not entitled to
23 participate and/or consent to any affiliation
24 decisions.  True?
25     A.  He didn't have the right to make an

Page 46

1 affiliation decision, yes.
2     Q.  And he wasn't entitled to participate and/or
3 consent.  True?
4     A.  He wouldn't have been able to make the
5 decision to affiliate or not, yes.
6     Q.  So your interpretation of participate or
7 consent is to make the decision?
8     A.  To make the decision to affiliate, yes.
9     Q.  And you would agree that the club manager,
10 Ritz-Carlton Management Company, did not have the
11 ability to -- or was not entitled to either
12 participate in or consent to the Cobalt decision to
13 affiliate.  True?
14     A.  Correct.  It was only Cobalt.
15     Q.  Okay.  What is your understanding of the
16 reason for that sentence, "Neither the developer,
17 members association, or club manager shall be entitled
18 to participate in or consent to program manager's
19 decision in regard to the affiliation"?
20     A.  That it was only --
21        MR. SELLINGER:  Objection to form.
22     A.  It was only Cobalt.  Cobalt had the ultimate
23 decision of determining who was going to be
24 affiliated, and these other entities or groups did
25 not.

Page 47

1 BY MR. REISER:
2     Q.  You were involved in the payment of
3 $1.4 million to the association down in St. Thomas in
4 order to influence the decision as to whether to
5 affiliate; were you not?
6     A.  I was not.
7     Q.  Do you know anything about that payment?
8     A.  I know about a $1.4 million payment, yes.
9     Q.  You had nothing to do with negotiating that?
10     A.  I did.
11     Q.  So who did you negotiate that payment with?
12     A.  I negotiated it with Lee and I negotiated it
13 with the board.
14     Q.  Who at the board?
15     A.  Specifically, with a couple of the board
16 members.
17     Q.  Who particularly?
18     A.  John Doyle and Tom Doyle.
19     Q.  Brothers or --
20     A.  No, they aren't.
21     Q.  So why did you pay the board or the
22 association, I should say -- strike that.  Let me
23 start over.
24        Why did Marriott Vacation Worldwide
25 Corporation pay the St. Thomas board $1.4 million?

Page 48

1        MR. MARX:  Just designate questions and
2 answers as confidential under the parties'
3 settlement agreement.
4        THE WITNESS:  Can I answer?
5        MR. MARX:  Of course.
6     A.  We paid it to -- well, it was in a discussion
7 of the bad debt issue that existed for the
8 association.
9 BY MR. REISER:
10     Q.  It was in connection to that, but why did you
11 pay it?
12     A.  Why did we pay it?  Because we were helping
13 the association work through their bad debt.
14     Q.  And it was conditioned upon the association
15 approving an amendment to the declaration that would
16 allow the affiliation.  True?
17     A.  Yes, it was.
18     Q.  So why did you think you needed the
19 association's participation or consent to that
20 affiliation?  Why were you paying them 1.4 million to
21 influence that decision?
22     A.  We weren't influencing --
23        MR. SELLINGER:  Hold on.  Objection to
24 form.
25     A.  We weren't paying to influence the decision.

Page 49

13 (Pages 46 - 49)

1  We were paying them to help them with their bad debt.
2  The only way we could help them with their bad debt
3  was to help take back some of the inventory that they
4  had that owners weren't paying for. The only way the
5  company could take back the inventory was to have
6  something to do with the inventory when we ultimately
7  owned it.
8      So all of those things were connected
9  together. There was no need to influence them.
10 BY MR. REISER:
11     Q. So your company took back inventory as part
12 of that $1.4 million payment?
13     A. Yes. That's the bad debt part. So the
14 owners -- there were a portion of owners who were not
15 paying, and they were sitting as bad debt for the
16 association for a period of time -- a long period of
17 time.
18     Unfortunately, in St. Thomas, it takes a long
19 time on inventory. Those owners that don't pay
20 become, in essence, a burden to the association. That
21 burden continued. It got bigger and bigger, and the
22 association was having challenges, so the company
23 stepped in and offered a solution to them to help them
24 through this because they couldn't figure another way
25 around it.

Page 50

1  foreclose on those prompts and take back the
2  fractionals in exchange for the unpaid debt. True?
3      A. Correct.
4      Q. Okay. So is it true that, for $1.4 million
5  in payment to the association, you took back
6  $6 million in inventory?
7      A. No.
8      Q. How much -- what inventory did you get back?
9      A. But the $6 million and 1.4 don't have
10 anything to do with each other. The 6 million is past
11 dues that people didn't pay. That had nothing to do
12 with the value of the inventory that you're bringing
13 back.
14     Q. I'm not saying it does, but I'm saying -- the
15 $6 million is what was owed to the association. True?
16     A. Correct.
17     Q. And if they had foreclosed on that, they
18 would've gotten back 100-plus units that were in
19 default. True?
20     A. Correct.
21     Q. And those hundred or so properties that they
22 would've gotten back, did Marriott Vacation Club get
23 those 100 or so properties in return for the $1.4
24 million?
25     A. They did over time, yes, but they were -- so,

Page 52

1      Q. So the association was owed roughly
2  $6 million in past debt based on -- you were involved
3  in the transaction. Do you remember the order of
4  magnitude -- around $6 million in past debt?
5      A. I don't remember the exact amount. You mean
6  the number of bad debt? It probably would've been
7  close to that. I think there was 134 delinquent
8  members that were included.
9      Q. So it was up to $6 million; right?
10     A. I don't remember. You're saying the 6
11 million. I don't remember. It was certainly a
12 large number.
13     Q. It was way more than 1.4 million at any rate.
14 True?
15     A. Right, but it's two different -- yes,
16 correct.
17     Q. Okay. So did Marriott Vacation Club get --
18 strike that. The bad debt that was owed, that was
19 owed to the association. True?
20     A. Yes.
21     Q. And that was for overdue dues. True?
22     A. Overdue maintenance fees?
23     Q. Overdue maintenance fees.
24     A. Correct.
25     Q. The remedy for the association was to

Page 51

1  in essence, we stepped into the association's shoes,
2  so that when they -- we would help them foreclose on
3  the inventory, and, in essence, get the inventory back
4  and they would have a paying member again, because
5  they didn't -- the association didn't -- getting the
6  inventory back was one thing, but then they had to do
7  something with the inventory.
8      Q. What I'm saying, Ms. Sobeck, is the
9  inventory we're talking about ultimately ended up on
10 Marriott Vacation Club's books. True?
11     A. Correct.
12     Q. For $1.4 million. True?
13     A. Yeah, for $1.4 million.
14     Q. And it was $6 million in debt?
15     A. It was $6 million. You're saying $6 million.
16 Yes, around there.
17     Q. Pretty good deal for Marriott?
18     A. No. I'm sorry. Again, the $6 million and
19 the $1.4 million are two separate things. $6 million
20 is not the value of the inventory. If the association
21 would have gotten those interests back, they wouldn't
22 have gotten $6 million with the inventory. That was
23 fees that were out there that were never going to be
24 paid -- chronically delinquent members.
25     Q. Well, how much was the inventory worth then?

Page 53

14 (Pages 50 - 53)

1  Did you ever do any calculations as to what each
2  inventory was worth?
3      Because it sounds to me, if there were
4  100 units it got back, and Marriott Vacation Club got
5  them for $1.4 million, they got them for about $11,400
6  apiece.
7      A. Quite frankly, we're still working on getting
8  some of them. We don't even have it all back yet.
9      Q. That's okay. I'm not asking about that.
10      I'm asking, is that true that, if you got 100
11  members back for $1.4 million, you got them at about
12  11 --
13      A. No.
14      Q. You have an MBA. I think you can do the
15  math --
16      A. I can do the math. Thank you. But we
17  actually have -- there's other dues that we're also
18  continuing to pay on those interests, so it's not just
19  1.4. We're continuing to pay maintenance fees after a
20  period of time on the inventory even if we don't own
21  it.
22      Q. I'm going to get to that in a minute, but I
23  want to close off this subject. It's true that the
24  average price of the 100 units or so you got back was
25  $11,400 --

Page 54

1  they come back on our books.
2      Q. Where are the records of that? They're in
3  the accounting of your company. True?
4      A. Uh-huh, yes.
5      Q. Do you know how much maintenance fees were
6  paid during the time period that you weren't obligated
7  to pay them, but you did?
8      A. Not off the top of my head. It's
9  rolling every year. Just like this year, we're going
10  to pay a whole other group. So of the 134 interests
11  that were part of that settlement, like I said, we're
12  continuing to try to get those interests back. We
13  have another payment that will be made shortly on -- I
14  think we still have 38 or 9 interests of that
15  settlement that we still don't have, and we'll make
16  another maintenance fee check for those.
17      Q. So the agreement was that you would pay them
18  $1.4 million, and, ultimately, upon foreclosure, you
19  would get those properties. True?
20      A. Upon foreclosure, yes.
21      Q. So it would be the HOA that would foreclose
22  and then they'd transfer them to you?
23      A. Correct.
24      Q. But during the time -- once they foreclosed
25  and they were transferred to you, you paid the

Page 56

1      MR. SELLINGER: Objection to form.
2  BY MR. REISER:
3      Q. -- per fractional approximately?
4      MR. SELLINGER: Objection to form.
5      A. No. Because there are maintenance fees that
6  we were also stepping in and paying after a certain
7  time.
8      So the $1.4 million was a point in time. As
9  we're buying things back, foreclosing on them, going
10  through the process, the company was stepping in and
11  paying the maintenance fees associated with the
12  interest.
13  BY MR. REISER:
14      Q. Of course they were, because they owned the
15  units at that point --
16      A. They didn't own --
17      Q. -- once they transferred back --
18      THE REPORTER: Wait.
19      A. We were doing it before that.
20  BY MR. REISER:
21      Q. Okay. At any rate, once you got the units
22  back into your books, it was appropriate for you to
23  pay the maintenance fees going forward. True?
24      A. Once we got it on our books, yes. We were
25  paying -- many of the interests we were paying before

Page 55

1  maintenance fees going forward?
2      A. Yes.
3      Q. During the time they weren't foreclosed, you
4  also paid the maintenance fees from the settlement
5  going forward. True?
6      A. Correct. That's what I'm saying. But that's
7  not the 1.4.
8      Q. When you say the settlement, was there a
9  lawsuit?
10      A. No.
11      Q. Why is it a settlement?
12      A. It's just the verbiage that I'm using. I
13  don't know if that's proper.
14      Q. There was no obligation for Marriott Vacation
15  Worldwide to pay that $1.4 million. True?
16      A. No, there was no obligation.
17      Q. And it was conditioned on the vote being a
18  favorable vote of the members to affiliate. True?
19      A. Yes, because we wouldn't have agreed to buy
20  all that inventory back if we didn't have someplace
21  to -- something to actually do with it once we had it
22  back.
23      Q. Okay. And that thing you were going to do
24  with it was place it in the NATO Trust and allow
25  Marriott Vacation Club members to use it. True?

Page 57

15 (Pages 54 - 57)

1    A. Yes, in the Marriott Vacation Club Trust. It
2  wasn't the NATO Trust.
3    Q. It's a different trust or is that the same
4  trust?
5    A. I don't know what --
6    Q. We've been calling it the NATO Trust --
7    A. Oh. MVC Trust.
8    THE REPORTER: You're talking over each
9  other.
10  BY MR. REISER:
11   Q. Would you agree that the member association
12  in Jupiter was participating in or consenting to the
13  program manager's decision as to whether to affiliate?
14   A. In Jupiter?
15   Q. Yeah.
16   A. You totally lost me. I'm sorry. I don't
17  understand.
18   Q. If you don't understand, you don't
19  understand. That's about as clear as I can get it.
20   A. Okay. Well, I don't understand.
21   Q. All right. Would you agree that the members
22  association participated in or consented to Cobalt's
23  decision to affiliate the St. Thomas Club with the
24  Marriott Vacation Club?
25   MR. SELLINGER: Objection to form.
Page 58

1  BY MR. REISER:
2    Q. Cobalt wouldn't affiliate unless the
3  declaration was changed so that the --
4    A. The company --
5    MR. SELLINGER: Hold on a minute. Finish
6  the question. Give me a chance to object and
7  then answer. Go ahead. I don't want to
8  interrupt you.
9    MR. REISER: Thank you. You know what?
10  I'm done with this line of questioning.
11   MR. MARX: We can end the confidential
12  designation in that case.
13   MR. REISER: I'm not agreeing that
14  anything is confidential at this point, but
15  we can think about that later. I'll have to
16  see your confidentiality agreement and
17  consider whether it's even binding on us.
18   MR. MARX: Understood, Mike. I just have
19  to preserve it. We can -- under the terms of
20  the order, it's been designated --
21   MR. REISER: Got you.
22  BY MR. REISER:
23   Q. Let me show you what has been previously
24  marked as exhibits.
25   You're aware, are you not, that the three
Page 60

1    A. Are we talking about Jupiter or St. Thomas?
2  You're jumping around.
3  BY MR. REISER:
4    Q. Did I say Jupiter? I'm sorry if I did.
5  Okay. Sorry about that.
6    Would you agree that the members association
7  at St. Thomas participated in and consented to the
8  Cobalt decision to affiliate with Marriott Vacation
9  Club?
10   A. Cobalt --
11   MR. SELLINGER: Objection to form.
12   A. -- had the ultimate decision to affiliate.
13  BY MR. REISER:
14   Q. Did they participate? Did the member
15  association participate in that decision?
16   A. My perception of this is that they are --
17  make the ultimate decision -- noted, they did not make
18  the ultimate decision. Cobalt made the ultimate
19  decision.
20   Q. Cobalt wouldn't do it unless they got
21  approval by the members. True?
22   MR. SELLINGER: Objection to form.
23   A. Cobalt wouldn't -- Cobalt -- I can't. I
24  don't -- you lost me there. You're saying Cobalt
25  wouldn't do it unless --
Page 59

1  clubs we're here on today -- Aspen, San Francisco, and
2  Tahoe -- all signed -- or their board --
3  representative of the board all signed an
4  acknowledgement of and joinder to affiliation
5  agreement between the Lion & Crown and Marriott
6  Resorts Travel Company?
7    A. I am.
8    Q. What is the Marriott Resorts Travel Company?
9    A. I actually don't know what the Marriott
10  Resorts Travel Company is.
11   Q. Did you have anything to do with preparing
12  these acknowledgement of and joinder to affiliation
13  agreement?
14   A. They're done by our law department.
15   Q. Let me show you Exhibit 1392.
16   By the way, is there a law firm that prepared
17  these acknowledgement of and joinders or is it
18  in-house?
19   A. I don't know.
20   Q. So when you say that you assume it was
21  prepared by lawyers, you don't know whether it was
22  in-house or a law firm?
23   A. No. Our law department would -- I don't know
24  if they outsource it or not.
25   Q. So what was the purpose of having the board
Page 61

16 (Pages 58 - 61)

1  sign an acknowledgement of and joinder to an
2  affiliation agreement?
3      A.  We were interested in the members' overall
4  thoughts about the program, if they were interested in
5  it or not.  We went through the boards to gather their
6  opinions on it.  This was the way for -- in essence,
7  for them to acknowledge or agree to move forward with
8  the affiliation.  But it's just an acknowledgement
9  that they agree with the actions that we're taking.
10     Q.  Who required them to sign this?
11         MR. SELLINGER:  Objection to form.
12 BY MR. REISER:
13     Q.  Who asked the club to sign this
14 acknowledgement of and joinder to affiliation
15 agreement?
16     A.  We were asking.  We were asking them to sign
17 it.
18     Q.  And you don't see this in any way violative
19 of section 7.2a of the affiliation agreement?
20     A.  No.  It's still ultimately our decision, but
21 we just wanted them to acknowledge that they had -- in
22 essence, we'd come up with a process to get the member
23 feedback.  Once we got it, they acknowledged that we
24 were moving forward with the affiliation.
25 BY MR. REISER:

Page 62

1      Q.  Did you have any involvement with the law
2  department in drafting this provision?
3      A.  I did not.
4      Q.  Who did?
5      A.  Who?
6      Q.  Who did from MORI?  Who was involved in
7  dealing with the law department to draft these
8  acknowledgement of and joinder to each members
9  association to sign on the affiliation?
10     A.  The law department drafted them.
11     Q.  Who on the business side was working with the
12 law department to get these drafted?
13     A.  I mean, it would've been me.  I was the one
14 who was working with our law department through the
15 whole process.  But because I was working with them
16 doesn't mean that I was actually drafting it.  They
17 were drafting it.
18     Q.  So did you ask them for a document that would
19 acknowledge the affiliation?
20     A.  Did I ask for it?  No.  They thought it would
21 be a good idea to do.
22     Q.  So they thought it would be a good idea?
23     A.  Uh-huh.
24     Q.  The law department?
25     A.  Yes.

Page 64

1      Q.  Why did you need their acknowledgement?
2          MR. SELLINGER:  Objection to form.
3      A.  I don't think we did.  We just thought it
4  would be good practice.
5  BY MR. REISER:
6      Q.  Despite the fact that the agreement says that
7  they have no power to consent, you require their
8  acknowledgement?
9          MR. SELLINGER:  Objection to form.
10     A.  They agreed to sign it.  I'm not sure what
11 you mean.
12 BY MR. REISER:
13     Q.  So they just agreed to sign it for just
14 gratuitous reasons.  It wasn't required, but you went
15 through the process of getting these drafted by law
16 firms and having them sign it?
17     A.  We thought it would be good for them to
18 acknowledge that they agreed we were moving forward.
19 It wasn't a requirement.
20     Q.  What does joinder mean?  It seems to me that
21 the title of this -- acknowledgement of and joinder to
22 the affiliation agreement.  Why did you have them sign
23 a joinder to the affiliation agreement?
24     A.  Again, I didn't draft it; so the intent of
25 joinder is more for the law department than me.

Page 63

1      Q.  So they came to you and said --
2          MR. SELLINGER:  Well, hold on a minute.
3  I just want to go on record.
4          In answering questions from Mr. Reiser,
5  please do not disclose communications between
6  yourself and the law department because that
7  would be privileged.
8          MR. REISER:  I think the privilege has
9  been waived, so I think I'm entitled to the
10 communications between you and the law
11 department.
12         So I know you're going to instruct her
13 not to answer.  I'm not suggesting you're
14 not.  But I believe there's a waiver of
15 privilege, so I would like to put it on the
16 record.
17 BY MR. REISER:
18     Q.  Who did you talk to at the law department
19 with regard to having the association sign the
20 acknowledgement and joinder?
21         MR. SELLINGER:  You can ask that
22 question.  But given your statement about the
23 privilege being waived, I'm required to make
24 a statement that, any time during the
25 depositions, at least of Mr. Cunningham and

Page 65

17 (Pages 62 - 65)

1   Ms. Sobeck that I've been involved in, I have
2   given instructions not to answer about
3   communications between counsel and business
4   folks.
5       So I've allowed -- because you're
6   entitled to ask why business folks take
7   certain actions, I've allowed you to ask what
8   was done after speaking to counsel, what was
9   done in reliance on counsel, et cetera.
10      But I have never authorized any
11  discussion of what happened with counsel, and
12  there's no -- I think you and Mr. Ferguson
13  asked a day or so ago, is there a reliance on
14  counsel's defense which might waive the
15  privilege by putting it at issue, and I was
16  very clear there is no reliance on counsel
17  defense. The defense is based on what
18  agreements say.
19      So there's certainly been no waiver, but
20  you can ask your questions one by one and
21  I'll assert instructions as appropriate.
22      MR. REISER: Fair enough.
23  BY MR. REISER:
24      Q. Who did you speak to in the law department
25  with regard to drafting these?

Page 66

1   A. Barbara Egolf.
2   Q. Anybody else?
3   A. Not specifically about the acknowledgement,
4   no.
5   Q. So it's your testimony that it was Barbara
6   Egolf who suggested that this acknowledgement and
7   joinder of affiliation agreement be signed by the
8   membership?
9       MR. SELLINGER: I'm going to instruct you
10  not to answer to the extent it relates to
11  your conversations between you and Ms. Egolf.
12      MR. REISER: I guess that's for the
13  judge.
14  BY MR. REISER:
15  Q. Was there a business reason, to your
16  knowledge, to have the acknowledgement of and joinder
17  to affiliation agreement signed by the associations?
18  A. A business reason? You know, I think it was
19  good to know that the boards were on board -- the
20  boards were on board with us moving forward with the
21  affiliation. We certainly knew it ultimately
22  Cobalt's decision to do. But having the boards, you
23  know, acknowledge in writing that they were supportive
24  of moving forward, we thought, was good practice.
25  Q. There are several boards that were not

Page 67

1   willing to go along with the affiliation. True?
2   A. No.
3   Q. Bachelor Gulch, did that board go along with
4   the affiliation that was proposed?
5   A. The Bachelor Gulch board changed management
6   companies.
7   Q. Right. It was around the time the
8   affiliation was proposed, was it not?
9   A. It was around the same time, yes.
10  Q. And as far as you know, because you met with
11  Mike Mullenix on several occasions, they decided to
12  terminate Ritz-Carlton Management Company because of
13  the proposed affiliation. True?
14      MR. SELLINGER: Objection to form.
15  A. They decided to terminate the management
16  agreement for many reasons.
17  BY MR. REISER:
18  Q. What do you understand those reasons to be?
19  A. I believe they wanted a different -- they
20  wanted a different management company. They wanted
21  somebody -- they thought Timbers offered them a
22  different way of managing than the Ritz-Carlton
23  Management Company did, and that that was more
24  appealing to the owners.
25  Q. So you've never seen this letter dated

Page 68

1   November 5, 2012, that's been previously marked as
2   Exhibit 1124, from Mike Mullenix, where he's
3   discussing the absolute vehement objection to the
4   affiliation proposal? You can look at it.
5   A. Yes, I've seen this letter.
6   Q. Does that refresh your recollection as to why
7   the Bachelor Gulch board terminated the Ritz?
8   A. My answer again is that I think there were
9   many reasons that they decided not to move forward
10  with the Ritz-Carlton Management Company.
11  Q. They just wanted a change and they wanted to
12  replace the Ritz brand with The Timbers. Is that your
13  testimony, Ms. Sobeck?
14      MR. SELLINGER: Objection to form.
15  A. I'm not saying that they just wanted to
16  change. I think there were other things that they --
17  they didn't like the Marriott Vacation Club. They
18  thought The Timbers brought them other opportunities.
19  They, you know -- I think they had challenges along
20  the way that made them make the decision to make --
21  the owners make the decision to go with another
22  management company.
23  BY MR. REISER:
24  Q. Do you agree that the affiliation proposal
25  was a big reason that they terminated?

Page 69

18 (Pages 66 - 69)

1       MR. SELLINGER: Objection to form.
2       A. The affiliation agreement was -- they were
3   certainly very focused on the Marriott Vacation
4   Clubs -- any affiliation that was involved with the
5   Ritz-Carlton.
6   BY MR. REISER:
7       Q. That was the primary reason they terminated.
8   True?
9       MR. SELLINGER: Objection to form.
10      A. There were many reasons that they terminated.
11  BY MR. REISER:
12      Q. I'm asking, in your opinion, was it the
13  primary reason they terminated the affiliation?
14      A. I don't know what the primary reason was. I
15  know there were a lot of different reasons. They made
16  the decision.
17      Q. In the November 5th letter that was just
18  shown to you, do you see any reason other than the
19  affiliation that was brought up?
20      A. No, but the letter is about affiliation, so I
21  don't think they were talking about everything -- all
22  of the reasons that they were looking at specifically
23  about the proposed affiliation.
24      Q. You don't remember Mr. Mullenix and Jo-Ann
25  Perfido coming down to Orlando and discussing the

Page 70

1   contract. True?
2       A. They couldn't terminate the Ritz contract, I
3   guess. You're saying that it was their decision. It
4   wasn't their decision. It was the members' decision.
5       Q. Well, they were going to vote to -- have the
6   membership vote to terminate?
7       A. They were going to put it up to the members
8   to vote.
9       Q. The vote was only because of the affiliation,
10  as you recall?
11      A. It wasn't --
12      MR. SELLINGER: Objection to form.
13  BY MR. REISER:
14      Q. You can answer.
15      A. They communicated many different things
16  through the process of why they were leaving.
17      Q. As you sit here today, the primary reason was
18  the affiliation. Isn't that true, Ms. Sobeck?
19      MR. SELLINGER: Objection to form.
20      A. Again, the primary reason -- there were a lot
21  of different reasons that they terminated. Marriott
22  Vacation Club was certainly one of the reasons that
23  the conversations started and they were very concerned
24  about the affiliation, yes.
25  BY MR. REISER:

Page 72

1   affiliation with you?
2       A. I was -- I had conversations with -- I'm
3   trying to remember back. I remember talking about the
4   affiliation with Joanne and Mike, yes.
5       Q. Here in Orlando?
6       A. I believe it was in Orlando.
7       Q. So they came down to Orlando specifically to
8   oppose the affiliation agreement upon threat of
9   terminating if you wouldn't delay the termination -- I
10  mean, delay the affiliation. Isn't that true?
11      A. They talked about it, yes. They talked about
12  the affiliation and so on.
13      Q. That was the only reason to come down to
14  Orlando, to try to get Marriott Vacation Club to not
15  affiliate. True?
16      A. They -- yes. I mean, they were interested in
17  affiliation. They were interested in not moving
18  forward. They were concerned about Marriott Vacation
19  Club.
20      Q. They were not interested in any affiliation
21  with Marriott Vacation Club. Is that true?
22      A. That is true.
23      Q. And they told you in no uncertain terms that,
24  if the proposal for the affiliation was going to go
25  forward, they were going to terminate the Ritz

Page 71

1       Q. We're going to take Mr. Mullenix's deposition
2   next week. I guess I'll just ask him what he told you
3   that day, compared to what you just said.
4       MR. SELLINGER: Look, there's no need to
5   make those kind of comments that are sort of
6   disparaging to the witness. You can take
7   whatever depositions you plan on taking, but
8   that's really not needed.
9       MR. REISER: All right.
10      THE VIDEOGRAPHER: We have five minutes
11  left, Counsel.
12  BY MR. REISER:
13      Q. Next I'm going to ask you about a -- let me
14  ask you first -- did you go on maternity leave
15  sometime during this era?
16      A. I did.
17      Q. When were you on maternity leave?
18      A. I was on maternity leave -- my son was born
19  April 29th of 2012. He's five. I have a daughter
20  who's two years older than that -- July 7, 2010. So I
21  was on -- with him, I was on for six weeks. With my
22  daughter, I was on for about two months.
23      Q. Okay. So that was in 2010 and --
24      A. And 2012.
25      Q. Okay. You were not on maternity leave in

Page 73

19 (Pages 70 - 73)

1  July of 2012.  Is that true?
2      A.  July of 2012?  No.  July of 2012, I wouldn't
3  have been.  I would've been very pregnant, though.
4      Q.  Were you on maternity leave when the
5  evolution letter came out from Eveleen Babich?
6      A.  No, I was not.
7      Q.  Were you on maternity leave at any time after
8  that?  I'm not good with dates, I guess.
9      A.  Can you tell me the date of the evolution
10  letter?  I don't remember.
11      Q.  July 17, 2012.
12      A.  July 17th, I was, after -- yes.  My son was
13  born August 29, 2012.
14      Q.  So you were on maternity leave during the --
15  after the birth for six weeks?
16      A.  For six weeks, yes.
17      MR. REISER:  We might as well just break
18  here.
19      THE VIDEOGRAPHER:  The time is 10:26.
20  That concludes media one in the deposition of
21  Stephanie Sobeck.
22      (Brief recess.)
23      THE VIDEOGRAPHER:  The time is 10:38.
24  This is media two in the deposition of
25  Stephanie Sobeck.

Page 74

1  BY MR. REISER:
2      Q.  I'm going to show you Exhibit 1021.  This is
3  an e-mail dated June 11, 2012, from John Hearns to
4  yourself regarding the Aspen board.
5      It states, "Stephanie, if he has not already
6  done so, I understand that Jay Neveloff may request
7  that the developer vote their interest in the upcoming
8  board of directors election to ensure that both Randy
9  Mercer and Tyler Oliver are elected to the board."
10      Do you recall getting this e-mail?
11      A.  I do.
12      Q.  Did you ever talk to Jay Neveloff about this
13  request?
14      A.  I don't believe he ever contacted me, no.
15      Q.  Did the developer vote their interest in the
16  October 2012 board of directors election to ensure
17  Randy Mercer and Tyler Oliver were elected?
18      MR. SELLINGER:  Objection to form.
19      A.  I don't know how the developer voted, and I
20  don't remember -- that was quite a while ago.
21  BY MR. REISER:
22      Q.  Why would John Hearns write you this letter
23  about the developer voting their interests?  Were you
24  the developer that actually voted -- were you the
25  representative of the developer that actually voted

Page 75

1  the interest of the developer?
2      MR. SELLINGER:  Objection to form.
3      A.  So the proxies would come to the company and
4  we would fill out the -- how we would want to vote,
5  yes, and it would go back to the association.
6  BY MR. REISER:
7      Q.  So I'm just trying to get your personal role
8  in it, though.  Would the proxies come back to you and
9  you would fill them out?
10      A.  No.  The proxies go to association
11  governance.
12      Q.  John Hearns is employed by the Ritz-Carlton
13  Hotel Company; right?
14      A.  Correct.
15      Q.  And do you know any reason why he was
16  involved in this election?
17      MR. SELLINGER:  Objection to form.
18      A.  John probably would have been talking to his
19  general manager who was on site, Nicolas DiMeglio.
20  That's probably why he would've been involved, I would
21  think.
22  BY MR. REISER:
23      Q.  So, logistically, how would the developer
24  vote their interest in a board of directors meeting?
25      A.  The developer would fill out the proxy for

Page 76

1  the vote or whatever other items would come up, and it
2  would be sent back for a proxy.  Somebody would just
3  be at the meeting to represent the developer.
4      Q.  Who would the proxy be given to?
5      A.  Depends on the meeting.  Sometimes it's given
6  back to the MORI representative that's there.
7  Sometimes you can assign the proxy to the board of
8  directors, to the current president or whoever was at
9  the meeting, if somebody wasn't going to be at the
10  meeting from MORI.
11      Q.  Was it common for the developer to vote their
12  shares in board of directors --
13      A.  Yes.  We would vote interests.
14      Q.  You're aware, are you not, of a term limit
15  that applies to board of directors at various Ritz
16  Clubs?
17      A.  There's different term limits at different
18  associations, yes.
19      Q.  And you're aware that Randy Mercer had
20  already termed out at the time this new election was
21  happening, or you weren't?
22      A.  I was not.
23      Q.  Do you know any reason why the term limits
24  did not apply to Randy Mercer in the 2012 election?
25      MS. LIVINGSTON:  Object to the form.

Page 77

20 (Pages 74 - 77)

1    A. I do not.
2        MR. SELLINGER: Same objection.
3    BY MR. REISER:
4        Q. You have no knowledge that the term limits
5    were ever amended to allow more than two terms for a
6    director?
7        MR. SELLINGER: Objection to form.
8        MS. LIVINGSTON: Object to the form.
9        A. I do not know what the term limits are for
10   the Aspen board, and I don't know if Randy was -- if
11   he had termed out or not.
12   BY MR. REISER:
13       Q. You believe it would be inappropriate for a
14   termed out director to be voted in using the
15   developer's shares?
16       A. Somebody who had already been through their
17   time, through their term limit, I don't believe they
18   would be eligible to run again.
19       Q. Right. You're not telling me that he ran --
20   he was on the board for two consecutive terms, '05 to
21   '11, he was termed out. Then this letter comes in and
22   the developer voted their shares for Randy Mercer, who
23   had previously been termed out.
24       So I'm asking you, do you think it would be
25   appropriate to vote the developer's shares for a

Page 78

1    termed-out board member?
2        MS. LIVINGSTON: Object to the form.
3        MR. SELLINGER: Objection to form.
4        A. But, I'm sorry, you said that he termed out
5    in 2011?
6    BY MR. REISER:
7        Q. Correct.
8        A. This is in 2012. So if somebody is -- if
9    you're off the board for a period of time, you can go
10   back on a board and your term starts again. It's not
11   that you can only have so many years for your -- for
12   life. You just have to be off the board for a period
13   of time and then you can go back on.
14       Q. So where do you glean that understanding of
15   the Aspen bylaws?
16       A. That's my understanding of how all the term
17   limits work, frankly. If there's a term limit in
18   place, my understanding is that you just have to go
19   off the board for a period of time; that you can't run
20   consecutive terms. You can't run back to back. So if
21   you're off the board for a period of time, then you
22   can go back onto a board, as long as you've been off
23   and not continuously on for a period.
24       Q. So that's how the Ritz-Carlton Management
25   Company interpreted the bylaws at Aspen; that it was

Page 79

1    okay for a termed-out director to take a time off and
2    come back on the board?
3        A. That would've been -- that's my understanding
4    of how -- yes.
5        Q. Okay. We marked as Exhibits 1023 and 1026 at
6    previous depos the two letters that went out on
7    July 17, 2012 on the brand evolution. I'm going to
8    probably show you the marked ones. Let me just show
9    you 1023.
10       MR. SELLINGER: What's 1026?
11       MR. REISER: 1026 is the second letter
12       that has the folks who had already joined.
13       It's the same letter, but there's an
14       additional paragraph in 1026.
15   BY MR. REISER:
16       Q. Can I actually just replace that with these?
17       A. Sure.
18       Q. You can read these letters, if you want, in
19   full, but I presume you're familiar with these letters
20   that announced the evolution of the brand?
21       A. I am.
22       Q. Did you have any role in preparing these
23   letters?
24       A. I might have read them before they went, but
25   I didn't write it.

Page 80

1        Q. Do you remember the reaction of any club
2    members to the receipt of these letters?
3        A. Yes.
4        Q. What was the overall reaction from the club
5    members that you recall?
6        MR. SELLINGER: Objection to form.
7        A. The overall reaction --
8    BY MR. REISER:
9        Q. Do you have a feel for the majority
10   opinion -- reaction -- to these letters from the club
11   members or not? Maybe you don't.
12       A. The majority opinion, no --
13       MR. SELLINGER: Objection to form.
14       A. There were a few select members who had
15   concerns about this, who had concerns about Marriott
16   Vacation Club -- any affiliation with The Ritz-Carlton
17   Destination Club. I certainly had no thought it was a
18   majority of members who felt that way.
19   BY MR. REISER:
20       Q. We actually were provided with a spreadsheet
21   by your counsel in this litigation that is a native
22   spreadsheet. It's an Excel spreadsheet. So it's 790
23   or so lines of comments by -- it's up on the big
24   screen there. That's the only way we can show it.
25       If the screen can kind of scroll down and

Page 81

21 (Pages 78 - 81)

1  move to the left-hand side, you can see the number of
2  rows.  This spreadsheet, I'll represent to you, has
3  over 750 comments by members of The Ritz-Carlton
4  Destination Club.  This was provided, again, to us by
5  your counsel.
6        Do you recollect reviewing any of these
7  reactions to the proposed affiliations by any of the
8  members?
9        A.  Yeah -- I'm not sure -- what is the basis of
10 this?
11       Q.  The basis is --
12       A.  I'm sorry.  What's it a summary of?
13       Q.  Oh.  It's actually the actual comments by
14 members --
15       A.  From what?
16       Q.  From a survey that Marriott Vacation Club did
17 on the affiliation.
18       A.  Is this the survey from Bachelor Gulch?
19       Q.  No.  The survey across all clubs.
20       MR. MARX:  In fairness, could you give
21 the witness the opportunity to see the title
22 of the document -- the top of it -- just so
23 it provides her with context?
24       MR. REISER:  Sure.  No problem.
25 BY MR. REISER:

Page 82

1        Q.  On the left, it says "record number" -- the
2  very top.  Again, this is your spreadsheet, Marriott
3  Vacation Worldwide's spreadsheet.
4        A.  Understood.  I'm trying to understand what it
5  is.
6        MR. MARX:  Can you shorten it so we can
7  see the file name?
8  BY MR. REISER:
9        Q.  Do you recognize this document?
10       A.  I recognize -- yes, I recognize the
11 questions.  I believe those were the questions when
12 Bachelor Gulch decided they were moving forward with a
13 survey to the members to talk about --
14       Q.  Well, you see the resort column, it says it's
15 a bunch of different resorts?
16       A.  I'm sorry.  This is when Bachelor Gulch
17 talked about going out to RFP, is what I'm
18 representing.
19       Q.  So how is this related to the Bachelor Gulch
20 situation?
21       A.  Because -- so when Bachelor Gulch decided to
22 go out and RFP, we obviously had concerns that, if
23 they were not that happy, we wanted to understand from
24 the rest of the members -- kind of thoughts on the
25 program, thoughts on the future of the program, things

Page 83

1  that they'd like to see.
2        This was a very -- I mean, this whole period
3  of the club -- I mean, the club was evolving.  We had
4  lost a couple clubs.  Kapalua and Abaco were going
5  away.  There were just a lot of things going on, and
6  we wanted to do a survey of the members to understand
7  their thoughts.
8        Q.  This survey -- the 750-plus responses to this
9  survey -- do you remember a large response to this
10 survey?
11       A.  Yes, I do.
12       Q.  Does the document on the screen appear to be
13 the results of this survey?
14       A.  Does the document -- yes -- the summary of
15 the survey, yes.
16       Q.  Okay.  And these are actual comments by --
17 the actual comments by the members?
18       A.  Yes.
19       Q.  You recall, don't you, Ms. Sobeck, that the
20 overwhelming response to the survey was that the
21 members were not happy?
22       MR. SELLINGER:  Objection to form.
23       A.  There were certainly some comments about
24 members having concerns.  I mean, there were a lot
25 more clubs and now there were fewer.  There were

Page 84

1  things that had changed that members were concerned
2  about.  But I don't think all the comments were
3  necessarily negative.
4  BY MR. REISER:
5        Q.  I'm not saying a hundred percent of them.
6  But I've gone through it and I'm sure you have too.
7  My reading of this is probably 95 percent or so of
8  these 750 responses are not only negative, but
9  gratuitously negative.
10       MR. SELLINGER:  Objection to form.
11 BY MR. REISER:
12       Q.  Is that your recollection too?
13       A.  Members were concerned when Abaco went away
14 and Kapalua went away, and there was definitely --
15       Q.  And they were also --
16       MR. SELLINGER:  Hold on a minute.  Finish
17 your answer.
18 BY MR. REISER:
19       Q.  Sorry.
20       A.  Yeah.  There was concern.  But through this,
21 we actually saw members were saying good things, too,
22 about how they liked their -- liked their time at
23 their home club and other things.
24       Q.  Right.  But you didn't see very many comments
25 that were happy with the direction that Marriott

Page 85

22 (Pages 82 - 85)

1  Vacation Club was going, at least with the loss of the
2  clubs; right?
3      A.  Yes.  There was concern because the club was
4  shrinking.
5      Q.  And there was also great concern about the
6  affiliation that was proposed too; correct?
7          MR. SELLINGER:  Objection to form.
8      A.  There were some comments made as well about
9  the affiliation, yes.
10  BY MR. REISER:
11     Q.  And would you agree in this -- by the way,
12  this spreadsheet has been marked as Exhibit 1700 for
13  future reference.
14         Would you agree this spreadsheet,
15  Exhibit 1700, the vast majority of the members that
16  commented on the affiliation commented in a negative
17  way?
18         MR. SELLINGER:  Objection to form.
19     A.  The vast majority -- I can't say the vast
20  majority did.
21  BY MR. REISER:
22     Q.  What would you say?  Again, let me just
23  establish foundation.
24         'This is something that the club was relying
25  on in terms of getting feedback from the members as to
                                                    Page 86

1          MR. SELLINGER:  Objection to form.
2      A.  I see those two.
3  BY MR. REISER:
4      Q.  And it doesn't get much better --
5          MR. MARX:  Actually, Mike, I think the
6      first two comments on the spreadsheet that
7      you sorted by negative comments first and
8      positive comments at the very bottom of the
9      document --
10         MR. REISER:  That's a false statement.  I
11     didn't touch this spreadsheet.  It's exactly
12     as produced.
13  BY MR. REISER:
14     Q.  The third one says, "I was flat out lied to
15  by the sales representatives in the purchase of the
16  Kapalua property."
17         And then the comment to that about the other
18  comments says, "Really need to make it up to the
19  remaining members with first-class service that has
20  not occurred in the last few years."
21         The fourth one is, "Ritz brand diluted by Jet
22  Setter.  Marriott Vacation users way overpriced for
23  value.  Ritz Clubs going away.  Sold off most of
24  Tahoe."
25         Then the comment for additional comments,
                                                    Page 88

1  whether to proceed with the affiliation.  True?
2      A.  This, no --
3          MR. SELLINGER:  Objection to form.
4      A.  -- no.  This didn't have to do with the
5  affiliation.  This was more kind of the general
6  reading of the club.  You know, this talked about --
7  why are you giving RCDC a rating?  I think those were
8  actually questions we asked.  What would you like to
9  see in RCDC in the future?  It wasn't specific to
10  affiliation.
11  BY MR. REISER:
12     Q.  The very first comment on here says -- you
13  asked him, "Please feel free to include any comments
14  you would like to make about RCDC."  The first one
15  says, "Again, we bought Ritz-Carlton and not Marriott.
16  If you insist on cheapening the experience, then buy
17  us out."  There's about 20 exclamation points.
18         Do you see that?
19     A.  I do.
20     Q.  And the second one actually says, "You
21  foolishly and stubbornly lost Bachelor Gulch by
22  diluting our membership with Marriott.  What next?"
23  Then the comment to that is "Disgusting."
24         Those are the first two comments on the
25  spreadsheet; yeah?
                                                    Page 87

1  "What a joke.  You ask about new locations when you
2  are losing the locations you have now."
3          So this goes on and on.  There's 750 lines of
4  this.  You reviewed this spreadsheet in determining
5  what the members were thinking at the time Bachelor
6  Gulch actually left the club system.  True?
7      A.  We looked at the survey, yes.  That's what --
8  we wanted the members' feedback.
9      Q.  Did this feedback you got from the members
10  give you any pause about proceeding with the
11  affiliation?
12         MR. SELLINGER:  Objection to form.
13     A.  It didn't have to do -- I mean, really, from
14  those comments -- just the ones that you just read,
15  it's more that the club was shrinking more than
16  affiliation.
17         The reality is, we wanted to give people more
18  destination options.  We wanted to give them more
19  vacation places to go.
20  BY MR. REISER:
21     Q.  The second one says, "You foolishly and
22  stubbornly lost BG by misleading our membership with
23  the Marriott.  What next?  Disgusting."
24         You think that does not have anything to do
25  with the affiliation?
                                                    Page 89

23 (Pages 86 - 89)

1     A. I didn't say it didn't have anything to do
2  with it. I'm just saying, you said what it was about,
3  and there's other things that this was about, not the
4  affiliation.
5     Q. The last column on the spreadsheet asked for
6  comments by the members that could help you inform
7  their feeling about the affiliation. True?
8        MR. SELLINGER: Objection to form. The
9     last column?
10       MR. REISER: Column J.
11  BY MR. REISER:
12    Q. That's "Please feel free to include any
13  comments you would like to make about RCDC." That was
14  just a general questioning of the membership about
15  their feelings about RCDC?
16    A. Correct.
17    Q. I take it you read the comments by the
18  members that you asked them to provide. True?
19    A. I did. We did.
20    Q. I think you'll see, if you review -- did you
21  review this prior to today's deposition?
22    A. No. I saw it, but I didn't review it.
23    Q. When was the last time you reviewed it?
24    A. Reviewed it?
25    Q. Yeah.

Page 90

1     What happens sometimes is -- I mean, you pull
2  out the comment "disgusting" -- yeah, that's a
3  terrible comment, and it would have made us very
4  unhappy to see that. We wanted to do whatever we
5  could for those members.
6        But when, thematically, you look at what was
7  happening at the time -- when we were losing clubs and
8  losing vacation options for members -- and affiliation
9  was a way to give members other options. It wasn't
10  taking things away. It was giving options. It was a
11  voluntary way to allow members to go other places.
12       Thematically, what I see in these comments is
13  that members were concerned about a shrinking club,
14  that the club was getting small, the locations they
15  could go was getting smaller.
16       So, I guess, you keep bringing this back to
17  affiliation, but that's not what this survey was meant
18  to talk about.
19  BY MR. REISER:
20    Q. Okay. So you chose to focus on the loss of
21  the clubs and the opportunity to affiliate with a club
22  that didn't have the -- quite the luxury standards as
23  Ritz. Is that fair?
24       MR. SELLINGER: Objection to form.
25    A. No, it's not actually fair, because there

Page 92

1     A. Years ago.
2     Q. At the time it was created, do you think? Is
3  that --
4     A. Probably.
5     Q. Did you ever discuss any of these comments by
6  these members with Lee Cunningham?
7     A. Specifically these comments, I don't
8  remember.
9     Q. What about with Mary Lynn Clark?
10    A. Yeah. ML -- we call her ML -- ML would have
11  talked about the comments.
12    Q. Did the overall volume and nature of the
13  comments give you and ML Clark any pause in deciding
14  to proceed with the affiliation between RCDC and the
15  Marriott Vacation Club?
16       MR. SELLINGER: Objection to form.
17    A. It didn't give -- I think the comments, which
18  it was meant to do, helped us understand what was
19  going on in the membership and concerns that the
20  members had.
21       Like we always see in dealing with any member
22  issue or other, there's always a vocal few members who
23  have concerns and troubles. We try to look for larger
24  themes. We try to look for issues that exist amongst
25  the majority of the membership.

Page 91

1  were opportunities within -- there are options
2  within the Marriott Vacation Club exchange program
3  that are very commensurate with Ritz.
4       There's actually Ritz-Carlton Hotels that you
5  can access through the Marriott Vacation Club program
6  that, if the affiliation agreement and the exchange
7  didn't -- wasn't available -- that members couldn't go
8  to using the time. The actual way of accessing them
9  wouldn't be available to a Ritz-Carlton Destination
10  Club member through their original ownership if the
11  MVC affiliation hadn't occurred.
12  BY MR. REISER:
13    Q. So you're saying that it was of value to the
14  Ritz-Carlton members to pay dues at their club of --
15  let's say, San Francisco -- the average dues per night
16  were over a thousand dollars. You've heard that
17  figure?
18    A. Uh-huh.
19    Q. What's the average room rate of a
20  Ritz-Carlton Hotel?
21    A. I can't tell you that.
22    Q. Is it over a thousand dollars?
23    A. I don't know.
24    Q. You think that there was a bonus for the
25  folks at the Ritz-Carlton Club San Francisco who were

Page 93

24 (Pages 90 - 93)

1 paying a thousand dollars a night in maintenance fees
2 to be able to trade a night at the Ritz-Carlton
3 Destination Club in San Francisco for a night at a
4 Ritz-Carlton Hotel? That's your thinking?
5     A. I think it provided the San Francisco members
6 an opportunity they didn't have before. So a San
7 Francisco member who had 21 nights, who did pay over a
8 thousand dollars a night, if they weren't able to use
9 those 21 nights in a year, if they actually affiliated
10 with Marriott Vacation Club, they could actually bank
11 those nights and use them in the future.
12     So time that they could have lost in a year
13 and not gotten any value to, they actually could have
14 put into this program and taken those points that they
15 would have received and used them in another year for
16 a different way.
17     Would it have been good value? Would they
18 have gotten a thousand dollars of value for those
19 points? Maybe not, but they would have lost it
20 altogether if they didn't have the ability to do it.
21     And it was voluntary. They could certainly
22 do it if they wanted to or they didn't have to.
23     Q. Okay. So I'm going to show you next in
24 order -- I don't know if this has ever been marked, so
25 I'm going to mark it as 1701.

Page 94

1     (Exhibit 1701 was marked for
2     identification.)
3 BY MR. REISER:
4     Q. Do you remember a club member, Juan Pablo
5 Cappello?
6     A. No, I don't specifically.
7     Q. Is it true that the Marriott Vacation Club
8 would follow the comments on Facebook related to the
9 members' reaction to the proposed affiliation?
10     A. Our PR department, who this -- Jackie
11 Ader-Grob works in -- does follow Marriott Vacation
12 Club and Ritz-Carlton Facebook pages.
13     Q. She also follows the comments that are made
14 on the TUG user group -- Timeshare Users Group -- too?
15     A. I believe she does.
16     Q. She would be aware of what the members are
17 saying on the TUG and then she would relay that
18 information to you folks at the operations side?
19     A. Yeah, she normally -- I don't know if she
20 does all the time; but, certainly, when certain
21 comments come up, she sends them to us.
22     Q. Part of her job responsibilities are to
23 monitor what members are saying on the internet.
24 True?
25     A. I don't know if that's part of her job

Page 95

1 responsibility. She certainly does it and
2 communicates with us on it, but I don't know if it's
3 part of her job responsibilities. I appreciate her
4 doing that, though.
5     Q. You were aware that the chatter on Facebook
6 was extremely negative in reaction to the proposal by
7 Eveleen Babich on July 17, 2012?
8     MR. SELLINGER: Objection to form.
9     A. I was aware there were some negative comments
10 made on Facebook after the letter.
11 BY MR. REISER:
12     Q. What about on the TUG user group?
13     A. I believe there were some comments there as
14 well.
15     Q. And they were as well negative; do you
16 remember?
17     A. I believe there were some concerned members,
18 yes, who were posting them.
19     Q. And Juan Pablo Cappello was one of those
20 concerned members?
21     A. It appears that he was.
22     Q. Do you remember that gentleman was a partner
23 at the time at Greenberg Traurig law firm in Miami?
24     A. Juan Pablo Cappello?
25     Q. Yes.

Page 96

1     A. No, I don't remember. I don't know if he was
2 a partner.
3     Q. He wrote a pretty serious letter that we're
4 going to get to in a minute, and we'll see if maybe
5 that refreshes your recollection.
6     A. Okay.
7     Q. Next in order is 1042. So take a minute to
8 read it if you wouldn't mind. I'm going to be asking
9 you about the e-mail that starts on the bottom of
10 page 1 from Linda Sciberras.
11     Do you know her?
12     A. Sciberras. She used to be a sales executive
13 with the company.
14     Q. Did she work with you in Jupiter? I mean --
15     A. No. She worked -- I think she was in, like,
16 a telesales capacity.
17     Q. Why was The Ritz-Carlton Destination Club
18 announcing a new offering that would allow Marriott
19 Vacation Worldwide folks to trade into the Ritz
20 properties on August 7, 2012, before any affiliation
21 vote or anything else that happened?
22     A. I have no idea why she would've been
23 announcing this. There's one point in time -- and,
24 truly, kind of through this whole thing -- we had
25 developer inventory that were owned at these

Page 97

25 (Pages 94 - 97)

1 properties, that we were using the developer inventory
2 in Explorer. She certainly shouldn't have been
3 selling it like this. This is not a legally-approved
4 marketing piece from the company. There's no way.
5     Q. It does come from her e-mail though at
6 ritzcarltonclub.com?
7     A. Yeah, I see that. But there's certain things
8 that are required when they go through the normal
9 vetting process of the company. Each one of them
10 would have a number associated with the approval of
11 the piece, and this does not have that on there.
12     It says certain things. Like, actually, I'm
13 looking here. You see it says, "Primetime vacation
14 examples, two bedroom" -- these aren't actually
15 even -- these aren't the proper names of the
16 properties.
17     So, yes, she would have gotten in significant
18 trouble for this.
19     Q. Did she get fired for sending this out?
20     A. No, I don't believe so.
21     Q. She was at the regional office in Orlando,
22 right, in the same building you were at the time?
23 Yeah?
24     A. She was the regional membership executive.
25 Yeah, she was in Orlando. It was, like, telesales.

Page 98

1 That's where they're based.
2     Q. Same building as you?
3     A. No. They're in the other building.
4     Q. Oh, you have two buildings on Westwood?
5     A. Three, actually, but yes.
6     Q. All right. Your testimony here today,
7 Ms. Sobeck, is that this was not authorized -- this
8 e-mail?
9     A. It couldn't have been authorized, because the
10 Ritz-Carlton St. Thomas, for these points, a
11 two-bedroom residence -- like, there is no
12 Ritz-Carlton Jupiter. There's no Ritz-Carlton --
13 that's a hotel. So the only Ritz-Carlton product in
14 Jupiter that I'm aware of is the Ritz-Carlton Club in
15 Jupiter.
16     From a brand perspective, every Ritz-Carlton
17 has a "the" in front of it. These would all have to
18 have "clubs" behind them, because that's the actual
19 properties that they were indicating.
20     Q. So that's how you can tell this was not an
21 authorized e-mail. True?
22     A. Plus, there's no legal number. When we do
23 marketing pieces, they all have to get reviewed by our
24 legal department, and they get a little number at the
25 bottom of them that tags that they were reviewed, and

Page 99

1 we can always go back and see when and the time and so
2 on. It gets kept in archives.
3     Q. So you can tell definitively that this was
4 not an approved e-mail. True?
5     A. Yes.
6     Q. What, in your opinion, was the legal
7 authority for Marriott Vacation Club to offer to its
8 members Ritz-Carlton Development Company's unsold
9 inventory at the Ritz-Carlton Clubs?
10     MR. SELLINGER: Objection to form.
11     A. Can you say that again?
12     MR. REISER: Sure. Do you want to read
13     it back?
14     (The reporter read back the last
15     question.)
16     MR. SELLINGER: Let me add an addition to
17 my objection and instruction that you can
18 answer the question to the extent you're able
19 to do so without disclosing any conversations
20 with counsel; but consistent with prior
21 direction, at no point should you be
22 disclosing any communications between you and
23 counsel.
24     THE WITNESS: Okay. We were able to use
25 the inventory because it was owned by the

Page 100

1 development company. It was owned by the
2 developer. Just like any owner owns
3 inventory, they can do whatever they want
4 with the inventory. They can rent it; they
5 could give it to their housekeeper; they
6 could give it to their neighbor.
7     We owned the inventory. We paid
8 maintenance fees on it. We had all the
9 rights of an owner through that inventory.
10 So we took that inventory and used it through
11 our Explorer program, just like we used
12 hotels and others that the inventory -- there
13 was kind of two different pieces. One, it
14 was actually in the trust -- it was inventory
15 owned by the trust.
16     Another mechanism was the Explorer
17 program, which the Explorer program allowed
18 for inventory that wasn't owned by the trust
19 to be accessed by the Marriott Vacation Club
20 owners.
21     So that was inventory we owned, so we had
22 the ability to use that through that Explorer
23 program.
24 BY MR. REISER:
25     Q. Was that across all clubs? There was no

Page 101

26 (Pages 98 - 101)

1 difference between Aspen and San Francisco, for
2 instance?
3    A. No.  Yeah -- we could use -- it would've been
4 in all clubs.
5    Q. You don't remember there being a proviso in
6 the San Francisco Club that there be no rentals,
7 unless it was in conjunction with marketing of
8 fractionals?
9    A. Yeah, there would be no rentals, but this
10 wasn't rentals.
11    Q. They weren't rentals?
12    A. San Francisco?  These are members.  These are
13 members who are using it.  Somebody could go in on the
14 outside market and, because its inventory that was in
15 the Explorer program, go out and rent it on the open
16 market.  No -- these were all members of the Marriott
17 Vacation Club.
18    Q. Right.  But I thought their rationale was
19 just like any member could rent their units, that
20 Marriott Vacation Club, as the owner of units, could
21 rent their units?
22    A. Oh, in San Francisco, they couldn't.
23 There was -- sorry.  I was talking broadly about
24 members being able to do whatever they wanted.  And
25 most of the clubs, except for San Francisco, they go

Page 102

1 out and do rent.  San Francisco, they don't.
2 Although, I believe now there actually are some
3 members who are out renting.  But they could -- any
4 owner could do with it what they want.
5    Q. Let's focus on San Francisco now, because I
6 represent three different buildings.  Actually, I
7 represent the Aspen building -- the owners in Aspen,
8 San Francisco, and Tahoe.  So I want to focus for a
9 moment on San Francisco.
10    It's true, is it not, that San Francisco had
11 a provision in their governing documents that
12 precluded rentals?
13    A. Correct.
14    Q. All right.  That Marriott Vacation Club could
15 only rent its unsold inventory at the Ritz-Carlton
16 San Francisco in conjunction with efforts to sell or
17 market the sale of fractional interests?
18    MR. SELLINGER:  Objection to form.
19    A. We could only rent them for marketing
20 purposes.  That's probably how the documents were
21 written.
22    I'm saying, though, having it in the Marriott
23 Vacation Club Explorer program, though, isn't rentals.
24 It's not -- there wouldn't be any way for someone to
25 go out and rent it.  If you, today, were not a

Page 103

1 Marriott Vacation Club owner, and this situation had
2 existed, you wouldn't be able to access it because it
3 would be a members-only --
4 BY MR. REISER:
5    Q. So in San Francisco, what was the legal
6 authority, as you understood it, for the Marriott
7 Vacation Clubs placing their unsold inventory at
8 San Francisco into the Marriott Vacation Club system
9 for use by Marriott Vacation Club members?
10    MR. SELLINGER:  Same instruction.  You
11 can answer to the extent you can do so
12 without disclosing any conversations with
13 counsel.
14    A. Okay.  Because the inventory was owned by the
15 developer, and the developer, as an owner -- just like
16 any owner in San Francisco -- could use their time
17 however they wanted.  So if they wanted to give it to
18 someone else -- if they wanted to give it to a friend,
19 auction it off at a charity event or so on, they could
20 do that.  Those were owned nights by that owner.  The
21 developer had that right as well.  And so --
22 BY MR. REISER:
23    Q. The developer wasn't --
24    MR. SELLINGER:  Hold on.
25    MR. REISER:  Sorry.  You're right.

Page 104

1    A. So the developer took the weeks that it
2 owned, paid maintenance fees for, and used it in that
3 Explorer program.
4 BY MR. REISER:
5    Q. For profit, right?  They were getting money
6 for putting them in the Explorer program and having
7 those folks --
8    A. They weren't getting any profit for it, no.
9 They were --
10    Q. They were making no monetary gain from that
11 use of the product?
12    A. There's no money that comes along with it,
13 no.  I mean --
14    Q. They monetize --
15    MR. SELLINGER:  Hold on.  Hold on.  Go
16 ahead.
17    A. There's points that are associated with it.
18 The points and the point maintenance fees, I guess
19 you're trying to say -- I mean, the point maintenance
20 fees covered the maintenance fee of all the interests
21 that are owned within the trust.
22    So, no, by somebody using points in there,
23 there's no -- there's no money that comes along with
24 those points for somebody using San Francisco.
25 BY MR. REISER:

Page 105

27 (Pages 102 - 105)

1  Q. Is it your testimony there was no monetary
2  benefit to Marriott Vacation Club by putting their
3  developer-owned inventory into the Marriott Vacation
4  Club for use by Premier members?
5  A. That's a different question than you just
6  asked me.
7  Q. That's my question now.
8  A. So you're saying to put it into the trust?
9  Q. What I'm asking is, does Marriott Vacation
10  Club profit by taking their Ritz-Carlton Development,
11  San Francisco unsold inventory, place it into the
12  Marriott Vacation Trust and letting the members of the
13  Marriott Vacation Club use that inventory?
14  MR. SELLINGER: Objection to form.
15  A. So the -- so -- okay. It's a little bit
16  complicated. I can see why this is causing questions.
17  So the way that the trust is set up is, it's a
18  compilation of a lot of real estate that goes into the
19  trust. It gets put together -- maintenance fees. In
20  essence, you buy as much of that inventory and
21  maintenance fees comes along with it, so there's that
22  piece.
23  So, in essence, what we were doing -- the
24  developer was paying that portion of the maintenance
25  fees. Every year, up until we started using the
Page 106

1  was for -- that was different floors of the building.
2  For the fractions that existed, the developer paid the
3  same maintenance fees as the owners.
4  Q. You're sure of that?
5  A. You're making me question myself, but, yeah,
6  I'm sure that the fractions -- the interests that
7  existed were paying the same maintenance fees as the
8  other owners.
9  There was -- I think what you're talking
10  about is for inventory that wasn't developed, because
11  we had floors of time that was undeveloped in the
12  homeowners association, and there was some subsidy
13  associated with that. There was also subsidy
14  associated with the condominium owners association.
15  But all of the maintenance fees for all of
16  the owners of actual fractional interests would've
17  been the same.
18  Q. If you're wrong on that, would you agree that
19  the Marriott Vacations -- strike that. If the
20  developer's subsidy actually applied to the unsold
21  inventory, not just the unbuilt floors, you would
22  agree that the developer was not paying full
23  maintenance fees because of the developer subsidy?
24  MR. SELLINGER: Objection to form.
25  A. Yeah, but I'm not agreeing to that.
Page 108

1  Explorer, it was paying for the maintenance fees and
2  it wasn't getting -- there was no usage that was
3  coming along with it. It was, in essence, just paying
4  maintenance fees and sitting there and watching time
5  go away.
6  It went into the Explorer Program. And when
7  it went into the Explorer program, it allowed Marriott
8  Vacation Club members to use that time. The points
9  that they were giving to use that time, there was no
10  financial benefit to those points being used. Yes,
11  that is what I'm saying -- yes.
12  BY MR. REISER:
13  Q. It's not true that Marriott Vacation Club was
14  paying full maintenance fees in San Francisco because
15  there was a developer subsidy; right?
16  MR. SELLINGER: Objection to form.
17  A. The developer was paying the same maintenance
18  fees as the owners were paying.
19  BY MR. REISER:
20  Q. You're not aware of what's called a developer
21  subsidy in San Francisco, where the developer was only
22  required to pay the reserve amount and then whatever
23  additional amounts that the club members -- through
24  their dues?
25  A. Not for the fractions that existed, no. That
Page 107

1  BY MR. REISER:
2  Q. I'm saying, if that were the case, because
3  the documents speak for themselves?
4  A. It's not the case, though.
5  Q. Okay. But if it was the case?
6  MR. SELLINGER: Wait a minute. I'm
7  trying not to interrupt, but she said that
8  it's not. So now you're asking her to
9  completely --
10  MR. REISER: I'm asking her a
11  hypothetical at this point in time, yes.
12  Hypothetically, in her position as the asset
13  manager for this club, if she would
14  understand that to be the case on -- I'm
15  trying to test her knowledge of the developer
16  subsidy.
17  MR. SELLINGER: She told you what her
18  knowledge is. You're asking her to assume
19  certain things that she believes aren't true.
20  MR. REISER: I know I am. It's going to
21  be true or not depending on what the
22  developer subsidy says.
23  MR. SELLINGER: I understand, but what
24  value is her answer where --
25  MR. REISER: I want to know her
Page 109

28 (Pages 106 - 109)

1    understanding of the developer subsidy.
2        MR. SELLINGER: Well, that's appropriate.
3    You can ask her her understanding of the
4    developer subsidy.
5        MR. REISER: Let me ask her that then.
6    Good point. Thank you.
7    BY MR. REISER:
8        Q. For the developer subsidy, the way that
9    worked was, for any units in which the developer was
10   only paying the developer subsidy, as opposed to the
11   maintenance fees, you would agree that the developer
12   is not paying the -- was paying less in maintenance
13   fees than the owners that I represent in San Francisco
14   had bought?
15       MR. SELLINGER: Objection to form.
16       A. So -- but not for the fractional interests.
17   The fractional interests -- yes, there were floors of
18   inventory that were not developed yet. There was
19   fractional interests that were planned to come that
20   hasn't been built yet or hadn't been sold yet that
21   would've been -- that would have had lower maintenance
22   fees. They weren't fractional interests that were
23   being used.
24       Q. That's your understanding?
25       A. That's my understanding.
Page 110

1        Q. All right. I'm going to show you next
2    Exhibit 1188.
3        Do you remember writing this e-mail to Lee
4    Cunningham on April 12, 2013, regarding the upcoming
5    vote for the affiliation?
6        A. I don't remember writing it specifically, no.
7    I certainly did, though.
8        Q. It says, "Interesting feedback from Aspen
9    members regarding the letter sent out last week. It
10   looks like from this letter there will be a no for
11   affiliation."
12       Is that what you believed as of April 12,
13   2013, that there would be a no vote for affiliation?
14       A. Can I see the letter?
15       MR. FERGUSON: She doesn't have it in
16   front of her.
17   BY MR. REISER:
18       Q. Sure. I'll show you the letter. It's marked
19   as Exhibit 1180. It's the letter that was jointly
20   drafted by yourself, Lee Cunningham, and the board of
21   directors in Aspen in the April of 2013 meeting.
22   Right?
23       MR. SELLINGER: Objection to form.
24       A. Yeah, this was written by -- this is actually
25   written by the board, not by us.
Page 111

1    BY MR. REISER:
2        Q. You reviewed the April letters in preparation
3    for this deposition, did you not? You're familiar
4    with this letter?
5        A. I looked at this letter, yes.
6        Q. You looked at the e-mails leading up to it,
7    where you were in Aspen and you asked folks back at
8    the home office to prepare this letter and get it out
9    quickly?
10       MR. SELLINGER: Hold on a minute.
11   Objection to form. Go ahead.
12       A. They didn't prepare the -- the Aspen board
13   wrote the letter. Yes, I talked to association
14   governance about distributing the letter, but it was
15   not written by us.
16   BY MR. REISER:
17       Q. It was approved by you, right -- you and Lee?
18       A. I saw it, yeah.
19       Q. And you know that for a fact because you
20   reviewed a series of e-mails in preparation for this
21   deposition where it states that you and Lee were in
22   Aspen; correct?
23       A. Yes, we were in Aspen.
24       Q. And you were meeting with the board; correct?
25       A. Correct.
Page 112

1        Q. Let me just actually show you this letter to
2    refresh your recollection. It's Exhibit 1185 --
3    previously marked. Here it is.
4        1185 is an e-mail chain. The first e-mail on
5    the third page is from you to Eveleen Babich, Cindy
6    Hodge, and Lori Phillips. And it says, "Eveleen,
7    Cindy, and Lori, I am in Aspen with Lee and the Aspen
8    board right now. They and Lee would like to send out
9    an e-mail communication out to members by the end of
10   the day. It's a short paragraph e-mail. We want to
11   get it out before BG announces anything. We don't
12   know if they are going to, but could over the weekend.
13   Can you please start getting the template ready?
14   Nicholas will send you the verbiage shortly."
15       That refreshes your recollection that it was
16   actually Nicholas that prepared the verbiage for this
17   letter. True?
18       A. No.
19       MR. SELLINGER: Objection to form.
20   BY MR. REISER:
21       Q. Who prepared the verbiage?
22       A. I believe it was written by the board. It's
23   signed by the board.
24       Q. But you say in here that, "They and Lee would
25   like to send out an e-mail communication to the
Page 113

29 (Pages 110 - 113)

1 members by the end of the day." Right?
2     Lee was involved in preparing the e-mail.
3 True?
4     A. No --
5     MR. SELLINGER: Objection to the form.
6     A. It was written by the board.
7 BY MR. REISER:
8     Q. Okay. On April 5th, the third e-mail chain
9 in this -- and it's on the second page -- it says --
10 it's from you to the same folks. It says, "All,
11 please find the letter attached that the Aspen board
12 would like to send out today. It has been approved by
13 Lee and myself. Please format accordingly. Also,
14 please send out via mail to all members that do not
15 have e-mail addresses on file. Thank you." And you
16 have several exclamation points after that.
17     A. I do that sometimes.
18     Q. Does that refresh your recollection as to
19 whether you and Lee approved the April 5th letter that
20 went out to the members?
21     MR. SELLINGER: Objection to form.
22     A. Yes. We saw the letter. The boards, though,
23 just to be clear -- the boards can send communication
24 out to their members at any time. It's very common
25 for them. They send communication. They want to talk

Page 114

1 to their members.
2     So it's our practice -- we will look at it
3 for something -- a glaring issue or a fact that's not
4 correct -- but we try not to get in the way of
5 changing letters from boards to their members. That's
6 not really the --
7 BY MR. REISER:
8     Q. That's not what you do?
9     A. It's not really -- I mean...
10     Q. You don't have any history of changing
11 letters that the board wrote? You, personally, don't
12 have any experience in doing that?
13     A. No. We go through -- that's what I said. We
14 go through and look at letters. We make suggestions
15 to letters. But the board, very commonly,
16 communicates to their members. They need the ability
17 to be able to communicate to their members.
18     We may go in and make suggestions to letters
19 and suggest changes to letters. But, at the end of
20 the day, if the board wants to communicate something
21 out, they have the ability to do that.
22     Q. I'm not talking generally. I'm talking
23 specifically on this April 5th letter. This April 5th
24 letter, while you were in Aspen, was approved by you
25 and Lee Cunningham. True?

Page 115

1     A. Yes.
2     Q. Now you have that letter, and you've seen
3 that the letter went out. So getting back to
4 Exhibit 1188 that says there's -- there's an
5 attachment to 1188.
6     Do you see that?
7     A. Yes, sir.
8     Q. And the attachment is a bunch of comments
9 from -- this looks like the wrong attachment. Sorry.
10     MR. SELLINGER: It's not correct.
11 BY MR. REISER:
12     Q. Forget about the attachment then. It looks
13 like the wrong attachment. I can actually show you
14 Exhibit 1178, which is the correct attachment -- Aspen
15 board letter sent, member responses.
16     Can you tell me, Ms. Sobeck, whether the --
17     MR. SELLINGER: Wait, wait, wait. I'm
18 sorry.
19     MR. REISER: Let me finish my question,
20 please.
21 BY MR. REISER:
22     Q. The comment that you made in Exhibit 1188
23 that says, "Interesting feedback from Aspen members
24 regarding the letter sent out last week," were the
25 comments that are contained in Exhibit 1178?

Page 116

1     MR. SELLINGER: I'm sorry. Will you read
2 me the question back, please?
3     (The reporter read back the last
4 question.)
5 BY MR. REISER:
6     Q. You would agree that those are the comments
7 you were referring to that --
8     A. I guess I am, but I'm looking at the comments
9 and all of these are "good job, good job, great news."
10     Q. That's because they were reacting to the fact
11 that there was not going to be an affiliation until
12 there was a vote. Isn't that true?
13     MR. SELLINGER: Objection to form.
14     A. I don't know if that's -- I guess -- if
15 you're telling me that these are connected, which I
16 see they have the same dates on them -- I don't know
17 why they're saying "good job." I guess they're saying
18 they had -- I mean, the board is saying they had
19 positive discussions today with the board of directors
20 and Lee Cunningham.
21 BY MR. REISER:
22     Q. What else does it say in the second
23 paragraph? Can you read that?
24     A. Uh-huh.
25     Q. Out loud, please.

Page 117

30 (Pages 114 - 117)

1    A. It says, "The Ritz-Carlton/Marriott
2  representatives agree that, unless a majority of Aspen
3  Highlands members, excluding the Marriott interests
4  and members not in good standing, vote in favor of
5  doing so, the Ritz-Carlton/Marriott will not include
6  Aspen in the Marriott Vacation Club affiliation,
7  exchange, and points program."
8    Q. So you would agree that was a promise to the
9  members that, unless they voted -- a majority of them
10  voted in favor of the affiliation, there was not going
11  to be an affiliation. True?
12    MR. SELLINGER: Objection to form.
13    MS. LIVINGSTON: Object to the form.
14    MR. REISER: What's the objection?
15    MR. SELLINGER: The specific objection?
16    MR. REISER: I'd like to clean it up.
17    MR. SELLINGER: Read me the question
18  back.
19    (The reporter read back the last
20  question.)
21  BY MR. REISER:
22    Q. 1180, as we've identified, is the April 5th,
23  2013 letter that went to the members, promising them a
24  vote in paragraph 2 of this letter. I'll read it. It
25  says, "The Ritz-Carlton/Marriott representatives agree
                                    Page 118

1  BY MR. REISER:
2    Q. It sounds like you like that word
3  "evolution." It's used in the July 17th letter to
4  evolve the club to a Marriott Vacation Club. This was
5  to evolve the vote to a survey.
6    Is that what you're saying?
7    A. No. Vote and survey, we were always using
8  that very interchangeably.
9    Q. You were?
10    A. Uh-huh.
11    Q. Do you know Lee Cunningham doesn't believe
12  that to be true; that he believed that a survey was
13  different than a vote?
14    A. I don't know that.
15    MR. SELLINGER: Objection to form.
16  BY MR. REISER:
17    Q. You didn't hear that before?
18    A. That I heard what he thought, it was
19  different?
20    Q. No. I'm asking you -- strike that. Did you
21  ever talk to Lee Cunningham about his testimony he
22  gave on Friday and yesterday?
23    A. No.
24    Q. You didn't have one word with him about his
25  testimony?
                                    Page 120

1  that, unless a majority of Aspen Highlands members,
2  excluding the Marriott interests and members not in
3  good standing, vote in favor of doing so, the
4  Ritz-Carlton/Marriott will not include Aspen Highlands
5  in the Marriott Vacation Club affiliation, exchange,
6  or points program."
7    Wouldn't you agree, Ms. Sobeck, that that is
8  a promise to the members that, unless the majority of
9  Aspen Highlands members vote to do so, Ritz-Carlton
10  and Marriott agreed not to include the Aspen Highlands
11  in the Marriott Vacation Club affiliation, exchange,
12  or points program?
13    MR. SELLINGER: Objection to form.
14    A. Yeah -- I mean, I don't think it's a promise.
15  I mean, it's the association -- talk of the board --
16  talking about what took place in the discussion.
17    You know, this was very early on. This was
18  April 2013. The vote didn't actually go out until, I
19  believe, the end of the year. A lot of things evolved
20  between April and the end of the year of 2013 when an
21  actual vote was conducted.
22    The survey and the way that we were trying to
23  get opinions of the owners -- you know -- there was a
24  lot of evolution that happened between April and
25  December on the survey that was conducted.
                                    Page 119

1    A. I talked to him since then.
2    Q. Did he talk about his testimony?
3    A. No -- we had a few words about "How did it
4  go? Did it go okay?" But, no, there was no
5  specifics.
6    Q. You don't remember him telling you that he
7  changed his mind, that a vote was not necessary after
8  talking to Barbara Egolf?
9    MR. SELLINGER: Objection to form.
10    THE WITNESS: Isn't that like a counsel's
11  question?
12    MR. SELLINGER: You can ask about -- you
13  can respond to a conversation that you had
14  with Lee if you are able to.
15    A. Yeah -- we definitely discussed that a survey
16  was a better way to describe what we were doing than a
17  vote. We were using the words interchangeably early,
18  but a survey was counsel's --
19    MR. SELLINGER: Hold on a minute. I'm
20  sorry. I don't want to interrupt. Let me
21  make sure the instruction is clear.
22    THE WITNESS: Okay.
23    MR. SELLINGER: It's important. At no
24  point are you authorized to disclose your
25  communications with counsel.
                                    Page 121

31 (Pages 118 - 121)

1    THE WITNESS:  Okay.

2    MR. SELLINGER:  Mr. Reiser can ask you

3    what steps you took before, what steps you

4    took after, and what understanding you had --

5    but no -- you're instructed not to disclose

6    privileged conversations.

7    THE WITNESS:  Okay.

8    MR. SELLINGER:  Do your best to answer

9    the question, but follow the instruction and

10    make sure you're not intruding upon

11    privileged information.

12    A.  Yes.  It was definitely discussed that a

13    survey was a better way to describe what we were

14    ultimately doing at the end of 2013 through the Aspen

15    survey.

16    BY MR. REISER:

17    Q.  And no effort was made to inform the members

18    at Aspen Highlands that there was no longer going to

19    be a vote, as the word was used on April 5th; that

20    that vote was not going to take place.  It was,

21    rather, going to be a survey?

22    A.  I think it was made very clear in the

23    communications that went out with the survey of what

24    it was and what its intention was.  So, yeah, they

25    were told it was going to be a survey.

Page 122

---

1    BY MR. REISER:

2    Q.  So the Ritz-Carlton/Marriott representatives

3    agreed that unless the majority of Aspen Highlands

4    members -- so you would agree that means one half of

5    the 876 members?

6    A.  That's what a majority means; but, truly, in

7    the world of voting, there's a lot of different -- you

8    can have a majority of people who vote; you can have a

9    majority of people -- I mean, there's different ways

10    to look at it.

11    I see what the words are there and I can

12    certainly understand what you're saying.

13    Q.  So this looks like a promise to the members

14    that, unless a majority of the 876 vote in favor of

15    doing so, there would be no affiliation.  True?

16    MS. LIVINGSTON:  Object to the form.

17    MR. SELLINGER:  Objection to form.

18    BY MR. REISER:

19    Q.  So that's how you read this paragraph?

20    A.  Can I -- just to be clear -- I understand

21    what the words are.  We never would have thought we

22    could get 440 members to vote -- vote, survey,

23    whatever -- for.

24    You know, when we go out to the members,

25    these are member -- vacation destinations.  They come

Page 123

---

1    for two or three weeks a year.  They're very busy.

2    They're all very successful members with very busy

3    lives.  To get members to actually -- even for

4    elections and those type of things -- association

5    governance things -- it's very difficult to even get

6    quorum, much less half of the members to respond to

7    anything.

8    So, you know, to go through all this effort

9    and think we're going to get -- I mean, Aspen has 876

10    separate interests -- to think we were going to get

11    440 separate members to come forward and participate

12    in this, it's just -- it never would've been the case.

13    Q.  Well, I mean, you actually got a majority of

14    the members to vote down in St. Thomas to amend the

15    declaration to achieve your efforts; right?

16    A.  That's a whole different thing, though.

17    Actually, that --

18    Q.  Why is --

19    MR. SELLINGER:  Hold on.  Wait a minute.

20    Wait a minute.  Finish your answer.

21    A.  That's actually -- that was a declaration

22    amendment.  That we actually knew, going forward with

23    the association, that there were going to be -- have

24    to be all types of effort to go out and get members.

25    We actually specifically knew there that it was going

Page 124

---

1    to be an extreme effort to try to get those members to

2    step forward, and the board wanted us to do that,

3    wanted to do it themselves.  They actually assisted

4    with it because it was beneficial to them.

5    They were ecstatic we were helping with their

6    bad debt situation.  They wanted the change in the

7    declaration to happen, so that was something that

8    was -- we knew was going to be a big effort.  They

9    agreed; they stepped forward, and together we were

10    able to do that.

11    It's a very different situation than this

12    going out and understanding the opinions of the owners

13    on a decision that was ultimately Cobalt's decision to

14    make.

15    BY MR. REISER:

16    Q.  This doesn't say that they were looking for

17    the opinions of anybody.  This says that, unless a

18    majority of Aspen Highlands vote in favor of doing so,

19    the Marriott would not include Aspen Highlands in the

20    Marriott Vacation Club.  That was a promise made to

21    the members that you and Lee Cunningham approved.

22    True?

23    MS. LIVINGSTON:  Object to the form.

24    MR. SELLINGER:  Objection to form.

25    A.  I understand that that's what it says.

Page 125

Veritext Legal Solutions
866 299-5127

1  This -- from the time that this happened and the
2  letter happened and the survey happened in the end of
3  December, there was a lot of things that changed in
4  there. And the communication that went out with the
5  survey at the end of 2013 was very clear on what it
6  was. It evolved from this April 13th message. There
7  was a lot of time that went by and a lot of
8  discussions and work and understanding that happened
9  between April and the end of the year.
10 BY MR. REISER:
11     Q. So your counsel has produced all of the
12 back-and-forth drafts of the efforts to get the vote,
13 so we have all those. I think you're going to see
14 them when Mr. Ferguson questions you later this
15 afternoon. So I'm not unfamiliar with the change that
16 happened between this letter and the November 19th
17 letter that went out to the members.
18         And I know you were very involved in
19 wordsmithing the letter. True?
20     MR. SELLINGER: Objection to form.
21     A. I worked -- well, there were several -- there
22 were a couple different letters.
23 BY MR. REISER:
24     Q. There were iterations of the letter that
25 transpired over six months; right?

Page 126

1  the end of -- and this one. Other survey?
2     Q. You don't?
3     A. Well, we do surveys. We do, like, guest
4  satisfaction surveys, like, after you go stay.
5     Q. The members get a survey every time they stay
6  at the resort. True?
7     A. That's what I'm saying. Yeah, but that's
8  not --
9     Q. So they got another survey in December of
10 2014. How were they to know that that wasn't just
11 another survey? Especially since the letter said, as
12 written by you guys, the sole purpose of the survey
13 was to get their feedback on whether they wanted
14 affiliation.
15     MR. SELLINGER: Objection to form.
16     A. I'm sorry. I don't understand why you're
17 confusing the guest satisfaction surveys, which is
18 just a "how was your stay; was your room clean"
19 survey.
20 BY MR. REISER:
21     Q. I'm not confusing --
22     MR. SELLINGER: Hold on.
23     A. -- with the end-of-the-year survey; that it
24 was clearly outlined that we were looking for the
25 feedback of the owners in regards to affiliation.

Page 128

1     A. I was involved with that.
2     Q. So you were involved with all those
3  iterations?
4     A. Most of them.
5     Q. And you redlined the communications to the
6  members, along with Randy Mercer, back and forth?
7     A. Yes. We went back and forth on the letters.
8     Q. Okay. And you two evolved this promise of a
9  vote into a survey. True?
10     MR. SELLINGER: Objection to form.
11     A. The whole process -- it was always going to
12 be opinion gathering. Obviously, that's what it is.
13 It's opinion gathering. This isn't a governance --
14 there's no governance vote that was associated with
15 this or later in the survey. There's no document
16 change that's happening because of this.
17 BY MR. REISER:
18     Q. Did you ever tell any of the members that
19 this letter was no longer in play; that, instead, you
20 were just going to get their feedback again? Because
21 there had been other surveys between the evolution
22 letter on July 17, 2012 and the survey that went out
23 in December of 2014. There were numerous surveys that
24 were taken by The Ritz. True?
25     A. I don't remember any between the -- 2012 and

Page 127

1         Those are -- I understand what you're saying,
2  that they get multiple things from us, but, I mean,
3  the guest satisfaction survey that they get after
4  every stay, they've been getting those the whole time
5  that they've been members.
6  BY MR. REISER:
7     Q. What about the survey we spent some time on a
8  minute ago, Exhibit 1700? It has 780-plus comments
9  from people. That was a survey that was taken in
10 between the promise of a vote and the actual survey,
11 wasn't it?
12     A. I don't remember the date. I thought it was
13 before that, but maybe it was around the same -- I
14 don't remember.
15     Q. Okay. All right. I'm just showing you
16 Exhibit 1305. That was the final letter that went out
17 to the members that you had a role in drafting. True?
18 I'll show it to you. Here you go.
19     A. Yes.
20     Q. If you can go ahead and review this letter,
21 I'm going to step out for one minute. I'll be back.
22     A. Sure.
23     Q. So you've had a chance to review
24 Exhibit 1305?
25     A. Yes, sir.

Page 129

33 (Pages 126 - 129)

1   Q. On the last paragraph on this first page --
2   A. Yes.
3   Q. -- you would agree -- before I get to that
4   last paragraph -- you would agree that you had a role
5   in drafting this letter along with the board?
6   A. Yes.
7   Q. And on the last page of -- the last paragraph
8   of the first page, it states, "As mentioned above, the
9   sole purpose of the survey is to understand the Aspen
10  Highlands members' interest in this voluntary exchange
11  program, which would allow members to exchange a week
12  of their reserved allocated time for points within the
13  Marriott Vacation Club Destination exchange program."
14     That was the sole purpose of the survey, was
15  to understand their interest in the voluntary exchange
16  program?
17  A. Yeah.
18  Q. It wasn't to hold a vote of a majority of the
19  members. True?
20  A. Yeah, it was to survey the members and
21  understand how they felt about it.
22  Q. And the survey was not intended to be a vote
23  that was promised in the April 5th letter that we've
24  been discussing?
25     MR. SELLINGER: Objection to form.

Page 130

1      MS. LIVINGSTON: Object to the form.
2   A. It was a survey. It was a survey. It was a
3   survey then, and it was a survey.
4   BY MR. REISER:
5   Q. So it was a survey on April 5th, 2013, and it
6   was a survey on November 19, 2013. That's your
7   testimony?
8   A. It was always intended to get the -- to
9   understand the interest of the owners. No matter what
10  word we use, vote or survey, the intention of it was
11  always to understand the opinions of the owners and
12  their thoughts about the voluntary exchange program of
13  MVCD.
14  Q. Is there any regret on your part that the
15  words "vote" -- "majority vote" -- was required --
16  strike that.
17     Do you regret at all that the April 5th
18  letter sent out to the members promised them a vote of
19  the majority of members before there would be an
20  affiliation?
21     MS. LIVINGSTON: Object to the form.
22     MR. SELLINGER: Objection to form.
23  A. I regret if it's caused any confusion that
24  you're talking about. I think the -- at the end of
25  the day, I think it's very clear, the message evolved.

Page 131

1   It was extremely clear when it actually went out to
2   the members with what we were actually doing. So --
3   Q. Would you agree -- sorry. I'll let you
4   finish.
5   A. No.
6     MR. REISER: Can you put up 1175 again?
7   I can show you my copy.
8     MR. SELLINGER: We haven't looked at that
9   today. Hold on a minute so we can get a
10  copy.
11    MR. MARX: We don't have it from this
12  trip.
13    MR. REISER: From this trip? What do you
14  mean by that?
15    MR. MARX: The collection of documents
16  that we have from the depositions that were
17  taken this week.
18    MR. REISER: Okay.
19    MR. MARX: So if 1175 was shown in a
20  prior deposition, which I have no doubt that
21  it was, we would have it in the pile. And to
22  be honest, it may have been used this week,
23  because it's been a long week and the pile
24  sometimes gets confused.
25  BY MR. REISER:

Page 132

1   Q. All right. Why don't we just look at 1180
2   then? I think everybody's got that.
3   A. I have 1180.
4   Q. Okay. The second paragraph of 1180 is the --
5   this is the April 5th, 2013 letter that was approved
6   by you and Lee in Aspen. True?
7   A. Yes.
8   Q. The second paragraph of that letter says, as
9   we've read many times here today -- but for purposes
10  of this question, I'm going to read it again -- "The
11  Ritz-Carlton/Marriott representatives agree that,
12  unless a majority of Aspen Highlands members vote in
13  favor of doing so, the Ritz-Carlton/Marriott will not
14  include Aspen Highlands in the Marriott Vacation Club
15  affiliation, exchange, points program."
16     My question is, would you agree that a member
17  who received this letter would be reasonable in
18  assuming that there would be a vote of the majority of
19  members in good standing at the Aspen Highlands Club
20  before an affiliation would take place?
21     MR. SELLINGER: Objection to form.
22  A. There was a survey taken, and it was clearly
23  explained to the members of what was happening and
24  what the survey was for.
25  BY MR. REISER:

Page 133

34 (Pages 130 - 133)

1    Q. I'm going to move to strike as
2  non-responsive.
3       I'm asking you a question, and it's different
4  from what -- the survey that went out later on. I'm
5  asking you, would you agree that in April 2013, when
6  the members received this letter, that they would be
7  reasonable in assuming that there was going to be a
8  vote of the majority of the members of Aspen Highlands
9  before an affiliation between their club and the
10 Marriott Vacation Club would occur?
11      MR. SELLINGER: Objection to form.
12    A. I would agree that they would certainly think
13 that, yes, something was coming out, which is what the
14 intention was. Were we focused on the "vote" word?
15 No, we were not focused on the "vote" word. In our
16 mind, it was -- we knew exactly what it was for, and
17 the board knew what it was for. We were going out to
18 get people's opinions.
19 BY MR. REISER:
20    Q. Regardless of what you guys thought, again,
21 I'm asking whether you would agree that a member who
22 received this would be reasonable in assuming that,
23 based on this letter, there would be a majority of
24 Aspen Highlands members voting before there would be
25 an affiliation between their club and the Marriott

Page 134

1  Vacation Club?
2       MR. SELLINGER: Objection to form.
3     A. I certainly understand what you're saying. I
4  think that, if I was a member -- what you're trying --
5  you're asking me to put myself in a member's shoes --
6  I would need a lot more information than this to
7  understand either way of what was happening.
8       So this was a very short, quick letter that
9  was expedited out after a meeting that happened
10 between all of us. They were trying to get something
11 out to their members to let the members know that they
12 had talked to us and we were discussing how things
13 were progressing and so on.
14      So it really doesn't share much information.
15 I mean, I understand what you're saying. Yes, it says
16 vote; yes, it says majority. But at the same time,
17 it wasn't -- for us, it was not something that was
18 really -- that was being focused on, because we knew
19 there would be many more communications coming
20 afterwards to make things more explicitly detailed.
21 BY MR. REISER:
22    Q. And after you received feedback from the
23 members in response to the letter, you wrote the
24 letter we saw earlier, where you stated your opinion
25 that it looks like there was going to be a no vote in

Page 135

1  favor of affiliation. True?
2     A. Yeah. We're back to the 1188?
3     Q. Yeah.
4     A. Yeah -- I'm trying to understand why I
5  would've said that, because I'm looking through --
6  again, if this is the exhibit --
7     Q. It is. And they're saying "good job" because
8  there was a vote promised, and they thought they were
9  going to get a vote. Don't you read it like that?
10      MS. LIVINGSTON: Object to the form.
11      MR. SELLINGER: Objection to form.
12    A. I don't read it like that, quite frankly.
13 BY MR. REISER:
14    Q. So why are they saying "good job" then?
15    A. Good job because they're talking to us; good
16 job because we're having communications between the
17 Ritz-Carlton and that the board's engaged. I mean,
18 these are all voluntary board members, who are busy,
19 and they're spending their time working with us
20 through a solution.
21      Truly, all we were trying to do was offer
22 them a solution of other options -- a voluntary method
23 of being able to use a different program.
24    Q. That's all you were trying to do --
25      MR. SELLINGER: Hold on. I'm sorry. Are

Page 136

1  you finished with --
2       THE WITNESS: Yes, I am finished. I
3  guess I am finished.
4       THE VIDEOGRAPHER: Counsel, we have five.
5  BY MR. REISER:
6     Q. The letter actually reads, again, that there
7  would be a majority of Aspen members vote -- I mean, a
8  majority -- let me start over.
9       Doesn't it say that the -- isn't it true that
10 the -- well, strike that.
11      I just want to get to why, in Exhibit 1188,
12 you gleaned from the responses from the members that
13 there was going to be a no vote. If you don't know,
14 you don't know. It seems like you're puzzled by the
15 comments.
16      But, nonetheless, contemporaneous with
17 reading them, you understood and you wrote to Lee
18 Cunningham that it looked like there would be a no
19 vote. True?
20    A. I did write that. I see it right here. I
21 don't really -- as I read these, I don't really see
22 why. I mean, there's not even a lot of talk. There's
23 one -- here -- comment on MVC, but there's more
24 comments on the clubs. There's another one on MVC.
25 There's -- it's just a mix of comments about the other

Page 137

35 (Pages 134 - 137)

1  properties that they lost, about Abaco.
2      So, yeah, I see it --
3      Q. You're reading now --
4      MR. SELLINGER: Hold on.
5      MR. REISER: Phil, I mean, I can tell
6  when she's done. You don't have to really do
7  that every time. I think she was done. If
8  she's not, she can --
9      MR. SELLINGER: No. Hold on a minute.
10  No. She's entitled to answer, and there were
11  still words coming out of her mouth. I'm not
12  even accusing you of doing it deliberately,
13  but she is entitled to answer. She's towards
14  the end of her answer -- I agree with you --
15  but I don't know if she's done or not.
16      MR. REISER: Fair enough.
17  BY MR. REISER:
18      Q. Were you done?
19      A. Something really good could have been coming.
20  Yes, I'm done.
21      Q. I understand that you're reading these now
22  and you don't quite understand why you said that.
23  But, nonetheless, contemporaneous -- that is, in April
24  of 2013, you read the feedback from the members that
25  there was going to be a no vote on the affiliation.

Page 138

1  benefits were of this.
2      Because of the fact that we went with the
3  evolution letter, which I know we're focusing on the
4  negative, there were other members that were actually
5  interested in it.
6      By us or anyone deciding not to move forward
7  with this, it just wasn't -- you know -- it would've
8  been difficult on both sides. There was no --
9  unfortunately, there was no perfect answer.
10      We created, through this process, a survey,
11  working with the boards, understanding the members'
12  feedback -- the best process we could. We hadn't done
13  this before. There was no perfect roadmap to do this,
14  but we created what we thought was the best way to
15  move forward in a, obviously, difficult situation.
16      THE VIDEOGRAPHER: Out of time, Counsel.
17      MR. REISER: Let's switch the tape.
18      MR. MARX: Let's break for lunch now, so
19  we're clear that we don't waste ten minutes
20  and then we decide we're going to take a
21  lunch --
22      MR. REISER: Can I ask you a favor? When
23  we put the tape back in, can we go for, like,
24  two or three more documents and then break
25  for lunch? Because I'm going to turn it over

Page 140

1  True?
2      MR. SELLINGER: Objection to form.
3      A. That appears to be -- that appears to be
4  what -- yes -- what I wrote here.
5  BY MR. REISER:
6      Q. Okay. It was shortly thereafter that the
7  decision was made to not hold a vote and to, instead,
8  insert a survey, which the sole purpose was to gauge
9  the members' interest in the voluntary exchange
10  program?
11      MR. SELLINGER: Objection to form.
12      A. No. We had always -- it was always -- again,
13  I was always -- for us, it was -- survey, vote -- it
14  was always to try to understand the thoughts of the
15  members.
16      We want members happy. We want the members
17  to be able to enjoy. The challenge with any of these
18  things is, you get a vocal few; but at the same time,
19  as things were evolving between April and the end of
20  the year, what was happening is, members knew about
21  this. You're talking about the members who were
22  unhappy, but there were other members contacting us
23  wanting to access the program.
24      We had Ritz-Carlton members who were Marriott
25  Vacations members as well, and they knew what the

Page 139

1  to Matt, and I'm not going to be available to
2  ask any more questions because I'm going to
3  have to catch a flight. So five or ten more
4  minutes on the new tape, and then we can stop
5  for lunch.
6      THE VIDEOGRAPHER: The time is 11:58.
7  That concludes media two in the deposition of
8  Stephanie Sobeck.
9      (Brief recess.)
10      THE VIDEOGRAPHER: The time is 12:03.
11  This is media three in the deposition of
12  Stephanie Sobeck.
13  BY MR. REISER:
14      Q. I'm going to show you Exhibit 1208. Do you
15  have that? Here's a copy that I previously marked in
16  a deposition last week.
17      I'm actually -- don't worry about the top
18  part of it. What I'm really interested in is the
19  first e-mail in this e-mail chain dated May 14, 2013
20  from Lee Cunningham.
21      Do you remember a time in the May 2013 period
22  when there was a new enrollment form that went out for
23  Lion & Crown, and certain folks were thinking there
24  was some nefarious intent kind of language?
25      A. I do. There was an annual enrollment of Lion

Page 141

Veritext Legal Solutions
866 299-5127

1  & Crown, and it went out.  And Bachelor Gulch
2  communicated out that we had some type of -- we were
3  doing something shady on the back side.  I don't
4  remember how they said it.  That's the message.
5      Q.  Do you recall that Lee Cunningham, in
6  response to that event or that chatter by the Bachelor
7  Gulch folks, sent out a letter to all of the club
8  members to clarify the intent of the language in the
9  Lion & Crown...
10     A.  Yes.  And I think there might have been two
11 letters, right?  One is if a member had been
12 affiliated and one wasn't.  But, yes, I remember it,
13 because we were happy to clarify there wasn't any poor
14 intentions of it.
15     Q.  Okay.
16     A.  Yep, I remember.
17     Q.  Thank you for that.  I was just trying to get
18 the context of what I really want to ask you about,
19 which is on the second page of the letter, second
20 paragraph.
21        It starts, "Second, regarding other potential
22 affiliations, we want to assure you that a
23 Ritz-Carlton Club affiliation with Marriott Vacation
24 Club Destinations will not take place unless there's
25 an affirmative vote of each club's membership."

Page 142

1      Q.  You're right.  I don't expect you to.  But it
2  does say it in the letter.  It says -- Steve Andrews
3  to other folks -- "Dear Members, thank you for those
4  who took the time to respond to the survey in our last
5  communication.  We have summarized the results of the
6  78 members that responded."
7        That was more members that responded to the
8  survey that Marriott took approximately a little over
9  a year later with regard to the affiliation.  True?
10     A.  Yes.
11     Q.  There's a letter that went out that you
12 actually were informing folks that the vote in
13 San Francisco was 13 to 11.
14        Do you remember that letter?
15     A.  The affirmative vote for the affiliation?
16     Q.  Yeah.
17     A.  Yeah -- was it a letter?  I think it was an
18 e-mail to the board.
19     Q.  E-mail?
20     A.  Yeah.
21     Q.  It was 13 to 11, so 24 members responded to
22 that one?
23     A.  I don't remember the numbers, but, yes.  I
24 just don't remember the numbers of the actual vote,
25 but, okay.  I'm sure you...

Page 144

1        Do you remember that this letter -- strike
2  that.  Do you remember the promise of -- another
3  promise of a vote from Lee Cunningham's own hand?
4        MR. SELLINGER:  Objection to form.
5      A.  I mean, I certainly see the discussion here
6  about the vote again, yes.
7  BY MR. REISER:
8      Q.  Okay.  And then I was going to ask you next
9  about Exhibit 1278.
10        Do you remember that Steve Andrews and Al
11 Bruno were members of the board at the San Francisco
12 club in 2013?
13     A.  I do.
14     Q.  You've met both those gentlemen?
15     A.  I have.
16     Q.  Do you recall, in August of 2013 or
17 thereabouts, they sent out a letter to their members
18 reporting on a survey that the board had taken,
19 independent of Marriott, to survey the members on what
20 was going on with the club?
21     A.  I do remember that.  I remember them...
22     Q.  And you remember that the results of the
23 survey -- there were 78 members that responded to the
24 survey.  True?
25     A.  I don't remember 78.

Page 143

1      Q.  Okay.  And you see here in the e-mail that
2  was taken independently by the San Francisco board,
3  the numbers were a little different.  It said that
4  over 81 percent of the respondents would prefer to
5  liquidate their Ritz-Carlton Destination Club's San
6  Francisco purchase rather than convert to Marriott
7  Vacation Club or remain in the club as is.
8        You knew that this was a bad sign in terms of
9  the vote for the San Francisco club.  True?
10        MR. SELLINGER:  Objection to form.
11     A.  Right, but they were asking them something
12 different than what we were asking them.
13 BY MR. REISER:
14     Q.  How do you know what they asked them?
15     A.  It says they were talking about -- they were
16 talking about preference to liquidate or some of these
17 other things.  So, I mean -- sorry, that's not what
18 we -- the affiliation survey that we did at the end of
19 2013 had nothing to do with selling your time or
20 anything like that.
21     Q.  Do you remember around this time period
22 that the Marriott Vacation Club gave members of
23 San Francisco an option to trade their fractionals to
24 other clubs?
25     A.  I do.

Page 145

37 (Pages 142 - 145)

1    Q. Why was that?
2    A. You know, I don't remember. We had members
3 who were unhappy. There was concern about --
4 obviously, their maintenance fees were high. We
5 talked about that before. They were over a thousand
6 dollars.
7        There were some different ways that the
8 program for San Francisco works as far as individual
9 nights. They don't get reserved allocation. They had
10 a weekend restriction. There were several things that
11 were making them unhappy with their ownership.
12        So we thought, as a company, if we could
13 look for a couple options for them, that it would at
14 least give the owners a chance, if they want to -- in
15 San Francisco, they could either own in another club,
16 or, I think, we gave them the option to convert to
17 Marriott Vacation Club points on a permanent basis, if
18 they wanted to.
19    Q. Steve Andrews and Al Bruno both, shortly
20 after this e-mail, resigned from the board. Do you
21 remember that?
22    A. Uh-huh.
23    Q. Yes?
24    A. I do. Yes, I do.
25    Q. Why did they resign from the board, if you

1 know?
2    A. I think they had just had it. I think,
3 actually, one of them, I believe, took a different
4 ownership -- I'm not sure if it was Steve or Al, but I
5 think one of them ended up going somewhere else.
6    Q. Marriott didn't have anything to do with them
7 resigning from the board?
8    A. Did we have anything to do with them
9 resigning?
10    Q. Yes, that you're aware of.
11    A. I guess, if we would have -- if we would have
12 converted their time, we would have had something to
13 do with it. If they didn't want to own, then -- I
14 think it was Steve Andrews. I think he actually ended
15 up going to another club. So, yeah, we would have had
16 something to do with it because we would have helped
17 facilitate that for him.
18    Q. Did Steve Andrews get any special treatment
19 in the Hawaii club in relation to his trading from the
20 San Francisco membership?
21        MR. SELLINGER: Objection to form.
22    A. I'm sorry? Special treatment; what do you
23 mean?
24 BY MR. REISER:
25    Q. Did he get any special rights to use the

1 Hawaii Club or any use of the Hawaii Club as part --
2    A. I think that might have been where he -- that
3 was his -- he loved the Kapalua project. That was one
4 of the ones for him. I think he ended up exchanging
5 into Kapalua.
6    Q. But Kapalua was already out of it, wasn't it,
7 by August of 2013?
8    A. It was, but there was some developer that
9 was -- there was some minimal developer who owned
10 inventory that still existed.
11    Q. And you gave that developer-owned
12 inventory -- you gave Steve Andrews access to that
13 inventory?
14    A. I think we actually exchanged his time for
15 it. So his San Francisco -- because we didn't have
16 anything to do with Kapalua. It was not branded
17 anymore, so we didn't have anything to do with that
18 club.
19        So we had inventory there that we, in
20 essence, couldn't do anything. We were going to
21 eventually have to sell it. He was interested in
22 going, so we swapped him, for his San Francisco, to
23 that interest.
24    Q. He was the only member you allowed to swap
25 into Hawaii. True?

1        MR. SELLINGER: Objection to form.
2    A. I believe he's the only one who asked. We
3 didn't publicize Kapalua, because we didn't have -- we
4 had very limited inventory left, unlike the other
5 clubs. We had more inventory. They were, obviously,
6 all still Ritz-Carlton. We didn't really want our
7 members to go. We wanted to keep them in the
8 Ritz-Carlton program, so...
9 BY MR. REISER:
10    Q. What did you do with the excess inventory in
11 Kapalua?
12    A. We still have a few of the fractions left.
13 We didn't have that much. I can go back and look at
14 the number. We didn't have that many. We still have
15 two interests, I believe. Another one or two, we may
16 have done exchanges with for people who were
17 interested in going to Kapalua.
18    Q. There's a big lawsuit in Kapalua for the
19 fractionals going on. True?
20    A. There is a lawsuit in Kapalua.
21    Q. So there's a lot of fractional owners over
22 there that are unhappy with what happened in terms of
23 deflagging the Kapalua property?
24    A. I don't know the nature of the Kapalua. I
25 don't know if it's the fractional interests or...

Veritext Legal Solutions
866 299-5127

Page 150

```
 1      Q.  At the time the Kapalua property was
 2   deflagged, how much developer inventory was owned by
 3   Marriott -- fractional?
 4      A.  Fractional inventory?  I'm sorry.  I don't
 5   know the exact number.
 6      Q.  You were the asset manager for that property?
 7      A.  Jeff Hanson was actually the asset manager
 8   for Kapalua.  He was -- it was his one project.  That
 9   was a weird project because it was a joint venture.
10   Joint ventures require a lot more time and so on.  So
11   he actually dedicated most of his time to working
12   through that partnership.
13      Q.  I'm just wondering what price was obtained
14   through the disposition of the developer-owned
15   inventory of the fractionals that were owned by
16   Marriott following the deflag?
17      A.  What price?  I don't think we sold any
18   because I don't think we had them out on the open
19   market.  I think you could find out what the market
20   price is, because I believe -- I don't even know who's
21   selling them -- but I saw something the other day --
22   on Montage, there was something about the pricing.
23      Q.  What is the pricing in Hawaii for one of
24   those fractionals currently?
25      A.  I mean, they're all -- I think I was looking
```

Page 151

```
 1   at -- I can't -- I can send it to you.  I don't want
 2   to misspeak on the price.
 3      Q.  Is it six figures?
 4      A.  Six figures, uh-huh.
 5      Q.  Is it over 200,000 for a fraction there?
 6      A.  I don't remember.  I don't remember, and I
 7   don't remember the size of the fractions.
 8      Q.  And the value of the fractions in
 9   San Francisco when Steve Andrews traded his fraction
10   for the Kapalua fraction was somewhere under 50,000.
11   True?
12      A.  Yeah -- I don't think there had been sales
13   when Steve had sold.  I'm not sure if anybody's
14   actually sold.  And just to be clear, I was talking
15   about the market value of Hawaii now.  I don't know
16   what it was back when this occurred.
17      Q.  Okay.  You don't know what it was in 2013?
18      A.  In 2013, I don't.
19      Q.  You were aware, though, that it was
20   worth much more than the value of a fraction in
21   San Francisco, right, in 2013?
22      A.  I can -- no -- I mean, I wasn't aware of
23   that.  I think there's -- probably, to Steve, it was
24   worth probably a lot, because he loved going there and
25   that's -- he always said that's the reason he joined
```

Page 152

```
 1   the club.
 2         To us, it really wasn't worth that much
 3   because we couldn't do anything with the inventory.
 4      Q.  But the fractions that were -- that
 5   ultimately got taken over by Timbers and then Montage?
 6      A.  Well, Timbers just did a little interim
 7   agreement with them, but it's run by Montage today.
 8      Q.  Is it true then that Steve Andrews -- the
 9   developer inventory that you allowed him to trade from
10   San Francisco became a Montage fractional?
11      A.  I assume he still owns, but it would have,
12   yes.
13      Q.  Okay.  One final exhibit.  Then I'm going
14   to -- if I could show you Exhibit 1602?
15         MR. SELLINGER:  We don't have that.
16         MR. MARX:  Oh, thank you.
17         MR. SELLINGER:  Thank you.
18   BY MR. REISER:
19      Q.  So do you remember frequently asked questions
20   prepared by Marriott Vacation Club to go out to the
21   members in relation to a webinar that Steve Weisz and
22   Lee Cunningham held for the members in the summer of
23   2012, after the evolution was announced?
24      A.  Yes, I do.
25      Q.  Can you turn to the last page of this
```

Page 153

```
 1   document?  Number 12, it actually asks, "Why are these
 2   changes being made now?"  And the answer given by
 3   Marriott Vacation Worldwide, was that, "For mid 2009
 4   through June 2012, Marriott International, Inc., and
 5   Marriott Vacation Worldwide recorded losses in excess
 6   of $600 million on the Ritz-Carlton Club business
 7   line."
 8         MR. SELLINGER:  Objection to form.
 9         MR. REISER:  What's the objection?
10         MR. SELLINGER:  You said the answer given
11      by Marriott Vacation Worldwide, and I don't
12      believe it's a Marriott Vacation Worldwide
13      document.
14         MR. REISER:  Thank you.  I'll clarify.
15   BY MR. REISER:
16      Q.  Do you remember that the answer given by The
17   Ritz-Carlton Destination Club was as read, that the
18   changes are being made now because Marriott Vacations
19   Worldwide had lost $600 million on the Ritz-Carlton
20   business line?
21      A.  I do.
22      Q.  Do you recall Ritz-Carlton also explaining
23   that the Marriott Vacation Worldwide currently owns
24   nearly 25 percent of all Ritz-Carlton Club inventory
25   with sales pace at any reasonable price slowing to an
```

39 (Pages 150 - 153)

1  unprecedented and unsustainable level.  In the
2  meantime, Marriott Vacation Worldwide is paying
3  club dues on these unsold fractions in excess of
4  $11 million year, plus subsidizing the operating costs
5  at a number of clubs for an additional $4 million a
6  year?
7      Do you remember that being a reason given to
8  the members as to why Marriott was looking to both
9  sell its remaining inventory to the Marriott Vacation
10  Club Worldwide and affiliate the Marriott Vacation
11  Club with The Ritz-Carlton Destination Club?
12      MR. SELLINGER:  Objection; compound.
13      A.  Just to be clear, though, because 1 think
14  we're confusing things -- the opportunity to put the
15  inventory in the trust -- the unsold inventory in the
16  trust -- is completely separate from affiliation.
17  BY MR. REISER:
18      Q.  I understand.  That's been talked about a
19  lot.
20      A.  Okay, but that's not -- sorry.  You were kind
21  of combining them in that.  This is really talking
22  about the fact that we own all this inventory and we
23  need to do something with all this inventory, and the
24  expense of all this inventory on the books year after
25  year.  That's a whole different...

Page 154

1  Worldwide intends to sell most of its remaining unsold
2  Ritz-Carlton Club inventory through the Marriott
3  Vacation Club Destination programs."
4      Then it goes on to say, "Given the state of
5  the luxury fractional market and the market's unlikely
6  recovery in the near term, selling this inventory
7  through the Marriott Vacation Club Destination program
8  relieves the significant financial burden of the
9  unsold inventory in a balanced way."
10      Did you have any role in drafting this
11  language?
12      A.  I certainly would have seen it.  I don't
13  think I drafted it, but I certainly would have seen
14  it.
15      Q.  What was meant by "relieving the financial
16  burden on Marriott Vacation Club in a balanced way"?
17  Do you think it was the members' responsibility or
18  obligation in any way to help relieve Marriott
19  Vacation Club of its significant financial burden?
20      MR. SELLINGER:  Objection to form.
21      A.  Well, I mean, there was -- as we just read
22  before, it was $11 million a year in unsold
23  maintenance fees that the developer was carrying every
24  year and really getting no benefit out of.
25      So the ability for the developer to take that

Page 156

1      Q.  Go ahead and read the frequently asked
2  questions.  This addresses both the sale of the
3  developer unsold inventory, as well as the affiliation
4  question.  Does it not?
5      A.  Does it talk about both?  Sure.
6      Q.  Yeah.  This frequently asked questions is
7  dealing with both of the issues we just mentioned?
8      A.  Yeah, because it was -- yes, because it was
9  in response to the evolution letter that went out.
10      Q.  And they're talking about the Lion & Crown
11  program, which is the affiliation program.  True?
12      A.  Correct.
13      Q.  That's the affiliation angle, the Lion &
14  Crown?
15      A.  The affiliation, uh-huh.
16      Q.  Yeah.  So --
17      A.  I mean, the affiliation is through Cobalt;
18  but then Lion & Crown is the MVC, yes.
19      Q.  With regard to actually selling the
20  Ritz-Carlton inventory to the Marriott Vacation Club,
21  that's line item number three on the first page.  It
22  says, "Are there plans to put the remaining
23  Ritz-Carlton Club inventory into the Marriott Vacation
24  Club Destination program?"
25      Then it's answered, "Yes.  Marriott Vacations

Page 155

1  inventory and put it in the trust would give the
2  associations a paying member.
3      There was an agreement made that there was
4  going to be no use of unallocated or per diem time, so
5  there were kind of benefits that came along with the
6  inventory going in the trust.  Plus, the associations
7  were going to have, in essence, a member in good
8  standing forever, because the trust is going to
9  continue to pay its maintenance fees and there's going
10  to be no bad debt associated with that time.
11      So there was -- there was -- we certainly --
12  we had the right to do it.  Obviously, we did.  But
13  there was also benefits that came on the other side to
14  having that inventory in the trust for the
15  associations.
16  BY MR. REISER:
17      Q.  But, Ms. Sobeck, I thought you already said
18  that the unsold inventory of Marriott was -- that the
19  Marriott was paying full dues on that unsold
20  inventory.
21      A.  Uh-huh, yes.
22      Q.  There was no risk that Marriott would stop
23  paying their dues on the unsold inventory; right?
24      A.  There was no risk -- well, I guess Marriott
25  could -- Marriott Vacation Club could have eventually.

Page 157

40 (Pages 154 - 157)

1  I mean, we could have either sold them off to
2  somebody.  We could have sold them to somebody who
3  would've stopped paying.  We could have stopped paying
4  and let the inventory go back to the associations.
5        There was, obviously, a lot of options that
6  were out there.  Those aren't probably something we
7  would have done, because we would never want to do
8  that to the associations.
9        But it was not a long-term, sustainable
10  solution for how the company and the developer
11  continued to pay for developer inventory, that there
12  was nothing that could be done with it except to write
13  the check every year.
14     Q.  So I think I understand now.  So the decision
15  was influenced, at least in part, by the motivation of
16  relieving the Marriott Vacation Club from having to
17  pay $11 million-plus a year in maintenance fees?
18        MR. SELLINGER:  Which decision are you
19  asking about?
20  BY MR. REISER:
21     Q.  The decision to sell the unsold inventory to
22  the Marriott Trust.
23     A.  The decision to convey the inventory to the
24  trust, yes, it was certainly influenced by the $11
25  million in unsold maintenance fees that it was paying

Page 158

1  say it's just the members, that's not really how the
2  product works.
3     Q.  So you remember the sales literature in --
4  strike that.
5        Have you ever read the complaint in the
6  San Francisco lawsuit?
7     A.  I have not.
8     Q.  If you had, you would read that the marketing
9  materials that were promoted to the folks that were
10  thinking about buying a fractional stated that the
11  club was exclusively to be used by the members and
12  their guests.
13        Do you remember that?
14     A.  I don't remember specifically, but I can
15  imagine it being said, yes.
16     Q.  And after the sale of the San Francisco
17  developer-owned inventory to the trust, that was no
18  longer true?
19        MR. SELLINGER:  Objection to form.
20     A.  Well, it actually is true, because the owner
21  of the inventory is the trust, and it's the trust's
22  guests who are using the inventory.
23  BY MR. REISER:
24     Q.  Okay.  So trust guests.  All right.  So it's
25  the 425,000 Marriott Vacation Club members who were

Page 160

1  every year.
2     Q.  Okay.  And once it was sold into the trust,
3  anybody at the Marriott Vacation Club who purchased
4  whatever they paid for their points could use that
5  inventory at their formerly exclusive Ritz-Carlton
6  Destination Club.  True?
7     A.  Well, it wasn't exclusive.  I mean, those
8  members still had the ability to go out and rent it
9  and do other things with that inventory.
10        You know, the fact that there were Marriott
11  Vacation Club owners -- a Marriott Vacation Club owner
12  could walk down the street and rent in Aspen and go
13  back into Aspen through a rental -- through an owner
14  rental.
15        So, I mean, the fact that these owners could
16  get in there, they could have gotten in there through
17  the owners' inventory themselves.
18     Q.  What about San Francisco; that's not true, is
19  it?
20     A.  Hmm?
21     Q.  What you just said, in San Francisco, they
22  couldn't rent --
23     A.  No.  But if you owned in San Francisco, you
24  could give it to your neighbor and your neighbor is a
25  Marriott Vacation Club owner.  There's different -- to

Page 159

1  the potential guests?
2     A.  You could have a lot of friends too.
3        MR. REISER:  I don't have that many.
4        That's all I have.
5        THE VIDEOGRAPHER:  The time is 12:26.  We
6  are off record.
7        (Lunch recess.)
8        THE VIDEOGRAPHER:  The time is 1:17.  We
9  are back on record.
10        DIRECT EXAMINATION
11  BY MR. FERGUSON:
12     Q.  Ms. Sobeck, my name is Matt Ferguson.  We met
13  earlier.  I'm one of the co-counsel in the Aspen
14  Highlands case pending in the United States District
15  Court of Colorado.
16        You understand that your deposition can be
17  shown to a jury?  Do you have a general understanding
18  of that?
19     A.  I didn't, but that's fine.
20     Q.  Okay.  And you understand you're still under
21  oath?
22     A.  I do.
23     Q.  Have you ever heard of the Ragatz Fractional
24  Interest Conference, R-A-G-A-T-Z?
25     A.  Yeah.

Page 161

41 (Pages 158 - 161)

| | |
|---|---|
| 1 Q. Where is that held? | 1 going to skip around a little bit. |
| 2 A. I don't know. | 2 A. Okay. |
| 3 Q. Have you ever attended it? | 3 Q. With respect to Cornell, that has a renowned |
| 4 A. I don't think so. Maybe back in my Cornell | 4 hotel management part of its school. I mean, they |
| 5 days I did. Dick Ragatz was friends with our old | 5 have undergraduate programs and graduate programs? |
| 6 president of MVW. | 6 A. Uh-huh. |
| 7 Q. Who was the old president? | 7 Q. Is that a yes? |
| 8 A. Bob Phillips -- Bob Miller. | 8 A. Yes. |
| 9 Q. Was he someone that came before Mr. Weisz? | 9 Q. I'm going to remind you of that sometimes, |
| 10 A. Yeah. It was a long time ago. Dick Ragatz | 10 because she'll write down an "uh-huh." We'll argue |
| 11 has been around for a long time. | 11 about whether it's "uh-uh." |
| 12 Q. Did you work for Marriott Vacations Worldwide | 12 When you got your MBA, did you specialize in |
| 13 while you were getting your MBA? | 13 the hospitality industry? |
| 14 A. No. It was after. I, actually -- I should | 14 A. It was. It's an MMH -- is actually -- it's a |
| 15 say, I did a summer internship in between for two | 15 master's in management of hospitality, but it's a |
| 16 months, between my two years. | 16 business program. |
| 17 Q. Lani Kane-Hanan; do you know her? | 17 Q. How many years did you attend that? |
| 18 A. Lani? Uh-huh. | 18 A. Two. |
| 19 Q. I said that wrong. | 19 Q. Had you worked between college and your MBA |
| 20 A. That's okay. | 20 program at Cornell? |
| 21 Q. What is her position? | 21 A. I did. I worked for three years in Cheeca |
| 22 A. She's -- in essence, she's the head of our | 22 Lodge in Islamorada, Florida. |
| 23 development and our iPSM department, which is revenue | 23 Q. All right. Kind of a line person in |
| 24 management. Her title, I think, is EVP of product | 24 operations for the hotel itself? |
| 25 development and construction or something. | 25 A. I was actually a manager in training. I |
| Page 162 | Page 164 |

| | |
|---|---|
| 1 Q. Executive vice president? | 1 decided after college that I wanted to go and be a |
| 2 A. Yeah. | 2 general manager, so I went down and spent three years |
| 3 Q. Within the MVW family of companies? | 3 and I worked in every position at the hotel, from |
| 4 A. Yeah. She's a peer to Lee. She's on the | 4 front desk, cook, to valet, to housekeeper. |
| 5 executive committee. | 5 Q. And was Lee Cunningham at any of the prep |
| 6 Q. Did you ever hear her at the Ragatz | 6 sections you had with counsel? |
| 7 Conference say something to the effect that the Ritz | 7 A. Oh, you do jump around. Was he -- no, he was |
| 8 Destination Club system was like a bad first marriage? | 8 not in any prep sessions with counsel. |
| 9 A. No. | 9 Q. And I believe you said you talked to him in |
| 10 Q. Were you there? | 10 passing after his deposition on Friday? |
| 11 A. No. | 11 A. Yes. |
| 12 Q. Do you recall any time where she said, "It | 12 Q. And that was -- that's the only conversation |
| 13 was like a bad first marriage. We got out of it, but | 13 you had? |
| 14 we learned a lot"? | 14 A. Uh-huh, yes. We had a couple meetings |
| 15 A. No. | 15 earlier this week. |
| 16 Q. You were at the meeting with Mr. Weisz, | 16 Q. About non-litigation matters? |
| 17 Ms. Perfido, Mr. Mullenix, were you not? | 17 A. Yes. |
| 18 A. No. | 18 Q. Have you ever had anything to do with the |
| 19 Q. You weren't there, okay. | 19 Kapalua lawsuit in terms of testifying or providing |
| 20 Did you ever have any reports of what | 20 information? |
| 21 happened at a meeting that Mr. Mullenix attended here | 21 A. No. |
| 22 in Orlando with Ms. Perfido? | 22 Q. Have you ever had anything to do with the |
| 23 A. No. I saw some of the pieces of information | 23 litigation pending against the timeshare part of your |
| 24 that talked about a hand slam. No, I didn't. | 24 business here in Florida? |
| 25 Q. I just wanted to clear -- finish up -- I'm | 25 A. I have not. |
| Page 163 | Page 165 |

42 (Pages 162 - 165)

1  Q. So you were involved in the Hoyt litigation?
2  A. I was.
3  Q. And you were deposed in that case?
4  A. I was.
5  Q. Did you give any testimony in court?
6  A. No.
7  Q. Deposed something like this?
8  A. Yes. Right in this room.
9  Q. Right in this room. All right.
10  MR. MARX: I'll reserve judgment as to
11  the lawyers in that case as compared to you,
12  Mr. Ferguson.
13  MR. FERGUSON: Thank you. I don't know
14  who those guys are.
15  MR. FERGUSON: That was either a great
16  compliment or a terrible --
17  THE WITNESS: I don't know. I'm confused
18  too.
19  MR. REISER: You never know with Ian.
20  BY MR. FERGUSON:
21  Q. How long did you testify in that case? Was
22  it all day, a half a day, an hour; do you recall?
23  A. It was probably most of the day.
24  Q. And do you recall anybody else from Marriott
25  Vacations Worldwide being deposed during the week

Page 166

1  course?
2  A. Yes. I learned a lot at Cornell.
3  Q. What was that course called, if you know?
4  A. I don't know. You're really going back in
5  the memory banks.
6  Q. What year was that you were there?
7  A. It would be '98.
8  Q. Have you been in any conferences with Dr. Dev
9  since then -- hotel conferences?
10  A. I may have been at one -- not a conference.
11  I might have been at, like, one Cornell gathering, but
12  that was close to graduation.
13  Q. But in terms of hotel industry conferences
14  and seminars, you haven't seen him in that context?
15  A. I haven't seen him in years.
16  Q. Are you aware that he was an expert in a case
17  concerning a Ritz-Carlton Hotel property where
18  Ritz-Carlton was -- a Ritz-Carlton entity was sued for
19  breach of fiduciary duty?
20  A. No.
21  Q. Did you ever hear about him testifying or
22  being an expert witness in the case that involved
23  hotel branding or brand dilution?
24  A. No. I'm not surprised if he did.
25  Q. Was this course focused on branding, what the

Page 168

1  around the timeframe or in connection with that case
2  besides yourself?
3  A. I don't remember who was deposed. I was
4  there the whole day. I didn't see anybody else come
5  in.
6  Q. You didn't speak to any other employees or
7  officers of Marriott Vacations Worldwide or any Ritz
8  entity concerning the Hoyt case and whether they
9  testified?
10  A. I don't remember. I certainly could've, but
11  I don't remember specifically talking about Hoyt.
12  Q. I'm going to skip back to Cornell because I
13  forgot to ask you something.
14  You said you know Dr. Dev; right? Is he a
15  doctor?
16  A. Yes. Checki Dev is what we used to call him.
17  Q. How many courses did you take, if any, with
18  him?
19  A. One -- I believe one. He taught a -- he was
20  a brand management professor.
21  Q. It was a good course? Did you enjoy it?
22  A. Yes, I enjoyed it.
23  Q. How did you do?
24  A. I did great -- A.
25  Q. All right. So you learned a lot in that

Page 167

1  importance of a brand is?
2  A. My goodness. Yes. It was kind of brand
3  strategy, I think, was the course. It was a long time
4  ago.
5  Q. When you came to work with Marriott Vacation
6  Worldwide, was it -- I guess it was -- did you come --
7  you started with Marriott Vacation International, I
8  take it?
9  A. Well, all of us used to be Marriott
10  International, and it was one company, but I was down
11  here in Orlando at the MVC -- we were Marriott
12  Vacation Club then -- headquarters, yes.
13  Q. So it went from MVCI to MVW?
14  A. Yes. Well, one is a brand and one is a
15  company.
16  Q. I got you. The Marriott Vacation Worldwide
17  Corporation?
18  A. Worldwide Corporation, yeah, that's our...
19  Q. In terms of branding with respect to the
20  Ritz-Carlton brand, the lion and crown symbol, did you
21  receive any type of special training or instruction as
22  to how to keep that brand viable and valuable?
23  A. So back when I started working with
24  Ritz-Carlton originally, there was kind of what they
25  called -- I think it was any emerging -- emersion

Page 169

43 (Pages 166 - 169)

1  class. We would be sent up to Chevy Chase at the
2  time, which is where the corporate office was, and we
3  would spend a day or a day and a half and hear from
4  different brand executives and get the history of
5  Ritz-Carlton and how it started -- Horst Schulze and
6  that whole...
7      Q. So I take it that you learned that the Ritz
8  brand came from the famous hotel out in Paris, I
9  believe; is that right?
10     A. Yes.
11     Q. And that that brand was developed and
12 carefully -- it was stewardship as to its value and
13 what it meant to the consuming public?
14     A. Yes.
15     Q. It became synonymous with excellent service?
16     A. Yes.
17     Q. Is that right? And the brand would command a
18 higher price from the hotel-consuming public because
19 of its exclusivity?
20     A. Yes.
21     Q. And its great service?
22     A. Yeah, from the...
23     Q. Do you know of any time in the history of the
24 Ritz-Carlton brand that it had been affiliated with
25 any other type of product line?

Page 170

1  the onsite operations for all of our properties.
2      Q. Are there any competitive brands that you
3  believe are out there that are on equal footing with
4  Ritz? Hotel properties presently in the world.
5      MR. MARX: Objection to the form of the
6  question.
7      A. Sure. I assume you're talk about the luxury
8  tier of --
9  BY MR. FERGUSON:
10     Q. Luxury.
11     A. Sure.
12     Q. What are some of the well-known ones?
13     A. Four Seasons, Mandarin. There's actually
14 Ritz-Carlton Reserve. It's a whole other different
15 type of brand, but affiliated with Ritz-Carlton.
16     Q. Is St. Regis in that luxury group?
17     A. Yeah, I would put St. Regis -- I don't think
18 they're quite as good as Ritz-Carlton, but that's a
19 personal preference.
20     Q. And the Marriott, before the Starwood
21 takeover, it has Courtyard Marriott, it has JW
22 Marriott. It has various levels -- something Suites?
23     A. SpringHill Suites.
24     Q. -- SpringHill Suites. Those are different
25 brands under the Marriott umbrella; correct?

Page 172

1      A. I'm sorry?
2      Q. Do you know whether it was ever merged --
3  like, Ritz-Carlton Hotels light -- you have -- you're
4  allowed to go to a Ritz-Carlton Hotel that's less
5  expensive than another product, or are they all pretty
6  much the same?
7      A. Well, all the hotels are different prices. I
8  mean, you go stay at any hotel, it's different based
9  on where you go. There's different product lines,
10 like Ritz-Carlton Club; there's the Ritz-Carlton
11 Residences as well. I think there were actually a
12 couple Ritz-Carlton Golf Courses at one point, like
13 Creighton Farms and some other ones,
14     Q. But they all derived from the Paris property,
15 and then there were hotels opened here in the states
16 and other places in the world?
17     A. They were all branded with the same
18 Ritz-Carlton brand.
19     Q. Besides an emersion class, have you had any
20 other type of training or instruction in connection --
21 I was asking about seminars or emersion or
22 instructions in keeping the Ritz-Carlton brand viable.
23     A. No. I mean, that was the one time I went up
24 to Chevy Chase. Obviously, I work with the
25 Ritz-Carlton Hotel Company on a daily basis, who does

Page 171

1      A. Yes.
2      Q. At some point, the Ritz brand came under the
3  Marriott International umbrella because it acquired
4  it?
5      A. Correct.
6      Q. With respect to the Ritz-Carlton Destination
7  Clubs, when you all worked there at Marriott Vacation
8  Worldwide -- I know you dedicated time to the hotel
9  company, the management company, to Cobalt -- you said
10 you dedicated times to those various entities under
11 the Marriott Vacation Worldwide umbrella; right?
12     MR. MARX: Object to the form of the
13 question.
14     A. The hotel company is separate.
15 BY MR. FERGUSON:
16     Q. I meant to say the development company.
17     A. Okay.
18     Q. So you were talking about how you dedicate
19 time to those various entities?
20     A. Yes.
21     Q. Did you ever talk about kind of any hotels --
22 any of the clubs that were more valuable in terms
23 of -- let me withdraw that.
24     Were any of them considered the crown jewel
25 of the RCDC system?

Page 173

44 (Pages 170 - 173)

| | |
|---|---|
| 1    A. Were any of the Ritz-Carlton Clubs? | 1    don't always have the same summer week. One week, |
| 2    Q. Yeah. Like, this is it -- this is what we | 2    they'll have August 10th; another year, they have |
| 3    want everybody to look like. | 3    September -- they revolve somehow? |
| 4    A. Well, I think that's all opinion. I think | 4    A. Rotate. |
| 5    they're all -- I mean, they were all unique and pretty | 5    Q. Rotate. That's what I was looking for. |
| 6    awesome in their own way. You could look at it from | 6    A. Uh-huh. |
| 7    many different ways. | 7    Q. So the fixed weeks, actually -- and then you |
| 8        Jupiter had an amazing golf course. Bachelor | 8    also have fixed weeks? |
| 9    Gulch, obviously, fantastic. Aspen has -- they're all | 9    A. Fixed weeks. |
| 10   unique. I don't think there's any that are not | 10   Q. And you have three reserved and one |
| 11   beautiful. | 11   unreserved? |
| 12   Q. You're proud of all of them? | 12   A. Correct. |
| 13   A. Yes. | 13   Q. You understand, because you've been involved |
| 14   Q. And including -- you're proud of the ones you | 14   with the HOAs, that a Marriott -- or that an |
| 15   lost in terms of Abaco -- | 15   interest -- fractional interest -- is entitled to a |
| 16   A. Absolutely. | 16   vote where there's votes? |
| 17   Q. -- and Jupiter? | 17   A. Yeah -- the members. |
| 18   A. Yeah. Abaco was a little bit -- from a brand | 18   Q. And they vote their interest. If they have |
| 19   perspective, it didn't fit perfectly into the brand. | 19   one interest, they vote one vote. If they have two |
| 20   I will say that. | 20   interests, they can vote two interests? |
| 21   Q. And Bachelor Gulch, same question. | 21   A. Uh-huh, yes. |
| 22   A. Yeah. Bachelor Gulch was wonderful. | 22   Q. They can vote twice? |
| 23   Q. And Kapalua? | 23   A. Yes. |
| 24   A. Yes. Definitely fit very well in the | 24   Q. In fact, when you did the survey in this, |
| 25   Ritz-Carlton brands. | 25   starting on December 3rd -- sorry -- starting, I |
| Page 174 | Page 176 |
| 1    Q. I just want to focus, obviously, on Aspen | 1    believe, on December 5th and closing it on |
| 2    today a little bit. I'm going to just lead in with a | 2    January 13th, you actually worked with Ms. Verrechia |
| 3    couple questions on the April 5th timeframe in | 3    at Morrow, and you would count people that had more |
| 4    Exhibit 1180. I just wanted to focus on one part of | 4    than one unit as two votes; right? If they had two |
| 5    this, the middle paragraph of Exhibit 1180, the | 5    interests, and they answered your survey for or |
| 6    April 5th letter from the board to its members. | 6    against, you would count it as two for or two against |
| 7        I know you spent a lot of time on this, but | 7    if they owned two interests? |
| 8    we didn't spend any time on excluding -- the | 8        MR. SELLINGER: Objection to form. |
| 9    parenthetical that reads "excluding the Marriott | 9    A. I'm not -- I think we would've -- we probably |
| 10   interests and members not in good standing." | 10   would have done that, because that is what they would |
| 11       Do you see that? | 11   have represented in the association. |
| 12   A. Yes. | 12       And just to be clear, like Morrow, who we |
| 13   Q. Okay. And you understand an interest is a | 13   use -- we use them because it was just a third-party |
| 14   fractional interest? | 14   company to -- that was -- that we were familiar with |
| 15   A. Yes. | 15   doing kind of a ballot and collecting data from |
| 16   Q. It's a one-twelfth of a -- it's a one-twelfth | 16   owners. |
| 17   interest. They get to use one-twelfth of the year, | 17  BY MR. FERGUSON: |
| 18   four weeks. | 18   Q. Let me show you what's -- let me just finish |
| 19   A. Yes. It's a little different in Aspen than | 19   with this. |
| 20   others, but, yes. | 20   A. Sure. |
| 21   Q. There's different systems of divvying up the | 21   Q. This says, "Excluding the Marriott interests |
| 22   time in those fractionals? | 22   and the members not in good standing." That meant |
| 23   A. Yes. Aspen has four weeks. The other clubs | 23   that the Marriott -- the Marriott inventory -- and I |
| 24   have three. | 24   think it was in the -- I know it was 13.4 percent, but |
| 25   Q. And the Aspen revolves? I take it that they | 25   it was about 120 fractionals that were left? |
| Page 175 | Page 177 |

45 (Pages 174 - 177)

1    A. That were developer-owned.
2    Q. I'll digress a little bit again. Were you at
3  all involved in a decision to build a second building
4  up in Aspen Highlands?
5    A. No.
6    Q. Are you aware that there was one building and
7  they brought another building online after there was
8  some good sales for the first one?
9    A. Yeah. I know there was two buildings -- Elk
10  Lodge and --
11    Q. White River Lodge?
12    A. White River, right.
13    Q. Were they both built by the time you got
14  involved in the HOA matters?
15    A. By the time I was working in asset management
16  with them, yes, they were both built.
17    Q. Any discussions -- I know you guys -- the
18  development company ran into a recession. Was there
19  any discussion that you heard that, "Boy, we went for
20  too much inventory up there and couldn't sell it out.
21  We shouldn't have done that"?
22    A. I guess, to be clear, everybody went through
23  a recession; right? It wasn't just us who went
24  through a recession. But there was certainly more
25  inventory that we owned -- yeah -- it would've been
Page 178

1  nice not to have as much, just because there was
2  developer inventory that was not easily sold.
3    Q. But Ritz-Carlton Development Company made a
4  decision to go ahead and build a second building;
5  correct?
6    A. Yes.
7    Q. And the recession hit before you were able to
8  sell it out?
9    A. Correct.
10    Q. So it was stuck with inventory?
11    A. Right.
12    Q. Going back to Exhibit 1180, "excluding the
13  Marriott interests and members not in good standing,"
14  that meant that you were not going to allow Marriott
15  interests to be part of this vote?
16    A. Right. What we didn't want to do is, we
17  didn't want Marriott to say -- we didn't want Marriott
18  to influence. So the Marriott interests, obviously,
19  could have taken the survey and swayed the vote one
20  way or the other. So we didn't want Marriott to go in
21  and actually vote and, in essence, say, "Oh, we got
22  140 votes for and five votes against, and, therefore
23  we should move forward," because, I think, that sways
24  what is the actual opinion of the members. It doesn't
25  look -- it's not accurate.
Page 179

1    Q. So they could have -- if it was 120 or 140 --
2  they could have had 140 votes?
3    A. Yeah. I was saying 140 because you had the
4  120 members and then anybody else in addition who had
5  answered the survey.
6    Q. I didn't follow that.
7    A. So when you accumulated the -- when the end
8  results came of the survey, and you accumulated it up,
9  you would've had 120, plus any members who would have
10  taken the survey. And you would have had the for and
11  against. And if Marriott -- if the developer
12  interests would've been voted, it would've been skewed
13  one direction, which wouldn't have given an accurate
14  picture of what the members -- how the members felt.
15    Q. The members that weren't Marriott Vacation
16  Worldwide?
17    A. Exactly.
18    Q. All right. It says here also that the vote
19  would exclude members not in good standing; correct?
20    A. Correct.
21    Q. And the way members don't get in bad standing
22  is that they probably -- most of the time, they don't
23  pay their dues?
24    A. They would've paid their dues, yes.
25    Q. Or someone's done something terrible to --
Page 180

1    A. No. It's dues-based.
2    Q. That would be -- that right would be taken
3  away pursuant to a declaration; right?
4    A. I actually believe -- and I'm not sure in
5  Aspen -- I'm speaking more generally -- but I believe
6  that you don't take voting ability -- if we're talking
7  about association governance voting ability away from
8  members, because you still own the inventory. The
9  inventory is owned until you're not on the deed
10  anymore. I believe members can still vote an
11  interest.
12      This was -- since this wasn't an official
13  vote, what the board didn't want anybody to do was
14  actually go in and somebody who was in bad standing
15  and try to be influencing what the members in good
16  standing wanted to do.
17      So from a governance perspective, I don't
18  think that's how it worked, but the board was very
19  concerned. They didn't think that getting the voice
20  of the delinquent members was the right thing to do.
21    Q. Now, you said something interesting,
22  Ms. Sobeck, just then in that answer. I want to pull
23  that out. You said, "This was not an official vote."
24  You said that, right?
25    A. Yes. It wasn't an official vote.
Page 181

46 (Pages 178 - 181)

1    Q. Is there anywhere in this letter that you
2  said, "Hey, members" -- I mean, I went over the
3  signature of the four board members then, including
4  Tyler Oliver and Randal Mercer, who we discussed
5  earlier -- you guys apparently voted for it, right?
6  When I say Marriott Vacation Worldwide --
7    A. Oh, the developer voted for?
8    Q. Yeah.
9    A. I don't know if we did vote for. I know we
10 talked about it, but --
11   Q. With Mr. Hearns?
12   A. He requested that we vote that -- he said
13 that Jay was going to request that we vote for them.
14 That's what the discussion was. Then I was asked if
15 Jay did ask me that, and I do not remember Jay asking
16 me that.
17   Q. If the owner of that inventory, which I'll
18 call it development company -- if it voted, would you
19 have been the person that told Verrechia that 130 or
20 120 votes went for Tyler Oliver and Randy Mercer?
21 Would you have been the person doing that?
22   A. No.
23   Q. Who would have done that -- Lori Phillips?
24   A. Lori Phillips would have talked...
25   Q. Is there anywhere in this letter that you say

Page 182

1    Q. Have you ever gone to a polling booth and
2  pulled the lever for the candidate and it says, "This
3  is a survey. It's not official"?
4    A. No, I've never done that.
5    Q. That's not how votes work, is it?
6    A. I also vote for M&Ms. And for us -- again, I
7  think I covered it before -- survey and vote, from
8  what we were talking about, we were interchanging the
9  two.
10   Q. You vote for M&Ms?
11   A. Yeah. You know, when you get to vote -- you
12 get to vote for your favorite color M&M? Vote doesn't
13 only mean one thing, I guess, is my point.
14   Q. And where does one vote for M&Ms?
15   A. You never did that?
16   Q. No, I haven't.
17   A. Oh, my goodness. When they were introducing
18 the new colors of M&Ms.
19   Q. Understood. I do recall that.
20   A. I voted blue, and blue did not win.
21   Q. Do you believe that this Aspen Highlands
22 voting project was something akin to an M&M voting
23 project?
24   A. No.
25   Q. All right. And this has to do with your

Page 184

1  that the vote above is -- they say the vote above is
2  not official?
3    A. No, but this was not our letter. This is the
4  board's letter. I didn't write this letter.
5    Q. Yeah, but you had your lawyers look at it --
6  in-house lawyers -- correct?
7        MR. SELLINGER: Objection to form.
8    A. It appeared that they were sending it, but I
9  don't think any of their comments were included in it.
10 BY MR. FERGUSON:
11   Q. Let me show you a couple documents that you
12 weren't shown around this timeframe.
13   A. Sure.
14   Q. Exhibit 1186. 1186 is a two-page document --
15 some of it's kind of garbled. Probably something to
16 do with the way it was printed out. It is an RCDC
17 document. But I'll start at the top.
18       It says -- the subject says, "Aspen Highlands
19 voting project." Right?
20   A. Yes.
21   Q. It doesn't say "survey project", does it?
22   A. No.
23   Q. It doesn't say "unofficial voting project,"
24 does it?
25   A. It does not.

Page 183

1  vendor, Morrow & Company, because Verrechia works for
2  Morrow & Company; correct?
3    A. Yes, she does. I guess, to be clear, though,
4  I also don't think it relates to the voting for an
5  elected official, which is where my M&M comment came
6  from.
7    Q. Sobeck is obviously you. Frates-Mazzilli --
8    A. Kim Frates-Mazzilli.
9    Q. -- is she a Marriott Vacation Worldwide
10 person?
11   A. Yes, she is.
12   Q. What's her job function?
13   A. She works in finance and accounting. She
14 offers some support with certain projects. She'll
15 come and help me with certain projects.
16   Q. Kim Dunham, what did she do?
17   A. Deborah Dunham?
18   Q. Oh, I see. What does Deborah Dunham do?
19   A. I believe she works in association
20 governance. I don't work with her very much.
21   Q. She would be under Lori Phillips?
22   A. I believe she is. And then Cindy Hodge used
23 to be Lori's boss, but is no longer with us.
24   Q. Is she involved with association governance
25 also?

Page 185

47 (Pages 182 - 185)

1    A. Cindy Hodge?
2    Q. Yes.
3    A. Yes, she --
4    Q. Sorry.
5    A. That's okay.
6    Q. It happens a lot, because, for some reason,
7    you've got a slight pause and we jump on you. It's
8    not meant to be impolite to you.
9        MR. FERGUSON: And I know I'll start my
10   question and she's still going, so I'm not
11   doing it on purpose to cut her off.
12       MR. SELLINGER: I know. But knowing that
13   that happens, I would just ask you to pause
14   and wait.
15       MR. FERGUSON: I'm going to do that.
16       MR. SELLINGER: Because I'm trying to do
17   that, because I don't want to object before
18   she's done either.
19       THE WITNESS: I'm sorry. It sounds like
20   it's my problem, so I will try not to pause.
21       MR. SELLINGER: It's all his problem.
22       MR. FERGUSON: Every witness has a
23   different cadence. Your cadence has thrown
24   us off a couple times, but that's because I
25   go too fast. I speak quickly, but I'm not a

Page 186

1    Q. It says, "The purpose of the meeting is to
2    discuss managing a vote of the Aspen Highlands
3    members." It say, "This vote is non-association
4    related and is sponsored by MVW."
5        So the Aspen Highlands voting project
6    referenced here was going to be something that you all
7    handled, MVW?
8        A. It was. Meaning that we were going to charge
9    it out to the association, because we didn't want them
10   to have to pay for it.
11       Q. Now, when you were in Aspen, Colorado with
12   Mr. Cunningham on April 5th, 2013, and that letter was
13   drafted, and you said in one of your e-mails, "Lee
14   wants us to get" -- and Lee wants to get this out to
15   the members" -- did you say to Randy and -- Randy
16   Mercer and Tyler Oliver and Mr. -- I don't know who
17   else was on there -- but did you tell those
18   gentlemen -- it's all gentlemen on that board?
19       A. It is.
20       Q. We need some women up there. Did you tell
21   them, "Hey, we're doing this as an accommodation to
22   you"?
23       A. An accommodation?
24       MR. SELLINGER: Objection to form.
25       A. I don't understand the question. I'm sorry.

Page 188

1    fast talker.
2    BY MR. FERGUSON:
3    Q. All right. Cindy Hodge was Lori Phillips's
4    boss. Was that department solely in charge of
5    governance of HOAs or were there other duties within
6    that department?
7    A. In the association governance department?
8    Q. Yeah.
9    A. They were responsible for -- well, they do
10   association-type work. So they look at newsletters
11   that go out. They do -- they go through meeting
12   minutes; they go through the election process; get
13   nomination forms out to the sites. Those types of
14   things.
15   Q. Is it just for the RCDC system?
16   A. No. They do it for Marriott Vacation Club
17   and Ritz-Carlton Club.
18   Q. Understood. Okay. I take it, this was to
19   set up a phone conference about this Aspen Highlands
20   voting project?
21   A. Yes. I was using a lot of their expertise
22   because they do -- they handle votes/surveys. We were
23   handling it the same way, because we already had a
24   process set up. I felt, if we could replicate a
25   process, it would be easier and less room for errors.

Page 187

1    Doing the vote-survey as an accomodation?
2    BY MR. FERGUSON:
3    Q. Yeah.
4    A. We would -- as an accomodation -- we agreed
5    that we wanted to get the feedback from the members,
6    and so we offered to run it for them. We weren't
7    going to make the association do the work of it.
8    Q. My question was, did you ever say to them, in
9    words or to the effect of, "We're doing this as an
10   accomodation to you. You don't really have to do it,
11   but we're doing it as an accomodation"?
12   A. Well, yeah. They knew that it was our -- if
13   you have to think about -- when you have Lion & Crown,
14   we had other affiliations that were in Lion & Crown at
15   the time. We had ER; we had Abercrombie & Kent. We
16   had never gone out to anybody for those affiliations.
17   Those are just things we did. We had the right to do
18   it. We never talked to them about those.
19       This was just a little bit different because
20   we sent the letter out about it. We started to get
21   feedback from the members. So we looked for another
22   level of opinion and feedback from the membership
23   base.
24       You know, so there was no doubt we didn't
25   need their support or we didn't need them to say yes,

Page 189

48 (Pages 186 - 189)

1  but we wanted to -- we wanted to understand how the
2  members felt; we wanted to understand how the boards
3  felt before we moved forward, but that's why we did it.
4      Q.  Okay.  So Morrow & Company does things like
5  voting for officers -- board members, I should say?
6      A.  They do the votings for governance, yes.
7      Q.  Right.  So the main thing that the members
8  get to cast a vote for would be annually to one or two
9  of the board members rotating off?
10     MR. SELLINGER:  Objection to form.
11     MR. FERGUSON:  What's the objection?
12     MR. SELLINGER:  The main thing.  I'm not
13  sure what that refers to.
14     MR. FERGUSON:  Okay.  Thank you.
15  BY MR. FERGUSON:
16     Q.  Let me correct that.  Is one of the items
17  that members have to vote on pursuant to the
18  declaration in Aspen, Colorado the election of a board
19  member?
20     A.  Yes, it is.
21     Q.  Are you aware of any other types of elections
22  where a member can vote their interests?  If they have
23  two interests, they can vote two, three-three,
24  one-one.
25     Are there any things they can vote on -- let

Page 190

1  me put it this way.  Can you tell us any other types
2  of votes that are made by members in any respect other
3  than board members?  Just curious.  I don't know the
4  answer.
5      A.  Yes, certainly.  There would be other types
6  of governance-related votes that would be taken.  If
7  they wanted to be a change in the declaration or if
8  they wanted to do a change in the term limits or a
9  change in -- I think one of the things that came up in
10  the past was executive -- not executive -- board
11  member compensation.  Like, that was something that
12  had come up in the past and that went out to the
13  members.  So, yes.
14     Q.  So they would be able to vote on an amendment
15  of the declaration?
16     A.  Yes.
17     Q.  I think, in Colorado, that would be usually
18  two-thirds vote?
19     A.  I think it's a super majority.
20     Q.  So those are the kind of votes that Morrow &
21  Company handled for the association?
22     A.  That's -- they would handle those for us,
23  yeah -- for Marriott Vacation Club members.
24     Q.  Now, you're talking about this thing being
25  kind of a loosey-goosey survey process.  I think you

Page 191

1  said, not official.
2      But if you look at the next sentence here, it
3  says, "The vote process will mirror what we will do
4  for an association vote."
5      Do you see that?
6      A.  I do.
7      Q.  And the association votes, as we just
8  discussed, were things like amending the declaration;
9  correct?
10     A.  Correct.
11     Q.  And electing board of directors?
12     A.  Correct.
13     Q.  That's not a survey, is it?
14     A.  No, but I -- just to be clear about what I'm
15  saying -- I'm talking to our vendor.  To her, I'm
16  talking -- this is to talk about the process of how
17  we're going to do it.  It has nothing to do with -- I
18  mean, she's thinking, "How am I going to get this
19  done?"  I'm saying, "We're going to mirror what we
20  do," but it has nothing to do with the actual voter
21  outcome.
22     It's just saying that I want the data
23  captured the same way; I want there to be a website; I
24  want there to be X, Y, and Z.
25     So to try to connect that it's really the

Page 192

1  election of one of the board members in this, I'm
2  talking more about the actual process in which to do
3  it versus what the long-term meaning is for the data
4  that's collected.
5      Q.  So when this memo -- did you write this memo?
6      A.  I believe this is a meeting invitation that
7  you have.
8      Q.  And it's a pretty terse -- it's a pretty
9  succinct little memo, is it not?  It's four lines or
10  five lines?
11     A.  It's a meeting invitation.  All I was doing
12  was putting a little bit of information, so that, when
13  we all got on the conference call on April 10th at
14  9:00 in the morning, that they would understand what
15  it was that we were talking about.
16     Q.  So what you said then to Morrow & Company
17  was, "We're going -- this vote process for the
18  affiliation -- this vote process will mirror what we
19  do for an association vote, but all I'm talking about
20  is a website we're going to set up for it and whatnot.
21  This is not really a vote.  So if a person -- it's not
22  a vote like it is for a board of director."
23     MR. SELLINGER:  Objection to form.
24  BY MR. FERGUSON:
25     Q.  It's not counted the same way?

Page 193

49 (Pages 190 - 193)

1      A. I've actually said, it's a non-association
2  related item. We're just talking about the voting
3  process. We're going to handle the voting process the
4  same way.
5      Q. All right. It says, "except the documents
6  will be different. We are interested in a host
7  website that contains a video clip, and there may be
8  additional messaging over and above what we would do
9  for an association vote."
10     That meant that you were going to put a more
11 kind of robust marketing campaign behind this vote?
12     A. No, not marketing campaign. Just different
13 information.
14     Marriott Vacation Club was very foreign to a
15 lot of people. They didn't know how the program
16 worked, what it looked like, what are the options and
17 those type of things. So the thought is that -- how
18 do people be educated so that they know what their --
19 what is really offered through that exchange program.
20 So that's all we were talking about.
21     Q. I'm going to hand this out again so I go home
22 lighter -- my baggage is lighter.
23     A. Save a tree.
24     Q. This is RCDC SLC. That's Salt Lake City,
25 Ms. Babich's department?

Page 194

1      A. I'm sorry. I didn't write this.
2  BY MR. FERGUSON:
3      Q. I understand that, but --
4      A. You just asked me what I meant.
5      Q. Yeah, but you were at the meeting where --
6  this sentence starts out with MVW. That's your
7  company, right?
8      A. It's all of our companies.
9      Q. Right. And you're part of that company?
10     A. I am.
11     Q. When you went to Aspen, Colorado on
12 April 5th, I think you might have come over from
13 Bachelor Gulch. Right? You swung through Bachelor
14 Gulch first and then came over to Aspen?
15     A. I'm not sure. I could have. I had done it
16 in the past. I'm not sure about April 5th
17 specifically.
18     Q. When it said, "Marriott Vacation Worldwide
19 has agreed together with the offered board of directors," that
20 was you and Mr. Cunningham and Mr. Mercer and
21 Mr. Oliver. Correct?
22     MR. SELLINGER: Objection to form.
23     A. I would think that's who that was
24 representing, yes.
25 BY MR. FERGUSON:

Page 196

1      A. Yes, sir.
2      Q. 1183. "Ladies and gentlemen," at the bottom
3  of the page, is what Ms. Babich would call your RCDC
4  or Ritz-Carlton employees people who interface with
5  the customer?
6      A. Correct.
7      Q. In this case, the customers are members and
8  owners of fractional interests?
9      A. Her member services team, who they talk to?
10     Q. Right.
11     A. Yes.
12     Q. It says, on the second paragraph, "Marriott
13 Vacation Worldwide has agreed, together with the board
14 of directors, that we" -- who's we here -- the
15 leadership team at RCDC SLC -- "will not affiliate the
16 Aspen Club and club members with our Marriott Vacation
17 Club Destination program unless a majority of the
18 members vote otherwise."
19     Do you see that?
20     A. I do.
21     Q. When you said majority, did you mean a
22 majority of the 750 or so people that were eligible to
23 vote pursuant to the letter written on April 5th?
24     A. I didn't --
25     MR. SELLINGER: Objection to form.

Page 195

1      Q. When you said you didn't read this, had you
2  ever seen this document before?
3      A. I have not seen this before.
4      Q. It says at the bottom, "We anticipate that we
5  will receive calls from members regarding this
6  announcement, both Aspen Club members and others, who
7  learn about the letter. Please address any questions
8  you receive as follows."
9      They tell the folks words -- this is the
10 bottom of the page -- there is an announcement to the
11 Aspen Club members -- from -- this is an announcement
12 to the Aspen Club members from their board of
13 directors. "We do not have any additional information
14 at this time. If our members ask about the
15 affiliation in general, please advise them we do not
16 have any additional information at this time."
17     That's not exactly accurate, is it?
18     MR. SELLINGER: Objection to form.
19 BY MR. FERGUSON:
20     Q. That this is an announcement from the board
21 and we do not have any additional information at the
22 time. I mean, you were behind the scenes and working
23 with Verrechia to get a vote going; right -- the Aspen
24 Highlands vote project?
25     MR. SELLINGER: Objection to form.

Page 197

50 (Pages 194 - 197)

1    A. Yeah. I guess what this is saying -- don't
2  forget -- so Eveleen -- if Eveleen is the one that did
3  this -- I don't know if she did or not, but somebody
4  out running the member services team. She's talking
5  to her ladies and gentlemen, so she's talking to the
6  people on the phone with the members.
7       So we would not want them in any way
8  speculating about any of this. And, truly, Salt Lake
9  City, they would be the last ones to get information
10  about this. So, you know, I'm actually happy to say
11  that she says she doesn't have any additional
12  information, because we wouldn't want any of those
13  member services associates talking to or speculating
14  or sharing any information with members who were
15  calling in and asking questions.
16  BY MR. FERGUSON:
17    Q. At the bottom of the page of Exhibit 1183 --
18  bottom of page two -- it says, "What's not to be
19  shared with our members:"
20      Do you see that?
21    A. I do.
22    Q. It says, "We've been told by corporate and
23  our legal team that we should have more information to
24  share with our members about the affiliation shortly
25  after the Aspen and Bachelor Gulch board meetings."

1       That letter went out, I take it, before the
2  annual meeting occurred, or did the letter go out
3  after the meetings?
4    A. You're asking me when this letter went out?
5    Q. No. I'm talking about the April 5th letter
6  that we've been talking about the best part of the
7  day.
8    A. The April 5th letter -- well, I thought the
9  April 5th letter, we had seen a cover letter that said
10  we were trying to get it out before Bachelor Gulch
11  came out with anything, but --
12      MR. SELLINGER: Let me interrupt for a
13    moment. I'm seeing this exhibit for the
14    first time. The reference to what's been
15    told by our legal team, I think, should have
16    been redacted as privileged information. So
17    we would designate that information as
18    confidential at this time. It must have been
19    inadvertently not redacted.
20  BY MR. FERGUSON:
21    Q. Were you communicating with the line folks
22  at -- is it Eveleen? Is that how you say it?
23    A. Eveleen.
24    Q. We've been calling her Evelyn.
25    A. No. Eveleen Babich.

1    Q. Ms. Babich. Were you talking to her as a
2  representative of corporate regarding the information
3  that could be shared later about the affiliation?
4    A. I would've been talking to her about -- yeah,
5  I would've been talking to her throughout just to kind
6  of let her know what was going on.
7    Q. And you were in Aspen and she was in Utah.
8  Were you telephoning her on your telephone or were you
9  e-mailing her? How were you communicating with her?
10    A. Oh, you mean when we were in Aspen?
11    Q. Yeah.
12    A. I probably wouldn't have been talking to her
13  from, like, the Aspen board meeting.
14    Q. Well, she sent this out on April 6th, which
15  is -- 1:38 p.m. -- which is the next day. So
16  someone's been in touch with her between April 5th and
17  April 6th.
18    A. Right. Sorry. Can we go back to the
19  communication?
20    Q. 1180?
21    A. No. But there was one that was forwarded --
22  the one that talked about "the board and Lee want this
23  sent out." We have to see who was copied on that.
24  Probably, whoever was copied on that, was probably --
25    Q. I see.

1    A. -- had forwarded this to her to let her know.
2  She may have actually been copied. I just don't
3  remember.
4      Do you understand what I'm saying?
5    Q. Yeah. So when it went around internally, it
6  might have been copied to Ms. Babich?
7    A. Yeah. They would've let her know because
8  they would have wanted her to know --
9    Q. I got it.
10    A. There she is -- Eveleen Babich.
11    Q. Perfect. Which exhibit are you looking at?
12    A. I am looking at 1185, and it is on -- yep, so
13  she was copied. I even wrote it -- Eveleen, Cindy,
14  and Lori. There you go.
15    Q. Thank you.
16    A. It started off with them at 1:01, so I was
17  keeping her in the loop just so she understood what
18  was going on, because we don't like member services --
19  the team -- not to know what's happening that they
20  could start getting calls about.
21      (The attorneys from Reiser Law are no
22      longer present.)
23  BY MR. FERGUSON:
24    Q. You have 1185 in front of you then?
25    A. I have it right here.

| | |
|---|---|
| 1 | Did they just leave? |
| 2 | Q. Yeah. Mike's been in Florida for a month. |
| 3 | A. Where does he live? |
| 4 | Q. San Francisco. He had a trial here. |
| 5 | A. Time to go home. |
| 6 | Q. It is. |
| 7 | A. Although, it's nice weather now. |
| 8 | Q. So this is what you're referring to as to how |
| 9 | this was disseminated within the company? |
| 10 | A. Yes. |
| 11 | Q. So Cindy Hodge, who was in charge of |
| 12 | governance, had sent it to you and Ms. Babich and Lori |
| 13 | Phillips, with a copy to the hotel manager, Nicolas |
| 14 | DiMeglio? |
| 15 | A. Looks like I am writing them and saying, |
| 16 | "Hey, I'm here. We're going to send you something |
| 17 | shortly that they want to go out. Can you please get |
| 18 | started on a template?" They actually have to do the |
| 19 | template that goes out. |
| 20 | And then Cindy is saying, "AG is pulling the |
| 21 | information." So they are the ones who have all the |
| 22 | member information. So they're pulling the |
| 23 | information and -- "send us the information as soon as |
| 24 | you can." |
| 25 | I'm saying, "Please find the letter attached |

Page 202

| | |
|---|---|
| 1 | that we'd like to have sent out today and format |
| 2 | accordingly." So they would take that and put it |
| 3 | in -- I don't know how it came, but it probably came |
| 4 | in a little -- this is formatted -- it probably came |
| 5 | in an e-mail or something like that to them. |
| 6 | Q. One of the other people on this e-mail chain |
| 7 | you started at 1:10 p.m. on April 5th, 2013 was |
| 8 | Barbara Egolf. Right? |
| 9 | A. Yes, sir. |
| 10 | Q. Obviously, the conversation that you had |
| 11 | about having this Aspen Highlands vote project with |
| 12 | Mr. Mercer and his board had occurred before this |
| 13 | e-mail at 1:10 p.m.? |
| 14 | A. It looked like it was going on at the time. |
| 15 | Q. So in that morning, was there someone |
| 16 | drafting the words to it in front of you or was it |
| 17 | someone -- did Nicolas DiMeglio get told what to do? |
| 18 | How did it physically get drafted? |
| 19 | A. I have no idea. It could have been one of |
| 20 | the board members at the meeting. I don't know. It's |
| 21 | only a -- |
| 22 | Q. It could have been? It could have been you, |
| 23 | I take it; right? |
| 24 | A. No, it definitely wasn't me. I wouldn't say |
| 25 | "Ritz-Carlton/Marriott representatives." There's lots |

Page 203

| | |
|---|---|
| 1 | of things in here I would stay away from. |
| 2 | Q. Why would you stay away from |
| 3 | "Ritz-Carlton/Marriott"? Why would you stay away from |
| 4 | that particular term? |
| 5 | A. Because, first of all, at this time, we |
| 6 | weren't Marriott. We're Marriott Vacations Worldwide. |
| 7 | We're not Marriott representatives. We're also not |
| 8 | Ritz-Carlton. We're Ritz-Carlton Club; we're |
| 9 | Ritz-Carlton Destination Club; but we're not the hotel |
| 10 | company in either one of these ways. |
| 11 | Q. When I tell people I'm going to take a |
| 12 | deposition of Marriott, they think I'm in Chevy Chase. |
| 13 | A. Exactly. That's the second paragraph, but |
| 14 | the first paragraph says "The Ritz/Marriott." If I |
| 15 | ever wrote "Ritz," there are some brand people who |
| 16 | would take off my arm. You never shorten Ritz. |
| 17 | Q. The dash Carlton always has to be there? |
| 18 | A. And "the" with the capital "the." |
| 19 | Q. When did the Carlton name get attached to the |
| 20 | old Paris Ritz Hotel; do you know? |
| 21 | A. There was somebody -- there was actually a |
| 22 | Carlton that was another hotel. They came together. |
| 23 | There's a whole story behind that. |
| 24 | Q. Was that a London hotel, do you know? |
| 25 | A. I don't know where it was. I think it was |

Page 204

| | |
|---|---|
| 1 | London, because it was Paris and London, right? |
| 2 | Q. Right. |
| 3 | A. Yes. |
| 4 | Q. Let me show you what's been previously marked |
| 5 | as 1184. I have no idea if it's gone out. It's |
| 6 | easier for me just to give it out again. |
| 7 | This is another RCDC SLC leadership |
| 8 | memorandum on April 11th. It seems to follow up on |
| 9 | the prior one we saw -- prior communication internally |
| 10 | at Salt Lake City regarding the Aspen board of |
| 11 | directors letter. |
| 12 | Do you see the bottom is kind of the document |
| 13 | we saw before? |
| 14 | A. Uh-huh. Yes, I do. |
| 15 | Q. And then at the top -- there it is again -- |
| 16 | "Ladies and gentlemen, thank you for letting us know |
| 17 | that some of the Aspen Club members are inquiring |
| 18 | about the voting information, including the letter |
| 19 | that went out from the board of directors." |
| 20 | Did you receive any inquiries directly from |
| 21 | members? |
| 22 | A. About -- |
| 23 | Q. Voting. |
| 24 | A. About the question? No. Very few members |
| 25 | find their way to me. Most of the board members are |

Page 205

52 (Pages 202 - 205)

Veritext Legal Solutions
866 299-5127

1  who I talk to.
2    Q.  And you also -- internally, you said, "We
3  have been told that the board hopes to forward
4  information about the vote within the next 30 days;
5  and, as of yet, they do not know what process will be
6  used to facilitate the voting process.  If the member
7  has additional question, they are welcome to contact a
8  member of the board directly."
9      That didn't happen, did it?  They weren't
10  told anything in 30 days.
11    A.  They weren't.  It was a very long process
12  that we went through with the board.
13    Q.  And it wasn't --
14    MR. SELLINGER:  Hold on a minute.
15    A.  The board -- no -- because the board
16  started -- we started communicating about the letters.
17  They would go away for a while, and they were busy
18  with other things, I assume.  I don't know what -- I
19  would continue to kind of push them for updates or
20  feedback on communication that we had sent or drafted,
21  and then they would -- that would stop.
22      Then it actually got to a point, sometime end
23  of June, where I just didn't hear from them for a
24  couple months.  And then they came back in September
25  and were ready to go.  And I assume there were a lot

Page 206

1  of other things going on for them.  It was a long
2  process.
3  BY MR. FERGUSON:
4    Q.  It was a long process.  I take it, you would
5  say it's all the board's fault?
6    A.  No, I don't think it's the board's fault.  I
7  was -- we were certainly drafting communication.  It
8  was being shared back and forth.  But they had other
9  priorities going on that they must have been taking --
10  must have been working on.
11      Truly, there was no -- for us, there was
12  really no benefit that was coming from this.  We were
13  just allowing this opportunity out to members to
14  exchange.
15      So we were taking the calls, where members
16  were interested in exchanging and wanting to do this
17  now that they knew about it.  We couldn't do anything
18  about it, which was frustrating for them, because we
19  had to either move forward with it or not.
20      But, to us, there was no benefit that was
21  coming to the company for this exchange opportunity.
22  It was really more just offering vacation options for
23  the members.
24    Q.  No benefit at all?
25    A.  For us?  For the exchange, no.

Page 207

1    Q.  Well, today you are able to access exchange
2  inventory?
3    A.  Exchange of -- I'm sorry.  Who is able to
4  access --
5    Q.  Marriott Vacation Worldwide customers.  They
6  buy points these days.  They used to buy weeks.
7  That's available to them?
8    A.  The points program?
9    Q.  Yes.
10    A.  Yes, but --
11    Q.  As a result of that, you're able to take a
12  glossy brochure, either in paper or mostly online, and
13  you're able to have all the Marriott Vacation Club
14  properties and all the Marriott Vacation Club
15  experiences.  And at the very end of those brochures,
16  you have the luxury brand, the Ritz-Carlton Hotel.
17  Correct?
18    MR. SELLINGER:  Objection to form.
19    A.  Ritz-Carlton Hotel?
20  BY MR. FERGUSON:
21    Q.  Ritz-Carlton Club.  I'm sorry.
22    MR. SELLINGER:  Objection to form.
23  BY MR. FERGUSON:
24    Q.  Ritz-Carlton Club?
25    A.  Yes, but that had nothing to do with this,

Page 208

1  because that was the inventory going in the trust.
2  That wasn't the affiliation with Marriott --
3    Q.  If I look --
4    MR. SELLINGER:  Hold on.  You've got to
5  wait.
6    THE WITNESS:  I wasn't pausing there, was
7  I?
8    MR. SELLINGER:  So you're entitled to
9  finish your answer.
10    THE WITNESS:  Okay.  I mean, but that --
11  having it in the back -- the inventory is
12  actually in the trust.  So the inventory
13  being in the trust is the way that they can
14  access.
15    Even if this affiliation didn't exist,
16  there would still be all of the inventory in
17  the trust, except for Aspen.  Aspen is the
18  only one who wouldn't be.  All the rest of
19  them would be.
20    And they could be represented and have --
21  in essence, it would become a one-way street,
22  right?  The Marriott Vacation Club members
23  would be able to come in, but the
24  Ritz-Carlton would not be able to go out and
25  use that program.

Page 209

53 (Pages 206 - 209)

BY MR. FERGUSON:

1    Q. So you're saying that the Aspen Club --
2 that's the only way people could get into the Aspen
3 Club that are Marriott Vacation points people, would
4 be through exchange inventory?
5    MR. SELLINGER: Objection to form.
6    A. The only way that Marriott Vacation Club
7 members -- yes, today -- could get into Aspen is
8 through -- you're saying exchange -- owners depositing
9 their time and electing for points.
10    So the only way that a Marriott Vacation Club
11 member can get in today is if a Ritz-Carlton member
12 wants to go use the Marriott system.
13 BY MR. FERGUSON:
14    Q. But they can get in?
15    A. Because of a Ritz-Carlton member going out.
16    Q. And as a result of that, when you print out
17 your glossy brochures, and you look at page 64 at the
18 end, where you have all the Ritz-Carlton Clubs, you're
19 able to put down Aspen as a potential place for people
20 to stay?
21    MR. SELLINGER: As a result of what?
22 What's that?
23    MR. FERGUSON: Affiliation.
24    MR. SELLINGER: Objection to form.

Page 210

1 put in your brochure, when you're out -- when your
2 salespeople are out at the hotel in New York -- as
3 some of my clients call from there -- they get a sales
4 pitch. And they said, "You can use the Aspen Club at
5 Aspen Highlands ski mountain. If you buy enough
6 points, you can access this club."
7    That's what they tell them; right?
8    MR. SELLINGER: Objection to form.
9    MS. LIVINGSTON: Object to the form.
10    MR. SELLINGER: Objection to form. Long
11 question.
12    A. That is a long question, but, certainly, it's
13 one of the pictures in a lot of pictures. We have
14 properties -- we've got ski properties all over.
15 We've got Ritz-Carlton properties all over. They can
16 go to Ritz-Carlton Hotels.
17    I guess, I feel like you're trying to infer
18 that Aspen -- having Aspen on the brochure creates all
19 of this value, and I think that's a bit of a stretch.
20 BY MR. FERGUSON:
21    Q. See, my job today is just to ask you
22 questions. You're inferring things, and you actually
23 give pretty long answers.
24    My question was, you are able to do that?
25    MR. SELLINGER: Well, actually, her

Page 212

1    A. Yes. There is a way now, because members are
2 going back and forth, that Aspen is actually --
3 Marriott Vacation Club members could get into Aspen.
4 That is correct -- and then you could actually
5 represent.
6    Now, if no Marriott Vacation -- now, if no
7 Ritz-Carlton members wanted to use the program, then
8 there are no Marriott Vacation Club members coming to
9 Aspen.
10 BY MR. FERGUSON:
11    Q. Understood.
12    A. Okay.
13    Q. And you've got people that -- some people
14 have signed up, obviously --
15    A. Some people have signed up?
16    Q. Some members at Aspen have signed the Lion &
17 Crown enrollment form --
18    A. Yes.
19    Q. -- and they have the ability, when they do
20 that, to put points -- to put their weeks into the
21 exchange program?
22    A. Exactly. So they decided that they want to
23 go out and use the program.
24    Q. And what you all do with it at Marriott
25 Vacation Worldwide -- or can do -- is, you can then

Page 211

1 answers have been fine because that wasn't
2 your question. That's your question now.
3    MR. FERGUSON: Object to the form then.
4    MR. SELLINGER: I just don't think you
5 should be suggesting she's reading something
6 in your question that isn't in it. I think
7 she's reading exactly what's in your question
8 and trying to answer. Go ahead.
9    MR. FERGUSON: In the afternoon, and
10 Ms. Sobeck -- I know she's got a busy
11 household with those young kids, and she's
12 got a big job, and I know she doesn't want to
13 be here.
14    But I'm going to probably try to get you
15 to focus on my questions as opposed to
16 inferring what I'm asking so we can kind of
17 move this along a little bit. Okay?
18    THE REPORTER: We need to break.
19    MR. FERGUSON: Thank you.
20    THE VIDEOGRAPHER: The time is 2:14.
21 That concludes media three in the deposition
22 of Stephanie Sobeck.
23    (Brief recess.)
24    THE VIDEOGRAPHER: The time is 2:27.
25 This is media four in the deposition of

Page 213

54 (Pages 210 - 213)

1  Stephanie Sobeck.
2  BY MR. FERGUSON:
3      Q. Back on the record. We were talking about
4  what could be done with Aspen as a product that can be
5  used by Marriott Vacation points customers.
6          The bottom line is that the core business --
7  I know there's another part of it -- but the core
8  business of Marriott Vacation Worldwide, the spinoff
9  from Marriott International to MVCI, is to sell a
10  product known as points. It used to be weeks. Now
11  it's points.
12         MR. SELLINGER: Object to the form.
13     A. The core business? Well, we have a
14  management -- we have a management company. I'm
15  sorry. I can't say the core business. We have a lot
16  of different parts of the business. We have
17  financing, sales, management, rentals. All of those
18  make up --
19  BY MR. FERGUSON:
20     Q. At the end of the day, though, when you have
21  financing, it's financing for points?
22     A. Financing -- yes.
23     Q. When you have management, it's management of
24  hotels that are used by people who buy points?
25         MR. SELLINGER: Objection to form.

Page 214

1  New York, Monaco. They pick the most exclusive places
2  in the world to put on their doors for these high-end
3  luxury-good purveyors.
4      A. Sure.
5          MR. SELLINGER: Objection to form.
6      A. Okay.
7  BY MR. FERGUSON:
8      Q. And Dolce & Gabbana, they do that?
9      A. Well, you see that in a lot of different --
10  not just luxury and others -- but where their
11  locations are. Yes.
12     Q. And in a world of exclusivity -- at least
13  perceived exclusivity, because I'm probably not part
14  of that crowd -- Aspen is a place that has a very
15  special cache in the world of travel.
16         MR. SELLINGER: Objection to form.
17     A. Okay.
18  BY MR. FERGUSON:
19     Q. Do you agree with that?
20     A. I think it's a beautiful place to travel. We
21  have a lot of wonderful places to go.
22     Q. I think I had in front of you, before the
23  tape ran out, 1185.
24     A. Yes, sir.
25     Q. I was at the bottom of that.

Page 216

1      A. No.
2  BY MR. FERGUSON:
3      Q. Okay. Do you do other types of management?
4      A. Yeah. We have all of our -- whatever --
5  60 -- of the 60 projects, I mean, most of them are
6  weeks-based resorts. We still have all those -- what
7  we call legacy week projects that we manage. We do
8  rentals throughout the whole system. We sell product
9  elsewhere -- in Europe and Aruba -- that are weeks.
10  So the core NATO products, the North American product,
11  is points.
12     Q. Let's focus on North America then.
13     A. Okay.
14     Q. The main -- a main part of the business of
15  Marriott Vacation Worldwide in the United States is to
16  sell points?
17     A. Yes.
18     Q. And because I'm from Aspen, I'm going to ask
19  you this question. Have you ever seen places, like
20  Prada, that says on the front door -- it says, "Paris,
21  London, New York, Aspen"? Do you ever see -- you know
22  how the door -- the really fancy stores have that?
23  Have you ever come across that?
24     A. Like, just the name of the location?
25     Q. Yeah. They always put it on a door -- Aspen,

Page 215

1          At some point, this letter made its way
2  from -- I'm sorry -- this communication about the
3  member letter sent by the board on April 5th -- it is
4  referenced in an e-mail at the top -- top page of
5  Exhibit 1185 -- Lori Phillips to John Albert.
6          Who's John Albert?
7      A. John Albert is Lori's boss's boss.
8      Q. He oversees Cindy Hodge?
9      A. Yes.
10     Q. And what is John Albert's department?
11     A. He is responsible for project planning,
12  association governance -- from an operations project
13  planning -- association governance. I believe he may
14  have fire-life safety in there as well.
15     Q. So is he a senior vice president?
16     A. No, I don't believe so. I think he's the
17  vice president. He may be senior vice president. I
18  don't know. He might have gotten a promotion along
19  the way.
20     Q. But he's Cindy's boss?
21     A. Oh, here -- no. It says vice president.
22  Yes, he's Cindy's boss.
23     Q. This is in 2013. He may or may not have been
24  elevated?
25     A. Today, right.

Page 217

55 (Pages 214 - 217)

1    Q. It says resorts operations. So as part of
2  resorts operation, it has governance -- under him with
3  Cindy Hodge and Lori Phillips -- I forgot my question.
4  He oversees -- he has responsibility over RCDC-system
5  properties?
6    A. From an association governance perspective,
7  yes, but that's pretty much all.
8    Q. And some operational part of that?
9    A. No. Because all the operations -- the onsite
10 operations -- is run by the hotel company.
11   Q. Now, Ms. Phillips told her boss's boss, John
12 Albert, and her boss, Cindy Hodge, on April 3rd -- I'm
13 sorry -- April 8th of 2013 about the Aspen member
14 communication -- that Barbara's recommended edits were
15 not made to the final letter. Attached is the letter
16 approved by Barbara that was sent.
17     Do you know what that means?
18   A. No, I don't really, because it says that she
19 approved it, but it also says she made additional
20 edits. So, no. Maybe there were -- I don't know. I
21 don't know. Anything else would be speculation.
22   Q. When was the meeting with Ms. Egolf -- or was
23 there a meeting with Ms. Egolf -- when was the meeting
24 with her about a vote versus a survey?
25     MR. SELLINGER: So, here, tread very

Page 218

1    A. Yes.
2    Q. So you peg it between July and December?
3    A. July and September.
4    Q. September. I'm sorry. And where were you
5  when the meeting happened?
6    A. I don't know. It would've either been in
7  Lee's office or in my office or her office. I'm not
8  sure. Again, we have a lot of meetings in which such
9  things would be discussed.
10   Q. Again, without disclosing anything -- I'm
11 going to ask it pretty carefully because I've been
12 doing this too long. Did the issue of survey/vote
13 come up with Ms. Egolf in the context of a meeting
14 about a lot of things, or was there a particular
15 meeting about vote versus survey with Ms. Egolf and
16 Mr. Cunningham?
17   A. I don't remember it was specific about the
18 vote versus survey. I think there was a specific
19 meeting about the whole Aspen process and Aspen and
20 next steps and so on. I don't think it necessarily
21 was just about vote versus survey, but it was about
22 Aspen overall.
23   Q. Was Randy Mercer part of that meeting?
24   A. No.
25   Q. Was Randy Mercer told about that meeting --

Page 220

1  carefully so not to disclose privileged
2  information. Answer the narrow question of
3  when. Was there a meeting on that subject
4  matter? Which he's entitled to. But don't
5  get into the discussion beyond that.
6  BY MR. FERGUSON:
7    Q. I'm carefully doing it that way.
8    A. Yeah -- I don't know the specific date or
9  time, but it certainly happened between the July
10 timeframe and September.
11   Q. So you seem to know or perceive the meeting I
12 was talking about, so let's -- I take it you have a
13 lot of meetings with Ms. Egolf. You meet with her
14 fairly regularly?
15     MR. SELLINGER: Objection to form.
16   A. I meet with her very regularly.
17 BY MR. FERGUSON:
18   Q. And I referenced a meeting regarding
19 vote/survey. Did a particular meeting come to your
20 mind?
21   A. We have --
22   Q. When I say meeting -- or discussion?
23   A. Yeah, I remember having a discussion about
24 the vote/survey and -- yes.
25   Q. All right. We're all being careful here.

Page 219

1  the upshot about a vote versus a survey?
2    MR. SELLINGER: Well, just so it's
3  clear -- again, I want to make sure that
4  there's no waiver of a privilege --
5    MR. FERGUSON: You know I'm not trying to
6  do that.
7    MR. SELLINGER: Yeah -- I know you're
8  not, but I'm sort of obligated to make sure
9  it doesn't sort of spill out inadvertently,
10 because that did happen once today before I
11 had the chance to object.
12     You're not -- are you asking her whether
13 she shared the legal -- the conversation that
14 she had with Barbara, with Randy Mercer?
15     MR. FERGUSON: Yes, that's what I'm
16 asking.
17     MR. SELLINGER: So, yes or no, did you
18 disclose the advice that Barbara gave to
19 Randy?
20     THE WITNESS: The advice that Barbara
21 gave to Randy?
22     MR. SELLINGER: You know what? I know
23 what you want. I don't have a problem with
24 it. If you let us take a two-minute break, I
25 think I can --

Page 221

56 (Pages 218 - 221)

1      MR. FERGUSON:  But I don't want to do
2  that because that's a problem for me.
3  BY MR. FERGUSON:
4      Q. I'm just asking real simply, without
5  divulging a shred of information that was given by
6  Ms. Egolf or the questions you were asking her -- the
7  interchange with her -- did you discuss anything about
8  the vote/survey decisions, or whatever, following that
9  meeting with Mr. Mercer?  Just a decision -- any
10  decision that was made.
11      A. Yes, we would have gone through -- we had the
12  strategy laid out.  And, if nothing else, he would
13  have seen the full letter that explained what we were
14  doing and the survey and its requirements.
15      Q. Again, without divulging anything in this
16  meeting with Ms. Egolf and Mr. Cunningham, where
17  vote/survey in the process of Aspen was discussed --
18  again, without talking about it -- was there a letter
19  or a draft letter being generated in that meeting?
20      MR. SELLINGER:  I'm sorry.  Just read it
21  back.
22      (The reporter read back the last
23  question.)
24      MR. SELLINGER:  Just wait a minute.  In
25  order to avoid giving an instruction

Page 222

1  unnecessarily, because I don't know the
2  answer to the question, do you agree that,
3  regardless of the answer, yes or no, that
4  that's not a waiver of privilege?
5      MR. FERGUSON:  Yeah.  For the purpose of
6  this question, absolutely.
7      MR. SELLINGER:  Answer that yes or no.
8      A. No, I do not believe a letter was being
9  drafted in that meeting.
10  BY MR. FERGUSON:
11      Q. Did you draft -- yeah -- did you draft --
12  were you involved in drafting a document given to
13  Randy Mercer or anybody at the board as a result of
14  that meeting?
15      A. Yes.  The member letter.
16      Q. And as Mr. Reiser pointed out -- four, five,
17  six, seven iterations of a letter that was started, I
18  think, in May, do you know which iteration immediately
19  followed that meeting?
20      A. The letter that would have eventually gone to
21  the board, I think it was around the end of September.
22      Q. Again, without divulging anything, did you
23  have any e-mail communications with Ms. Egolf
24  concerning the member letter?
25      A. Yes.

Page 223

1      Q. And would that have been in the timeframe --
2  would it have been in the big timeframe of May to
3  December?  Okay?
4      A. I would put it closer to July through
5  September.
6      Q. July through September?
7      A. Yes.
8      Q. And because my question was so inartful, do
9  you recall -- it would've been easier just to say --
10  ask you what the timeframes you would've been
11  communicating -- without divulging anything, what is
12  the timeframe you would've been communicating with
13  Ms. Egolf concerning the member letter going to Aspen
14  Highlands owners?
15      A. Sorry.  About the letter we're talking about?
16      Q. The member letter, yeah.
17      A. It would've been in the September timeframe.
18  It looked like it was drafted by the end of the month,
19  so it probably would have taken a few weeks to discuss
20  and work through.
21      Q. Without divulging anything about what you
22  said or did or wrote in that, I just want to ask
23  you -- did she have input into this letter?
24      MR. SELLINGER:  I'm going to instruct her
25  not to answer that.

Page 224

1  BY MR. FERGUSON:
2      Q. How many e-mails did you exchange with
3  Ms. Egolf regarding the member letter?  I know it's
4  three or four years ago, but approximately.  Is it
5  two, ten?  Was it a pretty --
6      A. I have no idea.
7      Q. Did you e-mail her, versus her e-mailing --
8  I'm going to ask you two questions.  Did you e-mail
9  her or did she e-mail you?
10      A. We would have e-mailed each other, yeah.  It
11  would've been a two-way street.
12      Q. Were there any other MVW employees that may
13  have been copied on these e-mails?
14      A. Probably -- well, at the end, certainly, Lee
15  would've been involved, because we would have wanted
16  him to see the final drafts.
17      Q. Who?  Randy?
18      A. Lee.
19      Q. Lee.  I'm sorry.  I heard E and --
20      A. Lee.  I can't think of anyone off the top of
21  my head who would've been involved with drafting it
22  with Barbara and I.  Maybe Patrick.
23      Q. Who's Patrick?
24      A. Patrick Forth is a gentleman who works out in
25  Salt Lake City on Eveleen's team.

Page 225

57 (Pages 222 - 225)

| | |
|---|---|
| 1 Q. Let me show you Exhibit 1189. This is a | 1 That means you all get to say "Aspen, Monaco, |
| 2 letter from Mary Lynn Clark. | 2 New York, London." I mean, you get to say "Aspen" to |
| 3 Was she working out of Orlando or a different | 3 leverage sales, because your line salesmen are out |
| 4 location in August of 2 -- April of 2013? | 4 there saying, "Hey. Guess what? If you buy points, |
| 5 A. She was in Orlando. | 5 you can get into the Aspen Club." |
| 6 Q. What was her role in connection with RCDC | 6 MR. SELLINGER: Objection to form. |
| 7 properties with the system? | 7 A. They could say that. There were also other |
| 8 A. She used to run member services before this. | 8 Ritz-Carlton Clubs and Ritz-Carlton Hotels they could |
| 9 And I can't remember -- member services was in Orlando | 9 access. |
| 10 for a little while. She and I worked together with | 10 BY MR. FERGUSON: |
| 11 member services in Orlando. | 11 Q. Of course. She's talking about Aspen here? |
| 12 She -- member services was then transferred | 12 A. She's talking specifically about Aspen. |
| 13 back to Salt Lake City. And, again -- I'm sorry -- I | 13 Q. Then she said "MVCD owners." And those MVCD |
| 14 don't remember the years, but it was before this. It | 14 owners are either weeks people or, more recently, |
| 15 was probably in 2012. | 15 points people? |
| 16 And then she was working in a sales and | 16 A. Yes. Legacy weeks owners or points. |
| 17 marketing capacity. She was working for Brian Miller. | 17 Q. And she said in bullet point three here, |
| 18 Q. And if I look at the second page of 1189, she | 18 "MVCD owners will have usage rights to any allocated |
| 19 was, at least at the time -- I know she's moved on to | 19 week of member deposits." Correct? |
| 20 another hotel company -- hospitality company, I | 20 A. Yes. |
| 21 guess -- but she was vice president of marketing and | 21 Q. What actually happened, since the affiliation |
| 22 sales. Is that right? | 22 that occurred in April of 2014, is that MVCD owners -- |
| 23 A. Yes. | 23 those allocated weeks could actually be used by more |
| 24 Q. I asked you before and you -- before the | 24 than one MVCD member. |
| 25 break -- you were inferring some things I said. I | 25 Do you understand my question? |
| Page 226 | Page 228 |
| 1 think at some point, you said, "There was really | 1 A. I'm not -- |
| 2 nothing in it for the company" -- this exchange | 2 Q. Let me ask it more simply. Can exchange |
| 3 program or affiliation. | 3 program inventory, now done through Lion & Crown by |
| 4 Do you recall that? | 4 people who voluntarily enroll -- I think you pointed |
| 5 A. The affiliation? | 5 that out -- do MVCD points people or weeks people have |
| 6 Q. Yes. | 6 the ability to use it, say, for two nights or three |
| 7 A. Yes. | 7 nights, as opposed to a week? |
| 8 Q. But she appears to disagree with that, right? | 8 A. They have the right to use it for a short |
| 9 Because she has a whole section on page 1 that says, | 9 period of time. |
| 10 "What's in it for the company?" Do you see that? | 10 Q. And MVCD people, you can have one person in |
| 11 MR. SELLINGER: Objection to form. | 11 there for three days, another person in there for four |
| 12 BY MR. FERGUSON: | 12 days? |
| 13 Q. So for some reason -- | 13 A. You could, just like RCDC. |
| 14 A. Yeah, I can -- yeah, I see. | 14 Q. Okay. And I believe there's a memo where you |
| 15 Q. I was asking you about this before the break. | 15 said, "Eh, that's not going to happen much because |
| 16 And what I said is, "What could happen is, Lion & | 16 Aspen is hard to get to." |
| 17 Crown inventory in Aspen could be used for | 17 A. It's hard to get to. |
| 18 points-based reservations." | 18 Q. Have you studied -- do you study those usage |
| 19 A. Right. | 19 patterns since 2014, is it part of your purview in the |
| 20 Q. That's why I was asking you about one of | 20 asset management part of the company to study how the |
| 21 the -- a main business or a core business is selling | 21 exchange week inventory are being used by MVCD |
| 22 points. | 22 members? |
| 23 A. Right. | 23 A. No. |
| 24 Q. Then she went on to say, "Leverage Aspen as | 24 Q. Who would be doing that? |
| 25 an option for points-based sales." | 25 A. It would be done more through what we call |
| Page 227 | Page 229 |

58 (Pages 226 - 229)

1  iPSM or revenue management.
2     Q.  They manage inventory?
3     A.  Yes.
4     Q.  Are you aware of any types of contractual
5  relationships between Cobalt -- what's the full name
6  of that company?  Cobalt Management --
7     A.  Cobalt Travel.
8     Q.  Cobalt Travel.  Were you aware of any
9  contracts between Cobalt -- or contractual
10  relationships that have been documented between Cobalt
11  Travel and Lion & Crown?
12     A.  Yeah.  I think there's an affiliation
13  agreement between the two.  Cobalt Travel affiliates
14  with each of the associations, and then Cobalt Travel
15  affiliates with Lion & Crown, and then Lion & Crown
16  affiliates with others, I believe.
17     Q.  Do you consider Lion & Crown to have somehow
18  stepped into the shoes of Cobalt as a program manager?
19        MR. SELLINGER:  Objection to form.
20     A.  Do I think they stepped --
21        MR. FERGUSON:  Is that a legal question?
22        MR. SELLINGER:  I have no idea.
23        MR. FERGUSON:  Okay.  Yeah -- I got it.
24  Objection.  I don't know what you're talking
25  about.

Page 230

1     A.  Yes.
2     Q.  Does Marriott Vacations Worldwide ever use it
3  as a consultant?
4     A.  I don't use them as a consultant.  They
5  certainly could.
6     Q.  How do you know about HVS?  Let me ask you
7  this.  What knowledge do you have about what they do?
8     A.  I believe they go in and look at hotels -- my
9  guess -- we would use them as a company -- I'll give
10  you an idea of what my understanding is of what they
11  do.
12        I think our feasibility team uses them when
13  they go and they look at new properties and they do
14  valuations on the new properties.
15     Q.  Did you ever see a report by HVS in
16  connection with the Bachelor Gulch RCDC, Ritz-Carlton
17  Destination Club?
18     A.  A report?
19     Q.  Yeah.  Have you seen any reports that HVS has
20  done or had done for Mike Mullenix and the association
21  up at Bachelor Gulch?
22     A.  On the property?  Like a valuation on the
23  property?
24     Q.  Just to report -- let me get real specific.
25  I can see I'm confusing you and that's not my intent

Page 232

1        THE WITNESS:  Makes two of us.
2  BY MR. FERGUSON:
3     Q.  You believe that there is some type of
4  affiliation agreement?
5     A.  Yes.  My non-legal opinion or understanding
6  is yes.
7        MR. MEADE:  Can I just interrupt, Matt?
8  I don't believe that that agreement has been
9  produced, and we would ask that it be
10  produced.
11        MR. FERGUSON:  We looked for it.
12        MR. MARX:  Okay.  If it has -- we'll
13  produce it whether it has or hasn't.
14        MR. MEADE:  Thank you.
15        MR. FERGUSON:  Rather than ask Ms. Sobeck
16  about what it might say, we'll read it
17  ourselves.
18        THE WITNESS:  Yeah.
19  BY MR. FERGUSON:
20     Q.  You went to Cornell for hotel school and went
21  for an MBA and we went to law school to read
22  contracts.
23     A.  Right.
24     Q.  Have you ever seen a report by a hospitality
25  hotel company called HVS?  Do you know HVS?

Page 231

1  at all.
2        Have you ever seen a report that was
3  commissioned by the board of directors at the Bachelor
4  Gulch Ritz-Carlton Destination Club that was
5  commissioned by Mr. Mullenix and his board?
6     A.  No, I don't think so.
7     Q.  Were you ever aware of a report that was done
8  by HVS for that board?
9     A.  I don't think I am.  Was that when they were
10  still with us?  Now I'm interested.
11     Q.  Yeah.  When they were still with you.
12     A.  When they were with Ritz-Carlton?
13     Q.  Yeah.
14     A.  I don't believe I did.
15     Q.  That didn't come up in meetings with
16  Mr. Mullenix and Ms. Perfido up there in Avon,
17  Colorado, or Beaver Creek?
18     A.  The HVS study that they had done?
19     Q.  Yeah.
20     A.  I don't remember.
21     Q.  So today is the first time you've heard about
22  HVS --
23     A.  I know about HVS.  I didn't know there was an
24  HVS report.  Maybe I have and have forgotten.  I don't
25  remember one.

Page 233

59 (Pages 230 - 233)

1  Q. It's one of those questions I just figured
2  I'd ask you. There was one out there. I wondered if
3  you saw it.
4  A. No.
5  Q. Okay. Mike Reiser was referring to TUG,
6  which is a blog; is that right?
7  A. Yeah. Timeshare Users Group.
8  Q. Are you a member of that blog?
9  A. I am not.
10  Q. Have you been involved either indirectly --
11  sorry -- directly involved in watching the trends for
12  values of the fractional interests in Aspen, Colorado?
13  A. No, I have not.
14  Q. Do you have any knowledge about the
15  percentage of diminution in value that's occurred in
16  the last four or five years?
17      MR. SELLINGER: Objection to form.
18  A. The company has inventory that it has been
19  selling over the last two years probably -- the
20  remaining developer inventory. So...
21  BY MR. FERGUSON:
22  Q. That was done through the Lore Institute?
23  A. Yes.
24  Q. And Mr. Klein?
25  A. Yes, sir.

Page 234

1  Q. And is there a specific closing agent that
2  you all use for the Aspen inventory?
3  A. I assume we use American Title, because
4  American Title is who does most of our closings.
5  Q. But in terms of over -- withdraw that. I
6  know Mr. Cunningham, and, to some extent, you were
7  able to retain Lore Institute and Mr. Klein to
8  initiate a program to sell that remaining inventory.
9  Right?
10  A. Yes.
11  Q. I believe Mr. Cunningham -- and I think you'd
12  probably agree -- that for all intents and purposes,
13  that inventory has been sold off?
14  A. It actually -- we sold the last two interests
15  a couple months ago.
16  Q. Do you know how much those sold for?
17  A. No. I don't remember.
18  Q. Was it over $100,000?
19  A. I don't know. We can get you the sales data,
20  though.
21  Q. So we have -- you can get sales data for the
22  period that Mr. Klein took over or was retained to
23  sell that remaining inventory.
24      Is there sales data going back to all the
25  RCDC fractional interests that were sold for Aspen

Page 236

1  Q. Did you all -- this is just kind of -- kind
2  of documentation you all keep -- questions -- or
3  series of questions.
4      Is there a place in your sphere where that
5  sales data is kept? For example, we've got 120 units
6  since 84021 and 74013 -- those fractional interests --
7  is there a place you have, in one place, the
8  statistics of the price that was achieved and the
9  buyer and the seller? Obviously, the seller would be
10  RCDC in that case?
11  A. Right. You mean just a summary of all of the
12  sales that have been done and what they sold for?
13  Q. For Lore.
14  A. Through Lore, yes.
15  Q. And who has that?
16  A. Well, Jamie would have it. But, internally,
17  Dee Dinda would have it -- D-I-N-D-A.
18  Q. So Jamie is Jamie Klein?
19  A. Jamie Klein would collect all those things.
20  Q. And who is doing it for you internally?
21  A. Dee Dinda -- Mooney is her last name.
22  Q. At the break, we'll see if we can get a
23  spelling on that.
24  A. Dinda, D-I-N-D-A. And her last name is
25  Mooney, M-O-O-N-E-Y.

Page 235

1  Highlands?
2  A. Yes. I mean, it's sales. It's all public
3  records. You could pull any of it.
4  Q. Yeah -- you can pull it, but there's 876 and
5  fractionals are not very well maintained by Aspen and
6  other places. They just don't seem to have a handle
7  on handling fractionals.
8      So my question is simply, is there a person
9  that you could identify that would just have -- hey,
10  can you pull me all the sales of stuff we did since
11  2001 or 2000?
12  A. We could pull the sales that we have done,
13  but we couldn't pull the interests that have sold on
14  the outside market. We have none of that data.
15  Q. Just focusing on the inventory that was sold
16  by the development company to -- I'll call them
17  original buyers -- you do have that data?
18  A. Yeah, we should have it. I don't see any
19  reason why not.
20  Q. Not that we need all the deeds, but would
21  there be a place where you would have a summary, where
22  you would have the unit, the price, and the buyer?
23  A. We may have to create it, because it's
24  happened over different times, but we certainly should
25  have the information.

Page 237

60 (Pages 234 - 237)

1   Q.  Now, obviously, when a buyer from the
2  developer resells it to another person or conveys it
3  in some way to a new owner, at least the management
4  company, which you dedicate time to -- and
5  Ms. Phillips -- you would have to know about that
6  transfer, right, because you now have a new member?
7   A.  Yes.  It goes through our owner modifications
8  team.
9   Q.  Okay.  How is it made -- Mr. Smith has a
10  one-twelfth fractional ownership, three weeks reserved
11  and one week unallocated, and he wants to convey it to
12  his favorite first cousin.  For a dollar or a million
13  dollars, he conveys it.
14   What are they required to do in order to
15  report that conveyance to you, so you now know who the
16  new member is who you get dues from or you allow to
17  vote?  How do you -- is there something in the
18  documents that say, hey, owners, you need to tell us
19  when something is conveyed?
20   A.  There is a form that we give them that has
21  all of the pertinent data.  They have to -- I believe,
22  they have to get driver's licenses from both the buyer
23  and seller.  There has to be a recorded deed.  And
24  then they pay us -- I don't know -- a small fee, like
25  $40 or something -- or $50 or something --

Page 238

1  We would just have their names.
2   And, no, it wouldn't be easy to -- I don't
3  know how we would do -- there may be a way to go back
4  and look at transfer dates and pull a report.  I'm not
5  familiar with how that would work.
6  BY MR. FERGUSON:
7   Q.  But you would have a record of the seller to
8  the secondary buyer and the date of the conveyance?
9   A.  That would be more manual.  I could pull a
10  2015 member roster and a 2016 member roster and
11  compare them and see if names had changed.  But
12  there's not a specific form you would pull that would
13  show all the transfers that have happened.
14   Q.  So there's no printout you could generate?
15   A.  I don't know.  I don't know of any.  It's not
16  really my area, but I don't know of any.
17   Q.  But owner modification people would have the
18  documentation that was generated from the form and
19  given as required?
20   A.  Yes, they should have it.
21   Q.  Do you have any statistics as to how much of
22  the -- or how many fractional interests have passed
23  from original owners to secondary owners and onward?
24   A.  I don't know.
25   Q.  Do you know Mike Marino?

Page 240

1   Q.  Not a core business?
2   A.  Not a core business.  That all goes to owner
3  modifications.  Then they do it in the system.  So the
4  owner of record is changed, the new billing, and what
5  we call the primary member.  The primary member is
6  reestablished as the new owner.  They get all the
7  rights.  So if Joe Schmo, who used to own it, calls
8  in, he doesn't show up and he doesn't get any member
9  rights.
10   Q.  So there is documentation generated and
11  provided in connection with the conveyance of an
12  ownership of a fractional interest -- is generated for
13  owner modification people?
14   A.  It's given to the modification people.
15   Q.  They have a form to fill out and they also
16  have to give the deed?
17   A.  The owners have to do that -- the new owner
18  usually does it.  Then they send it to them to change
19  it in the system.
20   Q.  Rather than getting all those owner
21  modification forms and all those deeds, is there a
22  place where you store Smith to Jones 2012, $52,000?
23   MR. SELLINGER:  Objection to form.
24   A.  We would have none of the sales data.  We
25  don't require them to give us any sales information.

Page 239

1   A.  Mike Marino, yes.
2   Q.  I believe that he was involved at some point
3  in connection with the drafting of the MOU, the
4  memorandum of understanding, for Aspen Highlands.
5   A.  Yes, he was.
6   Q.  I believe he might have been -- let me just
7  ask you this.  Was he in Aspen on April 5th, 2013?
8  Was he at those board meetings?
9   A.  I believe he was at the board meetings.  He's
10  the association's counsel.
11   Q.  And before April of 2013, had you interacted
12  with Mr. Marino in any context other than being an
13  owner -- in a lawyer capacity?
14   A.  Yes.
15   Q.  Can you tell us what those instances were?
16   A.  He used to be involved in St. Thomas as well.
17   Q.  As an owner, as a member, as a lawyer, or
18  some combination?
19   A.  He used to be the attorney for the
20  association.
21   Q.  And he was a member there also?
22   A.  He was.  I think he had a suite.  He and his
23  buddy, Gino Orsini.
24   Q.  My best friend in grammar school was Thomas
25  Orsini.

Page 241

61 (Pages 238 - 241)

1    A. I think his cousin is now on the board. His
2  name is Enzo Orsini. There's a lot of Orsinis.
3    Q. Gino and Enzo.
4    A. Exactly.
5    Q. And had he acted as an attorney for any other
6  clubs in yours experience besides St. Thomas and
7  Aspen?
8    A. No, sir.
9    Q. Do you know whether he has ever represented
10  Marriott Vacation Worldwide in connection with any of
11  its labor employment needs?
12    A. No. I have no idea.
13    Q. Do you know what kind of lawyer he is -- what
14  he does as a practice? Do you know what kind of law
15  he practices?
16    A. I don't actually know what kind of law he
17  practices.
18    Q. Do you know -- do you have any recollection
19  of him, Mr. Marino, being involved with Bachelor Gulch
20  at any time in terms of being a lawyer?
21    A. Bachelor Gulch? No. I think it was Dan Wolf
22  is who they -- I think was their attorney.
23    Q. Do you know Mr. Thomas Boova? I think he's
24  in St. Thomas.
25    A. I know the name. I can't remember why.

Page 242

1  Boova?
2    Q. When is the first time you met Mr. Mercer in
3  connection with his ownership at Aspen Highlands?
4    A. (No response.)
5    Q. Let me ask it a better way. It's hard. We
6  know the documents so well. We spent some time with
7  them. He became a director, again, I think August or
8  September of '12 -- 2012. I think Mr. Reiser covered
9  with you that he had come off the board.
10    Had you interacted with Mr. Mercer on his
11  first stint on the Aspen Highlands tourist
12  accomodation board?
13    A. I don't -- I guess I knew him. I really
14  wasn't involved -- I mean, I was involved with Aspen
15  because it was one of my projects. I didn't have -- I
16  really dealt more with Jay Neveloff, because Jay is
17  the one that I actually worked with on the Willow
18  Creek Bistro transfer and those type of things. But
19  it was really Jay. Randy was a little bit more in the
20  background.
21    Q. On the early stint?
22    A. On the early stuff. And then, later, he
23  became --
24    Q. Randy took a more prominent role after
25  Mr. Neveloff left?

Page 243

1    A. Exactly.
2    Q. I understand that Mr. Mercer, after he was
3  elected, that he came and visited you and
4  Mr. Cunningham here about November of 2012.
5    Do you recall that?
6    A. He definitely came here. He lives down in
7  the Naples area, or Fort Myers.
8    Q. Fort Myers.
9    A. Yeah. I believe he came up and met with us.
10  And Tyler, I think, came with him.
11    Q. Well, Tyler Oliver and Mr. Randy Mercer came
12  again in 2013, shortly before the letter went out from
13  Mr. Cunningham to Mr. Mercer -- the November 19, 2013
14  letter.
15    A. Yes. Right.
16    Q. So do you recall a time when Mr. Mercer came
17  by himself?
18    A. (No response.)
19    Q. Let me help you out. We've got -- lawyers
20  have to giggle sometimes. There's an e-mail where
21  you're arranging his hotel at the Ritz-Carlton here in
22  Orlando, and he told you he needed two bedrooms or
23  another room because he snored.
24    A. Because he snores and his wife won't sleep
25  with him. I know -- all the stuff you get into.

Page 244

1  But I thought that's when Tyler came. It was
2  a separate time? I mean, we definitely saw him a
3  couple times here in Orlando over that period of time,
4  and then Lee went once and we went to Aspen, so...
5    Q. And talking about the Ritz-Carlton "need two
6  rooms" trip, whether he's alone or not, do you recall
7  what was discussed then?
8    A. We were talking -- and, generally, at all of
9  these meetings that we had had -- it was really two
10  things -- one was about the affiliation and the other
11  was about the management agreement, because their
12  management agreement was close to auto renewal.
13    Q. And this would've been 2012, and it was going
14  to auto renewal in 2014?
15    A. Yeah, it was '14. I think we had the
16  discussions and renegotiated the contract, so I think
17  it was -- I think that happened in 2013.
18    Q. Do you know why Mr. Hearns --
19    A. Maybe it was '14. I'm sorry. I'm getting --
20  right in there.
21    Q. Do you know why Mr. Hearns -- did you discuss
22  with Mr. Hearns why he was recommending that MVW vote
23  its interests on the upcoming election in
24  September 2012 for Mercer and Oliver?
25    A. I don't remember discussing, but it's

Page 245

62 (Pages 242 - 245)

1  something that -- it's not really that abnormal.
2  Randy had been on the board before, had relationships.
3      And then, from John's e-mail -- you know --
4  Jay was interested in having continuity. Jay had been
5  a very good -- I say partner, but he's not really a
6  partner. I mean, he was a very tough negotiator; but,
7  at the same time, he was somebody you could work with.
8  He was business-minded, you know. Through all of
9  these things between the management company and the
10  board, he was good to work with, and they -- you
11  know -- a very good advocate of the members, but
12  still, you know, you were able to work with him
13  through these issues.
14      So Jay wanted consistency in that. He had
15  come a long way since Sal Cutrona, who was before Jay,
16  and I think Jay wanted to make sure that that kind of
17  productive relationship continued between the
18  management of the company and the association.
19      Q. And then somehow it was -- Mercer and Oliver
20  were then acceptable to Marriott Vacation Worldwide --
21  acceptable enough for you to vote for?
22      MR. SELLINGER: Objection to form.
23      A. Again, I'm not really sure if we voted for
24  them or not. They certainly had -- I had no -- there
25  was nothing glaring as I talk about them or think back

Page 246

1  to them -- a reason that we wouldn't have wanted them
2  to be on the board.
3  BY MR. FERGUSON:
4      Q. Michael Mullenix was a bit more of a tiger, I
5  take it, than Mr. Mercer when it came to the brand
6  evolution that started on July 17, 2012?
7      MR. SELLINGER: Objection to form.
8      A. They certainly had a different style.
9  BY MR. FERGUSON:
10      Q. You know Mr. Neveloff as a very experienced
11  New York State real estate attorney?
12      A. I do.
13      Q. Do you recall that he, in turn -- withdraw
14  that. You probably don't know that.
15      Do you recall that there was a
16  cease-and-desist letter that came from a firm in
17  Denver called Brownstein Hyatt & Farber?
18      A. I remember seeing that, yes.
19      Q. And I believe that was addressed to Mr. Weisz
20  and Mr. Cunningham. Was that something that they gave
21  to you?
22      A. I saw a copy.
23      Q. Did you ever hear at all again from
24  Brownstein Hyatt & Farber?
25      A. Did I? No.

Page 247

1      Q. Did you ever speak with Brownstein Hyatt &
2  Farber? There's a lawyer named Phil Gosch there.
3      A. It doesn't sound familiar.
4      Q. Can you put up Exhibit 1700? That's that
5  salacious document.
6      A. The spreadsheet.
7      Q. I'm just going to have you --
8      MR. FERGUSON: Can you get it so it's
9  column J, I believe? Can you blow that up,
10  so we can scroll through some of those?
11  BY MR. FERGUSON:
12      Q. Can you see that column J?
13      A. I can see it. Certainly now I can see it.
14      Q. You passed your driver's test?
15      A. I passed my eye test, yes.
16      Q. And I'm just going to scroll through this.
17  I'm not going to go through all 1,700 lines, but --
18  700 lines. Otherwise, you would kill me.
19      But I've written down that -- when Mr. Reiser
20  was asking you about any kind of pushback or position
21  to affiliation, you said that -- and I wrote it
22  down -- there may have been some select members who
23  did that.
24      Do you recall that?
25      A. Uh-huh.

Page 248

1      Q. Is that a yes?
2      A. Yes.
3      Q. When you said "select members," does that
4  mean they were select like Mr. Cappello? They were a
5  forceful, experienced attorney type of select member,
6  or were you saying select in the context of
7  numerosity?
8      A. Who is Mr. Cappello?
9      Q. I'm sorry. I thought they covered that with
10  you. That's the lawyer from Greenberg Traurig that
11  wrote the letter to Mr. Weisz.
12      A. Oh, Juan.
13      Q. Juan Pablo Cappello.
14      A. Yes. Okay. Sorry.
15      Q. You're referring to someone as select because
16  of their position or were you saying select in terms
17  of numerosity?
18      A. I was saying select more in numerosity. I
19  mean, we had over 3,000 members, so...
20      Q. At least with respect to this, the first
21  comment you had under the "please feel free to include
22  any other comments" was, "We bought Ritz-Carlton and
23  not Marriott. If you insist on cheapening the
24  experience, then buy us out."
25      You would agree with me, would you not, that

Page 249

63 (Pages 246 - 249)

1 that has to do with the concept of affiliation?
2     A. I do.
3     Q. The next person says, "Disgusting."
4         MR. FERGUSON: Just scroll with your
5     button. I'll tell you when to stop.
6 BY MR. FERGUSON:
7     Q. There's one that says, in the middle of that
8 page, "I have absolutely no interest in being
9 affiliated with MVC or their properties. I believe
10 Marriott created Ritz as their premium brand" -- and
11 they didn't create it, but it is your premium brand?
12     A. Ritz-Carlton?
13     Q. Yes.
14     A. Ritz-Carlton Club, yes.
15     Q. There's nothing higher?
16     A. No.
17     Q. "Are they now merging a brand just simply to
18 dilute it for Ritz? How does anyone at Marriott
19 believe a Ritz-Carlton member would expect the same
20 resort service for the premium dues we pay?"
21         So this was another person that was at least
22 alluding to affiliation; correct? They actually use
23 the word.
24     A. Yes.
25         MR. FERGUSON: Just hit your button a
                                          Page 250

1     A. Yes, sir.
2     Q. The next person, they're very happy with the
3 present and future of the lovely Ritz-Carlton Clubs.
4         So you would get some positive comments here
5 and there?
6     A. Hmm?
7     Q. Oh, it says, "We are unhappy with the present
8 and future" -- I failed my driver's test. That person
9 was unhappy. Would you agree with that? He said it
10 or she said it?
11     A. Yeah.
12         MR. FERGUSON: Can you scroll down a few
13     more times?
14 BY MR. FERGUSON:
15     Q. At the top of the page, that person said,
16 "Ritz-Carlton really needs to get their act together.
17 Nobody is happy with this program when they are on
18 trips." It says, "Properties are dropping left and
19 right, and a new program with ER" -- that's Exclusive
20 Resorts?
21     A. Yes.
22     Q. That person went on to say, "that we will
23 never be able to use. The new Marriott timeshare
24 affiliation is not something we have an interest in."
25         Correct? It has to do with that?
                                          Page 252

1 couple of times.
2 BY MR. FERGUSON:
3     Q. Somebody wrote there on item 8,
4 "Disappointed, disappointed, disappointed."
5         I take it, you wouldn't know one way or
6 another if they were talking about affiliation or
7 brand evolution?
8     A. I don't.
9     Q. Was this survey the result of -- withdraw
10 that. Was this survey in any way related to the brand
11 evolution letter that Ms. Babich sent out on July 17,
12 2012, and the letter that was followed up by
13 Mr. Cunningham on August 17, 2012?
14     A. It was -- it was, yes. I mean, it was part
15 of that, and then also the additional properties. So
16 the evolution letter, as you know, included the
17 properties' announcement of elimination of Kapalua and
18 Abaco as well.
19     Q. And then the next person said, "I'm
20 uninterested in the exchange program, which gives me
21 very little credit for my property that I pay dearly
22 for in St. Thomas, but gives The Ritz another
23 profit-seeking opportunity."
24         That exchange would be related to the
25 affiliation; correct?
                                          Page 251

1     A. That's what it says, yes.
2     Q. There's one there. It says "Lay out a
3 compelling vision or shut it down. Merging with
4 Marriott lower-end clubs is not a viable option in my
5 opinion."
6         That would be related to the affiliation?
7     A. Yes.
8     Q. If you look at the one that says, "This has
9 been a disastrous investment with liquidity options.
10 Real estate is an investment, but The Ritz has
11 contributed to this poor investment through its
12 actions. The Ritz brand is forever damaged goods as a
13 result."
14         Would it be a fair statement that your
15 Ritz-Carlton Destination Club owners would express to
16 you their knowledge that the brand meant something --
17 that the brand name had value?
18         MR. SELLINGER: Objection to form.
19     A. Certainly, the Ritz-Carlton, many of them --
20 many of them loved the brands, like we all do.
21 BY MR. FERGUSON:
22     Q. All right. If you go a few more, then we'll
23 stop. It says -- the next one says, "Sorry to see
24 this once great brand in such a state of decline."
25         You don't know what that is relating to. It
                                          Page 253

64 (Pages 250 - 253)

1 could be losing clubs or affiliation or something
2 else, like the soap. Right? You don't know what that
3 one is?
4 A. Yes.
5 MR. FERGUSON: Can you go down a few
6 more? Keep going. There was one I was
7 looking for.
8 BY MR. FERGUSON:
9 Q. "2008 blew up your brand and you're holding
10 onto fantasy development. Prior to that, has hurt
11 your image. Lee Cunningham is a terrible
12 businessman."
13 This person, obviously, is not happy with
14 Mr. Cunningham; correct?
15 A. Does not appear to.
16 Q. One or two more. There's one at the top of
17 the page, "continue to downgrade by joining Marriott."
18 Do you see that?
19 A. Yes, I do.
20 Q. The next one is, "Bought ten years ago. Been
21 at home club once." Someone says, "Very
22 dissatisfied." Next one, "Very unhappy." Next one,
23 "Something substantial needs to be done fast to
24 satisfy Ritz members, as the news --
25 MR. SELLINGER: Actually, you misread

Page 254

1 needs to be done fast to satisfy Ritz members, as news
2 has been misleading and disappointing for the past
3 couple of years."
4 So we've only been through line 51. Would
5 you agree with me that, at least with the first --
6 with respect to the first 51 -- I know you've been
7 able to read some of those -- at least more people
8 were dissatisfied than were happy?
9 A. I agree. I agree. But I also do have to
10 say -- can I --
11 Q. You want to add something?
12 A. I do want to add something. Honestly, I
13 mean, that breaks my heart to see those. I mean, I've
14 seen them before and I see them again.
15 But the reality is, we -- it is certainly
16 more than we would ever want to see, and we knew that
17 there were people who weren't happy.
18 But this is, again, trying to figure out what
19 to do at this point, where we had thrown the Marriott
20 Vacation Club out as an option. It was out to the
21 membership, where then -- had members who were
22 interested in it. Some of them felt like it was the
23 worst thing ever, and us trying to figure out what to
24 do and how to move forward.
25 Because we had this exchange company. People

Page 256

1 the -- you didn't complete the very unhappy
2 one that you read.
3 BY MR. FERGUSON:
4 Q. "Very unhappy with sister club closures and
5 inability to exchange."
6 That's because Abercrombie & Kent had been
7 available to them, and that was no longer available to
8 them; correct?
9 A. I'm not sure that's what that is about. The
10 exchange happened. The sister club exchange was
11 through all the different properties.
12 Q. So the people would have an ability to
13 exchange with sister clubs through Cobalt?
14 A. Correct.
15 Q. They did have some time -- a little bit of
16 time -- the ability to exchange into the Abercrombie &
17 Kent stable of properties?
18 A. Correct.
19 Q. And there was some ability to do it through
20 Exclusive Resorts?
21 A. Correct.
22 Q. And that person is referring to some
23 inability to use one of those exchanges?
24 A. Right.
25 Q. The next one says, "Something substantial

Page 255

1 are yelling that there's not as many exchange options
2 as before. So we're trying to figure out, how do we
3 move forward and how do we do the right thing. In our
4 minds, it was a completely voluntary program, so -- to
5 allow members to use it. If they didn't want to use
6 it, then they didn't have to use it.
7 So it just -- this is part of the whole --
8 I'm sorry -- the word "evolution" -- but this is how
9 the evolution was really coming about. Because we
10 were hearing from members and trying to figure out the
11 right thing. And, you know, we got to the point where
12 we went to the board; they went to the members; and
13 then we decided, in all of them, based on the feedback
14 we got, to move forward.
15 Q. Thank you for all that. You do call your
16 owners valued members; correct?
17 A. I do, yes.
18 Q. And you value their feedback?
19 A. We do.
20 Q. In fact, if I look at Ms. Babich's letters --
21 and this letter -- and Mr. Cunningham's letters, you
22 say repeatedly in those letters -- when I see you --
23 the royal you -- Marriott Vacation Worldwide --
24 although, some people sign it RCDC -- they say that
25 you're relying upon feedback, right, to do the brand

Page 257

65 (Pages 254 - 257)

| | |
|---|---|
| 1 evolution? | 1    A.  Overall revenue for the company or sales |
| 2    MR. SELLINGER:  Objection to form. | 2 revenue? |
| 3    A.  We say we welcome feedback, yes. | 3    Q.  Sales revenues for points. |
| 4 BY MR. FERGUSON: | 4    A.  I don't know where it is year over year.  We |
| 5    Q.  Do you just ignore the feedback? | 5 can certainly look. |
| 6    A.  No.  Of course not. | 6    Q.  Is EBITDA up? |
| 7    Q.  The first 30 or 40 people here who gave you | 7    A.  EBITDA is up. |
| 8 pretty, if I can say, glowing bad reports and | 8    Q.  Are profits up? |
| 9 pretty -- they're pretty -- you know -- some are | 9    A.  Profits are -- yeah -- I think they grew a |
| 10 personal.  Some are disgusting, disgusting.  Is that | 10 little bit.  I think we're on the path to grow |
| 11 feedback you just ignored? | 11 compared to last year, yes. |
| 12    MR. SELLINGER:  Objection to form. | 12    Q.  And is the share price up? |
| 13    A.  No, we certainly didn't ignore it.  But at | 13    A.  Yes. |
| 14 the same time, again, we have -- at the time, we had | 14    Q.  It's a public company? |
| 15 3,000 members, so we were trying to do the best thing | 15    A.  It's a public company.  VAC. |
| 16 for all the members, which is very difficult.  We | 16    Q.  In terms of all those positive, I guess, |
| 17 always have members who are unhappy, unfortunately. | 17 trends or results, are salaries up? |
| 18 It's a bit of the nature of the product. | 18    A.  Salaries? |
| 19    And when you have so many members with very | 19    Q.  Yeah.  Has anybody been frozen out or are |
| 20 high standards and who are very particular, and, | 20 people generally getting salary increases every year? |
| 21 granted, they should be, but it's not uncommon that | 21    MR. SELLINGER:  Objection to form. |
| 22 you're not going to be able to please and do the right | 22    A.  It's the normal kind of merit increases that |
| 23 thing by everyone. | 23 we get.  We can say they're up.  Right, Doug? |
| 24 BY MR. FERGUSON: | 24 BY MR. FERGUSON: |
| 25    Q.  Is Marriott Vacation Worldwide, in the last | 25    Q.  Because we have a jury watching this, can you |
| Page 258 | Page 260 |
| 1 two or three years, performing well in terms of, let's | 1 explain, with your MBA, as simply as possible what |
| 2 say, the volume of its points sales?  Has it gone up, | 2 EBITDA means to you? |
| 3 gone down? | 3    A.  Earnings before debt service, taxes, and |
| 4    MR. SELLINGER:  Objection to form. | 4 amortization. |
| 5 BY MR. FERGUSON: | 5    Q.  So it's a way of looking at a company's |
| 6    Q.  Marriott Vacation Worldwide.  Did I say -- | 6 performance without -- before you put a lot of |
| 7    A.  No.  You mean the company? | 7 variables on top of it? |
| 8    Q.  Yeah. | 8    A.  Correct. |
| 9    A.  The company, yes, sales are going well. | 9    Q.  Thank you.  With respect to you, do you work |
| 10    Q.  So sales are up? | 10 on a system that gives you bonuses for performance? |
| 11    A.  Sales are -- yes. | 11    A.  Not for performance.  It's not like sales. |
| 12    Q.  In terms of dollars up? | 12 When I was in the sales organization, it was much more |
| 13    A.  Year over year, probably not this year | 13 performance-based.  But those of us who are working |
| 14 because we had big hurricanes. | 14 kind of the corporate office are much more just kind |
| 15    Q.  So people weren't exposed to the product, as | 15 of standard -- standard bonuses. |
| 16 they weren't able to travel as well as -- | 16    Q.  And did you ever have as a -- withdraw that. |
| 17    A.  We had sales centers that were closed due to | 17    So, generally, the trending at Marriott |
| 18 Irma and Maria. | 18 Vacation Worldwide since 2014-'15 has been fairly |
| 19    Q.  I understand St. Thomas is closed till March? | 19 positive? |
| 20    A.  Yes. | 20    A.  For the company? |
| 21    Q.  So volume of sales is up.  Are the dollars up | 21    Q.  Yeah. |
| 22 also over that period?  I know there might have been | 22    A.  Yes. |
| 23 some fluctuation this year, but are they generally up? | 23    Q.  Shareholders are probably happy because their |
| 24    A.  The sales revenue or -- | 24 stock prices went up? |
| 25    Q.  Yeah.  Revenue. | 25    A.  I would think they would be happy. |
| Page 259 | Page 261 |

66 (Pages 258 - 261)

| | |
|---|---|
| 1     Q. And the officers, Mr. Weisz and folks like<br>2   him and probably you a little bit -- Mr. Weisz was<br>3   able to buy shares at certain prices -- stock<br>4   prices -- and he's doing pretty well if he has a lot<br>5   of shares?<br>6         MR. SELLINGER: Objection to form.<br>7     A. He should be.<br>8   BY MR. FERGUSON:<br>9     Q. And are you given those options too as an<br>10  employee?<br>11    A. I do not get options.<br>12    Q. Do you invest in the company?<br>13    A. I am invested in the company.<br>14    Q. Besides working your butt off.<br>15    A. I'm very invested in the company.  Yes, I own<br>16  stock, if that's your question.<br>17    Q. So let's talk about what's down.  The number<br>18  of RCDC clubs are down, right?  They were -- they lost<br>19  four clubs at least?<br>20    A. Yes.<br>21    Q. And the morale of the -- at least with<br>22  respect to what we just looked at -- those first 51<br>23  lines -- the morale of the owners, at least some of<br>24  them, was pretty low -- was down?<br>25         MR. SELLINGER: Objection to form.<br><div align="right">Page 262</div> | 1     Q. No.  This particular question, since 2014.<br>2   Or do you have any knowledge --<br>3     A. Are they down from 2014?<br>4     Q. Yeah.<br>5     A. I don't know the answer to that.<br>6     Q. Have you seen or followed -- is there any<br>7   trending up since this MOU was signed and you allowed<br>8   people the voluntary option to provide their weeks<br>9   into an exchange program with Marriott Vacation<br>10  Worldwide?<br>11    A. Actually, that was Jamie.  Jamie Klein sold<br>12  most of our remaining interests with the MVC program.<br>13  He actually found fantastic value in it.  And the<br>14  owners he was selling to -- or the prospects that he<br>15  was selling to were -- he was selling at a lot based<br>16  on the value of the points, because he understood the<br>17  product.<br>18    Q. Let's see if you can answer my question,<br>19  though.  Have you seen the values trend up on resales<br>20  by owners, such as the 200 plaintiffs I represent?<br>21    A. I don't see how the -- like I said before, I<br>22  don't see how owners sell their resales on the outside<br>23  market.  We don't see that --<br>24    Q. You don't see that at all?<br>25    A. We don't.<br><div align="right">Page 264</div> |
| 1     A. I would say, in 2013 -- that's when it was<br>2   taken -- yes -- it was a very difficult time.<br>3   BY MR. FERGUSON:<br>4     Q. Today, what's up at RCDC is the number of<br>5   lawsuits.  You've got three lawsuits here on the<br>6   mainland and you've got one lawsuit at Kapalua;<br>7   correct?<br>8         MR. SELLINGER: Objection to form.<br>9     A. Yeah, there are three lawsuits here.<br>10  BY MR. FERGUSON:<br>11    Q. And the values -- the dollars you were able<br>12  to achieve with the Lore Institute were nowhere near<br>13  what they were before the recession?<br>14    A. They were not as high as they were<br>15  pre-recession.<br>16    Q. And the values of the properties -- I'm<br>17  sorry -- the values of the fractionals are down; are<br>18  they not?<br>19    A. Sorry?<br>20    Q. The values of the properties are down since<br>21  2014?<br>22    A. The market value -- sale value of the<br>23  properties?<br>24    Q. Yeah.  Fractional interest.<br>25    A. Fractional interest compared to pre --<br><div align="right">Page 263</div> | 1     Q. So it's something you don't follow?<br>2     A. I don't see it.  I wouldn't get your -- if<br>3   you were going to sell to your friends, I wouldn't<br>4   have a way of knowing what you sold for.<br>5     Q. And the marketing material that Mr. Lore<br>6   used, I take it, says, "If you can buy this unit for<br>7   $50,000 and you can -- which is a great value -- and<br>8   guess what?  You get to use the Marriott Vacation<br>9   Destination system."<br>10        Is that how he marketed those?<br>11        MR. SELLINGER: Objection to form.<br>12    A. It certainly says you can use the -- yeah,<br>13  you can use the program.<br>14  BY MR. FERGUSON:<br>15    Q. When Mr. Klein sold those units, because you<br>16  said they're sold out, those people, do they get an<br>17  automatic enrollment or do they have to actually<br>18  enroll like the other folks?<br>19    A. They would have to sign the affiliation --<br>20  the enrollment.<br>21    Q. Do you know what percentage of the folks that<br>22  bought from Mr. Klein's company, Lore Institute,<br>23  actually enrolled in the Lion & Crown?<br>24    A. I don't.<br>25    Q. So you weren't following his sales efforts in<br><div align="right">Page 265</div> |

<div align="right">67 (Pages 262 - 265)</div>

| | |
|---|---|
| 1 terms of how much exchange inventory you were getting | 1 of Lehman? |
| 2 from those sales? | 2    MR. SELLINGER: Objection to form. |
| 3    A. No, no. I follow the sales efforts, but not | 3    MR. FERGUSON: What's your objection? |
| 4 the -- what eventually happened with the inventory | 4    MR. SELLINGER: That the economy -- |
| 5 later. | 5    MR. FERGUSON: The macro economy has |
| 6    Q. Were you aware of any recovery in prices of | 6 recovered. |
| 7 the folks that have owned from 2000 or 2011 or bought | 7    MR. SELLINGER: I don't know what you're |
| 8 in 2012? Are you aware of any recovery of their | 8 referring to. |
| 9 resale value since the affiliation in 2014? | 9    MR. FERGUSON: The economy. |
| 10    MR. SELLINGER: Can you read that back? | 10 BY MR. FERGUSON: |
| 11    (The reporter read back the last | 11    Q. The United States economy, has it recovered |
| 12 question.) | 12 since this letter went out? |
| 13    MR. SELLINGER: You're jumping back and | 13    A. Are you talking, like, the stock market or |
| 14 forth with a lot of terms. Objection to | 14 real estate? |
| 15 form. | 15    Q. I'm talking about everything. People's |
| 16    MR. FERGUSON: I was talking to | 16 wages, stock market, real estate values. |
| 17 Mr. Meade. | 17    MR. SELLINGER: Objection to form. |
| 18    THE WITNESS: Can I stand up? | 18    A. I mean, real estate values, they're not what |
| 19    MR. FERGUSON: Yeah, absolutely. | 19 they used to be, no. Certainly things -- |
| 20    MR. MEADE: We can take a break. | 20    Q. Would you prefer I break it down by segments |
| 21    THE WITNESS: I can keep going. I'm | 21 of the economy for these questions? |
| 22 good. | 22    A. If you'd like to. I'm not an economist. |
| 23    MR. MEADE: I'd just like to chat for one | 23    Q. Yeah, I understand. But you have an MBA, so |
| 24 second. Let's take five minutes -- a short | 24 you generally have an understanding of the components |
| 25 break. We have to take one anyway pretty | 25 of an economy. Correct? |
| Page 266 | Page 268 |

| | |
|---|---|
| 1 soon. | 1    A. Sure. |
| 2    THE VIDEOGRAPHER: The time is 3:34. | 2    Q. Here's a strange question, because I don't |
| 3 That concludes media four in the deposition | 3 know the answer to it. Do people who buy points -- a |
| 4 of Stephanie Sobeck. | 4 certain level of points -- can their points appreciate |
| 5    (Brief recess.) | 5 or depreciate in terms of their value? |
| 6    THE VIDEOGRAPHER: The time is 3:49. | 6    MR. SELLINGER: Objection to form. |
| 7 This is media unit five in the deposition of | 7    A. They could -- if they wanted to go out and |
| 8 Stephanie Sobeck. | 8 sell them on the open market, they could sell them for |
| 9 BY MR. FERGUSON: | 9 whatever they wanted to. |
| 10    Q. 1061. Ms. Sobeck, I'm just going to go as | 10 BY MR. FERGUSON: |
| 11 quickly as possible, which is not too quick, through | 11    Q. And there's a secondary market for some of |
| 12 some of the documents you were involved with in the | 12 this product? |
| 13 next couple of hours and try to get you out of here | 13    A. I don't think many of our owners do sell them |
| 14 for dinnertime. | 14 on the outside market, but they certainly could. |
| 15    This is the letter Mr. Cunningham wrote to | 15    Q. Here's what I'm tying to get at. If I bought |
| 16 follow up on Ms. Babich's letter. | 16 $65,000 worth of points in 2015, or I bought a |
| 17    Do you recognize it? | 17 package, does that -- do those points -- can they |
| 18    A. I do. | 18 appreciate in terms of what they can be used for? Can |
| 19    Q. What role, if any, did you have in preparing | 19 they increase in value? Or is it like a car you drive |
| 20 it? | 20 off the lot, and it's, like, all right, my Mercedes is |
| 21    A. I would have reviewed it. | 21 no longer worth 50,000 -- |
| 22    Q. Since the time the evolution letter went out | 22    A. I think, when you drive the points off the |
| 23 in July with this follow-up letter, would you agree | 23 lot, you're probably not -- you're not going to get -- |
| 24 with me that the macro economy has recovered from the | 24 appreciate. Our product, in general, we do not sell |
| 25 recession that hit in September of 2008 with the fall | 25 it as an investment. We're very strict that it's not |
| Page 267 | Page 269 |

68 (Pages 266 - 269)

1  an investment and it doesn't appreciate.  It's a
2  vacation product, not a --
3      Q.  Real estate product.
4      A.  -- real estate product.  Well, it's real
5  estate, but it's not an investment.
6      Q.  Let's talk about the real estate market and
7  any recovery that you would be aware of.
8          Would you agree with me that, since August of
9  2012, that the national real estate market has
10  generally recovered?
11         MR. SELLINGER:  Objection to form.
12     A.  I don't know if it's recovered.  I know my
13  certain areas.  I happen to be one of the people who
14  sold a house and had to bring a $100,000 check to
15  closing.
16  BY MR. FERGUSON:
17     Q.  How long ago was that?
18     A.  It was right after the -- 2010.
19     Q.  But I'm asking for it now.  From the time --
20     A.  Right.  Understood.  I don't think right now
21  I could go back and buy that house for what I did back
22  when I bought it in 2006.
23     Q.  How about Miami?  That got -- one of the
24  hardest hit cities in the country, was it not?
25     A.  I'm not a real estate expert of the different

Page 270

1  markets.
2      Q.  So your knowledge of the national market
3  would be tied to what you did in 2010?
4      A.  No.  I certainly know that real estate
5  generally is healthier.  I think everybody sees sales
6  signs coming up and going down more often.  I just
7  don't -- I don't study the -- I don't know if you're
8  asking me about the residential market, the commercial
9  market.  I mean, I'm not really --
10     Q.  All right.  Let's talk about residential.
11  Have you followed the residential market at all in
12  Colorado?
13     A.  No.
14     Q.  How about California?
15     A.  No.
16     Q.  How about the residential market in Aspen,
17  Colorado?
18     A.  No.
19     Q.  Do you know whether -- you don't know whether
20  it's up or down since 2012?
21     A.  I don't.
22     Q.  Have you been at -- let me ask you this.
23  Have you been at meetings of the board of directors or
24  of the tourist accommodations in Aspen Highlands or in
25  members meeting -- general members meeting -- at which

Page 271

1  they discuss other fractional product in Aspen?
2      A.  In Aspen, yes.  Back in 2012, '13.  I haven't
3  been to those board meetings lately.
4      Q.  All right.  Do you recall that they -- do you
5  look at the minutes of some of those meetings from
6  Aspen?
7      A.  No.
8      Q.  That would be Ms. Phillips?
9          MR. SELLINGER:  Objection to form.
10  BY MR. FERGUSON:
11     Q.  Who looks at the minutes?
12     A.  Lori would look at them.  Rich would be at
13  the meetings.
14     Q.  Are you familiar with a property in Aspen
15  called The Dancing Bear?
16     A.  No.
17     Q.  Are you familiar with the line of products --
18  the line of luxury properties -- known as The Timbers?
19     A.  I am.
20     Q.  Would you generally agree that its product
21  line would be in the luxury category?
22     A.  Yes, I would.
23     Q.  Is Marriott Vacations Worldwide's points
24  system considered luxury or a different market?
25     A.  There are certainly parts of it that would be

Page 272

1  considered luxury.  But the luxury you're talking
2  about -- you know -- the twice-a-day housekeeping
3  service, no.
4      Q.  Are there any Marriott Vacations properties
5  that you can name that are considered in the luxury
6  category?
7      A.  From a product perspective?
8      Q.  For a product that's categorized as that.
9      A.  I mean, Marriott Vacation Club is a high-end
10  tier.  The products themselves -- our Newport product,
11  our Phuket product, I mean, they're high-end.  You put
12  them next to any Ritz-Carlton product and they're very
13  similar.  The service levels are different.
14     Q.  Are you aware of a fractional property in
15  Aspen called the Residence at Little Nell?
16     A.  Yes.
17     Q.  Do you know anything about whether or not its
18  fractional interests have increased or decreased since
19  the summer of 2012?
20     A.  No.
21     Q.  Do you know a property in Snowmass that's
22  part of the Timbers luxury brand called Timbers of
23  Snowmass?
24     A.  I do not.
25     Q.  Are you aware that Snowmass -- you know where

Page 273

69 (Pages 270 - 273)

1  Snowmass is -- right near Aspen?
2      A. Yes.
3      Q. Are you at all aware that there is a
4  fractional deeded ownership property run by Timbers in
5  Snowmass, Colorado?
6      A. I think I've seen it on their website, but,
7  no, I haven't been there. I don't know it.
8      Q. So you haven't followed the trends of whether
9  or not that's appreciated or depreciated since August
10 of 2012?
11     A. No.
12     Q. Would it surprise you that Aspen residential
13 real estate prices have recovered far beyond recession
14 levels?
15     MR. SELLINGER: Objection to form.
16     A. Would it surprise me? No.
17 BY MR. FERGUSON:
18     Q. It's something you just don't follow?
19     A. Aspen real estate prices? I'm not
20 responsible for the west anymore. I'm more east
21 coast.
22     Q. You were part of this process that resulted
23 in this affiliation with Marriott Vacation Worldwide,
24 the RCDC, Ritz-Carlton Destination Club in Aspen.
25 Were you at all concerned what it could do -- one way
                                                Page 274

1  or the other, were you concerned or were you not
2  concerned about any impact affiliation with a
3  non-luxury line of properties would have on the values
4  of those fractional interests?
5      MR. SELLINGER: Objection to form.
6      A. I mean, the values of the properties were
7  hurt by the recession. The affiliation that happened
8  a couple years after that, no, I didn't think the
9  affiliation -- to give members options, a voluntary
10 program that they could use or not, they could access
11 Ritz-Carlton property or not -- no, I certainly didn't
12 think that was going to have any effect on the real
13 estate values.
14 BY MR. FERGUSON:
15     Q. One way or another, up or down?
16     A. No.
17     Q. I mean, did you say, "Listen, these people
18 have lost four or five clubs. Some of them we didn't
19 open. People are unhappy." They would call it
20 Ritz-Carlton or RCDC, but they're unhappy. Did you
21 say, "Listen, part of our plan here is, Lee and" --
22 not Barbara -- we can't talk about Barbara -- but Lee
23 and Nicolas DiMeglio and Ms. Clark -- say, "Listen, if
24 we give them this option, their values are going to
25 recover"?
                                                Page 275

1      MR. SELLINGER: Objection to form.
2      A. Why we gave them the option was more about
3  the member satisfaction. So it's not -- when we look
4  at the decisions for the members, it's not really --
5  we're not making decisions based on the real estate
6  value. We're making it based on member satisfaction,
7  member use, member vacations, member options. That's
8  why we make the decisions.
9      Because we're the management company, we run
10 the exchange company, those are the type of things
11 that we provide to the members. So it was more
12 offering them opportunities versus -- more
13 opportunities versus less opportunities that was
14 voluntary.
15 BY MR. FERGUSON:
16     Q. You're providing options, in part, because
17 they lost large segments of the RCDC system, starting
18 with Abaco, and the last one that broke away, I
19 believe, was Jupiter. That's one of the reasons you
20 had to give them options?
21     MR. SELLINGER: Objection to form.
22     MR. FERGUSON: What's the objection,
23 Philip -- Mr. Sellinger?
24     MR. SELLINGER: Oh. The characterization
25 as to the rationale. I think that's not
                                                Page 276

1  clear. Go ahead.
2      A. We were giving them options, because they
3  had -- there were properties that were no longer
4  Ritz-Carlton properties, and we wanted to give them
5  other ways to vacation.
6  BY MR. FERGUSON:
7      Q. Okay. But in terms of this desire to give
8  folks options, I take it that not not calculus as to
9  what -- not contained in the calculus to do those
10 other options -- in this case, the affiliation with
11 Marriott Vacation Worldwide -- was what impact it had
12 one way or the other on the value of fractional
13 interests?
14     MR. SELLINGER: Well, that, she answered
15 before.
16     A. I didn't follow the question. I'm sorry.
17 BY MR. FERGUSON:
18     Q. I mean, in your calculus to affiliate with
19 the Marriott Vacation Worldwide in Aspen Highlands,
20 Colorado, did you consider what impact, if any, up or
21 down, affiliation would have on the value of the 850
22 fractional owners up there?
23     A. No. As I said, we focused on member
24 satisfaction. I think you may be able to connect
25 member satisfaction and ultimate real estate value,
                                                Page 277

70 (Pages 274 - 277)

1  but we really focused on the satisfaction of members
2  and giving them ways to -- different ways to use the
3  product that they owned.  So --
4      Q.  So -- sorry.  Are you finished?
5      A.  Yeah, yes.
6      Q.  When these folks -- when they're deposed or
7  testify or answer questions -- they say, "When I
8  bought this, I was told it was a home.  They put my
9  pictures out.  They store my skis and my fishing rods,
10  and it would be a second home."
11      In fact, I see e-mails in these boxes behind
12  me where Mercer and people say, "This is your second
13  home."
14      Do you understand that was part of the
15  concept that was sold to these folks?
16      MR. SELLINGER:  Objection to form.
17  BY MR. FERGUSON:
18      Q.  That this was in fact a home, as opposed to a
19  fractional -- or a points system or weeks system in
20  another type of product line?
21      A.  I do, but they still -- absolutely, their
22  home club still existed, and we still store their skis
23  and we still have their bins with their pictures.
24      I guess I'm confused.  You're saying -- yeah,
25  they lost a lot of different opportunities to

Page 278

1  exchange.  This is their second home, and the second
2  home piece absolutely hasn't changed from what it
3  originally was, because it's still the same staff
4  who's there; they still see the same faces; they still
5  have the ability to use it like they use a second
6  home.
7      Q.  Didn't they shut down the storage program?
8      A.  Not that I'm aware of, no.  They may have
9  made people go from ten bins to two, because that was
10  always the original -- they expanded, a little bit,
11  their number of bins that they had.  No, they didn't
12  shut it down.
13      Q.  So the bottom line is, what was driving the
14  decision was to give folks options?
15      A.  Yes.
16      Q.  And you did that because you thought it was
17  the right thing to do?
18      A.  We did, yes.
19      Q.  You didn't think about whether or not this
20  was -- one way or another -- whether, hey, this is
21  going to be great for the values, they're going to
22  recover, or this is going to be terrible for the
23  values, they're not going to recover.  That just
24  wasn't something you all were considering?
25      MR. SELLINGER:  Objection to form.

Page 279

1  BY MR. FERGUSON:
2      Q.  I don't mean to trap you.  I wasn't there.
3      A.  No -- I understand what you're saying.  I
4  guess, I -- you know -- chasing real estate value is
5  not something that we do.  We're the management
6  company.  We focus on the members.  We focus on the
7  member satisfaction and member needs, and making sure
8  the property they have is well kept, that it's going
9  to be that way for a long way to come, that it's
10  properly funded, that the members are happy.
11      Those are the things that we -- all of those
12  things -- I think all the things we do eventually help
13  real estate value, but we're not responsible for real
14  estate value.  We're responsible for the properties
15  and the exchange company.
16      Q.  So as a management company, as you described
17  very well there, is that it's not in your purview;
18  it's just not something -- you're not driven by real
19  estate values one way or the other?
20      A.  No.  And the board -- we did talk about it
21  with Randy and the board.  And we talked about -- they
22  wanted to bring somebody to the property, which they
23  did.  We said, "Listen, we're happy to help
24  somebody -- this whole affiliation -- happy -- happy
25  to help train somebody, because we know you're not

Page 280

1  going to bring somebody off the street who understands
2  affiliation and that they're interested in it."
3      So we had Ivan, who used to work with us, he
4  came in.  We did the training program for him.  We
5  helped him in many ways get up on his feet, so that he
6  was there and able to assist the members as needed for
7  resale options.
8      Q.  I'm going to cover two things then.  You knew
9  from training him and working with him and bringing
10  him on board -- I think, in 2014?
11      A.  Sounds about right.
12      Q.  -- that, literally, prices had been
13  slaughtered up there in terms of what people would pay
14  for these, whether they came at 2002 prices or 2011,
15  2008 prices?
16      A.  Yes, we did.
17      MR. SELLINGER:  Objection to form.
18  BY MR. FERGUSON:
19      Q.  And I think your testimony is, you haven't
20  followed what they've done since 2014?
21      A.  I have not.
22      Q.  But you have followed what Marriott Vacations
23  Worldwide has done in connection with one of its core
24  businesses, which is selling points; right?
25      A.  Well, I don't know what you mean by followed.

Page 281

71 (Pages 278 - 281)

1    I certainly see our sales flash, yes.
2    Q. And since 2014, the points product has taken
3 off?
4    MR. SELLINGER: Objection to form.
5 BY MR. FERGUSON:
6    Q. It's done well?
7    A. The points product continues to sell, yes.
8    Q. Very well?
9    A. It sells well. We've got a great sales team.
10    Q. I'm just going to look for one document and
11 I'll come back.
12    So just to sum that up, the primary reason
13 you were looking for additional options -- one of the
14 reasons -- to sum that up, one of the reasons you were
15 using -- you were developing this option under the
16 Marriott Vacation Club system, through Lion & Crown,
17 was to -- I'll start over again.
18    Just to sum up, I believe your testimony is
19 that the reason, at least the primary reason, driving
20 the option that you gave Ritz-Carlton Destination Club
21 owners at Aspen Highlands was to increase the owner
22 satisfaction and their experience?
23    MR. SELLINGER: Objection to form.
24    A. That we -- yes -- that we wanted to help
25 their -- yes, give them vacation options. Correct.

1 BY MR. FERGUSON:
2    Q. If you learned that from someone learned --
3 if you learned that, in fact, the affiliation has had
4 a deleterious effect on values, either making them get
5 more slaughtered or not allowing them to recover,
6 would that be something that you regretted?
7    MR. SELLINGER: Objection to form.
8    A. Would it be something that I regretted? But
9 members don't -- it's optional, so they don't have to
10 use the program. I guess, I'm...
11 BY MR. FERGUSON:
12    Q. But if the fact that non- -- that a vacation
13 system -- Marriott Vacation Worldwide system -- right
14 or wrong -- is perceived to dilute the brand -- the
15 Ritz-Carlton brand that we talked about earlier -- if
16 that perception has caused either a further
17 devaluation or an inability to recover, would you
18 regret that option, which I think you said you gave
19 them because you thought it was the right thing to do,
20 in the goodness of your heart, would you regret making
21 that decision?
22    MR. SELLINGER: Objection to form.
23    A. Certainly, we wouldn't want to do anything
24 that's going to hurt our members. I mean, it's our
25 members and it's our club.

1    I don't think the affiliation, though -- the
2 real estate -- the real estate market and the
3 recession was -- you know -- directly affected that.
4 I know we're trying to connect the two, but they're
5 two separate things.
6    I mean, the recession was out there. We
7 didn't see a big rise in real estate values from the
8 recession to the time when the affiliation was
9 announced.
10 BY MR. FERGUSON:
11    Q. I mean, not to be cute or anything, but, I
12 mean, you didn't have kids when the recession hit. My
13 kids were -- Ian's kids -- it's been nine years since
14 the recession hit. And you and Mr. Cunningham have
15 testified that it's about the recession that's caused
16 these prices to drop.
17    Is it still your position that it's all
18 recession-related up at Aspen Highlands, if someone
19 bought a unit for $300,000 and now they can't sell it
20 for 30?
21    A. It could be other -- there could be,
22 certainly, other factors involved with it. I just
23 don't think it's the affiliation.
24    Q. That's your belief?
25    A. Yeah.

1    Q. If you learned that in fact it was the
2 affiliation that was having some impact on an
3 inability of those values to increase, would you
4 regret that?
5    MR. SELLINGER: Objection to form.
6    A. We certainly -- like I said, we certainly
7 wouldn't want to do anything to hurt the members.
8 BY MR. FERGUSON:
9    Q. Do you know any owners up in Aspen Highlands
10 named Hylands -- Hyland?
11    A. Aspen Highlands?
12    Q. H-Y-L-A-N-D is actually --
13    A. Hyland, no.
14    Q. Tim Hyland?
15    A. No. It doesn't sound familiar.
16    Q. Are you aware that Marriott does allow people
17 to do promotional stays in connection with marketing
18 for Marriott points -- MVW points? They allow people
19 to do promotional stays in properties?
20    A. We do previews. I think that's what you're
21 taking about. Yes, we do preview stays for owners --
22 or for prospects -- yes.
23    Q. Do they do Marriott Vacation Club sales in
24 places like New York?
25    A. Yes.

| | |
|---|---|
| 1   Q. Mr. Hyland says, during a sales pitch, they | 1   spend either a week or two weeks.  Right?  It's not a |
| 2   definitely -- that the salespeople there were saying | 2   weekend place.  It's a place you could spend a couple |
| 3   that using points to access Ritz-Carlton Club | 3   weeks? |
| 4   properties is much more cost effective than buying | 4   A. You could, yes. |
| 5   into the Ritz-Carlton Club system. | 5   Q. And the idea behind fractional ownership, the |
| 6       Are you aware that your salespeople were | 6   target market there are people who could probably |
| 7   telling people that in the last few months? | 7   afford to buy a home or condominium in Aspen or in |
| 8       MR. SELLINGER:  Object to the form. | 8   San Francisco, but they just don't have the -- it's |
| 9   A. I'm not aware of that. | 9   more cost effective for them to be a fractional, as |
| 10  BY MR. FERGUSON: | 10  opposed to buying a house and condo that requires them |
| 11  Q. What are you all doing, if anything -- maybe | 11  to own property, which can be some labor of love? |
| 12  you don't believe it's your purview, and that's | 12      MR. SELLINGER:  Objection to form. |
| 13  fair -- what are you all doing, if anything, to | 13  A. Yes.  Yeah -- and I wouldn't necessarily say |
| 14  increase the values of the people that are still in | 14  it's more cost effective.  I think it's more |
| 15  Ritz-Carlton Destination Club, such as the 800 people | 15  headache-free. |
| 16  in Aspen? | 16  BY MR. FERGUSON: |
| 17  A. Well, Ivan, obviously, came in.  We're giving | 17  Q. That's what I meant, yeah.  That's a selling |
| 18  Ivan support.  We've also -- in St. Thomas, we | 18  point of these fractionals? |
| 19  actually got the St. Thomas board -- introduced them | 19  A. Yes. |
| 20  with Jamie.  He was doing marketing and sales efforts | 20  Q. It's not a selling point of Marriott |
| 21  for them.  We helped them with their sales center, got | 21  Vacations points, is it?  That's not something -- or |
| 22  them some pictures, and so on, in St. Thomas. | 22  is it a selling point? |
| 23      So, yes, there are certain things that we're | 23  A. No.  It's different.  They're really two |
| 24  doing to really assist the board.  We don't do | 24  different systems. |
| 25  resales.  There's no resale efforts that are done by | 25  Q. Those two systems, although, you say it's |
| Page 286 | Page 288 |
| 1   the company.  So we would support any resale efforts | 1   optional and voluntary -- those two systems have in |
| 2   that the association wanted to promote on property for | 2   fact been merged with Aspen Highlands in some respect? |
| 3   them. | 3       MR. SELLINGER:  Objection to form. |
| 4   Q. So what you are doing, you give some support | 4       MS. LIVINGSTON:  Object to the form. |
| 5   to Mr. Skoric at Aspen Highlands? | 5   A. No.  I mean, the Ritz-Carlton Club owners |
| 6   A. Yes. | 6   still have their home club exchange, sister club, per |
| 7   Q. Do you recall an incident where Mr. Mercer | 7   diem -- they still have that club the same.  It really |
| 8   reported, at least to Mr. Cunningham, that salespeople | 8   looks -- I would look at it more like -- just like |
| 9   were literally laughing at people that had bought into | 9   they had Abercrombie & Kent or ER.  They just have |
| 10  the system, and he said something, like, that he's | 10  other options to take a week of their time and go do |
| 11  ashamed of what they said and he was going to punish | 11  something else. |
| 12  the salespeople that were doing that? | 12  BY MR. FERGUSON: |
| 13  A. Who was laughing?  I'm sorry.  Our -- | 13  Q. During the period we've been talking about |
| 14  Q. Your sales team. | 14  starting in July of 2012, primarily with the Babich |
| 15  A. No, I don't remember him saying there was | 15  evolution letter and Mr. Cunningham's follow-up a |
| 16  anybody laughing at them. | 16  month later, through '14, '15, had you met with |
| 17  Q. You don't recall that? | 17  Mr. Weisz?  Has he been in meetings involving the |
| 18  A. I don't recall it. | 18  brand evolution? |
| 19  Q. Okay.  It might not have been directed to | 19  A. No. |
| 20  you. | 20  Q. He doesn't really focus at all on The |
| 21  A. I certainly would never have accepted that, | 21  Ritz-Carlton Destination Club on a day-to-day basis? |
| 22  though. | 22  A. Not really.  It's a very small portion of the |
| 23  Q. The concept of The Ritz-Carlton Destination | 23  overall company. |
| 24  Clubs -- I'll focus on Aspen -- was that it would be a | 24  Q. It wasn't really something he wanted to take |
| 25  second home; that it would be a place where you could | 25  over when there was a spinoff? |
| Page 287 | Page 289 |

73 (Pages 286 - 289)

**Page 290**

1  MR. SELLINGER:  Objection to form.
2  BY MR. FERGUSON:
3  Q.  Did you ever hear he was unhappy having to
4  deal with The Ritz-Carlton Destination Club system?
5  A.  No, I don't think he was -- it was more of a
6  challenging product than the rest.  I don't know.
7  There really wasn't any question we were taking it
8  over.
9  Q.  And it was something that the Marriott
10  International spun off?  You guys were going to get
11  that one way or another?
12  MR. SELLINGER:  Objection to form.
13  A.  Yeah -- I mean, it's a timeshare fractional
14  product.  It would've been very strange for it to stay
15  there.
16  BY MR. FERGUSON:
17  Q.  Okay.  Understood.  So it's a natural fit for
18  the spinoff?
19  A.  Yes.
20  Q.  But in terms of what was -- when was the
21  spinoff again?  I'm sorry.
22  A.  2011.
23  Q.  So in terms of what was spun off, it had --
24  that system had been rocked in some ways by the
25  recession, right, when you guys got to take over?

**Page 291**

1  A.  You lost me.
2  Q.  The spinoff happened after Ritz-Carlton
3  Destination Club had taken some hits from the
4  recession?
5  A.  Yes.
6  Q.  Okay.  And among the hits were that it owned
7  up to 25 percent of the inventory systemwide?
8  A.  Correct.
9  Q.  And that came with a liability of dues and
10  whatnot?
11  A.  Correct.
12  Q.  I take it, from Mr. Weisz's standpoint -- and
13  he's someone you -- the head of your company -- that
14  was -- that doesn't go to the bottom line.  That's
15  something that's -- it goes to the bottom line, but
16  it's red ink as opposed to black?
17  MR. SELLINGER:  Objection to form.
18  A.  Yes.  It's definitely a drag on the bottom
19  line.
20  BY MR. FERGUSON:
21  Q.  So from 2011 -- after the spinoff started in
22  2012 -- there had to be a plan -- or there was a plan
23  put in place to deal with this red ink?
24  A.  Yes.
25  Q.  And the red ink would be primarily, I guess,

**Page 292**

1  the inventory?
2  A.  The red ink -- you're talking the red ink on
3  the bottom line?  Is that what you're talking about?
4  Q.  Yeah.
5  A.  Yes, because it would be the inventory -- the
6  maintenance fees that came along with the inventory,
7  yes.
8  Q.  Let me show you Exhibit 1022 briefly.  I've
9  used this before, I believe.  Just a real quick
10  question about this.
11  You sent out, at the bottom here, a message
12  to the association presidents on July 16, 2012 about a
13  webinar with the presidents.
14  Do you recall generally that, at least,
15  Mr. Neveloff wasn't real pleased that he got -- he, as
16  a president, got a one-day prior notice of the
17  announcement by Ms. Babich of the brand evolution?
18  A.  That the webinar before the evolution letter
19  that -- you're saying that he -- was I aware he was
20  concerned that he got a one-day notice?
21  Q.  Yeah.  Do you remember that a little bit?
22  A.  I do.
23  Q.  But Mr. Albert is telling the people that he
24  e-mailed here somehow -- I don't know if you're copied
25  on the top one.  Your e-mail is the genesis of what he

**Page 293**

1  e-mailed to Ms. Hodge and others.  It says, "For your
2  information, the long-awaited public announcement
3  about RCC" -- Ritz-Carlton Club, right?
4  How long had this brand evolution concept
5  been in the works before the letter was sent out on
6  July 17, 2012?
7  A.  How long?
8  MR. SELLINGER:  Objection to form.
9  BY MR. FERGUSON:
10  Q.  Is that something you decided to do a month
11  before, a year before?
12  A.  I don't remember how long.  I know it was out
13  there.  Obviously, we had all the communications done.
14  We had the -- we had done the webinar for the owners.
15  When did it all -- I think 2011, because it
16  was in November 2011, the spin.  This is the summer.
17  I mean, it probably had been a few months before the
18  letter went out that this was being discussed.
19  Q.  I'll give you an Exhibit 1135.  It's a
20  cease-and-desist letter.
21  A.  Is this the one you were talking about
22  earlier?
23  Q.  Yeah.  I just wanted to show it to you.
24  Without disclosing -- I had asked about this a little
25  while ago.  Without divulging any attorney-client

74 (Pages 290 - 293)

1  communications, did you have any role in retaining the
2  Baker Hostetler firm in Denver, Colorado?
3     A. No.
4     Q. Did this go to your legal department, as far
5  as you recall?
6     A. Yeah, this would have gone to our legal
7  department.
8     Q. I'll show you Exhibit 1106.
9     A. Yes, sir.
10    Q. 1106 is a Ritz-Carlton Club Aspen member
11 update. I believe this is late 2012 for the 2013 year
12 upcoming.
13       Do you see, on page 3 of Exhibit 1106, that
14 there's words that say "plan for 2013"?
15    A. I'm sorry. Where? Oh, plan for -- I got
16 you.
17    Q. So this appears to be -- this is a Marriott
18 Vacation Worldwide document; right?
19    A. Yes.
20    Q. Is this something that you were working on or
21 is this Mary Lynn Clark, or do you know?
22    A. I don't remember. It was something one of
23 us -- yeah, this is definitely something we would have
24 done -- ML or I or...
25    Q. If you go to page 3 again, you were talking

Page 294

1  about Lion & Crown usage options; correct?
2     A. Yes, sir.
3     Q. Okay. And when it says Marriott Vacation
4  Club Destinations, it talks about Ocean Explorer, Epic
5  Explorer, City Explorer. Then it has down here, over
6  50 Marriott Vacation Club resort locations.
7        Do you see that?
8     A. Yes.
9     Q. And that is a Marriott Vacation Worldwide
10 line of products?
11    A. That's the exchange program we're talking
12 about.
13    Q. Right. I understand.
14    A. Yes.
15    Q. Real quickly, my question was, is City
16 Explorer, Epic Explorer, and Ocean Explorer also part
17 of MVW?
18    A. Yeah, it's all part of that. I was saying
19 before, there's the properties that are in the trust
20 and the Explorer collection, and these are just the
21 collections within the Explorer Program.
22    Q. The points sample itineraries in the back --
23 for example, two-bedroom Aspen winter weeks, what's
24 being depicted there is a 7,200 point package. What
25 does that mean?

Page 295

1     A. Two-bedroom winter --
2     Q. The numbers got knocked off. I apologize for
3  that.
4     A. Oh, 7,200. So this would've been saying
5  that, if you had a two-bedroom Aspen winter week -- I
6  don't know where the footnotes are -- so I would like
7  to know, actually, specifically what week this is that
8  that Aspen week, assuming -- I don't know when it was
9  falling into -- I'm assuming these notes up here tell
10 what week it is. But it would've been worth
11 7,200 points if you were to deposit it with the MVCD
12 program.
13       Those 7,200 nights [sic] could be, used as an
14 example, for five-star accommodations, eight nights,
15 to go to the Taste of Italy, exclusive member-only
16 tour. In March, that would've been 6,000 points. And
17 then you could've gone to -- followed up with a
18 two-night stay in Tuscany at The Renaissance, where
19 you got a hotel and breakfast for two for another
20 1,100 hundred points.
21       So you could have changed your two-bedroom
22 winter week for 7,200 points into a 10-night stay in
23 Italy, where you got to go around Italy for
24 7,100 points.
25    Q. Okay. This is a conversion of a week, so --

Page 296

1     A. Just a sample.
2     Q. So a person who has Christmas week in Aspen
3  will get more points than the person that has the
4  mud -- we call it the mud season there -- but the May
5  week?
6     A. Yes.
7     Q. Between seasons, where it's not ski season
8  and it's not yet swimming season; right?
9     A. Uh-huh. Yes, sir.
10    Q. The letter that came from Mr. Gosch's firm,
11 do you know whether that came before or after
12 Mr. Cunningham came down to see you in the time you
13 needed the two rooms? Do you recall?
14    A. Mr. Cunningham?
15    Q. Mr. Mercer. I'm sorry.
16    A. No. I would -- well, we can look. I would
17 think it would've been after. This is 2012. I
18 thought that was in 2013 that Mr. Two-Room Snorer came
19 down, but I'm not sure.
20    Q. That trip that we are talking about, whether
21 it was '13 or '12, do you recall how long that meeting
22 was?
23    A. Yeah -- I don't think it lasted nearly as
24 long as we thought. We thought Randy was going to
25 have a lot to talk about. He talked about the

Page 297

75 (Pages 294 - 297)

1 management contract some and then talked about the
2 exchange program. It was kind of -- it was very
3 similar to the meeting when Tyler was there. Just
4 generally wanted to talk about them -- talk about
5 talking about them, in essence.
6     So we really need to sit down here in the
7 future and go through this stuff. This is what we're
8 thinking and what are your thoughts.
9     Q. Let me show you Exhibit 1131. This is a
10 letter from Mr. Cunningham, copying Mr. Weisz, to
11 Mr. Mullenix. He was writing about a meeting they had
12 in September.
13     I believe you testified that you were not at
14 that meeting; correct?
15     A. Yes.
16     Q. And were you at all involved in the drafting
17 of this letter to Mr. Mullenix?
18     A. No.
19     Q. No, you weren't?
20     A. No, I was not.
21     Q. Do you recall that there was a time when,
22 following that meeting with Weisz and Cunningham, that
23 the process to affiliate Bachelor Gulch with the
24 Marriott Vacation Club Destination program was put on
25 hold?

Page 298

1 Almost half, 40 percent, of Aspen Highlands members
2 have enrolled in the Lion & Crown exchange program,
3 making over 200 reservations in the short time since
4 those offerings were added to their exchange
5 opportunities."
6     At this time, that data had nothing to do
7 with Marriott Vacation Club Destinations; right?
8     A. No, it wouldn't.
9     THE REPORTER: You said 40 percent.
10 BY MR. FERGUSON:
11     Q. 47 percent. Thank you.
12     Would it be fair to state that most of these
13 participants enrolled because of the Abercrombie &
14 Kent program?
15     A. Yes.
16     Q. And then most of the reservations that were
17 being sold to Mr. Gosch had to do with reservations
18 through Abercrombie & Kent?
19     A. Yes.
20     Q. Had the Abercrombie & Kent opportunity ended
21 by December 21st of 2012?
22     A. I don't know when it was over. I don't know
23 when Abercrombie & Kent ended, we can certainly get
24 that for you.
25     Q. It goes on to say, "In the short time since

Page 300

1     A. Yes.
2     Q. Were you part of that decision?
3     A. Yes.
4     Q. Why did you put it on hold?
5     A. They were moving forward with RFP'ing the
6 management agreement, and the decision was made that
7 we wouldn't move forward with this until the
8 management agreement discussion was complete.
9     Q. When you say RFP, you meant that -- I think
10 their management contract was coming up sooner than --
11 earlier than Aspen Highlands?
12     A. They had an auto renewal that was earlier
13 than Aspen; correct.
14     Q. Let me show you Exhibit 1150, a letter from
15 Baker Hostetler to Mr. Gosch at Brownstein Hyatt
16 Farber. I believe that would be the response to the
17 cease-and-desist letter.
18     Do you generally agree with that?
19     A. That's what it looks like, yes.
20     Q. If you look at the second page, Mr. Walker of
21 Baker Hostetler, is saying -- it's about halfway down
22 the paragraph -- the first paragraph on page 2 of this
23 Exhibit 1150. It says, "According to RCDC's records,
24 the regular and consistent pattern of the Aspen
25 Highlands members is to participate in these options.

Page 299

1 those offerings were added to their exchange
2 opportunities, many of whom took advantage of the
3 offers through the Abercrombie & Kent program." So --
4     A. It appears it's still going, I would say,
5 based on that, but I don't know.
6     Q. And are those accurate statistics, that
7 47 percent of Aspen Highlands members had enrolled in
8 Lion & Crown?
9     A. In 2012?
10     Q. Yeah.
11     A. It seems like -- yes, I would think they are,
12 but I don't know off the top of my head.
13     Q. This is what's being told to the lawyer hired
14 by Mr. Neveloff and Mr. Mercer, that inherited this
15 law firm -- that being Brownstein Hyatt.
16     As you sit here today, you don't know whether
17 or not that enrollment statistic is accurate or not?
18     A. I would assume it's accurate. Do I remember
19 the percentage of enrolled members in 2012 for Aspen?
20 No, I do not.
21     Q. Do you know what the percentage of enrolled
22 people are in Lion & Crown today?
23     A. No, not as a percentage. I think, the last
24 report I saw, there were about 270 maybe.
25     Q. 270?

Page 301

76 (Pages 298 - 301)

1   A. I mean, I can get that for you. I don't --
2   Q. Mr. Cunningham had seen some. I don't think
3  he was kept up to date. Sounds like you are a little
4  bit more.
5      Your belief -- I'm not going to hold you to
6  260, 280, 300 --
7   A. No. I should get it for you, because I don't
8  do the -- so we report at the board meetings every
9  time we do the board meetings. I don't do Aspen
10  anymore, so I haven't since -- for years. So I would
11  more at St. Thomas.
12      I think, overall -- I remember the RCDC
13  members overall -- I think there's about 758 -- I have
14  in my head -- of total Ritz-Carlton Destination Club
15  members are affiliated with Lion & Crown right now.
16   Q. The biggest population then would probably be
17  St. Thomas, I suspect?
18   A. St. Thomas and Aspen. St. Thomas is 1,260
19  owners, and Aspen is 876.
20   Q. Again, not holding you to it -- if you want
21  to get it to me, that would be great -- but as you
22  recall, it would be about 270 Aspen --
23   A. I would rather get it for you.
24   Q. But if it was 270 members, they're allowed to
25  put in how many -- do they have to put in two weeks or

Page 302

1  the Marriott Vacation Club program?
2   A. Yes.
3   A. Yes. They have to deposit by October 31st.
4   Q. And that was a couple weeks ago or -- what
5  day is today -- a couple weeks ago. Did you get any
6  reports as to how much inventory was committed?
7   A. No.
8   Q. Who does that go to? It goes to --
9   A. I get them. The revenue management team.
10   Q. So they would know today what's been
11  committed to that program?
12   A. They would know how many weeks --
13  2018 weeks -- have been conveyed -- not conveyed --
14  deposited into the Marriott Vacation Club Destinations
15  exchange program by Ritz-Carlton members.
16   Q. I'm not -- please don't take this as being
17  argumentative, but I just want to know -- as an asset
18  manager, is this something you don't -- because I
19  would think of that as an asset. Is that something
20  you don't follow? Is that another group that follows
21  how much would be in that inventory?
22   A. Yeah. I don't follow it down to the
23  inventory level. I look more at the projects than how
24  inventory is moving through the system.
25   Q. Now, on the same day that Mr. Davis, I

Page 304

1  can it be one?
2   A. They can put in zero.
3      MR. SELLINGER: Objection to form.
4      MR. FERGUSON: I'll withdraw it.
5  BY MR. FERGUSON:
6   Q. How many weeks are they eligible to do if
7  they have enrolled?
8   A. They could put in all three weeks if they
9  wanted to.
10   Q. And out of the -- again, I'm not going to
11  hold you to numbers at all -- but out of the people
12  that you saw in the last report that are eligible,
13  what percentage of eligible people are actually
14  putting in their weeks into the program?
15   A. I don't know the answer to that.
16   Q. In addition to probably data that's out there
17  about how many enrollments there are, is there data
18  about -- is there data reported to you, Ms. Sobeck,
19  that tells you how much inventory is in the exchange
20  program?
21   A. In what exchange program?
22   Q. When eligible members put weeks in, whether
23  it's one week, two weeks or three weeks, there comes a
24  point in time where they have to commit; right?
25   A. They have to deposit -- are we talking about

Page 303

1  think -- or Mr. Walker --
2   A. It's Waller.
3   Q. Waller? I said it wrong.
4   A. W-A-L-L-E-R.
5   Q. On the same day that Mr. Gosch received the
6  Baker Hostetler one-and-a-half-page letter, there was
7  a letter on the same date, December 21st, in
8  Exhibit 1121, from Cunningham -- I should say that.
9  This is a draft of it. This is a particular draft of
10  the letter that Mr. Cunningham would eventually send.
11      Do you recognize this draft of a letter that
12  was being prepared, I guess, by you -- or from you to
13  Mr. Mercer regarding the follow-up to the meeting on
14  November 29, 2012?
15   A. Yeah -- yes. I need to read it again, but,
16  yes, I remember it.
17   Q. The purpose of this letter was to follow up
18  on the meeting on November 29, 2012?
19   A. Yes.
20   Q. And is this being redlined by you and
21  Mr. Cunningham or somebody else?
22      MR. SELLINGER: Do you have the cover
23  e-mail which would make that clear?
24      MR. FERGUSON: I do not. You guys can
25  tell me if I have it. I don't know.

Page 305

77 (Pages 302 - 305)

1   A. I would guess this probably would be being
2 redlined by myself, Lee, and the law department.
3       Oh, there you go. The 47 percent is in here
4 too.
5 BY MR. FERGUSON:
6   Q. It's in two places?
7   A. Yes. It's in our letter.
8       MR. SELLINGER: So let me just say, I'm
9 not looking at the cover letter, but if there
10 were -- I'm assuming this one does not have
11 edits from the law department, because that
12 would be privileged and would not have been
13 intended to turn over. That's my assumption
14 right now without seeing the cover letter.
15       Otherwise, I might give an instruction
16 not to answer and designate as confidential.
17 But right now, I don't have the information
18 to do that.
19 BY MR. FERGUSON:
20   Q. And this is the final that went out?
21   A. Okay.
22   Q. Exhibit 1152. Just a couple questions about
23 this. On the first page, at the end of the first
24 paragraph, it says -- this is you trying to rectify
25 misconceptions concerning the evolution of RCDC.

Page 306

1 can pull up a document -- is that you had stopped
2 selling -- at least actively selling inventory at
3 Aspen Highlands.
4       MR. SELLINGER: Objection to form.
5   A. Yeah. I don't remember when we stopped. We
6 certainly did stop. There was a point in time we
7 stopped. I don't remember the date.
8 BY MR. FERGUSON:
9   Q. It says, "The advertisement previously
10 provided by the association of counsel is an example
11 of such an offering." It says, "Like other owners at
12 Aspen Highlands, we" -- I guess that's the development
13 company, which is owned by Marriott Vacations
14 Worldwide, right?
15   A. Yes.
16   Q. -- "we will continue to offer opportunities
17 for prospective members to use developer's allocated
18 time, to assist with sales, and to offset the
19 developer's maintenance fees, expenses, for this
20 unsold inventory."
21       How would a marketing stay by a potential
22 buyer of a Ritz-Carlton fractional interest, which
23 wasn't actively being used -- how would that defray
24 the dues burden that you, as an inventory holder, were
25 shouldering?

Page 308

1 Right? Do you see the end of that paragraph?
2   A. Yes.
3   Q. Did you believe that Mr. Mercer, when he
4 arrived on November 29th, had misconceptions?
5   A. Yes.
6   Q. The next paragraph, four lines down, it says,
7 "Any rental offers from the developer that exist for
8 Aspen Highlands are generally for marketing purposes
9 and uses the developer's allocated time to introduce
10 Aspen Highlands to potential new members."
11       And you wrote that, right?
12   A. Yes.
13   Q. But by this time, I believe Mr. Cunningham
14 confirmed for us, you weren't really selling
15 fractional interests up in Aspen Highlands; right?
16       MR. SELLINGER: Objection to form.
17   A. I mean, if we were doing -- if we were using
18 it for marketing purposes and we were doing preview
19 packages, we were doing some type of sales.
20 BY MR. FERGUSON:
21   Q. Were you doing Marriott points sales?
22   A. From Aspen?
23   Q. Yeah.
24   A. I don't believe we ever did that.
25   Q. You had stopped, but my understanding is -- I

Page 307

1   A. Because we -- marketing packages are what we
2 call preview packages, and there's a rate associated
3 with those preview packages.
4   Q. When someone is considering buying a
5 fractional interest, do you give them a preview
6 package?
7   A. Not always, but sometimes we do. If
8 somebody's never been to a property before, they would
9 want to come look at it.
10   Q. The second page, it says, "The board" --
11 second page, second paragraph, it says, "The board has
12 previously expressed concerns about the use of Aspen
13 inventory through the Marriott Vacation Club program
14 creating a more transient feel at Aspen Highlands."
15       That was something that Mr. Mercer had
16 expressed to you earlier in November?
17   A. Correct.
18   Q. You said, "While we do not believe there is
19 any merit to this concern, given the more remote
20 location of Aspen Highlands in comparison to other
21 Colorado mountain destinations, we have been
22 considering an overall length of stay requirement for
23 any inventory that is used through the Marriott
24 Vacation Club program."
25       In fact, today, is there any type of stay

Page 309

78 (Pages 306 - 309)

1 requirement imposed with respect to Marriott Vacation
2 Club points people coming in and using exchange
3 inventory?
4     A. I don't think there is in Aspen. We have one
5 in St. Thomas, but I don't believe we have one in
6 Aspen. I want to say, we got comfortable with that
7 because we pulled length of stay.
8     Q. So you don't know?
9     A. Yeah -- no, I don't believe there is.
10     (Mr. Sellinger and Ms. Livingston no
11     longer present.)
12 BY MR. FERGUSON:
13     Q. If we pull out Exhibit 1020 -- that would be
14 in here.
15     A. How do you keep it all organized in your
16 head?
17     Q. I don't. I'm not organized. She's
18 organized. I usually stop depositions when I'm
19 overwhelmed with my own paperwork.
20     This is February 28, 2012, and I suspect that
21 might be improperly dated, and I forget why I know
22 that.
23     A. Improperly dated?
24     Q. I think it might be -- well, let's -- it is
25 dated -- it says February 28, 2012. I have it as an
Page 310

1     A. Are you asking me or are you telling me?
2     Q. Yeah. Would it be? Do you think it would
3 be?
4     A. Oh, because you're saying this was too
5 long -- this was too early?
6     Q. Yes. Or were you talking about having no
7 affiliation unless there was a vote as early as
8 February of 2012?
9     A. No. That seems very early.
10     Q. I'll help you out -- help myself out and it
11 will probably help you out. If you go to page 6,
12 asset management update -- you'll see that the third
13 bullet point under Kapalua Bay is December of 2012,
14 foreclosure --
15     A. Oh, yeah. There you go. And then on --
16     Q. Right.
17     A. -- so this is February 2013, yes.
18     Q. My understanding is, this is a document
19 that's prepared periodically to advise Marriott
20 International what's going on?
21     A. Yeah. I think Lee does these for their MI
22 meetings.
23     Q. I guess we would agree that this is 2013. Do
24 you think the date -- sorry -- do you think the month
25 is correct, or do you just not know?
Page 312

1 improper date, and let me see if I know why.
2     If you look at page 2 of Exhibit 1020, you'll
3 see that there is a -- starts with a strategy of
4 selling remaining luxury unsold inventory at the top?
5     A. Yes.
6     Q. I don't understand what it means by "includes
7 the unwind of RCDC Trust by diverting existing 109
8 members."
9     Those members weren't Aspen Highlands people,
10 are they?
11     A. Where are you looking?
12     Q. At the first sentence, second line.
13     A. No. Those are -- we actually sold the points
14 product for RCDC for a period of time, and then
15 unwound it, in essence, and those 109 members went to
16 different home clubs.
17     Q. If you look at the bottom of the page under
18 Aspen Highlands, it talks about the unwind of the
19 trust. And the second bullet point says, "We will not
20 affiliate Aspen Highlands with MVCD absent an
21 affirmative vote from the majority of the members."
22     Do you see that?
23     A. Yes.
24     Q. And this concept of a vote, this would
25 probably be a 2013 document? And I'm not trying --
Page 311

1     A. I don't know. I guess it would look like it
2 would be Kapalua because they're talking about
3 January.
4     Q. All right. So it would be after January. We
5 know that. Do you know whether or not this -- see
6 this bullet point here is almost identical, with the
7 exception of the words "excluding Marriott's interests
8 and members not in good standing" -- this language is
9 very similar to what Mr. Mercer and Mr. Oliver and the
10 other two board of directors put in the April 5th
11 letter.
12     Do you agree with that?
13     A. Yes.
14     Q. And the question is -- you guys were talking
15 about that internally, at least according to the
16 February date, well before the April 5th meeting, two
17 months before -- a month and a half before?
18     A. It appears so, yeah.
19     Q. Was this a representation or a statement made
20 to Randy as early as November, or do you know? Randy
21 Mercer.
22     A. It may have been a concept talked about. I
23 don't think we -- I don't think anything had been
24 decided then. It was really more -- he was there more
25 to kind of discuss things at a high level. He wanted
Page 313

79 (Pages 310 - 313)

1  any decisions to be made by the board overall.
2      Q.  Okay.  But did you help prepare this report
3  to Marriott International?
4      A.  I didn't.
5      Q.  Who's in charge of this?
6      A.  Lee, I believe, does these.  Somebody else --
7  ML might have helped him with this one.  I'm not sure.
8      Q.  So just finishing up on page 2 of
9  Exhibit 1020, the last bullet point on the page
10  would've been Mr. Cunningham that would've -- I'm sure
11  he didn't type it.  What's his assistant's name?
12      A.  Janet.
13      Q.  Janet would have assisted him with this?
14      A.  Who would have typed it?  I don't know.  It
15  may have been ML.  I don't know.
16      Q.  Did Mary Lynn Clark help Mr. Cunningham with
17  these types of reports?
18      A.  Sometimes she would help with this type of
19  thing.
20      Q.  Just one last time -- do you believe, yes or
21  no, that the concept of no affiliation without an
22  affirmative vote from the majority of the members
23  occurred internally before April 5th, or is it
24  something that's misdated to be afterwards?
25      MR. MARX:  Object to the form.

Page 314

1      A.  I do.
2      Q.  And was Mr. Cunningham or Mr. Weisz at those
3  meetings?
4      A.  I don't believe either of them were at the
5  meeting.  ML might have been, but it may have just
6  been John and I.
7      Q.  Do you recall Mr. Hearns saying, in words to
8  the effect, that the brand evolution letter that was
9  rolled out on July 17th would be in the top five
10  Harvard Business School cases -- a study on how bad a
11  simple corporate communication could ruin an iconic
12  vacation brand?
13      A.  I do not remember him saying that.
14      Q.  Do you recall that you spoke about restoring
15  market value at the meeting on March 11, 2013 with
16  Mr. Mullenix and Mr. Hearns?
17      A.  That was certainly an important issue for
18  Mike.
19      Q.  Do you recall that you said your first
20  solution was to identify, train, and educate a
21  preferred agent in the Vail Valley?
22      A.  Yes.
23      Q.  That's sort of what you did in Aspen?  Sorry.
24      A.  Exactly.  That's what I was going to say.
25  That's what we did in Aspen.

Page 316

1  BY MR. FERGUSON:
2      Q.  Do you understand my question?  Let me repeat
3  that.  If this is February 28, 2013, you would agree
4  with me that, internally, you were talking about this
5  concept of a majority -- affirmative vote of the
6  majority of the members of Aspen Highlands in order to
7  affiliate?
8      A.  Yes if it was a February date, and that was
9  correct, we would've been talking about it before.
10      Q.  Do you recall -- and maybe this helps out --
11  do you recall, when you left Bachelor Gulch and went
12  over to Aspen Highlands to go to the April 5th
13  meeting, that you already had in mind that there would
14  be a vote of the majority of the members?
15      A.  I don't.  Certainly, the concept makes --
16  yeah -- the concept would make sense.  Yeah, of
17  course, we would have had some type of -- that idea
18  makes perfect business sense.  We would have wanted to
19  know how the members felt.  We would have wanted to go
20  out and have some type of feedback from them.
21      So, yeah.  I'm sure that wasn't a new concept
22  that started at the April meeting.
23      Q.  Do you recall sometime afterwards, in March
24  of -- March 11, 2013 -- that you and Mr. Hearns met
25  with Mike Mullenix in Orlando, Florida?

Page 315

1      Q.  And you did that about two years later with
2  Ivan Skoric?
3      A.  Yes.  A year later.  Isn't that 2014?  Wasn't
4  that 2013 you're talking about?
5      Q.  Did you discuss with Mr. Mullenix the fact
6  that the concept of merging or affiliating a points
7  product with a fractional interest was confusing the
8  real estate community in terms of what was being sold?
9  Do you recall that being discussed?
10      A.  Say it again.  The points product?
11      Q.  Yeah.  That the migration or the affiliation
12  or merger of the points concept with a fractional
13  ownership concept was confusing the local real estate
14  community?
15      A.  Yeah, because we had The Ritz-Carlton
16  Destination Club points product that we were selling
17  and the three-week fractions.
18      Q.  Were there Ritz points system people in the
19  Bachelor Gulch Ritz Destination Club?
20      MR. MARX:  Object to the form of the
21      question.
22      A.  I don't know -- I don't know all the
23  inventory off the top of my head, because there was
24  inventory -- just like the MVC Trust, there was
25  inventory from different properties put into the

Page 317

80 (Pages 314 - 317)

| | |
|---|---|
| 1 points program. I don't remember if Bachelor Gulch | 1 BY MR. FERGUSON: |
| 2 inventory was in there or not. | 2   Q. And they have? |
| 3 BY MR. FERGUSON: | 3   A. They have. |
| 4   Q. I'm going to go pretty quickly. Poor | 4   Q. On page 4 of Exhibit 1369 there's a section |
| 5 Mr. Cunningham had to handle most of these the other | 5 under miscellaneous provisions. Are you there? |
| 6 day. | 6   A. Yes, sir. |
| 7     I asked a little while ago about documents | 7   Q. It says, "Personal use, commercial use." It |
| 8 about -- a relationship between Lion & Crown Travel | 8 says, "Use of the accommodations available through the |
| 9 Company and the Cobalt Travel Company. | 9 program" -- and this program would be Lion & Crown |
| 10     So I've handed you Exhibit 1369. This is a | 10 Travel program? |
| 11 document called a disclosure document between Lion & | 11   A. Yes. |
| 12 Crown and Cobalt Travel with the access to Lion & | 12   Q. -- "is limited solely to the personal use of |
| 13 Crown exchange program. | 13 participants, their guests and invitees, for |
| 14     What is this document? What is it for, do | 14 recreational use and by corporations or similar |
| 15 you know? | 15 entities that own interests." |
| 16   A. I believe this is what goes -- as a member | 16     So what that says is that owners, whether |
| 17 signs the affiliation agreement -- or affiliates -- | 17 they're persons or they own an LLC or trust, can only |
| 18 this is, in essence, the guide for Lion & Crown for | 18 use it for themselves or guests? |
| 19 what they're affiliating to. | 19   MR. MARX: Objection to form. |
| 20   Q. And the officers, at least in this timeframe, | 20   A. That's what that says, yes. |
| 21 were listed on page 2? | 21 BY MR. FERGUSON: |
| 22   A. Correct. | 22   Q. It says, "Purchase of an interest or use of |
| 23   Q. Of Exhibit 1369? | 23 accomodation available through the program." |
| 24   A. Yes. | 24     What does it mean, purchase of an interest -- |
| 25   Q. I want to take you to the third page under | 25 or purchase of an interest of accomodation available |
| Page 318 | Page 320 |

| | |
|---|---|
| 1 section 4, membership in the program. | 1 through the program? |
| 2   A. Yep. | 2   MR. MARX: Object to the form of the |
| 3   Q. The first line says, "A membership in the | 3 question. |
| 4 program is not an appurtenance to interests." | 4 BY MR. FERGUSON: |
| 5     I take it that generally means that it's | 5   Q. If you know. |
| 6 not -- it's not really a real estate interest if they | 6   A. Purchase of an interest or use of an |
| 7 enroll in this Lion & Crown system? | 7 accommodation available through the program for |
| 8   A. Correct. | 8 commercial purposes. |
| 9   MR. MARX: Objection to the form of the | 9   Q. I guess -- I know it's a legal kind of |
| 10 question. | 10 document, but it is a disclosure too. In your |
| 11 BY MR. FERGUSON: | 11 position, do you have any understanding of what a |
| 12   Q. Do you consider the rights to use the sister | 12 purchase of an interest would mean in the context of a |
| 13 club -- the home club -- correct? You could buy a | 13 disclosure agreement to a Lion & Crown enrollee? |
| 14 home club? For example, the people up in Aspen, | 14   MR. MARX: Object to the form of the |
| 15 Colorado that I represent bought into the home club of | 15 question. |
| 16 Aspen Highlands; correct? | 16   THE VIDEOGRAPHER: We're at five minutes. |
| 17   A. Correct. | 17   A. No. I mean, I guess what this would mean to |
| 18   Q. They had rights -- certain rights -- to use | 18 me is, the use of accommodations available through |
| 19 their weeks in other properties? | 19 this program for commercial purposes would be off |
| 20   A. Correct. | 20 limits. So I can't be a member and go out and get a |
| 21   Q. Is that an impertinent interest? | 21 week at Exclusive Resorts, and then turn around and |
| 22   MR. MARX: Object to the form of the | 22 rent that week on the open market to make money. |
| 23 question. | 23 BY MR. FERGUSON: |
| 24   A. No. Because, as we know, those things can go | 24   Q. Okay. So it does prohibit commercial uses |
| 25 away. | 25 for people that are enrolled in this program; right? |
| Page 319 | Page 321 |

81 (Pages 318 - 321)

1   A. For -- yes.
2   Q. It also says, "for contribution to or use in
3   a timeshare plan."
4       They're not allowed to put it -- they
5   couldn't give it to another timeshare program?
6       MR. MARX: Object to the form of the
7   question.
8   A. Yes, but this isn't -- sorry -- this is the
9   exchange company, so they don't own real estate.
10      So, in essence, I think what this would be
11  saying is that you go in through -- if I'm an owner, I
12  go and get time at Abercrombie & Kent. I reserve that
13  time. I can't give that time then to a timeshare plan
14  or other exchange program or other vacation plan to
15  use that time that I got through the system. That's
16  how I would read it. Again, I'm not an attorney.
17  BY MR. FERGUSON:
18  Q. That person in the Abercrombie -- that's
19  taking advantage of the Abercrombie & Kent product is
20  not able to use it for any commercial purpose?
21  A. Right. Just like if I'm a Ritz-Carlton owner
22  and I go and use my points to get a Marriott Vacation
23  Club week in Newport, I couldn't go out and then rent
24  that Marriott Vacation week in Newport.
25  Q. Exhibit 1229 is a May 29, 2013 update?
Page 322

1   A. Yes, sir.
2   Q. I just want to focus on page 2 of
3   Exhibit 1229. The second bullet point says, "We are
4   working with each association board to coordinate a
5   vote of the membership to affiliate their club with
6   the Marriott Vacation Club program. To date, only one
7   club has taken a vote and they chose not to affiliate
8   with Marriott Vacation Club."
9       So Bachelor Gulch actually took -- I used the
10  word before "unofficial" -- they actually took an
11  official vote. Do you not recall that?
12  A. When did they take an official vote? I don't
13  remember. It wasn't done through us. It wasn't done
14  through this process.
15  Q. I think -- do you recall that the board did a
16  vote and they said, "We're going to give a vote to the
17  entire membership?" It was a two-step process, and
18  the board voted not to affiliate and then they gave a
19  vote to all its members?
20  A. They voted to terminate the management
21  agreement. I'm not sure -- included in that vote was
22  something about affiliation as well, but I thought the
23  vote they took was in regards to the management
24  agreement.
25  Q. And this particular -- Mr. Cunningham and
Page 323

1   whoever helped him -- maybe Mary Lynn Clark -- said,
2   "Today, only one club has taken a vote, Bachelor
3   Gulch, and they chose not to affiliate with the
4   Marriott Vacation Club."
5       That would indicate that at least
6   Mr. Cunningham thought the vote had to do with
7   affiliation?
8       MR. MARX: Object to the form of the
9   question.
10      MR. FERGUSON: What's your objection?
11      MR. MARX: You called for this witness to
12  speculate as to what Mr. Cunningham knew or
13  didn't know. She's not in a position to
14  answer that question; therefore, I objected.
15  BY MR. FERGUSON:
16  Q. Do you know?
17  A. I don't know.
18  Q. And one last item here -- the next dash point
19  says, "Aspen, working with the board on language used
20  to doll for the vote. It was difficult to gain member
21  support."
22      Does that mean -- let me ask you this way
23  because it's not your document. At this time, were
24  you having difficulty obtaining member support for
25  affiliation?
Page 324

1   A. We hadn't gone out to the members yet. We
2   were working with the board and we were having kind of
3   the round-and-round iterations of a letter. So there
4   must have been a feeling that, at that time, there was
5   member concern about an affiliation, and, therefore,
6   we may have some challenges getting the members to
7   support.
8       MR. FERGUSON: Let's turn the machine off
9   and I'll come back for a final installment
10  and get you out of here.
11      THE VIDEOGRAPHER: The time is 5:08.
12  This is the end of media five of Stephanie
13  Sobeck.
14      (Brief recess.)
15      THE VIDEOGRAPHER: The time is 5:15.
16  This is media six in the deposition of
17  Stephanie Sobeck.
18  BY MR. FERGUSON:
19  Q. So we were just finishing up on Exhibit 1229.
20  But I believe your -- in terms of these Marriott
21  International updates, that was mostly
22  Mr. Cunningham's bailiwick?
23  A. Correct.
24  Q. Do you have any direct reporting duties with
25  respect to MI, Marriott International?
Page 325

82 (Pages 322 - 325)

| | |
|---|---|
| 1   A.  No, I do not.  Well, the Ritz-Carlton Hotel | 1   meeting with Ms. Egolf regarding survey versus vote; |
| 2   Companies, I don't report to them, but I work directly | 2   right? |
| 3   with them on these properties. | 3   A.  I believe it was.  Again, we were always -- |
| 4   Q.  This is Exhibit 1230, which I'm sure I used | 4   it was always vote-survey to us -- was the same thing. |
| 5   before.  This is a report we see.  It's called a | 5   We weren't going out with a formal vote. |
| 6   business review report, Ritz-Carlton Destination Club, | 6   Q.  We were talking about -- right before the |
| 7   period five. | 7   break also -- the voting process of Bachelor Gulch. |
| 8   Are you with me? | 8   Mr. Cunningham reported to Marriott International in |
| 9   A.  Yes. | 9   one of those bullet points. |
| 10   Q.  I take it that you do reports for -- like | 10   You do know that they performed a vote |
| 11   this periodically for this segment of your job | 11   similar to what would be done at Aspen Highlands -- |
| 12   function at Ritz-Carlton Destination Clubs? | 12   for example, electing a board of director -- where a |
| 13   A.  Correct. | 13   vote wasn't just something where you had a sentiment. |
| 14   Q.  I take it you do other reports for other | 14   The vote was to be counted to achieve a result -- a |
| 15   phases of the system that you dedicate time to? | 15   board of director or change in the amendment of the |
| 16   A.  I do a business report once a period, and it | 16   declaration? |
| 17   includes both.  At this time, I was only Ritz-Carlton. | 17   A.  That Bachelor Gulch had done that? |
| 18   Q.  And right here under Aspen, it says, "under | 18   Q.  Yes. |
| 19   review, underway" -- "work underway," rather.  It says | 19   A.  Yes.  They had done that for their management |
| 20   "all communications drafted for the member MVC | 20   agreement. |
| 21   affiliation survey." | 21   Q.  And they did not use Morrow & Company.  Is |
| 22   Do you see that? | 22   that your understanding? |
| 23   A.  Yes. | 23   A.  No, they did not use Morrow & Company. |
| 24   Q.  So do you recall you had a survey, at least | 24   Q.  Do you recall that you all were communicating |
| 25   in this document, as early as May 31st of 2012; is | 25   with the membership during the time that vote was in |
| Page 326 | Page 328 |
| 1   that right? | 1   effect -- the voting process was in effect? |
| 2   A.  Yes.  Well -- I'm sorry. | 2   A.  I do. |
| 3   Q.  Yeah.  Is there a problem with your prior | 3   Q.  Do you recall that that upset Mr. Mullenix |
| 4   testimony you want to correct? | 4   and his board, that you were all communicating with |
| 5   A.  No, no, no, there's not.  But as I look at | 5   his members? |
| 6   this document, everything is 2013.  The date has to be | 6   A.  Yes. |
| 7   wrong on here.  It can't be in May 2012 when | 7   Q.  Did he tell you to stand down from doing |
| 8   everything is -- | 8   that? |
| 9   Q.  Yeah.  I have it in 2013, right.  This is | 9   A.  Yes. |
| 10   2013. | 10   Q.  Why were you doing that? |
| 11   A.  Right, but my date -- I don't know what's up | 11   A.  Because we didn't feel like all of the facts |
| 12   with us and dates. | 12   were being shared accurately with the membership. |
| 13   Q.  I know.  Ian does it more than me.  But we | 13   Q.  Whose idea was it to communicate with the |
| 14   clone a letter and forget to change a date, so I | 14   Bachelor Gulch members during the voting process that |
| 15   suspect that's what's happening. | 15   had been approved by its board? |
| 16   A.  Maybe.  I don't know.  Anyway... | 16   A.  I would say, it was a group decision. |
| 17   Q.  Although, we probably shouldn't do that past | 17   Q.  And did the communication go out from RCDC |
| 18   the first two weeks of January. | 18   membership services?  Was there, like, a blast of a |
| 19   A.  Or in May.  I mean, come on.  Catch up. | 19   letter that went out? |
| 20   Q.  I had it as a '13 document.  I should have | 20   A.  How did it go out? |
| 21   made that clear. | 21   Q.  That's generally how things go out from -- |
| 22   As early as May 31, 2013, you were using the | 22   A.  Yeah.  It would go out from Ritz-Carlton, the |
| 23   words "affiliation survey."  Right? | 23   member services e-mail, correct. |
| 24   A.  Yes. | 24   Q.  Let me show you what's been marked as 1249. |
| 25   Q.  Had there been a decision -- this is prior to | 25   This is a -- I think someone talked about this today |
| Page 327 | Page 329 |

Veritext Legal Solutions
866 299-5127

**Page 330**

1  or yesterday -- the company called The Agency -- and
2  ask you is this something that was under your
3  authority or bailiwick to get done regarding The
4  Agency's work on marketing for the RCDC club -- home
5  club members?
6      MR. MARX:  Object to the form of the
7  question.
8  BY MR. FERGUSON:
9      Q.  It was a terrible question, so I'm going to
10  ask it again.
11     A.  Okay.
12     Q.  Is this a document that relates to work you
13  were doing in connection with votes concerning RCDC
14  affiliations with the Marriott Vacation Club?
15     A.  Yes.  It appears to be related to the work
16  that we were doing on the affiliations with Marriott
17  Vacation Club.
18     Q.  Is this a company that you oversaw retaining?
19     A.  No.  The Agency is an internal company.
20     It's --
21     Q.  Oh.
22     A.  -- it's our marketing and sales -- we have a
23  group.  It's a creative team.  They call themselves
24  The Agency.  They try to be all, you know,
25  particular -- creative.  They don't have chairs.  They

**Page 331**

1  sit on beanbags and those kinds of things.
2      Q.  I know a few people there.
3      A.  Yeah.
4      Q.  This is an internal, not external, vendor?
5      A.  Correct.
6      Q.  And the marketing objective here was to
7  increase the number of RCDC home club member "yes" --
8  in quotes -- votes regarding RCDC's affiliation with
9  the Marriott Vacation Club destinations program.
10  Right?  Did I read that correctly?
11     A.  That's what it says.
12     Q.  So at least with respect to the RCDC in July
13  of 2013, there was a concerted effort internally to
14  get "yes" votes?
15     MR. MARX:  Object to the form of the
16  question.
17     A.  I think it was an effort to give the members
18  the information that they needed about the
19  Ritz-Carlton -- the Marriott Vacation Club
20  Destinations program, which we felt like would've
21  gotten "yes" votes because they would have understood
22  all the benefits of the program.
23  BY MR. FERGUSON:
24     Q.  I mean, that's what you do in a vote.  You
25  try to say, "I'm the best candidate" or "I've got the

**Page 332**

1  best referendum" or "got the worst referendum."  You
2  try to influence what they're going to check in a box?
3      A.  But there is no -- again, I'm sorry to come
4  back to it, and I know you don't like it -- but there
5  was no benefit we were getting by having them vote
6  yes.
7      Q.  So Mary Lynn Clark was wrong when she said
8  there were some benefits?
9      A.  I mean, there are benefits -- yes -- that
10  Marriott Vacation Club members can go use Aspen.  But
11  it's a very large company with a very -- a lot of
12  members.  Any weeks that Aspen members would have used
13  within the Marriott Vacation Club -- you know -- the
14  425,000 Marriott Vacation Club owners -- there's very
15  few of them who are going to have any type of usage or
16  see any type of benefit with having Aspen -- a few
17  Ritz-Carlton Aspen members.
18     Q.  The points members won't.  You're talking
19  about points members?
20     A.  Points members.
21     Q.  You're not talking about Marriott Vacation
22  Worldwide in that prior answer?
23     A.  Points members -- well -- yeah -- they're
24  related.
25     Q.  But my question was, simply, the marketing

**Page 333**

1  objective here was to increase the number of RCDC home
2  club member votes to be "yes" regarding affiliation.
3  That's what it says?
4      A.  That's what it says.
5      Q.  And your view is that, if you only got out
6  all the great things you were going to offer them,
7  they should vote yes?
8      A.  If they knew what the -- yes, if they knew
9  the benefits of the program.
10     Q.  So you had -- did these people go ahead and
11  do things in order to try to get increased "yes"
12  votes?
13     A.  I don't think anything was ever done.  I
14  think we sent out the letter and we sent out the
15  survey, and there was no marketing collateral that
16  went with the survey.
17     Q.  And the last page talks about mandatories.
18  It talks about selecting two or three images to
19  showcase each section, and then there would be some
20  legal board review.
21     Was there some type of -- it says -- above
22  there, it says, "The tone and manner of the PDF should
23  reflect MVC brand voice and standards prompting
24  interest and excitement of how affiliation with the
25  MVCD program will expand the vacation experience of

84 (Pages 330 - 333)

1 the RCDC home members."
2       Was there a PDF generated as a result of the
3 agency, your internal marketing people?
4       A. I don't think there was ever. We ended up
5 doing what we used to call -- what we ended up calling
6 a how to use guide, which had the pretty pictures and
7 those type of things of how the program worked, but I
8 don't think we had a one-page PDF.
9       Q. All right. You talked about it, but you
10 don't think it was done?
11       A. I don't think it was ever done. If you have
12 it, I'd like to see it.
13       Q. No. I don't, I don't think.
14       A. You might. You've got a lot of the folders
15 back there.
16       Q. I might, yeah. Do you recall a survey going
17 out in the summer of 2013 -- as opposed to an
18 affiliation vote or a survey, but an actual survey
19 going out in the summer?
20       MR. MARX: Object to the form of the
21       question.
22       A. A survey about what?
23 BY MR. FERGUSON:
24       Q. I don't know. I'm going to show it to you
25 then.

Page 334

1       A. Okay.
2       Q. 1266. Just a few questions about 1266. This
3 is the one we copied on two sides. It's a --
4       A. Oh, this is the one we looked at before.
5       Q. Is it?
6       A. I don't know. It looks like it to me.
7       Q. It could be.
8       A. It looks the same to me. It has the same
9 information -- female, male -- which I thought was
10 very funny that they were...
11       Q. Yeah. If you go then to page -- sorry -- if
12 you do this -- one, two, three, four -- fourth page in
13 on Exhibit 1266, you'll see that the line 22 down --
14       A. "Disgusting." There it is.
15       Q. So this is the same document?
16       A. Yeah.
17       Q. Hallelujah. So it looks different because
18 it's not in landscape like the one on the computer?
19       A. Exactly.
20       Q. All right. So this survey was done in the
21 summer of 2013?
22       A. 2013, yeah, I believe it was.
23       Q. Just a quick few questions about it. On the
24 first page of Exhibit 1266, it has some sort of a
25 table, A through G columns. Under RCDC satisfaction,

Page 335

1 it has all zeros.
2       Q. Do you know what that means?
3       A. I don't know.
4       Q. Do you know what -- on section F, Ritz brand
5 impression, it has eight, eight, ten, nine, four,
6 zero, five, ten, five.
7       Do you know what's high and what -- I guess
8 ten is probably the best, would you guess? Would you
9 know that?
10       A. I would think that ten was the best. I
11 should probably look at how the questions were
12 written.
13       Q. Question F.
14       MR. MARX: We've spent, like, at least an
15       hour on this document.
16       MR. FERGUSON: Yeah, but I didn't have
17       this, Mr. Marx. Well, we had it on the
18       board. Mr. Cunningham didn't know what this
19       was. All I'm focusing on is matching the
20       table with the answers to the survey. That's
21       all I was trying to do. I'm pretty much
22       done.
23       THE WITNESS: Can I just make --
24       MR. FERGUSON: Remember how you said they
25       were sorted?

Page 336

1       MR. MARX: Yeah, you can --
2 BY MR. FERGUSON:
3       Q. Can you explain this document and how it's --
4       A. No -- I was just going to say, there was a
5 discussion before that they were sorted so that the
6 bad ones were at the top, and this "disgusting" was
7 number three on your screen, and it's number 22 on
8 here.
9       Q. It's been changed?
10       A. Yes.
11       Q. Well, we didn't do that. Whoever was in
12 charge of the document was --
13       A. Monkeying with it.
14       Q. -- monkeying with it.
15       Did I show you Exhibit 1270? I don't think
16 we used this one before.
17       A. Okay.
18       Q. Exhibit 1270 is a memorandum from Mary Lynn
19 Clark to you, August 20, 2013, and she's telling you
20 some options, option one and option two, for RCDC
21 thoughts.
22       Do you see that?
23       A. Yes.
24       Q. And she said, "I think I have two viable
25 options -- three, but no one will go out of

Page 337

85 (Pages 334 - 337)

1 business -- and four would be total unwind, which
2 would be huge cash."
3     She had four options in mind, but only two
4 were viable to her. Is that what you understood when
5 you received this memo?
6     A. That's what it says, yes.
7     Q. And this has generally to do with the
8 inventory that you all owned still; correct? Let me
9 do it this way. Option one says, "Tell each member
10 that we are putting remaining developer inventory in
11 the NATO Trust and let them vote for affiliation,
12 except Aspen, and sell remaining inventory."
13     Except Aspen's because their declaration did
14 not allow that to occur?
15     A. Correct.
16     Q. And she said, "Members will be mad, but at
17 least they know and can make their affiliation vote
18 with full knowledge."
19     So Mary Lynn Clark was talking about a vote.
20 Did you guys all clue her in that it's going to be a
21 vote -- that it's going to be a survey to get
22 sentiment as opposed to a vote?
23     A. Again, we used them interchangeably.
24     Q. She uses them interchangeably too?
25     A. I don't know --

Page 338

1     MR. MARX: Object to the form of the
2     question.
3     A. I don't know about her, but we were using
4 them interchangeably, so I wouldn't have corrected her
5 or told her otherwise.
6 BY MR. FERGUSON:
7     Q. And quickly look at the chart which you
8 attached. This is another one of those that we see on
9 the computer. It prints out a lot differently because
10 it's easier to read on the screen, although, it's
11 small.
12     So this is a chart that has goal, Aspen, and
13 then it looks like Aspen is the column B. Do you see
14 that? And then Vail was column C?
15     A. Yes.
16     Q. Turn to the next page, you've got D is Tahoe
17 and E is San Francisco and F is Jupiter. I'm going
18 to, obviously, focus on Aspen because that's the one
19 I'm representing people on. The goal of Aspen, it
20 says, "Maintain management contracts." Then it says,
21 "affiliation vote." Correct?
22     A. Yes.
23     Q. So you believe that, when she put down vote,
24 you all were using vote and survey interchangeably?
25     A. Yes.

Page 339

1     Q. It says, "increase member satisfaction." It
2 says, "don't allow Marriott owners in."
3     Where is that coming from? Is that coming
4 from the survey we saw in the prior exhibit, 1700 --
5 well, it's 1700, but it's a different number here --
6 Exhibit 1266.
7     Do you know where that language comes from,
8 "Don't allow Marriott owners in"?
9     MR. MARX: Object to the form of the
10     question.
11     A. I don't know where that comes from.
12 BY MR. FERGUSON:
13     Q. She also has a section seven that says,
14 "mitigate lawsuit." She has there "low."
15     Did you discuss with her what potential
16 litigation could occur as a result of the decisions
17 made in connection with the brand evolution?
18     A. No, I don't -- I have to say, this chart is a
19 little confusing to me. I'm not sure I understand it.
20     Q. All right. So you don't recall what she
21 meant when she --
22     A. Mitigation lawsuit, no. I mean...
23     Q. She said on the next page that Tahoe
24 litigation was medium, and she said San Francisco was
25 medium on the next page.

Page 340

1     Just looking at those other litigation
2 values, you don't have a recollection of what was
3 going on there?
4     A. I'm trying to put it together. On option one
5 here, she's saying, "cons, Tahoe and San Fran, members
6 very upset and potential lawsuits from them already
7 have risk today."
8     So, no, I don't.
9     Q. So you were -- at least Mary Lynn Clark was
10 discussing in the options memo and chart that there
11 could be potential litigation?
12     A. Yes.
13     Q. 1305, it's the November 19th letter that
14 eventually went out from Mr. Cunningham. I've got it
15 here. So that's the letter that eventually went out
16 after starting in late April-early May. It went out
17 on November 19, 2013; correct?
18     A. Yes, sir.
19     Q. And in that entire timeframe, I know you and
20 Mr. Mercer and Mr. Cunningham and Ms. Egolf, and folks
21 on both sides of those equations -- the association
22 and Marriott Vacations Worldwide -- had been busy
23 working on language.
24     Had there been any communique sent at all to
25 the members by Marriott Vacations Worldwide saying,

Page 341

86 (Pages 338 - 341)

1    "Hey, the thing your board talked about, the
2    affiliation vote of the majority of the members" --
3    did anybody communicate with them that there was going
4    to be a change from a vote to a survey?
5        A.  Isn't this -- I mean, doesn't this outline
6    it?  I would say that this is probably the
7    communication to them outlining the intent.
8        Q.  So there was a lag of -- April, May, June,
9    July, August, September, October, November -- nine
10   months between when you sent out -- Mr. Oliver and
11   Mr. Mercer sent out the April 5th letter -- it was a
12   lag of nine months before you talked to those folks
13   again?
14       A.  I don't believe -- regarding the affiliation
15   agreement?  I don't think there was anything else that
16   had gone out to them since then.
17          Now, there was the Lee letter in May; right?
18   The Lee letter clarifying the language in the existing
19   affiliation agreement, but not anything about the
20   survey, I do not believe.
21          MR. MEADE:  I don't mean to be rude.  I'm
22   leaving to catch a flight.  Thank you,
23       everyone.
24          MR. MARX:  Safe trip.
25          MR. MEADE:  Thank you.  You too.

Page 342

1        Q.  But you didn't say a vote to see how people
2    feel or what their sentiment is or getting a lens.
3    You said to Mr. Mercer, who's the board president of
4    the association that has as its constituency -- some
5    200 of my clients -- and you told Mr. Mercer on this
6    date that there would be a vote to decide.  Not a
7    survey to get a sentiment, not a survey to get a
8    glimpse into what they're feeling.
9        A.  To decide if they would like the opportunity
10   to exchange within the MVC system.
11       Q.  Those are your words.  You said, "steps to
12   make this happen -- was a letter sent out in vote of
13   members.  Need 51 percent of members to vote for
14   affiliation to move ahead."  You said those words.
15   Did you --
16       A.  Yes, these are my words.  Again, though, I
17   just want to be clear.  There would be no way -- there
18   were 440 members -- there would be 51 percent of the
19   members who we heard from.  This whole process and
20   thought that we had come up with to do this, we never
21   would have gotten -- it would've been a waste of time.
22       Q.  But Mr. Mullenix got it done, right?  He got
23   a vote done.  He hired a vendor.  It was a local
24   accounting firm out of Grand Junction, Colorado.  He
25   got a vote and he got everybody involved?

Page 344

1        (Mr. Meade no longer present.)
2    BY MR. FERGUSON:
3        Q.  Can you send over Exhibit 1285?  This is an
4    e-mail at the top -- it's an e-mail chain with
5    Mr. Mercer, and it's concerning some letters -- draft
6    letters -- dated September 20, 2013.
7           And just at the top, it looks like there's
8    some redlines going back and forth.  You said, "Based
9    on your comments on the letter, there seemed to be a
10   bit of confusion.  There are two separate steps that
11   we were talking about regarding Aspen and MVCD.  You
12   said step one was going out to the members on a vote
13   to decide if they would like the opportunity to
14   exchange within the MVCD system."
15          You wrote those words; right?
16       A.  Yes.
17       Q.  And you were talking about a vote -- about a
18   decision?
19       A.  We were talking about going to -- yeah -- to
20   hear from the members.
21       Q.  On a decision as opposed to a sentiment?
22       A.  I'm sorry.  I don't understand the
23   difference.  We were talking about getting an
24   understanding of how the members felt about
25   affiliation.

Page 343

1        A.  He got a vote of -- I mean, he got a vote of
2    something he needed to vote for, which was not to
3    review the management agreement.  This was not such
4    type of --
5        Q.  Even though Mr. Cunningham reported to
6    Marriott International that the vote he got was not to
7    affiliate, you're saying it was a vote not to --
8        A.  There may have been two different votes.  I
9    mean, he didn't -- that's why we ended up in the whole
10   place of not moving forward with the management
11   agreement.  So there may have been two different
12   things they were looking on in there, but it would've
13   been the management agreement that they were
14   actually...
15       Q.  Let me give you Exhibit 1532.
16       A.  Okay.
17       Q.  1532 is an e-mail chain that starts with
18   Mr. Mercer reporting to his board, Phil Schneider at
19   the time, Sal -- Sal Cutrona, Robert Harris, another
20   board member, and Tyler Oliver.  He attached this --
21       A.  Sorry.  Sal is not on here.
22       Q.  Well, who is satcom --
23       A.  Joel Alper.
24       Q.  Joel Alper.  You're right.  He sent this to
25   those gentlemen.  If you look at the next page, he

Page 345

87 (Pages 342 - 345)

1   sent a copy of it to Nick DiMeglio; correct? Page 2.
2       A. Yes.
3       Q. He says on page 2 on October 17th -- at the
4   bottom, there's four numbers -- "It is also in the
5   form of a survey, not an unwanted program. The steps
6   are as follows."
7           Are you with me?
8       A. Oh, I got you. Yes. I understand where you
9   are.
10      Q. He says, "It is also in the form of a survey,
11  but not an unwanted program."
12          Were you working with Mr. Mercer throughout
13  August, September, and October on the documents that
14  were going to go out for what is now being called a
15  survey?
16      A. I was sending them back and forth to him,
17  yes. He was concerned by our original drafts that
18  they were too hard to understand, in essence. We were
19  making modifications to that, which he appreciated.
20      Q. And looks like Mr. DiMeglio passed that on to
21  Mr. Hearns?
22      A. Yes.
23      Q. And also to you, correct -- Mr. Hearns to
24  you, correct?
25      A. Yes.
                                                Page 346

1   being clear. She thought there might be some
2   confusion in using the word "vote," which now it
3   appears there might have been.
4       Q. You're getting clearer now, you believe?
5       A. Yes.
6       Q. Okay. And then it says, "Randy Mercer and
7   Tyler Oliver have requested a meeting in Orlando on
8   November 14th to discuss the developer inventory and
9   our disposition plan."
10          Do you recall them coming for that meeting?
11      A. I do.
12      Q. I think we're probably pretty clear now that
13  there was one meeting that he came with his wife --
14  Mr. Mercer came with his wife in November of '12, and
15  then there was a second meeting that came in November
16  of '13?
17      A. Yes.
18      Q. And did you attend the meeting with Oliver
19  and Mercer here?
20      A. It was Lee and I.
21      Q. Did you discuss the affiliation survey at
22  that point?
23      A. We did. We gave him an update -- no,
24  actually -- yeah, an update. It hadn't gone out yet.
25  I don't think it went till the beginning of December,
                                                Page 348

1   Q. So you were able to find out what he was
2   communicating with his board internally?
3       A. Yeah, he -- well, he wasn't -- if he copies
4   Nicholas, he's copying us, because he's an associate
5   of RCHC.
6       Q. 1297, here it is. 1297 is another one of
7   those periodic reports, a business review report. And
8   here, under Aspen, you have -- under the board -- do
9   you see that?
10      A. Yes.
11      Q. There's a bullet point that says, "Board
12  meeting has been called for October 17th to discuss
13  the final affiliation letters to members and
14  discussing the survey process." Right?
15      A. Yes.
16      Q. So at some point, it was more use of the word
17  "survey" as opposed to "vote?"
18      A. Correct.
19      Q. And there was a conscious decision, following
20  the meeting with Ms. Egolf, to do a survey as opposed
21  to any form of official vote?
22      A. No, it was -- no. It was to use the word
23  "survey" versus "vote." We had always talked about
24  the process being the same, but it was more to be
25  clearer about what we were saying, because we weren't
                                                Page 347

1   I believe. Oh, no. I don't know. It was out around
2   that time. We definitely talked about affiliation.
3   We gave them an update.
4       Q. Here's a letter from -- Exhibit 1300. This
5   is -- you'll see, at the bottom, there was a member
6   services letter. "Dear Charles and Cynthia Gottlob:
7   On behalf of the Aspen Highlands Condominium
8   Association Tourist Board, please find a special board
9   letter."
10          Do you recall a special board letter going
11  out?
12      A. No, I don't. What did we say -- the board
13  meeting was -- so the board called a meeting on the
14  17th. No, I'm not surprised they would send out the
15  letter after the board meeting.
16      Q. Let me see if I can find that. While I'm
17  looking for that letter -- I'm not going to worry
18  about that letter.
19          You do recall this general timeframe that
20  there was an update given by the board to its members
21  regarding the survey for the affiliation?
22      A. I don't know specifically, no. It appears
23  there was.
24      Q. This particular person at Aspen Highlands
25  said, "Thanks for the update. There doesn't seem to
                                                Page 349

88 (Pages 346 - 349)

1 be much activity related to the member survey we
2 completed several months ago."
3          And that would've been the one with the word
4 "disgusting" in it that jumps around?  That was the
5 survey that was conducted?
6      A.  Correct.
7      Q.  So after you said, on April 5th, 2013, that
8 there would be a vote of the majority of the members
9 in order to affiliate, excluding the interest of
10 Marriott and members not in good standing, after that
11 went out, you did conduct a survey?
12          MR. MARX:  Object to the form of the
13 question.
14      A.  We did a survey from -- this is the one that
15 we looked at, yes.
16 BY MR. FERGUSON:
17      Q.  Exhibit 1700?
18      A.  Yes.  That was done in May.
19      Q.  Okay.  She said -- I think it's a she.  No.
20 Dr. Charles -- Dr. Gottlob.  After saying there hasn't
21 been much activity, he said, "I bought a fractional
22 unit.  You're trying to turn this into a Marriott
23 timeshare.  Not okay.  We need to get away from the
24 Ritz and look for another association like Bachelor
25 Gulch did."

Page 350

1      A.  This was part of it.  It's right here.  Oh,
2 no.  There was a separate -- there's a separate page
3 that gave each individual member the control number.
4 They had to have a control number to log in.
5      Q.  So did you send them a link?
6      A.  It was on -- it was the second letter that
7 goes with this one.
8      Q.  Let me show you Exhibit 1312.  That is
9 probably a draft of it, because you'll see -- sorry to
10 stand up -- I'm sorry.  I'm handing you Exhibit 1312.
11      A.  Correct.
12      Q.  And that is a Ritz-Carlton survey that
13 ultimately went out on December 5th, 4th, or 6th.  Do
14 you recall?
15      A.  I think it was the 4th.
16      Q.  I think you're right.
17      A.  But this is a hard copy.
18      Q.  Right.
19      A.  So if somebody -- if we didn't have an e-mail
20 address, we would have sent them this.  But there's a
21 letter that has a control number that went to a
22 website.  The information was all the same, but
23 it's -- just didn't look exactly like this.
24      Q.  So it was slightly different when it was
25 online?

Page 352

1          I take it that you know that Randy Mercer
2 and, I think, you all -- Marriott Vacation
3 Worldwide -- had advised the membership at Aspen
4 Highlands, obviously, that Bachelor Gulch had left.
5 They knew that?
6      A.  They -- yeah, we communicated with the
7 members when Bachelor Gulch decided to terminate the
8 management agreement.
9      Q.  After Exhibit 1305 -- I believe that's this
10 document -- you all retained Morrow & Company to go
11 forward with this survey process?
12      A.  Correct.
13      Q.  And did you have any input into the
14 generation of the survey form?
15      A.  I did.
16      Q.  And what did you -- what input did you have?
17 Did you draft it or -- did you draft it alone or did
18 you have people helping you?
19      A.  No.  I drafted it with the law department.
20      Q.  Let me show you Exhibit -- no, I'm not going
21 to show you this.
22          After the survey was sent out -- by the way,
23 how was it sent out?  Was it sent by RCDC, Salt Lake
24 City, or membership services, or was it a website
25 link?

Page 351

1      A.  Yeah, because you can't sign and return --
2 you can't sign this.  You wouldn't be able to -- this
3 is actually asking for signatures.
4      Q.  It says, "Note, all parties listed on the
5 survey must sign and date the survey for the votes to
6 be" -- and it ends there.
7          Do you know what the actual end user got in
8 terms of that note?
9      A.  No, I don't.  Probably to be tallied.
10      Q.  To be tallied for a decision or to take your
11 temperature or to say -- get your feeling?  Do you
12 have any recollection of --
13      A.  It says "affiliation survey" across the top.
14      Q.  Obviously, there was -- at least this note
15 contemplated there to be some more words; right?
16      A.  Yes.  It does look -- it looks like it was
17 cut off.
18      Q.  And you don't know what those words are?
19      A.  No.
20      Q.  It could have been to be tallied; it could've
21 been to count?  Something like that?
22      A.  Yes, I would expect.
23      Q.  Do you recall getting feedback from some
24 owner members that they thought this was not a
25 fairly-designed survey; that it was designed to get

Page 353

89 (Pages 350 - 353)

1  "yes" votes?
2      A.  No.  I mean, I think it had -- no, I don't
3  remember getting feedback that it was designed for a
4  "yes" vote.
5          You know, what we were trying to do was share
6  what was included or not included and to be as
7  transparent as possible about it.
8      Q.  So you don't recall any feedback like that?
9      A.  I don't.  I think somebody mentioned it
10  earlier today as well.
11      Q.  Do you recall having a discussion with
12  Mr. Mercer on Friday, December 6th, regarding getting
13  out a communication -- withdraw that.
14          Do you recall there came a time on or around
15  December 6th where you communicated with Mr. Mercer
16  about getting a communique out to the membership by
17  blast regarding the vote or the survey?
18      A.  I don't recall specifically, but I can
19  certainly see we would have wanted -- you know -- he
20  would send something out for the board to talk about
21  the survey and encourage people to take it, so we got
22  a real good understanding of what they were thinking.
23      Q.  But do you recall that the letter you sent
24  out was generally a description and an endorsement of
25  the affiliation -- for the affiliation?

Page 354

1      A.  The board's.  Not his alone.
2      Q.  So he sent out, two days after the vote
3  started, a communique that says, "We're in favor of
4  voluntary" -- in the first bullet point.  And it says
5  in the third bullet point, "We are in favor of
6  affiliation programs that are voluntary."  And the
7  third bullet point, it says, "We are in favor of
8  voluntary affiliation programs."  The fifth bullet
9  point, "We are in favor of this offering."
10          He was -- and the last one -- "We do this
11  voluntary affiliation program as a benefit to our
12  members."
13          That was in keeping with what you all
14  thought, right -- it was voluntary and it should be a
15  good option for people to sign up for?
16      A.  It was a good option.  Yeah, it was a good
17  option for the members.  But these are his words, not
18  mine.
19      Q.  I understand.  Do the words come at all from
20  all of you in terms of conceptual words -- I mean,
21  voluntary, benefit, optional, not mandatory.  Isn't
22  that the type of wording that you had all developed?
23  When I say all of you -- Marriott Vacation Club,
24  Marriott Vacation Worldwide -- had developed over the
25  summer?

Page 356

1      A.  His letter was?
2      Q.  Yeah.
3      A.  It was the board's letter.
4      Q.  Let me show you Exhibit 1356.  That is an
5  e-mail from you, at the top, to Mr. Cunningham.  You
6  said, "Here is a letter Randy wants to send today.
7  Hopefully he will be okay with my edits."
8          So it looks to me like Mr. Mercer sent to
9  you -- following that discussion we just talked about,
10  he sent you a letter he had drafted for your input?
11      A.  Yes.
12      Q.  And you gave some input and read -- and we'll
13  never know what it is today because this is printed in
14  black and white.
15      A.  Yes.  He would have shared it with me.  I get
16  more letters and look at them, make sure they're
17  factual and make sense and they're accurate.
18      Q.  Why was it that you would discuss with -- and
19  a decision was made to send out a letter that said
20  that the association was in favor of the affiliation
21  programs?
22      A.  Randy thought it was very important with
23  this, the management agreement, and everything, to
24  show the board's support of it to the members.
25      Q.  And that was his decision?

Page 355

1      A.  I mean, it was concepts that we were talking
2  about the board -- with the board -- from the
3  beginning of all this.  Because when the concern
4  existed, we wanted to make it clear that it was
5  voluntary, it was optional, it did bring other
6  options.  It was nothing new that was added to the
7  overall concept that had been talked about from the
8  beginning.
9      Q.  We're usually a little more high tech.  I
10  apologize.  There it is.  Exhibit 1323.  This is an
11  e-mail that starts at the bottom of page 3 of
12  Exhibit 1323.
13          It looks like Mr. Cutrona got a copy of the
14  letter from Mr. Mercer that you had looked at and
15  redlined -- added some red in.  He forwarded it to a
16  fellow named Doyle.
17          And Doyle is one of the folks that's on the
18  board at St. Thomas?
19      A.  Yes.
20      Q.  And he said to you on the bottom of page 2 --
21  he says, "I see from the attached letter that Aspen is
22  going out with the survey concerning the MVC trust.  I
23  thought it would be held off until we had our vote in
24  St. Thomas."
25          You said on the next e-mail up, on

Page 357

90 (Pages 354 - 357)

1  December 9th, "The final date of this survey is
2  scheduled for January 3rd.  Aspen is ready to conduct
3  their survey now, but the board is looking for a
4  majority of members to positively vote for affiliation
5  to move forward.  They simply want to understand their
6  members' interest level and plan to offer it to all
7  members since it is completely voluntary."
8      What you're saying there is, really, the
9  decision had been made to affiliate no matter what.
10  It didn't matter what the vote was going to be.
11      A.  We wanted to see what the members -- if the
12  membership would have come back and it would've been
13  zero for, 100 against, it would've been a different
14  topic.  But we knew at that point that it was going to
15  be positive.
16      Q.  You knew that.  How did you know that?
17      A.  The board was -- the board was supporting it.
18  It was moving in that direction.  The vote was
19  already -- by this time, which was the 9th, the vote
20  had already been out a few days.  I was getting daily
21  vote reports.
22      Q.  Who at Marriott Vacation Worldwide and at the
23  board in this timeframe -- from the timeframe we saw
24  you used The Agency internally to get "yes" votes,
25  until the time we see Mr. Mercer sending out a letter
                                                Page 358

1  in the middle of the vote, saying, "Hey, this thing is
2  great. It's voluntary.  We support it," who was
3  giving any potential negative points of view to the
4  members?
5      MR. MARX:  Object to the form of the
6  question.
7      A.  Who was giving negative points of view to the
8  members?
9  BY MR. FERGUSON:
10      Q.  Yeah.  Giving -- I mean, you've seen debates.
11  You all want the affiliation -- you personally -- not
12  personally -- you, in your capacity as an associate,
13  an officer at Marriott Vacation Worldwide, you,
14  obviously, were in favor of this option for the
15  affiliation to occur.  It looks like Mr. Mercer, at
16  some point, was, obviously, in favor of it.
17      Was there anybody giving the members any
18  potential downsides?  Was anybody saying, "Hey, look
19  what Mullenix did.  Just want to let you know, buyer
20  beware, that this Bachelor Gulch group broke away and
21  they had 700 people, and 600 voted against it"?
22      Did you ever have that -- did you ever
23  witness anybody giving that view -- other points of
24  view to the members?
25      MR. MARX:  Object to the form of the
                                                Page 359

1      question.
2      A.  Okay.  We did talk just before about -- there
3  was a letter that went out to share with the members
4  that Bachelor Gulch was leaving.
5  BY MR. FERGUSON:
6      Q.  Right.
7      A.  So, yes, it was shared that Bachelor Gulch
8  had left.
9      Quite frankly, because this was a
10  fully-voluntary program that created new options, the
11  downside that we were hearing from members was, in
12  essence, that they were going to a potential Marriott
13  person.  So a person who likes -- who owns in
14  Marriott, who was going to come into a Ritz-Carlton
15  Club, that in itself was -- that was the downside.
16      And from the company's perspective, we still
17  struggled -- what's -- a Marriott person coming in and
18  staying at a Ritz-Carlton.
19  BY MR. FERGUSON:
20      Q.  You don't -- from your perspective, there's
21  no issue there?
22      A.  For a Marriott person to come in and stay at
23  a Ritz-Carlton Destination Club?  No.
24      Q.  Okay.  Mr. Doyle went on -- you went on to
25  say to Mr. Doyle, "Unless we have an unforeseen
                                                Page 360

1  situation, we should be able to announce two weeks
2  before your special meeting that Aspen has decided to
3  affiliate."
4      You have the word "decided" here, do you not?
5      A.  I do.
6      Q.  Okay.  And just three months earlier, or four
7  months earlier, Bachelor Gulch held a vote, and it was
8  overwhelmingly in favor of not renewing the management
9  contract; correct?
10      A.  Correct.
11      Q.  It was overwhelmingly not in favor of an
12  affiliation?
13      MR. MARX:  Object to the form of the
14  question.
15      A.  Again, I thought it was just the management,
16  but...
17  BY MR. FERGUSON:
18      Q.  It might have been.
19      A.  If it was both, then, yes, I certainly see
20  how they would be tied together.
21      Q.  The upshot of the vote that was held -- the
22  official vote that was held at Bachelor Gulch -- was
23  that the management contract was not renewed?
24      A.  Yes.
25      Q.  And that the property was unflagged or
                                                Page 361

91 (Pages 358 - 361)

1  deflagged, I think, is the word you used.
2      A. Deflagged.
3      Q. Deflagged. That happened?
4      A. Yes.
5      Q. And that it then affiliated with another
6  luxury line of properties -- vacation properties --
7  called The Timbers?
8      A. Correct.
9      Q. And somehow, three or four months later,
10  you're telling Mr. Doyle, and me today, and the ladies
11  and gentlemen of the jury -- you're telling them that
12  you thought that the sentiment was to be for an
13  affiliation of Aspen Highlands?
14      A. Yes. From what we were seeing through Aspen
15  members and hearing from the board, yes, it was
16  positive.
17      Q. And what you were hearing from the members
18  was the votes that were occurring in December?
19      A. Yeah, we were getting survey results back
20  from the membership.
21      Q. Who was actually counting those? I mean, if
22  someone needed to double-check this ballot -- not as
23  bad as Bush versus Gore -- but how would someone fill
24  this out? Where can we see your documents or Morrow's
25  documents as to the actual checking of it? It was

Page 362

1  done electronically, but did someone print out the
2  final survey checks?
3      A. That's actually why we hired Morrow, because
4  they are a third-party company. They're a third
5  party. We didn't want it to be us. We wanted it to
6  be someone separate to collect all of that data and
7  information. That's what they do.
8      So they were the ones who -- yes, who were
9  counting each of the different survey results that
10  came in.
11      Q. At the end of the day, do you recall
12  approximately how many people voted in favor and how
13  many people voted against affiliation --
14  (inaudible) -- as an opportunity with the members at
15  Aspen Highlands? Do you recall the outcome?
16      A. I remember it was positive. I don't remember
17  the numbers.
18      Q. Do you recall what the differential was
19  between fors and against?
20      A. No. Are you sitting there looking at it? Do
21  you want to --
22      Q. No. I was looking at all the noise in the
23  hallway. I believe it was 74 to 67 or 69 -- about
24  52 percent in favor and 48 against.
25      A. Okay. That sounds about right.

Page 363

1      Q. And based upon those 74 votes, you believe
2  that you had -- the bottom line is, all you were
3  looking for is -- if it was a disastrous outcome, only
4  10 people in favor and 100 against, you would have
5  what?
6      MR. MARX: Objection to form.
7  BY MR. FERGUSON:
8      Q. Given it a second thought?
9      A. Well, it's a hypothetical situation. But, I
10  mean, if the members had raised their hand and all
11  said, "We don't want this. We're not interested," and
12  99 percent would have said "no," -- yeah -- I mean, we
13  wouldn't have moved forward with affiliation,
14  hypothetically. It obviously didn't happen.
15      Q. I've given you 1314. This is a compilation
16  of the comments that were coming in in connection with
17  the survey form that went out to the members on
18  December 4th; right? This is what Morrow & Company --
19      A. Yes.
20      Q. So in connection --
21      MR. MARX: Just for clarity, I think it's
22  fair to indicate that this document was
23  produced in discovery by Morrow & Company.
24      MR. FERGUSON: I understand that.
25      MR. MARX: I don't think the witness

Page 364

1  understood it. In fairness to her, we ought
2  to tell her that.
3      MR. FERGUSON: I understand what you're
4  saying.
5  BY MR. FERGUSON:
6      Q. This is pursuant to a subpoena that was
7  served on Morrow. At one point, I think "Morrow" was
8  stamped on here. Actually, not. When they're
9  produced in native, you don't get a Bates label on it.
10      Real quickly about this -- do you know
11  whether you all were reading these comments when they
12  were coming in in realtime?
13      A. They would have come to me. I don't know how
14  realtime -- I don't know -- I don't remember if I was
15  getting them every day, every couple days. But, yes,
16  I would have seen them.
17      Q. Did it concern you that some people were
18  using words like "fraud?"
19      A. Absolutely.
20      Q. Did it concern you that, for example, on
21  page 4 of Exhibit 1314, Dr. Lattore observed that, "I
22  voted no because I bought -- I had bought into -- I
23  could have bought into the Marriott system and did
24  not. This survey is doing everything possible to get
25  a yes response."

Page 365

92 (Pages 362 - 365)

1  A. I see that.
2  Q. Because it was designed to do that, wasn't
3 it?
4  A. No, it wasn't.
5  Q. It was designed like, do you want an
6 opportunity or do you not want an opportunity?
7 Everybody wants an opportunity; right?
8  A. That's not what it says, but it was designed
9 to share the information that was available through
10 the exchange program.
11  Q. So when you asked people, "I want the
12 opportunity to participate" or "I do not want the
13 opportunity to participate," people like opportunities
14 and to participate; right?
15      MR. MARX: Object to the form of the
16      question.
17 BY MR. FERGUSON:
18  Q. People like opportunities. It's the land of
19 opportunities. People like opportunities; right?
20  A. People love opportunities, yes.
21  Q. And they like to participate; not in a
22 deposition, but in a game or in a club. They like to
23 join things; right?
24  A. Okay. Are you seeing that wording?
25  Q. I'm just seeing that Dr. Lattore -- I'm just

Page 366

1 not indicative of anything. Extremely biased in how
2 it is presented. I am in the survey business and
3 would not offer such a survey to any of my clients."
4      Did you ever check into Mr. Skolnick's
5 background?
6  A. No, I did not.
7  Q. After -- I'm just going to do it in broad
8 strokes here. After that survey was finished on
9 January 13th, and it was 74 to 69 or whatever it was
10 -- 74 people, by the way, represented -- at that time,
11 represented about 10 percent of the people eligible to
12 vote?
13  A. Correct.
14  Q. You all didn't vote your interest?
15  A. We did not.
16  Q. After that occurred, you began the process of
17 working with Mr. Mercer, Ms. Egolf, and Mr. Marino to
18 get the memorandum of understanding done?
19  A. Correct.
20  Q. I'm going to go to that. Then I'm going to
21 let you go home and watch the rocket launch.
22      Exhibit 1383.
23  A. Yes.
24  Q. I'm going to show you -- this is a draft
25 redline of the MOU.

Page 368

1 kind of testing his feelings, and just asking you --
2 that people would like an opportunity, as opposed to
3 saying, "I don't want an opportunity." You don't ask
4 a kid -- if you ask a kid, "Do you want candy or do
5 you not want candy," they're going to pick candy all
6 the time, even though it's not good for them. Right?
7      This is worded to get "yes" votes, is it not?
8  A. So can I ask you a question? Is that
9 allowed?
10  Q. Probably not. Do you have a comment? Can
11 you do it in the form of a comment?
12  A. I do have a comment. So I do see
13 Dr. Lattore's comment on here. But as we talked about
14 before, there's 74 votes for, or survey results for,
15 and 66 against.
16      So because of Dr. Lattore, we don't move
17 forward. You're sitting here talking to me about not
18 moving forward, and the 77 people who did want the
19 affiliation option, and now we've decided not to give
20 it to them.
21      So since it was optional, since members could
22 choose to use it or not, that was that -- that
23 appeared to be the best path forward.
24  Q. So on page 8 of Exhibit 1314, a fellow named
25 Robert Scolnick said, "This is a terrible survey and

Page 367

1      Do you know who prepared the initial MOU?
2  A. I believe it would've been Barbara --
3 Ms. Egolf.
4  Q. So in the whereas clauses here, it says, "The
5 executive board on behalf of the association
6 previously met with representatives of MVCR" --
7      What is MVCR, or is there such a thing?
8  A. I don't know.
9  Q. -- "to discuss the potential opportunity for
10 members to participate taking out, voluntarily, the
11 Marriott Vacation Club exchange program."
12  A. Oh, it was Marriott Vacation Club Resorts. I
13 don't know why it was drafted that way.
14  Q. Was there once a program called Club Resorts
15 versus Club Destinations?
16  A. Not that I'm familiar with. It might have
17 been -- yeah, I don't know.
18  Q. The reason I'm asking that is because
19 Ms. Egolf prepared this. You would think that she
20 would know the name of the entity. And I'm not saying
21 anything bad there. I'm just wondering like --
22 cloning again -- did she clone this --
23      MR. MARX: I'm quite sure she didn't
24      draft this document.
25      MR. FERGUSON: Okay. She didn't.

Page 369

93 (Pages 366 - 369)

Page 370

1    MR. MARX: I don't want to testify on
2    behalf of the witness, but --
3    THE WITNESS: It came from me -- from her
4    to me. I don't know. There's a lot of
5    departments -- it's a big black hole back
6    there -- everything that they do. They have
7    all kinds of helpers.
8    BY MR. FERGUSON:
9    Q. Okay. You went on to say, "The parties agree
10   that a survey should be conducted to determine the
11   interest of majority of association members."
12       So that would be different from a survey
13   conducted for people to decide. What you're saying
14   here -- what was eventually said here was to determine
15   interest as opposed to decisions?
16   A. Voluntarily participate, yes.
17   Q. The next paragraph down on this draft, it
18   says, "A majority of members" -- taking out the word
19   "association." One draft said "voted," and that's
20   taken out. What's added in here is "who responded to
21   the survey." So it was someone changing the concept
22   of the vote to survey in this MOU.
23       Do you know who's doing that?
24   A. No, but it makes sense. It looks like it was
25   drafted in March. No, I don't know.

Page 372

1    A. Yes.
2    Q. And that negotiation, it was an amendment to
3    the declaration made that you looked at earlier with
4    Mr. Reiser?
5    A. Declaration? No, not in Aspen. That was an
6    amendment to the affiliation agreement.
7    Q. It was an amendment to the affiliation
8    agreement -- withdraw that.
9        All right. What time is the rocket launch?
10   A. Around 8:00. The window is 8:00 to 10:00.
11   Q. How do you see it?
12   A. Out my back window.
13       MR. FERGUSON: Thank you, Ms. Sobeck. I
14   know it's been a long day. I appreciate it.
15       THE WITNESS: It's been a pleasure.
16       MR. FERGUSON: You held up better than
17   all of us.
18       THE VIDEOGRAPHER: The time is 6:21.
19   That concludes the deposition of Stephanie
20   Sobeck.
21       (The reading and signing of the
22   transcript were not waived, and these
23   proceedings concluded at 6:21 p.m.)
24
25

Page 371

1    Q. Had it been drafted -- had this been drafted
2    in 2013 because you thought it was going to happen
3    faster?
4    A. Maybe.
5    Q. You just don't know?
6    A. I don't know.
7    Q. If you go to the second page, you'll see
8    paragraph 3 is altered somewhat.
9        I want to look at paragraph 4. It says, "The
10   parties acknowledge that the survey resulted in a
11   majority of members who responded to the survey
12   desiring to have the opportunity to participate on a
13   voluntary basis."
14       So that's the way this was eventually
15   couched, was that the majority of the people who were
16   surveyed responded positively, as opposed to a
17   majority of the membership?
18   A. Correct.
19   Q. Which was your testimony throughout the day
20   was never the intention?
21   A. To get a majority -- the 440 people?
22   Q. Yes. And then what happened the remainder of
23   the year is, you had discussion with Mr. Mercer, and
24   he was being assisted by Mr. Marino to negotiate or
25   renegotiate the terms of the management contract?

Page 373

1    Under penalties of perjury, I declare that I have read
2    the foregoing document and that the facts stated in it
3    are true.
4
5    _____
6    DATE            STEPHANIE SOBECK
7
8
9
10
11
12   Subscribed and sworn before me this _____ day of
13   _____, 2017.
14
15   State of Florida   )
16   County of        )
17
18
19   _____
20   NOTARY PUBLIC
21
22
23
24
25

94 (Pages 370 - 373)

```
 1          CERTIFICATE OF REPORTER
 2
 3  STATE OF FLORIDA
 4  COUNTY OF ORANGE
 5
 6          I, Lisa Gerlach, Court Reporter, do hereby
 7  certify that I was authorized to and did
 8  stenographically report the foregoing deposition; and
 9  that the transcript is a true and correct
10  transcription of the testimony given by the witness.
11          I further certify that I am not a relative,
12  employee, attorney or counsel of any of the parties,
13  nor am I a relative or employee of any of the parties'
14  attorney or counsel connected with the action, nor am
15  I financially interested in the action.
16          Dated this 16th day of November, 2017.
17
18
19
20
21
22
23      Lisa Gerlach
24      Lisa Gerlach, Court Reporter
25
                                            Page 374
```

Veritext Legal Solutions
866 299-5127

[& - 1700]

| & |
|---|
| **&**  22:17,23,24 |
| 23:1,5,11,14,16,22 |
| 23:25 24:3,5,7,12 |
| 24:21 25:10 61:5 |
| 141:23 142:1,9 |
| 155:10,13,18 |
| 185:1,2 189:13,14 |
| 189:15 190:4 |
| 191:20 193:16 |
| 211:16 216:8 |
| 227:16 229:3 |
| 230:11,15,15,17 |
| 247:17,24 248:1 |
| 255:6,16 265:23 |
| 282:16 289:9 |
| 295:1 300:2,13,18 |
| 300:20,23 301:3,8 |
| 301:22 302:15 |
| 318:8,11,12,18 |
| 319:7 320:9 |
| 321:13 322:12,19 |
| 328:21,23 351:10 |
| 364:18,23 |

| 0 |
|---|
| **00237**  1:8 6:20 |
| **00841**  5:13 |
| **00849**  5:13 |
| **01301**  6:17 |
| **05**  78:20 |
| **07**  18:18 |
| **07932-0677**  3:9 |
| **08**  18:18 |
| **09390**  1:3 |

| 1 |
|---|
| **1**  1:25 97:10 227:9 |
| **1,100**  296:20 |
| **1,260**  302:18 |
| **1,700**  248:17 |

**1.4**  48:3,8,25 49:20
50:12 51:13 52:4
52:9,23 53:12,13
53:19 54:5,11
55:8 56:18 57:15
**1.4.**  54:19 57:7
**10**  10:1 25:19
296:22 364:4
368:11
**100**  52:18,23 54:4
54:10,24 358:13
364:4
**100,000**  236:18
270:14
**1003**  42:21
**1020**  310:13 311:2
314:9
**1021**  75:2
**1022**  292:8
**1023**  80:5,9
**1026**  80:5,10,11,14
**1042**  97:7
**1061**  267:10
**109**  311:7,15
**10:00**  372:10
**10:26**  74:19
**10:38**  74:23
**10th**  176:2 193:13
**11**  34:6 38:21
54:12 75:3 78:21
144:13,21 154:4
156:22 158:17,24
315:24 316:15
**11,400**  54:5,25
**1106**  294:8,10,13
**1121**  305:8
**1124**  69:2
**1131**  298:9
**1135**  293:19
**1150**  299:14,23

**1152**  306:22
**1175**  132:6,19
**1178**  116:14,25
**1180**  111:19
118:22 133:1,3,4
175:4,5 179:12
200:20
**1183**  195:2 198:17
**1184**  205:5
**1185**  113:2,4
201:12,24 216:23
217:5
**1186**  183:14,14
**1188**  111:2 116:4,5
116:22 136:2
137:11
**1189**  226:1,18
**119**  2:6
**11:58**  141:6
**11th**  205:8
**12**  10:2 13:25 14:9
111:4,12 153:1
243:8 297:21
348:14
**120**  177:25 180:1,4
180:9 182:20
235:5
**1208**  141:14
**1229**  322:25 323:3
325:19
**1230**  326:4
**1249**  329:24
**1266**  335:2,2,13,24
340:6
**1270**  337:15,18
**1278**  143:9
**1285**  343:3
**1297**  347:6,6
**12:03**  141:10
**12:26**  161:5

**13**  144:13,21 272:2
297:21 327:20
348:16
**13.4**  177:24
**130**  182:19
**1300**  349:4
**1305**  129:16,24
341:13 351:9
**1312**  352:8,10
**1314**  364:15
365:21 367:24
**1323**  357:10,12
**134**  51:7 56:10
**1356**  355:4
**1369**  318:10,23
320:4
**1383**  368:22
**1392**  61:15
**13th**  126:6 177:2
368:9
**14**  141:19 245:15
245:19 289:16
**140**  179:22 180:1,2
180:3
**1434**  36:15 38:19
**1475**  2:14
**14th**  348:8
**15**  261:18 289:16
**15-54897**  1:13
6:24
**1532**  345:15,17
**16**  1:20 6:3 292:12
**1601**  4:8
**1602**  152:14
**161**  5:5
**16th**  374:16
**17**  74:11 80:7 96:7
127:22 247:6
251:11,13 293:6
**1700**  86:12,15
129:8 248:4 340:4

Page 1