# EXHIBIT 3

# IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF COLORADO

Civil Action No. 1:16-cv-01301-PAB-GPG

**RCHFU, LLC, *et al.***

Plaintiffs,

v.

**MARRIOTT VACATIONS WORLDWIDE CORPORATION, *et al.***

Defendants.

---

## EXPERT REPORT OF JON SIMON

### October 26, 2018

---

## I.     QUALIFICATIONS

1.     During my career, I have held numerous positions in the hospitality and vacation-ownership industry, as well as other industries, including (from earliest to latest):

- Manager of Strategic Planning and Analysis — Del Monte Corporation.

- Manager of Laventhol and Horwath's Real Estate and Hospitality Management Consulting Division for the Southeast United States, Latin America, and Caribbean.

- Senior Partner (Principal) at KPMG.

  - Partner in charge of the Real Estate and Hospitality consulting practice for the Southeast, United States, Latin America, and the Caribbean.

  - National Mergers and Acquisitions Support Partner for the National Real Estate and Hospitality Group (audit, tax and consulting).

  - National Compliance Partner for the Financial Services Unit.

  - Global Practice Leader for the Vacation Ownership Practice.

- Senior Vice President Strategy Officer of Interval International.

- Co-chief Executive Officer of Worldstar Resorts, Starwood Capital's first vacation-ownership/timeshare company.

- Partner and Chief Investment Officer of Destination Capital — A late-stage private-equity company investing in hospitality and marketing companies.

- Managing partner of Chasen Capital Advisors — A boutique consulting and investment-advisory group, specializing in the hospitality and vacation-ownership industry.

- Industry Positions — Served as a member of the board of directors and chair of the Finance Committee for the American Resort Development Association ("ARDA"), the master trade association for the vacation-ownership industry (the "Industry").

2.      I graduated magna cum laude from the University of Florida's School of Finance in the College of Business in 1982 with a degree in quantitative methods for business. I also completed all required course work for a real property appraisal from the American Society of Appraisers. In addition, while a partner at KPMG, I attended an advanced "partner school" on operations and management.

3.      I have given numerous speeches about the traditional hospitality and vacation ownership industries at various conferences and events, including the NYU Hospitality Investment Conference, America's Lodging Investment Summit, Caribbean Lodging Conference, ARDA conferences, and the Shared Ownership Investment Conference. In addition, I have written numerous articles on the vacation ownership industry, including a recent article for Hotel News Network (reprinted in other investor periodicals). Moreover, I was a principal and contributing author on "The Uniform Systems of Accounts for Timeshare" (First Edition) under contract for ARDA, and on "The First Financial Performance Survey of the Timeshare Industry," a survey of timeshare and vacation ownership companies, written under contract for ARDA. A full list of my positions, speaking engagements, and publications is listed on the CV attached as Appendix A.

4.      I have served as an expert and have also supported experts in several legal matters related to the vacation ownership industry and the traditional hospitality industry. Appendix A includes a list of the cases in which I was a designated expert witness over the past five years.

## II.    ASSIGNMENT

5.      I understand that this action was brought by Plaintiffs who are owners of more than 200 deeded 1/12 fractional interests at the Ritz-Carlton Aspen Highlands in Aspen, Colorado (the "Ritz-Aspen"), and is based on allegedly unlawful acts that Plaintiffs claim decimated the value of these fractional interests. The complaint alleges that over the last several years, Defendants, including Defendant Marriott Vacations Worldwide Corporation ("MVW") and its subsidiaries and affiliates, knowingly damaged Plaintiffs and unjustly enriched themselves by violating (or aiding and abetting in, or conspiring to violate) various fiduciary duties owed by certain Defendants to Plaintiffs.[1] At the core of the fiduciary duty (and constructive fraud) claims is the Marriott Defendants' actions in affiliating the Ritz-Aspen with the less exclusive and lower-priced Marriott Vacation Club ("MVC"), and, even before the official affiliation, allowing MVC members to use their MVC points to purchase nights at the Ritz-Aspen on more favorable and less expensive terms than provided to Plaintiffs.[2] I am informed that Plaintiffs intend to prove that the Aspen Highlands Condominium Association (the "Association") aided and abetted the Marriott Defendants and that these acts destroyed the value of Plaintiffs' fractional interests, while allowing the Marriott Defendants to substantially profit from using the Ritz brand and the lure of access to luxury properties to increase revenues from selling MVC points.

