**IN THE UNITED STATES DISTRICT COURT**

**DISTRICT OF COLORADO**

Civil Action No. 1:16-cv-01301-PAB-GPG

**RCHFU, LLC, *et al.***

Plaintiffs,

v.

**MARRIOTT VACATIONS WORLDWIDE CORPORATION, *et al.***

Defendants.

---

**PLAINTIFFS' REQUEST FOR SUPPLEMENTAL EXPERT REPORTS TO ANALYZE NEWLY PRODUCED DATA**

---

## I.       INTRODUCTION

Plaintiffs seek leave to designate a statistics expert to analyze SMS survey data that Marriott did not produce until months after Plaintiffs' initial expert reports were due. This new evidence directly supports Plaintiffs' disgorgement remedy: that Marriott must disgorge profits earned by marketing access to the Ritz-Carlton Destination Club at Aspen to prospective MVC points purchasers. Marriott surveyed individuals who sat through MVC sales presentations to learn how various aspects of MVC membership factored into individuals' decisions to purchase points. The more than 160,000 data points show that one-third of the respondents reported that the ability to use MVC points to stay at RCDC properties was an important factor in deciding to purchase points. Not only that, but the individuals whose MVC sales pitches included at least an adequate presentation on the ability to access RCDC with points were *2 to 2.5 times* more likely

to purchase points. This evidence supports Plaintiffs' claim that Marriott profited by being able to market RCDC access to MVC members – all at Plaintiffs' expense. Had Plaintiffs had this data when they were preparing their initial expert reports, they would have designated an expert to statistically analyze it (e.g., using regression analysis). What is more, *two of Marriott's experts have already used this new data in their reports*; thus Plaintiffs should be able to use the same information in a manner of their choosing. Therefore, Plaintiffs are justified under Federal Rules of Civil Procedure 16(b)(4) and 6(b)(1)(B) for seeking to add this expert at this time.

And contrary to Marriott's assertion, Plaintiffs never agreed to forego the right to disclose a new expert to analyze the new data. While the parties engaged in a prolonged meet-and-confer on additional discovery relating to the SMS survey data, they did not discuss Plaintiffs' designation of a new expert. The parties ultimately came to an agreement on the scope of documents that Marriott would produce, as well as the depositions of two Marriott employees who have knowledge of the survey data, but never agreed on the scope of additional expert discovery that this newly produced evidence warranted. *See* Declaration of Michael J. Reiser (Reiser Decl.). Thus, there would be no prejudice to Marriott if Plaintiffs designated an additional expert to analyze this data.

## II.     ARGUMENT

### A.  Plaintiffs Should Be Permitted to Disclose a Statistical Expert to Analyze Newly Produced Data

The SMS survey data directly supports Plaintiffs' unjust enrichment and disgorgement theories. Since the beginning, Plaintiffs' case has focused, in part, on the financial gain that Marriott has enjoyed from being able to market Plaintiffs' "exclusive" RCDC property to MVC points purchasers. *See, e.g.*, 7/18/16 Second Amended Complaint, Dkt. No. 40 at ¶ 10 ("Due to

defendants' actions, MVC members can now enjoy the benefits and use of the [Ritz-Aspen] for a fraction of the cost that Plaintiffs and Ritz Carlton Aspen Owners paid."), ¶ 92 (stating that Defendants obtained "a unilaterally imposed affiliation with the Marriott Vacations Club … to increase the attractiveness, value and price of MVC timeshares").

MVC members' ability to access the Ritz-Aspen and other RCDC properties for a fraction of what Plaintiffs paid has destroyed the value of Plaintiffs' units. *Id.* at ¶ 10. Thus, Plaintiffs have alleged throughout this case, including in the operative complaint, that it would be unjust for Marriott to retain the ill-gotten gains it received at Plaintiffs' expense. *See* Sixth Amended Complaint, Dkt. No. 250 at ¶ 86 ("Defendants have derived huge profits and/or cost savings through this affiliation, while devaluing Plaintiffs' vested property interests."), ¶ 124. The profits that Marriott has enjoyed from marketing RCDC access to potential MVC points purchasers constitute a disgorgement remedy for Plaintiffs' breach of fiduciary duty claim, as well as the focus of Plaintiffs' unjust enrichment claim. *See id.* at ¶ 95 ("as a result of [Defendants'] breaches of fiduciary duties, said Defendants profited at Plaintiffs' and Ritz Carlton Aspen Owners' expense, and said Defendants should be ordered to disgorge … all commissions, fees and profits they received as a result of the conduct described herein").

