IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:16-cv-01301-PAG-GPG

RCHFU, LLC, et al

    Plaintiffs,

v.

MARRIOTT VACATIONS WORLDWIDE CORPORATION, et al,

    Defendants.

**MARRIOTT DEFENDANTS' OPPOSITION TO
PLAINTIFFS' REQUEST FOR ADDITION OF NEW EXPERT
WITNESS AFTER EXPIRATION OF EXPERT REPORT DEADLINES**

Pursuant to the Court's direction, the Marriott Defendants[1] respectfully submit this opposition to Plaintiffs' request (ECF##362, 367) to serve a report from a new expert, Jason Bass, after the expiration of the October 26, 2018 deadline for affirmative expert reports set forth in the Court's Additional Case Schedule Addendum (ECF#316) ("Scheduling Order").

**STATEMENT OF RELEVANT FACTS**[2]

On October 26, 2018, Plaintiffs served reports from experts with whom they had been working for over a year: Chekitan Dev, a professor and hospitality industry "branding" expert who addresses so-called "halo" and "horn" effects of the MVC Affiliation, and Jonathan Simon, a

---

[1] The "Marriott Defendants" are Defendants Marriott Vacations Worldwide Corporation, Marriott Ownership Resorts, Inc., The Ritz-Carlton Management Company, LLC, The Cobalt Travel Company, LLC, and The Lion & Crown Travel Co., LLC.

[2] The facts below are set forth in detail in the accompanying Declaration of Ian S. Marx, dated March 28, 2019 ("Marx Decl.").

supposed hospitality industry financial expert who purports to quantify the alleged "halo" effect. Marx Decl. ¶ 2.

On December 28, 2018, the Marriott Defendants submitted rebuttal expert reports from Ceridwyn King, a hospitality industry branding expert who rebuts the Dev report, and Mark Israel, an economist who rebuts both the Dev and Simon reports. *Id*. ¶ 3. As part of their rebuttal of the supposed halo/horn effect, King and Israel cite data from Sales and Marketing Surveys ("SMS") taken from 2013 to 2018. *Id*. ¶ 7. The SMS are given to actual and prospective purchasers of the MVC Points product after sales presentations in order to assess these individuals' perceptions of more than 35 aspects of the sales presentations. *Id*. ¶ 4. In their rebuttal reports, King and Israel reference two SMS questions that ask responders (1) to state whether each of 28 different "features associated with" the MVC Program was "important" to their decision to purchase MVC Points (one such feature being "the ability to use [MVC] Points to stay at a Ritz-Carlton Club)"; and (2) to then rank which of those "features" they considered "important." *Id*. ¶¶ 5, 7. The SMS data shows that potential MVC Points purchasers consistently ranked "the ability to use [MVC] Points to stay at a Ritz-Carlton Club" among the lowest five features "important" to them and that only 3%-5% ranked that feature as one of the "top five" features "important" to them. *Id*. ¶ 7. In addition to King's and Israel's objections to Plaintiffs' experts' unsupported conclusions, the SMS data on these two questions were cited as further undermining those conclusions.[3]

---

[3] Although Plaintiffs refer to a third question in the SMS that referenced "the availability of Ritz-Carlton Clubs," that question was not referenced by the Marriott Defendants' rebuttal expert, because it was irrelevant. *Id*. ¶ 6, Ex. A. That question asked prospective purchasers "how satisfied they were" (on a scale of 1-10) with the *quality of the sales presentations* on each of the 28 subjects. *Id.* In any event, the survey results for this question were also provided to Plaintiffs' counsel long before they asked to submit a new report by a new expert.

2

Having worked with their experts for more than a year before reports were submitted, Plaintiffs could easily have sought documents and testimony regarding prospective MVC purchasers' perceptions regarding the availability of Ritz-Carlton Clubs; however, they never made document requests that would arguably have required the production of either the SMS or the compiled SMS results. *Id.* ¶ 8; ECF#363 at 9-13. Indeed, before receiving Plaintiffs' expert reports positing a "halo" effect, the Marriott Defendants had no reason to believe that the SMS were relevant or could be used by the Marriott Defendants' experts to rebut the wholly unsupported opinions of Plaintiffs' experts. Marx Decl. ¶ 9. Thus, the Marriott Defendants did not identify the SMS in their Rule 26(a)(1)(A) disclosures, nor did they produce them in discovery. *Id.* ¶¶ 9-10. After producing their expert rebuttal reports on December 28, 2018 (a mere six weeks after Plaintiffs served their affirmative expert reports), however, the Marriott Defendants amended their Rule 26(a)(1)(A) disclosures to reference the SMS and to disclose Urcil Peters as a knowledgeable witness as to the SMS' contents. *Id.* ¶ 11. The Marriott Defendants also provided Plaintiffs with copies of the SMS referenced in the King and Israel rebuttal reports. *Id.*, Exs. B-D. Despite having failed to request the production of the SMS in their extensive document requests, Plaintiffs professed outrage at references to the SMS in the King and Israel reports, and they demanded additional discovery regarding the topics covered by the SMS. *Id*. ¶¶ 8, 12. To avoid yet another discovery dispute, the Marriott Defendants conferred with Plaintiffs and agreed to:

