90

# RITZ-CARLTON, SAN FRANCISCO

## CLUB OWNER'S ASSOCIATION

### OPERATING AGREEMENT

THIS OPERATING AGREEMENT (the "Agreement"), made and entered into this 15th day of June, 2006, by and between THE RITZ-CARLTON MANAGEMENT COMPANY, L.L.C., a Delaware limited liability company authorized to do business in the State of California (hereinafter referred to as "Operating Company") and 690 Market Club Owners Association, a non-profit, mutual public benefit corporation (hereinafter referred to as the "Club Interest Association"), which said terms shall be deemed to extend to and include the successors and assigns of the said parties hereto.

WHEREAS, the Club Interest Association is a non-profit, mutual public benefit corporation created pursuant to Section 7110 et seq. of the California Corporations Code for the State of California, as amended and supplemented from time to time;

WHEREAS, pursuant to that certain Declaration of Covenants, Conditions and Restrictions for 690 Market Club, recorded June 15, 2006, as Document No. 2006-I194390-00 of the Official Records of the City and County of San Francisco, California (the "Club Interest Declaration"), the Club Interest Association is responsible for maintenance, control, operation and management of the Club Interest Project located at that that certain historical building located at 690 Market Street, San Francisco, California, commonly known as The Chronicle Building (the "Building"), which Club Interest Project is or shall be subject to the Club Interest Declaration;

WHEREAS, the Club Interest Declaration sets forth the duties, powers, obligations, maintenance responsibilities and functions of the Club Interest Association, as more particularly described in the Club Interest Declaration;

WHEREAS, the Club Interest Declaration provides that the Club Interest Association is authorized to engage an operator to delegate such of its powers to the operator as may be required for the proper functioning of the Club Interest Units and common elements submitted to the condominium form of ownership under the Club Interest Declaration ("Property").

WHEREAS, the parties desire, through this Operating Agreement, to provide for the management and operation of the Club Interest Project.

NOW, THEREFORE, in consideration of the premises and mutual covenants made herein, the Operating Company and Club Interest Association agree as follows:

EXHIBIT "A"

91

1.    Definitions.

Unless the context would clearly dictate otherwise, the terms utilized herein are as defined in the Club Interest Declaration which is hereby incorporated by reference as if fully set forth herein.

2.    Appointment and Acceptance of Operator Agency

The Club Interest Association hereby employs the Operating Company to act on behalf of the Club Interest Association and its members as the exclusive operating entity of the Property (as defined in this paragraph) and to manage the daily affairs of the Club Interest Project, and the Operating Company hereby agrees to so act. In taking any action under this Agreement, the Operating Company shall be acting on behalf of the Club Interest Association, and nothing in this Agreement shall be construed as creating a partnership, joint venture, or any other relationship between the parties to this Agreement, or as requiring Operating Company to bear any portion of losses arising out of or connected with the ownership or operation of the Property. Neither party shall have the power to bind or obligate the other except as expressly set forth in this Agreement, however, in furtherance of the intentions of the parties hereto, the Operating Company is authorized to act with such additional authority and power as may be necessary to carry out the spirit and intent of this Agreement.

3.    Term and Termination.

3.1    Term.

The term of this Agreement shall commence either as of the date hereof, the date of recording of the Club Interest Declaration in the Public Records of the City and County of San Francisco, California, or issuance of a certificate of occupancy by the City of San Francisco, California for any of the Property which is subjected to the Club Interest Declaration, whichever date is the last to occur, and shall continue for a period of five (5) years thereafter. Upon the expiration of said initial five (5) year period, this Agreement shall automatically renew for successive periods of three (3) years each until or unless (i) earlier terminated in accordance with this Agreement or (ii) terminated with ninety (90) days prior written notice to the Operating Company following a majority vote of the non-Declarant Club Interest Association membership approving such termination. Under no circumstances shall the Club Interest Association be authorized to terminate this Agreement without such a vote.

3.2    Termination of Club Interest Association.

If the Club Interest Association is terminated, then the Club Interest Owners shall, as to their separate interests, continue to be a party to this Agreement and bound by the provisions hereof, and the Operating Company shall manage such interests pursuant to the provisions of this Agreement as the nature of such interests and the context of this Agreement shall permit.

92

**3.3** _Termination by Operating Company._

The Operating Company may terminate this Agreement upon ninety (90) days written notice to the Club Interest Association at any time. In addition to other termination rights set forth in this Agreement, the Operating Company shall have the right to terminate this Agreement, upon thirty (30) days prior written notice thereof to the Club Interest Association, in the event of termination of either (a) that certain Master Association Operating Agreement by and between the Operating Company and 690 Market Master Association (the "Master Association"), dated on or about the date hereof, which provides for the Operating Company's management and administration of the 690 Market Street master community (excluding the commercial units), or (b) that certain Operating Agreement by and between the Operating Company and 690 Market Homeowners Association (the "Residence Association"), dated on or about the date hereof, which provides for the Operating Company's management and administration of the Residence Units.

**3.4.** _Termination by Club Interest Association_

In addition to the Club Interest Association's right to terminate the Agreement under Section 3.1, this Agreement may be terminated by the Club Interest Association for cause, at any time, upon one hundred twenty (120) days prior notice in the event the Operating Company shall fail to keep, observe or perform any material covenant, agreement, term or provision of this Agreement to be kept, observed or performed by the Operating Company; provided, however, if a breach or a failure to perform by the Operating Company any covenant, agreement, term or provision contained in this Agreement which is capable of being cured constitutes the cause for termination, this Agreement may be terminated only if such breach or failure to perform shall not have been cured by the Operating Company, or commencement and diligent pursuance of all reasonable efforts to effect such cure shall not have been undertaken by the Operating Company, within thirty (30) days following written notice of such default or breach given by the Club Interest Association to the Operating Company.

**3.5.** _Actions Upon Termination._

Upon termination of this Agreement ("Termination"), the following actions shall be taken:

(A)     The Operating Company shall, within sixty (60) days after such expiration or Termination, prepare and deliver to the Club Interest Association a final accounting statement with respect to any sums due from the Club Interest Association to the Operating Company or due from the Operating Company to the Club Interest Association pursuant to this Agreement, dated as of the date of Termination. Within thirty (30) days of receipt by the Club Interest Association of such final accounting statement, the parties shall make whatever cash adjustments are necessary pursuant to such final statement. In all events, all accounts shall be deemed final one year after the date of Termination.

(B)     All Software (as defined below) used at the Property which is owned by the Operating Company (or any affiliates thereof) or the licensor of any of them is

3

proprietary to the Operating Company (or such affiliate) or the licensor of any of them, and shall in all events remain the exclusive property of the Operating Company (or such affiliate) or the licensor of any of them, as the case may be, and nothing contained in this Agreement shall confer on the Club Interest Association the right to use any of such Software. The Operating Company shall have the right to remove from the Property without compensation to the Club Interest Association any Software (including upgrades and replacements). Furthermore, upon Termination, the Operating Company shall be entitled to remove from the Property any computer equipment which is: (i) owned by a party other than the Club Interest Association (without reimbursement to the Club Interest Association); or (ii) owned by the Club Interest Association, but utilized as part of a centralized property management system (with reimbursement to the Club Interest Association of all previous expenditures made by the Club Interest Association with respect to such equipment, subject to a reasonable allowance for depreciation).

As used herein, "Software" means all computer software and accompanying documentation (including all future upgrades, enhancements, additions, substitutions and modifications thereof), other than computer software which is commercially available, which are used by the Operating Company in connection with operating the Property, including without limitation, the property management system, the reservation system and the other electronic systems used by the Operating Company in connection with operating the Property.

(C) If this Agreement is terminated for any reason, other than a Termination by reason of a default of the Operating Company hereunder, a reserve shall be established to reimburse the Operating Company for all costs and expenses incurred by the Operating Company in terminating its employees at the Property, such as severance pay, unemployment compensation, employment relocation, and other employee liability costs arising out of the termination of employment of the Operating Company's employees at the Property.

(D) The provisions of this Paragraph 3 shall survive Termination.

4. Delegation of Authority.

Except to the extent prohibited by applicable law, the Club Interest Association hereby delegates to Operating Company all of the power and authority of the Club Interest Association to the extent necessary to perform the Operating Company's duties and obligations under this Agreement. The Operating Company, on behalf of and at the expense of, the Club Interest Association, to the exclusion of all other persons including the Club Interest Association and its members, shall have all the powers and duties of the Board of Directors of the Club Interest Association (the "Board") as set forth in the Articles of Incorporation and the governing documents of the Club Interest Association (except such thereof as are specifically required to be exercised by the Board or its members), and it shall perform, by way of illustration and not of limitation, the following services, the expenses of which will be incurred in substantial conformance with the approved budgets:

94

(A)     Hire, pay, supervise and discharge all persons necessary to be employed in order to properly manage, maintain, administer and operate the Club Interest Project. Such persons shall be employees of the Operating Company and not employees of the Club Interest Association or its members.   The Operating Company shall have full responsibility to supervise, direct and train all personnel (which costs shall be a Basic Expense of the Club Interest Association), to fix their compensation (subject to the budget), and generally to establish and maintain all employment policies and practices, provided that the Operating Company's employment policies and practices shall comply with all applicable laws, regulations and orders of any competent government authority. The Board shall have no right to supervise or direct any personnel of or employed by the Operating Company, and the Board agrees not to attempt to so supervise or direct. The Board and the Operating Company shall fully cooperate with each other to implement and carry out the provisions of this Section 4(A).

