IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Case No. 16-01301 PAB

RCHFU, LLC, et al.

      Plaintiffs,

v.

MARRIOTT VACATIONS WORLDWIDE CORPORATION, et al.

      Defendants.

---

## MARRIOTT DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

The Marriott Defendants[1] move the Court, pursuant to Fed. R. Civ. P. 56(a), for partial summary judgment (1) precluding Plaintiffs from recovering: (a) any amounts unrelated to or pre-dating the affiliation of The Ritz-Carlton Club, Aspen Highlands ("RC Club Aspen") with the Marriott Vacation Club Destinations Exchange Program (the "MVCD Program"), or (b) any profits allegedly earned by any of the Marriott Defendants in connection with or pre-dating the affiliation (the "MVC Affiliation"); (2) dismissing Plaintiffs' unjust enrichment claim (Count V of the Seventh Amended Complaint ("7AC")), in which such disgorgement of profits is sought; and (3) dismissing Counts I, II and III of the 7AC to the extent they pertain to the November 13, 2013 affiliation agreement between L&C and Marriott Resorts, Travel Company (the "2013 Affiliation Agreement").

## <u>INTRODUCTION</u>

Plaintiffs own luxury 1/12 fractional interests in the RC Club Aspen.  In April 2014, Cobalt (as "Program Manager"), exercising the unilateral discretion given to it under the

---

[1] Marriott Vacations Worldwide Corporation, Marriott Ownership Resorts, Inc., The Ritz-Carlton Management Company, LLC, The Cobalt Travel Company, LLC ("Cobalt") and The Lion & Crown Travel Co., LLC ("L&C").

documents governing Plaintiffs' purchase contracts, elected to affiliate RC Club Aspen with the MVCD Program.  From the outset of this case, Plaintiffs' principal focus has been their claim that the MVC Affiliation allegedly enabled large numbers of MVCD members to access RC Club Aspen, allegedly causing Plaintiffs' fractional interests to decline in value.

While the Marriott Defendants have strong defenses to this claim and fully expect to prevail on liability at trial, this motion focuses narrowly on two categories of damages that Plaintiffs are improperly demanding and one discrete issue involving the 2013 Affiliation Agreement.  The first category of damages is based on alleged conduct by the Marriott Defendants that pre-dates, or is otherwise unrelated to, the MVC Affiliation that became operational in December 2014 with unit exchanges beginning January 2015 ("Non-Affiliation-Related Damages").  No factual or legal basis for such damages was pleaded in any of the eight versions of Plaintiffs' Complaint, nor were such damages discussed in response to Defendants' Rule 12(b)(6) motion.  In the long and heavily-litigated fact discovery process, Plaintiffs never elicited any testimony that any non-affiliation-related conduct was wrongful or improper, nor did they even seek to elicit such testimony.  Once discovery was over, however, Plaintiffs apparently realized that the MVC Affiliation Related Damages that they had been claiming up to then would yield a far less robust recovery than they had expected (assuming liability could be proven).  Accordingly, Plaintiffs abruptly pivoted and, without seeking leave to amend their pleading, directed their expert witnesses to proffer entirely new damages theories designed to encompass actions allegedly taken by the Marriott Defendants as far back as 2011 even though the MVC Affiliation did not become operational at RC Club Aspen until December 2014 and units were not actually exchanged pursuant to that affiliation relationship until January 2015.  Plaintiffs'

experts claim that these Non-Affiliation-Related Damages total approximately $129.5 million.

The Tenth Circuit, this Court and other courts in the District have long recognized that allowing a plaintiff to inject new claims and theories into a case after fact discovery has closed severely prejudices the defendant. Eliminating these new claims and theories on summary judgment is an accepted means for curing the prejudice to defendant and, in this case, could likely facilitate a resolution of the matter. The Marriott Defendants should be granted summary judgment precluding Plaintiffs from recovering Non-Affiliation-Related Damages.

Plaintiffs also improperly seek an alleged $106.5 million in profits that they contend the Marriott Defendants earned from the MVC Affiliation and events preceding it. Disgorgement of profits is an equitable remedy, however, and equitable relief is only available where a plaintiff has no adequate remedy at law. Plaintiffs have an adequate remedy at law, as the damages they seek for the alleged diminution in their fractional interests' market value would, if awarded, make them whole. Thus, Plaintiffs should be precluded from seeking disgorgement of profits as a matter of law, and their unjust enrichment claim demanding that remedy should be dismissed.

In addition, Plaintiffs allege that Defendant Aspen Highlands Condominium Association, Inc. ("AHCA") breached its fiduciary duty to them by signing onto the 2013 Affiliation Agreement without having read it and, as a result, failed to discover that AHCA could have prevented the MVC Affiliation by a simple majority vote. Plaintiffs also assert constructive fraud and aiding and abetting claims against the Marriott Defendants in connection with that issue. AHCA, however, was neither a party to, nor an intended third-party beneficiary of, the 2013 Affiliation Agreement and, therefore, could not have enforced the provision of the agreement on which Plaintiffs base their claims. Accordingly, Counts I, II and III should be

dismissed to the extent they are based on the 2013 Affiliation Agreement.

**STATEMENT OF FACTS**

**A.  Background**

Plaintiffs own deeded 1/12 fractional interests in condominium units at RC Club Aspen. ECF #210 at 2.  Each 1/12 fractional interest entitles its owner to four use-weeks per year.  *Id*. These use-weeks can be spent either at RC Club Aspen in the specific unit for which the owner contracted or at any other resort with which RC Club Aspen is currently affiliated, subject to availability and other restrictions.  *Id*.  There are 205 fractional interests at issue.  The documents governing Plaintiffs' fractional interest purchases expressly contemplated that Cobalt, as RC Club Aspen's Program Manager, might decide to affiliate the resort with new locations and clubs.  *Id*. at 4-5 (citing ECF #109-2 at 12, § 7.2.a, providing that Cobalt "'may, in its sole discretion, elect to affiliate other locations with the [RC Club] Membership Program as Member Clubs or Associated Clubs from time to time'").

