# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

Civil Action No. 1:16-cv-01301-PAB-GPG

**RCHFU, LLC et al.**

Plaintiffs,

v.

**MARRIOTT VACATIONS WORLDWIDE CORPORATION et al.**

Defendants.

---

**PLAINTIFFS' OPPOSITION TO MARRIOTT DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT**

---

## I.  INTRODUCTION

When a property manager has "sole discretion" to make decisions about owners' property, it owes the owners fiduciary duties, including a of duty loyalty, to exercise this discretion in the owners' best interests. This fiduciary duty is based on control of the owners' property, and exists whether or not the property manager is an agent. Yet, in this case, the property manager used its complete control to benefit its own parent company at the expense of the owners it was bound to serve. This was a manifest breach of fiduciary duty.

Plaintiffs are the owners of one-twelfth fractional interests in luxury condominium units at the Ritz-Carlton Club Aspen Highlands ("Ritz-Aspen"). The Ritz-Aspen was developed by Marriott Vacation Club International ("MVCI"), which also owns a less exclusive timeshare line called the Marriott Vacation Club ("MVC"). When Plaintiffs purchased, they agreed to give almost complete control over their fractional interests to the Aspen Highlands Condominium

1

Association (the "Association"). The Association then retained Defendant Ritz-Carlton Management Company ("RC Management") to be the "managing agent" of the Ritz-Aspen. The Association and RC Management, in turn, delegated near complete managerial control over Plaintiffs' fractional interests to Defendant Cobalt Travel Company ("Cobalt").

On average, Plaintiffs paid over $200,000 for each unit and they pay between $12,000 and $16,000 in annual fees, including fees to both RC Management and Cobalt. As owners, they are entitled to use their units at the Ritz-Aspen for four weeks per year. While they could have paid far less for four weeks of condominium use by participating in a timeshare such as MVC, they chose the Ritz-Aspen based on the Ritz-Carlton brand and its promised exclusivity, meaning that the Ritz-Aspen would operate only for the benefit of those who purchased fractional units in Aspen or at the eight other Ritz-Carlton Club locations. This was true for a while.

But by 2013, MVCI and its parent company Marriott Vacations Worldwide ("MVW") had decided to abandon the upscale Ritz-Carlton luxury club product, and favor their points-based and much cheaper MVC. To this end, in 2014, Cobalt, at the urging of MVW and MVCI and the other defendants, affiliated the Ritz-Aspen with the MVC, meaning that over 400,000 MVC members could use their points to access the Ritz-Aspen for a small fraction of what Plaintiffs paid for the same access. The natural result of this affiliation was the decimation of the values of Plaintiffs' fractional interests due to the dilution of the Ritz-Carlton brand and loss of its exclusivity.

Based on the objections to affiliation that the boards of various clubs voiced, Defendants were well aware that affiliation would have a severe adverse effect on the value of Plaintiffs' fractional units. In addition, the Association's legal counsel informed the Association, and the

2

Association informed the other Defendants, that the governing documents, including the condominium Declaration creating the fractional units, prohibited the proposed affiliation. In response, the Association and other Defendants agreed not to effectuate the proposed affiliation without obtaining the approval of the members via a vote. But Defendants breached this agreement in 2014 when Cobalt, aided and abetted by the other defendants, imposed the affiliation on the Ritz-Aspen without holding the promised vote. Predictably, those fractional interests now sell for as low as $10,000, while at comparable luxury clubs that maintained their promised exclusivity, fractional interests have maintained their values.

In implementing this affiliation, Cobalt, along with the other Defendants, acted contrary to Plaintiffs' interests in order to benefit MVCI, MVW, and their related entities – a glaring breach of fiduciary duty that cost Plaintiffs, collectively, tens of millions of dollars. Plaintiffs' Second Amended Complaint (ECF No. 40, "SAC") adequately alleges that Defendants' actions breached or aided and abetted the breach of fiduciary duties in affiliating with MVC and destroying the values of the fractional interests as well as the viability of the overall project.

