# EXHIBIT H

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

Civil Action No. 1:16-cv-01301-PAB-GPG

**RCHFU, LLC,** *et al.*

Plaintiffs,

v.

**MARRIOTT VACATIONS WORLDWIDE CORPORATION,** *et al.*

Defendants.

___

**PLAINTIFFS' MOTION TO AMEND SCHEDULING ORDER TO ALLOW
PLAINTIFFS TO AMEND COMPLAINT TO ADD CLAIM FOR EXEMPLARY
DAMAGES; AND MOTION TO AMEND COMPLAINT**
___

Plaintiffs respectfully file this motion under Fed.R.Civ.P. 16 to amend the scheduling order to allow Plaintiffs to file an amended complaint to add a claim for exemplary damages. Plaintiffs concurrently move to amend the complaint under Fed.R.Civ.P. 15. This motion is based on the grounds that: (1) Plaintiffs' exemplary damages claims are governed by Colorado law, which prohibits such claims in the initial complaint and allows them only after a plaintiff establishes *prima facie* evidence of a triable issue; (2) the Scheduling Orders (ECF Nos. 60, 136 and 161) contemplate Plaintiffs moving to add a claim for exemplary damages; (3) there is good cause to amend the current Scheduling Order because Plaintiffs have been diligent in pursuing discovery and only recently, through the depositions of key Marriott employees, developed the requisite *prima facie* evidence of wanton and willful conduct; and (4) Plaintiffs satisfy Rule 15, which instructs that leave to amend should be freely granted.

**CERTIFICATE OF COMPLIANCE WITH D.C.COLO.L.CIV.R 7.1A**

The undersigned certifies that they have conferred with the Marriott Defendants'[1] counsel who have not yet indicated one way or another whether their clients oppose this Motion.

**INTRODUCTION**

Plaintiffs were not permitted to include a claim for exemplary damages in their original complaint under Colorado law. *See Klein v. Grynberg*, 44 F.3d 1497, 1503 (10th Cir. 1995); *Am. Econ. Ins. Co. v. William Schoolcraft, M.D., P.C.*, 2007 WL 160951, *1–2 (D. Colo. Jan. 17, 2007). Colorado law requires a plaintiff to wait until after initial disclosures *or subsequent discovery* yields an evidentiary basis of a defendant's fraudulent, malicious, or willful and wanton conduct. C.R.S. § 13-21-102(1)(a) and 1.5(a).

It was not until the recent depositions of Lee Cunningham, Stephanie Sobeck, and Mary Lynn Clark (and third parties) in November and December 2017 that the requisite prima facie case for exemplary damages emerged. Their testimony reveals that the Marriott Defendants did not simply err in a manner that breached the fiduciary duties they owed to Plaintiffs. Driven by corporate greed, the Marriott Defendants willfully and wantonly lied to Plaintiffs as part of their campaign to surreptitiously force a value-crushing affiliation between the Ritz-Carlton Destination Club ("RCDC") and the point-based Marriott Vacation Club (sometimes, "MVC") that allowed them to profit at the expense of Plaintiffs' deeded property rights.

The Marriott Defendants were well aware that two factors drove Plaintiffs to pay premium prices for fractional units at Ritz-Aspen: (1) owning a deeded property interest in an

---

[1] Marriott Vacations Worldwide Corporation, Marriott Ownership Resorts, Inc., The Ritz-Carlton Management Company, LLC, Cobalt Travel Company, LLC, and Lion & Crown Travel Co., LLC (collectively, "the Marriott Defendants" or "Marriott").

2

exclusive and trusted luxury brand in Aspen, and (2) having reciprocal rights at equally exclusive RCDC Private Residence Clubs[2] (such as Kapalua, Hawaii; Abaco, Bahamas; Bachelors Gulch, Colorado; and Jupiter, Florida). But after collecting premium purchase prices from Plaintiffs, the Marriott Defendants decided to abandon the Ritz-Carlton fractional product, and self-deal at Plaintiffs' expense. No new Ritz-Carlton Destination Clubs were built and three clubs (Abaco, Kapalua, and Bachelor Gulch) exited the Ritz system.

The Marriott Defendants determined that they could make much more money by using the Ritz-Carlton Destination Club luxury properties, including the Ritz-Aspen, to lure people to purchase points in the Marriott Vacation Club. To do so, they initiated a scheme (ultimately implemented in 2014) that forced an affiliation between the two clubs over the strenuous objections of Plaintiffs and other members. As a result, 400,000 Marriott Vacation Club members can stay at the Ritz-Aspen for a fraction of the premium prices that Plaintiffs paid. The value of Plaintiffs' deeded property interests has collapsed by 80-90% (or more) for a very obvious reason: No rational economic actor would pay premium prices when a much cheaper alternative — the purchase of Marriott Vacation Club points — gives them the same access.

