# EXHIBIT L

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 16-cv-01301-PAB-GPG

RCHFU, LLC, a Colorado limited liability company, et al.,

     Plaintiffs,

v.

MARRIOTT VACATIONS WORLDWIDE CORPORATION, et al.,

     Defendants.

---

## ORDER

---

This matter is before the Court on Defendant Aspen Highlands Condominium Association's Motion to Dismiss Plaintiffs' Fifth Amended Complaint [Docket No. 129] filed by defendant Aspen Highlands Condominium Association, Inc. (the "Association") and the Marriott Defendants' Motion to Dismiss Fifth Amended Complaint [Docket No. 131] filed by defendants Marriott Vacations Worldwide Corporation ("MVW"), Marriott Ownership Resorts, Inc. ("MVCI"), The Ritz-Carlton Management Company, LLC ("RC Management"), The Cobalt Travel Company, LLC ("Cobalt") and The Lion & Crown Travel Co., LLC ("Lion & Crown") (collectively, the "Marriott defendants").

## I. BACKGROUND[1]

This action arises out of a dispute regarding the management of the Ritz-Carlton Club, Aspen Highlands ("Aspen Highlands"), located in Aspen, Colorado and its

---

[1] The following facts are taken from the fifth amended complaint (the "complaint") and are assumed to be true for the purposes of this order.

affiliation with Marriott Vacation Club Destinations ("MVC").  MVC is a timeshare

program with more than 400,000 members operated by MVCI that sells points, which

can be used to stay at various resorts owned by MVCI or affiliated with the program.

Docket No. 119 at 11, ¶ 5.

    Plaintiffs own deeded 1/12 fractional interests in condominiums at Aspen

Highlands (the "fractional units")[2] that entitle them to use of the condominium for four

weeks per year.  Docket No. 119 at 11, ¶ 3 n.1.  Owners could exchange their time for

the ability to stay at other Ritz-Carlton Vacation Club properties through its exchange

program.  *Id*. at 71, ¶ 35.  Between 2001 and 2013, plaintiffs paid prices averaging over

$200,000.00 for their fractional units.  *Id*. at 12, ¶ 6.[3]

    On October 13, 1998, non-party Hines Highlands Limited Partnership ("Hines"),

the developer of the broader development of which Aspen Highlands is a part, made

and recorded the Declaration for Aspen Highlands Village (the "Master Declaration").

Docket Nos. 49-1, 49-2, 49-3.  The Master Declaration sets forth various aspects of a

planned community and includes a section entitled "No Timeshare," which states:

> Each Owner acknowledges that Declarant intends to create Fractional
> Ownership Interests with respect to certain Units within Aspen Highlands
> Village.  Other than the right of Declarant . . . and specific assigns . . . to
> create Fractional Ownership Interests . . ., no Unit shall be used for the
> operation of a timesharing, fraction-sharing, or similar program whereby

---

[2] The fractional units are sometimes referred to in the agreements discussed in
this order as "Units" while the areas of the condominiums that make up these fractional
units are referred to as "Tourist Accommodations Units."  *See, e.g.*, Docket No. 109-8
at 19, § 2.71.

[3] The fractional units were sold by non-party Ritz-Carlton Development Company
("RC Development"), a wholly-owned subsidiary of MVW, and the sole manager and
member of RC Management and Cobalt.  Docket No. 119 at 72, ¶ 39.

Case No. 1:16-cv-01301-PAB-GPG   Document 441   Filed 03/29/18   USDC Colorado   Page 3 of 28
Case 1:16-cv-01301-PAB-GPG   Document 210   Filed 07/28/17   USDC Colorado   pg 3 of 29
of 29

the right to exclusive use of the Unit rotates among participants in the
program on a fixed or floating time schedule over a period of years.

Docket No. 49-3 at 13, § 8.25.  On January 10, 2001, Hines and RC Development

made and recorded the Declaration of Condominium for Aspen Highlands

Condominiums ("Declaration of Condominium").  Docket No. 109-8 at 9.  The

Declaration of Condominium sets forth various aspects of the plan for Aspen Highlands

and includes a section entitled "Limit on Timesharing" stating:

> Other than the right of [Hines and RC Development] or a Successor
> Declarant and their respective officers, agents, employees, and assigns to
> create Fractional Ownership Interests . . . no Unit shall be used for the
> operation of a timesharing, fraction-sharing, interval ownership, private
> residence club, membership program, vacation club, exchange network or
> system or similar program whereby the right to exclusive use of the Unit is
> alternated or scheduled among participants in the program on a fixed or
> floating time schedule over a period of years whether by written, recorded
> agreement or otherwise.

Docket No. 109-8 at 70, § 19.8.  The Court refers to the "No Timeshare" and "Limit on

Timesharing" provisions together as the "restrictive covenants."

The Declaration of Condominium also sets the terms of membership and

management of the Association.  Docket No. 109-8 at 26, Art. 6.  The Association is a

Colorado non-profit that serves as the official owners association for owners of

fractional units.  Docket No. 119 at 66, ¶ 16.  It was organized to "manage, administer,

operate and maintain" the Aspen Highlands condominiums.  *Id*. at 67, ¶ 22.

On January 12, 2001, the Association and RC Management entered into The

Ritz-Carlton Management Company, L.L.C. Management Agreement ("Management

3

Agreement").  *Id*. at 69, ¶ 26; *see also* Docket Nos. 49-5, 49-6.[4]  The Management

Agreement charges RC Management with responsibility for day-to-day management of

Aspen Highlands and delegates various of the Association's powers to RC

Management.  Docket No. 119 at at 69-71, ¶¶ 26-36.  One of the powers granted to RC

Management is the power to:

> Engage a Program Manager through an affiliation agreement, who shall
> manage and administer the reservation procedures and exchange
> program for the Ritz-Carlton Club Membership Program (the 'Membership
> Program') through which Owners of Residence Interests reserve the use
> of accommodations at a Club as defined in and pursuant to The
> Ritz-Carlton Club Membership Program Reservation Procedures
> ('Reservation Procedures').

