IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Case No. 16-01301 PAB

RCHFU, LLC, et al.

      Plaintiffs,

v.

MARRIOTT VACATIONS WORLDWIDE CORPORATION, et al.

      Defendants.

---

## MARRIOTT DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY OF CHEKITAN DEV, JONATHAN SIMON AND R. MAURICE ROBINSON

---

The Marriott Defendants,[1] by and through their undersigned counsel, move to preclude Plaintiffs' experts Chekitan Dev, Jonathan Simon and R. Maurice Robinson.

### CERTIFICATE OF CONFERENCE

Pursuant to Local Rule 7.1(a), the Marriott Defendants' counsel conferred with Plaintiffs' counsel before making this motion and made a reasonable and good faith effort to resolve this dispute. Specifically, on August 7, 2019, the Marriott Defendants' counsel had a telephone conference with Plaintiffs' counsel to discuss the factual and legal bases for this motion. Plaintiffs' counsel refused to agree to the relief sought by the Marriott Defendants.

---

[1] Defendants Marriott Vacations Worldwide Corporation, Marriott Ownership Resorts, Inc., The Ritz-Carlton Management Company, LLC ("RC Management"), The Cobalt Travel Company, LLC ("Cobalt") and The Lion & Crown Travel Co., LLC.

## INTRODUCTION

Plaintiffs are owners of luxury 1/12 fractional interests in The Ritz-Carlton Club, Aspen Highlands ("RC Club Aspen").  In April 2014, Cobalt (as "Program Manager"), exercising the unilateral discretion given to it under the documents governing Plaintiffs' purchase contracts, elected to affiliate RC Club Aspen with the Marriott Vacation Club Destinations Exchange Program (the "MVCD Program" or "MVCD").  Plaintiffs claim that, as a result of this affiliation (the "MVC Affiliation"), MVCD members were able to access the resort, which they allege to have caused their fractional interests to decline in value and allegedly resulted in substantial profits to the Marriott Defendants.  Plaintiffs seek to recover significant damages from the Marriott Defendants -- tens of millions of dollars in compensatory damages and over $100 million in disgorged profits.  The experts upon whose flawed opinions they rely for this demand, however, cannot withstand scrutiny under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and its progeny.  The theory of damages they are proffering is a house of cards whose shaky foundation consists of two economic constructs from which conclusions were drawn based primarily on the experts' *ipse dixit*.

These economic constructs (so-called "horn" and "halo" effects) are the heart of Plaintiffs' experts' damages theory.  Horn and halo effects are cognitive biases that are essentially the reverse of each other.  A horn effect is said to exist when people's negative thoughts about one brand overshadows, and causes them to make initial negative assessments concerning, another brand.  Conversely, a halo effect is said to exist when people's positive thoughts about one brand improves their view of, and causes them to make initial positive assessments concerning, another brand.  Applied to this case, Chekitan Dev posits that a co-

mingling of the Ritz-Carlton and Marriott brands occurred when, *inter alia,* MVCD members were allowed access to RC Club Aspen, and he asserts that this created a horn effect that diminished the value of RC Club Aspen fractional interests to the detriment of their owners.  Dr. Dev further opines that that same supposed co-mingling of the Ritz-Carlton and Marriott brands created a halo effect that enhanced the value of, and allowed the Marriott Defendants to increase the prices charged for, MVC Points,[2] thus boosting profit margins.  Dr. Dev did not reach these conclusions by using any accepted methodology, however, nor did he conduct any experimental research or analyze any objective data.  Rather, he bases his conclusions solely on his "years of experience" and subjective reactions to the brands at issue.  With respect to Dr. Dev's opinions regarding both the horn and the halo effects, for example, even though a broad array of analytical tools were available to him (many of which he has cited in articles that he submitted to peer-reviewed publications over the years), he never attempted to measure any change in market participants' cognitive perception of the brands before and after the supposed co-mingling.

Dr. Dev's unsupported, methodology-free conclusions are improper net opinions.  They should be precluded, as should those of Messrs. Simon and Robinson, who blindly accept and then build on Dr. Dev's conclusions regarding the horn and halo effects.  For example, Mr. Simon relies largely on Dr. Dev's net opinions on the existence of the halo effect to calculate the profits the Marriott Defendants supposedly earned as a result of the MVC Affiliation.  Likewise, Mr. Robinson, relying on Dr. Dev's net opinions on the existence of the horn effect (as well as

---

[2]  Purchasers acquire beneficial interests ("Beneficial Interests") in the MVC Trust, a Florida land trust ("MVC Trust").  For each Beneficial Interest, owners are entitled to use an annual allotment of 250 Vacation Club Points ("MVC Points") in the Marriott Vacation Club Destinations Timeshare Plan.

Mr. Simon's net opinion on that same issue, see below), purports to calculate the amount Plaintiffs' fractional interests supposedly declined in value due to the MVC Affiliation.

The Simon and Robinson opinions are flawed in other ways as well.  For example, like Dr. Dev, Mr. Simon opines on the supposed existence of both the horn and halo effects and, again like Dr. Dev, bases his opinion, not on any methodology or data, but solely on his "many years of industry experience," that is, on his own say-so.  Indeed, in calculating the profits he claims the Marriott Defendants earned as a result of the MVC Affiliation, Mr. Simon employs a technique that (1) was constructed solely for this case; (2) was never used before by Mr. Simon or anyone else; (3) has never been mentioned in any literature or treatises; and (4) has never been subjected to any peer review.  Although Mr. Simon acknowledges that well-accepted analytical methods for measuring halo effects exist, he admits that he did not use any of them.

In addition to these failings, Mr. Simon acknowledges that, although his analysis begins three years before the MVC Affiliation took place, he made no attempt to isolate the MVC Affiliation's supposed impact on either the value of Plaintiffs' fractional interests or the price of MVC Points, i.e., he made no attempt to separate the alleged effects of the MVC Affiliation from the effects of conduct unrelated to the MVC Affiliation, for example, other economic conditions generally implicating the market.  That alone should doom his opinions.

Mr. Robinson, fares no better.  Tasked with quantifying the impact of the alleged horn effect and with calculating a total damages figure for Plaintiffs' fractional interests, Mr. Robinson did no independent analysis to determine, and does not opine on, either the existence of the horn effect or its supposed causative link to the value of Plaintiffs' fractional interests. Rather, although he is the only licensed real estate appraiser in the group, he relies entirely on the

net opinions of Dr. Dev and Mr. Simon.  Mr. Robinson also eschewed numerous well-accepted methods of valuing real property, including the Uniform Standards of Professional Appraisal Practice ("USPAP"), and, instead, used a calculation methodology of his own creation.  Mr. Robinson's "methodology," however, is not recognized in any peer-reviewed publication or elsewhere as being an appropriate or accepted valuation approach.  Indeed, he admits that his analysis is not really an appraisal and cannot be used to calculate any diminution in *market* value.  Rather, he purports to measure only "lost sales prices" (a term not recognized in the real estate appraisal field) by choosing two points in time (one four years before the MVC Affiliation and another two years after it) and comparing the potential sales prices for RC Club Aspen fractional interests to those of a set of so-called comparable properties ("comps") that *Plaintiffs' counsel* identified for him.  Then, contrary to accepted industry standards and with no support whatsoever, Mr. Robinson fails to make any adjustments to these attorney-selected comps that might have made them actually comparable to RC Club Aspen.  In short, he compares the lowest demand submarket in Aspen, where RC Club Aspen is located and is in a peripheral location with limited amenities, to one of the most exclusive submarkets in the country, and he weights the comps heavily in favor of properties located in the highest demand submarket in Aspen.

In addition, like Mr. Simon, Mr. Robinson makes no attempt to isolate the alleged impact of the MVC Affiliation on the properties' potential sales prices from other factors that he admits were also likely responsible for the decline (e.g., (1) fractional owners' widespread practice of renting their own properties to third parties (who, like MVCD members, do not pay the purchase costs and maintenance fees associated with RC Club Aspen ownership); and (2) the uncomplained-of access to RC Club Aspen that MVCD members had beginning three years

before the MVC Affiliation, which was far more extensive than their access pursuant to the MVC Affiliation.  These failures render Mr. Robinson's calculations unreliable and meaningless.

