# EXHIBIT D

# The Deposition Transcript of Mr. Simon 7.17.2018

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF COLORADO

3

4

5     RCHFU, LLC, ET AL.,                )
                                         )
6          PLAINTIFFS,                   )
                                         )
7       vs.                              )  No.
                                         )  1:16-CV-01301-
8     MARRIOTT VACATIONS WORLDWIDE       )  PAB-GPG
      CORPORATION,                       )
9                                        )
           DEFENDANTS.                   )
10    _____)

11

12

13

14           EXPERT DEPOSITION OF JON ROBERT SIMON

15               WEDNESDAY, JULY 17, 2019

16

17

18

19

20

21    REPORTED BY:  D'ANNE MOUNGEY, CSR 7872

22

23

24

25

Page 2

```
 1  EXPERT DEPOSITION OF JON ROBERT SIMON, TAKEN ON BEHALF OF
 2  DEFENDANTS AT 1840 CENTURY PARK EAST, LOS ANGELES,
 3  CALIFORNIA, COMMENCING AT 9:40 A.M. ON WEDNESDAY,
 4  JULY 17, 2019, BEFORE D'ANNE MOUNGEY, CSR 7872.
 5
 6
 7  FOR PLAINTIFFS:
 8      MATTHEW C. FERGUSON
        ATTORNEY AT LAW
 9      119 SOUTH SPRING
        SUITE 201
10      ASPEN, COLORADO 81611
        (970) 925-6288
11      FAX: 925-2273
        E-MAIL: MATT@MATTHEWFERGUSON.COM
12
13  FOR PLAINTIFFS:
14      -VIA TELECONFERENCE-
15      MICHAEL REISER
        ATTORNEY AT LAW
16      1474 NORTH BROADWAY
        SUITE 300
17      WALNUT CREEK, CALIFORNIA 94596
        (925) 256-0400
18      FAX: 285-2600
        E-MAIL: MICHAEL@REISERLAW.COM
19
20  FOR THE PLAINTIFFS AND THE WITNESS:
21      GIBBS LAW GROUP
        BY:  MICHAEL L. SCHRAG, ESQ.
22      505 14TH STREET
        SUITE 1110
23      OAKLAND, CALIFORNIA 94612
        (510) 350-9718
24      FAX: (510) 350-9701
        EMAIL:  MLS@CLASSLAWGROUP.COM
25
```

Page 3

```
 1  APPEARANCES (CONTINUED):
 2
 3  FOR DEFENDANTS:
 4      GREENBERG TRAURIG
        BY: ROGER B. KAPLAN, ESQ.
 5      -AND-
        IAN MARX, ESQ (VIA TELECONFERENCE)
 6      500 CAMPUS DRIVE
        SUITE 400
 7      FLORHAM PARK, NEW JERSEY 07932-0677
        (973) 360-7957
 8      FAX: (973) 295-1310
        E-MAIL: KPLANR@GTLAW.COM
 9          MARXI@GTLAW.COM
10
11  FOR CO-DEFENDANTS, ASPEN HIGHLAND CONDOMINIUM
    ASSOCIATION:
12
        HOGAN LOVELLS
13      BY:  ANDREW MARTIN NUSSBAUM, ESQ.
        1601 WEWATTA STREET
14      SUITE 900
        DENVER, COLORADO 80202
15      (303) 899-7300
        FAX: 899-7333
16      E-MAIL: ANDREW.NUSSBUAM@HOGANLOVELLS.COM
17
18  FOR DEFENDANTS:
19  - VIA TELECONFERENCE -
20      THE MEADE FIRM, PC
        BY: TYLER MEADE, ESQ.
21      12 FUNSTON AVENUE
        SUITE A
22      SAN FRANCISCO, CALIFORNIA 94129
        (415) 724-9600
23      E-MAIL: ANNIE@MEADEFIRM.COM
24
25
```

Page 4

```
 1  APPEARANCES (CONTINUED):
 2
 3  ALSO PRESENT VIA TELECONFERENCE:
 4      KIM GRAY, MARRIOTT CORPORATE COUNSEL
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1          I N D E X
 2  WITNESS        EXAMINATION          PAGE
 3  JON ROBERT SIMON
        MR. KAPLAN            7
 4
        MR. NUSSBUAM          250
 5
 6
 7
 8
 9          E X H I B I T S
10  NO.  PAGE      DESCRIPTION
11
    EX. 1  13    EXPERT REPORT OF JON SIMON,
12             10-26-18
13  EX. 2  13    SUPPLEMENTAL EXPERT REPORT OF JON
               SIMON, 6-7-19
14
    EX. 3  118   "THE HALO EFFECT" OCTOBER 14, 2009
15
    EX. 4  121   "BRANDED DEVELOPMENTS"
16
    EX. 5  162   NATO WATERFALL DETAIL
17
    EX. 6  176   MARRIOTT VACATION CLUB INSIDER
18             BULLETIN
19  EX. 7  177   2012-2013 VACATION CLUB POINTS
               CHART
20
    EX. 8  183   "TODAY'S DISCUSSION"
21
    EX. 9  187   EMAIL STRING, 2-9-12
22
    EX. 10  215  "BRAND EQUITY:  THE HALO EFFECT
23             MEASURE"
24  EX. 11  232     MARRIOTT VACATIONS WORLDWIDE
               CORPORATION HISTORICAL PRICING
25
```

Page 18

1     Aspen to its MVC points-based
2     customers."
3          Do you see that?
4     A    Well, let me read the whole paragraph first
5 since you picked it up towards the end.
6     Q    I did.  I read the last sentence of that.
7          MR. FERGUSON:  Where are you?
8          MR. KAPLAN:  At paragraph 8.  It's at page 6
9 of his report.
10         MR. FERGUSON:  Thank you.
11         THE WITNESS:  Okay.  If you can repeat your
12 question, please.
13 BY MR. KAPLAN:
14    Q    The question is:  You constructed a model to
15 calculate the amount.  It said the amount of the profits
16 that the Marriott defendants realized.
17    A    Yes.  Subject to the definition of profits
18 that I previously gave.
19    Q    Okay.  Had you ever used that model before?
20    A    No.  Actually, this was a rather unique
21 situation and so we had to construct a model for this
22 unique situation.
23    Q    Did you ever see a similar model constructed
24 in any other context?
25    A    Not to the best of my knowledge.

Page 19

1     Q    In all of the literature concerning the halo
2 effect, have you ever seen models used to measure the
3 halo effect?
4     A    Yes.  There are models that are used to
5 measure halo effect.
6     Q    You didn't use those models?
7     A    I did not use those models.
8     Q    Those models that you're referring to in some
9 of the articles that you cite in your own report,
10 they're peer reviewed models?
11    A    I believe so.
12    Q    But you chose not to use those?
13    A    I chose not to use those.
14    Q    And the model you used was a model that you
15 constructed for this case exclusively and had never been
16 used before?
17    A    That's correct.
18    Q    And had never been subject to peer review?
19    A    Well, that's not entirely correct.  This
20 model was subject to peer review and people that I
21 worked with who are industry experts and things of that
22 nature.
23    Q    Okay.  What I'm saying, it's never been
24 subject to peer review in the sense of submitting it to
25 a publication, have peers review it to determine if it

Page 20

1 is a reliable methodology?
2     A    No, sir.  I did not follow those particular
3 tasks.
4     Q    Now, let me -- I'll come back to that issue.
5          Let me ask you:  You've got CV in front of
6 you if you want.  It's appended as -- I think it's
7 Exhibit A to your report.  It's just in front of the
8 first exhibit.
9          If you want to refer to that, it should be in
10 there.  I apologize if it's not.
11    A    Might have gotten stapled wrong.
12    Q    I'll find it for you.
13    A    Okay.  Please.
14    Q    Here we go.  Appendix A.
15         I would like to go through and ask you some
16 questions about your background, your experience, your
17 expertise.  Okay?
18    A    Okay.
19    Q    So now, your CV indicates that you have
20 experience in the hospitality industry.
21    A    About 35 years' experience.
22    Q    And also in the vacation ownership industry?
23    A    About 30 years' experience.
24    Q    And what have you done in the vacation
25 ownership industry?

Page 21

1          I know it's a very broad question, but can
2 you just summarize your expertise?
3     A    Sure.  I was the global leader for KPMG's
4 vacation ownership practice.  I served on the board of
5 directors of the American Resort Development
6 Association, the industry trade association for
7 timeshares and fractionals.  I chaired the finance
8 committee of the American Resort Development
9 Association.
10         I produced the first uniform systems of
11 accounts for timeshare.  I produced the first financial
12 performance survey for timeshare.  I was recruited to
13 run Starwood Capitals first entrée into the timeshare
14 industry.  And I've done numerous assignments on the
15 vacation ownership -- for the vacation ownership
16 industry.
17    Q    So have you been retained specifically to
18 provide consulting services with regard to branding in
19 the vacation ownership industry?
20    A    I have experience in branding the vacation
21 ownership.  I don't -- I worked at Interval Leisure
22 Group, at that time Interval International.  I studied
23 the emergence of the major hotel companies, coming into
24 this space, the timeshare industry, and the fractional
25 industry.  I consulted with people along the way about

6 (Pages 18 - 21)

Page 30

1    Sitting here today, can you say one way or
2  the other whether you opined on the causality of the
3  diminution in value in that case?
4        MR. SCHRAG: Object to form, asked and
5  answered.
6        THE WITNESS: Yes, I believe I did.
7  BY MR. KAPLAN:
8    Q   And did you apply the same methodology that
9  you used in that case to the present case?
10       MR. SCHRAG: Object to form.
11       THE WITNESS: No. Because the facts were
12 different.
13 BY MR. KAPLAN:
14   Q   So the methodology you applied in this case
15 to determine whether there was a diminution in value,
16 causation, you had never used before?
17   A   Well, every case has differences. So by that
18 point, every case will stand independent of another case
19 so you wouldn't -- it's rare that you use exactly the
20 same analysis because the facts are different.
21   Q   I understand that.
22       MR. SCHRAG: Were you done with your answer?
23 I want to make sure he's not cutting you off.
24       THE WITNESS: Yes.
25 ///

Page 31

1  BY MR. KAPLAN:
2    Q   My question is: The method or the approach
3  you took in this case to determine whether there was
4  causation with respect to a loss in value, had you ever
5  used that method before?
6    A   There's not been a case where a major
7  timeshare company merged their fractional division into
8  the timeshare division that I was part of.
9    Q   So you're saying that you couldn't -- there's
10 no literature you consulted with respect to any
11 situation in which, one, fractional ownership brand was
12 associated with another fractional ownership brand?
13       MR. SCHRAG: Object to form.
14       THE WITNESS: I would say there's only a few
15 people in the country who have my level of expertise in
16 this industry, so there's not a lot of literature on the
17 subject.
18 BY MR. KAPLAN:
19   Q   Can you answer my question?
20       Do you know if there's any literature?
21       MR. SCHRAG: Were you done with your answer?
22       THE WITNESS: No, I wasn't.
23       MR. SCHRAG: You're cutting him off a little
24 bit now.
25       THE WITNESS: I have reviewed literature not

Page 32

1  necessarily -- well, about diminution in values. But
2  there's diminution of values from macro sources and
3  their diminution from values from macro or case specific
4  sources.
5  BY MR. KAPLAN:
6    Q   Are you done with your answer?
7    A   I am.
8    Q   Can you look at paragraph 16B of your first
9  report.
10   A   I'm sorry. Which paragraph is that?
11   Q   I have 16B. It's at page 10.
12       You state:
13       "Based on my experience in the vacation
14       ownership/private residence club
15       industry, it is my opinion that when a
16       corporation provides and markets access
17       to one of its luxury private residence
18       clubs to non-owners at a much lower
19       price of entry than what owners in that
20       private residence club paid, the value
21       of ownership interest in that club
22       significantly decline."
23       Do you see that?
24   A   Yes.
25   Q   You say "based on my experience"; is it based

Page 33

1  on anything else?
2    A   No. This was a unique situation.
3    Q   So it's not based on any studies in the
4  industry; correct?
5    A   Not that I know of.
6    Q   It's not based on any literature; correct?
7    A   Third-party literature.
8    Q   Any literature in this field that you're
9  aware of?
10   A   No. This was a wholly unique event.
11   Q   Explain your methodology to determine whether
12 access by a non-owner affected the value?
13       What precisely was the methodology that you
14 applied?
15       MR. SCHRAG: Object to form.
16       THE WITNESS: I'm sorry. Affected what
17 value?
18 BY MR. KAPLAN:
19   Q   The value of the fractional interest, the
20 vacation ownership interest.
21   A   Right.
22   Q   What was -- describe for me the methodology
23 that you applied in determining whether access by
24 non-owners affected the value of the fractional
25 interest.

