# EXHIBIT E

# <u>The Rebuttal Expert Report of Alan Tantleff 1.4.2019</u>

# IN THE UNITED STATES DISTRICT COURT
# DISTRICT OF COLORADO

Civil Action No. 1:16-cv-01301-PAB-GPG

RCHFU, LLC, a Colorado limited liability company, et al,

Plaintiffs,

v.

MARRIOTT VACATIONS WORLDWIDE CORPORATION, a Delaware corporation, et al,

Defendants.

EXPERT REPORT OF ALAN TANTLEFF IN REPLY TO:

REPORTS PREPARED BY

MAURICE ROBINSON & ASSOCIATES LLC (the "Amended Robinson Report")

And

JON SIMON (the "Simon Report")

ON BEHALF OF THE PLANTIFFS

Dated as of January 4, 2019

Table of Contents

Introduction ................................................................................................................ 2

Summary of Opinions .................................................................................................. 3

My Opinions ................................................................................................................ 6

Alternative Damages Theories ................................................................................... 49

Conclusions ................................................................................................................ 59

Appendix A: Photographs of Aspen Highlands from Site Inspection

Appendix B: Photographs of Construction in Snowmass Village from Site Inspection

Appendix C: Documents Relied Upon

Appendix D: Documents Considered

Introduction

      This "Second Report" concerns the expert reports submitted by Maurice Robinson ("Robinson") and Jon Simon ("Simon") both dated October 26, 2018, as well as the "Amended Robinson Report" dated December 19, 2018.  All three reports addressed the fractional ownership interests in 73 residential units ("Fractional Interests") located at The Ritz-Carlton Club, Aspen Highlands (the "Property"), which was completed in 2001 and is located in Aspen Highlands Village, Colorado.  "The Robinson Report" was accompanied by the Microsoft Excel spreadsheet (MR&A 10.26.18.xlsx), which I have termed the "Robinson Model," and the Amended Robinson Report was accompanied by the Microsoft Excel spreadsheet (MR&A 12.19.19.xlsx), which I have termed the "Amended Robinson Model."

      The Robinson Model contained a number of mathematical and computational errors, some of which have been corrected in the Amended Robinson Model.

      The Amended Robinson Report quantifies the loss of value, or Diminution of Value ("DoV"), allegedly suffered by the Plaintiffs due to the alleged actions of the Defendants.

      The "Simon Report" contends that the Fractional Interests suffered a loss in value because of a decreased level of "exclusivity" coupled with the "horn effect." For the purposes of this Second Report, I have only reviewed the exclusivity argument and Simon's contention that the actions of the Defendants caused a loss in value of the Plaintiffs' Fractional Interests. I will not address Simon's theory of the "halo effect" nor questions of disgorgement of profits.

      The Scope of Retention and Compensation, Summary of My Experience and Qualifications, and General Case Background remain the same as in my "First Report" dated October 26, 2018; therefore, these topics are not addressed within the following Second Report.

Summary of Opinions

1. Simon conflates various actions of the Defendants – some the subject of the Complaint and others that were not. The result is that he cannot attribute any DoV to the wrongful acts alleged in the Complaint. This has further implications in determining the effective starting date of Robinson's calculations of DoV.

2. The Simon Report does not include any analysis, examples, calculations, evidence or other support necessary to validate his opinions regarding the question of whether "Defendants' actions, if proven, caused Plaintiffs' property values to diminish…".

3. Simon suggests that "exclusivity" is the factor that drives the value of a Private Residence Club. Exclusivity is a marketing term – the Property remains "exclusive" in that it is a luxury resort that is restricted to members, permitted guests or renters from members (or through permitted exchange partners), but not available to the "general public." There is no indication of any loss of exclusivity at the Property resulting from the MVC Affiliation. In addition, Simon ignores that there are many factors that drive the value of Private Residence Clubs, such as amenities, exchange opportunities, location, size, etc. that he has not considered.

4. Like Simon, Robinson does not demonstrate how, or if, the actions of the Defendants, including the MVC Affiliation, negatively impacted the value of the Fractional Interests. He relies on a statement made in an appraisal that was provided with no supporting analysis. Nor does he do any independent analysis to support this claim.

5. Robinson's analysis results in an overstated calculation of potential damages. He begins his calculation several years prior to the MVC Affiliation and fails to segregate the Defendants' alleged series of actions from the MVC Affiliation.

6.  Robinson does not investigate any alternative factors that likely impacted the value of the Fractional Interests. Robinson did not apportion any change in value between the MVC Affiliation or to any other factor.

7.  Robinson utilizes the Sales Comparison Approach to quantify values. However, he does not, as standard professional methodology requires, use comparable properties to conduct his analysis. Rather, he uses an assortment of fractional interests (the "Comp Set") but does not adjust for fundamental differences between the Comp Set and the Property. Real estate valuation principles mandate making such adjustments.

8.  Location is an important, and often is the most important, factor in real estate (as shown in the popular saying "location, location, location") Robinson does not account for the differences in location in his analysis.

9.  Robinson's analysis should have adjusted for the comparative differences between Downtown Aspen, Snowmass Village, and Aspen Highlands.

10. Robinson's Comp Set is disproportionately weighted with assets in Downtown Aspen (80%) versus Snowmass Village (20%) and includes no Comparables in Aspen Highlands. Robinson excludes Comparables located in Snowmass Village without explanation; were these Comparables included, the results would have been drastically different.

11.  While still inferior to the properties in Downtown Aspen, the Property outperformed Snowmass Village between 2014 and 2018.

12. The loss of value experienced at the Property was likely a function of the conditions in the overall market, and more specifically Aspen Highlands' position as the least desirable submarket, in the Greater Aspen Area.

13. Robinson should have adjusted for differences between the date of construction/renovation, amenities, reputation, type of use, exchange networks, etc.

14. Although the Property has three times as many fractional interests as all but one of the Comparables, Robinson does not address how this larger supply impacted pricing.

15. Exchange Programs are not unique to the Property, and thus it cannot be determined to be the cause of a DoV.

16. The Plaintiffs contend they were denied the opportunity to vote on the MVC Affiliation. The owners of the fractional units in the former The Ritz-Carton Club, Bachelor Gulch, a highly desirable mountainside destination, voted to re-brand Bachelor Gulch as Timbers Bachelor Gulch in 2013, rather than affiliate with MVC. The Plaintiffs ignore that from 2014 to 2018, the period in which the MVC Affiliation occurred, the Timbers Bachelor Gulch fractional units declined 18.9%, over eight times the Property's 2.2% decline.

17. The Amended Robinson Model contains several mathematical and formulaic errors.

**My Opinions**

***Opinion 1: Simon conflates various actions of the Defendants – some the subject of the Complaint[1] and others that are not. The result is that he cannot attribute any DoV to the alleged wrongful acts. This has further implications in determining the effective starting date of Robinson's calculations of DoV.***

The MVC Affiliation *vis-à-vis* The Ritz-Carlton Club, Aspen Highlands was announced to members in April 2014 after the Board of Directors of the association of owners signed the Acknowledgement and Joinder, which then became operational on December 5, 2014.[2]  Shortly thereafter, Owners could begin depositing their weeks with Marriott Vacations Club "MVC" for MVC points, and MVC members could begin using MVC points to access those deposited weeks. Thus, under the Affiliation, Owners could not exchange their weeks for MVC points for any years prior to Joinder, nor could MVC members access the Property through the MVC Affiliation, as it had not yet been implemented.

The Complaint alleges that the MVC Affiliation resulted in Plaintiffs incurring DoV damages. Simon states that his role is "to opine on whether Defendants' actions, if proven, caused Plaintiffs' property values to diminish."[3]  Simon acknowledges that the Complaint concerns and addresses only actions pertaining to the MVC Affiliation, but he concludes that there were other improper acts by the Defendants – never asserted in the Complaint – that negatively impacted the value of the Fractional Interests at the Property. Though Simon does not specifically define those additional improper acts, he generally ascribes damages allegedly

---

1 Sixth Amended Complaint ("The Complaint")
2 2014.11.18 Notice of Effective Date - Aspen
3 Simon Report, 4-5

resulting from the MVC members' use of MVC points to access the Property "even before the affiliation."[4]

As noted above, the alleged wrongful actions in the Complaint are limited to the MVC Affiliation.  Owners could not exchange their weeks for MVC points and MVC members could not access the Property through the MVC Affiliation prior to the Joinder. Thus, any impact in value on the Fractional Interests caused by MVC members having "access to" the Property as a result of the MVC Affiliation could not have begun prior to the MVC Affiliation. I see no basis in the Complaint for the damages calculation to start before that event.[5]

***Opinion 2: The Simon Report does not include any analysis, examples, calculations, evidence or other support necessary to validate his opinions regarding the question of whether "Defendants' actions, if proven, caused Plaintiffs' property values to diminish…"[6].***

Simon's conclusions as to DoV are based on nothing more than his, and others', unsubstantiated opinions "that this would be a substantial factor in causing the value of the Plaintiffs' Fractional Interests to decline and/or not increase in value in comparison with similar properties without these issues."[7] Though many of Simon's assertions allude to "well-accepted"[8] principles, he does not cite to any sources or authorities as a basis for his conclusions.  There are no analyses, calculations, examples, or any other support provided in the Simon Report to demonstrate how, if at all, the MVC Affiliation impacted the values of the Fractional Interests. Furthermore, fractional interest values at different resorts do not rise or fall in sync with each other. Rather, as I will discuss later in this Second Report: 1) generally speaking, to make any

---

4 Simon Report, 4

5 See MVC Affiliation exchange nights in Tables 1 & 2. Prior to affiliation, developer inventory was accessed.

6 Simon Report, 4-5

7 Simon Report, 11 and 22.

8 Simon Report, 21

valid comparison of fractional interest values across resorts requires, as Simon acknowledges, identifying and considering "similar properties" – something neither Simon nor Robinson did;[9] and 2) more specifically, the value of Plaintiffs' Fractional Interests, was subject to multiple factors, many of which were beyond the control of the Defendants in this action.

Simon, like Robinson, does not consider any of the external factors which likely influenced values at the Property. As described throughout this Second Report, factors such as location, age of the property, competitive supply, and the Property's comparative larger supply of Fractional Interests would need to be considered to determine the extent to which any one factor influenced values.  There is no "causation." Simon has not shown (nor did Robinson show) how, if at all, the MVC Affiliation caused any damage to the Plaintiffs' Fractional Interests.[10]

***Opinion 3: Simon suggests that 'exclusivity' is the factor that drives the value of a Private Residence Club. Exclusivity is a marketing term – the Property remains exclusive in that it is a luxury resort that is restricted to members, guests or renters from members, or guests through external exchange programs, but not available to the "general public."***

There is no indication of any loss of exclusivity at the Property resulting from the MVC Affiliation.

---

9 That being said, even finding "similar properties" would not have absolved Robinson or Simon from conducting further analysis, considering other factors, or adjusting those properties.

10 Moreover, as discussed in my First Report, fractional interests are purchased for use and enjoyment, not for investment; and neither the utility, nor the quality, of these units changed as a result of the MVC Affiliation. Simon does not address this fact.

Simon claims that "the value of interests in a private residence club can drastically decline if the club's exclusivity is destroyed,"[11] and "the general public can access the same private residence club…"[12]

The "general public" cannot access the Property without the permission, cooperation and consent of the Fractional Interest owners. Access is limited to certain types of users – whether owners of Fractional Interests, their guests, invitees, and those who rented from owners, or through external exchange programs, such as MVC, where exchange members can access the Property under certain conditions.  In this regard, it is important to bear in mind that, under the MVC Affiliation, MVC members access the Property *only* because owners choose to deposit weeks with MVC in exchange for MVC points; MVC members can access the Property only during those deposited weeks.

Moreover, to the extent non-member access arguably did affect exclusivity and negatively impact value, the same effect would result from Owners, like the Plaintiffs in this case, renting their units to outsiders, which occurred completely independent of the MVC Affiliation and, in fact, began well before the MVC Affiliation.  However, Simon makes no distinction between exclusivity and value compromised by the Owners' election to rent their fractional interests to the "general public" before and after the MVC Affiliation and the access opportunity afforded to MVC members through the MVC Affiliation.  He fails to consider whether the alleged negative impact could be due to rentals, to a combination of rentals and MVC member access, or to neither factor.

---

11 Simon Report, 22
12 Simon Report, 22

As a matter of fact, nights at the Property rented to the general public by Owners (rental roomnights) far exceeded nights accessed by MVC members via MVC points under the Affiliation, as follows:

Table 1

| Roomnights Rented by Non-Owners | | | |
|---|---|---|---|
| Year | Rentals Roomnights | Pre-Affiliation Roomnights Through MVC Points | Post-Affiliation Roomnights Through MVC Points |
| 2011 | 722 | 267 | |
| 2012 | 1,020 | 545 | |
| 2013 | 734 | 846 | |
| 2014 | 1,133 | 1,300 | |
| 2015 | 1,589 | | 1,897 |
| 2016 | 2,090 | | 1,022 |
| 2017 | 1,803 | | 773 |
| **Total Nights** | **9,091** | **2,958** | **3,692** |
| **Avg/Yr (2011-14)** | **902.25** | **739.5** | |
| **Avg/Yr (2015-17)** | **1,827** | | **1,231** |
| **Avg/Yr (2011-17)** | **1,299** | **950** | |

Source: RCDC073606; RCDC073100 Rentals

It is worth noting that the number of roomnights secured through MVC points, were significantly less than the number of roomnights used by owners.

