# EXHIBIT G

# The Deposition Transcript of Mr. Robinson 6.18.2019

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                FOR THE DISTRICT OF COLORADO
 3
 4    RCHFU, LLC, et al.,              )
                                       )
 5                                     ) Civil Case No.:
           Plaintiffs,                 ) 1:16-cv-01301-PAB-GPG
 6                                     )
                                       )
 7         vs.                         )
                                       )
 8                                     )
      MARRIOTT VACATIONS               )
 9    WORLDWIDE CORPORATION, et al.,   )
                                       )
10                                     )
           Defendants.                 )
11    _____ )
12
13
14
15
16
            DEPOSITION OF R. MAURICE ROBINSON
17              Los Angeles, California
                Tuesday, June 18, 2019
18
19
20
21
22
23
24
      Reported by:  Dana Christensen
25    CSR No. 11251
```

Page 10

1 BY MR. SELLINGER:
2   Q.  So, Mr. Robinson, I understand that you've issued
3 an initial report and I understand that another report was
4 issued yesterday that we have not had the chance to
5 review, so unless otherwise indicated I'm going to be
6 asking you questions about your December 19th, 2018
7 amended summary of economic damages, okay?
8   A.  Okay.
9   Q.  And if you turn to page 6, the bottom paragraph,
10 it says, "In rendering my opinions I assume that
11 plaintiffs will establish liability," and then it goes on
12 after a clause, quote, "And that these breaches were
13 substantial factors in causing the property values of the
14 subject property to be significantly lower," unquote.  Do
15 you see that?
16   A.  Yes.
17   Q.  So you are assuming in this report that Ritz
18 allowing access to Marriott owners and the affiliation
19 were substantial factors in the decreasing property
20 values, right?
21   A.  Well, I'm assuming that the entirety of the
22 plaintiff -- of the defendants' alleged behaviors in total
23 were substantial factors.  I really didn't allocate
24 amongst the alleged activities or actions or behaviors, so
25 I don't know if any one of them was more substantial than

Page 11

1 others.
2   Q.  I understand you didn't allocate, and I am going
3 to come back and ask you about that, but for the moment
4 what I'm trying to get you to make clear is that the
5 conclusion that the defendants' behavior were substantial
6 factors in property diminution was an assumption that you
7 made, correct?
8   A.  Yes.
9   Q.  And you relied on Mr. Dev and Mr. Simon for those
10 assumptions, correct?
11   A.  Yes.
12   Q.  You did no independent analysis on your own to
13 conclude that the actions of the defendants were
14 substantial factors in causing property value to go down,
15 correct?
16   A.  Correct.
17   Q.  You did nothing to verify that the actions of the
18 defendants or the Marriott affiliation was a substantial
19 factor in causing property values to go down, correct?
20   A.  Correct.
21   Q.  And Mr. Dev, who you relied upon for that
22 conclusion, he's not a licensed real estate appraiser, is
23 he?
24   A.  No.
25   Q.  And Mr. Dev, who you relied on for that

Page 12

1 assumption, he's not a licensed real estate appraiser
2 either, correct?
3   A.  Asked and answered.
4      MR. FERGUSON:  I think you misspoke.
5      THE WITNESS:  If you meant Mr. Simon, he is not
6 an appraiser.
7 BY MR. SELLINGER:
8   Q.  Thank you.  So of Mr. Dev, Mr. Simon, and you,
9 you're the only licensed real estate appraiser, correct?
10   A.  Yes.
11   Q.  But you, the licensed real estate appraiser in
12 this report, relied on the non-licensed real estate
13 appraisers for their conclusions that the Marriott
14 affiliation and the conduct of the defendants were
15 substantial factors causing loss, correct?
16   A.  That's a good question.  I'm not sure.  Can you
17 ask that again?
18      MR. FERGUSON:  Can you repeat that back, please,
19 Dana?
20      (Record read:
21      "Question:  But you, the licensed real
22      estate appraiser in this report, relied on
23      the non-licensed real estate appraisers for
24      their conclusions that the Marriott
25      affiliation and the conduct of the

Page 13

1      defendants were substantial factors causing
2      loss, correct?")
3      THE WITNESS:  Here is how I will answer, and I
4 apologize for the nuances.  I happen to have a licensed
5 real estate -- I happen to have a general real estate
6 license, appraisal license in the State of California.
7 I'm not acting as an appraiser in this opinion or report.
8      The substantial factors, I'm not sure that's a
9 valuation issue either, so because I'm not opining on who
10 did what, let's call it liability, I don't know that I can
11 really answer that I relied on a non-appraiser, that it
12 was a substantial factor.  So the way you worded it does
13 not strike me as totally correct.
14 BY MR. SELLINGER:
15   Q.  You're a licensed real estate appraiser, right?
16   A.  Yes, I have two licenses.  I drive a car and I
17 have a real estate appraiser license.
18   Q.  Simon and Dev are not licensed real estate
19 appraisers?
20   A.  Correct.
21   Q.  You, the licensed real estate appraiser, relied
22 on two non-licensed real estate appraisers for the
23 conclusion, as you quote, that the breaches of Marriott,
24 the affiliation and other conduct were substantial factors
25 in causing the property values to be significantly lower,

4 (Pages 10 - 13)

1    A.  Yes.
2    Q.  Do you agree with that?
3    A.  I'm not sure what that is but I will not disagree
4  with it.
5    Q.  So as Mr. Simon describes his experience, the
6  only experience he lists in connection with hospitality
7  and shared ownership is in the areas of merger,
8  acquisitions, structuring, asset management, operations
9  and finance, correct?
10      MR. FERGUSON:  Objection, form.
11      THE WITNESS:  Yeah, in this paragraph here.
12  BY MR. SELLINGER:
13    Q.  In the CV that he prepared to describe his
14  background for this case, correct?
15      MR. FERGUSON:  Objection to form.
16      THE WITNESS:  In the first paragraph of that
17  particular CV for this case.
18  BY MR. SELLINGER:
19    Q.  Well, after that paragraph it turns to his
20  education and then his professional experience, correct?
21    A.  Yes.
22    Q.  But that paragraph, that is the entirety of his
23  general description of himself before he gets into the
24  education and professional experience, correct?
25    A.  Yes, that's the only paragraph before the

1  education and professional experience.
2    Q.  Okay.  Let's move on.  Now, Mr. Simon did not
3  conduct any analysis tying the defendants' alleged acts to
4  any specific decline in the value of the property,
5  correct?
6    A.  Right.  I think that's correct.
7    Q.  He didn't isolate the impact of defendants' acts
8  on the value of the property, correct?
9    A.  When you say "isolate," as opposed to what?  I
10  think he -- my understanding of his report was that he
11  found that the defendants behaved badly.
12    Q.  Correct.  But he didn't look at the defendants'
13  acts, the affiliation, and the other conduct and measure
14  the financial impact of that, correct?  He didn't quantify
15  it?
16    A.  On the property value decline?
17    Q.  Right.
18    A.  Yes.
19    Q.  You are agreeing with me, he did not do that?
20    A.  Yes, I agree with that.
21    Q.  And he did not isolate the impact of any of
22  defendants' actions from each other or any other actions
23  in the market; he simply looked at defendants' actions and
24  said that they were a substantial factor, period?
25      MR. FERGUSON:  Objection, form.

1      THE WITNESS:  Yes.  I don't want to misclassify
2  what he did, so I'm not that positive about that.
3  BY MR. SELLINGER:
4    Q.  Mr. Simon did not consider any external factors
5  which could have influenced the value of the property,
6  correct?
7      MR. FERGUSON:  Objection, form.
8      THE WITNESS:  I disagree.
9  BY MR. SELLINGER:
10    Q.  Where in his report does it say that he
11  considered external factors other than the actions of
12  defendants?
13    A.  I don't know.
14    Q.  You can't point to any place in the report where
15  it says Mr. Simon did that?
16    A.  Correct.
17    Q.  And Mr. Simon in his report concludes that the
18  defendants damaged the exclusivity of the club by allowing
19  a broader group to access the club without having to
20  purchase fractional interests, correct?
21    A.  Yes.
22    Q.  And that's an important part of his opinion?
23      MR. FERGUSON:  Objection, form.
24      THE WITNESS:  If he says so.
25            ////

1  BY MR. SELLINGER:
2    Q.  Well, it's an important part of you relying on
3  that aspect of his opinion?
4      MR. FERGUSON:  Objection, form.
5      THE WITNESS:  Not necessarily.
6  BY MR. SELLINGER:
7    Q.  In any event, Mr. Simon in reaching his
8  conclusion about exclusivity having been damaged by
9  defendants allowing Marriott members access to the
10  property, he does not in the report consider the
11  plaintiffs' rentals of their own units to outsiders could
12  have the same affect on exclusivity, does he?
13      MR. FERGUSON:  Objection, form.
14      THE WITNESS:  I wouldn't say that.
15  BY MR. SELLINGER:
16    Q.  Where in the report does it indicate that
17  Mr. Simon gave any consideration to plaintiff rentals?
18    A.  I don't know that it is in the report.
19    Q.  Okay.  And Mr. Simon's report does not
20  distinguish between the access to the Ritz-Carlton that
21  members of Marriott had prior to the affiliation in 2015,
22  correct?
23      MR. FERGUSON:  Objection, form.
24      THE WITNESS:  Not that I know of.
25            ////

7 (Pages 22 - 25)

Page 30

1 that's where I got my assignment. I don't think he was
2 done with his report at that time.
3    Q. Did you speak to Mr. Simon at the time?
4    A. Yes.
5    Q. For how long?
6    A. I have no idea. Let's say less than two hours.
7    Q. And any other conversation? And that's before
8 you started the assignment?
9    A. Correct. He introduced me to the lawyers, and I
10 in fact am a sub-consultant to his consulting contract.
11    Q. Did Mr. Simon tell you -- did you speak to
12 Mr. Simon any other time?
13    A. Yes.
14    Q. How many other times?
15    A. Many.
16    Q. Did Mr. Simon tell you why he was not opining as
17 to the diminution of value in addition to opining on the
18 affiliation and defendants' conduct being a substantial
19 cause in the diminution of value?
20       MR. FERGUSON: Objection, form.
21       THE WITNESS: I might have. That's not sticking
22 in my mind. I'm good at doing this kind of work. He's
23 good at the fractional industry. I think he saw it as a
24 very large assignment and thought it might be too much for
25 him alone so he introduced me as a damage expert. I

Page 31

1 acknowledged that I was not going to do the liability but
2 I did not see a problem.
3 BY MR. SELLINGER:
4    Q. In looking at Mr. Simon's report, you did not see
5 any consideration by Mr. Simon that location of the Ritz
6 property may have impacted the diminution of value, did
7 you?
8    A. I don't recall.
9    Q. You don't recall seeing any of that?
10    A. Correct.
11    Q. And location can affect the value of real estate,
12 correct?
13    A. Yes.
14    Q. I show you what's been marked as Robinson 8.
15 This is a appraisal of the Aspen property dated
16 December 2nd, 2013 prepared by Cushman & Wakefield,
17 previously marked as an exhibit in Mr. Donaldson's
18 deposition. Have you seen it before?
19    A. Yes.
20    Q. You reviewed it?
21    A. No, I've read it.
22    Q. What's the difference?
23    A. In the appraisal world when you review an
24 appraisal report, that has a lot of rules applied.
25 Anybody can read it, so I read it as a non-appraiser. I

Page 32

1 did not review it as an appraiser.
2    Q. All right. Turning to page 12. Top right are
3 the page numbers.
4    A. Got it.
5    Q. The last paragraph says, quote, "The subject
6 properties are located in the Ritz-Carlton Club at Aspen
7 Highlands at the base of the Aspen Highlands ski area
8 about three miles west of the town of Aspen. This is a
9 periphery location that does not have the critical mass of
10 support services and amenities on the level of the town of
11 Aspen," unquote. Do you see that?
12    A. Yes.
13    Q. Do you agree with that?
14    A. Yes.
15    Q. And that fact that it's a periphery location, the
16 Ritz, that does not have the critical mass of support
17 services and amenities as the downtown Aspen, that can
18 affect property value, right?
19       MR. FERGUSON: Objection, form.
20       THE WITNESS: Yes, it can.
21 BY MR. SELLINGER:
22    Q. Can you turn page 16?
23    A. Yes.
24    Q. Under the heading Purchasing Process, second
25 paragraph from the bottom, it states, quote, "High end of

Page 33

1 fractional and private residence club owners purchased
2 primarily for the certainty of quality accommodations,
3 location, and the quality compared to other options of a
4 similar price." Do you agree with that?
5    A. Yes.
6    Q. And to those high-end fractional and private club
7 purchasers, the location as well can affect their value,
8 what they are willing to pay, right?
9    A. Yes.
10    Q. I'm on Exhibit 13, Dancing Bear appraisal.
11 Showing you what's been marked 13, the Cushman & Wakefield
12 appraisal of the Dancing Bear residence properties in
13 Aspen. Have you, to use your terminology, read this
14 before?
15    A. Yes.
16       MR. FERGUSON: It's not exactly his terminology.
17 It's actually a term of art. I saw a little giggle that
18 he's making some argumentative suggestion reading and
19 review is different, but it really is different.
20       MR. SELLINGER: I don't want to fight with you.
21 I'm trying to accommodate his language so we don't have a
22 dispute.
23       MR. FERGUSON: You say his language, it's the
24 industry.
25       MR. SELLINGER: I'm not fighting it. I'm trying

9 (Pages 30 - 33)

Page 34

1 to accommodate his use of language.
2      MR. FERGUSON: I appreciate it.
3 BY MR. SELLINGER:
4   Q. Would you turn to page 49, please?
5   A. Yes.
6   Q. The second-to-last paragraph says "The
7 Ritz-Carlton of Aspen Highlands is a project which began
8 marketing in late 2003 and is approximately 80 percent
9 sold out. This is a sizable project of 876 shares which
10 has struggled with sales, which is a function of location
11 in our opinion. The Ritz brand has helped sales but the
12 Aspen Highlands area lies outside of Aspen with limited
13 services and nearby amenities." Do you see that?
14   A. Yes.
15   Q. Do you agree with that?
16   A. Well, I don't know. I don't know at the time if
17 this really was 80 percent sold out or anything like that.
18 If you are asking me if the last part of the sentence,
19 does the Aspen Highland area lie outside of Aspen, yes.
20 Does it have less services and nearby amenities than
21 downtown Aspen, yes.
22   Q. Do you have any reason to quarrel with the
23 statement that the Ritz-Carlton struggled with sales which
24 is a function of its location in the opinion of Cushman &
25 Wakefield?

Page 35

1   A. There's their opinion. I have no reason to
2 think -- well, actually I don't know. They seem to be
3 characterizing the sales as a struggle and they are
4 attributing it to location, which is their opinion, but I
5 have no opinion on their opinion.
6   Q. Do you have any reason to question that opinion,
7 that the location caused them to struggle with sales?
8   A. No, I have no idea.
9   Q. Do you have any reason to question, quarrel with
10 that conclusion?
11      MR. FERGUSON: Objection, form.
12      THE WITNESS: I don't really know what went into
13 that opinion.
14 BY MR. SELLINGER:
15   Q. And you note in your report that Mr. Ragatz --
16 withdrawn. You are familiar with Richard Ragatz?
17   A. I am.
18   Q. You note in your report that Mr. Ragatz referred
19 to Aspen Highlands as a poor stepsister to Aspen,
20 correct?
21   A. Yes.
22   Q. Do you agree with that?
23   A. I don't know what he was thinking when he said
24 that.
25   Q. Well, you cited it in your report.

Page 36

1   A. That doesn't mean that I know what he was
2 thinking when he said it.
3   Q. Why did you cite it in your report?
4   A. I don't remember. I don't know why. I put some
5 stuff in there that were quotes from other reports, but
6 sitting here now I'm not quite sure why I selected
7 those.
8   Q. You've --
9   A. I don't even see it. Oh, there it is.
10      MR. FERGUSON: What page?
11      THE WITNESS: My page 6, Exhibit 12, fourth
12 bullet, fourth sentence. There it is.
13 BY MR. SELLINGER:
14   Q. In Mr. Simon's report, going back to that, you
15 don't remember seeing in there any indication that
16 Mr. Simon considered the age of the property, the
17 competitive supply or the properties comparative larger
18 supply of fractional interests, correct?
19   A. Well, I don't remember hardly anything that is in
20 the report. I do know that he considered it, but I would
21 not be able to find it in the report.
22   Q. What I'm asking you is you don't remember seeing
23 any of that in the report, correct?
24   A. Correct.
25   Q. And in the report Mr. Simon doesn't discuss sales

Page 37

1 performance, inventory, pricing, or pricing for other
2 fractional interests in Aspen, correct?
3   A. He might. I don't remember.
4   Q. You don't remember seeing that in his report,
5 correct?
6   A. No, I don't remember any of these things in the
7 report. They might be but --
8   Q. I'm representing to you that they are not, but
9 I'm asking you because you're the witness.
10   A. Right, and since I've only read the report once
11 and only glanced at it then, I'm a little weary of you
12 saying didn't you see this in a footnote on page 6. I
13 appreciate your representation because I have not
14 memorized this thing.
15   Q. I'm not tricking you. I am not asking trick
16 questions.
17      Lastly on this, you don't remember seeing in his
18 report any discussion of the market trends or the market
19 forces on the value of the subject units, correct?
20   A. Correct.
21      MR. FERGUSON: Objection, form.
22      THE WITNESS: I know that he considered them. I
23 don't remember seeing it in the report.
24 BY MR. SELLINGER:
25   Q. Let's try answering my question without the

10 (Pages 34 - 37)

1 extra, you know, testimony. I'm asking you what's in the
2 report.
3    MR. FERGUSON: What extra testimony?
4    THE WITNESS: I don't know.
5 BY MR. SELLINGER:
6    Q. Hold on. If you and Mr. Ferguson want to talk
7 about what you and Mr. Simon discussed, he can do that on
8 redirect, but I would like you to answer my questions, all
9 right, and not be volunteering answers to other questions
10 that I have not asked; otherwise we will be here very
11 late. So let me ask you again. Why don't we read the
12 question back.
