IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Case No. 16-01301 PAB

RCHFU, LLC, et al.

    Plaintiffs,

v.

MARRIOTT VACATIONS WORLDWIDE CORPORATION, et al.

    Defendants.

---

### MARRIOTT DEFENDANTS' MOTION *IN LIMINE* TO PRECLUDE EVIDENCE OF NON-AFFILIATION-RELATED DAMAGES AND CONDUCT

Defendants Marriott Vacations Worldwide Corporation ("MVW"), Marriott Ownership Resorts, Inc., The Ritz-Carlton Management Company, LLC, The Cobalt Travel Company, LLC ("Cobalt"), and The Lion & Crown Travel Co., LLC (collectively, "Marriott Defendants") hereby move the Court *in limine* for an order precluding Plaintiffs (including their expert witnesses and counsel) from using or seeking to use at trial any evidence of conduct by the Marriott Defendants unrelated to and/or predating the potential or actual affiliation of The Ritz-Carlton Club, Aspen Highlands ("RC Club Aspen") with the Marriott Vacation Club Destinations Program (the "MVCD Program") ("Non-Affiliation-Related Conduct"), including any evidence purporting to show damages allegedly sustained by Plaintiffs as a result of Non-Affiliation-Related Conduct.

## CERTIFICATE OF CONFERENCE

Pursuant to Local Rule 7.1(a), the Marriott Defendants' counsel conferred with Plaintiffs' counsel before making this motion and made a reasonable and good faith effort to resolve this dispute. Specifically, on August 15, 2019, the Marriott Defendants' counsel had a telephone conference with Plaintiffs' counsel to discuss the factual and legal bases for this motion. On August 16, 2019, Plaintiffs' counsel communicated their refusal to agree not to proffer evidence of Non-Affiliation-Related Conduct at trial or seek damages allegedly sustained by Plaintiffs as a result of such conduct.

## FACTUAL BACKGROUND

**Description of Plaintiffs' Pleaded Claims**

1. Plaintiffs are owners of 1/12 fractional interests in luxury condominium units at RC Club Aspen. Each 1/12 fractional interest entitles its owner to four use-weeks per year. These use-weeks can be spent either at RC Club Aspen in the specific unit for which the owner contracted or at any other resort with which RC Club Aspen is currently affiliated, subject to availability and other restrictions. There are 205 fractional interests out of a total of 876 available fractional interests at issue in this case.

2. RC Club Aspen affiliated with the MVCD Program in 2014. This affiliation (the "MVC Affiliation"), which became operational on December 5, 2014, allowed RC Club Aspen members to voluntarily enroll in the MVCD Program, elect to deposit one or more of their RC Club Aspen use-weeks in the MVCD Program, and receive, in return, an allocation of exchange points that can be used to reserve accommodations at various Marriott Vacation Club ("MVC") resorts and for other vacation experiences (such as cruises and safaris). The MVC Affiliation

also enabled MVCD Program members with sufficient amounts of exchange points to access any RC Club Aspen use-weeks that RC Club Aspen members have elected to deposit in the MVCD Program.

3. All the claims asserted in the Seventh Amended Complaint (ECF #430, "7AC") concern the alleged damages that Plaintiffs have supposedly suffered due to: (a) the alleged failure to allow RC Club Aspen members to vote on whether the MVC Affiliation should take place (the "vote" issue); and (b) the MVC Affiliation itself.

4. Specifically, Plaintiffs allege that: (a) in July 2012, Defendant Cobalt proposed the MVC Affiliation (7AC ¶ 53); (b) in April 2013, Plaintiffs were promised a vote on the proposed MVC Affiliation (*id.* at ¶ 73); (c) in lieu of a vote, RC Club Aspen members were surveyed in order "'to understand whether [RC Club Aspen] members would like the opportunity to voluntarily exchange a week of their allocated time for points within the MVCD exchange program'" (*id.* at ¶ 83; *see also id.* at ¶ 84); (d) in April 2014, the RC Club Aspen homeowners association (Aspen Highlands Condominium Association ("Association")) agreed to the MVC Affiliation (*id.* at ¶ 85); and (d) as a result of the MVC Affiliation (which became effective in December 2014, with the exchange and use of weeks starting in January 2015), the value of Plaintiffs' fractional interests in RC Club Aspen was adversely affected. *Id.* at ¶ 105.

