IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Case No. 16-01301 PAB

RCHFU, LLC, et al.

      Plaintiffs,

v.

MARRIOTT VACATIONS WORLDWIDE CORPORATION, et al.

      Defendants.

---

**MARRIOTT DEFENDANTS' MOTION *IN LIMINE* TO BIFURCATE
TRIAL AND TO PRECLUDE REFERENCES TO MARRIOTT
DEFENDANTS' PROFITS DURING EARLIER PHASES OF TRIAL**

---

Defendants Marriott Vacations Worldwide Corporation, Marriott Ownership Resorts, Inc. ("MORI"), The Ritz-Carlton Management Company, LLC, The Cobalt Travel Company, LLC, and The Lion & Crown Travel Co., LLC ("L&C") (collectively, the "Marriott Defendants") hereby move the Court *in limine* for an order bifurcating the trial of this action into two trials: (1) a two-phase jury trial, with the first phase regarding liability and compensatory damages as to Plaintiffs' legal claims for relief, and, if necessary, a second phase regarding punitive damages; and (2) a bench trial on Plaintiffs' equitable claim for unjust enrichment and disgorgement of profits; and precluding Plaintiffs and their counsel from referring to or introducing any evidence during the first trial regarding the "unjust profits" allegedly earned by any of the Marriott Defendants.

1

## CERTIFICATE OF CONFERENCE

Pursuant to Local Rule 7.1(a), the Marriott Defendants' counsel conferred with Plaintiffs' counsel before making this motion and made a reasonable and good faith effort to resolve this dispute.  Specifically, on August 15, 2019, the Marriott Defendants' counsel had a telephone conference with Plaintiffs' counsel to discuss the factual and legal bases for this motion.  On August 16, 2019, Plaintiffs' counsel communicated their refusal to agree to the relief sought by the Marriott Defendants.

## FACTUAL BACKGROUND

### Plaintiffs' Claims

1.     Plaintiffs are owners of 1/12 fractional interests in luxury condominium units at The Ritz-Carlton Club, Aspen Highlands, Colorado ("RC Club Aspen").  Each 1/12 fractional ownership interest entitles its owner to four use-weeks per year.  These use-weeks can be spent either at RC Club Aspen in the specific unit for which the owner contracted or at any other resort with which RC Club Aspen is currently affiliated, subject to availability and other restrictions. There are 205 fractional interests out of a total of 876 available fractional interests at issue in this case.

2.     On April 24, 2014, Defendant Aspen Highlands Condominium Association, Inc. (the "Association") executed an Acknowledgement and Joinder to a 2013 Affiliation Agreement, which enabled RC Club Aspen members to voluntarily exchange their use-weeks at RC Club Aspen for exchange points ("MVC Points") with the Marriott Vacation Club Destinations Program (the "MVCD Program" or "MVCD").  That voluntary exchange program with MVCD (the "MVC

Affiliation") was announced to the RC Club Aspen members in an April 28, 2014 newsletter from the Association.

3.     The MVC Affiliation allowed RC Club Aspen members to elect to enroll in the MVCD Program, deposit one or more of their RC Club Aspen use-weeks in the MVCD Program, and receive, in return, MVC Points that could be used to reserve accommodations at various MVC resorts and for other vacation experiences (such as cruises and safaris).  The MVC Affiliation also enabled MVCD Program members with sufficient amounts of MVC Points to access any RC Club Aspen use-weeks that RC Club Aspen members have elected to deposit in the MVCD Program. As announced in a November 20, 2014 letter from L&C (which was responsible for the available exchange programs) to the RC Club Aspen owners, the MVC Affiliation became operational on December 5, 2014, meaning that, as of that date, RC Club Aspen owners could exchange their 2015 weeks for 2015 MVC Points within the MVCD Program, and MVCD Program members could begin using their 2015 MVC Points to reserve nights at RC Club Aspen during 2015 (by the MVCD Program using the 2015 weeks deposited by RC Club Aspen members).

