# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT

# DISTRICT OF COLORADO

Civil Action No. 1:16-cv-01301-PAB-GPG

**RCHFU, LLC,** *et al.*

Plaintiffs,

v.

**MARRIOTT VACATIONS WORLDWIDE CORPORATION,** *et al.*

Defendants.

---

# EXPERT REPORT OF JON SIMON

# October 26, 2018

---

## I.      QUALIFICATIONS

1.      During my career, I have held numerous positions in the hospitality and vacation-ownership industry, as well as other industries, including (from earliest to latest):

- Manager of Strategic Planning and Analysis — Del Monte Corporation.

- Manager of Laventhol and Horwath's Real Estate and Hospitality Management Consulting Division for the Southeast United States, Latin America, and Caribbean.

- Senior Partner (Principal) at KPMG.

  - Partner in charge of the Real Estate and Hospitality consulting practice for the Southeast, United States, Latin America, and the Caribbean.

  - National Mergers and Acquisitions Support Partner for the National Real Estate and Hospitality Group (audit, tax and consulting).

  - National Compliance Partner for the Financial Services Unit.

  - Global Practice Leader for the Vacation Ownership Practice.

- Senior Vice President Strategy Officer of Interval International.

- Co-chief Executive Officer of Worldstar Resorts, Starwood Capital's first vacation-ownership/timeshare company.

- Partner and Chief Investment Officer of Destination Capital — A late-stage private-equity company investing in hospitality and marketing companies.

- Managing partner of Chasen Capital Advisors — A boutique consulting and investment-advisory group, specializing in the hospitality and vacation-ownership industry.

- Industry Positions — Served as a member of the board of directors and chair of the Finance Committee for the American Resort Development Association ("ARDA"), the master trade association for the vacation-ownership industry (the "Industry").

2.      I graduated magna cum laude from the University of Florida's School of Finance in the College of Business in 1982 with a degree in quantitative methods for business. I also completed all required course work for a real property appraisal from the American Society of Appraisers. In addition, while a partner at KPMG, I attended an advanced "partner school" on operations and management.

3.      I have given numerous speeches about the traditional hospitality and vacation ownership industries at various conferences and events, including the NYU Hospitality Investment Conference, America's Lodging Investment Summit, Caribbean Lodging Conference, ARDA conferences, and the Shared Ownership Investment Conference. In addition, I have written numerous articles on the vacation ownership industry, including a recent article for Hotel News Network (reprinted in other investor periodicals). Moreover, I was a principal and contributing author on "The Uniform Systems of Accounts for Timeshare" (First Edition) under contract for ARDA, and on "The First Financial Performance Survey of the Timeshare Industry," a survey of timeshare and vacation ownership companies, written under contract for ARDA. A full list of my positions, speaking engagements, and publications is listed on the CV attached as Appendix A.

4.      I have served as an expert and have also supported experts in several legal matters related to the vacation ownership industry and the traditional hospitality industry. Appendix A includes a list of the cases in which I was a designated expert witness over the past five years.

## II.    ASSIGNMENT

5.      I understand that this action was brought by Plaintiffs who are owners of more than 200 deeded 1/12 fractional interests at the Ritz-Carlton Aspen Highlands in Aspen, Colorado (the "Ritz-Aspen"), and is based on allegedly unlawful acts that Plaintiffs claim decimated the value of these fractional interests. The complaint alleges that over the last several years, Defendants, including Defendant Marriott Vacations Worldwide Corporation ("MVW") and its subsidiaries and affiliates, knowingly damaged Plaintiffs and unjustly enriched themselves by violating (or aiding and abetting in, or conspiring to violate) various fiduciary duties owed by certain Defendants to Plaintiffs.[1] At the core of the fiduciary duty (and constructive fraud) claims is the Marriott Defendants' actions in affiliating the Ritz-Aspen with the less exclusive and lower-priced Marriott Vacation Club ("MVC"), and, even before the official affiliation, allowing MVC members to use their MVC points to purchase nights at the Ritz-Aspen on more favorable and less expensive terms than provided to Plaintiffs.[2] I am informed that Plaintiffs intend to prove that the Aspen Highlands Condominium Association (the "Association") aided and abetted the Marriott Defendants and that these acts destroyed the value of Plaintiffs' fractional interests, while allowing the Marriott Defendants to substantially profit from using the Ritz brand and the lure of access to luxury properties to increase revenues from selling MVC points.

6.      I have been retained, through my firm Chasen Capital Advisors, Inc., by Reiser Law, P.C., The Matthew Ferguson Law Firm, P.C., Gibbs Law Group LLP, and The Meade Firm, p.c. (collectively, "Plaintiffs' counsel") to opine on whether Defendants' actions, if proven,

---

[1] *See generally* Sixth Amended Complaint ("Complaint"), Dkt. No. 250.

[2] *See id.*

caused Plaintiffs' property values to diminish. I am not opining on the amount of the diminution in value, but understand that Maurice Robinson, who is under sub-contract with my firm, will offer expert opinions on that topic. My causation opinion is based on my knowledge of and experience in the vacation ownership industry, including the types of conduct that would typically cause the value of fractional interests to decline, and my review of evidence and testimony in this case.

7.      I also understand that Plaintiffs are seeking disgorgement of the amounts the Marriott Defendants were unjustly enriched from any fiduciary breaches (or aiding and abetting or conspiring to breach fiduciary breaches) or other illegalities Plaintiffs prove.[3] Plaintiffs' counsel has retained me to calculate the amount of profit that the Marriott Defendants have made from marketing and providing access to the Ritz Aspen property to MVC members and affiliating the Ritz-Aspen (and the Ritz-Carlton Destination Club of which Ritz-Aspen was a part) with MVC, which I assume for purposes of this opinion to be subject to disgorgement if Plaintiffs prove their breach of fiduciary duty or unjust enrichment claims and/or other claims allowing disgorgement as a remedy.

8.      There is a known effect in the hospitality and vacation ownership industries known as the "halo effect," which refers to the increased profits or brand premium a lesser brand (or unbranded real estate) can earn when it affiliates with a more exclusive brand. My knowledge of the halo effect is based on my knowledge of and experience in the hospitality and vacation ownership industry as well as documents I have reviewed for this engagement. I am also relying, in part, on the expert opinions of Professor Chekitan S. Dev, Ph.D. of the Hotel School at Cornell

---

[3] *See* Complaint at ¶¶ 95, 104, 112, 124.

University. Based on the principles of the halo effect and other well-established finance tenets and tools, I have constructed a model to calculate the amount of profits the Marriott Defendants earned as a result of the affiliation and providing access to nights at the Ritz-Aspen to its MVC points-based customers.

9.      My assignment also included rendering an opinion as to whether allowing MVC members access to Ritz Aspen, at first by opening developer-owned inventory to certain MVC members and then by affiliating the two clubs was a substantial factor in causing diminution in value of Plaintiffs' fractional interests at Ritz-Aspen.  The flip side of the halo effect is the "horn effect," which refers to financial damage to a more exclusively branded property when it affiliates with a lower tier brand and/or allows owners of the lesser brand systematic access to the luxury branded property. I was also asked to consider whether the "horn effect" caused damage to Plaintiffs' Ritz-branded fractional interests.

10.      My firm is being compensated at my hourly rate of $600 for general opinion-related work and $650 per hour for testimony (both trial and depositions) and preparation. This compensation does not depend on any conclusions I reach or the outcome of this matter. In addition, under my supervision, other individuals in my firm have assisted me on this matter and are being compensated for that work.

11.      A list of materials I have reviewed in this matter is attached as Appendix B. I reserve the right to revise my report based on any new documents that become available in this case.

12.     Finally, certain terms used in this opinion are interchangeable. The term "fractionals" is used interchangeably with "private residence clubs."[4] Further, the terms "timeshare" and "vacation ownership" are used interchangeably.

## III.   WHAT PLAINTIFFS REPORTEDLY INTEND TO PROVE

13.     I understand Plaintiffs intend to prove that in the latter half of 2011, the Marriott Defendants, without informing Ritz-Carlton Club members, began providing MVC members (who bought into a lower quality timeshare brand) access to the exclusive Ritz-Aspen, as well as the Ritz Carlton Clubs at Vail, San Francisco, Tahoe and St Thomas.[5] Plaintiffs paid premium prices averaging approximately $260,000 for deeded 1/12 fractional interests at the Ritz-Aspen, with each interest allowing the owner to stay at the club for four weeks per year.[6] Marriott had been running a separate timeshare line, MVC, which catered to individuals who were looking to spend far less money on a vacation ownership.[7] For years, Marriott's MVC line and its RCDC line were separate and distinct from one another.

14.     However, Plaintiffs allege that around 2011, Marriott started taking steps to abandon its Ritz-Carlton line in favor of MVC.[8] I am informed that Plaintiffs intend to show that

---

[4] While some in the industry arbitrarily define a private residence club as one that sells for $1,000 or more per square foot, there is no codified industry standard.

[5] *See generally* Complaint.

[6] Complaint at ¶¶ 3, 6.

[7] The minimum points purchase under the MVC's points program is 1,500 points. When points were introduced in the summer of 2010, they were priced at $9.20, therefore the minimum purchase was (1,500 pts. X $9.20) = $13,800. Even at today's price, which is around $14, the same purchase would only be $21,000 -- far below what a RCDC member was required to spend.

[8] *See, e.g.,* Marriott International, Inc. 2011 Form 10-k at p. 10 ("On September 8, 2011, management approved a plan for our former Timeshare segment to accelerate cash flow through the monetization of certain excess undeveloped land and excess built luxury inventory.").

Marriott saw its MVC line as one that could produce more revenue over time, especially with its transition to selling points instead of weekly intervals.[9] On the other hand, Marriott saw its Ritz-Carlton Destination Club line as an asset that was not producing enough revenue.[10] Thus, Marriott considered two options: to sell its Ritz-Carlton Destination Club line to a new owner, or to combine it with the MVC.[11]

15.     I am informed that Plaintiffs intend to prove that, instead of selling the Ritz-Carlton Destination Club line to a new owner, Marriott decided that it would be more profitable to "reengineer" or merge the club with MVC, and use access to Ritz-Carlton clubs as a lure to sell more MVC points. Thus, in or around July 2011, Marriott began marketing access to certain Ritz-Carlton clubs[12]  as a benefit or enhancement to purchasing MVC points.[13] Plaintiffs allege

---

[9] *See* "Update on access to Ritz-Carlton Club locations via Premier, Premier Plus," RCDC006549-6571 at RCDC006550 ("Consistent with our previously announced business strategy not to expand our Luxury Tier business segment, MVW will leverage our North America Points Program to assist in the sale of the remaining Luxury inventory."); 2/9/12 E-mail from Mary Lynn Clark, RCHC007814-20 ("We have consistently seen that if a Prospective Member can experience The Ritz-Carlton Destination Club, they are more likely to purchase a [MVC] Membership. Ultimately, with all marketing programs, our end goal is to sell Memberships.").

[10] *See* 8/28/2012 MVW Webinar Transcript, RCDC013119-27 at RCDC013120 (Steve Weisz, president and CEO of MVW, stating "Approximately 25% of the inventory in the Ritz Carlton Club system remains unsold and the pace of sales is slow. In this context, additional investment in new inventory is not feasible.").

[11] *See* June 2010 Confidential Information Memorandum by Deutsche Bank, prepared for use by those considering purchasing RCDC business, RCDC075690-75792.

[12] Aspen, Vail, St. Thomas, San Francisco, and Tahoe.

[13] *See, e.g.,* 7/27/2011 "Marriott Vacation Club Insider Bulletin" e-mail, Exh. 29 to Deposition of Richard Hayward (stating "[MVC] Owners with Premier and Premier Plus status can enjoy even more fabulous benefits, including access to Ritz-Carlton Destination Club resorts . . ."); MVC PowerPoint (including 2012 forecast), RCDC Sample51228-51251 at 51240 (discussing strategy to "expand [MVC] Explorer Collection use of RCDC from Premier & Premier Plus Members to increase MVCE points use in RCDC inventory . . .").

that in July 2012, Marriott announced its plan to affiliate the Ritz-Aspen with MVC to Plaintiffs

and other Ritz-Aspen owners.[14] Ritz-Aspen owners vehemently opposed this idea, as they

wanted to maintain their club's exclusivity.[15] Yet against Plaintiffs' and other owners' wishes, in

2014, Marriott officially affiliated the Ritz-Aspen with MVC – thereby granting hundreds of

thousands of MVC members access to the same club for which Plaintiffs had paid premium

prices.[16]

## IV.    SUMMARY OF OPINIONS

16.    A summary of my opinions is as follows:

a.    The fractional industry has undergone challenges over the years, due in large

part to the Great Recession. But I believe, as do other industry experts, that

---

[14] 7/17/2012 Letter from Eveleen Babich to Ritz-Aspen members, RCDC003559-60 ("additional benefits and experiences will be available through a new affiliation with Marriott Vacation Club Destinations").

