# EXHIBIT B

1

```
1            IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLORADO
2
     Case No. 16-cv-1301--PAB-GPG
3    _____

4    RCHFU, LLC., et al.,

5        Plaintiffs,

6    vs.

7    MARRIOTT VACATIONS WORLDWIDE CORPORATION, et al.,

8        Defendants.
     _____
9

10           Proceedings before GORDON P. GALLAGHER, United

11   States Magistrate Judge, United States District Court for the

12   District of Colorado, commencing at 12:38 p.m., November 20,

13   2018, in the United States Courthouse, Grand Junction,

14   Colorado.

15   _____

16           WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS

17   ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED. . .

18   _____

19                         APPEARANCES

20           MATTHEW FERGUSON, TYLER MEADE, MICHAEL REISER, SR.,

21   MICHAEL SCHRAG, and LINDA LAM, Attorneys at Law, appearing in

22   person for the Plaintiffs.

23   _____

24                        MOTIONS HEARING

25
```

1    that was attached to the purchase contract.  So our clients,

2    when they purchased, they saw this affiliation agreement

3    here.

4            That affiliation agreement is significant because

5    it says, arguably, that Cobalt has sole discretion to enter

6    into affiliations with other clubs.  And, in fact, until

7    March of 2018, it was thought by everyone that this is the

8    governing affiliation agreement; this is the agreement that

9    creates the merger with the Marriott Vacation Club.

10           But there are two other affiliation agreements.

11   There is a 2010 affiliation agreement between Cobalt and Lion

12   and Crown.  That -- in that agreement Cobalt says to Lion and

13   Crown, you can affiliate with other external entities.  That

14   was produced in discovery early on; we have it.  We didn't

15   quite know what to make with it.  We thought it had something

16   to do with an earlier affiliation with Abercrombie and Kent,

17   but we got those -- both of those affiliation agreements.

18           What we didn't get is the 2013 affiliation

19   agreement, and that's between Lion and Crown and Marriott

20   Resorts Travel Company.  We didn't get that until March of

21   2018.

22           Now, why is that important?  Well, if you look at

23   the affiliation agreement between RC Management and Cobalt,

24   one might conclude -- in fact, several courts have

25   concluded -- that Cobalt gets to make the decisions about

1   the Association's breach of fiduciary duty.

2           They then focus on the two thousand -- the

3   affiliation agreement that was attached to the purchase

4   contract, the one that says Cobalt has sole discretion in

5   matters of affiliation.  And they argued -- and this is the

6   second box there on the 2016 slide -- quote:  The Association

7   did not breach any fiduciary duty to plaintiffs because, one,

8   it did not affiliate the RC Club Aspen with MVC, which is the

9   action about which plaintiffs complain, nor could it have

10  done so because such affiliation was not within its power.

11          What they're saying there is that affiliation

12  agreement attached to the purchase contract, the one that we

13  thought governed, it has language saying Cobalt has sole

14  discretion to affiliate.  So they based their motion to

15  dismiss on that.

16          Now, there are a few other complaints filed and so

17  the motion to dismiss that was actually ruled upon was not

18  filed.

19          Now, we switch over to the 27 -- 2017 slide, that

20  first small box.  It was filed on 4/14/17.  It's the same

21  argument.  And in my slides here, I actually cite to the ECF

22  docket number so the Court can follow.  So they reiterate

23  that same argument.

24          The next big box there, still in blue, up on the

25  217 slide, we're shifting over to the Petric case.  And we're

1  doing that for a reason, because the fraud that was committed

2  here, Your Honor, was not just committed in this courtroom.

3  The same argument was made in the Petric case, in state court

4  in California.  And the exact same argument was made in the

5  Riser (ph) case involving a Tahoe property in federal court

6  in Sacramento.  I don't even mention the Riser case on this

7  slide because it -- as you can see, it's already too

8  cluttered.

