# EXHIBIT O

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                 FOR THE DISTRICT OF COLORADO
 3
 4
 5    RCHFU, LLC, ET AL.,               )
                                        )
 6          PLAINTIFFS,                 )
                                        )
 7       vs.                            )   No.
                                        )   1:16-CV-01301-
 8    MARRIOTT VACATIONS WORLDWIDE      )   PAB-GPG
      CORPORATION,                      )
 9                                      )
            DEFENDANTS.                 )
10    _____)
11
12
13
14           EXPERT DEPOSITION OF JON ROBERT SIMON
15                 WEDNESDAY, JULY 17, 2019
16
17
18
19
20
21    REPORTED BY:  D'ANNE MOUNGEY, CSR 7872
22
23
24
25
```

Page 2

1  EXPERT DEPOSITION OF JON ROBERT SIMON, TAKEN ON BEHALF OF
2  DEFENDANTS AT 1840 CENTURY PARK EAST, LOS ANGELES,
3  CALIFORNIA, COMMENCING AT 9:40 A.M. ON WEDNESDAY,
4  JULY 17, 2019, BEFORE D'ANNE MOUNGEY, CSR 7872.
5
6
7  FOR PLAINTIFFS:
8      MATTHEW C. FERGUSON
       ATTORNEY AT LAW
9      119 SOUTH SPRING
       SUITE 201
10     ASPEN, COLORADO 81611
       (970) 925-6288
11     FAX: 925-2273
       E-MAIL: MATT@MATTHEWFERGUSON.COM
12
13 FOR PLAINTIFFS:
14     -VIA TELECONFERENCE-
15     MICHAEL REISER
       ATTORNEY AT LAW
16     1474 NORTH BROADWAY
       SUITE 300
17     WALNUT CREEK, CALIFORNIA 94596
       (925) 256-0400
18     FAX: 285-2600
       E-MAIL: MICHAEL@REISERLAW.COM
19
20 FOR THE PLAINTIFFS AND THE WITNESS:
21     GIBBS LAW GROUP
       BY:  MICHAEL L. SCHRAG, ESQ.
22     505 14TH STREET
       SUITE 1110
23     OAKLAND, CALIFORNIA 94612
       (510) 350-9718
24     FAX: (510) 350-9701
       EMAIL:  MLS@CLASSLAWGROUP.COM
25

Page 3

1  APPEARANCES (CONTINUED):
2
3  FOR DEFENDANTS:
4      GREENBERG TRAURIG
       BY: ROGER B. KAPLAN, ESQ.
5        -AND-
       IAN MARX, ESQ (VIA TELECONFERENCE)
6      500 CAMPUS DRIVE
       SUITE 400
7      FLORHAM PARK, NEW JERSEY 07932-0677
       (973) 360-7957
8      FAX: (973) 295-1310
       E-MAIL: KPALANR@GTLAW.COM
9          MARXI@GTLAW.COM
10
11 FOR CO-DEFENDANTS, ASPEN HIGHLAND CONDOMINIUM
   ASSOCIATION:
12
   HOGAN LOVELLS
13 BY:  ANDREW MARTIN NUSSBAUM, ESQ.
   1601 WEWATTA STREET
14 SUITE 900
   DENVER, COLORADO 80202
15 (303) 899-7300
   FAX: 899-7333
16 E-MAIL: ANDREW.NUSSBUAM@HOGANLOVELLS.COM
17
18 FOR DEFENDANTS:
19 - VIA TELECONFERENCE -
20   THE MEADE FIRM, PC
     BY: TYLER MEADE, ESQ.
