IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Case No. 16-01301 PAB

RCHFU, LLC, et al.

    Plaintiffs,

v.

MARRIOTT VACATIONS WORLDWIDE CORPORATION, et al.

    Defendants.

---

**MARRIOTT DEFENDANTS' MOTION *IN LIMINE* TO EXCLUDE
THE CUSHMAN & WAKEFIELD APPRAISAL**

---

Defendants Marriott Vacations Worldwide Corporation, Marriott Ownership Resorts, Inc., The Ritz-Carlton Management Company, LLC, The Cobalt Travel Company, LLC ("Cobalt"), and The Lion & Crown Travel Co., LLC ("L&C") (collectively, "Marriott Defendants") hereby move the Court for an order *in limine* precluding Plaintiffs (including their expert witnesses and counsel) from introducing as evidence or referring at trial to the Summary Appraisal Report of The Ritz-Carlton Club, Aspen Highlands prepared by Cushman & Wakefield Western, Inc. ("C&W") (the "C&W Appraisal"), attached as Exhibit 1 to the August 19, 2019 Supplemental Restricted Declaration of Ian S. Marx ("Marx Restr. Decl.").

**CERTIFICATE OF CONFERENCE PURSUANT TO LOCAL RULE 7.1(A)**

On August 15, 2019, the Marriott Defendants' counsel had a telephone conference with Plaintiffs' counsel to discuss the factual and legal bases for this motion and made a reasonable and good faith effort to resolve this dispute. Plaintiffs' counsel refused to agree to the relief sought.

**INTRODUCTION**

Plaintiffs are owners of luxury 1/12 fractional interests in The Ritz-Carlton Club, Aspen Highlands ("RC Club Aspen"). Cobalt (as "Program Manager"), exercising the unilateral

discretion given to it under the documents governing Plaintiffs' purchase contracts, elected through a series of affiliation agreements to affiliate RC Club Aspen with the Marriott Vacation Club Destinations Exchange Program (the "MVCD Program").  Plaintiffs claim that, as a result of this affiliation (the "MVC Affiliation"), MVCD Program members were able to access the RC Club Aspen, which Plaintiffs allege caused their fractional interests to decline in value.  As support for this claim, Plaintiffs cite the C&W Appraisal, which they intend to introduce into evidence at trial.

The C&W Appraisal is not admissible evidence.  <u>First</u>, it is an out-of-court statement to which no exception to the hearsay rule applies.  <u>Second</u>, the part of the C&W Appraisal on which Plaintiffs rely most heavily for their diminution in value claim are conclusions regarding value and exclusivity ("Value Conclusions") that C&W drew based on erroneous and unverified statements that were made by unnamed owners to unnamed brokers and then passed along to a C&W appraiser (the "Underlying Statements").  The Value Conclusions are, thus, predicated on multiple layers of hearsay that lack any indicia of reliability and to which no exception to the hearsay rule applies.  <u>Third</u>, C&W failed to test the accuracy of its Value Conclusions (hardly surprising given that the C&W Appraisal was commissioned for a purpose entirely different from that for which Plaintiffs are now trying to use it).  <u>Fourth</u>, neither the C&W Appraisal itself nor the Value Conclusions are based on any sound analysis or methodology, nor do they comport with the rules governing appraisals.  <u>Fifth</u>, and in itself enough to preclude admissibility, the Value Conclusions are irrelevant because they confuse the MVC Affiliation, on which Plaintiffs' claims are based and which had not yet even been implemented at the time the C&W Appraisal was issued, with an earlier, discontinued "Portfolio Program," a Ritz-Carlton Club-based points program not involving MVCD Program members or Marriott Vacation Club ("MVC") properties.  Jurors exposed to the Value Conclusions would be unlikely to grasp this distinction and would be misled and confused.

