# EXHIBIT F

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                 FOR THE DISTRICT OF COLORADO
 3

    RCHFU, LLC, et al.,            )
 4                                 )
        Plaintiffs,                )
 5                                 )
    vs.                            )
 6                                 )
    MARRIOTT VACATIONS             )
 7  WORLDWIDE CORPORATION, et      )
    al.,                           ) Civil Case No.:
 8                                 ) 16-01301 PAB
        Defendants.                )
 9

10         Videotaped videoconference deposition of:
11                CHRISTOPHER T. DONALDSON
12
13             May 23, 2018 * 9:37 a.m.
14
15            Location:  Holland & Hart
16         222 South Main Street, Suite 2200
17            Salt Lake City, Utah 84101
18
19
20
21         Reporter:  Kelly Fine-Jensen, RPR
22      Notary Public in and for the State of Utah
23
24         Videographer:  Ryan Reverman, CLVS
25  PAGES 1 - 323
```

Page 1

1 about the appraisals, any questions you had with him
2 or discussed what was in them?
3    A.   He and I have had -- I've -- I've had
4 conversations with Mr. Vaughan recently.
5    Q.   About these -- about these matters?
6    A.   Well, it -- it was about a lot of matters.
7    Q.   Okay.
8    A.   Including this one.
9    Q.   Because we kind of wanted to take his
10 deposition, but then we were talking about fly
11 fishing and everything, and then I couldn't -- and I
12 couldn't get ahold of him.  So you got -- you got
13 involved.
14        Is it -- is it -- did he do most of the
15 legwork in the reports?
16    A.   Yes.  He did.
17    Q.   All right.  Did he mention whether or not
18 he was willing to have his deposition taken or -- to
19 you?  Did he discuss that with you?
20    A.   Oh, I think he was willing to if he got
21 engaged and -- and was going to receive payment for
22 it.
23    Q.   Oh, okay.  I'm happy to do that.  I just
24 didn't hear back from him.  Okay.
25        MR. REISER:  Did he -- service process for

1 two months?
2    Q.   (By Mr. Ferguson)  Yeah.  He -- we tried
3 to serve him with process and just couldn't --
4 couldn't do it.
5    A.   Oh, okay.
6    Q.   Tried to call him numerous times.  Not
7 that -- not that anybody really wants to hang out
8 with lawyers for a day.
9        Let me -- let me just show you some
10 exhibits here.  March you through a few.
11        I'm going to start at --
12        MR. FERGUSON:  Where did we end in
13 Florida, Ian?  I think it was 2246.
14        How about 2247.
15        (EXHIBIT 2247 WAS MARKED.)
16        MR. FERGUSON:  Here you go, Philip --
17        MR. MARX:  Well, actually, so -- just for
18 purposes of the record, what -- what Exhibit 2247 is,
19 that's the Dancing Bear Residences --
20        MR. FERGUSON:  Yeah.
21        MR. MARX:  -- Appraisal of Real Property,
22 as of November 17, 2010.
23        MR. FERGUSON:  That's what it is.
24        And I'll also add that this one is not
25 Bates labeled.  I pulled the run -- I pulled the

1 runoff that came in from Cushman.  But the Bates
2 range is 00278 to 00362.  It's under CUSHMAN II.  I
3 downloaded the wrong one.
4    Q.   (By Mr. Ferguson)  So I've put in front of
5 you this appraisal of real property.  It's in a
6 self-contained appraisal report.
7        Would you just explain very briefly what a
8 self-contained appraisal report is, sir?
9    A.   A self-contained appraisal report is -- is
10 actually an obsolete term at this time.
11    Q.   Okay.
12    A.   That was changed I believe in 2012.  USPAP
13 changes every two years.  And -- it's now just
14 called an appraisal report.
15        At the time, a self-contained appraisal
16 report was intended to be the most comprehensive
17 style of appraisal reporting, where the report would
18 contain the data and the discussion and analysis
19 adequate to lead a reader to the conclusion of value.
20    Q.   Okay.  And just -- just because a judge or
21 a jury might be reading this or seeing this video
22 some day, USPAP is the Uniform Standards of
23 Professional Appraisal Practice; correct?
24    A.   Yes, sir.
25    Q.   Okay.  And just very briefly, explain for

1 the ladies and gentlemen and the Court what -- what
2 the USPAP -- what it is and how you use it?  Just
3 simply.
4    A.   Okay.  Yeah --
5    Q.   So like explaining it like to lawyers.
6    A.   USPAP are the rules that appraisers have
7 to live by in terms of their -- their methodology,
8 their -- their considerations that -- in order to be
9 state licensed.  Most -- most -- most states require
10 USPAP as a minimum -- as -- USPAP as kind of a
11 minimum appraisal standard for what process -- what
12 the appraisal process is, how it needs to be
13 performed, and how it needs to be reported.
14    Q.   Okay.  And what is the -- the current --
15 well, let me withdraw that.
16        This self-contained appraisal report is a
17 -- is a -- now -- I don't want to say, "obsolete,"
18 but is an unused term under USPAP.  What is the
19 closest appraisal type report that would -- would --
20 what -- I mean, what is a self-contained appraisal
21 report, what is it called today, generally?
22    A.   Actually, it's gone to be a more --
23        MR. SELLINGER:  Objection to form.
24        THE WITNESS:  It's more broad.  It's
25 called an appraisal report.

1 is not correct?
2        MR. SELLINGER:  Objection to form.
3        THE WITNESS:  No.
4    Q.    (By Mr. Ferguson)  The answer is what?
5    A.    No.
6    Q.    Okay.  And on 2264 you'll see that the C&W
7 file number is 13-3800 -- sorry, 38033-900043-001.
8 Is that -- first of all, let's start with one.  But
9 I'm going to show you the Aspen report.  I think that
10 has a three after it.  I think Tahoe is number two.
11        What do these number mean?  Are these
12 offices?  Types of work?  Are they just numerical
13 numbers that administration people put on them?
14    A.    No.  There -- there is some meaning to
15 some of them.  I'm not sure I know all.
16        Thirteen is -- the first two numbers are
17 typically the year of the appraisal.
18    Q.    Okay.  Got it.
19    A.    The next -- the next five numbers are
20 typically some -- some office number.
21    Q.    Okay.
22    A.    And -- and I don't know what that -- you
23 know, it's a finance number or something that
24 accounting uses to -- you know, that -- I believe
25 that's the L.A. office --
Page 106

1    Q.    Okay.
2    A.    -- number.  My -- my number here in Utah
3 is 53004, or something like that.
4    Q.    Okay.
5    A.    And then the last number -- well, the --
6 the nine number is usually the -- just the sequencing
7 of jobs in any given year.
8        And -- and then the 001 follows
9 everything.  I have no idea what that is.
10    Q.    All right.  So there's -- there's not a
11 client identification part of this, like --
12    A.    No --
13    Q.    -- Marriott Vacations Worldwide has a
14 number?
15    A.    This is -- this is completely internal to
16 C&W.
17    Q.    Okay.  Now I got a color one for you.
18    A.    Oh, nice.  Thank you.  Color's always
19 better.
20        THE REPORTER:  2265.
21        (EXHIBIT 2265 WAS MARKED.)
22        MR. MARX:  This is Exhibit 2265.  It looks
23 like it's a draft appraisal for the Aspen property.
24 The Bates numbers are CUSHMAN II 140 through 208.
25    Q.    (By Mr. Ferguson)  This one's easy because
Page 107

1 I've got a stamp called "Draft" on the front of it.
2    A.    Right.
3    Q.    And if you look at page 144, they actually
4 -- they have your signatures, but they're stamped
5 "Draft" across them; correct?
6    A.    Yes.
7    Q.    Okay.  Clearly you were letting someone
8 know probably -- you were letting the end user, the
9 client, Bleu Florida Land Trust, know that this was a
10 draft?
11    A.    Yes.
12    Q.    Okay.
13    A.    And all the attorneys to come after.
14    Q.    If you go to page Roman numeral IV, it's
15 Bates labeled 146.
16        What does that Aspen Unit Summary mean?  I
17 think we've seen maybe that information in a
18 different format.  But just briefly, what is that?
19    A.    That's a call out of the subject property
20 as noted in Exhibit A of the letters of engagement,
21 which we have previously reviewed.
22    Q.    Okay.  And I'll cover more of this when I
23 come to the -- I'll -- I'll do the drafts first and
24 then I'll come back to the finals.
25        But would you go to the next page, Roman
Page 108

1 numeral VI, Bates label 147, of this draft report,
2 for Aspen Highlands, 65 fractions.
3        You'll see that it says, "Extraordinary
4 Assumptions."  We talked about that a little bit
5 before.
6    A.    Yes.
7    Q.    What was -- what was the extraordinary
8 assumption in connection with this particular
9 appraisal report, summary appraisal report in the old
10 days?
11    A.    Right.  Well, this is -- the assumption --
12 letting a reader know that we did not inspect the
13 property.
14    Q.    Okay.  And did this -- this report, did it
15 use a hypothetical condition?
16    A.    No.
17    Q.    Okay.  Do you recall what valuation models
18 or methods you used in connection with these?  You
19 have a cost approach, income approach, sales
20 comparison.  Do you recall what that -- generally
21 what this -- what approach or approaches were taken?
22    A.    Actually, the anticipated approach was
23 outlined in the letter of engagement.  This would be
24 a sales comparison approach.  And, indeed, that's
25 what's been applied in this appraisal, the sales
Page 109

28 (Pages 106 - 109)

1 comparison approach.
2    Q.   Okay.  So you ruled out the income
3 approach?
4    A.   Yes.
5    Q.   And you ruled out -- what's the other one?
6    A.   Cost approach.
7    Q.   Cost approach.  I said that already.
8    A.   Right.
9    Q.   I notice that you used all three of those
10 in the Dancing Bear engagement.  Why -- why was that?
11 Or why would that have been?
12    A.   I was appraising the entire project.
13    Q.   Okay.
14    A.   These are just condominium units in a much
15 larger building.  And to apply any kind of a cost
16 approach figure to a singular unit within a
17 condominium project is not -- is not feasible or not
18 appropriate.
19    Q.   Okay.  Thank you.
20       Would you go to page 11 of Exhibit 2265.
21    A.   Yes, sir.
22    Q.   Thank you.
23       This particular section of the draft
24 summary appraisal report, there is a chart again of
25 what's being appraised.  But there's a section

Page 110

1 written about the Ritz Carlton Club Aspen Highlands.
2       Do you see that?
3    A.   Yes.
4    Q.   Okay.  So that's specific to this
5 particular assignment?  Obviously, the San Francisco
6 and Tahoe appraisal reports do not have that?
7    A.   Yes, sir.
8    Q.   Okay.  And on the second paragraph down,
9 you went through the -- the history of the current
10 Aspen Highlands Village there and how Hines -- Hines
11 entities and Skico built that out?
12    A.   Yes.
13    Q.   Okay.  Now, there is something in here
14 about how great the Highlands Bowl is.
15    A.   Right.
16    Q.   Yeah.  So the bottom of that page 11, on
17 2265 says, "Subsequent to the sell out of this
18 development, the Ritz Carlton Club was converted to a
19 points system, discussed in the following paragraph.
20 This conversion has had a severely negative impact on
21 demand for fractional interests at Ritz Carlton Club
22 properties and the subject development in
23 particular."
24       What do you recall about any input that
25 you received to write that sentence to the intended

Page 111

1 user, Bleu Florida Land Trust?
2    A.   Well --
3       MR. SELLINGER:  Objection to form.
4       THE WITNESS:  -- I believe that, you know,
5 Mr. Vaughan did most of the writing --
6    Q.   (By Mr. Ferguson)  Okay.
7    A.   -- here.
8    Q.   Okay.
9    A.   Obviously I read it.  And I believe his
10 research was based on discussions, again, with
11 listing agents, selling agents that were actively
12 marketing these shares.  And -- and probably other
13 market participants, if you will.
