# EXHIBIT G

```
           IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLORADO


                                    )
   RCHFU, LLC, et al.,               ) Continued
                                     ) videoconference
          Plaintiffs,                ) deposition of:
                                     )
   vs.                               ) CHRISTOPHER T.
                                     ) DONALDSON
   MARRIOTT VACATIONS                )
   WORLDWIDE CORPORATION, et         ) Volume II
   al.,                              )
                                     ) Civil Case No.:
          Defendants.                ) 16-01301 PAB
                                     )


                June 25, 2018 * 9:06 a.m.



      Location:  CitiCourt, The Reporting Group
                 236 South 300 East
                 Salt Lake City, Utah 84111




         Reporter:  Kelly Fine-Jensen, RPR
      Notary Public in and for the State of Utah

                  Job No. NJ2947301
```

Page 329

1  Do you see that?
2  A.  Yes.
3  Q.  And it is that paragraph, entitled "Ritz
4  Carlton Club Vacation Club Points," that the report's
5  concluding that had the impact that you describe in
6  the prior paragraph; right?
7  A.  Yes.
8  Q.  Okay.  Now, can you tell us how the -- the
9  Portfolio membership program works?
10  A.  Well, I -- yeah.  That -- that I don't
11  recall --
12  MR. FERGUSON:  Object to form.
13  THE WITNESS:  Oh, go ahead.  I'm sorry.
14  What --
15  MR. FERGUSON:  Object to form and lacks
16  foundation.
17  THE WITNESS:  Okay.  All right.  Thank
18  you.  And I -- my apologies.  I will -- I'll slow
19  down, same as last time.
20  I am -- you know, that's five years ago.
21  I am having a hard time recalling exactly how the
22  Portfolio club works.  But I -- I believe it was, you
23  know, outlined -- I mean, we tried to outline it to
24  some degree there where we read before.  The -- the
25  Portfolio club allows transfer -- you know, I guess

Page 330

1  going to different resorts within the -- within the
2  club, within the -- or within the designated
3  properties in the portfolio.
4  Q.  (By Mr. Sellinger)  And what were the
5  designated properties within the portfolio?
6  MR. FERGUSON:  Objection.  Form.
7  THE WITNESS:  I don't recall which ones
8  those were.  They -- and, you know, that's such a
9  moving target.  Those portfolios morph and have
10  properties come and go.
11  My understanding is it would have been,
12  you know, at the very least, these other same
13  Ritz-Carlton resorts, San Francisco, Northstar
14  Highlands, and Aspen Highlands.
15  Q.  (By Mr. Sellinger)  Well, if the Portfolio
16  program gave Ritz members the ability to go to
17  different resorts, how did it give Marriott owners
18  access to the club, which is the -- the point of the
19  comment about the impact on the Ritz Carlton Club?
20  A.  My understanding -- and, again, this was
21  long ago and this was more Mr. Vaughan's aspect of
22  the report.  But my understanding is that the
23  Marriott Club -- Vacation Club members could transfer
24  into -- could take their week in any of the
25  properties that they wanted, including the Portfolio

Page 331

1  club.
2  Q.  I'll represent to you that the Portfolio
3  program gave no access to Marriott members for access
4  to the Ritz Club.
5  Do you know where your understanding that
6  Marriott people would have had access to the Ritz
7  Club through the Portfolio program came from?
8  MR. FERGUSON:  Objection.  Form.
9  THE WITNESS:  No.
10  Q.  (By Mr. Sellinger)  Do you know when the
11  Portfolio program -- I'm sorry.  I didn't mean to cut
12  you off.
13  A.  No.  No.  That's okay.
14  No.  The answer was no.  I don't recall
15  that.
16  Q.  Do you know when the Portfolio program
17  started?
18  A.  Isn't that -- is that what we mentioned --
19  MR. FERGUSON:  Objection.  Form.
20  THE WITNESS:  -- "subsequent to the sell
21  out of this development."  So -- yeah.  I don't --
22  no.  I do not know the exact date when that was
23  started or even, quite frankly, the year.  But I
24  assume --
25  Q.  (By Mr. Sellinger)  Do you know -- do you

