# EXHIBIT J

```
 1   RCHFU, LLC,  et al.,
 2   Plaintiffs,            United States District Court
                            District of Colorado
 3   v.                     No.  1:16-cv-01301 PAB-GPG
 4   MARRIOTT VACATIONS WORLDWIDE
     CORPORATION, et al.,
 5
          Defendants,
 6   _____/
     REISER, et al.,
 7
          Plaintiffs,     Eastern District of California
 8   v.                     No. 2:16-cv-00237-MCE-CKD
 9   MARRIOTT VACATIONS WORLDWIDE
     CORPORATION, et al,
10
          Defendants,
11   _____/
     PETRICK, et al.,
12
          Plaintiffs,
13                            San Francisco County
     vs.                      No. CGC-15-54897
14
     MARRIOTT VACATION WORLDWIDE
15   CORPORATION, et al.,
16        Defendants.
     _____/
17
18      VIDEOTAPED DEPOSITION OF STEPHANIE SOBECK
19                  May 15, 2018
20          Tuesday, 9:25 a.m.-4:52 p.m.
21
22
23
24   Job No. 2911163
25   Pages 1 - 275
```

Page 1

**Page 54**

1   You don't have her deposition here today?
2   MR. SELLINGER: No. I didn't know what
3   questions you were going to be asking. I
4   didn't think we were going to be talking
5   about the old deposition.
6       But, anyway, I'm just trying to see the
7   context. I do see Mercer now --
8   MR. FERGUSON: -- we didn't have this
9   document at the deposition, Mr. Sellinger.
10  MR. SELLINGER: I'm not looking to argue
11  with you. I'm just looking -- I see now the
12  reference to Mercer.
13  MR. FERGUSON: Thank you. Can you repeat
14  my question?
15  THE REPORTER: "And you're saying that he
16  didn't have the right to do that, but he did
17  have a right to sign the joinder and --
18  acknowledgement and joinder at some point.
19  Did he not?"
20  THE WITNESS: He had the ability to sign
21  the acknowledgement and joinder.
22  BY MR. FERGUSON:
23  Q. He had the right to do it?
24  MR. SELLINGER: Objection to form.
25  A. He had the right to do it.

**Page 55**

1   BY MR. FERGUSON:
2   Q. Was it a right to do it?
3   A. No. He had the ability to do it. He didn't
4   have to do it if he didn't want to.
5   Q. And if he didn't do it, there would not have
6   been a -- there would not have been an affiliation --
7   withdraw that -- there would not have been an ability
8   by Marriott Vacation Club people to access
9   Ritz-Carlton Destination Club in Aspen, Colorado.
10  Correct?
11  A. No. They were actually already accessing.
12  Q. How were they accessing it, Ms. Sobeck?
13  A. They were accessing it, actually, before.
14  They were accessing it through the Explorer Program.
15  So we had developer inventory, and the inventory was
16  being used through Explorer.
17      And Marriott Vacation members, before kind of
18  any of this had happened, were able to access it
19  through that Explorer Program.
20  Q. So there were some ways for Marriott Vacation
21  Club high-points users, platinum users, and whatnot to
22  access what you all had allowed?
23  A. Correct.
24  Q. Okay. Had there been any voice given to the
25  Marriott Vacation -- sorry -- to the RCDC folks up in

**Page 56**

1   Aspen to allow that access, or was it just hoisted
2   upon them?
3   MR. SELLINGER: Objection to form.
4   A. Well, it was the developer using their
5   inventory, just like any other member can use their
6   inventory.
7   BY MR. FERGUSON:
8   Q. Okay. We've covered all that.
9       You were then asked, "So your interpretation
10  of" --
11  MR. SELLINGER: Tell me where you're
12  reading.
13  MR. FERGUSON: I'm following exactly
14  where we were, Mr. Sellinger.
15  THE WITNESS: He's on 46, though. You're
16  on 47, I think.
17  MR. FERGUSON: Oh, we went back to show
18  you Mr. Mercer. Okay. Let's go to 47.
19  MR. SELLINGER: Okay.
20  BY MR. FERGUSON:
21  Q. You were then asked, "So your interpretation
22  of participate or consent is to make the decision?"
23  And you said, "To make the decision to affiliate,
24  yes."
25  Correct? Did I read that correctly?

