IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Case No. 16-01301 PAB

RCHFU, LLC, et al.

      Plaintiffs,

v.

MARRIOTT VACATIONS WORLDWIDE CORPORATION, et al.

      Defendants.

---

**DEFENDANT THE RITZ-CARLTON MANAGEMENT COMPANY, L.L.C.'S
OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

Plaintiffs own luxury 1/12 fractional interests in The Ritz-Carlton Club, Aspen Highlands ("RC Club Aspen"), at which Defendant The Ritz-Carlton Management Company, L.L.C. ("RC Management") serves as resort manager.   In April 2014, RC Club Aspen was affiliated (the "MVC Affiliation") with the Marriott Vacation Club Destinations Exchange Program ("MVCD" or "MVCD Program").   Plaintiffs allege that the MVC Affiliation enabled large numbers of MVCD members to access the resort, allegedly causing their fractional interests to decline in value.   Plaintiffs seek partial summary judgment against RC Management for breach of fiduciary duty and for constructive fraud, claiming that RC Management (1) falsely promised Plaintiffs that the MVC Affiliation would not happen at RC Club Aspen without an affirmative "vote" by a "majority" of  RC Club Aspen fractional owners ("Members") and, instead, provided only a "non-binding survey"; and (2) failed to disclose material information about the proposed MVC Affiliation, including allegedly withholding from Defendant Aspen Highlands Condominium

Association, Inc. ("AHCA"), a November 14, 2013 Affiliation Agreement ("2013 Affiliation Agreement") that Plaintiffs incorrectly claim gave it "veto power" over the MVC Affiliation.

As explained in detail below, genuine issues of material fact exist with respect to each of these allegations. Moreover, Plaintiffs have moved on only two of their breach of fiduciary duty claim's three elements, which is impermissible as a matter of law. In addition, Plaintiffs' constructive fraud claim fails because no evidence supports that claim's reliance element. Plaintiffs' motion for partial summary judgment should be denied.

### Response to Statement of Undisputed Material Facts ("RSUMF")

RC Management does not dispute the facts set forth in paragraphs 2-3, 5, 7-9, 11-14, 17, 19, 25-31, 37, 46, 48, 51-55, 57, 63, 65-66, 69, 71-73, 75-76, 79, 81-83, and 84(f) for purposes of this opposition. The referenced documents and record speak for themselves, and RC Management disputes the allegations to the extent that they are inconsistent with the documents, record or RC Management's assertions in this opposition.

1.      AHCA was not granted "pervasive" control over Plaintiffs' fractional interests. Marx Decl., Ex. 1 at §§ 13.1, 13.3, 13.4, 14.11.

4.      The Declaration of Condominium for Aspen Highlands Condominiums (the "Declaration") does not give AHCA "physical control over the units." *See* RSUMF 1.

6.      The governing documents for RC Club Aspen do not give AHCA the power to control reservations; that power is invested in The Cobalt Travel Company, LLC, f/k/a The Ritz-Carlton Travel Company, L.L.C. ("Cobalt"), as program manager. Marx Decl., Ex. 1 at Art. VII, Ex. 2 at § 5.1, Ex. 3, *passim*.

10.     AHCA's delegation of authority to RC Management was not "broad." *Id*., Ex. 4, *passim*. As property manager, RC Management is only permitted to enter the condominium units to

provide cleaning, maintenance and repair services or to abate illegal nuisances. *Id*. at § 4(V), Ex. 1 at § 14.11.   RC Management cannot transfer, convey, mortgage, or otherwise dispose of Plaintiffs' fractional interests, as they are deeded interests in real property for which rights of alienation are held by record owners. *Id*., Ex. 5 at ¶ 1, Ex. 1 at § 23.2.3.  RC Management cannot rent, exchange or otherwise determine who may use Plaintiffs' fractional interests during the time period when Plaintiffs have access rights, as that power is vested with Plaintiffs.  *Id*. §§ 13.1, 13.3, 13.4.

15.     Ms. Sobeck did not agree that RC Management owed a fiduciary duty to AHCA. *Id*., Ex. 6 at 166:14-20 ("I'm not sure legally what that is getting into.").

16.     Pursuant to The Ritz-Carlton Club Membership Program Affiliation Agreement ("AA"), AHCA and RC Management did not "appoint" Cobalt to serve as "Program Manager."  Rather, the AA provided that Cobalt had "exclusive" "rights and duties with regard to the reservation of use rights" pursuant to the Membership Program Documents,[1] and AHCA's decision to enter into the Management Agreement with RC Management was subject to the approval of Cobalt. *Id*., Ex. 2 at §§ 5.1, 4.5 ("Program Manager" has the right to "consent to the employment of any Club Manager engaged by the … Association to manage, operate and maintain the Club.").

18.     RC Management is an LLC and does not have officers.  ECF #1 at ¶ 12.

20.     Mr. Cunningham did not testify about the payment of RC Management or Cobalt employees.  *See* Marx Decl., Ex. 7 at 137:11-138:11, 138:18-140:16.  Moreover, the director of payroll for Defendant Marriott Ownership Resorts, Inc. testified that approximately 25 Cobalt employees were paid directly by Cobalt.  *Id*., Ex. 8 at 7:10-15, 10:21-11:12.

---

[1] "Membership Program Documents" include the AA "and any other documents governing the use and operation of the Membership Program. . . . "  Marx Decl. Ex. 1 § 23.2.6.

21.     Mr. Cunningham did not testify that he was the "controlling" officer of any of the listed entities.  *See also* RSUMF 18.

22.     "Ritz-Carlton Destination Club" is the d/b/a name of another Marriott Vacations Worldwide Corporation ("MVWC") subsidiary, The Ritz-Carlton Development Company, the developer of The Ritz-Carlton Destination Club ("RCDC") resorts.  Marx Decl., Ex. 7 at 27:3-7, 132:12-23, 134:19-25.

23.     The referenced letter was sent by Cobalt, not "MVW."  Moreover, Plaintiffs mischaracterize the letter, which discloses that MVCD members would have access to RCDC resorts.  *Id*., Ex. 9.

