# EXHIBIT 5



THE RITZ-CARLTON CLUB

Contract No.: **RA*8308/9**

## PURCHASE CONTRACT

## ASPEN HIGHLANDS CONDOMINIUMS

### The Ritz-Carlton Club, Aspen Highlands

### Aspen, Colorado

This Purchase Contract (hereinafter this "Contract" or "Agreement") is made on the date set forth below by and between the seller/co-declarant, The Ritz-Carlton Development Company, Inc., a Delaware corporation, hereinafter referred to as "Seller" whose address is 419 East Hyman Avenue, Aspen, Colorado 81612 and the undersigned buyer(s), hereinafter referred to as "Purchaser":

PURCHASER'S NAME: **JEFFREY A. BAYER**   Social Security No.: ▮

Address ▮

Home phone ▮   Work phone ▮   Fax No. ▮

E-mail address ▮

PURCHASER'S NAME: **GAIL L. BAYER**

PURCHASER'S NAME:

PURCHASER'S NAME:

Title Taken As: **JEFFREY A. BAYER and GAIL L. BAYER as Joint Tenancy with Right of Surviorship**

Estimated date of earliest occupancy, depending on particular Residence Interest purchased:

Estimated Closing Date: : Seller estimates that closing will take place

Date of this Agreement: **05/31/2000**

Residence **8308** ; Residence Interest **9**

Estimated First Year Club Dues      $ 9,191.53

    1.    <u>Agreement to Sell and Purchase</u>.  In consideration of the terms, covenants and conditions set forth herein Purchaser hereby agrees to purchase and Seller hereby agrees to sell to Purchaser the following real property:

> Residence Interest 9 consisting of an undivided 1/12 interest in Residence **8308** of ASPEN HIGHLANDS CONDOMINIUMS, according to the Declaration of Condominium for ASPEN HIGHLANDS CONDOMINIUMS, recorded _____, 200__ in Book _____, at Page _____, Reception No. _____ as amended and supplemented from time to time and according to the Map for ASPEN HIGHLANDS CONDOMINIUMS recorded _____, 200__ in Book _____ at Page _____, Reception No. _____ as amended and supplemented from time to time, all in the office of the Clerk and Recorder of Pitkin County, Colorado together with the perpetual use of seven (7) days per year for each 1/48 interest owned in accordance with the Association Documents and the Membership Program Documents for ASPEN HIGHLANDS CONDOMINIUMS.

Aspen Highlands Condominiums (the "Condominium") is located on Prospector Road, (Aspen Highlands Village), Aspen, Colorado 81611.

©1999 The Ritz-Carlton Development Company, Inc.

2. **Terminology.** The terms used in this Agreement shall have the same meaning as the identical terms utilized in the Declaration of Condominium for Aspen Highlands Condominiums (the "Condominium Declaration") unless the context otherwise requires.

3. **Purchase Price.** Purchaser agrees to pay the purchase price ("Purchase Price") as follows:

| | | |
|---|---:|---:|
| Purchase Price | | $ 180,000.00 |
| Less Credits | $ .00 | |
| Reservation Deposit credited to Purchase Price | $ .00 | |
| Cash Down Payment (paid on execution of contract) | $ 18,000.00 | |
| Additional Credit (See Addendum ___ attached, if applicable) | $ .00 | |
| Total Credits | | $ 18,000.00 |
| Balance Due | | $ 162,000.00 |
| Additional Payments Due (Due Date    ) | $ .00 | |
| Additional Down Payment (Due Date    ) | $ .00 | |
| Balance of Down Payment (Due Date    ) | $ .00 | |
| **Balance of Purchase Price due at Closing** | | $ 162,000.00 |

Estimated Closing Costs (see separate sheet for detail)   $ 4,023.00

Purchaser's financial obligation at Closing includes payment of the Purchase Price together with Closing Costs as described in section 6 below and all charges related to financing, if any. Purchaser shall be responsible for Purchaser's Residence Interest's full share of the Club Dues, which amount will be collected at closing if not previously paid.

4. **Deposit.**

   a. **Earnest Money.** One hundred percent (100%) of all funds and other property received from Purchaser prior to closing shall be held in escrow with interest payable to Seller, unless an approved alternate assurance arrangement is utilized in accordance with subsection c below. The name and address of the escrow agent is The Ritz-Carlton Sales Company, Inc., 419 East Hyman Avenue, Aspen, Colorado 81612 (the "Escrow Agent"). Unless an approved alternate assurance arrangement is utilized, all funds and other property received from Purchasers prior to closing shall be delivered to Escrow Agent within three (3) days of receipt by Seller. Purchaser is entitled to a receipt for the deposit upon request.

   b. **Escrow.** Escrow Agent is authorized to release documents, deposits or things of value only when all funds received are either available for immediate withdrawal as a matter of right from the financial institution in which the funds have been deposited, or are available for immediate withdrawal as a consequence of an agreement of a financial institution in which the funds are to be deposited (i.e. "Good Funds") upon the following events, or as provided in subsection c below:

   (1) Mutual agreement of both Purchaser and Seller;
   (2) Closing and transfer of title in accordance with sections 8 and 9 below;
   (3) Termination of the Contract by Purchaser in accordance with section 10 below;
   (4) Default of Purchaser in accordance with section 34 below;
   (5) Default of Seller in accordance with section 35 below;
   (6) Rescission by Purchaser in accordance with section 38 below.

   c. **Alternate Assurance for Escrowed Funds.** The Seller reserves the right, as an alternative arrangement, to secure the Purchaser's down payment by a letter of credit, bond or other security acceptable to the Colorado Real Estate Commission ("Commission") as required by Colorado law. In the event that an alternative arrangement is utilized to secure the Purchaser's down payment, the Seller may use the Purchaser's down payment for any purpose, at its own discretion. In such event, there is no restriction on the use of such funds by the Seller.

   (1) **Deposits Secured by Alternate Assurance.** Pursuant to 12-61-403(3)(e) C.R.S. and Rule S-20 of the Colorado Real Estate Commission's Subdivision Rules, the Commission has the discretion to approve a cash or surety bond, letter of credit or other financial assurance ("Alternate Assurance") from the Seller to protect the Purchaser's funds prior to closing in lieu

Bayer000329

of holding all or any portion of the funds in escrow. In the event Seller provides an Alternate Assurance, Seller may withdraw funds from escrow upon request to Escrow Agent provided the Coverage Requirements described below are maintained. Such Alternate Assurance shall name Escrow Agent as beneficiary or obligee.

