# EXHIBIT 6

```
 1    RCHFU, LLC,  et al.,
 2        Plaintiffs,          United States District Court
                                District of Colorado
 3    v.                       No.  1:16-cv-09390
 4
      MARRIOTT VACATIONS WORLDWIDE
 5    CORPORATION, et al.,
          Defendants,
 6    _____/
      REISER, et al.,
 7        Plaintiffs,
                                Eastern District of California
 8    v.                       No. 2:16-cv-00237-MCE-CKD
 9
      MARRIOTT VACATIONS WORLDWIDE
10    CORPORATION, et al,
          Defendants,
11    _____/
      PETRICK, et al.,
12        Plaintiffs,
13                              San Francisco County
      vs.                      No. CGC-15-54897
14
      MARRIOTT VACATION WORLDWIDE
15    CORPORATION, et al.,
16        Defendants.
      _____/
17
18         VIDEOTAPED DEPOSITION OF STEPHANIE SOBECK
19        taken at 450 South Orange Avenue, Suite 650,
          Orlando, Florida, commencing between 9:11 a.m.
20        - 6:20 p.m. on Thursday November 16, 2017
21        before Lisa Gerlach, Court Reporter, Notary
22        Public in and for the State of Florida at Large.
23
24    Job No. 2733702
25    Pages 1 - 374
```

Page 1

1   what year?
2        A.   It was around -- around 2009.
3        Q.   Who do you report to in asset management?
4        A.   I report to Lee Cunningham.
5        Q.   What are your responsibilities as an asset
6   manager?
7        A.   I'm responsible for the overall projects,
8   working with all the different disciplines within the
9   company to make sure we get the best outcome for each
10  of the different projects and the associations.
11       Q.   So are you looking out for the best interests
12  of the developer, via MORI, or are you looking out for
13  the best interests of the association?  Or what is
14  your -- who is your stakeholder in terms of your
15  responsibilities in overall project management?
16            MR. SELLINGER:  Objection to form.
17       A.   The -- it's different.  Marriott Vacation
18  Club and Ritz-Carlton are different.
19            So in Marriott Vacation Club, it's -- we
20  focus more, I would say, on developer issues; but
21  there's plenty of times where we work on -- through
22  association challenges or issues with the sites that
23  there aren't specific developer issues.  We really
24  look at the best interests, the best business
25  decisions for the overall property.

Page 26

1       A.  I don't remember.
2       Q.  I know you and Lee Cunningham had a board
3   meeting in April of 2013.  True?
4       A.  Yes.
5       Q.  When you signed the second amendment to the
6   affiliation, was that a different time that you were
7   in Aspen with Lee Cunningham and --
8       A.  I don't believe --
9           MR. SELLINGER:  Hold on.  Objection to
10      form.
11      A.  I don't believe he was at that meeting.
12  You're talking about two different meetings.
13  BY MR. REISER:
14      Q.  Yeah.  Let me actually show you the -- this
15  has been previously marked as Exhibit 1434.  Let me
16  show the witness.
17      A.  I'm not sure.  I'm sorry.  I'm really not
18  sure if this is the one.  I was thinking we were at
19  the meeting -- because there was one where we were
20  actually at the meeting.  He wanted it signed -- that
21  Randy wanted it signed there.  I apologize.  I don't
22  remember if it was this one or not.
23          This was actually the -- oh, yeah -- because
24  this was in conjunction with the amendment to the
25  management agreement, so this was different.

Page 36

```
 1      Club with Ritz-Carlton Destination Club?
 2           A.   Yes.  The developer wouldn't have had the
 3      ability to consent to them being affiliated.
 4           Q.   What about participate?  Do you agree that
 5      this sentence precluded the developer from
 6      participating in the program manager's decision to
 7      affiliate?
 8           A.   That's --
 9                MR. SELLINGER:  Objection to form.
10           A.   That's -- I mean, it says participate.
11      BY MR. REISER:
12           Q.   So you would agree that they're not allowed
13      to participate in the decision of Cobalt.  True?
14                MR. SELLINGER:  Objection to form.
15           A.   I'm sorry.  I'm having a hard time with --
16      what do you mean?  I feel like you're asking me to
17      read the words and I do see the words, but, I guess...
18      BY MR. REISER:
19           Q.   This is your document drafted by Marriott
20      Vacation Club International, so they're your words,
21      actually --
22           A.   They're not my words, actually.
23           Q.   Your company's words.  True?
24           A.   The company's words, yes.
25           Q.   What do you think "participate" means here as
```

