# EXHIBIT A

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                    DISTRICT OF COLORADO
 3     _____
 4     Civil Action No.:  1:16-cv-01301-PAB-GPG
 5     RCHFU, LLC, et al.
 6     Plaintiffs,
 7     v
 8     MARRIOTT VACATIONS WORLDWIDE CORPORATION, et al.
 9     Defendants.
10     _____
11
12              VIDEO DEPOSITION OF ROBERT HARRIS
13     taken before Shawn M. Breimayer, Certified Shorthand Reporter,
       at the office Rehmann, 4086 Legacy Parkway, Lansing, MI,
14     Friday, August 2, 2019, commencing at 10:03 a.m., pursuant to
       notice.
15     APPEARANCES:
16     FOR THE PLAINTIFF:   Matthew C. Ferguson
17                          119 South Spring, Suite 201
                            Aspen, CO 81611
18                          (970) 925-6288
19     FOR THE DEFENDANT:   Jessica Black
       ASPEN CONDOMINIUM    Hogan Lovells US LLP
20     ASSOCIATION          1200 Seventeenth Street, Suite 1500
                            Denver, CO 80202
21     FOR THE DEFENDANT:   Roger Kaplan
22     MARRIOTT VACATIONS   Greenberg Kaplan
       WORLDWIDE            500 Campus Drive, Suite 400
23                          Florham Park, NJ 07932
24     Reported by:  Shawn M. Breimayer, CSR-6888
25     PAGES 1 - 110
```

Page 1

```
 1            some inventory was to get this affiliation agreement in
 2            place and have people use it, that opportunity to give
 3            them exchange opportunity, exchange inventory?
 4       A.   I don't have that acknowledge.
 5                 MS. LIVINGSTON:  Object to form.
 6   BY MR. FERGUSON:
 7       Q.   Okay.
 8       A.   I don't know what was in their mind.
 9       Q.   Okay.  And had you known about all, and we're not going
10            to go through this, it's a nineteen page single spaced
11            document, which, which was negotiated on both sides by
12            Marriott and Marriott, because they own Lion & Crown
13            and Ritz and they own Marriott and Marriott Vacations
14            Worldwide points that's lawyered up here.  If you had
15            known all these terms back when it was acknowledged and
16            joined without having seen it, would you have agreed to
17            this agreement as it was, would you have agreed to have
18            joined this agreement as it was presently drafted?
19       A.   I don't like when you use the term all, so I'm going to
20            have to say I don't know, because you say all.
21       Q.   Mm-hm.
22       A.   Some of the terms I might find, if I read it all, that
23            I would like.
24       Q.   Okay.
25       A.   There are certain ones that I wouldn't have signed
```

Page 88

```
 1            because of termination and marketing.  Marketing,
 2            what's the best way to put it, other than -- if I put
 3            it back into MVC and then they use that for a marketing
 4            opportunity for somebody to come stay like I did when
 5            it was Ritz, I don't really object to that if their
 6            using their, of what becomes theirs.  But it was my
 7            understanding it would be, as I explained to you
 8            earlier, one for one and that's.
 9      Q.    Okay.
10      A.    So, but as far as the -- like that one is not the end
11            of the world for me, but the ability to not terminate I
12            found something very strong, you know, I may have
13            gotten over that one because of the fact that I or you
14            or anyone else who is an owner could get out by just
15            not putting time in.  But the fact that a majority of
16            our owners appear to be using that program, as far as
17            joining it, the numbers I last saw when I was on the
18            board I have no idea where it stands today would tell
19            me that our members liked it.  But I would like -- any
20            time things are going to affect me I would like to have
21            some control over time.
22      Q.    And there was no control over time?
23      A.    There was none that I have seen from what you have
24            shown me today.
25      Q.    All right.  And are you saying you don't object to the
```

Page 89

```
 1           fact that Marriott can obtain exchange inventory and
 2           use it to market its point program for any reason?
 3      A.   I don't like that they would be using that as their,
 4           you know, I'm putting my week in and then they used it
 5           to market their program, but you know.
 6      Q.   Because it's a private club, right?
 7      A.   Should be.
 8      Q.   All right.  And it's being used for commercial purpose,
 9           you, you, you, didn't understand when Mr. Mercer signed
10           this that they were, they could take inventory from
11           your friend, because you haven't put it in that you've
12           known for many years they can take that inventory and
13           they could do say, Marriott can do any, we can do
14           whatever we want with this.  We can market it.  We want
15           to sell, we want to do a sales push to sell Comfort Inn
16           points and we're going to give the top sales brokers
17           and their customers, you know, ten rooms here during
18           Christmas.  If you had no control of that, was that
19           something you had contemplated they could do?
20      A.   Well, I knew it was fee simple, therefore, any of those
21           owners who put that in could have done the same thing.
22           I could have gone out on the streets and given to
23           homeless people and I knew that.
24      Q.   I understand that.
25      A.   I just look at things like -- I'm a very big proponent,
```

Page 90

