# EXHIBIT B

MICHAEL J. REISER, ESQ. (Bar No. 133621)
LILIA BULGUCHEVA, ESQ. (Bar. No. 291374)
REISER LAW, P.C.
1475 N. Broadway, Suite 300
Walnut Creek, California 94596
Telephone: (925) 256-0400
Facsimile: (925) 476-0304
Email: michael@reiserlaw.com
Email: lilia@reiserlaw.com

TYLER MEADE, ESQ. (Bar No. 160838)
SAMUEL FERGUSON, ESQ. (Bar No. 270957)
THE MEADE FIRM P.C.
1816 Fifth Street
Berkeley, California 94710
Telephone: (510) 843-3670
Facsimile: (510) 843-3679
Email: tyler@meadefirm.com
Email: sam@meadefirm.com

Attorneys for Plaintiffs

SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SAN FRANCISCO

| | |
|---|---|
| WILLIAM P. PETRICK and SHARON F. PETRICK, individually and as Trustees of the William and Sharon Petrick Revocable Trust dated August 20, 2002; HOWARD BAUTSCH and BRUCE SCHLUTER; BAYOU ST. JOHN PROPERTIES, LLC, a Louisiana limited liability company; NORMAN BIKALES and ANN BIKALES, individually and as Trustees of the Bikales Family Trust UAD October 31, 2006; GEORGE BOEDECKER, individually and as Trustee of the George B. Boedecker Trust; BRAD STOFFER; JEFFREY BOHN and BRENDA BOHN, individually and as Trustees of the Jeffrey R. and Brenda Bohn 2005 Revocable Trust; FRANK J. BONETTO and JAMIE S. BONETTO, individually and as Trustees of the Bonetto Trust Agreement dated | CASE NO. CGC 15-545987 <br><br> **FOURTH AMENDED COMPLAINT FOR:** <br><br> **BREACH OF FIDUCIARY DUTY;** <br><br> **AIDING AND ABETTING;** <br><br> **CONSTRUCTIVE FRAUD;** <br><br> **PROMISSORY FRAUD;** <br><br> **FOR AN ACCOUNTING;** <br><br> **BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING;** |

-1-

October 28, 1991 and the 2014 Amended and Restated Bonetto Trust, dated September 26, 2014; STEPHEN BOWDEN and PAMELA BOWDEN; JAMES E. BRIGGS and IRMA T. BRIGGS, individually and as Trustees of the Briggs Family Trust dated December 18, 2004; ROBERT BRUNSWICK and KATHLEEN BRUNSWICK, individually and as Trustees of the Brunswick Revocable Family Trust dated December 16, 1998 and amended April 2, 2008; DAN V. LACKEY, individually and as Trustee of the 2004 Danny V. Lackey Living Trust; LACKEY INVESTMENTS, LLC, a North Carolina limited liability company; NANCY L. LACKEY, individually and as Trustee of the 2004 Nancy L. Lackey Living Trust; MARK P. BUTLER and CAROLYN J. BUTLER; PC Inc., a Nevada corporation; WILLIAM CAMPBELL and LINDA CAMPBELL, individually and as Trustees of the Campbell Family Trust U/D/T 03-16-1989; TIMOTHY CHENG and JUNIA CHU; SUAN C. CHEW, individually and as Trustee of the Suan Choo Chew 1997 Living Trust dated May 28, 1997 as amended and restated in 2002 and the Suan C. Chew Trust dated March 17, 2011; VIVIEN COHEN, individually and as Trustee of the Cohen Family Trust; GEORGE DAGRACA and PAULA DAGRACA; JOEL DAVIS and CYNTHIA DAVIS; LEROY DEAL and LISA DEAL; MARY DOBLEMAN and THOMAS DOBLEMAN; TOMARY LLC, a Nebraska limited liability company; THOMAS A. DOUD; MADELEINE S. FRANKEL; BERNARD FRIEDMAN and LESLIE FRIEDMAN; CRAIG S. GAINZA and SANDRA M. GAINZA, individually and as Trustees of the Gainza Family Trust, dated July 2, 2013; DENNIS A. GARDEMEYER and DENICE GARDEMEYER, individually and as

RESCISSION; and

UNJUST ENRICHMENT

**JURY TRIAL DEMANDED**

1  Trustees of the Gardemeyer Revocable
   Trust Dated March 10, 1993; RUPERT
2  HALL and YVONNE HALL;
   KATHLEEN JANSSEN, individually and
3  as Trustee of the KL Janssen Living Trust,
   UAD 7/26/2002; LYNN DIANE
4  KARABINAS and CHRISTOS
   KARABINAS; CLK ENTERPRISES,
5  LLC, an Arizona limited liability company;
   MICHAEL KELLY and WENDY
6  KELLY; ROBERT LAVICHANT;
   WILLIAM LAWSON and CHARLENE
7  LAWSON; SHERMAN F. LEVEY and
   DEBORAH RONNEN; DAVID
8  LICHTMAN and FRANCES LICHTMAN;
   DAVID G. MESSERSCHMITT and
9  DOROTHY MESSERSCHMITT,
   individually and as Trustees of the
10 Messerschmitt Family Trust dated July 8,
   1992; RICHARD J. METZLER,
11 individually and as Trustee of the Richard
   J. Metzler Trust under agreement dated
12 June 12, 1973; THOMAS MOORE and
   SUSAN MOORE, individually and as
13 Trustees of the Moore Family Trust dated
   March 27, 1998; GEORGE E. MYERS and
14 KATHLEEN H. MYERS; ROBERT A.
   ALTER, individually and as Trustee of the
15 Robert A. Alter Trust; GARY PURCELL
   and ROSETTA PURCELL, individually
16 and as Trustees of the Amore Trust dated
   May 24, 2000; THOMAS SAVARINO and
17 GINGER BROWN, individually and as
   Trustees of the Savarino Brown Family
18 Trust dated April 28, 1999; JOHN S. SEED
   and CATHERINE HANNA-SEED;
19 ANDREW SISOLAK and KATHY
   KOBATA; JOHN A. STAFSNES and
20 IATHAN T. ANNAND, individually and
   as Trustees of the John A. Stafsnes and
21 Iathan T. Annand Living Trust dated April
   25, 2005; RICHARD STRATTON;
22 THOMAS J. SWANSON and CHRISTIE
   R. SWANSON, individually and as
23 Trustees of the Swanson Enterprises
   Defined Benefit Pension Plan & Trust

FOURTH AMENDED COMPLAINT

dated January 1, 2007; SUSAN THOMAS, individually and as Trustee of the Leroy Thomas Jr. and Susan A. Thomas Trust, amended and restated in 2006, dated 11/7/2006 and the Leroy & S. A. Thomas Trust; ANDRE TOUMA and ROSELINE TOUMA, individually and as Trustees of the Touma Family Trust Agreement dated September 25, 1996; KEVIN VAUGHN and CHANDRA PASAMONTE; MISS MAE, LLC, a California limited liability company; DANIEL WEINER and LYNN GITOMER; JERALD WEINTRAUB and MELODY WEINTRAUB, individually and as Trustees of the Jerald M. Weintraub and Melody Howe Weintraub Revocable Living Trust dated February 5, 1998; PETER WELSH and SHIRLEY WELSH; JERRY WOOLF and VIRGINIA WOOLF; ARTHUR WOO and CHRISTINA A. WOO; ALAN M. ZNEIMER and ANN Y. ZNEIMER, individually and as Trustees of the Revocable Trust Declaration of Alan M. Zneimer & Ann Y. Zneimer Dated April 30, 2004; KENT R. ADAMSON and LAURIE B. ADAMSON, individually and as Trustees of the Adamson Family Trust Dated July 15, 2005; LEWIS CHEW and DIANNA L. CHEW; BRELEND C. GOWAN and STEPHANIE G. SAKAI; BRIAN L. HOEKSTRA and LORRAINE E. HOEKSTRA; EDWARD D. HON and MARY B. HON, individually and as Trustees of the Edward D. and Mary B. Hon Trust, Dated 9/21/1993; ROBERT McCORMICK and CHARLOTTE McCORMICK; KARL H. ROMERO, individually and as Trustee of the Karl H. Romero Revocable Family Trust and the Romero Family 1995 Trust; STEVEN D. SULLIVAN and SUSAN C. SULLIVAN; DOUGLAS E WEBBER and ROBIN M. WEBBER, individually and as Trustees of the Webber Family Trust Dated May 10, 2007; KENNETH A. BETHEL and JENNIFER D. BETHEL; GISELLE A.

PARRY and RAY K. FARRIS II;
WESTWIND ENTERPRISES, LTD., a
California limited liability company;
THOMAS SULLIVAN,

                    Plaintiffs,

        vs.

MARRIOTT VACATIONS
WORLDWIDE CORPORATION, a
Delaware corporation; MARRIOTT
OWNERSHIP RESORTS, INC., d.b.a.
MARRIOTT VACATION CLUB
INTERNATIONAL, a Delaware
corporation; RITZ-CARLTON
DEVELOPMENT COMPANY, INC., a
Delaware corporation; RITZ-CARLTON
SALES COMPANY, INC., a Delaware
corporation; RITZ-CARLTON
MANAGEMENT COMPANY, LLC, a
Delaware limited liability company; THE
COBALT TRAVEL COMPANY, LLC, a
Delaware limited liability company; R.C.
CHRONICLE BUILDING, L.P., a
Delaware limited partnership and DOES 1
THROUGH 50,

                    Defendants.

        The following Plaintiffs, who include more than half of the remaining fractional owners
at the Ritz-Carlton Club and Residences in San Francisco, bring this action based upon the
investigation of counsel and information and belief: William P. Petrick and Sharon F. Petrick,
individually and as Trustees of the William and Sharon Petrick Revocable Trust dated August
20, 2002; Howard Bautsch and Bruce Schluter; Bayou St. John Properties, LLC, a Louisiana
limited liability company; Norman Bikales and Ann Bikales, individually and as Trustees of the
Bikales Family Trust UAD October 31, 2006; George Boedecker, individually and as Trustee of
the George B. Boedecker Trust; Brad Stoffer; Jeffrey Bohn and Brenda Bohn, individually and
as Trustees of the of the Jeffrey R. and Brenda Bohn 2005 Revocable Trust; Frank J. Bonetto and

Jamie S. Bonetto, individually and as Trustees of the Bonetto Trust Agreement dated October 28, 1991 and the 2014 Amended and Restated Bonetto Trust, dated September 26, 2014; Stephen Bowden and Pamela Bowden; James E. Briggs and Irma T. Briggs, individually and as Trustees of the Briggs Family Trust dated December 18, 2004; Robert Brunswick and Kathleen Brunswick, individually and as Trustees of the Brunswick Revocable Family Trust dated December 16, 1998 and amended April 2, 2008; Dan V. Lackey, individually and as Trustee of the 2004 Danny V. Lackey Living Trust; Lackey Investments, LLC, a North Carolina limited liability company; Nancy L. Lackey, individually and as Trustee of the 2004 Nancy L. Lackey Living Trust; Mark P. Butler and Carolyn J. Butler; PC Inc., a Nevada corporation; William Campbell and Linda Campbell, individually and as Trustees of the Campbell Family Trust U/D/T 03-16-1989; Timothy Cheng and Junia Chu; Suan C. Chew, individually and as Trustee of the Suan Choo Chew 1997 Living Trust dated May 28, 1997 as amended and restated in 2002 and the Suan C. Chew Trust dated March 17, 2011; Vivien Cohen, individually and as Trustee of the Cohen Family Trust; George Dagraca and Paula Dagraca; Joel Davis and Cynthia Davis; Leroy Deal and Lisa Deal; Mary Dobleman and Thomas Dobleman; Tomary LLC, a Nebraska limited liability company; Thomas A. Doud; Madeleine S. Frankel; Bernard Friedman and Leslie Friedman; Craig S. Gainza and Sandra M. Gainza, individually and as Trustees of the Gainza Family Trust dated July 2, 2013; Dennis A. Gardemeyer and Denice Gardemeyer, individually and as Trustees of the Gardemeyer Revocable Trust Dated March 10, 1993; Rupert Hall and Yvonne Hall; Kathleen Janssen, individually and as Trustee of the KL Janssen Living Trust, UAD 7/26/2002; Lynn Diane Karabinas and Christos Karabinas; CLK Enterprises, LLC, an Arizona limited liability company; Michael Kelly and Wendy Kelly; Robert Lavichant; William Lawson and Charlene Lawson; Sherman F. Levey and Deborah Ronnen; David Lichtman and Frances Lichtman; David G. Messerschmitt and Dorothy Messerschmitt, individually and as Trustees of the Messerschmitt Family Trust dated July 8, 1992; Richard J. Metzler, individually and as Trustee of the Richard J. Metzler Trust under agreement dated June 12, 1973; Thomas Moore and Susan Moore, individually and as Trustees of the Moore Family Trust dated March 27, 1998; George E. Myers and Kathleen H. Myers; Robert A. Alter, individually and as Trustee

of the Robert A. Alter Trust; Gary Purcell and Rosetta Purcell, individually and as Trustees of the Amore Trust dated May 24, 2000; Thomas Savarino and Ginger Brown, individually and as Trustees of the Savarino Brown Family Trust; John S. Seed and Catherine Hanna-Seed; Andrew Sisolak and Kathy Kobata; John A. Stafsnes and Iathan T. Annand, individually and as Trustees of the John A. Stafsnes and Iathan T. Annand Living Trust dated April 25, 2005; Richard Stratton; Thomas J. Swanson and Christie R. Swanson, individually and as Trustees of the Swanson Enterprises Defined Benefit Pension Plan & Trust dated January 1, 2007; Susan Thomas, individually and as Trustee of the Leroy Thomas Jr. and Susan A. Thomas Trust, amended and restated in 2006, dated 11/7/2006 and the Leroy & S. A. Thomas Trust; Andre Touma and Roseline Touma, individually and as Trustees of the Touma Family Trust Agreement dated September 25, 1996; Kevin Vaughn and Chandra Pasamonte; Miss Mae, LLC, a California limited liability company; Daniel Weiner and Lynn Gitomer; Jerald Weintraub and Melody Weintraub, individually and as Trustees of the Jerald M. Weintraub and Melody Howe Weintraub Revocable Living Trust dated February 5, 1998; Peter Welsh and Shirley Welsh; Jerry Woolf and Virginia Woolf; Arthur Woo and Christina A. Woo; Alan M. Zneimer and Ann Y. Zneimer, individually and as Trustees of the Revocable Trust Declaration of Alan M. Zneimer & Ann Y. Zneimer Dated April 30, 2004; Kent R. Adamson and Laurie B. Adamson, individually and as Trustees of the Adamson Family Trust Dated July 15, 2005; Lewis Chew and Dianna L. Chew; Brelend C. Gowan and Stephanie G. Sakai; Brian L. Hoekstra and Lorraine E. Hoekstra; Edward D. Hon and Mary B. Hon, individually and as Trustees of the Edward D. and Mary B. Hon Trust, Dated 9/21/1993; Robert McCormick and Charlotte McCormick; Karl H. Romero, individually and as Trustee of the Karl H. Romero Revocable Family Trust and the Romero Family 1995 Trust; Steven D. Sullivan and Susan C. Sullivan; Douglas E. Webber and Robin M. Webber, individually and as Trustees of the Webber Family Trust Dated May 10, 1997; Kenneth A. Bethel and Jennifer D. Bethel; Giselle A. Parry and Ray K. Farris II; Westwind Enterprises, Ltd.; and Thomas Sullivan (collectively, "Plaintiffs"). Plaintiffs bring this action against the following Defendants: Marriott Vacations Worldwide Corporation; Marriott Ownership Resorts, Inc., d.b.a. Marriott Vacation Club International; Ritz-Carlton Development

Corporation; Ritz-Carlton Sales Company, Inc.; Ritz-Carlton Management Company, LLC; Cobalt Travel Company, LLC; and R.C. Chronicle Building, L.P. (collectively, "Defendants" or "Marriott").

## INTRODUCTION AND BACKGROUND

1.     This lawsuit concerns the Ritz-Carlton Club, San Francisco ("SF Ritz Residences"), a 24-story condominium project located at 690 Market Street. The building consists of mixed-use components, including 101 residential units, three commercial units, and common areas. Most of the residential units were sold as condominiums, but Defendants also marketed and sold 1/12[th] fractional interests in twenty[1] of the residential units known as "Club Interest Units." Plaintiffs are purchasers of fractional interests in these Club Interest Units. Each fractional interest (also known as a "Club Interest" or "Fractional Units") is worth 1/12[th] of a Club Interest Unit.

2.     Over the last few years, Defendants, including Defendant Marriott Vacations Worldwide Corporation ("MVW") and its subsidiaries and affiliates, have unjustly enriched themselves by violating (or aiding and abetting in, or conspiring to violate) various fiduciary duties owed by certain Defendants to Plaintiffs. These violations of fiduciary duties and other wrongful conduct undercut the essential features of the fractional interests sold to Plaintiffs. This wrongful conduct has decimated the value of Plaintiffs' deeded property interests — there are no willing buyers for Club Interests.

3.     Beginning in August 2007, Plaintiffs paid premium prices averaging over $250,000 for a 1/12th Club Interest at the SF Ritz Residences, based, *inter alia*, on Defendants' claims that: (a) the fractional interests were superior to mere timeshares and would, following sufficient sales to third party purchasers, be governed and operated as a member controlled residence club; (b) the fractional interests were like any other form of transferable real estate, akin to a "second home"; and (c) buyers would enjoy exclusive privileges. Then, over the

---

[1]     Initially, Defendants contemplated selling and/or marketed fractional interests in more than 20 units, but Defendants later withdrew units from the fractional offering, and opted instead to sell the withdrawn units as non-fractionalized condominiums.

ensuing years, Defendants used their complete control over Plaintiffs' property and their homeowners association ("Club Interest Association") to self-deal and profit at Plaintiffs' expense, and took other unilateral action to render these promises and representations false, gut the value of the fractional interests that they sold to Plaintiffs, and profit at their expense.

4.     The Plaintiffs are obligated to pay steadily increasing annual dues ("Annual Assessments") — now ranging from just under $20,000 per year for a one-bedroom unit and over $20,000 per year for two- and three-bedroom units. Because there are no willing buyers at any price, this liability is perpetual — that is, unless Plaintiffs relent and give their deeds back to Defendants for free. But Defendants do not always agree to take back the deeds. Several Plaintiffs have attempted to sell, found there were no buyers, and been refused when they asked Defendants to take back their deeds. Some have been sued by the Defendant-controlled Club Interest Association when they stopped paying their Annual Assessments. To paraphrase the lyrics of *Hotel California*, "you can check out anytime you like, but you can never leave [except when Marriott allows]."

5.     Defendants have thwarted efforts by Plaintiffs to sell their fractional interests, driven the value of those interests to zero and otherwise breached their fiduciary duties with wrongful conduct described herein that includes, but is not limited to, the following:

a.     First, despite statements to the California Department of Real Estate and the Securities & Exchange Commission ("SEC") that developer sales of the luxury Ritz-Carlton fractional units would continue, the developer, R.C. Chronicle Building, L.P. (which was itself controlled by Ritz-Carlton Development Company), opted to stop selling fractional interests at the SF Ritz Residences in order to retain control over the Club Interest Association, which allowed Marriott to perpetrate the misconduct alleged herein.

b.     Second, after selling fractional interests to Plaintiffs at premium prices, Defendants unilaterally, and without a promised membership vote:[2] (i) merged the Marriott

---

[2]     In a May 14, 2013 letter to Plaintiffs, MVW Chief Operating Officer Lee Cunningham stated: "we want to assure you that a Ritz-Carlton Club affiliation with Marriott Vacation Club Destinations will not take place unless there is an affirmative vote of each Club's membership."

Vacation Club, a competing timeshare program owned by MVW, with the Ritz-Carlton Club; and (ii) sold its unsold developer inventory to the Marriott Vacation Club. Both of these moves by the Defendants had the effect of giving hundreds of thousands of Marriott Vacation Club timeshare owners access to the same basic benefits at this San Francisco property at a fraction of what Plaintiffs paid, as well as adding luxury inventory to the Marriot Vacation Club. By paying a small fraction of the upfront costs of the Plaintiffs, as well as a small fraction of what the Plaintiffs pay in Annual Assessments, Marriott Vacation Club buyers have access to the same number of nights (21 annually) at the SF Ritz Residences at less than 20% of the cost. The affiliation also destroyed the structure of the Club, which was designed to allocate time to just a few hundred Club Members for twenty-one days over the course of the year. *See* CCRs § 1.3. The affiliation opened the club to transient usage, allowing hundreds of thousands of members of the Marriot Vacation Club to access the Club for as little as one night.

c. Third, Defendants made it impossible for Plaintiffs to list their properties through Ritz-affiliated brokers by, *inter alia*, closing the local Ritz sales office, and by ceasing altogether the sale of the Ritz fractional product, in favor of only selling the Marriott Vacation Club points product. This made it impossible for Plaintiffs to sell to a third-party buyer an integral part of what they originally purchased — membership in the Ritz-Carlton Membership Program — because Defendants informed those Plaintiffs who attempted to sell that the contractual terms that Defendants prepared and offered to Plaintiffs on a take-it-or-leave-it basis precluded third party buyers from participating in the Ritz-Carlton Membership Program unless they purchase their units from a Ritz-affiliated broker. Effectively, this allowed Defendants to control — and to prevent — all third-party sales.

d. Fourth, Defendants actively dissuaded people from buying Plaintiffs' fractional interests and instead steered them to their competing Marriott product. The experience of the Campbell Plaintiffs, who paid $255,000 for their fractional interest in 2007, is illustrative. They tried to sell their fractional interest for more than two years, engaging two separate real estate brokers, neither of whom found any willing buyers even after the Campbell Plaintiffs dropped their asking price to $150,000 and then to $90,000. When the few who inquired spoke

with Defendants about the transferability of benefits, Defendants said that they would not be able to participate in the Ritz-Carlton Membership Program unless they purchased through one of Defendants' brokers. Then, Defendants promoted the competing Marriott Vacation Points product.

6.      There is nothing wrong with the condominiums themselves. They are highly desirable luxury units that, when sold as condominiums, command huge prices. In short, the fractional interests Plaintiffs purchased have lost all value not because of general trends in the market, but because of Defendants' breaches of fiduciary duties and other wrongful conduct. Luxury fractional interests at other developments in San Francisco and elsewhere have increased in value.

7.      The number of fractional owners has dropped from a peak of approximately 163 to just over 100 now. While some have taken advantage of offers by Defendants to transfer their interests to other properties, many others — at least a dozen in early 2016 alone — have simply returned their deeds to Defendants for free. Others who re-financed and were unable to sell lost their units in foreclosure. Defendants benefit from this attrition because, as managed to their benefit, it allows them to regain control of luxury units for free and add units to their timeshare portfolio while continuing to receive substantial sums in Annual Assessments.

8.      Defendants' business model can be summarized as follows: Sell fractional interests at premium prices; drive the value of the fractional interests to zero; regain possession of the units for free or at greatly reduced cost; do this over time while maintaining a flow of inflated Annual Assessments; and then resell the units in the booming San Francisco real estate market or subsume them in the larger Marriot Vacation Club timeshare program.

9.      Plaintiffs are entitled to rescind their Purchase Contracts, whether Defendants' conduct was intentional, negligent, or entirely innocent. In rescission, Defendants must return all consideration paid to them by Plaintiffs, including the purchase price for each fractional interest and all subsequent annual fees. *See* Civ. Code § 1691(b)(1). Plaintiffs are also entitled to consequential damages in rescission, including but not limited to the loss of the time value of

///

their money. Civ. Code § 1692. The filing of this complaint shall constitute an offer by Plaintiffs to return their deeds if rescission is granted.

10.     In addition, Defendants acted in an unfair manner that interfered with Plaintiffs' rights to receive the benefits of their contracts with Defendants — a breach of the implied covenant of good faith and fair dealing.

11.     Finally, at all times relevant herein, Defendants owed fiduciary duties to Plaintiffs arising out of Defendants' absolute control over the Club Interest Association, as well their control over the use rights of each individuals' Club Interest. Defendants breached these fiduciary duties primarily by controlling the Club Interest Association to advance their own interests at Plaintiffs' expense, as well as by using their control over the use-rights at the Club to favor their own interests rather than the interests of the Plaintiffs for whom they were acting as agents. Under standard principles of restitution, Defendants must disgorge the profits they obtained by breaching their fiduciary duties, or aiding and abetting breaches of fiduciary duties.

## JURISDICTION AND VENUE

12.     Jurisdiction and venue are proper in the Superior Court of the County of San Francisco, State of California pursuant to a contractual provision that requires litigation of disputes in that Court (and thus is a waiver of removal rights) and because the SF Ritz Residences is located in San Francisco, California.

## DEFENDANTS

13.     Defendant R.C. Chronicle Building, L.P. ("R.C. Chronicle") is a Delaware limited partnership, has a principal place of business at 6649 Westwood Boulevard, Suite 500, Orlando, Florida, and is authorized to do business in California. Defendant R.C. Chronicle is, and at all relevant times was, the primary developer and the seller of Club Interest Units at the SF Ritz Residences. The other Defendants identified herein are also developers and/or sellers by virtue of their conduct and/or the agency/alter ego/vicarious liability relationships that exist between Defendants.

14.     Defendant Ritz-Carlton Development Company, Inc. ("Ritz-Carlton Development") is a Delaware corporation, has a principal place of business at 6649 Westwood

Boulevard, Orlando, Florida, and is authorized to do business in California. Defendant Ritz-Carlton Development developed the SF Ritz in a joint venture with R.C. Chronicle, and was the controlling member of the joint venture. Ritz-Carlton Development is also the sole owner, manager, and member of Defendant Cobalt and is responsible for the wrongful conduct alleged herein. Ritz-Carlton Development is a wholly-owned Marriott subsidiary.

15. Defendant Ritz-Carlton Sales Company, Inc. ("Ritz-Carlton Sales") is a Delaware corporation, has a principle place of business at 6649 Westwood Boulevard, Orlando, Florida, and is authorized to do business in California. At all relevant times, Defendant Ritz-Carlton Sales was a wholly-owned Marriott subsidiary, acted as the sales broker, and was otherwise involved in and responsible for the marketing and sale of the fractional interests at issue.

16. Defendant Ritz-Carlton Management Company, LLC is a Delaware limited liability company, has a principal place of business at 6649 Westwood Boulevard, Suite 500, Orlando, Florida, and is authorized to do business in California. At all relevant times, Defendant Ritz-Carlton Management Company was a wholly-owned Marriott subsidiary and the manager and operator of the SF Ritz Residences and the other Ritz-Carlton-branded properties included in the Ritz-Carlton Membership Programs.

17. Defendant Cobalt Travel Company, LLC ("Cobalt"), formerly known as the Ritz-Carlton Travel Company, LLC, is a Delaware limited liability company, has a principal place of business at 6649 Westwood Boulevard, Suite 500, Orlando, Florida, and is authorized to do business in California. Defendant Cobalt is a wholly-owned subsidiary of the Ritz-Carlton Development Company, Inc. Defendants R.C. Chronicle and Ritz-Carlton Management Company entered into an Affiliation Agreement with Defendant Cobalt pursuant to which the SF Ritz Residences and by extension its various owners, including Plaintiffs herein, became affiliated with and/or members of the Ritz-Carlton Membership Program. Defendant Cobalt is the Program Manager of the Ritz-Carlton Membership Program and also operates the reservation system through which Plaintiffs obtained use of their allotted number of days at the SF Ritz Residences and obtain access to the other facilities in the Ritz-Carlton Membership Program. Defendant Marriott Ownership Resorts, Inc., d.b.a. Marriott Vacation Club International

("MVCI"), is a Delaware corporation, has a principal place of business at 6649 Westwood Boulevard, Orlando, Florida, and is authorized to do business in California. Defendant MVCI was involved in and responsible for the wrongful conduct alleged herein.

18. Defendant Marriott Vacations Worldwide Corporation ("MVW") is a publicly-traded Delaware corporation with a principal place of business at 6649 Westwood Boulevard, Orlando, Florida. MVW is the parent company of the other Defendants and was involved in and responsible for the wrongful conduct alleged herein. MVW directly, and indirectly through wholly-owned subsidiaries, exerted control over the other Defendants, because, *inter alia*:

    a. Ritz-Carlton Management Company and Cobalt were shell companies serviced by persons technically employed by MVW;

    b. The costs and revenues generated in connection with the SF Ritz by Defendants were accounted for in MVW's consolidated financials; and

    c. Employees providing services to the other Defendants were treated as MVW employees.

19. The Defendants named in this complaint purport to be independent entities, but in reality they are all related, and are owned and controlled by Defendant MVW. In particular, the injuries suffered by Plaintiffs arise from the acts of three of MVW's subsidiaries: Ritz-Carlton Development, Ritz-Carlton Management Company and Cobalt. The remaining defendants are liable as alter egos, co-conspirators, and/or aiders and abettors. Each defendant was aware that the other defendants planned to engage and were engaging in the wrongful conduct alleged in this Complaint, and agreed with the other defendants to commit that wrongful conduct.

20. The true names and capacities of the Defendants DOES 1 through 50, whether individual, corporate, associate or otherwise, are unknown to Plaintiffs at the time of filing this Complaint and Plaintiffs, therefore, sue said Defendants by such fictitious names and will ask leave of court to amend this Complaint to show their true names or capacities when the same have been ascertained. Plaintiffs are informed and believe, and therefore allege, that each of the DOE Defendants is, in some manner, responsible for the events and happenings herein set forth and proximately caused injury and damages to Plaintiffs as herein alleged.

21.     Plaintiffs are informed and believe, and on that basis allege, that each Defendant named in this action, including each of the DOE defendants, was the agent, ostensible agent, servant, aider and abettor, co-conspirator, partner, joint venturer, representative and/or associate of each of the other Defendants, and was at all times relevant herein acting within the course and scope of his, her or its authority as agent, ostensible agent, servant, aider and abettor, co-conspirator, partner, joint venturer, representative and/or associate, and with the knowledge, authorization, consent, permission, and/or ratification of the other Defendants. On information and belief, all actions of each Defendant alleged herein were ratified and approved by the officers and/or managing agents of each other Defendant, whether DOE or otherwise. Each of the Defendants have interlocking or overlapping directors and/or officers with their respective principals or controlling entities, and are undercapitalized and/or spurious such that the corporate veil may be disregarded to prevent injustice and inequity to Plaintiffs.

22.     Each and all of the Defendants (directly and/or indirectly through individual agents, representatives, employees, principals, officers, directors and members) (a) actively or passively participated in the conduct, acts and omissions alleged herein, (b) materially assisted, aided, abetted and/or conspired with one or more other Defendants in committing the conduct, acts, and omissions alleged herein, (c) purposely, knowingly, recklessly, or negligently planned, directed, implemented, furthered, and/or consented to conduct, acts and omissions alleged herein, and/or (d) is directly, vicariously, jointly, and/or severally liable for the conduct, acts, and omissions alleged herein.

## PLAINTIFFS

23.     Plaintiffs William P. Petrick and Sharon F. Petrick are competent adult residents of San Francisco County, California and Trustees of the William and Sharon Petrick Revocable Trust dated August 20, 2002 (collectively, the "Petrick Plaintiffs"). On or about September 5, 2007, the Petrick Plaintiffs purchased an undivided 1/12th interest in Club Interest Unit No. 302 from Defendants for $232,000.

24.     Plaintiffs Howard Bautsch and Bruce Schluter are competent adult residents of New Orleans, Louisiana and managing and/or controlling members of Bayou St. John Properties,

LLC, a Louisiana limited liability company (collectively, the "Bautsch/Schluter Plaintiffs"). On or about September 12, 2007, the Bautsch/Schluter Plaintiffs purchased an undivided 1/12th interest in Club Interest Unit No. 404 from Defendants for $255,000.

