IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Case No. 16-01301 PAB

RCHFU, LLC, et al.

      Plaintiffs,

v.

MARRIOTT VACATIONS WORLDWIDE CORPORATION, et al.

      Defendants.

---

**MARRIOTT DEFENDANTS' REPLY BRIEF IN FURTHER
SUPPORT OF MOTION TO EXCLUDE EXPERT TESTIMONY
OF CHEKITAN DEV, JONATHAN SIMON AND R. MAURICE ROBINSON**

---

### INTRODUCTION[1]

In their moving brief, the Marriott Defendants described in detail the myriad reasons Plaintiffs' experts fail to satisfy *Daubert*.  These include, but are by no means limited to, the fact that their experts' opinions are not based on any accepted analytical methodology (which all three experts acknowledge exists and was available to them) but, rather, on their own and each other's litigation-driven *ipse dixit*.  Unable to meet the Marriott Defendants' *Daubert* challenge

---

[1] Regarding the September 20, 2019 due date for this brief, Plaintiffs timely attempted to file an over-length (35-page) brief in opposition to the Marriott Defendants' *Daubert* motion on September 3, 2019 (ECF #494).  They had failed to move separately for additional pages, however, and their opposition brief was rejected.  (ECF #496)  Plaintiffs moved for the additional pages (ECF #497), and, on September 6, 2019, their motion was granted (ECF #498).  Plaintiffs filed their opposition brief (ECF #499) the same day, making the Marriott Defendants' reply brief due in 14 days, i.e., on September 20, 2019.

In addition, the Marriott Defendants submit a September 20, 2019 Supplemental Declaration of Ian S. Marx attaching additional excerpts from the depositions of Dr. Dev and Mr. Simon.

head-on, Plaintiffs have no choice but to embrace their experts' net opinions and hope for the best.  Thus, Plaintiffs acknowledge, as they must, that Mr. Simon's "decades in the hospitality and vacation-ownership industry" are the sole basis for his opinions that "Marriott profited from the halo effect that flowed from" the MVC Affiliation and that a simultaneously-created horn effect diminished the value of Plaintiffs' fractional interests.  Pl. Br. at 15.  Plaintiffs also do not and cannot dispute that Messrs. Simon's and Robinson's calculations of "halo profits" and "lost sales value," respectively, are based on approaches that each admits were "made up" specifically for this case.  Plaintiffs likewise acknowledge, as they must, that Dr. Dev used no verifiable methodology to arrive at his opinion that the alleged "co-mingling" of the "more prestigious" RC Club Aspen with the "less prestigious" MVCD Program resulted in a halo effect for the latter. Rather, he based his opinion on his "40 years of being a student of brand management and all the research and teaching work …[he] has done in the field" and on his presumption (which the very literature upon which he relies does not support, *see* n.11, *infra*) that it has "almost always" been the case that "the less prestigious brand benefits from the halo of the more prestigious brand." *Id*. at 3 n.3.

Tacitly acknowledging that their experts' "make it up as they go" opinions are gravely imperiled, Plaintiffs argue that the *Daubert* standard should be relaxed  because their experts are not "scientists" and because an equitable claim is being asserted.  Neither of these circumstances are grounds for altering the *Daubert* standard.   *Daubert* requires district courts to act as gatekeepers to prevent unreliable opinions from being heard by fact-finders (usually juries).  Plaintiffs' experts' opinions are profoundly unreliable, and should not be admitted at trial.

## **ARGUMENT**

## I.   <u>NO RELAXATION OF THE *DAUBERT* STANDARD IS WARRANTED</u>

In their opposition brief, Plaintiffs dutifully cite the "five non-exclusive considerations" that *Daubert* sets forth for assessing the reliability of an expert opinion: "'whether the theory or technique has (1) been or can be tested, (2) been peer-reviewed, (3) a known or potential error rate, (4) standards controlling the technique's operation and (5) been generally accepted by the scientific community.'"    *Id*. (citation omitted).   But Plaintiffs effectively reject these requirements because they understand that their experts cannot meet any of them.   Instead, they seek to modify *Daubert*, claiming that it did not actually establish a strict standard for admissibility but, rather, was "'intended to relax traditional barriers to admission of expert opinion testimony'" and to employ a "'liberal standard for [such testimony's] admissibility.'" *Id*. at 2 (quoting *Cook v. Rockwell Int'l Corp.*, 580 F. Supp. 2d 1071, 1082 (D. Colo. 2006)). Plaintiffs neglect to mention that the *Cook* case in which the quoted language appears goes on to explain: "That being said, the proponent of an expert witness must demonstrate that the expert's proffered testimony meets Rule 702's requirements – relevance/fit, qualifications and reliability – before the expert's testimony will be admitted."  *Cook*, 580 F. Supp. 2d at 1083; *see also id*. at 1082 (describing court's gatekeeper role as "mandatory," and requiring a detailed inquiry, with "specific factual findings" as to reliability and relevance); *Goebel v. Denver & Rio Grande W. R.R. Co.*, 215 F.3d 1083, 1088 (10th Cir. 2000) (district court "must adequately demonstrate by specific findings on the record that it has performed its duty as gatekeeper").   Indeed, Plaintiffs miss the whole point of *Daubert*, which is "to assure that a trial expert adheres to 'the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'"   *Borel v. Trek Bicycle Corp.*, 2010 WL 2682118, at *1 (D. Colo. July 1, 2010) (quoting *Kumho Tire Co. v.*

*Carmichael*, 526 U.S. 137, 150 (1999)).  As one court in this District has explained, "[i]n *Daubert*, the Supreme Court recognized that simply because a witness had particular skill, knowledge or experience did not mean that the witness's testimony was reliable . . . . Therefore, the Court charged trial courts with the responsibility of acting as gatekeepers to exclude unreliable testimony."  *U.S. v. Nacchio*, 608 F. Supp. 2d 1237, 1250 (D. Colo. 2009).

