# EXHIBIT B

```
 1    RCHFU, LLC,  et al.,
 2        Plaintiffs,        United States District Court
                             District of Colorado
 3    v.                     No.  1:16-cv-09390
 4
      MARRIOTT VACATIONS WORLDWIDE
 5    CORPORATION, et al.,
          Defendants,
 6    _____/
      REISER, et al.,
 7        Plaintiffs,
                                 Eastern District of California
 8    v.                     No. 2:16-cv-00237-MCE-CKD
 9
      MARRIOTT VACATIONS WORLDWIDE
10    CORPORATION, et al,
          Defendants,
11    _____/
      PETRICK, et al.,
12        Plaintiffs,
13                               San Francisco County
      vs.                    No. CGC-15-54897
14
      MARRIOTT VACATION WORLDWIDE
15    CORPORATION, et al.,
16        Defendants.
      _____/
17
18         VIDEOTAPED DEPOSITION OF STEPHANIE SOBECK
19       taken at 450 South Orange Avenue, Suite 650,
         Orlando, Florida, commencing between 9:11 a.m.
20       - 6:20 p.m. on Thursday November 16, 2017
21       before Lisa Gerlach, Court Reporter, Notary
22       Public in and for the State of Florida at Large.
23
24    Job No. 2733702
25    Pages 1 - 374
```

Page 1

```
 1    A. I've actually said, it's a non-association
 2  related item. We're just talking about the voting
 3  process. We're going to handle the voting process the
 4  same way.
 5    Q. All right. It says, "except the documents
 6  will be different. We are interested in a host
 7  website that contains a video clip, and there may be
 8  additional messaging over and above what we would do
 9  for an association vote."
10       That meant that you were going to put a more
11  kind of robust marketing campaign behind this vote?
12    A. No, not marketing campaign. Just different
13  information.
14       Marriott Vacation Club was very foreign to a
15  lot of people. They didn't know how the program
16  worked, what it looked like, what are the options and
17  those type of things. So the thought is that -- how
18  do people be educated so that they know what their --
19  what is really offered through that exchange program.
20  So that's all we were talking about.
21    Q. I'm going to hand this out again so I go home
22  lighter -- my baggage is lighter.
23    A. Save a tree.
24    Q. This is RCDC SLC. That's Salt Lake City,
25  Ms. Babich's department?
```
Page 194

```
 1    A. Yes, sir.
 2    Q. 1183. "Ladies and gentlemen," at the bottom
 3  of the page, is what Ms. Babich would call your RCDC
 4  or Ritz-Carlton employees people who interface with
 5  the customer?
 6    A. Correct.
 7    Q. In this case, the customers are members and
 8  owners of fractional interests?
 9    A. Her member services team, who they talk to?
10    Q. Right.
11    A. Yes.
12    Q. It says, on the second paragraph, "Marriott
13  Vacation Worldwide has agreed, together with the board
14  of directors, that we" -- who's we here --  the
15  leadership team at RCDC SLC -- "will not affiliate the
16  Aspen Club and club members with our Marriott Vacation
17  Club Destination program unless a majority of the
18  members vote otherwise."
19       Do you see that?
20    A. I do.
21    Q. When you said majority, did you mean a
22  majority of the 750 or so people that were eligible to
23  vote pursuant to the letter written on April 5th?
24    A. I didn't --
25       MR. SELLINGER: Objection to form.
```
Page 195

```
 1    A. I'm sorry. I didn't write this.
 2  BY MR. FERGUSON:
 3    Q. I understand that, but --
 4    A. You just asked me what I meant.
 5    Q. Yeah, but you were at the meeting where --
 6  this sentence starts out with MVW. That's your
 7  company, right?
 8    A. It's all of our companies.
 9    Q. Right. And you're part of that company?
10    A. I am.
11    Q. When you went to Aspen, Colorado on
12  April 5th, I think you might have come over from
13  Bachelor Gulch. Right? You swung through Bachelor
14  Gulch first and then came over to Aspen?
15    A. I'm not sure. I could have. I had done it
16  in the past. I'm not sure about April 5th
17  specifically.
18    Q. When it said, "Marriott Vacation Worldwide
19  has agreed together with the board of directors," that
20  was you and Mr. Cunningham and Mr. Mercer and
21  Mr. Oliver. Correct?
22       MR. SELLINGER: Objection to form.
23    A. I would think that's who that was
24  representing, yes.
25  BY MR. FERGUSON:
```
Page 196

```
 1    Q. When you said you didn't read this, had you
 2  ever seen this document before?
 3    A. I have not seen this before.
 4    Q. It says at the bottom, "We anticipate that we
 5  will receive calls from members regarding this
 6  announcement, both Aspen Club members and others, who
 7  learn about the letter. Please address any questions
 8  you receive as follows."
 9       They tell the folks words -- this is the
10  bottom of the page -- there is an announcement to the
11  Aspen Club members -- from -- this is an announcement
12  to the Aspen Club members from their board of
13  directors. "We do not have any additional information
14  at this time. If our members ask about the
15  affiliation in general, please advise them we do not
16  have any additional information at this time."
17       That's not exactly accurate, is it?
18       MR. SELLINGER: Objection to form.
19  BY MR. FERGUSON:
20    Q. That this is an announcement from the board
21  and we do not have any additional information at the
22  time. I mean, you were behind the scenes and working
23  with Verrechia to get a vote going; right -- the Aspen
24  Highlands vote project?
25       MR. SELLINGER: Objection to form.
```
Page 197

