IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Case No. 16-01301 PAB

RCHFU, LLC, et al.

     Plaintiffs,

v.

MARRIOTT VACATIONS WORLDWIDE CORPORATION, et al.

     Defendants.

---

**MARRIOTT DEFENDANTS' RESPONSE TO ASPEN HIGHLANDS
CONDOMINIUM ASSOCIATION'S AND PLAINTIFFS' JOINT MOTION
FOR GOOD-FAITH DETERMINATION OF SETTLEMENT
AND CROSS-MOTION TO COMPEL DISCOVERY**

---

Pursuant to the parties' September 27, 2019 telephone conference with Magistrate Judge Gallagher, the Marriott Defendants[1] hereby (a) respond to the Joint Motion for Good-Faith Determination of Settlement filed by Aspen Highlands Condominium Association (the "Association" or "AHCA") and Plaintiffs (ECF #535) ("Settlement Motion") and (b) cross-move to compel discovery from the Association and Plaintiffs (the "Settling Parties").

## **INTRODUCTION**

While more information is needed to make a conclusive determination, the settlement agreement between the Association and Plaintiffs (the "Settlement Agreement" or "SA") bears hallmarks of collusion and bad faith. Apparently as part of a bargained-for reduction of the

---

[1] The "Marriott Defendants" are Marriott Vacations Worldwide Corporation, Marriott Ownership Resorts, Inc., The Ritz-Carlton Management Company, LLC, The Cobalt Travel Company, LLC, and The Lion & Crown Travel Co., LLC ("L&C").

amount the Association must pay Plaintiffs to settle the claims against it, four former Association directors ("Directors") have provided virtually identical sworn Declarations that are incorporated into the Settlement Agreement and support Plaintiffs' positions on key issues in the case. The Settlement Agreement requires the Directors to appear as witnesses for Plaintiffs at trial and "testify consistent with" the Declarations. *See* SA (ECF #535-2) at ¶ 5.

The Declarations lack any indicia of truthfulness, however, because they are contradicted by the sworn deposition testimony of one of the Directors. A serious question is, thus, raised as to whether the Settling Parties have colluded to harm the Marriott Defendants, which are the only remaining parties subject to liability in this case. Because the answer to this question will determine the position they take with respect to the Settlement Motion, the Marriott Defendants have requested narrowly tailored discovery into (1) communications between Plaintiffs' counsel and the Association's counsel relating to the Settlement Agreement and/or the Declarations; and (2) drafts of the Settlement Agreement and the Declarations.[2] Although these documents are readily available and could be produced without undue burden (indeed, the Association's President has demanded that they be produced to the Marriott Defendants), the Settling Parties have refused to cooperate.

The Settling Parties' refusal to produce this discrete set of documents is indefensible. The documents are vital because they will allow the Marriott Defendants to make an informed decision on whether to challenge the Settlement Agreement under Colo. Rev. Stat. § 13-50.5-105. Discovery is permitted under circumstances such as these. Accordingly, the Marriott

---

[2] The Settling Parties incorrectly assert that, in reserving their right to depose the Directors concerning the Settlement Agreement and Declarations following the production of documents, the Marriott Defendants are trying to delay a decision on the Settlement Motion. This is a purely hypothetical situation that may never need to be addressed and certainly not on this motion.

Defendants request that the Court: (a) defer a decision on the Settlement Motion; (b) grant the Marriott Defendants' cross-motion directing the Settling Parties to produce the above-described discovery; and (c) after its production, allow the Marriott Defendants a reasonable amount of time to respond to the Settlement Motion.

