# EXHIBIT I

```
 1          IN THE UNITED STATES DISTRICT COURT
 2                 DISTRICT OF COLORADO
 3    _____
 4    Civil Action No.:  1:16-cv-01301-PAB-GPG
 5    RCHFU, LLC, et al.
 6    Plaintiffs,
 7    v
 8    MARRIOTT VACATIONS WORLDWIDE CORPORATION, et al.
 9    Defendants.
10    _____
11
12            VIDEO DEPOSITION OF ROBERT HARRIS
13    taken before Shawn M. Breimayer, Certified Shorthand Reporter,
      at the office Rehmann, 4086 Legacy Parkway, Lansing, MI,
14    Friday, August 2, 2019, commencing at 10:03 a.m., pursuant to
      notice.
15    APPEARANCES:
16    FOR THE PLAINTIFF:   Matthew C. Ferguson
17                         119 South Spring, Suite 201
                           Aspen, CO 81611
18                         (970) 925-6288
19    FOR THE DEFENDANT:   Jessica Black
      ASPEN CONDOMINIUM    Hogan Lovells US LLP
20    ASSOCIATION          1200 Seventeenth Street, Suite 1500
                           Denver, CO 80202
21    FOR THE DEFENDANT:   Roger Kaplan
22    MARRIOTT VACATIONS   Greenberg Kaplan
      WORLDWIDE            500 Campus Drive, Suite 400
23                         Florham Park, NJ 07932
24    Reported by:  Shawn M. Breimayer, CSR-6888
25    PAGES 1 - 110
```

Page 1

### Page 6

1  MR. FERGUSON: Well, I don't know what you have.
2  If you could just mute it that would be great.
3  MR. KAPLAN: I'm not making any noise, but.
4  MR. FERGUSON: Well, you are, I mean, we'll turn
5  you down. Thank you.
6  BY MR. FERGUSON:
7  Q. And do you still own any units at the Ritz Carlton
8  Aspen Destination Club?
9  A. I do own a unit.
10 Q. Okay.
11 A. At the Ritz Carlton Aspen Destination Club.
12 Q. And what unit do you own?
13 A. 8308 unit number, or interest number 5, if I recall.
14 Q. And what type of a unit is that?
15 A. Three bedroom winter interest.
16 Q. Okay. And when did you purchase?
17 A. 2000 -- I'm going -- I can't give you an exact date,
18 but I believe it was 2007.
19 Q. Okay.
20 A. It could have been 2006, though.
21 Q. Do you recall the purchase price for the unit?
22 A. $340,000.
23 Q. I'm just going to -- and have you ever owned any other
24 units there?
25 A. No.

### Page 7

1  Q. And have you ever tried to sell that unit?
2  A. It's listed currently.
3  Q. Okay. And what is it listed for?
4  A. 95,000.
5  Q. And how long has it been listed?
6  A. Probably April. It could have been -- I've been out
7  skiing twice this year. It was one of the two ski
8  trips. Could have been the earlier.
9  Q. Is it listed with Ivan Swartz?
10 A. It is.
11 Q. Has it ever been listed before?
12 A. No. Well, since I've owned it, no.
13 Q. Have you ever had it appraised?
14 A. No.
15 Q. Have you ever enrolled in any, any of the exchange
16 programs that were, have been made available over time
17 by Marriott Vacation World?
18 A. Yes.
19 Q. Which ones?
20 A. Third Home and I joined the Marriott Vacation Club
21 points system that we initiated. I've never used
22 either of the two.
23 Q. Okay. And how many years have you enrolled --
24 withdrawn. When you say Marriott Vacation Club, does
25 that mean the --

### Page 8

1  A. The exchange program through the Marriott.
2  Q. And you signed up with Lion and Crown, is that what you
3  did?
4  A. Whatever the form was.
5  Q. Okay. But have you ever put a week into that exchange
6  program?
7  A. No.
8  Q. Do you have an understanding as to what happens once
9  one, when a Ritz Carlton Aspen owner puts a week into
10 that exchange program, vis-a-vi how Marriott Vacation
11 points people can use it?
12 A. Yes.
13 Q. What is your understanding?
14 A. It's one for one.
15 Q. Okay. And that means what?
16 A. I put in the third week of March.
17 Q. Uh-huh.
18 A. That's my allocated week.
19 Q. Yeah.
20 A. And someone from Marriott can come the third week of
21 March and I have 18 months to use the points at one of
22 their facilities.
23 Q. Okay. So let's talk about your side of the transaction
24 first. Do you -- you get points a opposed to week in a
25 location; is that right?

### Page 9

1  A. I've never done it, but that's my understanding, yes, I
2  would get points if I put a week in?
3  Q. So your points could equate to three fabulous days in
4  high season someplace or ten not so high season place
5  with another with the points? It's, basically points
6  as a currency?
7  A. It's a points as a currency.
8  Q. Okay. Now, with respect to the Marriott Vacation Club
9  points person, that, you said, comes -- gets the week
10 in, I think you said in August that you use an example?
11 A. March.
12 Q. March, okay. Is it your understanding that that
13 person, that one person gets to use your week?
14 A. Well, they're family or anybody that wants a night. If
15 they, if they want to come for one night just like I
16 can rent for a night and I've done that, they can come
17 for a night. They could come for the whole week.
18 Q. So is it possible that, for example, if you gave a week
19 up that a points person from Marriott Vacation Club
20 called the Smiths with their two kids could come for
21 two nights and then the Brown's can come for three?
22 A. Absolutely. Just like I, exactly when I rent it.
23 MR. KAPLAN: Objection -- I, just try not to
24 answer immediately, so if I have an objection I can
25 propose it before you answer.

