## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO

Civil Action No. 1:16-cv-01301-PAB-GPG

**RCHFU, LLC, *et al.***

Plaintiffs,

v.

**MARRIOTT VACATIONS WORLDWIDE CORPORATION, *et al.***

Defendants.

_____

## FINAL PRETRIAL ORDER
_____.

### 1.    DATE AND APPEARANCES

On May 8, 2020, the parties appeared electronically for a Final Pretrial Conference before the Honorable Gordon P. Gallagher presiding at the Wayne Aspinall Federal Building, 400 Rood Avenue, Grand Junction, CO 81501.

a.    **For Plaintiffs:**

Matthew C. Ferguson – THE MATTHEW C. FERGUSON LAW FIRM, P.C.
Aspen, Colorado 81611

Michael J. Reiser – REISER LAW, P.C.
Michael J. Reiser, Jr.
Matthew Reiser
Isabella Martinez
Walnut Creek, CA 94596

Tyler R. Meade – THE MEADE FIRM, P.C.
Seena Forouzan
San Francisco, CA 94129

Michael Schrag – GIBBS LAW GROUP LLP
Linda Pham Lam

Oakland, CA 94612

b.      **For Defendants -** Marriott Vacations Worldwide Corporation, Marriott Ownership Resorts, Inc., The Ritz-Carlton Management Company, LLC ("Ritz-Carlton Management"), The Cobalt Travel Company, LLC ("Cobalt"), and The Lion & Crown Travel Co., LLC ("Lion & Crown") (these five defendants, collectively, "MVW  Defendants"):

Philip R. Sellinger– GREENBERG TRAURIG, LLP
Roger B. Kaplan
Ian S. Marx
Florham Park, New Jersey 07932

Naomi Beer – GREENBERG TRAURIG, LLP
Denver, Colorado 80202

## 2.      JURISDICTION

The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1332, 1367 and 1453.  The Court confirmed that it has subject matter jurisdiction over this action by Order, dated March 19, 2018 (ECF #201).

## 3.      CLAIMS AND DEFENSES

Plaintiffs' operative complaint is the (Corrected) Seventh Amended and Supplemental Complaint and Jury Demand filed on July 9, 2019 (Dkt. # 430). The MVW Defendants' operative answer is their Answer and Affirmative Defenses to Corrected Seventh Amended Complaint (Dkt. # 434).

### A. <u>Plaintiffs' Summary of Plaintiffs' Claims and Response:</u>

Ritz-Carlton is a highly valued brand associated with the Ritz-Carlton Hotel Company, which develops, sells, operates and manages luxury properties all over the world.  Over the years, the Ritz-Carlton has become the preferred hotel company among luxury hotel chains based in large part on the prestige of its brand, luxurious amenities, and outstanding service.  Since 1998,

the Ritz-Carlton brand has been owned and/or controlled by Marriott International, Inc., which licensed its use to its Marriott Vacations Worldwide Corporation (sometimes, "MVW") after MVW was created in a late 2011 corporate spin-off.

In 1999, Marriott International announced the Ritz-Carlton Destination Club (sometimes "RCDC") fractional offering line: "The Ritz-Carlton Destination Club is an exclusive, luxury tier real estate offering combining the benefits of Second Home Ownership with the legendary, personalized services and amenities of The Ritz-Carlton Hotel Company, L.L.C." Ex. 8003 at p. 1. In the ensuing years, Marriott International developed Ritz-Carlton Destination Clubs in premier locations around the country — St. Thomas, Virgin Islands; Kapalua Bay, Hawaii; Abaco Bay, Bahamas; San Francisco and Lake Tahoe, California; Jupiter, Florida; and Bachelor Gulch, Vail, and Aspen, Colorado.

Defendants marketed separately deeded 1/12th fractional interests in these clubs to individuals who had the means to pay for exclusive access to a private residence club with significant limits on transient occupancy. Marriott International described the Ritz-Carlton Destination Club as "the world's foremost luxury destination club." Ex. 8002 at p. 1. With the promise of exclusive access and world-class amenities — such as twice daily maid service, members-only lounges, top notch concierge services — Ritz-Carlton Destination Clubs promised exclusivity and commanded premium prices well above conventional timeshare program prices.[1]

For the Ritz-Aspen, Defendants selected the new base village development at the Aspen Highlands ski area (minutes from Downtown Aspen) to build not one, but two "ski-in-ski-out"

---

[1] In a memorandum marketing RCDC for a sale to potential investors in 2010, Deutsche Bank, wrote: "Operating under the Ritz-Carlton name, one of the world's most powerful and respected luxury brands, RCDC is the leader in the worldwide luxury ownership segment." "This brand strength translates into pricing premiums as well as enhanced marketing effectiveness...." Ex. 49

lodge buildings (Elkhorn and White River) containing a total of 73 luxury two three and four-bedroom luxury condominiums. Marriott International and its development company Ritz-Carlton Development Company ("RCDC") did not to sell whole ownership condominiums but rather opted for fractional interests because the profit was far greater.

RCDC began marketing and then selling the 876 available fractional interests at the Ritz-Aspen in or about 2000, and eventually sold nearly 750 of them, including 231 to Plaintiffs. Purchasers paid premium prices, averaging over $200,000, with some selling for well over $500,000, for their deeded 1/12 fractional interests at the Ritz-Aspen. Each fractional interest grants its owner rights to stay at the property for four weeks per year, and the right to exchange weeks for weeks at other RCDC resorts. As with the other RCDC resorts, the Ritz-Aspen was built to far higher standards than Marriott Vacation Clubs.

Instead of cheaper time share programs like the Marriott Vacation Club, Plaintiffs chose the Ritz-Aspen based on the luxury brand and promised exclusivity. Plaintiffs pay between $15,000 and $17,000 in annual maintenance fees, which is significantly higher than the annual fees Marriott Vacation Club members pay. While the Marriott Defendants assert that the Plaintiffs have no rights in the Ritz-Carlton brand, they certainly paid premium sales prices for that name, and continue to pay high dues to maintain Ritz-Carlton's very high facility and service standards.

Fractional interest sales at the Ritz-Aspen were initially strong, but sales of luxury private residence clubs substantially slowed with the recession that began in 2008. By late 2011, shortly after Marriott International spun-off its vacation ownership business, Marriott Vacations Worldwide decided to stop investing in the luxury Ritz-Carlton Destination Club line and focus instead on sales of its points-based and much cheaper Marriott Vacation Club product (sometimes,

_____

at pp. 2, 12. Indeed, Marriott International pioneered the branded luxury segment of vacation

4

"MVC"). Ex. 2520. This was part of an industry-wide shift to points-based timeshare products. MVW labelled this effort a "reengineering" of its "luxury segment." Defendants used the term "evolution" in communications with Plaintiffs.

Realizing that the prospect of access to the Ritz-Aspen and other RCDC resorts would help it sell more MVC points at higher prices, MVW decided in early 2012 to "affiliate" the premium RCDC product line with the less exclusive and cheaper Marriott Vacation Club (the "Affiliation"). Before growing with the merger with ILG, the MVC included more than 400,000 members. The RCDC, on the other hand, included only a few thousand members.

Joining the two lines gave MVC members ready access to RCDC resorts, enhancing the attractiveness and value of MVC points. This allowed MVW to sell more MVC points at higher prices. Chekitan S. Dev, Ph.D., a professor at the Cornell University School of Hotel Administration and a leading marketing and brand management expert in the hospitality sector, will testify that MVW's ability to profit from affiliating with the luxury RCDC brand is known in the industry as the "halo effect." He will also testify about the corresponding "horn effect" that diminishes the value of a luxury brand affiliated with a down-market product.

Defendants announced the proposed Affiliation in July 2012 with a form letter sent to the RCDC membership, including Plaintiffs. Exs. 1023, 1024. The opposition was swift and vehement. The association boards representing members in St. Thomas, Bachelor's Gulch, Jupiter, and Kapalua expressed concern. *See* Ex. 1053 at p. 2. So too did the fractional owners' association at the Ritz-Aspen (the "Association"), stating in a July 2012 letter to Plaintiffs and other members: "Frankly, it has been our position that our members bought into a Ritz-Carlton brand and do not want that brand diluted." Ex. 1053 at p. 1. Defendants were well aware of this

---

ownership under the Ritz-Carlton brand. *Id.* at p. 21.

opposition. As MVW's Strategic Council, which was charged with shepherding the RCDC-MVC Affiliation through to completion, noted in August 2012: "The communication related to the 'Evolution' of the RCDC product line has not been well received by many of the members. Several boards have made their concerns known to us." Ex. 2143 at p. 5.

Individual members complained too — en masse — and Defendants were well aware of such complaints. For example, in an August 27, 2012, Juan Pablo Cappello, an owner at Ritz-Aspen and a partner at Greenberg Traurig, wrote directly to MVW executive Lee Cunningham:

> "[Y]our recent communications fail to acknowledge the underlying issue which all RCDC members need to understand. The Marriot Vacations Worldwide Corp. has a huge incentive to dilute the RCDC brand to further its greater interest of selling more Marriot Vacation Club memberships. The growth of Marriott Vacations Worldwide Corp. as a public company is tied with growth of the sales of more and more Marriot Vacation Club memberships. The sale of more RCDC memberships is not currently relevant for this public company. Thus, the value of the investment made by each RCDC members is at jeopardy." Ex. 1074.[2]

At one meeting attended by MVW representatives, the Association board "stated serious concerns about the 'collapse of the brand.'" Ex. 1264 at p. 1.

In November 2012, the Association hired a lawyer to send a "cease and desist" letter to MVW, Ritz-Carlton Management, and Cobalt that, among other things, accused Defendants of breaching their fiduciary duties. Ex. 1135 at p. 2.

Even before the July 2012 announcement, Defendants knew that members would recognize the peril from the proposed Affiliation. As another group within MVW called the Corporate Growth Committee acknowledged in a May 24, 2012 memorandum: "Access to the RCDC resorts by [MVC members] may result in the perception of lost exclusivity." Exs. 2520 at p. 8. But Defendants were not deterred by the harm their "reengineering" of their "luxury segment" would cause.  Ex. 2143 at p. 5. They planned a sophisticated communications/public

relations strategy to push the Affiliation through. In the words of the May 24 internal memorandum: "This risk can be mitigated through successful and well-coordinated communications with RCDC fractional owners, focusing on increased usage options available through the [MVC] program affiliation…." *Id.*

By October 2012, Defendants' Strategic Council had developed its "communication plan." As summarized in an internal memorandum dated October 25, 2012: "We have developed a communication plan outline related to future communication of the 'Evolution'. We have also spoken to a couple of PR firms to provide input into our plan and assist with ongoing communication. So far, we do not have a communication consultant selected, however we believe we have a viable option to consider. The primary focus on the going forward communication plan is the individual Members, shifting focus away from the boards." Ex. 2147 at p. 5.

Defendants' "communication plan" involved repeated misrepresentations in communications to members, such as the following: "Rest assured that as we advance forward, nothing about your Home Club Membership has changed." Exs. 1023, 1024. "To clarify, nothing about the Home Club Membership that you purchased has changed." *Id.* "[N]othing that you originally purchased has changed or will change as a result of the announcement." Ex. 1061. "Lee [Cunningham] will share our plans with you shortly. As you'll hear, they're grounded in logic, and are created with the goal to continue to enhance the value of your membership and vacation experiences through affiliation." Ex. 2207 at p. 2.

In January 2013, MVW's Strategic Council stated that it was "reevaluating [its] go forward strategy" and further that its "[c]urrent thinking (yet to be finalized)" was: (1) to "Go club by club and obtain a majority vote of the members endorsing the affiliation with their club

---

[2] Another Greenberg Traurig Miami partner owned and weighed in as well.

with Lion & Crown"; (2) to "Mount an aggressive communication/marketing campaign aimed at the member base for each club to give the best chance of success"; and (3) that "Lion and Crown would be described as having an affiliation with the MVCD Exchange Program." Ex. 2148 at p. 4.[3]

Defendants attempted to placate the opposition at the Ritz-Aspen by promising that the proposed Affiliation would not take place unless a majority of members *voted* in favor of it. This promise is memorialized in the April 5, 2013 letter to Ritz-Aspen members. Exs. 1180, 2507. Ritz-Carlton Management Company as well as MVW's PR firm had a hand in drafting this and other communications with members. *See, e.g.,* 11/16/17 Sobeck Depo. at 126:11-127:16, 129:15-19, 133:1-7; 10/9/18 Sobeck Depo. at 14:6-16, 28:11-17.

