# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Case No. 16-01301-PAB-GPG

RCHFU, LLC, et al.

      Plaintiffs,

v.

MARRIOTT VACATIONS WORLDWIDE CORPORATION, *et al*.

      Defendants.

---

## MVW DEFENDANTS' WITNESS LIST:
## EXHIBIT B TO THE PRETRIAL ORDER

---

Defendants Marriott Vacations Worldwide Corporation ("MVWC"), Marriott Ownership Resorts, Inc. ("MORI"), The Ritz-Carlton Management Company, LLC ("RC Management"), The Cobalt Travel Company, LLC ("Cobalt"), and The Lion & Crown Travel Co., LLC ("L&C") ("MVW Defendants" or "Defendants") identify the following witnesses they will or may call in connection with their defensive case[1]:

---

[1] MVW Defendants make no representation at this time as to the order in which such witnesses will or may be called at trial. MVW Defendants also reserve the right to call any witness listed the Plaintiffs' witness list, including but not limited to any witnesses who may not actually be called at the time of trial by MVW Defendants in their defensive case. Finally, MVW

A. **Nonexpert witnesses**

(1) <u>witnesses who will be present at trial</u>.

*a.   Stephanie Sobeck Butera*

Ms. Sobeck Butera is expected to provide testimony concerning the following subjects:

i.     The Ritz-Carlton Club, Aspen Highlands, The Ritz-Carlton Destination Club and the Marriott Vacation Club Destinations program, including the agreements and documents governing, relating to or concerning these resorts and programs.

ii.    All aspects of the affiliation between The Ritz-Carlton Club and the Marriott Vacation Club Destinations program (the "MVC Affiliation"), including the benefits to members of The Ritz-Carlton Club ("RCC Members") from the MVC Affiliation -- including the MVC properties to which they would have access; the alleged "promise" not to proceed with the MVC Affiliation without a vote of RCC Members; and other affiliation opportunities previously provided to RCC Members.

iii.   All aspects of the vote conducted of Aspen Members concerning the MVC Affiliation, including communications with the Board of Directors of the Aspen Highlands Condominium Association ("AHCA") with respect to the vote, and the process and results as well as with respect to the extension of the Management Agreement for The Ritz-Carlton Club, Aspen Highlands.

iv.    All aspects of the announcement of the MVC Affiliation and the response thereto by Aspen Members.

v.     All aspects of access by members of the Marriott Vacation Club Destinations program ("MVC Members") to The Ritz-Carlton Club,

---

Defendants reserve the right to call any additional witnesses and as-of-yet unanticipated witnesses not otherwise listed herein as may be necessary for impeachment or on rebuttal in the trial.

Aspen Highlands, including the cost of gaining access and rights to marketing such access.

vi.  The membership dues Aspen Members have been required to pay.

vii.  All aspects of the revenues received by the MVW Defendants from sale of MVC Points, including revenues attributable to access to The Ritz-Carlton Club generally and The Ritz-Carlton Club, Aspen Highlands, in particular.

viii.  All aspects of the operations of The Ritz-Carlton Club, The Ritz-Carlton Destination Club and the Marriott Vacation Club Destinations program, including de-flagging of any such club, and the re-engineering of the luxury segment of Marriott Vacation Club's product offerings.

b.  *Ivan Skoric*

Mr. Skoric is expected to provide testimony concerning the following subjects:

i.  All aspects of the sales of fractional interests at The Ritz-Carlton Club, Aspen Highlands, including documents and records relating to those sales.

ii.  All aspects of the Aspen real estate market, including documents and records relating to the market.

iii.  All aspects of the practice of Aspen Members renting their fractional interests to non-members, and MVC member access to The Ritz-Carlton Club, Aspen Highlands, including the impact of such rentals and MVC member access on the resale market for fractional interests in The Ritz-Carlton Club, Aspen Highlands.

iv.  All aspects of the factors that caused fractional interests in The Ritz-Carlton Club, Aspen Highlands to decrease in value, including but not limited to the impact of the financial crisis in 2008 and thereafter, the location of The Ritz-Carlton Club, Aspen Highlands relative to other locations in the overall Aspen real estate market, and changes in the market for timeshares and fractional interests.

c.   *Stephen Weisz*

Mr. Weisz is expected to provide testimony concerning the following subjects:

   i.   the impact of the Great Recession on the market for luxury fractional interest and on the business of MVC and RCC;

  ii.   general background concerning the MVW Defendants and their businesses;

 iii.   general background regarding the license agreements between the MVW Defendants and Marriott International, Inc.

 iv.   general background on the "re-engineering" of The Ritz-Carlton Club and its luxury segment (including the use of developer owned inventory by MVC and the deposit thereof into the MVC Trust) as well as the MVC Affiliation.

d.   *Mary Lynn Clark*

Ms. Clark is expected to provide testimony concerning the following subjects:

> All aspects of the MVC Affiliation, including her role therein and the benefits to the RCC Members from the MVC Affiliation, including the MVC properties to which they would have access.

e.   *Nicholas Rossi*

Mr. Rossi is expected to provide testimony concerning the following subjects:

i.   Access by MVC Members to The Ritz-Carlton Club, Aspen Highlands, including documents concerning such access.

ii.   Occupancy and usage of The Ritz-Carlton Club, Aspen Highlands, including by Aspen Members, MVC Members, guests and renters of Aspen Members, including documents concerning such occupancy and usage.

