IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 16-cv-01301-PAB-GPG

RCHFU, LLC, a Colorado limited liability company, et al.,

Plaintiffs,

v.

MARRIOTT VACATIONS WORLDWIDE CORPORATION, et al.,

Defendants.

_____

**ORDER**
_____

This matter is before the Court on Marriott Defendants' Motion to Exclude Expert
Testimony of Chekitan Dev, Jonathan Simon and R. Maurice Robinson [Docket No.
460] and Marriott Defendants' Motion to Preclude Testimony of Plaintiffs' Expert,
Jonathan R. Simon, Due to Improper *Ex Parte* Meeting and Communications with
Marriott Defendants' Employees [Docket No. 471].  The Court has jurisdiction pursuant
to 28 U.S.C. § 1332.

## I.  BACKGROUND

This lawsuit arises out of a dispute over the diminution in value of plaintiffs'
fractional interests in the Ritz-Carlton Club, Aspen Highlands ("Aspen Highlands"),
which allegedly resulted from defendants' choice to affiliate Marriott Vacation Club
("MVC") with Aspen Highlands.  Docket No. 430 at 10, ¶ 1; at 73, ¶ 48.  Plaintiffs sued
defendants, asserting claims of (1) breach of fiduciary duty; (2) constructive fraud;
(3) aiding and abetting a breach of fiduciary duty and constructive fraud; (4)

conspiracy; and (5) unjust enrichment  *Id.* at 94-104.  On October 26, 2018, plaintiffs

disclosed three experts: Mr. R. Maurice Robinson, Dr. Chekitan Dev, and Mr. Jon

Simon.  Docket No. 395-1 at 1, ¶ 3.  On August 12, 2019, defendants filed a motion to

"preclude Plaintiffs' experts Chekitan Dev, Jonathan Simon and R. Maurice Robinson."

Docket No. 460 at 1.[1]  On August 19, 2019, defendants filed a motion *in limine* to

preclude Mr. Simon from testifying at trial due to improper communications with

defendants' employees.  Docket No. 471.  Plaintiffs responded to each motion, *see*

Docket Nos. 499 and 509,[2] to which defendants replied.  Docket Nos. 520 and 530.

## II.  LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence provides that:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

---

[1] A wholesale request to exclude an expert in his or her entirety violates the Court's Practice Standards, which provide that a motion under Rule 702 "shall identify with specificity each **opinion** the moving party seeks to exclude."  *See* Practice Standards (Civil Cases), Chief Judge Philip A. Brimmer, § III.G.  "The motion shall also identify the specific ground(s) on which each opinion is challenged, e.g., relevancy, sufficiency of facts and data, methodology."  *Id.*  Defendants have failed to do so.  *See* Docket No. 460.  The Court will address defendants' arguments to the extent that they comply with the Practice Standards.

[2] Plaintiffs' Opposition to Marriott Defendants' Motion to Exclude Expert Testimony of Chekitan Dev, Jonathan Simon and R. Maurice Robinson [Docket No. 499] fails to comply with the Local Rules.  *See* D.C.COLO.LCivR 10.1(e) ("All pleadings and documents shall be double spaced.").

Fed. R. Evid. 702.  As the rule makes clear, while required, it is not sufficient that an expert be qualified based upon knowledge, skill, experience, training, or education to give opinions in a particular subject area.  Rather, the Court must "perform[] a two-step analysis."  *103 Investors I, L.P. v. Square D Co.*, 470 F.3d 985, 990 (10th Cir. 2006).  After determining whether the expert is qualified, the proffered opinions must be assessed for reliability.  *See id.*; Fed. R. Evid. 702 (requiring that the testimony be "based on sufficient facts or data," be the "product of reliable principles and methods," and reflect a reliable application of "the principles and methods to the facts of the case").

Rule 702 imposes on the district court a "gatekeeper function to 'ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.'" *United States v. Gabaldon*, 389 F.3d 1090, 1098 (10th Cir. 2004) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993)).  To perform that function, the Court must "assess the reasoning and methodology underlying the expert's opinion, and determine whether it is both scientifically valid and applicable to a particular set of facts."  *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1221 (10th Cir. 2003) (citing *Daubert*, 509 U.S. at 592-93).  Where an expert witness relies on experience, the expert "'must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.'" *United States v. Medina-Copete*, 757 F.3d 1092, 1104 (10th Cir. 2014) (quoting Fed. R. Evid. 702, advisory committee notes).  When examining an expert's method, however, the inquiry should not be aimed at the "exhaustive search for cosmic understanding but

for the particularized resolution of legal disputes." *Daubert*, 509 U.S. at 597.  It is the specific relationship between an expert's method, the proffered conclusions, and the particular factual circumstances of the dispute that renders testimony both reliable and relevant.

