Page 1

1         IN THE UNITED STATES DISTRICT COURT
2            FOR THE DISTRICT OF COLORADO
3
4   RCHFU, LLC, et al.,                    )
                                           )
5                                          ) Civil Case No.:
         Plaintiffs,                       ) 1:16-cv-01301-PAB-GPG
6                                          )
                                           )
7            vs.                           )
                                           )
8                                          )
    MARRIOTT VACATIONS                     )
9   WORLDWIDE CORPORATION, et al.,         )
                                           )
10                                         )
         Defendants.                       )
11  _____)
12
13
14
15
16
            DEPOSITION OF R. MAURICE ROBINSON
17              Los Angeles, California
                Tuesday, June 18, 2019
18
19
20
21
22
23
24
    Reported by:  Dana Christensen
25  CSR No. 11251

Page 10

1  BY MR. SELLINGER:
2    Q.  So, Mr. Robinson, I understand that you've issued
3  an initial report and I understand that another report was
4  issued yesterday that we have not had the chance to
5  review, so unless otherwise indicated I'm going to be
6  asking you questions about your December 19th, 2018
7  amended summary of economic damages, okay?
8    A.  Okay.
9    Q.  And if you turn to page 6, the bottom paragraph,
10 it says, "In rendering my opinions I assume that
11 plaintiffs will establish liability," and then it goes on
12 after a clause, quote, "And that these breaches were
13 substantial factors in causing the property values of the
14 subject property to be significantly lower," unquote.  Do
15 you see that?
16   A.  Yes.
17   Q.  So you are assuming in this report that Ritz
18 allowing access to Marriott owners and the affiliation
19 were substantial factors in the decreasing property
20 values, right?
21   A.  Well, I'm assuming that the entirety of the
22 plaintiff -- of the defendants' alleged behaviors in total
23 were substantial factors.  I really didn't allocate
24 amongst the alleged activities or actions or behaviors, so
25 I don't know if any one of them was more substantial than

Page 11

1  others.
2    Q.  I understand you didn't allocate, and I am going
3  to come back and ask you about that, but for the moment
4  what I'm trying to get you to make clear is that the
5  conclusion that the defendants' behavior were substantial
6  factors in property diminution was an assumption that you
7  made, correct?
8    A.  Yes.
9    Q.  And you relied on Mr. Dev and Mr. Simon for those
10 assumptions, correct?
11   A.  Yes.
12   Q.  You did no independent analysis on your own to
13 conclude that the actions of the defendants were
14 substantial factors in causing property value to go down,
15 correct?
16   A.  Correct.
17   Q.  You did nothing to verify that the actions of the
18 defendants or the Marriott affiliation was a substantial
19 factor in causing property values to go down, correct?
20   A.  Correct.
21   Q.  And Mr. Dev, who you relied upon for that
22 conclusion, he's not a licensed real estate appraiser, is
23 he?
24   A.  No.
25   Q.  And Mr. Dev, who you relied on for that

Page 12

1  assumption, he's not a licensed real estate appraiser
2  either, correct?
3    A.  Asked and answered.
4        MR. FERGUSON:  I think you misspoke.
5        THE WITNESS:  If you meant Mr. Simon, he is not
6  an appraiser.
7  BY MR. SELLINGER:
8    Q.  Thank you.  So of Mr. Dev, Mr. Simon, and you,
9  you're the only licensed real estate appraiser, correct?
10   A.  Yes.
11   Q.  But you, the licensed real estate appraiser in
12 this report, relied on the non-licensed real estate
13 appraisers for their conclusions that the Marriott
14 affiliation and the conduct of the defendants were
15 substantial factors causing loss, correct?
16   A.  That's a good question.  I'm not sure.  Can you
17 ask that again?
18       MR. FERGUSON:  Can you repeat that back, please,
19 Dana?
20       (Record read:
21       "Question:  But you, the licensed real
22       estate appraiser in this report, relied on
23       the non-licensed real estate appraisers for
24       their conclusions that the Marriott
25       affiliation and the conduct of the

