## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:16-cv-01301-PAB-GPG

**RCHFU, LLC et al.**

    Plaintiffs,

v.

**MARRIOTT VACATIONS WORLDWIDE CORPORATION et al.**

    Defendants.

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR LEAVE TO FILE SUPPLEMENTAL MOTION FOR SUMMARY JUDGMENT

    Defendants' attempt at a second bite of the summary judgment apple is procedurally inappropriate because their causation argument is not based on new facts or law, and they could have raised it in the summary judgment motion just decided. Defendants also distort the evidence and applicable standards to mask the futility of their proposed motion.

    Expert testimony on causation is not required here because a jury can infer from lay evidence that Defendants' fiduciary breach and constructive fraud caused at least some damage, including to the value of Plaintiffs' fractional interests as well as extra management fee payments to an unfaithful fiduciary. Indeed, Defendants conflate legal causation stemming from breach with apportioning damages, which they inappropriately dub "causation." Defendants also ignore burden-shifting principles in fiduciary breach cases, overstate Plaintiffs' evidentiary burden, and omit that causation is not an element of the unjust enrichment or constructive fraud claims.

1

Nor are Defendants correct that Plaintiffs cannot "establish the amount of unjust enrichment" without an expert. Because a breaching fiduciary is a "conscious wrongdoer," the amount of disgorgement is determined according to the eased standard and burden-shifting features of the Restatement (Third) of Restitution and Unjust Enrichment, §§ 51-53 (2011), which allows disgorgement to be calculated in a manner that ensures the fiduciary keeps none of its ill-gotten gains — even if the fiduciary pays more than is attributable to its wrongdoing.

## I. Defendants' Request Is Procedurally Inappropriate

The deadline to file motions for summary judgment passed almost a year ago. Dkt. 423. Yet, as both sides are vigorously preparing their cases for the January trial, Defendants seek further delay in this nearly five-year-old case by requesting a second summary judgment motion. Defendants were well aware of their causation argument in October 2018 when they served expert reports that addressed causation. Dkt. 482-34 at p. 10 (Tantleff rpt.). But they made a strategic decision not to raise the issue in their summary judgment motion.

The Tenth Circuit disfavors second summary judgment motions, cautioning that it is not the "usual practice to give litigants the proverbial second bite at the apple." *Pippin v. Burlington Resources Oil and Gas Co.,* 440 F.3d 1186, 1199 (10th Cir. 2006). While additional summary judgment motions may be appropriate where there is an expanded factual record, an intervening change in the law, or to correct manifest injustice, none of these conditions exist here. *Id.*

In addition, where, as here, the deadline for filing dispositive motions has long passed, a party seeking to file another summary judgment motion must show good cause under Rule 16(b)(4) to modify the scheduling order. *Predator Int'l, Inc. v. Gamo Outdoor USA, Inc.*, 2014 WL 103772, at *1 (D. Colo. Jan. 10, 2014). "Good cause for amendment does not exist where, as here, a party is aware of a particular argument or counter-argument, but fails to act timely to

2

address it." *Id.* at *1. Indeed, parties are generally expected to state all their arguments in support of summary judgment in a single motion, in order to avoid piecemeal litigation. *United States v. Copar Pumice Co., Inc.*, 2013 WL 12159365, at *3-4 (D.N.M. Sept. 12, 2013).

In this nearly five-year-old case, there is no good cause justifying Defendants' failure to include a causation argument in their recently decided summary judgment motion, which they could have linked to their *Daubert* motions. *See, e.g., Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 145 (1999) (noting that defendants filed a *Daubert* motion and an "accompanying motion for summary judgment" in district court). A second motion is procedurally improper.

