# EXHIBIT 4

**CONFIDENTIAL**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

RCHFU, LLC, *et al.*

                       Plaintiffs,

      v.

Marriott Vacations Worldwide Corporation, *et al.*

                    Defendants.

Civil Action No. 16- 01301-PAB-GPG

# EXPERT REPORT OF MARK A. ISRAEL

# December 28, 2018

**CONFIDENTIAL**

# CONTENTS

I.   QUALIFICATIONS AND ASSIGNMENT.................................................................2

     A.   QUALIFICATIONS ...............................................................................................2

     B.   ASSIGNMENT .....................................................................................................3

II.  BACKGROUND, PLAINTIFFS' ALLEGATIONS, AND SUMMARY OF
     PLAINTIFFS' EXPERTS' OPINIONS ..................................................................5

     A.   BACKGROUND ...................................................................................................5

          1.   The Marriott Vacation Club and The Ritz-Carlton Destination Club
               programs ...................................................................................................5

          2.   Evolution of the connection between the MVC and RCDC programs..............8

     B.   PLAINTIFFS' ALLEGATIONS ...........................................................................14

     C.   SUMMARY OF PLAINTIFFS' EXPERTS' OPINIONS.........................................15

III. SUMMARY OF CONCLUSIONS .......................................................................16

IV.  THE TANGIBLE BENEFITS TO MVC OWNERS FROM ACCESS TO
     RCDC PROPERTIES WERE DE MINIMIS. .....................................................19

     A.   USE OF RCDC PROPERTIES (AND ASPEN IN PARTICULAR) BY MVC MEMBERS
          WAS LIMITED. ..................................................................................................21

     B.   ADDITIONAL EVIDENCE CONFIRMS LIMITED TANGIBLE BENEFITS TO MVC
          MEMBERS FROM ACCESS TO RCDC PROPERTIES..........................................25

V.   PLAINTIFFS' UNJUST ENRICHMENT CLAIM DEPENDS ENTIRELY
     UPON AN AMORPHOUS HALO EFFECT THAT PLAINTIFFS'
     EXPERTS FAIL TO DEMONSTRATE APPLIES IN THIS CASE. ...........................30

     A.   PLAINTIFFS' CLAIM DEPENDS ON A THEORY THAT MVC MEMBERS PLACED
          SUBSTANTIAL VALUE ON ACCESS TO RCDC PROPERTIES DESPITE DE MINIMIS
          TANGIBLE BENEFITS..........................................................................................30

     B.   THE LITERATURE CITED BY PLAINTIFFS' EXPERTS DEMONSTRATES THAT A
          HALO EFFECT EXISTS ONLY UNDER CERTAIN CIRCUMSTANCES, WHICH MUST
          BE ESTABLISHED USING RELIABLE EMPIRICAL METHODS. ..............................31

     C.   PLAINTIFFS' EXPERTS FAIL TO DEMONSTRATE THAT ANY HALO EFFECT EXISTS
          HERE.................................................................................................................33

          1.   Plaintiffs' experts point to very limited evidence in the factual record
               that sheds light on any alleged halo effect........................................................34

i

**CONFIDENTIAL**

      2.    MVW's decision not to sell the RCDC business does not prove that MVW was unjustly enriched. ........................................................................38

VI.   **PLAINTIFFS' EXPERTS FAIL TO TIE ANY HALO EFFECT TO THE ALLEGEDLY ILLEGAL CONDUCT.** ...........................................................39

    A.   MVW USED THE RITZ-CARLTON BRAND TO MARKET THE MVC PROGRAM IN OTHER WAYS. ...................................................................................40

    B.   MR. SIMON FAILS TO ACCOUNT PROPERLY FOR THE STRENGTH OF THE MARRIOTT BRAND.........................................................................43

VII.  **MR. SIMON'S APPROACH TO QUANTIFYING THE HALO EFFECT FALLS WOEFULLY SHORT OF PROFESSIONAL STANDARDS** .........................46

    A.   MR. SIMON'S METHODOLOGY FAILS TO MEET PROFESSIONAL STANDARDS ON THREE KEY COMPONENTS OF A RELIABLE METHODOLOGY............................47

    B.   MR. SIMON'S FINDING OF A SIZEABLE NET HALO PRICE EFFECT IS DRIVEN ALMOST ENTIRELY BY HIS INACCURATE MEASUREMENT OF CHANGES IN MVC POINT PRICES. ....................................................................49

        1.    Mr. Simon improperly includes "changes" where the gross price did not change.......................................................................49

        2.    Mr. Simon ignores the time elapsed between price changes. ...........................52

        3.    Mr. Simon analyzes gross prices rather than the net prices consumers actually pay and MVW actually receives. .......................................55

        4.    Correcting these three errors eliminates almost all of Mr. Simon's measured halo effect. ...............................................................62

    C.   MR. SIMON DOES NOT DISTINGUISH RELIABLY THE HALO EFFECT PERIODS FROM THE "ORDINARY" PERIODS. ....................................................64

        1.    Mr. Simon's document-based approach is ad hoc. ...........................................64

        2.    Mr. Simon's unjust enrichment measure is especially sensitive to his ad-hoc identification of "extraordinary" price increases in the early years of the MVC program. ...............................................68

        3.    Mr. Simon fails to distinguish between the effects of the Affiliations and other means of access to RCDC properties by MVC points owners.............................................................................69

    D.   MR. SIMON FAILS TO APPLY VALID METHODS TO ACCOUNT FOR OTHER FACTORS THAT AFFECT THE PRICE OF MVC POINTS.....................................73

    E.   MR. SIMON'S ANALYSIS OF THE HALO EFFECT ON THE VOLUME OF MVC POINTS SOLD SUFFERS FROM THE SAME FLAWS AS HIS ANALYSIS OF PRICE CHANGES. ...................................................................................77

**CONFIDENTIAL**

VIII. MR. SIMON'S QUANTIFICATION OF AGGREGATE UNJUST
ENRICHMENT FROM HIS MEASURED HALO EFFECT IS
FUNDAMENTALLY FLAWED. ................................................................. 78

    A.    MR. SIMON'S TERMINAL VALUE/CAPITALIZATION CALCULATION, WHICH
GENERATES THE MAJORITY OF HIS UNJUST ENRICHMENT, IS FLAWED. ........................ 79

    B.    MR. SIMON FAILS TO CONSIDER MVW'S OPPORTUNITIES BUT-FOR THE
CHALLENGED CONDUCT ................................................................................................. 81

    C.    IF ONE ACCEPTS PLAINTIFFS' EXPERTS' OPINIONS, THEN MR. SIMON'S
MEASUREMENT OF UNJUST ENRICHMENT IS INCOMPLETE BECAUSE IT FAILS TO
QUANTIFY ANY OFFSETTING "HORN EFFECT" ON MVW. ............................................. 82

IX.    MR. SIMON SUBSTANTIALLY OVERSTATES THE ALLOCATION OF
ANY UNJUST ENRICHMENT TO PLAINTIFFS. ......................................................... 83

X.    SUMMARY OF FLAWS IN MR. SIMON'S ANALYSIS ............................................. 88

APPENDIX ........................................................................................................... 93

**CONFIDENTIAL**

## FIGURES

Figure 1: RCDC Properties Accounted for a Small Share of MVC Points Used....................25

Figure 2: RCDC Access was Rarely Identified as One of the Five Most Important MVC Program Features Considered in Purchase Decisions ..............................................................29

Figure 3: MVC Point Prices have Generally Followed a Steady Upward Trend....................54

Figure A1: RCDC Access was Rarely Identified as One of the Five Most Important MVC Program Features Considered in Purchase Decisions ..............................................................94

v

**CONFIDENTIAL**

# TABLES

Table 1: Summary of MVC Member Access to RCDC Properties Over Time ................ 13

Table 2: RCDC Roomnights Accessed by MVC Members ................................................ 22

Table 3: RCDC Properties Accounted for a Small Share of MVC Roomnights .............. 23

Table 4: Rank of MVC Program Features Based on Proportion of Respondents that Rated as Important to their Purchase Decision ............................................................................ 28

Table 5: MVC Points Pricing Summary Chart Relied Upon by Mr. Simon .................... 51

Table 6: Gross and Net Price Changes Over Time ........................................................... 60

Table 7: Correcting These Three Errors Nearly Eliminates Mr. Simon's Halo Effect ..... 63

Table 8: Mr. Simon's Halo Effect is Significantly Diminished when Using Net Price, Removing non-Price Changes, and Accounting for Time ................................................. 64

Table 9: RCDC Roomnights Available to MVC Members Through the Affiliations Made up a Small Percentage of Total Usage of RCDC Roomnights by MVC Members ........... 72

Table 10: Mr. Simon Overstates the Appropriate Allocation to the Aspen Plaintiffs ....... 87

Table A1: Rank of MVC Program Features Based on Proportion of Respondents that Rated as Important to their Purchase Decision ................................................................. 93

Table A2: Corrections to Mr. Simon's Measure of Price ................................................. 95

Table A3: Other Corrections to Mr. Simon's Measured Unjust Enrichment .................... 95

**CONFIDENTIAL**

### I.    QUALIFICATIONS AND ASSIGNMENT

#### A.    QUALIFICATIONS

1.    My name is Mark A. Israel.  I am a Senior Managing Director at Compass Lexecon, an economic consulting firm where I have worked since 2006.  From 2000 to 2006, I served as a full-time member of the faculty at Kellogg School of Management, Northwestern University.   I received my Ph.D. in economics from Stanford University in 2001.

2.    I specialize in the economics of industrial organization—which is the study of competition in imperfectly competitive markets, including the study of antitrust and regulatory issues—as well as applied econometrics.  At Kellogg and Stanford, I taught graduate-level courses covering topics including business strategy, industrial organization economics, and econometrics.  My research on these topics has been published in leading peer-reviewed economics journals including the American Economic Review, the Rand Journal of Economics, the Review of Industrial Organization, Information Economics and Policy, and the Journal of Competition Law and Economics.

3.    My work at Compass Lexecon has focused on the application of economic theory and econometric methods to competitive analysis of the impact of mergers, antitrust issues including a wide variety of single-firm and multi-firm conduct, class certification, and damages estimation.  I have analyzed these competition issues on behalf of a wide range of clients, including both private companies and government entities.   I have testified in Federal court, multiple State courts, and in many

2

**CONFIDENTIAL**

regulatory and arbitration proceedings in the U.S. and around the world.  I have submitted expert reports, declarations, and affidavits to government agencies and Federal courts.

4.    As two examples of my work relevant to this case, I served as the lead economic expert on behalf of Marriott International, Inc. ("Marriott International") in the Department of Justice's review of its acquisition of Starwood Hotels and Resorts; and I served as the lead economic expert on behalf of Marriott Vacations Worldwide Corporation ("Marriott Vacations Worldwide") in the Department of Justice's review of its acquisition of ILG Inc.  Through my work on those transactions I gained significant experience in the economic analysis of the hospitality industry in general and the vacation ownership (sometimes called timeshare) business in particular.

5.    I am being compensated for my work on this case at my hourly rate of $1,100 per hour.  I have no financial interest in the outcome of this matter.  I attach as Exhibit A my CV which includes a list of my previous testimony.

   **B.    ASSIGNMENT**

6.    I have been retained by counsel for defendants Marriott Vacations Worldwide; Marriott Ownership Resorts, Inc., d/b/a Marriott Vacation Club International; The Ritz-Carlton Management Company, LLC; Cobalt Travel Company, LLC; and the Lion & Crown Travel Co., LLC (collectively "MVW") to review and evaluate the

**CONFIDENTIAL**

opinions of Mr. Jon Simon[1] (and, to the extent relied upon by Mr. Simon, the opinions of Professor Chekitan Dev[2]) as they relate to Plaintiffs' claims of unjust enrichment.  In particular, I have been asked to evaluate whether Mr. Simon offers any reliable basis to conclude that MVW was unjustly enriched by the alleged actions in this case, and whether he offers a reliable methodology to quantify any unjust enrichment.

7.   Exhibit B contains a list of materials I have relied upon in forming my opinions.  I reserve the right to supplement my opinions in light of any new facts that may arise or any new opinions or analyses that Plaintiffs' experts might offer.  For example, I understand that Professor Dev and Mr. Simon have not yet been deposed regarding the opinions in their expert reports.

---

[1]   Expert Report of Jon Simon, October 26, 2018 (hereafter "Simon Report").

[2]   Expert Report of Chekitan S. Dev, Ph.D., October 26, 2018 (hereafter "Dev Report").

4

**CONFIDENTIAL**

## II.     BACKGROUND, PLAINTIFFS' ALLEGATIONS, AND SUMMARY OF PLAINTIFFS' EXPERTS' OPINIONS

### A.     BACKGROUND

#### 1.     The Marriott Vacation Club and The Ritz-Carlton Destination Club programs

8.     MVW designs, builds, manages, and maintains vacation ownership properties under several brands, including Marriott Vacation Club ("MVC") and The Ritz-Carlton Destination Club ("RCDC").[3]

9.     Marriott International entered the timeshare segment in 1984.[4]  In the early years of its existence, Marriott International's vacation ownership business focused on the sale of one-week timeshare intervals ("Legacy Weeks" owned by "Legacy Owners").[5]  Over time, to serve consumers' demands for more flexibility, the timeshare industry has shifted increasingly towards a points-based system. Following this marketplace trend, in June 2010, Marriott Ownership Resorts, Inc. ("MORI") launched the Marriott Vacation Club Destinations ("MVCD") program as a flexible points-based vacation ownership program (to be consistent with Mr. Simon's terminology, I will refer to the program as MVC and its points as MVC

---

[3]     MVW's two other brands are Grand Residences by Marriott and The Ritz-Carlton Residences, which are, at least in part, whole ownership properties (see: Marriott Vacations Worldwide 2017 Form 10-K, p. 5).

[4]     Prior to the spinoff of Marriott Vacations Worldwide in November 2011, Marriott International's vacation ownership business was part of Marriott Ownership Resorts, Inc., d/b/a Marriott Vacation Club International.

[5]     Marriott Vacations Worldwide, 2011 Form 10-K, p. 3.

**CONFIDENTIAL**

points).[6]  Purchasers (who then became members of the program) could purchase points and use their points to stay at a wide range of MVC properties, as well as to access other vacation experiences such as cruises, excursions, tours, adventure travel and hotels.[7, 8]

10.    As part of the new points-based MVC program, MORI created the Marriott Vacation Club Trust ("MVC Trust"), into which MORI's available traditional weeks timeshare inventory (available inventory of Legacy Weeks) was transferred, and into which interests in new MVC resort properties were placed.[9]  Consumers were then sold beneficial interests in the MVC Trust ("Beneficial Interests") with an initial minimum purchase of four Beneficial Interests (250 annual points per Beneficial Interest, or 1,000 annual points), which was later changed to a minimum purchase of six Beneficial Interests (or 1,500 points).[10]  MVC members could use

---

[6]    "Marriott Vacation Club Introduces New Vacation Ownership Program," MVC Newsroom, June 21, 2010, available at https://www.marriottvacationclub.com/news-press-releases/2010/06/2010-06-21-Marriott-Vacation-Club-Introduces-New-Vacation-Ownership-Program.shtml (accessed November 28, 2018) (hereafter "Marriott Vacation Club Introduces New Vacations Ownership Program"); Marriott International, 2010 Annual Report, p. 13.

[7]    Marriott Vacation Club Introduces New Vacations Ownership Program; Marriott Vacations Worldwide, 2011 Form 10-K, p. 6; "Four Great Ways to Enjoy Your Marriott Vacation Club Ownership," Exhibit 25 of Richard Hayward Deposition.

[8]    MVC members also pay an annual maintenance fee.  See, for example: Marriott Vacations Worldwide 2011 Form 10-K, p. 2.

[9]    Marriott International 2010 Annual Report, p. 36; Deposition of Stephen Weisz, President and CEO of MVW, May 17, 2018 (hereafter "Weisz Deposition"), pp. 158-159.

[10]   See, for example: "Pricing Information," MVC, as of February 27, 2014, available at https://web.archive.org/web/20140227221551/http://www.marriottvacationclub.com/timeshare-ownership/vacation-examples-and-pricing.shtml (accessed December 21, 2018).

**CONFIDENTIAL**

their MVC points to reserve time at the underlying properties in which the Trust owned interests.  MVC members could also use their annual MVC points to gain access to 1) experiences such as cruises, excursions, and other tours and travel packages included in the "Explorer Collection," 2) thousands of hotels and experiences through the Marriott Rewards Program operated by Marriott International, and 3) a global system of thousands of affiliated resorts through Interval International.[11]   In addition, the Legacy Owners (traditional timeshare weeks-based owners) could, on an annual basis, trade their Legacy Weeks for MVC points.[12]  Those timeshare weeks that were traded for points would then become accessible to MVC points owners.[13]

11.   Marriott International spun off its timeshare operations in November 2011, creating a new, publicly-traded independent company, Marriott Vacations Worldwide.[14]

12.   Since 2001, as part of its timeshare business described above, MORI, through a subsidiary, has also developed and sold fractional interests at nine RCDC properties.   In addition to The Ritz-Carlton Club, Aspen Highlands ("Aspen") located in Aspen, Colorado, these included RCDC properties in Bachelor Gulch,

---

[11]     Marriott Vacation Club Introduces New Vacation Ownership Program.

[12]     Marriott Vacations Worldwide 2011 Form 10-K, p. 7.

[13]     Marriott Vacations Worldwide 2011 Form 10-K, p. 7.

[14]     Marriott Vacations Worldwide, 2011 Form 10-K, pp. 3-4.

**CONFIDENTIAL**

Colorado; Jupiter, Florida; Lake Tahoe, California; St. Thomas, US Virgin Islands; San Francisco, California; Vail, Colorado; Abaco, Bahamas; and Maui, Hawaii.[15]

### 2.     Evolution of the connection between the MVC and RCDC programs

13.   Although Marriott International maintains distinct MVC and RCDC brands even today, the connection between the MVC and RCDC programs has grown stronger over time.

14.   *First*, beginning no later than July 2011, a subset of MVC members (those with Premier or Premier Plus status) could use their MVC points for stays at RCDC properties – Abaco, Aspen, San Francisco, St. Thomas, and Vail – through the Explorer Collection.[16, 17] These RCDC stays were limited to developer-owned inventory, meaning fractional interests at RCDC resorts that had not yet been sold.[18] In September 2012, developer-owned inventory at two additional RCDC properties,

---

[15]      Complaint, ¶ 4.

[16]      See for example: "Marriott Vacation Club Insider Bulletin," Marketing email from MVC to Julie Schorr, July 27, 2011 (Exhibit 29 to Richard Hayward Deposition).

[17]      MVW's RCDC roomnight summary data show that, between 2010 and 2011, MVC members used points to access to eight RCDC properties on a limited basis.  See: RCDC Annual Roomnights Summary Through 2017 for Aspen, Lake Tahoe, and San Francisco (RCDC073606-607 at 606); RCDC Annual Roomnights Summary Through 2017 for St. Thomas and Vail (RCDC073708-709 at 708); RCDC Annual Roomnights Summary Through 2017 for Jupiter, Bachelor Gulch, and Kapalua Bay (RCDC073710-711 at 710).

[18]      "Update on access to Ritz-Carlton Club locations via Premier, Premier Plus," MVW Presentation (RCDC006549-571 at 553).

**CONFIDENTIAL**

Lake Tahoe and Jupiter, also became available to Premier and Premier Plus members.[19, 20]

15.   In 2011, Premier and Premier Plus members accounted for approximately 9% of all MVC owners.[21,22]   Whereas MVC ownership required a minimum ownership of 1,500 points, Premier status required ownership of 6,500 points and Premier Plus status required ownership of 13,000 points, an investment at then-current point prices of $59,800 and $119,600 respectively.[23]

16.   *Second*, by the end of 2011, all MVC members were able to use points to book stays at the RCDC in Vail.   In particular, in 2011, MVW placed a portion of its

---

[19]   See for example: "Update on access to Ritz-Carlton Club locations via Premier, Premier Plus," MVW Presentation (RCDC006549-571 at 550-551).

[20]   The RCDC roomnight summary data indicate that these two RCDC properties were accessed in 2010 and 2011 on a limited basis (see: RCDC Annual Roomnights Summary Through 2017 for Aspen, Lake Tahoe, and San Francisco (RCDC073606-607 at 606); RCDC Annual Roomnights Summary Through 2017 for Jupiter, Bachelor Gulch, and Kapalua Bay (RCDC073710-711 at 710)). The same data also indicate that RCDC properties at Bachelor Gulch and Kapalua Bay were accessed by MVC members in or before 2012 (see: RCDC Annual Roomnights Summary Through 2017 for Jupiter, Bachelor Gulch, and Kapalua Bay (RCDC073710-711 at 710)).

[21]   This share is estimated using counts of the number of members that received MVC emails, including weeks-based owners.  Premier and Premier Plus members accounted for 32% of points-based MVC owners in April 2013 (see RCDC Sample09166-176 at 176).

[22]   Note that Mr. Simon states that "due to all MVC members' ability to 'bank and borrow' points [], any MVC member could use points from past or future years to have enough points to access a RCDC property.  Thus, in practice, RCDC's were open to a large portion MVC members." (Simon Report, fn. 84.)  However, I understand that prior to the Affiliations, even with the ability to "bank and borrow points," standard MVC members could not use those tools to achieve Premier and Premier Plus membership.

[23]   See, e.g., "Benefits at a Glance," 2011-12 (RCDC073593).  After applying the applicable discount of 10%, the net price of a MVC point from March to November 2011 was $9.20. See: "MVCD Price History Summary" (RCDC072265).

**CONFIDENTIAL**

developer-owned inventory at Vail in the MVC Trust,[24] and all MVC members could use MVC points to access this, like the other inventory in the MVC Trust. Notably, Vail was the only RCDC property that could be accessed by all MVC members at this point; the other RCDC properties, including Aspen, could only be accessed by Premier and Premier Plus members (accessing developer-owned inventory in these properties through the Explorer Collection).[25]

17.     *Third*, building on the program described in the last paragraph, starting in 2014 and continuing through to 2017, MVW transferred developer-owned inventory at the RCDC properties in San Francisco, Lake Tahoe, and St. Thomas (plus additional inventory at the RCDC in Vail) into the MVC Trust, thus making this inventory available for all MVC members.[26]  Notably, inventory at Aspen was never placed into the MVC Trust, meaning that any benefits to MVW associated with placing RCDC properties in the MVC Trust are not driven by the RCDC Aspen location.

---

[24]     See: RCDC Annual Roomnights Summary Through 2017 for St. Thomas and Vail (RCDC073708-709 at 708). MVW placed additional roomnights at the RCDC in Vail from its developer-owned inventory into the MVC Trust during 2012.

[25]     Simon Report, ¶ 49. The number of RCDC properties that MVC members could access has decreased over time.  The resort at Kapalua Bay disaffiliated at the end of 2012. Bachelor Gulch disaffiliated in 2013. The Abaco and Jupiter properties were disaffiliated from the The Ritz-Carlton brand in January 2013 and late 2014 respectively. See: "Update on access to The Ritz-Carlton Club locations via Premier, Premier Plus," MVW Presentation (RCDC006549-571 at 570); RCDC Annual Roomnights Summary Through 2017 for Jupiter, Bachelor Gulch, and Kapalua Bay (RCDC073710-711 at 710).

