IN THE UNITED STATES DISTRICT COURT

DISTRICT OF COLORADO

Civil Action No. 1:16-cv-01301-PAB-GPG

**RCHFU, LLC,** *et al.*

Plaintiffs,

v.

**MARRIOTT VACATIONS WORLDWIDE CORPORATION,** *et al.*

Defendants.

---

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' SUPPLEMENTAL MOTION FOR SUMMARY JUDGMENT**

---

## <u>INTRODUCTION</u>

Marriott's supplemental motion for summary judgment principally contends that Plaintiffs cannot obtain damages or disgorgement as a remedy for Marriott's alleged breaches of fiduciary duty because the Court has excluded the testimony of Plaintiffs' expert witnesses Chekitan Dev and Jonathan Simon. While Plaintiffs disagree with the Court's *Daubert* ruling (and intend to seek reconsideration, for the reasons set forth below), even without that testimony a jury could reasonably conclude that Plaintiffs' evidence is sufficient to support jury-awarded damages, and Court-awarded equitable disgorgement. Whether Marriott's challenged breach resulted in cognizable harm to Plaintiffs is ultimately a disputed issue of fact.

Under governing law, Plaintiffs can meet their prima facie burden, based on the existing evidentiary record, by showing as a matter of just and reasonable inference: (1) that Marriott's breach of fiduciary duty resulted in the affiliation of the luxury Aspen Highlands property with

1

the MVC membership points program; and (2) that the wrongful affiliation resulted in at least *some* harm to Plaintiffs who owned fractional interests at Aspen Highlands (for purposes of the damages remedy) and resulted in at least *some* additional profits to Marriott (for purposes of disgorgement). Once Plaintiffs make this minimal showing, the burden shifts to Marriott to establish that its breach of fiduciary duty was *not* a substantial factor in causing harm to Plaintiffs (including but not limited to diminished property values) and that Marriott did *not* profit by its breaches. *See* Restatement (Third) of Restitution § 51, cmt. *f.*  Plaintiffs have no obligation to rule out other causes in making a prima facie case.

## RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS

1. Plaintiffs admit ¶¶1, 2, 6, 7.

3. Plaintiffs admit that the Court excluded Simon's testimony but denies that no other causation evidence exists. *See, e.g.,* Reiser Decl., Ex. 1 (Weisz Depo at 108:24-109:6 testifying about members buying more points); Dkt. 461-8 (Expert Report of Maurice Robinson showing comparable properties fared better than Aspen Highlands in the same market conditions).

4. Plaintiffs admit that the Court excluded some of Dev's testimony but denies that no other causation evidence exists. *Id.*

5. Deny. Robinson calculated the difference in growth rates between fractional interests at Aspen Highlands and other comparable properties. Dkt. 461-8 (Robinson Report at p. 8-9).

8. Deny. Plaintiffs have disclosed through pleadings, discovery, and the final pretrial order their intention to seek disgorgement of Marriott's profits and management fees. *See, e.g.,* Dkt. 430 at ¶ 106, 136-137; Reiser Decl., Ex. 1 (Weisz Depo. at 108:8-109:6); Dkt. 578, p. 17 (Final Pretrial Order stating, "Marriott should be ordered to disgorge these profits it made"); Dkt. 578-

3, p. 8 (Plaintiffs' Exhibit List listing MVW's Form 10-K's, MVC Points Charts, SMS Survey Responses, and Management Agreement).

## <u>STATEMENT OF ADDITIONAL DISPUTED FACTS ("SADF")</u>

1.  Marriott represented to Plaintiffs that no affiliation with MVC would occur unless a majority of Aspen Highlands members voted for affiliation. Dkt. 444-29, 444-21.

2.  Marriott reneged on its promise and implemented the MVC affiliation without a vote. Dkt. 329, p. 1 ("everyone agrees a vote didn't occur"); Dkt. 444-7 (11/10/17 Cunningham Depo. at 205:19-20 ("we decided not to do the vote and went with [a] survey")).

3.  Marriott never provided the 2013 Affiliation Agreement to Plaintiffs or the Association's Board of Directors. Dkt. 445-29 (Association Responses to RFAs Nos. 1-5).

4.  At Ritz Clubs that held a vote, members voted against MVC affiliation. Dkt. 445-2 (7/8/2013 Bachelor Gulch Voting Results); Dkt. 445-3 (6/4/2014 Jupiter Voting Results).

5.  Expert Robinson found that prices at the Aspen Highlands declined in the years after the MVC Affiliation, while prices at comparable properties increased. Dkt. 461-8 (Robinson Report).

6.  Aspen Highlands owners testified about the decreased value of their units resulting from non-members accessing the Club using cheaper MVC points. Dkt. 585-2 to 585-5.

7.  The Management Agreement requires each owner of a fractional interest to pay an annual fee of $600 to RC Management. Dkt. 49-5 & 49-6 at § 14.

