IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Case No. 16-01301 PAB

RCHFU, LLC, et al.

     Plaintiffs,

v.

MARRIOTT VACATIONS WORLDWIDE
CORPORATION, et al.

     Defendants.

---

### DEFENDANTS' MOTION *IN LIMINE* TO EXCLUDE PLAINTIFFS' PROPOSED RULE 1006 EXHIBIT PURPORTING TO CALCULATE PROFITS ALLEGEDLY DERIVED FROM THE MVC AFFILIATION

---

Defendants Marriott Vacations Worldwide Corporation ("MVW"), Marriott Ownership Resorts, Inc., The Ritz-Carlton Management Company, LLC, The Cobalt Travel Company, LLC, and The Lion & Crown Travel Co., LLC, hereby move to exclude Plaintiffs' proposed Rule 1006 exhibit, which purports to calculate profits allegedly earned by MVW as a result of the MVC Affiliation. A copy of that exhibit ("Affiliation Profits Exhibit") is attached hereto as Appendix A.

### CERTIFICATE OF CONFERENCE

Pursuant to Local Rule 7.1(a), before making this motion, Defendants' counsel conferred with Plaintiffs' counsel and made a reasonable and good faith effort to resolve this dispute. Specifically, on December 4, 2020, Defendants' counsel had a telephone conference with Plaintiffs' counsel to discuss the factual and legal bases for this motion, and Plaintiffs' counsel refused to agree to the relief sought by Defendants.

### INTRODUCTION

On October 26, 2018, Plaintiffs produced a report by their expert, Jonathan Simon, in which he purported to opine as to causation of damages and the existence and calculation of profits

allegedly derived from the MVC Affiliation.  On June 1, 2020, however, the Court found that Simon had not met the requirements of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and he was precluded from offering his opinions at trial.  (*Daubert* Order, ECF #583). Because that ruling left Plaintiffs without an expert to present a profit calculation, Plaintiffs searched for a way to circumvent the *Daubert* Order.  What they came up with more than five months later is the Affiliation Profits Exhibit (Appendix A), which they incorrectly describe as a Rule 1006 Summary.  In fact, it is a pseudo-"expert" report, replete with opinions and assumptions (and a newly-devised profit calculation), prepared by Plaintiffs themselves.  As such, the Affiliation Profits Exhibit is inadmissible under Rule 1006 or any other rule of evidence.  It is also being offered far too late in the game.  The profit calculation Plaintiffs are now offering was never previously disclosed; thus, Defendants never had the opportunity to obtain expert testimony to counter the unfounded opinions and speculative assumptions on which it is based.  Plaintiffs should be precluded from offering the Affiliation Profits Exhibit into evidence at trial.

## **PROCEDURAL HISTORY**

During discovery, Defendants demanded that each Plaintiff:

> Identify the damages that you seek to recover on an individual basis, specifically by category as well as by amount, the basis for calculating each item of alleged damages, and all documents upon which the calculation of such alleged damages is based.

*See* Certification of Roger B. Kaplan, Ex. 1 (Defendants' Interrogatory No. 8).  Each Plaintiff gave an identical response to this interrogatory:

> Plaintiffs incorporate by reference objections Nos. 1, 2, 6, 8, and 11. **Plaintiffs further object on the grounds that the damages categories and calculations will be the subject of Fed. R. Civ. P. 26(a)(2) expert testimony and such disclosures and information as required will be provided in accord with the Scheduling Order entered in an Action (as amended).** Without waiving the Objections and subject to the Preliminary Statement, General Objections and specific objections, Plaintiffs respond as follows:

> Generally, Plaintiffs have been damaged by the significant diminution in value of their Fractional Units caused by the MVC affiliation. **Additionally, Plaintiffs are entitled to disgorgement of all commissions, fees and profits the Marriott Defendants received, an account of all commissions, fees and profits earned by Marriott Defendants and will seek a constructive trust imposed upon said commissions, fees and profits for the benefit of Plaintiff. Because expert discovery has not yet occurred, Plaintiffs reserve the right to supplement or modify the types of damages they seek.**

*See id.* (Plaintiffs' Response to Interrogatory No. 8) (emphasis added). This response has never been amended. *Id.*

On October 26, 2018, Plaintiffs produced their experts' reports, including Simon's report on causation of damages and the existence and calculation of profits allegedly derived from the MVC Affiliation (so-called "halo profits"), as well as Chekitan Dev's report concerning the "halo" effect on which Simon relied, in part, for his causation and disgorgement opinions. On December 28, 2018, Defendants produced expert reports rebutting Simon's and Dev's opinions.[1] By Orders dated April 7, 2019 and May 16, 2019, the Court struck as untimely a statistician's report proffered by Plaintiffs. (ECF ##386, 412). Dev and Simon also provided supplemental expert reports dated April 12, 2019 and June 7, 2019, respectively.

