**IN THE UNITED STATES DISTRICT COURT**

**DISTRICT OF COLORADO**

Civil Action No. 1:16-cv-01301-PAB-GPG

**RCHFU, LLC,** *et al.*

Plaintiffs,

v.

**MARRIOTT VACATIONS WORLDWIDE CORPORATION,** *et al.*

Defendants.

_____

**PLAINTIFFS' OPPOSITION TO MOTION IN LIMINE TO EXCLUDE PLAINTIFFS' PROPOSED RULE 1006 EXHIBIT ON PROFITS ALLEGEDLY DERIVED FROM THE MVC AFFILIATION**
_____

**I.       INTRODUCTION**

Far from being valid reasons to exclude, Marriott's criticisms of the Affiliation Profits Exhibit, in fact, show that the burden-shifting process on disgorgement is working. The exhibit is a simple compilation of data from Marriott's financial and survey records that applies basic math to estimate the profits Marriott made from 2014-2018 from using access to Ritz-Carlton Clubs as a lure to sell MVC points. This estimate of the increase in revenue Marriott earned from its unlawful conduct is sufficient to meet Plaintiffs' initial burden on proving disgorgement in the fiduciary duty context. The burden then shifts to Marriott to prove any deductible expenses and what amount of those profits was *not* attributable to the wrongful conduct. *See General Steel Domestic Sales, LLC v. Chumley*, 627 F. App'x 682, 686 (10th Cir. 2015).

1

Instead of waiting for the burden to shift, Marriott prematurely raises its rebuttal arguments on this motion in seeking to exclude the Affiliation Profits Exhibit in the first place. Marriott mistakes appropriate rebuttal topics for admissibility issues. Marriott's complaints about the precision of the data and calculations on the exhibit, however, don't warrant its exclusion. Plaintiffs have no burden to trace the precise amount of profits Marriott made from its unlawful conduct; any showing of an increase in total revenues is sufficient under the law. *See Andreas v. Volkswagen of Am., Inc.*, 336 F.3d 789, 795 (8th Cir. 2003). Marriott will be free to rebut the exhibit with its own data and arguments at trial, but its criticisms fail to refute that the Affiliation Profits Exhibit satisfies Plaintiffs' initial burden on disgorgement.

Moreover, Plaintiffs timely disclosed the summary exhibit. Plaintiffs produced it by the deadline for summary exhibits and listed the underlying documents (Marriott's Form 10-K's and survey documents) on their exhibit list for trial. Plaintiffs have also given ample notice through pleadings, discovery, and the final pretrial order of their intention to seek disgorgement of the profits Marriott made from selling MVC points using Plaintiffs' property. But even if Plaintiffs' disclosure of their disgorgement calculations was untimely, there would be no prejudice to Marriott. Marriott is the party with more precise information on what it earned from selling MVC points – and with trial over a year away, Marriott has plenty of time to analyze its own data to dispute Plaintiffs' compilation. Indeed, it has done so already.

The Affiliation Profits Exhibit also squarely comports with Rule 1006, which allows a party to use "a summary, chart, or *calculation* to prove the content of voluminous writings . . . that cannot be conveniently examined in court." Fed. R. Evid. 1006 (emphasis added). The exhibit lists the few relevant points of information (figures on revenues from points sales and

percentage of buyers who cited Ritz-Carlton as one of their top reasons for buying points) from Marriott's lengthy Form 10-K's over four years as well as survey documents it prepared, and then applies grade-school level math to arrive at estimated net profits amounts. Courts routinely find exhibits like this one admissible under Rule 1006, since the party opposing the exhibit can cure any prejudice by presenting its own evidence to rebut it at trial.

## II.     THE AFFILIATION PROFITS EXHIBIT

The Affiliation Profits Exhibit is a summary of evidence containing data that is either pulled directly from Marriott's financial and survey documents or adjusted with simple subtraction and multiplication. It is not a complex compendium of opinions and assumptions, as Marriott claims. Plaintiffs took these four steps to prepare it:

1. First, Plaintiffs listed the "Sales of vacation ownership products" revenue from Marriott's Form 10-K's from 2014 to 2018.[1]

2. Plaintiffs then subtracted "Costs of Vacation Ownership Products" and "Marketing and Sales Costs" to arrive at an estimated net profit amount from points sales for each year.