6.      I have been retained, through my firm Chasen Capital Advisors, Inc., by Reiser Law, P.C., The Matthew Ferguson Law Firm, P.C., Gibbs Law Group LLP, and The Meade Firm, p.c. (collectively, "Plaintiffs' counsel") to opine on whether Defendants' actions, if proven,

---

[1] *See generally* Sixth Amended Complaint ("Complaint"), Dkt. No. 250.

[2] *See id.*

4

caused Plaintiffs' property values to diminish. I am not opining on the amount of the diminution in value, but understand that Maurice Robinson, who is under sub-contract with my firm, will offer expert opinions on that topic. My causation opinion is based on my knowledge of and experience in the vacation ownership industry, including the types of conduct that would typically cause the value of fractional interests to decline, and my review of evidence and testimony in this case.

7.      I also understand that Plaintiffs are seeking disgorgement of the amounts the Marriott Defendants were unjustly enriched from any fiduciary breaches (or aiding and abetting or conspiring to breach fiduciary breaches) or other illegalities Plaintiffs prove.[3] Plaintiffs' counsel has retained me to calculate the amount of profit that the Marriott Defendants have made from marketing and providing access to the Ritz Aspen property to MVC members and affiliating the Ritz-Aspen (and the Ritz-Carlton Destination Club of which Ritz-Aspen was a part) with MVC, which I assume for purposes of this opinion to be subject to disgorgement if Plaintiffs prove their breach of fiduciary duty or unjust enrichment claims and/or other claims allowing disgorgement as a remedy.

8.      There is a known effect in the hospitality and vacation ownership industries known as the "halo effect," which refers to the increased profits or brand premium a lesser brand (or unbranded real estate) can earn when it affiliates with a more exclusive brand. My knowledge of the halo effect is based on my knowledge of and experience in the hospitality and vacation ownership industry as well as documents I have reviewed for this engagement. I am also relying, in part, on the expert opinions of Professor Chekitan S. Dev, Ph.D. of the Hotel School at Cornell

_____

[3] *See* Complaint at ¶¶ 95, 104, 112, 124.

5

University. Based on the principles of the halo effect and other well-established finance tenets and tools, I have constructed a model to calculate the amount of profits the Marriott Defendants earned as a result of the affiliation and providing access to nights at the Ritz-Aspen to its MVC points-based customers.

9.      My assignment also included rendering an opinion as to whether allowing MVC members access to Ritz Aspen, at first by opening developer-owned inventory to certain MVC members and then by affiliating the two clubs was a substantial factor in causing diminution in value of Plaintiffs' fractional interests at Ritz-Aspen.  The flip side of the halo effect is the "horn effect," which refers to financial damage to a more exclusively branded property when it affiliates with a lower tier brand and/or allows owners of the lesser brand systematic access to the luxury branded property. I was also asked to consider whether the "horn effect" caused damage to Plaintiffs' Ritz-branded fractional interests.

10.     My firm is being compensated at my hourly rate of $600 for general opinion-related work and $650 per hour for testimony (both trial and depositions) and preparation. This compensation does not depend on any conclusions I reach or the outcome of this matter. In addition, under my supervision, other individuals in my firm have assisted me on this matter and are being compensated for that work.

11.     A list of materials I have reviewed in this matter is attached as Appendix B. I reserve the right to revise my report based on any new documents that become available in this case.

12.     Finally, certain terms used in this opinion are interchangeable. The term "fractionals" is used interchangeably with "private residence clubs."[4] Further, the terms "timeshare" and "vacation ownership" are used interchangeably.

## III.     WHAT PLAINTIFFS REPORTEDLY INTEND TO PROVE

13.     I understand Plaintiffs intend to prove that in the latter half of 2011, the Marriott Defendants, without informing Ritz-Carlton Club members, began providing MVC members (who bought into a lower quality timeshare brand) access to the exclusive Ritz-Aspen, as well as the Ritz Carlton Clubs at Vail, San Francisco, Tahoe and St Thomas.[5] Plaintiffs paid premium prices averaging approximately $260,000 for deeded 1/12 fractional interests at the Ritz-Aspen, with each interest allowing the owner to stay at the club for four weeks per year.[6] Marriott had been running a separate timeshare line, MVC, which catered to individuals who were looking to spend far less money on a vacation ownership.[7] For years, Marriott's MVC line and its RCDC line were separate and distinct from one another.