Thus, Plaintiffs' initial expert reports largely focused on the positive effect that marketing RCDC access has had on MVC. One of Plaintiffs' experts, Dr. Chekitan Dev, opined that allowing MVC members to stay at RCDC properties (like the Ritz-Aspen) and marketing RCDC with MVC has provided MVC with a "halo effect." As Dr. Dev put it, the halo effect is "the positive impact that co-mingling a less prestigious brand with a more prestigious brand can have on the former." In coming to his opinion, Dr. Dev analyzed marketing materials, a survey among

RCDC owners, and other documents that Marriott had produced. Jon Simon, also Plaintiffs' expert, opined that Marriott was able to increase the price of each MVC point it sold due to the halo effect. Mr. Simon then calculated the amount of profit that Marriott has earned because of those price increases from August 2011 to the end of 2017.

The new data that Marriott produced provides an additional basis to quantify Marriott's gains from the halo effect. The information relates to a survey that Marriott conducted among individuals who attended MVC sales presentations between 2013 and 2018. Reiser Decl. at ¶ 3. The purpose of the survey was to determine which factors influenced potential purchasers of MVC points. The results show that more than a third of those who participated in the survey reported that "[t]he ability to use Vacation Club Points to stay at a Ritz-Carlton Club" was an important feature for them in deciding whether to purchase MVC points. The survey further shows that the individuals whose MVC sales pitches included satisfactory presentations of the RCDC access attribute were *2 to 2.5 times more likely to end up purchasing MVC points*.

Plaintiffs seek leave to designate a new expert to perform a logit regression analysis on this new data. That expert will isolate the ability to access RCDC from the other factors that prospective purchasers considered in deciding whether to purchase MVC points, and calculate the effect that RCDC access had on the probability that an individual would purchase MVC points. Without the survey data that Marriott recently produced, Plaintiffs could not have performed this analysis.

Thus, now that Marriott has (belatedly) disclosed this data and their experts are using it to thwart Plaintiffs' damages, Plaintiffs should be able to use that same data in their case.[1] Plaintiffs' designation of a statistics expert would cause no prejudice to Marriott, as its experts have already used this data in their rebuttal expert reports. It was Marriott who knew about this data before Plaintiffs did. Marriott has agreed to allow Mr. Simon and Dr. Dev to supplement their reports using this new information, but oppose a different expert submitting an opinion on the same data. That distinction makes no sense; Marriott should not be able to dictate *how* Plaintiffs use this data and *which* of Plaintiffs' experts analyze it.

Plaintiffs have good cause to seek leave to modify the scheduling order to designate an additional expert witness. Fed. R. Civ. P. 16(b)(4). The key factor in demonstrating good cause is diligence, showing that "scheduling deadlines cannot be met despite a party's diligent efforts, . . . " *Wilson v. City of Lafayette*, 2008 WL 3211288, at *1 (D. Colo. Aug. 6, 2008); *see also* Fed. R. Civ. P. 16(b)(4), Advisory Committee Notes, 1983 Amendments. Here, despite their diligent discovery efforts, Plaintiffs did not have this data (and did not know it existed) until Defendants relied on it in their expert reports; thus Plaintiffs could not have met the scheduling order

---

[1] Marriott should have produced this data in response to Plaintiffs' discovery requests (which sought "all documents concerning the use of the Ritz Properties by users that were not RCDC members from 2011 to the present"), as well as Marriott's Rule 26(a) disclosures. Reiser Decl. at ¶ 6, Exh. C; *Kiernan v. Alpine Credit, Inc.,* 2018 WL 2335705, *5 (D. Colo. May 23, 2018) ("Rule 26(a)(1)(A)(ii) requires disclosure of … all documents … that the disclosing party … may use to support its claims or defenses"). Marriott claims that these documents "were only made relevant in this litigation because of Plaintiffs' initial expert reports that contain unsupported opinions." Dkt. No. 363 at p. 2. But that explanation conflicts with each of Plaintiffs' complaints in this case, which seek the profits Marriott unjustly earned by using RCDC access as a lure to sell MVC points.

deadline for adding this additional expert.[2] *See Wilson*, 2008 WL 3211288, at *2 ("As Defendant has argued that its need for these two additional experts could not have been identified until after receipt of Plaintiff's expert disclosures, the Court finds that Defendant has demonstrated both appropriate grounds for increasing the number of expert witnesses and appropriate diligence in making its request . . . .").