- Produce the data underlying the SMS results;
- Make Mr. Peters available for deposition;
- Permit Dev and Simon to amend their reports solely to address the contents of the SMS documents (to which King and Israel would respond further);

3

- Make certain representations specifying that additional documents could not be located through the parties' agreed-upon e- discovery protocols; and

- Renegotiate a schedule for the completion of expert discovery.

*Id.* ¶¶ 12-13, 15-17.  Plaintiffs accepted these terms, which are reflected in a January 11, 2019 letter from the Marriott Defendants' counsel to Plaintiffs' counsel and a February 7, 2019 email exchange. *Id.*, Ex. E.

The Marriott Defendants performed their part of the bargain by producing the aforementioned discovery, including the deposition of Mr. Peters, to which Plaintiffs were not otherwise entitled, and, on February 14, 2019 and twice thereafter, the Marriott Defendants circulated a revised scheduling order reflecting the changes necessitated by the parties' agreement. *Id.* ¶¶ 14, 18, 19.  When Plaintiffs failed to respond, the Marriott Defendants submitted the schedule to the Court on March 7, 2019.  *Id.* ¶ 19; ECF#361.  Then -- after over two months of SMS-related negotiations and one month after confirming the parties' agreements on that topic -- in a March 12, 2019 call among counsel Plaintiffs abruptly announced, for the first time, that they would be seeking permission to serve an additional free-standing report from a purported statistical analysis expert (Mr. Bass) regarding the impact of the SMS results on their other experts' opinions on damages.  Marx Decl. ¶ 20.

## ARGUMENT

### I. PLAINTIFFS HAVE FAILED TO SHOW "GOOD CAUSE" TO SERVE A BELATED REPORT FROM A FOURTH EXPERT IN A NEW FIELD

Litigants in this District are repeatedly cautioned that a scheduling order "is not a frivolous piece of paper, idly entered, which can be cavalierly disregarded by counsel without peril." *Washington v. Arapahoe Cnty. Dep't of Soc. Servs.*, 197 F.R.D. 439, 441 (D. Colo. 2000).  Where

4

a scheduling order's deadline for serving expert reports has passed (as it has here), a plaintiff seeking to serve a new expert report must meet the Rule 16(b) standard for amending scheduling orders. *See Carroll v. Allstate Fire & Cas. Ins. Co.*, 2013 WL 3810864, at *7 (D. Colo. July 22, 2013) (where deadline for serving expert reports had passed, court applies Rule 16(b) standard to plaintiffs' request to serve new expert report in response to defendant's expert's rebuttal report). Rule 16(b) requires that a party show "good cause" to amend a scheduling order. *See Anderson v. Seven Falls Co.*, 2013 WL 3771300, at *7 (D. Colo. July 18, 2013) (denying plaintiff's motion for untimely addition of new rebuttal expert, noting that Rule 16's "good cause" requirement "reflects the important role a scheduling order plays in the court's management of its docket"); *see also Carroll*, 2013 WL 3810864, at **4, 6, 8 (finding no good cause under Rule 16(b) to amend scheduling order to permit plaintiffs to serve sur-rebuttal expert reports).

Rule 16(b)'s good cause standard "does not focus on the bad faith of the movant, or the prejudice to the opposing party. Rather, it focuses on the diligence of the party seeking leave to modify the scheduling order …. Properly construed, good cause means that scheduling deadlines cannot be met despite a party's diligent efforts…. Carelessness is not compatible with a finding of diligence and offers no reason for a grant of relief." *McFadden v. Town of Meeker Colo.*, 2017 WL 3397343, at *2 (D. Colo. Aug. 8, 2017); see *also David A. Bovino P.C. v. MacMillan*, 2014 WL 656842, at *4 (D. Colo. Feb. 20, 2014) (Brimmer, *J.*) (finding no good cause to modify scheduling order where plaintiffs had not provided "an adequate explanation for the delay nor asserted a persuasive reason" why the amendment could not have been sought sooner).