(B)     Take such action as may be necessary to comply with all insurance requirements under the provisions of this Agreement.

(C)     Contract for utilities, repairs, engineering, housekeeping, loss prevention and other services necessary for the management, maintenance, administration and operation of the Club Interest Project. Such contracts may be in the name of the Club Interest Association or the Operating Company, as the Operating Company may elect.

(D)     Purchase, lease or rent, on behalf of the Club Interest Association, equipment, tools, vehicles, appliances, goods, supplies, furnishings, furniture, and materials as shall be reasonably necessary to perform its duties, including the maintenance, upkeep, repair, replacement, refurbishing and preservation of the Property. Purchases shall be in the name of the Operating Company or the Club Interest Association, as the Operating Company shall elect.

(E)     Place or keep in force all insurance required in accordance with the provisions of this Agreement, or otherwise, as the Operating Company may deem necessary in its reasonable discretion to be necessary for the protection of a luxury resort; to act on behalf the Club Interest Association and each Club Interest Owner; to adjust all claims arising under said insurance policies; to otherwise exercise all of the rights, powers and privileges of the insured parties; to receive, on behalf of the insured parties, all insurance proceeds, subject to the provisions of this Agreement..

(F)     Maintain or provide for the maintenance of the Club Interest Association's financial record books, accounts and other records, and as necessary, issue certificates of account to Club Interest Owners and their Mortgagees, without liability for errors.  Such records shall be maintained in accordance with applicable California Statutes at the expense of the Club Interest Association and at no cost to the Operating Company. Except for the membership roster, these books and records shall be reasonably available for inspection by Club Interest Owners and their authorized representatives at reasonable times and with a minimum of seventy-two (72) hours prior written notice. These records also shall be available for inspection by an expert employed by and at the cost and

expense of the Club Interest Association upon seventy-two (72) hours prior written notice and at such reasonable time as the Operating Company may agree. Any of the foregoing inspections shall be conducted without cost to the Operating Company and without unreasonable disruption to the employees and operation of the Operating Company. Any expense associated with copying records shall be a cost of the Club Interest Association, unless a request is made by a Club Interest Owner or group of Club Interest Owners individually, and in such case the cost shall be borne by such Club Interest Owner(s).

(G)     If and so long as required by law or requested by the Club Interest Association, arrange for an annual independent audit of all the books and financial records of the Club Interest Project by a certified public accountant in accordance with generally accepted auditing principles. A copy of the audit shall be forwarded to the officers of the Club Interest Association.

(H)     Prepare and provide for the preparation of the itemized annual budget for the Club Interest Association meeting the requirements of the Club Interest Declaration and/or revisions to the budgets or a combination thereof, which the Operating Company determines necessary for submission to the Club Interest Association. The Operating Company shall submit the annual budget to the Board, setting forth the anticipated income and expenses of the Club Interest Project for the year, and shall specify therein each Club Interest Owner's share thereof for approval by the Board and the members of the Club Interest Association in compliance with the Club Interest Declaration and California statutes. The Operating Company is authorized to collect against the Club Interest Owners, on behalf of the Club Interest Association, all regular and special assessments and charges that may be due under the Club Interest Project documents. In allocating taxes, special assessments, and Basic Expenses, the Operating Company shall clearly label the portion of any amounts due which are attributable to ad valorem taxes and special assessments. The Operating Company shall decide whether ad valorem taxes and special assessments will be billed separately or as a part of the maintenance fees. Should an increase in assessments be required or a special assessment be required during the year, the same shall be recommended to the Board by the Operating Company for approval in accordance with California statutes.

(I)     Have authority and responsibility to maintain and replace the personal property within the Residential Limited Common Area-Club Interest and Club Interest Units, if any, and to determine the maintenance fee, proration of taxes, and other common expenses applicable to those Residential Limited Common Area-Club Interest and Club Interest Units, as defined in and provided for in the Club Interest Declaration. Except to the extent limited by applicable law, the Operating Company shall have sole discretion for making determinations as to replacements of personal property located within such Residential Limited Common Area-Club Interest and Club Interest Units, decor, and all other judgments relating to the Residential Limited Common Area-Club Interest for the Club Interest Units. Notwithstanding the foregoing, all replacements shall be such as to maintain the standard of quality of the furniture and other personal property and decor of a quality substantially comparable to that contained in such Residential Limited Common

96

Area-Club Interest or Club Interest Units at the time it was committed to the Club Interest Project and to other resorts included in The Ritz-Carlton Club brand.

(J)     Receive and deposit all funds collected from the Club Interest Owners, or otherwise accruing to the Club Interest Association, in a special account or accounts of the Operating Company in banks, savings and loan associations, or other appropriate financial institutions qualified to do business in the state of California, with suitable designation indicating the custodial nature thereof. Club Interest Association funds shall not be commingled (i) with funds managed by the Operating Company on behalf of other condominium associations, master associations, timeshare associations or other associations; or (ii) with its own funds. Reserves shall be maintained in separate accounts designated for such purposes separate and apart from operating accounts. Alternatively, the Operating Company is authorized to invest collected funds on behalf of the Club Interest Association as approved and directed by the Board; provided, however, that such investments are styled so as to indicate the custodial nature thereof. The Operating Company is authorized to draw on the Club Interest Association accounts for any payments to be made by the Operating Company to discharge any liabilities or obligations incurred pursuant to this Agreement, for the payment of the management fee or any other disbursements properly incurred on the Club Interest Association's behalf in substantial accordance with the provisions of the Club Interest Association's budget. Receipt of the foregoing funds by Operating Company shall not constitute income to it for income tax purposes, since same is received and held in a custodial capacity only.

(K)     Cause a representative of its organization to attend members meetings of the Board properly called according to the governing documents of the Club Interest Association.

(L)     Suggest amendments to the Club Interest Association's rules and regulations as it deems advisable, in its reasonable discretion, for the use and occupancy of the Property, for approval by the Board. The Operating Company shall have sole authority to promulgate and amend the rules and regulations for the Property Residential Limited Common Area-Club Interest of the Property subject to the rights of the Board to revise, repeal or modify such amended rules and regulations and subject to the provisions of the Club Interest Declaration.

(M)     Cause such alterations and/or additions to be made to the Property, as authorized by the Board and, when required, by the Club Interest Owners.

(N)     Retain and employ such professionals and such other experts whose services may be reasonably required to effectively perform its duties and exercise its powers hereunder, and to employ same on such basis as it deems appropriate.

(O)     Contract, upon such terms and conditions and for such purposes as the Operating Company deems necessary, and grant concessions and licenses to persons to provide facilities and services to or within the Property. All income derived from the foregoing grant of concessions and licenses shall inure to the benefit of the Club Interest

7

Association, and all expenses appertaining thereto shall likewise be borne by said Club Interest Association. The agreements, concessions and licensees may be entered into to provide facilities and services as specified herein for very nominal or no consideration whatsoever. The Operating Company shall use its best judgment in entering into such agreements or in granting such concessions or licenses; provided, however, the Operating Company shall not be liable because a greater sum might have been obtained or a shorter period contracted for. The Operating Company shall not be precluded from dealing with entities affiliated with itself for on-site concessions or other services without conflict or self-dealing. The Operating Company is expressly authorized to subcontract with one or more of its affiliates in carrying out its obligations under this Agreement as provided in Section 7 below. The Operating Company shall have the authority to lease or purchase space and equipment (on or off site), or lease portions of the Property, so long as Manager deems that such a lease is beneficial to the Club Interest Association.

(P)     Make and collect special assessments or charges, or a combination thereof, for such purposes and against such parties as provided for in the provisions of the Club Interest Declaration.

(Q)     Exercise such powers and rights as are reasonably necessary to fulfill the terms of this Agreement and as otherwise delegated to it under the terms and provisions of the Articles of Incorporation or the governing documents of the Club Interest Association, or as are specifically authorized by actions of the Board or the Club Interest Owners themselves. In carrying out its duties hereunder, the Operating Company may utilize its corporate and administrative infrastructure in performing services for the Club Interest Association in lieu of contracting with independent providers or consultants. Any expenses incurred by the Operating Company in utilizing its corporate or administrative infrastructure may be allocated as set forth in Section 20 below.

(R)     If repair to the Property or any portion thereof, including any Club Interest Units or the Residential Limited Common Area-Club Interest, is required due to loss by Act of God or other cause, which is other than normal wear and tear, comply with the provisions of the Club Interest Declaration on behalf of the Club Interest Association in repairing the Property and the remainder of this paragraph shall apply except as otherwise provided in the Club Interest Declaration. Should the loss be covered by insurance, the proceeds thereof shall be applied as a credit against the total costs of said repair and restoration in the proportions in which the assessments were levied. It shall be presumed that the first monies disbursed in payment of costs of repair and restoration shall be from insurance proceeds, where such are received, and then from assessments collected, and, should there be a surplus of such funds, the said surplus shall be distributed to or on behalf of the Club Interest Owners, as provided in the aforesaid Club Interest Declaration.