**B.  The MVC Affiliation**

On April 17, 2014, AHCA entered into several agreements that set out the terms under which RC Club Aspen owners would be able to participate in the MVCD Program on a voluntary basis.  *Id*. at 7.  The MVC Affiliation became operational on December 5, 2014.  *See* July 29, 2019 Declaration of Ian S. Marx ("Marx Decl.") Ex. M., at 1. Thus, starting in January 2015, RC Club Aspen owners could voluntarily enroll in any given year in the MVCD Program, elect to deposit one or more of their RC Club Aspen use-weeks in the MVCD Program, and receive, in return, points that can be used to reserve accommodations at various Marriott Vacation Club resorts and for other vacation experiences, e.g., cruises and safaris.  *Id.*, Ex. N at 3-4.  The MVC

Affiliation also enabled MVCD Program members to access RC Club Aspen use-weeks that RC Club Aspen owners elected to deposit in the MVCD Program.  *Id.*

C.  **Claims That Have Actually Been Pleaded**

All the claims asserted in the 7AC concern the damages Plaintiffs claim to have suffered due to (a) an alleged failure to allow RC Club Aspen owners to vote on whether the MVC Affiliation should take place (the "vote" issue),[2] and (b) the MVC Affiliation itself.  Plaintiffs allege that, as a result of the MVC Affiliation, the market value of their fractional interests in RC Club Aspen was adversely affected (*id.* at ¶ 105), and they seek damages for that alleged diminution in value.  ECF #430 at ¶¶ 105, 115, 122, 131; *see also id.* at ¶ 96 (alleging that, as a result of the MVC Affiliation, "approximately 400,000 [MVC] members … have access to luxury resorts that were formerly only available to Plaintiffs and [other RC Club Aspen owners] …, thus devaluing Plaintiffs' vested property interests").

Based on these allegations, the liability theories articulated in the five claims asserted in the 7AC involve (1) the potential for the MVC Affiliation to occur; (2) Defendants' actions in advocating for, or helping bring about, the MVC Affiliation; or (3) the actual implementation of the MVC Affiliation.[3]  *See, e.g., id.* at ¶ 99 (alleging breach of fiduciary duties "through inclusion of the Ritz-Carlton Club, Aspen Highlands . . . in the Marriott Vacation Club affiliation/exchange points program"); ¶¶ 100, 102 (alleging Defendants conspired "to impose

---

[2] Plaintiffs allege that, in April 2013, RC Club Aspen owners were promised a vote on the proposed MVC Affiliation (*id.* at ¶ 73) but, in lieu of a vote, were surveyed "'to understand whether [they] would like the opportunity to voluntarily exchange a week of their allocated time for points within the MVCD'" Program.  *Id.* at ¶¶ 83-84.  In April 2014, AHCA agreed to the MVC Affiliation.  *Id.* at ¶ 85.

[3] Notably, as part of its March 29, 2018 Order, the Court found, as a matter of law, that the governing documents did not preclude the MVC Affiliation.  ECF #210 at 22-23.

the affiliation of the Marriott Vacation Club affiliation/exchange/points program with the Ritz-Carlton Club, Aspen Highlands" and breached "fiduciary duties by . . . allowing the affiliation of the Marriott Vacation Club affiliation/exchange/points program with the Ritz-Carlton Club, Aspen Highlands"); ¶ 104 (alleging Association violated its duty "by executing the Acknowledgment and Joinder" and failing to prevent "the Marriott Vacation Club affiliation at Aspen Highlands"); ¶¶ 110-12 (alleging constructive fraud based on the "Affiliation Agreement" and the alleged failure to disclose facts about that "the affiliation"); ¶ 122 (alleging breach of fiduciary duty "based on promises made to plaintiffs . . . that such affiliation would not occur without a vote by the Plaintiffs and Ritz-Carlton Aspen Owners"); ¶ 124 (alleging aiding and abetting based on alleged failure to disclose the "Affiliation Agreement"); ¶129 (alleging conspiracy by "agreeing to the affiliation of the Ritz-Carlton Club, Aspen Highlands . . . with the Marriott Vacation Club" and the "Affiliation Agreement"); ¶ 130 (alleging, as a common objective, "the affiliation of the Ritz-Carlton Club, Aspen Highlands . . .  with the Marriott Vacation Club"); ¶ 136 (alleging Defendants were unjustly enriched "in achieving a unilaterally imposed affiliation with the Marriott Vacation Club . . . despite knowing that such an affiliation would devalue Plaintiffs' Fractional Units").

Plaintiffs also seek disgorgement of the profits that the Marriott Defendants allegedly received as a result of the MVC Affiliation.  *Id.* at ¶¶ 106, 116, 125, 132, 137.

### D. From the Inception of This Action, Plaintiffs Made Clear That This Case is about (and Their Alleged Damages Were Solely Caused by) the MVC Affiliation

Since this action was filed, Plaintiffs have characterized this case as being solely about the MVC Affiliation and have described their supposed damages as being solely the result of the MVC Affiliation.  For example:

- On March 30, 2018, Plaintiffs described two "central affiliation agreements" as being "central to the issues in the case, as they are the very agreements that effectuated the **affiliation** of the Ritz-Carlton Private Clubs with the points-based Marriott Vacation Destination Club that **lies at the core of this case**." (Marx Decl. at ¶ 2(I), Ex. I, ECF # 211 at ¶ 8) [4];

- On May 18, 2018, Plaintiffs asserted that "[t]his lawsuit is about the Marriott Defendants' fiduciary duties in relation to its control over the Ritz-Aspen's **affiliation** with the Marriott Vacation Club." (Marx Decl. at ¶ 2(J), Ex. J, ECF # 261 at 7); *see also id.* at 1-2 ("[T]he CGC Strategic Plan and any legal analysis of it concern **the very breach of fiduciary duty that is at issue in this case: the affiliation of Ritz-Carlton Destination Clubs with the Marriott Vacation Club**."); *id.* at 2 ("This Court held that Plaintiffs' constructive fraud claim centers on the Marriott Defendants' promise of a vote on the **affiliation**, and their subsequent imposition of the **affiliation** without any vote ever taking place. This is exactly what the CGC Strategic Plan discusses: strategy regarding the **affiliation**."); *id.* at 10 (describing "Marriott's larger scheme" as having "promised that the **affiliation** would not occur absent a vote, but then imposed the **affiliation** without holding any vote.");

- On February 2, 2018, Plaintiffs asserted that the Marriott Defendants had a "campaign to surreptitiously force a **value-crushing affiliation** between the Ritz-Carlton Destination Club ("RCDC") and the point-based Marriott Vacation Club (sometimes, "MVC") that allowed them to profit at the expense of Plaintiffs' deeded property rights. (Marx Decl. at ¶ 2(H), Ex. H, ECF # 185 at 2);