The SAC sets forth dual sources for the fiduciary duty—based on both the high level of control Defendants had over the condominium units themselves, as well as agency principles— and then describes how Defendants breached those duties and caused Plaintiffs damages. Because a complaint need do no more than that, Defendants' motion to dismiss should be denied. Defendants completely ignore the allegations of control over Plaintiffs fractional interests, which are sufficient to sustain the SAC. Moreover, Defendants' agency-based arguments ring hollow given that their own documents concede the agency relationship. Most importantly, Defendants jump the gun in contesting the existence of fiduciary relationships: "The existence of the

3

fiduciary relationship is a question of fact for the jury." *Moses v. Diocese of Colorado*, 863 P.2d 310, 322 (Colo. 1993). Thus, the Motion to Dismiss (ECF No. 47, "Motion") should be denied.

## II. STATEMENT OF THE CASE

The Ritz-Aspen is a luxury fractional ownership property located in Aspen. SAC at ¶ 4. It was established in 2001 as the first property under the Ritz-Carlton Destination Club ("Ritz-Carlton Club") brand, designed to be an upscale alternative to Defendant MVCI's other timeshare product line – the MVC. *Id.* at ¶ 4. MVCI had been running timeshare operations since the 1980s, but introduced the Ritz-Carlton Club brand in 1999 to sell fractional ownership interests that were more exclusive and deluxe in nature – distinct from the MVC. *Id.* at ¶¶ 2-3. As such, Ritz-Carlton Club interests were much more expensive than MVC interests. *Id.* at ¶ 3.

A fractional owner at the Ritz-Aspen is entitled to four weeks of stay there per year. *Id.* at ¶ 3. Owners are also part of the Ritz-Carlton Club Membership Program ("Membership Program"), through which they can reserve stays at the Ritz-Aspen and sister Ritz-Carlton Club resorts. *Id.* at ¶¶ 3-4. Between 2001 and 2012, hundreds of purchasers paid premium prices ranging from $150,000 to $400,000 for their deeded 1/12 fractional interests at the Ritz-Aspen. *Id.* at ¶ 6. These interests were sold based on Defendants' claims that they were superior to other timeshare offerings, such as the MVC, and that the Ritz-Aspen would operate for the exclusive use and enjoyment of Ritz-Carlton Club members as well as their families and guests. *Id.* at ¶ 6.

The Association was granted almost complete control over Plaintiffs' individual fractional interests. *Id.* at ¶ 23 & Ex. H at ¶ 23.8[1]. In 2001, the Association entered into a "Management Agreement" with RC Management whereby RC Management became the

---

[1] All exhibit citations are to exhibits to the Second Amended Complaint, ECF No. 40.

4

"managing agent" and would "act on behalf of the Association and its members as the exclusive managing entity and … manage the daily affairs of the Condominium and the [Fractional Ownership Interest] Plan." *Id.* at ¶ 25 &, Ex. A at ¶ 2 & Ex. H at ¶ 2.41. RC Management had all the power and authority necessary to carry out its duties in maintaining and managing Plaintiffs' fractional interests, including "to the exclusion of all other persons including the (Association) and its members . . . the powers and duties of the Executive Board." *Id.* at ¶ 26, Ex. A at ¶ 4. The agreement gave RC Management the power to hire a "program manager" to manage and administer the reservation procedures and exchange program for the Membership Program. *Id.* at ¶ 34. RC Management exercised that authority by hiring Defendant Cobalt, via an Affiliation Agreement that was also signed by the Association, to operate the reservation system that Ritz-Aspen owners had to use to obtain use of their allotted number of days. *Id.* at ¶ 40.

In 2012, MVW disclosed its intent to scale back its luxury products line – namely, the Ritz-Carlton Club. *Id.* at ¶ 8. In a July 17, 2012 letter, the general manager of Cobalt first informed owners of the possibility that the Ritz-Carlton Club would be affiliated with the MVC. *Id.* at ¶ 47. The letter described the affiliation as a means for Ritz-Aspen owners to use their allocated time to stay at MVC resorts, but failed to mention that the affiliation would also allow the 400,000 MVC members to access the Ritz-Carlton Club. *Id.* at ¶¶ 47-48.

In the following months, member-controlled boards of various Ritz-Carlton Club properties expressed serious concern about the proposed affiliation, including that such an affiliation would dilute the Ritz-Carlton brand, for which Plaintiffs and other owners paid premium prices. *Id.* at ¶¶ 49, 52. The Association wrote to Plaintiffs that "The Board has concerns that . . . the nature of our club will change by opening the club to MVW

5

timeshare/points members who have a much lower cost of entry." *Id.* at ¶ 52. In October 2012, the Association informed MVW that its counsel had determined that "the underlying Association documents … prohibit what MVW is planning." *Id.* at ¶ 57.