While Plaintiffs have suffered huge financial losses, the Marriott Defendants have profited immensely. The Marriott Defendants prominently feature the luxury Ritz-Carlton brand in their Marriott Vacation Club sales pitch and have reaped huge profits by opening up the Ritz-Aspen and other RCDC properties to market and sell MVC points. This is evidenced by the

---

[2] The Ritz-Aspen is called a Private Residence Club ("PRC") in hospitality industry parlance. These are deeded and here attached to the exclusive Ritz-Carlton Luxury brand. MVC on the other hand is a point-based vacation destination club and a far different product than sold to Plaintiffs at premium prices.

3

Marriott Vacations Worldwide Corporation's (sometimes, "MVW") share price, which has soared from $45 to over $135 since the affiliation.

After the Marriott Defendants' lengthy document production that delayed depositions until fall 2017, MVW Senior Vice President and Chief Operating Officer Lee Cunningham admitted that the Marriott Defendants promised that the affiliation between the Ritz-Carlton Destination Club and the Marriott Vacation Club — the event at the crux of this lawsuit — would not happen unless a majority of the members voted in favor of it. In the depositions of Mr. Cunningham and Stephanie Sobeck, Plaintiffs learned that the Marriott Defendants then discovered that they would lose this vote, and so they secretly substituted a highly misleading survey in place of the promised vote. This allowed them to force the affiliation through over the strenuous objections of the members, *including two Greenberg Traurig partners whose written objections mirror Plaintiffs' theory of the case*.

Moreover, such decisions were supposed to be made by Defendant Cobalt Travel Company, LLC ("Cobalt") without the involvement of the other defendants herein. But as Mr. Cunningham conceded in November 2017, Cobalt, the supposedly independent fiduciary that managed Plaintiffs' fractional interests, was under the exclusive direction and control of the other Marriott Defendants. Indeed, Mr. Cunningham admitted that *he* — not an independent Cobalt — decided to affiliate in total disregard of governing documents and the harm they knew would cause to Plaintiffs' property values.

Marriott's' abuse of its exclusive control over a supposedly independent Cobalt and their false promise of a vote establish a prima facie case for exemplary damages. C.R.S. § 13-21-102(1a) (requiring "a wrong done to the person or to personal or real property, and the injury

4

complained of is attended by circumstances of fraud, malice or willful and wanton conduct."). Because Plaintiffs made diligent efforts to obtain this *prima facie* evidence and could not reasonably have obtained it earlier due to the lengthy document production, good cause exists under Rule 16 to amend the scheduling order to permit the amendment to add exemplary damages.[3]

## RELEVANT PROCEDURAL BACKGROUND

This case was filed in Pitkin County on December 31, 2015. After Defendants removed the case, Plaintiffs elected not to pursue class certification and have amended the complaint several times to add additional plaintiffs. ECF Nos. 5, 36 (at p. 4), 40, 79, 87 (at p. 2), 105 (at p. 2), 109, 118, 119. The only substantive changes were that, after reviewing the Association's document production, Plaintiffs added causes of action for constructive fraud and promissory estoppel – along with the facts supporting those claims. ECF No. 109 at ¶¶ 56, 59, 70, 71, 72, 73. Every single version of the complaint has stated this or similar language:

> Plaintiffs expressly reserved all rights accorded under Colorado law, including but not limited to the right to amend this pleading as may be necessary in light of new or additional factual information gathered throughout the disclosure and discovery phases of this litigation **and the right to plead exemplary damages in accordance with C.R.S. § 13-21-102**.

*See e.g.,* ECF No. 119 at p. 101 (emphasis added).

On August 18, 2016, the first scheduling order in this case was issued stating that:

> Plaintiffs may seek to amend the pleadings to add a claim for exemplary or punitive damages in accordance with C.R.S. §13-21-102 and other applicable

---

[3] Pursuant to D.C.Colo.LCiv.R 15.1((b), the proposed Sixth Amended Complaint is attached as **Ex.** 16 to the Declaration of Matthew Ferguson dated February 2, 2018 ("Ferguson Decl."). A redlined version is attached as Ex. 17.

5

> law. Plaintiffs may need a further extension of [the] deadline to add a punitive damage claim.

ECF No. 60, at p. 16. The scheduling order has been modified twice since then. The first revision was issued on April 27, 2017 [ECF No. 136] and amended Sections 6 and 9, which concerned the report of discovery conferences and the case plan and schedule, respectively. It specifically noted that the Marriott Defendants' discovery was "taking a significantly longer time to accomplish" and thus several discovery deadlines were extended. *Id.* at p. 9. The second revised scheduling order on November 22, 2017 extended several discovery and motion deadlines. ECF No. 161 at p. 8. Neither revised order addressed the deadline to amend pleadings except to state that "all other portions of the Scheduling Order remain in force and effect." ECF No. 161 at p. 1.