Docket No. 119 at 71, ¶ 35 (quoting Docket No. 49-5 at 7, § 4.(S)).  In relation to this

grant, the Association, RC Management, RC Development, and Cobalt entered into

The Ritz-Carlton Club Membership Program Affiliation Agreement ("Affiliation

Agreement").  *Id*. at 72, ¶ 39; *see also* Docket No. 109-2.  Under the Affiliation

Agreement "Cobalt is the Program Manager of the Ritz-Carlton Club Membership

Program and also operates the reservation system through which Ritz-Carlton Aspen

Owners obtain use of their allotted number of days at the Ritz Aspen Highlands and

obtain access to the sister Ritz-Carlton Destination Clubs in the Ritz-Carlton Club

Membership Program."  Docket No. 119 at 73, ¶ 41.  The Affiliation Agreement provides

that, in addition to the Ritz-Carlton Club Membership Program, Cobalt "may, in its sole

discretion, elect to affiliate other locations with the Membership Program as Member

---

[4] The Court refers to this earlier filing because the document attached as Exhibit
A to plaintiffs' fourth amended complaint appears to be the operating agreement of a
different Ritz-Carlton Club property.  *See* Docket No. 109-1.

Clubs or Associated Clubs from time to time." Docket No. 109-2 at 12, § 7.2.a. The

Association and RC Management are not "entitled to participate in or consent to the

Program Manager's decision in this regard." *Id*.

The main events at issue in this case began when Cobalt's general manager

sent a letter dated July 17, 2012 to the Aspen Highlands owners stating that, "[b]ased

on the Ritz-Carlton Destination Club member feedback, additional benefits and

experiences will be available through a new affiliation with Marriott Vacation Club

Destinations." Docket No. 119 at 75, ¶ 48. Similar letters were sent to members of

other Ritz-Carlton Destination Clubs, some of whom, and their various boards, reacted

with concern. *Id*. at 76, ¶¶ 50-51. On August 17, 2012, Lee Cunningham of MVC sent

a letter on Ritz Carlton Destination Club letterhead reassuring members that "nothing

that you originally purchased has changed or will change as a result of the

announcement" in the prior letter. Docket No. 109-6 at 1; *see also* Docket No. 119 at

77, ¶ 52. By contrast, on the same day, the Association sent a letter to its members

expressing "concerns" about the impact of the announcement, including that the "nature

of our club will change by opening the club to [MVC] timeshare/points members who

have a much lower cost of entry," and stating that "there are specific provisions in our

Association documents which the Board believes does [sic] not permit MVW to conduct

a separate program as they currently intend." Docket No. 109-7 at 1-2.

In September 2012, the Association retained an attorney to evaluate whether the

governing documents allowed the proposed affiliation with MVC, which resulted in the

attorney sending a cease and desist letter to the Marriott defendants on behalf of the

Association on November 21, 2012. Docket No. 119 at 80, ¶ 60 and at 82, ¶ 65. The

letter demanded that the Marriott defendants refrain from pursing an affiliation with

MVC and stated, in part, that

> In addition to violating the [restrictive covenant in the] Declaration [of
> Condominium], any practice of allowing the use of the Tourist
> Accommodation Units at the Aspen Highlands Condominiums by the MVC
> Members may constitute, among other things, one or more breaches of
> the fiduciary duties of the HOA Manager [RC Management] to the
> Association under the HOA Management Agreement as a result of
> self-dealing among the HOA Manager, the Program Manager, the Marriott
> licensor entity and their respective affiliates to the detriment of the
> Association and its members. By permitting MVW and/or the Program
> Manager to utilize the Tourist Accommodation Units in clear violation of
> the Declaration, the HOA Manager would be enriching its affiliates and the
> Marriott licensor entity by creating an attractive offering for the MVC
> Members, which would increase sales and license fees under Marriott's
> arrangement with MVW, all at the expense and burden of the Association
> and its members.

Docket No. 109-14 at 2.

In April 2013, the Association sent letters to its members stating that, after

discussions with the Marriott defendants, "Ritz Marriott representatives agree that

unless a majority of Aspen Highlands Members (excluding the Marriott interests and

Members not in good standing) vote in favor of doing so, Ritz/Marriott will not include

Aspen Highlands in the Marriott Vacation Club affiliation/exchange/point program."

Docket No. 119 at 84, ¶ 68.

Similar actions were being taken by other Ritz-Carlton Clubs, some of which

decided against affiliation with MVC through member votes. For example, on June 2,

2013, the president of the Bachelor Gulch Club's association emailed the president of

Aspen Highlands Association's Board stating that "MVW/Ritz has interfered significantly

with the [Bachelor Gulch] Board's efforts to conduct a clean, straightforward vote" and

confused its members by offering a "'Survey Vote' on Ritz Letterhead asking whether or

not [Butler Gulch] Members wanted to have affiliation to the Marriott Vacation Clubs or not." Docket No. 119 at 85-86, ¶ 72. On July 6, 2013, the Bachelor Gulch president followed up and stated that 89% of its members who voted in the election voted to terminate the club's relationship with the Marriott defendants. *Id.* at 87, ¶ 75; see also id. at 76, ¶ 51 n.4 (alleging that Ritz-Jupiter Club's members also voted to terminate their relationship with the Marriott defendants to avoid the MVC affiliation).

On November 19, 2013, the Association and the Marriott defendants sent a letter to the members stating that they were conducting a "survey . . . to understand the Aspen Highlands Member's interest in this voluntary exchange program, which would allow Members to exchange a week of their reserved allocated time for points within the Marriott Vacation Club Destinations exchange program." Docket No. 119 at 88, ¶ 77. The letter did not mention that the "survey" was related to, or was a substitute for, the member vote referred to in the previous letters. *Id.*

On April 17, 2014, the Association entered into a Memorandum of Understanding stating that a majority of Aspen Highlands members who responded to the survey desired to "participate on a voluntary basis in the [MVC] Exchange Program" and set out various terms on which Aspen Highlands members would be able to do so. Docket No. 108-2 at 3, ¶ 4; *see also* Docket No. 119 at 91, ¶ 83 (alleging the MVC affiliation). The same month, the Association sent a letter to its members announcing the MVC exchange program. Docket No. 109-16 at 2. Plaintiffs allege that, due to the MVC affiliation opening up access to Aspen Highlands to MVC members who can pay approximately 20% of what they paid, plaintiffs' fractional units are worth less than 20% of the original purchase price, while the Marriott defendants have reaped financial

7

rewards.  Docket No. 119 at 13-14, ¶ 10.