## STATEMENT OF FACTS

### A.      Dr. Dev's Reports and Opinions

#### 1.      Dr. Dev Opines as to the Existence of a Horn Effect

In his initial October 26, 2018 report,[3] Dr. Dev opined that a co-mingling of the Ritz-Carlton and Marriott brands, accomplished, *inter alia*, by allowing MVCD members to access RC Club Aspen through the MVC Affiliation, resulted in a horn effect that caused Plaintiffs' fractional interests to decline in value.  He premised his opinion solely on his subjective knowledge and experience.  First Dev Report at 17.  He conducted no research, field experiments or surveys to acquire objective data of consumer perception of the Ritz-Carlton and Marriott brands (either pre- or post-MVC Affiliation), nor did he try to determine objectively whether the MVC Affiliation impacted consumer perception of either brand in order to assess whether a horn effect could have been created.  June 24, 2019 Deposition of Chekitan Dev ("Dev Dep.," Marx Decl. Ex. B) at 137:20-23, 139:1-24, 149:10-150:17, 152:25-153:15, 154:9-13, 166:25-167:6.

These failures render Dr. Dev incapable of forming an objectively valid opinion that the association of the Ritz-Carlton and Marriott brands, of which the MVC Affiliation was a part, caused a horn effect.  *See, e.g.*, R.W. Hamilton, R.T. Rust & C.S. Dev., "Which Features Increase Customer Retention?," *MIT Sloan Management Review* (2017) at 81; B.L. Simonon & J.A. Ruth, "Is a Company Known by the Company It Keeps?  Assessing the Spillover Effects of Brand Alliances on Consumer Brand Attitudes," *Journal of Marketing Research* (1998) at 31-34;

---

[3]  This report ("First Dev Report") is attached as Exhibit A to the accompanying Declaration of Ian S. Marx, dated August 12, 2019 ("Marx Decl.").

L. Leuthesser, C.S. Kohli & K.R. Harich, "Brand Equity: The Halo Effect Measure," *European Journal of Marketing* (1995) at 58-65.

### 2. Dr. Dev Opines as to the Existence of a Halo Effect

Dr. Dev also opines that the same co-mingling of brands he references in his horn effect caused a halo effect that increased the prices charged for MVC Points and, thus, boosted the Marriott Defendants' profit margins.  First Dev Report at 12-13.  As with his opinions on the horn effect, Dr. Dev offered no objective data describing consumer perception (either pre- or post-MVC Affiliation) or its impact on consumer behavior, and he conducted no research, field experiments or surveys to measure the presence of any halo effect.  Dev Dep. at 105:25-106:20, 107:5-11, 114:14-23, 120:17-121:4, 137:20-23, 139:1-24, 166:25-167:6.

Although a variety of analytical and statistical methods were available to Dr. Dev to attempt to establish the existence of any halo effect, he chose not to employ any of them.  In fact, after being shown several peer-reviewed articles regarding the halo effect (including those he co-authored and others cited in his report), Dr. Dev acknowledged that surveys and conjoint analyses (a survey-based statistical technique used in market research that helps determine how people value different attributes, such as feature, function and benefits, that make up a product) help predict which features attract and retain customers for measurement purposes, including for halo effects.  He admitted that he had used these surveys and analyses in other contexts but that he did not do so for this case.  *Id*. at 10:6-21, 12:19-13:6, 13:19-25, 99:19-100:7.

Dr. Dev also acknowledged that other, similar methodologies are available to identify a halo effect, including pre-testing (in which a questionnaire is tested on a sample of respondents before a full-scale study is launched, to identify any problems with the questionnaire), post-

testing (to measure the questionnaire's effectiveness) and the use of a multiple regression analysis (a statistical process for measuring the impact of particular factors by estimating how the typical value of a dependent variable changes when any one of the independent variables is varied). *Id*. at 81:22-84:23, 85:24-87:11. He further testified that, on past occasions, he has employed probabilistic discrete choice analyses (which create models that describe, explain and predict choices between two or more discrete alternatives) and other statistical methods to model customer choice decisions and determine and measure their drivers. *Id*. at 42:9-45:3, 57:15-60:17, 62:20-65:1. Dr. Dev agreed that such measures are necessary to determine the presence of the halo effect, and he further agreed that this measure should be linked to objective measures of consumer choice wherever possible. *Id*. at 90:16-91:16. Indeed, Dr. Dev admitted that, had he been submitting his opinions for publication in a peer-reviewed journal rather than for litigation purposes, the editors would have expected him to use multi-method approaches, typically employing state-of-the-art statistical applications, such as Bayesian models (in which probability is used to represent all uncertainty within the statistical model, both regarding the input and the output) and regression analyses, to verify and corroborate his conclusions, as he had done for several of his own articles. *Id*. at 32:25-36:15, 75:1-78:9, 81:12-16.

These failures render Dr. Dev incapable of forming an objectively valid opinion that the association of the Ritz-Carlton and Marriott brands, of which the MVC Affiliation was a part, caused a halo effect. *See e.g.*, R.W. Hamilton, R.T. Rust & C.S. Dev. at 81; B.L. Simonon & J.A. Ruth at 31-34; L. Leuthesser, C.S. Kohli & K.R. Harich, at 58-65.; *see also* December 28,

2018 Rebuttal Expert Report of Ceridwyn King ("First King Report," Supplemental Restricted Marx Decl. Ex. 1) at 2.[4]

### 3.    The SMS Data Does Not Support Dr. Dev's Halo Effect Opinion

Tacitly acknowledging the conclusory and unsupported nature of his opinion on the halo effect, on April 12, 2019, Dr. Dev submitted a supplemental report ("Second Dev Report," Supp. Rest. Marx Decl. Ex. 2), in which he revisited his opinion in light of certain later-produced Sales and Marketing Survey ("SMS") data.  The SMS data are the results of surveys, taken after sales presentations, of actual and potential MVC Points purchasers who were asked, *inter alia,* to identify and rank, out of dozens of discrete features, the five features most important to them in making their purchase decision.  Dr. Dev cited the SMS data as the objective support for the existence of a halo effect that had been missing from his first report.

The SMS data does not provide the objective support that Dr. Dev needs to render his halo effect opinion.  It was not designed to – and did not – assess consumer perceptions of the association between The Ritz-Carlton Destination Club ("RCDC") resorts and the MVCD Program.  Dr. Dev admits that the survey did not employ any statistical techniques (Dev Dep. at 183:10-184:13), and he concedes that the survey group included biased respondents who were likely not even interested in purchasing MVC Points.  *Id*. at 228:17-229:1, 230:16-231:2, 232:15-19.  In fact, rather than supporting Dr. Dev, the SMS data demonstrate that 93% of respondents who purchased MVC Points identified and ranked 21 features as ***more important to them than access to RCDC resorts*** in determining whether to purchase MVC Points and that the importance of such access dwindled over time.  *Id*. at 177:18-178:21, 179:24-180:5, 181:25-182:18, 193:24-

---

[4] Dr. King is a Professor at Temple University's School of Sport, Tourism and Hospitality Management.

194:15, 194:18-195:24, 198:1-199:12.  In short, the SMS data did not answer the fundamental question necessary to confirm the existence of a halo effect, namely, whether and to what extent access to RCDC resorts (such as RC Club Aspen) drove customer purchases of MVC Points. And, as noted, Dr. Dev admits that he did not conduct the extensive market research necessary to show a post-MVC Affiliation cognitive bias in favor of MVCD.  *Id*. at 105:25-106:20, 107:5-11, 114:14-23; *see also* June 14, 2019 Supplemental Rebuttal Expert Report of Ceridwyn King (Supp. Rest. Marx Decl. Ex. 3) at 2-3.  Given that the only data Dr. Dev examined do not indicate whether the MVC Affiliation, as implemented at RC Club Aspen, materially impacted consumer preferences for MVC Points (Dev Dep. at 197:12-17, 218:15-23), Dr. Dev has provided nothing more than a net opinion.