9 (Pages 30 - 33)

Page 34

```
 1        What was the methodology?
 2        MR. SCHRAG:  Object to form.
 3        THE WITNESS:  So when we look at the
 4  fractional industry, we look at how that industry came
 5  to be, what promises were made to the buyers of that
 6  industry, what did the product represent, and how could
 7  that product be tarnished by actions of one party to
 8  those owners of those fractional interests.
 9        So we went through that process.  We looked
10  at substantial data out there and basically looking at
11  what was the core reasons for the diminution of value as
12  a result of another party's action.
13        In St. Regis, it was one thing.  In this
14  case, it's another thing.  Both of them diminished value
15  based upon the actions of a third party.
16        In St. Regis, it was something different.  In
17  this specific case, it was the merging of a timeshare
18  platform with a fractional platform.
19  BY MR. KAPLAN:
20     Q    Are you done?
21     A    I'm done.
22     Q    All right.  So you say, "In this case, it was
23  the merging of a timeshare platform to a fractional
24  platform"; correct?
25     A    It's actually the providing access and then
```

Page 35

```
 1  finally providing the affiliation.
 2     Q    That's your conclusion, that it -- that's --
 3  that caused the diminution in value; correct?
 4        MR. SCHRAG:  Object to form.
 5        THE WITNESS:  That's correct.
 6  BY MR. KAPLAN:
 7     Q    But what was the methodology?
 8        How did you scientifically, empirically go
 9  about determining whether access, in fact, caused a
10  diminution in value?
11        What were the steps that you took --
12        MR. SCHRAG:  Object to form.
13  BY MR. KAPLAN:
14     Q    -- that could be repeated by another expert
15  to determine whether they could come out with the same
16  result?
17        Explain the steps that were taken.
18     A    All right.  So essentially, we look at the
19  original pricing of the fractional interest, how it
20  faired over time.  We look at the specifics of
21  macroeconomic issues.  We take those into consideration.
22  We then look for comparable properties that did not have
23  that similar pattern of conduct and then we measure
24  differences between the properties.
25        And we hopefully pick a large enough supply
```

Page 36

```
 1  of -- we do pick a large enough supply of properties to
 2  abstract from miscellaneous items.  But a lot of it
 3  depends on being an expert is understanding, reading the
 4  tea leaves, looking at what's going on, understanding
 5  what drives people to buy fractional interests.
 6     Q    Now, comparing the prices for the Ritz at
 7  Aspen and others -- you didn't do that; correct?
 8     A    Maurice Robinson did most of that comparison,
 9  with my consultation.
10     Q    Right.
11        But that assumed that there was causation --
12  he assumed that there was causation in making that
13  analysis; isn't that correct?
14     A    Maurice relied on my opinion on causation.
15     Q    So before you do the comparison, you have to
16  determine whether there's causation.
17        And what I'm trying to understand is, your --
18  none of that is mentioned in your report, isn't that
19  correct, what you just said?
20     A    Well, not specifically, but -- may I finish?
21     Q    Yeah.  Sure.
22     A    Not specifically, but, of course, you create
23  the situation that causality does determine this
24  diminution of value.  But we have a benchmark at the
25  front end of what do other projects sell for.
```

Page 37

```
 1        So in coming to that causality, you do look
 2  at what the other projects sold for.  It's not
 3  necessarily an output of -- other projects don't sell
 4  for something because of the causality.  The causality
 5  is specific to a specific project.
 6     Q    Okay.  So going back to 16B, in the first
 7  sentence, it says, in front of you, it says, "Based
 8  upon my experience," and then the sentence goes on to
 9  read.
10        And then in the second sentence, it says:
11        "My experience and commonsense indicate
12        that potential purchasers on the
13        secondary market would be far less
14        willing to pay a high entry price for
15        28 nights, plus annual maintenance fees
16        and taxes to own a fractional unit in a
17        purportedly private residence club, if
18        they could gain access to the same club
19        for a fraction of that price with
20        significantly lower purchase
21        requirements and maintenance."
22        Do you see that?
23     A    I do.
24     Q    So in that sentence, you're referring to "my
25  experience and commonsense"; correct?
```

10 (Pages 34 - 37)

Page 66

1 Club has remained the same; isn't that correct?
2    A    That's an interesting question, because the
3 question then becomes was the brand diluted?
4    Q    I haven't asked -- I asked you if the brand
5 for the Ritz-Carlton Aspen Highlands has remained the
6 same; correct?
7    A    Is the club still called the Ritz-Carlton
8 Aspen Highlands, yes.
9    Q    Do you know if the brand the Ritz-Carlton has
10 been adversely affected?
11    A    I would say it has in the opinion of the
12 owners.
13    Q    Do you know if -- have you consulted any
14 objective sources to determine if the brand, the
15 Ritz-Carlton, has been adversely affected?
16    A    By what?
17    Q    By anything by the affiliation, the brand
18 Ritz-Carlton?
19    A    Well, are you talking about the brand
20 separate and distinct from the Ritz-Carlton Aspen?
21    Q    First I'm talking about the brand
22 Ritz-Carlton.
23    A    No.  But the Ritz-Carlton in Aspen has
24 definitely been affected.
25    Q    We can agree the brand Ritz-Carlton, that

Page 67

1 brand is as strong as it's ever been?
2        MR. SCHRAG:  Object to form.
3        THE WITNESS:  I don't have any evidence that
4 it is or it isn't.
5 BY MR. KAPLAN:
6    Q    Are you familiar with publications like
7 JP Powers?
8    A    Yes.
9    Q    Are you familiar with the degree to which
10 Ritz-Carlton has been rated in that?
11    A    Again, those are subjective ratings.  By
12 using your own -- what you tend to call empirical, most
13 of those don't use that.  There is some survey data
14 about what people think about the Ritz-Carlton brand,
15 and to best of my knowledge, it's still a well-regarded
16 brand.
17    Q    So you discount subjective responses to
18 subjective as not being reliable?
19        MR. SCHRAG:  Object to form.
20        THE WITNESS:  Not at all.  I think it's part
21 of the empirical body of evidence.
22 BY MR. KAPLAN:
23    Q    Take a look at paragraph 34.  You say:
24        "Based on my knowledge and industry
25        experience, the value of interest in

Page 68

1        the private residence club can
2        drastically decline if the club's
3        exclusivity is destroyed."
4        Do you see that?
5    A    Yes.
6    Q    Again, as you sit here today, this is a
7 statement about a proposition in the industry.
8        Are there any publications, treatises,
9 articles that you can reference that supports this
10 statement?
11    A    No.  This statement specifically goes to my
12 knowledge and my industry experience.
13    Q    But you don't -- it's true that you can't
14 reference and you haven't referenced anything that
15 says -- that supports the proposition that the value of
16 interest in a private residence club can drastically
17 decline if the club's exclusivity is destroyed?
18    A    We're somewhat playing games here.
19        The fact was that the buyers of the
20 Ritz-Carlton Club were promised exclusive access.  All
21 right?  That exclusive access was altered by the
22 defendants in this case.  Such alterations, in my
23 experience and based on my knowledge of this industry,
24 led to the diminution of value.
25    Q    In your opinion?

Page 69

1    A    Yes, in my opinion.
2    Q    And -- but I want to know:  Is there an
3 industry source that supports your proposition that the
4 value of interest in a private residence club can
5 drastically decline if the club's exclusivity is
6 destroyed?
7    A    In my experience, the defendants' egregious
8 behavior in this specific circumstance stands pretty
9 much on its own.  There's no other area that I've seen
10 exclusivity so destroyed in a high-end fractional that
11 promised exclusivity as in this case.
12    Q    Now, I'm going to ask the question one more
13 time.
14        MR. KAPLAN:  Can I have it read back.
15        (The record was read as follows:
16        Q    But I want to know:  Is there an
17        industry source that supports your
18        proposition that the value of
19        interest in a private residence club
20        can drastically decline if the club's
21        exclusivity is destroyed?)
22        THE WITNESS:  Define an industry source.  I
23 consider myself an industry source.
24 BY MR. KAPLAN:
25    Q    A publication, a peer review article, a study

18 (Pages 66 - 69)

Page 70

1 that someone can reference to determine whether your
2 opinion is based upon industry standards?
3       Is there something I can look at that
4 supports that proposition in the industry?
5       MR. SCHRAG: Object to form.
6       THE WITNESS: Unfortunately your -- the
7 defendants in this case are one of the very few
8 exceptions who violated that, so there wouldn't be a lot
9 of writing to that.
10 BY MR. KAPLAN:
11    Q   Your answer --
12       MR. SCHRAG: Objection.
13       Let him finish.
14 BY MR. KAPLAN:
15    Q   Are you done?
16       MR. FERGUSON: You're cutting him off.
17       THE WITNESS: I kind of forgot where I was.
18 BY MR. KAPLAN:
19    Q   Your answer to that is no, there is no
20 industry publication article or a resource that I can
21 look at that supports the proposition that the value of
22 interest in a private residence club can drastically
23 decline if the club's exclusivity is destroyed?
24       The answer is no; correct?
25    A   No, it's not correct.

Page 71

1    Q   Then please cite me the industry source.
2    A   No.  You're asking me to make an absolute
3 determination as sitting here right now. What I'm
4 telling you, the most I can tell you is I specifically
5 have not seen another source.  I'm not going to say
6 there isn't another source out there that does say that.
7       Again, there may be other expert opinions and
8 other cases that absolutely parrot my opinion.  I think
9 my opinion is based upon commonsense and I think my
10 opinion encapsulates this specific situation.
11    Q   As you sit here today, you cannot refer me to
12 such an industry source or publication?
13    A   As I sit here today, I don't have one at my
14 fingertips, but I would be happy to look for you.
15    Q   You had four or five months --
16       MR. SCHRAG: Objection; asked and answered.
17 BY MR. KAPLAN:
18    Q   -- to prepare your report?
19    A   That question was never asked of me.
20    Q   This is your statement in your report;
21 correct?
22    A   I stand by that statement.
23    Q   And you had plenty of time to support that
24 statement if you wanted to; correct?
25       MR. SCHRAG: Objection; asked and answered.

Page 72

1       THE WITNESS: I think you're
2 mischaracterizing the statement.  It says "based on my
3 knowledge and experience."
4 BY MR. KAPLAN:
5    Q   So this isn't based upon what's accepted in
6 the industry or not, this is simply based upon your
7 knowledge and experience?
8       MR. SCHRAG: Object to form, misstates
9 testimony.
10       THE WITNESS: No.  I think my knowledge in
11 industry and experience is what's expected in the
12 industry.
13 BY MR. KAPLAN:
14    Q   So, again, all I want to do is confirm,
15 Mr. Simon, that as you sit here today, there's no
16 industry source or article or other expert opinion that
17 you can refer to me that supports the proposition that
18 the value of interest in a private residence club can
19 drastically decline if the club's exclusivity is
20 destroyed?
21       MR. SCHRAG: Objection; asked and answered.
22       THE WITNESS: I'll stand with my prior
23 testimony.
24 BY MR. KAPLAN:
25    Q   Which is "no"?

Page 73

1    A   No --
2    Q   You cannot refer me -- refer me to another
3 expert that has stated that opinion.
4       Can you give me the name of an expert?
5    A   I gave you the testimony before that, because
6 I'm sitting here right now, does not mean that there
7 isn't.
8    Q   So as you sit here right now, you cannot
9 provide me with such a source; correct?
10    A   That would be correct.
11    Q   Right.
12       Now, you say that it can drastically decline.
13       Does that mean that it always drastically
14 declined?
15    A   In my opinion, if you violate exclusivity in
16 a private fractional club, yes, it would always decline.
17    Q   Let me ask you: If you violate that
18 exclusivity for one person that accesses the club, is
19 that -- will it drastically decline if only one other
20 person accesses the club?
21    A   It would depend who that person is.
22    Q   One time?  Once?
23    A   It depends how that exclusivity is broadcast
24 to the public.
25    Q   Is there a rule of thumb that you can apply

19 (Pages 70 - 73)

Page 74

1 to what extent exclusivity needs to be lost before the
2 value is affected?
3     A    I would say when you bring the knowledge into
4 the public domain that a project is no longer exclusive,
5 that would constitute the point in which would trigger
6 diminution in value.
7     Q    It doesn't matter the extent to which
8 exclusivity is lost?
9         MR. SCHRAG:  Object to form.
10        THE WITNESS:  No.  I'm glad you asked this
11 because this is all about the fulfillment question.
12        Fulfillment is irrelevant in this specific
13 case.  It has no relevance whatsoever.  How many people
14 actually stay?  It could be one person.  It could be
15 10,000 people.  The fact that you advertise that you are
16 providing access to people who are not exclusive members
17 of this club is what does the damage.
18 BY MR. KAPLAN:
19    Q    In paragraph 34, you say, "The key is
20 access."
21        Do you see that in the middle of the
22 paragraph?
23    A    I do.
24    Q    You say:
25        "The key is access.  If the general

Page 75

1         public can access the same private
2         residence club for a far lower entry
3         price than owner's purchase prices and
4         maintenance fee commitments, then the
5         club has lost substantial exclusivity."
6         Do you see that?
7     A    I do.
8     Q    And you go on to say:
9         "And units within the club are
10        substantially more likely to decline in
11        value."
12        So say the key is access; correct?
13    A    The key is advertising access.
14    Q    Well, you say here the key is access.
15    A    Well, I say it in other parts of the report
16 that it's about advertising access.
17    Q    Show me where in your report in causation you
18 say it's the advertising of the access.
19    A    You have to give me a couple minutes.  I will
20 go through this.
21        MR. KAPLAN:  Sure.  Do you want to take a
22 break?
23        MR. SCHRAG:  Sure.
24        MR. KAPLAN:  I want to talk about it in terms
25 of the loss of value.