Table 2

| Percent of Total Roomnights Rented by Non-Owners | | | |
|---|---|---|---|
| Year | Rentals Roomnights | Pre-Affiliation Roomnights Through MVC Points | Post-Affiliation Roomnights Through MVC Points |
| 2011 | 3.2% | 1.2% | |
| 2012 | 4.4% | 2.3% | |
| 2013 | 3.0% | 3.5% | |
| 2014 | 4.9% | 5.6% | |
| 2015 | 6.7% | | 8.0% |
| 2016 | 8.8% | | 4.3% |
| 2017 | 8.1% | | 3.5% |
| **Avg/Yr (2011-14)** | **3.9%** | **3.2%** | |
| **Avg/Yr (2015-17)** | **7.9%** | | **5.3%** |
| **Avg/Yr (2011-17)** | **5.6%** | **4.1%** | |

Source:  RCDC073606; RCDC073100 Rentals

Thus, Owners renting their roomnights to the "general public" was greater than access to the Property by MVC members using MVC points, and far greater after the MVC Affiliation; and both were a small fraction of the total number of available roomnights. In addition, access via rental from the owners or through a broker can be significantly cheaper than buying the Fractional Interest outright.

Simon contended that "the value… can drastically decline if the club's exclusivity is destroyed."[13] I see no correlation, nor has Simon proposed one, that the MVC members usage of 5.3% of the total inventory "destroyed" exclusivity. Furthermore, this access is provided only when an Owner elects to exchange their unwanted time at the Property to use at another MVC resort, a valuable benefit to many. No MVC members can enter the Property under the MVC Affiliation unless Owners participate in the Exchange Program.

---

13 Simon Report, 22

As I have previously noted the term "exclusivity" is not an industry term, but a marketing term, equated with luxury and quality of service.[14]  There is no evidence to suggest that there was any difference in the luxury of the Property and quality of service provided before and after 2015.  The MVC Affiliation enabled certain MVC members to access weeks that owners voluntarily deposited with MVC, and this access did not change the quality, service, product, rental policies or other aspects of the Fractional Interests.  I see no evidence of the destruction of exclusivity. In fact, the Property remains exclusive, as short term, transient travelers are precluded from staying at the Property – a reality I experienced firsthand when conducting the site inspection. I was unable to reserve a room through any online travel agency "OTA" platform, visiting the Marriott.com website, or through a travel agent.

Moreover, limited access may be unrelated to "luxury."  Luxury is more often than not related to those who can afford to pay. First Class on an airplane is exclusive; private members clubs are exclusive; Aspen is an exclusive destination. USA Today described the Aspen Food Festival as the most "exclusive" in the country, despite the fact that anyone can attend.[15] "Exclusivity" in these instances is a function of the cost of access, and not any other limitation on access.

Simon also notes that "Branding plays an important role in exclusivity. Those who purchase a fractional interest at a premium price are often relying on the project's luxury branding...."[16] The Ritz-Carlton continues to be a highly-regarded, luxury brand that consistently wins awards, notably from J.D. Power, Travel Weekly, Conde Nast, AAA, Forbes and the U.S

---

14 See First Report

15 USA Today, "Diamonds, caviar and the Instagram-famous: Inside America's most exclusive food festival." Trevor Hughes. June 19, 2018

16 Simon Report, 21

Department of Commerce (Malcolm Baldrige National Quality Award.)[17] The MVC Affiliation created  no change in branding that would compromise the exclusivity of the Property.

The Plaintiffs do not allege the condition or level of services offered by the Property diminished. Nor is it as if the Property was substituted with an inferior resort. As explained in my First Report, "based on my inspection, units are highly desirable luxury units, and the MVC Affiliation did not impact the Property's exclusive quality. The Property continues to be managed by The Ritz-Carlton Management Company, L.L.C. to the high Ritz-Carlton standards."[18]

***Opinion 4 – Like Simon, Robinson does not demonstrate how or if the actions of the Defendants, including the MVC Affiliation, negatively impacted the value of the Fractional Interests. He relies on a statement made in an appraisal that was provided with no supporting analysis. Nor does he do any independent analysis to support this claim.***

Robinson relies on the statements made by the Cushman and Wakefield appraisers, John C. Vaughan and Christopher T. Donaldson. In their appraisal report dated December 2, 2013 (the "Cushman & Wakefield Appraisal"), the authors state, "overall, the conversion to a points system and the integration of the Marriott Vacation Club has had a negative impact on the market value of existing fractional interests in the Ritz Carlton Club."[19] Of particular note, this report was dated December 2, 2013 – before (1) the MVC Affiliation was announced to members in April 2014, (2) the implementation of the MVC Affiliation at The Ritz-Carlton Club, Aspen Highlands on December 5, 2014, and (3) any MVC members could use points to access the

---

17 http://www.ritzcarlton.com/en/about/awards
18 Tantleff Report, 27
19 Cushman & Wakefield Summary Appraisal of Real Property BFLT, December 16, 2013, 19.

Property through the MVC Affiliation beginning in January 2015. Thus, to the extent this statement relates to MVC member access, it necessarily relates to MVC member access prior *to and not as a result of* the MVC Affiliation (and through other means) and not through the MVC Affiliation.

In any event, the statement is devoid of any support in the record. The authors performed no analysis to substantiate this claim. As Mr. Donaldson later testified, multiple factors impact value, and in order to determine any impact one must isolate or discount the other factors.

In his deposition, Donaldson states that he performed no analysis that isolated the impact of the MVC Affiliation on values of the Fractional Interests:[20]

> **Q**. And if you wanted to know the impact, if any, of the Marriott affiliation or access of Marriott members, you'd have to discount all the other factors, the national real estate trend, and the fractional interest trends. And you didn't do that either; correct?
>
> **A.** Correct.

As Mark Dunec wrote in his expert report, dated October 26th, 2018 (the "Dunec Report"), "the Appraisers fail to provide any evidence of proper research and/or analysis to support [the] claim of impairment in the Report."[21] The Dunec Report further addresses the Cushman & Wakefield Appraisal's weaknesses, including that no work file was provided to support the statement.[22]

Robinson also states that other Plaintiff experts, such as Jon Simon and Dr. Chekitan Dev, will opine that the allegations "were substantial factors in causing values at the Property to be significantly lower than they would have been absent Defendants' unlawful actions."[23]

---

[20] Donaldson Deposition, 251-252
[21] Mark Dunec Expert Report dated October 26, 2018, 6-7
[22] Mark Dunec Expert Report dated October 26, 2018, 11
[23] Amended Robinson Report, 6

However, neither Simon nor Dev conducted an analysis: 1) tying the Defendants' alleged acts to any decline in value of the Property; 2) isolating the impact of the Defendants' acts on the value of the Property; or 3) quantifying the impact of the Defendants' acts on the value of the Property.

Robinson himself acknowledges that MVC Affiliation was not the only factor that could have impacted value.  There are other factors that were unrelated to the actions of the Defendants that likely caused changes in the value of the Plaintiffs' Fractional Interests.  Other references suggest that a decline in value was likely attributable to other factors. For example, in Cushman and Wakefield's <u>Dancing Bear Appraisal</u> dated November 17, 2010, **before** the MVC Affiliation,  Christopher Donaldson describes the Property as "a sizable project of 876 shares which has struggled with sales which is a function of location in our opinion."[24] In the report of Richard Ragatz entitled <u>Comments on Pricing the Remaining Unsold Inventory at the St. Regis Residence Club, New York and St. Regis Residence Club, Aspen</u>, dated August 2015, (again before the MVC Affiliation) Ragatz derides the Property's location: " Aspen Highlands, which has more or less become a poor step-sister to Aspen."[25]  I provide other commentary on the Property's inferior location later in this Second Report.

Neither Robinson nor Simon perform any analysis to determine how the DoV could have been attributed to market factors other than the MVC Affiliation, or to isolate the alleged impact, if any, of the MVC Affiliation.

---

24 Dancing Bear Appraisal, 49
25 St. Regis Report, 50

***Opinion 5 – Robinson's analysis results in an overstated calculation of potential damages. He begins his calculation several years prior to the MVC Affiliation and fails to segregate the Defendants' alleged "series of actions"[26] from the MVC Affiliation.***

Robinson's thesis is that "a series of actions led by the Defendants, beginning in **2011**, caused a severe reduction in the sales prices (and thus, for the purposes of this analysis, diminution in value) of the Fractional Interests at the subject Property, which continues today *[Emphasis Added.]*"[27]  In short, Robinson begins the calculation of DoV in 2011, three years prior to the implementation of the MVC Affiliation.[28]

For the reasons discussed above, the analysis must begin concurrent with the implementation of the MVC Affiliation at Ritz Carlton Club Aspen,[29] i.e. in 2015.

Robinson acknowledges that the start date is in question. The Amended Robinson Model has the functionality to select one of four potential start dates: 8/1/11, 8/1/12, 1/1/13, and 1/1/14. However, the Amended Robinson Model does not include an option to start the analysis on 1/1/15, which is the date when MVC members could first begin using MVC points to access the Property as a result of the MVC Affiliation.

***Opinion 6: Robinson does not investigate any alternative factors that likely impacted the value of the Fractional Interests. Robinson did not apportion any change in value to the MVC Affiliation or to any other factor.***

---

26 Amended Robinson Report, 5

27 Amended Robinson Report, 5

28 Amended Robinson Report, 5

29 Robinson had the obligation to show WHEN the MVC Affiliation impacted value (if it did) – this theoretically might be concurrent with its implementation, shortly before the implementation when the impact might be known or anticipated, or after when its affects are visible. Robinson did no analysis to determine if the MVC Affiliation impacted value or when that change in value might have begun or ended.

Several factors likely influenced the value of the Fractional Interests, including those addressed in the following table.  Robinson conducted no analysis of these factors, nor did he attempt to assess or apportion any change in value to these other factors. Robinson had an obligation to investigate whether these factors impacted value; instead he ascribed the entire change in value solely to the MVC Affiliation.

Table 3

| # | Influencing Factor | Description |
|---|---|---|
| | Factors Influencing Value | |
| 1 | Derogatory Comments by Counsel | The Plaintiff's counsel, Matthew Ferguson, has disparaged the Property through his public comments; he compared the level of service to that of a "Holiday-Inn" (Aspen lawsuit: Marriott affiliation dilutes Ritz-Carlton brand, January 5, 2016). |
| 2 | High Volume of Rentals | Plaintiffs and other Owners provided a numbers of non-Owners access to the Property, through the weeks available to rent. |
| 3 | Litigation | As discussed in the deposition of Ivan Skoric, the Plaintiffs' lawsuit and attendant publicity, likely reduced interest in the Property. (Deposition of Ivan Skoric, April 27, 2018, 314) |
| 4 | Large Supply | The Property has an disproportionately large number of interests, far exceeding any of the Comparables. |
| 5 | Cannibalizing Sales Tactics | Owners did not maximize the sales prices of their interests, rather pricing them for to sell quickly, often undercutting each other. |
| 6 | Location | As described in this report, the Property is located in a less desirable area of Greater Aspen |
| 7 | Lack of Amenities | As described in this report, Aspen Highlands has the fewest amenities of three Greater Aspen Submarkets |
| 8 | Loss of Other RCDC Options | The Plaintiffs no longer have access to other Ritz-Carlton properties including, Bachelor Gulch, Jupiter, and Kapalua Bay. |
| 9 | Age Of Project | The Comparable properties throughout Greater Aspen were either completed or renovated after the Projects' completion. |
| 10 | Superior Competitive Supply | All of the Comparables, save for the Hyatt Grand Aspen, are superior to the Property based on their location and date of construction/renovation. |
| 11 | Affiliation with the MVC Exchange Program | Plaintiffs claim that affiliation with the MVC Affiliation impacts the value of their Fractional Interests. |
| 12 | Other Factors | The Property may be subject to other factors to which I am un aware. |

As previously discussed, one must isolate any variable to determine if any change in value can be attributed to that factor. For example, if the value of a private residence changed in a market where the elementary school closed, and a large heavy industrial site opened next door simultaneously, one cannot ascribe a change in value solely to the school closing, without evaluating other factors.

Similarly, it is improper to ascribe the total change in value solely to the MVC Affiliation, when the Property was subject to a multitude of external forces.