13    MR. FERGUSON: And the answer.
14    MR. SELLINGER: No, not the answer. I'm asking
15 the questions.
16    MR. FERGUSON: I want to hear his answer because
17 you suggested he did not answer it and added stuff to it.
18 To you use your word, it's quarreling. I don't get it.
19 And then you sold my witness.
20    MR. SELLINGER: If you want to hear the answer --
21    MR. FERGUSON: It's very short.
22    MR. SELLINGER: So you can read the question and
23 answer, but then I would like you to read the question
24 again and have that appear in the transcript, and I would
25 like the witness to answer that question.

1    (Record read:
2    "Question: I'm not tricking you. I am not
3    asking trick questions.
4    "Lastly on this, you don't remember seeing
5    in his report any discussion of the market
6    trends or the market forces on the value of
7    the subject units, correct?
8    "Answer": Correct.
9    "MR. FERGUSON: Objection, form.
10   "THE WITNESS: I know that he considered
11   them. I don't remember seeing it in the
12   report.")
13   MR. FERGUSON: Now just the question, please.
14   (Record read:
15   "Question: I'm not tricking you. I am not
16   asking trick questions.
17   "Lastly on this, you don't remember seeing
18   in his report any discussion of the market
19   trends or the market forces on the value of
20   the subject units, correct?")?
21   THE WITNESS: Correct.
22 BY MR. SELLINGER:
23    Q. Okay. Let's move on. Now, we've talked about
24 Mr. Simon. Mr. Dev, you read his report?
25    A. Parts of it.

1    Q. You didn't review it in an appraisal sense I take
2 it?
3    A. I didn't read the whole thing, and I think there
4 were two of them.
5    Q. And as far as you are aware, and I will represent
6 to you that Mr. Dev did not quantify the impact of
7 defendants' acts or the affiliation on the value of the
8 property, correct?
9    A. Okay.
10   Q. Does that correlate with your recollection?
11   A. My lack of recollection.
12   Q. So let me ask it a different way. You don't
13 remember in Mr. Dev's report any indication that he
14 quantified the impact of defendants' acts on the value of
15 the property, correct?
16   A. Correct.
17   Q. And you don't recall in Mr. Dev's reports any
18 calculations or analyses to talk about how the affiliation
19 and defendants' actions impacted the property value,
20 correct?
21   A. I can't, definitely can't remember that.
22   Q. And you don't remember Mr. Dev in his report
23 looking at any other factors that might have contributed
24 to a diminution in value, correct?
25   A. He might have. I don't remember.

1    Q. You don't remember any analysis of that in his
2 report, correct?
3    A. Correct.
4    Q. And you don't remember any analysis in Dev's
5 report that he looked at the location of the property as a
6 factor in diminution in value in his report?
7    A. Yeah, he might have. I don't remember. In the
8 parts that I read, I didn't see it.
9    Q. And did you speak to Mr. Dev as well?
10   A. No.
11   MR. FERGUSON: He's Dr. Dev, by the way. Philip,
12 he's Dr. Dev.
13 BY MR. SELLINGER:
14   Q. And you don't recall seeing in Dev's report that
15 he made any inspection of the property, correct?
16   A. I don't recall.
17   Q. You don't recall seeing in Dev's report that he
18 evaluated sales performance or pricing of fractional
19 interests in the market, correction?
20   MR. FERGUSON: Objection, form.
21   THE WITNESS: Did I see any fractional interests,
22 I don't know. I don't remember.
23 BY MR. SELLINGER:
24   Q. And you don't have any branding experience
25 yourself, correct?

11 (Pages 38 - 41)

Page 42

1    A.  Incorrect.
2    Q.  What branding experience do you have?
3    A.  In the hotel industry.
4    Q.  Just tell me what the experience is.
5    A.  Well, I'm a hotel development advisor, and so
6    part of my expertise is selecting or advising or
7    suggesting or evaluating different brands of the hotel
8    world when a new hotel is going to be built, what would be
9    the appropriate brand.  So yes, I do have branding
10   experience.
11   Q.  Can you identify any scientific or technical
12   method that Dev used to reach his conclusion about the
13   impact of the affiliation?
14       MR. FERGUSON:  Objection, form.
15       THE WITNESS:  I'm not sure what that would look
16   like.
17   BY MR. SELLINGER:
18   Q.  Can you identify any technical or scientific
19   method that Dev used to reach his conclusion about the
20   impact of the affiliation?
21   A.  Well, that's a tough question.  I don't have his
22   report in front of me.  I doubt I've read through the
23   whole thing.  I don't think I can.
24   Q.  Are you able to identify any scientific or
25   technical method that Simon used to reach his conclusion

Page 43

1    about the impact of the affiliation?
2        MR. FERGUSON:  Objection, form.
3        THE WITNESS:  Not that I can recall.
4    BY MR. SELLINGER:
5    Q.  When you reviewed Mr. Dev's report, did you
6    disagree with any part of it?
7    A.  I wouldn't say I reviewed it.
8    Q.  I'm sorry.  I --
9    A.  When I read parts --
10   Q.  By the way, that was a slip on my part.
11   A.  I'm trying to be accurate.
12   Q.  Thank you.
13   A.  I read parts of his report.  I don't think I
14   disagreed with anything or even agreed with anything.
15   Q.  Okay.  How about Simon's report, when you read
16   his report, did you disagree with any parts of it?
17   A.  I don't recall.
18   Q.  And again, didn't agree or disagree?
19   A.  Well, I may have agreed or disagreed.  I just
20   can't recall any of those specifics.
21   Q.  Okay.  So as you sit here today, just before we
22   move on to your report now, you can't tell us whether you
23   agree or disagree with the specifics in either Dev's or
24   Simon's report?
25       MR. FERGUSON:  Objection, form.

Page 44

1        THE WITNESS:  Right.  Let's -- it's too Broad a
2    question.  So I will say that there's probably stuff in
3    there that I agree and disagree with.  Not -- having not
4    been able to recall what's in Dev's two reports, I can't
5    cite anything in particular.  If you really care, which I
6    don't think you do, I could go through Jon's report and
7    tell you what I agree and disagree with, but generally
8    having only reviewed them lightly, or read them lightly, I
9    cannot recall what they actually said on the specifics, so
10   I can't really answer that as a yes or no that there's
11   nothing in there that I agree or disagree with.  This is
12   more of a recollection problem rather than agree or
13   disagree problem.
14   BY MR. SELLINGER:
15   Q.  In your report you state that your analysis,
16   conclusions of value and report should not be considered
17   an appraisal as defined by USPAP, correct?
18   A.  Correct.
19   Q.  And USPAP are the uniform standards of
20   professional appraisal practice?
21   A.  Correct.
22   Q.  And are they the governing standards for
23   appraisals?
24   A.  Yes.
25   Q.  And the USPAP standards must be followed by

Page 45

1    licensed appraisers when performing appraisals?
2    A.  Yes, and appraisal reviews.
3    Q.  And appraisal reviews?
4    A.  Yes, those are the two instances where the USPAP
5    standards apply.
6    Q.  And your report is not an appraisal or appraisal
7    review, correct?
8    A.  Correct.
9    Q.  And, therefore, your report was not done pursuant
10   to USPAP standards?  You didn't have to?
11   A.  Right.  It was not an appraisal.
12   Q.  You do in your report opine as to value,
13   correct?
14   A.  Not market value, no.  I define lost value, so
15   try not to get confused with what USPAP considers value
16   and what I call lost value for purposes of the report.
17   Q.  Well, you are saying your report calculates lost
18   value, right?
19   A.  Correct.
20   Q.  And to calculate lost value, how does that differ
21   from opining as to value?
22   A.  Well, opining as to value for an appraiser
23   involves actually doing an appraisal, which there's a lot
24   of steps.  My lost value, as I define in the report, is
25   really the difference between two sales prices, a but-for

12 (Pages 42 - 45)

Page 46

1 and an as-is, so you subtract one from the other and
2 that's the lost sales price, which I use the term "lost
3 value" in the report. It's not a USPAP term.
4    Q.   So the lost value, the term you use and the
5 conclusion you reach is not a USPAP term?
6    A.   No. Correct.
7    Q.   Where does it come from?
8    A.   I sort of made it up. I mean in diminution of
9 value, you know, there's the word "value," so for a while
10 I was calling it lost sales prices and I was using them
11 interchangeably, and in this version of the report I
12 titled it lost value, but I thought I defined it pretty
13 well.
14    Q.   And when you said you made up the term lost
15 value, is there a treatise or some source of that kind
16 that uses the term lost value in the concept that you use
17 in your report?
18    A.   Well, lost value is not unique to me. I don't
19 know that I can remember reading anything that defines it
20 exactly the same way. I think a lot of damage experts use
21 the words lost value for -- to define what they are
22 measuring, which is all I did in this case.
23    Q.   When you said you made up the term lost value,
24 what did you mean?
25    A.   For the purpose of this report I used lost value.

Page 47

1 I did not mean like it was unique. Lost value occurs out
2 in the world a lot. If you Google it, you will see it.
3    Q.   Is there a treatise or some other source that
4 uses the methodology that you use for lost value that you
5 can point to now?
6    A.   Geez, I don't know. It might be.
7    Q.   Are you able to point to any?
8    A.   No, I could not point to anything one way or the
9 other.
10    Q.   Okay. Now, in preparing your report you were
11 acting in the capacity of consulting and providing
12 litigation support; would that be fair?
13    A.   Yes. I would say that I was. It's a consulting
14 assignment. Litigation support was the general use and my
15 function was analyst.
16    Q.   And when you say your function was the analyst,
17 what does that mean?
18    A.   I was doing math.
19    Q.   As an expert witness here, are you an advocate?
20    A.   No.
21    Q.   What's the difference between -- in what way are
22 you not an advocate?
23    A.   I'm an objective expert and you're an advocate.
24    Q.   What is an advocate in the real estate sense?
25        MR. FERGUSON: Objection, form.

Page 48

1        THE WITNESS: Yeah, I don't know definition wise,
2 but an advocate is somebody who can, as an example, take a
3 contingent fee, they are representing their client's
4 interest regardless of the truth, and their job is to
5 advocate for the client's behalf as opposed to conduct
6 objective, impartial analysis.
7 BY MR. SELLINGER:
8    Q.   Now, an appraisal that is compliant with the
9 USPAP requirements requires a signed certification,
10 correct?
11    A.   That's right.
12    Q.   And that signed certification certifies that the
13 opinion is impartial and unbiased, correct?
14    A.   That's right.
15    Q.   And there's no such signed certification under
16 USPAP to your report here, correct?
17    A.   Right. It's not a USPAP report.
18    Q.   And a USPAP compliant report also requires a
19 certification that the analysis, the opinions, and the
20 conclusions were developed and the report prepared in
21 compliance with USPAP, correct?
22    A.   Right.
23    Q.   And you have no certification to that effect
24 either?
25    A.   Correct.

Page 49

1    Q.   Are you a member of the American Society of
2 Appraisers?
3    A.   Yes.
4    Q.   What is your designation?
5    A.   That's a good question. AM, appraisal member,
6 something like that.
7    Q.   And does the American Society of Appraisers have
8 any valuation standards?
9    A.   I suppose they do.
10    Q.   Does your report in this case comply with the ASA
11 standards?
12    A.   I don't know.
13    Q.   If you didn't comply in your report with the
14 USPAP standards and you don't know whether or not you
15 complied with the ASA standards, what standards did you
16 follow in preparing this report?
17        MR. FERGUSON: Objection, form.
18        THE WITNESS: Well, since it was not an appraisal
19 and those are appraisal organizations, there was no need
20 to follow the standards of appraisal organizations. I'm a
21 consultant. I belong to other organizations as well, so I
22 don't know that there was any regulatory agency out there
23 that applies standards. I belong to several professional
24 societies who hold up ethics and integrity and
25 do-a-good-job type standards, which I have met.

13 (Pages 46 - 49)

Page 50

1 BY MR. SELLINGER:
2    Q.  So in preparing the report in this case, you
3 didn't comply with USPAP or the ASA because you don't
4 believe you were required to.  Are there any standards
5 that you can point to relating to the methodology of lost
6 value that you employed, that you followed in preparing
7 this report?
8       MR. FERGUSON:  Objection, form.
9       THE WITNESS:  Okay.  I don't know.
10 BY MR. SELLINGER:
11    Q.  All right.  Let's go on then.  How many
12 fractional ownership units have you appraised before?
13       MR. FERGUSON:  Objection, form.
14       THE WITNESS:  I don't know that I've appraised
15 any.
16 BY MR. SELLINGER:
17    Q.  Have you valued fractional interest units
18 before?
19       MR. FERGUSON:  Objection, form.
20       THE WITNESS:  If you call this diminution of
21 value, value in interests, I've done this and I've done
22 another assignment similar to it, the St. Regis one, which
23 is, again, a damage analysis, the difference between two
24 sales prices, so it's really -- I'm not sure what you mean
25 by "value."

Page 51

1 BY MR. SELLINGER:
2    Q.  So other than this case and the St. Regis case
3 that you did with Mr. Simon, Mr. Reiser, and Mr. Ferguson,
4 have you had any other cases where you have done a lost
5 valuation of fractional interests?
6       MR. FERGUSON:  Objection, form.
7       THE WITNESS:  Let's see.  No.
8 BY MR. SELLINGER:
9    Q.  And you've never appraised fractional interests,
10 correct?
11    A.  Correct.
12    Q.  And you've never analyzed or evaluated fractional
13 interests in Aspen or Colorado before this case,
14 correct?
15    A.  Correct.
16    Q.  Have you done any valuations before this case
17 which include analyzing exchange companies and exchange
18 programs between fractional interest businesses?
19       MR. FERGUSON:  Objection, form.
20       THE WITNESS:  I don't think so.
21 BY MR. SELLINGER:
22    Q.  Before this case have you ever done any
23 valuations -- withdrawn.
24       Have you ever done any appraisals involving the
25 impact of affiliations between two different companies?

Page 52

1       MR. FERGUSON:  Objection, form.
2       THE WITNESS:  In the fractional world?
3 BY MR. SELLINGER:
4    Q.  Yes.
5    A.  No, I've never done any appraisals or
6 fractionals.
7    Q.  Have you done any appraisals of any kind
8 involving the impact of affiliations between two different
9 companies?
10    A.  Not that I can recall.
11    Q.  Have you done any valuations involving
12 affiliations between two different companies?
13    A.  I don't think so.
14    Q.  Have you ever done any studies of the types of
15 exchange programs the various fractional interest
16 companies have?
17    A.  No.
18    Q.  Does an appraiser have to be licensed in Colorado
19 to appraise property there?
20    A.  I think so.
21    Q.  Does one have to be licensed in Colorado to opine
22 as to value for property in Colorado?
23    A.  If it's an appraisal, yes.
24    Q.  And if it's not an appraisal?
25    A.  Then no.  The appraisal license only covers

Page 53

1 appraisals and appraisal reviews.
2    Q.  I'm sorry.  Let me ask the question differently.
3 I probably didn't ask it well.
4       Can anyone opine as to value, real estate value,
5 in Colorado?
6    A.  Probably.
7       MR. FERGUSON:  Objection form.
8 BY MR. SELLINGER:
9    Q.  And can anyone opine as to lost value of real
10 estate in Colorado?
11       MR. FERGUSON:  Objection, form.
12       THE WITNESS:  I guess so.
13 BY MR. SELLINGER:
14    Q.  Does Colorado have licensed appraisers?
15    A.  Yes.
16    Q.  Does Colorado have a licensed state appraiser
17 regulatory board?
18    A.  Yes, they do.
19    Q.  Have you visited the Ritz-Carlton Aspen
20 property?
21    A.  Yes.
22    Q.  When did you do that?
23    A.  October 2018.
24    Q.  And what did you do during your site visit?
25    A.  I visited about -- well, on site, I stayed there

14 (Pages 50 - 53)

Page 54

1 two nights I believe and visited all of the public spaces
2 and some of the rooms and private spaces, experienced the
3 facilities as a guest.
4    Q.   And what else did you do during that visit?
5    A.   Visited most of the other fractional units or
6 properties in the Aspen area.
7    Q.   When you say most of the other properties, how
8 many did you visit?
9    A.   I visited St. Regis club, the Dancing Bear, the
10 Timbers Club at Snowmass, the Residences at Little Nell,
11 the Hyatt Grand Residence Club, Sanctuary and Snowmass
12 Club in Snowmass, so with the Ritz that's eight.
13    Q.   And for the -- other than the Ritz, the other
14 seven properties that you just listed, what did you do
15 when you visited each of those?
16    A.   I met with a representative who showed me some of
17 the guest units and walked me around the property,
18 answered questions.  So again, I got to see most of the
19 public spaces and a sample of the private guest units.
20    Q.   And did you explore the area as well?
21    A.   Yes.
22    Q.   And what did you do in that regard?
23    A.   Drove around and walked around Aspen, Aspen
24 Highlands and Snowmass and the areas in between.
25    Q.   Are you familiar with how each of those three

Page 55

1 submarkets are perceived in relation to each other?
2        MR. FERGUSON:  Objection, form.
3        THE WITNESS:  I have my opinion.
4 BY MR. SELLINGER:
5    Q.   And what's your opinion?
6    A.   Well, to some degree they're all considered the
7 Aspen market.  There are distinctions between the three of
8 them, but I think for most people coming in looking for a
9 high-end fractional there isn't that much distinction
10 between Aspen Highlands and Aspen and even Snowmass.  But
11 if you're a local, there would be a lot more distinction
12 once you live there.
13    Q.   What are the distinctions between these three
14 submarkets that you are referring to?
15        MR. FERGUSON:  Objection, form.  You're referring
16 to those as submarkets.
17        THE WITNESS:  Yeah, I'm not sure.  But you can
18 slice the salami into a lot of places.  Even downtown
19 Aspen probably has submarkets.  But the downtown Aspen is
20 generally the preferred location because of the high-end
21 homes and retail outlets; it has more panache if you will
22 or cachet as the place to be for the uber wealthy.
23        Aspen Highlands is a couple of miles away; it's
24 kind of an attachment or branch if you will of Aspen.  You
25 could walk between the two of them.  Locals say the hill

Page 56

1 is better for skiing than Aspen Highlands.  I didn't ski
2 so I have no opinion on that.