5. Based on these allegations, Plaintiffs seek damages for the alleged diminution in value of their fractional interests caused by the MVC Affiliation. *Id.* at ¶¶ 105, 115, 123, 131; *see also* ¶ 96 (alleging that, as a result of the MVC Affiliation, "approximately 400,000 [MVC] members … have access to luxury resorts that were formerly only available to Plaintiffs and [other RC Club Aspen members] …, thus devaluing Plaintiffs' vested property interests").

3

Plaintiffs also seek disgorgement of the profits that the Marriott Defendants allegedly received as a result of the MVC Affiliation. *Id.* at ¶¶ 106, 116, 125, 132, 137.

6. Based on the foregoing allegations, the liability theories articulated in the five claims asserted in the 7AC (filed July 9, 2019) involve (a) the potential for the MVC Affiliation to occur; (b) Defendants' actions in advocating for, or helping bring about, the MVC Affiliation; or (c) the actual implementation of the MVC Affiliation.

7. In Count I (breach of fiduciary duty asserted against the Association and certain of the Marriott Defendants), Plaintiffs allege that Defendants breached fiduciary duties by including RC Club Aspen in the MVC Affiliation, allowing the MVC Affiliation to take place, participating in the MVC Affiliation decision, and failing to enforce certain provisions in the RC Club Aspen's governing documents that allegedly precluded the MVC Affiliation. *Id*. at ¶¶ 111, 115, 135.[1] In Count II (constructive fraud claim asserted against the Association and certain of the Marriott Defendants), Plaintiffs allege that Defendants made misrepresentations in "the disclosures they made to Plaintiffs and other Members related to the affiliation …," and they complain about the "vote" issue. *Id.* at ¶ 122. The other Counts repeat these themes. *See id.,* Count III (aiding and abetting breach of fiduciary duty and constructive fraud asserted against all Defendants), *id.*, Count IV (civil conspiracy asserted against all Defendants, reiterating allegations in Counts I-III); *id.*, and Count V (unjust enrichment asserted against the Marriott Defendants, citing their allegedly "wrongful" conduct in "achieving" the inclusion of RC Club Aspen in the MVC Affiliation. *Id*. ¶ 135-36.

---

[1] By Order dated March 29, 2018, the Court struck the "failing to enforce certain provisions in the RC Club Aspen's governing documents" portion of these claims, finding that the governing documents did not preclude the MVC Affiliation. ECF #210 at 22-23.

4

**Plaintiffs' Experts Now Offer Entirely New Damages Theories**

8. The above-described liability theories pleaded in the SAC have not changed since the original Complaint was filed on December 31, 2015. As a result, the fact discovery taken by the Marriott Defendants, which took place over roughly two years and concluded on July 16, 2018, was premised entirely on these liability theories.

9. Now, however, for the first time in this three-year-old case, Plaintiffs are attempting to assert that they have been damaged, not only by the MVC Affiliation and the "vote" issue, but also by Non-Affiliation-Related Conduct that long predates the MVC Affiliation and is not alleged in any claim in this case.

10. Specifically, Plaintiffs now take the position that, because developer-owned fractional interests at RC Club Aspen was used to enable MVC members to access weeks at RC Club Aspen from 2011 to 2014 (and that fractional interests owned by the MVC Trust, a Florida land trust ("MVC Trust") at four other Ritz-Carlton Destination Club ("RCDC") resorts was used to enable MVCD Program members to access those resorts), their fractional interests began losing value (i.e., they began to be damaged) even before the MVC Affiliation, which did not become effective until December 2014. Plaintiffs also seek the disgorgement of any profits the Marriott Defendants supposedly realized from 2011 to 2014 due to this use of developer-owned and MVC Trust-owned inventory. Plaintiffs, however, do not (and cannot) allege in the 7AC that the use of developer-owned and MVC Trust-owned fractional interests at the RC Club Aspen and other RCDC resorts was in any way unlawful, improper or prohibited by any contract or governing document.

5

11. The Marriott Defendants did not learn about these new liability and damages theories until October 26, 2018, when Plaintiffs submitted three Rule 26(a)(2)(B) expert reports.