4.     Plaintiffs' damage claims consist of the alleged diminution in value of their fractional ownership interests in RC Club Aspen allegedly caused by the MVC Affiliation. Plaintiff allege that the MVC Affiliation was wrongful as both a breach of fiduciary duty by the Association and certain of the Marriott Defendants (Count I), and a constructive fraud by the Association and certain of the Marriott Defendants (Count II).   Thus, in Count I, Plaintiffs allege that Defendants breached fiduciary duties by including RC Club Aspen in the MVC Affiliation, allowing the MVC Affiliation to take place, and participating in the MVC Affiliation decision. In Count II, Plaintiffs allege that Defendants made misrepresentations in certain disclosures to

Plaintiffs and other RC Aspen owners related to the MVC Affiliation, and they complain about the alleged failure to allow the owners to vote on whether the MVC Affiliation should take place. Counts III (aiding and abetting breach of fiduciary duty and constructive fraud asserted against all Defendants) and IV (civil conspiracy asserted against all Defendants) reiterate the allegations of Counts I and II and are derivative of them.

5.     Plaintiffs' claim for diminution in value damages is supported by their proffered damages expert, R. Maurice Robinson, a hospitality industry consultant and real estate appraiser, in a report dated October 26, 2018, and a revised report dated December 19, 2018. Mr. Robinson calculates the highest compensatory diminution in value damage amount for all Plaintiffs of $28.75 million (and potential prejudgment interest of $12.82 million), and calculates significantly lower amounts ($17-$19 million) based on different assumptions regarding the proper start date for the damages period.[1]

6.     In Count V of the Complaint, Plaintiffs assert a fifth claim against the Marriott Defendants for unjust enrichment, citing their allegedly wrongful conduct in bringing about the inclusion of RC Club Aspen in the MVC Affiliation.  As to this equitable claim, Plaintiffs seek the

---

[1]  Mr. Robinson's December 19, 2019 revised report, which is attached as Exhibit C to the August 19, 2019 Omnibus Declaration of Ian S. Marx ("Marx Decl."), presumes a causal relationship between Defendants' actions and Plaintiffs' alleged damages, based on Plaintiffs' other experts, Jonathan Simon and Chekitan Dev, whose opinions are discussed below.  The Marriott Defendants will present expert testimony demonstrating that Plaintiffs' calculation is grossly inflated by several factors reflecting flaws in the methodology employed by Mr. Robinson, the use of premature "start dates" for the damages period, the failure to use an appropriate set of comparable properties, the failure to account for several factors responsible for the diminution in value of Plaintiffs' fractional interests that were unrelated to the MVC Affiliation, and various mathematical errors. After correcting for these errors, the Marriott Defendants' experts show that Plaintiffs suffered no diminution in value damages.

equitable remedy of a disgorgement of the "unjust profits" that the Marriott Defendants allegedly received as a result of the inclusion of RC Club Aspen in the MVC Affiliation.

7.    The nature and extent of the disgorgement remedy sought by Plaintiffs was one of the subjects of October 26, 2018 and June 7, 2019 reports from Mr. Simon, a financial consultant to the hospitality and vacation-ownership industries.  Mr. Simon states that he was retained by Plaintiffs, *inter alia*, "to calculate the amount of profit that the Marriott Defendants have made from marketing and providing access to the Ritz Aspen property to MVC members and affiliating the Ritz-Aspen (and the Ritz-Carlton Destination Club of which Ritz-Aspen was a part) with MVC. . . ." Expert Report of Jonathan Simon, dated October 26, 2018 (the "Original Simon Report") (Marx. Decl., Ex. A) at ¶ 7.[2]

8.    In forming his opinions, Mr. Simon relied on the October 26, 2018 expert report of Dr. Dev, a professor at Cornell University's School of Hotel Administration who specializes in brand management and various other aspects of marketing.[3]  Dr. Dev finds that the association of the supposedly more prestigious Ritz-Carlton brand with the supposedly less prestigious Marriott brand that resulted from the MVC Affiliation created a "halo effect," which in turn allegedly resulted in increased profits to the Marriott Defendants.  *Id*. at ¶ 16(d).  Mr. Simon then purports to calculate the amount of the profits represented by the halo effect that should be disgorged if Plaintiffs succeed on their unjust enrichment claim, by measuring the changes in prices for MVC

---

[2]  Mr. Simon's June 7, 2019 supplemental report (the "Supplemental Simon Report") is attached as Exhibit 1 to the August 19, 2019 Supplemental Restricted Omnibus Declaration of Ian S. Marx ("Restricted Marx Decl.").

[3]  Dr. Dev's October 26, 2018 report is attached as Exhibit D to the Marx Decl.  Dr. Dev's Supplemental Expert Report dated April 12, 2019, is attached to the Restricted Marx Decl. as Exhibit 3.

Points that MORI charged at various points in time.  *Id*. at ¶ 16(d), (e).