[15] *See, e.g.,* 8/11/2012 E-mail from Jay Neveloff, AHCA00015576 (opening the Ritz-Aspen to MVC members on a nightly basis "will, I believe, change the character of our club, increase the wear and tear and for all I know this can be the first move on a 'slippery slope.'"); 7/30/2012 E-mail from Jack Zemer, AHC00015528-29 ("I am very disappointed on the direction taken by the company."); 7/19/2012 E-mail from Pat Lattore, RCDC016302-04 ("My greatest fear is that soon the Marriott timeshare owner will flood the Ritz system and use per diem …"); 8/21/2012 e-mail from Jay Neveloff, AHCA00015681 (" … the early responses to our Board's letter which went out on Monday has essentially been unanimous in recognizing and opposing a move towards unifying the Ritz Club and MVW timeshare/points system …"). *See also* "Ritz-Carlton Destination Club Member Study, Detailed Report" by APCO, August 2013 at p. 4 (". . . Members have seen their fractional ownership interest erode in both real and perceived value and they are unhappy with the introduction of Marriott Vacation properties and members into 'their' (Ritz-Carlton) system."); "Member Focus Group Interviews – Ritz-Carlton Destination Club Research Report" by APCO, January 2014 at RCDC073241-42 (members "bought the Ritz-Carlton Destination Club because of the Ritz name and standards . . .") (members "struggle to see how they will benefit" from the MVC affiliation).

[16] *See* April 2014 Letter from Association to Ritz-Aspen members, AHCA00013867-69 (announcing the Ritz-Aspen's inclusion in the Marriott Vacation Club Destinations Exchange Program).

fractionals and private residence clubs remain viable products, especially in high-value real estate markets like Aspen, Colorado. There continues to be additional phases and new fractional projects in Aspen such as Dancing Bear Phase 2 (developed and visited during due diligence), The W Residences (under construction)[17] and the Aspen Club (currently planned).[18] Further, since 2012, the market for fractionals has largely stabilized in terms of national revenues, albeit at lower levels than the market's historical high before the Great Recession.[19]

b.  Based on my experience in the vacation ownership/private residence club industry, it is my opinion that when a corporation provides and markets access to one of its luxury private residence clubs to non-owners at a much lower price of entry than what owners in that private residence club paid, the values of ownership interests in that club significantly decline. My experience and common sense indicate that potential purchasers on the secondary market would be far less willing to pay a high entry price for 28 nights plus annual maintenance fees and taxes to own a fractional unit in a purportedly private residence club if they could gain access to the same club for a fraction of that price, with significantly lower purchase requirements and maintenance fees.

---

[17] *See* http://www.waspenskyresidences.com/#sketches-header (last visited October 25, 2018).

[18] *See* http://aspenclub.com/residences/ (last visited October 25, 2018); *see also* Expert Report of Maurice Robinson at p. 4.

[19] "The Shared-Ownership Resort Real Estate Industry in North America: 2017," Ragatz Associates, April 2017 at p. 40.

c.  Thus, if Plaintiffs prove that the Marriott Defendants (i) began providing MVC members access to the luxury RCDC properties, including Ritz-Aspen, without having to make the economic commitment of a four-week purchase and maintenance fees, beginning with developer-owned inventory in August 2011 and (ii) subsequently affiliated Ritz-Aspen with MVC (thus allowing MVC members permanent  access to the Ritz-Aspen for a fraction of what Plaintiffs and other Ritz-Aspen owners paid), then it is my opinion that this would be a substantial factor in causing the value of Plaintiffs' fractional interests to decline and/or not increase in value in comparison with similar properties without these issues. In addition, any diminution in value is also a result of what is known in this industry as the horn effect, the converse of the halo effect. In other words, the marketing of the two brands together tarnished the Ritz-Aspen's exclusivity and brand reputation, and is also a substantial factor in causing Plaintiffs' fractional interests to have diminished values. To the extent Plaintiffs prove that the Association aided and abetted or conspired with Marriott Defendants in effectuating the merger or affiliation of Ritz Aspen with MVC, then this causation opinion causation applies to the Association.

d.  It is well-accepted in the vacation ownership industry, and it is my opinion that that when a luxury brand is integrated with a lower-end brand, the lower-end brand's value increases due to a so-called halo effect. Based on my own knowledge and experience in this industry, my review of documents and testimony in this action, and the expert opinion of Professor Chekitan S. Dev,

11

it is my opinion that the Marriott Defendants achieved a halo effect on the MVC brand by providing MVC members access to the Ritz-Aspen, a property that was far more exclusive and deluxe than any MVC resort. By providing that access (and making it permanent by the affiliation), the Marriott Defendants were able to increase the price of each MVC point they sold – thus profiting from the actions that Plaintiffs claim were wrongful.

e.   I used my experience in the industry and familiarity with vacation ownership branding and general finance expertise to quantify the profits that the Marriott Defendants have made from the halo effect. Further, the methodology I used to calculate future profits from the halo effect is grounded in the well-accepted enterprise value to adjusted EBITDA approach for valuing the EBITDA streams of vacation ownership companies.[20] Starting from the enterprise value approach, I calculated what MVW made specifically from the portion of its price increases on its MVC points that, based on evidence I reviewed, arose from providing MVC members with access to Ritz-Carlton Destination Clubs (including Ritz clubs in locations other than Aspen).[21] These calculations show that MVW has already profited approximately $248.6 million from affiliating MVC with Ritz-Carlton Destination Clubs from August 2011

---

[20] I base this aspect of my opinion, in part, on my in-depth experience working on the Diamond Resorts acquisition by Apollo Global, and Bluegreen Corporations being taken private by BFC Financial, as well as my familiarity with the Gold Key, Vistana and Hyatt acquisitions by Diamond and ILG, respectively.

[21] I also assessed the amount that MVW earned from the increase in the *volume*, as opposed to price, of MVC points it sold as a result of marketing RCDC to MVC points purchasers, but did not include the resulting amount in the disgorgement calculation.

through the end of 2017. I have calculated the halo effect profit specifically attributable to Plaintiffs' fractional interests at the Ritz-Aspen to be 13.87% of this amount, or approximately $34.48 million. This calculation accounts for increases in the price of MVC points that MVW enjoyed from affiliating MVC with the Ritz-Aspen and marketing access to the Ritz-Aspen to MVC members. Next, using well-accepted finance principles, I then calculated the profits that MVC will continue to make going forward as a result of the co-branding and affiliation. This capitalized amount is $470 million system-wide, of which I attribute $65.19 million to Plaintiffs' fractional interests. Based on these calculations, the total amount MVW earned and will earn from marketing RCDC to MVC points purchasers is $718.6 million. The portion of this amount attributable to Plaintiffs in this action is 13.87% or $99.7 million,[22] the amount I assume to be subject to disgorgement if this remedy is deemed appropriate.[23] Exhibit H lists the disgorgement amount per Plaintiff.

---

[22] I am informed that if the court awards disgorgement, it may add prejudgment interest to the amount of halo profits already earned and that the interest rate it would use would be 8%. In the event that this prejudgment interest is awarded, I have calculated the amount of halo profits earned system wide with interest for the period of August 2011 through year end 2017 to be $348,801,290. Ex. B.  The prorated disgorgement amount with interest would then be 13.87% of this or approximately $48.38 million.  When added to the $65.19 million in capitalized halo effect profits, the total amount of disgorgement would be approximately $113.57 million.

[23] I note that this disgorgement amount is distinct from the diminution in property values Plaintiffs suffered due to the affiliation.

## V. BACKGROUND ON VACATION OWNERSHIP BUSINESS

### A. Marriott International's Entry into the Vacation Ownership Business

17.     In 1984, Marriott International entered the timeshare business by acquiring the Monarch Beach Resort.[24]  Marriott had created a wholly owned subsidiary for its timeshare branch, which it named Marriott Ownership Resorts Incorporated ("MORI").[25] Stephen Weisz, who was a long-time senior operations and branding officer at Marriott, led MORI. This was an opportunity for Marriott to differentiate itself from other timeshare offerings, through things such as the ability to exchange time for Marriott Reward points (the currency within Marriott's frequent traveler program). MORI ended up creating a network of resorts for trading among owners of vacation ownership interests.

18.     In addition to offering the benefit of alternatives for using time, Marriott sought to use its own well-known brand to promote its timeshare operations. Consumers had confidence in Marriott's brand, which would prove to be credible, in an industry that historically suffered from a reputation of predatory practices and material misrepresentations at the point of sale. To counter these notions and cultivate consumer confidence, Marriott introduced the following elements into its timeshare business:

> a. Professional management of vacation ownership properties by a top tier hospitality company;
>
> b. A promise to avoid the devious sales and marketing practices of unbranded timeshare companies;

---

[24] Marriott Vacation Club Brand Milestones, https://www.marriottvacationclub.com/common/cms/mvc/pdfs/news/MVC-Brand-Milestones.pdf (accessed on October 1, 2018).

[25] *Id.*

    c.  The credibility of Marriott's well-recognized brand;

MORI grew rapidly. By 2007, Marriott was earning approximately $1.747 billion in annual revenue from its timeshare segments.[26]

### B. Marriott Purchases the Ritz-Carlton Brand and Launches the Ritz-Carlton Destination Club

    19.    In 1998, Marriott purchased the iconic Ritz-Carlton brand that was based in Atlanta, Georgia.[27] In doing so, Marriott was seeking to place a new crown jewel in its collection of brands and cater to the luxury traveler.

    20.    A year later, in 1999, Marriott entered the world of private residence clubs with the announcement of its Ritz-Carlton Destination Club ("RCDC") line.[28] As Marriott put it, "[t]he Ritz-Carlton Destination Club is an exclusive, luxury tier real estate offering combining the benefits of Second Home Ownership with the legendary, personalized services and amenities of The Ritz-Carlton Hotel Company, L.L.C."[29] Marriott marketed the RCDC line as one with ultimate luxury, world-renowned Ritz-Carlton services and amenities, and as an opportunity to own a second home in a vacation destination. The line was never called a timeshare, but catered to a wealthy audience who had the means to pay for exclusivity in a private residence club at

---

[26] Marriott International's 2007 Annual Report at p. 43, http://www.annualreports.com/HostedData/AnnualReportArchive/m/NASDAQ_MAR_2007.pdf (accessed on October 1, 2018).

[27] History of the Ritz-Carlton Hotel Company, www.ritzcarlton.com/en/about/history (accessed on October 1, 2018).

[28] Company Overview, https://www.myritzcarltonclub.com/en-us/press.jsp (accessed on October 1, 2018).

[29] *Id.*

iconic destinations such as Aspen, Vail, St. Thomas, and Jupiter. Indeed, Marriott touted RCDC as "the world's foremost luxury destination club."[30]

21.     That RCDC was distinct from any timeshare ownership was clear from the prices that owners paid to own an interest in any RCDC. Marriott sold fractional interests in its RCDC properties for hundreds of thousands of dollars per interest – in stark contrast to the $15,000 to $30,000 per interval prices that timeshare owners paid. RCDCs included world-class amenities and services, such as daily maid service, private members-only lounges, top notch concierge services, world class spas, and limousines to shuttle owners around town. In 2001, Marriott International, through its wholly owned subsidiary, now known as Marriott Vacations Worldwide Corporation ("MVW"), a defendant in this action, developed the Ritz-Aspen as a private residence club in Aspen, Colorado. The project was sold in deeded 1/12 fractional interests. Beginning in 2001, hundreds of purchasers paid premium prices, averaging over $200,000, with some selling for over $500,000, for their deeded 1/12 fractional interests at the Ritz-Aspen. Aspen, Colorado.[31]  In my opinion, Aspen is one of the top markets in the U.S., if not the world, for fractional interest products -- based on my personal review of the market and experience with fractional and private residence club products.

---

[30] Confidential Information Memorandum on The Ritz-Carlton Destination Club by Deutsche Bank, RCDC075690-075792.

[31] *See* www.ritzcarltonclub.com/ritz-carlton-real-estate-press/2009/09/THE%20RITZ-CARLTON%20DESTINATION%20CLUB%20CELEBRATES%2010%20YEARS%20IN%20LUXURY%20VACATIONING.shtml (last visited October 25, 2018).

22.     As noted by Mr. Robinson, who is opining on the diminution in value Plaintiffs suffered, sales prices of comparable projects in Aspen generally rose from 2012 through 2018[32] — while Ritz-Aspen sales prices plummeted during this period.[33]

## C. The Great Recession Drove Marriott to Reorganize its Vacation Ownership Business

23.     The fractional industry in the United States experienced its zenith in 2006 through early 2008.[34] However, the sales volume of virtually all sectors of the real estate industry— including fractionals-- plummeted from their peak periods of 2006-2008 during the Great Recession. Sales volumes for fractionals declined from 2008 to 2012, but then began stabilizing in 2013.[35]

## C.  Marriott International's Plan for MORI

24.     In early 2010, Marriott started to consider ways in which it could separate itself from MORI and its RCDC line, given that those business models were at odds with a new corporate strategy of becoming asset-light.

25.     As part of this shift, MORI wanted to move away from its historic model of selling weekly intervals in its vacation ownership properties. Thus, in the summer of 2010, MORI introduced the concept of selling points that purchasers could use to stay at a range of resorts, as opposed to deeded interests in any specific resort. Meanwhile, Marriott continued selling weekly intervals only in select markets.[36]

---

[32] *See generally* Expert Report of Maurice Robinson.

[33] *See id.*

[34] "The Shared-Ownership Resort Real Estate Industry in North America: 2017" by Ragatz Associates at p. 15.

[35] *Id.* at pp. 15-16.

[36] Marriott Vacations Worldwide 2012 Annual Report at p. 5.

26.      Marriott saw its introduction of points or "vacation currency" as an effort to maximize cash flow of the business model and to discontinue luxury private residence clubs.[37] These points were not backed by a direct interest in any underlying real estate, but rather were a use right that was coupled with a beneficial interest in a Florida-based land trust. Hence, the North American Trust (otherwise known as "NATO") came into existence.[38] Points were more flexible than ownership in weekly interests, because they could be sold and used in more discrete units of use time. However, points had to be backed by hard assets (developed inventory). In order for Marriott to create saleable points, MORI had to contribute assets into the NATO trust.