9           But let's talk about the Petric motion to dismiss.

10 In essence, they made the same argument in Petric.  The

11 second bullet point:  The affiliation agreement makes clear

12 that all important discretionary decisions, including

13 affiliating with new membership programs, EGMVC, are made

14 solely by the program manager, i.e., Cobalt.  The governing

15 documents expressly provide that the RCCSF Association has no

16 authority to participate in approval or object to Cobalt's

17 decision.

18          So they make the same argument in all three cases.

19          What happens in 2018?  We're now in the blue box,

20 the first blue box on the 2018 slide.  Something truly

21 remarkable and actually truly terrifying happens here.  The

22 Court -- the state court presiding over the Petric case

23 dismisses all breach of fiduciary duty allegations.  Other

24 important findings remain, but all of the breach of fiduciary

25 duty allegations are dismissed by the Petric court.

1      Quote:  The relevant fiduciary duties here can only

2  extend to decisions for which the association is responsible.

3  Where an association possesses no decision-making authority

4  over the alleged wrongful acts, no fiduciary duty can have

5  been exercised and no breach of fiduciary duty can be

6  successfully alleged.

7      In other words, based on the affiliation agreement

8  attached to the purchase contract, they obtain a dismissal of

9  claims in Petric, and then they come to this Court, February

10  22, 2018, notice of supplemental new authority.  It's ECF

11  Docket Number 191 at page 2.  They ask this Court to adopt

12  the Petric court's ruling.

13      Now, if that is the only affiliation agreement, and

14  if Cobalt actually does have sole discretion, one could

15  understand why they did that, and there might be a legitimate

16  basis for making that argument in three different courts.

17  But as I go through the remainder of the slides, we'll see

18  that what they really did is they buried the most important

19  affiliation agreement, the one that actually governs this

20  affiliation with the Marriott Vacation Club.

21      THE COURT:  Has somebody gone back to Petric and

22  tried to get a reconsideration of that ruling?

23      MR. MEADE:  Petric case is actually in the process

24  of being settled.

25      So I'm now on the orange squares, I'm going to

25

1   and December of 2017.

2           Well, let's switch to the 2018 slide.  What do we
3   learn?  The first red box on the 2018 slide is dated 3/12/18.
4   Mike Reiser discovers the 2013 affiliation agreement.  Let me
5   tell you how he discovers it.

6           I told you in my little handmade slide that the
7   2013 affiliation agreement is between these two Marriott
8   entities, Lion and Crown and Marriott Resorts Travel Company,
9   and it provides that the merger with the Marriott Vacation
10  Club has no effect in a particular club, unless the
11  association board of that club signs an acknowledgment of and
12  joinder in the affiliation.

13          So there is really two separate documents.  There
14  is the 2013 affiliation agreement that says it's not going to
15  apply to a club, unless the board agree to it.  And then
16  there is an addendum.  And one thing that's undisputed here,
17  Your Honor, is that the Marriott defendants showed the boards
18  in the various clubs only the acknowledgment of and joinder
19  in the 2013 affiliation agreement, and it's variably
20  preworded (ph).

21          What they were doing, Your Honor, is they were
22  getting cover.  They knew -- as we'll talk about in a moment,
23  they knew that this merger with the Marriott Vacation Club
24  was deeply troubling.  They had received letters from
25  attorneys hired by three different boards saying, If you do

1   this, you will be breaching fiduciary duties.  And they
2   needed some cover to make -- to achieve their business, if
3   you will, of merging these two clubs.  So they created this
4   document that they kept secret from all the boards, and then
5   they had the boards just sign a separate document, an
6   acknowledgment of and joinder in the affiliation.
7          And I've read that document multiple times and it's
8   incredibly difficult to understand, but the bottom line here
9   is they hoodwinked the boards.  They got them to sign the
10  document without letting them know that they could have
11  actually stopped the affiliation at their club.  And this is
12  true in Aspen, this is true in San Francisco, this is true in
13  Tahoe, and other clubs.
14         In other words, they hid -- this scheme that we're
15  talking about began even before this litigation.  They hid
16  the relevant document from the boards because they didn't
17  want the boards to know they could stop the affiliation.
18  They hid it from three courts.  This one, the state court in
19  San Francisco and the federal court in Sacramento.  And they
20  hid it in discovery in three different cases.
21         Now, to be sure -- and defendants are represented
22  by capable counsel.  He will stand in front of you and say,
23  You know what, this 2013 affiliation was mentioned a few
24  times.  And that's true.  There are a few places that mention
25  the 2013 affiliation.  And if we had perfect vision in a case