21   12 FUNSTON AVENUE
     SUITE A
22   SAN FRANCISCO, CALIFORNIA 94129
     (415) 724-9600
23   E-MAIL: ANNIE@MEADEFIRM.COM
24
25

Page 4

1  APPEARANCES (CONTINUED):
2
3      ALSO PRESENT VIA TELECONFERENCE:
4          KIM GRAY, MARRIOTT CORPORATE COUNSEL
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1          I N D E X
2  WITNESS           EXAMINATION           PAGE
3  JON ROBERT SIMON
              MR. KAPLAN              7
4
              MR. NUSSBUAM          250
5
6
7
8
9          E X H I B I T S
10
   NO.    PAGE         DESCRIPTION
11
   EX. 1   13      EXPERT REPORT OF JON SIMON,
12              10-26-18
13 EX. 2   13      SUPPLEMENTAL EXPERT REPORT OF JON
              SIMON, 6-7-19
14
   EX. 3   118     "THE HALO EFFECT" OCTOBER 14, 2009
15
   EX. 4   121     "BRANDED DEVELOPMENTS"
16
   EX. 5   162     NATO WATERFALL DETAIL
17
   EX. 6   176     MARRIOTT VACATION CLUB INSIDER
18              BULLETIN
19 EX. 7   177     2012-2013 VACATION CLUB POINTS
              CHART
20
   EX. 8   183     "TODAY'S DISCUSSION"
21
   EX. 9   187     EMAIL STRING, 2-9-12
22
   EX. 10  215     "BRAND EQUITY:  THE HALO EFFECT
23              MEASURE"
24 EX. 11  232     MARRIOTT VACATIONS WORLDWIDE
              CORPORATION HISTORICAL PRICING
25

2 (Pages 2 - 5)

Page 6

1  I N D E X (CONTINUED):
2
3
4
5       QUESTIONS INSTRUCTED NOT TO ANSWER
6             PAGE    LINE
7              49       13
8
9
10
11
12       INFORMATION REQUESTED
13             (NONE)

Page 7

1        LOS ANGELES, CALIFORNIA
2    WEDNESDAY, JULY 17, 2019; 9:40 A.M.
3
4
5        JON ROBERT SIMON,
6  having been first duly sworn by the reporter, was
7        examined and testified as follows:
8
9             EXAMINATION
10 BY MR. KAPLAN:
11   Q   Mr. Simon, good morning. My name is Roger
12 Kaplan. I'm with the firm Greenberg Traurig and we
13 represent the Marriott defendants in this case.
14       You're here as an expert witness on behalf of
15 the plaintiffs; correct?
16   A   Correct.
17   Q   Have you ever been deposed before?
18   A   Yes.
19   Q   How many times?
20   A   A half dozen.
21   Q   Only in connection with business matters?
22   A   Yes.
23   Q   As an expert?
24   A   Yes.
25   Q   Let me go through a few instructions with

Page 8

1  you. You may have heard them before.
2       As you can see, we have a court reporter in
3  the room. She will be taking down verbatim my
4  questions, your answers and anything that other counsel
5  may have to say.
6       You understand that?
7   A   I do.
8   Q   Because we're going to have a verbatim record
9  at the end of the day, it's important for me to be clear
10 in my questions, for you to understand my questions and
11 for you to be clear and precise in your answers.
12      Do you understand that?
13  A   I do.
14  Q   As a result, if I ask a question that is in
15 any way ambiguous or not clear, I don't want you to
16 answer the question. I would like you to ask for a
17 clarification.
18      Do you understand that?
19  A   I do.
20  Q   And the reason why I'm telling you this is
21 because if I do ask a question and you respond, the
22 reader of the transcript will assume that you understood
23 the question and intended to ask it.
24      Do you understand that?
25  A   I understand.

Page 9

1   Q   Do you have any questions concerning my
2  instructions or the procedure before we begin?
3   A   I do not.
4   Q   Let me ask you: What did you do to prepare
5  for your deposition today?
6   A   I read through my files, spoke with counsel a
7  bit.
8   Q   Okay. When you say your files, what do you
9  mean?
10  A   My report, analyses that we did, things of
11 that nature.
12  Q   So you went through both reports?
13  A   Yes, I did.
14  Q   Did you go through the exhibits of your
15 reports?
16  A   I did.
17  Q   Did you go through the materials that were
18 cited in your report, such as articles?
19  A   I did.
20  Q   So you reviewed the articles; correct?
21  A   Correct.
22  Q   Anything else?
23  A   Not that comes to mind.
24  Q   Did you review Dr. Dev's reports in this
25 case?