For these and other reasons outlined below, admitting the C&W Appraisal (including its Value Conclusions) into evidence would severely prejudice the Marriott Defendants. Accordingly, Plaintiffs should be precluded from introducing the C&W Appraisal (or any part of it) into evidence or referring to it at trial.

## STATEMENT OF FACTS

### A. The C&W Appraisal Was Commissioned in 2013 to Assess the Value of Interests Held in a Trust That Contained the Inventory of a Discontinued Ritz-Carlton-Related Exchange Program

In 2009 (several years before the implementation of the MVC Affiliation at issue in this case), The Ritz-Carlton Destination Club ("RCDC") announced the Portfolio Program, a points-based luxury exchange program that allowed participating members to access participating RCDC properties. July 17, 2012 Letter from Eveleen Babich, attached as Exhibit A to the August 19, 2019 Declaration of Ian S. Marx ("Marx Decl."); *cf.* Deposition of Jay Neveloff ("Neveloff Dep.," attached to Marx Decl. as Exhibit B) at 17:4-18:1. Portfolio members purchased interests in the Bleu Florida Land Trust ("BFLT"), which held the inventory that comprised the Portfolio Program, and the "points" that Portfolio Program members would receive annually were currency that members would use to book their desired accommodation type for their desired length of time. The Portfolio Program was only for RCDC owners and did not involve MVCD Program members or MVC properties. Neveloff Dep. (Marx Decl. Ex. B) at 17:12-18; Deposition of Mary Lynn Clark (attached to Marx Decl. as Exhibit C) at 32:17-33:4.

In late 2012, the BFLT began to unwind itself, and the Portfolio Program was discontinued. As part of that process, the BFLT Association, Inc. ("BFLT Association"), the association of owners of interests in the Portfolio Program, engaged C&W to appraise the value of the interests held in the BFLT Trust. *See* C&W Appraisal (Marx Restr. Decl. Ex. 1) at Addendum C. The

3

C&W Appraisal was dated December 16, 2013 and issued by C&W Senior Director John C. Vaughan and C&W Managing Director Christopher T. Donaldson. *Id.* at 30.

### B. The MVC Affiliation, upon Which All Plaintiffs' Claims Are Based, Was First Implemented in December 2014, Allowing Exchanges Beginning 2015

Plaintiffs' claims in this case all relate to the MVC Affiliation, which was implemented by Cobalt, as Program Manager, in December 2014 and which (beginning in January 2015) allowed RC Club Aspen members to elect to enroll in the MVCD Program, deposit one or more of their RC Club Aspen use-weeks in the MVCD Program, and receive, in return, an allocation of exchange points that could be used to reserve accommodations at various MVC resorts and for other vacation experiences (such as cruises and safaris) subject to availability and other restrictions. November 20, 2014 Email from RCDC Member Communications (attached to Marx Decl. as Exhibit D). The MVC Affiliation also enabled MVCD Program members to access any RC Club Aspen use-weeks that RC Club Aspen members elected to deposit in the MVCD Program. April 2014 Letter from the Aspen Highlands Condominium Association at 3-4 (attached to Marx Decl. as Exhibit E).

Plaintiffs claim that the MVC Affiliation caused the value of their fractional interests to decline, and they seek damages for that alleged diminution in value. Seventh Amended Complaint at ¶¶ 105, 115, 123, 131; *see also id.* at ¶ 96 (alleging that, as a result of the MVC Affiliation, "approximately 400,000 [MVC] members … have access to luxury resorts that were formerly only available to Plaintiffs and [other RC Club Aspen members] …, thus devaluing Plaintiffs' vested property interests"). Plaintiffs also seek disgorgement of the profits that the Marriott Defendants allegedly received as a result of the MVC Affiliation. *Id.* at ¶¶ 106, 116, 112, 125, 137.