14    Q.   Do you recall whether or not you knew at
15 the time you signed this report and -- and supported
16 the quality control, and signed it in that capacity,
17 and also as a signatory, do you recall whether or not
18 -- whether or not Ritz-Carlton Development Company or
19 Marriott Vacations Worldwide were actively selling
20 fractional interests at Aspen Highlands?
21    A.   That I do not recall.
22    Q.   Okay.  Do you have any recollection that
23 anyone told you that they had stopped selling or
24 marketing fractional units at Aspen Highlands?
25    A.   I -- I don't have that recollection.  But

Page 112

1 I would assume I had discussions related to how that
2 was going with Mr. Vaughan.
3    Q.   Yeah.  And you've done about a thousand
4 appraisals since 2013?
5    A.   Yeah.  A lot of them.
6    Q.   Okay.  All right.  And then you'll see on
7 the next page, page 12, of Exhibit 2265 -- I won't
8 make you look at every single word in the
9 Repercussions of Conversion to Points System, but
10 does that appear to be the same paragraph relative to
11 the Ritz-Carlton Aspen Highlands summary appraisal
12 report?
13    A.   Yes.  It does.
14       MR. SELLINGER:  Objection to form.
15    Q.   (By Mr. Ferguson)  And do you recall
16 whether or not anyone at Bleu Florida Land Trust,
17 Mr. Pierce, or any of those people we saw on that
18 letter, or any lawyers or anybody, responded and
19 objected to this section of the summary appraisal
20 report, here in draft form of course?
21    A.   No.  I do not.
22    Q.   Okay.
23       MR. FERGUSON:  Here you go, Kelly, Ian.
24       (EXHIBIT 2266 WAS MARKED.)
25       MR. MARX:  226 -- I'm sorry.  2266 is --

Page 113

29 (Pages 110 - 113)

1    Q.   Did you -- did you do the analysis within
2  the report?
3    A.   Yes.
4    Q.   Did you do analysis about the Aspen
5  market?
6    A.   Yes.
7    Q.   Did you do the analysis about the macro
8  market with respect to fractional type property?
9    A.   Yes.
10    Q.   Okay.  And did you do analysis with
11  respect to the actual physical plant of the building?
12    A.   Yes.
13    Q.   Had you inspected the building in 2007?
14    A.   Yes.
15    Q.   Had you inspected it in 2010?
16    A.   Yes.
17    Q.   All right.  And based upon some of those
18  things that we just went through, did you
19  arrive at a valuation conclusion with respect to the
20  inventory that was left at Dancing Bear?
21    A.   Yes.
22    Q.   What was that?
23    A.   That was 40 --
24       MR. SELLINGER:  Objection to form.
25       THE WITNESS:  $40,450,000.

Page 134

1    Q.   (By Mr. Ferguson)  And on page four
2  there's a line that says, "Per remaining share:
3  $316,016."
4       What does that mean?
5    A.   That -- that means that if you --
6       MR. SELLINGER:  Objection to form.
7       THE WITNESS:  If you divide that
8  40,450,000 by the number of shares being appraised,
9  it comes out to that value per share.
10    Q.   (By Mr. Ferguson)  All right.  And what do
11  you mean by "exposure time" and "marketing time"?
12    A.   Exposure time is required by USPAP.  It's
13  intended to -- it's kind of -- it's -- it's somewhat
14  of an assumption, if you will.  That when I state an
15  exposure time, I'm saying it took that many months to
16  achieve this market value of $40 million.
17    Q.   Okay.
18    A.   The marketing -- the exposure period is an
19  assumption of the time period prior to the date of
20  value.
21       The marketing period is the projection of
22  the potential marketing time required subsequent to
23  the date of the value at that value.
24    Q.   Would that 18 months then mean that you
25  were projecting it would be sold, totally sold out,

Page 135

1  absorbed by then, or is it something else?
2    A.   That is something else.
3    Q.   Okay.
4       MR. SELLINGER:  Objection to form.
5    Q.   (By Mr. Ferguson)  Please explain.
6    A.   That 18 months is tied specifically to
7  that $40 million conclusion.
8    Q.   Okay.
9    A.   The -- the sell out of the individual
10  shares is addressed in the appraisal.
11    Q.   Okay.  I just wanted to spend a little bit
12  of time, but not too much, because it's in writing
13  here, but you have a Fractional Market Analysis on
14  page nine of Exhibit 2247, the Dancing Bear appraisal
15  report from November 17, 2010.
16    A.   Yes.
17    Q.   And I -- we can look at the redline in the
18  2248, but if you just kind of scan those three or
19  four pages, looks like four pages, is this something
20  that you actually wrote or is this something you had
21  -- some of it was off the shelf, so to speak, or do
22  you recall?
23    A.   I wrote this.
24       MR. SELLINGER:  Objection to form.
25       THE WITNESS:  I -- if -- if you note in

Page 136

1  the second paragraph --
2    Q.   (By Mr. Ferguson)  Yes.
3    A.   -- on page nine --
4    Q.   Yes.
5    A.   -- I call out the primary source of this
6  information.
7    Q.   Ragatz & Associates?
8    A.   Yes.
9    Q.   Okay.  All right.  And did you utilize --
10  what -- what weight did you put on the Ragatz &
11  Associates' -- let me read this.
12       Okay.  There's something here called the
13  Shared-Ownership Resort Real Estate Industry in North
14  America.  What does that mean?
15    A.   That's the title of the document that
16  Ragatz publishes, which is a market report.
17    Q.   All right.  And is that a report you had
18  access to and were able to read?
19    A.   Yes.
20    Q.   All right.  And did you -- why did you
21  recognize that report and -- and the Ragatz &
22  Associates as something you could rely upon?
23    A.   They're very well regarded in that -- in
24  -- in the fractional industry and do a lot of
25  consulting and work with developers and such.  And

Page 137

35 (Pages 134 - 137)

1 are the only source of that much data on that
2 industry in one place.
3    Q.   All right.  And is it -- is an iteration
4 of this fractional market analysis, as it's evolved
5 in the last eight years, would it be -- some of this
6 be in the W Hotel report?
7    A.   Most likely in some form.
8    Q.   And have you followed -- let me withdraw
9 that.
10       Have you read subsequent reports to --
11 sorry, the 2010 Ragatz reports, in connection with
12 analyses of fractional properties?
13    A.   Yes.  I have.
14    Q.   If you go to the bottom of the page, and
15 that's why I was kind of asking you before, it says,
16 "Some organizations in the vacation ownership
17 industry still use the term high-end fractional and
18 PRC" -- which is Private Residence Club; right?
19    A.   Yeah.  What page?
20    Q.   Same page nine.  The first page of the
21 Fractional Market Analysis.
22    A.   Okay.
23    Q.   -- "interchangeably when, in fact, they
24 are different products for different consumers."
25       And I just wanted to touch upon this just

Page 138

1 slightly -- a little bit more than we did before.
2       It says, "A high-end fractional product
3 can be easily integrated into a multi-use development
4 that includes a hotel, timeshare, condominium
5 ownership, et cetera."
6       Again, are any of these components extant,
7 existing, with respect to the Ritz-Carlton Aspen
8 Highlands?  Is it -- is it a -- is it part of a hotel
9 or timeshare or condominium ownership?
10    A.   Yes.  I feel like the Aspen Highlands is
11 more integrated.  It has the base, village,
12 commercial.
13    Q.   Okay.
14    A.   Don't know about whole ownership, as I
15 mentioned.
16    Q.   Got you.  All right.
17    A.   And there are amenities.
18    Q.   Got you.
19    A.   I think most of the amenities are for the
20 owners --
21    Q.   All right.
22    A.   -- the pool and such.  But I think the --
23 the main thing there is the integration with the
24 commercial space --
25    Q.   Okay.

Page 139

1    A.   -- that creates a mixed-use environment,
2 as was referenced in there.
3       Whereas, Private Residence Club, again, is
4 -- is oriented towards more exclusivity and
5 singularity of the product.
6    Q.   Okay.  Did you -- with respect -- I know
7 we're talking about Dancing Bear here, but when you
8 did Ritz Carlton Club Aspen Highlands, did you review
9 any of the marketing materials that were given to
10 people as to how it was marketed to people like my
11 clients who bought them?
12    A.   Oh, there's a good chance I did that.
13 Yes.
14    Q.   Okay.  And if you go to the middle of the
15 page -- the paragraph at the bottom of page nine, it
16 says, "A PRC -- a PRC truly is a luxury residence
17 with furniture, fixtures, and equipment that would be
18 found in an upscale property."
19       I know that you've distinguished that.
20 And I'm not asking for any change in that.  But does
21 the Ritz Carlton Club fit within at least these
22 portions of a PRC description, which is the fixtures,
23 furniture, and equipment --
24    A.   Take me there again, would you?
25    Q.   Yeah.  I'm sorry.  Right -- right here.

Page 140

1    A.   Oh, right.  I got it.  I got it.
2       MR. SELLINGER:  Objection to form.
3       THE WITNESS:  The -- the Ritz-Carlton I
4 would say qualifies as a luxury product.
5    Q.   (By Mr. Ferguson)  Okay.
6    A.   It's nicely appointed and good quality.
7 Indeed, I believe that furniture, fixtures, and
8 equipment were included.
9    Q.   Okay.
10    A.   And most likely upscale.  I did not see
11 it.  And, you know, to the extent that there is a
12 shuttle, et cetera.
13    Q.   Okay.  On page 11 of Exhibit 2264 there's
14 a Terminology - Four Fractional Categories.  It says,
15 "Traditional Fractional Interest:  Product selling
16 for less than $1,000 per foot.  These are usually
17 resort homes or condominiums of average to good
18 quality, in regional resort areas, with typical
19 resort amenities and services.  Often characterized
20 as at the 'three to four star' level of quality."
21       Are there any examples that you can give
22 that are -- that are branded that fall within the
23 traditional fractional interest category in your
24 report?
25    A.   Branded?  Not -- I can't think of any

Page 141

36 (Pages 138 - 141)

1 branded that are there.
2    Q.   Okay.  What's an example that one might
3 know from an airport magazine or --
4    A.   Well, the Old Greenwood project I
5 mentioned before.
6    Q.   Okay.
7    A.   I think the Hyatt Lodge at Northstar.
8    Q.   Okay.
9    A.   Trying to think of -- of -- of Aspen.
10       Yeah.  I -- I think Timbers is a weekly
11 timeshare, in Snowmass.  I -- I don't know that
12 they're fractional.
13    Q.   Okay.  But you haven't -- you haven't done
14 any actual analysis or study of The Timbers
15 product --
16    A.   No.
17    Q.   -- project, in Snowmass?
18    A.   Yeah.  And nothing -- yeah.  And nothing
19 branded that I can think of.
20    Q.   All right.  And then the next one is:
21 "Private Residence Clubs, (PRCs):  Products selling
22 for $1,000 or more per square foot.  These represent
23 the pinnacle of quality - not just among fractional
24 interests but in comparison with virtually any resort
25 accommodations available."  And then you go into some
Page 142

1 of the --
2       MR. SELLINGER:  Matt, can you just --
3 Matt, I'm sorry.  Can you just tell me where you're
4 reading from?
5       MR. FERGUSON:  Bottom of page 11.  Private
6 Residence Clubs.
7    Q.   (By Mr. Ferguson)  What are some examples
8 of private residence clubs?  I know you said Dancing
9 Bear?
10    A.   Yeah.  Dancing Bear I think is a good one,
11 in Aspen.  There's one called Franz Klammer, in
12 Telluride.
13    Q.   Okay.
14    A.   There are -- the original one is the Deer
15 Valley Club in --
16    Q.   Right.
17    A.   -- Deer Valley Resort.
18    Q.   Right.  Who was the fellow that -- the
19 fellow who started that?