Page 332

1  know the current status of the Portfolio program?
2  A.  I do not.
3  Q.  Would it surprise you if I told you that
4  the Portfolio program ended by 2012 or 2013?
5  MR. FERGUSON:  Objection.  Form.
6  THE WITNESS:  No.  It would not.
7  Q.  (By Mr. Sellinger)  Looking at page 19,
8  under the Ritz Carlton Club Vacation Club Points, you
9  see the third bullet says, "Vacation Club Points may
10  be used to book vacations at any of the Ritz-Carlton
11  Club locations, plus more than 50 resorts from the
12  Marriott Vacation Club Collection."
13  Do you see that?
14  A.  Yes, sir.
15  Q.  And would it surprise you if I represented
16  to you that that is not at all a part of the
17  Portfolio program, it's a part of a separate program
18  operated by Marriott Vacation Club?
19  MR. FERGUSON:  Objection.  Form.
20  THE WITNESS: I'm sorry.  The -- the first
21  part of the question again, please?
22  Q.  (By Mr. Sellinger)  Yeah.  Would it
23  surprise you if I told you that the Portfolio program
24  did not allow access to the 50 resorts from the
25  Marriott Vacation Club?

3 (Pages 329 - 332)

Page 333

1  MR. FERGUSON: Objection. Form.
2  THE WITNESS: That would surprise me. My
3  understanding was they had access to all.
4  But that -- that's not -- again, this --
5  this -- this aspect of the appraisal was more driven
6  by my partner, Mr. Vaughan.
7  Q. (By Mr. Sellinger) Understood.
8  Looking at the fourth bullet it says,
9  "Vacation Club Points may also be used to book
10 vacations for stay at the Ritz-Carlton and Marriott
11 hotels from the Hotel Collection, as well as
12 specialty travel options from the Explorer
13 Collection."
14 Do you see that?
15 A. Yes.
16 Q. And your understanding was that, too, was
17 part of the Portfolio program; right?
18 MR. FERGUSON: Objection. Form.
19 THE WITNESS: My -- my understanding --
20 and, again, five years ago. My understanding was
21 that the Vacation Club owners were gaining access to
22 whatever -- whatever properties were owned by
23 Marriott.
24 Q. (By Mr. Sellinger) Was it your
25 understanding, as described here, as you've described

Page 334

1  the Portfolio program, that it gave Ritz members the
2  opportunity to stay at Ritz-Carlton and Marriott
3  hotels from the Hotel Collection and the Explorer
4  Collection?
5  MR. FERGUSON: Objection. Form.
6  THE WITNESS: No.
7  Q. (By Mr. Sellinger) And -- and what was
8  your understanding of that bullet?
9  A. Which bullet? Number five?
10 Q. The -- the fourth bullet.
11 A. My understanding of that is -- is, you
12 know, access to a broad range of properties that,
13 again, I think there are additions and subtractions
14 to those ongoing. But Vacation -- that my
15 understanding of that is expanded options for
16 Vacation Club Points.
17 Q. Under the Portfolio program?
18 MR. FERGUSON: Objection. Form.
19 THE WITNESS: Under the Portfolio program,
20 and as well as the Marriott program.
21 Q. (By Mr. Sellinger) Do you know how the
22 Marriott program worked?
23 MR. FERGUSON: Objection. Form.
24 THE WITNESS: The -- I -- the -- the
25 Marriott program was -- once it went to points, I did