**Page 57**

1   A. That's what it says. It wasn't to affiliate.
2   I mean, I think you're asking me many different ways.
3   It's to acknowledge that the members were going to
4   have access.
5       Again, the affiliation was already done. I'm
6   not saying it correctly.
7   Q. It was already done because someone signed it
8   on November 14 --
9   A. Right. The affiliation was already
10  completed.
11  Q. Are you aware that Mr. Mercer and Mr. Oliver
12  visited with you all down here in Orlando on
13  November 14, 2013, the day that Mr. Delorey and
14  Mr. Cunningham signed that document?
15  A. I didn't know that was the same day, but I
16  was -- I do know they were there.
17  Q. You did meet with them, right, when they were
18  here?
19  A. Yes.
20  Q. Did you tell them, "Hey, we signed this
21  affiliation agreement between Lion & Crown and
22  Marriott Resorts Travel Company"?
23  A. I don't think specifically, no.
24  Q. Did you tell him, "Hey, we just signed a
25  document that's going to give you the right to

15 (Pages 54 - 57)

1    Q. At least by this time, you were telling him
2 that there could be people from the Marriott Vacation
3 Club that could be there for less than a week?
4    A. Sure. Just like Ritz-Carlton Destination
5 Club members. They don't have to come for a full
6 week. They can come for less.
7    Q. But do you know whether that language made it
8 into -- do you know whether that concept made it
9 into the MOU, that a Marriott Vacation Club person
10 could come in for less than a week?
11    A. I don't know if it did or not.
12    Q. Do you understand that it was a concern of
13 some people that Marriott Vacation Club folks, if they
14 can come in for less than a week's stay, would put
15 additional strain on member services -- turnover of
16 rooms -- a private residence club like that? Do you
17 remember that being expressed?
18    A. There would be no effect on member services.
19    Q. No effect with room turnover two or three
20 times in a week?
21    A. Not to member services.
22    Q. How about housekeeping?
23    A. Well, there could have been, but members have
24 the ability to do the same thing, so I don't know what
25 the difference would be.

Page 118

1    Q. But when this thing was marketed and sold to
2 206 of our clients, most of them were told that this
3 would be a place they can come for a week or two weeks
4 and treat as their home. It's a private residence
5 club; right? That's what it was started to be?
6        MR. SELLINGER: Objection to form.
7    A. It was a --
8        MS. LIVNGSTON: Object to form.
9    A. No. It was a vacation destination club for
10 owners who were interested in going to the
11 Ritz-Carlton.
12    Q. You don't believe it's a private residence
13 club?
14    A. A private residence club? There was nothing
15 in there that kept members from renting it to their
16 friends or letting other people use it.
17    Q. So if I pull up -- and I have them -- about
18 10 or 12 of these Ragatz reports -- you know Ragatz;
19 right?
20    A. Yes, I do.
21    Q. And I look in his report of the HVS report
22 that was done for Bachelor Gulch, there's a term --
23 and I think it's also in the Cushman & Wakefield
24 appraisals that were done for the Bleu Trust inventory
25 that you you all owned -- they use the term "private

Page 119

1 residence club" as a term of art within the lodging
2 industry.
3        Are you familiar with that term of art?
4        MR. SELLINGER: Objection to form.
5    A. What's a term of art?
6 BY MR. FERGUSON:
7    Q. That it's a term. You have a transient -- a
8 transient person is someone who comes and goes in a
9 hotel. There's a private residence club. There's
10 vacation clubs. It's a term that's used within the
11 lodging and hospitality industry.
12    A. Okay.
13    Q. Are you familiar with it?
14    A. Yes, I'm familiar with that.
15    Q. Do you consider the product that was built in
16 1999, 2001, and sold to the people up there in
17 Aspen -- did you consider that to be a private
18 residence club?
19    A. We considered it a luxury fractional product.
20 We still do.
21    Q. If you go to page 1 of Exhibit 1388, it looks
22 like Mr. Marino wrote directly to you and Ms. Egolf,
23 and he said, "I'm writing to you, of course, only
24 through Barbara, your legal counsel. The board has
25 approved the MOU with the following language in

Page 120

1 Section 7C, which you previously have approved."
2        So it looks like you were closing in on the
3 final language for the MOU around this timeframe --
4 early April or mid April 2013 -- 2014?
5    A. Yes.
6    Q. Do you recall that Mr. Marino and/or
7 Mr. Mercer were asking for a termination right or
8 provision in the MOU? Do you recall that at all?
9    A. No, I don't.
10    Q. Here's the MOU, Exhibit 1607. It looks like
11 this was signed by Cunningham and Mercer. It's dated
12 April 17, 2014.
13        Does that sound about right?
14    A. Yes.
15    Q. Is this a contract?
16        MR. SELLINGER: Objection to form.
17        MS. LIVNGSTON: Object to form.
18    A. I don't know if it's a contract. Legally,
19 are you saying?
20 BY MR. FERGUSON:
21    Q. Yeah. Let me do it another way. What does
22 this thing do?
23    A. Well, that's why we really didn't think we
24 needed it. This was Randy and Michael just clarifying
25 the discussions we had. So we didn't really