24.     The cited document does not contain the quoted language or citation.  Conf. Marx Decl., Ex. 1.

32.     Ms. Sobeck testified that, while she and Mr. Cunningham make suggestions as to the contents of letters from AHCA to RC Club Aspen Members, AHCA has discretion to communicate whatever information it wishes.  Marx Decl., Ex. 10 at 114:8-115:21.

33.     A specific form of "vote" was not promised, and no clear distinction was ever made between a survey and a vote, as the intention was to ascertain Members' opinions on the MVC Affiliation.  *Id*., Ex. 7 at 31:3-5, 228:10-13, Ex. 11 at 309:6-13.

34.     *See* RSUMF 33.  Moreover, the cited document is not an acknowledgement that a "vote" on the MVC Affiliation would be unsuccessful.  To the contrary, Ms. Sobeck observed that "you never know when we educate [RC Club Aspen Members] what will happen" with respect to the "vote."  Marx Decl., Ex. 12.

35.   The alleged SUMF is based on mischaracterizations of the cited document and testimony. The Strategic Council's purpose was to address issues of strategic importance to MVWC (*id.*, Ex. 13 at 32:2-9), and there was only general awareness of how certain proposals were being received by RCDC members.  *Id.* at 89:14-93:11.

36.   *See* RSUMF 33.

38-39.  The Ritz-Carlton Club, Bachelor Gulch's and The Ritz-Carlton Club, Jupiter's respective members voted to terminate RC Management for several reasons having nothing to do with the MVC Affiliation.  Conf. Marx Decl., Ex. 2; Marx Decl. Ex. 6 at 206:24-207:2, Ex. 50.

40.   The referenced survey from APCO Worldwide Inc. ("APCO") was not exclusively focused on member satisfaction issues.  Conf. Marx Decl. Ex. 3.

41.   The quotation is taken out of context, as APCO also concluded, for example, that RCDC members are "generally satisfied once on site," "currently have strong positive impressions of the Ritz-Carlton brand," and "Aspen Home Club Members have the highest satisfaction ratings" concerning the frequency and content of RCDC communications.  *Id.* at 4, 8.

42.   The e-mail did not "[give Ms. Sobeck] a chance to disagree" with any findings in the Cushman & Wakefield ("C&W") material, as it was not directed to her but, rather, to Benjamin Pierce, President of the Bleu Florida Land Trust Association ("BFLT Assocation"), the entity that commissioned the C&W appraisal.  Marx Decl., Ex. 14.  Moreover, Ms. Sobeck did not recall receiving the appraisal at the time in 2013.  *Id.*, Ex. 6 at 197:20-198:2.

43.   The BFLT Association, not RC Management, commissioned the C&W appraisal.  *Id.*, Ex. 15 at 36:8-20.

44.    The quoted language does not pertain to the MVC Affiliation.  *Id.*, Ex. 16 at 229:13-22, 230:18-23.

45.    Ms. Sobeck did not "present" the C&W appraisal to RC Management.  Rather, she provided an update to the BFLT Association as to the status of actions necessary to dissolve the Bleu Florida Land Trust.  *Id.*, Ex. 17 at 2.

47.    *See* RSUMF 44.

49.    Mr. Weisz did not testify that MVCD members purchased points "because of access to" RCDC resorts; rather, he testified that some MVCD members may value access to RCDC resorts, which may be a reason for some points purchases.  Marx Decl., Ex. 13 at 108:24-109:6.

50.    The quoted deposition testimony from Mr. Cunningham is taken out of context, as it omits the qualification that "we highlight all the inventory and the advantages of owning more points."  *Id.*, Ex. 18 at 443:9-19.

56.    The quoted language is taken out of context.  Ms. Sobeck testified that, at the time of her e-mail to the president of the homeowners' association at a different RCDC resort (Conf. Marx Decl., Ex. 4 at 2), she "knew . . . [the survey results were] going to be positive" because "the [AHCA] Board was supporting it" and she was "getting daily vote reports."  Marx Decl., Ex. 10 at 358:14-21.  The contents of the other cited e-mail concern an affiliation survey at a different RCDC resort.  Conf. Marx Decl., Ex. 5.

58.    The November 19, 2013 letter disclosed that, by virtue of the MVC Affiliation, MVCD members would be able to access RC Club Aspen.  RC Management disputes that this was a "negative consequence" of the MVC Affiliation.  Marx Decl., Ex. 19 at 1-3.

59.     The quoted language is incorrect.  The Members were surveyed "regarding ***their interest in*** a potential optional exchange affiliation" with the MVCD Program.  *See Id.*, Ex. 20 at 1 (emphasis added).

60.     The survey was conducted by RC Development and AHCA, not by RC Management.  *Id.*

61.     The December 2013 FAQs disclosed that, by virtue of the MVC Affiliation, MVCD members would be able to access RC Club Aspen.  RC Management disputes that this was a "negative consequence" of the MVC Affiliation.  *Id.*, Ex. 21 at 3.

62.     AHCA did not "recommend[] that members respond to the survey in favor of affiliation"; rather, AHCA indicated that it was in favor of the MVC Affiliation and provided the reasons for its position.  *Id.*, Ex. 22.

64.     Ms. Sobeck testified that the language in the cited letter "are [Mr. Mercer's] words, not mine."  *Id.*, Ex. 10 at 356:17-18; *see also* RSUMF 32.  Moreover, the letter itself indicates that Ms. Sobeck's proposed changes were merely suggestions that Mr. Mercer could accept or reject as he deemed appropriate.  Marx Decl., Ex. 23.

67.     After receiving a link to the Affiliation survey in December 2013 and entering a pin code, Members were instructed to "Click Here To Vote."  *Id.*, Ex. 24.

68.     The cited letter did not announce that the MVC Affiliation "had taken effect."  It only stated that RC Club Aspen would be included in the forthcoming MVC Affiliation.  *Id.*, Ex. 25. MVCD members could not reserve time at RC Club Aspen by virtue of the MVC Affiliation until January 1, 2015.  *Id.*, Ex. 26.

70.     There was no "merger" between RCDC and the MVCD Program.  Rather, on August 8, 2010, Cobalt affiliated RCDC with the Lion & Crown Exchange Program (the "L&C Program").