Such Alternate Assurance shall equal or exceed 110% of all escrowed funds released to Seller prior to closing. If the Commission approves such Alternate Assurance such Alternate Assurance will serve as security for all funds released to Seller.

The Seller may post increased or substitute Alternate Assurances as may be approved by the Commission from time to time. Notwithstanding anything contained herein to the contrary, no increase or substitute Alternate Assurance shall be instituted, and Escrow Agent may not rely on any such increased or substitute Alternate Assurance, without the prior written approval of the Commission.

If Seller receives escrowed funds such that the Alternate Assurance does not equal or exceed 110% of the amount released (the "Coverage Requirement"), Seller shall (i) immediately deliver funds to Escrow Agent within five (5) days sufficient funds to meet such Coverage Requirement, or (ii) Seller shall within such five (5) day period deliver such additional Alternate Assurances to Escrow Agent to meet such Coverage Requirement.

(2) Expiration of Alternate Assurance. The Seller shall provide Escrow Agent with a replacement, supplement or extension of the Alternate Assurance acceptable to the Commission at least forty-five (45) days prior to the expiration of the Alternate Assurance.

If Escrow Agent has not received the replacement, supplement or extension thirty (30) days prior to such expiration Escrow Agent shall provide the Commission with a statement showing the status of the total funds secured by the Alternate Assurance as of thirty (30) days prior to the expiration of the Alternate Assurance. Escrow Agent shall then make demand for payment from the Seller to Escrow Agent of all funds disbursed to Seller which are secured by the Alternate Assurance.

In the event such payment is not forthcoming from the Seller within five (5) days from mailing of demand by Escrow Agent, then Escrow Agent shall make demand upon the Alternate Assurance to the extent of all funds disbursed to Seller. Escrow Agent shall then hold such funds in accordance with this Agreement.

In the event the Escrow Agent fails to make the necessary demand on the Alternate Assurance as set forth above, the Commission shall have the right to then make the demand on the Alternate Assurance in accordance with the terms of this Agreement.

5. Payment of Balance of Purchase Price. The balance of the Purchase Price shall be paid in U.S. funds by Purchaser to Seller in cash, by certified or cashier's check or by wire transfer at time of Closing. EXCEPT AS OTHERWISE AGREED IN WRITING, THIS CONTRACT IS NOT CONTINGENT ON THE PURCHASER OBTAINING FINANCING.

6. Closing Costs. Purchaser shall pay all Closing Costs, which include the cost of recording the special warranty deed, Colorado documentary fees, Club Dues and owner's title insurance premium. Club Dues include Purchaser's full share of the annual maintenance fees assessed by the Aspen Highlands Condominium Association, Inc. ( the "Condominium Association"), real estate taxes and assessments, and Membership Program Dues. If any portion of the Purchase Price is financed, Purchaser shall also pay all loan application and loan closing costs, including the cost of recording the deed of trust and the premium for a mortgagee's policy of title insurance on the deed of trust.

7. Club Dues. Purchaser understands and agrees that in accordance with the Condominium Declaration and the Aspen Highlands Condominiums Rules and Regulations, Purchaser will be responsible for Purchaser's share of any and all ongoing costs and expenses incurred in the operation of the Condominium (including fees for operation of other associations to which the condominium property is subject), ad valorem taxes assessed against the Residence described herein, costs and expenses of The Ritz-Carlton Club Membership Program that are attributable to the Purchaser each fiscal year, and Purchaser's share of any and all costs and expenses incurred in the operation of the Master Common Elements.

The current estimated annual assessments including amounts owed to the Master Association and other associations as well as for real estate taxes for the Residence Interest described herein are set forth on the first page of this Agreement.

The current Membership Program Dues charged are $ **155.05** per Residence Interest.

Bayer000330

Jun. 7. 2000 11:55AM                                                                 No. 1806   P. 2

PURCHASER ACKNOWLEDGES THAT THESE AMOUNTS ARE ESTIMATES ONLY AND THAT ACTUAL ASSESSMENTS, CLOSING COSTS AND CHARGES MAY VARY FROM THIS ESTIMATE.

The Purchaser shall only be required to pay the following maximum Club Dues for fiscal year 2001: $ 8,355.94 for a Two Bedroom Membership and $ 9,191.53 for a Three Bedroom Membership. Purchaser acknowledges that the Association's budget for fiscal year 2001 is based upon the Fractional Ownership Plan consisting of 73 Tourist Accommodation Units which are located or will be located in Buildings 2, 4 and 8. In addition to the Assessments paid by Seller with respect to Residence Interests owned by it, Seller will pay any difference between the amounts assessed to Owners in Buildings 4 and 8, and those amounts necessary to fund Owner's Association operations for fiscal year 2001. This subsidy shall be limited to fiscal year 2001, unless extended by Seller, in its sole discretion.

There is no assurance that Building 2 will be added to the Fractional Ownership Plan. If Building 2 and its respective 26 Tourist Accommodation Units are not added to the Fractional Ownership Plan, the Association's budget for fiscal year 2002 and subsequent years will be based on 47 Tourist Accommodation Units. This would result in a higher per unit assessment than that which Owners will be required to pay in fiscal year 2001.

8.   Closing.  If this Agreement is executed prior to the completion of construction of the Residence described herein, the closing of this Agreement will be completed by a date certain designated by Seller which date shall be within sixty (60) days after a temporary certificate of occupancy or other evidence of substantial completion has been issued for the Residence and the Residence Documents are recorded, or at such other time as agreed to by the parties. Purchaser authorizes Seller or its authorized agent to insert the recording information of the Condominium Declaration on the deed of trust and the special warranty deed at such time as the Residence Documents are recorded in the public records.

If a temporary certificate of occupancy or other evidence of substantial completion for the Residence described herein has already been issued as of the date of execution of this Agreement, the closing of this Agreement will be completed by a date certain designated by Seller which date shall be within sixty (60) days after the date of this Agreement or at such other time as agreed to by the parties.