Page 45

```
 1        A.  Are we talking about Jupiter or St. Thomas?
 2   You're jumping around.
 3   BY MR. REISER:
 4        Q.  Did I say Jupiter?  I'm sorry if I did.
 5   Okay.  Sorry about that.
 6            Would you agree that the members association
 7   at St. Thomas participated in and consented to the
 8   Cobalt decision to affiliate with Marriott Vacation
 9   Club?
10        A.  Cobalt --
11            MR. SELLINGER:  Objection to form.
12        A.  -- had the ultimate decision to affiliate.
13   BY MR. REISER:
14        Q.  Did they participate?  Did the member
15   association participate in that decision?
16        A.  My perception of this is that they are --
17   make the ultimate decision -- noted, they did not make
18   the ultimate decision.  Cobalt made the ultimate
19   decision.
20        Q.  Cobalt wouldn't do it unless they got
21   approval by the members.  True?
22            MR. SELLINGER:  Objection to form.
23        A.  Cobalt wouldn't -- Cobalt -- I can't.  I
24   don't -- you lost me there.  You're saying Cobalt
25   wouldn't do it unless --
```

Page 59

```
 1    BY MR. REISER:
 2        Q.   Cobalt wouldn't affiliate unless the
 3    declaration was changed so that the --
 4        A.   The company --
 5             MR. SELLINGER:  Hold on a minute.  Finish
 6        the question.  Give me a chance to object and
 7        then answer.  Go ahead.  I don't want to
 8        interrupt you.
 9             MR. REISER:  Thank you.  You know what?
10        I'm done with this line of questioning.
11             MR. MARX:  We can end the confidential
12        designation in that case.
13             MR. REISER:  I'm not agreeing that
14        anything is confidential at this point, but
15        we can think about that later.  I'll have to
16        see your confidentiality agreement and
17        consider whether it's even binding on us.
18             MR. MARX:  Understood, Mike.  I just have
19        to preserve it.  We can -- under the terms of
20        the order, it's been designated --
21             MR. REISER:  Got you.
22    BY MR. REISER:
23        Q.   Let me show you what has been previously
24    marked as exhibits.
25             You're aware, are you not, that the three
```

Page 60

```
 1    clubs we're here on today -- Aspen, San Francisco, and
 2    Tahoe -- all signed -- or their board --
 3    representative of the board all signed an
 4    acknowledgement of and joinder to affiliation
 5    agreement between the Lion & Crown and Marriott
 6    Resorts Travel Company?
 7         A.   I am.
 8         Q.   What is the Marriott Resorts Travel Company?
 9         A.   I actually don't know what the Marriott
10    Resorts Travel Company is.
11         Q.   Did you have anything to do with preparing
12    these acknowledgement of and joinder to affiliation
13    agreement?
14         A.   They're done by our law department.
15         Q.   Let me show you Exhibit 1392.
16              By the way, is there a law firm that prepared
17    these acknowledgement of and joinders or is it
18    in-house?
19         A.   I don't know.
20         Q.   So when you say that you assume it was
21    prepared by lawyers, you don't know whether it was
22    in-house or a law firm?
23         A.   No.  Our law department would -- I don't know
24    if they outsource it or not.
25         Q.   So what was the purpose of having the board
```

Page 61

```
 1    responsibility.  She certainly does it and
 2    communicates with us on it, but I don't know if it's
 3    part of her job responsibilities.  I appreciate her
 4    doing that, though.
 5         Q.  You were aware that the chatter on Facebook
 6    was extremely negative in reaction to the proposal by
 7    Eveleen Babich on July 17, 2012?
 8             MR. SELLINGER:  Objection to form.
 9         A.  I was aware there were some negative comments
10    made on Facebook after the letter.
11    BY MR. REISER:
12         Q.  What about on the TUG user group?
13         A.  I believe there were some comments there as
14    well.
15         Q.  And they were as well negative; do you
16    remember?
17         A.  I believe there were some concerned members,
18    yes, who were posting them.
19         Q.  And Juan Pablo Cappello was one of those
20    concerned members?
21         A.  It appears that he was.
22         Q.  Do you remember that gentleman was a partner
23    at the time at Greenberg Traurig law firm in Miami?
24         A.  Juan Pablo Cappello?
25         Q.  Yes.
```

Page 96

```
1        Q.   So you were involved in the Hoyt litigation?
2        A.   I was.
3        Q.   And you were deposed in that case?
4        A.   I was.
5        Q.   Did you give any testimony in court?
6        A.   No.
7        Q.   Deposed something like this?
8        A.   Yes.  Right in this room.
9        Q.   Right in this room.  All right.
10            MR. MARX:  I'll reserve judgment as to
11       the lawyers in that case as compared to you,
12       Mr. Ferguson.
13            MR. FERGUSON:  Thank you.  I don't know
14       who those guys are.
15            MR. FERGUSON:  That was either a great
16       compliment or a terrible --
17            THE WITNESS:  I don't know.  I'm confused
18       too.
19            MR. REISER:  You never know with Ian.
20   BY MR. FERGUSON:
21       Q.   How long did you testify in that case?  Was
22   it all day, a half a day, an hour; do you recall?
23       A.   It was probably most of the day.
24       Q.   And do you recall anybody else from Marriott
25   Vacations Worldwide being deposed during the week
```