```
 1              not because of any of this, in private property rights.
 2              And I think that when looked at this, not this
 3              agreement, because I never saw it and I don't find it
 4              to be what I thought we had.
 5         Q.   Mm-hm.
 6         A.   But at the same time, I do believe in private property
 7              rights and that, you know, I could do whatever I wanted
 8              with my weeks, so therefore, if I gave to it Marriott
 9              and got points, you know, who they put in I could not
10              control.  And I knew that when I went into it.
11         Q.   Okay.
12         A.   But.
13         Q.   So the termination clause is the thing that bothers you
14              the most?
15         A.   It probably is probably the single thing.  I would have
16              to go back and look at them all again.  But that would
17              certainly be, the termination clause certainly bothers
18              me.
19                   MR. FERGUSON:  Okay, that's all I have.  Go
20              ahead, Roger.
21                   MR. KAPLAN:  Good afternoon, Mr. Harris.
22                   MS. LIVINGSTON:  Hold on a second, Roger.
23                   THE WITNESS:  I can hear you.
24                   MR. KAPLAN:  I can hear you.
25                   MR. FERGUSON:  Mr. Harris, I'm Roger Kaplan with
```

Page 91

```
 1            the firm Greenberg Traurig.  We represent the Marriott
 2            defendants.  So let me take a few minutes just to go
 3            over some of your testimony here today.
 4                         CROSS-EXAMINATION
 5   BY MR. KAPLAN:
 6      Q.    First of all, can you pull out Exhibit 1005, which I
 7            think is --
 8      A.    Yes.
 9      Q.    -- that exhibit in front of you.  And let me
10            specifically refer you to the page in which you say
11            wow, we looked at San Francisco, it's so nice.  Do you
12            see that?
13      A.    Yes, I read it earlier.  Which page is that on?  I got
14            it.
15      Q.    When you say wow, we looked at San Francisco, it's so
16            nice, amazing Marriott would let the brand deteriorate
17            so badly, however, if you look at the number of brands
18            they have now it's staggering.  Now, you were basing
19            that statement solely on the e-mail that Mr. Schneider
20            had send to you, correct, you remember reacting to his?
21      A.    Number one was my own statement of use.  Second
22            sentence would be reaction.  Third would be my
23            experience with seeing the number of brands Marriott
24            has opened and acquired over the years.
25      Q.    Okay.
```

Page 92

```
 1    A.   So I can't testify as to one single statement
 2         acquire -- being for everything.
 3    Q.   Okay.  So the wow, we love San Francisco was so nice
 4         was based upon your own personal observation?
 5    A.   Personal experience in staying there.
 6    Q.   Right, okay.  Your statement amazing Marriott would let
 7         the brand deteriorate so badly, you were reacting to
 8         Mr. Schneider's statement --
 9    A.   Correct.
10    Q.   -- as to what he thought, correct?
11    A.   Correct, that's what I stated.
12    Q.   You were reacting to his use there?
13    A.   Correct.
14    Q.   Correct.  You don't know whether what he said was true
15         or not true, correct?
16    A.   Absolutely I don't.
17    Q.   Okay.  Now, if you go to the front e-mail, which we are
18         going to 10?
19    A.   Mm-hm.
20    Q.   And you were asked questions regarding that you have
21         little trust, for example, as to how much access MVC
22         would have to Aspen at that point in time?
23              MS. LIVINGSTON:  Object to form.
24              THE WITNESS:  I state that I, I have little
25         trust after reading all of this that I had little
```

Page 93

```
 1              trust.
 2   BY MR. KAPLAN:
 3       Q.  Okay.  So you had, after you read Mr. Schneider's
 4           e-mail, your reaction was you had, it caused you to
 5           have little trust, correct?
 6       A.  That's, for that sentence, yes.
 7       Q.  Okay.  So again, you were reacting to Mr. Schneider's
 8           e-mail.  You don't know if it was true or not true,
 9           correct?
10       A.  Correct, as I stated earlier.
11       Q.  Okay.  Now, in fact, your knowledge of how the
12           affiliation works is that Marriott Vacation Club
13           Destinations and MVC members can only have access to
14           Aspen Highlands to the extent an owner at Aspen
15           Highlands deposits a week with MVC, correct?
16       A.  That's the reason.
17       Q.  Is that --
18       A.  That's the reason I was in favor of going forward with
19           an agreement.
20       Q.  So if you have, during the course of one year, one
21           member of Aspen Highlands depositing one week there
22           would be one week available to MVC members, that's your
23           understanding?
24       A.  Technically, yes.  They could gain access through
25           renting also and be also be a member, so the way you
```

Page 94

```
 1            Vacation Club had absolute discretion to control its

 2            own program?  That's what you testified to about an

 3            hour ago?