25.     Plaintiffs Norman Bikales and Ann Bikales are competent adult residents of Monterey County, California and Trustees of the Bikales Family Trust UAD October 31, 2006 (collectively, the "Bikales Plaintiffs"). The Bikales Plaintiffs purchased two fractional interests from Defendants. On or about August 24, 2007, they purchased an undivided 1/12th interest in Club Interest Unit No. 801 for $255,000. On or about November 1, 2007, they purchased an undivided 1/12th interest in Club Interest Unit No. 804 for $242,500.

26.     Plaintiff George Boedecker is a competent adult resident of Boulder, Colorado and Trustee of the George B. Boedecker Trust (collectively, the "Boedecker Plaintiffs"). On or about August 24, 2007, Mr. Boedecker purchased an undivided 1/12th interest in Club Interest Unit No. 1201 from Defendants for $268,000.

27.     Plaintiff Brad Stoffer is a competent adult resident of Lake Oswego, Oregon. On or about January 2, 2008, Mr. Stoffer and the Boedecker Plaintiffs purchased an undivided 1/12th interest in Club Interest Unit No. 804 from Defendants for $282,500.

28.     Plaintiffs Jeffrey Bohn and Brenda Bohn are competent adults resident of Honolulu, Hawaii and Trustees of the Jeffrey R. and Brenda Bohn 2005 Revocable Trust (collectively, the "Bohn Plaintiffs"). On or about July 7, 2008, the Bohn Plaintiffs purchased an undivided 1/12th interest in Club Interest Unit No. 1002 from Defendants for $308,300.

29.     Plaintiffs Frank J. Bonetto and Jamie S. Bonetto are competent adult residents of Contra Costa County, California and Trustees of the Bonetto Trust Agreement dated October 28, 1991 and the 2014 Amended and Restated Bonetto Trust, dated September 26, 2014 (collectively, the "Bonetto Plaintiffs"). The Bonetto Plaintiffs purchased two fractional interests from Defendants. On or about August 24, 2007, they purchased an undivided 1/12th interest in Club Interest Unit No. 302 for $189,500. On or about August 24, 2007, they purchased an undivided 1/12th interest in Club Interest Unit No. 405 for $249,000. The Bonettos later

///

transferred title from the Bonetto Trust Agreement Dated 10/28/91 to the 2014 Amended and Restated Bonetto Trust, dated September 26, 2014.

30.     Plaintiffs Stephen Bowden and Pamela Bowden are competent adult residents of San Diego County, California (collectively, the "Bowden Plaintiffs"). On or about August 24, 2007, the Bowden Plaintiffs purchased an undivided 1/12th interest in Club Interest Unit No. 404 from Defendants for $249,000.

31.     Plaintiffs James E. Briggs and Irma T. Briggs are competent adult residents of Lone Tree, Colorado and Trustees of the Briggs Family Trust dated December 18, 2004 (collectively, the "Briggs Plaintiffs"). On or about April 21, 2008, the Briggs Plaintiffs purchased an undivided 1/12th interest in Club Interest Unit No. 802 from Defendants for $325,000. They had previously purchased a fractional interest in a smaller unit, but then upgraded to the fractional interest in 802.

32.     Plaintiffs Robert Brunswick and Kathleen Brunswick are competent adult residents of Orange County, California and Trustees of the Brunswick Revocable Family Trust dated December 16, 1998 and amended April 21, 2008 (collectively, the "Brunswick Plaintiffs"). On or about April 21, 2008, the Brunswick Plaintiffs purchased an undivided 1/12th interest in Club Interest Unit No. 303 from Defendants for $239,000.

33.     Plaintiff Dan V. Lackey is a competent adult resident of North Carolina, trustee of the 2004 Danny V. Lackey Living Trust, and the manager of Lackey Investments, LLC, a North Carolina limited liability company. Plaintiff Nancy L. Lackey is a competent adult resident of North Carolina, the wife of Dan Lackey, and Trustee of the 2004 Nancy L. Lackey Living Trust. (Collectively, Dan and Nancy Lackey, their respective trusts, and Lackey Investments, LLC are referred to as the "Lackey Plaintiffs.") On or about November 1, 2007, the Lackey Plaintiffs purchased two undivided 1/12th interests in Club Interest Unit No. 802 from Defendants for $309,000 each. The first was held in the name of Lackey Investments, LLC, and the second was held in the name of the two Lackey living trusts.

34.     Plaintiffs Mark P. Butler and Carolyn J. Butler are competent adult residents of Napa County, California and the President and Vice-President, respectively, of PC Inc., a

Nevada corporation (collectively, the "Butler Plaintiffs"). On or about January 9, 2008, the Butler Plaintiffs purchased an undivided 1/12th interest in Club Interest Unit No. 302 from Defendants for $232,000. This factional interest was purchased by the Butlers individually.

35. On or about March 7, 2012, the Butler Plaintiffs (through PC Inc.) purchased an undivided 1/12th interest in Club Interest Unit No. 802 from the Lackey Plaintiffs (or more specifically, the two Lackey living trusts) for $100,000.

36. On or about May 17, 2012, the Butler Plaintiffs (through PC Inc.) purchased another undivided 1/12th interest in Club Interest Unit No. 802 from the Lackey Plaintiffs (or more specifically, Lackey Investments, LLC) for $50,000. On or about September 13, 2012, the Butler Plaintiffs resold this fractional interest to Javier Burillo and Rose Burillo.

37. Plaintiffs William Campbell and Linda Campbell are competent adult residents of Orange County, California and Trustees of the Campbell Family Trust U/D/T 03-16-1989 (collectively, the "Campbell Plaintiffs"). On or about August 24, 2007, the Campbell Plaintiffs purchased an undivided 1/12th interest in Club Interest Unit No. 305 from Defendants for $255,000.

38. Plaintiffs Timothy Cheng and Junia Chu are competent adult residents of Alameda County, California (collectively, the "Cheng/Chu Plaintiffs"). On or about August 24, 2007, the Cheng/Chu Plaintiffs purchased an undivided 1/12th interest in Club Interest Unit No. 1202 from Defendants for $288,000.

39. Plaintiff Suan C. Chew is a competent adult resident of Placer County, California, the Trustee of the Suan Choo Chew 1997 Living Trust dated May 28, 1997 as amended and restated in 2002, which was the original purchaser of a fractional interest, and Trustee of the Suan C. Chew Trust dated March 17, 2011, which is the current owner of record of that fractional interest (collectively, the "Suan Chew Plaintiffs"). On or about August 24, 2007, the Suan Chew Plaintiffs purchased an undivided 1/12th interest in Club Interest Unit No. 801 from Defendants for $288,000.

40. Plaintiff Vivien Cohen is a competent adult resident of Placer County, California and Trustee of the Cohen Family Trust (collectively, the "Cohen Plaintiffs"). Her husband, with

whom she originally purchased a fractional interest, is now deceased. On or about June 9, 2009, the Cohen Plaintiffs purchased an undivided 1/12th interest in Club Interest Unit No. 1002 from Defendants for $359,500. In 2013, Ms. Cohen transferred ownership of this fractional interest to the Cohen Family Trust.

41.     Plaintiffs George Dagraca and Paula Dagraca are competent adult residents of Victor, New York (collectively, the "Dagraca Plaintiffs"). On or about August 24, 2007, the Dagraca Plaintiffs purchased an undivided 1/12th interest in Club Interest Unit No. 404 from Defendants for $237,000.

42.     Plaintiffs Joel Davis and Cynthia Davis are competent adult residents of Boulder, Colorado (collectively, the "Davis Plaintiffs"). On or about January 2, 2008, the Davis Plaintiffs purchased an undivided 1/12th interest in Club Interest Unit No. 804 from Defendants for $297,000.

43.     Plaintiffs Leroy Deal and Lisa Deal are competent adult residents of Reno, Nevada (collectively, the "Deal Plaintiffs"). On or about August 24, 2007, the Deal Plaintiffs purchased an undivided 1/12th interest in Club Interest Unit No. 302 from Defendants for $204,000.

44.     Plaintiffs Mary Dobleman and Thomas Dobleman are competent adult residents of Omaha, Nebraska and managing and/or controlling members of Tomary LLC, a Nebraska limited liability company (collectively, the "Dobleman Plaintiffs"). On or about March 26, 2010, the Dobleman Plaintiffs purchased an undivided 1/12th interest in Club Interest Unit No. 309 from Defendants for $216,000.

45.     Plaintiff Thomas A. Doud is a competent adult resident of Hong Kong. On or about August 24, 2007, Mr. Doud purchased an undivided 1/12th interest in Club Interest Unit No. 404 from Defendants for $249,000.

46.     Plaintiff Madeleine S. Frankel is a competent adult resident of Santa Clara County, California. On or about July 3, 2008, Ms. Frankel purchased an undivided 1/12th interest in Club Interest Unit No. 301 from Defendants for $227,500.

///

47.     Plaintiffs Bernard Friedman and Leslie Friedman are competent adult residents of New York, New York (collectively, the "Friedman Plaintiffs"). On or about August 24, 2007, the Friedman Plaintiffs purchased an undivided 1/12th interest in Club Interest Unit No. 1202 from Defendants for $288,000.

48.     Plaintiffs Craig S. Gainza and Sandra M. Gainza are competent adult residents of Fairfield, California and Trustees of the Gainza Family Trust, dated July 2, 2013 (collectively, the "Gainza Plaintiffs"). On or about August 24, 2007, the Gainza Plaintiffs purchased an undivided 1/12th interest in Club Interest Unit No. 1201 from Defendants for $268,000.

49.     Plaintiffs Dennis A. Gardemeyer and Denice Gardemeyer are competent adult residents of El Dorado County, California and Trustees of the Gardemeyer Revocable Trust Dated March 10, 1993 (collectively, the "Gardemeyer Plaintiffs"). On or about December 1, 2008, the Gardemeyer Plaintiffs purchased an undivided 1/12th interest in Club Interest Unit No. 301 from Defendants for $239,000.

50.     Plaintiffs Rupert Hall and Yvonne Hall are competent adult residents of San Joaquin County, California (collectively, the "Hall Plaintiffs"). On or about August 24, 2007, the Hall Plaintiffs purchased an undivided 1/12th interest in Club Interest Unit No. 305 from Defendants for $255,000.

51.     Plaintiff Kathleen Janssen is a competent adult resident of San Joaquin County, California and Trustee of the KL Janssen Living Trust, UAD 7/26/2002 (collectively, the "Janssen Plaintiffs"). On or about August 24, 2007, the Janssen Plaintiffs purchased an undivided 1/12th interest in Club Interest Unit No. 1201 from Defendants for $288,000.

52.     Plaintiffs Lynn Diane Karabinas and Christos Karabinas are competent adult residents of Arizona and managing and/or controlling members of CLK Enterprises, LLC, an Arizona limited liability company (collectively, the "Karabinas Plaintiffs"). Mr. Karabinas is President of CLK Enterprises. On or about January 2, 2008, the Karabinas Plaintiffs purchased an undivided 1/12th interest in Club Interest Unit No. 303 from Defendants for $232,000.

53.     Plaintiffs Michael Kelly and Wendy Kelly are competent adult residents of Hyannis Port, Massachusetts (collectively, the "Kelly Plaintiffs"). On or about January 2, 2008,

the Kelly Plaintiffs purchased an undivided 1/12th interest in Club Interest Unit No. 804 from Defendants for $297,000.

54. Plaintiff Robert Lavichant is a competent adult resident of Las Vegas, Nevada and Thailand. On or about May 30, 2008, Mr. Lavichant purchased an undivided 1/12th interest in Club Interest Unit No. 803 from Defendants for $297,000.

55. Plaintiffs William Lawson and Charlene Lawson are competent adult residents of Clermont, Florida (collectively, the "Lawson Plaintiffs"). On or about August 24, 2007, the Lawson Plaintiffs purchased an undivided 1/12th interest in Club Interest Unit No. 405 from Defendants for $236,500.

56. Plaintiffs Sherman F. Levey and Deborah Ronnen are competent adult residents of Rochester, New York (collectively, the "Levey/Ronnen Plaintiffs"). On or about August 24, 2007, the Levey/Ronnen Plaintiffs purchased an undivided 1/12th interest in Club Interest Unit No. 302 from Defendants for $212,000.

57. Plaintiffs David Lichtman and Frances Lichtman are competent adult residents of Fort Worth, Texas (collectively, the "Lichtman Plaintiffs"). On or about October 19, 2010, the Lichtman Plaintiffs purchased an undivided 1/12th interest in Club Interest Unit No. 401 from Defendants for $127,500.

58. Plaintiffs David G. Messerschmitt and Dorothy Messerschmitt are competent adult residents of Contra Costa County, California and Trustees of the Messerschmitt Family Trust dated July 8, 1992 (collectively, the "Messerschmitt Plaintiffs"). On or about June 1, 2010, the Messerschmitt Plaintiffs purchased an undivided 1/12th interest in Club Interest Unit No. 404 from Defendants for $216,000. The Messerschmitt Plaintiffs were unable and/or unwilling to continue paying the substantial Annual Assessments and knew there were no willing buyers. They were also (rightfully) concerned about the impact that continued ownership would have on their heirs and/or estate. On or about December 23, 2014, Defendant R.C. Chronicle agreed to accept the Messerschmitts' deed, an accommodation not granted to all purchasers. This was achieved by means of a purchase agreement in which the purchase price was zero, such that the Messerschmitt Plaintiffs lost their entire initial investment.

59.     Plaintiff Richard J. Metzler is a competent adult resident of Winnetka, Illinois and the Trustee of the Richard J. Metzler Trust under agreement dated June 12, 1973 (collectively, the "Metzler Plaintiffs"). On or about August 24, 2007, the Metzler Plaintiffs purchased an undivided 1/12th interest in Club Interest Unit No. 305 from Defendants for $268,000. In or about 2009, Mr. Metzler transferred his interest to the Richard J. Metzler Trust.

60.     Plaintiffs Thomas Moore and Susan Moore are competent adult residents of Owls Head, Maine and Trustees of the Moore Family Trust dated March 27, 1998 (collectively, the "Moore Plaintiffs"). On or about August 24, 2007, the Moore Plaintiffs purchased an undivided 1/12th interest in Club Interest Unit No. 302 from Defendants for $212,000.

61.     Plaintiffs George E. Myers and Kathleen H. Myers are competent adult residents of Napa County, California (collectively, the "Myers Plaintiffs"). On or about August 24, 2007, the Myers Plaintiffs purchased an undivided 1/12th interest in Club Interest Unit No. 404 from Defendants for $249,000.

62.     Plaintiff Robert A. Alter is a competent adult resident of Orange County, California and a Trustee of the Robert A. Alter Trust (collectively, the "Alter Plaintiffs"). On or about August 24, 2007, the Alter Plaintiffs purchased an undivided 1/12th interest in Club Interest Unit No. 802 from Defendants for $309,000.

63.     Plaintiffs Gary Purcell and Rosetta Purcell are competent adult residents of Los Angeles County, California and Trustees of the Amore Trust dated May 24, 2000 (collectively, the "Purcell Plaintiffs"). On or about March 3, 2008, the Purcell Plaintiffs purchased an undivided 1/12th interest in Club Interest Unit No. 401 from Defendants for $239,000.

64.     Plaintiffs Thomas Savarino and Ginger Brown are competent adult residents of Santa Clara County, California and Trustees of the Savarino Brown Family Trust dated April 28, 1999 (collectively, the "Savarino/Brown Plaintiffs"). On or about August 24, 2007, the Savarino/Brown Plaintiffs purchased an undivided 1/12th interest in Club Interest Unit No. 301 from Defendants for $204,000.

65.     Plaintiffs John S. Seed and Catherine Hanna-Seed are competent adult residents of Edmonton, Canada (collectively, the "Seed Plaintiffs"). On or about November 1, 2007, the

Seed Plaintiffs purchased an undivided 1/12th interest in Club Interest Unit No. 803 from Defendants for $288,000.

66.     Plaintiffs Andrew Sisolak and Kathy Kobata are competent adult residents of Monterey County, California (collectively, the "Sisolak/Kobata Plaintiffs"). On or about November 1, 2007, the Sisolak/Kobata Plaintiffs purchased an undivided 1/12th interest in Club Interest Unit No. 803 from Defendants for $297,000.

67.     Plaintiffs John A. Stafsnes and Iathan T. Annand are competent adult residents of Monterey County, California and Trustees of the John A. Stafsnes and Iathan T. Annand Living Trust dated April 25, 2005 (collectively, the "Stafsnes Plaintiffs"). On or about August 24, 2007, the Stafsnes Plaintiffs purchased an undivided 1/12th interest in Club Interest Unit No. 301 from Defendants for $204,000.

68.     Plaintiff Richard Stratton is a competent adult resident of Reno, Nevada. On or about August 24, 2007, Mr. Stratton purchased an undivided 1/12th interest in Club Interest Unit No. 303 from Defendants for $232,000.

69.     Plaintiffs Thomas J. Swanson and Christie R. Swanson are competent adult residents of Potomac, Maryland and Trustees of the Swanson Enterprises Defined Benefit Pension Plan & Trust dated January 1, 2007 (collectively, the "Swanson Plaintiffs"). On or about November 1, 2007, the Swanson Plaintiffs purchased an undivided 1/12th interest in Club Interest Unit No. 801 from Defendants for $297,000.

70.     Plaintiff Susan Thomas is a competent adult resident of Alameda County, California, Trustee of the Leroy Thomas Jr. and Susan A. Thomas Trust, amended and restated in 2006, dated 11/7/2006, which was the original purchaser of a fractional interest, and Trustee of the Leroy & S. A. Thomas Trust, which is the current owner of record of that fractional interest (collectively, the "Thomas Plaintiffs"). Her husband, with whom she originally purchased a fractional interest, is now deceased. On or about August 24, 2007, the Thomas Plaintiffs purchased an undivided 1/12th interest in Club Interest Unit No. 304 from Defendants for $249,000. This purchase took place after the signatories to the Purchase Contract (Robert and Tracey Hirt) assigned their rights in that agreement to the Thomas Plaintiffs.

71.     Plaintiffs Andre Touma and Roseline Touma are competent adult residents of San Mateo County, California and Trustees of the Touma Family Trust Agreement dated September 25, 1996 (collectively, the "Touma Plaintiffs"). On or about February 8, 2008, the Touma Plaintiffs purchased an undivided 1/12th interest in Club Interest Unit No. 802 from Defendants for $325,000. The Touma Plaintiffs had previously purchased a fractional interest in a smaller unit, but then upgraded to the fractional interest in unit 802.

72.     Plaintiffs Kevin Vaughn and Chandra Pasamonte are competent adult residents of San Mateo County, California and members of (and with a controlling interest in) Miss Mae, LLC, a California limited liability company (collectively, the "Vaughn/Pasamonte Plaintiffs"). On or about September 28, 2007, the Vaughn/Pasamonte Plaintiffs purchased an undivided 1/12th interest in Club Interest Unit No. 405 from Defendants for $255,000.

73.     Plaintiffs Daniel Weiner and Lynn Gitomer are competent adult residents of Contra Costa County, California (collectively, the "Weiner/Gitomer Plaintiffs"). Plaintiffs Jerald Weintraub and Melody Weintraub are competent adult residents of Contra Costa County, California and Trustees of the Jerald M. Weintraub and Melody R. Howe Weintraub Revocable Living Trust dated February 5, 1998 (collectively, the "Weintraub Plaintiffs"). On or about December 11, 2007, the Weiner/Gitomer Plaintiffs and the Weintraub Plaintiffs purchased an undivided 1/12th interest in Club Interest Unit No. 804 from Defendants for $297,000.

74.     Plaintiffs Peter Welsh and Shirley Welsh are competent adult residents of Naples, Florida (collectively, the "Welsh Plaintiffs"). On or about November 1, 2007, the Welsh Plaintiffs purchased an undivided 1/12th interest in Club Interest Unit No. 803 from Defendants for $297,000.

75.     Plaintiffs Jerry Woolf and Virginia Woolf are competent adult residents of Monterey County, California (collectively, the "Woolf Plaintiffs"). On or about April 1, 2010, the Woolf Plaintiffs purchased an undivided 1/12th interest in Club Interest Unit No. 405 from Defendants for $216,000.

76.     Plaintiffs Arthur Woo and Christina A. Woo are competent adult residents of Santa Clara County, California (collectively, the "Woo Plaintiffs"). On or about November 1,

2007, the Woo Plaintiffs purchased an undivided 1/12th interest in Club Interest Unit No. 303 from Defendants for $232,000.

77.     Plaintiffs Alan M. Zneimer and Ann Y. Zneimer are competent adult residents of Contra Costa County, California and Trustees of the Revocable Trust Declaration of Alan M. Zneimer & Ann Y. Zneimer Dated April 30, 2004 (collectively, the "Zneimer Plaintiffs"). On or about August 24, 2007, the Zneimer Plaintiffs purchased an undivided 1/12th interest in Club Interest Unit No. 1202 from Defendants for $255,000. The Zneimer Plaintiffs fell behind on their mortgage payments, and their mortgagor foreclosed in 2012, although the property remains in their name.

78.     Plaintiffs Kent R. Adamson and Laurie B. Adamson are competent adult residents of Orange County, California, and Trustees of the Adamson Family Trust Dated July 15, 2005 (collectively, the "Adamson Plaintiffs"). On or about January 8, 2008, the Adamson Plaintiffs purchased an undivided 1/12th interest in Club Interest Unit No. 301 from Defendants for $232,000.

79.     Plaintiffs Lewis Chew and Dianna L. Chew are competent adult residents of Santa Clara County, California (collectively, the "Lewis and Dianna Chew Plaintiffs"). On or about November 1, 2007, the Lewis and Dianna Chew Plaintiffs purchased an undivided 1/12th interest in Club Interest Unit No. 803 from Defendants for $297,000.

80.     Plaintiffs Brelend C. Gowan and Stephanie G. Sakai are competent adult residents of Yolo County, California (collectively, the "Gowan/Sakai Plaintiffs"). On or about January 15, 2009, the Gowan/Sakai Plaintiffs purchased an undivided 1/12th interest in Club Interest Unit No. 401 from Defendants for $159,000.

81.     Plaintiffs Brian L. Hoekstra and Lorraine E. Hoekstra are competent adult residents of Scottsdale, Arizona (collectively, the "Hoekstra Plaintiffs"). On or about June 25, 2010, the Hoekstra Plaintiffs purchased an undivided 1/12th interest in Club Interest Unit No. 401 from Defendants for $159,000.

82.     Plaintiffs Edward D. Hon and Mary B. Hon are competent adult residents of Kamuela, Hawaii and Trustees of the Edward D. and Mary B. Hon Trust, Dated 9/21/1993

(collectively, the "Hon Plaintiffs"). On or about December 8, 2009, the Hon Plaintiffs purchased an undivided 1/12th interest in Club Interest Unit No. 304 from Defendants for $185,000.

83. Plaintiffs Robert McCormick and Charlotte McCormick are competent adult residents of Orange County, California (collectively, the "McCormick Plaintiffs"). On or about September 10, 2007, the McCormick Plaintiffs purchased an undivided 1/12th interest in Club Interest Unit No. 305 from Defendants for $237,000.

84. Plaintiff Karl H. Romero is a competent adult resident of Orange County, California, and was Trustee of the Romero Family 1995 Trust, which was the original purchaser of a fractional interest, and the Trustee of the Romero Karl H Family Trust, a subsequent owner of that fractional interest (collectively, the "Romero Plaintiffs"). On or about August 24, 2007, the Romero Plaintiffs purchased an undivided 1/12th interest in Club Interest Unit No. 305 from Defendants for $265,000. On or about July 6, 2010, the Romero Family 1995 Trust assigned the fractional interest to Karl H. Romero in his individual capacity. On or about January 15, 2015, Mr. Romero transferred the interest to the Romero Karl H. Family Trust by quitclaim deed, and on March 4, 2015, the interest was assigned to Karl H. Romero by quitclaim deed.

85. Plaintiffs Steven D. and Susan C. Sullivan are competent adult residents of Alameda County, California (collectively, the "Sullivan Plaintiffs"). On or about August 29, 2007, the Sullivan Plaintiffs purchased an undivided 1/12th interest in Club Interest Unit No. 405 from Defendants for $249,000.

86. Plaintiffs Douglas E. and Robin M. Webber are competent adult residents of Reno, Nevada and Trustees of the Webber Family Trust Dated May 10, 1997 (collectively, the "Webber Plaintiffs"). On or about January 2, 2008, the Webber Plaintiffs purchased an undivided 1/12th interest in Club Interest Unit No. 804 from Defendants for $297,000.

87. Plaintiffs Kenneth A. and Jennifer D. Bethel are competent adult residents of Stanislaus County, California (collectively, the "Bethel Plaintiffs"). On or about August 24, 2007, the Bethel Plaintiffs purchased an undivided 1/12th interest in Club Interest Unit No. 301 from Defendants for $199,000.

///

88.     Plaintiffs Giselle A. Parry and Ray K. Farris II are competent adult residents of Santa Clara County and managing and/or controlling members of Westwind Enterprises, Ltd., a California limited liability company (collectively, the "Parry/Farris Plaintiffs"). On or about August 24, 2007, the Parry/Farris Plaintiffs purchased an undivided 1/12th interest in Club Interest Unit No. 1201 from Defendants for $268,000.

89.     Plaintiff Thomas Sullivan is a competent adult resident of San Francisco County, California and was a Trustee of the Sullivan Family Trust (collectively, the "Thomas Sullivan Plaintiffs"). On or about November 1, 2007, the Thomas Sullivan Plaintiffs purchased an undivided 1/12th interest in Club Interest Unit No. 801 from Defendants for $249,000.

90.     Any releases signed and/or agreed to by any Plaintiffs (*e.g.*, the Messerschmitt Plaintiffs) are invalid because they were obtained by means of economic duress and/or were obtained without adequate disclosure of all relevant facts. Because Defendant R.C. Chronicle and/or the other Defendants controlled the Club Interest Association at the time of the releases, Defendants owed the releasing Plaintiffs a fiduciary duty that required them to disclose all material facts prior to obtaining the release. Their failure to do so gives rise to a presumption of fraud that negates the releases. *See Chung v. Johnston*, 128 Cal.App.2d 157, 163-165 (1954).

## GENERAL ALLEGATIONS

**A.     History of Marriott's Timeshare Business.**

91.     In the 1980s, Marriott International, Inc. established Defendant Marriott Ownership Resorts Inc. d.b.a. Marriott Vacation Club International ("MVCI") to run Marriott's timeshare operations. In 1984, Marriott's Monarch on Hilton Head Island became the first MVCI resort. By 2009, MCVI had grown to over 400,000 timeshare owners. The evolution of this timeshare program, known as the "Marriott Vacation Club," is at the heart of this case.

92.     Marriott International purchased a 49% interest in the Ritz-Carlton Hotel Company in 1995, and then purchased another 50% in 1999, giving Marriott International a 99% ownership interest in the Ritz-Carlton Hotel Company, but more importantly, ownership of the Ritz-Carlton brand. Ritz-Carlton is a highly valued brand associated with the Ritz-Carlton Hotel Company, which develops, sells, operates and manages luxury properties all over the world.

Over the years, the Ritz-Carlton has become the preferred hotel company among luxury hotel chains, based in large part on the prestige of its brand, luxurious amenities, and outstanding service.

93. In 1999, MVCI introduced "The Ritz-Carlton Club" (also known as "The Ritz-Carlton Destination Club" and the "Ritz-Carlton Membership Program"), as a luxury alternative which it described as its "luxury" product line, and which was distinct from its "Marriott Vacation Club" timeshare product, which it described as its "upscale" product line. Between 2001 and 2011, MVCI developed and sold approximately 3,200 deeded 1/12 luxury fractional interests under the Ritz-Carlton Club brand at the following nine locations: Aspen Highlands, Colorado; Bachelor Gulch, Colorado; Jupiter, Florida; North Lake Tahoe, California; St. Thomas, U.S.V.I.; Maui, Hawaii; Vail, Colorado; Abaco, Bahamas; and as relevant here, San Francisco, California.

94. Initially, the Ritz-Carlton Club and the Marriott Vacation Club were entirely distinct product lines in keeping with their differing benefits and target clientele, but Marriott could not resist using the highly valued "Ritz-Carlton" brand to increase the profitability of the Marriott Vacation Club.

95. In 2010 when MCVI began converting legacy owners of Marriott Vacation Club timeshares to a "points-based product" wherein purchasers bought interests in a land trust ("MVC Trust") set up by MVCI to own its resorts. By the end of 2011, many of the Marriott Vacation Club's over 400,000 owners at over 50 Marriott Vacation Club resorts worldwide were utilizing points purchased from MVCI to trade for use of Marriott Vacation Club resorts. Further, by the end of 2011, Marriott Vacation Club points were available for sale on the secondary market for a fraction of the cost at which MVCI sold them "new."

96. In November 2011, Marriott International, Inc. "spun-off" Defendant MVW as a separately traded public company, and MVW became the exclusive developer and manager of vacation ownership and related products under the Marriott brand and the exclusive developer of vacation ownership and related products under the Ritz-Carlton brand.

///

97. In its first Annual Report filed with the SEC following the spin-off (dated March 21, 2012), MVW revealed its intent to abandon the upscale Ritz-Carlton product line, stating: "we have significantly scaled back our development of Luxury segment vacation ownership products. We do not have any Luxury segment projects under construction nor do we have any current plans for new luxury development. While we will continue to sell existing Luxury segment vacation ownership products, we also expect to evaluate opportunities for bulk sales of finished inventory and disposition of undeveloped land."

98. In a condominium without fractional units, the scope of a condominium association's fiduciary duties is circumscribed by the fact that the condominium association's authority covers only common areas and does not extend into control over the individual units. Here, however, a distinct set of governing documents establishes a *Club Interest Association.* Unlike a traditional homeowners association, which has authority only over common areas, the Club Interest Association (and by extension its designated agents, including Ritz-Carlton Management Company and Cobalt) has authority over the separately-deeded property interests (not just common areas) of each individual Club Interest owner. The scope of the fiduciary duties at issue here is, therefore, different from the normal condominium context because the scope of the Club Interest Association's authority over each Plaintiffs' fractional property interest is more extensive.[3]

99. The Developers, R.C. Chronicle and Ritz-Carlton Development assumed the Club Interest Association's fiduciary duties by retaining control over that association through the appointment of its employees or agents to a majority of the Club Interest Association board member positions.[4] Ritz-Carlton Management Company, an affiliate of Ritz-Carlton

---

[3] *See Vai v. Bank of Am. Nat'l Trust & Sav. Ass'n*, 56 Cal. 2d 329, 338 (1961) ("The key factor in the existence of a fiduciary relationship lies in control by a person over the property of another"); 34A Cal. Jur. 3d Fraud and Deceit § 13 (same); *United States v. Wilson*, 881 F.2d 596, 599 (9th Cir. 1989) ("A fiduciary relationship will 'arise[ ] when the Government assumes ... control over ... property belonging to Indians'").

[4] *See Raven's Cove Townhomes, Inc. v. Knuppe Development Co.*, 114 Cal.App.3d 783, 799-800 (1981) (holding developer owes fiduciary duties while it controls association board and

FOURTH AMENDED COMPLAINT

Development[5], assumed these same duties by contractually agreeing with the Club Interest Association to be the manager of the fractional units, with near absolute authority over almost every aspect of their use. These fiduciary duties are shared by Cobalt because Ritz-Carlton Management delegated its sweeping authority to Cobalt to run the Membership Program such that Cobalt became Ritz-Carlton Management's subagent.[6] The other defendants aided and abetted the breach of fiduciary duties by these three defendants.