Plaintiffs also claim that *Daubert* should be relaxed here because their experts are not "scientists."  According to Plaintiffs, their experts should be able to rely exclusively on their "experience" and their review of selectively-culled facts curated by Plaintiffs' counsel to give "qualitative" opinions based on no methodology (in the case of Dr. Dev's and Mr. Simon's opinions on causation) or to give quantitative opinions based on methodologies created specifically for this litigation (in the case of Mr. Simon's calculation of "halo effect" profits and Mr. Robinson's "horn effect" "lost sales value").  Pl. Br. at 7-9, 16-23, 33-35.  Non-scientific opinion is not exempt from *Daubert* review.  To the contrary, an "opinion from an expert who is not a scientist should … receive the same degree of scrutiny for reliability as an opinion from an expert who purports to be a scientist."  *Alvarez v. San Antonio Citation Serv. Ctr.*, 2008 WL 11334094, at *4 (S.D. Tex. Sept. 11, 2008) (citing *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 991 (5th Cir. 1997)).  Indeed, someone who "[m]erely tout[s] his expertise rather than relying on analytic strategies widely used by specialists in the field [is not] an expert as Rule 702 defines that term."  *EEOC v. Bloomberg, LP*, 2010 WL 3466370, at *15 (S.D.N.Y. 2010) (in employment discrimination action, excluding opinions from social psychologist on gender stereotypes "supported [only] by what appears to be a 'because I said so' explanation") (internal quotation omitted).  Regardless of the type of expert, where industry standards exist (as they do

here), the expert must apply them to the facts and cannot premise his opinions on his "own authority." *Grdinich v. Bradlees*, 187 F.R.D. 77, 82 (S.D.N.Y. 1999); *see also Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (declaring that *Daubert*'s reliability prong requires "some objective, independent validation of the expert's methodology").

While experience can be a basis for expert testimony, it must have a reliable foundation. *Kumho Tire*, 526 U.S. at 152. This means that experts who rely on their experience must "explain how th[eir] experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Gianfrancisco v. Excelsior Youth Ctrs., Inc.*, 2012 WL 2890916, at *5 (D. Colo. July 16, 2012) (Brimmer, *J.*) (internal quotation omitted). Experts cannot use their "experience" as a cover for making unsubstantiated assumptions. *See e.g.*, *Trevino v. Gates*, 99 F.3d 911, 922-23 (9th Cir. 1996) (excluding lost income damages expert whose opinions were premised on assumptions rather than on pay stubs, W-2 forms, tax returns, cancelled checks, or employer testimony). Nor can their "experience" come from counsel-supplied articles and other materials. *See, e.g., In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 439 (S.D.N.Y. 2016) (in product liability case, precluding testimony from expert whose "experiences with [the product came] from reviewing a number of articles supplied to him by Plaintiffs' counsel"); *Prohaska v. Sofamor, S.N.C.,* 138 F. Supp. 2d 422, 437 (W.D.N.Y. 2001) (criticizing "litigation-driven expertise" where expert "relied upon the plaintiff's attorney to provide him with the relevant scientific literature"). Experts can only rely on materials that are "'of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject.'" *Daubert*, 509 U.S. at 595 (quoting Fed. R. Evid. 703); *see also id.* at 592 (noting that Federal Rules 702 and

703 grant expert witnesses testimonial latitude unavailable to other witnesses on the "assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline"). These standards apply to all experts, but Plaintiffs' experts cannot meet them. Accordingly, their opinions should be excluded.

## II. MESSRS. SIMON'S AND ROBINSON'S CASE-SPECIFIC APPROACHES FOR MEASURING MONETARY RECOVERY DO NOT SATISFY *DAUBERT*

### A. Messrs. Simon's and Robinson's Methodologies Are Inherently Unreliable

In assessing the reliability of non-scientific expert methods based on experience or training, the district court should examine factors such as "how often [the] expert's experience-based methodology has produced erroneous results, or whether such a method is generally accepted in the relevant . . . community" and "whether his preparation is of a kind that others in the field would recognize as acceptable." *Kumho Tire,* 526 U.S. at 151. To answer these questions, the Tenth Circuit looks at whether the expert's methods "were form[ulat]ed specifically for this litigation" and whether the expert has "employed the [same] theory on previous occasions." *Atlantic Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1166 (10th Cir. 2000) (affirming exclusion of economist's use of novel "profit maximization theory," instead of fair market value of gas, in calculating royalties). Courts typically exclude expert methodologies that are not generally accepted in the expert's professional field. *See, e.g., Club Car, Inc. v. Club Car (Quebec) Import, Inc.*, 362 F.3d 775, 780 (11th Cir. 2004) (affirming exclusion of expert's lost profit damages opinion where expert employed flawed gross sale and profit-based methodology not accepted by accounting community).