50 (Pages 194 - 197)

**Page 198**

1  A. Yeah. I guess what this is saying -- don't
2  forget -- so Eveleen -- if Eveleen is the one that did
3  this -- I don't know if she did or not, but somebody
4  out running the member services team. She's talking
5  to her ladies and gentlemen, so she's talking to the
6  people on the phone with the members.
7     So we would not want them in any way
8  speculating about any of this. And, truly, Salt Lake
9  City, they would be the last ones to get information
10 about this. So, you know, I'm actually happy to say
11 that she says she doesn't have any additional
12 information, because we wouldn't want any of those
13 member services associates talking to or speculating
14 or sharing any information with members who were
15 calling in and asking questions.
16 BY MR. FERGUSON:
17  Q. At the bottom of the page of Exhibit 1183 --
18 bottom of page two -- it says, "What's not to be
19 shared with our members:"
20    Do you see that?
21  A. I do.
22  Q. It says, "We've been told by corporate and
23 our legal team that we should have more information to
24 share with our members about the affiliation shortly
25 after the Aspen and Bachelor Gulch board meetings."

**Page 199**

1     That letter went out, I take it, before the
2  annual meeting occurred, or did the letter go out
3  after the meetings?
4   A. You're asking me when this letter went out?
5   Q. No. I'm talking about the April 5th letter
6  that we've been talking about the best part of the
7  day.
8   A. The April 5th letter -- well, I thought the
9  April 5th letter, we had seen a cover letter that said
10 we were trying to get it out before Bachelor Gulch
11 came out with anything, but --
12    MR. SELLINGER: Let me interrupt for a
13    moment. I'm seeing this exhibit for the
14    first time. The reference to what's been
15    told by our legal team, I think, should have
16    been redacted as privileged information. So
17    we would designate that information as
18    confidential at this time. It must have been
19    inadvertently not redacted.
20 BY MR. FERGUSON:
21  Q. Were you communicating with the line folks
22 at -- is it Eveleen? Is that how you say it?
23  A. Eveleen.
24  Q. We've been calling her Evelyn.
25  A. No. Eveleen Babich.

**Page 200**

1   Q. Ms. Babich. Were you talking to her as a
2  representative of corporate regarding the information
3  that could be shared later about the affiliation?
4   A. I would've been talking to her about -- yeah,
5  I would've been talking to her throughout just to kind
6  of let her know what was going on.
7   Q. And you were in Aspen and she was in Utah.
8  Were you telephoning her on your telephone or were you
9  e-mailing her? How were you communicating with her?
10  A. Oh, you mean when we were in Aspen?
11  Q. Yeah.
12  A. I probably wouldn't have been talking to her
13 from, like, the Aspen board meeting.
14  Q. Well, she sent this out on April 6th, which
15 is -- 1:38 p.m. -- which is the next day. So
16 someone's been in touch with her between April 5th and
17 April 6th.
18  A. Right. Sorry. Can we go back to the
19 communication?
20  Q. 1180?
21  A. No. But there was one that was forwarded --
22 the one that talked about "the board and Lee want this
23 sent out." We have to see who was copied on that.
24 Probably, whoever was copied on that, was probably --
25  Q. I see.

**Page 201**

1   A. -- had forwarded this to her to let her know.
2  She may have actually been copied. I just don't
3  remember.
4     Do you understand what I'm saying?
5   Q. Yeah. So when it went around internally, it
6  might have been copied to Ms. Babich?
7   A. Yeah. They would've let her know because
8  they would have wanted her to know --
9   Q. I got it.
10  A. There she is -- Eveleen Babich.
11  Q. Perfect. Which exhibit are you looking at?
12  A. I am looking at 1185, and it is on -- yep, so
13 she was copied. I even wrote it -- Eveleen, Cindy,
14 and Lori. There you go.
15  Q. Thank you.
16  A. It started off with them at 1:01, so I was
17 keeping her in the loop just so she understood what
18 was going on, because we don't like member services --
19 the team -- not to know what's happening that they
20 could start getting calls about.
21    (The attorneys from Reiser Law are no
22    longer present.)
23 BY MR. FERGUSON:
24  Q. You have 1185 in front of you then?
25  A. I have it right here.

51 (Pages 198 - 201)