## FACTUAL BACKGROUND

### A.  The MVC Affiliation

On November 13, 2013, L&C and Marriott Resorts, Travel Company ("MRTC") entered into an affiliation agreement ("2013 Affiliation Agreement") that created the exchange affiliation between The Ritz-Carlton Clubs ("RC Clubs") and the Marriott Vacation Club Destinations Exchange Program ("MVCD" or "MVCD Program") (the "MVC Affiliation").  Under the 2013 Affiliation Agreement, a participating RC Club is defined as one whose owners' association has signed an "Acknowledgment and Joinder" to the agreement.  The Association signed such an Acknowledgment and Joinder ("Joinder") on or about April 24, 2014.  The MVC Affiliation, which became operational on December 5, 2014, allowed members of The Ritz-Carlton Club, Aspen Highlands ("RC Club Aspen") to voluntarily enroll in the MVCD Program, elect to deposit one or more of their RC Club Aspen use-weeks in the MVCD Program, and receive, in return, MVC Points that can be used to reserve accommodations at various MVC resorts and for other vacation experiences subject to availability and other restrictions.  The MVC Affiliation also enabled MVCD Program members to access any RC Club Aspen use-weeks that RC Club Aspen members have elected to deposit into the MVCD Program.

**B. The Settlement Agreement Attaches Bargained-for Director Declarations That Contain Inconsistent Statements**

On July 27, 2019, the Marriott Defendants were advised that the Association and Plaintiffs had reached a settlement in principle concerning Plaintiffs' claims against the Association; however, they were not told the details of the settlement. On August 22, 2019, the Association's counsel sent the Marriott Defendants' counsel a copy of the executed Settlement Agreement and gave the Marriott Defendants one day to state their position on an anticipated motion to approve the settlement. *See* August 22, 2019 email from Jessica Black Livingston to Ian Marx, attached as Ex. A. to the Declaration of Ian S. Marx dated October 8, 2019 ("Marx Decl."). The Marriott Defendants' counsel advised that, while a one-day turn-around on an answer was not feasible, a response would be provided promptly. *See* August 22, 2019 email from I. Marx to J. Black Livingston (Marx Decl. Ex. B).

A review of the Settlement Agreement, however, revealed a potentially serious problem. The Settling Parties had not just bargained for the Association's cooperation in Plaintiffs' continued litigation against the Marriott Defendants (which would not be unusual in the settlement context). Rather, they had bargained for specific scripted testimony from four former Association Directors: Randal Mercer, Philip Schneider, Tyler Oliver and Robert Harris. The Settlement Agreement provides that the Directors:

> … shall each provide sworn declarations (the "Declarations") providing the testimony as set forth in each of said Declarations which are attached hereto. . . . The Declarations will be delivered within 24 hours of the Effective Date of this Agreement. Plaintiffs may use the Declarations in support of any motion, court filing, and for any other purpose allowed by applicable law.

SA (ECF #535-2) at ¶ 4. The Settlement Agreement further requires the Directors to appear at trial to "testify consistent with" the Declarations. *Id.* at ¶ 5.

In their bargained-for Declarations, which were made in mid-July 2019, each of the Directors aver that, "prior to signing the Joinder on April 24, 2014, they were not aware that the [2013] Affiliation Agreement" contained certain terms, outlined below.   *See* Director Declarations, SA (ECF #535-2) Exs. 2-5, ¶ 4.  Each of the Directors further aver that, had they been aware of such terms, they "would not have signed the Joinder." *Id.* at ¶ 5.  At his August 2, 2019 deposition, however, Director Robert Harris gave sworn testimony that flatly contradicts these averments, not only as to himself, but also as to the other Directors.   Specifically, Mr. Harris testified that the terms in the 2013 Affiliation Agreement, of which he and the other Directors now claim to have been unaware prior to signing the Joinder were, in fact, well known to them at that time.

### 1.   The Directors knew that MVCD members could reserve short stays

In their respective Declarations each Director avers that he had been unaware that the MVC Affiliation permitted MVCD members to reserve less than the full week an RCDC owner deposited into the MVCD Program.   *See id.* at ¶ 4(a) (quoting 2013 Affiliation Agreement, which provided that MVCD "Members may reserve . . . through participation in the MVCD Program, any L&C [RCDC] Accommodations ….").

But Mr. Harris testified at deposition that he knew that any MVCD Member could "come for one night just like I can rent for a night and I've done that, they can come for a night." Deposition of Robert Harris ("Harris Dep.") (Marx Decl. Ex. I), at 9:15-17; *see also id.* at 9:18-22, 10:7-9, 10:24-11:9, 16:4-9 (same).  The other Directors were also aware of this feature of the MVC Affiliation because Mr. Harris had advised them more than three months before they signed the Joinder that:

> … it is a points program it's not necessarily a week for week exchange. . . . [A]ny number of Marriott people could use my given up week for 1 night or 7. I agree it is no different usage of our club than if I turn my week over for rental and it is rented to 7 different people [during] the week.