| | |
|---|---|
| 1    THE WITNESS: Happy.<br>2    MR. KAPLAN: Thank you.<br>3 BY MR. FERGUSON:<br>4  Q. So you were saying that just like anybody else -- just<br>5     like you can you can rent it for one night to somebody<br>6     and the other night to another person; is that right?<br>7  A. I have done that and I've also rented for one night.<br>8     It's fee simple.<br>9  Q. So in Marriott Exchange, Marriott Guest Exchange Week,<br>10    and I know you don't do this, your understanding is<br>11    that they can have seven different Marriott Vacation<br>12    people come in there one night each, right?<br>13    MR. KAPLAN: Objection.<br>14    THE WITNESS: I don't really understand the<br>15    question.<br>16 BY MR. FERGUSON:<br>17 Q. That's all right, I'll redo it. The -- we were just<br>18    talking about the exchange week that someone puts in to<br>19    the program from the Marriott, from the Ritz Carlton<br>20    Destination Club side, that week is now available to<br>21    the Marriott Vacations Worldwide Corporation, you<br>22    understand that, correct?<br>23 A. I do.<br>24 Q. Okay. And you understand that they can -- is it your<br>25    understanding that Marriott Vacation Worldwide can now<br>Page 10 | 1    THE WITNESS: I have no understanding what his<br>2    understanding is at this point.<br>3 BY MR. FERGUSON:<br>4  Q. Did -- when you were considering -- withdrawn. Let me<br>5     just go back to some background information. You<br>6     joined the board in, I have it right here. When did<br>7     you join the board?<br>8  A. When I did the join the board?<br>9  Q. Yes.<br>10 A. Is that the question?<br>11 Q. Yes, sir.<br>12 A. I was elected in 2013. I attended my first meeting --<br>13    I was not able to attend their first meeting, because I<br>14    had a conflict with another organization in New York,<br>15    which I was on the board of, so I went to the first<br>16    meeting, I believe, was in April of that year.<br>17 Q. April of '14?<br>18 A. '14.<br>19 Q. Okay.<br>20 A. I did attend a finance committee meeting, but I did not<br>21    go to the board meeting. I didn't attend. I did it by<br>22    phone.<br>23    MR. FERGUSON: I'm going to mark this, can we<br>24    mark this Harris 1001?<br>25    MR. KAPLAN: Can you describe the document that<br>Page 12 |
| 1     say to someone with points, hey, Smith's you can have<br>2     it for two nights Friday and Saturday and you move out<br>3     and I'm going to have the Brown's come in for four days<br>4     and then someone come for, for another one day. You<br>5     understand -- is that your understanding that they can,<br>6     they can use that week of exchange inventory and split<br>7     it amongst three, four, five, seven Marriott Vacation<br>8     points people, correct?<br>9  A. Correct.<br>10 Q. Okay.<br>11    MR. KAPLAN: Objection.<br>12    THE WITNESS: I'm sorry.<br>13 BY MR. FERGUSON:<br>14 Q. All right. And how long have you had that<br>15    understanding?<br>16 A. Since the program was put into effect somewhere during,<br>17    I believe it was the year '14.<br>18 Q. Okay.<br>19 A. 2014.<br>20 Q. All right. Have you discussed that concept week for<br>21    week with Mr. Mercer?<br>22 A. Yes.<br>23 Q. Okay. And do you know whether or not he has the same<br>24    understanding you do?<br>25    MS. Livingston: Objection to form.<br>Page 11 | 1     is being marked?<br>2     MR. FERGUSON: Yes, it's -- it is Bates labeled,<br>3     it's a December 6, 2013 e-mail from Mr. Harris to Mr.<br>4     Mercer, Oliver, Jill Alper, Phil Schneider regarding a<br>5     member, a member memo about new affiliations. And I<br>6     can't read the Bates label, but I think it's ACHA<br>7     19366, possibly, because it's been cut off. But I<br>8     think I sent it to you.<br>9     MR. KAPLAN: Yeah, and that's Harris 1?<br>10    MR. FERGUSON: Yeah.<br>11    MS. Livingston: 1001.<br>12    MR. KAPLAN: 1001.<br>13    (Deposition Exhibit 1001 marked at 10:15 am.)<br>14 BY MR. FERGUSON:<br>15 Q. First of all, do you, do you recall being involved in<br>16    sending a letter out in late December as a board<br>17    recommending or touting the affiliation program to<br>18    members?<br>19 A. Do I recall?<br>20 Q. Yeah.<br>21 A. No.<br>22 Q. Okay. In terms of your level of involvement in<br>23    December of 13, that's when a, a survey went out to the<br>24    members for Mr. Cunningham. What was your level<br>25    involvement at that time, were you just coming up to<br>Page 13 |

1  speed?
2  A. I really knew very little, had not met anyone except
3     Mr. Mercer.
4  Q. Mm-hm.
5  A. As I said, I attended a -- I believe this was January,
6     but I'm -- can't swear to it, a finance committee
7     meeting. And I really didn't know a lot about the
8     whole, other than I had been an owner there, I didn't
9     really know a whole a lot about anything, other than
10    from the board standpoint, other than things over the
11    years that I had read on, you know, letters that come
12    out.
13 Q. Right. As a member?
14 A. As a member.
15 Q. Right. And if you look at Exhibit Harris 1001, there's
16    an e-mail from you on December 6, 2013. It's regarding
17    member memo?
18 A. Mm-hm.
19 Q. About new affiliation program, and I'm not going to
20    pull that out, because of time. But it says Randy, the
21    way I understand it was it is a points program, it's
22    not necessarily a week for week exchange. And then,
23    you go on to say if I give up a summer week I would
24    receive X points to be used at any number of Marriott
25    Vacation Resorts and certain other properties whenever

Page 14

1     I wish or also bank them for future use. And then it
2     says I could use them for any number of nights,
3     likewise, any number of Marriott people could use my
4     given week for one night or seven. Do you see that?
5  A. I do.
6  Q. So that was your understanding from pretty much the get
7     go?
8  A. Apparently so.
9  Q. Okay. And do you have any recollection that other
10    people one the board did not have the same
11    understanding you had, which was it was going to be a
12    one week for one week pure?
13 A. I don't know.
14        MS. Livingston: Object to form.
15        MR. KAPLAN: Object.
16        THE WITNESS: I don't know of anyone who didn't
17    understand, because we always understood that if you
18    put a week in, it had to be, it had to be an allocated
19    week, you put an allocated weekend in, and then, you --
20    they could only use that week. Marriott could use that
21    week. We got points.
22 BY MR. FERGUSON:
23 Q. Right.
24 A. So those points were available if I wanted to use them
25    here in Lansing, Michigan at the Marriott Wonderful

Page 15

1     World Resort.
2  Q. Right.
3  A. And stay here last night.
4  Q. And the Marriott side, you understood, I think we've
5     been through this, but your understanding, and it's
6     reflected in this e-mail, was that it could be more
7     than one family coming in that week, it could be two or
8     three or four, five, six, seven families?
9  A. Just as though I would rent it, yes.
10 Q. Why did you add that on there?
11 A. What?
12 Q. As well, the comment about renting it?
13 A. Because I've always understood that I owned a fee
14    simple interest in that time, and that I could do
15    whatever I wanted with it. I've used it for an
16    auction, for instance, one year for a charity
17    organization.
18 Q. And is it your view that because Marriott got ahold of
19    someone's week in an exchange program that they had the
20    same rights as a fee simple owner?
21 A. It's no one -- I don't look at it as rights. If I rent
22    it to and you want to come stay on Saturday night, you
23    don't have all the same rights that I would have, but
24    you would be able to use and enjoy the club.
25 Q. Do you view the exchange week that Marriott gets

Page 16

1     it's -- ahold of through the exchange affiliation
2     program that we are going to talk about this morning,
3     is your view that they have the right to split that
4     week up as they deem fit?
5  A. Yes.
6  Q. Okay. And do you, again, Mr. Mercer share that view
7     with you as far as you recall?
8  A. I can't testify to that. I can't recall any discussion
9     about that with him, but.
10 Q. Would it surprise you that he testified as late as
11    2018, I'm sorry, yeah, 2018, last September that he
12    thought it was still one week, they could, only one
13    family could come in for that one week for Marriott?
14 A. If that's his understanding it wouldn't surprise me.
15 Q. Why is that?
16 A. Because it's his understanding.
17 Q. Okay. And do you recall whether or not you voted on
18    the survey that was sent out in December, voted where
19    you marked up the survey in December 2013 or January of
20    2014?
21 A. I believe I did.
22 Q. Okay. And what did you put down in terms of you wanted
23    the opportunity or not have the opportunity?
24 A. I wanted the opportunity.
25 Q. Okay. And what did you see as a benefit to you in

Page 17

5 (Pages 14 - 17)