But Defendants' executives and managers soon realized the opposition was so strong that they could never win a vote in favor of the Affiliation. As one senior executive, Stephanie Sobeck, warned in an April 12, 2013 email: "It looks like . . . there will be a 'no' for affiliation." Ex. 1188, 2618. Even so, her boss, Lee Cunningham, reiterated the promise of a vote in another letter to the members in May 2013, stating "we want to assure you that a Ritz-Carlton Club affiliation with Marriott Vacation Club Destinations will not take place unless there is an affirmative vote of each Club's Membership." Ex. 1208.

The situation soon became even worse for the Marriott Defendants. In June 2013, members at Bachelor Gulch voted overwhelmingly to terminate their respective management agreements with the Ritz-Carlton Management Company in order to avoid affiliating with the MVC. *See* Ex. 1253 at p. 2. Bachelor Gulch members so voted despite the significant cost; the

---

[3] The latter quote presaged the 2013 Affiliation Agreement between Lion & Crown and another MVW subsidiary (Marriott Resorts, Travel Company, Inc. d.b.a. MVC Exchange Company) that governed the Affiliation. Ex. 2102.

terminations meant they would no longer have access to the other RCDC resorts, and the valued Ritz-Carlton brand name would be stripped from their property. In industry parlance, this is known as "de-flagging." Members at Jupiter would later do the same. Ex. 8001 at pp. 11-12.

APCO Worldwide, Inc., the public relations and communications consulting firm that Defendants hired to help with their "communication plan," soon delivered more bad news in August 2013. Member surveys and focus groups performed by APCO further documented widespread and vehement member opposition to the proposed Affiliation.[4] A PowerPoint presentation included these findings APCO: Members "are unhappy with the introduction of the Marriott Vacation properties into 'their' (Ritz-Carlton) system." Exs. 2260, 25,113046 at p. 4. "[M]any members believe the Marriott partnership dilutes the brand." *Id.* "[S]ome members … feel it devalues their Ritz-Carlton membership." *Id.*[5]

Faced with the prospect of yet another RCDC location — arguably the crown jewel among Ritz-Carlton Destination Clubs and the resort most appealing to MVC members — rejecting the RCDC-MVC Affiliation, Defendants decided to renege on their promise of a vote. In the words of Lee Cunningham, the executive who made the decision, "we decided not to do the vote and went with [a] survey." 11/10/17 Cunningham Depo. at 205:19-20, 235:6-16, 233:18-25. Cunningham conceded that no one communicated to the members that there was no longer going to be a vote. *Id.* at 217:3-9, 218:19-24. No vote among Ritz-Aspen members regarding the proposed Affiliation ever took place.

Later, in place of the promised vote, Cunningham sent an e-mail to Plaintiffs and other

---

[4] It should be noted that there are multiple surveys. The APCO surveys just discussed are distinct from the survey that was conducted in place of the promised vote. Also distinct are the SMS surveys relevant to the remedies calculations.

Aspen members on December 4, 2013 with a link to a biased, online *survey* regarding the potential Affiliation with MVC. Exs. 10, 12. Sobeck (and others) conceded that the proposed Affiliation would go forward regardless of the survey results. Ex. 1323 ("the Board is not looking for a majority of members to positively vote for affiliation to move forward"); Ex. 1447 ("This survey is similar to Aspen in that we are not looking for a majority vote. It's merely a mechanism to get feedback and the affiliation is expected to occur regardless.").

Moreover, the email, crafted by the PR team pursuant to Defendants' "communication plan," once again concealed Defendants' decision to renege, falsely stating that only a survey was promised:

> ***As promised earlier this year***, *The Ritz-Carlton Club, Aspen Highlands ("Aspen") **Members are being surveyed** regarding their interest in a potential exchange affiliation with the Marriott Vacation Club Destinations ("MVCD") program. We have worked collaboratively with your Board of Directors **on this potential opportunity**, and you should have received a series of letters on **April 5, 2013** [the date of the first promise of a vote] and November 19, 2013 regarding this Member survey.*

> *We want you to know that we remain committed to providing Members of the Ritz-Carlton Destination Club voluntary **access to unique, luxury vacation experiences built upon The Ritz-Carlton's legendary, world-class, personalized services and amenities. We continue to evaluate other opportunities with luxury vacation partners**, much like the current optional exchange opportunity with Exclusive Resorts. These exchange opportunities with luxury vacation partners are not related to or affected by this survey.*

> *The sole purpose of this survey is to understand whether the Aspen Highlands Members would like the opportunity to voluntarily exchange a week of their allocated time for points within the MVCD exchange program. The MVCD exchange program is just that – an optional exchange program. <u>If an Aspen Highlands Member decides to exchange one of their weeks of allocated time for points within the MVCD exchange program, then a MVCD member could reserve a stay in the allocated week that was exchanged using the points that they own.</u> The Board would like to understand the Members' interest in **this voluntary exchange opportunity** through the MVCD program. We encourage each Member to participate in the survey. The survey will close on 1/13/14, so please take the opportunity to fill out the survey at your earliest convenience.*

Ex. 10 (emphasis added).

---

[5] These findings were made known to Cunningham, Sobeck and other MVW executives, but were withheld from the RCDC members and RCDC associations. Indeed, the APCO report (and another in January 2014) were not produced by the Marriott Defendants in discovery.

The online survey itself was no more forthright. Ex. 12. Above the ultimate question, the following two boxes appeared:

## THE RITZ-CARLTON CLUB, ASPEN HIGHLANDS
## AFFILIATION

| NO AFFILIATION | AFFILIATION |
|---|---|
| **The Ritz-Carlton Club System\*** | **with the Marriott Vacation Club Destination Exchange Program\*** |
| • Deeded Reserved Allocation | • Deeded Reserved Allocation |
| • Home Club & Club System Exchange | • Home Club & Club System Exchange |
| • The Hotel Reservation Service | • The Hotel Reservation Service |
| • Waitlist | • Waitlist |
| • Per Diem | • Per Diem |
| • Exclusive Resorts Affiliation | • Exclusive Resorts Affiliation |
| • Other Potential Future Luxury travel affiliation | • Other Potential Future Luxury travel affiliation |
| | **PLUS**<br>Click <u>HERE</u> for more information About the following |
| | • Ability to bank and borrow time from year to year |
| | • Access to the Ritz-Carlton Club residences that are part of the points-based reservation system |
| | • Access to more than 50 Marriott Vacation Club Resorts |
| | • Access to the "Explorer Collection" including, among other experiences, luxury cruises, safaris, wine tours, several Ritz-Carlton Hotels and Marriott Hotels and Resorts and more |

Immediately below these two boxes, was the ultimate question:

11

> VOTE:
> ○ I want the opportunity to for Ritz-Carlton Club, Aspen Highlands Members to participate in the Marriott Vacation Club Destination exchange program
> ○ I do not want the opportunity to for Ritz-Carlton Club, Aspen Highlands Members to participate in the Marriott Vacation Club Destination exchange program
>
> If you have questions or wish to schedule a follow-up call with one of our Ladies and Gentlemen, please contact us at RCDCcommunications@ritzcarltonclub.com.
>
> The Ritz-Carlton Destination Club is also seeking your feedback on any other issues that are important to your membership at The Ritz-Carlton Club, Aspen Highlands. We encourage you to make your feedback known and share comments below.
>
> We appreciate you as a Ritz-Carlton Destination Club Member and look forward to continuing to create luxury travel experiences and cherished memories for you and your loved ones.

The e-mail came with FAQs that disclosed neither the likely negative impact on the value of Plaintiffs' fractional interests that would result from the Affiliation. Ex. 1534. The affiliation was couched as an "opportunity." Nor did the FAQs disclose that Defendants intended to implement the Affiliation regardless of the survey results. As a former Association board member Jay Neveloff succinctly put it, "There was no discussion as to the negatives- that interests our members swap will be used by hordes of time share owners, that are likely to come for shorter stays meaning wear and tear and clogging the pipeline for members who want shorter stays." Ex. 1313. Later, Mr. Neveloff stated: "I don't believe that the communication sent to members came remotely close to presenting the pros and cons." Ex. 1353.

While the survey was ongoing, the Association at Marriott's urging sent a one-sided letter to members — that Sobeck helped shape and edit — recommending that they vote in favor of the Affiliation. Exs. 1538, 1540; *see also* Ex. 1536. But very few members responded to the survey and when the results were tallied in January 2014, only 141 off the nearly 750 fractional interests sold, participated in the survey, and only 74 — nowhere close to a majority of fractional owners — "want[ed] the *opportunity* to for Ritz-Carlton Club, Aspen Highlands Members to participate in the Marriott Vacation Club Destination exchange program," to quote the language of the

question posed in the survey. Exs. 1340 at p. 3; Ex. 1356 at p. 8 (emphasis added). Sobeck noted that the poor turnout did not matter: "We decided it was probably not necessary to send a reminder about the survey since we already have a good cross section of the Membership…." Ex. 8005.

While this Christmas time survey was being conducted (December 5, 2013 to January 14, 2014), APCO was retained to conduct focus groups of RCDC members. APCO reported to MVW in a January 2014 report as follows relative to the Affiliation:

> "A related concern is whether or not allowing MVC members access to the Clubs will result in devaluing their asset; many spoke about the loss of clubs impairing the value of their asset and question if this new affiliation will result in a further decline. Another concern is competing for Club inventory with thousands of MVC members. Finally, as we heard in the survey, several of the members flat out said they do not want MVC members in their clubs." Ex. 3056.

Meanwhile, in late 2013, Defendants prepared and signed the 2013 Affiliation Agreement, the third of three different affiliation agreements. Exs. 1856, 2102. At the outset of the Ritz-Aspen, Cobalt, Ritz-Carlton Management, and the Association entered into the 2001 Affiliation Agreement appointing Cobalt (the Program Manager) with control over both the Ritz-Carlton Destination Club and the power to affiliate with external clubs. Ex. 1003. In the 2010 Affiliation Agreement, an agreement between MVW subsidiaries, Cobalt delegated the latter authority (to affiliate with external clubs) to Lion & Crown. Ex. 2101. In the 2013 Affiliation Agreement, another agreement between MVW subsidiaries, Lion & Crown affiliated the Ritz-Carlton Destination Clubs with the Marriott Vacation Club — subject to the association at each RCDC resort signing the Acknowledgment of and Joinder in the 2013 Affiliation Agreement. Exs. 2102, 1392.

In other words, while the original 2001 Affiliation Agreement may have vested Cobalt with complete control over external exchange programs with non-RCDC resorts such that the

Association *formerly* had no role in such matters, the 2013 Affiliation Agreement provided otherwise, as this Court has found. Dkt. No. 563 (MSJ Order) at pp. 17-22. Based on the Court's interpretation of the plain meaning of the 2013 Affiliation Agreement,[6] Plaintiffs have prepared a special jury instruction stating that the 2013 Affiliation Agreement provided that the Affiliation would not extend to the Ritz-Aspen unless the Association signed the Acknowledgment of and Joinder to it.[7]

The Marriott Defendants kept the 2013 Affiliation Agreement secret. They admit they never provided it to the Association board. 5/15/18 Sobeck Depo. at 170:15-20; *see also* Dkt. No. 273 at p. 9 ("It is undisputed that previously-deposed AHCA board members were unaware of the 2013 Affiliation Agreement at the time of the events in question and that they did not have a

---

[6] Among other things, the fifth "Whereas" clause of the 2013 Affiliation Agreement provides that certain members of L & C "whose members' association has executed an Acknowledgment Agreement" may participate in the MVC program. Section 3.4(f) states: "MVCD Members will not have access to those resorts available through the L&C Program that are not L&C Destinations (i.e., *where an Acknowledgment Agreement was not executed*)" (emphasis added). Section 6.9 states: "Notwithstanding anything contained herein to the contrary, MVCD Members will not be entitled to the use and benefit of any (i) Accommodations at a L&C Destination without an Acknowledgement Agreement in place...." The agreement defines "Acknowledgement Agreement" as "an Acknowledgment of and Joinder to Affiliation Agreement among MVCD, Lion & Crown, and an applicable Participating L&C Association in the form attached to this [2013 Affiliation] Agreement." The provisions of the 2013 Affiliation Agreement giving each association board the power to prevent the MVC affiliation from applying to their club by refusing to sign the "Acknowledgement Agreement" are consistent with the Amended and Restated Articles of Incorporation filed with the Colorado Secretary of State in 2000, which granted the Association control over "use rights" at the Ritz Aspen. Articles of Incorporation at Art. V, § 5.9 (the Association has the power "[t]o ... grant to, third parties beneficial use rights in and to condominium and non-condominium property." Ex. 1005 at § 5.9.