*f.*   *Daniel Hicks*

Mr. Hicks is expected to provide testimony concerning the following subjects:

   i.    Access by MVC Members to The Ritz-Carlton Club, Aspen Highlands, including both before and after the MVC Affilation, including documents concerning such access.

   ii.   Occupancy and usage of The Ritz-Carlton Club, Aspen Highlands, including by Aspen Members, MVC Members, guests and renters of Aspen Members, including documents concerning such occupancy and usage.

   iii.   Usage by Aspen Members of the Marriott Vacation Club Destinations program, including documents concerning such usage.

   iv.   Aspen Members' rentals of their fractional interests, including documents concerning such rentals.

   v.    The cost of gaining access to The Ritz-Carlton Club, Aspen Highlands, borne by Members of the Marriott Vacation Club Destinations program and to Members of The Ritz-Carlton Club, Aspen Highlands, and documents concerning such costs of access.

*g.*   *Urcil Peters*

Mr. Peters is expected to provide testimony concerning the following subject:

Consumer surveys, including those concerning the purchase of points in the MVC Trust, including the preferences of potential purchasers and the potential impact of the MVC Affiliation on potential purchasers of MVC Points, including documents and reports concerning such surveys.

h.   *Zachary Sonberg*

Mr. Sonberg is expected to provide testimony concerning the following subject:

> All aspects of the prices charged by MORI for MVC Points in the MVW Trust, including the means and methods by which the price for Points is set and changed, incentives and other discounts that are offered to potential purchasers of MVC Points, and all documents concerning the pricing of MVC Points.

(2) <u>witnesses who may be present at trial if the need arises</u>.

a. <u>*Richard Hayward*</u>

Mr. Hayward is expected to provide testimony concerning the following subjects:

i.   The membership dues Aspen Members have been required to pay, including all documents concerning such fees.

ii.   Access by MVC Members to The Ritz-Carlton Club, Aspen Highlands, including access in connection with the marketing of MVC Points sales, including documents concerning such access.

iii.   The marketing of MVC Points based on access to The Ritz-Carlton Club, Aspen Highlands, including all documents concerning such marketing and rights to marketing such access.

iv.   General background regarding the license agreements between the MVW Defendants and Marriott International, Inc.

b. <u>*Lee Cunningham*</u>

Mr. Cunningham is expected to provide testimony concerning the following subjects:

i.   The Ritz-Carlton Club, Aspen Highlands, The Ritz-Carlton Destination Club and the Marriott Vacation Club Destinations program, including the agreements and documents governing, relating to or concerning these resorts and programs.

ii.     All aspects of the MVC Affiliation, including the benefits to RCC Members from the MVC Affiliation -- including the MVC properties to which they would have access; the alleged "promise" not to proceed with the MVC Affiliation without a vote of RCC Members; and other affiliation opportunities previously provided to RCC Members.

iii.    All aspects of the vote conducted of Aspen Members concerning the MVC Affiliation, including communications with the Board of Directors of the AHCA with respect to the vote, and the process and results as well as with respect to the extension of the Management Agreement for The Ritz-Carlton Club, Aspen Highlands.

iv.     All aspects of the announcement of the MVC Affiliation and the response thereto by Aspen Members.

v.      All aspects of access by MVC Members to The Ritz-Carlton Club, Aspen Highlands, including the cost of gaining access and the rights to market such access.

vi.     The membership dues Aspen Members have been required to pay.

vii.    General background regarding the license agreements between the MVW Defendants and Marriott International, Inc.

viii.   All aspects of the revenues received by the MVW Defendants from sale of MVC Points, including revenues attributable to access to The Ritz-Carlton Club generally and Ritz-Carlton Club, Aspen Highlands, in particular.

ix.     All aspects of the operations of The Ritz-Carlton Club, The Ritz-Carlton Destination Club and the Marriott Vacation Club Destinations program, including de-flagging of any such club, and the re-engineering of the luxury segment of Marriott Vacation Club's product offerings.

   *c.   Evelyn Babich*

Ms. Babich is expected to provide testimony concerning the MVC Affiliation, its implementation and administration, the "evolution" of The Ritz-Carlton Club,

communications sent to RCC, Aspen and MVCD Members, the role, activities and communications of the Member Services departments of the MVW Defendants and documents relating thereto.

### d.   Lori Philips

Ms. Philips is expected to provide testimony concerning association governance, elections, minutes, documents and other issues relating to the Aspen Highlands Condominium Association.

### e.   Nicholas Dimeglio

Mr. Dimeglio is expected to provide testimony concerning The Ritz-Carlton Club, Aspen Highlands, including the general conditions of the resort, the access and experience of guests and all documents relating to the condition, access to and guests at the resort.