In addition to the witness having appropriate qualifications and methods, the proponent of the witness's opinions must demonstrate that the process by which the witness derived his or her opinions is reliable. *United States v. Crabbe*, 556 F. Supp. 2d 1217, 1220 (D. Colo. 2008).  "[T]he trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). Ultimately, the test requires that the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.*

While the proponent of the challenged testimony has the burden of establishing admissibility, the proffer is tested against the standard of reliability, not correctness, *see Allstate Sweeping, LLC v. City & Cty. of Denver*, No. 10-cv-00290-WJM-MJW, 2011 WL 2173997, at *3 (D. Colo. June 2, 2011); the proponent need only prove that "the witness has sufficient expertise to choose and apply a methodology, that the methodology applied was reliable, that sufficient facts and data as required by the methodology were used and that the methodology was otherwise reliably applied." *Crabbe*, 556 F. Supp. 2d at 1221.

Assuming the standard for reliability is met, the Court must also ensure that the proffered testimony will assist the trier of fact.  *See Kumho Tire*, 526 U.S. at 156; *United*

4

*States v. Rodriguez-Felix*, 450 F.3d 1117, 1122-23 (10th Cir. 2006).  "Relevant expert

testimony must logically advance[] a material aspect of the case and be sufficiently tied

to the facts of the case that it will aid the jury in resolving a factual dispute."  *United*

*States v. Garcia*, 635 F.3d 472, 476 (10th Cir. 2011) (internal quotation marks and

citations omitted).  In assessing whether expert testimony will assist the trier of fact, the

Court should also consider "whether the testimony 'is within the juror's common

knowledge and experience,' and 'whether it will usurp the juror's role of evaluating a

witness's credibility.'"  *Id.* at 476-77 (quoting *Rodriguez-Felix*, 450 F.3d at 1123).

## III.  ANALYSIS

### A.   All Expert Opinions Concerning Pre-2015 Conduct or Conduct Unrelated to the MVC Affiliation

Defendants argue that "[e]ach of Plaintiffs' experts offers opinions premised on

acts by the Marriott Defendants taken four years before the MVC Affiliation's January 1,

2015 implementation date, i.e., the date when MVCD members could first access

[Aspen Highlands] through the MVC Affiliation."  Docket No. 460 at 22.  They contend

that "Plaintiffs' expert reports should be precluded to the extent they are based on pre-

2015 conduct or conduct unrelated to the MVC Affiliation."  *Id.* at 23.

In making this argument, defendants do not identify the specific opinions that

they move to be excluded.  This violates the Court's Practice Standards, which require

that motions under Rule 702 "identify with specificity each **opinion** the moving party

seeks to exclude" and "identify the specific ground(s) on which each opinion is

challenged, e.g., relevancy, sufficiency of facts and data, methodology."  Practice

Standards (Civil Cases), Chief Judge Philip A. Brimmer, § III.G.  The purpose of the Practice Standard is to focus the analysis on specific opinions.  "The burden is on [the moving party] to identify the specific opinions it seeks to exclude."  *Chateau Village N. Condo. Ass'n v. Am. Family Mut. Ins. Co.*, No. 14-cv-01583-PAB-NYW, 2016 WL 1444626, at *3 (D. Colo. Apr. 13, 2016).  Therefore, these objections are waived and will not be addressed by the Court.[3]  *See Seeley v. Home Depot U.S.A., Inc.*, No. 17-cv-00584-PAB-NYW, 2018 WL 4275375, at *7 n.12 (D. Colo. Sept. 7, 2018) (finding that the defendant had waived objections to expert opinion when defendant failed to identify with specificity the opinions it sought to exclude); *see also Estate of Grubbs v. Weld Cty. Sheriff's Office*, No. 16-cv-00714-PAB-STV, 2018 WL 3145629, at *5 (D. Colo. June 26, 2018) (limiting Rule 702 analysis to opinions that are clearly challenged in Rule 702 motion).  Insofar as defendants' motion seeks to exclude plaintiffs' experts opinions "to the extent they are based on pre-2015 conduct or conduct unrelated to the MVC Affiliation," Docket No. 460 at 23, defendants' motion is denied.

## B.  Chekitan Dev

Defendants argue that Dr. Dev's expert testimony "should be precluded in its entirety."  Docket No. 460 at 23.  As set forth above, such a request violates the Court's Practice Standards.[4]  Practice Standards (Civil Cases), Chief Judge Philip A. Brimmer, § III.G.  Defendants do set forth two specific opinions of Dr. Dev that they argue are

---

[3] The Court has already ruled on defendants' motion *in limine* to preclude evidence of non-affiliation-related damages or conduct.  *See* Docket No. 564 at 30.

[4] *See* Docket No. 460 at 23-25 (raising arguments not tied to any specific challenged opinion).

inadmissible: (1) "Dr. Dev's opinion that a co-mingling of the Ritz-Carlton and Marriott brands resulted in a horn effect that caused Plaintiffs' fractional interests to decline in value" and (2) Dr. Dev's opinion "that the aforementioned co-mingling of brands created a halo effect that increased the prices charged for MVC Points and, thus, boosted the Marriott Defendants' profit margins." Docket No. 460 at 25-26.[5] The Court will focus its analysis on these two opinions. *Estate of Grubbs*, 2018 WL 3145629, at *5.