Page 13

1       defendants were substantial factors causing
2       loss, correct?")
3        THE WITNESS:  Here is how I will answer, and I
4  apologize for the nuances.  I happen to have a licensed
5  real estate -- I happen to have a general real estate
6  license, appraisal license in the State of California.
7  I'm not acting as an appraiser in this opinion or report.
8        The substantial factors, I'm not sure that's a
9  valuation issue either, so because I'm not opining on who
10 did what, let's call it liability, I don't know that I can
11 really answer that I relied on a non-appraiser, that it
12 was a substantial factor.  So the way you worded it does
13 not strike me as totally correct.
14 BY MR. SELLINGER:
15   Q.  You're a licensed real estate appraiser, right?
16   A.  Yes, I have two licenses.  I drive a car and I
17 have a real estate appraiser license.
18   Q.  Simon and Dev are not licensed real estate
19 appraisers?
20   A.  Correct.
21   Q.  You, the licensed real estate appraiser, relied
22 on two non-licensed real estate appraisers for the
23 conclusion, as you quote, that the breaches of Marriott,
24 the affiliation and other conduct were substantial factors
25 in causing the property values to be significantly lower,

Page 14

1 correct?
2  A.  Yes.
3  Q.  And if the opinion of Dev or the opinion of Simon
4 that the actions of defendants and the affiliation were
5 substantial factors in the prices declining, if those
6 opinions are correct, then the valuations in your report
7 would fall as well, correct?
8  A.  Yeah, I'm not there.
9  Q.  If the opinion of Dev and Simon that the
10 affiliation and defendants' conduct were substantial
11 causes of the property values diminishing, if those
12 opinions were wrong, then that would undermine the
13 valuation opinions that you give, correct?
14      MR. FERGUSON:  Objection, form.
15      THE WITNESS:  Yeah, no.  I don't think so.  I
16 think my opinions stand.  If I can back up.
17 BY MR. SELLINGER:
18  Q.  No, I don't want you to back up.  Answer my
19 question.
20      MR. FERGUSON:  He was.
21      THE WITNESS:  The whole truth of the answer --
22 BY MR. SELLINGER:
23  Q.  It's a yes are no question.
24      MR. FERGUSON:  No, it's not.
25              ////

Page 15

1 BY MR. SELLINGER:
2  Q.  It's a yes or no question.  One of your
3 valuations that you give fall.  If the answer is no, just
4 tell me no.  If I want an explanation, I will ask you.
5 During cross-examination Mr. Ferguson can come back and
6 follow up.
7      MR. FERGUSON:  Re-direct.  He said no already
8 then.
9 BY MR. SELLINGER:
10  Q.  So let's move on.  Let me ask you the question
11 this way:  Why did you rely on the opinions of Mr. Dev and
12 Mr. Simon for the affiliation and the actions of
13 defendants being substantial factors in causing the
14 valuation to fall?
15  A.  Because it wasn't a part of my assignment to
16 actually search for the liability.  I'm not a liability
17 opiner or expert here, so part of the instructions or
18 assumptions with or without any particular experts are
19 that the sales price has dropped, measure it, and that's
20 what I did.
21  Q.  But why, why did you make the determination that
22 the Marriott affiliation and the actions of the defendants
23 were the substantial factor in causing real estate prices
24 to go down?
25      MR. FERGUSON:  Object to form.

Page 16

1      THE WITNESS:  Because I was not asked to.  It was
2 not part of my assignment.  There's a lot of things I
3 didn't do.  I only did what I was asked to do in this
4 assignment, which is measure the drop in sales prices.
5 BY MR. SELLINGER:
6  Q.  If you were doing a real estate appraisal, you
7 would measure -- you would do an analysis to conclude what
8 the cause was of prices going down, would you not?
9  A.  No, not necessarily.
10  Q.  If you are doing a -- let me put it a different
11 way.  You could have in this assignment as the only
12 licensed real estate appraiser of the three, you could
13 have both concluded that the affiliation and -- withdrawn.
14 Let me state it differently.
15      As the only licensed real estate appraiser of the
16 three expert witnesses, you could have examined whether
17 the affiliation and the actions of the defendants
18 contributed to the decline?
19      MR. FERGUSON:  Objection, form.
20 BY MR. SELLINGER:
21  Q.  Correct?
22  A.  No.
23  Q.  Why not?
24  A.  I was not asked to.
25  Q.  I understand that you were not asked to.  I'm not