## II. Even if Defendants Could Establish Good Cause, a Second Summary Judgment Motion Would Be Futile

### A. Expert testimony is not required to prove causation and there is sufficient evidence from which the jury can infer causation

This case is based on Defendants' decision to affiliate the expensive and exclusive Ritz-Aspen with the cheaper and larger Marriott Vacation Club (the "Affiliation"), and forcing that Affiliation on the Ritz-Aspen through breaches of fiduciary duty and constructive fraud. A jury is well equipped to decide the central causative question here: whether Defendants' misconduct — which included misleading Plaintiffs and the Association regarding the terms of the Affiliation, substituting a survey for a promised vote, and concealing the 2013 Affiliation Agreement from the Association board when it had the opportunity to refuse the Affiliation — led to some (or in other words "the fact of") damage. Were Plaintiffs harmed, at least to some extent, when Defendants opened the club to MVC members at a lower price point and for nightly stays? Basic consumer experience says yes; where one can stay at a property for a lower price, there is no reason to pay more for the same access.

3

Defendants' suggestion that Plaintiffs need an expert to prove that a change in use rights at the Ritz-Aspen had negative consequences, i.e. the fact of damage, is wrong. Rather, the causation standards are far more flexible than Defendants suggest and preclude summary judgment on this record. A plaintiff in Colorado seeking damages for a breach of fiduciary duty need only show that the fiduciary's conduct was "a substantial contributing cause of the injury." *Lariviere, Grubman & Payne, LLP v. Phillips*, 2011 WL 650001, at *20 (D. Colo. Feb. 11, 2011). A jury can infer causation from circumstantial evidence. *Truck Ins. Exchange v. MagneTek, Inc.*, 360 F.3d 1206, 1215 (10th Cir. 2004). "An inference need not be justified beyond all doubt and is not precluded by a mere possibility that the contrary may be true." *Weir v. Federal Ins. Co.*, 811 F.2d 1387, 1392 (10th Cir. 1987).

The relevant question is whether there is *any* evidence from which a reasonable juror could find that Defendants caused Plaintiffs' injuries, not whether the evidence is dispositive on causation. *See Mueller v. Swift*, 2017 WL 2362137, at *13 (D. Colo. May 31, 2017). While Defendants incorrectly imply that Plaintiffs must *rule out* every other potential cause, in fact a plaintiff need only present evidence that "rules in" the defendant's conduct as a potential cause. *See Hollander v. Sandoz Pharm. Co.,* 289 F.3d 1193, 1211 (10th Cir. 2002).

Expert testimony is not required to establish causation in this case. *See Truck Ins. Exchange*, 360 F.3d at 1214 (whether causation is beyond the average experience of a layperson is a discretionary determination for the court); Mot. at p. 9 (conceding this point); *McCoy v. Whirlpool Corp.*, 287 Fed. App'x. 669, 679 (10th Cir. 2008) ("Whether expert testimony is admissible under Rule 702 is a distinct and separate question from whether … other evidence is sufficient to prove causation").

Plaintiffs' straightforward evidence of causation is persuasive. For one, Plaintiffs have testified in their depositions that Defendants' decision to allow MVC members to access the Ritz-Aspen for a small fraction of what Plaintiffs paid has had a negative impact on Plaintiffs' property values. *See Loughridge v. Chiles Power Supply Co., Inc.,* 431 F.3d 1268, 1281, 1284 (10th Cir. 2005) (sustaining damages award based on plaintiffs' testimony on their homes' diminution in value). For example, when asked for the basis of his opinion as to why values at the Ritz-Aspen have dropped, Plaintiff Jacob Slevin testified: ". . . [Marriott] essentially opened up a back door to access these properties at far less money . . . I think the brand has been diluted. If you're in the Aspen market and you follow these things, you know that the Ritz-Carlton isn't limited to Ritz-Carlton guests anymore . . ." Declaration of Michael Schrag ("Schrag Decl."), Exh. 1 at 108:12-109:17. Another plaintiff, Joel Schneider, responded similarly when asked how he believed Defendants' actions harmed his fractional interest: "Well, it seems pretty clear to me that since the affiliation the value of my property has plummeted, and there seems to be no other reason for this decrease in value . . . I think the reason is the dilution from the Marriott Vacation Club." Schrag Decl., Exh. 2 at 65:12-66:4.