[26]     See: RCDC Annual Roomnights Summary Through 2017 for Aspen, Lake Tahoe, and San Francisco (RCDC073606-607 at 606); RCDC Annual Roomnights Summary Through 2017 for Aspen, Lake Tahoe, and San Francisco (RCDC073606-607 at 606).

**CONFIDENTIAL**

18.     Finally, at different points during 2014, MVW finalized and announced an

exchange affiliation between MVC and each RCDC at Aspen, San Francisco, Lake

Tahoe, Vail and St. Thomas, when the owners association boards at each of these

Clubs entered into an Acknowledgment and Joinder to the Affiliation for each of

the Clubs (the "Affiliations").[27]  The Affiliation of RCDC Aspen Highlands and

MVC occurred and was announced in April 2014 when the Aspen Highlands Board

signed an Acknowledgment and Joinder for the Affiliation.[28]  The Affiliations for

Aspen, San Francisco, Lake Tahoe, and St. Thomas became effective December

2014,[29] at which point RCDC owners could begin depositing their 2015 weeks with

MVC in exchange for MVC points for use in 2015 – which then made those 2015

---

[27]     See for example: "Acknowledgement Of And Joinder To Affiliation Agreement Between
The Lion & Crown Travel Co., LLC And Marriott Resorts, Travel Company, Inc.," by
and among Marriott Resorts Travel Company, Inc., The Lion & Crown Travel Co., and
690 Market Club Owners Association (San Francisco), December 2014 (RCDC000196-
199); "Acknowledgement Of And Joinder To Affiliation Agreement Between The Lion &
Crown Travel Co., LLC And Marriott Resorts, Travel Company, Inc.," by and among
Marriott Resorts Travel Company, Inc., The Lion & Crown Travel Co., and Highlands
Resort Club Association, Inc. (Lake Tahoe), October 20, 2014 (RCDC002853-856);
"Acknowledgement Of And Joinder To Affiliation Agreement Between The Lion &
Crown Travel Co., LLC And Marriott Resorts, Travel Company, Inc.," by and among
Marriott Resorts Travel Company, Inc., The Lion & Crown Travel Co., and Aspen
Highlands Condominium Association, Inc. (Aspen), April 24, 2014 (RC 004136-139). I
understand that the Owners Association Boards for the RCDC properties at Vail and St.
Thomas also signed similar Affiliation agreements in 2014.

[28]     "Acknowledgement Of And Joinder To Affiliation Agreement Between The Lion &
Crown Travel Co., LLC And Marriott Resorts, Travel Company, Inc.," April 24, 2014
(RC 004136-139); Letter from Aspen Highlands Condominium Association, Inc. to
Members, April 2014 (AHCA00003114-117).

[29]     The Affiliation for Vail was also approved in 2014, but it appears that it became effective
in late 2014, because the documents show that some RCDC owner roomnights were
exchanged and deposited with the MVCD for 2014.

11

**CONFIDENTIAL**

weeks deposited with MVCD available to be booked by MVC members using their MVC points beginning in 2015.[30]

19.   Table 1 below summarizes the access that MVC members had to RCDC properties, and the means through which this access was granted, over time.[31]

---

[30]   "Job Aide – Lion & Crown and MVCD Affiliation – Frequently Asked Questions," December 5, 2014 (RCHC008102-112 at 102 and 105); Email from Eveleen Babich (General Manager of The Lion & Crown Travel Company, L.L.C.) to 690 Market Club Owners Association Re: Notice of Effective Date of Acknowledgement of and Joinder to Affiliation Agreement, January 20, 2015 (RCDC070235). Roomnight data indicate that 91 roomnights at RCDC Vail were elected for MVC points in 2014 (See: RCDC Annual Roomnights Summary Through 2017 for Vail and St. Thomas (RCDC073708-709 at 708).

[31]   This table is based upon the RCDC roomnight summary data produced by MVW.  I understand that there are slight discrepancies between the data and the documentary evidence discussed above.

**CONFIDENTIAL**

**Table 1: Summary of MVC Member Access to RCDC Properties Over Time**

**(2010-2017 as of the End of Each Calendar Year)**

| Property | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
|----------|------|------|------|------|------|------|------|------|
| Aspen | D | D | D | D | D | D, A | D, A | A |
| Bachelor Gulch | - | - | D | | | | | |
| Kapalua Bay | D | D | | | | | | |
| Jupiter | D | D | D | D | | | | |
| Lake Tahoe | D | D | D | D | D, T | D, T, A | D, T, A | D, T, A |
| Abaco[(*)] | - | D | D | | | | | |
| San Francisco | D | D | D | D | D, T | D, T, A | D, T, A | D, T, A |
| St. Thomas | D | D | D | D | D, T | D, T, A | D, T, A | D, T, A |
| Vail | D | D, T | D, T | D, T | D, T, A | D, T, A | D, T, A | D, T, A |

**Notes:**

1. "-" = Not accessed by MVC members.

2. D = Through developer-owned inventory (only applicable to Premier and Premier Plus members from 2010-2014).

3. T = Through Trust-owned inventory

4. A = Through the Affiliations

5. Shaded cells represent properties that had disaffiliated from RCDC by the end of the given year. The resort at Kapalua Bay disaffiliated at the end of 2012, the resorts at Abaco and Bachelor Gulch disaffiliated in 2013, and the resort at Jupiter disaffiliated in 2014.

6. (*) = Roomnight data are not available for Abaco. Access for Abaco was determined based on documentary evidence.

**Sources:** RCDC Annual Roomnights Summary Through 2017 for Aspen, Lake Tahoe, and San Francisco (RCDC073606); RCDC Annual Roomnights Summary Through 2017 for St. Thomas and Vail (RCDC073708); RCDC Annual Roomnights Summary Through 2017 for Jupiter, Bachelor Gulch, and Kapalua Bay (RCDC073710); Exhibit 29 to Richard Hayward Deposition; RCDC006549.

**CONFIDENTIAL**

### B.    PLAINTIFFS' ALLEGATIONS

20.    Plaintiffs are owners of 233 fractional interests (of the 876 total fractional interests) at Aspen, a 73-unit fractional-ownership property in Aspen, Colorado.[32]

21.    In their Complaint, Plaintiffs focus on the Affiliation between Aspen and MVC as the event that they claim harmed Plaintiffs by substantially reducing the value of their fractional interests in Aspen units.[33]

22.    Plaintiffs' experts appear to characterize the Plaintiffs' allegations more broadly than does the Complaint.  According to Mr. Simon:

> The complaint alleges that over the last several years, Defendants, including Defendant Marriott Vacations Worldwide Corporation ("MVW") and its subsidiaries and affiliates, knowingly damaged Plaintiffs and unjustly enriched themselves by violating (or aiding and abetting in, or conspiring to violate) various fiduciary duties owed by certain Defendants to Plaintiffs. At the core of the fiduciary duty (and constructive fraud) claims is the Marriott Defendants' actions in affiliating the Ritz-Aspen with the less exclusive and lower-priced Marriott Vacation Club ("MVC"), *and, even before the official affiliation, allowing MVC members to use their MVC points to purchase nights at the Ritz-Aspen on more favorable and less expensive terms than provided to Plaintiffs.*[34] [Emphasis added.]

23.    Professor Dev also evaluates this broader conduct, namely "the co-mingling of the Ritz-Carlton and Marriott brands, first by allowing MVC members to access

---

[32]    Complaint, ¶ 1; Marriott Vacations Worldwide 2017 Form 10-K, p. 14; Simon Report, Exhibit H.

[33]    Sixth Amended Complaint, ¶¶ 9-10.

[34]    Simon Report, ¶ 5 (citations, to Sixth Amended Complaint, omitted).

14

**CONFIDENTIAL**

RCDCs (including Aspen), co-marketing the two, and then systematically affiliating the distinct RCDC and MVC products."[35]

### C.   SUMMARY OF PLAINTIFFS' EXPERTS' OPINIONS

24.   Mr. Simon asserts that by providing MVC members access to the RCDC properties, MVW achieved a "halo effect" on the MVC brand,[36] with which it was able to increase the price of each MVC point it sold, leading to unjust enrichment of MVW.[37]   Mr. Simon calculates that MVW has been unjustly enriched as a result of this halo effect in the amount of $718.6 million: $248.6 million from August 2011 through December 2017, and another $470.0 million (or 65% of the total damages) from January 2018 going forward as a result of his assumption that the halo effect will continue, *in perpetuity*.[38]   Mr. Simon determines that 13.87% of this amount is "attributable to Plaintiffs in this action" (i.e., a subset of owners of Aspen units), yielding an estimate of unjust enrichment owed to Plaintiffs of $99.6 million.[39]

---

[35]   Dev Report, ¶ 5.

[36]   In what follows, for convenience I adopt the term "halo effect" to describe the effect on MVC profits that Mr. Simon is attempting to measure, even though no such effect may exist in this case.

[37]   Mr. Simon also alleges that the halo effect increase the volume of MVC points that MVW was able to sell, but he provides very little analysis of this claim and, notably, does not quantify this effect on unjust enrichment (Simon Report, ¶¶ 85-86).

[38]   Simon Report, ¶ 16e.

[39]   Simon Report, ¶ 16e.

15

**CONFIDENTIAL**

### III.    SUMMARY OF CONCLUSIONS

25.    My main conclusion is simple.  Mr. Simon has failed to demonstrate reliably that MVW was unjustly enriched by the challenged conduct and, in particular, he has failed to put forward a reliable methodology for quantifying any such unjust enrichment.  Indeed, even if I accept Mr. Simon's methodology for the sake of argument (without accepting its validity), simply correcting for some fundamental errors made by Mr. Simon wipes out all or nearly all of his calculated unjust enrichment.

26.    This main conclusion is supported by the more detailed findings summarized in the remainder of this section.

27.    First, the tangible benefits to MVC owners from access to RCDC properties are very small.  Thus, Plaintiffs' experts' halo effect theory of unjust enrichment depends critically upon MVW having generated substantial increases in the price of MVC points despite de minimis actual benefits to MVC members.

28.    Second, the evidence that Plaintiffs' experts cite to support the general existence of a halo effect actually proves that such an effect is present only under certain circumstances and can be demonstrated to hold in a given case only by rigorous empirical analysis.  And Plaintiffs' experts fail to point to evidence in the record that demonstrates that the connection between the RCDC and MVC programs generated a halo effect here.  Thus, the support of their theory falls entirely to Mr. Simon's empirical analysis.

16

**CONFIDENTIAL**

29.   Third, Plaintiffs' experts' halo effect theory centers upon The Ritz-Carlton brand and cannot reliably distinguish between (i) the value conveyed by marketing The Ritz-Carlton Destination Clubs through the Affiliations and (ii) the value conveyed through other marketing strategies for the brand, including but not limited to promoting access to The Ritz-Carlton hotels or promoting access to The Ritz Carlton Destination Clubs through developer-owned inventory. Given that Plaintiffs' experts are alleging a theory of benefit to MVW that is not tied to tangible metrics of accessibility or use of The Ritz-Carlton properties, they have no ability to say that these alternative strategies would not have been equally effective in generating whatever halo effect (if any) existed. Their theory is simply too vague and unsupported to rule out any such possibilities.

30.    Fourth, Mr. Simon's empirical analysis cannot come close to carrying the weight that Plaintiffs' argument puts on it. Indeed, it falls woefully short of professional standards and is completely incapable of supporting Plaintiffs' halo effect theory. In particular, Mr. Simon's analysis of the halo effect suffers from three key flaws.

- Mr. Simon fails to measure accurately the change in price of MVC points. His measure of price is flawed in three ways, described in detail below. Correcting these three fundamental errors in his price measure almost completely eliminates Mr. Simon's unjust enrichment damages.

  o  Mr. Simon improperly includes "changes" where the gross price in fact did not change.

17

**CONFIDENTIAL**

- o Mr. Simon ignores the elapsed time between price changes which is obviously a relevant factor in explaining the size of any price increase.

- o Mr. Simon analyzes the halo effect using gross price instead of net price, and thus does not analyze the price that actually reflects revenue to MVW and thus that could possibly contribute to any unjust enrichment.

- o Correcting just these three obvious errors in measuring price reduces Mr. Simon's damages by 94% from $99.6 million to $6.3 million.

- Mr. Simon also does not distinguish reliably between the halo effect periods and the "ordinary" periods. He uses an unreliable, ad hoc, anecdotal review of a very small subset of MVW communications to determine when the halo effect purportedly affected the price of MVC points. Moreover, in determining the relevant halo effect periods, he implicitly assumes that any connection between the MVC and RCDC programs was not allowed and thus at issue in this case, whereas Plaintiffs' focus of the complaint relates to the formal Affiliations between MVC and certain RCDC properties.

  - o Limiting Mr. Simon's halo effects to the post-2014 (i.e., post-Affiliations) period, and also correcting the three errors in measuring price discussed above completely eliminates Mr. Simon's measured unjust enrichment.

- Mr. Simon fails to apply valid methods to account for all of the other relevant factors (aside from the alleged halo effect) that affect the price of MVC points. Hence, he has failed to isolate the effect of the challenged conduct from other potential explanations for changes in prices.

18

**CONFIDENTIAL**

31.    Finally, Mr. Simon substantially overstates the allocation of any unjust enrichment to Plaintiffs.  He provides no justification for using property values as the basis for allocation.  A more appropriate metric that bears substantially greater relationship to any alleged unjust enrichment is the extent of access to RCDC properties by MVC points owners.  If this more appropriate allocation measure is applied, it reduces Aspen Plaintiffs' share from 13.9% to 2.2% and reduces Mr. Simon's measured unjust enrichment accordingly.

- Correcting the three errors in measuring price described above, and using this more appropriate allocation measure, reduces Mr. Simon's unjust enrichment by 99% from $99.6 million to $1.0 million.

- Making all of these corrections and further limiting unjust enrichment to the post-2014 (i.e., post-Affiliations) period completely eliminates Mr. Simon's measured unjust enrichment (regardless of which measure of allocation is used).

## IV.    THE TANGIBLE BENEFITS TO MVC OWNERS FROM ACCESS TO RCDC PROPERTIES WERE DE MINIMIS.

32.    The limited connection between the MVC and RCDC programs mean that any tangible benefits to MVC owners from the connection with the RCDC program were de minimis.  In particular, MVC owners only gained a tangible benefit from the connection between the RCDC and MVC programs to the extent that these connections enabled MVC owners to use their points to stay at an associated RCDC property.  In what follows in Section IV, I demonstrate that, consistent with the discussion in Section II, such use of points by MVC members to stay at RCDC

19

**CONFIDENTIAL**

properties was, in fact, very limited.  The use of Aspen specifically by MVC members was, of course, even more limited.

33.   This means that Mr. Simon's theory of unjust enrichment depends entirely on a claim that the premium that MVC members were willing to pay for access to RCDC properties was substantial even though any tangible benefit was very small.  As discussed in Section V, even the vague, general theory of halo effect advanced by Professor Dev and Mr. Simon would require rigorous empirical proof to show it applies here and applies sufficiently strongly to support such a perception so far out of line with reality.  As discussed in Sections V and VII, both the quantitative and qualitative evidence presented by Plaintiffs' experts fall far short of this standard.

34.   In the rest of this section I first present data demonstrating that the use of RCDC properties (and Aspen in particular) by MVC member was limited, using three different metrics.  First, relatively few RCDC roomnights were used by MVC points owners.  Second, RCDC properties accounted for only a small share of all roomnights accessible with MVC points (including roomnights at Marriott-branded and other properties in the MVC portfolio).  Third, RCDC properties accounted for only a small share of all points redeemed by MVC members.

35.   I then demonstrate the limited tangible benefits to MVC members from RCDC properties in two other ways.  First, RCDC properties were substantially more expensive than were other MVC properties.  Second, consumer surveys show that most point purchasers did not view access to RCDC properties as an important benefit.

20

**CONFIDENTIAL**

A.  **USE OF RCDC PROPERTIES (AND ASPEN IN PARTICULAR) BY MVC MEMBERS WAS LIMITED.**

36.  First, relatively few RCDC roomnights were actually accessed by MVC points owners.  As shown in Table 2, with the exception of the RCDC in Vail (where developer-owned inventory was put into the Trust starting in 2011), relatively few roomnights were booked by MVC owners at RCDC properties.  On average, from 2011 through 2017, only 950 roomnights were booked at Aspen per year and 6,161 roomnights were booked in total at all RCDC properties other than Vail per year. To put this in perspective, there were over 400,000 MVC owners in this time period.  Thus, on average there was only 1 roomnight booked at Aspen per year for every 421 members each year from 2011 to 2017, and only 1 roomnight booked per year at an RCDC property other than Vail for every 65 members.  Said differently, the probability that any given MVC member stayed at an RCDC property in a given year was extremely low.  Considering that many of the stays that did occur at RCDC properties were surely longer than one night, the true probability that any given MVC member stayed at an RCDC property was even smaller.

21

**CONFIDENTIAL**

**Table 2: RCDC Roomnights Accessed by MVC Members**

| Year | Roomnights Booked Using MVC Points | | | | | | | | | | Aspen Share of Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Aspen | Bachelor Gulch | Kapalua Bay | Jupiter | Lake Tahoe | Abaco | San Francisco | St. Thomas | Vail | Total | |
| 2010 | 5 | 0 | 4 | 62 | 47 | N/A | 28 | 44 | 0 | 190 | 2.6% |
| 2011 | 267 | 0 | 263 | 395 | 165 | N/A | 523 | 301 | 279 | 2,193 | 12.2% |
| 2012 | 545 | 224 | 290 | 624 | 334 | N/A | 1,020 | 618 | 1,860 | 5,515 | 9.9% |
| 2013 | 846 | 7 | | 1,159 | 642 | | 1,580 | 1,120 | 4,445 | 9,799 | 8.6% |
| 2014 | 1,300 | | | 894 | 621 | | 1,959 | 1,201 | 5,740 | 11,715 | 11.1% |
| 2015 | 1,897 | | | | 1,114 | | 2,820 | 2,500 | 7,350 | 15,681 | 12.1% |
| 2016 | 1,022 | | | | 1,347 | | 3,208 | 3,174 | 8,768 | 17,519 | 5.8% |
| 2017 | 773 | | | | 1,501 | | 3,932 | 2,939 | 9,121 | 18,266 | 4.2% |
| 2010-2014 (Pre-Affiliation) | 2,963 | 231 | 557 | 3,134 | 1,809 | N/A | 5,110 | 3,284 | 12,324 | 29,412 | 10.1% |
| 2015-2017 (Post-Affiliation) | 3,692 | | | | 3,962 | | 9,960 | 8,613 | 25,239 | 51,466 | 7.2% |

Note: Shaded cells represent properties that had disaffiliated from RCDC.

Sources: RCDC Annual Roomnights Summary Through 2017 for Aspen, Lake Tahoe, and San Francisco (RCDC073606); RCDC Annual Roomnights Summary Through 2017 for St. Thomas and Vail (RCDC073708); RCDC Annual Roomnights Summary Through 2017 for Jupiter, Bachelor Gulch, and Kapalua Bay (RCDC073710).

37.   Second, RCDC properties accounted for only a small share of all roomnights accessible with MVC points. The core use of MVC points was for stays at MVC properties. As shown in Table 3, only 0.5% and 0.1% of accessible MVC roomnights were at Aspen in the pre-Affiliation and post-Affiliation periods, respectively. The share was also small when considering all RCDC properties: Only 3.9% of accessible MVC roomnights were roomnights at RCDC properties in the pre-Affiliation period from 2011 to 2014. This fraction actually *decreases* to 2.0% in the post-Affiliation period from 2015 to 2017.

**CONFIDENTIAL**

**Table 3: RCDC Properties Accounted for a Small Share of MVC Roomnights**

| Year | Aspen Roomnights | | | All RCDC Roomnights | | | MVC Roomnights | | % Aspen ([a]+[b]+[c]/ [d]+[e]+[f]+[g]+[h]) | % RCDC ([d]+[e]+[f]/ [d]+[e]+[f]+[g]+[h]) |
|---|---|---|---|---|---|---|---|---|---|---|
| | Trust-Owned [a] | Developer-Owned [b] | RCDC Member Elected [c] | Trust-Owned [d] | Developer-Owned [e] | RCDC Member Elected [f] | Trust-Owned [g] | Elected for Points by Legacy Owners [h] | | |
| 2011 | 0 | 3,388 | 0 | 4,032 | 27,328 | 0 | 175,322 | 222,110 | 0.8% | 7.3% |
| 2012 | 0 | 3,332 | 0 | 9,072 | 18,627 | 0 | 287,686 | 284,620 | 0.6% | 4.6% |
| 2013 | 0 | 3,220 | 0 | 9,072 | 13,300 | 0 | 398,622 | 309,890 | 0.4% | 3.1% |
| 2014 | 0 | 2,324 | 0 | 14,490 | 7,952 | 91 | 527,240 | 323,190 | 0.3% | 2.6% |
| 2015 | 0 | 560 | 952 | 17,535 | 2,450 | 1,785 | 623,588 | 336,490 | 0.2% | 2.2% |
| 2016 | 0 | 252 | 1,054 | 19,740 | 840 | 1,908 | 733,572 | 349,790 | 0.1% | 2.0% |
| 2017 | 0 | 0 | 938 | 20,307 | 231 | 1,904 | 868,938 | 372,400 | 0.1% | 1.8% |
| **2010-2014 (Pre-Affiliation)** | **0** | **12,264** | **0** | **36,666** | **67,207** | **0** | **1,388,870** | **1,139,810** | **0.5%** | **3.9%** |
| **2015-2017 (Post-Affiliation)** | **0** | **812** | **2,944** | **57,582** | **3,521** | **5,688** | **2,226,098** | **1,058,680** | **0.1%** | **2.0%** |

**Notes:** The Affiliation is defined as beginning in 2015 with the exception of RCDC member elected roomnights in 2014. MVC Roomnights Elected by Weeks-Based Owners are calculated by applying the proportion of weeks-based owners who elected points in 2013 (see: RCDC08062-079 at 066) to the total number of weeks that were enrolled in the program at the end of each year as per MVW's 10-Ks. Figures for 2010 are not reported as it was a partial year for the MVC program whereas the RCDC roomnight summaries report inventory figures for the full year.

**Sources:** MVC Trust Inventory Summary (RCDC073755_NAT); RCDC Annual Roomnights Summary Through 2017 for Aspen, Lake Tahoe, and San Francisco (RCDC073606); RCDC Annual Roomnights Summary Through 2017 for St. Thomas and Vail (RCDC073708); RCDC Annual Roomnights Summary Through 2017 for Jupiter, Bachelor Gulch, and Kapalua Bay (RCDC073710); Marriott Vacations Worldwide 2011-2017 Form 10-Ks; RCDC08062-079 at 066.