8.  Marriott's CEO, Stephen Weisz, testified that allowing MVC members to access Ritz-Carlton clubs helps Marriott sell more points. Reiser Decl., Ex. 1 (Weisz Depo. at 108:24-109:6).

9.  In 2014 through 2018, Marriott's net revenue from MVC points sales (i.e. gross revenue from points sales minus "costs of vacation products" and "marketing and sales" costs) was between $648 and $990 million. Reiser Decl., Exs. 2-7, (MVW 2014-2018 10-K and Compilation Spreadsheet).

10. When Marriott surveyed MVC points purchasers in 2014 to find out why they had purchased MVC points, 5.5%-7.4% responded that gaining access to the Ritz-Carlton Destination Club line was among their top five reasons. Reiser Decl., Exs. 9-10 (SMS Survey Results Exhibits 6006 and 6008) and Reiser Decl., Ex. 8 (Peters Depo. at 42:5 – 42:20).

## ARGUMENT

## I.  PLAINTIFFS HAVE A PRIMA FACIE CASE OF BREACH OF FIDUCIARY DUTY

Plaintiffs' threshold burden is merely to show by just and reasonable inference that *some* cognizable harm to Plaintiffs resulted in whole or in part from Marriott's challenged conduct, i.e., that Marriott's breach of fiduciary duty affected the affiliation vote, and that the affiliation was at least one factor causing harm. Expert testimony is not needed for Plaintiffs to make this threshold showing (which shifts the burden to Marriott to *disprove* the connection between the affiliation and the alleged harms, including the economic injury suffered when the value of Plaintiffs' fractional interests plunged in comparison with similar high-end properties).

### A.  Colorado does not require strict "but for" causation for breach of fiduciary duty

Colorado does not require "but for" causation when a beneficiary seeks damages for breach of fiduciary duty, merely a showing that the breach is a "substantial factor" in loss. *See generally* DeMott, *Causation in the Fiduciary Duty Realm*, 91 B.U. L. Rev. 851, 854, 864-866 (May 2011). This lesser burden is consistent with the "remedial" nature of fiduciary law, which

4

imposes heightened duties on fiduciaries to act solely in their beneficiaries' interests and not engage in self-dealing. *Id.* at 852. The challenged conduct "need not have been the only cause or the last or nearest cause [of a claimed harm; it] is sufficient if it concurs with some other event, either in combination with it or separately, to cause the claimed injury." *In re Swine Flu Immunization Prod. Liab. Litig.*, 495 F.Supp. 1188, 1206 (D. Colo. 1980); *see also Berg v. United States*, 806 F.2d 978, 981–82 (10th Cir. 1986); *Milbank, Tweed, Hadley & McCloy v. Boon*, 13 F.3d 537, 543 (2d Cir. 1994) (fiduciary cannot avoid liability by showing that the plaintiff's "losses *might* have resulted from other possible causes") (emphasis in original).

Under Colorado law, a plaintiff need only establish that a breach was a substantial factor in resulting loss, without having to eliminate other contributing factors, including "market forces beyond the defendant's control." *Rupert v. Clayton Brokerage Co.*, 737 P.2d 1106, 1112 (Colo. 1987); *Murphy v. Schaible, Russo & Co.*, 2020 WL 2041346, at *10 (D. Colo. Apr. 28, 2020).

## B. Burden-shifting for breach-of-fiduciary-duty claims

To recover on their breach-of-fiduciary-duty claim, Plaintiffs must establish that: (1) Marriott owed them a fiduciary duty; (2) Marriott breached that duty; and (3) Plaintiffs suffered some resulting loss under the "substantial factor" standard. Marriott does not dispute that factual questions preclude summary judgment regarding the first two elements. Nor does it dispute that Plaintiffs' evidence shows dramatically reduced post-affiliation property values, based on Robinson's expert analysis, which calculated diminution-of-value damages "'by subtracting the actual or average sales price per square foot at [Aspen Highlands] from the 'But For' price per square foot (what the price would have been absent the challenged conduct, estimated from the analysis of comparable properties)" to determine the reduced value per square foot. June 1, 2020

5

Order, Dkt. 583 (quoting Dkt. No. 461-6 at 3); *see also id.* (quoting Dkt. 461-6 at 8) ("The basis for the calculation of the But For Sales Prices is my opinion that, absent the Defendants' actions, the Actual Sales Prices . . . of the subject interests would have moved in tandem with the rest of the luxury fractionals in the Aspen market."). That opinion, which this Court characterized as "a sound one that is commonly relied upon by the real estate valuation industry," *should* be enough to create triable issues of damages *and* causation, because it stated what the value of Plaintiffs' interests would have been "but for" Marriott's challenged conduct. More importantly, the jury, as a matter of just and reasonable inference, can draw the common-sense conclusion that when a luxury property's value plunges while the value of similar properties in that market rises shortly after that property affiliated with a low-cost timeshare program whose members pay far less for access than existing owners, that affiliation was likely a substantial factor in reduced value.