In July 2019, Defendants moved to exclude, among other things, Dev's and Simon's expert reports (*Daubert* Motion, ECF #460). Defendants' *Daubert* Motion was fully briefed and submitted to the Court in September 2019. (ECF ## 494-95).

In the May 13, 2020 Final Pretrial Order ("PTO") (ECF #578), Plaintiffs provided an extensive list of over 500 exhibits (ECF #578-3), including all the exhibits from their expert reports (including Simon's exhibits) that purported to show and calculate alleged profits derived from the MVC Affiliation. Nowhere on that exhibit list was any version of the Affiliation Profits Exhibit

---

[1] Defendants' expert, Dr. Mark Israel, rebutted Simon's opinion on alleged MVC Affiliation profits, and Dr. Ceridwyn Kind, Ph.D., rebutted both Simon's and Dev's reports.

that Plaintiffs now seek to introduce into evidence.  In addition, although Plaintiffs' witness list summarized in detail the expert opinions and testimony they would be offering at trial, including opinions and testimony on profits allegedly derived from the MVC Affiliation (ECF 578-1 at 18-24), Plaintiffs made no mention of the Affiliation Profits Exhibit (Appendix A) that they now seek to offer or the profit calculation contained in that exhibit.

On June 1, 2020 the Court issued its *Daubert* Order (ECF #583), which, among other things, excluded Simon's testimony on causation of damages and disgorgement and his calculation of "halo" profits supposedly derived from the MVC Affiliation, as well as Dev's testimony on the "halo" effect.  With respect to the preclusion of Simon's testimony on "halo profits," the Court found that:

- "In his deposition, Mr. Simon confirmed that [t]here are [peer-reviewed] models that are used to measure 'halo effect' and he did not use these models . . . [A]nd studies cited by Dr. Dev in his expert report, a report which Mr. Simon purportedly relied upon . . . indicate that there are industry-accepted scientific methods which are used to determine whether a halo effect exists and, if so, how to calculate that halo effect." *Daubert* Order at 16.

- Such articles "demonstrate whether a halo effect exists is not a subjective determination; rather, this determination is based on economic principles and there exist in the industry generally accepted processes for measuring halo effects. But Mr. Simon admitted in his deposition that he did not use these models.  Because Mr. Simon failed to use a generally accepted methodology in forming his opinions, instead creating his own solely for use in this litigation, the Court finds that Mr. Simon's opinion does not 'employ[] . . the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Id.* at 17.

- "Because the Court has determined that Mr. Simon's opinion that a halo effect exists in this case is unreliable, his opinion as to the extent of that halo effect – i.e.,

how much defendants allegedly profited from the alleged halo effect – is also unreliable." *Id.* at 18.

Plaintiffs did not seek reconsideration of the *Daubert* Order insofar as it excluded Simon's disgorgement opinions and profit calculation, nor did they provide Defendants with any version of the Affiliation Profits Exhibit that they now seek to introduce as evidence at trial.

## THE PROFFERED AFFILIATION PROFITS EXHIBIT

The Affiliation Profits Exhibit made its first appearance in this case as an exhibit to Plaintiffs' November 6, 2020 Opposition to Defendants' Supplemental Motion for Summary Judgment (ECF #600-2). Shortly thereafter (on November 20, 2020), Plaintiffs identified the Affiliation Profits Exhibit as a Rule 1006 Summary that they would seek to offer into evidence. Far from simply summarizing voluminous evidence that cannot be conveniently examined in court (which is what a Rule 1006 summary is meant to accomplish), Plaintiffs are attempting to use the Affiliation Profits Exhibit as a vehicle for introducing, at trial, an entirely new profit calculation without any expert testimony to support the methodology used or the reliability of the assumptions and opinions underlying the calculation.