3. Based on testimony from a Marriott employee that 65% of points sales are to existing owners and 35% are to new owners, Plaintiffs multiplied those percentages by the net profit figures.

4. Lastly, based on Marriott's survey data showing that 4.7% to 7.4% of existing owners and 5.3% to 5.9% of responding owners listed access to Ritz-Carlton Clubs as one of

---

[1] This figure is an estimate for revenue from points sales because points sales make up the majority of Marriott's vacation ownership business. *See* Marriott Vacations Worldwide Form 10-K (for fiscal year ended January 31, 2018) at p. 8 ("We sell the majority of our products through points-based ownership programs, including Marriott Vacation Club . . .").

3

their top reasons for purchasing points, Plaintiffs multiplied those percentages by the estimated net profit amounts from existing and new owners.

The result is an estimate of the profits Marriott made from 2014-2018 by marketing access to Ritz-Carlton Clubs to points purchasers. *See Andreas*, 336 F.3d at 795 (once plaintiff shows a nexus between defendant's conduct and increased profits, the burden shifts to defendant to show profits *not* attributable to the wrong). Marriott's criticisms of the calculations may be appropriate arguments on rebuttal, but they don't change the fact that the exhibit is based on admissible evidence and simple math.

### III.    ARGUMENT

#### A. The Affiliation Profits Exhibit Is Timely and Consistent with Plaintiffs' Disclosures Throughout this Case

From the beginning of the case, through pleadings, discovery, and the final pretrial order, Plaintiffs have given Marriott notice that they will seek disgorgement of profits from MVC points sales. The operative complaint and each prior version of the complaint allege that Marriott has been unjustly enriched because "MVC members can now enjoy the benefits and use of the Ritz-Carlton Club Aspen Highlands property for a fraction of the cost that Plaintiffs and Ritz-Carlton Aspen Owners paid." Dkt. 430 at ¶ 10. Therefore, Plaintiffs seek to disgorge "all commissions, fees and profits [Marriott] received as a result" of that conduct. *Id*. at ¶ 106, 116, 125, 132.

Throughout discovery, Plaintiffs sought evidence to support their claim for disgorgement. For example, Plaintiffs served a request for "Documents sufficient to show Marriott Defendants' annual revenues and profits from selling MVC timeshares from 2012 to the present." Exh. A to Declaration of Linda Lam (10/13/16 Responses to Plaintiffs' RPDs at p. 6). Indeed, in response

4

to that request, Marriott produced the very 10-K's that Plaintiffs used in the Affiliation Profits Exhibit. Plaintiffs deposed Marriott's Vice President of Customer Insights (Urcil Peters) for information on what motivated customers to purchase MVC points, including the impact that access to Ritz-Carlton Clubs had on those decisions. Exh. B to Lam Decl. (Peters Depo. at 14:4-19:14). Plaintiffs also sought (and obtained) high-level corporate planning documents about Marriott's strategy to steer away from selling Ritz-Carlton products in favor of using the allure of the Ritz-Carlton brand to sell more MVC points. *See* Dkt. 239. These are only a few examples of Plaintiffs' case-long efforts to seek information on the amount of profits Marriott reaped from affiliating Plaintiffs' property with MVC.

Plaintiffs also put Marriott on notice of their disgorgement theory in the final pretrial order. *See, e.g.,* Dkt. 578 at 17 ("the Marriott Defendants have reaped substantial profits . . . from the Affiliation that allows them to market access to the Ritz-Aspen to prospective MVC points purchasers . . . Marriott should be ordered to disgorge these profits . . ."). When the final pretrial order was filed in May 2020, Plaintiffs intended to call an expert, Jon Simon, to opine on the amount of disgorgement. Two weeks after the final pretrial order was issued, however, the Court excluded Simon's testimony on disgorgement. Dkt. 583 at p. 18. Plaintiffs thereafter notified Marriott in their opposition to Marriott's supplemental summary judgment motion that, consistent with settled authority in cases involving disgorgement for fiduciary breaches, they would prove disgorgement by using Marriott's own documents – specifically, Marriott's SEC Form 10-K's and its annual Sales and Marketing Surveys. Dkt. 599-2 (attaching Affiliation Profits Exhibit to opposition brief). Plaintiffs again produced the Affiliation Profits Exhibit as a Rule 1006 summary exhibit by the deadline to serve summary exhibits under the pretrial order.