14.     However, Plaintiffs allege that around 2011, Marriott started taking steps to abandon its Ritz-Carlton line in favor of MVC.[8] I am informed that Plaintiffs intend to show that

---

[4] While some in the industry arbitrarily define a private residence club as one that sells for $1,000 or more per square foot, there is no codified industry standard.

[5] *See generally* Complaint.

[6] Complaint at ¶¶ 3, 6.

[7] The minimum points purchase under the MVC's points program is 1,500 points. When points were introduced in the summer of 2010, they were priced at $9.20, therefore the minimum purchase was (1,500 pts. X $9.20) = $13,800. Even at today's price, which is around $14, the same purchase would only be $21,000 -- far below what a RCDC member was required to spend.

[8] *See, e.g.,* Marriott International, Inc. 2011 Form 10-k at p. 10 ("On September 8, 2011, management approved a plan for our former Timeshare segment to accelerate cash flow through the monetization of certain excess undeveloped land and excess built luxury inventory.").

Marriott saw its MVC line as one that could produce more revenue over time, especially with its transition to selling points instead of weekly intervals.[9] On the other hand, Marriott saw its Ritz-Carlton Destination Club line as an asset that was not producing enough revenue.[10] Thus, Marriott considered two options: to sell its Ritz-Carlton Destination Club line to a new owner, or to combine it with the MVC.[11]

15.     I am informed that Plaintiffs intend to prove that, instead of selling the Ritz-Carlton Destination Club line to a new owner, Marriott decided that it would be more profitable to "reengineer" or merge the club with MVC, and use access to Ritz-Carlton clubs as a lure to sell more MVC points. Thus, in or around July 2011, Marriott began marketing access to certain Ritz-Carlton clubs[12] as a benefit or enhancement to purchasing MVC points.[13] Plaintiffs allege

---

[9] *See* "Update on access to Ritz-Carlton Club locations via Premier, Premier Plus," RCDC006549-6571 at RCDC006550 ("Consistent with our previously announced business strategy not to expand our Luxury Tier business segment, MVW will leverage our North America Points Program to assist in the sale of the remaining Luxury inventory."); 2/9/12 E-mail from Mary Lynn Clark, RCHC007814-20 ("We have consistently seen that if a Prospective Member can experience The Ritz-Carlton Destination Club, they are more likely to purchase a [MVC] Membership. Ultimately, with all marketing programs, our end goal is to sell Memberships.").

[10] *See* 8/28/2012 MVW Webinar Transcript, RCDC013119-27 at RCDC013120 (Steve Weisz, president and CEO of MVW, stating "Approximately 25% of the inventory in the Ritz Carlton Club system remains unsold and the pace of sales is slow. In this context, additional investment in new inventory is not feasible.").

[11] *See* June 2010 Confidential Information Memorandum by Deutsche Bank, prepared for use by those considering purchasing RCDC business, RCDC075690-75792.

[12] Aspen, Vail, St. Thomas, San Francisco, and Tahoe.

[13] *See, e.g.,* 7/27/2011 "Marriott Vacation Club Insider Bulletin" e-mail, Exh. 29 to Deposition of Richard Hayward (stating "[MVC] Owners with Premier and Premier Plus status can enjoy even more fabulous benefits, including access to Ritz-Carlton Destination Club resorts . . ."); MVC PowerPoint (including 2012 forecast), RCDC Sample51228-51251 at 51240 (discussing strategy to "expand [MVC] Explorer Collection use of RCDC from Premier & Premier Plus Members to increase MVCE points use in RCDC inventory . . .").

that in July 2012, Marriott announced its plan to affiliate the Ritz-Aspen with MVC to Plaintiffs and other Ritz-Aspen owners.[14] Ritz-Aspen owners vehemently opposed this idea, as they wanted to maintain their club's exclusivity.[15] Yet against Plaintiffs' and other owners' wishes, in 2014, Marriott officially affiliated the Ritz-Aspen with MVC – thereby granting hundreds of thousands of MVC members access to the same club for which Plaintiffs had paid premium prices.[16]

## IV.   SUMMARY OF OPINIONS

16.     A summary of my opinions is as follows:

a.   The fractional industry has undergone challenges over the years, due in large part to the Great Recession. But I believe, as do other industry experts, that

---

[14] 7/17/2012 Letter from Eveleen Babich to Ritz-Aspen members, RCDC003559-60 ("additional benefits and experiences will be available through a new affiliation with Marriott Vacation Club Destinations").