Similarly, Plaintiffs can satisfy the factors under Fed. R. Civ. P. 16(b)(1)(B) for modifying the scheduling order after a deadline has expired. *See Pioneer Inv. Servs. Co. v. Brunswick Associates Ltd. Partnerships*, 507 U.S. 380, 388, 394-95 (outlining the relevant factors). The reason for the delay is the most important factor in this analysis. *Stringfellow v. Brown*, 105 F.3d 670, 1997 WL 8856, *1 (10th Cir. Jan.10, 1997). Here, not only was the delay caused by factors outside Plaintiff's control, *Panis v. Mission Hills Bank, N.A.*, 60 F.3d 1486, 1494 (10th Cir. 1995), but Defendants will not suffer prejudice, the length of the delay and impact on proceedings will be minimal, and Plaintiffs have acted in good faith. *See also Trujillo v. Romero*, 2015 WL 13662725, at *2–3 (D.N.M. May 27, 2015) (finding good cause and excusable neglect and allowing scheduling order to be modified to disclose an expert witness); *King v. Rozek Co.*, No. 11-CV-01685-CMA-MJW, 2012 WL 2884788, at *3 (D. Colo. July 13, 2012) ("The court finds that plaintiff's request for leave to endorse an expert is supported by

---

[2] Courts in the Tenth Circuit also consider the factors for reopening discovery discussed in *Smith v. United States*, 834 F.2d 166, 169 (10th Cir. 1987), as "highly instructive" when considering requests to modify case scheduling orders. *See, e.g.*, *Anderson Living Tr. V. WPX Energy Prod., LLC*, 308 F.R.D. 410, 440-41 (D.N.M. 2015). All of the *Smith* factors, except for the fact that Defendants oppose this request, weigh strongly in favor of allowing Plaintiffs to add a new expert: trial is not imminent, Defendants would not be prejudiced, Plaintiffs were diligent in obtaining discovery, it was not foreseeable that this expert would be necessary by the deadline to designate affirmative experts, and it is highly likely that this discovery will lead to relevant evidence.

excusable neglect"); *Kerns v. Bd. of Commissioners of Bernalillo Cty.*, 2010 WL 1632732, at *7 (D.N.M. Mar. 31, 2010) (permitting late disclosure of an expert witness by Plaintiffs when they discovered new data held by Defendants); *Rowe v. E.I. du Pont de Nemours & Co.*, 2010 WL 703210, at *4 (D.N.J. Feb. 24, 2010) (similar).

## B. Plaintiffs Never Agreed Not to Designate a New Expert to Analyze the SMS Survey Data

The Reiser declaration and the attached correspondence show that during the parties' meet-and-confer on Marriott's production of this SMS survey data, the parties did not discuss Plaintiffs' designation of a new expert. Rather, after Marriott announced in December 2018 that two of its experts would be relying on new evidence, the parties exchanged a series of e-mails and letters (and spoke on the phone) about Marriott's document production as well as the depositions of Urcil Peters and Zach Sonberg, two Marriott employees who were knowledgeable about those documents. Reiser Decl. at ¶ 4. The parties also briefly discussed scheduling of expert depositions. *Id*. at ¶ 5. Marriott sent a letter on January 4th proposing dates for expert depositions, but Plaintiffs did not want to agree on a schedule for those before having a chance to analyze the newly produced survey data and decide whether they would request additional documents from Marriott. *Id*.