Plaintiffs have not demonstrated the good cause required under Rule 16(b) for amending the Scheduling Order. Plaintiffs do not, and cannot, explain why they never pursued discovery

5

concerning MVC purchasers' perceptions of the "availability of Ritz-Carlton Clubs" (even though they had been working with their experts for more than a year on their "halo" argument), nor do they explain why they waited three months after receiving the Marriott Defendants' rebuttal reports to seek leave to serve a new expert report from a new witness on an entirely new topic. *See Anderson*, 2013 WL 3771300, at *7 (finding no good cause to serve rebuttal report from new expert where plaintiff had 58 days from service of defendant's expert report to designate a rebuttal report or move for leave to amend the scheduling order). Instead, Plaintiffs try to blame the Marriott Defendants for not having somehow divined that the SMS would be relevant to rebut expert reports that they had not yet seen. Plaintiffs cannot reasonably contend that the SMS were within the scope of their discovery requests or the negotiated and agreed-upon e-discovery search protocols employed over the years. Marx Decl. ¶¶ 8, 10. As noted, the SMS's relevance did not become apparent to the Marriott Defendants until the end of 2018, when their experts were preparing rebuttal reports to Dev's and Simon's opinions. *Id.* ¶ 9.[4] At this late stage, Plaintiffs are not entitled to a "do over" for strategic decisions made over several years of discovery.

An examination of the secondary factors the Tenth Circuit considers in determining good cause (after considering the movant's diligence) further supports this conclusion. These factors include (1) the imminence of trial, (2) whether the motion is opposed, (3) prejudice to the non-movant, (4) the foreseeability of additional discovery in light of the Court-ordered discovery

---

[4] Plaintiffs will likely argue that the Marriott Defendants should have somehow anticipated the relevance of these issues through passing references in the Sixth Amended Complaint to the "additional profits" that the Marriott Defendants earned by virtue of the MVC Affiliation. Neither that pleading nor any of Plaintiffs' other pre-2019 submissions suggest that this general concept of enhanced profits is in any way connected to the concept of surveying purchasers of MVC Points as to their perceptions of the "importance" of 28 "features" in an MVC sales presentation, only one of which concerned the "availability of Ritz-Carlton Clubs" to MVC Points owners.

schedule, and (5) the likelihood that any such further discovery will lead to relevant evidence. *Smith v. United States*, 834 F.2d 166, 169 (10th Cir. 1987). Except for factor (1) (lack of a trial date), these factors either weigh strongly in the Marriott Defendants' favor or are neutral.

Factor (2) obviously favors the Marriott Defendants, as they are opposing Plaintiffs' request. Likewise, factor (3) (prejudice to the non-movant) strongly favors the Marriott Defendants because they have already prepared responsive expert reports based on the theories set forth in the expert reports that Plaintiffs initially submitted. Plaintiffs are now attempting to address the obvious flaws in their experts' theories by introducing a new expert. If Plaintiffs are now, at this late stage, permitted to add a new expert on a wholly new topic, the Marriott Defendants will have to change the entire approach they have taken with their experts up to now.[5] In addition to having to revise expert reports already submitted and possibly engaging a new rebuttal expert, the Marriott Defendants' experts would have to prepare a responsive report to Mr. Bass's proposed report, and he would have to be deposed. *See Quintana v. Edmond*, 2009 WL 1798219 at *2 (D. Colo. June 23, 2009) ("There can be no doubt that allowing Plaintiff to take additional discovery requires Defendants to incur additional and unanticipated expenses …."). Moreover, the resulting extensions of the schedule would even further delay summary judgment and other pre-trial motions, as well as trial. *See Fresquez v. Baldwin*, 2010 WL 5934891, at **28-29 (D. Colo. Dec. 15, 2010) ("Both the court and Defendant[] are entitled to expect that by a date certain, Plaintiff's list of

---

[5] *See Anderson*, 2013 WL 3771300, at *7 ("Plaintiff's belated disclosure of a rebuttal expert will likely require Defendant to incur additional expense in deposing the newly disclosed expert, consulting with its own experts, and supplementing their reports."); *Beller ex rel. Beller v. United States*, 221 F.R.D. 689, 694 (D.N.M. 2003) (plaintiff's service of a supplemental expert report would give defendant "the right to take a new deposition of this expert," which "might well lead to [defendant] having to modify its prior report or retain a new expert or experts to counter the opinion testimony being offered in [the] revised report").