(S)     Engage a Program Manager through an affiliation agreement, who shall manage and administer the reservation procedures and exchange program for The Ritz-Carlton Club Membership Program (the "Membership Program") through which (i) all Owners of Club Interests reserve the use of accommodations at the Club Interest Project

pursuant to the Procedures for Reserving Usage for the Ritz-Carlton Club, San Francisco ("Reservation Procedures"), and (ii) certain Owners of Club Interests who, in accordance with the Reservation Procedures, have membership in the Membership Program, may reserve the use of the accommodations at a Club as defined in and pursuant to the Reservation Procedures.  The Program Manager shall have the broadest possible delegation of authority regarding administration of the Reservation Procedures.  The Program Manager shall be authorized, in its sole discretion, to promulgate, adopt and amend the Reservation Procedures from time to time, in order to maintain uniformity of reservation procedures within Membership Program and to more effectively fulfill reservation requests. The Operating Company on behalf of the Club Interest Association shall assess the Owners of Club Interests the reasonable cost (as determined by Program Manager) of operating such Reservation Procedures, which cost shall be included as part of the Basic Assessment.

(T)     Provide an integrated telephone line switching system ("PBX") to be utilized by the Club Interests to make local and long distance calls.  The Club Interest Association shall provide a space in the Residential Limited Common Area-Club Interest (unless authorized to locate such PBX in a space owned by the Master Association or Club Interest Association) in which to locate the PBX equipment and shall pay all costs and expenses to properly maintain such space.  In addition, the Club Interest Association shall charge the Owners of Club Interests all costs and expenses for the maintenance and operation of the PBX system including, but not limited to, electrical power, wiring, and any related equipment necessary for individual use of the system.  The Operating Company shall at all times have access to the PBX system without providing notice to the Club Interest Association.  The PBX equipment shall be owned by the Club Interest Association and all revenues from local, if applicable, and long distance telephone calls shall inure to the benefit of the Club Interest Association.

(U)     Perform such duties as may be required of an operating entity under the Club Interest Declaration or applicable law, or as may be reasonably necessary or convenient to function as the managing entity of the Club Interest Project and perform the duties required hereunder.

(V)     Enter into the individual Club Interest Units (subject to the provisions of the Club Interest Declaration) to perform all activities that the Operating Company or its affiliates is authorized or required to perform pursuant to the Club Interest Declaration, including provision of cleaning and maid service, maintenance and repair of the Property and abatement of nuisances or other activities of the Club Interest Owners or occupants of the Property that are prohibited by applicable law or the Club Interest Declaration.

(W)     Apply for, obtain and maintain, either in its own name or on behalf of the Club Interest Association's name, as may be required by the applicable authorities, all licenses and permits required for the Club Interest Association in connection with the management and operation of the Club Interest Project.  The Club Interest Association, through its Board, agrees to execute and deliver any and all applications and other documents and otherwise to cooperate to the fullest extent with Operating Company in

99

applying for, obtaining and maintaining such licenses and permits.   The cost of any licenses or permits shall be an operating expense of the Club Interest Association.

(X)     The Operating Company shall have the authority to grant or deny any approvals required to be obtained by any Club Interest Owner from the Club Interest Association or the Board as applicable under the Club Interest Project's governing documents.

(Y)     If and so long as provided for in the Club Interest Declaration or required by law or requested by the Club Interest Association, arrange for an annual review of (i) the Club Interest Association's application for and/or compliance with the California Government Code §50280 et seq., also known as the Mills Act, and/or the California Mello-Roos Community Facilities Act of 1982, (ii) compliance review of the Easement, Access and Use Agreement between 690A HCT LLC and Teachers Insurance & Annuity Association of America, dated as of December 23, 2004, (iii) compliance review of the Parking and Access Easement between R. C. Market Holdings, L.P. and R. C. Chronicle, L.P., dated as of October 19, 2005, and (iv) compliance review of that certain easement recorded in the Office of the Assessor-Recorder of the City and County of San Francisco, California, providing for the use rights of certain portions of the second and third floors of the building located at 660 Market Street, San Francisco, California.  A copy of any materials related to such reviews shall be forwarded to the officers of the Club Interest Association.

5.     Insurance.

5.1    Property Insurance.

Effective on the opening date of the Club Interest Project (the "Opening Date"), the Club Interest Association shall procure and maintain (or Operating Company shall procure and maintain the following if (i) Club Interest Association requests in writing, at least sixty (60) days prior to the Opening Date, that Operating Company procure and maintain the following, (ii) the Club Interest Project satisfies the then-current insurability criteria under Operating Company's insurance program, and (iii) Operating Company approves such request, in its sole and absolute discretion) at the Club Interest Association's sole cost and expense the following:

A.     Property insurance (and to the extent applicable builders risk insurance), including boiler and machinery coverage, on the Club Interest Project (including its component parts, except the improvement and betterments and personal property of each Club Interest Owner), all Residential Limited Common Area-Club Interest,  equipment and fixed asset supplies  and contents against loss or damage by fire, lightning and all other risks as commonly covered by an "all risk of physical loss," form or equivalent policy of insurance, including, but not limited, to fire, windstorm, sprinkler leakage, vandalism and malicious mischief, water damage, explosion of steam boilers, pressure vessels and other similar apparatus, and other hazards generally included under extended coverage, in an amount not less than the full replacement cost (less excavation and foundation costs) of the Club Interest Project, contents, signs awnings, canopies, gazebos, fences and retaining walls. Such coverage shall include an

100

agreed value provision, waiver of co-insurance, landscape improvements coverage of not less than Five Million Dollars ($5,000,000) and law and ordinance coverage in an amount equal to twenty five (25%) of the replacement value or Ten Million Dollars ($10,000,000) whichever is greater;

B.    Business interruption insurance including extra expense covering at least two (2) years' loss of profits, maintenance fees (if the Club Interest Association elects to insure such maintenance fees), necessary continuing expenses, and if applicable, rent, for interruptions at the Club Interest Project, including an extended period of indemnity of not less than Three Hundred and Sixty Five (365) days, caused by any occurrence covered by the insurance referred to in Section 5.1.A., 5.1.C. and 5.1.D;

C.    If flood insurance is excluded under the property insurance required under this Agreement and the Building is located in whole or in part within an area identified as having a special flood hazard, flood insurance in an amount equal to not less than ten percent (10%) of the replacement cost of the Club Interest Project, to the extent available at commercially reasonable terms, but in no event less than an amount equal to the maximum amount available under the National Flood Insurance Program for such coverage;

D.    If the Building is located in an "earthquake prone zone" as determined by the U.S. Geological Survey, insurance coverage for loss or damage caused by earth movement. Such coverage, including business interruption, shall be for not less than the probable maximum loss as determined by a recognized earthquake-engineering firm, less a reasonable deductible. If the Club Interest Association procures the insurance described in this Section 5.1.D and the Club Interest Association participates in a blanket or shared insurance program, the Club Interest Association shall provide written notice to the Operating Company if actual losses under such program erode the coverage available to the Club Interest Project;

E.    If excluded under the property insurance required under this Agreement, terrorism insurance as available under the Terrorism Risk Insurance Act (as the same may be amended or replaced) or to the extent such coverage is available at commercially reasonable terms; and

F.    Such other property insurance as is customarily maintained by the Operating Company at similar properties.

G.    All insurance procured by the Club Interest Association hereunder shall be obtained from reputable insurance companies of recognized responsibility and financial standing reasonably acceptable to the Operating Company. Any premiums and deductibles under said policies shall be subject to the reasonable approval of the Operating Company. Such premiums and deductibles (net of any credits, rebates and discounts) shall be paid as Basic Expense in accordance with this Agreement.

H.    All such policies of insurance shall be carried in the name of the Club Interest Association, with the Operating Company as an additional insured unless the Operating Company procures such insurance on the Club Interest Association's behalf at which point the

11

101

Operating Company shall be the named insured and shall name the Club Interest Association as an additional insured. Any property losses there under shall be payable to the respective parties as their interests may appear. The documentation with respect to each Mortgage shall contain provisions to the effect that proceeds of the insurance policies required to be carried under Section 5 shall be available for repair and restoration of the Residential Limited Common Area-Club Interest, to the extent required pursuant to Section 5.

I.      If the Club Interest Association procures the insurance described in this Section 5.1, the Club Interest Association shall deliver to the Operating Company (i) certificates of insurance for such insurance or, upon Operating Company's request, a certified copy of the policy(ies) so procured and, (ii) in the case of insurance policies about to expire, certificates with respect to the renewal(s) thereof. All such certificates of insurance shall, to the extent obtainable, state that the insurance shall not be canceled, non-renewed or materially changed without at least thirty (30) days' prior written notice to the certificate holder.

J.      Each of the Club Interest Association and the Operating Company hereby waives its rights of recovery and its insurer rights of subrogation from the other party or any of its affiliates (and their respective directors, officers, shareholders, agents and employees) for loss or damage to the Club Interest Project, and any resultant interruption of business regardless of the cause of such property or business interruption loss.

K.      All premiums for the insurance required in this Section shall be allocated on an equitable basis reasonably agreeable to the Club Interest Association and the Operating Company.

L.      If (i) the Club Interest Association is eligible to participate in the Operating Company's property insurance program, (ii) the Club Interest Association nevertheless elects to procure its own property insurance and (iii) the costs of the premiums and/or deductibles for coverage under the Club Interest Association's property insurance program to be paid as Basic Expense under Section 5 exceed the costs of the premiums and deductibles that would have been payable under the Operating Company's property insurance program by more than ten percent (10%), then the Club Interest Association shall be solely responsible (i.e., such costs shall not impact the Operating Fee or be treated as Basic Expense) for the entire amount by which such costs under the Club Interest Association's program exceed such costs under the Operating Company's program.