- On June 1, 2018, Plaintiffs asserted that the 2013 Affiliation Agreement "reveals that the Association had the power to prevent the Ritz-Aspen from **affiliating** with the Marriott Vacation Club ("MVC") – **an event that caused values to plummet**." (Marx Decl. at ¶ 2(K), Ex. K, ECF # 274 at 1); *see also id.* at 4 (asserting that, "[w]hile the promised vote is an important component of the case, Plaintiffs allege more broadly that the Association breached its fiduciary duty by failing to prevent **the MVC affiliation that caused the decimation of value**");

Plaintiffs have made these same assertions since the inception of the case. For example:

- On August 15, 2016, Plaintiffs asserted that "[t]he **affiliation** served the interests of the Marriott Defendants, but decimated the values of Plaintiffs' fractional interests at the Ritz-Aspen…." (Marx Decl. at ¶ 2(B), Ex. B, ECF # 59 at 2);

---

[4] Plaintiffs' briefs are identified below by their ECF numbers; however, for the Court's convenience, full copies of the briefs are attached to the accompanying Marx Decl. Emphases have been added.

- On December 14, 2016, Plaintiffs sought leave to amend their complaint on the basis of "new evidence that further supports Plaintiffs' claims," which consisted of (a) a legal opinion provided to AHCA "on the issue of whether the Declaration prohibited the ***MVC [A]ffiliation*** at issue"; (b) "a cease and desist letter to the Marriott Defendants, explaining that the ***affiliation*** was unlawful"; and (c) an email from one fractional owner purporting to inform Marriott "that the proposed ***affiliation*** was an act of self-dealing." (Marx Decl. at ¶ 2(C), Ex. C, ECF # 85).  On January 19, 2017, Plaintiffs again sought leave to amend their complaint due to new ***MVC Affiliation***-related evidence, asserting that, "[a]s a result of the Marriott Defendants and the Association reneging on their promise, Plaintiffs had no say and could do nothing about the proposed ***affiliation*** that would ultimately destroy the value of their units."  (Marx Decl. at ¶ 2(E), Ex. E, ECF # 101 at 7);

- On March 15, 2017, in again seeking leave to amend their complaint, Plaintiffs asserted that new documents "not only bolster existing claims, but support a new cause of action for constructive fraud" based on the ***MVC Affiliation***. (Marx Decl. at ¶ 2(F), Ex. F, ECF # 110 at 5).

Numerous other examples of Plaintiffs' statements are provided in the Marx Declaration at ¶¶ 2(A)-(K) and the Restricted Supplemental Marx Declaration ("Suppl. Marx Decl.") at ¶¶ 3(A)-(B).  The Court has also described Plaintiffs' claims in this case as involving the "affiliation with Marriott Vacation Club Destinations."  *See* Marx Decl. at ¶ 3, Ex. L, March 29, 2018 Order (ECF # 210 at 5) (quoting Fifth Am. Compl. ¶ 48 (ECF # 119 at 75); *see also id.* at 6-7 (noting that Plaintiffs counsel's cease and desist letter "demanded that the Marriott defendants refrain from pursuing the affiliation with MVC" and discussing actions taken by the RC Aspen Association and other RC Clubs "against the affiliation with MVC").

### E.  <u>New Damages Theories Propounded by Plaintiffs' Experts But Never Pleaded</u>

The liability theories pleaded in the 7AC are the same as those pleaded in the original Complaint filed on December 31, 2015.  Accordingly, the fact discovery taken by the Marriott Defendants (which took place over roughly two years and concluded on July 16, 2018) was premised entirely on these liability theories.  It was not until October 26, 2018 that Plaintiffs, through three expert reports submitted pursuant to Fed. R. Civ. P. 26(a)(2)(B), began to assert

that they have been damaged, not only by the MVC Affiliation and the vote issue, but also by conduct that long predates the MVC Affiliation and is not alleged in any claim ("Non-Affiliation-Related Conduct").  Specifically, Plaintiffs now claim that, because inventory at RC Club Aspen owned by The Ritz-Carlton Development Company, Inc. (the "Developer")[5], a non-defendant, was used to enable MVCD members to access weeks at RC Club Aspen from 2011 to 2014 (and that inventory owned by the MVC Trust, a Florida land trust (the "MVC Trust"), a non-defendant, at four other The Ritz-Carlton Destination Club ("RCDC") resorts was used to enable MVCD members to access those resorts), their fractional interests began losing value *even before* the MVC Affiliation, which, as noted, did not become operational until December 2014, with unit exchanges starting in January 2015.  Plaintiffs also seek the disgorgement of any profits the Marriott Defendants supposedly realized from 2011 to 2014 due to this use of Developer-owned and MVC Trust-owned inventory.  Notably, Plaintiffs never alleged in the 7AC or any pleading that the use of Developer and MVC Trust-owned inventory at the RC Club Aspen and other RCDC resorts from 2011 to 2014 was unlawful, improper or prohibited by any contract or governing document, nor have they ever sought to elicit such testimony.

### 1.   The Simon Reports: Initial and Supplemental

Jonathan Simon is a consultant to the hospitality and vacation-ownership industries. Notwithstanding Plaintiffs' pleaded allegations and claims, Mr. Simon states that his assignment "included rendering an opinion as to whether allowing MVC members to access Ritz-Aspen, *at first by opening developer-owned inventory to certain MVC members and then* by affiliating

---

[5] *See* 7AC, Ex. B (Aspen Affiliation Agreement, Introductory Paragraph (identifying The Ritz-Carlton Development Company, Inc. as the "Developer")); 7AC ¶ 39 (identifying The Ritz-Carlton Development Company, Inc. as seller of the fractional interests at the RC Club Aspen).

the two clubs was a substantial factor in causing diminution in value of Plaintiffs' fractional interests at Ritz-Aspen." Expert Report of Jonathan Simon, dated October 26, 2018, Marx Decl. Ex. O at ¶ 9 (emphasis added). Mr. Simon also considers the impact of "providing MVC members … access to . . . the Ritz Carlton Clubs at Vail, San Francisco, Tahoe and St. Thomas" (*id*. at ¶ 13) through a process of "taking its unsold RCDC inventory from [these] clubs and contributing it to the NATO trust." *Id.* at ¶ 46. This Non-Affiliation-Related Conduct, largely occurring before 2015, and not in any way prohibited by law or agreement or pled in any pleadings as a basis for a claim, forms a significant part of Mr. Simon's calculations of the approximately $106.5 million in profits that he claims were improperly earned by the Marriott Defendants. *Id.* ¶¶ 64-86; *see also* Simon Supplemental Expert Report dated June 7, 2019, Suppl. Marx Decl. Ex. D at 5, Ex. A (opining that the Marriott Defendants earned approximately $106.5 million for the period 2011 to 2017, i.e., $36.3 in actual profits supposedly earned during that period and an additional $70.2 million in capitalization of future unjust enrichment profits).