In April 2013, the Association wrote to Ritz-Aspen owners that unless a majority of the owners voted in favor of doing so, the Ritz-Aspen would not be included in the MVC affiliation. *Id.* at ¶ 60, Ex. L. No such vote ever took place. *Id.* at ¶ 61. Even so, in April 2014, Cobalt, acting in concert with the other Defendants decided to include the Ritz-Aspen in the MVC affiliation. *Id.* at ¶ 62. The Association disingenuously claimed that the affiliation occurred "[i]n response to the Members' wishes." *Id.* at ¶ 63, Ex. M.

Due to Defendants' actions, approximately 400,000 MVC members – who paid a small fraction of the purchase prices Plaintiffs paid, and who pay much less in annual fees – have access to the supposedly exclusive offering for which Plaintiffs paid premium prices. *Id.* at ¶ 67. While Defendants have derived huge profits and cost savings from this affiliation, the value of Plaintiffs' fractional interests has been destroyed. *Id.* at ¶ 67. Even more, Plaintiffs have had to pay, in the form of inflated annual maintenance fees, for the increased use and wear-and-tear resulting from the opening of the Ritz-Aspen to MVC members. *Id.* at ¶ 67.

### III. ARGUMENT

#### A. The SAC States Claims for Breach of Fiduciary Duty Based On Control Over Plaintiffs' Fractional Interests and Agency Principles

The SAC alleges two independent sources of fiduciary duties owed by Defendants: (1) Defendants' high degree of control over Plaintiffs' property; and alternatively (2) agency (and sub-agency) relationships between Plaintiffs and Defendants. Yet, in their motion to dismiss,

6

Defendants only challenge the fiduciary duties arising from agency principles and fail to even mention the fiduciary duties that stem from Defendants' control over Plaintiffs' property. This alone is reason to deny Defendants' motion. Moreover, although Defendants' arguments against the existence of agency relationships fails for several reasons, Defendants' fatal flaw is ignoring that whether agency relationships and, more broadly, fiduciary duties exist are questions of fact that cannot be decided on a motion to dismiss. *See Moses,* 863 P.2d at 322*; Wildearth Guardians v. Public Service Co. of Colorado*, 2010 WL 1568574, *3 (D. Colo. Apr. 15, 2010).[2]

### 1. The SAC Alleges Fiduciary Duties Arising from Control Over Property

Under Colorado law, a fiduciary relationship may exist even in the absence of an agency or other special relationship. A fiduciary relationship exists whenever one person is entrusted to act for the benefit of or in the interests of another and has the legal authority to do so. Colo. Jury Instr., Civil 26:2; *Tepley v Public Employees Retirement Ass'n*, 955 P.2d 573, 577. A fiduciary relationship also arises where one party "has a high degree of control over the property or subject matter of another." *Tara Woods Ltd. P'ship v. Fannie May*, 731 F.Supp.2d 1103, 1116 (D. Colo. 2010); *see also Oaster v. Robertson*, 2016 WL 1247803, *18 (D. Colo. Mar. 28, 2016) (same); *Vikell Investors Pacific, Inc. v. Hampden, Ltd.*, 946 P.2d 589, 596-97 (Colo. App. 1992) (same); *Paine, Webber, Jackson & Curtis, Inc. v. Adams*, 816 P.2d 508, 517-18 (Colo. 1986) (whether stockbroker owes client a fiduciary duty depends on the degree of control); *Vai v. Bank of Am.*

---

[2] *Dime Box Petroleum Corp. v. Louisiana Land & Expl. Co.*, 938 F.2d 1144, 1147–48 (10th Cir. 1991), relied upon by Defendants, is not to the contrary. In that case, the Court merely held that the parties had agreed in a non-adhesive contract to a heightened standard of liability. No such agreement exists here. Far from holding that the existence of a fiduciary duty is a question of law that can be resolved at the motion to dismiss stage, the Court noted that the existence of a joint venture – the basis for the fiduciary duty alleged in that case – is a question of fact, which was proven at trial. *Id.* at 1147.

7

*Nat'l Trust & Sav. Ass'n*, 56 Cal.2d 329, 338 (1961) ("[t]he key factor in the existence of a fiduciary relationship lies in control by a person over the property of another").