Plaintiffs have been diligent in pursuing discovery in this complex mass action. On September 8, 2016, Plaintiffs propounded their first set of written discovery to the Marriott Defendants and the Association. Ferguson Decl. at ¶ 5. Both served their responses and objections to those requests on October 11, 2016. Ferguson Decl. at ¶ 6. The Association produced documents promptly (some of which led to the prompt addition of the constructive fraud and promissory estoppel claims). ECF No. 87. Marriott produced very meager initial documentation and has since taken an extraordinarily long time to produce their documents and people. This is detailed in the parties' recent joint status report and request to extend fact discovery *See* ECF No. 152 at pp. 1–2.[4]

---

[4] The Marriott Defendants disclosed only 4,871 pages of records on November 10, 2016. Nothing was produced for many months and until June 2017. The records initially disclosed were the governing Association documents (which Plaintiffs had), Ritz's records for communication logs for Plaintiffs se of the units (voluminous and not highly relevant), some Association budgets and Owner Usage Summaries (voluminous and not highly relevant). Ferguson Decl. at ¶¶ 8–9.

6

On August 4, 2017, in a letter from their Marriott Defendants' counsel, they announced "*believe[d]* that … the production … is *substantially* complete." Ferguson Decl. at **Ex. 1** (emphasis added). In all, the Marriott Defendants produced approximately 150,000 pages, which Plaintiffs promptly reviewed, organized, and used to prepare for depositions. Ferguson Decl. at ¶ 11; *see also* ECF No. 152 at p. 2 (¶ 4). Immediately, Plaintiffs began noticing relevant depositions on September 12, 2017, including depositions of Stephanie Sobeck (MVW's senior vice president of asset management) on October 11, 2017, and COO Cunningham on October 12, 2017. At the Marriott Defendants' September 19, 2017, letter request, Plaintiffs then agreed to move these depositions to mid-November. *See* Ferguson Decl. at **Ex. 2**. In addition to deposing Cunningham and Sobeck, Plaintiffs have thus far conducted eleven other depositions in various locations around the country. Lists of the depositions conducted to date and those scheduled or being scheduled for the next few weeks are set out in **Appendix I.**

## ARGUMENT

### A. Under Rule 16(b)(4), Good Cause Exists to Amend the Scheduling Order to Allow a Motion to Amend to Claim Exemplary Damages

"After a scheduling order deadline, a party seeking leave to amend must demonstrate (1) good cause for seeking modification under Fed.R.Civ.P. 16(b)(4), and (2) satisfaction of the Rule 15(a) standard." *Birch v. Polaris Indus., Inc.*, 812 F.3d 1238, 1247 (10th Cir. 2015) (quoting *Gorsuch, Ltd., B.C. v. Wells Fargo Nat'l Bank Ass'n*, 771 F.3d 1230, 1240 (10th Cir. 2014)). "In practice, [the Rule 16(b)(4)] standard requires the movant to show the scheduling deadlines cannot be met despite [the movant's] diligent efforts. Rule 16's good cause requirement may be satisfied, for example, if a plaintiff learns new information through discovery . . . ." *Birch*, 812 F.3d at 1247.

7

The tension in Colorado, however, is that a plaintiff must wait until after the exchange of initial disclosures, at the earliest, to add an exemplary damage claim. C.R.S. § 13-21-102(1.5)(a). In fact, a plaintiff may not plead a claim for such damages until after he "establishes the existence of a triable issue of exemplary damages." *Id; see also Am. Econ. Ins. Co.*, No. 05-cv-01870, 2007 WL 160951, at *1–2 (D. Colo. Jan. 17, 2007) (pleading requirements of C.R.S. § 13-21-102(1.5) apply in federal actions); *W. Ridge Grp., L.L.C. v. First Tr. Co. of Onaga*, No. 07-cv-01587, 2009 WL 641258, *5 (D. Colo. Mar. 10, 2009) (same). Plaintiffs have now reached that point — the depositions of Cunningham, Sobeck, and Mary Lynn Clark, when coupled with documents thus far produced establish a *prima facie* case.

Plaintiffs have diligently reviewed, analyzed and organized many tens of thousands of documents and pre-marked over 500 deposition exhibits in order to proceed efficiently with depositions. ECF No. 152 at p. 2 (¶ 4). Given the extraordinarily long time to even get their "rolling" production, the Marriott Defendants cannot claim lack of Rule 16 diligence. Accordingly, there is good cause, under the circumstances and the requirements of Colorado law, to amend the scheduling order. The requisite *prima facie* showing for an exemplary damages claim has been diligently pursued and only recently established during recent depositions.

### B. Under Rule 15(a)(2), Good Cause Exists to Amend the Complaint to Add a Claim for Exemplary Damages

In general, and unless futile, leave to amend a complaint should be "freely given." Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires."). An amendment is futile only if the plaintiff can prove no set of facts in support of his amendment. *Jefferson County Sch. Dist. v. Moody's Investor's Services*, 175 F.3d 848, 859 (10th Cir. 1999) ("A proposed amendment is futile if the complaint, as amended, would be subject to dismissal.").