On December 31, 2015, plaintiffs filed this lawsuit as a class action in the District

Court for Pitkin County, Colorado.  Docket No. 1 at 3, ¶ 1.  On May 27, 2016, the

Marriott defendants removed the case to federal court pursuant to the Class Action

Fairness Act of 2005, 28 U.S.C. §§ 1332, 1446, 1453.  Docket No. 1 at 2.  On March

31, 2017, plaintiffs filed the operative complaint.  Docket No. 119.  The complaint does

not contain any class action allegations.  *Id*.  Plaintiffs bring five claims: (1) breach of

fiduciary duty against the Association, RC Management, and Cobalt; (2) constructive

fraud against the same defendants; (3) aiding and abetting a breach of fiduciary duty

and constructive fraud against all defendants; (4) conspiracy against all defendants;

and (5) unjust enrichment against RC Management, Cobalt, MVW, MVCI, and Lion &

Crown.  *Id*. at 92-100.  Plaintiffs seek monetary damages and disgorgement of all

monies they have paid.  *Id*. at 101-102.

On April 14, 2017, the Association filed its motion to dismiss and the Marriott

defendants filed their motion to dismiss.  Docket Nos. 129, 131.

## II.  STANDARD OF REVIEW

Defendants request that the Court dismiss plaintiffs' complaint pursuant to Rule

12(b)(6) of the Federal Rules of Civil Procedure.  *See* Docket Nos. 129, 131.  Under

Rule 12(b)(6), the "court's function . . . is not to weigh potential evidence that the parties

might present at trial, but to assess whether the plaintiff's complaint alone is legally

sufficient to state a claim for which relief may be granted."  *Dubbs v. Head Start, Inc.*,

336 F.3d 1194, 1201 (10th Cir. 2003) (citations omitted).  In doing so, the Court "must

accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff." *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007) (quotation marks and citation omitted).  "In addition to the complaint, the district court may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity." *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002).  A court, however, need not accept conclusory allegations.  *Moffett v. Halliburton Energy Servs., Inc.*, 291 F.3d 1227, 1232 (10th Cir. 2002).  Generally, "[s]pecific facts are not necessary; the statement need only 'give the defendant fair notice of what the claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)) (omission marks, internal quotation marks, and citation omitted).  The "plausibility" standard requires that relief must plausibly follow from the facts alleged, not that the facts themselves be plausible.  *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008).  However, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (internal quotation marks and alteration marks omitted).  Thus, even though modern rules of pleading are somewhat forgiving, "a complaint still must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." *Bryson*, 534 F.3d at 1286 (quotation marks and citation omitted).

## III. ANALYSIS

### A. First Claim - Breach of Fiduciary Duty Claim

In order to plead a breach of fiduciary duty, a plaintiff must plead specific facts from which a factfinder could infer "1) the existence of a fiduciary relationship between plaintiff and defendant; 2) defendant's breach of the fiduciary duty; and 3) damages as a result of the breach." *F.D.I.C. v. Refco Grp., Ltd.*, 989 F. Supp. 1052, 1080 (D. Colo. 1997); *see also Aller v. Law Office of Carole C. Schriefer, P.C.*, 140 P.3d 23, 26 (Colo. App. 2005); Colo. Jury Instr., Civil § 26:1.[5]  The Marriott defendants challenge the first element, arguing that neither the Association nor RC Management and Cobalt owed plaintiffs a fiduciary duty.  The Association argues that plaintiffs' claim is barred by the economic loss rule and the business judgment rule.  The Marriott defendants also argue that the second element is not satisfied because associating with MVC was permissible under the governing contracts.

#### 1. Existence of Fiduciary Duties

Plaintiffs claim that the Association, RC Management, and Cobalt owe them fiduciary duties for two reasons: (1) defendants had a high degree of control over plaintiffs' property and (2) agency and subagency relationships existed between plaintiffs and defendants.  Docket No. 140 at 6.

The Marriott defendants argue that plaintiffs' control of property theory fails, but

---

[5] The parties appear to assume that Colorado law applies.  *See, e.g.*, Docket No. 129 at 5; Docket No. 131 at 8; Docket No. 139 at 7.  Finding no reason to apply the law of a different jurisdiction, the Court concurs and will apply Colorado law.  *Cf. Grynberg v. Total S.A.*, 538 F.3d 1336, 1346 (10th Cir. 2008) ("Because the parties' arguments assume that Colorado law applies, we will proceed under the same assumption.").

only with respect to RC Management.  Docket No. 141 at 5.[6]  They argue that RC

Management lacks control over plaintiffs' fractional units because it cannot sell, finance,

rent, or exchange plaintiffs' fractional rights.  *Id.* (citing the Management Agreement).

The Marriott defendants also argue that there are no allegations that plaintiffs placed a

high level of trust and confidence in RC Management.  *Id.* at 6-7.  These arguments are

unconvincing.  "A fiduciary relationship arises under Colorado law in situations in which

one party 'has a high degree of control over the property or subject matter of another,

or when the benefitting party places a high level of trust and confidence in the fiduciary

to look out for the beneficiary's best interest.'"  *Tara Woods Ltd. P'ship v. Fannie Mae*,

731 F. Supp. 2d 1103, 1117 (D. Colo. 2010), *aff'd*, 566 F. App'x 681 (10th Cir. 2014)

(unpublished) (quoting *MDM Group Assocs., Inc. v. CX Reinsurance Co.*, 165 P.3d 882,

889 (Colo. App. 2007)).  As plaintiffs allege, the Management Agreement grants broad

powers over plaintiffs' property to RC Management and the further right to entrust those

powers to a management company, as RC Management did to Cobalt.  Docket No. 119

at 69-72, ¶¶ 26-38.  Although the powers granted to RC Management to manage

plaintiffs' property throughout the Management Agreement are significant,[7] the control

---

[6] The Marriott defendants did not address this theory in their motion to dismiss.
*See* Docket No. 131.