        **B.**        **Mr. Simon's Reports and Opinions**

        **1.**        **Mr. Simon Opines as to the Cause of the Fractional Interests' Alleged Diminution in Value**

In his October 26, 2018 expert report ("Simon Report," Marx Decl. Ex. C), Mr. Simon opines that the MVC Affiliation caused a diminution in value of Plaintiffs' fractional interests. Mr. Simon fails to support his opinion with any analysis, examples, calculations, or other quantitative evidence.  *See* Simon Report at 7-8; July 17, 2019 Deposition of Jonathan Simon ("Simon Dep.," Marx Decl. Ex. D) at 32:11-33:10 (analysis not based on industry studies or literature); *id.* at 67:23-68:12, 69:16-71:14 (analysis unsupported by publications, treatises or articles); *id.* at 72:14-73:10 (cannot cite any industry source supporting opinion that value of interest in private residence club can decline if club's exclusivity is destroyed).  Instead, Mr. Simon repeatedly testified that his opinion is based solely on his "years of experience" as a consultant to the hospitality industry.  Simon Dep. at 32:11-33:10, 37:6-38:14, 67:23-73:10.

In addition, Mr. Simon fails to account for other causes of the alleged diminution in value of Plaintiffs' fractional interests.  Mr. Simon acknowledges (and Plaintiffs do not dispute) that, for four years before the MVC Affiliation, a broad array of non-owners were able to access RC Club Aspen without purchasing fractional interests, including guests of fractional owners (some of whom are Plaintiffs), invitees of the Marriott Defendants, persons renting from fractional interest owners (who actually visited the resort more frequently than MVCD members), MVCD members with Premier or Premier Plus status (who had access to the resort through Developer-owned fractional interests before the MVC Affiliation), and members of other exchange programs used by the members.  *Id*. at 79:15-80:10, 100:17-101:18, 106:6-107:10, 108:17-109:8-13, 110:3-111:2, 112:2-113:7.  Yet he made no effort to determine whether such pre-MVC Affiliation access by non-owners caused some or all of the alleged loss of exclusivity upon which he bases his conclusion.  Nor did he try to distinguish between pre- and post-MVC Affiliation conduct, or non-MVCD and MVCD access to the resort, in opining as to the cause of any alleged diminution in value to Plaintiffs' fractional interests.  *Id*. at 93:21-95:12, 96:23-97:4, 114:5-9.  Notably, Mr. Simon acknowledges that events that took place before January 1, 2015 (the date on which MVC members could first gain access to the resort through the MVC Affiliation) have nothing to do with the MVC Affiliation.  *Id*. at 196:9-17.

In opining on causation, Mr. Simon also fails to consider RC Club Aspen's location.  Of the three submarkets that Plaintiffs' experts deem relevant (Downtown Aspen, Snowmass Village and Aspen Highlands), Aspen Highlands (in which RC Club Aspen is located) is considered the least desirable, as the others offer potential purchasers access to many more amenities.  *See* this Statement of Facts ("SOF"), Sect. C(2), *infra*.  It is, thus, hardly surprising

that the other two submarkets have consistently outperformed Aspen Highlands with respect to the value of the fractional interests at the resorts located in those submarkets.

Moreover, Mr. Simon fails to account for the fact that exchange programs (e.g., the MVCD Program) are not unique to RC Club Aspen but, rather, are a feature of almost every other fractional interest and timeshare vacation-ownership product.  Simon Dep. at 80:4-81:8. That fact alone is sufficient to undermine Mr. Simon's conclusion that the MVC Affiliation was the sole cause of any diminution in the value of Plaintiffs' fractional interests.[5]

### 2. Mr. Simon Opines as to the Existence of the Halo Effect

Without any academic credentials in economics and relying largely on Dr. Dev's net opinions (Simon Dep. at 3:6-25), Mr. Simon opines that MVCD members' access to RC Club Aspen increased the demand for MVC Points, drove price increases for MVC Points during specific time periods (which he identified through a subjective, *ad hoc* and anecdotal review of fewer than half a dozen communications from the Marriott Defendants over the course of six years), and increased the Marriott Defendants' profits from sales of MVC Points.  As with his causation opinion on the alleged decline in value of Plaintiffs' fractional interests, Mr. Simon offers no methodology to support any of these opinions, pointing, again, to his "years of industry experience."  *Id*. at 131:9-135:18, 156:13-158:12.  Mr. Simon concedes that, under his approach, the presence of a halo effect is in the eye of the beholder.  *Id*. at 138:15-139:19.  Describing how

---

[5] An interesting example (which Mr. Simon fails to explain or account) is the experience of the fractional interest owners at the RCDC Bachelor's Gulch Resort in Colorado.  Bachelor Gulch did not affiliate with the MVCD Program because, in 2013, the members voted to terminate their management agreement with RC Management and to re-brand the resort under a competitor's flag.  Thus, no affiliation occurred.  Yet the fractional interests at the Bachelor's Gulch Resort experienced a diminution in fair market value *eight times* that of the fractional interests at RC Club Aspen.  January 4, 2019 Rebuttal Expert Report of Alan Tantleff ("Tantleff Report," Marx Decl. Ex. E) at 42-43.  Mr. Tantleff is an industry consultant with over 30 years of experience.

he determines the existence of a halo effect, Mr. Simon testified: "So when I look at things, and I'm a trained observer to look at things, I look at the relationship of one thing to another [and] make a determination."  He was then asked: "So that's sort of in the eye of the beholder, you being an expert, [that] the halo effect occurred in this case[?]"  Mr. Simon answered "Yes."  *Id.* at 139:5-9.  In other words, Mr. Simon essentially testified that he knows it when he sees it -- the very definition of an improper net opinion.

Moreover, the few publications that Mr. Simon cites do not support his opinions.  Rather, they make clear that a halo effect only occurs under certain circumstances and that rigorous empirical analysis is required to demonstrate the presence of a halo effect in a given case.  *See* L. Leuthesser, C. Kohli & K. Harich, "Brand Equity, The Halo Effect Measure" (cited in Simon Report at 12 n.20) at 60-61.  Mr. Simon admits that he did not perform any rigorous empirical analysis.  Simon Dep. at 19:1-13, 137:23-139:9, 215:5-219:25; *see also* December 28, 2018 Rebuttal Expert Report of Mark Israel ("Israel Report," Supp. Rest. Marx Decl. Ex. 4) at 16-17.[6]

While Mr. Simon acknowledges that at least four different objective methods of measuring a halo effect are used in the field, he admits that he used none of those methods in arriving at his conclusions.  *See* Simon Dep. at 215:5-219:25; *see also* L. Leuthesser, C. Kohli & K. Harich at 60-61 (halo effect can be measured by (1) "simple observance of the average inter-attribute correlations," (2) "factor analysis of the rating data, coupled with statistical correlation for halo," (3) the "partialling out technique," and (4) the "double-centering methodology").

In rendering his halo effect opinion, Mr. Simon also fails to distinguish between the value supposedly derived from marketing RCDC resorts through the MVC Affiliation and the value

---

[6] Dr. Israel is a Professor at Northwestern University's Kellogg School of Management.

derived from the other marketing strategies for the brand that the Marriott Defendants used from time to time.  Nor does he distinguish between any halo effect that the MVC Affiliation allegedly caused with respect to RC Club Aspen as opposed to RCDC resorts as a whole.