Page 76

1         (Whereupon, a recess was held
2         from 11:11 a.m. to 11:19 a.m.)
3         MR. KAPLAN:  Back on the record.
4 BY MR. KAPLAN:
5     Q    Just to pick up, Mr. Simon, in paragraph 34,
6 it is correct you say the key is access?
7     A    Yes.
8         MR. SCHRAG:  I thought a question was pending
9 where you asked him for some sources --
10        MR. KAPLAN:  I did.
11        MR. SCHRAG:  -- and that's why we took a
12 break.
13        MR. KAPLAN:  Right.
14        MR. SCHRAG:  Do you want the sources?
15        MR. KAPLAN:  The sources -- why don't we
16 repeat the last question.
17        (The record was read as follows:
18        Q    Show me where in your report in
19        causation you say it's the
20        advertising of the access.)
21        THE WITNESS:  I went back and I had a chance
22 to look at my report and other things.  There's a number
23 of areas that come to mind.
24        One of them is your own appraiser --
25 defendants' own appraiser, CW, came out and directly

Page 77

1 said that providing access to the Ritz-Carlton by the
2 Marriott Vacations Club system would diminish values.
3 So there's a source, and that's a certified appraiser.
4         You also have Mark Earl did a report for
5 Bachelor Gulch Club and said that if it continued to
6 merge the systems and provide access, that would lead to
7 diminution of value.
8         There's a specific -- it's not exactly on
9 point, but Mary Lynn Clark talks about in a memo, how do
10 I leverage this access to Ritz-Carlton?  And she doesn't
11 speak to specifically the diminution.  That's more the
12 CW, the defendants' own appraiser, who they brought in.
13 BY MR. KAPLAN:
14    Q    You didn't cite that in your report?
15    A    I'm not sure if I did.  If I didn't, it was
16 cited in Maurice Robinson's report.
17    Q    Now, just moving on.  You say in
18 paragraph 34:
19        "If the general public can access the
20        same private residence club."
21        What are you referring to as the "general
22 public"?
23    A    In this specific instance, we're really
24 talking about introducing a commercial operation into a
25 private residence club.  In that case, it was basically

20 (Pages 74 - 77)

Page 78

1 opening up to the entire general public of MVCI members.
2 So that's what I was referring to.
3     Q    It's not the general public, it would have to
4 be a member of the Marriott Vacation Club; correct?
5     A    Well, there's a nuance position here, and
6 that is that members by right of acquisition of a deed
7 are allowed to rent their units. But I don't consider
8 that providing access to the general public. I consider
9 that as a member exercising a right that runs with the
10 ownership of the real estate.
11    Q    Right.
12        That an owner can let anyone he wants access
13 his or her fractional interest; correct?
14    A    An owner can rent his unit out.
15    Q    Or let someone stay there as a guest?
16    A    Or let somebody stay there as a guest.
17    Q    Right.
18        Now, are there any controls on who an owner
19 can rent to, that you're aware of?
20    A    No. But that doesn't invalidate the
21 question. The concept is similar to a private country
22 club membership. I can let my friends play at my
23 private country club membership at my discretion.
24 That's allowed. It doesn't violate the exclusivity of
25 the country club.

Page 79

1     Q    Now, do you know -- we've been talking --
2 touching on what the affiliation is.
3        Do you know what the affiliation is?
4     A    Yes.
5     Q    The affiliation, do you know when it
6 occurred?
7        Your report says that there was a -- it was a
8 joinder and acknowledgment by the association board in
9 April 2014; correct?
10    A    That's correct.
11    Q    Your report also says it became operational
12 in December 2014?
13    A    Right. For the 2015 use year.
14    Q    For the 2015 use year.
15        Now, let me ask you about prior to the
16 affiliation, okay?
17        Access to the Ritz-Carlton at Aspen was
18 limited to owners; correct?
19    A    No.
20    Q    Not limited. Let me strike that.
21        Access -- owners had access; correct?
22    A    Owners had access.
23    Q    Guests had access?
24    A    Guests of owners had access.
25    Q    Invitees had access?

Page 80

1     A    Invitees had access.
2     Q    Renters had access; right?
3     A    Renters from owners would have access.
4     Q    There were external exchange clubs, such as
5 Abercrombie and Kent; are you familiar with that?
6     A    I am.
7     Q    There was ThirdHome; correct?
8     A    I don't know exactly when ThirdHome came in,
9 but ThirdHome is more of a kind of exchange. You put
10 one home up for the other home.
11    Q    That permitted members of the general public
12 to access the Ritz?
13        MR. SCHRAG: Object to form.
14        THE WITNESS: No. Again, this is an
15 exclusive club that makes itself determination about who
16 they let in and who they would exchange with. I don't
17 consider that necessarily the general public.
18 BY MR. KAPLAN:
19    Q    Well, any member of Abercrombie and Kent
20 could access the club to the extent that a member
21 exchanged their time at the club to exchange for an
22 Abercrombie and Kent time; correct?
23    A    Well, yeah. It's a good point.
24        It started to get so abusive that they
25 terminated that relationship because Abercrombie and

Page 81

1 Kent was accessing the club way too frequently, and as a
2 result, everybody was concerned about diminishing the
3 value of the club.
4     Q    So you're saying the extent of the access is
5 important in determining loss of value?
6     A    No, it's not that. It's the actual
7 advertising to a huge group of access. So you're
8 saying -- I -- well, I'll leave my answer at that.
9     Q    Prior to the affiliation, members of MVC
10 could access using developer inventory; correct?
11    A    That's correct.
12    Q    Developer inventory is inventory that was
13 owned by an owner, correct, the developer; is that
14 correct? Yes or no?
15        MR. SCHRAG: Object to form.
16        THE WITNESS: I don't consider developer
17 inventory to be analogous to owner inventory, meaning
18 the people who actually purchased in it.
19 BY MR. KAPLAN:
20    Q    I didn't ask you that question.
21        MR. SCHRAG: Were you done?
22        THE WITNESS: I'm done.
23 BY MR. KAPLAN:
24    Q    Is a developer an owner?
25    A    Not in the sense of the other owners, no.

21 (Pages 78 - 81)

Page 90

1    THE WITNESS: No. I believe the sixth
2 amended complaint discusses specifically access from
3 other areas, not just the affiliation.
4 BY MR. KAPLAN:
5    Q    That's your testimony, that the sixth amended
6 complaint discusses that?
7         MR. SCHRAG: Object to form, calls for a
8 legal conclusion.
9 BY MR. KAPLAN:
10    Q    Okay. You say in paragraph 5 that the court
11 claim in this case is through the affiliation -- a core
12 claim in this case is through the affiliation; correct?
13    A    Paragraph 5 of which document?
14    Q    Your first report.
15         You say:
16         "At the core of the fiduciary duty and
17         constructive fraud claims is the
18         Marriott defendants' actions in
19         affiliating the Ritz Aspen with the
20         less exclusive and lower priced
21         Marriott vacation club, MVC."
22         MR. SCHRAG: Can you finish the rest of it?
23         THE WITNESS: I was going to say that.
24         MR. KAPLAN: I will.
25         MR. SCHRAG: Thank you.

Page 91

1 BY MR. KAPLAN:
2    Q    You say that's at the core of the fiduciary
3 duty.
4         MR. SCHRAG: Can you finish.
5         MR. KAPLAN: I will. Please stop
6 interrupting me.
7 BY MR. KAPLAN:
8    Q    And then you say:
9         "And even before the official
10         affiliation allowing MVC members to use
11         their MVC points to purchase nights at
12         the Ritz Aspen on more favorable and
13         less expensive terms than provided to
14         plaintiffs."
15         Do you see that?
16    A    I do.
17    Q    Do you know whether or not that's actually a
18 claim in the case?
19         MR. SCHRAG: Objection; calls for a legal
20 conclusion.
21 BY MR. KAPLAN:
22    Q    Do you know?
23    A    Do I know that?
24    Q    That permitting access to the Ritz Aspen
25 prior to the official affiliation is part of the claims

Page 92

1 in this case?
2         MR. SCHRAG: Objection; calls for a legal
3 conclusion.
4         THE WITNESS: That's a legal conclusion.
5 BY MR. KAPLAN:
6    Q    Okay. I'm asking you: Do you know one way
7 or the other?
8    A    Again, it's a legal conclusion.
9    Q    But I'm asking you about your knowledge.
10         MR. SCHRAG: Same objection.
11         THE WITNESS: Same answer.
12 BY MR. KAPLAN:
13    Q    Is your report based on the assumption that
14 it is part of the claims in the case?
15    A    My report is based upon that both the access
16 and the affiliation led to the diminution of value and
17 allowed the defendants to earn profits they otherwise
18 should not have had.
19    Q    Does that mean that your report, both on the
20 cause -- on the diminution in value and the halo effect
21 is based on the assumption that access prior to the
22 affiliation is part of plaintiffs' claims in this case?
23         MR. SCHRAG: Asked and answered.
24         THE WITNESS: I believe I answered that.
25 ///

Page 93

1 BY MR. KAPLAN:
2    Q    Is that a "yes"?
3    A    I believe I answered it.
4    Q    Is it a "yes"?
5    A    We can go back and read my answer.
6    Q    Well, I'm asking you now: Is your assumption
7 that access prior to the affiliation is part of
8 plaintiffs' claims in this case?
9    A    From a legal perspective, no. I don't know.
10    Q    I'm not asking from a legal perspective.
11         I'm asking from the perspective of the
12 opinion that you have rendered that has -- for example,
13 you're considering causation of diminution in value,
14 you're considering as part of that, the access that was
15 granted prior to the affiliation; correct?
16    A    I think both access prior to the affiliation
17 and the affiliation caused diminution in value.
18    Q    Okay. Now, so that's part of your opinion;
19 correct?
20    A    That would be correct.
21    Q    At any point in time did you through a
22 regression analysis or any other analysis attempt to
23 distinguish between the causation caused by the conduct
24 prior to the affiliation, the access prior to the
25 affiliation, and the access as a result of the

24 (Pages 90 - 93)

Page 94

1 affiliation?
2         MR. SCHRAG:  Object to form.
3         THE WITNESS:  Yes.  There was an analysis.
4 BY MR. KAPLAN:
5     Q    What was the analysis in terms of trying to
6 separate out the causation caused by one versus the
7 other?
8     A    The analysis includes many things.  It
9 includes reading the CW appraisal which discusses it, it
10 involved looking at the APCO survey.  There's analysis
11 of many different things.
12        If you're talking about specifically
13 regression, I reject that as the only way to establish
14 that.
15    Q    Did you in any way determine what portion of
16 the causation was caused by access prior to the
17 affiliation versus access through the affiliation?
18        MR. SCHRAG:  Object to form.
19        THE WITNESS:  I consider it as one continuous
20 action on the parts of the defendants, that they
21 provided access and then they permanized access with the
22 affiliation.  They're not two distinct events.
23 BY MR. KAPLAN:
24    Q    Okay.  So in your report, you say phase I was
25 access prior and phase II was the affiliation.

Page 95

1     A    I do remember that.
2     Q    So what I'm asking you is:  Did you ever just
3 look at what harm was caused by phase II, the
4 affiliation, without consideration of phase I, which was
5 access prior to the affiliation?
6     A    Well, the way I laid out of my opinion, it
7 absolutely can be done because it does talk about
8 phase I and phase II.  So if you wanted to do that
9 analysis, you could do that analysis.  We bifurcate the
10 two pieces in this opinion, but it can be done.
11    Q    It can be done, but you didn't do it?
12    A    Right.
13    Q    With regard -- and I'll get to the halo
14 effect as well.
15        In considering the halo effect, you also
16 considered the access prior to the affiliation as well
17 as the access as a result of the affiliation; correct?
18    A    Repeat the question.
19    Q    Well, you identify halo periods prior to the
20 affiliation in 2011, '12 and '13 and you also identify a
21 halo period in 2015.
22    A    That's correct.
23    Q    So the halo periods -- or the halo price
24 increases prior to the affiliation that you identify in
25 '11, '12 and '13 had nothing to do with the affiliation;

Page 96

1 correct?
2     A    They are separate and distinct from the
3 affiliation.
4     Q    And did you ever separate just the halo
5 effect from the affiliation as opposed to also
6 considering the effect of access prior to the
7 affiliation?
8         MR. SCHRAG:  Object to form.
9         THE WITNESS:  On the diminution side,
10 absolutely.  On the disgorgement side, it wasn't cleanly
11 separated.
12 BY MR. KAPLAN:
13    Q    Okay.  When you say "on the diminution side,"
14 where in your report do you separate the diminution in
15 value caused just by the affiliation as opposed to
16 conduct prior to the affiliation -- access through other
17 means?
18    A    I think Maurice Robinson does an excellent
19 job in basically listing how the values fell through the
20 access period and into the affiliation period.
21    Q    So you're relying on Robinson for that?
22    A    For the quantification of the diminution.
23    Q    Okay.  I'm asking you about for the
24 causation.  That's what you're testifying to.
25        Where in your report do you separate out the

Page 97

1 causation arising from the affiliation, the diminution
2 in value, as opposed to or separated from the causation
3 arising from access prior to the affiliation?
4     A    I think it's one continual causation.
5     Q    So the answer is you didn't separate them?
6     A    Separate the causation?
7     Q    Yes.
8     A    Like I said, the causation is one continuous
9 thing.  So yes, it looks at the causation of -- it
10 specifically says that the causation -- that the
11 affiliation essentially made the causation permanent.
12    Q    I understand that's what your opinion says.
13        But if -- strike that.
14        So whatever loss -- strike that.
15        Did you look at whether the loss in value
16 occurring prior to the affiliation continued to go down
17 in value or remained the same or was affected
18 differently after the affiliation?
19        MR. SCHRAG:  Object to form.
20        THE WITNESS:  I know causation is like a
21 river flowing downhill.  It just continues to go forward
22 to do that.  If you stop all access, the damage still
23 would have been done.
24        So I'm not sure exactly what you're trying to
25 separate here.