17

As noted below, in his deposition Donaldson acknowledges the need to address the variables affecting value, yet neither Donaldson nor Robinson did so:

> **Q**. And if you wanted to know the impact, if any, of the Marriott affiliation or access of Marriott members, you'd have to discount all the other factors, the national real estate trend, and the fractional interest trends. And you didn't do that either; correct?
>
> **A.** Correct.

I have developed a pie chart below ("Chart 1") to show that a multitude of factors occurred that likely impacted value, in addition to the MVC Affiliation. Robinson made no effort to determine or assess any change in value to these factors; instead he attributed all the change to the MVC Affiliation.

<u>Chart 1</u>
Factors that could have influenced the change in value of the Plaintiffs' Fractional Interests



*Opinion 7: Robinson utilizes the Sales Comparison Approach to quantify values. However, he does not use comparable properties to conduct his analysis. Rather, he uses a widespread*

*assortment of fractional interests (the Comp Set) but does not adjust for fundamental differences between the Comp Set and the Property. Real estate valuation principles mandate making such adjustments.*

Robinson defines several fractional resorts as comparable in order to calculate the "But For Sales Price" of the Plaintiff's Fractional Interests. Four of these projects are located in the area surrounding the Aspen Base Village ("Downtown Aspen") within walking distance of Aspen's famous shops and restaurants. One is located in Snowmass Village. None are located in Aspen Highlands.

There are wide variations in the characteristics of the individual assets that comprise Robinson's Comp Set (a "Comparable" or "Comparables"). One project has an average sales price per unit of four times that of the Property's Fractional Interests; another project sold penthouse unit interests at a 70% premium to the average sales price per square foot to its standard units, which skews the data.[30] To the extent a Sales Comparison Approach is useful, it must accommodate for the fact that all real estate is unique, and thus any comparables need to be adjusted for their uniqueness.

Simon acknowledges the need to use "similar properties" to conduct an analysis. The Robinson Model Comp Set includes a wide variety of properties, none of which were adjusted to account for material differences.[31]

---

30 Amended Robinson Model
31 Simon Report, 11

Table 4

Different Markets Perform Differently

| Average Annual Change in Value - 8/1/2010 to 10/16/18 | | | |
| --- | --- | --- | --- |
| Location | Downtown Aspen | Snowmass Village | Aspen Highlands |
| Number of Properties | 4 | 1 | 1 |
| Average Annual Change in Value | 2.4% | -1.8% | -13.9% |

Source: Amended Robinson Model

His analysis demonstrates that different markets perform differently – as shown in the table above. Downtown Aspen performed the best with a nominal increase in value over the time period, while fractional interests in the one Snowmass Village property lost value. Aspen Highlands, which is considered the weakest of the submarkets, performed the worst. Even assuming that some loss in value was due to the MVC Affiliation, it is unlikely that the entire loss in value of the Property's Fractional Interests was attributable to the MVC Affiliation; yet Robinson does not investigate this.

As shown below, the rate of appreciation or depreciation varies with each of the Comparables Robinson selected. There is a wide disparity in performance of these Comparables, which must be attributed to factors other than the MVC Affiliation. Please note for the purposes of this comparison, I have used Robinson's unsupported analysis start date.

Table 5

Different Properties Perform Differently

| Average Annual Change in Value - 8/1/2010 to 10/16/18 | | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| Property | RCDC | St Regis Resort Aspen | The Timbers Residence Club | The Dancing Bear | The Residence at Little Nell | The Hyatt Grand Aspen |
| Average Annual Change in Value | -13.9% | 8.8% | -1.8% | 4.9% | 1.6% | -5.8% |

Source: Amended Robinson Model

There is no evidence to suggest that the Property performed differently from the Comp Set due to the MVC Affiliation.

The analysis above (the Amended Robinson Model does not discuss adjustments) highlights the need to adjust the Comparables. His model acknowledged that certain sales, which occurred in one of the projects he deems comparable, "skews" the data. Below is an excerpt of his model, identifying this weakness.

| Sold Date | Sold Price | | Total Sq.Ft. | Price/Sq.Ft. | Bedrooms | Unit Number | Notes |
|---|---|---|---|---|---|---|---|
| 11/7/2016 | $760,000 | 7 | 2,000 | 380 | 3 | B10 | |
| 11/17/2016 | $795,000 | 7 | 2,000 | 398 | 3 | E14 | |
| 11/21/2016 | $795,000 | 7 | 2,000 | 398 | 3 | B16 | |
| 12/5/2016 | $2,000,000 | 7 | 3,009 | 665 | 4 | Interest Ph-20a | |
| 12/5/2016 | $2,000,000 | 7 | 3,009 | 665 | 4 | Interest Ph-20b | |
| 12/5/2016 | $2,000,000 | 7 | 3,009 | 665 | 4 | Interest Ph-20c | |
| 12/5/2016 | $2,000,000 | 7 | 3,009 | 665 | 4 | Interest Ph-20d | |
| 12/5/2016 | $2,000,000 | 7 | 3,009 | 665 | 4 | Interest Ph-20e | |
| 12/5/2016 | $2,000,000 | 7 | 3,009 | 665 | 4 | Interest Ph-20f | |
| 12/5/2016 | $2,000,000 | 7 | 3,009 | 665 | 4 | Interest Ph-20g | |
| 12/5/2016 | $2,000,000 | 7 | 3,009 | 665 | 4 | Interest Ph-20h | |
| AVERAGE PRICE 2016 | $1,059,029 | | 2,231 | $475 | | | Skewed by Penthouse sales |
| 2/15/2017 | $795,000 | 7 | 2,000 | 398 | 3 | C11 | |
| 3/15/2017 | $825,000 | 7 | 2,000 | 413 | 3 | A13 | |
| 3/15/2017 | $825,000 | 7 | 2,000 | 413 | 3 | E10 | |
| 3/24/2017 | $825,000 | 7 | 2,000 | 413 | 3 | C3 | |

Source: Amended Robinson Model

Robinson acknowledges that the data is "skewed" by including sales that are neither "similar" nor "comparable."

One must adjust any comparable sale, when opining to a value using the Sales Comparison Approach, even if the properties are considered similar. This process is widely-known, common industry practice, and a requirement of a "sales comparison approach" to property real estate appraisal:

> *Sale Comparison Approach*: *The process of deriving a value indication for the subject property by comparing sales of similar properties to the property being appraised, identifying appropriate units of comparison,* **and making adjustments to the sale prices (or unit prices, as appropriate) of the comparable properties** *based on relevant, market-derived elements of comparison.*[32] *[Emphasis Added]*

---

32 The Dictionary of Real Estate Appraisal, sixth edition, 207

In order to assess the relevance of the Comparables, Robinson should have made adjustments to each of the Comparables. Instead, he ignores key physical, locational, market, and economic factors that would impact the relevance or usefulness of the Comparables in determining the alleged DoV of the Fractional Interests.

The Comparables should be adjusted for attributes like location, views, the specific weeks of use, carrying costs, parking, amenities, age, date of refurbishment, ease of exchange, ease of rental, etc.

Robinson has not followed normal and customary practice in conducting a Sales Comparison Approach; thus, his results are flawed.

**Opinion 8: Location is an important factor in real estate. Robinson does not accommodate the differences in location in his analysis.**

The Cushman & Wakefield Appraisal discusses the Property's locational disadvantage compared to Downtown Aspen, stating it has "a periphery location that does not have the critical mass of support services and amenities on the level of the Town of Aspen."[33]

Highlighting the importance of location on PRC/Fractional Interests the Cushman & Wakefield Appraisal further states, "high-end fractional and private residence club owners purchase primarily for the certainty of quality accommodations, location, and quality compared to other options of a similar price."[34] This calls into serious question whether properties in Downtown Aspen are appropriate comparables.

---

33 Cushman & Wakefield Summary Appraisal of Real Property BFLT, December 16, 2013, 12.
34 Cushman & Wakefield Summary Appraisal of Real Property BFLT, December 16, 2013, 16.

The Property's competitive disadvantage is reiterated by Ragatz Associates Report Prepared for Starwood Vacation Ownership, which refers to Aspen Highlands as "a poor step-sister to Aspen."[35]

Furthermore, a draft appraisal of the Dancing Bear Appraisal, dated November 17, 2010, written by the same author of the Cushman & Wakefield Appraisal, Christopher T. Donaldson, states that the Property struggled due to its location, "This is a sizable project of 876 shares which has struggled with sales, which is a function of location in our opinion. The Ritz brand has helped sales, but the Aspen Highlands area lies outside of Aspen with limited services and nearby amenities."[36]

The Plaintiffs state the DoV began when "Marriott Defendants… began providing MVC members access to the exclusive Ritz Carlton."[37] Although Robinson provides no support for the specific date when this access occurred, according to the Amended Robinson Model, it occurred in August 2011. However, according to the Dancing Bear Appraisal, The Ritz-Carlton Club, Aspen Highlands "struggled with sales"[38] even prior to the issuance of the Dancing Bear Appraisal in 2010.

The Dancing Bear Appraisal emphasizes that location is primary to the determination to purchase a fractional interest in a PRC.[39] Cushman and Wakefield attributes the Property's struggles to its location, characterizing Aspen Highlands as a "periphery" location, lacking the

---

[35] St. Regis Report, 50
[36] Dancing Bear Appraisal, 49
[37] Simon Report, 7
[38] Dancing Bear Appraisal, 49
[39] Dancing Bear Appraisal, 16

"critical mass of support services and amenities on the level of the Town of Aspen,"[40] and Ragatz termed the location "a poor step-sister to Aspen."[41]

### *Opinion 9: Robinson's analysis should have adjusted for the comparative differences between Downtown Aspen, Snowmass Village, and Aspen Highlands.*

The following section addresses the relative appeal of Downtown Aspen, Aspen Snowmass Village, and Aspen Highlands.

**Downtown Aspen**

Downtown Aspen became an international destination based not just on skiing, but on its diverse dining scene, contemporary art, spas, and outdoor activities.[42] The mountain-side resort-town has gained the reputation as a playground for the rich and famous, which is buttressed by the fact that in 2016 at least 50 Forbes billionaires owned homes in Downtown Aspen.[43] Of the 128 ski towns analyzed by SmartAsset in a 2015 survey, Downtown Aspen was ranked as the nations' second-best ski town, having the fifteenth highest concentration of bars and restaurants, and the seventh highest concentration of entertainment establishments.[44]

Downtown Aspen also offers a vibrant cultural landscape, with dozens of art galleries and a recently constructed $45 million, 33,000 sf contemporary art museum.[45] Aspen Film organizes

---

40 Cushman & Wakefield Summary Appraisal of Real Property BFLT, December 16, 2013, 12.

41 St. Regis Report, 50

42 CNN Travel, " A Non-Skier's Guide to Aspen," December 15, 2017

43 Ski Magazine, "2015 Top Ski Towns: Aspen, Colorado"

44 Smart Asset, "The Best Ski Towns in America - 2015 Edition, November 29, 2016. SmartAsset combines ski specific factors such as snowfall, acreage, and number of lifts with quality of life factors such as median income, number of bars, and entertainment establishments (including concert venues, movie theaters, and museums).

45 Ski Magazine, "2015 Top Ski Towns: Aspen, Colorado"

a major movie event in Aspen every season.  Educational programs and numerous special presentations cumulatively attract approximately 30,000 participants each year.[46]

**Snowmass Village**

Snowmass Village has a variety of shops, hotels, fine dining and entertainment venues. The town offers a summer concert series, downhill mountain bike races, weekly rodeos, and the Jazz Aspen Snowmass Labor Day Festival.[47]  In my opinion Snowmass Village is a more vibrant town than Aspen Highlands with a larger residential and tourist base, offering a considerably more developed retail presence. Furthermore, Snowmass Village is in the midst of a 10-year, $600 million project that will add ten buildings, including additional hotels and high-end condominiums and a public plaza.[48]

**Aspen Highlands**

Aspen Highlands is not a town nor village; rather it is a small community centered around a mixed-use development, offering a limited retail area of 36,000sf.[49] The area does not have the cache of Downtown Aspen, and according to Forbes Magazine, "Aspen Highlands has traditionally been the locals' and experts' mountain of choice, with a much more "ski bum" and much less "chichi" feel."[50]

Aspen Highlands was developed as a low ski density, high-end mountain. My inspection revealed many of Aspen Highlands' challenges, including a lack of restaurants and retailers. Instead, Aspen Highlands has a number of offices and service providers, such as lawyers or tour operators, in addition to many vacant store fronts. As a result, Aspen Highlands has minimal

---

46 https://aspenfilm.org/about-aspen-film/

47 https://www.masonmorse.com/areas/snowmass-village

48 All Is Snowmass, "Construction Begins on $600 Million Snowmass Base Village," July 10, 2017

49 https://www.hines.com/properties/aspen-highlands-village-aspen

50 Forbes, "Why Aspen and Snowmass is this season's hot ski destination," January 17, 2013.

pedestrian traffic, less amenities and less vibrancy. These weaknesses are shown in the photographs from my site inspection, discussed in my First Report, and included in Appendices A and B.