3        The quality of the Ritz is generally equal to the
4 quality of the comps in Aspen, some are better, some
5 worse.  It's right up there in the five-diamond luxury
6 level as the rest of them, but there's less to do in the
7 Aspen Highlands area outside of the Ritz because of the
8 fewer retail establishments and smaller general
9 residential community.
10        And then Snowmass is, well, physically further.
11 It's kind of in between in terms of size or things to do.
12 Locals tell me the mountain is not quite as good but it's
13 big and there's plenty to keep busy on.  There's more
14 shops than Aspen Highland, but it suffered from lack of
15 investment if you will for about ten years because of the
16 strained ownership problems that the Village had, so there
17 really wasn't much progress or investment from a real
18 estate standpoint in the commercial areas of Snowmass for
19 let's say 2008 to 2015, so while it's bigger than Aspen
20 Highlands, I don't know that it's any nicer.  It depends
21 on what you're looking for.
22 BY MR. SELLINGER:
23    Q.   I will come back to these issues in a short
24 while.  Let me just follow up on a couple of other things.
25        USPAP requires for an appraisal that in

Page 57

1 developing the appraisal an appraiser must collect,
2 verify, and analyze all information necessary for credible
3 assignment results, correct?
4    A.   I have seen that, yes.
5    Q.   And if a report is -- if an appraisal complies
6 with USPAP, it has to do all of that, right?
7    A.   It should.  I don't know that every appraisal
8 does, but we're talking should.
9    Q.   Should, all right.  And you've told us that your
10 report was not required to comply with USPAP so you didn't
11 attempt to go through the USPAP hoops, right?
12    A.   So I have a nuanced answer to that so I will not
13 say right.  USPAP merely says if you are going to do a
14 good job, cover a few steps.  You can do a good job and
15 cover those steps and other steps and not be an appraisal,
16 so some steps I did go through that USPAP would say right,
17 good, we like that too, and others I didn't because I
18 didn't need to.
19    Q.   So tell me what USPAP steps you did not follow.
20    A.   I didn't write an appraisal report, I did not
21 write an appraisal review report, didn't develop an
22 appraisal report or appraisal review report, so
23 there's -- USPAP has about ten standards, so I did not
24 follow all ten standards, because if I did, it would have
25 been an appraisal report.

15 (Pages 54 - 57)

Page 62

1 sold. For some of them works, prices, standard comparison
2 to the market, and for some whether the program adjoins a
3 hotel or has access to an exchange program, correct?
4    A.  Yes.
5    Q.  And that's all the information you list as to
6 these comparables, correct?
7    A.  Right.  Very much a summary.
8    Q.  If this was an appraisal compliant with USPAP,
9 you would have to list a lot more information, correct?
10    A.  Yes.
11    Q.  And your report does not analyze the criteria
12 behind their selection, correct?
13    A.  Analyze?  Let's see.  No, I think I just state
14 it.
15    Q.  And the report does not list the specific
16 attributes that make them appropriate comparables for the
17 Ritz-Carlton, correct?
18    A.  I'm not sure honestly.  I mean, yeah, I guess I'm
19 not sure about that.  Some yes, some no maybe.
20    Q.  Okay.  Let me ask it differently then.  Your
21 report does not compare the attributes of the comparable
22 properties to the Ritz property, nor adjust for any
23 differences like location or views or anything like that,
24 correct?
25    A.  Correct.

Page 63

1    Q.  And you're familiar with the case Lexington
2 Services Associates versus 703 Bienville Partners, LTD?
3    A.  I can't recall it.
4    Q.  Do you recall being an expert witness in a case
5 in Dallas in 2002 with that caption?
6    A.  Barely.  What was the property?
7    Q.  I'll show you the report.
8        MR. MARX:  Will you mark this as Robinson 49,
9 please?
10        MR. SELLINGER:  And let's mark 50 as well.
11 Exhibit 49 is a transcript of testimony you gave in a
12 case, Lexington Service Associates versus 703 Bienville
13 Partners, and Exhibit 50 is a report you issued in that
14 case, and it may help you to look at them together.
15        So I will direct your attention to a specific
16 part of the transcript and report, but if you want to take
17 a minute or two to just get your bearings with the
18 documents, you can feel free to do that.
19        MR. FERGUSON:  I would request you to take time
20 to review as long as you need to for both of these
21 documents.
22        THE WITNESS:  Okay.  Thank you.
23 BY MR. FERGUSON:
24    Q.  Okay.  So I'm going to direct your attention
25 first to Exhibit 49, which is a transcript of your

Page 64

1 testimony in that case, and page 21.
2    A.  Okay.
3    Q.  And let me just look at that for a minute.  They
4 are a little different I think.  This is a different
5 version.  It's the same but it's formatted differently.
6        MR MARX:  Would you like me to find the passage?
7        MR. SELLINGER:  Yes.
8 BY MR. SELLINGER:
9    Q.  Okay.  If you turn to page 40.
10    A.  Okay.
11    Q.  You see an answer that begins with the word
12 "Well"?
13    A.  Yes.
14    Q.  The answer reads, quote, "Well, you could go back
15 in time and see how many reservations came through those
16 media in historic periods and through some adjustments try
17 to determine how many reservations would have come through
18 those same media during the time in question."  Subject --
19 excuse me.  "Subtract what did come through and come up
20 with a potential number of reservations that didn't come
21 through because of the glitch and you would adjust them
22 for other factors, such as how the general market was
23 doing, improvements in the competitive supply relative to
24 your property management issues, maintenance and condition
25 of your hotel issues, and any of these other factors that

Page 65

1 would come into play in the relative performance of your
2 property," unquote.  Did I read that correctly?
3    A.  Yes.
4        MR. FERGUSON:  Except for one word.
5 BY MR. FERGUSON:
6    Q.  And let me see this again.  If you look on
7 page 64, do you see the question, "If you didn't adjust
8 for it, should you include it?"  Do you see that?
9    A.  Okay, yes.
10    Q.  And your answer is "If you couldn't adjust for
11 something and something were material, impact your
12 numbers, yeah, you would have to take it out."  Did I read
13 that correctly?
14    A.  Yes.
15    Q.  And that concept of adjustments is a real estate
16 concept you're well familiar with, correct?
17        MR. FERGUSON:  Objection, form.
18        THE WITNESS:  Well, yes.  There are adjustments
19 in real estate analysis.
20 BY MR. SELLINGER:
21    Q.  When you are looking at comparables and you are
22 making adjustments, what is the purpose of that?
23    A.  Okay.  Classic real estate appraisal methodology
24 calls for adjusting the attributes of the comp to the
25 subject, so when you are doing an appraisal, you'd want to

17 (Pages 62 - 65)

Page 66

1 make an adjustment to the comp that you selected and
2 adjust it to the attributes of the subject property.
3     MR. SELLINGER: Dana, just read that back for me.
4         (Record read:
5         "Answer: Okay. Classic real estate
6         appraisal methodology calls for adjusting
7         the attributes of the comp to the subject,
8         so when you are doing an appraisal, you'd
9         want to make an adjustment to the comp that
10        you selected and adjust it to the
11        attributes of the subject property.")
12 BY MR. SELLINGER:
13    Q.  And why does classic real estate methodology call
14 for adjusting the attributes of the comp to the subject
15 property?
16     MR. FERGUSON: Objection, form.
17     THE WITNESS: One reason is that no two
18 properties are the same and so you want to rely on the
19 appraiser's subjective opinion as to trying to adjust the
20 differences to make them as same as possible when you are
21 doing an appraisal.
22     MR. SELLINGER: Please read that.
23         (Record read:
24         "Answer: One reason is that no two
25         properties are the same and so you want to

Page 67

1         rely on the appraiser's subjective opinion
2         as to trying to adjust the differences to
3         make them as same as possible when you are
4         doing an appraisal.")
5 BY MR. SELLINGER:
6    Q.  And the purpose of adjusting the comparables in
7 classic real estate appraisal to adjust for the
8 differences to make them the same as possible as the
9 subject property is so the comparisons that you make and
10 draw would be as valid as possible?
11     MR. FERGUSON: Objection, form.
12     THE WITNESS: That's part of it.
13 BY MR. SELLINGER:
14    Q.  What are other reasons for in classic real estate
15 methodology adjusting the attributes of comps to the
16 subject property?
17     MR. FERGUSON: Objection, form.
18     THE WITNESS: Also misstates testimony. Oh,
19 appraisal methodology. Because in an appraisal you are
20 trying to come up with a specific value for a specific
21 piece of real estate, and since no other piece of real
22 estate is exactly the same, it's incumbent upon the
23 appraiser to find comps that are close but different and
24 then adjust for the differences so that you can get the
25 specific opinion of value for the subject property.

Page 68

1 BY MR SELLINGER:
2    Q.  But when you are doing an appraisal, if you did
3 not adjust for the differences between properties, then a
4 value that you would attribute based on a comp would be
5 imprecise or inaccurate if there were not such
6 adjustments?
7     MR. FERGUSON: Objection, form.
8     THE WITNESS: Sometimes. Certainly for an
9 individual property like a house I would agree with that;
10 it's better to do the adjustments. Mass appraisals, as an
11 example, don't do adjustments like that by nature. If you
12 call it a mass appraisal, you are free from doing
13 individual adjustments because you have got probably
14 hundreds of comps and its burdensome.
15 BY MR. SELLINGER:
16    Q.  Now, in this case, Lexington versus 703
17 Bienville, you were basically doing a penetration analysis
18 in order to measure lost profits caused by a Lexington
19 service reservation system, correct?
20    A.  Well, I think a penetration analysis was done by
21 the firm of PKF Consulting, and I was evaluating their
22 analysis and criticizing it. I wonder if I did do one
23 myself. Did I do one myself in here? I don't remember.
24 But anyway, a penetration analysis was part of the work
25 done by the other experts, so when I was retained it had

Page 69

1 already been done.
2    Q.  But in this case the issue was what was the lost
3 value or the lost profits as a result of some errors in a
4 reservation system, correct?
5    A.  That's my recollection.
6    Q.  And in trying to determine what those lost
7 profits or lost values were, you looked at comparables,
8 correct?
9     MR. FERGUSON: Objection, form.
10     THE WITNESS: I think so, yes.
11 BY MR. SELLINGER:
12    Q.  And the testimony that we just reviewed is that
13 you needed to make adjustments for differences in
14 measuring those lost profits or lost values to make the
15 comparables as close to the property as possible,
16 correct?
17    A.  I think so.
18    Q.  Okay. Good. Now, you did not adjust for the
19 comparables in this case, correct?
20    A.  Correct.
21    Q.  And why not?
22    A.  Well, it is my opinion that the differences in
23 the comparables and the comparables from the subject
24 property, the Ritz, were already baked in, if you will, by
25 the market, the people buying the fractional interests in

18 (Pages 66 - 69)

Page 70

1 each of the properties.  So stated more clearly perhaps,
2 the properties were priced differently, and they should
3 have been because they were all different, and so each
4 property had a, I will call it a relative ranking in the
5 market in terms of desirability and the pricing reflected
6 that, so that was already in there.
7    Q.   But you would agree that you could call Aspen a
8 market or you could call Aspen Highlands, Snowmass and
9 downtown submarkets within Aspen; you could do either one,
10 correct?
11    A.   Yes, it's up to the appraiser, so you would get
12 differences of opinions of that, but that's fair.
13    Q.   I mean it's fair to call Aspen Highlands one
14 submarket, Snowmass one submarket, and downtown Aspen one
15 submarket, correct?
16       MR. FERGUSON:  Objection, form.
17       THE WITNESS:  Yes, you could say that.
18 BY MR. SELLINGER:
19    Q.   So as I understand what you said is that each of
20 the comparables in this case were priced differently at
21 inception, the period you were looking at; is that what
22 you said?
23       MR. FERGUSON:  Objection, form.
24       THE WITNESS:  Okay, yes.  To be a little more
25 clear, inception for me is the starting date of the damage

Page 71

1 period, so I'm with you on that if we both agree.  So as
2 of the starting date of the damage period there were
3 comps, they were priced differently, and there were a lot
4 of differences between them.
5 BY MR. SELLINGER:
6    Q.   Now, different submarkets can perform
7 differently, correct?
8    A.   Correct.
9    Q.   Okay.  So one submarket in a particular period of
10 time for a host of factors might perform differently than
11 another submarket, right?
12    A.   Yes.
13    Q.   And what kind of factors could affect one
14 submarket performing differently from another submarket?
15    A.   Hypothetically?
16    Q.   Yes.
17    A.   Well, demand generators could abandon one market.
18 A tragedy could occur or something creating a stigma.  The
19 800-pound gorilla real estate property owner in the market
20 could either accelerate the commercial investment in the
21 submarket whereby all ships would rise with the tide, if
22 you will, or, opposite, there could be a period of many
23 years where no commercial investment was done in one
24 submarket and a lot was done in another submarket and that
25 could impact the pricing in the two submarkets.

Page 72

1    Q.   I'm actually though asking, and I think part of
2 your answer went to this, but not how submarkets can
3 perform alike or one can influence the others but the
4 reverse, how they can perform differently.  So you
5 mentioned that demand generators in some markets could be
6 different, correct?
7    A.   Yes.
8    Q.   And you mentioned that there could be stigma in
9 one submarket and not another, which could create
10 different performances among submarkets, right?
11    A.   That's correct.
12    Q.   You mentioned there could be accelerated
13 investment in one submarket versus another and that could
14 impact how the different submarkets perform differently?
15    A.   Yes.
16    Q.   And when you talk about demand generally, can you
17 elaborate on that more?
18    A.   I guess in the context of fractionals, high-end
19 fractionals, the particular buyer has certain attributes
20 and services and facilities and amenities that he or she
21 wants to see, and to the extent that a submarket
22 collectively invests in those things, like a ski hill or
23 some other thing, to do that is attractive to the buyers,
24 then that would shift the interests of potential future
25 buyers to the one submarket over the one that did not make

Page 73

1 the investment.
2       MR. SELLINGER:  Just read that back.
3       (Record read.)
4 BY MR. SELLINGER:
5    Q.   I think I understand.  So you're saying that the
6 amenities and services that would be attractive to
7 high-end buyers in one submarket could cause that
8 submarket to perform better over time than another
9 submarket that did not have those amenities and
10 services?
11    A.   Yes.
12    Q.   So I will come back to that but let me move on
13 for the moment.
14       Is the word "impairment" a real estate term that
15 you are familiar with?
16    A.   I've heard it.
17    Q.   What does it mean to you?
18       MR. FERGUSON:  Objection, form.
19       THE WITNESS:  Let's see.  Some flaw that reduces
20 the desirability of the property that's impaired.
21       MR. SELLINGER:  Okay.  Just one moment.  Let's
22 take a one-minute break.
23       (Break taken from 11:30 a.m. to 11:33 a.m.)
24       MR MARX:  Please mark this Exhibit 48.
25          ////

19 (Pages 70 - 73)

Page 74

1  BY MR. SELLINGER:
2    Q.  Showing you what's been marked Robinson 48.  It's
3  excerpts from a chapter in a book entitled Real Estate
4  Damages, published by the Appraisal Institute by Randall
5  Bell.  Are you familiar with this treatise?
6    A.  No.
7    Q.  Are you familiar with the Appraisal Institute?
8    A.  Yes.
9    Q.  What is the Appraisal Institute?
10   A.  It's one of the professional organizations that
11 appraisers can choose to belong to.
12   Q.  And are you a member?
13   A.  No.
14   Q.  Do they publish books or treatises that are
15 relied upon by appraisers and experts, real estate experts
16 in the field?
17   A.  I would think so, yes.
18   Q.  Are you familiar with Randall Bell?
19   A.  I think I've heard his name.  I don't know that
20 we've met.
21   Q.  And you've heard his name in what context?
22   A.  He was an expert in a case that I was involved
23 in, but I don't think we got to the point where I ever saw
24 any writings of his.
25   Q.  Is he recognized as a knowledgeable expert in the

Page 75

1  field?
2        MR. FERGUSON:  Objection, form.
3        THE WITNESS:  I don't know.
4  BY MR. SELLINGER:
5    Q.  If you turn to page 234, actually, just start --
6  I'm sorry.  Let's start at the beginning.  The book is
7  called Real Estate Damages, and the next page, Chapter 11,
8  is entitled Completing a Reliable Damage Analysis; do you
9  see that?
10   A.  Yes.
11   Q.  And then there's a heading Detrimental Condition
12 Fundamentals; do you see that?
13   A.  Yes.
14   Q.  If you turn to the next page, 234, the second
15 full paragraph starts by saying, quote, "It is also
16 important to keep in mind that the observation of a value
17 diminution does not automatically reflect causality with
18 respect to a detrimental condition.  Some challenges in
19 this regard might include," and there's a bullet.
20 "Distinguishing the effects of the detrimental condition
21 which often occur over a significant period of time from
22 the effects of market condition"; do you see that?
23   A.  Yes.
24   Q.  And do you agree with that?
25   A.  Yes.

Page 76

1    Q.  Is that a generally accepted proposition in
2  looking at the impact of a detrimental condition and
3  measuring its impact in real estate?
4    A.  I don't know about that, but it strikes me as a
5  reasonable statement.
6    Q.  I show you what's been marked Robinson Exhibit 7,
7  and it's an article entitled Real Estate Value Impacts
8  from Fracking, Industry Response and the Proper Analytical
9  Techniques, written by Richard Roddewig and Rebel Cole.
10 Are you familiar with Mr. Roddewig?
11   A.  I have heard of him.  I actually thought it was
12 "Roddewig."
13   Q.  It may be.
14   A.  You may be right.  I don't know.  I have never
15 met him or spoken to him, but I have seen him as an expert
16 also in cases that I've been on.
17   Q.  And are you familiar with writings that he's
18 done?
19   A.  I've never seen one.
20   Q.  Is he recognized as an expert in the field?
21       MR. FERGUSON:  Objection to form.
22       THE WITNESS:  I wouldn't know.
23 BY MR. SELLINGER:
24   Q.  If you turn to page 10, the second paragraph,
25 excuse me, the second column, first full paragraph says

Page 77

1  "The courses in the peer review publications of the
2  appraisal profession list the following generally
3  recognized and accepted methods for determining the impact
4  on real estate markets, property prices, market rents, and
5  market value from environmental conditions"; do you see
6  that?