12. One of these expert reports comes from Jon Simon, a financial consultant to the hospitality and vacation-ownership industries. Mr. Simon states that he was retained by Plaintiffs "to opine on whether Defendants' actions, if proven, caused Plaintiffs' property values to diminish" and "to calculate the amount of profit that the Marriott Defendants have made from marketing and providing access to the Ritz Aspen property to MVC members and affiliating the Ritz-Aspen (and the Ritz-Carlton Destination Club of which Ritz-Aspen was a part) with MVC . . . ." Expert Report of Jon Simon, dated October 26, 2018 (attached as Exhibit A to the August 19, 2019 Omnibus Declaration of Ian S. Marx ("Marx Decl."), ¶¶ 6-7.

13. But Mr. Simon does not restrict his opinions to the allegations regarding the MVC Affiliation. Rather, Mr. Simon states that his "assignment also included rendering an opinion as to whether allowing MVC members to access Ritz-Aspen, ***at first by opening developer-owned inventory to certain MVC members and then*** by affiliating the two clubs was a substantial factor in causing diminution in value of Plaintiffs' fractional interests at Ritz-Aspen." *Id*. at ¶ 9 (emphasis added). Mr. Simon discusses in some detail how certain Marriott Defendants entertained the concept of making RC Club Aspen available to certain MVC members and then followed through on that concept. *Id*. at ¶¶ 13-15, 16(c), 29-31, 35, 43-54, 56-57. Mr. Simon's opinions also consider the impact of "providing MVC members (who bought into a lower quality timeshare brand) access to . . . the Ritz Carlton Clubs at Vail, San Francisco, Tahoe and St. Thomas" *id*. at ¶ 13, through a process of "taking its unsold RCDC inventory from [these] clubs and contributing it to the NATO trust," *id*. at ¶ 46, which he distinguishes from the use of

developer-owned fractional interests. *Id*. at ¶ 57 n.83.[2] This Non-Affiliation-Related Conduct forms a significant and integral part of Mr. Simon's calculations of the profits that he claims were improperly earned by the Marriott Defendants. *Id*. ¶¶ 64-86.

14. A second expert for Plaintiffs is R. Maurice Robinson, a financial consultant to the hospitality and real estate industries, who states that he was retained by Plaintiffs to "estimate the Diminution of Value damages . . . suffered by" Plaintiffs. Amended Expert Report of R. Maurice Robinson, dated December 19, 2018 (Marx. Decl. Ex. C.) at 1. In formulating his opinions, Mr. Robinson relied upon Mr. Simon "to opine on whether the[] wrongful acts [of Defendants] were a substantial factor in causing values a[t] the Property to be lower than they otherwise would be. . . ." *Id*. at 6-7. Mr. Robinson calculates approximately $41.6 million in damages based on a "Damages Period" that starts on August 1, 2011. *Id*. at 2. Of this amount, Mr. Robinson has calculated approximately $18.6 million in damages just for the period from August 1, 2011 to August 1, 2012. *Id*. at 2, 17. That figure consists entirely of damages associated with Pre-Affiliation Conduct, which started in 2011.

15. In addition to calculating damages using the August 2011 earlier start date, Mr. Robinson provides three alternative damages calculations using August 1, 2012, January 1, 2013 and January 1, 2014 as start dates. *Id*. at 17-18. Using the earliest of these alternative start dates (August 1, 2012), Mr. Robinson's damages calculation comes to about $23 million. *Id*. at 17.

---

[2] For example, Mr. Simon relies on a "points chart" that was sent "to existing MVC members that, for the first time, gave all MVC members access to the RCDC in Vail," *id*. at ¶ 49, 56, arguing that by late November 2011, "MVW was then not only providing RCDC access through its developer-owned inventory, but was allowing MVC members to directly access RCDC Vail through the NATO trust. This allowed all MVC members to access most RCDC properties which was a significant step toward integrating MVC with RCDC." *Id*. at ¶ 57.

Mr. Robinson's damages calculations using the two later start dates are similarly inflated, as they also include alleged damages associated exclusively with the use of developer-owned fractional interests at RC Club Aspen (as well as MVC Trust-owned fractional interests at other RCDC resorts) and other Non-Affiliation-Related Conduct.