9.      In particular, through an *ad hoc* review of a small subset of communications from MORI that discuss MVCD member access to Ritz-Carlton Destination Club resorts, Mr. Simon identifies purported "halo periods" of allegedly artificially enhanced price increases that he attributes to the MVC Affiliation.  *Id*. at ¶¶ 16(e), 54-63.  Allocating the cumulative effect over several years of these "halo price increases", Mr. Simon originally concluded that the effect of these "halo price increases" accounts for $718.6 million of "unjust profits" realized by the Marriott Defendants, of which he allocated $99.7 million to Plaintiffs for a potential unjust enrichment disgorgement remedy.  *Id*. at ¶ 16(e).  In his supplemental report, Mr. Simon revised this calculation upward to $767.5 million in alleged total "unjust profits" from the "halo price increases," of which $106.4 million is allocated to Plaintiffs for a potential unjust enrichment disgorgement remedy.  Supplemental Simon Report (Ex 1 to Restricted Marx Decl.) at 6-7.[4] (Plaintiffs also seek an award of punitive damages.)

10.      In light of these claims and legal and equitable theories of liability and recovery, the Marriott Defendants propose that the case be bifurcated into a separate jury and subsequent bench trial.  The first, the jury trial would consist of two phases.  The first phase would concern the issues of Defendants' liability for breach of fiduciary duty, constructive fraud, aiding and abetting, and conspiracy, and the amount of any compensatory (*i.e.*, diminution of market value) damages to be awarded to Plaintiffs to the extent that any Defendant is found liable under one or more of these legal claims.  If necessary (*i.e.*, to the extent that one or more Defendants is found

---

[4]  On August 12, 2019, the Marriott Defendants moved to preclude each of these opinions from Mr. Simon and Dr. Dev on *Daubert* grounds.  ECF # 460.  That motion is *sub judice*.

liable with respect to one or more of Plaintiffs' legal claims, and some amount of compensatory damages is awarded), there would then be a second phase of the jury trial regarding Defendants' liability for punitive damages, and if warranted, the amount of any such award.

11.     The second, the bench trial, would concern the Marriott Defendants' liability for Plaintiffs' equitable claim of unjust enrichment, and the amount of any disgorgement of profits to be awarded to Plaintiffs to the extent that any Marriott Defendant is found liable under this equitable claim.  This second trial may take place after further briefing on the availability of any equitable remedy following (and in light of) the jury's verdict and any specific findings made in connection with that verdict.  This determination could be made by the Court after the completion of the jury trial and in light of any jury verdict(s).[5]

## ARGUMENT

12.     District courts may order separate trials in a single action "[f]or convenience, to avoid prejudice, or to expedite and economize." Fed. R. Civ. P. 42(b).  Such "courts have broad discretion in deciding whether to sever issues for trial." *Anaeme v. Diagnostek, Inc.*, 164 F.3d 1275, 1285 (10th Cir. 1999).  "Bifurcation is not an abuse of discretion if such interests favor separation of issues and the issues are clearly separable." *Angelo v. Armstrong World Indus., Inc.*, 11 F.3d 957, 964 (10th Cir. 1993) (affirming bifurcation of issues of liability and damages in trial of asbestos personal injury action).

---

[5] On July 29, 2019, the Marriott Defendants moved for partial summary judgment on Plaintiffs' ability to recover certain types of damages, including disgorgement of profits as an equitable remedy in light of Plaintiffs' legal claims for relief.  ECF #441.  That motion is *sub judice*, and if it were to be granted, then there would be no need for a second trial.  Moreover, even if that motion were unsuccessful, the appropriateness and amount of the equitable remedy of unjust enrichment and disgorgement may need to be deferred until after the jury trial and verdict(s) on liability, compensatory damages and punitive damages (if applicable).

13.     Issues are clearly separable for purposes of Rule 42(b) where the substance of the main concepts of the testimony to be offered in different phases will differ.  *Id*. at 965.  District courts throughout the United States, including this Court, thus frequently exercise this power to sever by bifurcating trials into separate phases, in which issues concerning the availability or the amount of punitive damages are tried separately from issues concerning the defendant's liability for, and the proper measure of, compensatory damages.  *See EEOC v. JBS US, LLC*, 2011 WL 3471080, at *8 (D. Colo. Aug. 8, 2011) (Brimmer, *J.*) (overruling objections to bifurcation of issues of compensatory and punitive damages in trial of employment discrimination action).