27.      Marriott started selling points using a price chart. The chart shows the number of points that are necessary for staying at any of Marriott's resorts. Certain resorts require more points than others based on a number of factors. NATO was originally a timeshare trust, and held all timeshares, with no fractional access.[39]

28.      Around the same time it was introducing its points-based system, MORI shifted to focusing its sales from new owners to existing owners.[40] Historically, MVW had a lower percentage of sales to existing owners. However, in order to achieve efficiencies in sales and

------

[37] Marriott Vacations Worldwide June 2011 Form 10-12b at p. 69 ("Through the use of our points-based products, we are able to more closely match inventory development with sales pace and reduce inventory levels, thereby improving our cash flows over time.); *see also* 5/24/2012 Corporate Growth Committee memorandum, RCDC070195-7024 at RCDC070195 ("In December 2011 CGC was presented with a strategic plan to transfer the remaining unsold Ritz-Carlton Destination Club ("RCDC") inventory . . . to the NATO Trust, sell the remaining assets through dispositions, and cease all future RCDC specific sales and marketing activities.").

[38] Deposition of Stephen Weisz ("Weisz Depo.") at 159:3-7.

[39] *See id*. at 30:19-31:5 (discussing a point in time when fractional inventory was placed in the NATO trust).

[40] According to MVW's Form 10-K's from 2012-2017, existing owners rose to between 60% to 66% of total sales. "In 2017, approximately 66 percent of our sales of vacation ownership products were to our existing owners." Marriott Vacations Worldwide 2017 Form 10-K at p. 4.

marketing costs, MVW and its predecessor company, MORI, started to target existing owners in order to manage lead flow and sales and marketing expenses. But existing owners already owned intervals when Marriott introduced its points system. Since Marriott needed to focus on selling as many points as it could, it had to get these existing owners to buy more points. In my opinion, its use of access to RCDC resorts by MVCI points owners was the "carrot" to get them to buy more points.

### D.  Marriott International Looks Into Selling Its RCDC Line

29.     In line with MORI's shift towards a points-based structure in its timeshare line, Marriott also wanted to move towards a points-based structure within its luxury RCDC division. By 2010, sales in luxury private residence clubs had substantially slowed down from pre-recession highs. But by December 2011, Marriott had largely abandoned its efforts to sell fractional interests. A May 2012 memo from executives Lee Cunningham and Tony Terry to MVW's Corporate Growth Committee stated, "In December 2011 CGC was presented with a strategic plan to transfer the remaining unsold Ritz-Carlton Destination Club ("RCDC") inventory . . . to the NATO Trust, sell the remaining assets through dispositions, and cease all future RCDC specific sales and marketing activities."[41] This was consistent with what MVW announced in its 2012 Annual Report: "We have significantly scaled back our development of Luxury segment vacation ownership products . . . During 2012 we placed inventory from one of our Luxury properties into the MVCD program, and we intend to place most of our remaining

---

[41] 5/24/2012 Corporate Growth Committee memo on Ritz-Carlton Destination Club Proposed Strategic Plan, RCDC070195-70204 at RCDC070195.

Luxury inventory into the MVCD program. We have repositioned our Luxury sales centers to sell the MVCD points product."[42]

30.      In the fall 2010, Marriott International attempted to sell its RCDC business to a third party – in a marketing offering led by Deutsche Bank.[43] This attempt was widely known within the industry. Based on my attendance at ARDA Annual Conventions and Conferences, it was relatively widespread knowledge that there were a number of interested parties, including Timbers Group, Discovery Land Company, as well as a TPG Capital-affiliated group. Through numerous conversations with others at the fall 2010 ARDA Annual Conference,[44] I learned that there were proposals or letters of intent of approximately $125-150 million for RCDC. Much of the value of the RCDC line came from its luxury brand, which at this point, had been Marriott's "crown jewel" for years. The Deutsche Bank offering highlighted "The Ritz-Carlton Destination Club ("RCDC") or the Business is the world's foremost luxury destination club" and goes on to tout "[a] marketing and sales platform capable of supporting a growing worldwide business."[45] These market representations sit in stark contrast to MVW management's internal desire to shut the RCDC business down.[46]

---

[42] Marriott Vacations Worldwide 2012 Form 10-k at p. 13.

[43] *See* June 2010 Confidential Information Memorandum by Deutsche Bank, prepared for use by those considering purchasing RCDC business, RCDC075690-75792.

[44] The conference was held in November of 2010 at the Fairmont in Washington D.C.

[45] *See* June 2010 Confidential Information Memorandum by Deutsche Bank, prepared for use by those considering purchasing RCDC business, RCDC075690-75792 at RCDC075699.

[46] If Plaintiffs can prove at trial such was true, then the decision not to sell RCDC and combine it with MVCI supports another strategic goal, namely the halo effect.

31. The written record indicates, and I believe it is undisputed, that MVW had no intention of developing the luxury RCDC product line any further. In a Form 10-12b filed for its spinout, MVW strongly signals its intention to abandon the luxury line as early as June 2011[47]

## VI. DISCUSSION OF EXPERT OPINIONS

### A. Diluting Exclusivity Damages a Private Residence Club

32. It is well-accepted in the vacation ownership industry, and it is my opinion that exclusivity, or lack thereof, can have a dramatic effect on property values. Owners in private residence clubs purchase their interests at substantially higher prices than timeshares and are sold on exclusivity and unparalleled luxury. Such owners typically pay in the hundreds of thousands of dollars for the clubs' exclusivity and luxury. These higher prices are grounded in part on the fact that all owners must commit to purchasing the entire fractional interest, in this case 1/12. Owners who pay such high prices for a fractional interest do so with the understanding that only other individuals who paid similar prices for the same fractional period (and, to a limited extent, their renters) would have access to the same property.

33. Branding plays an important role in exclusivity. Those who purchase a fractional interest at a premium price are often relying on the project's luxury branding (such as Ritz-Carlton or St. Regis, two well-known luxury vacation ownership brands). Based on my experience in the industry and interviews with both developers and owners, buyers of these luxury club interests expect that the branding of their club will not be integrated, merged, or

---

[47] MVW's Form 10-12b, June 2011, p. 72 ("Given the continued weakness in the economy, particularly in the luxury real estate market, we have significantly scaled back our development of Luxury segment vacation ownership products. We do not have any Luxury segment projects under construction nor do we have any current plans for new luxury development.").

affiliated with less expensive and exclusive brands or clubs.[48] Such lower-end brands are often owned by the same parent corporation that owns the luxury brand – and those lower-end brands are tailored to different customer bases.

34.     Based on my knowledge and industry experience, the value of interests in a private residence club can drastically decline if the club's exclusivity is destroyed. A corporation can damage a club's exclusivity by allowing a broader group to access the club for a fraction of the price that owners paid to access it. The key is *access*. If the general public can access the same private residence club for a far lower entry price than owners' purchase prices and maintenance fee commitments, then the club has lost substantial exclusivity – and units within the club are substantially more likely to decline in value.

**B. The Marriott Defendants' Conduct Affected Plaintiffs' Property Values**

35.     If Plaintiffs prove that the Marriott Defendants allowed MVC members to access the Ritz-Aspen for a fraction of what Plaintiffs paid for their fractional interests, i.e. without committing to purchasing four weeks and paying annual maintenance fees, it is my opinion that such access, is a substantial factor in causing Plaintiffs' property values to diminish, i.e. be lower that they would have been absent the Marriott Defendants' conduct. That access, which, according to Plaintiffs, began in August 2011 and was made permanent by the 2014 formal affiliation, would be a substantial factor in diminishing the Ritz-Aspen's exclusivity, for which

---

[48] *See also* "Ritz-Carlton Destination Club Member Study, Detailed Report" by APCO, August 2013 at p. 4 (". . . Members have seen their fractional ownership interest erode in both real and perceived value and they are unhappy with the introduction of Marriott Vacation properties and members into 'their' (Ritz-Carlton) system."); "Member Focus Group Interviews – Ritz-Carlton Destination Club Research Report" by APCO, January 2014 at RCDC073241-42 (members "bought the Ritz-Carlton Destination Club because of the Ritz name and standards . . .") (members "struggle to see how they will benefit" from the MVC affiliation).

Plaintiffs paid a premium. Plaintiffs' fractional interests would therefore have reduced resale value, since any MVC member who purchased enough points could now have access to the Ritz-Aspen without having to purchase four weeks or pay the associated annual maintenance fees.[49] To the extent Plaintiffs prove that the Association aided and abetted or conspired with the Marriott Defendants in effectuating the merger or affiliation of the Ritz Aspen with MVC, then this causation opinion applies to the Association.

36.     Jointly marketing RCDC and the MVC and providing access to MVC members would also have caused what is known in the industry as a horn effect on the Ritz-Aspen. When a luxury brand is integrated with a lower-end brand, the luxury brand can become damaged and thus suffer from a horn effect. Here, the joint marketing of the two clubs, as well as allowing MVC members access to Ritz-Aspen and the affiliation between Ritz-Aspen and MVC would have tarnished the Ritz-Aspen's branding and been a substantial factor[50] in causing diminution in the values of Plaintiffs' fractional interests.

---

[49] Association board member Randy Mercer understood the effect of allowing MVC members to access the Ritz-Aspen. As he put it on his board candidacy statement, "I am very concerned about the dilution of value which may occur as a result of this latest effort of MVW. A points-based system faced critical evaluation when it was introduced the first time around, despite the high cost of entry with multiple week purchase requirements." *See* AHCA000000295.

[50] While I recognize that the fractional industry as a whole declined, the key here is that the Ritz-Aspen was compared to other fractional projects (all of which increased from their low-point after the Great Recession) in the same marketplace; and none of which opened their clubs up to traditional timeshare access subsequent to selling fractional interests. *See* Expert Report of Maurice Robinson at p. 10, table 3.

### C.  The Halo Effect

37.     The halo effect, a corollary to the horn effect, is a phenomenon that is well-recognized in the world of branding. Edward Thorndike originally coined it in the 1920's.[51] Put simply, the halo effect occurs when a superior brand has a value-added effect on a lower-end brand. I know from my involvement in the industry that the halo effect was one of the primary reasons why Marriott purchased the Ritz-Carlton brand in 1998; the purchase gave Marriott a new way to lift its entire collection of brands and access new luxury demand segments.

38.     We know, based on the opinion of one of the top hospitality professors in the industry, Cornell's School of Hospitality, Dr. Chekitan Dev, that the halo effect is a strong economic brand phenomena. Dr. Dev has produced numerous articles on the halo effect and other hospitality matters and specifically opined that the halo effect exists in this particular case.[52] Specifically, Dr. Dev states: "this co-branding has benefitted MVC by allowing it to enjoy a halo effect from its association with RCDC."[53] Not only did having this luxury brand allow Marriott to target different market segments, but by jointly marketing the clubs and providing access to the timeshare club it also gave a lifting effect on the MVC brand.

39.     Industry experts estimate that the halo effect adds approximately 20% to 30% in value on properties that are not adorned with any halo. Indeed, in a study titled "Branded Developments: The impact of branding on luxury residential developments in 2012," Knight Frank, a global real estate consulting firm, reached the following conclusions:

---

[51] "The halo effect," The Economist, Oct. 14, 2009 (https://www.economist.com/news/2009/10/14/the-halo-effect) (accessed on October 2, 2018).

[52] *See generally* Expert Report of Dr. Chekitan Dev.

[53] *Id*. at ¶ 4.

a.  Branded developments are priced at a premium over non-branded developments with an average uplift (in pricing) of 31%;

b.  In Puerto Rico, the average uplift from premium brands is around 45%. However, for the Ritz-Carlton Dorado Beach in Puerto Rico, a luxury beachfront resort where the average asking price per interest was 777 pounds sterling per square foot, the average price for non-branded parts of the development was 218 pounds sterling per square foot – resulting in a branding uplift of 250% in purchase price.

c.  As another example, in South Beach, Miami, the premium on a branded residential project was 27% of the purchase price of comparable non-branded projects.[54]

40.    How the halo effect works in practice requires an explanation. For instance, if a luxury condominium building is developed to a certain quality level and could sell unbranded at $1,000,000 per condominium, then the same condominiums could sell for $1,300,000 if they were branded. It then becomes a matter of scale. For a building with 200 units, the halo effect could be worth $60 million in extra revenue with little or no incremental product cost to the developer. If there were 20 such buildings in key markets around the U.S., the halo effect could add up to over $1 billion in additional sales revenue.

41.    Marriott understood brand premiums and the related halo effect as well as anyone in the hospitality industry. Stephen Weisz, MVW's CEO, knew about the halo effect. As he puts

---

[54] "Branded Developments: The impact of branding on luxury residential developments, 2012," by Knight Frank, https://content.knightfrank.com/research/481/documents/en/2012-1106.pdf (accessed on October 2, 2018).

it when discussing the halo effect, "It all depends on how they're linked, how they're positioned in the consumer's mind, et cetera. There are numerous examples where companies go to great pains to not link their various brands."[55] However, MVC did the opposite: it chose to "link" MVC and RCDC, to create more value in MVW.