1          MR. MATT FERGUSON:  No, Your Honor.  In fact, I was
2   going to ask if you would prefer that we put it all in a
3   declaration or we could mark them here.
4          THE COURT:  Let's mark it and do it here.  So I'll
5   make Plaintiffs' -- or I'll just do a combined exhibit.  We
6   won't do plaintiffs and defendants because that's a hassle.
7   So Exhibit 1 is going to be -- unless Mr. -- unless the
8   defendants have their exhibits already marked.  Do you all
9   have anything marked yet or can you wait and hold off and
10  we'll --
11         MR. MASTERS:  We can hold off, Your Honor.
12         THE COURT:  So Exhibit 1 is going to be the
13  colorful chart.  Exhibit 2 will be what I just received,
14  which is essentially two-page 8 1/2 by 11 of foam board chart
15  that Mr. Ferguson was about to refer to.
16         All right, go ahead.
17         MR. MATT FERGUSON:  Your Honor, I wanted to address
18  the questions you've asked two or three times now, which
19  is -- which is about the Cocina case and what was going on
20  there.  Was the conduct worse there than it is here.  Mr.
21  Meade has gone through that.
22         But what I really want to focus the Court on is
23  this:  It is far worse, it's worse because of this.  The
24  affiliation agreement that was withheld, the bubble on the
25  MRTC affiliation agreement that was first put up, was

 1   withheld, not from only us in 2016, '17 and '18, it was
 2   withheld from three boards.
 3         The testimony in this case is that Mr. Mercer, the
 4   president of our association that represents us, our
 5   plaintiffs, 230 of them -- 230 owners or 400 people and the
 6   other owners, testified that he had never saw it.  It was
 7   never given to him.  When we asked a vice president that was
 8   in charge of the situation, Ms. Soback:  Why did you have him
 9   sign this document and not give it to him to read?  He's
10   joining something, why aren't you asking him to read?  Why
11   aren't you giving it to him?  And their answer was, and
12   you'll see it in Mr. Reiser's affidavit:  Well, he didn't ask
13   for it.  Did your in-house lawyers -- they have a team of
14   lawyers, Ms. Barbara Egoff (ph), did they give it to
15   Mr. Mercer or his lawyer?  Well, I don't think so.  They
16   didn't ask for it.
17         So they didn't want these people to see this
18   document.  Some of the reasons were that they didn't know it
19   was for ten years that the affiliation would last that long.
20   So they -- what they actually did was, they negotiated this
21   memorandum of understanding -- and I'll show you this chart
22   in a minute.  A memorandum -- this is 2014.  They negotiated
23   this 2014 memorandum of understanding, which is basically --
24   Ms. Sobeck testified to it, it was really kind of
25   meaningless; it was just a -- it was an aside.