3 (Pages 6 - 9)

Page 10

1  A   Yes. I reviewed Dr. Dev's, I reviewed
2  Dr. Israel's, I reviewed Alan Tantleff's, I reviewed
3  Cerdiwyn King's a little bit. I didn't get in depth.
4  It was really outside my area.
5      Let's see --
6  Q   Mark Israel?
7  A   Yes. I said Dr. Israel.
8  Q   Okay. Did you read their transcripts of the
9  deposition?
10 A   I was not able to read their transcripts.
11 They were not produced in time.
12 Q   Did you have a chance to look at, for
13 example, Dr. Dev, any of the materials he cited in his
14 report?
15 A   I looked over Dr. Dev's opinions and I didn't
16 dig into all the materials in his report.
17 Q   Did you dig into some of the materials?
18 A   I may have dug into some of them, but by and
19 large, no.
20 Q   Let me ask you: Did you review any of the
21 articles that are cited in his report with regard to the
22 so-called halo, H-A-L-O, effect?
23 A   I may have.
24 Q   As you sit here today, can you recall any of
25 them?

Page 11

1  A   Not specifically.
2  Q   But the articles you cited in your report,
3  you did review?
4  A   Yes.
5  Q   When were you retained as an expert in the
6  case?
7  A   Some time roughly I want to say June of 2018.
8  Q   And who retained you?
9  A   The law -- The Gibbs Law Firm, Matthew
10 Ferguson's law firm, Michael Reiser's law firm and Tyler
11 Meade's law firm.
12 Q   Have you ever done any work for those
13 attorneys previously?
14 A   Yes.
15 Q   In connection with what matter?
16 A   A litigation in New York.
17 Q   What's the name of that case?
18 A   That would have been the St. Regis
19 litigation, the St. Regis Club litigation in New York.
20 Q   That's not listed on your CV; is there a
21 reason?
22 A   Probably I haven't updated my CV for that.
23 Q   Any other cases that you've been retained by
24 either Mr. Reiser, Mr. Meade, Mr. Ferguson or
25 Mr. Schrag?

Page 12

1  A   No, sir.
2  Q   I think we know your billing rate based upon
3  what's in your report.
4      Do you know how much you billed to date?
5  A   Somewhere over 400,000.
6  Q   In connection with the St. Regis case, do you
7  know how much you've billed in that case?
8  A   I would hazard to say somewhere around 300
9  plus thousand.
10 Q   So when you were retained in this case, can
11 you tell me what your assignment was?
12 A   My assignment was to look at the actions of
13 the defendants and to come to an opinion, determination
14 as to whether there was causality with their actions
15 vis-a-vie the diminution of Ritz-Carlton and whether
16 their actions allowed them to profit from the merger of
17 the Marriott Vacation Club and access to the Marriott
18 Vacation Club to the Ritz-Carlton Club.
19 Q   Did you -- is that it?
20     MR. SCHRAG: Object to form.
21 BY MR. KAPLAN:
22 Q   Was that the sum and substance of your
23 desire?
24     MR. SCHRAG: Object to form.
25     THE WITNESS: Those were the two major items.

Page 13

1  As far as items that fall under there, there could have
2  been several items that fell under, but those were the
3  major charges.
4  BY MR. KAPLAN:
5  Q   Now, in paragraph 6 of your report -- let me
6  give you a copy of your report.
7  A   Please.
8     MR. KAPLAN: I've marked as Exhibit 1, your
9  report dated October 26, 2018, together with the CV and
10 together with the exhibits. So you can take a look at
11 that and satisfy yourself that that's a complete copy.
12    And I will also give you as Simon Exhibit 2,
13 a copy of your supplemental report together with the
14 exhibits that are identified in that.
15    And you can satisfy yourself that that's an
16 accurate copy as well.
17    (Whereupon, Defendants' Exhibit 1 and
18    Exhibit 2 were marked for identification
19    by the Court Reporter.)
20 BY MR. KAPLAN:
21 Q   So let me suggest -- you recognize those
22 documents, Exhibit 1 as your first report and Exhibit 2
23 as your second report?
24 A   Yes.
25 Q   Now, any time during the course of the

4 (Pages 10 - 13)

Page 46

1  Q  Do they publish annual statistics in the
2 industry that you're aware of?