### C. The Value Conclusions Are Based on Inadmissible Hearsay, and the Entire C&W Appraisal (including the Value Conclusions) Is Unreliable

#### 1. The Value Conclusions are based on inadmissible hearsay

The C&W Appraisal contains the following Value Conclusions:

4

- "Overall, the conversion to a points system and the integration of the Marriott Vacation Club has had a negative impact on the market value of existing fractional interests in the Ritz Carlton Club." C&W Appraisal (Marx Restr. Decl. Ex. 1) at 19;

- "This was a major conversion that had a significant impact on existing owners of Ritz Carlton Club fractional interests." *Id.*;

- "While providing greater flexibility to owners, the conversion to a points system has been perceived by existing fractional owners as diluting the exclusivity of the Ritz Carlton Club by opening specific resorts to the Marriott Vacation Club. Conversely, the Marriott Vacation Club is now perceived in the marketplace as providing an excellent opportunity to access luxury product offered by the Ritz Carlton Club properties." *Id.* at 19;

- "This conversion [to a points system] has had a severely negative impact on demand for fractional interests at Ritz Carlton Club properties and the subject development in particular." *Id.* at 18;

- "[T]he conversion of the Ritz Carlton Club to a points system affiliated with the Marriott Vacation Club, has resulted in a significant decline in demand for fractional interests at the Ritz Carlton Club Aspen Highlands." *Id.* at 12.

- "The conversion of the Ritz Carlton Club to a points system exacerbates the negative attributes that impair the marketability of the subject units*." Id.* at 20.

The Underlying Statements on which these Value Conclusions are based constitute out-of-court statements that undisclosed owners allegedly made to undisclosed real estate brokers, who then allegedly relayed them to Mr. Vaughan, who further relayed them to Mr. Donaldson. *See* May 23, 2018 Deposition of Christopher T. Donaldson ("5/23/18 Donaldson Dep.," attached to Marx Decl. as Exhibit F) at 111:16-112:13 (testifying that C&W Appraisal's conclusion that "conversion has had a severely negative impact on demand for fractional interests" was based on "discussions . . . with listing agents, selling agents that were actively marketing these shares. And – and probably other market participants, if you will"); *see also* June 25, 2018 Deposition of Christopher T. Donaldson ("6/25/18 Donaldson Dep.," attached to Marx Decl. as Exhibit G) at 343:4-344:14 (noting that Mr. Vaughan's conversations were with listing agents and sales agents who had supposedly spoken to owners, and acknowledging that C&W Appraisal and work files do not reference such conversations).

## 2. The Value Conclusions were outside the scope of C&W's retention, and their basis was never tested

C&W was not retained to offer conclusions relating to the MVC Affiliation, which had not yet been implemented.  5/23/18 Donaldson Dep. (Marx Decl. Ex. F) at 286:17-23 (asked to confirm that C&W had not been "hired to measure the impact, if any, of the conversion or MVC access," Mr. Donaldson replied "Correct").  As C&W was not hired to provide the Value Conclusions, Mr. Donaldson did not test, analyze or confirm the accuracy of the Underlying Statements on which those Conclusions are based.  6/25/18 Donaldson Dep. (Marx Decl. Ex. G) at 391:16-392:19).[1]

## 3. C&W acknowledges that the Underlying Statements are an insufficient basis for the Value Conclusions

Mr. Donaldson concedes that the Underlying Statements are an insufficient basis for the Value Conclusions.  *See id.* at 389:20-390:4 (testifying that, if he were submitting an expert report to a court on the impact of the conversion to a points system, "[i]t would include more than just what's in this appraisal[.]"); *see also id.* at 390:8-11 (explaining that a true analysis of the impact of the conversion to a points system "would include a much … greater detailed property history of sales . . . [and] more information on … market trends … and more comparable data").  Significantly, Mr. Donaldson acknowledges that, to determine "the impact of the conversion," a court or jury would need all the aforementioned additional information.  *Id.* at 390:12-23.