20    A.   David Disick and -- no, it's Dering.
21 Steve Dering.
22    Q.   Kind of the forerunners?
23    A.   Yeah.
24    Q.   Okay.  So those are some examples --
25 Residences at Little Nell would be a private
Page 143

1 residence club?
2    A.   Yes.
3    Q.   Okay.  And then the next one you have is
4 -- you talk about the "five-star" quality, et cetera.
5       Then you have Destination Clubs.  They
6 differ from the above three types.  And that's --
7 that's my question.  And I feel like I'm a school mom
8 here.  But you say, "four fractional categories," but
9 there's three:  traditional fractional interest,
10 private residence clubs, then destination clubs.
11       Is there another one that's -- and I'm not
12 criticizing you.  Is there another one that's
13 supposed to be there that --
14    A.   No.  I think -- and -- and I can tell you
15 this is pretty much extracted right out of the Ragatz
16 report.
17    Q.   I got you.
18    A.   So, you know, again, their terminology for
19 fractional categories.  So while it says it differs
20 from the above three types, it's still considered a
21 -- a fractional ownership because it is deeded real
22 estate.
23       But as I think the Ritz Club changed to
24 where you -- you -- you buy an interest in deeded
25 real estate, but you buy -- you're buying into a
Page 144

1 trust that holds the real estate, so your equity is
2 not so property specific.
3    Q.   Then in the following pages of the Dancing
4 Bear, you -- you talk about industry size.  And -- on
5 page 12.
6    A.   Yes.
7    Q.   And when -- when it says, "industry
8 size" -- and, again, you reference the
9 Shared-Ownership Resort Real Estate Industry report
10 by Ragatz -- are these fractionals that you list
11 below?  Obviously they're -- they're not timeshares.
12 They're fractional-type products?
13    A.   That is correct.  Yeah.  So that -- that
14 label "U.S. Fractional Locations" --
15    Q.   Right.
16    A.   -- is correct.
17    Q.   Okay.  And it looks like Colorado had, at
18 least at that time, the most?
19    A.   At that time, yes.
20    Q.   Okay.  And has it fallen behind in the
21 lead or is it still in the lead, if you know?
22    A.   You know, I don't recall what -- you know,
23 there's certainly been an attrition throughout in
24 this industry.  And so that's probably a -- you know,
25 a much lesser number.  But I think just by virtue of
Page 145

37 (Pages 142 - 145)

1       Are you there?
2    A.   Yeah.
3    Q.   Okay.  You'll see there's a sentence that
4  starts:  "The project involved tax credits for the
5  renovation of an historic structure" --
6    A.   Yes.
7    Q.   -- "as well as Mello Roos bonds."
8    A.   Uh-huh (affirmative).
9    Q.   And then the last sentence reads:  "The
10  subject units were part of the fractional inventory
11  that was not sold by the developer and were held as
12  inventory by the Ritz Carlton Club.  Title to the
13  subject units was transferred to the Bleu Florida
14  Land Trust in 2009."
15       Was that information that Mr. Vaughan
16  provided or is that something you dug up from the
17  client?
18    A.   That would be Mr. Vaughan.
19    Q.   Okay.  And then if you go to page 20 of
20  Exhibit 2268, the San Francisco report, I just wanted
21  to -- for the -- for the record, have you actually just
22  not explain, would you -- would you actually just
23  read -- read Repercussions of Conversion to Points
24  System there where it starts:  "While providing
25  greater flexibility to owners."  Do you see that?

Page 174

1    A.   Yes.
2    Q.   Would you just read that for me.
3    A.   All three sections -- all three
4  paragraphs?
5    Q.   Yeah.  I might ask you a question in
6  between -- between them.
7    A.   Okay.
8    Q.   I've asked most of my questions so far.
9  But I just want to get it read -- read by you.
10    A.   "While providing greater flexibility to
11  owners, the conversion to a points system has been
12  perceived by existing fractional owners as diluting
13  the exclusivity of the Ritz Carlton Club by opening
14  specific resorts to the Marriott Vacation Club."
15    Q.   Okay.  My -- my first question with
16  respect to this first sentence in that paragraph is
17  the perception by fractional owners, by existing
18  fractional owners.  Do you know whether or not -- or
19  do you recall whether or not you spoke to actual
20  owners or existing owners at the time this was
21  generated?
22    A.   I did not.
23    Q.   Okay.
24    A.   And I do not know if Mr. Vaughan spoke to
25  owners.

Page 175

1       I -- I do know that Mr. Vaughan spoke to
2  realtors and real estate agents either involved in --
3  involved in buying or selling.
4    Q.   I'm going to skip ahead to -- over here to
5  the Aspen Club.
6       Did you ever meet a -- a real estate
7  broker with respect to Aspen Highlands, Colorado, a
8  fellow named Ivan Skoric, realty broker?
9    A.   I did not.
10    Q.   Okay.  Thank you.
11       Will you continue with the first -- first
12  paragraph of Exhibit 2268, on page 20.
13    A.   Yes.
14    Q.   What does it say?
15    A.   "Conversely, the Marriott Vacation Club is
16  now perceived in the marketplace as providing an
17  excellent opportunity to access the luxury product
18  offered by the Ritz Carlton Club properties."
19    Q.   Okay.  And we described that in the
20  context of -- of the concept of halo effect; right?
21    A.   Yes.
22    Q.   Okay.
23       MR. SELLINGER:  Objection to form.
24    Q.   (By Mr. Ferguson)  And can you read the
25  last paragraph of Exhibit 2268, on page 20.

Page 176

1    A.   The very last paragraph?
2    Q.   Yeah.  Yeah.
3    A.   "There were some analysts" --
4    Q.   "Overall."  That section:
5    A.   "Overall, the conversion to a points
6  system and the integration of the Marriott Vacation
7  Club has had a negative impact on the market value of
8  existing fractional interests in the Ritz Carlton
9  Club.  The impact to whole ownership units at the
10  Ritz Carlton Club has also been negative, but not of
11  the same magnitude as that experienced by the
12  fractional interests."
13    Q.   I believe -- I believe we discussed that a
14  little bit before.
15       There's -- the last sentence of -- sorry.
16  Yeah.  The last paragraph and sentence of that page
17  20, can you read that also, where it says, "There
18  were some."
19    A.   "There were some analysts that projected a
20  comeback for the fractional industry due to the shift
21  in market perceptions related to large second homes
22  and their cost versus the more economical and trouble
23  free form of ownership offered by fractional
24  product."
25    Q.   And when you read your market analysis,

Page 177

45 (Pages 174 - 177)

1 assignments.
2    Q.   Okay.  Good.
3         MR. SELLINGER:  Ian, could you mark the
4 Aspen final appraisal that we have, which is Cushman
5 I 000191.  And tell me what exhibit number you're
6 using.
7         (EXHIBIT 2270 WAS MARKED.)
8         MR. MARX:  2270.  I'm not going to hand it
9 out.
10   Q.   (By Mr. Sellinger)  Mr. Donaldson, as I
11 think you learned before, we have multiple versions
12 which seem to be of the same document.  But I just
13 have markings on this one.
14   A.   Okay.
15   Q.   So -- and -- and do you want to just
16 check, on page 30 you'll see the signatures there.
17 Just so you --
18   A.   Yes, sir.
19   Q.   Okay.  So if you turn to page one in the
20 cover letter, in the second paragraph, the last
21 sentence reads:  "The depth of discussion contained
22 in this report is specific to the needs of the client
23 and to the intended use below."
24        Do you see that?
25   A.   Yes, sir.

Page 214

1 Q.   What does it mean, that "specific to the
2 needs of the client"?
3    A.   Well, that -- that is language that I
4 think is inserted generally to address the type of
5 report summary, restricted use or self contained.
6 So, really, that's what the needs -- that's -- that's
7 the context for the needs of the client in this -- I
8 believe in this sentence, is related to the letter of
9 engagement and, you know, the type of report that
10 they've requested.
11   Q.   And when -- when -- when you refer to the
12 type of report that they requested and the specific
13 needs of the client, what are you referring to?
14   A.   Well, in this case, I was -- I was trying
15 to see if we called this a summary report.  I believe
16 we called this a summary report.  And so that's --
17 that's -- typically, that is a qualifier for us in
18 terms of saying it's okay and that we've done a
19 summary report.  It meets the needs of the client.
20   Q.   Right.  Right.  But the -- but the client
21 wasn't asking for a full-blown appraisal; right?
22   A.   Right.
23   Q.   The client wasn't asking for the kind of
24 appraisal you would prepare if you were submitting an
25 expert report in court; correct?

Page 215

1    A.   That's correct.  There was no litigation
2 called out -- well, actually, I think there was
3 litigation called out in our engagement letter.
4    Q.   You -- you weren't -- you weren't
5 preparing this -- this -- you weren't preparing this
6 report for court purposes, though; correct?
7    A.   I can't speak to that.  That would be a
8 John Vaughan question.  But -- because I -- I
9 actually think that he had contemplated potential
10 litigation in preparation of these appraisals.
11   Q.   When you referred earlier to "summary," I
12 mean, this is -- this is less than the report you
13 would do -- less than the kind of report you would
14 prepare in other commercial context?  For example,
15 it's much less than the Dancing Bear appraisal;
16 correct?
17   A.   No.  That's -- I would say negative to
18 that.  The -- the -- a -- a summary report is very
19 common.  Lenders, other people request it.  A summary
20 report is -- is simply -- just does not have the full
21 explanation that -- and -- and data presentation that
22 might be expected in a self-contained report.  And so
23 it really -- it -- it -- it depends.
24   Q.   The client was asking for less here than
25 you would have if you did a self-contained report;

Page 216

1 correct?
2         MR. FERGUSON:  Objection.  Form.
3         THE WITNESS:  A summary report, by
4 definition, is lesser content than a self-contained
5 report, yes.
6    Q.   (By Mr. Sellinger)  Okay.  And on page
7 three of your cover letter you say, "At the request
8 of the client, we have not inspected the subject
9 units and have based our valuation on information
10 provided by the client."
11        Do you see that?
12   A.   Page?
13   Q.   Page three.
14   A.   Oh, page three.  Yes.
15   Q.   Yeah.  And how often are you doing
16 appraisals where you're -- and I'm not being
17 critical.  I'm just trying to understand the context
18 here --
19   A.   Okay.
20   Q.   -- of these particular appraisals.
21        How often is it that you'll base your
22 valuation on the information provided by the client?
23   A.   Well, very often we rely on information
24 provided by the client to -- to understand the
25 subject property.

Page 217

55 (Pages 214 - 217)

1   Q.   -- "Summary Appraisal Report must be
2 consistent with the intended use of the appraisal
3 and, at a minimum, colon."
4       Correct?
5   A.   Yes. I'm with you.
6   Q.   And then if you turn to the next page, it
7 U-26, at Roman numeral VIII at the bottom, it says,
8 "Summarize the information analyzed, the appraisal
9 methods and techniques employed, and the reasoning
10 that supports the analyses, opinions, and
11 conclusions."
12       Do you see that?
13   A.   Yes, sir.
14   Q.   And if you turn to the next page, U-27, it
15 says -- under Comment, the second paragraph:  "The
16 appraiser must provide sufficient information to
17 enable the client and intended users to understand
18 the rationale for the opinions and the conclusions."
19 And continues.
20       Do you see that?
21   A.   Yes, sir.
22   Q.   So -- so you agree that even though this
23 is a summary report, it's -- it's supposed to set
24 forth the reasoning that supports the analyses, the
25 opinions, and the conclusions; correct?