Page 335

1  not follow, you know, exactly how that -- the points
2  worked. But the point-based system is different than
3  -- than what the timeshare program used to be, is my
4  understanding.
5  Q. (By Mr. Sellinger) Okay. So you don't
6  know how a Marriott person would actually come to be
7  able to access a Ritz Carlton Club using points?
8  MR. FERGUSON: Objection. Form.
9  THE WITNESS: Yeah. That -- that's -- you
10 know, that's all internal. Simply cashing in points.
11 Q. (By Mr. Sellinger) Do you have any idea
12 what the procedure is and the number of points that
13 would be required for anything like that?
14 A. Well, the -- the --
15 MR. FERGUSON: Objection. Form.
16 THE WITNESS: -- the number of points
17 varies considerably, I think, depending on the
18 property, the time of year. So the number of points
19 is variable.
20 And it's my understanding -- sorry. What
21 is the other part of the question there, Philip?
22 Yeah. The -- well, the procedure --
23 Q. (By Mr. Sellinger) Do -- do you have
24 any --
25 A. Pardon me?

Page 336

1  Q. Let me stop and read the question back.
2  A. Okay.
3  (Record read as follows:
4  "QUESTION: Do you have any idea what the
5  "procedure is and the number of points
6  "that would be required for anything like
7  "that?")
8  MR. FERGUSON: And I objected to form.
9  THE WITNESS: The procedure used to be,
10 you know, back when I actually had a Marriott
11 Vacation Club ownership, was calling on the phone and
12 talking to a representative. And then that went
13 online. And -- and you simply go in and access --
14 you know, access the website and cash in -- find out
15 what your points are, how many points you have, and
16 then engage.
17 Q. (By Mr. Sellinger) You -- you indicate in
18 the -- in the report on page 19, where you talk about
19 the perception of existing owners -- do you see that?
20 Under the heading Repercussions of Conversion to
21 Points System it says, "While providing greater
22 flexibility to owners, the conversion to a points
23 system has been perceived by existing fractional
24 owners as diluting the exclusivity of the Ritz
25 Carlton Club by opening specific resorts to the

Page 337

1  Marriott Vacation Club."
2      Do you see that?
3  A.  Yes, sir, I do.
4  Q.  Okay. Do you know what the basis for the
5  perception that's described about Ritz Carlton Club
6  owners, where that came from?
7  A.  In my -- in my discussions with
8  Mr. Vaughan, he -- he felt -- he -- those -- those
9  were derived from his interviews with agents and
10 sales representatives that were marketing resales of
11 those shares.
12 Q.  And you -- you told us last time that you
13 certainly didn't speak to any brokers or agents or
14 owners; correct?
15 A.  No. That was all Mr. Vaughan's direct
16 research.
17 Q.  Okay. And you're not aware of his
18 speaking to any owners either directly; correct?
19 A.  I can't say I'm aware of him having spoken
20 with any owners. No, sir.
21 Q.  All right. And there are no names of
22 brokers -- we covered this last time -- indicated in
23 the report; correct?
24 A.  No.
25 Q.  And --

Page 338

1  A.  I --
2  Q.  -- in the -- yes?
3  A.  I'd just -- I'd like to point out that in
4  some of our reports it's not uncommon. We don't
5  often include names because that doesn't feel
6  appropriate in some cases.
7  Q.  We looked at the work file that Cushman &
8  Wakefield produced. There are no brokers named there
9  or records of any conversations with brokers either.
10     Are you aware of that?
11 A.  Not aware of the work file. That -- that
12 was Mr. Vaughan -- well, I had my work file.
13 Mr. Vaughan was the -- the point person that
14 conducted the direct research, as I just mentioned.
15 Q.  Okay. So -- so in the -- in the report,
16 the only description of the conversation with
17 brokers, which you testified to in the last session,
18 was that the sellers -- based on conversations with
19 brokers -- that the sellers wanted to exit their
20 investment.
21     Do you recall that?
22 A.  Yes.
23     MR. FERGUSON: Objection. Form.
24 Q.  (By Mr. Sellinger) Okay. There's no
25 indication in this report or the San Francisco report