Page 121

31 (Pages 118 - 121)

Page 238

```
 1    A.  That's funny.  Mine doesn't --
 2    Q.  Oh, it doesn't?
 3    A.  No.  Mine has a squiggly -- you can be
 4 assured that I did not use a heart as a bullet point.
 5    Q.  Sorry for presuming that.
 6    A.  Yeah.  That's not really my style.
 7    Q.  At any rate, the bullet point that you listed
 8 here under background, those were what you gleaned
 9 from the survey; right?  Those points that -- you were
10 basically outlining the points you gleaned from the
11 survey that Bruno and Steve Andrews took; right?
12        MR. SELLINGER:  Objection to form.
13    A.  Through the survey responses and discussions
14 with the board.
15 BY MR. REISER:
16    Q.  Under the second bullet point, under
17 background, it says, "Members allege that the annual
18 club dues are too high and that RCDC is undermining
19 the value of their ownership by renting its inventory
20 at rates that are far below the nightly costs
21 associated with their ownership."
22        The next sentence -- my question is -- is the
23 next sentence something that you are putting in there
24 in terms of what the facts are, or is that something
25 that you gleaned from the inventory [sic] as well?  By
```

Page 239

```
 1 that next sentence, I mean, "RCDC has rented its
 2 inventory as permitted by the governing documents for
 3 the purpose of marketing the sale of its inventory."
 4        Is that your comment or is that something you
 5 also gleaned from the survey?
 6    A.  This would've been discussions with counsel.
 7        MR. SELLINGER:  Okay.  I'll instruct you
 8    not to get into discussions with counsel.
 9        THE WITNESS:  Would you look at that
10    rain?
11        MR. REISER:  I'm glad we're safe and
12    sound at the cozy confines of the Greenberg
13    Traurig conference room.
14        THE WITNESS:  Thank goodness.
15        MR. SELLINGER:  Okay.  Off the record --
16    okay -- five more hours then?
17        THE WITNESS:  No, thank you.
18 BY MR. REISER:
19    Q.  So the second one says, "These stays do not
20 require a tour and are generally available at a rate
21 between $400 and $600 per night."
22        Is that factual?  You understood that the
23 rentals at San Francisco were renting between $400 and
24 $600 a night back in 2013?
25    A.  Yes, it would've been.
```

Page 240

```
 1    Q.  Then you point out that the annual dues at
 2 $20,000 for 21 -- you point out that the annual dues
 3 are $20,000 for 21 nights of usage.
 4        So I think you're trying to point out that
 5 the maintenance fees are about a thousand bucks a
 6 night, right, as compared to the $400 to $600 they're
 7 being rented for?
 8        MR. SELLINGER:  Objection to form.
 9    A.  Yeah, I mean, I say that, actually, below.
10 BY MR. REISER:
11    Q.  Finally, on this point, it says, "RCDC has
12 also utilized this marketing right to rent" -- you put
13 rent in quotes -- "inventory to the MVCD exchange
14 program for access by its Premier and Premier Plus
15 members."
16        That's a statement by you.  That's not
17 something you learned from the survey; right?
18    A.  Yes.
19    Q.  Okay.  So is this access by Premier and
20 Premier Plus members different than access from the
21 Explorer Program you were mentioning?
22    A.  No.  It's Explorer.
23    Q.  So to be precise, the Explorer Program that
24 was allowing access through that program that you
25 mentioned earlier -- that some folks in Aspen were
```

Page 241

```
 1 using the Explorer Program -- that was only people who
 2 had attained Premier or Premier Plus membership in
 3 Marriott Vacation Club; right?
 4    A.  Yes.
 5    Q.  What does it take to get Premier and Premier
 6 Plus membership?
 7    A.  You have to own a certain number of points.
 8    Q.  Do you remember how many that is?
 9    A.  No.
10    Q.  Do you know whether Marriott Vacation Club
11 sales folks attempted to sell Marriott Vacation
12 members more points to obtain Premier or Premier Plus
13 membership status so they could obtain the right to
14 access Ritz-Carlton inventory?
15        MR. SELLINGER:  Objection to form.
16    A.  I know that Marriott Vacation Club sales
17 executives would always try to upgrade people into
18 Premier and Premier Plus.
19 BY MR. REISER:
20    Q.  One of the things they would mention, in
21 terms of trying to upgrade them, would be, "If you
22 obtain this, you could actually get access to the
23 Ritz."  Right?
24        MR. SELLINGER:  Objection to form.
25    A.  The sales executives would talk about all the
```