*Id*. Ex. 32.  Thereafter, on November 14, 2013, The Lion & Crown Travel Co., LLC ("L&C") affiliated RCDC with the MVCD Program (*id*., Ex. 27), and, afterward, the homeowners' associations of some RCDC resorts, including RC Club Aspen, signed acknowledgements and joinders to the 2013 Affiliation Agreement.  *Id*., Ex. 28.

74, 77.   Neither the 2013 Affiliation Agreement nor the Articles of Incorporation gave AHCA the power to prevent the MVC Affiliation.  *Id*., Ex. 6 at 36:3-18, Ex. 29 at § 5.11.

78.    The Articles of Incorporation did not grant AHCA control over exchange programs or veto power over the MVC Affiliation.  RSUMF 74, 77.

80.    Ms. Sobeck did not state that she was speaking on behalf of RC Management.  Marx Decl., Ex. 6 at 59:14-61:17, 96:9-20.

84.    (a)    *See* RSUMF 33, 67.
(b)    The MVC Affiliation was created to provide additional exchange opportunities for RCDC members, not as an independent profit center.  *See id*. at 49-50, 58-62.
(c)    The MVC Affiliation did not harm Plaintiffs.  *See id*. at 24, 40-47.
(d)    The MVC Affiliation was not "imposed" on RC Club Aspen Members regardless of the survey results.  *See id*. at 56.
(e)    *See id*. at 74, 77.
(g)    The Marriott Defendants did not fail to disclose the mechanics associated with MVCD member access to RC Club Aspen.  *See id*. at 57, 59, 61, 62.
(h)    The Marriott Defendants did not fail to disclose to Plaintiffs how they could convert unused weeks at RC Club Aspen into MVC points and the associated details.  *Id*.

**Statement of Additional Disputed Facts ("SADF")**

1.    Pursuant to the Declaration, Declarant vests the creation and operation of The Ritz-Carlton Club Membership Program ("Membership Program") with the Program Manager [Cobalt] (The Membership Program is defined as a "program of benefits and services **created and operated by the Program Manager** [Cobalt] as they may exist from time to time").  Marx

Decl., Ex. 1 at § 23.2.5. (emphasis added). Thus, from its inception, the Association had no authority regarding the Membership Program and no ability to delegate any authority to Cobalt.

2.      Contemporaneous Colorado disclosure statements pertaining to RC Club Aspen confirm that Cobalt is "responsible for the operation of" the Membership Program, i.e., the "combination of benefits and services including reservation and exchange services for members." *See Id*., Ex. 30 at 3; *see also Id*., Ex. 31 at § I.11 ("Membership Program … shall mean the service name given to the variety of exchange and reservation services and vacation and travel benefits currently offered and the restrictions currently imposed through Program Manager.").

3.      The disclosure statements make plain that RC Management's management role is distinct from Cobalt's role as Program Manager and that the former is strictly limited to management of on-site operations. *Id*., Ex. 30 at 3 (RC Management "will be responsible for on-site operations of the tourist accommodation units committed to the plan of fractional ownership," whereas Cobalt "will be responsible for the operation of [the] Membership Program").

4.      The AA among Cobalt (as "Program Manager"), The Ritz-Carlton Development Company ("RC Development," as "Developer"), RC Management (as "Club Manager") and AHCA affirms that (a) Cobalt was already the Program Manager for the existing Membership Program ("WHEREAS, the Program manager has established a reservation system … and other related benefits and services known as The Ritz-Carlton Membership Program … for the purpose of providing a means for Members to reserve the use of accommodations and facilities at the [RC] Club [Aspen] and other locations affiliated with the Membership Program …); and (b) the "rights, duties and obligations [of affiliation] … are exclusive to the Program Manager." *Id*., Ex. 2 at §§ 5.1, 7.2.a ("[The Program Manager may] in its sole discretion, elect to affiliate other

locations with the Membership Program as Member Clubs or Associated Clubs from time to time. Neither the Developer, Members Association, nor Club Manager shall be entitled to participate in or consent to the Program Manager's decision in this regard."); *id.* at § 7.2.b ("The Program Manager may in its sole discretion, create a separate membership program, develop individual resort properties as residential, transient or other use, or enter into management agreements with resort properties without the approval of the Developer, Members Association or Club Manager").

5.      Consistent with the AA, from 2010 to 2014, without AHCA's consent or subsequent objection, L&C affiliated with external exchange programs through Abercrombie & Kent, Exclusive Resorts, LLC and 3rd Home Limited.  *Id.*, Ex. 6 at 26:3-22, Ex. 49 at 171:24, 184:9-10, 268:25-270:2, 275:2-3.

6.      Although AHCA's consent was not required, its acknowledgement of the affiliation referenced in the 2013 Affiliation Agreement was sought as a means of ensuring AHCA's cooperation.  *Id.* Ex. 27 § 3.1, Ex. 6 at 45:13-23.

7.      The Management Agreement provides that no fiduciary relationship between RC Management and AHCA was being created.  *Id.*, Ex. 4 at § 2.

8.      RC Management's authority came entirely from AHCA.  *Id.* § 4.

9.      RC Management's discrete role is to manage the RCDC resorts, which largely involves billing and collecting, working with Cobalt on Member services, and communicating with AHCA.  *Id.*, Ex. 7 at 25:11-13, Ex. 10 at 28:6-29:16.

10.     Plaintiffs only purchased the right to access their units at the resort for a set number of weeks, and they have no rights regarding the exchange system**.**  *Id.*, Ex. 5 at ¶¶ 1, 11.

11.    RC Management had no involvement in the MVC Affiliation, which was solely a function of Cobalt's business.  *Id*., Ex. 7 at 147:8-16 ("[I]t wasn't a Management Company-related decision.  Affiliation is related to Cobalt Travel.  It's related to that component of the business, which is all about the use of the product and the movement of the product."); *id*., Ex. 10 at 47:9-14 (RC Management "was not entitled to either participate in or consent to the Cobalt decision to affiliate" because "it was only Cobalt").