The closing will be at such time (within such sixty (60) days) and place as shall be specified by Seller or the closing may be conducted by mail, if authorized by Seller. ~~Seller shall give Purchaser not less than fourteen (14) days advance written notice of the closing date. Seller, at its sole option, may require Purchaser to close in escrow up to ninety (90) days prior to the estimated date for issuance of a certificate of occupancy.~~ If Seller requires Purchaser to close in escrow, Purchaser shall execute any and all necessary closing documents and deposit all additional funds due and owing with the escrow agent within the specified time period. Immediately prior to the closing, Escrow Agent shall transfer all funds and closing documents received by it to the Title Company, who will finalize the closing. The estimated closing date for the Residence Interest being purchased pursuant to this Agreement is set forth on the first page of this Agreement.

If no rescission or default has occurred, Title Company shall release and disburse the escrowed funds and deliver and record closing documents such that the transaction can close escrow upon presentation of an affidavit by the Seller and Broker requesting release of the escrowed funds, with a copy sent to Purchaser, and upon satisfaction of the following conditions:

a.   Substantial completion of construction of Aspen Highlands Condominiums as certified by project architect;

b.   Completion of construction of all amenities within or adjacent to the building in which the Residence is located or posting of a cash or surety bond or letter of credit approved in writing by the Commission, equal to 125% of the estimated cost of completion of the amenities;

c.   Recording of the Condominium Declaration and Condominium Map for Aspen Highlands Condominiums in the office of the Clerk and Recorder of Pitkin County, Colorado;

d.   Incorporation of Aspen Highlands Condominium Association, Inc.;

e.   Recording of the Declaration and Map for Aspen Highlands Village Parking Facility in the office of the Clerk and Recorder of Pitkin County, Colorado;

f.   Incorporation of Aspen Highlands Village Parking Facility Association, Inc.; and

g.   Title to the property is vested in Seller, and Seller has delivered its special warranty deed to Escrow Agent for delivery to Purchaser subject only to the Permitted Exceptions, as defined below.

9.   Title.  Seller warrants that, at closing, title to the interest will be conveyed free and clear of all encumbrances, subject to the matters set forth in Exhibit "A" attached hereto, except taxes and

Bayer000331

assessments for the year of closing and subsequent years, (including, but not limited to, pending and certified county or municipal improvement liens), those matters shown on the final Map and the standard printed exceptions appearing in the Title Commitment referred to below, and except for restrictions, reservations, conditions, limitations and easements of record or imposed by governmental authorities having jurisdiction or control over the subject property (collectively, the "Permitted Exceptions").

At least ten (10) days before Closing, Seller will deliver to Purchaser a title insurance commitment (the "Commitment") issued by a title company (a "Title Company") to insure the title to the Residence Interest in Purchaser's name for the amount of the Purchase Price. Purchaser waives any right to otherwise receive delivery of a title insurance commitment within ninety (90) days after the execution of this Agreement. PURSUANT TO THE TERMS OF THIS AGREEMENT, THE PARTIES AGREE THAT PURCHASER IS RESPONSIBLE FOR THE COST OF THE OWNER'S TITLE INSURANCE POLICY. If the Commitment discloses the existence of any defects in title, other than the Permitted Exceptions and such defects render title to any portion of the Residence Interest uninsurable and the defects are not waived by Purchaser, Purchaser must give Seller written notice of the title defects within ten (10) days after receipt of the Commitment. Thereafter, Seller will have forty-five (45) days in which Seller may elect to cure the defects and render title insurable or five (5) days in which to elect not to cure the defect or provide title insurance against the defects. If Seller fails or elects not to cure the defects or provide title insurance after timely notice of the defects, Purchaser, as its sole and exclusive remedy, may elect, within fifteen (15) days after the end of the forty-five (45) day period or within three (3) days after notice from Seller that Seller elects not to cure the alleged defect, whichever is earlier, either (a) to terminate this Agreement, in which event all amounts paid to Seller under this Agreement will be returned to Purchaser, and neither party will have any further obligations under this Agreement; (b) grant one or more additional periods of time within which Seller may continue to attempt to cure, remove or obtain title insurance protection against the exceptions; or (c) to accept title with all defects as shown in the Commitment, without adjustment in the Purchase Price. If Purchaser fails to give timely notice of termination, Purchaser will be deemed to have elected to accept title as shown in the Commitment and to have waived all defects. Purchaser expressly relinquishes and waives any and all other remedies, claims, demands, and causes of action at law or in equity against Seller for failure to deliver marketable title.

Seller will convey the Residence Interest in the Residence described herein to Purchaser by recording a special warranty deed subject to the Permitted Exceptions. The deed will be delivered for recording immediately following closing; provided, however, that the deed will not be recorded until after the issuance of a temporary certificate of occupancy or other evidence of substantial completion notwithstanding the earlier payment of the purchase price in full or in part and the execution of a promissory note in partial payment of the purchase price.

Within sixty (60) days following recording of the special warranty deed, Seller will cause the Title Company to issue to Purchaser, at Purchaser's expense, a title insurance policy (the "Owner's Policy") in conformance with the Commitment.

10. <u>The Fractional Ownership Plan.</u> As more specifically described in the Condominium Declaration, Seller, as co-declarant, has subjected the Condominium to a fractional ownership plan (the "Fractional Ownership Plan") as governed by the provisions of the Colorado Common Interest Ownership Act ("CIOA") and the provisions of sections 38-33-110 to 38-33-113 of the Colorado Condominium Ownership Act. Purchaser will own an undivided interest in a Residence in the Condominium for each Residence Interest purchased.

Purchaser shall be entitled to the use and occupancy of a Residence for seven (7) days for each 1/48 interest owned (the "Allocation") subject to the provisions of The Ritz-Carlton Club Membership Program-Reservation Procedures (the "Reservation Procedures") and the rules and regulations of the Condominium Association. Check in and check out times will be established from time to time by rule and regulation of the Condominium Association. Purchaser will be required to reserve use of a Residence for the Allocation in accordance with the Reservation Procedures. Purchaser will also be able to reserve use of Residences beyond his or her Allocation on a space available basis pursuant to the Reservation Procedures. The Condominium Association and the Program Manager reserve the right to charge additional housekeeping and administrative fees for space available, non-Allocated, use which is sometimes referred to as the variable cost of occupancy plus a premium. In addition, Purchaser will be entitled to reserve occupancy of Residences at other resorts pursuant to a private exchange system provided through The Ritz-Carlton Club Membership Program by virtue of The Ritz-Carlton Club Membership Program Affiliation Agreement (the "Affiliation Agreement").