Page 166

```
 1         Q.  When you said you didn't read this, had you
 2    ever seen this document before?
 3         A.  I have not seen this before.
 4         Q.  It says at the bottom, "We anticipate that we
 5    will receive calls from members regarding this
 6    announcement, both Aspen Club members and others, who
 7    learn about the letter.  Please address any questions
 8    you receive as follows."
 9             They tell the folks words -- this is the
10    bottom of the page -- there is an announcement to the
11    Aspen Club members -- from -- this is an announcement
12    to the Aspen Club members from their board of
13    directors.  "We do not have any additional information
14    at this time.  If our members ask about the
15    affiliation in general, please advise them we do not
16    have any additional information at this time."
17             That's not exactly accurate, is it?
18             MR. SELLINGER:  Objection to form.
19    BY MR. FERGUSON:
20         Q.  That this is an announcement from the board
21    and we do not have any additional information at the
22    time.  I mean, you were behind the scenes and working
23    with Verrechia to get a vote going; right -- the Aspen
24    Highlands vote project?
25             MR. SELLINGER:  Objection to form.
```

Page 197

1    A.  Yeah.  I guess what this is saying -- don't
2    forget -- so Eveleen -- if Eveleen is the one that did
3    this -- I don't know if she did or not, but somebody
4    out running the member services team.  She's talking
5    to her ladies and gentlemen, so she's talking to the
6    people on the phone with the members.
7         So we would not want them in any way
8    speculating about any of this.  And, truly, Salt Lake
9    City, they would be the last ones to get information
10   about this.  So, you know, I'm actually happy to say
11   that she says she doesn't have any additional
12   information, because we wouldn't want any of those
13   member services associates talking to or speculating
14   or sharing any information with members who were
15   calling in and asking questions.
16   BY MR. FERGUSON:
17        Q.  At the bottom of the page of Exhibit 1183 --
18   bottom of page two -- it says, "What's not to be
19   shared with our members:"
20            Do you see that?
21        A.  I do.
22        Q.  It says, "We've been told by corporate and
23   our legal team that we should have more information to
24   share with our members about the affiliation shortly
25   after the Aspen and Bachelor Gulch board meetings."

Page 198

```
 1    who I talk to.
 2         Q.   And you also -- internally, you said, "We
 3    have been told that the board hopes to forward
 4    information about the vote within the next 30 days;
 5    and, as of yet, they do not know what process will be
 6    used to facilitate the voting process.  If the member
 7    has additional question, they are welcome to contact a
 8    member of the board directly."
 9              That didn't happen, did it?  They weren't
10    told anything in 30 days.
11         A.   They weren't.  It was a very long process
12    that we went through with the board.
13         Q.   And it wasn't --
14              MR. SELLINGER:  Hold on a minute.
15         A.   The board -- no -- because the board
16    started -- we started communicating about the letters.
17    They would go away for a while, and they were busy
18    with other things, I assume.  I don't know what -- I
19    would continue to kind of push them for updates or
20    feedback on communication that we had sent or drafted,
21    and then they would -- that would stop.
22              Then it actually got to a point, sometime end
23    of June, where I just didn't hear from them for a
24    couple months.  And then they came back in September
25    and were ready to go.  And I assume there were a lot
```

Page 206

```
 1    of other things going on for them.  It was a long
 2    process.
 3    BY MR. FERGUSON:
 4         Q.  It was a long process.  I take it, you would
 5    say it's all the board's fault?
 6         A.  No, I don't think it's the board's fault.  I
 7    was -- we were certainly drafting communication.  It
 8    was being shared back and forth.  But they had other
 9    priorities going on that they must have been taking --
10    must have been working on.
11              Truly, there was no -- for us, there was
12    really no benefit that was coming from this.  We were
13    just allowing this opportunity out to members to
14    exchange.
15              So we were taking the calls, where members
16    were interested in exchanging and wanting to do this
17    now that they knew about it.  We couldn't do anything
18    about it, which was frustrating for them, because we
19    had to either move forward with it or not.
20              But, to us, there was no benefit that was
21    coming to the company for this exchange opportunity.
22    It was really more just offering vacation options for
23    the members.
24         Q.  No benefit at all?
25         A.  For us?  For the exchange, no.
```

Page 207