 4       A.   Yes.

 5       Q.   Okay.  And having that absolute control that you could

 6            determine how to use any weeks deposited by Aspen

 7            Highlands, correct?

 8       A.   Correct.

 9       Q.   It could change their rules, and they're free to change

10            their rules as to how Marriott Vacation Club members

11            use and access points?

12       A.   Correct.

13       Q.   Okay.  So I'd like now to turn to the memorandum of

14            understanding, which has been marked as 7010.  And you

15            also have Exhibit 1004 in front of you, which was an

16            April 5, 2013 e-mail?

17                 MS. LIVINGSTON:  Just a minute Roger, we're

18            getting it.

19                 MR. FERGUSON:  While they're looking at we show

20            there's five people on the conference call, so whoever

21            you guys are, can you tell us who you are?

22                 MR. KAPLAN:  Okay, anybody respond?

23                 MS. LIVINGSTON:  Not that we heard.

24     BY MR. KAPLAN:

25       Q.   Mr. Harris, looking at the April 5, 2013 e-mail?
```

Page 96

```
 1    A.   Yes.
 2    Q.   And I don't have it in front of me, but why don't you
 3         read into the record, who is that from and who is that
 4         to?
 5    A.   It's a chain e-mail between a lot of people.  I mean,
 6         if you want me to go through, I'm happy to go through
 7         all of them.
 8    Q.   No.
 9    A.   You want the original e-mail?
10    Q.   The e-mail that I believe was Mr. Mercer that said
11         should we push one more time in the ability to
12         terminate, you see that?
13    A.   Yes.
14    Q.   Okay.  And who is that e-mail from and to?
15    A.   Tyler Oliver was, was who it was from to Randy Mercer
16         and copied myself, and doesn't look like anybody else.
17         So it was just be between the three of us at that point
18         on this e-mail.  Wait, two, yeah, Tyler Oliver, it was
19         Tyler Oliver, myself, and Mercer.
20    Q.   Okay.  And he's saying, and can you just identify who
21         Mr. Oliver is?
22    A.   He was a board member at the time.
23    Q.   Okay.  So, Mr. Oliver, is a board member, is saying
24         should we push one more time on ability to terminate,
25         correct?
```

Page 97

```
 1      A.   Correct.
 2      Q.   And that's the subject that has been raised previously,
 3           correct?
 4      A.   Yes, to the best of my knowledge, yes.
 5      Q.   Okay.  So because he's saying push one more time,
 6           correct?
 7      A.   Correct.
 8      Q.   So, at this point in time, on the memorandum of
 9           understanding the board had already asked Marriott for
10           the ability to terminate, correct?
11      A.   Correct.
12      Q.   And Marriott had denied that request, correct?
13      A.   It would appear so.  I don't know if they addressed it,
14           so I have no way of knowing they denied.
15      Q.   Okay.  But certainly, from the tenor of this e-mail it
16           looks like we need to push one more time on the ability
17           to terminate would certainly would suggest they tried
18           and they didn't succeed previously, correct?
19      A.   That would be a better way to put it, yes.
20      Q.   Okay.  And do you know if they pushed one more time on
21           the ability to terminate?
22      A.   I do not know.
23      Q.   You were never informed?
24      A.   I can't say at this point.  It was too far back.
25      Q.   Okay.  Do you know if you spoke to Mr. Oliver and Mr.
```

Page 98

```
 1            Mercer about pushing one more time on the ability to
 2            terminate?
 3       A.   I might have.  Mr. Mercer and I, you know, from time to
 4            time would pick up the phone and call each other about
 5            something, but that was more in later years.  Because
 6            this is still on April 5th, which was late at night,
 7            apparently, and, in my world late at night.
 8       Q.   But this was twelve days before the actual signing of
 9            the memorandum of understanding, correct?
10       A.   That would be my understanding, yes.
11       Q.   Okay.  And we've already gone through this, and the
12            memorandum of understanding was marked as 7010 does not
13            have any termination terms, correct?
14       A.   Correct.
15       Q.   It has no terms, you agree, with me it's indefinitely,
16            correct?
17       A.   Yes.
18                 MR. FERGUSON:  Objection.  Form.
19   BY MR. KAPLAN:
20       Q.   All right.  Mr. Harris, you're a sophisticated
21            businessman, aren't you?
22       A.   It all depends upon somebody's definition.
23       Q.   Okay.  Well, you list your background as you, you have
24            a degree?
25       A.   Yes.
```

Page 99