**B.      Plaintiffs' Purchases of Fractional Interests at the SF Ritz Residences.**

100.      In the marketing materials, brochures, websites, and other sales materials that Defendants prepared and/or distributed and that Plaintiffs received and/or reviewed prior to their purchases, Defendants stressed the exclusivity and the prestige associated with ownership of fractional interests in units at the SF Ritz Residences and membership in the Ritz-Carlton Club, and their intention to undersell Club Interest Units so that Plaintiffs and other fractional buyers would have no difficulty using their contractually-allotted time. For example, one item of marketing material reads in pertinent part:

> ***For those who act decisively, the possibilities are endless.***
> ***<u>Only a few will have the opportunity to become a Member of</u>***
> ***<u>The Ritz-Carlton Club, San Francisco</u>***
>
> *<u>The Ritz-Carlton Club is the most exclusive residence club in the world.</u> We are building a system of Clubs in premier urban, beach, golf and ski locations. The Club*

---

stating, "Thus, a developer and his agents and employees who serve as directors of an association . . . may not make decisions for the Association that benefit their own interests at the expense of the association and its members"); *Cohen v. S & S Construction Co.*, 151 Cal.App.3d 941, 945 (1983) ("This fiduciary duty extends to individual homeowners, not just the homeowners association").

[5]      The RC Development signed the management agreement on June 15, 2006 as RC Management's sole member.

[6]      *See Streit v. Covington & Crowe*, 82 Cal.App.4th 441, 446, fn. 3 (2000) ("if an agent is authorized by the principal to employ a subagent, the subagent owes the same duties to the principal as does the agent"); *Sequoia Vacuum Systems v. Stansky*, 229 Cal.App.2d 281, 287 (1964) ("Every agent owes his principal the duty of undivided loyalty. During the course of his agency, he may not undertake or participate in activities adverse to the interests of his principal").

FOURTH AMENDED COMPLAINT

*was designed by Ritz-Carlton loyalists, creating a combined vision of second home ownership with the legendary services of the Ritz-Carlton staff.*

*The Ritz-Carlton Club, San Francisco is an offering of one and two bedroom luxurious residences where the benefits of private second-home ownership are complimented by the legendary services of the Ritz Carlton Hotel Company. Each fractional interest is deeded in perpetuity and becomes part of your estate. Your interest may be enjoyed, willed or sold as you would with most any Real Estate.*

**Membership Privileges**

...

- <u>*The Club residences are intentionally undersold to accommodate for greater flexibility (16 unsold weeks in each residence-112 days per Residence)*</u>

- *To maximize leisure-time usage, you may use your allocated time in San Francisco or any other Ritz-Carlton Club on a space available basis at no additional cost.*

..."

**The Ultimate in Luxury**

- *As member you will receive the legendary service of The Ritz Carlton Hotel, complimented [sic.] by the exclusive amenities for Members only.*

...

- *You will enjoy the piece [sic.] of mind knowing your residence is managed by The Ritz-Carlton; the world's premier provider of luxury assets. Our level of integrity ensures that your residence will be maintained in the style our loyalists have come to expect.*

*\*Current pricing from $232,000*

A true and correct copy of this document is attached hereto as Exhibit A and incorporated by reference (underlining added).

101. Like the "*intentionally undersold*" representation quoted above, the following language in another promotional document falsely implied that Plaintiffs' ability to use their contractually-allotted time would be preserved by restricting access to the SF Ritz Residences:

**Will The Ritz-Carlton Club be open to the public?**
No. The Ritz-Carlton Club will be operated for the use, benefit and enjoyment of the Members, their families and their guests.

A true and correct copy of this document is attached hereto as Exhibit B and incorporated herein by reference. In fact, as more fully alleged below, Defendants opened the facility to members of

///

another club through a merger. Among other negative consequences alleged herein, this made it difficult for many Plaintiffs to use their allotted time at the SF Ritz Residences.

102.    Indeed, the exclusivity of the Club was incorporated into the governing documents of the development. Pursuant to section 1.3 of the CCRs, use rights are allocated to Club Interest Owners for twenty-one days a year. In other words, all members of the Ritz-Carlton Club, numbering just a few hundred, committed to using the Club for twenty-one days a year. The offering was not set up as a transient hotel, but was instead limited to buyers who paid large purchase prices to secure an interest in a club where all users were expected to have a similar use-impact on the Club.

103.    Consistent with intending to limit the impact and wear and tear on the club, as well as to keep the club available only to members who paid large premiums to buy into the Club, owners of fractional interests are prohibited under section 2.21 of the CCRs from subjecting their units to any exchange program, timeshare program or vacation club without the prior written consent of the Declarant. Additionally, section 2.13 of the CCRs prohibits any Club Interest from being used for any trade, business or commercial purpose.

104.    During the sales process, Defendants represented to Plaintiffs and other buyers that the fractional interests marketed and sold to them were distinct from and far safer than timeshare interests, which are known for dropping in value. Among other things, Defendants claimed to Plaintiffs that these fractional interests were more likely to hold their value because Plaintiffs would obtain recorded deeds memorializing their partial interests and Plaintiffs would control the Club Interest Association (the association for owners of fractional interests). In reality, Defendants' offering is no better than a timeshare. Defendants have retained complete control over the Club Interest Association, and the supposedly positive attributes of a deeded interest are entirely illusory here. If anything, Defendants' offering is worse than a timeshare in that the fractional interests at issue here have not merely dropped in value, but have lost all or essentially all value.

105.    Defendants made various other representations that were misleading and/or likely to deceive, including but not limited to the following:

a. Defendants told Plaintiffs that the three commercial units would include a health club, which never materialized, although a workout room was added.

b. Defendants represented to Plaintiffs and other buyers that there would be a "curb cutout" to allow Plaintiffs to easily and safely access the building, which is located on a busy thoroughfare. This feature never materialized. Defendants knew or should have known that the City of San Francisco was unlikely to approve a curb cutout at that location.

c. Defendants represented that they would help maintain the value of the fractional interests through buy backs. Yet when some Plaintiffs asked Defendants to buy back their fractional shares, Defendants refused.

d. Defendants represented that Plaintiffs and other buyers would have access to sought-after resorts, such as the Ritz-Carlton Club, Kapalua Bay, through the Ritz-Carlton Membership Program. But Defendants later removed some of the most desirable resorts from this program and/or caused other facilities to remove themselves from the program.

106. Based on the Defendants' representations regarding the SF Ritz Residences and the Ritz-Carlton Membership Program, which Defendants knew or should have known Plaintiffs would rely upon, Plaintiffs paid premium prices to Defendants for their fractional interests. Plaintiffs thereby obtained the contractual right to 21 days of use of a Club Interest Unit for each $1/12^{th}$ fractional interest purchased. In addition, as a condition of purchase and ownership, they were enrolled in the Ritz-Carlton Membership Program (a.k.a. Ritz-Carlton Club) pursuant to which they were allowed access to other participating resorts and clubs.

107. Defendants did not offer these fractional interests at preset prices. To the contrary, Defendants sought to obtain as much as they could possibly get from each buyer, even if the result was that buyers paid vastly different prices for the same fractional interest. For example, the Cohen Plaintiffs paid $359,500 for a fractional interest in Club Interest Unit No. 1002, while the Bohn Plaintiffs paid just $308,300 for the same fractional interest. It should also be noted that even after these significant purchase prices were paid, the per-night cost remained extremely high; if the Annual Assessment is divided by the 21 days of allotted use, this results in a per-
///

night cost for most Plaintiffs of nearly $1,000. These same units have been advertised by Defendants at a fraction of that per-night cost ("from $359 / night").

108. These sales were made pursuant to a standardized contract and set of related agreements, primarily consisting of a Purchase Contract, a disclosure statement describing the Ritz-Carlton Membership Program, and an Affiliation Agreement. True and correct copies of these documents are attached hereto as Exhibits C, D, and E (without the exhibits, addenda, and other ancillary documents attached to and/or provided with them) and incorporated herein by reference. These documents (including the exhibits, addenda, and other ancillary documents attached to and/or provided with them) are collectively referred to herein as the "Purchase Contract."

109. With the Ritz-Carlton brand and legacy in mind, Plaintiffs agreed to pay and have paid significantly more than the cost of fractional ownership interests offered by less prestigious brands, such as the Marriott Vacation Club. This includes significant Annual Assessments calculated in a manner that has never been disclosed to Plaintiffs. The Purchase Contract suggests the Annual Assessment consists of property taxes, Club Assessments to cover each purchaser's share of certain vaguely defined costs, and Membership Program Dues for participating in the Ritz-Carlton Membership Program.

110. In all 68 plaintiffs (or groups of plaintiffs) paid Defendants a total of over $17 million dollars, plus years of inflated Annual Assessments thereafter, for their fractional interests and the right to participate in the Ritz-Carlton Membership Program.

**C. Defendants Improperly Retain Control Over the Associations and Used That Control to Profit at Plaintiffs' Expense.**

111. Defendants improperly maintained control over the Club Interest Association by ceasing sales efforts (which reduced the number of purchasers who could cast votes), and agreeing to take back units from *some* owners who simply wished to walk away (which allowed Defendants to acquire those votes). Defendants then used their expanded voting power to self-deal to Plaintiffs' detriment. In addition, Defendants have taken the position that they can cast an additional 60 votes for five units that were withdrawn from the fractional offering and left

undeveloped. In the last director's election in November 2014, Defendants cast 175 votes, far above the 122 votes allocated to Plaintiffs and other purchasers of fractional interests.

112.    Defendants' exercise of absolute control has allowed them to pursue a self-serving agenda and perpetrate the wrongful conduct alleged herein. Among other things, Defendants have used their control to keep rental revenue that would otherwise have gone to Plaintiffs, and raise Annual Assessments and open the SF Ritz Residences to members of the Marriott Vacation Club. Defendants' directors have rejected measures that would have protected Plaintiffs from the harm alleged herein, and have refused open debate of the issues raised herein. This conduct is a clear violation of the fiduciary duties that Defendants assumed and retained by failing to relinquish control over the Club Interest Association.[7] In addition, Defendants have violated Business & Professions Code § 11266 by amending provisions of the declaration, articles of incorporation, bylaws, rules, and/or regulations without the requisite number of votes residing in members other than the developer.

113.    Specifically, R.C. Chronicle (the declarant), together with its joint venture partner Ritz-Carlton Development, have retained majority voting power on the Club Association. Though they are supposed to act for the benefit of the Association and Club Members as members of the board, these Defendants have pursued a self-serving agenda to the detriment of Club Members. Among other things, they have: (1) failed to properly supervise their affiliates and defendants RC Management and Cobalt, who have collectively been assigned absolutely authority to conduct the affairs of the Association without proper oversight and have effectively usurped all the power of the board; and (2) conspired and/or acquiesced in a supposed "affiliation" that is more accurately described as a merger with the Marriot Vacation Club to the detriment of Club Interest Owners, as more fully discussed below.

---

[7]    *See Raven's Cove Townhomes, Inc. v. Knuppe Development Co.*, 114 Cal.App.3d at 799-800 (holding developer owes fiduciary duties while it controls association board and stating "Thus, a developer and his agents and employees who serve as directors of an association . . . may not make decisions for the Association that benefit their own interests at the expense of the association and its members"); *Cohen v. S & S Construction Co.*, 151 Cal.App.3d at 945  ("This fiduciary duty extends to individual homeowners, not just the homeowners association").

**D.     Inflated Annual Assessments.**

114.     Sales representatives told Plaintiffs that their Annual Assessments would decrease as additional fractional interests were sold, but Defendants decided to reduce the number of units in which they sold fractional interests. Due to this and other factors, the Annual Assessments have not decreased as promised.[8] To the contrary, once the fractional interests were sold, Defendants ratcheted up the Annual Assessments until the annual cost of the 21 days of use became exorbitant — especially when coupled with the substantial purchase prices, which in the vast majority of cases exceeded $200,000 and was as high as $359,500. The 2015 Annual Assessment for a one-bedroom unit is $18,091 (a 31% increase from the first year); for a two-bedroom unit the Annual Assessment is $20,545.21 (also a 31% increase from the first year); for a three-bedroom unit it is $23,943 (same).

**E.     Defendants Profit at Plaintiffs' Expense By Merging The Ritz-Carlton Club with the Marriott Vacation Club.**

115.     At the same time, Defendants have not only diluted the promised exclusive nature of the SF Ritz Residences and the Ritz-Carlton Membership Program but also upended the entire structure of the offering through a merger with a much larger, less exclusive program.

116.     On or about July 17, 2012, Defendants announced their *intention* to "affiliate" the Ritz-Carlton Club with the Marriott Vacation Club. This announcement, which assured Class Members that "nothing about the Home Club Membership…has changed," was highly misleading in that it attempted to conceal the radical changes that were to come. For example, the July 17, 2012 letter failed to disclose that the proposed "affiliation" would allow the 400,000 Marriott Vacation Club members to access the Ritz-Carlton Club locations. Nor did it disclose that these Marriott Vacation Club members could rent Fractional Units at the SF Ritz Residences

---

[8]     Moreover, Defendants closed the local sales office two years ago and thereby ceased any effort to sell additional fractional interests in the twenty units in which fractional interests were sold. Defendants were obligated to continue paying Annual Assessments on unsold fractional interest for only one year, but have apparently continued to pay them on a voluntary basis. If and when Defendants discontinue this, the impact on Plaintiffs' Annual Assessments would be dramatic.

on a nightly basis, even though the CCRs contemplated that all Owners would use the Club for 21 nights a year. Finally, it did not disclose that 132 units at the SF Ritz which were acquired by the Marriot Vacation Club would be converted into luxury inventory for the Marriot timeshare program, thereby placing over half the units in the Club into a timeshare program, rather than selling them to buyers to own as a Club Interest.

117. The announcement generated concern amongst the various "member controlled" Boards of Directors of the various Ritz-Carlton Destination Clubs. For instance, in a letter dated August 3, 2012, the Association Board of the Ritz-Carlton Club-St. Thomas wrote to its members:

> "We have been in frequent communications with each other and the Presidents of the other RCDC Clubs since this announcement. Our general but preliminary consensus regarding the 'evolution' of the RCDC brand as described in Eveleen Babich's letter of July 17th is that we are concerned that this may not be an enhancement to our Membership Interests. We all, as members, invested in the Ritz-Carlton brand!"

118. On August 10, 2012, the Board of the Ritz-Carlton Club, Jupiter wrote its members:

> "We were disappointed as to how Ritz Carlton, Marriott Vacations Worldwide Corporation and Cobalt Travel Company, LLC ('RCDC Parties') separately and collectively chose to characterize these matters they have defined as the 'evolution of the RCDC brand.' No input from your Board of Directors or, to our knowledge, any of the other RCDC Club Boards was ever solicited by these companies while they determined these significant changes to the RCDC system in which we all own a Membership Interest."

119. On November 5, 2012, the President of the Board of the Ritz-Carlton Bachelor Gulch, Michael Mullenix, wrote a letter to Mr. Steven Weisz, President and CEO of MVW and Lee Cunningham, Executive Vice President and COO of MVW, stating:

> "I am writing on behalf of the Board of Directors to continue our dialogue about the proposed affiliation of Ritz Carlton Bachelor Gulch Members with Lion and Crown in 2013 and beyond and to request that such proposed affiliation be canceled. At a minimum, the proposed affiliation should be delayed until January 1, 2014 and the status quo maintained until that time . . . The Board and membership of the Club have serious concerns that the Club's affiliation with Lion and Crown is contrary to the Club's

governing documents and, in any event, will have permanent negative impacts on the club, including most importantly to the value of our residence units . . . ."[9]

120.    In a May 14, 2013 letter to Plaintiffs, MVW Chief Operating Officer Lee Cunningham promised that the merger with Marriott Vacation Club would not take place without a member vote, stating: "regarding other potential affiliations, we want to assure you that a Ritz-Carlton Club affiliation with Marriott Vacation Club Destinations will not take place unless there is an affirmative vote of each Club's membership."

121.    This was a lie. In an internal November 4, 2014 memo regarding the "San Francisco Affiliation," Eveleen Babich, the General Manager for Member Services of the Ritz-Carlton Destination Club, told other executives that there would be no vote but rather just a "survey," *and that the merger would go through regardless of the results*.

122.    Indeed, despite promises by Defendants that no merger with the Marriott Vacation Club would occur without a vote of the membership, no vote ever occurred. Instead, in December 2014, Defendants, including MVW, Ritz-Carlton Management and Cobalt, favored Marriott's interests over Plaintiffs' interests and unilaterally imposed the merger with Marriott Vacation Club, and/or forced, agreed and/or conspired the Club Interest Association to do so. This, and the other wrongful conduct alleged herein, was committed in breach of the fiduciary duties owed to Plaintiffs.

123.    The merger was directly contrary to the wishes of Plaintiffs and other owners at the SF Ritz Residences. In August 2013, two independent members of the Board of Directors at the SF Ritz Residences conducted a survey of the membership. 81% of the members surveyed indicated that they would prefer to terminate their affiliation with Ritz-Carlton Management and Cobalt, or liquidate their Ritz-Carlton Club interest rather than allow the merger with the Marriott Vacation Club.

124.    The merger radically upended the offering marketed to Plaintiffs and other fractional purchasers. Now, approximately 400,000 Marriott Vacation Club members — who

---

[9]    Later, both Jupiter and Bachelor Gulch voted to terminate its management agreement with Ritz-Carlton in response to the merger announcement.

paid a third less in purchase prices and who pay approximately a third of the annual fees — have access to resorts that were formerly only available to Plaintiffs and a few thousand other Ritz-Carlton Club members. Defendants have derived huge profits and/or cost savings through this merger while devaluing Plaintiffs' vested property interests. Worse yet, Plaintiffs have had to pay for the increased use and wear and tear resulting from the opening of the SF Ritz Residences to Marriott Vacation Club Members.

### F. Marriot Violated the CCRs by Renting Unsold Inventory and then Using It for Commercial Purposes.

125. Defendants' improper conduct extended well beyond the wrongful merger of the Ritz-Carlton Membership Program with the Marriott Vacation Club. Defendants used unsold inventory in a manner that violated the CCRs, first by renting unsold inventory on a nightly basis, and then by using unsold inventory for commercial purposes after the unlawful merger.

126. Beginning in 2012 and continuing until the unlawful merger (at least), the Marriot Defendants, which acquired 132 of the Club Interests from R.C. Chronicle, offered their Club Interests on websites like Jetsetter.com, and also to members of the Marriott Vacation Club for "per night" rentals. This was a violation of section 2.13 of the CCRs for the SF Ritz Residences, which prohibits Club Interests from being used for any commercial purpose if not expressly authorized by the CCRs. Rental by Club Interest owners is not expressly authorized.

127. In 2013, a fractional owner at the SF Ritz Residences asked Defendants a telling question: "Given [that] all Club Members are treated 'equally' under the Rules, how is it that the Ritz is able to advertise and sell rooms on a per night basis to outsiders, while other club members are restricted from advertising and selling their own inventory to third parties on a per night basis?" In internal emails, MVW executive Kendra Johnson proposed to respond that Defendants were allowed to rent in connection with marketing activities — that is until MVW Senior Vice President for Global Inventor & Revenue Management Nick Rossi correctly pointed out that this justification no longer applied since Defendants had halted all efforts to sell the unsold inventory.

///

128.    This unlawful rental program continued for years despite Defendants' knowledge that it violated the CCRs. Defendants attempted to conceal the rental program with vague representations like the following that appeared in an August 30, 2012 "Frequently Asked Questions for Members": "Marriott Vacations Worldwide intends to sell most of its remaining unsold Ritz-Carlton Club inventory through the Marriott Vacation Club Destinations program." What Defendants should have said is "Marriott Vacations Worldwide is going to violate the CCRs by renting unsold inventory on a 'per night' basis."

129.    Internal Marriott documents reveal that Defendants were aware that the transfer of unsold inventory to the NATO trust was likely to be challenged because the SF Ritz Residences was not designed for high volume of transient usage.

## G.    Defendants' Wrongful Conduct Drives The Value of Plaintiffs' Fractional Interests to Zero.

130.    As one would expect of rational economic actors, Marriott Vacation Club Members availed themselves of the superior Ritz-Carlton facilities. If all fractional owners at the SF Ritz Residences used all twenty-one days allotted to them, the twenty Club Interest Units would have an occupancy rate of approximately 67%. In 2013, the occupancy rate for these units was approximately 90%, presumably reflecting usage by members of the Marriott Vacation Club and other non-owner guests. As a result of this dilution, some Plaintiffs have had difficulty obtaining the full twenty-one days of use they purchased for each $1/12^{th}$ interest.

131.    In short, Defendants' representations that "*[t]he Club residences are intentionally undersold to accommodate for greater flexibility*" and that access to the SF Ritz Residences would be restricted were false, misleading, likely to deceive, and/or otherwise unlawful.

132.    In 2009, the year that the Ritz-Carlton Club celebrated its 10th anniversary, Defendants posted The Ritz-Carlton Destination Club Frequently Asked Questions on the Ritz-Carlton website (the "2009 FAQ"), a true and correct copy of which is attached hereto as Exhibit F and incorporated herein by reference. The 2009 FAQ answered several important questions dealing with the membership and its benefits. One such question and answer (which also appeared in at least one later version of the document) reads as follows:

**Is The Ritz-Carlton Destination Club open to the public?**
No, The Club is operated for the exclusive use, benefit and enjoyment of the Members, their families and their guests. However, on a limited basis, guests can visit a Club location as a sponsored guest to experience the lifestyle prior to enrolling.

133. In 2012 or 2013, around the time of the Marriott merger, Defendants removed this question and answer, as is evident in the 2013 version of the FAQ. The removal of this question and answer following the 2012 merger with the Marriott club shows that the Defendants knew or should have known that the merger rendered these representations false, misleading and likely to deceive potential purchasers.

134. In or about August 2012, shortly after Defendants announced the intention to merge with the Marriott Vacation Club, Defendants sent Plaintiffs and other Ritz-Carlton Club members a letter that read in pertinent part: "First of all, we would like to assure you that nothing that you originally purchased has changed or will change as a result of the announcement mentioned above." This statement is false, as more particularly alleged above and below. A true and correct copy of this letter is attached hereto as Exhibit G and incorporated herein by reference. It was signed by Lee Cunningham, who represented himself as the Executive Vice President and COO of the Ritz-Carlton Destination Club but failed to mention that he also holds these titles at Defendant MVW.

135. Defendants knew or should have known that the merger of the Ritz-Carlton Membership Program with the Marriott Vacation Club was contrary to the representations that Defendants made to Plaintiffs in advertising and other marketing material, and further that the merger and the other conduct alleged herein would unfairly interfere with the benefits that Plaintiffs were supposed to receive under their Purchase Contracts.

136. As a result of these actions, Plaintiffs have been severely injured. Membership in the Ritz-Carlton Club has been so diluted by the merger with the Marriott Vacation Club, as well as by Marriot's conversion of its substantial holdings at the SF Ritz into additional inventory for its timeshare portfolio, that availability of the units, both at the SF Ritz Residences and at other Ritz-Carlton locations, is greatly reduced. Plaintiffs must continue to pay the Annual Assessments or lose their use privileges and face litigation. Selling is not an option. There is no

market for these units, and certainly no way to recoup anything close to the substantial purchase prices.

137.     That the fractional interests have collapsed in value is clear. Plaintiffs are aware of only a handful of instances in which fractional interests have been sold, but those sales were many years ago and not the product of arms-length negotiations. In these few instances, all of which were several years ago, the sales were at fire-sale prices ranging from $20,000 to $100,000. The number of fractional owners has dropped from approximately 160 several years ago to less than 110. While some fractional owners switched to other programs run by Defendants, other buyers simply "walked away" (in the particular instances in which Defendants allowed that), something no rational economic actor would do if the fractional interests had any value in the marketplace.

138.     The Messerschmitt Plaintiffs are an example of this category, opting to "sell" their unit back to Defendants for free because they were unwilling and/or unable to continue paying the Annual Assessments and they were concerned about the impact of this "asset" on their estate. Stating the latter in another way, they did not want to saddle their heirs with this perpetual liability. Even though they lost their entire purchase price — $216,000 paid in cash — they were lucky. In other instances, Defendants refused to accept deeds from Plaintiffs who could no longer afford their mortgages and/or Annual Assessments. For example, the Swanson Plaintiffs attempted to sell their fractional interest but found no willing buyers. They asked Defendants to take their deed back, but Defendants refused. They fell behind on their dues, and Defendants, acting through the Club Interest Association, sued them.

139.     Perhaps most illustrative of the collapse in value is the settlement in *Benner, et al. v. R.C. Chronicle Building, L.P., et al.* (San Francisco Superior Court No. CGC-12-527401), a class case involving Defendants' failure to disclose Mello-Roos bonds and related property taxes as required by California law. Most of the Plaintiffs in the present case were members of the *Benner* Class. The settlement approved by the Court included this surprising option: the fractional buyers who comprise the class could opt to receive approximately $7,500 in the undisclosed Mello-Roos taxes that they paid and, in the words of the class settlement notice,

"execute a contract that surrenders all title, right, and interest in your timeshare to The Ritz-Carlton" for no remuneration. According to reports to the Court in the *Benner* action, a dozen buyers have elected this option.

140.    To elaborate on the latter, for nothing more than a few thousand dollars in excess property taxes that Defendants should have disclosed and were therefore liable for, a dozen buyers of fractional interests were willing to return their deeds to avoid having to pay substantial sums annually for assets that, because of Defendants' conduct, have absolutely no market value. Nobody would choose this option if there were willing buyers for these fractional interests.

141.    The market for these particular fractional interests is not likely to rebound. Defendants made sure that they would profit from any re-sales by representing that buyers in these secondary transactions could participate in the Ritz-Carlton Membership Program only if a Ritz-Carlton representative brokered the transaction. At least according to Defendants, buyers in secondary transactions handled by other real estate agents or brokers could not participate in the Ritz-Carlton Membership Program, meaning they would have no right to use the other participating facilities. This was unfair even when Ritz-Carlton maintained a local sales office to handle such secondary transactions. It became even more unfair when Ritz closed that sales office approximately two years ago and otherwise acted to prevent Plaintiffs from being able to engage Ritz-affiliated brokers.

142.    Defendants have driven the value of Plaintiffs' fractional interests to zero by actively thwarting efforts by Plaintiffs to sell their units to third parties, including by warning potential third party buyers that they would not be able to participate in the Ritz-Carlton Membership Program, and by steering those buyers to the far cheaper, competing Marriott product. Defendants' failure to maintain the promised exclusivity of the SF Ritz Residences and the ready availability of Club Interest Units, their decision to terminate Plaintiffs' access to some of the most desirable resorts represented to be part of the Ritz-Carlton Club at the time of purchase, and their failure to live up to the other promises and representations alleged in this Complaint have also caused the value of the fractional interests that Plaintiffs purchased to

///

collapse such that Plaintiffs are now locked into a perpetual liability without the benefits Defendants promised.

143.     Defendants discontinued any meaningful effort to sell fractional interests at the SF Ritz, opting instead to market their competing Marriott Vacation Club product to Plaintiffs' detriment. The cessation of sales efforts was undertaken so that the "developer inventory" that Defendants could not de-annex and sell outright could be utilized by the Defendants as inventory for the benefit of Marriott Vacation Club members, thereby causing the fractional interests that Plaintiffs purchased to become obsolete and worthless.

## H.     As Deeded Owners of Property that Nobody is Willing to Buy, Plaintiffs are Locked Into a Perpetual, Costly Liability.

144.     The promotional document attached as Exhibit A notes: "*Each fractional interest is deeded in perpetuity and becomes part of your estate.*" Likewise, Defendants have described the Membership Program as being "appurtenant" to the deed, meaning it continues for as long as the corresponding ownership interest lasts. Plaintiffs do not have the option of cancelling their membership. The Purchase Contract further provides: "membership in the [Ritz-Carlton] Membership Program may not be partitioned from ownership of a Club Interest." Thus, Plaintiffs must continue to pay their Annual Assessments (which include the Membership Program Dues) for as long as they own their property. They cannot terminate that obligation without ridding themselves of their deeds, but no one is willing to buy them. Defendants only agree to take them back when it serves their interests, and in many instances it does not serve their interests to do so.

## I.     Defendants Attempted to Immunize Themselves From Liability With an Ineffective Disclaimer of Fiduciary Relationships.

145.     California law required the Club Interest Association to hire a professional management company. Bus. & Prof. Code § 11267. Defendants used their absolute control over the offering to make an affiliated company, Defendant Ritz-Carlton Management, the required management company. In an attempt to allow Ritz-Carlton Management to operate Club Offering for the benefit of Defendants without threat of liability, Defendants inserted a provision in the Management Agreement that purports to disclaim the creation of "a partnership, joint

venture, or any other relationship *between the parties to [the Management Agreement].*" But this could not possibly disclaim a fiduciary relationship between Defendants *and Plaintiffs* because *Plaintiffs did not sign — and thus are not parties — to the Management Agreement.*

146.    In the closely related case of *Reiser v. Marriott Vacations Worldwide Corp.*, 2017 WL 569677, at *5 (E.D. Cal. Feb. 13, 2017), the Marriott and Ritz defendants relied on an essentially identical provision to argue that no fiduciary duties were owed to the plaintiff owners. The federal court squarely rejected that contention — and denied a motion to dismiss breach of fiduciary duty claims — based on the lack of privity, stating:

> Defendants counter by citing the terms of the Management Agreement itself, which contains express disclaimer provisions that bar any agency relationship from being imputed. Those provisions, however, only bar an agency relationship *between the signing parties*. Plaintiffs were not parties to the Management Agreement, and instead possess only an ownership agreement in fractional units governed by the Agreement. Consequently, the disclaimer language is not binding upon them.

147.    To the extent this or any other provision could be interpreted to negate fiduciary duties inherent in the structure of this offering, it is void as contrary to public policy. Civ. Code § 1668 ("All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law"); Civ. Code § 1670.5(a) ("If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result").[10]

---

[10]    Further, it would be a breach of fiduciary duty for a fiduciary, such as the Club Interest Association, to delegate all authority to an entity that disclaims any fiduciary obligations. *See Cohen v. Kite Hill Cmty. Assn.*, 142 Cal.App.3d 642, 650–51 (1983) ("in recognition of the increasingly important role played by private homeowners' associations in such public-service functions as maintenance and repair of public areas and utilities, street and common area lighting, sanitation and the regulation and enforcement of zoning ordinances, the courts have recognized that such associations owe a fiduciary duty to their members"). If the Court finds the Management Agreement negates any fiduciary duties, Plaintiffs allege, in the alternative, that Defendants violated fiduciary duties by allowing the Club Interests Association to delegate all responsibility to Ritz-Carlton Management, and then to Cobalt without ensuring that Ritz-

**J.    Sources of Fiduciary Duties.**

148.    There are multiple sources of fiduciary duties arising both as a matter of law and out of the SF Ritz "Governing Instruments," which include the CCRs and The Ritz-Carlton, San Francisco Membership Program Affiliation Agreement, ("Affiliation Agreement").[11] These duties arise because of the high degree of control that Defendants gave themselves over Plaintiffs' separately deeded property interests. *See, e.g., Reiser v. Marriott Vacations Worldwide Corp.*, 2017 WL 569677, at *5 (denying motion to dismiss fiduciary duty claims in a closely related case based on closely analogous governing instruments").

**a.    The Developers, R.C. Chronicle and Ritz-Carlton Development.**

149.    The fiduciary duties of the developers — R.C. Chronicle, its joint venture Ritz-Carlton Development, and their alter egos, co-conspirators, and/or successors — arise as a matter of law because, through all relevant times herein, they retained control over the Club Interest Association, through the appointment of developer affiliated directors to the Club Interest Association Board of Directors. *See Raven's Cove Townhomes, Inc. v. Knuppe Development Co.*, 114 Cal.App.3d at 799-800 (developer owes fiduciary duties while it controls association board and stating "Thus, a developer and his agents and employees who serve as directors of an association . . . may not make decisions for the Association that benefit their own interests at the expense of the association and its members"). Also as a matter of law, this fiduciary duty runs between the developers and Plaintiffs. *Cohen v. S & S Construction Co.*, 151 Cal.App.3d at 945 ("This fiduciary duty extends to individual homeowners, not just the homeowners association").