Judged under this standard, the novel designed-for-this-case methods that Messrs. Simon and Robinson used to calculate "halo profits" and "lost sales value," respectively, are inherently

unreliable.  While Plaintiffs make much of these individuals' industry experience (*see* Pl. Br. at 15-16, 19-20, 32), neither they nor their experts ever explain ***how*** any of that experience was applied, either in forming opinions about the causal relationship between the MVC Affiliation and the alleged halo effect on MVC Points profits and alleged horn effect on the value of RCDC fractional interests, or in creating a methodology to measure these supposed effects.

Moreover, Mr. Simon admits that, in calculating the "halo" profits he attributes to the MVC Affiliation, he did not apply industry-recognized objective and empirical methods for measuring halo effects.  Simon Dep. at 19:1-13, 137:23-139:9, 215:5-219:25.  Rather, he admits that he invented his model specifically for this engagement and that it has never been used before or since by him or anyone else.  *Id*. at 18:14-25, 19:1-20:3, 137:23-139:9, 215:5-219:25, 220:1-11, 221:1-9.[2]

Similarly, Mr. Robinson admits that his "lost sales value" approach to measuring damages was "made up" for purposes of this litigation (Robinson Dep. at 45:20-46:13) and that no professional or industry standards exist for it or were applied by him.  *Id*. at 49:13-50:9.[3]  Mr. Robinson also failed to adjust the market values of his set of allegedly comparable properties to account for the unique character of each property and its key differences with RC Club Aspen.[4]

---

[2] Likewise, neither Plaintiffs nor Mr. Simon can point to any objective industry or professional standards for distinguishing between the "ordinary price increases" and the "halo price increases" ("HPIs") that lie at the heart of his calculation of the Marriott Defendants' alleged profits.  Pl. Br. at 20.  Nor is there any reference in any industry or academic literature to these terms.  Like the rest of his opinions, Mr. Simon simply made them up.

[3] His admission directly contradicts Plaintiffs' assertion that he "applied a well-accepted methodology for calculating diminution in value."  Pl. Br. at 32.

[4] Plaintiffs do not dispute that Mr. Robinson's comp set (1) included five properties markedly different from RC Club Aspen in numerous respects; (2) was weighted heavily in favor of properties in the most exclusive submarket in Downtown Aspen; (3) included anomalous

Although Plaintiffs argue that this failure should go to the weight of his opinions (*see* Pl. Br. at 35), courts have held that failing to adhere to proper professional practices in working with comparable properties is grounds for excluding the expert's opinions because it undermines the reliability of the expert's methodology.  *See* Def. Br. (ECF #460) at 33-34 (citing authorities); *see also Sabal Trail Transmission, LLC v. 3.921 Acres of Land*, 2017 WL 9939115, at *10 (M.D. Fla. Oct. 23, 2017) (excluding opinion of expert land appraiser for failure to adjust for differences in comparable properties); *Guardian Pipeline, L.L.C. v. 950.80 Acres of Land*, 486 F. Supp. 2d 741, 763 (N.D. Ill. 2007) (finding federal commission's exclusion of expert land appraiser's opinions for failure to adjust for differences in comparable properties was consistent with *Daubert*).[5]  Mr. Robinson's opinions should be excluded for this reason alone.[6]

### B. Plaintiffs Cite No Authority Supporting the Admissibility of the Simon and Robinson Opinions

properties that "skewed" the results; and (4) was taken from properties selected for him by Plaintiffs' counsel.  *See* Def. Br. at 17-20.

[5] Mr. Robinson also makes the fact- and data-free assumption that, "but for" the MVC Affiliation, the market for fractional interests at RC Club Aspen would have moved in lock-step with, and behaved ***identically*** to, the other fractional interest condominium resorts in his comp set.  Such an assumption does not pass muster under *Daubert*.  *See Johnson Elec. N. Am., Inc. v. Mabuchi Motor Am. Corp.*, 103 F. Supp. 2d 268, 284 (S.D.N.Y. 2000) (excluding opinion in patent infringement action where damages expert's "but for" analysis consisted solely of unwarranted assumptions unsupported by actual market data).

[6] Plaintiffs' assertion that Mr. Robinson's methodology "mirrors what the *Cook* court readily accepted" (Pl. Br. at 34) is based on a gross mischaracterization of the expert valuation opinion offered in that case.  In *Cook*, plaintiffs' expert assessed the market value decline of environmentally-contaminated real property using an analysis that "incorporated five different, multi-disciplinary approaches" to determine the extent to which plaintiffs' properties had been impacted by the environmental conditions at issue.  *Cook*, 580 F. Supp. 2d at 1130.  The court concluded that each of the five sub-parts of the expert's analysis was widely used by real estate professionals in assessing the impact of environmental conditions on property values.  *Id*. at 1132-38.  By contrast, Mr. Robinson's single-step methodology was created solely for use in this case and is not recognized by appraisers or anyone else in the real estate valuation community.