December 6, 2013 email chain between the Directors with subject line: "2013-12-06 Member Memo about new Affiliation Program," Harris Dep. Ex. 1001 (Marx Decl. Ex. J); *see also* Harris Dep. (Marx Decl. Ex. I) at 15:6-7 (confirming that was the understanding "pretty much [from] the get go"); *id.* at 15:16-21 ("I don't know of anyone who didn't understand [that]."). In addition, about two weeks before the Joinder was signed, RCDC's Stephanie Sobeck emailed Director Randy Mercer (who forwarded her email to the other Directors the same day) that "MVC members have the opportunity to use less than a full week." April 5, 2014 email, Harris Dep. Ex. 1004 (Marx Decl. Ex. K) at 2. Thus, based on Mr. Harris' deposition testimony and attached exhibits, it appears that, in their Declarations, which are exhibits to the Settlement Agreement, the Directors have inconsistently averred that they did not know, prior to signing the Joinder, that MVCD members could stay at RC Club Aspen for less than a week at a time.

## 2. The Directors knew that the Association could not terminate the MVC Affiliation

The Directors also aver that they were unaware, prior to signing the Joinder, that the MVC Affiliation would have an initial ten-year term and could be renewed by either L&C or Marriott. *See* Director Declarations, SA Exs. 2-5 ¶¶ 4 (k), (l). In other words, the Directors aver that they did not know that the Association lacked the power to terminate the MVC Affiliation.

But Mr. Harris has testified that he knew MVCD, L&C and Marriott had the sole right to terminate the MVC Affiliation. Indeed, the termination issue was discussed at some length prior to signing the Joinder. *See* Harris Dep. (Marx Decl. Ex. I) at 26:14-22, 30:18-24 (testifying that

it was important to him and the other Directors that the Association be able to "get out of" the MVC Affiliation within a short period of time). Mr. Harris testified that, when discussing a Memorandum of Understanding ("MOU") on the MVC Affiliation in early April 2014 (*id.* at 37:11-25), the Directors had asked that the Association be given a termination right but L&C had rejected that request. Harris Dep. Ex. 1004 (Marx Decl. Ex. K) at 2. Shortly thereafter (on April 5, 2014), Director Oliver asked the other Directors: "Shall we push one more time on our ability to terminate?" *Id.* at 1. Mr. Harris testified that he knew that the MOU, which he understood governed the rights of the Association *vis-à-vis* the MVC Affiliation, did not permit the Association "to terminate its joinder to the affiliation agreement." Harris Dep. (Marx Decl. Ex. I) at 41:1-4; *see also id.* at 97:23-98:13; 99:8-14; 100:19-101:15 (testifying that he and the other Directors agreed to move forward with the MOU and the MVC Affiliation even though they knew the final documents did not contain a termination provision); *id.* at 91:16-18 (testifying that the lack of a termination provision was "probably the single thing" that bothered him). Thus, based on Mr. Harris' deposition testimony and attached exhibits, it appears that, in making their Declarations, the Directors have inconsistently averred that they did not know, prior to signing the Joinder, that MVCD, L&C and Marriott had the sole right to terminate the MVC Affiliation.

### 3. The Directors knew that MVCD could charge fees to RCDC members who enrolled in the MVC Affiliation

In the Declarations, the Directors aver that they did not know, prior to signing the Joinder, that "MVCD reserve[d] the right to charge exchange fees and renewal fees" to RCDC owners who elected to join the MVC Affiliation. SA Exs. 2-5, ¶ 4(f). Mr. Harris, however, has testified that he understood at the time that the MOU permitted Marriott to charge a fee to RCDC members for electing to enroll in the Affiliation. Harris Dep. (Marx Decl. Ex. I) at 96:1-12; *see*

*also id.* at 103:1-6.  Thus, based on Mr. Harris's testimony, the Directors' contrary averment in the Declarations is inconsistent.