**Page 26**

1  Q. All right. And were you at all involved to any extent
2     in the actual drafting of the, of a memorandum of
3     understanding in connection with the affiliation?
4  A. My recollection is I didn't, wasn't involved in the
5     drafting, but I was involved in the understanding that
6     there were limitations to its length.
7  Q. What do you mean by its length?
8  A. It was my understanding it had either a six, and this
9     is purely from memory, I haven't gone back to look at,
10    but that there would be a six or a one year out clause.
11 Q. All right.
12 A. That was important to me.
13 Q. Okay. Why was that important to you?
14 A. It's like any time I advise clients on agreements of
15    any kind where you're getting married, so to speak, at
16    that time, I felt it was important to try it, see if
17    the members liked it. If they didn't, you could get
18    out easy. And I had maintained that position.
19 Q. All right. So you want to have the ability to get out
20    of the, out of a contract if it doesn't work out, isn't
21    working out for you?
22 A. Yes.
23 Q. All right. And did you know that -- well, withdrawn.
24    With respect to Mr. Marino, you said on page one of
25    Exhibit 1002, Harris, it says Mike, you said Mike looks

**Page 27**

1     like the natural. You see that?
2  A. Yes.
3  Q. Okay. And that was based upon what Mr. Mercer was
4     telling you?
5  A. Yes. I have not, at that point, had not met him or
6     known anything about him other than what I read.
7  Q. All right.
8  A. I was given three choices. Of those three choices, I
9     think it would be the logical choice is what I'm saying
10    there.
11 Q. Did you understand he was not a Colorado lawyer,
12    correct?
13 A. I don't know that I understood that.
14 Q. Okay. And he wasn't, he wasn't a lawyer in the
15    hospitality industry?
16 A. I don't know that I knew that I -- if I read what was
17    written, and I'm not sure where that was cut from or if
18    it was written by someone else and then pasted there,
19    because there's a little less than signs and the, looks
20    like an exclamation point in front of each one. Looks
21    like it's, could have been something somebody else sent
22    and it was copied and pasted. I just don't know.
23 Q. Yeah.
24 A. But based upon that, he had worked with St. Thomas
25    counsel and had been Aspen's counsel.

**Page 28**

1  Q. All right.
2  A. So that would be my understanding of what his
3     understanding was with hospitality.
4  Q. And that you were also told by Mr. Mercer he had worked
5     on "hundreds of agreements with Ms., with Barbara
6     Egolf." That was another thing you considered?
7  A. Yes.
8  Q. Okay. And did you ever confirm one way or another, one
9     way or another whether that was, in fact accurate?
10 A. No.
11 Q. And prior to this time -- withdrawn. One of the
12    reasons we're taking your deposition is because of some
13    late produced documents in this case. And I just want
14    to know, had you ever heard of a survey company called
15    Apco, A-p-c-o, that had conducted surveys and, a survey
16    in 2013, August of 2013?
17 A. Would that have been the one that I testified that I
18    answered?
19 Q. No. That was Marriott's one. It was a survey where
20    they had a vendor out of Washington, D.C. do a, a
21    mailing, an e-mail where there's a series of questions
22    asked and they put that information together?
23 A. I will tell you, I think I have seen it as a result of
24    production in this case. For some reason, I saw it,
25    possibly, but again, I could be confusing it with the

**Page 29**

1     one that I responded to.
2  Q. Okay. Were you aware of a focus grouping done where
3     people were called in by Apco in January of 2014, right
4     around this timeframe to, to answer questions about,
5     among other things, the affiliation with Marriott?
6  A. No.
7  Q. Let me show you --
8  A. Are we done with those two?
9  Q. Yes, yeah, we are right now. Thank you. Jessica told
10    me you've been an expert, so you know how to handle
11    Exhibits, so.
12 A. That's why I asked.
13    MR. FERGUSON: Let me have this marked as
14    Exhibit 1003 for Harris's deposition. Roger, this is
15    ACHA 5818, 5821, sorry 22. It's a, just the meeting
16    minutes of the tourist accomodation directors on April
17    5, 2014.
18    (Deposition Exhibit 1003 marked at 10:40 a.m.)
19 BY MR. FERGUSON:
20 Q. Mr. Harris, it looks like with respect to these, I
21    don't believe these are the final ones, they're not,
22    but they're the, the minutes unsigned of April 5, 2014.
23    It says it's Schneider, Mercer, Oliver, and Harris as
24    the treasurer were here. And also present were Mr.
25    DiMeglio, Mr. Hearns, and some folks at the hotel. And

8 (Pages 26 - 29)

**Page 30**

1  then, it says that Eveleen Babich, Sobeck were present,
2  and then, Michael Marino you see as a guest, correct?
3  A. Yes.
4  Q. And just with respect to the e-mail where you said Mr.
5  Marino, looks good to you, based upon Mr. Mercer's
6  description of those three lawyers. Here's the meeting
7  where he's present and you indicated you had a dinner.
8  Does this, does this refresh your recollection or is
9  this around the time that you --
10 A. I know --
11 Q. -- met Mr. Mercer?
12 A. I know it was early April.
13 Q. Okay. And did you discuss the affiliation at this
14 meeting; do you recall?
15 A. If we hired him because of the affiliation, then it
16 would be my understanding that that would be probably
17 what we discussed.
18 Q. Okay. And do you recall whether or not in this
19 timeframe, it was this timeframe that you were wanting
20 there to be a six month or one month, one year out of
21 the affiliation agreement?
22 A. It was -- what I recalled, and it was not via the term,
23 and this is from recollection, it was not via the term
24 affiliation agreement as much as it was an MOU.
25 Q. Right. All right. What you do you what do you recall

**Page 31**

1  about the memorandum of understanding?
2  A. Was that Marriott had the ability to do this without
3  us, but that we had pushed back on this and negotiated
4  terms differently for us than say St. Thomas or someone
5  else.
6  Q. Right, right. And you said that you thought that
7  Marriott had the, they could do this no matter what?
8  A. I've been told they could.
9  Q. And who told you that?
10 A. I believe it was Mr. Marino, because that would have
11 been the only counsel that I would have had exposure to
12 on this type of, on that type of agreement. I don't
13 think it was the local counsel.
14 Q. Okay. So it was your understanding that Marriott could
15 affiliate with the Marriott Vacation Club one way or
16 another?
17 A. I was told that, yes.
18 Q. Okay. And you think it was Mr. Marino?
19 A. I'd have to say yes, I think.
20 Q. Okay. I want to show you what's been previously marked
21 as Exhibit 7002?
22 A. Are we done?
23 Q. Yeah, yeah, thanks. I might come back to that.
24 A. I just like to keep one in front of me at a time.
25 Q. I got it, I got it.