[7] That the board at each RCDC resort association had the power to prevent the Affiliation from applying to their club is also apparent in a November 2014 email exchange between Sobeck and other executives: When Richard Hayward asked: "Is the ultimate decision the boards or management company?", Sobeck succinctly responded, "Decision to affiliate? The Boards." Ex. 2213.

copy of that agreement until it was produced by the Marriott Defendants in this case").[8] There were two reasons for this: First, it revealed that the board of each RCDC association had effective veto power over the Affiliation at least at their particular club.

Second, the 2013 Affiliation Agreement contained a number of onerous provisions that the association boards would find troubling, including: (1) Section 7.1, granting MVC the unilateral right to charge exchange and renewal fees on Ritz members in its sole and absolute discretion, with no countervailing right for Lion & Crown to charge fees to MVC members; (2) Section 7.7, granting MVC the exclusive right to utilize any accommodation provided to MVC "for any purpose, including ... in MVCD's sole and absolute discretion, any purpose related to marketing, selling, or promoting the MVCD Program or other timeshare or fractional projects developed, marketed, or offered by MVCD's affiliates"; (3) Section 7.8, granting MVC the sole and absolute discretion to determine the number of exchange points required to access the RCDC; and perhaps even worse, (4) Sections 10.1 and 10.4, which affiliated the Lion & Crown with the MVC for a ten-year term with automatic five-year renewal periods, with no right of individual Ritz clubs to withdraw from the Affiliation.

While Ritz-Carlton Management may not have been the MVW subsidiary with control over affiliation with external clubs (except to the extent it was an alter ego), Ritz-Carlton Management was obligated to provide a copy of the 2013 Affiliation Agreement to the Association board when it asked the Association board to sign Exhibit 1392, the Acknowledgment of and Joinder in the 2013 Affiliation Agreement. Stephanie Sobeck, in her

---

[8] Defendants' failure to provide the 2013 Affiliation Agreement to Plaintiffs was the subject of the magistrate judge's finding that Defendants had violated Rule 26 by failing to initially produce the 2013 Affiliation Agreement. Dkt. No. 330 at 18, 21.

capacity as an officer of Ritz-Carlton Management,[9] sent Exhibit 1392 to the Association board by email on January 30, 2014 and asked that it be signed. Ex. 1353 at p. 2. Pursuant to the Management Agreement, Ritz-Carlton Management agreed to become the Association's agent and handle most functions of the Association board.

When asked at a deposition why she never provided the Association with a copy of the 2013 Affiliation Agreement that she asked the Association board to acknowledge and join by means of Exhibit 1392, Ms. Sobeck responded that the board didn't ask for a copy. 5/15/18 Sobeck Depo. at 59:14-61:7. That is a surprising excuse given that Ms. Sobeck also conceded that Ritz-Carlton Management owed fiduciary duties to the Association. *Id.* at 166:8-167:4. Indeed, in Section 2 of the Management Agreement, titled "Appointment and Acceptance of Agency," the Association delegated to Ritz-Carlton Management the power "to act on behalf of the Association and its members as the exclusive managing entity of the Condominium and to manage the daily affairs of the Condominium and the Plan," and RC Management "agree[d] to so act." Ex. 1002 at § 2. Section 4 of the Management agreement provided that Ritz-Carlton Management, "on behalf of and at the expense of, the Association, to the exclusion of all other persons including the Association and its members, shall have all the powers and duties of the Executive Board as set forth in the Declaration and the bylaws of the Association (except such thereof as are specifically required to be exercised by its directors or members)." Ex. 1002 at § 4.

Association board members Randal Mercer, Philip Schneider, Tyler Oliver, and Robert Harris will testify that the Association would not have signed the Acknowledgment of and Joinder in the 2013 Affiliation Agreement had they been provided with a copy of the 2013 Affiliation Agreement. Exs. 8013-8016.

---

[9] 11/16/17 Sobeck Depo. at 27:19-23, 31:23-25; 11/15/17 Cunningham Depo. at 379:9-17.

The Affiliation has permanently destroyed the value of Plaintiffs' property. Plaintiffs can barely give their interests away, because anyone can now access the Ritz-Aspen through the MVC without having to pay for four weeks per year and the high annual maintenance fees that fractional interest owners paid and continue to pay. Plaintiffs seek compensatory damages, disgorgement, and punitive damages. Plaintiffs' compensatory damages are the difference between what Plaintiffs' interests would be worth had they grown with the market, and what Plaintiffs' interests are actually worth due to Marriott's conduct. At the same time, the Marriott Defendants have reaped substantial profits (and will continue to profit) from the Affiliation that allows them to market access to the Ritz-Aspen to prospective MVC points purchasers. Marriott has increased prices on MVC points to account for the Ritz-Aspen access and has kept those higher prices. Marriott should be ordered to disgorge these profits it made from its fiduciary breaches.

All the people who performed work on behalf of Ritz-Carlton Management, Cobalt, and Lion & Crown during the relevant time period were executives and employees of and paid by Marriott Vacations Worldwide such that they were alter egos of each other and of Marriott Vacations Worldwide. *See* 11/10/17 Cunningham Depo. at 137:11-138:11, 138:18-140:16.

Plaintiffs assert the five causes of action discussed below.

First Cause of Action — Breach of Fiduciary Duty against Ritz-Carlton Management, Cobalt, and Lion & Crown: Ritz-Carlton Management, Cobalt, and Lion & Crown were fiduciaries and breached the duties of honesty, loyalty, good faith, and full disclosure that fiduciaries owe their beneficiaries.

Ritz-Carlton Management owed control-based fiduciary duties to Plaintiffs that this Court held do not extend to the decision to Affiliate. Dkt. No. 563 (MSJ Order) at pp. 28-29. However,

Ritz-Carlton Management assumed a broader scope of fiduciary duties in at least two respects. *Id.* at pp. 29-30.

First, in the 2001 Affiliation Agreement, Ritz-Carlton Management made a promise to the Association, which was one of the parties to that agreement, to "Fully and accurately describe the Membership Program to Members..." and not to "misrepresent the Membership Program." Ex. 1003 at § 4.1(b). Ritz-Carlton Management also agreed in the Management Agreement to become the Association's agent and perform administrative functions for the Association.[10] The fiduciary duties that result from that agency relationship extend not only to the Association, but to Plaintiffs as well.[11] Ritz-Carlton Management thus assumed a fiduciary duty of full and complete disclosure regarding the Membership Program and the Affiliation.[12]

Ritz-Carlton Management breached its' duties of loyalty and full and complete disclosure by concealing the 2013 Affiliation Agreement when it asked the Association to execute the Acknowledgment of and Joinder in that agreement. The effect of this concealment was to prevent the Association and by extension its members from learning about hidden changes that the 2013 Affiliation Agreement made to the Membership Program. As indicated, that agreement contained a number of one-sided provisions that remained entirely unknown to Plaintiffs and the Association

---

[10] An agency relationship arises from the manifestation of consent by one party (the principal) to another (the agent) that the other shall act on its behalf and subject to its control. *Stortroen v. Beneficial Finance Co. of Colorado*, 736 P.2d 391, 395 (Colo. 1987) (citing Rest.2d Agency § 1(1) (1957)). An agent owes fiduciary duties to its principal. *City & County of Denver v. Fey Concert Co.*, 960 P.2d 657, 669 (Colo. 1998); *McKinney v. Christmas*, 143 Colo. 361, 363 (Colo. 1960); Rest.2d Agency § 387 (1957).

[11] *Colorado Homes, Ltd. v. Loerch-Wilson*, 43 P.3d 718 (Colo. App. 2001) (allowing breach of fiduciary duty claims to proceed against both a homeowners' association and the management company engaged by the HOA to manage the association); *Caprer v. Nussbaum*, 36 A.D.3d 55 (2006) (finding managing agent of condominium owes fiduciary duties to individual unit owners).

[12] *Wheeler v. Carl Rabe, Inc.*, 599 P.2d 902 (Colo. 1979) (fiduciaries have "a strict duty of disclosure").

until Plaintiffs' counsel discovered the 2013 Affiliation Agreement in 2018 and demanded that it be produced.

Second, Ritz-Carlton Management assumed a broader scope of fiduciary duties by spearheading communications with members, including the Association's communications with its' membership, and also the Marriott Defendants' communications about the planned changes to the Membership Program. *See, e.g.,* 11/16/17 Sobeck Depo. at 28:6-14, 29:3-16, 31:18-32:7, 126:11-127:16, 129:15-19, 133:1-7. Ritz-Carlton Management breached these fiduciary duties by fashioning misleading communications to Plaintiffs by other members, and by failing to disclose information that its' executives knew about the Affiliation that would negatively impact the Ritz-Aspen.[13] Dkt. No. 563 (MSJ Order) at pp. 29-30.

The fact that certain MVW executives (e.g., Sobeck and Cunningham) held multiple roles across the various MVW subsidiaries does not allow them to avoid Ritz-Carlton Management's fiduciary liability by claiming they "were wearing a different hat" when misrepresenting or failing to disclose facts. As officers of Ritz-Carlton Management, Sobeck and Cunningham were required to meet the disclosure requirement applicable to fiduciaries regardless of the "hats" they were wearing at the time of the relevant communications.[14]

The fiduciary duties of Cobalt arise from its complete control over the Plaintiffs' access to their separately deeded property interests as well as its complete control over the Membership

---

[13] *German v. S.E.C.*, 334 F.3d 1182, 1189 (10th Cir. 2003) (fiduciary duty requires "reasonable care to avoid misleading" beneficiary); *Trussell v. United Underwriters, Ltd.*, 228 F.Supp. 757, 762 (D. Colo. 1964) (citing *Equitable Life Insurance Co. of Iowa v. Halsey, Stuart & Co.*, 312 U.S. 410, 424-26 (1941)) ("a half-truth is as bad as an outright lie.").

[14] *Kennedy v. Tallant*, 1976 WL 840, at *8 (S.D. Ga. Oct. 22, 1976), aff'd, 710 F.2d 711 (11th Cir. 1983) (finding duty of disclosure for controlling shareholders who wore many "hats"); *Aronoff v. Lenkin Co.*, 618 A.2d 669, 687 (D.C. 1992) (noting the agent's duty to disclose to the principal "all matters coming to [the agent's] notice or knowledge concerning the subject [ ] of the agency, which it is material for the principal to know for his protection or guidance.") (citing, *inter alia*, Rest.2d

Program.[15] In the Management Agreement, the Association gave Ritz-Carlton Management the power to "Engage a Program Manager through an affiliation agreement, who shall manage and administer the reservation procedures and exchange program for the Ritz-Carlton Club Membership Program." Ex. 1002 at § 4(S).[16] Pursuant to that authority, Ritz-Carlton Management Agreement entered into the 2001 Affiliation Agreement with Cobalt in which Cobalt was given control over the reservation procedures, inter-RCDC exchanges, and external affiliations. Ex. 1003.

Further, a fiduciary relationship arose because Cobalt became the Plaintiffs' agent through the aforementioned provisions of the Management Agreement and 2001 Affiliation Agreement. In a similar vein, Lion & Crown became Plaintiffs' fiduciary through the subagency relationship created by the 2010 Affiliation Agreement in which Cobalt delegated its authority over external affiliations to Lion & Crown.[17] The control that Lion & Crown assumed over external exchange

---

Agency § 13 (1958)).

[15] "A fiduciary relationship arises under Colorado law in situations in which one party 'has a high degree of control over the property or subject matter of another, or when the benefitting party places a high level of trust and confidence in the fiduciary to look out for the beneficiary's best interest.'" *Tara Woods Ltd. P'ship v. Fannie Mae*, 731 F. Supp. 2d 1103, 1117 (D. Colo. 2010), *aff'd*, 566 F. App'x 681 (10th Cir. 2014) (unpublished) (quoting *MDM Group Assocs., Inc. v. CX Reinsurance Co.*, 165 P.3d 882, 889 (Colo. App. 2007)); *see also Bailey v. Allstate Ins. Co.*, 844 P.2d 1336, 1339 (Colo. App. 1992) ("Generally, a fiduciary duty arises between individuals through a relationship of trust, confidence, and reliance.").

[16] The Management Agreement further provided that "The Program Manager shall have the broadest possible delegation of authority regarding administration of the Reservation Procedures." *Id.*

[17] "A subagent is 'a person appointed by an agent empowered to do so, to perform functions undertaken by the agent for the principal, but for whose conduct the agent agrees with the principal to be primarily responsible.'" *City & County of Denver,* 960 P.2d at 670. Like an agent, a subagent has fiduciary duties to the principal and "is subject to all the liabilities of an agent to the principal." *Moses v. diocese of Colorado*, 863 P.2d 310, 325 n.18 (Colo. 1993) (citing Rest.2d Agency, § 5 cmt. *d*).

programs pursuant to the 2010 Affiliation Agreement provides an alternative basis for the fiduciary duties that Lion & Crown owed to Plaintiffs.