### f.   John Hearns

Mr. Hearns is expected to provide testimony concerning The Ritz-Carlton Hotel Company, including services provided by it to The Ritz-Carlton Club, Aspen Highlands and the MVC Affiliation.

### g.   Lani Kane-Hannan

Ms. Kane-Hanan is expected to provide testimony concerning the following subjects: (i) the impact of the Great Recession on the market for luxury fractional interest; (ii) general background concerning the MVW Defendants and their businesses; (iii) general background on the "re-engineering" of The Ritz-Carlton Club and its luxury segment as well as the MVC Affiliation.

### h.   Nicole Verrecchia

Ms. Verecchia is expected to provide testimony concerning the vote regarding the MVC Affiliation administered to Aspen Members by Morrow & Company and documents and records relating thereto.

### i.   Stacey Jackson-Rauso

Ms. Jackson-Rauso is expected to provide testimony concerning the sale of fractional interests at The Ritz-Carlton Club, Aspen Highlands.

### j.   *Representative Plaintiffs*

Defendants reserve the right to call a representative group of up to ten Plaintiffs to testify (from amongst the group identified in Section A(3) below). Defendants will specifically identify the particular Plaintiffs who may be called 60 days before trial. The Plaintiffs are expected to testify concerning issues pertaining to Plaintiffs' allegations and their ownership of fractional interests in The Ritz-Carlton Club, Aspen Highlands, including the resale value of such fractional interests, the location of the resort, the owners' rental of their fractional interests, the impact of the Great Recession and other external factors on the value of their fractional interests, the alleged "promise" of a vote on the MVC Affiliation (including the plaintiffs' alleged reliance on any such promise), communications to and from the Aspen Members by and to the AHCA and the MVW Defendants, notification to the Aspen Members that the MVC Affiliation was proceeding and the actions (or inactions) of the Aspen Members following such notification.

### k.   *Robert Harris*

Mr. Harris is expected to provide testimony concerning issues pertaining to Plaintiffs' allegations and the MVW Defendants' defenses, including Plaintiffs' ownership of fractional interests in The Ritz-Carlton Club, the alleged "promise" of a vote on the MVC Affiliation, communications to and from the Aspen Members by and to the AHCA and the MVW Defendants, notification to the Aspen Members that the MVC Affiliation was proceeding and the actions (or inactions) of the Aspen Members following such notification, the survey conducted in connection with the MVC Affiliation, the board members' negotiations with Defendants to prevent the conveyance of developer interests into the MVC Trust, the Board members' knowledge concerning the Affiliation and how it would operate, the negotiation and signing of the Acknowledgment and Joinder and the Memorandum of Understanding, and negotiation of changes to the RC Management Agreement.

### l.   *Randal Mercer*

Mr. Mercer is expected to provide testimony concerning issues pertaining to Plaintiffs' allegations and the MVW Defendants' defenses, including Plaintiffs' ownership of fractional interests in The Ritz-Carlton Club, the alleged "promise" of a vote on the MVC Affiliation, communications to and from the Aspen Members by and to the AHCA and the MVW Defendants, notification to the Aspen Members that the MVC Affiliation was proceeding and the actions (or inactions) of the Aspen Members following such notification, the survey conducted in connection with the MVC Affiliation, the board members' negotiations with Defendants to prevent the conveyance of developer interests into the MVC Trust, the Board members' knowledge concerning the Affiliation and how it would operate, the negotiation and signing of the Acknowledgment and Joinder and the Memorandum of Understanding, and negotiation of changes to the RC Management Agreement.

### m. _Tyler Oliver_

Mr. Oliver is expected to provide testimony concerning issues pertaining to Plaintiffs' allegations and the MVW Defendants' defenses, including Plaintiffs' ownership of fractional interests in The Ritz-Carlton Club, the alleged "promise" of a vote on the MVC Affiliation, communications to and from the Aspen Members by and to the AHCA and the MVW Defendants, notification to the Aspen Members that the MVC Affiliation was proceeding and the actions (or inactions) of the Aspen Members following such notification, the survey conducted in connection with the MVC Affiliation, the board members' negotiations with Defendants to prevent the conveyance of developer interests into the MVC Trust, the Board members' knowledge concerning the Affiliation and how it would operate, the negotiation and signing of the Acknowledgment and Joinder and the Memorandum of Understanding, and negotiation of changes to the RC Management Agreement.