Defendants challenge these two opinions for identical reasons. They contend that Dr. Dev's opinions that the co-mingling of the Ritz-Carlton and Marriott brands resulted in both a horn effect and a halo effect are not backed by objective data and are unsupported by "research, field experiments or surveys." Docket No. 460 at 25-26. Instead, they argue that these opinions are based solely on Dr. Dev's "subjective knowledge and experience." *Id.* at 25. The Court construes this argument as a contention that Dr. Dev's opinions are not supported by sufficient facts or data or are not based on a reliable methodology.

In his report, Dr. Dev opines that the affiliation between MVC and the Ritz-Carlton Destination Club ("RCDC") "provided MVC with a halo effect – and conversely burdened Plaintiffs' RCDC fractional interests with the horn effect." Docket No. 461-1

---

[5] For purposes of this litigation, a "halo effect" refers to "the positive impact that co-mingling a less prestigious brand with a more prestigious brand can have on the former," Docket No. 461-1 at 3, ¶ 4, or "the increased profits or brand premium a lesser brand (or unbranded real estate) can earn when it affiliates with a more exclusive brand." Docket No. 461-3 at 6, ¶ 8. A "horn effect" refers to "the negative impact that [an] affiliation can have on the more prestigious brand," Docket No. 461-1 at 3, ¶ 4, or "financial damage to a more exclusively branded property when it affiliates with a lower tier brand and/or allows owners of the lesser brand systematic access to the luxury branded property." Docket No. 461-3 at 7, ¶ 9.

at 4, ¶ 5.  Dr. Dev bases his opinions on his "education, teaching, research, and work experience" and "the evidence and testimony from this case."  *Id.*, ¶ 6.  To support his opinion that the affiliation created a halo effect, benefitting Marriott, Dr. Dev relies upon several pieces of evidence that he asserts support his conclusion.  For example, he points to Marriott promotional and informational materials to support the notion that Marriott "was well aware of this halo effect."  *Id.* at 14, ¶ 34 (citing email sent to Marriott members informing them that they could "enjoy . . . fabulous benefits, including access to Ritz-Carlton Destination Club resorts").  He also cites evidence demonstrating that Marriott executives believed that the affiliation could benefit Marriott.  *See id.* at 19, ¶ 43 (citing an email between Marriott executives stating that Marriott could "leverage Aspen as an option for points-based sales" (alteration markers omitted) and citing deposition testimony from Stephanie Sobeck, vice president of asset management for Marriott Vacations Worldwide ("MVW"), in which she states that Marriott salespeople could promote buying MVC points as a means to stay at Aspen Highlands).  This evidence, however, does not support Dr. Dev's opinion that the affiliation actually resulted in a halo effect or that prospective customers placed a higher value on the Marriott brand and its services than they did before the affiliation.  At best, it demonstrates that Marriott was aware of the value of the Ritz-Carlton brand and that Marriott executives intended for their company to receive a benefit from the affiliation. The Court finds that Mr. Dev's halo-effect opinion, to the extent it is based on this evidence, is not supported by sufficient facts or data.

To further support his opinion that a halo effect benefitted defendants, Dr. Dev

produced a supplemental expert report in which he relies upon a survey conducted by
Marriott of potential customers.  Docket No. 462-2 at 3.  The potential customers were
asked, after a Marriott sales presentation, whether they recalled Ritz-Carlton access
being discussed as an available feature of purchasing MVC points.  *Id.* at 4.  Dr. Dev
represents that "twice as many sales prospects who reported being satisfied with the
RCDC access feature following the sales presentation purchased points," as compared
to individuals who did not remember such access being discussed.  *Id.* at 6.  According
to Dr. Dev, this supports his opinion that the affiliation created a halo effect to benefit
defendants.  *Id.* at 3.  The Court is not satisfied with the reliability of this survey.  First,
as Dr. Dev admits in his report, the survey experiment does not contain a true control
group – a group of potential purchasers to whom Ritz-Carlton access was not
mentioned – and instead uses as its control group a group of members who "[did] not
recall" Ritz-Carlton access being discussed during the presentation.  *Id.* at 3-4.
Moreover, Dr. Dev admitted in his deposition that he is not "privy to all the details of the
survey," does not "have the [survey's] raw data," and "[was not] given the methodology"
behind the survey.  Docket No. 461-2 at 27, 183:13-15.  He also stated that the survey
lacked "statistical techniques."  *Id.* at 184:6-13.  While the Court "is not charged with
weighing the correctness of an expert's testimony," *Sierra Club and Mineral Policy Ctr.*
*v. El Paso Props., Inc*., No. 01-cv-02163-BNB-MEH, 2007 WL 1630710, at *4 (D. Colo.
June 4, 2007), its gate-keeping role requires it to "make certain that an expert, whether
basing testimony upon professional studies or personal experience, employs in the
courtroom the same level of intellectual rigor that characterizes the practice of an

expert in the relevant field." *Kumho*, 526 U.S. at 152.  The Court cannot conclude that

the survey upon which Dr. Dev relies "employs . . . the same level of intellectual rigor"

that would typically be used in the field, given the deficiencies acknowledged by Dr.