Page 17

1 trying to debate you.  But you could have performed that
2 analysis as a licensed real estate appraiser had you been
3 asked to, correct?
4      MR. FERGUSON:  Objection, form.
5      THE WITNESS:  I don't see how being a licensed
6 real estate appraiser contributes at all to the liability
7 issue, so whether I had a license or didn't have a
8 license, no, I don't think I could have been a liability
9 expert, nor would you ask a real estate appraiser to do
10 it.
11 BY MR. SELLINGER:
12  Q.  I'm not asking about liability, so listen to my
13 question and try to answer that.
14      As a licensed real estate appraiser, licensed
15 real estate appraisers can explore whether conditions in
16 the market are substantial factors in causing declines in
17 property value, correct?
18  A.  Yes.
19  Q.  And that's done commonly, correct?
20  A.  Sure.
21  Q.  And here your assignment, rather than asking you
22 to do that, was to have you opine as to the diminution in
23 value but somebody else to opine as to the substantial
24 factors?
25      MR. FERGUSON:  Wait a second.  You're asking one

5 (Pages 14 - 17)

Page 26
1  BY MR. SELLINGER:
2    Q.  And there's nothing in the report that suggests
3  Mr. Simon considered whether the alleged negative impact
4  on value by -- withdrawn.
5        Mr. Simon doesn't consider whether the alleged
6  negative effect on exclusivity could be due to rentals, a
7  combination of rentals, and Marriott member access before
8  the affiliation or neither in the report, correct?
9    A.  Not that I know of.
10    Q.  Okay.  And are you aware that rentals by owners
11  to the general public at the Ritz property far exceeded
12  nights that Marriott members accessed pursuant to the
13  affiliation?
14    A.  I have become aware of that.
15    Q.  Okay.  And in Mr. Simon's report, he does not
16  cite to any sources or authorities, treatises, to support
17  the conclusion that defendants' actions substantially
18  caused property values to diminish, correct?
19    A.  I wouldn't know.
20    Q.  Is there anything in his report that is in front
21  of you that you can point to, an authority or a treatise,
22  that Mr. Simon cites to support the conclusion that
23  defendants' actions caused property values to diminish?
24        MR. FERGUSON:  Philip, you put a report in front
25  of him that's several pages long from many months ago.

Page 27
1  He's prepared to testify to his report.  I understand that
2  he says other experts have done this work, but if you want
3  him to read the report, we'll take the hour and he can do
4  that.  You're asking about cites in there now, authority
5  cites.  I think in fairness to him, I think he should see
6  the whole report, and I don't think you really want to do
7  that.
8  BY MR. SELLINGER:
9    Q.  He has the report.  I have seen no cites,
10  authorities or treatises in there, and you told me that
11  you don't remember, right?
12        MR. FERGUSON:  He didn't say that.  He said he
13  didn't know.
14  BY MR. SELLINGER:
15    Q.  Do you remember Simon citing to any authority
16  cite or treatises?
17    A.  I don't remember seeing any or even looking for
18  them, so they could be in here.  I don't know.
19    Q.  So during the break, you can take a look.
20        MR. FERGUSON:  During the break we will take a
21  break.  If you want him to stop and read it, we will do
22  that.
23  BY MR. SELLINGER:
24    Q.  Mr. Simon in his report does not consider any
25  other external factor in his report that likely or could

Page 28
1  have impacted the value of the property, correct?
2    A.  I don't know.
3    Q.  Do you remember?  I mean you read the report, you
4  relied on the report in the opinion that you have given,
5  correct?
6        MR. FERGUSON:  Objection, form.
7        THE WITNESS:  I'm going to say somewhat.  When I
8  gave my opinion, I had not read his report.  He had
9  written his report, and I have skimmed his reports since
10  but not reading all of the details that you are asking me.
11  So when you ask me is something not in his report, I don't
12  really know.  It could be in his report.  It may take me a
13  while to look and be able to answer to the best of my
14  ability.  So I've been answering that I don't know or it
15  could be or not that I've seen based on any glancing
16  through his report one time after I wrote my report.  So
17  I'm probably not the right expert to be opining on what's
18  in his report.
19  BY MR. SELLINGER:
20    Q.  Well, what was your basis for assuming, as you
21  said on page 6, that the breaches were substantial factors
22  in causing the property value to decline and that other
23  experts, Simon and Dev, were going to opine on that
24  subject?
25    A.  Basically instruction of the assignment.  The