Deposition testimony from third-party witnesses is also competent evidence that Defendants' wrongdoing caused some damage to Plaintiffs. For instance, the parties deposed Juan Pablo Cappello, a Ritz-Aspen owner who wrote a letter opposing the affiliation after it was announced in 2012. Cappello testified that his interest significantly dropped in value due to, at least in part, Marriott "making the inventory of the remaining properties accessible to people . . . who had paid a much lower price point to buy their interest in the Marriott Vacation Club." Schrag Decl., Exh. 3 at 106:6-12. Board member Jay Neveloff agreed that "co-branding with Marriott greatly devalued the ownership of the members." Schrag Decl., Exh. 4 at 124:18-125:8.

Moreover, Defendants' own documents demonstrate that the Affiliation caused damage. For example, Marriott's Corporate Growth Committee noted in 2012 that one of the risks of allowing MVC members to use their points to stay at the Ritz-Aspen was "[a]ccess to the RCDC properties by NATO owners [MVC members] may result in the perception of lost exclusivity." Dkt. 511-6 (5/24/12 CGC Memo) at p. 2. APCO, a consulting company Defendants hired to survey Ritz-Carlton club members about their ownership experience, found that "[m]embers have seen their fractional ownership investment erode in both real and perceived value and they are unhappy with the introduction of Marriott Vacation properties and members into 'their' (Ritz-Carlton) system." APCO August 2013 Report, Dkt. 445 at p. 4.

The jury can also reasonably infer causation from the evidence that expert Maurice Robinson assembled and summarized in support of his damages analysis. The Court found that Robinson's "approach of comparing sales prices of comparable properties to the sales prices of plaintiffs' properties is a sound one that is commonly relied upon by the real estate valuation industry." Dkt. 583 at p. 22. The Court also noted that Robinson "indicates that '[t]he basis for the calculation of the But For Sales Prices is my opinion that, absent the Defendants' actions, the Actual Sales Prices . . . of the subject Interests would have moved in tandem with the rest of the luxury fractionals in the Aspen Market.'" *Id*. at p. 20.

Thus, the evidence underlying Robinson's model shows the Ritz-Aspen's change in market value as compared to that of comparable fractional interest properties. The model separates factors affecting only the Ritz-Aspen from general market factors affecting all comparable properties, such as the Great Recession. Robinson chose a set of luxury fractional interest properties in Aspen that are comparable to the Ritz-Aspen. Dkt. 461-6 at pp. 5-6.

Robinson found that while interests at the comparable properties *increased* at an average annual rate of 2.6%, Plaintiffs' interests *declined* at an average annual rate of 14.8% during the damages period. *Id*. at pp. 8-9. He explained that absent Defendants' conduct, changes in prices at the Ritz-Aspen would have generally matched the change in average sales prices at the comparable properties. *Id*. at p. 10. Also, Robinson presents different "start dates" to his model — two of which start after the Affiliation was announced to the marketplace, and therefore rule out the effects of pre-affiliation conduct on Ritz-Aspen prices. *See id*. at pp. 17-18. A reasonable juror could infer from this evidence that the Affiliation, which only affected the Ritz-Aspen, caused property values to drop. *See Cook v. Rockwell Intern. Corp*., 580 F.Supp.2d 1071, 1136 (D. Colo. 2006) (sales analysis relevant to support "opinion that residential property has been diminished in value due to [defendants' conduct]").

Tenth Circuit authority belies Defendants' blanket assertion that expert testimony is required to prove causation whenever diminution in the value of real property is alleged. Mot. at pp. 9-10. *Loughridge* establishes that a plaintiff can prove causation as to diminution in value damages without expert testimony. There, homeowners sued the seller and maker of radiant heating systems. *Id*. at 1272. The homeowners alleged that the heating systems were defective, requiring costly repairs. *Id*. They sought the cost of those repairs and the diminution in value of their homes. *Id*. at 1273. The district court reduced the jury's damages award, finding it inconsistent with the plaintiffs' theory. The plaintiffs appealed. *Id*.