38.     More generally, MVC members can use their points for a variety of vacation experiences, beyond just stays at MVC and (where possible) RCDC properties. These other uses included cruises, tours, hotel stays, insurance, and other benefits. In fact, stays at RCDC properties accounted for a tiny fraction of MVC points used. Instead, points were used predominantly for stays at non-RCDC properties and other experiences.[40]  For example, in 2013 as shown in Figure 1, only 0.9% of MVC points used were spent on all RCDC properties (including Aspen) in the Explorer Collection (and because Aspen was one of several available RCDC properties, the share of points spent on stays at Aspen specifically must have been well below 0.9%).  The vast majority, 72%, were used for stays at properties

---

[40]     See for example, "Benefits at a Glance", MVC, available at https://www.marriottvacationclub.com/common/cms/mvcau/pdfs/benefits-at-a-glance-chart-US.pdf  (accessed December 20, 2018); "How to Redeem Points", Marriott, https://www.marriott.com/loyalty/redeem.mi (accessed November 13, 2018).

**CONFIDENTIAL**

through the MVC Trust.[41]  Cruises accounted for the second largest fraction at 8%,

and tours, hotels, airfare, insurance, and exchanges for Marriott Rewards points

each accounted for a larger fraction of points used than did RCDC properties in the

Explorer Collection.

---

[41]      While this includes stays at Vail, for which developer-owned inventory was put into the
MVC Trust, no Aspen inventory was put in the Trust.

**CONFIDENTIAL**

**Figure 1: RCDC Properties Accounted for a Small Share of MVC Points Used**



Notes: The data is from 2013. Points that were banked, borrowed, or expired were excluded.
Source: RCDC008062-079.

### B. ADDITIONAL EVIDENCE CONFIRMS LIMITED TANGIBLE BENEFITS TO MVC MEMBERS FROM ACCESS TO RCDC PROPERTIES.

39.   Any tangible benefit to MVC members from the RCDC properties is further limited

by the high price that MVC members are required to pay (in MVC points) for stays

in RCDC properties.   RCDC properties were substantially more expensive than

other MVC properties.   For example, it takes 875 to 2,700 points to stay for a (non-

holiday) weekend in a two-bedroom unit at Aspen or the RCDC in Vail, depending

25

**CONFIDENTIAL**

on the season.[42]  In contrast, these same point levels can be more than sufficient to book a week-long stay in a two-bedroom unit at Marriott's Streamside-Birch resort located at Vail, Colorado during the corresponding season.[43]

40.  Consumers often make a trade-off between price and quality.  Even if the RCDC properties are of higher quality than other MVC properties, from the consumers' perspective the value of the inclusion of RCDC properties in the MVC portfolio can be offset by their higher prices (in the form of larger number of points required). To the extent MVC members are required to take substantially shorter stays to take advantage of the higher-quality RCDC properties, they are not necessarily more desirable overall from a consumer's point of view.

41.  Finally, perhaps the clearest evidence that most MVC members did not view access to RCDC properties as an important benefit comes from surveys of those members. Starting in 2013, MVW performed quarterly surveys asking potential purchasers to select the features they considered "important" in their decision about whether to purchase MVC points.  Respondents were also asked to rank the features they rated as important.[44, 45]  Table 4 below ranks the features by the share of existing members

---

[42]     See, for example: 2017-2018 Points Chart (RCDC072653-729 at 725-726).

[43]     2017-2018 Points Chart (RCDC072653-729 at 725-726, 691).  There is, in general, a substantial premium for RCDC properties over MVC properties that are located in the same city.

[44]     The survey questionnaire asks, among other questions: (a) "Below is a list of features associated with Marriott Vacation Club Ownership.  Please select the features that are important to you when deciding whether to purchase with Marriott Vacation Club;" and (b) "Now, please rank the features that you feel are important to you when deciding

26

**CONFIDENTIAL**

that purchased additional points that identified them as "important." As the table shows, in each year from 2013 to 2018, access to RCDC proprieties ranked 21st or 22nd out of the 28 features included in the survey. Access to RCDC properties ranked below a long list of other features including the presence of specific features in the vacation unit (kitchen, washer/dryer), ease of booking, and the use of points for Marriott hotels, cruises, and excursions.[46]

---

whether to purchase with Marriott Vacation Club. The feature of most importance to you will be a 1, the feature that is next most important to you a 2, and so forth until all of the features have been ranked." (See RCDC075966.)

[45] Four groups of respondents were surveyed: existing owners that purchased additional points, existing owners that did not purchase additional points, first-time buyers that purchased points, and prospective buyers that did not purchase points. (See RCDC075967 and RCDC075968.)

[46] Table A1 in the Appendix shows that the results were similar for first-time points buyers. The results were also similar for existing members, and potential new members, that decided not to purchase points. I do not include these results in my report.

CONFIDENTIAL

**Table 4: Rank of MVC Program Features Based on Proportion of Respondents that Rated as Important to their Purchase Decision
Existing Members Who Purchased Additional Points (2013-2018)**



42.    The survey also asked potential buyers to identify the five most important features in their purchasing decision.  Figure 2 shows that, among existing members (limited to those that purchased additional points) access to RCDC properties again ranked very low.  During the 2013 to 2018 period, only 6.3% of existing members that purchased additional points identified RCDC access as one of the five most important features.  Twenty one other features were more frequently listed in the top five, including "MVC resort locations in destinations I'm interested" which was

28

**CONFIDENTIAL**

in the top five for over 61% of members who purchased additional points and "Variety of MVC resort locations" which was in the top five for over 37% of members who purchased additional points.[47]

**Figure 2: RCDC Access was Rarely Identified as One of the Five Most Important MVC Program Features Considered in Purchase Decisions**
**Existing Members Who Purchased Additional Points (2013-2018)**



---

[47]     Figure A1 in the Appendix shows that the results were similar for first-time buyers. The results were also similar for existing members, and potential new members, that decided not to purchase points.

CONFIDENTIAL

V.     **PLAINTIFFS' UNJUST ENRICHMENT CLAIM DEPENDS ENTIRELY UPON AN AMORPHOUS HALO EFFECT THAT PLAINTIFFS' EXPERTS FAIL TO DEMONSTRATE APPLIES IN THIS CASE.**

A.     PLAINTIFFS' CLAIM DEPENDS ON A THEORY THAT MVC MEMBERS PLACED SUBSTANTIAL VALUE ON ACCESS TO RCDC PROPERTIES DESPITE DE MINIMIS TANGIBLE BENEFITS.

43.    In the last section, I established that the tangible benefits from access to RCDC properties were de minimis during the relevant period.  Mr. Simon does not appear to dispute this point.  Instead Mr. Simon claims that access to the RCDC program had an "enormous" effect even if actual usage of the program was tiny.  He asserts that "[t]he actual fulfillment or the number of nights MVC owners stayed in any RCDC resort is of less importance than MVW selling access to RCDCs as a major benefit to buying points.  This strategy had an enormous impact on point sales in the MVC system, where tens of millions of points were being sold each year."[48]

44.    Professor Dev and Mr. Simon argue that the perceived halo effect also allowed MVW to charge substantially higher prices for MVC points despite de minimis tangible benefits.

45.    However, Professor Dev and Mr. Simon fail to demonstrate that the halo effect applies to this case.  First, the articles and other evidence that Professor Dev and Mr. Simon cite for the general existence of a halo effect cannot establish that it applies in this case.  Indeed the articles actually show that whether the halo effect applies depends heavily on the specific circumstances at hand.

---

[48]        Simon Report, ¶ 49.

**CONFIDENTIAL**

46.    Second, with regard to the specifics of this case, the existence of the halo effect is not established by the evidence pointed to by Plaintiffs' experts.  Thus, the entire burden of supporting this theory falls to Mr. Simon's empirical analysis of MVC points price changes, which as I describe below is fundamentally flawed and thus incapable of carrying this burden.

      **B.**      THE LITERATURE CITED BY PLAINTIFFS' EXPERTS DEMONSTRATES THAT A HALO EFFECT EXISTS ONLY UNDER CERTAIN CIRCUMSTANCES, WHICH MUST BE ESTABLISHED USING RELIABLE EMPIRICAL METHODS.

47.    I understand that MVW has retained Professor Ceridwyn King to respond to the opinions of Professor Dev regarding the halo effect.  Hence, in this section I provide just a high-level discussion of the conclusions in the articles and other materials on which Professor Dev and Mr. Simon rely to establish the point that any proof of the alleged effects in this case comes down to Mr. Simon's fatally flawed empirical analysis.

48.    As defined by Professor Dev, a halo effect is the effect of "co-mingling a less prestigious brand with a more prestigious brand."[49]  Mr. Simon refers to the halo effect as "the increased profits or brand premium a lesser brand (or unbranded real estate) can earn when it affiliates with a more exclusive brand."[50]  Mr. Simon relies

---

[49]     Dev Report, ¶ 4.

[50]     Simon Report, ¶ 8.

**CONFIDENTIAL**

heavily on the opinions of Professor Dev regarding the halo effect phenomenon both generally and specifically as it relates to this case.[51]

49.   Professor Simon cites to an online article in The Economist from 2009 for the halo effect concept.  However, this article certainly cannot establish that the halo effect applies to this case.  Instead, it discusses the halo effect in general terms, doing little more than describing that if people have a positive (or negative) impression of something, it can impact their impression of a separate item.[52]  For example, if a company is profitable, people may make positive assumptions regarding that company's management, regardless of the actual drivers of performance.  This article says nothing regarding the relevance of the halo effect concept to branding and certainly nothing about whether such an effect would apply to this case in particular.

50.   Moreover, the limited peer-reviewed literature Professor Dev and Mr. Simon cite does not in fact support Mr. Simon's opinions in this case.  Even accepting that a halo effect can occur in theory (despite the limited evidence cited to by Plaintiffs' experts), the literature cited by Plaintiffs' experts makes clear that it will not apply in every instance where two brands are affiliated.  The few academic articles cited by Professor Dev all outline methods of measuring a potential halo effect using rigorous empirical methodologies.   The methodologies detailed by the articles

---

[51]      See, e.g., Simon Report, ¶ 38.

[52]      Simon Report, ¶ 37.

**CONFIDENTIAL**

require detailed data regarding consumer perceptions.[53]  As discussed in more detail

below, Mr. Simon fails to present evidence demonstrating that a halo effect existed

here, let alone evidence based on a detailed analysis of consumer perception data.

In fact, as discussed in Section IV.B, above, surveys of perceptions of MVC points

purchasers show that MVC members did not view access to RCDC properties as an

important benefit.  Bottom line, these articles say that the existence of a halo effect

requires empirical support, and as explained below, Mr. Simon's empirical

approach simply cannot provide such support.

##### C.   PLAINTIFFS' EXPERTS FAIL TO DEMONSTRATE THAT ANY HALO EFFECT EXISTS HERE.

51.    Before turning to Mr. Simon's empirical method, I explain that the qualitative

evidence pointed to by Plaintiffs' experts also cannot establish the existence of any

halo effect here, let alone evidence of the magnitude of such an effect.

---

[53]    Leuthesser, Chiranjeev, and Harich discuss methods requiring consumer ratings data
(Leuthesser, Lance, Chiranjeev S. Kohli, and Katrin R. Harich (1995), "Brand Equity:
The Halo Effect Measure," *European Journal of Marketing*, 29(4), pp. 57-58).  Simonin
and Ruth conduct a controlled study in which they gathered responses from subjects
regarding their familiarity and attitudes towards two brands (Simonin & Ruth (1998), "Is
a Company Known by the Company it Keeps," *Journal of Marketing Research*, February
1998).  Similarly, Burton, Cook, Howlett & Newman conduct a series of three
experiments that involved first gathering survey information from the pool of test subjects
and then conducting statistical analyses to test their hypotheses regarding halo effects
(Burton, Cook, Howlett & Newman (2014), "Broken Halos and Shattered Horns:
overcoming the biasing effects of prior expectations through objective information
disclosure," *Journal of the Academy of Marketing Science*, February 2014).

**CONFIDENTIAL**

> **1.** **Plaintiffs' experts point to very limited evidence in the factual record that sheds light on any alleged halo effect.**

52. Dr. Simon cites to documents purporting to demonstrate the existence of the alleged halo effect in this case. However, these materials provide little (if any) support of Plaintiffs' experts' theories that despite little tangible benefits consumers perceived outsized benefits from the connection between MVC and RCDC.

53. Plaintiffs' experts point to three broad categories of documents. In the remainder of this section, I walk through the problems with each of these categories.

54. First, most of the documents cited by Plaintiffs' experts are purported to show that the alleged conduct adversely affected the value of *RCDC properties*, not that MVW (or MVC members) benefited from affiliating with the RCDC brand. These documents therefore shed no light on any halo effect or unjust enrichment to MVW.

55. For example, both Mr. Simon and Professor Dev cite to a report prepared by APCO Worldwide, Inc., a corporate communication consulting firm that was hired by MVW to conduct surveys and focus groups of RCDC owners.[54] This report however only purports to show that RCDC members believed they may have been negatively affected by the Affiliations.[55] Other documents include communications

---

[54] Dev Report, ¶ 37; Simon Report, ¶ 33.

[55] Ritz-Carlton Destination Club Member Study Detailed Report, MVW, August 2013 (RCDC073182-201 at 185).

**CONFIDENTIAL**

amongst RCDC owners, which again focus on allegedly adverse effects that RCDC owners believed they had suffered.[56]

56. Second, many of the remaining documents relied upon by Plaintiffs' experts are simply examples of MVW advertising the existence of RCDC properties in the MVC program (e.g., emails, points charts) among many other options for points. The fact that MVW is marketing the various options for points, however, is not evidence that MVC owners viewed access to RCDC properties as particularly valuable, let alone that they viewed such access as substantially more valuable than the limited tangible benefits they in fact received (as the halo effect theory requires). For instance, Professor Dev cites to an email from MVW to its members that states "Owners with Premier and Premier Plus status can enjoy even more fabulous benefits, including access to Ritz-Carlton Destination Club resorts . . ."[57] This promotional email merely shows that MVW was making its members aware of the benefits of its program. Some materials cited by Mr. Simon, like the points charts, do not even specifically market RCDC properties, but comprehensively list all of the properties (including Marriott-branded properties) available to members. This "marketing" is providing MVC owners with comprehensive information about

---

[56]   For example, one of the documents that Professor Dev cites to is a letter from two RCDC San Francisco members to the rest of the membership that speaks to how the Affiliation is allegedly harming the RCDC product. Dev Report, ¶ 36 citing email from Stacey Jackson-Rauso to Kim Frates-Mazzilli, August 28, 2013 (RCDC010759-761 at 761).

[57]   Dev Report, ¶ 34 citing "Marriott Vacation Club Insider Bulletin," Marketing email from MVC to Julie Schorr, July 27, 2011 (Exhibit 29 to Richard Hayward Deposition).

**CONFIDENTIAL**

the options available to them, and if anything, would work to help perceptions line up with the reality that any tangible benefit from the challenged conduct is limited.

57.   Last, Plaintiffs experts point to select testimony by MVW executives that purport to speak to the existence of a halo effect.   Yet none of this evidence in fact demonstrates a halo effect.   For example, in attempting to substantiate the fact that MVW was aware of the benefits of using the RCDC properties to market the MVC program, Mr. Simon points out that Stephen Weisz, CEO of MVW, testifies that "he knew about the halo effect."[58]   Mr. Simon however mischaracterizes the implication of Mr. Weisz's testimony as Mr. Weisz is mainly emphasizing the uncertainty and nebulous nature of the halo effect (and thus the need to prove that it exists in a particular case).   Mr. Weisz was asked:

> So is it true that, when two brands are associated with each other, if one brand is considered a higher quality brand, then that brand will provide a halo effect to the less prestigious brand and then create some perceived benefit to the less exclusive brand?[59]

He replied:

> It all depends on how they're linked, how they're positioned in the consumer's mind, et cetera.   There are numerous examples where companies go to great pains to not link their various brands.   So while I understand the concept of halo effect, I'm not so sure it's universally applied.[60]

---

[58]      Simon Report, ¶ 41.

[59]      Weisz Deposition, p. 99.

[60]      Weisz Deposition, p. 99.

**CONFIDENTIAL**

58.   Professor Dev cites to one April 2013 email by Mary Lynn Clark, then a Vice President of Marketing and Sales at RCDC, which includes a single line of text stating "[leverage] Aspen as an option for points based sales."[61]   But this single line does not support Plaintiffs' theory.   In particular, it does not show that MVC members perceived a substantial value of the option that was out of line with the reality of limited access nor prove that MVW actually benefitted from this option in a form of increased profits.

59.   Professor Dev also cites to the testimony of Stephanie Sobeck, a Senior Vice President at MVW, which (in the context of discussing the Clark email) agrees that MVC sales people could mention Aspen in selling points.[62]   Professor Dev neglects to mention Ms. Sobeck's testimony directly about the halo effect:

> Q: So if that affiliation agreement went away, no more access by Marriot Vacation to Aspen right?
>
> A: Yes, there would be no access, but I'm not –
>
> Q: And there would be no way --
>
> A: But I'm not sure what that – I don't – I think you're insinuating that that hurts Marriot Vacation Club in some way, and it does not.
>
> Q: Okay. If they don't have access to it, could they put the Aspen Club on the points charts when they're showing members that they could stay at the Ritz-Carlton Clubs for X points? They wouldn't have Aspen on there anymore.

---

[61]   RCDC004731-33 at 31.

[62]   Dev Report, ¶ 43.

A: No they wouldn't have Aspen. But they have the other clubs.
They have Ritz-Carlton Hotels through Explorer. They have all
types of luxury options through Explorer. And we have 50 other
resorts. I don't think not having Aspen, which is one property
within this whole suite of resorts, would affect Marriott in any
way."

Q. So you don't think there's a halo effect with the Aspen Club at
all, do you?

A. I don't.[63]

60. Ms. Sobeck further testified that "there was really no benefit that was coming from

[the Aspen Affiliation]."[64]

### 2. MVW's decision not to sell the RCDC business does not prove that MVW was unjustly enriched.

61. Mr. Simon also asserts that MVW's decision not to sell its RCDC business for a

substantial amount demonstrates that MVW earned substantial value from the

connection between the MVC program and RCDC properties.[65]  Both the evidence

he relies upon and his underlying logic are substantially flawed.

62. First, Mr. Simon does not even point to reliable evidence to support his conclusion

that MVW could have sold the RCDC portfolio for a substantial amount.  He asserts

that there were "proposals or letters of intent of approximately $125-150 million for

RCDC."  He points to no MVW documents or testimony to support this contention,

---

[63]     Deposition of Stephanie Sobeck, May 15, 2018, pp. 190-191.

[64]     Deposition of Stephanie Sobeck, November 16, 2017, p. 207.

[65]     See e.g., Simon Report, fn. 46 ("If Plaintiffs can prove at trial such was true, then the
decision not to sell RCDC and combine it with MVCI supports another strategic goal,
namely the halo effect.").

**CONFIDENTIAL**

but rather to unnamed and unsupported "conversations with others at the fall 2010 ARDA Annual Conference." In contrast, MVW's President and CEO Stephen Weisz testified that he did not recall that any offers were made for the RCDC business and that MVW did not hire any investment banks to facilitate a potential sale.[66]

63. Even if there were offers, MVW's decision not to sell just means that the value of the RCDC business was higher to MVW than it was to others. That does not mean, however, that this value flowed from any halo effect resulting from linking the RCDC business to the MVC program (or from the Affiliations in particular). It only means that MVW expected to be better positioned to realize that value than other potential purchasers, which could be true for a wide variety of reasons, including simply that MVW was operationally efficient at running such programs with or without any linkage to MVC.

## VI.   PLAINTIFFS' EXPERTS FAIL TO TIE ANY HALO EFFECT TO THE ALLEGEDLY ILLEGAL CONDUCT.

64. Even if, despite all the discussion above, one were to grant the existence of a halo effect that benefited MVC, Plaintiffs' experts' general halo effect theory certainly cannot tie that effect to the specific challenged actions in this case. Plaintiffs' experts' halo effect theory centers upon the Ritz-Carlton brand and cannot reliably distinguish between the value conveyed through marketing The Ritz-Carlton

---

[66]      Weisz Deposition, pp. 24-25.

**CONFIDENTIAL**

Destination Clubs and that conveyed through other marketing strategies, including but not limited to promoting access to Ritz-Carlton hotels, or even from the mere fact that the two brands exist together in MVW's portfolio of properties.[67]  Indeed, much of the discussions in Professor Dev's and Mr. Simon's reports talk generally about the benefits of the Ritz-Carlton brand (which Marriott clearly has legitimate access to) and are not specific enough to distinguish the effects of marketing, for example, Ritz-Carlton hotels as opposed to RCDC properties.[68]

### A.   MVW USED THE RITZ-CARLTON BRAND TO MARKET THE MVC PROGRAM IN OTHER WAYS.

65.   To the extent that the perceptions generated by a connection with the Ritz-Carlton brand are as valuable as Plaintiffs' experts say they are, MVW would have a strong incentive to create such a perception with its marketing efforts through whatever means it could.

66.   MVW owns licenses from Marriott International that grant it rights to use the Marriott and Ritz-Carlton brands in its vacation ownership business.[69]  Plaintiffs do not (and could not) allege that any use of the Ritz-Carlton brand in conjunction with

---

[67]   MVW could also have deployed a number of other strategies to take advantage of the perception.

[68]   For example, Professor Dev explains "given the distinct luxury status of the Ritz-Carlton brand, *it is my opinion that MVW's use of the Ritz-Carlton brand* and access by MVC points based customers to RCDC, including Aspen, benefitted MVW and harmed Plaintiffs." (Dev Report, ¶ 32, emphasis added).

[69]   Marriott International, Inc., Form 8-K, November 17, 2011, p. 1.

**CONFIDENTIAL**

marketing the MVC program was illegal.  MVW is able to use, and in fact did use, the Ritz-Carlton brand in ways that Plaintiffs do not challenge.

67.   Indeed, during the same period in which MVW was promoting the availability of stays at RCDC properties to MVC owners, it was similarly promoting the availability of stays at Ritz-Carlton *hotels* to MVC owners.  For example, an email targeting the same Premier and Premier Plus owners that could access RCDC properties explains:

> Now you can enjoy an expanded world of upscale travel options! As an Owner with Premier Plus status, you may have access to three new tiers of luxury cruises, including two exclusive Premier Plus tiers.  With your special status, you can also use Vacation Club Points to stay at select hotels by The Ritz-Carlton®.

> The City Explorer Collection has expanded to include these prestigious hotels in coveted vacation spots, available only to Owners with Premier or Premier Plus status: [listing five Ritz-Carlton hotels.][70]

68.   In some materials, MVW marketed access to Ritz-Carlton hotels and RCDC properties in the same sentence ("Owners with Premier and Premier Plus status can enjoy…[t]he ability to use Vacation Club Points to reserve luxury residences at select Ritz-Carlton Club® resorts and hotels").[71]

---

[70]   "The Ritz-Carlton Hotel Stays," available at http://pages.email1.marriott-vacations.com/insider?loc=HQ59*1-2U1SZ3&article=1&campaign=2013-jun&state= (accessed November 28, 2018). Based on the URL address, I infer that this email was from June 2013.