The Tenth Circuit recognizes that under the common law of trusts, a plaintiff's threshold burden is merely to establish a prima face case. *Pioneer Centres Holding Co. Employee Stock Ownership Plan & Tr. v. Alerus Fin., N.A.*, 858 F.3d 1324, 1335 (10th Cir. 2017) ("[O]nce 'a beneficiary has succeeded in proving that the trustee has committed a breach of trust and that a related loss has occurred, the burden shifts to the trustee to prove that the loss would have occurred in the absence of the breach.'") (quoting Restatement (Third) of Trusts § 100 cmt. *f* (2012)). Application of this burden-shifting is illustrated in *Brotherston v. Putnam Investments, LLC*, 907 F.3d 17, 23 (1st Cir. 2018), an ERISA case in which plaintiff employees challenged Putnam's breach of fiduciary duty by including its own mutual funds in the company's 401(k) plans without determining whether they were prudent investments. *Id.* at 23-24, 30-31. The district court erroneously held that the employees failed to prove a "resulting loss," even though

their expert had compared the financial performance of the Putnam funds to other benchmark funds and found it lacking. *Id.* at 32-33. The First Circuit reversed, holding that plaintiffs' prima facie causation burden was satisfied by their expert's comparison of how defendants' funds performed in comparison with how other funds performed — just as Robinson has demonstrated how Aspen Highland's post-affiliation value sharply fell in comparison with comparable benchmark properties. *Id.* at 33.[1]

As the First Circuit explains, once an ERISA plaintiff presents some evidence of "related loss" in its prima facie case, the burden to *disprove* causation shifts to the defendant fiduciary:

> The common law of trusts — like ERISA — classifies causation as an element of a claim for breach of fiduciary duty. *See* Restatement (Third) of Trusts, § 100 cmt. *e.* It also places the burden of disproving causation on the fiduciary once the beneficiary has established that there is a loss associated with the fiduciary's breach. *Id.* cmt. *f.* This burden allocation has long been the rule in trust law.

---

[1] The First Circuit recognized that benchmark comparisons enable the trier of fact to determine (1) whether the fluctuating value of defendant's product was unique to that product rather than a function of overall market conditions (as it would likely be if all similar products' values rose and fell in tandem) and (2) how to quantify the defendant's products' relative loss in value. *See id.* at 31 ("The Restatement calls 'for determining *whether* and in what amount *the breach has caused* a "loss[ ]" ... by reference to what the results "would have been if the portion of the trust affected by the breach had been properly administered."'") (quoting Restatement (Third) of Trusts, ch. 19, intro. Note) (emphasis altered). Robinson's damages analysis necessarily supported a finding of causation, because it attributed the substantial drop in value to Marriott's affiliation decision, the only apparent distinguishing factor between Aspen Highlands and other benchmark properties. *See Murphy.,* 2020 WL 2041346, at *10 ("If the defendant's conduct is a substantial contributing cause of the injury, it is irrelevant to the causation analysis whether other factors . . . also contributed to the injury.") (citation omitted). Plaintiffs intend to seek reconsideration of the Court's Orders of June 1 and October 13, 2020 to the extent necessary to respond to the Court's statement that Robinson's opinion does not bear on causation, and to address the Court's exclusion of Simon's expert opinion regarding causation (which rested in part upon Robinson's damages analysis, *see* Simon Report, Dkt. 473-1 at ¶ 22, 36 & n. 50). The Court principally excluded Simon's testimony based on his failure to expressly address factors *other than* affiliation that may have caused Aspen Highlands to drop in value. But under the substantial factor test, Plaintiffs have no obligation to eliminate other causative factors. An expert cannot be held to a higher standard at the *Daubert* stage than the party supporting that expert is required to prove at trial.

*Putnam Investments,* 907 F.3d at 36 (citing, inter alia, *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 363 (4th Cir. 2014)). These same burden-shifting principles apply to common law breach-of-fiduciary-duty claims, consistent with the principle that "as between innocent beneficiaries and a defaulting fiduciary, the latter should bear the risk of uncertainty as to the consequences of its breach of duty." *Estate of Stetson*, 345 A.2d 679, 690 (Pa. 1975).

Colorado law contains many examples of burden shifting in breach-of-fiduciary-duty cases. *See, e.g., In re Estate of Heyn*, 47 P.3d 724, 726 (Colo. App. 2002); *In re Estate of Foiles*, 338 P.3d 1098, 1100 (Colo. App. 2014); *Monday v. Robert J. Anderson, P.C.*, 77 P.3d 855, 857 (Colo. App. 2003); *see also Krueger v. Ary*, 205 P.3d 1150 (Colo. 2009).