Plaintiffs arrive at their new profit calculation in several steps, each of which contains unfounded opinions, faulty assumptions and/or blatant errors:

1. From MVW's SEC Form 10-Ks for each of the years from 2014 to 2018, Plaintiffs incorrectly assert that the amounts identified in such filings as "Sale of vacation ownership products" equal "Revenue from Points Sales". As explained in the section titled "Our Products" in each Form 10-K, MVW (through its subsidiaries) sold both points-based and weeks-based vacation ownership products during the years 2014-18 (and continues to do so). Accordingly, the calculations reflected in the Affiliation Profits Exhibit do not accurately reflect the alleged net profits from MVC Points sales because they are based on a fundamentally flawed assumption about the Company's product

5

line.

2. Even assuming that the numbers reflected in the Affiliation Profits Exhibit were attributable to only MVC Points sales (which Defendants deny), Plaintiffs take the figure reflecting "Revenue from Points Sales" and subtract from that "Costs of Vacation Ownership Products" and "Marketing and Sales Costs" to arrive at what they *interpret as and opine to be* "Net Profits from Points Sales."  In fact, this number reflects *gross* profits because only direct costs of sales are being subtracted.   To arrive at *net* profits, other expenses as reflected on the consolidated financials including general administrative expenses and overhead would also have to be subtracted.[2]

3. Plaintiffs then *assume* that, for all MVC Points sales made in each of the relevant years, 65% are to existing owners and 35% are to new owners.[3] Building on that incorrect assumption, Plaintiffs multiply what they incorrectly call "Net Profits from Points Sales" for each year (*see* Step 2, *supra*) by these respective percentages to arrive at "Net Profits from Existing Owners" and "Net Profits from New Owners" for each year.

4. Next, Plaintiffs use MVW's annual Sales and Marketing Surveys ("SMS Surveys"), which show, separately for existing owners and new owners who purchased points that year, what percentage of these owners rated the ability to "Use Points to stay at a Ritz-Carlton Club" (meaning *any* resort in the portfolio of RC Club Resorts, including potential future resorts) as one of the top five features affecting their purchasing decision.   Those percentages varied each

---

[2] Notably, the Affiliation Profits Exhibit also reflects MVW's "Total Gross Revenue from All Sources."  That number is entirely irrelevant to any profit calculation and is included solely for the possible prejudicial effect its disclosure might have on Defendants.

[3] Plaintiffs base this assumption on the following testimony from a MVW witness:

Q. On page 4 of your declaration you submitted in *Lennen v. Marriott*, you say, as of August 2018, MORI's records demonstrate that approximately 65 percent of BIs sold are purchased by existing owners. Do you have reason to quarrel with that statement as you sit here today? . . . .

A. I have no objection to that declaration.

(Deposition of Urcil Peters taken February 13, 2019, Tr. 29:21 – 30:2).

year from 4.7% to 7.4% for responding existing owners and from 5.3% to 5.9% for responding new owners.[4]

5. Plaintiffs then leap to the conclusion (i.e., they *opine*) that the *same percentages* of *all* existing and new owners for each year would not have purchased *any* MVC Points that year if access to Ritz-Carlton Clubs had not been included in the MVC Program.  They make that assumption even though (i) four other Program features were included in respondents' top-five ranking; (ii) respondents did not indicate where access to Ritz-Carlton Clubs stood within that top-five ranking; and (iii) 27 other features of the MVC Program were also rated as having affected respondents' purchasing decision.

6. Plaintiffs then *assume* that the above percentages (4.7% to 7.4% of responding existing owners and the 5.3% to 5.9% of responding new owners) represent the *same percentages* of total MVC Points sold by MVW each year.  Plaintiffs have no support for that assumption, nor do they account for (i) the possibility that a particular percentage of respondents may have purchased a smaller percentage of total MVC Points sold to all purchasers; or (ii) the fact that the more points purchased (particularly by existing owners), the greater the discounts on the price of the MVC Points, thereby accounting for a smaller share of total MVC Points sales.

7. Finally, building on the foregoing incorrect assumptions and opinions, Plaintiffs apply the above-mentioned percentages to the "Net Profits from Points Sales from Existing Owners" and "Net Profits from Points Sales from New Owners" calculated in Step 3 to arrive at a purported Net Profits realized from the MVC Affiliation for each year from 2014 to 2018 from existing and new owners.  Adding these yearly numbers together yields what Plaintiffs claim is a total Net Profits number.  No portion of this total is identified as having

---

[4] Indeed, in Chekitan Dev's Supplemental Expert Report of April 12, 2019, Plaintiffs' own expert notes "Based on my education, experience, and research, it is clear to me that customers who buy timeshares consider more than five factors in their purchase -- **thus 'top 5' is an arbitrary number**" because Marriott "ask[s] about 28 features on its survey (which includes the RCDC access feature)." (Dev Supplemental Report, ECF #460-2 at pgs. 7-8) (emphasis added).