Marriott, therefore, doesn't claim that Plaintiffs missed the deadline for summary exhibits; it only argues that Plaintiffs' reliance on Marriott's documents to show an appropriate disgorgement amount is somehow surprising. But given Plaintiffs' years-long efforts to obtain documents and testimony on the profits Marriott made from the MVC affiliation, along with the ample notice Plaintiffs gave in their pleadings and the final pretrial order, Marriott's claim of surprise is disingenuous. Even though the exact calculations in the Affiliation Profits Exhibit differ from Simon's calculations, Marriott has known from the beginning that Plaintiffs would estimate an unlawful profits amount for disgorgement.

**1. With trial now set for 2022, Marriott cannot show prejudice**

Even if Plaintiffs' disclosure of the calculations in their summary exhibit was not timely, there would be no harm to Marriott. Marriott is aware of the numbers Plaintiffs used in their disgorgement calculation -- financial data from Marriott's SEC filings (which Marriott produced in response to a request for documents sufficient to show profits from MVC points sales) and results from surveys Marriott conducted -- because Marriott prepared them and produced them in support of its own expert report. The disgorgement calculations are based on simple math that Marriott has already unpacked in its opening brief on this motion. Dkt. 604 at 5-8. If Marriott disagrees with these numbers, it would have information to rebut them – such as more precise information on how much it profited from marketing Ritz-Carlton access to MVC points customers. No additional discovery is necessary on Marriott's part. And with a trial date over a year away, Marriott has every opportunity to analyze its own data to rebut the Affiliation Profits Exhibit. Dkt. 614 (setting trial for 1/24/22).

6

The Tenth Circuit applied similar reasoning in *Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.*, 170 F.3d 985 (10th Cir. 1999). There, the plaintiff had asked for "compensatory damages" in its complaint. 170 F.3d at 992. At trial, it more specifically asked for the "difference between the amount [it] paid in premiums and the amount [defendant] paid in claims refunded to us." *Id*. The defendant argued that the plaintiff shouldn't be able to use that damage theory at trial because it failed to disclose the theory during the case.

The Tenth Circuit didn't even analyze whether or not the plaintiff properly disclosed the damage theory because the court was convinced that admitting the theory would not prejudice the defendant. *Id*. at 993. The court pointed out that the defendant already knew the numbers that formed the basis for the calculation ("indeed, [defendant] provided the calculation for the amount [plaintiff] paid in premiums") and the defendant had an opportunity to cure any prejudice. *Id*. The court also noted that the plaintiff, like Plaintiffs here, was likely prompted to adjust its damages calculations after an adverse ruling in the case; therefore, there was little chance that the plaintiff acted in bad faith by proffering a new theory. *Id*.

The same logic applies here. After Simon was excluded, Plaintiffs had to adjust their calculations to prove disgorgement. The adjustments reflected in the Affiliation Profits Exhibit are consistent with Plaintiffs' disclosures and rely on data long in Marriott's possession. While the precise calculations in the exhibit may be new to Marriott, it has over a year to analyze and prepare rebuttal data and calculations. Thus, there is no prejudice to Marriott and therefore no reason to exclude the calculations at trial.