[15] *See, e.g.,* 8/11/2012 E-mail from Jay Neveloff, AHCA00015576 (opening the Ritz-Aspen to MVC members on a nightly basis "will, I believe, change the character of our club, increase the wear and tear and for all I know this can be the first move on a 'slippery slope.'"); 7/30/2012 E-mail from Jack Zemer, AHC00015528-29 ("I am very disappointed on the direction taken by the company."); 7/19/2012 E-mail from Pat Lattore, RCDC016302-04 ("My greatest fear is that soon the Marriott timeshare owner will flood the Ritz system and use per diem …"); 8/21/2012 e-mail from Jay Neveloff, AHCA00015681 (" … the early responses to our Board's letter which went out on Monday has essentially been unanimous in recognizing and opposing a move towards unifying the Ritz Club and MVW timeshare/points system …"). *See also* "Ritz-Carlton Destination Club Member Study, Detailed Report" by APCO, August 2013 at p. 4 (". . . Members have seen their fractional ownership interest erode in both real and perceived value and they are unhappy with the introduction of Marriott Vacation properties and members into 'their' (Ritz-Carlton) system."); "Member Focus Group Interviews – Ritz-Carlton Destination Club Research Report" by APCO, January 2014 at RCDC073241-42 (members "bought the Ritz-Carlton Destination Club because of the Ritz name and standards . . .") (members "struggle to see how they will benefit" from the MVC affiliation).

[16] *See* April 2014 Letter from Association to Ritz-Aspen members, AHCA00013867-69 (announcing the Ritz-Aspen's inclusion in the Marriott Vacation Club Destinations Exchange Program).

fractionals and private residence clubs remain viable products, especially in high-value real estate markets like Aspen, Colorado. There continues to be additional phases and new fractional projects in Aspen such as Dancing Bear Phase 2 (developed and visited during due diligence), The W Residences (under construction)[17] and the Aspen Club (currently planned).[18] Further, since 2012, the market for fractionals has largely stabilized in terms of national revenues, albeit at lower levels than the market's historical high before the Great Recession.[19]

b. Based on my experience in the vacation ownership/private residence club industry, it is my opinion that when a corporation provides and markets access to one of its luxury private residence clubs to non-owners at a much lower price of entry than what owners in that private residence club paid, the values of ownership interests in that club significantly decline. My experience and common sense indicate that potential purchasers on the secondary market would be far less willing to pay a high entry price for 28 nights plus annual maintenance fees and taxes to own a fractional unit in a purportedly private residence club if they could gain access to the same club for a fraction of that price, with significantly lower purchase requirements and maintenance fees.

---

[17] *See* http://www.waspenskyresidences.com/#sketches-header (last visited October 25, 2018).

[18] *See* http://aspenclub.com/residences/ (last visited October 25, 2018); *see also* Expert Report of Maurice Robinson at p. 4.

[19] "The Shared-Ownership Resort Real Estate Industry in North America: 2017," Ragatz Associates, April 2017 at p. 40.

c.   Thus, if Plaintiffs prove that the Marriott Defendants (i) began providing MVC members access to the luxury RCDC properties, including Ritz-Aspen, without having to make the economic commitment of a four-week purchase and maintenance fees, beginning with developer-owned inventory in August 2011 and (ii) subsequently affiliated Ritz-Aspen with MVC (thus allowing MVC members permanent  access to the Ritz-Aspen for a fraction of what Plaintiffs and other Ritz-Aspen owners paid), then it is my opinion that this would be a substantial factor in causing the value of Plaintiffs' fractional interests to decline and/or not increase in value in comparison with similar properties without these issues. In addition, any diminution in value is also a result of what is known in this industry as the horn effect, the converse of the halo effect. In other words, the marketing of the two brands together tarnished the Ritz-Aspen's exclusivity and brand reputation, and is also a substantial factor in causing Plaintiffs' fractional interests to have diminished values. To the extent Plaintiffs prove that the Association aided and abetted or conspired with Marriott Defendants in effectuating the merger or affiliation of Ritz Aspen with MVC, then this causation opinion causation applies to the Association.