Throughout January, the parties continued their discussion on the categories of additional documents Marriott would produce. *Id*. at ¶¶ 5-9. On January 11th, Marriott proposed that Mr. Simon and Dr. Dev be able to amend their reports with information on the newly produced documents, and that Marriott's experts would then be able to submit rebuttals to those amendments. *Id*. at ¶ 7. But Plaintiffs never agreed to that proposal, and instead continued writing to Marriott about additional data that seemed to be missing from its production. *Id*. at ¶¶

8-13. Recognizing that there was still no formal agreement on Marriott's document production (or anything else that would be necessary to remediate Marriott's failure to produce the SMS survey data during discovery), Marriott's counsel wrote an e-mail to Plaintiffs stating, "Assuming that we are in agreement concerning our document production as to the surveys, we can produce Messrs. Peters and Sonberg for deposition in our Orlando office on Wednesday, February 13 …" *Id*. at ¶ 9. That e-mail does not even *mention* supplemental expert reports, much less an agreement. *Id.*

It was not until February 7th that the parties agreed on the scope of additional documents Marriott would be producing, as well as scheduling for the Peters and Sonberg depositions.[3] *Id*. at ¶¶ 13, 14. Marriott produced its last documents on February 12th, and Plaintiffs took the Peters and Sonberg depositions on February 13th. *Id*. at ¶ 14. At the same time, Plaintiffs continued to analyze the SMS survey data and realized that it directly supports the halo effect and disgorgement as a remedy. *Id*. at ¶ 16. Thus, on March 11th, Plaintiffs had a phone conversation with Marriott and proposed an expert discovery schedule that would allow Plaintiffs to produce a report from a statistical expert limited to an analysis of the SMS survey data. *Id*. at ¶ 17. A few days later, Marriott sent an e-mail opposing Plaintiffs' designation of a new expert. *Id*. at ¶ 18. There was no further discussion on this topic, and certainly no agreement.

Marriott's contention that the parties agreed on all discovery relating to the newly produced data on January 11th is contrary to the letter that Marriott itself cites. That January 11th

---

[3] The parties agreed to the proviso that if Plaintiffs learned during the Peters or Sonberg depositions (or any other source) that Marriott's representations about the SMS survey documents were inaccurate, then Plaintiffs would be able to request any additional survey reports that exist.

letter, Exh. A to Dkt. No. 363, is a letter from Marriott that says "we *propose* the following" before listing a schedule for the production of additional documents, the Peters and Sonberg depositions, as well as amended expert reports and depositions. *See id.* at 7; Exh. D. Instead of agreeing to that proposal, Plaintiffs continued to ask about additional documents related to the SMS survey, and the parties continued meeting and conferring on documents. *Id.* at ¶¶ 8-13. It took several more weeks for the parties to come to an agreement on the scope of Marriott's document production – and longer than that for Plaintiffs to digest the thousands of data points that Marriott was producing. Thus, Plaintiffs could not have come to an agreement on all remedies with respect to the SMS survey data on January 11th; Marriott had not even completed its production of new documents at that point.

At no point did the parties come to an agreement on the full scope of discovery on the SMS survey data, and Marriott has no evidence of such an agreement.

### III.    CONCLUSION

For all the above reasons, Plaintiffs seek leave to designate an additional expert who will analyze Marriott's recently produced SMS survey data.

Dated: March 28, 2019                                      Respectfully submitted,

THE MEADE FIRM

*/s/ Anne Decker* _____
Anne Decker (CA State Bar # 268435)
Tyler Meade (CA State Bar # 160838)
12 Funston Ave., Suite A
San Francisco, CA 94129
Telephone: (415) 724-9600
 E-mail: annie@meadefirm.com

## <u>CERTIFICATE OF SERVICE</u>

I, the undersigned, hereby certify that on this 28th day of March 2019, a true and accurate copy of the foregoing **PLAINTIFFS' REQUEST FOR SUPPLEMENTAL EXPERT REPORTS TO ANALYZE NEWLY PRODUCED DATA** was served via CM/ECF filing system upon the following:

> Jessica Black Livingston, Esq.
>   *jessica.livingston@hoganlovells.com*
> Hogan Lovells US LLP
> 1200 Seventeenth Street, Suite 1500
> Denver, Colorado 80202
>
>
> Naomi G. Beer, Esq.
>   *BeerN@gtlaw.com*
> Greenberg Traurig, LLP
> 1200 17th Street, Suite 2400
> Denver, Colorado 80202
>
> Ian S. Marx, Esq.
>   *MarxI@gtlaw.com*
> Philip R. Sellinger, Esq.
>   *SellingerP@gtlaw.com*
> Greenberg Traurig, LLP
> 500 Campus Drive, Suite 400
> Florham Park, New Jersey 07932


> */s/ Anne Decker*
> Anne Decker