7

testifying experts will be fixed and the case will proceed on that basis."). Although factors (4) and (5) are arguably neutral as they are more pertinent to purely discovery-related motions, factor (4) could be deemed to favor the Marriott Defendants because the need for any further discovery arising from the SMS documents or their contents should have been foreseeable to Plaintiffs given that they had been working with Dev and Simon for almost a year. Accordingly, Plaintiffs' motion should be denied for failure to show good cause under Rule 16(b).[6]

---

[6] Plaintiffs try to make an end-run around Rule 16(b) by characterizing their newly-proposed expert report as "supplemental." Although Rule 26(e)(1) permits an expert to "supplement his report and disclosures in certain limited circumstances" (i.e., "when the party or expert learns the information previously disclosed is incomplete or incorrect in some material respect"), the rule "is not intended to provide an extension of the expert designation and report production deadlines and may not be used for this purpose." *Cook v. Rockwell Int'l Corp.*, 580 F. Supp. 2d 1071, 1169 (D. Colo. 2006). To the contrary, "[s]upplementation does not confer a right to ignore Court deadlines, reopen discovery, find new facts, generate new reports, and then claim different damages," nor does it allow "a party to sandbag his opponent or to deepen or strengthen his case where the information should have been included in the expert report." *Rodgers v. Beechcraft Corp.*, 2016 WL 7888048, at **2-3 (N.D. Okla. Sept. 20, 2016); *see also Anderson*, 2013 WL 3771300, at *2 ("It is disingenuous to argue that the duty to supplement under Rule 26(e)(1) can be used as a vehicle to disclose entirely new expert opinions after the deadline established by the court."); *Myers v. Mid-West Nat'l Life Ins. Co.*, 2008 WL 2396763, at *2 (D. Colo. 2008) (rejecting plaintiffs' attempt to offer the report of a new expert who had not previously submitted a report as part of their supplemental disclosures). Allowing a party to misuse Rule 26(e)(1) as Plaintiffs would do here "would create a system where preliminary [expert] reports could be followed by supplementary reports and there would no finality to expert reports, as each side, in order to buttress its case or position, could 'supplement' existing reports and modify opinions previously given." *Cook*, 580 F. Supp. 2d at 1169. Plaintiffs repeatedly state that their newly-proposed expert report would rely upon the SMS to bolster and strengthen the positions already set forth in earlier expert reports. That is exactly the kind of improper "supplementation" that the courts in the above cases did not permit, and it should not be permitted here.

Plaintiffs' motion would fare no better if they try to portray their proposed new expert report as simply rebutting the King and Israel rebuttal reports (rather than advancing new, affirmative opinions on the damages resulting from the alleged halo effect on the price for MVC Points). The time to serve rebuttal reports has expired (ECF#328). Even if the proposed report could be considered a rebuttal report beyond the scope of the Scheduling Order, Plaintiffs were required under Rule 26(a)(2)(D)(ii) to disclose their proposed new expert's identity and opinions no later

## II. PLAINTIFFS SHOULD BE HELD TO THEIR AGREEMENT

In seeking to add a new expert with an entirely new area of expertise, Plaintiffs are proposing to jettison the agreement they reached with the Marriott Defendants in January and February 2019 regarding the completion of expert discovery. The Marriott Defendants relied in good faith on that agreement when they agreed to produce additional SMS-related documents and to allow an additional deposition even though the fact discovery deadline had passed and Plaintiffs were not entitled to ***any*** further discovery. *See* Statement of Relevant Facts, *supra.* It speaks volumes that Plaintiffs waited to divulge their plan to name a new expert until 10 weeks after the Marriott Defendants had documented the parties' agreement and had performed their part of it.