M.      If the Club Interest Project participates in Operating Company's property insurance program, but thereafter Club Interest Association elects to remove the Club Interest Project from Operating Company's property insurance program and to procure its own property insurance for the Club Interest Project, the Club Interest Association shall provide the Operating Company notice of such decision at least ninety (90) days prior to the next renewal date of coverage under the Operating Company's property insurance program (which is currently April 1st of each calendar year). If the Club Interest Association fails to timely provide such notice, but the Club Interest Association nevertheless procures its own property insurance for the Club Interest Project, the Club Interest Association shall pay (from its own funds, such that it does not impact the Operating Fee) to the Operating Company an amount equal to ten (10%) of the annual

102

premium under the Operating Company's property insurance program to cover all fixed costs and expenses incurred by Operating Company for the placement of such property insurance.  If the Club Interest Association elects to exit the Operating Company's property insurance program in the middle of a coverage year (i.e., prior to the end of a coverage year), (i) the premiums under each of the Operating Company's property insurance program and the Club Interest Association's replacement property insurance program will be prorated as of the date on which the Operating Company receives and approves certificates of insurance evidencing the Club Interest Association's replacement property insurance coverage and its compliance with the requirements of this Section 5.1 and (ii) the Club Interest Association shall pay to the Operating Company the amount described in the immediately preceding sentence.  If the Club Interest Association elects to exit the Operating Company's property insurance program pursuant to the foregoing provisions, the Club Interest Association may elect to again have the Club Interest Project participate in the Operating Company's property insurance program only upon Operating Company's prior approval, which the Operating Company may withhold in its sole and absolute discretion.

5.2     Operational Insurance

Commencing with the Opening Date and thereafter during the term of this Agreement and any renewals thereof, the Operating Company shall procure and maintain the following:

A.     Commercial general liability insurance against claims for bodily injury, death or property damage occurring in conjunction with the Operating Company's operations of the Club Interest Project, and automobile liability insurance on vehicles operated in conjunction with the operations of the Club Interest Project, with a combined single limit for each occurrence of not less than One Hundred Million Dollars ($100,000,000);

B.     Workers' compensation coverage as may be required under applicable laws covering all of the Operating Company's employees at the Club Interest Project, and employer's liability insurance of not less than One Million Dollars ($1,000,000) per accident/disease;

C.     Fidelity bond coverage in an amount not less than Two Million Dollars ($2,000,000) covering the Operating Company's employees at the Club Interest Project; and

D.     Employment practices liability insurance covering all of the Operating Company's employees at the Club Interest Project, to the extent available at commercially reasonable rates and terms, in an amount not less than Two Million Dollars ($2,000,000);

E.     Such other insurance in amounts as the Operating Company, in its reasonable judgment, deems advisable for protection against claims, liabilities and losses arising out of or connected with the operation of the Club Interest Project.

F.     All insurance described in Sections 5.2 may be obtained through blanket insurance programs, provided that such blanket programs substantially fulfill the requirements

13

specified herein. The blanket insurance programs may include an "Insurance Retention." Insurance Retention shall mean the deductibles or risk retention levels; however, the Club Interest Project's responsibility for such deductibles or risk retention levels shall be limited to the Club Interest Project's per occurrence limit for any loss or reserve as established for the Club Interest Project, which limit shall be the same as other similar properties participating in the blanket insurance programs.

G.    All insurance required under Section 5.2 shall be carried in the name of Operating Company.    The insurance required under 5.2.A shall include the Club Interest Association, and any Mortgagees specified by the Club Interest Association, in writing, as additional insureds.

H.    Operating Company, upon request, shall deliver to the Club Interest Association certificates of insurance evidencing the insurance coverages required under Section 5.2.A and any renewals thereof. All such certificates of insurance shall, to the extent obtainable, state that the insurance shall not be canceled or materially reduced without at least thirty (30) days' prior written notice to the certificate holder.

I.    All insurance premiums, costs and other expenses, including any Insurance Retention, shall be treated as a Basic Expense.  All charges under the blanket programs shall be allocated to the Club Interest Project and other similar participating condominiums on a reasonable basis.  Any losses and associated costs and expenses that are uninsured shall be treated as a cost of insurance and shall also be treated as part of those operating or other expenditures incurred or paid by or on behalf of the Club Interest Association by the Operating Company in connection with the normal course of owning, conducting and operating the business affairs of the Club Interest Association.

J.    Upon termination of this Agreement, a reserve in an amount determined by the Operating Company based on loss projections, shall be established from the Reserve Account to cover the amount of any Insurance Retention and all other costs and expenses that will eventually have to be paid by either the Club Interest Association or the Operating Company with respect to pending or contingent claims, including those that arise after termination of this Agreement for causes arising during the term (or any renewal term) of this Agreement.  If the Reserve Account is insufficient to meet the requirements of such reserve, the Club Interest Association shall deliver to the Operating Company, within ten (10) days after receipt of the Operating Company's written request thereof, the sums necessary to establish such reserve; and if the Club Interest Association fails to timely deliver such sums to the Operating Company, the Operating Company shall have the right (without affecting Operating the Company's other remedies under this Agreement) to withdraw the amount of such expenses from the operating accounts, working capital funds or any other funds of the Club Interest Association held by or under the control of the Operating Company.

5.3    Insurance Proceeds.

All proceeds of property damage insurance required to be maintained by the Club Interest Association under Section 5 when collected shall be deposited with the Operating

104

Company, in a trust account in a bank, or trust company approved by the Operating Company and the Club Interest Association, and such insurance proceeds shall be used to the extent necessary for the repairing, rebuilding, and replacement of the Club Interest Project and any other related improvement or improvements, together with replacing any Residential Limited Common Area-Club Interest, required in the operation of the Club Interest Project, all such proceeds being pledged and dedicated by the parties for that purpose. Any Mortgage on the Residential Limited Common Area-Club Interest shall contain provisions to the effect that all such proceeds shall be available for that purpose.

 5.4  <u>The Club Interest Association's Insurance.</u>

   A. In connection with the business and affairs of the Club Interest Association and the Club Interest Project, to the extent not delegated to the Operating Company in the Agreement, the Club Interest Association shall, throughout the term (or any renewal term) of this Agreement, provide and maintain, at its sole expense, commercial general liability insurance in amounts not less than a combined single limit of $10,000,000 for each occurrence, providing coverage for claims for personal injury, death and property damage occurring at the Club Interest Project or in connection with the business of the Club Interest Association. In the event that this Agreement is terminated, but the operating agreements for both the Club Interest Association and the Residence Association remains in full force and effect, the Club Interest Association shall provide and maintain, at Club Interest Association's sole cost and expense, commercial general liability insurance in amounts not less than a combined single limit of $10,000,000 for each occurrence, providing coverage for claims for personal injury, death and property damage occurring at the Club Interest Project, or in connection with the business of the Club Interest Association. Such $10,000,000 insurance may be purchased jointly with the Master Association and Residence Association, and provide protection against such claims for both the Club Interest Project, Residential Limited Common Area Full Ownership and the 690 Market Street master community and the Residence Project. The Operating Company shall be named as additional insured on the insurance described in this Section.

   B. The Club Interest Association shall procure and maintain (i) directors and officers liability insurance, (ii) fidelity coverage to protect against dishonest acts on the part of officers, directors, trustees and employees (if any) of the Club Interest Association and (iii) any other coverages required by the Governing Instruments to the extent not procured by Operating Company pursuant to Section 5 of this Agreement.

 5.5  <u>Club Interest Owner's Insurance.</u>

   Neither Operating Company nor the Club Interest Association has any responsibility for procuring insurance to protect the Owner's improvements and betterments, personal property and personal liability associated with the Owner's activities, and that the Club Owner must provide such insurance if desired or required by the Governing Instruments. Owners shall be required to obtain and maintain property and liability insurance, as appropriate, as required for the Club Interest Association and the Master Association under such association's governing documents.

105

6. Frequency of Services.

The services, obligations and responsibilities to be performed by the Operating Company shall be performed as often as set forth hereinabove; however, if no time frame is specified, then the Operating Company shall perform its services, obligations and responsibilities under this Agreement as often as it, in its sole discretion, and in accordance with all applicable laws and regulations, deems necessary to ensure compliance with The Ritz-Carlton Club brand standards. The services, obligations and responsibilities shall be performed in substantial accordance to the provisions provided for in the approved budget.

7. Contracts for Products and Services.

Subject to the provisions of this Section 7, Operating Company shall, on behalf of and as a common expense of the Club Interest Association, engage such third parties as Operating Company deems as necessary or desirable for the operation and maintenance of the Club Interest Project. Operating Company shall administer any contracts for such services on behalf of the Club Interest Association. Subject to the provisions of this Section 7, Operating Company shall not be precluded from executing agreements or granting concessions or licenses to itself or to any affiliate. To the extent not prohibited by California statutes or this Section 7, entering into any contract, agreement, concession or license by Operating Company with an affiliate shall not be considered to be self-dealing; provided that the prices and other terms of such contract, agreement, concession or license are competitive with those obtainable from unrelated vendors or are the subject of competitive bidding. The Operating Company shall not be required to obtain the best price available as to any service, material or purchase, but shall purchase or contract for same on such terms and with such person or party as it deems advisable and in the best interest of the Club Interest Association.