### 2.  The Robinson Report

Another consultant to the hospitality and real estate industries, R. Maurice Robinson calculates approximately $41.6 million in damages based on a "Damages Period" that starts with MVC owner access to Developer inventory on August 1, 2011, again more than three years before the MVC Affiliation became effective. Amended Expert Report of R. Maurice Robinson, dated December 19, 2018, Marx Decl. Ex. P at 2, 17, 18.

### 3.  The Dev Report

Chekitan Dev is a college professor. Like Messrs. Simon and Robinson, Dr. Dev does not restrict his opinions to the MVC Affiliation; rather, he bases his opinions on Non-Affiliation-

Related Conduct, including the use of Developer-owned inventory at RC Club Aspen.  Indeed, Dr. Dev begins his analysis "[i]n the latter half of 2011," when "MVW began to use the RCDC to enhance the appeal of purchasing MVC points."   Expert Report of Chekitan Dev, dated October 26, 2018, Marx Decl. Ex. Q at ¶¶ 3, 34, 35.

### 4.   The Marriott Defendants' Experts' Rebuttals

The Marriott Defendants' expert rebuttal reports are from Mark Israel, an economics consultant and college professor, and Alan Tantleff, an industry consultant.  Israel and Tantleff explain that, if Plaintiffs' recovery were limited to disgorgement of profits and diminution in value damages associated only with the MVC Affiliation (and if liability proven), they could recover no profits and their diminution in value damages would be $24,016.24.  Expert Rebuttal Report of Mark Israel, dated December 28, 2018, Suppl. Marx Decl. Ex. C. at ¶ 31; Expert Rebuttal Report of Alan Tantleff, dated January 4, 2019, Marx Decl. Ex. R at 51 (Table 21).

### F.   The Court Rejected Plaintiffs' Attempt to Expand the Scope of Its Claims to Non-Affiliation-Related Conduct after Discovery Had Closed

On January 14, 2019, after fact discovery had closed, Plaintiffs moved (at the Court's invitation) for leave to further amend their Complaint to address matters arising from Magistrate Judge Gallagher's December 31, 2018 resolution of a motion for discovery sanctions based on a discrete issue involving the inadvertent delayed production of the 2013 Affiliation Agreement. ECF #330, 337.  Because expert discovery had already commenced, however, Magistrate Judge Gallagher's order made clear that any "amendment of claims" was permissible only to the limited extent necessary "to correct the prejudice suffered by non-provision of" this single document.  ECF #330 at 30.  Notwithstanding that instruction, Plaintiffs' proposed amendments to the Complaint included several references to Non-Affiliation-Related Conduct.  *See, e.g.*, ECF

#337-2 (proposed amended complaint) ¶ 55 (concerning Marriott Defendants' supposed "decision to 're-engineer' the RCDC and merge it with [MVC] … [which began] with marketing access to the RCDC to select MVC members in mid-2011…."); ¶ 56 (alleging that "[t]he misconduct [began] in mid 2011 …, when the Marriott Defendants began to execute a 'Product Re-Engineering' plan for the RCDC [that] began with a committee called the Growth and Governance Council ('GGC'), which undertook a detailed analysis [of the plan]…."); ¶ 9 (alleging that "[b]y mid-2011 at the latest, [the GGC] had decided to 'wind down' the RCDC and began plotting how to do so in the most profitable way … without regard to the predictable harm to Plaintiffs and other RCDC owners"); ¶ 10 (alleging that "[b]eginning in 2011 and continuing through 2014," the Marriott Defendants "[pursu[ed] … this re-engineering…").  Magistrate Judge Gallagher denied Plaintiffs' motion, finding their proposed allegations untimely and improper because they went "far beyond" the underlying discovery dispute and the specific types of amendments permitted by the December 31, 2018 Order.  ECF #369 at 4.  The amended complaint that was ultimately filed (the 7AC) does not include those objectionable allegations.[6]

## STATEMENT OF UNDISPUTED FACTS

1.      Plaintiff's allegations of wrongdoing and liability on the part of Defendants in the 7AC involve only (a) the potential for the MVC Affiliation to occur; (b) Defendants' actions in advocating for, or helping bring about, the MVC Affiliation; (c) the actual implementation of the MVC Affiliation; and (d) the vote issue.  7AC ¶¶ 53, 73 83-85, 105.

2.      Plaintiffs' allegations of damages in the 7AC are limited to the alleged diminution in value of their fractional interests caused by the MVC Affiliation (*id*. ¶¶ 105, 115, 122, 131)

---

[6] The relevant facts pertaining to ARGUMENT, Point IV, *infra* (dealing with the 2013 Affiliation Agreement) are set forth in that section.

and to the disgorgement of profits allegedly received by the Marriott Defendants as a result of the MVC Affiliation. *Id.* at ¶¶ 106, 116, 125, 132, 137.

    3.    The 7AC does not allege that the Non-Affiliation-Related Conduct was improper or unlawful, and no fact or expert testimony has been adduced to this effect.

    4.    The 2013 Affiliation Agreement (Fifth, Sixth and Seventh "Whereas" clauses) provides, *inter alia*, that the agreement's purpose is to give "members of the L&C Program … the right to elect to become a participant in the MVCD Program" and to provide "each MVCD Member [with] the ability to make use of the L&C Accommodations…." Marx Decl. Ex. S.

## ARGUMENT

Rule 56 of the Federal Rules of Civil Procedure was amended in 2010 to allow a party to move for summary judgment on either all claims in the case, one or more claims in their entirety, "or [a] part of [a] claim." Fed. R. Civ. P. 56(a). Even if the record does not permit the dismissal of an entire claim on summary judgment, the Court "may enter an order stating any material fact — ***including an item of damages*** or other relief — that is not genuinely in dispute and treating the fact as established in the case." Fed. R. Civ. P. 56(g) (emphasis added).

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Adler v. Wal-Mart Stores,* 144 F.3d 664, 671 (10th Cir. 1998) (summary judgment will be granted unless nonmovant can "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant"). Under this standard, the Marriott Defendants' motion for partial summary judgment should be granted.