Here, the SAC alleges that (a) Plaintiffs granted the Association control over not only the common areas, but also over Plaintiffs' individual fractional interests, (b) the Association delegated this sweeping grant of control to RC Management, and then (c) the Association and RC Management further delegated this control to Cobalt. As a result of this control over Plaintiffs' separately deeded property interests, *all three of these defendants* owe Plaintiffs the fiduciary duties alleged in the SAC. *See Colorado Homes, Ltd., v. Loerch-Wilson*, 43 P.3d 718, 722-23 (Colo. App. 2011) (reinstating breach of fiduciary duty claims by individual unit owners against both the homeowners' association and the property management firm).

Paragraphs 25 to 37 of the SAC lay out how RC Management has the *exclusive authority* to manage Plaintiffs' property, including, among many other things, the permission to receive and deposit all funds collected from the owners and to maintain and replace personal property within Plaintiffs' fractional interests. The Management Agreement further delineates RC Management's almost complete control over Plaintiffs' individual fractional interests. Paragraphs 39, 40, and 42 describe the nature of Cobalt's control. Cobalt was hired by means of an agreement signed not only by RC Management, but also by the Association. SAC at ¶ 38.

Because Cobalt is the exclusive manager of the Membership Program, *it controlled Plaintiffs' access to their own units*. SAC at ¶ 34. Moreover, because Cobalt has the *sole discretion* to affiliate the Membership Program with other locations or member clubs, Cobalt exerts a high degree of control over Plaintiffs' property at the Ritz-Aspen, which was valued for its exclusivity and the fact that it provided owners with access to other Ritz-Carlton Club luxury

8

properties. SAC at ¶¶ 3, 4, 39, 40. Indeed, the Affiliation Agreement solidifies Cobalt's almost complete control over the decision to affiliate Plaintiffs' property with other member clubs by stating that "[n]either the Developer, Members Association, nor Club Manager shall be entitled to participate in or consent to the Program Manager's decision in this regard." SAC at ¶ 40.

Defendants concede, as they must, that the Association owes Plaintiffs fiduciary duties. Motion at 11 (citing *McShane v. Stirling Ranch Prop. Owners Ass'n.*, __ P.3d __, 2015 WL 1843807, *5 (Colo. App. Apr. 23, 2015)). But they fail to acknowledge the full scope of those duties. Typically, a homeowners' association has authority only over the common areas, and so the fiduciary duties are limited to its management of those areas. Here, however, the Association also assumed near complete control over Plaintiffs' separately deeded property interests, *i.e.*, the fractional interests that are the subject of this litigation. Ex. H at ¶ 23.8. Thus, both the Association and the recipients of authority delegated by the Association – RC Management and Cobalt – owe fiduciary duties relating to their management of Plaintiffs' fractional interests.

The New York appellate court's decision in *Caprer v. Nussbaum*, 36 A.D.3d 55 (2006), provides well-reasoned guidance here because it addressed the issue of when a managing agent of a condominium owes fiduciary duties to unit owners. In *Caprer*, condominium unit owners sued the managing agent (among other defendants) for breach of fiduciary duty by committing various acts of financial mismanagement. *Id*. at 180-81, 191. In ruling on the managing agent's summary judgment motion, the *Caprer* court noted that the manager had control in operating and maintaining *only* the common elements of the condominium and not any aspect of any individual unit. *Id*. at 192. The court specifically noted that the manager did not have authority "to hold any personal funds of the unit owners or otherwise act on their behalf, and the plaintiffs [did] not

9

allege any other basis for a fiduciary relationship." *Id*. at 192. Under those distinct facts, the court found that the manager owed a fiduciary duty only to the condominium.

Here, in contrast, Plaintiffs allege that the control of the Association, RC Management and Cobalt extends beyond common areas and into their separately deeded property interests. In direct contrast to the facts in *Caprer*, the SAC alleges that RC Management had authority to receive and hold all personal funds collected from the owners. SAC at ¶ 31; Ex. A at ¶ 4(J). The SAC further alleges that RC Management has the authority to engage a Program Manager to manage the reservation procedures and exchange program, which has a financial impact on owners' individual fractional interests. SAC at ¶ 34. Thus, under the reasoning of *Caprer*, each of these defendants owes fiduciary duties to owners (Plaintiffs) based on its control over the units themselves. In sum, because the SAC alleges that the Association, RC Management, and Cobalt have control over Plaintiffs' individual fractional interests at the Ritz-Aspen, they owe Plaintiffs a fiduciary duty to exercise that control in Plaintiffs' best interests and to refrain from self-dealing. SAC at ¶¶ 25-44.