8

A motion to amend to add a claim for exemplary damages requires a plaintiff provide a *prima facie* case of a triable issue showing that the "injury complained of is attended by circumstances of fraud, malice, or willful and wanton conduct." C.R.S. § 13-21-102(1)(a) and (1.5)(a).[5] A *prima facie* case means evidence that, unless rebutted and when viewed in the light most favorable to the plaintiff, is sufficient to establish a fact, and is established by a showing of a "reasonable likelihood that the issue will be ultimately submitted to the jury for resolution." *Stamp v. Vail Corp.*, 172 P.3d 437, 449 (Colo. 2007) (internal citations omitted); *Am. Econ. Ins. Co..*, No. 05-cv-01870, 2007 WL 160951 at *4 (D. Colo. Jan. 17, 2007); *Hendrickson v. Doyle*, No. 14-cv-02013, 2015 WL 2106225, *4 (D. Colo. May 4, 2015).

In *Hendrickson*, Magistrate Judge Kristen L. Mix granted a motion to add exemplary damages based on the type of evidence Plaintiffs present here. Judge Mix held that where the defendant is "'conscious of his conduct and the existing conditions and knew or should have known that injury would result, the statutory requirements' are met." *Hendrickson*, 2015 WL 2106225 at *4 ("[T]he Court is only concerned with whether the evidence, when viewed in the light most favorable to Plaintiff, is sufficient to make out a prima facie case of willful and wanton behavior . . . ."); *see also Stamp*, 172 P.3d at 449.

Exemplary damages are warranted where, as here, defendants consciously disregard the harm that would be caused by breaching, or aiding and abetting in the breach of, a fiduciary duty. *See Western Fire Truck, Inc. v. Emergency One, Inc.*, 134 P.3d 570, 578–79 ("'Wanton and reckless' conduct is defined as 'conduct that creates a substantial risk of harm to another and is

---

[5] As indicated, Colorado law governs whether Plaintiffs are entitled to exemplary damages. *See Klein*, 44 F.3d at 1503 ("In a diversity case, whether punitive damages are warranted is a matter of state law").

9

Case No. 1:16-cv-01301-PAB-GPG Document 441-9 filed 07/29/19 USDC Colorado pg 11
Case 1:16-cv-01301-PAB-GPG Document 185 Filed 02/07/18 USDC Colorado Page 10 of 19
of 20

purposely performed with an awareness of the risk in disregard of the consequences.'").[6] In *Western Fire Truck*, the defendant (E-One) manufactured vehicles that were sold exclusively through the plaintiff (Western) pursuant to a sales and service agreement. *Id.* at 572. Before the term of the agreement ended, E-One unilaterally terminated it. *Id.* At the same time, Western fired one of its salesman, James Costello, and filed, among others, a breach of fiduciary duty claim against Costello as well as an aiding and abetting that breach of fiduciary duty by E-One. *Id.* A jury verdict found that E-One aided and abetted Costello's breach of his fiduciary duty to Western. *Id.* at 575.

On facts less compelling than here, the appellate court affirmed, explaining that Costello owed a fiduciary duty to Western because he was Western's agent-employee. *Id.* The court then found sufficient evidence of E-One's aiding and abetting of Costello's breach of his fiduciary duty to Western to justify punitive damages: Costello testified that he had ongoing conversations with E-One employees about the termination of Western's contract and his possible new employment with E-One — all without telling Western. *Id.* at 578-79. Costello also favored E-One over Western by submitting a particular bid that Western did not want to submit (which an E-One manager helped him to prepare). *Id.* As the appellate court put it, "E-One was aware that its purposeful interactions with Costello could have, and later did, cause substantial harm to

---

[6] The existing complaint includes detailed allegations that Cobalt and Ritz-Carlton Management Company, LLC were Plaintiffs' agents [ECF No. 119 at ¶¶ 9, 26-43], which means they owed fiduciary duties to the principal. *City & County of Denver v. Fey Concert Co.*, 960 P.2d 657, 669 (Colo. 1998); *McKinney v. Christmas*, 143 Colo. 361, 363 (Colo. 1960); Rest.2d Agency § 387 (1957). In addition, both Ritz-Carlton Management and Cobalt owe fiduciary duties to Plaintiffs by virtue of their control over Plaintiffs' property. Under Colorado law, a fiduciary relationship arises where one party "'has a high degree of control over the property or subject matter of another.'" *Tara Woods Ltd. P'ship v. Fannie May*, 731 F.Supp.2d 1103, 1116 (D. Colo. 2010). The thrust of the complaint is that Cobalt and Ritz-Carlton Management breached their fiduciary duties to Plaintiffs, and the other Marriott Defendants aided and abetting in that breach. ECF No. 119 at ¶¶ 1, 9, 44 *et seq.*

10

Western." *Id*. at 578. Because E-One's actions in aiding and abetting Costello were wanton and reckless, exemplary damages against E-One were warranted. *Id*. at 579.