[7] These powers include the power to "[h]ire, pay, supervise and discharge all
persons necessary to be employed in order to properly manage, maintain, administer
and operate the Condominium and the Plan"; "[c]ontract for utilities, repairs,
engineering, housekeeping, loss prevention and other services necessary for the
management, maintenance, administration and operation of the Condominium and the
Plan"; "[p]lace or keep in force all insurance [and] act on behalf the Association and
each Owner [to] exercise all of the rights, powers and privileges of the insured parties";
"maintain and replace the personal property within the Common Elements and the
Tourist Accommodation Units, and to determine the maintenance fee, proration of

and trust placed in RC Management is best reflected in Paragraph 2 of the

Management Agreement, entitled "Appointment and Acceptance of Agency," which

concludes with a grant of "additional authority."  Docket No. 49-5 at 2-3, ¶ 2.  The

clause states:

> The Association hereby employs the Management Company [RC Management] to *act on behalf of the Association and its members* as the exclusive managing entity of the Condominium and to manage the daily affairs of the Condominium and the Plan, and the Management Company hereby agrees to so act.  In taking any action under this Agreement, the Management Company shall be acting on behalf of the Association, and *nothing in this Agreement shall be construed as creating a partnership, joint venture, or any other relationship between the parties to this Agreement*, or as requiring Management Company to bear any portion of losses arising out of or connected with the ownership or operation of the Condominium.  Neither party shall have the power to bind or obligate the other except as expressly set forth in this Agreement, however, in furtherance of the intentions of the parties hereto, *the Management Company is authorized to act with such additional authority and power as may be necessary to carry out the spirit and intent of this Agreement*.

*Id*. (emphasis added).  In the Management Agreement, RC Management agreed to act

for the benefit of the "Association and its members" by managing the members'

property, and RC Management was granted discretionary power to do so, showing a

high level of trust in RC Management to perform its duties.  Docket No. 49-5 at 2-3, ¶ 2;

---

taxes, and other common expenses"; "have sole authority to promulgate and amend rules and regulations for the Tourist Accommodations Units and Limited Common Elements of the Tourist Accommodations Units"; "Collect special assessments or charges"; "Exercise such powers and rights as are reasonably necessary to fulfill the terms of this Agreement and as otherwise delegated to it under the terms and provisions of the Declaration or the bylaws of the Association"; "Engage a Program Manager through an affiliation agreement, who shall manage and administer the reservation procedures and exchange program for The Ritz-Carlton Club Membership Program"; and "Enter into the individual Plan Units (subject to the provisions of the Declaration) to perform all activities that the Plan Manager is authorized or required to perform."  Docket No. 49-5 at 3-8, § 4.

*Bailey v. Allstate Ins. Co.*, 844 P.2d 1336, 1339 (Colo. App. 1992) ("Generally, a fiduciary duty arises between individuals through a relationship of trust, confidence, and reliance."). The Court finds that the plaintiffs have sufficiently alleged that the Management Agreement entrusted RC Management with control over plaintiffs' property sufficient to create fiduciary duties. Because the Court finds sufficient allegations that fiduciary duties existed based on control, and defendants do not contest this theory with respect to the Association and Cobalt, the Court does not reach plaintiffs' alternative theory that defendants owe fiduciary duties as agents of plaintiffs. *See* Docket No. 141 at 5; Docket No. 140 at 11-14.

### 2. Disclaimer

The Marriott defendants argue that, notwithstanding the powers granted, the same contract language "expressly disclaims any fiduciary relationship between the parties." Docket No. 131 at 9. The specific language the Marriott defendants refer to is the statement that "nothing in this Agreement shall be construed as creating a partnership, joint venture, or any other relationship between the parties to this Agreement." Docket No. 49-5 at 2-3, ¶ 2. However, when read in context, nothing in this language is inconsistent with RC Management owing fiduciary duties to plaintiffs. *See W. Gas Processors, Ltd. v. Enron Gas Processing Co.*, No. 87-A-1472, 1988 WL 73307, at *23 (D. Colo. July 7, 1988) (applying Colorado law and finding that a breach of fiduciary duty claim was not barred where the agreement did not "disclaim the fiduciary duties of honesty, fairness, and good faith upon which [the plaintiff's] claim for relief [was] based" and distinguishing cases where an "explicit description of the legal duties [was] set forth" in the contract). The title of the section where the language is

13

found is "Appointment and Acceptance of Agency."  Docket No. 49-5 at 2-3, ¶ 2.  An

agency relationship is a type of relationship that creates fiduciary duties.  *Stortroen v.*

*Beneficial Fin. Co. of Colorado*, 736 P.2d 391, 395 (Colo. 1987) ("Agency is the

fiduciary relation which results from the manifestation of consent by one person to

another that the other shall act on his behalf and subject to his control, and consent by

the other so to act." (quoting Restatement (Second) of Agency § 1(1) (1957))).

       The Marriott defendants also argue that the Management Agreement specifically

identifies RC Management as an independent contractor, which is inconsistent with

being an agent.  Docket No. 131 at 10 (citing Docket No. 49-6 at 8, ¶ 30).[8]  There are

two problems with this argument.  First, the Marriott defendants do not suggest how to

reconcile the independent contractor paragraph with the language in the "Appointment

and Acceptance of Agency" paragraph, which states that "[i]n taking any action under

this Agreement, the Management Company shall be acting on behalf of the

Association."  Docket No. 49-5 at 2, ¶ 2; *see also Hart v. Colorado Real Estate*

*Commission*, 702 P.2d 763, 765 (Colo. App. 1985) ("An agent is one who acts for or in

place of another by authority from him." (citation omitted)).  Second, an independent

contractor can be a fiduciary of the other contracting party and owe fiduciary duties

---

[8] The provision is titled "Independent Contractor" and states:

    The parties hereby agree and acknowledge that the Management
    Company is an independent contractor of the Association.  The
    Association hereby releases any right of control over the method, manner
    or means by which the Management Company performs its duties and
    responsibilities under this Agreement.