### 3.      Mr. Simon Purports to Calculate Alleged Halo Profits

Mr. Simon acknowledges that his model for calculating profits allegedly earned by the Marriott Defendants as a result of the MVC Affiliation (and the halo effect that he believes was created) was not based on any known or published methodology.  Rather, he describes it as a newly-constructed model of his own invention created specifically for this engagement, one that neither he nor anyone else has ever used before or since.  Simon Dep. at 18:14-25, 19:1-20:3, 137:23-139:9, 215:5-219:25, 220:1-11, 221:1-9.  Mr. Simon applied no valid methodology to account for all the other relevant non-MVC Affiliation factors that affected the price of MVC Points, such as additional benefits that could be accessed with MVC Points, general economic conditions, changes in competition in the vacation ownership marketplace, and changes in the Marriott Defendants' marketing and pricing strategies over time.  Israel Report at 75-76.  In fact, Mr. Simon admits that his calculations cannot be used to measure profits earned from the MVC Affiliation as of January 2015 (which is when units actually began being exchanged), and he acknowledges that he did not analyze the specific impact of the MVC Affiliation on such alleged profits.   Simon Dep. at 95:15-96:11, 227:25-228:22.   Rather, Mr. Simon measured profits starting from January 2011 – some four years before the implementation of the MVC Affiliation. In calculating alleged halo profits, Mr. Simon did not attempt to distinguish between pre- and post-MVC Affiliation pricing decisions.  Simon Dep. at 95:15-96:11.

To calculate the amount of profits he claims should be disgorged in this case (i.e., the amount of halo profits), Mr. Simon purports to translate the halo effect concept into a discrete amount of profits earned by the Marriott Defendants through their supposed ability to impose greater price increases for MVC Points at various subjectively-selected points in time.  He then compares these "halo price increases" or "HPIs" to other subjectively-selected small price increases at other points in time, i.e., to "ordinary price increases" or "OPIs."  But Mr. Simon fails to make any reliable distinction between HPIs and OPIs.

To determine which specific price changes fell into which bucket (HPI or OPI), Mr. Simon used no specific empirical methodology or analytical approach, much less one referenced in peer-reviewed literature or other reliable sources.  Simon Dep. at 95:15-96:11.  Instead, he performed an *ad hoc* review of a small subset of communications from the Marriott Defendants, identified for him by Plaintiffs' counsel (and which say nothing about the ability to charge higher prices as a result of access to RCDC resorts) to determine when Dr. Dev's supposed halo effect purportedly affected the price of MVC Points.  *Id*. at 179:5-180:20, 193:8-25.

C.    **Mr. Robinson's Reports and Opinions**

1.    **Mr. Robinson Assumes, and Does Not Opine as to, the Cause of the Fractional Interests' Alleged Diminution in Value**

On October 26, 2018, Mr. Robinson issued an expert report that he revised twice to correct seven mathematical errors ("Robinson Report," Marx Decl. Ex. F(1)-(3)).[7]  *See* June 18, 2019 Deposition of R. Maurice Robinson ("Robinson Dep.," Marx Decl. Ex. G) at 171:24-172:1. Mr. Robinson assumes liability and relies entirely on Dr. Dev's and Mr. Simon's net opinions

---

[7] All three reports are included in Marx Decl. Ex. I.  Citations in this brief, however, are to the latest report, which was issued on June 17, 2019.

regarding causation and the existence of a horn effect with respect to the MVC Affiliation though he concedes he did not even read their entire reports. Robinson Dep. at 11:2-20, 39:23-40:4, 81:15-17, 82:9-12, 87:8-17, 99:22-100:20, 102:2-11, 104:3-7.

Having chosen to accept Dr. Dev's and Mr. Simon's opinions that a causative relationship existed between the MVC Affiliation and an alleged diminution in value of Plaintiffs' fractional interests (he said such inquiry was beyond the scope of his opinions), Mr. Robinson, who had never appraised fractional interests before, failed to consider a number of other factors that likely impacted the interests' value. Robinson Dep. at 196:13-16, 50:11-15; Tantleff Report at 17. The most important is RC Club Aspen's peripheral location, the high volume of rentals of RC Club Aspen owners' interests (which Mr. Robinson concedes had the potential to depress the value of the interests, *see* Robinson Dep. at 102:12-23, 103:21-104:1, 106:17-107:10), and MVC members' access to RC Club Aspen years before the MVC Affiliation. *See id.* at 10:21-11:1; 25:17-24, 110:1-20 (model has "no allocation among any of the factors that might have affected the price … whether those factors were related to the affiliation, … caused by the defendants unrelated to the affiliation, or completely unrelated to the defendants"). His failure to consider the rentals and earlier uncomplained-of MVC member access is particularly important given that the supposed "exclusivity" of the resort goes to the heart of Mr. Simon's causation opinion. Simon Dep. at 73:25-74:17, 104:15-105:3.

### 2.     Mr. Robinson Purports to Calculate Alleged Diminution in Value Damages

Notwithstanding his real estate appraiser credentials, Mr. Robinson did not conduct an appraisal of fractional interests at RC Club Aspen consistent with either USPAP or other recognized valuation methodologies or follow the standards of any recognized professional

appraisal organization.   Thus, he admits that he is unable to offer a reliable opinion on any alleged diminution of the ***market*** value of Plaintiffs' fractional interests.   Robinson Report at 2; Robinson Dep. at 45:6-47:9, 49:13-50:9, 62:20-25, 68:16-69:20, 175:10-14, 215:1-7 (acknowledging that his valuation approach is not an appraisal and does not conform to USPAP or other real estate appraisal standards in several respects).

Instead, Mr. Robinson purports to calculate "lost value" – a term he "made up" to mean "the difference between two sales prices, a but-for [based on selected comps] and an as-is [based on RC Club Aspen]."   Robinson Dep. at 45:20-46:13.   Mr. Robinson calculates a "lost value" of $41.6 million for Plaintiffs' fractional interests.   *Id.* at 45:12-47:9, 175:10-14.[8]   Given that Mr. Robinson invented his "lost value" approach, no professional or industry standards exist for his report, and Mr. Robinson applied none.   *Id*. at 49:13-50:9.   To arrive at his $41.6 million figure, Mr. Robinson compared changes over time in the actual or average sales price per square foot for units at RC Club Aspen from a self-described "but for" price per square foot (which he says is "what the price would have been absent the challenged conduct, estimated from the analysis of [five allegedly] comparable properties").   Robinson Report at 2.

Mr. Robinson performed this calculation based on a selection of sales at RC Club Aspen and five other resorts (cherry-picked for him by Plaintiffs' counsel) that offer fractional interests and are located throughout Aspen.   Robinson Dep. at 121:13-19.   These supposedly comparable resorts are located in two of the three distinct Aspen submarkets: four (The Residences at Little Nell, St. Regis Residence Club, Dancing Bear and the Hyatt Grand Aspen) are in Downtown

---

[8] Mr. Robinson concedes that a fractional interest owner who made no effort to sell his or her interest has experienced no loss in value, and he has no idea how many Plaintiffs tried to sell their fractions.   Robinson Dep. at 178:3-9, 179:13-17.

Aspen (sometimes referred to as the "core") and one (The Timbers Club at Snowmass) is in Snowmass Village.  Robinson Report at 4-5.[9]  Mr. Robinson concedes that Downtown Aspen, Snowmass Village and Aspen Highlands (where RC Club Aspen is located) comprise different submarkets (Robinson Dep. at 70:7-17), and he acknowledges that submarkets can perform differently over time based on numerous different factors, including, significantly, the availability of support services and amenities.  *Id*. at 71:6-12, 72:1-15, 73:5-11, 114:7-115:13, 160:14-19.   Yet he ***failed to make any adjustments whatsoever*** for any of these differences. Importantly, Mr. Robinson could not cite a single authority that sanctioned the use of comps without adjusting for differences between or among them.  *Id*. at 62:20-25, 68:16-69:20, 215:1-7.