25 (Pages 94 - 97)

Page 98

1 BY MR. KAPLAN:
2    Q    So you're saying that if -- even if the
3 affiliation did not occur, then the access prior to the
4 affiliation through developer inventory would already
5 have occurred; correct?
6         MR. SCHRAG:  Object to form.
7         THE WITNESS:  It would have been -- again, it
8 was a continuation.  The values continue to fall.  They
9 did not stop falling.  They continue to fall and we
10 measured them relative to other comparables who had not
11 done that.
12 BY MR. KAPLAN:
13    Q    Mr. Robinson did, but he's not opining on
14 causation and you are.
15         And what I'm asking you is:  Is it your
16 opinion that the access through the Explorer club prior
17 to the affiliation, that damage would already have been
18 done; correct?  Isn't that what you said?
19         MR. SCHRAG:  Object to form.
20         THE WITNESS:  I said that that damage -- that
21 would have started the damage.
22 BY MR. KAPLAN:
23    Q    So whatever that damage would have been done
24 prior to 2015 would have occurred; correct?
25         MR. SCHRAG:  Object to form.

Page 99

1         THE WITNESS:  Yes.
2 BY MR. KAPLAN:
3    Q    And so in addition, whatever damage may have
4 occurred to the Ritz-Carlton Club brand from putting
5 inventory into the trust, that's separate -- can you
6 identify the separate causation from that as opposed to
7 the affiliation?
8         Have you done that?
9         MR. SCHRAG:  Object to form.
10        THE WITNESS:  Yes.  There were specifically
11 documents that went out that were talking about how do
12 we start scripting this post-affiliation and looking at
13 how we advertise this to the world that you can access
14 it through affiliation.  So yes.
15 BY MR. KAPLAN:
16    Q    Okay.  But that wasn't true for the Ritz,
17 that was true for other clubs through -- I'm talking
18 about trust inventory.
19        MR. SCHRAG:  Object to form.
20        THE WITNESS:  We've already discussed that
21 trust inventory -- that Aspen didn't have any inventory
22 that was put in the trust, so I'm uncertain what you're
23 asking.
24 BY MR. KAPLAN:
25    Q    Okay.  I'll move on.

Page 100

1         Now, you say in paragraph 35 that:
2         "Any MVC member who purchased enough
3         points can access the Ritz Aspen."
4         My first question is --
5    A    Wait.  Do you mind if I get there?  Sorry.
6         MR. NUSSBAUM:  What paragraph, Roger?
7         MR. KAPLAN:  Paragraph 35.  It's on page 23.
8 BY MR. KAPLAN:
9    Q    (Reading):
10        "Any MVC member who purchased enough
11        points could now have access to Ritz
12        Aspen without having to purchase four
13        weeks or pay the associated annual
14        maintenance fees."
15        Do you see that?
16   A    I do.
17   Q    Now, you understand prior to the affiliation,
18 only Premier and Premier Plus members could access?
19   A    Yes.
20   Q    And after the affiliation, it was open to all
21 members?
22   A    Yes.
23   Q    Assuming they had the points that were
24 required?
25   A    Yes.

Page 101

1    Q    Now, let me ask you:  Did they have the same
2 degree of access as owners do?
3    A    Well, they had -- Premier and Premier Plus
4 had 13-month reservation windows, which is similar to
5 what owners have.  Premier Elite could access it on a
6 per diem basis.  Just regular Premier members were
7 required to do it on a weekly basis.  So there was
8 similar accessibility, yes.
9    Q    Owners are guaranteed their time at the club;
10 correct?
11   A    Yes.
12   Q    Are MVC members guaranteed any time?
13   A    They're not guaranteed.
14   Q    It depends upon availability?
15   A    It depends upon availability.
16   Q    It also depends upon a competition within
17 MVC?
18   A    I don't know what you mean by "competition."
19   Q    Well, if you have a hundred members, MVC
20 members seeking to use points for the same week, then
21 you're in competition with MVC members, you don't have a
22 guarantee?
23   A    I think that's reasonable.
24   Q    So there's no guarantee either before the
25 affiliation or after it that if you had sufficient

26 (Pages 98 - 101)

Page 102

1 points, you would be able to stay at any of these clubs;
2 correct?
3     A    Well, for any individual person, no.  But
4 because the inventory was deeded into the trust, that
5 meant yes, they did have guaranteed access for trust
6 members for a certain amount.
7         Now, any individual member of the trust may
8 not be guaranteed access, but there was guaranteed
9 access by the trust by the very nature of putting it
10 into the trust.
11    Q    But that's trust inventory?
12    A    That's trust inventory.
13    Q    Has nothing to do with Ritz Aspen?
14    A    You had developer inventory prior.
15    Q    The developer inventory we've already
16 established is separate from the affiliation?
17    A    Developer inventory is separate from the
18 affiliation of the Ritz-Carlton Aspen.
19    Q    Right.
20        Now, do you have any idea what it could cost
21 an MVC member to acquire a similar amount of points to
22 be able to have four weeks of access to Ritz Aspen?
23    A    That's not the operative question in my mind.
24 The operative question -- it may cost more, but the
25 basic issue here is that -- it's twofold.

Page 103

1         One, I did not have to commit and buy four
2 weeks of inventory.  I could buy substantially less.
3 Then you had the capability of borrowing and banking
4 points to leverage the amount of points you have.
5         Finally, you have the aspect that the
6 maintenance fees even on equal increments were lower for
7 people in the MVCI platform.  So that basically raises
8 the extremely logical proposition, why would you buy
9 this inventory.
10        It gets further eroded by the fact that you
11 can go into Red Week, eBay and a lot of other places and
12 buy that inventory for two, three, four dollars a point,
13 substantially below what the developer sells it at.
14        So you basically killed the entire value
15 proposition at that point.
16    Q    My question is:  Did you make a determination
17 as to how many points and what the cost would be to have
18 a similar amount of access?
19    A    To which property?
20    Q    To Ritz Aspen.
21    A    To the Ritz Aspen?  Sure.  It's -- I think
22 it's basically outlined in a Lee Cunningham webinar.  I
23 believe that was sometime in August of 2012 when he
24 discusses we're trying to protect your values and he
25 goes on to give what I think is a very flawed

Page 104

1 hypothetical example in saying, hey, this is how much a
2 point costs basically at retail.
3         All right.  If you multiplied that retail
4 price by the number of weeks and what it requires for a
5 week's stay, depending on which time of year, it's more
6 money.  But that's not the reality.  It's a completely
7 contrived hypothetical.
8    Q    My question was:  Did you do an analysis of
9 what it would cost to buy a sufficient number of points?
10    A    We looked at Cunningham's example and we
11 don't have a problem with the contrived hypothetical.
12 But it's a contrived hypothetical, nonetheless.
13    Q    In your opinion?
14    A    No.  It's a contrived hypothetical.
15    Q    Is there any industry source that indicates
16 that the degree to which access, meaning the degree to
17 which access by non-owner would be required before
18 valuation would be affected?
19        MR. SCHRAG:  Objection.
20        THE WITNESS:  Again, I think I testified to
21 this.  All right?  You keep hitting on access a
22 fulfillment argument.  That's irrelevant in my mind.  In
23 my opinion, it's completely irrelevant.
24        Didn't matter if one room night was fulfilled
25 or 10,000 were fulfilled there.  The very fact that

Page 105

1 you're advertising now the merger of the two systems and
2 the ability for timeshare members who pay a lower price
3 to access the property is what destroys the values.
4 BY MR. KAPLAN:
5    Q    Did you compare the extent of rental access
6 to access using MVC points?
7    A    Whose rental access?
8    Q    Rentals by owners?
9    A    Which owners?
10    Q    Owners at Ritz Aspen?
11    A    Are you separating owners from Ritz Aspen
12 from Marriott's developer ownership inventory or the
13 individual owners?
14    Q    No.  The owners.  The individual owners.
15        Did you look at that?
16    A    Okay.  The individual owners, the people who
17 bought from the developer?
18    Q    Yes.
19        Did you look at the relative degree of rental
20 access versus access by MVC points?
21    A    I'll stick with my previous answers.  Again,
22 it's irrelevant.
23    Q    The answer is "no"?
24    A    The answer is not no.  "It's irrelevant" is
25 the answer.

27 (Pages 102 - 105)

Page 106

1  Q   My question is: Did you look at that?
2  A   Of course we looked at it.
3  Q   And you considered it not relevant?
4  A   No -- yes. I completely considered it not
5  relevant.
6  Q   Would you agree that rental access was more
7  than access through MVC points?
8  A   I would agree the fulfillment of rental
9  access was more.
10  Q   So to the extent the, quote, "general public"
11  could access Ritz Aspen, more of that access came
12  through renters than through MVC owners using points;
13  correct?
14  MR. SCHRAG: Object to form.
15  THE WITNESS: No. Actually, if you looked
16  at -- well, it's kind of -- it's a little bit
17  misleading.
18  If you look at the number of people who
19  registered the weeks -- well, strike that.
20  Repeat your question. I'm sorry.
21  MR. KAPLAN: Could you read my question back.
22  (The record was read as follows:
23  Q   So to the extent the, quote,
24  "general public" could access Ritz
25  Aspen, more of that access came

Page 107

1  through renters than through MVC
2  owners using points; correct?)
3  THE WITNESS: As a factual matter, there were
4  more occupied rooms by renters. However, you couldn't
5  distinguish those renters as whether they were family
6  members, whether they were relatives, whether they were
7  friends.
8  So yes, as a fact there were actually more
9  rental nights, but, again, I think that's irrelevant to
10  the question.
11  BY MR. KAPLAN:
12  Q   So did you -- in terms of effect on
13  valuation, if someone was interested in not securing
14  four nights -- four weeks every year, as you indicated
15  previously, but only one week, they could access it
16  through a rental, correct, if it was available?
17  A   It's one of the ways, yes.
18  Q   Okay. So that would be an alternative to
19  purchasing a fractional interest?
20  A   It would be as long as the owners provided
21  that access.
22  Q   Right.
23  And it would be the owner's choice to do
24  that; correct?
25  A   It's in the owner's discretion and that's why

Page 108

1  I separate that from the merger of the Marriott
2  commercial system.
3  The owners have that ability to pull that
4  access at any time, to give that access at their whim.
5  It's their guest. It's their people that they're
6  renting to. That's very different for Marriott
7  Vacations providing commercial access.
8  Q   We've already established that once the
9  affiliation was in effect and there was no longer any
10  developer inventory in Ritz Aspen, the only way an MVC
11  points owner could access is if an owner chose to give
12  their week or weeks into the MVC system; correct?
13  A   Yes. Through that commercial system, yes.
14  Q   They could have either chosen to do that and
15  receive points; correct?
16  A   Correct.
17  Q   Or they could have chosen if they didn't want
18  to use that week, to give it to a rental broker and see
19  if they could rent it?
20  A   They didn't have to give it to a rental
21  broker. They could have rented it to themselves.
22  Q   They could've given it to any Tom, Dick or
23  Harry or given it to a broker to rent?
24  A   That was the right that ran with the real
25  estate, yes.

Page 109

1  Q   So in looking at -- so if I'm a potential
2  purchaser of -- let's say I'd like to stay at the Ritz
3  Aspen and I'd like to do it on an annual basis, but I
4  only want to do it once a year, having a rental market
5  gives me an alternative to purchase it; correct?
6  A   Without incurring the associated liability,
7  it could if that rental access was out there. It's
8  somewhat limited. It's very limited.
9  Q   But you've already testified that the rental
10  access was more than the MVC points access?
11  A   I also testified that it's irrelevant.
12  Q   But you testified that it was more?
13  A   As a fact, yes.
14  Q   So if I'm looking at a potential purchase on
15  the secondary market of a Ritz Aspen fractional
16  interest, an alternative is to look at the rental market
17  and see if I can rent weeks there; correct?
18  A   You know, I would like to go back and examine
19  the question we said -- where I said as a fact it is.
20  We have corporate documentation. That
21  documentation's not been audited. I don't know the
22  integrity of that documentation.
23  As proposed or delivered by the defendants in
24  this case, it does show that there was higher rentals by
25  owners than there were through MVCI points.