**Comparison of Retail Services in Downtown Aspen, Snowmass Village, and Aspen Highlands**

As depicted in Table 6 below, nearly 90% of all business registered with the Chamber of Commerce in the Greater Aspen area are located in Downtown Aspen, followed by 7% and 3% in Snowmass Village and Aspen Highlands respectively.[51] Aspen Highlands suffers from a lack of retailers and restaurants necessary to support its visitation.[52]

Table 6[53]

| Distribution of the Greater Aspen Businesses | | | |
|---|---|---|---|
| Category | Aspen | Snowmass Village | Aspen Highlands | Totals |
| Arts & Culture | 17 | 1 | 0 | 18 |
| Business & Services | 244 | 15 | 5 | 264 |
| Governemnt | 7 | 1 | 0 | 8 |
| Housing and & Employee Housing | 3 | 0 | 0 | 3 |
| Lodging | 90 | 14 | 0 | 104 |
| Non-Profit | 26 | 2 | 0 | 28 |
| Real Estate | 35 | 0 | 4 | 39 |
| Recreation | 69 | 17 | 13 | 99 |
| Religious Services | 4 | 0 | 0 | 4 |
| Resturants & Nightlife | 114 | 6 | 1 | 121 |
| Shopping | 118 | 2 | 5 | 125 |
| Transportation | 16 | 0 | 0 | 16 |
| Wedding & Event Services | 29 | 2 | 0 | 31 |
| **Totals** | **772** | **60** | **28** | **860** |

51 Aspen Chamber of Commerce, 2018 Business Directory
52 Aspen Chamber of Commerce, 2018 Business Directory
53 Aspen Chamber of Commerce, 2018 Business Directory

Chart 2



Chart 3



Chart 4



Chart 5



Most visitors and buyers prefer Downtown Aspen to Aspen Highlands. This was confirmed by Ivan Skoric, the local broker I interviewed, who maintains an office in the Property. This preference is further evidenced by the comments of the Assistant General Manager of the Property, Mr. Sasha Jaramasz,  that the Property is spending approximately one million dollars per year transporting RCDC guests to Downtown Aspen. [54] Both Skoric and Jaramasz discussed the weaknesses in Aspen Highlands, including the fact that there is only one restaurant outside the Property – which is not sufficient for guests whose typical stay is one week.

Aspen Highlands is at a competitive disadvantage to both Downtown Aspen and Snowmass Village.

**Opinion 10: Robinson's Comp Set is disproportionately weighted in assets in Downtown Aspen (80%) versus Snowmass Village (20%) and has no Comparables in Aspen Highlands.**

---

[54] This conversation with Mr Jaramasz occurred during my site inspection of the Property, from July 23 through July 25, 2018.

***Had Robinson utilized more Comparables in Snowmass Village, the results would have been significantly different.***

Robinson's analysis presents sales data for fractional projects that he considers "competitive" to the Project.[55] This data (which I discuss in depth later in this Second Report) is summarized below.

One must carefully select properties to include as Comparables in a comp set. Robinson's "cherry-picking" of assets results in inflated growth rates. Robinson's calculation is artificially inflated through the inclusion of four Comparables located in Downtown Aspen (80% of the Comp Set), a significantly stronger market than Aspen Highlands. None of the assets in the Comp Set are located in Aspen Highlands, and only one asset in the Comp Set is located in Snowmass Village. There are other properties in Snowmass Village, including the Sanctuary at Snowmass Village and Snowmass Club, that Robinson could have included in his Comp Set, but he chose not to do so.

As shown in Table 7, I have recreated the Amended Robinson Model – save for his mathematical errors – to rely on a Comp Set including only properties in Snowmass Village ("Snowmass Comp Set") - Timbers Resort Residence Club, Sanctuary at Snowmass Village, and Snowmass Club. According to this calculation, the average CAGR for the Snowmass Village Comp Set was -4.55% [a loss of value] for a start date of 8/1/11.

Additionally, I have also added the hypothetical scenario in which the analysis has a base year ending 12/31/14, or, in other words, a start date of 1/1/15. Under this scenario, which is meant to calculate alleged damages from the time the MVC Affiliation was implemented at the Property, the CAGR of the Snowmass Comp Set is -3.33%. Perhaps the most interesting aspect

---

55 Amended Robinson Report

of this analysis is that the Property outperformed the Snowmass Comp Set, with a CAGR of -0.6% from 1/1/15.

Table 7

**Sales Price CAGR by Year (From Base Year Ending 7/31/2011)**

| Analysis Year | CAGR Exp | Start Date | End Date | Ritz | Timbers | Sanctuary | Snowmass | Average |
|---|---|---|---|---|---|---|---|---|
| Include in Analysis | | | | | Yes | Yes | Yes | |
| -2 | | 8/1/2007 | 7/31/2008 | | | | | |
| -1 | | 8/1/2008 | 7/31/2009 | | | | | |
| 0 | | 8/1/2009 | 7/31/2010 | | | | | |
| 1 | 0.00 | 8/1/2010 | 7/31/2011 | | | | | |
| 2 | 1.00 | 8/1/2011 | 7/31/2012 | -24.34% | -10.85% | -13.61% | -2.15% | -8.87% |
| 3 | 2.00 | 8/1/2012 | 7/31/2013 | -13.65% | -9.19% | -22.68% | 4.23% | -9.21% |
| 4 | 3.00 | 8/1/2013 | 7/31/2014 | -26.56% | -7.08% | -6.25% | -2.72% | -5.35% |
| 5 | 4.00 | 8/1/2014 | 7/31/2015 | -23.67% | -3.84% | -8.90% | -3.54% | -5.43% |
| 6 | 5.00 | 8/1/2015 | 7/31/2016 | -17.20% | -4.48% | -9.22% | -6.74% | -6.81% |
| 7 | 6.00 | 8/1/2016 | 7/31/2017 | -14.68% | -3.46% | -9.30% | -6.55% | -6.44% |
| 8 | 6.42 | 8/1/2017 | 12/31/2017 | -15.73% | -2.65% | -8.73% | -6.16% | -5.85% |
| 9 | 7.21 | 1/1/2018 | 10/16/2018 | -14.81% | -1.92% | -6.26% | -5.45% | -4.55% |

Source: FTI Calculation

Table 8

**Sales Price CAGR by Year (From Base Year Ending 12/31/2014)**

| Analysis Year | CAGR Exp | Start Date | End Date | Ritz | Timbers | Sanctuary | Snowmass | Average |
|---|---|---|---|---|---|---|---|---|
| Include in Analysis | | | | | Yes | Yes | Yes | |
| -2 | | 1/1/2011 | 12/31/2011 | | | | | |
| -1 | | 1/1/2012 | 12/31/2012 | | | | | |
| 0 | | 1/1/2013 | 12/31/2013 | | | | | |
| 1 | 0.00 | 1/1/2014 | 12/31/2014 | | | | | |
| 2 | 1.00 | 1/1/2015 | 12/31/2015 | 11.46% | 4.30% | -17.85% | -6.84% | -6.80% |
| 3 | 2.00 | 1/1/2016 | 12/31/2016 | 10.90% | -1.32% | -14.02% | -11.19% | -8.84% |
| 4 | 3.00 | 1/1/2017 | 12/31/2017 | 5.70% | 0.51% | -9.81% | -8.11% | -5.80% |
| 5 | 3.79 | 1/1/2018 | 10/16/2018 | -0.60% | 1.87% | -5.06% | -6.80% | -3.33% |

Source: FTI Calculation

The amended model (also see Tables 20-31) above shows that negative sales trends were not specific to the Property, but rather a larger trend existing outside the Downtown Aspen market.

As shown below, Robinson alleges that the Property should have realized a CAGR of 1.6% with a calculation start date of 8/1/11. Just as I have for my own analysis, I have increased

30

the functionally of the Amended Robinson Model to enable it to calculate CAGRs with a start date of 1/1/15 resulting in a CAGR of 4.31% for all of the Robinson Comps. (including, improperly, Downtown Aspen), which is only 491 basepoints above what was realized at the Property (-0.6%) for the same time period, which is less than a third of the 5.5% Robinson calculated for the larger timeframe.

Table 9

**Average Annual Sales Prices/sf of Subject Property and Comps**

|  | Include? | Yes | Yes | Yes | Yes | Yes |  |
|---|---|---|---|---|---|---|---|
| FY | Ritz Aspen | St. Regis | Timbers | Dancing Bear | Little Nell | Hyatt | Average |
| CAGR from 2010 to 2018 | -13.9% | 8.8% | -1.8% | 4.9% | 1.6% | -5.8% | 1.6% |

(1) Start year covers Aug-10 to Jul-11 End Year Covers Jan-18 to Oct-18
Source: Amended Robinson Model

Table 10

**Average Annual Sales Prices/sf of Subject Property and Comps**

|  | Include? | Yes | Yes | Yes | Yes | Yes |  |
|---|---|---|---|---|---|---|---|
| FY | Ritz Aspen | St. Regis | Timbers | Dancing Bear | Little Nell | Hyatt | Average |
| CAGR from 2014 to 2018 | -0.6% | 5.9% | 1.4% | 4.2% | 8.7% | 1.3% | 4.31% |

(1) Start year covers Jan-14 to Dec-14 End Year Covers Jan-18 to Oct-18
Source: Amended Robinson Model

***Opinion 11: While still inferior to the properties in Downtown Aspen, the Property outperformed Snowmass Village between 2014 and 2018.***

The start of the analysis is highly important and significantly changes the results of the model. As shown below, if the analysis were to start on 1/1/15 (using 2014 as a base year) the Property outperformed the Snowmass Village submarket by 900 basepoints.

Table 11

| Total Price Change Per Square Foot By Submarket (2014-2018) | | | |
|---|---|---|---|
| Submarket | Downtown Aspen | Snowmass Village | Aspen Highlands |
| Percent Change | 22.2% | -11.3% | -2.3% |

Source: Amended Robinson Model and Skoric Provided MLS Data

***Opinion 12: The loss of value experienced at the Property is likely a function of the overall market, and more specifically Aspen Highlands' categorization as the least desirable submarket in the Greater Aspen Area.***

As described both throughout this Second Report, and in my First Report, the Greater Aspen market is divided between three submarkets: Downtown Aspen, Snowmass Village, and Aspen Highlands. Each of these submarkets offers different qualities and mix of amenities. Those properties located in Downtown Aspen are viewed as the most desirable, followed by Snowmass Village, with Aspen Highlands occupying the lowest of the three tiers.

As shown in the Table 12 below, Robinson's Comp Set can be divided into three categories: four properties in Downtown Aspen, one in Snowmass Village and the Ritz Carlton Aspen Highlands.  For the below analysis, I added two additional properties in Snowmass Village that Robinson could have included in his analysis, the Sanctuary at Snowmass Village and the Snowmass Club.

It is important to recognize that the greatest delta between two tiers exists in the "step-down" from Downtown Aspen to Snowmass Village at 566 basis points. The difference between value change between Snowmass Village and Aspen Highlands is 28% less, at 406 basis points. There is a clear hierarchy of desirability between the submarkets.

Table 12

| Total Price Changer Per Square Foot By Submarket (2010-2018) | | | |
| --- | --- | --- | --- |
| Submarket | Downtown Aspen | Snowmass Village | Aspen Highlands |
| Percent Change | 28.7% | -27.9% | -68.5% |

Source: Amended Robinson Model and Skoric Provided MLS Data

Graphically, these changes in value look as follows:

Chart 6



Robinson has conducted no analyses to determine if the change in value in Aspen Highlands is anything more than the natural depreciation that Aspen Highlands has seen relative to Aspen.  As previously stated, downtown Aspen is a highly desirable market that appears to have retained its value. I previously noted that both the Cushman & Wakefield appraisers and Ragatz have noted the challenges that Aspen Highlands faces, such as a "poor stepchild,"[56] "struggle[ing] with sales, … [as]a function of location … [however] The Ritz brand has helped sales"[57]

To further illustrate this trend, I analyzed the sale of both condominiums and single-family homes, which Robinson suggests can provide guidance on the values of fractional interests.

---

[56] St. Regis Report, 50
[57] Dancing Bear Appraisal, 49

I note that there is a big distinction between single-family homes and condominiums and fractional interests.  Robinson provided no data to support a correlation between single-family homes and condominium sales and the sale of fractional interests.  As previously discussed, for a sales comparison approach to be instructional, similar properties need to be selected.  Single-family homes, condominiums and fractional interests are not identical.

Notwithstanding, I conducted the below analysis.

I analyzed data from a local broker, Tim Estin, which shows sales prices separated by market.[58] The sales data was analyzed using a CAGR calculation, utilizing a base year of both 2010 and 2014. Downtown Aspen consistently performed better than other markets in the area.

Aspen Highlands is a small market with limited sales. Aspen Highlands had only one single condo and single-family home sale in both 2010 and 2018; therefore, I consider the sample size too small to provide an accurate barometer of the residential market's value, in addition to other weaknesses of this approach that I have described.