7    A.  Yes.
8    Q.  And then it's got bullets, and the second bullet
9  says paired sales analysis and the third one is multiple
10 regression analysis; do you see that?
11   A.  Yes.
12   Q.  Are you familiar with the concept of multiple
13 regression analysis?
14   A.  Yes.
15   Q.  And what's its purpose?
16   A.  Drawing correlations between sets of data.
17   Q.  So it essentially looks at whether different
18 variables could have an effect on price, correct?
19   A.  You could use multiple regression for that.
20   Q.  And you could use a regression analysis to
21 determine what factors impact price most, what factors can
22 be ignored and how they relate to each other, correct?
23   A.  Theoretically you could.
24   Q.  And do you agree with the concept expressed in
25 the Roddewig article that multiple regression analysis is

20 (Pages 74 - 77)

Page 78

1 a generally accepted way to determine the impact on real
2 estate markets of a particular impairment condition?
3       MR. FERGUSON: Objection, form.
4       THE WITNESS: Well, conceptually, but I don't see
5 it very often in appraisals. This is I think, in my
6 experience, less than 1 percent of all the appraisals I've
7 ever seen have even tried to use a multiple regression
8 analysis, so I think he's really just talking about
9 potential tools in the appraisal professional's toolbox,
10 but these aren't used very much.
11 BY MR. SELLINGER:
12    Q. Do you agree that multiple regression analysis is
13 a generally recognized method for determining the impact
14 on real estate prices of a potentially impairing
15 condition?
16       MR. FERGUSON: Objection, form.
17       THE WITNESS: I don't know generally recognized;
18 I'm not sure what that means. I have heard of it. I
19 don't often see it. If done well I would look at it and
20 consider it as its value.
21 BY MR. SELLINGER:
22    Q. Have you ever done a multiple regression
23 analysis?
24    A. I've done single regression analysis where I
25 isolate one variable and try to correlate it, so a simple

Page 79

1 version of it would be my approach.
2    Q. And when have you done a single regression
3 analysis?
4    A. I can't even recall. I was trying to isolate
5 some variables in a operating statement for a hotel, so
6 basically there were -- I think I was trying to determine
7 the fixed versus variable elements of a hospitality
8 operation, so you could hold some things constant and let
9 the other variable go free and then try to draw some
10 conclusion as to as revenue goes up $100, this one
11 variable goes up X dollars.
12    Q. So how do you do a single regression analysis?
13    A. Well, how I did it is I took about 36 months of
14 actual historic operating data for the hotel, so I had 36
15 months of top-line revenue and I had 36 months of, let's
16 call it, I can't remember exactly what the expense item
17 was but for this analysis let's say housekeeping expenses,
18 so I could chart using this regression analysis 36 data
19 points over time where you had both the total revenue
20 number and the housekeeping expenses, and then what a
21 regression analysis does is it draws the best and
22 tightest, most accurate line between the 36 points to see
23 what the rate is, if you will. The slope of the line is
24 the answer you're looking for, what relationship or
25 percentage relationship is between the two variables, and

Page 80

1 the conclusion one would get from that type of simple
2 regression analysis is as the revenue moves up and down,
3 does the housekeeping expenses move up and down and so is
4 there a correlation and what is the ratio, if you will.
5 So that's a simple regression, and I believe that's all
6 I've ever done in this area.
7       I have to say it's really dependent on having a
8 lot of good data. If you only had a few points of data,
9 it is unreliable, and if you have holes in the data, it
10 throws it off, so that's why I think most appraisers do
11 not use multiple regression analysis. You just have got
12 to have a ton of good, reliable data to rely on the
13 analysis, and most of the time appraisers don't.
14    Q. How many times have you done single regression
15 analysis?
16    A. Less than twelve.
17    Q. How often do appraisers generally do that?
18       MR. FERGUSON: Objection, form.
19       THE WITNESS: Virtually never.
20 BY MR. SELLINGER:
21    Q. And the twelve time you've done single regression
22 analyses, have they been in connection with appraisals or
23 evaluations?
24       MR. FERGUSON: Objection, form.
25       THE WITNESS: Probably neither. I'd say every

Page 81

1 time I've done it, it was for litigation support analysis
2 that really wasn't an appraisal, very much like this, the
3 report that I've done, so I don't see it as a common
4 appraisal method at all. I'm really searching my memory
5 bank for when I've ever seen an appraiser do a multiple
6 regression analysis.
7 BY MR. SELLINGER:
8    Q. So the times that you have done a single
9 regression analysis have been when you've done litigation
10 support reports like you've done in this case?
11    A. Yes, as an analyst, not an appraiser.
12    Q. Did you do a single regression analysis in this
13 case?
14    A. No.
15    Q. You've never charted different variables to try
16 and isolate the impact of the affiliation, correct?
17    A. Correct, I did not.
18    Q. And you've never charted data points to determine
19 the impact of any of the various actions of the defendants
20 as well, correct?
21    A. If you're -- please restate the question. I
22 don't want to answer the wrong question.
23    Q. Yes.
24       MR. SELLINGER: If you read me the question back,
25 I will try to do a better job framing it.

21 (Pages 78 - 81)

Page 82

1 THE WITNESS: Or I might understand it the second
2 time around so you might not have to repeat it.
3 (Record read:
4 "Question: And you've never charted data
5 points to determine the impact of any of
6 the various actions of the defendants as
7 well, correct?")
8 BY MR. SELLINGER:
9 Q. Yeah. In this case you did not do a regression
10 analysis charting any of the actions of the defendants to
11 try and isolate the impact of any of them, correct?
12 A. Correct.
13 Q. Okay. Looking back at the Roddewig article
14 again, Exhibit 7, he also used the term "a paired sales
15 analysis"; do you see that?
16 A. Yes.
17 Q. What is that?
18 A. That's a real estate appraisal technique where
19 the same property sells multiple times and so you can
20 measure the change in pricing over time without having to
21 go into all of the subjective assessments and adjustments
22 that appraisers are forced to do because all properties
23 are different, so this is an ideal situation that again
24 most appraisers don't get to do. But if the same property
25 sells multiple times, you can then use it to isolate what

Page 83

1 was going on outside of the property, if you will.
2 Q. So is it -- am understanding you that in a paired
3 sales analysis you would want to look at either the same
4 property or something as close as possible to try and
5 isolate the impact of some impairment that you are trying
6 to measure?
7 A. Close. But honestly, paired sales you cannot
8 get -- you cannot use a property that is close to your
9 property. My understanding of paired sales, and I use
10 them rarely because I don't have the data often, it has to
11 be the exact same property, so even in this case with the
12 same unit but a different week is not a paired sale. The
13 same unit with a different view is not a paired sale. It
14 has to really be the exact same interests sold at a
15 different time and then you have a paired sale.
16 Q. So in doing general real estate appraisals,
17 because of the difficulty that you've described in getting
18 a paired sale, you look for the closest comparables
19 possible and make adjustments to try and bring them as
20 close as possible?
21 A. No. Appraisers in general rarely get the
22 opportunity to do a paired sale, so they do what you said.
23 They don't have perfect comp so they make adjustments
24 because you have to because no two pieces of real estate
25 are alike. I didn't do any of that in this case. I did

Page 84

1 not have a paired sale and I do not do adjustments.
2 Q. I understand that, but the premises that because
3 of the difficulty of doing paired sales, appraisers when
4 they have comps, they try and pick the closest comps that
5 they can and then make adjustments to get as close to a
6 perfect comparison as you can?
7 MR. FERGUSON: Objection, form.
8 THE WITNESS: I'll go with that as a theory.
9 yeah.
10 BY MR. SELLINGER:
11 Q. I mean the concept is that a comparable does not
12 have value unless you are adjusting for material
13 differences to account for that, right?
14 MR. FERGUSON: Objection, form.
15 THE WITNESS: Only if you're trying to do an
16 appraisal. If you're trying to find market value of your
17 subject property, then you look for comps and you make
18 adjustments of your subject property. If that's not what
19 your goal is, you don't need adjustments.
20 BY MR. SELLINGER:
21 Q. Let me stop you there. If you are looking to
22 determine the value of a property and you find comps and
23 you make adjustments, what's the purpose of doing those
24 adjustments?
25 A. The real estate appraisal says if you want the

Page 85

1 market value of a subject property, you look at comps and
2 you make adjustments. You adjust the comps to the subject
3 property to get as close as you can so that when you make
4 an estimate of the opinion of value, you can say I looked
5 at comps, I made my subjective adjustments but I'm the
6 appraiser and I could do that, so that is the substance of
7 the support of my opinion of value of the market value of
8 the subject property.
9 Q. And that's what USPAP requires?
10 A. For appraisals.
11 Q. And that's generally accepted real estate
12 practice for appraisals?
13 A. Yes, that's the sales comparison methodology in a
14 nutshell. Go find comps, make adjustments and come up
15 with your estimate of the value, market value.
16 Q. And comps and adjustments is the generally
17 accepted methods for appraising the value of a property?
18 A. One of the three, yes.
19 Q. Other than the cost comparison approach and the
20 income approach?
21 A. Right. Those are the three.
22 Q. Thank you. In your report you make a reference
23 to the Donaldson, Cushman & Wakefield appraisal of the
24 Ritz property, correct?
25 A. Yes.

22 (Pages 82 - 85)

Page 86

1    Q.  But you don't say in the report that you are
2  relying on it, right?
3    A.  Correct.
4    Q.  Why do you refer to it?
5    A.  It's really just a tee up.  The reason I'm doing
6  my analysis is that the alleged actions by the defendant
7  may have led to a diminution of value at the subject
8  property.  I was given the Cushman & Wakefield appraisal,
9  and they came to the conclusion that the plaintiffs are
10 trying to prove, so I think I just threw this in as part
11 of the tee up towards here's another firm that said
12 something similar in one of their reports, but I
13 didn't -- it was not the basis for my analysis.  It was
14 really just an introduction to the reader.
15   Q.  And unlike Dev and Simon where you say that, you
16 know, you're essentially relying on them for the
17 determination of substantially contributing causes from
18 the affiliation, you don't make that statement as to
19 Cushman & Wakefield?
20      MR. FERGUSON:  Objection, form.
21      THE WITNESS:  I will give you a longer answer
22 than you want.  The answer is -- well, I agree that I
23 don't rely on Cushman & Wakefield in any -- in their
24 opinion of the reason for the damages.
25              ////

Page 87

1  BY MR. SELLINGER:
2    Q.  And why is it that you do not rely on Cushman &
3  Wakefield?
4    A.  I don't need to.  I made an assumption.  I did
5  not really come to a conclusion on causality.  The
6  assumption was if the defendants' actions caused this,
7  then the defendants, you know, caused the problem.
8    Q.  You made no conclusion on causality?
9    A.  Correct.
10   Q.  You made no conclusion that the action of the
11 defendants, the affiliation, caused the property value to
12 go down, correct?
13   A.  Correct.
14   Q.  And your report doesn't do that?
15   A.  Correct.
16   Q.  And you don't do that?
17   A.  Correct.
18   Q.  Now, the conclusion -- withdrawn.  Now, the
19 diminution of value analysis that you do begins in 2011
20 based on allegations of a series of actions by defendants
21 in that period of time, correct?
22   A.  Yes.
23   Q.  And the damage calculation in your report
24 of -- where is the $44 million number?
25   A.  Page 2 in the middle of the second full

Page 88

1  paragraph.
2    Q.  Yes.  So your calculation of damages of
3  $41.6 million is a calculation, as you said, starting in
4  2011, correct?
5    A.  Yes.
6    Q.  Through an end date of October of 2018,
7  correct?
8    A.  That's correct.
9    Q.  And the $41 million calculation of damages that
10 you've calculated is based on conduct that occurred before
11 the implementation of the affiliation between Ritz and
12 Marriott, correct?
13      MR. FERGUSON:  Objection, form.
14      THE WITNESS:  You're going to have to represent
15 that the affiliation occurred after that date.
16 BY MR. SELLINGER:
17   Q.  Yes.  So I will represent to you that the
18 implementation of the affiliation was on December 5th,
19 2014 advising people that going forward they could
20 exchange properties.
21      So your damage calculation accounts for conduct
22 of the defendant before, for several years before Marriott
23 members began to access the property pursuant to the
24 affiliation, correct?
25   A.  It seems that way.  I don't know.  I really don't

Page 89

1  know.
2    Q.  And if you are looking at 2011 as the start date
3  of your valuation, and I will represent to you that the
4  members of Marriott who accessed under the affiliation
5  started accessing in 2015, you're not able to say that the
6  entire amount of those damages or lost value relates to
7  the affiliation, correct?
8        MR. FERGUSON:  Objection, form.
9        THE WITNESS:  I would say that's correct.
10 BY MR. SELLINGER:
11   Q.  Okay.  And in fact if, as the Dancing Bear
12 appraisal had stated, that the Ritz Carlton struggled with
13 sales even before 2010 when it was issued, you certainly
14 would not say that was the result of the affiliation,
15 correct?
16       MR. FERGUSON:  Objection, form.
17       THE WITNESS:  Certainly not the start of the
18 affiliation.
19 BY MR. SELLINGER:
20   Q.  Okay.  And you have four potential start dates in
21 your report, right?  August 1, 2011; August 1, 2012;
22 January 1, 2013, and January 1, 2014, right?
23   A.  Yes.
24   Q.  What's the relevance of each date?
25       MR. FERGUSON:  Objection, form.

23 (Pages 86 - 89)

Page 90

1    THE WITNESS: I don't think I can articulate it.
2  I have some information but not all. It was just an
3  instruction of the assignment.
4  BY MR. SELLINGER:
5    Q.  Well, did you ask why those start dates were
6  given?
7    A.  Yes.
8    Q.  And what were you told?
9    A.  Well, regarding the first one, the August 1st,
10  2011, there was an announcement made by Marriott Vacation
11  Club to some of its members, perhaps up to 300,000 of
12  them, I don't know, that they were going to start to allow
13  the timeshare members to use the Ritz-Carlton Destination
14  Clubs, and that occurred evidently in July of 2011, so the
15  announcement occurred at that point as opposed to the
16  actual implementation date that you gave.
17    Q.  And what's the relevance of August 1st, 2012?
18    MR. FERGUSON: Object to form.
19    THE WITNESS: I remember them telling me
20  something but I can't recall what that was. I would have
21  to refresh my recollection on it. Again, it was a, you
22  know, mid 2012 either announcement or something in the
23  bulletin, or I actually don't remember.
24  BY MR. SELLINGER:
25    Q.  And what is the relevance of January 1st, 2013?

Page 91

1    A.  I don't recall.
2    Q.  What's the relevance of January 1, 2014?
3    A.  I don't know.
4    Q.  And why did you build into your model the
5  functionality to toggle between these different start
6  dates?
7    A.  The attorneys for the plaintiffs indicated that
8  there was some legal argument over the start date so could
9  I make a model that accounted for multiple start dates
10  since my job is basically providing the Court with damage
11  estimates and that date will be decided one way or the
12  other. So my model is useful to the Court in estimating
13  damages regardless of which of the four dates would be
14  chosen.
15    Q.  And you're not opining on the impact of any of
16  the actions of the defendants on particular dates,
17  correct?
18    A.  Correct.
19    Q.  You have not evaluated the defendants' actions or
20  the affiliation, you are just looking at changing value
21  over time?
22    A.  Yes, changing sales prices over time, and it
23  could have started any date. These were the four that I
24  was instructed to use and used. I will not be opining on
25  why the dates or which date is better.

Page 92

1    Q.  And in your report and in your fourth damage
2  alternative, you conceived that if instead of using an
3  August 2011 start date, you use the start date of
4  January 1st, 2014, your total damages would decline from
5  41 million and change to 23 million and change, correct?
6    MR. FERGUSON: Object to form.
7    THE WITNESS: Yes. I should say that in this
8  report, my amended report dated December 19, those are the
9  numbers. I have since created another report and the
10  numbers have changed, but we will get to that later.
11  BY MR. SELLINGER:
12    Q.  And the difference between you move from this
13  report to a August 2011 start date to January 1st, 2014
14  start date, that's a decline of almost half of the
15  damages, correct?
16    A.  Yes, roundly.
17    Q.  And you don't in this report do an analysis of
18  the loss of valuation with a start date of January 1,
19  2015, which is the date when Marriott members actually
20  could begin using points to access the Ritz-Carlton as a
21  result of the affiliation, correct?
22    A.  Correct.
23    Q.  Now, you've seen Mr. Tantleff's report,
24  correct?
25    A.  Yes.

Page 93

1    MR. SELLINGER: Let's take a couple of minutes.
2    (Break taken from 12:07 p.m. to 12:27 p.m.)
3  BY MR. SELLINGER:
4    Q.  When we broke we had covered the changes in your
5  calculations. We went through a start day date of
6  January 2014 and then we cut it into almost half, right?
7    A.  Yes.
8    Q.  You see that in Mr. Tantleff's report he takes
9  the position that damages should be started to run from
10  January 1, 2015, correct?
11    MR. FERGUSON: Objection, form.
12    THE WITNESS: Yes.
13  BY MR. SELLINGER:
14    Q.  Have you run that analysis yourself?
15    A.  No.
16    Q.  When you got the Tantleff report, were you
17  curious as to what the numbers would be if you ran it from
18  January 1, 2015?
19    A.  Yes.
20    MR. FERGUSON: Objection, form.
21  BY MR. SELLINGER:
22    Q.  How come you didn't run it?
23    A.  Time, shortage of time.
24    Q.  The Tantleff report was prepared on January 4th
25  of 2019, so five months ago?

24 (Pages 90 - 93)

1   Q.  As you sit here today what adjustments can you
2 tell me you would make to your model if you used the
3 January 1, 2015 start date other than changing that as the
4 start date?  Are there any other adjustments today that
5 you would tell me you need to make?
6   A.  Just generally, every time you see a pound sign,
7 value, exclamation point, it means you broke the formula.