16. Finally, Plaintiffs offer the expert report of Chekitan Dev, a professor at Cornell University's School of Hotel Administration who specializes in brand management and various other aspects of marketing. According to Dr. Dev, Plaintiffs retained him to opine on and "examine[] the co-branding of the Ritz-Carlton and Marriott brands in conjunction with the cross-marketing and affiliation between the [MVC] and Ritz-Carlton Destination Club ('RCDC')." Expert Report of Chekitan Dev, dated October 26, 2018 (Marx Decl. Ex. D), ¶ 2.

17. Like Messrs. Simon and Robinson, Dr. Dev does not restrict his opinions to the MVC Affiliation. Rather, Dr. Dev discusses, and premises his opinions on, Non-Affiliation-Related Conduct, including the use of developer-owned fractional interests at RC Club Aspen. Indeed, Dr. Dev begins his analysis "[i]n the latter half of 2011," when "MVW began to use the RCDC to enhance the appeal of purchasing MVC points." *Id*. ¶ 3. Dr. Dev then analyzes the impact on the Marriott and Ritz-Carlton brands of the Marriott Defendants' decision to "offer[ certain] MVC members access to previously exclusive RCDC properties" (*id*.) and of communications with MVC members announcing these benefits and other marketing efforts. *Id*. at ¶¶ 34-35.

18. In sum, Plaintiffs are improperly attempting to use their experts to advance liability and damages theories that have never been pleaded in this three-year-old case. Courts, including this one, routinely prohibit such practice. Accordingly, Plaintiffs should be precluded

8

from contending, at trial that the use of developer-owned and MVC Trust-owned fractional interests to permit access to the RC Club Aspen (and other RCDC resorts) by MVC members from 2011 to 2014 was in any way wrongful or that they are entitled to any damages arising from the use of such Developer-owned or MVC Trust-owned fractional interests. In other words, Plaintiffs should not be permitted to proffer any evidence of Non-Affiliation-Related Conduct; rather, they should be limited to proffering evidence supporting claims relating to the MVC Affiliation and the "vote" issue, and any damages allegedly flowing therefrom.

## ARGUMENT

19.     The Tenth Circuit has made clear that, where a plaintiff seeks "to make the complaint a moving target, to salvage a lost case by untimely suggestion of new theories of recovery, to present theories seriatim in an effort to avoid dismissal, or to knowingly delay raising an issue until the eve of trial," evidence of previously un-pleaded theories of liability will be precluded and motions for leave to amend to add such theories will be denied. *Minter v. Prime Equip. Co.*, 451 F.3d 1196, 1206 (10th Cir. 2006) (internal quotations and citations omitted). Doing otherwise is "'simply unfair,'" as it is unduly prejudicial "'[t]o require defendant to incur additional costs and to change its strategy'" where the "'plaintiff has concocted a new theory . . . years into the litigation.'" *General Steel Domestic Sales, LLC v. Chumley*, 2012 WL 2589241, at *1 (D. Colo. July 3, 2012) (Brimmer, *J.*) (quoting *Roberts v. Ground Handling, Inc.*, 2007 WL 2753862, at *5 (S.D.N.Y. Sept. 20, 2007)). Indeed, the Tenth Circuit has specifically instructed district courts not to liberally construe complaints "to raise any legal theory [potentially] supported by the allegations of the complaint" or to read into the

9

complaint a new theory raised "late in the game." *Zohari v. Gates*, 561 F.3d 1076, 1086 (10th Cir. 2009).

20. Indeed, federal courts throughout the country routinely preclude evidence and strike expert opinions premised on new liability theories offered for the first time in expert reports. *See, e.g., Finjan, Inc. v. Blue Coat Sys., Inc.*, 2015 WL 3640694, at *4 (N.D. Cal. June 11, 2015) (striking infringement theories in patent litigation disclosed for first time in expert report and finding prejudice to defendant "inherent," as it had "no way of knowing that Plaintiff's focus would shift to" one infringement theory "and away from" the theory pleaded in complaint); *Parrish v. Freightliner, LLC*, 471 F. Supp. 2d 1262, 1268, 1270 (M.D. Fla. 2006) (in wrongful death action against tractor-trailer manufacturer, striking expert report premising liability on a design defect not disclosed in interrogatory responses; noting that defendant had "spent considerable time and resources defending this case under the [old design defect] theory," court found "wholesale change in liability theory" "contrary to both the letter and spirit of the Federal Rules," as "[d]iscovery is not a game of 'blind man's bluff'") (quoting *Dollar v. Long Mfrg. N.C., Inc.*, 561 F.2d 613, 616 (5th Cir. 1977)); *National Union Fire Ins. Co v. Dowd & Dowd*, 1999 WL 1324285, at *3 (N.D. Ill. Dec. 21, 1999) (in legal malpractice action, finding relevant question was whether proposed expert's testimony related to a theory of liability that could be "gleaned from the allegations in the complaint" and declaring that plaintiff would be barred from "assert[ing] a wholly new theory of liability into the case").