14.     This practice is particularly appropriate where, as here, having the same jury charged with deciding the issue of liability and compensatory damages also hear evidence offered in support of a punitive recovery is likely to unduly prejudice the defendant by inflaming the jury or confusing the two issues.  *See, e.g.*, *S.S. v. Leatt Corp.*, 2014 WL 356938, at *1 (N.D. Ohio Jan. 31, 2014) (bifurcating punitive damages at trial of products liability action where "introduction of defendant's wealth, which affects only the punitive damages aspect of the claim, may cause prejudice to the defendant because the jury may improperly consider defendant's wealth in determining liability"); *Chesapeake Appalachia LLC v. Mountain V Oil & Gas Inc.*, 2012 WL 4045729, at *3 (S.D. W. Va. Sept. 13, 2012) (holding that defendant in litigation over mineral rights and alleged wrongful drilling of gas well would "suffer unfair prejudice" from presentation of testimony as to its wealth "if bifurcation of the punitive damages phase of the trial is not permitted"); *EEOC v. Prospect Airport Servs., Inc.*, 2011 WL 6097748, at *1 (D. Nev. Dec. 6, 2011) (bifurcating punitive damages from trial of employment discrimination action alleging sexual harassment in light of "strong likelihood that a jury, attempting to determine liability, would

be unduly influenced by the other acts evidence supporting the claim for punitive damages"); *In re Genetically Modified Rice Litig.*, 2010 WL 5177975, at *1 (E.D. Mo. Dec. 14, 2010) (bifurcating issue of punitive and other exemplary damages from trial in action alleging property damage to crops from food contamination, where certain evidence "could lead jurors to focus on punishing [defendant] for the contamination, rather than compensating the farmers for the contamination's effect on crop prices that is the basis for compensatory damages. It could also lead jurors to confuse the standard for finding liability for negligence with the standard for awarding punitive damages.").

15.     The same concerns about undue prejudice to the Marriott Defendants and jury confusion are present here, and compel the deferral of the issue of punitive damages to a second phase of the jury trial, in the event that the jury returns a verdict for Plaintiffs on liability and finds that there has been some showing of actual damages suffered by Plaintiffs.  In that regard, evidence regarding either the assets and net worth of the Marriott Defendants, or that certain Marriott Defendants have allegedly realized $767 million in "unjust profits" from the MVC Affiliation, has nothing to do with the liability issues in the case (namely, whether Defendants broke a supposed promise to Plaintiffs for a "vote" on the  Affiliation, or whether proceeding with the actual Affiliation was otherwise in violation of a fiduciary duty or constructively fraudulent), or the amount of compensatory damages to which Plaintiffs may be entitled for the diminution in market value of their fractional interests.

16.     As such, allowing the jury to hear such evidence in the first phase of the jury trial could cause them to improperly weigh or be unduly influenced by the Marriott Defendants' net worth or the profits allegedly earned from the MVC Affiliation in determining these liability

issues, and thus unfairly prejudice the Marriott Defendants.  Similarly, the jury could easily become confused as to the relevant standards for finding liability for breach of fiduciary duty or constructive fraud (and their derivate claims) with those for awarding punitive damages.

17. The Court similarly has discretion to bifurcate the proceedings into an initial jury trial on Plaintiffs' legal claims and the issue of money damages (*i.e.*, Counts I through IV of the Complaint and diminution in market value, and if necessary, punitive damages), and a second, bench trial on Plaintiffs' equitable claim for unjust enrichment and equitable remedy (*i.e.*, Count V and a disgorgement of the Marriott Defendants' alleged "unjust profits" from the MVC Affiliation).  District courts throughout the United States have bifurcated trials in precisely this fashion in a variety of matters where the parties have asserted distinct legal and equitable claims, counterclaims, defenses, and theories of recovery.  *See, e.g., Liberty Mut. Fire Ins. Co. v. Woolman,* 913 F.3d 977, 992 (10th Cir. 2019) (insurance coverage action for worker's compensation and employer liability benefits; affirming district court's decision to bifurcate trial by first trying to jury insured's counterclaim for breach of duty to procure insurance policy, followed by bench trial on insurer's declaratory judgment claim on lack of duty of coverage); *New Jersey Dept. of Envtl. Prot. v. Amerada Hess Corp.*, 2018 WL 2317534, at *12 (D.N.J. May 22, 2018) (action by State to recover environmental clean-up costs; statutory and common law claims seeking primary and compensatory restoration damages would be tried to jury, followed by bench trial on claims seeking restitution for past restoration costs and injunctive relief); *Abbott GmbH v. Centocor Ortho Biotech, Inc.*, 870 F. Supp. 2d 206, 227 (D. Mass. 2012) (patent infringement action; invalidity claims would be tried to jury, followed by bench trial, if necessary, on appeal

from interference proceedings conducted before U.S. Patent and Trademark Office).[6]