42.     During its marketing to sell RCDC to third parties, MVW extolled at length all of the value and potential RCDC had.[56] But despite Deutsche Bank's glowing marketing, management noted that the business came with an approximate $11 million annual liability in maintenance fees associated with the unsold inventory.[57] Stephen Weisz knew that by placing the inventory into the NATO trust, he could accomplish two things; (i) off-load the associated maintenance fees of the unsold inventory so that it was spread across 400,000 MVC members,[58] and (ii) he could have a new brand to lure members to buy points and he could provide access to a new luxury tier to traditional timeshare owners who previously lacked access to the Ritz Carlton Clubs. In my opinion, the only way Marriott International would not have executed a third-party sale of RCDC, was if it perceived that RCDC had greater value when packaged with MVC based on its impact on the pricing and volume of MVC points sold, i.e. the co-branding and access to the RCDC resorts by MVC members. The Marriott family and key executives stood to own at least 21% of the spun-out company.[59]

---

[55] Weisz Depo. at 99:12-15.

[56] *See* June 2010 Confidential Information Memorandum by Deutsche Bank, RCDC075690-75792.

[57] 8/28/2012 "Ritz Carlton Club Member Update" webinar by Steve Weisz at RCDC013124.

[58] Weisz Depo. at 81:9-15 ("So we agreed that maybe one of the ways to do this would be to take some of the inventory that we own today, and, in fact, put that into the NATO trust; thereby guaranteeing those maintenance fees were going to continue to be paid . . .").

[59] "Marriott International Announces Plan to Spin Off Timeshare Business and Reports Fourth Quarter 2010 Results," https://www.marriottvacationsworldwide.com/news/2011/01/marriott-

43.     Starting in early 2011, Marriott International was well into its plan to spin out its timeshare business as a new separately traded public company, MVW (i.e., Marriott Vacations Worldwide), which would be independent of Marriott International. Shares of MVW were to be a tax-free dividend to shareholders. This would insulate Marriott International from the risky, capital-intensive business model of fractional interests. The Marriott family was highly incentivized to create value in MVW, as they would collectively own 21% of its shares post spin out.[60]

44.     On February 14, 2011, Marriott International officially announced its plan to spin-off MORI to the public. As part of that announcement, Marriott International noted that it would not be pursuing the sale of RCDC to a third party, but instead would be including it in the newly spun-out company.[61]

45.     However, Marriott had no plans to further develop RCDC.[62] Rather, MVW was going to exit the luxury fractional interest business. In internal Corporate Growth Committee

---

international-announces-plan-to-spin-off-timeshare-business-and-reports-fourth-quarter-2010-results.shtml (accessed on October 2, 2018).

[60] "Marriott International Announces Plan to Spin Off Timeshare Business and Reports Fourth Quarter 2010 Results," https://www.marriottvacationsworldwide.com/news/2011/01/marriott-international-announces-plan-to-spin-off-timeshare-business-and-reports-fourth-quarter-2010-results.shtml (accessed on October 2, 2018).

[61] *See* "Marriott International Announces Plan to Spin Off Timeshare Business and Reports Fourth Quarter 2010 Results," http://www.marriottvacationsworldwide.com/news/2011/01/2-14-2011-Marriott-International-Announces-Plan-To-Spin-Off-Timeshare.pdf (accessed on October 2, 2018).

[62] MVW's Form 10-12b, June 2011, p. 72 contains the following statement: "Given the continued weakness in the economy, particularly in the luxury real estate market, we have significantly scaled back our development of Luxury segment vacation ownership products. We do not have any Luxury segment projects under construction nor do we have any current plans for new luxury development. While we will continue to sell existing Luxury segment vacation ownership products, we also expect to evaluate opportunities for bulk sales of finished inventory and disposition of undeveloped land."

memos, MVW executives discussed their plans to close all the company's sales offices that sold RCDC interests – and in some RCDC locations, to replace those with offices selling Marriott's new points product.[63] MVW made no effort to further develop its RCDC line after the spin-off.

## A. MVW Places Ritz-Carlton Destination Clubs in the Marriott Vacation Club System

46.     Not long after MVW's spin-off, Marriott began internal discussions about its intent for RCDC. In December 2011, MVW discussed taking its unsold RCDC inventory from clubs in San Francisco, Vail, St. Thomas, Lake Tahoe, Jupiter and Aspen and contributing it to the NATO trust.[64]

47.     In a May 24, 2012 memo by MVW's Corporate Growth Committee, MVW outlined its specific intentions with RCDC:

   a.   Converting the existing 105 RCDC Trust owners to the Marriott Vacation Club Destinations ("NATO Trust"), points product or to RCDC Home Fractional Ownership. Estimated cost of executing is $1.5 million including transaction costs and repurchasing RCDC points from an estimated 10% of owners unwilling to convert to NATO;

   b.   Unwinding the RCDC Bleu Florida Land Trust ("RCDC Trust") and transferring the underlying inventory to the NATO Trust.

   c.   Transferring the remaining Ritz Carlton Destination Club ("RCDC") core inventory to the NATO Trust;

---

[63] Corporate Growth Committee memo on "Ritz-Carlton Destination Club Proposed Strategic Plan," RCDC072212-72221 at RCDC072213.

[64] *See* Corporate Growth Committee memo on "Ritz-Carlton Destination Club Proposed Strategic Plan," RCDC072212-72221.

    d.   Selling the remaining assets where possible (bulk disposition); and

    e.   Ceasing all future RCDC specific sales and marketing activities.[65]

48.    In July 2011, MVW informed its MVC members that they could start gaining access to RCDC properties, including the Ritz-Aspen. In an email to its MVC members, Marriott announced an enhancement to its Premier and Premier Plus members, who had a certain number of points. In that e-mail, Marriott specifically marketed access to the Ritz-Aspen, RCDCs in St. Thomas, San Francisco, and Vail to MVC members.[66] For the first time, MVC members could access and stay at RCDC properties by spending far less on points compared to the cost of an RCDC Membership. This access was significantly cheaper than what Plaintiffs and other owners at the Ritz-Aspen paid, since they had to purchase a minimum of four weeks per year for a fractional interest. The MVC member merely had to have enough points for a much smaller amount of time. Further, MVC members could borrow or bank time, thereby significantly leveraging the smaller amount of points required for a stay.[67] Not only that, but the maintenance fees that MVC members were paying were far less than what Plaintiffs had to pay as they were required to pay all maintenance fees associated with their entire interest which were substantially higher than MVCI owners.[68]

49.    MVC really began to heavily advertise the "access" to the RCDC properties in July of 2011. At that time, it was consistently promoting to all MVC members the access to

---

[65] Corporate Growth Committee memo on "Ritz-Carlton Destination Club Proposed Strategic Plan," RCDC072212-72221.

[66] 7/27/2011 E-mail re: "Marriott Vacation Club Insider Bulletin – Your Benefits Keep Getting Better!" Exh. 29 to Hayward Depo.

[67] Marriott Vacations Worldwide 2012 Form 10-k at p. 4; "Marriott Vacation Club Destinations Points Owner Webinar," Exh. 28 to Hayward Depo.

[68] *See id.*

RCDC available to its Premier and Premier Plus members through its Explorer program.[69] Then, by the end of 2011, it created a whole new level of access to RCDC by ordinary (non-Premier) MVC points holders. Specifically, in late 2011, MVW released a points chart to existing MVC members that, for the first time, gave *all* MVC members access to the RCDC in Vail. The chart listed the price of each point, as well as the number of points that would be necessary for a MVC member to stay at the RCDC in Vail.[70] This was the beginning of the first phase of price per point increases connected to the halo effect of allowing MVC members access to RCDC properties.  By doing this, MVW was merging its RCDC line with MVC – and allowing access to RCDC properties to timeshare owners who had paid substantially less than what any RCDC owner paid to own their fractional interest. In other words, MVW was now marketing and providing access to previously exclusive RCDC inventory to MVC timeshare owners. Indeed, MVW had a plan to advertise RCDC access on its MVC sales gallery digital signs, and to send to its sales executives "eight daily 'To The Point' messages … that focus on Premier and Premier Plus status access to Ritz-Carlton Club properties."[71] The actual fulfillment or the number of nights MVC owners stayed in any RCDC resort is of less importance than MVW selling access to RCDCs as a major benefit to buying points. This strategy had an enormous impact on point sales in the MVC system, where tens of millions of points were being sold each year.[72]

---

[69] 7/27/2011 E-mail re: "Marriott Vacation Club Insider Bulletin – Your Benefits Keep Getting Better!" Exh. 29 to Deposition of Richard Hayward.

[70] 2012-2013 Vacation Club Points Charts, RCDC072463-072522 at RCDC072495.

[71] "Update on access to Ritz-Carlton Club locations via Premier, Premier Plus," RCDC006549-6571.

[72] Between 2011 and 2017, MVW's point sales grew from 44 million points to 61 million points while the number of owners remained flat. *See* "MVCD cumulative figures," RCDC072262.

50.     MVW thereafter instituted a series of price increases which would increase its revenue from points sales by hundreds of millions of dollars. As further explained below, MVW began marketing access to RCDCs as a primary benefit of purchasing MVC points.

**B.  MVC's Launching, Marketing, and Pricing of its Points**

51.     In July 2010, Marriott launched its points program and announced a price of $9.20 per point. At that time, Marriott was targeting existing owners and focusing on getting them to purchase points before Marriott raised the price per point for new owners.[73]

52.     Two months later, after MVW was able to gauge its members' acceptance of its new points product and MVW had a chance to market points, MVW increased the price of each point by $0.45, resulting in a new price per point of $9.65.[74]

53.     In December 2010, MVW then implemented a $0.15 per point increase, resulting in a price of $9.80 per point. As my calculations now show, this was in-line with the normal and ordinary price increase ("OPI"), averaging $0.1344,[75] that MVW implemented every 3-6 months during 2010-2017, absent the extraordinary events discussed below.[76]

54.     From July 2011 and into 2013, MVW aggressively marketed access to RCDCs as part of the MVC system.[77] MVW sent out e-mails to the entire MVC membership advertising its

---

[73] Marriott International, 2011 Form 10-K at p. 36 ("Since the MVCD Program was a significant change from our prior approach to the timeshare business, marketing efforts initially focused on existing owners, to encourage participation and purchase of additional product.")

[74] *Id.*

[75] I explain this calculation in Paragraph 66 below.

[76] *Id*.

[77] *See* Moore001189 (produced in *Petrick v. Marriott Vacations Worldwide Corp.*, Case No. CGC 15-545987 in Superior Court of California, County of San Francisco) (showing Ritz-Carlton being advertised in a MVC sales office).

Premier memberships, which MVW claimed would provide access to more RCDC resorts.[78] For instance, MVW sent out an e-mail to MVC members in July 2011 with a point schedule for RCDC resorts, with the headline, "EXCLUSIVELY for our Owners with Premier or Premier PLUS Status."[79] The e-mail went on to list the number of points that would be required to purchase stays during certain weeks at various RCDC resorts, including Aspen.[80]

55.     The following year, August 2012, MVW sent out an announcement in its "Marriott Vacation Club Insider" e-mail that MVC owners with enough points could now stay in an "expanded selection of Ritz-Carlton Club resorts."[81] By the end of 2012, MVW was on a campaign to eventually include all RCDC locations in the MVC system, and to eventually allow more and more MVC members to have access to those locations. In a November 2012 e-mail, a MVC senior manager of business development wrote, "Currently, all RCDC Clubs except Vail can only be booked by Premier and Premier Plus members. My understanding was that once the resorts were seeded in the trust we would move them from the Explorer Collection (luxury Residences) to the MVC Collection . . ."[82]

---

[78] *See, e.g.,* 7/27/2011 "Marriott Vacation Club Insider Bulletin" e-mail, Exh. 29 to Deposition of Richard Hayward (stating "[MVC] Owners with Premier and Premier Plus status can enjoy even more fabulous benefits, including access to Ritz-Carlton Destination Club resorts . . ."); MVC PowerPoint (including 2012 forecast), RCDC Sample51228-51251 at 51240 (discussing strategy to "expand [MVC] Explorer Collection use of RCDC from Premier & Premier Plus Members to increase MVCE points use in RCDC inventory . . ."); 9/3/2012 e-mail from Marriott Vacations Club stating "As of 2012, Marriott/Ritz-Carlton has completely 'redesigned' our ownership usage options and now the seven Ritz-Carlton Club resorts are accessible through the Marriott Vacation Club International Destinations program!!") .

[79] *See* July 26, 2012 E-mail from Henry Troy, AHCA00015533-37.

[80] *Id.*

[81] *See* 8/15/2012 "New Ritz-Carlton Club Options" e-mail, AHCA00015737-39.

[82] 11/16/2012 e-mail from Teresa Andrus to Eveleen Babich, RCDC002561.

56.     Sometime in the late summer or early fall of 2011, MVW created its points chart for the upcoming calendar year. Around the same time, MVW advertised that MVC members could use points for RCDC Vail stays. MVW's decision to give MVC members access to RCDC Vail must have been made before the 2012 points chart launched, since sales associates were all trained on how to use RCDC as a lure for points sales starting in fall 2011.

57.     On November 30, 2011, as MVW was then not only providing RCDC access through its developer-owned inventory, but was allowing MVC members to directly access RCDC Vail through the NATO trust.[83] This allowed all MVC members to access most RCDC properties which was a significant step toward integrating MVC with RCDC.[84] MVW implemented an initial extraordinary price increase of $.72 or 7.05%, resulting in a price of $10.94 per point. This $.72 increase in price per point"[85] represents the largest percentage and dollar increase in price per point since MVW's launch of the system to present day.