1          And so the Association thinks that they're
2   negotiating something very important, they're joining and
3   acknowledging the agreement that was not produced, the
4   2000- -- the 2013 affiliation agreement.
5          When Mr. Reiser took the depositions of folks that
6   control the boards in San Francisco and Tahoe -- those were
7   actually still employees at that time of Marriott.  They
8   still controlled those boards.  When they were shown that
9   affiliation agreement that they acknowledged and joined in
10  2014, just like Mr. Mercer:  I've never seen this, I've never
11  seen this.
12         So those documents -- that's why this is a worse
13  situation.  The documents were withheld from the boards.  Is
14  it a coincidence they were withheld in this -- in three
15  cases?  I doubt it.
16         Not only that -- and I pulled the case of nine
17  frauds or 18 frauds, 18 lies.  You've got the affiliation
18  agreement withheld from three boards, maybe St. Thomas, which
19  would be another one.  We have it, as Mr. Meade has shown
20  you -- we've shown you in three motions to dismiss, they
21  called it the (inaudible) in California.  It's put forth, the
22  Cobalt affiliation agreement is put forward as the device by
23  which they could have the sole authority to do this
24  affiliation.  It was withheld from three courts and it's
25  withheld in three cases.

```
 1              Now, we did the right thing here, Your Honor, as
 2    plaintiffs.  We decided to do three cases together, do the
 3    depositions in a group.  We didn't take -- we didn't have to
 4    take the depositions in three cases.  We tried to do the
 5    right thing.  And guess what, the plaintiffs answered 230
 6    sets of requests for admissions from two parties, two
 7    requests for production of documents from the HOA.  We did
 8    the work.  Interrogatories, the same thing.  If they wanted a
 9    deposition of people, we gave that to them.  We played by the
10    rules.
11              And so three times the affiliation agreement was
12    withheld from the boards.  Three times it was not presented
13    to this Court in motions to dismiss and three times it was
14    withheld in discovery.
15              And the same is exactly true for the APCO
16    documents.  That survey is done -- and I'll show you this
17    timeline in a moment, Your Honor.  That survey -- the
18    critical part of this case is, basically starts, I guess it's
19    as good a time as any to do it.  It starts in two thousand --
20    late 2011 when Marriott International, the big -- when you go
21    check into a Marriott or a Courtyard, that's the company that
22    owned the Ritz-Carlton Hotel brand and it then spun off
23    Marriott Vacation Club.
24              And what did they spin off?  They spun off Marriott
25    Vacation Club point system and the Ritz-Carlton Club system
```

1    those blue reports there, which are attached -- this is the
2    focus group.  They get a report issued by August 26.  Again,
3    we had none of these documents during discovery.  All these
4    depositions were taken in October of 2017.  We're getting
5    this information in June of 2018.
6               Mr. Cunningham, he's about our era of a gentleman.
7    He actually tells his secretary to:  Print this out, print
8    this thing out for me is, print it out.  Ms. Sobeck is
9    telling the club, she's the person who interfaces with Randy
10   Mercer on our board, she interfaces with the folks in San
11   Francisco, those boards, in Lake Tahoe, and places like St.
12   Thomas also, she's interfacing with them.  And you can see in
13   our case, there is a survey going on, the APCO survey.  We
14   didn't have the name, but we now look -- we now can look back
15   on some of her memorandums and she says:  I'm going to share
16   this with the clubs.
17              Well, guess what?  This thing was so devastating on
18   affiliation, that she never shared it.  She would show up at
19   a meeting and say, Well, we took a survey and guess what?
20   Your members would love cruises and a wine tour.  That's what
21   they really like.  That's what she reports.  She doesn't
22   report that there are dozens of dozens, if not hundreds, of
23   comments in the open-ended questions saying:  We don't want
24   this.  They ignore it.
25              So there is another set of nine lies.  She says

58

1   speaks and I heard what he was going to say about the import
2   of this -- of this affiliation agreement, acknowledgment
3   were, he is going to explain that.  But I will tell you what
4   they were really trying to achieve with this affiliation
5   agreement and this acknowledgment was deniability --
6   plausible deniability, plausible deniability.
7          They said we're getting threatened by a former
8   partner at Greenberg Traurig, we're getting threatened by
9   boards, we're getting threatened by lawyers, they had two or
10  three litigations.  We have -- and they're predicting
11  litigation of this, by the way.  We have those memos,
12  including APCO memos that we hadn't had.  They're predicting
13  that and they're saying we're getting sued for fiduciary duty
14  breaches.
15         So why -- why are five or six executives, five or
16  six lawyers in their law department working on a lonely
17  little affiliation agreement?  And why are all the
18  communications and draft withheld?  They were coming up with
19  a plan that said, Listen, if some day we're sued, we can say
20  we gave the clubs a right to vote and we gave them an
21  opportunity to acknowledge and join.  The problem is they
22  never gave them the agreement to acknowledge and join.
23         Thank you.
24         THE COURT:  Thank you, Mr. Ferguson.  Why don't we
25  take -- we've been going close to an hour and a half.  Why