3  A  Yes, I did the first one.
4  Q  Are they generally regarded in the industry
5 as reliable?
6  A  That's a great question. The ARDA statistics
7 are, by and large, voluntary; right? Whenever you deal
8 with a voluntary submission, you do have questions of
9 reliability.
10     ARDA breaks those statistics down into a core
11 group that answers their questionnaires annually. And
12 then there's other smaller timeshare companies, but
13 nobody goes in and audits the information. So by and
14 large, there's an assumed validity of that information.
15  Q  Do people in the industry generally rely on
16 their annual reports?
17  A  I would say -- when you use the term "rely,"
18 I would think that people take it into consideration.
19  Q  Are you familiar with the ARDA International
20 Foundation?
21  A  Yes.
22  Q  What is that?
23  A  AIF generally does studies for the
24 development association.
25  Q  What kind of studies?

Page 47

1  A  They'll do -- AIF will fund that -- the
2 annual financial performance survey study. They do
3 other studies. I believe they were the payor for the
4 Next Gen study, so there's numerous studies that AIF
5 does.
6  Q  Do you know if they publish annual statistics
7 on, for example, sales prices in the industry?
8  A  Consolidated sales prices or by company?
9  Q  Consolidated.
10  A  Yeah, they probably do.
11  Q  Again, do people reference that in the
12 industry as one source that they consider?
13  A  Yes, they do.
14  Q  Now, at page 40 of your report in footnote
15 101, there's a sentence that says -- if you look in the
16 middle of the footnote, there's a sentence that's stuck
17 in there that says:
18     "As part of the due diligence for the
19     subject litigation, I attended an MVC
20     sales presentation (one of many
21     presentations I've attended for
22     timeshare companies) on September 23,
23     2018, at MVC's Newport Coast Villas."
24     Do you see that?
25  A  I do see that.

Page 48

1  Q  So were you attending that presentation as a
2 potential purchaser?
3  A  I regularly attend different presentations to
4 get a feel and a beat and the pulse of what's going on
5 in the industry. Sometimes clients retain me to see if
6 the salesmen are doing anything improper.
7     So I do it constantly and provide feedback.
8 I've done it for most of the major brands.
9  Q  But you're not there looking to purchase an
10 interest?
11     MR. SCHRAG: Object to form.
12     THE WITNESS: I might have. I mean, in all
13 candor, I go to these presentations and they're really
14 good sales guys. And it probably wouldn't be my
15 preference to buy it unless there was something
16 exceptional in there, but I didn't go for the specific
17 purpose to buy.
18 BY MR. KAPLAN:
19  Q  In fact, your sentence says, "as part of the
20 due diligence for the subject litigation"?
21  A  That's correct.
22  Q  So you did it specifically in this case
23 because you were retained as an expert by plaintiffs?
24  A  That's correct.
25  Q  Was this a one-on-one presentation?

Page 49

1  A  Yes. It starts out as a one-on-one and
2 towards the end they will bring in a sales manager.
3  Q  But I mean, you weren't there with other
4 potential consumers or purchasers that were hearing the
5 presentation with you, it's one-on-one?
6  A  It's one-on-one.
7  Q  And you interacted with the sales executive?
8  A  Yes.
9  Q  Did you tell him that you were there as an
10 expert witness retained in a litigation against Marriott
11 Vacations Club?
12  A  No, I would not do that.
13  Q  Let me ask you -- and did counsel for
14 plaintiffs know that you were going there beforehand?
15     MR. SCHRAG: Object to form.
16     I'm going to instruct you not to answer about
17 communications with counsel.
18     MR. KAPLAN: I have not asked him for the
19 substance of the communication. I've just asked him
20 whether counsel knew.
21     MR. SCHRAG: That question calls for the --
22 calls for him to review communications with counsel.
23     MR. KAPLAN: Okay. We'll reserve our
24 position on that.
25 ///

13 (Pages 46 - 49)

Page 50

 1  BY MR. KAPLAN:
 2     Q    You say -- do you recall who made the
 3  presentation?
 4     A    I just reviewed this and I know Dave -- a guy
 5  named Dave was the sales manager.  I want to say a guy
 6  named Mark, but I could be off on that.