## 4. The C&W Appraisal (including its Value Conclusions) are unreliable because C&W ignored a host of factors that could have caused the fractional interests' alleged diminution in value

Although the C&W Appraisal asserts (by way of the Value Conclusions) that the conversion to a points system negatively impacted the value of fractional interests and diminished exclusivity, C&W admits that it failed to account for other factors that could have had such

---

[1] Nothing in the record suggests that Mr. Vaughan did so, either.

impacts. For example, with respect to exclusivity, a broad array of non-owners routinely accessed RC Club Aspen fractional interests because it was common practice for owners of those interests to rent them out. *See, e.g.*, Exhibit 2610 from the Deposition of Daniel Hicks (attached to Marx Decl. as Exhibit H) (chart summarizing number of nights rented out); Deposition of Daniel Hicks (attached to Marx Decl. as Exhibit I) at 89:17-93:24 (explaining Exhibit 2610). Donaldson was unaware that outsiders could access the RC Club Aspen through rentals, a fact that he conceded would have been pertinent to the C&W Appraisal's Value Conclusions. 6/25/18 Donaldson Dep. (Marx Dep. Ex. G) at 347:7-348:9. C&W also ignored that outsiders accessed RC Club Aspen as guests of fractional owners and as members of other exchange programs used by the owners. *See, e.g.*, May 15, 2018 Deposition of Stephanie Sobeck ("5/15/18 Sobeck Dep.," attached to Marx Decl. as Exhibit J) at 119:12-16 ("[N]othing . . . kept members from renting [their units] to their friends or letting other people use [their units]."); November 16, 2017 Deposition of Stephanie Sobeck ("11/16/17 Sobeck Dep.," attached to Marx Decl. as Exhibit K) at 24:7-18.

In addition, although the Value Conclusions inaccurately suggest otherwise, it is undisputed that MVCD Program members were able to access the RC Club Aspen years before the MVC Affiliation. *See, e.g.,* 5/15/18 Sobeck Dep. (Marx Decl. Ex. J) at 55:5-23; 240:11-241:7 (explaining that, from 2011 to 2014, MVCD Program members with Premier and Premier Plus status could (1) access the RC Club Aspen and other RCDC resorts through developer-owned fractional interests and (2) access other RCDC resorts through the deposit of developer-owned inventory at other RCDC resorts into a Florida land trust ("MVC Trust"); *cf.* 5/23/18 Donaldson Dep. (Marx Decl. Ex. F) at 231:20-232:4 (acknowledging that the C&W Appraisal fails to discuss the deposit of unsold developer fractional interests at other RCDC resorts into the MVC Trust).

Mr. Donaldson also admits that C&W failed to consider numerous other factors that could have negatively impacted the value of fractional interests, including:

- the decline in sales volume in the fractional industry as a whole (5/23/18 Donaldson Dep. (Marx Decl. Ex. F) at 233:15-235:9);

- the industry-wide "downward pressure on pricing and weak demand" (*id.* at 235:10-14);

- decreased marketability of fractional interests due to the credit crisis (*id.* at 238:5-239:4);

- unanticipated poor sales performances in 2010 while "households continued to repair and rebuild balance sheets and shed non-essential expenses" (*id.* at 239:5-14);

- the availability of whole ownership products at significant discounts detracting from any pressure on the pricing of fractional interests (*id.* at 239:15-7);

- the location of RC Club Aspen, which experienced a strong demand for residential product but a "constrained" demand for fractional interests (*id.* at 240:8-15);

- high maintenance costs and real estate taxes (*id.* at 241:10-23); and

- Aspen's fractional ownership market's failure to recover from the recession.  *Id.* at 243:8-25.

Relatedly, in preparing the C&W Appraisal and reaching the Value Conclusions, C&W made no attempt to isolate the alleged impact of the "conversion" from other factors impacting value.  *Id.* at 249:17-253:1 (testifying that he did not isolate different factors that impacted the pricing of fractional interests and conceding that, to determine "the impact, if any, of the Marriott affiliation or access of Marriott members, you'd have to discount all the other factors," which he did not do); *id.* at 276:20-278:25 (conceding that it would also help to "look[] at listings and sales of other resorts that didn't experience the same conversion or access").