Page 222

1 received $2,500; correct?
2   A.   Yes, sir.
3   Q.   And -- and would I be correct in assuming
4 that you and Mr. Vaughan shared that $2,500 equally
5 or was there some other split?
6   A.   You know, I -- I don't recall.  But, yes,
7 he -- he -- he shared some of the fee with me I'm
8 sure of that.
9   Q.   Well, he's -- he's the guy who did the --
10 the bulk of the work; correct?  That's what you told
11 us?
12   A.   Yes.  That's why when you said split the
13 fee with him, you know, I -- we didn't split it
14 50/50.  I don't recall what the fee split arrangement
15 was between us.
16   Q.   He received more than 50 percent because
17 he did more of the work?
18   A.   That -- that's likely -- that's the likely
19 scenario, yes.
20   Q.   Okay.  So you received less than $1,250 on
21 average for each of the four appraisals; right?
22   A.   I can't say, "right," because I do not
23 recall what the fee split was.
24   Q.   But that's your best estimate because you
25 think he -- he received more than you?

Page 224

1   A.   Yes.  Along with sufficient information.
2   Q.   Okay.  The -- you mentioned that you were
3 paid -- or Cushman was paid $20,000 for these four
4 appraisals; correct?  The three properties, Aspen,
5 San Francisco, Lake Tahoe, and also Jupiter; correct?
6   A.   Yes, sir.
7   Q.   So -- and that's $5,000 per appraisal;
8 right?
9   A.   Well, yeah.  That's the straight math.
10 You know, I don't know how -- if one -- if one was --
11 you know, Lake Tahoe was a lot easier because it was
12 one condo.  So, you know, I don't know what the
13 rationale was for getting to 20,000.  But that's the
14 math -- the number of properties, yes.
15   Q.   You were -- you were paid an average of
16 $5,000 per appraisal; correct?
17   A.   Yes, sir.
18   Q.   All right.  And am I correct in
19 understanding that at Cushman & Wakefield, the
20 business model is that the company receives half of
21 the fee and the appraisers receive the other half of
22 the fee; is that right?
23   A.   Yes, sir.
24   Q.   Okay.  So here, of the $5,000 average per
25 appraisal, Cushman received $2,500 and the appraisers

Page 223

1   A.   On average, I probably received less than
2 that, yes.
3   Q.   Okay.  And so -- so if I understand it,
4 your role -- and, again, I'm not -- I'm not being
5 critical.  I'm really just trying to sort of
6 understand the -- the context of what we're seeing
7 here.  Your role was to bring your experience to the
8 table, but you didn't really put in a lot of time in
9 -- in looking at the underlying data or anything like
10 that; right?
11   A.   I mostly just reviewed what was in the
12 appraisal and contributed to some of the appraisal
13 content, i.e. the market analysis, local area, and
14 that kind of thing.
15       Yes.  John -- John Vaughan did the bulk of
16 -- of the other work you just described, yes.
17   Q.   Okay.  So any -- any -- any research that
18 was needed to be done was done by Vaughan, you
19 brought your understanding of the market, generally?
20   A.   Correct.  And -- and provided additional
21 research that was in the file, as noted by the
22 Dancing Bear appraisals.
23   Q.   Okay.  Fair enough.  Fair enough.
24       You didn't conduct any -- you didn't do
25 any independent research for this assignment, the

Page 225

57 (Pages 222 - 225)

1 only research that you contributed was, as you say,
2 Dancing Bear, that you had done that work three years
3 earlier?
4     A.   Yes, sir.  Any -- any -- any information I
5 had in my files I contributed.  Just to reiterate, I
6 did not do any frontline, new research related to
7 this appraisal.
8     Q.   Okay.  No conversation with anyone at
9 Ritz-Carlton or Marriott, you've told us that; right?
10    A.   Yes.
11    Q.   No conversation with any brokers in
12 connection with these three appraisals?
13    A.   You know, I -- I can't -- I can't say for
14 sure I did not make any phone calls to brokers that I
15 was familiar with at Northstar or Aspen, just to
16 check on things.
17         But, again, no -- no research that was
18 directly written into the appraisal.
19    Q.   Okay.  So you did no research that was
20 written into -- into any of these three appraisals,
21 independent research?
22    A.   Again, other -- other than the market
23 analysis and -- and -- and the stuff I've mentioned
24 already.
25    Q.   And Dancing Bear?

Page 226

1     A.   Dancing Bear.  But I had a more current --
2 I had a more current macro fractional market analysis
3 than that -- what was -- Dancing Bear was so old.  I
4 had done recently other fractional projects for which
5 I had the fractional market analysis already
6 prepared.  And I took that and inserted it in here.
7         So that was my original research with
8 regards to the market analysis.
9         Does that make sense?
10    Q.   And as you sit here today -- as you sit
11 here today, you can't remember having spoken to any
12 of the brokers specifically in connection with these
13 appraisals; correct?
14    A.   Not -- not any of the subject brokers.
15         Any -- any -- any contact with the subject
16 or about the subject would have been through
17 Mr. Vaughan.
18         MR. SELLINGER:  Okay.  Ian, would you show
19 Mr. Donaldson, please, exhibit -- well, Tabs 8, 9,
20 and 10.  And give me the exhibit numbers we're using.
21         (EXHIBITS 2272 THROUGH 2274 WERE MARKED.)
22         MR. MARX:  Here you go, Matt.
23         You know, while Mr. Donaldson is looking
24 at them, I'll identify them for the record.
25         Exhibit 2272 is a letter dated

Page 227

1 November 18th, 2014 to the Aspen Highlands
2 Condominium Association, Inc.
3         Exhibit 2273 is a letter dated
4 November 18th, 2014 to the Highlands Resort Club
5 Association, Inc.
6         And Exhibit 2274 is a January 20th, 2015
7 letter to Marriott Resorts Travel Company, Inc.
8     Q.   (By Mr. Sellinger) So, Mr. Donaldson,
9 these letters are each notices of effective date of
10 acknowledgment of and joinder to affiliation
11 agreements.
12         And the affiliation with the Marriott
13 Vacation Club, that is a significant subject of the
14 lawsuits that -- that are currently pending, gave the
15 Ritz members the opportunity to enroll -- to enroll
16 their weekend, exchange it into the Marriott Vacation
17 Club.  And also allowed the Marriott Vacation Club
18 members to exchange their -- to -- to take that Ritz
19 week.
20         These three letters -- look at
21 Exhibit 2272.  It shows that -- if you look at the
22 middle of the second paragraph:  "We have just
23 received confirmation that technology will be
24 launched and go live on December 5th, 2014.  And at
25 that time, Lion & Crown will open the exchange

Page 228

1 opportunity."
2         And then if you go two lines down it says,
3 "As we anticipate sending an announcement to members
4 by close of business on Thursday, November 20th,
5 2014, regarding the open -- of the exchange -- on
6 December 5th, 2014."
7         Do you see that language?
8     A.   Yes.  I do.  Sorry.  You were cutting out
9 a little bit.  But, yes, I do see that.  It was kind
10 of garbled.
11    Q.   Yeah.  I don't know where that -- where
12 that noise was coming from.
13         But in any event -- so -- so here, the
14 Ritz members and the Marriott members are able to
15 exchange on December 5th, 2014, that's for the Aspen
16 Club, and Exhibit 2273 is for the Lake Tahoe Club,
17 and 2274 is for the San Francisco Club.
18         So these exchanges, the affiliation
19 program, those all took place after -- after your
20 appraisal; correct?
21    A.   Those dates are after our effective date
22 of valuation.
23         MR. REISER:  Object to form.
24    Q.   (By Mr. Sellinger) And -- and, obviously,
25 whatever impact, if any, that the affiliation and

Page 229

1 those exchanges had, had no impact on your appraisal,
2 which is the end of the prior year; correct?
3        MR. FERGUSON:  Objection to the form.
4        MR. REISER:  Object to form.
5        THE WITNESS:  Well, theoretically, if this
6 has not occurred until after the date, then it hadn't
7 occurred.  And I don't know what kind of anticipation
8 or communication there was before these letters in
9 terms of -- and -- and I'm talking -- I'm talking
10 just about perception, market perception.
11     Q.   (By Mr. Sellinger)  Are you aware of the
12 fact that there were affiliation agreements that
13 allowed this exchange opportunity in -- to become
14 effective in December of 2014?
15        MR. FERGUSON:  Objection.  Form.
16        MR. REISER:  Object to form.
17        THE WITNESS:  No.
18     Q.   (By Mr. Sellinger)  And your report
19 doesn't talk about -- anywhere -- perception of
20 events that were going to happen in the future,
21 doesn't say anything about a future affiliation;
22 correct?
23     A.   No, sir.  Not that I saw.
24     Q.   Okay.  And -- and we just went over the
25 USPAP regulations which say that you've got to

Page 230

1 support the conclusions and the analyses that are in
2 your report; correct?
3     A.   I'm -- I'm going to take a look back at
4 that to see what the exact wording is.
5        Is that page 25?
6     Q.   It was 25, 26 to 27.
7     A.   "The appraiser must provide" --
8     Q.   "Summarize the information" -- go ahead.
9     A.   I was just going to -- the -- the part
10 that I -- I was looking for is:  "The appraiser must
11 provide sufficient information to enable the client
12 and intended users to understand the rationale for
13 the opinions and conclusions."
14     Q.   And -- and it says in number VIII, on page
15 U-26:  "Summarize the information analyzed, the
16 appraisal methods and techniques employed, and the
17 reasoning that supports the analyses, opinions, and
18 conclusions"; correct?
19     A.   Yes.  Yes.
20     Q.   Okay.  Now, the -- I'll represent to you
21 that in addition to the affiliation taking place in
22 2014, that Ritz, as the developer, had unsold
23 inventory that it deposited into a -- a Marriott
24 trust.  And that occurred in 2014 as well.
25        The report doesn't discuss any of the

Page 231

1 implications of that event, which occurred in 2014;
2 correct?
3        MR. FERGUSON:  Objection.  Form.
4        THE WITNESS:  Correct.
5        MR. SELLINGER:  Okay.  Now, Ian, could you
6 -- oh, withdrawn.
7     Q.   (By Mr. Sellinger)  You've got the Aspen
8 appraisal that's been marked as Exhibit 2270?
9     A.   Yes, sir, I do.
10     Q.   Okay.  And can you look at the -- pull out
11 the -- we're going to talk about Aspen and San
12 Francisco together -- the San Francisco appraisal,
13 Exhibit 2268.
14        Okay?
15     A.   Okay.
16     Q.   I'm going to -- and in order,
17 Mr. Donaldson, to -- to expedite this, I'm not going
18 to take you through it the same way that -- that
19 Mr. Ferguson did.  Where the language is identical,
20 I'm going to point you to the identical language and
21 I'll ask you once, and I'll be asking you about both
22 reports.  Because that'll save -- save you some time.
23        Okay?
24     A.   Thank you.  I'm -- I'm with you on that.
25        MR. FERGUSON:  I'm sorry.  Which exhibit?

Page 232

1        THE REPORTER:  2268.
2     Q.   (By Mr. Sellinger)  So let's -- Aspen, in
3 the Sales Volume section, at the bottom of page 15.
4 And the identical language is in San Francisco on
5 page 17.
6        So it's the Sales Volume section in -- in
7 Aspen and San Francisco, page 15 in Aspen and 17 in
8 San Francisco.
9     A.   Okay.  Yeah.  I'm with you.
10        MR. SELLINGER:  Yeah.  Ian, make sure --
11 yeah.  Ian, make sure he's using 2270.  Because
12 that's going to have the same page numbers.