Page 339

1  of any comment from the brokers other than the
2  sellers wanted to exit their investment.
3      So do you know whether Mr. Vaughan was in
4  touch with the plaintiffs' lawyers in this Hoyt
5  versus Marriott Vacations Worldwide?
6  A.  No. I do not know all parties to which
7  Mr. Vaughan had discussions.
8      And, excuse me, those would be the
9  attorneys for the -- for the -- for the plaintiff?
10 Q.  Attorneys for the plaintiffs, yes.
11     (EXHIBIT 2277 WAS MARKED.)
12 Q.  (By Mr. Sellinger) So I show you what has
13 been marked Exhibit 2277, a copy of the complaint in
14 a case entitled Hoyt versus Marriott Vacations
15 Worldwide. It's the amended class action complaint.
16 And it's Bates numbered CUSHMAN III 00064 through
17 00098.
18     I assume you've not seen this document
19 before, Mr. Donaldson; correct?
20 A.  Correct.
21     MR. FERGUSON: Objection. Form.
22     THE WITNESS: I have not.
23 Q.  (By Mr. Sellinger) This was in the work
24 file that was produced by Cushman & Wakefield to
25 counsel in this case. Was not provided by Marriott

Page 340

1  to Mr. Vaughan.
2      So I would ask you: Do you have any idea
3  from where Mr. Donaldson may have acquired the
4  complaint filed by plaintiffs in a class action
5  complaint, Hoyt versus Marriott, which deals with,
6  among other things, the Portfolio program?
7      MR. FERGUSON: Objection. Form.
8      THE WITNESS: No. I do not. And that
9  would have been Mr. Vaughan, I believe. Again, I
10 assisted Mr. Vaughan. I was not the direct contact.
11 So any -- I would -- any of this kind of
12 correspondence certainly would have gone through
13 Mr. Vaughan. And I -- I do not know how he would
14 have obtained this.
15 Q.  (By Mr. Sellinger) Are you -- and -- and
16 I understand he's the one who is doing the primary
17 research.
18     Are you aware that he was in touch with
19 the plaintiffs' lawyers?
20     MR. FERGUSON: Objection. Form.
21     THE WITNESS: I -- at this time, I have to
22 say no. At -- at the time of the research in 2013, I
23 may or may not have known that. Again, my -- my role
24 was definitely not directly related to any
25 discussions with any -- any client related people.

5 (Pages 337 - 340)

Page 341

1  Q. (By Mr. Sellinger) Would it -- would it
2 be unusual, in your mind, for Mr. Vaughan to have
3 been in contact with plaintiffs' lawyers who were
4 suing Marriott for claims relating to the Portfolio
5 program and the relationship between Ritz and
6 Marriott?
7       MR. FERGUSON: Objection. Form.
8       THE WITNESS: I'm sorry, again. Would it
9 be unusual if -- if what?
10  Q. (By Mr. Sellinger) Would it be unusual
11 for Mr. Vaughan -- withdrawn.
12       Would it be unusual for someone doing an
13 appraisal on property such as this to be in touch
14 with lawyers for plaintiffs suing the owner of the
15 property for issues that are described in this class
16 action complaint?
17       MR. FERGUSON: Objection. Form.
18       THE WITNESS: No. I don't think that
19 would be unusual. And, you know, I think -- you
20 know, very often, what -- what -- what the appraiser
21 needs is -- is the information on the subject
22 property and if they have information. So, I don't
23 think it was unusual one way -- one way or the other.
24 Wherever he needed to get the property information.
25  Q. (By Mr. Sellinger) Okay. So we -- we do