12.    The May 14, 2013 letter from Mr. Cunningham to RC Club Aspen Members was not written by or on behalf of RC Management but, rather, on behalf of "The Ritz-Carlton Destination Club," and was sent from an e-mail address for "RCDC Member Communications." *Id*., Ex. 33.

13.    Sending e-mails to Members from RCDC Member Communications was the function of RCDC's member services group, not RC Management.  *Id*., Ex. 10 at 329:17-23.

14.    The role of the member services group exclusively involved "work related to Cobalt Travel for Ritz-Carlton Destination Club."  *Id*., Ex. 7 at 138:21-139:6.

15.    Any damages flowing from any alleged breach of duty (i.e., any diminution in value of Plaintiffs' interests) are not due to the MVC Affiliation but to a host of other factors, including the inherent decline in luxury goods immediately after purchase, the effects of the 2008-10 "Great Recession," declining consumer preferences for traditional "weeks-based" timeshare interests, the rise of home-sharing websites (such as Airbnb), and the negative publicity that Plaintiffs' counsel have generated regarding this action.  *Id*., Ex. 34 at 9-10.

16.    The MVC Affiliation did not diminish the exclusivity of RC Club Aspen.  Third parties who rented from the Members made greater use of the resort than the MVCD members who

accessed the property through the MVC Affiliation.  The same is true with respect to MVCD Premier and Premier Plus members who had access to Developer-owned fractional interests at RC Club Aspen years before the MVC Affiliation.  *Id.*, Ex. 35 at 89:17-93:24, Ex. 36; Conf. Marx Decl., Ex. 6.

17.     RC Management did not conceal the 2013 Affiliation Agreement, which is referenced both in the title of the April 24, 2014 Acknowledgment of and Joinder to Affiliation Agreement (Marx Decl., Ex. 28) ("Acknowledgment Agreement") (in large, all-capital letters) and in the first paragraph, which makes plain that the referenced affiliation agreement is "between [Cobalt's predecessor] and [L&C] dated November 14, 2013." *Id.*, Ex. 37 at 8:3-11.

18.     The e-mail from Mr. Cunningham to RC Club Aspen Members with the link to the survey was sent to approximately 600 Members. *Id.*, Ex. 38 at 159:11-19.

19.     Of the 124 RC Club Aspen Members who responded to the survey, 66 voted in favor of the MVC Affiliation, and 58 voted against it. *Id.*, Ex. 39.

20.     The word "majority," as used in AHCA's April 5, 2013 letter, was never intended to mean a majority of all Members but only a majority of those actually voting. *Id.*, Ex. 40, Ex. 7 at 31:25-32:5, 234:11-19.

21.     The fact that RC Club Aspen Members cannot be forced to vote or to respond to a survey is inconsistent with the suggestion that the opinion of a majority of the entire membership was contemplated. *Id.*, Ex. 11 at 89:21-23.

22.     Several Plaintiffs were unaware of the April and May 2013 statements about the upcoming MVC Affiliation issue from AHCA and Mr. Cunningham, respectively, and the alleged promise of a vote. *See, e.g.*, *id.*, Ex. 41 at 110:20-111:7, Ex. 42 at 95:13-96:20, Ex. 43 at

12

83:17-85:12, Ex. 44 at 131:2-132:25, Ex. 45 at 118:3-21, 121:7-123:3.

23.     Several Plaintiffs took no action after April 2014, when it had become clear to them that no "vote" (as they now claim to understand it) on the MVC Affiliation would be taking place. *Id.*, Ex. 25, Ex. 45 at 123:4-12, Ex. 46 at 138:14-139:14, Ex. 47 at 101:15-102:10, Ex. 48 at 213:13-214:18.

## ARGUMENT[2]

### I.      DISPUTED MATERIAL FACTS EXIST AS TO WHETHER RC MANAGEMENT OWED ANY FIDUCIARY DUTY THAT WAS BREACHED

#### A.  It Is Disputed Whether RC Management Owed Plaintiffs a Fiduciary Duty with Respect to the MVC Affiliation

While "[g]enerally, a homeowners' association owes a fiduciary duty to homeowners" (*McShane v. Stirling Ranch Prop. Owners Ass'n,* __ P.3d __, 2015 WL 1843807, at *5 (Colo. App., Apr. 23, 2015)), such duty is only owed "'with respect to matters within the scope of [the] agency.'" *Arst v. Stifel, Nicolaus & Co.,* 86 F. 3d 973, 978 (10th Cir. 1996); *see also Jarnagin v. Busby, Inc.,* 867 P. 2d 63, 67 (Colo. App. 1993) (establishing breach of fiduciary duty requires showing that "the nature and scope of the duty … extended to the subject matter of the suit").

Plaintiffs allege that "RC Management and AHCA breached their fiduciary duty to them by promising, but failing to conduct, a vote on the MVC Affiliation." Pl. Br. at 21.  But from inception and under the Declaration, AHCA and, by extension, RC Management, had no fiduciary duty to Plaintiffs with respect to the MVC Affiliation because their duties were strictly

---

[2] Evidence offered in support of a motion for summary judgment must be in a form admissible at trial. *Adams v. American Guar. & Ins. Co.,* 233 F.3d 1242, 1246 (10th Cir. 2000).  Several of the documents and deposition excerpts upon which Plaintiffs rely contain inadmissible hearsay statements, often in multiple levels. *See, e.g.,* SUMF 27, 35, 40-42, 44, 47, 65-66.  Likewise, while RC Management does not dispute numerous facts offered by Plaintiffs, many are immaterial to the MVC Affiliation or to the elements of Plaintiffs' claims and, thus, are inadmissible on relevance grounds. *See, e.g., id.,* 1-14, 17, 19-20, 38-47.

limited to managing RC Club Aspen.  By contrast, the contemporaneous and interrelated governing documents that created RC Club Aspen show that Cobalt, the creator and Program Manager of the Membership Program, was vested with sole and exclusive authority to operate the Membership Program, which includes entering into additional affiliations.  *See Nat'l Mortg. Inv'rs v. Beazer Homes Holdings Corp.*, 2011 Colo. Dist. LEXIS 2193, *6-7 (D. Colo. May 25, 2011) ("'[S]eparate agreements that pertain to the same transaction should be read together even though they do not expressly refer to each other...,'" and "'[w]here different writings relating to the same subject are executed at the same time between the same parties, a fundamental principle of construction requires they be treated as one and the same instrument.'") (internal citations omitted).