11. <u>The Ritz-Carlton Club Membership Program.</u> As more specifically described in the Condominium Declaration and in the Affiliation Agreement, the Condominium is a member resort of a multisite exchange plan known as The Ritz-Carlton Membership Program (the "Membership Program"). Pursuant to the Condominium Declaration and the Affiliation Agreement, membership in the Membership Program is an appurtenance to each Residence Interest in the Condominium and may not be partitioned therefrom. The Membership Program is a service name for the exchange and reservation services and vacation and travel benefits currently offered and the restrictions currently imposed by The Ritz-Carlton Travel Company, L.L.C., a Delaware limited liability company (the "Program Manager"). Services provided by the Program Manager include the operation of the exchange program and master reservation system through which Owners of Residence Interests in the Condominium and owners at other resorts which participate in the Membership Program, reserve the use of the accommodations of the Condominium or other resorts which participate in the Membership Program, if any, pursuant to the priorities, restrictions and limitations of the Reservation Procedures and the rules and regulations of the Membership Program. The principal place of business of the Program Manager is 6649 Westwood Boulevard, Suite 500, Orlando, Florida 32821. The Program Manager owns the hardware and a license for the software which comprise the reservation system.

Bayer000332

By Purchaser's execution of this Agreement, Purchaser agrees to abide by the rules, regulations and restrictions imposed upon Purchaser by the Membership Program, including the Reservation Procedures, as the same may unilaterally be amended from time to time by the Program Manager. No such amendment will result in the loss of use of the Allocation provided an Owner complies with the Reservation Procedures, as amended. By execution of this Agreement, Purchaser also hereby designates the person set forth above as Purchaser's designated Member for purposes of receiving the membership privileges in The Ritz-Carlton Club Membership Program which includes making reservations and receiving notices on behalf of Purchaser, and Purchaser acknowledges that Purchaser may be required to pay an administrative fee to change the designation of the Member. Purchaser hereby appoints the Member and all successors thereto as Purchaser's agent and attorney-in-fact for the purposes set forth herein.

12. <u>Term of the Membership Program</u>. The term of the Membership Program will continue indefinitely as long as there are two or more locations participating in the Membership Program subject to earlier termination due to default or mutual agreement. In the event that a resort is deleted from the Membership Program earlier than the expiration date for the Membership Program, Owners of Residence Interests in the deleted resort will not be eligible to continue participation in the Membership Program for the remainder of the term of the Membership Program. A Purchaser will always be eligible to reserve available accommodations at any resorts which participate in the Membership Program that is affiliated with the Membership Program during the term of that Purchaser's Membership.

13. <u>Other Clubs</u>. The Program Manager has reserved the right to affiliate additional resorts or delete existing resorts participating in the Membership Program from time to time. Purchasers should refer to the Affiliation Agreement for details and The Ritz-Carlton Travel Company, LLC Disclosure Statement concerning the addition or deletion of resorts.

14. <u>Other Programs</u>. In addition to the right to make reservations for accommodations at Clubs through the Membership Program, the Program Manager has reserved the right, but not the obligation, to provide Owners with the opportunity to make reservations for accommodations through other programs and by other means.

15. <u>Furnishings</u>. The Residences will have furniture, appliances, equipment and accent furnishings substantially similar in quality to those shown in the models and renderings and on the plans and specifications. Since the models, renderings and the materials are for display purposes only, Seller reserves the right to make substitutions of material of similar or better quality, including, but not limited to substitution of colors, textures and finishes and substitution of the brand and model of appliances and furnishings.

16. <u>Modifications to Plans and Specifications</u>. Seller reserves the right to make amendments, additions or changes in the proposed plans and specifications prior to closing as may be necessary to conform to applicable governmental requirements, to expedite the completion of construction or for other purposes in Seller's discretion provided such modifications do not, in the reasonable judgment of the project architect materially and adversely affect the quality of construction and the finishes and furnishings to be included in the Residences and the value of the Residence Interest to be purchased by the Purchaser.

17. <u>Modifications to Residence Documents</u>. Seller reserves the right to amend the Residence Documents at any time or from time to time prior to the Closing as Seller may deem necessary or appropriate including the following: to make any necessary corrections, to meet the requirements of applicable laws, governmental regulations, lending institutions and marketing programs, or so long as the amendments do not materially adversely affect the value of the Residence Interest. Purchaser acknowledges that Seller has reserved the right, at any time after Closing, to amend the Residence Documents for the purposes and under the conditions outlined in those documents.

18. <u>Personal Use</u>. The use of the accommodations and facilities of the Condominium is limited solely to the personal use of the Purchaser, the Purchaser's guests, invitees, exchangers and renters and for recreational uses by corporations or other similar entities owning Residence Interests. This Agreement contains the entire understanding between the Purchaser and Seller relating to the purchase and sale of the Residence Interest described herein.

Purchaser acknowledges that neither Seller nor any of its agents or representatives has made any representations of any kind as to tax or other economic benefits or advantages which may be realized from purchasing a Residence Interest. Seller makes no representations as to the income tax consequences of the purchase, use or exchange of Residence Interests and related rights and appurtenances or as to the deductibility of related expenses such as interest, taxes and depreciation. Each Purchaser should consult the Purchaser's own tax advisor as to these issues. A Residence Interest should not be purchased in reliance upon any particular kind of tax consequence. Purchaser agrees to defend and indemnify Seller against all claims of real estate brokers or salesmen due to acts of Purchaser or Purchaser's representatives other than brokers or salesmen employed by Seller.