```
 1    Q.   You have an advanced degree?
 2    A.   No.  By that, you mean graduate like an MBA?
 3    Q.   Yes.
 4    A.   No.
 5    Q.   You were a CPA?
 6    A.   I'm a CPA.
 7    Q.   You've worked at an accounting firm?
 8    A.   Yes.
 9    Q.   Have you participated in negotiations with
10         transactions?
11    A.   Yes.
12    Q.   And has it been your experience that sometimes you get
13         what you want and sometimes you don't?
14    A.   It's always about coming to terms to keep everybody
15         happy, usually.
16    Q.   Right.  And sometimes you do a deal even though you
17         don't get what you want, right?
18    A.   Correct.
19    Q.   So you wanted a termination clause in the memorandum of
20         understanding, you asked for it, you didn't receive it,
21         but the board, nevertheless, agreed to the memorandum
22         of understanding, correct?
23    A.   That is correct.
24    Q.   They made a determination that even without the
25         termination clause they would agree to the memorandum
```

Page 100

```
 1              of understanding, correct?
 2         A.   Correct.
 3         Q.   And you regarded it, you testified before, that as
 4              between the three documents we've talked about today,
 5              the acknowledgement and joinder, the 2013 affiliation
 6              agreement, and the memorandum of understanding, you
 7              considered the memorandum of understanding to be the
 8              operative document with respect to the association,
 9              correct?
10         A.   Correct.
11         Q.   Okay.  So the operative document with respect to the
12              association would be approved and signed by the
13              association does not have a termination clause, even
14              though the association had asked for it, correct?
15         A.   Correct.
16         Q.   Okay.  Now, in the memorandum of, the memorandum of
17              understanding the association is agreeing that its
18              members can exchange their weeks into the Marriott
19              Vacation Club Destination Exchange Program through Lion
20              & Crown Exchange Program, correct?
21         A.   Correct.
22         Q.   Okay.  Now, is there any limitation whatsoever on what
23              Marriott Vacation Club can do with those weeks in the
24              memorandum of understanding?
25         A.   I believe 7C would be as close as I can see right now.
```

Page 101

```
 1              It says they can't use, they were not able to use space
 2         available time.
 3    Q.   Well, okay, but I'm talking about with regard to weeks
 4         exchanged into the MVCD program?
 5    A.   No, they could, always knew they -- my understanding
 6         has always been, and still is, that they could only use
 7         that week.  They means Marriott could use that week for
 8         what -- for their points people, we'll call them, or
 9         their program.
10    Q.   Right.  Is there any limitation in this memorandum of
11         understanding in Marriott using those weeks deposited
12         by members for marketing or promotional activities?
13    A.   Not that I see at this point.
14    Q.   Okay.  Is there any limitation in the memorandum of
15         understanding in Marriott being able to alter the rules
16         of its MVCD program?
17    A.   I'm sorry, could you repeat?  I didn't catch the whole
18         question.  It broke up towards the end.
19              MR. KAPLAN:  The court reporter can read it
20         back.
21           (Court Reporter Read Question Back)
22              THE WITNESS:  Okay, I thought you said deed
23         program.  That's why I was questioning, okay.  I don't
24         believe there is.
25    BY MR. KAPLAN:
```

Page 102

```
 1     Q.   Okay.  And so, you understood that Marriott had
 2          absolute discretion to control its own programs and
 3          there's nothing in the memorandum of understanding,
 4          which you consider to be the operative document, which
 5          would limit that absolute discretion, correct?
 6     A.   Correct.
 7               MS. LIVINGSTON:  Roger, do you have a sense for
 8          how much longer you have?
 9               MR. KAPLAN:  No, I, I.
10               THE WITNESS:  Because I was 20 over what I was
11          deposed, subpoenaed for.
12               MR. KAPLAN:  Well, we took a break.
13               THE WITNESS:  Well, I'll give you 5 for the
14          break, which I would consider part of your two hours,
15          because breaks are normal in depos.  I would also tell
16          you that I would give you 5 for technology issues.  But
17          I'm at 21 now.  I'm going to terminate very quickly if
18          you don't have something.
19   BY MR. KAPLAN:
20     Q.   Mr. Harris, have you, over the past three years,
21          noticed any difference in the quality of the services
22          at the Aspen Highlands?
23     A.   No, the quality of services at Aspen Highlands remains
24          identical to all times that Nicholas has been there.
25     Q.   Have you observed any degrading of the prices of Ritz
```

Page 103