///

///

///

Carlton Management and Cobalt would abide by the fiduciary duties imposed on the Club Interest Association as a matter of law. *Sequoia Vacuum Systems v. Stansky*, 229 Cal.App.2d at 287 ("Every agent owes his principal the duty of undivided loyalty. During the course of his agency, he may not undertake or participate in activities adverse to the interests of his principal").

[11]    *See* Amended and Restated Declaration of Covenants, Conditions and Restrictions for 690 Market Club, recorded July 11, 2007, section 1.58.

### b. The Management Agreement Gives Rise to a Fiduciary Duty Owed by Ritz-Carlton Management.

150.     Ritz-Carlton Management owes fiduciary duties to Plaintiffs for the same reason that the Club Interest Association owes fiduciary duties to Plaintiffs. *Cohen v. Kite Hill Cmty. Assn.*, 142 Cal.App.3d at 650–51 ("in recognition of the increasingly important role played by private homeowners' associations in such public-service functions as maintenance and repair of public areas and utilities, street and common area lighting, sanitation and the regulation and enforcement of zoning ordinances, the courts have recognized that such associations owe a fiduciary duty to their members"). Indeed, Ritz-Carlton Management Agreement stepped into the shoes of the Club Interest Association pursuant to the Management Agreement.

151.     Further, Ritz-Carlton Management assumed fiduciary duties by assuming a high degree of control over Plaintiffs' separately deeded property interests. *See, e.g., Reiser v. Marriott Vacations Worldwide Corp.*, 2017 WL 569677, at *5 ("Plaintiffs also claim that a fiduciary duty was triggered when the Management Agreement gave RC Management control not just over the common areas, but also Plaintiffs' individually deeded property interests…. Whether or not a fiduciary duty exists depends on the surrounding facts and circumstances…. Under California law, the key factor is whether there is 'control by a person over the property of another.' … Plaintiffs have pleaded exactly that—RC Management had control over their individually deeded property interests"); *Vai v. Bank of Am. Nat'l Trust & Sav. Ass'n*, 56 Cal.2d at 338 ("The key factor in the existence of a fiduciary relationship lies in control by a person over the property of another").

152.     The CCRs, section 4.4 provides: "The Club Interest Association shall have the authority to engage and the obligation to use its best efforts to engage and maintain a reputable firm as the Management Company and Program Manager for the Club Interest Project and operation of the Membership Program." Indeed, given the complexities involved in managing fractional units, California law *mandates* that the Club Interest Association hire a professional management company, and further establishes the authority of the professional management company to hire sub-agents. *See* Bus. & Prof. Code § 11267(a)(2).

153.    On June 15, 2006, the Club Interest Association entered into the "Ritz-Carlton, San Francisco Club Owners Association Operating Agreement" ("Management Agreement") with its affiliate, the Defendant Ritz-Carlton Management. Pursuant to paragraph 2 therein, captioned "Appointment and Acceptance of Operator Agency," the Ritz-Carlton Management agreed "to act on behalf of the Club Interest Association *and its members* as the exclusive operating entity of the Property . . . and to manage the daily affairs of the Club Interest Project and the Operating Company hereby agrees to so act." (Emphasis added.)

154.    Paragraph 4 of the Management Agreement, captioned "Delegation of Authority," provides: "[Ritz-Carlton Management Company], on behalf of and at the expense of, the Club Interest Association, to the exclusion of all other persons including the Club Interest Association and its members, shall have all the powers and duties of the Board of Directors of the Club Interest Association (the "Board") as set forth in the Articles of Incorporation and the governing documents of the Club Interest Association (except such thereof as are specifically required to be exercised by the Board or its members) . . . ."

155.    In addition, the Management Agreement specifically delegated to Ritz-Carlton Management Company absolute control over Plaintiffs' deeded property interests, including authority over the rules and regulations governing each plaintiffs' use of a fractional unit (¶ 4(L)), and all authority needed to maintain the Club Interest Units (¶ 4(I)). In addition, the Management Agreement gave Ritz-Carlton Management Company authority to conduct a wide range of activities on behalf of the Club Interest Association, including management of employees (¶ 4(A)); preparing the Association's budget, keeping financial records, and managing funds received on behalf of the Association (¶¶ 4(H), 4(F) and 4(J)).

156.    Paragraph 4(S) of the Management Agreement provides Ritz-Carlton Management Company with the authority to:

"Engage a Program Manager through an affiliation agreement, who shall manage and administer the reservation procedures and exchange program for the Ritz-Carlton Club Membership Program (the 'Membership Program') through which (i) all Owners of Club Interests reserve the use of accommodations at the Club Interest Project pursuant to the Procedures for Reserving Usage for the Ritz-Carlton Club, San Francisco ("Reservation Procedures") . . . The Program Manager shall have the broadest possible delegation of

authority regarding administration of the Reservation Procedures. . . . Ritz-Carlton Management Company on behalf of the Club Interest Association shall assess the Owners of Club Interests the reasonable cost (as determined by the Program Manager) of operating such Reservation Procedures, which cost shall be included as part of the Basic Assessment"

157.    Paragraph 14 of the Management Agreement provides "As compensation for its services hereunder, [Ritz-Carlton Management Company] shall receive an annual net fee, free from all charges and expenses" $554.23 (in 2007 dollars) per fractional interest from the Owners of the Club Interests in the Club Interest Units."

158.    Based upon the terms of the Management Agreement and also by operation of law, Ritz-Carlton Management is the agent of the Plaintiffs, and as such, owes Plaintiffs fiduciary duties, including the duties of loyalty and the duty to avoid self-dealing. In addition, based upon the high degree of control over Plaintiffs' Fractional Units arising from its authority, as set forth in the Management Agreement, Ritz-Carlton Management Company owes Plaintiffs and Class Members fiduciary duties, including a duty of loyalty and the duty to avoid self-dealing.

### c.    The Affiliation Agreement Gives Rise to Fiduciary Duty Owed by Cobalt.

159.    Pursuant to its contractual and statutory authority to hire subagents, Defendant Ritz-Carlton Management, in turn, delegated managerial authority and control over Plaintiffs' use of their Club Interest Units to its sub-agent, Cobalt, which is another affiliate of the developer and a wholly-owned Marriott subsidiary. This was done in the Affiliation Agreement, which was entered into by R.C. Chronicle, Ritz-Carlton Management, and the Club Interest Association. As a matter of law, all of the fiduciary duties that run between Ritz-Carlton Management and Plaintiffs also run between Cobalt and Plaintiffs. *Streit v. Covington & Crowe*, 82 Cal.App.4th at 446 n. 3 ("If an agent is authorized by the principal to employ a subagent, the subagent owes the same duties to the principal as does the agent") (citing Civ. Code § 2351 and Rest.2d, Agency, § 428).

160.    Pursuant to the Affiliation Agreement, Defendant Cobalt assumed near complete control over Plaintiffs' separately deeded Club Interests. Cobalt is the Program Manager of the Ritz-Carlton Club Membership Program and also operates the reservation system through which

Plaintiffs obtain use of their allotted number of days at the SF Ritz Residences and obtain access to the sister Ritz-Carlton Destination Clubs in the Ritz-Carlton Club Membership Program. Cobalt is wholly and exclusively in charge of managing and administering Plaintiffs' use rights in their separately deeded property, with the power to place plaintiffs in units that are equivalent to their separately deeded property. Cobalt is also wholly and exclusively in charge of managing and administering the use rights of Permitted Users and Exchange Users as contemplated under the CCRs.

161.    In addition, the Affiliation Agreement, paragraph 7.1(a) provides: "The Program Manager (Cobalt) may, in its sole discretion, elect to affiliate other locations with the Membership Program as Member Clubs or Associated Clubs from time to time. Neither the Developer, Association, nor Manager shall be entitled to participate in or consent to the Program Manager's decision in this regard."

162.    Plaintiffs retained only two powers. The first one is limited and underscores the authority granted to Defendants: Plaintiffs retained the right to use a unit — not necessarily their own — for 21 days, but only if they followed the procedures applicable to a reservation system operated by Cobalt. Second, Plaintiffs, as members of the Club Interest Association, could vote to terminate Ritz-Carlton Management Company and with it, Cobalt. But doing so would mean the loss of the Ritz-Carlton brand attached to their fractional interests, and also result in their expulsion from the Ritz-Carlton Management Program.

163.    Based upon the terms of the Management Agreement and the Affiliation Agreement, Cobalt is the agent or subagent of the Plaintiffs, and as such, owes Plaintiffs fiduciary duties, including a duty of loyalty and duty to avoid self-dealing. Alternatively, these duties arise from the near exclusive control that Cobalt exercises over Plaintiffs' Fractional Units arising from its authority as set forth in the Affiliation Agreement — including all use rights of Club Members, Permitted Users and Exchange Users.

164.    By the actions described above and below and in breach of their fiduciary duties Defendants profited at the Plaintiffs' expense. Despite the destruction of the value of the Fractional Units, Plaintiffs continue to pay steadily increasing annual dues, much of which goes

directly to Defendants in the form of lucrative "management fees" and other "reimbursements" supposedly incurred by Defendants under the management contracts, including payroll related costs. Plaintiffs pay these management fees and reimbursements to the Defendants regardless of usage or occupancy.

165. Due to the conduct of the Defendants described herein, the Fractional Units owned by Plaintiffs are now virtually worthless and Defendants, including MVW; MVCI; Ritz-Carlton Management Company, LLC; Cobalt Travel Company, LLC; have been unjustly enriched by the wrongful and unlawful conduct described herein. Due to defendants' actions, MVC members can now enjoy the benefits and use of the Ritz-Carlton Club San Francisco property for a small fraction of the cost that Plaintiffs paid.

## FIRST CAUSE OF ACTION

### (Breach of Fiduciary Duty Against All Defendants)

166. Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs as if fully set forth in this cause of action.

167. The developers, R.C. Chronicle, its joint venture partner Ritz-Carlton Development, and their alter egos, co-conspirators, and/or successors, owed fiduciary duties to Plaintiffs for the reasons stated above, including in paragraph 150 *supra*.

168. Defendant Ritz-Carlton Management, and its alter egos, co-conspirators, and/or successors, owed fiduciary duties to Plaintiffs for the reasons stated above, including in paragraphs 151 through 159, *supra*.

169. Defendant Cobalt, and its alter egos, co-conspirators, and/or successors, owed fiduciary duties to Plaintiffs for the reasons stated above, including in paragraphs 160 through 166, *supra*.

170. Defendants, and each of them, had a duty to act with the utmost good faith in the best interests of Plaintiffs and other Club Interest owners, and not for the benefit of themselves, their affiliates, other defendants, and/or co-conspirators. This includes a duty of candor and loyalty to Plaintiffs and other Club Interest owners.

///

171. As more fully alleged elsewhere in this Complaint, Defendants, and each of them, breached this duty by self-dealing and otherwise advancing Marriott's interests at the expense of Plaintiffs' interests, and/or by failing to act as a reasonably careful fiduciary/board member would have acted under the same or similar circumstances. Such breaches are more fully alleged above and include, but are not limited to, the following:

a. In addition to the other wrongful conduct alleged above, Defendants — including R.C. Chronicle and Ritz-Carlton Development — used their control of the Club Interest Association to delegate almost complete control over Plaintiffs' separately deeded property interests first to Ritz-Carlton Management and then to Cobalt in a manner that — according to Defendants — immunizes all of them from any liability for breach of fiduciary duties that they owe, as matter of law, to Plaintiffs. Assuming for purposes of argument this strategy is effective, it constitutes a breach of fiduciary duty in that a fiduciary cannot legally engineer immunity to fiduciary duties imposed as a matter of law.

b. Defendants — including R.C. Chronicle and Ritz-Carlton Development — failed to supervise Ritz-Carlton Management and Cobalt after delegating to those entities near absolute control over Plaintiffs' separately deeded property interests.

c. Defendants — including R.C. Chronicle and Ritz-Carlton Development — had a duty to act with the utmost good faith in the best interests of Plaintiffs. As more fully alleged elsewhere in this Complaint, Defendants and/or their agents on the Club Interest Association breached this duty by self-dealing and otherwise advancing Marriott's interests at the expense of Plaintiffs' interests, and/or by failing to act as a reasonably careful fiduciary/board member would have acted under the same or similar circumstances.

///

1        d.      Among other things, Defendant Cobalt and its alter egos and co-conspirators, in violation of Cobalt's fiduciary duty to Plaintiffs, and aided and abetted in said fiduciary duty violations by the other defendants, entered into an Affiliation Agreement with L&C, which allows some or all of the over 400,000 members of Defendant MVW's Marriott Vacation Club who are able to acquire sufficient points in the Marriott Vacation Club system, to use the Fractional Units at the SF Ritz Residences. This was a breach of fiduciary duty because it allowed Defendants to profit at Plaintiffs' expense. Specifically, it gutted the value of the fractional interests that Plaintiffs acquired, which Cobalt was managing for their benefit and acting as their agent.

e.      Defendants promised Plaintiffs and other Club Interest owners that the merger with the Marriott Vacation Club would not take place absent a vote in favor of the merger by Club Interest owners when they had no intention of actually putting the merger to a vote or respecting the wishes of Plaintiffs and other Club Interest owners.

f.      Defendants — including R.C. Chronicle and Ritz-Carlton Development, who controlled the Club Interest Association — failed to enforce the CCRs to protect the interests of Plaintiffs and other Club Interest owners, and instead allowed Marriot and its other affiliates to engage in activities that were clearly prohibited under the terms of the CCRs, such as renting Club Interests on a nightly basis in violation of CCRs section 2.13.

g.      Defendants — including R.C. Chronicle and Ritz-Carlton Development, who controlled the Club Interest Association — failed to disclose to the Club Association and the Plaintiffs the true aims of their parent-company, Marriot, which always intended to (1) convert more than a hundred Club Interests into Marriot timeshare inventory, and (2) never permit the

///

promised vote on whether to affiliate with Marriot, despite representations that they would do so.

    h.    Defendants — including R.C. Chronicle and Ritz-Carlton Development, who controlled the Club Interest Association — failed to either prevent the Marriot Merger from taking place, or firing Cobalt as the Program Manager, as an independent Board would have done.

172. Plaintiffs were harmed by Defendants' breach of the fiduciary duties they owed to Plaintiffs in the manner alleged elsewhere in this Complaint, and Defendants' conduct was a substantial factor in causing that harm.

173. Defendants, and each of them, committed the acts alleged herein maliciously, fraudulently, and/or with oppression within the meaning of Civil Code § 3294, and all such conduct was authorized and/or ratified by an owner, officer, director, or managing agent of each Defendant. Plaintiffs seek an award of punitive and exemplary damages in an amount according to proof.

## SECOND CAUSE OF ACTION

### (Aiding and Abetting Breach of Fiduciary Duty Against All Defendants)

174. Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs as if fully set forth in this cause of action.

175. Defendants, and each of them, aided and abetted the remaining Defendants' scheme to commit the wrongful and unlawful conduct alleged herein, including but not limited to the breaches of fiduciary duties.

176. The aiding and abetting Defendants had prior notice of the remaining Defendants' wrongful and unlawful activities, but nonetheless acted affirmatively to help the other Defendants perpetrate their scheme against Plaintiffs.

177. Defendants' aiding and abetting the wrongful and unlawful conduct alleged herein has damaged Plaintiffs in an amount to be proved at trial that is in excess of the jurisdictional limit of this Court.

///

## THIRD CAUSE OF ACTION

### (Constructive Fraud Against all Defendants)

178. Plaintiffs incorporate by reference the allegations contained in the preceding, and subsequent paragraphs, as if fully set forth in this cause of action.

179. Defendants R.C. Chronicle, Ritz-Carlton Development, Ritz-Carlton Management and Cobalt and each of them had a fiduciary duty of candor to the Plaintiffs to act honestly, loyally and with full disclosure.

180. On May 14, 2013, Lee Cunningham informed each Plaintiff that no affiliation of the Ritz-Carlton Club, San Francisco with the Marriott Vacation Club would occur unless a majority of the members of the Ritz-Carlton Club, San Francisco voted in favor of said affiliation.

181. Yet R.C. Chronicle, Ritz-Carlton Development, Ritz-Carlton Management and Cobalt never intended to allow the promised vote, as evidenced by the admission by the General Manager of Cobalt, Eveleen Babich, that: "This survey is similar to Aspen in that we are not looking for a majority vote. It's merely a mechanism to get feedback and the affiliation is expected to occur regardless. Please keep that information confidential."

182. Cobalt, acting in concert with R.C. Chronicle, Ritz-Carlton Development, Ritz-Carlton Management, deceptively and without informing the Plaintiffs or the non-interested members of the Club Interest Association, entered into an Affiliation Agreement between the Ritz-Carlton Club San Francisco and the Marriott Vacation Club, without holding the promised vote.

183. The Defendants knew that the Plaintiffs relied on the promises of Cunningham and others that there would be no affiliation with Marriot without a vote of the membership. Plaintiffs justifiably relied to their detriment on the aforementioned promise that a majority vote of the members would be required before the affiliation would be instituted. Had Plaintiffs known the truth, they would have taken steps to prevent the affiliation, including demanding that the majority of members vote in favor of affiliation, or suing for injunctive relief to stop the affiliation in the absence of a majority vote.

-55-

184.    By virtue of the misrepresentations and non-disclosure of the material facts described above and herein, the Defendants afforded themselves the means by which to take undue advantage of Plaintiffs.

185.    Defendants' conduct, including the misrepresentations and non-disclosure of the material facts described above and herein, tended to deceive.

186.    As a result of the tendency of Defendants' misrepresentations and non-disclosures of the material facts described above and herein to deceive, Plaintiffs suffered damages, including the destruction of the value in their fractional units, in an amount to be proven at trial.

187.    Further, R.C. Chronicle, Ritz-Carlton Development, Ritz-Carlton Management and Cobalt, aided and abetted by MVC, have profited at Plaintiffs' expense and said Defendants should be ordered to disgorge to Plaintiffs all commissions, fees and profits they received as a result of the conduct described herein; that an accounting of all commissions, fees and profits earned by MVC, R.C. Chronicle, Ritz-Carlton Development, Ritz-Carlton Management and Cobalt be ordered by the Court, and that a constructive trust be imposed upon said commissions, fees and profits for the benefit of Plaintiffs.

## FOURTH CAUSE OF ACTION

### (Promissory Fraud Against All Defendants)

188.    Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs, as if fully set forth in this cause of action.

189.    As described in detail above, MVW falsely promised that a majority vote of the membership would decide whether the affiliation of the Ritz-Carlton Club San Francisco with the Marriott Vacation Club would occur.

190.    At the time the promise of a vote was made, MVW and the other Defendants, including R.C. Chronicle, Ritz-Carlton Development, Ritz-Carlton Management and Cobalt had no intention of honoring the promise, and intended to affiliate the Ritz-Carlton Club San Francisco with the Marriott Vacation Club regardless of whether a vote was held, or whether a majority voted against the affiliation.

///

191.     In making the false promise described above, MVC, in concert with R.C. Chronicle, Ritz-Carlton Development, Ritz-Carlton Management and Cobalt, intended to deceive Plaintiffs and to induce them not to take action to block the affiliation, such as an action for injunctive relief, or a membership vote to terminate the agreements with Ritz-Carlton Management and Cobalt.

192.     Plaintiffs reasonably relied on the promise of a vote on the issue of affiliation of the Ritz-Carlton Club San Francisco with then Marriott Vacation Club in that they refrained from taking action to block the affiliation such as an action for injunctive relief, or a membership vote to terminate the agreements with Ritz-Carlton Management and Cobalt.

193.     No vote was ever held, yet the MVC and the other defendants affiliated the Ritz-Carlton Club San Francisco with then Marriott Vacation Club in late 2014.

194.     As a proximate result of Defendants' promissory fraud, Plaintiffs suffered damages, including the destruction of the value in their fractional units, in an amount to be proven at trial.

195.     As a result of Defendants' promissory fraud described herein, Defendants MVC, R.C. Chronicle, Ritz-Carlton Development, Ritz-Carlton Management and Cobalt profited at Plaintiffs' expense and said Defendants should be ordered to disgorge to Plaintiffs all commissions, fees and profits they received as a result of the conduct described herein; that an accounting of all commissions, fees and profits earned by MVC, R.C. Chronicle, Ritz-Carlton Development, Ritz-Carlton Management and Cobalt be ordered by the Court, and that a constructive trust be imposed upon said commissions, fees and profits for the benefit of Plaintiffs.

## **FIFTH CAUSE OF ACTION**

### **(Accounting Against All Defendants)**

196.     Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs as if fully set forth in this cause of action.

197.     At all times relevant herein, Defendants were: (a) agents and/or fiduciaries of Plaintiffs; (b) alter egos of other defendants that are agents of Plaintiffs or that owe fiduciary

duties to Plaintiffs; and/or (c) aiders and abettors or co-conspirators in the breach of fiduciary duties by other defendants owing such duties to Plaintiffs.

198.    The extent of the funds or property acquired by Defendants in the course of the above described agency and fiduciary relationships is not known by Plaintiffs and is ascertainable only by an accounting, and so Plaintiffs request such an accounting from this Court.

## SIXTH CAUSE OF ACTION

### (Breach of the Implied Covenant Against All Defendants)

199.    Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs as if fully set forth in this cause of action.

200.    Plaintiffs, and each of them, entered into standardized Purchase Contracts with Defendants for the purchase of fractional interests in Club Interest Units at the SF Ritz Residences and participation rights in the Ritz-Carlton Membership Program.

201.    Plaintiffs performed or substantially performed all significant things that the Purchase Contracts required of them, and/or were excused from having to do those things. All conditions required for Defendants' performance have occurred or were excused.

202.    An implied covenant of good faith and fair dealing is implied in the Purchase Contracts by operation of law. Pursuant to these implied duties, Defendants could not legally interfere with the rights of Plaintiffs to receive the benefits due to them under the Purchase Contracts. Nor could Defendants do anything inconsistent with any promises that a reasonable person in Plaintiffs' position would be justified in understanding were included in the Purchase Contracts.

203.    Defendants breached the implied covenant of good faith and fair dealing by: (a) acting in a manner that, as more fully alleged above, unfairly interfered with Plaintiffs' right to receive the benefits of the Purchase Contracts; and/or (b) violating and/or breaching implied promises that Plaintiffs reasonably understood to be included in the Purchase Contracts.

///

///

204.     Plaintiffs reasonably believed that Defendants had agreed to continue to market and sell all fractional interests at the SF Ritz, or at least sell a sufficient number to make the fractional offering viable.  Defendants breached this implied promise.

205.     Plaintiffs were harmed by Defendants' breach of the implied covenant of good faith and fair dealing as more particularly alleged above, and Defendants' conduct was a substantial factor in causing that harm.

206.     Defendants, and each of them, committed the acts alleged herein maliciously, fraudulently, and/or with oppression within the meaning of Civil Code § 3294, and all such conduct was authorized and/or ratified by an owner, officer, director, or managing agent of each Defendant. Plaintiffs seek an award of punitive and exemplary damages in an amount according to proof.

## SEVENTH CAUSE OF ACTION

### (Rescission, Cal. Civ. Code § 1689, Against All Defendants)

207.     Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs as if fully set forth in this cause of action.

208.     When marketing fractional interests in the Club Interest Units to Plaintiffs, Defendants intentionally, negligently, and/or mistakenly misstated material facts and/or falsely concealed material facts as more fully alleged above.

209.     Plaintiffs are informed and believe and thereupon allege that Defendants, and each of them, knew of the falsity of said representations or lacked sufficient knowledge to have made the representations, and concealed the true facts from Plaintiffs.

210.     As a direct and proximate result of their justifiable reliance on the material misrepresentations and omissions of the Defendants, Plaintiffs purchased the fractional interests at issue in this litigation.

211.     Plaintiffs would not have purchased fractional interests had the true facts been disclosed. Plaintiffs signed their respective Purchase Contracts based on the material mistakes of fact alleged herein. Defendants knew, or should have known, that Plaintiffs were ignorant of the true facts relating to the transactions at issue.

212.     Service of this Complaint and related pleadings on Defendants constitutes notice of rescission of the Contracts between Plaintiffs and Defendants. Plaintiffs are entitled to rescission of their Purchase Contracts pursuant to Civil Code § 1689, on the grounds of mutual and unilateral mistake of material fact, and also fraud in the inducement.

213.     Among other remedies prayed for herein, Plaintiffs seek the restoration of the parties to their original, pre-agreement positions, including the recovery and payment of restitution of any and all monetary consideration that Plaintiffs paid to Defendants, and the nullification of any releases signed by any Plaintiffs herein.

214.     Plaintiffs seek a return of the purchase price each paid, plus all other sums paid to Defendants, including but not limited to the Annual Assessments. Pursuant to Civil Code § 1692, Plaintiffs are also entitled to recover the consequential damages they sustained as a direct and proximate result of Defendants' intentional misconduct and/or negligent conduct in an amount to be determined at trial in excess of the jurisdictional threshold of this Court.

## EIGHTH CAUSE OF ACTION

### (Unjust Enrichment Against All Defendants)

215.     Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth in this cause of action.

216.     At all times relevant herein, there has existed a res consisting of monies improperly obtained by Defendants through the wrongful conduct alleged herein, including but not limited to fees paid by Plaintiffs, and rental income obtained from others.

217.     Defendants obtained these monies by means of the wrongful acts alleged elsewhere in this Third Amended Complaint. Plaintiffs have a legal right to these monies, and Defendants would be unjustly enriched if they were permitted to keep these improperly obtained monies.

218.     Accordingly, pursuant to Civil Code §§ 2223, 2224 and 3517, Plaintiffs seek a declaration from this Court that all funds improperly obtained by Defendants are held in a constructive trust for the benefit of Plaintiffs, and an Order that Defendants return these improperly obtained funds to Plaintiffs in order to prevent Defendants' unjust enrichment.

# **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray judgment against Defendants, and each of them, as follows:

1. For special damages according to proof;

2. For general damages according to proof;

3. For restitution of all monies paid to the Defendants or their successors, assigns, alter egos or otherwise related parties, according to proof;

4. For an accounting of all funds and property received by Defendants in their capacities as agents and fiduciaries of Plaintiffs, and or co-conspirators or aiders and abettors of breaches of fiduciary duties owed by other defendants;

5. For an Order pursuant to Civil Code §§ 2223, 2224, and 3517 that all funds improperly obtained by Defendants are held in a constructive trust for Plaintiffs' benefit, and a further Order requiring Defendants to return such improperly-obtained funds to Plaintiffs in order to prevent Defendants' unjust enrichment;

6. For rescission of *all* agreements entered into with Defendants and the return of all consideration paid to Defendants;

7. For attorneys' fees and costs according to proof;

8. For compensatory and punitive damages according to proof;

9. For pre-judgment and post-judgment interest; and

10. For such other and further relief as the Court may deem proper.


DATED:  October 16, 2017                    REISER LAW, P.C.

                                            THE MEADE FIRM P.C.


                                            By: */s/ Tyler Meade*
                                                Tyler Meade
                                                Attorneys for Plaintiffs

# PROOF OF SERVICE

I am a citizen of the United States. My business address is 1816 Fifth Street, Berkeley, California 94710. I am employed in the County of Alameda, where this service occurs. I am over the age of 17 years, and not a party to this action. On the date set forth below, I served the following document(s):

**FOURTH AMENDED COMPLAINT FOR: BREACH OF FIDUCIARY DUTY; AIDING AND ABETTING; CONSTRUCTIVE FRAUD; PROMISSORY FRAUD; FOR AN ACCOUNTING; BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING; RESCISSION; and UNJUST ENRICHMENT; JURY TRIAL DEMANDED; EXHIBITS A-G**

On the following person(s) in this action by placing a true and correct copy thereof enclosed in a sealed envelope addressed as follows:

*Via Email and Fedex:*

> Hon. Charles (Tim) W. McCoy, Jr.
> 429 E. Macalester Pl.,
> Claremont, CA 91711
> Email: cmccoy@jamsadr.com

*Via Email:*

> Geri Yulo, Case Manager
> JAMS
> 555 W. 5th St., 32nd Floor
> Los Angeles, CA 90013
> Email: gyulo@jamsadr.com

*Via Email/ECF and Fedex:*

> William J. Goines
> Greenberg Traurig, LLP
> 1900 University Avenue, 5th Floor
> East Palo Alto, CA 94303-2283
> Facsimile: (650) 328-8508
> Email: goinesw@gtlaw.com

> Philip R. Sellinger
> Ian S. Marx
> Greenberg Traurig LLP
> 500 Campus Drive, Suite 400
> Florham Park, NJ 07932
> Email: sellingerp@gtlaw.com
> marxi@gtlaw.com

-1-

[X] (BY EMAIL/ECF) By electronically filing the foregoing through File & Serve Xpress which will be sent electronically to the registered participants on or before October 16, 2017.

[X] (BY E-MAIL OR ELECTRONIC TRANSMISSION) Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the document(s) to be sent to the person(s) at the e-mail address(es) listed above who are not registered participants of File & Serve Xpress. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

[X] (BY MAIL) I am readily familiar with my firm's practice for collection and processing of correspondence for mailing with the United States Postal Service, to-wit, that correspondence will be deposited with the United States Postal Service this same day in the ordinary course of business. I sealed said envelope(s) and placed it for collection and mailing on the date indicated below, following ordinary business practices.

[X] (BY FEDERAL EXPRESS) I caused the aforementioned envelope(s) to be delivered to Federal Express for overnight courier service to the address(es) listed above for the person(s) identified above.

I declare under penalty of perjury, under the laws of the State of California, that the foregoing is true and correct. Executed on October 16, 2017 at Berkeley, California.

Raquel Rivera

PROOF OF SERVICE

# EXHIBIT A



*For those who act decisively, the possibilities are endless.*
*Only a few will have the opportunity to become a Member of*
*The Ritz-Carlton Club, San Francisco.*

*The Ritz-Carlton Club is the most exclusive residence club in the world. We are building a system of Clubs in premier urban, beach, golf and ski locations. The Club was designed by Ritz-Carlton loyalists, creating a combined vision of second home ownership with the legendary services of The Ritz-Carlton staff.*

*The Ritz-Carlton Club, San Francisco is an offering of one and two bedroom luxurious residences where the benefits of private second-home ownership, are complimented by the legendary services of The Ritz-Carlton Hotel Company. Each fractional interest is deeded in perpetuity and becomes a part of your estate. Your interest may be enjoyed, willed or sold as you would with most any Real Estate.*

## Membership Privileges

- *You may choose a $1/12^{th}$, $1/6^{th}$ or $1/4^{th}$ fractional interests in a one or two bedroom residence ranging from 1275 sq ft to 2090 sq ft.*
- *A $1/12^{th}$ interest guarantees 21 days, a $1/6^{th}$ interest guarantees 42 days and a $1/4^{th}$ interest guarantees 63 days annually within the Ritz-Carlton Club system.*
- *The Club residences are intentionally undersold to accommodate for greater flexibility (16 unsold weeks in each residence-112 days per Residence)*
- *To maximize leisure-time usage, you may use your allocated time in San Francisco or any other Ritz-Carlton Club on a space available basis at no additional cost.*
- *The Ritz-Carlton Club, San Francisco may be used by your family, friends or business associates.*
- *You (or your immediate family) may acquire additional time over and above your allocated days at a nominal fee established at each Club location*
- *VIP status in Ritz-Carlton Hotels that includes exclusive member benefits*

## The Ultimate in Luxury

- As a member you will receive the legendary service of The Ritz-Carlton Hotel, complimented by exclusive amenities for Member's only.
- The Club provides valet parking, twice daily housekeeping, turn-down service a dedicated Club Concierge; 24 hour security and engineering and an owner's storage area for your private belongings.
- The Club will stock your residence with provisions prior to your arrival and provide in room chef services, upon request.
- You will enjoy a lovely twelfth floor terraced lounge with fireplace, sitting areas and bar. Charter Members will receive a private wine cellar.
- You will have access to the member's only business center, 700 sq ft boardroom and 2600 sq ft private fitness center.
- You will enjoy the piece of mind knowing your residence is managed by The Ritz-Carlton; the world's premier provider of luxury assets. Our level of integrity ensures that your residence will be maintained in the style our loyalists have come to expect.