None of the authorities cited by Plaintiffs supports the admissibility of the approaches taken by their experts.  *U.S. v. Kamahele*, 748 F.3d 984 (10th Cir. 2014), is inapposite, as that case only concerns the special situation of police officers acting as expert witnesses.  Even so, the police officer expert in *Kamahele* (unlike Plaintiffs' experts) had not "simply disgorge[d] his factual knowledge to the jury."  *Id.* at 999.  Rather, he had "relied on multiple sources and verified his information whenever possible" and had "filtered" that information based on his personal experience with the specific school system and youth gang at issue.  *Id.*

Likewise inapposite are *Hertz Corp. v. Gaddis-Walker Electric Inc.*, 1997 WL 606800 (10th Cir, 1997), and the pre-*Daubert* case, *Scholz Homes, Inc. v. Wallace*, 590 F.2d 860 (10th Cir. 1979), as those cases merely involved calculation errors or missing data for which the expert failed to account in applying accepted methodologies.  They did not involve expert-invented methodologies that had never been independently validated.

Plaintiffs also cite *F & H Coatings, LLC v. Acosta*, 900 F.3d 1214 (10th Cir. 2018), *Bitler v. A.O. Smith Corporation*, 400 F.3d 1227 (10th Cir. 2005), and *Summit 6, LLC v. Samsung Electronics Co. Ltd.*, 802 F.3d 1283 (Fed. Cir. 2015), but those cases are all distinguishable.  For example, *F & H Coatings* was an OSHA case in which an expert was permitted to testify as to "general subjects" relating to plant safety procedures.  *F & H Coatings*, 900 F.3d at 1224.  The expert's testimony was found reliable because it was premised on an industry-wide comparison of the different methods and additional safety features used by other employers with respect to the specific equipment at issue as well as a comprehensive survey of the considerations that went into designing the support system for the equipment.  *Id.*

*Bitler* is also distinguishable.  In that case, the expert was a fire investigator who simply "observed the physical evidence at the scene of the accident and deduced the likely cause of the explosion."  *Bitler*, 400 F.3d 1227 at 1235.  The court held that, although this method was "not susceptible to testing or peer review, it does constitute generally acceptable practice as a method for fire investigators to analyze the cause of fire accidents." *Id*.

*Summit 6* is also nothing like this case.  At issue there was the calculation of royalties as damages for patent infringement.  Although the damages expert admitted he had employed a survey-based calculation method "not previously used or published in peer-reviewed journals" (*Summit 6*, 802 F.3d at 1289), the Federal Circuit held that a broad range of methods of calculating reasonable patent royalties had been accepted by the federal courts, including a court in the Southern District of New York, which had accepted a very similar approach.  *Id*. at 1294, 1296.  The court found the expert's methodology to be "structurally sound and tied to the facts of the case" and noted that its heavily "fact-based nature" made peer review "impractical, if not impossible."  *Id*. at 1298.  By contrast, Messrs. Simon and Robinson offer opinions that are structurally unsound and not tied to facts, and they admit that, although they could have used peer-reviewed, generally-accepted methodologies, they chose not to do so.

Finally, Plaintiffs' reliance on *U.S. v. Hall*, 974 F. Supp. 1198, 1202 (C.D. Ill. 1997), and *U.S. v. Crabbe*, 556 F. Supp. 2d 1217 (D. Colo. 2008), is misplaced because those cases do not at all support their position.  In *Hall,* for the expert's testimony to be admissible the court required, "at a minimum," evidence of peer review of the expert's opinions in scholarly journals,[7]

---

[7] In *Smith v. Ford Motor Company*, 215 F.3d 713 (7th Cir. 2000), the court merely noted that the lack of peer review alone is not a sufficient basis upon which to exclude an expert's testimony.

observational or other field studies, the comparative similarity of any observations obtained, the reasons why the studies were deemed valid and reliable, and a general consensus on the meaning of the data – none of which is present here.  *Hall*, 974 F. Supp. at 1203.  In *Crabbe*, the court found the expert's testimony inadmissible where, as here, the expert "lacked a reliable methodology and sufficient facts to support his component opinion" and could not show that his chosen methodology was generally accepted.  *Crabbe*, 556 F. Supp. 2d at 1228.  Thus, nothing in the case law supports admitting the opinions of Messrs. Simon and Robinson into evidence.

### C. The Presence of an Unjust Enrichment Claim Does Not Alter the Admissibility Standard for Plaintiffs' Experts

Plaintiffs contend that, because their pleading contains an equitable unjust enrichment claim seeking restitution and disgorgement of profits, the *Daubert* standard does not apply to their experts.  Pl. Br. at 23-29.  Not surprisingly, Plaintiffs cite no authority for that startling contention.[8]  The fact that equitable claims have been asserted does not give experts license to indulge in sheer speculation, ignore important facts, employ case-specific methodologies of their own invention, or offer net opinions.

Indeed, courts routinely apply the full *Daubert* standard when considering experts' damages opinions offered in connection with unjust enrichment claims.  *See, e.g., Fidelitad, Inc. v. Insitu, Inc.*, 2016 WL 7508843, at *5 (E.D. Wash. July 8, 2016) (precluding opinion of expert who, in calculating unjust enrichment damages, had failed to measure value of services actually

---

Lack of peer review is just one of many factors militating against allowing Plaintiffs' experts' testimony.