### 4.   The Directors knew that MVCD could use RCDC units for marketing

Finally, the Directors aver that, prior to signing the Joinder, they did not know that MVCD could use RCDC accommodations for marketing purposes. SA Exs. 2-5, ¶ 4(h).  But Mr. Harris has testified that he knew at the time that Marriott was free to use weeks deposited by RCDC members "for marketing or promotional activities."  Harris Dep. (Marx Decl. Ex. I) at 101:16-102:13.  Although he testified that he was bothered by that (*id.* at 88:25-89:1), he went on to say: "I do believe in private property rights and that … I could do whatever I wanted with my weeks, so therefore, if I gave to it Marriott and got points, … who they put in I could not control.  ***And I knew that when I went into it.***"  *Id.* at 90:18-91:4 (emphasis added).  Such testimony further calls the veracity of the Directors' Declarations into question.

### C.  In Light of the Discrepancies between the Harris Testimony and the Declarations, the Marriott Defendants Seek Limited Discovery concerning the Settlement Agreement and Declarations

Given the appearance of improper collusion between Plaintiffs and the Association in connection with the Settlement Agreement, on August 29, 2019, the Marriott Defendants advised the Association that they could not take a position on the anticipated Settlement Motion unless the discovery outlined above was provided.  *See* August 29, 2019 email from I. Marx to J. Black Livingston (Marx Decl. Ex. C).  During the first two weeks of September, the parties' respective counsel continued to discuss the requested discovery, with the Association's counsel neither agreeing nor refusing to produce it.  In an apparent attempt to break the impasse, Association President Salvatore Cutrona, after reaching out directly to the Marriott Defendants (*see*

September 12, 2019 emails between S. Cutrona and Lee Cunningham (Marx Decl. Exs. D, E)), instructed the Association's counsel to comply with the discovery requests, stating: "I have issued the following email to our attorneys and would expect prompt action on it, as we are not talking about a lot of correspondence back and forth."   September 12, 2019 email from S. Cutrona to L. Cunningham (Marx. Decl. Ex. F).  Mr. Cutrona directed the Association's counsel to

> **… provide [the Marriott Defendants] what they asked for immediately**.  More specially, I ask that you, working with Plaintiff's attorneys as necessary, make the following available with copy to me on behalf of AHCA as soon as possible:
> 1. All communications between Plaintiffs' counsel and the AHCA's counsel concerning, relating or pertaining to:
>     a.  the Settlement Agreement and/or
>     b. the Declarations.
> 2. All drafts of:
>     a.  the Settlement Agreement
>     b. the Declarations.

*Id.* (emphasis in original).  Notwithstanding Mr. Cutrona's instruction, on September 21, 2019, the Association's counsel advised that the Settling Parties would not be providing the requested discovery.  *See* September 21, 2019 email from J. Black Livingston to I. Marx (Marx Decl. Ex. G); *see also* September 23, 2019 email from I. Marx to J. Black Livingston (Marx Decl. Ex. H).

## ARGUMENT

## I.    THE SETTLING PARTIES MAY HAVE ACTED IN BAD FAITH BY COLLUDING TO INJURE THE MARRIOTT DEFENDANTS' INTERESTS AS NON-SETTLING PARTIES

Colorado has adopted the Uniform Contribution Among Tortfeasors Act ("UCATA"), under which a settling tortfeasor may be discharged from all liability for contribution to a non-settling tortfeasor if the release "is given in good faith."  C.R.S. § 13-50.5-105.  The duty of good faith required under UCATA is owed to the non-settling defendant.  *Copper Mountain, Inc. v.*