**Page 32**

1  MR. FERGUSON: 7002 is the affiliation
2  agreement, Roger.
3  MR. KAPLAN: Yes.
4  BY MR. FERGUSON:
5  Q. I just want to have this out in front of you, prior to
6  today, have you ever seen the affiliation agreement?
7  And it's dated 14 November 2013. You can see it on the
8  third page in. It's between the members of Line &
9  Crown Travel Company giving access to Marriott Vacation
10 Club Destinations Exchange, and then, Marriott Resorts
11 people having access to Lion & Crown. So this is the
12 affiliation agreement that's one of the parts of this
13 litigation. Had you ever seen it prior to today?
14 A. I believe it was produced to me via counsel once it was
15 discovered.
16 Q. In the case?
17 A. In this case.
18 Q. And without --
19 A. I can't tell -- I don't believe I have ever seen it
20 before that.
21 Q. All right. And you have, obviously, litigation counsel
22 that you have privileges with, but there's been some
23 discussions of, of these agreements in the context of
24 like Mr. Marino, like this, so the attorney client
25 privilege has been waived, to some extent, but I want

**Page 33**

1  to make sure that you don't come out.
2  MS. LIVINGSTON: So the association has waived
3  privilege with regard to advice given by Mr. Marino.
4  THE WITNESS: Mr. Marino, yes.
5  MS. LIVINGSTON: Specifically and only relating
6  to the affiliation agreement, but of course, has not
7  waived our privilege.
8  THE WITNESS: Yes.
9  BY MR. FERGUSON:
10 Q. Okay. So my understanding is that you hadn't seen this
11 until the litigation, correct?
12 A. That would be my understanding, too.
13 Q. All right, all right. And did you check your files to
14 see if you ever had it before?
15 A. We produced everything that --
16 Q. Sure.
17 A. -- twice to you.
18 Q. Right.
19 A. I kept everything electronically and I turned over my
20 electronic file. I don't keep everything. But I went
21 through all my electronic files, too, on memorandum, no
22 not memorandum, what's the best way to put it,
23 anything, the pre reads for the board meetings, things
24 like that.
25 Q. Right.

## Page 34

1  A. And I turned those over early on.
2  Q. All right.
3  A. And they were common, because they were already
4     maintained on site.
5  Q. This has been previously marked as 2213.
6        MS. LIVINGSTON: Do you want to keep this out?
7        MR. FERGUSON: Yeah, leave it right there.
8     2213, Roger.
9        MR. KAPLAN: Yeah, can you identify it?
10       MR. FERGUSON: Yeah, it's an e-mail at the top
11    from Stephanie Sobeck to Richard Hayward, copied to
12    Stephanie Rauso-Jackson. It's regarding the San
13    Francisco survey update, a survey vote update.
14 BY MR. FERGUSON:
15 Q. You obviously know who Ms. Sobeck is, correct?
16 A. I couldn't tell you what her position was, but I
17    recognize the name.
18 Q. You under --
19 A. She was at the meeting.
20 Q. Okay.
21 A. Which I saw her. I wasn't even sure if she was. I
22    wouldn't identify her if she walked in the room.
23 Q. Okay. And Richard Hayward, you know him?
24 A. I do know him.
25 Q. And you understand he's the asset manager in charge of

## Page 35

1     the Western Ritz Carlton Destination Clubs for Marriott
2     Vacation Worldwide?
3  A. I understood he was while I was on the board.
4  Q. He might have moved on, I don't know?
5  A. I have no idea.
6  Q. Okay, I don't know. You'll see that at the bottom here
7     it says some information about a vote or survey about
8     San Francisco. And Sobeck, in the middle of the page,
9     sends that to Mr. Hayward and Ms. Jackson-Rauso or
10    Rauso-Jackson. And it said, Mr. Richard Hayward, who
11    you -- when you were on the board you understood he was
12    the primary contact person at Marriott Vacations
13    Worldwide, correct?
14 A. He became that while I was on the board. He wasn't
15    initially. It may have been Ms. Sobeck, it may have
16    been an another person, I don't know.
17 Q. Right.
18 A. I mean, it was a another person and then he became, and
19    I believe it was a woman.
20 Q. Okay. And you'll see that she sends those, that
21    information to Mr. Hayward and Mr. Hayward said it's
22    the ultimate decision of the boards or management
23    company, Rich. And she said, Ms. Sobeck, who I'll
24    represent to you was the predecessor asset manager for
25    Marriott Vacations Worldwide for the Ritz Carlton

## Page 36

1     Destination Club in Aspen, decision to affiliate,
2     question mark, the boards, okay?
3  A. Okay.
4  Q. And this was on November 17, 2014. It's --
5  A. I see it.
6  Q. It's, you know, about a year, year and three days after
7     that affiliation agreement was signed there in Orlando
8     that you didn't have in your files. Is this the first
9     time you've seen an indication from executives at
10    Marriott Vacations Worldwide that the decision rests
11    with the board as opposed to the management company?
12 A. I believe --
13       MS. LIVINGSTON: Object to form.
14       MR. KAPLAN: Join.
15       THE WITNESS: I believe so.
16 BY MR. FERGUSON:
17 Q. That would be contrary to what Mr. Marino was telling?
18 A. Again, it was my understanding from Mr. Marino. I
19    don't want to put words in his mouth, but yeah.
20 Q. You know, you know one way or another whether Ms.
21    Sobeck or Ms. Egolf or anyone at Marriott Vacations
22    Worldwide ever gave the affiliation agreement to the
23    lawyer you ultimately chose and Mr. Marino?
24 A. I do not know that either way.
25 Q. Let me show you what's been previously marked as the

## Page 37

1     memorandum of understanding.
2        MR. FERGUSON: Roger, that's the MOU dated
3     December 17, 2014. I hope you have that one.
4        MR. KAPLAN: Yeah.
5        MR. FERGUSON: Okay.
6  BY MR. FERGUSON:
7  Q. What -- we were taking about this a little awhile ago,
8     the memorandum of understanding. What involvement, if
9     any, did you have in the preparation, negotiation,
10    discussion of this particular document, sir?
11 A. The discussions, I was part of discussions on it at
12    the, at that board meeting which I think was dated
13    April 5th of that year. Obviously, we must have
14    discussed it. They had said we did. I do recall that
15    it said a majority -- just looking at the rest of this,
16    and the, the majority had voted for it, or voting is
17    the wrong term, had responded to a survey in favor as I
18    did.
19 Q. I was more along the line of asking, had you, did you,
20    were you involved in getting this done, drafted,
21    negotiated at all or was --
22 A. No.
23 Q. Okay.
24 A. I mean, you asked, I think you used the word discussed.
25 Q. Yeah, I did a little bit, you're right, I did. And

### Page 38

1    one, you're looking at the third whereas clause in the
2    first page of 7010 or A-1 that's marked by Mr. Shea in
3    one of the earlier depositions of Mr. Marsman, I
4    believe. Says, whereas a majority of members who
5    responded to the survey responded affirmatively for the
6    MC, MVCD exchange program opportunity. Do you recall
7    what that survey, how many people responded to that
8    survey?
9    A. I don't. I mean, I've seen the survey. I mean, I just
10   can't give you any numbers.
11   Q. Okay. Did you know that the survey was somewhere in
12   the range of like six, 71 to 68?
13   A. I know it was, yeah, I know that was a very typical
14   response from our members. I mean, that's about how
15   many used to vote.
16   Q. You weren't made aware of that 257 people had responded
17   to the Apco survey earlier that year?
18   A. No.
19   Q. All right. Let me have that --
20   A. Was that just our members?
21   Q. Just the Aspen members, yeah.
22   A. So 250, okay.
23        MR. FERGUSON: Let me just have this marked as
24   Exhibit 1004.
25        THE WITNESS: Are we done with that?