Cobalt and Lion & Crown breached their fiduciary duties by imposing the Affiliation described above and favoring MVW's interests over Plaintiffs' interests. Defendants knew this Affiliation would allow them to reap huge financial gains from selling more Marriott Vacation Club points because the "halo effect" of the Ritz-Carlton brand and the exclusivity of the Ritz-Carlton Destination Club would be enticing to purchasers of Marriott Vacation Club points. Defendants also knew that the Affiliation would harm values at the Ritz-Aspen based on the "horn effect." Marriott Vacation Club members could obtain access to the formerly exclusive Ritz-Aspen at a price point far lower than what Plaintiffs paid.

Plaintiffs further claim that all three of these defendants breached their fiduciary duties by promising that the Affiliation would not occur without an affirmative vote from a majority of the Ritz-Aspen membership, then secretly substituting a survey that Plaintiffs claim was misleading. Plaintiffs also claim these defendants failed to act as reasonably prudent fiduciaries.

Plaintiffs are entitled to recover under this cause of action:

a.  Disgorgement of profits;

b.  Damages for diminution in value; and

c.  Prejudgment interest.

Plaintiffs are also entitled to recover exemplary damages: 1 to 3x (damages for diminution in value plus prejudgment interest).

Second Cause of Action — Constructive Fraud against Ritz-Carlton Management, Cobalt, and Lion & Crown: Ritz-Carlton Management, Cobalt, and/or Lion & Crown committed constructive fraud by reneging on their promise of a vote and by failing to disclose: (1) that the

Marriott Defendants quietly substituted a misleading survey for the promised vote and intended to carry out the Affiliation regardless of the survey results; (2) that the Affiliation would allow the defendants to profit by selling more Marriott Vacation Club points while, at the same time, harming the value of Plaintiffs' property; (3) the 2013 Affiliation Agreement and its one-sided provisions that ceded undue control over the Ritz-Aspen to the Marriott Vacation Club; and (4) that the owners' Association at the Ritz-Aspen could have prevented the Affiliation with a simple majority vote of its directors.

Plaintiffs are entitled to recover under this cause of action:

a.      Disgorgement of profits;

b.      Damages for diminution in value; and

c.      Prejudgment interest.

Plaintiffs are also entitled to recover exemplary damages: 1 to 3x (damages for diminution in value plus prejudgment interest).

Third Cause of Action — Aiding and Abetting Breach of Fiduciary Duty and Constructive Fraud against All Defendants: Marriott Vacations Worldwide, Marriott Vacation Club International, and/or Lion & Crown aided and abetted Ritz-Carlton Management, Cobalt, and/or Lion & Crown in breaching of fiduciary duties and constructive fraud. In addition, the Marriott Defendants aided and abetted the Association's breach of fiduciary duty.

Moreover, all defendants aided and abetted a breach of fiduciary duty by (1) facilitating the Affiliation that would harm Plaintiffs' property values, and (2) concealing information from the owner's Association and its members, including a contract (known as the 2013 Affiliation Agreement) that gave the Association the power to prevent the Affiliation with a majority vote of

its directors. That agreement contains one-sided provisions that were unknown to the Association and Plaintiffs at the time the Association agreed to the Affiliation.

Defendants' concealment of this information aided and abetted the Association's failure to exercise the reasonable diligence required of fiduciaries.[18] Exhibit 1392, the Acknowledgment of and Joinder in the 2013 Affiliation Agreement, mentions the 2013 Affiliation Agreement, but the Association board members never asked to see it and instead executed Exbibit 1392 without knowing the contents of the 2013 Affiliation Agreement. *See* Ex. 1392 at p. 1 (mentioning "that certain Affiliation Agreement between MRTC and Lion & Crown dated November 14, 2013 (as the same may be amended or otherwise modified from time to time solely by Lion & Crown and MRTC in their sole discretion, the 'Affiliation Agreement.')"; *id.* at p. 2 ("Association hereby acknowledges the terms of the Affiliation Agreement and joins in such Affiliation Agreement").

Plaintiffs are entitled to recover under this cause of action:

    a.    Disgorgement of profits;

    b.    Damages for diminution in value; and

    c.    Prejudgment interest.

Plaintiffs are also entitled to recover exemplary damages: 1 to 3x (damages for diminution in value plus prejudgment interest).

Fourth Cause of Action — Conspiracy against All Defendants: Marriott Vacations Worldwide, Marriott Vacation Club International, and/or Lion & Crown, in furtherance of their own financial gain, conspired with Ritz-Carlton Management, Cobalt, and/or Lion & Crown to

---

[18] *See, e.g., Command Communications, Inc. v. Fritz Companies, Inc.*, 36 P.3d 182, 188 (Colo. App. 2001); *see also* Restatement (Third) of Trusts, § 77, cmt. *c* (2007) ("lack of awareness or understanding of . . . terms" does not ordinarily excuse a trustee).

commit the above beaches of fiduciary duty and constructive fraud. Plaintiffs are entitled to recover under this cause of action:

      a.      Disgorgement of profits;

      b.      Damages for diminution in value; and

      c.      Prejudgment interest.

Plaintiffs are also entitled to recover exemplary damages. 1 to 3x (damages for diminution in value plus prejudgment interest).

      2.      <u>Fifth Cause of Action — Unjust Enrichment against Ritz-Carton Management, Cobalt, Marriott Vacations Worldwide, Marriott Vacation Club International and Lion &Crown</u>: This cause of action, which will be tried to the Court, seeks disgorgement of all ill-gotten gains obtained as a result of the wrongful conduct summarized above.

The above discussion implicitly addresses most of the Marriott Defendants' defenses, including many inaccurate factual assertions. Other defenses (e.g., advice of counsel, business judgment rule, apportionment) were waived because they were not pled in the Marriott Defendants' Answer.

**B.  <u>Defendants' Summary of the Parties' Claims and Defenses:</u>**

<u>**The Parties**</u>

This case involves The Ritz-Carlton Club, Aspen Highlands ("RC Club Aspen"), a luxury condominium located on the slopes of the Aspen Highlands ski area in Aspen, Colorado. Plaintiffs are 204 owners of approximately 230 $1/12^{th}$ deeded "fractional interests" in a specific condominium unit at RC Club Aspen. There are 876 such fractional interests in total. At the time of the MVC Affiliation discussed below, approximately 80 such interests were still owned by the developer, The Ritz-Carlton Development Company, Inc., and approximately 795 interests had

been purchased by owners, including the Plaintiffs.  Each fractional interest entitles its owner to the use of an allocated four weeks per year of the specific unit at RC Club Aspen to which the fractional interest pertains, as well as the ability to participate in any exchange programs between RC Club Aspen and other condominium resorts or vacation destinations available through those exchange programs.  Ownership of a fractional interest does not convey to its owner any rights to The Ritz-Carlton Club brand, which is owned by Marriott International, Inc. ("MI") and used by MI for its global hotel business. Defendants Marriott Vacations Worldwide Corporation ("MVW"), Marriott Ownership Resorts, Inc. ("MORI"), The Ritz-Carlton Management Company, LLC ("RC Management"), The Cobalt Travel Company, LLC ("Cobalt"), and The Lion & Crown Travel Co., LLC ("Lion & Crown") (collectively, "Defendants") either: (1) managed RC Club Aspen (RC Management); (2) operated the reservation system and exchange programs affiliated with RC Club Aspen (Cobalt and Lion & Crown); (3) developer of the MVC Trust (MORI); or (4) is the parent company (MVWC) of those Defendants that performed such activities or that developed or sold interests in RC Club Aspen. MVWC has a license agreement with MI to utilize The Ritz-Carlton Club brand for the development, marketing and sale of timeshare and fractional products.

**The RCDC Network and the Origins of the MVC Affiliation**

RC Club Aspen is one of several similar resorts known collectively as The Ritz-Carlton Destination Club ("RCDC") resorts.  Among its other advantages, fractional interest ownership allows RC Club Aspen owners to voluntarily deposit their weeks with the RCDC exchange network and seek to reserve a week at another RCDC resort ("RCDC Resort") which may become available as a result of an owner at that other RCDC Resort depositing their week and seeking an exchange. This system was put into place through the 2001 Affiliation Agreement with Defendant

Cobalt, which gave Cobalt complete control and discretion over both the internal exchange program among RCDC Resorts and the external exchange programs with non-RCDC resorts.

The original RCDC Resorts network was quite broad.  For financial and other reasons, however, several RCDC Resorts were deleted from the program in the early 2010s, and the "Great Recession" in the late 2000s made it unfeasible to build new RCDC Resorts.  As a result, fractional interest owners in RCDC Resorts who wished to exchange their weeks had fewer destination options within the RCDC Resorts network.  Recognizing this problem, Defendant Cobalt sought to increase usage options.  In 2010, Defendant Cobalt entered into an affiliation agreement with Defendant Lion & Crown (the "2010 Affiliation Agreement"), under which Lion & Crown would effectuate external exchange programs with non-RCDC resorts, thus providing additional usage options to RCDC members.  To that end, beginning in 2010, Lion & Crown entered into and implemented external exchange affiliations with Abercrombie & Kent, Third Homes, and Exclusive Resorts, pursuant to which RCDC members, including RC Aspen owners, could voluntarily deposit their weeks at their home resorts and seek to use available weeks at these other clubs depending upon what weeks were deposited by owners at these clubs.[19]  As a continuation of this process, in July 2012, Cobalt announced that the RCDC Resorts network would affiliate with the Marriott Vacation Club Destinations Exchange Program ("MVCD Program"), an exchange program that is operated by the exchange company, Marriott Resorts, Travel Co., Inc.  The parties have referred to this as the "MVC Affiliation."

**Defendants and the Association Work Together to Seek
the Owners' Input on the Proposed MVC Affiliation**

---

[19] Abercrombie & Kent offers a variety of vacation experiences that include cruises, expeditions, safaris and other guided tours for individuals and groups and private jet journeys. Third Home and Exclusive Resorts are clubs consisting largely of privately owned homes and condominium units whose owners can exchange weeks within their own club network or exchange weeks with other affiliated clubs such as RCDC.

The announcement of the proposed MVC Affiliation provoked responses from the Aspen Highlands Condominium Association, Inc. ("Association")[20], from some other RCDC Resorts owner association boards, and from some RC Club Aspen fractional interest owners, including a few of the Plaintiffs; and these responses, in turn, prompted discussions between representatives of Defendants and the Association.[21]   While the Association and the Defendants had an arm's length relationship, they worked closely and collaboratively to serve the needs of RC Club Aspen owners.   Thus, in April and May 2013, the owners received two letters from the Association and RCDC, respectively, both of which stated that RC Club Aspen would not become part of the MVC Affiliation unless a majority of members voted in favor of it.   Notwithstanding these emails, Defendants did not thereby "assume" a fiduciary duty to the members, as Plaintiffs contend.   As a matter of law, simply making, without consideration, a promise of a future benefit or performance that a party had no obligation to provide does not result in the promisor "assuming" a fiduciary duty concerning the subject of the promise.

Soon after these April/May 2013 emails were sent, Defendants began to work with their lawyers to develop a plan to implement the vote.   The RC Club Aspen's governing documents contemplate or require a formal ballot vote of a majority of the membership only with respect to specific subjects (e.g., the termination of the management agreement or, in certain instances, where unsold developer interests are being transferred).   Given this understanding and working

---

[20] The Association is the RC Club Aspen homeowners' association and is run by an independent Board of Directors elected by the owner-members.  The Association was a defendant in this case; however, on July 30, 2019, it entered into a Settlement Agreement with Plaintiffs, which the Court approved by Order dated November 12, 2019 (ECF #555).

[21] Plaintiffs' references to the fact that some RC Club Aspen owners who complained in 2012 or 2013 were, at that time, partners of Greenberg Traurig, long before Greenberg Traurig represented Defendants, should be excluded from evidence and from Plaintiffs' opening statement as being entirely irrelevant, intended solely to instill an emotional reaction, and as unduly prejudicial under Evid. Rule 403.

closely with the Association, who was represented by counsel, beginning as early as May 2013, long before the vote at Bachelors Gulch or the APCO survey,[22] Defendants and the Association determined that the most appropriate procedure for determining the members' views regarding the MVC Affiliation would be to conduct the vote through the mechanism or procedure of a survey-vote of RC Club Aspen members that would give each and every member who chose to respond, and not merely a "sampling" of owners, the opportunity to "vote" for or against the MVC Affiliation. There was no promise that the vote would be conducted through any specific mechanism or procedure, or in the same manner, such as a formal ballot vote necessary to approve certain major decisions such as terminating the management agreement.