### n. _Gerald Marsden_

Mr. Marsden is expected to provide testimony concerning issues pertaining to Plaintiffs' allegations and the MVW Defendants' defenses, including Plaintiffs' ownership of fractional interests in The Ritz-Carlton Club, the alleged "promise" of a vote on the MVC Affiliation, communications to and from the Aspen Members by and to the AHCA and the MVW Defendants, notification to the Aspen Members that the MVC Affiliation was proceeding and the actions (or

inactions) of the Aspen Members following such notification, the survey conducted in connection with the MVC Affiliation, the board members' negotiations with Defendants to prevent the conveyance of developer interests into the MVC Trust, the Board members' knowledge concerning the Affiliation and how it would operate, the negotiation and signing of the Acknowledgment and Joinder and the Memorandum of Understanding, and negotiation of changes to the RC Management Agreement.

o.  *Philip Schneider*

Mr. Schneider is expected to provide testimony concerning issues pertaining to Plaintiffs' allegations and the MVW Defendants' defenses, including Plaintiffs' ownership of fractional interests in The Ritz-Carlton Club, the alleged "promise" of a vote on the MVC Affiliation, communications to and from the Aspen Members by and to the AHCA and the MVW Defendants, notification to the Aspen Members that the MVC Affiliation was proceeding and the actions (or inactions) of the Aspen Members following such notification, the survey conducted in connection with the MVC Affiliation, the board members' negotiations with Defendants to prevent the conveyance of developer interests into the MVC Trust, the Board members' knowledge concerning the Affiliation and how it would operate, the negotiation and signing of the Acknowledgment and Joinder and the Memorandum of Understanding, and negotiation of changes to the RC Management Agreement.

p.  *Michael Marino*

Mr. Marino is expected to provide testimony concerning issues pertaining to Plaintiffs' allegations and the MVW Defendants' defenses, including Plaintiffs' ownership of fractional interests in The Ritz-Carlton Club, the alleged "promise" of a vote on the MVC Affiliation, the survey conducted in connection with the MVC Affiliation, the board members' negotiations with Defendants to prevent the conveyance of developer interests into the MVC Trust, the Board members' knowledge concerning the Affiliation and how it would operate, the negotiation and signing of the Acknowledgment and Joinder and the Memorandum of Understanding, and negotiation of changes to the RC Management Agreement.

(3) <u>witnesses where testimony is expected to be presented by means of a deposition and, if not taken stenographically, a transcript of the pertinent portions of the deposition testimony.</u>

a.   Defendants intend to present testimony by means of deposition of the following Plaintiffs, concerning issues pertaining to Plaintiffs' allegations and their ownership of fractional interests in The Ritz-Carlton Club, Aspen Highlands, including the resale value of such fractional interests, the location of the resort, the owners' rental of their fractional interests, the impact of the Great Recession and other external factors on the value of their fractional interests, the alleged "promise" of a vote on the MVC Affiliation (including the plaintiffs' alleged reliance on any such promise), communications to and from the Aspen Members by and to the AHCA and the MVW Defendants, notification to the Aspen Members that the MVC Affiliation was proceeding and the actions (or inactions) of the Aspen Members following such notification.  The page and lines of the pertinent portions of the deposition testimony will be disclosed, pursuant to Rule II(E)(2) of Judge Brimmer's Practice Standards, 45 days before trial:

      i.  Jeffrey Bayer
     ii.  Michael Bornstein
   iii.  Paul Brunswick
   iv.  Charlotte Buchanan
    v.  Monica Campanella
   vi.  Kevin Clare
  vii.  Jennifer Colson
 viii.  Toby Cone
   ix.  Perry Cox
    x.  Richard Davis
   xi.  Dennis Egidi
  xii.  Fred Friedman
 xiii.  Thomas Friermood
 xiv.  Dennis Gable
  xv.  Ronald Glazer
 xvi.  Frank Greico
xvii.  Carol Hidalgo
xviii.  Greg Jacobson

    xix.  Annette Kalcheim
    xx.  Jennifer Kaplan
    xxi.  Pat Lattore
    xxii.  Jeremy Lowell
    xxiii.  Lori Jagoda Lowell
    xxiv.  Vladimir Malakhov
    xxv.  Carol McCluer
    xxvi.  John McEvoy
    xxvii.  Lisa Miller
    xxviii.  Dee Nowell
    xxix.  Michael Pacin
    xxx.  Anthony Prinster
    xxxi.  Thomas Prose
    xxxii.  John Rubin
    xxxiii.  Joel Schneider
    xxxiv.  John Schultz
    xxxv.  Robert Sklar
    xxxvi.  Jacob Slevin
    xxxvii.  Heyward Taylor
    xxxviii.  William Waxman
    xxxix.  Stephen Weinstein
    xl.  Clair White
    xli.  Edward Zelnick
    xlii.  Jack Zemer
    xliii.  Any additional Plaintiffs whom plaintiffs identify on their Witness List and who are made available for deposition pursuant to the Court's Pre-Trial Order.