Dev.  Since the survey is an insufficient factual basis to support the opinion, the Court

will exclude Dr. Dev's opinion on the halo effect.  *See Gen. Elec. Co. v. Joiner*, 522

U.S. 136, 146 (1997) (a court may exclude an expert opinion if it "conclude[s] that there

is simply too great an analytical gap between the data and the opinion proffered").

Dr. Dev's support for his opinion that the affiliation created a horn effect suffers

from the same deficiencies.  He states that "[t]here is substantial evidence that RCDC

owners, including Plaintiffs, did not want to affiliate their clubs with MVC," and

discusses a survey conducted of RCDC owners indicating they were concerned that

giving Marriott members access to the club would "devalu[e] their asset" and "dilute[]

the [Ritz-Carlton] brand."  Docket No. 461-1 at 15-16, ¶¶ 37-38.  He also states that

"[t]here is additional evidence that MVW executives knew . . . that [the affiliation] would

dilute the Ritz-Carlton brand and cause RCDC fractional interests to lose value."  *Id.* at

16-17, ¶ 39 (citing a letter from MVW's vice president of marketing and sales stating

that the RCDC members she spoke to "[do not] want MVCI").  This evidence, however,

does not sufficiently guarantee the reliability of Dr. Dev's opinion.  The evidence

demonstrates that Aspen Highlands members were concerned that providing club

access to Marriott members would diminish the value of their fractional interests.  It

establishes that some Ritz-Carlton members were against an affiliation and that some

Marriott executives were aware of the members' concerns.  But this evidence does not

show that a horn effect actually took place or that prospective customers actually viewed the Ritz-Carlton brand as less valuable than before the affiliation.  Dr. Dev's reliance on subjective opinions or concerns of a potential horn effect is not a sufficient factual basis to support his opinions.

Plaintiffs argue that, even without this evidence, Dr. Dev's opinion would be reliable because it is based on his extensive experience.  Docket No. 499 at 12-13. According to plaintiffs, Dr. Dev "[drew] on his experience in academia, as well as practical experience working in the hospitality industry . . . and work directly related to Marriott and Ritz." *Id.* at 13.

"When an expert's testimony is based on knowledge and experience, the proponent need only show that the testimony has a reliable basis in the relevant discipline" and that the opinion "fit[s] the facts of the case." *Two Moms and a Toy, LLC v. Int'l Playthings, LLC*, No. 10-cv-02271-PAB-BNB, 2012 WL 5249459, at *5 (D. Colo. Oct. 24, 2012) (citing *Kumho*, 526 U.S. at 149-50)).  "Experts . . . who rely 'primarily on experience' must explain 'how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.'"  *Id.* (quoting Fed. R. Evid. 702, Adv. Comm. Notes (2000)).  Dr. Dev does not do so.  While he explains his experience in significant detail, *see* Docket No. 461-1 at 4-6 , ¶¶ 8-12, Dr. Dev does not connect this experience in a meaningful way to his opinions, stating only that his opinions are based on his "specialized knowledge and experience."  *See, e.g., id.* at 13, ¶ 32.  He does not explain how his experience leads to his conclusions or how he applied his experience to the facts of

this case.  *See generally id.*  Instead, his opinions appear to be based only on the

evidence cited above.  *See, e.g., id.* at 19, ¶ 43.  Thus, because Dr. Dev failed to

sufficiently connect his experience to the opinions rendered, the Court cannot conclude

that his opinions are reliable.  For these reasons, the Court will exclude Dr. Dev from

opining as to the existence of a halo or horn effect.

### C.   Jon Simon

Defendants seek to exclude three opinions of Mr. Simon: (1) his opinion that the

MVC affiliation caused a diminution in the value of plaintiffs' fractional interests; (2) his

opinion that a halo effect exists in this case; and (3) his calculation of "halo profits."

Docket No. 460 at 26-30.  In the alternative, defendants have filed a motion *in limine*

seeking to exclude Mr. Simon's testimony – to the extent that it is "devoted to the halo

effect and disgorgement or unjust enrichment based on the halo effect" – on the basis

that Mr. Simon obtained his base knowledge on these subjects from improper *ex parte*

communications with defendants' employees.  Docket No. 471 at 1-2.

#### 1.  *Causation*

Defendants seek to exclude Mr. Simon's opinion that the affiliation caused a

diminution in value of plaintiffs' fractional interests on the basis that it is unreliable.

Docket No. 460 at 26-27.  Specifically, defendants argue that Mr. Simon's opinion

(1) fails to distinguish between the loss attributable to defendant's allegedly wrongful

conduct and the loss attributable to other factors, *id.* at 28; and (2) is not based on

objectively verifiable evidence or methodology, but is instead Mr. Simon's "own

untested, untestable and wholly unreliable approach [created] out of whole cloth for

purposes of this litigation."  *Id.* at 29.