Page 29
1  lawyer said there's two experts that will be opining on
2  liability; you just do the math between the sales
3  prices.
4    Q.  What lawyer gave you that assignment?
5    A.  I don't recall.  It could have been either
6  Michael or Matt.
7    Q.  Mr. Reiser and Mr. Ferguson?
8    A.  Yes, there's another Michael, too, Schrag.  It
9  could have any one of them.  So this was provided to me
10  last June.
11    Q.  Did you ask plaintiff's counsel why they were
12  breaking the assignment into two witnesses and experts and
13  not having one expert do the whole job?
14        MR. FERGUSON:  Objection, form.
15        THE WITNESS:  Let's see.  I'm not sure if I asked
16  but -- actually, yes, I did ask.
17  BY MR. SELLINGER:
18    Q.  And what were you told?
19    A.  Well, I was brought in after Simon was already
20  in, so Simon was the expert that they hired.
21    Q.  And why wasn't Simon opining as to diminution of
22  value so he could do the entire job?
23    A.  You'll have to ask him that, but he's brought me
24  in saying that I would be good to do the diminution of
25  value portion and he would do the liability portion, so

Page 86

1  Q.  But you don't say in the report that you are
2  relying on it, right?
3  A.  Correct.
4  Q.  Why do you refer to it?
5  A.  It's really just a tee up. The reason I'm doing
6  my analysis is that the alleged actions by the defendant
7  may have led to a diminution of value at the subject
8  property. I was given the Cushman & Wakefield appraisal,
9  and they came to the conclusion that the plaintiffs are
10 trying to prove, so I think I just threw this in as part
11 of the tee up towards here's another firm that said
12 something similar in one of their reports, but I
13 didn't -- it was not the basis for my analysis. It was
14 really just an introduction to the reader.
15 Q.  And unlike Dev and Simon where you say that, you
16 know, you're essentially relying on them for the
17 determination of substantially contributing causes from
18 the affiliation, you don't make that statement as to
19 Cushman & Wakefield?
20     MR. FERGUSON: Objection, form.
21     THE WITNESS: I will give you a longer answer
22 than you want. The answer is -- well, I agree that I
23 don't rely on Cushman & Wakefield in any -- in their
24 opinion of the reason for the damages.
25           ////

Page 87

1  BY MR. SELLINGER:
2  Q.  And why is it that you do not rely on Cushman &
3  Wakefield?
4  A.  I don't need to. I made an assumption. I did
5  not really come to a conclusion on causality. The
6  assumption was if the defendants' actions caused this,
7  then the defendants, you know, caused the problem.
8  Q.  You made no conclusion on causality?
9  A.  Correct.
10 Q.  You made no conclusion that the action of the
11 defendants, the affiliation, caused the property value to
12 go down, correct?
13 A.  Correct.
14 Q.  And your report doesn't do that?
15 A.  Correct.
16 Q.  And you don't do that?
17 A.  Correct.
18 Q.  Now, the conclusion -- withdrawn. Now, the
19 diminution of value analysis that you do begins in 2011
20 based on allegations of a series of actions by defendants
21 in that period of time, correct?
22 A.  Yes.
23 Q.  And the damage calculation in your report
24 of -- where is the $44 million number?
25 A.  Page 2 in the middle of the second full

Page 88

1  paragraph.
2  Q.  Yes. So your calculation of damages of
3  $41.6 million is a calculation, as you said, starting in
4  2011, correct?
5  A.  Yes.
6  Q.  Through an end date of October of 2018,
7  correct?
8  A.  That's correct.
9  Q.  And the $41 million calculation of damages that
10 you've calculated is based on conduct that occurred before
11 the implementation of the affiliation between Ritz and
12 Marriott, correct?
13     MR. FERGUSON: Objection, form.
14     THE WITNESS: You're going to have to represent
15 that the affiliation occurred after that date.
16 BY MR. SELLINGER:
17 Q.  Yes. So I will represent to you that the
18 implementation of the affiliation was on December 5th,
19 2014 advising people that going forward they could
20 exchange properties.
21     So your damage calculation accounts for conduct
22 of the defendant before, for several years before Marriott
23 members began to access the property pursuant to the
24 affiliation, correct?
25 A.  It seems that way. I don't know. I really don't

Page 89

1  know.
2  Q.  And if you are looking at 2011 as the start date
3  of your valuation, and I will represent to you that the
4  members of Marriott who accessed under the affiliation
5  started accessing in 2015, you're not able to say that the
6  entire amount of those damages or lost value relates to
7  the affiliation, correct?
8      MR. FERGUSON: Objection, form.
9      THE WITNESS: I would say that's correct.
10 BY MR. SELLINGER:
11 Q.  Okay. And in fact if, as the Dancing Bear
12 appraisal had stated, that the Ritz Carlton struggled with
13 sales even before 2010 when it was issued, you certainly
14 would not say that was the result of the affiliation,
15 correct?
16     MR. FERGUSON: Objection, form.
17     THE WITNESS: Certainly not the start of the
18 affiliation.
19 BY MR. SELLINGER:
20 Q.  Okay. And you have four potential start dates in
21 your report, right? August 1, 2011; August 1, 2012;
22 January 1, 2013, and January 1, 2014, right?
23 A.  Yes.
24 Q.  What's the relevance of each date?
25     MR. FERGUSON: Objection, form.