Like Defendants do here, the *Loughridge* defendant tried to argue that the plaintiffs "provided no basis for their opinions on the value of their property." *Id*. at 1283. But the Tenth Circuit looked to the plaintiffs' testimony that, in their opinion, their homes lost up to $200,000 in value *because of* the defective heating systems. *Id*. at 1281-82. The plaintiffs testified as to the

7

fact of damages—that they sold their homes for less than they would have, had their homes included a working heating system—and the amount of those diminution in value damages. *Id*.

The Tenth Circuit held that this testimony alone was sufficient to sustain a jury award for diminution in value damages, because the plaintiffs were "deemed to have special knowledge of their property given their long ownership and familiarity with it." *Id*. at 1283. The court noted that "because [Plaintiffs] sufficiently established the fact of damages, it was within the province of the jury to determine the amount of those damages to be awarded." *Id*. at 1282; *see also id.* at 1281 ("once the fact of damage has been established with the requisite degree of certainty, a plaintiff will not be barred from recovery for failing to prove the amount of loss with mathematical certainty."); *see also Oliver v. Amity Mut. Irrigation Co.*, 994 P.2d 495 (Colo. App. 1999) (plaintiffs not required to introduce expert testimony to prove irrigation ditch owner had negligently maintained his ditch, causing a break which damaged the plaintiff's adjacent property). As in *Loughridge* and *Oliver*, Plaintiffs are well-equipped to opine as laypersons on the causal connection between Defendants' wrongdoing and their harm.

The cases Defendants cite do not support requiring an expert on causation here. For example, Defendants' leading case, *James River Ins. Co. v. Rapid Funding, LLC*, 658 F.3d 1207 (10th Cir. 2005), actually supports Plaintiffs' position. *James River* is not about causation at all. (In fact, the word "causation" does not appear anywhere in the opinion.) In *James River*, neither party disputed that a fire *caused* damage to the building. Instead, the court there considered whether and in what circumstances expert testimony is necessary to *calculate the amount of loss* that results from damage — in that case, how to balance loss from the fire as compared to previous depreciation and structural damage. *See James River*, 658 F.3d at 1212-16. Here,

8

Plaintiffs *have* an admissible valuation opinion to supplement evidence that Defendants' conduct caused at least some damage, thus rendering *James River* inapplicable.[1]

*Sonrisa Holding, LLC v. Circle K Stores, Inc*., another case Defendants cite, is also inapplicable. 2019 WL 2471370 (D. Colo. June 12, 2019). In *Sonrisa*, the defendant, Circle K, operated a gas station where an oil spill occurred. During the spill, petroleum products migrated onto the plaintiffs' property. *Id*. The plaintiffs incurred costs in remediating the contamination, including building a vapor barrier on their property. The plaintiffs then sued to recover those remediation costs as well as other damages. *See id*. at *6. The court held that expert testimony was necessary to prove that the spill proximately caused the remediation costs, because highly technical issues such as the extent of the petroleum migration, the risk of vapor hazards, and the need for a vapor barrier system (as opposed to other mitigation efforts) was beyond the common knowledge of a juror. *Id*. at *8. The holding in *Sonrisa* was specific to the technical issues surrounding remediation costs pertaining to petroleum hazards, and therefore is inapposite.

Here, no such scientific or technical issues are in play: the jury need only determine whether affiliating the lower tier MVC with the higher tier Ritz-Aspen and allowing MVC members access for a fraction of Plaintiffs' cost was a substantial factor in reducing the value of Plaintiffs' interests, compared to what they would have been absent affiliation. Ample non-technical evidence — including the Robinson sales comparison report, Plaintiffs' testimony, and documents — allows a jury to infer causation, making another summary judgment motion futile.

---

[1] Furthermore, Plaintiffs seek disgorgement of Ritz-Carlton Management Company's fees for its unfaithful service. Defendants do not argue (nor could they) that the causal connection between unfaithful service and payment of management fees turns on expert testimony, or that an expert is required to establish the amount of fees paid.