[71]   "Ask the Expert: Ownership Status," available at http://pages.email1.marriott-vacations.com/owner-insider?loc=HQ59*1-2U1SZ0&article=ask-the-

**CONFIDENTIAL**

69.     In addition, Ritz-Carlton hotels can also be accessed by MVC members through the Marriott Rewards program.[72]  MVW also owns the rights to the Ritz-Carlton Residences brand ("a luxury tier whole ownership residence brand… luxury residential condominiums co-located with The Ritz-Carlton Destination Club resorts).[73]  With or without the alleged conduct, MVW would be operating a product associated with the Ritz-Carlton brand.

70.     Moreover, if it were substantially valuable, there were other luxury experiences in its portfolio that MVW could have used (even more than it did) to create an "elite" perception among its MVW owners that wouldn't have even revolved around the Ritz-Carlton brand.   MVC members could also access other luxury branded properties such as St. Regis and Four Seasons Residence Clubs through an association with the Interval International exchange program that allowed MVC owners to use their points to access Interval International's thousands of affiliated resorts.[74, 75]

---

expert&campaign=2014-jan&cid=email-mvc-owners-insider-2014-jan-cb-learnmore-ask-the-expert (accessed November 28, 2018).

[72]     "New Partner: The Ritz-Carlton – Participation in Marriott Rewards," September 23, 2010, available at https://web.archive.org/web/20100923013825/http://www.marriott.com:80/Multimedia/PDF/us/rewards/mr_Ritz_FAQ.pdf (accessed December 8, 2018).

[73]     Marriott Vacations Worldwide 2017 Form 10-K, p. 5.

[74]     "Four Seasons Extends Affiliation of Two Resorts to Interval International," *sellingtimeshares.net,* May 19, 2014, available at https://www.sellingtimeshares.net/four-seasons-extends-affiliation-two-resorts-interval-international/ (accessed December 18, 2018); "Starwood Vacation Ownership Renews Interval International Affiliation," *The Timeshare Authority,* March 3, 2014, available at

**CONFIDENTIAL**

71.     Furthermore, as discussed above, I understand that Plaintiffs have not put forward a theory as to why MVW could not grant access to MVC owners to developer-owned inventory at RCDC properties.  To the extent that is allowable, then MVW would still have the ability to market access to RCDC properties.   And given that Plaintiffs' experts are alleging a theory of benefit to MVC that is not tied to tangible metrics of accessibility or use of Ritz-Carlton properties, they have no ability to say that these alternative methods of providing access to Ritz-Carlton properties would not have been equally effective in generating an equally large halo effect (assuming that one exists).

**B.     MR. SIMON FAILS TO ACCOUNT PROPERLY FOR THE STRENGTH OF THE MARRIOTT BRAND.**

72.     To support his conclusions about the presence of large halo effects in the real estate industry, Mr. Simon cites to a seven-page research report (the "Knight Frank Report"), which purports to show that the size of halo effects on other branded real estate developments is larger than his estimated halo effect at issue here.   Based on this comparison, Mr. Simon claims that his estimate "represents a conservative

---

http://www.thetimeshareauthority.com/2014/03/03/starwood-vacation-ownership-renews-interval-international-affiliation/ (accessed December 18, 2018).

[75]     See, for example: Marriott Vacations Worldwide 2016 Form 10-K, p. 5. MVW acquired ILG, Interval International's parent company, in September 2018 ("Marriott Vacations Worldwide Completes Acquisition of ILG, Inc.," *prnewswire,* September 1, 2018, available at https://www.prnewswire.com/news-releases/marriott-vacations-worldwide-completes-acquisition-of-ilg-inc-300705763.html (accessed December 16, 2018).

**CONFIDENTIAL**

premium to calculate the halo effect."[76]   However, the Knight Frank Report is analyzing an entirely different issue and sheds no light on the size of any halo effect resulting from the challenged conduct by MVW.

73.   First, the Knight Frank Report is not even evaluating a halo effect.  As defined by Professor Dev, a halo effect is the effect of "co-mingling a less prestigious brand with a more prestigious brand."[77]   The Knight Frank Report does not look at the effect of "co-mingling" multiple brands in a single portfolio.  Rather, it analyzes the "premium" of prices of branded properties over the prices of completely separate unbranded properties.  It is not measuring the value of "co-mingling" two brands, but rather it is attempting to measure the value of relabeling an existing property with a new brand name.

74.   Second, the Knight Frank Report is not comparing one brand against another brand but, rather, is attempting to quantify the premium of branded properties over and above *unbranded* properties.  In contrast to the "unbranded" developments analyzed in the Knight Frank Study, MVC properties are associated with the "well-known"

---

[76]   Simon Report, ¶ 67 ("In my opinion, and after looking at the Knight Frank study previously cited where the premiums for attaching a luxury brand to an unbranded product was approximately 31% and my observation about adding brands to properties with no brands or lesser brands, this represents a conservative premium to calculate the halo effect.")

[77]   Dev Report, ¶ 4.

**CONFIDENTIAL**

Marriot brand.[78]  Indeed, elsewhere in his report, Mr. Simon himself explains that

Marriott's brand was a key asset in its success:

> In addition to offering the benefit of alternatives for using time, *Marriott sought to use its own well-known brand* to promote its timeshare operations.  *Consumers had confidence in Marriott's brand, which would prove to be credible,* in an industry that historically suffered from a reputation of predatory practices and material misrepresentations at the point of sale.  To counter these notions and cultivate consumer confidence, Marriott introduced the following elements into its timeshare business:
>
> a.  Professional management of vacation ownership properties by a top tier hospitality company;
>
> b.  A promise to avoid the devious sales and marketing practices of unbranded timeshare companies;
>
> c.  *The credibility of Marriott's well-recognized brand.*[79]

75.  Third, the specific details of the Knight Frank analysis differ in substantial ways

from the circumstances in this case.  The Knight Frank Report is evaluating the

impact of branding on the prices of *residential* developments, not of vacation

ownership developments (let alone of points in a vacation ownership club).  The

Knight Frank Report is analyzing prices on residential developments *across the*

*globe*.  Only two of the 17 locations analyzed by Knight Frank are in the United

States.   As the Knight Frank Report itself acknowledges, premiums differ

substantially across locations; premiums at the two United States locations were

---

[78]     Marriott also owns a variety of other strong brands including the St. Regis luxury brand.

[79]     Simon Report, ¶ 18 (emphasis added).

well below average.[80]  And the branded properties analyzed by Knight Frank differ from the unbranded properties by more than just a brand name; the study points to good design and better services at those properties as part of the explanation for the premium, making the comparison inapt for an assessment of the halo effect alleged here.[81]

## VII.   MR. SIMON'S APPROACH TO QUANTIFYING THE HALO EFFECT FALLS WOEFULLY SHORT OF PROFESSIONAL STANDARDS

76.   Mr. Simon's "methodology" begins with a narrative description of the chronology of the increases in the MVC gross price per point over time, loosely relating these increases to MVW marketing activities that roughly corresponded in time with the price increases.  Based only upon this loose chronology, rather than any empirical analysis or other evidence regarding the reason for the price increase, he labels these eight price increases (out of 26 total increases) as "halo price increases."  He then measures the average price increase for the other 18 increases and labels that the average "ordinary price increase."  He subtracts this "ordinary" price increase from each of his "halo price increase" to get a "net halo price increase."[82]

---

[80]   "…the rate of uplift ranges from 5.7% in Jakarta to over 50% in several locations." The rate of uplift in Miami is 19.6% and New York 12.4%. The average rate of uplift among 17 global locations is 30.0%. (Knight Frank Report, p. 4).

[81]   The study specifically acknowledges that "Branded developments are provided with more services and facilities than their non-branded competitors." (Knight Frank Report, p. 4). Furthermore, included as one of the "drivers of the price premium" that Mr. Simon cites to, is that the "…benefits and convenience of the service offer is prized by buyers…" (Knight Frank Report, p. 4).

[82]   Simon Report, ¶¶ 53, 66, and Exhibit F.

**CONFIDENTIAL**

### A.   MR. SIMON'S METHODOLOGY FAILS TO MEET PROFESSIONAL STANDARDS ON THREE KEY COMPONENTS OF A RELIABLE METHODOLOGY.

77.   There is a well-established set of economic tools widely used by economists to conduct the type of analysis that Mr. Simon is attempting to undertake here— namely, isolating the effect of challenged conduct on prices, accounting for all of the other factors that affect price.  Those tools are used to isolate the effect of a particular factor (here, the access to RCDC properties by MVC members) on price, controlling for other potential explanations for changes in price.  As I (and my co-authors) explain in the chapter we wrote in the ABA treatise on antitrust damages:[83]

> Econometric models-particularly those involving regression analysis-are uniquely suited to isolating the effect of a single factor on the market factor of interest, while properly accounting for other relevant factors….Thus, when correctly implemented, econometric techniques can isolate and measure the effect of a single explanatory factor-such as the impact of the alleged conduct on the economic outcomes that are relevant when estimating damages.

78.   In simple terms, such an approach will model price as a function of the conduct at issue, as well as other factors.  Said in mathematical terms, this can be written as PRICE = f (CONDUCT, OTHER FACTORS), meaning that price is determined by the conduct at issue and other factors, and an econometric regression approach can be used to isolate the effect of the conduct from the other factors.  To do so, such an approach (or any valid empirical approach to measuring the effect of the challenged conduct on price) must start with a reliable measurement of prices (or price

---

[83]   *Proving Antitrust Damages: Legal and Economic Issues Third Edition* (2017), Chicago, Illinois: American Bar Association, Section of Antitrust Law (hereafter "Proving Antitrust Damages (2017)"), pp. 124-125.

CONFIDENTIAL

changes).  Without a reliable measure of prices, any inferences drawn from the analysis will be erroneous.

79.   A reliable empirical analysis must also include a reliable measure of the challenged conduct.  Sometimes this might include a "dummy" variable to distinguish periods in which the conduct was in effect from periods in which it was not.  Other times this might include measures of the intensity or extent of that conduct.

80.   Finally, proper methodology must control adequately for other potential explanations for the observed changes in pricing, to isolate the effect of the challenged conduct.

81.   Mr. Simon's approach falls well short of professional standards on each of these three fronts.

82.   First, Mr. Simon fails to measure reliably the changes in the price of MVC points. As described in Section VII.B, this flows from three separate errors in his methodology.  Correcting these errors alone eliminates almost all of Mr. Simon's estimate of unjust enrichment.

83.   Second, Mr. Simon employs an ad-hoc and unreliable methodology for measuring the challenged conduct.  As described in Section VII.C, rather than develop a systematic metric for the presence and/or intensity of the challenged conduct, he instead relies upon an ad-hoc and error-filled review of documents.

84.   Third, Mr. Simon fails to investigate adequately the relevant factors that could have driven the price changes, let alone evaluate the impact of each of these factors on

**CONFIDENTIAL**

prices.  As explained in Section VII.D, there are a variety of factors that are likely to be important in explaining changes in the price of MVC points, which Mr. Simon ignores in his calculations.

85.   Finally, Section VII.E explains that Mr. Simon's analysis of any halo effect on the volume of points suffers from the same flaws.

> **B.   MR. SIMON'S FINDING OF A SIZEABLE NET HALO PRICE EFFECT IS DRIVEN ALMOST ENTIRELY BY HIS INACCURATE MEASUREMENT OF CHANGES IN MVC POINT PRICES.**

86.   Mr. Simon's measurement of price changes suffers from three key flaws.

> **1.   Mr. Simon improperly includes "changes" where the gross price did not change.**

87.   First, Mr. Simon includes "price changes" where there was actually no price change.  Table 5 below reproduces the MVW document on which Mr. Simon relies for his gross prices.[84]  As can be seen in three of his "ordinary" price increases (indicated by "*"s in the table) the MVW document reports the exact same gross (standard) price as the previous date: $10.22 on 6/16/11, $10.94 on 12/29/11, and $13.90 on 12/08/17.  As Table 5 also demonstrates, the 12/29/11 and 12/08/17 dates were actually included because they were associated with an increase in discounts but not a change in gross price, making it particularly inappropriate to include them in a list of gross price changes that ignores discounts (as discussed below).  The 6/16/2011 event was also associated with no change in either gross price or discount

---

[84]   Mr. Simon's Exhibit F is based upon this document, but his exhibit only includes gross prices, excluding the discounts that are also in the document.

**CONFIDENTIAL**

and thus also should not be included in a list of gross price changes since there was no price change.

88.     These non-price-changes are not appropriately treated as dates of gross price increases as Mr. Simon does.  By averaging these three "ordinary" $0.00 price "increases" with the other "ordinary" price increases he identifies, Mr. Simon reduces his average "ordinary price increase" (or "OPI") and thus inflates his measure of halo effect and unjust enrichment.

**CONFIDENTIAL**

**Table 5: MVC Points Pricing Summary Chart Relied Upon by Mr. Simon**



**CONFIDENTIAL**



**CONFIDENTIAL**



53

**CONFIDENTIAL**



**CONFIDENTIAL**



55

**CONFIDENTIAL**



**CONFIDENTIAL**



57

**CONFIDENTIAL**



58

**CONFIDENTIAL**



**CONFIDENTIAL**



**CONFIDENTIAL**

**CONFIDENTIAL**

## 4.  Correcting these three errors eliminates almost all of Mr. Simon's measured halo effect.

104.  Correcting all three of these errors – (1) dropping price "changes" where in fact prices remained the same, (2) accounting for the time elapsed between price changes, and (3) using net price rather than gross price – eliminates nearly all of Mr. Simon's unjust enrichment damages.

105.  Table 7 shows that, after correcting for these three errors, the average per-day net price change during the halo periods ($0.00102 per day) is barely above the average per-day net price change in the non-halo periods ($0.00097 per day).  This tiny difference leaves little room for any possible halo effect.  Mr. Simon finds a large halo effect only by using his error-filled method.  For example, if one focuses on gross price changes as Mr. Simon did, the difference between the average price change per day in the "halo" periods and the average price change per day in the "ordinary" periods is eight times larger than that computed when properly using net prices ($0.00048 per day v. $0.00006 per day).

---

these up-front benefits changed over time these could potentially eliminate instances where Mr. Simon has measured a halo effect.

**CONFIDENTIAL**

**Table 7: Correcting These Three Errors Nearly Eliminates Mr. Simon's Halo Effect**

| Price Metric | Average "Halo" Price Change Per Day | Average Ordinary Price Change Per Day | Mr. Simon's "Halo Effect" Per Day |
|---|---|---|---|
| Using Gross Prices | $0.00195 | $0.00147 | $0.00048 |
| Using Net Prices | $0.00102 | $0.00097 | $0.00006 |
|  |  |  |  |
| Note: Both gross and net calculations correct Mr. Simon's treatment of the three $0.00 gross price "increases." | | | |

106. As shown in Table 8, correcting for all three of these errors reduces Mr. Simon's cumulative halo effect from $1.26 to $0.07 per point.[95]  This has the effect of reducing Mr. Simon's measure of unjust enrichment by 94% from $99.6 million to $6.3 million.  Appendix Table A2 to this report presents these results, as well as the results from correcting various combinations of Mr. Simon's three pricing errors, described above.

---

[95]     As discussed elsewhere, Mr. Simon does account for discounts in some way later in his methodology, so Mr. Simon's effective estimate of the net price halo effect would be somewhat less than $1.26.

**CONFIDENTIAL**

**Table 8: Mr. Simon's Halo Effect is Significantly Diminished when Using Net Price, Removing non-Price Changes, and Accounting for Time**

| Date of "Halo" Price Increase | Simon | | | Simon Corrected | | | | |
|---|---|---|---|---|---|---|---|---|
| | Gross Price Change | OPI | "Halo" Effect | Net Price Change Per Day | OPI Per Day | "Halo" Effect Per Day | Days Since Preceding Price Change | "Halo" Effect |
| 11/30/2011 | $0 72 | $0 13 | $0 59 | $0 0013 | $0 0010 | $0 0004 | 272 | $0 10 |
| 4/19/2012 | $0 22 | $0 13 | $0 09 | $0 0007 | $0 0010 | -$0 0003 | 141 | -$0 04 |
| 9/6/2012 | $0 24 | $0 13 | $0 11 | $0 0015 | $0 0010 | $0 0005 | 140 | $0 07 |
| 3/21/2013 | $0 24 | $0 13 | $0 11 | -$0 0001 | $0 0010 | -$0 0010 | 196 | -$0 20 |
| 6/13/2013 | $0 24 | $0 13 | $0 11 | $0 0030 | $0 0010 | $0 0020 | 84 | $0 17 |
| 3/26/2015 | $0 24 | $0 13 | $0 11 | -$0 0001 | $0 0010 | -$0 0011 | 196 | -$0 22 |
| 6/18/2015 | $0 18 | $0 13 | $0 05 | $0 0017 | $0 0010 | $0 0008 | 84 | $0 06 |
| 9/10/2015 | $0 26 | $0 13 | $0 13 | $0 0024 | $0 0010 | $0 0014 | 84 | $0 12 |
| Cumulative | $2 34 | $1 08 | $1 26 | - | - | - | - | $0 07 |

Sources  Simon Report backup; Net Price information produced by MVW.

107.  To be clear, this is not to say that $6.3 million is the correct measure of unjust enrichment.  Reliably measuring price is only one of three key steps to measuring accurately any effect of the challenged conduct.  In the next two sections I describe why, even with these corrections, Mr. Simon's approach remains unreliable because it fails to distinguish "halo" from "ordinary" price increases in a reliable way, and it fails to account for other potential explanations for changes in MVC points prices.

      **C.**      **MR. SIMON DOES NOT DISTINGUISH RELIABLY THE HALO EFFECT PERIODS FROM THE "ORDINARY" PERIODS.**

            **1.**      **Mr. Simon's document-based approach is ad hoc.**

108.  Mr. Simon simply takes two sets of price changes, labels one as affected, and then assumes with no empirical support that all differences between the two sets of price changes are due to the challenged conduct.  Mr. Simon does not perform any quantitative analysis to determine which price increases are attributable to alleged halo effects.  Rather, he simply performs an ad-hoc review of MVW marketing

CONFIDENTIAL

materials and by loosely tying the timing of these marketing materials to the timing of price increases in MVC points, he identifies a total of eight "halo" price increases during 2011, 2012, 2013 and 2015.  He then asserts that "these extraordinary price increases tied directly to MVW granting access to RCDCs and to affiliation with RCDCs."[96]

109.  Mr. Simon's methodology for identifying the halo price effects is fundamentally flawed because his methodology for inferring the motivations for price increases is unreliable and ad hoc.  Mr. Simon relies on several types of materials as support for his alleged halo price increases.  In what follows, I walk through the major categories of these materials below and show that none of them supports what Mr. Simon asserts.

- First, Mr. Simon's methodology selectively focuses on the RCDC dimension of the marketing materials that he cites while ignoring the fact that these same materials are marketing other MVC properties in the same way.  For example, Mr. Simon points to a Vacation Club Points Chart in late 2011 to show that MVW was advertising access to the RCDC Vail property.[97]  But this document is a 50-page brochure advertising 48 other MVC properties with the Vail property listed in the middle of other points

---

[96]    Simon Report, ¶ 65.

[97]    "2012-2013 Vacation Club Points Charts," MVC (RCDC072463-522 at 465, 495).

charts and not referenced disproportionately as compared to the other MVC properties.

- Second, Mr. Simon's methodology ignores other marketing materials in the halo periods that demonstrate that MVW was also marketing numerous other dimensions of the program.  For example, the only document from 2013 that Mr. Simon cites to is a March 2013 email between the salesperson and the potential customer that included many links to other MVC vacation options as well as particularly emphasizing certain perks of Premier membership including cruises, rental discounts, sporting events, and luxury hotels.[98]  Mr. Simon does not make any attempt to separate the effect of advertising access to the RCDC properties from other activities that are being simultaneously advertised.[99]

---

[98]    E-mail from MVC salesperson to Tyler Oliver, March 16, 2013 (AHCA00000785-791 at 786).

[99]    As another example, Mr. Simon claims that MVC "began to heavily advertise the 'access' to the RCDC properties in July of 2011" (Simon Report, ¶ 49).  To substantiate this claim, he cites to an email bulletin to members advertising that Premier and Premier Plus members can access certain RCDC properties ("Marriott Vacation Club Insider Bulletin," Marketing email from MVC to Julie Schorr, July 27, 2011 (Exhibit 29 to Richard Hayward Deposition)).  However, this email also advertises "exclusive sporting event packages for the Super Bowl and more!" as well as discounts on villa rentals at MVC resorts; last-minute booking discounts at MVC resorts; and travel protection.  In addition, this is just one of a series of monthly newsletters sent to MVC members.  Copies of similar newsletters are available online such as an August 2011 newsletter that stresses access to an MVC Hawaii resort as well as excursions to the Galapagos Islands and Great Britain *(see* "Marriott Vacation Club Insider," available at https://www.my-vacationclub.com/common/vc/en-us/enewsletters/august_2011_premier_plus.htm (accessed November 13, 2018). I infer the date of this email from the URL address of the webpage.)

**CONFIDENTIAL**

- Third, Mr. Simon's methodology ignores other similar materials where MVW was marketing access to RCDC properties in periods which Mr. Simon has labelled "ordinary," and does not explain how the marketing efforts in his halo periods can be distinguished from those in the "ordinary" periods. For instance, the RCDC in Vail is still listed in MVC points charts in 2014 (an "ordinary" period)[100] and benefits charts that show that members can access the RCDC properties are published on a regular basis, including during "ordinary" periods.[101,102]

110. In sum, Mr. Simon fails to identify accurately which price increases occurred in periods when MVW was marketing MVC points owners' access to RCDC properties, let alone whether they were driven by benefits perceived by MVC members from the connection with RCDC properties. An ad-hoc approach to measuring the period in which the conduct occurred is susceptible to cherry picking

---

[100]   "2014 – 2015 Vacation Club Points Charts," MVC (RCDC072523-584 at 581).

[101]   See for example: "Benefits at a Glance," (RCDC073604-605 at 604).

[102]   Beyond these three categories, none of the other documents cited by Mr. Simon provide direct evidence of the alleged halo effect. For example, one of the only two documents Mr. Simon cites to in support of his alleged 2015 halo price increases is simply a memo informing existing RCDC (not MVC) members that they have the ability to exchange through the MVC program. ("Job Aide – Lion & Crown and MVCD Affiliation – Frequently Asked Questions," December 4, 2014 (RCHC008102-112)). However, this document cannot lend support to his alleged halo price increases in 2015. Mr. Simon also cites to an internal MVC email that discusses the need to create scripting for sales representatives to address questions about RCDC inventory being available to MVC owners (Simon Report, ¶ 63 citing 7/30/2014 e-mail from Dinda Dee, RCDC073759). But again, this document does not support the existence of any halo effect.

67

**CONFIDENTIAL**

periods with higher prices and finding damages when none exist.[103]  In contrast, appropriate approach needs to be solidly tied to substantial, objective changes in the characteristics of the program and/or a systematic measure of "halo" marketing. Mr. Simon's ad hoc approach to classifying price changes cannot support a reliable assessment of alleged halo effects.