In determining how to quantify Plaintiffs' threshold burden, this Court should apply the principles established by the Supreme Court in cases holding that where the law requires burden-shifting, the plaintiff's initial burden is merely to present sufficient evidence from which the trier of fact could draw "a just and reasonable inference" that the elements of a prima facie case exist. *See, e.g., Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 687-88 (1946); *Tyson Foods, Inc. v. Bouaphakeo*, 136 S.Ct. 1036, 1047 (2016) (applying *Mt. Clemens* to liability inquiry); *Lindsay v. Yates*, 578 F.3d 407, 418 (6th Cir. 2009). The burden then shifts to the defendant to negate those inferences — which means, in a "substantial factor" case like this, that Marriott must prove that the MVC affiliation was not a factor *at all* in causing Plaintiffs' alleged harms.

### C.  Plaintiffs have presented sufficient evidence to establish a prima facie case and raise a rebuttable presumption under Colorado law

Given the governing legal framework, Marriott is not entitled to summary judgment. The record contains ample evidence from which the jury could draw a just and reasonable inference

8

that Marriott's breach of fiduciary duty not only resulted in the MVC affiliation but was also a substantial cause of Plaintiffs' related losses — the harms to Plaintiffs that resulted from affiliation, whether or not other causes may also have been a factor.

First, the trier of fact can infer causation based on Robinson's testimony, as shown above. In addition, it can find that Plaintiffs suffered legally cognizable harm by being deprived of the right to vote on the decision to affiliate and by being deprived of material facts concerning the terms of the affiliation. SADF Nos. 2-3. Plaintiffs were also deprived of their full use and enjoyment of the club's facilities as a result of the affiliation allowing so many more individuals to share those previously exclusive facilities.

Plaintiffs suffered considerable economic harms as well. For example, many owners have testified about drops in property values resulting from the MVC affiliation, because the affiliation allows MVC members to purchase access using far cheaper MVC points. SADF No. 6. The record also documents that post-affiliation, the prices for Plaintiffs' units dropped well below what they had originally paid. SADF No. 5. Each of these harms would be independently sufficient to establish causation by just and reasonable inference, and thus to preclude summary judgment. *See Yukos Capital S.A.R.L v. Feldman*, 2020 WL 5948910, at \*20 (2d Cir. Oct. 8, 2020) ("courts sometimes conflate the concept of 'damage' (harm suffered) and 'damages' (compensation for harm suffered)").

Plaintiffs' principal claim for damages, of course, is based on the diminution of value of their fractional interests as a result of affiliation, which cheapened the costs of ownership and thus reduced the value of Plaintiffs' ownership interests. The *fact* of that loss can be established by logical inference, even if the quantification of that loss requires expert damages analysis.

Judge Posner's analysis of burden-shifting and causation in *CDX Liquidating Trust v. Venrock Assocs.*, 640 F.3d 209 (7th Cir. 2011), provides useful guidance. In *CDX,* a holder of common stock in a bankrupt company sued the company's former directors for breach of fiduciary duty. The issue on appeal was whether the directors' disloyal actions was a proximate cause of the company's financial difficulties. *Id*. at 213-14. The Seventh Circuit held that because plaintiffs had proved a breach of fiduciary duty, it was the directors' burden to prove that their conduct did *not* cause the alleged resulting harm. *Id*. at 215.

The defendants in *CDX*, like Marriott here, "[thought] it heresy to excuse a plaintiff from having to prove causation and make them prove its absence." *Id.* at 217. But Judge Posner explained that such burden-shifting is commonplace in our legal system, *id.*, and the court rejected the *CDX* defendants effort to attribute their company's loss to the bursting of the dot-com bubble because they could not completely rule out their own conduct as a substantial cause of plaintiff's law, leaving causation to be decided as a factual matter by the jury. *Id*. at 215-16.

As here (and in *Putnam Investments*), the *CDX* plaintiffs sought to prove "related loss" by comparing their company's changed finances with the finances of a similarly situated control group, demonstrating that at least one comparable company that faced similarly adverse market conditions but was "uncontaminated by disloyal directors" fared much better than defendants. According to the court, that evidence was sufficient, because it constituted "some evidence [that the company's] common shareholders were by hurt by the defendants' misconduct, over and above the hurt inflicted by events over which the defendants had no control." *Id*. at 218. That was enough to create a disputed factual issue for the jury, "*no matter which side has the burden of proof.*" *Id*. (emphasis added).

This case presents a strikingly similar set of circumstances. Plaintiffs assert that Marriott breached its fiduciary duty to them (and aided and abetted the Association's breach) by failing to hold a promised vote, withholding material information and engaging in self-dealing by affiliating MVC with Aspen Highlands. Like the *CDX* defendants, Marriott argues it would be inappropriate to "demand[] that defendant affirmatively disprove the essential element of causation." Dkt. 598, p. 10. Yet *CDX* and *Putnam* make clear that once Plaintiffs have shown by just and reasonable inference that it is more probable than not that affiliation was *a* substantial cause of harm, Marriott can only avoid liability by demonstrating that all harm was exclusively caused by factors having nothing to do with affiliation. While Plaintiffs may have to overcome that evidence to satisfy their ultimate burden of persuasion, for purposes of summary judgment the only issue is whether, in the absence of expert testimony from Dev and Simon, a trier of fact could find that Plaintiffs have a prima facie case of breach and resulting harm.