been obtained from Plaintiffs, who represent only 26% of the interests at RC Club Aspen, which is only one of many resorts in the Ritz-Carlton Club portfolio[5] that could be accessed using MVC Points during this time period or in the future.[6]

As should be clear from the foregoing, the Affiliation Profits Exhibit is not a "summary" of anything; rather, it is a pseudo-"expert" report prepared by laypersons. As such, it is not admissible under Rule 1006 or under any other rule of evidence. It is also woefully out of time. Admitting the Affiliation Profits Exhibit into evidence would be highly prejudicial to Defendants because the newly-minted profit calculation it contains was never disclosed to Defendants. Thus, Defendants had no opportunity to prepare any expert testimony to counter the many erroneous opinions and assumptions on which the profit calculation is based. Plaintiffs should be precluded from offering the Affiliation Profits Exhibit into evidence.

## **ARGUMENT**

## I.  **DEFENDANTS SHOULD BE PERMITTED TO FILE THIS *IN LIMINE* MOTION**

Under the Court's Scheduling Order, motions *in limine* were to be filed by August 19, 2019 (ECF #423).[7]  The Court has noted, however, that deadlines in a scheduling order "may be modified for good cause" and that, "[t]o establish 'good cause,' a party must generally show that 'the scheduling order's deadline could not have been met with diligence.'" *See* October 13, 2020 Order granting Defendants leave to file a supplemental summary judgment motion (EFC #596 at 3, quoting *McMillan v. Wiley*, 813 F.Supp.2d 1238, 1254 (D. Colo. 2011)).  The Court explained

---

[5] The reference in the survey to access to a Ritz-Carlton Club refers generally to resorts in the Ritz-Carlton Club portfolio, including potential future resorts, not to any specific Ritz-Carlton Club location.

[6] As noted, the Court refused to permit Plaintiffs to offer a statistical expert to opine on conclusions to be drawn from the SMS Surveys.

[7] Defendants filed a number of *in limine* motions in compliance with that deadline.  *See* ECF ##466-71, 475.

that such determinations are "within a district court's discretion" and that "[s]uch motions are 'particularly appropriate on an expanded factual record'" *Id.* at 3 (citing *Whitford v. Boglino*, 63 F.3d 527, 530 (7th Cir. 1995); *Hoffman v. Tonnemacher*, 593 F.3d 908, 911 (9th Cir. 2010)).

Good cause for relaxing the Scheduling Order deadline for this *in limine* motion is easily demonstrated here.  Had Plaintiffs' Affiliation Profits Exhibit (and included profit calculation) been disclosed in discovery, Defendants would have moved to exclude the exhibit before the Scheduling Order deadline.  But Plaintiffs did not disclose the Affiliation Profits Exhibit until November 6, 2020, in their opposition to Defendants' Supplemental Motion for Summary Judgment.  Thus, Defendants could not have moved *in limine* with respect to that exhibit before the Scheduling Order deadline.

Judicial resources could also be saved by addressing the admissibility of Plaintiffs' Affiliation Profits Exhibit before trial.  With Simon's profit calculation opinions having been excluded, the Affiliation Profits Exhibit is Plaintiffs' only "evidence" regarding the existence or calculation of the amount of profits that were allegedly derived from the Affiliation.  Thus, if Defendants' instant motion is granted and the Affiliation Profits Exhibit is excluded, Plaintiffs' disgorgement claims would not have to be tried.

## II. PLAINTIFFS' AFFILIATION PROFITS EXHIBIT SHOULD BE EXCLUDED

### A.  The Affiliation Profits Exhibit Should Be Excluded Because It Was Not Disclosed during Discovery or in the Final PTO