//

//

### B. The Affiliation Profits Exhibit Is a Proper Rule 1006 Summary Exhibit Because the Data It Contains Derive from Admissible Evidence in Other Exhibits

The Tenth Circuit has long 'recognized the value of exhibits that summarize data contained in other exhibits and present the evidence in a 'simpler form.'" *SFF-TIR, LLC v. Stephenson*, 2020 WL 2922190, at *17 (N.D. Okla. June 3, 2020) (citation omitted). Rule 1006 allows a party to use a summary or calculation to prove voluminous information that "cannot be conveniently examined in court." Fed. R. Evid. 1006. A party may use a summary of business records so long as the underlying records are admissible. *Harris Mkt. Research v. Marshall Mktg. & Comm'cns, Inc.*, 948 F.2d 1518, 1525 (10th Cir. 1991) (citation omitted). The rule clearly allows for voluminous data to be presented in the form of a calculation; "[a] mathematical calculation well within the ability of anyone with a grade-school education" is lay opinion that may be reflected on a Rule 1006 summary exhibit. *Bryant v. Farmers Ins. Exchange*, 432 F.3d 1114, 1124 (10th Cir. 2005).

The Affiliation Profits Exhibit falls squarely within the confines of Rule 1006. It compiles data on revenue from MVC points sales over five years from Marriott's 10-K's, along with survey data that Marriott gathered from MVC points purchasers. Dkt. 604 at Appendix A. The exhibit essentially takes what Marriott made in selling points each year and multiplies that amount by the percentage of survey respondents who cited access to Ritz-Carlton properties as one of their top reasons for purchasing points. The only calculations are grade-school level math: subtracting costs from gross revenues to arrive at net profits, and then multiplying that number by percentages of survey respondents. *See id*.

Marriott doesn't dispute that the underlying Form 10-K's and survey documents are admissible, since these are documents Marriott itself created and produced in this case. *See* Dkt.

8

604. The documents are admissible non-hearsay, since they are relevant statements of a party-opponent. Fed. R. Evid. 801(d)(2). Because the Affiliation Profits Exhibit summarizes these admissible records and applies simple math to data from those records, it is admissible under Rule 1006.

None of the cases Marriott cites on Rule 1006 exhibits are applicable here. The issue in *State Office Systems, Inc. v. Olivetti Corp. of America*, 762 F.2d 843 (10th Cir. 1985), was whether an exhibit summarizing both past damages and future lost profits was admissible under Rule 1006. The court held that the summary of past damages was admissible under the rule, but the future lost profits were not admissible because they were "projections of future events" rather than just a compilation of records. 762 F.2d at 845-46. Marriott uses ellipses in its brief to omit the fact that the court's basis for not admitting the future lost profits piece under Rule 1006 was its "projections of future events" rather than just its "interpretation[] of past data." Dkt. 604 at 11. Here, the Affiliation Profits Exhibit doesn't include any projections of future profits; it only compiles and interprets data to estimate profits Marriott has already made on MVC points sales.

*Eichorn v. AT&T Corp.* is similarly inapplicable because the summary exhibit at issue there also projected future events. 484 F.3d 644, 648 (3d Cir. 2007). The *Eichorn* summary exhibit showed "what each plaintiff would have earned in pension benefits," and included assumptions about future events such as when the plaintiffs would have retired and how their salaries would have increased. *Id*. For these reasons, the calculations were beyond summarized data and were not admissible as a Rule 1006 exhibit. *Id*. at 650. Because the Affiliation Profits Exhibit doesn't include any assumptions about future events, *Eichorn* is inapplicable.

This Court's decision in *Water Pik, Inc. v. Med-Systems, Inc.* wasn't even about a summary exhibit. No. 10-cv-01221-PAB-CBS, 2012 U.S. Dist. LEXIS 1373 (D. Colo. Jan. 5, 2012). There, this Court analyzed whether a proposed witness's testimony qualified as lay opinion under Rule 701, or whether it was excludable expert opinion under Rule 702. Because the witness's testimony would be based on his expertise in financial analyses, it could not be considered lay opinion testimony. The Court excluded his testimony under that reasoning and never reached the question of whether it would be appropriate for him to testify as a summary witness under Rule 1006. *Id.* at *7-8.

The Affiliation Profits Exhibit is, therefore, a proper summary exhibit under Rule 1006 and Marriott has cited no authority to the contrary.