d.   It is well-accepted in the vacation ownership industry, and it is my opinion that that when a luxury brand is integrated with a lower-end brand, the lower-end brand's value increases due to a so-called halo effect. Based on my own knowledge and experience in this industry, my review of documents and testimony in this action, and the expert opinion of Professor Chekitan S. Dev,

it is my opinion that the Marriott Defendants achieved a halo effect on the

MVC brand by providing MVC members access to the Ritz-Aspen, a property

that was far more exclusive and deluxe than any MVC resort. By providing

that access (and making it permanent by the affiliation), the Marriott

Defendants were able to increase the price of each MVC point they sold – thus

profiting from the actions that Plaintiffs claim were wrongful.

e.   I used my experience in the industry and familiarity with vacation ownership

branding and general finance expertise to quantify the profits that the Marriott

Defendants have made from the halo effect. Further, the methodology I used

to calculate future profits from the halo effect is grounded in the well-accepted

enterprise value to adjusted EBITDA approach for valuing the EBITDA

streams of vacation ownership companies.[20] Starting from the enterprise value

approach, I calculated what MVW made specifically from the portion of its

price increases on its MVC points that, based on evidence I reviewed, arose

from providing MVC members with access to Ritz-Carlton Destination Clubs

(including Ritz clubs in locations other than Aspen).[21] These calculations

show that MVW has already profited approximately $248.6 million from

affiliating MVC with Ritz-Carlton Destination Clubs from August 2011

---

[20] I base this aspect of my opinion, in part, on my in-depth experience working on the Diamond Resorts acquisition by Apollo Global, and Bluegreen Corporations being taken private by BFC Financial, as well as my familiarity with the Gold Key, Vistana and Hyatt acquisitions by Diamond and ILG, respectively.

[21] I also assessed the amount that MVW earned from the increase in the *volume*, as opposed to price, of MVC points it sold as a result of marketing RCDC to MVC points purchasers, but did not include the resulting amount in the disgorgement calculation.

through the end of 2017. I have calculated the halo effect profit specifically attributable to Plaintiffs' fractional interests at the Ritz-Aspen to be 13.87% of this amount, or approximately $34.48 million. This calculation accounts for increases in the price of MVC points that MVW enjoyed from affiliating MVC with the Ritz-Aspen and marketing access to the Ritz-Aspen to MVC members. Next, using well-accepted finance principles, I then calculated the profits that MVC will continue to make going forward as a result of the co-branding and affiliation. This capitalized amount is $470 million system-wide, of which I attribute $65.19 million to Plaintiffs' fractional interests. Based on these calculations, the total amount MVW earned and will earn from marketing RCDC to MVC points purchasers is $718.6 million. The portion of this amount attributable to Plaintiffs in this action is 13.87% or $99.7 million,[22] the amount I assume to be subject to disgorgement if this remedy is deemed appropriate.[23] Exhibit H lists the disgorgement amount per Plaintiff.

---

[22] I am informed that if the court awards disgorgement, it may add prejudgment interest to the amount of halo profits already earned and that the interest rate it would use would be 8%. In the event that this prejudgment interest is awarded, I have calculated the amount of halo profits earned system wide with interest for the period of August 2011 through year end 2017 to be $348,801,290. Ex. B.  The prorated disgorgement amount with interest would then be 13.87% of this or approximately $48.38 million.  When added to the $65.19 million in capitalized halo effect profits, the total amount of disgorgement would be approximately $113.57 million.

[23] I note that this disgorgement amount is distinct from the diminution in property values Plaintiffs suffered due to the affiliation.

have improperly profited (if Plaintiffs prove their claims) and also underscores the conservative

nature of my disgorgement calculation.


Executed this 26th day of October, 2018

Jon Simon

46