Counsel should be able to rely upon the word and agreement of opposing counsel, and as a matter of policy and practice, such consensual resolutions of discovery disputes are to be encouraged and enforced. *See Hoelzel v. First Select Corp.*, 214 F.R.D. 634, 635 (D. Colo. 2003) ("Rule 7.1A serves a particularly important function in connection with discovery disputes because the parties, through negotiations, frequently are able to narrow the discovery requests in a way which eliminates the need for judicial intervention …. Without meaningful negotiations by the parties, the courts would be flooded with discovery motions."). This is consistent with the fundamental mandate that each Federal Rule of Civil Procedure "be construed, administered and employed by the court and the parties to secure the just, speedy and inexpensive determination of

---

than 30 days after service of the King and Israel reports, i.e., by January 27, 2019, and they have failed to show good cause for not having met this deadline. *See, e.g.*, *Anderson*, 2013 WL 3771300, at *7 (finding no good cause to permit plaintiff to serve untimely rebuttal report). The proposed report would also be improper if it is considered a sur-rebuttal report, as the Federal and Local Rules do not contemplate such reports. *See, e.g.*, *EEOC v. JBS USA, LLC*, 2016 WL 3078719, at *3 (D. Colo. May 6, 2016); *Carroll*, 2013 WL 3810864, at **6-8; *Rothenberg v. Standard Ins. Co.*, 2012 WL 212846, at *2 (D. Colo. June 12, 2012).

9

every action and proceeding." *See* Fed. R. Civ. P. 1. Plaintiffs should be held to the agreement they made with the Marriott Defendants in January and February 2019, an agreement the Marriott Defendants relied on and fully performed.

### III. THIS DISPUTE COULD BE RESOLVED BY PRECLUDING ALL PARTIES FROM USING SMS OR SMS-RELATED MATERIAL FOR ANY PURPOSE

Plaintiffs contend that the Marriott Defendants are attempting to use the SMS offensively (ECF#367), and they cite *Glielmi v. Raymond Corporation*, 2013 WL 209131 (D.N.J. Jan. 17, 2013) for the proposition that a party may be allowed to serve a new expert report as a remedy for the untimely production of documents. *Glielmi*, a personal injury action arising out of the operation of a forklift, is unavailing to Plaintiffs, however, as that court made no such holding. Rather, *Glielmi* merely prohibited the defendant from introducing evidence regarding tests conducted on the forklift that had not been produced in discovery, but had been provided to its expert. Plaintiffs' reliance on *Glielmi* is misplaced because as explained above, the production of the SMS information was not untimely and was necessitated solely by Plaintiffs' submission of expert reports containing unsupported theories. However, given Plaintiffs' reliance on *Glielmi* and the preclusion order in *Glielmi*, in the interest of ending Plaintiffs' unfounded complaints, the Marriott Defendants would not object to an order precluding all parties from using the SMS or any SMS-related material for any purpose in this case

Dated: March 28, 2019      Respectfully submitted,

By:    *s/ Ian S. Marx*
Philip R. Sellinger
Ian S. Marx
GREENBERG TRAURIG, LLP
500 Campus Drive, Suite 400
Florham Park, New Jersey 07932

10

Tel:      303.572.6500  
Fax:     303.572.6540  
Email:  SellingerP@gtlaw.com  
            MarxI@gtlaw.com

*Attorneys for Defendants Marriott Vacations Worldwide Corporation, Marriott Ownership Resorts, Inc., The Ritz-Carlton Management Company, LLC, The Cobalt Travel Company, LLC, and The Lion & Crown Travel Co., LLC*

11

# CERTIFICATE OF SERVICE

      I hereby certify that, on March 28, 2019, a true and accurate copy of the foregoing **MARRIOTT DEFENDANTS' OPPOSITION TO PLAINTIFFS' REQUEST FOR ADDITION OF NEW EXPERT WITNESS AFTER EXPIRATION OF EXPERT REPORT DEADLINES** was filed and served with the Clerk of the Court via CM/ECF filing system, which will send notification to the following:

Michael J. Reiser
Law Office of Michael J. Reiser
1475 N Broadway, Suite 300
Walnut Creek, CA 94596
*Counsel for Plaintiffs*

Matthew C. Ferguson
The Matthew C. Ferguson Law Firm, P.C.
119 South Spring, Suite 201
Aspen, Colorado 81611
*Counsel for Plaintiffs*

Tyler R. Meade
The Meade Firm P.C.
12 Funston Avenue., Suite A
San Francisco, California 94129
*Counsel for Plaintiffs*

Linda Pham Lam
Michael Schrag
Gibbs Law Group LLP
505 14th Street, Suite 1100
Oakland, CA 94612
*Counsel for Plaintiffs*

                                                      *s/ Rebecca Zisek*
                                                      Rebecca Zisek
                                                      *(Original on file at offices of Greenberg Traurig, LLP, pursuant to C.R.C.P. 121, § 1-26)*