Notwithstanding any contrary provision of this Agreement, Operating Company shall not enter into a contract with a third person whereby such person will furnish goods or services for the management, operation, maintenance or repair of the Club Interest Project or Property for a term longer than three (3) years, without the Club Interest Association's prior written consent (which Operating Company acknowledges will be granted only upon the consent of a majority of Club Interest Owners other than the Declarant), except for:

(a) a contract with a public utility company if the rates charged for materials or services are regulated by the California Public Utilities Commission; provided, however, that the term of the contract shall not exceed the shortest term for which the supplier will then contract at the regulated rate;

(b) prepaid casualty and/or liability insurance policies not to exceed three (3) years duration provided that the policy permits short-rate cancellation by the insured;

(c) the following types of contracts, provided that the lessor or provider is not an entity in which Declarant or Operating Company has a direct or indirect interest of ten percent (10%) or more:

16

106

    i.      a lease of furniture, furnishings, appliances and other personal property;

    ii.     agreements for cable television services and equipment or satellite television services and equipment;

    iii.    agreements for burglar alarm and fire alarm equipment, installation and services;

    iv.    a lease for laundry room fixtures and equipment; and

    v.     fidelity insurance for the Operating Agreement.

    (d)    a contract for a term not to exceed five (5) years that is terminable by the Club Interest Association after no longer than one (1) year without cause, penalty or other obligation upon ninety (90) days written notice of termination to the other party.

8.      Building Compliance.

    The Operating Company shall not be responsible for the compliance of the Property or any of its equipment with the requirements of any building codes or with any statutes, ordinances, laws, rules, or regulations (including those relating to the existence and disposal of solid, liquid, and gaseous wastes, and toxic or hazardous substances) of any city, county, state, or federal governments or agencies, or any public authority or official thereof having jurisdiction over it. However, the Operating Company shall notify the Club Interest Association promptly or forward to the Club Interest Association promptly any complaints, warnings, notices, or summonses received by the Operating Company relating to any such matters. The Club Interest Association authorizes the Operating Company to disclose the ownership of the Property to any such officials and agrees to indemnify, defend, and hold the Operating Company, its representatives, servants, and employees, harmless from all loss, cost, expense, and liability whatsoever which may be imposed on them by reason of any present or future violation or alleged violation of such laws, ordinances, rules, or regulations. The cost of compliance with laws, ordinances, rules and regulations incurred by Operating Company shall be a Basic Expense of the Club Interest Association.

9.      Waiver of Reserves.

    Notwithstanding the delegating by the Club Interest Association to the Operating Company of its power to determine and collect assessments during the term of this Agreement, the Club Interest Association retains the power to waive required reserves making up a part of those assessments in the manner permitted by law.

107

10.  Payment of Basic Expenses.

        The Operating Company shall apply assessments collected to those items specified in the Articles of Incorporation and governing documents of the Club Interest Association, including the Operating Company's fee and expenses in substantial accordance with the approved budget. Savings in one category of budgeted expenses may be used to offset overages in other categories.

11.  Collection of Assessments.

        With the authorization of the Board and subject to applicable law, the Operating Company may take such action in the name of the Club Interest Association by way of filing, recording, satisfying, foreclosing, or vacating a lien against a Club Interest Owner's Club Interest should such Club Interest Owner fail to pay assessments or maintenance fees, and take such other appropriate action, either in its name on behalf of the Club Interest Association or in the name of the Club Interest Association, or if necessary, engage legal counsel to pursue legal process. The Operating Company may compromise liens in such amount as it deems advisable and render statements as to the current status of a Club Interest Owner's account. Any lien or charge against any Club Interest Owner shall be limited to the Club Interest owned by the defaulting Club Interest Owner and shall not be filed so as to encumber the Club Interests owned by any other Club Interest Owners in the any Club Interest Unit related to such Club Interest. The Club Interest Association shall aid and assist the Operating Company in any reasonable manner requested by the Operating Company in the request, demand, making or collecting of assessments, maintenance fees, charges, late fees or interest, or a combination thereof, which may be due the Club Interest Association. The costs of collection shall be a Basic Expense of the Club Interest Association.

12.  Denial of Use of Accommodations and Facilities.

        The Operating Company is authorized to deny use of the accommodations and facilities of the Club Interest Project to any Club Interest Owner who is delinquent in the payment of any assessment against such Club Interest Owner for common expenses or for ad valorem real estate taxes and may deny such use to any person claiming under such delinquent Club Interest Owner. The Operating Company is also authorized to rent any delinquent Club Interest Owner's Club Interest and any use rights appurtenant thereto and apply the rental income towards the Operating Company's customary rental commissions, if any, cleaning charges, travel agent commissions, or any other commercially reasonable charges and all costs and expenses incurred by the Operating Company in connection with the rental with the balance of such rental income applied to such delinquent Club Interest Owner's account. The Operating Company is not required to obtain the highest nightly rental rate available, nor any particular rental rate. However, the Operating Company must use reasonable efforts to secure a rental that is commensurate with other rentals of similar Club Interests. The Operating Company shall not be required to rent the entire Use Period.

108

### 13.   No Advances by Operating Company.

The Operating Company shall not be required to pay Basic Expenses from its own funds, and shall only be required to perform its services and to make disbursements to the extent that, and so long as, payments received from assessments or other revenues, if any, of the Club Interest Association are sufficient to pay the costs and expenses of such services and the amounts of such disbursements. If it shall appear to the Operating Company that the assessments and other revenue, if any, of said Club Interest Association and its members are insufficient, the Operating Company shall forthwith determine such additional assessment as is required and advise the Board and its members. Any funds that may be advanced to the Club Interest Association by the Operating Company shall be repaid at the earliest possible date and if such advance was approved by the Board, shall bear interest at the rate of eighteen percent (18%) per annum, or the highest interest rate allowed by law, until paid.

### 14.   Operating Fee.

As compensation for its services hereunder, the Operating Company shall receive an annual net fee, free from all charges and expenses, which shall be an amount equal to Five Hundred Fifty Four and 23/100 Dollars ($554.23) (in 2007 dollars) per Club Interest from the Owners of the Club Interests in the Club Interest Units (the "Operating Fee"). The Operating Fee shall be increased annually at Operating Company's sole discretion by the same percentage increase of the proposed new year's budget over the immediate prior year's budget excluding all amounts for the Operating Fee.

### 15.   No Interference.

The Club Interest Association shall not unreasonably interfere, nor allow or cause any of the officers or Club Interest Owners to unreasonably interfere, with the Operating Company in the performance of its duties or the exercise of any of its powers described in this Agreement.

### 16.   Default.

If either party defaults hereunder, then the other party, sixty (60) days after having given written notice to any officer of the defaulting party, may declare this Agreement in default, unless such default is cured by the defaulting party within sixty (60) days after receipt of such notice. Upon default, either party may, in addition to any other remedy given it by agreement or in law or in equity, bring an action against the other party for damages, injunctive relief or such other rights and remedies as it may have, or a combination thereof, and the prevailing party shall be liable for the other party's reasonable attorneys' fees and costs incurred thereby. All of such rights upon default shall be cumulative, and the exercise of one or more remedies shall not be deemed to exclude or constitute a waiver of any other or additional remedy.

109

17.     Arbitration.

A dispute under this Agreement shall be governed exclusively by the laws of the State of California and shall be controlled and decided by arbitration. The parties agree that the arbitration shall be held in California and subject to the American Arbitration Association's Commercial Arbitration Rules then in effect. The decision shall be binding and non-appealable by either party. Unless the arbitrator determines otherwise, the party losing the arbitration shall be responsible for and pay all the reasonable costs, expenses, and attorney's fees incurred by the other party.

18.     Indemnity.

The Club Interest Association agrees that it shall defend, indemnify and hold harmless the Operating Company from and against any and all costs, damages, liabilities and expenses (including reasonable attorney's fees) arising from any claim by any person or entity relating to the Club Interest Project or any part thereof, or any death, injury to person or property damage occurring on or about the Club Interest Project or any part thereof or directly or indirectly arising out of any construction defects or claims, or the conduct or operation of the Club Interest Project or the performance of the Operating Company's duties or services hereunder. If any proceeding shall be brought or threatened against the Operating Company with respect to any matter for which the Operating Company is entitled to indemnity pursuant to the preceding sentence, the Operating Company shall promptly notify the Club Interest Association in writing and the Club Interest Association shall assume the defense thereof, including the employment of counsel approved by the Operating Company and the payment of all costs of litigation. Notwithstanding the preceding sentence, the Operating Company shall have the right to employ its own counsel and to determine its own defense of such action in any such case, but the fees and expenses of such counsel shall be at the expense of the Operating Company unless (i) the employment of such counsel shall have been authorized in writing by the Club Interest Association or (ii) the Club Interest Association, after due notice of the action, shall not have employed counsel satisfactory to the Operating Company to have charge of such defense, in either of which events the reasonable fees and expenses of counsel for the Operating Company shall be borne by the Club Interest Association. The Club Interest Association shall not be liable for any settlement of any such action effected without its consent. The provisions of this Section 18 shall survive the termination of this Agreement.

19.     Successors and Assigns.

This Agreement shall be binding upon and inure to the benefit of the successors and assigns of the Operating Company and the successors and assigns of the Club Interest Association.

20.     Special Charges.

Subject to the requirements for levy of Assessments as provided in the Club Interest Declaration, the Operating Company as operator for the Club Interest Association shall be authorized to impose a special personal charge against a Club Interest Owner for repair or

110

replacement of Residential Limited Common Area-Club Interest or property of the Club Interest Association caused, in the opinion of the Operating Company, by the negligence or misuse of a Club Interest Owner, his family, guests, lessees or invitees; or failure, in the opinion of the Operating Company, of a Club Interest Owner to maintain those portions of his Club Interest and Residential Limited Common Area-Club Interest, if any, assigned to his Club Interest, as he or she is required to repair and maintain; or violation of the provisions of the Club Interest Declaration which require the removal of same by the Operating Company or which increase the costs of maintenance and repair by the Operating Company, or increase insurance rates.