I.     **PLAINTIFFS HAVE PLEADED NO FACTUAL OR LEGAL BASIS FOR (AND, THUS, MAY NOT RECOVER) NON-AFFILIATION-RELATED DAMAGES**

The Tenth Circuit has made clear that, where a plaintiff seeks "to make the complaint a moving target, to salvage a lost case by untimely suggestion of new theories of recovery, to present theories seriatim in an effort to avoid dismissal, or to knowingly delay raising an issue until the eve of trial," evidence of previously unpleaded theories of liability will be precluded, and motions for leave to amend to add such theories will be denied. *Minter v. Prime Equip. Co.*, 451 F.3d 1196, 1206 (10th Cir. 2006) (internal quotations and citations omitted). Doing otherwise is "'simply unfair,'" as it is unduly prejudicial "'[t]o require defendant to incur additional costs and to change its strategy'" where the "'plaintiff has concocted a new theory . . . years into the litigation.'" *General Steel Domestic Sales, LLC v. Chumley*, 2012 WL 2589241, at *1 (D. Colo. July 3, 2012) (Brimmer, J.) (quoting *Roberts v. Ground Handling, Inc.*, 2007 WL 2753862, at *5 (S.D.N.Y. Sept. 20, 2007)). Significantly, the Tenth Circuit has specifically instructed district courts not to construe complaints liberally "to raise any legal theory [potentially] supported by the allegations of the complaint" or to read into the complaint a new theory raised "late in the game." *Zohari v. Gates*, 561 F.3d 1076, 1086 (10th Cir. 2009).

These principles support the granting of partial summary judgment to preclude a plaintiff from offering theories at trial that were never pleaded. *See Bio Med. Techs. Corp. v. Sorin CRMS USA, Inc.*, 2015 WL 4882572, at *8-*9 (D. Colo. Aug. 17, 2015) ("'[A] claim or theory that is not adequately raised in the complaint will not be considered' on summary judgment" (quoting *Fuqua v. Lindsey Mgmt. Co.*, 321 Fed. Appx. 732, 734 (10th Cir. 2009) and granting summary judgment in case arising under medical device sales agreement on "new and previously undisclosed" fraudulent non-disclosure liability theory not pleaded in complaint with supporting

facts, as to which defendant was not given "fair notice" at any point during litigation)).

Courts are particularly intolerant of new liability theories where, as here, the plaintiff was already given multiple opportunities to amend its complaint. *See TD v. Patton*, 149 F. Supp. 3d 1297, 1310 (D. Colo. 2016) (granting summary judgment, including on new theory of "final policy-maker" municipal liability that was not alleged in any version of complaint, and was thus "not anticipated" by defendant). Other courts have similarly granted summary judgment motions where newly proffered liability theories had no basis in the underlying complaint. *See, e.g.*, *Lewis v. Powers*, 2018 WL 6272259, at *13 (D. Colo. Nov. 30, 2018) (granting summary judgment on plaintiff's "last-ditch effort to expand her claim" for violation of Americans with Disabilities Act by "inject[ing a] new theor[y] of liability" regarding entrance to restaurant not pleaded in any version of complaint and introduced for first time after close of discovery); *Powell v. City & Cnty. of Denver*, 973 F. Supp. 1198, 1203 n.4 (D. Colo. 1997) (granting summary judgment on new, unpleaded "dangerous activity" theory of liability in suit by anti-abortion protestors against abortion clinic, explaining that "[s]uch a belated claim prejudices [clinic] because it was deprived of the chance to discover facts and obtain expert testimony that might have disposed of [plaintiffs'] argument").

Federal courts likewise routinely preclude evidence, including expert opinions, premised on new liability theories offered for the first time in expert reports. *See, e.g., Finjan, Inc. v. Blue Coat Sys., Inc.*, 2015 WL 3640694, at *4 (N.D. Cal. June 11, 2015) (striking infringement theories in patent litigation disclosed for first time in expert report and finding prejudice to defendant "inherent," as it had "no way of knowing that Plaintiff's focus would shift to" one infringement theory "and away from" the theory pleaded in complaint); *Parrish v. Freightliner,*

*LLC*, 471 F. Supp. 2d 1262, 1268, 1270 (M.D. Fla. 2006) (in wrongful death action against tractor-trailer manufacturer, striking expert report premising liability on a design defect not disclosed in interrogatory responses; court noted that defendant had "spent considerable time and resources defending this case under the [old design defect] theory" and found plaintiff's "wholesale change in liability theory" "contrary to both the letter and spirit of the Federal Rules," as "[d]iscovery is not a game of 'blind man's bluff'") (quoting *Dollar v. Long Mfrg. N.C., Inc.*, 561 F.2d 613, 616 (5th Cir. 1977)).

In granting motions *in limine*, this Court has rejected the same litigation tactics Plaintiffs are using, namely, raising, for the first time in their expert reports, new liability theories never previously pleaded. *See General Steel*, 2012 WL 2589241, at *1 (barring evidence of sales presentations in support of new, previously un-pleaded liability theories in defamation action); *Water Pik, Inc. v. Med-Systems, Inc.*, 2012 WL 275596, at *4 (D. Colo. Jan. 5, 2012) (Brimmer, J.) (in trademark infringement action, barring damages testimony from new expert that departed from prior expert's damages theories and raised new ones). Of importance in these cases were the dilatory behavior of the party offering new theories late in the case and the prejudice the other party would suffer if the theories were allowed.

As to both of those considerations, it is worth noting that, after filing their initial Complaint in December 2015, Plaintiffs have had multiple opportunities to amend their pleading to add liability theories focusing on Non-Affiliation-Related Damages, but they failed to do so.[7] As a result, over the roughly two years of fact discovery, the Marriott Defendants focused almost

---

[7] Since December 2015, Plaintiffs have amended their pleading seven times – twice as a matter of right (ECF #1-1, 40), three times with Defendants' consent (ECF #71, 109, 118), and twice over Defendants' objections (ECF #185, 193, 342, 344, 394). The last amendment (the 7AC) was filed in June 2019.

exclusively on the MVC Affiliation.  They had no opportunity – or reason – to examine Plaintiffs and non-party fact witnesses concerning the propriety of the access to RC Club Aspen (and other RCDC resorts) that was provided to certain MVCD members from 2011 to 2014 through the use of Developer-owned and MVC Trust-owned inventory, to serve written interrogatories and requests for admission on that topic, or to discover the types of documents that Plaintiffs and their counsel might have compiled on it.