### 2. The SAC Independently Alleges Fiduciary Duties Arising from Agency

It is settled that an agent owes fiduciary duties to its principal. *City & County of Denver v. Fey Concert Co*., 960 P.2d 657, 669 (Colo. 1998); *McKinney v. Christmas*, 143 Colo. 361, 363 (Colo. 1960); Rest.2d Agency § 387 (1957). The existence of an agency relationship, therefore, by itself establishes fiduciary duties owed by the agent. The existence of agency is memorialized in the Declaration, which specifies that a "Managing Agent" would be appointed Ex. H at ¶ 23.6. ("It is contemplated that the (Board of Directors) will delegate the responsibility for

10

Case No. 1:16-cv-01301-PAB-GPG Document 58 Filed 08/15/16 USDC Colorado Page 11 of 19
Case 1:16-cv-01301-PAB-GPG Document 141-2 filed 07/28/19 USDC Colorado pg 12 of 20

administration and management of the Plan of Fractional Ownership ... to a Managing Agent pursuant to a Management Agreement"); and Ex. H at ¶ 2.41.

Whether or not an agency relationship exists is a question of fact. *Stortroen v. Beneficial Finance Co. of Colorado*, 736 P.2d 391, 395 (Colo. 1987). As a general matter, an agency relationship arises from the manifestation of consent by one party (the principal) to another (the agent) that the other shall act on its behalf and subject to its control. *Id*. (citing Rest.2d Agency § 1(1) (1957)). An agency relationship may exist even though the parties did not intend to create one. *Id*. Indeed, "the existence of an agency relationship can be proven by the conduct of the parties." *Moses*, 863 P.2d at 324. "No one factor, including control, is determinative. The most important factor in determining whether a person is an agent is "the *right* to control, not the fact of control." *Id.* (citations omitted) (emphasis added). The Declaration gives Plaintiffs that right of control by allowing them to amend or terminate any provision affecting the fractional ownership plan, which necessarily includes the termination of Cobalt. Ex. H at ¶ 22.3.

The SAC explains, in detail, the source of each agency relationship between Plaintiffs and Defendants. At the outset, Paragraph 25 alleges that RC Management, via the Management Agreement, entered into an agency relationship with members of the Association (which includes Plaintiffs) to manage the Condominium and the fractional ownership interest plan. Paragraph 25 points to the specific clause in the Management Agreement that delegates this authority. SAC at ¶ 25. The "Appointment and Acceptance of Agency" paragraph states:

> The Association hereby employs the Management Company to act *on behalf of the Association and its members* as the exclusive managing entity of the Condominium and to manage the daily affairs of the Condominium and the Plan, and the Management Company hereby agrees to so act.

Management Agreement at ¶ 2, Ex. A (emphasis added).

11

This plain delegation of authority is the *sine qua non* to establishing an agency relationship, not to mention Defendants' own choice of the agency label. Further, in an analogous setting, hotel management contracts create an agency relationship between a hotel's owner and its manager. *See, e.g., Woolley v. Embassy Suites, Inc.*, 227 Cal.App.3d 1520, 1531 (1991). Where a hotel owner divests itself of day-to-day control of a hotel's operations to a manager, while retaining ownership, the manager becomes an agent of the hotel owner. *FHR TB, LLC v. TB Isle Resort, LP.*, 865 F.Supp.2d 1172, 1195 (S.D. Fla. 2011).

Citing to the Management Agreement, Paragraphs 25-35 of the SAC delineate how Plaintiffs have divested themselves of the management responsibilities of their property interests, while still retaining ownership. These paragraphs show that RC Management can hire employees to manage the Condominium, maintain the Association's books and accounting, prepare annual budgets, replace personal property within Plaintiffs' fractional interests, and amend the rules pertaining to the fractional interests. SAC ¶¶ 26-32. The Management Agreement confirms that Plaintiffs are the principals of RC Management by stating that RC Management may only be terminated by a vote of the Plaintiffs-owners. Ex. A at ¶ 4. It follows that RC Management owed fiduciary duties to Plaintiffs within the scope of its agency. *See McKinney v. Christmas*, 143 Colo. at 363.