The Marriott Defendants' behavior here is more egregious than that in *Western Fire Truck*. Cobalt was supposedly an independent entity selected by Ritz-Carlton Management Company (the Association's agent) to be the Program Manager of the Ritz-Aspen and its sister Ritz-Carlton Destination Clubs. ECF No. 119 at ¶¶ 26–27, 35, 39–41. The Affiliation Agreement (not to be confused with the MVC affiliation), the original contract that conferred this authority on Cobalt, emphasized this important independence:

> The Program Manager may, in its sole discretion, elect to affiliate other locations with the Membership Program as Member Clubs or Associated Clubs from time to time. ***Neither [Ritz-Carlton Development], Members Association, nor [Ritz-Carlton Management] shall be entitled to participate in or consent to the Program Manager's decision in this regard***.

ECF No. 109-2 at ¶7.2(a) at p. 13 of 21 (emphasis added); *see also id.* at p. 5 of 21 (definitions supporting bracketed information).

Yet, when Cunningham was deposed in mid-November, Plaintiffs learned that the decision to "affiliate" with Marriott Vacation Club was not made by Cobalt as an independent entity, *but rather by Cunningham*, who was not only MVW's Chief Operating Officer, but also the executive in charge of Ritz-Carlton Development Company, LLC and Defendant Ritz-Carlton Management Company, LLC, both of which were not allowed to participate in the decision under the express terms of the relevant contract. Ferguson Decl. at **Ex. 3** (Affiliation Agreement at § 7.2(a)); Ferguson Decl. at **Ex. 4** (Deposition of Lee Cunningham ["Cunningham Dep."] at 10:12–11:15, 25:11–18, 131:9–132:11, 135:24–136:3, 136:11–137:1, 143:18–24,

11

376:10–11). Indeed, Cunningham admitted that he made the ultimate decision to "affiliate" the two clubs. **Ex. 4** at 144:2–20, 152:18–19.

Cunningham also conceded that the supposedly independent Cobalt had no employees and that there was no real separation between any of the Marriott entities:

> Q. Are you aware of anybody that works for Ritz-Carlton Management Company that's not employed by Marriott Vacation Club Worldwide?
>
> A. No.
>
> Q. Are you aware of anybody that's employed by Ritz-Carlton Development Company that's not employed in actuality by Marriott Vacation Worldwide Corporation?
>
> A. No.
>
> Q. Is there anybody employed at Cobalt Travel that's not also employed by Marriott Vacation Club Worldwide?
>
> A. No.
>
> Q. Is there anybody employed by Lion & Crown Travel Service that is not --
>
> A. No.
>
> Q. -- is not employed by Marriott Vacation Club Worldwide?
>
> A. No.

*Id.* at 139:15–140:8; 141:13–18.

Moreover, the recent testimony also underscores MVW's profit motive for orchestrating this breach of fiduciary duty. Mary Lynn Clark, MVW's senior vice president of product development, testified that Marriott was using the Ritz-Aspen as "leverage" to sell MVC points to individuals who were interested in accessing Ritz-Carlton properties. *See* Ferguson Decl. at **Ex. 5** (Deposition of Mary Lynn Clark ["Clark Dep."] at 190:20–191:25). Clark admitted telling potential Marriott Vacation Club customers that access to the Ritz-Aspen would be an option for them. *Id.* at 191:3–25. She explained: "I was selling new members a product that contained Ritz-Carlton in it … The currency was MVCD points. I was not able to sell the fractional. People

12

were not buying fractionals at that time." *Id.* at 189:18–23. Indeed, Cunningham conceded that the Marriott Defendants' primary business is to sell points. Cunningham Dep. at 112:9–12.

More admissions have recently been made that establish a prima facie case. Sobeck and Cunningham came to meet with the Ritz-Aspen Board on April 5, 2013 to discuss the affiliation. Knowing that a November 21, 2012, letter from Brownstein Hyatt Farber (the Association's attorneys) stated that an affiliation with the MVC would, among other things, violate governing legal documents, (Ferguson Decl. at **Ex. 6**); (Ferguson Decl. at **Ex. 7**) (Deposition of Stephanie Sobeck ["Sobeck Dep."] at 247:15–18), Cunningham and Sobeck negotiated and approved the critical April 5, 2013, letter sent by the Association Board to every owner promising:

> The Ritz-Carlton/Marriott representatives agree that unless a majority of Aspen Highlands Members (excluding the Marriott interests and Members not in good standing) vote in favor of doing so, The Ritz-Carlton/Marriott will not include Aspen Highlands in the Marriott Vacation Club affiliation/exchange/points program.