Docket No. 49-6 at 8, ¶ 30

based on the contractual relationship. *See Bradbury v. Phillips Petroleum Co.*, 815 F.2d 1356, 1360 (10th Cir. 1987) (explaining that "the terms 'agents' and 'independent contractor' are not necessarily mutually exclusive" while applying Colorado law (citation omitted)); *see also 1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1251 (10th Cir. 2013) ("[A]n independent contractor can be an agent."). Considering the Management Agreement as a whole, the Court finds that, at this stage of the proceedings, the independent contractor paragraph appears consistent with the existence of fiduciary duties. *See Bayview Loan Servicing, LLC v. Boland*, No. 08-cv-566-WDM-KLM, 2009 WL 3234270, at *5 (D. Colo. Sept. 30, 2009) (explaining that, under Colorado law, a "disclaimer is not controlling" on the issue of whether a fiduciary relationship exists pursuant to an agreement (citing *Christoph v. Colo. Communications Corp.*, 946 P.2d 519, 523 (Colo. App. 1997)). Accordingly, the Court rejects the Marriott defendants' argument that provisions in the Management Agreement requires dismissal of plaintiffs' breach of fiduciary duty claim.

### 3. *Economic Loss Rule*

The Association argues that the plaintiffs' breach of fiduciary duty claim against it should be dismissed because it "rests on the Association's Board's alleged breach of its contractual fiduciary duty under the Declaration" of Condominium that "requires the Board to 'represent the interests of' the owners 'in a fair and just manner on all matters that may affect any or all' owners and holds the Board to 'the standards of good faith and reasonableness.'" Docket No. 129 at 5 (quoting Docket No. 109-8 at 29-30, § 6.8). Plaintiffs respond that the "economic loss rule is inapplicable because the [complaint]

15

alleges a judicially recognized, special independent fiduciary duty that supports a tort action even though the parties have entered into a contractual relationship."  Docket No. 139 at 2.  Plaintiffs argue that the fiduciary duties that form the basis for their claims against the Association are independent of the contractual duties set out in the Declaration of Condominium that the Marriott defendants reference.  Docket No. 139 at 10.

"Under the economic loss doctrine, 'a party suffering only economic loss from the breach of an express or implied contractual duty may not assert a tort claim for such a breach absent an independent duty of care under tort law.'"  *Spring Creek Expl. & Prod. Co., LLC v. Hess Bakken Investments II, LLC*, 882 F.3d 1176, 1192 (10th Cir. 2018) (quoting *Town of Alma*, 10 P.3d at 1264).[9]   Courts must initially identify "the source of the duties of the parties."  *Town of Alma v. AZCO Constr., Inc.*, 10 P.3d 1256, 1262 (Colo. 2000).  "Tort obligations generally arise from duties imposed by law," while "[i]n contrast, contract obligations arise from promises made between parties."  *Id.* ("'A breach of a duty which arises under the provisions of a contract between the parties must be redressed under contract, and a tort action will not lie.'" (quoting *Tommy L. Griffin Plumbing & Heating Co. v. Jordan, Jones & Goulding, Inc.*, 463 S.E.2d 85, 88

---

[9] The Colorado Supreme Court has identified "three main policy reasons" that support the application of the rule "between and among commercial parties . . .:  (1) to maintain a distinction between contract and tort law; (2) to enforce expectancy interests of the parties so that they can reliably allocate risks and costs during their bargaining; and (3) to encourage the parties to build the cost considerations into the contract because they will not be able to recover economic damages in tort."  *BRW, Inc. v. Dufficy & Sons, Inc.*, 99 P.3d 66, 72 (Colo. 2004).

(S.C. 1995))).[10]  As the Colorado Supreme Court made clear, the focus should not be on the nature of the loss, i.e., whether it is economic, but rather on the source of the duty.  *Id.* at 1262 n.8 ("[W]e believe that a more accurate designation of what is commonly termed the 'economic loss rule' would be the 'independent duty rule.'").  In order to avoid the application of the economic loss rule, one must not only identify an independent duty, but must also assert a tort claim *based on* that independent duty.

Plaintiffs' complaint makes no reference to the Executive Board's duty of fairness that the Association claims is the basis for plaintiffs' claim.  *See* Docket No. 119 at 67-68, ¶ 24.  Rather, the complaint focuses on the fiduciary duties, including the duty of loyalty, owed by the Association to the unit owners by virtue of the Association's control over the owners' property.  *Id.*; *see also Town of Alma*, 10 P.3d at 1263 ("[S]ome special relationships by their nature automatically trigger an independent duty of care that supports a tort action even when the parties have entered into a contractual relationship.").  In *Colorado Homes, Ltd. v. Loerch-Wilson*, 43 P.3d 718, 721-22 (Colo. App. 2001), the court addressed whether a homeowner's claim against its homeowners association was barred by the economic loss rule.[11]  The trial court granted summary judgment on the homeowner's breach of fiduciary duty claim based on the economic loss rule.  *Id.* at 721.  The court of appeals reversed, recognizing a "fiduciary duty of the

---

[10] *See Hamon Contractors, Inc. v. Carter & Burgess, Inc.*, 229 P.3d 282, 291 (Colo. App. 2009) ("The court in [*Town of Alma*] did not draw any bright lines among types of torts (e.g., fraud, negligence) that are always barred by the economic loss rule, those that may be barred, and those that are never barred.").

[11] The "homeowner" owed fiduciary duties in *Colorado Homes* was actually the developer, which retained ownership of some lots.  43 P.3d at 722.