To give just one illustration of the seriousness of Mr. Robinson's failure to adjust for differences, The Residences at Little Nell is in the heart of Downtown Aspen.  Literally hundreds of restaurants and other amenities are within walking distance, making Little Nell one of the most unique fractional interest resorts in the country.  *See id.* at 117:5-8 ("Little Nell stands alone.").  By contrast, RC Club Aspen, which is in Aspen Highlands, has no more than a handful of restaurants or amenities within walking distance, a factor that Mr. Robinson admits depresses property values in that submarket.  Robinson Report at 12; Robinson Dep. at 31:14-33:9, 158:10-19; *see also* Robinson Report at 6 (conceding RC Club Aspen's peripheral location in Aspen Highlands caused an overall sluggishness in sales); Robinson Dep. at 34:6-35:21 (same); *see also id.* at 55:19-22 ("[D]owntown Aspen is generally the preferred location because of the high-end homes and retail outlets; it has more panache … or cachet as the place to be for the uber

---

[9] Mr. Robinson's comp set is unduly weighted in favor of resorts in Downtown Aspen, the best-performing of the Aspen submarkets, which comprise 80% of the set, while resorts in Snowmass Village are under-included.  Robinson Dep at 118:12-119:4, 155:16-25; Robinson Report at 4-5.

wealthy."). Predictably, before the MVC Affiliation occurred, Little Nell's fractional units sold out three times faster than units at the other supposedly comparable resorts and for five times the sale prices of units at RC Club Aspen. *Id.* at 116:19-117:8, 126:3-16, 127:11-15, 212:12-214:6. Compared more broadly, the fractional properties that Mr. Robinson examined in Downtown Aspen retained their value better than the one he examined in Snowmass, *id.* at 154:15-20, and the Snowmass property retained its value better than Aspen Highlands. *Id.* at 148:25-149:8. Mr. Robinson violated the first rule of real estate appraisal: "location, location, location."

Importantly, Mr. Robinson fails to account for any other economic and market factors that caused or contributed to the decline in value of Plaintiffs' fractional interests, even though he acknowledges that several of these (and other) factors affected valuation. Robinson Dep. at 31:11-33:9, 158:10-19 (location of property impacts value, particularly where other locations offer superior amenities); *id.* at 102:12-23, 103:21-104:1 (owner rentals impacted value by affecting exclusivity of RC Club Aspen); *id.* at 106:17-107:10 (rise of Airbnb impacted value of Plaintiffs' interests); *id.* at 75:14-25 (detrimental conditions at property impact value), 101:2-5 (agreeing that "there are factors other than anything that the defendants did that could have affected the prices" for Plaintiffs' interests); *id.* at 107:24-109:14 (larger size of RC Club Aspen impacted value of Plaintiffs' interests). Mr. Robinson also made no effort to apportion the loss in value that he believes is specifically attributable to the impact of the MVC Affiliation. *See id.* at 81:15-17, 82:9-12, 99:22-100:20, 102:2-11, 104:3-7. Indeed, Mr. Robinson does not attribute the decline in value to any particular factor (*id.* at 102:2-11), and he concedes that, to properly measure the impact of the MVC Affiliation, one would need to discount for all such other contributing factors, which neither he (*id.* at 113:8-22) nor the other two experts did.

In addition, Mr. Robinson included, again without adjustment, properties that he admits "skewed" his analysis.  Robinson Dep. at 144:5-145:13.  One such property had an average sale price per unit four times that of RC Club Aspen's fractional interests, and a second sold penthouse unit interests at a 70% premium and were further inappropriate because "one individual paid a huge premium for aggregation value."  *Id.* at 116:19-117:8, 126:3-16, 127:11-15, 143:14-148:20, 212:12-214:6.  In addition, Mr. Robinson failed to adjust for differences in the attributes of the other properties in his comp set in comparison to RC Club Aspen, such as views or supply, even though standard appraisal practices require such adjustments.  *See* R. Roddewig & R. Cole, "Real Estate Value Impacts from Fracking, Industry Response and the Proper Analytical Techniques," *Real Estate Issues* (Vol. 39, No. 3 2014) at 10.

Like Mr. Simon, Mr. Robinson did not calculate damages using a start date of January 1, 2015, which is when MVCD members actually began to have access to RC Club Aspen through the MVC Affiliation.  Rather, he calculates alleged damages for several different periods starting as far back as January 2011.  Mr. Robinson concedes (as he must) that this renders him unable to determine what amount, if any, of his $41.6 million lost value figure can be attributed to the MVC Affiliation.  *Id*. at 89:2-9, 93:8-15.

## **ARGUMENT**

## I.  **THE *DAUBERT* STANDARD**

Fed. R. Evid. 702 states:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the evidence is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and

methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The Tenth Circuit has consistently applied Rule 702 and *Daubert* to require district courts to act as gatekeepers to assess the reasoning and methodology underlying an expert's opinion and to determine whether the opinion is scientifically valid and applicable to a particular set of facts. *Alfred v. Caterpillar, Inc.*, 262 F.3d 1083, 1086 (10th Cir. 2001). As gatekeeper, the trial court is tasked with evaluating whether: (1) a proposed expert is qualified to speak with authority on a particular subject or issue; (2) the expert's testimony is reliable; and (3) there is a relevant connection between the expert's opinions and particular disputed factual issues in the case, i.e., whether there is a "fit." *Goebel v. Denver & Rio Grande W. R.R. Co.*, 215 F.3d 1083, 1087 (10th Cir. 2000). The opinion's proponent has the burden of showing admissibility by a preponderance of the evidence. *Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987).

To be deemed reliable, an "expert's . . . testimony must be based on scientific knowledge, which 'implies a grounding in the methods and procedures of science' based on actual knowledge, not 'subjective belief or unsupported speculation.'" *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003) (quoting *Daubert*, 509 U.S. at 590). Courts need not admit mere assumptions proffered under the guise of expert opinions. *See Hoffman v. Ford Motor Co.*, 493 Fed. Appx. 962, 976 (10th Cir. 2012).

"Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). In short, "'[t]he trial court's gatekeeping function requires more than simply taking the expert's word for it.'"

*Bullock v. Daimler Trucks N. Am., LLC*, 2010 WL 4135330, at *3 (D. Colo. Sept. 30, 2010) (Brimmer, *J.*) (quoting Fed. R. Evid. 702 Adv. Comm. Notes (2000)).

## II.    PLAINTIFFS' EXPERTS' OPINIONS ARE INADMISSIBLE TO THE EXTENT THEY ARE PREMISED ON PRE-2015 CONDUCT OR CONDUCT UNRELATED TO THE MVC AFFILIATION

Damages opinions can be excluded where they are premised on factual allegations that deviate from the pleadings and the facts.  *See Target Mkt. Publ'g, Inc. v. ADVO, Inc.*, 136 F.3d 1139, 1145 (7th Cir, 1998); *KW Plastics v. U.S. Can Co.*, 131 F. Supp. 2d 1289, 1294 (M.D. Ala. 2001); *see also Goebel,* 215 F. 3d at 1087 (admissibility requires a "fit" between the expert's opinions and disputed factual issues in the case).

Each of Plaintiffs' experts offers opinions premised on acts by the Marriott Defendants taken four years before the MVC Affiliation's January 1, 2015 implementation date, i.e., the date when MVCD members could first access RC Club Aspen through the MVC Affiliation.  These acts include providing access to RC Club Aspen to MVCD members with Premier and Premier Plus status through developer-owned inventory and the deposit of developer-owned inventory at other RCDC resorts into the MVC Trust from 2011 to 2014.

The Complaint does not allege that these acts were improper, illegal, unauthorized by contract or the cause of any of Plaintiffs' alleged damages.  Plaintiffs' pleaded claims are all based on the MVC Affiliation.  Indeed, each version of the Complaint articulated claims and liability theories that involved only (1) the potential for the MVC Affiliation to occur; (2) the Marriott Defendants' actions in advocating for, or helping bring about, the MVC Affiliation; or (3) the actual implementation of the MVC Affiliation.  Plaintiffs had multiple opportunities to amend their pleading to add new claims and liability theories focusing on non-MVC Affiliation

related conduct and damages, but they failed to do so.  Plaintiffs cannot recover damages based on allegations and liability theories asserted for the first time in their experts' reports.

Moreover, in offering their opinions on horn and halo effects and their damages calculations, Plaintiffs' experts made no attempt to assess or measure the alleged effects of the MVC Affiliation in isolation from those of conduct or events that occurred before, or were unrelated to, the MVC Affiliation, e.g., conduct that gave MVCD members access to RCDC resorts by means other than the MVC Affiliation or the conduct of Plaintiffs themselves in renting their units to outsiders.[10]  Plaintiffs' expert reports should be precluded to the extent they are based on pre-2015 conduct or conduct unrelated to the MVC Affiliation.