28 (Pages 106 - 109)

Page 110

1    Q    So in determining the effect on value, as
2  it -- strike that.
3        In the portion of your report that looks at
4  the causation of diminution in value --
5        Are you with me so far?
6    A    I am.
7    Q    -- one alternative to a potential purchaser
8  is to rent from owners, to the extent owners are putting
9  their units for rent, or they could purchase through MVC
10 and hope to be able to use their points at Ritz Aspen if
11 those weeks were available and if they can be the
12 successful competitor within the MVC system to actually
13 get that unit -- to actually get that week; correct.
14        Those would be alternatives to actually
15 purchasing a fractional interest?
16        MR. SCHRAG: Object to form.
17        THE WITNESS: Well, I think you said
18 "purchase from MVCI." They could also purchase on the
19 Internet points.
20 BY MR. KAPLAN:
21   Q    Right.
22        So you have all these alternatives if someone
23 wants to stay at the Ritz Aspen; correct?
24   A    You have different alternatives.
25   Q    I could be a renter if someone puts their

Page 111

1  unit up for rent; correct?
2    A    Yes.
3    Q    And I'm a member of the general public if I'm
4  a renter; correct?
5    A    I don't consider that a member of the general
6  public. I consider that a discretionary rental by the
7  owner to somebody else. We don't know that those are
8  the general public. We don't know those aren't
9  relatives. We don't know those aren't friends.
10        We've gone through this example before that I
11 can get on to a private club by being a friend of a
12 member or relative of a member. That in and of itself
13 to me isn't opening it up to the general public. That's
14 a different proposition.
15   Q    Are you not aware of members putting their
16 weeks out to rent for anyone who is prepared to pay what
17 they're asking for the rental value?
18        MR. SCHRAG: Object to form.
19 BY MR. KAPLAN:
20   Q    Are you not aware of that happening in this
21 case?
22        MR. SCHRAG: Object to form.
23        THE WITNESS: I've never said I wasn't aware
24 of it.
25 ///

Page 112

1  BY MR. KAPLAN:
2    Q    So one alternative, if I want to stay at the
3  Ritz Aspen, an alternative to actually buying a
4  fractional interest is on an annual basis, look to see
5  what's available for rent; correct?
6    A    If something is available for rental.
7    Q    Another alternative, as you said, is to look
8  at maybe MVC points.
9        But then I'd have to compete with all MVC
10 owners who might be seeking to rent -- to use their
11 points to stay at Ritz; correct?
12        MR. SCHRAG: Objection; asked and answered.
13        THE WITNESS: Well, I have answered that.
14 I've answered that.
15 BY MR. KAPLAN:
16   Q    Another alternative is to buy points, have a
17 sufficient number of points, put my request in, hope
18 that an owner exchanges their week and hope that I'm the
19 successful winner of the competition within MVC to stay
20 at Ritz, that's another alternative; correct?
21   A    Yeah. That's an excellent point. Because of
22 the fact that if you looked at the number of members who
23 enrolled in it, it dramatically goes up after the
24 affiliation. But, again, I'm not sure where that gets
25 you.

Page 113

1    Q    Can you answer -- those are the alternatives?
2    A    I did answer those questions.
3    Q    So those are alternatives to getting access
4  to Ritz Aspen?
5    A    Those are alternatives to getting access --
6    Q    So in --
7    A    -- to Ritz Aspen.
8        MR. SCHRAG: Let him finish.
9  BY MR. KAPLAN:
10   Q    -- in making your determination on causation,
11 did you do any analysis as to what -- how much of the
12 causation was caused by the different methods that the
13 general public could access the Ritz Aspen?
14        MR. SCHRAG: Object to form.
15        THE WITNESS: Again, I'll try to get this
16 through.
17        The analysis we made came to the conclusion
18 that it was not the fulfillment or the ability to access
19 through different methods. When they advertised that
20 anybody basically could get it by going through -- well,
21 anybody, the general public I referred to in this case
22 initially prior to affiliation as being the 400,000
23 people in MVCI who if they had enough points could
24 access the program.
25        So it's the advertising of access, not the

29 (Pages 110 - 113)

Page 114

1 fulfillment. I think you keep coming down this
2 fulfillment road, and I don't know how to make it
3 clearer. It's just not relevant.
4 BY MR. KAPLAN:
5     Q    My question was: Did you attempt to separate
6 the causation that is attributable to access other means
7 other than the MVC points?
8     A    I looked at it and I determined, in my
9 opinion, it was not relevant.
10     Q    But you made that determination as to how
11 much of the causation was attributable to different
12 methods of access?
13         MR. SCHRAG: Object to form; asked and
14 answered.
15         THE WITNESS: I made the determination that
16 the advertising of access was the principle reason why
17 values failed.
18 BY MR. KAPLAN:
19     Q    Let me turn to your halo effect.
20         Now, you say in paragraph 8 and in other
21 places that -- you say in paragraph -- let me refer you
22 to 16.
23     A    Do you mind if I read the whole paragraph?
24     Q    No. Go ahead. Sure.
25         (Document reviewed by the witness.)

Page 115

1         MR. KAPLAN: Okay.
2         THE WITNESS: No. I'm still reading.
3         MR. KAPLAN: Okay. Go ahead.
4         (Document reviewed by the witness.)
5         THE WITNESS: Okay.
6 BY MR. KAPLAN:
7     Q    Okay?
8     A    Yes, I'm ready.
9     Q    I'm referring to the first sentence. You
10 say:
11         "It is well-accepted in the vacation
12         ownership industry and it is my opinion
13         that when a luxury brand is integrated
14         with a lower-end brand, the lower end
15         brand's value increases due to the
16         so-called halo effect."
17         Now, you say "it's well-accepted."
18         Is there any treatise or article that has
19 actually studied this phenomenon in the vacation ownership
20 industry?
21     A    Yeah. I believe Marriott is one of the
22 pioneers of basically trying to obtain halo effect by
23 grouping their properties together.
24         So L.A. Live, for example, you have a
25 Ritz-Carlton, you have a Courtyard, there's another

Page 116

1 Marriott product there -- there's the Marriott. So by
2 linking those properties together, you accomplish both
3 operational efficiencies, but you also have a tendency
4 to bring up the other products as opposed to a lone
5 Courtyard sitting by itself by pushing that product with
6 these other products, it does tend to give a better
7 proposition in general.
8         In certain instances, you'll have cross room
9 charging capabilities. So, in effect, you've taken a
10 Courtyard, which is a limited service property, and
11 you've imputed it with the rights of a full service
12 property by positioning these two properties together if
13 you can charge across the platform, which is typically
14 the case.
15     Q    Your sentence is that it's well-accepted in
16 the vacation ownership industry, that when you integrate
17 a luxury brand with a lower-end brand, the lower end
18 brand's value increases.
19         Where is that well accepted? What articles
20 can I look at? Are there any studies? Are there any
21 peer review studies that has actually looked at that
22 question?
23         MR. SCHRAG: Object to form.
24         THE WITNESS: I think that if you asked any
25 expert in the field, they would give you that answer.

Page 117

1 BY MR. KAPLAN:
2     Q    But you can't point me to an authoritative
3 source in the industry that is published or I can look
4 at for that proposition?
5     A    I consider myself an authoritative source in
6 the industry.
7     Q    So that's your opinion?
8     A    Yes. And I think that opinion would be
9 shared with other experts in the industry.
10     Q    Now, in paragraph 37 you say --
11     A    We're still on the original?
12     Q    Yeah.
13         You say:
14         "The halo effect, the corollary to the
15         horn effect, is a phenomenon that is
16         well-recognized in the world of
17         branding."
18         And you reference Edward Thorndike's original
19 coining of that term in the 1920s and you footnote an
20 article called "The Halo Effect, the Economist."
21         Do you see that?
22     A    I do.
23     Q    Are you aware of the fact that Edward
24 Thorndike's study had nothing to do with branding?
25     A    No. It had to do with consumer perceptions.

30 (Pages 114 - 117)

Page 130

1    Q    In fact, the way you've defined a halo effect
2  is the integration of a luxury brand with a lower-end
3  brand, that article doesn't relate to halo effect at
4  all?
5          MR. SCHRAG:  Objection; misstates testimony.
6          THE WITNESS:  That's one definition of a
7  halo.  Halo isn't just binary, either.  You have it or
8  you don't.  Halo could be an unbranded property to a
9  branded property or it could be associated with a
10  branded property with a higher end branded property.
11  BY MR. KAPLAN:
12    Q    The way you defined it is the integration of
13  a luxury brand with a lower-end brand, that article
14  doesn't support that thesis?
15    A    That's the way I defined it for this
16  particular assignment.
17    Q    That's the only case we have at the moment is
18  your opinion for this assignment.
19          But that article does not in any way
20  substantiate your assertion that when a luxury brand is
21  integrated with a lower-end brand, the lower end brand's
22  value increases?
23          MR. SCHRAG:  Object to form.
24          THE WITNESS:  Again, we can sit here and play
25  these games.  Not having a brand to me can constitute a

Page 131

1  lower-end brand.  Zero.
2  BY MR. KAPLAN:
3    Q    Now, what do you mean by "a luxury brand"?
4          Is there an industry definition of a luxury
5  brand?
6    A    Yeah.  Generally when we talk about luxury
7  brands, we generally talk about brands that are five
8  star and above.  Five star, five diamond.
9    Q    Do you consider the Ritz-Carlton brand to be
10  a luxury brand?
11    A    I do.
12    Q    What about the Marriott brand?
13    A    I do not consider it a luxury brand.
14    Q    Do you know whether JP Powers rates it as a
15  luxury brand?
16    A    I don't care what JP Powers looks at.  I
17  would tell you that anybody in the hotel industry today
18  would tell you that the core Marriott product is not a
19  luxury brand.  It's a four-star brand, at best.
20    Q    Is there an industry source that you're
21  relying on for that?
22    A    I'm sure there's plenty of industry sources
23  out there.  I'm relying on my experiences over 35 years
24  of what I've read, what I've studied and everything
25  else.

Page 132

1          So there is -- I can almost say with complete
2  certainty that there are industry sources out there.
3  The fact I didn't cite it does not change the equation.
4  The equation is the same.
5          You asked a question:  Is the Marriott brand
6  a luxury brand?  I'm telling you, no, it's not.
7    Q    In your opinion?
8    A    No.  In virtually anybody's opinion.
9    Q    You're saying -- do you consider Conde Nast
10  to be an authoritative industry source?
11    A    Yes, it's one of them.
12    Q    Michelin?
13    A    Michelin, definitely.
14    Q    And JP Powers?
15    A    JP Powers could be.
16    Q    Could be or is?
17    A    Could be.
18          JP Powers is a consumer preference type of
19  deal.
20    Q    Are you familiar with Marriott's rating
21  within the JD Power system?
22    A    What Marriott are you talking about?
23    Q    Marriott.
24    A    There's no such thing as just Marriott.
25    Q    JW Marriott.  Just the Marriott.