As shown in Table 13 below, both condos and single-family homes located in Downtown Aspen have appreciated more on a sales price per square foot than those in Snowmass Village. This trend remains constant if we use a 2010 or a 2014 base year.

This data cannot be used to draw any conclusions about an individual property's value, absent the adjustments necessary as stated in this Report. It is only instructive to demonstrate that different markets perform differently, as do different properties.

---

58 Estin Provided Sales Data, Since 2004

Table 13

| 2010 Base Year Single Family CAGR | | |
|---|---|---|
| Year | Aspen | Snowmass |
| 2010 | | |
| 2011 | 2% | 1% |
| 2012 | 1% | -11% |
| 2013 | 1% | -4% |
| 2014 | 3% | -8% |
| 2015 | 5% | 0% |
| 2016 | 4% | -1% |
| 2017 | 5% | -3% |
| **2018** | **4%** | **-3%** |

7% Swing

| 2014 Base Year Single Family CAGR | | |
|---|---|---|
| Year | Aspen | Snowmass |
| 2010 | | |
| 2011 | | |
| 2012 | | |
| 2013 | | |
| 2014 | | |
| 2015 | 14% | 39% |
| 2016 | 7% | 14% |
| 2017 | 8% | 5% |
| **2018** | **5%** | **3%** |

2% Swing

| 2010 Base Year Condo CAGR | | |
|---|---|---|
| Year | Aspen | Snowmass |
| 2010 | | |
| 2011 | -1% | -11% |
| 2012 | -4% | -9% |
| 2013 | -1% | -4% |
| 2014 | 5% | -2% |
| 2015 | 4% | -1% |
| 2016 | 4% | -1% |
| 2017 | 4% | -1% |
| **2018** | **6%** | **-1%** |

7% Swing

| 2014 Base Year Condo CAGR | | |
|---|---|---|
| Year | Aspen | Snowmass |
| 2010 | | |
| 2011 | | |
| 2012 | | |
| 2013 | | |
| 2014 | | |
| 2015 | 0% | 4% |
| 2016 | 2% | 1% |
| 2017 | 4% | 2% |
| **2018** | **7%** | **0%** |

7% Swing

Source: Aspen_Aspen, Highlands_Snowmass Village_PropertySalesDatasince2004_TimEstin-AspenSotherbysBroker.xlsx

Downtown Aspen has outperformed Snowmass Village in terms of sales price appreciation. Buyers continue to favor the prestige and greater level of amenities in Downtown Aspen. I believe that Robinson's failure to account for this disparity undermines his analysis.

***Opinion 13: Robinson should have adjusted for differences in the date of construction/renovation, amenities, reputation, type of use, exchange networks, etc.***

The following is a discussion of comparable resorts within Greater Aspen.

*Robinson's Comparables*

The east wing of the St. Regis Resort Aspen was redeveloped as the St. Regis Residences Club Aspen in 2005. The property, located in the heart of Downtown Aspen, offers 275 four-week ownership interests and is comprised of two- and three-bedroom units, measuring 1,700 to 2,200sf. The addition of the St. Regis Residences Club was part of an $37 million renovation, which also included the construction of a new luxury spa. In 2011 the St. Regis Resort Aspen, underwent an $40 million renovation of the hotel and rooms. [59] [60] [61] The St. Regis has both lifestyle and premier categories (lifestyle has access every other year, while premier has annual access). Robinson aggregates the lifestyle and premier sales and does not adjust for the differing utility of these categories.

The Timbers Resorts Residence Club in Snowmass Village is comprised of 288 fractional interests in thirty-six, three-bedroom units, measuring approximately 2,000 square feet each. The property, located at the base of Assay Hill at Snowmass Ski Area, features a 24-hour concierge, a state-of-the-art fitness facility, an owners' lounge, an executive business center, and slope side equipment lockers. [62] This resort achieved sellout in January of 2004 when Timbers sold the remaining 64 interests to the private vacation club Exclusive Resorts.[63] Owners at The Timbers Resorts Residence Club in Snowmass Village are also members of the "Timbers Reciprocity Program [which] allows Owners the ability to trade vacation time with other Owners and experience destination throughout the entire [Timbers] portfolio."[64]

---

59 Business Wire, "St. Regis Residence Club Aspen Opens; Sales are Strong for Exclusive Residence Property; First Million-Dollar Fractional Sale Sets New Industry Benchmark, " February 1, 2005.

60 Aspen Peak, "The St. Regis Aspen Brings The Outdoors In, " February 8, 2012.

61 Sherpa Report "St. Regis Aspen Residence Club Memberships Sell Out," December 26, 2006.

62 https://www.collectionmembers.com/files/property_guides/Property_Guide_TimbersClub.pdf

63 Aspen Times, "Timbers Club First Fractional to Sell Out" January 29, 2004

64 Timbers Reciprocity Program_Timbers Collection

The Dancing Bear is located in Downtown Aspen and was constructed in two phases, each offering 1/8 fractional interests. Phase one, Dancing Bear Parkside, is comprised of nine, three-bedroom residences and opened in 2009. [65] [66] Construction on the second phase, Dancing Bear Mountainside, was halted in 2009, when the Dancing Bear filed voluntary Chapter 11 bankruptcy in November 2010. The project was later completed in 2016. [67] The second phase was completed in 2016 and encompasses ten, three-bedroom units and a four-bedroom unit[68] The second phase also included eight deeded interests in a nearly 3,000 square foot penthouse, each of which was bought by the same individual for $2 million apiece. [69] [70] The sale of all eight penthouse interests for $16 million, or more than two and a half times the average of regular Dancing Bear interests, artificially inflates the project's performance.

According to Forbes, the Little Nell Hotel is "easily Aspen's finest lodging and maybe the finest ski-in/ski-out hotel in North America."[71] The Little Nell Hotel underwent an $18 million renovation in 2009.[72] The Residences at Little Nell was completed in 2008 and is comprised of 208 six-week ownership interests. This property is located directly across from the Little Nell Hotel and has units ranging from 2,800sf to 3,700sf, all of which offer views of Aspen Mountain.[73]As stated in the Appraisal, the Residences at Little Nell "is regarded as the top of the market for private residences clubs in Aspen due to its location, quality of product and services, and brand name."[74]

---

[65] The Dancing Bear Aspen,"FAQ."

[66] The Aspen Skinny, "Dancing Bear Mountainside Building Opens."

[67] In the United States Bankruptcy Court For the District of Colorado, Case No. 10-25805 MER, Case No. 10-36493 MER, Case No. 10-39584 MER, 3.

[68] The Aspen Skinny, "Dancing Bear Mountainside Building Opens."

[69] Aspen Daily, "Penthouse is relisted at nearly $30 million". January 2, 2017

[70] Forbes, "Real Estate Boom in Aspen as Dancing Bear Penthouse Sells for Record $16 Million." December 16, 2016

[71] Forbes "Why Aspen and Snowmass is this season's hot ski destination," January 17, 2013.

[72] Porch.com, "The Hottest Place to Stay in Aspen: The Little Nell Hotel," May 19, 2015.

[73] AspenTimes.com, "Residences, Aspen's newest luxury property, set to open," January 5, 2009.

[74] Cushman & Wakefield Summary Appraisal of Real Property BFLT, December 16, 2013, 17.

The Hyatt Grand Aspen opened in 2005 and encompasses 50 units in 1/20[th] intervals. Individual units range from one to four-bedroom configurations, measuring 912 to 3,450sf. The property is located at the base of Aspen Mountain, one block from the Aspen Mountain Gondola.[75]

*Analysis of the Robinson Comparables*

Each of these properties is unique in terms of location, product, age, fractional membership program, exchange opportunities, etc. To suggest that each is "comparable" without making adjustments is inappropriate and contradictory to generally accepted appraisal practices.

Furthermore, the sales data is skewed by distressed sales spawned by bankruptcies, sale of developer units vs. resales, and the sale of large penthouse units. Robinson did not adjust for any of these issues. The fact that sale of penthouse units at Dancing Bear skews the data is acknowledged by Robinson's comment ("skews the data"), but no adjustments were made. These units were purchased for alternate use – a single private residence – and thus it is inappropriate to use this data (and other sales as well) for any "comparable" sales analysis.

*Additional Snowmass Village Comparables*

Although Robinson includes the Timbers Resort Residence Club in Snowmass Village as a comparable, he excludes Residence at Snowmass Club and the Sanctuary at SMV. The Snowmass Club is a 210-acre fractional resort containing 40 residences and claims to be "the only true year-round resort in Snowmass Village."[76] The residences are split between phase I and II, or the Residence at Snowmass Club and the Sanctuary at SMV respectively. The Residences at Snowmass Club are all single level, one and two-bedroom units, deeded as 1/7[th] interests. The

---

75 https://newsroom.hyatt.com/2005-12-19-Hyatt-Grand-Aspen-Opened-December-17-2005
76 https://www.snowmassclub.com/ownership

remaining units, or Sanctuary Residences, range from three to five-bedroom multi-level floorplans, and are deeded as 1/8[th] interests.[77][78]

The Snowmass Club offers a "19,000-square-foot athletic club, 11 outdoor tennis courts, 2 indoor Hru-Tru tennis courts, year-round outdoor pools, hiking trails and much more 19,000-square-foot athletic club, 11 outdoor tennis courts, 2 indoor Hru-Tru tennis courts, year-round outdoor pools, hiking trails"[79] in addition to the award-winning Jim Engh golf course.

As previously discussed, the Comp Set is skewed because four of the five Comparables are located in Downtown Aspen. As the analysis shows, Downtown Aspen has performed significantly better than Snowmass Village and Aspen Highlands.  Had Robinson considered including other Snowmass Village properties, which are likely better comparables, the results would have been materially different.

***Opinion 14: Although the Property has three times as many fractional interests as all but one of the Comparables, Robinson does not address that this larger supply may impact pricing.***

The Property has 876 shares. Robinson cites five fractional interest/PRC's ranging from 160 to 288 shares, excluding the Hyatt, which offers 1/20[th] shares. Based on my experience, as well as discussions with local real estate brokers including Mr. Ivan Skoric, the volume of fractional units at the Property contributes to oversupply and resultant downward pricing pressure. Mr. Skoric further noted that sellers of the Fractional Units often cannibalize other sales by lowering their price.

---

77 https://www.snowmassclub.com/ownership/tours-and-floor-plans
78 Conversations with Snowmass Club Sales Office
79 https://www.snowmassclub.com/about

However, Robinson did not address/quantify the impact of the larger supply or individual price slashing on the Fractional Units' pricing.

***Opinion 15: Exchange Programs are not unique to the Property, and thus it cannot be determined to be the cause of a Diminution of Value.***

Robinson's thesis is that the Defendants' actions, particularly the MVC Affiliation, directly impacted value of the Fractional Interests.

Other properties in Greater Aspen, including several in the Comp Set, offer exchange programs. Owners at both Dancing Bear and Timbers Resort Residences are eligible for exchanges at other Timbers Resorts[80]; while owners at the Hyatt Grand Aspen have access to Hyatt's large network of resorts. Robinson notes, "[Hyatt] Owners have access to Hyatt Hotels worldwide through the Hyatt "points" system."[81]

Therefore, one cannot ascribe the DoV to an exchange program or affiliation such as the MVC Affiliation.