8 These are very complicated if-then formulas and so they
9 pull from multiple cells, and if one of the cells is
10 shifted like you do here, when you start at a different
11 date you shift the cells that it's pulling from, so you
12 have to check the formulas to make sure that you're
13 capturing numbers that aren't zero or blank, which it
14 indicates here he has.
15   Q.  So other than checking the formulas to make sure
16 that you are capturing the information that was already
17 there, anything else that you would adjust in your model
18 to calculate lost sales as of January 1, 2015 when the
19 affiliation began to be implemented?
20   A.  No, not much.  That's basically it.
21   Q.  I got it.  Okay.  Going back to your model.  Does
22 your model account for any external factors aside from the
23 Marriott members' access to the property which could have
24 influenced property value?
25   A.  Yes.

1   Q.  What factors?
2   A.  I would say all factors.
3   Q.  Where?
4   A.  In the sales prices.
5   Q.  Does your report analyze any external factors
6 specifically that could have had an impact on the
7 Ritz-Carlton?  I understand that you have looked at sales,
8 but does it specifically look at any particular factors
9 that could have affected the Ritz?
10   A.  I'll answer that the model by capturing the sales
11 prices, which is the actual market, you know, proof if you
12 will of all the factors, the model takes all of those into
13 consideration.  I did not isolate any of the factors.
14 including the start of the earlier announced affiliation.
15 so the model doesn't take into account any individual
16 factor and yet it takes into account all of the factors
17 together kind of in a basket.
18   Q.  So you're saying the prices that are a part of
19 your analysis in your model reflect all of the factors of
20 influenced price?
21   A.  Absolutely.
22   Q.  But your model does not isolate actions of the
23 defendants that could have affected price from any other
24 external factor that could have affected price?
25   A.  Exactly.

1   Q.  And your model does not isolate the impact of the
2 affiliation on price from any other actions of the
3 defendants that might have affected price?
4   A.  Correct.
5   Q.  Your model doesn't isolate whether Marriott
6 members' access to the Ritz before the affiliation played
7 a larger role than access after the affiliation for
8 example, correct?
9   MR. FERGUSON:  Object to form.
10   THE WITNESS:  Right.  It does not isolate.
11 BY MR. SELLINGER:
12   Q.  It doesn't isolate any factors at all?
13   A.  Correct.
14   Q.  And there's no allocation among any of the
15 factors that might have affected the price of Ritz,
16 whether those factors were related to the affiliation,
17 whether they were caused by the defendants unrelated to
18 the affiliation or completely unrelated to defendants,
19 correct?
20   A.  Correct.
21   Q.  And do you agree that any -- withdrawn.  Do you
22 agree that there are factors unrelated to the affiliation
23 that could have affected the prices?
24   MR. FERGUSON:  Objection, form.
25   THE WITNESS:  Yes, I guess so.

1 BY MR. SELLINGER:
2   Q.  Do you agree that there are factors other than
3 anything that the defendants did that could have affected
4 the prices?
5   A.  Yes.
6   Q.  And as you've told us, properties don't exist in
7 a vacuum, they are subject to a multitude of external
8 factors, correct?
9   A.  Correct.
10   Q.  But the loss valuation that you performed
11 attributes 100 percent of the loss to the actions of the
12 defendants, right?
13   MR. FERGUSON:  Objection, form.
14   THE WITNESS:  Does it?
15 BY MR. SELLINGER:
16   Q.  If it doesn't, you tell me.
17   A.  Right.  So I would say not necessarily.  My
18 version of it is that I have quantified the lost sales
19 price.
20   Q.  Over time?
21   A.  Over time.  And the assumption was that this was
22 attributable to behavior by the defendants, one of which
23 was announcing the upcoming affiliation allowing timeshare
24 users into the Ritz-Carlton Destination Club, but I don't
25 contribute to anything in particular.  I'm merely

26 (Pages 98 - 101)

Page 102

1    quantifying the change in sales value for the Court.
2        Q.   So you don't attribute the change in sales value
3    that your report addresses to any particular factor?
4        A.   Correct.
5        Q.   Got it.   All your report does is it quantifies
6    the change in sales value over periods of time?
7        A.   Sales price, yes.
8        Q.   Sales price.   And whatever factors may have
9    contributed to that change in sales of price, you are not
10   opining on?
11       A.   Correct.
12       Q.   Now, we alluded to this earlier, you're aware
13   that a large number of plaintiffs rented their units to
14   outside renters prior to the affiliation, correct?
15           MR. FERGUSON:   Objection, form.
16           THE WITNESS:   Yes, I'm aware of that.
17   BY MR. SELLINGER:
18       Q.   Is it possible that buyers were less inclined to
19   purchase fractional interests at the Ritz because it was
20   far cheaper and easier to rent in off week from an owner
21   than buying an fractional interest?
22       A.   Yes.
23       Q.   And are you aware that -- I'm sorry, let me ask
24   it differently.   Do you think that there is a difference
25   in the impact on exclusivity or on value if a non-owner is

Page 103

1    able to access the property through rental versus a
2    non-owner is able to access a property through
3    affiliation?
4            MR. FERGUSON:   Objection, form.
5            THE WITNESS:   I have no opinion on that.
6    BY MR. SELLINGER:
7        Q.   You're not able to articulate any difference
8    between the two as you sit here today?
9            MR. FERGUSON:   Objection, form.
10           THE WITNESS:   Well, I haven't tried.
11   BY MR. SELLINGER:
12       Q.   Well, I'm giving you the opportunity as you sit
13   here.   Are you able to articulate any difference between a
14   non-owner gaining access through renting from an owner
15   versus a non-owner gaining access through the affiliation?
16           MR. FERGUSON:   Objection, form.
17           THE WITNESS:   Not in the sense that, you know,
18   for any given week how the non-owners got on the property
19   really doesn't matter.
20   BY MR. SELLINGER:
21       Q.   Okay.   To the extent that non-owners gaining
22   access through the affiliation affected the exclusivity
23   and negatively affected sales prices, the same affect
24   could occur from owners giving access to rentals, right?
25           MR. FERGUSON:   Objection, form.

Page 104

1            THE WITNESS:   Sure, possibly.
2    BY MR. SELLINGER:
3        Q.   And your lost sales analysis doesn't evaluate
4    whether any alleged negative impact on sales was due to
5    rentals through a combination of rentals and Marriott
6    member access or neither, correct?
7        A.   Correct.
8        Q.   Are you familiar with Airbnb or online travel
9    agencies?
10       A.   Yes.
11       Q.   Do you know how much Airbnb has been valued at on
12   the market by any changes?
13       A.   Billions, but I don't know the specific number.
14       Q.   Have you heard of Third Home?
15       A.   I think I've heard of it but I've never seen it
16   in use.
17       Q.   Do you know what Third Home, what its business
18   model is, renting expensive homes to individuals?
19       A.   Yes.
20       Q.   And are you aware that the medium value of the
21   home that they rent is $3 million?
22       A.   I was not aware.
23       Q.   Is that consistent with your understanding of the
24   type of properties they rent?
25           MR. FERGUSON:   Objection, form.

Page 105

1            THE WITNESS:   Yeah, it's not inconsistent.   I
2    really didn't have a number in mind, but it doesn't sound
3    unreasonable.
4    BY MR. SELLINGER:
5        Q.   Are you aware that Third Home rents high,
6    high-value properties to individuals on a single rental
7    basis?
8        A.   Yes.
9        Q.   And how would you categorize the rise of
10   Airbnb?
11           MR. FERGUSON:   Objection, form.
12           THE WITNESS:   Rapid.
13   BY MR. SELLINGER:
14       Q.   What do you see as Airbnb's value proposition?
15       A.   Access to non-hotel rentals for guests.
16       Q.   Would it be fair to say that their value
17   proposition is access to high-end properties on a rental
18   basis?
19       A.   For Airbnb, they are mostly not high-end
20   properties.   I mean the average rate realized by Airbnb on
21   a nightly basis is less than hotels, so there's a lot of
22   inventory in Airbnb, some of which is at the luxury end
23   but not the majority of them.
24       Q.   Is Airbnb an indiscreet disrupter?
25       A.   Very much so.

27 (Pages 102 - 105)

Page 106

1 Q.  In what sense?
2 A.  The hospitality industry had controlled
3 distribution of available lodging product for many years.
4 The OTAs started to disrupt the access to the properties
5 and the distribution program, and then Airbnb; both was a
6 provider of new lodging alternatives and easiest, most
7 consumer-friendly way to access them ever.
8 Q.  OTAs are online travel agencies, right?
9 A.  Right.  They are separate and distinct from the
10 hotel companies that they compete with.
11 Q.  Do you believe that individuals are increasingly
12 likely to stay at Airbnb's as opposed to traditional
13 hotels?
14 A.  I would say yes based on the number of room
15 nights occupied through the Airbnb channel every year is
16 increasing dramatically.
17 Q.  Do you believe that it's possible that the
18 abundance of Airbnb's rental homes in vacation
19 destinations could make the idea of fractional interest
20 ownership less attractive?
21 A.  Yes.
22 Q.  And Airbnb has put up potential to decrease
23 demand for the product?
24 A.  For purchasing the fractional.  I think the
25 demand to use them does not necessarily change by a new

Page 107

1 distribution outlet, but the pricing would be affected.
2 Q.  So the abundance of Airbnb's in vacation
3 destinations has the potential to decrease the sales price
4 of fractional interests?
5 A.  Yes.
6 Q.  And the potential buyer could see Airbnb as a
7 cheaper option than buying a fractional because there are
8 no up-front costs or maintenance costs, right?
9 MR. FERGUSON:  Objection, form.
10 THE WITNESS:  Yes.
11 BY MR. SELLINGER:
12 Q.  Do you agree that an increase in supply coupled
13 with a stable demand could lead to lower prices?
14 A.  It could.
15 Q.  And under what circumstances?
16 A.  If the new supply did not induce new demand by
17 itself.  Many times when you bring in a high-end
18 competitor into the market, it induces new demand that
19 would otherwise not even be in the market, so yes, supply
20 goes up and the demand for the existing product is stable
21 but the new supply brings in new demand as well, so
22 sometimes the markets don't react in the same way that you
23 would anticipate.
24 Q.  Ritz-Carlton is three times larger than any of
25 the other comparables that you use in your analysis.

Page 108

1 correct?
2 A.  I believe so.
3 Q.  Ritz has 876 shares; is that right?
4 A.  I believe I've seen that number, yes.
5 Q.  And the five fractionals that you use as comps
6 have between 160 or 288 shares, excluding the Hyatt,
7 correct?
8 A.  Yes, I was thinking the Hyatt might have a
9 thousand or so.
10 Q.  So other than the Hyatt, the Ritz has far more
11 shares and, therefore, more supply than each of the other
12 comparables, right?
13 MR. FERGUSON:  Objection, form.
14 THE WITNESS:  Yes, correct.
15 BY MR. SELLINGER:
16 Q.  And do you agree that the different sized
17 properties may perform in a different manner than
18 properties of another size in the same market?
19 MR. FERGUSON:  Objection, form.
20 THE WITNESS:  Can you be more specific?  What you
21 do you mean by "perform," like at a lower occupancy rate?
22 BY MR. SELLINGER:
23 Q.  In terms of -- well, let's use that as one.  The
24 occupancy rate, desirability, sales price, whatever, the
25 different size properties in a market might perform

Page 109

1 differently from each other?
2 MR. FERGUSON:  Objection, form.
3 THE WITNESS:  It could be a factor, but also
4 sometimes it's just not depending on the life cycle as
5 well.  In the beginning when you are trying to sell out a
6 large project versus trying to sell out a small project is
7 probably most pronounced, but once everything is sold out,
8 it's probably less pronounced, the impact on sales
9 prices.
10 BY MR. SELLINGER:
11 Q.  But do you agree that different sized properties
12 can perform differently in terms of sales prices than
13 other properties in the same market?
14 A.  Yes.
15 MR. FERGUSON:  Objection, form.
16 BY MR. SELLINGER:
17 Q.  Looking at your report in Lexington, Exhibit 50.
18 If turn to page 5, you say "In our opinion the competitive
19 set for the St. Louis and St. Ann Hotels should be
20 primarily comprised of similarly sized independent
21 hotels"; do you see that?
22 A.  Yes.
23 Q.  And you, in looking for comps in that case, were
24 looking for similarly sized hotels for that reason because
25 they perform similarly?

28 (Pages 106 - 109)

Page 110

1    MR. FERGUSON: Objection, form.
2    THE WITNESS: Yes, very important in a hotel
3 rental situation that you don't confuse this with a
4 convention-oriented hotel or a big box.
5 BY MR. SELLINGER:
6    Q.   But your recommendation of using comps of
7 similarly sized hotels reflects the general proposition
8 that when you are looking at comps similarly sized are the
9 most comparable to different sizes, correct?
10    A.   Right, but in this case it was for rental
11 performance of hotels as opposed to sales prices for
12 fractionals, so I'm trying not to confuse the two, but
13 definitely for hotels the comp set should be similarly
14 sized, among other factors.
15    Q.   That I understand.
16    MR. SELLINGER: Could you read my question back,
17 please. And when reading my question back always put it
18 in the transcript so the answer follows the question.
19    (Record read:
20    "Question: But your recommendation of using
21    comps of similarly sized hotels reflects
22    the general proposition that when you are
23    looking at comps similarly sized are the
24    most comparable to different sizes, correct
25    "Answer: Right, but in this case it was

Page 111

1    for rental performance of hotels as opposed
2    to sales prices for fractionals, so I'm
3    trying not to confuse the two, but
4    definitely for hotels the comp set should
5    be similarly sized, among other factors.")
6 BY MR. SELLINGER:
7    Q.   Let me try and ask a better question. Would you
8 agree as a general proposition in real estate valuation in
9 appraisals that in looking at comps to the extent you can
10 find similarly sized comps, you should do that?
11    A.   Yes.
12    Q.   Because similarly sized comps eliminates one of
13 the variables that could affect performance?
14    A.   Yes.
15    Q.   Okay. Would it surprise you if the broker, Ivan
16 Florek, who handled sales at the property said that the
17 volume of fractional interests at the Ritz-Carlton in
18 Aspen contributed to an over supply and result in downward
19 pricing pressure?
20    MR. FERGUSON: Objection, form.
21    THE WITNESS: Yeah, the timing is probably the
22 missing link here. If he was trying to sell 800 units all
23 at once, that is a very valid issue that I would imagine
24 would show up as opposed to, you know, his compatriots
25 trying to sell out developments that are half the size,

Page 112

1 but once it's already sold out it's not really a factor.
2 BY MR. SELLINGER:
3    Q.   In your capacity as a real estate professional,
4 do you believe that a poor public perception of a property
5 could affect its sales price?
6    A.   Yes.
7    Q.   Do you believe that press reports of litigation
8 involved in a property could negatively affect sales
9 price?
10    A.   Yes, it could.
11    Q.   Do you believe that if there were reports in the
12 press that compared the service levels of the Ritz Aspen
13 to that of a Holiday Inn, that that could affect sales
14 price?
15    MR. FERGUSON: Objection, form.
16    THE WITNESS: It's possible.
17 BY MR. SELLINGER:
18    Q.   You are smiling. Are you aware of an article to
19 which I'm referring to?
20    A.   Actually just the quote that Alan used as one of
21 his factors that I haven't seen yet.
22    Q.   Okay. As a property agen, would you agree that
23 property interests can lose value?
24    A.   Could but usually don't, especially branded
25 ones.

Page 113

1    Q.   Mr. Robinson, I show you the deposition of
2 Mr. Donaldson, one of the authors of the Cushman real
3 estate appraisal.
4    A.   Yes.
5    Q.   And ask you to turn to page 251.
6    A.   Yes.
7    Q.   251, line 20, the following question and answer
8 appear: Quote, "Question: And if you wanted to know the
9 impact if any of the Marriott affiliation or access of
10 Marriott members, you'd have to discount all the other
11 factors, the national real estate trend and the fractional
12 interest trends, and you didn't do that either, correct?
13 Answer, correct." Do you see that?
14    A.   Yes.
15    Q.   Do you agree with that question and answer that
16 if you wanted to know the impact if any of the Marriott
17 affiliation or access of Marriott members you'd have to
18 discount all the other factors that could have affected
19 sales price?
20    MR. FERGUSON: Objection, form.
21    THE WITNESS: Yes, if could you do that, that
22 would be helpful.
23 BY MR. SELLINGER:
24    Q.   Okay. Have you read the Donaldson deposition?
25    A.   Yes.

29 (Pages 110 - 113)

Page 114

1    Q.   When did you read that?
2    A.   Saturday or Sunday.  I should say this is
3  Volume 1, which I read back in 2018.  I just got Volume 2
4  over the weekend and read it, and now I'm realizing this
5  is his first day, Volume 1, so I read this one in, let's
6  call it October of 2018 I think
7    Q.   In your capacity as a real estate appraiser, can
8  you explain the impact that locations and submarket can
9  have on the property?
10       MR. FERGUSON:  Objection, form.
11       THE WITNESS:  Appraisers are always looking to
12  select the right set of comps, and one of the factors is
13  location, and within the factor of location a sub-factor
14  could be slicing markets into submarkets, and so if there
15  really is a big difference between a market and its
16  submarkets, that could be a factor in pricing.
17  BY MR. SELLINGER:
18    Q.   Okay.  All things being equal, the property in
19  the more desirable area should fetch a higher price than
20  property in a less desirable area?
21    A.   For fractional interests I would agree with
22  that.
23    Q.   And you've already told us that for high-end
24  properties, the amenities and services can be attractive
25  and important to buyers, correct?

Page 115

1    A.   I think so.
2    Q.   And could obviously affect the value, correct?
3    A.   Right.  The pricing is dependent on the perceived
4  services, amenities and facilities.
5    Q.   And the amenities and services are important in
6  terms of pricing for vacation properties as well,
7  correct?
8    A.   Yes.
9    Q.   Including fractional interests?
10    A.   Correct.
11    Q.   Amenities and services and their availability are
12  important in the pricing of fractional interests?
13    A.   Yes.
14    Q.   What methodology did you use to identify the five
15  comparables that you used for the Ritz-Carlton?