21. This Court has twice rejected the kind of litigation tactics that Plaintiffs are using here, namely, raising, for the first time in their expert reports, new liability theories never previously pleaded. In *General Steel*, plaintiff raised new, previously un-pleaded liability

theories in its trial brief, arguing that its false advertising claim included, not only the defendants' written website advertising (upon which the complaint had focused), but also commercial speech, e.g., certain uniform sales presentations. Like Plaintiffs here, the *General Steel* plaintiff never sought leave to amend its complaint to expand the scope of its false advertising claim; accordingly, defendant moved *in limine* to exclude evidence regarding plaintiff's sales presentations and other oral statements.

22. This Court granted defendant's motion, declaring that "it is too late in the game for General Steel to be significantly redefining the scope of its claims." *General Steel*, 2012 WL 2589241, at *1. The Court found its decision appropriate given that plaintiff had a "more than adequate opportunity" to notify defendant "that it would be supporting its false advertising claim with facts regarding anything other than the substance of [defendant's] websites. . . ." *Id*.

23. This Court reached a similar result in *Water Pik, Inc. v. Med-Systems, Inc.*, 2012 WL 275596 (D. Colo. Jan. 5, 2012) (Brimmer, *J*.), a trademark infringement action. In that case, defendant moved *in limine* to admit the testimony of its proposed damages witness, Robert Trout, who planned to testify regarding the parties' actual sales, costs and expenses for their respective sinus irrigation products. Defendant had not disclosed Dr. Trout as a witness in either its Rule 26(a)(2) disclosures or in the final pretrial order, and he was only proffered after the Court had stricken the testimony of defendant's original damages expert, Michael Bandemer. Critically for present purposes, Dr. Trout's proposed testimony departed from the damages theories set forth in Mr. Bandemer's expert report, and he also offered several new theories.

24. Defendant attempted to support its motion by arguing that Dr. Trout would not be testifying as an expert witness but, rather, would merely be summarizing voluminous financial

11

records and using his financial analysis expertise to evaluate the parties' financial statements and to describe the methods and calculations that he used to summarize sales, costs and expenses for the competing product lines. Defendant's motion *in limine* was denied, however, and Dr. Trout was precluded from testifying at trial. In reaching its decision, the Court noted that, having been offered after discovery had closed and only a few months before trial, Dr. Trout's proposed testimony came as a "complete surprise" to plaintiff, whose strategy had focused largely on rebutting the testimony and damages theories that had been advanced by the previous expert, Mr. Bandemer. Thus, plaintiff would be "clearly prejudic[ed]" by the last-minute change in damages theories – a prejudice that could only be cured by re-opening discovery close to the end of the litigation, which the Court refused to do. *Id*. at *4.

25. What Plaintiffs are attempting to do here (offer never-before-pleaded theories of liability and damages through expert reports) is the same issue that was confronted in the above-discussed cases. Major considerations for the Court in those cases were the dilatory (at least) behavior of the party offering new theories late in the case and the prejudice the other party would suffer if the theories were allowed.

26. In that regard, it is important to note that, after filing their initial Complaint in December 2015, Plaintiffs have had multiple opportunities to amend their pleading to add liability theories focusing on Non-Affiliation-Related Conduct, but they failed to do so.[3]

---

[3] Since December 2015, Plaintiffs have amended their pleading seven times – twice as a matter of right (ECF #1-1, 40), three times with Defendants' consent (ECF #71, 109, 118), and twice over Defendants' objections (ECF #185, 193, 342, 344, 394). The last amendment (the 7AC) was filed in June 2019.