18.     The Court should adopt a similar approach here.  The factual issues common to Plaintiffs' legal and equitable claims – namely, Defendants' liability for breach of fiduciary duty and constructive fraud (or aiding, abetting or conspiring to achieve such actions) and whether Plaintiffs suffered a loss in the market value of their fractional interests – would need to be tried to the jury as part of the first trial.  *See Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 479 (1962).  The equitable factual issues do not overlap with these issues.  Under Colorado law, an equitable claim for unjust enrichment and disgorgement requires that Plaintiff show (a) the existence of a benefit that was conferred on the Marriott Defendants at Plaintiffs' expense (*i.e.*, whether the Marriott Defendants received unjust profits at Plaintiffs' expense); (b) whether that benefit was retained by the Marriott Defendants; and (c) whether it would be unjust and inequitable under the circumstance for the Marriott Defendants to continue to retain the benefit without commensurate compensation. *Lewis v. Lewis*, 189 P.3d 1134, 1141 (Colo. 2008); *Salzman v. Bachrach*, 996 P.2d 1263, 1265–66 (Colo. 2000); *Cablevision of Breckenridge, Inc. v. Tannhauser Condo. Ass'n*, 649 P.2d 1093 (Colo. 1982).[7]  These issues would be reserved for the second proceeding, *i.e.*, the bench trial.

19.     The issues underlying Plaintiffs' legal claims for breach of fiduciary duty, constructive fraud, aiding and abetting, and conspiracy, and their associated diminution in market value damages, are distinct enough from those underlying Plaintiffs' equitable claim for unjust

---

[6]  The legal claims must be tried before the equitable claims.  *See Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 550 (1990).
[7]  The separate, equitable factual issues arise from the elements of Plaintiffs' distinct claim for unjust enrichment, which is "a judicially-created remedy designed to undo the benefit to one party that comes at the unfair detriment of another" and "is based on principles commonly associated with restitution."  *Lewis v. Lewis*, 189 P.3d at 1141.

enrichment and its associated disgorgement of profits remedy, to merit separate trials. The primary evidence to be offered in support of the equitable portion of the case will involve expert testimony on Plaintiffs' "halo effect" theory, documentation of the prices for MVC Points, testimony regarding the reason for those prices, and any resulting profits to the Marriott Defendants. None of this evidence is in any way relevant to any of Plaintiffs' legal claims, or to whether (and, if so, by how much) the market value of their fractional interests declined as a direct result of the MVC Affiliation (the compensatory damages).

20.     On the other hand, presenting all of this evidence together in a single jury trial would be overwhelming and confusing, and would waste the jury's time, as the determination of whether Plaintiffs are entitled to any equitable relief and the amount of such relief is for the Court in the exercise of its discretion and equity. *See Quarles v. Spess Oil Co.*, 2009 WL 319624, at *1 (10th Cir. Feb. 10, 2009) (affirming district court judgment, in which equitable claim for unjust enrichment was severed before case was submitted to jury, and then resolved by district court through findings of fact and conclusions of law following trial); *Wellons, Inc. v. Eagle Valley Clean Energy, LLC*, 2017 WL 3130930, at *6 (D. Colo. July 24, 2017) (plaintiff's "equitable claim [of unjust enrichment] was not presented to the jury."). Several other federal courts have likewise bifurcated unjust enrichment claims (and other equitable claims where plaintiffs seek remedies similar to those sought here) for later determinations in bench trials. *See, e.g., Combustion Eng'g, Inc. v. Miller Hydro Grp.*, 13 F.3d 437, 440 (1st Cir. 1993) (unjust enrichment and promissory estoppel); *Hanwha Azdel, Inc. v. C & D Zodiac, Inc.*, 2013 WL 3989147, at *1-*2 (W.D. Va. Aug. 2, 2013) (restitution and constructive trust, seeking disgorgement of profits earned by defendant); *G.K. Las Vegas Ltd. P'ship v. Simon Prop. Grp., Inc.*, 2009 WL 10692668, at *3-*4 (D. Nev. Oct.

5, 2009) (rescission, accounting and constructive trust regarding cash distributions alleged to have been wrongfully withheld from plaintiff).