58.     In 2013, MVW, through its sales executives, signaled that it planned on expanding the number of RCDC resorts available to MVC members, and advertised that tier of

---

[83] Developer owned inventory is separate and distinct from inventory which is placed in the NATO trust. As a developer, MVW has unsold inventory in numerous resorts including RC Aspen which can be used for marketing or other purposes during the sales process. The NATO trust, on the other hand is where MVW owners buy their points from and which give rise to usage. Vail inventory was contributed to the NATO trust and therefore no longer owned by MVW.

[84] On the surface, it may seem as if only Premier and Premier Elite MVC members could access RCDC properties at this time. However, due to all MVC members' ability to "bank and borrow" points (Marriott Vacations Worldwide 2012 Form 10-k at p. 4), any MVC member could use points from past or future years to have enough points to access a RCDC property. Thus, in practice, RCDC's were open to a large portion MVC members.

[85] MVCD Price History Summary, RCDC072265.

"Luxury Club Residences."[86] In a 2014 "Sales, Marketing and Service Conference Product Update," MVW noted that the "[c]urrent plan [wa]s to add more Ritz-Carlton Destination Club inventory to the MVCD Trust by the end of the year . . ."[87] However, the marketing of access to RCDC properties to MVC members was far more important to the halo and horn effects than the actual implementation of the affiliation. That said, it was the affiliation that allowed MVW to *permanently* market access to the Ritz-Aspen as a benefit of purchasing MVC points. This is because before the affiliation, MVC members were only able to access the Ritz-Aspen through developer-owned inventory. Once that inventory was sold out, MVW would have had no way of allowing MVC members to continue booking stays at the Ritz-Aspen – had the affiliation not taken place.

59.     After reviewing the evidence showing that MVW was actively promoting RCDC access to MVC members from the latter half of 2011 to 2013 during the first halo event which largely relied upon MVC developer owned inventory, I conclude that price increases during this period that were above the OPI[88] were attributable to the specific enhancement of allowing MVC members access to RCDC.[89]

---

[86]  *See* 3/16/2013 e-mail from MVC salesperson to Tyler Oliver, AHCA00000785 and AHCA00000770.

[87] RCDC008062-8079 at RCDC008075.

[88] As explained later in this opinion, our calculation of OPI includes both inflationary components and amounts attributable to other system enhancements such as access to sporting events, addition of cruise line itineraries etc.

[89] MVC did not execute exact on the quarter price increases, but the price increases strongly correlated with the quarter ends or beginnings with several exceptions. *See* MVCD Price History Summary, RCDC072262-65.

60.     However, as mentioned, prior to 2014, MVW had to rely on developer-owned inventory in order to allow MVC members to have access to the Ritz-Aspen. MVW considered transferring that developer-owned inventory into the NATO trust, but MVW was concerned that the club's declaration prohibited such transfer.[90] Therefore, the only way to accomplish permanent "access" for MVC members (after all developer inventory was sold) was to affiliate the Ritz-Aspen with Lion and Crown, the new name for the Ritz-Carlton exchange vehicle.

61.     In an effort to open the system up to capture additional halo effect, affiliation was required. While the announcement of the the affiliation of Aspen to Aspen members occurred in April of 2014, MVC was plagued by technology setbacks and temporarily had their sales associates slow down pushing RCDC affiliation access to MVC members. However, in December of 2014, MVC started pushing RCDC affiliation access as a set up to another series of price per point increases in 2015.

62.     On December 2014, RCDC released a memo to its sales people (among others) that said the following "Beginning Friday, December 5, 2014 Members of The Ritz-Carlton Club, Aspen Highlands, The Ritz-Carlton Club, St. Thomas and The Ritz-Carlton Club, Lake Tahoe will have the ability to exchange through the Marriott Vacation Club Destinations exchange program (MVCD)."[91]

63.     Simultaneously, of course, MVC members had a new pathway to access Ritz Aspen. All of this was planned in conjunction with MVC sales associates to market this access to

---

[90] 5/24/2012 Corporate Growth Committee memo at RCDC072216 ("However, conveying Aspen interests to the NATO Trust poses a risk of further objection along similar lines [i.e. anti-commercialization provisions in the Aspen governing documents].").

[91] "Job Aide – Lion & Crown and MVCD Affiliation – Frequently Asked Questions," RCHC008102-8112 at RCHC008102.

MVC timeshare owners. A July 30, 2014 memo from Dee Dinda to a number of recipients lays the groundwork for the second phase of halo effect price increases. That e-mail indicates that Premier and Premier Plus members would be losing their preferred access to RCDC inventory, since RCDC inventory would soon be open to the entire MVC population. Specifically, it states: "Sales is aware of the new reservation windows. We will need to make them aware of the affiliations, (maybe in their huddles) but since they are not permitted to discuss RCDC inventory until 5/15/15, we need to **create scripting for them to address questions about RCDC inventory being available to MVC owners.**" (Emphasis added).[92] Thus, it is my opinion that MVC executed three more halo price increases in 2015 connected to the affiliation. These included gross increases of \$.24 on March 26th, 2015, \$.18 on June 18th 2015 and \$.26 on September 10th, 2015[93]

### C. Calculating the Financial Benefit the Marriott Defendants Received from the Halo Effect

64.     I now turn to my methodology to use the Net Halo Price Effect to calculate the amount the Marriott Defendants have earned already and will earn in the future as a result of using access to the Ritz Carlton Club to increase the price and volume of MVC points sales. Then, assuming that Plaintiffs prevail on liability on their breach of fiduciary duty or unjust enrichment claims and are entitled to disgorgement, I calculate an appropriate disgorgement amount by apportioning these earnings to Plaintiffs' fractional units.

65.     Based on my analysis of MVW's marketing RCDC access to MVC members (described above), I identified price increases that were attributable in part to the first phase of

---

[92] *See* 7/30/2014 e-mail from Dinda Dee, RCDC073759.

[93] *See* MVCD Price History Summary at RCDC072265.

halo effect: (1) November 30, 2011 increase of $.72, (2) April 2012 increase of $.22 per point, (3) September 2012 increase of $.24 per point, (4) March 2013 increase of $.24 per point, (5) June 2013 increase of $.24 per point for a total of $1.66. The second phase of the halo effect on price per point, which took place in conjunction with the affiliation, includes the increases on March 26th, 2015 of $.24, June 18th, 2015 of $.18 and September 10th, 2015 of $.26 for a total of $.68 before OPI's. As detailed above, these extraordinary price increases tied directly to MVW granting access to RCDCs and to affiliation with RCDCs. In the aggregate, these halo effect price increases sum up to: ($.72 + $.22 + $.24 + $.24 +$ .24+$.24+$.18+$.26) per point sold - or $2.34. From this amount, I subtracted the OPI's totaling $1.08 (8x $.134) corresponding to the 8 halo periods for a Net Halo Price Effect of $1.26.[94]

66.     My first step in calculating disgorgement is to calculate the OPI's. In calculating the OPI's, I measured the average increase for all price-per-point increases that did not include a halo component. Based on this calculation, OPI's averaged $.1344 per price increase period which translates to approximately $.1008 per quarter.[95] OPI's have two components: (1) amounts attributable to inflation; and (2) additional real growth in pricing attributable to increases in demand, incremental system enhancements, and/or other minor program additions which did not follow a major event announcement implicating the halo effect at issue here. Examples of these incremental system enhancements include access to sporting events, concerts, and additional

---

[94] MVCD Price History Summary, RCDC072265.

[95] *See* Exhibit F.

cruise itineraries -- which do not represent major changes to the program in my opinion.[96]

Inflation during the period from August 2011 through first quarter 2018 1.56% per year.[97]

67.     As shown in Exhibit F, gross Halo effect **prior** to subtracting out OPI's was $2.34. OPI's during non-Halo periods averaged $.1344.  Given that there were 8 periods of Halo, the OPI portion would be (8*$.1344) or approximately $1.08. By subtracting the $1.08 from the gross halo increases of $2.34, provides us with a net Halo of $1.26. To put that into context, **total price increases** from August 2011-first quarter 2018 were $3.74. Therefore, for the period of August 2011 when they first started to openly advertise access to RCDC by Premier and Premier Elite MVC members through the Explorer program, until first quarter 2018 (our last year of data provided by Defendants), the halo accounted for 34%. Conversely, 66% of price increases over the same period were attributable to inflation and system enhancements such as sporting event access, cruise line itinerary additions, special events etc. Another way to look at this is the percent of halo compared to average price. The average price over the same period was approximately $12.09. Therefore, as a percent, the halo effect was $1.26/$12.09 or only accounts for 10.4% of the average price for the period from August 2011 through first quarter 2018. In my opinion, and after looking at the Knight Frank study previously cited where the premiums for attaching a luxury brand to an unbranded product was approximately 31% and my observation

---

[96] *See* "Exclusive Premier Plus Benefits at a Glance" (Exh. 24 to Hayward Depo.); "Four Great Ways to Enjoy Your Marriott Vacation Club Ownership" (Exh. 25 to Hayward Depo.); 7/27/2011 Marriott Vacation Club Insider Bulletin e-mail (Exh. 29 to Hayward Depo.).

[97] FRED Graph Observations, Federal Reserve Economic Data, http://fred.stlouis.org, Economic Research Division, Federal Reserve Bank of St. Louis.

about adding brands to properties with no brands or lesser brands, this represents a conservative premium to calculate the halo effect.[98]

68.     We then researched and looked for any other major announcements or improvements in the MVC points program (aside from access to RCDC) during the period of 2011-2014 that could have contributed to the extraordinary price increases. We considered the previously discussed incremental system enhancements to the MVC system that were publicly announced such as access to sporting events, special programs and additional cruise line itineraries. In my opinion, those improvements did not cause the seven extraordinary price increases I identified. Thus, in my opinion, based on evidence I have reviewed to date both produced by Defendants in discovery and through other research of published announcements, 100% of the seven identified extraordinary price increases (total price increases minus OPI's) were attributable to the halo effect. Indeed, those attending MVC sales presentations were overwhelmingly sold access to RCDC as a main benefit of purchasing MVC points.[99] MVW was touting RCDC access as a primary component of its points program to MVC members.[100]

69.     It is important to note, that even though the net halo effect amounted to $1.26 (after deducting OPIs) over the various periods, such amount is a cumulative amount and is

_____

[98] During the course of my 40 years in the hospitality industry and completing hundreds of feasibility studies, and in operations as well, branding plays a major role in uplift of pricing or average daily rates in the hospitality industry.

[99] *See* 8/28/12 E-mail from John Sternfield to Randy Mercer, Exh. 1811 to Gosch Depo. ("I volunteered to take a MVCI presentation (for the free golf) and to get some insight as to how they were 'selling' their points program . . . What I didn't expect was that they were using the Ritz as the primary carrot to get folks to buy more points.")

[100] *See, e.g.,* 7/27/2011 "Marriott Vacation Club Insider Bulletin" e-mail, Exh. 29 to Deposition of Richard Hayward (stating "[MVC] Owners with Premier and Premier Plus status can enjoy even more fabulous benefits, including access to Ritz-Carlton Destination Club resorts . . .").

realized each quarter in part. For instance, 2011 had 1 halo effect price increases, 2012 has 4 halo effect price increases ranging from $.22 to $.24 prior to deduction for OPIs. And 2015 has 3 identified halo effect price increases ranging from $.18-$.26 (also prior to deducting for OPI's) associated with the affiliation. My model adjusts for the gradual realization of the halo effect over time as shown on Exhibit F.

70.     In calculating the halo effect after deducting OPIs, I then deducted associated variable costs from this number to calculate a net halo pricing impact. Given that I took just the incremental portion of the pricing impact, there is no need to subtract COS (cost of sales or product), fixed sales and marketing expenses, corporate overhead and general and administrative costs. Instead, I considered expenses which are attached to any increases of price. Thus, I deducted 19% to account for sales commissions and overrides, royalty fees to Marriott International, other price-related closing costs  and miscellaneous variable general and administrative expenses not passed thorough to the buyer.[101]

71.     However, these halo observations were based on "published" prices, not realized prices. MVC gives owners discounts off of retail prices based on the number of points an owner purchases. The more points, generally the greater the discount. In order to take these discounts into account in my halo analysis, I measured in the MVCD annual points summary actual

---

[101] I use 19% based on my knowledge of commissions and overrides (14%), Marriott International's incremental percentage royalty fee of 2% (Marriott International Inc. Form 8-k for period ending 11/17/11 at p. 7), other miscellaneous general and administrative and closing costs, not passed through to the buyer, which are purely variable in nature of 3%. As part of the due diligence for the subject litigation, I attended a MVC sales presentation (one of many presentations I have attended for timeshare companies) on September 23rd 2018 at MVC's Newport Coast Villas. On a potential acquisition of 3,000 points valued at $41,880 or $13.96 per point (prior to a 15% discount if I bought that day), closing costs were $1,900 or 4.5% that were levied on the purchaser. Thus, in order to be conservative, we allowed for miscellaneous and other seller-paid closing costs not paid by the purchaser of 3% as shown on Exhibit E.

realized price.[102]  I then measured the difference between the actual realized point pricing and the published or retail pricing per point. I then discounted the halo effect price increases to comport with the percentage differences I calculated. *See* Exhibit C.

72.     After accounting for all these factors, I calculate the system-wide halo effect from August 2011 through the end of 2017 to be $248.6 million. *See* Exhibit F.[103]

73.     The next step is to calculate what the Marriott Defendants will continue to earn from the halo effect. In my field, this is known as placing a "terminus" on the analysis. MVW has continued to sell access to the RCDC as a significant benefit of MVC membership as part of the overall sales process of MVC points to first time buyers and existing owners. Thus, the halo effect is embedded into the *price per point* in perpetuity.