58

1   speaks and I heard what he was going to say about the import
2   of this -- of this affiliation agreement, acknowledgment
3   were, he is going to explain that.  But I will tell you what
4   they were really trying to achieve with this affiliation
5   agreement and this acknowledgment was deniability --
6   plausible deniability, plausible deniability.
7          They said we're getting threatened by a former
8   partner at Greenberg Traurig, we're getting threatened by
9   boards, we're getting threatened by lawyers, they had two or
10  three litigations.  We have -- and they're predicting
11  litigation of this, by the way.  We have those memos,
12  including APCO memos that we hadn't had.  They're predicting
13  that and they're saying we're getting sued for fiduciary duty
14  breaches.
15         So why -- why are five or six executives, five or
16  six lawyers in their law department working on a lonely
17  little affiliation agreement?  And why are all the
18  communications and draft withheld?  They were coming up with
19  a plan that said, Listen, if some day we're sued, we can say
20  we gave the clubs a right to vote and we gave them an
21  opportunity to acknowledge and join.  The problem is they
22  never gave them the agreement to acknowledge and join.
23         Thank you.
24         THE COURT:  Thank you, Mr. Ferguson.  Why don't we
25  take -- we've been going close to an hour and a half.  Why

1   fraud on the board initially by not giving them an agreement
2   that they're joining.  Imagine that?  Here, sign this
3   agreement, but we're not going to -- sign this agreement
4   joining an agreement, but we're not going to show you the
5   agreement you're joining.  That doesn't speak to negligence.
6   They purposefully didn't give the documents to the board
7   because they didn't ask for them is what their excuse was.
8   That doesn't speak to negligence.
9           Missing something that says affiliation agreement
10  when they even now admit that they identified this agreement,
11  at least in the Petric case, to produce, it can't be that
12  they identified, on the one hand, to produce and then all of
13  a sudden they just don't produce it -- you know, they just
14  don't produce it.
15          But the most important point here, Your Honor, and
16  why this deserves the ultimate sanction here that we're
17  requesting is they committed a fraud on the courts.  I mean,
18  their entire argument was:  We can't aid and abet a fiduciary
19  duty because the HOA had no role in this.
20          That was more than just not showing them the
21  affiliation agreement.  They made an affirmative
22  misrepresentation to these courts, knowing that they had a
23  document in their files that wasn't produced and it was never
24  shown to the boards even, they made an affirmative
25  misrepresentation to three courts, including two federal

1  courts, that the association had no role.  It was belied by

2  documents they were concealing.

3           So strike one:  Holding it from the boards in

4  violation of a fiduciary duty of full disclosure.

5           Part two:  Withholding it from us in discovery --

6  strike two.

7           Strike three:  Your Honor, is lying to the courts.

8  And it cost us in San Francisco.  Luckily, we had, in this

9  case, some facts that were additional to San Francisco where

10  we had a promise of a vote -- explicit promise of a vote,

11  that, you know, we were able to survive a motion to dismiss

12  on this point because of that.

13           THE COURT:  That raises a question, though -- I'll

14  give the defense an opportunity to respond to this.  What

15  authority do I have -- assuming that that's correct, what

16  authority do I have in this case to make recompense for the

17  supposed fraud or frauds in another case or cases that

18  haven't been joined or related?

19           MR. REISER, SR.:  Well, they were joined and

20  related for purposes of discovery.  So discovery abuses, the

21  strike two in my analogy there is governed there.

22           But you don't need the fraud on the Court in

23  Petric.  We have a fraud on the Court in this case.  That

24  would be my answer.

25           I mean, it's additional bad conduct.  And if we