 7     Q    And do you know who the manager was?
 8     A    I think it was Dave.
 9     Q    That was Dave?
10     A    Yeah.
11     Q    And the sales executive?
12     A    Walter, maybe.  I think it's Walter.  He was
13  an African-American gentleman.
14     Q    During the presentation did you ask
15  questions?
16     A    I did.
17     Q    Did you ask questions about Ritz-Carlton
18  Destination Club?
19     A    Well, he proposed access to Ritz-Carlton
20  Destination Clubs and I asked follow-up questions.
21     Q    And what did he say about the Ritz-Carlton
22  Destination Club?
23         MR. SCHRAG:  Object to form.
24         THE WITNESS:  Well, he goes into all the
25  multi -- the benefits of being a member of MVCI,

Page 51

 1  discussed -- they have an area in their sales gallery
 2  that's kind of like a wall of credibility and a wall
 3  that shows you the product.  As you walkthrough there,
 4  there will be big pictures of different resorts that are
 5  in the MVCI program, there will be pictures of
 6  Ritz-Carltons.
 7         There was especially heavy emphasis during
 8  that sales about the ILG merger and that we're going to
 9  be merging the -- we've merged the Ritz-Carlton system
10  and now we're going to be merging Hyatt, Westin,
11  Sheraton and St. Regis into the MVCI program.  So your
12  opportunities abound.
13  BY MR. KAPLAN:
14     Q    Is that it?
15     A    That's the sum.  Sum.
16     Q    Was there a -- either a map or interactive TV
17  showing all the locations on a wall?
18     A    Yes.
19     Q    And there were 40 or 50 MVC locations?
20     A    Probably about 50.
21     Q    50.
22         There were also other locations?
23     A    Right.
24     Q    Ritz-Carlton was part of that?
25     A    Yes.

Page 52

 1     Q    So they were shown as part of the locations
 2  that the Marriott Vacation Club was shown at?
 3     A    I don't recollect whether or not they were
 4  specifically on the map.  They were certainly in the
 5  sales gallery and certainly -- he has a computer he
 6  comes into the room with and kind of shows things and
 7  tries to show you how easy it is to book.
 8     Q    Did you ask him about booking to get
 9  Ritz-Carlton Destination Club reservations?
10     A    It was discussed.
11     Q    Did you ask him questions?
12     A    Yes.  Because he wrote -- he brought the
13  concept up of being able to stay at Ritz-Carltons.
14     Q    Did he say that purchasing an MVC membership,
15  the principle benefit was gaining access to Ritz-Carlton
16  Destination Club?
17     A    It was one of the principle benefits.
18     Q    And he said that, "it's a principle benefit"?
19     A    Well, I don't know if he used the term
20  "principle benefits," but when he designed a vacation
21  plan for me, two out of the five vacation years were at
22  Ritz-Carltons.  So that's 40 percent of the stays over
23  five years would have been at Ritz-Carlton properties.
24     Q    Did you take notes of this meeting?
25     A    Yes.

Page 53

 1     Q    Do you still have those notes?
 2     A    Yes.
 3         MR. KAPLAN:  We'll ask for production of
 4  those notes.
 5         MR. SCHRAG:  We'll consider that.
 6  BY MR. KAPLAN:
 7     Q    Now, after you attended this meeting, did you
 8  communicate with counsel just the fact that you had
 9  attended that meeting?
10         MR. SCHRAG:  I'm going to object that he not
11  reveal communications with counsel.
12  BY MR. KAPLAN:
13     Q    After you had that meeting, did you have a
14  communication with counsel?
15         MR. SCHRAG:  You can answer yes or no.
16         THE WITNESS:  Yes.
17  BY MR. KAPLAN:
18     Q    How soon after?
19     A    Within a week.
20     Q    Prior to having that meeting, do you know if
21  you had -- without revealing the substance -- do you
22  know if you had a communication with counsel within a
23  week prior to having that meeting, that sales
24  presentation?