### 5. In preparing the C&W Appraisal and reaching the Value Conclusions, C&W failed to use accepted appraisal techniques and procedures and made other errors

Mr. Donaldson acknowledges that the "[Uniform Standards of Professional Appraisal Practice ("USPAP")] are the rules that appraisers have to live by in terms of their … methodology [and] … in order to be state licensed.  *Id.* at 45:6-13.  He further explained that "[m]ost … states

8

require … USPAP as kind of a ***minimum*** appraisal standard for what … the appraisal process is, how it needs to be performed, and how it needs to be reported." *Id.* at 45:9-13 (emphasis added). Mr. Donaldson conceded that "to develop credible assignment results" under USPAP standards, the C&W Appraisal should have set forth the reasoning supporting all of its analyses, opinions, and conclusions. *Id.* at 222:22-223:1, 288:9-289:17; *see also id.* at 290:14-293:6 (conceding that C&W Appraisal violated USPAP requirements in "Conclusions of Value" section).

The Marriott Defendants' expert appraiser (Mark Dunec of FTI Consulting) confirms Mr. Donaldson's admission that the C&W Appraisal, including its Value Conclusions, do not comport with industry standards. (Plaintiffs submitted no rebuttal report; accordingly, the testimonies of Messrs. Donaldson and Dunec are unrebutted.) According to Mr. Dunec, "the [C&W] Appraisers fail to provide any evidence of proper research and/or analysis to support this claim of impairment [of the value of fractional interests by virtue of the MVC Affiliation] in the Report." October 26, 2018 Expert Report of Mark S. Dunec ("Dunec Report," attached to Marx Decl. as Exhibit L) at 7. With respect to the Value Conclusions in particular, after listing myriad factors that the C&W appraisers failed to consider and the many misconceptions underlying their assumptions, Mr. Dunec explained that, "[t]o the extent [the C&W] Appraisers seek to claim impairment to marketability and value due to stigma, they must provide support for the claim, not just as a measure of their expertise and competency, but because such support is a requirement of the industry standards set forth in [t]he [USPAP]." *Id.* at 8.

Continuing his critique of the Value Conclusions, Mr. Dunec stated that because "the industry recognizes that the presence of a potentially adverse condition does not necessarily cause adverse effects on value," appraisers who are adhering to industry standards will "substantiate their claim with a form of analysis . . . [such as] a regression analysis, historical sales comparisons, or

9

some other replicable analysis." *Id*.; *see also* 5/23/18 Donaldson Dep. (Marx Decl. Ex. F) at 279:14-289:17; 292:11-293:6 (acknowledging that well-established methods exist for measuring whether a "detrimental condition" causes a diminution in value but C&W used none in reaching Value Conclusions). Mr. Dunec summarized: "As evidenced by their failure to perform any sort of analysis related to their claims of detrimental factors impacting value, Messrs. Vaughan and Donaldson did not properly assess the Subject Units' value." Dunec Report (Marx Decl. Ex. L) at 9. Importantly, Mr. Dunec also pointed out that, in reaching the Value Conclusions, "the [C&W] Appraisers fail to distinguish, and actually confuse, the use of a points based use system for the Ritz-Carlton [C]lubs only, which was ended by 2012, and the [MVC] Affiliation which . . . was implemented in December of 2014. The discontinued points based use system for the Ritz-Carlton Clubs did not permit members of the MVC Affiliation to access the Ritz-Carlton Clubs." *Id.* at 6.

The C&W Appraisal as a whole is also unreliable. For one thing, the C&W appraisers failed to consider sales performances from comparable properties. 5/23/18 Donaldson Dep. (Marx Decl. Ex. F) at 273:15-278:25 (explaining that, although appraisals typically analyze comparables from other properties, that was not done for the C&W Appraisal); Dunec Report (Marx Decl. Ex. L) at 7-9 (among other issues, the appraisers "made insufficient effort to evaluate comparables, other than to compare sales prices of comparable units within the same development").