13        MR. MARX:  Yep.  We're -- we're square.
14        THE WITNESS:  I'm with you.
15     Q.   (By Mr. Sellinger)  Okay.  So Sales
16 Volume.  The reports state:  "The fractional industry
17 has suffered significant decline in sales volume over
18 the past several years consistent with other housing
19 related real estate.  Sales for all of the product
20 types declined 76.9 percent during the recession.
21 The drop in sales volume for Private Residence Clubs
22 was more pronounced than the other two categories."
23        Did I read that right?
24     A.   Yes, sir.
25     Q.   And that point, that's accurate; right?

Page 233

59 (Pages 230 - 233)

1    A.    Yes -- yes, sir.  I think so.  This is --
2    Q.    Yeah.  I'm -- I'm not -- I'm not arguing
3  with you.
4    A.    No.  No.
5    Q.    I'm just -- I'm just looking to -- to
6  confirm.
7    A.    And I guess --
8    Q.    Okay.
9    A.    -- I didn't understand your question by
10  "accurate."  What you just read is accurate.  This
11  information was extracted from the Ragatz report.
12  So, yeah, I'm trusting it's accurate.
13    Q.    So you -- you put this in the report that
14  you signed, so you are standing by this statement;
15  correct?
16    A.    Absolutely.
17    Q.    Okay.  I mean -- and the -- the -- the
18  decline in sales volume over those years that you've
19  described here, that would impact and devalue the --
20  the interest of the Ritz-Carlton properties in Aspen
21  and San Francisco; correct?
22    A.    Certainly was a consideration in that,
23  yes.
24    Q.    It would be -- it would contribute to that
25  -- that price decline; correct?

Page 234

1  market, generally; correct?
2        MR. FERGUSON:  Objection.  Form.
3        THE WITNESS:  Yes.  Yes.
4    Q.    (By Mr. Sellinger)  All right.  And if you
5  turn to page 19.
6        And -- and -- and by the way, those --
7  those market trends, the diminished market of 76.9
8  percent and diminished sales prices, that's not --
9  that's not anything that Ritz-Carlton did, what
10  you're describing in this section; correct?
11    A.    That's correct.  This is a -- a -- a macro
12  market view of overall market trends nationwide
13  actually and beyond the nation, the Caribbean and
14  such.
15    Q.    Understood.  Okay.
16        Now, let's look at the Conclusion section,
17  which is in Aspen on page 19 and in San Francisco on
18  page 20.
19        It reads:  "The shared-ownership, or
20  fractional interest, industry experienced the same
21  trends as other residential real estate during the
22  recession, but the negative dynamics of the credit
23  crisis were exacerbated by the non-essential nature
24  of this product type.  Sales volume decreased
25  dramatically and many properties became distressed."

Page 236

1    A.    "Contribute" is not the right word for me
2  in -- in my -- in -- in my world.
3        It would be indicative that the subject
4  had followed the same trend.
5    Q.    Okay.  And the same thing is true for Lake
6  Tahoe; correct -- as well; correct?
7    A.    Yes, sir.
8    Q.    The same?  Yes?
9    A.    Yes.
10    Q.    Okay.  And it goes on to say, "The large
11  expansion during 2004 was the result of numerous
12  projects in many market areas coming online at the
13  beginning of the run up in resort real estate.  Sales
14  volume increases continued in 2007 and began to
15  decline in 2008 as the recession took hold.  While
16  the housing market began to stabilize in 2012 and
17  recover in 2013, the fractional industry continues to
18  see downward pressure on pricing and weak demand."
19        And that was an -- an accurate statement
20  as well; correct?
21    A.    Yes, sir.  I believe so.
22    Q.    Okay.  And that would also -- I'm going to
23  use -- be indicative of sales of the market and sales
24  prices declining at the Ritz-Carlton properties as
25  well as a result of what was happening in this

Page 235

1        That statement was accurate?
2    A.    Yes.
3        MR. FERGUSON:  What page are you on?
4        MR. MARX:  19 in the Aspen.  20 in San
5  Francisco.  It's the same language in both.
6    Q.    (By Mr. Sellinger)  That statement was
7  accurate?
8    A.    Oh, yeah.  I'm sorry.  I did say yes.
9  Yes.  Yes.
10    Q.    I'm not -- I'm not hearing you.
11    A.    Oh, is this -- did the battery go out or
12  something on this?  Or is this -- should it --
13        THE REPORTER:  Is it red or green?
14        THE WITNESS:  Nothing's happening.
15        MR. MARX:  Let's see what's going on.  I'm
16  walking behind.
17        MR. REISER:  Hey, Philip, are you -- are
18  you there?
19        MR. SELLINGER:  Yeah.  I am.  I think
20  they're having a problem on their side.
21        (Discussion held off the record.)
22        THE VIDEOGRAPHER:  Returning on the
23  record.
24        The time is 3:45 p.m.
25        Counsel.

Page 237

60 (Pages 234 - 237)

1    THE WITNESS: Okay. We're ready now.
2    Q.   (By Mr. Sellinger) Okay. I'll just --
3  I'll just read it -- I'll just ask it again.
4    A.   Please.
5    Q.   The next sentence on page 19 in Aspen and
6  20 in San Francisco is: "The shared-ownership, or
7  fractional interest, industry experienced the same
8  trends as other residential real estate during the
9  recession, but the negative dynamics of the credit
10 crisis were exacerbated by the non-essential nature
11 of this product type. Sales volume decreased
12 dramatically and many properties became distressed."
13     That's an accurate statement as well, I
14 take it?
15   A.   Yes.
16   Q.   And those trends in the market, as to
17 marketability and prices, would negatively affect the
18 Ritz-Carlton properties; correct?
19   A.   They -- they would be reflective of the
20 negative -- yes, the -- the same negative trends
21 should be reflective in the -- in the Ritz-Carlton
22 subject properties, both.
23   Q.   Okay. And nothing that Ritz-Carlton did
24 with the affiliation or the conversion or any access
25 to -- of -- of Marriott Vacation Club members relates

Page 238

1  to that -- that point in that negative market trend;
2  correct?
3    A.   Correct. This is a much larger market
4  indication.
5    Q.   All right. The next sentence reads:
6  "Most developers did not anticipate the poor sales
7  performance that occurred in 2010, as households
8  continued to repair and rebuild balance sheets and
9  shed non-essential expenses."
10     That statement's accurate?
11   A.   Yes.
12   Q.   Okay. And, again, it wasn't Ritz's fault
13 that that happened; right?
14   A.   No. That was the market.
15   Q.   Okay. If you jump down a paragraph it
16 states: "In our opinion, the fractional industry is
17 facing a longer timeline for recovery than the whole
18 ownership product in resort areas. This is due to
19 the opportunities for well-capitalized buyers in
20 distressed markets to purchase whole ownership
21 properties at significant discounts. The fractional
22 market is not likely to experience upward pressure on
23 pricing until the excess inventory of the whole
24 ownership product has been absorbed."
25     Is that accurate?

Page 239

1    A.   Yes.
2    Q.   And that would decrease marketability and
3  pricing for the Ritz properties; correct?
4    A.   Same as all the others, yes.
5    Q.   Okay. And Ritz didn't do anything to
6  cause that problem; right?
7    A.   No.
8    Q.   And the next paragraph says, "The subject
9  property is located in a market where demand for
10 residential product is very strong, yet demand for
11 the fractional interests remains constrained."
12     That was accurate?
13   A.   I think that's more accurate for San
14 Francisco than Aspen. But it's accurate for both
15 markets to -- to some degree.
16   Q.   This is in the Aspen report, on page 20;
17 correct? It's in the San Francisco report on page
18 21?
19   A.   Twenty-one.
20   Q.   But -- but this is -- but this is --
21 you're -- you're writing this in the Aspen report --
22   A.   Yes, sir.
23   Q.   -- that you signed; correct?
24   A.   Yes.
25   Q.   Okay. So it's accurate, but just even

Page 240

1  more so in -- in San Francisco?
2    A.   Yes.
3    Q.   Okay. And that would impact the
4  marketability and the pricing of the Ritz properties;
5  correct?
6    A.   Yes.
7    Q.   And Ritz didn't do anything to contribute
8  to that problem; correct?
9    A.   Correct.
10   Q.   And the last paragraph says, "The
11 subject's -- fractional ownership, combined with the
12 high maintenance costs and -- and real estate taxes,
13 have severely impaired the subject's marketability."
14     Do you see that?
15   A.   Yes.
16   Q.   And that's accurate?
17   A.   Yes.
18   Q.   And that would impair the marketability
19 and the value of the Ritz units?
20   A.   Yes.
21   Q.   And that didn't have anything to do with
22 the affiliation or the conversion; correct?
23   A.   Correct.
24   Q.   Okay. Now --
25     MR. FERGUSON: My final -- hold on,

Page 241

61 (Pages 238 - 241)

1 Philip.
2      My final report is totally different than
3 your final report.  Is there a reason?  If I look at
4 20 in this one, I have this page.  Very strange.
5      MR. SELLINGER:  Yeah.  I -- I was not able
6 to figure out what -- what the difference is during a
7 break.
8      MR. FERGUSON:  All right.
9      MR. SELLINGER:  So, you know, we can -- we
10 can figure that out --
11      MR. FERGUSON:  Okay.
12      MR. SELLINGER:  Yeah.  Okay.
13      MR. FERGUSON:  Just give me one second.
14 Because I just -- we'll have to clear this up.
15      But my 19 Market Analysis is totally
16 different than your 19 Market Analysis.
17      THE WITNESS:  San Francisco or --
18      MR. FERGUSON:  I'm looking -- I'm looking
19 at Aspen.
20      MR. SELLINGER:  Okay.
21      MR. FERGUSON:  It's just weird.  I don't
22 know why.
23      MR. SELLINGER:  Yeah.  I -- I don't know
24 why either.  They've come out of Cushman's files, so
25 this is what we've got.

Page 242

1      Q.   Okay.  If you would look at -- and this is
2 Exhibit 2248.  It's the Dancing Bear -- Dancing Bear
3 draft.  Because we -- we never had the -- and I'm not
4 sure that Cushman had the final.  Or at least it
5 doesn't appear that that was produced.
6      So just for page similarity, I'm going to
7 be working off this one.
8      Okay.  You have that in front of you?
9      A.   Yes.  Exhibit 2248.
10      Q.   Right.  CUSHMAN II 000278; right?
11      A.   Yes, sir.
12      Q.   Okay.  If you would turn, please, to page
13 46.
14      A.   Forty-six.  I'm there.  Fractional
15 Ownership Valuation?
16      Q.   Right.  So if you go to the bottom of that
17 page, do you see the section on Gross Sales Revenue?
18      A.   Yes, sir.
19      Q.   And there's a -- a -- a -- a chart.  You
20 see Dancing Bear Contract Revenue Summary?
21      A.   Yes.
22      Q.   After that, it reads:  "The above table
23 indicates there were 90 shares under contract for
24 total revenues of $63,372,550.  The subject developer
25 reports having called each contract holder to

Page 244

1      MR. FERGUSON:  Got it.
2      Q.   (By Mr. Sellinger)  Okay.  So we're back
3 to -- we're -- we're -- we're back to Exhibit 2270.
4 I want to make sure that's what you're looking at?
5      A.   Yes, sir.
6      Q.   Okay.  So let's now look at the Aspen
7 Fractional Market on page 17.
8      So in -- in this report, as of
9 December 2nd, 2013, you write:  "The fractional
10 ownership market in Aspen was thriving in the big
11 market years of 2004 through 2007, and even early
12 2008.  However, this market fell off significantly
13 with the downturn in the market and has yet to
14 recover in terms of sales volume and pricing."
15      That was accurate?
16      A.   Yes.
17      Q.   And that would decrease the value of the
18 Ritz-Carlton interests?
19      MR. FERGUSON:  Objection.  Form.
20      THE WITNESS:  Yes.  The declining market
21 in Aspen would impact the Ritz-Carlton as well.