Page 342

1 have -- just to review the record, we've got
2 conclusions in this report that we covered last time
3 about the repercussions of the conversion to a points
4 system; correct?
5  A. Yes, sir.
6  Q. And in the -- in the report itself,
7 there's no reference of any conversations with
8 brokers specifically, other than that buyers were
9 looking to exit their investment. We covered that;
10 right?
11  A. Correct.
12  Q. Okay. There's nothing in the file, the
13 work file, indicating conversations with brokers at
14 all. And there's nothing in the file between
15 Marriott and Mr. Vaughan relating to this conversion
16 program, other than the report and the draft.
17       So my question to you is: Would it be
18 unusual for Mr. Vaughan to draw conclusions about the
19 impact of the conversion to the points program based
20 on conversations with plaintiffs' counsel suing
21 Marriott, and a copy of the complaint from
22 plaintiffs' counsel, and not having had that
23 discussion at all with Marriott?
24       MR. FERGUSON: Objection. Form.
25       THE WITNESS: I would -- I would -- well,

Page 343

1 I'll just answer the question.
2       It would be unusual if Mr. Vaughan had no
3 more conversations than with the attorneys.
4       I believe that Mr. Vaughan had extensive
5 conversations with market participants, like the
6 brokers that I mentioned. And even though they're
7 not mentioned in the appraisal, it's my understanding
8 that he spoke with a lot of listing agents and sales
9 agents that were representatives of the buyers and
10 sellers that had direct contact with them, and were
11 understanding of their motivations to sell.
12  Q. (By Mr. Sellinger) But you have no
13 knowledge, even from Mr. Vaughan, of what those
14 conversations were?
15  A. Oh, I -- I believe I mentioned that
16 before. You know, his conversations with selling --
17 and -- and to some degree you just mentioned that --
18 that they were motivated to sell. And the reason --
19 my understanding from those conversations Mr. Vaughan
20 relayed was, you know, that they were motivated to
21 sell because they did not -- they were -- they were
22 unhappy with the situation.
23  Q. Unhappy with what situation?
24  A. The -- the one we're discussing here about
25 the Marriott points.

Page 344

1  Q. Where -- where in this report is there any
2 indication that any of these market participants or
3 brokers indicated that they were selling because they
4 were unhappy with the conversion to points?
5  A. It's not indicated in the appraisal. But
6 we were talking about my discussions with Mr. Vaughan
7 and was I aware of his discussions. They are not in
8 the report, but my understanding is he had extensive
9 discussions.
10  Q. But there's -- but there's nothing in the
11 report indicating that brokers or market participants
12 indicated that the sellers were unhappy with the
13 conversion; correct?
14  A. That is correct.
15  Q. Okay. And, again, putting aside whatever
16 conversations he may have had with brokers, would you
17 find it unusual for him to speak with plaintiffs'
18 lawyers suing Marriott over the conversion and not
19 have had that conversation directly with Marriott?
20 Would that surprise you?
21  A. No.
22  Q. And why is that?
23  A. The -- the -- the attorneys are the
24 representatives of Marriott and I would assume would
25 be the -- the spokesperson.

6 (Pages 341 - 344)

Page 345

1  Q. Let me rephrase -- yeah. Let me rephrase
2  the question then. Because I think we -- we missed
3  each other.
4     Would it surprise you to learn that
5  Mr. Vaughan had conversations with the attorneys for
6  the plaintiffs who were suing Marriott, but did not
7  have a specific conversation with Marriott folks
8  about the conversion to the points program? Would
9  that -- would that be unusual in your mind?
10  A. That -- no.
11  Q. Okay. All right. Let's move on.
12     Are you aware that only certain Marriott
13  members through the Marriott program were able to
14  access the Ritz properties based on a very
15  substantial number of points?
16  A. No.
17  Q. Are you aware that the cost for a Marriott
18  person to access Ritz Aspen for the same number of
19  nights as the Ritz Aspen folks was at least as much
20  or more as it would cost Ritz people?
21  A. No.
22  Q. Do you have any idea as to the number of
23  Marriott folks who accessed the Ritz Aspen or Ritz
24  San Francisco through the affiliation program?
25  A. No.