For example, contemporaneous disclosure statements for RC Club Aspen filed with the State of Colorado confirm that Cobalt is "responsible for the operation of [the RC] Club Membership Program … [i.e., the] combination of benefits and services including reservation and exchange services for members."  SADF 2.  The disclosure statements also distinguish RC Management's management role from Cobalt's role as Program Manager and make plain that the former is strictly limited to managing on-site operations.  SADF 3.  Given that participation in the Membership Program was mandatory, Cobalt's role as Program Manager was, from the outset, an integral part of the condominium plan itself.[3]

---

[3] *See e.g.,* Marx Decl., Ex. 31 at § III ("A purchaser of a Residence Interest in a Ritz-Carlton Club is automatically enrolled in the Membership Program as a Member at the time that he acquires his Residence Interest. There is no Membership Program contract with purchaser separate and distinct from the purchaser's contract with the Developer for the acquisition of a Residence Interest at a Club. Membership in the Membership Program is an appurtenance to all Residence Interests at Clubs and is required of all purchasers.").

Likewise, the Declaration defines the Membership Program as a "program of benefits and services ***created and operated by the Program Manager [Cobalt]***."  SADF 1 (emphasis added). In addition, the AA (entered into simultaneously with and exhibited to the Declaration) confirms that (1) Cobalt was already the Program Manager for the existing Membership Program (SADF 2); (2) the "rights, duties and obligations [of affiliation] … are exclusive to" Cobalt; and (3) membership was mandatory.  Marx Decl., Ex. 2 at § II ("Definitions").  The AA (the ministerial means by which RC Club Aspen was made subject to the Membership Program, *see* Marx Decl., Ex. 1 at § 23.7)) also makes plain that AHCA's decision to enter into the Management Agreement was subject to Cobalt's approval.  *Id.* Ex. 2 at § 4.5.

Read together, these documents show, at a minimum, that disputed issues of material fact exist as to Plaintiffs' assertions that the provision in the Management Agreement under which RC Management is permitted to "engage" a Program Manager was a "delegation" to Cobalt of RC Management's supposed authority to manage or administer the Membership Program and that AHCA and RC Management "appointed" Cobalt Program Manager pursuant to the AA.  *See* SUMF 13, 16; ECF #452 ("Pl. Br.") *passim*; RSUMF 16.  Thus, disputed issues of material fact exist as to whether AHCA and RC Management owed any duty to Plaintiffs with respect to the MVC Affiliation (over which they had no control).

### B.  It Is Disputed Whether RC Management Owed Plaintiffs Any Fiduciary Duty

Plaintiffs argue that RC Management owed fiduciary duties to them through its (1) "special relationship with the [RC Club Aspen fractional] Members; (2) "high degree of control over Plaintiffs' fractional interests and the units at" the resort; (3) acceptance of delegation of "control over Plaintiffs' units" from AHCA; and (4) "express role as Plaintiffs' agent."  Pl. Br. at 19.  Significant evidence of record contradicts each of these contentions.

As Plaintiffs concede (*see id*. at 18), the issue of whether a fiduciary duty exists and was breached is a mixed question of law and fact. *Paine, Webber, Jackson & Curtis, Inc. v. Adams*, 718 P.2d 508, 518 (Colo. 1986); *see also Johnston v. CIGNA Corp.*, 916 P.2d 643, 648 (Colo. App. 1996) (reversing entry of summary judgment on breach of fiduciary duty claim due to disputed factual issues relating to the alleged breach). Summary judgment on a breach of fiduciary claim is precluded where, as here, disputes exist as to the "degree of practical control" that the defendant exercised with respect to the plaintiff's property. *Hudson v. Wilhelm*, 651 F. Supp. 1062, 1065-66 (D. Colo. 1987) (denying summary judgment on breach of fiduciary duty claim where factual disputes existed as to degree of practical control exercised by defendant over plaintiff's account).

The Management Agreement explicitly recognizes RC Management's independent contractor status and provides that no partnership, joint venture, or any other relationship between RC Management and AHCA was being created. *See* Marx Decl., Ex. 4 at §§ 2, 30. Such disclaimer language is fully enforceable under Colorado law. *See Mandelbaum v. Fiserv, Inc.,* 787 F. Supp. 2d 1226, 1241 (D. Colo. 2011).

Even without this express disavowal of a "special relationship," other provisions of the Management Agreement show that, at a minimum, it is materially disputed whether a principal/agent relationship exists between RC Management and AHCA. An agent is "one who 'act[s] on the principal's behalf and subject to the principal's control." Rest. 3d of Agency § 1.01. The key feature of an agency relationship is the principal's right to control the agent; thus, an agent is "'the very antithesis'" of an independent contractor. *City and Cnty. of Denver v. Fey Concert Co.,* 960 P.2d 657, 660-61 (Colo. 1998). The Management Agreement gives

16

AHCA no right to control how RC Management goes about its duties.[4]  As for the allegation that RC Management had a "high degree of control over Plaintiffs' fractional interests and the units," RC Management is only allowed to enter units to provide cleaning, maintenance and repair services or to abate illegal nuisances.  *See* RSUMF 10.  RC Management cannot transfer, convey, mortgage, or otherwise dispose of Plaintiffs' fractional interests, as they are deeded interest in real property for which rights of alienation are held by record owners.  *Id*.  RC Management cannot rent, exchange or otherwise determine who may use Plaintiffs' fractional interests during the time period in which they have access rights, as that power is vested with them. *Id*.