19. <u>Representations, Warranties and Understandings of Purchaser</u>. Purchaser represents to Seller and the title insurer, if any, that Purchaser has full authority and capacity to enter into this Agreement. Purchaser also represents that Purchaser is purchasing a Residence Interest for the personal use of Purchaser and Purchaser's family members and guests only and with no expectation of deriving any profit or tax advantage therefrom whether through income, appreciation or otherwise and with no expectation that Purchaser will receive any assistance from Seller in the rental of accommodations or the resale of the Purchaser's Residence Interest. Purchaser acknowledges that, if

Bayer000333

Purchaser is not a natural person, Purchaser is purchasing a Residence Interest solely for the personal use of its officers, directors, principals, employees and guests. Purchaser acknowledges that purchase and use of Residence Interests for commercial purposes is expressly prohibited.

      a.    No Investment Representations. Purchaser acknowledges that neither Seller nor any of its agents or employees has made any warranties or representations upon which Purchaser has relied concerning the investment value, the possibility or probability of profit or loss, or the tax consequences which may result from the purchase of the Residence Interest.

      b.    Roads. Purchaser acknowledges that the roads to the Condominium and within Aspen Highlands Village are or may be subject to restricted or gated access limitations and are subject to the rules and regulations of the Aspen Highlands Commercial Metropolitan District and the Aspen Highlands Residential Metropolitan District, which hold easements to and are responsible for maintaining the roads.

      c.    Amenities. Purchaser acknowledges that the health club located in Building 8 of the Condominium as identified on the Map will be owned and operated by the Seller. Seller has entered into an agreement with the Condominium Association, which grants to the Owners of Residence Interests access to the health club pursuant to the terms thereof. Purchaser further acknowledges that no interest in the health club in Building 8 of the Condominium, shall be conveyed to Purchaser pursuant to this Agreement. The Seller, as the owner of the health club shall have the right, in its sole discretion, subject to the agreement with the Condominium Association referenced in this subsection above, to remove, relocate, discontinue operation of, restrict access to, charge fees for the use of, sell interests in or otherwise deal with such amenities in its sole discretion without regard to any prior use of or benefit to any residents of the Condominium. Purchaser further acknowledges that the outdoor swimming pool and jetted tub located immediately adjacent to Building 8 and the health club located in Building 8 will be available for use by members of the Aspen Highlands Village Residential Amenities Association, which members include private home and townhome owners within Aspen Highlands Village.

      d.    Ski Facilities. Purchaser acknowledges the Residence and the Condominium is located adjacent to a public skiing facility and year-round recreation area (the "Ski Facility"). The Ski Facility may generate an unpredictable amount of visible, audible and odorous impacts and disturbances from activities relating to the construction, operation, use and maintenance thereof. The activities associated with the Ski Facility include, without limitation: (i) vehicular and residential traffic, including, without limitation, (a) buses, vans, snowcats, snowmobiles and other vehicles which transport residents and guests of Aspen Highlands Village over, around and through the Ski Facility and Aspen Highlands Village, and (b) construction vehicles and equipment; (ii) activities relating to the construction, operation and maintenance of ski trails, skiways and skier bridges and tunnels relating to the Ski Facility, including, without limitation, (a) construction, operation and maintenance of Aspen Highlands access roads (including the mountain road located proximate to and east of the Condominium), snow-making equipment and chair lifts, gondolas and other skier transportation systems, and (b) operation of snow-grooming vehicles and equipment and safety and supervision vehicles; and (iii) activities relating to the use of the Ski Facility, including, without limitation, skiing, snow-boarding, hiking, horseback riding, bicycling and other recreational activities.

      e.    Construction. Purchaser acknowledges the Condominium is located directly adjacent to or in the vicinity of other development projects currently under construction or planned for construction; and, prior to the build-out of such developments and the build-out of the Condominium, substantial construction-related activities are to be expected which may cause noise, dust and other attendant inconveniences. Purchaser further acknowledges that such adjacent development projects are to include, without limitation, commercial operations capable of causing noise, odors and other attendant inconveniences.

      f.    Underground Utilities. Purchaser acknowledges that certain underground utilities underlie portions of the Condominium including, without limitation, portions of units within the Condominium.

      g.    Ski Area Operations. Purchaser acknowledges that Seller is not the operator of the Aspen Highlands, Aspen Mountain, Buttermilk or Snowmass ski areas or any other ski areas, and accordingly, Seller cannot make any representations relating thereto. NEITHER SELLER NOR ANY OF ITS EMPLOYEES OR AGENTS HAVE MADE ANY GUARANTEES REGARDING THE OPENING OR CLOSING DATES OF THE SKI AREAS IN ANY GIVEN YEAR. Purchaser fully understands that the operator of those ski areas may decide, in its sole discretion, whether any or all of the chairlifts within those ski areas should be operated.

      h.    Mixed-Use Condominium. Purchaser acknowledges the Residence is part of a mixed-use condominium and fractional ownership resort which includes residential condominium units committed to a plan of fractional ownership known as The Ritz-Carlton Club, Aspen Highlands, as well as affordable housing units and commercial units. In addition, Purchaser acknowledges that the commercial units may generate an unpredictable amount of visible, audible and malodorous impacts and disturbances from activities relating to the operation, use and maintenance thereof.

      i.    Legal Entities and Associations. If required by title company, Purchaser, if an organization other than a natural person, shall deliver to Seller at or prior to Closing a copy of a resolution of Purchaser, duly adopted and certified by an authorized representative of Purchaser as required by the laws of the state of Purchaser's organization, authorizing the purchase of the Residence

Bayer000334

Jun. 7. 2000 11:55AM                                                                                              No.1806   P. 3

Interest, together with all certificates of organization, certificates of authority, trade name affidavits and other documents required by Colorado law to enable Purchaser to hold title to the Residence Interest. Purchaser represents that at Closing Purchaser will be in good standing and authorized, as necessary, to conduct its business in Colorado.

        j.    <u>Joint and Several Liability</u>.  If Purchaser is comprised of two or more parties, they shall be jointly and severally obligated under this Agreement.

    20.    <u>Contract</u>.  This Agreement may not be modified or amended except as set forth herein and shall be construed in accordance with the laws of the State of Colorado. All the terms and provisions of this Agreement shall survive the closing. Time is of the essence hereunder, particularly where the obligation to pay money is concerned. If this Agreement is executed outside of the sales office of Seller located in Aspen, Colorado, it shall constitute an offer by Purchaser to Seller, and shall in all events be subject to acceptance by Seller in Seller's discretion at Seller's offices in Aspen, Colorado.