*Current pricing from $232,000

**Current Founding Member's will have their 2008 annual dues waved and will receive 7 night Premium Club Level certificates for stays at Ritz-Carlton Hotels worldwide.**
  **This offer is valid for a select number of memberships and is subject to change.

Please consider me a resource in your examination and feel free to contact me at **1-415-247-1152.** You may also want to take a look at our websites for more information. www.rcr-sanfrancisco.com and www.ritzcarltonclub.com. I look forward to working with you as you explore this exceptional real estate opportunity in San Francisco.

Warm Regards,

*Mary Ann*

Mary Ann Woodward
Membership Executive
The Ritz-Carlton Club Residences, San Francisco
maryann.woodward@ritzcarltonclub.com

# EXHIBIT B

## Why was The Ritz-Carlton Club created?

Through extensive research with Ritz-Carlton guests, The Ritz-Carlton Hotel Company determined a considerable interest existed in Second Home Ownership under The Ritz-Carlton name. The results concluded that families generally take multiple escapes of varying lengths throughout the year. In deciding on a Second Home, they prefer a private environment, a location rich in amenities, a trusted management company, quality and services like a country club and a variety of experiences captured in one purchase. It is with these considerations that we developed The Ritz-Carlton Club.

## What is a Private Residence Club?

For a customer in love with our area, but not wanting the financial and managerial commitment of a Second Home, it is the ideal form of Second Home Ownership. Members balance the benefits of owning a Second Home with their current use patterns and a financial commitment commensurate with usage. The net result is that the Members end up owning a Deeded Fractional Interest of a very well-designed, fully equipped, well-built and extremely well-serviced home in a private club, all under the banner of The Ritz-Carlton®. Whether it be for a day, a week or a weekend, Members can customize their usage to fit their needs. Members here at The Ritz-Carlton Club, San Francisco also have the option of enjoying the flexibility of utilizing other Ritz-Carlton Club destinations on a reciprocal basis.

## What is the difference between Private Residence Clubs and Timeshares?

With timeshare, consumers buy in increments of one week and is an alternative to traditional vacation accommodations. Private Residence Clubs combine the benefits of Second Home Ownership with a superior level of service that caters to your every need. Ritz-Carlton Club Members purchase a Deeded Fractional Interest of a beautifully designed, elegantly furnished Club Residence. While this Interest may parallel Ownership of a Second Home, it comes free of the concerns so typical of year-round upkeep and maintenance.

## Will The Ritz-Carlton Club be open to the public?

No. The Ritz-Carlton Club will be operated for the use, benefit and enjoyment of the Members, their families and their guests.

## How does Ownership actually work?

A Member buys a Fractional Interest in the San Francisco Club and receives a deed to a one-, two- or three-bedro Residence to occupy for their allocated time per year. Members can enjoy the Club Residence beyond their allocated space-available per-diem basis. The per-diem rate is still to be determined. Our Members reserve their Fractional Inter as if they were reserving tee times at a country club.

## Does a Member really own the real estate?

Yes, membership includes a Deeded Fractional Ownership Interest that parallels the Ownership structure of a Secor Without, however, the hassles of upkeep and maintenance, as well as opening and closing the home at each visit.

## Can a Fractional Interest in a Club Residence at The Ritz-Carlton Club, San Francisco be re

Definitely. A fractional interest in a Club Residence can be resold similar to any fee simple Ownership Interest, or, a real property interest, it may be bequeathed by will.

## What is included in a membership purchase?

First, there are the allocated days-per-year plus a Member can book additional unallocated days, subject to availabi there is the Club Residence itself - it is fully furnished and equipped with all dinnerware, flatware, linens, furnishings an appliances. It has everything and anything you would expect in a beautiful San Francisco home, including an entertainme consisting of a flat-screen television, DVD player and stereo system. Each home is serviced as if it were a suite at a Ritz hotel. Each Member has twice-daily housekeeping, personal storage space and a personal Concierge.

## When in-residence do Members have any daily fees?

They do not. As a Member, there are no daily fees associated with occupancy aside from staying beyond their alloca at which point there is a per-diem charge per night.

# EXHIBIT C

EXHIBIT C

Contract No.: RF*0302/03,15,32

## PURCHASE CONTRACT

## 690 MARKET CLUB

### The Ritz-Carlton Club, San Francisco

### San Francisco, California

This Purchase Contract (hereinafter this "Contract" or "Agreement") is made on the date set forth below by and between the seller, R.C. Chronicle Building, L.P., a Delaware limited partnership, hereinafter referred to as "Seller" whose address is 658 Market Street, San Francisco, California 94104 and the undersigned buyer(s), hereinafter referred to as "Purchaser":

PURCHASER'S NAME: WILLIAM P. PETRICK, AS TRUSTEE

Address:     1354 BLACK SAGE CIRCLE

NIPOMO, CA 93444

Home No.:  805-343-1054 *DNC*     Work No.:   805-343-2668 *DNC*     Fax No.:  (   )  -

E-mail address: wpp42000@yahoo.com

PURCHASER'S NAME: SHARON F. PETRICK, AS TRUSTEE

PURCHASER'S NAME:

PURCHASER'S NAME:

Title Taken as: As Trustee

Member: WILLIAM P. PETRICK, AS TRUSTEE  (See section 11 below)

Estimated Closing Date: 09/01/2007

**Estimated date of earliest occupancy, depending on particular Club Interest Unit purchased, shall be thirty (30) to sixty (60) days after Closing, as determined by Seller.**

Date of this Agreement:  July 08, 2007

Club Interest Unit No.: 0302;        Club Interest No.: 7

Estimated First Year Club Assessment:  $13,762.41     *(2 mos prorated)*

     1.     Agreement to Sell and Purchase.  In consideration of the terms, covenants and conditions set forth herein, Purchaser hereby agrees to purchase and Seller hereby agrees to sell to Purchaser the following real property:

rf.ca.inc.) 2.20.07

Club Interest 7 consisting of an undivided **1/12th** interest in Club Interest Unit 0302 of 690 MARKET CLUB (the "Club"), according to the Declaration of Covenants, Conditions and Restrictions for 690 Market Club (the "Club Declaration"), instrument no. 2006-I194390-00 recorded June 15, 2006 in the Office of the Assessor-Recorder of the City and County of San Francisco, California, as may be amended and supplemented from time to time, together with the use of twenty-one (21) days per Club Calendar Year for each 1/12 interest owned in accordance with the Governing Instruments and the Membership Program Documents for the Club, all as more particularly described in Exhibit "A" attached hereto.

The Club is located at 690 Market Street, San Francisco, California 94104. Purchaser shall have the right to occupy an Assigned Unit in accordance with the terms of the Club Declaration and the Membership Program Documents, and to use the Common Areas (other than those Limited Common Areas not appurtenant to such Club Interest Unit) and the Common Furnishings therein.

        2.    <u>Terminology</u>. The terms used in this Agreement and not otherwise defined shall have the same meaning as the identical terms utilized in the Club Declaration or the Master Declaration of Covenants, Conditions and Restrictions for 690 Market Condominiums (the "Master Declaration").

        3.    <u>Purchase Price</u>. Purchaser agrees to pay the purchase price ("Purchase Price") as follows:

| | | |
|---|---|---|
| Purchase Price | | $ 232,000.00 |
| Less Credits | | |
| Reservation Deposit credited to Purchase Price | $ 0.00 | |
| Cash Down Payment (due on execution of contract) | $ 23,200.00 | |
| Total Credits | | $ 23,200.00 |
| Balance Due | | $ 208,800.00 |
| Additional Payments Due (Due Date ) | | |
| Additional Down Payment (Due Date ) | | |
| **Balance of Purchase Price due at Closing** | | **$ 208,800.00** |

Estimated Closing Costs (see separate sheet for detail)    $2,053.00

Purchaser's financial obligation at Closing includes payment of the Purchase Price together with Closing Costs as described in section 6 below and all charges related to financing, if any. Purchaser shall be responsible for Purchaser's Club Interest's full share of the Club Dues, as well as the pro rated amount for ad valorem taxes, which amount will be collected at closing if not previously paid.

4. Deposit.

a. Earnest Money. One hundred percent (100%) of all funds and other property received from Purchaser prior to closing shall be held in escrow with interest payable to Seller, unless an approved alternate assurance arrangement is utilized in accordance with subsection c below. The name and address of the escrow agent is First American Title Insurance Company, 1160 N. Town Center Drive, #190, Las Vegas, Nevada 89144 (the "Escrow Agent"). Unless an approved alternate assurance arrangement is utilized, all funds and other property received from Purchaser prior to closing shall be delivered to Escrow Agent within three (3) days of receipt by Seller. Purchaser is entitled to a receipt for the deposit upon request.

b. Escrow. Escrow Agent is authorized to release documents, deposits or things of value only when all funds received are either available for immediate withdrawal as a matter of right from the financial institution in which the funds have been deposited, or are available for immediate withdrawal as a consequence of an agreement of a financial institution in which the funds are to be deposited (i.e. "Good Funds") upon any one of the following events, or as provided in subsection c below:

(1) Mutual agreement of both Purchaser and Seller;
(2) Establishment of an alternate assurance arrangement in accordance with section 4.c below;
(3) Closing and transfer of title in accordance with sections 8 and 9 below;
(4) Termination of the Contract by Purchaser in accordance with section 9 below;
(5) Default of Purchaser in accordance with section 32 below;
(6) Default of Seller in accordance with section 33 below;
(7) Rescission by Purchaser in accordance with section 40 below.

c. Alternate Assurance for Escrowed Funds. The Seller reserves the right, as an alternative arrangement, to secure the Purchaser's down payment by a letter of credit, bond or other security acceptable to the California Department of Real Estate ("DRE") as required by California law.

(1) Deposits Secured by Alternate Assurance. Pursuant to Section 11243 of the California Vacation Ownership and Time-share Act of 2004, , the DRE has the discretion to accept an escrow or surety bond, irrevocable letter of credit or other financial assurance ("Alternate Assurance") from the Seller to protect the Purchaser's funds prior to closing in lieu of holding all or any portion of the funds in escrow. In the event Seller provides an Alternate Assurance, Seller may use the Purchaser's down payment for any purpose, at its own discretion. In such event, there is no restriction on the use of such funds by the Seller.

(2) Expiration of Alternate Assurance. The Seller shall provide Escrow Agent with a replacement, supplement or extension of the Alternate Assurance acceptable to the DRE at least forty-five (45) days prior to the expiration of the Alternate Assurance.

If Escrow Agent has not received the replacement, supplement or extension thirty (30) days prior to such expiration, Escrow Agent shall provide the DRE with a statement showing the status of the total funds secured by the Alternate Assurance as of thirty (30) days prior to the expiration of the Alternate Assurance. Escrow Agent shall then make demand for payment from the Seller to Escrow Agent of all funds disbursed to Seller which are secured by the Alternate Assurance.

In the event such payment is not forthcoming from the Seller within five (5) days from mailing of demand by Escrow Agent, then Escrow Agent shall make demand upon the Alternate Assurance to the extent of all funds disbursed to Seller. Escrow Agent shall then hold such funds in accordance with this Agreement.

In the event the Escrow Agent fails to make the necessary demand on the Alternate Assurance as set forth above, the DRE shall have the right to then make the demand on the Alternate Assurance in accordance with the terms of this Agreement.

5.     <u>Payment of Balance of Purchase Price</u>. The balance of the Purchase Price shall be paid in U.S. funds by Purchaser to Seller in cash, by certified or cashier's check or by wire transfer at time of Closing. EXCEPT AS OTHERWISE AGREED IN WRITING, THIS CONTRACT IS NOT CONTINGENT ON THE PURCHASER OBTAINING FINANCING.

6.     <u>Closing Costs</u>. Purchaser shall pay all Closing Costs, which include the cost of recording the grant deed, City and County of San Francisco documentary transfer fees, the Initiation Fee described in Section 10 below (unless waived by Seller), Club Assessments/Dues and owner's title insurance premium. All escrow and closing charges and the cost of title insurance shall be paid by Purchaser. Club Assessments include Purchaser's full share of the annual maintenance fees assessed by the 690 Market Club Owners Association (the "Club Interest Association"), the 690 Market Master Association (the "Master Association"), real estate taxes and assessments, and Membership Program Dues. If any portion of the Purchase Price is financed, Purchaser shall also pay all loan application and loan closing costs, including the cost of recording the deed of trust and the premium for a mortgagee's policy of title insurance on the deed of trust.

7.     <u>Club Assessments</u>. Purchaser understands and agrees that in accordance with the Club Declaration and other Governing Documents, Purchaser will be responsible for Purchaser's share of any and all ongoing costs and expenses incurred in the operation of the Club (including fees for operation of other associations to which the condominium property is subject), ad valorem taxes assessed against the Club Interest Unit described herein, costs and expenses of The Ritz-Carlton Club Membership Program that are attributable to the Purchaser each fiscal year, and Purchaser's share of any and all costs and expenses incurred in the operation of the Master Common Elements.

The current estimated annual assessments including amounts owed to the Master Association and other associations for the Club Interest described herein are set forth on the first page of this Agreement.

The current Membership Program Dues charged are $924.37 per Club Interest.

**PURCHASER ACKNOWLEDGES THAT THESE AMOUNTS ARE ESTIMATES ONLY AND THAT ACTUAL ASSESSMENTS, CLOSING COSTS AND CHARGES MAY VARY FROM THIS ESTIMATE.**

The Purchaser shall only be required to pay the following maximum Club Assessments for fiscal year 2007: $13,762.39 for a One Bedroom Club Interest, $15,629.09 for a Two Bedroom Club Interest, and $18,214.24 for a Three Bedroom Club Interest. Purchaser acknowledges that the Club Interest Association's budget for fiscal year 2007 is based upon the Fractional Ownership Plan consisting of 49 Club Interest Units. In addition to the Club Assessments paid by Seller with respect to Club Interest(s) owned by it, Seller will pay any difference between the amounts assessed to Owners and those amounts necessary to fund the Club Interest Association's operations for fiscal year 2007. This subsidy shall be limited to fiscal year 2007, unless extended by Seller, in its sole discretion.

There is no assurance that any additional Club Interest Units or Club Interests will be added to the Fractional Ownership Plan. If no other Club Interest Units are added to the Fractional Ownership Plan, the Club Interest Association's budget for fiscal year 2008 and subsequent years will be based on 17 Club Interest Units. This would result in a higher per unit assessment than that which Owners will be required to pay in fiscal year 2008 and subsequent years.

8.     Closing.  If this Agreement is executed prior to the completion of construction of the Club Interest Unit described herein, the closing of this Agreement will be completed by a date certain designated by Seller which date shall be within sixty (60) days after a certificate of occupancy or other evidence of substantial completion has been issued for the Club Interest Unit and the Governing Instruments are recorded, or at such other time as agreed to by the parties. Purchaser authorizes Seller or its authorized agent to insert the recording information of the Club Declaration (and Master Declaration) on the deed of trust and the grant deed at such time as the Governing Instruments are recorded in the public records.

If a certificate of occupancy or other evidence of substantial completion for the Club Interest Unit described herein has already been issued as of the date of execution of this Agreement, the closing of this Agreement will be completed by a date certain designated by Seller which date shall be within sixty (60) days after the date of this Agreement or at such other time as agreed to by the parties.

The closing will be at such time (within such sixty (60) days) and place as shall be specified by Seller or the closing may be conducted by mail, if authorized by Seller. Seller shall give Purchaser not less than fourteen (14) days advance written notice of the closing date. Seller, at its sole option, may require Purchaser to close in escrow up to ninety (90) days prior to the estimated date for issuance of a certificate of occupancy. If Seller requires Purchaser to close in escrow, Purchaser shall execute any and all necessary closing documents and deposit all additional funds due and owing with the escrow agent within the specified time period. Immediately prior to the closing, Escrow Agent shall transfer all funds and closing documents received by it to the Title Company, who will finalize the closing. The estimated closing date for the Club Interest being purchased pursuant to this Agreement is set forth on the first page of this Agreement.

If this transaction is not in a position to close, for reasons other than Purchaser's default, on or before the date which is the earlier to occur of (a) one (1) year from the date designated by Seller (or at such other time as agreed to by the parties) or (b) three (3) years from the date of this Agreement, Seller shall order all of the money remitted by Purchaser under the terms of this Agreement to be refunded to Purchaser.

If no rescission or default has occurred, Escrow Agent shall release and disburse the escrowed funds, if any, and deliver and record closing documents upon completion of the closing on the closing date.

9.     Title.  Seller warrants that, at closing, title to the interest will be conveyed free and clear of all encumbrances, with the exception of the following:  (a) all easements, conditions, restrictions, covenants, limitations and reservations including, but not limited to, those contained in the Club Declaration, Master Declaration and Condominium Map for 690 Market Street, as may be amended, the Articles of Incorporation, Bylaws and Rules and Regulations for the Club Interest Association and the Master Association, and The Ritz-Carlton Club Membership Program Membership Program Documents; (b) taxes and assessments for the year of closing and subsequent years, (including, but not limited to, certified county or municipal improvement liens); (c) standard printed exceptions appearing in the Commitment referred to below; and, (d) any restrictions, reservations, conditions, limitations and

easements of record or imposed by governmental authorities having jurisdiction or control over the subject property (collectively, the "Permitted Exceptions").

At least ten (10) days before Closing, Seller will deliver to Purchaser a title insurance commitment (the "Commitment") issued by a title company (a "Title Company") to insure the title to the Club Interest in Purchaser's name for the amount of the Purchase Price. Purchaser waives any right to otherwise receive delivery of a title insurance commitment within ninety (90) days after the execution of this Agreement. PURSUANT TO THE TERMS OF THIS AGREEMENT, THE PARTIES AGREE THAT PURCHASER IS RESPONSIBLE FOR THE COST OF THE OWNER'S TITLE INSURANCE POLICY. If the Commitment discloses the existence of any defects in title, other than the Permitted Exceptions and such defects render title to any portion of the Club Interest uninsurable and the defects are not waived by Purchaser, Purchaser must give Seller written notice of the title defects within ten (10) days after receipt of the Commitment. Thereafter, Seller will have forty-five (45) days in which Seller may elect to cure the defects and render title insurable or five (5) days in which to elect not to cure the defect or provide title insurance against the defects. If Seller fails or elects not to cure the defects or provide title insurance after timely notice of the defects, Purchaser, as its sole and exclusive remedy, may elect, within fifteen (15) days after the end of the forty-five (45) day period or within three (3) days after notice from Seller that Seller elects not to cure the alleged defect, whichever is earlier, either (a) to terminate this Agreement, in which event all amounts paid to Seller under this Agreement will be returned to Purchaser, and neither party will have any further obligations under this Agreement; (b) grant one or more additional periods of time within which Seller may continue to attempt to cure, remove or obtain title insurance protection against the exceptions; or (c) to accept title with all defects as shown in the Commitment, without adjustment in the Purchase Price. If Purchaser fails to give timely notice of termination, Purchaser will be deemed to have elected to accept title as shown in the Commitment and to have waived all defects. Purchaser expressly relinquishes and waives any and all other remedies, claims, demands, and causes of action at law or in equity against Seller for failure to deliver marketable title.

Seller will convey the Club Interest described herein to Purchaser by recording a grant deed subject to the Permitted Exceptions. The deed will be delivered for recording immediately following closing; provided, however, that the deed will not be recorded until after the issuance of a (temporary) certificate of occupancy or other evidence of substantial completion notwithstanding the earlier payment of the purchase price in full or in part and the execution of a promissory note in partial payment of the purchase price.

Within sixty (60) days following recording of the grant deed, Seller will cause the Title Company to issue to Purchaser, at Purchaser's expense, a title insurance policy (the "Owner's Policy") in conformance with the Commitment.

10.    The Fractional Ownership Plan. As more specifically described in the Club Declaration, Seller, as Declarant, has subjected the Club to a fractional ownership plan (the "Fractional Ownership Plan") as governed by the provisions of the California Vacation Ownership and Time-share Act of 2004 (the "Act"). Purchaser will own an undivided interest in a Club Interest Unit in the Club for each Club Interest purchased.

Purchaser shall be entitled to the use and occupancy of a Club Interest Unit for twenty-one (21) days each Club Calendar Year for each 1/12 Club Interest owned (the "Allocation") subject to the provisions of The Ritz-Carlton Club Membership Program Procedures for Reserving Usage for The Ritz-Carlton Club, San Francisco (the "Reservation Procedures"), other of the Membership Program Documents, and the rules and regulations of the Club Interest and Master Associations. Check in and check out times will be established from time to time by rule and regulation of the Club Interest Association. Purchaser will be required to reserve use of a Club Interest Unit for the Allocation in

accordance with the Reservation Procedures. The Program Manager may not reserve occupancy for Purchaser in the specific Club Interest Unit noted in this Agreement or in Purchaser's grant deed, however, Purchaser will be reserved into a Club Interest Unit (i.e., number of bedrooms) of similar unit type to that purchased. Purchaser will also be able to reserve use of Club Interest Units beyond his or her Allocation on a space available basis pursuant to the Reservation Procedures. The Club Interest Association and the Program Manager reserve the right to charge additional housekeeping and administrative fees for space available, non-Allocation use, which is sometimes referred to as the variable cost of occupancy plus a premium. In addition, Purchaser will be entitled to reserve occupancy of Club Interest Units (or however such fractional program units may be identified) at other resorts pursuant to a private exchange system provided through The Ritz-Carlton Club Membership Program by virtue of The Ritz-Carlton Club Membership Program Affiliation Agreement (the "Affiliation Agreement"). Pursuant to the Notice of Initiation Fee (which is or shall be set of record) and the Membership Program Documents, the failure of any purchaser to pay the required Initiation Fee shall result in the loss of such owner's rights to reserve occupancy at other resorts pursuant to The Ritz-Carlton Club exchange program. Seller waives the Initiation Fee for the purposes of Purchaser's Closing under this Agreement.

11. The Ritz-Carlton Club Membership Program. As more specifically described in the Club Declaration and in the Affiliation Agreement, the Club is a member resort of a private exchange plan known as The Ritz-Carlton Membership Program (the "Membership Program"). Pursuant to the Club Declaration and the Affiliation Agreement, membership in the Membership Program may not be partitioned from ownership of a Club Interest. The Membership Program is a service name for the exchange and reservation services and vacation and travel benefits currently offered and the restrictions currently imposed by The Cobalt Travel Company, LLC, a Delaware limited liability company (the "Program Manager"). Services provided by the Program Manager include the operation of the exchange program and master reservation system through which Owners of Club Interests and owners at other resorts which participate in the Membership Program, reserve the use of the accommodations of the Club or other resorts which participate in the Membership Program, if any, pursuant to the priorities, restrictions and limitations of the Reservation Procedures and the rules and regulations of the Membership Program. The principal place of business of the Program Manager is 6649 Westwood Boulevard, Orlando, Florida 32821. The Program Manager owns the hardware and a license for the software which comprise the reservation system.

By Purchaser's execution of this Agreement, Purchaser agrees to abide by the rules, regulations and restrictions imposed upon Purchaser by the Membership Program, including the Reservation Procedures, as the same may unilaterally be amended from time to time by the Program Manager. No such amendment will result in the loss of use of the Allocation provided an Owner complies with the Reservation Procedures, as amended. By execution of this Agreement, Purchaser also hereby designates the person set forth above as Purchaser's designated Member for purposes of receiving the membership privileges in The Ritz-Carlton Club Membership Program which includes making reservations and receiving notices on behalf of Purchaser, and Purchaser acknowledges that Purchaser may be required to pay an administrative fee to change the designation of the Member. Purchaser hereby appoints the Member and all successors thereto as Purchaser's agent and attorney-in-fact for the purposes set forth herein.

12. Term of the Membership Program. The term of the Membership Program will continue indefinitely as long as there are two or more locations participating in the Membership Program subject to earlier termination due to default or mutual agreement. In the event that a resort is deleted from the Membership Program earlier than the expiration date for the Membership Program, Owners of Club Interests in the deleted resort will not be eligible to continue participation in the Membership Program for the remainder of the term of the Membership Program. A Purchaser (other than those who fail to pay the required Initiation Fee, as described above) will always be eligible to reserve available accommodations

at any resorts which participate in the Membership Program that is affiliated with the Membership Program during the term of that Purchaser's Membership.

13.    Other Clubs. The Program Manager has reserved the right to affiliate additional resorts or delete existing resorts participating in the Membership Program from time to time. Purchasers should refer to the Affiliation Agreement for details and The Cobalt Travel Company, Inc. Disclosure Statement concerning the addition or deletion of resorts.

14.    Exchange Programs. In addition to the right to make reservations for accommodations at the Club and other resorts through the Membership Program, the Program Manager has reserved the right, but not the obligation, to provide Owners with the opportunity to make reservations for accommodations through other programs and by other means.

15.    Furnishings. The Club Interest Units will have furniture, appliances, equipment and accent furnishings substantially similar in quality to those shown in the model, if any, and renderings and on the plans and specifications. Since the model, renderings and the materials are for display purposes only, Seller reserves the right to make substitutions of material of similar or better quality, including, but not limited to substitution of colors, textures and finishes and substitution of the brand and model of appliances and furnishings.

16.    Modifications to Plans and Specifications. Seller reserves the right to make amendments, additions or changes in the proposed plans and specifications prior to closing as may be necessary to conform to applicable governmental requirements, to expedite the completion of construction or for other purposes in Seller's discretion provided such modifications do not, in the reasonable judgment of the project architect materially and adversely affect the quality of construction and the finishes and furnishings to be included in the Club Interest Units and the value of the Club Interest to be purchased by the Purchaser.

17.    Modifications to Governing Instruments and Membership Program Documents. Seller reserves the right to amend the Governing Instruments and Membership Program Documents at any time or from time to time prior to the Closing as Seller may deem necessary or appropriate including the following: to make any necessary corrections, to meet the requirements of applicable laws, governmental regulations, lending institutions and marketing programs, or so long as the amendments do not materially adversely affect the value of the Club Interest. Purchaser acknowledges that Seller has reserved the right, at any time after Closing, to amend the Governing Instruments and Membership Program Documents for the purposes and under the conditions outlined in those documents.

18.    Personal Use. The use of the accommodations and facilities of the Club is limited solely to the personal use of the Purchaser, the Purchaser's guests, invitees, exchangers and renters and for recreational uses by corporations or other similar entities owning Club Interests. This Agreement contains the entire understanding between the Purchaser and Seller relating to the purchase and sale of the Club Interest described herein.

Purchaser acknowledges that neither Seller nor any of its agents or representatives has made any representations of any kind as to tax or other economic benefits or advantages which may be realized from purchasing a Club Interest. Seller makes no representations as to the income tax consequences of the purchase, use or exchange of Club Interests and related rights and appurtenances or as to the deductibility of related expenses such as interest, taxes and depreciation. Each Purchaser should consult the Purchaser's own tax advisor as to these issues. A Club Interest should not be purchased in reliance upon any particular kind of tax consequence. Purchaser agrees to defend and indemnify Seller

against all claims of real estate brokers or salesmen due to acts of Purchaser or Purchaser's representatives other than brokers or salesmen employed by Seller.

19. <u>Representations, Warranties and Understandings of Purchaser</u>. Purchaser represents to Seller and the title insurer, if any, that Purchaser has full authority and capacity to enter into this Agreement. Purchaser also represents that Purchaser is purchasing a Club Interest for the personal use of Purchaser and Purchaser's family members and guests only and with no expectation of deriving any profit or tax advantage therefrom whether through income, appreciation or otherwise and with no expectation that Purchaser will receive any assistance from Seller in the rental of accommodations or the resale of the Purchaser's Club Interest. Purchaser acknowledges that, if Purchaser is not a natural person, Purchaser is purchasing a Club Interest solely for the personal use of its officers, directors, principals, employees and guests. Purchaser acknowledges that purchase and use of Club Interests for commercial purposes is expressly prohibited.

a. <u>No Investment Representations</u>. Purchaser acknowledges that Seller has not authorized any representation as to the investment value of a Club Interest, and has specifically not authorized the representation of any potential for rental income, the possibility or probability of profit or loss, or the tax consequences which may result from the purchase of the Club Interest.

b. <u>Amenities</u>. Purchaser acknowledges that the fitness room and certain parking serving the Club may be located outside of the Project building.

c. <u>Construction</u>. Purchaser acknowledges the Project shall be built in multiple phases and remains under construction or is planned for construction; and, prior to the build-out of the Project, substantial construction-related activities are to be expected which may cause noise, dust and other attendant inconveniences. Purchaser further acknowledges that such development is likely to include, without limitation, commercial operations capable of causing noise, odors and other attendant inconveniences.

d. <u>Mixed-Use Condominium</u>. Purchaser acknowledges the Club Interest Units are part of a mixed-use condominium and fractional ownership resort which includes residential condominium units committed to a plan of fractional ownership known as The Ritz-Carlton Club, San Francisco, residential wholly owned condominium units known as The Ritz-Carlton Residences, San Francisco, and commercial units. In addition, Purchaser acknowledges that the commercial units may generate an unpredictable amount of visible, audible and malodorous impacts and disturbances from activities relating to the operation, use and maintenance thereof.

e. <u>Legal Entities and Associations</u>. If required by Title Company, Purchaser, if an organization other than a natural person, shall deliver to Seller at or prior to Closing a copy of a resolution of Purchaser, duly adopted and certified by an authorized representative of Purchaser as required by the laws of the state of Purchaser's organization, authorizing the purchase of the Club Interest, together with all certificates of organization, certificates of authority, trade name affidavits and other documents required by California law to enable Purchaser to hold title to the Club Interest. Purchaser represents that at Closing Purchaser will be in good standing and authorized, as necessary, to conduct its business in California.

f. <u>Joint and Several Liability</u>. If Purchaser is comprised of two or more parties, they shall be jointly and severally obligated under this Agreement.

g. <u>Foreign National Status</u>. The United States Department of the Treasury, Office of Foreign Assets Control ("OFAC"), prohibits Seller from engaging, directly or indirectly, in

transactions with individuals or entities on OFAC's list, as updated from time to time, of Specially Designated Nationals and Blocked Persons (the "SDN List"). OFAC also administers, from time to time, sanction and embargo programs involving certain designated countries (each an "Embargoed Country").

(1)     By signing below, Purchaser represents and warrants to Seller as follows:

(a)     Purchaser is not included on the SDN List, and is not owned or controlled by, or acting for or on behalf of, any individual, organization or other entity included on the SDN List.

(b)     Purchaser is not a resident or national of any Embargoed Country.

(c)     Purchaser is not affiliated with, and does not give support to or receive support from, any terrorist, terrorist organization, narcotics trafficker or person engaged in activities related to the proliferation of weapons of mass destruction.

(d)     Purchaser is not an individual, organization or other entity with whom Seller or its affiliates are prohibited from transacting business, or with whom they may transact business only subject to the imposition of significant fines or penalties.

(e)     Purchaser is in compliance with all applicable anti-money laundering laws, including, without limitation, the USA Patriot Act, and the laws administered by OFAC, including, without limitation, Executive Order 13224.

(f)     None of Purchaser's employees, directors, officers, or others with a controlling interest in Purchaser, nor any of its affiliates or the funding sources of either is on the SDN List.

(g)     Neither Purchaser nor any of its affiliates is directly or indirectly controlled by the government of any country or person that is subject to an embargo by the United States government that prohibits Seller from conducting the business activities contemplated by this Agreement with Purchaser.

(h)     Neither Purchaser nor any of its affiliates is acting on behalf of an Embargoed Country.