[8] Plaintiffs cite the Restatement (Third) of Restitution and Unjust Enrichment (2011) (which describes certain presumptions and shifting of burdens of proof at trial) in an attempt to cobble together an argument to support their position.  They do not, however, cite any authority holding that *Daubert* does not apply here, nor is there any such authority.

provided and included commissions for work never performed); *Fail-Safe, L.L.C. v. A.O. Smith Corp.*, 744 F. Supp. 2d 870, 889-93 (E.D. Wisc. 2010) (precluding opinion of expert who, in calculating unjust enrichment damages, had "cherry picked" evidence that supported his conclusion, ignored contrary evidence, failed to research competing products, and failed to explain why he chose the data used in his analysis); *KW Plastics v. U.S. Can Co.*, 131 F. Supp. 2d 1289, 1295 (M.D. Ala. 2001) (in misappropriation of trade secrets case, precluding expert's opinion on unjust enrichment damages where expert had "*fail[ed] to give more than fleeting thought* to numerous matters that are relevant to a report on unjust enrichment," such as determining the value of the specific trade secrets used and the causal link between use of the trade secrets and the securing of new business) (italics in original).

The traditional *Daubert* criteria are also applied to assess the reliability of expert opinions purporting to calculate other restitutionary awards, including disgorgement of profits.  *See, e.g.*, *Hebrew Univ. of Jerusalem v. General Motors LLC*, 2012 WL 12507522, at *6 (C.D. Cal. May 31, 2012) (rejecting expert's calculation of profits, noting the absence of any "article, study, or other literature" supporting the expert's methodology and finding unwarranted the expert's "assumption that a company's sales directly result from [the complained-of conduct] in this formulaic manner"); *Gutierrez v. Wells Fargo & Co.*, 2010 WL 1233810, at *8 (N.D. Cal. Mar. 26, 2010) (in action arising from bank's unlawful overdraft practices, excluding expert's opinion that a restitution award could be based on the order in which the bank posted transactions, noting that expert's sequencing approach was not modeled on the bank's actual practices); *National Rural Telecommc'ns Co-op v. DIRECTV, Inc.*, 319 F. Supp. 2d 1059, 1080-81 & n.34 (C.D. Cal. 2003) (in claim brought under state's Unfair Competition Law, refusing to consider expert

reports equating amount of defendant's profits as restitution with amount of plaintiff's lost profits, where conclusion was unsupported by any analysis, and amount of lost profits was itself determined by improperly calculating expectation damages).

The traditional *Daubert* standard also applies in cases where the substantive law shifts the burden of proof for certain elements of a claim from plaintiff to defendant. S*ee, e.g., Corwin v. Walt Disney Co.*, 475 F.3d 1239, 1251-52 (11th Cir. 2007) (in copyright infringement action, affirming district court's refusal to consider plaintiff's expert report because expert had used improper methodology); *Iconics, Inc. v. Massaro*, 266 F. Supp. 3d 461, 468 (D. Mass. 2017) (in copyright infringement action, excluding plaintiff's damages expert where expert had used novel and unsupported approach to calculate plaintiff's lost profits based on purported "equity shares" in defendant's profits); *Amos v. Rent-A Center, Inc.*, 2001 WL 36095915, at *3 (S.D. Fla. Dec. 13, 2001) (in employment discrimination action, precluding expert from opining on psychological damage to plaintiffs where expert had relied solely on interviews with plaintiffs as factual basis for opinions and had used techniques and methodology that were not peer-reviewed); *McGuire v. City of Santa Fe*, 954 F. Supp. 230, 233-34 (D.N.M. 1996) (in employment discrimination action, precluding damages experts' opinions on hedonic damages where "serious questions [were raised] regarding the scientific basis for [the experts'] valuation"). Thus, the fact that Plaintiffs allege unjust enrichment does not entitle them to have expert admissibility determined under some "*Daubert* Lite" standard.[9]

---

[9] Even if Plaintiffs' unjust enrichment claim could serve to relax the evidentiary standards for assessing the methodologies used by Dr. Dev and Mr. Simon (which it does not), both experts also opine on actual and proximate causation, which are required elements of Plaintiffs' legal claims seeking diminution in value damages. *See FDIC v. Refco Grp., Ltd.*, 989 F. Supp. 1052, 1080 (D. Colo. 1997) (causation, in the form of "damages as a result of the breach," is an

## III.    DR. DEV'S AND MR. SIMON'S NET OPINIONS ON CAUSATION ARE INADMISSIBLE UNDER *DAUBERT*

A conclusory statement inadequately supported by facts and data or based on no methodology is a "net" opinion and does not meet *Daubert*'s reliability and "fit" requirements. *See* Def. Br. at 23-24 (citing cases).   Both Dr. Dev and Mr. Simon offer inadmissible net opinions on causation.