*Poma of Am., Inc.*, 890 P.2d 100, 104 (Colo. 1995).  "[A] settlement is reached in 'good faith' in the absence of collusive conduct."  *Id.* at 108.  If the settlement is found collusive, "there is no discharge."  *Id.* at 104 (quoting UCATA, 12 U.L.A. 98 (1975) § 4 (Commissioner's Comment to subsection (b)).  A settlement agreement is collusive "when it is aimed to injure the interests of an absent tortfeasor."  *Id.* at 108; *see also Dacotah Mktg. & Research, L.L.C. v. Versatility, Inc.*, 21 F. Supp. 2d 570, 578 (E.D. Va. 1998) ("Collusion in violation of the [UCATA] 'good faith' standard occurs when the release is given with the tortious purpose of intentionally injuring the interests of nonsettling parties….").  Thus, an inquiry into good faith does not scrutinize the settlement amount but, rather, looks at whether the settlement is intended "to harm the nonsettling defendant."  *Copper Mountain*, 890 P.2d at 107.  The non-settling defendant is generally harmed "when the ***arm's length*** negotiation between plaintiff and settling tortfeasor breaks down.  If the plaintiff no longer seeks to gain as much as possible through settlement, but is ***otherwise motivated***, the nonsettling defendant is left exposed, his interests unprotected in a transaction that may significantly affect those interests."  *Dacotah*, 21 F. Supp. 2d at 578 (emphasis added).  In *Dacotah*, for example, the settlement negotiation became collusive when the parties stopped negotiating at arm's length over the amount of the settlement and began focusing on the settling defendant's cooperation in the plaintiff's "quest for recovery" against the non-settling defendant.  *Id.* at 579.

Here, the Association has provided, through the Declarations of former Association Directors, specific, predetermined, identical testimony intended to harm the Marriott Defendants, apparently in exchange for a reduction in the amount the Association must pay Plaintiffs in order to have all claims against it released.  Moreover, while the Association was obviously interested

in reducing its monetary obligation, this was not a straightforward, arm's-length negotiation over the settlement amount.  Rather, the Declarations themselves were extensively negotiated.  *See* Settlement Motion (ECF #535) at 8 ("[T]he Settlement Agreement and its terms were vigorously negotiated between Plaintiffs and the AHCA, with both sides taking into account and attempting to reduce the risks and uncertainty they would face in proceeding to a jury trial on Plaintiffs' claims."); *id.* at 9 (noting that counsel extensively negotiated the "non-monetary aspects of the settlement" and that "the contents of the declarations provided by the four AHCA directors pursuant to provision 4 of the Settlement Agreement were repeatedly discussed").  The Settling Parties' "vigorous[] negotiat[ion]" over the four former Directors' testimony in itself suggests a "collusive alliance" to supplement the record with testimony directly harmful to the Marriott Defendants.  *See Dacotah*, 21 F. Supp. 2d at 579 ("A release is not given in 'good faith' when it "facilitate[s] a collusive alliance against a non-settling tortfeasor").  In addition, the Settlement Agreement does not just require the Directors to testify at trial; it contractually obligates them to "testify consistent with their respective declarations."  SA (ECF #535-2) at ¶ 5.  And those Declarations are dubious.  *See* FACTUAL BACKGROUND (B)(1)-(4), *supra* (listing key Declaration elements that are contradicted by Director Harris's sworn deposition testimony); *cf. Kennedy v. Ford Motor Co.*, 80 F. App'x 100, 103 (10th Cir. 2003) (unpublished) (payment for change of testimony is fraudulent).  These circumstances suggest that Plaintiffs and the Association may have acted in bad faith by colluding to produce a settlement that is intentionally injurious to the Marriott Defendants.

The Settling Parties miss the point when they assert that a plaintiff may properly bargain for a settling party's continued participation or assistance in presenting evidence at trial.  Here,

the subject of the bargain was not just continued participation or assistance; it was the ***specific content*** of trial testimony and ***the requirement that specific testimony be given***.  Such a bargain is decidedly improper.  *See Minpeco, S.A. v. Hunt*, 127 F.R.D. 460, 462–63 (S.D.N.Y. 1989) (explaining that, while it may be proper for a settling defendant to assist in procuring a witness's testimony, it is not proper to control a witness's testimony, require specific testimony, or require a witness to testify) (citing *Goodrich v. Tenney*, 33 N.E. 44 (Ill. 1893)).[3]