### Page 39

1         MR. FERGUSON: Yeah, for now.
2    (Deposition Exhibit 1004 marked at 11:47 a.m.)
3         MR. FERGUSON: Roger, this is an e-mail chain.
4    I don't know if I got it that you were there or not,
5    but it's ACHA 9175 through 9178. And it's an e-mail
6    chain with Barbara Egolf, Stephanie Sobeck in the back,
7    and they're talking about some language should go in
8    there. But I don't want to go through this whole
9    e-mail?
10        MR. KAPLAN: What's the date of that?
11   BY MR. FERGUSON:
12   Q. It's dated, top e-mail is April 5, 2014, which would
13   have been the same date as the meeting that year,
14   correct, Mr. Harris?
15   A. I'm sorry, I was reading this.
16   Q. That's all right. It's the same date as the meeting?
17   A. This April 5th --
18   Q. Yeah.
19   A. -- on the top?
20   Q. Yeah.
21   A. The top response by Tyler is that date. I didn't look
22   at all the responses. It looks like the first three on
23   the front page was all done on April --
24   Q. Right.
25   A. -- 5th.

### Page 40

1    Q. And you'll see that Mr. Mercer has forwarded to you and
2    Mr. Oliver the MOU. And then Mr. Oliver says on
3    Saturday, 10:08 PM, he was up late, I think that covers
4    it, shall we push one more time on our ability to
5    terminate. And Randy said, we are not sure, probably
6    going back, and then our plain English clause must be
7    used as perfect, so, it's perfect, so why not. And he
8    said I like it simple. Do you know whether or not
9    there was ever obtained a termination clause for the
10   affiliation agreement?
11   A. I've been under the understanding --
12   Q. Mm-hm.
13   A. -- that there was. I may be wrong, but that's always
14   been my understanding. I know that a member, any
15   member can terminate with one year by just not --
16   either not putting a week in or quitting.
17   Q. Right. But can the association, to your understanding,
18   well withdrawn. You understand the affiliation
19   agreement that you didn't get a copy of is not between,
20   is not between the association, it's between Marriott
21   entities, correct?
22   A. Correct.
23   Q. All right. And the memorandum of understanding is
24   between Lion & Crown and Aspen Highlands, correct?
25   A. Correct.

### Page 41

1    Q. And does the MOU have anything in there that allows the
2    association to terminate its joinder to the affiliation
3    agreement of November 14, 2013?
4    A. I don't see any time limitations in this agreement.
5    Q. All right. Um, were you, were you looking at the
6    memorandum of understanding when it was going back and
7    forth or was that pretty much left to Mr. Mercer,
8    Oliver, and Marino?
9    A. I don't want to testify to either way, I just don't --
10   it's simply I don't recall back to '14.
11   Q. All right. Let me show what's been previously marked
12   as 7012.
13        MS. LIVINGSTON: Thank you.
14        MR. FERGUSON: Roger, 7012 is the affiliation
15   acknowledgement of and joinder to the affiliation
16   agreement between Lion & Crown Travel Company, LLC.
17        MR. KAPLAN: Yes, okay.
18   BY MR. FERGUSON:
19   Q. So Mr. Harris, this is a document dated, its
20   interlineated, you'll see, April 24, 2014 and it's
21   signed by Randall L. Mercer, president on behalf of the
22   Aspen Highland Condominium Association, Inc. And
23   you'll see that Mr. Delaney and Mr. Cunningham signed
24   it for the two sides of the Marriott Vacations
25   Worldwide parties to the affiliation agreement we saw a

**Page 86**

1  corners of the order.
2      MR. FERGUSON: You don't understand the order,
3  sir.
4      MR. KAPLAN: I get it and you don't understand
5  it. It was limited to the 2013 affiliation agreement
6  and the joinder acknowledgement, period. You have
7  eaten up an hour of time going into everything but
8  that.
9      MR. FERGUSON: You don't have -- my position is
10 you have no time here today. Your company is
11 understand sanctions, sir. Your company is under
12 sanctions.
13     MR. KAPLAN: I represent the defendants.
14     MR. FERGUSON: Turn him down, please.
15     MR. KAPLAN: And I'm entitled to participate.
16     MR. FERGUSON: I don't believe you are, but
17 we'll see when we get to that point. You just wasted
18 three minutes of your time.
19 BY MR. FERGUSON:
20 Q. You understood it was a fire sale when they were unable
21    to put that inventory into the trust, correct?
22 A. I don't want to use the term fire sale. I do
23    understood that they sold it below what many of us had
24    allotted for.
25 Q. Okay. And do you recall Mr. Catrona speaking to that,

**Page 87**

1     and said they had done the same thing in St. Thomas and
2     it destroyed values?
3         MS. LIVINGSTON: Object to form.
4         MR. KAPLAN: Objection.
5         THE WITNESS: That's not what I ever understood
6     from Mr. Catrona.
7  BY MR. FERGUSON:
8  Q. I mean, yeah, Catrona?
9  A. I don't recall him saying that. But I also recall
10    that's not what they did in St. Thomas. What I came to
11    learn is they took all the people who weren't paying
12    their dues and agreed to reimburse the club all those
13    dues in return for them getting a, those units to put
14    into the trust.
15 Q. Because they wanted, they wanted to get inventory so
16    they could sell Marriott points, correct?
17 A. My understanding, and it was given to me by Mr.
18    Hayward, it's approximately 40 percent of St. Thomas is
19    in the trust.
20 Q. Okay.
21 A. I may be off on that percentage, but it's a high
22    number.
23 Q. And when they couldn't get their hands on the, on the,
24    put their inventory into a trust for Aspen Ritz
25    Carlton, what they wanted to do in order to maintain

**Page 88**

1     some inventory was to get this affiliation agreement in
2     place and have people use it, that opportunity to give
3     them exchange opportunity, exchange inventory?
4  A. I don't have that acknowledge.
5         MS. LIVINGSTON: Object to form.
6  BY MR. FERGUSON:
7  Q. Okay.
8  A. I don't know what was in their mind.
9  Q. Okay. And had you known about all, and we're not going
10    to go through this, it's a nineteen page single spaced
11    document, which, which was negotiated on both sides by
12    Marriott and Marriott, because they own Lion & Crown
13    and Ritz and they own Marriott and Marriott Vacations
14    Worldwide points that's lawyered up here. If you had
15    known all these terms back when it was acknowledged and
16    joined without having seen it, would you have agreed to
17    this agreement as it was, would you have agreed to have
18    joined this agreement as it was presently drafted?
19 A. I don't like when you use the term all, so I'm going to
20    have to say I don't know, because you say all.
21 Q. Mm-hm.
22 A. Some of the terms I might find, if I read it all, that
23    I would like.
24 Q. Okay.
25 A. There are certain ones that I wouldn't have signed