Over the next six months, Defendants continued to work closely and collaboratively with the Association to develop the survey, to exchange drafts of documents, to craft the communications with the RC Club Aspen owners concerning the survey's content and purpose (including a several-page FAQ regarding the MVC Affiliation) and to ensure that all these materials adequately and accurately described the MVC Affiliation and its implications to the satisfaction of the Association.

The Association's main concern during this process involved Defendants' initial proposal to amend the RC Club Aspen's Declaration to permit the transfer of the developer's unsold developer owned fractional interests into the MVC Trust, a Florida land trust ("MVC Trust"), which was established for the points-based ("MVC Points") timeshare program developed by Defendant MORI. The Association's Board objected to that proposal. Defendants ultimately yielded to the Association and agreed that the Declaration would not be amended, and that no

---

[22] Plaintiffs' reference to the fact that the APCO surveys and the 2013 Affiliation Agreement were not, initially, produced in discovery cannot be put before the jury in their opening or during trial because the Court has ruled on Defendants' *in limine* motion that such references are precluded.

unsold developer owned RCC Club Aspen fractional interests would be transferred to the MVC Trust.  Having accomplished this objective, the Association fully supported the MVC Affiliation as being in the members' interests, viewing the Affiliation as providing a purely voluntary exchange alternative for those members who wanted to participate in it.

Defendants continued to work with the Association to construct and distribute the online survey, and, in early December 2013, Defendants sent the survey to the RC Club Aspen owners. In letters to members, the Association and Defendants made the survey's importance and significance clear, explaining that this survey was not like other voluntary surveys or proxies that owners may have received in the past but, rather, was being distributed pursuant to the emails the members had previously been sent and was being taken for the express purpose of ascertaining their views on the MVC Affiliation.  By proceeding in this fashion in good faith, Defendants (with the Association's assistance, participation and approval) provided the vote that had been previously offered to the members; they violated no obligation or fiduciary duty to Plaintiffs (assuming any were owed) regarding the survey-vote or by misrepresenting or failing to disclose any material facts to the members; and they did not constructively defraud Plaintiffs by misrepresenting or failing to disclose any material facts about the Affiliation or the survey-vote. In addition, Defendants had no obligation to disclose the terms of the 2013 Affiliation Agreement to the members, and no obligation to disclose the possibility of, or predictions regarding, *future* events that might arise from the Affiliation.

As to the responses:  a total of 141 responses were received, with 74 in favor of the MVC Affiliation and 67 against it.  Accordingly, the Association accepted the results of the survey and, in April 2014, having been represented by independent counsel, the Association voluntarily executed a Memorandum of Understanding and an Acknowledgement and Joinder Agreement to a

November 14, 2013 Affiliation Agreement between Marriott Resorts, Travel Co., Inc. (the MVC Program exchange company) and Lion & Crown, which had formally affiliated the MVCD external exchange program and the RCDC external exchange program.   This provided the framework for the MVC Affiliation to be adopted on an RCDC Resort-by-RCDC Resort basis as similar acknowledgment and joinder agreements were executed by each RCDC Resort's owners' association. By signing the Memorandum of Understanding and the Acknowledgement and Joinder, the Association formally demonstrated its support of the MVC Affiliation (during which time the Association and Defendants also were discussing the proposed extension of the RC Management Contract). The evidence will show that, at the time the Association signed the Acknowledgement and Joinder and the Memorandum of Understanding, the Association and its Board Members fully understood and knew that the Affiliation would permit MVCD members to use points for less than a week (or 1 or 2 days) at RC Club Aspen; that the Association could not, thereafter, terminate its agreement to the Affiliation; that MVCD could use the RC Aspen weeks deposited for MVC points for any purpose, including promotional purposes; and that the Affiliation was purely voluntary for RC Club Aspen members who did not have to join and did not have to elect to exchange their weeks if they did not like the renewal or exchange fees imposed or the points assigned to RC Club Aspen weeks.

In an April 2014 newsletter sent to all RC Club Aspen owners shortly after the Acknowledgement and Joinder had been signed, the Association advised its membership of the survey results, announced that the MVC Affiliation was being implemented, and described some of the MVC Affiliation's benefits.  In November 2014, Defendants and the Association advised RC Club Aspen owners that the MVC Affiliation would become effective at RC Club Aspen in early December 2014; thus, owners could begin exchanging their weeks for exchange points in the

MVCD Program ("MVCD Exchange Points") starting January 1, 2015.  A significant number of RC Club Aspen owners, including many Plaintiffs, have exercised this option, with some making multiple visits to MVCD resort properties or using MVCD Exchange Points for other vacation options.

Significantly, no Plaintiff claimed, either at the time the April 2014 newsletter was sent or, indeed, at any time until this lawsuit was filed in December 2015, that the MVC Affiliation should not have gone forward because the members had not "voted" on it.   Plaintiffs' failure to complain deprived Defendants and the Association of the opportunity to address any such complaints before the MVC Affiliation went into effect on January 1, 2015.  Thus, Plaintiffs are estopped from claiming that the "survey" and its results were not what was allegedly promised and offered in the April and May 2013 emails.  Plaintiffs' claims are also barred by the doctrines of laches and waiver.

Plaintiffs' failure to complain also demonstrates that none of them justifiably relied to their detriment by either acting or refraining from acting based on any alleged promise of a formal vote conducted in a particular manner by either Defendants or the Association.  While many of the Plaintiffs failed to respond to the December 2013 survey, several did respond by "voting" in favor of the MVC Affiliation, and others acted based on their own investigation of the MVC Affiliation's merits.  Plaintiffs also could not have justifiably relied on any promise by Defendants or the Association because they had no ability to stop the MVC Affiliation.  *See infra.*  Moreover, many Plaintiffs admitted at deposition that they never heard about any promise of a vote, a vote conducted in any particular manner, or were simply not following the issue at the time, thereby further negating any basis for claiming reliance.

**Plaintiffs Were Not Contractually or Legally Entitled to a**
**Vote on the MVC Affiliation, and No Fiduciary Duties Were Breached**

By virtue of their fractional interest purchases, Plaintiffs are bound to RC Club Aspen's governing documents, including a 2001 Affiliation Agreement among (a) RC Management; (b) the Association; (c) Cobalt (then known as the "Ritz-Carlton Travel Co., Inc."); and (d) the Resort's developer, The Ritz-Carlton Development Company, Inc. The 2001 Affiliation Agreement gave Cobalt the absolute right to affiliate with external exchange programs. *See* § 7.2a (giving Cobalt the right, "in its sole discretion, [to] elect to affiliate other locations with the Membership Program as Member Clubs or Associated Clubs from time to time"). The Agreement further provided that the Association was not "entitled to participate in or consent to the Program Manager's decision in this regard." *Id.*

In its March 29, 2018 Order (ECF #210 at 22-23), the Court held that the MVC Affiliation was authorized by the 2001 Affiliation Agreement and that the MVC Affiliation did not contravene, and was not prohibited by, any provisions of the RC Club Aspen Declaration or any other RC Club Aspen organizational document. Moreover, in its March 20, 2020 Order (ECF #563 at 28-29), the Court held that none of the Defendants had undertaken any fiduciary duties to Plaintiffs with respect to affiliations with external exchange programs. Specifically, and as the Court has already ruled on Plaintiffs' summary judgment motion, RC Management did not owe any fiduciary duty to either the Association or RC Club Aspen members with regard to the Affiliation because affiliation activities were not within its area of responsibility or duties, nor was it encompassed by any obligation to keep the members informed about the Membership Program because that was a contractual duty between RC Management and the Association which did not create any fiduciary duties owed to RC Club Aspen members. Similarly, as a matter of law, Cobalt and Lion & Crown did not owe RC Club Aspen members any fiduciary duties arising from either: (i) Cobalt's operation of the reservation system for RC Club Aspen or the operation of the

RC Club internal exchange program, or (ii) Lion & Crown's operation of the external exchange program for RC Club resorts. In addition, under the 2001 Affiliation Agreement RC Management was not entitled to participate in any affiliation decision by Cobalt; under 2010 Affiliation Agreement Cobalt was not entitled to participate in any external affiliation decision by Lion & Crown; and both Agreements provided that "in no event shall the terms and conditions of this Agreement be deemed in any way to inure to the benefit of any person or party not expressly made a Party hereto," thereby defeating any claim by Plaintiffs that any obligations or fiduciary duties to them arose from or under such Agreements.

Defendants also did not assume a fiduciary duty to Plaintiffs based on any promise to conduct a vote on the MVC Affiliation, or a promise to the association to keep the members informed about the Membership Program, as a mere promise to perform a future act does not, and cannot as a matter of law, give rise to the assumption of a fiduciary duty. *See supra.*

Nor did anything in either the November 2013 Affiliation Agreement or the April 2014 Acknowledgement and Joinder give RC Club Aspen owners the right to a vote on the MVC Affiliation or even to be consulted on the subject, and did not create any fiduciary duties owed to the Plaintiffs regarding the Affiliation. Those agreements did not revoke, or in any way diminish, Lion & Crown's delegated authority to affiliate RC Club Aspen with external exchange programs in general or to affiliate RC Club Aspen with the MVCD Program in particular, without participation by the members or the Association. Those Agreements merely affirm that RC Club Aspen's participation in the MVC Affiliation is voluntary, both as to the Association and to the Association's individual members. The only reason the 2013 Affiliation Agreement required RCDC owners' associations to sign an acknowledgement and joinder was to ensure those associations' cooperation in the MVC Affiliation's implementation. Thus, the April 2014

Acknowledgement and Joinder made clear that the Association's sign-off for its members to participate in the MVC Affiliation was being provided as a "special accommodation" "even though [Cobalt] was not required to obtain the association's consent." And, as noted above, even if the 2013 Affiliation Agreement contemplated or required the Acknowledgment and Joinder by the Association, that did not impose a fiduciary duty on RC Management, Cobalt or Lion & Crown, nor did they assume a fiduciary duty, with regard to such Acknowledgment and Joinder.

Likewise, without merit are Plaintiffs' claims that Defendants aided and abetted the Association's breaches of its fiduciary duties to Plaintiffs and that Defendants and the Association conspired and acted improperly together to bring about the MVC Affiliation. In addition to the above-explained reasons why the Association did not breach its fiduciary duties to Plaintiffs (or otherwise act wrongfully) by endorsing the December 2013 survey or in executing the April 2014 Acknowledgment and Joinder, the Association acted with the advice and assistance of independent counsel. Thus, the Association's actions are protected by the business judgment rule. Under that rule, the Association's Directors cannot be held liable for errors or mistakes in judgment when they (1) acted on matters calling for the exercise of their judgment or discretion; (2) used such judgment with the advice of counsel; and (3) acted in good faith. All three elements of the rule are met here. Accordingly, since the Association cannot be found to have breached a fiduciary duty to Plaintiffs arising from its acts and omissions in connection with the MVC Affiliation, Defendants cannot be liable for aiding and abetting, or conspiring regarding, any such non-breach. [23]

---

[23] Contrary to Plaintiffs' contention, the business judgment rule has been fully preserved as a defense against Plaintiffs' allegations that the Association breached its fiduciary duties to Plaintiffs, given that it was asserted in the Association's motion to dismiss; in the Association's summary judgment motion; and in the Association's Affirmative Defense No. 2 ("Plaintiffs' claims are barred in whole or in part by the business judgment rule") (Dkt. 433 at 80). In this

**Defendants Did Not Conceal the November 2013 Affiliation Agreement from the Association**

First, Plaintiffs' claims and counts do not allege any claim that Defendants breached any fiduciary duties owed to the Association or constructively defrauded the Association. Nor could Plaintiffs assert any such claim because they do not have standing to assert such claims on behalf of the Association.