b. Defendants intend to present testimony by means of deposition of the following non-Parties, concerning issues pertaining to Plaintiffs' allegations and the MVW Defendants' defenses, including Plaintiffs' ownership of fractional interests in The Ritz-Carlton Club, Aspen Highlands, including the resale value of such fractional interests, the location of the resort, the owners' rental of their fractional interests, the impact of the Great Recession and other external factors on the value of Plaintiffs' fractional interests, the alleged "promise" of a vote on the MVC Affiliation (including the plaintiffs' alleged reliance on any such promise), communications to and from the Aspen Members by and to the AHCA and the MVW Defendants,

notification to the Aspen Members that the MVC Affiliation was proceeding and the actions (or inactions) of the Aspen Members following such notification, the survey conducted in connection with the MVC Affiliation and services provided by APCO Worldwide, Inc.  The page and lines of the pertinent portions of the deposition testimony will be disclosed, pursuant to Rule II(E)(2) of Judge Brimmer's Practice Standards, 45 days before trial

    i.    Robert Harris
    ii.    Randal Mercer
    iii.    Tyler Oliver
    iv.    Gerald Marsden
    v.    Jay Neveloff
    vi.    Philip Schneider
    vii.    Michael Marino
    viii.    Michael Mullenix
    ix.    Juan Pablo Cappello
    x.    William Dalbec

B. **Expert witnesses**:

(1) witnesses who will be present at trial.

a.  *Alan Tantleff*

    i.  Mr. Tantleff will offer an affirmative opinion, consistent with and encompassing the opinions expressed in his expert reports and deposition testimony in this case, including the following:

Interest in Shared Ownership projects (such as Fractional Interest projects or Private Residence Clubs ("PRCs"))), like The Ritz-Carlton Aspen Highlands ("Ritz Aspen") peaked in 2007, with the advent of a deep and prolonged economic recession, known as the Great Recession. Market volatility, diminished household wealth, financing difficulty, and a reduced appetite for risk and investments led to a decline in the sales beginning in 2008.

Simultaneously, improved technology, including the development of home-sharing websites, increased the supply and ease of booking of vacation rental

properties.  This encouraged consumer interest in vacation flexibility, and further depressed sales in Shared-Ownership products such as Ritz Aspen.

Plaintiffs attribute the diminution in the value of their fractional interests to the MVC Affiliation.  But, even if the MVC Affiliation had some impact on value, it was, as demonstrated above, not the sole factor; and there is no way to apportion the loss of value attributable to any one of the various factors contributing to the overall decline.

Moreover, Plaintiffs' claim that the MVC Affiliation diminished the value of their interests also ignores that:  1) many of the Plaintiffs acquired their interests pre-Great Recession, at the height of the market; 2) Shared-Ownership interests, like other luxury goods, depreciate in value immediately after purchase; 3) this lawsuit and the surrounding publicity negatively impacted Ritz Aspen fractional value; and 4) Plaintiffs have already received the use value of their fractional interests, as well as the benefits from the MVC Affiliation.

The foregoing conclusions are based on several opinions, including the following:

1. The majority of Plaintiffs purchased their fractional interests in 2001 to 2005, prior to the Great Recession and during a recognized Real Estate "Bubble" – i.e., a time when real estate prices were inflated and not economically sustainable.  During this period, sales volume for fractional interests increased from $513 million to $2.3 billion in 2007.

2. Fractional interest and PRC sales volumes declined from 2007 through 2017 (with only a modest uptick in 2016), dropping from $2.3 billion to $175 million, a decrease of 89.6%.

3. As a result of the declining interest in fractional interests and PRCs, sales in existing projects (like Ritz Aspen) virtually ceased and development of new projects slowed substantially.  From 2007 to 2017, the number of active fractional interest/PRCs in the United States declined 66.7%, despite the fact that developers dramatically reduced the pricing of unsold inventory.  The drop was most rapid in

the five years following the Great Recession (2008-2012), when the number of active projects in the United States declined from 153 to 80, or 47.7%.

4. The growth and market acceptance of (i) home sharing sites, (ii) online travel agents, and (iii) a secondary market for the sale of fractional units have all converged to encourage vacation flexibility and undermine demand for fractional interests.

5. Because Shared-Ownership interests are not a generally sought-after product, developers expend significant amounts for marketing these products. These costs are reflected in Shared-Ownership interest sales prices, and account for the depreciation in value immediately after sale.

6. Plaintiffs' actions have negatively impacted their fractional interest values.

    a. Owners, through pre- and post-affiliation rentals and other grants of access to non-members, have, from the inception, permitted exactly the same third-party access they contend was introduced by the MVC Affiliation and caused property value to decline. It is impossible to segregate any such negative impact. Renters used thousands of nights at RCC Aspen before the MVC Affiliation occurred. After 2015, only a fraction of the total net available room nights were available through MVC Affiliation exchange. Thus, even if the negative impact of the MVC Affiliation access could be calculated, it would be negligible.

    b. In addition, MVC Member access pre-dated the MVC Affiliation. It is impossible to segregate any negative impact caused by the MVC Member access, either before or after the MVC Affiliation. As early as 2010, MVCD members were using Ritz Aspen developer inventory through the MVCD Explorer Program. From 2013-2015, the number of nights used by MVC members (through developer inventory, and later

through exchange) was roughly equivalent to the nights rented to third parties by Owners (without the added use by those otherwise gifted access by Owners); and, in both 2016 and 2017, and thereafter, rental nights exceeded nights used by MVCD Exchange Program. Additionally, MVCD Members are only able to use nights made available by Owners who elect to exchange with MVC. During 2015 and 2016, and thereafter, a small percentage of the total net available room nights were available through MVC Affiliation exchange. Thus, even if the negative impact of MVC access could be calculated, it would be negligible.