Defendants contend that Mr. Simon's opinion on causation is unreliable because he "completely ignores other possible causes" for the loss in value of plaintiffs' fractional interests.  *Id.* at 28.  For example, defendants challenge Mr. Simon's "failure to consider that, for four years before the [affiliation], a broad array of non-owners were able to access RC Club Aspen without purchasing fractional interests" and that this could have contributed to the alleged diminution.  *Id.*  Defendants also note Mr. Simon's failure to "distinguish between pre- and post-[affiliation] conduct, or between non-MVCD and MVCD access to the resort, in opining as to the cause of any alleged diminution in value to Plaintiffs' fractional interests."  *Id.*

 In his report, Mr. Simon states that, based on his experience in the vacation ownership industry, it is his opinion "that when a corporation provides and markets access to one of its luxury private residence clubs to non-owners at a much lower price of entry than what owners in that private residence club paid, the values of ownership interests in that club significantly decline."  Docket No. 461-3 at 11, ¶ 16b.  He then concludes that an alleged diminution in value of plaintiffs' interests is attributable to the affiliation.  *Id.* at 23, ¶ 36.  Plaintiffs argue, "[g]iven that he drew on his substantial expertise and experience, in addition to the record, in coming to these conclusions, Simon's accounting for other possible causes of the observable halo and horn effects more than satisfies Rule 702 standards."  Docket No. 499 at 23.

The problem with plaintiffs' argument, however, is that plaintiffs fail to identify Mr. Simon's "accounting for other possible causes of the observable halo and horn effects"

that they argue satisfies Rule 702 standards.  *See id.*  In Mr. Simon's report, he does

not set out what other possible causes could have led to an alleged diminution in value

of plaintiffs' shares, or "account[]" for those possible causes or opine what effect, if any,

those factors have on his causation opinion.  *See, e.g.*, Docket No. 461-3 at 23-24,

¶¶ 35-36.  By failing to do so, Mr. Simon does not create a link between his experience

and his opinion as applied to the facts of this case.  *Medina-Copete*, 757 F.3d at 1104.

Mr. Simon does not explain how he decided to attribute the alleged diminution in value

to the affiliation rather than other unnamed factors, and does not explain why, based on

his experience, other potential causes can be eliminated here.

  Courts have excluded causation opinions where the expert has failed to

differentiate between or exclude other potential causes of a plaintiff's damages.  *See*

*Sunlight Saunas, Inc. v. Sundance Sauna, Inc.*, 427 F. Supp. 2d 1022, 1031 (D. Kan.

2006) ("Because [the expert] attributes all lost profits to defendants without considering

increased competition in the market, other market conditions or alleged wrongdoing of

other competitors, [the expert's] testimony would not assist the jury in determining the

fact or the amount of damages."); *In re Williams Securities Litig.*, 496 F. Supp. 2d 1195,

1266 (N.D. Okla. 2007) (excluding expert opinion for lack of sufficient methodology

where expert "fail[ed] to differentiate between losses rooted in causes cognizable under

the loss causation doctrine . . . [and] losses attributable to industry-specific stresses,

the meltdown in the telecommunications sector, and other negative developments

unrelated to the alleged fraud").

  The Court finds that, even if Mr. Simon's opinion is based on his own

experience, he cannot ignore the fact that other potential causes for the loss in value of plaintiffs' shares exist.  A general belief that a higher-end brand providing lower-cost access to its brand can dilute the brand's value is not enough to form an opinion that this happened *in this case*; Mr. Simon's failure to explain why, based on his experience, other potential causes for the diminution in value are inapplicable here renders his opinion unreliable.  For this reason, the Court will exclude Mr. Simon's causation opinion.

### 2.   The Halo Effect and the Calculation of Halo Profits

Defendants seek to exclude (1) Mr. Simon's opinion that the affiliation created a halo effect; and (2) Mr. Simon's calculation of "halo profits," or profits realized by defendants as a result of the halo effect.  Docket No. 460 at 29-30.  First, defendants contend that Mr. Simon's opinion on the existence of a halo effect is unreliable because it is not supported by authority and not based on a recognized methodology.  *Id.* at 29. Plaintiffs respond that, because Mr. Simon's testimony comprises "non-scientific elements," the Court should focus not on Mr. Simon's methodology, but his professional and personal experience.  Docket No. 499 at 16 (citing *Crowley v. Chait*, 322 F. Supp. 2d 530, 539 (D.N.J. 2004)).  Plaintiffs argue that Mr. Simon's opinions are reliable because they are based on his experience and because Mr. Simon "connects his longstanding industry experience to the facts of the case to draw a conclusion about halo and horn effects."  *Id.* at 18.

In his report, Mr. Simon opines that "the Marriott Defendants achieved a halo effect on the MVC brand by providing MVC members access to" Aspen Highlands and

by making such access permanent via the affiliation.  Docket No. 461-3 at 13.  He

states that his "knowledge of the halo effect is based on [his] knowledge of and

experience in the hospitality and vacation ownership industry as well as documents [he

has] reviewed for this engagement."  *Id.* at 6.  Further, he states that "[i]t is well-

accepted in the vacation ownership industry, and it is my opinion that when a luxury

brand is integrated with a lower-end brand, the lower-end brand's value increases due

to a so-called halo effect."  *Id.* at 12.