Page 98

1  Q. As you sit here today what adjustments can you
2  tell me you would make to your model if you used the
3  January 1, 2015 start date other than changing that as the
4  start date? Are there any other adjustments today that
5  you would tell me you need to make?
6  A. Just generally, every time you see a pound sign,
7  value, exclamation point, it means you broke the formula.
8  These are very complicated if-then formulas and so they
9  pull from multiple cells, and if one of the cells is
10 shifted like you do here, when you start at a different
11 date you shift the cells that it's pulling from, so you
12 have to check the formulas to make sure that you're
13 capturing numbers that aren't zero or blank, which it
14 indicates here he has.
15 Q. So other than checking the formulas to make sure
16 that you are capturing the information that was already
17 there, anything else that you would adjust in your model
18 to calculate lost sales as of January 1, 2015 when the
19 affiliation began to be implemented?
20 A. No, not much. That's basically it.
21 Q. I got it. Okay. Going back to your model. Does
22 your model account for any external factors aside from the
23 Marriott members' access to the property which could have
24 influenced property value?
25 A. Yes.

Page 99

1  Q. What factors?
2  A. I would say all factors.
3  Q. Where?
4  A. In the sales prices.
5  Q. Does your report analyze any external factors
6  specifically that could have had an impact on the
7  Ritz-Carlton? I understand that you have looked at sales,
8  but does it specifically look at any particular factors
9  that could have affected the Ritz?
10 A. I'll answer that the model by capturing the sales
11 prices, which is the actual market, you know, proof if you
12 will of all the factors, the model takes all of those into
13 consideration. I did not isolate any of the factors,
14 including the start of the earlier announced affiliation,
15 so the model doesn't take into account any individual
16 factor and yet it takes into account all of the factors
17 together kind of in a basket.
18 Q. So you're saying the prices that are a part of
19 your analysis in your model reflect all of the factors of
20 influenced price?
21 A. Absolutely.
22 Q. But your model does not isolate actions of the
23 defendants that could have affected price from any other
24 external factor that could have affected price?
25 A. Exactly.

Page 100

1  Q. And your model does not isolate the impact of the
2  affiliation on price from any other actions of the
3  defendants that might have affected price?
4  A. Correct.
5  Q. Your model doesn't isolate whether Marriott
6  members' access to the Ritz before the affiliation played
7  a larger role than access after the affiliation for
8  example, correct?
9      MR. FERGUSON: Object to form.
10     THE WITNESS: Right. It does not isolate.
11 BY MR. SELLINGER:
12 Q. It doesn't isolate any factors at all?
13 A. Correct.
14 Q. And there's no allocation among any of the
15 factors that might have affected the price of Ritz,
16 whether those factors were related to the affiliation,
17 whether they were caused by the defendants unrelated to
18 the affiliation or completely unrelated to defendants,
19 correct?
20 A. Correct.
21 Q. And do you agree that any -- withdrawn. Do you
22 agree that there are factors unrelated to the affiliation
23 that could have affected the prices?
24     MR. FERGUSON: Objection, form.
25     THE WITNESS: Yes, I guess so.

Page 101

1  BY MR. SELLINGER:
2  Q. Do you agree that there are factors other than
3  anything that the defendants did that could have affected
4  the prices?
5  A. Yes.
6  Q. And as you've told us, properties don't exist in
7  a vacuum, they are subject to a multitude of external
8  factors, correct?
9  A. Correct.
10 Q. But the loss valuation that you performed
11 attributes 100 percent of the loss to the actions of the
12 defendants, right?
13     MR. FERGUSON: Objection, form.
14     THE WITNESS: Does it?
15 BY MR. SELLINGER:
16 Q. If it doesn't, you tell me.
17 A. Right. So I would say not necessarily. My
18 version of it is that I have quantified the lost sales
19 price.
20 Q. Over time?
21 A. Over time. And the assumption was that this was
22 attributable to behavior by the defendants, one of which
23 was announcing the upcoming affiliation allowing timeshare
24 users into the Ritz-Carlton Destination Club, but I don't
25 contribute to anything in particular. I'm merely