Finally, Defendants' reliance on securities cases is misplaced. Securities fraud actions are subject to specific proof requirements that don't apply in other contexts. For example, an investor-plaintiff in a securities action must prove "loss causation" by showing that it was the revelation of the defendant's misrepresentation, as opposed to other factors, that caused share prices to drop. *In re Williams Sec. Litig.-WCG Subclass*, 558 F.3d 1130, 1137 (10th Cir. 2009). On the other hand, a plaintiff suing for breach of fiduciary duty need only show that the defendant's breach was a substantial factor in causing the harm, a lesser standard of proof. *See Garrett v. Bryan Cave LLP*, 211 F.3d 1278, 2000 WL 430163, at *4 (10th Cir. Apr. 21, 2000) ("[B]reaches of a fiduciary relationship in any context comprise a special breed of cases that often loosen normally stringent requirements of causation and damages.") (citations omitted). [2]

### B. Defendants Ignore Important Burden Shifting Principles in Fiduciary Duty Cases

Moreover, in cases of self-dealing by a fiduciary, the burden actually shifts to the fiduciary to prove that its breach *did not* cause loss. *See, e.g., Eads v. Dearing*, 874 P.2d 474, 477 (Colo. App. 1993) (. . . "where a fiduciary relationship exists, *the burden rests on the fiduciary to show that no advantage was taken.*") (emphasis added); *Pioneer Centres Holding Company v. Alerus Financial, N.A.*, 858 F.3d 1324, 1335 (10th Cir. 2017) (when a "beneficiary

---

[2] The other cases Defendants cite are similarly inapplicable. *Hall v. Conoco Inc*. was a case where the court held that under Oklahoma law, the plaintiff needed an expert to opine on whether benzene exposure had long-term carcinogenic effects. 886 F.3d 1308, 1317 (10th Cir. 2018). Likewise, in *Lowery v. City of Albuquerque*, the court held that the plaintiff needed an expert to opine on the danger of certain drug particles and the quantity necessary to present a health risk. 2012 WL 1378522, at *21 (D.N.M. Apr. 9, 2012). And the court in *Cary v. Auto. Ins. Co*. only held that the specific subject matter at issue there — how to test for the presence of mold in a home and the results of that testing — are "beyond the typical knowledge and experience of a lay juror." 838 F.Supp.2d 1117, 1122 (D. Colo. 2011). None of these cases support the notion that expert testimony is required to show that Defendants' conduct caused some damage to Plaintiffs in the form of diminution in value to their real property.

[succeeds] in proving that [a] trustee has committed a breach of trust and that a related loss has occurred, the burden shifts to the trustee to prove that the loss would have occurred in the absence of the breach") (citing Restatement (Third) of Trusts § 100, cmt. *f* (2003)).

Because of the sacred nature of the fiduciary relationship, courts "do not take kindly to arguments by fiduciaries who have breached their obligations that, if they had not done this, everything would have been the same." *In re Beck Industries, Inc.*, 605 F.2d 624, 636 (2d Cir. 1979) (Friendly, J.). Yet that is exactly what Defendants try to do. They argue that because Plaintiffs' expert opinion from Jon Simon on the ultimate question of causation was excluded, Defendants cannot be held liable. But the standard is different; Plaintiffs need only demonstrate that the Affiliation could have caused *some* harm (i.e., fact of damage); at that point, the burden shifts to Defendants to rule out that the Affiliation was harmful.