> **2.     Mr. Simon's unjust enrichment measure is especially sensitive to his ad-hoc identification of "extraordinary" price increases in the early years of the MVC program.**

111.  Any increase in the early years that Mr. Simon attributes to the halo effect will have the effect of increasing prices and generated unjust enrichment damages for all later periods.  Hence, Mr. Simon's unjust enrichment measure is especially sensitive to his ad-hoc identification of "extraordinary" price increases in the early years of the MVC program.  As explained in more detail below, these larger price increases in the early years are consistent with MVW's strategy of setting the initial price per point low to generate sales momentum, and then taking relatively larger price increases in the early years to catch up to market price.

112.  As noted above, Mr. Simon's method for identifying the halo effect price increase is an attempt to relate (loosely) the timing of price increases with the timing of efforts to market the availability of RCDC properties to MVC owners.  By far the largest

---

[103]     It is known in the context of price-fixing cases that if an ad hoc approach is used to determine the relevant damages period of an alleged conspiracy, then "one will likely find evidence of a systematic price elevation to infer conspiracy," even if there is no period with a conspiracy.  Dennis W. Carlton (2004), Using Economics to Improve Antitrust Policy, *Columbia Business Law Review*, 283, pp.288-289 and Appendix 1.

**CONFIDENTIAL**

of his halo effect price increases is a $0.72 increase in November 2011.  To support his conclusion that this was driven by the halo effect, Mr. Simon points to a MVC point chart released in late 2011.  However, the point chart is a comprehensive summary of the points required to stay at each MVC property – it does not emphasize RCDC properties.  Indeed, the only RCDC property even mentioned is the Vail property (because some Vail inventory had been transferred to the MVC Trust).  Even the Vail property is buried in the middle of many other MVC properties.  Thus, Mr. Simon has no basis to support his conclusion that the $0.72 increase was driven by marketing RCDC properties.  Moreover, Aspen was not even mentioned in that points chart and Mr. Simon has provided no explanation as to why any of this $0.72 increase should be unjust enrichment attributable the Plaintiffs in this case.

113.  Mr. Simon's measure of unjust enrichment is highly sensitive to his categorization of this $0.72 increase as a halo price increase.  Simply converting this single halo price increase from Mr. Simon's calculation to an "ordinary" price increase, and making no other changes, reduces his cumulative halo effect by 63% from $1.26 to $0.46 per point.

> **3.      Mr. Simon fails to distinguish between the effects of the Affiliations and other means of access to RCDC properties by MVC points owners.**

114.  An additional flaw in Mr. Simon's method for classifying halo effect periods is that he looks for any examples of MVW marketing access to RCDC properties to prospective MVC points purchasers, rather than identifying only marketing related

specifically to the challenged conduct in this case.  In fact, as described above, access to RCDC properties was given through a variety of mechanisms, not all of which are at issue in this case, including Premier and Premier Plus members' access to developer-owned inventory, units at Vail (and later other properties) in the MVC Trust (which was accessible by all MVC members), and the formal Affiliations between the programs. If the halo effect identified by Mr. Simon is generated by marketing access to RCDC properties to MVC members, then marketing these other mechanisms of access, which occurred well before the Affiliations, could be sufficient to generate the full effect. The contribution of the Affiliations themselves in creating this effect could be zero.

115.  I understand from counsel for MVW that Plaintiffs have only challenged the formal Affiliation with Aspen and have not challenged access by MVC members through other means.  Under this theory, the extent that MVW has been unjustly enriched by the challenged conduct, it would only have been through halo effects resulting from the Affiliation.

116.  If only the Affiliation is being challenged, Mr. Simon's methodological framework would indicate that all price increases prior to the Affiliation should be labeled as "ordinary."  This follows because such pre-Affiliation price increases are the result of conduct that is not being challenged (even if they involve marketing of RCDC properties to MVC points purchasers) and therefore should be considered in developing the baseline with which to compare any halo effects generated by the challenged conduct.

117. Making this adjustment to Mr. Simon's methodology but otherwise following his approach reduces Mr. Simon's estimate of a cumulative halo effect by 88%, from $1.26 to $0.15 per point.  Mr. Simon's measure of unjust enrichment damages decreases from $99.6 million to $9.7 million.[104]

118. Making this same adjustment to Mr. Simon's methodology while also correcting all three of the errors he makes in measuring the price of an MVC point completely eliminates Mr. Simon's estimate of a cumulative halo effect.  The analysis yields a negative halo effect of -$0.05 as compared to Mr. Simon's estimated cumulative halo effect of $1.26 per point. Appendix Table A3 to this report presents these results, as well as the results from correcting various combinations of Mr. Simon's three pricing errors.[105]

119. I note that, even with the set of changes I have made, my measure of unjust enrichment is almost surely too high.  As discussed in Section II, MVC points owners received increased access to RCDC properties in 2015 for two reasons: (1) the Affiliations, and (2) increased RCDC developer-owned inventory added to the

---

[104]    Alternately, I analyze a scenario which limits the analysis to the post-2014 period and relies on Mr. Simon's distinction between "halo" and "ordinary" periods (i.e., all price increases from 2010 through 2014 are dropped from the analysis).  In this scenario, Mr. Simon's estimate of a cumulative halo effect falls by 74% from $1.26 to $0.33 per point.

[105]    Alternately, I analyze a scenario which limits the analysis to the post-2014 period, relying on Mr. Simon's distinction between "halo" and "ordinary" periods (i.e., all price increases from 2010 through 2014 are dropped from the analysis) and correcting all three of the errors that Mr. Simon makes when measuring the price of an MVC point.  Doing so reduces Mr. Simon's estimate of a cumulative halo effect by 99% from $1.26 to $0.01 per point.

**CONFIDENTIAL**

MVC Trust. Thus, the post-2014 halo effects measured by this approach would be generated not only by the conduct that needs to be isolated (the Affiliations) but also by other changes to the program. Hence, any actual effect of the Affiliations on net prices would be even smaller than that measured here.

120. As shown in Table 9 below, access to RCDC properties as a result of the Affiliations accounted for only a small fraction of total access to RCDC properties by MVC members between 2015 and 2017. MVC members also had access to RCDC properties through Trust-owned inventory, as well as (to a lesser extent) through the limited remaining developer-owned inventory. The roomnights exchanged by RCDC owners through the Affiliations accounted for only 10.9% of all RCDC roomnights used by MVC members during the 2015-2017 period. The roomnights exchanged by Aspen owners through the Aspen Affiliation accounted for only 5.7% of all RCDC roomnights used by MVC members during that period.

**Table 9: RCDC Roomnights Available to MVC Members Through the Affiliations Made up a Small Percentage of Total Usage of RCDC Roomnights by MVC Members**

| Property | 2015 | | 2016 | | 2017 | | Total | |
|---|---|---|---|---|---|---|---|---|
| | Affiliation Elected Roomnights | MVC Points Occupied Roomnights (Total) | Affiliation Elected Roomnights | MVC Points Occupied Roomnights (Total) | Affiliation Elected Roomnights | MVC Points Occupied Roomnights (Total) | Affiliation Elected Roomnights | MVC Points Occupied Roomnights (Total) |
| Aspen | 952 | 1,897 | 1,054 | 1,022 | 938 | 773 | 2,944 | 3,692 |
| Lake Tahoe | 63 | 1,114 | 63 | 1,347 | 70 | 1,501 | 196 | 3,962 |
| San Francisco | 63 | 2,820 | 84 | 3,208 | 70 | 3,932 | 217 | 9,960 |
| St. Thomas | 574 | 2,500 | 476 | 3,174 | 672 | 2,939 | 1,722 | 8,613 |
| Vail | 133 | 7,350 | 231 | 8,768 | 154 | 9,121 | 518 | 25,239 |
| Total | 1,785 | 15,681 | 1,908 | 17,519 | 1,904 | 18,266 | 5,597 | 51,466 |
| Affiliation Elected Roomnights as a Percentage of All RCDC Roomnights Booked Using MVC Points | 11.4% | | 10.9% | | 10.4% | | 10.9% | |
| Affiliation Elected Roomnights at Aspen as a Percentage of All RCDC Roomnights Booked Using MVC Points | 6.1% | | 6.0% | | 5.1% | | 5.7% | |

Note: 91 roomnights at Vail were elected through the Affiliation in 2014.
Sources: RCDC Annual Roomnights Summary Through 2017 for Aspen, Lake Tahoe, and San Francisco (RCDC073606); RCDC Annual Roomnights Summary Through 2017 for St. Thomas and Vail (RCDC073708).

**CONFIDENTIAL**

### D.   MR. SIMON FAILS TO APPLY VALID METHODS TO ACCOUNT FOR OTHER FACTORS THAT AFFECT THE PRICE OF MVC POINTS.

121.   Reliably measuring the effect of a particular set of conduct on the price of a good or service requires isolating that effect from the effects of other potential explanations. As I explain in the ABA chapter discussed above:

> Market outcomes are often the result of a complex interaction among a large number of factors. For example, market prices were likely affected by a wide variety of demand and supply factors unrelated to the alleged anticompetitive act. Isolating and measuring the effect of an alleged anticompetitive act on price (or on other market outcomes) requires properly accounting for these other factors. Otherwise, one might attribute to the alleged anticompetitive act the effect of one or more of these other factors or miss the effects of the act in question by failing to control for a relevant factor.[106]

122.   Mr. Simon acknowledges that a reliable methodology must isolate the effects of the affiliation from other factors that affect the price and volume of MVC points. Yet Mr. Simon attributes the entire amount of each halo price increase to the alleged conduct with the exception of his adjustment to remove the "OPI" which he alleges accounts for "(1) amounts attributable to inflation; and (2) additional real growth in pricing attributable to increases in demand, incremental system enhancements, and/or other minor program additions."[107]   Mr. Simon states that he "considered"

---

[106]   Proving Antitrust Damages (2017), p. 123. While the discussion in this chapter is tailored to the area of antitrust, these concepts are broadly applicable to measuring commercial damages (and unjust enrichment) in other areas as well. For a similar discussion in a broader context, see, for example Daniel L. Rubinfeld, "Reference Guide on Multiple Regression," in Federal Judicial Center Reference Manual on Scientific Evidence Third Edition, pp. 303-357.

[107]   Simon Report, ¶ 66.

**CONFIDENTIAL**

other benefits in the MVC program, but – without citing to any evidence, describing any scientific methodology, or providing any further explanation – he simply asserts that "[i]n my opinion, those improvements did not cause the seven extraordinary price increases I identified."[108]

123.  Mr. Simon's discussion acknowledges the possibility that there were factors other than the challenged conduct that could have driven these price increases.  Yet he merely asserts, without providing any quantitative analysis or other evidence, that these other improvements did not cause the "extraordinary" price increases.

124.  As I explain in my ABA chapter, a proper analysis of prices must control for both supply factors (e.g. costs), and demand factors (e.g., consumer income).  As shown above, correcting Mr. Simon's errors in measuring price erase almost all of his estimated unjust enrichment even using his own methodological framework.  Therefore, it is not necessary to describe in extensive detail how to appropriately build a model which controls for all relevant factors.  Nevertheless, the failure to control for such alternative factors is yet another reason why Mr. Simon's approach falls far short of professional standards and is not reliable.

125.  Potential factors that are likely to be relevant in explaining changes in MVC points, but which Mr. Simon did not control for, include (but are not limited to):

---

[108]     Simon Report, ¶ 68.

- Additional benefits that could be accessed with MVC points.  MVC points could be used at a wide and expanding range of benefits including stays booked through exchange programs and other luxury experiences.  The set of choices expanded during the period analyzed by Mr. Simon, a factor that would need to be controlled for in any reliable analysis.

- General economic conditions.  General economic conditions, and particularly disposable income by potential purchasers of MVC points will have a substantial effect on the demand for vacation ownership properties in general and MVC points in particular.[109]  It is entirely standard to control for such economic conditions in any analysis of prices over time.[110]

- Changes in competition by other vacation ownership companies (both points-based and weeks-based programs).  MVW competes with numerous vacation ownership companies and other travel and leisure options, and the price of MVC points will be affected by increases or decreases in the competitiveness of these options.[111]  This is yet another factor that Mr. Simon ignores that should be controlled for in any reliable analysis of prices over time.

---

[109]     See for example: Marriott Vacations Worldwide 2012 Form 10-K, p. 16.

[110]     See, e.g., Proving Antitrust Damages (2017), p. 132 ("The explanatory variables are typically the major economic factors that may explain variation in the dependent variable. Examples of such economic factors can include consumer income, other consumer demographics that can affect willingness to pay for the product, and manufacturing costs.").

[111]     See for example: Marriott Vacations Worldwide 2016 Form 10-K, pp. 20-21.

**CONFIDENTIAL**

- Changes in MVW's marketing strategy and efforts over time. Just as Mr. Simon asserts that MVW's marketing of access to RCDC properties was an important factor in determining prices for MVC points, marketing of the wide range of other benefits would also be important.[112]

- Changes in MVW's pricing strategy. In April 2010, before the points-based program was introduced, MVW set a business strategy of setting an initial points price that was below market rate, to allow MVW to "establish sales momentum" as it rolled out.[113] The strategy then called for larger than average price increases in 2011 and 2012 to catch the point prices back up to market rates.[114] Such a pricing strategy could explain the large halo effects Mr. Simon finds in 2011 and 2012, yet his methodology fails to consider this explanation.

126. A comparison of the trend in MVC point prices to the trend in prices in vacation ownership products more generally illustrates the importance of controlling for other factors influencing prices. In particular, I compare the changes in price of MVC points to a broader measure of price changes in the timeshare industry overall. This comparison indicates that the years of Mr. Simon's halo effects correlate highly with the years of higher than average price growth in the industry

---

[112]   See, for example: Marriott Vacations Worldwide 2011 Form 10-K, pp. 7-8; Marriott Vacations Worldwide 2016 Form 10-K, pp. 6-7.

[113]   Conversation with Zach Sonberg, MVW, December 19, 2018.

[114]   See: Rows 188 and 190 in Tab "WF-Det - Sales Volume" of RCDC075970.

as a whole.[115]  Seven of the eight halo price increases identified by Mr. Simon occur

in 2012, 2013, and 2015, years in which price growth was strong for the industry as

a whole.  Conversely, prices in the industry fell in 2014 and 2016, two years in

which Mr. Simon identifies only "ordinary" increases in the MVC points price.[116]

127.  This indicates that there are other industry-wide factors, such as those discussed

above, which are contributing to the increase in MVC point prices during Mr.

Simon's halo effect periods.  Because Mr. Simon does not control sufficiently for

other factors that were unusual in his halo effect periods that could have accounted

for any larger than average price increases, Mr. Simon's estimated halo effects are

further unreliable.

E.    MR. SIMON'S ANALYSIS OF THE HALO EFFECT ON THE VOLUME OF MVC
      POINTS SOLD SUFFERS FROM THE SAME FLAWS AS HIS ANALYSIS OF PRICE
      CHANGES.

128.  Mr. Simon argues that his estimate of unjust enrichment is conservative because he

does not include any profits that MVW earned as a result from any halo effect on

the volume of points.[117]

129.  Mr. Simon's only support for his assertion that there was a halo effect that resulted

in MVW selling additional MVC points is that the volume of MVC points sold

---

[115]    "State of the US Timeshare Industry 2015 United States Study," AIF, 2015, p. 34; "State
of the Vacation Timeshare Industry 2017 United States Study," AIF, 2017, p. 32. I
calculated the change in MVC points on an annual basis to allow comparison with the
annual pricing information in the industry studies.

[116]    "State of the Vacation Timeshare Industry 2017 United States Study," AIF, 2017, p. 32.

[117]    Simon Report, ¶¶ 85-86.

**CONFIDENTIAL**

grew over time after 2012, while the number of members did not.[118]  In other words, the number of points sold per member increased.

130.  Mr. Simon does even less to demonstrate an effect on MVC points volumes than he did in his fundamentally flawed approach to demonstrating an effect on MVC points prices.  In analyzing volumes, he does nothing to examine whether there were other explanations for the increase in points per member.  Indeed, he himself notes that after introducing its points system MVW "shifted to focusing its sales from new owners to existing owners…in order to achieve efficiencies in sales and marketing costs."[119]  Thus an increase in points per owner is exactly what would be expected.  Hence, such an increase is not evidence of any halo effect.   More generally, absent any analysis of changes in the number of points sold, Mr. Simon's assertion of an additional halo effect through the number of points is just an assertion to which no weight can be credited.

## VIII.   MR. SIMON'S QUANTIFICATION OF AGGREGATE UNJUST ENRICHMENT FROM HIS MEASURED HALO EFFECT IS FUNDAMENTALLY FLAWED.

131.  After calculating the halo effect on the price per point, Mr. Simon converts that into a measure of the unjust enrichment allegedly received by MVW as a result of the alleged conduct.   In what follows, I explain that even if Mr. Simon had demonstrated reliably that there was some halo effect on the price of points – which

---

[118]      Simon Report, ¶ 85.

[119]      Simon Report, ¶ 28.

he has not, for the reasons given above – his methodology for translating this effect into unjust enrichment is also substantially flawed. As a result of several errors and/or unsupported assumptions, Mr. Simon substantially overstates unjust enrichment even conditional on his estimate of the halo effect.

132. In Section VIII.A, I note that roughly two-thirds of Mr. Simon's measure of unjust enrichment flows from halo effects on prices which he assumes will continue in perpetuity. Mr. Simon's conclusions on future unjust enrichment are even more speculative than his analysis of past halo effects, and are highly sensitive to changes in his methodology.

133. In Section VIII.B, I explain that Mr. Simon's measure of unjust enrichment fails to account for MVW's opportunities but-for the challenged conduct and as a result, he substantially overstates unjust enrichment.

134. In Section VIII.C, I explain that, if one accepts Plaintiffs' experts' theories, then Mr. Simon has overstated unjust enrichment because he has failed to account for any "horn effect" on MVW.

A. **MR. SIMON'S TERMINAL VALUE/CAPITALIZATION CALCULATION, WHICH GENERATES THE MAJORITY OF HIS UNJUST ENRICHMENT, IS FLAWED.**

135. Mr. Simon claims that "the halo effect is embedded into the price per point in perpetuity."[120] Mr. Simon estimates a value of the halo effect of $34.5 million from 2011 to 2017, and a value of the halo effect from 2018 forward of $65.2 million.

---

[120]     Simon Report, ¶ 73.

**CONFIDENTIAL**

Thus, Mr. Simon's capitalized future value accounts for nearly two-thirds of his overall estimate of the size of the halo effect.

136. As described above, Mr. Simon's estimate of the halo effect through 2017 is fatally flawed. His capitalized value extrapolates these same flaws into estimates of future value and is therefore similarly flawed for all of the same reasons (and, in fact, multiplies all these errors up into larger numbers). Moreover, estimation of the effect in future years is even more speculative than his quantification of the effect in past years. Mr. Simon's approach effectively assumes continuation of the MVC-RCDC Affiliations and the value of the Ritz-Carlton brand into perpetuity and assumes that the benefits generated will remain at the levels they are today.[121]

137. Mr. Simon fails to account for the substantial uncertainty in the future associated with the Ritz-Carlton brand name, the nature of the association between the MVC and RCDC properties, or the continuation of any outsized halo effect that is not connected to tangible benefits to MVC members. There is no guarantee that the remaining RCDC properties will remain affiliated with the RCDC program. There is no guarantee that properties in the RCDC program will remain affiliated with the

---

[121] Specifically, his capitalization method assumes that the relationship between 2017 EBITDA and total value is the same for MVW as it is for the two companies he uses as comparables.

MVC program.[122]  And there is certainly no guarantee that any halo effect will continue in perpetuity.

138. Mr. Simon's unjust enrichment measure is highly sensitive to his assumptions about these future damages.  For example, limiting any future unjust enrichment to the existing 10-year duration of the contract (and making no other changes) would reduce Mr. Simon's estimate of total unjust enrichment by roughly 30% (from $99.6 million to $70.0 million using his allocation methodology.)[123]

### B.    MR. SIMON FAILS TO CONSIDER MVW'S OPPORTUNITIES BUT-FOR THE CHALLENGED CONDUCT.

139. To measure damages from challenged conduct properly, it is important to identify the conduct at issue and to remove only that conduct in constructing the but-for world, in order to measure the effect of that specific conduct and only that conduct. Mr. Simon has failed to do so.  In particular, he has not considered other options that MVW would have had available to it had it not been able to affiliate the RCDC

---

[122]    For example, the Affiliation Agreement has a 10-year term, after which either party could decide not to trigger additional 5-year renewal periods ("Affiliation Agreement providing Members enrolled with The Lion & Crown Travel co., LLC access to Marriott Vacation Club Destinations Exchange Program and Marriott Resorts, Travel Company, inc. D/B/A/ MVC Exchange Company Members access to Accommodations Received From Participating L&C Members and Lion & Crown," effective November 14, 2013, p. 13 (RCDC067469-520 at 483)).

[123]    Mr. Simon uses a capitalization rate of 11.72% to translate his estimated halo effect in 2017 into the value of the halo effect in perpetuity. Specifically, he divides his 2017 unjust enrichment by .1172. This is the basic formula for valuing a growing perpetuity (=X/(r-g)), where his .1172 is equal to the discount rate (r) less the annual growth rate of cash flows (g). Using the annual growth rate of MVW revenue from 2013 to 2018 of 2.8%, this implies a discount rate of 14.5%. I implement a discounted cash flow approach using these rates to estimate Mr. Simon's unjust enrichment through 2024.

**CONFIDENTIAL**

properties with MVC.  In such a world, it may have been more profitable for MVW to sell the RCDC business, in which case the profits from that sale should be included in any benchmark against which any unjust enrichment should be measured.

140.  For example, to the extent that Mr. Simon is correct and MVW had viable offers to purchase the business for $125 to $150 million, then this should be the baseline against Mr. Simon calculates his unjust enrichment, not $0 profits.  Thus, this would reduce his total measure of unjust enrichment by $125 to $150 million (and would reduce his allocation to the Aspen Plaintiffs accordingly).

C.  **IF ONE ACCEPTS PLAINTIFFS' EXPERTS' OPINIONS, THEN MR. SIMON'S MEASUREMENT OF UNJUST ENRICHMENT IS INCOMPLETE BECAUSE IT FAILS TO QUANTIFY ANY OFFSETTING "HORN EFFECT" ON MVW.**

141.  Professor Dev opines that "[c]o-branding (including affiliating) a less prestigious brand with a more prestigious brand creates a halo effect, or a positive spillover effect, for the less prestigious brand, and a horn effect or negative spillover effect for the more prestigious brand."[124]  With respect to the specific "co-branding" activities at issue here, Professor Dev opines that these activities generated both a halo effect and a horn effect.[125] Mr. Simon offers similar opinions.  It follows from these opinions that such co-branding can either benefit or harm the owner of the two brands, depending upon the relative magnitudes of the two effects.

---

[124]     Dev Report, ¶ 29; see also Dev Report ¶¶ 4-5.

[125]     Dev Report, ¶ 5.