Just as the evidence in *CDX* showed that companies facing similar economic adversity maintained higher valuations when not contaminated by disloyal directors, so too does Robinson's analysis demonstrate that the post-affiliation values at Aspen Highlands were materially lower than the counterpart values of properties that did not allow access to a sizeable group of timeshare members at dramatically lower prices. *See* Dkt. 461-8 (Robinson Report).

When this Court found Robinson's methodology reliable, it correctly noted that he had calculated damages by subtracting the actual or average sales price per square foot [at Aspen Highlands] from the "But For" price per square foot (*what the price would have been absent the challenged conduct*, estimated from the analysis of comparable properties) . . ." *Daubert* Order, Dkt. 583 at p. 20. As in *CDX*, that opinion (and the evidence-based facts upon which it was

11

based) demonstrates "related loss," i.e, that the affiliation played at least some substantial role in Plaintiffs' fractional interests' drop in values. Marriott seeks to explain those losses owing to the recession and other factors unrelated to its wrongdoing. But as in *CDX*, even if Marriott presents evidence of *additional* factors, there is a sufficient link between Marriott's wrongful conduct and the resulting harm to Plaintiffs' property values to get to a jury. *Murphy*, 2020 WL 2041346 at *10 (where the defendant's wrongdoing is a "substantial contributing cause of the injury, it is irrelevant to the causation analysis whether other factors . . . also contributed to the injury.").[2]

### D.  At a minimum, the Court can award nominal damages and equitable relief

Even if not every type of harm suffered by Plaintiffs resulted in economic damages, they are still entitled to nominal damages and an equitable order instructing Defendants to hold the promised-but-wrongfully-withheld affiliation vote.

While no Colorado court has squarely addressed whether nominal damages are available for breaches of fiduciary duty, this Court has approvingly cited Arizona law holding that nominal damages may be awarded for such breach if "plaintiffs have experienced actual damages insusceptible to reasonable calculation or defendants had engaged in corporate plunder or diverted corporate opportunities to themselves." *Chimney Rock Public Power District v. Tri-*

---

[2] Plaintiffs recognize that that Court's Order allowing Marriott to file this motion stated that causation could not be "established" through the Robinson's testimony or the evidence he cited (which Plaintiffs contend would be independently sufficient to state a prima facie case and shift the burden). Dkt. 596 at p. 10. Whether Robinson's opinion and supporting evidence would be sufficient to meet Plaintiffs' ultimate burden of *persuasion* is not the issue, though, because it is sufficient to create a just and reasonable inference of resulting loss. To the extent the Court intended to rule otherwise, Plaintiffs believe the Court erred and will be submitting a motion to reconsider. Under *CDX* and *Putnam*, the fact that the value of Aspen Highlands plummeted compared to the value of comparable properties that did not affiliate with an affinity group whose members could inexpensively gain access to the previously high-value property should be sufficient, by itself, to establish prima facie causation through just and reasonable inference.

*State Generation and Transmission Ass'n, Inc.*, 2014 WL 811566, at *5 (D. Colo., March 3, 2014) (*citing AMERCO v. Shoen*, 907 P.2d 536, 542 n.7 (Ariz. App. 1995)). This case involves both situations. *See also Cook v. Rockwell Int'l Corp.*, 273 F. Supp. 2d 1175, 1199 (D. Colo. 2003); *Crawford v. French*, 633 P.2d 524, 527 (Colo. App. 1981); *Bayer v. Neiman Marcus Group, Inc.*, 861 F.3d 853, 872 (9th Cir. 2017) (cases holding nominal damages are commonly awarded as a remedy for tortious conduct that does not cause cognizable monetary harm).

The Court has ample authority to award equitable relief, pursuant to Plaintiffs' prayer for "all other relief allowed by law and equity." Dkt. 430 at Prayer at ¶ g. It has long been settled that "equitable relief will be granted to enforce a fiduciary duty or confidence reposed." *Henderson v. Johns*, 13 Colo. 280, 289 (1889). Thus, the Court has ample authority under Fed. R. Civ. P. 54(c) to fashion an equitable remedy to address Marriott's breach, including an order requiring it to hold the promised vote on affiliation. Otherwise, to deny all relief in the face of Marriot's breach would contradict the maxim that "there can be no wrong without a remedy." *Steiger v. Burroughs*, 878 P.2d 131, 134 (Colo. App. 1994).