In interrogatories propounded by Defendants during discovery, Plaintiffs were specifically asked to identify the damages they sought, the basis for calculating such alleged damages and all documents upon which such calculation is based.  *See* PROCEDURAL HISTORY, *supra.*  In their response, Plaintiffs did not disclose the calculations, opinions and assumptions offered in the Affiliation Profits Exhibit.  Instead, they stated that the requested information, including the

calculation and basis for their disgorgement of profits claims, would be disclosed in their expert reports (which were to be deemed a further response to this particular interrogatory). Plaintiffs' expert reports, however, did not disclose the calculations, opinions and assumptions offered in the Affiliation Profits Exhibit, nor were they disclosed in the Final PTO. Having failed to make the required disclosures in the proper manner at the proper time, Plaintiffs should not be permitted to introduce an entirely new profit calculation now, only two months before the trial date. *See McCammond v. Schwan's Home Serv., Inc.*, 2011 U.S. Dist. LEXIS 92012, at *8 (D. Colo. Aug. 17, 2011) ("The purpose of the final pretrial order is to put the other party on notice of which . . . theories of the case and/or defenses a party intends to pursue at trial"); *Hasan v. AIG Prop. Cas. Co.*, 2018 U.S. Dist. LEXIS 77435, at *6 (D. Colo. May 8, 2018) (amendments to final pretrial orders will not be permitted if they "seek to change the movant's theory of its case after discovery has closed" or "seek to avoid prior rulings."). Plaintiffs should be precluded from offering the Affiliation Profits Exhibit into evidence.

## B. The Affiliation Profits Exhibit Is Not a Proper Rule 1006 Summary Because It Contains, and Is Based on, Opinions and Assumptions Not Supported by Expert Testimony

Rule 1006 permits witnesses to "use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs . . . ." Fed. R. Civ. P. 1006. "[S]ummaries are permissible when voluminous evidence 'cannot conveniently be examined in court,' and when the evidence upon which the summary is based is made available to the other parties at a 'reasonable time and place.'" *United States v. Samaniego*, 187 F.3d 1222, 1223 (10th Cir. 1999) (quoting Fed. R. Evid. 1006). "The purpose of Rule 1006 is to provide a practicable means of summarizing voluminous information." 6 Weinstein's Federal Evidence § 1006.02 (2020). The proponent of the summary bears the burden to establish that the "evidence upon which [the

summary] is based is admissible.  *Samaniego*, 187 F.3d at 1223 (reversing jury verdict due to government's failure to establish admissibility of records underlying Rule 1006 summary).

Summaries of underlying data that contain or are based on opinions or assumptions are inadmissible under Fed. Rule of Evid. 1006 unless the opinions or assumptions of the preparer of the summaries are admissible under Rules 701 or 702.  One of the most cited cases on this issue is the Tenth Circuit's landmark decision in *State Office Systems, Inc. v. Olivetti Corp. of America*, 762 F.2d 843 (10th Cir. 1985).  In *Olivetti*, the plaintiff company's president had used company records to prepare a summary proffered to show the company's past and future lost profits.  The court found the summary "not legitimately admissible … under Rule 1006," as it was an "interpretation[] of past data …, not a simple compilation of voluminous records."  *Id.* at 846-47. The interpretation of past data is opinion testimony, the admissibility of which is governed by Rules 701 and 702.  *Id.*; *see also* Rule 701 (describing limited circumstances under which laypersons may offer opinion testimony); Rule 702 ("[a] witness who is qualified by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise if [specified requirements are met].").[8]

---

[8] The *Olivetti* court ultimately found the proffered opinion testimony admissible because, "given [the company president's] position as president and treasurer of the company, his lengthy experience in marketing and selling [defendant] Olivetti computers in Kansas, and his personal knowledge of [plaintiff's] operations, sales, able and profits, he qualified as a witness to render an opinion concerning [the company's] lost future profits."  A similar finding of admissibility could not be made here, as the Affiliation Profits Exhibit (which is essentially an interpretation of past data and, thus, opinion testimony) is presented by neither an expert nor a qualified layperson with knowledge of MVW's business operations and financial records.  Likewise inapplicable here is the *Olivetti* court's finding that defendant Olivetti's objections to the profits summary went "more to the weight of the evidence than its admissibility."  *Id.*  In that case, the court noted that "[Olivetti] had ample opportunity to cross-examine [the company president] about the basis for the figures, and [had] introduced testimony from its own expert about calculations of what future profits would be."  In this case, Plaintiffs have only now disclosed their new profit calculation; thus, Defendants have had no opportunity to explore the basis for Plaintiffs' opinions, much less secure an expert to rebut them.