### C. Marriott's Disagreement as to the Precision of the Data in the Affiliation Profits Exhibit Do Not Make the Exhibit Inadmissible

Marriott's challenges to the precision of the Affiliation Profits Exhibit are relevant to its rebuttal arguments on disgorgement, but not to the exhibit's admissibility. This is true for two reasons. First, whether the exhibit is admissible depends on whether it conforms with Rule 1006 – not whether Marriott agrees with the summaries and calculations in it. Courts routinely admit Rule 1006 exhibits even if one party believes that the exhibit imprecisely summarizes the underlying documents, since the party opposing the exhibit will be free to refute it with its own arguments and evidence. *See, e.g., Anderson Living Trust v. WPX Energy Production, LLC*, 2015 WL 7873715, at *8 (D.N.M. Nov. 6, 2015) (admitting summary exhibit because defendants "can rebut any prejudice by challenging Exhibit 428's findings on cross-examination and through the testimony of their own expert"); *SFF-TIR, LLC*, 2020 WL 2922190 at *22 (admitting summary

exhibits and noting that "Plaintiffs will have the opportunity at trial to challenge the demonstrative [summary] exhibits' accuracy and the underlying data").

Second, the data in Affiliation Profits Exhibit is relevant and admissible under burden-shifting principles that apply to disgorgement in the fiduciary duty context. In Colorado, a plaintiff who seeks to disgorge profits from a breaching fiduciary need only show some "causal connection" between the bad conduct and "a measurable increase in the defendant's net assets." Restatement (Third) of Restitution § 51, cmt. *i*; *John Doe (1) v. Archdiocese of Denver,* 413 F.Supp.2d 1187, 1191 (D. Colo. 2006) ("Colorado courts look to the Restatement to determine the extent of fiduciary obligations . . .").

As in copyright infringement cases, once a plaintiff has established that the defendant engaged in wrongful conduct, it is sufficient for the plaintiff to present evidence of the defendant's *total profits or gross revenue*, at which point the burden shifts to the defendant to prove any deductible expenses or any "*elements of profit attributable to factors other than the copyrighted work*." *Andreas,* 336 F.3d at 795 (emphasis in original). If the defendant cannot meet its burden of proving expenses and profit from other factors, "the gross figure stands as the defendant's profits." *Id.* The plaintiff has no obligation to trace the precise amount of profits resulting from the infringing conduct. *Id.; see also General Steel Domestics Sales, LLC,* 627 Fed.App'x at 686 (affirming this Court's method of calculating disgorgement, which required plaintiff to prove defendant's "gross profits during the period in question" and then requiring the defendant "to prove which portion of those profits wasn't attributable" to the wrong); *Polar Bear Productions, Inc. v. Timex Corp.,* 384 F.3d 700, 711 (9th Cir. 2004) (holding that plaintiff needed only to show some evidence that defendant's infringing conduct "at least partially

11

caused" an increase in defendant's revenues, at which point the burden would shift to defendant to prove which profits did *not* result from infringement). The Affiliation Profits Exhibit does what these cases require plaintiffs seeking disgorgement to do: show some increase in Marriott's gross profits or revenues resulting from the unlawful conduct.

Marriott's criticisms of Plaintiffs' disgorgement calculations on the Affiliation Profits Exhibit are exactly what the *Andreas* and *Polar Bear* courts deemed to be rebuttal arguments that a defendant is free to make after a plaintiff shows some increase in total revenues. For example, Marriott claims that the amount Plaintiffs list as "Revenue from Points Sales" includes revenues from points sales *and* weeks-based vacation ownership products. Dkt. 604 at p. 5. This is the type of argument a defendant is expected to make on disgorgement after the burden shifts: which portion of the profits *wasn't* attributable to the wrong. In other words, the disgorgement cases anticipate that plaintiffs may present imprecise profit data and that the defendant will rebut and refine the profit calculations. Marriott also claims that what Plaintiffs represent as "Net Profits from Points Sales" is actually gross profits because other expenses still need to be subtracted from that amount. *Id*. Again, this is the exact type of rebuttal argument that the *Andreas* court contemplated a defendant making after the burden shifts. 336 F.3d at 795 (burden shifts to defendant to prove deductible expenses after plaintiff shows increase in defendant's gross revenues).