21.   Allocation of Expenses.

The Operating Company and its employees and agents may perform similar services for other master associations, condominium associations, timeshare associations and entities. In this regard, the Operating Company is authorized to provide such services, as appropriate, on a consolidated basis whereby such services are provided to more than one association. To require the Operating Company to strictly cost account with regard to each association or interest in an association managed by the Operating Company would increase the costs of administration hereunder borne by the Club Interest Association. Accordingly, the Operating Company is hereby authorized to allocate to the Club Interest Association its appropriate and fair share of such costs and expenses as are general and, as to those which are not general, to charge the same to the appropriate party(ies) on such basis (weighted or not) as the Operating Company deems fair and equitable.

22.   Operating Company Assumes No Liability.

The Operating Company assumes no liability whatsoever for any acts or omissions of the Board or the Club Interest Association, or current or previous Club Interest Owners of the Property, or any previous management or other agent of either. The Operating Company assumes no liability for any failure of or default by any individual Club Interest Owner in the payment of any assessment or other charges due the Club Interest Association or in the performance of any obligations owned by any individual Club Interest Owner to the Club Interest Association. The Operating Company likewise assumes no liability for any failure of or default by concessionaires in any rental or other payments to the Club Interest Association, nor does the Operating Company assume any liability for previously unknown violations of environmental or other regulations which may become known during the period this Agreement is in effect.

23.   Proprietary Marks.

"Proprietary Marks" include, but are not limited to, all trademarks, trade names, symbols, logos, slogans, designs, insignia, emblems, devices, service marks and distinctive designs of buildings and signs, architectural plans, drawings, specifications, computer files, or combinations thereof, which are used to identify The Ritz-Carlton Development Company, Inc., the Operating Company or any of their affiliates. All works in which copyright rests in Operating Company or any affiliate of Operating Company or any other and all patents registered or applied for in the name of Operating Company or any affiliate of Operating Company shall be considered "Proprietary Marks." The term "Proprietary Marks" shall include

111

all present and future Proprietary Marks, whether they are now or hereafter owned by Operating Company or any affiliate of Operating Company, and whether or not they are registered under the laws of the United States of any other country. The name, "The Ritz-Carlton Club", used in conjunction with other words or names, are examples of Proprietary Marks. Proprietary Marks shall remain the exclusive property of Operating Company or one of its affiliates. Upon termination of this Agreement, the Club Interest Association shall have no right to use the Proprietary Marks and any use of the Proprietary Marks by the Club Interest Association shall immediately cease. In addition, upon termination, neither the Association nor the Club Interest Owners shall any longer be entitled to participate in or have access to any additional benefit or program provided or sponsored by Operating Company or any of its affiliates.

24.  Conflicting Provisions.

The invalidity in whole or in part of any provision of this Agreement shall not affect the validity of the remaining portions hereof. The provisions of this Agreement shall be paramount to California statutes as to those provisions where permissive variances are permitted; otherwise, the provisions of the aforesaid Acts shall prevail and shall be deemed incorporated herein. The applicable terms and provisions of the Articles of Organization or the governing documents shall be deemed paramount to the terms and provisions of this Operating Agreement nd, where applicable, the terms and provisions of this Operating Agreement shall be deemed amended to comply with the foregoing.

25.  No Waiver.

No waiver of a breach of any of the covenants contained in this Agreement shall be construed to be a waiver of any succeeding breach of this same covenant.

26.  Time of Essence.

Time is of the essence in every particular, and especially where the obligation is to pay money.

27.  Entire Agreement.

This Agreement constitutes the entire agreement between the parties hereto, and neither party has been induced by the other by representations, promises or understandings not expressed herein. No modification to any provision hereof shall be valid unless in writing, signed by the parties to this Agreement.

28.  Notices.

Any notices required or provided for in this Agreement shall be in writing and shall be addressed as indicated below or to such other address as the Operating Company or the ssociation may specify hereafter in writing.

112

## TO THE OPERATING COMPANY

The Ritz-Carlton Management Company, L.L.C.
6649 Westwood Boulevard, Suite 500
Orlando, Florida 32821-6090
Attention: Vice President of Operations

with a copy to:

The Ritz-Carlton Management Company, L.L.C.
6649 Westwood Boulevard, 3rd Floor
Orlando, FL 32821
Attn: Law Department

## TO THE ASSOCIATION

President of the Association at the address of the President as on file with the Operating Company.

Notices or other communications between the parties to this Agreement may be mailed by United States registered or certified mail, return receipt requested, postage prepaid, and may be deposited in a United States Post Office or a depository regularly maintained by the post office. Such notices may also be delivered by hand, by facsimile or by any other receipted method or means permitted by law. For purposes of this Agreement, notices shall be deemed to have been "given" or "delivered" upon personal delivery thereof or forty-eight (48) hours after having been deposited in the United States mails as provided herein.

29. <u>Affiliated Corporations.</u>

The Operating Company is an affiliated company of a wholly-owned subsidiary of The Ritz-Carlton Development Company, Inc.

30. <u>Independent Contractor.</u>

The parties hereby agree and acknowledge that the Operating Company is an independent contractor of the Association. The Association hereby releases any right of control over the method, manner or means by which the Operating Company performs its duties and responsibilities under this Agreement.

31. <u>Excusable Delays.</u>

In the event that the Operating Company shall be delayed, hindered in or prevented from the performance of any act required hereunder by reason of strikes, lock-outs, labor troubles, inability to procure materials, failure of power, restrictive governmental laws or regulations, riots, insurrection, war, Act of God, or any other reason beyond the Operating Company's control, then performance of such act shall be excused for the period of the delay,

113

and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay.

32. Brand Standards.

For so long as this Agreement remains in effect, the parties agree that the Club Interest Project shall be maintained and operated in accordance with "The Ritz-Carlton Brand Standards", which standards are defined as the standards of operation, service, furnishing, equipping, and maintenance applicable to substantially all of The Ritz-Carlton branded hotels and The Ritz-Carlton Clubs managed and operated by The Ritz-Carlton Hotel Company, L.L.C., an affiliate of Operating Company. Any failure of the Association to maintain the Club Interest Project in accordance with The Ritz-Carlton Brand Standards, which failure is not caused by the acts or omissions of Operating Company, shall constitute a default under this Agreement and the sole remedy of Operating Company, subject to the right of notice and right to cure as provided for in Section 16, shall be to terminate this Agreement.

In the event of either a legal requirement, including an order, judgment or directive by a court or administrative body which is issued in connection with any litigation involving the Association, which restricts or prevents the Operating Company, in a material and adverse manner, from operating the Property in accordance with The Ritz-Carlton Brand Standards (including without limitation, any restrictions on expenditures by the Operating Company from the operating accounts or from the Reserve Account, other than restrictions which are set forth in this Agreement), the Operating Company shall be entitled, at its option, to terminate this Agreement upon sixty (60) days' written notice to the Association. The foregoing shall not reduce or otherwise affect the rights of the parties pertaining to default remedies under this Agreement.

33. Advances and Refurbishments.

Any refurbishments shall be in accordance with the Operating Company's then existing refurbishment standards. For any refurbishments, the Operating Company shall have a right to bid for such services. In addition, if the Association undertakes any major refurbishments or major capital repairs or construction, the Operating Company shall provide project oversight for a reasonable fee in order to ensure compliance with The Ritz-Carlton Brand Standards and the refurbishment standards.

Notwithstanding the foregoing, the Operating company shall not be required to perform any act or duty hereunder involving an expenditure of money unless there shall be sufficient funds therefore in the bank accounts of the Association; if at any time the funds in the bank accounts of the Association are not sufficient to pay the charges incident to this Agreement, the Operating Company, although not obligated to do so, may advance such sums as it deems necessary, and in such event, the Operating Company shall be entitled to reimburse itself from the Association funds for the amount of such advances, together with interest at the rate of eighteen percent (18%) per annum commencing from and after twenty (20) days from the date of the advance by the Operating Company.

114

34.   Survival of Provisions.

All representations and warranties of the parties contained herein shall survive the termination of this Agreement. All provisions of this Agreement that require the Association to have insured or to defend, reimburse, or indemnify the Operating Company shall survive any termination; and if the Operating Company is or becomes involved in any proceeding or litigation by reason of having been the Operating Company for the Association, such provisions shall apply as if this Agreement were still in effect.

35.   Anti-Money Laundering Laws.

The Association hereby represents its compliance with all applicable anti-money laundering laws, including, without limitation, the USA PATRIOT Act, and the laws administered by the United States Treasury Department's Office of Foreign Assets Control, including, without limitation, Executive Order 13224.

*(Rest of Page Intentionally Left Blank)*

*(Signature Page Follows)*

115

IN WITNESS WHEREOF, the parties hereto have caused these presents to be signed by their proper officer(s) as of the date first written above.

THE RITZ-CARLTON MANAGEMENT COMPANY, L.L.C.