Moreover, because none of the claims asserted in the 7AC mention or relate to Non-Affiliation-Related Damages, the Marriott Defendants had no meaningful opportunity – or reason – to develop evidence concerning, or defenses to, this new damages theory raised for the first time in Plaintiffs' expert reports.  Had Plaintiffs pleaded any claims based on Non-Affiliation-Related Conduct for which they sought damages or other relief, the Marriott Defendants would have established the propriety of such conduct through witnesses and documents and would have challenged any damages claims through witnesses and documents.

In sum, the Marriott Defendants justifiably relied on Plaintiffs' pleadings when they moved to dismiss the Complaint solely on MVC Affiliation-related issues (ECF #46, 84, 131); retained experts who prepared reports based on the understanding that Plaintiffs' claims solely concerned the MVC Affiliation; and developed their overall litigation strategies based on how Plaintiffs framed their claims.  To now allow Plaintiffs to use expert opinions as a means to expand their claims after the close of fact discovery would be unfair and highly prejudicial to the Marriott Defendants.  *Cf. Water Pik*, 2012 WL 275596, at *4.  Nor should discovery be re-opened to address these issues for the first time in this already-three-year-old litigation.  *Cf. id.*

## II. PLAINTIFFS CANNOT RECOVER DAMAGES BASED ON MVCD MEMBERS' ABILITY TO ACCESS RC CLUB ASPEN THROUGH THE USE OF DEVELOPER INVENTORY

Even if the Court construed Plaintiffs' claims as seeking damages allegedly sustained, and profits allegedly earned, as a result of MVCD members' ability to access the RC Club Aspen through means other than the MVC Affiliation (i.e., through the use of Developer-owned inventory)—which, for the reasons set forth above, it should not—those claims fail as a matter of law. First, this Court has already determined that the Declarations[8] do not prohibit MVCD members from accessing the RC Club Aspen. *RCHFU, LLC v. Marriott Vacations Worldwide Corp.*, 2018 WL 1535509, at *9 (D. Colo. Mar. 29, 2018) (rejecting Plaintiffs' argument that alleged "restrictive covenants" in Declarations prohibited the MVC Affiliation) (citing *Hoyt v. Marriott Vacations Worldwide Corp.*, 2014 WL 509903, at *3 (D. Minn. Feb. 7, 2014) (applying Colorado law and ruling that MVC Affiliation did not breach any of RC Club Aspen's governing documents)). Thus, the Developer did not violate the Declarations (or any other governing document) by allowing MVCD members to use the inventory it owned at the RC Club Aspen.

Second, as the seller of the fractional interests at the RC Club Aspen, the Developer owed Plaintiffs no fiduciary duty whatsoever and, thus, could not have breached any such duty by allowing MVCD members to use its inventory to access the RC Club Aspen. *See, e.g.*, *ConcealFab Corp. v. Sabre Indus., Inc.*, 2019 WL 3282966, at *26 (D. Colo. July 22, 2019) ("[M]ost business relationships or contractual relationships, such as those between a buyer and seller, do not by themselves create fiduciary obligations, and fiduciary obligations should be

---

[8] "Declarations" refers to the Declaration for Aspen Highlands Village (ECF # 49-1 to -3) ("Master Declaration") and the Declaration of Condominium for Aspen Highlands Condominiums (ECF # 109-8) ("Declaration of Condominium").

extended reluctantly to commercial or business transactions."); *SGS Acquisition Co. v. Linsley*, 352 F. Supp. 3d 1109, 1120 (D. Colo. 2018) (no fiduciary relationship existed where the parties "were simply engaged in an arm's length business transaction").

Finally, Plaintiffs can point to no evidence showing, or even suggesting, that allowing MVCD members to use Developer-owned inventory to access RC Club Aspen was improper or unlawful.  Indeed, Plaintiffs have never tried to elicit testimony on that point from a single fact or expert witness, which further demonstrates that they have always prosecuted this case as only involving the MVC Affiliation.  Because it was neither improper nor unlawful for the Developer to permit MVCD members, or anyone else, to use the inventory it owned at RC Club Aspen, Plaintiffs have no basis to recover damages allegedly resulting from, or profits allegedly earned because of, that use.  Plaintiffs should, therefore, be precluded from any such recovery.

## III.   PLAINTIFFS' UNJUST ENRICHMENT CLAIM SHOULD BE DISMISSED

Under Colorado law, a claim for unjust enrichment requires that Plaintiff show "(1) a benefit was conferred on Defendants at the expense of Plaintiff; (2) the benefit was appreciated by Defendants; and (3) the benefit was accepted by Defendants under such circumstances that retaining the benefit without paying its value would be inequitable." *Lewis v. Lewis,* 189 P.3d 1134, 1141 (Colo. 2008) (quoting *Salzman v. Bachrach*, 996 P.2d 1263, 1265–66 (Colo. 2000)). Unjust enrichment is an equitable remedy.  *See Harris Grp., Inc. v. Robinson*, 209 P.3d 1188, 1205 (Colo. App. 2009).  It is "a judicially-created remedy designed to undo the benefit to one party that comes at the unfair detriment of another."  *Lewis,* 189 P.3d at 1141 (citing Restatement of Restitution § 1 cmt. a (1937)).  In *Lewis,* for example, defendants (plaintiff's former in-laws) were ordered to disgorge the profits made on the undisclosed sale of a house on which plaintiff

had paid the mortgage and maintained in reliance on her in-laws' offer to give her the house someday.  The court held that, given the relationship of trust between the parties, in equity and fairness, the profits belonged to plaintiff because "a benefit was conferred on Defendants at the expense of Plaintiff."  *Id.* at 1114.  Had the court decided otherwise, plaintiff would have had no remedy, as there was no enforceable contract between the parties.

Where an adequate damage remedy at law exists, however, Colorado courts hold that the equitable remedy of disgorgement under an unjust enrichment claim is not available.  *See, e.g., Harris*, 209 P.3d at 1205 ("'[E]quity may not be used to fashion relief when there is a 'plain, speedy, [and] adequate remedy at law.'" (quoting *Szaloczi v. John R. Behrmann Revocable Trust*, 90 P.3d 835, 842 (Colo. 2004) (confirming that "because unjust enrichment is an equitable theory of relief, and the company had an adequate remedy at law, the company was not entitled to an award of damages for unjust enrichment")));[9] *L-3 Commc'ns Corp. v. Jaxon Eng'g & Maint., Inc.*, 125 F. Supp. 3d 1155, 1175 (D. Colo. 2015) ("[U]njust enrichment is an equitable remedy that is not available when a remedy at law lies to address the same conduct.").  Indeed, a plaintiff who demands both equitable and legal remedies for the same alleged harm is essentially seeking a double recovery.