Because the SAC adequately alleges that RC Management is an agent of Plaintiffs, it also adequately alleges that Cobalt is a subagent of Plaintiffs. "A subagent is 'a person appointed by an agent empowered to do so, to perform functions undertaken by the agent for the principal, but for whose conduct the agent agrees with the principal to be primarily responsible.'" *City & County of Denver,* 960 P.2d at 670. Like an agent, a subagent has fiduciary duties to the principal

12

and "is subject to all the liabilities of an agent to the principal." *Moses*, 863 P.2d at 325 n.18 (citing Rest.2d Agency § 5 cmt. d). Here, Paragraph 34 alleges that RC Management had the authority to engage a "Program Manager" through an affiliation agreement to "manage and administer the reservation procedures and exchange program for the Ritz-Carlton Club Membership Program (the 'Membership Program')…" SAC at ¶ 34. RC Management exercised that authority by hiring Cobalt to manage and administer the Membership Program. Cobalt therefore owes fiduciary duties as a subagent. SAC at ¶ 41.

### 3. Defendants' Contractual Disclaimer Arguments Fail

Defendants attempt to argue that no fiduciary relationships exist as a matter of law by pointing to vague disclaimer language in the Management Agreement that does not even mention fiduciaries or fiduciary duties. Their argument fails for several reasons. First, *Plaintiffs* never signed a contract stating that RC Management was not their fiduciary; a statement to that effect signed by a Defendant-controlled entity – assuming for purposes of argument that the cited provision so qualifies – does not bind *Plaintiffs*.

Second, under *Bayview Loan Servicing, LLC v. Boland*, 2009 WL 3234270, at *5 (D. Colo. Sept. 30, 2009), an attempt to disclaim an agency relationship is not dispositive at the pleading stage. *Id.* (denying motion to dismiss because agency is a question of fact).

Third, even if agency or fiduciary relationships could be disclaimed as a matter of law, the language on which Defendants rely falls far short of doing so. The Management Agreement merely states that nothing therein "shall be construed as creating a partnership, joint venture, or any other relationship between the parties to this Agreement." Motion at 9-10. It does not mention fiduciary relationships. *See* Ex. A. That there is no partnership or joint venture does not

13

preclude other agency relationships, let alone a fiduciary relationship based on control of Plaintiffs' property.[3]

Defendants' argument that RC Management cannot be an agent because the Management Agreement recognizes it as an independent contractor is also unavailing. An independent contractor can also be an agent. *1-800 Contacts, Inc. v. Lens.com, Inc*., 722 F.3d 1229, 1251 (10th Cir. 2013); *Bradbury v. Phillips Petroleum Co*., 815 F.2d 1356, 1360 (10th Cir. 1987)). Whether an independent contractor is also an agent "depends on the circumstances of the undertaking." *City and County of Denver*, 960 P.2d at 669 (citing Rest.2d Agency § 2).[4]

### 4. The SAC Adequately Alleges Breach And Damages

The SAC alleges, in detail, how Defendants breached or aided and abetted the breach of fiduciary duties by affiliating the Ritz-Aspen with the Marriott Vacation Club. SAC at ¶¶ 64, 67. A party may breach the fiduciary duty it owes to another by engaging in self-dealing, violating the duty of loyalty, and acting against the interests of the one he owes a fiduciary duty to. *See Jet Courier Serv., Inc. v. Mulei*, 771 P.2d 486, 492 (Colo. 1989) (quoting Rest.2d Agency, § 387)). The SAC sufficiently alleges that Defendants breached their fiduciary duty to Plaintiffs in two ways: (1) violating the duty of loyalty by virtue of the affiliation, and (2) failing to enforce the restrictive covenant against such affiliation. SAC at ¶¶ 62, 65-66.

---

[3] Defendants' reliance on *Rocky Mountain Expl., Inc. v. Davis Graham & Stubbs LLP*, 2016 WL 908640, at *7 (Colo. App. Mar. 10, 2016), is misplaced because there the agreement expressly disavowed a fiduciary relationship; whereas there was no such express disavowal here.

[4] Defendants citation to *Willey v. Mayer*, 876 P.2d 1260, 1266 (Colo. 1994), is puzzling, because an entirely different issue was at play there. *Willey* concerned whether a principal could be held liable to a third party for his agent's abuse of authority. *Id*. No such issue exists here.