Ferguson Decl. at **Ex. 8**.[7] However, the Marriott Defendants never allowed Plaintiffs this promised vote and instead conspired to surreptitiously substitute a meaningless "survey" — without disclosing that change to members. Cunningham Dep. at 205:5–20, 232:2–3, 232:21–233:25, 234:20–24, 235:1–25. In Cunningham's words:

> Q. Was there ever a letter that went out to the members that said, "Listen, folks, we're so sorry. We promised that we wouldn't affiliate unless there was a vote of the

---

[7] At his deposition, Mr. Cunningham lied about promising a vote saying that he disagreed with the content of the April 5, 2013 letter and that it went out with the "wrong language," even though overwhelming evidence shows that he, in fact, approved the letter before it was sent. Cunningham Dep. at 214 16-216:20. Cunningham's May 14, 2013 letter reassuring members that no affiliation would take place without an affirmative vote further shows his dishonesty at his deposition. Ferguson Decl. at **Ex. 9**

13

majority members"? You said, "I'm so sorry, but we're going to give you a survey instead"?

   A. No.

*Id.* at 217:3–8; *see also id.* at 218:19–219:1.

Cunningham (reluctantly) conceded a survey is quite different from the promised vote. *Id.* at 221:24–222:4, 234:25–235:5. Eveleen Babich, then general manager of members services for the Ritz-Carlton Club, acknowledged that a survey is non-binding and the Marriott Defendants planned to affiliate (for their own gain) even if a majority of those surveyed were opposed to it. Ferguson Decl. at **Ex. 11.** In her November 4, 2014 email regarding the Ritz-Carlton Club San Francisco, Babich stated: "*This survey is similar to Aspen in that we are not looking for a majority vote. It's merely a mechanism to get feedback and the affiliation is expected to occur regardless. Please keep that information confidential.*" *Id.* (emphasis added).

Cunningham's and Sobeck's testimony reveals that the Marriott Defendants, for their own financial gain, intentionally denied Plaintiffs a vote because they knew Ritz-Aspen members would vote against affiliation to protect their luxury experience and the value of their fractional shares. As both acknowledged, Marriott often surveyed owner "feedback" at Ritz-Aspen and sister clubs. Cunningham Dep. at 57:7–23, 100:10–101:8, 366:24–367:8; Sobeck Dep. 83:19–84:11. One survey was conducted after the proposed "affiliation" was announced, and the Marriott Defendants tracked extensive member feedback in a voluminous Excel spreadsheet. Cunningham Dep. at 363:5–365:25; Ferguson Decl. at **Appendix A.[8]** The overwhelming majority of the 750 comments strongly opposed affiliation. Based on this survey

---

[8] **Appendix A** is a compilation of some of the types of statements that Marriott received that foretold a vote would go against affiliation. The full and voluminous exhibit is 128 pages in landscape on an Excel sheet and is unable to be easily attached but can be provided upon request. The parties know it as Deposition Exhibit 1266 and also 1700.

14

feedback, as well as letters from members, the Marriott Defendants knew there was strong opposition to the "affiliation." As Mr. Cunningham conceded:

> Q. You knew that by May 29, 2013, that it was going to be difficult to get member support for the affiliation. True?
>
> A. At that point, that was our assessment.

Cunningham Dep. at 247:19–22.

The other reason Cunningham and his team surreptitiously reneged on the promised vote was that, in May 2013, the Ritz-Carlton Club at Bachelor Gulch, the only Club that was allowed the promised vote, rejected affiliation *Id.* 245:25–246:6. Ferguson Decl. at ¶ 38 and **Ex. 15.**

One week after the members received the April 5, 2013 letter promising the majority vote, Sobeck emailed Cunningham noting: "[i]nteresting feedback from Aspen members regarding the letter sent out last week" and concluding that "***It looks like from this letter there will be a no for affiliation***." Ferguson Decl. at ¶ 31 and **Ex. 12** (emphasis added); **Ex. 6** (Sobeck Dep. at 138:23–139:4) (emphasis added). Sobeck also conceded that the Marriott Defendants knew that a majority of members were not likely to approve the "affiliation." **Ex. 6** at 123:21–23.

Emblematic of the strong opposition to the "affiliation" with MVW is the August 27, 2012 letter from former Greenberg Traurig partner and Ritz-Aspen owner Juan Pablo Cappello, which Cunningham acknowledged receiving.[9] Ferguson Decl. at **Ex. 13.** Mr. Cappello wrote:

> Your recent communications fail to acknowledge the underlying issue which all RCDC members need to understand. <u>The Marriot Vacations Worldwide Corp. has a huge incentive to dilute the RCDC brand to further its greater interest of selling more Marriot Vacation Club Memberships.</u> The growth of Marriott Vacations Worldwide Corp. as a public company is tied with the growth of sales of more and more Marriott Vacation Club memberships. The

---

[9] Mr. Cappello's letter, which was copied to the highest levels of MVW and Board of the Association, also noted Mr. Cunningham's failure to disclose in his August 17, 2012 "evolution" letter his true role of Executive Vice President and Chief Operating Officer of Marriott Vacations Worldwide Corporation. Cunningham admitted at deposition that there is no corporate entity "Ritz-Carlton Destination Club." Cunningham Dep. at 132:12–23.