17

homeowners association to the homeowner to enforce restrictive covenants . . . in recognition of the power held by homeowner associations, the quasi-governmental functions they serve, and the impact on value and enjoyment that can result from the failure to enforce covenants." *Id*. at 721-22 (internal citations omitted).[12] It held that the fiduciary duty to enforce the restrictive covenants existed independent of the contractual obligation to enforce the restrictive covenants and, thus, the homeowner's breach of fiduciary duty claim was not barred by the economic loss rule. *Id*. at 722. Because plaintiffs' fiduciary duty claims are likewise independent of the Association Board's duty of fairness under the Declaration of Condominium, the Court finds that plaintiffs' breach of fiduciary duty claim is not barred by the economic loss rule. *See Casey v. Colorado Higher Educ. Ins. Benefits All. Trust*, 310 P.3d 196, 202-03, *as modified on denial of reh'g* (Colo. App. Sept. 13, 2012)) ("Fiduciary relationships may be the kind of special relationship that will trigger an independent common law duty of care." (citation omitted)).

### 4. *Business Judgment Rule*

The Association argues that the business judgment rule immunizes it from plaintiffs' breach of fiduciary duty claims because plaintiffs fail to allege facts showing

---

[12] The Marriott defendants argue that the Association does not owe fiduciary duties to the individual unit owners, citing decisions based on the law of states other than Colorado. Docket No. 131 at 12. In light of *Colorado Homes*, the Court rejects this argument. *See also Semler v. Hellerstein*, 2016 WL 6087893, at *5 (Colo. App. Oct. 6, 2016), *cert. granted sub nom. Bewley v. Semler*, 2017 WL 1277497 (Colo. Mar. 20, 2017) ("[M]uch like officers of a corporation, the board members of a homeowners association owe a fiduciary duty to both the association and its members." (citations omitted)).

Case No. 1:16-cv-01301-PAB-GPG   Document 144   Filed 03/29/18   USDC Colorado   Page 1 of 29
Case 1:16-cv-01301-PAB-GPG   Document 210-1   Filed 07/28/22   USDC Colorado   Page 20 of 29
of 29

the Association's actions were taken in bad faith.  Docket No. 142 at 4.  Plaintiffs

respond that they have alleged facts showing bad faith and arbitrary action by (a) the

Association promising a vote on the affiliation decision and then approving the affiliation

without a vote and (b) the Association opposing the affiliation on the basis that it would

violate the restrictive covenants, but then agreeing to the affiliation anyway.  Docket No.

139 at 15-16.  In reply, the Association claims that the decision not to hold a vote and to

allow the affiliation were made in good faith based on the meaning of the restrictive

covenant and powers granted by the Affiliation Agreement, namely, that the affiliation

was permissible and did not require a vote.  Docket No. 142 at 5.

"The good faith acts of directors of profit or non-profit corporations which are

within the powers of the corporation and within the exercise of an honest business

judgment are valid."  *Rywalt v. Writer Corp.*, 526 P.2d 316, 317 (Colo. App. 1974).  The

court in *Rywalt* also noted that "[c]ourts will not . . . interfere with or regulate the conduct

of the directors in the reasonable and honest exercise of their judgment and duties"

absent evidence that the "directors acted in bad faith or in fraud of the rights of the

members."  *Id*. (citations omitted).  "The business judgment rule shields from liability a

director's exercise of discretion when it is an honest business judgment made in good

faith and is not arbitrary."  *Chimney Rock Pub. Power Dist. v. Tri-State Generation &*

*Transmission Ass'n, Inc.*, No. 10-cv-02349-WJM-KMT, 2014 WL 788057, at *6 (D.

Colo. Feb. 27, 2014) (citing *Colo. Homes*, 43 P.3d 718, 724 (Colo. App. 2001) (citing

*Rhue v. Cheyenne Homes, Inc.*, 168 Colo. 6, 449 P.2d 361 (1969))).  In applying the

business judgment rule, "[w]hether a party acted in good faith is a question of fact which

must be determined on a case by case basis." *Polk v. Hergert Land & Cattle Co.*, 5 P.3d 402, 405 (Colo. App. 2000) (citing *Amoco Oil Co. v. Ervin*, 908 P.2d 493 (Colo. 1995)).

The Court finds that the allegations in the complaint sufficiently set forth a claim that the Association acted arbitrarily by declining to hold a vote before agreeing to the MVC affiliation. Plaintiffs allege that the Association promised such a vote and told its members that such a vote was legally required, before acting contrary to these statements without disclosure or explanation. *See* Docket No. 119 at 84, ¶ 68 and 89-90, ¶¶ 80-81. With respect to the Association's change of opinion regarding the legality of the affiliation, the complaint sufficiently alleges that this action was also arbitrary. Although the Association now presents arguments that the Board acted in good faith based on a particular legal rationale, there are no allegations in the complaint to indicate that the Association's present legal position was the Board's rationale and basis for its actions. *See Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994) ("The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true."). Instead, plaintiffs allege that the Association initially took a position that the MVC affiliation was impermissible under the restrictive covenants, and then, without explanation, acted contrary to that position, i.e., that the Association acted arbitrarily. *See* Docket No 119 at 84, ¶¶ 68-69 and 87-90, ¶¶ 76-77, 80-81. The Court finds plaintiffs' allegations are sufficient to overcome the business judgment rule at the pleading stage. *Cf. Polk*, 5 P.3d at 406 (finding factual allegations supporting an inference of bad faith precluded

20

summary judgment despite the defendants presenting arguments and evidence
supporting a conclusion that their actions were beneficial and in good faith).

### 5.  *Breach of the Fiduciary Duty*

The Marriott defendants argue that plaintiffs have not alleged a breach of any
fiduciary duty owed to plaintiffs by the Association because affiliating with the MVC was
not in the Association's power and because the restrictive covenants did not preclude
the MVC affiliation.  Docket No. 131 at 12-14.  In particular, the Marriott defendants
argue that Cobalt's possession of the exclusive power to make decisions under the
Affiliation Agreement precludes a claim against the Association.  *Id*. at 13.  Plaintiffs
respond that the Association violated its duty of loyalty by entering into the MVC
affiliation and by failing to enforce the restrictive covenants.  Docket No. 140 at 15.