## III.   DR. DEV OFFERS ONLY NET OPINIONS, WHICH ARE INADMISSIBLE UNDER *DAUBERT*

Dr. Dev's proposed expert testimony, which focuses on the horn and halo effects allegedly associated with the MVC Affiliation, should be precluded in its entirety because it is based on no methodology.  Rather, it is merely a series of inadmissible net opinions.

Defined as a conclusory statement that is unsupported by adequate facts and data or that is based on no methodology, a net opinion does not meet *Daubert*'s reliability and "fit" requirements.  *See O'Sullivan v. Geico Cas. Co.*, 233 F. Supp. 3d 917, 927-28 (D. Colo. 2017); *Alarid v. Biomet, Inc.*, 2016 WL 379564, at *3 (D. Colo. Feb. 1, 2016); *see also TBL Collectibles, Inc. v. Owners Ins. Co.*, 285 F. Supp. 3d 1170, 1193 (D. Colo. 2018) (Brimmer, *J.*) (explaining that an expert may not offer an opinion that fails to "articulate the factual basis for his conclusions or explain how the standards applied relate to the [relevant] issue[s]" in the case).

---

[10] On July 29, 2019, the Marriott Defendants moved for partial summary judgment with respect to, *inter alia*, any damages based upon pre-MVC Affiliation conduct (ECF #441).

Net opinions are inadmissible under *Daubert* because they are based solely on the expert's subjective belief or unsupported speculation (*BancFirst v. Ford Motor Co.*, 489 Fed. Appx. 264, 266 (10th Cir. 2012)) and "require blind acceptance of the expert's *ipse dixit*."  *Huang v. Marklyn Grp. Inc.*, 2014 WL 3559367, at *5 (D. Colo. July 18, 2014).

Even when opining on a supposedly "non-scientific" topic, "[e]xperts . . . who rely solely or primarily on experience, must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Gianfrancisco v. Excelsior Youth Ctrs., Inc.*, 2012 WL 2890916, at *5 (D. Colo. July 16, 2012) (Brimmer, *J.*) (internal quotation omitted).  "In other words, [such an expert] must show how she reached [her] conclusions based on the information she reviewed." *Id*.  "Without facts, data, or methodology," even a non-scientific expert's "opinions do not meet the strictures of Rule 702."  *Id*. (excluding expert opinion that defendant's HR staff did not monitor employees' compensation structure or provide a safe environment to register complaints); *see also Pertile v. General Motors, LLC,* 2017 WL 4099895, at *7 (D. Colo. Sept. 15, 2017) (expert's conclusory opinion that defendant's trucks had an "excessive" number of "faults" excluded because it was not based on a disclosed methodology or standard).

This same principle applies to branding experts who (like Dr. Dev) attempt to offer conclusory opinions based solely on their "experience."  For example, in *Nature's Products, Inc. v. Natrol, Inc.*, 2013 WL 112753370 (S.D. Fla. Oct. 7, 2013), defendant's branding expert's opined that plaintiff's removal of certain of defendant's products from store shelves affected customer perception of defendant's entire brand.  The court found the expert's opinion (including his estimate of the cost of returning the brand to its past revenue levels) unreliable because he

offered "no indication of a methodology that is subject to peer review, includes a calculable rate of error, or is capable of acceptance/testing by a community of experts in marketing/branding" to support his calculation or his proposed time period. *Id*. at *4. The expert had also failed to "review[] sufficient data points [such as statistical data, surveys or comparisons with the experiences of other successful rebranding campaigns] to reach his conclusions based on personal knowledge and experience." *Id*. Although the expert need not have followed the court's suggested methods, *Daubert* required "that he utilize *some* demonstrable method that can be assessed." *Id*. (italics in original); *see also Moore v. Weinstein Co.*, 2012 WL 1884758, at *7 (M.D. Tenn. May 23, 2012) (excluding branding expert's opinion that the "fame" of music duo Sam & Dave was "tied" to the branding of the song "Soul Man" because it lacked foundation, reflected "no data or analysis relating to the issue of 'branding'" and was based solely on expert's "personal recollection and subjective impressions"); *cf. Goldemberg v. Johnson & Johnson Consumer Cos.*, 317 F.R.D. 374, 395-96 (S.D.N.Y. 2016) (on class certification motion, finding branding expert's opinion sufficient under *Daubert* because expert had used a detailed methodology to support the calculation of a class-wide price premium associated with supply and demand changes for products accompanied by removal of branding).

Measured against these standards, Dr. Dev's opinions are plainly inadmissible under *Daubert*. Dr. Dev's opinion that a co-mingling of the Ritz-Carlton and Marriott brands resulted in a horn effect that caused Plaintiffs' fractional interests to decline in value is based solely on his subjective knowledge and experience. *See* SOF(A)(1), *supra*. He conducted no research, field experiments or surveys to acquire objective data of consumer perception of the Ritz-Carlton and Marriott brands (either pre- or post-Affiliation), nor did he try to determine objectively

whether the MVC Affiliation impacted consumer perception of either brand in order to assess whether a horn effect could have been created.  *Id.*

Likewise, Dr. Dev conducted no research, field experiments or surveys or provided no other objective data to support his opinion that the aforementioned alleged co-mingling of brands created a halo effect that increased the prices charged for MVC Points and, thus, boosted the Marriott Defendants' profit margins.  *See* SOF(A)(2), *supra*.  Dr. Dev admitted that, although a variety of methods for testing his halo effect theory are available (some of which he had used in other contexts), he used none of those methods for this case.  *Id.*

Nor does the SMS data provide any objective support for the existence of a halo effect.  Those surveys were not designed to – and did not – assess consumer perceptions of the association between RCDC resorts and the MVCD Program.   And, as Dr. Dev admits, the surveys were not conducted using statistical techniques and included biased respondents who likely were not interested in purchasing MVC Points.  *Id.*  Indeed, the SMS data actually show that an overwhelming percentage of respondents who purchased MVC Points (93%) identified and ranked 21 features as more important to them than access to RCDC resorts in determining whether to purchase MVC Points and that the importance of such access dwindled over time.  *Id.*

IV.    **MR. SIMON'S OPINIONS DO NOT MEET THE *DAUBERT* STANDARD**

A.    **Mr. Simon's Opinion That the MVC Affiliation Caused a Diminution in Value of Plaintiffs' Fractional Interests Is Unreliable**

The Tenth Circuit and courts in this Circuit have excluded, as unreliable, expert opinions on loss causation where the expert failed to distinguish between the loss attributable to the defendant's allegedly wrongful conduct and the loss attributable to unrelated factors.  *See, e.g., In re Williams Sec. Litig.-WCG Subclass*, 558 F.3d 1130, 1134, 1136 (10th Cir. 2009) (affirming

grant of summary judgment for defendant in securities class action where sole evidence of loss causation was expert opinion that failed to account for market and industry effects on stock price); *Hubbell v. Carney Bros. Constr.*, 2011 WL 1060239, at *2-*3 (D. Colo. Mar. 23, 2011) (in action arising from construction defect, striking expert damages report for failing to exclude other factors in opining that defect caused diminution in property's value).   Courts in other jurisdictions have held the same.   *See, e.g., Cannon v. BP Prods. N. Am., Inc.,* 2013 WL 5514284, at *7 (S.D. Tex. Sept. 30, 2013) (expert's hedonic regression analysis found unreliable because it failed to account for alternative explanations for diminution in property value, such as crime rates, location in relation to floodplain, and availability of insurance after major hurricane); *Trugreen Cos. v. Scotts Lawn Serv.,* 508 F. Supp. 2d 937, 960-61 (D. Utah 2007) (expert's opinion on causation found unreliable because it failed to account for at least eight "confounding causes" of parties' respective revenue gains and losses unrelated to defendant's alleged misconduct); *Sigur v. Emerson Process Mgmt.*, 2007 WL 1893632, at *5 & n.13 (M.D. La. Apr. 25, 2007) (expert's opinion on the cause of decline in plaintiff's sales found unreliable because it failed to account for impact of other market factors, e.g., hurricanes, cyclical nature of "turnaround operations" in the industry, or the impact of competition); *Prepaid Wireless Servs., Inc. v. Southwestern Bell Wireless*, 2002 WL 34367328, *4–*5 (S.D. Tex. July 23, 2002) (finding expert's damages opinion unreliable because his "model does not address which damages were caused by Defendants' breaches").