Page 133

1    A    You just qualified it.  You said it was a
2  JW Marriott.  That's a completely different animal than
3  a core Marriott.  Marriott has 30 brands.  They're
4  completely different.
5          You can't say a Marriott is a luxury brand.
6  You can say a Ritz-Carlton is a brand.  You can say the
7  luxury collection that Marriott now owns is a brand.
8  You can say the JW Marriott is a brand.  But that's not
9  Marriott.
10    Q    The JW Marriott is a luxury brand?
11    A    The JW Marriott attempts to be a luxury brand
12  in certain places.  It tends to be more of an inner city
13  larger property that provides luxury services.
14    Q    Well, in -- in your report in paragraph 18,
15  you say that:
16          "The Marriott brand, the Vacation Club
17          brand is a well-recognized top-tier
18          hospitality brand."
19    A    I'm sorry.  What paragraph are you on?
20    Q    Paragraph 18.
21          So it's true that you recognize that the
22  Marriott brand is a top-tier hospitality brand and
23  that's what it brought to the vacation ownership
24  industry?
25    A    I completely agree that Marriott is a top

34 (Pages 130 - 133)

Page 134

1 tier. But is it luxury, no.
2    Q    And your distinction between top tier and
3 luxury?
4    A    Top tier could be a four-star brand. Luxury
5 would be five star and above.
6    Q    Is there a recognized standard in the
7 industry that you're applying or that's just your
8 opinion?
9    A    It's wildly recognized.
10    Q    Where is it wildly recognized?
11    A    You can find it in a bunch of different
12 publications. I'd be happy to go find it for you.
13    Q    You haven't cited it?
14    A    No. I'd be happy to give it to counsel and
15 he can give it to you. It's wildly known. It's not my
16 opinion only. I don't know how to be more crystal
17 clear.
18        I simply said a top-tier brand. That's in
19 relation to lower-tiered brands. For instance, Diamond
20 Resorts would be a lower-tier brand. Westin would be a
21 higher-tiered brand. Sheraton would be a lower-tier
22 brand in the U.S. Internationally it has some higher
23 branding associated.
24    Q    Your distinction between Marriott being a
25 well-known top-tiered brand and a luxury brand, you have

Page 135

1 not cited any sources in your report that says that
2 there's a distinction between those?
3    A    It's common knowledge in the industry.
4    Q    Aside from common knowledge, you have not
5 cited to any sources in the industry for that
6 distinction?
7    A    Where there are things that are common
8 knowledge, all right, generally we don't cite.
9    Q    Okay. But you haven't done it in this case?
10    A    I haven't provided you the specific cite, but
11 again, it's common knowledge.
12    Q    In your opinion?
13    A    No. Anybody understands branding. It's not
14 just my opinion. It's common knowledge. That would
15 mean that it's not just my opinion.
16    Q    It's common knowledge in your opinion?
17    A    No. It's common knowledge, period.
18    Q    Okay.
19        MR. SCHRAG: Robert, it's about like 12:35.
20        MR. KAPLAN: Let me just finish.
21 BY MR. KAPLAN:
22    Q    What do you mean by integrate a luxury brand
23 with a lower quality brand?
24    A    Well, in this specific case, integration
25 means that you're allowing the lower-tier brand to

Page 136

1 access the upper-tiered brand.
2    Q    And that's your definition of integration?
3    A    It's my expert definition of integration.
4    Q    Is there an industry definition of
5 integration that you're relying upon?
6    A    Integration is integration in my mind.
7    Q    So the answer is there's no industry
8 definition of integrating one hospitality brand or
9 vacation ownership brand with another?
10    A    I'm sorry. Your question simply doesn't make
11 sense.
12        Integration is integration. In this
13 particular case, and that's what we're assigned to look
14 at, is this particular case, the integration was taking
15 one brand, the Marriott brand, and allowing it to
16 integrate or to be able to access the luxury brand.
17        MR. KAPLAN: I know. Just give me a few
18 minutes.
19        MR. SCHRAG: Yeah. Finish your line.
20 BY MR. KAPLAN:
21    Q    In going back, again, to your definition of
22 the halo effect is the integration of a luxury brand
23 with a lower-end brand.
24        Are you aware of any methodology that is
25 commonly accepted in the industry to determine whether

Page 137

1 or not that halo effect has, in fact, occurred?
2    A    I'm sorry. Am I aware of what?
3    Q    Okay. You're saying that the halo effect can
4 occur when a luxury brand is integrated or associated
5 with a lower-end brand.
6        Are you saying that that occurs in every
7 single case?
8    A    That there's a halo effect?
9    Q    Yes.
10    A    If you integrate the brands, it likely occurs
11 in those cases and Dr. Dev would agree with me and we
12 looked at both of those -- I looked at that opinion.
13    Q    Is it every single case?
14        Is there a source in the industry that says
15 it occurs every single time?
16    A    Again, it depends on the facts.
17    Q    Did you rely on any accepted methodology to
18 determine whether the halo effect occurred in this case?
19        MR. SCHRAG: Object to form.
20        THE WITNESS: Yeah. I think my methodology
21 is acceptable.
22 BY MR. KAPLAN:
23    Q    I know you think it's acceptable, but is
24 there a methodology that is generally accepted in the
25 industry that you use in determining whether the halo

**35 (Pages 134 - 137)**

Page 138

1 effect occurred?
2    A   I also took into consideration Dr. Dev's
3 opinion on this which is based upon -- he is a branding
4 expert and has written extensively on halo, so he came
5 up with an opinion that absolutely says that this
6 specific integration and this specific case caused halo.
7    Q   Are you aware of any generally accepted
8 industry method that is used to determine whether under
9 these circumstances a halo effect actually occurs?
10    A   You keep asking the same question.  I'll just
11 stick with my previous answers.
12       The very fact is in this particular case, by
13 looking at the situation, we determined that halo
14 exists.  Dr. Dev determined that halo exists.
15    Q   You did not apply a generally accepted or
16 generally used methodology to determine whether halo
17 existed; correct?
18    A   I think I did.
19    Q   You did?
20    A   Yes.
21    Q   What was -- what empirical methodology did
22 you use to determine whether halo is --
23    A   By definition, empirical means by the senses.
24 So when I look at things, and I'm a trained observer to
25 look at things, I look at the relationship of one thing

Page 139

1 to another.  In doing so, you're able to make
2 determinations.  That's a methodology.  It may not be a
3 quantitative methodology.  Maybe that's what you're
4 trying to ask.
5    Q   So that's sort of in the eye of the beholder,
6 you being an expert, in my view, the halo effect
7 occurred in this case?
8       MR. SCHRAG:  Object to form.
9       THE WITNESS:  Yes.
10       MR. KAPLAN:  Fine.  Thank you.  We can split
11 for lunch.
12       (Whereupon, a lunch recess was held
13       from 12:40 p.m. to 1:16 p.m.)
14       MR. KAPLAN:  Back on the record.
15 BY MR. KAPLAN:
16    Q   Mr. Simon, still continuing with the halo
17 effect.
18    A   Right.
19    Q   Now, would you agree that the Ritz-Carlton
20 brand is far more known as the Ritz-Carlton Destination
21 Club?
22    A   No.
23    Q   You would not agree?
24    A   Absolutely not.  I wanted to bring something
25 into you because we got into this whole discussion about

Page 140

1 who in the industry agrees with my assessment that MVW
2 is not a luxury brand and all of that.
3       During the break, I was able to just visit
4 your site, your defendants' site, and they clearly lay
5 out that MVW is not a luxury brand on the site.  They
6 call it a "premium brand," which is what I was trying to
7 relate to you.  It's not just my opinion, it's not just
8 common knowledge, it's your own client's admission that
9 Ritz-Carlton is a luxury brand, MVW and Marriott is not
10 a luxury brand.  It's a premium brand.
11       And that's the distinction I'm trying to help
12 you with when we say four-star and five-star brands.
13    Q   Are you done?
14    A   Yes.
15    Q   Would you agree that the average consumer
16 hears the name Ritz-Carlton and associates it with a
17 hotel -- hotel and resorts?
18    A   No, because they've done a really good job at
19 advancing the whole RCDC brand, so I think that anybody
20 who's familiar with Ritz-Carlton knows about the
21 destination club.
22    Q   Is that based upon any statistical or
23 empirical analysis or surveying?
24    A   It's based upon empirical analysis.  If you
25 read the depositions of the various plaintiffs, all of

Page 141

1 them said they bought Ritz-Carlton Destination Club
2 because of its close association with the Ritz-Carlton
3 brand.  So they were all saying this is how they
4 recognize Ritz.
5       And as a matter of fact, you can go a step
6 further and know that MVW does not do the management for
7 the Ritz-Carlton Residence Club.  It's actually the
8 Ritz-Carlton Hotel Company.
9       Ritz-Carlton Management Company, which is an
10 MVW company, is the ostensible manager of a resort, but
11 it's really the Ritz-Carlton Hotel Company that manages
12 it, and the patrons know it and the guests know it and
13 the salesman know it, so I think it's pretty common
14 knowledge of that as well.
15    Q   My question was:  In the general population,
16 that the Ritz-Carlton brand is known as a luxury brand?
17       You agree with that?
18    A   I agree with that.
19    Q   Would you say that the -- in the general --
20 not just purchasers of Ritz-Carlton clubs, but in the
21 general population, they're more familiar with the
22 Ritz-Carlton brand as opposed to Ritz-Carlton
23 Destination Clubs?
24    A   Again, it's -- to me, it's the same thing.
25 They purposely use the Ritz-Carlton brand based upon its

36 (Pages 138 - 141)

Page 154

1 ownership industry, the timeshare industry, there was a
2 rebound after the great recession, was there not?
3     A    It came back up, but albeit the slower pace
4 than the hospitality industry.  What you had is the
5 industry went to an extremely low level probably from
6 about 10 billion plus down to 6 billion.  So you did
7 have a correction back in the market and it rebounded.
8        But that's -- there was some price increase.
9 It's more of a volume increase overall.
10     Q    Are you not aware of publications by ARDA
11 which show that there were price increases --
12 significant price increases in the timeshare industry in
13 2012, '13 and '15?
14     A    Are you saying price-per-point industry?  Are
15 you saying average interval price?  Are you saying
16 average transaction price?
17        What are you talking about?
18     Q    Overall prices rose in the vacation ownership
19 industry in those years; are you aware of that one way
20 or the other?
21     A    Of course.  It doesn't have anything to do
22 with this pricing here.
23     Q    Are you aware of the fact that the
24 publications by ARDA showed that there were price
25 declines in 2014 and 2016, which you identified as years

Page 155

1 with ordinary price increases?
2     A    Again, you're conflating all kinds of
3 timeshare into this thing.  It's just you're comparing
4 apples and oranges.
5     Q    Did you consider those?
6     A    Of course I did.
7     Q    Where does it say in your report that you
8 considered the trends in the industry and competition in
9 the industry in determining whether a price was a halo
10 price increase or an ordinary price increase?
11     A    You can't look at it that way.  Again, it's a
12 flawed question.  Essentially you have to look at the
13 specifics of this particular case.  You can't say in
14 general prices rose and, therefore, prices of cars rose.
15 Or even more so, the price of a Lincoln rose.  You have
16 to look at the specific thing.
17        I don't like amalgamations for that very
18 purpose.  They're interesting to look at, but they
19 provide no insight.
20     Q    Did you consider -- I'm going to ask it again
21 because I would like an answer.  You may think my
22 question is not a good question, but it's my question.
23     A    Okay.
24     Q    In all due respect, it's my question.
25        Nowhere in your report did you consider the

Page 156

1 impact of competition in assessing whether Marriott's
2 price increases were halo or non-halo price increase?
3        MR. SCHRAG:  Object to form.
4        THE WITNESS:  What competition are you
5 talking about?
6 BY MR. KAPLAN:
7     Q    Any competition.
8     A    I don't know what that means.
9     Q    The fact what competition was doing, what
10 their prices were doing, the supply and demand in the
11 industry, the demand by consumers for increased vacation
12 ownership options.
13        Anywhere in your report did you consider
14 those economic realities in determining whether a halo
15 price increase was a halo price increase, or was it due
16 to economic and competitive factors in the industry?
17        Did you consider that in your report?
18     A    Of course.  That's what OPI is all about.
19     Q    So where in your report did you consider what
20 the industry was doing?
21        Show me the paragraph where you say:  I've
22 also considered the price trends in the industry and
23 compared that to the prices that MVC was taking in
24 certain years.
25        Where is that?

Page 157

1     A    I'm very familiar with the industry --
2     Q    I'm not asking whether you're familiar.
3        MR. SCHRAG:  Don't interrupt him.
4        MR. FERGUSON:  You're yelling also.
5 BY MR. KAPLAN:
6     Q    Mr. Simon, where in -- can you listen to my
7 question?
8        MR. SCHRAG:  Wait, wait, wait.  Let him
9 finish his answer.
10        THE WITNESS:  I'm very well aware of the
11 industry.  I'm very well aware of the price increase.
12 We can talk about VPGs.  We can talk about the average
13 contract value.  I look at all that information all the
14 time.  It's factored into my opinion, my experience.
15        If you're looking, did I have a specific
16 paragraph in here?  The answer is no.  It does not mean
17 we didn't consider it.  We indeed considered it.
18 BY MR. KAPLAN:
19     Q    But it's not mentioned as being considered in
20 your report?
21     A    I just said that there's not a specific
22 paragraph in here, but we did consider it.
23     Q    And nowhere in your report do you consider
24 sources such as ARDA indicating that in certain years,
25 timeshare interests are increasing in price or

40 (Pages 154 - 157)

Page 158

1  decreasing and whether the Marriott Vacation points
2  prices corresponded with those increases or decreases?
3      A    Yes, we considered it.  I mean, we have
4  considered that information.  And, again, when you look
5  at big amalgamations like that, you don't derive a lot
6  of knowledge.  I can tell you directionally, the
7  market's moving up.  We account for that in OPI.  OPI is
8  a normal system enhancement.  It's an inflation.  That's
9  what you also see in that amalgamation.
10         Does it mean anything specific to the facts
11  of this case?  No.  It does to OPI, but not to the halo
12  piece.
13     Q    You state in your report that you recognize
14  that some of the early price increases were due to the
15  fact that Marriott had priced its product at a lower
16  level and then took certain price increases to bring it
17  up to the level it thought was appropriate.
18     A    Yes.  I'm glad you asked that.  That's
19  specifically the reason why Dr. Israel is wrong when he
20  calculates OPI and includes the first three in there.
21  Your own witnesses talk about that.  We buy into that
22  logic.  We said that in a subsequent report.  We do buy
23  into it.
24         That's why we eliminated the first three
25  price increases, because they were extraordinary, but

Page 159

1  they were extraordinary non-halo, so we discarded those.
2  That's the right way to calculate OPI, to take out
3  extraordinary price increases.
4      Q    Are you aware of the fact before Marriott
5  launched the MVC product, that they had projected those
6  kinds of price increases through 2012?
7      A    Well, I think when you translate from an
8  interval product, a weekly interval product to a price
9  product, you try to make projections.
10         But after being in this business 35 years,
11  the one thing I can tell you about projections is
12  they're always wrong.  They're either high or they're
13  low.
14     Q    Are you aware of the fact that that was their
15  projection?
16     A    That they projected higher prices?
17     Q    That they projected taking those price
18  increases to get back to a level that they wanted at the
19  end of 2012.
20     A    I think Zack Sonberg's testimony, if I recall
21  it right, was basically that we expected that in the
22  first year we'd increase about 12 percent and the second
23  year we'd increase 7 1/2 percent and by the third year
24  we want to stabilize at 3 percent.
25         So we looked at those relationships and we

Page 160

1  generally looked at the amount of percentage increases
2  that were beyond just a normal and ordinary price
3  increase.
4      Q    Isn't that exactly what happened to the price
5  of points from 2010 through 2012, that they projected a
6  price increase from approximately 9 dollars and 32 cents
7  to 12 dollars and 34 cents, and at the end of 2012, they
8  were at 12 dollars and 40 cents?
9          Were you aware of that?
10     A    I am.  And project whatever you want.  It
11  doesn't have anything necessarily to do in my mind with
12  what the actual prices you got.
13     Q    So you stop -- you said that you are
14  discounting the price increases prior to November 30,
15  2011, because they were catch-up price increases;
16  correct?
17         MR. SCHRAG:  Object to form, misstates
18  testimony.
19  BY MR. KAPLAN:
20     Q    Were they catch-up price increases?
21     A    I mean, I'm not sure what your definition of
22  "catch-up price increases" are.  That assumes that they
23  were trying to catch up to a benchmark price.  They were
24  raising their prices.  I do give them credit for
25  initially pricing their -- points are -- let's go back.