---

[80] About Timbers Resorts_Dancing Bear Aspen

[81] Amended Robinson Report, 5

Tables 14 & 15

| Exchange Programs within the Robinson Comp Set | |
|---|---|
| **Property** | **Program Description** |
| St. Regis | Interchange Program:<br>- Trade between Aspen, New York and the Phoenician in Scottsdale, Az<br>- Maximum two Weeks Interchange per Use Year<br>- Not Applicable for Mid-Season<br>-Interchange weeks are not applicable for SPG Conversion or the St. Regis Rental Program |
| Timbers | Timbers Reciprocity Program:<br>- The Timbers Reciprocity Program is a simple online trading system that allows Owners at exclusive clubs in the portfolio the ability to trade weeks at their home property for time at other exquisite and private destinations. |
| Dancing Bear | The Dancing Bear is part of the Timbers Reciprocity Program (See Above) |
| Little Nell | Not Disclosed on Website |
| Hyatt | Hyatt Point System:<br>- Allows for owners to access Hyatt Hotels worldwide through the Hyatt "points" system. |

| Exchange Programs within the Snowmass Comp Set | |
|---|---|
| **Property** | **Program Description** |
| Timbers | Timbers Reciprocity Program:<br>- The Timbers Reciprocity Program is a simple online trading system that allows Owners at exclusive clubs in the portfolio the ability to trade weeks at their home property for time at other exquisite and private destinations. |
| Sanctuary at Snowmass Village | Reciprocity Program:<br>- Owners have access to a wonderful Reciprocity Program offered through our Partnership with the Registry Collection, a world class exchange program with over 240 properties world-wide. Owners may trade any Planned Weeks per year for points to use as credits for any Registry Collection Resort. Examples include an elegant Tuscan villa, a cabin at Big Bear Lake in California, a beach front home in Cabo San Lucas or a cottage on the coast in North Carolina. |
| Snowmass Club | Reciprocity Program:<br>- Owners have access to a wonderful Reciprocity Program offered through our Partnership with the Registry Collection, a world class exchange program with over 240 properties world-wide. Owners may trade any Planned Weeks per year for points to use as credits for any Registry Collection Resort. Examples include an elegant Tuscan villa, a cabin at Big Bear Lake in California, a beach front home in Cabo San Lucas or a cottage on the coast in North Carolina. |

Source: St Regis aspen membership overview; Timbers Reciprocity Program _ Timbers Collection; About Timbers Resorts _ Dancing Bear Aspen; Hyatt Residence Club.pdf; Reciprocity - Snowmass Club

***Opinion 16: The Plaintiffs contend they were denied the opportunity to vote on the MVC Affiliation.*** [82] ***The owners of the fractional units in the former The Ritz-Carlton Club, Bachelor Gulch, a highly desirable mountainside destination, voted to re-brand as Timbers Bachelor Gulch in 2013, rather than affiliate with MVC. Robinson ignores that from 2014 to 2018, the Timbers Bachelor Gulch fractional units declined in value by 18.2%-over eight times the Property's 2.3% decline.***

The former The Ritz-Carlton Club, Bachelor Gulch was constructed in 2002 with similar amenities and services as the Property, such as luxurious accommodations and ski-in/ski-out access to Beaver Creek Mountain.  As a result of a members' vote in July 2013,[83] since January 2014, the property has been operated as "Timbers Bachelor Gulch."[84] I had visited Timbers Bachelor Gulch previously.

The Property and Timbers Bachelor Gulch are similar as they were built as The Ritz-Carlton Clubs within one year of each other, are located directly on the mountain, provide ski-on/ski-off access, and have limited services and nearby amenities.[85]

 Robinson includes the Aspen Timbers Resort Residence Club as a comparable, indicating he believes the Timbers brand to offer a similar level of service to the Ritz-Carlton.

Accordingly, I have run an additional analysis utilizing The Ritz-Carlton Club, Bachelor Gulch / Timbers Bachelor Gulch sales (CAGRs) to demonstrate what Robinson's But For Value of the Property might look like had he employed this comparable. The numbers are summarized below:

---

82 Sixth Amended Complaint, 86-89.
83 July 6, 2013 Boards Email to Membership Regarding Election Results
84 Microsoft Word - Timbers Bachelor Gulch Transition Release 11.2.13.docx
85 http://www.denverrealestate.com/blog/2015/01/ritz-carlton-bachelor-gulch-now-selling-final-24-luxury-residences-at-closeout-prices/

Tables 16

| Total Price Changer Per Square Foot By Submarket (2010-2018) | | |
|---|---|---|
| Submarket | Bachelor Gulch Ritz | Aspen Highlands |
| Percent Change | -42.7% | -68.5% |

Source: Amended Robinson Model; Skoric Provided MLS Data; Bachelor Gulch MLS Data

Tables 17

| Total Price Changer Per Square Foot By Submarket (2014-2018) | | |
|---|---|---|
| Submarket | Bachelor Gulch Ritz | Aspen Highlands |
| Percent Change | -18.1% | -2.3% |

Source: Amended Robinson Model; Skoric Provided MLS Data; Bachelor Gulch MLS Data

As shown in the Alternative Damages Theories section of this Second Report, the former The Ritz-Carlton Club, Bachelor Gulch performed worse than the Snowmass Village Comp Set, and worse than the Property.

**Opinion 17: The Amended Robinson Model contains several mathematical and formulaic errors.**

I have reviewed the Amended Robinson Model that accompanied the Amended Robinson Report and have identified several formulaic and mathematic errors, in addition to the conceptual and methodological mistakes discussed elsewhere in this Second Report.

These math and formulaic errors are so prevalent and persistent (in addition to the methodological errors) that the Amended Robinson Model cannot be used.

*Miscalculation of Fiscal Year*

Firstly, the Amended Robinson Model identifies the first base year of the analysis as the fiscal year beginning August 1, 2010 and ending July 31, 2011.[86] However, in calculating the Property's average sales price per square foot, Robinson mistakenly excludes all sales occurring in calendar year 2010 (i.e. from August 1, 2010 through December 31, 2010). This exclusion

---

[86] I previously discussed why this beginning date was inappropriate.

effectively exaggerates the decline in sales price from 2010 to 2018 and ultimately inflates the

But For Sales Price.

The sales that have been omitted are shown below:

| Contract Date (All Closed) | Sold Price | Fiscal Year Calc. | Bedrooms | Unit No. | Total Sq.Ft. | Price/Sq. Ft |
|---|---|---|---|---|---|---|
| 5/11/2010 | $116,000 | | 3 | 8212 | 1,619 | $72 |
| 5/19/2010 | $90,000 | | 2 | 8415 | 1,239 | $73 |
| 6/1/2010 | $94,400 | | 3 | 2206 | 1,612 | $59 |
| 7/19/2010 | $87,400 | | 3 | 8312 | 1,619 | $54 |
| 8/6/2010 | $73,600 | | 2 | 8411 | 1,444 | $51 |
| 8/10/2010 | $213,000 | | 3 | 8312 | 1,619 | $132 |
| 8/27/2010 | $117,000 | | 2 | 8410 | 1,706 | $69 |
| 9/3/2010 | $276,000 | | 3 | 8307 | 1,832 | $151 |
| 9/17/2010 | $150,880 | | 3 | 2309 | 1,721 | $88 |
| 9/27/2010 | $82,800 | | 3 | 8312 | 1,619 | $51 |
| 9/27/2010 | $72,000 | | 2 | 8411 | 1,444 | $50 |
| 10/6/2010 | $260,000 | | 3 | 2409 | 1,718 | $151 |
| 10/6/2010 | $115,000 | | 3 | 8215 | 1,680 | $68 |
| 11/8/2010 | $276,000 | | 3 | 8307 | 1,832 | $151 |
| 11/29/2010 | $72,000 | | 2 | 2302 | 1,328 | $54 |
| 12/1/2010 | $160,000 | | 3 | 8307 | 1,832 | $87 |
| 12/9/2010 | $90,500 | | 2 | 8404 | 1,422 | $64 |
| **AVERAGE PRICE 2010** | **$138,540** | | | | **1626** | **$85** |
| **2011** | | | | | | |
| 1/10/2011 | $115,000 | 1 | 2 | 2302 | 1,328 | $87 |
| 1/26/2011 | $364,000 | 1 | 3 | 8307 | 1,832 | $199 |
| 2/9/2011 | $100,000 | 1 | 3 | 8104 | 1,616 | $62 |
| 2/23/2011 | $187,000 | 1 | 3 | 8307 | 1,832 | $102 |
| 3/9/2011 | $149,000 | 1 | 3 | 8301 | 1,618 | $92 |
| 3/17/2011 | $100,000 | 1 | 3 | 8206 | 1,626 | $62 |
| 3/28/2011 | $31,000 | 1 | 2 | 8403 | 1,308 | $70 |

*Should have been included in FY 1*

Amended Robinson Model

In the red box above, I show that Robinson's methodology was to utilize a "1" to denote

the first fiscal year; however, he only included properties that were in calendar year 1.

*Miscalculation of the CAGR*

Robinson overstates the CAGR calculation, by utilizing an incorrect and inflated

timeframe; this calculation starts August 1st, 2011 and ends October 16th, 2018, a period of 7.21

years. However, he incorrectly calculates his CAGR based upon 7.79 years. This mistake was

made because Robinson calculates the final year from January 2018 (.79 years) not from August

2018 – the end of his fiscal year (.21 years).

*Miscalculation of Prejudgment Interest*

Robinson attempts to quantify interest on the damage calculations, which he terms "Prejudgment Interest." This theory of Prejudgment Interest has been improperly applied and results in an increase to the damages calculations. This mistake manifests itself differently for 1) Fractional Interests still held by Plaintiffs and 2) Plaintiffs who sold their Fractional Interests.

*Calculating interest on Fractional Interests still held by the Plaintiffs*

As shown below, Robinson determines that Prejudgment Interest in the amount of $11,233,593 should be awarded to those Plaintiffs still in possession of their interests.[87]

This is incorrect. The concept of Prejudgment Interest is to compensate the prevailing party for the loss of the use of money. Since these units have always been in the possession of the Plaintiffs for their use, there is no "loss of the use of the money." Robinson calculates interest from 2011. The DoV damages calculation compensates the Plaintiffs for the alleged decline in the value of the Fractional Interests. Prejudgment Interest should only be applied from the date that he quantifies the damages (October 16, 2018) through the date that it is paid.

By example, if a Plaintiff still owns his/her unit, Robinson's theory is that he/she is entitled to an amount equal to the DoV, which when added to value of each Plaintiff's owned Fractional Interest, equals the But For Value – or the value which each Plaintiff is in the same place it would have been but for the acts of the Defendants. I demonstrate this in the following chart.

---

[87] There were 205 Plaintiffs who still owned their Fractional Interests at the time of the Amended Robinson Report was issued and 29 who sold their Fractional Interests.

Chart 7



Source: Amended Robinson Model

The proper application of Prejudgment Interest would be to calculate interest from the time of the calculations to the present, or in the case of Plaintiffs who never sold their units, from Robinson's date of October 16, 2018.  Awarding interest from 2011 is a misapplication of the concept that results in inflated damages.

Table 18

| For 205 Plaintiff(s) who have not sold their interest | | | |
|---|---|---|---|
| Per sf per Unit Sales Prices | | | **8%** |
| Year | But For All Units per sf | Actual $/sf | Difference/sf | Interest/sf |
| 2011 | $99.87 | $70.97 | $28.90 | $2.31 |
| 2012 | $97.80 | $69.95 | $27.85 | $2.41 |
| 2013 | $92.29 | $37.16 | $55.13 | $4.79 |
| 2014 | $95.23 | $31.85 | $63.39 | $5.83 |
| 2015 | $87.59 | $36.51 | $51.09 | $5.31 |
| 2016 | $103.49 | $36.19 | $67.30 | $4.98 |
| 2017 | $102.55 | $31.26 | $71.29 | $4.67 |
| 2018 | $104.93 | $30.40 | $74.53 | $3.31 |
| | | | Total Per sf/Unit | $33.63 |
| | | | Average sf/Unit | 1,613 |
| | | | Total Units | 205 |
| **Total Interest All Units** | | | | **$11,120,547** |

Source: Amended Robinson Model

46

The damages Robinson has earmarked as interest due to Plaintiffs who retained their Fractional Interests accounts for 27.02% of the model's total damages.

Awarding interest from 2011 is "double-dipping."

*Calculating interest on Fractional Interests sold by the Plaintiffs*

For the 29 Plaintiffs who sold their units, Robinson calculates interest NOT from the date of sale, but again from 2011.  It is improper to begin calculations before a date of sale, as the Plaintiffs did not yet incur any alleged damages.  There is no need to compensate the Plaintiffs for the deprivation of the use of money.

Properly, Robinson should have begun interest calculations from the date of sale, or the time that the Plaintiff could be compensated for the inability to use the money.

As an example, if a Plaintiff sold its interest in 2015, then it would only be deprived of the use of this money from the date of sale, not from 2011. Robinson should have applied Prejudgment Interest from the date that each Plaintiff sold their unit, not from 2011.

Below is a table that depicts Robinson's interest calculations for Plaintiffs who sold their Fractional Interests.