16    A.   I looked at the eight properties on the market
17  that were the most high-end, and since my concept was the
18  high-end buyer, the buyer who would consider buying the
19  Ritz would look at other high-end fractionals in the Aspen
20  market, so I wanted to see all of those, I did.  And then
21  a couple of them were not quite as high-end as the others,
22  two in the Snowmass area, so they didn't seem to make the
23  grade; I would not call them a luxury fractional, so I
24  tried to stick with the luxury ones.
25       Timbers, which was in Snowmass, was very much a

Page 116

1  luxury project and sold as one, so I included that.  And
2  the other ones were as well, so that's essentially what I
3  went for I guess.  What would a buyer of a luxury
4  fractional unit in the Aspen area, what would they look
5  at.
6    Q.   And you say that two properties that you looked
7  at in Snowmass, Sanctuary and Snowmass Club, those were
8  the two that you did not include as comps, correct?
9    A.   Right.
10    Q.   Did you visit those properties?
11    A.   Yes.
12    Q.   And took the same sort of tour that you took of
13  the others?
14    A.   Exactly.  They were actually two phases the same
15  property but they market them separately.
16    Q.   You said they were not as high-end as the other
17  properties, correct?
18    A.   Yes.
19    Q.   But among the properties that you did use, some
20  were more high-end than others, correct?
21    A.   Yes.
22    Q.   Little Nell in the highest end, correct?
23    A.   I would say so.
24    Q.   It's one of the highest-end vacation properties
25  in the country, correct?

Page 117

1    A.   I think so.
2    Q.   And certainly more high-end than Ritz Carlton
3  Aspen, correct?
4    A.   Yes.
5    Q.   So there's not insubstantial difference in
6  highlanders, if that's a term, between the Little Nell and
7  the Ritz-Carlton?
8    A.   Yes.  I would say Little Nell stands alone.
9    Q.   And if you were to describe Little Nell, it's
10  standing alone in the luxury vacation property market,
11  what terminology would you use to describe Little Nell?
12    A.   Well, it's still a part of the luxury fractionals
13  in Aspen, but in any competitive set, you know, you could
14  rank the properties, so a good competitive set has
15  properties that are better than the subject property and
16  worse.  You want to get close to, so the ones that are
17  just slightly better and slightly worse or the best
18  competitive set.  But somebody coming to buy a luxury
19  property in the Aspen market, they would look at Little
20  Nell and they would look at the Ritz-Carlton.
21       MR. SELLINGER:  Dana, would you mind reading
22  that back, and a little slowly so I can make a couple of
23  notes.
24       (Record read.)
25       ////

30 (Pages 114 - 117)

Page 118

1 BY MR. SELLINGER:
2   Q.  In your competitive set, what properties are
3 worse than Ritz-Carlton Aspen Highlands?
4   A.  I would say -- I will go down the list.  Little
5 Nell would be the top property.  Dancing Bear would be the
6 second.  Ritz, St. Regis and Timbers are probably all
7 clustered in the middle of that set, and Hyatt Grand is
8 probably the one that is half a notch below the Ritz, and
9 then, you know, the Snowmass and the Santuary would be
10 further lower than the Hyatt for the eight properties that
11 I saw.
12   Q.  So you're saying the Ritz, the St. Regis, and the
13 Timbers are the three closest to each other as
14 comparables?
15   A.  Yes.
16   Q.  The Ritz is in Aspen Highlands, right?
17   A.  Yes.
18   Q.  The St. Regis is in Aspen, downtown Aspen?
19   A.  Yes.
20   Q.  And Timbers is in Snowmass, correct?
21   A.  Yes.
22   Q.  So of the three most comparable properties,
23 one-third of them are in Aspen Highlands, correct?
24   A.  Yes.
25   Q.  One-third of them are in downtown Aspen,

Page 119

1 correct?
2   A.  Yes.
3   Q.  And one-third of them are in Snowmass, correct?
4   A.  Yes.
5   Q.  You agree that Little Nell is like the Rolls
6 Royce of fractional interests?
7     MR. FERGUSON:  Objection, form.
8     THE WITNESS:  I don't know.  That's a colorful
9 analogy.  I get your drift but I would probably never say
10 that.
11 BY MR. SELLINGER:
12   Q.  Did you consider the two properties that
13 Cushman & Wakefield used as comparables, the Innsbruck
14 downtown and the Roaring Fork Club a little bit north of
15 Aspen?
16   A.  No.  I was told that those were not luxury
17 fractionals so I did not visit them.
18   Q.  Told by whom?
19   A.  Now I can't remember.  It was before I even went
20 out there, so I don't remember.
21   Q.  Did you discuss which comps to use with
22 counsel?
23   A.  Yes.
24   Q.  At what stage?
25   A.  Before my original report was prepared.

Page 120

1   Q.  So the original report was prepared?
2   A.  In October.
3   Q.  In October.  And when was it that you visited the
4 property?
5   A.  Also October.
6   Q.  And when was it that you had the discussion with
7 counsel about the comps?
8   A.  I'd say from June until October.  We discussed it
9 many times.
10   Q.  So you were discussing the comps with counsel
11 prior to visiting the properties, any of the properties,
12 correct?
13   A.  Yes.
14   Q.  And which counsel were you talking to?
15   A.  Mr. Reiser, Mr. Ferguson, and maybe Mr. Schrag.
16   Q.  And what was the nature of those conversations
17 with counsel about the comps prior to you going out and
18 visiting any of the properties or visiting Aspen?
19   A.  Well, first was an inquiry on my part of what are
20 the available potential candidates for a comp set, so they
21 would explain to me the various attributes and the
22 locations of the properties.  I would do some research as
23 to sales prices of the various comps, potential comps.
24 And nobody really -- well, everybody had different
25 opinions as to what would be in the comp set, but it was

Page 121

1 ultimately going to be my opinion, so I went and visited
2 the eight that seemed to have the potential to be
3 competitive, or seven comps competitive to the Ritz, and I
4 determined that really five of them are most competitive
5 and lesser so the other two.  And I know that there are
6 other timeshare and fractionals in the Aspen area that we
7 did not visit, but based on the sales pricing they were
8 way much lower and a little bit of Internet research,
9 looking at pictures and descriptions and trying to
10 categorize or place or rank them, there were several
11 others that just fell below the luxury standard so they
12 did not make the cut.
13   Q.  Okay.  I think I've got that.  Let me just ask a
14 couple of follow-ups.  So plaintiffs counsel, Mr. Reiser,
15 Mr. Ferguson, Mr. Schrag identified in the first instance
16 the properties for you to evaluate as possible comps,
17 correct?
18     MR. FERGUSON:  Objection, form.
19     THE WITNESS:  Right.
20 BY MR. SELLINGER:
21   Q.  And then you looked at those properties when you
22 visited in October of 2018 after doing some research?
23   A.  Right.
24   Q.  And those conversations you had with Mr. Reiser,
25 Mr. Ferguson, and Mr. Schrag before you went to Aspen

31 (Pages 118 - 121)

Page 126

1  It's $95.00 a square foot for Ritz-Carlton, not $95,000.
2  I think they were selling for higher.
3    Q.  So your exhibit shows that in 2010 the average
4  square-foot price at Ritz-Carlton Aspen was $95.00 a
5  square foot and the average square-foot price at Little
6  Nell was $474.00 a square foot, correct?
7    A.  Yes.
8    Q.  So Little Nell was selling actually for almost
9  five times the Ritz back in 2010, correct?
10    A.  On a the per-square-foot basis.
11    Q.  Correct.  And that was before the affiliation,
12  right?
13    A.  Yes.
14    Q.  And before any of the conduct that is alleged in
15  this case?
16    A.  Yes.
17    Q.  And in 2011 the Ritz-Carlton was selling for
18  $71.00 a square foot correct, under your chart?
19    A.  Right, the price started to go down there.
20    Q.  And for Little Nell it was $496.00, correct?
21    A.  Right.  The prices were still rising.
22    Q.  And Little Nell was selling for more than four
23  times the Ritz Aspen price at that time, correct?
24       MR FERGUSON:  Objection, form.
25       THE WITNESS:  Oh, yes.  Once the Ritz was

Page 127

1  impacted Little Nell was selling for almost nine times, so
2  that's a big difference after the alleged impact.
3  BY MR. SELLINGER:
4    Q.  Well, it's not nine times.
5       MR. REISER:  You're both wrong.  It's about
6  seven.
7       THE WITNESS:  Thank you.  So it went up from say
8  four and a half times to seven time-ish, mostly because of
9  the drop of the Ritz.
10  BY MR. SELLINGER:
11    Q.  But focusing on 2010 again before there's any
12  conduct that's challenged and before the affiliation,
13  Little Nell is selling for five times per square foot
14  almost of the Ritz Aspen, correct?
15    A.  Correct.
16    Q.  And you don't know what happened between 2010 and
17  2011, right, specifically?
18    A.  Well, yeah, the bulletin went out.  The Marriott
19  Vacation sent the bulletin out to its however many members
20  of their timeshare product program announcing that some of
21  its members will be able to access the Ritz-Carlton and
22  the price started dropping.
23    Q.  Well, I will represent to you that the bulletin
24  that was sent out was in July of 2012.  Have you seen that
25  bulletin by the way?

Page 128

1       MR. FERGUSON:  Object to form.
2       THE WITNESS:  I misspoke.  The bulletin probably
3  went out in 2012, but something else went out in July of
4  2011 where they notified their members that the premier
5  members or premier plus could start to access or could
6  soon access the Ritz-Carlton Destination Club, so that
7  sort of first announcement I believe was in 2011.
8  BY MR. SELLINGER:
9    Q.  So have you seen an announcement in 2011 about
10  the Marriott members being able to access the club at
11  all?
12    A.  No, I can't remember.
13    Q.  Okay.  Would you agree that a property like
14  Little Nell that is selling for almost five times per
15  square-foot price at Ritz Aspen before any of the
16  challenged conduct in this case, that that property could
17  perform differently in the market than the Ritz-Carlton,
18  which is selling for five times less?
19       MR. FERGUSON:  Object to form.
20       THE WITNESS:  In what way differently?
21  BY MR. SELLINGER:
22    Q.  That the increase or decrease in sales could
23  change in a -- that the market demand could be different.
24  Let me rephrase it so you have a real question.
25       Would you agree that a product like Little Nell

Page 129

1  selling in 2010 for almost five times the price of Ritz
2  Aspen could appreciate or depreciate at a different price,
3  different amount than the Ritz-Carlton based on simply
4  demand for that kind of product with that kind of price
5  differential and exclusivity and high-end premier status
6  in the market?
7       MR. FERGUSON:  Objection, form.
8       THE WITNESS:  So yeah, all the properties are
9  going to have their own level of demand, and the amounts
10  of their appreciation will vary.
11  BY MR. SELLINGER:
12    Q.  So that's really what I want to make sure.  So
13  the demand for property --
14       MR. REISER:  I don't think he was finished with
15  his answer.
16       THE WITNESS:  It's fine.  You can fire away.
17  BY MR. SELLINGER:
18    Q.  The demand for the property that is five times
19  higher than the Ritz-Carlton could affect the price versus
20  the demand for a property five times less?
21    A.  I get what you are saying on that but --
22    Q.  But do you agree or disagree?
23       MR. FERGUSON:  Objection, form.
24       THE WITNESS:  I think it already had.  I think
25  it's baked into the price.  The demand attributes of the

33 (Pages 126 - 129)

Page 142

1    Q.   Can you take a look and tell me?
2    A.   Actually, I don't think I did. I think I used
3  the comp set as a whole without making any adjustments,
4  which is common in the industry. All the other hotel
5  analysts do it that way. There's no adjustments going on
6  by either PKF or myself.
7    Q.   So your view was because you were in the
8  submarket of the French Quarter, you could take the comps
9  in that submarket without adjustments; that's what you did
10  here?
11       MR. FERGUSON: Objection, form.
12       THE WITNESS: You're mixing up some concepts
13  here. It doesn't matter if I was in a market or
14  submarket, I didn't make adjustments. All I needed was
15  three to five comps and then you could run the comp set
16  against the single, or in this case two, subject
17  properties and do the analysis. So it does not have to do
18  with submarkets and it doesn't have to do with adjustment.
19  BY MR. SELLINGER:
20    Q.   But what you did in this case is you looked at
21  the submarket of the French Quarter and you took comps
22  from that submarket, correct?
23    A.   Yes.
24    Q.   You did not take comps from outside the submarket
25  where your subject property was, correct, in this case?

Page 143

1    A.   I did not. Those were sufficient.
2    Q.   I understand, but you did not take comps outside
3  the submarket in this case, right?
4    A.   Right. In this case there was not any reason
5  to.
6    Q.   Do you recall who engaged you in connection with
7  the Lexington case?
8    A.   Yes, the law firm, and I will not be able to
9  pronounce their names, out of the Texas.
10    Q.   When you are trying to measure the impact of a
11  condition, would the inclusion of a unit which sold at a
12  disproportionately high price skew the analysis?
13    A.   Depending on the analysis. In this case, no.
14    Q.   The Dancing Bear project sold penthouse units at
15  a 70 percent premium over the average sales price per
16  square foot to its standard units, did it not?
17       MR. FERGUSON: Objection, form.
18       THE WITNESS: I don't know that. There was an
19  aberration in the second phase of the Dancing Bear where
20  one individual paid a huge premium for aggregation value
21  if you will. Is that what you're referring to?
22  BY MR. SELLINGER:
23    Q.   Yeah. And an individual aggregated a bunch of
24  penthouses and paid a substantial premium for them over
25  the average per-square-footage sales price, correct?

Page 144

1    A.   That is what it appears.
2    Q.   And that skewed the data, did it not?
3    A.   Right, which is why I removed that from my
4  corrected analysis.
5    Q.   Hold on a minute. 18-A, this is a screenshot
6  from your amended damaged analysis, correct?
7    A.   Yes.
8       MR. FERGUSON: Objection, form.
9  BY MR. SELLINGER:
10    Q.   And you indicate -- and this references the
11  Dancing Bear sales, correct?
12    A.   Yes.
13    Q.   And it shows eight penthouse units that are sold
14  at a substantial premium per square footage over the other
15  units sold at the same property in that project,
16  correct?
17    A.   Yes.
18    Q.   And it's a 70 percent premium from $2 million,
19  excuse me, from $2,000 a square foot to $3,000 a square
20  foot, correct?
21    A.   Incorrect.
22    Q.   What is it?
23    A.   Well, I have not done the calculation, but that's
24  the square footage.
25    Q.   I apologize.

Page 145

1    A.   It's bigger than the other ones.
2    Q.   Okay, I'm sorry. But in any event,
3  the -- without doing the math, just looking at this
4  information you can see that those eight penthouse units
5  sold at a substantial premium over the other units per
6  square footage, correct?
7    A.   Exactly.
8    Q.   And you noted on this exhibit that that number
9  was skewed, correct?
10    A.   Yes.
11    Q.   That's your terminology, "skewed by Penthouse
12  sales"?
13    A.   Correct.
14    Q.   And in your amended Robinson analysis, you
15  included those sales even though they were skewed by these
16  penthouse sales, correct?
17    A.   That's correct, but I have removed them.
18    Q.   Hold on. I get to ask the questions, you answer
19  my questions, and then afterwards you, him, and
20  Mr. Ferguson can bring up whatever you want.
21       MR. FERGUSON: Don't scold the witness. He was
22  just talking. He was answering. If you don't like the
23  answers, don't ask him, but he answered as fairly as he
24  could. Don't jump down his throat.
25       MR. SELLINGER: Are you done?

37 (Pages 142 - 145)

Page 146

1      MR. FERGUSON: Maybe.
2  BY MR. SELLINGER:
3      Q.  You were aware when you prepared the Robinson
4  amended analysis that these penthouse sales skewed the
5  data, correct?
6      A.  Yes.
7      MR. FERGUSON: Objection, form.
8  BY MR. SELLINGER:
9      Q.  You wrote that it's skewed, correct?
10     A.  As I note to myself that that year looked like
11 there was a lot of high penthouse sales, which would skew
12 the data in that year.
13     Q.  And notwithstanding noting that those penthouse
14 sales skewed the data, you included them anyway in the
15 amended Robinson analysis, right?
16     A.  Yes.  Would you like to know why?
17     Q.  And then after you reviewed Mr. Tantleff's report
18 where he criticized your including skewed penthouse sales,
19 only then did you prepare a new analysis that omitted that
20 skewed data; is that correct?
21     A.  Not exactly.
22     Q.  Did you submit a corrected report eliminating the
23 skewed sales prior to seeing Mr. Tantleff's analysis?
24     A.  No.
25     Q.  Okay.  Now, the Dancing Bear also, I think you

Page 147

1  alluded to a few minutes ago, had a Phase 2 that came out
2  during the damage period that you calculated, correct?
3      A.  That's correct.
4      Q.  And Phase 2 was selling new units rather than
5  resales, correct?
6      A.  Yes.
7      Q.  And selling new units can artificially inflate
8  prices if you are comparing them to resale units,
9  correct?
10     MR. FERGUSON: Objection, form.
11     THE WITNESS: It can just as easily deflate.
12 BY MR. SELLINGER:
13     Q.  Selling new units can -- new units are not
14 necessarily comparables to resale units.  There are
15 differences which can go up or down; is that your point?
16     A.  Right.  And also increasing the supply, like you
17 tried to mention earlier, because the Ritz had a lot of
18 extra supply, 800 units instead of maybe 500 like someone
19 else, sometimes having too much supply floods the market,
20 and you would think that would lower the pricing, but here
21 at Dancing Bear it proved otherwise.  They doubled the
22 amount of supply on the market and yet the pricing went
23 up.  There was no dilution in the pricing.
24     Q.  So let's look at that.  Look back at Exhibit 18.
25 So here for Dancing Bear, and this is from your amended

Page 148

1  report.  From 2014 to 2015 the average square-foot price
2  dropped from 379 to 350, correct?
3      A.  Correct.
4      Q.  And then from 2015 to 2016 the average square
5  price increased from 350 to 459, correct?
6      A.  Correct, although that might be skewed by the
7  penthouse sales, which I corrected in my corrected report,
8  so that might not be accurate once you remove the
9  penthouse sales, which I learned from Mr. Tantleff was not
10 bought as a fractional.