27. As a result, the Marriott Defendants' discovery efforts over the roughly two years during which fact discovery took place (from the first service of written discovery requests in September 2016 until the close of fact discovery in July 2018) focused almost exclusively on the MVC Affiliation.[4] The Marriott Defendants, thus, had no opportunity -- or reason -- to examine Plaintiffs and non-party fact witnesses about the access to RC Club Aspen (and other RCDC resorts) that was provided to certain MVC members from 2011 to 2014 through the use of developer-owned and MVC Trust-owned fractional interests, to serve written interrogatories and requests for admission on that topic, or to discover the types of documents that Plaintiffs and their counsel had compiled on it.

28. Moreover, because none of the five claims asserted in the SAC (or its previous iterations) mention or relate in any way to Non-Affiliation-Related Conduct, the Marriott Defendants had no meaningful opportunity -- or reason -- to develop evidence concerning, or defenses to, this new allegation raised for the first time in Plaintiffs' expert reports. Had Plaintiffs pleaded any claims based on Non-Affiliation-Related Conduct, the Marriott Defendants would have established the propriety of such conduct through fact witnesses and documents, and they would have engaged expert witnesses to challenge Plaintiffs' experts' opinions on this subject.

29. Instead, in justifiable reliance on Plaintiffs' pleadings, the Marriott Defendants premised their motions to dismiss various versions of the Complaint (ECF #46, 84, 131) solely on MVC Affiliation-related issues; they have retained affirmative experts whose reports have

---

[4] Although not requested by Plaintiffs, the Marriott Defendants produced usage summaries dating back to 2011, and Plaintiffs requested (and were provided) discovery regarding changes in corporate structure and strategy that took place in 2011.

been prepared based on the understanding that Plaintiffs' claims solely concerned the MVC Affiliation; and they have developed their overall litigation and defense strategies solely on the manner in which Plaintiffs' claims have been framed in this regard. .  Thus, to allow Plaintiffs to use expert opinions as a means to expand their claims after the close of fact discovery would be unfair and highly prejudicial to the Marriott Defendants.  *Cf. Water Pik*, 2012 WL 275596, at *4.  Nor should discovery be re-opened to address these issues for the first time in this already-three-year-old litigation.  *Cf. id.*

## CONCLUSION

For all the foregoing reasons, the Marriott Defendants respectfully request that the Court enter an order precluding Plaintiffs from using or seeking to use at trial any evidence of conduct by the Marriott Defendants unrelated to the MVC Affiliation or the "vote" issue, including any evidence of damages allegedly sustained by Plaintiffs as a result of such unrelated conduct.

Dated:  August 19, 2019          Respectfully submitted,

By:     *s/ Philip R. Sellinger*
Philip R. Sellinger
Ian S. Marx
GREENBERG TRAURIG, LLP
500 Campus Drive, Suite 400
Florham Park, NJ 07932
Email:  SellingerP@gtlaw.com
           MarxI@gtlaw.com

*Attorneys for Defendants Marriott Vacations Worldwide Corporation, Marriott Ownership Resorts, Inc., The Ritz-Carlton Management Company, LLC, The Cobalt Travel Company, LLC, and The Lion & Crown Travel Co., LLC*

## CERTIFICATE OF SERVICE

      I hereby certify that, on August 19, 2019, a true and accurate copy of the foregoing **MARRIOTT DEFENDANTS' MOTION *IN LIMINE* TO PRECLUDE EVIDENCE OF NON-AFFILIATION-RELATED DAMAGES AND CONDUCT** was filed and served with the Clerk of the Court via CM/ECF filing system, which will send notification to the following:

Michael J. Reiser
Law Office of Michael J. Reiser
1475 N Broadway, Suite 300
Walnut Creek, CA 94596
*Counsel for Plaintiffs*

Matthew C. Ferguson
The Matthew C. Ferguson Law Firm, P.C.
119 South Spring, Suite 201
Aspen, Colorado 81611
*Counsel for Plaintiffs*

Tyler R. Meade
The Meade Firm P.C.
1816 Fifth Street
Berkeley, CA 94710
*Counsel for Plaintiffs*

Linda Pham Lam
Michael Schrag
Gibbs Law Group LLP
505 14th Street, Suite 1100
Oakland, CA 94612
*Counsel for Plaintiffs*

                                            */s/ Jaclyn DeMais*
                                            Jaclyn DeMais