21.     Finally, allowing Plaintiffs to introduce evidence of the alleged "unjust profits" that certain Marriott Defendants allegedly earned as a result of the MVC Affiliation carries with it the additional danger of undue prejudice to the Marriott Defendants.   Indeed, when Plaintiffs' maximum compensatory diminution in value damages are between $17 and $28 million (depending upon the proper "start date") under their theory of the case, and far less under Defendants' calculations, having the jury simultaneously hear evidence that the Marriott Defendants allegedly earned as much as *$767 million* in unjust "halo price profits" would likely be used by Plaintiffs to inflame the jury and prejudice its consideration of the legal claims and compensatory damages.  *See High Tech. Careers v. San Jose Mercury News*, 1995 WL 115480, at *4 (N.D. Cal. Mar. 14, 1995) (bifurcating trial and excluding "supracompetitive profit evidence" from first phase in light of "high" danger of prejudice to defendant, as plaintiff "could have used the evidence of [defendant's] high profits to play on 'David versus Goliath' sympathies"); *see generally Doebler's Pa. Hybrids, Inc. v. Doebler*, 2006 WL 3325607, at *2 (M.D. Pa. Oct. 30, 2006) ("This court has most frequently granted bifurcation in those cases in which the presentation of damages evidence is inordinately disproportionate to the evidence on liability.").

21.   Likewise, evidence as to any alleged "halo price damages" should not be introduced in any jury trial on punitive damages, because it could result in a double recovery by Plaintiffs.  In that regard, there is substantial risk that the jury could consider such evidence in determining punitive damages, when the Court would then consider the same evidence in determining and awarding an equitable remedy of disgorgement for unjust enrichment.  Accordingly, any evidence

of so-called "halo profits" earned by the Marriott Defendants should be precluded from the jury trial and reserved for the Court's consideration of Plaintiffs' unjust enrichment claim. [8]

## **CONCLUSION**

For all the foregoing reasons, the Marriott Defendants respectfully request that the Court enter an order bifurcating the case into two trials, as described above, and precluding Plaintiffs (including their counsel) from referring to, or introducing evidence regarding, any alleged profits earned by any of the Marriott Defendants, during the first trial.

Dated:    August 19, 2019              Respectfully submitted,

By:     _s/ Philip R. Sellinger_
Philip R. Sellinger
Ian S. Marx
GREENBERG TRAURIG, LLP
500 Campus Drive, Suite 400
Florham Park, NJ 07932
Email:  SellingerP@gtlaw.com
          MarxI@gtlaw.com

*Attorneys for Defendants Marriott Vacations Worldwide Corporation, Marriott Ownership Resorts, Inc., The Ritz-Carlton Management Company, LLC, The Cobalt Travel Company, LLC, and The Lion & Crown Travel Co., LLC*

---

[8]  Indeed, the Court would need to assess Plaintiffs' equitable claim for unjust enrichment in light of any jury verdict on their legal claims because "[e]quity may not be used to fashion relief when there is a 'plain, speedy, [and] adequate remedy at law.'" *Harris Grp., Inc. v. Robinson*, 209 P.3d 1188, 1205-1207 (Colo. App. 2009) (quoting *Szaloczi v. John R. Behrmann Revocable Trust*, 90 P.3d 835, 842 (Colo. 2004)).

## CERTIFICATE OF SERVICE

I hereby certify that, on August 19, 2019, a true and accurate copy of the foregoing **MARRIOTT DEFENDANTS' MOTION *IN LIMINE* TO BIFURCATE TRIAL AND TO PRECLUDE REFERENCES TO MARRIOTT DEFENDANTS' PROFITS DURING EARLIER PHASES OF TRIAL** was filed and served with the Clerk of the Court via CM/ECF filing system, which will send notification to the following:

Michael J. Reiser
Law Office of Michael J. Reiser
1475 N Broadway, Suite 300
Walnut Creek, CA 94596
*Counsel for Plaintiffs*

Matthew C. Ferguson
The Matthew C. Ferguson Law Firm, P.C.
119 South Spring, Suite 201
Aspen, Colorado 81611
*Counsel for Plaintiffs*

Tyler R. Meade
The Meade Firm P.C.
1816 Fifth Street
Berkeley, CA 94710
*Counsel for Plaintiffs*

Linda Pham Lam
Michael Schrag
Gibbs Law Group LLP
505 14th Street, Suite 1100
Oakland, CA 94612
*Counsel for Plaintiffs*

*/s/ Jaclyn DeMais*
Jaclyn DeMais