74.     The mathematical process in real estate finance to capturing the future benefit is to capitalize the incremental benefit to arrive at the present value of future benefits. While there are many ways to derive a capitalization rate, the industry standard approach to valuing EBITDA streams for the purpose of valuation in the vacation ownership industry is the Enterprise Value to Adjusted EBITDA multiple.[104] In addition to calculating this multiple for the set of MVW and its

---

[102] MVCD Price History Summary (combined realized prices for First Time Buyers and Reloads RCDC072262.

[103] As part of the due diligence for the subject litigation, I attended a MVC sales presentation (one of many presentations I have attended for timeshare companies) on September 23rd 2018 at MVC's Newport Coast Villas. On a potential acquisition of 3,000 points valued at $41,880 or $13.96 per point (prior to a 15% discount if I bought that day), closing costs were $1,900 or 4.5% that were levied on the purchaser. In order to be conservative, we allowed for miscellaneous and other seller paid closing costs not paid by the purchaser of 3% as shown on Exhibit E.

[104] *See* "Corporate Valuations in the Hospitality Business," Lecture Series 6-11, 4th Edition, Professor Chris Droussiotis, MBA, CHE, Fairleigh Dickinson University, International School of Hospitality Management.

most identifiable public company comparable, I looked at historic completed transactions of Hyatt Vacation Ownership, Vistana Experience (previously Starwood Vacation Ownership), Intrawest, Gold Key and Interval Leisure Group's acquisition by MVW, which closed late summer 2018, the most recent indicator of current multiples.

75.     The Enterprise Value ("EV") is a measure of a company's total value, often used as a more comprehensive alternative to equity market capitalization. EV is calculated as the market capitalization plus debt (excluding receivables related debt), minority interest and preferred shares, minus total cash and cash equivalents."[105]  I calculated the EV for Marriott Vacations, Hilton Grand Vacations and Interval Leisure Group for the second quarter 2018 (the last two are identified as direct competitors to MVW).[106]

76.     Where Enterprise Value is the numerator in determining the EV multiple, adjusted EBITDA (or earnings before interest, taxes, depreciation) and amortization is the denominator in calculating the multiple. In the vacation ownership industry, adjusted EBITDA is used as a primary comparative metric. In adjusting EBITDA, non-recurring and non-cash expenses are taken out to get a better proxy for recurring EBITDA.[107]

77.     Based on this analysis, the company-wide EV to Adjusted EBITDA multiples as of 6/30/2018 were: 10.35 for the Hilton Grand Vacations, 12.67 for ILG, and 13.55 for MVC,

---

[105] *See* https://www.investopedia.com/terms/e/enterprisevalue.asp (accessed on October 3, 2018).

[106] Wyndham was excluded. While it has a number of similarities with MVW, it has a significant portion of its business which involves hotel branding contracts. This would have skewed the multiple numbers significantly higher.

[107] In adjusting EBITDA for non-cash and non-recurring items like stock-based compensation, one-time gains or losses and other like items are taken out, to arrive at the industry standard metric of adjusted EBITDA. In addition, we incorporated ASC 606 which relates to revenue recognition from VOI sales as reported in each company's annual or quarterly reports.

with an average multiple of 12.2.[108] Wyndham's as we discussed above was excluded as its multiple was in the very high teens and thus would have biased the numbers to a higher range.

78.     There was one more step to coming to the EV/Adjusted EBITDA multiple. When using company multiples, this is a multiple which is based on **all** of the Company's streams of EBITDA. But not all cash flow streams are equal. Riskier cash flow streams should be capitalized at higher rates which is equivalent to discounting the future cash flow at higher rates to account for attendant risk. It is my opinion, which is widely supported in the industry, that cash flow from management or brand contracts, royalties, membership fees or like recurring streams of cash flow are less risky than VOI sales revenues, which are non-recurring and build from zero each year and have substantially lower margins. As a result, I then applied a 30% reduction to our multiplier to come up with a capitalization rate terminal value as applied to the last full year of halo price, as this is a function embedded into VOI sales. Applying this to our average multiple of 12.19, yielded a 8.53 multiple which was used in capitalizing price halo component.  The capitalization rate is the inverse of the multiple, or in this case 11.72%.

79.     Using this multiple, I calculate that MVW will earn $470 million dollars from capitalized halo price effect based on year end 2017 of net halo impact of $55.09 million

---

[108] Enterprise Value (EV) to Adjusted EBITDA multiple vary from time to time based on a company's market capitalization, preferred stock, minority interests and debt and cash and cash equivalents in the calculation of EV. Enterprise Value were sourced from Ycharts (www.ycharts.com) as of 6/30/2018. Ycharts derives its information from Morningstar and Capital IQ. The exception was for Interval International which had a listed Enterprise Value of $5.18 billion by Gurufocus (www.gurufocus.com/chart/ILG) as of August 31st, 2018 based on a closing share price of $34.13. Given that the transaction was fixed based on both share and cash compensation, the actual closing price was below this number at $4.6-$4.7 billion. For the purposes of calculating the multiple we used $4.7 billion instead of the $5.18 billion for Enterprise Value which provides a more conservative average multiple.

multiplied by the 8.53 multiple; in other words this is the future value of the halo effect across eligible interests in the RCDC system.

80.     I also looked at the price-to-earnings ratio as an alternative capitalization model, but in my opinion, it is not suitable for this purpose. Price-to-earnings ratios are inherently volatile. In MVW's case, the price-to-earnings ratios as measured at the end of the years of 2011 to 2017, ranged from 14.5 to 42 times earnings. In addition, one would have had to calculate earnings related to halo effect, which is inherently subject to certain accounting requirements under Generally Accepted Accounting Principles (GAAP). My goal was to capture the economic effect with as little accounting distortion as possible.

81.     After applying the methodology described above, I concluded that $470 million was related to the capitalization of the halo price effect by capitalizing the 2017 annual amount. When this is added to the $248.6 million in realized halo effect benefits, the total halo price component equals $718.6 million.

82.     Importantly, the above number is a disgorgement figure in total for all the RCDC owners subject to potential disgorgement awards. This amount should be pro-rated in proportion to the number of Plaintiffs' fractional interests in this case.

83.     I then calculated the percentage which should be allocated specifically to Plaintiffs. My analysis concludes that Plaintiffs would be entitled to 13.87% of the total disgorgement, based on the total value of fractional interests owned by Plaintiffs compared to the approximate value owned by all potentially eligible RCDC purchasers. The specifics are included in Exhibit H. I arrived at this number by taking the total eligible RCDC purchasers of fractional interests at St. Thomas, Aspen, San Francisco, Tahoe and Vail. This came to 2,208

total interests whose total purchase price was approximately $437.9 million.[109] I then calculated the cumulative amount of the Plaintiffs' purchase price of $60,723,350 million as a percentage of the total sales for this group of eligible plaintiffs of $437,942,717, which equals 13.87%.

84.　　Based on the above numbers, that would entitle Plaintiffs to ($248.6 million X .1387) = $34.5 million related to halo price effect from 2012-2017; halo price effect capitalized ($470 million X .1387) = $65.2 million for a combined halo price effect of $99.7 million for the Plaintiffs if disgorgement is deemed an appropriate remedy. These amounts are shown in Exhibit A-1.

85.　　Not only did MVW enjoy increased pricing in MVC points from marketing access to RCDC, but it also sold *more* points than it would have sold, absent access to RCDC. This reflects an increase in points volume from the halo effect. When MVC announced that its members would be able to access RCDC properties with enough points, MVC saw an increase in the number of points sold – even though the number of club members remained static.[110] This leads me to conclude that MVC members purchased more points than they did before because of they were given access to RCDC.

86.　　To remain conservative, however, my calculations do not include any profits MVW received from an increase in volume from the halo effect. This analysis is nonetheless germane because it puts in proper context the full extent to which the Marriott Defendants may

---

[109] *See* "RCC Inventory Breakdown," RCDC015509; "Ritz-Carlton Destination Club Inventory Summary as of Period 1, 2012," RCDC019950_NAT. RCDCs at Jupiter and Bachelor Gulch were not included in this calculation because access to these RCDC locations were never marketed to MVC points purchasers. *See, e.g.*, 7/27/2011 "Marriott Vacation Club Insider Bulletin" e-mail, Exh. 29 to Hayward Depo.; Marriott Vacation Club Points Charts (Exhs. 30, 31, 32).

[110] *See* Marriott Vacations Worldwide Form 10-k for 2012 at p. 10; 2013 at p. 2; 2014 at p. 2; 2015 at p. 4; 2016 at p. 11; 2017 at p. 4.

have improperly profited (if Plaintiffs prove their claims) and also underscores the conservative nature of my disgorgement calculation.

Executed this 26ᵀᴴ day of October, 2018

Jon Simon

**Appendix A**
**Curriculum Vitae**

**Jon Robert Simon**
P.O. Box 3863, Manhattan Beach, CA 90266
310-989-6788
jonsimon@chasencapital.com

Experienced finance and investment professional with over 30 years of consulting, operations and investing experience. Mr. Simon is recognized for his work in mergers, acquisitions, deal structuring, asset management, capital formation and restructuring, operations, and finance in the hospitality and shared-ownership industries. Mr. Simon also has detailed experience in private-equity investing for not-real-estate-asset classes. Mr. Simon's broad experience advising and managing hard-asset and service-based companies provides unique tactical and strategic planning capabilities and execution in a variety of business environments.

EDUCATION
Mr. Simon graduated from the University of Florida, Magna Cum Laude, with a degree in Quantitative Methods for Business from the School of Finance in the College of Business and a minor in accounting. Mr. Simon participated in advanced partner programs at KPMG for valuations, quantitative management, professional practice standards, and general operations management.

PROFESSIONAL EXPERIENCE

January 2005 – Present
**Chasen Capital Advisors**
Los Angeles, CA
*Managing Partner*
As Managing Partner, Mr. Simon leads the firm's hospitality and leisure practice and oversees the western U.S. for this boutique investment-advisory and consulting firm. A sample of some of the engagements and transactions Mr. Simon has worked on include:
- Starwood Capital Group / SLS Las Vegas – Working as an "operating partner" led in the initial concept, re-branding and the redevelopment of the SLS Las Vegas. Mr. Simon worked as an integral team member in negotiations with Mesa West, the senior debt holder, on acquiring the senior debt position of approximately $200 million. Mr. Simon created the financial structure to buy out the senior debt to control the entire capital stack and thereafter foreclosing on the equity holders Stockbridge Capital ($500 million) and EB-5 debt ($400 million) in the capital stack. SCG is one of two finalists in the transaction.
- APOLLO Global Real Estate – Working with the hospitality vertical of this major private-equity firm, Mr. Simon was asked to review the company's investment with DiNapoli Capital in the Riviera Hotel in Palm Springs. Major engagement tasks included an evaluation of the Coachella Valley marketplace, a review of the hotel's current operations and the derivation of redevelopment strategies including the marketing and sale of a large

portion of the hotel's existing room inventory to the major Public and Private timeshare companies and the development options related to such a potential sale.

- Bluegreen Corporation vs. Class Action – Mr. Simon acted as lead expert for the defense (Bluegreen Corporation) in a suit alleging that the company was taken private at less than fair consideration to the minority shareholders of this previously public company. Mr. Simon advised legal counsel, valuation counsel and other members of the legal team on all aspects related to the lodging and vacation ownership industry and comparative valuations. Mr. Simon also worked with legal counsel in depositions of Plaintiffs experts and rebuttal of Plaintiff's expert opinion. Plaintiffs eventually entered into a confidential settlement.

- MGM Resorts International – Mr. Simon led a multi-disciplined team of legal counsel, exchange company representatives and administrative and accounting professionals in the assessment of overall corporate strategy and a potential Vacation Ownership Club for the MGM brand. The team looked at the MGM distribution system of hotels throughout Las Vegas and the U.S., its loyalty and affinity club M-Life, and other operating segments in MGM Resorts in assessing the viability of an MGM club and its related potential benefit. From the Club structure we were also retained to look at converting Vdara at City Center to vacation ownership use on a scheduled take-down basis. As the "developers" of the project we would oversee all aspects of VOI sales and marketing, lead flow, while financing and management would be retained by MGM.

- Las Vegas Sands Corporation – As lead partner, Mr. Simon led the team in the restructure, development of the highest and best use and economic forecasts of the stalled $1 billion St. Regis Condominium tower attached to the Venetian and Palazzo Hotels in Las Vegas, Nevada. Major engagement components included advising the board of directors on alternative development strategies, determining market support for various uses and full development and operating projections of the subject project.

- Eden Roc – Miami Beach – Mr. Simon served as lead partner for the ownership group in the assessment of the legal case from a business standpoint, and expert witness in a $250 million lawsuit against Marriott International Corporation. Major engagement tasks included analysis of the acquisition, detailed review of the new development and operations of the hotel under Marriott's management, and determination of legal strategies, supporting documentation and expert opinion in the mediation and litigation.

- Atlantis Resort, the Bahamas – As one of the senior team members, Mr. Simon and the team represented several of the mezzanine debt holders in a legal action against the senior debt holders of this multi-billion-dollar resort located in the Bahamas. Mr. Simon led all aspects of determination of the assets' current and long-term values. The mezzanine debt holders prevailed in litigation against the senior lender in the restructuring of the capital stack.