25     A    I believe you asked that and counsel told me

| Page 54 | Page 56 |
|---|---|
| 1  not --<br>2       MR. SCHRAG: Objection. Just yes or no.<br>3       And I'm going to instruct you not to reveal<br>4  any substance of the communications with counsel.<br>5  BY MR. KAPLAN:<br>6   Q   How far in advance did you make the<br>7  appointment for that presentation?<br>8   A   I'm not sure, as I sit here today.<br>9   Q   Well, it wasn't the day before?<br>10  A   It wasn't months before.<br>11  Q   Not months. I understand.<br>12      It wasn't a day before?<br>13  A   No. It was probably weeks. You have to get<br>14  on their calendar.<br>15  Q   So it was weeks before?<br>16  A   Could have been a week, could have been two<br>17  weeks, could have been more.<br>18      MR. SCHRAG: Why don't we take a break.<br>19      MR. KAPLAN: What has it been?<br>20      MR. SCHRAG: About an hour or so.<br>21      MR. KAPLAN: Okay. I'll take you at your<br>22  word. Why don't we take a two-minute break.<br>23      MR. SCHRAG: We need more than two.<br>24      MR. KAPLAN: We can take a five-minute break,<br>25  then. | 1       I want to -- I would like to discuss those<br>2  paragraphs with you at this time.<br>3       So you say in paragraph 32, if you want to<br>4  consult your report:<br>5           "It is well-accepted in the vacation<br>6           ownership industry and it is my opinion<br>7           that exclusivity or lack thereof can<br>8           have a dramatic effect on property<br>9           values."<br>10          Do you see that?<br>11  A   Yes.<br>12  Q   Can you direct me to any literature in the<br>13  industry, you don't cite anything in your report, that<br>14  sets forth or has studied that proposition?<br>15  A   I studied that proposition.<br>16  Q   Well, so you've studied that proposition<br>17  where it is well-accepted that exclusivity or a lack<br>18  thereof can have a dramatic effect on values of vacation<br>19  ownership interests?<br>20  A   Well, to fully answer it, you would have to<br>21  go back how to the fractional industry start and what it<br>22  was aimed to do.<br>23      And what it was aimed to do -- there's a<br>24  whole demographic -- socioeconomic demographic of<br>25  higher-end owners who were trying to choose between |
| Page 55 | Page 57 |
| 1       (Whereupon, a recess was held<br>2       from 10:37 a.m. to 10:48 a.m.)<br>3       MR. KAPLAN: Back on the record.<br>4  BY MR. KAPLAN:<br>5   Q   Just to follow up, Mr. Simon, on one or two<br>6  questions.<br>7       With respect to that meeting at the<br>8  Newport Coast, that sales presentation, it's mentioned<br>9  in your report, are you relying upon what occurred at<br>10  that meeting?<br>11  A   To form my opinion?<br>12  Q   Yeah.<br>13  A   No.<br>14  Q   And are your notes listed among the documents<br>15  that were considered or relied upon at the end of your<br>16  report?<br>17  A   No. I listed the documents that I relied<br>18  upon.<br>19  Q   So let me turn -- you have in your report at<br>20  beginning of page 21 --<br>21  A   Of the original report?<br>22  Q   Yes, of the original report.<br>23      You have a Section 8, "Diluting Exclusivity<br>24  Damages, a Private Residence Club." And it goes from<br>25  paragraphs 32 to 36. | 1  their own second home and having something that would<br>2  mirror a second home.<br>3       So the fractional industry was really born to<br>4  give people a larger allocation of time that would mimic<br>5  a second home experience without all the maintenance and<br>6  upkeep.<br>7   Q   Are you done with your answer?<br>8   A   Yes.<br>9   Q   My question is: You say it is well-accepted<br>10  in the vacation ownership industry.<br>11      Is there any literature, articles that I can<br>12  reference that would support that proposition, or are<br>13  you relying solely on your experience in the industry?<br>14      MR. SCHRAG: Object to form.<br>15      THE WITNESS: No. There's stuff out there.<br>16  I mean, Ragatz is a person who is well-known and well<br>17  regarded in the industry in terms of his market work on<br>18  fractionals. He's written about it.<br>19      You have Robert Port. You have a number of<br>20  different people who have written on this, written about<br>21  fractionals and are they a good deal, what are they<br>22  trying to convey.<br>23      So there's a substantial amount of literature<br>24  out there.<br>25  /// |

15 (Pages 54 - 57)