Further contributing to the C&W Appraisal's unreliability is the fact that the C&W appraisers never even set foot on RC Club Aspen property but, instead, relied solely on information—often unverified—from other sources. *See, e.g.*, C&W Appraisal (Marx Restr. Decl. Ex. 1) at 30 (noting that Vaughan and Donaldson "did not make a personal inspection of the property that is the subject of this report"); 5/23/18 Donaldson Dep. (Marx Decl. Ex. F) at 136:11-138:2 (testifying that he relied on a market report by Ragatz & Associates as a primary source for

10

certain information in the Appraisal); *id.* at 144:3-16 (acknowledging that information was "pretty much extracted right out of the Ragatz report); *id.* at 226:4-7 (admitting that he performed no "frontline, new research related to this appraisal").

Likewise rendering the C&W Appraisal deficient is the fact that, as a mere summary report, it does not meet the appraiser's standards for use in a litigation. *Id.* at 214:19-216:3 (conceding that the C&W Appraisal is not a "full-blown appraisal" of "the kind … you would prepare if you were submitting an expert report in court"). Similarly disqualifying is the C&W appraisers' limited understanding of the fractional interest industry. 6/25/18 Donaldson Dep. (Marx Decl. Ex. G) at 373:5-10 (testifying that his sole training and education in fractional interests consists of having attended one seminar on that topic); *see also id.* at 390:25-391:15 (admitting that he has no "scientific, technical, or specialized knowledge" about points programs).

## ARGUMENT

### A. THE C&W APPRAISAL AND THE VALUE CONCLUSIONS ARE INADMISSIBLE HEARSAY

Hearsay is an out-of-court statement "offer[ed] in evidence to prove the truth of the matter asserted in the statement." F.R.E. 801(c). Hearsay is inadmissible unless it falls into one or more of the exceptions to the hearsay rule listed in Rule 803. F.R.E. 802. Where multiple layers of hearsay are involved, for the statement to be admissible, each component layer must fall within an exception to the hearsay rule. *See* F.R.E. 805 ("Hearsay within hearsay"). In most cases, that is an insurmountable burden for the statement's proponent. *See, e.g., In re Air Crash Disaster at Stapleton Int'l Airport, Denver, Colo., on Nov. 15, 1987*, 720 F. Supp. 1493, 1498 (D. Colo. 1989) ("[D]ouble-hearsay and predominant reliance thereon are indicia of untrustworthiness."); *Regan-Touhy v. Walgreen Co.*, 526 F.3d 641, 650 (10th Cir. 2008) (finding evidence of an "alleged statement [that] comes to the court only by way of a three-link chain" inadmissible hearsay); *Boren*

11

*v. Sable*, 887 F.2d 1032, 1035 (10th Cir. 1989) (finding wife's testimony about what her husband told her about what he told the defendant inadmissible double hearsay).  Appraisals are, by their nature, out-of-court statements.  *Kechi Twp. v. Freightliner, LLC*, 592 F. App'x 657, 659 (10th Cir. 2014) (finding testimony based on an appraisal constituted hearsay).  Thus, to be admissible, they must fall within an exception to the hearsay rule.

Here, Plaintiffs will seek to have the C&W Appraisal admitted into evidence at trial in order to support their claim that the MVC Affiliation impacted their fractional interests' value, exclusivity, and marketability.  That is, they will offer the C&W Appraisal for the truth of the Value Conclusions that were derived from the Underlying Statements, that is, from multiple layers of hearsay statements that allegedly originated with undisclosed owners, were then relayed to undisclosed brokers or agents, and were then passed along to Mr. Vaughan.  *See* Statement of Facts ("SOF") Sect. C(1), *supra.*  The C&W Appraisal, however, does not fall into any exception to the hearsay rule, nor do the Value Conclusions or any of the multiple hearsay layers on which the Value Conclusions are supposedly based.