22      Q.   (By Mr. Sellinger)  Okay.  And that didn't
23 have anything to do with what -- anything
24 Ritz-Carlton did; correct?
25      A.   Correct.

Page 243

1 renegotiate, and the results of those efforts was the
2 closing of 32 shares."
3      Was that accurate?
4      A.   Yes.
5      Q.   And then if you turn to the next page, at
6 the end of the first paragraph, before the Supply
7 Analysis section, if you go back two sentences it
8 reads:  "However, probably more significant is the
9 fallout of 58 contracts which is evidence of the
10 large decline in demand which has extended the
11 absorption period."
12      A.   Yes.
13      Q.   "The subject received 949,638 in forfeited
14 deposits from the failed contracts."
15      And that was accurate as well, too?
16      A.   Yes.
17      Q.   So with Dancing Bear, they had 90
18 contracts -- 90 sales under contract, and only 32 of
19 them sold; right?
20      A.   Yes.
21      Q.   Okay.  And where it says -- the language
22 we just read, that the fallout of the 58 contracts is
23 evidence of the large decline in demand which has
24 extended the absorption period, what does that mean,
25 "extended the absorption period"?  Does it mean that,

Page 245

62 (Pages 242 - 245)

1 therefore, if buyers want to get a decent price,
2 they've got to be willing to hold the property for
3 much longer?
4        MR. FERGUSON: Objection. Form.
5        THE WITNESS: In this -- in this analysis
6 and in my development approach here, what -- what I'm
7 -- what I'm trying to say here is that the large
8 decline in demand -- the absorption period is the
9 sellout period that it's going to take to sell the
10 remaining shares. And so with less demand, it's
11 going to take longer to sell the remaining shares.
12    Q.   (By Mr. Sellinger) Okay. And if there's
13 less demand and it's going to take longer to sell the
14 remaining shares, then what happens if somebody has
15 to sell? They're under pressure, they've got to
16 unload their property?
17    A.   You mean -- you mean, a buyer that's
18 already purchased a share needs to sell what -- and
19 --
20    Q.   Yes. And you're in the -- yes. If you
21 have a buyer who -- who owns property, they need to
22 sell, and you're in a market that you've just
23 described where the absorption period is extended, so
24 what does that seller do if they've got to unload
25 their property, they have economic pressure?

1    A.   I know you know the answer to that
2 question. They -- it's a supply and demand thing.
3 They're going to lower their price.
4    Q.   Okay. So that -- that -- the longer
5 absorption period, as a result of the -- the -- the
6 poor market, basically is going to drive prices down
7 for a buyer who's in distress?
8    A.   The -- I can't -- I can't say "yes" to
9 that question. I don't think that's exact -- those
10 two are kind of separate things.
11        The -- the extended absorption period is
12 relate -- related to the amount of time it's going to
13 take the developer to sell their remaining developer
14 shares at whatever prices they are trying to sell
15 them at.
16        How -- how that relates to a resale seller
17 is -- is different. The resale seller is now an
18 autonomous, singular unit or singular share, and they
19 can pick whatever price they want. And, presumably,
20 if they need to sell sooner, will lower the price.
21        But they're -- they're unrelated.
22    Q.   But the -- well, but the -- the fact is --
23 but the absorption period -- the -- the more -- the
24 more property that's on the market, the harder it is
25 that it's going to be able to sell in this kind of

1 market; right?
2        MR. FERGUSON: Objection. Form.
3        THE WITNESS: Well, once again, the longer
4 it's going to take, yes.
5    Q.   (By Mr. Sellinger) And if you don't have
6 that time, you've got to sell for less if you've got
7 to unload it?
8    A.   Yes. If you're distressed and needing to
9 get out of a -- a -- a single unit, lower prices --
10 you know, that's very common in fractional.
11    Q.   And the -- the report doesn't quantify the
12 impact of these negative developments in the market,
13 the fractional interest market, the real estate
14 market, the Aspen market that you, of course,
15 describe. This doesn't quantify the impact of those
16 on the prices of the Ritz-Carlton and the San
17 Francisco and the Tahoe interests; correct?
18        MR. FERGUSON: Objection. Form.
19        THE WITNESS: I'm -- I'm sorry, Philip.
20 I'm going to -- I'll -- I'll try to restate that
21 question.
22        This is an appraisal of the Dancing Bear.
23 And -- and so my analysis in the Dancing Bear
24 certainly takes into consideration the absorption
25 time that it's going to take for the developer. So

1 the impacts of that are baked into my value of the
2 Dancing Bear.
3        How that relates to the Ritz-Carlton is a
4 -- a different situation in terms of -- you know, we
5 didn't -- we did not do a bulk value estimate in the
6 Ritz-Carlton appraisals.
7    Q.   (By Mr. Sellinger) Okay. And when you --
8 when you say you -- you didn't do a full value
9 estimate; is that what you're saying?
10    A.   Well, I'm saying we did not do a
11 development approach to get to a single bulk value.
12 And I -- I mentioned that already.
13    Q.   Oh. Oh.
14    A.   In other words --
15    Q.   I got it. Got it. Got it. Okay.
16    A.   Yeah.
17    Q.   But moving off Dancing Bear, talking about
18 your appraisals for Aspen, San Francisco and Tahoe,
19 your report didn't break out the impact of the
20 negative trends in the real estate market and the
21 fractional interest market and the Aspen real estate
22 market from any other factors that impacted value;
23 correct?
24    A.   That -- that's correct.
25        Can -- can I restate that question? Yes,

1  those are -- those are all forces that led to our
2  value conclusions.
3      Q.   Right.
4      A.   Correct -- so correct.
5      Q.   But -- but -- but you -- but you didn't
6  break those out from the other factors that may have
7  contributed; correct?
8      A.   Those -- yeah.  To some degree I would say
9  those are probably inseparable.
10     Q.   What do you mean "inseparable"?
11     A.   Well, in -- in terms -- I -- I thought
12 your question was, I didn't break out the impact of
13 the market and I didn't break out the impact of the
14 -- the -- the points system, and I didn't break out
15 the impact of just in Aspen?  Is that -- I thought
16 that's what you meant?
17     Q.   You -- you didn't -- you didn't break out
18 -- for example, you didn't break out the impact of
19 the -- you know, for the -- for Aspen -- well, let me
20 withdraw.
21          San Francisco, you didn't say the value is
22 "X" -- well, let me state it differently.
23          You didn't quantify the impact of the
24 maintenance fee versus the impact of the downturn in
25 the real estate market and quantify each; correct?

Page 250

1      A.   That's correct.  Exactly.  That's --
2  that's what I was trying to convey -- convey in my
3  answer just now.  Yes.  Correct.
4      Q.   Your value takes everything that you talk
5  about in the report into account?
6      A.   Yes.  Because that is --
7      Q.   But if you wanted --
8      A.   Oh, go ahead.
9      Q.   No.  You go ahead.
10     A.   The -- all of those market forces are
11 assumed to be what has created the pricing that's in
12 place as of the date of appraisal.
13     Q.   Understood.
14          So if you wanted to determine the impact
15 of the -- the maintenance fees on the value in San
16 Francisco, you'd have to discount all of the other
17 factors, take them out of the equation.  And you --
18 you didn't do that; correct?
19     A.   Yeah.  Did not.  No.
20     Q.   Okay.  And if you wanted to know the
21 impact, if any, of the Marriott affiliation or access
22 of Marriott members, you'd have to discount all the
23 other factors, the national real estate trend, and
24 the fractional interest trends.  And you didn't do
25 that either; correct?

Page 251

1      A.   Correct.
2      Q.   Okay.  Now, let's look at the Aspen
3  appraisal at page 16.
4          MR. FERGUSON:  2270; right?
5          THE WITNESS:  Yeah.
6          MR. FERGUSON:  Yeah.  Because they are
7  different.
8          THE WITNESS:  Who's on first?
9          MR. FERGUSON:  Right.
10     Q.   (By Mr. Sellinger)  Okay.  Page -- page --
11 page 16, under Product Characteristics --
12     A.   Yes, sir.
13     Q.   -- it says, "The subject's maintenance
14 fees, at over $20,000 per interest, include real
15 estate taxes, but are very high by industry
16 standards, and have a negative impact on the
17 fractional -- on the marketability of the fractional
18 interests at the property."
19          Do you see that?
20     A.   Yes.
21     Q.   And we looked at before the language on
22 page 20 that the "subject's fractional ownership,
23 combined with the high maintenance costs and real
24 estate taxes, have severely impaired the subject's
25 marketability"; correct?

Page 252

1      A.   Yes.
2      Q.   And if you look at the San Francisco
3  appraisal, which is 2068, at page 21 --
4          MR. FERGUSON:  That's Dancing Bear.
5      Q.   (By Mr. Sellinger)  -- the last paragraph
6  --
7          MR. FERGUSON:  Hold -- hold on, Philip.
8  We've got a lot of paper here.
9          THE WITNESS:  Oh, yeah.  No.  I got -- I
10 got it right here.
11         MR. MARX:  Page 21, on 2268.
12         THE WITNESS:  I'm with you.
13     Q.   (By Mr. Sellinger)  "The subject's Deed
14 Restriction for fractional ownership, combined with
15 high maintenance costs, real estate taxes, and
16 Mello-Roos payments, have severely impacted the
17 subject's marketability."
18          Do you see that?
19     A.   Yes, sir.
20     Q.   And each of those three statements that I
21 just read, those are accurate?
22     A.   Yes.
23     Q.   And basically telling the reader that
24 those will decrease -- decrease the value of the
25 Ritz-Carlton interests; correct?

Page 253

64 (Pages 250 - 253)

1    Q.   (By Mr. Sellinger)  Some of the sellers.
2         MR. FERGUSON:  Which sellers?
3    Q.   (By Mr. Sellinger)  Mr. Donaldson?
4  Sellers in the down market -- sellers in the down
5  market with a non-essential product, if they -- if --
6  if they need money for other necessary expenditures,
7  they can sell -- they can sell for that purpose;
8  correct?
9    A.   That -- that is one option.  Yes.
10   Q.   And that might make such a seller sell for
11  -- more quickly or at a lower price than someone who
12  didn't have financial pressures on them; correct?
13   A.   Correct.
14   Q.   And that sale, where somebody's selling in
15  a distressed situation, that's not necessarily
16  selling at market value because of their unique
17  circumstances; correct?
18   A.   Well, that's an interesting question.  I
19  -- I can't say "correct."  When we're sitting in --
20  in the middle of the recession, there is debate as to
21  whether -- as to what is the market.  And the
22  market -- if -- if at the time all you have is
23  distressed sales, there are some that would consider
24  that the market.
25        So I guess that's -- that's just a

*Page 270*

1  distinction that we make.
2    Q.   The point that I'm making is that if you
3  have -- if you have certain sellers who, because of
4  the recession and their economic pressures, are
5  forced to unload the investment, that could
6  artificially depress the sales prices; correct?
7         MR. FERGUSON:  Objection.  Form.
8         THE WITNESS:  That could lower the price
9  -- that -- they could create a lower price for their
10  unit than -- than would be typical or would be
11  considered market due to their distress.  Correct.
12   Q.   (By Mr. Sellinger)  All right.  And if
13  those sales of lower prices that were below market
14  due to the distress were included in the sales in
15  your valuation, that would lower the sales prices;
16  correct?
17   A.   Using those sales, again, we consider it
18  indicative of sales occurring in the market.  So,
19  yes, that could lower -- potentially lower the value
20  conclusion.
21   Q.   And we know that that happened here
22  because your report talks about conversations with
23  brokers, people who -- your report uses the word
24  "distressed."  The sellers were in some form of
25  distress; correct?