Page 346

1     MR. FERGUSON: Objection. Form.
2  Q. (By Mr. Sellinger) Would -- would it make
3  a difference to you in terms of measuring whatever
4  impact, if any, that affiliation program had to know
5  how many Marriott people were accessing Ritz
6  properties through that program?
7     MR. FERGUSON: Objection. Form.
8     THE WITNESS: That could be useful
9  information, yes.
10  Q. (By Mr. Sellinger) Now, are you aware
11  that the affiliation between Ritz and Marriott was
12  not the only way in which non-Ritz Club owners were
13  able to access the Ritz resort?
14  A. My apologies. One more time. Am I aware
15  if?
16  Q. Yeah. Are you aware that -- that people
17  who were not owners of interest in the Ritz Carlton
18  Club were able to access Ritz Aspen and Ritz San
19  Francisco through means other than the Marriott
20  affiliation?
21     MR. FERGUSON: Objection. Form.
22     THE WITNESS: No. Unless -- I mean, I --
23  I -- I do believe that the -- those rentals -- I'm --
24  I don't -- I'm not -- no. I'm not aware.
25     What I was going to say is that I do

Page 347

1  believe that some of those units get sold as nightly
2  rentals to guests, to the public. But, you know,
3  that I'm not aware of the nightly rental policy at
4  these hotels.
5  Q. (By Mr. Sellinger) Okay. So then let's
6  look at Aspen in particular.
7     Are you aware that the Ritz Carlton Club
8  owners were able to rent out their units to
9  outsiders?
10  A. I'm not aware of that one way or the
11  other.
12  Q. Okay. So I'll -- I'll represent to you
13  that that occurred.
14     And I'll also represent to you that after
15  the affiliation with Marriott, more Ritz Carlton Club
16  owners rented to third parties than Marriott owners
17  came in through affiliation. Okay?
18  A. Okay.
19  Q. Are you aware of that? I take it not?
20     MR. FERGUSON: I object to the
21  representations and the question.
22     Thank you.
23     THE WITNESS: No. I am not aware of that.
24  Q. (By Mr. Sellinger) Would it be pertinent
25  to the conclusion in the report about the impact of

Page 348

1  the conversion to points to know that more people
2  came into the resort, third parties renting from
3  owners, than through the Marriott affiliation? Would
4  that be something important, in writing the report,
5  to know that?
6  A. Yes. That --
7     MR. FERGUSON: Objection. Form.
8     THE WITNESS: That information would be of
9  interest.
10     It sounds to me like you're talking about
11  information that was subsequent to the date of value.
12  Q. (By Mr. Sellinger) There were actually
13  rentals -- I'll represent to you that there were
14  rentals taking place before the date of value of
15  December of '13.
16     Would it be important in the conclusions
17  that are drawn in the report for you to have known
18  that Ritz owners were renting to third parties?
19     MR. FERGUSON: Objection. Form.
20     THE WITNESS: I believe -- well, I can't
21  say that Mr. Vaughan did not know that already.
22     It wouldn't surprise me. That's -- that's
23  -- that's part -- that's a data point. That's
24  information that I think is useful.
25  Q. (By Mr. Sellinger) You don't know whether

Page 373

 1  like San Francisco?
 2      A.   I don't recall.
 3      Q.   Any?
 4      A.   I -- no.  I don't think so.
 5      Q.   Do you have any training or education in
 6  fractional interests?
 7      A.   I have attended seminars on fractional
 8  interests.
 9      Q.   How many?
10      A.   One.
11      Q.   How about Mr. Vaughan, do you know if he
12  has any training or -- in fractional interests?
13      A.   Do not know.
14      Q.   Do you have any training in private
15  residence clubs?
16      A.   That was all part of the same symposium I
17  went to.
18      Q.   Okay.  And whose symposium was that?  Who
19  sponsored it?  Do you remember?
20      A.   I believe that was Ragatz.  It -- it was
21  in Deer Valley.  The instructor was a gentleman named
22  David Disick, who at the time was very active and an
23  industry leader, if you will.
24      Q.   How long was the symposium for?
25      A.   I believe that was a day.