Thus, it is disputed whether RC Management has the kind or degree of "control" over Plaintiffs' fractional interests that might give rise to a fiduciary duty.  Even if RC Management owed a fiduciary duty to AHCA under the Management Agreement (which it does not), that duty would not extend to Plaintiffs as individual AHCA members.  *See, e.g.*, *Willey v. Mayer,* 876 P.2d 1260, 1266 (Colo. 1994) (under general agency law principles, third parties harmed by agent's acts must seek recourse only from principal); Rest. 2d of Agency § 352 (agent is not liable for harm to a person other than his principal).[5]   It is thus disputed whether RC

---

[4] To the contrary, the Management Agreement provides that AHCA "releases any right of control over the method, manner or means by which [RC Management] performs its duties and responsibilities under this Agreement" (Marx Decl., Ex. 4 at § 30), and delegates to RC Management "all of [its] power and authority … to the extent necessary to perform [RC Management]'s duties and obligations under this Agreement." *Id*. § 4.  It further provides RC Management with "all the powers and duties of the Executive Board" "to the exclusion of all other persons including the Association and its members…." *Id.*

[5] Notably, when the Marriott Defendants' motion to dismiss Plaintiffs' claims for breach of fiduciary duty and aiding and abetting breach of fiduciary duty was denied earlier in the case (ECF #210 at 13), the Court merely found that Plaintiffs had "sufficiently alleged" the existence

Management owes Plaintiffs any fiduciary duty.

### C. Even If RC Management Owed Fiduciary Duties to Plaintiffs, Disputed Material Facts Exist as to Whether Such Duties Were Breached

Plaintiffs argue that RC Management breached its fiduciary duty to them by (1) promising, but failing to conduct, a vote on the MVC Affiliation; (2) failing to disclose "all material facts" about the Affiliation; and (3) failing to disclose the 2013 Affiliation Agreement. Pl. Br. at 21-25. Each of these contentions is disputed.

### 1. The allegedly promised "majority vote"

In alleging a promised "majority vote," Plaintiffs rely on only two communications. Neither communication, however, came from RC Management.  The first is an April 5, 2013 letter that Plaintiffs acknowledge was ***from AHCA*** (not RC Management) to the Members.  Pl. Br. at 7-8, 21.[6]  The second, a May 14, 2013 letter to the Members from Mr. Cunningham, written on behalf of "The Ritz-Carlton Destination Club" and sent from "RCDC Member Communications," also did not come from RC Management.  *Id.* at 8-9, 21; SADF 11-14.

Even if the Court were to conclude, despite this evidence, that RC Management promised Plaintiffs a majority vote on whether RC Club Aspen would be included in the MVC Affiliation

---

of such duties. *Id.*  The standard for summary judgment is different.  To prevail on this motion, Plaintiffs must show an absence of disputed material facts and entitlement to judgment as a matter of law.  *See Estes v. Fortunato*, 2011 WL 832262, at *1 (D. Colo. Mar. 3, 2011) ("The standards for dismissing a complaint under Rule 12(b)(6) and the standards for granting summary judgment are substantially different.") (internal quotation and citation omitted). Plaintiffs have failed to meet that burden.

[6] Plaintiffs' disputed allegation that Mr. Cunningham and Ms. Sobeck "approved of the wording of the" letter (Pl. Br. at 8) does not create liability for RC Management. As noted above, Mr. Cunningham and Ms. Sobeck were acting on behalf of RC Management's affiliated company, RCDC.  Parents, subsidiary and sibling corporations are separate legal entities, and no evidence has been adduced to show that one affiliated entity should be held responsible for another's actions.  *See Skidmore, Owings & Merrill v. Canada Life Assurance Co.*, 907 F.2d 1026, 1027 (10th Cir. 1990) (corporate form cannot be disregarded without evidentiary justification).

and then replaced that vote with a non-binding survey, factual disputes exist as to the meaning of the words "vote," "survey" and "majority." AHCA's April 5, 2013 letter to RC Club Aspen Members stated that "'Ritz Marriott representatives agree that unless a majority of Aspen Highlands Members … vote in favor of doing so, Ritz/Marriott will not include Aspen Highlands in the [MVC] affiliation/exchange/point program.'" Marx Decl., Ex. 40. Mr. Cunningham's May 14, 2013 letter stated that, "we want to assure you that a Ritz-Carlton Club affiliation with [MVCD] will not take place unless there is an affirmative vote of each Club's membership." Marx Decl., Ex. 33. Later, on November 19, 2013, Mr. Cunningham again wrote to RC Club Aspen Members to advise them that they would be receiving a survey in the coming weeks, whose "sole purpose [was] to understand the Aspen Highlands member's interest in this voluntary exchange program." Marx Decl., Ex. 19. On December 4, 2013, the Members received an e-mail from Mr. Cunningham that contained a link to the survey and reiterated that the "sole purpose of this survey is to understand whether the Aspen Highlands Members would like the opportunity to voluntarily exchange a week of their allocated time for points within the MVCD exchange program." Marx Decl., Exs. 20, 24. Factual disputes exist as to whether this survey, which allowed the Members to vote "yes" or "no" on the MVC Affiliation, effectively provided RC Club Aspen Members with a "vote" on the MVC Affiliation. See RSUMF 33, 67.

Factual disputes also exist as to whether the word "majority" in AHCA's letter was intended to mean a majority of all Members or only a majority of those actually voting. (A majority of those who responded to the vote/survey favored the MVC Affiliation. See SADF at 19.) Numerous courts have found the word "majority" to be ambiguous in a variety of voting contexts. See Fulk v. United Transp. Union, 160 F.3d 405, 408 (7th Cir. 1998) (provision in

union's constitution requiring leadership to "poll the entire membership … and be governed by the majority of the votes cast" was "ambiguous as to which majority [*i.e.*, the entire membership vs. only the votes cast] must govern "); *Diamond v. United Food & Commercial Workers Union Local 881,* 768 N.E.2d 865, 867-68 (Ill. Ct. App. 2002) (provision in union's constitution requiring that all dues, fees and assessments "be established, increased or levied by the Local Union by a majority vote by secret ballot of the members" was "potentially ambiguous" as "[a]rguably, the term 'vote' limits the class from which a majority is determined to those actually voting"), and municipal governance, *see Commonwealth of Pa. ex rel. Babnoni v. Klemm,* 454 A.2d 531, 532-33 (Pa. 1982) (provision in city charter for overriding a mayoral veto ambiguous as to whether a two-thirds vote of all members of the city council, or only two-thirds of those present for the vote, was required).