Purchaser authorizes Seller or its authorized agent to insert or change Condominium Residence numbers wherever necessary to conform with the recorded Condominium Declaration and to make any changes, insertions or deletions in this Agreement and the documents to be executed hereunder as may be necessary to insure compliance with the terms of this Agreement; provided, however, that any changes in such documents shall be of an administrative nature only and shall not materially or adversely alter the reasonable expectations of Purchaser.

    21.    <u>Radon Gas</u>.  Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Colorado. Additional information regarding radon and radon testing may be obtained from your county public health unit.

    22.    **<u>Warranty Limitation</u>.  Seller warrants the materials and workmanship of the Condominium for a period of one (1) year from the date of issuance of a temporary certificate of occupancy. Unless required by Colorado law, Seller does not make any other warranty of any kind, express or implied, and Seller hereby disclaims any and all such other warranties, including but not limited to implied warranties of merchantability and fitness for a particular purpose, with respect to the construction of the Residences and the Common Elements and with respect to the personal property located within the Residences or within the Condominium. The Owners assume all risk and liability resulting from the use of this property.**

    23.    <u>Seller Right of First Refusal before Resale</u>.  As long as the Seller holds Residence Interests for sale at the Condominium or until December 31, 2020, whichever is earlier, Purchaser is required to offer the Purchaser's Residence Interest to Seller upon the same terms and conditions, including financing, as is offered by or to a third party before Purchaser may resell, transfer, assign or hypothecate the Purchaser's Residence Interest to a third party. Accordingly, Purchaser must notify Seller in writing no less than 20 days in advance of the proposed closing date of the Purchaser's intent to sell and must include a copy of the proposed transaction reduced to writing in all respects. Seller shall notify Owner within ten (10) days of receipt of such notice and copy of the proposed contract whether Seller wishes to exercise its right of first refusal. If Seller elects to exercise its right of first refusal, the purchase by Seller shall be closed on or before the proposed closing date. If Seller fails to notify Purchaser of its election to exercise its right of first refusal, Purchaser may proceed to close the transaction with the third party upon the original terms and conditions offered by or to the third party. Seller's right of first refusal is a covenant that runs with the land and shall be a requirement binding on any successor in title to Purchaser as long as Seller holds Residence Interests or sale at the Condominium or until December 31, 2020, whichever is earlier.



"Notwithstanding anything to the contrary set forth herein, Seller waives its right of first refusal in the case of a conveyance by Purchaser to a member of Purchaser's immediate family, which shall be deemed, for these purposes, to be limited to children, grandchildren, parents, grandparents and siblings, or to a privately held company owned and controlled by Purchaser, both prior to the transfer and for not less than five years thereafter."

    24.    <u>Completion of Construction</u>.  Although Seller is not the developer of the project, Seller agrees, subject to the provisions of this Agreement, and excepting delays caused by strikes, inability to obtain labor or material, governmental restrictions, enemy action, civil commotion, fire, acts of God, and delays caused by conditions beyond Seller's control, to use its best efforts to have the developer, Hines Highlands Limited Partnership, complete construction of and obtain a temporary certificate of occupancy for the accommodation described above on or before the estimated closing date. In all events Seller will cause the developer to complete construction of the building which contains the Residence described above no later than two (2) years after the date of the first Agreement requiring the conveyance by Seller of a Residence Interest.

    25.    <u>Seller/Broker Relationship</u>.  All sales within Colorado will be made by brokers and salespersons licensed by the State of Colorado unless specifically exempted pursuant to C.R.S. 12-61-101(4). The Selling Broker, The Ritz-Carlton Sales Company, Inc., and its salespersons have been engaged as a single and limited agent for the Seller. The Selling Broker has previously disclosed in writing to the Purchaser that different relationships are available which include Buyer Agency or Transaction Broker. Selling Broker has agreed to act solely as Seller's agent in connection with sales at the Condominium.

    26.    <u>Association Matters</u>.

Bayer000335

Jun. 7. 2000 11:56AM                                                                                     No.1806   P. 4

a. <u>Condominium Association</u>. Purchaser acknowledges that as an owner of a Residence Interest, Purchaser shall be subject to the provisions of and restrictions contained in the Condominium Declaration and the Map, shall automatically become a member of the Aspen Highlands Condominium Association, Inc. (the "Condominium Association") and shall be governed by the Condominium Association's articles of incorporation, bylaws, and rules and regulations from time to time in effect.

b. <u>Master Association</u>. Purchaser also acknowledges that as an Owner of a Residence Interest, Purchaser shall be subject to the provisions of the Master Declaration and shall automatically become a member of the owner's association formed pursuant to the Master Declaration (the "Master Association") and shall be governed by the Master Association, and its articles of incorporation, bylaws, and rules and regulations from time to time in effect. These documents require, among other things, payment of assessments to the Master Association independent of those to be paid to the Condominium Association (although such assessments of the Master Association may be made through the Condominium Association).

c. <u>Other Restrictions</u>. Purchaser also acknowledges that Purchaser shall be subject to all other instruments and documents recorded with the Clerk and Recorder of Pitkin County, Colorado, which concern and restrict the use, occupancy and maintenance of the Condominium.

d. <u>Residence Documents</u>. By signing this Agreement, Purchaser acknowledges receipt of the following documents (the "Residence Documents"):

(1) The Declaration for Aspen Highlands Condominiums and the articles of incorporation, bylaws and rules and regulations of the Condominium Association;

(2) The Ritz-Carlton Club Membership Program Reservation Procedures; and

(3) The Ritz-Carlton Club Membership Program Affiliation Agreement.

Upon request, Seller will provide to Purchaser copies of the Master Declaration and the Declaration for Aspen Highlands Village Parking Facility.