Purchaser agrees that it will notify Seller in writing immediately upon the occurrence of any event which would render the foregoing representations and warranties of this Paragraph 19.f. incorrect. Notice should be sent by mail to the following address: The Ritz-Carlton Club, c/o The Ritz-Carlton Development Company, Inc., Attn:  Law Department, 6649 Westwood Boulevard, Suite 110, Orlando, Florida 32821 and via confirmed telefacsimile at 407-206-6420.

(2)     If at any time Purchaser or any of its affiliates becomes, or is discovered to be, an individual, organization or other entity described by any of Sections 1(a) through 1(h) above (a "Prohibited Purchaser"), Purchaser shall, immediately and without further action or notice on behalf of Seller, forfeit any use, voting and other rights attached to the property purchased hereby and shall not be entitled to a refund of any deposits, fees or other

monies paid with respect to such property. Upon the occurrence of such an event, Purchaser shall waive any claims it may have against Seller and its parent and sister companies, affiliates, subsidiaries, employees, agents, officers and directors as a result of such forfeiture and will indemnify Seller and its parent and sister companies, affiliates, subsidiaries, employees, agents, officers and directors for any losses incurred by them arising from Purchaser's status as a Prohibited Purchaser, including any breach of Purchaser's representations and warranties set forth herein.

(3)   Purchaser shall not transfer or attempt to transfer Purchaser's interest in the property purchased hereby to any individual, organization or other entity which would be considered a Prohibited Purchaser under the terms of this Agreement (a "Prohibited Transferee"). Any such transfer or attempted transfer may subject Purchaser to fines or other liabilities, and such transaction may be declared null and void. Purchaser hereby agrees to indemnify and hold harmless Seller and its parent and sister companies, affiliates, subsidiaries, employees, agents, officers and directors from any losses incurred by them arising from Purchaser's transfer or attempted transfer of Purchaser's interest in the property purchased hereby to any Prohibited Transferee.

20.   <u>Contract</u>. This Agreement may not be modified or amended except as set forth herein and shall be construed in accordance with the laws of the State of California. All the terms and provisions of this Agreement shall survive the closing. Time is of the essence hereunder, particularly where the obligation to pay money is concerned. If this Agreement is executed outside of the sales office of Seller located in San Francisco, California, it shall constitute an offer by Purchaser to Seller, and shall in all events be subject to acceptance by Seller in Seller's discretion at Seller's offices in San Francisco, California.

Purchaser authorizes Seller or its authorized agent to insert or change condominium Club Interest Unit numbers wherever necessary to conform with the recorded Club Declaration and to make any changes, insertions or deletions in this Agreement and the documents to be executed hereunder as may be necessary to insure compliance with the terms of this Agreement; provided, however, that any changes in such documents shall be of an administrative nature only and shall not materially or adversely alter the reasonable expectations of Purchaser.

21.   <u>Radon Gas; Seismic Hazard Zone</u>. Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in California. Additional information regarding radon and radon testing may be obtained from your county public health unit. In addition, Purchaser is advised that the Club is located in a Seismic Hazard Zone (Area of Potential Liquefaction according to the official seismic hazard zone maps approved by the State Geologist and issued for the California Department of Conservation, Division of Mines and Geology pursuant to California Public Resources Code Section 2696).

22.   <u>Seller Right of First Refusal before Resale</u>. In accordance with the terms of the Club Declaration, Purchaser is required to offer the Purchaser's Club Interest to Seller upon the same terms and conditions, including financing, as is offered by or to a third party before Purchaser may resell, transfer, assign or hypothecate the Purchaser's Club Interest to a third party. Accordingly, Purchaser must notify Seller in writing prior to accepting any such offer and must include a copy or summary of the offer received. Seller shall notify Owner within fifteen (15) days of receipt of such notice and copy of the proposed contract in the event Seller wishes to exercise its right of first refusal. If Seller elects to exercise its right of first refusal, the purchase by Seller shall be closed on or before the proposed closing date. If Seller fails to notify Purchaser of its election to exercise its right of first refusal, Purchaser may proceed to

close the transaction with the third party upon the original terms and conditions offered by or to the third party. Seller's right of first refusal is a covenant that runs with the land and shall be a requirement binding on any successor in title to Purchaser.

23. <u>Completion of Construction</u>. Seller shall, subject to the provisions of this Agreement, and excepting delays caused by strikes, inability to obtain labor or material, governmental restrictions, enemy action, civil commotion, fire, acts of God, and delays caused by conditions beyond Seller's control, to use its best efforts to complete construction of and obtain a (temporary) certificate of occupancy for the accommodation described above on or before the estimated closing date. In all events Seller will complete construction of the Project phase which contains the Club Interest Unit described above no later than two (2) years after the date of this Agreement.

24. <u>Seller/Broker Relationship</u>. All sales within California will be made by brokers and salespersons licensed by the State of California unless specifically exempted pursuant to California code. The Selling Broker, The Ritz-Carlton Sales Company, Inc., and its salespersons have been engaged as a single and limited agent for the Seller.

25. <u>Association Matters</u>.

a. <u>Club Interest Association</u>. Purchaser acknowledges that as an owner of a Club Interest, Purchaser shall be subject to the provisions of and restrictions contained in the Club Declaration and shall automatically become a member of the Club Interest Association and shall be governed by the Club Interest Association's articles of incorporation, bylaws, and rules and regulations from time to time in effect.

b. <u>Master Association</u>. Purchaser also acknowledges that as an Owner of a Club Interest, Purchaser shall be subject to the provisions of the Master Declaration and shall automatically become a member of the Master Association and shall be governed by the Master Association, and its articles of incorporation, bylaws, and rules and regulations from time to time in effect. These documents require, among other things, payment of assessments to the Master Association independent of those to be paid to the Club Interest Association (although such assessments of the Master Association may be made through the Club Interest Association).

c. <u>Other Restrictions</u>. Purchaser also acknowledges that Purchaser shall be subject to the Membership Program Documents and all other instruments and documents recorded with the Assessor-Recorder of the City and County of San Francisco, California, which concern and restrict the use, occupancy and maintenance of the Club and the Project.

d. <u>Governing Instruments</u>. By signing this Agreement, Purchaser acknowledges receipt of and accepts as part of this Agreement the following documents (the "Governing Instruments"):

    (1) The Club Declaration and the articles of incorporation, bylaws and rules and regulations of the Club Interest Association;

    (2) The Master Declaration and the articles of incorporation, bylaws and rules and regulations of the Master Association;

    (3) The operating budget of the Club Association; and

    (4) Notice of Initiation Fee which is or shall be a matter or record against the Project;

e. **Membership Program Documents.** By signing this Agreement, Purchaser acknowledges receipt of and accepts as part of this Agreement the following documents (the "Membership Program Documents"):

(1) The Ritz-Carlton Club Membership Program Procedures for Reserving Usage; and

(2) The Ritz-Carlton Club Membership Program Affiliation Agreement.

26. <u>Parking.</u> Purchaser shall be entitled to use the Valet Services for the parking of one (1) vehicle during Purchaser's occupancy of a Club Interest Unit, in accordance with the terms of the Governing Instruments. Due to the fact that the dedicated parking area for the Project may, in part, be located outside of the Project building, and due to the limited number of dedicated parking spaces otherwise, it is possible that vehicles of Club Interest Owners may be parked at a nearby off-site location to be determined by the operation of the Valet Services, and each Purchaser expressly consents to such off-site parking. The Club Association and the Management Company will have full right, power and authority to regulate all such parking spaces including, without limitation, the right to assign or not assign exclusive parking spaces to certain units within the Project and the right to adopt rules and regulations governing the use of such parking.

27. <u>Governing Law and Severability.</u> **This Agreement shall be governed by, and shall be construed in accordance with the laws of the State of California. The parties hereby waive any right they may have under any applicable law to a trial by jury with respect to any suit or legal action which may be commenced by or against the other concerning the interpretation, construction, validity, enforcement or performance of this Agreement or any other agreement or instrument executed in connection with this Agreement. In the event any such suit or legal action is commenced by either party, the other party hereby agrees, consents and submits to the personal jurisdiction of the District Court of San Francisco County, California, with respect to such suit or legal action, and each party also hereby consents and submits to and agrees that venue in any such suit or legal action is proper in said court and county, and each party hereby waives any and all personal rights under applicable law or in equity to object to the jurisdiction and venue in said court and county. Such jurisdiction and venue shall be exclusive of any other jurisdiction and venue.** Wherever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

28. <u>Insulation of Premises.</u> Seller and Purchaser hereby acknowledge pursuant to Section 460.16 of the Federal Trade Commission Regulations regarding labeling and advertising of home insulation, that the types, thicknesses and R-Values of insulation presently anticipated to be installed in the Club Interest Unit containing the Club Interest at the time of Closing shall be as set forth below:

| Location | Type of Insulation | R-Value |
|---|---|---|
| Exterior walls | Fiberglass Batt. | R-19 |
| Ceiling/Roof/Floors | Thermal Batt. | R-30 |

The "R-Value" indicates the resistance of insulation to heat flow. The higher the R-Value, the greater the insulating power. Seller has not made its own independent determination of the R-value data provided to Seller by the insulation manufacturer.

      29.   Taxing Districts. SPECIAL TAXING DISTRICTS MAY BE SUBJECT TO GENERAL OBLIGATION INDEBTEDNESS THAT IS PAID BY REVENUES PRODUCED FROM ANNUAL TAX LEVIES ON THE TAXABLE PROPERTY WITHIN SUCH DISTRICTS. PROPERTY OWNERS IN SUCH DISTRICTS MAY BE PLACED AT RISK FOR INCREASED MILL LEVIES AND EXCESSIVE TAX BURDENS TO SUPPORT THE SERVICING OF SUCH DEBT WHERE CIRCUMSTANCES ARISE RESULTING IN THE INABILITY OF SUCH A DISTRICT TO DISCHARGE SUCH INDEBTEDNESS WITHOUT SUCH AN INCREASE IN MILL LEVIES. PURCHASERS SHOULD INVESTIGATE THE DEBT FINANCING REQUIREMENT OF THE AUTHORIZED GENERAL OBLIGATION INDEBTEDNESS OF SUCH DISTRICTS, EXISTING MILL LEVIES OF SUCH DISTRICT SERVICING SUCH INDEBTEDNESS, AND THE POTENTIAL FOR AN INCREASE IN SUCH LEVIES.

      30.   Seller Contingency. In the event that Seller does not have at least one-half of the Club Interests in the Club Interest Units in the first phase of the Project under contract on or before the date of issuance of a temporary certificate of occupancy or other evidence of substantial completion of the Club, then Seller reserves the right at its option to cancel this Agreement and refund all monies paid together with interest earned thereon to Purchaser.

      31.   Acknowledgement. Purchaser acknowledges that Purchaser has reviewed and understands all documents referenced in this Agreement. Further, Purchaser acknowledges that Seller has advised Purchaser to obtain legal counsel to review all aspects of the transaction contemplated by this Agreement, and to represent Purchaser in connection with the examination of title and the Closing.

      32.   Purchaser's Default. Upon Purchaser's default or breach of any term or condition of this Agreement, the Seller shall have the right to declare the Agreement cancelled and may retain all sums paid hereunder by Purchaser as liquidated and agreed damages, and not as a penalty, and the parties hereto shall be relieved from all obligations hereunder. The parties agree that the damages that may result from a breach of this Agreement are uncertain and difficult to ascertain, and that the agreed upon amount is a reasonable estimate of probable damages. In connection with any litigation arising out of this Agreement the prevailing party shall be entitled to recover all costs incurred, including reasonable attorneys' fees, through and including all appellate levels.

INITIALS: Purchaser(s) _UPP_ _JFP_ : Seller _NP_

Pursuant to California Code of Regulations section 2791, the Seller shall give written notice, in the manner prescribed by Section 116.340 of the Code of Civil Procedure for service in a small claims action, to Escrow Agent and to Purchaser that Purchaser is in default under the Agreement and that Seller is demanding that Escrow Agent remit $ 23,200.00 from the Purchase Money to Seller as liquidated damages unless, within 20 days, Purchaser gives Escrow Agent Purchaser's written objection to disbursement of Purchase Money as liquidated damages.

Purchaser shall have a period of 20 days from the date of receipt of the Seller's 20-day notice and demand in which to give Escrow Agent Purchaser's written objection to disbursement of Purchase Money as liquidated damages.

Purchaser's failure to timely give the escrow holder the aforesaid written objection shall constitute a waiver of any cause of action the Purchaser may have against the Seller under the Agreement.

This waiver is conditioned upon service of the Seller's 20-day notice and demand in a manner prescribed by Section 116.340 of the Code of Civil Procedure for service in a small claims action.

33. Seller's Default. In the event Seller shall fail to satisfy its obligations as described herein, then Purchaser, at Purchaser's option, shall elect, with notice to Seller and Escrow Agent, to (a) rescind and terminate this Agreement and receive all deposit monies previously paid by Purchaser, or (b) seek other remedies then available to Purchaser, including without limitation, the right to specific performance by Seller hereunder. All notices herein required shall be in writing and shall be served on the parties at the address following their names. The mailing of a notice by registered or certified mail, return receipt requested, shall be sufficient notice. If pursuant to this section Purchaser seeks to receive all sums paid hereunder, the Purchaser shall provide an affidavit to Escrow Agent requesting release of the escrowed funds, with a copy sent to Seller. If Seller does not object to such notice within ten (10) days of receipt thereof, Escrow Agent shall release all sums paid hereunder to Purchaser.

34. Damage to Property. In the event the Club Interest Unit shall be damaged by fire or other casualty prior to the time of closing in an amount of not more than ten percent (10%) of the total Purchase Price, or the Common Area of the Condominium Project shall be materially damaged by fire or other casualty prior to the time of closing, Seller shall have the right to extend the closing date a reasonable period of time in order to repair such damage. If the damage is not repaired within such period of time or if the damage to the Club Interest Unit exceeds ten percent (10%) of the total Purchase Price, this Agreement may be terminated at the option of Purchaser. Should Purchaser elect to carry out this Agreement despite such damage to the Club Interest Unit or common elements, Purchaser shall *not* be entitled to a credit of the insurance proceeds payable to Seller resulting from such damage to the Property. Any such insurance proceeds shall be delivered to the owners' association. Should any fixture(s) or service(s) in the Club Interest Unit fail or be damaged between the date of this Agreement and the date of closing, then Seller shall be liable for the repair and replacement of such fixture(s) or service(s) with a unit of similar size, age and quality, but only to the extent that the maintenance or replacement of such fixture or service is not the responsibility of the owners' association.

35. Special Power of Attorney. The undersigned Purchaser(s) do/does hereby make, constitute and appoint Seller as my (our) true and lawful attorney, for me (us) in my (our) name and on my (our) behalf for the limited purpose of performing all necessary matters concerning the correction of typographical, clerical and other non-material errors in documents prepared by Seller and associated with such closing, including, but not limited to, full power to sign, execute, acknowledge, deliver and set over all documents and instruments necessary for the correction of typographical, clerical and non-material errors, including, but not limited to, this Agreement signed by me (us) if such changes are non-material in nature and solely pertain to the correction of typographical, clerical and other non-material errors in such documents, for all intents and purposes as I (we) might could do if I (we) was (were) personally present; and I (we) hereby ratify(ies) and confirm(s) all that said attorney shall lawfully do or cause to be done by virtue of these presents. This special power of attorney shall expire and be of no further effect upon the recordation of the grant deed conveying title to Purchaser.

36. Miscellaneous.

a. The provisions of this Agreement shall extend to, bind and inure to the benefit of the parties hereto and their respective personal representatives, heirs, successors, and assigns.

b. Purchaser may not assign this Agreement without the prior written consent of Seller.

c. The provisions of this Agreement shall survive the Closing and the delivery of the grant deed. Seller shall, at or after the Closing, and without further consideration, execute, acknowledge and deliver to Purchaser such other documents and instruments, and take such other actions, as Purchaser shall reasonably request or as may be necessary to more effectively transfer to Purchaser the Club Interest in accordance with this Agreement.

d. This Agreement shall be construed without regard to any presumption or other rule requiring construction against the party causing this Agreement to be drafted.

e. All terms and words used in this Agreement, regardless of the number or gender in which they are used, shall be deemed to include any other number and any other gender as the context may require.

f. In the event of any litigation between Seller and Purchaser concerning the subject matter of this Agreement, the prevailing party shall be paid by the non-prevailing party all its costs and expenses, including, without limitation, reasonable attorneys' fees and reasonable costs incurred incident to such litigation.

g. This Agreement may be executed in more than one counterpart, each of which shall be deemed an original, but all together shall be only one document. Signatures to this Agreement may be delivered by facsimile transmission which transmission copy shall be considered an original and shall be binding and enforceable against the parties.

h. The captions of this Agreement are inserted for convenience of reference only and do not define, describe or limit the scope or intent of this Agreement or any term hereof.

i. If the time period for the performance of any act called for under this Agreement expires on a Saturday, Sunday or any other day on which banking institutions in California are authorized by law or executive order to close (a "Legal Holiday"), the act in question may be performed on the next succeeding day that is not a Saturday, Sunday, or Legal Holiday.

37. Judicial Reference.

a. Reference of Dispute. Any dispute regarding this contract or arising over the design, specifications, surveying, planning, supervision, testing or observation of construction or construction of an improvement to, or survey of, the Project, whether seeking damages or equitable relief (such as, but not limited to, specific enforcement of any provision of this Contract, declaratory relief or injunctive relief) shall be heard and determined by a referee as provided by the California Code of Civil Procedure Sections 638 to 645.1. The venue of any such proceeding shall be in San Francisco County, California (unless changed by order of the referee).

b. Procedure for Appointment. The party seeking to resolve the dispute shall file in court and serve on the other party a complaint describing the matters in dispute. Service of the complaint shall be as prescribed by law. At any time after service of the complaint, any party may request the designation of a referee to try the dispute. Thereafter the parties shall use their best efforts to agree upon the selection of a referee. If the parties are unable to agree upon a referee within ten days after a written request to do so by any party, then any party may petition the presiding judge of the Superior Court in which the action is filed or the Superior Court judge to whom the matter has been assigned (the "Judge") to appoint a referee. For the guidance of the Judge making the appointment of the referee, the parties agree that the person so appointed shall be a retired judge or a lawyer experienced in the subject matter of the dispute.

c.     <u>Appointment of Proposed Referee as Judge Pro Tem</u>. In recognition that (i) there is no action pending as of this date in which the parties thereto can stipulate to the appointment of a temporary judge, (ii) there is no statute authorizing such a stipulation in advance of the filing of an action in the Superior Court, and (iii) the appointment of a referee as a temporary judge (Judge Pro Tem) under Article VI, Section 21 of the California Constitution and California Rules of Court Rule 244, would be preferable to a general reference, Seller, for itself, its successors and assigns, and Purchaser, for himself (themselves), and his (their) successors and assigns, hereby covenant that in the event of the filing of an action in the Superior Court to resolve any dispute regarding any dispute contemplated hereunder, the parties hereto shall use their best efforts to stipulate that the proposed referee be appointed as a temporary judge under Article VI, Section 21 of the California Constitution and California Rules of Court Rule 244.

d.     <u>Decision and Jurisdiction of Referee</u>. The referee or Judge Pro Tem shall decide all issues of fact and law submitted by the parties for decision in the same manner as required for a trial by court, including all law and motion matters, ex parte matters and discovery disputes. The referee or Judge Pro Tem shall try and decide the dispute according to all of the substantive, evidentiary and procedural law of the State of California. When the referee or Judge Pro Tem has decided the dispute, the referee or Judge Pro Tem shall prepare a statement of decision and judgment. The judgment entered by the Superior Court shall be appealable in the same manner as any other judgment.

e.     <u>Discovery</u>. Discovery shall be allowed and conducted under the supervision of the referee or Judge Pro Tem pursuant to the provisions of the California Code of Civil Procedure and the California Rules of Court.

f.     <u>Cooperation</u>. The parties shall diligently cooperate with one another and the person appointed as referee or Judge Pro Tem to resolve the dispute and shall perform such acts as may be necessary to obtain a prompt and expeditious resolution of the dispute. If either party refuses to diligently cooperate, and the other party, after first giving notice of its intent to rely on the provisions of this subsection, incurs additional expenses or attorneys' fees solely as a result of such failure to diligently cooperate, the referee or temporary judge may award such additional expenses and attorneys' fees to the party giving such notice, even if such party is not the prevailing party in the dispute.

g.     <u>Allocation of Costs</u>. The costs of the proceeding shall be borne by the parties as determined by the referee or Judge Pro Tem. If either party refuses to pay his share of the costs of the proceeding at the time required, the other party may do so in which event that party will be entitled to recover (or offset) the amount advanced, with interest at the maximum rate permitted by law, even if that party is not the prevailing party. The referee or Judge Pro Tem shall include such costs in his judgment or award.

38.     <u>Square Footage</u>. Statements of approximate square footages of a Club Interest Unit, as well as of the Common Areas located within the Project, may be made in the Condominium Plan and the Master Declaration. Purchaser acknowledges, however, that square footage calculations may change during the course of construction, and may be determined in a variety of methods. For example, architects often measure square footage from the outside edge of the exterior walls to the mid-point of the interior walls. Another method, typically used in condominium plats, measures square footage from the inside edge of the exterior walls to the inside edge of the interior walls. So long as the Club Interest Unit is constructed substantially in accordance with the plans and specifications for the Project, Purchaser will have no right t rescind this Purchase Agreement, nor will Purchaser be entitled to any claim for breach of this Purchase Agreement or adjustment of the Purchase Price, on account of alleged discrepancies in square footage calculations.

39.     Lead-Based Paint Disclosure.  Seller has advised you that you are purchasing an interest in residential real property on which a residential dwelling was built prior to 1978 and that such property may present exposure to lead from lead-based paint.  As part of its renovation of the property, Seller has advised that it shall remediate all lead-based paint.  Seller has advised that Purchaser will be provided a separate disclosure under 42 U.S.C. 4852(d).

40.     Rescission.  You may cancel this Agreement without any penalty or obligation within seven calendar days of receipt of the conditional public report (or final public report, if no conditional public report was issued to you) or after the date you sign this Agreement, whichever date is later.  If you decide to cancel this Agreement, you must notify the Seller in writing of your intent to cancel.  Your notice of cancellation shall be effective upon the date sent and shall be sent to R.C. Chronicle Building, L.P., c/o The Ritz-Carlton Sales Company, Inc., at 658 Market Street, San Francisco, CA 94104. Your notice of cancellation may also be sent by facsimile to (415) 247-1145 or by hand-delivery. Any attempt to obtain a waiver of your cancellation right is void and of no effect.

**[SIGNATURES BEGIN ON NEXT PAGE]**

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the dates set forth below.

**PURCHASER(S)**

_William P Petrick_
WILLIAM P. PETRICK, AS TRUSTEE
Dated: 7/8/2007

_Sharon F Petrick_
SHARON F. PETRICK, AS TRUSTEE
Dated: 7/2/2007

Dated: _____

Dated: _____

**SELLER**

R.C. CHRONICLE BUILDING, L.P.

By its Authorized Agent

By: _____
Name: ROBERT VAN DISK

Date Accepted: 7/8/07

BROKER:

THE RITZ-CARLTON SALES COMPANY, INC.

By: _Mary Ann Woodward_
Name: _Mary Ann Woodward_
Membership Executive: Mary Ann Woodard
Dated: 7-8-07

**Exhibit A to Purchase Contract**

**(690 Market Club)**

**Governing Instruments:**

Governing Instruments means:

      (i)     the Master Declaration and the Club Interest Declaration;

      (ii)    the articles and the bylaws of the Master Association and the Club Interest Association;

      (iii)   any rules and regulations adopted by the Master Association and the Club Interest Association;

      (iv)   the Procedures for Reserving Usage;

      (v)    the Affiliation Agreement; and

      (vi)   any policies and procedures adopted by the Club Interest Association, as the foregoing are defined in the Club Interest Declaration and as amended or supplemented from time to time.

**Membership Program Documents:**

Membership Program Documents shall mean:

      (i)     the Affiliation Agreement;

      (ii)    the Procedures for Reserving Usage;

      (iii)   the disclosure guide; and

      (iv)   any other documents governing the use and operation of the Membership Program, as the foregoing are defined in the Club Interest Declaration and as amended or supplemented from time to time.

# EXHIBIT D

THE COBALT TRAVEL COMPANY, LLC

DISCLOSURE STATEMENT

FOR

THE RITZ-CARLTON CLUB MEMBERSHIP PROGRAM



THE RITZ-CARLTON CLUB

THE COBALT TRAVEL COMPANY, LLC

DISCLOSURE STATEMENT

FOR

THE RITZ-CARLTON CLUB MEMBERSHIP PROGRAM

THIS DISCLOSURE STATEMENT CONTAINS IMPORTANT INFORMATION REGARDING THE EXCHANGE PROGRAM OWNED AND OPERATED BY THE COBALT TRAVEL COMPANY, LLC IN ACCORDANCE WITH STATE LAW.

# I. Definitions

Certain terms used in this Disclosure Statement have a specialized meaning. Terms not defined herein are defined in The Ritz-Carlton Club Membership Program Reservation Procedures. These important terms are defined as follows:

1. <u>Affiliation Agreement</u> means The Ritz-Carlton Club Membership Program Affiliation Agreement. An Affiliation Agreement is a contract between Program Manager and a developer and/or the Club Manager of a Ritz-Carlton Club pursuant to which the accommodations and facilities of a Ritz-Carlton Club are included as a part of the Membership Program, and the owners of Residence Interests in a Ritz-Carlton Club become Members as a condition of their ownership.

2. <u>Allocation</u> means the total number of days each year, as established in the Residence Documents, for which a Member or Local Member is entitled to use a Residence without incurring a per diem charge. An Allocation may be further divided into Reserved Allocations and Unreserved Allocations (as defined below). No Allocation can be used outside of the (Home Club's) Club Calendar Year in which it was originally allocated.

3. <u>Calendar</u> means the annual calendar(s) promulgated by the Program Manager or Members Association and made available to all Members which defines Seasons, the Reserved Allocation and other pertinent information for each specific Club in a given year.

4. <u>Club Manager</u> means The Ritz-Carlton Club Management Company, L.L.C., a Delaware limited liability company engaged by the Developer, or as applicable, the Members Association, with responsibility for the management and operation of a particular Club.

5. <u>Club</u> or <u>Ritz-Carlton Club</u> means the Residences and common areas of a particular location in which Members have Residence Interests and are affiliated with the Membership Program on a mandatory basis by virtue of their Residence Interest.

6. <u>Club System Exchange</u> means the exchange of Allocation usage from the Home Club to another Club within the same Calendar Season.

7. <u>Converted Reserved Allocation</u> as described under the definition of "Reserved Allocation."

8. <u>Developer</u> means the person who has developed and created a plan for the shared usage by Members and Local Members of Residences and common facilities at a particular Home Club and is selling or has sold Residence Interests therein directly or through others.

9. <u>Home Club</u> means the Club in which a Member or Local Member owns a Residence Interest.

1

10. <u>Local Member</u> means the owner of record of a Residence Interest at a Club other than RCC-Jupiter, RCC-Aspen Highlands, RCC-Bachelor Gulch and RCC-St. Thomas has not acquired Club System Exchange privileges in the Membership Program for such Club Interest.

11. <u>Member</u> means the owner of record of a Residence Interest at any Club and who is not a Local Member.

12. <u>Members Association</u> means all of the Members and Local Members, including the Developer as the owner of unsold Residence Interests, who have Residence Interests at a particular Club and who are part of an association of Members and Local Members, whether such association is incorporated or unincorporated.

13. <u>Membership Program Dues</u> means the cost and expenses of the Membership Program that are assessable to the Members Association each calendar year and are included in the Club Dues and become an obligation of each Member and Local Member.

14. <u>Membership Program</u> or <u>The Ritz-Carlton Club Membership Program</u> means the service name given to the variety of exchange and reservation services and vacation and travel benefits currently offered and the restrictions currently imposed through Program Manager. These services provided by Program Manager include the operation of the exchange program and reservation system through which Members reserve the use of the accommodations at a Club pursuant to the priorities, restrictions and limitations set forth in Membership Program Documents.

15. <u>Membership Program Documents</u> means the Affiliation Agreement and the Reservation Procedures and any other documents relating thereto as they may be amended from time to time.

16. <u>Program Manager</u> means The Cobalt Travel Company, LLC, (f/k/a The Ritz-Carlton Travel Company, L.L.C.) a Delaware limited liability company.

17. <u>Reservation Procedures</u> means the rules for The Ritz-Carlton Membership Program governing the reservation and use of Residences in the Home Club and the residences and facilities at other locations affiliated with the Membership Program that have been adopted, promulgated and/or amended from time to time by Program Manager in its sole discretion in accordance with the terms and conditions set forth herein and in the Program Documents.

18. <u>Reserved Allocation</u> means the portion of the Allocation as established in the Residence Documents, for which a Member and Local Member is assigned exclusive use and possession of a specific Residence or a specific type of Residence during a specific period or periods of time each year pursuant to the Calendar for a given Home Club. A Member or Local Member may be able to convert Reserved Allocation for use outside of its originally assigned Season, but it must be utilized at the Member's Home Club and within the same Club Calendar Year, and is based on availability (hereinafter referred to as "Converted Reserved Allocation").

19.  Residence means an apartment, villa, unit or other separate lodging accommodations available for occupancy at a Club as defined in the Residence Documents.

20.  Residence Documents means those documents governing the use of Residences at a particular Home Club pursuant to which the Developer has created Residence Interests owned or to be owned by Members and Local Members.

21. Residence Interest means the legal right by whatever means legally evidenced (e.g., deed, lease, license, contract, etc.) and however defined (e.g., timeshare estate, timeshare license, or other ownership interest) which is owned or otherwise acquired by a Member or Local Member which grants such Member or Local Member the right to use accommodations and facilities at a Club in accordance with the Program Documents.

22.  Unreserved Allocation means the days remaining (if any) each year from a Member's Allocation after the number of days designated as Reserved Allocation are deducted, as may be specifically established in a Club's Residence Documents.  Currently, Unreserved Allocation is provided for only in the Residence Documents for The Ritz-Carlton Club, Aspen Highlands.

## II. Information about Program Manager

The Cobalt Travel Company, LLC ("Program Manager") is a Delaware limited liability company with principal offices located at:

6649 Westwood Boulevard
Orlando, FL 32821

The Program Manager is a wholly owned subsidiary of The Ritz-Carlton Development Company, Inc. ("RCDC"), a Delaware corporation. RCDC is the sole member of The Cobalt Travel Company, LLC. All Ritz-Carlton Clubs were either developed by RCDC or one of its subsidiaries or affiliates and/or are managed by The Ritz-Carlton Management Company, L.L.C., a Delaware limited liability company and a wholly owned subsidiary of RCDC, or one of its subsidiaries or affiliates.

## III. Membership in the Club

A purchaser of a Residence Interest in a Ritz-Carlton Club is automatically enrolled in the Membership Program as a Member at the time that he acquires his Residence Interest, unless a required Initiation Fee is not paid by such purchaser, in which event the purchaser will be enrolled in the Membership Program as a Local Member.  There is no

Membership Program contract with purchaser separate and distinct from the purchaser's contract with the Developer for the acquisition of a Residence Interest at a Club. Membership in the Membership Program is an appurtenance to all Residence Interests at Clubs and is required of all purchasers. The purchaser's decision to participate in the Membership Program's exchange program (Member's only) and reservation system by making a reservation for accommodations at a Club, other than a reservation for use of a Residence at the Member's Home Club for his or her Reserved and Unreserved Allocation, is voluntary. In the event that the Member no longer owns a Residence Interest at a Club, he or she will no longer be a Member or Local Member and the new owner of that Residence Interest will automatically become a Member or Local Member. Participation in the Membership Program is also dependent upon the continued affiliation with the Membership Program of the Club where the Member or Local Member owns his or her Residence Interest.