### A.   Dr. Dev Offers Unreliable Net Opinions

Dr. Dev acknowledges that, in his field, "full analysis of the halo effect" requires the "researcher … to be aware of the ratings of individual brands," and he confirms that the measure of a halo effect "should be linked to object[ive] measures of consumer choice ***wherever possible.***"   Dev. Dep. at 91:1-16 (emphasis added).   Dr. Dev has likewise affirmed that publication criteria at top-tier, peer-reviewed publications require the use of "state of the art methodology."   *Id*. at 35:8-16; *see also id*. at 21:8-15 (for "highest quality peer-reviewed report journals…we always try to … bring in some actual field data that either supports or refutes our finding"); 58:18-20 (in "a peer-reviewed refereed publication you can assume that everything in [it] has been stress tested for correctness").

Dr. Dev also acknowledges (and the literature upon which he relies confirms) that various quantitative techniques and methodologies are available to explain and measure halo and horn effects.   Indeed, he and other branding experts have used these techniques and methodologies. *See id.* at 32-33 (discussing Bayesian model); 56:1-58:25 (discussing computer modeling); 75:1-76:25 (discussing multi-variant regression analysis); *see also id.* at 42:9-45:3, 57:15-60:17,

---

element of a breach of fiduciary duty claim); *Barnett v. Elite Props. of Am., Inc.*, 252 P.3d 14, 24 (Colo. App. 2010) (proximate causation is an element of a constructive fraud claim).

62:20-65:1, 81:12-16; 107:12-15, 107:23-108:8, 108:25-109:5, 110:15-18, 111:23-114:13, 129:6-130:9 (same). For this case, however, Dr. Dev admits that he conducted no research, field experiments or surveys to measure the presence of any halo or horn effects. *Id*. at 105:25-106:20, 107:5-11, 114:14-23, 120:17-121:4, 137:20-23, 139:1-24, 149:10-150:17, 152:25-153:15, 154:9-13, 166:25-167:6. In other words, Dr. Dev used *no* methodology.

Plaintiffs, however, contend that Dr. Dev "utilize[d] an appropriate methodology," just not one the Marriott Defendants would have "chosen." Pl. Br. at 6-7. They argue that Dr. Dev's "methodology" (which, as they describe it, consisted of his reading a counsel-prepared collection of pleadings, deposition transcripts and documents and then theoretically applying his knowledge and experience of the halo/horn concepts to these facts) was sufficient for him to form reliable opinions about the existence of halo/horn effects caused by the MVC Affiliation. *Id*. at 9-15. Plaintiffs claim that this "methodology" is a generally accepted approach because Dr. Dev has "regularly employ[ed]" it "in peer-reviewed journals." *Id*. at 14.

But Plaintiffs are unable to cite any academic article that either adopts Dr. Dev's approach or approves of identifying a halo or horn effect without having first conducted some statistical analysis, survey or other empirical exercise. Even the articles Plaintiffs cite to support Dr. Dev's use of a "qualitative" methodology to identify a halo or horn effect do not make the desired point. *Id.* at 8 n.7.[10] Those articles do not even address the halo/horn effect, and some of

---

[10] Plaintiffs purport to distinguish between Dr. Dev's "qualitative" initial report and his "quantitative" supplemental report discussing the SMS data. Pl. Br. at 5. With respect to the former, they argue that "if he wanted to quantify the impact of the halo effect" he "*might do* one of the several of the analytical methods" referenced in the literature, but that "[q]uantifying the impact was expressly not his assignment." *Id.* at 14 (quoting Dev. Dep. at 139:1-24) (emphasis in original). But Mr. Simon purports to quantify the impact of the halo effect without using any of the methodologies Dr. Dev cites as reliable. Moreover, Dr. Dev acknowledges that, to assess

them (which were ***co-authored by Dr. Dev)*** affirmatively state that a quantitative analysis ***is***

***required*** to assess brand equities.[11]   Thus, although Plaintiffs argue that the kind of

methodological approach that could yield a "peer review of [Dr. Dev's] particular opinion in this

case is not necessary" (*id*. at 14), his "read and opine" approach does not meet his own standards

---

a halo/horn effect, a researcher needs "to be aware of the ratings of individual brands" before he
can objectively measure those effects.  Dev. Dep. at 91:1-16.  As discussed above, he has not
done that here.  Finally, with respect to Dr. Dev's assumption that it has "almost always" been
the case that "the less prestigious brand benefits from the halo of the more prestigious brand," Pl.
Br. at 3 n.3, nothing in the literature discusses the impact of "prestige" (a concept that Dr. Dev
fails to define, much less measure according to any industry-accepted criteria) on consumer
perception or behavior.  In the academic literature Dr. Dev cites, halo and horn effects are not
assessed based on "prestige" but on brand strength and awareness, which can be empirically
tested.  *See, e.g.*, Simonin, B.L. & Ruth, J.A., *Is a Company Known by the Company It Keeps?
Assessing the Spillover Effects of Brand Alliances on Consumer Brand Attitudes*, Journal of
Marketing Research, Vol. 35, No. 1 (Feb. 1998), 30-42.