The Settling Parties also try to justify the Declarations by asserting that they "contain nearly identical testimony" to that which the Association already provided in discovery.  *See* Settlement Motion (ECF #535) at 10.  Putting aside the Declarations' inconsistencies with Mr. Harris' deposition testimony, their assertion begs the obvious question: If the bargained-for Declarations are identical to evidence already established in discovery, then why were they necessary at all?  The Declarations' late production (after the close of discovery) and their prominence in the Settlement Agreement belies the Settling Parties' attempt to downplay their significance.  Drafts of the Declarations and communications surrounding the negotiation of the Settlement Agreement will be relevant in determining whether the Declarations were procured in good faith or if they involved improper collusion aimed at acquiring (and perhaps manufacturing) specific testimony harmful to the Marriott Defendants.  The Settling Parties'

---

[3] The settlement in *Copper Mountain*, *supra,* presents an example of permissible bargaining.  In that case, the settlement agreement merely required the settling defendant to retain expert witnesses to address its own liability at trial; the settlement agreement did not dictate the ***content*** of the experts' testimony.  Moreover, the plaintiff was able to provide non-collusive reasons for this settlement term, explaining that it was simply a matter of (1) trial efficiency (plaintiff having to present the expert testimony "would encumber [the plaintiff's] case"); and (2) money (providing such an expert witness would "require resources [the plaintiff] did not possess").  *Id.*

resistance to producing the requested documents despite the Association President's express instruction that they be produced further amplifies the appearance of bad faith.

## II.     THE MARRIOTT DEFENDANTS ARE ENTITLED TO DISCOVERY TO MEET THEIR BURDEN TO SHOW BAD FAITH

Given that "it is the burden of the party challenging the agreement to prove that the agreement was collusive" (*Copper Mountain*, 890 P.2d at 108), where indicia of collusion are present, a non-settling party may be granted discovery to enable it to effectively challenge the settlement. *See Stubbs v. Copper Mountain, Inc.*, 862 P.2d 978, 986 (Colo. App. 1993) (holding that discovery into good faith under C.R.S. § 13-50.5-105 may be warranted), *aff'd sub nom., Copper Mountain,* 890 P.2d 100 (*en banc*); *see also id.* (where good cause for discovery has been shown, trial court should "fashion an appropriate procedure" that balances the "need for discovery … against the need for keeping the procedure within a framework that does not discourage settlement or strain the resources of the settling parties or the court"). Courts in other jurisdictions agree that, where warranted by the circumstances, discovery should be permitted in order to gather the evidence necessary to determine good faith. *See, e.g., Burlington N. & Santa Fe Ry. Co. v. Han*, 2015 WL 401744, at *7-*8 (N.D. Okla. Jan. 28, 2015) (holding that courts "may consider evidence that indicates collusion, fraud or other tortious or wrongful conduct on the part of the settling parties" and that a non-settling defendant "is entitled to explore these issues in order to provide the Court with the evidence necessary to attack whether [the settling

parties] conducted their settlement in good faith" and "to determine whether there has been collusion").[4]

The Marriott Defendants should be granted the discovery they seek for several reasons. First, the discovery is essential for resolving the serious questions that have been raised concerning the Declarations' veracity.  *See* FACTUAL BACKGROUND (B)(1)-(4), *supra.* Second, the discovery being sought is narrowly tailored to the good faith inquiry, as it is limited to communications relating to the Settlement Agreement and/or the Declarations and drafts of those documents.  Third, the documents requested are readily available, and their production would not unduly burden the Settling Parties.  *See* September 12, 2019 email from S. Cutrona to L. Cunningham (Marx. Decl. Ex. F) ("All of the [documents requested] are in [the Association's] possession."); *see also* Declaration of Jessica Black Livingston (ECF #542) ("Livingston Decl.") at ¶¶ 13-16 (averring that "[c]ounsel engaged in frequent . . . email exchanges while negotiating