**Page 89**

1     because of termination and marketing. Marketing,
2     what's the best way to put it, other than -- if I put
3     it back into MVC and then they use that for a marketing
4     opportunity for somebody to come stay like I did when
5     it was Ritz, I don't really object to that if their
6     using their, of what becomes theirs. But it was my
7     understanding it would be, as I explained to you
8     earlier, one for one and that's.
9  Q. Okay.
10 A. So, but as far as the -- like that one is not the end
11    of the world for me, but the ability to not terminate I
12    found something very strong, you know, I may have
13    gotten over that one because of the fact that I or you
14    or anyone else who is an owner could get out by just
15    not putting time in. But the fact that a majority of
16    our owners appear to be using that program, as far as
17    joining it, the numbers I last saw when I was on the
18    board I have no idea where it stands today would tell
19    me that our members liked it. But I would like -- any
20    time things are going to affect me I would like to have
21    some control over time.
22 Q. And there was no control over time?
23 A. There was none that I have seen from what you have
24    shown me today.
25 Q. All right. And are you saying you don't object to the

## Page 90

1     fact that Marriott can obtain exchange inventory and
2     use it to market its point program for any reason?
3   A. I don't like that they would be using that as their,
4     you know, I'm putting my week in and then they used it
5     to market their program, but you know.
6   Q. Because it's a private club, right?
7   A. Should be.
8   Q. All right. And it's being used for commercial purpose,
9     you, you, you, didn't understand when Mr. Mercer signed
10    this that they were, they could take inventory from
11    your friend, because you haven't put it in that you've
12    known for many years they can take that inventory and
13    they could do say, Marriott can do any, we can do
14    whatever we want with this. We can market it. We want
15    to sell, we want to do a sales push to sell Comfort Inn
16    points and we're going to give the top sales brokers
17    and their customers, you know, ten rooms here during
18    Christmas. If you had no control of that, was that
19    something you had contemplated they could do?
20  A. Well, I knew it was fee simple, therefore, any of those
21    owners who put that in could have done the same thing.
22    I could have gone out on the streets and given to
23    homeless people and I knew that.
24  Q. I understand that.
25  A. I just look at things like -- I'm a very big proponent,

## Page 91

1     not because of any of this, in private property rights.
2     And I think that when looked at this, not this
3     agreement, because I never saw it and I don't find it
4     to be what I thought we had.
5   Q. Mm-hm.
6   A. But at the same time, I do believe in private property
7     rights and that, you know, I could do whatever I wanted
8     with my weeks, so therefore, if I gave to it Marriott
9     and got points, you know, who they put in I could not
10    control. And I knew that when I went into it.
11  Q. Okay.
12  A. But.
13  Q. So the termination clause is the thing that bothers you
14    the most?
15  A. It probably is probably the single thing. I would have
16    to go back and look at them all again. But that would
17    certainly be, the termination clause certainly bothers
18    me.
19       MR. FERGUSON: Okay, that's all I have. Go
20    ahead, Roger.
21       MR. KAPLAN: Good afternoon, Mr. Harris.
22       MS. LIVINGSTON: Hold on a second, Roger.
23       THE WITNESS: I can hear you.
24       MR. KAPLAN: I can hear you.
25       MR. FERGUSON: Mr. Harris, I'm Roger Kaplan with

## Page 92

1     the firm Greenberg Traurig. We represent the Marriott
2     defendants. So let me take a few minutes just to go
3     over some of your testimony here today.
4           CROSS-EXAMINATION
5 BY MR. KAPLAN:
6   Q. First of all, can you pull out Exhibit 1005, which I
7     think is --
8   A. Yes.
9   Q. -- that exhibit in front of you. And let me
10    specifically refer you to the page in which you say
11    wow, we looked at San Francisco, it's so nice. Do you
12    see that?
13  A. Yes, I read it earlier. Which page is that on? I got
14    it.
15  Q. When you say wow, we looked at San Francisco, it's so
16    nice, amazing Marriott would let the brand deteriorate
17    so badly, however, if you look at the number of brands
18    they have now it's staggering. Now, you were basing
19    that statement solely on the e-mail that Mr. Schneider
20    had send to you, correct, you remember reacting to his?
21  A. Number one was my own statement of use. Second
22    sentence would be reaction. Third would be my
23    experience with seeing the number of brands Marriott
24    has opened and acquired over the years.
25  Q. Okay.

## Page 93

1   A. So I can't testify as to one single statement
2     acquire -- being for everything.
3   Q. Okay. So the wow, we love San Francisco was so nice
4     was based upon your own personal observation?
5   A. Personal experience in staying there.
6   Q. Right, okay. Your statement amazing Marriott would let
7     the brand deteriorate so badly, you were reacting to
8     Mr. Schneider's statement --
9   A. Correct.
10  Q. -- as to what he thought, correct?
11  A. Correct, that's what I stated.
12  Q. You were reacting to his use there?
13  A. Correct.
14  Q. Correct. You don't know whether what he said was true
15    or not true, correct?
16  A. Absolutely I don't.
17  Q. Okay. Now, if you go to the front e-mail, which we are
18    going to 10?
19  A. Mm-hm.
20  Q. And you were asked questions regarding that you have
21    little trust, for example, as to how much access MVC
22    would have to Aspen at that point in time?
23       MS. LIVINGSTON: Object to form.
24       THE WITNESS: I state that I, I have little
25    trust after reading all of this that I had little