Second, the April 2014 Acknowledgment and Joinder makes multiple references to the November 2013 Affiliation Agreement, which was available upon request, both to the Association and to counsel that the Association retained in connection with its Board's review of the Acknowledgment and Joinder. The provisions of the November 2013 Affiliation Agreement about which Plaintiffs now complain were also well known to the Board's Directors. In addition to the MVC Affiliation, the Association's concern at the time included ensuring that unsold fractional interests at RC Club Aspen would not be transferred to the MVC Trust such that they were made available to MVCD Program members. The Association had negotiated for and obtained Defendants' agreement on that issue and also fully supported the MVC Affiliation. *See supra.*

The Association was also represented by independent counsel when the April and May 2013 letters were drafted and distributed; when Defendants and the Association and its Board members were working together to construct the survey and to prepare the letters, notices and FAQs distributed to the members in connection with the survey; and when the Association signed

---

regard, the fact that the Association was represented by independent counsel is an element of the business judgment rule, demonstrating that the Association took appropriate steps to retain relevant expertise and counsel to advise them on their business judgment; and, in any event, this was asserted in the Association's Affirmative Defense No. 14 ("Plaintiffs' claims are barred in whole or in part because the Association was acting pursuant to the advice of its counsel") (Dkt 433 at 80). Thus, Plaintiffs have had full notice that the business judgment rule and advice of

the Memorandum of Understanding and the Acknowledgment and Joinder.   Given this independent representation, Defendants cannot be held liable for any actions that the Association took or failed to take, including, but not limited to, failing to ask for a copy of the 2013 Affiliation Agreement before signing the Memorandum of Understanding and the Acknowledgement and Joinder Agreement.   Stated differently, Defendants cannot, as a matter of law, be held liable for not providing information to the Association when the Association was represented by independent counsel and failed to request the information, knowing that such information existed based on the face of the Acknowledgement and Joinder itself.

Wishing to avoid that conclusion, Plaintiffs (incorrectly) believe that they have found a way around it.   As an express condition of their settlement with the Association (which the Court approved by Order dated November 12, 2019 (ECF #555)), the Association agreed that four of its former Directors would provide identically-worded declarations as prepared by Plaintiffs' counsel, and would testify at trial consistently with the substance of those declarations. Briefly summarized, each Director has declared that the Association would not have agreed to the 2014 Acknowledgment and Joinder had it known the 2013 Affiliation Agreement contained provisions regarding (a) the inability of the Association to unilaterally terminate the MVC Affiliation; (b) MVCD Program's ability to change the program unilaterally; (c) MVCD Program members' ability to stay for periods of between one and seven days; and (d) Defendants' ability to use any exchanged weeks for promotional stays at RC Club Aspen.   These declarations are improper under 28 U.S.C. § 201(c)(2) as they were induced and paid for as part of the settlement amount and by the settlement agreement's release of the Association and its Directors from liability. In addition, they are inconsistent with the documentary evidence, the Directors' sworn deposition

_____

counsel was and would be a defense to any claim that the Association breached its fiduciary duties

testimony, and the fact that the Association and its members were represented by independent counsel.  As noted, once the Association had negotiated for and obtained Defendants' agreement not to convey unsold developer owned fractional interests at RC Club Aspen, the Association was fully on board with the MVC Affiliation and voluntarily signed the Acknowledgement and Joinder knowing the MVC Affiliation's major aspects and implications.  As a matter of law, the former Directors' declarations and any proffered testimony consistent therewith should be excluded from evidence because it was improperly bargained and paid for by Plaintiffs and their counsel as part of the settlement agreement.

**The MVC Affiliation Caused No Injury to Plaintiffs**

Causation is a required element of all Plaintiffs' claims.  Because causation must arise from the alleged tortious conduct, to recover at trial Plaintiffs must prove that Defendants' alleged tortious conduct was a substantial and material contributing cause of, or reason for, any losses they supposedly incurred.  The Court has held that non-MVC Affiliation-related conduct is not part of the claims in this case.  Accordingly, Plaintiffs must establish causation arising solely from the tortious conduct they allege with respect to the MVC Affiliation, i.e., the implementation of the MVC Affiliation without a majority of RC Club Aspen members having formally voted in favor of it and the substitution of a survey for the supposedly promised majority of all members vote.

As an initial matter, Plaintiffs' alleged monetary losses consist entirely of the decline in the resale value of their fractional interests from their initial purchase prices.  Yet Plaintiffs' purchase contracts and the other governing documents incorporated into those contracts by reference explicitly provide that Plaintiffs' fractional interests were being purchased solely for personal use and not as an investment and that Plaintiffs had no expectation that their interests

to Plaintiffs.

would appreciate in, or retain, their value.  Thus, their claims are barred.

As for any claimed "loss," the MVC Affiliation did not alter in any way Plaintiffs' fractional interests, or Plaintiffs' ability to use their allocated four weeks at RC Club Aspen (or to exchange those weeks to visit other RCDC Resorts).  The Plaintiffs do not claim that they did not receive the full benefit of personal use of their fractional interests.  Rather, Plaintiffs received exactly what they bargained for:  a set number of nights at RC Club Aspen in the types of units they purchased, which they could either use themselves, give to guests or friends, rent to strangers, or exchange for other options.

Contrary to Plaintiffs' contention, the Affiliation could not, was not intended to, and did not, give the 400,000 MVCD members "ready" access to RCDC resorts. In addition, there is no evidence that RC Club Aspen members were hindered or unable to use their weeks as a result of the Affiliation. Indeed, the evidence will show that Plaintiffs' usage of their weeks at RC Club Aspen was the same before and after the Affiliation and was unaffected by the Affiliation.

Plaintiffs also cannot show that the MVC Affiliation was responsible for any decline in their fractional interests' resale value.  The vast majority of Plaintiffs purchased their fractional interests at RC Club Aspen before 2008, when the real estate market was booming, and prices were at an all-time high.  While the Great Recession, which began in Autumn 2008, affected all segments of society, it hit the luxury timeshare market particularly hard, setting off a nationwide decline from which the industry has still not fully recovered.  The Aspen fractional interest market suffered along with the rest of the industry, though to a somewhat lesser degree.

Likewise, unsustainable is Plaintiffs' claim that the market value of their fractional interests declined due to a loss of "exclusivity" resulting from the MVC Affiliation allowing third parties to access RC Club Aspen at a far lower cost than they had paid.  First, Plaintiffs' claimed

right of exclusivity does not exist because nothing in the governing documents for RC Club Aspen promises owners exclusivity or the right to bar others from the use of fractional interests. Additionally, any such claimed loss of exclusivity occurred long before the MVC Affiliation and resulted from a host of factors having nothing to do with the MVC Affiliation. The most significant of these factors was Plaintiffs' (and their fellow RC Club Aspen fractional interest owners') own practice of liberally renting their units to third parties. In addition, a substantial number of MVCD members already had access to RC Club Aspen before January 2015 through an "Explorer Program" offered by the MVCD Program, and the Court has held that such access by MVCD members unrelated to the MVC Affiliation is nonactionable. To the extent Plaintiffs are entitled to exclusivity and to the extent any loss of exclusivity has occurred, it is attributable to these third-party rentals and pre-MVC Affiliation access by MVCD members, which was not changed by the MVC Affiliation. As such, to the extent Plaintiffs have suffered any losses (through a diminution in their fractional interests' market value or otherwise), those losses were caused by their own conduct, by supervening, intervening or alternative causes or parties over which Defendants had no control, or by conduct the Court has held nonactionable (i.e., pre-MVC Affiliation MVCD member access). Accordingly, Plaintiffs cannot prove that the MVC Affiliation caused them to suffer any loss. Even if such causation could be established, Plaintiffs' recoverable losses would have to be proportionally reduced by what they and other RC Club Aspen members caused by their own actions in renting out their weeks or in selling at below-market prices and by the losses caused by the nonactionable pre-MVC Affiliation access by MVCD members.

Plaintiffs are also misguided in claiming that the low prices at which MVCD members could access RC Club Aspen created a lack of exclusivity that supposedly tanked the market for

their fractional interests.  In fact, it cost the average Plaintiff less to occupy a unit at RC Club Aspen than it would cost the average MVCD member to purchase the MVC Points needed to access the same unit for the same amount of time.  The annual fees paid by MVC Points owners with the necessary number of points to access a similar unit at RC Club Aspen are also close to the annual fees paid by RC Club Aspen owners.  RC Club Aspen owners also have many other benefits not enjoyed by MVCD members, including guaranteed access to their four weeks per year at their home resort.  MVCD members, by contrast, must compete with each other for the few units that are exchanged under the MVC Affiliation.

As for Plaintiffs' complaint concerning the supposedly low prices paid by MVCD members for access to RC Club Aspen, the evidence shows that non-MVCD members who rented from RC Club Aspen owners paid far less than RC Club Aspen owners to access a unit at RC Club Aspen.  (Notably, RC Club Aspen owners, including many Plaintiffs, also allow friends or family members to use their weeks to occupy a unit at no cost at all.)  Defendants will offer testimony showing that, to the extent resale prices of fractional interests at RC Club Aspen were affected by a loss of exclusivity, it was due to the thousands of non-MVCD Program renters who paid far less per night than it cost a MVCD member to obtain the necessary MVCD Exchange Points.

Finally, even if the jury were to determine that Plaintiffs have, in fact, suffered financial loss or other monetary injury, it would then need to determine whether and to what extent those injuries were caused by the acts or omissions of (1) Defendants; (2) the Association (as a result of its own breaches of fiduciary duty or other wrongdoing); and (3) Plaintiffs and other RC Club Aspen members (as a result of their rental practices, below-market sales of their fractional interests and other actions that contributed to their own injuries).  Defendants would be entitled to

a set-off, from the amount of any money judgment, that reflects the allocated fault of the Association, Plaintiffs and other RC Club Aspen members, either as contributory fault or as intervening superseding causes of any injury suffered by Plaintiffs.[24]

**Defendants Were Not Unjustly Enriched at Plaintiffs' Expense**

Defendants have not profited from the MVC Affiliation and Plaintiffs have absolutely no right to The Ritz-Carlton Club brand. Defendants are the only parties with the right to use The Ritz-Carlton Club brand for any purpose pursuant to a license agreement with MI. Under the license agreement, Defendants are expressly permitted to affiliate The Ritz-Carlton Clubs with the MVCD Program and to market MVCD accordingly, much like MI has marketed The Ritz-Carlton Hotels as a part of its portfolio of hotels that guests can use. Additionally, the MVC Affiliation was not designed to be profitable. Rather, its purpose was to provide RC Club Aspen fractional interest owners (including Plaintiffs) more vacation options. Indeed, it would be impossible to link any specific revenue stream earned by the Defendants to either the MVC Affiliation as a whole or to the RC Club Aspen's inclusion in the MVC Affiliation.

Cognizant of that impossibility, Plaintiffs base their made up theory and model of unjust enrichment on expert opinion that (1) a "co-mingling" of the Ritz-Carlton and Marriott brands occurred as a result of the MVC Affiliation (which Defendant had every right to do), thus creating

---

[24] Contrary to Plaintiffs' contention, set-off and allocation of fault have been fully preserved as a matter of law, and by Defendants' Second Affirmative Defense ("any damages that Plaintiffs may have suffered were caused by their own conduct, or by supervening, intervening or alternative causes or parties over which the Marriott Defendants did not have control") (Dkt 434 at 44); Third Affirmative Defense ("Plaintiffs have failed to take reasonable steps to mitigate, alter, reduce, or otherwise diminish their alleged damages") (Dkt 434 at 44-45); and as referenced in Defendants' opposition to the Court's approval of the settlement between Plaintiffs and the Association (Dkt. 543 at 9) (referencing the Colorado Uniform Contribution Among Tortfeasors Act, C.R.S. § 13-50.5-105). Thus, Plaintiffs have had full notice that Defendants would seek to set-off and allocate any damages caused by Plaintiffs or the actions of third parties including other RC Club members the Association.

a "halo effect" that enabled MORI to sell more MVC Points; and (2) MORI took advantage of this halo effect by artificially raising prices for MVC Points (thus generating additional "halo profits") during a series of discrete "halo periods."  The evidence shows, however, that the MVC Affiliation, which was implemented in January 2015, had no bearing or effect on the prices that MORI was able to charge for MVC Points.  The sales volume for MVC Points did not materially change as a result of the MVC Affiliation, and any post-MVC Affiliation increases in the prices for MVC Points were not caused by the MVC Affiliation and were in line with other price increases.

In attempting to defend his opinion, Plaintiffs' "halo" expert failed to make several key distinctions and recognize certain exclusivity rights the Defendants have.  Most importantly, he did not distinguish between pre-MVC Affiliation conduct and pricing decisions (evidence of which is inadmissible to prove liability, *see supra*) and post-MVC Affiliation conduct and pricing decisions.  Plaintiffs' expert's analysis improperly begins four years before the MVC Affiliation became operational (i.e., four years before January 1, 2015), yet he made no attempt to isolate the MVC Affiliation's supposed impact on MVC Points prices.  That is, he did not try to separate the alleged effects of the MVC Affiliation from the effects of permitted non-affiliation conduct that associated the Ritz-Carlton and MVCD brands long before the MVC Affiliation, and the additional benefits that could be accessed with MVC Points, changes in competition in the vacation ownership marketplace, and changes in MORI's marketing and pricing strategies over time.  In fact, the evidence does not support the "halo" theory.  Rather, it shows that MORI was able to market RCDC Resorts to potential MVC Points purchasers -- both before and after the implementation of the MVC Affiliation -- through the use of unsold developer owned fractional interests in the RCDC Resorts that were permissibly made available to MVCD members

(including access to RC Club Aspen through developer owned fractional interests both before and after the MVC Affiliation), and through use of fractional interests owned by the MVC Trust at certain RCDC Resorts both before and after the MVC Affiliation.