c. Owners sold their interests without regard to sales proceeds. Indeed, sellers often tried to lower their prices to undercut competing owners, thereby sending prices into a "downward spiral."

d. Plaintiffs' lawsuit and the surrounding publicity likely harmed marketability of the Ritz Aspen fractional interests. In 2016, plaintiffs' counsel, Matthew Ferguson, disparaged Ritz Aspen in public comments, to the Aspen Times: "They (the Ritz-Carlton members) paid for a better product," Ferguson said. "If you make a reservation for the Four Seasons and they put you in a Holiday Inn, that's what's happening here."

7. Rather than devaluing the asset, the MVC Affiliation increased value by providing Owners greater opportunity for voluntary exchange into MVC properties, cruises, and safaris. Affiliation of fractional interest/PRCs with external exchange companies is not uncommon.

8. "Exclusivity" is a marketing term, not a quantitative value concept. It is synonymous with "first-class," "luxury," "private," or "quality service." The units at Ritz Aspen remain highly desirable luxury units post-MVC Affiliation. The Property is managed by Ritz-Carlton Management, which strictly maintains brand standards. Plaintiffs' attempt to recharacterize "exclusive" to mean "not available to the public," is counter to the facts and the governing documents. Owners have always had the right to rent their units or give them away.

9.  Fractional interests are not, nor should they, be purchased for investment purposes. Rather, fractional interest ownership is intended as a commitment to and purchase of future vacations. This fundamental concept is reiterated in the purchase agreement (which expressly states that Seller has made no representation concerning investment value), and further endorsed by the American Resort Development Association ("ARDA"), a trade association representing the vacation ownership and resort development industries.

10. Plaintiffs claim that annual maintenance fees increased due to wear and tear resulting from MVC Member access is wrong.  Changes in annual assessments were consistent with rising Aspen costs and general inflation, as well as general real estate trends.    Furthermore, Plaintiffs have not demonstrated that the maintenance fee increases were an impediment to sale or had a material impact on value, utility or enjoyment.  Moreover, Plaintiffs knew or should have known that the annual dues were subject to increase; and that the higher maintenance fees accorded them rights and benefits not granted to MVC members paying lesser dues, including, guaranteed access for allotted weeks, the ability to reserve additional nights at reduced rates, and exchange with other RCDC clubs through Cobalt Travel.

11. Plaintiffs further allege that following the MVC Affiliation, MVC members could access the Property at a greatly reduced price, which contributed to the decline in prices. Owners' average purchase price is similar to the amount that typical MVC members would be required to spend in order to access a similar week at the Property, and Owners retained superior rights of access to the Property.

    ii.  If Plaintiffs' experts Maurice Robinson and James Simon are permitted to offer affirmative opinions on valuation concerning Plaintiffs' fractional interests, Mr. Tantleff would offer rebuttal testimony consistent with and encompassing the opinions expressed in his expert reports and deposition testimony in this case, including the following:

1. Simon cites a variety of actions by Defendants (some of which predate actions complained of in the Complaint) that he contends diminished fractional interest value.  However, he makes no effort to isolate the individual impact of these actions. The result is that he cannot establish starting date for the accrual of damages, much less attribute any diminution in value, caused by the wrongful acts alleged in the Complaint.

2. Simon failed to validate his opinions with any analysis, examples, calculations, evidence or other support.

3. Simon suggests that "exclusivity" is the factor that drives the value of a Private Residence Club. Exclusivity is a marketing term – the Property remains "exclusive" in that it is a luxury resort that is restricted to members, permitted guests or renters from members (or through permitted exchange partners), but not available to the "general public." There is no indication of any loss of exclusivity at the Property resulting from the MVC Affiliation. In addition, Simon ignores that other factors that impact value, such as amenities, exchange opportunities, location, size, etc.

4. Robinson relies on an unsupported statement made in an appraisal, that has been excluded by the Court as unreliable, that Defendants' actions, including the MVC Affiliation, negatively impacted the value of the Fractional Interests. He offers no  independent analysis to support this claim.

5. Contrary to Court Order, Robinson's calculations rely on figures that pre-date the MVC Affiliation.  His analysis results in an overstated calculation of potential damages by failing to segregate the alleged impact of the MVC Affiliation.

6. Robinson does not investigate any alternative factors that likely impacted the value of the Fractional Interests, much less apportion any change in value between the MVC Affiliation and any other factor.