Plaintiffs are correct that "Rule 702's distinction between 'scientific' and 'other

specialized knowledge' contemplates that not all expert testimony is scientific or relies

upon scientific methodology."  *Beebe v. Colorado*, 18-cv-01357-CMA-KMT, 2019 WL

6044742, at *8 (D. Colo. Nov. 15, 2019).  However, whether an expert's experience is

based on "professional studies or personal experience," the role of Rule 702 is to

ensure that the expert "employs in the courtroom the same level of intellectual rigor that

characterizes the practice of an expert in the relevant field."  *Kumho Tire*, 526 U.S. at

152.  In his deposition, Mr. Simon confirmed that "[t]here are [peer-reviewed] models

that are used to measure halo effect" and that he did not use these models.  Docket

No. 461-4 at 4, 19:1-13.  And studies cited by Dr. Dev in his expert report, a report

which Mr. Simon purportedly relied upon, *see* Docket No. 461-3 at 6, ¶ 8, indicate that

there are industry-accepted scientific methods which are used to determine whether a

halo effect exists and, if so, how to calculate that halo effect.  *See, e.g.*, Lance

Leuthesser, Chiranjeev S. Kohli & Katrin R. Harich, *Brand Equity: The Halo Effect

Measure*, 29(4) European Journal of Marketing 57, 57-66 (1995) (analyzing certain

industry-accepted approaches to measuring a halo effect).  This article indicates that there are certain generally accepted industry standards related to measuring a halo effect, *see id.* at 60 ("Although it is difficult to state with any degree of precision the point at which halo is present, a rough rule of thumb is that average inter-correlations of around 0.060- 0.70 or greater are suggestive of a halo effect."), and that persons attempting to quantify a brand's halo effect should be careful not to include "factors which can lead to artificially high inter-attribute correlations, referred to as 'halo-like' effects."  *Id.* at 59.  "It is important that halo effects are not artificially induced in the measurement process."  *Id.*

As the articles cited by Dr. Dev demonstrate, whether a halo effect exists is not a subjective determination; rather, this determination is based on economic principles and there exist in the industry generally accepted processes for measuring halo effects.  But Mr. Simon admitted in his deposition that he did not use these models.  *See* Docket No. 461-4 at 4.  Because Mr. Simon failed to use a generally accepted methodology in forming his opinions, instead creating his own solely for use in this litigation, the Court finds that Mr. Simon's opinion does not "employ[] . . . the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Kumho Tire*, 526 U.S. at 152; *cf. Crowell v. Ritz Carlton Hotel (Virgin Islands, Inc.)*, 2013 WL 12250337, at *10 (D.V.I. Dec. 5, 2013) (finding that expert's reliance on his experience alone was an insufficient basis for opinion on hotel industry standards where the expert acknowledged that publications set forth industry standards, but where the expert had not relied upon those standards).  For these reasons, the Court will grant defendants'

motion to the extent it seeks to exclude Mr. Simon's halo-effect opinion.

Defendants also seek to exclude as unreliable Mr. Simon's calculation of halo profits.  Docket No. 460 at 30.  Because the Court has determined that Mr. Simon's opinion that a halo effect exists in this case is unreliable, his opinion as to the extent of that halo effect – i.e., how much defendants allegedly profited from the alleged halo effect – is also unreliable.[6]  *See* Docket No. 461-4 at 26, 215:5-217:20 (Mr. Simon stating he did not use a "mathematical model" to calculate halo profits).  Accordingly, the Court will grant defendants' motion to exclude the opinions of Mr. Simon in its entirety.[7]

### D.   R. Maurice Robinson

---

[6] In addition, the Court finds that Mr. Simon's halo-profit opinion is unreliable because he fails to distinguish profits allegedly resulting from the affiliation and profits allegedly resulting from conduct predating the affiliation.  In his expert report, Mr. Simon calculates what he believes to be the value gained by defendants as a result of "using access to the Ritz Carlton Club to increase the price and volume of MVC points sales."  Docket No. 461-3 at 37.  Mr. Simon considered the initial access to Aspen Highlands and the eventual affiliation to be one prolonged event rather than two separate events.  *See* Docket No. 461-4 at 12, 94:19-22 ("I consider it as one continuous action on the part of defendants, that they provided access and then they permanized [sic] access with the affiliation.  They're not two distinct events.").  As a result, Mr. Simon did not calculate separate figures for disgorgement of profits attributed specifically to the affiliation.  *See id.* at 28, 228:9-13 (stating that he had no calculation of halo profits attributable to just the affiliation); *id.* at 228:14-19 (stating that he was not asked to calculate price increases solely caused by the affiliation).  As a result, the Court finds that Mr. Simon's calculations are unreliable.  *Cf. Trugreen Co. L.L.C. v. Scotts Lawn Serv.*, 508 F. Supp. 2d 937, 959-61 (D. Utah Feb. 13, 2007) (finding expert opinion unreliable where the expert had failed to account for "potentially confounding causes of revenue gains and losses").

[7] For this reason, the Court denies defendants' Motion to Preclude Testimony of Plaintiffs' Expert, Jonathan R. Simon, Due to Improper *Ex Parte* Meeting and Communications with Marriott Defendants' Employees [Docket No. 471] as moot.