Page 102

1  quantifying the change in sales value for the Court.
2    Q.  So you don't attribute the change in sales value
3  that your report addresses to any particular factor?
4    A.  Correct.
5    Q.  Got it. All your report does is it quantifies
6  the change in sales value over periods of time?
7    A.  Sales price, yes.
8    Q.  Sales price. And whatever factors may have
9  contributed to that change in sales of price, you are not
10 opining on?
11   A.  Correct.
12   Q.  Now, we alluded to this earlier, you're aware
13 that a large number of plaintiffs rented their units to
14 outside renters prior to the affiliation, correct?
15       MR. FERGUSON: Objection, form.
16       THE WITNESS: Yes, I'm aware of that.
17 BY MR. SELLINGER:
18   Q.  Is it possible that buyers were less inclined to
19 purchase fractional interests at the Ritz because it was
20 far cheaper and easier to rent in off week from an owner
21 than buying an fractional interest?
22   A.  Yes.
23   Q.  And are you aware that -- I'm sorry, let me ask
24 it differently. Do you think that there is a difference
25 in the impact on exclusivity or on value if a non-owner is

Page 103

1  able to access the property through rental versus a
2  non-owner is able to access a property through
3  affiliation?
4        MR. FERGUSON: Objection, form.
5        THE WITNESS: I have no opinion on that.
6  BY MR. SELLINGER:
7    Q.  You're not able to articulate any difference
8  between the two as you sit here today?
9        MR. FERGUSON: Objection, form.
10       THE WITNESS: Well, I haven't tried.
11 BY MR. SELLINGER:
12   Q.  Well, I'm giving you the opportunity as you sit
13 here. Are you able to articulate any difference between a
14 non-owner gaining access through renting from an owner
15 versus a non-owner gaining access through the affiliation?
16       MR. FERGUSON: Objection, form.
17       THE WITNESS: Not in the sense that, you know,
18 for any given week how the non-owners got on the property
19 really doesn't matter.
20 BY MR. SELLINGER:
21   Q.  Okay. To the extent that non-owners gaining
22 access through the affiliation affected the exclusivity
23 and negatively affected sales prices, the same affect
24 could occur from owners giving access to rentals, right?
25       MR. FERGUSON: Objection, form.

Page 104

1        THE WITNESS: Sure, possibly.
2  BY MR. SELLINGER:
3    Q.  And your lost sales analysis doesn't evaluate
4  whether any alleged negative impact on sales was due to
5  rentals through a combination of rentals and Marriott
6  member access or neither, correct?
7    A.  Correct.
8    Q.  Are you familiar with Airbnb or online travel
9  agencies?
10   A.  Yes.
11   Q.  Do you know how much Airbnb has been valued at on
12 the market by any changes?
13   A.  Billions, but I don't know the specific number.
14   Q.  Have you heard of Third Home?
15   A.  I think I've heard of it but I've never seen it
16 in use.
17   Q.  Do you know what Third Home, what its business
18 model is, renting expensive homes to individuals?
19   A.  Yes.
20   Q.  And are you aware that the medium value of the
21 home that they rent is $3 million?
22   A.  I was not aware.
23   Q.  Is that consistent with your understanding of the
24 type of properties they rent?
25       MR. FERGUSON: Objection, form.

Page 105

1        THE WITNESS: Yeah, it's not inconsistent. I
2  really didn't have a number in mind, but it doesn't sound
3  unreasonable.
4  BY MR. SELLINGER:
5    Q.  Are you aware that Third Home rents high,
6  high-value properties to individuals on a single rental
7  basis?
8    A.  Yes.
9    Q.  And how would you categorize the rise of
10 Airbnb?
11       MR. FERGUSON: Objection, form.
12       THE WITNESS: Rapid.
13 BY MR. SELLINGER:
14   Q.  What do you see as Airbnb's value proposition?
15   A.  Access to non-hotel rentals for guests.
16   Q.  Would it be fair to say that their value
17 proposition is access to high-end properties on a rental
18 basis?
19   A.  For Airbnb, they are mostly not high-end
20 properties. I mean the average rate realized by Airbnb on
21 a nightly basis is less than hotels, so there's a lot of
22 inventory in Airbnb, some of which is at the luxury end
23 but not the majority of them.
24   Q.  Is Airbnb an indiscreet disrupter?
25   A.  Very much so.