### C. Causation is not an element of Plaintiffs' unjust enrichment claim

A second summary judgment motion would not avoid a trial because causation is not an element in an unjust enrichment claim. *Simek v. J.P. King Auction Co.*, 160 F. App'x 675, 683 (10th Cir. 2005); *see also Arst v. Stifel, Nicolaus & Co.*, 954 F. Supp. 1483, 1492 (D. Kan. 1997) (collecting cases); Dkt. 563 (MSJ Order) at p. 13 (stating elements of unjust enrichment). As stated in the Restatement (Third) of Restitution and Unjust Enrichment ("Restatement" or "Rest.3d"): "Absence of but-for causation does not necessarily exonerate the wrongdoer, because a finding that the defendant would have realized the profit in any event does not compel the conclusion that the defendant, under the circumstances, has not been unjustly enriched." Rest.3d § 51, cmt. *e*. A breaching fiduciary's obligation to disgorge proceeds and consequential gains "is limited only by the possibility that they might *in unusual circumstances* be unduly remote." *Id.* §

11

53, cmt. *c* (emphasis added). Thus, even if expert testimony was required to establish causation on other claims, Plaintiffs' unjust enrichment claim would proceed to trial.

### D. Plaintiffs' evidence satisfies their initial burden on disgorgement

Implicitly recognizing that Plaintiffs need not prove but-for causation in order to obtain disgorgement, Defendants try to argue that Simon's excluded model is the only possible way to estimate ill-gotten gains that Defendants must disgorge. Mot. at p. 3. But this argument fails because it ignores the relaxed standard for calculating disgorgement from a breaching fiduciary. Those who breach their fiduciary duties are considered "conscious wrongdoers" under the Restatement. Rest.3d at § 43, cmt. *a* ("a disloyal fiduciary — without regard to notice or fault — is treated as a conscious wrongdoer"). That means disgorgement is calculated to ensure the conscious wrongdoer keeps none of its ill-gotten gains — even if the calculation might result in it paying more than is attributable to its wrongdoing. *See id.* at §§ 51-53 and cmts. thereto.

A fiduciary-breach plaintiff has the *initial* "burden of producing evidence from which the court may make at least a *reasonable approximation* of the defendant's unjust enrichment." *Id.* at § 51(5)(d) & cmt. *i* (emphasis added). Not much is required to meet this initial burden: "A claimant who is prepared to show a causal connection between defendant's wrongdoing and a measurable increase in the defendant's net assets will satisfy the burden of proof as ordinarily understood." *Id.* at § 51, cmt. *i*. And as the Tenth Circuit has stated, "[o]nce the plaintiff demonstrates gross profits, they are presumed to be the result of" the challenged misconduct. *Gen. Steel Domestic Sales, LLC v. Chumley*, 627 F. App'x 682, 688 (10th Cir. 2015).

At this point, the burden shifts and the defendant is "free . . . to introduce evidence tending to show that the true extent of unjust enrichment is something less;" but the "[r]esidual risk of uncertainty in calculating net profit is assigned to the wrongdoer." *Am. Master Lease LLC*

*v. Idanta Partners, Ltd.*, 225 Cal. App. 4th 1451, 1487 (2014). The Tenth Circuit has approved this "burden-shifting regime" for proving disgorgement. *Gen. Steel Domestic Sales*, 627 F. App'x at 686-88; *cf. Miami Int'l Realty Co. v. Paynter,* 841 F.2d 348, 350 (10th Cir. 1988) (applying Colorado law) (lost-profits recovery "will not be denied 'simply because the amount of profit lost is difficult to ascertain'"). The disgorgement figure this process yields is proper even if there is some uncertainty. As Comment *i* to Restatement § 51 explains:

> Underlying the rules about evidentiary burdens in these cases is the equitable disposition that resolves uncertainty in favor of the claimant against the conscious wrongdoer. "Reasonable approximation" will suffice to establish the disgorgement liability of a conscious wrongdoer, when the evidence allows no greater precision, because the conscious wrongdoer bears the risk of uncertainty arising from the wrong. The same disposition against the wrongdoer yields the rule that "when damages are at some unascertainable amount below an upper limit and when the uncertainty arises from the defendant's wrong, the upper limit will be taken as the proper amount." *Gratz v. Claughton*, 187 F.2d 46, 51-52 (2d Cir. 1951) (L. Hand, J.). ***Supposing, in other words, that the true measure of unjust enrichment is an indeterminable amount not less than 50 and not more than 100, liability in disgorgement will be fixed at 100***.