**CONFIDENTIAL**

142.  For all the reasons discussed above, Mr. Simon has failed to demonstrate that MVW was unjustly enriched as a result of any halo effect.  But if one accepts his theory then for the purposes of measuring unjust enrichment, one would need to account for the full effects from affiliating the RCDC and MVC programs, including not only any benefit received from his purported halo effect on the MVC program, but also any harm from his purported "horn" effect on the RCDC brand.  Yet Mr. Simon completely ignores this "horn" effect when measuring unjust enrichment, and therefore fails to implement his own theory properly.

IX.    **MR. SIMON SUBSTANTIALLY OVERSTATES THE ALLOCATION OF ANY UNJUST ENRICHMENT TO PLAINTIFFS.**

143.  After calculating the total unjust enrichment allegedly received by MVW as a result of the challenged conduct, Mr. Simon concludes that "Plaintiffs would be entitled to 13.87% of the total disgorgement, based on the total value of fractional interests owned by Plaintiffs compared to the approximate value owned by all potentially eligible RCDC purchasers."[126]  As with the rest of his empirical analysis, Mr. Simon's allocation methodology is fundamentally flawed.

144.  Even within Mr. Simon's own approach to allocating unjust enrichment – based upon the relative value of Plaintiffs' fractional interests – he substantially overstates Plaintiffs' share.  Mr. Simon only includes units in five RCDC properties (Aspen, San Francisco, St. Thomas, Tahoe, and Vail) in this analysis, ignoring units in four

---

[126]    Simon Report, ¶ 83.

CONFIDENTIAL

other RCDC properties that were also linked to the MVC program (Abaco, Bachelor Gulch, Jupiter, and Kapalua Bay) via MVW's developer-owned interests. MVC owners booked roomnights at each of these properties.[127]

145. Mr. Simon gives no reason for excluding Abaco and Kapalua Bay. He explains that "RCDCs at Jupiter and Bachelor Gulch were not included in this calculation because access to these locations were never marketed to MVC points purchasers."[128] This is incorrect. In fact, Mr. Simon himself cites to documents that show the marketing of the RCDC properties at Jupiter (and Abaco).[129]

---

[127]   See: Table 2 above (citing to RCDC Annual Roomnights Summary Through 2017 for Jupiter, Bachelor Gulch, and Kapalua Bay (RCDC073708-709 at 708) for the number of roomnights booked at Bachelor Gulch, Jupiter, and Kapalua Bay. Similar data on roomnights at Abaco were not available, but the property was marketed to MVC members alongside other RCDC properties (see for example: "Marriott Vacation Club Insider Bulletin," Marketing email from MVC to Julie Schorr, July 27, 2011 (Exhibit 29 to Richard Hayward Deposition)).

[128]   Simon Report, fn. 109. To substantiate his point, Mr. Simon cites to an email sent to MVC members in July 2011 and points charts from 2012 to 2016. By showing that these properties are not marketed in some documents, Mr. Simon does not show that they were never marketed. In fact, one would not expect to see the properties in the points charts as prior to the Affiliation, only the RCDC in Vail was listed (see for example: "2012 – 2013 Vacation Club Points Charts," Exhibit 30 to Richard Hayward Deposition) and the relevant properties had been disaffiliated from the Ritz-Carlton brand by the time of the Affiliation.

[129]   See "Marriott Vacation Club Insider Bulletin," Marketing email from MVC to Julie Schorr, July 27, 2011 (Exhibit 29 to Richard Hayward Deposition) ("The Abaco Club on Winding Bay, a Ritz-Carlton Managed Club, is a breathtaking island treasure offering gorgeous ocean views and unparalleled relaxation."); and "FW: Marriott Destination Club Point Schedule for Ritz-Carlton Destinations (aka Explorer Collection,Luxury Residences)," email from Jay Neveloff to David Oesterich, August 2, 2012 (AHCA00015533-537 at 535-537) (Points schedule for RCDC properties including Abaco and Jupiter).

**CONFIDENTIAL**

146. Correcting Mr. Simon's value-based allocation methodology to include all RCDC properties reduces his estimate of the Plaintiffs' share of unjust enrichment from 13.9% to 7.8%, which has the effect of reducing Mr. Simon's estimate of unjust enrichment to Plaintiffs by 43.9% (=(13.9% - 7.8%)/13.9%).[130]

147. Even more importantly, Mr. Simon uses the wrong metric to allocate unjust enrichment to Plaintiffs. Mr. Simon provides no justification allocating based upon the relative value of Plaintiffs' fractional interests. Mr. Simon's allocation approach focuses on the relative value of RCDC properties to RCDC property owners, rather than the relevant metric for any calculation of unjust enrichment: the relative benefits to MVC members and to MVW created by the access to RCDC properties. These benefits depend not on sales prices but are more accurately captured by evaluating the extent to which MVC members accessed the different RCDC properties.

148. As explained above, the benefits to MVC members from RCDC properties differed over time and across property based upon the various ways in which MVC members could access the particular RCDC property. Access was much greater for some RCDC properties than others. An appropriate allocation methodology must account for these differences.

---

[130]     "Ritz-Carlton Destination Club Inventory Summary as of Period 1, 2012," (RCDC019950).

**CONFIDENTIAL**

149. As shown in Table 10 below, although Aspen (all units) accounted for 44.6% of Mr. Simon's value-based metric, Aspen accounted for only 8.2% of roomnights accessed by MVC members using MVC points.[131]  These values represent the share of all units at Aspen of total RCDC units.  Plaintiffs, however, only own 233 of the 876 fractional interests at Aspen and so the share attributable to *Plaintiffs' interests* is substantially smaller than the share attributable to *all Aspen units*.  After accounting for the fact that Plaintiffs own only a subset of the fractional interests at Aspen,[132] Mr. Simon's allocation of 13.9% compares with an allocation based on roomnights for Plaintiffs' share of any unjust enrichment equal to 2.2%.[133, 134]

150. As shown in Table 10, the roomnights-based allocation produces shares much more in line with the relative importance of these properties to MVC points owners discussed above in Section IV.  Mr. Simon's value-based approach allocates the vast majority of value to just two properties – Aspen and St. Thomas.  Vail, despite its substantial prominence in the MVC points program (which Mr. Simon

---

[131]   Allocating based upon the relative number of roomnights available to MVC points owners rather than the relative number of roomnights actually used yields similar results.

[132]   Specifically, Plaintiffs owned 233 of 876 fractional interests at Aspen, so Aspen's share of roomnights of 8.2% is multiplied by 0.27 (=233/876) to arrive at Plaintiffs share of 2.2%.

[133]   Even when limiting to only the five properties considered by Mr. Simon, the appropriate allocation to Aspen Plaintiffs based on roomnights booked would be 2.3%.

[134]   Performing the same calculation on the post-Affiliation period of 2015-2017 yields a similar number.

**CONFIDENTIAL**

acknowledges),[135] is allocated only a 2.2% share.  In contrast, in a roomnights-based allocation, Vail is allocated a 46.6% share, by far the highest of any of the RCDC properties, consistent with the much greater access that MVC members had to Vail than to Aspen and other RCDC properties.

**Table 10: Mr. Simon Overstates the Appropriate Allocation to the Aspen Plaintiffs**

| RCDC Property | Simon Allocation (Based on Value of Units Sold) | Corrected Allocation (Based on Roomnights Occupied using MVC Points) |
|---|---|---|
| Aspen (All Units) | 44.6% | 8.2% |
| Aspen (Plaintiff Units) | 13.9% | 2.2% |
| Bachelor Gulch | 0.0% | 0.3% |
| Jupiter | 0.0% | 3.8% |
| Kapalua Bay | 0.0% | 0.7% |
| Lake Tahoe | 3.0% | 7.1% |
| San Francisco | 9.8% | 18.6% |
| St. Thomas | 40.4% | 14.7% |
| Vail | 2.2% | 46.6% |
| | | |

**Notes:** The "Aspen (Plaintiff Units)" row accounts for the fact that the Aspen plaintiffs owned only 233 of the 876 total fractional units at the RCC Aspen resort. Roomnight data for the Abaco property are not available and therefore Abaco was conservatively excluded from the calculation.

**Sources:** Simon Report backup, RCDC Annual Roomnights Summary Through 2017 for Aspen, Lake Tahoe, and San Francisco (RCDC073606); RCDC Annual Roomnights Summary Through 2017 for St. Thomas and Vail (RCDC073708); RCDC Annual Roomnights Summary Through 2017 for Jupiter, Bachelor Gulch, and Kapalua Bay (RCDC073710); Simon Report, Exhibit H.

---

[135]    Mr. Simon points to the inclusion of Vail in the MVC Trust as an event which "created a whole new level of access to RCDC by ordinary (non-Premier) MVC points holders" and identifies it as "the beginning of the first phase of price per point increases connected to the halo effect of allowing MVC members access to RCDC properties" (Simon Report, ¶ 49).

**CONFIDENTIAL**

151. Applying this more appropriate allocation methodology to Mr. Simon's existing halo effects model, and making no other changes, reduces the unjust enrichment to Plaintiffs by 84% from $99.6 million to $15.8 million.

## X.      SUMMARY OF FLAWS IN MR. SIMON'S ANALYSIS

152. My main conclusion is simple.  Mr. Simon has failed to demonstrate reliably that MVW was unjustly enriched by the challenged conduct and, in particular, he has failed to put forward a reliable methodology for quantifying any such unjust enrichment.  Indeed, even if I accept Mr. Simon's methodology for the sake of argument (without accepting its validity), simply correcting for some fundamental errors made by Mr. Simon wipes out all or nearly all of his calculated unjust enrichment.

153. This main conclusion is supported by the more detailed findings summarized in the remainder of this section.

154. First, the tangible benefits to MVC owners from access to RCDC properties are very small.  Thus, Plaintiffs' experts' halo effect theory of unjust enrichment depends critically upon MVW having generated substantial increases in the price of MVC points despite de minimis actual benefits to MVC members.

155. Second, the evidence that Plaintiffs' experts cite to support the general existence of a halo effect actually proves that such an effect is present only under certain circumstances and can be demonstrated to hold in a given case only by rigorous empirical analysis.  And Plaintiffs' experts fail to point to evidence in the record that demonstrates that the connection between the RCDC and MVC programs

88

CONFIDENTIAL

generated a halo effect here.  Thus, the support of their theory falls entirely to Mr. Simon's empirical analysis.

156. Third, Plaintiffs' experts' halo effect theory centers upon The Ritz-Carlton brand and cannot reliably distinguish between (i) the value conveyed by marketing The Ritz-Carlton Destination Clubs through the Affiliations and (ii) the value conveyed through other marketing strategies for the brand, including but not limited to promoting access to The Ritz-Carlton hotels or promoting access to The Ritz Carlton Destination Clubs through developer-owned inventory.  Given that Plaintiffs' experts are alleging a theory of benefit to MVW that is not tied to tangible metrics of accessibility or use of The Ritz-Carlton properties, they have no ability to say that these alternative strategies would not have been equally effective in generating whatever halo effect (if any) existed.  Their theory is simply too vague and unsupported to rule out any such possibilities.

157.  Fourth, Mr. Simon's empirical analysis cannot come close to carrying the weight that Plaintiffs' argument puts on it.  Indeed, it falls woefully short of professional standards and is completely incapable of supporting Plaintiffs' halo effect theory.  In particular, Mr. Simon's analysis of the halo effect suffers from three key flaws.

- Mr. Simon fails to measure accurately the change in price of MVC points.  His measure of price is flawed in three ways, described in detail above.  Correcting these three fundamental errors in his price measure almost completely eliminates Mr. Simon's unjust enrichment damages.

**CONFIDENTIAL**

- o   Mr. Simon improperly includes "changes" where the gross price in fact did not change.

- o   Mr. Simon ignores the elapsed time between price changes which is obviously a relevant factor in explaining the size of any price increase.

- o   Mr. Simon analyzes the halo effect using gross price instead of net price, and thus does not analyze the price that actually reflects revenue to MVW and thus that could possibly contribute to any unjust enrichment.

- o   Correcting just these three obvious errors in measuring price reduces Mr. Simon's damages by 94% from $99.6 million to $6.3 million.

- •   Mr. Simon also does not distinguish reliably between the halo effect periods and the "ordinary" periods.  He uses an unreliable, ad hoc, anecdotal review of a very small subset of MVW communications to determine when the halo effect purportedly affected the price of MVC points.  Moreover, in determining the relevant halo effect periods, he implicitly assumes that any connection between the MVC and RCDC programs was not allowed and thus at issue in this case, whereas Plaintiffs' focus of the complaint relates to the formal Affiliations between MVC and certain RCDC properties.

  - o   Limiting Mr. Simon's halo effects to the post-2014 (i.e., post-Affiliations) period, and also correcting the three errors in measuring price discussed above completely eliminates Mr. Simon's measured unjust enrichment.

**CONFIDENTIAL**

- Mr. Simon fails to apply valid methods to account for all of the other relevant factors (aside from the alleged halo effect) that affect the price of MVC points. Hence, he has failed to isolate the effect of the challenged conduct from other potential explanations for changes in prices.

158. Finally, Mr. Simon substantially overstates the allocation of any unjust enrichment to Plaintiffs. He provides no justification for using property values as the basis for allocation. A more appropriate metric that bears substantially greater relationship to any alleged unjust enrichment is the extent of access to RCDC properties by MVC points owners. If this more appropriate allocation measure is applied, it reduces Aspen Plaintiffs' share from 13.9% to 2.2% and reduces Mr. Simon's measured unjust enrichment accordingly.

- Correcting the three errors in measuring price described above, and using this more appropriate allocation measure, reduces Mr. Simon's unjust enrichment by 99% from $99.6 million to $1.0 million.

- Making all of these corrections and further limiting unjust enrichment to the post-2014 (i.e., post-Affiliations) period completely eliminates Mr. Simon's measured unjust enrichment (regardless of which measure of allocation is used).

**CONFIDENTIAL**

_____

Mark A. Israel

December 28, 2018

**CONFIDENTIAL**



**CONFIDENTIAL**



**CONFIDENTIAL**

### Table A2: Corrections to Mr. Simon's Measure of Price

| Correction | Simon's Allocation (13.9%) | | Correctly Allocating Using Roomnights Accessed (2.2%) | |
|---|---|---|---|---|
| | Simon's Corrected Unjust Enrichment | Percent Change | Simon's Corrected Unjust Enrichment | Percent Change |
| Mr. Simon's Model | $99,643,435 | - | $15,753,418 | -84% |
| Remove Non-Price Changes | $83,512,821 | -16% | $13,203,201 | -87% |
| Control for Time Elapsed Between Price Changes | $70,672,690 | -29% | $11,173,204 | -89% |
| Use Net Prices Instead of Gross Prices | $67,071,047 | -33% | $10,603,792 | -89% |
| Control for Time Elapsed Between Price Changes and Remove Non-Price Changes | $45,084,003 | -55% | $7,127,686 | -93% |
| Use Net Prices Instead of Gross Prices and Remove Non-Price Changes | $34,933,890 | -65% | $5,522,975 | -94% |
| Use Net Prices Instead of Gross Prices and Control for Time Elapsed Between Price Changes | $51,418,758 | -48% | $8,129,198 | -92% |
| Use Net Prices Instead of Gross Prices, Control for Time Elapsed Between Price Changes, and Remove Non-Price Changes | $6,346,409 | -94% | $1,003,354 | -99% |

### Table A3: Other Corrections to Mr. Simon's Measured Unjust Enrichment

| Correction | Simon's Allocation (13.9%) | | Correctly Allocating Using Roomnights Accessed (2.2%) | |
|---|---|---|---|---|
| | Simon's Corrected Unjust Enrichment | Percent Change | Simon's Corrected Unjust Enrichment | Percent Change |
| Mr. Simon's Model | $99,643,435 | - | $15,753,418 | -84% |
| Limit to Post-2014 Treating Prior Periods as Non-Halo Periods | $9,674,090 | -90% | $1,529,453 | -98% |
| Limit to Post-2014 Treating Prior Periods as Non-Halo Periods (Using Net Price) | -$3,403,989 | -103% | -$538,163 | -101% |
| Limit to Post-2014 Treating Prior Periods as Non-Halo Periods (Correcting All Three of Mr. Simon's Errors in Measuring Prices) | -$4,350,327 | -104% | -$687,778 | -101% |
| Calculate Unjust Enrichment Until the End of the Initial Term of the Affiliation Agreement | $70,000,367 | -30% | $11,066,911 | -89% |

95

**CONFIDENTIAL**

# Exhibit A

**CONFIDENTIAL**

**Mark A. Israel**                                                              **November 2018**
**Senior Managing Director, Compass Lexecon**

555 12th Street NW, Suite 501
Washington, DC 20004
(202) 753-5205 (direct)
misrael@compasslexecon.com

## PROFESSIONAL EXPERIENCE HIGHLIGHTS

- Served as an expert for both the Federal Government and private parties in cases involving: fixed and mobile telecommunications, cable television, broadband internet service, social media, other high technology industries, food distribution, airlines, railroads, shipping, health insurance, financial markets, credit cards, beverages, retail, energy, and many others.

- Testified in Federal Court, in multiple state courts, in front of the United States Copyright Royalty Judges, in front of international competition authorities, and in arbitration proceedings. Appeared in front of government agencies including DOJ, FTC, and FCC, and state agencies on behalf of numerous clients.

- Submitted expert reports in Federal Court, and affidavits, declarations, and papers to U.S. competition agencies, FCC, DOT, international competition authorities, and state regulators.

- Written numerous academic articles on topics including competition economics, merger policy, telecommunications, airlines, insurance markets, and labor markets. Research published in leading scholarly and applied journals including *The American Economic Review*, *The Rand Journal of Economics*, *International Journal of Industrial Organization*, *The Journal of Competition Law and Economics,* and many others, and presented to business, government, and academic audiences worldwide.

- Co-author of the chapter on Econometrics and Regression Analysis in the ABA Treatise, *Proving Economic Damages: Legal and Economic Issues,* 2017.

## AREAS OF EXPERTISE

- Antitrust and competition economics; industrial organization economics

- Applied econometrics

- Economic and econometric analysis of horizontal and vertical mergers

- Economic and econometric analysis of antitrust litigation topics, including: Class certification, damages, and liability issues in cases involving price fixing, exclusive dealing, monopolization, bundling, price discrimination, and exclusionary practices

## EDUCATION

- Ph.D., Economics, STANFORD UNIVERSITY, June 2001.
- M.S., Economics, UNIVERSITY OF WISCONSIN-MADISON, August 1992.
- B.A., Economics, ILLINOIS WESLEYAN UNIVERSITY, Summa Cum Laude, May 1991.

**CONFIDENTIAL**

## EMPLOYMENT HISTORY

Compass Lexecon: *Senior Managing Director*, Head of Compass Lexecon North American Antitrust Practice, January 2016 – Present.

(Previously: *Executive Vice President*, April 2013 – January 2016; *Senior Vice President*, January 2009 – March 2013; *Vice President*, January 2008 – December 2008; *Economist*, January 2006 – December 2007.)

Kellogg School of Management, Northwestern University: *Assistant Professor of Management and Strategy*, 2000 – 2006; *Associate Professor of Management and Strategy*, 2007 – 2008.

State Farm Insurance: *Research Administrator*, 1992 – 1995.

## RECENT PROFESSIONAL RECOGNITIONS

Global Competition Review Who's Who Legal: Competition 2018, leading Economist.

Global Arbitration Review's 2018 International Who's Who of Commercial Arbitration, leading Expert Witness.

American Antitrust Institute 2015 Antitrust Enforcement Awards, *Outstanding Antitrust Litigation Achievement in Economics,* Finalist.

## LIVE TESTIMONIAL EXPERIENCE

Testimony as Economic Expert on behalf of Wilh. Wilhelmsen Holding ASA, In the Matter of the *Federal Trade Commission v. Wilh. Wilhelmsen Holding ASA Wilhelmsen Maritime Services As Resolute Fund II, L.P. Drew Marine Intermediate II B.V. and Drew Marine Group, Inc.*, In the United States District Court for the District of Columbia, No. 1:18-cv-00414-TSC; Deposition: May 24, 2018; Live Trial Testimony: June 12, June 13, 2018.

Testimony as Economic Expert on behalf of Joint Sports Claimants, In the Matter of *Determination of Cable Royalty Funds*, United States Copyright Royalty Judges in the Library of Congress, Docket No. 14-CRB-0010-CD (2010-2013); Live Testimony: March 12, 2018.

Testimony as Economic Expert on behalf of Comcast Corporation, In the Matter of *Viamedia, Inc. v. Comcast Corporation and Comcast Spotlight, LP*, In the United States District Court Northern District of Illinois Eastern Division, Case No. 16-cv-5486; Deposition: January 5, 2018.

Testimony as Economic Expert on behalf of Trinity, In the Matter of *Jackson County, Missouri, Individually and on behalf of a class of others similarly situated, v. Trinity Industries, Inc., and Trinity Highway Products, LLC*, In the Circuit Court of Jackson County, Missouri at Independence, Case No. 1516-CV23684; May 24, 2017.

**CONFIDENTIAL**

Testimony as Economic Expert on behalf of Energy Solutions, Inc., In the Matter of the *United States of America v. Energy Solutions, Inc., Rockwell Holdco, Inc., Andrews County Holdings, Inc., and Waste Control Specialists, LLC*, In the United States District Court for the District of Delaware, Civil Action No. 16-cv-01056-SLR; Deposition: April 17, 2017; Live Trial Testimony: May 2, May 3, 2017.

Testimony as Economic Expert on behalf of Facebook, Inc., In the Matter of *Social Ranger, LLC v. Facebook, Inc.*, In the District Court of Delaware, C.A. No. 14-1525-LPS; Deposition: March 6, 2017.

Testimony as Economic Expert on behalf of Regal Entertainment Group, In the Matter of *iPic – Gold Class Entertainment, LLC et al., v. Regal Entertainment Group, AMC Entertainment Holdings, Inc., et al.*, In the District Court of Harris County, Texas, 234th Judicial District, No. 2015-68745; Deposition: January 12, 2016, February 15, 2017; Live Trial Testimony: January 21, 2016.

Testimony as Economic Expert on behalf of Anthem Inc., In the Matter of the *United States of America et al. v. Anthem Inc. and Cigna Corp.*, In the District Court of the District of Columbia, No. 16-cv-01493 (ABJ); Deposition: November 9, 2016; Phase 1 Live Trial Testimony: December 1, December 2, 2016; Phase 2 Live Trial Testimony: December 22, 2016.

Testimony as Economic Expert on behalf of Defendants, In the Matter of *Darren Ewert v. Nippon Yusen Kabushiki Kaisha et al.*, Supreme Court of British Columbia, No. S-134895; Deposition: September 14, 2016.

Testimony in Commercial Arbitration on Issues Related to Mobile Wireless Competition; New York, NY; April 12, 2016.

Testimony as Economic Expert on behalf of Federal Trade Commission, In the Matter of *Federal Trade Commission et al. v. Sysco Corporation and USF Holding Corp.*, Civil Action No. 15-cv-00256 (APM); Deposition: April 28, 2015; Live Trial Testimony: May 7, May 8, May 14, 2015.

Appearances in Federal Communications Commission, Economists Panels:
- Comcast/Time Warner, January 2015
- AT&T/T-Mobile, July 2011
- Comcast/NBCUniversal, August 2010

Appearance before California Public Utility Commission, Public Hearings on Comcast/Time Warner Merger, Los Angeles; April 2015.