## II.  PLAINTIFFS CAN PROVE CONSTRUCTIVE FRAUD

There is also sufficient evidence to establish each element of constructive fraud: (1) a duty arising from a relationship between the parties, (2) deceptive material representations or omissions, (3) reliance, (4) injury proximately caused by the deception, and (5) defendant's gain at plaintiff's expense. *Barnett v. Elite Prop., Inc.*, 252 P.3d 14, 23 (Colo. App. 2010).

To start, Marriott no longer disputes that it owes fiduciary duties to Plaintiffs. *See generally* Dkt. 589. As a fiduciary, it told Plaintiffs that unless a majority of Aspen Highlands members voted to approve the MVC affiliation, no affiliation would occur. SADF No. 1.

Plaintiffs relied on Marriott's promise and refrained from taking other actions to prevent the affiliation — resulting in Marriott imposing the affiliation, to Plaintiffs' surprise, without a vote. SADF Nos. 1-2. The lack of a vote resulted in Marriott making the unilateral decision to affiliate, which led to the various consequences described above. The fact that at other Ritz clubs where votes *were* conducted the members voted *against* affiliation, reinforces Plaintiffs' showing that they were harmed by Marriott's deception. SADF No. 4. *See* Dkt. 210, p. 26 (finding "Plaintiffs' allegations of different outcomes at similar resorts where a vote was held, along with allegations of the Marriott defendants' efforts . . . to avoid such a vote at Aspen" sufficient to show material misrepresentations and causation).

## III.  PLAINTIFFS' EVIDENCE FULLY SUPPORTS DISGORGEMENT

In addition to damages, Plaintiffs seek two types of disgorgement: (1) a return of the fees they paid Marriott to act as their fiduciary and manage their property, and (2) the profits Marriott has made as a result of its breach.

### A.  Marriott has long known about Plaintiffs' disgorgement theories

Marriott's characterization of Plaintiffs' disgorgement theories as "never-before-disclosed" is simply false. Plaintiffs have sought an order requiring Marriott to disgorge its ill-gotten fees and profits since the start of this case. *See* Dkt. 5 at Prayer ¶ c (seeking order requiring RC Management to forfeit "all compensation paid to them by Plaintiffs" and "all profits Defendants received as a result of the conduct described herein"). Plaintiffs also asserted in the Final Pretrial Order that the "Marriott Defendants have reaped substantial profits . . . from the Affiliation . . . [and] should be ordered to disgorge these profits." *See* Dkt. 578, pp. 17, 21. In addition, Plaintiffs timely disclosed their disgorgement evidence in their final exhibit and witness

list (including the Management Agreement, Marriott's 10-Ks, and the deposition testimony of Urcil Peters, who oversaw Marriott's MVC member surveys). Dkt. 576-3, pp. 1, 8; Dkt. 576-1, p. 15. Marriott has no basis for claiming surprise.[3]

### B. Plaintiffs are entitled to seek disgorgement of management fees

Plaintiffs paid Marriott (through Defendant RC Management) substantial fees each year to manage their Aspen Highlands interests and the property as a whole. SADF No. 7. Plaintiffs seek an order requiring Marriott to disgorge these management fees, which Plaintiffs paid to obtain Marriott's services as a loyal fiduciary. When a fiduciary breaches its duties, the law allows a plaintiff to recoup compensation it paid for the fiduciary's non-self-interested services.

Marriott makes two arguments regarding management fees: first, that Plaintiffs cannot obtain disgorgement because there is no evidence that Marriott's receipt of those fees was related to its alleged breach of fiduciary duty; and second, that Plaintiffs cannot obtain disgorgement because Plaintiffs paid those fees through an intermediary.

First, courts have ample authority to require a breaching fiduciary to disgorge all compensation paid for the fiduciary's services. *Gray v. English*, 30 F.3d 1319, 1324 (10th Cir. 1994). This is a prophylactic rule that serves an important deterrent function. *Id.* An agent who is disloyal to his principal "is not entitled to compensation which otherwise would be due to him"

---

[3] To the extent Plaintiffs' methodology for calculating disgorgement has evolved in response to this Court's recent rulings, the final pretrial order should be modified to accommodate those changes. Although a final pretrial order is meant to "control the subsequent course" of a case, courts may permit modifications "to prevent manifest injustice." *Hasan v. AIG Prop. Casualty Co.*, 2018 WL 2113270, at *2 (D. Colo. May 8, 2018). To the extent the Court requires Plaintiffs to seek amendment of the final pretrial order to preserve the disgorgement remedy, Plaintiffs will do so, and will emphasize the changed circumstances resulting from the Court's *Daubert* rulings, issued after issuance of the pretrial order.

even if the disloyal conduct did not ultimately harm the principal. Restatement (Second) of Agency § 469, cmt. *a.*; *see also Jet Courier Service, Inc. v. Mulei*, 771 P.2d 486, 499 (Colo. 1989) ("The general rule is that an employee is not entitled to any compensation for services performed during the period he engaged in activities constituting a breach of his duty of loyalty even though part of these services may have been properly performed") (citation omitted).[4]

Marriott also contends (without citing any relevant evidence) that Plaintiffs lack standing to seek disgorgement because they paid those fees to the Association, which in turn remitted them to Marriott. The fact that the Association acted as an intermediary or a pass-through makes no difference. What matters is that Plaintiffs were the ones who paid those management fees to Marriott for its fiduciary services. *See In re Ladevereaux*, 2006 WL 549239, at *9 (D. Mass. Mar. 6, 2006) (debtor had standing to seek disgorgement of attorney's fees that debtor's mother paid on her behalf, as debtor "surely has standing to protect the value of monies advanced for her benefit").