The *Olivetti* decision has been relied upon by other Circuit Courts of Appeal.  For example, in *Eichorn v. AT&T Corp.*, 484 F.3d 644 (3d Cir. 2007), the Third Circuit cited *Olivetti* and other authorities in cautioning that "Rule 1006 is 'not a back-door vehicle for the introduction of evidence which is otherwise inadmissible." *Id.* at 650 (citing and quoting *Peat, Inc. v. Vanguard Research, Inc.,* 378 F.3d 1154, 1160 (11th Cir. 2004), and *United States v. Pelullo*, 964 F.2d 193, 204-05 (3d Cir. 1992)).  Notably, the *Eichorn* court found that:

> [P]laintiffs' proffered calculations are better described as a synthesis rather than a summary. . . . The calculations went beyond the data they summarized and included several assumptions, inferences, and projections . . . which represent [the witness's] opinion, rather than the underlying information. The proposed evidence is thus subject to the rules governing opinion testimony and was properly held inadmissible.

*Id.* at 650.  Likewise, in *Gomez v. Great Lakes Steel Div. Nat'l Steel Corp.*, 803 F.2d 250, 258 (6th Cir. 1986), the Sixth Circuit cited *Olivetti* and other authorities in finding that a particular exhibit had been erroneously admitted under Rule 1006, as its damages calculations contained assumptions and opinions and "was therefore not a simple compilation of voluminous records." Other cases have reached similar conclusions.  *See, e.g., United States v. Bray*, 139 F.3d 1104, 1110, 1111 (6th Cir. 1998) (explaining that the sole purpose of Rule 1006 is to permit the summary of "documents [that are] so 'voluminous' that they 'cannot be conveniently examined in court' by the trier of fact"; however, the summary cannot be "embellished by or annotated with the conclusions of or inferences drawn by the proponents"); *Krakauer v. Dish Network L.L.C.*, 2016 U.S. Dist. LEXIS 160521 (M.D. N.C. September 19, 2016) (noting that "summary exhibits under Rule 1006 function 'as a surrogate for voluminous writing that are otherwise admissible,'" but they "cannot be 'embellished by or annotated with the conclusions of or inferences drawn by the proponent'") (quoting *Bray*, *supra*).

Of particular relevance to this case is this Court's decision in *Water Pik, Inc. v. Med-Sys.*,

Civil Action No. 10-cv-01221-PAB-CBS, 2012 U.S. Dist. LEXIS 1373 (D. Colo. Jan. 5, 2012) (Brimmer, J.). In *Water Pik*, plaintiff had attempted to circumvent the Court's exclusion of its expert's testimony on "the methodology used to determine damages for disgorgement" by offering a previously undisclosed Rule 1006 summary witness to provide "a summary of the sales, costs, and expenses" for certain product lines. *Id.* at *3-*4. The Court held that the evidence the witness proposed to give was inadmissible under Rule 701 because it is not "simple mathematical equations that anyone with a grade-school education could understand." *Id.* at *6-*8 (citing Fed. R. Evid. 701 and *James River Ins. Co. v. Rapid Funding*, LLC, 658 F.3d 1207 (10th Cir. 2011)). Rather, the evidence would "necessarily entail opinions and inferences" that require scientific, technical, or other specialized knowledge, i.e., it fell "within the scope of Rule 702." *Id.* at *7-*8. Since the evidence was of the type for which expert testimony was needed and plaintiff's expert had been excluded, the evidence was inadmissible.

Like the proffered material in the above-discussed cases, the Affiliation Profits Exhibit (Appendix A) is not a mere "summary" of voluminous documents; rather, it is a compilation of assumptions and opinions unsupported by any expert, including the following assumptions and opinions:

- that the SMS Survey was statistically valid, and that the results of the responding purchasers could be projected to reflect a profile of all purchasers of MVC Points;
- that the percentage of SMS survey respondents who rated use of MVC Points to access Ritz-Carlton Clubs as among their top five reasons to purchase (4.7% to 7.4% of responding existing owners and 5.3% to 5.9% of responding new owner) is necessarily the *same* percentages of *all* owners who *would not have purchased any MVC Points* if access to Ritz-Carlton Clubs was not included in the MVC Program;[9]

---

[9] As noted above (fn. 4), Plaintiffs' own expert, Chekitan Dev, notes that, the "**the 'top 5' is an arbitrary number**" (Dev Supplemental Report, ECF #460-2 at pgs. 7-8) (emphasis added).