Regarding the survey data, Marriott argues that Plaintiffs failed to account for the fact that other program features might have contributed to survey respondents' decision to purchase points as well as the fact that there are Ritz-Carlton Clubs other than the Aspen one. Dkt. 604 at p. 7-8. Again, in disgorgement cases, these are the types of arguments that defendants make after

12

a plaintiff shows some increase in profits related to the unlawful conduct, and the burden shifts to the defendant to show the amount of those profits that are *not* linked to the unlawful conduct. Here, the burden will shift to Marriott to show the amount of profits it earned on MVC points unrelated to the affiliation with the Ritz-Carlton Club at Aspen.

The Affiliation Profits Exhibit is, therefore, admissible because it is sufficient to meet Plaintiffs' burden on disgorgement. The exhibit and its underlying documents show an increase in MVC points sales from the affiliation between Ritz-Carlton Clubs and MVC – which is the primary fiduciary breach Plaintiffs will prove at trial. Every criticism Marriott raised about the exhibit goes to Marriott's rebuttal on disgorgement, not whether the exhibit is admissible.

### 1. Even if the Court excludes the Affiliation Profits Exhibit, Plaintiffs can still prove disgorgement using Marriott's documents

The Affiliation Profits Exhibit will help the Court at trial because it takes the few relevant bits of information from several long documents (Form 10-K's and SMS survey results) and presents them on a single document. The calculations on the exhibit are simple math that show what percentage of MVC points sales is attributable to points purchasers' ability to stay at Ritz-Carlton Clubs. If the Court excludes the summary exhibit, Plaintiffs can still introduce the underlying 10-K's and survey results at trial, and then demonstrate how they show Marriott's ill-gotten profits. The Affiliation Profits Exhibit is not "Plaintiffs' only 'evidence'" on disgorgement, as Marriott claims. Dkt. 604 at p. 9. A trial on disgorgement would be necessary with or without the exhibit being admitted into evidence.

//

//

//

## IV. CONCLUSION

For all the above reasons, Marriott's motion *in limine* should be denied. Plaintiffs should be allowed to present the Affiliation Profits Exhibit at trial, at which point Marriott will be free to rebut it.

Dated: January 26, 2021                                      Respectfully submitted,

GIBBS LAW GROUP LLP

*/s/ Linda Lam*
Michael Schrag (CA State Bar# 185832)
Linda Lam (CA State Bar# 301461)
505 14th Street, Suite 1110
Oakland, CA 94612
Telephone: (510) 350-9722
E-mail: mls@classlawgroup.com
E-mail: lpl@classlawgroup.com

THE MATTHEW C. FERGUSON LAW FIRM, P.C.
Matthew C. Ferguson, #25687
119 South Spring, Suite 201
Aspen, Colorado 81611
Telephone: (970) 925-6288
E-mail: matt@matthewfergusonlaw.com

THE MEADE FIRM, P.C.
Tyler Meade (CA State Bar# 160838)
12 Funston Avenue, Suite A
San Francisco, CA 94129
Telephone: 510-843-3670
E-mail: tyler@meadefirm.com

REISER LAW, P.C.
Michael J. Reiser, #16161
1475 N. Broadway, Suite 300
Walnut Creek, CA 94596
Telephone: (925) 256-0400
E-mail: michael@reiserlaw.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on this 26th day of January 2021, a true and correct copy of the foregoing **PLAINTIFFS' OPPOSITION TO MOTION IN LIMINE TO EXCLUDE PLAINTIFFS' PROPOSED RULE 1006 EXHIBIT ON PROFITS ALLEGEDLY DERIVED FROM THE MVC AFFILIATION w**as served via ECF filing upon:

Naomi G. Beer, Esq.
BeerN@gtlaw.com
Greenberg Traurig, LLP
1200 17th Street, Suite 2400
Denver, Colorado 80202

Ian S. Marx, Esq.
MarxI@gtlaw.com
Philip R. Sellinger, Esq.
SellingerP@gtlaw.com
Greenberg Traurig, LLP
500 Campus Drive, Suite 400
Florham Park, New Jersey 07932

*/s/ Linda Lam*
Linda Lam