By: THE RITZ-CARLTON DEVELOPMENT COMPANY, INC., its sole member

By: _____
Name: Daniel B. Zanini
Title: Vice President

690 Market Club Owners Association

By: _____
Name: John Albert
Title: President

V:\ORL535-Legal\Legal  Shared\RCC-San  Francisco  (282)\RCC-(Fractionals)  Condo  Documents\California-situs  state\Management Agreements\Operating Agreement _Club Association CL.01.24.06.doc

116

EXHIBIT "E"
TO THE AMENDED AND RESTATED DECLARATION OF COVENANTS,
CONDITIONS AND RESTRICTIONS FOR 690 MARKET CLUB

Amended and Restated Limited Subsidy Agreement

## AMENDED AND RESTATED
## LIMITED SUBSIDY AGREEMENT

THIS AMENDED AND RESTATED LIMITED SUBSIDY AGREEMENT ("Agreement") is made as of the 5th day of July 2007, by and between 690 Market Club Owners Association, California nonprofit mutual benefit corporation (the "Association"), and R.C. Chronicle Building, L.P., a Delaware limited partnership ("Developer"), with reference to the following facts and circumstances:

### RECITALS

A.      Developer is the owner of certain real property (the "Property") located in San Francisco County, State of California, as more particularly described on Exhibit A attached hereto and made a part hereof.

B.      The Property is being developed as part of a mixed use condominium project known as 690 Market Street Condominiums in a building located on the Property ("Building") that will include, among other things, commercial units, whole ownership units, and fractional ownership units ("Club Interest Units"), which Club Interest Units are part of a separate regime known as 690 Market Club (the "Club Interest Project"), which are subject to that certain Declaration of Covenants of Covenants, Conditions and Restrictions for 690 Market Club ("Declaration") recorded June 15, 2006, as Document No. 2006-I194390-00 of the Official Records of the City and County of San Francisco, California. The Declaration provides for the operation and maintenance by the Association of the Club Interest Units within the Club Interest Project.

C.      On June 16, 2006, the parties executed that certain Limited Subsidy Agreement ("First Agreement") related to the payment by Developer of any deficiencies between the amounts assessed to all Owners of Club Interest Units, including Club Interests therein, and the Basic Expenses necessary to operate the Club Interest Project during fiscal year 2007 in connection with the Club Interest Units.

D.      In accordance with Section 8(d) of the First Agreement, the parties desire to amend and restate the First Agreement to reflect the change in phasing of the Club Interest Project and correlating deficiencies for fiscal year 2007 related thereto.

E.      The initial phase of the Club Interest Project included, among other things, twelve (12) Club Interest Units on floors 3, 4 and 12 of the Building (collectively, "Phase 1"), which is expected to be completed and ready for occupancy on or about October, 2007.

F.      A second phase of the Club Interest Project may include, among other things, fourteen (14) Club Interest Units on floors 5, 6 and 8 of the Building ("Phase 2").

G.      A third phase of the Club Interest Project may include, among other things, eighteen (18) Club Interest Units on floors 2, 7, 9 and 10 of the Building ("Phase 3").

H.      Association has approved a tentative Budget for fiscal year 2007 ("2007 Budget") based upon forty-four (44) Club Interest Units to be located on floors 2 through 10 and floor 12 of the Building, however, there is no assurance that Developer will add floor 2 and floors 5 through 10 and the respective thirty-two (32) Club Interest Units to the Club Interest Project.

I.      The 2007 Budget includes assessments for the Club Interest Units that may be included in Club Interest Project.

J.      Pursuant to the Declaration, the annual budget of the Association includes a pro-rata share of the expenses of maintaining the Common Area levied by the Master Association, and therefore

118

the Assessments payable by members of the Association include an allocable share of such Basic Expenses.

K.     The twelve (12) Club Interest Units located on floors 3, 4 and 12 of the Building will be completed and available for occupancy prior to the thirty-two (32) Club Interest Units located on floor 2 and floors 5 through 10, if such units are added to the Club Interest Project, which leads to increased staffing ratios and related costs for the former units during the Association's initial period of operation.

L.     In accordance with Sections 11241(a)(2) and 11241(c) of the California Vacation Ownership and Time-share Act of 2004, Developer is willing to pay any deficiencies between the amounts assessed to all Owners of Club Interest Units, including Club Interests therein, and the Basic Expenses necessary to operate the Club Interest Project during fiscal year 2007 in connection with the Club Interest Units. Specifically, Developer and the Association intend to establish by this Agreement a program whereby Developer will provide for the payment of Developer's appropriate share of the costs and expenses of the Association. It is the intention of Developer and the Association that Developer shall, pursuant to the terms and conditions set forth below, pay all of the "Deficiencies" of the Timeshare Association and by its payments hereunder eliminate any need for a Special Assessment during the term hereof (other than special assessments approved by the Board and, if necessary, by Owners, for capital expenditures during the term hereof).

## TERMS AND CONDITIONS

1.     Definitions. Except as otherwise provided herein, the terms used in this Agreement shall have the same meaning as the meanings attributed thereto in the Declaration. As used herein, the term "Assessment" does not refer to nor include personal or default Assessments credited to a specific Owner.

2.     Payment of Deficiencies. In addition to its obligation to pay Assessments as an Owner, Developer hereby agrees to pay the Deficiencies, as defined below, to the Association either on a period basis (pursuant to the Developer's period calendar) or on or before December 31, 2007, as necessary to meet the cash flow needs of the Association related to the Basic Expenses of the Club Interest Units. Based on the 2007 Budget, Developer shall secure or has secured a deficit bond in the amount of $1,479,115, or such lesser amount as deemed acceptable by the California Department of Real Estate, to cover any Deficiencies.

(a)     Deficiencies. "Deficiencies" means, for each Fiscal Year of the Association, the difference between (i) the cumulative total amount of the expenses related to the Club Interest Project that are attributable to the Club Interest Units and the Club Interest Project for fiscal year 2007 including (x) the Reserve Expenses, (y) the Basic Expenses for the Residential Limited Common Area—Club Interest, plus (z) the portion of Basic Expenses for the Common Area assessed by the Master Association and (ii) the annual Assessments received for fiscal year 2007 with respect to the Club Interests sold by the Developer. In addition, the term "Deficiencies" includes any shortfalls for fiscal year 2007 that are budgeted as (x) part of the annual Assessment in a subsequent year, or (y) a special Assessment. No provision of this definition shall, when used hereinafter, entitle Developer to pay less than a full pro-rata share of the Reserve Expenses of the Association for each Club Interest owned by Developer.

(b)     "Reserve Expenses" means those amounts set forth in the budget of the Association for any fiscal year of the Association under consideration for reserves for replacement, repair or refurbishment of:

1.     the items for which the Association has or anticipates having a duty to maintain and replace, or

119

2. the items for which the Master Association has or anticipates having a duty to maintain and replace, a pro-rata share of which is included as a reserve component in the regular annual assessment levied against each Club Interest Unit (or Club Interest, as applicable) by the Association.

3. Notwithstanding the foregoing, Reserve Expenses shall not include any expense set forth in the budget for the Association which is not actually incurred by the Association or the Master Association. For example, if the Club Interest Project at the beginning of a fiscal year of the Association includes thirty two (32) Club Interest Units, but only eight (8) of such Club Interest Units are furnished with Common Furnishings on the Starting Date (defined below), Reserve Expenses would include reserves for replacement of only the Common Furnishings within the eight (8) Club Interest Units which accrue between the Starting Date and the end of such fiscal year, and not within the remaining unfurnished seventeen (17) Club Interest Units, notwithstanding the provision in the budget for reserves for Common Furnishings within all thirty two (32) Units. In the foregoing example, Reserve Expenses would include reserves for the entire fiscal year for all other depreciable assets which are subject to maintenance and replacement by the Association, including interior paint, flooring, water heaters and air-conditioning units within all eight (8) Club Interest Units. Reserves for repair and replacement of the Common Area allocable to all thirty two (32) Club Interest Units would be payable as part of the Basic Expenses assessed to the thirty two (32) Club Interest Units by the Master Association. Developer would accordingly pay, for each Club Interest it owns, a full pro-rata share of the reserves for repair and replacement of the Common Area allocable to the Club Interest Project.

(c) "Starting Date" means the date on which the first grant deed for each Phase is recorded after the date hereof which conveys a Club Interest owned by Developer excluding any deed which conveys the entire interest in the Club Interest Project then owned by Developer.

(d) Special Assessments. There shall be no special Assessments during the term of this Agreement assessed against the Club Interest Units or the Club Interests.

(e) Annual Accounting. Accounting for this Agreement shall be made no later than ninety (90) days after the end of the fiscal year of the Association.

3. [INTENTIONALLY OMITTED]

4. Term. The term of this Agreement shall be for the Association's fiscal year 2007.

5. Club Interest Units. The subsidy set forth in this Agreement only affects the expenses assessed against Club Interest Owners under the Club Interest Association's operating budget by the Club Interest Association.

6. Surety Bonds. Developer agrees, if required by applicable federal or state law, to furnish to the Association a surety bond ("Bond") in an amount sufficient to provide for Developer's payment of its monetary obligations pursuant to this Agreement. The Bond shall secure the obligation of Developer to pay the Deficiencies during the term of this Agreement.