Here, the impropriety of Plaintiffs' demand for equitable relief is particularly blatant because the "expense" they claim to have incurred (which they assert resulted in the alleged

---

[9] In *Harris,* defendants were found liable for breach of confidentiality agreements, conversion, breach of fiduciary duty, and intentional interference with contract, by joining a competitor and taking customers away from plaintiff.  The Colorado Court of Appeals reversed the trial court's entry of a judgment for unjust enrichment (disgorgement of defendants' profits), which was awarded in addition to damages for plaintiffs' own lost profits.  The court, thus, agreed with defendants that, because plaintiff "had an adequate remedy at law, the company was not entitled to an award of damages for unjust enrichment."  *Harris*, 209 P.3d at 1205.

"benefit" to the Marriott Defendants that entitles them to disgorgement) is the very "diminution in value" of their fractional interests for which they also seek legal damages. Plaintiffs are not entitled to equitable relief because their tort claims provide adequate legal remedies that, if awarded, would fully restore them to their "prior status" (*see Harris,* 209 P.3d at 1205 (purpose of unjust enrichment claim is to "restore the plaintiff to his or her prior status")), and any additional recovery under their unjust enrichment claim would give them a windfall. *Beck v. Northern Nat. Gas Co.*, 170 F.3d 1018, 1024 (10th Cir. 1999) ("The basic principle of damages is to make a party whole by putting him or her back in the same position as if the injury had not occurred, not to grant a windfall."). Accordingly, Plaintiffs' unjust enrichment claim, together with the disgorgement of profits demanded thereunder, should be dismissed as a matter of law.[10]

## IV.   AHCA, NOT A PARTY TO, OR INTENDED THIRD-PARTY BENEFICIARY OF, THE 2013 AFFILIATION AGREEMENT, COULD NOT HAVE PREVENTED RC CLUB ASPEN FROM PARTICIPATING IN THE MVC AFFILIATION

On November 13, 2013, L&C and Marriott Resorts, Travel Company ("MRTC") entered into the 2013 Affiliation Agreement that created the exchange affiliation between the RC Clubs and MVCD and defined a participating RC Club as one whose owners' association had signed an "Acknowledgment and Joinder" to the agreement.  Plaintiffs claim that AHCA breached its fiduciary duties "by executing the Acknowledgment and Joinder without requesting or reading the 2013 Affiliation Agreement itself" and that, "[a]s a result of this breach of the duty of care, the Association failed to discover that it could have prevented the Marriott Vacation Club

---

[10] Should the Court allow Plaintiffs to assert an equitable unjust enrichment claim despite having an adequate remedy at law, such claim should at least be limited to the post-2015 period, *i.e.,* to any unjust enrichment resulting directly from the MVC Affiliation and not from any prior events. *See* ARGUMENT, Point I, *supra* (explaining that Plaintiffs may not recover under unpleaded damages theories).

affiliation at Aspen Highlands with a simple majority vote."  7AC, ECF# 430, at ¶ 104. Plaintiffs further claim that the Marriott Defendants constructively defrauded AHCA,[11] and aided and abetted AHCA's supposed breach of fiduciary duty, by "concealing" the 2013 Agreement "to induce the Association into executing the requisite Acknowledgment" and "misleading them into believing they had no power to stop the Marriott Vacation Club affiliation." *Id.* at ¶¶ 46, 85-89, 110, 124 (Second and Third Causes of Action).

These claims fail as a matter of law because under Florida law, AHCA had no legal ability to do as the Plaintiffs allege.  Although the definitional sections in the 2013 Affiliation Agreement ***contemplated*** AHCA's execution of the Acknowledgment,[12] AHCA was neither a signatory to, nor a third-party beneficiary of, the 2013 Affiliation Agreement and, therefore, had no right to enforce the agreement's terms to ***require*** a signed Acknowledgment. Florida law (which controls the 2013 Affiliation Agreement, *see* § 11.7) holds that only "intended" third-party beneficiaries to a contract have a right to enforce the contract and that "incidental beneficiaries" have no such right.  *Bochese v. Town of Ponce Inlet*, 405 F. 3d 964, 981-93 (11th Cir. 2005) (applying Florida law); *see also Restatement (Second) of Contract*s § 302 (1979) ("intended beneficiary" *vs.* "incidental beneficiary" based on "the intention of the parties"); *see also id.* at § 302(1)(a),(b) (intended beneficiary status requires an expressed right to

---

[11] Plaintiffs lack standing to assert a constructive fraud claim on behalf of AHCA.  *See, e.g., Bixler v. Foster*, 596 F. 3d 751, 756, n.4 (10th Cir. 2010) (plaintiff "cannot rest his claim to relief on the legal rights or interests of third parties").

[12] The 2013 Affiliation Agreement states, in ***definitional*** sections, that an "'L&C Destination' means those resorts available for use through the L&C Program where the owners' association for the L&C Destination has executed an Acknowledgment Agreement" and that a "'Participating L&C Association' means the owners' association for an L&C Destination (i.e., an owners' association that has executed an Acknowledgment Agreement)." Marx Decl. Ex. U, 2013 Affiliation Agreement § 2.

"performance" or a "benefit"). Furthermore, "a third party is an intended beneficiary of a contract between two other parties only if a direct and primary object of the contracting parties was to confer a benefit on the third party," and "[t]he contracting parties' intent to benefit the third party must be specific and must be clearly expressed *in the contract* in order to endow the third-party beneficiary with a legally enforceable right." *Bochese,* 405 F. 3d at 981-93 (italics in original). If the agreement shows that the contracting parties' "primary" purpose in executing an agreement was not to confer a benefit on a third party, "any benefit from the contract reaped by the third party is merely 'incidental,' and the third party has no legally enforceable right in the subject matter of the contract." *Id.* Any intent to benefit a third party that must be inferred from contradicted circumstantial evidence is by definition not "apparent, direct, or primary." *Id.*[13]

Based on these principles and the 2013 Affiliation Agreement's plain language, AHCA was, at most, an incidental beneficiary of that agreement and, as such, had no right to enforce its terms. *See Bochese,* 405 F. 3d at 982. The parties' stated primary purpose for executing the 2013 Affiliation Agreement was not to confer a right on AHCA to affiliate the RC Club Aspen with the MVCD Program; rather, it was to give L&C and MVCD members the ability to participate in each other's programs through the MVC Affiliation.[14]   Cobalt, as Program

---

[13] The law is the same in Colorado. *See S K Peightal Eng'rs, LTD v. Mid Valley Real Estate Solutions V, LLC,* 342 P.3d 868, 2873-74 (Colo. 2015); *Vallagio at Inverness Residential Condo. Ass'n, Inc. v. Metro. Homes, Inc.,* 412 P.3d 709, 718 (Colo. Ct. App. 2005).