14

First, Defendants breached their duty of loyalty by favoring their own interests to the detriment of Plaintiffs' interests. Paragraph 43 states that Cobalt entered into an agreement with Lion & Crown, which allowed members of the MVC to use the fractional interests at the Ritz-Aspen. SAC at ¶ 43. Implementing this affiliation allowed over 400,000 MVC members to use their "points" to obtain access to the units and amenities at the Ritz-Aspen, for a fraction of what Plaintiffs paid, causing the value of Plaintiffs' fractional interests to decline by as much as 80% and annual fees to increase. *Id.* at ¶¶ 10, 67. All the while, the affiliation has allowed Defendants to achieve huge profits by advertising that purchasers of MVC timeshares will have access to the Ritz Carlton clubs. *Id.* at ¶¶ 67, 92; *see also* ¶¶ 8, 56. In short, the affiliation was an act of self-dealing that benefitted Defendants only. *Id.* at ¶¶ 67, 92.

Separately, as more fully stated below, the Association breached its fiduciary duty to Plaintiffs by failing to enforce a restrictive covenant against further timesharing. Under *Colorado Homes*, 43 P.3d at 721-22, a homeowners association has a fiduciary duty to enforce restrictive covenants. The SAC alleges that the Association was informed by its lawyers that the proposed affiliation could not take place absent an amendment of the Declaration. SAC at ¶¶ 54, 71; Ex. H. Yet, against the advice of its own lawyers, the Association proceeded with the other Defendants to carry out the affiliation. *Id.* at ¶ 71. RC Management also had the duty to enforce this covenant because, under the Management Agreement, it has all the powers and duties that the Association has. Ex. A at ¶ 4 ("The Management Company . . . shall have all the powers and duties of the Executive Board as set forth in the Declaration and the bylaws . . .").

The SAC also sufficiently alleges how each Defendant aided and abetted in the breach, causing Plaintiffs' damages. "The elements of the tort of aiding and abetting a breach of

15

fiduciary duty include: (1) breach of a fiduciary duty owed to a plaintiff, (2) a defendant's knowing participation in the breach, and (3) damages. (citation omitted). Also, Restatement (Second) of Torts § 876(b) (1977), upon which the tort is premised, includes as an additional element that a defendant must give substantial assistance to the other's breach." *Nelson v. Elway*, 971 P.2d 245, 249-250 (Colo. App. 1998).

The SAC adequately alleges that the other Defendants aided and abetted Cobalt despite being specifically prohibited from even consulting with Cobalt on decisions related to affiliations. SAC at ¶ 40. Paragraph 44 describes how MVW participated in that breach. It explains that MVW directly controls Cobalt and RC Management because those companies are shell companies of MVW, and serviced by MVW employees. MVW actively encouraged the affiliation by communicating with Plaintiffs to falsely inform them that nothing would change as a result of an affiliation with MVC and otherwise encourage affiliation, *id.* at ¶ 55-62, even though it had been advised by counsel that such an action would require an amendment to the underlying Association documents. *Id.* at ¶¶ 57, 64.

Paragraph 62 alleges that RC Management aided and abetted the breach of fiduciary duty by agreeing to the inclusion of the Ritz-Aspen in the MVC affiliation. The Association aided and abetted the breach in the same manner, even though both it and MVW had promised and were contractually bound not to participate in the affiliation decision. *Id.* at ¶ 62. The SAC further explains that the Association was in active discussions with MVW in 2012 and 2013 regarding the proposed affiliation, and that the Association represented to Plaintiffs that the affiliation would not take place unless Ritz-Aspen owners voted in favor of it. *Id.* at ¶ 60. There was never such a vote, yet it was the Association that announced to Plaintiffs in April 2014 that the

16

affiliation took place anyway. *Id.* at ¶¶ 63-64. These acts exhibit the Association's participation in the breach of fiduciary duty to Plaintiffs.

Defendants appear to contend that the Association could not have breached or aided and abetted in the breach because a contractual clause purportedly limited its ability to do so. Motion at 12. Defendants argument fails because it ignores the fact that the SAC alleges that the Association aided and abetted in the affiliation, regardless of any limiting contractual clause. SAC at ¶ 62. The possibility that the Association may have also violated a contract provision in doing so is a question that is independent from whether, based on the facts, the Association actually aided and abetted in the affiliation. The issue of whether "actions constitute a breach of (the) duty of loyalty involves a question of fact . . . based upon all the circumstances of the case." *Jet Courier Service, Inc. v. Mulei*, 771 P.2d 486, 494 (Colo. 1989).