15

> sale of more RCDC memberships is not currently relevant for this public company. Thus, the value of the investment made by each RCDC members is at jeopardy. The recent communications by you and your team have undermined your credibility with the RCDC membership. Unless the Marriot Vacations Worldwide Corp. changes its attitude and begins to address the clear conflict of interest that will destroy the value of our investment, I continue to encourage the RCDC Aspen Highlands board to explore exiting from the Marriot relationship and cancel all management contracts.

*Id*. (emphasis in the original). In other words, a lawyer from the very law firm now defending Marriott warned and predicted in August 2012 that any "reengineering" or "evolution" that included affiliation would gut fractional values.

In late 2013, Cushman & Wakefield was retained by Marriott related entities to perform an appraisal of the value of Ritz-Aspen fractional shares. Cushman's appraisal, dated as of December 2, 2013, *right at the time of the rigged survey of the Aspen members* and prior to announcing its decision to affiliate very clearly informed Marriott that:

> [T]he conversion to a points system has been perceived by existing fractional owners as diluting the exclusivity of the Ritz-Carlton Club by opening specific resorts to the Marriott Vacation Club. Conversely, the Marriott Vacation Club is now perceived in the marketplace as providing an excellent opportunity to access the luxury product offered by the Ritz Carlton properties. . .. Overall, the conversion to a points system and integration of the Marriott Vacation Club has had a negative impact on the market value of existing fractional interests in the Ritz Carlton Club. The impact to whole ownership units at the Ritz Carlton Club has also been negative, but not of the same magnitude as that experienced by the fractional interests.

Ferguson Decl. at **Ex. 14.** Additional facts are set forth in the Ferguson Declaration.

Thus, even with the knowledge that the affiliation would decimate the value of Plaintiff's deeded fractional interests (a fact not shared with owners or the Board), the Marriott Defendants willfully decided to affiliate — without the promised vote that they knew would doom the

16

affiliation.[10] As in *Western Fire Truck*, Plaintiffs here have established *prima facie* evidence that the Marriott Defendants acted with — at a minimum — wanton and reckless disregard for Plaintiffs' rights.

## CONCLUSION

For the reasons stated, Plaintiffs respectfully request that the scheduling order be amended to permit this motion, and that leave be granted for Plaintiffs to add a claim for exemplary damages.

Dated: February 7, 2018

Respectfully submitted,

LAW OFFICE OF MICHAEL J. REISER

 */s/ Michael J. Reiser*
Michael J. Reiser, # 16161
961 Ygnacio Valley Road
Walnut Creek, CA 94596
Telephone: (925) 256-0400
Facsimile: (925) 476-0304
E-mail: reiserlaw@gmail.com
*Attorney for Plaintiffs*

GIBBS LAW GROUP, LLP

 */s/ Michael Schrag*
Michael Schrag (CA State Bar # 185832)
Linda Lam (CA State Bar# 301461)
505 14th Street, Suite 1110
Oakland, CA 94612
Phone: (510) 350-9718
Facsimile: (510) 350-9701
E-mail: mls@classlawgroup.com
E-mail: lpl@classlawgroup.com
*Attorney for Plaintiffs*

THE MATTHEW C. FERGUSON LAW FIRM, P.C.

 */s/ Matthew C. Ferguson*
Matthew C. Ferguson, #25687
119 South Spring, Suite 201
Aspen, Colorado 81611
Telephone: (970) 925-6288
Facsimile: (970) 925-2273
E-mail: matt@matthewfergusonlaw.com
*Attorney for Plaintiffs*

THE MEADE FIRM, P.C.

 */s/ Tyler Meade*
Tyler Meade (CA State Bar # 160838)
1816 Fifth Street
Berkeley, CA 94710
Telephone: 510-843-3670
Facsimile: 510-843-3679
E-mail: tyler@meadefirm.com
*Attorney for Plaintiffs*

---

[10] The Marriott Defendants failed to produce the Cushman Appraisal for Aspen Highlands (and several other clubs). By chance, an appraisal was produced for the San Francisco Property – but only a subpoena to Cushman dislodged this "smoking gun" for Ritz-Aspen.