The Marriott defendants' argument that the Association cannot breach its duty of
loyalty by agreeing to the MVC affiliation because it lacked power over the affiliation is
unpersuasive at this stage of the proceedings.  Plaintiffs allege that the Association's
failure to hold the promised vote before approving the affiliation agreement constitutes
a breach of the duty of loyalty.  Docket No. 139 at 13-14; *see also* Docket No. 140 at
16-18.  Notably, plaintiffs claim that the Association sent a letter to plaintiffs stating that,
based on discussions with the Association, "Ritz Marriott representatives agree that
unless a majority of Aspen Highlands Members (excluding the Marriott interests and
Members not in good standing) vote in favor of doing so, Ritz/Marriott will not include
Aspen Highlands in the Marriott Vacation Club affiliation/exchange/point program."
Docket No. 119 at 84, ¶ 68.  The Association acknowledges that it later entered into the
"April 2014 Memorandum of Understanding that formalized the trading program that

21

Case 1:16-cv-01301-PAB-GPG   Document 211   Filed 03/29/18   USDC Colorado   Page 22 of 28

[plaintiffs] allege caused them harm."  Docket No. 129 at 2; *see also* Docket No. 108-2

(April 17, 2014 Memorandum of Understanding between the Association and Lion &

Crown).  Thus, notwithstanding the Affiliation Agreement's grant of affiliation powers to

Cobalt, plaintiffs allege the Association took a direct role in negotiating and approving

the MVC affiliation, promised plaintiffs a vote before they would do so, and had an

Agreement with the Marriott defendants that the MVC affiliation was contingent on such

a vote.  In light of these circumstances, the Court rejects the Marriott defendants'

argument that Cobalt's power under the Affiliation Agreement precludes the Association

from breaching a fiduciary duty to plaintiffs in relation to the MVC affiliation.

      The Court, however, agrees that the restrictive covenants do not preclude the

MVC affiliation and, therefore, plaintiffs cannot sustain a breach of fiduciary duty claim

based on the Association's failure to enforce the restrictive covenants.  In *Hoyt v.

Marriott Vacations Worldwide Corp.*, 2014 WL 509903, at *3 (D. Minn. Feb. 7, 2014),

the court, applying Colorado law, analyzed the affiliation agreement and governing

documents with the same restrictive covenants at issue here and found that, "because

the Agreements expressly contemplate the addition of non-owner Associate Members

to the Membership Program, the plaintiffs' allegations related to such changes cannot

state a claim for breach of contract."  Plaintiffs do not attempt to distinguish *Hoyt;*

instead, they argue that the interpretation of the restrictive covenants should not be

resolved at this stage because they are ambiguous.  Docket No. 140 at 18.  Plaintiffs do

not point to any specific ambiguity and the Court finds no ambiguity relevant to plaintiffs'

claim.[13]  The Court agrees with the court in *Hoyt*.  Accordingly, because the

Association's failure to enforce the restrictive covenants cannot have caused plaintiffs'

damages, the Court will dismiss plaintiffs' breach of fiduciary duty claim against the

Association insofar as it is based on its failure to enforce the restrictive covenants.

### B.  Second Claim - Constructive Fraud

"Constructive fraud is defined as 'a breach of duty which, irrespective of moral

guilt, the law declares fraudulent because of its tendency to deceive, violate confidence,

or to injure public interests.'"  *Sec. Nat'l Bank v. Peters, Writer & Christensen, Inc.*, 569

P.2d 875, 880-81 (Colo. App. 1977) (quoting *Miller v. First National Bank*, 67 S.E.2d

362 (N.C. 1951)).  "'Neither actual dishonesty nor intent to deceive is an essential

element of constructive fraud.'"  *Id.* (quoting same).  "Such fraud often arises if a special

confidential or fiduciary relationship exists, which affords one party the power and

means to take undue advantage of the other."  *Scott Sys., Inc. v. Scott*, 996 P.2d 775,

---

[13] Under Colorado law, "[i]nterpretation of a written contract is a question of law for the court."  *In re Marriage of Thomason,* 802 P.2d 1189, 1190 (Colo. App. 1990) (citing *Pepcol Mfg. Co. v. Denver Union Corp.*, 687 P.2d 1310 (Colo. 1984)).  The primary goal of contract construction is to determine and effectuate the intent and reasonable expectations of the parties.  *Copper Mountain, Inc. v. Industrial Sys., Inc.,* 208 P.3d 692, 697 (Colo. 2009).  Contract language must be examined and construed consistently with the plain and generally accepted meaning of the words employed.  *Id.*; *see Pepcol Mfg. Co.,* 687 P.2d at 1313-14 ("In the absence of contrary manifestation of intent in the contract itself, contractual terms that have a generally prevailing meaning will be interpreted according to that meaning.").  "The court should interpret a contract in its entirety with the end in view of seeking to harmonize and to give effect to all provisions so that none will be rendered meaningless."  *Copper Mountain*, 208 P.3d at 697 (internal quotation marks omitted).  "Extraneous evidence is only admissible to prove intent where there is an ambiguity in the terms of the contract."  *USI Props. E., Inc. v. Simpson*, 938 P.2d 168, 173 (Colo. 1997); *see also Pepcol Mfg. Co.*, 687 P.2d at 1314 ("It is axiomatic that in the absence of an ambiguity a written contract cannot be varied by extrinsic evidence.").

780 (Colo. App. 2000) (citation omitted). "To establish a claim for constructive fraud, a plaintiff must show (1) the existence of a duty due to a relationship between the parties; (2) violation of the duty by making deceptive material representations of past or existing facts or remaining silent when a duty to speak exists; (3) reliance thereon by the complaining party; (4) injury to the complaining party proximately caused thereby; and (5) the gaining of an advantage by the party to be charged at the expense of the complaining party." *Barnett v. Elite Properties of Am., Inc.*, 252 P.3d 14, 24 (Colo. App. 2010) (citing *Trytko v. Hubbell, Inc.*, 28 F.3d 715, 728 (7th Cir.1994)).