Courts also exclude as unreliable expert opinions not based on objectively verifiable evidence.   *See, e.g., Bruno v. Bozzuto's, Inc.*, 311 F.R.D. 124, 137-38 (M.D. Pa. 2015) (excluding opinion of damages expert relying on projections not based on verified financial

data); *Cook v. Smith*, 2006 WL 8439583, at *6-*7 (M.D. Fla. May 30, 2006) (precluding damages expert from opining as to lost wages based on unverified sources of information).

Mr. Simon's opinion on causation is plainly unreliable under *Daubert*. As explained in detail above, he attributes all loss in the value of Plaintiffs' fractional interests to the MVC Affiliation and completely ignores other possible causes. *See* SOF(B)(1), *supra* (discussing Mr. Simon's failure to consider that, for four years before the MVC Affiliation, a broad array of non-owners were able to access RC Club Aspen without purchasing fractional interests, including guests of fractional owners, invitees of the Marriott Defendants, persons renting from fractional interest owners (who actually visited the resort more frequently than MVCD members), MVCD members with Premier or Premier Plus status (who had access to the resort through Developer-owned fractional interests before the MVC Affiliation), and members of other exchange programs used by the owners). Mr. Simon also failed to distinguish between pre- and post-MVC Affiliation conduct, or between non-MVCD and MVCD access to the resort, in opining as to the cause of any alleged diminution in value to Plaintiffs' fractional interests. *Id.* Mr. Simon's conclusions are particularly jarring given his admission that events that took place before January 1, 2015 have nothing to do with the MVC Affiliation. *Id.*

Further undermining the reliability of Mr. Simon's opinion on causation is his failure to consider that of the three submarkets that Plaintiffs' experts consider relevant to their opinions, RC Club Aspen is located within the least desirable one, and exchange programs like the MVCD Program are a feature of almost every other fractional interest and timeshare vacation-ownership product. *Id.* Therefore, Mr. Simon's opinion that the MVC Affiliation was the sole cause of any diminution in value of Plaintiffs' fractional interests should be rejected as unreliable.

In addition to failing to consider other causes for the alleged diminution in value, Mr. Simon fails to support his opinion with any analysis, examples, calculations, or other quantitative evidence.  Like Dr. Dev, he improperly relies solely on his "experience" and his own subjective assessment of the brands.  *See id.* (admitting that his analysis is not based on industry studies or literature and is unsupported by publications, studies or literature and that he cannot provide any industry source to support opinion that value of interest in private residence club can drastically decline if club's exclusivity is destroyed).  In short, Mr. Simon did not use a recognized approach upon which other experts traditionally rely.  Instead, he created his own untested, untestable and ***wholly unreliable*** approach out of whole cloth for purposes of this litigation.

### B. Mr. Simon's Opinion regarding the Existence of the Halo Effect and His Calculation of "Halo Profits" Should Be Precluded As Unreliable

#### 1. Mr. Simon's Opinion regarding the Existence of the Halo Effect Is Unreliable

Mr. Simon relies largely on Dr. Dev's net opinions and his "years of industry experience" to conclude that the MVC Affiliation created a halo effect in that it increased the demand for MVC Points, drove price increases for MVC Points during specific time periods and increased the Marriott Defendants' profits from sales of MVC Points.  *See* SOF(B)(2), *supra.*  Mr. Simon, however, cites no authority to support his opinion.  *See id.* (explaining that the few publications Mr. Simon cites do not support his opinions but, rather, make clear that a halo effect only occurs under certain circumstances and that ***rigorous empirical analysis is required*** to demonstrate the presence of a halo effect in a given case) (citing articles); *see also id.* (citing Mr. Simon's admission that he performed no rigorous empirical analysis).  Mr. Simon also used no recognized methodology in identifying the halo effect.  *Id.* (Mr. Simon acknowledges that at least four

different objective methods of measuring a halo effect are recognized and used in the field but he employed none of them in this case). In rendering his halo effect opinion, Mr. Simon also fails to distinguish between the value supposedly derived from marketing RCDC resorts through the MVC Affiliation and the value derived from the other marketing strategies for the brand that the Marriott Defendants used from time to time. *Id.* Nor does he distinguish between any halo effect that the MVC Affiliation allegedly caused with respect to RC Club Aspen as opposed to RCDC resorts as a whole. *Id.*

Given these myriad flaws, Mr. Simon's halo effect opinion is demonstrably unreliable and should be precluded as such. *See generally LifeWise Master Funding v. Telebank,* 374 F.3d 917, 929 (10th Cir. 2004) (affirming exclusion of expert damages testimony where, *inter alia*, "the methodology is misleading, not reliable, . . . unsupported by use in any other comparable setting, [and] does not fit the present case").

## 2.   Mr. Simon's Calculation of Halo Profits Is Unreliable

Expert opinions on the calculation of the disgorgement of profits are subject to the same high standards of reliability required of opinions on money damage awards under *Daubert*. *See Hebrew University of Jerusalem v. General Motors LLC*, 2012 WL 12507522 (C.D. Cal. May 31, 2012) (rejecting expert's calculation of profits to be disgorged due to defendant's alleged misconduct, noting the absence of any "article, study, or other literature" supporting the expert's methodology and finding unwarranted the expert's "assumption that a company's sales directly result from [the complained-of conduct] in this formulaic manner").[11]

---

[11] In *Hebrew University,* plaintiff had complained that defendant GM had made unauthorized use of an image of Albert Einstein in one of its advertisements, and plaintiff engaged an expert to calculate the profits attributable to GM's use of the image. The expert derived a dollar figure of

Mr. Simon purports to calculate so-called "halo profits," i.e., profits that he claims were earned as a result of the MVC Affiliation and should be disgorged.  In doing so, however, he uses a methodology entirely of his own invention and one that was never used before (or since) for such a purpose.  *See* SOF(B)(3), *supra; see also Feduniak v. Old Republic Nat'l Title Co.*, 2015 WL 1969369, at *4 (N.D. Cal. May 1, 2015) (valuation methods developed solely for purposes of litigation are subject to special scrutiny).

In addition to having been devised specifically for this case, Mr. Simon's calculation is highly subjective.  *See id.* (explaining that Mr. Simon performed his calculation by selecting various points in time at which either "halo price increases" or "ordinary price increases" for MVC Points occurred and that he did not use a reliable method for distinguishing between HPIs and OPIs but, rather, determined which price increases were HPI or OPI based on an *ad hoc* review of a small subset of communications from the Marriott Defendants).

*Daubert* prohibits such a highly subjective approach.  *See In re: Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Prods. Liab. Litig.*, 185 F. Supp. 3d 761, 782-83 (D.S.C. 2016) (excluding opinion of expert who used "cherry-picked data" from among numerous medical studies and ignored several studies completely); *Universal Coin & Bullion, Ltd. v. Federal Express Corp.*, 2015 WL 12001264, at *13 (W.D. Tenn. June 30, 2015) (in determining damages period, rationale for expert's selection must be "derived by a reasonable scientific method and supported by the record," rather than be the result of "'cherry-picked' event dates

---

sales associated with every dollar spent by GM on advertising over an 18-month period by dividing GM's total sales volume by its total advertising and promotion expense, which he then multiplied by GM's total spending on the Einstein advertisement.  The expert accounted for GM's gross margin and deducted advertising costs, resulting in a total calculation of profits to be disgorged.  The court found the expert's methodology unreliable, granted GM's *Daubert* motion and precluded the damages testimony on disgorgement.  *Id*. at *6.

based on unreliable criteria" (citing *Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*, 752 F.3d 82, 92 (1st Cir. 2014)).