Page 161

1          Points are a very intangible product.  People
2  didn't understand points when they first rolled out, so
3  it was hard to sell points.  You actually had to
4  increase the value of proposition.  One of the ways you
5  do that is underpricing points.  I agree with that.  I
6  recognize that in the report.
7          We thought that after essentially a year and
8  a half, you had some really good uptake in the program
9  and that that was not a consideration.
10     Q    That's what you concluded?
11     A    Obviously.
12     Q    But you are aware of the fact that there are
13  documents that existed prior to the launch that
14  projected these introductory price increases through the
15  end of 2012?
16     A    Let's go through the timeline.
17         You roll out points in around June, July of
18  2010.  At that same point you were just premarketing the
19  Ritz-Carlton Destination Club.  So there's probably a
20  consideration in there that option A is keeping the club
21  and getting a bounce from it.  Option B is putting it
22  out.  You did budgets.  That's really all you can assess
23  from that.
24         MR. KAPLAN:  Let me show you what I'll mark
25  as Exhibit 5, which is a document that's been previously

41 (Pages 158 - 161)

Page 178

1    A    Sorry.  Make sure none of your notes are in
2  it.
3    Q    No.  It's fine.
4         We marked the 2012 to 2013 points chart as
5  Simon Exhibit 7.
6         You recognize that as the document --
7  specifically I'll direct your attention to under the
8  West, there's the Ritz-Carlton Vail Club.
9    A    Yes.
10        MR. FERGUSON:  What page is it on?
11        MR. KAPLAN:  Second page.  Table of contents.
12        MR. FERGUSON:  Thank you.
13 BY MR. KAPLAN:
14   Q    By the way, this is one of the documents that
15 you rely on as indicating that they -- that MVC was
16 marketing the Ritz-Carlton Destination Club with the
17 Marriott Vacation Club, correct, the points chart?
18   A    It's additional marketing access to the
19 Ritz-Carlton Destination Club.
20   Q    And in this case, the inclusion of the Vail
21 club was for all members because it was trust inventory;
22 correct?
23   A    That's correct.
24   Q    And, again, that's not the affiliation?
25   A    No, it's not the affiliation.

Page 179

1    Q    And going back to Exhibit 6, Simon 6, the
2  access that was represented by Simon 6 was also not the
3  affiliation?
4    A    It was not the affiliation.
5    Q    By the way, you would agree with me that in
6  all subsequent points charts, Marriott continued in each
7  year to list the Ritz-Carlton Destination Clubs in
8  their -- in the points charts; correct?
9    A    No, no.  The points charts are available to
10 all MVCI members.
11   Q    That's right.
12   A    Access to -- certain Ritz-Carlton Destination
13 Clubs was only open to Premier and Premier Elite through
14 the Explorer program.
15   Q    Right.
16        But what I'm saying is that --
17   A    Are you saying Vail was offered --
18   Q    -- Vail was offered in every year going
19 forward; correct?
20   A    Yes.
21   Q    There was no change in marketing; correct?
22   A    Right.
23   Q    In that respect?
24   A    That's correct.
25   Q    And, therefore, the offering of Vail occurred

Page 180

1  during 2011, 2012, 2013, 2014; correct?
2    A    No.  Vail was -- I believe the first time it
3  was opened up to the whole MVCI program was 2012.
4    Q    2012, '13 and '14?
5    A    Yes.
6    Q    So the marketing through this was the same as
7  in the halo period in 2012 and '13 and in 2014, there
8  was no difference?
9    A    Well, just with this document, but there are
10 a lot of other documents that talked about a lot of
11 other properties.
12   Q    I can only talk about one document at a time.
13        But this document didn't change, this
14 marketing tool remained the same during halo periods and
15 non-halo periods; correct?
16   A    Yes.  I'll give you that.
17   Q    Are you saying that Marriott was not
18 marketing access to Ritz-Carlton Destination Clubs
19 during the ordinary price increase periods?
20   A    No, I never said that.
21   Q    Do you recognize that they were or were not?
22   A    I recognize that Marriott -- we tied certain
23 events.  So let's talk about this document.  Let's talk
24 about this document since we rolled them both out.  All
25 right?

Page 181

1         This document gets released in July of 2011.
2  They go ahead and they -- I told you they had a previous
3  price increase and then this document comes into play,
4  Vail, the one that offers Vail for the first time.
5         You've got to understand when this document
6  is produced.  This document isn't produced on
7  November 30th.  This document is produced subsequent --
8  prior to November 30th.  What they do in this is they
9  script program for salespeople to offer RCDC as a main
10 benefit.
11        How do I know that?  Well, there's evidence
12 in the record that talks about -- I'll call it the
13 Kapalua e-mail.  I don't have the specific number with
14 me, but in an e-mail a member of RCDC goes to Kapalua.
15 He writes to one of the chairmans, I believe -- I'm
16 trying to remember who it is -- but writes to one of the
17 chairmans and says -- and I think that's in my report.
18 I think we reference it in my report -- he writes to him
19 and says, hey, I was staying at the Kapalua RCDC Club
20 and I wanted some free golf, so I decided to go sit
21 through an MVCI program, the premium -- or what you get
22 for attending that program was a round of free golf.
23        He says what I didn't realize is while I knew
24 they were marketing access, I didn't realize that
25 Ritz-Carlton was almost the primary thing that they were

46 (Pages 178 - 181)

Page 190

1 line of questioning. You asked about documents in a
2 certain range.
3        Do you want him to look through his reports
4 in that range?
5        MR. KAPLAN: The report is in front of him.
6        MR. SCHRAG: Okay. I just want -- you can
7 look through the documents --
8        MR. KAPLAN: He's free --
9        MR. SCHRAG: -- if there's documents within
10 that date frame. I don't know if there are. If there
11 are, you can tell him.
12        THE WITNESS: Give me a second. Let me just
13 look through it real quick.
14        (Document reviewed by the witness.)
15        THE WITNESS: So clearly footnote 9 on
16 page 8, it says:
17        "We have consistently seen that if a
18        perspective member can experience the
19        Ritz-Carlton Destination Club, they are
20        more likely to purchase an MVC
21        membership."
22        So, I mean, she's basically laying halo out
23 right there. I mean, clear as day.
24 BY MR. KAPLAN:
25        Q    Okay.

Page 191

1        A    Let's see if there's other ones.
2             It's page 8, footnote 2 of my original
3 report. It's like crystal clear here.
4             Then in August. Let me see what this says.
5        Q    Page 8 you're saying?
6        A    Footnote 9.
7        Q    9; right?
8        A    I'll read it again.
9        Q    No, you don't --
10       A    Well, I want to make sure she can get it
11 down. She accused me of talking too fast.
12            This is entitled "Update to access
13 Ritz-Carlton Club locations via Premier and Premier
14 Plus." And then it gives you the RCDC 6549 through
15 6571. At RCDC 006550, open parenthetical:
16            "(Consistent with our previously
17            announced business strategy not to
18            expand our luxury tier business
19            segment, MVW will leverage our North
20            American points program to assist in
21            its sale of the remaining luxury
22            inventory."
23            E-mail from Mary Lynn Clark:
24            "We have consistently seen that if a
25            prospective member can experience the

Page 192

1            Ritz-Carlton Destination Club, they are
2            more likely to purchase an MVC
3            membership."
4        Q    Okay. That was the e-mail that we just
5 marked?
6        A    Right.
7             Then I was going to go through and keep
8 looking for other ones.
9        Q    Let me ask you a follow-up question on that.
10            Is there any reference in that e-mail or any
11 other document that you've seen which indicates that
12 that also gives the ability to charge higher prices?
13            MR. SCHRAG: Object to form.
14            THE WITNESS: I think they go hand in hand.
15 What she's talking about is leveraging off of access to
16 MVC, which is our entire halo argument.
17 BY MR. KAPLAN:
18       Q    My question is: Again, it references the
19 ability to sell more points.
20            Is there any reference to the ability to
21 price at a higher price in this e-mail?
22       A    In this e-mail it doesn't specifically refer
23 to higher pricing. But, again, selling more or getting
24 more out of it is part and parcel of this whole thing.
25       Q    That's selling more?

Page 193

1        A    Yeah.
2        Q    We're talking about charging higher prices --
3        A    No. But I think it's consistent. But go
4 ahead.
5        Q    It doesn't reflect --
6        A    I'll agree with you, that specific doesn't
7 say --
8        Q    If we were to go through every single one of
9 the marketing documents that you referenced, none of
10 them -- some of them may indicate that it may give MVC
11 an ability to sell points, but none of them reference an
12 ability to raise prices, would you agree with me or
13 should we go through each and every document?
14            MR. SCHRAG: Object to form.
15            THE WITNESS: No, no, no. They don't
16 specifically do it. We link what basically they're
17 pushing out of the MVC -- the RCDC access to the higher
18 than normal or higher than OPI price increases.
19 BY MR. KAPLAN:
20       Q    That's your conclusion, that's not reflected
21 in any of the marketing documents that you've
22 identified; right?
23            MR. SCHRAG: Object to form.
24            THE WITNESS: Yes. And there's nothing to
25 the contrary either.

49 (Pages 190 - 193)

Page 194

1 BY MR. KAPLAN:
2    Q   Do you know how far in advance these price
3 increases were determined?
4    A   How far in advance?
5    Q   Right.
6        Before each price increase?
7    A   Yeah.  The record is kind of mixed on that.
8        There is discussion in the evidence that
9 basically says there's -- it's not even a committee.
10 It's a meeting of people.  They get around the table and
11 they kind of talk about what the price is going to be
12 and it's almost like magically a price per point is set.
13        But, again, there's nothing out there that
14 distracts from this.  I think this is an extremely
15 reasonable linking of access to RCDC with the increasing
16 prices.
17    Q   Did you perform any yardstick analysis to
18 determine whether a halo price increase was due to RCDC
19 marketing as opposed to --
20        MR. SCHRAG:  Object to form.
21 BY MR. KAPLAN:
22    Q   -- to any other factor?
23    A   I'm just giving counsel a chance to --
24        MR. SCHRAG:  I just objected to form.
25        You can answer.

Page 195

1        THE WITNESS:  Okay.  I'm sorry.  I forgot the
2 question.
3        MR. KAPLAN:  The court reporter can read it
4 back.
5        MR. SCHRAG:  Please.
6        (The record was read as follows:
7        Q   Did you perform any yardstick
8        analysis to determine whether a halo
9        price increase was due to RCDC
10        marketing as opposed to --
11        MR. SCHRAG:  Object to form.
12        Q   -- to any other factor?)
13        THE WITNESS:  So yardstick, which you equated
14 with benchmark earlier, I think you'll agree with that,
15 but I'll use that analogy, yeah, we're basically
16 benchmarking price increases to marketing material.  So
17 yeah, I would say in that context yes, we did.
18 BY MR. KAPLAN:
19    Q   Okay.  But that's your correlation to the
20 marketing material.
21        Is there any correlation to similar either
22 more or less marketing during your ordinary price
23 increase periods?
24    A   Yeah.  Here's the thing.  Once you embed
25 halo, right, and you put halo in there, it stays there.