Table 19

| Last Name of Plaintiff | Unit Number | Square Footage of Unit | Damages per SF | Damages per Unit | 8% Interest per SF | Interest per Unit | Damages with Interest | % of Total Damages and Interest |
|---|---|---|---|---|---|---|---|---|
| Cowan (1) | 2304- Fixed | 1,457 | $84.94 | $123,755 | $41.32 | $60,207 | $183,962 | 0.44% |
| Rosenthal (1) | 8307-11 | 1,832 | $54.90 | $100,585 | $31.70 | $58,070 | $158,655 | 0.38% |
| Wexler | 8403-12 | 1,308 | $75.20 | $98,359 | $34.66 | $45,338 | $143,696 | 0.35% |
| Pacin (1) | 2408- Fixed | 1,332 | $82.54 | $109,942 | $34.16 | $45,503 | $155,445 | 0.37% |
| Rosenthal (2) | 8410-9 | 1,706 | $77.34 | $131,943 | $41.14 | $70,183 | $202,126 | 0.49% |
| Adelman | 8404-7 | 1,422 | $81.87 | $116,422 | $40.29 | $57,292 | $173,715 | 0.42% |
| Gurland | 8404-10 | 1,422 | $75.36 | $107,156 | $34.68 | $49,322 | $156,478 | 0.38% |
| Likover, M.D. | 8202-12 | 1,617 | $79.77 | $128,993 | $39.58 | $64,006 | $192,998 | 0.46% |
| Kimball | 8104-10 | 1,622 | $78.82 | $127,853 | $35.19 | $57,081 | $184,934 | 0.44% |
| Bloom | 8412-5 | 1,365 | $75.65 | $103,257 | $34.73 | $47,403 | $150,660 | 0.36% |
| Miller | 8403-4 | 1,308 | $95.85 | $125,366 | $34.62 | $45,287 | $170,654 | 0.41% |
| Weinstein | 8314-11 | 1,616 | $50.46 | $81,551 | $31.83 | $51,430 | $132,981 | 0.32% |
| Rosen | 8212-3 | 1,619 | $63.88 | $103,414 | $35.16 | $56,931 | $160,345 | 0.39% |
| Rosenthal (3) | 8308-12 | 1,751 | $57.23 | $100,203 | $32.04 | $56,096 | $156,299 | 0.38% |
| Guenther | 8202-6 | 1,617 | $47.40 | $76,639 | $30.26 | $48,934 | $125,573 | 0.30% |
| Kalcheim | 8306-3 | 1,609 | $64.16 | $103,231 | $34.32 | $55,228 | $158,459 | 0.38% |
| Bermant | 8308-2 | 1,751 | $65.22 | $114,203 | $33.20 | $58,141 | $172,344 | 0.41% |
| Woods | 8104-3 | 1,622 | $44.44 | $72,077 | $29.56 | $47,944 | $120,021 | 0.29% |
| Lockyer | 8204-11 | 1,617 | $78.54 | $126,993 | $39.17 | $63,332 | $190,325 | 0.46% |
| Patinkin (1) | 8210-9 | 1,918 | $58.74 | $112,658 | $32.50 | $62,332 | $174,990 | 0.42% |
| Patinkin (2) | 8210-12 | 1,918 | $52.74 | $101,158 | $30.48 | $58,459 | $159,617 | 0.38% |
| Malakhova | 2205-5 | 1,471 | $74.84 | $110,089 | $37.92 | $55,782 | $165,871 | 0.40% |
| Youngblood | 8201-21 | 1,619 | $25.83 | $41,814 | $25.13 | $40,692 | $82,506 | 0.20% |
| Jacoby | 8310-6 | 1,922 | $53.61 | $103,039 | $30.77 | $59,144 | $162,183 | 0.39% |
| Wright | 8305-1 | 1,673 | $47.46 | $79,398 | $27.88 | $46,642 | $126,040 | 0.30% |
| McEvoy | 2309-12 | 1,721 | $66.14 | $113,828 | $36.17 | $62,247 | $176,074 | 0.42% |
| Spizizen | 8207-2 | 1,830 | $56.98 | $104,278 | $31.91 | $58,391 | $162,668 | 0.39% |
| Blanchard | 2208-11 | 1,615 | $82.85 | $133,802 | $40.62 | $65,600 | $199,402 | 0.48% |
| Pacin (2) | 2408 - Fixed | 1,332 | $62.19 | $82,842 | $32.76 | $43,639 | $126,482 | 0.30% |
| Total or Average | 29 | 1607 | $65.11 | $3,034,849 | $32.76 | $1,590,654 | $4,625,504 | 11.12% |

Source: Amended Robinson Model

*Miscalculation of Prejudgment Interest Continued*

For units sold prior to the final year of the analysis, Robinson applies an 8% compounded interest factor, calculated on an annual basis. Based upon Robinson's methodology, any two Plaintiffs who sold their Fractional Interests within the same fiscal year would have realized the same "lost-values." In the Amended Robinson Model, Plaintiffs who sold their Fractional Interests 11 months apart but within the same fiscal year, could experience the same Diminution of Value. A monthly interest calculation would be more accurate.

48

<u>Alternative Damages Theories</u>

**Snowmass Comp Set**

While I don't agree with the methodology of the Amended Robinson Report and the Amended Robinson Model for the many reasons discussed within this Second Report, I have attempted to correct the mathematical and formulaic errors and have applied a different Comp Set. This analysis is only theoretical to demonstrate that the skewed assumptions upon which the Amended Robinson Model relies are tilted greatly in the favor of the Plaintiffs.

More specifically, the changes that I made include in this Alternative Damages Theory, for demonstrative purposes, only include:

- Changed the effective "Start Date" to 1/1/15, consistent with the date of the implementation of the MVC Affiliation – effectively starting with the "base year" of 2014.  I did also, however, compute these damages with a start date of 8/1/11;

- Adjusted the Comp Set
    - To include only the three Snowmass Comparables;
    - A second analysis including only the former The Ritz-Carlton Club, Bachelor Gulch

- Corrected the 2010 fiscal year to include those sales that had been mistakenly omitted (from August 2010 through December 2010);

- Corrected the Prejudgment Interest to account for the time that the Plaintiffs did not have use of the money;
    - for those Plaintiffs that did not sell their units, from August 1, 2011 – the date Robinson calculated damages – to October 16, 2018

49

- for those Plaintiffs that sold prior to 2018, from the date of the sale through October 16, 2018

- Corrected the duration from 7.79 to 7.21 years, consistent with the Robinson evaluation timeframe from August 1, 2011 through October 16, 2018;

The reader will note that the adjustment of the starting date of the analysis corresponding with the date of the implementation of the MVC Affiliation at the Property eliminates a number of the Plaintiffs who sold their units prior to 2015. This is consistent with the application of the Robinson model in that to the extent the MVC Affiliation impacted value, it would have impacted value of the buyers of the units, not the sellers.

Table 20 reflects FTI's recalculation of Damages (making the above changes), but using, as Robinson mistakenly does, a start date of August 1, 2011. Table 21, which follows, reflects FTI's recalculation of Damages using a start date of January 1, 2015, as that is the date after which the challenged MVC Affiliation became operational:

<u>Table 20</u>

| FTI Calculated Damages (From Analysis Start Date 8/1/2011) | | | | | |
|---|---|---|---|---|---|
| Plaintiff Sale Date | Number of Plaintiffs | DoV Calculation | 8% Interest | Totals Damages | Average Damages per Plaintiffs |
| Not Sold | 205 | $12,414,589.59 | $0.00 | $12,414,589.59 | $60,558.97 |
| 2011 | 0 | N/A | N/A | $0.00 | $0.00 |
| 2012 | 1 | $48,460.67 | $21,503.04 | $69,963.70 | $69,963.70 |
| 2013 | 4 | $342,960.28 | $115,501.85 | $458,462.12 | $114,615.53 |
| 2014 | 11 | $893,090.91 | $212,339.87 | $1,105,430.78 | $100,493.71 |
| 2015 | 3 | $85,239.02 | $12,451.09 | $97,690.10 | $32,563.37 |
| 2016 | 8 | $332,381.67 | $28,126.36 | $360,508.03 | $45,063.50 |
| 2017 | 0 | N/A | N/A | $0.00 | $0.00 |
| 2018 | 2 | $129,061.20 | $396.02 | $129,457.23 | $64,728.61 |
| Total Damages | 234 | $14,245,783.34 | $390,318.22 | $14,636,101.56 | $62,547.44 |

Table 21

| FTI Calculated Damages (From Analysis Start Date  1/1/2015) | | | | | |
|---|---|---|---|---|---|
| Plaintiff Sale Date | Number of Plaintiffs | DoV Calculation | 8% Interest | Totals Damages | Average Damages per Plaintiffs |
| Not Sold | 205 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2015 | 3 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2016 | 8 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2017 | 4 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2018 | 2 | $22,168.92 | $1,847.32 | $24,016.24 | $12,008.12 |
| 2019 | 0 | N/A | N/A | $0.00 | $0.00 |
| 2020 | 0 | N/A | N/A | $0.00 | $0.00 |
| 2021 | 0 | N/A | N/A | $0.00 | $0.00 |
| 2022 | 0 | N/A | N/A | $0.00 | $0.00 |
| Total Damages | 222 | $22,168.92 | $1,847.32 | $24,016.24 | $108.18 |

Additionally, Robinson did not attempt to determine the portion of any DoV that may have been caused by the MVC Affiliation from DoV attributable to other factors that impacted the Property value.  Purely for the sake of this alternative analysis, I have evenly allocated a portion of the DoV to each of the 12 factors I previously identified as having impacted the value of the Property.  I also calculated the damages assuming that the MVC Affiliation was responsible for 50% of the loss in value; however, like Robinson, I conducted no analysis to determine if the MVC Affiliation was responsible for 1/12, 1/2 or none of the change in value.

However, as previously discussed, there are at least eleven other factors, in addition to the MVC Affiliation, which impacted the value of fractional interests at the Property, which Robinson failed to consider. FTI has therefore also has done an analysis that takes into consideration all twelve factors impacting value and allocates one-twelfth of the decline to the MVC Affiliation.  Those results are shown below. In Table 22, I have calculated Plaintiffs' damages (again making the changes identified above (*see* bulleted text on Pages 49-50 above), using an August 1, 2011 start date, based on the assumption that the challenged MVC Affiliation was responsible for half of the diminution of value of Plaintiffs' Fractional Interests.  Table 23 reflects the same analysis with a start date of January 1, 2015.

51

½ DoV Attributable to the MVC Affiliation
Table 22

| FTI Calculated Damages With DoV Allocation (From Analysis Start Date  8/1/2011) | | | | | |
|---|---|---|---|---|---|
| Plaintiff Sale Date | Number of Plaintiffs | DoV Calculation | 8% Interest | Totals Damages | Average Damages per Plaintiffs |
| Not Sold | 205 | $6,207,294.80 | $0.00 | $6,207,294.80 | $30,279.49 |
| 2011 | 0 | N/A | N/A | $0.00 | $0.00 |
| 2012 | 1 | $24,230.33 | $10,751.52 | $34,981.85 | $34,981.85 |
| 2013 | 4 | $171,480.14 | $57,750.92 | $229,231.06 | $57,307.77 |
| 2014 | 11 | $446,545.45 | $106,169.94 | $552,715.39 | $50,246.85 |
| 2015 | 3 | $42,619.51 | $6,225.54 | $48,845.05 | $16,281.68 |
| 2016 | 8 | $166,190.84 | $14,063.18 | $180,254.02 | $22,531.75 |
| 2017 | 0 | N/A | N/A | $0.00 | $0.00 |
| 2018 | 2 | $64,530.60 | $198.01 | $64,728.61 | $32,364.31 |
| Total Damages | 234 | $7,122,891.67 | $195,159.11 | $7,318,050.78 | $31,273.72 |

Table 23

| FTI Calculated Damages With DoV Allocation (From Analysis Start Date  1/1/2015) | | | | | |
|---|---|---|---|---|---|
| Plaintiff Sale Date | Number of Plaintiffs | DoV Calculation | 8% Interest | Totals Damages | Average Damages per Plaintiffs |
| Not Sold | 205 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2015 | 3 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2016 | 8 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2017 | 4 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2018 | 2 | $11,084.46 | $923.66 | $12,008.12 | $6,004.06 |
| 2019 | 0 | N/A | N/A | $0.00 | $0.00 |
| 2020 | 0 | N/A | N/A | $0.00 | $0.00 |
| 2021 | 0 | N/A | N/A | $0.00 | $0.00 |
| 2022 | 0 | N/A | N/A | $0.00 | $0.00 |
| Total Damages | 222 | $11,084.46 | $923.66 | $12,008.12 | $54.09 |

In the next two tables, I have done the same analysis, but rather than allocating half of the decline in value to the MVC Affiliation, I have instead used a one-twelfth allocation.  Thus, Table 24 calculates Plaintiffs' damages (again making the changes identified above (*see* bulleted text on Pages 49-50 above), using an August 1, 2011 start date, based on the assumption that the challenged MVC Affiliation was responsible for one-twelfth of the diminution of value of Plaintiffs' fractional interests.  Table 25 reflects the same analysis with a start date of January 1, 2015.