11     Q.  But the prices did go way up in 2016, correct?
12     A.  Yes.
13     Q.  And in the case of Dancing Bear, the Phase 2 new
14 sales contributed to that, correct?
15     A.  Yes.
16     Q.  And that affected the sales prices thereafter for
17 Dancing Bear, correct?
18     A.  Well, yes.  Let me just say that Dancing Bear
19 absorbed its new supply and the prices generally
20 increased.
21     Q.  All right.  So you have Mr. Tantleff's report?
22     MR MARX:  I don't think we've marked it yet.
23 We'll mark it as Robinson 15, please.
24 BY MR. SELLINGER:
25     Q.  So Robinson Exhibit 18 that we've been looking at

Page 149

1  shows the total increase or decrease for each of the five
2  comps in the Ritz Aspen, correct?
3      A.  Yes.
4      Q.  So it shows that the Ritz Aspen went down
5  13.9 percent, the St. Regis went up 8.8, Timbers went down
6  1.8, Dancing Bear went up 4.9, Little Nell 1.6, and Hyatt
7  went down 5.8, correct?
8      A.  Correct.
9      Q.  If you turn to the Tantleff report on page 20, in
10 this top chart at top Table 4, he is taking that same data
11 and he grouped the four downtown Aspen properties
12 together, St. Regis, Dancing Bear Little Nell and Hyatt as
13 downtown Aspen as four properties that went up 2.4
14 percent; do you see that?
15     A.  Yes.
16     Q.  And then Snowmass Village he took the one
17 property down 1.8 percent, Timbers, and it's the same; do
18 you see that?
19     A.  Yes.
20     Q.  And Aspen Highlands, again the one property is
21 13.9 percent, right?
22     A.  Yes.
23     Q.  So what he's done is he's taken your data there
24 and he's just broken it down into three submarkets that
25 shows that the four properties in downtown Aspen

38 (Pages 146 - 149)

Page 154

1    A.  Okay. I think that's what that means.

2    Q.  And if you go back to page 20, Table 4, the four

3 downtown Aspen properties collectively went up 2.4

4 percent, correct?

5    A.  Yes.

6    Q.  So the four downtown Aspen properties performed

7 substantially better during the time period you evaluated

8 than the three Snowmass properties, correct?

9    A.  Let's see. It looks that way from a sales price

10 standpoint. Those two that I did not include were really

11 laggers and they dragged on, even at Timbers.

12    Q.  Now I want you to try and answer my question.

13 During the period you measured, the three Snowmass

14 comps -- withdrawn.

15       During the period you measured, 2011 to 2018, the

16 three Snowmass fractional interests performed

17 substantially worse than the four downtown Aspen

18 properties you considered, correct?

19       MR. FERGUSON: Objection, form.

20       THE WITNESS: Yes.

21 BY MR. SELLINGER:

22    Q.  Now, in your comps, again looking back at Tab 18,

23 you've got four in downtown Aspen and one in Snowmass,

24 correct?

25    A.  Correct.

Page 155

1    Q.  And you've told us that downtown Aspen performed

2 better than Snowmass during that time period, correct?

3    A.  Based on what?

4    Q.  Based on the report that you just looked at.

5    A.  Oh, Mr. Tantleff told us, yes.

6    Q.  Well, based on the data that you compiled in your

7 comps.

8    A.  And there's new comps that I haven't seen yet. I

9 have not seen the data. I've seen the properties.

10    Q.  You don't have any reason to question that, do

11 you?

12       MR. FERGUSON: Objection, form.

13       THE WITNESS: I don't really know one way or the

14 other. I would like to see his data.

15 BY MR. SELLINGER:

16    Q.  So going back to your analysis, you've told us

17 that the Ritz, the St. Regis and Timbers were the most

18 comparable properties, right?

19    A.  The most similar.

20    Q.  And one-third of those is in downtown Aspen,

21 one-third is in Snowmass and one-third is in Aspen

22 Highlands, correct?

23       MR. FERGUSON: Objection, form.

24       THE WITNESS: True.

25       ////

Page 156

1 BY MR. SELLINGER:

2    Q.  And if you had measured either using those

3 three -- withdrawn.

4       If you had used one-third waiting for each of the

5 three areas, Ritz, St. Regis and Timbers, downtown,

6 Snowmass and Aspen Highlands, the impact on value would be

7 different than using four properties in downtown Aspen and

8 one in Snowmass correct?

9       MR. FERGUSON: Objection, form.

10       THE WITNESS: That is really distorting the data.

11 There is no submarket called Aspen Highlands. There is

12 one impacted property. If you want to say that a third of

13 the data should be the impacted property, doesn't that

14 distort?

15 BY MR. SELLINGER:

16    Q.  Well, you want to say that 80 percent of the data

17 should be units that include the hottest areas in the

18 world that have all the amenities and services that the

19 other markets don't have, correct?

20       MR. FERGUSON: Objection, form.

21       THE WITNESS: Well, Aspen Highlands is in my mind

22 closer to Aspen than Snowmass, so it should be more

23 heavily weighted towards Aspen.

24 BY MR. SELLINGER:

25    Q.  Aren't you the one who told us that amenities and

Page 157

1 services are the most important or one of the most

2 important factors?

3       MR. FERGUSON: Objection, form.

4       THE WITNESS: Right, but Ritz has very similar

5 amenities and services to St. Regis as an example, Timbers

6 as an example.

7 BY MR. SELLINGER:

8    Q.  Let's go to Exhibit 8 again then, the Cushman

9 appraisal.

10    A.  Of?

11    Q.  Of Aspen.

12    A.  Okay.

13    Q.  So just before we get there, my understanding of

14 what you are saying is that you want to treat Aspen

15 Highlands Snowmass and downtown Aspen together because the

16 differences are not material?

17       MR. FERGUSON: Objection, form.

18       THE WITNESS: Depending on who's looking at it.

19 A local would say they are material. A buyer coming from

20 outside might say they're material, might not, but it's

21 already baked into the price, is it not?

22 BY MR. SELLINGER:

23    Q.  The Cushman appraisal, page 13 under Product

24 Profile. I don't know if we looked at this before. The

25 second sentence, quote, "The well-educated, affluent baby

40 (Pages 154 - 157)

Page 158

1　boomer is typically more concerned about time than money
2　and demands services over savings. This market is less
3　price sensitive than others as long as time is preserved
4　by conveniences and services and quality is not spared,"
5　end quote. Do you see that?
6　　A. I do.
7　　Q. And do you agree with that?
8　　A. As a general statement of the entire fractional
9　universe, yeah, that seems appropriate.
10　　Q. If you could turn to page 12, the last paragraph,
11　second sentence talking about Aspen Highlands quote. "This
12　is a periphery location that does not have the critical
13　massive support services and amenities on the level of the
14　downtown of Aspen"; do you see that?
15　　A. I do.
16　　Q. And you agree with that as well, correct?
17　　　MR. FERGUSON: Objection, form.
18　　　THE WITNESS: Yes, for the Highlands versus the
19　downtown.
20　BY MR. SELLINGER:
21　　Q. And can you pull out the Dancing Bear appraisal,
22　No. 13?
23　　A. Yes.
24　　Q. Page 49.
25　　A. Yes.

Page 159

1　　　MR. FERGUSON: Let me get there, please.
2　　　THE WITNESS: 334 Bate stamp.
3　BY MR. SELLINGER:
4　　Q. Under Ritz-Carlton and Aspen Highlands the third
5　sentence, "The Ritz Grand has helped sales but the Aspen
6　Highlands area lies outside of Aspen with limited services
7　and nearby amenities; do you agree with that?
8　　　MR. FERGUSON: Objection, form.
9　　　THE WITNESS: Generally. I mean it's three miles
10　outside of Aspen.
11　BY MR. SELLINGER:
12　　Q. Right. More significant than the three miles, do
13　you agree that Aspen Highlands has limited services and
14　amenities?
15　　A. Well, the nearby amenities, but they provide the
16　shuttle services and you can easily get to Aspen. So not
17　every buyer wants to be in the hubbub if you will of
18　downtown Aspen, so Ritz sold 800 units to people who were
19　perfectly fine being in Aspen Highlands in a similar
20　quality facility and then just taking a ride for dinner or
21　whatever they do in downtown Aspen and going back to their
22　lovely fractional.
23　　Q. Do you disagree with the conclusion of Cushman
24　that being able to walk out to amenities and services has
25　a value over having to take a three-mile shuttle to get

Page 160

1　there?
2　　A. Sure. I didn't say that. That's why they are
3　priced similar.
4　　Q. You agree with that?
5　　A. I agree some buyers will want to be able to walk
6　out and they will pay more.
7　　Q. And the demand for units with services and
8　amenities may be different than the demand for units with
9　fewer services and amenities?
10　　　MR. FERGUSON: Objection, form.
11　　　THE WITNESS: The demand for every unit is
12　different, every unit, even Little Nell.
13　BY MR. SELLINGER:
14　　Q. But in addition to that, the demand for units
15　with a lot of services and amenities can be different than
16　the demand for units with limited services and amenities,
17　correct?
18　　　MR. FERGUSON: Objection, form.
19　　　THE WITNESS: Right.
20　BY MR. SELLINGER:
21　　Q. Over time the demand for units with a lot of
22　services and amenities can change to a different
23　percentage than the demand for units with less services
24　and amenities, correct?
25　　　MR. FERGUSON: Objection, form.

Page 161

1　　　THE WITNESS: It could be but it could also be
2　the same.
3　BY MR. FERGUSON:
4　　Q. But it could be different over time as well,
5　correct?
6　　A. Anything is possible but you're not really
7　proving it. It's baked into the price, right, so there
8　are people that want to pay more for those walking
9　distance and there are people who don't, and over time
10　there's really -- there's demand for both. It's all in
11　the pricing. If they were priced the same, I would agree
12　with you, but if they are priced differently, that's why
13　people buy different goods.
14　　　MR. REISER: For the record, there is a
15　seven-hour limit on this and I don't know if the guy from
16　the HOA wants to ask questions too, but we're approaching
17　five as I understand it.
18　　　MR. MARX: No, we're at four hours, nine minutes
19　and seven seconds.
20　　　MR. REISER: So you are the official timekeeper?
21　　　MR MARX: Well, I'm keeping tabs.
22　　　MR. REISER: That's fine. You do it at every
23　depo.
24　　　MR. SELLINGER: You're using up my time.
25　　　　　　////

41 (Pages 158 - 161)

Page 170

1   Q.  We talked about that before?

2   A.  Yes.  I don't know that that was an error, but
3   when Mr. Tantleff mentioned that it was a single buyer who
4   tried to, or who did buy the eight fractionals to take it
5   out of the fractional world as his personal residence if
6   you will, I think that's how he characterized it, I did
7   not realize that.  I thought it was just eight people
8   buying eight fractions, but if somebody bought it as their
9   personal residence, I agree that it should not be treated
10  as the same sales price.  It's not the same market as a
11  buyer of a fractional, so I took it out.  I'm not sure
12  that it was an error, but definitely new information came
13  to light.  I agree with him.  It's different than the
14  market.

15      Q.  So that was the fifth correction to your original
16  report, right?

17      MR. FERGUSON:  Object to form.

18      THE WITNESS:  Yes.

19  BY MR. SELLINGER:

20      Q.  And then the sixth correction to your original
21  report, in your newest report from last night, is that you
22  subtracted six months from the damage period, correct?

23      A.  Yes.  That's poorly worded on my part.  The
24  damage period remains the same, but I had reported it as
25  7.8 years long and it's really 7.2 years long, so the

Page 171

1   amount of time is the same but I had miscounted if you
2   will the partial years.

3       Q.  You actually though had to subtract six months
4   from that damages period, correct?

5       A.  Well, only from the report of how long the damage
6   period was.  I left the whole damage period in.  I didn't
7   change the damage period, and now I refer to it as 7.2
8   years instead of referring to it incorrectly as 7.8
9   years.

10      Q.  And the seventh correction from your original
11  report deals with sales at the Hyatt Grand in the final
12  time period, correct?

13      A.  That's right.  For the early sales, for the sales
14  in the early part of 2018 I had incorrectly assigned them
15  to 2017 for the Hyatt Grand's comp sales, so when I
16  noticed it while making the other corrections from
17  Mr. Tantleff, I saw it, he may have seen it, he may not
18  but he did not mention it, so this is one that I added to
19  his three.  So it took some sales out of 2017 and put them
20  back in 2018 where they should have been back in 2018
21  impacting those two years, but there's no net new sales.
22  They just were re-allocated amongst 2017 and 2018 now
23  correctly.

24      Q.  So that's the seventh correction from your
25  original report, correct?

Page 172

1       A.  Yes.

2       Q.  On the Dancing Bear, the correction of the
3   Dancing Bear penthouse fractional sales to eliminate them,
4   what type of analysis did you do to determine that those
5   sales could have inappropriately impacted the average
6   sales price?

7       A.  Okay.  Now that I am considering them not
8   fractional sales but whole ownership sale and I removed
9   it, it impacted the overall sales price for that year for
10  Dancing Bear and the subsequent impact in the model was
11  fairly light, less than $100,000 worth of damages, but it
12  did lower the damages by I think $66,000 or something once
13  I took them out.

14      Q.  Did you do any analysis or did you simply remove
15  them and just re-run the model?

16      A.  The latter.

17      Q.  And did you conduct any other analysis to
18  determine whether any other factors could have skewed the
19  average sales?

20      MR. FERGUSON:  Objection, form.

21      THE WITNESS:  For Dancing Bear?

22  BY MR. SELLINGER:

23      Q.  Yes.

24      A.  No, no, that was the only thing I pulled out.

25      Q.  And we spoke earlier about the fact that at

Page 173

1   Dancing Bear the second phase with new sales came online
2   midway through your analysis, correct?

3       A.  Yes, that was the only addition of supply in the
4   competitive sect.

5       Q.  And what type of analysis, if any, did you do to
6   determine the impact that those new developer interests
7   coming from market had on prices at the property?

8       A.  Well, I eyeballed it, if you will.  I mean once
9   you put the data in, one can tell that the new sales in
10  the last couple of years when Phase 2 came on board were
11  higher than the years before, so my conclusion from that
12  small analysis was that the new units were priced higher,
13  and that impacted the overall performance of Dancing
14  Bear.

15      Q.  And did you do anything to separate the infusion
16  of those new units from the existing units or make any
17  adjustments to account for that?

18      A.  No, that's the competitive market that the buyers
19  are buying when new supply comes in.  That's just part of
20  the market so --

21      Q.  So you did nothing to separate the new stock from
22  the old stock in your analysis?

23      A.  Correct.  There's no need to separate.

24      Q.  You treated the two separate phases as one?

25      A.  Right.

44 (Pages 170 - 173)

Page 174

1  Q.  Now, Mr. Tantleff's report is dated, his rebuttal
2  report, is dated January 4, 2018?
3  A.  2019.
4  Q.  '19, excuse me.  And you say you prepared your
5  corrected amended report last night, June 15th, 2019,
6  right?
7  A.  17th.
8  Q.  I'm sorry, 17th.  Why were you not -- when was it
9  that you say you were provided with Tantleff's rebuttal
10  report?
11  A.  I think I had said like two days ago, but
12  thinking about it now, maybe it was six days ago or
13  something like that, but the early-to-middle part of last
14  week I got it.
15  Q.  And why did you not receive the Tantleff report
16  from June until last week?
17  A.  Well, I don't know specifically, but I had been
18  dormant since December; I had not charged an hour or done
19  anything on this project.  So the Tantleff report and
20  other stuff that came into the files were just not
21  provided to me, nor was I working on this project so I did
22  not even ask for it.
23  Q.  Had you expected to receive them?
24  A.  No, I did not even know that he had provided a
25  rebuttal report.  As soon as I heard that my deposition

Page 175

1  was set, I went into my file and started reviewing it, and
2  then the attorneys provided the Checki report, the
3  Tantleff report, two Tantleff reports, and the two Dunec
4  reports, so the first time I saw them was two weeks ago.
5  They all came at once.
6  Q.  You did not do anything to ask counsel not to
7  provide that to you any earlier, did you?
8  A.  I didn't know they even existed.  No, I didn't
9  say one way or another.
10  Q.  I want to make sure I understand your testimony
11  from earlier relating to your comment about lost value.
12  Your report does not opine as to fair market value; is
13  that correct?
14  A.  Correct.
15  Q.  Is it also correct that your report does not
16  opine on diminution in value?
17  A.  Well, my understanding of diminution in value is
18  the difference between the two sales prices, so I thought
19  it was a legal term, I may be wrong, but I was instructed
20  to call it a diminution in value analysis.
21  Q.  But that's really the question I'm asking.
22  That's the terminology you used in your original report
23  and the amended report, but now I understand you from your
24  testimony today to be saying you're testifying and opining
25  on lost sales values; is that what it actually is?

Page 176

1  A.  No, it's lost sales prices.
2  Q.  Lost sales prices?
3  A.  Right.  I'm still calling it diminution in value,
4  as I understand that's what it supposed to be in a legal
5  standpoint, but as an analyst it's lost sales prices,
6  which I'm calling lost value.  It's not market value, as
7  you can tell.
8  Q.  But putting aside the legal terminology or what
9  you lawyers may be using to understand what it is from
10  your perspective that you are doing, you are measuring
11  lost sale prices?
12  A.  Exactly.
13  Q.  And for lost sale prices to apply to individual
14  plaintiffs, wouldn't those lost sales prices affect them
15  when they attempted to sell?  Or I will ask it
16  differently.  When would your calculation of lost sale
17  prices actually affect a particular plaintiff?
18  A.  Well, every year that there was a negative
19  difference between the but-for sales price and the actual
20  average sales price, there was a loss of value that year.
21  Every year that it went the other direction, they gained
22  value.  So I looked at it on a year-by-year basis, and if
23  the but-for price went up -- well, that's not a good way
24  to describe it.