- Meineke China – As part of a multi-disciplinary team, Mr. Simon was the lead partner on the establishment, organization, and development of the business plans (both tactical and long term strategic) of Meineke China, an automobile servicing and body repair company. The company was conceived to be established as two separate entities of a real estate and operating company. Major engagement tasks included assessing the potential real estate and funding needs required to establish Meineke service centers throughout the Peoples

Republic of China, a two-million-square-foot distribution center, 400-room hotel, and one million square feet of office space in Meishan and Chengdu, China.

- Chicago Commercial Hotel – As part of the Arcturus Group team, Mr. Simon was actively involved in oversight of the property's management company on behalf of a new owner who stepped into the "ownership" role from the foreclosure of a mezzanine debt position.

- Paulson Cos/CNL – Along with Warnick and Company, Mr. Simon participated on the evaluation of one of the key 5-star hotels in the multi-billion-dollar bankruptcy of the CNL portfolio from Morgan Stanley. Mr. Simon was lead advisor on the restructuring and change of governance of the Arizona Biltmore's Condominium Rental Pool Operations.

- Maritz Wolff & Co. / Broadreach Capital Partners – In conjunction with REH Capital Mr. Simon served as a support partner advising owner's counsel on a variety of business issues including all aspects of operations, alleged financial mismanagement and violations of its fiduciary obligations by Four Seasons Hotel and Resorts to the owners of the Four Season's Aviara Resort located in Carlsbad, CA. Advisory assignment included review of all resort components, books, contracts and records, including, tennis, golf, vacation ownership hotel, F&B departments. Contributions led to the successful negotiated termination to Four Season's management contract.

- Tamarack Ski Resort – Working as a co-lead on this $500 million complex commercial real estate restructure/bankruptcy, with Links Realty Advisors, Mr. Simon's team was selected by the borrower, unsecured creditors, and secured lenders to assume the role of Chief Restructuring Officer(s) / Chief Operating Officer and responsible party for the entity's bankruptcy. Proposed tasks included coordinating all resort budgets, overseeing limited resort operations, overseeing the bankruptcy and positioning the subject property for sale.

- Capri Capital Partners Co-lead partner working with Links Realty Advisors advising an institutional fund manager regarding asset valuation and potential strategies for maximizing the value of its $40 million mezzanine investment in their Four Season's resort asset located in the Southwestern United States. Business tasks involved advising on the strategic benefits and risks of a UCC Foreclosure, designing short-term tactical take-over plans for operation of the resort, and performing financial and operational reporting.

- Inter-investment Group Asia – Co-lead advisor on the planned establishment of a $165 million China Real Estate Opportunity Fund specializing in commercial real estate and hospitality assets in secondary provinces throughout China. Specific tasks included negotiating management contracts for two five-star hotels with hotel operators, solicitation and structuring of preferred equity investments, senior debt facilities and reorganization of the operations platform. Successful solicitation and negotiation of three term sheets from major hedge funds and investment banks.

May 2001 – December 2004
**Destination Capital**
Los Angeles, CA
*Principal and Chief Investment Officer*

- One of nine principals in a start-up Private Equity/Venture Capital Fund concentrating on investments in the leisure, lifestyle, marketing, and media space.

- In first full year of operations, originated, structured and closed on $150 million in transactions, in service-based companies.

- As Chief Investment Officer, acted as the lead partner in virtually all aspects of negotiations, structuring, financing and execution.

- Additional responsibilities included investment targeting, presentations to investment committee, strategic areas of investment focus and presentation to investors.

- Served as a special advisor to the board of directors of Panoramic Communications, a diversified marketing and communications solutions company, on all aspects of the Company's mergers and acquisitions, disposition of business units, financial and strategic planning.

1998 – 2004
**WorldStar Resorts, LLC**
Los Angeles, CA
*President and Co-Chief Executive Officer*

- Senior officer of this vacation-ownership company reporting to the Board of Managers, of this Starwood Capital subsidiary.

- Responsible for all aspects of the Company's business with special oversight in the areas of strategic planning, acquisition, deal structuring, and financing.

- Took company from a complete startup to the acquisition and operations of a 150 person, $75+ million (revenue) vacation-ownership company based in Las Vegas, Nevada.

- Solicited and creatively structured millions of dollars in non-shareholder capital contributions from investors.

- Successfully merged operational aspects of the Company into an existing high-end fractional-and-shared-ownership resort-development company.

1986 – 1998
**KPMG Peat Marwick, LLP**
Miami, FL
*Senior Partner – Management Consulting*

- Partner/Principal in Charge of the firm's Southeastern United States, Latin American and Caribbean Real Estate and Hospitality Consulting Practice.

- National support partner of the mergers and acquisitions, financial structuring, valuations, feasibility and strategic repositioning practices.

- Served as the National Compliance Partner for the Real Estate and Hospitality Consulting national practice.

- Some of the larger transactions in which a co-leadership role was held:

  - Westin Hotels and Resorts acquisition by Aoki Corporation.

  - Arvida/JMB Partners L.P. II – Public Real Estate Syndication.

- Created the first dedicated consulting unit for the Big 4 accounting firms in the vacation-ownership industry. Served as the unit's Global Practice Leader. Senior partner on the following select assignments;

  - Chief Strategist and consultant for Promus Hotels and Resorts strategic plan for entering the vacation-ownership industry.

  - Lead consultant in the conceptualization and development planning for the Four Seasons inaugural vacation-ownership program at the Four Seasons Aviara resort.

  - Represented Morgan Stanley Realty's due-diligence team in its acquisition bid for Shell Vacation Resorts, one of the country's largest independent vacation-ownership developers.

  - Created the first "State of the Industry" metrics report for the American Resort Development Association.

  - Led in the creation of first Uniform Systems of Accounts for Vacation Ownership; served on the board of directors for ARDA, and chaired the finance committee.

  - Authored KPMG's Hotel Feasibility Manual for its consulting division.

- Along with one co-partner, grew the department from a small regional practice to 14 management consultants and approximately $5.0 million in annual billings.

## ORGANIZATIONS

American Resort Development Association (Previously Board of Directors and Chair of the Finance Committee); Urban Land Institute; Founder and Young President of Mt. Sinai Hospital in Miami Beach, FL.; Leadership Miami recognizing outstanding executives under 35, American Hotel and Motel Association, and was elected to the Society of Industry Leaders (Real Estate and Hospitality). In 2014, Mr. Simon was elected to membership in the International Society of Hospitality Consultants, a prestigious group of the top hospitality consultants in the world. Inclusion is by invitation only.

## ARTICLES AND SPEECHES ON THE HOSPITALITY AND VACATION OWNERSHIP INDUSTRIES

2017 – "Why the Major Hotel Brands Divesting Their Vacation Ownership Divisions" – written for ISHC and published in the April issue of Hotel News Network.

2014-2017 – Guest Lecturer at University of Southern California's Gould School of Law – "Marketing and Sales Functions of Vacation Ownership and Synergies with Conventional Hotel Operations."

2017 – "Asset Light and Capital Light Strategies for the Vacation Ownership Industry", written for International Society of Hospitality Consultants for Hotel News Network.

2015 – "Synergies of Vacation Ownership and Traditional Hotel Development and Operations" – "Speech at the Shared Ownership Investment Conference."

Mr. Simon served as one of the key speakers in a shared ownership symposium hosted by Jeffer Mangles Butler & Mitchell and Interval International Leisure Group.

2013 – "Transforming to an Asset Light Strategy for the Vacation Ownership Industry" speech in the Shared Ownership Investment Conference - General Session panelist.

2011 – "Vacation Ownership Re-emerges after the Great Recession"

Jon Simon – Managing Partner Chasen Capital Advisors, Chris Ferrero, Senior Associate, Arcturus Group, published in Institutional Investor.

1998 – Hospitality Operations and Managing the Management Company – Mr. Simon lectured at the general session of the Caribbean Hotel and Motel Association's annual convention as the Partner in Charge of KPMG's Real Estate and Hospitality Consulting for the southeast United States and the Caribbean.

1996 – Uniform Systems of Accounts for Vacation Ownership – 1st Edition

Done under contract for the American Resort Development Association by KPMG – Co-Lead Partner overseeing preparation of the publication.

1996 – United States Vacation Ownership Study – State of the U.S. Industry

Done under contract for the American Resort Development Association by KPMG – Lead Partner in preparing the first comprehensive statistical analysis of the U.S. vacation-ownership industry.


### EXPERT WITNESS ENGAGEMENTS - LAST 5 YEARS

Diamond Resorts vs. Select Plaintiffs, Appraisal Action Delaware Chancery Court 2016-2017. Render Expert Opinion on Behalf of Defendants (Diamond Resorts), No Testimony, Case No. 12759-VCMR

**BLUEGREEN CORPORATION SHAREHOLDER LITIGATION -** CASE NO. 502011CA018111, TESTIMONY IN DEPOSITION, EXPERT REPORT AND REBUTTAL REPORT 2015 ON BEHALF OF BLUEGREEN CORPORATION

Eden Roc LLLP v. Marriott International Inc., et al., No. 651027/2012, N.Y. Sup., App. Div., 1st Dept.). – Expert Report and Mediation Expert on behalf of Plaintiffs, Eden Roc.

## Appendix B
## List of Documents Reviewed

### Academic Articles

- Commercial Investment Real Estate, CCIM Institute, Cap Rate Calculations, How do Investors Determine ROI in an Unsteady Market, Eric B. Garfield, MAI, MRICS.

### Bates Numbered Documents

- RCDC Sample11263
- RCDC015560
- RCDC Sample51228
- RCDC016037
- RCDC Sample28072
- RCDC Sample28072
- RCDC008528
- RCDC009844
- RCDC003557
- AHCA00000001
- RCDC003559
- RCDC003561
- RCDC001778
- RCDC001781
- RCDC016302
- AHCA00000007
- RCDC068289-68338
- AHCA00000012
- AHCA00000015
- AHCA00000019
- RCDC Sample00841
- AHCA00000022
- AHCA00000024
- RCDC005784
- AHCA00000027
- AHCA00000031
- AHCA00015525
- AHCA00015526
- AHCA00000042
- AHCA00015530
- AHCA00000045
- RCDC006614
- AHCA00000056
- AHCA00000058
- AHCA00015544
- AHCA00015553
- AHCA00000061
- AHCA00015576
- RCDC009054
- AHCA00015581
- RCDC016389
- AHCA00015737
- AHCA00015582
- AHCA00000073
- AHCA00015585
- AHCA00013875
- AHCA00015591
- AHCA00015620
- AHCA00015655
- AHCA00000081

- AHCA00015668
- AHCA00015678
- AHCA00015633
- AHCA00015642
- AHCA00015650
- AHCA00015658
- AHCA00015660
- AHCA00015666
- AHCA00015670
- AHCA00015674
- AHCA00015795
- AHCA00015681
- AHCA00015859
- AHCA00015731
- AHCA00000082
- AHCA00002550
- AHCA00015772
- AHCA00015774
- AHCA00015791
- AHCA00015788
- RCDC002657
- AHCA00015774
- RCDC015762
- AHCA00015778
- RCDC013180
- RCDC007247
- AHCA00000084
- AHCA00015880
- RCDC006537
- RCDC013119
- AHCA00000086
- AHCA00015866
- RCDC007332

- RCDC013128
- RCDC015918
- RCDC Sample53237
- RCDC007335
- AHCA00015897
- RCDC013131
- AHCA00015937
- RCDC005698
- RCDC013134
- AHCA00000087
- AHCA00015938
- AHCA00016031
- AHCA00011526
- AHCA00015135
- AHCA00015176
- AHCA00016051
- AHCA00016050
- AHCA00015042
- AHCA00010789
- AHCA00010791
- AHCA00010792
- AHCA00000291
- AHCA00000295
- AHCA00000293
- AHCA00003728
- RCDC015509
- AHCA00010910
- AHCA00010911
- AHCA00000328
- AHCA00010228
- RCDC003227
- AHCA00011411
- AHCA00015047

- AHCA00011098
- AHCA00015038
- AHCA00011199
- RCDC009856
- AHCA00015046
- AHCA00011431
- AHCA00011435
- RCDC003112
- RCDC015924
- AHCA00012037
- AHCA00012037
- AHCA00012040
- AHCA00011131
- AHCA00011452
- AHCA00010212
- AHCA00011172
- AHCA00011126
- AHCA00011128
- AHCA00011153
- AHCA00011166
- AHCA00011172
- AHCA00011180
- AHCA00012149
- AHCA00012958
- AHCA00012978
- AHCA00012964
- AHCA00011215
- AHCA00011221
- AHCA00011215
- RCDC002561
- AHCA00010226
- AHCA00000607
- AHCA00011488

- AHCA00011540
- AHCA00011501
- AHCA00011529
- AHCA00000611
- AHCA00011225
- AHCA00012115
- AHCA00015093
- AHCA00011235
- AHCA00011576
- RCDC006030
- RCDC016283
- RCDC016279
- RCDC016281
- RCDC016279
- RCDC016283
- RCDC015513
- AHCA00000655
- AHCA00011619
- AHCA00015001
- RCDC003295
- AHCA00011602
- AHCA00011599
- AHCA00010211
- AHCA00000660
- RCDC009063
- AHCA00003934
- AHCA00003738
- RCDC006074
- AHCA00012109
- AHCA00000675
- RCDC008361
- RCDC009091
- AHCA00000676