For example, the business records exception (F.R.E. 803(6)) does not apply because, *inter alia,* "[t]he essential component of the business records exception is that each actor in the chain of information is under a business duty or compulsion to provide accurate information." *United States v. McIntyre*, 997 F.2d 687, 699 (10th Cir. 1993) (holding that motel's arrival and departure log was inadmissible hearsay not subject to the business records exception because the motel clerk relied on information received from guests in compiling the log); *United States v. Snyder*, 787 F.2d 1429, 1434 (10th Cir. 1986) ("The reason underlying the business records exception fails, however, 'if any of the participants is outside the pattern of regularity of activity.'" (quoting J. Weinstein & M. Berger, Weinstein's Evidence, at 803-186 (1985))).  Therefore, the general rule

is that "[a]ny information provided by . . . an outsider to the business preparing the record[] must itself fall within a hearsay exception to be admissible." *United States v. Gwathney*, 465 F.3d 1133, 1141 (10th Cir. 2006).  Neither the unidentified brokers nor the unidentified owners were under a duty to provide accurate information; thus, their statements do not fall within the business records exception or within any other exception to the hearsay rule.

Accordingly, the C&W Appraisal, including the Value Conclusions, should be excluded from evidence as inadmissible hearsay.

### B. THE C&W APPRAISAL AND ITS VALUE CONCLUSIONS SHOULD BE EXCLUDED AS UNRELIABLE BECAUSE THEY ARE BASED ON NO SOUND METHODOLOGY

Mr. Donaldson conceded that the Value Conclusions are not supported by any methodology, that they were not tested and that no recognized industry protocol was followed in reaching them.  *See* SOF Sect. C(2)-(5), *supra*.  Mr. Donaldson further acknowledged that, although proper methods for determining the impact of a "detrimental condition" exist, C&W used none of them in reaching the Value Conclusions, i.e., in assessing the supposed impact of the "conversion to points" or MVCD Program member access to the RC Club Aspen.  Rather, C&W relied entirely on unverified hearsay statements from undisclosed individuals.  *See id.*  In addition, in preparing the C&W Appraisal and reaching the Value Conclusions, C&W appraisers failed to account for significant factors that may have impacted values; failed to isolate the impact of the MVC Affiliation from other factors; and failed to consider comparable properties as industry practice requires.  *See id.*; *cf. Hubbell v. Carney Bros. Constr.*, 2011 WL 1060239, at *2-*3 (D. Colo. Mar. 23, 2011) (in action arising from construction defect, striking expert damages report for failing to exclude other factors in opining that defect caused diminution in property's value).

These methodological failures render the C&W Appraisal, including the Value Conclusions, unreliable and irrelevant.  *See Water Pik, Inc. v. Med-Systems, Inc.*, 726 F.3d 1136,

1145 (10th Cir. 2013) (affirming lower court's finding that, due to methodological flaws, the survey at issue was "devoid of any probative value and therefore irrelevant"); *Pertile v. General Motors, LLC,* 2017 WL 4099895, at *7 (D. Colo. Sept. 15, 2017) (excluding expert testimony because it was based on no disclosed methodology or standard). Accordingly, the C&W Appraisal, including the Value Conclusions, should be excluded from evidence as unreliable.