*Page 271*

1         MR. FERGUSON:  Objection.  Form.
2         THE WITNESS:  I'd like to see where -- I
3  might need to look at that language.
4         But, yes, certainly Mr. -- Mr. Vaughan's
5  discussion of his interviews indicated that there
6  were sellers who were distressed.
7    Q.   (By Mr. Sellinger)  Okay.  And those
8  distressed sellers would not be getting market price,
9  and that could artificially depress a valuation;
10  correct?
11        MR. FERGUSON:  Objection.  Form.
12        THE WITNESS:  Not necessarily.  That's the
13  distinction I was trying to make just a bit ago in
14  terms of at a certain point, if -- if there are no
15  other sales except those sales, or those types of
16  sales, one could argue that is indeed the market as
17  of that date of value.
18        And it's very important to note --
19   Q.   (By Mr. Sellinger)  Okay.  But --
20   A.   I'm sorry --
21   Q.   Okay.  And I -- and I really don't -- I'm
22  sorry.  What were you saying?
23   A.   No.  I -- that's why it's very important
24  to note that appraisal values are date specific.
25   Q.   Okay.  Do you believe that in December of

*Page 272*

1  '13, when you did your three appraisals, that the
2  entire market was in distress?
3    A.   Did not do enough other work in Aspen to
4  say the entire market was in distress.  But I think,
5  based on the macro trends we discussed earlier, the
6  -- the -- the market -- I don't know if you want to
7  call the entire market distressed.  The entire market
8  was certainly strained and experiencing lack of
9  demand and declining prices.
10   Q.   Okay.  And that lack of demand and
11  declining prices and distress because of the
12  recession, that certainly wasn't the fault of Ritz;
13  correct?
14   A.   That's correct.
15   Q.   Okay.  Now, when you do appraisals, do you
16  oftentimes use comparables from other -- other
17  properties that are not the subject of the appraisal?
18   A.   Yes, sir.
19   Q.   Okay.  And in the Dancing Bear appraisal,
20  you did comparables of other properties; correct?
21   A.   Yes.
22   Q.   And -- and did you visit those properties?
23   A.   I believe I visited all of those
24  properties, yes, at one time or another.
25   Q.   And here -- here, for the Aspen appraisal,

*Page 273*

1 you did not use comps from any other -- any other
2 property; correct?
3    A.   That's true.
4    Q.   And of all the appraisals you've done in
5 your career, if you had to give us an estimate, I
6 mean, what percentage of times do you use comparables
7 from other properties and what percentage of time do
8 you not?
9    A.   Well, that certainly depends on the
10 property type.  Again, I -- I use that phrase "it
11 depends" often.  It depends.
12    Q.   Well, just to answer the question.  The
13 question is:  What percentage of time do you use
14 comparables from other properties and what percentage
15 of time do you not?  Your best estimate.
16    A.   Oh, you know, easily, you know, three
17 quarters or more of the time you use comps.  Again,
18 it depends on the product type.
19    Q.   No.  But I'm asking --
20       MR. FERGUSON:  You're interrupting the
21 witness.  You're interrupting the witness.
22       THE WITNESS:  Sorry.  80 -- 80 percent or
23 higher.
24    Q.   (By Mr. Sellinger)  80 percent of the
25 appraisals you do or more you will use comparables

Page 274

1 from other properties?
2    A.   Yes.  Because --
3    Q.   Okay.  And -- and -- and in these
4 appraisals, for Aspen and San Francisco, you did not;
5 correct?
6    A.   That is correct.
7    Q.   Okay.  Now, on page 17 of the Aspen
8 appraisal, we looked at this before, you discuss the
9 Aspen fractional market and you discuss Little Nell
10 and St. Regis and Grand Aspen and several other
11 properties; correct?
12    A.   Correct.
13    Q.   But you say nothing about the sales
14 performance; correct?
15       MR. FERGUSON:  Objection.  Form.
16    Q.   (By Mr. Sellinger)  You don't have any
17 specifics on the sales; correct?
18    A.   Well, yeah.  I'm just looking through that
19 to see what -- what I -- what -- what is said here.
20 And I guess it seems like we might be talking -- no.
21 There does not appear -- there -- there's certainly
22 no specifics as to pricing.
23    Q.   Okay.  And you don't have anything on
24 either developer pricing or resale pricing for these
25 other properties in Aspen; correct?

Page 275

1       MR. FERGUSON:  Objection.  Form.
2       THE WITNESS:  Yeah.  And I'm -- I'm just
3 checking a couple tables here.
4    Q.   (By Mr. Sellinger)  No.  I'm asking you on
5 page 17 where you discuss -- well, you can look at
6 your other tables here if you want.
7    A.   Okay.  Oh, yeah, on page 17, that's
8 correct.
9    Q.   Okay.  And you don't reflect any of the --
10 the work that you did in Dancing Bear, the economic
11 analyses and sales work is not reflected here;
12 correct?
13    A.   That is correct.  It was -- that -- that
14 was three years old at this point.
15    Q.   Okay.  But, I mean, you could have updated
16 it.  But that -- but -- but that wasn't done in this
17 particular appraisal; correct?
18    A.   Correct.
19       MR. FERGUSON:  Objection.  Form.
20    Q.   (By Mr. Sellinger)  Okay.  Now, had that
21 work been done, had you looked at six other
22 properties in Aspen and done the detailed kind of
23 valuation that you did in Dancing Bear, would that
24 have been helpful in this analysis?
25       MR. FERGUSON:  Objection.  Form.

Page 276

1    Q.   (By Mr. Sellinger)  And, again, I'm not
2 faulting you.  Because I understand the scope was
3 different.  But I'm just asking whether it would be
4 helpful?
5    A.   Well, yes, it would be helpful.  And we
6 had access to that information in our files.  It was
7 not presented in this summary report.
8    Q.   Okay.  And if you wanted to measure the
9 impact of the conversion to points --
10       MR. SELLINGER:  Ian, I just got a message
11 on the screen that said something about the session
12 ending in five minutes.
13       Do you have -- can you see that?
14       MR. MARX:  I just saw it, too.  I don't
15 know --
16       MR. SELLINGER:  You got a tech guy?
17       MR. MARX:  You think it's on this end?
18 You think --
19       MR. SELLINGER:  Because there's no one
20 here, Ian.  So you've got to probably do it quickly.
21       (Discussion held off the record.)
22       THE VIDEOGRAPHER:  Going off the record.
23       The time is 4:58 p.m.
24       (Break taken at 4:58 to 5:02 p.m.)
25       THE VIDEOGRAPHER:  Going back on the

Page 277

70 (Pages 274 - 277)

1 record.
2          5:02 p.m. is the time.
3          Counsel.
4     Q.   (By Mr. Sellinger) So, Mr. Donaldson, if
5 you wanted to measure the impact, if any, of the
6 conversion to points or MVC member access to Aspen or
7 San Francisco, it would help, would it not, to try
8 and isolate that issue by looking at listings and
9 sales of other resorts that didn't experience the
10 same conversion or access?
11    A.   The more market data that's given
12 consideration, the better. So yes.
13    Q.   Well, okay. But as a general -- as a
14 general matter, I'm sure that's true.
15         But I'm saying, in particular, if you want
16 to isolate -- if you want to isolate the impact, if
17 any, of those circumstances at the Ritz resorts, it
18 would help to look at listings and sales at other
19 resorts that didn't have that so you could use that
20 to try and measure the impact, if any; correct?
21    A.   That's -- that's one way to -- that's a --
22 a methodology that could be useful. It's -- I'm not
23 sure how to answer that in terms of "correct,"
24 because there -- there are just so many variables.
25 It -- it's -- it's possible.

                                        Page 278

1     Q.   Are -- are you familiar with Randy Bell?
2 Do you know that name, in appraisal?
3     A.   Randy Bell? Yes. I believe so. He's --
4 he's authored books on distress or stigma or
5 something like that. Stuff like that, I think.
6     Q.   Exactly. A recognized authority in that
7 field?
8     A.   I believe so. Yes.
9          MR. SELLINGER: Okay. Ian, would you show
10 Mr. Donaldson from Tab 15.
11         THE REPORTER: It'll be 2275.
12         MR. MARX: 2275.
13         (EXHIBIT 2275 WAS MARKED.)
14    Q.   (By Mr. Sellinger) I show you parts of a
15 -- a -- a -- a book written by Randall Bell for the
16 Appraisal Institute entitled Real Estate Damages,
17 Applied Economics and Detrimental Conditions.
18         And I've -- would you turn to the third
19 page in the exhibit. The page numbers are not
20 particularly legible. But I think it's 233. So if
21 you go two pages ahead, I can read page 235.
22    A.   Okay.
23         MR. FERGUSON: Where is it?
24    Q.   (By Mr. Sellinger) And do you see that
25 Chapter 11 is Completing a Reliable Damage Analysis?

                                        Page 279

1     A.   Yes.
2     Q.   And do you see that after the
3 Introduction, there's a section: Detrimental
4 Condition Fundamentals?
5     A.   Yes.
6     Q.   If you turn to the next page, the second
7 full paragraph says, "It is also important to keep in
8 mind that the observation of value diminution does
9 not automatically reflect causality with respect to a
10 detrimental condition. Some challenges in this
11 regard might include: Distinguishing the effects of
12 a detrimental condition, which often occurs over a
13 significant period of time, from the effects of
14 market conditions."
15         Do you agree with that?
16    A.   Yes.
17    Q.   And then further down, Bell writes, under
18 the section entitled Market Data: "Specialized
19 techniques for collecting relevant market data should
20 be used to draw properly supported conclusions.
21 Market data for the analysis -- market data for the
22 analysis of detrimental conditions is not necessarily
23 as easy to obtain as conventional appraisal data, but
24 the process of collecting market data is an essential
25 aspect of the analysis."

                                        Page 280

1          Do you agree with that?
2     A.   Yes.
3     Q.   And then on the next page, 235, the first
4 full paragraph: "The quality of the market data
5 ultimately drives the quality of the analysis,
6 regardless of the analytical approaches chosen.
7 Quantifying damages based solely on experience and
8 professional judgment is reckless at best and
9 probably unethical, particularly when some type of
10 market data for measuring the impact of almost any
11 detrimental condition is available."
12         Do you see that -- do you --
13    A.   Yes.
14    Q.   -- agree with that?
15    A.   Yes.
16    Q.   And two paragraphs down he writes:
17 "Failing to research and apply relevant market data
18 is the single most common flaw noted in the analysis
19 of detrimental conditions. While preconceptions
20 about the detrimental -- analysis of detrimental
21 conditions do exist, questions can only be resolved
22 with relevant market data."
23         Do you agree with that?
24    A.   Yes.
25    Q.   So here, again, if you wanted to, you

                                        Page 281

Veritext Legal Solutions
866 299-5127

1 know, measure the impact, if any, of the conversion
2 to points or MVC members access to Aspen or San
3 Francisco, the market data from other properties that
4 would allow you to isolate that particular issue of
5 the conversion to points would be very helpful, and
6 is what Bell is really saying, what you should be
7 doing if you want to draw that kind of conclusion
8 about a detrimental condition; correct?
9    A.   Correct.
10    Q.   Okay.  Now, you also mentioned -- in
11 addition to Randy Bell, you mentioned several times
12 Ragatz.
13         Are you familiar with Ragatz?
14    A.   Yes.
15    Q.   What's his first name?  Do you know?
16    A.   I want to say David.
17    Q.   Is it Richard?
18    A.   Oh, you know what?  Yeah --
19    Q.   Richard --
20    A.   -- actually, I think -- I think you're
21 right.  I think it's Richard Ragatz.  I -- I haven't
22 recall offhand.  I've actually -- I've spoken with
23 him at some point in the past, but it's been some
24 time.