Page 374

 1      Q.   Given that Cushman & Wakefield has
 2  multiple offices in California, why were appraisers
 3  in Hawaii and Utah chosen for this assignment for San
 4  Francisco?
 5      A.   First of all, I would -- I would -- I
 6  would point out, first of all -- my apologize.
 7  There's a blurb with "Incoming Call" that comes up
 8  and blocks the screen for me here.
 9           We're also getting feedback.  Are you
10  getting feedback at all?
11           MR. SELLINGER:  I'm not.
12           THE REPORTER:  Let me have somebody look
13  at it.
14           (Brief pause.)
15           THE WITNESS:  I recall the question now.
16  I actually lived in Colorado in 2013 and was working
17  out of our Denver, Colorado office.
18      Q.   (By Mr. Sellinger)  Is it fair to say you
19  were picked for this assignment because of your
20  experience in resorts in Colorado and Tahoe; correct?
21      A.   Yes.
22           MR. FERGUSON:  Object to form.
23           THE WITNESS:  My -- my -- yes.
24      Q.   (By Mr. Sellinger)  And San Francisco, or
25  any experience in that city or urban markets, was not

Page 375

 1  the reason that you were picked for the assignment;
 2  is that fair?
 3           MR. FERGUSON:  Objection.  Form.
 4           THE WITNESS:  My experience with
 5  fractional ownership appraisal is why I got -- why I
 6  assisted with the San Francisco project as well.
 7      Q.   (By Mr. Sellinger)  How many folks at
 8  Cushman & Wakefield have experience in fractional
 9  interests?
10           MR. FERGUSON:  Objection.  Form.
11      Q.   (By Mr. Sellinger)  As of December 2013.
12           MR. FERGUSON:  Valuation?
13           THE WITNESS:  I would say just a few.
14      Q.   (By Mr. Sellinger) Okay.  Before the
15  break we went over the portions of your reports that
16  referenced the fact that many prospects for this type
17  of product, fractional interest luxury product, own
18  their own private transportation, including air
19  transport.
20           Do you recall that --
21      A.   I do.
22      Q.   -- section of the reports?  How have sales
23  for private planes changed from the initial
24  development period to the effective date of value?
25           MR. FERGUSON:  Objection.  Form.

Page 376

 1           THE WITNESS:  I am not aware --
 2           MR. FERGUSON:  Is there a period of time?
 3           THE WITNESS:  I am not aware --
 4      Q.   (By Mr. Sellinger)  From the development
 5  -- go ahead.
 6           MR. FERGUSON:  Do you have a period of
 7  time, Philip?
 8           MR. SELLINGER:  Yes.  From the initial
 9  development of the two projects, Aspen and San
10  Francisco, to the valuation in December 2013.
11           MR. FERGUSON:  Okay.  Thank you.
12           Objection.  Form.
13           THE WITNESS:  Okay.  I have not been aware
14  of private plane sales trends during that time
15  period.
16      Q.   (By Mr. Sellinger)  How did the increased
17  accessibility of luxury properties on the Internet
18  affect overall pricing of fractional interests
19  generally?
20           MR. FERGUSON:  Objection.  Form.
21           THE WITNESS:  I do not have research to
22  answer that question one way or the other.
23      Q.   (By Mr. Sellinger)  How did the growth in
24  vacation rental marketplaces, such as Airbnb and Home
25  Away, affect the fractional interest industry?