Because "there is no way to compel people to vote," requiring a majority of all voters to approve something "would, for all practical purposes, cause institutional paralysis."  *Babnoni,* 454 A.2d at 532-33.  As Mr. Cunningham and Ms. Sobeck testified, given that the approximately 600 eligible RC Club Aspen Members could not be compelled to participate in the vote/survey, it would have been unrealistic to require that the MVC Affiliation be approved by a majority of the entire membership.  SADF 18-21.  Thus, the meaning of the phrase "majority of Aspen Highlands Members" is a disputed issue of material fact.[7]

### 2. The alleged failure to disclose "all material facts" about the MVC Affiliation and the 2013 Affiliation Agreement

---

[7] *Canfield v. Jeannotte*, 72 P. 1062 (Colo. 1903) (cited in Pl. Br. at 21), which concerned an agent's surreptitious purchase of his principal's interest in a mining lease, is inapposite and does not support Plaintiffs' claim that the vote "muted opposition to the [MVC A]ffiliation," thereby permitting it to go forward.

Another factual dispute exists as to Plaintiffs' allegation that RC Management breached fiduciary duties to them by failing to disclose certain "material facts" about the MVC Affiliation, including certain provisions in the 2013 Affiliation Agreement that Plaintiffs claim to be relevant to AHCA's alleged "veto power" over the MVC Affiliation.   As discussed, the governing documents show that Cobalt is responsible for operating the Membership Program and for all affiliations, including the MVC Affiliation, whereas RC Management's duties are limited to the management of on-site operations.   *See* Point I.A, *supra*; *see also* SADF 1-4, 11.   Thus, Plaintiffs' allegation that RC Management breached an alleged fiduciary duty to them by failing to disclose "all material facts" about the MVC Affiliation is, at a minimum, disputed.   As for Plaintiffs' allegation that RC Management concealed the 2013 Affiliation Agreement, RC Management was not a party to either that Agreement or to the 2014 Acknowledgement and Joinder to it.   Accordingly, genuine issues of material fact exist as to whether RC Management had any duty to disclose the 2013 Affiliation Agreement to Plaintiffs (through AHCA).

Even if such a duty were found (and it should not be), factual disputes exist as to whether AHCA (and, thus, Plaintiffs)[8] had actual or constructive knowledge of the 2013 Affiliation Agreement because of the repeated references made to it in the Acknowledgment Agreement. SADF 17; *see also San Juan Basin Consortium, Ltd. v. EnerVest San Juan Acquisition Ltd. P'ship*, 67 F. Supp. 2d 1213, 1226 (D. Colo. 1999) (denying summary judgment because it was disputed whether purchaser was on actual or constructive notice of agreement at issue).

---

[8] AHCA stood in a representative capacity for Plaintiffs with respect to all dealings with RC Management.  *See* Marx Decl., Ex. 4 at § 2 (appointing RC Management "to act on behalf of the Association and its members"); Marx Decl., Ex. 1 at § 6.8 (requiring AHCA to "represent the interests of" the Members "in a fair and just manner on all matters that may affect any or all" Members), § 7.1 (setting forth AHCA's duties as representative of Members).

Issues of disputed material fact also exist with respect to the significance of the 2013 Affiliation Agreement.  As background, the affiliation between the Membership Program and the L&C Program gave the participants the right to access both programs' accommodations and facilities.  In addition, L&C was expressly given the "sole and absolute discretion … to affiliate other Accommodations with the Program … [which would] result in the addition of new Participants, who … w[ould] also reserve … the use of Accommodations and facilities within the Program, including Accommodations affiliated with RC[D]C."  Marx Decl., Ex. 32 at § 8.1(a).  The 2013 Affiliation Agreement between the L&C Program and the MVCD Program (which was effective as of November 14, 2013) gave their respective members the right to use the accommodations and facilities of each other's programs without the need for AHCA's consent, which was consistent with L&C's authority and prior practice.  *See* RSUMF 70, 74, 77; SADF 5-6; Marx Decl., Ex. 27 at § 11.1.  On April 24, 2014, AHCA executed the Acknowledgement Agreement merely to pledge its ***cooperation*** "to ensure that Participating L&C Members and MVCD Members are able to reserve, check-in, and use . . . the Accommodations at" RC Club Aspen.  Marx Decl., Ex. 28 § 2.  AHCA did not have "veto power" over the MVC Affiliation, as Plaintiffs contend.[9]

## II.   PLAINTIFFS IMPROPERLY SEEK JUDGMENT ON ONLY A PORTION OF THEIR BREACH OF FIDUCIARY DUTY CLAIM

A "party may not seek summary judgment on a portion of a claim."  *Home Design Servs., Inc. v. Schroeder Constr.*, 2012 WL 527202, at *1 (D. Colo. Feb. 16, 2012); *see also Carabjal v. Lincoln Benefit Life Co.*, 2007 WL 2221147, at *3 (D. Colo. July 31, 2007) (same).  Courts have repeatedly found that the language added to the relevant federal rule (Fed. R. Civ. P. 56(g)) in

---

[9] Moreover, AHCA was not a third-party beneficiary of the 2013 Affiliation Agreement and, thus, had no right to enforce its terms.  *See* ECF #441 at 11-12, 21-25.

2010 allowing a district court to "enter an order stating any material fact – including an item of damages or other relief – that is not genuinely in dispute and treating the fact as established in the case" does not permit parties to move for partial summary judgment on only some elements of a claim. *See Powers*, 2017 WL 4102752, at *1 (courts "have expressly found motions seeking to resolve only one issue relevant to a plaintiff's claims to be entirely inappropriate under any provision of Rule 56.") (citing, *inter alia*, *Cardenas v. Kanco Hay, L.L.C.*, 2016 WL 3881345, at *7 (D. Kan. July 18, 2016) ("While plaintiff's motion states that plaintiff is asking for partial summary judgment, the motion does not describe a claim, a part of a claim, or an item of damages, upon which a 'judgment' may be entered.   Judgment cannot be entered upon ... 'elements' of the claims upon which plaintiff moves for partial summary judgment.")).