27.  Parking.

a. <u>Parking Spaces</u>. Purchaser and Seller acknowledge and agree that the Condominium Association will own a portion of Aspen Highlands Village Parking Facility (the "Parking Facility") consisting of one (1) parking space per Residence subject to the Fractional Ownership Plan allocated for the exclusive use of the Owners of Residence Interests and that the Condominium Association will have full right, power and authority to regulate all such parking spaces as determined by the board of directors of the Condominium Association including, without limitation, the right to assign or not assign exclusive parking spaces to certain units within the Condominium and the right to adopt rules and regulations governing the use of such parking consistent with the Parking Documents.

b. <u>Parking Documents</u>. The Parking Facility will be governed by the provisions of a declaration (the "Parking Declaration") and of the articles of incorporation, bylaws and rules and regulations from time to time in effect of the association (the "Parking Association") created pursuant to the Parking Declaration (all such documents, the "Parking Documents"). The Parking Documents will subject the parking spaces to reasonable regulation designed to protect all owners of such spaces and will not subject such owners to costs other than each owner's pro rata portion of the reasonable and customary costs of maintenance and operation of the parking facility and other normal and typical common ownership expenses.

Purchaser acknowledges and understands that Purchaser shall have no direct ownership interest in any parking nor any vote in matters of the Parking Association.

28. <u>Governing Law and Severability</u>. This Agreement shall be governed by, and shall be construed in accordance with the laws of the State of Colorado. The parties hereby waive any right they may have under any applicable law to a trial by jury with respect to any suit or legal action which may be commenced by or against the other concerning the interpretation, construction, validity, enforcement or performance of this Agreement or any other agreement or instrument executed in connection with this Agreement. In the event any such suit or legal action is commenced by either party, the other party hereby agrees, consents and submits to the personal jurisdiction of the District Court of Pitkin County, Colorado, with respect to such suit or legal action, and each party also hereby consents and submits to and agrees that venue in any such suit or legal action is proper in said court and county, and each party hereby waives any and all personal rights under applicable law or in equity to object to the jurisdiction and venue in said court and county. Such jurisdiction and venue shall be exclusive of any other jurisdiction and venue. Wherever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

Page 9

Bayer000336

29. <u>Insulation of Premises</u>. Seller and Purchaser hereby acknowledge pursuant to Section 460.16 of the Federal Trade Commission Regulations regarding labeling and advertising of home insulation, that the types, thicknesses and R-Values of insulation presently anticipated to be installed in the Residence containing the Residence Interest at the time of Closing shall be as set forth below:

| Location | Type of Insulation | Thickness | R-Value |
|---|---|---|---|
| Exterior walls | Fiberglass Batt. | 6 ¼ inch | R-19 |
|  | Closed Cell Fiberglass Reinforced Polyisocyanurate Board. | 1 ¼ inch | R-9 |
| Ceiling/Roof | Sprayed Polyurethane Foam. | 6 inch | R-38 |
|  | Sprayed Mineral Wool. | 1 ½ inch | R-5.6 |
| Floors | Thermal Batt. | 12 inch | R-38 |

The "R-Value" indicates the resistance of insulation to heat flow. The higher the R-Value, the greater the insulating power. Seller has not made its own independent determination of the R-value data provided to Seller by the insulation manufacturer.

30. <u>Notice Regarding Soils Condition</u>. Purchaser hereby acknowledges that Purchaser has reviewed a summary report of the soils conditions and any site recommendations applicable to the land to be developed as the Condominium. A copy of the summary report is available for further review at Seller's offices located at 419 East Hyman Avenue, Aspen, Colorado 81612.

31. <u>Taxing Districts</u>. SPECIAL TAXING DISTRICTS MAY BE SUBJECT TO GENERAL OBLIGATION INDEBTEDNESS THAT IS PAID BY REVENUES PRODUCED FROM ANNUAL TAX LEVIES ON THE TAXABLE PROPERTY WITHIN SUCH DISTRICTS. PROPERTY OWNERS IN SUCH DISTRICTS MAY BE PLACED AT RISK FOR INCREASED MILL LEVIES AND EXCESSIVE TAX BURDENS TO SUPPORT THE SERVICING OF SUCH DEBT WHERE CIRCUMSTANCES ARISE RESULTING IN THE INABILITY OF SUCH A DISTRICT TO DISCHARGE SUCH INDEBTEDNESS WITHOUT SUCH AN INCREASE IN MILL LEVIES. PURCHASERS SHOULD INVESTIGATE THE DEBT FINANCING REQUIREMENT OF THE AUTHORIZED GENERAL OBLIGATION INDEBTEDNESS OF SUCH DISTRICTS, EXISTING MILL LEVIES OF SUCH DISTRICT SERVICING SUCH INDEBTEDNESS, AND THE POTENTIAL FOR AN INCREASE IN SUCH LEVIES.

32. <u>Seller Contingency</u>. In the event that Seller does not have at least one-half of the Residence Interests in the Tourist Accommodation Units in Buildings 4 and 8 under contract on or before the date of issuance of a temporary certificate of occupancy or other evidence of substantial completion of the Condominium then Seller reserves the right at its option to cancel this Agreement and refund all monies paid together with interest earned thereon to Purchaser.

33. <u>Acknowledgement</u>. Purchaser acknowledges that Purchaser has reviewed and understands all documents referenced in this Agreement. Further, Purchaser acknowledges that Seller has advised Purchaser to obtain legal counsel to review all aspects of the transaction contemplated by this Agreement, and to represent Purchaser in connection with the examination of title and the Closing.

34. <u>Purchaser's Default</u>. Upon Purchaser's default or breach of any term or condition of this Agreement, the Seller shall have the right to declare the Agreement cancelled and may retain all sums paid hereunder by Purchaser as liquidated and agreed damages, and not as a penalty, and the parties hereto shall be relieved from all obligations hereunder. The parties agree that the damages that may result from a breach of this Agreement are uncertain and difficult to ascertain, and that the agreed upon amount is a reasonable estimate of probable damages. In connection with any litigation arising out of this Agreement the prevailing party shall be entitled to recover all costs incurred, including reasonable attorneys' fees, through and including all appellate levels. If pursuant to this section Seller seeks to receive all sums paid hereunder, the Seller shall provide an affidavit to Escrow Agent requesting release of the escrowed funds, with a copy sent to Purchaser. If Purchaser does not object to such notice within ten (10) days of receipt thereof, Escrow Agent shall release all sums paid hereunder to Seller.