## IV. Club Procedures and Obligations

The procedures for utilizing the Membership Program's reservation system are set forth in the Reservation Procedures attached to this Disclosure Statement as Exhibit "A". **THE TERMS AND CONDITIONS OF THIS DISCLOSURE STATEMENT AND THE RESERVATION PROCEDURES PERTAINING TO THE MEMBERSHIP PROGRAM ARE SUBJECT TO CHANGE BY PROGRAM MANAGER WITHOUT ADVANCE NOTICE, INCLUDING, BUT NOT LIMITED TO, FEES, BENEFITS AND RESERVATION PROCEDURES.**

Members and Local Members will be required to pay all Membership Dues assessed against them in accordance with the Membership Program Documents and the Residence Documents for the Club where the Member or Local Members owns his or her Residence Interest. The Program Manager will assess each Club the total amount of Membership Dues attributable to Members and Local Members owning Residence Interests at such Club, and the Club Manager for the Club shall be responsible for collecting the Membership Dues from Members in accordance with the Affiliation Agreement and the Residence Documents which govern the Club. Currently, Membership Dues range anywhere from approximately $150.00 to $325.00 per Member or Local Member depending on such member's Club location. In addition to Membership Dues and transaction fees currently described in the Reservation Procedures, the Program Manager reserves the right to charge Members and Local Members other reasonable fees as may be determined by Program Manager from time to time.

## V. Reciprocal Use Program

Pursuant to the Affiliation Agreement, the Program Manager may create a separate Membership Program for Ritz-Carlton Club Owners. Therefore, the Program Manager has entered into a Reciprocal Use Agreement by the Program Manager and the Members' Associations of each Ritz-Carlton Club and a non-Ritz-Carlton Club resort (a "Reciprocal Use Club") to provide a Reciprocal Use Program which will allow Members to exchange their Ritz-Carlton Club usage for usage at a Reciprocal Use Club and owners at the Reciprocal Use Club to exchange their usage for usage at a Ritz-Carlton Club. The current fee for exchange will be $50.00 (subject to change) due and payable at the time an exchange is requested.

The procedures for utilizing the Reciprocal Use Program's reservation system are set forth in the Reservation Procedures attached to this Disclosure Statement as Exhibit "B". **THE TERMS AND CONDITIONS OF THIS DISCLOSURE STATEMENT AND THE RESERVATION PROCEDURES PERTAINING TO THE RECIPROCAL USE PROGRAM ARE SUBJECT TO CHANGE BY PROGRAM MANAGER WITHOUT ADVANCE NOTICE, INCLUDING, BUT NOT LIMITED TO, FEES, BENEFITS AND RESERVATION PROCEDURES.**

## VI. Clubs

Members and Local Members are entitled to make reservations, in accordance with the Reservation Procedures, for any Ritz-Carlton Club that is affiliated with the Membership Program or any Reciprocal Use Club that is affiliated with the Reciprocal Use Program from time to time by the Program Manager. At this time, those Clubs listed herein below are the only locations where membership in the Membership Program has been extended to owners of Residence Interests. However, the Program Manager retains the ability to extend membership in the Membership Program to owners of Residence Interests at other Clubs to be added, in its sole and unfettered discretion, on a voluntary basis in accordance with such terms and conditions as may be determined by the Program Manager from time to time. The names and addresses of all currently participating Clubs are as follows:

Resorts with 51 or more units:

**RITZ-CARLTON CLUBS**

THE RITZ-CARLTON CLUB, ASPEN HIGHLANDS[4]
0075 and 0133 Prospector Road
0039 Boomerang Road
Aspen, CO 81611

THE RITZ-CARLTON CLUB, ST. THOMAS[5]
6900 Great Bay

St. Thomas, US Virgin Islands 00802

THE RITZ-CARLTON CLUB, BACHELOR GULCH[3]
100 Bachelor Ridge Trail
Avon, Colorado 81620

THE RITZ-CARLTON CLUB, JUPITER[4]
106 Ritz-Carlton Club Drive
Jupiter, Florida 33477

THE RITZ-CARLTON CLUB, KAPALUA BAY[4]
1 Bay Drive
Kapalua, Hawaii 96761
(Occupancy estimated 3rd Quarter 2008)

Resorts with 21 – 50 units:

THE RITZ-CARLTON CLUB, SAN FRANCISCO[4]
690 Market Street
San Francisco, CA 94104
(Occupancy estimated 4th Quarter 2007)

**RECIPROCAL USE CLUBS**

47 PARK STREET, A MARRIOTT GRAND RESIDENCE CLUB[2]
47 Park Street
London W1K 7EB

Resorts with 11 – 20 units:
None

Resorts with 6 – 10 units:
None

Resorts with 1 - 5 units:
None

In compliance with State law, an independent audit of Club operations has been performed and reported through the period ending December 31, 2004. The percentage of confirmed exchanges contained in any exchange company audit report is a summary and should not be relied upon when determining the probability of receiving a particular reservation.

The Cobalt Travel Company, LLC Statement of Key Operating Statistics for the year ending December 31, 2004, together with the Report of Independent Certified Public Accountants, is attached to this Disclosure Statement as Exhibit "C".

V:\ORL535-Legal\Legal Shared\COBALT TRAVEL CO DISCL STMT (285)\Cobalt Travel Company Disclosure Statement cl 2.28.06.doc

7

# EXHIBIT E

# THE RITZ-CARLTON CLUB, SAN FRANCISCO

# MEMBERSHIP PROGRAM

## AFFILIATION AGREEMENT

198

## TABLE OF CONTENTS

I.    Recitals and Owner Covenants ...............................................................................2
II.   Definitions ...............................................................................................................2
      Affilation Agreements ...........................................................................................2
      Agreement ..............................................................................................................2
      Allocation ...............................................................................................................2
      Associate Member ................................................................................................2
      Associated Club .....................................................................................................2
      Associaiton ............................................................................................................2
      Calendar .................................................................................................................3
      Club ........................................................................................................................3
      Club System Exchange ........................................................................................3
      Developer ...............................................................................................................3
      Effective Date ........................................................................................................3
      Guest of the Program Manager ...........................................................................3
      Home Club .............................................................................................................3
      Club Manager ........................................................................................................3
      Local Member ........................................................................................................3
      Member ...................................................................................................................3
      Member Club ..........................................................................................................4
      Membership Program or The Ritz-Carlton Club Membership Program .........4
      Membership Program Documents .......................................................................4
      Membership Program Dues ..................................................................................4
      Membership Program Marks .................................................................................4
      Membership Program Materials ...........................................................................4
      Operating Agreement ............................................................................................4
      Owner ......................................................................................................................4
      Procedures for Reserving Usage .........................................................................4
      Program Manager ..................................................................................................5
      Reservation System ..............................................................................................5
      Reserved Allocation ..............................................................................................5
      Residence or Club Interest Unit ..........................................................................5
      Residence Documents ..........................................................................................5
      Residence Interest or Club Interest .....................................................................5
      Season ....................................................................................................................5
      Subject Club ...........................................................................................................5
      Unreserved Allocation ..........................................................................................5
III.  The Subject Club's Relationship with the Membership Program ....................6
IV.   Covenants of the Developer, Members Association, ........................................6
V.    Operation and Management of the Reservation System .................................8
VI.   Assessments, Collections and Transaction Costs ...........................................9
VII.  Affiliation and Deletion of Clubs from Membership Program ........................11
VIII. Membership Program Marks and Membership Program Materials................13
IX.   Term, Early Termination and Remedies. ..........................................................14
X.    Miscellaneous .....................................................................................................16

THIS RITZ-CARLTON CLUB, SAN FRANCISCO MEMBERSHIP PROGRAM .FFILIATION AGREEMENT ("Agreement") is made and entered this 1st day of May, 2006, by and among The Cobalt Travel Company, LLC, a Delaware limited liability company, whose address is 6649 Westwood Boulevard, Suite #500, Orlando, Florida 32821-6090, ("Program Manager"), R.C. Chronicle Building, L.P. ("Developer"); 690 Market Club Owners Association (the "Association"), and The Ritz-Carlton Management Company, L.L.C., a Delaware limited liability company, whose address is 6649 Westwood Boulevard – Suite #500, Orlando, Florida 32821-6090 ("Manager"). The aforedescribed parties are sometimes individually referred to as a "Party" or collectively as "Parties", and said terms shall also include respective successors and assigns of any Party or Parties.

## RECITALS

WHEREAS, the Developer has developed or shall develop a luxury fractional ownership project known as The Ritz-Carlton Club, San Francisco, located in San Francisco, California (the "Subject Club"); and

WHEREAS, the Program Manager has established a reservation system (the "Reservation System") and other related benefits and services known as The Ritz-Carlton Club Membership Program (the "Membership Program") for the purpose of (i) providing a means for Local Members (defined below) and Members (defined below) to reserve the use of accommodations and facilities at the Subject Club and (ii) providing Club System Exchange privileges at the Subject Club to other Club locations within the Membership Program, in accordance with and as restricted by the terms of the Membership Program as set forth in the Affiliation Agreements (defined below) and the procedures governing reservations for such Club locations (the "Reservation Procedures"); and

WHEREAS, the Association is a California nonprofit mutual benefit corporation responsible for the management and operation of the Subject Club; and

WHEREAS, the Association has entered into a certain property management agreement with the Manager, which, among other things, provides for the delegation, to the extent permitted by law and not otherwise prohibited, of certain management and operations responsibilities to the Manager; and

WHEREAS, the Developer and the Association desire that the Subject Club become affiliated with the Membership Program as a Member Club (defined below) and that each Owner at the Subject Club become a Member or Local Member of the Membership Program with the ability to make use of the Reservation System (defined below) and the other benefits of the Membership Program in accordance with the terms of this Agreement and the Procedures for Reserving Usage (defined below); and

WHEREAS, the Manager desires to have the Subject Club become affiliated with the Membership Program and further desires to coordinate its activities and perform services associated therewith in accordance with the provisions of this Agreement; and

WHEREAS, the Program Manager desires that the Developer, the Association, the Manager, the Local Members and the Members acknowledge that the Program Manager shall have all of the duties, obligations and responsibilities for the operation of the Reservation

System regarding the use of Residences (defined below) at the Subject Club as part of the Membership Program in accordance with the terms of this Agreement, the Procedures for Reserving Usage and applicable law, so as to fully integrate the Residences at the Subject Club and their respective Members and Local Members into the Membership Program, to the extent that such rights may be limited in accordance with this Agreement and the Procedures for Reserving Usage.

NOW, THEREFORE, in consideration of the mutual covenants and obligations contained in this Agreement, the parties hereby agree as follows:

## AGREEMENT

### I.    Recitals and Owner Covenants

1.1  By execution of this Agreement, the Parties agree that the above recitals are true and correct and are hereby incorporated into this Agreement.

1.2  By acceptance of a conveyance of a Residence Interest (defined below) at the Subject Club subject to the Residence Documents (defined below), which have been provided to or made available to each Local Member and Member, each Local Member and Member is deemed to have consented to the terms and conditions of this Agreement and to have further consented to the appointment of the Association as the authorized representative to act on behalf of the Local Member and Member with respect to the provisions of this Agreement. Wherever the Association acknowledgment, consent, understanding and/or agreement is stated or implied in this Agreement, such acknowledgment, consent, understanding and/or agreement shall be deemed to also have been given by the Board of Directors, if applicable, and each Local Member and Member.

### II.    Definitions

Unless the context requires a different meaning, the following terms used in this Agreement are defined as follows:

Affiliation Agreements means those agreements governing the participation of the Clubs in the Membership Program, including this Agreement.

Agreement means this Ritz-Carlton Club, San Francisco Membership Program Affiliation Agreement.

Allocation means the total number of days each year, as established in the Residence Documents, for which a Local Member and Member is entitled to use a Residence without incurring a per diem charge.

Associate Member means a person having privileges within the Membership Program through a separate category of membership other than that type of membership associated with ownership of a Residence Interest and mandatory affiliation with the Membership Program.

Associated Club means a location pursuant to which membership in the Membership Program is made available to persons on a voluntary basis in accordance with such terms and

conditions as may be determined by the Program Manager and for which an agreement similar to the subject Agreement has been executed.

Association has the meaning ascribed to that term in the preamble of this Agreement.

Calendar means the annual calendar(s) promulgated by the Program Manager and made available to all Members and Local Members which identifies Seasons (defined below) and other pertinent information for each specific Club in a given year. The Calendar shall identify Reserved Allocation and Unreserved Allocation, where pertinent (as such terms are defined below), at other Clubs.

Club means a Member Club or Associated Club, or in some cases the Subject Club depending upon the context.

Club System Exchange means the exchange by a Member of Allocation usage from the Subject Club to another Club in accordance with the Procedures for Reserving Usage.

Developer has the meaning ascribed to that term in the preamble of this Agreement.

Effective Date has the meaning ascribed to that term in Section 10.1 of this Agreement.

Guest of the Program Manager means any person who lodges in a Residence at a Club on a space-available basis as an invited guest of the Program Manager, who, except where otherwise specifically provided, shall be treated as a guest.

Home Club means the particular Club in which the Local Member, Member or Associate Member owns a Residence Interest.

Manager means the person engaged by the Developer, or as applicable, the Association, with responsibility for the management and operation of a particular Club.

Local Member means an Owner at the Subject Club who is not a Member and therefore does not have Club System Exchange (as such term is defined in the Procedures for Reserving Usage) privileges within the Membership Program.

Member means a person (natural or otherwise) who owns a Residence Interest and also has Club System Exchange privileges in the Membership Program. In the case of the Subject Club, a Member means, in accordance with the Procedures for Reserving Usage, (1) an Owner at the Subject Club who purchases a Residence Interest from or through (a) the Developer, (b) The Ritz-Carlton Development Company, Inc. ("RCDC") or an affiliate thereof, or (c) any broker authorized from time to time as an "Approved Broker" by RCDC, (2), acquires the Residence Interest by virtue of being a Family Member (as defined in the Procedures for Reserving Usage) by gift, will, testamentary disposition, intestate succession or trust from an Owner, (3) has paid the initiation fee required by the Program Manager, or (4) an Owner who is otherwise granted membership in the Membership Program by RCDC or the Program Manager, upon the terms and conditions then determined by RCDC or the Program Manager in their discretion. Where more than one person own a Residence Interest, then such persons shall designate at the time of purchase of a Residence Interest which person will be deemed to be the Member (cannot be more than one) for purposes of reserving usage under the Procedures for Reserving Usage. Where a Member is not an individual, it shall designate at the time of purchase of a Residence

Interest, which individual will be treated as the individual Member for purposes of reserving usage under the Procedures for Reserving Usage, and such designated person will remain in place until changed in accordance with the Residence Documents.

Member Club means a Club which becomes affiliated with the Membership Program from time to time pursuant to an agreement similar to this Agreement or otherwise, and for which membership in the Membership Program is a mandatory obligation of ownership of a Residence Interest. For locations where membership in the Membership Program may only be a condition of ownership of Residence Interests in some Residences, the term "Member Club" shall only be deemed to refer to such Residences.

Membership Program or The Ritz-Carlton Club Membership Program means the program of benefits and services created and operated by the Program Manager as they may exist from time to time, which Members and Local Members in the Subject Club participate in by virtue of being granted such privilege in accordance with the Procedures for Reserving Usage, and which Members in other Clubs participate in by virtue of ownership of a Residence Interest or by other means established by the Program Manager, e.g., the benefits and services made available to Associate Members.

Membership Program Documents means this Agreement, the Procedures for Reserving Usage and any other documents governing the use and operation of the Membership Program, as may be amended from time to time.

Membership Program Dues means the costs and expenses of the Membership Program that are assessable to the Association each calendar year and become common charges.

Membership Program Marks means all present and future trademarks or service marks, trade names, symbols, logos, slogans, designs, insignia, emblems, devices and distinctive designs, whether owned by or licensed to the Program Manager or any of its affiliates or subsidiaries, and whether or not registered under the laws of the United States of America or any other country, which are used to identify the Membership Program and/or Program Manager or are otherwise used in the promotion and/or operation of the Membership Program, including, but not limited to, the marks identified on Exhibit A attached hereto, as may be amended from time to time by the Program Manager in its sole discretion.

Membership Program Materials means those reservation services, promotional and/or informational materials developed by the Program Manager for the Membership Program from time to time.

Operating Agreement means the agreement between the Association and the Manager for the management and operation of the Subject Club.

Owner means the owner of record of a Residence Interest at the Subject Club, at Associated Clubs and/or at other Member Clubs.

Parties or Parties has the meaning ascribed to such terms in the preamble to this Agreement.

Procedures for Reserving Usage means the procedures, rules and regulations (as from time-to-time amended) promulgated by the Program Manager in order to administer the

Reservation System for the Subject Club, a current copy of which is on file with the Program Manager.

Program Manager has the meaning ascribed to that term in the preamble of this Agreement.

Reservation Procedures has the meaning ascribed to that term in the Recitals of this Agreement, and includes the Procedures for Reserving Usage.

Reservation System means the method, means or system by which Members and, as applicable, Local Members and Associate Members reserve the use of any Residences at any Member Club and, as applicable, an Associated Club pursuant to the Reservation Procedures or Procedures for Reserving Usage.

Reserved Allocation further defines the Allocation as established in the Residence Documents, for which a Member is assigned usage of a specific Residence or a specific type of Residence during a specific period or periods of time each year pursuant to the Calendar for a given Home Club. In the case of the Subject Club, there is no Reserved Allocation.

Residence or Club Interest Unit means an apartment, villa, unit or other separate lodging accommodations available for occupancy at a Club as defined in the Residence Documents.

Residence Documents means those documents governing the use of Residences at a particular Club pursuant to which the developer of such Club has created Residence Interests owned or to be owned by Members such as, but not limited to, any declaration or other instrument establishing the Residence Interest conveyed to Owners, any bylaws or articles of incorporation of the Association and any rules and regulations applicable to the Association.

Residence Interest or Club Interest means the particular real property interest in or use rights a Local Member or Member has at the Subject Club and a Member has at a Member Club.

Season means that time or times of the year set forth in the Calendar for each particular Club which reflects usage of a Residence consistent with the Residence Interest purchased by a Member as set forth in the Residence Documents.

Subject Club has the meaning ascribed to that term in the Recitals of this Agreement. Membership in the Membership Program by Owners at the Subject Club is made available to such Owners in accordance with the terms and conditions of the Residence Documents, this Agreement and the Procedures for Reserving Usage and as may be determined by the Program Manager.

Unreserved Allocation means the days remaining (if any) each year from a Member's Allocation after the number of days designated as Reserved Allocation are deducted as established in the Residence Documents. In the case of the Subject Club, there is no Unreserved Allocation.

### III.   The Subject Club's Relationship with the Membership Program.

3.1 The Subject Club is hereby affiliated with the Membership Program in accordance with the terms and conditions of the Membership Program Documents. During the term of this Agreement and any renewal terms, the Developer, the Association and Manager shall cooperate fully with the Program Manager in the promotion and operation of the Membership Program at the Subject Club.

3.2 The Developer, the Association and the Manager hereby acknowledge the following:

a.   In accordance with the Residence Documents, membership in the Membership Program is an appurtenance to and a condition of ownership of a Residence Interest at the Subject Club, however certain of the Local Member's rights and privileges shall be limited, in accordance with the terms and conditions of the Procedures for Reserving Usage.

b.   The Program Manager manages the use of all Residences at the Subject Club, and at all Member Clubs, through the Reservation System operated under the name of The Ritz-Carlton Club Membership Program.

c.   In the event the Program Manager affiliates other resorts with the Membership Program in accordance with Article VII below, the Members at such locations will compete, through participation in the Reservation System, with Local Members, Members and Associate Members at all Clubs, including the Subject Club, for reservations for any Residences at such Clubs that are available after any priority given to Local Members, Members and Associate Members at its Home Club, if any.

d.   The relationship between the Association and the Program Manager and the operation of the Membership Program on behalf of the Local Members and Members at the Subject Club constitutes legitimate business of the Association.

e.   The Membership Program is not a legal entity nor an association of any kind, but instead is a service name given to the variety of reservation services and other benefits currently offered and the restrictions currently imposed through the Program Manager. Local Members, Members and Associate Members do not acquire any interest in the Membership Program per se as part of their Residence Interest. The services provided by the Program Manager do not include Manager's site management and assessment collection duties for the Subject Club, which are provided for and governed by the Operating Agreement.

### IV.   Covenants of the Developer, Association, and Manager

4.1 In connection with the Subject Club, the Developer, Association and Manager collectively agree to do the following:

a.   Promptly submit or cause to be submitted to the Program Manager copies of all fully executed and recorded deeds or other evidence satisfactory to the Program Manager indicating that a Residence Interest at the Subject Club has been transferred to a Local Member or Member and setting forth that the Residence Interest is subject to membership in the Membership Program as an appurtenance to the Residence Interest such

that the Local Member's or Member's use of a Residence at the Subject Club or other Member Club (by a Member) is subject to the terms and conditions of the Membership Program.

b.      Fully and accurately describe the Membership Program to Local Members, Members and prospective purchasers of Residence Interests at the Subject Club (including any limitations of rights under the Membership Program as to Local Members). The Developer, Association and Manager shall not in any way misrepresent the Membership Program or the Subject Club's relationship with the Program Manager to Local Members or Members or prospective purchasers of Residence Interests at the Subject Club.   The Developer, Association and Manager shall not amend, summarize, change or modify any Membership Program Materials without the prior express written consent of the Program Manager, and shall provide such Membership Program Materials, the Membership Program Documents and Residence Documents, as amended, to Local Members and Members at the Subject Club upon their reasonable request and/or as required by applicable law.

c.      Remain informed of new services and benefits provided by the Program Manager to Local Members and Members at the Subject Club.

d.      Comply with all applicable federal, state and local laws, as well as all applicable administrative rules, regulations and orders in the conduct of their respective businesses as such conduct may affect the Subject Club and the Membership Program.

4.2 The Association agrees that at the time the Developer transfers control of the Subject Club to the Association as set forth in the Residence Documents, the Subject Club shall continue to be affiliated with the Membership Program pursuant to the provisions of the Membership Program Documents.

4.3 The Developer and Association represent and warrant to the Program Manager that (a) the Developer owns or leases, or shall own or lease or have a contract for the purchase or lease prior to marketing or commencement of sales, the real estate and improvements constituting the Subject Club; and (b) each Local Member and Member at the Subject Club shall acquire, possess and enjoy the right to use a Residence at the Subject Club in accordance with the restrictions contained in the applicable deed or other instrument pursuant to which a Local Member or Member acquired a Residence Interest, the Residence Documents and the Membership Program Documents and in accordance with applicable law.

4.4 The Developer, Association and Manager agree that during the term of this Agreement, while the Subject Club remains affiliated with the Membership Program, all requests for reservations of Residences at the Subject Club be processed through the Program Manager.

4.5 The Developer, Association and Manager agree to manage, operate and maintain the Subject Club in a manner consistent with the standards of quality and customer service established by the Program Manager for all Member Clubs from time to time. In this regard, the Program Manager shall have the right to consent to the employment of any Manager engaged by the Developer or Association to manage, operate and maintain the Subject Club.   The Developer, Association and Manager agree to immediately notify the Program Manager of any change in any fact or circumstance affecting the operation of the Subject Club and/or the Membership Program with respect to the Subject Club, including, but not limited to, the termination of any existing Manager, and they further agree that should the

7

⌐ Program Manager's consent not be obtained and given to the termination and/or employment of a new Manager that the Program Manager shall have the right to immediately terminate this Agreement and the affiliation of the Subject Club with the Membership Program.

## V.    Operation and Management of the Reservation System.

5.1 By execution of this Agreement, the Developer, Association and Manager hereby acknowledge that the Program Manager has all of the rights and duties with regard to: (i) the reservation of use rights by Local Members at the Subject Club and (ii) the reservation of use rights by Members at the Subject Club and at other Member Clubs or Associated Clubs, for the purpose of implementing the reservation restrictions by virtue of and as outlined in the Membership Program Documents.   The Parties agree that the Program Manager's rights, duties and obligations as set forth in this Agreement are exclusive to the Program Manager, and the Program Manager hereby agrees to perform all such duties and obligations.

5.2 The Program Manager shall have the right to adopt and amend those portions of the Membership Program Documents which the Program Manager, in its sole discretion, determines are necessary or desirable to amend from time to time in order to operate and manage the Membership Program and/or Reservation System. The Membership Program Documents will only be adopted or amended in a manner that in the Program Manager's reasonable business judgment will be for the principal purpose of improving upon the quality and operation of the Membership Program and/or Reservation System and furthering the collective enjoyment of the Membership Program by present and future Local Members and Members (including Associate Members) as a whole.   The Developer, Association and Manager agree that each Local Member's and Member's use of a Residence at his or her Home Club under the Membership Program and the participation of each Member in the Club System Exchange under the Membership Program shall be governed by the provisions of the Membership Program Documents as adopted and amended from time to time by the Program Manager.

5.3 The Developer, Association and Manager agree that the Program Manager shall have the right subject to the Procedures for Reserving Usage to reserve any unreserved use of Residences for its own promotional use, rental for its own account or any other purpose as the Program Manager determines in its sole discretion.  In return, the Program Manager agrees to make available to the Association that portion of such unreserved usage verified by the Manager as being reasonably necessary to perform additional maintenance of the Residences.

5.4 The Developer, Association and Manager acknowledge and agree that all personal and intellectual property related to the Program Manager's operation of the Reservation System for Residences at the Subject Club, including, but not limited to, any and all computer hardware and software, is and always shall be the personal property of the Program Manager. In the event that this Agreement is terminated, irrespective of whether the termination is voluntary or involuntary and irrespective of the cause of such termination, the Program Manager shall continue to own and control the Reservation System, subject to, and in accordance with applicable law.

5.5 By execution of this Agreement, the Developer, Association and Manager hereby acknowledge that the Program Manager is responsible for exercising all of the rights and duties associated with the affiliation of Residences at the Subject Club with any other

program which provides use rights to Local Members at the Subject Club and to Members at the Subject Club and other various locations through exchange of use rights or other means, and neither the Developer, Association nor Manager shall affiliate or attempt to affiliate such Residences with any such program other than as directed and approved by the Program Manager. The Program Manager shall have the right, but not the obligation, to manage all such use rights made through any such program on behalf of Local Members and Members at the Subject Club in coordination with the provider of such other use program.

## VI.    Assessments, Collections and Transaction Costs

6.1    The Program Manager shall have the responsibility for providing the Developer, Association and Manager with notice of its total proposed Membership Program Dues assessment for the Subject Club for the upcoming operating year at least ninety (90) days prior to the Association's annual meeting. In accordance with the Residence Documents, costs and expenses incurred by the Program Manager in connection with the operation of the Reservation System and the delivery of other Membership Program services and benefits shall be assessed by the Program Manager as Membership Program Dues to each Member and Local Member and/or Club based upon a reasonably prorated formula, together with a reasonable fee to the Program Manager which will contain a reasonable profit factor. Any extraordinary or special costs and expenses incurred by the Program Manager with respect to a given Member or Local Member, group of Members or Local Members, or Club, may be assessed by the Program Manager only to the affected Member or Local Member, group of Members or Local Members or Club as a portion of their Membership Program Dues. Except as provided herein, the Developer, Association, and Manager are not entitled to approve increases in Membership Program Dues assessments. Subject to the terms of the Declaration of Covenants, Conditions and Restrictions for 690 Market Club, the Program Manager agrees that in no event shall the amount of Membership Program Dues assessed to the Subject Club per Member or Local Member in a given calendar year exceed one hundred and twenty-five percent (125%) of the Dues assessed to the Subject Club per Member or Local Member in the previous calendar year (i.e., a twenty-five percent (25%) increase) without the approval of the Subject Club Local Members and Members. The vote necessary to approve such increase by an action without a meeting, or at a meeting at which a quorum is present by ballot, in person or by proxy, shall be the greater of (i) twenty-five percent (25%) of the voting power of the Association residing in Local Members or Members other than the Developer, or (ii) a majority of the voting power of the Association voting at a meeting or in an action without a meeting by ballot, in person or by proxy, residing in Members and Local Members (other than Developer).

6.2 As provided in Section 3.2a of Article III above, this Agreement, including the rights and obligations set forth herein, shall constitute an appurtenance to and obligation of ownership of a Residence Interest at the Subject Club, although (i) membership in the Membership Program as a Local Member does not have Club System Exchange privileges, and (ii) membership in the Membership Program and the enjoyment of Club System Exchange privileges under the Membership Program as a Member is granted in accordance with the Procedures for Reserving Usage and in the event (1) an Owner at the Subject Club purchases a Residence Interest from or through (a) the Developer, (b) The Ritz-Carlton Development Company, Inc. ("RCDC") or an affiliate thereof, or (c) any broker authorized from time to time as an "Approved Broker" by RCDC, (2), acquires the Residence Interest by virtue of being a Family Member (as defined in the Procedures for Reserving Usage) by gift, will, testamentary disposition, intestate succession or trust from an Owner, (3) has paid the initiation fee required by the Program Manager, or (4) is otherwise granted membership in the Membership Program

by RCDC or the Program Manager, upon the terms and conditions then determined by RCDC or the Program Manager in their discretion. The Association shall be liable to the Program Manager for all Membership Program Dues assessed hereunder; however, the Association may, in accordance with the Residence Documents for the Subject Club, assess and collect from each Member and Local Member that portion of the Membership Program Dues attributable to such Member or Local Member. The Association agrees that it shall pay to the Program Manager an amount equal to all the Membership Program Dues assessed against Members for a given year by February 28th (or such other reasonable date established by the Program Manager) of that year, whether or not the Association has actually been successful in collecting such amount from the Members and Local Members by such date.

6.3 The Developer, Association and Manager agree to use their best efforts to annually assess and collect all amounts due from Members and Local Members for the maintenance and operation of the Subject Club, as required by the Residence Documents. All Membership Program Dues owed to the Program Manager from Members and Local Members shall be assessed and collected by the Association and the Manager with such amounts. Membership Program Dues shall be remitted to the Program Manager by the Association on at least a weekly basis (or such other reasonable periodic basis established by the Program Manger) as collected; and in any event, pursuant to Section 6.2 above, shall be paid in full to the Manager by the Association no later than February 28th (or such other reasonable periodic basis established by the Program Manger) of each year.

6.4 The Developer, Association and Manager acknowledge and agree that any Member or Local Member making a reservation pursuant to the Procedures for Reserving Usage, other than a reservation by a Member or Local Member to use a Residence at the Subject Club as part of the Member's or Local Member's Allocation, shall be personally liable for any transaction charges assessed to the Member or Local Member by the Program Manager from time to time as set forth in the Procedures for Reserving Usage.

6.5 A Member or Local Member shall only be permitted to use a reservation pursuant to the Procedures for Reserving Usage if all assessments, including taxes, Membership Program Dues and other charges attributable to the applicable Residence Interest for the year for which the reservation is requested have been paid in full. In the event the Association has not yet assessed such amounts to become due, then, as a condition to acceptance by the Program Manager of the reservation request, the Member or Local Member may be required to remit to the Program Manager an amount equal to the estimated amounts to become due, as determined by the Program Manager after consultation with the Manager. All such monies shall be held by the Program Manager for the benefit of the Association and/or the Member or Local Member as required by applicable law. Any interest earned on such funds will be paid to the Association, and, in no event, will it be due and payable to the Member or Local Member. In the event the amount remitted to the Program Manager for the estimated amounts due is in excess of the actual amounts due, the excess amount shall be returned to the Member or Local Member or applied to the following year's assessments, at the Program Manager's sole discretion. In the event the amount remitted to the Program Manager is less than the actual amounts due, the Member or Local Member shall remain liable for the deficiency and in no event shall be forgiven for said deficiency. The Association agrees, however, not to exercise any "lock-out" remedy it may have pursuant to applicable law and/or the Residence Documents, against any Member or Local Member with respect to any deficiency which may exist between actual amounts assessed to the Member or Local Member for a given calendar year, and the

estimated amounts for that calendar year actually collected by Program Manager and to the Association.