It should also be noted that many of the articles Dr. Dev cites emphasize a dramatically changing
hospitality industry.  That makes his opinions (which are based solely on his "experience" of
what was once traditionally true) even more suspect and unreliable.  *See, e.g.,* Avery, J. and Dev,
C. (2015), "Accor: Strengthening the Brand with Digital Marketing," *Harv. Bus. Sch. Case 315-
138,* at 3 ("Major brands were engaged in hand-to-hand combat for every room night and an
explosion of new hotel concepts was challenging legacy brands.  Emerging competitors, such as
Airbnb, were disrupting the industry by booking rooms in private residences…OTAs [i.e., online
travel agencies] continued to increase their share of hotel bookings and creating a sense among
consumers that "a room is a room."); Dev, C. & Keller, K. (2001), "Brand Revitalization,"
*Cornell Hotel and Restaurant Administration Quarterly*, 55(4), at 333 ("Brands that fail to …
meet competitive threats fade quietly from the marketplace and are soon forgotten.")

[11] *See, e.g.,* Prasad, K. & Dev, C. (2000), "Managing Hotel Brand Equity: A Customer-Centric
Framework for Assessing Performance," *Cornell Hotel and Restaurant Administration
Quarterly*, 41(3), 24-25 (discussing a hypothetical application of the authors' computer model to
measure brand equity by "convert[ing] the quantitative customer ratings first into performance
and awareness indices and then into a brand-equity index" and promoting the authors' tool
because the ability "to quantify and measure such equity … will help in gauging the impact of
the brand's own marketing-mix actions on customers"); *see also Brand Revitalization*, at 334,
339 (using comprehensive "brand audit" to "fully understand target customers"); "The Park
Hotels: Revitalizing an Iconic Indian Brand," *Harv. Bus. Sch. Case,* 314-114, 5 (assessing
"consumers' expectations of the brand").

(*see* Dev Dep. at 32:25-36:15, 75:1-78:9, 81:12-16), much less those of the Supreme Court.  *See Kumho Tire*, 526 U.S. at 150 (trial expert must adhere to "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field").

As if these failings were not enough, the "facts" upon which Dr. Dev relied to opine on the halo/horn effect allegedly caused by the MVC Affiliation are not of the type upon which experts in the field rely.  The authors of the articles Dr. Dev cites make clear that it is the perception of the consumer impacted by the conduct alleged to cause a halo/horn effect that must be analyzed.[12]  Dr. Dev did not do that.  The materials from which he drew his facts reflect the perception of Marriott executives and existing RCDC members, not that of buyers whose behavior might be influenced by brand co-mingling.[13]  Dr. Dev reviewed nothing that would have informed him as to (a) whether prospective purchasers of MVC Points would be more

---

[12] *See e.g.,* Simonin & Ruth, *Company It Keeps*, *supra*, at 30-42 ("[B]rand alliance evaluations have spillover effects on attitudes towards each partner's brand and . . . the strength of these effects is moderated by brand familiarity); Shocker, A.D., *Positive and Negative Effects of Brand Extension and Co-Branding*, NA - Advances in Consumer Research Vol. 22 (1995), 432-34 (addressing research on "the extent that consumer perceptions and reactions to brand extensions spill over to the parent company… Studies in this vein have measured whether consumer perceptions, beliefs, or overall affect toward the brand name are affected by the introduction of brand extensions); Leuthesser, L., Kohli, C., Harich, K., *Brand equity: the halo effect measure*, European Journal of Marketing, Vol. 29 Iss. 4 (1995), 57–66 ("[T]he halo effect has been fairly consistently defined as a rater's failure to discriminate among conceptually distinct and potentially independent attributes.").

[13] Specifically, Dr. Dev reviewed (1) internal memoranda and e-mails of the Marriott Defendants; (2) promotional materials sent to potential MVC Points purchasers; (3) deposition testimony from Association Board members; (4) interviews with Marriott Defendants' personnel; (5) the APCO survey of then-current RCDC members; and (6) the Cushman & Wakefield appraisal for the Bleu Florida Land Trust.  Pl. Br. at 9-10.  Regarding the Cushman & Wakefield appraisal: its purpose was not to analyze whether the MVC Affiliation had any impact on buyers' perceptions or on value, but  to assess the value of interests held in a trust that contained fractional interests from a different (and since discontinued)  exchange program.  *See* Marriott Defendants' Motion *In Limine* to Exclude Cushman & Wakefield Appraisal (ECF #475) at 3-4.  One of the appraisal's authors actually admitted at deposition that the statements made in that document regarding the MVC Affiliation were inherently unreliable.  *Id.* at 6-9.

inclined to buy because of potential RCDC access; or (b) whether prospective purchasers of fractional interests at RC Club Aspen would be less inclined to buy because MVCD members could stay at the resort.

Dr. Dev's after-the-fact attempt to bolster his "qualitative" opinion with what Plaintiffs allege to be "quantitative" SMS data (*id*. at 10-11) is unavailing because – by his own admission – the SMS data does not comply with the rigorous testing methods described in the academic articles he cites.  *See* Dev. Dep. at 183:10-184:13, 228:17-229:1, 230:16-231:2, 232:15-19. Rather, the surveys from which the SMS data were compiled were not conducted using any statistical techniques, and the survey group included biased respondents who were likely not even interested in purchasing MVC Points.  Def. Br. at 9.  The surveys were also not designed to – nor did they – assess consumer perceptions of the association between RCDC resorts and the MVCD Program.  Accordingly, the surveys say absolutely nothing about whether access to such resorts drove purchases of MVC Points.