---

[4] *See also Troyer v. Adams*, 77 P.3d 83, 113–14 (Haw. 2003) (where a legitimate dispute exists "as to whether a settlement has been given in good faith, a fuller hearing—including deposition testimony—may be called for" since "the good faith of the parties is substantially a function of their states of mind and the circumstances of which they are aware at the time of settlement"); *Smith v. Texaco, Inc.*, 232 Ill. App. 3d 463, 467 (Ill. App. Ct. 1992) (in determining good faith, the trial court "may evaluate counsels' arguments, affidavits, depositions, other discovery evidence and evidence received at the hearing"); *Custer v. Cerro Flow Prod., Inc.*, 112 N.E.3d 151, 177 (Ill. App. Ct.), *appeal denied*, 108 N.E.3d 807 (Ill. 2018) (finding "trial court's determination that the Settlement Agreement was entered in good faith was without foundation and, as such, was an abuse of discretion" and finding court erred by failing to request "basic information … during the good-faith hearings"); *Mahathiraj v. Columbia Gas of Ohio, Inc.*, 617 N.E.2d 737, 742 (Ohio 1992) ("[T]he trial court's discretion in determining the good faith of a settlement allows it to choose both the type of proceeding it will conduct to determine good faith in an individual case … as well as its evidentiary sources, including affidavits, depositions, and other discovery materials of record, or even evidence from an evidentiary hearing, if appropriate."); *cf. Commercial Union Ins. Co. v. Ford Motor Co.*, 640 F.2d 210, 213 (9th Cir. 1981) ("[W]here good faith is in issue, the parties may have to present evidence settlement was negotiated in good faith.").

the monetary and non-monetary aspects of the settlement" and "[t]he contents of the declarations . . . were repeatedly discussed").   Fourth, the Association's President has directed the Association's counsel to provide the requested discovery.  *See* Cutrona email (Marx Decl. Ex. F). Finally, the Association's counsel avers that the Settlement Agreement was reached in good faith and with no aim to harm or injure the interests of the Marriott Defendants.  Livingston Decl. at ¶¶ 11-12.  The Association ought not be able to assert, through an attorney declaration, a position on the key question that must be answered to make a finding of good faith without giving the Marriott Defendants an opportunity to test that assertion.

## CONCLUSION

For these reasons, and those that may be advanced at argument, which the Marriott Defendants request, the Marriott Defendants request that the Court: (a) defer a decision on the Settlement Motion; (b) grant the Marriott Defendants' cross-motion directing the Settling Parties to produce the above-described discovery; and (c) after its production, allow the Marriott Defendants a reasonable amount of time to respond to the Settlement Motion.

Respectfully submitted,

GREENBERG TRAURIG, LLP

By:    *s/ Ian S. Marx*
Philip R. Sellinger
Ian S. Marx
500 Campus Drive, Suite 400
Florham Park, New Jersey 07932
Tel: 973.360.7900 / Fax: 973.301.8410
Email:  SellingerP@gtlaw.com,
MarxI@gtlaw.com

*Attorneys for the Marriott Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this 8th day of October, 2019, a true and accurate copy of the foregoing **MARRIOTT DEFENDANTS' RESPONSE TO ASPEN HIGHLANDS CONDOMINIUM ASSOCIATION'S AND PLAINTIFFS' JOINT MOTION FOR GOOD-FAITH DETERMINATION OF SETTLEMENT AND CROSS-MOTION TO COMPEL DISCOVERY** was filed and served with the Clerk of the Court via CM/ECF filing system which will send notification to the following:

Michael J. Reiser
Law Office of Michael J. Reiser
1475 N Broadway, Suite 300
Walnut Creek, CA 94596
*Counsel for Plaintiffs*

Matthew C. Ferguson
The Matthew C. Ferguson Law Firm, P.C.
119 South Spring, Suite 201
Aspen, Colorado 81611
*Counsel for Plaintiffs*

Tyler R. Meade
The Meade Firm P.C.
1816 Fifth Street
Berkeley, CA 94710
*Counsel for Plaintiffs*

Linda Pham Lam
Michael Schrag
Gibbs Law Group LLP
505 14th Street, Suite 1100
Oakland, CA 94612
*Counsel for Plaintiffs*

Jessica Black Livingston
Hogan Lovells US LLP
1601 Wewatta Street, Suite 900
Denver, Colorado 80202
*Counsel for Defendant*
*Aspen Highlands Condominium Association, Inc.*

*s/ Gregory Scavelli*
Gregory Scavelli