| | |
|---|---|
| 1  trust.<br>2  BY MR. KAPLAN:<br>3  Q. Okay. So you had, after you read Mr. Schneider's<br>4     e-mail, your reaction was you had, it caused you to<br>5     have little trust, correct?<br>6  A. That's, for that sentence, yes.<br>7  Q. Okay. So again, you were reacting to Mr. Schneider's<br>8     e-mail. You don't know if it was true or not true,<br>9     correct?<br>10 A. Correct, as I stated earlier.<br>11 Q. Okay. Now, in fact, your knowledge of how the<br>12    affiliation works is that Marriott Vacation Club<br>13    Destinations and MVC members can only have access to<br>14    Aspen Highlands to the extent an owner at Aspen<br>15    Highlands deposits a week with MVC, correct?<br>16 A. That's the reason.<br>17 Q. Is that --<br>18 A. That's the reason I was in favor of going forward with<br>19    an agreement.<br>20 Q. So if you have, during the course of one year, one<br>21    member of Aspen Highlands depositing one week there<br>22    would be one week available to MVC members, that's your<br>23    understanding?<br>24 A. Technically, yes. They could gain access through<br>25    renting also and be also be a member, so the way you<br>Page 94 | 1     Vacation Club had absolute discretion to control its<br>2     own program? That's what you testified to about an<br>3     hour ago?<br>4  A. Yes.<br>5  Q. Okay. And having that absolute control that you could<br>6     determine how to use any weeks deposited by Aspen<br>7     Highlands, correct?<br>8  A. Correct.<br>9  Q. It could change their rules, and they're free to change<br>10    their rules as to how Marriott Vacation Club members<br>11    use and access points?<br>12 A. Correct.<br>13 Q. Okay. So I'd like now to turn to the memorandum of<br>14    understanding, which has been marked as 7010. And you<br>15    also have Exhibit 1004 in front of you, which was an<br>16    April 5, 2013 e-mail?<br>17       MS. LIVINGSTON: Just a minute Roger, we're<br>18    getting it.<br>19       MR. FERGUSON: While they're looking at we show<br>20    there's five people on the conference call, so whoever<br>21    you guys are, can you tell us who you are?<br>22       MR. KAPLAN: Okay, anybody respond?<br>23       MS. LIVINGSTON: Not that we heard.<br>24 BY MR. KAPLAN:<br>25 Q. Mr. Harris, looking at the April 5, 2013 e-mail?<br>Page 96 |
| 1     phrased the question leaves it open to other ways they<br>2     could get there.<br>3  Q. Okay. I'm talking about not renting. I'm talking<br>4     about --<br>5  A. Using points.<br>6  Q. -- MVC members using pointing to access Aspen?<br>7  A. That is correct.<br>8  Q. Did you --<br>9  A. That is correct.<br>10 Q. Okay. So only, if only one member deposits one week it<br>11    would be exactly one week in the MVC program or MVC<br>12    members to access, correct?<br>13 A. Correct.<br>14 Q. If five members deposited five weeks it would be five<br>15    weeks to access, correct?<br>16 A. Correct, same question.<br>17 Q. Okay. So the fact that MVC has 200,000, 400,000,<br>18    however many thousands of members, the ability to<br>19    access Aspen Highlands's group points is, in fact,<br>20    limited by the number of weeks deposited by Aspen<br>21    Highlands's owners, correct?<br>22 A. That was always my understanding, yes.<br>23 Q. Okay, thank you. Okay, so we cleared that up. Let me<br>24    ask you, you had said that, in your testimony, that<br>25    it's always been your understanding that Marriott<br>Page 95 | 1  A. Yes.<br>2  Q. And I don't have it in front of me, but why don't you<br>3     read into the record, who is that from and who is that<br>4     to?<br>5  A. It's a chain e-mail between a lot of people. I mean,<br>6     if you want me to go through, I'm happy to go through<br>7     all of them.<br>8  Q. No.<br>9  A. You want the original e-mail?<br>10 Q. The e-mail that I believe was Mr. Mercer that said<br>11    should we push one more time in the ability to<br>12    terminate, you see that?<br>13 A. Yes.<br>14 Q. Okay. And who is that e-mail from and to?<br>15 A. Tyler Oliver was, was who it was from to Randy Mercer<br>16    and copied myself, and doesn't look like anybody else.<br>17    So it was just be between the three of us at that point<br>18    on this e-mail. Wait, two, yeah, Tyler Oliver, it was<br>19    Tyler Oliver, myself, and Mercer.<br>20 Q. Okay. And he's saying, and can you just identify who<br>21    Mr. Oliver is?<br>22 A. He was a board member at the time.<br>23 Q. Okay. So, Mr. Oliver, is a board member, is saying<br>24    should we push one more time on ability to terminate,<br>25    correct?<br>Page 97 |

**Page 98**

1  A. Correct.
2  Q. And that's the subject that has been raised previously,
3     correct?
4  A. Yes, to the best of my knowledge, yes.
5  Q. Okay. So because he's saying push one more time,
6     correct?
7  A. Correct.
8  Q. So, at this point in time, on the memorandum of
9     understanding the board had already asked Marriott for
10    the ability to terminate, correct?
11 A. Correct.
12 Q. And Marriott had denied that request, correct?
13 A. It would appear so. I don't know if they addressed it,
14    so I have no way of knowing they denied.
15 Q. Okay. But certainly, from the tenor of this e-mail it
16    looks like we need to push one more time on the ability
17    to terminate would certainly would suggest they tried
18    and they didn't succeed previously, correct?
19 A. That would be a better way to put it, yes.
20 Q. Okay. And do you know if they pushed one more time on
21    the ability to terminate?
22 A. I do not know.
23 Q. You were never informed?
24 A. I can't say at this point. It was too far back.
25 Q. Okay. Do you know if you spoke to Mr. Oliver and Mr.

**Page 99**

1     Mercer about pushing one more time on the ability to
2     terminate?
3  A. I might have. Mr. Mercer and I, you know, from time to
4     time would pick up the phone and call each other about
5     something, but that was more in later years. Because
6     this is still on April 5th, which was late at night,
7     apparently, and, in my world late at night.
8  Q. But this was twelve days before the actual signing of
9     the memorandum of understanding, correct?
10 A. That would be my understanding, yes.
11 Q. Okay. And we've already gone through this, and the
12    memorandum of understanding was marked as 7010 does not
13    have any termination terms, correct?
14 A. Correct.
15 Q. It has no terms, you agree, with me it's indefinitely,
16    correct?
17 A. Yes.
18       MR. FERGUSON: Objection. Form.
19 BY MR. KAPLAN:
20 Q. All right. Mr. Harris, you're a sophisticated
21    businessman, aren't you?
22 A. It all depends upon somebody's definition.
23 Q. Okay. Well, you list your background as you, you have
24    a degree?
25 A. Yes.

**Page 100**

1  Q. You have an advanced degree?
2  A. No. By that, you mean graduate like an MBA?
3  Q. Yes.
4  A. No.
5  Q. You were a CPA?
6  A. I'm a CPA.
7  Q. You've worked at an accounting firm?
8  A. Yes.
9  Q. Have you participated in negotiations with
10    transactions?
11 A. Yes.
12 Q. And has it been your experience that sometimes you get
13    what you want and sometimes you don't?
14 A. It's always about coming to terms to keep everybody
15    happy, usually.
16 Q. Right. And sometimes you do a deal even though you
17    don't get what you want, right?
18 A. Correct.
19 Q. So you wanted a termination clause in the memorandum of
20    understanding, you asked for it, you didn't receive it,
21    but the board, nevertheless, agreed to the memorandum
22    of understanding, correct?
23 A. That is correct.
24 Q. They made a determination that even without the
25    termination clause they would agree to the memorandum

**Page 101**

1     of understanding, correct?
2  A. Correct.
3  Q. And you regarded it, you testified before, that as
4     between the three documents we've talked about today,
5     the acknowledgement and joinder, the 2013 affiliation
6     agreement, and the memorandum of understanding, you
7     considered the memorandum of understanding to be the
8     operative document with respect to the association,
9     correct?
10 A. Correct.
11 Q. Okay. So the operative document with respect to the
12    association would be approved and signed by the
13    association does not have a termination clause, even
14    though the association had asked for it, correct?
15 A. Correct.
16 Q. Okay. Now, in the memorandum of, the memorandum of
17    understanding the association is agreeing that its
18    members can exchange their weeks into the Marriott
19    Vacation Club Destination Exchange Program through Lion
20    & Crown Exchange Program, correct?
21 A. Correct.
22 Q. Okay. Now, is there any limitation whatsoever on what
23    Marriott Vacation Club can do with those weeks in the
24    memorandum of understanding?
25 A. I believe 7C would be as close as I can see right now.