Further, Plaintiffs' expert admitted at deposition that he had not analyzed any "halo profits" limited to the post-MVC Affiliation period (i.e., after 2015). The Court's March 20, 2020 Order (ECF #564 at 13-15), however, states that evidence unrelated to the MVC Affiliation is inadmissible at trial with respect to issues of liability. Moreover, one of Defendants' experts is prepared to testify that limiting the analysis to the post-2015 period and using Plaintiffs' methodology would yield, not the nine-figure calculation proffered by Plaintiffs, but, rather, a calculation in the low six figures. Indeed, the calculation would be zero after correcting the major analytical errors in Plaintiffs' expert's analysis.

For example, Plaintiffs' expert failed to distinguish between non-MVC Affiliation access by MVCD members to RCDC Resorts (through developer owned fractional interests and MVC Trust-owned fractional interests) and MVC Affiliation-related access by MVCD members to RCDC Resorts, and he has no basis or methodology to identify or isolate the portion of any post-MVC Affiliation price increase that is attributable to non-MVC Affiliation access by MVCD members versus MVC Affiliation-related access by MVCD members. He also failed to distinguish between the value supposedly derived from marketing RCDC Resorts through the MVC Affiliation and that derived from the other marketing strategies that MORI used from time to time. He further failed to isolate or identify any "halo effect" that the MVC Affiliation allegedly caused with respect to RC Club Aspen in particular, as opposed to RCDC Resorts as a whole.

In addition to these flaws (any one of which is fatal to his opinion), Plaintiffs' expert's "halo profits" analysis is deficient in other respects as well. For instance, he did not use any

recognized quantitative models to measure "halo" effect and his selection of "halo" and "ordinary" periods of price increases are arbitrary, as he used no specific empirical methodology or analytical approach to determine which price changes fell into which category.  Instead, he identified the "halo" periods through a subjective, ad hoc, anecdotal review of a small number of communications over a six-year period selectively provided to him by Plaintiffs' counsel.

Likewise, Plaintiffs' expert overstated the alleged "halo profits" attributable to RC Club Aspen by improperly attributing two-thirds of the alleged "halo profits" to future profits that MVWC may obtain from the MVC Affiliation, and by allocating that alleged unjust enrichment to Plaintiffs based solely on the historical purchase prices (7-14 years *before* the MVC Affiliation) paid by Plaintiffs as compared to all historical prices paid by RCDC owners among five RCDC Resorts.  He also improperly (1) used the gross published MVC Points prices to establish MORI's price increases (rather than the net prices received from the purchasers, which would be the relevant figure for an unjust enrichment analysis); (2) failed to consider the elapsed time preceding a price increase; (3) arbitrarily eliminated two "ordinary" price increases that took place in two different years; (4) attributed two-thirds of his "halo profits" to a capitalized present value of future unjust enrichment in perpetuity, which is based on the wholly speculative assumption that the "halo price increases" are now permanently embedded in the prices for MVC Points; (5) disproportionately allocated 13.9% of any claimed "halo" price benefit to Plaintiffs when, based on usage of the MVC Affiliation at the various RCDC Resorts, the allocation would be only 2.6%; and (6) ignoring the reality that The Ritz-Carlton brand has been commingled by MI, its owner, with other Marriott brands for years.

Finally, the historical data demonstrate that relatively few MVCD members have actually vacationed at RC Club Aspen.  In addition, the MVCD Program offered MVC Points purchasers a

wide range of high-end luxury options. Therefore, making RC Club Aspen (and other RCDC Resorts) generally available to MVCD members through the MVC Affiliation did not materially benefit Defendants or cause them to gain any other advantage at Plaintiffs' expense or without giving them appropriate value.

In addition, Plaintiffs are not entitled to any form of equitable relief because they have adequate remedies at law.

### Any Diminution of Value Damages That Plaintiffs Could Recover Would Be Minimal

According to Plaintiffs' damages expert, over 95% of the diminution of value damages Plaintiffs seek is attributable to the period from 2011 to 2014. The Court's March 20, 2020 Order, however, states that evidence unrelated to the MVC Affiliation (which did not become operational at RC Club Aspen until January 1, 2015) is inadmissible at trial with respect to liability and, thus, cannot be used to measure compensatory damages. Consistent with this Court-ordered temporal limitation, Defendants' damages expert will testify that, even if all the decline in the market value of Plaintiffs' fractional interests could be attributable to the MVC Affiliation (which Defendants vigorously dispute for the reasons stated above), their collective losses from January 1, 2015 to the present would total only about $24,000. And this figure would be reduced to about $2,000 after accounting for all the factors that contributed to the decline in the market value of Plaintiffs' fractional interests.

The much larger figure calculated by Plaintiffs' damages expert should not be credited by the jury for several reasons. First, he eschewed numerous well-accepted methods of valuing real property, including the Uniform Standards of Professional Appraisal Practice and used, instead, a calculation methodology of his own creation that is not recognized in any peer-reviewed publication or elsewhere as being an appropriate or accepted valuation approach. In addition: (1)

he selected an inappropriate set of comparable properties that failed to account for the fact that RC Club Aspen is located in the lowest valued of Aspen's three submarkets; (2) he failed to make adjustments to the properties in his set to account for their relevant differences with RC Club Aspen; and (3) he failed to isolate the alleged impact of the MVC Affiliation on the properties' potential sales prices from the other factors discussed above and to apportion the loss in value among these factors.

**The Defendants' Good Faith and Other Defenses**

As a result of the facts described above, Plaintiffs' claims are barred because the Defendants conduct has at all times been undertaken with legitimate business justification and in the reasonable and good faith belief in the lawfulness of their actions.  Moreover, the Defendants are not liable for exemplary damages because Plaintiffs have not suffered any injury or damages, and to the extent Plaintiffs have suffered any injuries, they were not attended by circumstances of fraud and was not willful, wanton or without regard to the rights of Plaintiffs.

## 4.    STIPULATIONS

1.    The parties are working toward a stipulation as  to the facts set forth in an "Aspen Highlands Plaintiffs' Fact Sheet", that includes Plaintiffs' identities and any changes in ownership; the seller's identity, if different than The Ritz-Carlton Development Company, Inc.;  the date of purchase; the identity of the Fractional Interest acquired and owned by a Plaintiff; the purchase price of the Fractional Interest(s); the date of any sale of a Fractional Interest by a Plaintiff to a third party, if any,  and the sales price and terms; the amount of membership dues paid by Plaintiffs and the years paid; and whether a particular Plaintiff has ever utilized the exchange program with MVCD, rented his or her fractional interest and/or responded affirmatively or negatively to the December 2013 survey as conducted by Defendants.

2.      The parties anticipate working toward stipulating to certain non-controversial background facts prior to trial and will provide the court with the stipulations.

3.      The parties anticipate working toward stipulating to the authenticity of certain exhibits prior to trial and will provide the court with the stipulations.

4.      The parties anticipate working toward stipulating to the admissibility of certain evidence prior to trial and will provide the court with the stipulations.

### 5.      PENDING MOTIONS

| *Motion* | *Response* | *Reply* |
|---|---|---|
| Marriott Defendants' Motion to Exclude Expert Testimony of Chekitan Dev, Jonathan Simon, and R. Maurice Robinson<br><br>Dkt. # 460<br><br>August 12, 2019 | Plaintiffs' Opposition to Marriott Defendants' Motion to Exclude Expert Testimony of Chekitan Dev, Jonathan Simon, and R. Maurice Robinson<br><br>Dkt. # 499<br><br>September 6, 2019 | Marriott Defendants' Reply Brief in Further Support of Motion Exclude Expert Testimony of Chekitan Dev, Jonathan Simon, and R. Maurice Robinson<br><br>Dkt. # 520<br><br>September 20, 2019 |
| Marriott Defendants' Motion to Preclude Testimony of Plaintiffs' Expert Jon Simon Due to Improper *Ex Parte* Meeting and Communications with Marriott Defendants' Employees<br><br>Dkt. #471<br><br>August 19, 2019 | Plaintiffs' Opposition to Motion to Preclude Testimony of Plaintiffs' Expert Jon Simon Due to Improper Ex Parte Meeting and Communications with Marriott Defendants' Employees<br><br>Dkt. #509<br><br>September 9, 2019 | Marriott Defendants' Reply in Further Support of Motion to Preclude Testimony of Plaintiffs' Expert Jon Simon Due to Improper Ex Parte Meeting and Communications with Marriott Defendants' Employees<br><br>Dkt. #530<br><br>September 23, 2019 |
| MVW Defendants' Motion for Reconsideration of March 20, 2020 Order with Respect to Motion *in Limine* to Bifurcate Trial into Liability and Punitive Phases | Plaintiffs' Opposition to Marriott Defendants' Motion for Reconsideration of March 20, 2020 Order with Respect to Motion *in Limine* to Bifurcate Trial into Liability and | MVW Reply in Further Defendants' Motion for Reconsideration of March 20, 2020 Order with Respect to Motion *in Limine* to Bifurcate Trial |

| Dkt. # 569<br>April 3, 2020 | Punitive Phases  Dkt. # 573<br>April 24, 2020 | into Liability and Punitive Phases<br>Dkt. # 575<br>May 7, 2020 |
|---|---|---|
| Marriott Defendants' Motion to Restrict in Response to Court Order Denying in Part and Granting in Part the Marriott Defendants' Motions to Restrict Access<br>Dkt. # 570<br>April 9, 2020 | Plaintiffs' Opposition to Marriott Defendants' Motion to Restrict in Response to Court Order Denying in Part and Granting in Part the Marriott Defendants' Motions to Restrict Access<br>Dkt. # 572<br>April 14, 2020 | Marriott Reply in Further Support of Defendants' Motion to Restrict in Response to Court Order Denying in Part and Granting in Part the Marriott Defendants' Motions to Restrict Access<br>Dkt. # 574<br>April 28, 2020 |

In addition, Plaintiffs anticipate filing the following motions:

| Plaintiffs' Application for Fees and Costs Re: Marino and Harris Depositions.<br>Dkt. # TBD<br>Target May 14, 2020 | Note: Parties Discussing Resolution | |
|---|---|---|
| Plaintiffs' Motion to Correct Identification pf Plaintiffs-Owner of Fractional Interest and Add Proper Plaintiff-Owner to Complaint – Maria Prose.<br>Dkt # TBD<br>Target May 12, 2020 | Note: Parties Discussing Resolution and possible unopposed motion | |

## 6.     WITNESSES

**a.    Plaintiffs' Nonexpert Witnesses:**

1.      Fed. R. Civ. P. 26(a)(3)(A)(i) Witnesses: A List separately identifying Witnesses Plaintiffs expect to be Present and "May Call", except for impeachment, is annexed hereto as

**EXHIBIT "A".**[25]

2.       Fed. R. Civ. P. 26(a)(3)(A)(ii) Witnesses (testimony is expected to be presented by means of a  deposition): A List of Witnesses Plaintiffs expect to call by way of deposition is annexed hereto as **EXHIBIT "A".**

3.       Witnesses where testimony is expected to be presented by means of a deposition and, if not taken stenographically, a transcript of the pertinent portions  of the deposition testimony.  See Fed. R. Civ. P. 26(a)(3)(B). **None**.

**b.    The Marriott Defendants' Nonexpert Witnesses:**

4.       Fed. R. Civ. P. 26(a)(3)(A)(i) Witnesses: A List separately identifying Witnesses the MVW Defendants expect to be Present and "May Call", except for impeachment, is annexed hereto as **EXHIBIT "B".**

5.       Fed. R. Civ. P. 26(a)(3)(A)(ii) Witnesses (testimony is expected to be presented by means of a  deposition): A List of Witnesses the MVW Defendants expect to call by way of Deposition is annexed hereto as **EXHIBIT "B".**

6.       Witnesses where testimony is expected to be presented by means of a deposition and, if not taken stenographically, a transcript of the pertinent portions  of the deposition testimony.  See Fed. R. Civ. P. 26(a)(3)(B). **None**.