7.  Robinson uses utilizes a sales comparison approach to quantify values, which relies on an assortment of unadjusted fractional interest values.  Professional real estate valuation principles mandate making such adjustments.

    a.  Though location is a fundamental factor in real estate valuation, Robinson does not adjust for the comparative differences between Downtown Aspen, Snowmass Village, and Aspen Highlands.  Aspen Highlands is the least desirable submarket.

    b.  Robinson's Comp Set is disproportionately weighted with assets in Downtown Aspen (80%) versus Snowmass Village (20%) and includes no comparables in Aspen Highlands. Robinson excludes comparables located in Snowmass Village without explanation; were these comparables included, the results would have been drastically different.

    c.  While still inferior to the properties in Downtown Aspen, the Property outperformed Snowmass Village between 2014 and 2018.

    d.  Robinson should have adjusted for differences between the date of construction/renovation, amenities, reputation, type of use, exchange networks, etc.

    e.  Although the Property has three times as many fractional interests as all but one of the Comparables, Robinson does not address how this larger supply impacted pricing.

8.  The loss of value experienced at the Property was also likely a function of overall market conditions.

9.  Plaintiffs contend they were denied the opportunity to vote on the MVC Affiliation.  They cite the example of the former The Ritz-Carton Club, Bachelor Gulch, where members voted in 2013 to rebrand, rather than affiliate with MVC. The re-branding proved detrimental.  From 2014 to 2018, the Timbers Bachelor Gulch

fractional units declined 18.9%.  This is over eight times the  2.2% decline in value suffered by Ritz Aspen during the same, post-MVC affiliation, period.

10. The Amended Robinson Model contains several mathematical and formulaic errors.

Based upon the foregoing, Mr. Tantleff may offer alternative damage calculations.

c.   *Mark Israel*

If Plaintiffs' experts Chekitan Dev and Jon Simon are permitted to offer affirmative opinions on "halo" or disgorgement damages, Dr. Israel would offer rebuttal testimony consistent with and encompassing the opinions expressed in his expert reports and deposition testimony in this case, including the following:

In general, as set forth in his expert reports, Dr. Israel will testify and demonstrate that Messrs. Dev and Simon have failed to demonstrate reliably that there was any "halo" effect, or that MVW was unjustly enriched, by the challenged conduct. As set forth in Dr. Israel's expert reports, Dr. Israel will also testify and demonstrate that Mr. Simon has failed to put forward a reliable methodology for quantifying any such unjust enrichment.

In addition, even accepting Mr. Simon's methodology for the sake of argument (without accepting its validity), simply correcting for some fundamental errors made by Mr. Simon, Dr. Israel will testify and demonstrate that this eliminates all or nearly all of Mr. Simon's calculated unjust enrichment.

First, Dr. Israel will testify and demonstrate that the tangible benefits to MVC owners from access to RCDC properties, and in particular Ritz Aspen, are very small. Thus, Plaintiffs' experts' halo effect theory of unjust enrichment depends critically upon MVW having generated substantial increases in the price of MVC points despite de minimis actual benefits to MVC members, particularly since most sales are sales to existing members who are familiar with the MVCD Program and its benefits.

21

Second, Dr. Israel will testify that the evidence that Plaintiffs' experts cite to support the general existence of a halo effect actually proves that such an effect is present only under certain circumstances and can be demonstrated to hold in a given case only by rigorous empirical analysis, which was not performed in this case. Dr. Israel will testify that Plaintiffs' experts fail to establish a connection between the RCDC and MVC programs that generated a halo effect here. Thus, the support of their theory falls entirely to Mr. Simon's empirical analysis.

Third, Dr. Israel will testify and demonstrate that Plaintiffs' experts' halo effect theory centers upon The Ritz-Carlton brand and cannot reliably distinguish between (i) the value conveyed by marketing The Ritz-Carlton Destination Clubs through the Affiliations and (ii) the value conveyed through other marketing strategies for the brand, including but not limited to promoting access to The Ritz-Carlton hotels or promoting access to The Ritz Carlton Destination Clubs through developer-owned inventory. Given that Plaintiffs' experts are alleging a theory of benefit to MVW that is not tied to tangible metrics of accessibility or use of The Ritz-Carlton properties, they have no ability to say that these alternative strategies would not have been equally effective in generating whatever halo effect (if any) existed. Their theory is simply too vague and unsupported to rule out any such possibilities.

Fourth, Dr. Israel will testify and demonstrate that Mr. Simon's empirical analysis falls short of professional standards and is incapable of supporting Plaintiffs' halo effect theory.

Fifth, Mr. Simon's analysis of the halo effect, even if accepted, suffers from several key flaws: Mr. Simon ignores the elapsed time between price changes which is obviously a relevant factor in explaining the size of any price increase. Mr. Simon analyzes the halo effect using gross price instead of net price, and thus does not analyze the price that actually reflects revenue to MVW and thus that could possibly contribute to any unjust enrichment. Correcting these fundamental errors in his price measure completely eliminates or almost completely eliminates Mr. Simon's unjust enrichment damages.

Sixth, Mr. Simon also does not distinguish reliably between the halo effect periods and the "ordinary" periods. He uses an unreliable, ad hoc, anecdotal review of a very small subset of MVW communications to determine when the halo effect purportedly affected the price of MVC points. Moreover, in determining the relevant halo effect periods, he implicitly assumes that any connection between the MVC and RCDC programs was not allowed and thus at issue in this case, whereas Plaintiffs' focus of the complaint relates to the formal Affiliations between MVC and certain RCDC properties.