Finally, defendants challenge "Mr. Robinson's opinions regarding the loss in value of Plaintiff's fractional interests."  Docket No. 460 at 32; *see also id.* at 33 (seeking to preclude "Mr. Robinson's opinions on lost sales value" and challenging "Mr. Robinson's [sales] analysis").  These challenges fail to comply with the Court's Practice Standards because (1) they do not set forth each specific opinion challenged and (2) they do not state a specific basis for challenging those specific opinions.  The Court identifies one specific challenge to Mr. Robinson's opinions in defendants' motion: a challenge to Mr. Robinson's "valuation method."  *Id.* at 34 (arguing that Mr. Robinson's valuation method is unsupported by authority and cannot withstand the scrutiny applied to methods developed for purposes of litigation).  As a result, the Court limits its analysis to defendants' challenges to Mr. Robinson's valuation method.

Defendants argue that Mr. Robinson's valuation method is unreliable because it is unsupported by authority and does not conform to industry standards.  *Id.* at 34-35. They contend that "to the extent an expert uses a particular appraisal or valuation method, there must be sufficient authority in the relevant field to support use of the method under similar circumstances" and that "Mr. Robinson can point to no authority supporting his valuation method."  *Id.* at 34.  *See, e.g.*, *Barfield v. Sho-Me Power Elec. Coop.*, 2013 WL 12145824, at *3 (W.D. Mo. July 8, 2013) (stating that "the absence of any authority supporting [an expert's] opinion would likely be dispositive of a *Daubert* challenge" but finding that expert's opinion was supported by sufficient authority) (emphasis omitted).

In his expert report, Mr. Robinson sets forth his calculation of plaintiffs'

diminution of value damages ("DOV damages"), stating that he calculated these damages "by subtracting the actual or average sales price per square foot at [Aspen Highlands] from the 'But For' price per square foot (what the price would have been absent the challenged conduct, estimated from the analysis of comparable properties), and then multiplying that difference by the average square footage per unit, and then by the total number of Plaintiffs' units."  Docket No. 461-6 at 3.  Mr. Robinson selects five properties that he believes are comparable to Aspen Highlands to estimate the "But For" price per square foot.  *Id.* at 4-5.  Mr. Robinson states that, "[w]hen examining the market trends of projects selling luxury-level fractional interests in a given market, it is common for fractional industry analysts to look at local whole-ownership residential condominium projects as another source of comparable pricing and trends."  *Id.* at 5. He indicates that "[t]he basis for the calculation of the But For Sales Prices is my opinion that, absent the Defendants' actions, the Actual Sales Prices . . . of the subject Interests would have moved in tandem with the rest of the luxury fractionals in the Aspen market."  *Id.* at 8.  Ultimately, Mr. Robinson concludes that the average annual sales prices for Aspen Highlands properties declined "at an average annual rate of -14.18% since 2011," while the comparable properties' sales values increased "by an average annual rate of 2.6% on a compound basis" for this same time period.  Docket No. 461-8 at 9-10 (Mr. Robinson's amended supplemental expert report).

Plaintiffs argue that Mr. Robinson's valuation method is "substantially the same" as the valuation method deemed reliable in *Cook v. Rockwell Int'l Corp.*, 580 F. Supp. 2d 1071 (D. Colo. 2006).  Docket No. 499 at 33.  In *Cook*, a property damages expert

was hired to quantify the plaintiffs' diminished property value resulting from a nearby nuclear weapons production facility's trespass and nuisance.  580 F. Supp. 2d at 1079, 1129-30.  In completing a market sales analysis "to assess the possible impact of the [facility]" on the area surrounding plaintiffs' property (the "Class Area"), the expert compared "the rate of appreciation or depreciation in housing prices over time within the Class Area with the rate of price appreciation or depreciation in other [comparable] metropolitan submarkets."  *Id.* at 1135.  After "us[ing] these data to calculate the compound appreciation/depreciation rate for [a] six-year period for condominium and detached single-family housing in each submarket," the expert concluded that the properties and vacant land within the Class Area had the lowest appreciation rates and lowest average price per acre, respectively, of the areas studied.  *Id.*  The court concluded that the expert's opinion was reliable because "the analysis of sales data is a sound and accepted method for addressing real estate valuation issues."  *Id.* at 1136.

Defendants argue that *Cook* is distinguishable from this case because the *Cook* expert "incorporated five different, multi-disciplinary approaches" to form his opinion, whereas Mr. Robinson's "single-step methodology was created solely for use in this case and is not recognized by appraisers or anyone else in the real estate valuation community."  Docket No. 520 at 8 n.6 (quoting *Cook*, 580 F. Supp. 2d at 1130).  Defendant is correct that the expert in *Cook* considered five different approaches in forming his ultimate diminution in value opinion, *see* 580 F. Supp. 2d at 1130, but this does not take away from the court's conclusion that the expert's market sales approach was "a sound and accepted method for addressing real estate valuation issues, and

21

that [the expert's] method for calculating the relative rates of appreciation was also sound." *Id.* at 1136.