Rest. 3d § 51, cmt. *I*.[3] (emphasis added).

At trial, Plaintiffs will satisfy their burden on proving the amount of disgorgement using Defendants' own documents. For example, Marriott's annual Form 10-K's filed with the SEC show the amount of profits Marriott made each year from selling MVC points. *See* Dkt. 576-3 (Plaintiffs' Exhibit List, listing Form 10-K at p. 8). The Form 10-K's show Marriott's gross and net revenues from selling vacation ownership products (which are comprised of only MVC

---

[3] Recognizing the impossibility of precision in most disgorgement calculations, and the general ineffectiveness of "ordinary accounting principles," *id.* at § 51, cmts. e and *g*, the Restatement places the burden of that imprecision on the conscious wrongdoer, explaining "*any question of liability for supplemental enrichment is necessarily decided so as to exclude the possibility that the defendant might retain a benefit from the underlying wrong.*" *Id.* at § 53, cmt. *b* (emphasis added); *Id.* at § 51, cmt. *e* ("the object of the disgorgement remedy — to eliminate the possibility of profit from conscious wrongdoing — is one of the cornerstones of the law of restitution and unjust enrichment").

points). Also, the management agreements between the Association and Ritz-Carlton Management Company show the amount Defendants earned from management fees Ritz-Aspen owners paid (even though a large portion of those fees only benefited Defendants, who were managing the property for the benefit of its MVC points sales). *See id.* at p. 4. Once Plaintiffs prove Defendants' gross revenues from MVC points, the burden will shift to Defendants to prove their "deductible expenses and the elements of profit attributable to factors other than the [wrongdoing]." *Andreas v. Volkswagen of Am., Inc.*, 336 F.3d 789, 795 (8th Cir. 2003). Therefore, documents like these, as well as testimony from witnesses on Defendants' profits from the MVC, are sufficient evidence of disgorgement amounts.

In summary, because equity seeks to "strip the defendant of wrongful gain," even "'[s]ome degree of speculation' . . . is permissible" when "calculating a[] [disgorgement] award." *Gen. Steel Domestic Sales, LLC v. Chumley*, 2013 WL 1900562, *18 (D. Colo. May 7, 2013) (Brimmer, J.) (quoting *Australian Gold, Inc. v. Hatfield*, 436 F.3d 1228, 1241 (10th Cir. 2006)). And because disgorgement serves partly to deter future misconduct, a disgorgement award can "exceed[] the profits gained." *Kokesh v. S.E.C.*, 137 S. Ct. 1635, 1644-45 (2017); Rest. 3d § 51, cmt. *a.*

### III. Conclusion

In sum, because Defendants cannot show good cause for amending the scheduling order to allow for another summary judgment motion, and their proposed motion on causation would be futile, the present motion should be denied.

Dated: July 13, 2020                                                Respectfully submitted,

*/s/ Michael Schrag*
Michael Schrag (CA State Bar #185832)
**GIBBS LAW GROUP LLP**

505 14th Street, Suite 1110  
Oakland, CA 94612  
Telephone: (510) 350-9700  
E-mail: mls@classlawgroup.com  

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that on this 13th day of July 2020, a true and correct copy of the foregoing **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR LEAVE TO FILE SUPPLEMENTAL MOTION FOR SUMMARY JUDGMENT** was served via ECF filing upon:

Naomi G. Beer, Esq.  
BeerN@gtlaw.com  
Greenberg Traurig, LLP  
1200 17th Street, Suite 2400  
Denver, Colorado 80202  

Ian S. Marx, Esq.  
MarxI@gtlaw.com  
Philip R. Sellinger, Esq.  
SellingerP@gtlaw.com  
Greenberg Traurig, LLP  
500 Campus Drive, Suite 400  
Florham Park, New Jersey 07932  

*/s/ Linda Lam*  
Linda Lam