Appearance as Economic Testifying Expert in front of Department of Justice, Federal Trade Commission, Federal Communications Commission, and State Regulatory Agencies in many additional transactions, including: Danaher/NetScout, AT&T/Leap Wireless, T-Mobile/MetroPCS, American Airlines/US Airways, SpectrumCo/Cox/Verizon Wireless, oneworld antitrust immunity application, PepsiCo/bottlers, Houghton Mifflin/Harcourt, Chicago Mercantile Exchange/Chicago Board of Trade.

**CONFIDENTIAL**

## EXPERT REPORTS, AFFIDAVITS, AND DECLARATIONS

Declaration of Mark A. Israel, In the Matter of *Oscar Insurance Company of Florida v. Blue Cross and Blue Shield of Florida, Inc., d/b/a Florida Blue; Health Options Inc., d/b/a Florida Blue HMO; and Florida Health Care Plan Inc., d/b/a Florida Health Care Plans,* In the United States District Court Middle District of Florida Orlando Division, Case No. 6:18-cv-01944, November 19, 2018.

Reply Declaration of Mark Israel, Michael Katz, and Bryan Keating, In the Matter of Applications of T-Mobile US, Inc. and Sprint Corporation, Consolidated Applications for Consent to Transfer Control of Licenses and Authorizations, Federal Communications Commission, WT Docket No. 18-197, September 17, 2018.

Expert Report of Gustavo Bamberger, Robert Calzaretta, and Mark Israel, In the Joint Application of Hawaiian Airlines, Inc. and Japan Airlines, Co., Ltd., Appendix 6 to "Joint Application for Approval of and Antitrust Immunity for Alliance Agreements," Department of Transportation, Case No. DOT-OST-2018-0084, June 13, 2018.

Expert Reports of Mark A. Israel, In the Matter between *Cygnus Electronics Corporation and Sean Allott and Panasonic Corporation et al.,* In the Ontario Superior Court of Justice, Court File No. 3795/14CP, Report: November 17, 2017; Reply Report: February 23, 2018; Supplemental Report: May 22, 2018.

Expert Report of Mark A. Israel, In the Matter of the *Federal Trade Commission v. Wilh. Wilhelmsen Holding ASA Wilhelmsen Maritime Services As Resolute Fund II, L.P. Drew Marine Intermediate II B.V. and Drew Marine Group, Inc.*, In the United States District Court for the District of Columbia, No. 1:18-cv-00414-TSC, May 11, 2018.

Reports of Dr. Mark A. Israel, In the Matter of *Viamedia, Inc. v. Comcast Corporation and Comcast Spotlight, LP,* In the United States District Court for the Northern District of Illinois Eastern Division, Case No. 16-cv-5486, Rebuttal Report: November 30, 2017; Errata Sheet for Rebuttal Report: January 4, 2018.

Declaration of Mark A. Israel, In the Matter between *Robert Foster and Murray Davenport and Sears Canada Inc. et al.*, In the Ontario Superior Court of Justice, Court File No. 766-2010 CP, November 1, 2017.

Expert Report of Mark Israel and Bryan Keating, "Economic Analysis of Dr. Evans' Claims as They Relate to *Restoring Internet Freedom*," Federal Communications Commission, WC Docket No. 17-108, October 31, 2017.

Written Rebuttal Testimony of Dr. Mark A. Israel, In the Matter of Distribution of Cable Royalty Funds, Before the Copyright Royalty Judges, Washington, D.C., No. 14-CRB-0010-CD, September 15, 2017.

Declaration of Mark A. Israel, Allan L. Shampine, and Thomas A. Stemwedel, In the Matter of Restoring Internet Freedom, Federal Communications Commission, WC Docket No. 17-108, July 17, 2017.

CONFIDENTIAL

Expert Report of Dr. Mark A. Israel, In the Matter of *St. Clair County, Illinois, and Macon County, Illinois, Individually and on behalf of all other counties in the State of Illinois, v. Trinity Industries, Inc. and Trinity Highway Products, LLC*, In the United States District Court for the Southern District of Illinois, Civil Action No.: 3:14-cv-1320, April 25, 2017.

Expert Rebuttal Report of Mark A. Israel, In the Matter of the *United States of America v. Energy Solutions, Inc., Rockwell Holdco, Inc., Andrews County Holdings, Inc., and Waste Control Specialists, LLC*, In the United States District Court for the District of Delaware, Civil Action No. 16-cv-01056-SLR, April 10, 2017.

Expert Report of Mark A. Israel, In the Matter of the *United States of America v. Energy Solutions, Inc., Rockwell Holdco, Inc., Andrews County Holdings, Inc., and Waste Control Specialists, LLC*, In the United States District Court for the District of Delaware, Civil Action No. 16-cv-01056-SLR, March 27, 2017.

Expert Report of Mark A. Israel, In the Matter of *Jackson County, Missouri, Individually and on behalf of a class of others similarly situated, v. Trinity Industries, Inc., and Trinity Highway Products, LLC*, In the Circuit Court of Jackson County, Missouri at Independence, Case No. 1516-CV23684, March 24, 2017.

Expert Report of Mark A. Israel, In the Matter of *Honeywell International Inc. v. iControl Networks, Inc. and Alarm.com Holdings, Inc.*, In the United States District Court for the District of New Jersey, No. 2:17-cv-01227, February 26, 2017.

Written Direct Testimony of Dr. Mark A. Israel, In the Matter of Distribution of Cable Royalty Funds, Before the Copyright Royalty Judges, Washington, D.C., No. 14-CRB-0010-CD (2010-13), December 22, 2016.

Expert Report of Mark Israel, In the Matter of *Social Ranger, LLC v. Facebook, Inc.*, In the United States District Court for the District of Delaware, C.A. No. 14-1525-LPS, November 23, 2016.

Expert Report of Mark A. Israel, In the Matter between *Darren Ewert and DENSO Corporation et al.*, In the Supreme Court of British Columbia, Vancouver Registry, No. S-135610, November 15, 2016.

Supplemental and Rebuttal Expert Report of Mark A. Israel, In the Matter of the *United States of America et al. v. Anthem Inc. and Cigna Corp.*, In the United States District Court, District of Columbia, No. 16-cv-01493 (ABJ), October 28, 2016.

Expert Report of Mark A. Israel, In the Matter of the *United States of America et al. v. Anthem Inc. and Cigna Corp.*, In the United States District Court, District of Columbia, No. 16-cv-01493 (ABJ), October 7, 2016.

Reply Verified Statement of Mark Israel and Jonathan Orszag, "Review of Commodity, Boxcar, and TOFC/COFC Exemptions," Surface Transportation Board, Docket No. EP 704 (Sub-No. 1), August 26, 2016.

Third Declaration of Mark Israel, Daniel Rubinfeld, and Glenn Woroch, "Analysis of the Regressions and Other Data Relied Upon in the Business Data Services FNPRM And a Proposed Competitive Market Test," Federal Communications Commission, WC Docket Nos. 16-143, 15-247, 05-25, RM-10593, August 9, 2016.

**CONFIDENTIAL**

Verified Statement of Mark Israel and Jonathan Orszag, "Review of Commodity, Boxcar, and TOFC/COFC Exemptions," Surface Transportation Board, Docket No. EP 704 (Sub-No. 1), July 26, 2016.

Second Declaration of Mark Israel, Daniel Rubinfeld, and Glenn Woroch, "Analysis of the Regressions and Other Data Relied Upon in the Business Data Services FNPRM And a Proposed Competitive Market Test," Federal Communications Commission, WC Docket Nos. 16-143, 05-25, RM-10593, June 28, 2016.

Expert Declaration of Mark A. Israel, In the Matter of *Liberman Broadcasting, Inc. and LBI Media, Inc. v. Comcast Corporation and Comcast Cable Communications, LLC*, Federal Communications Commission, MB Docket No. 16-121, June 7, 2016.

Expert Report of Mark A. Israel, In the Matter of *La Crosse County, Individually, and on behalf of all others similarly situated v. Trinity Industries, INC. and Trinity Highway Products, LLC*, In the United States District Court, Western District of Wisconsin, Case No. 3:15-cv-00117-scl, May 27, 2016.

Expert Report of Mark A. Israel, In the Matter between *Darren Ewert and Nippon Yusen Kabushiki Kaisha et al.*, In the Supreme Court of British Columbia, Vancouver Registry, No. S-134895, May 20, 2016.

Second Supplemental Declaration of Mark Israel, Daniel Rubinfeld, and Glenn Woroch, In the Matter of Special Access for Price Cap Local Exchange Carriers, Federal Communications Commission, WC Docket No. 05-25, April 20, 2016.

Supplemental Declaration of Mark Israel, Daniel Rubinfeld, and Glenn Woroch, In the Matter of Special Access Rates for Price Cap Local Exchange Carriers, Federal Communications Commission, WC Docket No. 05-25, March 24, 2016.

Declaration of Mark Israel, Daniel Rubinfeld, and Glenn Woroch, In the Matter of Special Access Rates for Price Cap Local Exchange Carriers, Federal Communications Commission, WC Docket No. 05-25, February 19, 2016.

Declaration of Mark Israel, Daniel Rubinfeld, and Glenn Woroch, "Competitive Analysis of the FCC's Special Access Data Collection," Federal Communications Commission, WC Docket No. 05-25, January 26, 2016.

Declaration of Dr. Mark Israel, In the Matter of *iPic – Gold Class Entertainment, LLC et al., v. Regal Entertainment Group, AMC Entertainment Holdings, Inc., et al.*, In the District Court of Harris County, Texas, 234th Judicial District, No. 2015-68745, January 18, 2016.

Declaration of Dennis Carlton, Mark Israel, Allan Shampine & Hal Sider, "Investigation of Certain Price Cap Local Exchange Carrier Business Data Services Tariff Pricing Plans," Federal Communications Commission, WC Docket No. 15-247, January 7, 2016.

Declaration of Mark A. Israel, Attached to "Response of AT&T Mobility LLC to Notice of Apparent Liability for Forfeiture," Federal Communications Commission, File No. EB-IHD-14-00017504, July 17, 2015.

**CONFIDENTIAL**

Reports in the Matter of *Federal Trade Commission et al. v. Sysco Corporation and USF Holding Corp.*, In the United States District Court for the District of Columbia, Civil Action No. 1:15-cv-00256 (APM), Declaration: February 18, 2015; Report: April 14, 2015; Rebuttal Report: April 21, 2015.

Declaration of Mark A. Israel, Bryan G. M. Keating, and David Weiskopf, "Economic Analysis of the Effect of the Comcast-TWC Transaction on Voice and Broadband Services in California," December 3, 2014.

Expert Report of Mark A. Israel, "Economic Analysis of the Effect of the Comcast-TWC Transaction on Broadband: Reply to Commenters," Federal Communications Commission, MB Docket No. 14-57, September 22, 2014.

Supplemental Declaration of Mark Israel and Allan Shampine, In the Matter of Amendment of the Commission's Rules Related to Retransmission Consent, Appendix A to "Reply Comments of the National Association of Broadcasters," Federal Communications Commission, MB Docket No. 10-71, July 24, 2014.

Declaration of Mark Israel and Allan Shampine, In the Matter of Amendment of the Commission's Rules Related to Retransmission Consent, Appendix B to "Comments of the National Association of Broadcasters," Federal Communications Commission, MB Docket No. 10-71, June 26, 2014.

Expert Report of Mark A. Israel, "Implications of the Comcast/Time Warner Cable Transaction for Broadband Competition," Federal Communications Commission, MB Docket No. 14-57, April 8, 2014.

Declaration of Michael L. Katz, Philip A. Haile, Mark A. Israel, and Andres V. Lerner, "Sprint's Proposed Weighted Spectrum Screen Defies Economic Logic and Is Inconsistent with Established Facts," Federal Communications Commission, WT Docket No. 12-269, March 14, 2014.

Reply Declaration of Mark A. Israel, "Competitive Effects and Consumer Benefits from the Proposed Acquisition of Leap Wireless by AT&T: A Reply Declaration," Federal Communications Commission, WT Docket No. 13-193, October 23, 2013.

Declaration of Mark A. Israel, "An Economic Analysis of Competitive Effects and Consumer Benefits from the Proposed Acquisition of Leap Wireless by AT&T," Federal Communications Commission, WT Docket No. 13-193, August 1, 2013.

Supplemental Reply Declaration of Michael L. Katz, Philip A. Haile, Mark A. Israel, and Andres V. Lerner, "Comments on Appropriate Spectrum Aggregation Policy with Application to the Upcoming 600 MHz Auction," Federal Communications Commission, WT Docket No. 12-269, June 13, 2013.

Reply Declaration of Michael L. Katz, Philip A. Haile, Mark A. Israel, and Andres V. Lerner, "Comment on the Submission of the U.S. Department of Justice Regarding Auction Participation Restrictions," Federal Communications Commission, WT Docket No. 12-269, June 13, 2013.

CONFIDENTIAL

Reply Declaration of Michael L. Katz, Philip A. Haile, Mark A. Israel, and Andres V. Lerner, "Spectrum Aggregation Policy, Spectrum-Holdings-Based Bidding Credits, and Unlicensed Spectrum," Federal Communications Commission, GN Docket No. 12-268, March 12, 2013.

Declaration of Igal Hendel and Mark A. Israel, "Econometric Principles That Should Guide the Commission's Analysis of Competition for Special Access Service," Federal Communications Commission, WC Docket No. 05-25, February 11, 2013.

Reply Declaration of Mark A. Israel and Michael L. Katz, "Economic Analysis of Public Policy Regarding Mobile Spectrum Holdings," Federal Communications Commission, WT Docket No. 12-269, January 7, 2013.

Declaration of Mark A. Israel and Michael L. Katz, "Economic Analysis of Public Policy Regarding Mobile Spectrum Holdings," Federal Communications Commission, WT Docket No. 12-269, November 28, 2012.

Declaration of Mark Israel, "An Economic Assessment of the Prohibition on Exclusive Contracts for Satellite-Delivered, Cable-Affiliated Networks," Federal Communications Commission, MB Docket Nos. 12-68, 07-18, & 05-192, September 6, 2012.

Expert Report of Mark Israel, "Implications of the Verizon Wireless & SpectrumCo/Cox Commercial Agreements for Backhaul and Wi-Fi Services Competition," Federal Communications Commission, WT Docket No. 12-4, August 1, 2012.

Expert Report of Mark A. Israel, Michael L. Katz, and Allan L. Shampine, "Promoting Interoperability in the 700 MHz Commercial Spectrum," Federal Communications Commission, WT Docket No. 12-69, July 16, 2012.

Affidavits of Dr. Mark A. Israel in the Matter of *Bloomberg L.P. v. Comcast Cable Communications, LLC*, Federal Communications Commission, MB Docket No. 11-104, Declaration: June 21, 2012; Declaration: June 8, 2012; Supplemental Declaration: September 27, 2011; Declaration: July 27, 2011.

Expert Report of Robert Willig, Mark Israel, Bryan Keating, and Jonathan Orszag, "Response to Supplementary Comments of Hubert Horan," Docket DOT-OST-2009-1055, October 22, 2010.

Expert Report of Robert Willig, Mark Israel, Bryan Keating, and Jonathan Orszag, "Measuring Consumer Benefits from Antitrust Immunity for Delta Air Lines and Virgin Blue Carriers," Docket DOT-OST-2009-1055, October 13, 2010.

Expert Report of Mark Israel and Michael L. Katz, "Economic Analysis of the Proposed Comcast-NBCU-GE Transaction," Federal Communications Commission, MB Docket No. 10-56, July 20, 2010.

Expert Report of Mark Israel and Michael L. Katz, "The Comcast/NBCU Transaction and Online Video Distribution," Federal Communications Commission, MB Docket No. 10-56, May 4, 2010.

Expert Report of Mark Israel and Michael L. Katz, "Application of the Commission Staff Model of Vertical Foreclosure to the Proposed Comcast-NBCU Transaction," Federal Communications Commission, MB Docket No. 10-56, February 26, 2010.

CONFIDENTIAL

Expert Report of Robert Willig, Mark Israel, and Bryan Keating, "Competitive Effects of Airline Antitrust Immunity: Response of Robert Willig, Mark Israel, and Bryan Keating" in Docket DOT-OST-2008-0252, January 11, 2010.

Affidavit of Dr. Mark A. Israel on Class Certification in the Matter of Puerto Rican Cabotage Antitrust Litigation, in the United States District Court for the District of Puerto Rico, MDL Docket No. 3:08-md-1960 (DRD), December 10, 2009.

Expert Report of Robert Willig, Mark Israel, and Bryan Keating, "Competitive Effects of Airline Antitrust Immunity," Docket DOT-OST-2008-0252, September 8, 2009.

Expert Report and Supplemental Expert Report of Dennis W. Carlton and Mark Israel in the Matter of *Toys "R" Us-Delaware, Inc., and Geoffrey Inc. v. Chase Bank USA N.A.*, in American Arbitration Association New York, New York, Commercial Arbitrations No. 13-148-02432-08, Expert Report: February 27, 2009; Supplemental Expert Report: March 20, 2009.

Expert Reports of James Levinsohn and Mark Israel, In the Matter of 2006 NPM Adjustment Proceeding pursuant to Master Settlement Agreement, October 6, 2008, January 16, 2009, March 10, 2009.


## OTHER EXPERT WORK IN REVIEW OF MERGERS/TRANSACTIONS

*Successful acquisition of Keystone Foods by Tyson Foods, Inc. 2018.* Served as lead economic expert for U.S. jurisdiction. Presented economic analyses demonstrating that competition would remain strong post-merger. Ultimately, antitrust agencies in the U.S., China, Japan, and Korea cleared the transaction.

*Successful acquisition of NEX Group PLC by CME Group Inc. 2018.* Co-lead economic expert with Thomas Stemwedel. Presented several econometric analyses demonstrating that Treasury futures contracts and cash Treasury securities were economic complements rather than substitutes. Based heavily on these Compass Lexecon submissions, the DOJ and CMA closed their investigations without requiring any divestitures.

*Successful acquisition of Time Warner by AT&T, Inc. 2018.* Lead economist throughout the DOJ investigation. Then director of all economic work during trial, serving as the central connection point between all experts and counsel and directing development of all aspects of the economic case. Defendants ultimately prevailed in trial and the merger closed in June 2018.

*Successful acquisition of VCA Inc. by Mars, Inc. 2017.* Co-lead economic expert with Mary Coleman. Made multiple presentations to FTC demonstrating ample competition in general, emergency, and specialty veterinary services, including econometric analyses showing lack of direct competitive impact of Mars and VCA on one another. Transaction was ultimately cleared subject to a small number of divestitures.

*Successful acquisition of Mobileye by Intel. 2017.* Served as lead economic expert for Intel. Assisted counsel in preparing FTC presentations and materials demonstrating lack of significant head-to-head competition and lack of valid vertical foreclosure theories. Investigation was closed without Second Request.

**CONFIDENTIAL**

*FTC litigation against DraftKings, Inc. and FanDuel Inc. (Civil Action No. 17-cv-1195 (KBJ)).* 2017. Served as lead economic expert for FTC and prepared to serve as FTC's testifying expert against the merger, prior to the parties' abandonment of the proposed merger. Developed economic and econometric evidence that the merging parties were closest substitutes and thus likely would have increased prices as a result of their proposed merger.

*Successful merger of ASE Group and SPIL.* 2017. Lead economic expert on behalf of ASE Group. Submitted reports and testified to the Taiwan Fair Trade Commission, which ultimately cleared the transaction, then made multiple presentations to U.S. FTC, which also cleared the transaction. Economic analyses focused on implications of profit margins for market definition and competitive effects, ultimately demonstrating that the transaction was unlikely to cause significant harm to competition.

*Successful acquisition of Alarm.com of two business units (Connect and Piper) from iControl Networks.* 2017. Led team that demonstrated substantial and growing competition in home security and connected home marketplace and thus lack of competitive harm from acquisition. Work focused on importance of downstream market definition as well as empirical evidence of impact of competition on Alarm.com pricing and profitability.

*Successful acquisition of Samsung Electronics, Ltd.'s printer business by HP Inc.* 2016. Led team in evaluating the competitive effects of the acquisition, including assessing shares and competitive effects in overlap areas. Notably, the transaction gained regulatory approval in the U.S. during the initial review period without issuing a Second Request.

*Successful acquisition of Sun Products Corp. by Henkel AG.* 2016. Led team demonstrating lack of competitive impact despite overlaps in laundry detergent and related products.

*Successful acquisition of Starwood Hotels & Resorts by Marriott International.* 2016. Led team that performed detailed analysis of competitive conditions, extensive econometric analysis of pricing, and full review of Marriott's internal pricing models to demonstrate that Starwood and Marriott were not close competitors, combined ownership of the brands would not lead to upward pricing pressure, and competition would remain robust post-merger.

*Successful acquisition of PR Newswire by GTCR.* 2016. Lead economic expert for GTCR. Made presentations to DOJ showing lack of competitive harm from the transaction, based on detailed analysis of win/loss data, including calculations showing no possible upward pricing pressure (UPP) concerns regardless of the level of margins.

*Successful acquisition of Schurz Communications' Broadcast Stations by Gray Television.* 2015. Lead economic expert for Gray. Made presentations to DOJ demonstrating output expanding effects of proposed transaction in light of the scale economies in television production and advertising and the small size of the DMAs affected by the transaction.

*Successful acquisition of the Communications Business of Danaher Corporation by NetScout Systems.* 2015. Lead economic expert for NetScout. Made presentations to DOJ describing proper economic framework for analysis of competition and potential merger harms, and demonstrated that the presence of multiple viable competitors and numerous other credible threats to be used by powerful buyers in a dynamic industry made theories of anti-competitive harm from the merger implausible.

10

**CONFIDENTIAL**

*Successful acquisition of Windmill Distribution Co. by Manhattan Beer Distributors.* 2015. Lead economic expert for Manhattan Beer Distributors. Submitted White Paper to DOJ demonstrating, based on margin data, that the merger would be highly unlikely to lead to anti-competitive effects. Transaction was granted early termination from the Hart Scott Rodino process by the DOJ.

*Proposed acquisition of Time Warner Cable by Comcast Corporation.* 2014-2015. Served as lead economic expert on broadband issues on behalf of Comcast Corporation. Submitted multiple Declarations and made multiple presentations to DOJ and FCC, explaining lack of horizontal, bargaining, or vertical/foreclosure concerns with regard to broadband competition as a result of the transaction.

*Successful acquisition of Leap Wireless by AT&T.* 2014. Lead economic expert for AT&T. Submitted multiple Declarations to FCC and made presentation to DOJ, demonstrating the transaction would generate substantial consumer benefits, while generating at most minimal upward pricing pressure in a properly defined mobile wireless services market and no issues related to spectrum concentration or other competitive concerns.

*Successful merger of American Airline and US Airways.* 2013. Lead consulting expert, managing Compass Lexecon team of over 25 economists supporting multiple experts. Made multiple presentations to DOJ, worked on expert reports in litigation, and assisted counsel with the analysis leading to settlement of litigation, permitting transaction to close.