Marriott's assertion that Plaintiffs are required to establish which specific portion of the management fees are "attributable to the MVC affiliation" is also incorrect. Dkt. 598, p. 19. Under *Gray* and *Jet Courier Service*, a court may order a breaching fiduciary to disgorge all fees a plaintiff has paid, and Marriott does not cite any authority to the contrary.

---

[4] The Management Agreement, which governs the relationship between Plaintiffs and Marriott, shows what each Plaintiff paid in fees to Marriott. Section 14 states that each owner of a fractional interest must pay an annual fee of $600 plus 10% "of all money the Management Company is required to collect . . . pursuant to the budget and for ad valorem taxes and special assessments . . ." Management Agreement at § 14. Plaintiffs should be entitled to an equitable order requiring Marriott to disgorge those fees once they establish at trial that Marriott breached its fiduciary duties by imposing the MVC affiliation, because Plaintiffs were paying for services by a *non-breaching* management company. Any dispute Marriott may assert about whether or how much each Plaintiff paid in management fees only raises a triable issue of fact.

### C.  Plaintiffs are entitled to seek disgorgement of Marriott's profits

Plaintiffs are also entitled to pursue their claim that Marriot must disgorge the profits it earned at Plaintiffs' expense. A plaintiff who seeks disgorgement need not prove but-for causation, i.e., that the profits would not have been earned but for the challenged misconduct. *See* Restatement (Third) of Restitution § 51, cmt. *f*. Rather, a plaintiff need only show some "causal connection" between the wrongdoing and "a measurable increase in the defendant's net assets." *Id.* at cmt. *i*. Once the plaintiff presents such evidence, the burden shifts to defendant to prove the extent to which some portion of those profits may have been attributable to other factors or are subject to equitable offset. *Id.*; *see also John Doe (1) v. Archdiocese of Denver*, 413 F.Supp.2d 1187, 1191 (D. Colo. 2006) ("Colorado courts look to the Restatement to determine the extent of fiduciary obligations . . ."). Contrary to Marriott's argument that Plaintiffs have no proof of that its breached resulted in any increased profits, the evidence (as further discussed below) shows that Marriott has been able to sell at least 5% more MVC points per year as a result of being able to market access to Ritz-Carlton properties (such as Aspen Highlands) to potential points purchasers. SADF Nos. 8-10.

*Andreas v. Volkswagen of Am., Inc*., 336 F.3d 789 (8th Cir. 2003), is an infringement case that demonstrates how burden-shifting operates in disgorgement cases. The issue in *Andreas* was whether a plaintiff seeking disgorgement in a copyright infringement case had established a sufficient causal connection between defendant automobile manufacturer's sales campaign and the profits it earned from selling its vehicles. *Id.* at 795. The Eighth Circuit explained that the plaintiff had no obligation to trace the precise amount of profits resulting from the infringing advertising campaign. Rather, once the plaintiff established the alleged infringement, it was

17

sufficient for the plaintiff to present evidence of the defendants' total profits or gross revenue, at which point the burden would shift to the defendant to prove any deductible expenses or any "*elements of profit attributable to factors other than the copyrighted work*." *Id.* (emphasis in original) (citation omitted). "Any doubt" as to the amount of profits is thus resolved in the plaintiff's favor; and if the defendant cannot meet its burden of proving expenses and profit from other factors, "the gross figure stands as the defendant's profits." *Id.* On the facts of that case, the Eighth Circuit concluded the plaintiff had "enough circumstantial evidence" to be entitled to disgorgement of profits, subject to defendants' showing of "what effect other factors had on its profits." *Id.* at 797.