- that the response percentages would have been the same if the respondents had been asked to rate the importance of access to *only* RC Club Aspen instead of to the Ritz-Carlton Club portfolio generally or to another Ritz-Carlton Club resort;

- that the ability to access Ritz-Carlton Clubs with MVC Points was the *conclusive* and *deciding* factor affecting purchasing decisions even though (i) it was only one of the top five reasons given by respondents; (ii) respondents were not asked where access to the Ritz-Carlton Clubs ranked among the top five reasons; and (iii) survey respondents also gave 27 other reasons for their MVC Points purchasing decisions; and

- that the above percentages (4.7% to 7.4% of responding existing owners, and 5.3% to 5.9% of responding new owners) represented the *same percentages* of total MVC Points sold by MVW each year to *all* purchasers, without accounting for (i) the possibility that those percentages of existing and new purchasers may have purchased a *smaller* percentage of total MVC Points sold to all purchasers, or (ii) the fact that purchasers who purchased more points received discounts from MVC Points prices, which directly affected the total MVC Points sales.

As if these flaws were not enough, Plaintiffs compounded their errors by simply adding what they incorrectly interpreted to be net profit amounts for the years 2014-2018 to arrive at a purported total Affiliation Profits amount.  None of that total amount, however, is allocated to (i.e., identified as having been obtained from) Plaintiffs, who represent only 26% of the interests at RC Club Aspen, which is only one of many resorts in the Ritz-Carlton Club portfolio that could be accessed by using MVC Points during this time period or in the future.  And, without expert testimony, Plaintiffs have no basis for making such allocation.

In short, the Affiliation Profits Exhibit is not a summary, but, rather, a collection of speculative assumptions and unfounded opinions unsupported by any expert testimony.  As such, the exhibit is not admissible under Rule 1006 or under any other rule of evidence.

## **CONCLUSION**

For all the foregoing reasons, Plaintiffs should be precluded from offering their Affiliation

Profits Exhibit (Appendix A) into evidence at trial.

Dated:  December 8, 2020                    Respectfully submitted,

                                            GREENBERG TRAURIG, LLP

                                            By:  *s/ Philip R. Sellinger*
                                                      Philip R. Sellinger
                                                      Roger B. Kaplan
                                                      Ian S. Marx
                                                 500 Campus Drive, Suite 400
                                                 Florham Park, New Jersey 07932
                                                 Tel: 973.360.7900 / Fax: 973.301.8410
                                                 Email:  SellingerP@gtlaw.com
                                                            KaplanR@gtlaw.com
                                                            MarxI@gtlaw.com
                                                 *Attorneys for Defendants Marriott Vacations*
                                                 *Worldwide Corporation, Marriott*
                                                 *Ownership Resorts, Inc., The Ritz-Carlton*
                                                 *Management Company, LLC, The Cobalt*
                                                 *Travel Company, LLC, and The Lion &*
                                                 *Crown Travel Co., LLC*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 8th day of December 2020, a true and accurate copy of the foregoing **DEFENDANTS' MOTION *IN LIMINE* TO EXCLUDE PLAINTIFFS' PROPOSED RULE 1006 EXHIBIT PURPORTING TO CALCULATE PROFITS OBTAINED FROM THE MVC AFFILIATION** was filed and served with the Clerk of the Court via CM/ECF filing system, which will send notification to the following:

Michael J. Reiser
Law Office of Michael J. Reiser
1475 N Broadway, Suite 300
Walnut Creek, CA 94596
*Counsel for Plaintiffs*

Matthew C. Ferguson
The Matthew C. Ferguson Law Firm, P.C.
119 South Spring, Suite 201
Aspen, Colorado 81611
*Counsel for Plaintiffs*

Tyler R. Meade
The Meade Firm P.C.
1816 Fifth Street
Berkeley, CA 94710
*Counsel for Plaintiffs*

Linda Pham Lam
Michael Schrag
Gibbs Law Group LLP
505 14th Street, Suite 1100
Oakland, CA 94612
*Counsel for Plaintiffs*