7. Effect of Agreement Upon Developer's Assessment Obligations. In the event Developer default in the performance of any of its obligations hereunder and such default shall not have been ed within ten (10) days after notice of default is given to Developer by the Association, (a) Developer's default hereunder shall be deemed a default in the payment of Assessments under the

120

Declaration, which default shall be deemed to have occurred on the date of expiration of the grace period set forth herein and (b) the Association shall have the right to exercise each and all of the rights and remedies set forth herein and in the Declaration with respect to the non-payment of the Assessments by Developer as owner of Club Interest Units, or Club Interests, as applicable, and as provided under the Bond; provided, however, that notwithstanding Developer's failure to cure any default hereunder within the time period specified, Developer shall have the right thereafter to cure such default, and upon so doing, Developer may notify the Association of Developer's intention thereafter to comply with the terms of this Agreement and, if necessary, to reinstate the Bond, in which case all of the rights, duties and obligations of Developer and the Association hereunder shall continue unabated and any Assessments paid by Developer shall be treated as having been paid with respect to Developer's obligations under this Agreement.

8.   Miscellaneous.

(a)   Notices. Any notice, request, demand, instruction or other document to be given hereunder to any party shall be in writing and shall either be personally delivered to the person at the appropriate address set forth below (in which event such notice shall be deemed effective only upon such delivery) or delivered by mail, sent by registered or certified mail, return receipt requested, as follows:

If to the Association:               690 Market Club Owners Association
                                     6649 Westwood Blvd., Suite 500
                                     Orlando, FL 32821

If to Developer:                     R.C. Chronicle Building, L.P.
                                     6649 Westwood Blvd., Suite 500
                                     Orlando, FL 32821

With a Copy to:                      HCT (690A Market), Inc.
                                     c/o Hunter Group
                                     1411 Harbor Bay Parkway, Suite 100
                                     Alameda, CA 94502

                                     and

                                     The Ritz-Carlton Development Company, Inc.
                                     6649 Westwood Blvd., Suite 500
                                     Orlando, FL 32821

Notices so mailed shall be deemed to have been given 48 hours after the deposit of same in any United States mail post office box in the state to which the notice is addressed or 72 hours after deposit in any such post office box other than in the state to which the notice is addressed, postage prepaid, addressed as set forth above. The addresses and addressees for the purpose of this paragraph may be changed by giving notice of such change in the manner herein provided for giving notice. Unless and until such notice is received, the last address and addressee stated by notice, or as provided herein if no notice of change has been sent or received, shall be deemed to continue in effect for all purposes hereunder.

(b)   Waiver. The waiver or failure to enforce any provision of this Agreement shall not operate as a waiver of any future breach of such provision or of any other provisions hereof.

(c)   Merger. All understandings and agreements heretofore had between the parties respecting the subsidization contemplated by this Agreement are merged by this Agreement and the exhibits attached hereto, all of which fully and completely express the agreement of the parties. There are

no agreements except as specifically set forth in this Agreement or to be set forth in the instruments or other documents delivered or to be delivered hereunder.

(d)    Amendments.  Except as provided in subparagraph 8(a), above, no change in or addition to, or waiver or termination of this Agreement or any part thereof shall be valid unless in writing and signed by or on behalf of each of the parties hereto.

(e)    Paragraph Headings.  The paragraph headings herein contained are for the purposes of identification only and shall not be considered in construing this Agreement.

(f)    Successors and Assigns.  All of the terms and provisions of this Agreement shall be binding upon, inure to the benefit of and be enforceable by the parties and each of their respective successors and assigns.

(g)    Attorneys' Fees.  In the event any controversy, claim or dispute between the parties hereto, arising out of or relating to this Agreement or the breach thereof, results in arbitration or litigation, the prevailing party in such proceedings shall be entitled to recover from the losing party reasonable expenses, attorneys' fees and costs.

(h)    Severability.  Every provision of this Agreement is intended to be several.  If any term or provision hereof is illegal or invalid for any reason whatsoever, such illegality shall not affect the validity of the remainder of the within Agreement.

(i)    Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be an original and all of which, when taken together, shall constitute a single document.

*(Rest of page intentionally left blank)*

*(Signature page follows)*

122

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

ASSOCIATION:

690 MARKET CLUB OWNERS ASSOCIATION

By: _____
Name: John Albert
Title: President

DEVELOPER:

R.C. Chronicle Building, L.P.,
a Delaware limited partnership

By:    RCC (GP) Holdings LLC,
        a Delaware limited liability company,
        its sole General Partner

By: _____
Name: Peter J. Worth, Jr.
Title: Authorized Representative

V:\ORL535\Legal\Legal Shared\RCC-San Francisco (282)\RCC-Fractional Documents\California-situs state\Subsidy Agreement\Amended and Restated Club Subsidy Agreement 7.5.07.doc

123

## Exhibit A
### to Limited Subsidy Agreement

Phase 1:  The real property referred to in Recital A of the Limited Subsidy Agreement consists of all of the Club t Units on floors 3, 4 and 12 of the Building as defined and described in that certain Declaration of Covenants, ions and Restrictions for 690 Market Club, recorded or to be recorded in the Office of the Assessor-Recorder for y and County of San Francisco, California and as shown on that certain Condominium Map recorded or to be ;d in the Office of the Assessor-Recorder for the City and County of San Francisco, California.

Phase 2:  The real property referred to in Recital A of the Limited Subsidy Agreement consists of all of the Club t Units on floors 5, 6 and 8 of the Building as defined and described in that certain Declaration of Covenants, ions and Restrictions for 690 Market Club, to be recorded in the Office of the Assessor-Recorder for the City and r of San Francisco, California and as shown on that certain Condominium Map to be recorded in the Office of the or-Recorder for the City and County of San Francisco, California.

Phase 3:  The real property referred to in Recital A of the Limited Subsidy Agreement consists of all of the Club t Units on floors 2, 7, 9 and 10 of the Building as defined and described in that certain Declaration of Covenants, ions and Restrictions for 690 Market Club, recorded or to be recorded in the Office of the Assessor-Recorder for ty and County of San Francisco, California and as shown on that certain Condominium Map recorded or to be :d in the Office of the Assessor-Recorder for the City and County of San Francisco, California.

124

EXHIBIT "F"

TO THE AMENDED AND RESTATED DECLARATION OF COVENANTS,
CONDITIONS AND RESTRICTIONS FOR 690 MARKET CLUB

Schedule of Allocated Percentage Interests for Club Interests

690 MARKET CLUB OWNERS ASSOCIATION

Phases............................................ 1 & 2
Number of Units.............................. 26
Total Square Footage........................ 41,137

| Unit Number | Square Footage | Assessment Interest Per Unit | Assessment Interest Per Club Interest In Such Unit |
|---|---|---|---|
| **GROUP A** | | | |
| 301 | 1,276 | 3.14% | .262% |
| 302 | 1,303 | 3.14% | .262% |
| 303 | 1,291 | 3.14% | .262% |
| 401 | 1,276 | 3.14% | .262% |
| 402 | 1,303 | 3.14% | .262% |
| 403 | 1,291 | 3.14% | .262% |
| 501 | 1,276 | 3.14% | .262% |
| 502 | 1,304 | 3.14% | .262% |
| 503 | 1,299 | 3.14% | .262% |
| 601 | 1,276 | 3.14% | .262% |
| 602 | 1,304 | 3.14% | .262% |
| 603 | 1,299 | 3.14% | .262% |
| **GROUP B** | | | |
| 304 | 1,707 | 4.33% | .361% |
| 305 | 1,785 | 4.33% | .361% |
| 404 | 1,707 | 4.33% | .361% |
| 405 | 1,785 | 4.33% | .361% |
| 504 | 1,715 | 4.33% | .361% |
| 505 | 1,801 | 4.33% | .361% |
| 604 | 1,715 | 4.33% | .361% |
| 605 | 1,878 | 4.33% | .361% |
| 801 | 1,775 | 4.33% | .361% |
| 803 | 1,679 | 4.33% | .361% |
| 804 | 1,889 | 4.33% | .361% |
| 1201 | 1,795 | 4.33% | .361% |
| 1202 | 1,932 | 4.33% | .361% |
| **GROUP C** | | | |
| 802 | 2,476 | 6.02% | .502% |
| **TOTALS** | 41,137 | 1.0000 | |

F-1

125

## SUBORDINATION

The undersigned, as holder of the beneficial interest in and under that certain Construction Deed of Trust, Absolute Assignment of Leases and Rents, Security Agreement and Fixture Filing (the "Deed of Trust") recorded on March 30, 2005, as Instrument No. 2005 H929923 in the Office of the Recorder for the City and County of San Francisco, California, which Deed of Trust is by and between R. C. Chronicle Building, L.P., a Delaware limited partnership, and 942 HCT LLC, a California limited liability company, collectively, as Trustor, for the benefit of Concord Minuteman (Cayman) Ltd., an exempted company organized under the laws of the Cayman Islands, security agent for itself and Mitsui Sumitomo Insurance (London) Ltd., a limited company registered in England, as Beneficiary, hereby expressly subordinates said Deed of Trust (and all amendments thereto) and its beneficial interest thereunder to this Amended and Restated Declaration of Covenants, Conditions and Restrictions for 690 Market Club (the "Declaration") being recorded concurrently with this Subordination, as such Declaration may be amended from time to time.

Date: June 29, 2007                    Concord Minuteman (Cayman) Ltd.

                                       By _____
                                       Its _____
                                           [Print Name and Title]

                                           R. Scott Chisholm,
                                           Authorized Signer



126

STATE OF ILLINOIS        )
                         )
COUNTY OF ___COOK___     )

On _29 JUNE 2007_, before me, _CHARLES MUELLER_, a Notary Public, personally appeared _R. SCOTT CHISHOLM_, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

"OFFICIAL SEAL"
Charles Mueller
Notary Public, State of Illinois
My Commission Exp. 12/23/2007

Signature _____

W02-WEST:5JEP1\400034344B.1

-2-