[14] *See* Marx Decl. Ex. U, 2013 Affiliation Agreement (Fifth, Sixth and Seventh "Whereas" clauses) (agreement's purpose is to give "members of the L&C Program … the right to elect to become a participant in the MVCD Program and have the ability to make use of the MVCD Program in accordance with the terms of th[e] Agreement and the Exchange Procedures"; to provide "each MVCD Member [with] the ability to make use of the L&C Accommodations [that] are committed to the MVCD Program [by] a Participating L&C Member who has elected to participate in the MVCD Program"; and "[to] coordinate the L&C Program's and the MVCD Program's activities with one another….").

Manager, has the unilateral discretion to affiliate the RC Club Aspen with the MVCD Program. The 2013 Affiliation Agreement cannot be read as giving AHCA the power to obstruct its primary purpose. Nor did the 2013 Affiliation Agreement give AHCA any right to performance by, or a benefit from, any party to the agreement. Any argument that AHCA's "benefit" under the 2013 Affiliation Agreement was the right to prevent RC Club Aspen members from participating in the MVC Affiliation fails because that was not "specifically" or "clearly expressed" in the Agreement. *See Bochese,* at 981 (intent to benefit the third party must be specific and clearly expressed). Nor are the Agreement's passing references to "owners' associations" executing an Acknowledgment specific or clearly expressed. *See Bochese*, 405 F.3d at 983 (agreement's reference to third party "without any expression of an intent to confer a benefit on [him was] wholly insufficient to establish that he was an intended beneficiary of the agreement," and "[n]othing in the record suggest[ed] that [the contracting party] was motivated by anything other than its own financial gain"); *Montgomery Bank, N.A. v. Alico Road Business Park, LP*, 2014 WL 6305396, at *3 (M.D. Fla. Nov. 13, 2014) (same).

Because AHCA was not an intended third-party beneficiary of the 2013 Agreement, it could not have enforced the provision of the agreement that Plaintiffs claim gave it the power to prevent RC Club Aspen from participating in the MVC Affiliation (by refusing to sign the Acknowledgment).[15] Stated differently, a refusal by AHCA to sign the Acknowledgment would

---

[15] Even if AHCA refused to sign the Acknowledgment and had been an intended third-party beneficiary, the parties to the 2013 Affiliation Agreement would have been free to amend the agreement to eliminate any purported requirement for a signed Acknowledgment. *See Restatement* § 311(1), (2) (explaining that, unless agreement expressly prohibits the "[d]ischarge or modification of a duty to an intended beneficiary," the parties to the agreement "retain the power to discharge or modify the duty by subsequent agreement"); *see also Palm Lake Partners II, LLC v. C&C Powerline, Inc.*, 38 So.3d 844, 849 (Fla. Dist. Ct. App. 2010) (same). The only

not have prevented RC Club Aspen from participating in the MVC Affiliation.  Accordingly, Plaintiffs' First, Second and Third Causes of Action fail as a matter of law to the extent they are based on AHCA's failure to discover and exercise an alleged right to prevent RC Club Aspen from participating in the MVC Affiliation.

## CONCLUSION

For all the foregoing reasons, the Court should grant the Marriott Defendants' motion for partial summary judgment precluding Plaintiffs from recovering any Non-Affiliation-Related Damages or seeking disgorgement of profits, dismissing Count V of the 7AC (unjust enrichment), and dismissing Counts I, II and III of the 7AC to the extent they relate to the 2013 Affiliation Agreement.

Dated:  July 29, 2019

Respectfully submitted,
GREENBERG TRAURIG, LLP

By:     *s/ Ian S. Marx*
Philip R. Sellinger
Ian S. Marx
500 Campus Drive, Suite 400
Florham Park, NJ 07932
Email:  SellingerP@gtlaw.com,  MarxI@gtlaw.com
*Attorneys for the Marriott Defendants*

---

exception to the power to "modify or discharge" a benefit owed to an intended beneficiary is that "[s]uch power terminates when the beneficiary, before he receives notification of the discharge or modification, materially changes his position in justifiable reliance on the promise or brings suit on it or manifests assent to it at the request of the promisor or promisee." *Restatement* § 311(3); *Palm Lake*, 38 So. 3d at 849; *Bucheck Constr. Corp. v. W.E. Music*, 420 So.2d 410, 414 (Fla. Dist. Ct. App. 1982).  Even if AHCA had refused to assent to the Acknowledgment, the 2013 Affiliation Agreement could have been amended if done before AHCA "materially changed its position in justifiable reliance" on the Agreement, which it did not do.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 29th day of July, 2019, a true and accurate copy of the foregoing **MARRIOTT DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT** and attached exhibits were filed and served with the Clerk of the Court via CM/ECF filing system, which will send notification to the following:

Michael J. Reiser
Law Office of Michael J. Reiser
1475 N Broadway, Suite 300
Walnut Creek, CA 94596
*Counsel for Plaintiffs*

Matthew C. Ferguson
The Matthew C. Ferguson Law Firm, P.C.
119 South Spring, Suite 201
Aspen, Colorado 81611
*Counsel for Plaintiffs*

Tyler R. Meade
The Meade Firm P.C.
1816 Fifth Street
Berkeley, CA 94710
*Counsel for Plaintiffs*

Linda Pham Lam
Michael Schrag
Gibbs Law Group LLP
505 14th Street, Suite 1100
Oakland, CA 94612
*Counsel for Plaintiffs*

Jessica Black Livingston
Hogan Lovells US LLP
1601 Wewatta Street, Suite 900
Denver, Colorado 80202
*Counsel for Defendant*
*Aspen Highlands Condominium Association, Inc.*

*/s/ Jaclyn DeMais*