### B. The SAC Alleges That Restrictive Covenants Prohibited the Affiliation

The SAC alleges a claim based on what the Association's own attorney concluded, *i.e.*, that two restrictive covenants, § 8.25 of the Master Declaration and § 19.8 of the Declaration of Condominium, prohibited the affiliation. SAC at ¶¶ 54, 57, 62, 70, 71, 81. Section 19.8 states that "no Unit shall be used for the operation of a timesharing, fraction-sharing ... membership program, vacation club ... or similar program whereby the right to exclusive use of the Unit is alternated or scheduled among participants in the program...." *Id.* at ¶ 54. Section 8.25 states that "no Unit shall be used for the operation of a timesharing, fraction-sharing, or similar program whereby the right to exclusive use of the Unit rotates among participants in the program...."

Defendants seek an adjudication of this claim based on their reading of these very general provisions. But the proper interpretation of them should not be resolved at the pleading stage.

17

*Chimney Rock Pub. Power Dist. v. Tri-State Generation & Transmission Ass'n, Inc.*, 2012 WL 84572, at *7 (D. Colo. Jan. 11, 2012) (declining to grant a motion to dismiss "based on an alleged breach of such a general and ambiguous contractual provision").

### C. The SAC Adequately Alleges a Claim for Unjust Enrichment

The SAC properly pleads every element of an unjust enrichment claim under Colorado law, *i.e.*, "(1) that a benefit was conferred on the defendant by the plaintiff; (2) that the benefit was appreciated by the defendant; and (3) that the benefit was accepted by the defendant under such circumstances that it would be inequitable for it to be retained without payment of its value." *DCB Const. Co., Inc. v. Central City Dev. Co.*, 965 P.2d 115, 124 (Colo. 1998) (citation omitted). SAC at ¶¶ 90-93. Defendants do not argue otherwise. Rather, they seek a summary adjudication of this claim based on their contention that they did not do anything wrong. Motion at 17-18. But as discussed throughout this opposition, the SAC properly alleges a breach of fiduciary duties that unjustly enriched Marriott entities.

### IV. CONCLUSION

For all the foregoing reasons, Defendants' motion to dismiss should be denied in its entirety, and that leave to amend be granted if there is any deficiency in the allegations.

Dated: August 15, 2016                           Respectfully submitted,

*/s/ Michael Schrag*
Michael Schrag (admitted *pro hac vice*)
GIBBS LAW GROUP LLP
505 14th Street, Suite 1110
Oakland, CA 94612
Phone: (510) 350-9718
Facsimile: (510) 350-9701
E-mail: mls@classlawgroup.com

*Attorneys for Plaintiffs*

18

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on this 15th day of August, 2016, a true and accurate copy of the foregoing **Plaintiffs' Opposition to Marriott Defendants' Motion to Dismiss Second Amended Complaint** was filed and served via CM/ECF filing system upon following:

Matthew C. Ferguson, Esq.
The Matthew C. Ferguson Law Firm, P.C.
119 South Spring, Suite 201
Aspen, Colorado 81611

Michael J. Reiser, Esq.
Lilia Bulgucheva, Esq.
Law Office of Michael J. Reiser
961 Ygnacio Valley Road
Walnut Creek, California 94596
Michael L. Schrag, Esq.
Gibbs Law Group LLP
1 Kaiser Plaza, Suite 1125
Oakland, California 94612

Tyler R. Meade, Esq.
The Meade Firm p.c.
1816 Fifth Street
Berkeley, California 94710

Daniel F. Shea, Esq.
Jessica Black Livingston, Esq.
Hogan Lovells US LLP
1200 Seventeenth Street, Suite 1500
Denver, Colorado 80202

Naomi G. Beer, Esq.
Greenberg Traurig, LLP
1200 17th Street, Suite 2400
Denver, Colorado 80202

Ian S. Marx, Esq.
Philip R. Sellinger, Esq.
Greenberg Traurig, LLP
500 Campus Drive, Suite 400
Florham Park, New Jersey 07932

*/s/ Linda Lam*
Linda Lam