17

Case No. 1:16-cv-01301-PAB-GPG Document 441-9 filed 07/29/19 USDC Colorado pg 19
Case 1:16-cv-01301-PAB-GPG Document 185 Filed 02/07/18 USDC Colorado Page 18 of 19
of 20

## Appendix I

| Deponent: | Date: | Location: |
|---|---|---|
| Jay Neveloff [11] | October 4, 2017 & January 30, 2018 | New York, New York |
| Gerald Marsden [12] | October 5, 2017 | New York, New York |
| Philip Schneider [13] | October 18, 2017 | Scottsdale, Arizona |
| Randal Mercer [14] | October 24, 2017 | Fort Myers, Florida |
| Juan Pablo Cappello [15] | October 26, 2017 | Miami, Florida |
| Lee Cunningham [16] | November 10 & 15, 2017 | Orlando, Florida |
| Lori Phillips [17] | November 13, 2017 | Orlando, Florida |
| Stephanie Sobeck [18] | November 16, 2017 | Orlando, Florida |
| Philip Gosch [19] | December 1, 2017 | Denver, Colorado |
| Michael Marino [20] | December 6, 2017 | New York, New York |
| Mary Lynn Clark [21] | December 6, 2017 | Florham Park, New Jersey |
| Michael Mullinex [22] | December 12, 2017 | Ladue, Missouri |
| Tyler Oliver [23] | January 12, 2018 | Kansas City, Missouri |

Among the remaining depositions to be conducted are the following:

| | |
|---|---|
| Ivan Skoric | Aspen, Colorado |
| Nick DiMeglio | Aspen, Colorado |
| John Hearns | Bethesda, Maryland |
| Evelyn Babich | Park City, Utah |
| Stephen Weisz | Orlando, Florida |
| John Vaughn | Newport Beach, California |
| Morrow & Co. | New York, New York |
| Randy Mercer (cont.), | Aspen, Colorado |

---

[11] Former Association Board Member and President.
[12] Former Association Board Member and Treasurer.
[13] Former Association Board Member.
[14] Current Association Board Member and President.
[15] Former Greenberg Traurig partner and Unit Owner.
[16] MVW
[17] MVW
[18] MVW
[19] Outside counsel to Association from Brownstein Scheck Farber.
[20] Lawyer asked by Association to work on Affiliation documents.
[21] MVW
[22] Former Association Board Member and President of the Association for the RCDC at Bachelors Gulch.
[23] Former Association Board Member

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that on February 7, 2018, I electronically filed the foregoing **PLAINTIFFS' MOTION TO AMEND SCHEDULING ORDER TO ALLOW PLAINTIFFS TO AMEND COMPLAINT TO ADD CLAIM FOR EXEMPLARY DAMAGES; AND MOTION TO AMEND COMPLAINT; DECLARATION OF MATTHEW C. FERGUSON IN SUPPORT OF PLAINTIFFS' MOTION TO AMEND SCHEDULING ORDER TO AMEND COMPLAINT TO ADD CLAIM FOR EXEMPLARY DAMAGES AND MOTION TO AMEND COMPLAINT** with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following e-mail addresses:

| | |
|---|---|
| **Michael J. Reiser**<br>Reiser Law, P.C.<br>1475 N. Broadway, Suite 300<br>Walnut Creek, CA 94596<br>michael@reiserlaw.com<br><br>**Matthew C. Ferguson**<br>The Matthew C. Ferguson Law Firm, P.C.<br>119 South Spring, Suite 201<br>Aspen, Colorado 81611<br>matt@matthewfergusonlaw.com<br><br>**Michael L. Schrag**<br>Gibbs Law Group LLP<br>505 14th Street, Suite 1110<br>Oakland, CA 94612<br>mls@classlawgroup.com<br><br>**Tyler R. Meade**<br>The Meade Firm P.C.<br>1816 Fifth Street<br>Berkeley, CA 94710<br>tyler@meadefirm.com<br><br>*Attorneys for Plaintiffs* | **Daniel F. Shea, Esq.**<br>**Jessica Black Livingston, Esq.**<br>Hogan Lovells US LLP<br>1200 Seventeenth Street, Suite 1500<br>Denver, Colorado 80202<br>Telephone: (303) 899-7300<br>Fax: (303) 899-7333<br>dan.shea@hoganlovells.com<br>jessica.livingston@hoganlovells.com<br>*Attorneys for Defendant Aspen Highlands Condominium Association*<br><br>**Naomi G. Beer**<br>**Ian S. Marx, Esq.**<br>**Philip R. Sellinger, Esq.**<br>Greenberg Traurig, LLP<br>1200 17th Street, Suite 2400<br>Denver, Colorado 80202<br>Phone: (303) 572-6500<br>Fax: (303) 572-6540<br>BeerN@gtlaw.com<br>SellingerP@gtlaw.com<br>MarxI@gtlaw.com<br>*Attorneys for Defendants Marriott Vacations Worldwide Corporation, Marriott Ownership Resorts, Inc., Ritz-Carlton Management Company, LLC, Cobalt Travel Company, LLC and Lion & Crown Travel Company, LLC* |

                                        */s/ Tyler R. Meade*
                                        Tyler R. Meade
                                        Attorney for Plaintiffs
                                        The Meade Firm P.C.
                                        1816 Fifth Street
                                        Berkeley, CA 94710
                                        Fax: (510) 843-3679
                                        tyler@meadefirm.com