Defendants argue that the material facts that plaintiffs allege should have been disclosed are not facts because they are untrue. Docket No. 131 at 19-20; Docket No. 129 at 15-16. In particular, defendants argue that the governing documents did not bar the affiliation proposal and did not require a vote prior to the affiliation. *Id*. The Association also argues that plaintiffs have not alleged reliance because the Association lacked authority to prevent the MVC affiliation and claims that plaintiffs have not alleged that their injury was proximately caused by the alleged misrepresentations. Docket No. 129 at 16-17.[14] Plaintiffs respond that their allegations are analogous to those upheld in *Sec. Nat. Bank* because they were denied notice and an opportunity to vote on the MVC affiliation proposal. Docket No. 140 at 19; Docket No. 139 at 18.

---

[14] The Association argues that plaintiffs' constructive fraud claim against it is barred by the economic loss rule and business judgment rule for the same reasons that it claims that the fiduciary duty claim is barred. Docket No. 129 at 5, 15. The Court rejects these arguments for the same reason, namely, that the constructive fraud claim is based on the breach of the independent duty of loyalty and plaintiffs have alleged arbitrary action.

The Court agrees with defendants that plaintiffs' constructive fraud claim cannot be premised on a failure to disclose a conflict between the affiliation proposal and the governing documents because, as discussed above, there is no conflict. *See Hoyt*, 2014 WL 509903, at *2. Likewise, the Court finds that plaintiffs' constructive fraud claim fails insofar as it is predicated on the failure to disclose the governing documents requirement of a vote because plaintiffs point to no provision of the governing documents that would require a vote in the absence of a conflict with respect to the affiliation proposal.

Nevertheless, the Court finds that the plaintiffs' allegations that the Association, RC Management, and Cobalt substituted a survey for the promised vote without informing the members of its intention to do so supports a claim for constructive fraud. *See* Docket No. 119 at 95, ¶ 98. Constructive fraud is possible even where a defendant "acted in good faith without intent to deceive," but nonetheless breaches a fiduciary duty owed to another on account of failure to make full disclosure. *See Sec. Nat. Bank*, 569 P.2d at 882. Defendants attack the conclusory allegations contained in the claim itself, but fail to account for or discuss the incorporated allegations in the body of the complaint that detail plaintiffs' reliance on the promised vote. Plaintiffs' allegations include to allegations that the Marriott defendants engaged in similar tactics in relation to other Ritz-Carlton clubs and that, at clubs where member votes were held, the members defeated affiliation proposals and avoided MVC affiliation. *See* Docket No. 119 at 76, ¶ 51 n.4. Defendants' argument that the powers granted by the Affiliation Agreement are dispositive is unpersuasive in light of these allegations and the allegations that the Marriott defendants agreed with the Association not to carry out the

25

affiliation without a vote.  The Court finds that plaintiffs' allegations are sufficient to show material misrepresentations and omissions, plaintiffs' justifiable reliance on defendants' statements, and causation.  Plaintiffs' allegations of different outcomes at similar resorts where a vote was held, along with allegations of the Marriott defendants' efforts, with the cooperation of the Association, to avoid such a vote at Aspen Highlands are sufficient to state a claim for constructive fraud.  Accordingly, the Court will dismiss plaintiffs' constructive fraud claim insofar as it is based on allegations that defendants failed to disclose conflicts with the governing documents and the governing documents' requirement that a vote be held, but will otherwise allow the claim to proceed.

### C.  Third Claim - Aiding and Abetting

"The elements of the tort of aiding and abetting a breach of fiduciary duty include: (1) breach by a fiduciary of a duty owed to a plaintiff, (2) a defendant's knowing participation in the breach, and (3) damages."  *Nelson v. Elway*, 971 P.2d 245, 249 (Colo. App. 1998) (citing *Holmes v. Young*, 885 P.2d 305 (Colo. App.1994); Restatement (Second) of Torts § 876(b) (1977)).  The Association argues that there are no allegations that support a claim that it aided in the MVC affiliation.  Docket No. 129 at 18.  As plaintiffs point out, the Association ignores plaintiffs' allegation that it agreed to and worked with the Marriott defendants to cause the affiliation.  Docket No. 139 at 17.  In particular, the Association does not address the April 2014 Memorandum of Understanding signed by the Association that "formalized the trading program that [plaintiffs'] allege caused them harm."  Docket No. 129 at 2.  The Marriott defendants do not challenge plaintiffs' third claim except insofar as it is predicated on the first and

26

second claims, which the Court will allow to proceed in part. Docket No. 131 at 17-18.

Therefore, the Court will deny defendants' motions with respect to plaintiffs' third claim.

### D. Remaining Claims

Defendants only challenge plaintiffs' fourth and fifth claims based on their

challenges to the duties underlying plaintiffs' other claims. *See* Docket No. 129 at 19-

20; Docket No. 131 at 20. Because the Court finds that those claims sufficiently allege

a breach of defendants' duties, the Court will deny defendants' motion with respect to

plaintiffs' fourth and fifth claims.

## V. CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Defendant Aspen Highlands Condominium Association's Motion

to Dismiss Plaintiffs' Fifth Amended Complaint [Docket No. 129] and Marriott

Defendants' Motion to Dismiss Fifth Amended Complaint [Docket No. 131] are

**GRANTED** in part and **DENIED** in part as set forth in this order. It is further

**ORDERED** that plaintiffs' first and second claims are dismissed insofar as they

are based on the alleged failure to enforce, violation of, and failure to disclose a

violation of the restrictive covenants contained in the Master Declaration and

Declaration of Condominium.

DATED March 29, 2018.

BY THE COURT:

_s/Philip A. Brimmer_____
PHILIP A. BRIMMER
United States District Judge