Mr. Simon's halo profits calculation also fails to account for other relevant non-MVC Affiliation factors that affected the price of MVC Points. *See* SOF(B)(3), *supra* (noting Mr. Simon's failure to account for additional benefits that could be accessed with MVC Points, general economic conditions, changes in competition in the vacation ownership marketplace, and changes in the Marriott Defendants' marketing and pricing strategies over time). Mr. Simon also does not distinguish between pre-2015 profits and post-2015 profits or between pre- and post-MVC Affiliation pricing decisions. *Id.*

## V.     MR. ROBINSON'S OPINIONS DO NOT MEET THE *DAUBERT* STANDARD

Mr. Robinson's opinions regarding the loss in value of Plaintiffs' fractional interests suffer from methodological flaws and other deficiencies and errors that render them unreliable.

As an initial matter, Mr. Robinson relies entirely on Dr. Dev's and Mr. Simon's net opinions regarding causation and the existence of a horn effect with respect to the MVC Affiliation. *See* SOF(C)(1), *supra.* In order to rely on another expert's analysis or opinions in formulating one's own opinions, however, the expert must demonstrate that he is familiar with the methods and reasons underlying the other expert's report and that the other expert's report is reliable under *Daubert*. *See Arkansas River Power Auth. v. Babcock & Wilcox Power Co.*, 2016 WL 9734697, at *4 (D. Colo. Oct. 31, 2016) (citing *TK-7 Corp. v. Estate of Barbouti*, 993 F.2d 722, 732-33 (10th Cir. 1993)). Here, Mr. Robinson made no such inquiry and offered no such evidence. Thus, his opinion as to the loss of value of Plaintiffs' fractional interests was fatally flawed from the outset, and, from there, his errors only compounded.

For example, Mr. Robinson fails to account for any other economic and market factors that caused or contributed to the decline in value of Plaintiffs' fractional interests, even though he acknowledges that several of these factors (as well as others) affected valuation.  *See* SOF(C)(2), *supra* (acknowledging, *inter alia,* that a property's location impacts value, particularly where other locations offer superior amenities; that detrimental conditions at a property impact value; that there are "factors other than anything that the defendants did that could have affected [fractional interest] prices"; that owner rentals of fractional interests affected RC Club Aspen's exclusivity, thus impacting value; and that the rise of Airbnb impacted fractional interests' value).  Mr. Robinson also made no effort to apportion the loss in value that he believes is specifically attributable to the impact of the MVC Affiliation.  *Id.*  That failure alone is enough to preclude Mr. Robinson's opinions on lost sales value.  *See, e.g., Williams Sec. Litig.-WCG Subclass*, 558 F.3d at 1134, 1136; *Hubbell*, 2011 WL 1060239, at *2-*3.

In addition, Mr. Robinson's decision to focus on the "but for" sales price of Plaintiffs' fractional interests brings with it a high set of *Daubert* reliability standards and relevance requirements for the comps that Plaintiffs' counsel selected for his analysis, which Mr. Robinson's analysis does not come close to meeting.  To satisfy *Daubert*, an expert opinion from a witness who opines regarding the decline in the value of a real property interest must comply with established practices in collecting, selecting and accurately adjusting and reporting on the comparable sales data upon which the expert ultimately relies in reaching his conclusions.  *See, e.g., Davis v. Carroll,* 937 F. Supp. 2d 390, 417 (S.D.N.Y. 2013); *Cayuga Indian Nation of N.Y. v. Pataki*, 83 F. Supp. 2d 318, 323-26 (N.D.N.Y. 2000).  Although Mr. Robinson acknowledges that, because all real estate is unique, "classic real estate appraisal methodology calls for

adjusting the attributes of the comp to the subject" (Robinson Dep. at 65:21-66:2), his sales comparison approach does not use a properly selected and adjusted set of comps. *See* SOF(C)(2), *supra*; *see also The Dictionary of Real Estate Appraisal* (6th ed.) at 207 (cited in Tantleff Report at 19, 21, n.32) (stressing that adjusting comps is a critical part of the appraisal process). Courts have upheld *Daubert* challenges to expert appraisal (or appraisal-like) opinions that fail to do any analysis (or, thus, any adjustment) of comparable property listings or asset valuations. *See, e.g., Schwegmann Family Trust No. 2 v. Circuit City Stores, Inc.*, 2008 WL 2795136, at *4 (E.D. La. July 16, 2008); *Patterson v. Stathas*, 2007 WL 7647004, at *3 (S.D. Fla. July 20, 2007); *General Elec. Capital Corp. v. Stelmach Constr. Co.*, 2001 WL 969052, at *5 (D. Kan. Aug. 15, 2001).

Likewise, to the extent that an expert uses a particular appraisal or valuation method, there must be sufficient authority in the relevant field to support use of the method under similar circumstances. *See, e.g., Fannie Mae v. LaRuffa,* 702 Fed. Appx. 505, 507 (9th Cir. 2017); *Sabal Trail Transmission, LLC v. +/- 1.823 Acres of Land*, 2018 WL 2426364, at *2 (M.D. Fla. May 30, 2018); *Barfield v. Sho-Me Power Elec. Coop.*, 2013 WL 12145824, at *3 (W.D. Mo. July 8, 2013). Mr. Robinson can point to no authority supporting his valuation method.

Finally, valuation methods developed solely for purposes of litigation, such as those used by Mr. Robinson (and Mr. Simon, *see* Point IV(B), *supra*) are subject to special scrutiny. *See Feduniak*, 2015 WL 1969369, at *4; *see also Development Specialists, Inc. v. Weiser Realty Advisors LLC,* 2012 WL 242835, at *8 (S.D.N.Y. Jan. 24, 2012) (excluding valuation opinion from damages expert for "failure to engage" USPAP in favor of a valuation method of her own creation). Mr. Robinson's valuation method cannot withstand such scrutiny, as he acknowledges

it not an appraisal and does not conform to USPAP or other real estate appraisal standards in several respects.  Robinson Dep. at 45:6-47:9, 49:13-50:9, 62:20-25, 68:16-69:20, 175:10-14, 215:1-7.  Mr. Robinson's opinions are thoroughly unreliable, and he should be precluded from offering them at trial.

**<u>CONCLUSION</u>**

For all the foregoing reasons, the Marriott Defendants respectfully request that the Court preclude Dr. Dev and Messrs. Simon and Robinson from offering opinions at trial.  In addition, the Marriott Defendants respectfully request a hearing on this motion, pursuant to Section III(G) of this Court's Practice Standards.

Dated:  August 12, 2019

Respectfully submitted,

GREENBERG TRAURIG, LLP

By:     *s/ Ian S. Marx*
Naomi G. Beer
Philip R. Sellinger
Ian S. Marx
1200 Seventeenth Street, Suite 2400
Denver, Colorado 80202
Tel:     303.572.6500 / Fax:     303.572.6540
Email:  BeerN@gtlaw.com,
SellingerP@gtlaw.com,  MarxI@gtlaw.com

*Attorneys for the Marriott Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 12th day of August, 2019, a true and accurate copy of the foregoing **MARRIOTT DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY OF CHEKITAN DEV, JONATHAN SIMON AND R. MAURICE ROBINSON** and attached exhibits were filed and served with the Clerk of the Court via CM/ECF filing system, which will send notification to the following:

Michael J. Reiser
Law Office of Michael J. Reiser
1475 N Broadway, Suite 300
Walnut Creek, CA 94596
*Counsel for Plaintiffs*

Matthew C. Ferguson
The Matthew C. Ferguson Law Firm, P.C.
119 South Spring, Suite 201
Aspen, Colorado 81611
*Counsel for Plaintiffs*

Tyler R. Meade
The Meade Firm P.C.
1816 Fifth Street
Berkeley, CA 94710
*Counsel for Plaintiffs*

Linda Pham Lam
Michael Schrag
Gibbs Law Group LLP
505 14th Street, Suite 1100
Oakland, CA 94612
*Counsel for Plaintiffs*

Jessica Black Livingston
Hogan Lovells US LLP
1601 Wewatta Street, Suite 900
Denver, Colorado 80202
*Counsel for Defendant*
*Aspen Highlands Condominium Association,*
*Inc.*