Page 196

1 It doesn't dissipate over time so you refresh it.  It's
2 in there.
3        So you have this burst of price increasing
4 that almost exactly corresponds with all this marketing
5 material.  And then it kind of falls off and then the
6 next major push of pricing increase is all around the
7 affiliation of 2014, which basically came into effect December
8 of 2014 and became operable December 2015.
9    Q   Okay.  You attribute -- certainly we can
10 agree that the price increases that you identify as halo
11 price increases in 2011, 2012 and 2013 were not related
12 to the affiliation?
13    A   Yes.  Those would have been prior to the
14 affiliation.
15    Q   Okay.  And then you attribute the 2015 price
16 increases to the affiliation?
17    A   Yes.
18    Q   Was it entirely the affiliation or was it
19 also, in part, the fact that inventory in -- inventory
20 in RCDC properties was transferred to the trust in late
21 2014 and 2015?
22        MR. SCHRAG:  Object to form.
23        THE WITNESS:  Was it strictly limited to the
24 affiliation?
25        Most people would not know about property

Page 197

1 being transferred to a trust.  That wouldn't come into
2 their consciousness.  They wouldn't know about it.
3        The affiliations would be a marketing event
4 around which to raise prices.
5 BY MR. KAPLAN:
6    Q   So you made -- to the extent that the 2015 --
7 we're talking about from Marriott's point of view --
8    A   Yes.
9    Q   -- meaning their reasons for imposing a price
10 increase?
11    A   Right.
12    Q   So to the extent that the contribution of
13 inventory into the trust affected pricing, in addition
14 to affiliation, did you separate out those factors in
15 any way?
16        MR. SCHRAG:  Object to form.
17        THE WITNESS:  Again, you had a situation in
18 which they just changed the mechanism.  So before it was
19 developer-owned inventory that they accessed through
20 various methods, Explorer, et cetera, then they transfer
21 the trust.  So it still provided the same avenue into
22 access.  They just changed the mechanism which you could
23 do it.
24 BY MR. KAPLAN:
25    Q   What I'm asking you is:  For example, if you

50 (Pages 194 - 197)

Page 214

1 used by MVC points and it's a very small number, isn't
2 it?
3    A    You have to compare that to the number of
4 people that try to get the points.
5    Q    Precisely.
6        Meaning it was extraordinarily difficult for
7 an MCV owner to reserve time at an RCDC property, given
8 the limited supply and given the number of MVC members
9 competing for that limited supply?
10       MR. SCHRAG: Object to form.
11       THE WITNESS: Again, it doesn't naturally
12 follow, but it's possible.
13 BY MR. KAPLAN:
14    Q    Did you consider that?
15    A    Yeah. We considered all kinds of things with
16 the membership program. This is not my first rodeo with
17 Marriott. I've done lots of work with Marriott in the
18 past.
19    Q    Let me talk to you about the quantification
20 of the halo effect.
21    A    Let's do it.
22    Q    There's an article that you cited.
23       MR. KAPLAN: I think we're up to Simon 10.
24 ///
25 ///

Page 215

1        (Whereupon, Defendants' Exhibit 10 was
2        marked for identification by the
3        Court Reporter.)
4 BY MR. KAPLAN:
5    Q    Let me show you an article which we've marked
6 as Simon 10. It's called "Brand Equity, The Halo Effect
7 Measure." It's by Lance Leuthesser, Chiranjeev Kohli,
8 Katrin Harich. You cited in footnote 20 at page 12 of
9 your report.
10    A    Right.
11    Q    And this article, have you reviewed this
12 recently?
13    A    No. But I know what this article is about.
14 It's about abstracting from different biases. I think
15 it's that article, and trying to isolate it through
16 mathematics. So yeah, I'm generally familiar with it.
17    Q    So they are trying to identify measures of
18 the halo effect in this; correct?
19    A    Yes.
20    Q    If you look at what's page -- marked as
21 page 60, they have a section dealing with measuring halo
22 effect and they actually list several accepted
23 approaches to measuring the effect and let me -- I'll
24 read to you:
25       "Approaches to measuring the halo

Page 216

1    effect" --
2    A    Wait. I'm sorry.
3        I see. I'm sorry.
4    Q    (Reading):
5        "Approaches to measuring the halo
6        effect have ranged from simple
7        observance of the average
8        inter-attribute correlations to factor
9        analysis of the rating data coupled
10       with statistical correlation for halo."
11       Are you familiar with those methodologies?
12    A    I understand what they're trying to discuss
13 in here.
14    Q    You are familiar with that methodology?
15    A    I'm not familiar with the methodology,
16 per se, but I understand this part of it to try to model
17 this.
18    Q    You didn't use this methodology?
19    A    I did not use this. I can't tell you whether
20 Dr. Dev used this or has used something similar to this
21 in coming to his conclusion that there was halo.
22    Q    But you --
23    A    I did not use it.
24    Q    You did not use it even though you were aware
25 of this article, you cited it?

Page 217

1    A    Yeah.
2    Q    And these are generally accepted methods of
3 measuring halo effect?
4        MR. SCHRAG: Object to form.
5        THE WITNESS: Based on who?
6 BY MR. KAPLAN:
7    Q    It's a peer review published article and
8 they're talking about approaches to:
9        "Measuring the halo effect. It ranged
10       from simple observance of the average
11       inter-attribute correlations through
12       factor analysis of the rating data
13       coupled with statistical correction for
14       halo."
15    A    Yeah. This is a very statistical approach to
16 measuring halo. It's a mathematical model.
17    Q    It's one approach?
18    A    Yeah.
19    Q    But you did not choose this approach?
20    A    I did not use the mathematical model.
21    Q    You used a mathematical approach, it's one
22 that you constructed on your own?
23    A    Right, right.
24    Q    And --
25    A    By the way, by the way, let's just be clear,

55 (Pages 214 - 217)

1 none of defendants' experts used this model either.
2    Q    If you go to the next page, in addition to
3 identifying a methodology that was mentioned in that
4 paragraph, they say that -- they're using two different
5 methodologies.  One is the partialling out methodology.
6 And they say:
7        "By far, the most commonly employed
8        technique for removing halo is
9        partialling out technique."
10       Meaning identifying that portion that is a halo
11 effect.
12       So are you familiar with the partialling out
13 technique?
14    A    No.  This part of it is not -- you know,
15 again as far as I've ever seen -- used all the time in
16 this particular industry, but I'm sure according to
17 this, this is a way to mathematically model and try to
18 calculate and quantify halo.
19    Q    Right.
20       But this is reported as the most commonly
21 employed, the partialling out technique, and you did not
22 use that?
23    A    I did not use this.
24    Q    And then they look at another methodology
25 which is the double centering methodology.

1       Do you see that?
2    A    Yes.  We did not use that.
3    Q    You did not use that?
4    A    We did not.
5    Q    In fact, there were methodologies available
6 to you which are -- which are used in the industry and
7 you didn't use any of those methodologies?
8       MR. SCHRAG:  Object to form.
9       THE WITNESS:  I may have indirectly used the
10 methodology by picking up Professor Dev, who is
11 extremely well-known for his measurement of halo and
12 basically comes to his conclusion.  So essentially, I
13 looked at halo and I observed it through my lens, right,
14 Dr. Dev observed it through his lens and we both came to
15 the same conclusion.
16 BY MR. KAPLAN:
17    Q    But this talks about measuring halo, this
18 article, an article that you cited as authoritative.
19       And in your attempt to measure the halo
20 effect, you didn't use the methods that were set forth
21 in this article?
22    A    In the first case I didn't cite it as
23 authoritative.  I said it's something we considered.
24    Q    You didn't use these methodologies?
25    A    I just testified to that.

1    Q    You invented your own methodology?
2    A    Yes.
3    Q    And had that methodology of trying to
4 identify halo price increases versus ordinary price
5 increases, had you ever seen that used in any context?
6    A    We discussed this earlier in that this is a
7 unique situation.  Different professionals will approach
8 this from different viewpoints.
9    Q    Okay.  But you didn't --
10   A    I've never seen this used in the hospitality
11 industry, I can tell you that much.
12   Q    "This" meaning the article we just discussed
13 is -- it doesn't talk about any industry, it talks about
14 measuring strategies in attempting to measure the halo
15 effect.
16   A    That's what this article says.
17   Q    That's not specific to any industry?
18   A    No.  I'm just telling you that as a guy who
19 worked in the industry for 35 years, I've never seen
20 this article applied inside the hospitality industry.
21   Q    And you've also never seen your model applied
22 inside the hospitality industry either?
23   A    No.  I've seen brand premiums applied all
24 over the place.  And again, they don't back to this
25 level of quantification.

1    Q    My question is:  Have you ever seen the model
2 that you constructed applied either in the hospitality
3 industry or any other industry?
4    A    No.  Because like I said at the beginning,
5 this is a very unique set of circumstances.  We model
6 what we think is a reasonable estimate of halo.  And
7 that's what I want to emphasize.  It's a reasonable
8 estimate of halo.  It's not the only measure of halo,
9 but it is a reasonable estimate.
10   Q    Let me go through the methodology you used to
11 quantify -- to measure the halo effect.
12       Under the model that you constructed, you
13 identify eight halo price increases.
14   A    That's correct.
15   Q    You then took the gross price increase for
16 each of those increases from the prior -- from the
17 existing price; correct?
18   A    Yes.
19   Q    You took the gross price?
20   A    We started with gross --
21   Q    Right.  I'm going to go through all the
22 steps.
23   A    Go ahead.  Go ahead.  Go ahead.  Yes, yes,
24 yes.  Go ahead.
25   Q    I want to make sure I have your approach

56 (Pages 218 - 221)

Page 226

1 essentially the cumulative halo price increase from all
2 the other --
3    A    That would be correct.
4    Q    -- prior halo period?
5    A    That's correct, because it's in pricing.
6    Q    You also in your first report and in your
7 second report do a separate analysis for 2013 to 2017
8 and 2014 to 2017.
9    A    That's correct.
10    Q    And you do that in both reports?
11    A    That's correct.
12    Q    Why did you do 2013 to 2017 and 2014 to 2017?
13    A    It was an assumption that counsel gave us to
14 use.
15    Q    In either case, though, whether it's 2013 to
16 '17 or 2014 to '17, the calculations that you made
17 included the cumulative effect from the prior years, you
18 were only multiplying it by the number of points from
19 2013 forward; correct?
20    A    Right.  So the theory was that halo is
21 embedded in the price and the only reason those were
22 provided to us is to calculate the potential periods the
23 court could look at in assessing the amount of damages
24 during that period --
25    Q    Okay.

Page 227

1    A    -- but it was buried in those pricing.
2    Q    Even those calculations include the
3 cumulative halo price increases from the previous
4 period?
5    A    Agreed.
6    Q    They're built in?
7    A    They're built in.
8    Q    So you've presented -- if the analysis is
9 limited to 20- -- strike that.
10       If the damage period is limited to 2015
11 forward, you have no calculation that looks only at the
12 halo price increases that occurred in 2015 without the
13 cumulative effect of the prior halo price increases?
14    A    Well, that's an interesting question, because
15 it comes down to, you know, what is being analyzed,
16 then?
17       Is it being analyzed that only those pieces
18 count for halo or only those pieces for whatever legal
19 reasons are out there are allowed to be accounted for?
20       So either way, it's in the pricing.  The only
21 thing we're talking about is the period of years in
22 which we're summing here; not the fact whether there was
23 price increases related to what we believed with halo.
24 That doesn't change.
25    Q    My question is:  Assuming the court says that

Page 228

1 all the price increases prior to 2015 are irrelevant,
2 they're not relevant, and the only thing you're entitled
3 to unjust enrichment for the halo price increases caused
4 by the affiliation --
5       Which would be 2015; correct?
6    A    (No audible response.)
7    Q    "Yes"?
8    A    Yes.  I'm sorry.
9    Q    -- you have no calculation of those halo --
10 the effect of those halo price increases times the
11 number of points in 2015 forward that does not include
12 the cumulative effect of the prior price increase?
13    A    That would be correct.
14    Q    So you presented no model that looks at halo
15 price increases just limited to the price increases
16 caused by the affiliation?
17       MR. SCHRAG:  Object to form.
18       THE WITNESS:  We can easily do that, but we
19 weren't asked to do that.
20 BY MR. KAPLAN:
21    Q    You haven't done that?
22    A    I have not done that.
23    Q    So just -- so that's your methodology.
24       You arrived at essentially the halo -- the
25 cumulative halo price increase times the number of

Page 229

1 points in each period or on a daily basis in your
2 supplemental report, correct?
3    A    Yes.
4    Q    And then you applied a 19 percent discount
5 for variable costs?
6    A    Deduction.
7    Q    Okay.
8    A    Expense deduction, not discount.
9    Q    And then you also applied deduction or a
10 discount to take it from what you considered gross to
11 realized prices; correct?
12    A    That's correct.
13    Q    And when you did that, you took an annual
14 average comparing the total gross prices to the realized
15 prices?
16    A    Yes.  That's the only data we have.
17    Q    And let's just stick with your first report,
18 then we can talk about your supplemental report.
19    A    That's fine.
20    Q    Your first report took an annual average of
21 the difference between the gross prices and the realized
22 prices?
23    A    Yes.
24    Q    That did not account for the possibility that
25 the realized prices, meaning net prices, were

58 (Pages 226 - 229)