1/12 DoV Attributable to the MVC Affiliation

Table 24

| FTI Calculated Damages With DoV Allocation (From Analysis Start Date  8/1/2011) | | | | | |
|---|---|---|---|---|---|
| Plaintiff Sale Date | Number of Plaintiffs | DoV Calculation | 8% Interest | Totals Damages | Average Damages per Plaintiffs |
| Not Sold | 205 | $1,034,549.13 | $0.00 | $1,034,549.13 | $5,046.58 |
| 2011 | 0 | N/A | N/A | $0.00 | $0.00 |
| 2012 | 1 | $4,038.39 | $1,791.92 | $5,830.31 | $5,830.31 |
| 2013 | 4 | $28,580.02 | $9,625.15 | $38,205.18 | $9,551.29 |
| 2014 | 11 | $74,424.24 | $17,694.99 | $92,119.23 | $8,374.48 |
| 2015 | 3 | $7,103.25 | $1,037.59 | $8,140.84 | $2,713.61 |
| 2016 | 8 | $27,698.47 | $2,343.86 | $30,042.34 | $3,755.29 |
| 2017 | 0 | N/A | N/A | $0.00 | $0.00 |
| 2018 | 2 | $10,755.10 | $33.00 | $10,788.10 | $5,394.05 |
| Total Damages | 234 | $1,187,148.61 | $32,526.52 | $1,219,675.13 | $5,212.29 |

Table 25

| FTI Calculated Damages With DoV Allocation (From Analysis Start Date  1/1/2015) | | | | | |
|---|---|---|---|---|---|
| Plaintiff Sale Date | Number of Plaintiffs | DoV Calculation | 8% Interest | Totals Damages | Average Damages per Plaintiffs |
| Not Sold | 205 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2015 | 3 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2016 | 8 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2017 | 4 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2018 | 2 | $1,847.41 | $153.94 | $2,001.35 | $1,000.68 |
| 2019 | 0 | N/A | N/A | $0.00 | $0.00 |
| 2020 | 0 | N/A | N/A | $0.00 | $0.00 |
| 2021 | 0 | N/A | N/A | $0.00 | $0.00 |
| 2022 | 0 | N/A | N/A | $0.00 | $0.00 |
| Total Damages | 222 | $1,847.41 | $153.94 | $2,001.35 | $9.02 |

**Former The Ritz-Carlton Club, Bachelor Gulch (Timbers Bachelor Gulch) CAGR**

As previously discussed, the former The Ritz-Carlton Club, Bachelor Gulch has similar amenities and services as the Property, and a result of the members' vote in August 2013, since January 2014, the property has been operated as Timbers Bachelor Gulch. I have run additional analyses utilizing The Ritz-Carlton Club, Bachelor Gulch / Timbers Bachelor Gulch sales (CAGRs) to demonstrate what Robinson's But For Value of the Property might look like had he employed this comparable.

Tables 26 and 27 illustrate FTI's calculations of Plaintiffs' damages using the Bachelor Gulch property as a comparable (with Table 26 using the August 1, 2011 start date and Table 27 using the January 1, 2015 start date).

Table 26

| FTI Calculated Damages (From Analysis Start Date  8/1/2011) | | | | | |
|---|---|---|---|---|---|
| Plaintiff Sale Date | Number of Plaintiffs | DoV Calculation | 8% Interest | Totals Damages | Average Damages per Plaintiffs |
| Not Sold | 205 | $9,794,588.01 | $0.00 | $9,794,588.01 | $47,778.48 |
| 2011 | 0 | N/A | N/A | $0.00 | $0.00 |
| 2012 | 1 | $25,505.72 | $11,317.43 | $36,823.16 | $36,823.16 |
| 2013 | 4 | $220,678.48 | $74,319.90 | $294,998.37 | $73,749.59 |
| 2014 | 11 | $795,469.45 | $189,129.55 | $984,599.00 | $89,509.00 |
| 2015 | 3 | $103,249.96 | $15,081.99 | $118,331.95 | $39,443.98 |
| 2016 | 8 | $384,746.52 | $32,557.51 | $417,304.03 | $52,163.00 |
| 2017 | 0 | N/A | N/A | $0.00 | $0.00 |
| 2018 | 2 | $108,139.53 | $331.83 | $108,471.36 | $54,235.68 |
| Total Damages | 234 | $11,432,377.68 | $322,738.21 | $11,755,115.89 | $50,235.54 |

Table 27

| FTI Calculated Damages (From Analysis Start Date  1/1/2015) | | | | | |
|---|---|---|---|---|---|
| Plaintiff Sale Date | Number of Plaintiffs | DoV Calculation | 8% Interest | Totals Damages | Average Damages per Plaintiffs |
| Not Sold | 205 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2015 | 3 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2016 | 8 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2017 | 4 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2018 | 2 | $17,299.88 | $1,441.81 | $18,741.69 | $9,370.85 |
| 2019 | 0 | N/A | N/A | $0.00 | $0.00 |
| 2020 | 0 | N/A | N/A | $0.00 | $0.00 |
| 2021 | 0 | N/A | N/A | $0.00 | $0.00 |
| 2022 | 0 | N/A | N/A | $0.00 | $0.00 |
| Total Damages | 222 | $17,299.88 | $1,441.81 | $18,741.69 | $84.42 |

Tables 28 and 29 reflect the same analyses as above (using the Bachelor Gulch property as a comparable) but attributing one half of the diminution of value of Plaintiffs' fractional interests to the challenged MVC Affiliation (Table 28 uses an August 1, 2011 start date and Table 29 uses a January 1, 2015 start date).

½ DoV Attributable to the MVC Affiliation

Table 28

| FTI Calculated Damages With DoV Allocation (From Analysis Start Date  8/1/2011) | | | | | |
|---|---|---|---|---|---|
| Plaintiff Sale Date | Number of Plaintiffs | DoV Calculation | 8% Interest | Totals Damages | Average Damages per Plaintiffs |
| Not Sold | 205 | $4,897,294.01 | $0.00 | $4,897,294.01 | $23,889.24 |
| 2011 | 0 | N/A | N/A | $0.00 | $0.00 |
| 2012 | 1 | $12,752.86 | $5,658.72 | $18,411.58 | $18,411.58 |
| 2013 | 4 | $110,339.24 | $37,159.95 | $147,499.19 | $36,874.80 |
| 2014 | 11 | $397,734.73 | $94,564.78 | $492,299.50 | $44,754.50 |
| 2015 | 3 | $51,624.98 | $7,541.00 | $59,165.97 | $19,721.99 |
| 2016 | 8 | $192,373.26 | $16,278.75 | $208,652.02 | $26,081.50 |
| 2017 | 0 | N/A | N/A | $0.00 | $0.00 |
| 2018 | 2 | $54,069.77 | $165.91 | $54,235.68 | $27,117.84 |
| Total Damages | 234 | $5,716,188.84 | $161,369.10 | $5,877,557.94 | $25,117.77 |

Table 29

| FTI Calculated Damages With DoV Allocation (From Analysis Start Date  1/1/2015) | | | | | |
|---|---|---|---|---|---|
| Plaintiff Sale Date | Number of Plaintiffs | DoV Calculation | 8% Interest | Totals Damages | Average Damages per Plaintiffs |
| Not Sold | 205 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2015 | 3 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2016 | 8 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2017 | 4 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2018 | 2 | $8,649.94 | $720.91 | $9,370.85 | $4,685.42 |
| 2019 | 0 | N/A | N/A | $0.00 | $0.00 |
| 2020 | 0 | N/A | N/A | $0.00 | $0.00 |
| 2021 | 0 | N/A | N/A | $0.00 | $0.00 |
| 2022 | 0 | N/A | N/A | $0.00 | $0.00 |
| Total Damages | 222 | $8,649.94 | $720.91 | $9,370.85 | $42.21 |

Finally, Tables 30 and 31 reflect the same analyses as above (using the Bachelor Gulch property as a comparable) but attributing one twelfth of the diminution of value of Plaintiffs' fractional interests to the challenged MVC Affiliation (Table 30 uses an August 1, 2011 start date and Table 31 uses a January 1, 2015 start date).

1/12 DoV Attributable to the MVC Affiliation

Table 30

| FTI Calculated Damages With DoV Allocation (From Analysis Start Date  8/1/2011) | | | | | |
|---|---|---|---|---|---|
| Plaintiff Sale Date | Number of Plaintiffs | DoV Calculation | 8% Interest | Totals Damages | Average Damages per Plaintiffs |
| Not Sold | 205 | $816,215.67 | $0.00 | $816,215.67 | $3,981.54 |
| 2011 | 0 | N/A | N/A | $0.00 | $0.00 |
| 2012 | 1 | $2,125.48 | $943.12 | $3,068.60 | $3,068.60 |
| 2013 | 4 | $18,389.87 | $6,193.32 | $24,583.20 | $6,145.80 |
| 2014 | 11 | $66,289.12 | $15,760.80 | $82,049.92 | $7,459.08 |
| 2015 | 3 | $8,604.16 | $1,256.83 | $9,861.00 | $3,287.00 |
| 2016 | 8 | $32,062.21 | $2,713.13 | $34,775.34 | $4,346.92 |
| 2017 | 0 | N/A | N/A | $0.00 | $0.00 |
| 2018 | 2 | $9,011.63 | $27.65 | $9,039.28 | $4,519.64 |
| Total Damages | 234 | $952,698.14 | $26,894.85 | $979,592.99 | $4,186.29 |

Table 31

| FTI Calculated Damages With DoV Allocation (From Analysis Start Date  1/1/2015) | | | | | |
|---|---|---|---|---|---|
| Plaintiff Sale Date | Number of Plaintiffs | DoV Calculation | 8% Interest | Totals Damages | Average Damages per Plaintiffs |
| Not Sold | 205 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2015 | 3 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2016 | 8 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2017 | 4 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2018 | 2 | $1,441.66 | $120.15 | $1,561.81 | $780.90 |
| 2019 | 0 | N/A | N/A | $0.00 | $0.00 |
| 2020 | 0 | N/A | N/A | $0.00 | $0.00 |
| 2021 | 0 | N/A | N/A | $0.00 | $0.00 |
| 2022 | 0 | N/A | N/A | $0.00 | $0.00 |
| Total Damages | 222 | $1,441.66 | $120.15 | $1,561.81 | $7.04 |

These examples can be used as alternatives to Robinson's flawed model for demonstrative purposes.  The existing Robinson Model cannot be used as it is materially flawed – it contains numerous calculation, formulaic and mathematical errors.

The calculations I have provided address the significant weaknesses in the Robinson model (in addition to cleaning up the math errors):

- Robinson's selection of highly desirable comparables from Downtown Aspen is inappropriate – selection of "similar" properties, such as those in Snowmass which would have yielded more accurate results.

57

- The Robinson Model should only be used when the DoV calculation corresponds with the MVC Affiliation – not four years prior.

- Interest calculations should correspond to the time period that the Plaintiffs have been denied the use of the monetary award – from the date of his calculation through the date of the actual award.

- The Robinson Model did not apportion any DoV to the MVC Affiliation – in my adjustments I have demonstrated how one ought to do so.

The calculations I have presented generally follow the Robinson methodology but address many of the weaknesses in his calculations.

**Conclusions**

Neither the Simon Report nor the Amended Robinson Report/Model can be relied upon to prove any damages are owed to the Plaintiffs, or to calculate damages should any be awarded.

First of all, no correlation has been established between the MVC Affiliation and the changes in value experienced by the Property's Fractional Interests. The MVC Affiliation has been conflated with other actions of the Defendant, and no model has been developed, nor any calculation made, to determine and isolate what portion of the DoV, if any, is attributable to the MVC Affiliation rather than attributable to any one or more of the various other factors affecting the value of the Property.

The Property was subject to numerous external factors, beyond the control of the Defendants, which impacted value. Ascribing the entire change in value to the MVC Affiliation is inappropriate.

There is significant evidence to suggest that changes in value were the result of other factors – comments that Aspen Highlands is a "poor stepsister"[88] or that the Project is "struggling with sales"[89] due to its location.

Using any comparable sales data to determine a property's value requires adjustments to make these properties truly comparable, something Robinson did not do.  Factors - like the views, size of units, age, parking, amenities, week of use, ease of exchange – all need to be addressed in a comparable sales analysis.

Location is an important factor. Robinson's calculations are weighted heavily by the disproportionate inclusion of multiple sales in Downtown Aspen, a strong, attractive and sought-after submarket. Sales in Snowmass Village (according to Robinson) are significantly weaker,

---

88 St. Regis Report, 50

89 Dancing Bear Appraisal, 49

yet this market is under-represented in the analysis. Downtown Aspen comprises 80% of the Comp Set – while Snowmass Village is only 20%. The Comp Set as defined by Robinson does not include a single asset in Aspen Highlands.

Robinson's data includes a number of outliers or sales data that should not be included, such as the sale of a number of units at Dancing Bear to consolidate into one unit for private use, which Robinson acknowledges "skews" the data. With regard to Robinson's own calculations, the methodology he chose was wrought with errors and inconsistencies. Robinson's Model inflates potential damages by ignoring sales early in first fiscal year and utilizing an incorrect timeframe to calculate CAGR, each of which is outlined in this Second Report.  There are so many mathematical and formulaic errors in the Amended Robinson Model that it can't be relied on or used for anything.

Solely for demonstrative purposes, I have reworked the Amended Robinson Model to correct mathematical and formulaic errors and changed numerous assumptions.  I have offered some calculations demonstrating what Robinson's DoV might look like if he employed different assumptions.  These calculations either drastically reduce or eliminate any DoV that could be attributable to the MVC Affiliation.

Based upon these issues, Robinson's damages calculation would need a complete retooling to be considered accurate and methodologically sound.

* * *

The opinions, analyses, and calculations contained in this Report are based on the information available to me as of January 4, 2019. I reserve the right to modify or supplement this Report if new or different information is made available to me.

Respectfully submitted,

Alan Tantleff

January 4, 2019