25     Basically each year I calculated the difference

Page 177

1  between the but-for and the as-is, the as-is being the
2  actual average of sales that had occurred, not the
3  specific property because the 205 they didn't even sell,
4  so I thought a loss every year, and then I added
5  them up over the seven-and-quarter year period.
6  Q.  If a plaintiff has used their interests and not
7  attempted to sell, how have they lost value during that
8  time period?
9  MR. FERGUSON:  Objection, form.
10  THE WITNESS:  Let's separate the two.  There's
11  value of use and then there's value of money, and so they
12  were entitled to use their property for however four
13  months a year -- four weeks a year, so none of my analysis
14  has to do with that.  As far as I'm concerned there's no
15  accusation.  I don't see any -- I don't think that they
16  lost the use, the access to their four weeks, so none of
17  the diminution of the value has to do with use value; you
18  still get your use.  But if you could have sold it for
19  $10,000 more, then you lost the opportunity to have
20  monetized the $10,000.
21  BY MR. SELLINGER:
22  Q.  So I think I understand what you are saying.  If
23  someone attempted to sell their unit, then they would have
24  lost whatever the differential is in the sales prices that
25  you mentioned?

45 (Pages 174 - 177)

Page 178

1    A.   Yes, as of that year because each year it
2  changed.
3    Q.   Okay.  But for somebody who has not actually
4  attempted to sell their unit, any loss that they realize
5  would be realized at that time because the market can
6  change going forward, correct?
7        MR. FERGUSON:  Objection, form.
8        THE WITNESS:  That's right because the next year
9  it could have a lower loss.
10 BY MR. SELLINGER:
11   Q.   Or it could appreciate and go up?
12   A.   Precisely.
13   Q.   And you've not done any analysis, have you, as to
14 whether individual plaintiffs attempted to sell during
15 your damage period?
16   A.   Well, I have certainly heard of plaintiffs that
17 tried to sell but the price was so low that they pulled it
18 off the market or they got a bid that was so far below
19 their desired transaction price that they pulled it off
20 the market.  I don't know if you would call that an
21 analysis; it was just part of what I heard.
22   Q.   And how many instances of such a plaintiff
23 attempting to sell but not selling because of market
24 conditions have you heard of?
25   A.   I'm not sure.  I don't think I have a number.

Page 179

1    Q.   What's your best estimate?
2    A.   I did not really ask for a number.
3    Q.   Well, how did you hear about it?
4    A.   When I was on site I talked to owners, and I
5  heard that story a few times that they or some other guy
6  or some other guy went to sell it and it didn't meet their
7  expectations so they pulled it off, so I really did not
8  try to compile it.
9    Q.   So a few people mentioned to you that they or
10 others had tried to sell and because of the prices they
11 did not sell?
12   A.   Correct.
13   Q.   Did you do any other analysis other than those
14 few conversations relative to whether plaintiffs attempted
15 to sell, at what times, what the impact would have been as
16 of that time period?
17   A.   No.
18   Q.   And if a plaintiff were interested in selling his
19 unit or her unit at a particular period in time, wouldn't
20 you need to account for the supply in demand at that
21 particular time as one of the factors impacting sales
22 prices?
23   A.   I think that was probably in the sales price.  In
24 other words, let's say the year 2015, however many sales
25 there were and however many were offered for sale and did

Page 180

1  not sell, that impacted the sales that actually occurred
2  that year, so when I use the average sales price that
3  actually occurred in that year, it takes into account the
4  supply-in-demand conditions present at that time, which
5  could easily have changed the following year and the year
6  before, so the increment of one more persons putting it on
7  the market, I did not make any account for that.
8        MR. SELLINGER:  Let's take a couple of minutes.
9        Off the record.
10        (Break taken from 3:53 p.m. to 4:14 p.m.)
11        MR. SELLINGER:  Subject to being able to review
12 your corrected amended report which we received on lead to
13 this deposition this morning and consulting with our
14 expert about it, at this point I have no further
15 questions.
16        MR. NUSSBAUM:  I have a few questions for you
17 Mr. Robinson if that's okay.
18        THE WITNESS:  Yes.
19        EXAMINATION
20 BY MR. NUSSBAUM:
21   Q.   The first question I have is has the Court ever
22 refused to qualify you as an expert?
23   A.   No.
24   Q.   Have you ever testified on behalf of a homeowners
25 association before?

Page 181

1    A.   Yes, deposition testimony I believe.
2    Q.   When was that?
3    A.   Maybe ten years ago.  Palm Desert timeshare
4  homeowner's association.
5    Q.   Palm Desert is what you said?
6    A.   Palm Desert, yeah.  I might have that.  Sun Dunes
7  HOA.  It was a litigation.  The HOA versus the timeshare
8  owners, and I was on the side of the HOA.
9    Q.   What was the nature of the dispute?
10   A.   The property had been rundown pretty badly and
11 was losing value and the homeowners were charging the HOA
12 with negligence and poor management and diminution of
13 value of their timeshare units, so I think I rebutted an
14 expert on the owners' side.  It didn't go very far.  I
15 can't remember if it went to deposition, but that's the
16 one time I was an expert for a homeowner.
17   Q.   Do you remember what court that was?
18   A.   Riverside County Superior Court.
19   Q.   Have you ever testified on behalf of a
20 condominium homeowners association?
21   A.   No.
22   Q.   On page 4 of your amended report you talk about
23 the fact that you compiled a comparable set of whole
24 ownership condominiums in West Aspen?
25   A.   That's right.

46 (Pages 178 - 181)

Page 194

1  Q.  Have you seen for example Marriott International
2  being sued for massive data breaches in the last few
3  months?
4  A.  Yes, they had a several-million person data
5  breach, and I'm sure their stock took a hit for a while,
6  but I don't think there's a permanent stigma.
7  Q.  Was there more press about that litigation than
8  there was about the Ritz-Carlton in Aspen?
9  A.  Many thousands of times larger.
10  Q.  And with respect to litigation, have you ever
11  been retained by the law firm of Greenberg & Traurig,
12  specifically the Century City office that we're sitting in
13  today?
14  A.  Yes.
15  MR. SELLINGER:  Objection to form.
16  BY MR. FERGUSON:
17  Q.  How many times have you been retained by the
18  Greenberg Traurig Century City office?
19  A.  Probably a half dozen times, four different
20  attorneys, several cases for some of them.
21  Q.  Who were the attorneys that you were retained
22  by?
23  A.  Let's see.  Eric Rowen; Scott Bertzyk,
24  B-e-r-t-z-y-k; Michael Starler, S-t-a-r-l-e-r; Howard
25  Steinberg.  Those are the four that I remember, although

Page 195

1  both Mr. Bertzyk and Mr. Rowen have retained me several
2  times.
3  Q.  And how long was the most recent retention, and
4  then I will ask you when did you start, or you could do it
5  in opposite order.
6  A.  I don't even remember them all.
7  Q.  Give an approximate.
8  A.  I'd say in the past three years I have probably
9  done two projects for them, and in the two or three years
10  probably another one or two.  It seems like every other
11  year I get an assignment from another Greenberg lawyer
12  here.
13  Q.  Did they ever involve damages through real
14  estate?
15  A.  Oh, yeah.  Most of the time I'm the damages
16  expert for them.
17  Q.  Did you provide an analysis of damages?
18  A.  Yes, for litigation support assignments or I'm
19  acting as an analyst providing information for the Court.
20  Q.  And Greenberg & Traurig paid you for your
21  services?
22  A.  Yes.
23  Q.  Did they ever use you in a deposition in those
24  cases?
25  A.  Yes, several went to deposition and at least one

Page 196

1  went to trial.
2  Q.  And in any of the those cases that you did
3  analysis of real estate damages for lawyers here in the
4  Greenberg Traurig office, you named four of them, did you
5  ever do any of those under all the guidelines or the rules
6  and regulations of USPAP?
7  A.  No, none of them I was acting as an appraiser,
8  none of them were appraisals.  They were very similar to
9  this project.  It's not an appraisal; I say so in the
10  report.  It's not covered by USPAP.  They never had a
11  problem with it, other lawyers never had a problem with
12  it, judges admitted me and accepted me.
13  Q.  Were you opining on any of those if you recall on
14  causation, direct causation?
15  A.  No, they were diminution of value or lost
16  profits.
17  Q.  And when you worked for Greenberg Traurig, did
18  you agree with them that the data that you developed for
19  them was confidential and belonged to the law firm, if you
20  recall?
21  MR. SELLINGER:  Objection to form.
22  THE WITNESS:  I don't recall.
23  BY MR. FERGUSON:
24  Q.  I mean if we asked for it, would you turn it over
25  to us?

Page 197

1  A.  Oh, no.  I would absolutely not turn it over.  I
2  assume everything is confidential in things like this.
3  Q.  Did any judges throw out your reports to your
4  recollection?
5  A.  No.
6  Q.  Did they ever hire a guy named Dunee out of
7  New Jersey to say that you had not complied with USPAP
8  standards and somehow that impacted the value of your
9  analysis?
10  A.  No, this was a first.
11  Q.  In any of those reports you did for the four
12  Greenberg Traurig lawyers here over the last several years
13  and two to three in last couple of years and then every
14  other year going backwards, did any of those include you
15  doing any regression analysis?
16  MR. SELLINGER:  Objection to form.
17  THE WITNESS:  I don't think so.  Regression is
18  fairly rare.
19  BY MR. FERGUSON:
20  Q.  You mentioned how you had done a few single, I
21  suppose multiple regression analyses and you explained to
22  Mr. Sellinger single regression analysis, did any of those
23  reports that you did in litigation for Greenberg Traurig
24  lawyers here in Century City, were any of those the single
25  regression analysis examples, if you recall?

50 (Pages 194 - 197)

Page 210

1 2012. Does this help refresh your recollection that it
2 was a bulletin in July of 2011?
3     MR. SELLINGER: Objection to form.
4     THE WITNESS: Right. I may have mischaracterized
5 what this July of 2011 e-mail was, but this looks like the
6 one.
7 BY MR. FERGUSON:
8   Q. Were you aware of a letter called like a brand
9 evolution letter by Ritz in 2012?
10   A. Right. Yes, July of 2012, that was the second
11 starting date. If that was the trigger, then starting at
12 August 1st, 2012 is an appropriate starting date.
13     MR. FERGUSON: That's all I have subject to the
14 production of Mr. Tantleff's files.
15     MR. SELLINGER: No. 1, for the record we
16 certainly dispute that you're concluding subject to
17 Mr. Tantleff's files, which were requested three days ago
18 I'm told and produced but --
19     MR. FERGUSON: Automatic disclosures in
20 litigation, sir.
21     MR. SELLINGER: We don't have to resolve that
22 today.
23     MR. FERGUSON: I doubt that there will be a
24 problem. I got it.
25     MR. SELLINGER: I will have some follow-ups so

Page 211

1 let's take a few minutes.
2     (Break taken from 5:04 p.m. to 5:16 p.m.)
3         FURTHER EXAMINATION
4 BY MR. SELLINGER:
5   Q. Mr. Ferguson asked you a question about the
6 article that he was quoted in demeaning the Aspen
7 property; do you remember that?
8   A. Yes.
9   Q. And you have not done any research relevant to
10 the impact of that analysis, correct?
11   A. Correct.
12   Q. And your report does not get into any analysis of
13 that issue at all, correct?
14   A. Correct.
15   Q. Now, on the subject of over supply or supply,
16 Mr. Ferguson asked you some questions; do you recall
17 that?
18   A. Yes.
19   Q. And one of the things that you said is while
20 Aspen may have been large, once the property sold out, it
21 was sold out, so the fact that its sizes is so does not
22 really have an impact, correct?
23   A. Right, on individual sales.
24   Q. Now, are you aware that the Ritz-Carlton Aspen
25 did not sell out until like 2016, 2017?

Page 212

1     MR. FERGUSON: Objection, form.
2     THE WITNESS: No, I wasn't.
3 BY MR. SELLINGER:
4   Q. If there was a significant percentage of unsold
5 inventory at the Ritz-Carlton Aspen until 2016, that would
6 be an external factor which would have an impact on sales
7 prices, correct?
8   A. It could. I mean the other properties also were
9 still in their sales mode.
10   Q. Well, some of the properties had sold out in --
11   A. The Little Nell.
12   Q. Little Nell had sold out right away, correct?
13     MR. FERGUSON: Objection, form.
14     THE WITNESS: Before the damages period, yes.
15 BY MR. SELLINGER:
16   Q. So Little Nell went for sale when?
17   A. I have that in the report. Let's see. 2005.
18   Q. And it was sold out sometime before 2010,
19 right?
20   A. Correct.
21   Q. And when did the Ritz-Carlton start being sold?
22   A. Let's see. 2001.
23   Q. So Ritz-Carlton went for sale four years before
24 Little Nell?
25   A. Uh-huh.

Page 213

1   Q. Little Nell sold out at the most in five years,
2 correct?
3   A. Yes.
4   Q. And Ritz-Carlton, if it was not sold out until
5 2016 was 16 years, correct, 15 years?
6   A. Yes, it would have been.
7   Q. So three times longer to sell out Ritz-Carlton
8 than Little Nell?
9   A. True, but in terms the whole market Little Nell
10 was just one property, and a fairly small one. The whole
11 market still had properties that it was selling out
12 throughout the entire period, same as Ritz. So Ritz, the
13 fact that it had -- I don't see that it was impacting the
14 market.
15   Q. Ritz-Carlton took three times longer to sell out
16 than Little Nell, correct?
17   A. Right.
18   Q. And during the period of time before which
19 Ritz-Carlton sold out, there was over-supply of
20 Ritz-Carlton properties, correct?
21     MR. FERGUSON: Objection, form.
22     THE WITNESS: What do you mean by that?
23 BY MR. SELLINGER:
24   Q. During the time that Ritz-Carlton was not sold
25 out, you have new inventory unsold from Ritz-Carlton,

54 (Pages 210 - 213)

Page 214

1 correct?
2   A.  Yes, same with every property until they sell
3 out.
4   Q.  And Little Nell sold out in five years and
5 Ritz-Carlton, 15 correct?
6   A.  Little Nell is the exception, yes.
7   Q.  And the difference in supply between Little Nell
8 and Ritz-Carlton is a variable between those two
9 properties that could affect pricing, correct?
10   A.  Anything is possible, but during the damage
11 period Little Nell had already sold out, so it is not
12 even -- the new supply from Little Nell was not even a
13 factor in the damage period.
14   Q.  If during the damage period from 2011 to 2016 you
15 had unsold inventory in different amounts from
16 Ritz-Carlton, that supply could impact pricing, correct?
17   A.  Yes, it's already baked into the pricing.  The
18 Hyatt Grand had unsold inventory, the Timbers Club had
19 unsold inventory.  Dancing Bear, St. Regis, they all had
20 unsold inventory and there was pricing going on.  During
21 that time none of these guys added inventory, so if the
22 price had been lower at Ritz Aspen because they had extra
23 inventory, nothing changed; they still had the inventory
24 and they were selling it just like these other guys during
25 the damage period.

Page 215

1   Q.  When an appraiser performs an appraisal and looks
2 at comps, does he or she adjust for supply in comparing
3 properties, yes or no?
4   A.  They absolutely could in certain circumstances.
5   Q.  And USPAP requires that supply be one of the
6 factors that is used and adjusted for, correct?
7   A.  I think so.
8   Q.  Okay.  Now, you mentioned that you have done some
9 work for Marriott International; is that right?
10   A.  Yes.
11   Q.  What were the names of the cases?
12   A.  Well, the first one was a limited partnership
13 that had sued Marriott International over the Courtyard,
14 LP.  It was I think 1200 or 1500 limited partnership
15 holders against Marriott International over the 800
16 Courtyard properties.
17   Q.  And where was the case pending?
18   A.  San Antonio, Texas.
19   Q.  What time period?
20   A.  Early 2000s.
21   Q.  And you were retained by whom?
22   A.  The mediation firm.  As it was going to court the
23 judge required I think mediation, and so I was retained by
24 the law firm that I can't recall.
25   Q.  The mediator law firm?

Page 216

1   A.  The mediator law firm, and Marriott paid half and
2 the plaintiffs paid half, but basically in the room with
3 the parties helping to settle the mediation.  The night
4 before trial we settled at like midnight.
5   Q.  But were you retained not by Marriott but by the
6 mediator?
7   A.  Correct.
8   Q.  So Marriott International did not make the
9 decision to retain you in that case, correct?
10   A.  I don't know how it came down, but no.  They paid
11 me but did not hire me directly.
12   Q.  Well, Marriott International did not hire you
13 directly or indirectly.  The mediator hired you as the
14 mediator's analyst, correct?
15   A.  Right.  They may have asked Marriott's approval
16 before I got to come in to be retained.
17   Q.  Are you aware that that happened?
18   A.  No, but afterwards they said, you know, we were
19 happy that you were selected.
20   Q.  You're not aware that Marriott International had
21 any involvement in the decision of the mediator to hire
22 you in that case, correct?
23   A.  I don't know one way or the other.
24   Q.  Any other work that you have done on behalf of
25 Marriott International?

Page 217

1   A.  Yes.
2   Q.  What is that?
3   A.  Okay.  Maybe five years later the Renaissance
4 Hollywood, California, and Marriott was in a dispute with
5 the owner, so they were the manager of the property, and
6 it was heading to some litigation or arbitration and
7 Marriott retained me as one of their experts.  I did some
8 market work for them, and they settled before we
9 testified.
10   Q.  Did you prepare a report?
11   A.  I can't recall.
12   Q.  Did you -- and you did not testify?
13   A.  Right.  It was a pretty short assignment.
14   Q.  And was it a filed litigation, a filed case?
15   A.  Probably, yes.
16   Q.  Where was it?
17   A.  Renaissance Hollywood.
18   Q.  California?
19   A.  Yeah.  It had another name to it as well, but
20 that was the name of the property.  It's a Loews now.
21   Q.  Do you know which Marriott entity?
22   A.  International.  Marriott was the management
23 company, which at the time was Marriott International.
24 They were being threatened to being thrown out, if you
25 will, probably through a clause in their management

55 (Pages 214 - 217)