- AHCA00000677
- AHCA00003720
- RCDC016081
- AHCA00000690
- AHCA00000696
- AHCA00011757
- RC 003560
- RCDC005686
- AHCA00000785
- RCDC003193
- RCDC003193
- AHCA00010490
- AHCA00010572
- AHCA00010490
- AHCA00011872
- AHCA00010554
- AHCA00000895
- RCDC Sample55039
- AHCA00000807
- AHCA00013519
- AHCA00015433
- AHCA00015447
- AHCA00015436
- AHCA00015435
- RCDC004407
- RCDC016492
- RCDC003563
- AHCA00010621
- AHCA00010622
- AHCA00012081
- AHCA00000823
- RCDC002210
- RCDC005908
- RCDC005909
- RCDC005910
- AHCA00012881
- AHCA00012889
- AHCA00004006
- RCDC002212
- RCDC005913
- RCDC009737
- RCDC013458
- RCDC009916
- RCDC004731
- RCDC004678
- RCDC008301
- RCDC004398
- RCDC001998
- RCDC016492
- RCDC003196
- RCDC003201
- RCDC003196
- RCDC003200
- RCDC003196
- RCDC002216
- RCDC006109
- RCDC002623
- MORROW000211
- RCDC002620
- RCDC002622
- RCDC006131
- RCDC005708
- RCDC005708
- AHCA00012207
- AHCA00015390
- AHCA00015389

- AHCA00009874
- RCDC002352
- AHCA00009740
- AHCA00010628
- AHCA00010641
- AHCA00010651
- AHCA00011848
- AHCA00014916
- AHCA00009886
- AHCA00009778
- AHCA00009773
- AHCA00014915
- AHCA00000875
- AHCA00009864
- AHCA00009874
- AHCA00009906
- AHCA00013363
- AHCA00013375
- AHCA00013386
- AHCA00013391
- AHCA00013352
- AHCA00013352
- AHCA00000876
- AHCA00009916
- AHCA00009933
- AHCA00009911
- AHCA00013513
- AHCA00021095
- AHCA00013510
- AHCA00012107
- AHCA00012109
- RCDC005694
- RCDC005693

- RCDC Sample52479
- RCDC005712
- AHCA00013396
- AHCA00000892
- AHCA00009968
- AHCA00009977
- AHCA00012353
- AHCA00012354
- AHCA00000917
- AHCA00009985
- AHCA00012356
- AHCA00012357
- AHCA00000919
- RCDC015965
- RCDC010180
- AHCA00012389
- RCDC004714
- AHCA00012402
- AHCA00012416
- AHCA00012402
- RCDC007349
- RCDC005037
- AHCA00028764
- RCDC001534
- RCDC005916
- AHCA00013402
- AHCA00003731
- AHCA00013412
- AHCA00003719
- RCDC005927
- RCDC005925
- RCDC005923
- RCDC005920

- RCDC005929
- RCDC005927
- AHCA00003717
- RCDC005935
- AHCA00010666
- AHCA00012433
- RCDC012809
- RCDC005716
- RCDC006098
- RCDC004748
- AHCA00013473
- AHCA00011865
- AHCA00012021
- RCDC005033
- RCDC005031
- RCDC006101
- RCDC005721
- APCO WORLDWIDE003496
- RCDC004694
- RCDC001988
- RCDC004694
- RCDC004697
- RCDC010759
- RCDC010762
- RCDC004697
- AHCA00012431
- AHCA00012433
- AHCA00012435
- AHCA00012440
- AHCA00001085
- AHCA00012442
- AHCA00012445
- AHCA00012447
- AHCA00012449
- AHCA00012454
- AHCA00012461
- AHCA00012459
- AHCA00004079
- RCDC005727
- AHCA00012457
- RCDC000271
- AHCA00012473
- AHCA00012476
- AHCA00012478
- AHCA00012480
- AHCA00012481
- AHCA00013870
- RCDC003229
- AHCA00012498
- RCDC006493
- RCDC006165
- AHCA00008792
- RCDC006052
- RCDC005733
- RCDC009718
- RCDC005936
- RCDC006148
- RCDC005955
- RCDC009689
- AHCA00013482
- AHCA00013491
- RCDC Sample26412
- RCDC067469-67520
- AHCA00001357
- AHCA00013639
- RCDC002894

- AHCA00004805
- RCDC005008
- RCDC012647
- RCDC012649
- CUSHMAN II 000603
- RCDC006104
- RCDC002412
- RCDC007490
- AHCA00012862
- RCDC000888
- RC 003818
- AHCA00012828
- AHCA00012834
- MORROW000333
- RCDC006093
- MORROW000332
- MORROW000331
- AHCA00012838
- AHCA00012839
- AHCA00012837
- RCDC009724
- AHCA00012873
- RCDC007487
- AHCA00012864
- AHCA00002628
- AHCA00012837
- AHCA00013589
- RCDC007487
- MORROW000324
- MORROW000322
- MORROW000325
- RCDC006503
- RCDC007351
- RCDC013018
- MORROW000322
- RCDC016315
- MORROW000327
- MORROW000328
- MORROW000329
- RCDC005857
- RCDC005844
- MORROW000330
- RCDC006097
- RCDC006096
- RCDC005755
- RCDC013569
- RCDC003574
- RCDC003571
- MORROW000320
- AHCA00008010
- MORROW000321
- AHCA00004406
- MORROW000319
- MORROW000219
- RCDC006094
- RCDC006046
- RCDC003580
- RCDC005745
- RCDC006038
- APCO WORLDWIDE000560
- AHCA00008005
- AHCA00008612
- AHCA00014702
- RCDC016554
- AHCA00024759
- AHCA00005255

- RCDC015432
- AHCA00008673
- AHCA00008666
- RCDC017102
- RCDC005897
- AHCA00014619
- RCDC004712
- RCDC003601
- RCDC003595
- AHCA00008821
- RCDC006113
- AHCA00014676
- AHCA00014679
- AHCA00014684
- AHCA00014739
- AHCA00014740
- AHCA00014748
- AHCA00014768
- AHCA00014775
- AHCA00014784
- AHCA00008930
- AHCA00014787
- AHCA014789
- AHCA00014831
- AHCA00008949
- AHCA00009159
- AHCA00014877
- AHCA00014879
- AHCA00014898
- AHCA00001761
- AHCA00009184
- AHCA00009192
- AHCA00013867

- AHCA00017951
- AHCA00014858
- AHCA00009227
- AHCA00007956
- AHCA00009623
- AHCA00009594
- AHCA00009608
- AHCA00009604
- RCDC008545
- RCDC008541
- RCDC005029
- RCDC006150
- RCDC013241
- RCDC004671
- AHCA00017810
- RCDC005786
- AHCA00003981
- RCDC009096
- RCDC009092
- RCDC010316
- RCDC005829
- RCDC002670
- RCDC009108
- AHCA00004608
- AHCA00004403
- AHCA00007191
- AHCA00008034
- AHCA00008037
- RCDC003431
- AHCA00002092
- AHCA00007974
- AHCA00007979
- RCDC013523

- AHCA00004610
- RCDC003259
- RCDC005773
- RCDC009558
- AHCA00004617
- RCDC009637
- RCDC009573
- AHCA00004633
- RCDC009568
- RCDC002665
- RCDC016344
- RCDC009630
- RCDC010176
- RCDC003315
- RCDC010148
- RCDC015545
- AHCA00008385
- RCDC000808
- AHCA00008530
- RCDC013507
- RCDC013509
- RCDC013507
- RCDC006153
- RCDC013533
- RCDC013535
- AHCA00008589
- AHCA00008602
- RCDC002853
- AHCA00004747
- AHCA00013668
- RCDC019869
- RCDC005778
- RCDC000177

- RCDC006484
- RCDC006484
- RCDC007723
- RCDC003426
- RCDC000167
- RCDC002845
- RCDC002849
- RCDC002669
- RCDC016305
- RCDC000829
- RCDC015948
- RCDC002880
- RCDC013533
- RCDC003434
- RCDC020611
- RCDC013505
- RCDC013538
- RCDC013516
- RCDC002901
- RCDC005041
- RCDC017084
- RCDC013546
- RCDC013605
- RCDC013605
- RCDC003406
- RCDC003406
- RCDC003406
- RCDC002825
- RCDC022023
- RCDC000604
- RCDC016035
- RCDC016581
- RCDC016583

- RCDC016584
- RCDC016585
- RCDC016588
- RCDC016592
- RCDC004726
- RCDC017084
- AHCA00025538
- RCDC016581
- RCDC016593
- RCDC016593
- RCDC021485
- RCDC002774
- RCDC002781
- RCHC000501
- AHCA00026081
- AHCA00026081
- AHCA00026152
- AHCA00021097
- AHCA00021246
- AHCA00021243
- RCDC006507
- RCDC009833
- AHCA00003505
- AHCA00013696
- RCDC Sample52506
- RCDC009562
- RCDC Sample19938
- RCDC Sample11529
- RCDC006532
- RCDC Sample50280
- AHCA00021130
- AHCA00021344
- AHCA00021368

- AHCA00021400
- AHCA00021428
- AHCA00021516
- AHCA00021576
- AHCA00021657
- RCDC064733
- RCDC064736
- RCDC064742
- RCDC064702
- RCDC064712
- RCDC064722
- RCDC064742
- RCDC Sample51228
- RCHC007814
- RCDC016915
- RCDC006549
- AHCA00015533
- RCDC006614
- Exhibit #1049
- AHCA00017089
- AHCA00015737
- AHCA00018893
- AHCA00018895
- RCDC Sample53234
- RCDC009856
- RCDC002561
- AHCA00000675
- AHCA00026759
- RCDC Sample11390
- AHCA00000785
- AHCA00000770
- AHCA00018731
- RCDC Sample11423

- RCDC Sample09166
- RCDC067469
- RCHC000852
- RCDC070205
- AHCA00000053
- RCDC008062
- RCHC008102
- RCDC073369
- RCHC005140
- RCDC003406
- RCDC000263
- RCDC073562_NAT
- RCDC Sample43138
- RCDC Sample43123
- RCHC008045
- RCDC009859
- Richard Hayward Exhibits #1 through #50
- Richard Hayward Exhibit #1601

## Depositions

- Lee Cunningham- November 10th, 2017; November 15th, 2017; May 18th, 2018
- Mary Lynn Clark- December 6th, 2017; October 9th, 2018
- Christoper T Donaldson- May 23, 2018
- Stephanie Sobeck- November 16th, 2017; May 5th, 2018; October 9th, 2018
- Steve Weisz- May 17th, 2018

## Industry and Company Reports

- Marriott International Announces Plan to Spin Off Timeshare Business and Reports Fourth Quarter 2010 Results, Feb. 14, 2011
- Knight Frank, Residential Research, Branded Developments, "The Impact of Branding on Luxury Residential Developments, 2012
- April 2017 Ragatz Shared Ownership Industry Report

## Public Press

- Marriott Vacation Club Introduces New Vacation Ownership Program, June 21, 2010
- Explorer Collection, Marriott Vacation Club Destinations October 7, 2010
- NBC News, Europe Economy, The Next Big Thing in Luxury, "Branded Real Estate", November 13, 2012
- Halo Effect, www.investopedia.com
- The History of the Ritz-Carlton Hotel Company, Ritz-Carltion.com
- Western Reserve Partners, LLC, Timeshare Market Update, 2011
- Marriott Vacations, Branded Milestones
- Marriott Vacations Worldwide Corporation, Wikipedia

## Legal Documents

- Plaintiff's Sixth Amended Complaint- May 15, 2018
- Order re: Motion to Dismiss Plaintiff's Fifth Amended Complaint- March 29, 2018

## Government Documents

- Marriott Vacations Worldwide Corporation Form 10-K 2017
- Marriott Vacations Worldwide Corporation Form 10-K 2016
- Marriott Vacations Worldwide Corporation Form 10-K 2015
- Marriott Vacations Worldwide Corporation Form 10-K 2014

- Marriott Vacations Worldwide Corporation Form 10-K 2013
- Marriott Vacations Worldwide Corporation Form 10-K 2012
- Interval Leisure Group, Inc. Form 10-K 2017
- Interval Leisure Group, Inc. Form 10-K 2016
- Interval Leisure Group, Inc. Form 10-K 2015
- Interval Leisure Group Inc. Form 10-K 2014
- Wyndham Worldwide Corporation – Form 10-K 2017
- Wyndham Worldwide Corporation – Form 10-K 2016
- Wyndham Worldwide Corporation – Form 10-K 2015
- Wyndham Worldwide Corporation – Form 10-K 2014
- Wyndham Worldwide Corporation – Form 10-K 2013
- Hilton Grand Vacations Corporations – Form 10-K 2017
- Hilton Grand Vacations Corporation – Form 10-K 2016
- Hilton Worldwide Holdings, Inc. – Form 10-K 2015
- Hilton Worldwide Holdings, Inc. – Form 10-K 2014
- Hilton Worldwide Holdings, Inc. – Form 10-K 2013

## Websites

- Hotel Online – DIAMOND Resorts, LLC Signs Agreement to Acquire Vacation Ownership Company, Sunterra Corporation - March 12, 2007.
- Trip Advisor.
- Trust Pilot.
- Red Week.
- Rip Off Report.
- Better Business Bureau.
- Seeking Alpha – Bluegreen Vacations Files for $100 million Timeshare Management IPO, October 30, 2017.
- Reference for Business – Sunterra Corporation – Company Profile.
- Capitol Forum – Various Articles.
- The Art of Vacationing – "Enrolled Club Points vs. Trust Points", March 1, 2011.
- Timeshare Users Group Online Forums