### C. THE VALUE CONCLUSIONS SHOULD BE EXCLUDED BECAUSE C&W MISUNDERSTOOD AND CONFLATED THE PORTFOLIO PROGRAM AND THE MVC AFFILIATION

It is fundamental that "[i]rrelevant evidence is inadmissible." Fed. R. Evid. 402. Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence; and . . . the fact is of consequence in determining the action." Fed. R. Evid. 401. Even relevant evidence may be excluded, however, "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. In performing the Rule 403 balancing test, "[t]he district court has considerable discretion" (*United States v. Tan*, 254 F.3d 1204, 1211 (10th Cir. 2001)) and should place "particular scrutiny … on the proponent's showing of probative value." *Toy v. American Family Mut. Ins. Co.*, 2014 WL 485922, at *2 (D. Colo. Feb. 6, 2014) (Brimmer, *J.*). Evidence is appropriately excluded under Rule 403 where it could create "the possibility of unfair prejudice associated with the admissibility of unreliable or inaccurate information, as well as … confusion of the jury…." *Lorraine v. Markel Am. Ins. Co.*, 241 F.R.D. 534, 584 (D. Md. 2007) (citing *St. Clair v. Johnny's Oyster and Shrimp Inc.*, 76 F. Supp. 2d 773 (S.D.Tx. 1999).

In reaching their Value Conclusions, the C&W appraisers made a fundamental error. They mistakenly conflated the Portfolio Program that ended by 2012 with the MVC Affiliation that was not implemented until December 2014 with exchanges starting January 2015. *See* SOF Sects. (A),

14

(B), *supra*; *see also id.* at C(5) (quoting Mr. Dunec, who states: "the [C&W] Appraisers fail to distinguish, and actually confuse, the use of a points based use system for the Ritz-Carlton [C]lubs only, which was ended by 2012, and the [MVC] Affiliation which . . . was implemented in December of 2014. The discontinued points based use system for the Ritz-Carlton Clubs did not permit members of the MVC Affiliation to access the Ritz-Carlton Clubs."). The likelihood this error would confuse the jury while prejudicing the Marriott Defendants is extremely high, as jurors will be misled into believing that C&W corroborates Plaintiffs' theories and expert opinions when the Value Conclusions are, in reality, simply inaccurate and have no probative value. Accordingly, the C&W Appraisal (including its Value Conclusions) should be excluded because it is irrelevant under F.R.E. 402 and unduly prejudicial under F.R.E. 403. *See Mid-Continent Cas. Co. v. Blutone Enters., LLC*, 422 F. App'x 671, 672 (10th Cir. 2011) (affirming exclusion of document where basis for introducing it was false and document was irrelevant, confusing, and prejudicial).

## CONCLUSION

For all the foregoing reasons, the Marriott Defendants respectfully request that the Court enter an order precluding Plaintiffs (including their expert witnesses and counsel) from introducing the C&W Appraisal into evidence or referring to it at trial.

Dated: August 19, 2019                            Respectfully submitted,

By:   *s/ Philip R. Sellinger*
      Philip R. Sellinger
      Ian S. Marx
      GREENBERG TRAURIG, LLP
      500 Campus Drive, Suite 400
      Florham Park, NJ 07932
      Email:   SellingerP@gtlaw.com
               MarxI@gtlaw.com

*Attorneys for the Marriott Defendants*

15

## CERTIFICATE OF SERVICE

I hereby certify that, on August 19, 2019, a true and accurate copy of the foregoing **MARRIOTT DEFENDANTS' MOTION *IN LIMINE* TO EXCLUDE THE CUSHMAN & WAKEFIELD APPRAISAL** was filed and served with the Clerk of the Court via CM/ECF filing system, which will send notification to the following:

Michael J. Reiser
Law Office of Michael J. Reiser
1475 N Broadway, Suite 300
Walnut Creek, CA 94596
*Counsel for Plaintiffs*

Matthew C. Ferguson
The Matthew C. Ferguson Law Firm, P.C.
119 South Spring, Suite 201
Aspen, Colorado 81611
*Counsel for Plaintiffs*

Tyler R. Meade
The Meade Firm P.C.
1816 Fifth Street
Berkeley, CA 94710
*Counsel for Plaintiffs*

Linda Pham Lam
Michael Schrag
Gibbs Law Group LLP
505 14th Street, Suite 1100
Oakland, CA 94612
*Counsel for Plaintiffs*

*/s/ Jaclyn DeMais*
Jaclyn DeMais