25    Q.   And -- and is he recognized in -- in -- in
Page 282

1 the field of fractional interest?
2    A.   Yes, sir.
3    Q.   In that market?  Yes?
4    A.   Yes.  In -- in -- just globally, I guess.
5 Yes.
6    Q.   And you've relied on his data in your own
7 reports as I understand it?
8    A.   Yes.
9    Q.   Okay.  What part of his reports have you
10 relied -- used his data in?
11    A.   Mostly in the market analysis.  Reporting
12 macro --
13    Q.   When you say, "the market analysis" --
14    A.   The macro market analysis.
15    Q.   And you used his analysis for the macro
16 market analysis for fractional interests?
17    A.   Correct.  And in some cases, his -- he has
18 average pricing and absorption and other things that
19 are helpful if we're working on a development
20 approach, like the Dancing Bear.
21    Q.   Okay.  Excuse me.
22         MR. SELLINGER:  And, Ian, can you show
23 Mr. Donaldson from Tab 14.
24         MR. MARX:  2276?
25         THE REPORTER:  Correct.
Page 283

1         (EXHIBIT 2276 WAS MARKED.)
2    Q.   (By Mr. Sellinger)  Are you familiar with
3 Richard Roddewig and Rebel Cole?
4    A.   Not so familiar with him.  I've heard --
5 I'm familiar with Richard Roddewig.
6    Q.   And what do you know about him?
7    A.   Just that he writes these kind of
8 articles.  I think he's oil and gas oriented.
9    Q.   Okay.  So this is an article entitled Real
10 Estate Value Impacts From Fracking:  Industry
11 Response and Proper Analytical Techniques.
12         And can you turn to page ten.
13    A.   Okay.  I'm there.
14    Q.   On page ten, in the third paragraph, it
15 reads:  "Unlike unlicensed economists who analyze
16 home prices in areas experiencing fracking, licensed
17 real estate appraisers are required by standards of
18 professional practice to apply a set of carefully
19 selected techniques to determine such impacts.
20 Licensed appraisers are required by their
21 professional standards to utilize the methods that
22 their peers would use in similar assignments, and
23 they determine what their peers would do in similar
24 situations by reference to their professional
25 appraisal journals and publications, their
Page 284

1 professional meetings and conferences, and their
2 professional appraisal education courses, seminars,
3 and appraisal discussion groups."
4         Do you agree with that?
5    A.   Yes.
6    Q.   And then in the -- the -- the next column,
7 where he's talking about ways to measure -- when he's
8 talking about long-established and generally
9 recognized appraisal methods that could be used to
10 determine the impact of fracking, he says that you
11 could do "paired sales analysis."
12         Do you see that?
13    A.   Yes.
14    Q.   And do you agree with that, that that's a
15 way to -- that's a long-established and generally
16 recognized appraisal method to determine the impacts
17 of a -- of an event?
18    A.   Yes.
19    Q.   And what are paired sales analyses?
20    A.   A -- a paired -- a paired sales -- a
21 paired sales analysis is -- is -- the ideal paired
22 sales analysis would be to have two sales identical
23 in every respect except for that one difference.  You
24 know, you -- you've got two pieces of land, for
25 example, one's right next to each other -- one's on
Page 285

72 (Pages 282 - 285)

1 the corner, one's not on the corner.  And so they
2 both sold on the same day and subject to the same
3 market conditions.  And the corner lot sells for more
4 than the lot next to it.  You have a paired sale
5 where you can derive the impact of the -- the corner
6 location.
7       That's my example.
8    Q.   Understood.  Okay.  And that's an ideal
9 analysis to isolate -- if you really want to isolate
10 the impact of a detrimental condition, a paired sale
11 analysis is the way to do it --
12    A.   Yes.
13    Q.   -- right?
14    A.   Yes.  And I just mentioned the ideal.  It
15 -- very often, it gets a lot more complicated than
16 that.
17    Q.   And -- and -- and in this case, that
18 wasn't your assignment?  Again, I'm not being
19 critical.  You weren't being hired to measure the
20 impact, if any, of the conversion or MVC access?
21 That's not what you were being asked to do; correct?
22       MR. FERGUSON:  Objection.  Form.
23       THE WITNESS:  Correct.
24    Q.   (By Mr. Sellinger)  So you didn't do a --
25 a paired sales analysis; right?

Page 286

1    A.   Correct.
2    Q.   And if you -- would you look back at USPAP
3 at U-14.
4       MR. FERGUSON:  What did he say?  14?
5       THE WITNESS:  Yes, sir.
6       MR. FERGUSON:  Page U-14.
7       THE WITNESS:  I'm there.
8       MR. FERGUSON:  Hold it.  Here I am.
9    Q.   (By Mr. Sellinger)  Okay.  Under Scope of
10 Work Acceptability, it says, "The scope of work must
11 include the research and analyses that are necessary
12 to develop credible assignment results"; correct?
13    A.   Correct.
14    Q.   And then if you turn to page 19.
15    A.   U-19?
16    Q.   Under standards -- yes.  U-19.
17       Under standards one -- Standards Rule 1-4
18 it says, "In developing a real property appraisal, an
19 appraiser must collect, verify, and analyze all
20 information necessary for credible assignment
21 results."  And then (a):  "When a sales comparison
22 approach is necessary for credible assignment
23 results, an appraiser must analyze such comparable
24 sales data as are available to indicate a value
25 conclusion."

Page 288

1    A.   We did not.  No.
2    Q.   And on page ten of Roddewig's article, he
3 lists another long-established and generally
4 recognized appraisal method to determine an -- an
5 impact of an -- of an event, he lists "multiple
6 regression analysis."
7       Do you agree with that?
8    A.   Yes.
9    Q.   Okay.  And what is a multiple regression
10 analysis?
11    A.   Multiple -- multiple regression analysis
12 requires getting, you know, a -- a -- a -- to the
13 extent you can, statistical, meaningful -- a
14 statistically meaningful body of data whereby you can
15 chart it on a -- on a graph where you have an "X" and
16 a "Y" axis, and -- you know, back to the corner
17 location and no corner location -- and you can -- you
18 can get a -- sort of a -- you -- you can get a -- a
19 -- a line that -- that shows, generally, what kind of
20 standard deviation there might be within this dataset
21 that gives you some idea of about what the impact is,
22 depending on what metric you're using, price per
23 square foot or whatever.
24    Q.   And multiple regression analysis was --
25 was not done here; correct?

Page 287

1       Do you see that?
2    A.   Yes.
3    Q.   So moving beyond just a general appraisal
4 of -- of -- of overall real estate value, which was
5 done, and focusing on what I was asking you before,
6 if your assignment had been to compare -- to measure
7 -- withdrawn.
8       If your assignment had been to measure the
9 impact of any -- if any, of the conversion to points,
10 the affiliation, and MVC access, to do that, which
11 wasn't your assignment, but had that been your
12 assignment, under this rule and the -- the literature
13 that we just read, for credible results there you
14 would have had to do some kind of paired sales or --
15 or -- or similar work to try and isolate the impact
16 of the event that you were evaluating; correct?
17    A.   Correct.
18    Q.   Okay.  And by the way, have you ever, in
19 any of your other assignments, been asked to measure
20 the impact, if any, of exchanges between clubs or
21 access of club members to clubs?
22    A.   Not -- not in my -- not in any of my
23 assignments.  No, sir.
24    Q.   Okay.  All right.  On -- back to the Aspen
25 report.

Page 289

73 (Pages 286 - 289)

1      MR. FERGUSON:  2270?
2      THE WITNESS:  Yes, sir.
3    Q.   (By Mr. Sellinger)  On page 25 you list a
4  -- a number of comparable sales; correct?
5    A.   Yes.
6    Q.   And the highest of these sales is $349,000
7  and the lowest is 11,000; correct?
8    A.   Yes.  Correct.
9    Q.   But the Conclusions of Value that you
10 attribute to the properties you're appraising here,
11 the non-penthouse unit, range from $30,000 to $45,000
12 for a fractional interest; correct?
13   A.   Correct.
14   Q.   Your report doesn't have any explanation
15 as to how those conclusions were derived and why
16 they're lower than a majority of the comparable
17 listings; correct?
18   A.   Well, I -- I would point to -- you know,
19 the -- the sentence that reads:  "The remaining ten
20 sales are in a much tighter range, from 50,000 to a
21 100,000, and 12,500 to 25,000 per week."  That --
22   Q.   Okay.  So let -- let -- I'm sorry.
23   A.   I'm just saying that's -- you know, that's
24 -- that's -- that's obviously the -- in -- in this --
25 in this particular location, that's the extent of the

Page 290

1  discussion for -- for the comparable sales.
2    Q.   Okay.  Which sentence are you reading?
3    A.   "The remaining ten sales" -- you know,
4  basically, this is saying, throwing out the high and
5  the low, the -- the remaining ten sales indicate a
6  much tighter range of 50,000 to 100,000.
7    Q.   Okay.  So even if you exclude the high and
8  the low, your remaining ten sales are between 50,000
9  and $100,000, that's what you're pointing to;
10 correct?
11   A.   Yes.
12   Q.   But your Conclusions of Value put the
13 Ritz-Carlton non-penthouse units 30 to 45 per
14 fractional interest; correct?
15   A.   30 to 60.
16   Q.   For the non-penthouse units, 30 to 45;
17 correct?
18   A.   Oh.  That's correct.
19   Q.   And your report doesn't -- your report
20 doesn't give any explanation as to how you have
21 prices of 30 to 45 for your valuations of the
22 non-penthouse when, even if you exclude the high and
23 the low, the range is 50 to 100 in the recent sales;
24 correct?
25   A.   Correct.

Page 291

1    Q.   Okay.  Let's turn to the listings at page
2  24.
3        Your listings range from 43,000 to 89,000;
4  correct?
5    A.   Summary of Listings.  So I'm -- this is
6  small print.  That -- yes.  Correct.
7    Q.   And your Conclusions of Value for the
8  non-penthouse units, again, range from 30,000 to
9  $45,000; correct?
10   A.   Correct.
11   Q.   And there's no explanation in the report
12 as to how those conclusions were derived at and --
13 and why they're lower than the majority of the
14 listing prices; correct?
15   A.   That's correct.
16   Q.   Okay.  And look back at USPAP again.
17       On page U-25.  We looked at this before.
18       "The content of a summary appraisal report
19 must be consistent with the intended use of the
20 appraisal, and at a minimum."  And then if you turn
21 to U-26, at little Roman numeral VIII it says,
22 "Summarize the information analyzed, the appraisal
23 methods and techniques employed, and the reasoning
24 that supports the analyses, opinions, and
25 conclusions"; correct?

Page 292

1    A.   Correct.
2    Q.   And at least in terms of what we just
3  reviewed as to the deviation between the appraisal of
4  35 and 50, and the listings and the sales prices, the
5  report doesn't set that out; correct?
6    A.   It does not set that out.  Correct.
7    Q.   Okay.  Now, on -- on your examination by
8  Mr. Ferguson, he showed you two exhibits.  One was
9  1903 and one was 1902.
10   A.   Yes.  Sales summaries?
11   Q.   Yes.  Exhibit 1903, he pointed -- so these
12 are apparently non-developer sales.  And he pointed
13 you on page three to four different sales:  one to
14 Croom of 135,000; one to Pierce, 210,000; one,
15 Martinez, 249,000; and one, Sandy Jun, for 220,000.
16       Do you see that?
17   A.   Yes.
18   Q.   Now, if -- and -- and you -- apparently
19 you are unaware of why these were not included in the
20 -- in the valuation and the listing of sales in your
21 report; correct?
22   A.   Correct.  I -- I don't know that we had
23 this data or not.
24   Q.   Understood.  Understood.  And I'm not
25 quarreling with you.

Page 293

74 (Pages 290 - 293)