14 (Pages 373 - 376)

Page 389

1  Q. (By Mr. Sellinger) Okay. And I believe
2 you testified in the last session that you were not
3 familiar with the Fairmont Heritage in San Francisco;
4 correct?
5  A. That's correct.
6      MR. FERGUSON: Objection. Form.
7  Q. (By Mr. Sellinger) So just -- I want to
8 just finish up on not the valuation numbers and the
9 -- and the numerical values that you described in
10 your reports for Aspen and San Francisco, but I want
11 to come back to the couple of sentences that you
12 reviewed with Mr. Ferguson and we chatted about
13 dealing with the conversion to -- the conversion to a
14 points program. Okay?
15  A. Okay.
16  Q. Now, that's a relatively limited part of
17 this -- this report; right?
18      MR. FERGUSON: Objection. Form.
19      THE WITNESS: Yes.
20  Q. (By Mr. Sellinger) Is -- if you were to
21 -- and, again, I'm not being critical of anything
22 that was done. I'm just trying to, you know,
23 establish the record.
24      If you were going to submit an expert
25 report to a court on the impact of the conversion to

Page 390

1 a points system, it would not be the limited parts
2 that are in these appraisals; correct?
3  A. It would include more than just what's in
4 this appraisal, yes.
5  Q. Right. So what other things would it
6 include?
7      MR. FERGUSON: Objection. Form.
8      THE WITNESS: I think it would include a
9 much -- a greater detailed property history of sales.
10 And I think more information on -- on market trends.
11 And -- and basically more comparable data.
12  Q. (By Mr. Sellinger) And if a jury or a
13 court were to be presented with the issue of the
14 impact of the conversion, would you want that jury or
15 court to have that additional data you just
16 described?
17      MR. FERGUSON: Objection. Form.
18      THE WITNESS: More information is always
19 helpful.
20  Q. (By Mr. Sellinger) Okay. And you would
21 want a court or a jury to have that information;
22 correct?
23  A. Yes.
24      MR. FERGUSON: Objection. Form.
25  Q. (By Mr. Sellinger) And neither you, nor

Page 391

1 Mr. Vaughan, have any scientific, technical, or
2 specialized knowledge about the impact of points
3 programs or conversion; is that correct?
4      MR. FERGUSON: Objection. Form.
5      THE WITNESS: Well, say those three again.
6 Scientific, specialized --
7  Q. (By Mr. Sellinger) Technical.
8 Scientific, technical, and specialized knowledge.
9      MR. FERGUSON: Objection. Form.
10      THE WITNESS: I cannot speak for
11 Mr. Vaughan. But, no, I do not.
12  Q. (By Mr. Sellinger) And neither you, nor
13 Mr. Vaughan, have any -- any training or education in
14 points programs; correct?
15  A. No -- no specific training on those, no.
16  Q. All right. And the conclusions in this
17 report about the impact of the conversion of the
18 points program, those have not been tested; correct?
19      MR. FERGUSON: Objection. Form.
20      THE WITNESS: May I ask what you mean by
21 "tested"?
22  Q. (By Mr. Sellinger) Yeah. Has anybody
23 else, as far as you're aware, taken your conclusions
24 and tried to verify or test the accuracy of them?
25  A. I'm not aware of any other people that

Page 392

1 have our report, other than you and the client.
2  Q. Okay. And the conclusions about the
3 impact on -- of the conversion and the points
4 program, those haven't been subjected to any kind of
5 peer review or publication; correct?
6      MR. FERGUSON: Objection. Form.
7      THE WITNESS: Certainly not publication.
8 No other peer review, no, to my knowledge, other than
9 our internal company.
10  Q. (By Mr. Sellinger) And -- which is really
11 Mr. Vaughan writing it and you reviewing what he
12 wrote, that was it?
13  A. This assignment was completed between the
14 two of us, yes.
15      I don't -- I do not know if Mr. Vaughan
16 had any other of his associates review it. But I'm
17 not aware of that.
18      MR. SELLINGER: I have nothing further.
19      Thank you.
20      MR. SHEA: This is Dan Shea.
21      Did you get that I have no questions on
22 behalf of the Aspen Highland Condominium Association?
23      MR. FERGUSON: I'm having a hard time.
24 Are you saying no questions, Dan?
25      MR. SHEA: I already said that.