Although a breach of fiduciary duty claim has three elements (the existence of a fiduciary relationship, breach of the duty owed, and resulting damages, *see FDIC v. Refco Grp., Ltd.*, 989 F. Supp. 1052, 1080 (D. Colo. 1997)), Plaintiffs improperly seek summary judgment on only the first two elements, which is unsurprising given that factual disputes exist as to whether they were damaged by the MVC Affiliation. *See* SADF 15-16. Plaintiffs should be denied summary judgment on their breach of fiduciary duty claim for this reason alone.

III.   **SUMMARY JUDGMENT ON PLAINTIFFS' CONSTRUCTIVE FRAUD CLAIM SHOULD BE DENIED**

The elements of a claim for constructive fraud are: (1) the existence of a duty due to a relationship with defendant; (2) defendant's violation of the duty by making deceptive material representations of past or existing facts, or remaining silent when a duty to speak exists; (3) plaintiff's reliance on such representations or silence; (4) injury to plaintiff proximately caused by such reliance; and (5) the gaining of an advantage by defendant at plaintiff's expense.

23

*Barnett v. Elite Props. of Am., Inc.*, 252 P.3d 14, 24 (Colo. App. 2010).   In addition to the disputed issues of material fact that exist with respect to the other elements of the claim (*see supra*), factual disputes also exist as to its reliance and "advantage" elements (indeed, Plaintiffs point to no record evidence that RC Management gained any such advantage, which it disputes).

Plaintiffs offer no evidence to show that each of them relied to their detriment on statements of fact or alleged non-disclosures by RC Management, including the alleged promise of a vote on the MVC Affiliation or the substitution of a survey for such a vote.   To the contrary, several Plaintiffs have testified that they were not even aware of the April - May 2013 statements from AHCA and Mr. Cunningham, respectively, concerning the upcoming MVC Affiliation issue and the alleged promise of a vote.   *See* SADF 22.   Thus, these Plaintiffs could not have relied upon the statements.   *See Squires ex rel. Squires v. Goodwin*, 829 F. Supp. 2d 1062, 1076 (D. Colo. 2011) (plaintiff who testified that she had no recollection of reading letter containing allegedly false statements could not assert fraud-based claims).

Even if some circumstantial inference of reliance was permissible here (which it is not), RC Management would be permitted to offer evidence to rebut that presumption.   *See Kopeikin v. Merchants Mortgage & Trust Corp.,* 679 P. 2d 599, 602 n.3 (Colo. 1984) (remanding for further proceedings on plaintiffs' fraudulent concealment claims because defendants had had no opportunity to offer evidence to refute these claims).   The above (and similar) testimony of Plaintiffs who did not rely on any promise of a formal vote on the MVC Affiliation should preclude any such inference.[10]   To that point, several Plaintiffs testified that they took no action

---

[10] Importantly, Plaintiffs must prove reliance ***individually***, as no inference or concept of "group reliance" is appropriate outside the class action context.   *Baker v. Chevron U.S.A., Inc.,* 533 Fed. Appx. 509, 522-23 (6th Cir. 2013) (requiring proof of environmental contamination and resulting

after it had become clear that no "vote" on the MVC Affiliation would be taking place.   *See* SADF 23.   Plaintiffs did not even file this case until December 31, 2015, more than 18 months after learning that the MVC Affiliation would occur and a full year after it became operational.

## **CONCLUSION**

For the above reasons, Plaintiffs' motion for partial summary judgment should be denied.

Dated:  August 26, 2019                                  Respectfully submitted,

                                                                             GREENBERG TRAURIG, LLP

                                         By:        *s/ Philip R. Sellinger*  
                                                           Philip R. Sellinger  
                                                           Ian S. Marx  
                                                           500 Campus Drive, Suite 400  
                                                           Florham Park, NJ 07932  
                                                           Tel: 973.360.7900 / Fax: 973.301.8410  
                                                           E-mail:  SellingerP@gtlaw.com, MarxI@gtlaw.com  
                                                           *Attorneys for Defendant*  
                                                           *The Ritz-Carlton Management Company, L.L.C.*

---

physical damage for all properties at issue "[b]ecause this is ***not a class action***") (emphasis added); *McDade v. YRC Worldwide, Inc.,* 2017 U.S. Dist. LEXIS 147811, at *1-*3 (N.D. Ill. Sept. 13, 2017) (requiring individual proof of racial discrimination despite consolidation of cases because they are "***not a class action***") (emphasis added); *Primavera Familienstiftung v. Askin,* 130 F. Supp. 2d 450, 500-01 (S.D.N.Y. 2001) (requiring showing of justifiable reliance by each plaintiff through plaintiff-specific evidence in investment fraud action because "[t]his is ***not a class action***") (emphasis added).   In the very few non-class-action fraud cases in which an inference of reliance was permitted, it was simply to allow plaintiffs ***against whom summary judgment had been granted*** to have their claims decided by a jury, and ***no evidence had been adduced to undermine a finding of reliance as to all plaintiffs***.   *See, e.g., Neurontin Mktg. & Sales Practices Litig.,* 712 F. 3d 51, 58 (1st Cir. 2013); *Kopeikin,* 679 P. 2d at 602 n.3.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 26th day of August, 2019, a true and accurate copy of the foregoing **DEFENDANT THE RITZ-CARLTON MANAGEMENT COMPANY, LLC'S OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT** and attached exhibits were filed and served with the Clerk of the Court via CM/ECF filing system, which will send notification to the following:

Michael J. Reiser
Law Office of Michael J. Reiser
1475 N Broadway, Suite 300
Walnut Creek, CA 94596
*Counsel for Plaintiffs*

Matthew C. Ferguson
The Matthew C. Ferguson Law Firm, P.C.
119 South Spring, Suite 201
Aspen, Colorado 81611
*Counsel for Plaintiffs*

Tyler R. Meade
The Meade Firm P.C.
1816 Fifth Street
Berkeley, CA 94710
*Counsel for Plaintiffs*

Linda Pham Lam
Michael Schrag
Gibbs Law Group LLP
505 14th Street, Suite 1100
Oakland, CA 94612
*Counsel for Plaintiffs*

*/s/ Gregory Scavelli*
Gregory Scavelli