35. <u>Seller's Default</u>. In the event Seller shall fail to satisfy its obligations as described herein, then Purchaser, at Purchaser's option, shall elect, with notice to Seller and Escrow Agent, to (a) rescind and terminate this Agreement and receive all deposit monies previously paid by Purchaser, or (b) seek other remedies then available to Purchaser, including without limitation, the right to specific performance by Seller hereunder. All notices herein required shall be in writing and shall be served on the parties at the address following their names. The mailing of a notice by registered or certified mail, return receipt requested, shall be sufficient notice. If pursuant to this section Purchaser seeks to receive all sums paid hereunder, the Purchaser shall provide an affidavit to Escrow Agent

Bayer000337

requesting release of the escrowed funds, with a copy sent to Seller. If Seller does not object to such notice within ten (10) days of receipt thereof, Escrow Agent shall release all sums paid hereunder to Purchaser.

36. Damage to Property. In the event the Residence shall be damaged by fire or other casualty prior to the time of closing in an amount of not more than ten percent (10%) of the total Purchase Price, or the common elements of the Condominium shall be materially damaged by fire or other casualty prior to the time of closing, Seller shall have the right to extend the closing date a reasonable period of time in order to repair such damage. If the damage is not repaired within such period of time or if the damage to the Residence exceeds ten percent (10%) of the total Purchase Price, this Agreement may be terminated at the option of Purchaser. Should Purchaser elect to carry out this Agreement despite such damage to the Residence or common elements, Purchaser shall *not* be entitled to a credit of the insurance proceeds payable to Seller resulting from such damage to the Property. Any such insurance proceeds shall be delivered to the owners' association. Should any fixture(s) or service(s) in the Residence fail or be damaged between the date of this Agreement and the date of closing, then Seller shall be liable for the repair and replacement of such fixture(s) or service(s) with a unit of similar size, age and quality, but only to the extent that the maintenance or replacement of such fixture or service is not the responsibility of the owners' association.

37. Miscellaneous.

a. The provisions of this Agreement shall extend to, bind and inure to the benefit of the parties hereto and their respective personal representatives, heirs, successors, and assigns.

b. Purchaser may not assign this Agreement without the prior written consent of Seller.

c. The provisions of this Agreement shall survive the Closing and the delivery of the special warranty deed. Seller shall, at or after the Closing, and without further consideration, execute, acknowledge and deliver to Purchaser such other documents and instruments, and take such other actions, as Purchaser shall reasonably request or as may be necessary to more effectively transfer to Purchaser the Residence Interest in accordance with this Agreement.

d. This Agreement shall be construed without regard to any presumption or other rule requiring construction against the party causing this Agreement to be drafted.

e. All terms and words used in this Agreement, regardless of the number or gender in which they are used, shall be deemed to include any other number and any other gender as the context may require.

f. In the event of any litigation between Seller and Purchaser concerning the subject matter of this Agreement, the prevailing party shall be paid by the non-prevailing party all its costs and expenses, including, without limitation, reasonable attorneys' fees and reasonable costs incurred incident to such litigation.

g. This Agreement may be executed in more than one counterpart, each of which shall be deemed an original, but all together shall be only one document. Signatures to this Agreement may be delivered by facsimile transmission which transmission copy shall be considered an original and shall be binding and enforceable against the parties.

h. The captions of this Agreement are inserted for convenience of reference only and do not define, describe or limit the scope or intent of this Agreement or any term hereof.

i. If the time period for the performance of any act called for under this Agreement expires on a Saturday, Sunday or any other day on which banking institutions in Colorado are authorized by law or executive order to close (a "Legal Holiday"), the act in question may be performed on the next succeeding day that is not a Saturday, Sunday, or Legal Holiday.

38. Rescission. In accordance with C.R.S. section 12-61-405(1)(i) and Section 5-190-050(Q) of the Pitkin County Land Use Code, the Purchaser has the right to rescind the agreement with or without cause and at the Purchaser's sole option, by telegram, mail or hand delivery at any time within ten (10) calendar days following the date of the signing of this agreement by both parties. Such request shall be considered made if by mail when postmarked, and if by telegram when filed for transmission, and if by hand delivery, when delivered to the Seller's place of business. This right of rescission cannot be waived.

If Purchaser decides to rescind this Agreement, Purchaser must notify the Seller in writing of his or her intent to cancel within ten (10) calendar days following the date of the signing of this Agreement by both parties. The notice of recission must be delivered to Seller at 419 East Hyman Avenue, Aspen, Colorado 81612. Upon such right of rescission having been exercised, the Seller shall refund all payments made by Purchaser within seven (7) days after written notice has been delivered to the Seller, or within three (3) days after receipt of funds from the Purchaser's cleared check, whichever is later. Any interest generated by the funds deposited in the escrow account shall be paid to Seller.

Bayer000338

Jun. 7. 2000 11:56AM                                              No.1806   P. 5

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the dates set forth below.

**PURCHASER(S)**

_____
JEFFREY A. BAYER
Dated: 6/7/00

_____
GAIL L. BAYER
Dated: 6/7/00

Dated: _____

Dated: _____

**SELLER**

THE RITZ-CARLTON DEVELOPMENT COMPANY, INC.

By its Authorized Agent

By: _____
Name: JEFF SISK
Date Accepted: 6-10-00

**BROKER:**

THE RITZ-CARLTON SALES COMPANY, INC.

By: Susan Shoaf
Name: Susan Shoaf
Membership Executive
Dated: 6-10-00
Seller's Agent

**ACKNOWLEDGMENT**

The undersigned hereby acknowledges receipt of this Purchase Contract and a deposit in the amount of $18,000 ("Deposit"), and agrees to hold said Purchase Contract and Deposit in accordance with the terms above.

**ESCROW AGENT:**

THE RITZ-CARLTON SALES COMPANY, INC.

By: Sheila Blackwell
Name: Sheila Blackwell
Authorized Officer
Dated: 6/10/00

The undersigned hereby authorize SELLER to complete this Purchase Contract by inserting the appropriate date and document recording information.

Purchaser _____   Dated: 6/7/00

RA Purch Contract 3-27-00

Page 12

**Bayer000339**