## VII.   Affiliation and Deletion of Clubs from Membership Program

7.1   The Parties agree that the Program Manager shall have the following rights with respect to the addition of locations as Member Clubs or Associated Clubs:

a.   The Program Manager may, in its sole discretion, elect to affiliate other locations with the Membership Program as Member Clubs or Associated Clubs from time to time.   Neither the Developer, Association, nor Manager shall be entitled to participate in or consent to the Program Manager's decision in this regard.  The Developer, Association and the Manager acknowledge and understand that in the event other locations are affiliated with the Membership Program, the addition of accommodations and facilities will result in the addition of new Members and/or Associate Members, who, subject to the Allocation for each respective Member and/or Associate Member, will compete with existing Local Members, Members and/or Associate Members in making reservations for the use of available accommodations and facilities within the Membership Program, including Residences at the Subject Club.

b.   The Program Manager may, in its sole discretion, create a separate membership program, develop individual resort properties as residential, transient or other use, or enter into management agreements with resort properties without the approval of the Developer, Association or Manager; and the Program Manager is under no obligation to affiliate with the Membership Program any specific location.

7.2   In addition to the provisions of Article IX below, the Parties agree that any deletion of Member Clubs and/or Associated Clubs from the Membership Program shall be governed by the following:

a.   In the event of a deletion of any Member Club or Associated Club that results in accommodations or facilities of such Member Club or Associated Club being unavailable for use by Members and/or Associate Members, the Program Manager shall notify all Members and Associate Members with confirmed reservations at the applicable Member Club or Associated Club of such unavailability of use within thirty (30) days after the related event of casualty, eminent domain action or automatic deletion.

b.   The Program Manager may, in its sole discretion, delete an entire existing Member Club or Associated Club from the Membership Program due to casualty where any of the affected accommodations or facilities are not reconstructed or replaced.  With respect to casualty, subject to applicable law the Parties further agree that:

(1)   The Association and Manager shall obtain and maintain casualty insurance as to all accommodations, facilities and furnishings located upon the Subject Club in amounts required by applicable law and/or the Residence Documents.  The Program Manager shall not be liable for any costs associated with obtaining or maintaining such insurance.

(2)   Any insurance proceeds resulting from a casualty at the Subject Club shall be applied to the replacement or acquisition of additional similar accommodations or facilities.

(3)     Any replacement of accommodations or facilities of the Subject Club due to casualty shall be made so as to provide Owners with an opportunity to enjoy a substantially similar experience as was available with the deleted accommodations or facilities, as determined by the Program Manager in its sole discretion. In determining whether the replacement accommodations and facilities will provide a substantially similar experience, the Program Manager shall consider all relevant factors, including, but not limited to, some or all of the following:  size, capacity, furnishings, maintenance costs, location (geographic, topographic and scenic), demand and availability for use.  The Program Manager reserves the right, in its sole discretion, to reject replacement accommodations and facilities that do not meet its affiliation criteria including the high standards of quality and customer service established by the Program Manager for all Member Clubs or Associated Clubs from time to time.

c.     The Program Manager may, in its sole discretion, delete existing Member Clubs or Associated Clubs from the Membership Program where an eminent domain action has taken place and where any of the affected accommodations or facilities are not replaced.  With respect to any such eminent domain action, subject to applicable law, the Parties further agree as follows:

(1)     In the event of a taking of all or a portion of the accommodations and facilities of a Member Club or Associated Club by eminent domain, the Developer, Association and the Manager agree that any proceeds resulting from such taking shall be applied, with the prior express written approval of the Program Manager, to the replacement or acquisition of additional similar accommodations or facilities.

(2)     Any replacement of accommodations or facilities due to a taking by eminent domain shall be made upon the same basis as replacements made due to casualty as set forth above.

d.     The Program Manager may, in its sole discretion, delete an existing Member Club or Associated Club pursuant to the specific termination rights contained in the applicable agreement pursuant to which the location became affiliated with the Membership Program.  A Member Club or Associated Club will also be automatically deleted from the Membership Program upon the expiration or earlier termination of the term of its fractional ownership plan, if any, and/or other similar plan for shared ownership and/or use of Residences as set forth in the applicable Residence Documents.

e.     During any reconstruction or replacement period, Members may temporarily compete for available accommodations on a greater than one-to-one Member to accommodation ratio.  If available, the Association and Manager shall acquire business interruption insurance for securing replacement accommodations or facilities during any reconstruction, replacement or acquisition period.

f.     The Program Manager may delete an Associated Club from the Membership Program at any time, in its sole discretion in accordance with the terms of the applicable agreement pursuant to which the Associated Club became affiliated with the Membership Program.

g.     In the event that a Member Club or Associated Club is deleted from the Membership Program, all Members who own Residence Interests at the deleted

location or Associate Members of a deleted location will also be deleted from the Membership Program and will not be able to make reservations at other Member Clubs or Associated Clubs.

7.3 While the Program Manager does not currently intend to substitute new locations for existing Member Clubs, the Program Manager reserves the right to exercise substitution rights, from time to time, in accordance with applicable law.

7.4 The Developer, Association and Manager understand and acknowledge that the accommodations and facilities of Associated Clubs are voluntarily affiliated with the Membership Program and there is no guarantee that accommodations and facilities at an Associated Club will ever be available for reservation or use by Members. The Developer, Association and Manager also understand and acknowledge that the Allocation associated with Residence Interests owned by Local Members at the Subject Club and other Clubs and which Allocation has not been forfeited by such Local Members to the Program Manager by failing to timely reserve, will not be available for exchange reservation through the Membership Program.

## VIII.    Membership Program Marks and Membership Program Materials

8.1. The Program Manager and its affiliates and subsidiaries are the owners of all rights in the Membership Program Marks. Neither the Association nor the Local Members and Members have any license to use or other interest in the Membership Program Marks. The Developer and/or the Manager may identify the Subject Club as a Ritz-Carlton Club location and part of the Membership Program until such time as the Program Manager, in its sole discretion, determines otherwise.

8.2 The Developer, Association and Manager acknowledge that:

a.      the Program Manager has the right to exclude others from using the Membership Program Marks and Membership Program Materials and any variant or combination of said marks or materials that the Program Manager determines, in its sole discretion, to be confusingly similar to the Membership Program Marks or Membership Program Materials;

b.      the Program Manager has the right to control the use of the Membership Program Marks and Membership Program Materials in connection with the Membership Program; and

c.      all uses of the Membership Program Marks and Membership Program Materials inure exclusively to the benefit of the Program Manager.

8.3 The Developer and Manager may use the Membership Program Marks and Membership Program Materials only with prior written approval from the Program Manager and in connection with any materials furnished from time to time by the Program Manager and only for the sole purpose of promoting the Membership Program. Said Parties shall comply with all requests of the Program Manager with respect to the appearance and use of the Membership Program Marks and Membership Program Materials. Said Parties agree to promptly submit one copy of all printed material which will use any of the Membership Program Marks or all or a portion of any Membership Program Materials to the Program Manager for inspection and approval in advance of use, which approval may be withheld or conditioned by the Program Manager in its sole and absolute discretion.

8.4  In the event Program Manager, in its sole discretion, provides written notice to the Developer and/or the Manager that it shall no longer be permitted to use Membership Program Marks, each Party notified shall immediately take steps to cease all use of the marks(s) identified in Program Manager's notice and shall:

(a)  immediately remove from the Subject Club and any off-site locations all signs containing the Membership Program Marks;

(b)  immediately destroy all stationery, descriptive literature or printed or written matter bearing the Membership Program Marks;

(c)  immediately cease and desist from using the Membership Program Marks (or any variation thereof) orally or in writing;

(d)  take immediate action to effect changes to any and all documents of the Developer and/or the Manager that reflect the Membership Program Mark(s) to eliminate the use of such mark(s) as soon as possible, but in any event, elimination must occur within three (3) months after receipt of notice that use of the mark(s) is no longer permitted.

The provisions of this Section 8.4 may be enforced by any remedy at law or equity, including mandatory and/or prohibitory injunctions by the Program Manager against the Association, the Associate Members, the Developer and/or the Manager.

## IX.    Term, Early Termination and Remedies.

9.1  This Agreement shall have a term commencing on the Effective Date and shall continue until the Operating Agreement (including renewal terms thereunder) is terminated or unless terminated by a vote of not less than a majority of the votes entitled to be cast by non-Developer Members and Local Members in the Association.  Under no circumstances shall the Association be authorized to terminate this Agreement without such vote.  In addition to any other rights that Program Manager has or may have to terminate this Agreement, Program Manager may terminate this Agreement at the end of the then current term of the Operating Agreement or any renewal term thereof by giving written notice to the Association no later than ninety (90) days prior to the end of any such initial term or subsequent renewal term. Notwithstanding the foregoing, this Agreement may otherwise be terminated as provided for below in this Article IX.

9.2 Termination of this Agreement, the result of which is that the Subject Club is no longer affiliated with the Membership Program, can occur as follows:

a.    This Agreement will automatically terminate upon:

(1)    the declaration of bankruptcy or insolvency of the Developer, Association or Manager according to law or if any general assignment shall be made of the Developer's, Association's or Manager's property for the benefit of creditors; provided, however, the Program Manager shall have the right, in its sole discretion, to continue the Agreement as to the Parties that have not been declared bankrupt or insolvent or made the subject of a general assignment for the benefit of creditors or during the pendency of such actions; or

(2)     the deletion of the Subject Club in accordance with Article VII above.

b.     The Parties may terminate this Agreement:

(1)     by the mutual written agreement of all of the Parties, effective upon the date agreed to by all Parties; or

(2)     in the event of a material breach of any of the terms, conditions, covenants, representations or warranties contained in this Agreement without the breaching Party curing the asserted breach to the reasonable satisfaction of the Party giving such notice within thirty (30) days of the date of written notice to the breaching Party stating the grounds for such termination; or

(3)     in the event the Association votes at a meeting to terminate this Agreement and does so in accordance with Section 9.1 of this Agreement, upon ninety (90) days written notice to the Program Manager. Any such meeting of the Association shall be considered a special meeting of the Association and shall only be held if requested by the Board or the Owners at the Subject Club, as provided for in the Bylaws of the Association. Any special meeting of the Association called to consider a termination of this Agreement pursuant to this Section 9.2(b)(3) may only be held within thirty (30) days of any anniversary date of the Operating Agreement at the Subject Club.

c.     The Program Manager may terminate or suspend its participation in this Agreement, immediately upon written notice to the Developer, Association and Manager, in the event that the Program Manager determines, in its sole discretion, that the Developer, Association and/or Manager have failed to manage, operate and maintain the Subject Club in a manner consistent with the standards of quality and customer service established by the Program Manager from time to time, including, but not limited to, the employment or termination by the Developer and/or Association of a management company without the Program Manager's consent, as addressed at Section 4.5 of Article IV hereinabove.

9.3   Any Party's exercise of its right to terminate pursuant to this Agreement shall in no way limit or impair its right to seek other legal or equitable remedies in connection with a breach by any other Party.

9.4   Upon termination of this Agreement, the following events shall occur:

a.     The Developer shall immediately discontinue the offering of Residence Interests with appurtenant memberships in the Membership Program to prospective purchasers at the Subject Club.

b.     The Developer, Association and Manager shall immediately cease using and thereafter cease using all the Membership Program Marks and any name or mark similar thereto and all Membership Program Materials including, but not limited to, all of the Program Manager's personal and intellectual property utilized in connection with the operation, promotion, identification and management of the Membership Program, except as specifically authorized by this Agreement. No property right in or privilege to use the Membership Program Marks or Membership Program Materials is created by this Agreement that will extend beyond

the expiration or termination of this Agreement, except as specifically permitted by this Agreement. Failure to cease using the Membership Program Marks or Membership Program Materials following termination of this Agreement shall entitle the Program Manager to receive liquidated damages from the offending Party in the amount of One Thousand Dollars ($1,000) per day in addition to any other injunctive or equitable relief available to the Program Manager.

   c. The Program Manager shall honor all reservations and reservation privileges of Members or Associate Members from other Member Clubs or Associated Clubs reserving time at the Subject Club that are confirmed or accrued prior to termination or suspension and shall honor all reservations and reservation privileges of Members at the Subject Club reserving time at other Member Clubs or Associated Clubs that are confirmed or accrued prior to termination of this Agreement. The Developer, Association and Manager shall honor all reservations and reservation privileges of Members or Associate Members from other Member Clubs or Associated Clubs reserving time at the Subject Club that are confirmed or accrued prior to termination. This requirement shall survive the termination of this Agreement.

   d. Members and Local Members at the Subject Club shall no longer be affiliated with the Membership Program, and reservation procedures for Allocation at the Home Club by Members and Local Members shall be implemented by the Manager.

   9.5  In the event that the Developer, Association and/or Manager fails to perform its duties under this Agreement to the extent that a Local Member, Member, Associate Member or other authorized person with a confirmed reservation at the Subject Club is wrongfully denied access to a Residence at the Subject Club, then the Developer, Association and/or Manager shall immediately correct such denial of access at its own expense.

   9.6  Each Party acknowledges that, unless specifically stated otherwise in this Agreement, damages cannot adequately compensate the other Parties for a breach of any of the provisions of this Agreement, and therefore the Parties agree that each Party shall be entitled to a remedy of specific performance or injunctive relief, as appropriate, in the event of a breach or threatened breach of any such provisions by any other Party, in addition to any other appropriate legal or equitable remedies.

   9.7  Each Party agrees to indemnify, defend and hold harmless the other Parties from and against any and all claims, demands, obligations, deficiencies, judgments, damages, suits, losses, penalties, expenses, costs (including attorneys' fees at the trial and appellate levels) and liabilities of any kind, type or nature whatsoever directly or indirectly resulting from, arising out of or in connection with this Agreement or the operation of its business as a result of any acts or omissions by it or any of its directors, officers, partners, employees, representatives, agents, brokers, salesmen or associates.

   X. <u>Miscellaneous.</u>

   10.1  This Agreement shall become effective on either the date of recording of the Declaration of Covenants, Conditions and Restrictions for 690 Market Club in the Public Records of San Francisco County, California, or the date upon which the Association is eligible to make reservations, which ever is earlier (the "<u>Effective Date</u>"), and shall continue in force and effect until its scheduled termination or until such time as it is otherwise terminated pursuant to the terms hereof.

10.2 The Program Manager reserves the right, and the Developer, Association and Manager acknowledge the Program Manager's right, to assign its rights and duties under this Agreement. No other Party may assign its rights and duties under this Agreement without the prior written consent of the Program Manager, which it may give or withhold in its sole discretion.

10.3 Except as may be otherwise provided herein, any notice, demand, request, consent, approval or communication under this Agreement shall be in writing and shall be deemed duly given or made: (a) when deposited, postage prepaid, in the United States mail, certified or registered mail with a return receipt requested, addressed to the Party at the address shown above; (b) when delivered personally to the Party at the address specified above; or (c) when deposited with a nationally recognized overnight courier service, fee prepaid, with receipt of confirmation requested, addressed to the Party as specified above. A Party may designate a different address for receiving notices hereunder by giving notice thereof to the other Parties pursuant to this Section 10.3.

10.4 The headings in this Agreement are intended solely for convenience of reference and shall be given no effect in the construction or interpretation of this Agreement. All references in this Agreement to particular recitals, articles, sections and subsections are references to recitals, articles, sections and subsections of this Agreement.

10.5 In the event that any clause or provision of this Agreement is held to be invalid by any court of competent jurisdiction, the invalidity of such clause or provision shall not affect any other provision of this Agreement. Failure of any Party to insist on strict compliance with the provisions of this Agreement shall not constitute waiver of that Party's right to demand later compliance with the same or other provisions of this Agreement.

10.6 This Agreement constitutes the entire understanding and agreement among the Parties concerning the subject matter of this Agreement. All understandings between the Parties are merged into this Agreement, and there are no representations, warranties, covenants, obligations, understandings or agreements, oral or otherwise, in relation thereto between the Parties other than those incorporated herein.

10.7 This Agreement shall be governed by, and shall be construed in accordance with, the laws of the State of Florida without regard to its conflict of law provisions. In the event any such suit or legal action is commenced by either Party, the other Parties hereby agree, consent and submit to the personal jurisdiction of the Circuit Court of the Ninth Judicial Circuit of Florida in and for Orange County, Florida, with respect to such suit or legal action, and each Party also hereby consents and submits to and agrees that venue in any such suit or legal action is proper only in said court and county, and each Party hereby waives any and all personal rights under applicable law or in equity to object to the jurisdiction and venue in said court and county. Such jurisdiction and venue shall be exclusive of any other jurisdiction and venue.

10.8 In the event any Party initiates action to enforce its rights hereunder, the prevailing Party shall recover from the non-prevailing Party its reasonable expenses, court costs and reasonable attorneys' fees, whether suit be brought or not. As used herein, expenses, court costs and attorneys' fees include expenses, court costs and attorneys' fees incurred in any appellate proceeding. All such expenses shall bear interest at the highest rate allowable under the laws of the State of Florida from the date the prevailing Party pays such expenses

until the date the non-prevailing Party repays such expenses. Expenses incurred in enforcing this Section 10.8 shall be covered by this provision.

10.9 This Agreement and all of its provisions shall be binding upon and inure to the benefit of the Parties and their successors and permitted assigns. In no event shall the terms and conditions of this Agreement be deemed in any way to inure to the benefit of any person or party not expressly made a Party hereto except for successors or permitted assigns to Parties hereto.

10.10 **THE PARTIES HEREBY WAIVE ANY RIGHT THEY MAY HAVE UNDER ANY APPLICABLE LAW TO A TRIAL BY JURY WITH RESPECT TO ANY SUIT OR LEGAL ACTION WHICH MAY BE COMMENCED BY OR AGAINST THE OTHER CONCERNING THE INTERPRETATION, CONSTRUCTION, VALIDITY, ENFORCEMENT OR PERFORMANCE OF THIS AGREEMENT OR ANY OTHER AGREEMENT OR INSTRUMENT EXECUTED IN CONNECTION WITH THIS AGREEMENT.**

10.11 Except for changes to this Agreement or provisions within this Agreement which the Program Manager may make in its sole discretion pursuant to the terms of this Agreement, neither this Agreement nor any of its provisions can be changed, waived, discharged, terminated or otherwise altered, except by an instrument in writing signed by the Party against whom enforcement of the change, waiver, discharge, termination or alteration is sought.

10.12 This Agreement may be executed by the Parties in separate counterparts via facsimile, each of which shall be deemed an original and both of which together shall be deemed to be one and the same instrument.

*(Rest of page intentionally left blank)*

*(Signature page follows)*

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed as of th' 'ate set forth above.

WITNESSES

Print Name: _ILEANA RODRIGUEZ_

Print Name: _GARTH GREENE_

PROGRAM MANAGER:

The Cobalt Travel Company, LLC
a Delaware limited liability company

By: The Ritz-Carlton Development
Company, Inc., Sole Member

By: _____
Print Name: __Robert A. Phillips__
As its: __Vice President__


WITNESSES

Print Name: _____

Print Name: _____

DEVELOPER

R.C. CHRONICLE Building, L.P., a
Delaware limited partnership

By: HCT (690A Market), Inc., a California
corporation, its General Partner


By: _____
Print Name: _____
As its: _____


WITNESSES

Print Name: _____

Print Name: _____

ASSOCIATION:

690 Market Club Owners Association

By: _____
Print Name: _____
As its: _____President_____

19

IN **WITNESS WHEREOF**, the parties have caused this Agreement to be executed as of the date set forth above.

| WITNESSES | PROGRAM MANAGER: |
|---|---|
| | The Cobalt Travel Company, LLC<br>a Delaware limited liability company |
| | By: The Ritz-Carlton Development<br>Company, Inc., Sole Member |
| Print Name: _____ | |
| | By: _____ |
| Print Name: _____ | Print Name: ___Robert A. Phillips___ |
| | As its: ___Vice President___ |

| WITNESSES | DEVELOPER |
|---|---|
| | R.C. CHRONICLE Building, L.P., a<br>Delaware limited partnership |
| | By: HCT (690A Market), Inc., a California<br>corporation, its General Partner |
| Print Name: _ROBERT D. PERLINE_ | |
| Print Name: _LYNN M. LANE_ | By: _____<br>Print Name: ___Jim Hunter___<br>As its: ___President___ |

| WITNESSES | ASSOCIATION: |
|---|---|
| | 690 Market Club Owners Association |
| Print Name: _____ | By: _____<br>Print Name: ___John Albert___<br>As its: ___President___ |
| Print Name: _____ | |

19



IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the date set forth above.

WITNESSES

PROGRAM MANAGER:

The Cobalt Travel Company, LLC
a Delaware limited liability company

By: The Ritz-Carlton Development
Print Name: _____     Company, Inc., Sole Member

By: _____
Print Name: _____     Print Name:   Robert A. Phillips
                                 As Its:    Vice President

WITNESSES

DEVELOPER

R.C. CHRONICLE Building, L.P., a
Delaware limited partnership

By: HCT (690A Market), Inc., a California
corporation, its General Partner

Print Name: _____

By: _____
Print Name: _____     Print Name:   Jim Hunter
                                 As its:    President

WITNESSES

ASSOCIATION:

690 Market Club Owners Association

By: _____
Print Name:  KATHY KRAUSE      Print Name:    John Albert
                                 As its:       President
Print Name:  GARTH GREENE

WITNESSES

MANAGER:

The Ritz-Carlton Club Management
Company, L.L.C., a Delaware limited liability
company

By: The Ritz-Carlton Development
Company, Inc., Sole Member

Print Name: Kathy Kraus

Print Name: Garth Greene

By: _____

Print Name: C. Stephen Bradley

As Its: Vice President

## EXHIBIT A

### Membership Program Marks



THE RITZ-CARLTON*CLUB

# THE RESIDENCES
#### AT THE RITZ-CARLTON, SAN FRANCISCO



THE RITZ-CARLTON CLUB®
SAN FRANCISCO



THE RITZ-CARLTON CLUB℠ AND RESIDENCES
SAN FRANCISCO

# EXHIBIT F


## THE RITZ-CARLTON DESTINATION CLUB
## FREQUENTLY ASKED QUESTIONS

**Why is The Ritz-Carlton Hotel Company, L.L.C. getting into the destination club industry?**
The 10-year success of The Ritz-Carlton Club brand is driven by our legendary service commitment, Member insights and market trends. Therefore, the brand's evolution to the new Ritz-Carlton Destination Club includes existing fractional ownership interests now known as Home Club Membership, and a points-based, Portfolio Membership. The industry is shifting, and The Ritz-Carlton is part of this evolution.

**Why change The Ritz-Carlton Club?**
This year, as The Ritz-Carlton Club celebrates its 10th anniversary, the brand is evolving to include a new option for Members. Based on the marketplace and Member insights, including the requests for a broader portfolio and enhanced usage flexibility, we developed a membership that fulfills such wishes. It is our mission to offer Members an exceptional vacation lifestyle.

**How is The Ritz-Carlton Destination Club different from other destination clubs?**
The Ritz-Carlton Destination Club is redefining the very idea of a "destination club." A "destination club" is much more than today's common definition of a country club membership. We're blending the attributes of luxurious vacation home living and heightened travel flexibility within an equity-based model, while also maintaining exclusivity and privacy. Only the trusted Ritz-Carlton brand can deliver this.

The Ritz-Carlton Destination Club:
- Two vacation options – Home Club and Portfolio Memberships -- to meet the needs of our discerning Members and enable greater travel flexibility
- First branded hospitality company to offer a points-based membership (Portfolio Membership)
- Legendary, Ritz-Carlton service to create inspiring vacations
- Broad possibilities to travel the world, including exchange to participating Ritz-Carlton hotels
- Membership peace of mind by offering a deeded structure -- no matter which membership is selected
- Exclusivity, and yet inviting club

**What is a Home Club Membership and how does it work?**
Identical to the current Ritz-Carlton Club fractional ownership offering, the Home Club Membership is designed as a home resort preference for those with an affinity to travel to a specific Club location on a recurring basis. Deeded ownership at a Ritz-Carlton Destination Club property allows Members and their guests to use an allocated number of days per interest. With priority access to their home resort, Members may also use a portion of their time at other home Club locations on a reciprocal use basis in accordance with reservation procedures. Furthermore, Members have an opportunity to reserve supplemental time as space allows.

- more -

**What is a Portfolio Membership and how does it work?**
Conversely, Portfolio Memberships offer a beneficial interest in a trust where Members can customize their vacations through a points-based currency. This annual allotment of currency is used to reserve accommodations based on their travel dates and residence floor plan best suited for their trip. An entry membership grants 5,000 Club points, but additional beneficial interests can be purchased in 2,500 Club point increments.

**What services are available to Members of The Ritz-Carlton Destination Club?**
Members enjoy the convenience of a dedicated concierge staff providing services above and beyond customary concierge duties, such as airport pick-up, pre-arrival provisioning of the residence, unpacking and pressing pre-sent garments and arranging a complete itinerary. For Members who enroll in the Home Club Membership, the ladies and gentlemen of The Ritz-Carlton Destination Club remove personal items from storage and place them in the residence according to the Member's specifications. At most properties, personal chefs are also available upon request.

**How much does it cost to belong to The Ritz-Carlton Destination Club?**
Prices vary depending on location and membership purchased. Currently, a deeded interest with a Home Club Membership ranges from the low $100,000s to the low $800,000s.

Beneficial interests within the Portfolio Membership are sold in increments of 2,500 Club points with a minimum purchase requirement of 5,000 points. Pricing starts at $120,000.

Members of both options are also responsible for annual dues to cover their portion of the yearly operating costs.

**Where are The Ritz-Carlton Destination Clubs located?**
Our goal is to offer a balanced focus of golf, ski, beach and urban experiences. Currently, we have properties in Aspen Highlands, Vail* and Bachelor Gulch, Colo.; St. Thomas, U.S.V.I.; Jupiter, Fla.; San Francisco and North Lake Tahoe*, Calif.; Kapalua Bay* in Maui and Kauai Lagoons, Hawaii*; and Abaco, The Bahamas.
*Future locations*

**Can Members use their Ritz-Carlton Destination Club membership at Ritz-Carlton hotels?**
Yes, those who purchase a Portfolio Membership may use up to 25 percent of their points for stays at participating Ritz-Carlton hotels and resorts.

**Can The Ritz-Carlton Destination Club memberships be resold?**
Like any form of real estate, the Member's deed can be sold, willed or transferred by the Member at any time.

**How are point values determined for the Portfolio Membership?**
Club point values are determined by the destination, season and the size of the residence.

- more -

**How often can Members utilize a residence and how are reservations handled?\***
*Home Club Memberships*
Members work with their member experience manager to manage their vacations. Each year, Members are allocated a specific number of days based on a property's usage calendar. Beyond use at their home Club, a portion of this time may also be used at other Home Club locations on a reciprocal use basis in accordance with reservation procedures.

Members are asked to confirm or request changes to their allocation for each upcoming season. Throughout the year, Members have an opportunity to reserve supplemental time on a space available basis, if they so desire.
*\*Reservation procedures can vary by property.*

*Portfolio Memberships*
Again, Members are assigned a member experience manager to manage their vacations. The Portfolio Membership affords Members the opportunity to discover a wide variety of locations and experiences annually. Reservation requests are full-filled as availability allows and on a first-come-first-serve basis, in accordance with reservation procedures.

**Is The Ritz-Carlton Destination Club open to the public?**
No, The Club is operated for the exclusive use, benefit and enjoyment of the Members, their families and their guests. However, on a limited basis, guests can visit a Club location as a sponsored guest to experience the lifestyle prior to enrolling.

**Where would a prospective Member go for more information on The Ritz-Carlton Destination Club?**
Those with inquiries regarding The Ritz-Carlton Destination Club may visit www.ritzcarltondestinationclub.com.

# # #

# EXHIBIT G



THE RITZ-CARLTON DESTINATION CLUB®

Dear Valued Members,

We are writing to provide you further information regarding certain changes announced on July 17th to the Lion & Crown Travel Company and The Ritz-Carlton Destination Club system.

First of all, we would like to assure you that nothing that you originally purchased has changed or will change as a result of the announcement mentioned above. As a Member of The Ritz-Carlton Destination Club, you will continue to enjoy at your Home Club the service levels that you have come to expect from The Ritz-Carlton brand. Rest assured that our other Ritz-Carlton Club locations will also continue to deliver on these exacting brand standards.

Access to the Home Club product you purchased – a deeded interest in a fixed unit with a rotating calendar – along with the exchange and per diem programs in your Home Club and sister Ritz-Carlton Clubs remain unchanged. Additionally, The Hotel Reservation Service remains in place with no change, subject to annual review and approval of The Ritz-Carlton Hotel Company in accordance with past practice.

We also would like to make it clear that we value you as a Member and look forward to providing the world-class service you have come to expect for your member services needs through our dedicated Ritz-Carlton Club Member Services staff and The Ritz-Carlton Hotel Company during your Club stays for many years to come.

Based on prior Member feedback, The Ritz-Carlton Destination Club team has been exploring ways to broaden the experiences available to all Ritz-Carlton Destination Club Members through external exchange affiliations. As you may know, our first outside affiliation was with Abercrombie & Kent which began over two years ago. While the experiences that affiliation provided were attractive, the imbalance in size between the two groups proved to be too great and ultimately led to the cancellation of that arrangement.

The affiliation option announced in our July 17, 2012 letter regarding the evolution of The Ritz-Carlton Destination Club is the next step in providing significantly more vacation options for our Ritz-Carlton Destination Club Members. This new option is being offered with no additional cost to current Home Club Members and participation is completely optional. Should Members decide to participate in this opportunity, they would be able to exchange one or more weeks for Lion & Crown points. This choice is an annual decision in the same way that utilizing the current sister Club exchange program is an annual decision.

Members choosing to take advantage of the exchange program would receive points in their account that they could then use to access all of the options within the Marriott Vacation Club Destinations program. Prior to the launch of the program for Ritz-Carlton Destination Club Members, the Destinations exchange club is working to expand its luxury experience options. We anticipate that participants will be able to use their points to access oceans and river cruises on luxury lines as well as premier events such as the Masters, Fashion Week in New York City, the Kentucky Derby and more. These new options are in addition to opportunities already provided through the Destinations exchange club which offers access to more than 50 Marriott Vacation Club locations around the world, including locations such as Newport Coast, California, Aruba and Marbella, Spain. The service levels provided at these locations are aligned with standards befitting the Marriott brand and provide numerous new destinations for Members to experience through the use of their Ritz-Carlton Destination Club Membership. This affiliation option will be available for you to choose in 2013 with usage in 2014.

We are also continuing to explore exchange affiliation options that would be available exclusively to Ritz-Carlton Destination Club Members through their Membership in the Lion & Crown exchange program, such as Member access to private luxury vacation homes, affiliation with other club networks, and a variety of other experiences provided through select luxury partners.

We understand our original communication generated questions for a number of our Members and may not have fully anticipated all of your questions regarding the changes to The Ritz-Carlton Destination Club. We have received initial feedback from a few Members and your Board and would appreciate hearing from you with your comments and questions. Your feedback will allow us to communicate with you and the other Members in the upcoming weeks. We would love to hear from you directly at *Member.inquiry@ritzcarltonclub.com*.

We have scheduled a webinar for Members of The Ritz-Carlton Destination Club with myself and the President and Chief Executive Officer of Marriott Vacations Worldwide on August 28th at 4:00 PM Eastern Standard Time to help address questions we have received from our Members. So that we can address as many questions as possible during the webinar, please provide any feedback or questions by August 24th. To access this event please follow one of the methods below:

Via phone:
Local: 1-480-629-9645
Toll-free: 1-866-225-8754
Conference ID: 4561025

Via live webcast:
Webcast URL:
http://event.on24.com/r.htm?e=506272&s=1&k=C03FF2022A5A681002887D3AB3218910
Webcast Password: mvwc0828

Regards,

Lee Cunningham
Executive Vice President & Chief Operating Officer
The Ritz-Carlton Destination Club