**B.**     **Mr. Simon Has No Basis for His Opinions on Causation**

Mr. Simon acknowledges that his causation analysis and opinions are not based on any industry studies, publications, treatises, articles, or other literature.  Simon Dep. at 67:23-68:12, 69:16-71:14, 72:14-73:10.  He also concedes that he performed no analysis to determine the presence of a halo effect, essentially claiming that "he knows it when he sees it."  *Id*. at 19:1-13, 131:9-135:18, 137:23-139:19, 156:13-158:12, 215:5-219:25.  For the same reasons Dr. Dev's net opinions on causation are inadmissible (*see* Point III(A), *supra*), so, too, are Mr. Simon's.

Further undermining the validity of Mr. Simon's causation analysis for the alleged diminution of value in Plaintiffs' fractional interests and his calculation of so-called "halo

profits" is his (and Mr. Robinson's) failure to segregate the impact of the MVC Affiliation from various pre-MVC Affiliation acts and other conduct unrelated to the MVC Affiliation. Plaintiffs discount the importance of this failure, however, citing the distinction between whether a defendant's conduct is the sole, or only a substantial, cause of plaintiff's loss for purposes of an unjust enrichment claim. Pl. Br. at 22-23, 29-30.

As an initial matter, Plaintiffs' argument is irrelevant because a damages expert's failure to properly distinguish between causes alleged by the plaintiff and other causal factors goes to admissibility, not weight, as Plaintiffs urge. *See* Def. Br. at 26-27. Plaintiffs' "substantial cause" argument is also inconsistent with Mr. Simon's sworn testimony. Mr. Simon acknowledges that the MVC Affiliation began in January 2015 and that any HPIs caused by the MVC Affiliation could only have been instituted after that date. Simon Dep. at 79:3-14, 95:19-96:3, 163:15-164:11, 196:15-17. He also concedes that his calculation of HPIs for the period from 2011-2014 had nothing to do with, and were not caused by, the MVC Affiliation. *Id.* at 196:9-14. Thus, Mr. Simon admits that the MVC Affiliation was not, and could not have been, even a contributing factor to these 2011-2014 HPIs, much less a "substantial cause" of them. Further undercutting Mr. Simon's approach is his admission that his calculation of the post-January 2015 HPIs is built on and includes the HPIs from the 2011-2014 period, which have nothing to do with the MVC Affiliation. *Id.* at 227:25-228:22.

Finally, Plaintiffs incorrectly contend that, by citing to the report of one of their own experts (Mark Israel), the Marriott Defendants have effectively conceded that any reliability challenges to Mr. Simon's opinions are properly decided in a "classic 'battle of the experts'" at trial. Pl. Br. at 31-32. The Marriott Defendants have conceded no such thing. These challenges

should be decided in a *Daubert* hearing by this Court in its role as gatekeeper; they should not be decided by the jury at trial.  *See United States v. Taylor*, 704 F. Supp. 2d 1192, 1199 (D.N.M. 2009) (striking defense expert's opinion as unreliable and declaring that, "to allow [the challenged expert] to give this testimony during a trial would not be, as Defendant argues, a healthy 'battle of the experts.'  Instead, it would be to engage in what this Court considers the highly questionable practice of allowing a second Daubert hearing to play out in front of the jury … [, which] would very likely confuse the jury.").

## CONCLUSION

For all the foregoing reasons and for the reasons set forth in their moving brief, the Marriott Defendants respectfully request that the Court preclude Dr. Dev and Messrs. Simon and Robinson from offering opinions or testimony at trial.

Dated:  September 20, 2019                    Respectfully submitted,

GREENBERG TRAURIG, LLP

By:      *s/ Philip R. Sellinger*
         Naomi G. Beer
         Philip R. Sellinger
         Ian S. Marx
         1144 Fifteenth Street, Suite 3300
         Denver, Colorado 80202
         Tel:      303.572.6500 / Fax:      303.572.6540
         Email:  BeerN@gtlaw.com,
         SellingerP@gtlaw.com,  MarxI@gtlaw.com

         *Attorneys for the Marriott Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that, on this 20th day of September, 2019, a true and accurate copy of the foregoing **MARRIOTT DEFENDANTS' REPLY BRIEF IN FURTHER SUPPORT OF MOTION TO EXCLUDE EXPERT TESTIMONY OF CHEKITAN DEV, JONATHAN SIMON AND R. MAURICE ROBINSON** and attached exhibits were filed and served with the Clerk of the Court via CM/ECF filing system, which will send notification to the following:

Michael J. Reiser
Law Office of Michael J. Reiser
1475 N Broadway, Suite 300
Walnut Creek, CA 94596
*Counsel for Plaintiffs*

Matthew C. Ferguson
The Matthew C. Ferguson Law Firm, P.C.
119 South Spring, Suite 201
Aspen, Colorado 81611
*Counsel for Plaintiffs*

Tyler R. Meade
The Meade Firm P.C.
1816 Fifth Street
Berkeley, CA 94710
*Counsel for Plaintiffs*

Linda Pham Lam
Michael Schrag
Gibbs Law Group LLP
505 14th Street, Suite 1100
Oakland, CA 94612
*Counsel for Plaintiffs*

*/s/ Gregory Scavelli*
Gregory Scavelli