Page 102

1  It says they can't use, they were not able to use space
2  available time.
3  Q. Well, okay, but I'm talking about with regard to weeks
4  exchanged into the MVCD program?
5  A. No, they could, always knew they -- my understanding
6  has always been, and still is, that they could only use
7  that week. They means Marriott could use that week for
8  what -- for their points people, we'll call them, or
9  their program.
10 Q. Right. Is there any limitation in this memorandum of
11 understanding in Marriott using those weeks deposited
12 by members for marketing or promotional activities?
13 A. Not that I see at this point.
14 Q. Okay. Is there any limitation in the memorandum of
15 understanding in Marriott being able to alter the rules
16 of its MVCD program?
17 A. I'm sorry, could you repeat? I didn't catch the whole
18 question. It broke up towards the end.
19     MR. KAPLAN: The court reporter can read it
20 back.
21    (Court Reporter Read Question Back)
22     THE WITNESS: Okay, I thought you said deed
23 program. That's why I was questioning, okay. I don't
24 believe there is.
25 BY MR. KAPLAN:

Page 103

1  Q. Okay. And so, you understood that Marriott had
2  absolute discretion to control its own programs and
3  there's nothing in the memorandum of understanding,
4  which you consider to be the operative document, which
5  would limit that absolute discretion, correct?
6  A. Correct.
7     MS. LIVINGSTON: Roger, do you have a sense for
8  how much longer you have?
9     MR. KAPLAN: No, I, I.
10    THE WITNESS: Because I was 20 over what I was
11 deposed, subpoenaed for.
12    MR. KAPLAN: Well, we took a break.
13    THE WITNESS: Well, I'll give you 5 for the
14 break, which I would consider part of your two hours,
15 because breaks are normal in depos. I would also tell
16 you that I would give you 5 for technology issues. But
17 I'm at 21 now. I'm going to terminate very quickly if
18 you don't have something.
19 BY MR. KAPLAN:
20 Q. Mr. Harris, have you, over the past three years,
21 noticed any difference in the quality of the services
22 at the Aspen Highlands?
23 A. No, the quality of services at Aspen Highlands remains
24 identical to all times that Nicholas has been there.
25 Q. Have you observed any degrading of the prices of Ritz

Page 104

1  Carlton, of the prestige of the Ritz Carlton brand?
2     MR. FERGUSON: Roger, you're so far afield of my
3  examination and the court's order.
4     MR. KAPLAN: I --
5     MR. FERGUSON: You're so far afield that I'm
6  going to ask Jessica to shut you down.
7     MR. KAPLAN: Well, that's not correct, because
8  you asked about the Ritz Carlton brand fifteen minutes
9  ago.
10    MR. FERGUSON: All right, go ahead.
11 BY MR. KAPLAN:
12 Q. Now, to answer my question, have you noticed any
13 degradation of the Ritz Carlton?
14 A. It's a very broad question and you're talking about
15 degradation of a brand, which, you know, I'm not sure
16 that I'm either qualified to answer or that I can
17 answer.
18 Q. Okay.
19 A. I note -- I'll give you an example of some degradation
20 if you want to hear it. It used to be that wearing
21 name tags in the Ritz Carlton was prohibited, that it
22 was a place for ladies and gentlemen. I have gone to
23 Ritz Carlton resorts every year for many years, both in
24 Florida and California, and I can tell you that I see
25 people wearing name tags and clothing with what I would

Page 105

1  say was not the old style Ritz Carlton. So I could say
2  there's degradation in the Ritz Carlton brand, yes, but
3  that doesn't mean there is and I'm certainly not a
4  hospitality expert to testify there's a degradation of
5  brand. I'm here as a fact witness purely, which has
6  nothing to do with me being on the board member at
7  Aspen.
8  Q. And you're talking about the Ritz Carlton brand
9  overall?
10 A. Well, that's what you asked, the Ritz Carlton brand.
11 The brand includes hotels, residences, and clubs, and
12 the, and cruise ships now.
13 Q. Okay. One other thing, and you testified earlier, that
14 your understanding is that the actual access of MVC
15 owners to Aspen Highlands through points has been very
16 low. Do you recall that?
17 A. Yes, I asked for those statistics many times throughout
18 my board tenure and I found them to be primarily on
19 shoulder seasons, which is not the best time to be in
20 Aspen, and I've found that I -- the number I recall,
21 and I may be dead wrong, was three-and-a-half percent
22 on average. They were provided to us by Mr. Hayward's
23 team.
24 Q. And, in fact, the usage by MVC owners using points has
25 been below the usage by renters, correct?

27 (Pages 102 - 105)

**Page 106**

1  A. I would believe so since I rent my unit out sometimes.
2  Q. All right.
3  A. And many people rent. That's not necessarily -- I may
4     have had the statistic at one time. I don't have it in
5     front of me today, but I would think it's probably true
6     based on my experience, sir.
7  Q. And you have no objection to renters, as to whoever is
8     renting to whomever they want?
9  A. No, I stated my belief on property rights and fee
10    simple.
11 Q. And, in fact, owners, when they rent, they may not even
12    know who they're renting to?
13 A. You rarely do.
14 Q. Okay. Could be people with tattoos and rings in their
15    noses, correct? Could be, right?
16 A. It --
17        MR. FERGUSON: Roger, you have.
18        THE WITNESS: It could be anybody. I'm not
19    going to sit here and degradate people who have rings
20    in their noses or tattoos on their body.
21 BY MR. KAPLAN:
22 Q. I'm not, I'm not degredating?
23 A. But you are. You're saying they're somewhat different.
24 Q. I'm, all I'm saying is it could be people from, from,
25    from Hollywood California who may be worth billions and

**Page 107**

1     they have tattoos and rings in their noses, you don't
2     know who you're renting to, right?
3  A. Correct.
4  Q. Okay. Or they could wear sweats and sandals all the
5     time, correct?
6  A. Are we going to sit here -- I'm going to go ahead and
7     terminate, because I'm beyond my two hours I agreed to.
8  Q. I'm, I'm --
9  A. I don't think that we're going to go through
10    everybody's dress code and get me to testify on dress
11    codes.
12        MR. KAPLAN: All right, I'm done. Thank you,
13    Mr. Harris.
14        MR. FERGUSON: Can I ask two pertinent
15    questions? That will take literally take two minutes,
16    one minute.
17        THE WITNESS: I'm fine.
18        MS. LIVINGSTON: Yeah, fine.
19           REDIRECT EXAMINATION
20 BY MR. FERGUSON:
21 Q. Okay. Were you aware, are you aware that Ms. Sobeck
22    testified to this MOU was a meaningless document?
23 A. No.
24        MR. FERGUSON: That's all I have.
25        THE VIDEOGRAPHER: This concludes today's

**Page 108**

1  deposition. We are off the record at 12:26 p.m.
2         (Deposition ended at 12:26 p.m.)

**Page 109**

1  STATE OF MICHIGAN )
                     ) ss.
2  COUNTY OF KENT    )
3     I, Shawn Breimayer, (CSR-6888) do hereby certify that the
4  foregoing deposition consisting of 109 pages, is a complete,
5  true and correct transcript of the deposition proceedings and
6  testimony of Robert Harris held in this case on Friday, August
7  2, 2019; and do also certify that the foregoing transcript is
8  a true and correct transcript of my stenographic notes of said
9  deposition so reported and transcribed by me.
10
11 I further certify that I am neither attorney or counsel for,
12 nor related to or employed by any of the parties to the action
13 in which this deposition was taken; and further, that I am not
14 a relative or employee of any attorney or counsel employed by
15 the parties hereto, or financially interested in the action.
16
17 Dated: August 9, 2019
18
19
20
21 Shawn M. Breimayer, CSR
22 Notary Public, Ionia County, MI
23 Acting in Kent County, MI
24 My Commission Expires: 3-20-2020
25

28 (Pages 106 - 109)