**c.    Plaintiffs' Expert Witnesses:**

7.       Fed. R. Civ. P. 26(a)(3)(A)(i) Expert Witnesses: A List separately identifying witnesses Plaintiffs' expect to be Present and "May Call", except for impeachment, is annexed hereto as **EXHIBIT "A".**

8.       Fed. R. Civ. P. 26(a)(3)(A)(ii) Expert Witnesses (testimony is expected to be

---

[25]   This witness list might change if the first stipulation referenced below above is not reached.

presented by means of a deposition): A List of Expert Witnesses Plaintiffs expect to call by way of deposition is annexed hereto as EXHIBIT "A".

9.     Witnesses where testimony is expected to be presented by means of a deposition and, if not taken stenographically, a transcript of the pertinent portions of the deposition testimony. See Fed. R. Civ. P. 26(a)(3)(B). **None**.

**d.   The MVW Defendants' Expert Witnesses:**

10.    Fed. R. Civ. P. 26(a)(3)(A)(i) Expert Witnesses: A List of Separately Identifying Expert Witnesses the MVW Defendants' expect to be present and "May Call", except for impeachment is annexed hereto as EXHIBIT "B".

11.    Fed. R. Civ. P. 26(a)(3)(A)(ii) Expert Witnesses (testimony is expected to be presented by means of a deposition): A List of Expert Witnesses the MVW Defendants Expect to Call by way of deposition is annexed hereto as EXHIBIT "B".

12.    Witnesses where testimony is expected to be presented by means of a deposition and, if not taken stenographically, a transcript of the pertinent portions of the deposition testimony. See Fed. R. Civ. P. 26(a)(3)(B). **None.**

## 7.     EXHIBITS

**a.     Plaintiffs' Initial List of Exhibits:**   Plaintiffs' Preliminary List of Exhibits is annexed hereto as EXHIBIT "C".

**b.     The MVW Defendants' Initial List of Exhibits:** The MVW Defendants' Preliminary List of Exhibits is annexed hereto as EXHIBIT "D".

**Parties' Note:** The parties anticipate that there may be instances in which they seek to offer documents not listed on Exhibits C and D. In those instances, the proposed exhibits will be furnished to the other party as soon as practicable, and the parties will attempt in good faith to

accommodate same where no prejudice has been caused.

**Plaintiffs' Note:** Plaintiffs propose the ultimate development of a single Joint Exhibit List and the joint preparation of a single set of Exhibits by both sides. The MVW Defendants agree to work where possible toward that objective.

Copies of listed exhibits must be provided to opposing counsel and any pro se party no later than 60 days before trial. The objections contemplated by Fed. R. Civ. P. 26(a)(3) shall be filed with the clerk and served by hand delivery or facsimile no later than 30 days after the exhibits are provided.

## 8.    DISCOVERY

Subject to the requirements of Fed.R.Civ.P. 26(e)(1), discovery is complete, except for the depositions of certain Plaintiffs, who have been listed as witnesses, or potential witnesses, on Plaintiffs' Witness List (Exhibit A, subject to the following: PLAINTIFFS' POSITION: The parties agree that these witnesses will be made available for deposition by Plaintiffs during the month July 2020 in Denver during one calendar week unless otherwise agreed to conduct them elsewhere.  Given COVID-19 restrictions and limitations, the parties may conduct some or all the depositions by videoconference and their counsel can choose whether they will attend in person or not.  Any of these witnesses who are not made available for deposition may not testify at trial. DEFENDANTS' POSITION: The parties agree that these witnesses will be made available for deposition by Defendants on consecutive days during the month of July 2020 in Denver unless COVID-19 restrictions and limitations make that impracticable; if depositions during July 2020 are impracticable, the depositions may take place on later dates when practicable but in no event later than 60 days before trial. If in person depositions are not practicable during that timeframe, such depositions shall take place by videoconference with no attorneys in the presence of the

witness, and any witness who is not made available may not testify at trial. Defendants will have the right to amend their trial Witness List (Exhibit B), to include these witnesses as witnesses whose testimony might be offered by deposition, after their depositions are taken.

Further, given the time between issuance of expert reports as part of expert disclosures and the time of trial, affirmative expert reports may be updated solely to account for that passage of time by no later than 75 days before the scheduled trial date, and rebuttal reports to such updated reports shall be provided by no later than 45 days before the scheduled trial date. Such updating shall be solely for the purpose of updating calculations to account for the time period between the expert reports and the updated reports, without altering or changing the expert's methodology. Pursuant to Fed.R.Civ.P. 26(e)(2), Defendants object to any modification, amendment or supplementation of any expert disclosures other than to update calculations to account solely for the passage of time. Any issue regarding the updating of reports may be brought to the attention of the Court by the party believing it is necessary.

Other than as set forth above, unless otherwise ordered upon a showing of good cause in an appropriate motion or agreed upon by the parties in a stipulation,  there will be no discovery after entry of the Final Pretrial Order.

## 9.     SPECIAL ISSUES

MVW Defendants submit that the Court should consider the following issues of law before trial:

1.     Whether, as a matter of law, a party that does not owe a fiduciary duty to a plaintiff with respect to a subject matter can nevertheless "assume" a fiduciary duty merely by making a promise, with no consideration, of some future performance with respect to that subject matter. *See, e.g., In re Thiel (Wimer & Assocs. v. Thiel)*, 2015 U.S. Dist. LEXIS 21961, at *17-*18

(W.D.N.C. Feb. 24, 2015) (rejecting claim that defendant had assumed fiduciary duty by promising to use her retirement funds to pay for plaintiff's legal services); *Garber-Cislo v. State Farm Auto. & Ins. Co.*, 2011 U.S. Dist. LEXIS 163890, at *10-*11 (E. D. Mich. Dec. 16, 2011) (dismissing breach of fiduciary duty claim premised on claim that defendant assumed fiduciary duty by promising to "carry out insurance contract in good faith," "treat policyholders consistent with all applicable legal requirements," "explain all relevant coverages under policy," and "diligently investigate the facts to determine if a claim is valid"); *Borumand v. Assar*, 2005 U.S. Dist. LEXIS 5496, at *29 (W.D.N.Y. Mar. 31, 2005) (dismissing fiduciary duty claim alleged to arise from defendant's promise to return shares purchased with plaintiff's funds because "[a] mere promise, by itself, is insufficient to establish a fiduciary duty").   Although the Court held in its Order on the summary judgement motions [Dkt 563] that "[t]he Court construes [Plaintiffs' position] as an argument that [Defendants] *assumed* additional fiduciary duties and breached those duties" (emphasis added), this issue was not specifically briefed by the parties and the case cited by the Court for this proposition, *Wheeler v. Carl Rabe, Inc*., 599 P.2d 902, 904 (Colo. 1979), is inapposite because in that case a real estate agent for the seller of property, which already owed a fiduciary duty to the seller with respect to the subject of the sale, breached that already existing fiduciary duty by failing to disclose and misrepresenting the financial condition of the buyer, which fell within the existing fiduciary duty of the agent -- i.e., the agent did not "assume" a new fiduciary duty outside of its already existing fiduciary duty. Because this is a central issue in the case, the Court would benefit by having this briefed and considering this issue before trial. This issue would also affect what can or cannot be said in Plaintiffs' opening statement to the jury and, therefore, should be considered before trial.

2.       Whether Plaintiffs should be permitted to contend that MVW Defendants

constructively defrauded Plaintiffs by failing to inform the Plaintiffs that MVW Defendants wanted the Affiliation in order to make profits by selling more points in the MVC Trust (see Pretrial Section 3.B), because: (a) no such contention or allegation was asserted in the Seventh Amended Complaint, in any discovery responses, or in any prior submissions to the Court and, therefore, has been waived; (b) the contention ignores the MVW Defendants' exclusive right to utilize The Ritz-Carlton Club brand and the fact that the Plaintiffs have no rights to the brand; and (c) as a matter of law, a claim of constructive fraud must be based on a failure to disclose *past or present facts*, and cannot be based on a party's undisclosed *motivations* concerning *future* events or consequences that may, or may not, occur.  *See High Country Movin', Inc. v. U.S. W. Direct Co.*, 839 P.2d 469, 471 (Colo. App. 1992) (fraud cannot be based on defendant's failure to disclose intention regarding future events), citing Restatement (Second) of Torts § 530(1)); *Burman v. Richmond Homes Ltd.*, 821 P.2d 913, 921 (Colo. App. 1991) (action for fraud must be based on a false representation of a past or present material facts, and not on failure to disclose future events).  This issue would also affect what can or cannot be said in Plaintiffs' opening statement to the jury and, therefore, should be considered before trial.

3.     Plaintiffs contend that these are not "unusual" issues of law within the meaning of this Pretrial Order and are simply alerting the court of issues they will raise in a trial brief. The Marriott Defendants raise issues and then make arguments in the context of this Pretrial Order. Plaintiffs will brief and issues properly brought forth by the Marriott Defendants in a Trial Brief or otherwise.

## 10.     SETTLEMENT

a.     Counsel for the parties and representative of the parties engaged in two separate in person sessions of mediation with Mediated Solutions, San Francisco, California. These formal

mediations occurred in June 2018 and December 2019, and, despite lengthy sessions, no settlement was reached between these parties.

b.      The participants in the mediation above, included all named counsel above and party  representatives for Plaintiffs and the MVW Defendants.

c.      The parties were promptly informed of all offers of settlement.

d.      Counsel for the parties do not intend to hold any more formal mediations but have stayed engaged from time to time about resolution of the claims by compromise.

e.      It appears from the discussion by all counsel that  there is: some possibility of settlement.

f.      Counsel  for  the  parties  have  considered  ADR  in  accordance  with  D.C. COLO.LCivR.16.6 and have engaged in the two mediations set forth above.

## 11.     OFFER OF JUDGMENT

Counsel and any pro se party acknowledge familiarity with the provision of rule 68 (Offer of Judgment) of the Federal Rules of Civil Procedure.  Counsel have discussed it with  the clients against whom claims are made in this case.

## 12.     EFFECT OF FINAL PRETRIAL ORDER

Hereafter, this Final Pretrial Order will control the subsequent course of this action and the trial and may not be amended except by consent of the parties and approval by the  court or by order of the court to prevent manifest injustice.  The pleadings will be  deemed merged herein.  This Final Pretrial Order supersedes the Scheduling Order.  In  the event of ambiguity in any provision of this Final Pretrial Order, reference may be  made to the record of the pretrial conference to the extent reported by stenographic  notes and to the pleadings.

## 13.     TRIAL AND ESTIMATED TRIAL TIME; FURTHER TRIAL  PREPARATION PROCEEDINGS

1.      Pursuant to the Court's March 20, 2020 Order (ECF #564 at 24), trial of Plaintiffs' first cause of action for breach of fiduciary duty, second cause of action for constructive fraud, third cause of action for aiding and abetting breach of fiduciary duty, and fourth cause of action are to a jury, and trial of Plaintiffs' fifth cause of action for unjust enrichment is to the Court. MVW Defendants' Motion for Reconsideration of March 20, 2020 Order with Respect to Motion in Limine to Bifurcate Trial into Liability and Punitive Phases (ECF #569) is pending.

2.      Plaintiffs estimate that the single trial for both phases will be 8 -10 days.  The MVW Defendants estimate that the trial time will be 13-14 days for the jury trial and 1-2 days for the bench trial.

3.      The trial shall take place at the United States District Court Alfred A. Arraj United States Courthouse, 901 19th Street, Denver, CO 80294 / Courtroom A701.

DATED this_____day of May, 2020.

                                                           BY THE COURT


                                                           _____
                                                           United States Magistrate Judge
                                                           Gordon P. Gallagher


          APPROVED:

          /s/ Matthew C. Ferguson
          Matthew C. Ferguson, #25687
          119 South Spring, Suite 201
          Aspen, Colorado 81611
          *Counsel for Plaintiffs*


          /s/ Michael J. Reiser
          Michael J. Reiser
          Law Office of Michael J. Reiser
          1475 N Broadway, Suite 300

Walnut Creek, CA 94596
*Counsel for Plaintiffs*

/s/ <u>Tyler R. Meade</u>
Tyler R. Meade
The Meade Firm P.C.
12 Funston Ave., Suite A
San Francisco, CA 94129
Telephone: (415) 724-9600
*Counsel for Plaintiffs*

/s/ <u>Linda Pham Lam</u>
Linda Pham Lam
Michael Schrag
Gibbs Law Group LLP
505 14th Street, Suite 1100
Oakland, CA 94612
*Counsel for Plaintiffs*


/s/ <u>Ian S. Marx, Esq.</u>
Ian S. Marx, Esq.
MarxI@gtlaw.com
Philip R. Sellinger, Esq.
SellingerP@gtlaw.com
Greenberg Traurig, LLP
500 Campus Drive, Suite 400
Florham Park, New Jersey 07932
*Counsel for the Marriott Defendants*