Seventh, Mr. Simon fails to apply valid methods to account for all of the other relevant factors (aside from the alleged halo effect) that affect the price of MVC points.  Hence, he has failed to isolate the effect of the challenged conduct from other potential explanations for changes in prices.

Eighth, most (two thirds) of the unjust enrichment calculated by Mr. Simon is based on a capitalized valuation of future unjust enrichment, which Dr. Israel will testify cannot be assumed and has been overestimated by Mr. Simon.

Ninth, making all of the foregoing corrections and further limiting unjust enrichment to the post-Affiliation period completely eliminates Mr. Simon's measured unjust enrichment

Finally, even if any unjust enrichment could be established, Mr. Simon substantially overstates the allocation of any unjust enrichment to Plaintiffs. He provides no justification for using property values as the basis for allocation. A more appropriate metric that bears substantially greater relationship to any alleged unjust enrichment is the extent of access to RCDC properties by MVC points owners. If this more appropriate allocation measure is applied, it reduces Aspen Plaintiffs' share from 13.9% to 2.2% and reduces Mr. Simon's measured unjust enrichment accordingly.

d.   *Ceridwyn King*

If Plaintiffs' experts Chekitan Dev and James Simon are permitted to offer affirmative opinions on "halo" or disgorgement damages, Dr. King would offer rebuttal testimony consistent with and encompassing the opinions

expressed in her expert reports and deposition testimony in this case, including the following:

Professor Dev's conclusion that a co-mingling of The Ritz-Carlton and Marriott brands occurred when Marriott Vacation Club members were permitted to access The Ritz-Carlton Destination Club properties and that co-marketing and later affiliating The Ritz -Carlton Destination Club with the Marriott Vacation Club had (i) the "halo effect" of boosting Marriott Vacations Worldwide Corporation profits through enhanced Marriott Vacation Club point sales, and (ii) the inverse "horn effect" on The Ritz-Carlton Destination Club fractional interests, causing those interests to decline in value, are not based on any accepted scientific methodology and are not based on any factual evidence that the halo effect or horn effect occurred.

It is not possible to evaluate whether a halo effect has improved Marriott Vacation Club profits, or a horn effect has devalued The Ritz-Carlton Destination Club interests, without supporting objective data documenting both (i) the cognitive bias applied by target customers to the brands at issue; and (ii) whether such a bias influenced their subsequent purchase behavior relative to Marriott Vacation Club points or The Ritz-Carlton Destination Club fractional interests. Further, consideration as to associational factors that have the potential to contribute to consumer bias with respect to the related brands is also integral to the analysis. Since Professor Dev fails to consider any survey data documenting customer perceptions, his opinion that the affiliation of The Ritz-Carlton Destination Club with the Marriott Vacation Club resulted in profit maximization for Marriott Vacation Club or contributed to the decline of value of The Ritz-Carlton Destination Club fractional interests is scientifically invalid.

(2) witnesses who may be present at trial (see Fed. R. Civ. P. 26(a)(3)(A)); And

*Mark Dunec*

Mr. Dunec may be called to present a rebuttal opinion, if Plaintiffs' expert Maurice Robinson is permitted to testify concerning valuation of Plaintiffs' fractional interests, Mr. Dunec would offer rebuttal

testimony consistent with and encompassing the opinions expressed in his expert report and deposition testimony in this case, including the following:

Mr. Dunec would establish that in offering his opinion here, Mr. Robinson is providing real estate valuation services as an expert witness.  As a licensed appraiser, Mr. Robinson should have complied with the Uniformed Standards of Professional Appraisal Practice ("USPAP").  Robinson did not comply with USPAP, rendering him in violation of professional standards and rendering his opinions unreliable.

(3) expert witnesses where testimony is expected to be presented by means of a deposition and, if not taken stenographically, a transcript of the pertinent portions of the deposition testimony.

None.

Dated:   May 7, 2020                    Respectfully submitted,

                                        By:  s/ Philip R. Sellinger
                                        Philip R. Sellinger
                                        Ian S. Marx
                                        Roger B. Kaplan
                                        GREENBERG TRAURIG, LLP
                                        500 Campus Drive, Suite 400
                                        Florham Park, New Jersey
                                        Tel: (973) 360-7900
                                        Fax: (973) 301-8410
                                        Email:  SellingerP@gtlaw.com
                                                MarxI@gtlaw.com
                                                KaplanR@gtlaw.com

                                        - and -

Naomi G. Beer, Esq.
GREENBERG TRAURIG, LLP
1144 15th Street, Suite 3300
Denver, Colorado 80202
Tel: (303) 572-6500
Fax: (303) 572-6540
Email:  BeerN@gtlaw.com
*Attorneys for Defendants Marriott Vacations*
*Worldwide Corporation, Marriott Ownership Resorts, Inc., The Ritz-Carlton Management Company, LLC, The Cobalt Travel Company, LLC, and The Lion & Crown Travel Co., LLC*