The Court agrees with the *Cook* court and finds that Mr. Robinson's approach of comparing sales prices of comparable properties to the sales prices of plaintiffs' properties is a sound one that is commonly relied upon by the real estate valuation industry. *See Whitehouse Hotel Ltd. P'ship v. C.I.R.*, 615 F.3d 321, 333 (5th Cir. 2010) (discussing the "commonly recognized" valuation method of using comparable properties' sales prices to determine general market value); *Mass. Mut. Life Ins. Co. v. DB Structured Prods., Inc.*, 2015 WL 2130060, at *3-4, *9 (D. Mass. May 7, 2015) (finding expert's modified automatic valuation method[8] sufficiently reliable, despite lack of peer review or independent validation, because automatic valuation methods "are accepted within the real estate appraisal and underwriting industry"); *Gordon v. New England Cent. R.R., Inc.*, 2019 WL 4069389, at *5 (D. Vt. Aug. 27, 2019) (describing a sales comparison approach as a "recognized methodology"); *cf. Kanellakopoulos v. Unimerica Life Ins. Co.*, 2018 WL 984826, at *6 (N.D. Cal. Feb. 20, 2018) (rejecting argument that expert's opinion regarding a lost increase in sales price of property was unreliable where expert had "look[ed] at comparable homes in the same zip code" which had similar features and sold in the same time frame as the plaintiff's home and had "that it is accepted industry knowledge that comparables generally are the best way to determine the resale benefit of a remodel"). Accordingly, the Court will not

---

[8] An automatic valuation method, or AVM, is a "computer program[] that use[s] statistical models to reach objective estimates of the market value of real property." *DB Structured Products*, 2015 WL 2130060, at *2.

exclude Mr. Robinson's valuation opinion on this basis.

In addition, defendants argue that "valuation methods developed solely for purposes of litigation, such as those used by Mr. Robinson[,] . . . are subject to special scrutiny." Docket No. 460 at 34. They argue that Mr. Robinson's valuation method fails to withstand this scrutiny because "it [is] not an appraisal and does not conform to [the Uniform Standards of Professional Appraisal Practice] or other real estate appraisal standards in several respects." *Id.* at 34-35. Defendants cite to two cases in support, but do not explain what this "special scrutiny" entails or how such scrutiny should be applied to Mr. Robinson's opinion. *Id.* at 34.[9] But as plaintiffs note, Mr. Robinson was not hired to conduct an appraisal. *See* Docket No. 461-8 at 3 ("I am not acting as an appraiser . . . merely as an analyst calculating damages."). Thus, the Court is unconvinced by defendants' argument that the opinion is unreliable because it does not conform to seemingly inapplicable appraisal standards – standards which defendants do not provide or explain. *See* Docket No. 460 at 34-35. The Court will

---

[9] In *Feduniak v. Old Republic Nat'l Title Co.*, 2015 WL 1969369 (N.D. Cal. May 1, 2015), the court found that it was "very significant" that an expert's methodology had been developed for purposes of the litigation. *Id.* at *4. The court excluded the opinion because the fact that the expert created the methodology for the litigation, "combined with the *Daubert* factors[,] . . . undermine[d] any confident in the reliability of [the expert's] testimony. *Id.* In *Development Specialists, Inc. v. Weiser Realty Advisors LLC*, 2012 WL 242835 (S.D.N.Y. Jan. 24, 2012), the court found an expert's valuation opinion unreliable where the expert had used a valuation approach that was "different than that used by other experts in the industry" and that was "without known validation in the industry literature." *Id.* at *8. The Court finds these cases distinguishable, because – as set out in its earlier ruling – the method used by Mr. Robinson is not atypical of the real estate valuation field. Thus, the Court does not find that the fact that Mr. Robinson developed this method for purposes of this litigation to be fatal to its reliability.

deny defendants' motion to the extent that it seeks to exclude Mr. Robinson's valuation opinion.[10]

## IV.   CONCLUSION

For these reasons, it is

**ORDERED** that Marriott Defendants' Motion to Exclude Expert Testimony of Chekitan Dev, Jonathan Simon and R. Maurice Robinson [Docket No. 460] is **GRANTED IN PART** and **DENIED IN PART**.  It is further

**ORDERED** that Marriott Defendants' Motion to Preclude Testimony of Plaintiffs' Expert, Jonathan R. Simon, Due to Improper *Ex Parte* Meeting and Communications with Marriott Defendants' Employees [Docket No. 471] is **DENIED AS MOOT**.

DATED June 1, 2020.

BY THE COURT:

_____

PHILIP A. BRIMMER
Chief United States District Judge

---

[10] Defendants' arguments that "Mr. Robinson fails to account for any other economic and market factors that caused or contributed to the decline in value of Plaintiffs' fractional interests" and that "Mr. Robinson's analysis does not come close to meeting" . . . "reliability standards and relevance requirements" for selecting the comparable properties are not tied to any specific opinion and are not considered. *See* Docket No. 460 at 33.  Even if the Court construed these as arguments attacking Mr. Robinson's valuation method, these arguments attack the merits, rather than the admissibility, of Mr. Robinson's method.  *See Cook*, 580 F. Supp. 2d at 1136 (finding that defendants' argument that comparable property analysis was based on too few comparable sales was a matter "to be raised through the adversarial process" and "[did] not provide a basis for exclusion").