*Successful merger of T-Mobile USA and MetroPCS.* 2013. Lead economic expert for T-Mobile USA. Conducted economic analyses of competitive effects of the transaction, as well as consumer benefits from reduced costs and increased network quality. Presented analyses to both DOJ and FCC.

*FTC investigation of acquisition of Dollar Thrifty Automotive Group by* Hertz. 2012. Served as a lead economic expert for FTC and prepared to serve as FTC's testifying expert against the merger, prior to case settlement. Conducted empirical analyses based on previous rental car mergers demonstrating likely price increases from the transaction.

*Decision by Federal Communications Commission not to extend the ban on exclusive contracts for satellite-delivered, cable-affiliated networks.* 2012. Lead economic expert for National Cable and Telecommunications Association. Submitted economic analysis demonstrating that the ban on exclusive distribution of satellite-delivered, cable affiliated networks is no longer warranted given increased marketplace competition. FCC made decision to allow the ban to sunset.

*Successful sale of wireless spectrum by SpectrumCo and Cox ("Cable Companies") to Verizon Wireless and successful completion of related commercial agreements.* 2012. On behalf of the Cable Companies, performed economic analyses demonstrating lack of competitive harm from the transaction on markets for backhaul and Wi-Fi services. Presented analyses to FCC.

*Successful acquisition by LIN Media of broadcast television stations from NVTV.* 2012. Lead economic expert for LIN Media. Prepared economic analysis demonstrating lack of competitive concern over potential issues related to Shared Service and Joint Sale Arrangements.

**CONFIDENTIAL**

*Proposed acquisition of T-Mobile USA by AT&T*. 2011. Served as one of the lead economists, initially for T-Mobile (along with Michael Katz) and ultimately for both parties (along with Michael Katz and Dennis Carlton). Made multiple presentations to DOJ and FCC. Appeared in FCC Workshop, ex parte meeting.

S*uccessful application for antitrust immunity by Delta and Virgin Blue*. 2010. Together with Robert Willig, Bryan Keating, and Jon Orszag, prepared economic analyses demonstrating substantial net consumer benefits from antitrust immunity. Submitted results in expert reports to Department of Transportation.

*Successful joint venture between Comcast and NBC Universal (and ultimate full acquisition of NBC Universal by Comcast)*. 2010. Served as one of the lead economists (along with Michael Katz) on behalf of the merging parties. Wrote multiple reports submitted to FCC (with Michael Katz) demonstrating lack of significant competitive concerns from the transaction. Made multiple presentations to DOJ and FCC. Appeared in FCC Workshop of economists, ex parte meeting.

*Successful application for antitrust immunity for oneworld alliance and associated joint venture of American Airlines, British Airways, and Iberia Airlines*. 2009-2010. Together with Robert Willig and Bryan Keating, prepared economic analyses demonstrating substantial net consumer benefits associated with antitrust immunity for the joint venture. Submitted results in expert reports to Department of Transportation.

*Successful acquisition by PepsiCo of bottlers, PBG and PAS*. 2009. Performed econometric and simulation analyses demonstrating pro-competitive effect of merger on PepsiCo's own brands, other brands distributed by PBG and PAS, and overall marketplace. Presented results to FTC (together with Dennis Carlton).

*Successful merger of Delta Airlines and Northwest Airlines*. 2008. In support of Dennis Carlton, developed empirical and theoretical analyses to demonstrate merger's pro-competitive nature. Work focused on (ultimately settled) private litigation opposing the merger.

*Successful acquisition of Harcourt Education by Houghton Mifflin*. 2007. Along with Daniel Rubinfeld and Frederick Flyer, developed econometric analyses demonstrating lack of competitive harm from proposed merger. Presented results to DOJ.

*Successful acquisition of Chicago Board of Trade by Chicago Mercantile Exchange*. 2007. Along with Robert Willig and Hal Sider, developed and presented multiple empirical analyses demonstrating lack of competitive harm from merger. Submitted multiple white papers and made multiple presentations to DOJ.

## SELECTED OTHER EXPERT/CONSULTING WORK

Led team supporting Dennis Carlton's testimony in Toshiba/Hannstar TFT-LCD Antitrust litigation vs. Plaintiff Best Buy, 2013.

Led team supporting Dennis Carlton's testimony in Toshiba's TFT-LCD Class Action Antitrust litigation. Named Litigation Matter of the Year for 2012 by *Global Competition Review*, 2012.

CONFIDENTIAL

As economic expert for US Airways, developed econometric analysis of air traffic at major US airports, presented to Philadelphia Airport management team, 2011.

Prepared analysis of the competitive impact of low-cost-carrier competition in Washington, D.C. and New York airports. Filed with DOT, 2011.

On behalf of major pharmaceutical firm, developed econometric model to forecast pharmaceutical expenditures, 2009.

Developed econometric model to measure of the importance of network effects in credit cards in the context of measuring damages incurred by a major credit card issuer, 2007-2008.

## PUBLICATIONS

"Are Legacy Airline Mergers Pro- or Anti-Competitive? Evidence from Recent U.S. Airline Mergers," (with Dennis Carlton, Ian MacSwain, and Eugene Orlov), forthcoming in the *International Journal of Industrial Organization*, 2018.

"Competitive Effects of International Airline Cooperation," (with Robert J. Calzaretta and Yair Eilat), Volume 13, Issue 3, Pages 501-548 in the *Journal of Competition Law & Economics*, September 2017.

"Econometrics and Regression Analysis," (with Chris Cavanagh, Paul Denis, and Bryan Keating), Chapter 6 in the *American Bar Association's Proving Antitrust Damages: Legal and Economic Issues, Third Addition*, 2017.

"Complementarity without Superadditivity," (with Steven Berry, Philip Haile, and Michael Katz), Volume 151, Pages 28-30 in *Economics Letters*, February 2017.

"Antitrust in a Mobile World," (with Yonatan Even, Jonathan M. Jacobson, Scott Martin, and Dr. Helen Weeds), Chapter 17 of *International Antitrust Law & Policy: Fordham Competition Law 2015*, Edited by James Keyte, Juris Publishing, Inc., 2016.

"Buyer Power in Merger Review," (with Dennis W. Carlton and Mary Coleman), Chapter 22 of *The Oxford Handbook of International Antitrust Economics*, Volume 1, Roger D. Blair and D. Daniel Sokol, eds, Oxford University Press, 2015.

"The Evolution of Internet Interconnection from Hierarchy to 'Mesh': Implications for Government Regulation," (with Stanley M. Besen), *Information Economics and Policy*, December 2013.

"Airline Network Effects and Consumer Welfare," (with Bryan Keating, Dan Rubinfeld, and Robert Willig), *Review of Network Economics*, November 2013.

"The Delta-Northwest Merger: Consumer Benefits from Airline Network Effects (2008)," (with Bryan Keating, Daniel L. Rubinfeld, and Robert D. Willig), *The Antitrust Revolution*, Sixth Edition, Edited by John E. Kwoka, Jr. and Lawrence J. White, Oxford University Press, New York, July 2013.

"Proper Treatment of Buyer Power in Merger Review," (with Dennis W. Carlton), *Review of Industrial Organization*, July 2011.

13

**CONFIDENTIAL**

"Response to Gopal Das Varma's Market Definition, Upward Pricing Pressure, and the Role of the Courts: A Response to Carlton and Israel," (with Dennis W. Carlton), *The Antitrust Source*, December 2010.

"Will the New Guidelines Clarify or Obscure Antitrust Policy?" (with Dennis W. Carlton), *The Antitrust Source,* October 2010.

"Should Competition Policy Prohibit Price Discrimination?" (with Dennis W. Carlton), *Global Competition Review*, 2009.

"The Empirical Effects of Collegiate Athletics: An Update Based on 2004-2007 Data," (with Jonathan Orszag), Paper commissioned by National Collegiate Athletic Association, available at *http://www.epi.soe.vt.edu/perspectives/policy_news/pdf/NCAASpending.pdf*, February 2009.

"Services as Experience Goods: An Empirical Examination of Consumer Learning in Automobile Insurance," *The American Economic Review*, December 2005.

"Tenure Dependence in Consumer-Firm Relationships: An Empirical Analysis of Consumer Departures from Automobile Insurance Firms," *The Rand Journal of Economics*, Spring 2005.

"The Impact of Youth Characteristics and Experiences on Transitions Out of Poverty," (with Michael Seeborg), *Journal of Socio-Economics*, 1998.

"Racial Differences in Adult Labor Force Transition Trends," (with Michael Seeborg), *Journal of Economics*, 1994.

## WORKING PAPERS AND RESEARCH IN PROGRESS

"Do Premiums Increase After Health Insurance Mergers? – A Reassessment of Guardado et al.'s Findings," (with Robert C. Bourke, Ben Wagner, and David A. Weiskopf), available at *https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2933062,* March 2017.

 "Are You Pushing Too Hard? Lower Negotiated Input Prices as a Merger Efficiency: The Anthem-Cigna Merger," (with Erica Benton, Loren Smith, Thomas Stemwedel, and Ka Hei Tse), February 2017.

## SELECTED RECENT PRESENTATIONS

Concurrences Review and The George Washington University Law School, 6th Bill Kovacic Antitrust Salon: Where is Antitrust Policy Going?, "A Judge's Eye View on Antitrust: Mergers, Cartels, Remedies…," Panelist, September 2018.

Fordham Competition Law Institute, 45th Annual Conference on International Antitrust Law and Policy, "Merger Remedies," Panelist, September 2018.

Georgetown Center for Business and Public Policy, "Airline Competition Conference," Panelist, July 2017.

J.P. Morgan Special Situations Investor Forum, "The Antitrust Merger Review Process," Panelist, March 2017.

**CONFIDENTIAL**

American Bar Association Section of Antitrust Law, "Economic Issues Raised In The Comcast – Time Warner Cable Merger," Panelist, February 2016.

Fordham Competition Law Institute, 42nd Annual Conference on International Antitrust Law and Policy, "Antitrust in a Mobile World," Panelist, October 2015.

American Bar Association Section of Antitrust Law, "Merger Practice Workshop," Faculty Member, October 2015.

Searle Center Conference on Antitrust Economics and Competition Policy, Panel on Recent Transactions in the Telecom Industry, Panelist, September 2015.

National Bureau of Economic Research, Summer Institute 2015, Industrial Organization Meetings, "Panel Discussion of the Comcast-Time Warner Merger," Panelist, July 2015.

Federal Communications Bar Association, "How the Antitrust Agencies and the FCC are Likely to Analyze Vertical Mergers," Panelist, November 2014.

The Coca Cola Company Global Antitrust Forum, "Round Table Discussion on Use of Economics and Economists," Panel Chair, November 2014.

Compass Lexecon Competition Policy Forum, Lake Como Italy, "Consolidation of the Telecoms Industry in the EU and the U.S.," Panelist, October 2014.

The IATA Legal Symposium 2014, Aviation Law: Upfront and Center, "Merger Analysis – A sudden shift in approach by DOJ in the American Airlines and US Airways merger," Panelist, February 2014.

Georgetown Law 7th Annual Global Antitrust Enforcement Symposium, "Merger Enforcement and Policy," Panelist, September 2013.

American Bar Association Section of Antitrust Law, "Airline Mergers: First Class Results or Middle-Seat Misery?" Panelist, May 2013.

American Bar Association Section of Antitrust Law, "Go Low or Go Home!  Monopsony a Problem?" Panelist, March 2012.

Federal Communications Bar Association Transactional Committee CLE Seminar, "The FCC's Approach to Analyzing Vertical Mergers," Panelist, October 2011.

The Technology Policy Institute Aspen Forum, "Watching the Future: The Economic Implications of Online Video," Panelist, August 2011.

American Bar Association Forum on Air & Space Law, 2011 Update Conference, "Antitrust Issues: What's on the Horizon for the Industry," Panelist, February 2011.

American Bar Association Section of Antitrust Law, "Antitrust in the Airline Industry," Panelist, September 2010.

**CONFIDENTIAL**

## GRANTS AND HONORS

Searle Fund for Policy Research Grant, 2004-2006, for "An Empirical Examination of Asymmetric Information in Insurance Markets."

Kellogg School of Management Chairs' Core Course Teaching Award, 2003 & 2005.

Bradley Dissertation Fellowship, Stanford University, 1999-2000.

Stanford University, Outstanding Second Year Paper Prize, 1997.

## ADVISORY, EDITORIAL, AND TRUSTEE BOARDS

Global Competition Review, Editorial Board, Member

Illinois Wesleyan University, Board of Trustees, Trustee

## REFEREE FOR ACADEMIC JOURNALS

American Economic Review

The Journal of Industrial Economics

The Rand Journal of Economics

Journal of the European Economic Association

The Review of Economic Studies

The Review of Economics and Statistics

Journal of Risk and Insurance

**CONFIDENTIAL**

# Exhibit B

CONFIDENTIAL

| List of Materials Considered<br>Expert Report of Mark A. Israel, December 28, 2018<br>*RCHFU, LLC, et al. v. Marriott Vacations Worldwide Corporation, et al.* | |
|---|---|
| **Bates Stamp/Title** | ***Date*** |
| *Depositions and Exhibits* | |
| Clark, Mary Lynn (former Vice President of Marketing and Service at Ritz-Carlton Destination Club) | 6-Dec-17 |
| Cunningham, Lee (Executive Vice President and Chief Operating Officer at Ritz-Carlton Destination Club/Ritz-Carlton Management Company) | 10-Nov-17 |
| Cunningham, Lee (Executive Vice President and Chief Operating Officer at Ritz-Carlton Destination Club/Ritz-Carlton Management Company) | 18-May-18 |
| Hayward, Richard (Vice President of Asset Management at Marriott Vacation Club) | 6-Jul-18 |
| Sobeck, Stephanie (Vice President of Asset Management at Marriott Vacation Worldwide) | 16-Nov-17 |
| Sobeck, Stephanie (Vice President of Asset Management at Marriott Vacation Worldwide) | 15-May-18 |
| Weisz, Stephen (CEO and President at Marriott International) | 17-May-18 |
| | |
| *Expert Materials* | |
| Expert Report of Chekitan S. Dev, Ph.D. (and backup materials) | 26-Oct-18 |
| Expert Report of Jon Simon (and backup materials) | 26-Oct-18 |
| | |
| *Legal* | |
| Sixth Amended Complaint and Jury Demand, *RCHFU, LLC, et al., v. Marriott Vacations Worldwide Corporation, et al.* , In the United States District Court, District of Colorado, Civil Action No. 1:16-cv-01301-PAB-GPG | 15-May-18 |
| | |
| *Interviews* | |
| Conversation with Zach Sonberg (Marriott Vacations Worldwide) | 19-Dec-18 |
| | |
| *Academic Texts and Articles* | |
| ABA Section of Antitrust Law, *Proving Antitrust Damages: Legal and Economic Issues,* Third Edition, 2017, Chicago, Illinois: American Bar Association | |
| Bernard L. Simonin and Julie A. Ruth, "Is a Company Known by the Company it Keeps," *Journal of Marketing Research* , Vol. XXXV, February 1998, pp. 30-42 | |
| Daniel L. Rubinfeld, "Reference Guide on Multiple Regression," *Reference Manual on Scientific Evidence* , Third Edition, Federal Judicial Center, 2011, pp. 303-358 | |
| Dennis W. Carlton, "Using Economics to Improve Antitrust Policy," *Columbia Business Law Review* , Vol. 2004, No. 2, 283 | |
| Lance Leuthesser, Chiranjeev S. Kohli, and Katrin R. Harich, "Brand Equity: The Halo Effect Measure," *European Journal of Marketing* , Vol. 29, No. 4, 1995, pp. 57-58 | |
| Scot Burton, Laurel Aynne Cook, Elizabeth Howlett, and Christopher L. Newman, "Broken Halos and shattered horns: overcoming the biasing effects of prior expectations through objective information disclosure," *Journal of the Academy of Marketing Science* , Vol. 43, No. 2, March 2015, pp. 240-256 | |
| | |
| *Industry Reports* | |
| "Branded Developments: The impact of branding on luxury residential developments, 2012," by Knight Frank, available at https://content.knightfrank.com/research/481/documents/en/2012-1106.pdf, accessed December 17, 2018 | |
| "State of the US Timeshare Industry," AIF, 2015 | |
| "State of the Vacation Timeshare Industry 2017 United States Study," AIF, 2017 | |
| | |
| *SEC Filings* | |
| Marriott International, Inc., Annual Report, 2010 | |
| Marriott International, Inc., Form 8-K, November 17, 2011 | |
| Marriott Vacations Worldwide Corporation, Form 10-K, 2011 | |

**CONFIDENTIAL**

| | |
|---|---|
| Marriott Vacations Worldwide Corporation, Form 10-K, 2012 | |
| Marriott Vacations Worldwide Corporation, Form 10-K, 2013 | |
| Marriott Vacations Worldwide Corporation, Form 10-K, 2014 | |
| Marriott Vacations Worldwide Corporation, Form 10-K, 2015 | |
| Marriott Vacations Worldwide Corporation, Form 10-K, 2016 | |
| Marriott Vacations Worldwide Corporation, Form 10-K, 2017 | |
| | |
| *News, Press and Websites* | *Accessed* |
| "Ask the Expert: Ownership Status," Marriott Vacation Club International, 2018, available at http://pages.email1 marriott-vacations.com/owner-insider?loc=HQ59*1-2U1SZ0&article=ask-the-expert&campaign=2014-jan&cid=email-mvc-owners-insider-2014-jan-cb-learnmore-ask-the-expert | 28-Nov-18 |
| "Benefits at a Glance," Marriott Vacation Club, *n.d.*, available at https://www.marriottvacationclub.com/common/cms/mvcau/pdfs/benefits-at-a-glance-chart-US.pdf | 20-Dec-18 |
| "How to Redeem Points", Marriott International, Inc., 1996-2018, available at https://www.marriott.com/loyalty/redeem mi | 4-Nov-18 |
| "Marriott Vacation Club Insider," Marriott International, Inc., 2011, available at https://www my-vacationclub.com/common/vc/en-us/enewsletters/august_2011_premier_plus.htm | 8-Nov-18 |
| "Marriott Vacation Club Introduces New Vacation Ownership Program," Marriott Vacation Club, June 21, 2010, available at https://www marriottvacationclub.com/news-press-releases/2010/06/2010-06-21-Marriott-Vacation-Club-Introduces-New-Vacation-Ownership-Program.shtml | 18-Nov-18 |
| "Marriott Vacations Worldwide Completes Acquisition of ILG, Inc.," *PR Newswire*, September 1, 2018, available at https://www.prnewswire.com/news-releases/marriott-vacations-worldwide-completes-acquisition-of-ilg-inc-300705763.html | 16-Dec-18 |
| "New Partner: The Ritz-Carlton – Participation in Marriott Rewards," Marriott, September 23, 2010, available at https://web.archive.org/web/20100923013825/http://www marriott.com:80/Multimedia/PDF/us/rewards/mr_Ritz_FAQ.pdf | 8-Dec-18 |
| "Pricing Information," Marriott Vacation Club, February 27, 2014, available at https://web.archive.org/web/20140227221551/http://www.marriottvacationclub.com/timeshare-ownership/vacation-examples-and-pricing.shtml | 20-Dec-18 |
| "Starwood Vacation Ownership Renews Interval International Affiliation," *The Timeshare Authority*, March 3, 2014, available at http://www.thetimeshareauthority.com/2014/03/03/starwood-vacation-ownership-renews-interval-international-affiliation/ | 4-Dec-18 |
| "The Ritz-Carlton Hotel Stays," Marriott Vacation Club International, 2018, available at http://pages.email1 marriott-vacations.com/insider?loc=HQ59*1-2U1SZ3&article=1&campaign=2013-jun&state= | 28-Nov-18 |
| "What Does Exploration Look Like to You," Marriott Vacation Club International, 2018, available at https://www.marriottvacationclub.com/destinations/explorer-collection/ | 13-Dec-18 |
| David Van Norman, "Four Seasons Extends Affiliation of Two Resorts to Interval International," Selling Time Shares, May 19, 2014, available at https://www.sellingtimeshares.net/four-seasons-extends-affiliation-two-resorts-interval-international/ | 18-Dec-18 |
| | |
| *Bates-Stamped Documents* | |
| AHCA00000602-603 | |
| AHCA00000770 | |
| AHCA00000785-791 | |
| AHCA00003114-117 | |
| AHCA00004209 | |
| AHCA00015533-537 | |
| AHCA00015588-590 | |
| AHCA00015737-739 | |
| Moore001189 | |
| RCDC Sample08948-949 | |
| RCDC Sample08950-951 | |

**CONFIDENTIAL**

| | |
|---|---|
| RCDC Sample08952-953 | |
| RCDC Sample08954-955 | |
| RCDC Sample08956-957 | |
| RCDC Sample08958-959 | |
| RCDC Sample08972-973 | |
| RCDC Sample08974-975 | |
| RCDC Sample09166-176 | |
| RCDC Sample09177-178 | |
| RCDC Sample09179-180 | |
| RCDC Sample09181-182 | |
| RCDC Sample09183-184 | |
| RCDC Sample09185-186 | |
| RCDC Sample09187-188 | |
| RCDC Sample09189-190 | |
| RCDC Sample09191-192 | |
| RCDC Sample51228-251 | |
| RCDC002561-562 | |
| RCDC004731-733 | |
| RCDC006549-571 | |
| RCDC010759-761 | |
| RCDC019950 | |
| RCDC067469-520 | |
| RCDC072262-264 | |
| RCDC072265 | |
| RCDC072407-462 | |
| RCDC072463-522 | |
| RCDC072523-584 | |
| RCDC072562-729 | |
| RCDC072585-651 | |
| RCDC072653 | |
| RCDC073182-201 | |
| RCDC073583 | |
| RCDC073584 | |
| RCDC073586 | |
| RCDC073591 | |
| RCDC073592 | |
| RCDC073593 | |
| RCDC073593 | |
| RCDC073594 | |
| RCDC073596 | |
| RCDC073598 | |
| RCDC073600 | |
| RCDC073601 | |
| RCDC073602 | |
| RCDC073604-605 | |
| RCDC073606-607 | |
| RCDC073691 | |
| RCDC073692 | |
| RCDC073693 | |
| RCDC073694 | |
| RCDC073695 | |
| RCDC073696 | |

**CONFIDENTIAL**

| | | |
|---|---|---|
| | RCDC073697 | |
| | RCDC073708-709 | |
| | RCDC073710-711 | |
| | RCDC073755 | |
| | RCDC073759 | |
| | RCDC074030-032 | |
| | RCDC075966 | |
| | RCDC075967 | |
| | RCDC075968 | |
| | RCDC075969 | |
| | RCDC075970 | |
| | RCDC075971-73 | |
| | RCDC075974-76 | |
| | RCDC075977-79 | |
| | RCDC075980-82 | |
| | RCHC008102-112 | |
| **All documents cited or referenced in the Expert Reports of Mr. Simon and Professor Dev, including Exhibits and Backup Materials, were also considered.** | | |
| **All documents cited or referenced in my Expert Report, including Exhibits and Backup Materials, were also considered.** | | |