The Ninth and Tenth Circuits have similarly recognized the appropriateness of burden-shifting in disgorgement cases. In *Polar Bear Productions, Inc. v. Timex Corp.*, 384 F.3d 700 (9th Cir. 2004), Timex allegedly used plaintiff's film footage without permission to market its own products. The Ninth Circuit held that plaintiff needed only to present some evidence that Timex's infringing conduct "at least partially caused" an increase in Timex's revenues, at which point the burden of production would shift to Timex to prove which profits did *not* result from infringement. *Id.* at 711. The Tenth Circuit applied the same approach in *General Steel Domestics Sales, LLC v. Chumley*, 627 Fed.App'x 682 (10th Cir. 2015) (Gorsuch, J.). There, the court affirmed the district court's method of calculating disgorgement — requiring the plaintiff to prove the defendant's "gross profits during the period in question" and then requiring the defendant "to prove which portion of those profits wasn't attributable" to the wrong. *Id.* at 686.[5]

---

[5] Marriott tries to distinguish *General Steel* on the ground that it was a Lanham Act case. But trademark law is the original source of the disgorgement doctrine and courts have always looked to the Restatement of Restitution and opinions by early courts of equity for guidance on

Plaintiffs have presented far more evidence to show that the wrongful affiliation at least "partially caused" in an increase revenues from MVC points sales than the Ninth Circuit deemed acceptable in *Polar Bear*. A material factual dispute thus exists concerning whether a causal relationship exists between Marriott's wrongdoing and "a measurable increase in the defendant's net assets" for purposes of a disgorgement remedy. After all, Marriott's own documents (including financial records and filings) and executive testimony show a significant relationship between the MVC affiliation and Marriott's gross profits. Marriott's CEO Weisz admitted during his deposition that allowing MVC members access to Ritz-Carlton clubs helps Marriott sell more points. Reiser Decl., Ex. 1 (Weisz Depo. at 108:24-109:6, "I certainly think there's some members that probably value that and would buy more points as a result of it."). Moreover, Marriott's Form 10-K reports and the results of Marriott's own surveys of MVC points purchasers links the 2014 affiliation to significantly increased profits. SADF No. 9-10.

In that first year of affiliation, for example, Marriott's 10-K reports demonstrate that its net revenue from MVC points sales (i.e. gross revenue from points sales minus "costs of vacation ownership products" and "marketing and sales" costs) was $648 million. When Marriott surveyed its MVC points purchasers to find out *why* they had purchased MVC points that year, between 5.5 and 7.4% of the respondents answered that gaining access to the Ritz-Carlton Destination Club line was among their top five reasons. A fact finder could reasonably conclude,

---

disgorgement in trademark cases. *JL Beverage Co., LLC v. Jim Bean Brands Co*., 815 Fed.App'x 110, 114-15 (9th Cir. 2020) (Friedland, J., concurring). "[T]he theoretical justification for awarding profits" in trademark cases "was based on an analogy to the equitable remedy of a constructive trust . . ." *Id*. at 115. Moreover, these principles from the Restatement and common law equally apply to the fiduciary context. *See Grynberg*, 538 F.3d at 1347 ("[w]here a person in a fiduciary relation to another acquires property, and the acquisition or retention of the property is in violation of his duty as fiduciary, he holds it upon a constructive trust for the other.")

based on that evidence, that between 5.5 and 7.4% of the points revenue Marriott received that year (or approximately $9.1 million) was attributable to affiliation — an affiliation that would not have occurred but for Marriott's breach of fiduciary duty. SADF Nos. 9-10. The record includes the same evidence for each of the next four years as well. *See* Reiser Decl., Ex. 2, 9-10. (spreadsheet compilation from Marriott's Form 10-Ks and survey data). While it is true that these purchasers listed Ritz-Carlton access as only one of their top five reasons for purchasing points, this evidence is more than sufficient to enable a jury to find a "causal connection" between Marriott's breach and profits. Marriott may of course present evidence showing which of its profits are *not* attributable to the MVC affiliation. But for purposes of summary judgment, what matters is that sufficient evidence exists on the current record from which a jury could reasonably infer the requisite causation.

## **CONCLUSION**

For the reasons stated, Plaintiffs respectfully request that Marriott's supplemental motion for summary judgment be denied.


Dated: November 6, 2020                                    Respectfully submitted,

                                                           */s/ Michael Schrag*
                                                           Michael Schrag (CA State Bar #185832)
                                                           GIBBS LAW GROUP LLP
                                                           505 14th Street, Suite 1110
                                                           Oakland, CA 94612
                                                           Tel: (510) 350-9700
                                                           E-mail: mls@classlawgroup.com

                                                           *Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I, the undersigned, hereby certify that on this 6th day of November 2020, a true and correct copy of the foregoing **PLAINTIFFS' OPPOSITION TO DEFENDANTS' SUPPLEMENTAL MOTION FOR SUMMARY JUDGMENT** was served via ECF filing upon:

Naomi G. Beer, Esq.
BeerN@gtlaw.com
Greenberg Traurig, LLP
1200 17th Street, Suite 2400
Denver, Colorado 80202

Ian S. Marx, Esq.
MarxI@gtlaw.com
Philip R. Sellinger, Esq.
SellingerP@gtlaw.com
Greenberg Traurig, LLP
500 Campus Drive, Suite 400
Florham Park, New Jersey 07932

*/s/ Denise Kwan*
Denise Kwan