*s/ Gregory Scavelli*
Gregory Scavelli

# Appendix A

**Compilation Spreadsheet**                                                                                 1

| | | | | |
|---|---|---|---|---|
| **2014 (MVC 10-K; *see* RCDC066221)** | | | | |
| Total Gross Revenue from All Sources | | $ 1,736,000,000.00 | | |
| Revenue from Point Sales | | $ 648,000,000.00 | | |
| Less: Costs of Vacation Ownership Products | | $ 197,000,000.00 | | |
| Less: Marketing and Sales | | $ 315,000,000.00 | | |
| Net Profits from Point Sales | | $ 136,000,000.00 | | |
| | | | **Access to Ritz Top 5 Reason to Purchase** | |
| | **Urcil Peters Dep. Tr. 29:2-30:4** | | **(SMS SURVEY; see Urcil Peters Dep. Exhibit 6006 and 6008)** | |
| 2014 Net Profit from Existing Owners | 65.00% | $ 88,400,000.00 | 7.40% | $ 6,541,600.00 |
| 2014 Net Profit from New Owners | 35.00% | $ 47,600,000.00 | 5.50% | $ 2,618,000.00 |
| | | | | $ **9,159,600.00** |
| **2015 (MVC 10-K; *see* RCDC066409)** | | | | |
| Total Gross Revenue from All Sources | | $ 1,830,463,000.00 | | |
| Revenue from Point Sales | | $ 675,329,000.00 | | |
| Less: Costs of Vacation Ownership Products | | $ 204,299,000.00 | | |
| Less: Marketing and sales | | $ 330,599,000.00 | | |
| Net Profits from Point Sales | | $ 140,431,000.00 | | |
| | | | **Access to Ritz Top 5 Reason to Purchase** | |
| | **Urcil Peters Dep. Tr. 29:2-30:4** | | **(SMS SURVEY; see Urcil Peters Dep. Exhibit 6006 and 6008)** | |
| 2015 Net Profit from Existing Owners | 65.00% | $ 91,280,150.00 | 6.30% | $ 5,750,649.45 |
| 2015 Net Profit from New Owners | 35.00% | $ 49,150,850.00 | 5.40% | $ 2,654,145.90 |
| | | | | $ **8,404,795.35** |
| **2016 (MVC 10-K; *see* RCDC066563)** | | | | |
| Total Gross Revenue from All Sources | | $ 1,811,235,000.00 | | |
| Revenue from Point Sales | | $ 637,503,000.00 | | |
| Less: Costs of Vacation Ownership Products | | $ 155,093,000.00 | | |
| Less: Marketing and sales | | $ 363,295,000.00 | | |
| Net Profits from Point Sales | | $ 119,115,000.00 | | |

Compilation Spreadsheet                                                                                                    2

| | Urcil Peters Dep. Tr. 29:2-30:4 | | Access to Ritz Top 5 Reason to Purchase (SMS SURVEY; see Urcil Peters Dep. Exhibit 6006 and 6008) | |
|---|---|---|---|---|
| 2016 Net Profit from Existing Owners | 65.00% | $ 77,424,750.00 | 5.90% | $ 4,568,060.25 |
| 2016 Net Profit from New Owners | 35.00% | $ 41,690,250.00 | 5.90% | $ 2,459,724.75 |
| | | | | $ 7,027,785.00 |
| **2017 (MVC 10-K; *see* pg 38)** | | | | |
| Total Gross Revenue from All Sources | | $ 1,951,945,000.00 | | |
| Revenue from Point Sales | | $ 727,940,000.00 | | |
| Less: Costs of Vacation Ownership Products | | $ 177,813,000.00 | | |
| Less: Marketing and sales | | $ 408,715,000.00 | | |
| Net Profits from Point Sales | | $ 141,412,000.00 | | |
| | Urcil Peters Dep. Tr. 29:2-30:4 | | Access to Ritz Top 5 Reason to Purchase (SMS SURVEY; see Urcil Peters Dep. Exhibit 6006 and 6008) | |
| 2017 Net Profit from Existing Owners | 65.00% | $ 91,917,800.00 | 5.90% | $ 5,423,150.20 |
| 2017 Net Profit from New Owners | 35.00% | $ 49,494,200.00 | 5.30% | $ 2,623,192.60 |
| | | | | $ 8,046,342.80 |
| **2018 (MVC 10-K; *see* pg 57)** | | | | |
| Total Gross Revenue from All Sources | | $ 2,803,000,000.00 | | |
| Revenue from Point Sales | | $ 990,000,000.00 | | |
| Less: Costs of Vacation Ownership Products | | $ 260,000,000.00 | | |
| Less: Marketing and sales | | $ 513,000,000.00 | | |
| Net Profits from Point Sales | | $ 217,000,000.00 | | |
| | Urcil Peters Dep. Tr. 29:2-30:4 | | Access to Ritz Top 5 Reason to Purchase (SMS SURVEY; see Urcil Peters Dep. Exhibit 6006 and 6008) | |
| 2018 Net Profit from Existing Owners | 65.00% | $ 141,050,000.00 | 4.70% | $ 6,629,350.00 |
| 2018 Net Profit from New Owners | 35.00% | $ 75,950,000.00 | 5.50% | $ 4,177,250.00 |
| | | | | $ 10,806,600.00 |
| | | | **TOTAL 2014-2018** | $ 43,445,123.15 |